VIRGINIA:

IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

NICOLE P. ERAMO,                              )
2628 Jefferson Park Circle                    )
Charlottesville, VA 22903                     )
                                              )
                    Plaintiff,                )     Civil Action No. _CL15-205_
                                              )
        v.                                    )
                                              )
ROLLING STONE LLC,                            )
1290 Avenue of the Americas,                  )
New York, NY 10104-0295,                      )
                                              )          FILED
SABRINA RUBIN ERDELY,                         )     5|12|15  11:10a
613 S. 9th Street,                            )        (Date & Time)
Philadelphia, PA 19147-2027,                  )     City of Charlottesville
                                              )     Circuit Court Clerk's Office
and                                           )     Llezelle A. Dugger, Clerk
                                              )     By _____
WENNER MEDIA LLC,                             )          Deputy Clerk
1290 Avenue Of The Americas,                  )
New York, NY 10104-0295,                      )
                                              )
                    Defendants.               )

## COMPLAINT

Plaintiff Nicole P. Eramo, in support of her Complaint against Defendants Rolling Stone LLC, Sabrina Rubin Erdely, and Wenner Media LLC states the following:

## NATURE OF THE ACTION

1.      This defamation action arises out of the publication of the false and later discredited article in *Rolling Stone* magazine entitled, "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA" (hereinafter, "A Rape on Campus" or "the article"). *Rolling Stone's* Contributing Editor, Sabrina Rubin Erdely, wrote the article, which caused a national media firestorm and has been viewed online more than 2.7 million times.

Case 3:15-cv-00023-GEC   Document 14-1   Filed 06/09/15   Page 1 of 39   Pageid#: 312

2.    Defendants' purpose in publishing the article was to weave a narrative that depicted the University of Virginia ("UVA") as an institution that is indifferent to rape on campus, and more concerned with protecting its reputation than with assisting victims of sexual assault.

3.    The article leads with a horrific, graphic description of a violent gang rape of a UVA freshman, identified only as "Jackie" in the article. The article claims that Jackie was asked out to a fraternity date party by a coworker at the University pool who was a member of the Phi Kappa Psi fraternity. At the party, Jackie was led to a pitch-black room upstairs, where she was tackled through a glass table, punched in the face, and brutally gang raped for three hours by seven men while her date, "Drew," directed the assault as part of a fraternity initiation ritual.

4.    To personify the University's alleged institutional indifference to rape, Erdely and *Rolling Stone* cast Dean Eramo, who met with and counseled Jackie, as the chief villain of the story. Erdely and *Rolling Stone* claimed — both in the article and in a slew of media appearances and interviews designed to increase publicity for the article — that Dean Eramo intentionally tried to coddle Jackie to persuade her not to report her rape; that she was indifferent to Jackie's allegations; that she discouraged Jackie from sharing her story with others; that she "abuse[d]" Jackie; that she did "nothing" in response to Jackie's allegations; that she claimed that UVA withholds rape statistics "because nobody wants to send their daughter to the rape school"; that she did not report Jackie's alleged assault to the police; that she "brushed off" Jackie; and that she actively sought to "suppress" Jackie's supposed gang rape.

5.    These statements, and the portrayal of Dean Eramo, in "A Rape on Campus" and in Erdely and *Rolling Stone's* subsequent public statements, are categorically false. Indeed, publicly available information demonstrates that the highly disparaging claims about Dean

Eramo are all untrue. In fact, upon being told of Jackie's allegations of sexual assault — which differed materially from the description Erdely and *Rolling Stone* published — Dean Eramo immediately offered to assist Jackie in holding her attackers accountable — by going to the police, by pursuing misconduct proceedings within the University, or by both. Dean Eramo ultimately persuaded Jackie to speak with the police, and she arranged and attended two different meetings between Jackie and officers from the University Police Department and the Charlottesville Police Department.

6. Dean Eramo's efforts did not result in an official complaint or report to police — not because Dean Eramo tried to "suppress" Jackie's allegations or persuade her to remain silent — but because Jackie adamantly refused to cooperate with law enforcement or name her alleged attackers. As the Charlottesville Police Department has since confirmed, Jackie insisted both to Dean Eramo and to the police that she did not want her claims investigated, and she refused to provide any specific details that would have allowed them to do so. When police again tried to investigate the supposed sexual assault following the nationwide outcry after the publication of "A Rape on Campus," Jackie retained a lawyer and refused to speak with the detectives who were trying to substantiate her claims. As the *Washington Post* later noted, contrary to Erdely and *Rolling Stone's* portrayal of Dean Eramo as "incompetent and insensitive," Dean Eramo was "actually quite active in seeking an investigation and justice for the allegations" Jackie presented.

7. Erdely and *Rolling Stone's* allegations against Dean Eramo are not only clearly false, but they are defamatory *per se*. By claiming that Dean Eramo "abused" Jackie, discouraged her from reporting her alleged gang rape, and coddled Jackie into inaction to protect UVA, *Rolling Stone* and Erdely attributed to Dean Eramo conduct unfit for a counselor of victims of sexual assault and the head of UVA's Sexual Misconduct Board. Moreover, these

statements prejudiced Dean Eramo in her profession as a UVA Dean and administrator who is responsible for the welfare of UVA students and sexual assault survivors.

8. Not surprisingly, these claims had a devastating effect on Dean Eramo's reputation. As a woman who has dedicated her life to assisting victims of sexual assault and domestic abuse, Dean Eramo saw herself tarred in the national press as the chief architect of a conspiracy to suppress Jackie's assault in order to protect UVA's reputation. Dean Eramo received a wave of emails and letters from people across the county attacking her as, among other things, "evil," a "wretched rape apologist," and a "disgusting, worthless piece of trash."

9. *Rolling Stone* and Erdely's highly defamatory and false statements about Dean Eramo were not the result of an innocent mistake; they were the result of a wanton journalist who was more concerned with writing an article that fulfilled her preconceived narrative about the victimization of women on American college campuses, and a malicious publisher who was more concerned about selling magazines to boost the economic bottom line for its faltering magazine, than they were about discovering the truth or actual facts.

10. Erdely and *Rolling Stone* acted with actual malice when they published "A Rape on Campus." Erdely and *Rolling Stone* knew that Jackie was not a reliable source for truthful information about her interactions with Dean Eramo. They had serious doubts about the truth of the disparaging claims they planned to make about Dean Eramo, but intentionally violated commonly accepted journalistic norms and consciously failed to investigate sources and information that they believed would have revealed the falsity of the charges they leveled. Erdely and *Rolling Stone* were intent on painting a narrative that depicted Dean Eramo as complicit in a cover up of Jackie's allegations and, having made the decision to so accuse Dean Eramo, celebrated their preconceived narrative by including an intentionally doctored illustration

of Dean Eramo that depicts her as callous toward a sexual assault victim sitting and crying in her office.

11.     Erdely and *Rolling Stone's* malice further is evidenced by the many half-truths, untruths, and flat out lies Erdely and *Rolling Stone* told in the days following publication of the story in an effort to defend the credibility of a story they knew was likely false. Erdely and *Rolling Stone* claimed to have interviewed sources they did not interview, claimed to have verified Jackie's claims when they did no such thing, and claimed to know who Jackie's alleged perpetrators were when in fact they had no idea whether they even existed.

12.     Perhaps Defendants' most outrageous and disgraceful conduct occurred in the last days of November and early days of December 2014. By Erdely and *Rolling Stone's* own admission, by November 26, 2014 they had concluded that Jackie was unreliable and were concerned about the integrity of their story — as Erdely herself put it, an "alarm bell" was going off in her head. However, Erdely and *Rolling Stone* kept up a public charade designed to prevent an increasingly skeptical public from learning that the story was false.

