to have been tackled through a glass coffee table and violently assaulted for three hours on a bed of shattered glass without suffering any lasting physical injuries.

139. But once Erdely found a source that would allow Erdely to print an incredibly vivid, extreme, and graphic story of gang rape that Erdely knew would draw attention to her article, Erdely was unwilling to let go of that story. Erdely thus willfully ignored countless red flags demonstrating that Jackie's account of the gang rape and her subsequent actions with Dean Eramo were not truthful.

140. Jackie would go silent for days at a time and refuse to respond to Erdely's texts, emails, or phone calls.

141. Jackie demurred when asked what had happened to the dress she wore the night of the rape, which according to Erdely was covered with bloodstains, and would have held physical evidence of the supposed assault and Jackie's supposed injuries. After repeatedly delaying and deflecting the question, Jackie suddenly claimed that her mother had thrown it away.

142. Jackie claimed that her mother would be willing to speak with Erdely, but calls and voice messages Erdely left for Jackie's mother went unreturned.

143. Jackie claimed that the individual identified as "Randall" would be willing to speak with Erdely, but when Erdely briefly tried to follow up on this request, Jackie simply stopped responding to Erdely's messages.

144. Jackie refused to provide Erdely or *Rolling Stone* with the real name of "Drew," the supposed ringleader of the gang rape who Jackie supposedly worked with at the University Aquatic and Fitness center. Jackie would refer to him only by a first name. This bothered Erdely, who knew this was a red flag and that Jackie's story could not be verified without this information.

145. On October 20, less than a month before she published the article, Erdely asked Jackie again for "Drew's" name, saying, "it's something I need to do," and "I have to do my due diligence." Jackie refused to provide the name and stopped responding to Erdely's communications for two weeks.

146. Because Jackie had told Erdely the alleged ringleader's supposed first name, Erdely decided to ask some of Jackie's supportive friends for his full name. They were unable to provide it. Erdely also searched online through directories and social media, but was unable to find any information matching the name Jackie had given her to an actual UVA student or graduate, let alone to a member of Phi Kappa Psi. Nor was this a needle-in-the-haystack proposition: at the time of Jackie's alleged gang rape in September 2012, only 14 brothers resided at the Phi Kappa Psi fraternity house, and at most a handful of males worked as lifeguards at the University pool. Yet Erdely could not tie any of them to the description Jackie had provided Erdely of her alleged assailant.

147. By this time, Erdely and *Rolling Stone* had substantial doubts as to the truth of the story they intended to publish. Erdely's editor, Sean Woods, claimed that he pressed Erdely about verifying Drew's existence, telling her to directly contact the University pool and the fraternity, and to look through student directories. He claimed he instructed her to go around Jackie because he knew "we need to verify [Drew's identity]." Woods claimed he had such a discussion with Erdely at least three times.

148. But with the deadline for the story's completion only two weeks away, and notwithstanding their subjective doubts about the accuracy of Jackie's story, Erdely and *Rolling Stone* decided that they would go forward with the story regardless, and without doing any additional investigation or reporting to verify the accuracy of Jackie's claims regarding her gang rape or supposed treatment by UVA following her gang rape. Erdely was worried that without

the graphic gang rape leading the narrative, her story would not get the attention she was hoping for. Accordingly, despite knowing subjectively that additional investigation was required in order to verify the article's accuracy, *Rolling Stone* and Erdely made the calculated decision to call Jackie and inform her that they would not make further attempts to identify the alleged perpetrator, and would simply identify him by a pseudonym in the story.

149. With assurances that *Rolling Stone* would make no effort to test the accuracy of her story, Jackie called back quickly and was suddenly happy to cooperate again — yet another obvious red flag.

### Erdely and *Rolling Stone* Act With Actual Malice By Purposefully Avoiding Obtaining A FERPA Waiver To Access University Records That Would Have Contradicted *Rolling Stone's* And Erdely's Preconceived Storyline

150. Many of Jackie's claims could have been factually disproven if Erdely and *Rolling Stone* had required (or even requested) that Jackie waive the restrictions of the Family Educational Rights and Privacy Act ("FERPA"), which would have given *Rolling Stone* access to records of Jackie's interactions with UVA, and with Dean Eramo specifically. Erdely and *Rolling Stone* knew that these records could substantiate or disprove Jackie's claims, and knew that they could obtain them by simply asking Jackie for a FERPA waiver. Erdely and *Rolling Stone* also knew that UVA and Dean Eramo could not effectively comment on the truth or falsity of Jackie's claims without such a waiver.

151. Erdely and *Rolling Stone* made a calculated decision not to ask Jackie for a FERPA waiver to purposefully avoid the facts they would learn from receiving the records. Because they subjectively doubted the veracity of Jackie's claims, Erdely and *Rolling Stone* did not want to come into possession of records that would objectively cast doubt on Jackie's credibility.

152. Moreover, because they knew that UVA was hampered in what it could say about Jackie without a FERPA waiver, Erdely and *Rolling Stone* also knew that by not requesting a waiver from Jackie, they could portray UVA and Dean Eramo as obstructing their reporting and refusing to answer questions about Jackie's case. The article in fact did just that, claiming that "UVA declined to make [Dean] Eramo available for comment," and that UVA President Sullivan refused to provide any details about Jackie's allegations or UVA's actions in response to those allegations. Erdely and *Rolling Stone* cleverly portrayed these responses as stonewalling in order to further the narrative of institutional indifference and inaction, when in fact Erdely and *Rolling Stone* knew that they had purposefully muzzled UVA and Dean Eramo by choosing not to obtain a FERPA waiver.

153. *Rolling Stone's* and Erdely's intentional decision not to require a FERPA waiver from Jackie amounts to actual malice.

**Erdely and *Rolling Stone* Act With Actual Malice By Making A Calculated Decision To Hide From Public View That They Were Relying Entirely On A Single Source Who They Subjectively Doubted**

154. Knowing that Erdely's reporting was inadequate, that she had not verified any significant factual aspects of Jackie's story, and that the story would not be believed if these fundamental gaps in reporting were acknowledged, Erdely and *Rolling Stone* made calculated decisions to gloss over these failures in a way that they hoped would avoid critical scrutiny.

155. For example, *Rolling Stone* used pseudonyms for key players in the story (in addition to Jackie), including "Drew," Jackie's coworker and the supposed ringleader of the assault, and also "Randall," "Andy," and "Cindy," the three friends who supposedly met with Jackie immediately after her supposed gang rape. There was no journalistic justification for using pseudonyms rather than real names for these individuals. Instead, Erdely and *Rolling Stone* knew that if readers or other journalists knew they had not even spoken to these people,

nobody would trust their account of Jackie's rape and Dean Eramo's supposed indifference to it. *Rolling Stone* thus used pseudonyms for these individuals hoping that they would prevent anyone from learning their true identities and from trying to verify a story about which Erdely and *Rolling Stone* had subjective doubts.

156. This calculated effort is further evidenced by the fact that at no time in the article did *Rolling Stone* or Erdely acknowledge that they had no idea who "Drew" was, or that they had been unable to verify that he even existed. The article is in fact constructed and written to give readers the false impression that Erdely and *Rolling Stone* not only knew who Drew was, but also that they were withholding his identity from readers because of Jackie's supposed fear of him.

