# EXHIBIT A



Davis Wright
Tremaine LLP

27th Floor
1633 Broadway
New York, NY 10019-6708

Elizabeth A. McNamara
212.603.6437 tel
212.489.8340 fax

lizmcnamara@dwt.com

February 4, 2015

**VIA E-MAIL and MAIL**

Thomas A. Clare                                  CONFIDENTIAL SETTLEMENT
Clare Locke LLP                                  COMMUNICATION
902 Prince Street
Alexandria, VA 22314

Re:     "A Rape on Campus" by Sabrina Rubin Erdely (the "Article")

Dear Tom:

       I write in response to your January 21 letter. As I noted previously, it would have been helpful to have this information before our recent meeting, in order to have a productive in-person discussion regarding your client's specific claim. Nevertheless, as we explained during our meeting, we do not believe that Dean Eramo has a viable claim against Rolling Stone arising out of the Article. Nothing in your letter changes that conclusion.

       The Article concerns the growing public awareness of sexual assaults, particularly on the nation's campuses. The Article focuses on the University of Virginia for good reason: UVA is one of only 12 schools selected for a compliance review by the Department of Education's Office. While UVA is hardly unique, as observed by the Office of Civil Rights secretary quoted in the Article, compliance reviews are "targeted efforts," based on "very serious concerns." Indeed, UVA has been the scene of well-known sexual and other violent assaults like Liz Securro's 1984 rape—at the Phi Psi fraternity—and more recently the tragic death of Yeardley Love and the pending civil rights complaints, including a complaint filed with the Office of Civil Rights identifying Dean Eramo as a defendant.

       The Article bookends this exploration of how UVA is grappling with sexual assaults on its campus with Jackie's personal story of her gang rape at the Phi Kappa Psi fraternity. The assault Jackie depicted was graphic and harrowing but it did not stand alone as an example of UVA's serious issues with sexual assault; it was reported alongside the stories of other UVA survivors such as Emily Renda, Liz Securro, "Stacy" and Susan Russell's daughter, among others. But Jackie's story was a particular focus of the Article and the suggestion that after the Article's publication her account has been discredited in any way is of serious and ongoing concern for Rolling Stone.

DWT 26078411v1 3770077-000050

| Anchorage | New York | Seattle |
| Bellevue | Portland | Shanghai |
| Los Angeles | San Francisco | Washington, D.C. |

www.dwt.com

Case 3:15-cv-00023-GEC   Document 27-1   Filed 07/16/15   Page 2 of 8   Pageid#: 968

To that end, Rolling Stone promptly published two editorial notes—the first on the very same day it learned of a concern with Jackie's story—acknowledging errors in the Article and apologizing for certain editorial decisions that contributed to those errors. Then, the magazine made the unusual, and commendable, decision to retain the highly respected dean of the Columbia Journalism School to conduct an independent review of the reporting and editing process.[1] Rolling Stone now waits for that report to be completed before it makes its final judgment on the Article. But, in the meantime, Rolling Stone is extremely troubled if it published any inaccuracies in the story told to Ms. Erdely and others by Jackie, and it has taken steps to address those concerns.

That said, we do not agree with the premise of your letter or your client's claim: that because Jackie's account of her gang rape is somehow flawed or false, all references concerning Dean Eramo or UVA are likewise false. That syllogism finds no support in the facts or the law. As you are well aware, certain well-established guideposts inform any libel claim. Challenged statements must be considered in the context in which they appear, not in isolation, and the language at issue is given its natural and reasonably understood meaning, not a strained or twisted variation. Even falsity is not technical, but must be substantial and filtered through the known and accepted relevant facts. Finally, at bottom, any libel inquiry turns on what Rolling Stone knew and believed at the time of publication.[2]

Here, the depiction of Dean Eramo in the Article is nuanced, fair and very well-documented. Over and over, the Article underscores that she is "beloved by survivors" and recognizes that she "surely has among the most difficult jobs at UVA." There is no dispute that Jackie reported a sexual assault involving more than one man to Dean Eramo; her own emails (concerning "these men") and her meeting with Jackie *and* Alex Pinkleton (where Dean Eramo told them that "all the boys involved have graduated") document that. Nor is there any dispute that Dean Eramo's office was aware of, and was looking into, allegations of other sexual assaults at Phi Psi; in fact, as acknowledged by UVA's President and the national spokesperson for Phi Psi, an investigation of the fraternity was commenced immediately following Ms. Erdely's visit to the campus. And Ms. Erdely did not stumble on Jackie's story. She was directed to Jackie by Emily Renda, then working closely with Dean Eramo in the Student Affairs office the—same Emily Renda that included Jackie's account of being "gang-raped" in her Congressional testimony about campus sexual-assault policies. There is no question that both the author and

---

[1] You have asked whether the Columbia Journalism School report will be published in the February issue of Rolling Stone. The Columbia Journalism School is undertaking its review with full independence, and Rolling Stone therefore has not imposed a deadline for its completion. As Rolling Stone has stated publicly—and as has been widely reported—the final report will be published in its entirety on Rolling Stone's website and excerpted in the following issue of the print magazine.

