**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | | |
|---|---|---|
| **NICOLE P. ERAMO** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:15-cv-00023-GEC** |
| | ) | |
| **ROLLING STONE LLC,** | ) | |
| **SABRINA RUBIN ERDELY, and** | ) | |
| **WENNER MEDIA LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Nicole P. Eramo, through her undersigned counsel, respectfully submits this Statement of Undisputed Facts in Support of Plaintiff's Motion for Partial Summary Judgment.

**I.      Plaintiff Nicole P. Eramo.**

1.      Plaintiff Nicole Eramo is a resident of Charlottesville, Virginia.  (July 1, 2016 Decl. of Nicole Eramo in Supp. of Pl.'s Mot. for Partial Summ. J. ¶ 1 ("Eramo Decl.") (Ex. 1).)

2.      Ms. Eramo has been a salaried employee of the University of Virginia in Charlottesville since October of 1997.  (*Id*. ¶ 3.)

3.      Ms. Eramo is currently employed by the University of Virginia with the title Executive Director of Assessment and Planning.  (*Id*. ¶ 3.)  She has been in that position since March 1, 2016.  (*Id*.)

4.      Prior to March 1, 2016, Ms. Eramo was employed at the University of Virginia as an Associate Dean of Students in the Office of the Dean of Students.  (*Id*. ¶ 4.)

5.      From May 2010 through February 2015, Ms. Eramo's title at the University of Virginia was Associate Dean of Students.  (*Id.*)

6.      At the time the *Rolling Stone* magazine article "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA" (hereinafter, "A Rape on Campus" or "the article") was published in November 2014, Ms. Eramo was one of seven employees in the Dean of Students Office with the title "Associate Dean."  (*Id*. ¶ 5.)  Across all departments, there were dozens of employees of the University of Virginia with the title "Associate Dean" in November 2014.  (*Id.*)

7.      At the time the article was published, Ms. Eramo's job responsibilities included, among other things, coordinating student leadership programming offered by the Office of the Dean of Students; serving on an on-call rotation for the Dean of Students Office to assist callers and walk-in students with a variety of issues such as mental health issues, academic issues, roommate conflicts, and the like; serving as a liaison to the University's student-run Honor Committee; and assisting with prevention programming for sexual violence and hazing.  (*Id*. ¶ 6.)

8.      Another one of Ms. Eramo's primary job responsibilities as an Associate Dean of Students at the time the article was published was doing intake for students who alleged they were victims of sexual misconduct and/or intimate partner violence.  (*Id*. ¶ 7)  In this role, Ms. Eramo's primary duties were to support and comfort the students, assist them in seeking options for medical and/or mental health treatment, to assist them with seeking any necessary housing or academic accommodations that the University could provide, to explain to students their options for pursuing a criminal complaint with the police and/or a sexual misconduct complaint through the University's disciplinary process, and to support and assist students with whichever option(s) they chose to pursue.  (*Id*.)

9. In her role doing intake for students who alleged that they were victims of sexual misconduct, Ms. Eramo was not responsible for receiving formal reports of alleged sexual misconduct. Rather, if a student elected to pursue a formal complaint of sexual misconduct after meeting with Ms. Eramo, the student would typically lodge a formal complaint with Allen Groves, the Dean of Students and then-Deputy Title IX Coordinator for students. At that time the student's case would be turned over to a team of trained investigators who would work to investigate the student's claims. (Eramo Decl. ¶ 8.)

10. In her role doing intake for students who alleged that they were victims of sexual misconduct, Ms. Eramo did not supervise any other employees nor did any employees report to her, and Ms. Eramo was supervised in this role by higher-level administrators such as Dean of Students Allen Groves. (*Id.* ¶¶ 9-10.)

11. In her role doing intake for students who alleged that they were victims of sexual misconduct, Ms. Eramo did not have decision-making authority over University policy with respect to student reports of sexual misconduct, nor did she ever personally author any of the University's policies on this subject matter. (*Id.* ¶ 11.) The University's policies and procedures for responding to reports of sexual misconduct were guided by the requirements of federal law and regulations, and were ultimately determined by higher-level administrators such as the Office of the President and the General Counsel. (*Id.*)

12. During her time as an Associate Dean of Students, Ms. Eramo gave a small number of interviews and quotes to certain media outlets — the vast majority of which were to the local University of Virginia student newspaper, *The Cavalier Daily* — regarding the University's sexual misconduct policies and sexual violence prevention initiatives. (Feb. 5, 2016 Pl.'s Resps. to Defs.' Interrogs., Resp. to Interrog. No. 2 (Ex. 2).)

13. Due to restrictions of federal law, in particular the Family Educational Rights Privacy Act ("FERPA"), Ms. Eramo and other school administrators are not permitted to speak with reporters and the media regarding the particulars of any student's sexual assault allegations or reports unless that student — or all students in cases where records involve multiple students — provides the University with a signed FERPA waiver. (Apr. 27, 2016 Deposition of Allen Groves Vol. II at 288:15-289:16 ("Groves Dep. Vol. II") (Ex. 3); Eramo Decl. ¶ 14 (Ex. 1).)

14. Prior to the publication of "A Rape on Campus" Ms. Eramo had never discussed specific details regarding any student's sexual assault allegations with the media, consistent with federal law that prohibited her from doing so. (Eramo Decl. ¶ 15 (Ex. 1).)

15. Prior to the publication of "A Rape on Campus," Plaintiff had never discussed any details regarding "Jackie's" sexual assault allegations with the media, consistent with federal law that prohibited her from doing so. (*Id.* ¶ 16.)

16. Prior to the publication of "A Rape on Campus," Defendants were aware that due to legal restrictions, Ms. Eramo was not permitted to speak with *Rolling Stone* magazine or any other journalists regarding the details of "Jackie's" or any other student's sexual assault allegations and interactions with Plaintiff. (S. Erdely Reporting Notes, RS004072-4502, at RS004326 (Ex. 4);[1] May 12, 2016 Deposition of S. Erdely at 80:15-81:15, 170:11-171:19 ("Erdely Dep.") (Ex. 5); Apr. 21, 2016 Deposition of E. Garber-Paul at 240:10-23, 313:3-13 ("Garber-Paul Dep." (Ex. 6); Nov. 13, 2014 Email from Liz Garber-Paul to Sabrina Erdely, RS013300-13307 (Ex. 7); Oct. 9, 2014 Email from Anthony de Bruyn to Sabrina Erdely, RS016682-16683 (Ex. 8).)

---

[1] Erdely's Reporting Notes constitute Erdely's typed notes that she took during her interviews with various persons and contain numerous uncorrected typographical/spelling errors. For ease of reading, we have corrected those purely typographical/spelling errors without including brackets around corrected spellings when we have quoted from those notes herein; no substance or grammatical errors have been changed without indication.

17.     Ms. Eramo's supervisors at the University of Virginia did not permit an interview between Ms. Eramo and Erdely, in part because Ms. Eramo could not say anything about specific student cases or allegations due to student privacy.  (Apr. 28, 2016 Deposition of Patricia Lampkin at 8:22-9:4; 32:5-33:21 ("Lampkin Dep.") (Ex. 9).)

18.     When told by a University of Virginia public relations official that Ms. Eramo could not talk about specific cases or allegations because of student privacy, Erdely specifically raised the possibility of her obtaining a waiver from the student to allow the University and Ms. Eramo to discuss such issues.  (S. Erdely Reporting Notes, RS004072-4502, at RS004326 (Ex. 4.)  However, Erdely never attempted to obtain such a waiver from Jackie and never presented one to UVA.  (Erdely Dep. at 169:23-172:11 (Ex. 5).)

19.     Immediately following the publication of "A Rape on Campus," Ms. Eramo was unable to publicly defend her handling of Jackie's allegations in the news media because of the legal restrictions that prevented her from discussing her interactions with Jackie.  (Eramo Decl. ¶ 17 (Ex. 1).)

20.     At the time the article was published, Ms. Eramo was aware that the alleged assault Jackie had described to her differed materially from the assault described in the article, that Jackie had not identified any of the alleged assailants to Ms. Eramo, and that Jackie did not identify Phi Kappa Psi as the alleged location of her sexual assault when she originally met with Ms. Eramo.  (*Id.* ¶ 18.)  Because Ms. Eramo was not permitted to speak publicly about her interactions with Jackie, these facts did not become public until they were released by the Charlottesville Police Department some four months after the article was published.  (*Id.*)

21.     At the time the article was published, Ms. Eramo was aware that she had arranged for and attended multiple meetings between Jackie and the Charlottesville Police Department in

the Spring of 2014 in an effort to have Jackie's sexual assault allegations investigated by law enforcement, but that Jackie refused to disclose any details regarding her alleged assault to the police or to cooperate with an investigation. (*Id.* ¶ 21.) Because Ms. Eramo was not permitted to speak publicly about her interactions with Jackie, these facts did not become public until they were released by the Charlottesville Police Department some four months after the article was published. (*Id.* ¶ 23.)

## II.  Defendants Publish "A Rape on Campus."

22.    Defendants Wenner Media LLC and Rolling Stone LLC (hereinafter, "*Rolling Stone*") jointly publish the publication known as *Rolling Stone* magazine.  (May 12, 2015 Compl. ¶¶ 18, 20 [Dkts. 14-1, 14-2]; July 16, 2015 Answer ¶¶ 18, 20 [Dkt. 27].)

23.    Defendants published "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA" in Issue 1223 of *Rolling Stone* magazine, dated December 4, 2014.  (Answer ¶¶ 1, 18.)

24.    *Rolling Stone's* then-Managing Editor, Will Dana, testified that the date of December 4, 2014 on the print edition of the magazine represents the date the edition is to be removed from newsstands, and that his best estimate was that the print edition of the magazine was available at newsstands on November 19, 2014.  (Mar. 15, 2016 Deposition of William Dana at 44:12-45:13 ("Dana Dep.") (Ex. 10).)

25.    *Rolling Stone* also published "A Rape on Campus" online at www.rollingstone.com on November 19, 2014.  (Compl. ¶ 45; Answer ¶ 45.)

26.    "A Rape on Campus" was authored by *Rolling Stone* Contributing Editor Sabrina Rubin Erdely.  (Sabrina Rubin Erdely, *A Rape on Campus,* ROLLING STONE MAGAZINE (Dec. 5, 2014), RS001070-79 ("Original Article") (Ex. 11); Erdely Dep. at 6:4-11 (Ex. 5); Aug. 26, 2015 Wenner Media LLC's Resps. to Pl.'s Interrogs., Interrog. No. 1 (Ex. 12).)

27.     The primary editor for the article was Sean Woods, the Deputy Managing Editor for *Rolling Stone*.  (Aug. 26, 2015 Wenner Media LLC's Resps. to Pl.'s Interrogs., Interrog. No. 1 (Ex. 12); Apr. 22, 2016 Deposition of Sean Woods at 10:19-11:6 ("Woods Dep.") (Ex. 13).)

