**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| NICOLE P. ERAMO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     **Case No. 3:15-cv-00023-GEC** |
| | ) |
| ROLLING STONE LLC, | ) |
| SABRINA RUBIN ERDELY, and | ) |
| WENNER MEDIA LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Elizabeth A. McNamara (*pro hac vice*)
Samuel M. Bayard (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 489-8230
Fax: (212) 489-8340

Alison B. Schary (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4248
Fax: (202) 973-4448

W. David Paxton (VSB No. 19798)
Michael J. Finney (VSB No. 78484)
GENTRY LOCKE
10 Franklin Road S.E., Suite 900
P.O. Box 40013
Roanoke, VA 24022-0013
Telephone:    (540) 983-9300
Fax:    (540) 983-9400

*Attorneys for Defendants Rolling Stone LLC,*
*Sabrina Rubin Erdely, and Wenner Media LLC*

**<u>TABLE OF AUTHORITIES</u>**

<b>Page(s)</b>

**Federal Cases**

*Abbas v. Foreign Policy Grp., LLC*,
  975 F. Supp. 2d 1 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015) .........................66, 72

*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*,
  No. CV 10–5696 CRB, 2013 WL 3460707 (N.D. Cal. July 9, 2013) ....................................67

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...............................................................................................................27, 50

*Arthur v. Offit*,
  No. CIV.A. 01:09-CV-1398, 2010 WL 883745 (E.D. Va. Mar. 10, 2010) ......................33, 67

*Avins v. White*,
  627 F.2d 637 (3d Cir. 1980)........................................................................................................48

*Barry v. Time, Inc.*,
  584 F. Supp. 1110 (N.D. Cal. 1984) ..........................................................................................48

*Baumback v. Am. Broad. Cos.*,
  161 F.3d 1 (4th Cir. 1998) (unpublished) ................................................................44, 45, 46

*Baylor v. Comprehensive Pain Mgmt. Ctrs., Inc.*,
  No. 7:09-CV-00472, 2011 WL 1327396 (W.D. Va. Apr. 6, 2011).......................................38

*Biospherics, Inc. v. Forbes, Inc.*,
  151 F.3d 180 (4th Cir. 1998) ........................................................................................ *passim*

*Biro v. Conde Nast*,
  883 F. Supp. 2d 479 (S.D.N.Y. 2012), *aff'd*, 807 F.3d 541 (2d Cir. 2015) ............................36

*Bose Corp. v. Consumer Union of U.S., Inc.*,
  466 U.S. 485 (1984)...............................................................................................................50, 65

*CACI Premier Techs. v. Rhodes, Inc.*,
  536 F.3d 280 (4th Cir. 2008) ............................................................................................28, 30, 67

*Carr v. Forbes, Inc.*,
  259 F.3d 273 (4th Cir. 2001) ................................................................................................48, 51

*Chapin v. Greve*,
  787 F. Supp. 557 (E.D. Va. 1992), *aff'd sub nom. Chapin v. Knight-Ridder,
  Inc.*, 993 F.2d 1087 (4th Cir. 1993) ................................................................................37, 40

i

*Chapin v. Knight-Ridder, Inc.*,
   993 F.2d 1087 (4th Cir. 1993) ...................................................................... *passim*

*Church of Scientology Int'l v. Daniels*,
   992 F.2d 1329 (4th Cir. 1993) ...................................................................... *passim*

*Clyburn v. News World Communications, Inc.*,
   705 F. Supp. 635 (D.D.C. 1989), *aff'd*, 903 F.2d 29 (D.C. Cir. 1990) ...................................56

*D.A.R.E Am. v. Rolling Stone Magazine*,
   101 F. Supp. 2d 1270 (C.D. Cal. 2000), *aff'd*, 270 F.3d 793 (9th Cir. 2001)...........................64

*Eastwood v. National Enquirer, Inc.*,
   123 F.3d 1249 (9th Cir. 1997) ...............................................................................50

*Fiacco v. Sigma Alpha Epsilon*,
   528 F.3d 94 (1st Cir. 2008)...............................................................................45, 47

*Fitzgerald v. Penthouse Int'l, Ltd.*,
   691 F.2d 666 (4th Cir. 1982) ...............................................................................47

*Garrison v. Louisiana*,
   379 U.S. 64 (1964)...............................................................................38, 71

*Grossman v. Smart*,
   807 F. Supp. 1404 (C.D. Ill. 1992) ...............................................................................45, 46

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989)...............................................................................49, 50, 59, 60

*Hatfill v. New York Times Co.*,
   488 F. Supp. 2d 522 (E.D. Va. 2007), *aff'd*, 532 F.3d 312 (4th Cir. 2008)...........46, 50, 57, 59

*Haynes v. Alfred A. Knopf, Inc.*,
   8 F.3d 1222 (7th Cir. 1993) ...............................................................................69

*Herbert v. Lando*,
   781 F.2d 298 (2d Cir. 1986)...............................................................................55

*Hoffman v. Washington Post Co.*,
   433 F. Supp. 600 (D.D.C. 1977), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978)...............................65

*Horsley v. Rivera*,
   292 F.3d 695 (11th Cir. 2002) ...............................................................................68

*Howard v. Antilla*,
   294 F.3d 244 (1st Cir. 2002)...............................................................................50

*Hugger v. Rutherford Inst.*,
94 F. App'x 162 (4th Cir. 2004) ................................................................62, 64

*In re Baxter*,
No. 01-00026-M, 2001 WL 34806203 (W.D. La. Dec. 20, 2001) ...........................................45

*Janklow v. Newsweek, Inc.*,
788 F.2d 1306 (8th Cir. 1986) ................................................................36

*Jenoff v. Hearst Corp.*,
453 F. Supp. 541 (D. Md. 1978), *aff'd*, 644 F.2d 1044 (4th Cir. 1981) ................................51

*Lapkoff v. Wilks*,
969 F.2d 78 (4th Cir. 1992) ................................................................29

*Lohrenz v. Donnelly*,
223 F. Supp. 2d 25 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) ............................65

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991) ................................................................49, 50

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) ................................................................28, 67

*Moldea v. New York Times Co.*,
22 F.3d 310 (D.C. Cir. 1994) ................................................................35

*Nat'l Found. for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc.*,
705 F.2d 98 (4th Cir. 1983) ................................................................29

*New Life Ctr., Inc. v. Fessio*,
No. 99-1658, 2000 WL 1167800 (4th Cir. Aug. 16, 2000) (unpublished) ...............................51

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ................................................................43, 49

*Newton v. Nat'l Broad. Co., Inc.*,
930 F.2d 662 (9th Cir. 1990) ................................................................62

*Phantom Touring, Inc. v. Affiliated Publ'ns*,
953 F.2d 724 (1st Cir. 1992) ................................................................30, 33, 35

*Philadelphia Newspapers, Inc. v. Hepps*,
475 U.S. 767 (1986) ................................................................38

*Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*,
829 F.2d 1280 (4th Cir. 1987) ................................................................29

iii

*Price v. Viking Penguin*,
   881 F.2d 1426 (8th Cir. 1989) ...............................................................69

*Partington v. Bugliosi*,
   56 F.3d 1147 (9th Cir. 1995) ....................................................31, 35, 70

*Reuber v. Food Chem. News, Inc.*,
   925 F.2d 703 (4th Cir. 1991) (*en banc*) ..................................... *passim*

*Riley v. Harr*,
   292 F.3d 282 (1st Cir. 2002).............................................................29, 36

*Rosenblatt v. Baer*,
   383 U.S. 75 (1966)...............................................................................44

*Ryan v. Brooks*,
   634 F.2d 726 (4th Cir. 1980) .........................................51, 60, 62, 64

*Saenz v. Playboy Enters., Inc.*,
   653 F. Supp. 552 (N.D. Ill. 1987), *aff'd*, 841 F.2d 1309 (7th Cir. 1988) ...............................33

*Schnare v. Ziessow*,
   No. 03-1879, 104 F. App'x 847 (4th Cir. 2004) (unpublished)................................................67

*Snyder v. Phelps*,
   580 F.3d 206 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) ....................................28

*St. Amant v. Thompson*,
   390 U.S. 727 (1968).....................................................................50, 60, 61

*Statement. Henry v. Nat'l. Association of Air Traffic Specialists, Inc.*,
   836 F. Supp. 1204 (D. Md. 1993), *aff'd*, 34 F.3d 1066 (4th Cir. 1994) ...............................51

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) ......................................................51, 55

*Time, Inc. v. Johnston*,
   448 F.2d 378 (4th Cir. 1971) .......................................................51, 67

*Time, Inc. v. Pape*,
   401 U.S. 279 (1971)...............................................................................70

*Tucker v. Fischbein*,
   237 F.3d 275 (3d Cir. 2001) (Alito, J.) ..............................................65

*Wells v. Liddy*,
   186 F.3d 505 (4th Cir. 1999) ...............................................................37

iv

*Woods v. Evansville Press Co., Inc.*,
    791 F.2d 480 (7th Cir. 1986) ....................................................................50, 69

**State Cases**

*Gazette, Inc. v. Harris*,
    325 S.E.2d 713 (Va. 1985)......................................................................................37

*Goodwyn v. Virginian-Pilot Media Cos.*,
    No. CL11-815 (Portsmouth Circuit Ct. 2012) .....................................................45

*Huggins v. Povitch*,
    No. 131164/94, 1996 WL 515498 (N.Y. Sup. Ct. Apr. 19, 1996)..........................68

*Pease v. Tel. Publ'g Co.*,
    462 A.2d 463 (N.H. 1981) ....................................................................................66

*Pendleton v. Newsome*,
    772 S.E.2d 759 (2015) .........................................................................................38

*Reader's Digest Ass'n v. Superior Ct.*,
    37 Cal. 3d 244 (1984) ...........................................................................................64

*Richmond Newspapers, Inc. v. Lipscomb*,
    362 S.E.2d 32 (Va. 1987)................................................................45, 61, 62, 64

*Wallace v. Geckosystems Int'l Corp.*,
    No. CV K11C–03–018 JTV, 2013 WL 4054147 (Del. Super. July 31, 2013) ......66

*Webb v. Hansen*,
    No. CL10-2933 (Chesapeake Circuit Ct. 2012)....................................................45

*Webb v. Virginia Pilot Media Cos.*,
    752 S.E.2d 808 (Va. 2014)...........................................................................37, 41

**Rules**

Federal Rules of Civil Procedure
    30(b)(6) ...................................................................................................................6
    56..........................................................................................................................72
    56(a) ......................................................................................................................27

**Constitutional Provisions**

Title IX of the United States Code.................................................................3, 6, 8, 26

First Amendment to the United States Constitution ............................................ *passim*

v

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................... 5

    A.    The Parties ............................................................................................. 5

        1.    Defendants Rolling Stone and Sabrina Rubin Erdely ...................... 5

        2.    Plaintiff Nicole Eramo ................................................................ 6

    B.    The Reporting, Editing, and Fact-Checking of "A Rape on Campus" ........................ 7

        1.    Genesis of the Article ............................................................... 7

        2.    Erdely Is Introduced to Jackie by UVA Employee Emily Renda with Eramo's Knowledge ................................................................ 8

        3.    Erdely Interviews Jackie and Her Friends ..................................... 9

        4.    Plaintiff Does Not Dispute the Relevant Facts of Her Meetings with Jackie .................................................................................. 11

        5.    Plaintiff Does Not Dispute that Jackie Gave Erdely the "Rape School" Comment and Does Not Dispute the Statistics Reported in the Article Concerning UVA's Handling of Sexual Assault Claims ............................... 14

        6.    Jackie Reports Pressure from the UVA Administration Over Her Participation in the Article ...................................................... 15

        7.    UVA Prevents Erdely from Speaking with Plaintiff and Confirms September 2014 Investigation of Phi Kappa Psi for Multiple Gang Rapes .... 16

        8.    Erdely Took Additional Steps to Confirm Jackie's Account ........................... 17

        9.    None of the Sources Erdely Was Ultimately Unable to Reach had Relevant Information Concerning Eramo ....................................... 18

        10.   Rolling Stone Subjects the Article to Rigorous Fact-Checking ...................... 19

    C.    The Article ........................................................................................ 20

    D.    The Eramo Illustration ........................................................................ 20

    E.    Post-Publication ................................................................................ 21

    F.    The Retraction and CJR Report ............................................................ 23

    G.    The Complaint .................................................................................. 25

    H.    The OCR Investigation and Letter of Finding .......................................... 26

ARGUMENT ................................................................................................. 27

    I.    MOST CHALLENGED STATEMENTS AND CLAIMED IMPLICATIONS IN THE ARTICLE ARE NOT ACTIONABLE AS A MATTER OF LAW ................. 27

A.   This Lawsuit Challenges Subjective Expressions Of Opinion Fully Protected By The First Amendment. .......................................... 27

B.   The Article Cannot Reasonably Be Understood As Stating Or Implying That Eramo Took "No Action," Silenced Jackie, Discouraged Her From Reporting, Or Abused Her. ............................................ 37

    1.   Statement #1 is not of and concerning Eramo and cannot reasonably be understood as implying that Eramo abused Jackie. ..... 38

    2.   Statement #2 cannot support the defamatory construction Plaintiff places on it. ........................................................ 39

    3.   Statement #4 is not defamatory as a matter of law and is substantially true. .......................................................... 40

    4.   The illustration does not defame Eramo. ............................................ 42

II.   NO EVIDENCE SUPPORTS A FINDING THAT ANY FALSE STATEMENT OR IMPLICATION IN THE ARTICLE WAS PUBLISHED WITH ACTUAL MALICE ................................................................................ 43

A.   As A Public Official And/Or A Limited-Purpose Public Figure At The Time Of Publication, Eramo Must Demonstrate That Defendants Published The Statements At Issue With Actual Malice ................................ 43

    1.   Eramo was a public official at the time of publication. ..................... 43

    2.   Eramo is also a limited-purpose public figure. .................................. 47

B.   Eramo Must Show Actual Malice By Clear And Convincing Evidence. ....... 49

C.   The Undisputed Evidence Precludes A Finding Of Actual Malice. .............. 51

    1.   Defendants had no reason to doubt the accuracy of the "rape school" quote (Statement #3) ............................................... 52

    2.   Significant corroborating evidence backed up the reporting on Eramo, and Rolling Stone had no reason to doubt the basis for its opinions about UVA and Eramo. ....................................... 53

    3.   The fact that Defendants relied on Jackie as a source does not demonstrate actual malice .................................................. 55

        a.   Jackie was entirely credible, and Defendants fully believed in her as a source .................................................... 55

        b.   Jackie's story had the imprimatur of UVA. ............................ 57

        c.   Jackie's allegations were not inherently incredible ............... 58

    4.   There is no evidence that Erdely or Rolling Stone consciously avoided the truth ............................................................. 59

    5.   Plaintiff's remaining theories of actual malice are without merit. ....... 64

III.   ERAMO'S LIBEL CLAIM BASED ON POST-PUBLICATION STATEMENTS FAIL FOR THE SAME REASONS .............................. 66

     A.     The Post-Publication Statements Are Expressions of Opinion or Hyperbole, Protected By The First Amendment............................................... 66

     B.     Eramo Cannot Prove Actual Malice With Respect To The Post-Publication Statements By Clear And Convincing Evidence. ........................ 69

CONCLUSION ........................................................................................................... 72

Defendants Rolling Stone LLC, Wenner Media LLC (collectively, "Rolling Stone"), and Sabrina Rubin-Erdely ("Erdely") respectfully submit this memorandum of law in support of their motion for summary judgment to dismiss the Complaint in its entirety.

## PRELIMINARY STATEMENT

This defamation action arises out of an article titled "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA" (the "Article"), which was written by Defendant Erdely and published by Defendant Rolling Stone in November 2014. The Article opens with the account by a young woman, Jackie, of her alleged gang rape at a Phi Kappa Psi ("PKP") fraternity party at the University of Virginia ("UVA") in September 2012. After publication, the Article came under intense scrutiny from other media organizations, calling into question details of Jackie's account of her sexual assault. In response, Rolling Stone asked the Columbia University Graduate School of Journalism to conduct a comprehensive independent investigation that resulted in a report that found a number of reporting errors concerning Jackie's account of her gang rape. In response, Rolling Stone removed the Article from its website and apologized to the UVA community, and specifically to Plaintiff Nicole Eramo ("Eramo").

But those regrettable errors do not support Eramo's claims in this action. Despite Eramo's attempt to piggyback on those errors to suggest that the Article's reporting on UVA's *response* to Jackie's allegations are false and defamatory, her claims fail for several independent reasons: the challenged statements and implications are non-actionable opinions, they are not defamatory, or are not "of and concerning" Eramo. Nor can Plaintiff, a public official and/or public figure, establish by the necessary "clear and convincing evidence" that any of the challenged statements were published with actual malice, that is subjectively knowing they were false or with serious doubts as to their accuracy.

Drawing upon interviews with a wide range of sources – including experts, government

1

officials, current and former students, sexual assault victims and their family members, and UVA President Teresa Sullivan (Rolling Stone was repeatedly denied access to Eramo) – the Article examines the ways universities respond to student allegations of sexual assault. Following the opening description of Jackie's assault, the Article describes how Jackie reported her assault to Dean Eramo, Chair of the Sexual Misconduct Board, and later reported that two other woman were gang raped at the same fraternity. Despite being apprised of a host of options and assured that it is her choice how to proceed – a model of "victim choice" followed by many schools – Jackie elects to do nothing. Yet, the serious nature of the allegations Jackie reported to UVA – a sexual assault by multiple men during a party at a popular fraternity – sets up the central question of the Article: What is a university's responsibility when it receives a report of this nature, even if the victim herself does not necessarily want to press forward with a formal disciplinary action?

At bottom, Eramo's claims turn on Rolling Stone's subjective views on the answer to that question. She claims that the Article implies that she took "no action" or showed "indifference" in response to Jackie's gang rape allegations, and "silenced" or "discouraged" Jackie from reporting her assault. Yet, even these cherry-picked, out of context phrases from the Article and post-publication interviews are all shorthand for the Article's well-supported critiques of UVA's response to Jackie's reports: (1) that UVA should have alerted the university about a campus safety issue and should have sooner commenced an independent investigation into the multiple allegations of gang rape, and (2) that strict allegiance to "victim choice" has the net effect of causing victims to not pursue actions. These views touch on a nationwide highly charged debate concerning how to properly address sexual assaults, a debate that has roiled campuses for years and remains front page news to this day, as the Stanford rape demonstrates.

Eramo cannot and does not dispute any of the underlying facts that informed these

opinions: UVA never alerted the campus to any public safety concerns arising out of three allegations of gang rape at the same fraternity; nor did UVA undertake an independent investigation of the claims until _after_ it was aware of Rolling Stone's article. Likewise, as the Article documents, there is no dispute that Jackie and most alleged sexual assault victims choose not to report their assaults and proceed with formal hearings or prosecution; UVA's own statistics document that less than 25 percent of victims choose to move forward with their claims.

Rolling Stone is hardly alone in its expressed views. Sexual assault experts quoted in the Article agreed that "despite the absence of an official report, Jackie's passing along two other allegations should compel the school to take action out of regard for campus safety." With regard to the emphasis on victim choice, an expert opined that it is an "alarming trend" that can result in "discouraging and silencing [victims]." Even the U.S. Department of Education, Office of Civil Rights ("OCR") reached conclusions regarding Eramo's direct involvement in violations of Title IX that seriously undermine her entire case. In language much stronger than anything reported in the Article, the OCR concluded that UVA, including Eramo, violated Title IX and created a "hostile environment" for victims of sexual assault at UVA because it "did not promptly investigate information in cases that involved fraternities" and did not take steps "necessary to protect safety of the broader University community."

Eramo heatedly takes issue with both the OCR's Letter of Finding and the Article's opinions criticizing her and UVA's approach to sexual assaults. Eramo is fully entitled to voice her disagreement with Rolling Stone's opinions about the proper way to handle sexual assault cases on university campuses, but she must do so "on the field of polemical battle [rather] than in a defamation suit," for the First Amendment abhors the very object of this lawsuit, "an award of damages that would leave only a legacy of a one-sided debate." _Reuber v. Food Chem. News_,

*Inc.*, 925 F.2d 703, 717, 721 (4th Cir. 1991) (*en banc*). Indeed, criticizing a public university for its policies and practices with respect to sexual assault cases is an exercise at the core of the First Amendment.[1]

Even if Eramo could establish that there are false and defamatory statements of fact concerning her – which she has not – she still cannot meet her burden to prove by "clear and convincing evidence" that Defendants published any of the challenged statements with actual malice. Up until the early morning hours of December 5, 2014, Rolling Stone and Erdely believed wholeheartedly that the Article and each challenged statement was true, and that Jackie was a credible and reliable source. Both Erdely and Rolling Stone spent countless hours interviewing Jackie and corroborating key aspects of her story through emails and other documents, as well as numerous interviews with friends and other sexual assault survivors with whom Jackie had shared her story. In significant ways, Jackie's story came with the imprimatur of UVA: Emily Renda, a UVA employee, who worked closely with Eramo, brought Jackie's case to Erdely's attention. Both President Sullivan and Phi Kappa Psi confirmed that UVA (belatedly) had commenced an investigation of Jackie's allegations in the fall of 2014, and undisputed evidence in the record shows that Eramo and other UVA administrators believed Jackie's story to be true at the time the Article was published.

