**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

-------------------------------------------------------x

NICOLE P. ERAMO,

                  Plaintiff,

      - against -

ROLLING STONE LLC, SABRINA RUBIN
ERDELY, AND WENNER MEDIA LLC,

              Defendants.

-------------------------------------------------------x

Case No. 3:15-cv-00023-GEC

**DECLARATION OF
SEAN WOODS IN SUPPORT OF
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

I, Sean Woods, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am over the age of 18, a resident of New York, New York and competent to make this declaration.  I have personal knowledge of the statements set forth below.  I submit this declaration in support of the motion by Defendants Rolling Stone LLC, Wenner Media LLC (collectively, "Rolling Stone"), and Sabrina Rubin Erdely for summary judgment in this action.

2.      I am Deputy Managing Editor at Rolling Stone.  In that position, I oversaw the reporting and editing of Sabrina Rubin Erdely's article titled "A Rape on Campus:  A Brutal Assault and Struggle for Justice at UVA" (the "Article" or "A Rape on Campus"), which was published on Rollingstone.com on November 19, 2014 and in the December 5, 2014 print edition of *Rolling Stone* magazine.  (The December 5 date is an "off-sale" date when magazines are to be removed from newsstands.  The print edition was available on newsstands and to subscribers on or about November 19, 2014.)  I understand that Plaintiff Nicole Eramo challenges a number of the statements in the Article as false (the "Statements").  At the time the Article was published, I had no doubt about the accuracy of the Article and firmly believed it to be true, including the Statements at issue in this case.  When, a few weeks after publication, I learned that

my reporter had lost faith in her primary source's credibility, I was completely blindsided. My fellow editors and I acted swiftly and unequivocally to notify the public of our concerns within hours of this notice and to effectively retract anything in the Article that came from Jackie. To this day, I feel terrible and I sincerely regret that we published an Article that contained any false information and caused any harm to those affected by the Article.

**My Professional Background**

3.      I am a graduate of Hunter College, where I received a B.A. in Classics.

4.      Prior to working at *Rolling Stone*, I started out as a fact-checker for *Vibe* magazine for a few years and then I joined Rolling Stone in 1999.

5.      Since 1999, I have been employed by Wenner Media LLC, the parent company of Rolling Stone. I started as a freelance fact-checker at Rolling Stone and became a full-time staff fact-checker in 2002. In about 2004, I was promoted to the editorial team as an Associate Editor. Subsequently, I was promoted to Senior Editor, then Assistant Managing Editor, and then again to Deputy Managing Editor of *Rolling Stone* in 2012/2013. I am also a contributing editor for *Men's Journal*, another publication owned by Wenner Media LLC.

6.      In my position as Deputy Managing Editor for *Rolling Stone*, I oversee work on the feature articles that *Rolling Stone* publishes. Feature articles are the longest and most prominent articles in the magazine. *Rolling Stone*'s features cover a wide array of topics, including national and international affairs, politics, social commentary, celebrity news, and music. I personally do the primary editing work on the majority of the feature stories that appear in the magazine. I have devoted nearly the entirety of my career to *Rolling Stone,* and take great pride in the work I do for the magazine and the stories we publish. Over the course of my career, I have worked on articles on many topics, including the Iraq invasion, drug kingpins, cyber-crimes, and climate change. Some of these stories have won or been nominated for awards and

honors.  But, I believe an editor should remain behind the scenes.  What is important to me is that I do work that mattered and is true.  The success of any story turns on it being credible and accurate.  To that end, I work closely with the magazine's Research Department to make sure that the features I work on are as accurate as possible before publication.

7.      In 2014, at the time the Article was published, I reported to Will Dana, the Managing Editor of *Rolling Stone*.  As Managing Editor, Will Dana exercised editorial supervision over all articles appearing in the magazine.  But I was the primary editor with ultimate day-to-day responsibility for the reporting, editing, and fact-checking on the Article.

**My Team for "A Rape on Campus"**

8.      I worked with two of my best and most trusted colleagues on "A Rape on Campus."

9.      The author of the Article, Sabrina Rubin Erdely, is an award-winning feature writer and investigative journalist with over twenty years of experience writing for major American publications, including *Rolling Stone*, *SELF*, *GQ*, *The New Yorker*, *Mother Jones*, *Glamour,* and *Men's Health*.  She has received numerous awards for her work, including two National Magazine Award nominations.  At the time the Article was published, Sabrina was a freelance contributing editor at Rolling Stone.

10.     Sabrina and I have had a long professional relationship together.  Since I brought Sabrina to Rolling Stone as a freelance writer in 2008, we have worked together on more than fifteen feature stories, including the ASME-nominated feature "School of Hate," "The Gangster Princess of Beverly Hills," and "The Poorest Rich Kids in the World," a harrowing tale of the traumatic upbringing of the heirs to the Doris Duke fortune.

11.      Sabrina is an experienced, rigorous, and careful journalist.  I have always found Sabrina to be a good judge of character and believe her to be skilled at working with difficult

sources and distinguishing truth from falsehoods.  Sabrina is incredibly thorough and dogged; she pursues every angle she sees and tracks down and confirms that her facts are well supported.

12.     I particularly trust Sabrina when it comes to writing about sexual assault victims. Both at Rolling Stone and elsewhere, Sabrina has written numerous articles dealing with issues of sexual assault.  For example, her *Philadelphia* magazine article "Intimate Intimidation," which tells the story of a doctor who sexually assaulted multiple patients, was nominated for an ASME award in the public interest category.  In addition, I have worked with Sabrina on several articles relating to sexual assault for *Rolling Stone*.  In 2011, we published "The Catholic Church's Secret Sex-Crime Files," which used grand-jury reports to chronicle the prosecution of priests accused of sexually abusing a 10-year-old boy and covering it up.  That same year, we published "Kiki Kannibal: The Girl Who Played with Fire," the story of a teenage Internet celebrity who was pressured into a sexual relationship with an older man.  Finally, in 2013, we published "The Rape of Petty Officer Blumer," an in-depth look at sexual assault in the military.

13.     Because of my absolute trust in Sabrina's abilities and judgment as an investigative journalist, I did not feel it necessary to micromanage her reporting on "A Rape on Campus," but I worked closely and carefully with her to work through the reporting and editorial issues that came up throughout the process. At no time had I ever been aware of any concern about the accuracy of Sabrina's reporting or any failure on her part to nail down a story.  Far from knowledge of any concern with Sabrina's reporting, in my experience she was steadfast in insuring that every story she worked on was fair, accurate, and thorough.  This is why this experience has been such a shock to me.

14.     Liz Garber-Paul, a staff fact-checker at Rolling Stone, was the fact-checker assigned to the Article.  I have worked for years with Liz Garber-Paul and know that she is an

intelligent, diligent, and careful fact-checker.  By way of example, Liz was the fact-checker on "The A-Team Killings" by Matthieu Aikins, which won a Polk award, and involved a fact-intensive and complicated story about U.S. special forces committing alleged war crimes in Afghanistan.  Based on my experience with Liz, at the time of publication I had absolute confidence in her abilities and judgment.  As with Sabrina, I felt confident relying on Liz to do her job without having to monitor her closely or second-guess her decisions.  At the same time, as the primary editor on the piece, I exercised my authority and editorial judgment to maintain the narrative flow and readability of the Article while still making it as accurate as possible.

**The Article**

15.     The Article is an investigative feature that examines the issues and controversies surrounding sexual assault at UVA, as well as universities nationwide, including cultural attitudes and practices that put women at risk, the role of university administrators in investigating and adjudicating sexual assault, and the proper weight to be given to victim choice in responding to claims of sexual assault.  When we assigned the Article to Sabrina, issues surrounding sexual assaults on campuses was a widely discussed topic that generated a lot of controversy—from the student dragging around a mattress at Columbia to Yale students caught chanting pro-rape taunts.  It remains a topic fraught with conflicting opinions and strong feelings as is evident from the press surrounding the Stanford student given a light sentence for rape and Ken Starr's dismissal at Baylor after a blind eye was turned on sexual assaults by athletes.

16.     The Article opens with the story of "Jackie," a UVA student who claims she was violently gang raped by a group of men at a Phi Kappa Psi fraternity party in September of 2012.  It then chronicles Jackie's interactions with classmates, family, UVA administrators, and other sexual assault victims as she struggles to come to terms with the alleged rape.  A full description

of the Article is included in and attached to the Declaration of Sabrina Rubin-Erderly (¶135 to ¶ 150), which I have reviewed and believe is accurate.  (A true and correct copy of the Article is attached hereto as **Exhibit 1**.)

**When the Article was Published, I Believed Jackie's Story Was Entirely Accura**te

17.     At the time of publication, I believed completely in the accuracy of the Article and viewed Jackie as an entirely credible source.  In particular, I had no concerns or doubts relating to any statements emanating from Jackie concerning Eramo.  The reasons for my confidence in Jackie and her story are set forth below.

*Jackie appeared credible to two of my best people.*

18.     As noted above, I have worked with both Sabrina Rubin Erdely and Liz Garber-Paul closely for years.  They are two of my best people, and I trust their judgment and abilities.  I know that Sabrina interviewed Jackie for approximately 20 hours over months of interviews, and that Liz spoke to Jackie for over four hours over the course of two weeks.  After those extensive interviews, both Sabrina and Liz came away with the firm conviction that Jackie was a credible and trustworthy source.  I understand from them that Jackie told the same facts to both Sabrina and Liz, and that she described her story with great detail and emotional authenticity.  As an editor, I necessarily rely on my reporters and fact-checkers to make first-hand credibility determinations and to dig deep into the facts behind a story.  Because Jackie went through about 20 hours of interviews with one of my best reporters and confirmed the account with one my best fact-checkers, I felt strongly at the time of publication that we had an extremely compelling picture of Jackie's credibility.

