**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

-------------------------------------------------------- x

NICOLE P. ERAMO,

                          Plaintiff,

        - against -

ROLLING STONE LLC, SABRINA
RUBIN ERDELY, AND WENNER
MEDIA LLC,

                     Defendants.

-------------------------------------------------------- x

Case No. 3:15-cv-00023-GEC

**DECLARATION OF
SABRINA RUBIN ERDELY
IN SUPPORT OF
DEFENDANTS' MOTION
FOR SUMMARY
JUDGMENT**

I, Sabrina Rubin Erdely, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am over the age of 18, a resident and citizen of Philadelphia, Pennsylvania and competent to make this declaration.  I have personal knowledge of the statements set forth below.   I am a defendant in this action, and I submit this declaration in support of the motion by Defendants Rolling Stone LLC, Wenner Media LLC (collectively, "Rolling Stone"), and myself for summary judgment in this action.

2.     I am the author of the article titled "A Rape on Campus:  A Brutal Assault and Struggle for Justice at UVA" (the "Article"), which was published on Rollingstone.com on November 19, 2014 and in the December 4, 2014 print edition of *Rolling Stone* magazine.[1]  The Article opens with a detailed account told to me by Jackie, a student at the University of Virginia, of her alleged rape by multiple men at a fraternity house in the early weeks of her freshman year.  The Article goes on to detail Jackie's interactions with classmates, family, other sexual assault victims, and UVA administrators, including Plaintiff Nicole Eramo ("Eramo"), as

---

[1] A copy of the print version of the Article is attached as Exhibit 1 to the Declaration of Sean Woods.

she struggles to come to terms with the alleged rape.

3.      As set forth more fully below, I spent months researching and reporting this article.  I spoke with over 25 sources, including numerous current and former students, sexual assault victims and their family members, government officials, experts, and UVA President Teresa Sullivan.  In addition to scores of hours of interviews, including approximately 20 hours of interviews with Jackie, I reviewed hundreds of documents, including court documents, news articles, research, text messages, emails (including multiple emails between Jackie and Eramo) and case files provided by students who had gone through the University process to report their assaults.  I visited UVA for several days in the fall to conduct several interviews in person (and had planned to interview Plaintiff at that time, until my interview was abruptly cancelled at the last minute).

4.      Ultimately, I chose to use Jackie's story as a prism to address the broader issue of how colleges struggle to respond to allegations of sexual assaults on campus.  The extremely troubling nature of the allegations that Jackie reported to UVA—a sexual assault by multiple men during a party at a popular fraternity—crystallized for me the central question of the Article: What is the responsibility of university officials when they receive a report of this nature, even if the victim herself does not want to take action?

5.      As set forth more fully below, at the time the Article was published—and until the early morning hours of December 5, 2014—I had complete confidence in Jackie's credibility as a source, in the accuracy of her account, and in the accuracy of the Article.  I would never have written or published an Article in which I did not have complete confidence.  When I lost faith in Jackie's credibility following a series of conversations in the early-morning hours of December 5, I immediately alerted my editors at *Rolling Stone* to tell them that we needed to retract the

Article.  That morning, my editors and I drafted a statement making clear that we were effectively retracting the Article, which was appended to the online Article and publicly disseminated by around midday on December 5.

6.      This experience has been devastating to me, both professionally and personally. Never in my 20-plus years as a reporter have I had a story or a source fall apart on me after publication.  After feeling so sure about the Article, and believing so strongly that it would help spur change on college campuses, losing faith in the credibility of one of my major sources post-publication took me entirely by surprise.  I was stunned and shaken by the experience, and remain so to this day.

7.      I understand that Eramo challenges a number of the statements in the Article as false (the "Statements").  I cannot stress enough that at the time the Article was published, and until the early morning of December 5, I firmly believed that everything in it was true.  It was never my intent in any way to denigrate Plaintiff, who I believed had what was "surely … among the most difficult jobs at UVA," as I stated in the Article.  I knew that Plaintiff was "beloved by survivors," including Jackie and many other women who spoke to me.  These women considered her a friend, a confidante, and an "asset to the community"—all of which I reported in the Article.

8.      Furthermore, it was never my intent to portray Eramo as failing to do her job properly, or of actively suppressing Jackie or other students from seeking justice.  Nor do I believe that the Article I wrote portrays Plaintiff in the way she describes in this lawsuit.  Against the backdrop of Title IX, which requires schools to consider both the interests of individual students and the safety of the community as a whole, I was making an argument about university policy and best practices: arguing that universities may not be well-equipped to handle

3

allegations of serious felonies like rape, and opining that the supportive, "victim choice" approach followed by UVA and other schools—well-intentioned though it may be—may result in fewer students choosing to pursue formal action to hold their perpetrators accountable.

9.    As I have said publicly, I am deeply sorry about any negative impact this Article has had on others.  It was never my intention to cause harm, and I feel nothing but sorrow and regret over the entire experience.  If I had had any doubts prior to publication about the integrity of this story, or about Jackie's credibility as a source, I would not have published it; instead, I would have gone back to my extensive reporting file to write a different story, one in which Jackie's story was at most a footnote.

**Professional Background**

10.    I am an award-winning feature writer and investigative journalist with over twenty years of experience writing for major American publications, including *Rolling Stone*, *SELF*, *GQ*, *The New Yorker*, *Mother Jones*, *Glamour* and *Men's Health*.

11.    I began my career in magazine writing as an undergraduate student at the University of Pennsylvania, writing for and editing *34th Street*, the magazine of the student-run *Daily Pennsylvanian*, and where I wrote a feature that in 1993 won the *Rolling Stone* College Journalism Competition.  After graduating from the University of Pennsylvania in 1994 with a B.A. in English, I was hired by *Philadelphia* magazine as a staff writer.  I  remained on staff at *Philadelphia* for six years, rising to the position of senior writer.

12.    After leaving *Philadelphia* magazine in  2000, I became a freelance writer contributing to numerous national magazines.  In 2008, I began writing for *Rolling Stone* as a freelancer.  In 2010, I became a freelance contributing editor for the magazine, a title that I held at the time the Article was published.

4

13.     Over the course of my 20-plus years as a features writer and investigative journalist, I have covered a wide array of subjects, including a modern-day Bonnie and Clyde; the life lessons learned from a con man; the rise and fall of a teenage Internet celebrity; and the stranger-than-fiction lives of the heirs to the Duke family fortune.  For the sake of my articles, I have trekked through Tibet, watched an autopsy, joined a religious cult, visited maximum-security prisons, and once tried out to be a Philadelphia Eagles cheerleader.  I have received numerous awards for my work, including two National Magazine Award nominations.  My work has been used in college textbooks and anthologized in Best American Magazine Writing and Best American Crime Writing.  In addition to my work as a writer, I have also taught courses in magazine writing at the University of Pennsylvania and Temple University and lectured frequently about writing and reporting.

14.     I have also written numerous articles dealing with issues of sexual assault.  My article "Intimate Intimidation," published in *Philadelphia* in 1996, won multiple awards and was nominated for a National Magazine Award.  In 2013, I published an article in *Rolling Stone* titled "The Rape of Petty Officer Blumer," an in-depth look at sexual assault in the military. In the course of writing these Articles and others, I have interviewed dozens of sexual assault victims and policy experts, and spent hundreds of hours researching these issues.

**Genesis of the Article**

15.     I first discussed the general idea for the Article with Sean Woods, my longtime editor at *Rolling Stone*, in or about March 2014.  We discussed a potential feature story about how universities are dealing with issues of sexual assault on campus.  The "culture of rape," particularly on campuses, was a widely debated and chronicled topic in the news at the time, with a Columbia student dragging a mattress around campus and Yale students under fire for

offensive remarks condoning assaults.  Our initial idea was to follow one case through the process to explore how universities deal with these reports.

16.     Based upon my initial conversations with my editors, I submitted a brief, three-paragraph pitch for an Article about campus rape in the spring of 2014.  (A true and correct copy of that pitch is attached hereto as **Exhibit 12**.) In my pitch for the Article, I observed that the Department of Education's Office for Civil Rights had initiated Title IX investigations against a number of elite schools, and that the White House had recently announced a task force focused on campus sexual assault.  The pitch was approved by *Rolling Stone*.

17.     Submitting a pitch is part of the standard process for initiating a reporting project at *Rolling Stone*.  The pitch is not a concrete outline for the story; instead, its purpose is to provide background about the topic and suggest a starting point for the reporting to come.  The pitch is never revisited or revised during the reporting process, and the ultimate story is often very different than what is set out in that preliminary proposal.

18.     Over the summer of 2014, I interviewed students at numerous universities, including Yale, Harvard, the University of Pennsylvania, and the University of Virginia.  I also interviewed various experts in the subject of sexual assault like David Lisak, a noted psychologist and researcher, and Wendy Murphy, an attorney who had brought a number of Title IX actions arising out of sexual assaults.  Ms. Murphy provided me with two Title IX complaints filed on behalf of a UVA student.  (True and correct copies of these two complaints are attached hereto as **Exhibits 13** and **14**.)

19.     As I conducted these interviews, my vision for the story evolved.  Rather than focusing on a campus that had been covered in the media as having a particularly toxic climate toward sexual assault, I decided to focus on a campus that was more typical of the average

American university dealing with these issues.

20.     By July of 2014, I had settled on UVA as the site for my story.  I chose UVA because based on my conversations with students and experts, it was an elite public school with a high-achieving student body and a robust social climate, as well as student advocates who were actively involved in education around issues of sexual assault.  In an early interview with lawyer Wendy Murphy, I learned that UVA was under investigation for Title IX violations and, despite its strict honor code, had not expelled a student for sexual assault in 10 years.

**Reporting Process**

21.     When interviewing sources, my general practice is to type a contemporaneous transcript of the conversation on my computer as we speak, or to record the interview (with the source's permission) and transcribe the audio myself after the interview.

22.     I followed the practice described above in reporting the Article.  In preparation for fact-checking the Article, I prepared a streamlined document containing those interviews relating to the final Article.  This 431-page document, referred to herein as my "Reporting File," contains the transcripts of all interviews relevant to the Article (except for two interviews that were transcribed separately, as noted in the document), as well as numerous email exchanges with sources.  (A true and correct copy of my Reporting File is attached hereto as **Exhibit 15**.)

23.     Because I type my notes contemporaneously—and thus at high speed—they often contain typos, which I generally do not bother to go back and correct.  For purposes of clarity and readability, when quoting from my Reporting File in this declaration, I have corrected spelling errors that appear in the original document.

*Initial interviews with Emily Renda*

24.     The first person I connected with at UVA was Emily Renda, a recent graduate of

the university who had written publicly about her experience as a survivor and her involvement in campus anti-rape advocacy.  I emailed Emily on July 7, 2014, and we spoke for several hours on July 8 and 11.  (My transcript of those two interviews can be found on the pages Bates-stamped RS004115 through RS004143 of Exhibit 15.)

25.     During our first interviews, Emily described the culture of drinking, partying and sex at UVA, where much of first-year social life revolves around the school's Greek institutions. She told me she had just been hired by the Vice President of Student Affairs at UVA to help the school with its Title IX compliance, and she affirmed that UVA would be a good school to focus on for my Article.  (Ex. 15 at RS004116.)

26.     Emily also described ███████████████████████████████████████████ █████████████████████████, and described the retaliation she suffered for her activism on campus.  (Ex. 15 at RS004119.)  Emily offered to put me in touch with several other UVA students and alumni who would be willing to talk with me about their experiences.  She told me that one of these individuals, a "girl [she] worked with closely," had "alleged she was gang raped in the fall, before rush, and the men who perpetrated it were young guys who were not yet members of the fraternity."  She told me that this woman recalled one of the men saying to another in the course of the assault: "C'mon man, don't you want to be a brother."  (*Id.* at RS004119.)  Emily also told me that this woman received "pushback" from peers who said that she "must have been doing something to lead them on," and that as a result, this woman felt a "strong sense of self blame."  (*Id.* at RS004125.)

27.     After our second interview, I reviewed Emily's testimony submitted to the Senate Committee on Health, Education, Labor and Pensions on June 26, 2014.  (A true and correct copy of this testimony is attached hereto as **Exhibit 16**.)  As I noted at the time, Emily's

testimony included an account of a woman named "Jenna" who was "gang-raped" and had friends who were not supportive.  I noted that "Jenna's" story corresponded to the story of the woman with whom she had promised to put me in touch.

28.     Following our second interview, Emily forwarded me contact information for three UVA survivors willing to speak with me about their experiences: ▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮, and Jackie.  (These emails are included in my Reporting Transcript at the pages Bates-stamped RS004143-4145.)  Over the next several weeks, I interviewed all three women, along with several experts and UVA alumni active in sexual assault advocacy.  I spoke with ▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮ about their own sexual assaults and their experiences in working with the UVA administration and resources, including Eramo.  We also spoke at length about the campus culture and social life at UVA.  (My contemporaneous notes for my interviews of ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮ are set forth on the pages Bates-stamped RS004183-4200 and RS004215-422, respectively, of Exhibit 15.)

29.     On July 14, 2014, before my first interview with Jackie, Emily Renda emailed me to raise a concern about publishing the name of the fraternity where Jackie was allegedly assaulted, which she identified as Phi Kappa Psi.  Specifically, Emily noted that there were two additional women with "similar stories to Jackie" that the University was trying to persuade to come forward in hopes of taking "punitive action against the fraternity," and she was concerned that these witnesses would appear less credible if they came forward after the fraternity was named in the Article.  Emily explained her concern to me as follows:

> I may need to urge you not to publish the name of the fraternity (phi kappa psi) in her case because we are trying to pursue ongoing action.  There are two other young women with similar stories to Jackie who have not come forward fully yet and we are trying to persuade them to in order to get punitive action against the fraternity.  If the article is published with her story in conjunction with the frat name before the other two girls come forward, it could appear that their stories are

coached or false, which would create a credibility issue and take away our ability to kick off that frat.  Does this make sense?  Please call me with questions— basically I just raise this issue because I want to see these guys gone and I want to keep it as legally sound as possible.

(A true and correct copy of Emily's email is pasted into my Reporting File and can be found at

the pages Bates-stamped RS004145-4146 of Exhibit 15.)

30.     Shortly after receiving this email, I spoke with Emily by phone.  Emily told me

that she was calling from a conference at Dartmouth College concerning sexual assault on

college campuses, which she was attending along with Dean Nicole Eramo. Emily reiterated that

UVA was trying to bring two other alleged victims forward and that its "goal is to get good

punitive action to stick" against the fraternity.  She told me that "two staff people" were trying to

bring the two women forward anonymously and described Jackie as having "formally made the

dean's office aware" of her own assault allegations.  Emily also told me that "our associate

dean"—Nicole Eramo—"is very passionate about getting them punished"  and "very interested

in making sure we can do something punitive and make something stick."  (My

contemporaneous notes of this July 14 phone conversation with Emily are set forth on the pages

Bates-stamped RS004146-4147 of Exhibit 15.)

*Initial interviews with Jackie*

31.     With that backdrop, later in the day on July 14, I had my first interview with

Jackie.  (My contemporaneous notes of this interview are set forth on the pages Bates-stamped

RS004152 to RS004170 of Exhibit 15.)  Over the course of several hours Jackie told me about

her experience of being "gang raped at a fraternity" in her first year, on September 28, 2012.

(Ex. 15 at RS004153.)  She recalled that it was the same night as a party on campus thrown by

Playboy to celebrate UVA being chosen as the nation's number one party school. (*Id.* at

RS004158.)

32.     I walked Jackie through her account in detail, asking numerous follow-up questions along the way.  She told me that she went to a "date function" at a fraternity with a third-year student who was a fellow lifeguard at the University pool.  She said it was her first fraternity party, and that she kept spilling her drinks out onto the floor because she didn't drink alcohol.  Jackie told me that her date asked if she wanted to go upstairs, and she agreed. Upstairs, she entered a dark room where she heard other voices and realized there were others in the room.  She told me that she started to scream, and then someone told her to shut up; she tripped and fell through a glass coffee table; and she bit the hand of someone who tried to cover her mouth, at which point she was punched in the face.  She recalled one of the men saying "grab its motherfucking leg"—which stood out to her because it suggested she was "less than human" —and "heard them say something like 'we all had to do it so you do too.'"  Jackie said that the men were not calling each other by real names, but instead nicknames like "Armpit or Blanket." She noted that the assault did not occur during fraternity rush season, but "it may have been dirty rushing."  Jackie told me that this particular frat was "one of the wealthier frats on grounds," and that she had "met two other girls who had a similar experience at this same fraternity."  (Ex. 15 at RS004154-4155.)

33.     Jackie told me that in the course of that night, she was assaulted by seven different men, while her date and another man oversaw the assault.  She told me that she recognized the last assailant from a small anthropology lecture, and that he "physically could not perform" when it was his turn.  She said that the other men taunted him, calling him a "pussy" and asking him "what, is she not hot enough for you?" before handing him a beer bottle and telling him to use that.  (*Id.* at RS004156.)

34.     Jackie relayed precise details, such as the time displayed on a digital clock when

she got upstairs (12:52 a.m.); the surface that she was laying on (a hardwood floor with a rug on

it, with broken glass from the table); the scent of marijuana in the room; and the position of the

man who was restraining her.  She said that at some point she passed out, and that when she

finally left the room it was around 3:30 in the morning.  She told me that the fraternity wasn't on

the main road (Rugby Road), and that she didn't know precisely where she was when she left the

house.