13.     From November 26, 2014 until December 5, 2014 — when *Rolling Stone* was finally forced to admit publicly that it had lost faith in the story, after the fraternity involved presented information concretely repudiating Erdely and *Rolling Stone's* account — Erdely and *Rolling Stone* continued to conduct a nationwide press tour in which they repeatedly and callously doubled down on their false claims that Dean Eramo was indifferent to Jackie's allegations, that she did nothing in response to them, that she did not report them to the police, and that she instead sought to suppress Jackie's allegations and discourage her from reporting them. Erdely and *Rolling Stone* also continued to profess publicly absolute faith in Jackie's credibility, despite knowing privately that she was not credible. Ironically, far from Dean Eramo suppressing Jackie's alleged gang rape to protect UVA's reputation, it was Erdely and

*Rolling Stone* that engaged in a clear pattern of suppression of the truth and active deceit to protect the reputation of their magazine — with complete disregard for the harm they were causing to Dean Eramo.

14. Despite Erdely and *Rolling Stone's* efforts to hide the truth, "A Rape on Campus" was eventually exposed as a monumental hoax. Commentators have called the article "a disgrace" and "bogus journalism" that "violated nearly every tenet of reporting." Even a report commissioned by *Rolling Stone* itself called the article "a journalistic failure" and noted that *Rolling Stone* "set aside or rationalized as unnecessary essential practices of reporting," and then intentionally "glossed over the gaps" it knew existed in the reporting of the article.

15. Even in the aftermath of what has been described as Erdely and *Rolling Stone's* "systematic failures" that lead to publication of "A Rape on Campus," *Rolling Stone* elected not to discipline Erdely or any of its editors.

16. Dean Eramo brings this action to vindicate her rights under civil law, to restore her reputation as a highly-regarded university administrator and advocate for victims of sexual violence, and to establish Erdely and *Rolling Stone's* liability for the irreparable harm that they caused to her reputation by the false and defamatory statements published in "A Rape on Campus," as well as the myriad defamatory statements made by Erdely and *Rolling Stone* during their subsequent publicity tour. Dean Eramo seeks an award of compensatory damages for the reputational harm caused by Erdely and *Rolling Stone's* defamatory statements and, given the willful and malicious nature of Defendants' conduct in knowingly publishing defamatory falsehoods about Dean Eramo, she also seeks an award of punitive damages.

## PARTIES

17. Plaintiff Nicole Eramo is an individual and resident of the Commonwealth of Virginia, City of Charlottesville. She is an Associate Dean of Students at UVA, located in

Charlottesville. Dean Eramo was one of the primary targets of Defendants' false and defamatory article.

18.  Defendant Rolling Stone LLC is a privately held Delaware limited liability company with its headquarters in New York, New York. Upon information and belief, Rolling Stone LLC has a sole member, which is Wenner Media LLC. Rolling Stone LLC publishes Rolling Stone magazine in conjunction with Wenner Media LLC. Defendants Rolling Stone LLC and Wenner Media LLC are collectively referred to herein as "*Rolling Stone*." *Rolling Stone* published the false and defamatory article about Dean Eramo on its website and in its December 2014 print edition of the magazine.

19.  Defendant Sabrina Rubin Erdely is a journalist and magazine reporter who is employed as a Contributing Editor for *Rolling Stone* magazine. Erdely is a resident of the Commonwealth of Pennsylvania. Erdely authored and published the defamatory article that falsely accused Dean Eramo of discouraging Jackie to report her alleged rape.

20.  Defendant Wenner Media LLC is a privately held Delaware limited liability company with its headquarters in New York, New York. No publicly available information identifies the members of Wenner Media LLC. Wenner Media LLC publishes *Rolling Stone* magazine in conjunction with Rolling Stone LLC, and also publishes *Us Weekly* and *Men's Journal* magazines. Defendants Rolling Stone LLC and Wenner Media LLC are collectively referred to herein as "*Rolling Stone*." *Rolling Stone* published the false and defamatory article about Dean Eramo on its website and in its December 2014 print edition of the magazine.

## JURISDICTION AND VENUE

21.  This Court has specific personal jurisdiction over Defendants under Virginia's long-arm statute, Va. Code § 8.01-328.1, as well as under the Due Process Clause of the U.S. Constitution, because, among other things, the causes of action asserted in this Complaint arise

from Defendants transacting business in this Commonwealth and causing tortious injury by an act or omission in this Commonwealth. Moreover, exercising jurisdiction would not offend traditional notions of fair play and substantial justice because Defendants could have — and should have — reasonably foreseen being haled into a Virginia court to account for their defamatory statements regarding a Virginia citizen and resident they knew to be employed by the University of Virginia.

22.     Defendants knew that that Dean Eramo is a resident of Virginia and that UVA is a Virginia institution and, as such, their act of writing and publishing an article critical of Dean Eramo and the University manifests their intent to aim their defamatory publication into Virginia and at a Virginia audience.

23.     *Rolling Stone* also regularly solicits business in this Commonwealth and derives substantial revenue from sale of magazines and sale of advertising resulting from their directing their publications, including the article at issue in this action, into this Commonwealth and at residents of this Commonwealth. *Rolling Stone* magazine may be purchased at any number of retail locations within Virginia, and, upon information and belief, it has thousands of Virginia subscribers of its print edition, and accordingly, it sends thousands of magazines each month into Virginia — including the December 2014 print edition in which the defamatory article was published. *Rolling Stone* also purchased at least one photograph used in the defamatory article from the *Cavalier Daily*, UVA's student newspaper.

24.     For her part, Ms. Erdely conducted multiple interviews in — and directed myriad communications via phone and email into — the Commonwealth of Virginia as part of her pre-publication work in authoring "A Rape on Campus." For example, Erdely spoke with Jackie, who lived in Charlottesville, Virginia, by telephone at least nine times, texted and emailed with her numerous times, and interviewed her in person in Charlottesville. Erdely spent

approximately one week in Charlottesville reporting the story, during which time she interviewed other individuals mentioned in the article, toured the campus, and attended a UVA Board of Visitors meeting. Erdely directed other phone calls and emails into Virginia to other UVA students, administrators, and fraternity representatives, as well as to Jackie's mother. Upon information and belief, Erdely continued her reporting — and had additional contacts with Virginia citizens and residents through emails, phone calls, and in-person interviews in Virginia — after the article was initially debunked.

25.    Venue is proper in this circuit under Va. Code § 8.01-262 because the causes of action asserted herein arose in this Circuit and the plaintiff resides in this Circuit.

## FACTS

### Dean Eramo Dedicates Her Career To Advocating For Victims Of Sexual Assault And Domestic Violence

26.    Plaintiff Nicole Eramo is a "triple Hoo," having earned three degrees from UVA (the school's unofficial term for a student is "Wahoo"). She earned her Bachelor of Arts in 1997, a Masters in Education in Social Foundations in 2003, and a Ph.D. in Education in 2010. Dean Eramo has worked for UVA in various capacities since 1997.

27.    Dean Eramo began working for UVA upon completion of her undergraduate studies in 1997 as a Special Assistant to the Honor Committee. In this capacity, she was responsible for, among other things, assisting with programs to educate students on ethical issues in education, coordinating juror participation in student-led trials for honor code violations, and working with students, parents, faculty, and administrators regarding Honor System issues and concerns. She held this position until 2006.

28.    From 2005 to 2006, Dean Eramo also worked as a Doctoral Intern in the Office of the Provost, while earning her Ph.D. In this position she was responsible for working on policies

for tenure and non-tenure track faculty, and for leading and coordinating meetings of the Provost's Internal Policy Committee.