157. The article also falsely claims that "Randall," one of the friends that met Jackie on the night of September 28, declined to be interviewed, "citing his loyalty to his own frat." In fact, Erdely never spoke with "Randall" and never attempted to speak with "Randall," "Cindy," or "Andy." This false statement was designed to lend credibility to the claims in the article both by falsely suggesting that Erdely did attempt to interview Randall (and knew who he was), and by claiming that he refused to speak with her out of loyalty to his frat, which fit Erdely's preconceived narrative that Jackie's rape was suppressed due to a "pervasive rape culture" that values institutional loyalty over aid to rape victims.

158. In fact, Erdely and *Rolling Stone* never asked for these three individuals' last names and did not know their true identities.

159. Erdely has acknowledged that she knew she should have contacted the three friends, and that she was "surprised" that none of her superiors at *Rolling Stone* required her to do so. Because she was worried that interviewing any of these individuals would yield facts that would discredit Jackie's claims, Erdely was happy to avoid interviewing them and pleased that

*Rolling Stone* did not ask her to. She later conceded that she "wasn't going to press that issue." She instead claimed to her editors that there was no way to reach these individuals, which of course was not true, as *Rolling Stone* knew.

160. Shortly before publication, the employee nominally assigned by *Rolling Stone* to fact check the article raised concerns about the fact that "Randall" had not been contacted for an interview, and that despite this fact the article was misleadingly written to make it appear that he had. *Rolling Stone* and Erdely ignored the fact checker's concerns. The *Washington Post* would later call this action "one of the story's many unfathomable deceits."

161. After *Rolling Stone* published the article, the individual identified as "Randall" freely gave multiple media interviews, and said that he would have spoken to Erdely if she had tried to contact him. He would have told Erdely that her account of the meeting with the three friends, its location, the quotations of the participants, the description of Jackie's assault, and the description of her supposed injuries was inconsistent with what he observed and with what Jackie told him that night.

162. "Randall," "Andy," and "Cindy" all freely spoke with the Columbia Journalism School, and in interviews said that the sexual incident Jackie described to them differed significantly from the gang rape depicted in the article. All said that if Erdely had contacted them, they would have told her this.

163. They also would have told Erdely that Jackie had told her friends that the alleged ringleader was not a fellow lifeguard at the Aquatic and Fitness Center, but a junior in her chemistry class named "Haven Monahan." Jackie had provided Erdely with a different first name (and no last name) for the alleged ringleader.

164. Erdely later acknowledged that Jackie never actually requested that she refrain from contacting "Randall," "Cindy," or "Andy." Rather, Erdely decided that she would forego

the basic journalistic step of contacting them to verify or dispel Jackie's story out of fear that Jackie would withdraw her tentative cooperation and Erdely would lose her sensationalized and fictionalized story.

165.     Erdely later claimed that her editors at *Rolling Stone* agreed to simply drop the issue of speaking with these friends, while *Rolling Stone* editor Sean Woods claimed that Erdely told him she had exhausted all possible avenues for finding them — a facially implausible claim in an age of social media and on a college campus where all students are listed in a directory. In truth, Erdely did not want to risk her too-good-to-be-true story by speaking to the friends, who she knew would almost certainly dispute Jackie's characterization of them as callously telling her not to report her gang rape to protect their social standing and ability to rush fraternities.

**Erdely and *Rolling Stone* Acted With Actual Malice When They Rejected Jackie's Request To Withdraw From The Story Because Jackie Was Uncomfortable With How The Article Would Portray Dean Eramo**

166.     Jackie attempted to withdraw from the story and directly asked Erdely not to include her claimed gang rape and interactions with Dean Eramo in the article. Jackie told *Rolling Stone* and Erdely that she was not comfortable with the portrayal of her alleged sexual assault or of her interactions with Dean Eramo. Jackie told *Rolling Stone* that the way the magazine intended to portray Dean Eramo was inaccurate.

167.     This was an obvious red flag that Jackie's story was not credible and that the claims about Dean Eramo that Erdely and *Rolling Stone* planned to publish were likely false. Erdely refused Jackie's pleas and said that the article would go forward regardless. Jackie later stated that she felt manipulated by Erdely and her efforts to fit Jackie into her preconceived narrative, saying she "felt completely out of control over [her] own story."

**Erdely and *Rolling Stone* Acted With Actual Malice By Making A Calculated Decision Not To Seek Meaningful Comment From Phi Kappa Psi**

168.     Erdely engaged in other actions that demonstrate she was actively avoiding any sources or information that would contradict the claims from Jackie that she wanted to publish. While she made no effort to identify or speak to any of the alleged eight participants in the gang rape, she did send a cryptic email to the local chapter president of Phi Kappa Psi, which simply said: "I've become aware of allegations of gang rape that have been made against the UVA chapter of Phi Kappa Psi. Can you comment on those allegations?"

169.     Erdely knew that this request for comment was absurdly vague and was intentionally designed in a way that would allow her to claim she asked Phi Kappa Psi for its side of the story, while doing so in a way that would not allow Phi Kappa Psi to contest the truth of the allegations in any meaningful way. She knowingly did not provide such basic information as the date of the supposed gang rape, the fact that it occurred during a date function party, the number of men involved, any information about the supposed victim, the fact that the ringleader was supposed to have been a Phi Psi member and lifeguard at the Aquatic Fitness Center, the fact that pledges were supposedly present and encouraged to participate as some sort of initiation ritual, or the fact that it was supposed to have occurred in an upstairs room and resulted in a shattered glass table and a significant amount of blood.

170.     Erdely knew that if she provided any such details Phi Kappa Psi could easily have disproved Jackie's story. For example, if Erdely had told Phi Psi the date of the alleged assault and that it took place at a date function, the fraternity would have been able to tell her that there was no party at Phi Psi that night. If Erdely told the fraternity that the ringleader was a brother and employee of the Aquatic and Fitness Center, Phi Psi could have told Erdely that no members of the fraternity were so employed in 2012. If Erdely had told the fraternity that pledges were present and told to participate, Phi Psi could have told Erdely that at UVA, students rush

47

fraternities in the spring, not the fall, and that therefore no pledges could have been present at an alleged assault in the house in September 2012. If Erdely had told the fraternity that the alleged victim was thrown through a glass coffee table and beaten, assaulted, and bloodied for hours on the shattered glass, Phi Psi could have told her that nobody had seen any physical evidence supporting such a claim.

171. The local chapter president responded and told Erdely the obvious — that this request for comment was far too vague for the fraternity to offer meaningful comment or dispute the allegations. He told her that while the University had told Phi Psi of an allegation of a sexual assault during a party, they had no details on the alleged assault or the identity of the alleged accuser. Erdely chose not to provide such details in response to the fraternity president's email.

172. This was intentional. Erdely was satisfied that she had "checked the box" of asking the fraternity for comment while knowingly withholding details that would have allowed the fraternity to address the veracity of the claim. The local chapter president later described Erdely's underhanded tactics as "complete bullshit."

173. Erdely employed the same tactic when contacting the national executive director of Phi Kappa Psi. This individual told Erdely that he had learned of allegations of gang rape during Phi Psi parties, and that one alleged assault occurred in September 2012. But he told her that they had no evidence by which to substantiate or dispel the allegation. Erdely again chose not to provide any details of Jackie's alleged assault to the fraternity and simply asked for comment.

174. Once the details of Jackie's supposed gang rape were published in the article, Phi Kappa Psi was easily able to demonstrate that the gang rape story published in the article was false, and would easily have been able to do so prior to publication if Erdely had not intentionally withheld details that would have allowed them to do so.