[2] Your client is unquestionably a public figure—she has been the public face of the University on sexual assault issues for years preceding this Article.

DWT 26078411v1 3770077-000050

Rolling Stone had full faith in Jackie's credibility and the accuracy of its Article at the time of publication. In no small measure, Rolling Stone believed in the credibility of Jackie's story **because** it came with the imprimatur of UVA, and of Dean Eramo specifically.[3]

Strangely absent from your letter is any recitation of the facts as known by your client and how those facts, if at all, conflict with the Article. You suggest that Rolling Stone is only interested in "legal posturing" rather than getting to the "right result." Yet, absent concrete evidence and facts supporting a conclusion that the Article includes false and defamatory statements concerning Dean Eramo, Rolling Stone has no basis for reaching the result that you seek. Instead, your letter selects a series of statements from the Article and conclusorily states over and over without any explanation that the Article "defames Dean Eramo." We will address these statements in the order you identify them.

- The subhead of the article plainly does not "accuse" Dean Eramo of "abusing" Jackie. The story includes numerous examples of "abuse" that Jackie and other campus activists faced after reporting and speaking out about their sexual assaults—including being called a "cunt" and hit in the face with a beer bottle. In context, the subhead's referenced "abuse" could not reasonably be ascribed to Dean Eramo. To the contrary, the Article specifically describes Dean Eramo's response to Jackie's report of her assault: she "comforted her, then calmly laid out her options… She assured Jackie there was no pressure—whatever happened next was entirely her choice." It reports that Dean Eramo followed this meeting with a note "thanking Jackie for sharing" recognizing that it was "very difficult" for her, but promising that she would assist "if you decide that you would like to hold these men accountable." No reader of the Article could reasonably conclude that Dean Eramo "abused" Jackie when she reported her assault.

- You contend that Jackie's discredited story renders false "**all** of the subsequent statements in the article regarding Dean Eramo's interactions with Jackie and the steps that Dean Eramo did/did not take with Jackie…" Yet, as noted above, there is no dispute that Jackie reported a sexual assault involving more than one man to Dean Eramo—as confirmed by Dean Eramo's own emails and her meeting with Jackie and Alex Pinkleton. The Article's detailed description of Dean Eramo's response to that report, from the options she presented to the fact that such a report activates a review by UVA's Title IX officer, is not in dispute, and your

<hr>

[3] To her credit, Dean Eramo seemed open to an interview with Ms. Erdely for the Article. But the university administration ultimately intervened, refusing to allow Ms. Erdely to interview Dean Eramo, the head of the UVA Women's Center, and many other university officials. Instead, she was given only a 45-minute interview with the president, flanked by a public-relations representative and a lawyer, wherein the president repeatedly claimed not to know the answer to Ms. Erdely's questions.

letter does not challenge it. Nor is there any dispute that no action was taken by the school based on that report until *after* it was clear that Rolling Stone's article was going to feature Jackie's story. What caused the investigation at that point if the school did not credit her story? Indeed, when the magazine became aware that UVA commenced the investigation of Phi Psi, even if belated, that fact only underscored the magazine's confidence in its reporting.

- In the context of the paragraph where it appears, the reference to Jackie being "discouraged" from "sharing her story" plainly refers to the pushback Jackie faced about her decision to speak to Rolling Stone—not about speaking generally about her experience or reporting her assault. The paragraph begins by stating that Jackie "is worried about what might happen to her once this article comes out," noting that "Jackie fears the backlash could be big," and ends with the observation that "even some of Jackie's closest friends see her going public as tantamount to betrayal." Further, as noted above, the Article makes it clear that Dean Eramo gave Jackie a multitude of options to pursue her claim if she so desired, and told her it was "her choice" about how to proceed. The pressure on various UVA students—including Jackie—not to speak with Rolling Stone is well documented in multiple emails and interviews with sources.

- Your letter next challenges the Article's statement that the UVA administration is "less concerned with protecting students than it is with protecting its own reputation from scandal." Notably, your letter ignores the most important words in this statement—that "***critics say***" the administration was more concerned with protecting its own reputation than protecting students. Rolling Stone's reporting—from the multiple sources that follow this statement—unquestionably supports this assessment of UVA by critics. Nor is there any basis for your strained conclusion that the use of "administration" in the challenged sentence necessarily refers to Dean Eramo. To the contrary, the Article includes an administration response to this challenge by "critics," and it comes not from Dean Eramo but from UVA President Teresa Sullivan. Even assuming *arguendo* that the word "administration" includes Dean Eramo, among other administration officials referenced in the Article, there is copious support in the Article itself—and in the sourcing—that UVA *is* seen as willing to protect its reputation at the expense of victims. To name just a few examples:

  o President Sullivan admitted that not publishing assault statistics might not comport with "best practices";

  o "Stacy," another sexual assault victim, reports that she felt misled by the deans when her attacker was not expelled from campus, and opined that