28.     *Rolling Stone's* Managing Editor at the time it published "A Rape on Campus" was Will Dana.  (Dana Dep. at 18:9-20:22 (Ex. 10); Aug. 26, 2015 Wenner Media LLC's Resps. to Pl.'s Interrogs., Interrog. No. 1 (Ex. 12).)

29.     Sabrina Rubin Erdely, the author of "A Rape on Campus," originally intended for the article to be "situated at a college that had already been in the media as being a fairly egregious example of sexual assault and mishandling sexual assault."  (Erdely Dep. at 15:4-14 (Ex. 5).)

30.     However, "as [her] reporting evolved, [she] decided to steer away from campuses that had been in the media as being pointed to as exampled of having horrendous sexual assault climates, and [she] decided to steer toward college campuses that seemed more typical of a college campus environment."  (*Id*. at 15:15-16:13.)

31.     The introductory summary paragraph on the first page of the article — which is called the "deck" — states in large, bolded type:

> **Jackie was just starting her freshman year at the University of Virginia when she was brutally assaulted by seven men at a frat party.  When she tried to hold them accountable, a whole new kind of abuse began.**

(Original Article (Ex. 11); Garber-Paul Dep. at 128:18-24 (Ex. 6).)

32.     The article opens with a graphic description of "Jackie's" alleged gang rape at the University of Virginia's Phi Kappa Psi fraternity house on September 28, 2012.  (Original Article (Ex. 11); Garber-Paul Dep. at 246:11-17 (Ex. 6).)

33.     The article states:

SIPPING FROM A PLASTIC CUP, JACKIE GRIMACED, THEN discreetly spilled her spiked punch onto the sludgy fraternity-house floor. The University of Virginia freshman wasn't a drinker, but she didn't want to seem like a goody-goody at her very first frat party – and she especially wanted to impress her date, the handsome Phi Kappa Psi brother who'd brought her here. Jackie was sober but giddy with discovery as she looked around the room crammed with rowdy strangers guzzling beer and dancing to loud music. She smiled at her date, whom we'll call Drew, a good-looking junior — or in UVA parlance, a third-year — and he smiled enticingly back.

"Want to go upstairs, where its quieter?" Drew shouted into her ear, and Jackie's heart quickened. She took his hand as he threaded them out of the crowded room and up a staircase.

Four weeks into UVA's 2012 school year, 18-year-old Jackie was crushing it at college. A chatty, straight-A achiever from a rural Virginia town, she'd initially been intimidated by UVA's aura of preppy success, where throngs of toned, tanned, and overwhelmingly blonde students fanned across a landscape of neoclassical brick buildings, hurrying to classes, clubs, sports, internships, part-time jobs, volunteer work and parties; Jackie's orientation leader had warned her that UVA students' schedules were so packed that "no one has time to date – people just hook up." But despite her reservations, Jackie had flung herself into campus life, attending events, joining clubs, making friends and now, being asked on an actual date. She and Drew had met while working lifeguard shifts together at the university pool, and Jackie had been floored by Drew's invitation to dinner, followed by a "date function" at his fraternity, Phi Kappa Psi. The "upper tier" frat had a reputation of tremendous wealth, and its imposingly large house overlooked a vast manicured field, giving "Phi Psi" the undisputed best real estate along UVA's fraternity row known as Rugby Road.

Jackie had taken three hours getting ready, straightening her long, dark, wavy hair. She'd congratulated herself on her choice of a tasteful red dress with a high neckline. Now, climbing the frat-house stairs with Drew, Jackie felt excited. Drew ushered Jackie into a bedroom, shutting the door behind them. The room was pitch-black inside. Jackie blindly turned toward Drew, uttering his name. At that same moment, she says, she detected movement in the room – and felt someone bump into her. Jackie began to scream.

"Shut *up*," she heard a man's voice say as a body barreled into her, tripping her backward and sending both of them crashing through a low glass table. There was a heavy person on top of her, spreading open her thighs, and another person kneeling on her hair, hands pinning down her arms, sharp shards digging into her back, and excited male voices rising all around her. When yet another hand clamped over her mouth, Jackie bit it, and the hand became a fist that punched her in the face. The men surrounding her began to laugh. For a hopeful moment Jackie wondered if this wasn't some collegiate prank. Perhaps at any second someone would flick on the lights and they'd return to the party.

"Grab its motherfucking leg," she heard a voice say. And that's when Jackie knew she was going to be raped.

She remembers every moment of the next three hours of agony, during which, she says, seven men took turns raping her, while two more – her date, Drew, and another man – gave instruction and encouragement. She remembers how the spectators swigged beers, and how they called each other nicknames like Armpit and Blanket. She remembers the men's heft and their sour reek of alcohol mixed with the pungency of marijuana. Most of all, Jackie remembers the pain and the pounding that went on and on.

As the last man sank onto her, Jackie was startled to recognize him: He attended her tiny anthropology discussion group. He looked like he was going to cry or puke as he told the crowd he couldn't get it up. "Pussy!" the other men jeered. "What, she's not hot enough for you?" Then they egged him on: "Don't you want to be a brother?" "We all had to do it, so you do, too." Someone handed her classmate a beer bottle. Jackie stared at the young man, silently begging him not to go through with it. And as he shoved the bottle into her, Jackie fell into a stupor, mentally untethering from the brutal tableau, her mind leaving behind the bleeding body under assault on the floor.

When Jackie came to, she was alone. It was after 3 a.m. She painfully rose from the floor and ran shoeless from the room. She emerged to discover the Phi Psi party still surreally under way, but if anyone noticed the barefoot, disheveled girl hurrying down a side staircase, face beaten, dress splattered with blood, they said nothing. Disoriented, Jackie burst out a side door, realized she was lost, and dialed a friend, screaming, "Something bad happened. I need you to come and find me!" Minutes later, her three best friends on campus – two boys and a girl (whose names are changed) – arrived to find Jackie on a nearby street corner, shaking. "What did they do to you? What did they make you do?" Jackie recalls her friend Randall demanding. Jackie shook her head and began to cry. The group looked at one another in a panic. They all knew about Jackie's date; the Phi Kappa Psi house loomed behind them. "We have to get her to the hospital," Randall said.

Their other two friends, however, weren't convinced. "Is that such a good idea?" she recalls Cindy asking. "Her reputation will be *shot* for the next four years." Andy seconded the opinion, adding that since he and Randall both planned to rush fraternities, they ought to think this through. The three friends launched into a heated discussion about the social price of reporting Jackie's rape, while Jackie stood behind them, mute in her bloody dress, wishing only to go back to her dorm room and fall into a deep, forgetful sleep. Detached, Jackie listened as Cindy prevailed over the group: "She's gonna be the girl who cried 'rape,' and we'll never be allowed into any frat party again."

TWO YEARS LATER, JACKIE, NOW a third-year, is worried about what might happen to her once this article comes out. Greek life is huge at UVA, with nearly one-third of undergrads belonging to a fraternity or sorority, so Jackie fears the backlash could be big – a "shitshow" predicted by her now former-friend Randall, who, citing his loyalty to his own frat, declined to be interviewed. But her concerns go beyond taking on her alleged assailants and their fraternity. Lots of people have discouraged her from sharing her story, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang rape

allegations more than a year ago. On this deeply loyal campus, even some of Jackie's closest friends see her going public as tantamount to betrayal.

"One of my roommates said, 'Do you want to be responsible for something that's gonna paint UVA in a bad light?'" says Jackie, poking at a vegan burger at a restaurant on the Corner, UVA's popular retail strip. "But I said, 'UVA has flown under the radar for so long, *someone* has to say something about it, or else its gonna be this system that keeps perpetuating!'" Jackie frowns. "My friend just said, 'You have to remember where your loyalty lies.'"

From reading headlines today, one might think colleges have suddenly become hotbeds of protest by celebrated anti-rape activists. But like most colleges across America, genteel University of Virginia has no radical feminist culture seeking to upend the patriarchy. There are no red-tape-wearing protests like at Harvard, no "sex-positive" clubs promoting the female orgasm like at Yale, no mattress-hauling performance artists like at Columbia, and certainly no SlutWalks. UVA isn't an edgy or progressive campus by any stretch. The pinnacle of its polite activism is its annual Take Back the Night vigil, which on this campus of 21,000 students attracts an audience of less than 500 souls. But the dearth of attention isn't because rape doesn't happen in Charlottesville. Its because at UVA, rapes are kept quiet, both by students – who brush off sexual assaults as regrettable but inevitable casualties of their cherished party culture – and by an administration that critics say is less concerned with protecting students than it is with protecting its own reputation from scandal.

…

AT THE END OF HER FRESHMAN year, Jackie found herself in the Peabody Hall office of Dean Nicole Eramo, head of UVA's Sexual Misconduct Board. This was a big step for Jackie. She still hadn't even managed to tell her own mother exactly what had happened at Phi Kappa Psi. Upon returning to school for her second semester, Jackie had tried to put on a brave face and simply move forward, but instead continued falling apart. Though a psychiatrist had Jackie on Wellbutrin, she had remained depressed, and couldn't concentrate, and spent the semester so frightened and withdrawn that her academic dean finally called her in to discuss why she'd failed three classes. In his office, with her mother beside her, she'd burst into tears, and her mother explained she'd had a "bad experience" at a party. He'd blanched and given Jackie the e-mail for Dean Eramo.

If Dean Eramo was surprised at Jackie's story of gang rape, it didn't show. A short woman with curly dark hair and a no-nonsense demeanor, Eramo surely has one of the most difficult jobs at UVA. As the intake person on behalf of the university for all sexual-assault complaints since 2006, it's her job to deal with a parade of sobbing students trekking in and out of her office. (UVA declined to make Eramo available for comment.) A UVA alum herself, Eramo is beloved by survivors, who consider her a friend and confidante – even though, as only a few students are aware, her office isn't a confidential space at all. Each time a new complaint comes through Eramo's office, it activates a review by UVA's Title IX officer, is included in UVA's tally of federally mandated Clery Act crime

statistics, and Eramo may, at her discretion, reveal details of her conversation with the student to other administrators. (Jackie was mortified to learn later that Eramo had shared her identity with another UVA administrator.) After all, a dean's foremost priority is the overall safety of the campus.

When Jackie finished talking, Eramo comforted her, then calmly laid out her options. If Jackie wished, she could file a criminal complaint with police. Or, if Jackie preferred to keep the matter within the university, she had two choices. She could file a complaint with the school's Sexual Misconduct Board, to be decided in a "formal resolution" with a jury of students and faculty, and a dean as judge. Or Jackie could choose an "informal resolution," in which Jackie could simply face her attackers in Eramo's presence and tell them how she felt; Eramo could then issue a directive to the men, such as suggesting counseling. Eramo presented each option to Jackie neutrally, giving each equal weight. She assured Jackie there was no pressure – whatever happened next was her choice.