To be sure, Rolling Stone made mistakes in the editorial and fact-checking process, which have been amply aired in the court of public opinion. But those errors are founded in the truth or falsity of Jackie's account of her sexual assault and the reaction of her three friends. In an effort to support her unfounded claims, Eramo tries to transport that criticism to the Article's uncontroverted reporting on UVA's response to Jackie's allegations. But UVA's response is not

---

[1] *See infra* Parts I, III.

4

in dispute; nor did Defendants have any reason to question it. In the end, Eramo's claim that Rolling Stone or Erdely consciously disregarded or avoided the truth fails. At every turn, Defendants sought out documents and relevant witnesses – including Eramo – and, in the end, published the Article firmly believing in its accuracy.[2]

In sum, after nearly a year of discovery, there are no material facts in dispute relevant to Eramo's claims. It is clear that the majority of statements challenged in this action are non-actionable opinion, and for the only one that is a statement of fact – the "rape school" comment – there is absolutely no evidence that Defendants acted with actual malice (or even negligence). For all the reasons set forth herein, Defendants respectfully request that the Court dismiss this case with prejudice

## STATEMENT OF UNDISPUTED MATERIAL FACTS[3]

The facts relevant to this motion are not subject to any genuine dispute and are more fully described in the accompanying declarations.[4]

### A.    The Parties

#### 1.    Defendants Rolling Stone and Sabrina Rubin Erdely

Founded in 1967, *Rolling Stone* magazine is considered by many the preeminent journal of popular music and is recognized as a major voice in politics and topical journalism. *Rolling Stone* has been honored with numerous journalism awards, including six ASME National Magazine Awards since 2001. Wenner Media is the publisher of *Rolling Stone.*[5]

Erdely, the author of the Article, is an award-winning feature writer and investigative

---

[2] *See infra* Parts II, III.

[3] This section shall hereinafter be referenced as "SUMF."

[4] Declaration of Sean Woods ("SW"); Declaration of Sabrina Rubin Erdely ("SRE"); Declaration of Elisabeth Garber-Paul ("LGP"); Declaration of William Dana ("WD"); Declaration of Joseph Hutchinson ("JH"); Declaration of Elizabeth A. McNamara ("EAM").

[5] WD ¶¶ 4-5, 8.

5

journalist with over twenty years of experience writing for major American publications.  Erdely was a longtime freelance contributing editor for *Rolling Stone* at the time the Article was published.[6]

### 2. Plaintiff Nicole Eramo

At the time the Article was published, and at all times relevant to Plaintiff's claims, Eramo was the Associate Dean of Students at the University of Virginia ("UVA") and the chair of UVA's Sexual Misconduct Board ("SMB"), since 2006.[7]  In this role, Eramo served as UVA's "primary point person" for reports of sexual misconduct and sexual assault at UVA.[8] She had substantial responsibility for administering UVA's intake and adjudication of sexual misconduct cases, including the ability to issue sanctions in informal resolution proceedings.[9] She planned and conducted trainings for faculty, staff and students, and she worked on revisions of UVA's sexual misconduct policies and procedures.[10]

Eramo asserts that she has been "widely lauded for her work as an advocate for victims of sexual assault at UVA and has earned a reputation as [a] tireless supporter of victims and of UVA students generally," adding that she has received prestigious awards from UVA for her work with sexual assault victims.[11]  Colleagues described her as an "expert in all things related

---

[6] SRE ¶¶ 10-14; SW ¶¶ 9-10.

[7] Compl. ¶¶ 29-31.  She also acted as Deputy Title IX Coordinator in 2015.  Lampkin Tr. 73:1-25.  (Relevant sections from the transcript of the April 28, 2016 deposition of Patricia Lampkin, in her personal capacity and as a Rule 30(b)(6) designee for UVA on certain topics (hereinafter "Lampkin Dep."), are attached as Exhibit 86 to the McNamara Declaration.)  *See also* EAM Ex. 94.

[8] Eramo Dep. 129:24-130:3; Groves Dep. 82:7-11, 333:6-334:13; 345:9-25.  Indeed, UVA confirmed to Erdely that Eramo was the "primary authority on sexual assault at UVA."  SRE ¶ 64.

[9] Eramo Dep. 31:24-33:19, 43:25-44:18; Groves Dep. 306:17-22, 307:13-25; Davis Tr. 155:7-14.

[10] Compl. ¶ 29;  Lampkin Dep. 77:19-23; EAM Ex. 95 at UVA020003951; EAM Ex. 96 at UVA020004176-4177; EAM Ex. 97 at UVA040007990.

[11] Compl. ¶ 33.  However, well before the Article and as Erdely was aware, Eramo was personally named in federal Title IX complaints filed with the Office for Civil Rights for Department of Education and the Department of Health and Human Services, in which the complainant made allegations again Eramo arising out of her handling of a sexual assault case.  SRE Ex. 13, 14; Eramo Dep. 115:7-116:22, 117:14-118:7; Groves Dep. 393:4-396:25.  (Relevant sections from the transcript of the April 26 & 27, 2016 deposition of Allen W. Groves, in his personal capacity and as a Rule 30(b)(6) designee for UVA on certain topics (hereinafter "Groves Dep."), are attached as Exhibit 84 to the

to sexual assault" at UVA.[12]  Indeed, UVA confirmed that Eramo was the face of sexual misconduct issues at UVA: "[O]n our Web page, if you clicked on 'sexual misconduct,' I believe Nicole's picture came up and there was a little description."[13]  From 2009 to 2014, she gave at least 21 press interviews on sexual assault and related topics, and she published an opinion piece in the *Cavalier Daily* in 2013 "regarding the University's process when a sexual misconduct case is reported."  She also spoke to local television stations, appeared on panels, gave workshops, and spoke at conferences on the topic of sexual misconduct on college campuses.[14]  In an interview just weeks before the Article was published, Eramo defended UVA's policies with respect to treatment of sexual assault cases and discipline for perpetrators.[15]

Eramo was UVA's primary point of contact for Jackie concerning her allegations of sexual assault.[16]  At all times Eramo communicated with Jackie concerning her allegations, Eramo acted in her official capacity as a UVA administrator.[17]

**B.    The Reporting, Editing, and Fact-Checking of "A Rape on Campus"**

**1.    Genesis of the Article**

In the spring of 2014, Erdely began researching an article concerning rape on college campuses.  At the time, the "culture of rape" on campuses and how schools should grapple with reports of sexual assaults was a widely debated and chronicled topic in the news.  The OCR was

---

McNamara Declaration.  Relevant sections from the transcript of the May 4, 2016 deposition of Nicole P. Eramo (hereinafter "Eramo Dep."), are attached as Exhibit 83 to the McNamara Declaration.)

[12] EAM Ex. 98.  *See also* Groves Dep. 341:9-342:10.

[13] Groves Dep. 333:16-18.

[14] EAM Ex. 99, at Responses No. 4-6, 7, 9.  *See also* EAM Ex. 100, at UVA040001920; EAM Ex. 101, at UVA040001901; EAM Ex. 102, at UVA040001857

[15] EAM Ex. 103; Eramo Dep. 74:23-75:9, 78:7-14, 88:7-14, 90:8-103:21.

[16] Groves Dep. 350:4-8.

[17] Groves Dep. 351:2-24.

in the midst of conducting Title IX compliance reviews against a limited number of elite schools – including UVA.[18]

After conducting initial interviews with students at a number of different schools, Erdely decided to focus on UVA for the Article. In part, she chose UVA because she believed it was a "typical" campus with respect to these issues.[19] Beginning in July 2014, Erdely interviewed more than 25 sources over the course of approximately six months, taking over 400 pages of detailed, contemporaneous notes and gathered voluminous documentary evidence.[20]

### 2. Erdely Is Introduced to Jackie by UVA Employee Emily Renda with Eramo's Knowledge

Erdely was first introduced to Jackie by Emily Renda, a recent graduate and UVA employee working on Title IX issues.[21] Renda offered to put Erdely in touch with several UVA rape survivors, including Jackie, a student who she "worked with closely" who alleged that she had been "gang raped" at a fraternity house in the beginning of her freshman year.[22] As Erdely came to learn, Renda – testifying as a "representative of UVA" – had recently included Jackie's "gang rape" story in public testimony before the U.S. Senate.[23] Renda notified Eramo that she was planning to provide Jackie's name to a *Rolling Stone* reporter and Eramo communicated no concerns about Jackie's credibility as a source for *Rolling Stone*.[24]

Before Erdely even connected with Jackie, Renda made clear that UVA knew Jackie had

---

[18] SRE ¶¶ 15-18; SW ¶ 56.

[19] SRE ¶¶ 19, 20.

[20] SRE ¶¶ 3, 20-23, SRE Ex.15; LGP ¶ 11, Appendix of Back-Up Material.

[21] SRE ¶¶ 24-28; Renda Dep. 11:19-12:9, 34:18-20, 134:18-22. (Relevant sections from the transcript of the March 18, 2016 deposition of Emily Renda (hereinafter "Renda Dep.") are attached as Exhibit 89 to the McNamara Declaration.)

[22] SRE ¶¶ 26, 28.

[23] SRE ¶ 27; SRE Ex. 16; Renda Dep. 33:20-25, 35:24-36:16, 138:16-142:16. Renda provided drafts of her testimony to Eramo and various other UVA administrators, and never received any indication that Jackie's account should not be included in Congressional testimony. Renda Dep. 138:16-139:24, 145:4-9; Groves Dep. 174:23-175:15; EAM Ex. 104.

[24] Renda Dep. 154:11-156:14; Eramo Dep. 231:7-20; 232:7-233:12; EAM Ex. 105.

been assaulted at PKP, and she told Erdely that UVA knew of two other women with "similar stories" that UVA was "trying to pursue."  While attending a conference on sexual assault issues at Dartmouth College with Eramo in July 2014, Renda wrote to Erdely explaining that "we are trying to persuade" the two other women to "come forward" so that UVA could "get punitive action against the fraternity."[25]  In a follow-up telephone conversation, not disputed by Eramo, Emily told Erdely that "our associate dean" – Nicole Eramo – "is very passionate about getting [the fraternity] punished" and "very interested in making sure we can do something punitive and make something stick."[26]

### 3.    Erdely Interviews Jackie and Her Friends

Erdely interviewed a number of different sexual assault victims at UVA, including Jackie, and included their stories in the Article, but she ultimately decided to use Jackie's story as the opening narrative.[27]  In her months of reporting, Erdely spent over 20 hours interviewing Jackie on at least six different occasions on the phone and in person.[28]  Jackie described her gang rape in depth, providing the details recounted in the opening section of the Article, along with the reactions of three friends she called after the assault, who she named as Ryan, Catherine, and Alex.[29]  Jackie told Erdely that she had met with UVA at least twice about her sexual assault – once in May 2013 and once in April 2014 – but had not yet decided whether to take any formal action.  Then, confirming what Erdely had already learned from Emily, Jackie revealed that she had told UVA about two other women who alleged similar assaults by multiple men at PKP

---

[25] SRE ¶ 29; Renda Dep. 72:24-73:8, 176:17-180:2.

[26] SRE ¶ 30; Renda Dep. 176:17-180:2, 240:24-242:2; Eramo Dep. 241:23-244:14.

[27] SRE ¶¶ 4, 24-28, 51-59, 82.

[28] *See, e.g.,* SRE ¶¶ 3, 31-49, 68-75, 87-94, 128-129.

[29] SRE ¶¶ 31-45; Jackie Tr. 210:3-13.  (Relevant sections from the transcript of the April 7, 2016 deposition of "Jackie" (hereinafter "Jackie Dep.") are attached as Exhibit 92 to the McNamara Declaration.)

parties, and that she had convinced one of those women to submit an anonymous report.[30]

From her hours of interviews, Erdely believed Jackie to be a thoroughly credible, honest, and forthcoming source.[31]  Rolling Stone's fact-checker also spent hours confirming Jackie's story with her and likewise found Jackie to be entirely credible: her story was consistent, detailed and filled with emotional authenticity.[32]  But Erdely's investigation far from ended with speaking to Jackie.  She corroborated key elements to her story with independent documentation and sources.  Erdely interviewed several of Jackie's friends, including Alex Pinkleton, Sara Surface, Annie Forrest, Rachel Soltis, and Emily Renda.  Based on these interviews, Erdely confirmed that Jackie's description of her gang rape to Erdely was consistent with the facts her friends knew.[33]  Jackie's freshman roommate, Rachel Soltis, confirmed Jackie's description of her depression in the fall of 2012, after the assault, and that Jackie had revealed the "whole story" of the gang rape, after first describing it as forced oral sex on multiple men.[34]  Erdely observed firsthand as Jackie experienced a traumatic breakdown at the sight of the PKP house, and she confirmed Jackie's description of the house's interior when she went inside.[35]

There is no evidence that anyone Erdely interviewed who knew Jackie doubted her story or credibility prior to the Article's publication, much less that they communicated any such

---

[30] SRE ¶¶ 29-30, 36-38, 41-44.

[31] *See, e.g.,* SRE ¶¶ 171-179.

[32] LGP ¶¶ 14-17.

[33] *See, e.g.,*SRE ¶¶ 172, 175, 176 (collecting references).  Discovery in this case has further confirmed that Jackie told friends the same details that she told to Erdely.  *See, e.g.,* EAM Ex. 106, at line 2750.

[34] SRE ¶¶ 95, 96, 98.  Erdely did not understand the shift in Jackie's story from an initial account of forced oral sex by multiple men to vaginal penetration by multiple men to suggest any lack of credibility; to the contrary, she found this evolution of details to be consistent with behavior she had observed in other sexual assault and trauma victims and knew, based upon research, to be a common symptom of traumatic memory.  SRE ¶ 97.  Emily Renda also confirmed this reality of trauma victims to the fact-checker.  LGP ¶ 25. At her deposition, Eramo agreed that the trauma of sexual assault can impact a victim's memory, causing the details of the victim's assault to emerge over time.  Eramo Dep. 138:12-139:5.

[35] SRE ¶¶ 75, 76.

10

doubts to Erdely.[36]  The undisputed evidence also shows that UVA (including Eramo) did not

doubt Jackie's story.[37]

### 4. Plaintiff Does Not Dispute the Relevant Facts of Her Meetings with Jackie

Jackie provided documentation corroborating her meetings with Eramo, and the relevant

facts concerning Eramo's interactions with Jackie, and Erdely's knowledge of those facts, are not

in dispute.  As the Article reports,[38] and emails supplied by Jackie confirmed, Jackie first met

with Eramo in May 2013, after being referred by her "association dean" when she revealed her

sexual assault during a meeting to discuss her poor academic performance.[39]  After Jackie shared

her story, Eramo laid out her various options, including filing a criminal complaint or proceeding

through a formal or informal resolution process within the University.[40]  Eramo told Jackie that it

was her choice how to proceed, and Jackie told her that she did not want to take any action yet.[41]

After this first meeting, as Jackie documented, Eramo sent Jackie a follow-up email

thanking her for sharing her story, telling her "I could tell that was very difficult for you," and

explaining that while she respected Jackie's wish not to file a report, she would be happy to

assist "if you would like to hold these men accountable." [42]  When Jackie returned to campus in

the fall, Eramo put her in touch with Emily Renda, who at the time was a fourth-year student

---

[36] *See, e.g.*, Surface Dep. 100:25-101:6, 122:19-24; Pinkleton Dep. 127:17-129:15; Renda Dep. 139:25-142:16, 212:15-214:13.  (Relevant sections from the transcript of the March 23, 2016 deposition of Sara Surface (hereinafter "Surface Dep.") are attached as Exhibit 88 to the McNamara Declaration.  Relevant sections from the transcript of the March 24, 2016 deposition of Alexandria Pinkleton (hereinafter "Pinkleton Dep.") are attached as Exhibit 87 to the McNamara Declaration.)

[37] *See, e.g.,* Groves Dep. 158:19-160:8, 184:20-185:7; Eramo Dep. 164:21-165:22; Renda Dep. 240:24-242:2.

[38] A true and correct copy of the Article, as it appeared in the December 4, 2014 print edition of *Rolling Stone* magazine is attached as Exhibit 1 to the Woods Declaration (hereafter the "Article").

[39] SRE ¶¶ 36, 41, 82, 83; SRE Ex. 26; Eramo Dep. 146:10-12, 148:25-149:21; EAM Ex. 108 at UVA030008567; *see* Article at RS001076.  (A copy of the Article is attached as Exhibit 1 to the Woods Declaration.)

[40] SRE ¶¶ 36, 41, 82, 83; SRE Ex. 26; Jackie Dep. 230:24-233:9; Eramo Dep. 154:13-155:12, 156:13-157:10, 160:6-161:18; EAM Ex. 108 at UVA030008576; *see* Article at RS001076.

[41] SRE ¶¶ 36, 41; SRE Ex. 26; Jackie Dep. 230:24-233:9; Groves Dep. 305:20-306:7, 308:3-14; EAM Ex. 108 at UVA030008576; *see* Article at RS001076.

[42] SRE ¶ 83, SRE Ex. 26; Eramo Dep. 162:25-164:13; *see* Article at RS001077.

active in One Less, a student-run sexual assault education group. [43]  Beyond making that connection, although Eramo reported Jackie's assault to her superiors, no further action was taken by UVA at that time. [44]

Almost a year after her first report, Jackie claimed she was physically assaulted by several men on the "Corner" near UVA's campus, who threw a bottle at her in what she believed was retaliation for speaking out against fraternities. [45]  Jackie met with Eramo in April 2014 to report the assault and also revealed to Eramo that she knew of two other alleged victims of gang rape at the PKP house. [46]  Jackie described Eramo's reaction to this new information: "It wasn't as shocked as you might think. ... [S]he wasn't like 'my god that's crazy.'" [47]

Jackie supplied multiple documents confirming the Corner assault, including emails with Eramo (showing she took Jackie to the police to report an incident on "the Corner") and photographs of her injured face. [48]  The documents Jackie supplied confirmed that she decided not to press charges or pursue the matter further and that Eramo supported her decision, telling her "Never forget, however, that it is YOUR choice." [49]  Erdely also obtained confirmation from the Charlottesville Police Department that Jackie had reported a "felony assault" to the police

---

[43] Renda Dep. 23:9-24:10; EAM Ex. 109; Eramo Dep. 170:2-7, 170:20-171:4; *see* Article at RS001078.

[44] Eramo admits that even at that first meeting, she believed that the fraternity Jackie identified with "Phi" in the name on Madison Lane might be Phi Kappa Psi. Eramo Dep. 159:14-21. Eramo testified that she had "concerns about public safety" based upon her initial meeting with Jackie. Yet, based on the facts Jackie provided in her first meeting, UVA did not determine where Jackie worked at IM-Rec, obtain a roster of lifeguards, and cross-check that roster with the rosters of fraternities on Madison Lane with "Phi" in the name (of which there were two possibilities), or any other fraternity. UVA did not issue a warning to campus or take any action to investigate Jackie's allegations at this time. Eramo Dep. 164:14-167:13, 168:2-4; Groves Dep. 110:1-2, 121:14-18, 124:17-24. Instead, they decided that Eramo would try to continue working with Jackie. Eramo Dep. 165:20-22. Between October 2013 and April 2014, Eramo took no action with regard to Jackie's allegations. Eramo Dep. 175:10-19. Other than offering Jackie support and referring her to One Less, UVA did nothing between May 2013 and April 2014 to investigate Jackie's sexual assault allegations. Groves Dep. 124:7-24.

[45] SRE ¶¶ 38, 41, 84; SRE Ex. 27; EAM Ex. 108 at UVA030008613; *see* Article at RS001078.

[46] SRE ¶¶ 38, 41, 84; SRE Ex.27; EAM Ex. 108 at UVA030008613-8615; *see* Article at RS001078.

[47] SRE ¶ 43.

[48] SRE ¶¶ 41, 42, 84; SRE Ex. 27, 18;LGP ¶ 18.

[49] SRE ¶ 84; SRE Ex. 27, at RS017033.