*Jackie had other indicia of reliability.*

19.     In my mind, it was significant to Jackie's credibility that she was willing to let Rolling Stone use her real first name in the Article.  Given all the biographical detail in the Article and Jackie's previous public activism on campus, it was my understanding that she would be identifiable to many people on campus.  It was also my understanding that Jackie had been retaliated against for her activism on campus, so I viewed her as a whistleblower, a brave victim willing to share her story with the world and stand by its accuracy.

20.     In addition, I considered Jackie's motivations and believed that she had no obvious motivation to lie to Rolling Stone.  She was not seeking fame or fortune, or she would have encouraged us to use her full name.  She did not want to get revenge on her alleged perpetrators, or she would have named them rather than being terrified to do so.  She did not appear to have any particular axe to grind with UVA, and in particular she was a staunch supporter of Eramo.  In fact, at Jackie's request, Liz Garber-Paul recommended that I add language to the Article stating that Jackie believed Eramo was an "asset to the community," and I did.  (**Ex. 1** at RS001078.)  While Jackie expressed some criticism of the UVA administration generally and certain aspects of UVA culture, she did not appear to have a grudge or vendetta against any person.  Plus Jackie's respect and affection for Eramo made it especially unlikely that she would spread false information to Rolling Stone about her.

*Jackie provided significant corroborating evidence.*

21.     Not only did Jackie present as a credible and reliable source to two of my best people, she also provided emails and other documentation that corroborated much of her story. (A full description of this corroborating evidence is contained in the Declaration of Elisabeth Garber-Paul (¶ 18), which I have reviewed and believe is accurate.)  To name just a few examples, Jackie provided us with emails between herself and Eramo that substantiated that

Jackie reported a sexual assault involving multiple men to Eramo in May 2013.  (**Exhibit 26** to the Erdely Declaration, at RS018284 (offering assistance "if you decide at some point that you would like to hold <u>these men</u> accountable") (emphasis added).)  These emails also confirmed that Eramo respected Jackie's "wishes not to report this matter further to the authorities or through the Sexual Misconduct policy here on Grounds," but would support her if she changed her mind. (**Ex. 26**, at RS018283-8284.)

22.     Jackie also provided emails between herself and Eramo from April 2014, which confirmed that Jackie had reported to Eramo in April 2014 that a group of men outside a bar on "the Corner" threw a bottle at her face in retaliation for her activism, and that Jackie also reported this incident to the police.  (*See* **Exhibit 27** to the Erdely Declaration.)  In one of these emails about the bottle-throwing incident, Eramo wrote to Jackie: "Never forget, however, that it is YOUR choice."  (**Ex. 27** at RS017033 (capitalization in original).  To me, this email not only confirmed that Jackie had reported the bottle incident to Eramo, but it also verified without doubt that Eramo followed UVA's practice of deferring to victim choice.  (*See* **Ex. 1** at RS001076.).  Jackie also provided us with photos of her injuries from the bottle-incident, and Sabrina independently obtained a letter from the Charlottesville Police Department confirming that Jackie had reported an April 6, 2014 "aggravated assault" on the Corner that resulted in a "laceration," (*see* **Exhibit 17** to the Erdely Declaration), further confirming what Jackie had told us about this part of her story.

23.     In addition, Jackie sent us corroboration that she worked at the UVA pool at the time of her alleged attack, and that she sought mental health counseling at the University health center after the alleged gang rape.  (These emails are attached to the Erdely Declaration as **Exhibit 40** and **Exhibit 41** to the Erdely Declaration**,** and **Exhibit 58** to the Garber-Paul

Declaration.)  Finally, she sent us text messages documenting that one of the other alleged Phi Kappa Psi rape victims, as well as the intermediary who put the woman in contact with Jackie, had declined to speak with Rolling Stone.  (These text messages are attached to the Erdely Declaration at **Exhibit 42** and **Exhibit 43.**)  These text messages confirmed something I had learned years earlier in working on a story, which never ran, about the murder of UVA student Yeardley Love at the hands of her boyfriend and fellow classmate—namely, that UVA students are extremely loyal and do not like talking to reporters about topics that might make their school look bad.

*Jackie's story had the imprimatur of UVA.*

24.     In evaluating Jackie's credibility, it was also important to me that Jackie's story appeared to come with the imprimatur of UVA.  The University's apparent belief in her story went far toward giving me comfort that it was accurate.  In particular, I found it compelling that Emily Renda, an employee of UVA, connected Sabrina with Jackie in the first place and testified about Jackie's story before Congress.  Jackie did not seek Sabrina out; nor did Sabrina find her in some random way.  She was directed to Jackie by a UVA representative as a good source to speak about sexual assault at UVA.  I also knew that Emily told Sabrina early in the reporting process that Eramo knew about Jackie's allegations and those of two other women regarding the same fraternity, and that Eramo felt "very passionate" about getting the fraternity punished.  Again, Emily Renda's interviews strongly verified that UVA credited Jackie's allegations and wanted to see that something was done to redress them.

25.     I was also aware the Emily Renda had testified before Congress about sexual assault issues and the first anecdote she used in her testimony involved Jackie's "gang rape" at a "fraternity," although she used a pseudonym.  I could not believe that anyone—particularly

someone representing UVA—would testify under oath about an alleged gang rape unless they firmly believed that it happened.

26.     UVA's (belated) investigation of PKP was yet further corroboration of the seriousness and significance of Jackie's story.  The University presumably would not start an investigation if it did not believe and credit Jackie's story.  President Sullivan confirmed in an on-the-record interview with Sabrina that "a fraternity" was under investigation in connection with Jackie's gang-rape allegations.  As reported in the Article, President Sullivan further stated on the record that the investigation began during the fall semester of 2014, after Sabrina commenced reporting on the story.  (A copy of Sabrina Rubin Erdely's interview notes are attaches as **Exhibit 15** to the Declaration of Sabrina Rubin Erdely, and the referenced material is found at RS004456.)  There was no doubt that the fraternity President Sullivan referenced was Phi Kappa Psi because Jackie and Alex Pinkleton both confirmed that UVA had contacted that fraternity, and the national and local representatives of Phi Kappa Psi confirmed to Sabrina that the University had contacted them in September 2014.  I was also aware that the UVA alumni magazine was working on a story about victims of sexual assault that included Jackie's story, which gave me further comfort in relying on her as a source.

27.     Most significant to me, Eramo herself told Jackie and Alex Pinkleton in a September 17, 2014 meeting, that Eramo had learned "through the grapevine" that "all the boys involved have graduated."  This statement was not only corroborative of the notion that UVA found the allegations to be credible, but suggested that UVA might have in fact identified who the perpetrators were.  (**Ex. 1** at RS001079.)  I note that Plaintiff has <u>not</u> challenged the accuracy of this quote in this lawsuit.

28.     Of course, I was aware that UVA had not adjudicated Jackie's allegations and found them to have merit.  After all, UVA's failure to notify the campus about the allegations or to conduct its own independent investigation was at the core of the Article's criticism of UVA's response to Jackie's claims.  But all of these facts created a strong impression that UVA—like Rolling Stone—credited Jackie's allegations and found them believable.  It is ironic that Eramo now claims that Rolling Stone should have known Jackie was lying when she did not.

*Jackie demonstrated reliability in reporting what others said.*

29.     As set forth more fully in the Declarations of Sabrina Rubin Erdely and Elisabeth Garber-Paul, I know that Sabrina was able to double-check or "test" a number of Jackie's statements about what other people said and, whenever she did so, they always checked out.  That went far toward establishing that Jackie was an accurate reporter of other's quotes.  The most telling example for me is the anecdote, relayed above, of Eramo telling Jackie and Alex Pinkleton that Eramo had learned "through the grapevine" that "all the boys involved have graduated."  Sabrina first heard this quotation from Jackie.  Sabrina then pressure checked that statement with Alex Pinkleton, and Alex independently confirmed that Eramo had said it.  That Jackie did well under this kind of pressure-testing gave me additional comfort that she was a credible source.  Together, all of this corroboration, coupled with my firm belief in Jackie's credibility, made me have a high degree of confidence in the accuracy of Jackie's story and, more specifically, Jackie's account of her interactions with Eramo.

*The decision not to get comment from "Drew" appeared reasonable at the time and was anchored in Rolling Stone's firm belief that Jackie's story was true.*

30.     During the course of the reporting process, I was aware that Sabrina knew the first name or nickname of the ringleader of her alleged attack, but that Jackie had not disclosed his last name.  Jackie told Sabrina early on that the name of the man who worked with her at the

UVA pool and who took her to the Phi Kappa Psi party and orchestrated the rape was named
"███."  I believe Sabrina asked Jackie directly for ███'s last name for the first time in September
2014, but Jackie did not disclose the name at that time.

31.     In late October 2014, Sabrina told me that Jackie again had balked when Sabrina
asked her for ███'s full name so that Sabrina could approach him for comment.  Sabrina told me
that Jackie was terrified for her physical safety and believed that she might face physical
retribution if Sabrina attempted to contact ███.  Jackie's reluctance to share the last name of the
ringleader of her attack did not cause me to question Jackie's credibility because I understood
from Sabrina that it was consistent with the reactions and sentiments of other sexual assault
victims that Sabrina had spoken to, both at UVA and elsewhere, who did not want Sabrina to
contact their alleged attackers.  Moreover, to me, it is just common sense that a rape victim who
has gone through a terrible trauma might be fearful of putting a reporter in contact with one of
her attackers.

32.     I told Sabrina that she should continue to try and get ███'s last name from Jackie,
but also should try other avenues for tracking him down, such as talking to Jackie's friends,
trying to get pool records, looking at yearbooks, and examining social media.  I know from
Sabrina that Jackie's friends either did not know ███'s full name or refused to share it with her
out of respect for Jackie's wishes, and that Sabrina was having a hard time making any other
reporting avenues work because she did not have a last name to work with.