35.     Immediately after the assault, Jackie said, she called a close male friend named

Ryan, crying and telling him that "something bad" had happened.  (Ex. 15 at RS004157-4158.)

She told me that Ryan arrived with two other friends of hers, whose names she gave as Catherine

and Alex, and said that he wanted to take her to the women's center or the hospital.  Jackie said

that the other two friends questioned his plan, asking him, "is that such a good idea?" and

worrying that Jackie's reputation would be "shot for the next four years."  Jackie told me that the

three friends engaged in a discussion in front of her, with the two friends warning Ryan that

Jackie would be "the girl who cried rape, and we'll never be allowed into any frat party again."

(*Id.* at RS004158-4159.)  She told me that she subsequently drifted apart from this group of

friends and was no longer close with them.  (*Id.* at RS004160-4161)

36.     Jackie said she first reported her assault to UVA in the second semester of her

freshman year.  She told me that she was having difficulties in school and went to a meeting with

her association dean, accompanied by her mother; at that meeting, Jackie revealed that she had

been assaulted, and the dean put her in touch with Dean Eramo—who Jackie said she "loved"

and thought was "fantastic."  Jackie told me that she's "told all of this to Dean Eramo, the dean

of sexual assault."  She said that in that initial meeting, she "told [Dean Eramo] what happened,"

and Eramo provided various options "if I wanted to move forward.  But Jackie said "there was

12

so much to it, and I didn't know what I wanted to do." (Ex. 15 at RS004165)

37.     Jackie told me that she knew of two other women who alleged that they were assaulted by multiple men at the same fraternity, and that she had spoken with Eramo about these additional allegations. When I asked what Eramo said in response to the allegations, Jackie told me that Eramo had gone to the Dean of Students—who I understood to be Dean Allen Groves— who said that if there was more than one report, the women could come forward anonymously and they could try to "take away [the fraternity's] charter." (Ex. 15 at RS004169.)

38.     Jackie's description of her conversation with Eramo about convincing the additional victims to come forward was entirely consistent with my earlier conversation with Emily Renda. *See* ¶¶ 29-30. Jackie also told me that she—like Emily—had been harassed on campus by men who were upset about her advocacy. She said that in the spring of 2014, around the time of UVA's annual "Take Back the Night" events, she was called a "cunt" and a "bitch" by several men, one of whom threw a beer bottle at her face. Jackie told me she filed a police report about the physical assault. (Ex. 15 at RS004169.)

39.     At the close of our initial interview, I asked Jackie to put me in touch with other individuals, including her former friend Ryan who was familiar with her story. Jackie said she was "sure that [Ryan] wouldn't mind" speaking with me, and also suggested that I speak with her friends Rachel Soltis and Alex Pinkleton. (Ex. 15 at RS004168.) Jackie subsequently emailed me contact information for Alex Pinkleton and another friend, Annie Forrest. She told me that she "still ha[d]n't had a chance to get in touch with Ryan" but would let me know when they connected. (*Id.* at RS004237.)

40.     I conducted two more lengthy interviews with Jackie by phone over the next several weeks, one on July 30, 2014 and one on August 16, 2014. (My contemporaneous notes

for these interviews are set forth on the pages Bates-stamped RS004238-4256 (July 30) and RS004309-4316 (August 16) of Exhibit 15.)  In these interviews, I spoke with Jackie about her background and went back over some of the specific details from the night of her assault.  In particular, I asked Jackie if she still had the dress she wore the night of the assault.  She agreed to follow up with her mother about what ultimately happened to the red dress, and I told her that I would like to speak with her mother about her experience.  Jackie promised to put us in touch.  (Ex. 15 at RS004241-4242.)

41.     During these interviews, we also discussed in detail Jackie's meetings with Eramo.  Jackie said that in her first meeting (which occurred in May 2013) she told Eramo "there [were] 7 guys and 2 of them told me what to do."  (Ex. 15 at RS004246.)  She told me that Eramo had a warm demeanor and gave her a hug, and that she took some notes but didn't ask Jackie a lot of questions as she told her story.  Jackie said that after she told her story, Eramo went over her options: "[S]he walked me through formal trials versus informal hearings versus going through the criminal charges[,] and what would be best for me and what was comfortable for me[.]"  (*Id.* at RS004246.)  Jackie told me that in response to hearing these options, she told Eramo she would "think about it."  When Jackie returned to campus the next fall, she told Eramo she wanted to focus on healing herself rather than taking action against her assailants—and Eramo "respected that."  (*Id.* at RS004250.)  Jackie indicated that they never discussed the matter further until spring of 2014, when Jackie went to Eramo about being hit with a bottle and Eramo "asked me if I wanted to press police charges on that."  Jackie said she "revisited" with Eramo the idea of taking some action against her assailants, but at this point she was still considering whether to move forward.  (*Id.* at RS004250-4251.)

42.     Jackie told me that she had filed a police report over the incident in which a bottle

14

was thrown at her face, but that she ultimately decided not to press charges because it was her understanding that it would be prosecuted as a state felony, since it was not on university property—and she did not feel comfortable pursuing a charge that severe.  After our interview, I filed a Freedom of Information Act request for the police report and discussed my request with Lt. Sandridge at the Charlottesville Police Department.  Lt. Sandridge informed me that while she could not release the police report itself, she could provide me with the criminal incident information from that report.  (A true and correct copy of that letter is attached hereto as **Exhibit 17**.)  The letter she sent confirmed that Jackie had reported an aggravated assault occurring on April 6, 2014, near 1600 University Avenue in Charlottesville—an address that corresponds to the area near the UVA campus known as the "Corner," where Jackie told me the assault had occurred.  The letter also confirmed that a "laceration" was reported as a result of the assault, which corresponded to Jackie's account that her she suffered a cut and bruise on her face from the incident.  (Ex. 17 at RS015353.)  Jackie sent me pictures she had taken and that had been shared on social media in connection with Take Back the Night Events, in which an injury is clearly visible on her right cheek.  (True and correct copies of these images are attached hereto as **Exhibit 18**.)

43.     During our July 30 interview, I asked Jackie to describe Eramo's reaction to Jackie's account of her rape in their initial meeting, and whether she appeared to be shocked. Jackie responded:

> [S]he didn't seem that shocked actually, she just seemed like, it seemed like she seemed genuinely sorry this happened on her campus. But she didn't say 'oh my god' or anything like that, she just nodded and listened.  But she didn't, yeah, now that I think about it, she never seemed surprised by my story.

(Ex. 15 at RS004248.)  During our August 16 interview, I asked about Eramo's reaction when Jackie reported during their April 2014 meeting that she knew of two additional women who

15

were allegedly assaulted by multiple men at Phi Psi.  I specifically asked Jackie to describe the look on Eramo's face when she relayed this information during their in-person meeting.  Jackie responded: "It wasn't as shocked as you might think.  She was just"—and here, she used a mild tone to convey what she recalled of Eramo's tone—"'oh, you have to have her come in'—she wasn't like 'my god that's crazy.'"  (*Id.* at RS004312.)

44.      During our August 16 interview, I told Jackie I was wondering about Eramo's obligation to warn the community in light of Jackie's reports.  In response, Jackie told me that Eramo had explained to her previously that Eramo's primary responsibility is "first and foremost to protect the University," her employer, and that Eramo had also explained to Jackie that "nobody wants to send their daughter to the rape school."  I asked Jackie to give me more specifics about the circumstances under which Eramo had allegedly said this; Jackie told me it was while meeting in the fall of 2013, after she returned for her second year, after Jackie asked Eramo "why there was nothing published about all this stuff that goes on, why there was no warning, especially if it happens so often here."  Jackie described Eramo's response as follows:

> She was like well it's terrifying, we don't publish the information of how many rapes are reported by students, number one we don't have to, if someone asks for it we have to give it out, but we don't have to tell the public, and number two, who wants to send their daughter to the rape school.

(*Id.* at RS004314-4315.)  Jackie repeated the "rape school" quote to me—unprompted—in another interview nearly a month later, on September 11.  *See* ¶ 71.

45.      Jackie also told me that she had told her "whole story" to Emily Renda, including that she was raped by seven men while two others gave instructions, and that the last assailant could not perform.  (Ex. 15 at RS004253.)  In our first interview, Jackie had told me she was first introduced to Emily by Eramo, and that in one of their early conversations at a coffeehouse, they were discussing the "red stick figure statistics" indicating one in four women will be sexually

16

assaulted in college.  Jackie recalled that Emily had said: "We're that statistic right here. We're those red stick figures, the two of us."  (*Id.* at RS004153.)

46.     I confirmed Jackie's account of her interactions with Emily in a follow-up phone interview with Emily on August 15.  (My contemporaneous notes for this interview are set forth on the pages Bates-stamped RS004304-4309 of Exhibit 15.)  Emily confirmed that Eramo had put her in touch with Jackie, and she confirmed the accuracy of the quote about "red stick figures" that Jackie had attributed to her.  (Ex. 15 at RS004305-4306.)  Emily also confirmed again that "Dean Eramo knows about" the two other women allegedly assaulted at Phi Psi, but that these women were still unwilling to come forward.  (*Id.* at RS004308.)

47.     When I can, I will "test" sources concerning their description of an event or first-hand recollections of quoted exchanges, by checking the description with the other party involved.  It is a good way to gauge a source's ability to accurately recount events.  Every time I did this with Jackie's story, it always demonstrated that Jackie was entirely accurate when she relayed events or quotes with third parties.

48.     During my July 30 and August 16 interviews with Jackie, I asked to speak with the other women who claimed they were sexually assaulted at Phi Psi: ▮▮▮▮, the current undergraduate who had allegedly been assaulted, as well as the mutual friend (▮▮▮▮) who put them in touch.  I also asked to speak to the alleged victim who had graduated (▮▮▮▮) and her sister ▮▮▮) who had alerted Jackie to the assault.  Jackie was reluctant to give me their contact information without first obtaining their permission for me to speak with them.  This approach made sense to me; in my experience reporting on sensitive topics like sexual assault, it is often most productive to approach a potential source through a mutual connection, particularly when, as here, their personal accounts were told to her in confidence.

49.     During this time, I also repeatedly reminded Jackie to put me in touch with her friend Ryan.  Far from avoiding contacting him, for over two months I repeatedly pressed Jackie to be put in touch with him.  (*See, e.g.,* Ex. 15 at RS004168, RS004242, RS004309.)  I also consistently pressed to be put in touch with the other two women who were allegedly raped at Phi Psi.  Jackie sent me an email on August 14, saying that she "ha[d]n't heard back from" ███████ or Ryan, but that she had reached the sister of the victim who had graduated, who said she "wants to discuss it with her parents before she talks to anyone."  (Ex. Ex. 15 at RS004309.) Over the next several weeks, Jackie provided me with updates on her attempts to connect with the two women and Ryan, replete with precise details concerning her efforts that caused me not to have the slightest doubt that she was genuinely trying to put me in touch with these people. (*See, e.g.,* Ex. Ex. 15 at RS004309-4310.)

50.     In addition to waiting for Jackie to connect me with Ryan, I also tried to find out the full names of all three of the friends on my own.  With only common first names—Ryan, Catherine, and Alex—and no last names, I could not find them in UVA's student directory.  Nor was I able to determine their identities by searching through Jackie's connections on Facebook. Based on my conversations with Jackie, it was my understanding that of the three friends, Ryan would be the most likely to cooperate—and so I considered him my primary point of contact, believing that I would be able to reach the others through him.

### Interviews with other sources in summer 2014

51.     At this point in time, mid-August 2014, I was still casting my net broadly to gather background information for my story. I had not yet settled on what the story would look like, or who the major players would be.  Throughout July and August, I spoke with a number of sources, including several other UVA sexual assault victims, alumni, and experts.

18

52.     On or about July 16, I spoke with Liz Seccuro, a UVA alumna who had published a book about her own assault by multiple men at a Phi Kappa Psi fraternity party in the 1980s. (My contemporaneous notes for this interview are set forth on the pages Bates-stamped RS004171-4183 of Exhibit 15.) Ms. Seccuro told me about her own assault.  She also told me that based on her experiences with UVA—where she was an active alumna—UVA is "papering themselves to death and thumbing their nose at the White House initiative," and they "turn a blind eye" to sexual assault issues.  (Ex**.** 15 at RS004171-4172.)  Ms. Seccuro also told me based upon her experiences—and the experience of another woman, with whom she offered to put me in touch—UVA "really does think they're above the law."  She told me that this other woman had asked UVA to install better lighting in the area where she had been raped; and in response, she was told that the extra lights would not match Thomas Jefferson's "aesthetic vision" for the campus.  (*Id*. at RS004174.)  I later spoke with this woman directly, and she confirmed the account.  (My contemporaneous notes of my interview with Jane Doe are set forth on the pages Bates-stamped RS004413-4417 of Exhibit 15.)

53.     I spoke with Ms. Seccuro for a second time on or about August 13.  (My contemporaneous notes for this interview are set forth on the pages Bates-stamped RS004293-4295 of Exhibit 15.)  In this interview, I asked Ms. Seccuro to elaborate on her previous observation that UVA was "thumbing their nose" at the White House initiative.  Ms. Seccuro explained that while UVA revises its sexual assault policy, it doesn't change what happens on the ground; she doesn't believe that students are encouraged to go to the police with their reports, and that the school's official report of sexual assault statistics "doesn't seem to mesh with what's happening."  (Ex. 15 at RS004293.)  Ms. Seccuro told me that UVA's Clery statistics are "buried," and remarked that "everyone's hiding their crime statistics" but "UVA's especially

good at it." (*Id.* at RS004294.)  When I asked Ms. Seccuro for her impression of Eramo, she

responded: "I think Dean Eramo knows where her bread is buttered.  I think she's protecting the

University and killing these victims with kindness, but she's not as effective as she could be in

her role as dean, especially as a woman … She befriends them and nothing ever happens. She

surrounds them in a cocoon …." (*Id.* at RS004293.)

54.     On August 5, I spoke by Skype with Jackie's friend Alex Pinkleton.  (My

contemporaneous notes for this interview are set forth on the pages Bates-stamped RS004256-

4272.)  Alex told me in detail about ███████████████████████████████

Like Jackie, Alex told me that she didn't call ███████████████ at first. Alex's

description of reporting ██████ to Eramo—the options provided, the way those options were

described, and the fact that it was the victim's decision about how to proceed—was consistent

with the way that Jackie had described her own meeting with Eramo.  Alex also mentioned

Jackie's former friend Catherine—the student I call "Cindy" in the Article—who she said "told

[Jackie] not to go to the clinic to get checked."  Alex told me that she knew Catherine personally

and she was "heavily into the hookup culture" at UVA.  (Ex. 15 at RS004261.)  This

characterization was consistent with the way Jackie had described Catherine to me, and came

from a source who knew Catherine independently of Jackie.

55.     Through the female survivors I had spoken with, I was referred to two male UVA

students, Brian Head and Matt Menezes, who were members of an all-male campus group called

"One in Four," focused on sexual assault prevention.  (My contemporaneous notes for these

interviews are set forth on the pages Bates-stamped RS004273-4292 of Exhibit 15.)  Mr.

Menezes told me that he had written an op-ed when Emily Renda was harassed for her advocacy

work in the spring of 2014, and he noted that Jackie had been assaulted on the Corner "right

around the same time." (Ex. 15 at RS004288.) Mr. Menezes also told me about the reaction on campus when a student published a critical account of her experience reporting her sexual assault, under the pseudonym "Anonymous Wahoo." He told me that Anonymous Wahoo's account—which most students saw as a Facebook post—made a big splash on campus, and "Dean Eramo just got eviscerated" in her account. (*Id.* at RS004292.) I included the story of the "Anonymous Wahoo" in the Article. (Article at RS001077.)

56.     In late July, I spoke with John Foubert, a former assistant dean of students at UVA and the founder of One in Four. (My contemporaneous notes for this interview are set forth on the pages Bates-stamped RS004201-4214 of Exhibit 15.) I told Dr. Foubert that I was planning to focus on UVA as emblematic of issues common at many schools, not because it was more egregious than any other school. Dr. Foubert disagreed, telling me that based on his time as a UVA dean, "I do think UVA is more egregious than most." He told me that he had worked for five or six different universities and UVA "was definitely worse, it definitely stands out … both in their lack of prevention and in their lack of response to sexual assault." (Ex. 15 at RS004202.)

57.     Also, in late July, I spoke with S. Daniel Carter, a national expert on college safety and former director of public policy for the advocacy group Clery Center for Security on Campus. (My contemporaneous notes for this interview are set forth on the pages Bates-stamped RS004222-4236 of Exhibit 15.) Mr. Carter explained the evolution of Title IX policies and guidance from the Department of Education. We also discussed a number of Title IX cases that had been filed against UVA, some of which were folded into the ongoing review by the Department of Education's Office for Civil Rights. Mr. Carter underscored that, as I believed, UVA's approach to sexual assault is not "particularly unique"; instead, UVA's challenges are

21

typical of "most four-year residential colleges across the country." (Ex. 15 at RS004230.) I also

asked Mr. Carter how common gang rapes were on college campuses; he told they were "not

uncommon," and that when they occur they usually involve "athletic teams and fraternities." (*Id.*

at RS004233-4234.) I described, at a high level, what I knew of Jackie's case—a student who

had reported a gang rape to the UVA administration, but decided not to report to police and did

not want to engage in an administrative hearing—and asked him what the school's obligation

would be in that situation. Mr. Carter told me that UVA had "an obligation to pursue an

investigation" of Jackie's claims. I explained that the school knew the name of the fraternity at

this point, and had received reports of two other alleged victims at the same fraternity house.