29.     In September 2006, she became an Assistant Dean of Students at UVA. One of her chief responsibilities as an Assistant Dean of Students was to chair UVA's Sexual Misconduct Board, the University body that adjudicates all reports of sexual assault and misconduct. In addition to overseeing the Board's adjudications, Dean Eramo worked to educate students about sexual assault and about the Board and its functions.

30.     Dean Eramo has made assisting those in crisis the focus of her professional career, and she devotes much of her free time to this calling as well. From 1998 through 2006, she worked as a volunteer and manager for the Shelter for Help in Emergency in Charlottesville, a nonprofit that works to support and empower victims of domestic violence. There, Dean Eramo worked the phones to help counsel and assist callers in crisis situations, and also managed the shelter's operations. She underwent weeks of extensive training in order to prepare for this volunteer position.

31.     In 2010, Dean Eramo became an Associate Dean of Students. In this capacity she continued to chair the Sexual Misconduct Board, and she also took on a greater role as an advocate and supporter of victims of sexual assault, providing outreach and support to individual affected students. Dean Eramo also serves as a member of the Dean-on-Call rotation, making herself available to respond to any kind of student emergency after hours, and working with individual students, families, and academic colleagues to coordinate ongoing support and services for UVA students in need.

32.     Dean Eramo has undergone extensive training for her work as an advocate for sexual assault victims. She has attended seminars and conferences on college student sexuality, sexual assault, the role of alcohol in college sexual assaults, sexual assault and domestic violence

survivor support, legal issues surrounding campus sexual assaults, and engaging males in prevention of violence against women, among many others.

33.     Dean Eramo has been widely lauded for her work as an advocate for victims of sexual assault at UVA and has earned a reputation as tireless supporter of victims and of UVA students generally. In 2010 she received the Raven Award from the Raven Society for service to the University. In April 2014, Dean Eramo received the Z Society's Pale Z Award, its highest and rarest honor, for her work with students whose lives have been affected by sexual violence. In 2015, the UVA Honor Committee awarded Dean Eramo the Henry St. George Tucker Award as the faculty member who best embodies the ideals of honor at UVA.

34.     Following the publication of "A Rape on Campus" in November 2014, dozens of students and community supporters that have interacted with Dean Eramo wrote an open letter to the *Cavalier Daily* — UVA's student newspaper — "advocating for our advocate, Nicole Eramo." These students and supporters praised Dean Eramo as "above and beyond the best resource the University has," called her "superb" at her job, commended her for being "passionate" and "selfless," and complimented her as "professional, caring, and extremely competent at an extremely difficult job."

### Erdely Develops An Agenda-Driven Journalism Career Recently Marred By Sensationalized Stories About Sexual Assault

35.     Erdely has stated publicly that she decided to become a journalist in college. Since graduating from the University of Pennsylvania in 1994, Erdely has written for a number of publications, including *GQ*, *The New Yorker*, *Mother Jones, Cosmopolitan* and *Self*. Erdely has a history of writing stories about the victimization of women, including rape, harassment, and women's unequal access to health and medical care in the United States and around the world.

36.     Many of Erdely's stories have been criticized for their lack of factual accuracy. While studying at the University of Pennsylvania, Erdely received a college journalism award from *Rolling Stone* for an article she wrote profiling folk singer Michelle Shocked. Erdely later admitted that "just about everything in the story was wrong," because Erdely failed to attend a significant portion of a press conference where Shocked was interviewed. Erdely missed "practically everything" during the event, failed to secure time with the singer during the question and answer portion of the conference, and instead cobbled together "facts" about the singer borrowed from other mainstream publications. After the piece was published, Shocked's husband called Erdely to explain the factual problems with the story. According to Erdely, this "taught her such an important early lesson."

37.     Long before Erdely wrote "A Rape on Campus," Erdely has made a practice of using narrative journalism in which a shocking rape case is used as the vehicle to show that a given institution is indifferent to, or actively seeks to conceal, sexual assaults.

38.     As early as 1996, Erdely published an article entitled "Intimate Intimidation" in *Philadelphia* magazine, detailing the alleged molestation of a gynecology patient by her physician during an exam. Like "A Rape on Campus," Erdely describes in graphic detail the alleged assault by the accuser, and then goes on to paint a picture of how the states' medical licensing systems, the physician's employers, and even the justice and court systems failed in their respective duties — each ultimately failing to protect the women who had been molested.

39.     In the November 2008 edition of *Self* magazine, Erdely published an article entitled "The Crime Against Women No One Understands," which much like "A Rape on Campus" begins with a graphic depiction of one woman's account of a rape she suffered after her drink was allegedly drugged during a date. The article used this graphic depiction of an anal rape to argue that juries often fail to convict "nonstranger" date rapists because the crimes are not

violent attacks and because victims do not necessarily act the way jurors expect a rape victim to act.

40.     More recently, Erdely has authored articles about sexual assault that have fallen under serious criticism for their factual inaccuracy. In 2011, Erdely wrote a story for *Rolling Stone* in which she claimed that an altar boy, pseudonymously called "Billy Doe," was raped by two priests and a Catholic schoolteacher in Philadelphia, and that these crimes were covered up by Catholic officials. The article was titled "The Catholic Church's Sex-Crime Files: How a scandal in Philadelphia exposed documents that reveal a high-level conspiracy to cover up decades of sexual abuse." Following the debunking of "A Rape on Campus," *Newsweek* examined the Billy Doe story, determining that "the factual discrepancies in Jackie's story are dwarfed by the factual discrepancies in Billy's story that was published in the September 15, 2011 issue of *Rolling Stone*," and noting Billy Doe's "astonishing lack of credibility."

41.     Whereas Erdely's previous rape stories generally involved somewhat verifiable allegations — where individuals were charged and/or convicted — Erdely has since dispensed with the need for verification in favor of more sensationalist narrative journalism. In 2013, *Rolling Stone* published a story by Erdely called "The Rape of Petty Officer Blumer: Inside the military's culture of sex abuse, denial and cover-up." The structure of that article is very similar to "A Rape on Campus." That article was centered on the story of a female naval officer who was arrested for drunk driving and subsequently behaved erratically and was extremely intoxicated, fighting with officers, screaming incoherently, and attempting to remove her clothes in her jail cell. Erdely claimed that the woman had been drugged at a bar and sexually assaulted, and that this was the reason for her behavior. Erdely further implied that Navy officials tried to dissuade the officer from reporting her rape and did little to investigate her claims.

42.     In reality, Naval officials conducted an extensive investigation that lasted a year and a half, performed a toxin screen that revealed no "date rape" drugs in the woman's system, interviewed individuals that were at the bar with the officer that night, and generally found no physical evidence whatsoever supporting the claim that she was sexually assaulted. But in order to support her narrative that the military is indifferent to sexual assault, Erdely simply ignored this inconvenient evidence and reported the rape and supposed cover-up as if they were fact.

43.     *Rolling Stone* published both the Billy Doe and Officer Blumer articles and was therefore aware of Erdely's penchant for placing wholesale trust in unreliable sources and for purposefully avoiding facts that do not support her preconceived narrative regarding the particular institution that is failing to protect individuals from rape.

44.     According to Erdely herself, when she set out to write "A Rape on Campus," she wanted to repeat the narrative she wove about the U.S. Navy in "The Rape of Petty Officer Blumer," but this time using an elite college as the offending institution. The *Washington Post* reported that Erdely worked for six weeks interviewing women at Harvard, Yale, Princeton, and Penn, before she identified Jackie as an enthusiastic source "dying to share [her story]."

### Rolling Stone Publishes "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA"

45.     On November 19, 2014, *Rolling Stone* published "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA." The article was published online on *Rolling Stone's* website. The article was republished in the hardcopy edition of *Rolling Stone* dated December 4, 2014.