**Erdely and *Rolling Stone* Acted With Actual Malice By Interviewing And
Disregarding Sources And The Information They Provided About Dean Eramo**

175.    The sexual assault survivors at UVA who Erdely did interview flatly contradicted
Erdely and *Rolling Stone's* claims that Dean Eramo was "indifferent," that she "abuse[d]" Jackie,
that she "discouraged [Jackie] from sharing her story," that she claimed UVA hides rape
statistics "because nobody wants to send their daughter to the rape school," that she "brushed
off" Jackie and "did nothing with the information [Jackie provided]," that she sought to
"suppress" Jackie's gang rape, that she did not report it to the police, and that Jackie was put
through an "ordeal at the hands of [Dean Eramo]," who met her complaint with "indifference."

176.    Emily Renda, the individual who first told Erdely about Jackie and her claimed
sexual assault, also told the Columbia Journalism School that she provided Erdely with
information in July 2014 — well in advance of publication of the article — that flatly
contradicted Erdely's and *Rolling Stone's* claims that Dean Eramo and UVA wanted to keep
Jackie's supposed rape quiet. In fact, Renda warned Erdely about naming Phi Kappa Psi in the
article, because UVA was still trying to convince Jackie to file a formal report, and to convince
Jackie to persuade the two other alleged, anonymous victims to come forward and do the same
— which would finally allow the administration to take action against the fraternity if the claims
were well-founded. Because of her bias against fraternities and her desire to falsely paint Dean
Eramo as indifferent to Jackie's sexual assault, Erdely willfully and recklessly disregarded this
information.

177.    On information and belief, Jackie herself told *Rolling Stone* prior to publication of
the article that the planned portrayal of Dean Eramo and attribution of quotes such as UVA being
"the rape school" were false.

178.    Erdely and *Rolling Stone* recklessly disregarded Jackie's repudiation of the
defamatory statements they planned to make regarding Dean Eramo.

179. Jackie, who was supposedly "abuse[ed]" by Dean Eramo, also gave a lengthy statement to the *Cavalier Daily* after the article was published. In that statement she explained that Erdely and *Rolling Stone's* claims about how Dean Eramo treated her were completely false:

> Of all the professors, deans, faculty and staff at the University of Virginia, Dean Nicole Eramo has made the most significant and, ultimately, the most positive impact on my life. Dean Eramo has truly saved my life. If it were not for her, I do not know if I could be alive today. When I came to Dean Eramo my first year, I was depressed and suicidal…I was barely hanging on. Dean Eramo was helpful and understanding and, above all, compassionate. She listened attentively to my story and provided me with several resources. At the time, I was scared and I felt alone and I was in no position to pursue legal or University action. Dean Eramo gave me the power to make my own decisions—something so small that made me feel like I finally had a sense of control in my life. Eventually, Dean Eramo put me in touch with Emily Renda and other members of One Less. This action alone was probably the best thing anyone has ever done for me. I can't imagine what my life would be like now if it were not for Nicole Eramo. She has changed everything for the better. She has made me a better person. She has helped me get through the most difficult time in my life and has been with me every step of the way. I have said it before and I will say it again and again—Dean Nicole Eramo is an asset to this university. I do not want to go to the University of Virginia if she is not a resource for students in need of help in the aftermath of sexual violence. There is no one more qualified or capable of doing this job. Dean Eramo is above and beyond the best resource the University has.

180. Similarly, Emily Renda and Sara Surface, two student activists who were approached by Erdely and interviewed for the article, have said that the *Rolling Stone* article unfairly vilified Dean Eramo, whom both praised as a strong supporter of sexual assault victims. Renda said that rather than accurately portray Dean Eramo's work at UVA, Erdely decided to "create an effigy, hang it and burn it." Both Renda and Surface, along with other anti-sexual assault student activists who were interviewed, were also puzzled that Erdely did not mention their activism in the article.

181. Alex Pinkleton, another student activist interviewed for the article, disputed Erdely's and *Rolling Stone's* claims that Dean Eramo and UVA are indifferent to sexual assaults of students, stating "The university's response is not, 'We don't care.' When I reported my own assault, they immediately started giving me resources."

182.    Similarly, Surface has said, "[t]he administrators and staff that work directly with me and advocate for survivors are not more interested in the college's reputation over the well-being of its students."

183.    Shockingly, when confronted with Renda and Surface's statements, Erdely insisted that they were "confused," and that their insistence that Dean Eramo was a strong supporter of students and that there was in fact an active activist community at UVA addressing sexual assault prevention and education, was simply "another aspect of their denialism."

### Erdely and *Rolling Stone* Acted With Actual Malice By Repeatedly Lying In An Effort To Bolster The Credibility of Their False Story

184.    Further evidence of *Rolling Stone* and Erdely's actual malice, the serious doubts as to the accuracy of the false statements they published, and their purposeful avoidance of the truth, can be found in a number of clearly deliberate half-truths and untruths Erdely and *Rolling Stone* told about the article and their efforts in researching and publishing the piece.

185.    Very shortly after publication, responsible journalists began to question aspects of the story and Erdely's reporting. In response to these legitimate questions and inquiries, Erdely and *Rolling Stone* repeatedly obfuscated in an attempt to gloss over holes in their reporting, demonstrating that Erdely and *Rolling Stone* had substantial doubts about the truth of what they published.

186.    Importantly, Erdely admitted to the Columbia Journalism School that she had serious doubts about Jackie's credibility following a conversation she had with Jackie on *November 26, 2014* — one week after the article was published — when Jackie was unable to tell her the exact name of the supposed ringleader of her assault. Erdely admitted to being continuously bothered by Jackie's refusal to identify this individual, and admitted that as she was talking to Jackie and typing notes, her fingers stopped, "an alarm bell went off in [her] head," and she admitted to being "worried about the integrity of her story." She also knew she needed

to do additional investigation because of these concerns. Erdely discussed her loss of confidence in the integrity of her story with her editors at *Rolling Stone*, who thus also had serious doubts as to the truth of the article.

187.    While Erdely admitted to privately having serious doubts about the truth of her publication at this time, *Rolling Stone* and Erdely continued to publicly profess full confidence in Jackie's credibility, deliberately misleading the public in an effort to continue to bolster the credibility of a story they knew was likely false.

188.    Erdely appeared on the *Slate* DoubleX Gabfest podcast on November 27 — the day after the "alarm bell went off in [her] head" — and repeatedly avoided answering questions that she knew would cause others to question the veracity of the article. She gave three nonresponsive answers to three direct questions about whether she actually tried to interview the alleged perpetrators. She gave a nonresponsive answer to a direct question about whether she knew who "Drew" was. And she gave a nonresponsive answer to a direct question about whether she actually spoke to "Randall," "Cindy," or "Andy," and whether they verified Jackie's story and her supposed injuries. Erdely knew that if she answered these questions truthfully, people might begin probing whether her article was actually true. Because Erdely doubted that it was, she tried to avoid directly answering the questions in the hope that she could gloss over her glaring failures and prevent any second-guessing of her article.

189.    Erdely also tried to bolster her story and Jackie's credibility, saying "I will just say I found [Jackie's] story to be very, I found her very credible. I put her story through the ringer, to the extent that I could." By her own admissions to the Columbia Journalism School, at the time Erdely made these statements, she knew them to be false. In fact, she had serious doubts about Jackie's credibility and the truth of the article at that time.