UVA was "too afraid of negative publicity or getting the pants sued off them";

o Liz Seccuro observes that UVA "thinks they're above the law... they go to such lengths to protect themselves. There's a national conversation about sexual assault, but nothing at UVA is changing;"

o Daniel Carter opines that "UVA and other elite schools tend not to respond well to criticism and sanctify tradition above all else;"

o Wendy Murphy, who has filed Title IX claims against UVA and other schools, notes that "These schools love to pretend they protect the children ... but that's not true: They're interested in the money;"

o Susan Russell states that her daughter's sexual assault was buried in the school's statistics, and that she believed this misdirection is deliberate in order to persuade people that the school is "safe";

o A former UVA dean stated that UVA is "more egregious than most" with respect to handling sexual assault claims; and

o UVA was found in violation of the Clery Act in 2008 after administrators told two female students that they would face expulsion under the honor code if they spoke publicly about their sexual-misconduct hearings, including their displeasure with the way the proceedings were handled.

- Laura Dunn's opinion describes an "alarming trend" on "campuses" at various "schools"; it cannot reasonably be read as a statement about Dean Eramo specifically. And even if it was, this statement is plainly Dunn's non-actionable opinion. There is no way to prove true or false what these "people" were or were not "thinking" or "pretending" to do. Further, Dunn was not alone in her view. Multiple sources reported a belief that an approach which emphasizes compassion and even-handed "choices," wittingly or unwittingly results in victims doing nothing.

- Even if the "rape school" quote was fabricated by Jackie—and, if so, the author and Rolling Stone had no basis to believe that it was—the import of the quote is entirely consistent with other statements in the Article. Not only is it evident that UVA buried statistics and facts about the prevalence of sexual assault on the campus—a practice President Sullivan acknowledged was not in keeping with "best practices"—at least one parent believes that the misdirection is deliberate.

As Susan Russell observes, "When a parent goes to the campus crime log, and they don't see sexual assault, they think the school is safe." The explanation for why UVA buried its sexual assault statistics ascribed to Dean Eramo—"nobody wants to send their daughter to the rape school"—is not substantively different in its meaning.

- It is undisputed that Dean Eramo received an allegation of gang rape from Jackie, and that the university did not take any action to warn the campus in response to this allegation. Based on these facts, the article makes the obvious observation that the "UVA administration" "*presumably* judged there to be no threat to public safety." In fact, it was only after the author visited UVA—and the article's publication was imminent—that someone at the university finally reached out to Phi Psi about sexual allegations and placed them "under investigation." Nor can one reasonably conclude that Dean Eramo is the "instrumentality" for this failure to report sooner. The Article describes a culture of not reporting that is university-wide—not specific to Dean Eramo. And the Article makes clear that complaints submitted to Dean Eramo "activate[] a review by UVA's Title IX officer"—who is *not* Dean Eramo. If anyone at UVA is the "instrumentality" of UVA's failure to report, it is plainly this Title IX officer, who is tasked with reviewing and reporting crime statistics under the Clery Act—not Dean Eramo.

- We assume that you do not dispute the Article's repeated statement that Dean Eramo is "beloved" and "trusted" by students and an "asset to the community," including by Jackie and many of the sexual assault victims who seek her out. But it is also clear from the many sources quoted in Article that the approach taken by Dean Eramo and UVA has resulted in few reports—as UVA admitted, only nine of the 38 students who came to Dean Eramo in the last academic year filed a formal complaint. The Article never says that this is a "deliberate and calculating" approach, as you suggest. Rather, as noted above, it is an opinion, shared by many, that "Advocates who survivors *love* are part of the system that is failing to address sexual violence."

- It was the opinion of campus security expert Daniel Carter, among others, that UVA "should" have investigated Jackie's report of an assault by more than one man, particularly after the school was apprised that there were other assaults at Phi Psi, as documented in emails to the author. Laura Dunn's similar view that the university "should have been taking action" and "could really be sued" is likewise her non-actionable opinion.

- Finally, your letter objects to the "inflammatory" illustration of Dean Eramo that purports to show her smiling and giving a "thumbs up" to a story of sexual

assault. The image is from an actual photograph of Dean Eramo that ran in the student newspaper, and it is used with a caption describing her as the "head of UVA's Sexual Misconduct Board and beloved by students." Nor does it show her giving a "thumbs up" – she is clearly holding a pen, with her thumb resting on the top of the pen.

In sum, Rolling Stone stands by its reporting of the action—or inaction, as it were—by UVA in response to student claims of sexual assault. The magazine remains seriously troubled that its reporting of Jackie's account of her assault was false in any way. But, that very real concern does not create a viable libel claim by Dean Eramo concerning her depiction in the Article. Nor have you provided us with any facts or statements from the Article that otherwise support a claim. Nonetheless, we would be happy to speak with you further concerning your client's concerns. In the meantime, however, Rolling Stone cannot agree to your demands. This letter is not a full recitation of the applicable facts or law, which are expressly reserved.

Sincerely yours,

Elizabeth A. McNamara

cc:     Natalie Krodel, Esq.