Like many schools, UVA has taken to emphasizing that in matters of sexual assault, it caters to victim choice. "If students feel that we are forcing them into a criminal or disciplinary process that they don't want to be part of, frankly, we'd be concerned that we would get fewer reports," says associate VP for student affairs Susan Davis. Which in theory makes sense: Being forced into an unwanted choice is a sensitive point for the victims. But in practice, that utter lack of guidance can be counterproductive to a 19-year-old so traumatized as Jackie was that she was contemplating suicide. Setting aside for a moment the absurdity of a school officering to handle the investigation and adjudication of a felony sex crime — something Title IX requires, but which no university on Earth is equipped to do — the sheer menu of choices, paired with the reassurance that any choice is the right one, often has the end result of coddling the victim into doing nothing.

"This is an alarming trend that I'm seeing on campus," says Laura Dunn of the advocacy group SurvJustice. "Schools are assigning people to victims who are pretending, or even thinking, they're on the victim's side, when they're actually discouraging and silencing them. Advocates who survivors *love* are part of the system that is that is failing to address sexual violence."

Absent much guidance, Jackie would eventually wonder how other student victims handled her situation. But when she clicked around on UVA's website, she found no answers. All she found were the UVA police's crime logs, which the university makes available online, but which are mostly a list of bike theft, vandalism, and public drunkenness complaints. That's because only a fraction of UVA students who report sex crimes turn to campus police. The rest go to Dean Eramo's office, to Charlottesville police or the county sheriff's office. Yet when RS asked UVA for its statistics, the press office repeatedly referred us to the UVA police crime logs. UVA parent Susan Russell believes that misdirection is deliberate. "When a parent goes to the campus crime log, and they don't see a sexual assault, they think the school is safe," Russel says, adding that her daughter's 2004 sexual assault once appeared in the log mislabeled "Suspicious Circumstances."

Eventually, UVA furnished ROLLING STONE with some of its most recent tally: In the last academic year, 38 students went to Eramo about a sexual assault, up from about 20 students three years ago. However, of those 38, only nine resulted in "complaints"; the other 29 students evaporated. Of those nine complaints, four resulted in Sexual Misconduct Board hearings. UVA wasn't willing to disclose their outcomes, citing privacy. Like most colleges, sexual assault proceedings at UVA unfold in total secrecy. Asked why UVA doesn't publish all its data, President Sullivan explains that it might not be in keeping with "best practices" and thus may inadvertently discourage reporting. Jackie got a different explanation when she'd asked Dean Eramo the same question. She says Eramo answered wryly, "Because nobody wants to send their daughter to the rape school."

For now, however, Jackie left her first meeting with Eramo feeling better for having unburdened herself, and with the dean's assurance that nothing would be done without her say-so. Eramo e-mailed a follow-up note thanking Jackie for sharing, saying, "I could tell that was very difficult for you," and restating that while she respected Jackie's wish not to file a report, she'd be happy to assist "if you decide that you would like to hold these men accountable." In the meantime, having presumably judged there to be no threat to public safety, the UVA administration took no action to warn the campus that an allegation of gang rape had been made against an active fraternity.

…

'WHEN DID IT HAPPEN TO you?" Emily Renda asked Jackie as they sat for coffee at the outdoor Downtown Mall in the fall of 2013.
"September 28th," Jackie whispered.
"October 7th, 2010," Emily responded, not breaking her gaze, and Jackie knew she'd found a friend. As Jackie had begun her second year at UVA, she'd continued struggling. Dean Eramo had connected her with Emily, a fourth-year who'd become active in One Less, a student-run sexual-assault education organization that doubles as a support group. Sitting with Emily, Jackie poured out her story, wiping her eyes with napkins as she confided to Emily that she felt like a broken person. "You're not broken," Emily told her. "They're the ones who are fucked up, and what happened to you wasn't your fault." Jackie was floored with gratitude, desperate to hear those words at last – and from someone who knew. Emily invited her to a meeting of One Less, thus introducing her to UVA's true secret society.

In its weekly meetings, the 45-member group would discuss how to foster dialogue on campus. Afterward they'd splinter off and share stories of sexual assault, each tale different and yet very much the same. Many took place on tipsy nights with men who refused to stop; some were of sex while blackout drunk; rarer stories involved violence, though none so extreme as Jackie's. But no matter the circumstances, their peers' reactions were largely the same: Assaults were brushed off, with attackers defended ("He'd never do anything like that"), the victim questioned ("Are you sure?"). After feeling isolated for more than a

year, Jackie was astonished at how much she and this sisterhood had in common, including the fact that a surprising number hadn't pursued any form of complaint. Although many had contacted Dean Eramo, whom they laud as their best advocate and den mother – Jackie calls her "an asset to the community" – few ever filed reports with UVA or with police. Instead, basking in safety of one another's company, the members of One Less applauded the brave few who chose to take action, but mostly affirmed each other's choices not to report, in an echo of their university's approach. So profound was the students' faith in its administration that although they were appalled by Jackie's story, no one voiced questions about UVA's strategy of doing nothing to warn the campus of gang-rape allegations against a fraternity that still held parties and was rushing a new pledge class.

…

But payback for being so public on a campus accustomed to silence was swift. This past spring, in separate incidents, both Emily Renda and Jackie were harassed outside bars on the Corner by men who recognized them from presentations and called them "cunt" and "feminazi bitch." One flung a bottle at Jackie that broke on the side of her face, leaving a blood-red bruise around her eye.

She e-mailed Eramo so they could discuss the attack – and discuss another matter, too, which was troubling Jackie a great deal. Through her ever-expanding network, Jackie had come across something deeply disturbing: two other young women who, she says, confided that they, too, had recently been Phi Kappa Psi gang rape victims.

A BRUISE STILL MOTTLING HER face, Jackie sat in Dean Eramo's office in May 2014 and told her about the two others. One, she says, is a 2013 graduate, who'd told Jackie that she'd been gang-raped as a freshman at the Phi Psi house. The other was a first-year whose worried friends had come home wearing no pants. Jackie said the girl told her she'd been assaulted by four men in a Phi Psi bathroom while a fifth watched. (Neither woman was willing to talk to RS.)

As Jackie wrapped up her story, she was disappointed by Eramo's nonreaction. She'd expected shock, disgust, horror. For months, Jackie had been assuaging her despair by throwing herself into peer education, but there was no denying her helplessness when she thought about Phi Psi, or about her own alleged assailants still walking the grounds. She'd recently been aghast to bump into Drew, who greeted her with friendly nonchalance. "For a whole year, I thought about how he had ruined my life, and how he is the worst human being ever," Jackie says. "And then I saw him and I couldn't say anything."

"You look different," Drew told Jackie while she stared back at him in fear, and he was right: Since arriving at UVA, Jackie had gained 25 pounds from antidepressants and lack of exercise. That interaction would render her too depressed to leave her room for days. Of all her assailants, Drew was the one she wanted to see held accountable – but with Drew about to graduate, he was going

to get away with it.  Because, as she miserably reminded Eramo in her office, she didn't feel ready to file a complaint.  Eramo, as always, understood.

　　　　Given the swirl of gang-rape allegations Eramo had now heard against one of UVA's oldest and most powerful fraternities – founded in 1853, its distinguished chapter members have included President Woodrow Wilson – the school may have wondered about its responsibilities to the rest of the campus. Experts apprised of the situation by RS agreed that despite the absence of an official report, Jackie's passing along two other allegations should compel the school to take action out of regard for campus safety.  "That fact that they already had that first victim, they should have been taking action," says SurvJustice's Laura Dunn.  "That school could really be sued."

(Original Article (Ex. 11).)

34.　　The supposed quote from Ms. Eramo calling UVA "the rape school" was also included as a pull-quote in the article, in large, bolded text that stated:

**Jackie says when she asked why UVA's rape states were hard to find, the dean said, "Because nobody wants to send their daughter to the rape school."**

(*Id.*)

35.　　The article also included a large "illustration" of Ms. Eramo that an illustrator hired by *Rolling Stone* created by using a real photograph of Ms. Eramo giving a lecture. (*Id.*; (Lecture Photo, RS002308 (Ex. 14); May 13, 2016 Deposition of John Ritter at 17:16-23, 18:20-20:10, 58:3-67:11 ("Ritter Dep.") (Ex. 15).)

36.　　The document attached as Exhibit 14 is the original photograph of Ms. Eramo that illustrator John Ritter used to create the "illustration" that appeared in the article:



(Ritter Dep. at 57:2-67:11 (Ex. 15).)

37.     The "illustration" of the photograph appeared on page 74 of the print version of the article.  The caption accompanying the photo illustration of Ms. Eramo in the article asks, "Where's the Justice?"



(Original Article at RS001076 (Ex. 11).)

38.    In a press release issued contemporaneously with the publication of the article, *Rolling Stone* described the article to other media outlets.   (Woods Dep. at 175:4-176:25 (Ex. 13); *Rolling Stone* Press Release, RS008128-29 (Ex. 16).)

39.    The *Rolling Stone* press release said:



**Rolling Stone: A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA**

The new issue of *Rolling Stone* features a chilling account of rape at the University of Virginia campus. It tells the story of "Jackie," who was just starting her freshman year at UVA when she was brutally assaulted by seven men at a frat party. When Jackie tried to hold the men accountable, she was horrified to learn how the administration largely overlooks victims of sexual assault...and how the abusers keep getting away with their crimes.

The article was written by contributing editor Sabrina Rubin Erdely. Erdely sheds light on UVA's long history of basically letting sexual abuse go unpunished – and how victims have been discouraged from pressing charges.

The full story is on RollingStone.com: http://www.rollingstone.com/culture/features/a-rape-on-campus-20141119

(*Id.*)

40.    In an October 1, 2014 email to *Rolling Stone* magazine photo editor Sasha Lecca, author Sabrina Rubin Erdely described the article as "a story about how rape plays out against the culture at the University of Virginia….   Where the main narrative is about a girl who says she was gang raped at a fraternity and the school has done nothing….   The theme will be about the culture of inaction and silence at UVA — both from the students, who want to ignore sexual assaults, because it spoils the giant party of college, and also because of some demented loyalty to the institution and its image of perfection; and from the administration, who'll do anything to avoid scandal."

| From: | Sabrina Rubin Erdely <sabrina@sabrinaerdely.com> |
| Sent: | Wednesday, October 01, 2014 8:47 PM |
| To: | Sacha Lecca |
| Subject: | Re: College rape |

Hi Sacha! Yes, I'm doing a story about how rape plays out against the culture of University of Virginia. It has turned into a story like I truly didn't expect, very dark (surprise!) where the main narrative is about a girl who says she was gang raped at a fraternity, and the school has done nothing. In fact, I've found that the school is actually aware of 2 other recent allegations of gang rape by this fraternity (!!) and has done nothing about it. I'm interviewing the president tomorrow and I predict it will be rough.