12

occurring on the weekend of April 5 at the Corner, resulting in a "laceration" on her face.[50]

In this action, Eramo asserts that when she brought Jackie to the police to report the physical assault on the Corner, Jackie also revealed to police that she had been sexually assaulted at Phi Psi. There is no evidence in the record that Erdely ever knew Jackie mentioned her sexual assault to police; instead, the documents and information in Erdely's possession indicate only that Jackie went to police about her physical assault with the bottle on the Corner, and then ultimately decided not to pursue the matter.[51] An internal memo that Eramo prepared in May 2014 about her interactions with Jackie, at the direction of UVA's Dean of Students, similarly asserts that Eramo connected Jackie with police specifically to report the bottle incident.[52]

Beyond this, however, UVA and Eramo took no further action to notify the campus concerning these reports of multiple gang rapes of Phi Psi, nor did it commence any sort of independent investigation until mid-September 2014.[53] When Erdely consulted experts in the field about Jackie's case – specifically, about what a university should do when it receives

---

[50] SRE ¶ 42; SRE Ex. 17. Eramo has confirmed that Jackie showed up to this meeting with a bruise on her face. EAM Ex. 110; Eramo Dep. 216:20-217:1.

[51] *See* SRE Ex. 27;SRE ¶¶ 85, 195; SW ¶ 73; LGP ¶ 66(b). Eramo admitted in her deposition that the "incident" referred to in these emails was the bottle attack, not Jackie's sexual assault. Eramo Dep. 184:16-18, 186:21-24. At her deposition, Renda testified, that she, too, believed Jackie had gone to the police solely about the bottle-throwing incident in April 2014 and "wasn't aware" that Jackie had mentioned her sexual assault to the police. Renda Dep. 230:9-232:12

[52] EAM Ex. 110.

[53] As of April 2014, UVA confirmed that it was aware that Jackie's assault occurred at PKP, and that she learned of two other women who alleged sexual assaults by multiple men at the same fraternity house, including the names of these two women. EAM Ex. 110; EAM Ex. 111; EAM Ex. 108 at UVA030008613-8616; Eramo Dep. 210:15-18; Groves Dep. 144:4-145:15, 282:15-17. Shortly thereafter, UVA received an anonymous report of a sexual assault consistent with Jackie's description. EAM Ex. 108 at UVA030008616; EAM Ex. 110; Groves Dep. 148:20-150:7. UVA did not send out any alert to the campus; did not undertake any independent investigation to identify the other two alleged victims; did not go back to try to determine the identity of "Drew" by comparing rosters from IM-Rec and Phi Kappa Psi; and did not reach out to Phi Kappa Psi. Groves Dep. 165:4-167:21; Eramo Dep. 219:5-9. Associate Vice President for Student Affairs Susan Davis confirmed at her deposition that in her role as an investigator for student sexual misconduct complaints, she was not asked to investigate Jackie's allegations. Davis Dep. 12:10-13:19. Despite "escalated" concern about Jackie's allegations by May 2014 (Eramo Dep. 196:2-3), Eramo did not reach out to Jackie over the summer of 2014 to encourage her to file a complaint or identify the two students. Eramo Dep. 227:9-228:9. By this point, Eramo also admits that she heard Jackie speak at UVA's Take Back the Night vigil in April 2014 – and that based on Jackie's description of the assault, she understood at that point that Jackie was alleging vaginal penetration by multiple men. Eramo Dep. 177:13-20, 178:7-18.

13

allegations like Jackie's yet the victim does not want to move forward. These experts agreed that UVA had an obligation to investigate Jackie's allegations.[54]

### 5. Plaintiff Does Not Dispute that Jackie Gave Erdely the "Rape School" Comment and Does Not Dispute the Statistics Reported in the Article Concerning UVA's Handling of Sexual Assault Claims

It is undisputed that (as the Article reports) of the 38 students who came to Eramo with reports of sexual assault in 2013-14, only nine decided to move forward with any formal action.[55] It is also undisputed that (as the Article reports) between 1998 and 2014, 183 students were expelled for Honor Code violations and *none* for sexual assault.[56] Nor is it disputed that these statistics are not readily available to students and parents. The Article quotes Susan Russell, the mother of a UVA sexual assault victim, as stating: "When a parent goes to the campus crime log, and they don't see sexual assault, they think the school is safe."[57] Liz Seccuro, another rape victim told Erdely that "everyone's hiding their crime statistics," but "UVA's especially good at it."[58] Even UVA President Sullivan confirmed to Erdely that UVA does not publish granular statistics showing the number of students who took any particular course of action after reporting an assault to UVA.[59]

Against this backdrop, the Article reports that Eramo explained to Jackie that sexual assault statistics are not available because "nobody wants to send their daughter to the rape

---

[54] SRE ¶¶ 57- 59. Eramo admitted that Laura Du nn, among other experts quoted in the Article, is considered to be an authority on sexual assault issues. Eramo Dep. 234:19-238:4. UVA has previously described S. Daniel Carter as a "national expert" on sexual assault issues, and solicited feedback from him on their draft policies. EAM Ex. 112 at UVA010004916.

[55] SRE ¶ 103; SRE Ex. 30; Eramo Dep. 69:20-24; *see* Article at RS001077. Plaintiff further confirmed that "relatively few" of the students who report a sexual assault at UVA end up filing a formal complaint. Eramo Dep. 67:6-12, 69:20-24.

[56] Eramo Dep. 54:21-55:17; SRE ¶ 138; LGP ¶ 40, LGP Ex. 60 at RS013354; *see* Article at RS001074.

[57] SRE ¶ 102; Article at RS001076.

[58] SRE ¶ 54.

[59] SRE ¶ 104. In her deposition in this action, Jackie's friend Alex Pinkleton confirmed that statistics about sexual assault were "not readily available" before the Article was published. Pinkleton Dep. 71:3-20.

14

school."[60]  There is no evidence in the record indicating that Erdely did not believe this quote to be accurate at the time the Article was published.  It was entirely consistent with the above information and, specifically, Russell's quote.[61]  Jackie provided the "rape school" quote to Erdely on two separate occasions and confirmed it a third time with Rolling Stone's fact-checker.[62]  At her deposition, Eramo conceded that Jackie told Erdely this quote.[63]  Furthermore, given that Jackie obviously loved and respected Eramo – even prefacing this account with the caveat that she "[didn't] want to get her in trouble" – Erdely had no basis to suspect that Jackie was reporting false information.[64]

Nor does Eramo dispute that the calm, neutral demeanor described by Jackie when she reported her and the two other assaults – not acting "aghast" or "surprised" at a student's story – was consistent with her practice at the time.  Eramo admitted that when meeting with a student victim, she would listen to the victim's story "without judgment" and would "come at it with … neutrality."[65]

6. **Jackie Reports Pressure from the UVA Administration Over Her Participation in the Article**

As the Article was being finalized, Jackie told Erdely that she was receiving pressure from family, peers, and the UVA administration over her participation in the Article.  In particular, she told Erdely that Eramo was pressing her not to allow *Rolling Stone* to use her name in the Article:

> Dean Eramo does not want my name in the article at all, she said if my name was in the article then this and that.  She wanted me to talk to someone in PR about it.  …  For Dean Eramo it's a huge deal. I think

---

[60] Article at RS001077.
[61] SRE ¶ 144.
[62] SRE ¶¶ 44, 71, 144, 191; LGP ¶ 55.
[63] Eramo Dep. 22:25-23:5.
[64] SRE ¶¶ 36, 71, 186, 191.
[65] Eramo Dep. 137:25-138:10.

15

she's upset because I told the UVA Alumni Magazine that I didn't want them using my name.[66]

Erdely was also told by Jackie's friend Alex Pinkleton that Jackie was receiving "polar opposite information" from Eramo and Erdely about her participation in the Article.[67]

### 7. UVA Prevents Erdely from Speaking with Plaintiff and Confirms September 2014 Investigation of Phi Kappa Psi for Multiple Gang Rapes

Erdely confirmed an in-person interview with Plaintiff for September 12, 2014.[68] UVA unilaterally cancelled this interview the day before it was scheduled to occur and advised Erdely that Eramo would not be made available for comment.[69] Erdely pushed back, telling UVA's representative that she "must insist on speaking to Nicole who, as we discussed, is the primary authority on sexual assault at UVA." UVA still refused to make her available for an interview.[70] Instead, UVA made President Sullivan available for an interview. During her interview with President Sullivan, in response to Erdely's question about "three separate allegations of gang rape against Phi Psi," she confirmed that UVA was finally investigating "a fraternity" and that the investigation had commenced in the fall semester.[71] President Sullivan also told Erdely that "it's possible for us to take action against an organization even if we don't have the names of individuals."[72]

Following Erdely's interview with President Sullivan, a UVA representative contacted Erdely to caution that Erdely's "characterization of the facts" of a case from spring 2014 were

---

[66] SRE ¶ 129.

[67] SRE ¶ 121; SRE Ex. 37. Plaintiff admits that she had concerns about Jackie participating in the Article. Eramo Dep. 224:17-225:4, 225:25-226:15, 300:23-301:15.

[68] SRE ¶ 61; SRE Ex. 19; Eramo Tr. 263:4-25.

[69] SRE ¶¶ 64, 65; Lampkin Dep. 36:1-37:25, 38:25-39:19; ; EAM Ex. 113.

[70] SRE ¶ 64.

[71] SRE ¶¶ 103-106; Groves Dep. 283:6-19.

[72] SRE ¶ 106.

16

"incorrect" – the case of "Stacy," as she is described in the Article.[73]  Despite going out of their

way to raise a concern about Erdely's understanding of "Stacy's" case, UVA did not tell Erdely

that she had anything "incorrect" with respect to Jackie's case – including that Eramo had

received "three separate allegations," that the allegations concerned "gang rape," and that the

assaults allegedly occurred at PKP.[74]

Shortly after Erdely returned from her visit to UVA's campus in mid-September, Erdely

learned from Jackie and Alex Pinkleton that UVA had contacted a representative from the

national organization of PKP for a meeting to discuss Jackie's allegations.  Jackie told Erdely

that she met with Eramo, along with her friend Alex, and that Eramo told both girls that she

heard "through the grapevine through members of Phi Psi that all the boys involved have

graduated."[75]  Erdely confirmed the accuracy of this quote with Pinkleton.[76]  The Article

includes this quote,[77] and Plaintiff has not challenged its accuracy in this action.

Erdely next confirmed with the national representative of PKP that the fraternity was

contacted by UVA concerning multiple allegations of gang rape at the PKP house, providing

dates for the three allegations of which she was aware.[78]  Erdely also confirmed with the chapter

president that UVA informed the chapter of sexual assault allegations.[79]  Comment from both the

national and chapter representative are included in the Article.[80]

### 8.     Erdely Took Additional Steps to Confirm Jackie's Account

In addition to confirming that Jackie's friends had the same salient details of her account,

---

[73] SRE ¶ 107; Groves Dep. 287:9-16.
[74] SRE ¶ 108; Groves Dep. 283:6-287:16, 298:2-7.
[75] SRE ¶ 88.
[76] SRE ¶ 90.
[77] Article at RS001079.
[78] SRE ¶ 115.
[79] SRE ¶ 114.
[80] Article at RS001079.

Erdely also took steps to cross-check and confirm Jackie's account. She tested Jackie's reliability as a source for third-party quotes by double-checking Jackie's account of various conversations with the other participants, including Renda, Pinkleton, and Annie Forrest.[81] Erdely obtained documentation from Jackie that she worked as a lifeguard at the University pool; documentation that she sought mental health services in February 2013, prior to reporting her assault; and email exchanges with Eramo documenting Eramo's meetings in April 2013 and April 2014.[82] She also obtained text messages exchanged between Jackie and one of the two additional alleged victims and the victim's friend, in which the two women refused to participate in the Article and berated Jackie for continuing to ask about it.[83]

In the end, Erdely and Rolling Stone had no doubts about the accuracy of Jackie's story. Every anecdote and quote that could be corroborated, checked out, and key facts were independently confirmed. Jackie was not hiding behind anonymity and was prepared to have her first name used in the Article; nor did they see any motivation for her to lie and knew that victims of sexual assault rarely lie.[84]

### 9. None of the Sources Erdely Was Ultimately Unable to Reach had Relevant Information Concerning Eramo

Central to Plaintiff's arguments in this case are that Erdely did not find out the last name of Jackie's assailant prior to publication and did not reach the three friends known in the Article as "Randall," "Andy," and "Cindy." There is no evidence that Erdely avoided trying to get in contact with these individuals; no evidence that she had their contact information but chose not to reach them; and most importantly, no evidence that any of these individuals would have provided relevant information about *Jackie's interactions with Eramo*.

---

[81] SRE ¶ 175 (collecting references).
[82] SRE ¶ 176 (collecting references).
[83] SRE ¶ 131, SRE Ex. 42, 43.
[84] SW ¶¶ 17-29; SRE ¶¶ 171-187; LGP ¶¶ 14-24; WD ¶ 4.

18

Erdely's notes and emails make clear that she asked Jackie repeatedly to put her in touch with Ryan ("Randall"), who she believed to be the most likely of the three friends to cooperate.[85] Jackie eventually told Erdely that she ran into Ryan and he refused to participate in her "shit show," recounting his response in detail.[86] Erdely tried unsuccessfully to locate the two other friends independently via social media, but with only first names and Jackie's friends unwilling to provide names without Jackie's permission, she believed that she had run into a dead-end.[87]

In depositions for this action, none of the three friends expressed any basis to believe that Erdely had their full names prior to publication and chose not to contact them.[88] Nor is there any evidence that the three friends had any knowledge of Jackie's interactions with Eramo.[89]

Erdely also repeatedly pressed Jackie to find out "Drew's" last name – to the point that Jackie stopped returning Erdely's calls.[90] She also tried independently – and unsuccessfully – to find his last name.[91] Jackie urged friends not to reveal the name to Erdely, claiming that she was "on a witch hunt" to interview him, and Jackie's friends stood behind her in her refusal to provide Erdely with the name, claiming that pressuring Jackie was traumatizing her.[92]

### 10. Rolling Stone Subjects the Article to Rigorous Fact-Checking

Rolling Stone subjected the Article to rigorous fact-checking, which is described more

---

[85] SRE ¶¶ 35, 39, 49, 50.

[86] SRE ¶ 70.

[87] SRE ¶¶ 50, 180, 181. Pinkleton Dep. 210:12-25; Surface Dep. 141:9-13. While Erdely had in her notes a version of Kathryn Hendley's last name – "catherine hindley or hinkley" – from her interview with Rachel Soltis, she testified that she did not even see this in her notes until well after the Article was published. SRE ¶ 99. Furthermore, because neither the first nor last name is correct, there is no way to know whether Erdely could have found Ms. Hendley with this information even if she had noticed it. *Id.*

[88] Hendley Dep. 47:8-12; Duffin Dep. 153:15-154:14, 233:14-17. (Relevant sections from the transcript of the April 14, 2016 deposition of Kathryn Hendley are attached as Exhibit 91 to the McNamara Declaration. Relevant sections from the transcript of the April 15, 2016 deposition of Ryan Duffin are attached as Exhibit 90 to the McNamara Declaration.)

[89] Hendley Dep. 86:22-87:10; Duffin Dep. 239:1-23.

[90] SRE ¶¶ 94, 116-128.

[91] SRE ¶¶ 123, 124; Pinkleton Dep. 125:13-24; SW ¶ 32.

[92] EAM Ex. 114 at RESPJ00001096; SRE ¶¶ 121-126; Pinkleton Dep. 215:2-15; Surface Dep. 94:9-14.

19

fully in the accompanying Garber-Paul Declaration.  Garber-Paul spent 80 hours fact-checking the Article.[93]  All of the key quotes in the Article were independently corroborated, including the "rape school" quote.[94]  Eramo's statement that she heard that "all the boys involved have graduated" was confirmed with both Alex Pinkleton and Jackie.[95]  Garber-Paul obtained substantial confirmation of key facts in the Article relating to UVA and Eramo directly from UVA, despite UVA's refusal to make Eramo available for comment or to discuss specific cases.[96]  Nothing occurred in the fact-checking process for the Article that gave Garber-Paul any pause or concern.[97]  To the contrary, Garber-Paul had complete confidence in the Article's accuracy when it was published.[98]

## C.  The Article

The Article was published online on November 19, 2014, titled "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA."[99]  The Article was 9,000 words and ran 10 pages in print.[100]  Neither Erdely nor anyone at Rolling Stone had any doubts in the Article's accuracy at the time it was published.[101]

## D.  The Eramo Illustration

The Article is accompanied by three photo illustrations by John Ritter – a large "opener" illustration and two smaller "spot" illustrations within the Article.[102]  Rolling Stone provided

---

[93] LGP ¶ 8.
[94] LGP ¶ ¶ 43-64.
[95] LGP ¶¶ 22, 55..
[96] LGP ¶ 37-42.
[97] LGP ¶ 67.; SRE ¶ 133.
[98] LGP ¶¶ 2, 12, 43-64, 67-68.
[99] SRE ¶¶2, 135
[100] SRE ¶ 135.
[101] SRE ¶¶ 5, 7; SW ¶¶ 2, 17; LGP ¶¶ 2, 67; WD ¶¶ 2, 10, 14.
[102] JH ¶¶ 9-11, 13-14.

minimal instruction for the "spot" illustration that depicts Eramo meeting with a student.[103]

Mr. Ritter submitted a single working sketch for the Eramo illustration, and Rolling Stone

promptly approved it without any revisions.[104]  The photo illustration shows Eramo comforting a

troubled student, while scenes outside her office symbolize the controversy surrounding issues of

sexual assault on college campuses.[105]  The illustration's caption expressly notes that Eramo is

"beloved by students."[106]

Everyone involved in the selection and approval of the illustration testified that the

illustration is a nuanced and fair representation of Eramo's role in the story, and that they had no

intention of creating a negative portrayal of Eramo.[107]

**E.**    **Post-Publication**

After the Article was published, Rolling Stone received an outpouring of letters from

UVA alumni and students thanking them for the story and telling Rolling Stone about their own

similar experiences in reporting sexual assaults at UVA.[108]  Erdely also received a number of

requests for press appearances, most of which were declined.[109]  She agreed to appear on an

episode of the "DoubleX Gabfest," a podcast produced by Slate, at 9 a.m. on Wednesday,

November 26 – the day before Thanksgiving.  She also agreed to appear on the Brian Lehrer

Show on WNYC, immediately following the Slate interview. [110]  Nothing Erdely said on the

---

[103] JH ¶ 14.  The image of Eramo in the photo illustration comes from a Cavalier Daily photo licensed by Rolling Stone.  JH ¶ 15.  Mr. Ritter was not given any instruction about whether or how to depict, alter the appearance of, or obscure Dean Eramo's body or eyes.  JH ¶¶ 20-21.  Mr. Ritter did not alter the shape or appearance of Eramo's face, body, or clothing in the photo other than to move her gaze so that it she was looking directly at the student she was counseling in the illustration. Ritter Dep. 62:20-64:20.
[104] JH ¶ 17.
[105] JH ¶¶ 18; SW ¶ 69; WD ¶ 21.
[106] Article at RS001076.
[107] JH ¶¶ 18-21; SW ¶ 69-70; WD ¶¶ 20, 22.
[108] SW ¶ 23.
[109] SRE ¶ 152.
[110] *Id.*.

21

Slate podcast or Brian Lehrer Show was based on any information other than her reporting for the published Article and her own opinions; she was simply summarizing and discussing the Article.[111]  During the Slate interview, she expressed concern that UVA did not launch an investigation or warn the campus when Jackie first came to them with allegations of a violent gang rape, nor when she came to them a second time to reveal that she had learned of two other victims – instead, they deferred to Jackie's decision not to take any formal action.

Immediately after the Slate interview, Erdely was called for an interview on the Brian Lehrer Show.  Like the Slate hosts, Mr. Lehrer asked Erdely questions about the Article.  Erdely reiterated the opinions that she had expressed in the Article.  Eramo's name was never mentioned at any point during Erdely's interview with Mr. Lehrer.  Both the Slate and Brian Lehrer Show websites linked to the Article. [112]

Following these two interviews, Erdely spoke again with Jackie.  At this point for the first time, Jackie provided the full name of "Drew."[113]  Erdely located a graduate student with the same name and remained confident in Jackie's story.[114]

After Thanksgiving, the Washington Post and other news organizations began to criticize Rolling Stone's reporting and editorial process for the Article.  Despite the criticism, Rolling Stone's faith in the Article's accuracy and Jackie's credibility remained firm.[115]  Rolling Stone issued a press statement on December 1 reiterating its belief in the Article and its faith in Jackie's credibility.[116]  At the same time, at Will Dana's request, Erdely began to draft an in-depth response piece explaining her reporting process and why she believed so firmly in Jackie's

---

[111] SRE ¶¶ 153-157.
[112] SRE ¶ 157.
[113] SRE. ¶¶ 158, 159.
[114] SRE ¶ 160.
[115] SW ¶¶ 77-78, 80-88, 90;WD ¶¶ 25-29; SRE ¶ 161.
[116] WD ¶ 27; SW ¶¶ 80-87.  This press Statement is the foundation for **Statements # 12** and **13**.