33.     Faced with this potential impasse with Jackie, I discussed the issue with Sabrina
on several occasions and with Will Dana on at least one occasion in late October and early
November 2014.  Sabrina explained to me why she believed Jackie was an extremely credible
witness.  She identified many of the facts and considerations outlined above that also caused me

to believe that Jackie was credible.  We also discussed our belief that the lead of the story was framed as a personal narrative from Jackie's point of view and that readers would not be confused into thinking we had spoken with the perpetrators.  For me, the Article was ultimately about UVA's response to Jackie's allegations, not the he said/she said details of the rape itself.  I conveyed this information to Will, and we talked through the issues.  After careful thought and deliberation, we came to the determination that, in the event that Sabrina was unable to uncover ██'s identity without Jackie's assistance, we were comfortable going forward without Sabrina learning ██'s last name or reaching out to him and the other alleged perpetrators for comment.  At bottom, this decision was rooted in our firmly held confidence in Jackie as a source and the fact that all the evidence we had indicated that UVA and her friends shared our confidence.

34.    Since publication of the Article, many have criticized our judgment, but it is important to note that these journalistic decisions are not defined in some black/white construct. As two journalism professors pointed out in the *New York Times* after the Article was published, getting comment from the alleged perpetrators was not necessarily required as a matter of standard journalistic practice because we were not naming the accused in the Article.  As the *Times* wrote:

> Marc Cooper, an associate professor in journalism at the University of Southern California, said the magazine had not misled anyone or abrogated a duty in not contacting those accused, because they were unnamed. If the article had been written as a first-person account, he said, there would be no questions.
>
> "I don't think there's nearly as much at stake as people think," Mr. Cooper said.
>
> Helen Benedict, a Columbia University journalism professor who has reported on sexual assault in the military, also defended the story.
>
> "If a reporter were doing a story about a university accused of failing to address the mugging or robbery of a student, that reporter

13

would not be expected to interview the alleged mugger or robber,"
she said. "The piece might have been stronger with more than one
source, but exposés of wrongdoing often start with one whistle-
blower."

(A true and correct copy of this *New York Times* article is attached hereto as **Exhibit 2**.)

35.     I did not believe that "Drew" was identifiable in the Article because it would have

required the triangulation of three pieces of information—that he was a Phi Psi brother, that he

was a third-year, and that he worked at the pool—and I did not think that the general public

would be able to do that.  The other alleged perpetrators were even less identifiable from the

information in the Article.

36.     In the context of all the factors we considered—including that we could not find

"Drew" or the other perpetrators; we were very concerned for Jackie's physical safety and did

not want to re-traumatize her; and we had great confidence in Jackie's story—I believe the

decision we made was a reasonable one at the time.  Of course, in hindsight I regret that

decision, but I can say without hesitation that I did not make this decision out of any desire to

avoid learning the truth about Jackie's story, and I certainly did not do so out of any desire to

avoid learning the truth about anything we published relating to Dean Eramo, which is

something totally separate from the details of the alleged gang rape.

37.     As I made clear at my deposition, if I had had *any* doubts about Jackie's

credibility or the accuracy of her story before publication, I would have eliminated her story

from the Article or relegated it to a summary paragraph without details and chosen another lead.

We had other options—we could have led the Article with "Stacy's" story or, if necessary, I

would have published a different article from my inventory.  This would have hardly been the

first time that I worked a long night to revise or fix an article when an issue arose.  We had

several other options; I stuck with Jackie's story as the lead because I had complete faith that it was entirely accurate.

38.     Despite my conviction that our decision regarding "Drew" was reasonable at the time, I do regret an error that I made in connection with Drew's identity when editing the Article. During my conversations with Sabrina about ▇ in late October, I suggested that Sabrina disclose in her next draft that Jackie had refused to reveal ▇'s full name to Rolling Stone. Sabrina added a sentence towards the back of her second draft stating that Jackie "refused to divulge his full name to *RS*."  (Attached hereto as **Exhibit 3** is a true and correct copy of Sabrina's second draft of the Article.  The referenced text is at RS019061.)  When I read the draft, however, I thought that Sabrina had put this statement too far back in the piece to make it meaningful.  So, while I was editing this draft, I removed it from the back of the Article intending to put it higher up in the piece.  I had trouble finding a satisfactory place to put it from a narrative perspective, and I ultimately left it out.  This revision was motivated by a desire that the piece read well and flow naturally, not to avoid making it clear that we did not know "Drew's" full name.  Of course, this also had nothing to do with Eramo or how she is depicted in the Article.

*The decision to go forward without contacting the "three friends" likewise appeared justified at the time and reflects Rolling Stone's trust in Jackie.*

39.     In or around September 2014, Sabrina brought to my attention that she was having difficulty identifying and getting comment from the three individuals who met with Jackie after her alleged gang rape and were called "Randall," "Cindy," and "Andy" in the Article.  Sabrina told me that she had asked Jackie early in the reporting process to ask her friend Ryan (called "Randall" in the Article) if he would be willing to speak with Sabrina.  Sabrina also told me that Jackie was willing to ask Ryan if he would participate, but she did not feel

comfortable putting Sabrina in contact with her friends Catherine and Alex[1] (called "Cindy" and "Andy" in the Article).  Sabrina told me that Jackie had refused to divulge the last names of any of these individuals.  For her part, Sabrina told me that she hoped that Ryan would be the most sympathetic of the three friends to speak with and that he would provide an introduction to Catherine and Alex.

40.     After Sabrina's trip to Charlottesville in mid-September, Sabrina told me that, while interviewing Jackie in person, Jackie told her that she ran into Ryan at a restaurant, and that Ryan had refused to speak with Sabrina and used very strong language, predicting that Jackie's participation in the story would result in a "shit show" (a quotation that was included in the Article).  Sabrina and I both had no reason to doubt Jackie's statement about what Ryan said, so at that point we understood that Ryan was not going to be available to speak with Rolling Stone.  Sabrina also told me that she tried to go around Jackie by asking Jackie's friend Alex Pinkleton if she would disclose Catherine's and Alex's last names, but Alex Pinkleton had refused because she did not want to go against Jackie's wishes.  Sabrina told me that she had tried to find their last names on social media, but had not been successful.  I pressed Sabrina to do what she could to find and speak with the three friends, but beyond Ryan's quote that Jackie relayed, we came to a dead end.

41.     At the point when Sabrina first raised the issue with me, she was getting ready to write her first draft of the Article.  I told her to use pseudonyms in the first draft as a temporary measure as she tried to track down Catherine and Alex through other means.  (Again, at this point Sabrina and I did not understand there was any reason to try to find Ryan's last name because we believed Jackie when she told Sabrina that Ryan was unwilling to talk.)  Thereafter,

---

[1] To avoid confusion, I should point out that this Alex is not Alex Pinkleton, one of Jackie's close friends and an on-the-record source for the Article.

as we moved through the editing process, I recall repeatedly asking Sabrina to try to find Catherine and Alex, but Sabrina told me that she had been unable to figure out their last names.

42.     Sabrina and I then discussed whether we felt comfortable going forward with the anecdotes in the Article about Ryan, Catherine, and Alex based on Jackie's first-hand accounts of these conversations. Sabrina emphasized to me how much she trusted Jackie as a source and found her to be 100% solid and credible. As noted above, Sabrina had been able to confirm Jackie in other instances where Jackie told her what other people said. This gave me comfort that we could rely on Jackie as a first-hand witness to these conversations. We were also aware that Jackie had consistently over the years spoken about the reactions of her friends to her assault. Indeed, the friends' reaction is even featured in Emily Renda's Congressional testimony. Further, Sabrina told me she had spoken to Alex Pinkleton and Rachel Soltis, who confirmed that these individuals were real and corroborated the general characterization of the three friends that Jackie provided to Sabrina, including that "Cindy" was a "hookup queen." Finally, as a practical matter, we viewed it as unlikely that Cathryn and Alex would talk to us given Ryan's refusal, which was consistent with information we were getting from Jackie, Alex Pinkleton, and others about hostility on campus towards the story.

43.     Moreover, I felt strongly that the drafts of the Article made clear that the entire lead, as well as the interactions between Jackie and the three friends, came entirely from Jackie's point of view. Consistent with that, I took out Sabrina's editorial note in her first draft—"all her POV"—and replaced it with  "Jackie recalls," which made clear to readers that Jackie's conversation with "Randall," "Cindy," and "Andy" after the alleged rape was her recollection.

44.     All these considerations need to be viewed in the context of our trust in Jackie, which was firm. If we had not trusted Jackie so much, we would have been much more hesitant

to publish quotations attributable to the three friends without confirming those quotations with them.  Rolling Stone generally seeks to verify quotations with the person to whom they are attributed.  We take this very seriously, but we also recognize that sometimes it is not possible to verify a quotation because the person cannot be located or reached, and it is not uncommon to rely on what a reliable source conveys about the words that another person used in a conversation the source witnessed first-hand.  In this instance, I felt that Jackie had proved to be a solid source and therefore we could trust what she told us about her interactions with the three friends.

45.     In short, the decision to go forward with Jackie's anecdotes about her conversations with the three friends appeared justified at the time.  I do regret not making clearer in the Article that Randall's "shit show" quote came from Jackie, not directly from him.  Liz Garber-Paul raised this issue with me during the fact-checking process, and I declined her suggestion that the "shit show" quote be put more explicitly on Jackie.  I have been criticized by the CJR Report and others for this decision, and, in retrospect, I see that the Article could have been clearer in its attribution of this quote.  I deeply regret the mistake.  This was an honest mistake that stemmed from my desire to maintain the narrative flow and readability of the Article.  I did not make this decision to obscure the fact that Rolling Stone had not spoken directly with "Randall," and I certainly did not make this decision in an effort to avoid the truth about Jackie's alleged gang rape or, more pertinently, about Jackie's interactions with Eramo, which is what this lawsuit is about.  In the end, the depiction of the three friends in the Article has nothing to do with the Statements that Eramo challenges in this action.