Mr. Carter responded: "That is the kind of scenario that would trigger under OCR guidelines the

institution to take remedial action. … [T]hey do have an obligation to do something." (*Id.* at

RS004235.)

      58.    On or about August 14, I spoke with Laura Dunn, a lawyer and expert on campus

sexual assault issues and founder of the advocacy group SurvJustice. (My contemporaneous

notes for this interview are set forth on the pages Bates-stamped RS004295-4303 of Exhibit 15.)

SurvJustice had recently filed a high-profile suit on behalf of a group of students at John Hopkins

University over the school's failure to notify the campus that police were investigating an alleged

gang rape at a fraternity. We spoke about the Johns Hopkins case, and about the prevalence of

gang rapes in general. Ms. Dunn told me that "gang rapes are more common when there's a

strong Greek culture," and she told me about several examples of alleged gang rapes in which

the perpetrators ultimately were not prosecuted. (Ex. 15 at RS004297-4298.) As with Mr.

Carter, I posed the outline of Jackie's case to Ms. Dunn and asked what the school's

responsibility would be after receiving such a report, even if the victim did not want to move

forward.  Ms. Dunn told me that under Title IX, the school had "an obligation to the whole community from the first moment" Jackie reported her allegations to UVA.  She noted that  in "gang rape situations, where you need to act, you cannot wait for someone else to be gang raped, and once this dean knows … they have the legal knowledge necessary to be held liable." (*Id.* at RS004300.)

59.     I also told Ms. Dunn that this victim had told the dean that she learned of two other victims who were allegedly gang raped at the same fraternity house.  Ms. Dunn told me that under the Clery Act, Jackie's secondhand report would be sufficient to put UVA on notice: "The fact that they already had that [first] victim's report—they should have already been taking action, and for them to continue to delay as if they need these other victims, it's just not true. That school could really be sued."  (Ex. 15 at RS004301.)  We also discussed the loyalty students feel toward their schools and their deans—and I told her that the survivors I had spoken to at UVA all seemed to love their dean, but it was unclear whether she was encouraging them to report.  Ms. Dunn responded:

> This is a trend I'm seeing on many campuses that's very alarming and I think it's going to get worse.  They say, 'We're great on sexual violence, we have this advocate"—well guess who the advocate works for, the school. Students think the advocate is for them, they are great people their heart is in the right place but they have actively revealed that they cannot fulfill their moral obligations because this is their job and who will hire them in higher education if they don't take a stand for the university. … [T]hey're assigning people to victims that are not actually on their side, they don't have the victim's best interests in mind.  That's what happened in my case, she was not actually my advocate, she was just seeing me through a process meant to fail. It's a hard critique but it's true. Advocates who survivors love are part of the system that is hiding and failing to address sexual violence, and they're doing it under the guise of 'we're helping victims but they're actually discouraging victims. … So they're pretending or even thinking they're on the victim's side when they're actually discouraging and silencing them.

(*Id.* at RS004301.)  I quoted from Ms. Dunn's response in the Article.  (Article at RS001076.)

*Reporting trip to UVA campus*

60.      After our interview on August 16, I lost touch with Jackie for several weeks. I tried to reach her by phone and email, to no avail.  I discussed with Sean Woods, my editor at *Rolling Stone*, that Jackie was no longer responding to me.  In my experience writing about sensitive topics, including stories about sexual assault, it was not uncommon for a source— especially a sexual assault victim— to go silent for a period of time following several intense interviews.  We decided that when I visited UVA's campus for a reporting trip—planned for September 11-13—I would try to meet Jackie in person and find out whether or not she was interested in participating with the Article.

61.      On September 5, I emailed Nicole Eramo to let her know that I would be coming to campus and would love to set up an interview.  After some emails about logistics, she agreed to an interview on the afternoon of Friday, September 12 and copied two representatives from UVA's Public Affairs office.  (A true and correct copy of our email exchange is attached hereto as **Exhibit 19**.)

62.      On September 9, I spoke with one of the UVA Public Affairs representatives, McGregor McCance, by phone about my upcoming interview of Nicole Eramo.  (My contemporaneous notes of this conversation are set forth on the pages Bates-stamped RS004326-4328 of Exhibit 15.)  Mr. McCance told me that Eramo was "nervous" and wanted him to go over parameters for her interview.  He told me that Eramo could talk about the school's policies, process and structure relating to sexual misconduct cases, but she could not talk about "any specific cases or allegation because of student privacy."  I asked whether there was some sort of waiver that could be obtained from a student; Mr. McCance sounded surprised and told me "we can look into that, we've never done that."  Mr. McCance never got back to me about whether

24

this might be possible or workable.  As an alternative, I also asked if I might be able to ask

questions as hypotheticals, to avoid talking about a specific case.  Mr. McCance agreed that "that

might be a way to get at the stuff you want to get."  (Ex. 15 at RS004326.)

63.     I told Mr. McCance that I was particularly interested in statistics, including the

number of students choosing particular methods of resolution after reporting their assaults to the

dean's office and the results of those processes.  He said that I should just ask Eramo directly

about these numbers, explaining that "she's the one who's really the authority."  (Ex. 15 at

RS004327.)  Mr. McCance noted that UVA President Teresa Sullivan had given speeches about

campus safety, and I said I would be interested in speaking with her after my upcoming visit if

she was available.  Mr. McGregor told me that would be a "possibility," but that "Nicole

[Eramo] is the best source for information on sexual misconduct."  (*Id.* at RS004328.)

64.     On the morning of September 11—as I was on my way to the airport to travel to

Charlottesville, and the day before my scheduled interview with Eramo at UVA—Mr. McCance

responded to my email asking that I be allowed to interview Claire Kaplan, director of the UVA

Women's Center, to tell me that "neither Nicole nor Claire will be available for an interview."

Instead, they would make President Sullivan available for an interview at a later date.  Mr.

McCance encouraged me to attend the Board of Visitors meeting on September 12 while I was in

town.  I immediately responded to Mr. McCance and told him that while I would be happy to

speak with President Sullivan, "I must insist on speaking to Nicole who, as we discussed, is the

primary authority on sexual assault at UVA."  Despite agreeing that "Nicole is indeed among the

most knowledgeable of our policies and procedures here," Mr. McCance reiterated that

"[u]nfortunately, she is not going to be available for an interview."  (A true and correct copy of

my email September 11, 2014 email exchange with Mr. McCance is attached hereto as **Exhibit**

**20.**  This email exchange is pasted into my Reporting File at the pages Bates-stamped RS004329-4332 of Exhibit 15.)

65.    I was surprised and disappointed by UVA's about-face, now denying me access to Dean Eramo or Claire Kaplan.  Eramo had readily agreed to be interviewed and McCance had acknowledged that she was the "best source for information on sexual misconduct."  (Ex. 15 at RS004328.)  By shutting down the interviews, it appeared UVA was stonewalling me.

*Emily Renda Interview in Charlottesville*

66.    I arrived in Charlottesville on Thursday, September 11.  That afternoon, I met with Emily Renda for an in-person interview at a local coffeehouse.  (My contemporaneous notes of this conversation are set forth on the pages Bates-stamped RS004333-4336 of Exhibit 15.)  We spoke about the guidance that had recently been issued by the Department of Education's Office for Civil Rights in April 2014, which clarified that schools may need to conduct an investigation of sexual assault allegations in the interest of campus safety, even if the reporting victim does not want to move forward.  Emily told me that the new guidance was discussed at the Dartmouth College conference that she had attended with Eramo in July.  She also told me that Eramo was upset at the prospect of having to override a victim's wishes and commence an investigation, saying "I'd rather lose my job than force someone to do that" (Ex. 15 at RS004333) and that if she was ever forced to go against a survivor's wishes, "I hope I get fired."  (*Id.* at RS004335.)

67.    I asked Emily about Eramo's role with respect to students who report sexual assaults, and whether she represents the students or the university in that process. Emily said that Eramo "represent[s] the administration," and that she is part of UVA's Title IX office.  Emily also confirmed that Eramo was in charge of UVA's Sexual Misconduct Board and that she is the

"first stop, the gateway" for students reporting sexual assaults to the university.  (Ex. 15 at RS004333.)

*Jackie Interviews in Charlottesville*

68.     As I was on my way to meet Emily, I received an email from Jackie telling me that she would available to meet for dinner.  We met at a restaurant near campus on the evening of September 11.  I recorded our in-person interview, with Jackie's permission.  In person, I found Jackie just as compelling and credible as I had in my hours of phone conversations.  (A true and correct copy of my recording from this interview is attached hereto as **Exhibit 21**.  I subsequently transcribed the recording into my Reporting File, and my transcription can be found at the pages Bates-stamped RS004336-4363 of Exhibit 15.  In the course of this litigation, I understand that the parties also commissioned a certified transcript of this audio file, a true and correct copy of which is attached hereto as **Exhibit 22**.)

69.     At this point, I still did not know whether or not Jackie wanted to be involved with the Article.  Jackie confirmed to me that she had been having doubts about participating, based in large part on the negative reaction she was receiving from peers.  She told me that one of her classmates asked if she "want[ed] to be responsible for something that's gonna paint UVA in a bad light" and told her that "you have to remember where your loyalty lies."  Jackie told me that Alex Pinkleton, too, had received "mostly negative" reactions from friends about participating in my Article."  (Ex. 15 at RS004338.)  Ultimately, Jackie agreed that she wanted to participate in the Article, and told me that she would be comfortable using her first name (but not her last name) and naming Phi Kappa Psi as the location of her assault.  (*Id.* at RS004362.  The audio of this exchange can be found at 2:21:09 to 2:21:24 of Exhibit 21.  In the certified transcript of this audio file created in the course of this litigation (Ex. 22), this exchange can be

found at the pages Bates-stamped RS118340-8341.)

70.     Jackie also told me that she had finally connected with her friend Ryan.  She said

that she had recently run into him while ordering a milkshake at a fast-food place near campus

called Cook Out.  She relayed their conversation to me in detail:

> And I was like "so did you get any of my texts?" and he's like "yeah I got them"
> and I was like "so would you be interested?" and he was like [offended] "No! you
> and I haven't spoken in like two years!" and I was like "But I thought—I just
> wanted to talk to you about that night, and to give the reporter more background"
> and he's like [angry] "I'm in a fraternity here, Jackie, I don't want the Greek
> system to go down, and it seems like that's what you want to happen. I have
> priorities, I want to graduate from here and something like this is going to
> completely change the Greek system, and I don't want to be part of—" he called it
> a shit show, he said "I don't want to be part of whatever little shit show you're
> running."

(Ex. 15 at RS004339.  The audio of this exchange can be found at 9:36 to 10:30 of Exhibit 21.

In the certified transcript of this audio file created in the course of this litigation (Ex. 22), this

exchange can be found at the pages Bates-stamped RS118230-8231.)  A detailed description of

her exchange with Ryan lends credibility to its accuracy.  It never remotely occurred to me that

Jackie was making this up.  Jackie had previously referred me to several friends or witnesses so I

had no reason to question this (unsuccessful) referral.

71.     During this interview, Jackie repeated to me the story about Eramo's "rape

school" comment, which she had originally told me during our August 16 interview.  At no time

did I prompt her with her previous quote; instead, she offered it on her own.  Jackie confirmed

again, as she said previously, that this conversation occurred in the fall of her second year after

Jackie asked "why there was nothing published about how many sexual assaults occur at UVA."

She went on to explain:

> Yeah, and she—I don't want to get her in trouble for saying this, but she looked at
> me very like solemnly and was like, "Well who would want to send their daughter
> to the rape school"?  And I thought about it, and I realized that she's right.  You

know? And the university would never want to publish something like that, espcially if their numbers are really high, because who would want to send their daughter to the rape school."

(Ex. 15 at RS004351.  The audio of this exchange can be found at 1:23:07 to 1:23:42 of Exhibit 21.  In the certified transcript of this audio file created in the course of this litigation (Ex. 22), this exchange can be found at the pages Bates-stamped RS118291-8292.)

72.     Jackie also gave me a detailed account of meeting ████, the alleged gang-rape victim who had by now graduated from UVA.  Not only did Jackie recall the exchange, but she recounted particularly unique words and phrases that ████ used, and recalled her own reaction to those word choices.  In response to my questions, Jackie described in detail ████ appearance, her demeanor, her body language, the timbre of her voice, and how her personality compared to her younger sister.  There was nothing about the facts or how Jackie told the story that caused me in any way to question its accuracy.  (The audio of this exchange can be found at 1:45:23 to 1:56:46 of Ex. 21.  In the certified transcript of this audio file created in the course of this litigation (Ex. 22), this exchange can be found at the pages Bates-stamped RS118312-21.)

73.     Jackie also suggested additional women I should contact.  She encouraged me to get in touch with her friend Annie Forrest, who she said first told her about Liz Seccuro's book and the fact that Ms. Seccuro had also been gang-raped at Phi Psi.  (Ex. 15 at RS004343.)  Jackie also gave me contact information for her freshman year roommates, including her friend Rachel Soltis.  Jackie said she told Rachel about her assault in the beginning of the second semester of her first year.  (*Id*. at RS004344.)  I also asked Jackie for her mother's number, and she provided her mother's cell phone number "so you don't have to contend with my father."  *Id*. at RS004346.

74.     The next night, on Friday, September 12, I went out for dinner with Jackie,

Jackie's boyfriend Connor, and Alex Pinkleton.  I recorded our conversation over dinner, with

the permission of all parties.  (A true and correct copy of my recording from this interview is

attached hereto as **Exhibit 23**.  I subsequently transcribed the recording into my Reporting File,

and my transcription can be found at the pages Bates-stamped RS004374-4396 of Exhibit 15.)  It

was evident at the dinner that Alex and Connor were both well-versed in Jackie's sexual assault

story and they showed no doubts about its accuracy.  During our dinner, Jackie showed me some

of the scars on her arm that she says are from the night of her assault.  We discussed whether she

had scars on her back as well, as she described.  Connor observed that he hadn't noticed scars on

her back, but Jackie explained that her mother had asked about them and they may have faded

over the intervening two years.  None of this struck me as odd or raised any concerns.  Jackie

also told me that she knew UVA had an anonymous report from ███████, because she was with

███████ when she submitted it.  At one point, Alex revealed ████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

            75.      After dinner, I went out on Rugby Road with Jackie, Alex, Connor, and another of

their friends.  The women pointed out various fraternities where they knew of sexual assaults that

had occurred.  When we came into view of the Phi Psi house, Jackie froze and became visibly

overcome with emotion: she looked terrified and began to cry, then collapsed in inconsolable

sobs and swiftly left with Connor to go home.  For me to have witnessed her spontaneous,

uninhibited reaction dramatically reinforced the fact that Jackie appeared as a traumatized sexual

assault victim.  It was so meaningful, that I later recounted it in some detail to my editor, Sean Woods.  (Ex. 15 at RS004394-4395.)

76.     After Jackie left the group, I walked around the outside of the Phi Psi house with Alex and her friend, and the three of us went inside the house.  I noted that the house had two staircases inside, one on either side of the house, as well as a set of side stairs outside the house leading to the front porch, just as Jackie described.  I also verified that Jackie's description of going upstairs to members' bedrooms was accurate.  This visit to Phi Psi provided yet another brick in the wall of confidence I had in Jackie's story.  While out on Rugby Road, I asked Alex Pinkleton if she would share with me the last names of Jackie's former friends Ryan, Alex, or Catherine, who met her the night of her assault.  Alex declined to give me any of their names without Jackie's permission.

### Other UVA Interviews

77.     While I was at UVA, I also interviewed two UVA students active in  fraternity life and campus sexual assault issues, Tommy Reid and Will Cadigan.  I recorded the interview with their permission, and Rolling Stone had the audio transcribed for me.  (A true and correct copy of the transcript of this interview is attached hereto as **Exhibit 24**.) On September 13, I interviewed Sara Surface, a friend of Jackie and Alex Pinkleton and a member of One Less.  I recorded the interview with her permission, and Rolling Stone had the audio transcribed for me. (A true and correct copy of the transcript of this interview is attached hereto as **Exhibit 25**.) Sara and I discussed Jackie's assault, which Sara specifically described as a "gang rape."  I mentioned that Jackie had said there were nine men involved, and Sara did not in any way suggest that number was incorrect.  (Ex. 25 at RS004784.)

78.     While visiting UVA, I also attended a presentation to the Board of Visitors on

September 12 about UVA's response to sexual assault.  (My contemporaneous notes of this meeting are set forth on the pages Bates-stamped RS004363-4372 of Exhibit 15.)  In response to a question about the Department of Education, Office of Civil Rights ("OCR") investigation of UVA, Dean Allen Groves referred to the ongoing OCR investigation as a "standard" and "routine" compliance review.  Based on subsequent reporting, I came to understand that this description was not entirely accurate.  After the meeting, I introduced myself to Nicole Eramo and reiterated my desire to speak with her.  Other than pleasantries, she did not respond.