46.     The centerpiece of the article is Erdely's description of the story of "Jackie," a UVA student who Erdely claims was gang-raped during a date function party at the Phi Kappa Psi fraternity house just weeks into her freshman year, on September 28, 2012. Erdely tells the story of Jackie's alleged sexual assault in vivid and graphic detail.

47.     According to Erdely, Jackie was invited to the party by a "handsome Phi Kappa Psi brother" — called "Drew" in the article — who worked with Jackie at the UVA pool. Erdely wrote that during the party, "Drew" asked Jackie to go upstairs to a room at the fraternity house. Upon entering the "pitch-black" room, Jackie felt someone bump into her and she screamed. A man told her to shut up, tackling her backward and sending her crashing through a glass table. Erdely then claimed that for the next three hours, Jackie was gang-raped on a carpet strewn with broken glass by seven men who also punched her and violated her with a beer bottle. Erdely further claimed that this gang rape was some kind of fraternity initiation ritual directed, orchestrated, and encouraged by "Drew," with one assailant supposedly telling another, "Don't you want to be a brother? We all had to do it, so you do, too." According to Erdely, in addition to her coworker "Drew," Jackie recognized another assailant as a member of her "tiny anthropology discussion group."

48.     Erdely then claimed that Jackie — whom she reported as being sober during the attack — passed out, and woke up alone on the floor at 3 a.m. Erdely wrote that Jackie emerged from the room to find the fraternity party still going on, and snuck out a side staircase barefoot, face beaten, and in a dress "spattered with blood."

49.     According to the article, Jackie then phoned three friends for help. They are identified in the article only by the pseudonyms "Randall," "Andy," and "Cindy." According to Erdely, Randall initially said that they should take Jackie to the hospital. But her friend Cindy asked if that was a good idea, because "[h]er reputation will be *shot* for the next four years."[1]

_____

[1] Emphasis in original.

Andy supposedly agreed, adding that they ought to think through whether to report a brutal and violent gang rape because it could affect his and Randall's ability to rush fraternities.

50.     Erdely described this scene as taking place in front of the Phi Kappa Psi house, which "loomed behind them," while Jackie, "mute in her bloody dress," watched her supposed friends argue about whether reporting her gang rape would affect their social standing. According to Erdely, Cindy's view prevailed, because if the rape were reported, "we'll never be allowed into any frat party again." Erdely later claimed that Cindy, who she described as a "hookup queen," callously told Jackie that she should have enjoyed being brutally gang raped by "[a] bunch of hot Phi Psi guys." Andy supposedly called Jackie "a baby" for being upset about the rape. Erdely also quoted Randall as saying that publicizing the rape could result in a "shitshow," but wrote that he declined her interview request, "citing his loyalty to his own frat."

51.     Erdely also claimed that Jackie faced violent retaliation for sharing her story with campus support groups. According to Erdely, in Spring 2014 Jackie was harassed outside bars on the Corner (a strip of bars and restaurants off campus) by men who recognized her from her "presentations." According to Erdely, Jackie was called a "cunt" and "feminazi bitch," and one of the men threw a bottle at her that shattered on the side of her face.

52.     Erdely also claimed that since the attack, Jackie had regularly seen her attackers on campus, including "Drew," who acted nonchalantly as if the coordinated gang rape had not happened, and thanked her for "a great time." Erdely also wrote that two other girls had been gang raped at the Phi Psi house in incidents similar to Jackie's, but said that neither woman was willing to talk to *Rolling Stone* about the assaults.

53.     Erdely also repeatedly noted that Jackie was not willing to take any formal or official action, whether with the University or the police, to bring her attackers to justice. She wrote that Jackie "didn't feel ready to file a complaint," that she "badly wants to muster the

courage to file criminal charges or even a civil case," but that she feels "paralyzed" and has not done so.  Erdely did not explain why Jackie, who in Erdely's words had been "dying to share [her story]" for publication in a national magazine, would at the same time be unwilling to pursue a disciplinary process through the University or file a criminal complaint with the police.

### *Rolling Stone* and Erdely Target Dean Eramo As the Villain In Their Story

54.     Much of "A Rape on Campus" is dedicated to describing Jackie's interactions with Dean Eramo and, according to Erdely, Dean Eramo's alleged actions (or inactions) designed to discourage Jackie from reporting her gang rape and bringing her attackers to justice.

55.     Erdely in fact started the article with the tagline, "Jackie was just starting her freshman year at the University of Virginia when she was brutally assaulted by seven men at a frat party.  When she tried to hold them accountable, a whole new kind of abuse began."  She then wrote: "Lots of people have discouraged her from sharing her story, Jackie tells me with a pained look, including the trusted UVA Dean [Eramo] to whom Jackie reported her gang-rape allegations more than a year ago."

56.     According to Erdely, the gang rape occurred on September 28, 2012.  But Jackie did not bring the alleged sexual assault to the attention of school officials until many months later, towards the end of the second semester, when Jackie was called in to meet with her academic dean after failing three classes.  According to Erdely, upon being confronted with her poor academic performance, Jackie burst into tears, and her mother told the academic dean that Jackie had had a "bad experience" at a party.  According to Erdely, the academic dean put Jackie in touch with Dean Eramo.

57.     Erdely asserted that Jackie told Dean Eramo the same story of gang rape vividly described in the article, and then claimed, "[i]f Dean Eramo was surprised at Jackie's story of gang rape, it didn't show."

58.     Erdely then wrote: "When Jackie finished talking, Eramo comforted her, then calmly laid out her options. If Jackie wished, she could file a criminal complaint with police. Or, if Jackie preferred to keep the matter with in the university, she had two choices. She could file a complaint with the school's Sexual Misconduct Board, to be decided in a 'formal resolution' with a jury of students and faculty, and a dean as a judge. Or Jackie could choose an 'informal resolution,' in which Jackie could simply face her attackers in Eramo's presence and tell them how she felt; Eramo could then issue a directive to the men, such as suggesting counseling. Eramo presented each option to Jackie neutrally, giving each equal weight. She assured Jackie there was no pressure — whatever happened next was entirely her choice."

59.     After falsely characterizing Jackie's assault and subsequent interaction with Eramo, Erdely goes on to state that "the sheer menu of choices, paired with the reassurance that any choice is the right one, often has the end result of coddling the victim into doing nothing." Erdely then quotes a third party to hammer home the thesis regarding Dean Eramo: "'This is an alarming trend that I'm seeing on campuses,' says Laura Dunn of the advocacy group SurvJustice. 'Schools are assigning people to victims who are pretending, or even thinking, they're on the victim's side, when they're actually discouraging and silencing them.…'"

60.     Erdely goes on to reinforce Dunn's statement — as applied to Dean Eramo — by continuing her false narrative regarding Jackie's interaction with Dean Eramo: "For now, however, Jackie left her first meeting with Eramo feeling better for having unburdened herself, and with the dean's assurance that nothing would be done without her say-so." Erdely only passively acknowledged that Jackie opted not to report the alleged gang rape to police.

61.     According to Erdely, when Jackie pressed Dean Eramo at a subsequent meeting for details on sexual assault statistics at UVA, Dean Eramo told her that they were not publicized

"because nobody wants to send their daughter to the rape school." *Rolling Stone* and Erdely elected to emphasize and highlight this as a "pull quote" in the article:



62.     Erdely then claimed that in May 2014, following the alleged bottle attack at the corner, Jackie emailed Dean Eramo to meet with her in order to discuss the alleged incident, as well as Jackie's claim that she had discovered two other women who were also gang raped at the Phi Kappa Psi fraternity house.  Jackie refused to identify these women and claimed that they wanted to remain anonymous.