190.     Erdely also doubled down on her defamatory statements about Dean Eramo, claiming that Dean Eramo did not call the police with regard to Jackie's claims and that she sought to "suppress" Jackie's claimed assault.  At the time she made these statements, Erdely had serious doubts as to their truth, and a high degree of awareness that they were likely false. Nevertheless, she continued to defame Dean Eramo and claim absolute faith in Jackie's credibility in the hope that nobody would discover that much of her bombshell article was false.

191.     Three days later, on November 30, Erdely continued the charade by tweeting out a link to a November 28 *Washington Post* article titled "Sabrina Rubin Erdely, woman behind Rolling Stone's explosive U-Va. alleged rape story."  In the article, Erdely again desperately tried to bolster Jackie's account despite her serious doubts as to the truth of her publication.  She told the *Washington Post*: "I find [Jackie] completely credible."  At the time she made this statement, Erdely knew it was a lie.

192.     The *Washington Post* story states that in her interview, Erdely refused to say whether she knew the names of Jackie's attackers or whether in her reporting she approached "Drew," the alleged ringleader, for comment.  Erdely attempted to deceive the *Washington Post* and its readers by falsely claiming that she was bound to silence about those details.

193.     Erdely knew these statements to be lies.  She had no agreement with Jackie that prevented her from admitting to the *Washington Post* that she did not know the names of any of Jackie's supposed attackers, that she had never approached "Drew" for comment, that she had no idea who "Drew" was or if he even existed, and that she had serious doubts about the integrity of her story.  Erdely simply claimed that she was bound to secrecy to avoid these admissions and to give the impression that she did know who the alleged perpetrators were and had verified that they existed.  Erdely told this lie hoping that it would prevent others from learning what she

already knew — that her claims about Jackie's gang rape and supposed ill treatment by Dean Eramo were likely false.

194. Erdely and *Rolling Stone* continued their highly misleading conduct in the ensuing days. On December 1, 2014, the *Washington Post* published an article by Paul Farhi titled, "Author of Rolling Stone article on alleged U-Va. rape didn't talk to accused perpetrators."

195. Erdely again refused to answer when the *Post* asked her directly whether she knew the names of the alleged perpetrators, including the supposed ringleader "Drew." Erdely told the *Washington Post*, "I can't answer that. This was a topic that made Jackie extremely uncomfortable." This was yet another knowingly false statement. Nothing prevented Erdely from telling the *Washington Post* that she did not know the names of any of the attackers, except her desire to obscure this fact to prevent people from figuring out that her entire article was based on a source whose fantastical claims could not be verified.

196. *Rolling Stone* editor Sean Woods, who edited Erdely's story, went even further. He told the *Washington Post* that *Rolling Stone* tried to contact the alleged assailants but "could not reach them." He claimed that "we verified their existence," and that "these guys exist and are real. We knew who they were." These were knowingly false statements, and *Rolling Stone* knew they were false. *Rolling Stone* did not attempt to contact the alleged perpetrators, *Rolling Stone* had no idea who they were or whether they existed, and *Rolling Stone* did not in any way verify their existence. Instead, Mr. Woods made these statements in an effort to cover up the fact that *Rolling Stone* had serious doubts about the accuracy of the article.

197. Amazingly, despite their knowledge that Jackie was not a credible source, Erdely and *Rolling Stone* still continued to double down on their false statements about Dean Eramo. Erdely insisted to the *Washington Post* that Dean Eramo "chose not to act on [Jackie's]

allegations in any way," and that Jackie's and others' allegations were "met with indifference." Erdely and *Rolling Stone* knew that these statements were false, or at the very least had serious doubts as to whether they were true.

198.    On December 2, the *Cavalier Daily* published the statements from Jackie and other women interviewed by Erdely, all of whom lauded Dean Eramo's compassion and efforts, and utterly rebutted the false claims that Dean Eramo was indifferent to Jackie's allegations and did nothing about them. Upon information and belief, *Rolling Stone* and Erdely saw and read the letters praising Dean Eramo on that day.

199.    Still desperate to convince a now-skeptical media and public that its claims about Jackie and Dean Eramo were credible — and despite harboring serious doubts about whether they were in fact true — on December 2, 3, and 4 *Rolling Stone* circulated a statement in response to media inquiries. The statement said:

> The story we published was one woman's account of a sexual assault at a UVA fraternity in October 2012 — and the subsequent ordeal she experienced at the hands of University administrators in her attempts to work her way through the trauma of that evening. The indifference with which her complaint was met was, we discovered, sadly consistent with the experience of many other UVA women who have tried to report such assaults. Through our extensive reporting and fact-checking, we found Jackie to be entirely credible and courageous and we are proud to have given her disturbing story the attention it deserves.

200.    *Rolling Stone* knew that these statements were false. *Rolling Stone* knew that Jackie was not a credible or reliable source. *Rolling Stone* knew that Jackie had already issued a statement completely rebutting any notion that Dean Eramo was indifferent to Jackie's alleged sexual assault, and categorically stating that Jackie did not make an official report of her alleged assault to the University or police because she did not wish to do so. Numerous media outlets republished *Rolling Stone's* statement nationally, which was *Rolling Stone's* intent.

201.    *Rolling Stone* provided this same statement to the *New York Times*, which also interviewed Erdely on December 2. Erdely falsely told the *New York Times* that "the university

administration did not pursue the accusations further," which she called "[t]he real scandal," in a purposeful effort to divert attention from the growing suspicion that Erdely's article was not based in fact.

### Dean Eramo Suffers Vicious And Hurtful Attacks
### Due To *Rolling Stone's* And Erdely's False Claims About Her

202.    The publication of the article and subsequent statements by Erdely caused irreparable harm to Dean Eramo's reputation, as well as significant emotional distress.

203.    Individuals incensed by Erdely's portrayal of Dean Eramo in the article easily learned Dean Eramo's email address — which is available on the UVA website — and in the days and weeks following the publication of the article Dean Eramo was subjected to unspeakable abuse in the form of hundreds of derogatory and downright threatening emails. A small sample of the invectives hurled at Dean Eramo includes:

- "I'm appalled. To turn away crying rape victims for the sake of the reputation of a school is disgraceful…. I hope you understand what you have been doing is wrong and you should be ashamed."

- "You are a rape apologist & a FATASS. Enormous Eramo the wretched rape apologist. resign you vile worthless creature."

- "Shame on you!! You did nothing to prevent another gang rape at UVrAPE. How do you sleep at night? Those girls were VICTIMIZED twice – first by the frat rapists and second by YOU…. I already have the RS article on Facebook. My 650 friends will send it around."

- "That article in Rolling Stone was disgusting. You are a rape apologist who must LOVE her precious money so much that you would turn your back on these young girls…. You are a disgusting, worthless piece of trash."

- "As an alumnus of UVA Medical School, your portrayal in the Rolling Stone article was nothing short of despicable. It appeared that you are part of an administration that perpetuates misogyny and criminal activity at the University."

- "I've read the Rolling Stone article and am disgusted by your behavior. I wonder how many rapists might be out in the world victimizing women as a result of you."

- "Dean Eramo what a piece of shit you are. You put on a show now after

abandoning these young women who have come to you for help. Resign."

- "You are a disgusting individual and have no place being around young people."

- "I just read the Rolling Stone article and it struck me that you are more evil than the rapists that you personally enable."