The theme will be about the culture of inaction and silence at UVA – both from the students, who want to ignore sexual assaults, because it spoils the giant party of college, and also because out of some demented loyalty to the institution and its image of perfection; and from the administration, who'll do anything to avoid scandal.

Photos of people will be hard. My main subject definitely doesn't want her picture to appear, and everyone is freaking out about whether they even want their names used. The fraternity is Phi Kappa Psi, and they have an impressive looking house – I snapped a photo of it from the outside, which I'll send in a moment. There's a young activist at UVA named Emily Renda who might be OK with you using her picture, not sure (and I'm not sure how big a role she'll play in my story). I also interviewed a woman who was gang-raped at the same fraternity back in 1984, Liz Seccuro, whom I'll mention, and who I'm sure would be fine with us using her image. I also have some documents from Title IX complaints/lawsuits against UVA if that's helpful.

(Oct. 1, 2014 Email from Sabrina Rubin Erdely to Sacha Lecca, RS018873 (Ex. 17); *see also* Erdely Dep. at 200:21-201:18 (Ex. 5).)

41.    According to Erdely, *Rolling Stone's* "essential point" in telling Jackie's narrative was that "A young woman suffered a horrific crime at a party and a prestigious university reacted with indifference to her claim." (Erdely Dep. at 295:3-19 (Ex. 5); Erdely Statement Draft, RS002176-79 (Ex. 18).)

42.    Other than Ms. Eramo, the article mentions only one other UVA administrator or member of the administration that interacted with Jackie in any way. (Original Article (Ex. 11).) The article states that an unnamed "academic dean" called Jackie in at the end of her freshman year, and that this unnamed dean's involvement was limited to putting Jackie in touch with Ms. Eramo:

> Upon returning to school for her second semester, Jackie had tried to put on a brave face and simply move forward, but instead continued falling apart. Though a psychiatrist had put Jackie on Wellbutrin, she had remained depressed, couldn't concentrate, and spent the semester so frightened and withdrawn that her academic dean finally called her in to discuss why she'd failed three classes. In

his office, with her mother beside her, she'd burst into tears, and her mother explained she'd had a "bad experience" at a party. He'd blanched and given Jackie the e-mail for Dean Eramo.

(*Id.*)

43.     Other than this brief reference to a meeting with an unnamed "academic dean" to discuss Jackie's failing grades, the article does not identify any other UVA administrator or member of the UVA administration that had any interaction with Jackie other than Ms. Eramo. (*See generally id.*)

44.     *Rolling Stone's* Deputy Managing Editor, Sean Woods, was unable to identify any other member of the UVA administration that Jackie interacted with other than Ms. Eramo. (Woods Dep. at 192:3-9 (Ex. 13).)  The only person in that UVA administration that he is aware of that interacted with Jackie regarding her alleged sexual assault was Ms. Eramo. (*Id*. at 227:8-15.)

45.     The article refers to Plaintiff by name, as "Nicole Eramo" or "Dean Eramo," thirty (30) times. (*See generally* Original Article (Ex. 11).)

46.     The article explicitly references Ms. Eramo by the title "Dean" an additional three times. (*Id*. at RS001072 ("Lot's of people have discouraged her from sharing her story, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang-rape allegations more than a year ago."); *id*. at RS001076 ("(Jackie was mortified to learn later that Eramo had shared her identity with another UVA administrator.)  After all, a dean's foremost priority is the overall safety of the campus."); *id*. at RS001077 ("Jackie says when she asked why UVA's rape stats were hard to find, the dean said, 'Because nobody wants to send their daughter to the rape school.'").)

47.     Elizabeth Garber-Paul, the *Rolling Stone* fact-checker for the article, acknowledged that the statement in the article about "the trusted UVA dean to whom Jackie

reported her gang rape allegations more than a year ago" referred to Ms. Eramo. (Garber-Paul Dep. at 159:8-10 (Ex. 6).)

48.     Sara Surface, a University of Virginia student activist who was interviewed by Sabrina Rubin Erdey, knew both Jackie and Ms. Eramo prior to the publication of the article. (Mar. 23, 2016 Deposition of Sara Surface at 54:12-17, 35:10-24, 15:11-22 ("Surface Dep.") (Ex. 19).) Ms. Surface understood the statement, "When she tried to hold them accountable, a whole new kind of abuse began," to refer to Ms. Eramo, and further testified that she understood "this depiction of Dean Eramo" as "suggesting that essentially Dean Eramo's actions are as bad as seven men gang raping [Jackie], which I think is ludicrous." (*Id*. at 119:20-120:20.)

49.     Ms. Surface understood the statement, "When she tried to hold them accountable, a whole new kind of abuse began," to refer to Ms. Eramo because it could only plausibly refer to Jackie's interactions with Ms. Eramo as described in the article, particularly because the article does not state or imply that Jackie met with the police or any other University of Virginia administrators besides Ms. Eramo with regard to pursuing a complaint over her claimed sexual assault. (June 30, 2016 Decl. of Sara Surface in Supp. of Pl. Nicole P. Eramo's Mot. for Partial Summ. J. ¶¶ 1-8 ("Surface Decl.") (Ex. 20).)

50.     Laura Casteen, a colleague of Ms. Eramo's who has known Ms. Eramo since 1999, read the article and understood the statement in the article "[w]hen she [Jackie] tried to hold them accountable, a whole new kind of abuse began" to refer to Ms. Eramo. (June 30, 2016 Decl. of Laura Casteen in Supp. of Pl. Nicole P. Eramo's Mot. for Partial Summ. J. ¶¶ 1-7 ("Casteen Decl.") (Ex. 21).) According to Ms. Casteen, "the conclusion that this statement refers to Nicole Eramo abusing Jackie is the only rational inference that I can draw from this statement" and "[t]he use of the phrase, '[w]hen she tried to hold them accountable' in particular

could only be plausibly read to refer to Jackie's interactions with Nicole Eramo as described in the article." (*Id.* ¶¶ 7-8.) Ms. Casteen explained the reason for this conclusion is that "the article does not refer or allude to any attempts by Jackie to hold her alleged perpetrators 'accountable' for her alleged sexual assault other than meeting with Nicole Eramo," and "[t]he article does not state or suggest that Jackie ever met with the police, nor does it state or suggest that Jackie interacted with any other University of Virginia administrators regarding her alleged sexual assault, other than a brief reference to an unnamed 'academic dean' whose sole role was described as referring Jackie to Nicole Eramo." (*Id.* ¶ 8.)

51. The print version of Rolling Stone in which "A Rape on Campus" appeared had a circulation of 1,420,059, of which 67,860 were newsstand sales. (Aug. 26, 2015 Wenner Media LLC's Resps. to Pl.'s 1st Interrogs., Resp. to Interrog. No. 9 (Ex. 12).)

52. The online version of the article on Rolling Stone's website received 2,775,904 unique visitors between November 19, 2014 and April 5, 2015. (*Id.*)

**III. Erdely Had Subjective Knowledge That Ms. Eramo Was Beloved By Survivors And Encouraged Survivors To Seek Punitive Action Against Their Perpetrators.**

53. In the entirety of her reporting, Erdely never met a sexual assault survivor who spoke negatively about Ms. Eramo or who suggested that Ms. Eramo discouraged her from reporting a sexual assault or discouraged her from seeking punitive action against the perpetrator. (*See generally* Erdely Reporting Notes at RS004072-4502 (Ex. 4).)

54. Erdely admitted numerous times throughout her reporting that she understood that Ms. Eramo is beloved by survivors. For example, during her interview with UVA President Sullivan, Erdely said, "now I have to say all the students I've talked to, these girls love Dean Eramo. … They think she's the greatest person ever. They think of her as a friend and a confidant." (*Id.* at RS004450.)

55.     Emily Renda, an activist in UVA's sexual assault survivor community, told Erdely that Ms. Eramo is "my favorite human being on the planet" for whom she "ha[s] so much respect" and "appreciat[ion]." (*Id*. at RS004335.)

56.     Two fraternity brothers at UVA who are active in the sexual assault survivor community also told Erdely that they have immense respect for Dean Eramo. Erdely wrote of her interview with these men that they went "out of their way to tell [her] how impressed they are with Dean Eramo, like everyone else." (*Id*. at RS004373.)

57.     A sexual assault victim who Erdely referred to by the pseudonym "Stacy" told Erdely that she's had a lot of "support" from and "good experiences" with Dean of Students' Office. (*Id*. at RS00490.)

58.     Even Jackie repeatedly told Erdely that Jackie loves Ms. Eramo. Jackie told Erdely this during a July 14, 2014 interview about her first meeting with Ms. Eramo, "so I made a meeting with her for the end of that semester. I love her. I think she's fantastic." (*Id*. at RS004165.) Erdely confirmed during her deposition that Jackie told her this. (Erdely Dep. at 62:16-63:2 (Ex. 5).)

59.     Jackie reiterated that sentiment during a September 2014 dinner Erdely had with Jackie and a then-friend of Jackie's. In particular Jackie told Erdely that "we love Dean Eramo." And Erdely responded, "I get that, and I'm getting that from everybody. Everybody loves her." (Erdely Reporting Notes at RS004381 (Ex. 4)).

60.     It is not just that sexual assault survivors told Erdely that they loved and respected Ms. Eramo. Each of the survivors also told Erdely how Ms. Eramo aided them when they came forward with their stories of sexual assault, and how Ms. Eramo encouraged these women to seek punitive action against their assailants. (*See generally* Erdely Reporting Notes (Ex. 4).)

61.     For example, a victim of ████████████ at the University of Virginia, MS,[2] told Erdely during a July 24, 2014 interview that ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████. (*Id.* RS004217.)

62.     On August 4, 2014 during an interview with PA, another sexual assault survivor, PA told Erdely that Ms. Eramo "was very helpful" and "great," was most "interested in [PA's] well-being first and foremost," and handled the response to her assault very well. (*Id.* at RS004263, RS004268.) Indeed, Erdely even remarked in her notes from her interview with PA that PA "wasn't down on the [UVA] administration at all, even when prompted to vent" by Erdely. (*Id.* at RS004256.)

63.     Another sexual assault victim, RE, told Erdely during a September 11, 2014 interview that "our associate dean [Ms. Eramo] is very passionate about getting [rapists] punished," (brackets added by Erdely) and "she's very interested in making sure we [victims] can do something punitive and make something stick." (*Id.* at RS004147.) Erdely confirmed that she was told this information during her deposition. (Erdely Dep. at 39:16-40:19 (Ex. 5).)

64.     LE, a woman who was ████████████████████, told Erdely during a July 18, 2014 interview that after LE met with Ms. Eramo, the administration "did a very thorough investigation" and that, in fact, it "did a much better job investigating [the ████ incident] than [the] police." (Erdely Reporting Notes at RS004188, RS004190 (Ex. 4).)