22

story and the Article.[117]  On the evening of December 4, Erdely was still revising what was intended to run under an "Editor's Note" the next day, a statement unequivocally confirming that Rolling Stone "stands by" the Article.  Following late-night calls with Jackie and her friends, events shifted dramatically and that Editor's Note never ran.[118]

## F.  The Retraction and CJR Report

In the early morning hours of December 5, 2014, Erdely had a series of phone conversations with Jackie and her friend Alex Pinkleton that caused her for the first time to lose faith in Jackie's credibility.[119]

As soon as Erdely got off the phone, she immediately wrote an email with the subject line "our worst nightmare" to her editors at Rolling Stone telling them that she no longer found Jackie to be credible and that the magazine needed to print a retraction of the Article.[120]  Within hours of receiving Erdely's email indicating that Jackie's credibility may be in doubt and that her account of her alleged sexual assault may be inaccurate, Rolling Stone published an Editor's Note, titled "A Note to Our Readers," at the top of the Article page.[121]  It acknowledged discrepancies in Jackie's account, apologized for certain editorial decisions, and stated, among other things:

> In the face of new information, there now appear to be discrepancies in Jackie's account, and we have come to the conclusion that our trust in her was misplaced. We were trying to be sensitive to the unfair shame and humiliation many women feel after a sexual assault and now regret the decision to not contact the alleged assaulters to get their account. We are taking this seriously and apologize to anyone who was affected by the story.[122]

---

[117] WD ¶¶ 27-29; SW ¶ 90; SRE ¶ 161.
[118] SRE ¶¶ 161-168.
[119] SRE ¶¶ 162-168; Pinkleton Dep. 153:10-154:6, 157:8-22.
[120] Erdely ¶¶ 167, 168; SRE Ex. 52.
[121] WD ¶ 33.
[122] *Id.*

The December 5 Editor's Note did not repeat or reaffirm any information in the Article.[123]

After concerns were raised that the magazine was blaming Jackie, Rolling Stone published a revised Editor's Note on December 6. The December 6 Editor's Note replaced the December 5 Editor's Note, both at the top of the Article and on the Note's standalone webpage. Again, this Note did not repeat or reaffirm any information in the Article. The December 6 Editor's Note identified the discrepancies in Jackie's story mentioned in the December 5 Washington Post story. It concluded:

> We published the article with the firm belief that it was accurate. Given all of these reports, however, we have come to the conclusion that we were mistaken in honoring Jackie's request to not contact the alleged assaulters to get their account….We should have not made this agreement with Jackie and we should have worked harder to convince her that the truth would have been better served by getting the other side of the story. These mistakes are on Rolling Stone, not on Jackie. We apologize to anyone who was affected by the story and we will continue to investigate the events of that evening.[124]

In mid-December, Rolling Stone asked the Columbia School of Journalism to conduct an independent review of the editorial process that led to the publication of the Article. The agreement gave them full independence in reporting and writing their report.[125]

On April 5, 2015, Rolling Stone published the CJR Report online. Concurrently with its publication, Rolling Stone took the Article down from Rollingstone.com and replaced it with the CJR Report, accompanied by an Editor's Note signed by Will Dana, the then-Managing Editor of the magazine.[126] The Editor's Note concluded with an apology to "our readers and to all of those who were damaged by our story and the ensuing fallout, including members of the Phi Kappa Psi

---

[123] *Id*. ¶35.
[124] *Id*. ¶¶ 37, 40-41..
[125] *Id*. ¶ 48.
[126] WD ¶ 51.

24

fraternity and UVA administrators and students."[127]

The CJR report included harsh criticisms surrounding certain editing and reporting decisions by Erdely and Rolling Stone pertaining almost exclusively to the lead of the story – the account of Jackie's gang-rape and her interactions with the three friends. However, the CJR Report did not uncover errors with respect to Rolling Stone's reporting on UVA or Eramo.[128] The Report further made clear that Rolling Stone and Erdely "believed firmly" that Jackie was a reliable source and that her account was true when the Article went to press, and it found "no evidence" that Erdely had invented any facts in the Article.[129]

Following the issuance of the CJR Report, Eramo released an "open letter" to Rolling Stone's publisher, Jann Wenner.[130] Rolling Stone published an edited version of Plaintiff's letter in the May 21, 2015 issue of Rolling Stone magazine, which was available on newsstands on or about May 8, 2015. Although Rolling Stone had already apologized to all UVA administrators – which included Plaintiff –Rolling Stone also included a specific apology to Eramo in the print magazine in response to her letter.[131]

**G.    The Complaint**

Plaintiff commenced this action in the Charlottesville Circuit Court on May 12, 2015. Defendants removed the action to this Court on Mary 29, 2015. Plaintiff admits that Paragraphs 220 and 225 of the Complaint are a complete recitation of the statements from the Article that

---

[127] *Id*. ¶ 51; SW ¶ 99..

[128] SW ¶ 102; WD ¶ 55.

[129] SW Ex. 27 at ERAMO-04542, ERAMO-04560. In discovery for this action, Eramo admitted that she spoke off the record to the Columbia Journalism Review to confirm information attributed in the Report to "UVA sources." Eramo 307:7-25, 316:2-324:13  It is undisputed that Eramo spoke to CJR without authorization from UVA. Groves Dep. 321:6-15, 323:11-16, 326:9-327:23; Eramo Dep. 308:6-310:2. Eramo also admits that she did not attempt to speak to Erdely off the record despite a similar lack of authorization. Eramo Dep. 326:20-327:12.

[130] WD ¶  57; Compl. ¶¶ 104-105.

[131] *Id*.

she is challenging in this action.[132]  (A full compendium of the challenged statements are attached as an Appendix to this brief and shall hereafter be referred to as the "Statements.")

## H.    The OCR Investigation and Letter of Finding

As the Article reported, UVA was among a small number of schools under investigation for a Title IX compliance review at the time the Article was published.[133]  After publication, on September 21, 2015, OCR issued its final "Letter of Finding" regarding UVA's compliance review.[134]  The Letter of Finding is highly critical of Eramo and UVA's practices in responding to sexual assault allegations.  OCR concluded, among other things, that UVA had mishandled informal reports of sexual assault over a number of years, including by failing to conduct its own investigations or evaluate complainants' requests for confidentiality against the need for campus safety.[135]

In particular, OCR found that in two instances in 2013 and 2014 – understood to be referring to Jackie and "Stacy's" sexual assault reports – "the University did not promptly investigate information in cases that involved fraternities."[136]  OCR found that in these two cases, "[i]n addition to reflecting the absence of a prompt investigation, the files do not reflect the University evaluating steps necessary to protect safety of the broader University community."[137]  OCR also found that UVA "failed to respond in a prompt and equitable manner" to these two cases, among others, and that this failure to respond "allowed a hostile environment to exist for affected students."[138]  In addition, OCR also concluded that Eramo's

---

[132] Eramo Dep. 30:6-8; 30:19-22.
[133] Article at RS001073; Davis Dep. 13:25-15:13
[134] SW Ex. 4.
[135] SW Ex. 4 at 2-3, 16-17; Davis Dep. 84:14-85:14.
[136] SW Ex. 4 at 17.  UVA testified that it believes the 2013 case refers to Jackie's case, and the 2014 case refers to "Stacy's" case.  Davis Dep. 90:1-12, 105:8-12, 141:19-142:3, 142:25-143:8.
[137] SW Ex. 4 at 17; Davis Dep. 92:16-93:1.
[138] SW Ex. 4 at 2, 20.  OCR further found that UVA's action – or, inactions – violated Title IX.  SW Ex. 4 at 17;

26

statements in a WUVA interview "created a basis for a hostile environment."[139]

**ARGUMENT**

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

As set forth in detail below, the challenged Statements and claimed implications are not actionable as a matter of law, and, even if they were, Eramo cannot establish by clear and convincing evidence that Defendants made them with actual malice. Accordingly, the Court should grant summary judgment and dismiss the action.

**I.** **MOST CHALLENGED STATEMENTS AND CLAIMED IMPLICATIONS IN THE ARTICLE ARE NOT ACTIONABLE AS A MATTER OF LAW**

As a threshold matter, most of the challenged Statements and claimed implications in the Article are not actionable for several reasons, including (1) they constitute expressions of opinion protected by the First Amendment; (2) they are not reasonably susceptible of the defamatory construction Plaintiff imposes on them; and/or (3) they are not of and concerning Eramo.

**A.** **This Lawsuit Challenges Subjective Expressions Of Opinion Fully Protected By The First Amendment.**

At bottom, Eramo's libel claim turns on the theory that the Article implies that she took "no action" in response to Jackie's allegations, and she "silenced" or "discouraged" Jackie from reporting her gang-rape to the police or pursuing disciplinary action through the Sexual

---

Davis Dep. 93:23-96:1.
[139] SW Ex. 4 at 3, 21; Davis Dep. 97:6-22; Eramo Dep. 123:7-11, 126:23-127:13); SW Ex. 4 at 21; Davis Tr. 97:23-99:13.

Misconduct Board. These supposed implications – which are not supported by the actual text of the Article (*see infra* Part 1.B) – rest on two subjective opinions set forth in the Article. <u>First</u>, the Article's criticism that UVA failed to take appropriate action to protect campus safety because it did not warn the campus about Jackie's allegations and did not undertake an investigation of Jackie's allegations soon enough. <u>Second</u>, the Article's opinion that UVA's practice of deferring to "victim choice" in matters of sexual-assault reporting has the effect of causing victims not to pursue meaningful action. Both of these subjective criticisms are based on disclosed and undisputed facts and are supported by the views of experts and critics, thereby leaving it for readers to draw their own conclusions. Accordingly this criticism – and any challenged statements and implications encapsulating the critique – are not actionable as a matter of law.

In *Milkovich v. Lorain Journal Co.*, the United States Supreme Court held that "a statement of opinion relating to matters of public concern which *does not contain a provably false factual connotation* will receive full constitutional protection." 497 U.S. 1, 18, 20 (1990) (emphasis added). The Supreme Court also recognized constitutional protection for "loose, figurative, or hyperbolic language." *Id.* at 20-21. Whether a statement constitutes protected opinion is a question of law for the Court. *CACI Premier Techs. v. Rhodes, Inc.*, 536 F.3d 280, 293 (4th Cir. 2008).

In determining whether a statement is protected opinion, courts "are obliged to assess how an objective, reasonable reader would understand a challenged statement by focusing on the plain language of the statement and the context and general tenor of its message," keeping in mind that "verifiability of the statement" is a touchstone because a statement not subject to objective verification is not likely to assert actual facts." *Snyder v. Phelps*, 580 F.3d 206, 219 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011). The Fourth Circuit has repeatedly made clear that a

28

statement is non-actionable opinion when – considering the language, context, and tenor – it constitutes a "subjective view, not a factual statement." *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998).[140] It also has consistently protected rhetorical hyperbole that cannot reasonably be understood as stating actual facts about the plaintiff. *Lapkoff v. Wilks*, 969 F.2d 78, 80 (4th Cir. 1992) (affirming summary judgment because statement that defendant "wouldn't trust [a car dealer] any farther than [he] could throw him" amounted to opinion).

The Fourth Circuit and other Courts of Appeals also recognize that "when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002) (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995)). *Accord Biospherics*, 151 F.3d at 185 ("When 'the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related.'") (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993)).

In *Biospherics*, a company sued Forbes over a story that discussed the company's development of a low-calorie sweetener called "Sugaree." The article stated that the company's stock was overvalued and noted that "investors will sour on Biospherics when they realize that Sugaree isn't up to the company's claims." 151 F.3d at 182. The article supported its argument with disclosed facts. *Id*. The Fourth Circuit affirmed the dismissal, holding that the challenged

---

[140] *Accord Chapin*, 993 F.2d at 1093 (statement that charity charged "hefty mark-up" was too subjective to be verifiable); *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1288 (4th Cir. 1987) ("Even when a statement is subject to verification, however, it may still be protected if it can best be understood from its language and context to represent the personal view of the author or speaker who made it."); *Nat'l Found. for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc.*, 705 F.2d 98, 100-01 (4th Cir. 1983) (statement that charity did not expend "reasonable percentage" of its income on program services held non-actionable opinion).

statements constituted non-actionable opinion under *Milkovich*. *Id*. at 184-86. It reasoned that the "context and tenor of the article" suggested that it reflected "the writer's subjective and speculative supposition" and that the article "clearly disclosed the factual bases for its view." *Id*. at 184-85. *See also Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 729-30 (1st Cir. 1992) (holding that statements in newspaper articles accusing plaintiff of dishonest marketing were protected opinion).

Similarly, in *CACI*, a radio host claimed that CACI, a military contractor, and other defense contractors in Iraq employed "[m]ercenaries all over the country, killing people," and she characterized the plaintiff and other contractors as "hired killers." 536 F.3d at 301. The Fourth Circuit affirmed summary judgment for the radio host, holding that no reasonable listener would understand the challenged statements to assert actual facts about CACI, but rather would understand them as "exaggerated rhetoric intended to spark the debate about the wisdom of the use of contractors in Iraq." *Id.* at 301-02. The court emphasized that protections for rhetorical hyperbole, as well as the actual malice standard, "minimiz[e] the danger of self-censorship on the part of those who would criticize, thus allowing robust debate about the actions of public officials and public figures . . . who are conducting the country's business." *Id*. at 304.

Here, Plaintiff claims that the Article implies that she took "no action" in response to Jackie's allegations. The Article never said that; in fact, it says the opposite. Rather, the Article repeatedly criticizes UVA for taking "no action" to *warn the campus* of multiple gang-rape allegations against an active fraternity and for failing to initiate an investigation until September 2014. The Article reports three separate times the specific contention, indisputably true, that "the UVA administration took no action to warn the campus that an allegation of gang rape had

been made against an active fraternity."[141]  The Article also expresses doubt about the promptness of UVA's efforts to investigate Jackie's claims, noting that, within days of Rolling Stone visiting campus as part of its investigation, the University "at last placed Phi Kappa Psi under investigation"—a fact that was confirmed by UVA President Sullivan.[142]  (We will refer to these criticisms collectively below as the "Campus Safety Opinion.")

Besides being substantially true, these statements unquestionably express Erdely's and Rolling Stone's subjective viewpoint that the University should have taken action to warn the campus.  It is impossible to verify whether UVA *should* have done more to protect campus safety versus respecting victim choice.  Whether it is better to prioritize campus safety or give victims a sense of control and promote reporting is a value-based, policy judgment that cannot be verified one way or the other.  Reasonable minds can and do differ on which is best, something that the Article acknowledges.  As the Ninth Circuit has explained, "[w]hen, as here, an author writing about a controversial occurrence fairly describes the general events involved and offers his personal perspective about some of its ambiguities and disputed facts, his statements generally should be protected by the First Amendment."  *Partington*, 56 F.3d at 1154.

Plaintiff also claims that the Article implies that she "silenced" Jackie or "discouraged" her from reporting her gang-rape to the police or pursuing disciplinary action at UVA.  This is based on the opinion, expressed largely in a single passage, that UVA's practice of catering to victim choice in matters of sexual-assault reporting has the consequence of causing victims not

---

[141] Article at RS001077 (observed immediately after Jackie first reports her gang rape).  The second is when discussing the attitudes of survivors in One Less: "no one voiced questions about UVA's strategy of doing nothing to warn the campus of gang-rape allegations against a fraternity that still held parties and was rushing a new pledge class," *id.* at RS001078; and the third is in a Statement challenged by Eramo, after Jackie tells Eramo that she knows of two other alleged PKP victims:  "Experts apprised of the situation by RS agreed that despite the absence of an official report, Jackie's passing along two other allegations should compel the school to take action out of regard for public safety."  *Id.* at RS001079.  The quoted language here is the crux of one of the allegedly defamatory Statements.  *See* **Statement #5** in the Appendix of Challenged Statements.
[142] Article at RS001079.

to pursue meaningful action.  (We will refer to this as the "Victim Choice Opinion" below.)  The

relevant passage reads:

> Like many schools, UVA has taken to emphasizing that in matters of
> sexual assault, it caters to victim choice. "If students feel that we are
> forcing them into a criminal or disciplinary process that they don't want to
> be part of, frankly, we'd be concerned that we would get fewer reports,"
> says associate VP for student affairs Susan Davis. Which in theory makes
> sense: Being forced into an unwanted choice is a sensitive point for the
> victims.  But in practice, that utter lack of guidance can be
> counterproductive to a 19-year-old so traumatized as Jackie was that she
> was contemplating suicide…the sheer menu of choices, paired with the
> reassurance that any choice is the right one, often has the end result of
> coddling the victim into doing nothing.
>
> "This is an alarming trend that I'm seeing on campuses," says Laura Dunn
> of the advocacy group SurvJustice. "Schools are assigning people to
> victims who are pretending, or even thinking, they're on the victim's side,
> when they're actually discouraging and silencing them. Advocates who
> survivors love are part of the system that is failing to address sexual
> violence."[143]

The passage is structured as an examination of dueling policy viewpoints on the merits of a

controversial issue in the nationwide debate on how to handle sexual assault on college

campuses.  First, it sets forth UVA's position that forcing victims into taking action might deter

reporting, quoting at length from Susan Davis, a UVA official.  It expands on this logic, noting

in Erdely's voice that "[b]eing forced into an unwanted choice is a sensitive point."  The Article

then sets forth the counterpoint, first articulated by Erdely and then by Laura Dunn, identified as

being with an "advocacy group," signaling a partisan point of view.  In Erdely's voice, the

passage uses colorful rhetorical language, noting that the "sheer menu of choices, paired with the

reassurance that any choice is the right one, often has the end result of coddling the victim into

doing nothing."  The word "coddling"  has no precisely defined meaning in this context, and

certainly does not express any sort of intentional silencing or suppression.  Moreover, the phrase

---

[143] Article at RS001076.

"often has the end result" is used in a loose, colloquial fashion to signal that Erdely is speculating about cause and effect. Dunn then speaks entirely in generalities about an "alarming trend" that she is seeing on "campuses" nationwide, and she uses hyperbolic language that signals to readers that her words are rhetoric on a controversial topic, not specific statements of fact about Eramo.

Likewise, the broader social context for the Article plainly signals to readers that the Campus Safety and Victim Choice Opinions are subjective viewpoints, not hard facts about Eramo. Unlike a front-page article in a newspaper, a magazine feature like the Article has a more editorial, viewpoint-driven orientation, and reasonable readers understand that they are more likely reading the author's personal and political and social viewpoints rather than objective facts. *See Phantom Touring*, 953 F.2d at 729 (protected opinions in part because they were found in "the type of article generally known to contain more opinionated writing than the typical news report"); S*aenz v. Playboy Enters., Inc.*, 653 F. Supp. 552, 565 (N.D. Ill. 1987) ("a reader reasonably anticipates a greater proportion of opinion in a weekly national magazine such as Newsweek or Time than in a local daily newspaper where the traditions of straight factual reporting are stronger."), *aff'd*, 841 F.2d 1309 (7th Cir. 1988).

Even more fundamentally, any reasonable reader would understand that the Article is relaying contrary viewpoints and taking sides in the emotional and heated debate about how to address sexual assault on college campuses. Therefore, readers naturally understand that the views expressed – both Erdely's and the activists and experts she relies upon – are personal viewpoints on policy issues, not hard facts about Eramo. *See Arthur v. Offit*, No. CIV.A. 01:09-CV-1398, 2010 WL 883745, at *5-6 (E.D. Va. Mar. 10, 2010) (*Wired* magazine's publication of a quote from an infectious disease specialist about an anti-vaccine activist must be understood in the context of the "emotional and highly charged debate" about childhood vaccination, and that

33

readers would "expect emphatic language on both sides and should accordingly understand that the magazine is merely reporting Defendant's personal opinion of Ms. Arthur's views").

Moreover, as in *Biospherics* and *Chapin*, the Article fully discloses the facts upon which the Campus Safety Opinion is based and there is no dispute those facts are accurate:

- In May 2013, Jackie reported to Eramo that she had been raped or sexually assaulted by multiple men at a fraternity party, and Eramo neutrally laid out Jackie's options for her and deferred to Jackie's choice not to take any action;

- In April 2014, Jackie reported to Eramo that she had a bottle thrown at her by men outside a bar on the Corner, and, at this time, Jackie also revealed that she knew of two other women who allegedly had been gang-raped at PKP;;

- In April 2014, Eramo deferred to Jackie's choice not to file a complaint or pursue disciplinary action after the bottle-throwing incident and the revelation that two other alleged PKP victims existed;

- In September 2014, UVA finally commenced an investigation of PKP in connection with Jackie's allegations;; and

- UVA never issued a warning to campus about Jackie's allegations or those of the two other alleged PKP victims.