**The Article's Reporting on UVA Was Accurate Despite Limitations Imposed by UVA.**

46.     I do not believe that Rolling Stone made errors in its reporting on how UVA handles sexual assault or the interactions between Jackie and Eramo.  For this reporting, Rolling

18

Stone relied on a number of different sources and corroborating documents, including Eramo's own emails and on-the-record statements by the President of the University.  Rolling Stone carried out this solid reporting despite the fact that UVA refused to make Eramo available for comment or discuss the specifics of any individual student cases.  At the time we published the Article, I had no doubt whatsoever that the information about UVA, and specifically Eramo, was entirely accurate.

47.     The Article sets forth certain key facts about Eramo's and UVA's handling of Jackie's allegations,  the substance of which I do not understand to be in dispute, even today:

(a)     <u>Jackie reported to Eramo in May 2013 that she had been raped or sexually assaulted by multiple men at a fraternity party</u>.  (**Ex. 1** at RS001076).  Not only did Jackie tell Sabrina and Liz this on the record, but, as I explained above, we had emails between Eramo and Jackie corroborating that Jackie reported an attack involving multiple men.  Moreover, President Sullivan did not dispute that there had been three allegations of gang rape brought to Eramo's attention regarding Phi Kappa Psi, which obviously included Jackie's case.  I understand that, in this lawsuit, Plaintiff contends that Jackie told Eramo in May 2013 that she was forced to perform oral sex on multiple men at a fraternity party, rather than having been vaginally gang raped.  To me, this is a distinction without a difference from the perspective of UVA's responsibility to take action in response to the allegations because both are very serious crimes.  As noted, Rolling Stone was not able to check this information with Eramo because she was not made available for comment, and UVA refused to answer specific questions about Jackie's case.  We had no reason to doubt this information at the time of publication, and I do not doubt the substance of it today.

(b)      In May 2013, Eramo neutrally laid out Jackie's options for her and deferred to Jackie's choice not to take any action.  (**Ex. 1** at RS001076.)  Again, not only did Jackie tell Sabrina and Liz this information on the record, but we had an email from Eramo stating: "I understand and respect your wishes to not report this matter further to the authorities or through the Sexual Misconduct policy here on Grounds."  (**Ex. 26** [RS018282-8288], at RS018284.)  In addition, President Sullivan and UVA public relations both confirmed that UVA "has taken to emphasizing that in matters of sexual assault, it caters to victim choice," and there is an on-the-record quote in the Article from UVA administrator Susan Davis explaining the reasons for doing so.  (**Ex. 1** at RS001076).  We had no basis to doubt this information at the time of publication, and I do not doubt it today.

(c)      In the Spring of 2014, Jackie reported to Eramo that she had a bottle thrown at her by men outside a bar on the Corner, and at this time Jackie also revealed to Eramo that she knew of two other women who allegedly had been gang raped at Phi Kappa Psi.  (*Id.* at RS001078.)  Jackie told us this information on the record.  That Jackie reported the bottle-throwing incident is beyond dispute based on Eramo's own emails from April 2014.  For the fact that Jackie reported that two other woman had been gang raped at PKP, we had substantial corroborating evidence, including Emily Renda, a UVA employee, telling Sabrina that Eramo was aware of these two other alleged gang-rape victims, and President Sullivan's failure to dispute that that there had been three allegations of gang rape brought to Eramo's attention regarding Phi Kappa Psi in recent years.  And, as noted, Rolling Stone was not able to check this information with Eramo because she was not made available for comment, and UVA refused to answer specific questions about Jackie's case.  Nonetheless, I do not understand Plaintiff or

UVA to be disputing these facts today, and therefore I have no reason to doubt them now and certainly had no cause to doubt them prior to publication.

(d)      In the Spring of 2014, Eramo deferred to Jackie's choice not to pursue formal proceedings after the bottle-throwing incident. (*Id*. at RS001078.)  Sabrina and Liz confirmed this information with Jackie on the record, and Eramo's own email to Jackie on April 22, 2014 said:  "Never forget, however, that it is YOUR choice." "Just let the detectives know what you are willing to do and I'm sure they will follow suit.  As I said, I'm happy to meet with them along with you if you need some moral support.  Just let me know." (**Ex. 27**, at RS017033.)  Sabrina and Liz also spoke with Jackie's friends Alex Pinkleton, Sara Surface, and Emily Renda, who generally corroborated that Jackie had been unwilling to pursue a criminal case or initiate a disciplinary proceeding at UVA.  Again, Rolling Stone was not able to check this information with Eramo because she was not made available for comment, and UVA refused to answer specific questions about Jackie's case.  But, based on the above, we had no cause to doubt this information at the time of publication, and I do not doubt it today.

(e)      In September 2014, UVA finally commenced an investigation of Phi Kappa Psi in connection with Jackie's allegations and the two other alleged victims.  (**Ex. 1** at RS001079**.**)  Sabrina confirmed the substance of this information on the record from President Sullivan.  UVA technically refused to identify which fraternity was under investigation, but Jackie and Alex Pinkleton both confirmed that UVA had contacted Phi Kappa Psi in connection with Jackie's allegations based on their conversation with Eramo in September 2014.  Further, local and national representatives of Phi Kappa Psi confirmed to Sabrina that the fraternity had been informed of the allegations in September 2014.  This information was solid at the time of publication and remains so today.

21

(f)      Eramo told Jackie and Alex Pinkleton in September 2014 that she had

learned "through the grapevine" that "all the boys have graduated."  (*Id*. at RS001079.)  As noted

above, Jackie told this information to Sabrina on the record, and Sabrina confirmed with Alex

Pinkleton that Jackie had accurately reported Eramo's statement.  We could not check this

information with Eramo because UVA refused to make her available for comment.  I do not

understand Plaintiff to be challenging the accuracy of this statement in this lawsuit, and I

certainly have no reason to doubt it.

(g)      UVA never issued a warning to campus about Jackie's allegations or those

of the two other alleged Phi Kappa Psi victims.  (*Id***.** at RS001077, 001079.)   This fact was self-

evident from Sabrina's and Liz's conversations with Jackie, Alex Pinkleton, Sara Surface, and

Emily Renda, as well Sabrina's and Liz's interactions with UVA public relations.  Liz also

independently checked that there was no public announcement concerning the allegations.  I do

not understand Plaintiff or UVA to dispute this assertion in any way and I have no reason to

doubt it today, much less prior to publication.

48.     The Article situates these facts about UVA's response to Jackie's allegations in

the larger context of UVA's other current challenges—including a then-active compliance

review by the Department of Education, Office for Civil Rights—and a troubled history in

dealing with sexual assault on campus.  (*Id*. at RS001073-74, RS001077-79.)  This reporting was

based on interviews and documentation provided by a number of reliable sources, including John

Foubert, a former UVA dean, Wendy Murphy, an attorney who had filed Title IX complaints

against UVA, Susan Russell, an unhappy parent of a former student who was sexually assaulted

while at UVA, "Stacy," a current student who was unhappy with the results of her disciplinary

process, another unhappy student who filed a Title IX complaint (that named Eramo) and wrote a

22

scathing editorial for a student publication, and Liz Seccuro, who was gang raped at Phi Kappa

Psi in 1984. (*Id.*). There is no doubt in my mind that this broader reporting on UVA is

completely accurate, and I do not understand Plaintiff to be challenging it in this lawsuit.

**Rape School Quote**

49.    I understand that Dean Eramo is challenging the "rape school" comment,

identified as Statement #3 in Defendants' Appendix of Challenged Statements:

> Like most colleges, sexual-assault proceedings at UVA unfold in
> total secrecy. Asked why UVA doesn't publish all its data,
> President Sullivan explains that it might not be in keeping with
> 'best practices' and thus may inadvertently discourage reporting.
> Jackie got a different explanation when she'd eventually asked
> Dean Eramo the same question. She says Eramo answered wryly,
> "Because nobody wants to send their daughter to the rape school."

(*Id.* at RS001077.)

50.    As set forth more fully in the Declarations of Sabrina Rubin Erdely and Elisabeth

Garber-Paul, Rolling Stone had absolutely no reason to question this statement at the time of

publication. We knew that Jackie told Sabrina about the "rape school" comment on two separate

occasions, once in an interview in August 2014 and again in a taped interview in September

2014. Then, Jackie volunteered the same statement to Liz during one of their fact-checking calls,

before Liz even asked her about it. The fact that Jackie confirmed the statement multiple times,

and then volunteered it to my fact-checker without asking, gave me comfort that the statement

was true. Moreover, as discussed above, Sabrina had told me that Jackie reliably conveyed the

quotes of others, including Eramo, so we had increased confidence that we could trust Jackie on

this. And given her evident affection for Eramo, there was no reason to think that she would

falsely say anything that might hurt Eramo.

51.    Furthermore, we did not rely solely on Jackie. Sabrina and Liz also determined

that the primary factual content of the quote—that UVA did not readily disclose complete and

fulsome sexual assault statistics—was amply documented.  President Sullivan confirmed to

Sabrina that UVA did not publish all its data out of concern that it might discourage reporting,

and Sara Surface and Emily Renda—both friendly to the administration's point of view—made

statements confirming UVA's rationale for not publishing more fulsome statistics.  Then, the

Article includes a quote from Susan Russell that directly echoed the same sentiment as the "rape

school" comment—namely, that UVA did not provide fulsome disclosure of sexual assault

statistics because it did not want parents to think the school was unsafe.  (*Id*. at RS001076-77.)

52.     Based on all this information, and given UVA's refusal to make Eramo available

for comment, there was no reason for Rolling Stone to doubt the accuracy of this quote at the

time of publication and I believed it was accurate.