79.     Later in September, I contacted representatives of the Department of Education's Office for Civil Rights to discuss compliance reviews and whether they are, as Dean Groves described them, "routine" and "standard."  (My contemporaneous notes of my September 24, 2014 interview of Catherine Lhamon, Assistant Secretary for Civil Rights at the U.S. Department of Education, are set forth on the pages Bates-stamped RS004442-4445 of Exhibit 15.  My emails with Jim Bradshaw concerning the interview parameters, along with a statement provided by the Office for Civil Rights, are set forth on the pages Bates-stamped RS004440-4442 of Exhibit 15.)  During our interview, Ms. Lhamon made clear that compliance reviews are "very far from random"; instead, she described them as a "targeted effort for us to go after very serious concerns."  When I told Ms. Lhamon that I had recently heard an ongoing investigation described at a board of trustees meeting as "standard" and "routine," Ms. Lhamon responded: "Those descriptions from that school are extraordinarily irresponsible.  Nothing annoys me more than a school not taking seriously their civil rights obligations, or their review from the federal government about their civil rights obligations."  (Ex. 15 at RS004443-44.)  I included Dean Groves' comments and Catherine Lhamon's response in the Article.  (Article at RS001079.)

*My Efforts to Interview Jackie's Mother*

80.    After leaving Charlottesville, and over the next few weeks, I repeatedly tried to get in touch with Jackie's mother, ▮▮▮▮ I left voicemails for her at the cell phone number Jackie provided on September 19, September 23, October 14, and October 23.  The name on the voicemail message at this number matched the name of Jackie's mother.  When I told Jackie that I was having trouble getting a response to my messages, Jackie responded that she had told her mother that I was trying to reach her, and her mother was afraid of her father's reaction if she participated in the Article.  Jackie provided her mother's home phone number as well, indicating that her mother would be happy to speak with me as long as her father wasn't home.  (Ex. 15 at RS004474-4475.)  Jackie also suggested that her mother might be willing to meet me in person in Charlottesville, and I raised this possibility as well in my voicemails. I never received a response to any of my messages or phone calls.

81.    While I was disappointed not to be able to speak with Jackie's mother, I took her failure to respond to my repeated attempts as a clear indication that she did not want to participate in the Article—which was perfectly logical, given the subject matter and the tense environment Jackie had described at home.  The fact that Jackie's mom appeared not to want to participate in the Article did not in any way make me doubt Jackie's credibility as a source, and it certainly did not affect my confidence in Jackie's account of her interactions with Nicole Eramo.

*Jackie Provided Documentation to Corroborate her Story*

82.    Following my interviews in Charlottesville, and Jackie's agreement that her first name would be used in the Article, I believed Jackie's story should be the opening narrative of the Article, which I discussed with Sean Woods, my editor.  I found Jackie to be a strong and

reliable source.  After our meeting in Charlottesville, Jackie forwarded me copies of documents

and emails that I had requested from her, including her correspondence with Eramo in

connection with their meetings in May 2013 and April 2014.  (Attached hereto as **Exhibit 26** is a

true and correct copy of a September 15, 2014 email from Jackie to me forwarding a series of

emails exchanged between Jackie and Nicole Eramo between May 14 and June 21, 2013.)  This

email chain confirmed that, as Jackie had told me, she set up a meeting with Eramo in May 2013

after being referred by her association dean (Dean Lyons) to Eramo for a "confidential

conversation."  The emails also confirmed that, as Jackie had told me, Eramo followed up after

their meeting to provide her with summer counseling options near her home, and that Jackie did

not avail herself of these options.  (Ex. 26 at RS018282-8284.)

83.     The email chain also included Eramo's follow-up message to Jackie following

their first meeting, which read in pertinent part:

> Thanks, too, for sharing what happened with me.  I could tell that was very
> difficult for you.  I understand and respect your wishes to not report this matter
> further to the authorities or through the Sexual Misconduct policy here on
> Grounds but I do want you to consider these options.  I would be happy to discuss
> with them with you in greater depth if you want to talk about the different
> possibilities and would be happy to assist you with filing a report or a complaint if
> you decide at some point that you would like to hold these men accountable.

(Ex. 26 at RS018284.)  This email confirmed to me that Eramo knew Jackie was reporting an

allegation of sexual assault by multiple men (referring to "these men"), and yet was leaving the

decision up to Jackie about how to proceed.  I included an excerpt of this email in the Article.

(Article at RS001077.)

84.     Jackie also provided documentation verifying that she had reported the bottle

incident that happened on the "Corner" near campus.  (Attached hereto as **Exhibit 27** is a true

and correct copy of an August 16, 2014 email from Jackie to me forwarding a series of emails

exchanged between Jackie and Nicole Eramo between April 15 and April 30, 2014.)  This email

chain began with Jackie asking to meet with Eramo about "an issue I experienced on the Corner

last Saturday, April 5th, with some boys who were very upset about things I had said about their

fraternity."  Along with setting up the meeting, Eramo indicated that she had attended Jackie's

speech about her sexual assault at Take Back the Night on Thursday, April 17, telling her "[y]ou

should be very proud of how far you have come and the work that you are doing."  On April 21,

following their first meeting, Eramo thanked Jackie for coming and said that she could arrange a

second meeting with police present, noting that "since the incident happened on the Corner, the

City of Charlottesville Police would need to take the report."  (Ex. 27 at RS017035.)  On April

22, following the second meeting, Eramo followed up again with Jackie, apologizing that "the

CPD officer was a little aggressive."  She suggested that "it may be worth it to at least have them

check the video on the Corner" because "if we can get good video and check photos of them

from the FSL rosters, we might be able to find them without having to go to the fraternities."

She assured Jackie to "never forget, however, that it is YOUR CHOICE.  Just let the detective

know what you are willing to do and I'm sure they will follow suit."  (Ex. 27 at RS017033.)

85.     In this litigation, counsel for Plaintiff have suggested that in the course of Jackie's

meeting with police about the bottle incident, she also told them about her sexual assault.  I had

no idea Jackie ever told police officers about her sexual assault, nor did I have any indication that

Eramo brought Jackie to the police to report her assault.  To the contrary, Eramo's emails state

that she was bringing in the police for Jackie to report the physical assault with a bottle—which,

unlike her rape, occurred on the Corner.  (Ex. 27 at RS017035 (noting that she would need a

Charlottesville officer since "the incident occurred on the Corner"), RS017033 (suggesting that

Jackie allow police to "check the video on the Corner" to try to identify the perpetrators and

match them against fraternity rosters).)  My conclusion was reinforced by the FOIA letter I received from the Charlottesville police, which referenced a report that directly correlated with the bottle incident and evidenced no report of a sexual assault.  *See* ¶ 42, Ex. 17.

86.     In addition to her exchanges with Eramo, Jackie had told me that she sought counseling as a result of her assault and to support that fact, she sent me an email evidencing a counseling appointment from February 2013.  (Attached hereto as **Exhibit 28** is a true and correct copy of a September 15, 2014 email from Jackie to me forwarding a February 27, 2013 email from Ashley Foresman, a resident in UVA's Counseling and Psychological Services (CAPS).)

### *UVA Contacts Phi Psi About the Sexual Assault Allegations*

87.     Shortly after my visit to UVA, on September 17, I received a text from Jackie telling me that she was about to meet with Eramo and that representatives of Phi Kappa Psi's national organizations were currently on campus.  When we spoke on the phone later that afternoon, Jackie told me that Dean Groves had contacted Phi Psi's national representative and brought him to campus "because of the article."  (My contemporaneous notes of this conversation are set forth on the pages Bates-stamped RS004401-4411 of Exhibit 15.)

88.     Jackie told me that she met with Eramo along with Alex Pinkleton.  Jackie said that during the meeting, Eramo told the girls, "We're just kind of fucked right now.  We're flat out fucked." (Ex. 15 at RS004402.)  Jackie also told me that during the meeting, Eramo told the two girls that "she heard through the grapevine through members of Phi Psi that all the boys involved have graduated."  Jackie told me she was surprised to hear from this from Eramo because she had just seen one of the men riding his bicycle on grounds two weeks ago—and she noted that Alex had pointed out, "doesn't that mean they're admitting it?" (Ex. 15 at RS004403-

36

4404.)

89.     I took Eramo's statement concerning the "boys" having "graduated" as a significant point of corroboration of Jackie's story.  To me, it signaled that the University had finally begun an investigation of Jackie's claims with the fraternity, and that nobody was denying Jackie's assault—instead, they were suggesting that the perpetrators were no longer within the University's jurisdiction.  This statement was a key factor in bolstering my belief in Jackie's credibility, as well as my belief that the University knew of her allegations and was not, in my opinion, doing enough to investigate and provide notice to the community.  I note that Eramo has *not* challenged the accuracy of this quote in this litigation.

90.     After my call with Jackie, I immediately called Alex Pinkleton to double-check Jackie's account of their conversation with Eramo.  (My contemporaneous notes of my conversation with Alex Pinkleton on September 17 are set forth on the pages Bates-stamped RS004411 to RS004413 of Exhibit 15.)  Alex confirmed that the meeting took place and confirmed that Eramo told them that "the boys involved have graduated."  Alex also confirmed that she reacted by pointing out that this sounded like an admission.  She explained, "It's so strange that their response wouldn't be 'no, we didn't gang rape.'"  Later, Alex also confirmed the "flat out fucked" quote.  (Ex. 15 at RS004465.)

*I Press Jackie Regarding the Two Other Victims and the Identity of "███"*

91.     I continued to press Jackie to find a way for me to speak to the two women who claimed they were also raped at Phi Psi.  During my September 17 call with Jackie, Jackie and I discussed various options, but Jackie told me that ██████ was very angry with her for pushing her to come forward, and had been resisting Jackie's entreaties since the spring.  Later in the call, I told Jackie that I believed I had figured out who the two sisters were, ████ and ████, and that

I wanted to reach out to ███. Jackie told me I did not have the right individuals and that she did not have ████ contact information, but promised to reach out to her sister ███ As I indicated in my notes, I did not believe Jackie when she said I had not found the right individuals. Instead, I believed that Jackie was trying to put me off because she did not feel comfortable with me contacting ███ directly, because she was told ████ story in confidence and had already been told by both women that they did not want to participate. This is not unusual in highly sensitive cases involving sexual assault and did not register as a "red flag" about Jackie's general credibility as a source. (Ex. 15 at RS004404.)

92.     In this same September 17 conversation, Jackie told me that when she first met with Eramo in the spring of 2013, Eramo "did a baby investigation on the frat, and looked into [it] to see if they had a party on Sept[ember] 28, which they did, kinda to make sure their facts matched up and they did. And she showed me the pictures of the different houses and I was able to pick out Phi Psi. She asked me to describe the inside of the house and I was able to do that, we went over a bunch of different stuff." (Ex. 15 at RS004410.) This further confirmed to me that Eramo knew from the time of Jackie's initial report that she was alleging Phi Psi as the location of her assault.

93.     During this call, Jackie and I also discussed the layout of the Phi Psi house, including that the "house is set up really weird," and that there was a set of stairs on either side of the house, as I had observed personally. (Ex. 15 at RS004410-4411.)

94.     It was during this call with Jackie that I broached the subject of approaching ███, the alleged ringleader of her assault (who is called "Drew" in the Article). Jackie responded: "I'm not sure I would be comfortable with that." I asked Jackie if she knew where he was. Jackie told me he had graduated, that she didn't know if he lived in Charlottesville anymore, and

38

that she had blocked him on Facebook.  She also told me that one of her friends had looked him

up on Facebook "so she could recognize and kill him."  (Ex. 15 at RS004404.)  I told her to think

about the idea of giving me ███'s name so that I could reach out to him.

### *Interview with Jackie's First Year Roommate*

95.     On September 19, I spoke with Rachel Soltis, one of Jackie's roommates from her

freshman year.  (My contemporaneous notes of this interview are set forth on the pages Bates-

stamped RS004419-4425 of Exhibit 15.)  As I told Rachel, one of my main objectives in calling

her was to confirm some of the things Jackie had told me about her reaction to her assault

freshman year.  Rachel confirmed that Jackie was a "normal, happy girl" at first, "but then she

was raped, gang raped by six different guys about the second weekend of school, around I want

to say around the 26th or 28th."  Rachel told me that after the weekend of the assault, she saw a

"big change" in Jackie, she became depressed, and would stay in her room with her door closed,

letting her alarm ring.  (Ex. 15 at RS004420.)  Rachel's account—including the specific details

about Jackie's alarm going off, and others believing she had gone out when in fact she was home

in bed with the lights off—was entirely consistent with what Jackie had told me.  Rachel told me

that Jackie's mood began to shift when she "started to talk about" her assault after becoming

involved with a support group, and that she "became very brave."  (*Id.* at RS004423.)

96.     Rachel said that at first, Jackie just said she had a "bad run in at a frat party."  She

told me that in the second semester of their freshman year, Jackie revealed for the first time that

she had been sexually assaulted that night—but at that point, she told the group that she had been

forced to perform oral sex on multiple men.  Rachel said that the following semester—in fall

2013, the beginning of their second year—Jackie finally told Rachel the "full story": that she had

been "raped by I think six guys, [and] they actually put a beer bottle inside her." (Ex. 15 at

RS004421.)  I asked Rachel whether she believed UVA should warn the community about

Jackie's allegations, and Rachel responded:

> I definitely do.  The university has countlessly tried to protect itself and its name
> by just, I feel like they ignore the problem to make themselves look better. … I
> definitely do think they should have done something.  Like me and several other
> people know exactly who did this to her, and just because we don't have the blue
> dress, the evidence, I don't think they should go unpunished. … I don't feel like
> [UVA] want[s] justice for its students.  They want to protect even the people who
> are doing these horrible things."

(*Id.* at RS004423.)  I understood Rachel's "blue dress" reference to be to Monica

Lewinsky's iconic "blue dress" that documented her sexual encounter.

97.     The fact that Rachel volunteered many of the key details about Jackie's story—

including Phi Psi, the bottle, the men referring to Jackie as an "it"—that were either identical to

what Jackie had told me, or close enough that I attributed the difference to Rachel's memory,

was highly corroborative to me because it showed that Jackie was telling the same story to me

that she had told others.  The fact that her description of the assault itself had evolved from a

"bad run in" to forced oral sex to vaginal penetration did not concern me, nor did it cause me to

doubt Jackie's credibility.  To the contrary, I found this to be entirely consistent with the

behavior of a victim of sexual assault or other trauma.  In my experience writing about trauma

victims and sexual assault victims, I know that their stories can sometimes evolve over time as

they come to terms with what happened to them and work through their own shame and self-

blame, and that this process can result in the victim revealing new or different details over time.

Furthermore, I noted that the evolution in Jackie's story did not faze her good friend Rachel, who

clearly believed her.  Rachel never expressed any concern to me about Jackie's credibility or

reliability as a source.

98.     Rachel also confirmed anecdotes about the three friends without my prompting.

Rachel told me that at the beginning of their freshman year, Jackie used to hang out frequently with her friends Catherine, Al, and another third male friend who she didn't recall.  Rachel told me that Catherine and Al "seemed like two really mean messed up people, too concerned with social status."  Rachel told me these reactions conformed to her experience of her classmates at UVA.  (Ex. 15 at RS004421.)

99.      Based upon questioning at my deposition, it appears that Plaintiff's counsel believes I was aware of Kathryn Hendley's full name based upon the fact that my notes record Rachel referring to her as "catherine hindley or hinkley."  As I explained at my deposition, I did not realize prior to publication that Rachel had guessed at Catherine's last name.  Notably, the reference to "catherine hindley or hinkley" is not bolded, which reinforces my recollection that I did not notice it at the time I was writing my Article or register its possible import.  (Ex. 15 at RS004421.)  As I testified at my deposition, I first learned that this was even in my notes after we had already retracted the Article, when Will Dana reviewed my transcript and brought it to my attention.  Furthermore, I note that despite the suggestions of Plaintiff's counsel, I did not in fact have Ms. Hendley's correct last name—nor her correct first name.  I was writing down phonetically two last names that Rachel was guessing at—"Hindley or Hinkley"—neither of which is actually Ms. Hendley's real last name, and I spelled her first name as "Catherine" rather than what turned out to be the correct spelling, "Kathryn."  To this day, even if I had been aware of Rachel's guess at the last name, I have no way of knowing whether I could have located Ms. Hendley with this information.

*Interview with Annie Forrest*

100.      I also spoke to another friend of Jackie's, Annie Forrest, on September 19.  (My contemporaneous notes of this interview are set forth on the pages Bates-stamped RS004425-

4430 of Exhibit 15.)  Annie told me that she was first connected to Jackie through Emily Renda, and that Jackie told her story over coffee in approximately February of 2014.  As I explained to Annie, one of my goals in speaking with her was to confirm every detail of Jackie's story that I could.  I asked Annie open-ended questions, and she volunteered specific details of Jackie's story that were consistent with Jackie's account—including, for example, that it was a "gang rape," at Phi Psi, at a "date function" she attended with a co-woker; that she was also raped using a foreign object; that one of her assailants had trouble becoming erect; and that her friends were "unsupportive" after the assault.  (Ex. 15 at RS004426.)  At no point did Annie suggest that she did not believe Jackie, or that she found Jackie not to be credible or reliable.