63.     Erdely wrote of this interaction: "[a] bruise still mottling her face, Jackie sat in Eramo's office in May 2014 and told her about the two others.  One, she says, is a 2013 graduate, who'd told Jackie that she'd been gang-raped as a freshman at the Phi Psi house.  The other was a first-year whose worried friends had called Jackie after the girl had come home wearing no pants.  Jackie said the girl told her she'd been assaulted by four men in a Phi Psi bathroom while a fifth watched.  (Neither woman was willing to talk to RS.)  As Jackie wrapped up her story, she was disappointed by Eramo's nonreaction.  She'd expected shock, disgust, horror."

64.     Erdely then claimed that Dean Eramo did nothing with this information or with Jackie's claim of having been attacked with a bottle in retaliation for speaking out about her assault. Erdely claimed that UVA as a whole did nothing until after it learned of *Rolling Stone's* probe into Jackie's story, at which time it placed Phi Kappa Psi under investigation.

65.     Erdely again acknowledged — again only in passing — that Jackie told Dean Eramo that she did not want to file a complaint for her alleged gang rape. But Erdely twisted Jackie's decision not to report the alleged incident to support Erdely's own preconceived story line — that Dean Eramo engaged in a calculated strategy to coddle Jackie into not reporting her rape in order to protect UVA's reputation. Erdely wrote: "Of all her assailants, Drew was the one [Jackie] wanted to see held accountable — but with Drew about to graduate, he was going to get away with it. Because, as she miserably reminded Eramo in [Eramo's] office, she didn't feel ready to file a complaint. Eramo, as always, understood."

66.     These claims and statements in the article concerning Dean Eramo are false.

67.     Dean Eramo has never called UVA "the rape school"; and upon information and belief, Jackie never told Erdely that Dean Eramo made these statements.

68.     Dean Eramo did not in any way "abuse" Jackie; rather she counseled her, supported her, and tried to assist Jackie in reporting her alleged assault to the police, despite Jackie's adamant and continuing refusals to do so.

69.     Dean Eramo did not in any way discourage Jackie from sharing the story of her gang-rape allegations, and in fact actively encouraged Jackie to speak to others about her allegations. Dean Eramo put Jackie in touch with a campus support group for sexual assault victims so that Jackie could share her story with others who could help support her. She also arranged for and attended two meetings between Jackie and detectives so that Jackie could share

her story with the police. At no time did Dean Eramo discourage Jackie from sharing her story with anyone.

70. The claim that Dean Eramo intentionally presented Jackie with an array of options in order to confuse her into not reporting her alleged gang rape is false. Dean Eramo encouraged Jackie to report her alleged sexual assault to the police, repeatedly offered to assist her in doing so, and in fact did arrange for Jackie to meet with detectives. Dean Eramo told Jackie that in addition to reporting her allegations to the police, she could pursue the University's disciplinary process.

71. Dean Eramo did not have a "nonreaction" to Jackie's claims that she was assaulted with a bottle and that she had learned of two additional students who claimed to have been sexually assaulted at Phi Kappa Psi. Dean Eramo immediately arranged for Jackie to meet with the police regarding the bottle incident, her alleged gang rape, and the other supposed victims. Dean Eramo encouraged Jackie to do all she could to get the other supposed victims — whom Jackie insisted wanted to remain anonymous — to come forward so that UVA could take action against the fraternity if the allegations were well founded.

### Rolling Stone and Erdely Engage A Prominent Illustrator To Create A Negative Image of Dean Eramo To Encapsulate Their Article's False Thesis

72. To underscore their false portrayal of Dean Eramo, Erdely and Rolling Stone also included in the article a doctored photograph of Dean Eramo. Rolling Stone ordered and paid for an innocuous photograph of Dean Eramo from the Cavalier Daily, UVA's independent student newspaper, depicting Dean Eramo standing in a UVA classroom speaking to students. Although Rolling Stone purchased the photograph for commercial use, it did not tell the Cavalier Daily that it intended to alter the picture in any way. The picture in its unedited format, as purchased from the student newspaper, appears below:



73. *Rolling Stone* employed a high-profile illustrator, John Ritter, to intentionally alter this photo for the article. Ritter Illustration's website boasts that its client list includes national and international publications and publishers like *The Atlantic*, *The New Yorker*, *Time*, *GQ*, *Harpers*, *Newsweek*, *Mother Jones*, *Glamour*, *Wired*, *Money*, *Forbes*, the Smithsonian, *New York Times*, *Boston Globe*, *Washington Post*, *Chicago Tribune* and Random House.

74. *Rolling Stone* retained Ritter Illustrations with the specific intent to portray Dean Eramo in a highly negative manner — specifically by causing Ritter to doctor the image in a way to give the appearance of Dean Eramo sitting at her desk, sneering while a sexual assault victim sits crying in front of her. In the doctored image, photoshopped images of protestors appear outside of Dean Eramo's office with signs that read "STOP VICTIM BLAMING," and "SHE'S BROKEN (HE'S OK)." *Rolling Stone* caused Ritter to alter the image of Dean Eramo's hand by lightening portions of the interior of her thumb, by darkening the pen she is holding, and by

placing a fake desk at the bottom of her hand to hide a portion of the pen, all in an effort to make

it appear as though Dean Eramo was giving a "thumbs up" while the victim sits crying in front of

her. *Rolling Stone* also caused Ritter to lighten the whites around Dean Eramo's eyes to depict

her expression as "wild-eyed" in the image. *Rolling Stone* also intentionally caused Ritter to edit

out of the image Dean Eramo's right hand, which is making a welcoming gesture in the original

photo, to further emphasize their false narrative that Dean Eramo was unsupportive of Jackie.

      75.    *Rolling Stone's* altered image of Dean Eramo as it appears in "A Rape on

Campus" is below:



76.     A simple comparison of the original photograph and *Rolling Stone's* manipulated version of the image demonstrates the lengths Erdely and *Rolling Stone* were willing to go to portray Dean Eramo as a villain:



## Rolling Stone And Erdely Promote Their False
## And Defamatory Story To The National Media

77.     Following publication of the article, *Rolling Stone* sent Erdely on a press tour designed to further publicize the article and to capitalize on all the attention it was receiving. During a string of appearances on podcasts, radio shows, and television talk shows, as well as interviews with online and print media, Erdely doubled down on her false claims concerning Dean Eramo.

78.     Erdely claimed on a November 26, 2014 broadcast of The Brian Lehrer Show that Dean Eramo "brushed off" Jackie, and that Dean Eramo did "nothing" in response to Jackie's sexual assault claim.

79.     Erdely claimed on a *Slate* podcast on November 27, 2014 that "[Jackie] had eventually kind of mustered up the courage to tell the administration that she had been brutally gang raped and that the University did nothing with this information and that they continued to do nothing even when she told them that she had become aware of two other women that were also gang raped at that fraternity." Erdely repeated this claim and went further, stating that "even in a situation that was so extreme and so obviously within the realm of criminal," she was shocked that Dean Eramo "would seek to suppress something like this." She then claimed that not only did Dean Eramo "not report it to police," but that "[Jackie] was discouraged from moving this [allegation] forward."

80.     Erdely continued her self-promotion on social media — capitalizing on the buzz surrounding "A Rape on Campus." For example, on November 30, Erdely tweeted out a link to a November 28 *Washington Post* article titled "Sabrina Rubin Erdely, woman behind Rolling Stone's explosive U-Va. alleged rape story."



## Rolling Stone And Erdely's House Of Cards Crumbles

81.     The *Rolling Stone* article became a nationwide sensation when it was published. It was viewed over 2.7 million times online, and Erdely and *Rolling Stone's* claims concerning Jackie, UVA, and Dean Eramo were repeated and republished by innumerable media outlets in print, online, and over the airwaves. The article was also widely shared on social media platforms like Facebook and Twitter.