- "I do hope you're pleased with your portrayal in *Rolling Stone's* article about the culture of rape at UVA, with which you are complicit. How exactly do you look in the mirror after gently pushing students away from the only possibly effective course of action in a case of rape, namely going to the police?... You are unspeakably horrible."

- "As a woman, how can you turn a blind eye to these girls who are seeking help from such brutal acts…girls Ms. Eramo; GIRLS. God will have his day with you and hold you accountable just as the boys who have raped and performed these disgusting acts…. You are a disgusting human being."

- "I hope you burn in hell forever you fat hypocrite!!!"

204. Commenters who read the online version of the article similarly called Dean Eramo "scum," an "enemy of women," and a "hack" that engaged in cover-ups and "served her alma mater uva by essentially preventing those embarrassing police complaints about rapes."

205. In the aftermath of the article, and while *Rolling Stone's* false allegations were being investigated, Dean Eramo was prohibited from continuing to work with students with whom she was counseling and had worked hard to build a trusting relationship. These innocent students were also harmed by having to "start over" with a different counselor.

206. As a result of the article, Dean Eramo's reputation was irreparably damaged among her colleagues, students, alumni, and, indeed, worldwide.

207. Dean Eramo has also suffered significant embarrassment, humiliation, mental suffering, and emotional distress as a result of the article and Erdely and *Rolling Stone's* subsequent statements. She has had extreme difficulty sleeping and eating as a result of the stress and anxiety caused by the publications. She also sought counseling from UVA's faculty employee assistance program. The stress brought on by the publication of the article also

affected Dean Eramo's ongoing treatment for a recurrence of breast cancer, with the publication occurring shortly before Dean Eramo was scheduled to undergo surgery. Dean Eramo entered surgery emotionally and physically debilitated and suffered post-surgical complications requiring several days of hospitalization and additional surgery.

## COUNT ONE — DEFAMATION FOR STATEMENTS IN THE NOVEMBER 19, 2014 ONLINE EDITION OF THE ROLLING STONE ARTICLE "A RAPE ON CAMPUS"

### (Against Defendants Erdely, Wenner Media LLC, and Rolling Stone LLC)

208. Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

209. Erdely and *Rolling Stone* published "A Rape on Campus" on November 19, 2014. The article was published to a worldwide audience on Rolling Stone's website. A true and correct copy of the online edition of the article is attached hereto as Exhibit A.

210. The article contained the following false and defamatory statements concerning Dean Eramo:

- "Jackie was just starting her freshman year at the University of Virginia when she was brutally assaulted by seven men at a frat party. When she tried to hold them accountable, a whole new kind of abuse began."

- "Lots of people have discouraged her from sharing her story, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang-rape allegations more than a year ago."

- "Like most colleges, sexual-assault proceedings at UVA unfold in total secrecy. Asked why UVA doesn't publish all its data, President Sullivan explains that it might not be in keeping with 'best practices' and thus may inadvertently discourage reporting. Jackie got a different explanation when she'd eventually asked Dean Eramo the same question. She says Eramo answered wryly, 'Because nobody wants to send their daughter to the rape school.'"

- "A bruise mottling her face, Jackie sat in Eramo's office in May 2014 and told her about the two others. One, she says, is a 2013 graduate, who'd told Jackie that she'd been gang-raped as a freshman at the Phi Psi house. The other was a first-year whose worried friends had called Jackie after the girl had come home wearing no pants. Jackie said the girl told her she'd been assaulted by four men in a Phi Psi bathroom while a fifth watched. (Neither woman was willing to talk to RS.) As Jackie

wrapped up her story, she was disappointed by Eramo's nonreaction. She'd expected shock, disgust, horror…. Of all her assailants, Drew was the one she most wanted to see held accountable — but with Drew about to graduate, he was going to get away with it. Because, as she miserably reminded Eramo in her office, she didn't feel ready to file a complaint. Eramo, as always, understood."

- "Given the swirl of gang-rape allegations Eramo had now heard against one of UVA's oldest and most powerful fraternities … the school may have wondered about its responsibilities to the rest of the campus. Experts apprised of the situation by RS agreed that despite the absence of an official report, Jackie's passing along two other allegations should compel the school to take action of out regard for campus safety."

211. These statements are of and concerning Dean Eramo.

212. These statements are false:

    a. Jackie did not try to hold her supposed assailants accountable; in fact, she adamantly refused to file a report with UVA or to file a complaint or participate in a police investigation after Dean Eramo arranged for Jackie to meet with police.

    b. Dean Eramo's interactions with Jackie can in no way be characterized as "abuse."

    c. Dean Eramo never told Jackie that UVA did not publish sexual assault statistics because nobody wants to send their daughter to the rape school and, on information and belief, Jackie did not tell Erdely that Dean Eramo said this.

    d. Dean Eramo did not have a "nonreaction" to Jackie's claim that two other girls were assaulted at Phi Psi; in fact, Dean Eramo arranged for Jackie to meet with police and Dean Eramo and UVA urged Jackie to identify the girls or have them come forward.

    e. Nor did Dean Eramo take "no action" in response to reports of Jackie's or two other girls' alleged sexual assaults.

213. The substantial danger of injury to Dean Eramo's reputation from such statements is readily apparent. Such statements would tend to so harm the reputation of another as to lower

her in the estimation of the community or to deter third persons from associating or dealing with her.

214. By such publication, *Rolling Stone* and Erdely did cause harm to Dean Eramo's reputation.

215. Erdely and *Rolling Stone's* publication of these false statements was negligent at a minimum.

216. At minimum, Erdely and *Rolling Stone* had serious doubts as to the truth of these statements and a high degree of awareness that they were probably false, and therefore were required to investigate their veracity before publishing them. Erdely and *Rolling Stone's* failure to do so amounts to actual malice.

217. Erdely and *Rolling Stone* purposefully avoided the truth, and purposely avoided interviewing sources and following fundamental reporting practices intentionally in order to avoid the truth.

218. At the time of publication, Erdely and *Rolling Stone* knew these statements were false, or recklessly disregarded the truth.

219. Erdely and *Rolling Stone's* actions were malicious, willful, and wanton, and evidence a conscious disregard for Dean Eramo's rights. Accordingly, punitive damages are appropriate.

220. Erdely and *Rolling Stone's* statements concerning Dean Eramo are defamatory *per se* because they it attribute to Dean Eramo unfitness to perform the duties of her profession, and foreseeably would hurt Dean Eramo in her profession. Moreover, these statements prejudice Dean Eramo in her profession as a UVA Dean and administrator who is responsible for the welfare of UVA students and sexual assault survivors. Dean Eramo is therefore entitled to presumed damages.

221.    *Rolling Stone* assigned Erdely, its Contributing Editor, to write the article, and she was acting within the scope of her employment when she published the false and defamatory statements in the article.  *Rolling Stone* participated in, authorized, and ratified Erdely's conduct.

222.    As a direct and proximate result of these false statements by Erdely and *Rolling Stone*, Dean Eramo has suffered damages, including, *inter alia*, injury to her reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

## COUNT TWO — DEFAMATION FOR STATEMENTS IN THE DECEMBER 2014 PRINT EDITION OF THE ROLLING STONE ARTICLE "A RAPE ON CAMPUS"

### (Against Defendants Erdely, Wenner Media LLC, and Rolling Stone LLC)

223.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

224.    Erdely and *Rolling Stone* published "A Rape on Campus" in the December 2014 the hardcopy edition of *Rolling Stone* magazine, which *Rolling Stone* distributes to a national and international audience.  A true and correct copy of the hardcopy edition of the article is attached hereto as Exhibit B.