65.     For her part, Jackie told Erdely during their July 30, 2014 interview that Ms. Eramo "has a very warm demeanor" and "seemed genuinely sorry" to hear about Jackie's

---

[2] To maintain the privacy of these individuals, pseudonymous initials have been used.

alleged rape. (*Id*. at RS004246-48.) In addition, Jackie told Erdely that Ms. Eramo was "helpful" in explaining to Jackie her options, including "formal trials versus informal hearings versus going through [] criminal charges." (*Id*.)

66. Jackie told Erdely that after she reported her alleged assault to Ms. Eramo and Ms. Eramo explained her options, Ms. Eramo repeatedly followed up with Jackie — even though Jackie "was really bad at ... stay[ing] in contact with her" — asked her numerous times if she had decided whether she wanted to press charges against her alleged attackers, and arranged meetings for Jackie to meet with the police. (*Id*. at RS004250). Erdely confirmed in her deposition that she knew that Ms. Eramo reached out to Jackie multiple times inquiring about that decision. (Erdely Dep. at 102:15-104:16 (Ex. 5).)

67. Erdely also confirmed that she knew that Ms. Eramo contacted the police on Jackie's behalf, because Jackie forwarded Erdely Jackie's and Ms. Eramo's email Spring 2014 exchange showing that Ms. Eramo arranged multiple meetings between Jackie and police detectives.



(*Id.* at 108:20-110:2; Aug. 16, 2014 Email from Jackie to S. Erdely, RS017031-42 (Ex. 22).)

68.    During their August 14, 2014 interview, Jackie also told Erdely that, when Jackie told Ms. Eramo that another girl had allegedly been sexually assaulted at Phi Psi, Ms. Eramo "was more concerned than anything for this girl's well-being," that Ms. Eramo "got pissed at the frat[ernity], and she said two other fraternities lost their charter this year, [and] it wouldn't bother [Ms. Eramo] at all to add a third."  (Erdely Reporting Notes at RS004312 (Ex. 4).)  Erdely confirmed in her deposition that she knew that Ms. Eramo reacted this way.  (Erdely Dep. at 105:10-20 (Ex. 5).)

69.    In emails Jackie wrote to Ms. Eramo and forwarded to Erdely in August 2014, Jackie wrote that Ms. Eramo was "always being a helpful source for me" (Aug. 14, 2014 Email

from Jackie to S. Erdely, RS017031-42 (Ex. 22)), and thanked Ms. Eramo for "all the help you've given me," (*id.*).

**IV.    Erdely Admitted Candidly That She Intended To Portray Ms. Eramo Negatively, As Though Ms. Eramo Discourages Victims From Reporting Their Assaults.**

70.    Erdely intended to convey the impression in the article that by comforting sexual assault victims and presenting them options to report their assaults, Ms. Eramo was encouraging victims to do nothing.  (Erdely Dep. at 207:13-210:3 (Ex. 5).)

71.    During a September 12, 2012 dinner and interview with Jackie and a then-friend of Jackie's who was active in the survivor support community, Erdely asked Jackie's friend about concerns or reservations that she had with the article. (Sept. 12, 2014 Interview Tr., RS118346-440, at 39:25-40:2 (Ex. 23); Erdely Dep. at 150:7-16 (Ex. 5).)

72.    Jackie's friend asked Erdely if the article was going to mention "the Dean Eramo part … Just anything about her…."  (Sept. 12, 2014 Interview Tr. at 40:6-9 (Ex. 23).)

73.    Jackie then said, "We love Dean Eramo," and the friend said, "Yeah."  (*Id*. at 40:10-11.)

74.    Erdely responded, "I know.  I mean, I'm getting that from everybody, and everybody loves her, and I totally understand that, but I mean she is going to play a part, I mean, she is going to play some part in this story because she plays a part in everybody's story."  (*Id*. at 40:12-16; Erdely Dep. at 152:7-18 (Ex. 5).)

75.    Jackie responded, "I just don't want anything like, like I feel it would be so completely dumb if like this comes out and they decide its like Dean Eramo who's giving them bad publicity and like they, you know, kind of like kick her in the bucket when it's not her.  It's people above her that they're the problem."   Jackie added, "I'm worried about like her job

security kind of like, you know?" (Sept. 12, 2014 Interview Tr. at 40:18-41:3 (Ex. 23); Erdely Dep. at 150:21-151:14 (Ex. 5).)

76. At that point in the interview, Erdely turned off her tape recorder and said to Jackie and her friend: "I do think there have been some legit worrisome issues that have been raised, that may not reflect well on the administration, of which dean eramo [sic] is the most public face because she's the one who deals with students. Because I do have some questions about whether Jackie's case has been handled properly." (Erdely Reporting Notes at RS004381 (Ex. 4); Erdely Dep. at 151:15-155:19 (Ex. 5).)

77. Erdely testified during her deposition that she "often take[s] the time to turn the tape recorder off when [she's] going to go on at some length." (Erdely Dep. at 153:2-154:5 (Ex. 5).)

78. While her tape recorder was off, Erdely expressed to Jackie and her friend that "I [Erdely] was concerned that the administration was not handling certain things correctly," and that Ms. Eramo is the person who is "most identifiable with this because she is the one who interfaces with students." (*Id.* at 154:16-155:11.)

79. After turning her tape recorder back on, Erdely said to Jackie and her friend: "I think that Dean Eramo seems like a wonderful person and I know you guys all really love her but I think that it's, it's not totally clear that she's actually doing right by you or the university in this scenario. In fact, I think she probably like is mishandling this whole situation…." (Sept. 12, 2014 Interview Tr. at 41:19-25 (Ex. 23); Erdely Dep. at 156:4-13 (Ex. 5).)

80. Minutes later, Erdely said, "just getting back to like why you're concerned. So I mean, is this going to make Dean Eramo look bad? I mean, it might, you know. It might make her look bad…. I mean, if it makes you feel better, I can make it clear how much you guys all

love her…. Right, it can be sort of me saying like, like, you know, 'This woman should be doing more,' you know…. But not you guys. I mean, you guys have never said anything to that effect." (Sept. 12, 2014 Interview Tr. at 48:25-49:14 (Ex. 23); Erdely Dep. 164:14-165:22 (Ex. 5).)

81. During an August 14, 2014 interview with a source named Laura Dunn, Erdely stated to Ms. Dunn: "I have to level with you here: this dean, [] she's a huge comfort to survivors, they love her, but not everything that's been said about her has rubbed me the right way – because at the end of the day these cases aren't being dealt with. It feels as though she's coddling these survivors, making them feel better, but unclear if she's encouraging them to report." (Erdely Reporting Notes at RS004301 (Ex. 4); Erdely Dep. at 83:25-85:7 (Ex. 5).)

82. Erdely was referring to Ms. Eramo when she made this statement. (Erdely Reporting Notes at RS004301 (Ex. 4); Erdely Dep. at 83:25-85:7 (Ex. 5)).

83. On two separate occasions Erdely told Jackie that Ms. Eramo and the UVA administration were merely trying to keep rapes quiet. In particular, during an August 14, 2014 interview with Jackie, Erdely told Jackie that "I've wondered if she's [Ms. Eramo] counseling the survivors but also, in a sense, that comfort she's giving them is also keeping them quiet." (Erdely Reporting Notes at RS004315 (Ex. 4); Erdely Dep. at 110:3-25 (Ex. 5).) Then, during an October 20, 2014 interview with Jackie, Erdely went on to state that she (Erdely) believes that the UVA administration "just want[s] to keep [sexual assaults] quiet and contained." (Erdely Reporting Notes at RS004471 (Ex. 4).)

84. In her first draft of the article, Erdely captioned the section of the article describing Jackie's first meeting with Ms. Eramo with the heading, "**FOUR: Jackie reports,**

**gets the Eramo/UVA treatment**." (Oct. 15, 2014 Email from Sean Woods to Jodi Peckman, Joe Hutchinson, & Sacha Lecca, RS002256-302 at RS002278 (Ex. 24).)

85.     This was Erdely's "shorthand" to "kind of summarize what happens" in that section of the article. (Erdely Dep. at 205:20-207:12 (Ex. 5).)

## V.     Defendants' Post-Article Statements, The Public Reaction, And Ms. Eramo's Loss Of Her Position As An Associate Dean.

86.     On November 26, 2014, Sabrina Rubin Erdely recorded an interview with a podcast called the *Slate DoubleX Gabfest*. (Compl. ¶ 188; Answer ¶ 188). The episode, titled "The Butch Goddess Edition," was published on November 27, 2014, and is publicly available online                                                                                                                                      at

[http://www.slate.com/articles/podcasts/doublex_gabfest/2014/11/the_double_x_gabfest_on_uva_frats_and_rape_in_rolling_stone_husbands_hurting.html](http://www.slate.com/articles/podcasts/doublex_gabfest/2014/11/the_double_x_gabfest_on_uva_frats_and_rape_in_rolling_stone_husbands_hurting.html). (Compl. ¶ 188; Answer ¶ 188; Erdely Dep. at 255:8-18 (Ex. 5).)

87.     During the *Slate* podcast interview, Sabrina Rubin Erdely made the following statements in response to questions from hosts Hannah Rosin, June Thomas, and Katy Waldman:

Hanna Rosin: It's just a crazy story.

Sabrina Rubin Erdely: I know. It boggles the mind, it boggles the mind. But then it actually, I mean it becomes even more disturbing when Jackie told me that she had actually told her friends who had discouraged her from reporting and who had totally downplayed the situation. She eventually had eventually kind of mustered up the courage to tell the administration that she had been brutally gang raped and that the University did nothing with this information and that they continued to do nothing even when she eventually told them that she had become aware of two other women who were also gang raped at that same fraternity. So the idea that this was some kind of culture in which there was so much indifference and apathy towards rape victims, it was radiating everywhere; from the student body, from the administration itself. I felt like this is something that I did not really expect to find.

…

Hanna Rosin: It's a gang rape, like they smashed her over a glass table, you know? They told five or six people to rape her. It seems like that can be the norm? I mean that seems such an extreme situation.

Sabrina Rubin Erdely: I know. It is incredibly extreme. I mean whether this was perpetrated by a serial rapist who has many victims – I mean it seems like no matter what, this is an incredibly messed up situation. But it was absolutely a violent crime and I think what was really telling was the idea that – and this really underscores the entire article; is the student body and the administration doesn't really treat rape as a crime, as a violent crime. They treat it in general like some kind of behavioral problem.

Hanna Rosin: Even this kind of rape?