- The Article accurately described the views of experts in the field who share the view that these facts "should compel the school to take action out of regard for campus safety," citing Laura Dunn again as well as S. Daniel Carter (not identified by name in the text).[144]

Likewise, the Victim Choice Opinion is based on accurate facts disclosed in the Article. Rolling Stone confirmed that Eramo did in fact follow UVA's practice of "catering to victim choice" in Jackie's case by reviewing Eramo's own emails, and the Article makes perfectly clear that Jackie – like many other sexual assault survivors on campus – never felt ready to pursue any decisive action against her perpetrators, something Plaintiff does not dispute.[145] UVA's own undisputed statistics further inform the view.[146]

---

[144] *See* Statement of Undisputed Material Facts ("SUMF") § B.4; *see also* SW ¶¶47, 56; LGP ¶¶ 20, 63.
[145] SUMF § B.4, *supra*; Article at RS001078.
[146] *Id.* at RS001077.  *See supra*, SUMF § B.5 ; LGP ¶ 38.

34

Where, as here, a speaker discloses the facts upon which her opinion is based and includes contrary viewpoints, leaving it to readers to draw their own conclusions, courts consistently find them protected by the First Amendment. *Biospherics*, 151 F.3d at 186; *Chapin*, 993 F.2d at 1093; *Partington*, 56 F.3d at 1156-57; *Phantom Touring*, 953 F.2d 724; *Moldea v. New York Times Co.*, 22 F.3d 310, 317 (D.C. Cir. 1994).

Plaintiff will no doubt argue that these opinions are not based on fully disclosed and accurate facts because Rolling Stone did not indicate in the Article that Eramo arranged for Jackie to report the bottle attack to the police in April 2014. Based on information that became public only *after* the Article was published,[147] Eramo alleges in her Complaint that she "arranged for Jackie to meet with the police regarding the bottle incident, her alleged gang rape, and the other supposed victims."[148] Therefore, she maintains that it is false to state or imply that that Eramo took "no action" when in fact she took her to the police. As explained above, Rolling Stone's opinions are not based on Eramo *literally* doing nothing – since the Article plainly describes Eramo taking various actions to support Jackie – but rather on Eramo deferring to Jackie's wishes and UVA's failure to address campus safety and issue a warning to campus or commence a formal investigation before September 2014. Indeed, knowledge that Jackie went to the police would not change the criticism since, as the undisputed facts establish, even after going to the police, Jackie *still* refused to proceed, or, as the Article reports "she didn't feel ready to file a complaint."[149] Eramo credited her decision, emphasizing to Jackie that this was "YOUR

---

[147] There is no evidence that Defendants had any knowledge about Jackie reporting her sexual assault to the police; instead, the evidence consistently indicates that Jackie went to the police solely about the bottle attack. *See supra*, SUMF § B.4.

[148] Compl. ¶ 71.

[149] Article at RS001078. The March 2015 Charlottesville Police Department press release, says that Jackie "maintained that she did not want to proceed with any investigation of the physical assault, nor did she provide *any disclosure* as to the facts of the alleged sexual assault." EAM Ex. 115, at ERAMO-04884.

choice."[150]

Courts have expressed "skepticism about a claim for defamation based on the omission of facts that may have cast the plaintiff in a different, more positive light, but would not otherwise render the expressed statements untrue." *Biro v. Conde Nast*, 883 F. Supp. 2d 479, 465 (S.D.N.Y. 2012), *aff'd*, 807 F.3d 541 (2d Cir. 2015). Permitting such claims to proceed infringes on the editorial decisions of writers and editors in deciding what information to include in their articles. The First Circuit rejected a similar argument in *Riley v. Harr,* 292 F.3d 282, where the plaintiff complained that the author should be deprived of the opinion defense because he failed to report evidence that potentially exculpated the plaintiff, stating that Harr was "free to make his own editorial choices, so long as he 'fairly describe[d] the general events involved.'" *Id.* (quoting *Partington*, 56 F.3d at 1154). Likewise, in *Janklow v. Newsweek, Inc.*, 788 F.2d 1306 (8th Cir. 1986), the Eight Circuit explained:

> Courts must be slow to intrude into the area of editorial judgment, not only with respect to choices of words, but also with respect to inclusions in or omissions from news stories. Accounts of past events are always selective, and under the First Amendment the decision of what to select must almost always be left to writers and editors. It is not the business of government.

*Id.* at 1306. Here, Rolling Stone omitted information about Jackie's report of the bottle-throwing incident because it did not materially alter the disclosed information: that Eramo honored Jackie's request not to file a complaint, and that UVA did not issue a campus warning or commence its own investigation until September 2014.[151] That editorial decision in no way undermines the validity of the facts on which these opinions are based.

In sum, as in *Biospherics* and *Chapin*, the Article accurately lays out the facts upon which its subjective opinions are based, making clear that the Campus Safety Opinion and the

---

[150] SRE Ex. 27.
[151] SW ¶ 74.

Victim Choice Opinion are subjective opinions about the information presented, not as statements of fact. Therefore, Plaintiff's libel claim, insofar as it is based on claimed implications in the Article that Eramo took "no action" or "silenced" or "discouraged" Jackie from reporting, must be dismissed as a matter of law.

### B. The Article Cannot Reasonably Be Understood As Stating Or Implying That Eramo Took "No Action," Silenced Jackie, Discouraged Her From Reporting, Or Abused Her.

Plaintiff's libel claim also fails for the independent reason that most of the challenged Statements, and Article as a whole, are not reasonably capable of the defamatory meaning Plaintiff ascribes to them.

"To be defamatory as a matter of law, a statement must be more than merely unpleasant or offensive; it must make the plaintiff appear odious, infamous, or ridiculous." *Chapin v. Greve*, 787 F. Supp. 557, 562 (E.D. Va. 1992), *aff'd sub nom. Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993) (internal quotation marks omitted). In addition, for a statement to be actionable, "a libel plaintiff must show that the alleged libel was published 'of or concerning' him." *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 738 (Va. 1985) (citing *Cave v. Shelor*, 16 Va. (2 Munf.) 193 (1811)). "Virginia law requires that the potential defamatory meaning of statements be considered in light of the plain and ordinary meaning of the words used in context as the community would naturally understand them." *Wells v. Liddy*, 186 F.3d 505, 523 (4th Cir. 1999). Whether a statement is actionable is a matter of law to be determined by the court. *Chapin*, 993 F.2d at 1092 (citing *Chaves v. Johnson*, 335 S.E.2d 97 (Va. 1985)).

Where, as here, the Plaintiff also urges defamation by implication or innuendo, "[a] defamatory implication must be present in the plain and natural meaning of the words used." *Chapin*, 993 F.3d at 1092. "[T]he meaning of the alleged defamatory language can not, by innuendo, be extended beyond its ordinary and common acceptation." *Webb v. Virginia Pilot*

37

*Media Cos.*, 752 S.E.2d 808, 811 (Va. 2014). In addition, as a matter of federal constitutional law, the Fourth Circuit held in *Chapin* that "a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also *affirmatively suggest that the author intends or endorses the inference.*" *Chapin*, 993 F.2d at 110 (emphasis added). *See also Baylor v. Comprehensive Pain Mgmt. Ctrs., Inc.*, No. 7:09-CV-00472, 2011 WL 1327396, at *7 (W.D. Va. Apr. 6, 2011) (same).[152]

       1.    **Statement #1 is not of and concerning Eramo and cannot reasonably be understood as implying that Eramo abused Jackie.**

Statement #1 appears under the title of the Article and is intended to be a summary sentence reflecting information found elsewhere in the Article.[153] It reads: "Jackie was just starting her freshman year at the University of Virginia when she was brutally assaulted by seven men at a frat party. When she tried to hold them accountable, a whole new kind of abuse began."[154] On its face, this Statement does not mention Eramo and is not reasonably understood as referring to her. In the context of the Article overall, the word "abuse" plainly refers to Jackie having a bottle thrown at her face for speaking out on campus, since this is the *only* means by which Jackie tried to hold her assailants accountable.[155] The Article provides no support for a conclusion that Eramo "abused" Jackie or anyone else. In response to her report, Eramo is described as "neutrally" laying out Jackie's options and expressly offering to help her "hold

---

[152] In *Pendleton v. Newsome*, 772 S.E.2d 759 (2015), the Virginia Supreme Court declined to follow *Chapin* on the assumption that *Chapin* was applying Virginia state law. *Id.* at 764. But *Chapin* imposed this burden as a matter of federal constitutional law, not state law, noting that "the constitution provides a sanctuary for truth" and dropping a footnote to *Garrison v. Louisiana*, 379 U.S. 64 (1964), and *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986).

[153] LGP ¶ 44; SW ¶ 65; SRE ¶ 189.

[154] Article at RS001070.

[155] *Id*. at RS001078. *See* SW ¶ 65; LGP ¶ 44. As noted above, Jackie refused to press charges. SUMF § B.4; SRE ¶ 42. It might also plausibly be understood as a reference to the callous treatment Jackie experienced from her peers. *Id.* at RS001072, RS001074.

38

these men accountable."[156]  The Article also makes clear that Jackie did not feel "abused" by

Eramo, but rather viewed her as an "asset to the community."[157]  Indeed, Eramo is "beloved by

survivors," with victims viewing her as "a friend and confidante" and "their best advocate and

den mother."[158]  It also shows Eramo helping Jackie to work through her trauma by introducing

her to Emily Renda and One Less.[159]  Far from abuse, there is not even a hint or suggestion that

Eramo exerted any pressure on Jackie or took any steps to persuade her from taking action.[160]

The text cannot support an implication that Eramo "abused" Jackie, and Statement #1 is not "of

and concerning" Eramo.  Therefore, summary judgment is appropriate on Eramo's libel claim

based on Statement #1.

> ### 2.    Statement #2 cannot support the defamatory construction Plaintiff places on it.

Statement #2 says:  "Lots of people have discouraged her from sharing her story, Jackie

tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang-

rape allegations more than a year ago."[161]  By stripping this statement out of context, Eramo

claims that this passage accuses her of discouraging Jackie from reporting her rape.  But, read in

its full context, as it must be, the statement refers to Eramo discouraging Jackie from

*participating in the Article*, not discouraging her from pursuing formal proceedings.

The paragraph in which Statement #2 is found starts with the topic sentence "Jackie is

worried about what might happen to her *once this article is out*,"[162] which plainly signals to

readers that this paragraph is about the potential blowback from Jackie's participation in the

---

[156] SW ¶¶ 61, 65; SRE ¶ 189.
[157] Article at RS001078; *see also* SW ¶¶ 63, 65; SRE ¶ 189.
[158] Article at RS001076, 001078.
[159] *Id.* at RS001078.
[160] *Id.* at RS001077.
[161] Article at RS001072.
[162] *Id.* (emphasis added).

Rolling Stone story.  The paragraph reinforces this understanding by explaining one cause for

Jackie's concern, the backlash from fraternities, which are powerful on campus.  Randall's

refusal to be interviewed by Rolling Stone "citing loyalty to his own frat" further confirms that

this paragraph is about potential repercussions from Jackie's participation in the Article.  Finally,

immediately following Statement #2, the paragraph concludes with the sentence, "On this deeply

loyal campus, even some of Jackie's closest friends see her *going public* as tantamount to a

betrayal."[163]  Thus, in context, the word "discouraged" in Statement #2 can only reasonably

mean "discouraged" from cooperating with Rolling Stone or using Jackie's name in the

Article.[164]  Far from discouraging, as noted above, the Article makes clear that Eramo would be

"happy to assist" if Jackie would like to "hold these men accountable."  Moreover, there is no

affirmative suggestion in the language – as correctly understood in context – that Erdely and

Rolling Stone "intended or endorsed" the implication that Plaintiff proffers, and discovery

yielded no evidence to support it.[165]  Therefore, Statement #2 is not actionable, and Plaintiff's

libel claim with respect to it is should be dismissed. [166]

> ### 3.     Statement #4 is not defamatory as a matter of law and is substantially true.

Statement #4 reads:

> A bruise still mottling her face, Jackie sat in Eramo's office in May 2014
> and told her about the two other [victims of alleged assaults at PKP]…. As
> Jackie wrapped up her story, she was disappointed by Eramo's
> nonreaction.  She'd expected shock, disgust, horror…as she miserably
> reminded Eramo in her office, she didn't feel ready to file a complaint.

---

[163] *Id.* (emphasis added).

[164] It is undisputed that Jackie told Erdely she was receiving pressure from peers, family, and UVA administrators (including Eramo) over the Article. Eramo admits she had concerns about Jackie participating in it. SUMF § B.6.

[165] SRE ¶ 190; SW ¶ 66; LGP ¶ 51.

[166] That a university administrator would discourage a young and vulnerable student from participating on the record in a national magazine story about her own rape is entirely understandable.  Accordingly, this information is not defamatory, as it does not make Eramo appear "odious, infamous, or ridiculous."  *Chapin*, 787 F. Supp. at 562.

Eramo, as always, understood.[167]

Plaintiff claims this statement is false because she "did not have a 'nonreaction' to Jackie's claim that two other girls were assaulted at Phi Psi; in fact, Eramo arranged for Jackie to meet with police and Eramo and UVA urged Jackie to identify the girls or have them come forward."[168] This strained construction of Statement #4 cannot be squared with the language of the paragraph or the broader context of the Article.

The word "nonreaction" plainly refers to Eramo's *visible emotional reaction* upon hearing Jackie's revelation about two other victims. This is self-evident from the sentence immediately following it, which says "She'd expected shock, disgust, horror." The Article portrays Eramo acting like a calm, professional administrator, as one would expect, and there is nothing defamatory about her portrayal in Statement #4.[169] Moreover, Eramo admitted in her deposition that the recommended presentation when working with victims of trauma is to "come at it with . . . neutrality," and she confirmed that it was her own practice to listen to victims "without judgment" and not to react in 'in an aghast manner' – demonstrating that this statement is also substantially true.[170]

Nor can Statement #4 reasonably imply that Eramo silenced or discouraged Jackie. To the contrary, it specifically says that Jackie "*reminded* Eramo in her office [that] *she didn't feel ready to file a complaint*,"[171] making clear that the option of reporting must have been raised by Eramo and Jackie, again, rejected the option. *See Webb*, 752 S.E.2d at 811 (holding that article was not capable of defamatory implication because it did "not state or suggest that Phillip undertook any affirmative action to arrange or endorse the school system's disciplinary

---

[167] Article at RS001078.
[168] Compl. ¶¶ 212(d), 227(d).
[169] SRE ¶ 192.
[170] Eramo 137:25-138:10.
[171] Article at RS001078 (emphasis added).

41

response" to the article even though the court recognized an implication of favoritism did exist). Rather, as noted above, this Statement simply reinforces the Article's subjective view that UVA's practice of catering to "victim choice" can have the *effect* of leading victims not to pursue meaningful action. In short, there is no basis for Eramo to claim that this language is either materially false or defamatory. Summary judgment on Statement #4 is therefore appropriate.

### 4. The illustration does not defame Eramo.

Plaintiff spent considerable time in discovery trying to prove that the illustration of Eramo painted her in a negative light and somehow contributed to the implication that Eramo "silenced" and "abused" Jackie. Here, again, the illustration on its face contradicts Plaintiff's theory. The photo illustration, which is not meant to be taken literally as a scene from real life,[172] thematically represents Eramo comforting a troubled student, while scenes outside her office denote the public controversy over how universities, including UVA, should address sexual violence on campus.[173] The caption, which provides key context for the illustration, expressly notes that Eramo is "beloved by students," further contradicting any impression that Eramo engaged in wrongdoing with the depicted student.[174] Everyone involved with commissioning the illustration testified that they had no intention of creating a negative portrayal of Eramo.[175] Moreover, the illustration itself contradicts Plaintiff's allegation that it shows her giving a "thumbs up" (the pen in her hand is still visible) or depicts her as wild-eyed.[176] The undisputed evidence establishes that all the visual elements that Eramo now complains of were occasioned by ordinary artistic choices about the composition, not by an intention to make

---

[172] JH ¶ 6; SW ¶ 69; WD ¶ 21.
[173] JH ¶¶ 6, 18; SW ¶ 69; WD ¶¶ 20-21.
[174] Article at RS001076.
[175] JH ¶¶ 19-21; SW ¶¶ 69-70; WD ¶¶ 20-22.
[176] Compl. ¶74.

42

Eramo look bad.[177]

In sum, the allegedly defamatory implications that Plaintiff now presses are not "present in the plain and natural meaning of the words [or image] used," *Chapin*, 993 F.3d at 1092, and Plaintiff cannot possibly carry her burden to show that the Article "affirmatively suggest[s] that the author intends or endorses the inference." *Id.* at 1093. Moreover, no evidence revealed in discovery remotely suggests that Erdely or anyone else at Rolling Stone intended or endorsed that inference. Accordingly, summary judgment is appropriate to the extent Plaintiff's claim is based on implications stemming from the Article as a whole.

## II. NO EVIDENCE SUPPORTS A FINDING THAT ANY FALSE STATEMENT OR IMPLICATION IN THE ARTICLE WAS PUBLISHED WITH ACTUAL MALICE

Even assuming Eramo could show that the Article makes actionably false and defamatory statements of fact about her, this Court must still grant summary judgment because there is no evidence that Defendants published any such statements with actual malice.

### A. As A Public Official And/Or A Limited-Purpose Public Figure At The Time Of Publication, Eramo Must Demonstrate That Defendants Published The Statements At Issue With Actual Malice

#### 1. Eramo was a public official at the time of publication.

In *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the Supreme Court held that in order to succeed in a defamation case, a "public official" must prove with "convincing clarity" that the defendant acted with "actual malice." The Court explained that public officials must meet this daunting standard because "actions brought by public officials against critics of their official conduct" lie at the very core of the First Amendment's protection for the press. *Id.* at 283. To be considered a public official, a government employee need not occupy the highest

---

[177] JH ¶¶ 20-21; Ritter Dep. 62:11-66:17; 72:11-74:8; 77:24-78:17; 81:10-82:23; 84:8-85:5. (Relevant excerpts from the May 13, 2016 deposition of John Ritter are attached as Exhibit 93 to the McNamara Declaration.)

echelons of governance.  Rather it is sufficient that the individual have "substantial

responsibility—actual or apparent—for the administration of governmental matters," a definition

which encompasses "[p]olicymakers, upper-level administrators, and supervisors."  *Baumback v.

Am. Broad. Cos.*, 161 F.3d 1, 3 (4th Cir. 1998) (unpublished)).  "In determining if a defamation

plaintiff actually had substantial responsibility for or control over the conduct of governmental

affairs, courts examine,  among other things, whether the plaintiff 'made[] recommendations,

participated in [] policy determinations, and exercised [] discretion.'"  *Id.* (quoting *Arctic Co. v.

Loudoun Times Mirror*, 624 F.2d 518, 521-22 (4th Cir. 1980) (emphasis omitted)).  A plaintiff

qualifies as a public official when her "position in government has such apparent importance that

the public has an independent interest in the qualifications and performance of the person who

holds it, beyond the general public interest in the qualifications and performance of all

government employees."  *Rosenblatt v. Baer*, 383 U.S. 75, 85-86 (1966).

Applying these principles, courts consistently hold someone of Eramo's stature at a

public university to be a public official.  In *Baumback*, for example, the Timber Management

Officer for timber sales in Eldorado National Forest sued ABC over a television news segment

about controversial timber contracts that referred to him as a "bureaucrat who got away with"

gross mishandling of the contracts.  The Fourth Circuit affirmed the district court's grant of

summary judgment to defendant, holding that the plaintiff was a public official as a matter of law

because, among other things, he made recommendations to the Forest Supervisor at Eldorado

and senior policymakers in Washington, participated in policy determinations for Eldorado as

well as the Forrest Service as a whole, and exercised discretion in awarding contracts to cut

Eldorado timber.  *Id.* at 4.[178]

---

[178] Virginia state courts have similarly held that a school administrator with "authority, real or apparent, to influence
in a significant way the conduct of education in his or her school" must be considered a public official.  EAM Ex.