**The Article Presents a Well-Supported Opinion that UVA Failed to Take Sufficient Action**
**in Response to Jackie's Allegations**

53.     Plaintiff essentially takes issue with a series of subjective opinions expressed in

the Article about the adequacy of UVA's response to Jacki's allegations.  These opinions are

subjective viewpoints that cannot be proven true or false, and the subjective conclusions reached

are supported by solid reporting and accurate facts that are included in the Article.  As noted

above, a lot of controversy and conflicting opinions surrounded discussions on how reports of

sexual assaults should be handled on campuses.  During the period covered by the Article, the

DOE was changing its guidance and schools, like UVA, were struggling to find the correct

balance between victim's choice, public safety and due process for the accused.

54.     Specifically, the Article expresses the opinion that UVA should have done

more—and acted more promptly—to independently investigate Jackie's allegations and to issue

a warning to campus.  As set forth in great detail in the previous section, the facts upon which

this opinion is based are set forth in the Article and indisputably correct.  UVA did not

24

commence an independent investigation of Jackie's claims until the Fall of 2014—a fact confirmed by the President of UVA.  And nobody has ever disputed that UVA never issued a warning in response to Jackie's allegations or the reports of two other rapes at the Phi Psi fraternity.  The Article's criticism was not that UVA (and Eramo) took "no action" in response to Jackie's allegations—to the contrary, it made clear that all options were presented to Jackie and she *chose* to not pursue those options.  Rather, the Article's critique was that UVA never issued a warning for public safety and was too slow to open an independent investigation.

55.     <u>Rolling Stones was not alone in reaching this conclusion</u>.  Several experts interviewed for the Article share the opinion that, based on the information UVA had concerning Jackie's allegations and two other possible victims at the same fraternity, UVA should have provided notice to the campus.  As the Article reports:

> Experts apprised of the situation by RS agreed that despite the absence of an official report, Jackie's passing along two other allegations should compel the school to take action out of regard for campus safety.

(*Id*. at RS001079.)

56.     After publication of the Article, the federal government weighed in and similarly agreed with the opinions expressed in the Article.  On September 21, 2015 the Department of Education Office for Civil Rights (the "OCR") issued its "Letter of Finding" regarding UVA's compliance review.  (A true and correct copy of the Letter of Finding is attached hereto as **Exhibit 4**.)  One of the reasons we selected UVA as the focus of the Article is that it was one of a handful of schools that was then subject to a Title IX "compliance review," which we understood to be a very serious matter.  The Letter of Finding is highly critical of Dean Eramo and practices UVA followed responding to sexual assault allegations.  The OCR concluded, among other things, that UVA had mishandled informal reports of sexual assault over a number

25

of years.  In particular, it found that two instances in 2013 and 2014—which we understand to mean Stacy and Jackie's allegations—the Letter of Finding reached conclusions eerily in sync with certain opinions expressed in the Article:

> OCR finds that at least in these two instances the University did not promptly investigate information in cases that involved fraternities.  In one of the cases, the Chair of the SMB [Eramo] took the written position that "unfortunately, the actions of our office are limited to assistance and support of the survivor at this point as [the student who reported the sexual assault] does not wish to file a complaint through the SMB."  In addition to reflecting the absence of a prompt investigation, the files do not reflect the University evaluating steps necessary to protect safety of the broader University community.

(**Exhibit 4** at 17.)  The Article's criticism of UVA failing to take action "to warn the campus that an allegation of gang rape had been made against an active fraternity" is entirely consistent with the finding of the federal government Office of Civil Rights in its Letters of Finding.[2]

57.  The Article also criticized UVA's admitted practice of catering to victim choice in matters of sexual-assault reporting and expressed the opinion that it might have the consequence of paralyzing students into taking no action at all.  For instance, Sabrina writes:

> [I]n practice, the utter lack of guidance can be counterproductive to a 19-year-old so traumatized as Jackie was that she was contemplating suicide.  Setting aside for a moment the absurdity of a school offering to handle the investigation and adjudication of a felony sex crime – something Title IX requires, but which *no* university on Earth is equipped to do – the sheer menu of choices, paired with the reassurance that any choice is the right one, often has the end result of coddling the victim into doing nothing.

(**Ex. 1 at RS001076**. (emphasis in original))

---

[2] Given the statements Eramo challenges here, it is quite revealing that the Letter of Finding also concluded that "statements from the Chair of the SMB [Dean Eramo] in a radio interview that was broadcast to the University community constituted an additional basis for the existence of a hostile environment for affected students." (**Exhibit 4** at 21.)  In addition, it determined that the "multiple roles play by the Chair of the SMB [Eramo] over the course of the complaint process created an appearance of a conflict of interest." Id. at 15.  These findings are far more damning to Eramo than anything the Article says about her.

58.     In the Article, Sabrina offers support for this point of view by quoting Laura

Dunn, a nationally recognized victims' rights attorney:

> "This is an alarming trend that I'm seeing on campuses," says
> Laura Dunn of the advocacy group SurvJustice.  "Schools are
> assigning people to victims who are pretending, or even thinking,
> they're on the victim's side, when they're actually discouraging
> and silencing them.  Advocates who survivors *love* are part of a
> system that is failing to address sexual violence."

(*Id*.) (emphasis in original).)  Ms. Dunn's quote speaks in generalities about an "alarming trend"

that she is seeing on "campuses" nationwide, and it does not purport to address Eramo or

Jackie's case specifically.  And, more fundamentally, Ms. Dunn's viewpoint that victim-choice

advocates are "actually discouraging or silencing" victims even when they think "they're on the

victim's side" is a subjective conclusion about the motivations of administrators that cannot be

verified one way or the other.  And the numbers also tended to support this opinion: as the

Article reports, in the last academic year, 38 students reported a sexual assault, but only nine

resulted in "complaints" and only four resulted in Sexual Misconduct board hearings.  (**Ex. 1** at

RS001077.)  Further, Sabrina's reporting on One Less, as the Article reports, demonstrated that a

"surprising number [of members] hadn't pursued any form of complaint . . . Few ever filed

reports with UVA or with the police."  (*Id*. at RS001078.)  In short, the facts supporting this

opinion are revealed in the Article and entirely accurate.

59.     Finally, the Article balances Dunn's opinion by incorporating UVA's view that

victim choice fosters reporting.  UVA's Susan Davis is quoted saying, "If students feel we are

forcing them into a criminal or disciplinary process that they don't want to be part of, frankly,

we'd be concerned that we would get fewer reports."  (*Id*. at RS001076.)  Sabrina herself

elaborates on Davis's point, noting that "Being forced into an unwanted choice is a sensitive

point for victims." (*Id.*)  The Article thus presents both sides of the argument and leaves it up to the reader to decide which of these two inherently subjective viewpoints is more persuasive.

**The Article Does Not Imply that Eramo Intentionally Discouraged or Silenced Jackie and Rolling Stone Did Not Intend to Do So**

60.    I understand that Plaintiff contends in this lawsuit that various Statements at issue, as well as the Article as a whole, imply that Eramo intended to silence Jackie or discourage her from reporting her alleged gang-rape to police and/or to pursue an official complaint through UVA's disciplinary process.  As the primary editor on the piece, I can say without hesitation that this assertion is not true; that the text of the Article does not reasonably support that argument; and that no one at Rolling Stone had any intention of implying any such thing.

61.    To the contrary, the Article shows Eramo treating Jackie with sensitivity and kindness.  It says that Eramo provided Jackie with all the options available to her—including reporting the assault to the police, pursing a complaint with the Sexual Misconduct Board, or having an informal hearing before Eramo.  The Article further says that Eramo presented these options "neutrally, giving each equal weight," and that she "assured Jackie there was no pressure—whatever happened next was entirely her choice."  (*Id***.** at RS001076.).  As noted above, the Article shows that Eramo wrote a follow-up email to Jackie, emphasizing that she would be happy to assist "if you decide that you would like to hold these men accountable."  (*Id.* at RS001077.)  It would be impossible to square the Article's affirmative statements showing that Eramo offered to assist in taking action to "hold these men accountable" with Plaintiff's interpretation that the Article accuses Eramo of trying to discourage or silence Jackie.

62.    Moreover, the Article shows Eramo helping Jackie to work through her trauma by introducing her to Emily Renda, who was connected to One Less, a sexual assault survivor organization.  (*Id.* at RS001078.)  Then, after the bottle-throwing incident, Eramo is again shown

28

calmly and neutrally listening to Jackie's claims that she knows of two other women raped at Phi Kappa Psi parties. (*Id*.) The Article makes very clear that, at that time, Jackie "didn't feel ready to file a complaint." (*Id*.)  There is no suggestion that Eramo exerted any pressure on Jackie or took any steps to persuade her from taking action.  And to the degree that the Article's criticism of "victim's choice" implies that it can result in discouraging victims from reporting, that criticism is a subjective opinion concerning the general approach of "victim choice," as I explain above.

63.     The Article also makes clear that Jackie did not feel discouraged or silenced by Eramo.  To the contrary, as noted, the Article states that "Jackie repeatedly calls [Eramo] 'an asset to the community.'" (*Id*.)  The Article paints a similar picture for other sexual assault survivors, saying that Eramo is "beloved by survivors, who consider her a friend and confidante," and that survivors "laud [her] as their best advocate and den mother." (*Id*. at RS001076, 001078.)  The Article further acknowledges that "Eramo surely has among the most difficult jobs at UVA." (*Id*. at RS001076.)  These positive assessments of Dean Eramo cannot be reconciled with the supposed implication that Eramo intentionally silenced, discouraged, or suppressed Jackie.  Even more implausible, that Eramo was the "villain" of the Article.  If anyone is a "villian" in the Article, it most certainly was "Drew," the ringleader of the alleged gang rape.

64.     It is my understanding that Plaintiff also identified several statements in the Article as being false and defamatory.  As set forth below, in several instances, the text of the Article we published cannot support the meaning that Plaintiff tries to impose on it, and at the time we published the Article I believed each of those statements to be entirely true and accurate.