101.    Annie also confirmed that, as Jackie had told me previously, Annie was the one who told Jackie about Liz Seccuro's book and made the connection that both Liz's and Jackie's assaults took place at Phi Psi.  (Ex. 15 at RS004427.)  Annie confirmed a second anecdote that Jackie had shared with me, about Annie speaking to a One Less meeting about multiple women in her sorority complaining of assault by a single perpetrator at a fraternity.  (*Id.* at RS004428-4429; *compare with id.* at RS004352-4353 (Jackie's account).) These confirmations further underscored that Jackie was a reliable source for relaying the content of conversations with third parties.

### *Interview with Susan Russell*

102.    On September 19, I interviewed Susan Russell, the mother of a UVA sexual assault victim who had filed a Title IX grievance with the Department of Education's Office for Civil Rights over UVA's handling of her daughter's assault.  (My contemporaneous notes of this interview are set forth on the pages Bates-stamped RS004433-4439 of Exhibit 15.)  Ms. Russell told me that in her experience, "there's a huge culture in Virginia to protect that institution."

42

(Ex. 15 at RS004433.)  After noting that her daughter's rape was labelled "suspicious circumstances," she told me that she believes the University mislabels its statistics "so when a parent goes to see the campus crime log, and they don't see sexual assault, they think the school is safe."  (*Id.* at RS004435.)  Ms. Russell expressed her frustration over UVA's approach to sexual assault, especially in comparison to their strict response to cheating under the University's honor code: "With sexual assault … they turn a blind eye. They have zero tolerance for cheating but not for rape, why? … Think about it, in what world do you get kicked out for cheating, but if you rape someone, you can stay?"  (*Id.* at RS004436.)

*Confirming Information with UVA and Interview with President Sullivan*

103.    On September 16, shortly after my visit to the UVA campus, I emailed Mr. McCance, of UVA's Public Affairs office, a list of data and statistics that I was requesting for the Article.  (A true and correct copy of my September 16, 2014 email to Mr. McCance is pasted into my Reporting File (Ex. 15) at the pages Bates-stamped RS004399-4400.  I added an additional request by email on September 29, 2014; a true and correct copy of this email is attached hereto as **Exhibit 29**.) According to the responses I received hours before my interview with President Sullivan, 38 students came to the Dean of Students office to talk about a sexual assault in the 2013-14 school year.  Of those 38 students, only nine filed a complaint through the Sexual Misconduct Board.  Mr. McCance also confirmed that no student had been expelled by the Sexual Misconduct Board in at least ten years, while 35 students had been expelled for honor code violations in the past five years.  (A true and correct copy of Mr. McCance's October 2, 2014 email setting forth responses to my queries is attached hereto as **Exhibit 30**.).

104.    On October 2, I interviewed UVA President Teresa Sullivan by telephone. President Sullivan was accompanied by Anthony de Bruyn, of UVA's Public Affairs office, and

Susan Davis of the Dean of Students office.  (My contemporaneous notes of this interview are set forth on the pages Bates-stamped RS004448-4459 of Exhibit 15.  I also recorded our interview, and a true and correct copy of my audio recording is attached hereto as **Exhibit 31**.) I asked President Sullivan why I had not been allowed to interview Eramo and Claire Kaplan, to which she responded "I'm sorry, I don't have any idea."  (Ex. 15 at RS004499.)  When I asked President Sullivan why UVA does not publish the types of statistics I had requested—showing how many students reported an assault to UVA, and how many of them took any particular course of action—she responded, "As far as I know that has not been identified as a best practice."  (*Id.* at RS004451.)  When I asked why only approximately one-quarter of complainants move forward with the Sexual Misconduct Board, according to the statistics I was provided, Susan Davis responded: "If students are coming forward and feel that we are forcing them into a criminal or disciplinary process that they don't want to be part of, frankly we'd be concerned that we would get fewer reports."  (*Id.* at RS004453.)  These responses are quoted in the Article.  (Article at RS001076-1077.)

105.    I asked President Sullivan about the case of "Stacy," which I had discussed with Annie Forrest.  (*See* ¶ 101.)  I explained that I had learned that in May 2014, a fraternity member was brought before the Sexual Misconduct Board by a student, and at the hearing, two other women also testified that the man had sexually assaulted them as well, to show a pattern of behavior—resulting in the man receiving a guilty verdict and a one-year suspension.  I asked President Sullivan whether she believed the UVA campus would be properly protected with this result.  President Sullivan deferred to Susan Davis; Susan Davis told me that she "can't speak to that case," or "any individual case," due to privacy requirements.  (Ex. 15 at RS004456.)  I asked whether I might pose the question in a hypothetical, rather than inquiring about a specific case—

44

an approach that Mr. McCance had suggested might work in our early September discussion—only to be shut down by President Sullivan, who told me, "We're not going to address that hypothetical, Sabrina." (*Id.*)

106.    Despite it being made clear that they were not going to address or answer questions about specific cases, I told President Sullivan I needed to ask her about "allegations of gang rape" at UVA involving Phi Kappa Psi.  I told President Sullivan that I had been told that since May 2013,[2] over the past year, Eramo has been "informed of three separate allegations of gang rape against Phi Psi."  I asked what the university has done in response, and President Sullivan replied: "Well, I can tell you that we do have a fraternity under investigation, and that we have spoken with the national chapter of that fraternity. I can also tell you that as far as I know, we don't have the names of any specific individuals."  When I asked what she meant by "under investigation," President Sullivan simply replied, "Under investigation. I don't know how else to spell that out for you."  President Sullivan confirmed that the investigation of Phi Psi began "within this semester."  I asked President Sullivan what the University's responsibility is to the campus in light of these allegations, even if Jackie had not given names of her assailants.  President Sullivan responded that "it's possible for us to take action against an organization even if we don't have the names of individuals."  (Ex. 15 at RS004456-4457.  The audio of this exchange can be found at 31:26 to 34:50 of Exhibit 31.  In the course of this litigation, I understand that a certified transcript was made of the recording of this exchange, which is attached hereto as **Exhibit 32**.)

107.    Within a week after our interview, Mr. de Bruyn emailed me to follow up on

---

[2] In my question, I erroneously said "May 2003" when I intended to say "May 2013."  But I also made clear that I was referring to "the past year," and I believe President Sullivan (correctly) understood my question as referring to the period from May 2013 until the date of our interview.

several questions I had asked during the interview.  In particular, Mr. de Bruyn told me that my

"characterization of the facts" of "Stacy's" case from spring 2014 were "incorrect."  I responded

to Mr. de Bruyn right away, asking him to clarify what was incorrect about "Stacy's" case, but

Mr. de Bruyn told me he was "unable to be more specific" due to "privacy concerns."  (A true

and correct copy of my October 9, 2014 email exchange with Mr. de Bruyn is pasted into my

Reporting File (Ex. 15) at the pages Bates-stamped RS004459-61.)

108.    Notably, despite going out of their way to raise a concern about my understanding

of "Stacy's" case, UVA did *not* tell me that I had anything "incorrect" with respect to Jackie's

case and my statement that I understood Eramo had been "informed of three separate allegations

of gang rape against Phi Psi."

### *Confirming "Stacy's" Story*

109.    I called Annie Forrest to double-check my information about "Stacy."  (My

contemporaneous notes of this conversation are set forth on the pages Bates-stamped RS004470

to RS004471 of Exhibit 15.)  Annie clarified that the two additional women who alleged that the

same man assaulted them did not actually testify at "Stacy's" hearing; instead, they submitted

evidence by letter and interviews.  RS004471.

110.    I then connected with "Stacy" on October 22.  (My contemporaneous notes of this

conversation are set forth on the pages Bates-stamped RS004479-4491 of Exhibit 15.)  "Stacy"

told me about her assault and the process of reporting it.  "Stacy" told me that counselors and

members of the Dean of Students office discouraged her from going through the formal hearing

process before the Sexual Misconduct Board, telling her "It's such a hard process, you need to

focus on your healing."  "Stacy" said that notwithstanding this advice, she decided to bring her

case before the Sexual Misconduct Board.

111.   "Stacy" told me that Eramo had stated in a public forum that a student could get expelled when there were "multiple assaults by one perpetrator."  "Stacy" believed that should apply to her case, since she had "learned of two other women who had allegedly been assaulted by the same perpetrator and obtained sworn statements testifying to the other two assaults," which she submitted as evidence in her own case.  But she learned that, according to the school, expulsion would only happen with "multiple formal complaints filed."  (Ex. 15 at RS004485.) "Stacy" told me that in an interview with WUVA just a month prior to her trial, Eramo had specifically asserted that multiple assaults by the same perpetrator would be grounds for expulsion.  (*Id.* at RS004487.)  I had received a link to this WUVA interview from Liz Seccurro shortly after it was published, and watched it at that time.  (A true and correct copy of Liz Seccuro's October 9, 2014 email forwarding a link to the WUVA interview is attached hereto as **Exhibit 33**.)  In the interview, Eramo admitted that no student had been expelled from UVA in recent memory for sexual assault.

112.   "Stacy" told me the trial took place in a small room where she was forced to sit near her assailant, and that it took almost ten hours from start to finish.  She said that she was "relieved" when the panel found him "responsible" for the sexual misconduct charges—she told me that she thought, "He's gone! Because he's a multiple assailant, and I'd been told so many times that that was grounds for expulsion."  But then she was disappointed to hear that he received only a one year suspension, along with mandatory therapy—and that he had still returned to campus for sporting events.  (Ex. 15 at RS004486-4487.)

113.   "Stacy" told me that she believed the University did not expel her assailant—or even apply a two-year suspension—because he was very wealthy.  (Ex. 15 at RS004482.)  She told me that based on her experience, "UVA doesn't want to expel—they say they do, but even

given the circumstances, they found the reasons not to.  And it's to protect themselves from

lawsuits and from bad publicity."  (Ex. 15 at RS004490.)  Following our call, at my request,

"Stacy" provided me with copies of the records from her formal hearing before the Sexual

Misconduct Board.

> *Phi Psi Confirms It Is Under Investigation*

114.    Meanwhile, I continued to pursue information regarding Jackie's assault at Phi

Psi.  After receiving confirmation from UVA that the fraternity was, in fact, under investigation

in relation to allegations of gang rape, I reached out to representatives of Phi Psi for comment.

On October 9, I emailed Stephen Scipione, a UVA undergraduate who was listed on UVA's

Inter-Fraternity Council website as the president of Phi Kappa Psi.  (A true and correct copy of

our email exchange between October 9, 2014 and October 15, 2014 is attached hereto as **Exhibit**

**34** and is pasted into my Reporting File (Ex. 15) at the pages Bates-stamped RS004462-4465.)  I

told Mr. Scipione that I was a writer for Rolling Stone and that I would like to speak with him

about "rape allegations at your chapter of Phi Kappa Psi," and asked for his availability for a

call.  Mr. Scipione did not respond to my email until Tuesday, October 14—and when he did, he

claimed he was too "swamped" to speak with me at any point in the coming weeks and requested

that I send questions by email instead.  I responded immediately to Mr. Scipione's email,

reiterating my request for a phone conversation: "I understand that you have a lot on your plate,

but really, you can't find a few minutes to speak with me by phone? I'm available right now, if

you'd like to call."  I then provided a set of questions, asking about the gang rape allegations,

UVA's communications with the fraternity regarding the allegations, and UVA's investigation

into those allegations.  I closed my email with another exhortation that "again, if you'd like to

call, I'm here at my desk."  Mr. Scipione never took up my offer of a phone conversation, instead

responding on October 15 with a written statement:

> On September 17th, 2014, we had been told that an individual who remains unidentified had supposedly reported to someone who supposedly reported to the University that during a party there was a sexual assault. We were not told that it was rape, but rather that something of a sexual nature took place. Even though this allegation is fourth hand and there are no details and no named accuser, the leadership and fraternity as a whole have taken this very seriously. To my knowledge, our chapter is not currently under investigation by the University. That being said, we are constantly working with the Dean, the Greek life office, our National organization, and others to figure out what happened and to ensure that, if someone [*sic*] did indeed happen, it does not happen again.

(Ex. 34 at RS016693.)  I incorporated Mr. Scipione's response on behalf of the chapter into the published Article.  (Article at RS001079.)

115.    With Mr. Scipione unwilling to speak, I called Shawn Collinsworth, a representative of the national fraternity, since I knew that the national organization had been contacted by UVA.  (My contemporaneous notes of this conversation are set forth on the pages Bates-stamped RS004478-4479 of Exhibit 15.)  I confirmed with Mr. Collinsworth that the national organization had been contacted by UVA on September 15 concerning "allegations of gang rape at the Phi Psi house during parties."  Mr. Collinsworth told me that he understood "the source of the allegation is anonymous and there is no evidence to substantiate that, but it is an investigation that remains active."  (Ex. 15 at RS004478.)  When he referred to a single allegation, and then stated he believed there were two, I told Mr. Collinsworth that I was aware of *three* separate allegations of gang rape during Phi Psi parties—the primary one allegedly taking place in September 2012, another in approximately February of 2014, and a third in approximately October 2008.  I asked for Mr. Collinsworth's response.  He said: "Again it's all the same, we went and tried to see if there was any truth … and when we went to investigate, again, everything is anonymous so we have nothing to substantiate this."  (*Id.* at RS004478-4479.)

*Follow-up Interviews and Efforts to Locate "█"*

116.    On October 15, I spoke again with Alex Pinkleton.  (My contemporaneous notes of this interview are set forth on the pages Bates-stamped RS004465-4467 of Ex. 15.)  In this interview, Alex reconfirmed Eramo's "flat out fucked" comment and observed that she was beginning to question Eramo's approach of emphazing victim choice.  She said:

> I mean I don't want to question her, you know how I feel about her, but if you felt you didn't do anything wrong why would you be fucked?  I question how she treats cases more.  She doesn't encourage you that much to go to trial.  She's like "it's your decision" the whole time, but shouldn't she be like "this is a good idea"?  Because it's not a fun process, and who's gonna do it if they aren't encouraged?

(Ex. 15  at RS004465-4466.)  I also told Alex that I wanted to reach Jackie and that I was looking for some additional information from her, including █'s name.

117.    I spoke with Jackie again on October 20.  (My contemporaneous notes of this interview are set forth on the pages Bates-stamped RS004471-4477 of Ex. 15.)  Jackie was enthusiastic about the Article and confirmed that she wanted to use her first name in it.  (Ex. 15 at RS004474.)  Jackie told me that she was considering moving forward with a trial against her assailants after graduation because she was afraid of retaliation while she was still on campus.  (*Id.* at RS004474.)

118.    During this conversation, I followed up on several outstanding items that I was still hoping to run down, including speaking with her mother and obtaining ███████ ███████████████.  (Ex. 15 at RS004475.)  I also asked Jackie for emails documenting her employment as a lifeguard at the time of her assault and texts from the other sexual assaul victims at Phi Psi.

119.    At the end of our conversation, I told Jackie that I needed to know █ name so that I could reach out to him.  Jackie was shocked and upset, and told me that he "completely

terrifies" her.  She told me that she did not want to be the one to give me his name, and

suggested that I find out by "ask[ing] Phi Psi for their list."  Given that Phi Psi had already

refused to speak with me further about this matter, I knew that was not a possibility.  Jackie said

she would "think about it," and I said I would send her a list of items to follow up on.  (Ex. 15 at

RS004477) and I did so.  (A true and correct copy of my October 20, 2014 email to Jackie is

attached hereto as **Exhibit 35**.)

120.     Jackie did not immediately respond to my follow-up email, or to my further calls

and attempts to reach her.  On October 24, I sent her an email letting her know I understood her

anxiety—which was a common reaction in sources at approximately this point in the reporting

process—and wanted to work with her on a way forward.  (A true and correct copy of my

October 24, 2014 email is attached hereto as **Exhibit 36**.)

121.     In the days following my October 20 interview with Jackie, her friends Alex and

Sara contacted me to tell me that Jackie was upset that I was trying to contact ███.  On October

23, Alex texted me to tell me that Jackie "100% doesn't want her name in the article"—which

surprised me, since Jackie had just told me she was willing to use her first name.  (A true and

correct copy of my text messages with Alex Pinkleton from October 23, 2014 to November 11,

2014 is attached hereto as **Exhibit 37**.)  Alex then told me that Jackie was "thinking about

pulling out entirely" from the Article because she was "pretty overwhelmed with the idea of

███."  I told Alex that we would "figure out a way forward that's comfortable for [Jackie]," and

that I needed to speak with her about it.  (Ex. 37 at RS014308-4309.)  Alex suggested that Jackie

was getting "polar opposite information" from Eramo and me about participating in the Article.

(*Id.* at RS014310.)

122.     I also told Alex that while I was open to discussing whatever changes Jackie

wanted to make, I wanted "to be clear" that "there's no pulling the plug at this point—the article is moving forward [and] I think it's important that Jackie stay involved." (Ex. 37 at RS014312-4313.) Unfortunately, I think I was the opposite of "clear" in this text message. What I was intending to convey to Jackie, through Alex, was that I would be moving forward with a story about UVA regardless of whether Jackie was a centerpiece of that story, a footnote, or not part of it at all. Because I knew Alex was excited about the article, I also hoped my message would urge Alex to lobby Jackie to participate. Around the same time, Sara Surface also weighed in and expressed concern that I was upsetting Jackie in trying to reach out to ██.