82.     However, within days of the publication of the article, responsible journalists began questioning Erdely's story. Richard Bradley, the former editor of *George* magazine — who had worked with infamous fabricator Stephen Glass — wrote a blog post on November 24, 2014 titled "Is the Rolling Stone Story True?" After noting the "enormous furor" caused by the article and the likely consequences, he wrote that he was "not sure I believe it," and that "[s]omething about this story doesn't feel right."

83.     Bradley argued that the vivid description of Jackie's gang rape was suspect because it "play[ed] into existing biases," such as "biases against fraternities, against men, against the South; biases about the naiveté of young women, especially Southern women; pre-existing suspicions about the prevalence — indeed, the existence — of rape culture; extant suspicions about the hostility of university bureaucracies to sexual assault complaints that can produce unflattering publicity." Bradley also noted that the article failed to actually identify any of the main players, such as Jackie, "Drew," the other attackers, and the three friends Jackie was with following the alleged assault.

84.     Ultimately, while Bradley acknowledged it was possible the story could have happened the way it is depicted in the article, he argued that the claim of a forcible gang rape as part of a frat initiation ritual, and of a beaten and bloodied Jackie being discouraged from

reporting the rape, "requires you to indulge your pre-existing biases." "This story," he wrote, "contains a lot of apocryphal tropes."

85.     Erdely's own media appearances further raised speculation about the article's veracity. While appearing on the *Slate* podcast on November 27, 2014 to hype her article, Erdely was evasive and nonresponsive when the hosts asked direct questions about the sourcing and reporting of the article. Asked directly three times whether she ever reached out to or interviewed the alleged attackers, Erdely intentionally avoided answering the question. She similarly avoided answering whether she knew the identity of "Drew," the supposed ringleader of the assault, and instead gave a totally nonresponsive answer about how Phi Kappa Psi was a symbol of "elitist fraternity culture."

86.     During the same *Slate* interview, Erdely also was asked directly whether she interviewed the three friends Jackie met with after the incident, and whether they verified that Jackie had the injuries Erdely described her as having from being smashed through a glass table and forcibly raped for three hours. Erdely again gave a nonresponsive answer that did not answer the question at all.

87.     On December 2, 2014 *Slate* published an article by Allison Benedikt and Hanna Rosin (one of the hosts of the podcast Erdely appeared on). After noting Erdely's evasive answers on the podcast about her reporting tactics, *Slate* had reached out directly to *Rolling Stone* editor Sean Woods, who confirmed that Erdely did not interview any of the men that Jackie alleged participated in the gang rape — including the supposed ringleader Drew. However, Woods claimed that *Rolling Stone* attempted to do so, saying, "[w]e could not reach them," insisting that the men "exist and are real," and declaring, "[w]e knew who they were." The *Slate* article questioned the fact that quotes of numerous different people in the story seemed to come only from Jackie rather than the quoted people themselves, and that Erdely's failure to

interview the men she was accusing of orchestrating a gang rape was a basic and fundamental journalistic failure.

88.     Also on December 2, the *Washington Post* published a blog post by Erik Wemple, who noted that Erdely's responses on the podcast "look bad for Rolling Stone." Wemple called the failure to interview the supposed perpetrators an "inexcusable" lapse, and noted the "flimsiness" of the story in other respects, such as Erdely's failure to identify key individuals and to make clear to whom she did and did not actually speak for the story. Wemple noted that Erdely refused his interview request, but that *Rolling Stone* sent the *Washington Post* a statement asserting that through "extensive reporting and fact-checking, [*Rolling Stone*] found Jackie to be entirely credible," and that her sexual assault complaint was met with "indifference" when she tried to report it to UVA.

89.     Once these basic questions were asked, Erdely's story quickly fell apart under scrutiny. The *Washington Post* rapidly tracked down and interviewed people Erdely purposefully decided not to interview, including the three friends that Erdely claimed met a bloody and beaten Jackie in front of the Phi Psi house and urged her not to report being raped. According to the friends, they actually met Jackie in front of a dorm nowhere near the Phi Psi house, and Jackie did not have any visible injuries at all — nor was there any blood on her clothing. At that time, according to these individuals, Jackie claimed that she had been forced to perform oral sex by five men in an unspecified fraternity house. The friends said that contrary to Erdely's claims, there was no discussion about the supposed social price of reporting the incident; instead, they urged Jackie to report the incident and even tried to call 9-1-1, but were stopped by Jackie, who insisted she did not want to call the police.

90.     Also on December 5, Phi Kappa Psi released a statement that rebutted a number of the key claims of Erdely's story. Phi Psi said that none of their members worked at the

University's Aquatic Fitness Center in 2012, which is where Jackie claimed to have met "Drew." The fraternity also said that records showed it did not host any kind of party or date function at the house on the weekend of September 28, 2012. The fraternity flatly denied Erdely's sensationalist claim that Jackie was gang raped as some sort of fraternity initiation ritual, and noted that the story did not make sense because at UVA students pledge fraternities in the spring, not the fall.

91.     Despite its repeated claims in the preceding days that it stood by the story and found Jackie credible, once the fraternity came forward with evidence showing that Erdely's story could not be accurate, *Rolling Stone* issued a statement on December 5 noting "discrepancies" in Jackie's account, and saying that "we have come to the conclusion that our trust in [Jackie] was misplaced." *Rolling Stone* then revised the statement after a public outcry over the belief that *Rolling Stone* was attempting to blame a young college student for its own decision not to conduct proper diligence for a 9,000-word article sourced entirely on one (pseudonymous) individual.

92.     Additional details would soon come to public light that not only cast doubt on Erdely's story, but also revealed just how lacking in credibility Jackie was as a source. Jackie's friends from UVA said they doubted her account and that upon being pressed after the article was published, Jackie gave the name of an individual as "Drew" which differed from the name she had previously given other friends after the alleged assault. Reached by the *Washington Post*, that individual said that he was not a member of Phi Psi and had never even met Jackie in person.

93.     The saga took an even more bizarre turn when the three friends of Jackie's who met her the night of the alleged assault (and whom Erdely elected not to interview) came forward with information suggesting that Jackie's assault claim may have been a desperate and

29

misguided attempt to earn the affections of her friend Ryan, called "Randall" in Erdely's article. Shortly after Ryan rebuffed Jackie's interest in a romantic relationship early on in the school year, Jackie began to tell Ryan and others in their circle of friends that she was being romantically pursued by a handsome junior in her chemistry class named "Haven Monahan." Jackie gave Ryan and another friend multiple supposed cell phone numbers for Haven Monahan and encouraged them to text with him; when they did, Monahan would write back gushing about how great Jackie was.

94.     The phone numbers Jackie provided her friends for "Haven Monahan" turned out to be associated with websites that allow users to text anonymously with other cell phone users as if they were coming from an actual cell phone. A picture of "Haven Monahan" Jackie showed to her friends turned out to be from a social media site of one of her high school classmates who did not attend UVA and was not good friends with Jackie. An individual claiming to be Haven Monahan at one point forwarded to Ryan an email Jackie had supposedly written to Haven extolling Ryan's virtues; it was later determined most of the passages about Jackie's feelings for Ryan were lifted wholesale from websites and television shows like "Scrubs" and "Dawson's Creek."

95.     Jackie's friends' suspicions further deepened when they searched the UVA student directory and social media websites for any trace of Haven Monahan, but found no student by that name at UVA.

96.     In fact, here was no student at UVA named Haven Monahan, and nobody by that name lived in Charlottesville in 2012.