225.    The article contained the following false and defamatory statements concerning Dean Eramo:

- "Jackie was just starting her freshman year at the University of Virginia when she was brutally assaulted by seven men at a frat party.  When she tried to hold them accountable, a whole new kind of abuse began."

- "Lots of people have discouraged her from sharing her story, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang-rape allegations more than a year ago."

- "Like most colleges, sexual-assault proceedings at UVA unfold in total secrecy.  Asked why UVA doesn't publish all its data, President Sullivan explains that it might not be in keeping with 'best practices' and thus may inadvertently discourage reporting.  Jackie got a different explanation when she'd eventually asked Dean Eramo the same question.  She says Eramo answered wryly, 'Because nobody wants to send their daughter to the rape school.'"

- "A bruise mottling her face, Jackie sat in Eramo's office in May 2014 and told her about the two others. One, she says, is a 2013 graduate, who'd told Jackie that she'd been gang-raped as a freshman at the Phi Psi house. The other was a first-year whose worried friends had called Jackie after the girl had come home wearing no pants. Jackie said the girl told her she'd been assaulted by four men in a Phi Psi bathroom while a fifth watched. (Neither woman was willing to talk to RS.) As Jackie wrapped up her story, she was disappointed by Eramo's nonreaction. She'd expected shock, disgust, horror…. Of all her assailants, Drew was the one she most wanted to see held accountable — but with Drew about to graduate, he was going to get away with it. Because, as she miserably reminded Eramo in her office, she didn't feel ready to file a complaint. Eramo, as always, understood."

- "Given the swirl of gang-rape allegations Eramo had now heard against one of UVA's oldest and most powerful fraternities … the school may have wondered about its responsibilities to the rest of the campus. Experts apprised of the situation by RS agreed that despite the absence of an official report, Jackie's passing along two other allegations should compel the school to take action out regard for campus safety."

226.  These statements are of and concerning Dean Eramo.

227.  These statements are false:

   a.  Jackie did not try to hold her supposed assailants accountable; in fact, she adamantly refused to file a report with UVA or to file a complaint or participate in a police investigation after Dean Eramo arranged for Jackie to meet with police.

   b.  Dean Eramo's interactions with Jackie can in no way be characterized as "abuse."

   c.  Dean Eramo never told Jackie that UVA did not publish sexual assault statistics because nobody wants to send their daughter to the rape school and, on information and belief, Jackie did not tell Erdely that Dean Eramo said this.

   d.  Dean Eramo did not have a "nonreaction" to Jackie's claim that two other girls were assaulted at Phi Psi; in fact, Dean Eramo arranged for Jackie to meet with police and Dean Eramo and UVA urged Jackie to identify the girls or have them come forward.

   e.  Nor did Dean Eramo take "no action" in response to reports of Jackie's or two other girls' alleged sexual assaults.

228.   The substantial danger of injury to Dean Eramo's reputation from such statements is readily apparent. Such statements would tend to so harm the reputation of another as to lower her in the estimation of the community or to deter third persons from associating or dealing with her.

229.   By such publication, *Rolling Stone* and Erdely caused harm to Dean Eramo's reputation.

230.   Erdely and *Rolling Stone's* publication of these false statements was negligent at a minimum.

231.   At minimum, Erdely and *Rolling Stone* had serious doubts as to the truth of these statements and a high degree of awareness that they were probably false, and therefore were required to investigate their veracity before publishing them. Erdely and *Rolling Stone's* failure to do so amounts to actual malice.

232.   Erdely and *Rolling Stone* purposefully avoided the truth, and purposely avoided interviewing sources and following fundamental reporting practices intentionally in order to avoid the truth.

233.   At the time of publication, Erdely and *Rolling Stone* knew these statements were false, or recklessly disregarded the truth.

234.   Erdely and *Rolling Stone's* actions were malicious, willful, and wanton, and evidence a conscious disregard for Dean Eramo's rights. Accordingly, punitive damages are appropriate.

235.   Erdely and *Rolling Stone's* statements concerning Dean Eramo are defamatory *per se* because they it attribute to Dean Eramo unfitness to perform the duties of her profession, and foreseeably would hurt Dean Eramo in her profession. Moreover, these statements prejudice Dean Eramo in her profession as a UVA Dean and administrator who is responsible for the

welfare of UVA students and sexual assault survivors. Dean Eramo is therefore entitled to presumed damages.

236. *Rolling Stone* assigned Erdely, its Contributing Editor, to write the article, and she was acting within the scope of her employment when she published the false and defamatory statements in the article. *Rolling Stone* participated in, authorized, and ratified Erdely's conduct.

237. As a direct and proximate result of these false statements by Erdely and *Rolling Stone*, Dean Eramo has suffered damages, including, *inter alia*, injury to her reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

## COUNT THREE — DEFAMATION FOR STATEMENT ON THE BRIAN LEHRER SHOW
### (Against Defendants Erdely, Wenner Media LLC, and Rolling Stone LLC)

238. Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

239. Erdely appeared on the Brian Lehrer Show on November 26, 2014, at the direction and encouragement of *Rolling Stone*. The Brian Lehrer Show is a radio program broadcast on WNYC, a public radio station in New York City broadcast in both AM and FM. The program is also broadcast to listeners nationwide and available for download on the WNYC website. A certified transcript of the November 26, 2014 episode of the Brian Lehrer Show is attached hereto as Exhibit C.

240. During her appearance on the Brian Lehrer Show, Erdely made the following false and defamatory statement concerning Dean Eramo:

- "[Jackie] was kind of brushed off by her friends and by the administration…. And eventually, when she did report it to the administration, the administration did nothing about, they did nothing with the information. And they even continued to do nothing even when she eventually told them that she had become aware of two other women who were also gang raped at the same fraternity."

241. This statement is of and concerning Dean Eramo, as the article only identifies one UVA administrator to whom Jackie reported the alleged assault. Moreover, Erdely intended to refer to Dean Eramo in this statement, and those who know Dean Eramo or who read "A Rape On Campus" understood this statement to be about Dean Eramo.

242. This statement is false. Dean Eramo did not do "nothing" in response to Jackie's allegations and did not continue to do nothing when Jackie claimed to know of other girls who were assaulted at the Phi Psi house. Dean Eramo encouraged Jackie to file a criminal complaint, arranged for her to meet with the police, and encouraged Jackie to convince the other supposed victims to come forward.

243. The substantial danger of injury to Dean Eramo's reputation from such a statement is readily apparent. Such a statement would tend to so harm the reputation of another as to lower her in the estimation of the community or to deter third persons from associating or dealing with her.

244. By such publication, *Rolling Stone* and Erdely caused harm to Dean Eramo's reputation.

245. Erdely and *Rolling Stone's* publication of this false statement was negligent at a minimum.

246. At minimum, Erdely and *Rolling Stone* had serious doubts as to the truth of this statement and a high degree of awareness that it was probably false, and therefore they were required to investigate its veracity before publishing the statement. Erdely and *Rolling Stone's* failure to do so amounts to actual malice.

247. Erdely and *Rolling Stone* purposefully avoided the truth, and purposely avoided interviewing sources and following fundamental reporting practices intentionally in order to avoid the truth.

248. At the time of publication, Erdely and *Rolling Stone* knew this statement was false, or recklessly disregarded the truth.