Sabrina Rubin Erdely: Even this case, right, exactly. And this is why this case blew my mind, that Jackie's situation blew my mind; that even in a situation that was so extreme and so obviously within the realm of criminal, that they would seek to suppress something like this because that's really what they did. Not only did they not report it to police, but really I feel she was sort of discouraged from moving this forward. I would think that the first thing would be to tell her this needs to go to the police. These are dangerous people who are hurting people. If they hurt you – and, you know, she heard them saying things during the rape like egging each other on and saying things like don't you want to be a brother, which seemed to indicate that this was some kind of initiation ritual.

June Thomas: Sabrina, one of the things that you talk about is how there are kind of three options; that Dean Eramo presented Jackie with three options as all people in this position do. That you can do sort of an informal report, you can take it to the police or you can have a kind of internal investigation, an investigation at the school. Has Jackie done any of those things at this point?

Sabrina Rubin Erdely: She has not. She has not done any of those things.

June Thomas: And is there any limit on how long she can wait? I mean its striking that she was willing to talk to you. As you said, you know, she told you the story the first time you talked to her, but she hasn't, is it that she hasn't decided which of the options she wants to take?

Sabrina Rubin Erdely: I think that she; I think that it's a couple of things. I think that one is she's very traumatized by this whole situation, and she's very afraid of the men who she's saying did these things to her. She's particularly afraid of Drew who she's assigned a tremendous amount of power in her own mind. You know, he's this person who really by orchestrating this, you know, he's transformed her from this happy person she was before, into a person that she described as being like an empty shell. So I think that the idea of facing him or them down in any way is really just emotionally crippling for her. She's having a hard time facing up to that, and I think that she needs a lot of support if she's

going to get to the place where she can actually confront them. When she does actually run into some of her alleged assailants on campus sometimes, she recognizes them all. She can identify them all. When she sees them, just the sight of them, obviously it's a shock but it also tends to send her into a depression. So it just goes to show sort of the emotional toll something like this would take. I just think it would require a great deal of support for her to move forward into any of these options to resolve her case and that's something that's been completely absent. She really has not had any of that support from her friends, from the administration, nor from her family.

Katy Waldman: Sabrina, can you talk a little bit more about the relationship between the community of survivors or alleged victims and the University, particularly Dean Eramo? There were lines in the article that implied that they had so much faith in the University and they believe UVA loves us, they care about us and they had faith in the institution. But is also seems like there would be grounds for a lot of anger and I'm just wondering what the general sense was you got of how these women thought about the institution and the people who are tasked with helping them?

Sabrina Rubin Erdely: What I found is that UVA is a place where their culture is one of extreme loyalty, so I guess it shouldn't have surprised me that the community of survivors, they're totally devoted to the University, even as they're not very happy with the way their cases are handled. They totally buy into that attitude that radiates from the administration that doing nothing is a fine option. You know if you unburden yourself to the Dean and take care of your own mental health, then that's good enough. They created this support group, which is great for them and they do activism, they do bystander support seminars, I mean intervention seminars and things like that which is great, but really what they're kind of doing is affirming one another's choices not to report, which is, of course, an echo of their own administration's kind of ethos.

(Certified Tr., Nov. 27, 2014 *Slate DoubleX Gabfest*, "Butch Goddess Edition," Compl. at Ex. D [Dkt. 14-8]; Answer ¶ 188); *see also* http://www.slate.com/articles/podcasts/doublex_gabfest/2014/11/the_double_x_gabfest_on_uva_frats_and_rape_in_rolling_stone_husbands_hurting.html; Erdely Dep. at 256:8-258:7 (Ex. 5).)

88.     When Erdely referred on the *Slate* podcast to Jackie having told the administration that she had been gang raped, the member of the administration that she was referring to was Ms. Eramo. (Erdely Dep. at 257:9-258:21 (Ex. 5).)

89. When Erdely stated on the *Slate* podcast that "[Jackie] told them that she had become aware of two other women who were also gang raped," she was referring to Jackie telling Ms. Eramo that Jackie had become aware of two other women who were allegedly gang raped. (*Id.* at 259:16-22.)

90. Erdely intended to convey that the support Ms. Eramo provided to Jackie was insufficient when she said on the *Slate* podcast that "it would require a great deal of support for her to move forward into any of these options to resolve her case and that's something that's been completely absent. She really has not had any of that support from her friends, from the administration, nor from her family." (*Id.* at 263:17-264:25.)

91. Erdely was referring to Ms. Eramo when she said on the Slate podcast, "What I found is that UVA is a place where the culture is one of extreme loyalty, so I guess it shouldn't have surprised me that the community of survivors, they're totally devoted to the university, even as they're not very happy with the way their cases are handled. They totally buy into the attitude that radiates from the administration that doing nothing is a fine option. You know, if you unburden yourself to the Dean and take care of your own mental health, then that's good enough." (*Id.* at 265:1-18.)

92. Laura Casteen also heard, and read a transcript of, Erdely's statements on the November 27, 2014 edition of the *Slate DoubleX Gabfest Podcast*, during which Erdely was interviewed about the subject matter of the "Rape on Campus" article. (Casteen Decl. ¶ 9 (Ex. 21).) Ms. Canteen understood, and does understand, Erdely's statements about "the administration" and "the dean" on the podcast to refer to Ms. Eramo. (*Id.* ¶ 11.) Ms. Canteen reached this conclusion "[b]ased on the wording and context of Ms. Erdely's statements, the prior statements about Nicole Eramo in the article, and [her] prior understanding of Nicole

Eramo's employment position with the University of Virginia," and because "[t]he article does not state or suggest that Jackie ever met or interacted with any University of Virginia administrators besides Nicole Eramo regarding her alleged sexual assault, other than a brief reference to an unnamed "academic dean" whose sole role was described as referring Jackie to Nicole Eramo. During her interview on the podcast, Ms. Erdely similarly did not refer to any other University of Virginia administrators that Jackie interacted with other than Nicole Eramo, and several of the statements [on the podcast] were in response to direct questions from the hosts of the program about Nicole Eramo." (*Id.* ¶¶ 12-13.) Based on those facts, "the conclusion that these statements about 'the administration' and 'the dean' refer to Nicole Eramo is the only rational inference that [she] can draw from these statements." (*Id.* ¶ 12)

93. Ms. Casteen further "understood, and do[es] understand, these statements to be asserting that Nicole Eramo did nothing with the information the article claims Jackie conveyed to Nicole Eramo about her alleged gang rape and two other alleged gang rapes, that Nicole Eramo does not treat rape as a crime, that Nicole Eramo sought to suppress Jackie's alleged gang rape, that Nicole Eramo did not report Jackie's alleged gang rape to the police, that Nicole Eramo discouraged Jackie from pursuing a complaint with the police and the University of Virginia regarding her alleged gang rape, that Nicole Eramo did not adequately support Jackie, and that Nicole Eramo's 'ethos' is to convince alleged sexual assault victims that they should merely 'unburden' themselves to her and should not pursue police or University misconduct proceedings against their perpetrators." (*Id.* ¶ 11.)

94. Ms. Surface also heard, and read a transcript of, Erdely's statements on the November 27, 2014 edition of the *Slate DoubleX Gabfest Podcast*, during which Erdely was interviewed about the subject matter of the "Rape on Campus" article. (Surface Decl. ¶ 9

(Ex. 20).)  Ms. Surface, based on the wording and context of Erdely's statements, the prior statements about Ms. Eramo in the "Rape on Campus" article, and her knowledge of Ms. Eramo's employment position at UVA, understood, and does understand, Erdely's statements about "the administration" and "the dean" to refer to Ms. Eramo.  (*Id.* ¶ 12.)

95.     Ms. Surface further "understood, and do[es] understand, these statements to be asserting that Nicole Eramo did nothing with the information the article claims Jackie conveyed to Nicole Eramo about her alleged gang rape and two other alleged gang rapes, that Nicole Eramo does not treat rape as a crime, that Nicole Eramo sought to suppress Jackie's alleged gang rape, that Nicole Eramo did not report Jackie's alleged gang rape to the police, that Nicole Eramo discouraged Jackie from pursuing a complaint with the police and the University of Virginia regarding her alleged gang rape, that Nicole Eramo did not adequately support Jackie, and that Nicole Eramo's 'ethos' is to convince alleged sexual assault victims that they should merely 'unburden' themselves to her and should not pursue police or University misconduct proceedings against their perpetrators."  (*Id.* ¶ 11.)

96.     Also on November 26, 2014, Erdely appeared as a guest on the *Brian Lehrer Show*, a radio program broadcast on the public radio station WNYC.  (Answer ¶ 239.)

97.     During her interview on WNYC, Erdely made the following statements in response to questions from host Brian Lehrer:

> Brian Lehrer: I mean, this is not your vague circumstances date rape, which is kind of getting most of the attention these days.  This is like a thuggish street gang attack.  So did you tell this story as a shocking outlier, as a way to shame UVA in particular, or just tell a horrific extreme story, or as an example of something that you think is a larger problem on campuses across the country?
>
> Sabrina Rubin Erdely: Well, the reason why her story really stood out is obviously because it was so extreme, but the reason why I used it was because her story, what really shocked me about her story was that her story was treated by her peers and by the administration much like stories of, let's call them "typical" sort of rape allegations, that they were treated, she was kind of brushed off by her

friends and by the administration. When she told her friends about it, they either didn't believe her, or they downplayed the situation, they encouraged her not to report it, because they said it would kill her reputation on campus, and eventually, when she did report it to the administration, the administration did nothing about, they did nothing with the information. And they continued to do nothing even when she eventually told them that she had become aware of two other women who were also gang raped at the same fraternity. So the idea that even in a case that was so extreme as Jackie's, that there would be this level of indifference, it really opened up a window into what was really happening on campus with regard to rape cases in general.

(Certified Tr., Nov. 26, 2014 *The Brian Lehrer Show*, Compl. at Ex. C [Dkt. 14-7]; Compl. ¶ 240; Answer ¶ 240; *see also* http://www.wnyc.org/story/mishandling-campus-rape/; Erdely Dep. at 250:4-251:16 (Ex. 5).)

98.     Erdely testified that her statement that Jackie was "brushed off" by the administration was "shorthand for the article itself." (Erdely Dep. at 252:16-20 (Ex. 5).)

99.     The only members of the administration that Erdely is aware of who interfaced with Jackie with respect to her sexual assault were Ms. Eramo and a "Dean Lyons," who referred Jackie to Ms. Eramo. (*Id.* at 253:1-254:9.)

100.     Erdely concedes that Dean Lyons did not "brush off" Jackie when he referred her to Ms. Eramo. (*Id.* at 255:5-7.)