44

Federal courts around the country have applied the same constitutional standard to hold consistently that administrators at public universities are public officials under the *New York Times* standard. Consider *Fiacco v. Sigma Alpha Epsilon*, 528 F.3d 94 (1st Cir. 2008), where the First Circuit affirmed summary judgment, holding that the Director of the Office of Community Standards, at the University of Maine was a public official. Recognizing broadly that "the goings-on inside a state university are of interest to the public," the court found significant that the plaintiff had "strong influence over the handling" of disciplinary proceedings relating to sensitive issues, including "date rape and hazing." *Id*. at 100. The court further observed that the plaintiff had ready access to the media, and "could and should have anticipated that some of the sensitive topics and situations handled by his office would attract public attention." *Id.*[179]

Here, the undisputed facts show that, at the time of publication, Eramo had substantial responsibility for the administration of UVA's intake and adjudication of sexual misconduct cases, an area of great concern to the public. Like the plaintiff in *Baumback*, she exercised discretion as head of the SMB, presiding over formal hearings, interviewing and training board members, and oversaw deliberations by the hearing panel charged with adjudication.[180] She also exercised discretion when presiding over informal resolution proceedings under the sexual misconduct policy, where she had discretionary authority to issue enforceable sanctions against

---

118 (*Goodwyn v. Virginian-Pilot Media Cos*., No. CL11-815 (Portsmouth Circuit Ct. 2012)) (holding that a school principal was a public official); EAM Ex. 119 (*Webb v. Hansen*, No. CL10-2933 (Chesapeake Circuit Ct. 2012) (transcript)), (assistant principal was a public official). In *Richmond Newspapers, Inc. v. Lipscomb*, the court held that an English teacher and acting department head at a public high school was not a public official where "[t]here has been no showing that Lipscomb … either influenced or even appeared to influence or control any public affairs or school policy"; the Court noted, however, that the case involved criticism *only* of the plaintiff's teaching abilities, and not at her performance as an administrator.). 362 S.E.2d 32, 37 (Va. 1987).

[179] *See also In re Baxter*, No. 01-00026-M, 2001 WL 34806203, at *13 (W.D. La. Dec. 20, 2001) (Vice-President for University Advancement and External Affairs of the University of Louisiana and Executive Director of the University Foundation was a public figure despite having "no direct or indirect supervisory responsibility over any university faculty members in their academic capacities"; *Grossman v. Smart*, 807 F. Supp. 1404, 1408 (C.D. Ill. 1992) (both a university's vice chancellor and a professor and chairperson of professorship search committee were public officials).

[180] *See supra*, SUMF § A.2.

45

assailants who admitted responsibility.[181]  In her intake role, Eramo also exercised considerable

discretion in deciding whether or not to honor a sexual assault victim's request not to take further

action on allegations by weighing that request against the risks to campus safety.[182]  Also as in

*Baumback*, Eramo participated in policymaking and made recommendations to other high-level

UVA officials by carrying out extensive reviews and revisions to UVA's sexual misconduct

policy and developing new protocols and procedures for intake of sexual violence cases.

Eramo's responsibilities included planning and conducting numerous trainings for SMB board

members, faculty, staff, and students regarding sexual violence reporting policies.[183]  *See Hatfill*

*v. New York Times Co.*, 488 F. Supp. 2d 522, 528 (E.D. Va. 2007) (holding that biological

weaponry expert was public official because his "participation in government training and

decisionmaking placed him in a position of public trust"), *aff'd*, 532 F.3d 312 (4th Cir. 2008).

 Eramo served as UVA's "primary point person" for intake of reports of sexual

misconduct and sexual assault at UVA.[184]  Dean Allen Groves testified that Eramo was *literally*

the face of the University for sexual misconduct issues on UVA's website: "So on our Web page,

if you clicked on 'sexual misconduct,' I believe Nicole's picture came up …."[185]  During the

reporting process, UVA public relations confirmed to Erdely that Eramo was the "primary

authority on sexual assault at UVA."[186]  Indeed, the focus on Eramo as Chair of the SMB in

OCR's Letter of Finding—which covers events prior to publication of the Article—speaks

volumes to her substantial public, discretionary, and policy-making role at UVA at the time the

---

[181] *Id.*; *see also* Groves Dep. 306:17-22; 307:13-25.

[182] *See supra*, SUMF § A.2; *see also* Eramo Dep. 31:24-33:19; 43:25-44:18.

[183] *See supra*, SUMF § A.2; EAM Ex. 95 at UVA020003951; EAM Ex. 96 at UVA020004176-4177; EAM Ex. 97.

[184] *See supra,* SUMF § A.2.

[185] *See supra,* SUMF § A.2. Groves also testified that Eramo was included in a photo shoot for a planned UVA alumni magazine story on sexual assault because of her "key role" relating to these issues.  (Groves 346:8-13).

[186] *See supra*, SUMF § A.2; SRE ¶ 64.

Article was published.[187]  As such, Eramo had both actual and apparent responsibility for sensitive and important governmental issues and she "could and should have anticipated that some of the sensitive topics and situations handled by [her] office would attract public attention." *Fiacco v. Sigma Alpha Epsilon Fraternity*, 528 F.3d 94, 100 (1st Cir. 2008).

### 2. Eramo is also a limited-purpose public figure.

Eramo also qualifies as a limited-purpose public figure, given her voluntary and prominent role in the public controversy over how universities—including UVA—should properly address sexual assaults on campus.  The Fourth Circuit has articulated a five-factor test to identify a limited-purpose public figure, asking whether: "(1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation."  *Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982).  Applying these factors, the Fourth Circuit has found researchers, published experts, and other individuals who "cast [themselves] into the forefront of a public issue" to be limited-purpose public figures with regard to those controversies.  *See id*. at 668-70 (researcher on the military application of dolphin technology who had lectured publicly, published several articles and reports, and given interviews to the press on the subject was a limited-purpose public figure with regard to that topic); *Reuber*, 925 F.2d at 708 (4th Cir. 1991) (research scientist whose findings were often

---

[187] SW Ex. 4 at 3, 11-15, 17, 21.  *See also* Davis Dep. 97:6-22, 97:23-99:13, 103:10-25 (UVA understood statements regarding "Chair of SMB" to be referring to Eramo).

47

cited in public health debates had "voluntarily injected himself into a public controversy" and thus was a limited-purpose public figure in that arena).[188]

Here, the undisputed facts establish conclusively that all five factors are met. Regarding the second and third factors, the "heart of [the] five-factor test," *Carr v. Forbes, Inc.*, 259 F.3d 273, 280 (4th Cir. 2001), the evidence demonstrates that Eramo voluntarily injected herself into the public controversy surrounding how universities should respond to sexual assault on campus. From 2009 to 2014, she gave at least 21 press interviews on sexual assault and related topics to the press, and she published an opinion piece in the *Cavalier Daily* in 2013 "regarding the University's process when a sexual misconduct case is reported." She also spoke to local television stations on issues relating to sexual assault at UVA and appeared on panels, gave workshops, and spoke at conferences on the topic of sexual misconduct on college campuses.[189] Eramo's comments to the press and others unquestionably were aimed at influencing the public debate on that topic to show that UVA was acting responsibly and sensitively. For instance, in an interview with *The Center for Public Integrity* in 2009, Eramo defended the University against allegations that it admonished students not to speak about their sexual assault proceedings: "'There was no quid pro quo here that I know,' says Nicole Eramo, current chair of the UVA Sexual Assault Board. 'That was just not part of our policy.'"[190] Likewise, in her

---

[188] Courts outside this jurisdiction have also held that prominent figures at educational institutions also fulfill the constitutional requirement of having intentionally "thrust themselves to the forefront" of certain issues. *See, e.g.*, *Barry v. Time, Inc.*, 584 F. Supp. 1110, 1113 (N.D. Cal. 1984) (former head basketball coach at the University of San Francisco was "at least a limited public figure with regard to comments concerning his position as head basketball coach at USF"); *Avins v. White*, 627 F.2d 637 (3d Cir. 1980) (former dean of Delaware Law School was a limited-purpose public figure with respect to the school's American Bar Association accreditation, in a case where he alleged a member of the ABA's accrediting team had made defamatory remarks about him during the school's evaluation process).

[189] *See supra*, SUMF § A.2; EAM Ex. 99, at 4-6, 7, 9.

[190] EAM Ex. 116.

WUVA interview just weeks before the Article was published, Eramo vigorously defended UVA's policies regarding treatment of sexual assault reports and discipline for perpetrators.[191]

The remaining factors likewise favor a finding that Eramo is a public figure. Her repeated press contacts, and her affiliation with an elite University and its public affairs department behind her, demonstrate beyond question that she has access to the channels of effective communication. There is likewise no question that the public controversy around sexual assault persisted up to the time of publication, as evidenced by the WUVA interview and Eramo's other communications with journalists in the months immediately prior to the Article.[192] Nor is there any possible dispute that Eramo retained her status as a public figure at the time the Article was published. Thus, in the context of statements concerning UVA's response to sexual violence on campus, Eramo is a limited-purpose public figure.

### B. Eramo Must Show Actual Malice By Clear And Convincing Evidence.

To "carve out an area of 'breathing space' so that protected speech is not discouraged," the Supreme Court requires public official and public-figure plaintiffs to establish that a statement was published with "actual malice." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989); *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991). This standard, which protects "uninhibited, robust, and wide-open" debate on public issues, *New York Times*, 376 U.S. at 270, requires the plaintiff to prove that the defendant published a false statement "with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Masson*, 501 U.S. at 510 (quoting *New York Times*, 376 U.S. at 279-80).

---

[191] *See supra*, SUMF § A.2; EAM Ex. 103; Eramo Dep. 74:23-75:9, 78:7-14, 88:7-14, 90:8-103:21.

[192] EAM Ex. 101, at UVA040001920 (noting both the national and UVA-centric aspects of the controversy; asking "Why is it that no student has been expelled for rape in modern University history? Why is sexual assault not part of the University's Honor Code?"); EAM Ex. 101, at UVA040001901 (responding to question "Do you feel that the University's current approach to preventing and investigating sexual assault is inadequate?"); EAM Ex. 102, at UVA040001857 (requesting interview to discuss "#HoosGotYourBack and the ongoing campaign against sexual assault that is frequently mentioned in the news as of late").

49

"The standard of actual malice is a daunting one." *Howard v. Antilla*, 294 F.3d 244, 252

(1st Cir. 2002) (quoting *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996)).

It focuses solely on the defendant's *actual* state of mind "at the time of publication." *Bose Corp.*

*v. Consumer Union of U.S., Inc.*, 466 U.S. 485, 512 (1984). "Mere negligence does not suffice."

*Masson*, 501 U.S. at 510. Rather, the term "[k]nowledge of falsity means … that the defendant

was *actually* aware that the contested publication was false," *Woods v. Evansville Press Co.*,

*Inc.*, 791 F.2d 480, 484 (7th Cir. 1986) (emphasis added), and "reckless disregard" means that

the plaintiff must show "that the defendant *actually* had a high degree of awareness … of

probable falsity." *Harte-Hanks*, 491 U.S. at 688 (emphasis added). Thus, it is a subjective test

as to the author's knowledge, not an objective one as to the information available:

> [R]eckless conduct is not measured by whether a reasonably prudent man
> would have published, or would have investigated before publishing.
> There must be sufficient evidence to permit the conclusion that defendant
> *in fact* entertained serious doubts as to the truth of his publication.

*St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added). *See also Hatfill*, 532 F.3d

at 317 ("The standard requires that the defendant have a 'subjective awareness of probable

falsity' of the publication.") (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332 (1974).

Indeed, even an "extreme departure from professional standards" does not rise to the level of

actual malice. *Harte-Hanks*, 491 U.S. at 665.

As an additional safeguard, the First Amendment requires plaintiffs to prove actual

malice by "clear and convincing" evidence. *Anderson*, 477 U.S. at 255-57. This standard of

proof imposes a "heavy burden [on plaintiffs], far in excess of the preponderance sufficient for

most civil litigation." *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1252 (9th Cir. 1997)

(citations omitted). *Accord Church of Scientology Int'l v. Daniels*, 992 F.2d 1329, 1334 (4th Cir.

1993) ("[a] public figure plaintiff faces a significant burden in proving actual malice").

50

Moreover, actual malice cannot be shown "in the abstract." *Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987). Instead, it must be specific as to *each defendant*'s knowledge and *each challenged Statement*. *Henry v. Nat'l. Association of Air Traffic Specialists, Inc.*, 836 F. Supp. 1204, 1212 (D. Md. 1993), *aff'd*, 34 F.3d 1066 (4th Cir. 1994).[193]

Accordingly, in light of the severe chilling effect that the cost and burden of trial imposes on free speech, in actual malice cases, "the granting of summary judgment is the rule, rather than the exception." *Jenoff v. Hearst Corp.*, 453 F. Supp. 541, 547 (D. Md. 1978), *aff'd*, 644 F.2d 1044 (4th Cir. 1981).

### C. The Undisputed Evidence Precludes A Finding Of Actual Malice.

Based on the undisputed facts, Plaintiff cannot clear actual malice's high hurdle to defeat Defendants' motion for summary judgment. After nearly a year of discovery, Eramo is unable to produce any evidence – let alone the "clear and convincing evidence" required – that Defendants believed the Article was false or entertained serious doubts as to the truth of any of the challenged Statements. To the contrary, the undisputed evidence shows that Defendants firmly believed – and still believe today – that the Article's reporting on Eramo and UVA's handling of sexual assault reports is accurate and well-substantiated.[194]

Like all articles published in *Rolling Stone*, the Article was extensively researched and fact-checked.[195] Throughout and as a result of this rigorous and exhaustive process, Erdely and her colleagues at Rolling Stone found Jackie to be entirely credible and believed in her story, as

---

[193] In keeping with this nearly high threshold, the Fourth Circuit repeatedly disposes of libel claims on the grounds that a public official and public figure plaintiffs failed to establish actual malice as a matter of law. *See, e.g. Carr v. Forbes, Inc.*, 259 F.3d at 275 (affirming grant of summary judgment on actual malice); *Church of Scientology*, 992 F.2d at 1335 (same); *Time, Inc. v. Johnston*, 448 F.2d 378, 379 (4th Cir. 1971) (reversing denial of summary judgment on actual malice); *Reuber*, 925 F.2d at 714-18 (en banc) (reversing jury verdict against defendant on issue of actual malice); *Ryan v. Brooks*, 634 F.2d 726, 727-28 (4th Cir. 1980) (same), *New Life Ctr., Inc. v. Fessio*, No. 99-1658, 2000 WL 1167800, at *7-10 (4th Cir. Aug. 16, 2000) (unpublished) (same).

[194] *See* SUMF § C.

[195] *See supra*, SUMF § B.1, B.10; SW ¶¶ 6, 17-29, 46-52; LGP ¶¶5, 8, 11, 13-24, 37-64.

51

well as the content of the Article as a whole. Furthermore, Defendants had independent evidence supporting the depiction of Jackie's interactions with Eramo and strong factual support for the subjective opinions expressed in the Article, including Eramo's own emails and on-the-record statements by the President of the University.[196] Rolling Stone carried out this extensive and even-handed reporting despite UVA's refusal to make Eramo available for comment or to comment on any specific cases.[197] Accordingly, the undisputed evidence comes nowhere near "clear and convincing evidence" of actual malice.

### 1. Defendants had no reason to doubt the accuracy of the "rape school" quote (Statement #3)

As set forth in the Statement of Undisputed Material Facts, there is no evidence in the record that Defendants had any doubt that Eramo said "nobody wants to send their daughter to the rape school."[198] Eramo does not dispute that Jackie provided this quote to Erdely. Yet, Rolling Stone was unable to check it directly with Eramo because UVA refused to make her available for comment and declined to answer specific questions about Jackie's case.[199] But Erdely and Garber-Paul had strong confidence in Jackie as a source for this quote because they had each confirmed that Jackie accurately conveyed the quotes of others (including Eramo) elsewhere. Moreover, Jackie had no motive to provide false information about Eramo, who she clearly loved and respected.[200]

Furthermore, the factual predicate for the quote – that UVA did not disclose complete and fulsome sexual assault statistics – was amply substantiated by other evidence Erdely had gathered. Most notably, UVA President Sullivan stated in her interview with Erdely that UVA

---

[196] SRE ¶¶ 82-90, 103-108; LGP ¶¶ 18, 37-42; SW ¶¶ 46-59.
[197] *See* SUMF § B.7; LGP ¶ 38-39.
[198] SUMF § B.5.
[199] *See* SUMF § B.7; LGP ¶ 57; SW ¶ 52.
[200] *See* SUMF B.5; SW ¶¶29, 50; LGP ¶ 22.

52

does not publish all of its sexual assault statistics because "it might not be in keeping with 'best practices' and thus may inadvertently discourage reporting." And, the "rape school" quote follows and is entirely consistent with Susan Russell's observation that was "misdirection" concerning crime statistics is deliberate because "when a parent goes to the campus crime log, and they don't see sexual assault, they think the school is safe."[201] Accordingly, there is no evidence that anyone at Rolling Stone entertained any doubts about the accuracy of this statement prior to publication or had any reason to doubt its accuracy.

> **2.      Significant corroborating evidence backed up the reporting on Eramo, and Rolling Stone had no reason to doubt the basis for its opinions about UVA and Eramo.**

As explained more fully above, none of the remaining Statements from the Article are actionable as a matter of law. But even if they were, the undisputed evidence demonstrates that Rolling Stone had copious sources and documents to support its reporting on UVA and Eramo. At the time of publication, Defendants had no reason to doubt the basis for the remaining challenged statements in the Article for the following reasons, among others:[202]

- <u>Statement #1</u>: As noted above, this does not refer to Eramo and, in the context of the Article as a whole, cannot reasonably be understood as implying that she abused, silenced, or discouraged Jackie from reporting. *See supra* at I.A.1. The "abuse" Jackie suffered refers primarily to the bottle-throwing incident, which Erdely verified with documentary evidence, including a letter from the police confirming that Jackie had filed a report regarding the bottle attack.[203] To the extent the term "abuse" also refers to Jackie's unsympathetic treatment by friends, that, too, was corroborated by multiple sources, including Renda's Congressional testimony.[204] Discovery has uncovered no evidence that Defendants actually entertained doubts about the accuracy of the "abuse" statement; nor is there any evidence that Defendants intended it to refer to Eramo and subjectively knew it was false.

---

[201] *See, e.g.,* SRE ¶¶ 53, 102, 104, 144, 191; LGP ¶¶ 38, 56-57; SW ¶ 51.

[202] For a complete portrait of the reporting that underlies each of the challenged statements, we respectfully refer the Court to SRE ¶¶ 188-195 , LGP ¶¶ 43-64, and SW ¶¶ 49-52, 64-68.

[203] *See* SW ¶ 22; LGP ¶¶ 18, 46; SRE ¶¶ 42, 84, 85, 189.

[204] LGP ¶ 47; SW ¶ 42; SRE ¶¶ 26, 98, 100, 189, Renda included Jackie's story of being treated poorly by her peers in her Congressional testimony and it was in keeping with the stories of many other women that Erdely spoke to at UVA.

- <u>Statement #2</u>: As noted above, Statement #2 reflects that Eramo, among others, discouraged Jackie from participating in the Article. *See supra* Part I.A.2. Plaintiff has adduced no evidence in discovery showing that this statement is substantially false, much less that Erdely or anyone at Rolling Stone entertained serious doubts as to its accuracy.[205] Erdely and Garber-Paul confirmed that Jackie on the record said Eramo "does not want my name in the article at all," and Alex Pinkleton confirmed the same thing.[206] Despite Erdely's requests, UVA did not make Eramo available for comment to confirm this information; nor would they comment on individual cases.[207] Based on their faith in Jackie's credibility as a source and demonstrated ability to report the statements of others, Erdely and Rolling Stone believed this information was accurate at the time of public.[208]

- <u>Statement #4</u>: As noted above, the reference to Eramo's "nonreaction" in response to Jackie's report plainly refers to her immediate emotional response, not to substantive action she did or did not take in response to Jackie's revelation that she knew about two other alleged PKP victims. *See supra* Part I.B.3. Jackie told Erdely in an interview that Eramo "wasn't as shocked as you might think …. [S]he wasn't like 'my god that's crazy,'" and Jackie confirmed Eramo's demeanor to Garber-Paul in a fact-checking call.[209] As noted above, Rolling Stone was unable to check this information with Eramo. Finally, Eramo confirmed in her deposition that it was her practice to listen to victims "without judgment" and not to react in 'in an aghast manner."[210] Accordingly, Statement #3 is substantially true and cannot possibly have been made with actual malice.

- <u>Statement #5</u>: As explained above, this statement expresses Defendants' nonactionable opinion that UVA should have taken more prompt and proactive steps to respond to Jackie's allegations. *See supra* Part I.A. The Article cites other experts who concurred with Defendants' opinion.[211] Moreover, the underlying facts informing this opinion are not in dispute.[212] Accordingly, the basis for Defendants' opinion is substantially true, and Defendants could not have acted with actual malice in expressing this opinion. And once again, there is no evidence that Defendants subjectively doubted the accuracy of Statement #5, or that they intended Eramo's strained interpretation of the Statement.