**Statement #1: "Jackie was just starting her freshman year at
the University of Virginia when she was brutally assaulted by**

**seven men at a frat party.  When she tried to hold them accountable, a whole new kind of abuse began."**

65.     Statement #1 is what is called the "Dek" or sub-head for the Article and is meant to succinctly encapsulate the Article and to draw the reader in.  I wrote the Dek with Will Dana. I intended the word "abuse" in Statement #1 to primarily refer to the physical abuse Jackie suffered after she had a bottle thrown at her face for speaking out about fraternities with bad reputations for sexual assault.  Jackie's speaking out about fraternities through One Less and at Take Back the Night is the *only* means by which Jackie "tried to hold [the men] accountable," as the sentence reads.  In fact, in the context of discussing the bottle incident and the retaliation suffered by Emily Renda, the Article expressly states that both received "payback for being so public on a campus accustomed to silence was swift."  (*Id.* at RS001078.)  The Article makes clear that Jackie refused to proceed against the men through UVA channels or the police.  I also believed that the word "abuse" encompassed the emotional pain that Jackie felt when some of her peers treated her in a callous and unsympathetic way in the aftermath of her gang-rape.  I did not—and do not today—understand it to mean that Eramo "abused" Jackie.  As explained above, the Article affirmatively portrays Eramo treating Jackie with great sensitivity, laying out her options for her neutrally, and offering to help "hold these men accountable."  This portrait would hardly support a conclusion that Eramo "abused" Jackie.  In short, the Article does not state that Eramo abused Jackie, nor did I or anyone on my team intend for it to imply as much.  The Statement's intended meaning—that Jackie suffered retaliation for speaking out against sexual assault—was entirely accurate.

> **Statement #2: "Lots of people have discouraged her from sharing her story, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang-rape allegations more than a year ago."**

66.     Read in its full context, Statement #2 does not state or imply that Eramo
discouraged Jackie from reporting her gang-rape allegations to the police or from pursuing
disciplinary action through UVA.  The paragraph starts with the topic sentence, "Jackie is
worried about what might happen to her once this article is out," which plainly signals to readers
that this paragraph is about the potential blowback from Jackie's participation in the Rolling
Stone story.  The paragraph proceeds to explain the cause of her concern: "Greek life is huge at
UVA" and "Jackie fears the backlash could be big."  Indeed, Randall is quoted as refusing to be
interviewed "citing his loyalty to his own frat."  Then, the paragraph ends with the sentence, "On
this deeply loyal campus, even some of Jackie's closest friends see her going public as
tantamount to a betrayal."  (*Id.* at RS001072) (emphasis added).)  In the context of this paragraph
as a whole, it is clear that "discouraged" means discouraging Jackie from cooperating or using
her name in the Article, something Jackie told Sabrina and Liz on the record.  And it hardly
reflects poorly on Eramo for her to suggest that it might not be a good idea for Jackie to tell her
story in a national magazine.  Moreover, as explained above, the rest of the Article plainly
describes Eramo as treating Jackie with sensitivity, laying out her options neutrally, and offering
to help her "hold these men accountable."  That overall depiction cannot possibly be squared
with a reading that Eramo intentionally sought to discourage Jackie from reporting her case to
the police or the Sexual Misconduct Board.[3]

> **Statement #4: "A bruise still mottling her face, Jackie sat in
> Eramo's office in May 2014 and told her about the two others.
> One, she says, is a 2013 graduate, who'd told Jackie that she'd
> been gang-raped as a freshman at the Phi Psi house.  The other
> was a first-year whose worried friends had called Jackie after
> the girl had come home wearing no pants.  Jackie said the girl
> told her she'd been assaulted by four men in a Phi Psi
> bathroom while a fifth watched.  (Neither woman was willing
> to talk to RS).  As Jackie wrapped up her story, she was**

---

[3] Statement #3 is the "rape school" quote which I have addressed above at ¶¶ 49-52.

> **disappointed by Eramo's nonreaction.  She'd expected shock,
> disgust, horror. . . .  Of all her assailants, Drew was the one she
> most wanted to see held accountable—but with Drew about to
> graduate, he was going to get away with it.  Because, as she
> miserably reminded Eramo in her office, she didn't feel ready
> to file a complaint.  Eramo, as always, understood."**

67.     I cannot see how this passage could possibly suggest that Eramo intentionally

silenced Jackie or discouraged her from reporting.  It specifically says that Jackie "reminded

Eramo in her office [that] she didn't feel ready to file a complaint."  (*Id.* at RS001078.)  By

saying "reminded," it can only logically be understood to mean that Eramo had suggested, again,

that filing a complaint was an option.  The language that "Eramo, as always, understood,"

suggests (accurately) that Eramo faithfully followed UVA's own policy of catering to victim

choice.  Furthermore, the statement that Eramo had a "nonreaction," rather than expressing

"shock, disgust, horror," plainly refers to Eramo's emotional demeanor when hearing Jackie's

story, not to any substantive action she did or did not take in response to Jackie's allegations.

The Article portrays Eramo acting like a calm, professional administrator, as one would expect,

and there is nothing remotely derogatory or negative about her portrayal in Statement #4.

Neither I nor my colleagues intended by this paragraph to suggest that Eramo silenced Jackie or

discouraged her from reporting.  I believed this Statement to be entirely accurate when we

published the Article.

> **Statement #5:  "Given the swirl of gang-rape allegations
> Eramo had now heard against one of UVA's oldest and most
> powerful fraternities . . . the school may have wondered about
> its responsibilities to the rest of campus.  Experts apprised of
> the situation by RS agreed that despite the absence of an
> official report, Jackie's passing along two other allegations
> should compel the school to take action out of regard for
> campus safety."**

68.     I understand that Eramo alleges that Statement #5 states or implies that she took

"no action" in response to Jackie's and the two other allegations of sexual assault.  Yet, the

Statement itself squarely identifies the "action" not taken: despite "responsibilities to the rest of the campus," UVA took no "action out of regard for campus safety."  As the Article reports in two other places, despite Jackie's reports about gang rapes, the "UVA administration took no action to warn the campus that an allegation of gang rape had been made against an active fraternity."  (*Id*. at RS001077.)  (See also "no one voiced questions about UVA's strategy of doing nothing to warn the campus of gang-rape allegations against a fraternity that still held parties . . . ," *id*. at RS0011078.).  That was the "no action" that the Article criticized UVA for failing to undertake.  And the fact that no public notice was provided is indisputably true.  In sum, at the time we published this statement—and even today—I believed this Statement to be true and accurate.

**Illustration is Not False or Demeaning**

69.     Finally, Plaintiff claims that the photo illustration of her in the Article somehow makes her out to be a "villain."  I cannot understand how that possibly could be a reasonable conclusion, especially because the caption expressly says that Eramo is "beloved by students." (*Id*. at RS001076.)  This photo illustration was not meant to be taken literally as a representation of real-life events, but rather as a visual representation of certain themes in the Article.  The illustration shows Eramo counseling a distraught victim in her office while protests are seen outside the window, which conceptually illustrates the difficulty of Eramo's job and the charged atmosphere on campuses relating to the issue of campus sexual assault.  Far from painting Eramo in a negative light, I believe it fairly represents Eramo doing her job in a difficult situation, which is something reflected in the Article more broadly.

70.     During the fact-checking process, Liz Garber-Paul raised a question with me about whether the illustration of Eramo was "too mean."  I discussed this question with Will Dana, and we came to the conclusion that we did not think the illustration was mean, but rather

showed her sensitively counseling a sexual assault survivor.  In addition, we changed the caption to the illustration to indicate that Eramo was "beloved by students," which further militated against any impression that the illustration was portraying Eramo in a negative or derogatory light.

71.     It is my view that, at bottom, Plaintiff simply takes issue with the opinions expressed in the Article that UVA should have done more in response to Jackie's allegations and that UVA's practice of deferring to victim choice has potentially negative consequences for victims.  But, as noted above, these opinions were not meant to be specific indictments of Eramo, and, on their own terms, they do not suggest that Dean Eramo intentionally tried to silence Jackie or discourage her from pursuing her case.  Rather, the Article plainly shows that Dean Eramo followed UVA's practice of deferring to victim choice and posits that this deference resulted in the University failing to take sufficient action to protect campus safety.  This is what my colleagues and I intended to show in the Article, not that Dean Eramo was a villain who purposely silenced, discouraged, or abused Jackie.

**Rolling Stone Did Not Conceal the Fact that Jackie Reported the Bottle Attack to the Police**

72.     At my deposition, Plaintiff's counsel asked me whether I cut a reference in Sabrina's first draft to Jackie reporting the bottle-throwing incident to the police because it was contrary to the Article's narrative that UVA coddled sexual assault victims into not reporting their attacks to the police.  As I said in my deposition, this is incorrect for several reasons.

73.     First, at the time of publication, I had no idea that Jackie ever told police officers about her sexual assault, nor did I have any indication that Eramo brought Jackie to the police to report her sexual assault.  To the contrary, Eramo's emails with Jackie from April 2014 made clear that she was bringing in police for Jackie to report the physical assault with a bottle— which, unlike the alleged rape, occurred on the Corner.  (**Ex. 27** at RS017035 (noting that a

Charlottesville Police Officer would need to be present because "the incident occurred on the Corner"); *id.* at RS017035 (suggesting that Jackie at least allow police to "check the video on the Corner" to try to identify the perpetrators and match them against fraternity rosters). Similarly, the FOIA letter that Sabrina received from the Charlottesville Police Department documents a report of "an aggravated assault" that resulted in a "laceration." Nowhere in the letter is there any reference to a report of a sexual assault, as you would most certainly expect if, in fact, Jackie was brought to the police to report her sexual assault. (**Ex. 17**.). Rather than raising any questions, the police report was significant evidence documenting Jackie's credibility. She said that she was attacked with a bottle and reported it to the police and the police confirmed those facts. I had no knowledge that Jackie and the police detectives had discussed her alleged gang rape. It is my understanding that this information only became public in March 2015, months after publication, when the Charlottesville Police Department issued a press release about Jackie's case.