123.    Because Jackie was not providing me with ██ name, I tried diligently to find it on my own. I knew that, according to Jackie, he had graduated by the fall of 2014—which means that he would not be listed in UVA's student directory. I looked up swim teams at UVA, trying to find the names of possible lifeguards. I was able to find some online newsletters sent to alumni that listed new Phi Psi members, but I could not locate the lists for the relevant years. I also looked on social media, but without a last name I could not identify the correct individual.

124.    I discussed my efforts with Alex, who was also trying to find a Phi Psi alum named "██" on social media. Like me, she was unable to find a "██" on Facebook who appeared to be in Phi Psi. (Ex. 37 at RS014322.) This did not in any way diminish my sense of Jackie's credibility. To the contrary, her fear about me contacting ██—and specifically, her fear of retaliation if I were to get the name from her—was consistent with the behavior of other sexual assault victims I had interviewed in the past. I told Alex that if I was not able to get ██ name and contact him, I would have to disclose that in the Article, and said: "Unfortunately it would diminish her credibility so I really really want to avoid that!" (*Id.* at RS014320.) To be clear, the fact that Jackie was not giving up ██ name did not diminish *my* faith in Jackie's

credibility.  By framing my pitch this way, I was hoping to convince Alex that it was in Jackie's best interest to provide me with the name—and get her on my side to lobby Jackie for this information.  ¶

125.    Given that I was unable to locate ■ on my own, Jackie was unwilling to provide his name, and Jackie's friends were unwilling or unable to obtain the name from her on my behalf, I discussed with my editor Sean how to address this issue in the Article.  I felt that I had exhausted all possible avenues to obtain his name, and I also told Sean that Jackie's friends and I were concerned about her mental health—and specifically, that she might harm herself—if we continued to press further.  Sean discussed the matter with Will Dana, who ultimately agreed that we could move forward with the Article despite not being able to reach him for comment.  Chief among our reasoning was the fact that we would not be naming him in the Article, and we felt comfortable that his position was already represented by his fraternity, which had two prominent, on-the-record quotes in the Article—from representatives at both the national and local level— denying knowledge of the assault.  Furthermore, I noted that other Articles about sexual assault victims who described their assault but did not name their attacker did not include comment from the alleged perpetrator—including, for example, a May 2014 *New York Times* cover story about Emma Sulkowicz, a Columbia student who carried a mattress around campus to protest her assault.  (A true and correct copy of that May 4, 2014 Article, titled "Fight Against Sexual Assaults Holds Colleges to Account," is attached hereto as **Exhibit 38**.)

126.    In making this decision, I was also motivated by concern for Jackie's mental health.  The fact that Jackie was so adamant about not providing ■ name did not suggest to me in any way that her story was not credible, or that she was lying about the identity or existence of her assailant.  To the contrary, it was evidence to me of her very real trauma, and

was consistent with reactions I received from other sexual victims who urged me not to name or

contact their assailants out of fear of retribution.  Nor did Sara or Alex, or any other of Jackie's

friends, ever suggest to me that they had doubts about Jackie's story or ██ existence based on

her refusal to provide his last name.

127.    If at this point in time—or at any point prior to publication—I had *any* concern

about the accuracy of Jackie's account, her credibility as a source, or the existence of ██, I

would not have hesitated to scrap my existing draft and start over with a new article that did not

include Jackie's story or feature it so prominently and instead focused on one of the other women

I had interviewed—most likely "Stacy."

128.    After not responding to my calls, emails, or text messages for over 10 days, Jackie

finally returned my call on November 3.  (My contemporaneous notes of our conversation are set

forth on the pages Bates-stamped RS004499-4502 of Exhibit 15.)  I told her that we would not

continue to pressure her for ██ name, and she expressed relief, telling me that ██ is "the one

person in the world I'm most terrified of … I have no clue what he's capable of."  (Ex. 15 at

RS004499.)  I explained the upcoming fact-checking process to her, and she sounded

enthusiastic about participating.

129.    During our November 3 call, Jackie also told me that she was receiving "a lot of

pressure" from the Dean of Students office about her participation in the Article.  She told me

that in particular, Eramo was pressuring Jackie not to use her name in the Article.  Jackie said:

> Dean Eramo does not want my name in the article at all, she said if my name was
> in the article then this and that.  She wanted me to talk to someone in PR about it.
> …  For Dean Eramo it's a huge deal.

(Ex. 15 at RS004500.)  I also asked Jackie again about her mother, who still had not returned my

calls.  Jackie told me her mother was upset about Jackie "air[ing] [her] dirty laundry" and told

Jackie that she never should have spoken to a reporter in the first place.  (*Id.* at RS004500.)

130.    Following my November 3 call with Jackie, I emailed her to request some additional documentation.  (A true and correct copy of my November 3, 2014 email is attached hereto as **Exhibit 39**.) In response to my request, Jackie provided me with emails to verify her employment as a UVA lifeguard in the fall of her freshman year, prior to her sexual assault.  (Attached hereto as **Exhibit 40** is a true and correct copy of a November 6, 2014 email from Jackie to me forwarding a September 12, 2012 email from uva-lifeguards@virginia.edu; attached hereto as **Exhibit 41** is a true and correct copy of a November 6, 2014 email from Jackie to me forwarding a September 9, 2012 email from Amanda Crombie to the email address uva-lifeguards@virginia.edu concerning pool cleaning.)

131.    Jackie also forwarded me text conversations with ████████ and ████████ in which each woman vehemently rejected her entreaties to speak with me.  I emailed these text messages to Sean Woods and Liz Garber-Paul, the fact-checker assigned to my story.  (True and correct copies of my November 6, 2014 emails attaching screenshots of these text messages are attached hereto as **Exhibits 42 and 43**.)

**Fact-Checking the Article**

132.    In preparation for the fact-checking process, I spoke with Liz Garber-Paul, an accomplished fact-checker for *Rolling Stone* who had been assigned to my piece.  I have worked with Ms. Garber-Paul in the past and found her to be a diligent and exacting fact-checker.  I provided Liz with my Reporting File, as well as my separately transcribed interviews with Sara Surface, Tommy Reid and Will Cadigan, additional documents and emails I had received from sources, and files containing additional research materials that I had gathered.

133.    I do not recall any substantive issues or concerns raised during the fact-checking

process.  It appeared to be a routine process, with normal changes and comments.

134.    On November 12, the final Article was sent to the printer for publication.

**The Published Article**

135.    The published Article was titled "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA."  The final Article was approximately 9,000 words and ran 10 pages in print.

136.    The Article opens with an account of Jackie's date-turned-assault on the night of September 28, 2012, as she described it to me during our interviews, including the negative response she received that night from two of the friends who came to meet her and discouraged her from reporting the assault.  The first 10 paragraphs of the Article set forth Jackie's first-person recollection of the events surrounding her assault.  The Article then goes on to detail Jackie's interactions with classmates, family, UVA administrators, and other sexual assault victims as she struggles to come to terms with the alleged rape.

137.    While Jackie's story is used as a central narrative, the Article discusses other sexual assault cases at UVA—past and present—as well as high-profile sexual assault cases occurring at other universities, situating Jackie's story within a broader narrative concerning how colleges respond to sexual assault allegations, both at UVA and around the country.  In particular, the Article reports that UVA's "sexual assault problems are not much worse than other schools; if anything … UVA's situation is likely the norm."  Yet, UVA is "one of only 12 schools under a sweeping investigation known as a 'compliance review:' a proactive probe launched by the Department of Education's Office of Civil Rights."  As described by the assistant secretary of the Office of Civil Rights ("OCR"), compliance reviews are "targeted efforts to go after very serious concerns."  (Article at RS001073.)

138.    The Article then proceeds to examine UVA's culture: while "Playboy crowned it the nation's number one party school," it also takes its honor code seriously, with 183 people expelled for honor code violations since 1998.  And, yet, during the same period, not a single student was expelled for sexual assault.  Despite these statistics, UVA President, denies that UVA "sweeps sexual assault under the rug," and the Article recounts recent "encouraging changes" at UVA to deal with sexual assault.  (Article at RS001074.)

139.    In this context, the Article describes Jackie's first meeting with Dean Nicole Eramo.  Eramo is the "head of UVA's Sexual Misconduct Board," one of the "caring folks who answer late-night calls from victims and even make emergency-room visits."  The Article introduces Eramo as a "short woman with curly dark hair and a no-nonsense demeanor" who "surely has among the most difficult jobs at UVA," serving as the "intake person on behalf of the university for all sexual-assault complaints since 2006." After noting that UVA would not make Eramo available for comment, the Article describes Eramo's response to Jackie's report of her assault as neutral and calm as she laid out Jackie's various options under UVA's policy:

> When Jackie finished talking, Eramo comforted her, then calmly laid out her options. If Jackie wished, she could file a criminal complaint with police. Or, if Jackie preferred to keep the matter within the university, she had two choices. She could file a complaint with the school's Sexual Misconduct Board, to be decided in a "formal resolution" with a jury of students and faculty, and a dean as judge. Or Jackie could choose an "informal resolution," in which Jackie could simply face her attackers in Eramo's presence and tell them how she felt; Eramo could then issue a directive to the men, such as suggesting counseling. Eramo presented each option to Jackie neutrally, giving each equal weight. She assured Jackie there was no pressure—whatever happened next was entirely her choice.

(Article at RS001076.)  The Article quotes from the email that Eramo sent to Jackie after their initial meeting, underscoring that she would assist Jackie, if she wanted to report her assault: "Eramo e-mailed a follow-up note thanking Jackie for sharing, saying, 'I could tell that was very difficult for you,' and restating that while she respected Jackie's wish not to file a report, she'd

be happy to assist 'if you decide that you would like to hold these men accountable.'"  The

Article then notes, correctly, that no warning was issued to the campus about Jackie's

allegations.  (Article at RS001077.)

140.    At this point, the Article explains the controversy surrounding "victim choice":

"[l]ike many schools, UVA has taken to emphasizing that in matters of sexual assault, it caters to

victim choice," quoting Associate VP for Student Affairs Susan Davis in explaining that UVA

emphasizes choice to encourage students to come forward.  While this approach of leaving all

decisions to the victim "in theory … makes sense," I observe that the lack of guidance

concerning which course of action to take "can be counterproductive" to young, traumatized

college students.  The Article explains: "Setting aside for a moment the the absurdity of a school

offering to handle the investigation and adjudication of a felony sex crime—something Title IX

requires, but which *no* university on Earth is equipped to do—the sheer menu of choices, paired

with the reassurance that any choice is the right one, often has the end result of coddling the

victim into doing nothing."  (Article at RS001076.)

141.    My criticism of the "victim choice" approach was shared by other sources and

experts I consulted.  To support this, the Article includes a quote from Laura Dunn, of the

advocacy group SurvJustice, who explained: "This is an alarming trend that I'm seeing on

campuses…Schools are assigning people to victims who are pretending, or even thinking,

they're on the victim's side, when they're actually discouraging and silencing them.  Advocates

who survivors *love* are part of the system that is failing to address sexual violence."  (Article at

RS001076.)

142.    To be clear—and I believe the Article itself is quite clear—the Article does not

say, nor did I intend to suggest, that Nicole Eramo was *intentionally* "coddling" victims in a

scheme to discourage them from moving forward with their assaults.  Instead, I expressed my

opinion—which I continue to believe—that presenting a traumatized young victim with a menu

of equally-valid options may have the *effect* of victims not choosing any of the options, or

continuing to mull their options indefinitely.  That certainly appeared to be the case with Jackie,

as well as other victims at UVA who opted not to take any formal action.  It also explained why,

as I note in the Article, despite 38 students initially reporting a sexual assault during the 2013-

2014 school, only nine of those (less than 25 percent) chose to move forward with their claims in

any way.  *See* ¶ 103.  My opinion was also consistent with the updated guidance issued by the

Department of Education in April 2014, clarifying that schools may be required to investigate a

student's allegation even if the student expressly did not want to move forward.  *See* ¶ 66.  Alex

Pinkleton expressed a similar opinion when she told me that she thought Eramo should

encourage victims more explicitly to go to trial.  *See* ¶ 116, Ex. 15 at RS004466.

143.    The Article reports that following Jackie's initial meeting with Dean Eramo,

Eramo had "connected" Jackie with Emily Renda, who at the time was a fourth-year student

active in One Less, "a student-run sexual-assault education organization that doubles as a support

group."  It describes the initial meeting between Jackie and Emily and states that Emily invited

Jackie to a One Less meeting, where it is clear that this "sisterhood" of sexual assault victims is a

haven for Jackie "after feeling isolated for more than a year."  The Article reports that many One

Less members "had contacted Dean Eramo" who they laud as their "best advocate and den

mother," or, as Jackie describes, an "asset to the community."  (Article at RS001078.)

144.    But the Article notes that despite the apparently warm relationship between

administrators and students, only a small minority of students who revealed sexual assault

allegations to Eramo in the past year decided to move forward with any formal action.  I pointed

out that UVA does not publish statistics about how many students move forward with a complaint and the results of those actions, and I quoted President Sullivan's response that they did not see publication of such statistics as a "best practice."  I also included the explanation that Jackie told me—unequivocally, without prodding, and on two separate occasions—she received from Eramo, which is that "nobody wants to send their daughter to the rape school."  Eramo's quote was consistent with the quote from Susan Russell that I also used in the Article: "When a parent goes to the campus crime log, and they don't see sexual assault, they think the school is safe."  (Article at RS001076-1077.)

145.    The Article then places Jackie's report of her assault in a historical context and describes Liz Seccuro's gang rape at Phi Psi in the 1984 and the dismissive reaction she received from a UVA dean, Susan Russell's daughter's experience in 2002, when she was admonished that she could never speak publicly about the sexual misconduct proceedings, or face expulsion for violating the honor code (found to be a Clery Act violation), and "Stacy's" present day frustration with her experience before the Sexual Misconduct Code.  (Article at RS001077-1078.)  Yet, the Article also makes clear that UVA is making some "encouraging changes" in how they address sexual assaults on campus.  (Article at RS001074.)

146.    The Article goes on to describe Jackie's second meeting with Eramo in the spring of 2014, which Jackie had scheduled after being hit in the face with a bottle outside a bar in retaliation for speaking out about sexual assault issues.  The Article reports that during this meeting, Jackie told Eramo about two additional women who she had met with and who alleged that they, too, had been assaulted by multiple men at the Phi Kappa Psi house.  It notes that "neither woman was willing to talk to RS."  The Article states that "[a]s Jackie wrapped up her story, she was disappointed by Eramo's nonreaction.  She'd expected shock, disgust, horror."

The Article also reports that in this meeting, Jackie told Eramo that she "didn't feel ready to file a complaint"—and that Eramo understood and supported her in that decision.  (Article at RS001078.)

147.    These interactions set up what was, for me, the central question of the Article: What is a university's responsibility when it receives allegations, like Jackie's, of a sexual assault involving multiple men—much less allegations of multiple victims of gang rape at a single fraternity house—yet the victims do not feel ready to move forward with formal action?  I believed strongly that UVA should have undertaken its own internal investigation as soon as it received Jackie's initial account, and certainly once it received her additional allegation of multiple victims, notwithstanding Jackie's express desire not to take any action.  I also believed, as the Article reports in three different places,  that even without a willing victim, UVA should have issued a warning to the campus about allegations of gang rape at the Phi Kappa Psi house, which was continuing to host parties.  As I noted in the Article, my opinion was shared by experts to whom I described Jackie's case.  I quoted one of those experts, Laura Dunn, for her take: "The fact that they already had that first victim, they should have been taking action. … That school could really be sued."  (Article at RS001079.)

148.    Beyond the experts I consulted who shared my opinion, I was also aware of the then-ongoing controversy and litigation involving Johns Hopkins and its failure to provide any notice to the community about serious sexual assault allegations.  The Johns Hopkins situation necessarily informed my opinion that UVA should have notified the campus about Jackie's allegations.

149.    The Article reports that UVA initiated an investigation of Phi Kappa Psi in September 2014, within days after I visited the campus.  It quotes President Sullivan's

confirmation of the investigation, as well as Eramo's statement to Jackie and Alex Pinkleton that she had had learned "through the grapevine" that "all the boys involved have graduated." (Article at RS001079.)  The Article also quotes both the Phi Kappa Psi chapter president (Stephen Scipione) and the fraternity's national representative (Shawn Collinsworth) about the University's actions and the fraternity's response, noting that the fraternity had "no evidence to substantiate the alleged assaults."  *Id.*

150.    The Article closes by returning to Jackie, noting that although she "badly wants to muster the courage to file criminal charges or even a civil case," she's "paralyzed."  (Article at RS001079.)

**Post-Publication Interviews**

151.    The Article was published online on November 19, 2014, and quickly went viral. The day after the Article was published, Jackie texted me to tell me that she "thought the article was really great."  She said: "I'm still slightly overwhelmed but thank you for everything … I hope this will do a lot of good amidst all the insanity right now."  (A true and correct copy of Jackie's November 20, 2014 text to me is attached hereto as **Exhibit 44.**)

152.    Rolling Stone and I received an onslaught of requests for press appearances, and we began to set up a few interviews before the Thanksgiving holiday.  We turned down the vast majority of the interview requests. I did agree to appear on an episode of "DoubleX Gabfest," a podcast produced by *Slate*.  The *Slate* podcast interview was scheduled for 9 a.m. on Wednesday, November 26—the day before Thanksgiving— with the episode scheduled to air on Thanksgiving Day.  (A true and correct copy of an email exchange finalizing the logistics for my *Slate* interview is attached hereto as **Exhibit 45**.)  I also agreed to a live interview by Brian Lehrer on his eponymous WNYC radio show.  That interview was set for 10 a.m. on Wednesday,

November 26, just after my *Slate* interview.  (A true and correct copy of an email exchange confirming the logistics for my Brian Lehrer interview is attached hereto as **Exhibit 46**.)