97.     If Erdely and *Rolling Stone* had not intentionally decided to avoid contacting "Randall," "Andy," and "Cindy," they would have told Erdely that the details of the sexual assault Jackie provided to *Rolling Stone* differed significantly from what she told them that night,

that the alleged assailant was originally claimed to be a classmate rather than a coworker, and that Jackie's odd behavior led them to have doubts about whether the individual she identified as her date and attacker existed at all. They would have also told Erdely that the quotes attributed to them in the article are false. All three have confirmed that they would have willingly spoken to Erdely had she bothered to contact them.

### *Rolling Stone* Refuses Dean Eramo's Request For A Retraction And An Apology

98.     In December 2015, after a swirl of media reports had already cast serious doubts on the veracity of "A Rape on Campus," Dean Eramo contacted *Rolling Stone* through her attorneys to initiate a dialogue regarding the article's treatment of her and to request that *Rolling Stone* take remedial measures to repair the harm done to Dean Eramo's reputation by the publication of the article. Counsel for Dean Eramo did not threaten litigation, nor did they demand any monetary payment.

99.     Despite the mounting avalanche of evidence that the claims made in the article regarding Jackie's alleged assault — and Dean Eramo's alleged indifference to the alleged assault — were entirely false, *Rolling Stone* responded by letter through its attorneys, insisting that the article was "well sourced and fact-checked." Rather than offer to apologize or retract the article, *Rolling Stone* demanded that Dean Eramo identify her "specific concerns" about the article and "the basis for those concerns."

100.    Counsel for Dean Eramo responded by letter, pointing out that there was already "ample information" in the public sphere demonstrating that Jackie was not a reliable source for truthful information, and that *Rolling Stone* had relied almost entirely on Jackie's account in disparaging Dean Eramo. The letter specifically noted numerous claims in the article that were categorically false, including, *inter alia*, *Rolling Stone's* claims that Dean Eramo "abuse[d]" Jackie, that she "discouraged Jackie from telling her story," that she was "less concerned with

protecting students than [she] is with protecting [the administration's] own reputation from scandal," that she called UVA "the rape school," and that she intentionally coddled Jackie into not reporting her rape. Noting that the article had already been thoroughly discredited, counsel for Dean Eramo decried *Rolling Stone's* "backwards," post-hoc approach of demanding that Dean Eramo do *Rolling Stone's* reporting and fact checking for it. The letter requested that *Rolling Stone* set aside legal posturing and act as a responsible journalistic enterprise should, by immediately retracting the article and apologizing to Dean Eramo.

101. *Rolling Stone* refused to retract the article and insisted that it stood by its reporting with respect to Dean Eramo, despite the fact that the entire world now knew that Jackie was not a credible or reliable source. *Rolling Stone* and Erdely did not apologize to Dean Eramo.

102. *Rolling Stone* and Erdely did not apologize to Dean Eramo after the Charlottesville Police Department officially declared that their claims about Dean Eramo were false in March 2015.

103. *Rolling Stone* and Erdely did not apologize to Dean Eramo after the Columbia University Graduate School of Journalism report further detailed Dean Eramo's efforts to assist Jackie and called the entire article "a journalistic failure."

104. Only after Dean Eramo wrote an open letter shaming *Rolling Stone* in April 2015 did *Rolling Stone* finally issue to media outlets a short, passive "apology" to Dean Eramo (among others) that took no responsibility whatsoever for the outrageous and malicious portrayal of Dean Eramo in the article.

105. *Rolling Stone* claimed by letter dated April 28, 2015 that in response to Dean Eramo's open letter, *Rolling Stone* would be including an edited copy of the letter in its May issue. *Rolling Stone* then failed to do so without offering any explanation.

106. Erdely still has not apologized to Dean Eramo.

**The Charlottesville Police Debunk Erdely And**
***Rolling Stone's* Story And Claims About Dean Eramo**

107. On March 23, 2015, the Charlottesville Police Department held a press conference and issued a press release titled, "Charlottesville Police Department's Investigation Into an Alleged Sexual Assault as Depicted in Rolling Stone Magazine Article Dated November 19, 2014." The press release chronicled the Department's investigation "in an effort to confirm or dispel the incident as graphically described in the article."

108. The Charlottesville Police Department stated Jackie first met with Dean Eramo on May 20, 2013, after Jackie was referred to Dean Eramo due to poor grades. At that time Jackie told Dean Eramo that she was the victim of a sexual act at a fraternity party, but Jackie was unable or unwilling to even identify the fraternity, let alone the names of any of the alleged attackers. In addition, the sexual act Jackie related to Dean Eramo was inconsistent with Erdely's depiction of a violent gang rape and beating in the *Rolling Stone* article.

109. Dean Eramo provided Jackie with several options, including encouraging her to lodge a criminal complaint with the police, but Jackie did not want to pursue those options at that time.

110. Thereafter, Dean Eramo continued to reach out to Jackie in the following weeks, assuring her that she would assist and support her if she decided she was ready to move forward with holding her perpetrators accountable. Dean Eramo also offered Jackie counseling services and put her in contact with a campus support group called One Less.

111. On April 21, 2014, Jackie again met with Dean Eramo and claimed to have been physically assaulted on April 6, 2014 on the University Corner near Elliewood Avenue. Jackie claimed that she was harassed by a group of four men and that when she turned after one yelled her name, she was struck in the face by a thrown glass bottle. Jackie claimed that her roommate at the time, a nursing student, had to help remove pieces of glass from Jackie's face. During the

same meeting, Jackie disclosed to Dean Eramo for the first time that her alleged sexual assault occurred at the Phi Kappa Psi fraternity house. Dean Eramo again encouraged Jackie to report the alleged assault to the police.

112. Indeed, the next day, Dean Eramo arranged a meeting with herself, Jackie, a University of Virginia police officer, and a Charlottesville police officer. During this meeting, Jackie described to police the alleged bottle-throwing incident and the alleged sexual assault in September 2012. Jackie refused to provide any specific details regarding the alleged sexual assault, and said that she confidentially reported it only to the Dean's office, and not the police, because she feared retaliation from the fraternity if she pursued a formal investigation.

113. On May 1, 2014, Charlottesville Police Detective Jake Via met with Jackie in the presence of Dean Eramo again to discuss the alleged physical assault and alleged sexual assault. Jackie maintained that she did not want to proceed with any investigation of the physical assault and refused to provide any disclosure as to the facts of the alleged sexual assault. A broader investigation was not initiated at that time because Jackie did not wish to pursue a complaint in the criminal justice system. The detective advised Jackie that if she changed her mind, her allegations would be fully investigated.

114. On November 19, 2014, following publication of the *Rolling Stone* article, UVA President Theresa Sullivan requested that the Charlottesville Police Department launch a criminal investigation into the allegations in the article. Detective Via contacted Jackie again, believing her to be the individual depicted in the *Rolling Stone* article.

115. Jackie agreed to meet with Detective Via following the Thanksgiving break. On December 2, 2014, Jackie went to the Charlottesville Police Department accompanied by her legal counsel. Through her legal counsel, Jackie declined to provide a statement or answer any of the detectives' questions.

116.     Since that time, and despite numerous attempts to gain her cooperation, Jackie has refused to speak with or provide any information to investigators.  Jackie has also refused to provide consent for investigators to access records in UVA's possession that are restricted from dissemination by federal law.

117.     UVA provided police with access to relevant members of the Office of the Dean of Students with knowledge of Jackie's previous contacts with that office, as well as certain redacted copies of documents reflecting Dean Eramo's meetings with Jackie; specifically, records reflecting meetings with Jackie regarding the alleged sexual assault, physical assault, and Jackie's claim to have heard of two other females who were sexually assaulted at the Phi Psi house.  The Charlottesville Police Department reported that the documents they received showed that the facts Jackie reported to UVA were not similar to the events depicted in the *Rolling Stone* article.