249. Erdely and *Rolling Stone's* actions were malicious, willful, and wanton, and evidence a conscious disregard for Dean Eramo's rights. Accordingly, punitive damages are appropriate.

250. Erdely and *Rolling Stone's* statement concerning Dean Eramo is defamatory per se because it attributes to Dean Eramo unfitness to perform the duties of her profession, and foreseeably would hurt Dean Eramo in her profession. Moreover, these statements prejudice Dean Eramo in her profession as a UVA Dean and administrator who is responsible for the welfare of UVA students and sexual assault survivors. Dean Eramo is therefore entitled to presumed damages.

251. Erdely was acting within the scope of her employment as Contributing Editor and author of the article when she appeared on the Brian Lehrer Show, at *Rolling Stone's* direction and with its encouragement, in order to gain publicity for the article. *Rolling Stone* participated in, authorized, and ratified Erdely's conduct.

252. As a direct and proximate result of this false statement by Erdely and *Rolling Stone*, Dean Eramo has suffered damages, including, *inter alia*, injury to her reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

## COUNT FOUR — DEFAMATION FOR STATEMENTS ON THE SLATE DOUBLEX GABFEST PODCAST
### (Against Defendants Erdely, Wenner Media LLC and Rolling Stone LLC)

253. Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

254. Erdely appeared on the Slate DoubleX Gabfest podcast on November 27, 2014, at *Rolling Stone's* direction and encouragement. This podcast is published nationally and available

on Slate.com and on iTunes. A certified transcript of the November 27, 2014 episode of the

DoubleX Gabfest podcast is attached hereto as Exhibit D.

255. During her appearance on the podcast, Erdely made the following false and

defamatory statements concerning Dean Eramo:

- "[Jackie] had eventually kind of mustered up the courage to tell the administration that she had been brutally gang raped, and that the University did nothing with this information and that they continued to do nothing even when she told them that she had become aware of two other women that were also gang raped at that fraternity."

- "It is incredibly extreme. I mean whether this was perpetrated by a serial rapist who has many victims — I mean it seems like no matter what, this is an incredibly messed up situation. But it was absolutely a violent crime and I think what was really telling was the idea that — and this really underscores the entire article; is the student body and the administration doesn't really treat rape as a crime, as a violent crime…. Even in this case, right, exactly. And this is why this case blew my mind, that Jackie's situation blew my mind; that even in a situation that was so extreme and so obviously within the realm of criminal, that they would seek to suppress something like this because that's really what they did. Not only did they not report it to police, but really I feel she was sort of discouraged from moving this forward."

- "She's particularly afraid of Drew who she's assigned a tremendous amount of power in her own mind…. So I think that the idea of [Jackie] facing him or them down in any way is really just emotionally crippling for her. She's having a hard time facing up to that, and I think that she needs a lot of support if she's going to get to the place where she can actually confront them. When she does actually run into some of her alleged assailants on campus sometimes, she recognizes them all. She can identify them all. When she sees them, just the sight of them, obviously it's a shock but it also tends to send her into a depression. So it just goes to show sort of the emotional toll something like this would take. I just think it would require a great deal of support for her to move forward into any of these options to resolve her case and that's something that's been completely absent. She really hasn't had any of that support from her friends, from the administration, nor from her family."

- "What I found is that UVA is a place where their culture is one of extreme loyalty, so I guess it shouldn't have surprised me that the community of survivors, they're totally devoted to the University, even as they're not very happy with the way that their cases are handled. They totally buy into the attitude that radiates from the administration that doing nothing is a fine option. You know, if you unburden yourself to the Dean and take care of your own mental health, then that's good enough. They created this support group, which is great for them and they do activism, they do bystander support seminars, I mean intervention seminars and things like that which is great, but really what they're doing is affirming one another's choices not to report, which is, of course, an echo of their own administration's kind of ethos."

256. These statements are of and concerning Dean Eramo, as the article only identifies one UVA administrator to whom Jackie reported the alleged assault. Moreover, Erdely intended to refer to Dean Eramo in these remarks, and those who know Dean Eramo or who read "A Rape On Campus" understood these statements to be about Dean Eramo.

257. These statements are false.

    a. Dean Eramo did not do "nothing" in response to Jackie's allegations and did not continue to do nothing when Jackie claimed to know of other girls who were assaulted at the Phi Psi house. Dean Eramo encouraged Jackie to file a criminal complaint, arranged for her to meet with the police, and encouraged Jackie to convince the other supposed victims to come forward.

    b. Dean Eramo in no way sought to "suppress" Jackie's alleged sexual assault, and in no way discouraged Jackie from seeking to hold the perpetrators accountable through the University and/or criminal processes. In fact, Dean Eramo supported Jackie with respect to reporting her alleged assault to the police and arranged for Jackie to meet with police.

    c. Dean Eramo did not in any way encourage Jackie not to report her alleged assault, and in fact did the opposite.

258. The substantial danger of injury to Dean Eramo's reputation from such statements is readily apparent. Such statements would tend to so harm the reputation of another as to lower her in the estimation of the community or to deter third persons from associating or dealing with her.

259. By such publication, *Rolling Stone* and Erdely caused harm to Dean Eramo's reputation.

260. Erdely and *Rolling Stone's* publication of these false statements was negligent at a minimum.

261. At minimum, Erdely and *Rolling Stone* had serious doubts as to the truth of these statements and a high degree of awareness that they were probably false, and therefore were required to investigate their veracity before publishing them. Erdely and *Rolling Stone's* failure to do so amounts to actual malice.

262. Erdely and *Rolling Stone* purposefully avoided the truth, and purposely avoided interviewing sources and following fundamental reporting practices intentionally in order to avoid the truth.

263. At the time of publication, Erdely and *Rolling Stone* knew these statements were false, or recklessly disregarded the truth.

264. Erdely and *Rolling Stone's* actions were malicious, willful, and wanton, and evidence a conscious disregard for Dean Eramo's rights. Accordingly, punitive damages are appropriate.

265. Erdely and *Rolling Stone's* statements concerning Dean Eramo are defamatory per se because they it attribute to Dean Eramo unfitness to perform the duties of her profession, and foreseeably would hurt Dean Eramo in her profession. Moreover, these statements prejudice Dean Eramo in her profession as a UVA Dean and administrator who is responsible for the welfare of UVA students and sexual assault survivors. Dean Eramo is therefore entitled to presumed damages.

266. Erdely was acting within the scope of her employment as Contributing Editor and author of the article when she appeared on the podcast, at *Rolling Stone's* direction and with its encouragement, in order to gain publicity for the article. *Rolling Stone* participated in, authorized, and ratified Erdely's conduct.

267. As a direct and proximate result of these false statements by Erdely and *Rolling Stone*, Dean Eramo has suffered damages, including, *inter alia*, injury to her reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

## COUNT FIVE — DEFAMATION FOR STATEMENT TO THE *WASHINGTON POST*
### (Against Defendants Erdely, Wenner Media LLC, and Rolling Stone LLC)

268. Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

269. Erdely and *Rolling Stone* gave interviews to the *Washington Post* and made statements that were included in a *Washington Post* story published on December 1, 2014, entitled "Author of Rolling Stone article on alleged U-Va. rape didn't talk to the accused perpetrators." This article was published and distributed nationwide in print, and online on the *Washington Post's* website. A true and correct copy of this story is attached hereto as Exhibit E.