101.     Laura Casteen also heard, and read a transcript of, Erdely's statement on the November 26, 2014 radio broadcast of the *Brian Lehrer Show* during which Erdely was interviewed about the subject matter of the "Rape on Campus" article. (Casteen Decl. ¶ 15 (Ex. 21).) Ms. Casteen "understood, and do[es] understand, Ms. Erdely's statement about 'the administration' on the radio show to refer to Nicole Eramo." (*Id.* ¶ 16.) Moreover, "[b]ased on the wording and context of Ms. Erdely's statement, the prior statements about Nicole Eramo in the article, and [her] prior understanding of Nicole Eramo's employment position with the University of Virginia," Ms. Casteen concluded that Erdely's "statement about 'the

administration' refer[ring] to Nicole Eramo is the only rational inference that [she] can draw from the statement." (*Id.* ¶ 17.) Ms. Casteen further "understood, and do[es] understand" this statement "to be asserting that Nicole Eramo did nothing with the information the article claims Jackie conveyed to Nicole Eramo about her alleged gang rape and two other alleged gang rapes." (*Id.* ¶ 16.)

102.    Ms. Surface also heard, and read a transcript of, Erdely's statement on the November 26, 2014 radio broadcast of the *Brian Lehrer Show* during which Erdely was interviewed about the subject matter of the "Rape on Campus" article.  (Surface Decl. ¶ 15 (Ex. 20).)  Ms. Surface, based on the wording and context of Erdely's statement, the prior statements about Ms. Eramo in the "Rape on Campus" article, and her knowledge of Ms. Eramo's employment position at UVA, understood, and does understand, Erdely's statement about "the administration" on the radio show to refer to Nicole Eramo.  (*Id.* ¶ 16.)  Moreover, Ms. Surface understood Erdely's statements to be asserting that Ms. Eramo did nothing with the information the article claims Jackie conveyed to Ms. Eramo about her alleged gang rape and two other alleged gang rapes, because "the article specifically claims that Jackie told Nicole Eramo (and not any other University of Virginia administrator) about both her gang rape and two other alleged gang rapes, and it does not state or suggest that Jackie ever met or interacted with any other University of Virginia administrators besides Nicole Eramo regarding her alleged sexual assault, other than a brief reference in the article to an unnamed 'academic dean' whose sole role was described as referring Jackie to Nicole Eramo." (*Id.*)

103.    Between November 28, 2014 and December 2, 2014, both Erdely and Sean Woods responded to inquiries from a reporter for the *Washington Post*, and made statements that were included in a December 1, 2014 *Washington Post* article entitled "Author of Rolling Stone

article on alleged U-Va. rape didn't talk to the accused perpetrators." (Compl. ¶ 269; *id*. at Ex. E; Answer ¶ 269.)

104.    Erdely made the following statement to the *Washington Post* on November 30, 2014, which was published in the *Post's* December 1, 2014 article:

> As I've already told you, the gang-rape scene that leads the story is the alarming account that Jackie — a person whom I found to be credible — told to me, told her friends, and importantly, what she told the UVA administration, which chose not to act on her allegations in any way — i.e., the overarching point of the article. THAT is the story: the culture that greeted her and so many other UVA woman I interviewed, who came forward with allegations, only to be met with indifference.

 (Compl. ¶ 269; *id*. at Ex. E; Answer ¶ 269; Nov. 30, 2014 Email from Sabrina Rubin Erdely to Paul Farhi, RS016119-122 at RS016121 (Ex. 25).)

105.    In response to questions from journalists regarding the reporting of "A Rape on Campus," *Rolling Stone* began issuing an official statement on December 1, 2014 which said: "In response to your question/s about Sabrina Rubin Erdely's "A Rape on Campus": The story we published was one woman's account of a sexual assault at a UVA fraternity in October 2012 – and the subsequent ordeal she experienced at the hands of University administrators in her attempts to work her way through the trauma of that evening. Through our extensive reporting and fact-checking, we found Jackie to be entirely credible and courageous and we are proud to have given her disturbing story the attention it deserves." (Dec. 1, 2014 Email from Sean Woods to Paul Farhi, RS003077 (Ex. 26); Woods Dep. at 227:24-230:11 (Ex. 13).)

106.    Both Ms. Eramo and *Rolling Stone* received many emails from members of the public who read the article and understood it as attributing to Ms. Eramo unfitness to perform the duties of her employment as an Associate Dean of Students, and as accusing Ms. Eramo of lacking integrity in the discharge of her employment duties. (Dec. 7, 2014 Email from dynatite@gmail.com to letters@rollingstone.com, RS021352-53 (Ex. 27); Dec. 4, 2014 Email

from Colleen Cicale to letters@rollingstone.com, RS021604 (Ex. 28); Nov. 28, 2014 Email from Peter Engisch to letters@rollingstone.com, RS021657 (Ex. 29); Nov. 20, 2014 Email from Kim Raff to Nicole Eramo, ERAMO-00805 (Ex. 30); Nov. 20, 2014 Email from Holly Rhodes to Nicole Eramo, ERAMO-00816 (Ex. 31).)

107.    On November 28, 2014 an individual named Peter Engisch sent an email to *Rolling Stone* at the inbox "letters@rollingstone.com" with the subject "A Rape on Campus." Engisch wrote that "Dean Eramo smells of cover up, deflect, delay and fake text book sensitivity. Protecting UVA is her No. 1 priority.    Sickening."    (Email from Peter Engisch to letters@rollingstone.com, RS021657 (Ex. 29).)

108.    On December 4, 2014 an individual named Colleen Cicale sent an email to *Rolling Stone* at the inbox "letters@rollingstone.com" saying "I just finished reading Sabrina Rubin Erdely's article about UVrApe," and adding that "[Jackie] should be proud of the work she has been doing as an advocate.  She could teach her Dean Eramo a lesson or two on how to treat survivors."   (Dec. 4, 2014 Email from Colleen Cicale to letters@rollingstone.com, RS021604 (Ex. 28).)

109.    On December 7, 2014, an individual sent an email to *Rolling Stone* at the inbox "letters@rollingstone.com" referencing the article about Jackie and stating: "Dean Eramo should be fired.  The Dean clearly set Jackie further adrift with her ambivalent response and bewildering options; Eramo well knew Jackie was so conflicted she'd not pursue the case, and Eramo intentionally guided Jackie to this 'solution', offering her a soft shoulder to cry on instead of an iron fist to help face her attackers and protect other students.  This softballing was intentional, in my opinion, to keep the case from becoming public and out of UVA control."  (Dec. 7, 2014 Email from dynatite@gmail.com to letters@rollingstone.com, RS021352-53 (Ex. 27).)

110.    On November 20, 2014, an individual named Kim Raff sent an email to Ms. Eramo with the subject "About the Rolling Stone article." (Nov. 20, 2014 Email from Kim Raff to Nicole Eramo, ERAMO-00805 (Ex. 30).) Beginning, "Dean Eramo, I am in the process of reading the Rolling Stone article about rapes on the UVA campus," the email said, "I am so sickened by what I have read and I think you should be ashamed of yourself and how you treat victims of sexual assaults." (*Id.*) The email went on to say, "Why you continue to protect these predators is baffling and I really can't understand how as a woman you can allow them to continue to victimize more young women/men. Please Please Please for the love of god RESIGN! You clearly do not contain the needed skills as a human/woman to do your job correctly. You are a horrible person and your school is an abomination and disgusts me. Please RESIGN so you don't ruin another student's life. Do the right thing." (*Id.*)

111.    On November 20, 2014, an individual named Holly Rhodes sent an email to Ms. Eramo with the subject "Shame on you." (Nov. 20, 2014 Email from Holly Rhodes to Nicole Eramo, ERAMO-00816 (Ex. 31).) The email stated, "As a woman, how can you turn a blind eye to these girls who are seeking help from such brutal acts…girls Ms. Eramo; GIRLS. God will have his day with you and hold you accountable just as the boys who have raped and performed these disgusting acts. Do the great state of Virginia a favor and resign. You are a despicable human being." (*Id.*)

112.    Former UVA student and employee Emily Renda, one of the sources that spoke with Erdely for the article, testified that after the article was published, she was "very" concerned about the effect the article would have on Ms. Eramo's career. (Mar. 18, 2016 Deposition of Emily Renda at 44:16-46:21, 101:6-102:7 ("Renda Dep.") (Ex. 32).) Renda felt that "Nicole Eramo's career was ruined" as a result of the article, and that "being kind of demonized in that

way meant that a level of trust and rapport with the community was now going to have to repaired, and you can't just repair – you can't just repair that kind of breach of trust… the thing she was very passionate about doing and was very good at doing was being there for people, and this characterization of her made it impossible for her to do that again." (*Id*. at 101:6-102:19.)

113.    Renda also helped Sara Surface, another student quoted in the article, prepare an open letter after the article was published that was sent to the president of UVA, the *Washington Post*, and the *Cavalier Daily*.  (*Id*. at 106:6-107:23; Nov. 24, 2014 *Letter: Advocating for Dean Eramo,* The Cavalier Daily, ERAMO-00878-91 ("Open Letter") (Ex. 33).)

114.    Renda and Surface prepared the open letter because the article "painted a very one-sided portrait of Nicole," and Renda and Surface were "worried that she would lose her job." (Renda Dep. at 106:6-107:4 (Ex. 32).)

115.    Shortly after the publication of the article, the University of Virginia removed Ms. Eramo from her role as the intake person for sexual assault cases reported by students. (Groves Dep. Vol. II at 365:25-367:6 (Ex. 3).)

116.    On March 1, 2016, the University of Virginia removed Ms. Eramo from her position as an Associate Dean and placed her in a different role with the title Executive Director of Assessment and Planning.  (Eramo Decl. ¶ 24 (Ex. 1).)

117.    Due to her change in positions, Ms. Eramo no longer holds the title of "Dean." (*Id*.)

118.    Both Ms. Eramo's immediate supervisor and the University of Virginia believed that she had done an "excellent" job in her position as Associate Dean of Students prior to the publication of the article. (Apr. 26, 2016 Deposition of Allen Groves Vol. I at 76:4-77:9 (Ex. 34).)

119. In her new role as Executive Director of Assessment and Planning, Ms. Eramo's job responsibilities no longer include working directly with survivors of sexual assault. (Eramo Decl. ¶ 26 (Ex. 1).)

120. The decision to remove Ms. Eramo from working directly with victims of sexual assault was made by University of Virginia Vice President Patricia Lampkin, who made the decision due to the negative perception of Ms. Eramo and the damage done to the perception of Ms. Eramo by the article. (Groves Dep. Vol. II at 367:10-14 (Ex. 3).)

121. One of the University of Virginia's motivating reasons for Ms. Eramo's reassignment from Associate Dean of Students to Executive Director of Assessment and Planning was the fact that the article "really tainted" her ability to gain trust with UVA students. (Lampkin Dep. at 76:2-16 (Ex. 9).)

**VI.  Defendants Publish A New Version Of "A Rape On Campus."**

122. *Rolling Stone* has admitted that by December 3 or 4, 2014, they were aware of "the depth of Jackie's lack of credibility" and that they "should stop speaking about the article [publicly]." (Dana Dep. at 157:12-21 (Ex. 10).)