Accordingly, Plaintiff cannot demonstrate that any of the Statements from the Article were published with actual malice.

---

[205] *See* SUMF § B.6
[206] SRE ¶¶ 121, 129; LGP ¶ 50.
[207] *See* SUMF § B.7; LGP ¶ 52.
[208] SRE ¶ 190; LGP ¶ 14-24, 50-53.
[209] SRE ¶¶ 43, 192; LGP ¶ 59.
[210] Eramo Dep. 137:25-138:10.
[211] Article at RS001079.
[212] *See* SUMF § B.4.

54

### 3. The fact that Defendants relied on Jackie as a source does not demonstrate actual malice

Lacking any evidence of actual malice –let alone "clear and convincing" evidence – with respect to each of the Article Statements, Plaintiff tries instead to make Jackie's credibility the central issue in this case. Plaintiff's theory appears to be that Defendants *knew* at the outset that Jackie was not a credible source or *consciously avoided* red flags indicating that she was not to be trusted, yet chose to rely on her anyway – and that as a result, everything in the Article was published with actual malice. This theory has no support in the law or the record. *See Tavoulareas*, 817 F.2d at 794 ("[d]efamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice in conjunction with a false defamatory statement.") Primarily, Eramo looks to events that occurred after the Article was published to inform her claims, but these "cannot be relevant to the publisher's state of mind [regarding] his alleged malice at the time of publication." *Herbert v. Lando*, 781 F.2d 298, 306 (2d Cir. 1986).

Plaintiff conjured up a host of theories in discovery in an attempt to cobble together an argument that Defendants entertained serious doubts about Jackie's credibility. Most pertain to details in Jackie's story that do not even relate to Eramo. The record evidence simply does not support any argument that Defendants believed or suspected Jackie was not a credible source or that her allegations were inherently incredible. To the contrary, the evidence consistently demonstrates that Defendants published the Article with full faith in its accuracy, including any Statement about Eramo.

### a. Jackie was entirely credible, and Defendants fully believed in her as a source

Erdely spent hours interviewing Jackie over the course of several months, both in person and by phone, and Garber-Paul spent over four hours on the phone with her to fact-check her account. During these interviews and conversations, both Erdely and Garber-Paul came away

55

entirely confident that Jackie was a reliable, honest, intelligent witness.[213]  Jackie also repeatedly

demonstrated reliability in reporting what others said in her presence – a key reason that

Defendants felt comfortable relying on her as a source for the quotes of others.[214]  Erdely and her

editors also gained confidence in Jackie because she was willing to use her own name, and she

would be identifiable, suggesting that Jackie was willing to stand up for her story in the face of

serious potential repercussions.  Jackie had nothing to gain – and everything to lose – from

telling her story so publicly, and she had no apparent grudge or motivation to lie.[215]  *See Clyburn*

*v. News World Communications, Inc.*, 705 F. Supp. 635, 642 (D.D.C. 1989) (journalist's

"reliance on a single source does not indicate actual malice especially where the source has no

apparent motive for misleading the reporters") (citations omitted), *aff'd*, 903 F.2d 29 (D.C. Cir.

1990).  Furthermore, Jackie appeared to have genuine respect and affection for Eramo, which

made it especially unlikely that she would provide false information about her to Rolling

Stone.[216]

       But Defendants did not rely solely on Jackie.  Erdely and Garber-Paul spoke with

Jackie's closest friends, and all of them confirmed that Jackie had told them in sum and

substance the same basic story that she told Rolling Stone.[217]  Of course, these third parties could

not confirm Jackie's alleged rape first-hand – but the fact that Jackie had told them substantially

the same account she told Rolling Stone lent further credibility to Jackie and her story.

       Jackie also provided emails and other documentation corroborating many details of her

---

[213] *See* SUMF § B.3; LGP ¶¶ 13-36.

[214] SRE¶¶ 175 (collecting references); LGP ¶ 22; SW ¶ 29.  In the most notable example, Jackie told Erdely that in a September 2014 meeting, Dean Eramo said that Eramo had learned  that "all the boys involved have graduated." Erdely checked this quote with Alex Pinkleton, and Pinkleton confirmed that not only this quote but another quote of Dean Eramo from that interview was accurate.  SRE ¶¶ 88-90.

[215] SW ¶ 20; SRE ¶ 172.

[216] SW ¶ 20; LGP ¶¶ 17; SRE ¶ 186.

[217] SRE ¶ 172 (collecting references); LGP ¶¶ 23-24.

56

story.  Most importantly, Jackie provided email exchanges with Eramo in May 2013 demonstrating that Jackie reported a sexual assault involving multiple men and that Eramo deferred to Jackie's wish not to report the matter.  She also provided emails substantiating that she met with Eramo again in April and May 2014, prompted by the bottle attack, and that she reported the bottle attack to Eramo and the police.  This corroborating evidence justifiably gave Erdely and Rolling Stone additional comfort that Jackie was telling the truth.[218]

### b.     Jackie's story had the imprimatur of UVA.

In no small part, Erdely and her editors believed Jackie because her story came with the imprimatur of UVA and they were aware that UVA itself was investigating Jackie's claims. Renda, an employee of UVA, connected Erdely to Jackie in July 2014, and Erdely knew that Renda had used Jackie's story in testimony before Congress.   Even before speaking with Jackie, Renda  told Erdely that Eramo were aware not only of Jackie's case, but also of two other alleged PKP gang-rape victims – which Jackie then also confirmed -- and that Eramo was "passionate" about getting the fraternity "punished."[219]  While these communications did not establish that UVA had *adjudicated* Jackie's allegations and found them to have merit, they strongly suggested that the UVA administration credited Jackie's allegations and found them believable.  This was further confirmed by UVA's (belated) commencement of a formal investigation of PKP in September 2014.[220]  *Hatfill*, 488 F. Supp. 2d at 531 (no actual malice where evidence showed defendant was aware Hatfill was a "person of interest" in an investigation).  Most importantly, the fact that Eramo told Pinkleton and Jackie that she learned that "all the boys involved have graduated" not only underscored that UVA found the allegations

---

[218] SRE ¶¶ 82-86, 176, LGP ¶ 18; SW ¶¶ 21-23.
[219] *See supra* SUMF § B.2; SRE ¶¶ 29, 30, 173.
[220] SRE ¶¶ 173-174; LGP ¶ 20-21; SW ¶ 26.

57

to be credible, but suggested that UVA might have in fact have identified the perpetrators.[221]

Despite being fully aware that Rolling Stone was speaking with Jackie as a source for the Article, at no point during Rolling Stone's five-month investigation did *anyone* at UVA ever express any uncertainty about Jackie's credibility or the truth of her story.  Nor did UVA make any effort to correct Erdely when she told UVA President Sullivan that she was aware of "three separate allegations of gang rape" at PKP being reported to Eramo within the past year – even though they *did* notify her that in the same interview, Erdely referenced incorrect facts in a different case (which Erdely promptly corrected).[222]

### c. Jackie's allegations were not inherently incredible

In addition, there is no evidence that Erdely or Rolling Stone did or should have found any part of the Article inherently implausible.  Although Jackie's story was dramatic and horrifying, it was not incredible.  As the Article reports, Liz Securro was gang-raped at UVA's chapter of PKP in 1984.[223]  Erdely also consulted experts who explained that such assaults did happen at universities, and most typically at fraternities -- making clear that the occurrence of a violent gang-rape on an elite college campus was not somehow beyond the pale.[224]

Furthermore, as detailed above, Defendants had ample evidence that the UVA community – including Eramo – found Jackie's story to be credible.  *See supra* Part II.C.3(b).  Discovery has only underscored that UVA internally viewed Jackie's allegations as "very serious," so much so that Dean Groves briefed his superiors, all the way to President Sullivan, on Jackie's case.[225]  If UVA administrators with significant resources and years of experience

---

[221] SRE ¶¶ 88-90, 173-174; SW ¶ 27; WD ¶ 16.

[222] SRE ¶¶ 106-108; LGP ¶ 23; Groves Dep. 262:16-263:12, 283:6-287:16, 298:2-7.

[223] Article at RS001077.

[224] SRE ¶¶ 57, 58.  Indeed, Plaintiff acknowledged at her deposition that she had dealt with two prior gang-rape cases at UVA before Jackie's case. Eramo Dep. 131:25-132:17.

[225] *See, e.g.,* Groves Dep. 158:19-160:8, 184:20-185:7; Eramo Dep. 164:21-165:22; Renda Dep. 240:24-242:2.

58

handling sexual assault cases did not find Jackie's claims "inherently incredible," then it is hard to see why anyone else should have.[226]

Most importantly, nothing about Jackie's account of *her interactions with Eramo* – the actual focus of this lawsuit – was remotely "inherently incredible."  As explained above, Rolling Stone absolutely believed – and had no reason to doubt, even today – the Article's depiction of Eramo's interactions with Jackie and UVA's response to her allegations.

### 4.  There is no evidence that Erdely or Rolling Stone consciously avoided the truth

Under the actual malice standard, "it is not enough for a plaintiff to prove simply that the defendant failed to investigate or check the accuracy" of a particular statement.  *Hatfill*, 523 F.3d at 317.  Instead, a failure to investigate may support a finding of actual malice only if such inaction is "a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of the statements at issue.  *Harte-Hanks*, 491 U.S. at 691.  "Conscious avoidance" requires clear and convincing evidence that the defendant was *aware* of evidence that would likely contradict her information, but *deliberately chose not to investigate* that evidence.

*Harte-Hanks* provides the classic fact pattern for "conscious avoidance."  In that case, the Supreme Court affirmed a jury's finding of actual malice where a newspaper reported allegations from the sister of a key prosecution witness that the prosecutor in the case offered them bribes in exchange for favorable testimony.  Key to the court's finding was the fact that the newspaper had the ability to interview the source's sister – arguably the most important source in the case, and

---

[226] Plaintiff insists that she was told a different, less detailed story, but discovery has revealed no evidence that Erdely or anyone at RS knew this before the Article was published.  Furthermore, UVA's representatives have uniformly confirmed that the University would not treat an allegation of forced oral sex by multiple men (which is the version Plaintiff claims to have received) with any less seriousness than an allegation of gang rape involving vaginal penetration.  Groves Dep. 115:3-9; Davis Dep. 35:17-36:20.  In any event, Plaintiff admitted at her deposition that by April 2014, she believed Jackie was alleging that her assault involved vaginal penetration.  Eramo Dep. 177:13-178:24.

the most likely to *corroborate* their source's account – and yet deliberately chose not to reach out to her despite contacting every other witness in the room, who denied the story. *Id*. at 682, 692. In fact, the newspaper even had a tape recording from the night in question, which it chose not review. *Id.* at 692. Based on these facts, a jury could infer that the newspaper deliberately avoided contacting the sister because it believed she would undercut the story. *Id.* at 683.

*Harte-Hanks* is a far cry from the facts in this case. There is no evidence that Defendants had other witnesses contradicting Jackie's account or refuting her credibility – to the contrary, every source Erdely spoke with who knew Jackie expressed belief in her story, and UVA appeared to believe it too. Nor is there any evidence that Defendants made a *conscious decision* not to contact key sources they had full ability to reach, or to review key evidence that was clearly within their possession. To the extent that Defendants failed to reach certain sources and failed to find out until after publication that Jackie was not credible, those facts do not support a deliberate strategic decision to avoid the truth.

In contrast, the law is clear that relying on an apparently reliable source without conducting additional investigation does *not* constitute conscious avoidance. "As long as the sources of the libelous information *appeared reliable*, and the defendants had no doubts about its accuracy, the courts have held the evidence of malice insufficient to support a jury verdict, even if a more thorough investigation might have prevented the admitted error." *Ryan*, 634 F.2d at 734 (emphasis added). The leading case for this proposition is *St. Amant v. Thompson*, 390 U.S. 727 (1968), in which the United States Supreme Court reversed a libel judgment in favor of the plaintiff, a union president, in a lawsuit based on the defendant's televised reading of an affidavit accusing the president of bribery. 390 U.S. at 730. The Court held that the plaintiff could not prove actual malice even though the defendant had relied *solely* on the affidavit, undertook no

60

independent investigation of the charges, was aware that the affiant was one of the plaintiff's rivals, and knew nothing of the affiant's veracity. *Id.*

In *Reuber v. Food Chemical News*, 925 F.2d 703 (4th Cir. 1991), the Fourth Circuit reversed a jury verdict for the plaintiff, finding insufficient evidence of actual malice arising out of the publication of a leaked letter of reprimand accusing the plaintiff of professional misconduct, even though the reporter "made a conscious decision not to inquire into the truth or falsity of [the supervisor's] allegations in the letter." Even this conscious choice was insufficient to show actual malice because the letter had superficial indicia of reliability – it was on letterhead from federally-sponsored cancer research center – and no evidence suggested that the reporter thought such inquiry would disprove the allegations. *Id.* at 716.[227]

In particular, consider *Richmond Newspapers, Inc. v. Lipscomb*, 362 S.E.2d 32 (Va. 1987), where the Supreme Court of Virginia held that there was insufficient evidence of actual malice to support a jury verdict even though a reporter failed to contact students who would have contradicted negative statements about the plaintiff, a school teacher. *Id.* at 34-35. The reporter relied on certain complaining parents and students, but did not get information from Lipscomb or school administrators because the school board's attorney advised them not to discuss the matter with the press, citing "the law dealing with confidentiality of both student and individual teacher records" and his fear of litigation. *Id.* At trial, a number of witnesses contradicted the negative statements in the article, and the students who gave that testimony "were all shown to have been readily available for interview in the Richmond area." *Id.* at 38. The school refused to provide the reporter the names and addresses of students, but that

---

[227] *See also Church of Scientology*, 992 F.2d at 1334 ("*Reuber* made it clear that actual malice cannot be established merely by showing a departure from accepted journalistic practices. The case emphasized that the failure to investigate, 'where there was no reason to doubt the accuracy of the sources used . . . cannot amount to reckless conduct.")

information was available from the students interviewed, including the names of some other students, but the reporter did nothing to contact them.  *Id.*  Citing *St. Amant*, the Virginia Supreme Court held that actual malice had not been established because there was insufficient evidence that the reporter had "obvious reasons to doubt" the veracity of the complaining parents and children.  *Id.* at 38.[228]

Here, the undisputed evidence shows that Jackie "appeared reliable" at the time of publication and that Rolling Stone and Erdely subjectively "had no doubts" about her story, and therefore the evidence is insufficient to support a jury verdict on actual malice, "even if a more thorough investigation might have prevented the admitted error."  *Ryan*, 634 F.2d at 734; *Reuber*, 925 F.2d at 716; *Church of Scientology*, 992 F.2d at 1334.  Summary judgment is appropriate on that ground alone.

Indeed, far from consciously avoiding information about Eramo, undisputed evidence shows that Rolling Stone aggressively sought to interview Eramo, even insisting on speaking with Eramo after being informed by UVA public relations that she would not be made available.[229]  In addition, the undisputed evidence shows that UVA refused to comment on or discuss the specifics of any individual cases, making it impossible for Rolling Stone to check with the University facts about Jackie's case or her interactions with Eramo.[230]  Rolling Stone's attempts to interview Eramo and its repeated engagement with UVA public relations strongly militate against a finding of actual malice.  *See, e.g.*, *Newton v. Nat'l Broad. Co., Inc.*, 930 F.2d

---

[228] *See also Hugger v. Rutherford Inst.*, 94 F. App'x 162 (4th Cir. 2004) (reliance on a single, apparently credible source – even when questions had been raised as to that source's reliability, and corroborating witnesses may have been available – could not support a finding of actual malice:  "a reasonable person may have waited to hear from one of the corroborating witnesses before issuing the press release," but held nonetheless that, "the First and Fourteenth Amendments do not allow states to impose a standard of reasonableness upon defamers who are discussing matters of public concern.").

[229] *See* SUMF § B.7

[230] LGP ¶ 39.  Eramo has argued that Erdely should have obtained a FERPA waiver, but the evidence demonstrates that Erdely raised the possibility of obtaining a waiver with UVA and, in any event, it would have been futile given that *all* students involved would need to waive FERPA.  SRE ¶ 63; Davis Dep. 178:25-185:21; EAM Ex. 117.

662, 686 (9th Cir. 1990) (repeated attempts to interview plaintiff dispel accusation of actual malice and purposeful avoidance of the truth).

With respect to Jackie's story more generally, the undisputed evidence likewise shows that Erdely and Rolling Stone were diligent in seeking to confirm every aspect of Jackie's case they could, including asking repeatedly to be provided with physical and documentary evidence, pestering Jackie to put Erdely in contact with additional sources, and interviewing sources expressly to "verify every part of [J]ackie's story, confirm eve[ry] part of her story that's confirmable."[231]  When these efforts were unsuccessful, it was not because Erdely consciously avoided the truth, but because Jackie provided Erdely with detailed and plausible explanations for why she could not provide the evidence and why potential sources were unwilling to help with the story.[232]  Rolling Stone also sought and obtained comment from local and national representatives of Phi Kappa Psi and included their denials in the Article.[233]  This undisputed record precludes a finding that Erdely and Rolling Stone consciously avoided discovering information that would contradict Jackie's story or, more specifically, the information she provided about Eramo.

Of course, in hindsight, if Erdely had reached the three friends or learned Drew's last name, she might have discovered serious discrepancies in Jackie's story.  But there is no evidence that Erdely, Garber-Paul, or anyone else willfully avoided locating and contacting these sources.  Nor is there any evidence that any of these potential sources had relevant information

---

[231] *See, e.g.,* SRE Ex. 15 at RS004419, RS004425; SRE ¶¶ 39, 49, 80, 81, 95-101, 172, 176, 177

[232] SRE ¶¶ 176, 177 (collecting references); SW ¶¶ 31, 36, 39-40; LGP ¶¶ 27, 31, 33.

[233] Article at RS001079.  Plaintiff alleges in her complaint that Defendants acted with actual malice in failing to "Seek Meaningful Comment From Phi Kappa Psi."  Compl. p. 47 (heading).  Plaintiff's adduced no evidence in discovery that remotely supports the existence of any such "calculated decision" and the record evidence shows only diligent efforts on Erdely's part to give Phi Kappa Psi a meaningful chance to comment, despite the chapter president's refusal to speak with her on the phone.  SRE ¶ 114, 115.

63

concerning *Jackie's interactions with Eramo* or any of the Statements challenged in this case.[234]

Courts are clear that the mere failure to follow up or locate potential sources who might conceivably provide contradictory evidence does not amount to clear and convincing evidence of actual malice. *See Reuber*, 925 F.2d at 716; *Ryan*, 634 F.2d at 734; *Hugger*, 94 F. App'x at 167; *Richmond Newspapers*, 362 S.E.2d at 39.[235] Accordingly, Defendants' failure to reach certain sources cannot give rise to actual malice.

### 5. Plaintiff's remaining theories of actual malice are without merit

The remainder of Plaintiff's theories do not add up to actual malice, much less clear and convincing evidence thereof. For example, Plaintiff claims that Rolling Stone published the Article with actual malice because it pursued "agenda-driven reporting" that ignored facts to fit a "biased, preconceived narrative" that would make the University look bad.[236] Even if Rolling Stone *was* biased against Eramo or UVA – and there is no evidence to support that conclusion – that would not be sufficient. The actual malice standard "directs attention to the defendant's attitude toward the truth or falsity of the material published [not the defendant's attitude toward the plaintiff.'" *Reader's Digest Ass'n v. Superior Ct.*, 37 Cal. 3d 244, 257 (1984); *accord Reuber*, 925 F.2d at 715. Rolling Stone defeated a nearly identical argument 15 years ago, winning summary judgment based on a lack of actual malice in *D.A.R.E Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270 (C.D. Cal. 2000), *aff'd*, 270 F.3d 793 (9th Cir. 2001). There, the Court flatly rejected an argument that a motive to "slant" a story supported actual malice, noting that the Supreme Court has repeatedly held that in defamation cases, the phrase "actual malice" "has nothing to do with bad motive or ill will." *Id*. at 1285 (quoting *Harte–Hanks*, 491

---

[234] *See* SUMF § B.9.

[235] This makes logical sense: if failing to reach all potentially relevant sources were sufficient to demonstrate actual malice, then this stringent standard would collapse into a mere negligence analysis.

[236] Compl. ¶¶ 126-30.

64

U.S. at 667 n.7).