74.     Second, I removed this information from Sabrina's draft for purely editorial reasons. At the time, I was focused on cutting down the length of the story, and I viewed this information as largely superfluous to the overall description of the interactions between Jackie and Eramo. The Article already said that Jackie was not willing to take any action at this time, and that Eramo was willing to help her "hold these men accountable" if Jackie chose to do so. Since we understood that Jackie refused to pursue a criminal investigation of the bottle incident—like she refused to pursue charges concerning her sexual assault—it was just another dead end. Even more mundanely, Sabrina had included the information about Jackie reporting her attack in a parenthetical—I thought it was too much detail in a piece that we were trying to

cut down, and I tend not to like parentheticals, so I removed it.  (A true and correct copy of

Sabrina's first draft is attached as **Exhibit 5**, and the referenced text is located at RS018911.)

**Jackie's Story Is Challenged in the Press and Rolling Stone Responds**

75.     On or around November 26, Sabrina informed me that she had a long

conversation with Jackie about the Article.  Sabrina told me that Jackie was happy with the story

and the significant impact the story was having at UVA.  Sabrina also told me that, during this

conversation, Jackie finally agreed to reveal ███s last name to her.  The name that Jackie gave

her was ██████.  Sabrina told me that she found a UVA graduate who was now a graduate

student by that name, and that she planned to do a little more research on this person over the

coming days.  Far from any concerns raised on this date, we were planning on following up on

the Article since it had generated so much interest.

76.     When I spoke to Sabrina about this development, she did not express to me any

doubts about Jackie's credibility.  For my own part, I still viewed Jackie as solid, and the fact

that she had provided a full name for ███ only strengthened my impression that she was telling

the truth.  The CJR Report quoted Sabrina saying that "[a]n alarm bell went off in my head" on

November 26 when Jackie did not know exactly how to spell ████ last name.  (A true and

correct copy of the CJR Report is attached hereto as **Exhibit 6**, and the referenced material is

found at ERAMO-04543.)  I have no reason to doubt that Sabrina said this to CJR, but based on

my conversation with her on the same date, Sabrina never indicated in any way that this

conversation with Jackie caused her to doubt Jackie or the integrity of her story.  To the contrary,

I got the impression then, and in the coming days, that Sabrina still passionately believed in the

accuracy of Jackie's story.

77.     Starting around this same time, the *Washington Post* and other news organizations

began to do stories on Rolling Stone's reporting and editorial process for the Article.  In

36

particular, Paul Farhi of the *Washington Post* contacted me and Sabrina with a number questions

about the reporting and editing behind the Article.  In the following days, Mr. Farhi, along with

Erick Wemple at the *Washington Post*, Judith Shulevitz at the *New Republic*, and other media

commentators began raising questions about the adequacy of our reporting and editing efforts,

including whether we had gotten comment from "Drew" and the other alleged perpetrators.

78.     At the time, I felt that these reporters were unfairly attacking Sabrina and

questioning Rolling Stone's reporting and editing process without sufficient justification.  The

media can be exceptionally tough on itself and it is not unusual for other news organizations to

critique the reporting of its competitors.  More fundamentally, at the time, I was so confident in

Jackie and the accuracy of her story that I believed that these reporters were nitpicking around

the edges of a fundamentally sound story.

79.     Prior to his December 1 *Washington Post* article being published, Paul Farhi

called me and asked questions about whether we sought comment from the alleged perpetrators.

(A true and correct copy of Paul Farhi's December 1 article is attached hereto as **Exhibit 7**.)

Regrettably, my conversation with Paul became heated, and I made one statement to him off-the-

cuff that was not entirely accurate.  His article quotes me as follows:

> Sean Woods, who edited the Rolling Stone story, said in an
> interview that Erdely did not talk to the alleged assailants.  "We
> did not talk to them.  We could not reach them," he said in an
> interview.
>
> However, he said, "we verified their existence," in part by talking
> to Jackie's friends.  "I'm satisfied that these guys exist and are real.
> We knew who they were."

This is substantially true.  In particular, I stand by the statement that we verified the perpetrator's

existence and were satisfied that they existed and were real.  Besides getting this information

from Jackie, a source that we had 100% confidence in, Sabrina had independent corroboration,

including the statement in the Article from Rachel Soltis saying that "me and several other

people know exactly who did this to her."  We also had Eramo's statement, confirmed by both

Jackie and Alex Pinkleton, that "all the boys involved have graduated," which suggested that

UVA knew who they were.  (**Ex. 1** at RS001078, -79).  It was incorrect, however, for me to say

that we knew the identities of the attackers.  I was talking about "Drew," not the other alleged

perpetrators, and referring to the fact that Jackie had given us his first name before publication

and recently given us the last name.  But I should have specified that I meant the ringleader, not

all the perpetrators.  I regret that mistake, which was an honest one made under pressure during a

heated and unpleasant telephone conversation with Paul.

80.     I am aware that Sabrina emailed a statement to Paul Farhi that he included in his

December 1 article.  It said:

> As I've already told you, the gang rape scene that leads the story is
> the alarming account that Jackie – a person whom I found to be
> credible – told to me, told her friends, and importantly, what she
> told the UVA administration, which chose not to act on her
> allegations in any way — i.e., the overarching point of the article.
> THAT is the story: the culture that greeted her and so many other
> UVA women I interviewed, who came forward with allegations,
> only to be met with indifference."

(Attached hereto as **Exhibit 8** is a true and correct copy of an email chain reflecting this

statement at RS0020155-56.)  (This is Statement #12 in Defendants' Appendix of Challenged

Statements.)

81.     I believe that the statement that UVA "chose not to act on her allegations in any

way" is a fair—if slightly hyperbolic—characterization of the opinion expressed in the Article

that, despite being notified of multiple gang-rape allegations involving a single fraternity, UVA

failed to warn the campus about the fraternity and to initiate an investigation of the fraternity

prior to the fall of 2014, when Rolling Stone was already looking into the matter. *See* paragraph 47 above.

82.     The statement that Jackie was met with "indifference" refers to the culture of UVA more broadly, including friends that treated her in an unsympathetic way and discouraged her and her friends from participating in the Article.  But to the extent that culture incorporates the administration, again, this is a fair encapsulation of the well-supported opinion expressed in the Article that UVA failed to take sufficient action in response to Jackie's allegations and never, as the Article accurately reports, chose to alert the campus to a possible public safety issue.

83.     In addition, Rolling Stone distributed a press statement, starting on or around December 1, 2014, which stated:

> The story we published was one woman's account of a sexual assault at a UVA fraternity in September 2012[4] -- and the subsequent ordeal she experienced at the hands of University administrators in her attempts to work her way through the trauma of that evening.  The indifference with which her complaint was met was, we discovered, sadly consistent with the experience of many other UVA women who have tried to report such assaults. Through our extensive reporting and fact-checking, we found Jackie to be entirely credible and courageous and we are proud to have given her disturbing story the attention it deserves.

(A true and correct copy of an email chain Will Dana sent to me containing this statement is attached hereto as **Exhibit 9**.)  (This is Statement #13 in Defendants' Appendix of Challenged Statements.)  We issued this statement to defend Rolling Stone against attacks on its reporting and editing process, and I think it needs to be viewed in that context, as a strongly worded defense that summarizes the gist of the Article without going into details.  Indeed, anyone to whom we sent this statement necessarily would have read the entire Article because they were reporting on it as a news story.

---

[4] We originally issued this statement with "October" as the date, which we subsequently changed to read "September 2012."

84.     Understood in this context, this statement simply encapsulates the opinion outlined in the Article that UVA did not take sufficient action to promptly investigate or warn the campus of allegations of a string of gang-rapes at an operating fraternity.  It uses strong rhetoric, including the words "ordeal" and "indifference" to describe the lack of decisive action taken in response to Jackie's claims, as well as Jackie's feeling of emotional paralysis when presented neutrally with an array of possible options and told that it was her choice.

85.     The statement further observes—entirely accurately—that the shortcomings in UVA's handling of Jackie's case are consistent with UVA's checkered history in responding to reports of sexual assault, which is detailed in the Article.  That history includes the case of the student identified as "Stacy" in the Article.  As related in the Article, she said she was discouraged from pursuing her case:  "My counselors, members of the Dean of Students office, everyone said the trial process would be way too hard on me[.]" . . .  They were like, 'You need to focus on your healing.'"  (**Ex. 1** at RS001077.)  Stacy also said she felt betrayed by the UVA administration because administrators gave her the impression that multiple assaults by a single student would result in expulsion.  But, after she pursued a case against her attacker and won, the University did not expel her attacker even though she presented "pattern evidence" that he had sexually assaulted two other women.  The University then clarified to her that "multiple assaults" meant other cases filed and successfully prosecuted before the Sexual Misconduct Board.  (*Id.* at RS001078.)

86.     In addition to Stacy, the press Statement's reference to "the experience of many other UVA women who have tried to report [sexual] assaults," refers to multiple examples chronicled exhaustively in the Article, including (1) the former student who filed a Title IX case against UVA and who penned a scathing critique of UVA's Sexual Misconduct Board; (2) Susan

Russell's daughter, who along with another student, pursued legal action against the University, resulting in a finding that UVA violated the Clery Act; (3) a former student raped on campus in 1993 who was told that UVA would not put electric lights on that section of campus because it would "ruin Jefferson's vision of what the University was supposed to look like"; and (4) Liz Seccuro who was gang raped at Phi Kappa Psi in 1984 and asked by a UVA dean whether it was just "regrettable sex."  (**Ex. 1** at RS001077, 001078.).  I do not understand Plaintiff to be challenging the accuracy of these facts set forth in the Article, nor could she given Rolling Stone's copious documentation for it.

87.     Finally, the press statement accurately states that we put the story through a rigorous editorial and fact-checking process and that we found Jackie to be entirely credible.  As explained here, and in Liz Garber-Paul's declaration, this is entirely accurate.