153.    The *Slate* podcast was a conversation about my article with three hosts: Hanna Rosin, June Thomas, and Katy Waldman.   The podcast remains available on *Slate*'s website, where it includes a link to the *Rolling Stone* article.  (A true and correct copy of the web page for the November 27, 2014 episode of the *Slate* "DoubleX Gabfest," available at http://www.slate.com/articles/podcasts/doublex_gabfest/2014/11/the_double_x_gabfest_on_uva_frats_and_rape_in_rolling_stone_husbands_hurting.html, is attached hereto as **Exhibit 47.**  A true and correct copy of the the audio of this interview, which is available on the website, is attached hereto as **Exhibit 48**.)

154.    The *Slate* interview began with a recap of my Article, and then a discussion about my reporting process.  Nothing I said on the *Slate* podcast was based on any information other than my reporting for the published Article and my own opinions; I was simply summarizing and discussing my Article.  Obviously, a 17-minute podcast interview with three hosts offers far less room for exposition than a 9,000-word article.  Accordingly, when I referred to what UVA had or had not done in response to Jackie's allegations, it was my intent and understanding that the audience—including my hosts—understood this as a reference back to my Article, where I laid out my opinions and the basis for them in full (and which was linked from the show's website).

155.    During the *Slate* interview, I reiterated the opinions that I had expressed in the Article.  I expressed concern that UVA did not launch an investigation or warn the campus when Jackie first came to them with allegations of a violent gang rape, nor when she came to them a second time to reveal that she had learned of two other gang-rape victims at Phi Kappa Psi parties—instead, they deferred to Jackie's decision not to take any formal action.  When I said in

the interview that the "University did nothing" with Jackie's information or sought to "suppress" it, I was referencing the undisputed fact that UVA took no action to warn the campus that multiple allegations of rape had been made at the same fraternity.  I made clear that Jackie had not taken any of the various options presented by Eramo.  I also talked about what I found to be the campus culture of "extreme loyalty," where students were loath to speak ill of the University—and survivors tended to reinforce one another's choices not to take formal action, but instead to focus on mental health and activism.

156.     The interview was a candid, off-the-cuff conversation.  I answered the hosts' questions as best I could—but given that I was calling in and not actually present in the room, and that I was getting questions from multiple people, I did not always catch every question. Having read the Complaint in this action, I understand that Plaintiff is trying to suggest that I was intentionally trying to hide information from the hosts.  I was not—and I think that it is especially clear if one listens to the audio recording of my interview.  For example, the hosts pressed me on the identity of "Drew," the lifeguard who was Jackie's date.  In responding to these questions, I was trying to be protective of my source, Jackie.  I knew how fearful she was of "Drew" and did not feel comfortable discussing and speculating about him publicly, beyond what was in the Article, without first discussing the matter with her.

157.     Immediately after my *Slate* interview, I was called for my interview on the *Brian Lehrer Show* on WNYC.  Like the *Slate* hosts, Mr. Lehrer asked me about my Article, and we discussed what I had written.  Once again, I reiterated the opinions that I had expressed in the Article, and nothing I said in my interview with Mr. Lehrer was based on any information other than my reporting for the published Article and my own opinions.  And once again, because I was speaking candidly on a brief radio segment, it was my intent and understanding that the

audience understood my references to what UVA did or did not do in response to Jackie's allegations as shorthand for what was spelled out in the Article, where I laid out my opinions and the basis for them in full (which was linked from the show's website).  In this interview, I pointed out that UVA was not unique, and the issues it faced were "very typical of many colleges."  Eramo's name was never mentioned at any point during my interview with Mr. Lehrer.

158.    After my morning interviews on Wednesday, November 26, I called Jackie to check in.  Jackie told me that she was feeling good about the Article and thanked me repeatedly, telling me that the Article really represents her.  She also told me that UVA's Dean of Students office had asked her to make a public statement that she never disclosed information to Eramo about her assault, and that she told them she would not lie.

159.    Now that the Article had been published, and Jackie was feeling good about the public reaction, I asked her if she would finally reveal █████ name to me.  Given the intense media coverage of the piece, I wanted to know his name in case he came forward or was otherwise identified.  Jackie finally told me that the man's name was ███████, and when I asked her to spell the last name, she wondered out loud whether it was spelled "█████" or █████."  Jackie also told me that █████ had just shut down his Facebook profile, according to her friend Rachel Soltis.  (A true and correct copy of my notes of conversations with Jackie, Sara Surface, and Alex Pinkleton between November 26, 2014 and the early-morning hours of December 5, 2014 is attached hereto as **Exhibit 49**.)

160.    As indicated in my notes, I made a mental note that it was odd Jackie did not seem to know how to spell the last name of her assailant.  I understand that when the Columbia Journalism Review ("CJR") published its report on the Article months later, it quoted me as

saying "an alarm bell went off in my head," and then the Report proceeds to suggest that "[o]ver the next few days, worried about the integrity of her story" I investigated the name that Jackie gave me.  CJR's speculation that I was at that point "worried about the integrity" of the Article is false.  I never said anything to that effect to the CJR.  In fact, I remained entirely confident in Jackie and her story, but wondered whether Jackie might have given me a fake, generic name to throw me off because she still did not want to reveal the real name.  But I searched the name ████████████ in UVA's directory and found a listing for a current graduate student.  I decided to wait until after the Thanksgiving holiday to pursue the matter further.

## Criticism of the Article

161.     A series of articles in the *Washington Post* and elsewhere criticized the Article and started to raise questions about Jackie's story.  However, nothing that was initially reported caused me to question the substance of Jackie's story.  At this point in time I had such confidence in Jackie and the Article that in consultation with my editors at *Rolling Stone*, I began drafting a response piece describing how I reported the story, explaining why I found Jackie so credible and standing behind my reporting in the Article.  I began working on this piece December 2 and was still tweaking it on the evening of December 4.  *Rolling Stone* was planning to post the piece online the following morning, December 5.  (A copy of the last working draft of the response piece, as circulated at 7:44 p.m. on December 4, 2014, is attached as Exhibit 10 to the Woods Declaration.)  Because of what I learned later that night, this response piece was never published.

## "Our Worst  Nightmare"

162.     Late in the evening on December 4, I received a text from Jackie indicating that Phi Psi would be coming out with a statement the following day challenging the Article.  I called

Jackie back just after midnight.  (My notes of our conversation are set forth on the pages Bates-stamped RS014976-4977 of Exhibit 49.  A true and correct copy of my phone records covering this period of time is attached hereto as **Exhibit 50**.  The record of my call to Jackie's phone number ███████████) is reflected on the page Bates-stamped RS119849, at 12:29 a.m. on December 5.)

163.     It was during this post-midnight call with Jackie that I first developed doubts about her credibility as a source.  Jackie told me that she had always believed ████ was in Phi Psi, but her friends Sara and Alex were now thinking that he was in a different fraternity, ████████.  I told Jackie that I had found the name she gave me, and it belonged to a graduate student; I asked her to look him up with me online, and she gave me an evasive excuse that she did not have access to a computer.  I made her stay on the phone with me as I searched, and her answers to my questions became more and more confusing and contradictory.  By the end of our conversation, I believed that Jackie was not being truthful.  When I suggested she go to the police, Jackie cried and hung up the phone.

164.     After I hung up with Jackie, I immediately called Alex Pinkleton.  (The record of my call to Alex's phone number (█████████████) is reflected on the page Bates-stamped RS119849 of Ex. 50, at 12:56 and 12:57 a.m.)  Alex told me that Jackie had given the same name—████████████████—to Sara and her, and when they investigated that name they came up with a lifeguard in ████████ not Phi Psi.  Alex said that she and Sara subsequently confronted Jackie with an "ultimatum," telling her it was her last chance to tell them what was going on.  When I called Sara Surface the next morning for further confirmation, Sara told me that after initially denying that the man whose picture they had showed her (the lifeguard in █████████) was the right person, she then changed her mind and said it was.  Sara also told me that Jackie had

said she was confused because her friend Rachel Soltis had been "keeping tabs" on her assailant since their first year, and he was in Phi Psi—but the man that Alex and Sara had found was not. (Ex. 49 at RS014978.)

165.    Alex told me that based on their interactions over the past few days, she had come to the conclusion that Jackie was lying about her assault.  She told me that she still believed that Jackie "clearly went through something," and it was clear to her that Jackie had experienced "trauma" and PTSD."  Alex told me that she had believed Jackie and "never had a reason to question her"—but at this point, "hardly anything she said to you or said to me or said over the past year is working out at all."  Sara told me that: "It pains me to say that she's not credible because I don't think that's the case.  I think trauma has done something to the details."  (Ex. 49 at RS014978. )

166.    It was only now, at 1:22 a.m. following my call with Alex, that Alex finally sent me, at my request, the full names and Facebook profiles for Alex Stock and Kathryn Hendley, two of the former friends Jackie said she met that night.  (A true and correct copy of Alex Pinkleton's December 5, 2014 email providing me with the names and Facebook profiles for Alex Stock and Kathryn Hendley is attached hereto as **Exhibit 51**.)  This was the first time I learned the last names of these two individuals, and the first time I learned that Kathryn's name was not spelled "Catherine," as I had previously believed.

167.    As soon as I got off the phone, I immediately wrote an email to my editors at *Rolling Stone*, Sean Woods and Will Dana, telling them that I no longer found Jackie to be credible and that we needed to print a retraction of the Article.  I sent the email at 1:54 a.m. on December 5, 2014.  (A true and correct copy of my December 5, 2014 email exchange with Sean Woods and Will Dana including my 1:54 a.m. email is attached hereto as **Exhibit 52**.)

168.     The subject line of my email was "our worst nightmare," and that was true. Never in my 20-plus years as a journalist had I ever lost faith in a source's credibility after publication; never had I imagined having to retract an article as a result.  The experience of losing faith in Jackie's credibility was devastating and disorienting. I had been completely blindsided.  I felt shattered.

169.     Early the next morning, my editors began working on a retraction statement, which was published atop the story in the early afternoon on December 5.  The retraction was edited on December 6.  In this note, we made clear that we had published the Article firmly believing in its accuracy, but in the face of newly discovered discrepancies in Jackie's story, we no longer found her to be a credible source and were no longer standing behind information she had provided.

170.     Shortly thereafter, Rolling Stone retained the Columbia Journalism Review to conduct an independent review of the magazine's reporting and editing processes behind the Article.  I fully participated in this review and was interviewed by the Columbia Journalism Review in January 2015.

**<u>Why I Believed Jackie</u>**

171.     It appears that the centerpiece of Plaintiff's claims in this case is to argue that I believed all along that Jackie was an unreliable source, yet forged ahead anyway.  Nothing could be further from the truth.  I had complete faith in Jackie as a source.  Through our 20-plus hours of interviews over the course of several months, I found her to be forthright and credible.  Jackie was voluble and confident, and she gave detailed descriptions that were consistent over time. She would tell me when she didn't know something and correct others in my presence when they said something she believed to be inaccurate.  At no time prior to the morning of December 5 did

69

I have any doubts about Jackie's credibility or the accuracy of her story.

172.   As with any source, I considered Jackie's motives.  Jackie had no reason to lie about her assault, and had agreed to use her first name—demonstrating how strongly she stood behind the account.  She was not seeking retribution against ███ who she did not want named in the Article.  Jackie had spoken out about her assault on campus, and based upon my interviews with her close friends, once Jackie began to come to terms with her assault, she had told her friends the same story she was telling me.  *See, e.g.,* ¶¶ 26, 77, 95-98, 100-101.  Her credibility was also confirmed when I personally observed her have an emotional, traumatic reaction at the sight of the Phi Psi house.  I also knew, from my own research and writing on this issue, that false allegations of sexual assault are very rare.

173.   Most importantly, Jackie came to me with the imprimatur of UVA.  I was first introduced to Jackie by Emily Renda, who was a UVA employee at the time, and I knew that Eramo had put Emily in touch with Jackie.  I knew that Emily had included Jackie's story of gang-rape by multiple fraternity men, followed by unsupportive reactions from her peers, in public testimony before Congress.  Before I even spoke with Jackie, Emily had told me—while in the company of Nicole Eramo—that UVA knew of two additional women who had been gang-raped at Phi Kappa Psi with "similar stories" to Jackie, and that UVA administrators— including Eramo—were in the process of trying to bring them forward and assemble a case to get "punitive action" against the fraternity.  Jackie clearly indicated to me that she had told the same story I knew to Eramo in their initial meeting (*see* ¶ 41), and I confirmed from Jackie's emails with Eramo that as of their initial meeting, Eramo was aware that Jackie was reporting a sexual assault by multiple men, offering to assist her "if you decide you would like to hold *these men* accountable."  *See* ¶ 83, Ex. 26 (emphasis added).  I found this all to be highly corroborative of

70

Jackie's story.

174.    Then, by the fall, I knew from President Sullivan, Phi Psi and Jackie and Alex that UVA had called a representative of Phi Kappa Psi's national organization to campus concerning the allegations of multiple gang rapes—including Jackie's.  While UVA went out of their way to correct an inaccuracy in my description of "Stacy's" case, nobody from UVA ever raised a similar concern when I asked about "three separate allegations of gang rape against Phi Psi" that had been brought to Eramo's attention within the past year.  Both Jackie and Alex confirmed to me that Eramo told them she heard that "all the boys involved had graduated."  *See* ¶ 88, 90. Taken together, this information confirmed that UVA was (finally) acting on Jackie's allegations, which gave me further comfort in the accuracy of the story.

175.    Throughout our interviews, I double-checked Jackie's recollection of third-party quotes—even items that were not necessarily consequential to the story—and time and again, I found them to be accurate.  *See, e.g.,* ¶¶ 45-47, 90, 101.  I also confirmed with Annie Forest that she had told Jackie about Liz Seccuro's assault at Phi Psi, just as Jackie told me.  This bolstered my belief that Jackie was a credible source for conversations to which she was a party—and is a key reason why I did not doubt her recollection of the "rape school" comment by Eramo, Ryan's refusal to participate in the Article, and the comments she ascribed to her former friends from the night of her assault.

176.    I also obtained significant documentation that verified Jackie's story, particularly the events surrounding her reports to UVA.  And I consistently pressed her for even more documentation.  I followed up with her repeatedly, asking for emails, text messages, documents, and physical evidence like her dress from that night.  Jackie provided me with many of these items, all of which supported her account.  *See, e.g.,* ¶¶ 82, 84, 86, 130, 131.  I also obtained

71

confirmation from the Charlottesville Police that Jackie had, in fact, reported the bottle assault to police as occurring on the date and at the location she told me, and that she had a "laceration" on her face as a result of the attack.  *See* ¶ 42.

177.    The fact that Jackie was unable to provide me with every single item I requested did not make me question her credibility.   For example, while I was disappointed not to be able to speak with Jackie's mother, I had confirmed from her voicemail that I was calling the correct number, and I understood that she clearly did not want to speak with me.  Nor was it concerning to me that Jackie was unable to produce ██████████████████████████████████ ████████████████████████        I recognized that ███████████████████████████████ █████████████████████████████████████████████████████████ ██████████████        Ultimately, this detail was dropped from the story at Jackie's request—a request which I fully understood and found to be completely reasonable.

178.    In fact, over the course of my 20-plus hours interviewing Jackie, there was only one discrepancy that I discovered and was never able to resolve: Jackie had said her mother went to Brown, but from the social media profile I found it appeared that her mother had gone to Providence College.  I had intended to ask Jackie's mother about this if we were ever able to speak.  But to me, this was a minor detail that did not in any way rise to the level of a "red flag" about Jackie's credibility.  Both schools are in the same city, and I assumed the discrepancy could be attributed to classes taken at Brown, or Jackie's mother telling her that she had gone to a more prestigious school.

179.    I understand that the media in general, and UVA and Eramo in particular, have made much of the fact that Jackie's story apparently evolved over time, with her originally describing it as forcible oral rape by multiple men and then eventually describing the assault as

72

one of vaginal penetration by multiple men.  I knew from my interview with Rachel Soltis that

early in the second semester of their freshman year, Jackie had initially described her assault as

oral rape by multiple men, and that she had told Rachel the "whole story" later that year.  The

evolution of Jackie's story was completely consistent with other victims of sexual assault and

trauma I have interviewed throughout my career—including women I interviewed for this

Article, who told me about slowly learning how to describe what had happened to them over

time—and I knew from research that an evolution of this sort is common and well-documented

in rape victims.  I firmly believed that Jackie reported a "gang rape" at Phi Kappa Psi by multiple

men, and also alerting the school that she knew of at least two other women with similar stories

over the past few years, based on my interviews with Jackie.  Indeed, neither President Sullivan

nor any other UVA representative corrected my characterization that it was a "gang rape," and

that was the term used by Emily Renda in her Congressional testimony.