118.     Investigators spoke with the two men (called Randall and Andy in the article) that Jackie met with following the alleged assault.  Police said that that the story Jackie told them was consistent with what she later told Dean Eramo — and inconsistent with what Erdely and *Rolling Stone* published in "A Rape on Campus."

119.     Investigators received documents from, and interviewed members of, the Phi Kappa Psi fraternity.  None of the members knew Jackie or had any knowledge of a sexual assault occurring at the fraternity in September 2012.

120.     The investigation revealed no evidence of a party having taken place at the fraternity house on September 28, 2012.  Instead, the investigation revealed evidence that a party did not happen at the fraternity that night.  Investigators acquired a photograph of the inside of the empty fraternity house from 11:33 p.m. on September 28, 2012, which gave no indication of a party or large gathering.  Calendars or scheduled events from the Intra-Fraternity Counsel

showed no publicized event at Phi Kappa Psi that weekend, and investigators discovered that the fraternity's sister sorority, Delta Gamma, held an event at their house that evening. Several of the 14 fraternity brothers that lived at Phi Psi at the time attended this event, and police determined it was unlikely Phi Psi would have held a competing party on the same night.

121. Investigators concluded that they could not find "any basis of fact to conclude that there was any event at the Phi Kappa Psi Fraternity house on the evening of September 28, 2012."

122. Investigators also interviewed two of Jackie's friends, who said that she told them she was going on a date that night with a person named Haven Monahan, and that they had exchanged text messages with a person claiming to be Haven Monahan. Investigators searched through fraternity rosters, employee records of the University Aquatic and Fitness center, student directories, social media sites, and other sources, and did not find anyone with the name Haven Monahan.

123. Police found no evidence whatsoever to support Jackie's claim that she was aware of two other girls that had been assaulted at the Phi Psi house in 2010 and 2014.

124. Police also found no evidence supporting Jackie's claim that she was attacked with a bottle in retaliation for speaking out about her alleged rape on campus. Jackie's roommate denied Jackie's claim that she helped Jackie to pick shards of glass out of her face, and detectives determined the abrasion on Jackie's face was not consistent with being hit with a bottle. Other details Jackie gave about the alleged incident turned out to be demonstrably false, such as her claim that she called her mother immediately after the incident, which was disproven by a check of her phone records.

125.     The Charlottesville Police Department determined that there was "no substantive basis of fact to conclude that an incident occurred that is consistent with the facts described in the November 19, 2014, Rolling Stone Magazine article."

**Erdely and *Rolling Stone* Publish "A Rape On Campus" With Actual Malice By Making A Calculated Decision Not To Pressure-Test Jackie's Claims In Order To Publish A Biased, Preconceived Narrative Despite Serious Doubts About The Credibility Of Their Sole Source**

126.     Erdely and *Rolling Stone's* epic failure of journalism was the result of biased, agenda-driven reporting, repeated failures to heed a multitude of red flags indicating that Jackie was not a credible source, willful inaction that was the product of deliberate decisions not to acquire knowledge of facts that would contradict Jackie's claims, a purposeful avoidance of the truth, and an utter failure to investigate the accuracy of Jackie's claims despite a high degree of awareness on the part of *Rolling Stone* and Erdely that they were probably false.  Erdely and *Rolling Stone's* actions, as detailed below, amount to actual malice.

127.     Erdely, a Contributing Editor for *Rolling Stone*, was in regular contact with her editors and colleagues at the magazine and kept them apprised of her "reporting" of "A Rape on Campus."  *Rolling Stone* was fully aware of Erdely's many egregious errors, purposeful avoidance of facts, subjective doubts, and failures to investigate that led to the ultimate debacle that the article became.

128.     In addition, by Erdely and *Rolling Stone's* own admission, both Erdely and *Rolling Stone* repeated, doubled down on, and defended their false claims concerning Dean Eramo even ***after*** admitting to having substantial doubts about the accuracy of Jackie's claims and the accuracy of the false statements about Dean Eramo in the article.

129.     Erdely admitted to the Columbia Journalism School that from the outset, before even speaking with Jackie, she was "searching for a single, emblematic college rape case that would show 'what its like to be on campus now … where not only is rape so prevalent but also

that there's this pervasive culture of sexual harassment/rape culture.'" Erdely shopped around a number of college campuses looking for the right rape story to lead her article, and settled on UVA because it fit the narrative of being an elite, Southern institution whose students are considered to be overwhelmingly white and wealthy.

130.     This narrative fits Erdely's pattern and practice of using narrative journalism in which a shocking rape case is used as the vehicle to show that a given institution is indifferent to, or actively seeks to conceal, sexual assaults, just as she did in her 2011 and 2013 *Rolling Stone* articles "The Catholic Church's Sex-Crime Files" and "The Rape of Petty Officer Blumer." Thus, even before she spoke to Jackie or settled on UVA as her target, Erdely was intent on writing a narrative that used a single, shocking rape case to depict a pervasive "rape culture" on a college campus and an administration that supposedly sought to cover up sexual assaults. Again, before even speaking to Jackie or focusing specifically on UVA, Erdely told one source that she wanted to apply the same formula as the Navy article to a college campus, writing: "The approach I took in that story is similar to the one I have in mind for a sexual assault story: To demonstrate the larger institutional and cultural problems through the smaller prism of a central narrative." Thus, regardless of the facts, Erdely had already planned to write an article stating that whatever school she settled on was indifferent to the problem of rape on campus.

131.     Erdely learned of Jackie after speaking with Emily Renda, who was involved in a campus group dedicated to education and awareness about sexual assaults. By the time of the publication of the article, Renda herself was an employee of UVA working on sexual assault issues. Erdely did not disclose this fact in her article, and instead purposefully omitted it to further her narrative that UVA's administration was indifferent to sexual assault.

132.     According to Erdely, Renda told Erdely of a student at UVA who claimed to have been gang raped as part of a fraternity initiation ritual. Renda explicitly warned Erdely,

"obviously, maybe her memory of it isn't perfect." But Erdely, who had not even spoken to Jackie, inexplicably told Renda that the story was "totally plausible."

133.    But when Erdely did speak to Jackie, Jackie related to her an account of her sexual assault that differed materially from the account that Erdely knew Jackie had given to Renda. Erdely intentionally decided to disregard this obvious red flag.

134.    Erdely's bias and refusal to stray from her preconceived narrative is supported by some of the sexual assault survivors she did interview for her story. Alex Pinkleton, a UVA student who is referenced and quoted in the article, said, "I did encounter skepticism with Sabrina [Erdely] because it seemed like she was unwilling to listen to anyone besides Jackie." Pinkleton also stated, "[Erdely] did have an agenda and part of that agenda was showing how monstrous fraternities are and blaming the administration for a lot of these sexual assaults."

135.    Pinkleton said that Erdely kept asking her questions designed to get Pinkleton to embellish her own sexual assault, like repeatedly trying to get her to say that her perpetrator was feeding her drinks to get her drunk. Pinkleton felt that a run-of-the-mill date rape was not good enough for Erdely, saying "I felt that she wasn't satisfied with my perpetrator as someone who wasn't clearly monstrous.... I didn't like that it seemed like she was looking for a story that had to be at a fraternity."

136.    A Yale student contacted by Erdely said that she "put [Erdely] in touch with a couple of students who had ... normal rape stories, and none of them were good enough for her."

137.    Another UVA student interviewed by Erdely said she and several other students "felt really uncomfortable" after being interviewed by Erdely, because they concluded that Erdely was not objective and had an agenda.

138.    Erdely admitted to the Columbia Journalism School that upon speaking to Jackie for the first time, she was "incredulous" about her story, particularly the fact that Jackie claimed