270. Erdely made the following false and defamatory statement to the *Washington Post* concerning Dean Eramo:

- "As I've already told you, the gang-rape scene that leads the story is the alarming account that Jackie — a person whom I found to be credible — told to me, told her friends, and importantly, what she told the UVA administration, which chose not to act on her allegations in any way — i.e., the overarching point of the article. THAT is the story: the culture that greeted her and so many other UVA women I interviewed, who came forward with allegations, only to be met with indifference."

271. This statement is of and concerning Dean Eramo, as the article only identifies one UVA administrator to whom Jackie reported the alleged assault. Moreover, Erdely intended to refer to Dean Eramo in this statement, and those who know Dean Eramo or who read "A Rape On Campus" understood this statement to be about Dean Eramo.

272. This statement is false. Dean Eramo did act on Jackie's allegations, both by encouraging her to file a criminal complaint with the police and by offering the opportunity to seek an administrative remedy through the University disciplinary system. Dean Eramo also

arranged for Jackie to meet with police. Dean Eramo did not respond to Jackie's allegations with indifference. By the time she made this statement, Erdely also knew that the other sexual assault survivors she had interviewed at UVA had completely refuted the claim that Dean Eramo was indifferent to their allegations.

273.     The substantial danger of injury to Dean Eramo's reputation from such a statement is readily apparent. Such a statement would tend to so harm the reputation of another as to lower her in the estimation of the community or to deter third persons from associating or dealing with her.

274.     By such publication, *Rolling Stone* and Erdely caused harm to Dean Eramo's reputation.

275.     Erdely and *Rolling Stone's* publication of this false statement was negligent at a minimum.

276.     At minimum, Erdely and *Rolling Stone* had serious doubts as to the truth of this statement and a high degree of awareness that it was probably false, and therefore they were required to investigate its veracity before publishing it. Erdely and *Rolling Stone's* failure to do so amounts to actual malice.

277.     Erdely and *Rolling Stone* purposefully avoided the truth, and purposely avoided interviewing sources and following fundamental reporting practices intentionally in order to avoid the truth.

278.     At the time of publication, Erdely and *Rolling Stone* knew this statement was false, or recklessly disregarded the truth.

279.     Erdely and *Rolling Stone's* actions were malicious, willful, and wanton, and evidence a conscious disregard for Dean Eramo's rights. Accordingly, punitive damages are appropriate.

71

280.    Erdely and *Rolling Stone's* statement concerning Dean Eramo is defamatory per se because it attributes to Dean Eramo unfitness to perform the duties of her profession, and foreseeably would hurt Dean Eramo in her profession.    Moreover, these statements prejudice Dean Eramo in her profession as a UVA Dean and administrator who is responsible for the welfare of UVA students and sexual assault survivors. Dean Eramo is therefore entitled to presumed damages.

281.    Erdely was acting within the scope of her employment as Contributing Editor and author of the article when she gave this statement to the *Washington Post*, at *Rolling Stone's* direction and with its encouragement, in order to defend the credibility of the article.    *Rolling Stone* participated in, authorized, and ratified Erdely's conduct.

282.    As a direct and proximate result of this false statement by Erdely and *Rolling Stone*, Dean Eramo has suffered damages, including, *inter alia*, injury to her reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

## COUNT SIX — DEFAMATION FOR DECEMBER 2, 2014 PRESS STATEMENT
### (Against Defendants Erdely, Wenner Media LLC, and Rolling Stone LLC)

283.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

284.    Erdely and *Rolling Stone* provided a press statement to numerous media outlets beginning on or about December 2, 2014, and continuing for several days.  This press statement was then republished nationwide in numerous articles and online posts, including by the *Washington Post* in a December 2, 2014 article entitled "Rolling Stone whiffs in reporting on alleged rape," and by the *Daily Beast* in a December 5, 2014 article entitled, "Rolling Stone Said Yesterday U-VA Rape Story Was 'Entirely Credible.'"  These republications were foreseeable

and intended by *Rolling Stone*. A true and correct copy of the December 2, 2014 *Washington Post* article is attached hereto as Exhibit F.

285. The press statement contained the following false and defamatory statement concerning Dean Eramo:

- "The story we published was one woman's account of a sexual assault at a UVA fraternity in October 2012 – and the subsequent ordeal she experienced at the hands of University administrators in her attempts to work her way through the trauma of that evening. The indifference with which her complaint was met was, we discovered, sadly consistent with the experience of many other UVA women who have tried to report such assaults. Through our extensive reporting and fact-checking, we found Jackie to be entirely credible and courageous and we are proud to have given her disturbing story the attention it deserves."

286. This statement is of and concerning Dean Eramo, as the article only identifies one UVA administrator to whom Jackie reported the alleged assault. Moreover, Erdely intended to refer to Dean Eramo in this statement, and those who know Dean Eramo or who read the article understood this statement to be about Dean Eramo.

287. This statement is false. Jackie did not suffer an ordeal at the hands of Dean Eramo, and Dean Eramo did not meet Jackie's complaint with indifference. Moreover, at the time it made this statement, *Rolling Stone* knew full well that Jackie was not credible.

288. The substantial danger of injury to Dean Eramo's reputation from such a statement is readily apparent. Such a statement would tend to so harm the reputation of another as to lower her in the estimation of the community or to deter third persons from associating or dealing with her.

289. By such publication, *Rolling Stone* and Erdely caused harm to Dean Eramo's reputation.

290. Erdely and *Rolling Stone's* publication of this false statement was negligent at a minimum.

291. At minimum, Erdely and *Rolling Stone* had serious doubts as to the truth of this statement and a high degree of awareness that it was probably false, and therefore they were required to investigate its veracity before publishing it. Erdely and *Rolling Stone's* failure to do so amounts to actual malice.

292. Erdely and *Rolling Stone* purposefully avoided the truth, and purposely avoided interviewing sources and following fundamental reporting practices intentionally in order to avoid the truth.

293. At the time of publication, Erdely and *Rolling Stone* knew this statement was false, or recklessly disregarded the truth.

294. Erdely and *Rolling Stone's* actions were malicious, willful, and wanton, and evidence a conscious disregard for Dean Eramo's rights. Accordingly, punitive damages are appropriate.

295. Erdely and *Rolling Stone's* statement concerning Dean Eramo is defamatory per se because it attributes to Dean Eramo unfitness to perform the duties of her profession, and foreseeably would hurt Dean Eramo in her profession. Moreover, these statements prejudice Dean Eramo in her profession as a UVA Dean and administrator who is responsible for the welfare of UVA students and sexual assault survivors. Dean Eramo is therefore entitled to presumed damages.

296. As a direct and proximate result of this false statement by Erdely and *Rolling Stone*, Dean Eramo has suffered damages, including, *inter alia*, injury to her reputation, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor, and against Defendants, as follows:

(1)    awarding Dean Eramo compensatory damages of not less than $7,500,000.00;

(2)    awarding Dean Eramo punitive damages of not less than $350,000.00;

(3)    awarding Dean Eramo all expenses and costs, including attorneys' fees; and

(4)    such other and further relief as the Court deems appropriate.

A JURY TRIAL IS DEMANDED.

Dated: May 12, 2015

Respectfully Submitted,

*[signature: Thomas A. Clare]*

Thomas A. Clare (Va. Bar No. 39299)
Elizabeth M. Locke (VA Bar No. 71784)
Joseph R. Oliveri (VA Bar No. 77152)
CLARE LOCKE LLP
902 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: joe@clarelocke.com

*Attorneys for Plaintiff*