123. At 1:54 a.m. on December 5, 2014, Sabrina Rubin Erdely sent an email with the subject line "our worst nightmare" to Managing Editor Will Dana and Deputy Managing Editor Sean Woods, stating that the magazine needed to issue a retraction of the article. (Dec. 5, 2014 Email from Sabrina Rubin Erdely to Will Dana & Sean Woods, RS010372 (Ex. 35).)

124. Erdely's December 5, 2014 email stated, in part: "Will and Sean – we can't run the statement tomorrow. In fact, we're going to have to run a retraction. I just got off the phone with Jackie and her friend Alex [Pinkleton]; neither I nor Alex find Jackie credible any longer. Today Jackie was interviewed by police but declined to report; her explanation to me for why she didn't go forward was lacking. I've been trying to verify the identity of her assailant, and

when I asked for help, it spiraled into confusion.  By the time we ended our conversation, I felt nearly certain that she was not being truthful….   I'm not saying Jackie wasn't raped in that house, or on that night.  However, Jackie isn't credible.  Tomorrow Phi Psi will apparently come out with a statement denying there was a party that night, or that there was a brother by the name of ▮ in that house.  The Washington Post is working on a story with all the details.  We have to issue a retraction."



(*Id*.; Erdely Dep. at 279:12-281:2 (Ex. 5).)

125.    According to Erdely she knew at that time that "[t]he whole thing stinks."  (Dec. 5, 2014 Email from Sabrina Rubin Erdely to Will Dana & Sean Woods, RS010372 (Ex. 35).)

126.    Erdely also knew that her **only** source in her reporting for what transpired in conversations between Jackie and Ms. Eramo was Jackie.  (Erdely Dep. at 80:15-81:15; 83:6-24 (Ex. 5).)

127.    *Rolling Stone's* then-Managing Editor Will Dana agreed with Erdely's email, stating, "I think we have to write something alone the line of 'how we screwed up.'" (*Id.* at 281:3-6.)

128.    As of December 5, 2014, *Rolling Stone* Managing Editor Will Dana entertained serious doubts about Jackie's credibility.  (Dana Dep. at 217:25-218:5 (Ex. 10).)

129.    *Rolling Stone* Managing Editor Will Dana, Deputy Managing Editor Sean Woods, and owner Jann Wenner discussed removing the article from the *Rolling Stone* website on or about December 5, 2014.  (*Id*. at 217:25-222:25.)

130.    Although Erdely insisted on retracting the article because Jackie lacked credibility, then-Managing Editor Will Dana and magazine owner and Publisher Jann Wenner were not convinced about that decision.  (*Id*. at 223:1-224:7.)  Jann Wenner made the ultimate decision not to remove the article from *Rolling Stone's* website.  (*Id*. at 219:11-220:5.)

131.    Will Dana had never met, spoken with, or interviewed Jackie.  (*Id.* at 121:6-16.)

132.    Jann Wenner had never met, spoken with, or interviewed Jackie.  (*Id.*)

133.    On December 5, 2014, *Rolling Stone* appended an "Editor's Note" to "A Rape on Campus" under the signature of then-Managing Editor Will Dana.  (*Id*. at 228:6-229:22.)

134.    The December 5, 2014 Editor's Note was published along with the original article on www.rollingstone.com.  (*Id*.)

135.    The December 5, 2014 statement that was appended to the article said:

TO OUR READERS

Last month, Rolling Stone published a story titled "A Rape on Campus" by Sabrina Rubin Erdely, which described a brutal gang rape of a woman named Jackie at a University of Virginia fraternity house; the university's failure to respond to this alleged assault — and the school's troubling history of indifference to many other instances of alleged sexual assaults. The story generated worldwide headlines much soul-searching at UVA. University president Teresa Sullivan promised a full investigation and also to examine the way the school responds to sexual assault allegations.

Because of the sensitive nature of Jackie's story, we decided to honor her request not to contact the man she claimed orchestrated the attack on her nor any of the men she claimed participated in the attack for fear of retaliation against her. In the months Erdely spent reporting the story, Jackie neither said nor did anything that made Erdely, or Rolling Stone's editors and fact-checkers, question Jackie's credibility. Her friends and rape activists on campus strongly supported Jackie's account. She had spoken of the assault in campus forums. We reached out to both the local branch and the national leadership of the fraternity where Jackie said she was attacked. They responded that they couldn't confirm or deny her story but had concerns about the evidence. In the face of new information, there now appear to be discrepancies in Jackie's account, and we have come to the conclusion that our trust in her was misplaced. We were trying to be sensitive to the unfair shame and humiliation many women feel after a sexual assault and now regret the decision to not contact the alleged assaulters to get their account. We are taking this seriously and apologize to anyone who was affected by the story.

Will Dana
Managing Editor

(Dec. 5, 2014 Email from Melissa Bruno to Taylor Shapiro, RS007829 (Ex. 36); Sabrina Rubin Erdely, *A Rape on Campus,* ROLLING STONE (Dec. 5, 2014) (Ex. 37).)

136.    The December 5, 2014 version of the article was a separate version of the article from the original, November 19, 2014 article. (Apr. 13, 2016 Rule 30(b)(6) Deposition of Alvin Ling at 14:10-16 ("Ling Dep.") (Ex. 38).)

137.    The December 5, 2014 version of the article had a separate and different URL than the November 19, 2014 version of the article. (*Id*. at 15:17-22; Apr. 13, 2016 Rule 30(b)(6) Deposition of Michal Provus at 79:10-81:10 ("Provus Dep.") (Ex. 39).)

138.    For purposes of *Rolling Stone's* own internal system for blocking or not blocking advertisements, the November 19, 2014 version of the article and the December 5, 2015 version of the article were considered separate content. (Ling Dep. at 15:23-16:10 (Ex. 38).)

139.    Will Dana, the Managing Editor of *Rolling Stone* at the time the article was published, testified that the article was not officially retracted until the article was removed from *Rolling Stone's* website in April 2015.  (Dana Dep. at 279:16-280:15, 297:5-19, 300:10-302:2 (Ex. 10).)

140.    The December 5 Editor's Note was intended only to retract, and convey *Rolling Stone's* loss of faith in, the portion of the article dealing specifically with the description of Jackie's gang rape.  (*Id*. at 306:16-313:7.)  The December 5, 2014 statement did not disavow the article's portrayal of Ms. Eramo.  (Erdely Dep. at 281:23-282:10 (Ex. 5).)

141.    According to Erdely, the December 5, 2014 Editor's Note only retracted a portion of the article, which did not include those portions relating to Ms. Eramo.  (*Id.* at 283:9-20.)

142.    In a December 6, 2014 email to Sabrina Erdely and Deputy Managing Editor Sean Woods, Dana confirmed this understanding of the December 5, 2014 Editor's Note, stating that "the Washington Post story did not do more than poke a couple of holes in Jackie's account," and proposing a second editor's note that would "point[] out the parts of the story that still stand."  (Dec. 6, 2014 Email from Will Dana to Sean Woods & Sabrina Rubin Erdely, RS016816 (Ex. 40).)

143.    *Rolling Stone* further confirmed that the December 5, 2014 Editor's Note did not retract the portions of the article concerning Ms. Eramo when its attorneys stated in a letter to Ms. Eramo's counsel on December 30, 2014, "[w]e are not aware of any inaccuracies concerning Dean Eramo in the above article, which was well sourced and fact checked" (Dec. 30, 2014

Letter From Elizabeth A. McNamara to Thomas A. Clare, Esq. (Ex. 41)), and further stated in a February 4, 2015 letter that "Rolling Stone stands by its reporting on the action — or inaction as it were [sic] — by UVA in response to student claims of sexual assault."  (Feb. 4, 2015 Letter from Elizabeth A. McNamara to Thomas A. Clare (Ex. 42).)



144.    The website URL to which the December 5, 2014 version of the article with the Editor's Note was posted received over one million unique visitors.  (Rolling Stone Website Analytics Report, RS001479 (Ex. 43).)

145.    *Rolling Stone* did not officially or unofficially retract the remaining portions of the article, including the portions of the article concerning Ms. Eramo, until the entire article was

officially retracted and removed from the *Rolling Stone* website in April 2015.  (Dana Dep. at 313:9-314:20 (Ex. 10).)

146.    *Rolling Stone* did not issue a direct apology to Ms. Eramo until May 2015, when it finally stated, "We would like to apologize to Dean Eramo and express our sincere regrets. We'd also like to reiterate our previous apology to the members of Phi Kappa Psi and anyone else who was hurt by our story."  (May 21, 2015 *Rolling Stone* Issue 1235, *Editor's Reply*, RS001132-33 (Ex. 44).)


Dated:  July 1, 2016                              Respectfully submitted,

                                                  By:   /s/ Elizabeth M. Locke
                                                  Thomas A. Clare (VA Bar No. 39299)
                                                  Elizabeth M. Locke (VA Bar No. 71784)
                                                  Andrew C. Phillips (VA Bar No. 88880)
                                                  Joseph R. Oliveri (VA Bar No. 84335)
                                                  CLARE LOCKE LLP
                                                  902 Prince Street
                                                  Alexandria, Virginia 22314
                                                  Telephone: (202) 628-7400
                                                  tom@clarelocke.com
                                                  libby@clarelocke.com
                                                  andy@clarelocke.com
                                                  joe@clarelocke.com

                                                  *Attorneys for Plaintiff Nicole P. Eramo*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of Plaintiff's Statement of Undisputed Facts

in Support of Plaintiff's Motion for Partial Summary Judgment was served on the below counsel

of record on July 1, 2016, via the Court's electronic filing system.

Michael John Finney & William David Paxton
GENTRY LOCKE RAKES & MOORE
P.O. Box 40013
Roanoke, VA 24022-0013
Telephone: (540) 983-9373
Telephone: (540) 983-9334
Fax: (540) 983-9400
Email: finney@gentrylocke.com
Email: paxton@gentrylocke.com

Elizabeth A. McNamara & Samuel M. Bayard
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 489-8230 / Fax: (212) 489-8340
Email: lizmcnamara@dwt.com
Email: samuelbayard@dwt.com

Alison B. Schary
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4248 / Fax: (202) 973-4448
E-mail: alisonschary@dwt.com

*Attorneys for Defendants Rolling Stone LLC,*
*Sabrina Rubin Erdely, and Wenner Media LLC*

Benjamin Gaillard Chew
MANATT, PHELPS & PHILLIPS, LLP
1050 Connecticut Avenue, NW, Suite 600
Washington, DC 20036-5303
Telephone:  (202) 585-6511
Email:  bchew@manatt.com

*Attorney for Defendant Sabrina Rubin Erdely*

Dated:  July 1, 2016                    By:  __/s/ Elizabeth M. Locke_____
                                        Elizabeth M. Locke