Similarly, Plaintiff cannot rely on post-publication statements as evidence of actual malice in the Article. Because the actual malice inquiry is subjective, actual malice must "necessarily be drawn solely upon the basis of the information that was available to and considered by the defendant prior to publication." *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) (quoting *McFarlane v. Sheridan Square Press*, 91 F.3d 1501, 1508 (D.C. Cir. 1996)).[237] But even if post-publication events were relevant, nothing that took place after publication on November 19 remotely supports a finding of actual malice. The undisputed evidence demonstrates that, despite growing criticism in the press, Erdely and Rolling Stone firmly believed in the accuracy of Jackie's story until December 5.[238] If anything, Rolling Stone's post-publication actions constitute *affirmative evidence* of a *lack* of actual malice. *See, e.g.*, *Hoffman v. Washington Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977) ("[I]t is significant and tends to negate any inference of actual malice on the part of the [newspaper] that it published a retraction."), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978).

\*    \*    \*

Whether considered individually or collectively, Plaintiff's hodgepodge of hindsight criticism regarding the reporting and editing of unrelated aspects of Jackie's story cannot begin to meet her burden of establishing clear and convincing evidence that Defendants knew or had serious doubts about any of the challenged Statements from the Article. As shown above, none of these allegations taken separately create a material issue regarding actual malice. Moreover, these allegations *in combination* do not amount to the creation of an issue as to actual malice. *See Tucker v. Fischbein*, 237 F.3d 275 (3d Cir. 2001) (Alito, J.) (plaintiff's 24 different theories

---

[237] *See also Bose Corp.*, 466 U.S. at 512 (evidence must establish that defendant "realized the inaccuracy at the time of publication").

[238] *See, e.g.*, SRE ¶¶ 161-168; SW ¶¶ 75-90; WD ¶¶ 24-31.

to support actual malice not sufficient).

### III. ERAMO'S LIBEL CLAIM BASED ON POST-PUBLICATION STATEMENTS FAIL FOR THE SAME REASONS

Plaintiff's libel claim based on the post-publication statements fail for the same reasons as the challenged Statements in the Article – namely that they constitute protected opinion and the record lacks "clear and convincing" evidence that they were made with subjective awareness of probable falsity.

#### A. The Post-Publication Statements Are Expressions of Opinion or Hyperbole, Protected By The First Amendment.

None of the post-publication statements purport to convey new facts about Eramo, but rather summarize and express subjective and strongly felt views about the contents of the Article in an off-the-cuff, rhetorical fashion. Given the bedrock principle that the allegedly defamatory statements must be understood in their proper context, the Court should evaluate these statements against the backdrops of the facts and opinions contained in the Article, not in isolation. Both press Statements specifically reference the Article and Erdely's comments on the Brian Lehrer program and the Slate DoubleX Gabfest podcast not only referenced the Article, but hyperlinks to the Article were posted on the websites. *See, e.g., Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 18 n.7 (D.D.C. 2013) (article's statements of fact were protected fair comment in light of the source material hyperlinked in the article), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015). *See also Pease v. Tel. Publ'g Co.*, 462 A.2d 463, 466 (N.H. 1981) (critical statements in letter to the editor were opinion based on disclosed facts because the article referred to "was in the public domain, and anybody with sufficient interest could have reviewed it in order to determine whether they agreed with [defendant's] opinion.").[239] Understood in their full context – as they

---

[239] *See also Wallace v. Geckosystems Int'l Corp.*, No. CV K11C–03–018 JTV, 2013 WL 4054147, at *7 (Del. Super. July 31, 2013) (because message board statement linked to an article which was the foundation of its assertions,

must – Rolling Stone's and Erdely's post-publication statements constitute protected expressions of opinion and rhetorical hyperbole that do not state actual facts about Eramo.

In *Milkovich*, the Supreme Court made clear that the First Amendment protects "rhetorical hyperbole" and "imaginative expression" that "traditionally added much to the discourse of our Nation." *Milkovich* at 20. As the Fourth Circuit has recognized, "To deny to the press the right to use hyperbole … would condemn the press to an arid, desiccated recital of bare facts." *Time, Inc.*, 448 F.2d at 384.

Anyone seeing Rolling Stone's and Erdely's comments to the Washington Post and other news outlets in early December 2014 would understand that they were staking out a strong rhetorical position in the face of aggressive challenges to its reporting, again signaling to readers that they were expressing opinions, not facts. *See Schnare v. Ziessow*, No. 03-1879, 104 F. App'x 847, 849-50, 851-52 (4th Cir. 2004) (unpublished) (statements in magazine article by dog show breeder accusing opponent of lying in affidavit held to be protected opinion because they would be reasonably understood as "a response to Schnare's accusation that Ziessow wanted to revise the breed standard in order to drive competitors from the market for his own person gain"); *Offit*, 2010 WL 883745, at *2-3, *5 (quote from an infectious disease specialist about an anti-vaccine activist who had criticized him held to be non-actionable opinion because "illustrative of the rough-and-tumble nature of the controversy over childhood inoculations").

In particular, courts routinely hold that statements made on radio shows are protected opinion or hyperbole because the talk radio format is notoriously associated with strong rhetoric and heated viewpoints. *See CACI*, 536 F.3d at 301-02 (holding that characterization of military contractors as "killers" in the course of talk radio show was reasonably understood as

statement was non-actionable opinion based on disclosed facts); *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, No. CV 10–5696 CRB, 2013 WL 3460707, at *4-5 (N.D. Cal. July 9, 2013) (blog post on a legal dispute between author and plaintiff linked to legal filings and was therefore non-actionable opinion based on disclosed facts).

67

"exaggerated rhetoric intended to spark the debate"); *Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) (accusation made during "emotional debate" on talk show held hyperbolic and nonactionable).[240]  Here, when viewed in their full context, including with the Article itself, Erdely's post-publication Statements on the Brian Lehrer Show and the Slate podcast that UVA "did nothing,"[241] "kind of brushed off" Jackie,"[242] and "doesn't really treat rape as a crime"[243] must be understood as encapsulating – in an imprecise and off-the-cuff fashion – the Article's subjective opinion that UVA failed to respond adequately to Jackie's allegations because it failed to issue a warning and failed to conduct a formal investigation prior to the fall of 2014.  Her statements are rife with signals that she is expressing her strongly worded opinions: e.g., "it seems like no matter what, this is an incredibly messed up situation"; "I think what was really telling;" or  "this case blew my mind."[244]  Likewise, the reference to "indifference" in the two press Statements at issue evokes the same subjective criticism based on the same accurate facts disclosed in the Article.  Rolling Stone's press statement uses strong rhetoric, including the word "ordeal," to describe the lack of decisive action taken in response to Jackie's claims, as well as Jackie's feeling of emotional paralysis when presented neutrally with an array of possible options and told that it was her choice.[245]

In a similar vein, Erdely's statements on the Slate podcast that "I feel she was sort of discouraged from moving this forward," and that UVA (1) "would seek to suppress something

---

[240] *See also Huggins v. Povitch*, No. 131164/94, 1996 WL 515498, at *7 (N.Y. Sup. Ct. Apr. 19, 1996) (statements made by guest on television show were protected opinion because, in the context of the show, it was "obvious to the viewer that hotly contested matters are about to be discussed and that [the guest's] remarks are likely to reflect a certain personal bias that should not be taken as objective fact").
[241] See **Statements #6, #7, and #11** in the Appendix.
[242] See **Statement #6** in the Appendix.
[243] See **Statement #8** in the Appendix.
[244] Compl., Ex. C at 9-10.
[245] SW ¶¶ 83-84.

68

like this,"[246] (2) failed to provide Jackie with the support she needed to move her claim forward,[247] and (3) had "an attitude that radiates from the administration that doing nothing is fine"[248] are all loose, vaguely worded, and hyperbolic characterizations of the opinions set forth in the Article – again, based on disclosed facts – that UVA's policy of deferring to victim choice in matters of sexual assault reporting and discipline may have the unintended consequence of victim inaction.[249]  Moreover, any reasonable listener or reader would have understood these and the other extemporaneous statements above to be rhetorical hyperbole on the part of someone who felt strongly about an issue of significant public consequence.

### B.    Eramo Cannot Prove Actual Malice With Respect To The Post-Publication Statements By Clear And Convincing Evidence.

Even if the Court finds that any of these Statements constitute statements of fact rather than opinion, summary judgment is still appropriate because the record is devoid of any evidence – much less clear and convincing evidence – that Erdely or Rolling Stone made these statements with actual malice.  At the time these statements were made, no significant new evidence had come to light since publication of the Article, and Erdely and Rolling Stone still firmly believed Jackie's credibility and in the accuracy of the Article and were defending the story vigorously.[250]  In particular, the record provides no support for Plaintiff's theory that an "alarm bell" went off in Erdely's head on November 26[251] that caused her to doubt the credibility

---

[246] See **Statement #9** in the Appendix.

[247] See **Statement #10** in the Appendix.

[248] See **Statement #11** in the Appendix.

[249] To the extent these statements characterize Eramo's intentions or motivations – *e.g.*, "that they would seek to suppress something like this" – the law is clear that "anyone is entitled to speculate on a person's motives from the known facts of his behavior." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993).  *See also Price v. Viking Penguin*, 881 F.2d 1426, 1432 (8th Cir. 1989) ("[s]tatements regarding motive are 'intrinsically unsuited' to serve as a basis for libel"); *Evansville Press*, 791 F.2d at 487 (statements about plaintiff's motivation for airing religious programming and comments critical of television station's soliciting reasons why people go to church were protected as opinion).

[250] *See supra* Part II.

[251] Moreover, Plaintiff's allegation that this "alarm bell" conversation with Jackie took place *before* Erdely appeared

of her source, nor for the proposition that Erdely entertained any serious doubts or shared them with anyone else prior to December 5.[252]

Moreover, to the extent Erdely's off-the-cuff comments state her point of view more aggressively than the Article itself, Plaintiff has adduced no evidence that she entertained serious doubts about those more aggressive positions at the time they were expressed. The actual malice standard permits a speaker such as Erdely to present a "rational interpretation[ ]" of an ambiguous situation and, given the fraught and complex nature of Jackie's case, the events that transpired at UVA "bristled with ambiguities." *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971). As the Ninth Circuit has explained:

> Authors should have "breathing space" in order to criticize and interpret the actions and decisions of those involved in a public controversy. If they are not granted leeway in interpreting ambiguous events and actions, the public dialogue that is so important to the survival of our democracy will be stifled.

*Partington*, 56 F.3d at 1159. *See also Chapin*, 993 F.2d at 1096 (when an "answer [is] within the wide range of possibilities, [it] is precisely [when] we need and must permit a free press to ask the question").

In this regard, this case is similar to *Church of Scientology v. Daniels*, in which the Fourth Circuit affirmed the grant of summary judgment dismissing a libel claim based on actual malice. 992 F.2d at 1332-35. There, the Church of Scientology sued a pharmaceutical executive for stating to the *USA Today* editorial board that Scientology is "no church" and that "every judge and every investigative journalist who has ever looked at it has come away with the same conclusion." 992 F.2d at 1330. The Fourth Circuit held that Daniels spoke without actual

---

on the Slate podcast (Compl. ¶ 188) is demonstrably false. The indisputable record evidence shows that Erdely appeared on both Brian Lehrer and Slate on the morning of November 26, and that she spoke to Jackie later that day. SRE ¶¶ 152, 158; SRE Exs. 45, 46.

[252] SRE ¶ 160; SW ¶¶ 75-78; WD ¶¶ 25-29.

malice as a matter of law because, while not literally accurate, his statements were generally supported by magazine and news articles that Daniels read which painted a picture of the Church that was "at odds with a common understanding of what a 'church' is." *Id.* at 1334-35. The Court explained that "literal inaccuracy in a colloquial or hyperbolic statement is not actionable," *id.* at 1335 (citing *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. US. 6, 13-14 (1970)), and that "incorrect interpretation of a report or use of stronger language than the source itself used is not proof of actual malice" (citing *Ryan*, 634 F.2d at 733).

Here, all of the post-publication Statements at most use truncated references to documented and spelled out specific details set forth in the text of the Article itself.[253] Against the factual background of Erdely's and Rolling Stone's exhaustive reporting and the careful explication of their opinions in the Article, no reasonable jury could conclude that when they are speaking either in defense of their story or extemporaneously live-on-air, had a subjective "high degree of awareness" of the supposed "probable falsity" of any of the subjective opinions and hyperbole they offered. *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *Daniels*, 992 F.2d at 1334. Finally, with respect to Erdely's specific statement that "Not only did they not report it to police, but really I feel she was sort of discouraged from moving this forward,"[254] the undisputed record evidence shows that, prior to publication, neither Erdely nor Rolling Stone had any information that Jackie had spoken to police about her sexual assault in April 2014, and in fact they had copious documentary evidence suggesting that she only reported the bottle attack.[255]

In short, even if the court finds that Erdely's and Rolling Stone's post-publication

---

[253] For example, **Statement #6** ("brushed off"; "did nothing"); **Statement #7** ("did nothing"); **Statement #9** ("seek to suppress"; "was sort of discouraged from moving this forward"); **Statement #10** (support was "completely absent"); **Statement #11** ("doing nothing is fine"); **Statement # 12** ("chose not to act on her allegations in any way"); **Statement #13** (use of the word "ordeal").

[254] *See* **Statement #9** in the Appendix.

[255] *See* SUMF § B.4.

71

statements are statements of fact rather than opinion, Plaintiff has not – and cannot – adduce clear and convincing evidence of actual malice with respect to them.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully submit that the Court should grant their motion for summary judgment under Fed. R. Civ. P. 56 and dismiss the Complaint in its entirety.

Dated: New York, New York
July 1, 2016

By:     /s/ Elizabeth A. McNamara
Elizabeth A. McNamara (*pro hac vice*)
Samuel M. Bayard (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP 1251
Avenue of the Americas, 21st Floor
New York, New York  10020-1104
Telephone:     (212) 489-8230
Fax:         (212) 489-8340
Email:     lizmcnamara@dwt.com
            samuelbayard@dwt.com

Alison Schary (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone:   (202) 973-4248
Fax:         (202) 973-4448
E-mail:     alisonschary@dwt.com

W. David Paxton (VSB No. 19798)
Michael J. Finney (VSB No. 78484)
GENTRY LOCKE
10 Franklin Road S.E., Suite 900
P.O. Box 40013
Roanoke, VA 24022-0013
Telephone:   (540) 983-9300
Fax:         (540) 983-9400
E-mail:     paxton@gentrylocke.com
E-mail:     finney@gentrylocke.com

*Attorneys for Defendants Rolling Stone LLC,
Sabrina Rubin Erdely, and Wenner Media LLC*

72

<u>**APPENDIX**</u>

**CHALLENGED STATEMENTS IN THE ARTICLE**

**Statement #1:** "Jackie was just starting her freshman year at the University of Virginia when she was brutally assaulted by seven men at a frat party. When she tried to hold them accountable, a whole new kind of abuse began." Compl. ¶¶ 210, 225; Article at RS001070.

**Statement #2:** "Lots of people have discouraged her from sharing her story, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang-rape allegations more than a year ago." Compl. ¶¶ 210, 225; Article at RS001072.

**Statement #3:** "Like most colleges, sexual-assault proceedings at UVA unfold in total secrecy. Asked why UVA doesn't publish all its data, President Sullivan explains that it might not be in keeping with 'best practices' and thus may inadvertently discourage reporting. Jackie got a different explanation when she'd eventually asked Dean Eramo the same question. She says Eramo answered wryly, 'Because nobody wants to send their daughter to the rape school.'" Compl. ¶¶ 210, 225; Article at RS001077.

**Statement #4:** "A bruise still mottling her face, Jackie sat in Eramo's office in May 2014 and told her about the two others. One, she says, is a 2013 graduate, who'd told Jackie that she'd been gang-raped as a freshman at the Phi Psi house. The other was a first-year whose worried friends had called Jackie after the girl had come home wearing no pants. Jackie said the girl told her she'd been assaulted by four men in a Phi Psi bathroom while a fifth watched. (Neither woman was willing to talk to RS). As Jackie wrapped up her story, she was disappointed by Eramo's nonreaction. She'd expected shock, disgust, horror. . . . Of all her assailants, Drew was the one she most wanted to see held accountable—but with Drew about to graduate, he was going to get away with it.

Because, as she miserably reminded Eramo in her office, she didn't feel ready to file a complaint. Eramo, as always, understood." Compl. ¶¶ 210, 225; Article at RS001078.

**Statement #5:** "Given the swirl of gang-rape allegations Eramo had now heard against one of UVA's oldest and most powerful fraternities . . . the school may have wondered about its responsibilities to the rest of campus. Experts apprised of the situation by RS agreed that despite the absence of an official report, Jackie's passing along two other allegations should compel the school to take action out of regard for campus safety." Compl. ¶¶ 210, 225; Article at RS001078-79.

## CHALLENGED STATEMENTS MADE POST-PUBLICATION

### Brian Lehrer Show

**Statement #6:** "[Jackie] was kind of brushed off by her friends and by the administration.... And eventually, when she did report it to the administration, the administration did nothing about, they did nothing with the information. And they even continued to do nothing even when she eventually told them that she had become aware of two other women who were also gang raped at the same fraternity." Compl. ¶ 240, Ex. C.

### Slate DoubleX Gabfest

**Statement #7:** "[Jackie] had eventually kind of mustered up the courage to tell the administration that she had been brutally gang raped, and that the University did nothing with this information and that they continued to do nothing even when she told them that she had become aware of two other women that were also gang raped at that fraternity." Compl. ¶ 255, Ex. D.

**Statement #8:** "It is incredibly extreme. I mean whether this was perpetrated by a serial rapist who has many victims — I mean it seems like no matter what, this is an incredibly messed up situation. But it was absolutely a violent crime and I think what was really telling was the idea

that — and this really underscores the entire article; is the student body and the administration doesn't really treat rape as a crime, as a violent crime.... Even in this case, right, exactly. Compl. ¶ 255, Ex. D.

**Statement #9:** "And this is why this case blew my mind, that Jackie's situation blew my mind; that even in a situation that was so extreme and so obviously within the realm of criminal, that they would seek to suppress something like this because that's really what they did. Not only did they not report it to police, but really I feel she was sort of discouraged from moving this forward." Compl. ¶ 255, Ex. D.

**Statement #10:** "She's particularly afraid of Drew who she's assigned a tremendous amount of power in her own mind.... So I think that the idea of [Jackie] facing him or them down in any way is really just emotionally crippling for her. She's having a hard time facing up to that, and I think that she needs a lot of support if she's going to get to the place where she can actually confront them. When she does actually run into some of her alleged assailants on campus sometimes, she recognizes them all. She can identify them all. When she sees them, just the sight of them, obviously it's a shock but it also tends to send her into a depression. So it just goes to show sort of the emotional toll something like this would take. I just think it would require a great deal of support for her to move forward into any of these options to resolve her case and that's something that's been completely absent. She really hasn't had any of that support from her friends, from the administration, nor from her family."  Compl. ¶ 255, Ex. D.

**Statement #11:** "What I found is that UVA is a place where their culture is one of extreme loyalty, so I guess it shouldn't have surprised me that the community of survivors, they're totally devoted to the University, even as they're not very happy with the way that their cases are handled. They totally buy into the attitude that radiates from the administration that doing nothing is a fine option. You know, if you unburden yourself to the Dean and take care of your own mental health, then that's good enough. They created this support group, which is great for

them and they do activism, they do bystander support seminars, I mean intervention seminars and things like that which is great, but really what they're doing is affirming one another's choices not to report, which is, of course, an echo of their own administration's kind of ethos." Compl. ¶ 255, Ex. D.

**December 1 *Washington Post* Story**

**Statement #12:** "As I've already told you, the gang-rape scene that leads the story is the alarming account that Jackie — a person whom I found to be credible — told to me, told her friends, and importantly, what she told the UVA administration, which chose not to act on her allegations in any way — i.e., the overarching point of the article. THAT is the story: the culture that greeted her and so many other UVA women I interviewed, who came forward with allegations, only to be met with indifference." Compl. ¶ 270.

**December 2 Press Statement**

**Statement #13:** "The story we published was one woman's account of a sexual assault at a UVA fraternity in October 2012 — and the subsequent ordeal she experienced at the hands of University administrators in her attempts to work her way through the trauma of that evening. The indifference with which her complaint was met was, we discovered, sadly consistent with the experience of many other UVA women who have tried to report such assaults. Through our extensive reporting and fact-checking, we found Jackie to be entirely credible and courageous and we are proud to have given her disturbing story the attention it deserves." Compl. ¶ 285.

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2016, the foregoing was served by CM/ECF on counsel of record for all parties to this action. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


/s/ Elizabeth A. McNamara
Elizabeth A. McNamara