88.     In short, I have absolute confidence in the accuracy and substantiation for the statements and opinions that Sabrina and myself made to the press in late November and early December 2014.  The one exception is my mistaken comment to Paul Farhi that "we knew who they were," but this statement has nothing to do with Eramo.

**Jackie's Story Unravels After Publication**

89.     On the morning of December 5, 2014, I woke up to a bombshell.  I had received an email from Sabrina sent at 1:54 am, with the subject line: "our worst nightmare."  (A copy of the email is attached as **Exhibit 52** to the Declaration of Sabrina Rubin Erdely.)  That email stated:

> Will and Sean – we can't run the statement tomorrow.  In fact, we're going to have to run a retraction.  I just got off the phone with Jackie and her friend Alex; neither I nor Alex find Jackie credible any longer.
>
> Today Jackie was interviewed by the police but declined to report; her explanation to me for why she didn't go forward was lacking.

41

I've been trying to verify the identity of her assailant, and when I asked for her help, it spiraled into confusion. By the time we ended our conversation, I felt nearly certain that she was not being truthful. I then called her friend Alex, who has been a valuable resource; I found out that over the past day, Alex has come to the conclusion that Jackie has probably been lying. Jackie gave specific details to her friends about her alleged assailant, including a full name (the same one she gave me), which they discovered belonged to someone at a different fraternity, not Phi Psi. They showed her a picture of that person, and Jackie denied it was him. But later, when Alex and Sara pressed her, she said that maybe it WAS him. The whole thing stinks. Alex feels betrayed.

I'm not saying that Jackie wasn't raped in that house, or on that night. However, Jackie isn't credible[.]

Tomorrow Phi Psi will apparently come out with a statement denying there was a party that night, or that there was a brother named "█" in that house. The Washington Post is working on a story with all the details.

We have to issue a retraction.

90.     I was absolutely shocked and devastated to read Sabrina's email notifying us that she had lost faith in Jackie's credibility. I felt completely blindsided and disappointed that such an important and impactful story had fallen apart. I was particularly surprised not only because I had had so much confidence in Jackie as a source, but also because I placed such great trust in Sabrina's and Liz's work on the story. To gauge how much of a surprise this was, consider that the "statement" that Sabrina references in the first line of her email was a full-throated defense of the Article that we had planned to publish on the morning of December 5. (A true and correct copy of an email I sent to Caryn Ganz and Sabrina at 7:44 pm on May 4, 2014, attaching a copy of the December 4 statement, is attached as **Exhibit 10**.) The December 4 statement opens with the line: "Ed note: Rolling Stone stands by our story 'A Rape on Campus.'" (*Id.* at RS018593.) In the body of the statement, Sabrina went on to explain in detail why Sabrina had absolute faith in Jackie and explained why we determined that getting comment from Drew was not necessary.

As is evident from this statement, both Sabrina and the rest of our team had absolute confidence in Jackie and were ready to defend the story against the world on December 4.  Of course, we never published that statement.  As I said in my deposition, I went to sleep on December 4 with full confidence in the story, and I was absolutely shocked and blindsided by Sabrina's email the next morning.

91.     Once we were notified of Sabrina's doubts regarding Jackie's credibility, Rolling Stone took swift action to notify its readers that Jackie's story could not be relied on.  On December 5, 2014, within <u>hours</u> after receiving Sabrina's "our worst nightmare" email, Rolling Stone published an Editor's Note at the top of the webpage where the Article appeared on Rollingstone.com.  The placement of the Editor's Note made it impossible for a reader to view the Article without first viewing the Note.  As I explained in my deposition, the December 5 Editor's Note effectively retracted any information in the Article that originated with Jackie.

92.     I can tell from an email that Melissa Bruno of the Rolling Stone public relations department sent to *The Washington Post* that we published the December 5 Editor's Note at approximately 12:57 p.m., a few hours after first learning of Sabrina's doubts.  (A true and correct copy of that email is attached hereto as **Exhibit 11**.)

93.     After we published the December 5 Editor's Note, there was a backlash on social media and in the press criticizing Rolling Stone for the phrase "our trust in [Jackie] was misplaced" in the December 5 Editor's Note.  Critics felt that this language blamed Jackie, an alleged sexual assault victim, rather than placing the blame squarely on Rolling Stone's reporting.  Will Dana and I conferred and he took immediate action to publicly correct the impression that we were blaming Jackie, rather than recognizing our failures.  Will Dana explains this in his Declaration (¶ 32 to ¶ 41), which I have reviewed, and believe is entirely

43

accurate.  He also explains the Editor's Notes that the magazine published on December 5 and 6, which I have reviewed and is accurate.  At bottom, we promptly published editorial notes that made clear to everyone that we no longer believed in Jackie's credibility and anything in the Article that could be reasonably attributed to Jackie was retracted.

94.     The CJR Report reached the same conclusion that our December 5 and 6 Editor's Notes amounted to an "effective retraction" of the Article and said further that "On Dec. 5, following Erdely's early-morning declaration that she had lost confidence in her sourcing, *Rolling Stone* posted an editor's note on its website that effectively withdrew the magazine's reporting on Jackie's case."  (**Ex. 6** at ERAMO-04555, ERAMO-04559.)

95.     In my twelve-plus years as an editor for *Rolling Stone* magazine, nothing like this had ever happened to me before.  I certainly had never been forced to retract a story.  The events of December 5 and 6 were incredibly painful to me both personally and professionally.  We published the Article with complete confidence in it, and to have such an important and impactful story that I had so much faith in blow up in my face like this was incredibly traumatic and something I am still haunted by and wrestle with constantly.

**The Decision to Leave the Article on the Website**

96.     Once we had alerted our readers to the fact that the Rolling Stone no longer stood behind Jackie's story via the early December Editor's Notes and Will Dana's tweets, Rolling Stone's editorial team determined that it was not necessary or appropriate to remove the Article from Rollingstone.com at that time.  I participated in these discussions with Will Dana and Jann Wenner.  As set forth in Will Dana's declaration, we had a number of reasons why we did not think that taking down the Article from the website was necessary.  I fully concur in the decision and the reasons for that decision.  At bottom, by having the Editor's Note at the top of the

Article, no one could reach the Article on-line and read it without the knowledge that Rolling

Stone no longer stood behind information that came from Jackie.

**The CJR Report**

97.     In mid-December, Rolling Stone asked the Columbia School of Journalism to

conduct an independent review of the editorial process that led to the publication of the Article.  I

was interviewed extensively in connection with Columbia's investigation.  Everyone involved

with the Article cooperated fully and we were entirely transparent during the process.  We fully

expected to take some significant hits from this review, but we thought that it was an important

step for the magazine to subject itself to this independent review.

98.     On April 5, 2015, Rolling Stone published the CJR Report online.  Concurrently

with its publication, Rolling Stone took the Article down from Rollingstone.com and replaced it

with the CJR Report.  It is my understanding that Rolling Stone took this extraordinary step

because of a heightened sense of responsibility flowing out of the findings of the CJS report.

99.     We also issued a final Editor's Note under Will Dana's name, notifying readers

that Rolling Stone was officially retracting the Article and taking it down.  (A copy of this

Editor's Note is attached as **Exhibit 79** to the Declaration of Will Dana.)  We concluded this

Editor's Note by stating:  "We would like to apologize to our readers and to all of those who

were damaged by our story and the ensuing fallout, including members of the Phi Kappa Psi

fraternity and the UVA administration and students."  We were extremely serious about this

apology and remain so to this day.

100.     The CJR Report was painful reading for me because it criticized many of my

editorial decisions.  In particular, the Report criticized my decision to permit the Article to go

forward without identifying and getting comment from "Drew," my decision to allow the story to

move forward without comment directly from the three friends, my failure to clearly attribute the "shit show" comment to Jackie, and my removal of Sabrina's disclosure that Rolling Stone did not know Drew's full name.

101.    I have addressed those editorial decisions at length above and have explained why I felt them to be reasonable decisions at the time.  In hindsight, I deeply regret the mistakes I made and feel terrible that they have caused anyone harm.  In many respects, the errors that I made resulted from my firm belief in Jackie as a source and my absolute conviction that she was telling us the truth, as well as my confidence in Sabrina and Liz Garber Paul's work.  In retrospect, obviously that belief was incorrect, but it was unshakeable prior to receiving Sabrina's email on December 5.  At the time of publication, I felt certain that we had pushed the reporting as far as we could, and I am humbled and chastened by the CJR Report's criticism on these points.

102.    That said, in connection with this action, I note that the CJR Report's criticisms about Rolling Stone's editing and reporting process pertain almost exclusively to the lead of the story—the account of Jackie's gang rape and her interactions with the three friends.  Whatever significant issues the Report identified with respect to those aspects of the Article, it did not uncover any significant errors with respect to Rolling Stone's reporting on what UVA or Dean Eramo did, or did not do, in response to Jackie's allegations.  (**Ex. 6** at ERAMO-04552-ERAMO-04555.).  Moreover, while it notes that in 2013 Jackie told Eramo she was forced to perform oral sex, not vaginally raped, the CJR Report makes clear that Jackie did tell Eramo the name of the fraternity in April 2014, and that Jackie also told Eramo about the two other alleged gang-rape victims at that time, just as the Article reported.  (*Id.* at ERAMO-04553.)  Of course,

46

we had no way to verify what Jackie told Eramo, since UVA refused to make Eramo available to comment or to answer specific questions about Jackie's case.

103.    The CJR Report is thus entirely consistent with my view, expressed above, that the Article's reporting on UVA and Eramo was solid.  Not only did I have no reason to doubt it at the time of publication, but I still believe today that our reporting on UVA and Eramo is substantially accurate.

This Declaration was executed on June 30, 2016 in New York, New York. I declare under penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct.

SEAN WOODS

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2016, the foregoing was served by CM/ECF on counsel of record for all parties to this action.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


/s/ Elizabeth A. McNamara
Elizabeth A. McNamara