180.   I also believed that I had tried diligently to contact the three friends—Ryan, Alex,

and Catherine—but by mid-September, after my visit to UVA, I was convinced I had hit a wall

on this lead.  I had asked Jackie repeatedly to put me in touch with Ryan, believing him to be by

far the most likely of the three to cooperate with me, and I fully believed her when she related

Ryan's vehement refusal to participating.  And if Ryan was this antagonistic to the idea of an

interview, I believed the door to the others would be closed as well.  I had tried unsuccessfully to

find them myself on social media, and I had also tried to get names from Alex Pinkleton—which

she refused to provide without Jackie's permission. After exhausting these leads, and with no

more to go on than three common first names (one of which was apparently misspelled) on a

campus of over 15,000 undergraduates, I believed wholeheartedly that I could not locate them

without the help of Jackie and her friends, who would not provide their names.  While I was

unable to speak to the three friends, I did independently confirm they existed and confirmed the description of "Cindy."

181.    I understand that the Columbia Journalism Review has quoted me as saying that "in retrospect, I wish somebody had pushed me harder" to reach out to the friends, and that I did not "press the issue" as a result.  I regret that quote, which was not an accurate reflection of my own efforts to reach the friends or my state of mind at the time of publication.  At the time, I truly believed that I had exhausted every lead available to find these individuals, and I also believed I had received an unequivocal denial of participation from the friend most likely to cooperate, Ryan.  What I meant to communicate to CJR is my regret, in retrospect, that my editors and I went forward with the Article's description of the friends without having been able to reach them.  I wish I had reduced the friends' role in the Article as a result of not being able to reach them, perhaps subsuming them into a more general collection of unsupportive peers rather than calling them out specifically.  Also, in hindsight, knowing how consequential interviews with the three friends might have been, I regret not being able to reach them.

182.    I also believed that I had hit a wall in my attempts to find out ███ name.  As I explain above, I had tried without success to find him on my own, and Jackie was adamantly refusing to provide his name.  *See ¶¶* 116-125.  Because Alex and Sara were also fighting me on getting his name, I understood that the friends had closed ranks.  (After publication, I learned that my understanding was correct—Jackie had apparently reached out to friends, including Rachel Soltis, instructing them not to give me ███ name and saying I was on a "witch hunt.")

183.    Ultimately, my editors and I made a call that the story could move forward without comment because "Drew" was not identified by name, and the fraternity was quoted in the piece prominently contesting the allegations on his behalf.  At no point prior to the early

morning hours of December 5 did it ever occur to me that ▓ might not be a real person, or that he might not be in Phi Psi.  To the contrary, I had every indication that Jackie was deeply traumatized by the very existence of this individual, and that she was afraid of retribution from him and from his fraternity.  I also knew that at least one of Jackie's friends was keeping tabs on him on social media, suggesting that others knew who he was even if they would not tell me.

184.     In sum, on the eve of publication, and until my devastating conversation with Jackie in the early-morning hours of December 5, I was completely confident in the accuracy of my story and believed that it was solidly sourced.  There was nothing that I felt I didn't know, and needed to know, in order to stand behind the Article.

**No Reason to Doubt Accuracy of Information about Eramo**

185.     In particular, I had no reason to doubt the accuracy of anything I said about Eramo in the Article.  Based upon my interviews with Jackie, the emails I reviewed, my interview with President Sullivan and Emily Renda's testimony, I was confident that UVA had the same story from Jackie that I did.

186.     I also had absolutely no reason to doubt information sourced from Jackie about her interactions with Eramo.  As the Article makes clear, Jackie plainly loved Eramo and held her in high regard; accordingly, there was no reason to think that Jackie might say things about her that were false and negative.  In particular, I had no reason to doubt the "rape school" comment.  *See* ¶¶ 44, 71.

187.     I believe that I painted a tough but nuanced picture of Eramo and the UVA administration as a whole in the Article.  At no time did I set out to make Eramo the "villain," as she alleges; nor did I think the Article portrays her as a "villain."  I made clear throughout the Article that students loved her—that they considered her a "den mother," an advocate, and—as

Jackie described her—"an asset to the community." I did not believe Eramo had any malicious intent in fostering warm relationships with these students, nor do I believe the Article ascribes any to her. But I firmly believed that UVA's approach of prioritizing the agency and comfort of victims—an approach followed by many other schools, as I noted in the Article—had the *result*, if not the *intent*, that many victims would not choose to take the difficult step of moving forward with formal action. My opinion was shared by experts I consulted and quoted in the Article, as well as some of the women I had interviewed (including Alex Pinkleton, *see ¶* 116), and it was borne out by the statistics shared by UVA, showing that less than 25 percent of students who reported an assault to Eramo in the past year had decided to move forward with a hearing. I also strongly believed that UVA should have warned the campus, or at least more thoroughly investigated her allegations, upon receiving them—even if Jackie did not want to pursue any action. Again, my opinion was shared by experts I consulted and quoted in the Article. From what I could tell, no such investigation started until September 2014, 18 months after the original report and 5 months after the second report—and that investigation appeared to consist entirely of reaching out to national representatives of the fraternity in anticipation of my Article.

**The Statements at Issue from the Article**

188.    I understand that Eramo has challenged five statements from the Article in this action, which are set out in the Appendix to the Brief in Support of Summary Judgment. I will address each statement in turn.

*Statement #1*

189.    This Statement is known as the "dek" of the Article, which appears just below the title. A "dek" is a one- or two-sentence lead-in that introduces the reader to the story. It is not a substitute for the story, and must be read in the context of the Article as a whole. Here, the

76

reference to "a whole new kind of abuse" is a generalized statement capturing all of the difficulties Jackie faced in the aftermath of her horrific assault, as described in the Article. This includes, but is not limited to, the negative reactions of Jackie's friends on the night of her assault; the emotional trauma and depression she experienced in the aftermath of her assault, and the lack of support she felt from UVA's mental health services; the pushback she received from peers and family about participating in this Article; the confusion and anxiety she experienced when she learned that Phi Kappa Psi had been contacted without her knowledge, her persistent fear of retaliation; and the turmoil she felt over whether and how to proceed with taking action against her assailants. In particular, I understood the "abuse" to reference the bottle that was thrown at her head by men who she believed to be fraternity brothers. Since Jackie refused to pursue a criminal complaint or an administrative proceeding, as the Article makes clear, the only way she "tried to hold [her assailants] accountable" was by speaking out at Take Back the Night and through her activism. Thus, I saw the "abuse" directly tied to the bottle incident. I had no intent to suggest that Eramo was "abusing" Jackie. In fact, this statement has no connection to Eramo—who, contrary to an "abuser," is repeatedly described in the Article as a beloved, motherly figure. I had no doubt about the accuracy of this information when the Article was published.

### *Statement #2*

190.    Statement #2 is found in the second section of the Article, beginning on the page Bates-stamped RS001072. The paragraph in which it appears discusses Jackie's concerns about "what might happen to her once this article comes out," and notes that "[o]n this deeply loyal campus, even some of Jackie's closest friends see her going public as tantamount to betrayal." In the context of this paragraph, it is clear that— as I intended—the reference to Eramo

"discourag[ing]" Jackie from sharing her story refers specifically to the pressure that Jackie was receiving not to participate or appear by name *in this Article*. Jackie specifically told me that she was receiving pushback from the Dean of Students office, and Eramo in particular, about her participation in the Article. *See* ¶ 129. Alex Pinkleton confirmed this. *See* ¶ 121, Ex. 37. In the context of the paragraph in which the "discouraged" language appears, it can only reasonably be read to mean discouraged Jackie from "going public" in the Article. Elsewhere, far from "discouraged," the Article make clear that Eramo would be "happy to assist" if Jackie wanted to hold the men accountable.

   *Statement #3*

   191.    I understand that Eramo disputes that she told Jackie that "nobody wants to send their daughter to the rape school." As I have explained above, Jackie provided me with this quote on two separate occasions. *See* ¶¶ 44, 71. In both instances, Jackie volunteered this quote without any prompting from me, and I understand that she also volunteered it to Liz Garber-Paul during their fact-checking conversations. In addition to my notes and my own recollection, I have submitted the audio recording of our September 11 interview which captures Jackie's words. I had otherwise found Jackie to be a reliable witness to statements by third parties in her presence, and I had no reason to believe she had any ill-motive in supplying this quote to me, since she clearly loved and respected Eramo. And the factual underpinnings to the quote were well-established. Rape statistics were hard to find, as UVA confirmed. As Susan Russell observed, the difficulty could be ascribed to the fact parents "think the school is safe" when they do not see sexual assaults on the public crime logs. At the time the Article was published, I fully believed that to be an accurate quote from Eramo, and I had no reason to doubt it.

### Statement #4

192.    Eramo challenges the Article's description of Jackie's meeting with her in the spring of 2014.  (While the Article states that the meeting was in "May 2014," the meeting in question actually occurred in late April of 2014.  I regret the error, but I do not believe that is the basis of Eramo's challenge to this passage.)  It appears that Eramo is not challenging the bulk of this passage, and instead focuses specifically on the statement that "As Jackie wrapped up her story, she was disappointed by Eramo's nonreaction.  She'd expected shock, disgust, horror."  I did not intend the word "nonreaction" to refer to anything other than Eramo's immediate emotional response to Jackie's story.  As I believe is clear from the context—describing the reaction Jackie was expecting to receive—the "nonreaction" I was referring to is specifically the fact that Eramo maintained a neutral, calm demeanor when listening to Jackie's story, and did not have an emotional outburst.  Jackie had specifically described Eramo's reaction during that meeting as "not as shocked as you might think," *see* ¶ 43, and this was not surprising to me: I expected that Eramo, as a trained professional who heard horrific stories from students as a daily part of her job, would maintain her composure when listening to a student.  I had no reason to believe this statement was false—nor do I understand Eramo to be alleging that she did, in fact, have an emotional outburst in front of Jackie during their spring 2014 meeting.  At the time the Article was published, I firmly believed this Statement to be accurate and did not believe or intend it to refer to anything other than the look on Eramo's face.

### Statement #5

193.    I note that Eramo has fixated on a single word in this statement: "action."  Here, I understand that Eramo is claiming suggest UVA took "no action" whatsoever when I noted that the experts I consulted "agreed that despite the absence of an official report, Jackie's passing

along two other allegations should compel the school to take action out of regard for campus safety." First, this statement does not refer solely or even specifically to Eramo; I was criticizing the UVA administration as a whole for failing to issue a warning to the campus, or to initiate its own investigation of Jackie's claims out of concern for the safety of the campus as a whole. I assumed, as at any other school, that such decisions would be discussed and resolved made among numerous senior administrators, including potentially the University President. Second, it is clear both in this paragraph and throughout the Article that the "action" I believe UVA should have taken is to issue a warning to campus, or at least to override Jackie's desire not to move forward and conduct its own investigation in the interest of campus safety. The basis for my opinion is clearly laid out in the Article, and it is shared by other experts who I quote in the Article. All the facts I relied upon for this opinion are revealed and are indisputedly accurate.

194. Further, the Article makes clear that Eramo did take actions and offered to "assist" Jackie if she elected to pursue proceedings. The Article shows Eramo offer Jackie counseling and providing Jackie with a host of options. Yet, Jackie repeatedly told Eramo that she did not feel ready to take any of them.

195. In the course of this litigation, I have learned that Eramo contends she took Jackie to meet with police about her sexual assault at the same time that Jackie reported the bottle assault on the Corner. I had no knowledge that Jackie ever told police about her sexual assault, nor any knowledge that Eramo had arranged any meeting for Jackie to speak with police about her sexual assault. Based upon my interviews with Jackie, the emails between Jackie and Eramo that I reviewed, and the record I obtained from the Charlottesville Police, I understood that Jackie had met with police *solely* to discuss the felony assault on the Corner in April 2014, and not her sexual assault in September 2012. Indeed, the emails *only* discuss the incident at the

Corner and, if a report of her sexual assault had been made to the police, I cannot fathom why the record I received from the Charlottesville Police would *only* reference the physical assault on the Corner.

**Post-Publication Statements at Issue**

196.    I also understand that in this litigation, Eramo is challenging statements that I made during my interviews with *Slate* and Brian Lehrer.  As I explained more fully above, these were short, unscripted, candid interviews where I was speaking generally about the issues I had treated at length and in detail in the Article itself.  I understood that the audience and hosts would take my comments in the context of the larger Article that I had worked on for over six months and which was linked on the web pages for each show.  I will address these in turn.

*Statement #6 (Brian Lehrer Show)*

197.    As in the Article, Eramo takes issue with statement that the UVA "did nothing" in response to Jackie's allegations.  First, as noted above, I do not believe that Eramo is synonymous with the UVA administration, nor did I intend to convey that.  Nor did I believe that she had sole, unilateral authority to issue a campus warning or commence an investigation.  Accordingly, I do not believe this statement specifically references Eramo.

198.    Second, as I explained above, when I said that the school took "no action" in response to Jackie's allegations, I was specifically referring to the issue I identified reportedly in the Article: that UVA did not issue a warning to the campus or undertake a prompt investigation in consideration for public safety, notwithstanding Jackie's wishes.  I believed that UVA should have done so, and experts that I consulted and quoted in the Article shared my opinion.  My description of Jackie being "brushed off" by her friends and the administration is simply a restatement of the same opinion: that the University did not do enough in response to Jackie's

report.  Indeed, the Article uses the phrase "brushed off" to refer to the reaction of other students, not Eramo.  (Article at RS001078.)

### *Statements #7-11 (Slate DoubleX Gabfest)*

199.    I understand that Eramo has challenged various statements that I made during my interview on the *Slate* podcast.  In all of these statements, I was expressing my opinion—as set forth more fully in the Article—that UVA did not do enough in response to Jackie's report. When I said that UVA "did nothing" or "suppressed" her allegations, I was referring, again, to my belief that UVA should have warned the campus or at least undertaken a prompt investigation of her allegations, notwithstanding Jackie's reluctance to report.

200.    Similarly, when I said that I believed Jackie was "discouraged" from moving forward, I was expressing my opinion based concerning the net effect of scrupulously following "victim choice," and I explain in the Article.  I was not saying that Eramo intentionally prevented her from moving forward.  As I laid out in the Article, Eramo provided Jackie and other survivors with emotional support, and they loved and trusted her.  I also made clear that Eramo provided them with all their various options for moving forward, including filing claims with the police or UVA—and yet few did.   The fact that Jackie did not pursue her claim, and so few victims moved forward with formal action, suggested to me that leaving the "choice" to the student had the end result of students often not moving forward.

### *Statement #12 (Washington Post)*

201.    I understand that Eramo has also challenged a quote attributed to me in the *Washington Post*.  The quote in question was excerpted from a longer email that I sent to Paul Farhi, the author of the piece, on November 30, 2014.  (Attached hereto as **Exhibit 53** is a true and correct copy of my email exchange with Mr. Farhi in which he sought comment for his

December 1, 2014 article.)  In my email, I explained to Mr. Farhi that he had incorrectly stated in a previous Article that I had an "agreement" with Jackie concerning identifying her assailant. I had no such agreement.  I also told Mr. Farhi that in his focus on the details of Jackie's story—basically, on whether I could "prove" that she had been raped in exactly the way she said she was—he was missing the point of my story, which was about the way Jackie's school and community reacted to her allegations.  When I said that the UVA administration "chose not to act on her allegations in any way" and responded with "indifference," I was referring, again, to my repeated observations in the Article—reiterating that I did not believe UVA did enough in response to Jackie's allegations because it did not warn the campus and did not promptly investigate her allegations on its own, deferring instead to Jackie's wishes about whether to move forward.  Based on the statistics I reviewed and the survivors I spoke with, I did not believe that UVA fostered a culture where students were encouraged and urged to move forward with formal hearings.  I understand that Eramo may disagree with my opinion, as well as the opinions of multiple survivors I interviewed who were unhappy with the University's response to their own allegations or experts I consulted concerning what UVA should have done.  In response, Farhi said he agreed with me that "the indifference of UVA's administration to this very serious charge IS appalling and indefensible."

### Statement #13 (Rolling Stone Press Statement)

202.    Finally, I understand that Eramo is challenging the press statement that *Rolling Stone* released on December 2, 2014.  While I did not draft this statement, I consider it, like the other post-publication statements, to be a restatement of my opinion as expressed in the Article: that UVA did not do enough in response to Jackie's allegations because it did not warn the campus or conduct its own investigation in response to her allegations.  The statement describes

Jackie's experience as an "ordeal" because as Jackie explained it to me, she still felt "paralyzed," unable to decide what she wanted to do.

203.    As the statement makes clear, as of December 2, 2014, Rolling Stone and I had full confidence in Jackie as a source, and we did not in any way believe that she was not credible.  As I explained at length above, the conversation in which I lost faith in Jackie as a source occurred in the early morning hours of December 5—nearly three days later.

This Declaration was executed on June 30, 2016 in Philadelphia, Pennsylvania.  I declare under penalty of perjury under the laws of the United States of America and the State of Pennsylvania that the foregoing is true and correct.

SABRINA RUBIN ERDELY

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 1, 2016, the foregoing was served by CM/ECF on counsel of record for all parties to this action.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Elizabeth A. McNamara
Elizabeth A. McNamara