**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| **NICOLE P. ERAMO** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | )    **Case No. 3:15-cv-00023-GEC** |
| | ) |
| **ROLLING STONE LLC,** | ) |
| **SABRINA RUBIN ERDELY, and** | ) |
| **WENNER MEDIA LLC,** | ) |
| | ) |
| **Defendants.** | ) |

**COUNTER-STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Nicole P. Eramo, through her undersigned counsel, respectfully submits this Counter-Statement of Material Facts in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

**I.**     **Before Setting Out To Write "A Rape on Campus," Erdely Had A History Of Writing About Rape And Institutional Indifference To Rape.**

1.     During her tenure as a journalist, Erdely has written many articles accusing various institutions of being indifferent to — or covering up — allegations of rape. Indeed, Erdely's articles about rape have a common thread in that they identify some vulnerable victim of sexual abuse and an indifferent institution to whom the victim reports her assault.

2.     In April 1996, Erdely authored "Intimate Intimidation," an article published in *Philadelphia Magazine*. (May 12, 2016 Deposition of Sabrina Rubin Erdely at 44:10-13 ("Erdely Dep.") (Ex. 1); Sabrina Rubin Erdely, "Intimate Intimidation," Philadelphia Magazine (April 1996) ("Intimate Intimidation") (Ex. 2).) Much like "A Rape On Campus," "Intimate

Intimidation" begins with a horrifying narrative of a woman being sexually assaulted. Rather than the assault occurring by fraternity members at UVA, Gail Greeby, the protagonist of the article, was assaulted by her gynecologist. Erdely's article goes on to accuse the medical profession, and in particular various state medical boards, of failing to stop the alleged perpetrator. According to Erdely, on the day of Greeby's assault "she became a victim not only of [the doctor], … but of a medical board that ignored her complaint and of a justice system that didn't believe her voice alone was enough." (Intimate Intimidation at 85.)

3.     In November 2008, Erdely authored an article "The Crime Against Women That No One Understands," which was published in *Self Magazine*. (Erdely Dep. at 44:14-17 (Ex. 1); Sabrina Rubin Erdely, "The Crime Against Women That No One Understands," Self Magazine (Nov. 2008) ("The Crime Against Women") (Ex. 3).) Just as in "Intimate Intimidation," Erdely begins the article with a graphic narrative of an alleged rape. According to Erdely, "Leigh," the alleged victim, claims she was date-raped by a man she met on a popular internet dating website after their first in-person date. (The Crime Against Women at 190.) As in so many of her articles, Erdely blames another institution—this time the "criminal justice system" and "juries"—for not understanding the nature of "nonstranger rape." Erdely wrote that "[n]ationwide, despite all the legal advances of the past three decades, little has changed for women who report a date rape. Because in far too many instances, juries don't believe date rape exists." (*Id*. at 191.) Erdely went on to write that "[t]o a juror, a rapist is a guy who jumps out of the bushes and throws a woman to the ground …. She has terrible injuries, and she leaps up and reports it immediately to the police. Anything that falls short of that story is questionable." (*Id*. (quoting a director of a women's rape advocacy group)). Finally, Erdely criticized the criminal

justice system because, according to Erdely, "[t]rials often hinge not on the behavior of the defendant, but rather on whether the woman did enough to protect herself." (*Id*. at 194.)

4.    In *Rolling Stone's* January 22, 2009 edition, Erdely authored an article titled "Sex, Lies and Phys Ed," about a star high school athlete who engaged in a sexual relationship with his young female physical education teacher.  (Erdely Dep. at 44:18-21 (Ex. 1); Sabrina Rubin Erdely, "Sex, Lies, and Phys Ed," Rolling Stone Magazine (Jan. 22, 2009) ("Phys Ed") (Ex. 4).) In the article, Erdely took aim at the alleged disparity of treatment between male and female sexual assault victims — and the high school's and the media's alleged indifference to when a young female high school teacher engages in an inappropriate relationship with a high school boy.  According to Erdely, "[g]iven such salacious details [about such an affair], the media tend to treat these cases as entertainment — at least, that is, when the teacher is a woman."  (Phys Ed at 61.)  Erdely went on to proclaim that when you "[b]lur the lines between teachers and students, [] it creates a backdrop that's part *Penthouse* Forum, part *Melrose Place* — a reflection of a broader cultural shift, in which a boy who has sex with his teacher is viewed not as a survivor of sexual abuse, but as the luckiest kid in the 10th grade.  Why treat a woman like a criminal, after all, when all she did was give some randy teen the best night of his life?" (*Id*. at 61-62.)  Finally, to emphasize her thesis that the high school was indifferent to this alleged sexual assault, Erdely writes that "[w]hen the [high school athlete] confessed the affair to the school police office, the cop high-fived him, then promised not to tell." (*Id*. at 62.)

5.    In 2011, Erdely wrote a story for *Rolling Stone* in which she claimed that an altar boy, pseudonymously called "Billy Doe," was raped by two Catholic priests and a Catholic schoolteacher in Philadelphia, and that these crimes were covered up by the Catholic church. (Erdely Dep. at 44:22-25 (Ex. 1); Sabrina Rubin Erdely, "The Catholic Church's Sex-Crime

3

Files: How a scandal in Philadelphia exposed documents that reveal a high-level conspiracy to cover up decades of sexual abuse," Rolling Stone Magazine (Sept. 15, 2011) ("Sex-Crime Files") (Ex. 5).) The article accused the Catholic church of "the cover-up of sexual abuse," which Erdely explained was because "the mindset of the church's rigid hierarchy, which promotes officials who are willing to do virtually anything they're told, so long as it's in God's name." (Sex-Crime Files at 65.)

6.      In 2013, Erdely wrote — and *Rolling Stone* published — an article called "The Rape of Petty Officer Blumer: Inside the military's culture of sex abuse, denial and cover-up." (Erdely Dep. at 42:25-43:7 (Ex. 1); Sabrina Rubin Erdely, "The Rape of Petty Officer Blumer: Inside the military's culture of sex abuse, denial and cover-up," Rolling Stone Magazine (Feb. 14, 2013) ("Rape of Petty Officer Blumer") (Ex. 6).) The article centered on the story of a female naval officer who was arrested for drunk driving and subsequently claimed that she had been drugged and sexually assaulted. In the article, Erdely implied that Navy officials tried to dissuade the officer from reporting her alleged rape and did little to investigate her claims. Erdely suggested in her article that the military was indifferent to this officer's claim of rape and engaged in an effort to cover it up. (Rape of Petty Officer Blumer.)

## II.     Before Interviewing The First UVA Source, Erdely Sets Out To Write An Article About Institutional Indifference To Rape On A College Campus.

7.      Ex. 7 is the "pitch" for the article that became "A Rape on Campus," which Erdely wrote in the winter or spring of 2014 and presented to Deputy Managing Editor Sean Woods. ("A Rape on Campus" Pitch, RS020610-11 ("Pitch") (Ex. 7); Apr. 27, 2016 Deposition of Sean Woods at 20:3-15 ("Woods Dep.") (Ex. 8); Erdely Dep. at 14:8-18 (Ex. 1).)

8.      In her pitch, Erdely wrote about looking at how "administrations" have "turned a blind eye" to sexual assault. (Pitch at RS020610.)

4

9.     Erdely wrote about how universities had shown "institutional indifference" to the problem of sexual assault on campus.  (*Id.*)

10.     She wrote that she would explore how Yale — her original target campus for the article — "deliberately shields those who commit rape from the consequences."  (*Id.*)

11.     Erdely wrote, "I'd like to examine sexual assault on college campuses: The various ways colleges have resisted involvement, and … juke their stats to make their campuses appear safer than they are; how they may now be scrambling to clamp down (or sidestep liability) …. As the story's main thread I'll focus on a sexual assault case on one particularly fraught campus — possibly at Yale, though the field is wide — following it as it makes its way through university procedure to its resolution, or lack thereof."  (*Id.* at RS020610-11.)

12.     In a June 6, 2014 email to a potential source regarding what would become the article, Erdely told the source that the article would "revolve around a survivor's experience dealing with rape and its aftermath," and "the way such cases are perceived and handled."  (June 6, 2014 Email from Sabrina Rubin Erdley to Source, RS016980 (Ex. 9).)  Erdely then said, "I did a similar article last year about rape in the military," and included a hyperlink to her February 2013 article "The Rape of Petty Officer Blumer: Inside the military's culture of sexual abuse, denial and cover-up."  (*Id.*)  As set forth above, that article was about the alleged sexual assault of a Navy officer, and it claimed that the military failed to investigate her rape and attempted to cover it up.  (Rape of Petty Officer Blumer (Ex. 6); Erdely Dep. at 42:25-43:12 (Ex. 1).)

13.     Similarly, Erdely told source David Lisak on June 1, 2014 that her intention was to take "an immersive look at what is going on in college campuses with respect to sexual assault; in much the same way that I wrote last year about the problem of military sexual assault, teasing out the issues of how and why, and how the issue of culture and climate helped to feed

into this **culture … of inaction**."[1]  (Sabrina Rubin Erdely Reporting Notes, RS004072-502, at RS004099 ("Erdely Reporting Notes") (Ex. 10); Erdely Dep. at 25:22-27:2 (Ex. 1).)

14.    In July 2014, before she had ever even interviewed Jackie, Erdely told Emily Renda, a sexual assault advocate at UVA, that she planned to write about "the cultural issues that are sort of in the air and feeds into the problem of rape, and **institutional indifference**."  (Erdely Dep. at 28:17-29:20.)

15.    Similarly, Erdely told source Alex Pinkleton on August 4, 2014, "[T]he story I'm working on is one that not only captures hopefully what it's like to survive a sexual assault on campus, and how that plays out, but also a picture of what it's like to be on campus now, what the environment is like, where not only is rape so prevalent but also there's this pervasive hostile culture, i.e., rape culture.  And to demonstrate what we're talking about when we talk about rape culture, that whole tangle of issues that seem to be present: drinking, hookup culture, gender roles, sexuality, language around consent, [and] **institutional indifference**."  (Erdely Reporting Notes at RS004256 (Ex. 10).)

### III.    Erdely Set Out To Portray Ms. Eramo As A Callous Administrator Who Was Indifferent To Rape Even Though Erdely Is Told Repeatedly That Ms. Eramo Is Passionate About Seeking Justice For Rape Survivors.

16.    Erdely admitted numerous times throughout her reporting that she understood that Ms. Eramo is beloved by survivors.  For example, during her interview with UVA President Theresa Sullivan, Erdely said, "now I have to say all the students I've talked to, these girls love Dean Eramo. … They think she's the greatest person ever.  They think of her as a friend and a confidant."  (*Id*. at RS004450.)

---

[1] Emphasis added unless otherwise specified.

17.     Emily Renda, an activist in UVA's sexual assault survivor community, told Erdely that Ms. Eramo was her "favorite human being on the planet," for whom she "ha[s] so much respect" and "appreciate[ion]."  (*Id*. at RS004335.)

18.     Two fraternity brothers at UVA who were also active in the sexual assault advocacy community also spoke highly of Ms. Eramo, with Erdely writing in her notes of the conversation that they went "out of their way to tell me how impressed they are with Dean Eramo, like everyone else."  (*Id*. at RS004373.)

19.     Even Jackie repeatedly praised Ms. Eramo to Erdely, telling Erdely, "I love her.  I think she's fantastic."  (*Id*. at RS004165.)

20.     During a September 2014 dinner interview with Jackie and a then-friend of Jackie's, Jackie told Erdely, "we love Dean Eramo," and Erdely responded, "I get that, and I'm getting that from everybody.  Everybody loves her."  (*Id*. at RS004381.)

21.     As early as July 2014, during one of the first interviews Erdely conducted with a UVA source, Emily Renda told Erdely with respect to Jackie's allegations that Ms. Eramo was "passionate" about seeing justice for Jackie, and that Ms. Eramo and the Dean of Students Office was working to investigate Jackie's allegations to pursue ongoing action against Phi Kappa Psi. (Mar. 18, 2016 Deposition of Emily Renda at 79:9-80:17; 176:17-178:7 ("Renda Dep.") (Ex. 11).)

22.     But one of Erdely's sources, a campus sexual assault advocate and then-friend of Jackie's named Alex Pinkleton, testified that Erdely repeatedly attempted to blame Ms. Eramo for the fact that Jackie had not pursued a formal sexual misconduct complaint or sought a hearing through the University, even though Jackie had never stated that she wanted to pursue a formal complaint.  (Mar. 18, 2016 Deposition of Alex Pinkleton at 140:6-141:10 ("Pinkleton Dep.")

(Ex. 12).)  Pinkleton further testified, "[Erdely's] point of view was that the main issue Jackie was having with getting her case to go anywhere was the administration, and she came in thinking that; and then even after Jackie and we – and Sara and I had said we didn't think that was the case in regards to Dean Eramo, [Erdely] kept saying that."  (*Id*. at 144:4-21.)

23.     Pinkleton further testified that Erdely "manipulate[d]" her, by claiming she wanted to examine how sexual assaults were handled at UVA, when really "she was looking for evidence specifically that fit into her story from the beginning, so she just pulled at everything that I said that could be taken as evidence that the administration was to blame…. But I think it was pretty clear to everyone else that what she really was going after in the article and in our conversations where she's very aggressive towards wanting information about [the] administration, that that was her scapegoat."  (*Id*. at 184:20-187:12.)

24.     Pinkleton further testified that Erdely constantly attempted to bait her into saying something negative about Ms. Eramo: "I think its more of like the subtle – more of like subtle instances throughout the process of where I repeated, you know, multiple times, 'I stand with Dean Eramo, this is what I think about her, et cetera, et cetera; and then she comes with me over, like, months of talking to her and keeps saying, well, this is what I see, and this is what Jackie's telling me, like, leading questions too…."  (*Id*. at 189:23-190:17.)

25.     Regarding her interviews with Erdely, Pinkleton testified, "The questioning is like a never-ending game of twenty questions and it is a rigged game at that.  Because, as was in Sabrina's case, there was already a pre-formed storyline and other stories were going to have to adhere to it.  The storyline was such that, (1), there would be – there would need to be a perfectly innocent victim and a monstrous perpetrator to have in the story; (2), there would be no support

8

or advocacy on [campus]; and (3), Dean Eramo would be the scapegoat for [the] administration."
(*Id*. at 191:15-193:23.)

26.     Pinkleton further testified, "I have reason to be suspicious of the tone and kind of the conclusions being drawn as [Erdely's] writing this up, just from past history of being put into an article as, like, a third-year bimbo, given that we had all of these conversations about a very serious topic in which I was an advocate and not just a random third year…. I don't really trust anything that [Erdely] says."  (*Id*. at 103:25-104:21.)

27.     Pinkleton testified that she was "lied to" by Erdely.  (*Id*. at 117:23-118:15.)

28.     Sara Surface, another student and prominent campus advocate source that Erdely interviewed, testified that Erdely was "out to get [Eramo]," and that Erdely told Surface that Erdely hoped to see Ms. Eramo get fired.  (Mar. 23, 2016 Deposition of Sara Surface at 59:11-60:12 ("Surface Dep.") (Ex. 13).)

29.     Surface felt that "[Erdely] wasn't accurately portraying Dean Eramo and a lot of the work of the administration and campus activists correctly."  (*Id*. at 118:18-119:18.)

30.     The two main concerns Surface expressed to Erdely were "the portrayal of Dean Eramo and the use of Jackie's name."  (*Id*. at 76:19-24.)

31.     Surface testified that she, Alex, and Jackie all "believed that Dean Eramo was not going to be portrayed as helping Jackie or of having done everything she could do for [Jackie]," that Jackie disagreed with this characterization, and that Jackie, Alex, and Sara all tried to make clear to Erdely that her intended portrayal of Ms. Eramo was inaccurate.  (*Id*. at 83:23-84:9.)

32.     Both Surface and Jackie attempted to dissuade Erdely from her false portrayal of Ms. Eramo.  Surface testified: "Sabrina made it clear that she – that Dean Eramo was not going to be portrayed well," and that "Jackie began to – to have extreme – she felt extremely guilty," to

the point where Jackie was "frequently calling Sabrina" and "saying that that portrayal of Dean Eramo was not correct." (*Id*. at 83:12-22.)

33.     Surface testified that she "began to have a number of concerns about Sabrina and her journalistic integrity," particularly because Surface was "very concerned about Sabrina's portrayal of the administration," to the point that Surface "considered reaching out to [Erdely's] editor to tell her – or to tell – to question [Erdely's] professionalism and accuracy in reporting." (*Id.* at 60:17-61:24.)

34.     Surface testified that in response to Erdely's repeated negative statements to her about the administration, Surface "told her again and again" that she was not getting all sides to the story and made it clear that Erdely's intended portrayal of the UVA administration was incorrect. (*Id.*)  Erdely acknowledged that Surface tried to give her "the deans' point of view." (Oct. 23, 2014 Email from Sabrina Rubin Erdely to Sean Woods, RS003259 (Ex. 14).)   In response, Erdely called Surface an "administrative watchdog."  (Surface Dep. at 74:23-76:16, 161:17-162:17 (Ex. 13).)

35.     Surface further testified that the community of sexual assault survivors at UVA was concerned about the article before it was published, because "the process had been extremely frustrating, [] we were worried about what content she was going to publish, because it was clear that [Erdely] wasn't listening to us." (*Id.* at 110:8-111:3.)

36.     Emily Renda testified that Erdely had a "set narrative in mind" about Ms. Eramo, and that nothing could have stopped her from writing the way she did about Ms. Eramo.  (Renda Dep. at 175:15-176:16 (Ex. 11).)

37.     Sean Woods was the Deputy Managing Editor of *Rolling Stone* magazine at the time "A Rape on Campus" was published.  (Sean Woods Dep. at 10:19-11:3, 12:7-12 (Ex. 8).) He was the assigning editor for the article.  (*Id*. at 13:11-18.)

38.     In her first draft, immediately following the article's first mention of Ms. Eramo, Ms. Erdely wrote a note to her editor, Sean Woods, that said: "**[end on a different note? the point: That despite the lip service given to rape at UVA and at colleges nationwide, in reality, the combination of a rape-tolerant student body and an indifferent administration creates a collegiate environment that's a free-for-all for sexual predators.]**"  (Oct. 15, 2014 Email from Sean Woods to Jodi Peckman, Joe Hutchinson, & Sacha Lecca, RS002256-302, at RS002269 (emphasis in original) (Ex. 15); Woods Dep. at 32:4-23.)

39.     On her first draft, Erdely's placeholder heading for the section describing Jackie's first interactions with Ms. Eramo was: "**FOUR: Jackie reports, gets the Eramo/UVA treatment**."  (Oct. 15, 2014 Email from Sean Woods to Jodi Peckman, Joe Hutchinson, & Sacha Lecca, at RS002278) (emphasis in original.)

40.     In an effort to underscore the claim that UVA was indifferent to sexual assault, Erdely also omitted from the article the fact that many of the sources identified as random students were actually heavily involved in campus advocacy and student groups related to sexual assault prevention and awareness.  Erdely quoted student Sara Surface describing the UVA "party scene," but did not mention that Surface was involved in multiple campus advocacy groups related to sexual assault issues.  (Sabrina Rubin Erdely, "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA," *Rolling Stone Magazine* (Dec. 5, 2014), RS001070-79, at RS001075 ("Original Article") (Ex. 16); Erdely Reporting Notes at RS004369 (Ex. 10).) Erdely quoted Alex Pinkleton talking about fraternity parties and identified her only as a "third

year … expertly clad in the UVA-after-dark uniform of a midriff-baring sleeveless top and shorts," omitting the fact that Erdely knew Pinkleton and was a member of One Less, a student advocacy group. (Original Article at RS001075; Pinkleton Dep. at 188:7-23 (Ex. 12).) Similarly, Erdely quoted student Brian Head talking about student partying, but omitted the fact that Head was the president of One in Four, an all-male student group dedicated to sexual assault awareness and prevention. (Original Article at RS001074; Erdely Reporting Notes at RS004273.)

**IV.  Before Writing "A Rape On Campus," Erdely Tells Another Source That There Is A Culture Of "Male Privilege And Entitlement" At UVA And That It Is Difficult For Men To Change.**

41.    During an interview with one source at UVA, Erdely and the source began talking about the culture on UVA's campus.  The source said to Erdely that "I think that's why we're not as radical because we think that we have to take these small steps to get the campus culture on the same line." (Sept. 13, 2014 Erdely Interview with Surface, RS004779-4806, at RS004804 (Ex. 17).)  Erdely responds: "I think that's very hard to ask people to change their ways—not to just be able to change their culture but actually to change things — I think. … But especially to ask the men to change because it's like you know what we're talking about is changing the culture of male privilege and entitlement in a sense that they've been looking forward to their whole lives — to go to college and indulge in these kinds of behaviors that they've always been taught it's normal and now they're being told that wait a minute, it's not normal and you need to rethink them and change." (*Id*. at RS004804-05.)

42.    When asked about this during her deposition, Erdely confirmed that she believes that there is, in fact, "a culture of male privilege and entitlement at UVA." (Erdely Dep. at 176:15-20 (Ex. 1).)

43.     When asked about it during her deposition, Erdely also confirmed that she believes men are taught as a norm that college is a place for drinking and having sex (*Id.* at 177:15-20), and that the culture of "male entitlement … bleeds into sexual assault" (*id.* at 178:4-16).

## V.     Erdely Tells Other Sources That One Of UVA's Deeply Rooted Traditions Is That "Fraternities Run The Show," And "Fraternity Members Are More Likely To Rape People."

44.     Erdely also told Jackie that at UVA "one of their deeply rooted traditions is [that] fraternities run the show" and "nobody really does anything about it." (Sept. 11, 2014 Interview Tr., RS118221-345, at RS118229 (Ex. 18).) According to Erdely, the only way "if something's going to be done about that, like, there needs to be something erratic that happens." (*Id.*)

45.     Erdely also told Jackie that she believes that "fraternity members are more likely to … rape people. They're also more likely to have … a rape-supportive attitude, you know, like to be more sexually aggressive…." (*Id.* at RS118236.)

46.     On July 14, 2014, Emily Renda told Erdely that she "wanted to raise a concern about publishing part of Jackie's story," specifically that Renda "may need to urge [Erdely] not to publish the name of the fraternity … because we are trying to pursue ongoing action." (Erdely Reporting Notes at RS004145 (Ex. 10).) When Renda explained that UVA was working to investigate Jackie's claims and her claims about two other supposed victims, and that prematurely accusing the fraternity without an adjudication of guilt could be a due process issue that would complicate future disciplinary proceedings, Erdely insisted that she wanted to be "able to name this fraternity and take them to task." (*Id.* at RS004147.)

## VI.     Erdely Knew That Jackie's Story Of Her Alleged Assault Changed Materially Over Time.

47.     During her first interview with Jackie on approximately July 14, 2014, Jackie told Erdely that her "first month [at UVA] in September," she "was gang raped at a fraternity [her] first year of college," and that the rape "wound up being a hazing thing." (Erdely Reporting Notes at RS004153.) Jackie explained to Erdely that her perpetrator "█," a third year whom she had allegedly met while lifeguarding together at the university pool, "picked [her] up and actually took [her] out to eat" before the alleged assault. (*Id.* at RS004153; 004161.) Later they went to his fraternity party, where █ took her upstairs to a room where the assault allegedly occurred. (*Id.* at RS004153.) Jackie told Erdely that "there ended up being eight other boys in the room," and that although █ "never touched [her] … he told the[] [others] what to do, and ***seven*** of them raped [her]." (*Id.*) Jackie also explained to Erdely that at one point, "one boy, the last one … he couldn't do it. He like physically could not perform … So they made him use a beer bottle." (*Id.* at RS4156.)

48.     Erdely's first interview with Jackie did not take place until approximately July 14, 2014. Before Erdely interviewed Jackie, she interviewed sexual assault survivor, Emily Renda on July 8, 2014. Renda told Erdely that fraternity rush at UVA — the time when young men interview and attempt to join a fraternity — does not happen until "early February," because UVA "do[esn't] allow rush until the spring." (*Id.* at RS004118.)

49.     During her first conversation with Erdely about Jackie, Renda told Erdely, speaking of Jackie's gang-rape claims, "obviously maybe her memory of it isn't perfect," because Renda thought that "since it was coming out in pieces, that there was either more or less to it." (Renda Dep. at 172:13-20 (Ex. 11).)

50.     Renda also went on to tell Erdely that Jackie "alleged she was gang raped in the fall, before rush, and the men who perpetrated it were young guys who were not yet members of

the fraternity, and she [Jackie] remembers one of them saying to another … 'cmon man don't you want to be a brother.'"  Erdely told Renda that the story was "totally plausible."  (Erdely Reporting Notes at RS004119 (Ex. 10).)

51.     Renda explicitly emphasized to Erdely that Renda did not have access to Jackie's case file and could not verify any of Jackie's allegations beyond what Jackie was saying.  (Renda Dep. at 117:9-118:8 (Ex. 11).)  Erdely also knew that Jackie and Renda were not friends at the time of Jackie's alleged rape, and therefore Renda only knew about Jackie's supposed alleged assault much later, after the fact.  (Erdely Dep. at 60:6-13 (Ex. 1).)

52.     In June 2014 testimony before a U.S. Senate subcommittee in which she briefly referenced Jackie's sexual assault allegations using a pseudonym, Renda stated that Jackie was assaulted by five men.  (Renda Senate Testimony, RS003587-93, at RS003587 (Ex. 19).); Renda Dep. at 35:24-36:15 (Ex. 11).)  Renda was told this number by Jackie.  (*Id*. at 36:17-37:6.)

53.     Erdely read Renda's Congressional testimony before the article was published. (Erdely Dep. at 37:8-14 (Ex. 1).)

54.     Erdely never asked Renda about her Congressional testimony or the number of perpetrators involved in Jackie's alleged assault.  (*Id*. at 37:8-22.)

55.     On September 19, 2014, Erdely interviewed one of Jackie's first-year roommates, Rachel Soltis.  During that interview, Erdely asked Soltis if the orchestrator of Jackie's gang rape had taken Jackie to dinner on the night of the alleged assault.  Soltis told Erdely "I honestly don't know that part, I can't recall, about him taking her out."  (Erdely Reporting Notes at RS004422 (Ex. 10).)  Soltis also told Erdely that Jackie had described her rape in two different ways.  Soltis explained to Erdely that Jackie first told Soltis and a group of other friends that "these guys forced her to do oral sex."  (*Id*. at RS4420.)  Soltis then explained to Erdely that it was not until

much later in time that Jackie told Soltis that "she was raped by I think six guys." (*Id.* at RS004421.) Soltis also told Erdely that in the later version, Jackie claimed she had been raped with a ███████. (*Id.*)

56. Jackie never told Erdely that she was forced to perform oral sex on any of her alleged attackers. (*See generally id.*)

57. Erdely never asked Jackie why Renda believed she had been raped by five men, why Soltice believed Jackie had been raped by six men, or why Jackie told Erdely that she had been raped by seven men. (*See generally id.*)

58. The same day as the Soltis interview, Erdely spoke with Annie Forrest, another then-friend of Jackie's, explaining to Forrest that Erdely was "hoping to verify every part of Jackie's story" and "to make it all as airtight as possible." (*Id.* at RS004425.) During that interview Forrest explained to Erdely that Jackie had told her that several men had raped her, during which "a coat hanger" was used. (*Id.* at RS004426.)

59. Erdely never asked Jackie to explain why Soltis believed that Jackie had been raped with a ███████, or why Forrest believed that Jackie had been raped with a coat hanger. (*See generally id.*)

60. Erdely acknowledged that she "discovered in [her] reporting that some of the details of [Jackie's] account … had morphed with time — early on, she had told friends that she had been forced to perform oral sex on a group of men, and her story had later changed to one of vaginal rape." (Erdely Statement Draft, RS002176-79, at RS002177 (Ex. 20).)

61. Erdely never asked Jackie to explain why her story of rape "morphed with time" from "forced … oral sex on a group of men … to one of vaginal rape." (*See generally* Erdely Reporting Notes (Ex. 10).)

62. Erdely never mentioned in "A Rape On Campus" that Jackie's story "morphed with time" from "forced … oral sex on a group of men … to one of vaginal rape." (*See generally* Original Article (Ex. 16).)

63. Erdely never told then-Managing Editor Will Dana that Jackie's story of sexual assault had changed over time prior to the publication of the article. (Mar. 15, 2016 Deposition of William Dana at 195:24-196:3, 203:10-16 ("Dana Dep.") (Ex. 21).) Dana testified that he would have acted aggressively had he been told of inconsistencies in Jackie's story. (*Id.* at 202:18-203:15.)

64. Erdely did know, however, that Jackie claimed that her rape was just like a rape that occurred on an episode of Law & Order SVU. (Sept. 12, 2014 Interview Tr., RS118346-440, at RS118374-75 (Ex. 22).) Jackie told Erdely during one of their interviews that she had watched an episode of Law & Order SVU from one "in a later season [where] Elliot was still in it" and that it involved "this girl who is at a fraternity party, and one guy taker her up to a room and calls his friends in, and like four of them gang rape her." (*Id.* at RS118375.)

65. Law & Order SVU Season 14, Episode entitled "Girl Dishonored," which originally aired on television in April 2013, involves a woman who is gang raped in the way Jackie described to Erdely during their interview, during a fraternity party, with one boy taking the victim up a flight of stairs in the fraternity house into a bedroom, where several men gang raped the victim. During the rape scene in the episode, one of the attackers yells "Grab her leg!" just as Jackie claimed to Erdely that one of her attackers yelled during her alleged attack, "Grab its motherfucking leg." (*Compare* Apr. 24, 2014, "Girl Dishonored," LAW AND ORDER SPECIAL VICTIMS UNIT (Ex. 23), *with* Erdely Reporting Notes at RS004154 (Ex. 10).)

66.     Prior to the publication of the article, Erdely also knew that Jackie had told Erdely inconsistent stories about how long the gang-rape supposedly lasted.  (Erdely Dep. at 52:17-53:21 (Ex. 1).)  She originally told Erdely that she was gang-raped for three-and-a-half hours, but then later claimed the rape lasted from exactly 12:52 a.m. to 3:30 a.m., which she knew from looking at a clock in the room.  (*Id*.)

67.     During Erdely's first interview with Jackie on approximately July 14, 2014, Jackie told Erdely that during her alleged rape "there was a glass coffee table in the middle of the room [and] I wound up crashing into that and it shattered under our weight.  And the glass went into my back.  I have scars from it.  I have scars on my back.  My friends are always like 'what are those from,' and I'm like they're from September 28, 2012 [the date of the alleged rape]." (Erdely Reporting Notes at RS004154.)  Jackie goes on to tell Erdely that she "had a huge bruise on [her] face," as a result of her alleged rape.  (*Id*.)

68.     Although Jackie described the significant injuries she received as a result of her alleged rape, Erdely never asked Jackie whether she sought treatment from a hospital.  (*See generally* Erdely Reporting Notes.)

69.     Erdely asked multiple people about Jackie's alleged injuries, yet nobody could corroborate them.  (*See generally id*.)  For example, Erdely asked Rachel Soltis whether she has "ever see[n] injuries on her—arms or back?"  Soltis responded, "come to think of it, she would always have a lot of scratches on her from the cat, because she has three cats.  I would often notice that.  But she has a lot of marks on her skin, bruises that haven't really healed, or some discolorations.  So I haven't really noticed."  (*Id.* at RS004424.)

70.     During dinner with Jackie on September 11, 2014, Erdely asked Jackie to see her scars from the assault.  According to Erdely, Jackie "pull[ed] back the beaded woven bracelets on her left wrists, [yet] in the dim lighting [Erdely] s[aw] nothing."  (*Id*. at RS004347.)

71.     The very next night, at a dinner with Jackie, Jackie's then-boyfriend, and Alex Pinkleton, Erdely asked Jackie again about her scars.  Jackie explained to Erdely "I was trying to look for them earlier and they're not as distinct anymore.  I used to have these really distinct white marks where glass had cut me."  Jackie's then-boyfriend chimed in, "I haven't really seen any marks on your back.  I haven't seen any."  (*Id*. at RS004378; Sept. 12, 2014 Interview Tr., RS118346-440, at RS118372 (Ex. 22).)

72.     In a December 17, 2014 email to Jackie, Erdely acknowledged that she had known Jackie's description of her injuries from supposedly being gang-raped on a shattered glass table was a lie.  Erdely wrote to Jackie, "You also told me 'all' of your friends have asked about the scars on your back – but none of your friends I've spoken with have ever seen scars on your back, including your boyfriend ██████. (If you recall, he said this when we were at dinner in September.)"  (Dec. 17, 2014 Email from Sabrina Rubin Erdely to Jackie, RS019639-41, at RS019640 (Ex. 24).)

**VII.     Although Jackie Claims That She ██████████████████ As A Result Of Her Alleged Assault, Erdely Cannot Corroborate The Claim Because Jackie Refuses To Produce Her ██████████.**

73.     During the same September 12, 2014 dinner, Erdely learned during the conversation that Jackie had told Alex Pinkleton that she ██████████ as a result of her alleged assault — a claim Jackie had not made to Erdely — and that Jackie has ████████████ ██████████.  Erdely asked Jackie, "██████████████████████ … I need to know, anything that bolsters your story is helpful." (Erdely Reporting Notes at RS004382 (Ex. 10); Sept. 12, 2014 Interview Tr. at RS118387-88 (Ex. 22).)  Erdely went on to ask Jackie, "█

█████████████████████████████" Jackie responded ████████. (Erdely Reporting Notes at RS004382; Sept. 12, 2014 Interview Tr. at RS118387-88.)

74.    Jackie's then-boyfriend stated that he was not aware of Jackie having ever █████████████████████████. (Erdely Reporting Notes at RS004382; Sept. 12, 2014 Interview Tr. at RS118386-87.)

75.    After learning this information, Erdely made repeated requests of Jackie to provide her with these ███████████. At that same dinner, Erdely asked Jackie to provide her with ███████ corroborating the fact that she was █████████. (Sept. 12, 2014 Interview Tr. at RS118392.)  Jackie responded that her mother must have those ████ at her home in █████, Virginia.  But then Jackie waffled and said that her mother does not have the ████ because Jackie never told her mother she had ████████ from her alleged assault. (*Id.*)

76.    At dinner, Erdely told Jackie that it was important for Jackie to obtain her ████ because they would corroborate Jackie's account of being raped.  Erdely said, "I mean for purposes of the article, like I'm hoping to just pull together as many little, no matter like how small the little scraps of evidence might seem, like I want to like pull them all together in one place, you know, to make it very clear that like this isn't just …." (*Id.* at RS118438.)  At that point, Alex, Jackie's friend chimed in, "it's not really deniable."  (*Id.*)  Erdely said "right, exactly, exactly."  (*Id.*)

77.    Then during an October 20, 2014 interview with Jackie, Erdely asked Jackie "do you have that ████████████████████████████████████████"?  Jackie responded, "I know it's at my house in █████.  So I have to ask my mom to look for it.

I don't know if she knows about it, but I have a folder of ██████████ in my room and I can ask her to bring it."  (Erdely Reporting Notes at RS004476 (Ex. 10).)

78.     Ultimately, Jackie never provided Erdely with the corroborating ██████████ before the article was published, and Erdely did not insist on seeing them before publishing the article.  (Erdely Dep. at 159:2-160:1 (Ex. 1).)

**VIII.  Although Jackie Claimed That She Wore A Red Dress That Was Bloodied From Her Injuries On The Night Of Her Alleged Assault, Erdely Could Not Corroborate The Claim Because Jackie Refused To Produce The Dress.**

79.     During their July 30, 2014 interview, Erdely asked Jackie about how she got ready for her date with ██ the night of her alleged assault.  Jackie responded that she "went through about ten dresses in my closet," and ultimately the one she picked "was *a red dress*." (Erdely Reporting Notes at RS004240.)  Erdely asked Jackie whether since "the dress was red, was the blood very evident against it?"  Jackie responded that "it wasn't evident."  (*Id.* at RS004242.)  Erdely also asked "what did you eventually do with the dress?  Did you get rid of it?" (*Id.* at RS004241.)  Jackie told Erdely that Jackie's mother suggested that Jackie should keep the dress "for evidence," but that Jackie told her mother "to burn it."  (*Id. at* RS004241.)

80.     On August 16, Erdely asked Jackie to find out if her mother had gotten rid of the red dress she was allegedly wearing the night of her attack.  (*Id.* at RS004315.)  Jackie responded that she would have to ask her mother "when [she] gets home," because Jackie was out of town. (*Id.*)

81.     During her interview with Rachel Soltis, Erdely asked Soltis about her feelings about "what should be done … about the fraternity" where Jackie was allegedly assaulted.  Soltis responds, in part, "just because we don't have the *blue dress*, the evidence, I don't think they should go unpunished."  (*Id.* at RS004423.)

82.     Erdely never asked Jackie why Soltis believed that Jackie wore a blue, rather than a red, dress on the night of her alleged assault.  (*See generally id*.)

83.     Ultimately, Jackie never provided Erdely the dress to corroborate her (Jackie's) story that she wore a red dress and that she was bloodied on the night of her alleged assault.  (*See generally id*.; Erdely Dep. at 92:4-22 (Ex. 1).)  Instead, Jackie simply told Erdely that her mother "threw it out."  (Sept. 11, 2014 Interview Tr. at RS118226 (Ex. 18).)

84.     Erdely's notes contained more than two pages of single-spaced questions that she intended to ask Jackie's mother to corroborate aspects of Jackie's story.  (Erdely Interview Notes, RS014335-58, at RS14339-42 (Ex. 25).)

85.     Erdely asked Jackie if she could speak with her mother to corroborate her story. (Erdely Reporting Notes at RS004346.)  But ultimately, Erdely never spoke with Jackie's mother to confirm this — or any other — information. (Erdely Dep. at 236:7-12 (Ex. 1).)

## IX.     Erdely Caught Jackie In Multiple Other Lies During Her Reporting, But Never Questioned Or Confronted Jackie About Them.

86.     During a September 11, 2014 interview, Jackie told Erdely that Jackie's mother went to Brown for college.  (Sept. 11, 2014 Interview Tr. at RS118225 (Ex. 18).)

87.     Prior to publication of the article, Erdely discovered that this was a lie after looking up Jackie's mother online.  In her notes, Erdely wrote, "note, her profile says she went to Providence College, NOT Brown, as Jackie told me."  (Erdely Interview Notes at RS014344 (Ex. 25).)  Erdely never asked Jackie about this discrepancy prior to publication.  (*See generally id*.)

88.     During a telephone interview with Jackie, Erdely told Jackie that Erdely believed she had located two potential corroborating sources whose full names Jackie had refused to provide to Erdely.  Erdely's notes reflect that she asked Jackie if these were the correct

individuals, and "she tells me it's not them, but I don't really believe her."  (Erdely Reporting Notes at RS004404 (Ex. 10).)

89.     During a September 19, 2014 telephone interview, Erdely asked Jackie's former roommate, Rachel Soltis, if Jackie had told Soltis how Jackie first came to meet with Ms. Eramo. (*Id.* at RS004422.)  Soltis said that Jackie told her that Jackie met Ms. Eramo when she had been called in to testify as a witness at a sexual misconduct trial involving a victim who was sexually assaulted a way similar to Jackie.  (*Id.*)  Erdely knew that this was a completely different story than Jackie had told Erdely about how she met Ms. Eramo, even writing in her notes "IF SO, THIS IS NEWS TO ME."  (*Id.*)  Yet Erdely never confronted or questioned Jackie about this glaring inconsistency.  (*See generally id*.)

90.     In an early interview, Jackie told Erdely that a friend of a friend who she did not know said to her at a party that she should have just had fun with being raped by a bunch of hot Phi Psi guys.  (*Id.* at RS004244.)  When Erdely later specifically asked Jackie about being told this at a party, Jackie reversed course and claimed that it was actually her former friend Kathryn Hendley — "Cindy" in the article — who said that to her two weeks after the alleged assault. (*Id*. at RS004406.)  Erdely recognized the about-face at the time, writing in her notes that she was "confused" about this contradictory story and two different attributions for the same quote. (*Id*.)   Nevertheless, Erdely did not confront Jackie about this discrepancy, and Defendants published this callous, supposed quote in the article, and attributed it to Kathryn Hendley. (Original Article at RS001074 (Ex. 16).)

91.     During one of their initial interviews, Jackie told Erdely a story about how she was attacked on a corner in Charlottesville by fraternity brothers whom she claimed threw a beer bottle at her face.  Jackie told Erdely that she was afraid to identify the name of Phi Psi in the

article because "I had a very bad experience … with some fraternity guys." (Erdely Reporting Notes at RS004167-8 (Ex. 10).) According to Jackie, as a result of Jackie being "very outspoken" about her experience being gang-raped at Phi Psi, and Jackie "t[elling] [her] friends who are first years not to go to [the Phi Psi house]," "three boys [who were in a fraternity] started calling [her] a fat cunt and a bitch, that [she] was trying to ruin their frat, and they threw a beer bottle at [her] face." (*Id*.) Jackie told Erdely that her "face was really messed up," because the bottle "hit right below my eye," and that it "was a really nasty cut." (*Id*.)

92.     Erdely understood that the alleged incident on the corner was supposedly a result of Jackie speaking out about her alleged gang rape. (Erdely Dep. at 70:13-72:13 (Ex. 1).)

93.     Jackie further told Erdely that her roommate, "Eliza," who Jackie claimed was a nurse at the time, "took the glass and everything out" of her face. (Erdely Reporting Notes at RS004168.) According to Jackie, Eliza was Jackie's "go to person" when the beer bottle was thrown at her face. (*Id.*; *id.* at RS004363; Erdely Dep. at 72:7-13)

94.     On September 11, 2014, when Erdely asked Jackie for Eliza's contact information, Jackie provided her with Eliza's email address. (Erdely Reporting Notes at RS004363; Erdely Dep. 72:19-73:23.)

95.     Erdely never reached out to Jackie's "go to person" to corroborate the bottle incident or the extent of Jackie's injuries before publication of the article. (Erdely Dep. at 72:19-73:23.)

96.     Instead, Jackie offered to, and did in fact, send Erdely photos of her alleged injuries.



(Erdely Reporting Notes at RS004314 (Ex. 10); Jackie Injury Photo, RS015312 (Ex. 26).)

97.    But Erdely — and Jackie's friends — subjectively believed that Jackie's injuries "looked like face paint."  At dinner on September 11, 2014, Jackie told Erdely that her friend, Alex Pinkleton, asked Jackie "is that face paint?"  ***And Erdely replied, "it looked like paint — like something smeared on your face."*** (Erdely Reporting Notes at RS004362; Sept. 11, 2014 Interview Tr. at RS118338-39 (Ex. 18).)

25

98.     From their earliest interviews in July 2014, Jackie repeatedly told Erdely that she was an active member of One Less, a campus sexual assault advocacy group.  (*See, e.g.*, Erdely Reporting Notes at RS004167, 4169, 4244, 4254 (Ex. 10).)

99.     But on September 30, 2014, Sara Surface told Erdely that One Less has just undertaken their selection process for joining the group, and that Jackie had just been admitted. (*Id.* at RS004446.)   Surface explicitly told Erdely that Jackie had not been a member of the group.  (*Id.*)

100.     Erdely never asked Jackie why she claimed to have been so involved in One Less throughout her time at UVA, when Surface told her that Jackie had just joined the group.  (*See generally id.*)

## X.     Jackie Refuses To Divulge To Erdely The Identities Of The Three Friends She Claimed She Met With Immediately After Her Supposed Sexual Assault.

101.     During their first interview in July 2014, Jackie told Erdely that after her sexual assault, she called her three best friends on campus, who met with a bloody, beaten Jackie outside of the Phi Kappa Psi house, then proceeded to callously tell Jackie not to go to the hospital or report her rape because it would hurt the friends' social standing and ability to get into fraternity parties.  (*Id.* at RS004158-4164.)   Jackie told Erdely that these individuals' first names were Ryan, Alex, and Catherine.  (*Id.*)

102.     After Jackie told Erdely about Ryan's, Alex's, and Katherine's reactions, Erdely asked Jackie for the three friends' last names.  (Erdely Dep. at 93:14-17 (Ex. 1).)   According to Erdely, she asked Jackie "many, many times" for their names.  (*Id.* at 94:21-24.)   But Jackie refused to provide Erdely their last names. (*Id.* at 93:14-25.)

103.    Erdely understood that the reason Jackie refused to provide contact information for these three friends — called "Andy," "Randall," and "Cindy" in the article — is that Jackie said she had a "strained relationship" with them.  (*Id*. at 93:14-94:8.)

104.    Instead, Erdely asked Jackie on July 30, 2014 if Jackie would see if Ryan would be willing to speak with Erdely.  (Erdely Reporting Notes at RS004242 (Ex. 10).)   Jackie responded that Jackie "can text him either later tonight or tomorrow," but that she had not yet "ha[d] a chance" to get in touch with him.  (*Id*.)

105.    On August 11, 2014, Erdely left a long detailed message for Jackie asking Jackie if she had spoken with Ryan yet to see if Ryan was willing to speak with Erdely.  (*Id.* at RS004309.)

106.    Having not heard from Jackie, two days later on August 13, 2014, Erdely left another long message for Jackie, again asking if Ryan would speak with her.  (*Id.* at RS004309.)

107.    Jackie responded via email the next day that she "ha[sn't] heard back from … Ryan."  (*Id.* at RS004309.)

108.    On August 16, 2014, Jackie told Erdely that Jackie "texted [Ryan] twice," and "messaged him on Facebook," but that she "still ha[sn't] heard back from [him]."  (*Id.* at RS004310.)

109.    During a dinner on September 11, 2014, Jackie told Erdely that Ryan had refused to speak with Erdely because he was in a fraternity and he did not "want the Greek system to … go down." (Sept. 11, 2014 Interview Tr. at RS118230-31 (Ex. 18).)

110.    Erdely simply took Jackie's word for it and told her that "Ryan is obviously out." (*Id.* at RS118256.)  Erdely ceased her efforts to speak with Ryan (or any of the three friends)

before publishing the article to confirm that he (or any of the three friends) were able or unwilling to corroborate Jackie's story. (Erdely Dep. at 275:13-276:17 (Ex. 1).)

111.   Erdely also requested that Jackie provide her contact information for "Alex" and "Catherine," but Jackie refused to provide it. (Apr. 21, 2016 Deposition of Elisabeth Garber-Paul at 102:20-106:1 ("Garber-Paul Dep.") (Ex. 27).)

112.   Woods testified that he repeatedly asked Erdely to find the three friends, but that "[s]he was telling me she couldn't find out who they were." (Woods Dep. at 126:16-127:25 (Ex. 8).) Erdely told Woods she did not know their last names and that nobody would give them to her. (*Id*. at 128:1-11.)

113.   But contrary to Erdely's claims to Woods, on September 19, 2014, during her interview with Jackie's first-year roommate, Rachel Soltis, Erdely learned the last name of Katherine Hendley. Erdely asked Soltis about Jackie's friends' reactions when Jackie told them about her alleged assault, and Soltis explained to Erdely, that "yeah Catherine Hindley or Hinkley, yeah she … Cathy and Al[ex] told Jackie not to tell because it would ruin [Jackie's] reputation." (Erdely Reporting Notes at RS004421 (Ex. 10).)

114.   Although Erdely had Hendley's last name (within one vowel of its proper spelling), Erdely never tried to identify or contact Ms. Hendley to verify whether she did, in fact, discourage Jackie from reporting an alleged gang-rape on the night of Jackie's alleged assault. (Erdely Dep. at 294:4-10 (Ex. 1).)

115.   Erdely knew that it was very easy to find UVA student contact information through UVA's people search. (*Id.* at 266:23-269:15.)

116.   Erdely also did not bother to tell *Rolling Stone's* fact-checker, Elizabeth Garber-Paul that she had learned Kathryn Hendley's last name during her reporting. (Garber-Paul Dep.

at 215:21-216:8 (Ex. 27).)  Garber-Paul did not discover this until after the article was published. (*Id*.)

117.    After publication, Woods learned that a source had in fact given Erdely Kathryn Hendley's full name — identified as "Cindy" in the article — but that Erdely never attempted to contact her.  (Woods Dep. at 129:18-130:3 (Ex. 8).)

118.    When Sean Woods provided Garber-Paul with Kathryn Hendley's full name after the publication of the article, Garber-Paul was able to obtain Hendley's email address in three minutes using UVA's public database.  (Dec. 11, 2014 Email from Elisabeth Garber-Paul to Sean Woods, RS002973 (Ex. 28); Garber-Paul Dep. at 323:6-325:12 (Ex. 27).)

119.    Although Erdely never spoke to Ms. Hendley, the article quotes Ms. Hendley as discouraging Jackie from reporting her gang rape, telling Jackie that if she did, "her reputation [would] be *shot* for the next four years," and saying to Jackie, referring to her gang rape, "Why didn't you have fun with it?  A bunch of hot Phi Psi guys?"  (Original Article at RS001072, 1074 (Ex. 16) (emphasis in original).)

120.    Had Erdely contacted Kathryn Hendley, she would have willingly spoken to Erdely.  (Apr. 13, 2016 Deposition of Kathryn Hendley at 50:20-51:16 ("Hendley Dep.") (Ex. 29).)  Hendley would have told Erdely that Jackie's description of the supposed meeting on the night of the assault was almost entirely fabricated.  (*Id*. at 16:14-19:18.)

121.    Hendley would have told Erdely that Jackie was not visibly injured or bloodied, that the meeting took place at a different time of day far from the Phi Psi house, and that Jackie claimed she had been forced to perform oral sex on "one or two" men.  (*Id*. at 22:8-26:25.)

122.    Hendley would have also told Erdely that the quotations Jackie attributed to Hendley were fabricated.  (*Id*. at 25:9-29:25.)

123.    Alex Pinkleton told Erdely she was friends with Kathryn Hendley ("Cindy" in the article) but despite being in possession of notes from that interview while conducting her own interview with Pinkleton, *Rolling Stone* fact-checker Elizabeth Garber-Paul also never asked Pinkleton for Kathryn Hendley's full name or contact information.  (Garber-Paul Dep. 270:25-271:17 (Ex. 27).)

124.    Will Dana, then-Managing Editor of *Rolling Stone*, agreed that if Erdely had the names of any of the three friends, he would have expected that that person would have been contacted.  (Dana Dep. at 383:5-17 (Ex. 21).)

125.    Ryan Duffin also would have spoken to Erdely if she had contacted him prior to the publication of the article.  (Apr. 15, 2016 Deposition of Ryan Duffin at 33:10-34:10 ("Duffin Dep.") (Ex. 30).)

126.    Duffin would have told Erdely that Jackie never reached out to him to ask if he would speak to Erdely, and that Duffin never declined to speak with Erdely.  (*Id*.  at 33:10-34:10.)  Duffin would have also told Erdely that the quotes Jackie attributed to Alex and Kathryn were fabrications.  (*Id*.)

127.    Had Erdely spoken with Duffin, she would have also learned that Duffin believed that Jackie invented a fake person who she called "Haven Monahan" to try to make Duffin jealous and spark a romantic interest in Jackie.  (*Id*. at 134:14-137:12.)  Duffin believed that Jackie provided him fake telephone numbers for this "Haven Monahan" and encouraged Duffin to exchange communications with him in a bid to instill romantic feelings in Duffin for Jackie.  (*Id*.)

128.    Erdely would have also learned that Jackie told Duffin that she had a date with this "Haven Monahan" on September 28, 2012 — the night she claimed she was sexually

assaulted — and that it was "Haven Monahan" who supposedly orchestrated her alleged sexual assault and allegedly forced Jackie to perform oral sex on five men. (*Id*. at 87:9-88:16, 19:14-20:6, 94:2-12.)

129.   Erdely would have learned that Duffin learned that there was no UVA student named Haven Monahan, and that Duffin eventually challenged Jackie regarding Haven Monahan's existence. (*Id*. at 96:20-97:17, 102:8-104:11.) Erdely would have learned that Duffin eventually had a falling out with Jackie over her repeated fabrications because he did not believe her story and did not trust her. (*Id*. at 110:17-111:23.)

130.   At the time of the publication of the article, *Rolling Stone* then-Managing Editor Will Dana believed that Erdely had reached out to Ryan Duffin — called "Randall" in the article — for comment, when in fact she had not. (Dana Dep. at 375:9-377:13 (Ex. 21).)

131.   Then-Managing Editor Will Dana agreed that if Erdely had in fact contacted Ryan Duffin, he would have willingly spoken to Erdely and would have rebutted certain central aspects of Jackie's account. (*Id*. at 379:4-380:9.)

132.   Will Dana agreed that *Rolling Stone* should have attempted to contact the three friends Jackie claimed she met with on the night of her alleged gang rape, and that doing so "would have been the easiest way to find out the flaws in [Jackie's] story." (*Id*. at 347:23-348:14.)

133.   Deputy Managing Editor Sean Woods admitted that Jackie's refusal to provide *Rolling Stone* with names and contact information of people that could verify her claims was a "roadblock" in *Rolling Stone's* reporting. (Woods Dep. at 167:12-168:2 (Ex. 8).)

134.    Sean Woods admitted that failing to contact any of the three friends Jackie supposedly met with on the night of her supposed sexual assault was "a mistake." (*Id*. at 123:8-23.)

135.    In the original draft of the article, Erdely wrote a note regarding the gang-rape scene and the depiction of the callous statements of Jackie's friends indicating to the reader that all of the quotes came from Jackie and that *Rolling Stone* had not interviewed any of the other supposed witnesses. (Oct. 15, 2014 Email from Sean Woods to Jodi Peckman, Joe Hutchinson, & Sacha Lecca, at RS002261 (Ex. 15).) Woods edited the draft to remove this disclaimer. (Woods Dep. at 83:1-84:1.)

136.    In a draft "mea cupla" statement that he wrote for Erdely days after *Rolling Stone* published the December 5, 2014 Editor's Note, Woods also stated to Erdely, "When Jackie balked at revealing her friends' names or said she would be contacting them for [Erdely], [Erdely] should have walked away." (Mea Culpa Draft, RS015041-42, at RS015041 (Ex. 31); Woods Dep. at 292:15-293:5, 298:5-24 (Ex. 8).) He further told Erdely, "[i]n [your] desire to bring this issue to a broader audience, [you] neglected to report Jackie's story as vigorously as [you] should have and to air both sides of a narrative without judgment or bias." (Mea Culpa Draft at RS0015041.)

## XI.    Jackie Refuses To Divulge To Erdely The Name Of The Supposed Ringleader Of Her Alleged Sexual Assault.

137.    Both Sean Woods' and Will Dana's reactions to reading the first draft of the article were that they wanted to push for more information on the identity of "Drew" — the pseudonym used in the article for the supposed ringleader of the assault — and the other supposed assailants, but Erdely told Woods that "she couldn't find that" and that she "ran into a wall." (Woods Dep. at 27:9-30:17.)

138.     During the reporting of the article, Woods told Erdely at least three times that she needed to learn the full name of the supposed ringleader of Jackie's gang rape so that *Rolling Stone* could verify his existence.  (*Id*. at 148:24-149:9.)

139.     Prior to the publication of the article, Erdely admitted to Alex Pinkleton that she attempted to verify the existence of the supposed ringleader of Jackie's gang-rape through Facebook using the first name Jackie provided and was unable to do so.  (Pinkleton Dep. 125:15-24 (Ex. 12).)

140.     Jackie also refused to tell *Rolling Stone* the names of any of her other supposed attackers.  (Garber-Paul Dep. at 150:3-20 (Ex. 27).)

141.     Erdely never asked Jackie for the name of one of her supposed gang-rapists who Jackie claimed was in a small anthropology discussion class with her.  (Erdely Dep. at 56:9-57:3 (Ex. 1).)

142.     Erdely never asked Jackie to see her transcript to determine whether Jackie did, in fact, take an anthropology class, and whether she, in fact, failed that semester.  (*See generally* Erdely Reporting Notes, *id*. at RS004156 (Ex. 10).)

143.     Erdely never asked Jackie how she was able to identify one of the perpetrators as the pledge master, as Jackie claimed, or what any of her alleged attackers looked like.  (*See generally* Erdely Reporting Notes, *id*. at RS004156; Erdely Dep. 55:21-23; 56:1 (Ex. 1).)

144.     Erdely never asked Jackie whether anyone attempted to enter or exit the room during the three-and-a-half hour period of her alleged gang-rape, during which a fraternity party was supposedly going on.   Moreover, Erdely never asked Jackie whether anyone heard her alleged screams.  (*See generally* Erdely Reporting Notes, *id*. at RS004155-57.)

145. *Rolling Stone* did not talk to a single source — including Jackie — that ever verified that any of Jackie's supposed assailants existed. (Dana Dep. at 189:18-190:15 (Ex. 21).)

146. At the time *Rolling Stone* published the article, it did not know the real or full name of the supposed ringleader of Jackie's alleged gang rape. (Garber-Paul Dep. at 58:12-15 (Ex. 27).)

147. On October 28, 2014, Pinkleton asked Erdely by text, "Have you found out what has to be said if ▮ last name isn't used?" (Text Messages between Sabrina Erdely and Alex Pinkleton, RS014307-33, at RS0014319 ("Erdely-Pinkleton Texts") (Ex. 32); *see also* Pinkleton Dep. at 203:16-204:6 (Ex. 12).) Erdely responded: "Yes, we'd have to say that she refused to disclose his name and so we couldn't follow up. Not in those words, but that's the sentiment. *Unfortunately, it would diminish her credibility, so I really, really want to avoid that*!"



(Erdely-Pinkleton Texts at RS0014319-20; Pinkleton Dep. at 203:16-204:6.)

148. Although Erdely actually did put a disclaimer in one draft of the article that would have informed readers that Jackie refused to divulge "Drew's" real name to *Rolling Stone*, Deputy Managing Editor Sean Woods cut that disclaimer from the article. (Woods Dep. at

153:2-154:2 (Ex. 8).) Woods admitted it was an intentional decision to leave this disclaimer out of the final version of the article. (*Id*. at 154:10-155:3.)

149. Woods admitted that *Rolling Stone* did not make it clear to readers of the article that *Rolling Stone* did not know the true name of the supposed ringleader of Jackie's gang-rape and had not even verified that he existed. (*Id*. at 151:20-152:9.)

## XII. Jackie Refuses To Divulge The Names Of Two Other Women She Claims Were Also Gang Raped At Phi Kappa Psi.

150. *Rolling Stone* also claimed in the article that two other girls had been gang-raped recently at Phi Kappa Psi and that Jackie shared this information with Ms. Eramo. (Garber-Paul Dep. at 202:7-203:1 (Ex. 27).)

151. Jackie told Elderly during one of their interviews that she (Jackie) was aware of two other women, ███████ and ██████, who had allegedly been gang-raped at the Phi Psi house. (Erdely Reporting Notes at RS004155 (Ex. 10); Erdely Dep. at 68:19-69:14 (Ex. 1).)

152. Erdely subjectively believed that this information was "shocking," and that she "can't imagine [gang-rape] is all that common." (Erdely Reporting Notes at RS004155.) Erdely subjectively believed that "the idea that 3 women were gang raped at the same fraternity seems like too much of a coincidence." (*Id*.)

153. Erdely never asked Jackie for ██████ or ██████ last name. (*See generally id*.)

154. Instead, Erdely relied on Jackie to see if ██████ and/or ██████ would speak to Erdely. (*Id*. at RS004310; Erdely Dep. at 69:15-70:12 (Ex. 1).) For example, on September 11, 2014, Erdely asked Jackie about "the other two [Phi Psi] survivors." (Sept. 11, 2014 Interview Tr. at RS118256 (Ex. 18).) Jackie responded that ██████ refused to speak with Erdely because her parents prohibited it. (*Id*.) Erdely then asked if Jackie would text ██████ to let her know that Erdely is on campus. (Erdely Reporting Notes at RS004345.) Erdely explained to Jackie

that "it would be important not only to put [████] story out there but to lend to Jackie's story" and credibility. (*Id.*)

155.    Erdely also asked Jackie to speak with a woman named "████," who could corroborate ████ story of gang-rape.  (*Id.* at RS004311.)  Again, however, although Erdely claims she "hounded" Jackie to get in touch with her, ultimately Erdely was unable to speak with ████ because Jackie failed to provide Erdely with ████ contact information.  (Erdely Dep. at 69:15-70:12 (Ex. 1).)

156.    During one of their interviews, Erdely told Jackie "that I think I've found who ████ and ████ [████ sister who, according to Jackie, was a first-year at UVA] are." According to Erdely, Jackie "tells [her] it's not them, but [Erdely] do[esn't] really believe her." Erdely told Jackie that she would "like to reach out to ████ and make sure she doesn't want to cooperate, hear it from her, maybe she's willing to at least verify the Jackie part of the story, the idea that Jackie confided in them."  (Erdely Reporting Notes at RS004404 (Ex. 10).)

157.    Jackie suggested instead that she (Jackie) should "talk to [████] sister," ████, because Jackie did not "have ████ phone number," but that she will "definitely talk to her and see what … she says."  Jackie ended the inquiry by telling Erdely that "she was very adamant that her family didn't want her participating in any way."  (*Id.* at RS004404-05.)

158.    Ultimately, Erdely never identified or spoke with ████, ████, ████, or ████ because Jackie refused to identify their full names or provide their contact information. (Erdely Dep. at 69:9-14; 70:1-12 (Ex. 1).)

159.    At the time it published the article, *Rolling Stone* did not know who these other supposed victims were and had only nicknames provided by Jackie.  (Garber-Paul Dep. at 203:18-204:10 (Ex. 27).)

36

160.    *Rolling Stone* also knew that UVA did not know who these other two supposed victims were.  (*Id*. at 254:23-255:8.)

161.    *Rolling Stone* never spoke to anyone other than Jackie who claimed to know who these two other supposed victims were.  (*Id*. at 204:11-206:5.)

162.    Erdely was unable to corroborate anything that Jackie told her about ████ and ████ alleged assaults.  Indeed, when Erdely asked Rachel Soltis whether Jackie "ever told [her] anything about [what] ████ might have told [Jackie] about Phi Psi," Soltis responded "not that I can recall."  (Erdely Reporting Notes at RS004425 (Ex. 10).)

163.    *Rolling Stone* asked Jackie to provide contact information for these supposed two other victims so that they could verify their existence, and Jackie refused to provide that information.  (Garber-Paul Dep. at 206:10-16 (Ex. 27).)

164.    In an October 25, 2014 email in which he sent Erdely edits on the first draft of the article, Deputy Managing Editor Woods wrote to Erdely: "A few notes, word choices made some cuts, etc.  Piece is great.  I worry we can't confirm the two other girls coming to Jackie and alleging gang rape at the same frat, lets discuss Monday am.  Any word from Jackie?"  (Oct. 25, 2014 Email from Sean Woods to Sabrina Rubin Erdely, RS003216 (Ex. 33).)  Erdely responded, "I have the same worry – I wish I had better sourcing on a lot of the Jackie stuff – a lot right now is resting on Jackie's say-so, including the entire lead."   (Oct. 26, 2014 Email from Sabrina Rubin Erdely to Sean Woods, RS018980 (Ex. 34).)

165.    When asked whether she had any knowledge of whether these two other alleged Phi Kappa Psi victims are real people or not, Garber-Paul, *Rolling Stone's* fact-checker, testified: "I don't know either way."  (Garber-Paul Dep. at 206:17-207:1 (Ex. 27).)

166.    In one of her reporting files, Erdely wrote that she "still need[s] to speak with: Jackie – ███; ███; ████; ███████; ████████████; mom. Catherine; alex? Jackie's mom" (Erdely Interview Notes at RS14338-9 (Ex. 25).)  Erdely never spoke with any of these people prior to publication nor did she receive the ████████████ from Jackie.  (*See generally* Erdely Reporting Notes (Ex. 10).)

167.    Instead, *Rolling Stone* again put a statement in the article stating that neither woman was willing to speak with *Rolling Stone*, falsely implying that *Rolling Stone* knew who the women were, had reached out for comment, and had been rejected.  (Original Article at RS001078 (Ex. 16).)

168.    Although Woods had access to Erdely's reporting file before publication, he only reviewed it in depth after "A Rape on Campus" was published. (Woods Dep. at 129:18-130:3 (Ex. 8).)

169.    Woods testified that he expects that the fact checker would do a detailed review of the reporting file prior to publication.  (*Id*. at 315:20-316:6.)  But Garber-Paul, the fact checker, testified that she only had time to "skim" Erdely's reporting file. (Garber-Paul Dep. at 295:4-11 (Ex. 27).)

170.    Woods admitted that when he reviewed Erdely's reporting notes, it was clear to him that there was a "pattern" of Jackie being "intent on controlling her narrative."  (Woods Dep. at 316:7-317:14.)

171.    Woods admitted that Jackie's many requests, demands, wishes, and failures to provide information should have been "unacceptable," and that *Rolling Stone's* acquiescence to their source resulted in *Rolling Stone* "handcuffing" its own reporting.  (Dec. 6, 2014 Email from Sean Woods to Will Dana, RS015172; Woods Dep. at 286:7-287:5 (Ex. 35).)

172.     Then-Managing Editor Will Dana acknowledged that during the reporting of the story, *Rolling Stone* and Erdely suspended their skepticism of Jackie as a source.  (Dana Dep. at 332:15-334:9 (Ex. 21).)

173.     Erdely called Alex Pinkleton on December 5, 2014, and "said that she had messed up and she should have used another one of the stories that had documentation, such as [Alex's], because she had had my trial documents; and she basically admitted to being so focused on this one story that even when she couldn't get ██████ name, she had just put so much work into it that she – she should have completely rewritten it and regrets that she didn't."  (Pinkleton Dep. at 206:4-24 (Ex. 12).)

174.     Erdely admitted to Pinkleton that she knew she should have rewritten the story but that "rewriting the whole story was so much work."  (*Id.* at 208:6-9.)

**XIII.  Jackie Repeatedly Refuses To Speak To Erdely And Attempts To Pull Out Of The Article, But Erdely Pressures Jackie Into Cooperating.**

175.     After Erdely repeatedly requested that Jackie reach out to Ryan, ██████, ██████, ██████ and ██████, and provide a name for the supposed ringleader of her assault during July and August 2014, Jackie began to refuse to return Erdely's phone calls.  Erdely tried to follow up with Jackie on August 21, August 27, and August 31, but Jackie did not respond to her requests.  (Erdely Reporting Notes at RS004316 (Ex. 10).)

176.     On September 2, 2014, Erdely sent an email to Emily Renda asking if Emily had heard from Jackie, stating that Erdely had not been able to reach her in weeks, and stating, "the silence on [Jackie's] end is starting to bring out the worried Jewish mother in me."

Sabrina Rubin Erdely <sabrina@sabrinaerdely.com>                    Tue, Sep 2, 2014 at 11:32 AM
To: Emily Renda <ejr5nt@virginia.edu>

Terrific, I'm so looking forward to meeting you in person.

Emily, I don't suppose you've heard from Jackie ████ recently? I haven't been able to reach her in the past couple of
weeks – I imagine she's just busy with back-to-school stuff, but the silence on her end is starting to bring out the worried
Jewish mother in me…

Best, s

(Sept. 2, 2014 Email from Sabrina Rubin Erdely to Emily Renda, RS017073 (Ex. 36).)

177.    Erdely did not get a hold of Jackie until September 11, 2014, when Erdely

personally went to Charlottesville. Jackie showed up to their scheduled dinner 15 minutes late,

before which Erdely was "seriously nervous" that Jackie would not show up, because as of that

time, Erdely knew that "there's only really room for one story to be front and center [in the

article], … and [Jackie's] is that story." (Erdely Reporting Notes at RS004336; RS004361 (Ex.

10).)

178.    On September 11, 2014, Erdely wrote in an email to Sean Woods: "What a day.

Tracked down Jackie. She was freaking out but now is totally back on board…. she'd be ok with

just using her first name, no last. That ok?" Woods responded, "Yes, ok."

From:        Sean Woods <sean.woods@rollingstone.com>
Sent:        Thursday, September 11, 2014 10:54 PM
To:          Sabrina Rubin Erdely
Subject:     Re: Uva


Yes. Ok

Sent from my iPhone

> On Sep 11, 2014, at 10:45 PM, "Sabrina Rubin Erdely" <sabrina@sabrinaerdely.com> wrote:
>
> What a day. Tracked down Jackie, she was freaking out but now is totally back on board. She's concerned for her
safety once the story comes out, afraid of being physically attacked on campus (with reason) but finally decided she'd be
ok with just using her first name, no last. That ok?

(Sept. 11, 2014 Email from Sean Woods to Sabrina Rubin Erdely, RS015470 (Ex. 37).)

179.    On September 16, 2014, Erdely interviewed Jackie and asked Jackie "how would

[Jackie] feel if [Erdely] reached out to him," meaning the alleged ringleader of Jackie's assault.

(Erdely Reporting Notes at RS004404 (Ex. 10).)  Jackie told Erdely that she would not "be comfortable with that."  (*Id.*)

180.    Erdely did not hear from Jackie again, despite leaving her several voicemails and sending her multiple text messages, until more than a month later.  (*Id.* at RS004471.)  Erdely explained the situation to *Rolling Stone's* photo editor, Sacha Lecca in an email.  Erdely told Lecca that "unfortunately … Jackie is in not-great mental shape right now, and won't be for a long while. … She went through a phase recently where she wasn't returning my calls and I had to go to Virginia to make sure she was still on board.  (Come to think of it, she hasn't returned my calls this week.)"  (Oct. 16, 2014 Email from Sabrina Rubin Erdely to Sacha Lecca, RS018959-60 (Ex. 38).)  Erdely told Lecca that she was "trying to be as accommodating [of Jackie] as possible":

From: Sabrina Rubin Erdely <sabrina@sabrinaerdely.com>
Sent: Thursday, October 16, 2014 5:58 PM
To: Sacha Lecca
Subject: Re: "jackie"

Sacha, thank you SO much for your feedback – I'm so happy you thought the story was strong & impactful. It's long, I know, but there was so much to say. (Hopefully once it's boiled down a little bit with Sean's help it'll be leaner & meaner.)

Yeah unfortunately I would say Jackie is in not-great mental shape right now, and won't be for a long while. I salute her for wanting to see this story through, but the experience has been overwhelming. She went through a phase recently where she wasn't returning my calls and I had to go to Virginia to make sure she was still on board. (Come to think of it, she hasn't returned my calls this week.) So I'm trying to be as accommodating as possible – which means that when she insisted on no photos, I didn't put up much of a fight, sorry. I argued instead for her to use her real first name (which is a fight I may ultimately lose anyway; last I spoke with her, she was reconsidering, at her friends' urging).

BTW it's possible that the UVA peer education group One Less would pose for a photo. That was Jackie's suggestion; she'd said she'd appear in a photo with her One Less sisterhood if she wasn't identified in the caption.

In the same conversation, she and I touched on whether she'd be willing to be photographed in silhouette. We never got around to resolving that. If she was up for that, would that interest you at all?

(*Id.*)

181.    On October 20, 2014, Erdely told Jackie "I'm going to have to call ▮ to offer him a chance to comment.  I'm not going to use his name in the article, but I have to do my due diligence anyway.  I imagine he's going to say nothing, but it's something I need to do."  (Erdely

Reporting Notes at RS004477 (Ex. 10).)  According to Erdely, Jackie "sound[ed] shocked" and she "stammer[ed]" at the request.  (*Id*.)  Erdely continued:  "I don't know his last name, I've never asked you for it before.  So I'm going to ask you for it now, so that I can reach out to him."  (*Id*.)  Jackie told Erdely, "I don't want to give his last name," and she refused to provide it. (*Id*.)

182.    Erdely again told Jackie that she "need[s] to call him, [because] even though he's not identified he may still be identifiable [in the article]."  (*Id*. at RS004477.)  The article "say[s] his fraternity and what year he graduated, that he worked at the pool," and that she "need[s] to give him a chance to comment back," because "[i]t's just part of the process." (*Id*.)  Jackie told Erdely that she "do[esn't] want to be the one to give [Erdely] the name," but that Erdely could figure out who it was by "ask[ing] Phi Psi for their list." (*Id*.)  Erdely replied, ***"I'm going to have to make this phone call.  Our lawyer is going to insist.***"  (*Id*.)

183.    Erdely also suggested to Jackie, "if I promise not to call [█] or reach out to him in any way, could you give me his full name so that I can tell my editors and our lawyer that I know he exists?"  (Erdely Interview Notes at RS14339 (Ex. 25).)  Jackie still did not agree to provide the name.

184.    Three days later, on October 23, 2014, Erdely received a call from Sara Surface, a then-friend of Jackie's, who told Erdely that Jackie was having "reservations about using her name" in the article.  (Erdely Reporting Notes at RS004492.)  Erdely explained to Surface, "I have to call (█)."  (*Id*.)

185.    On October 23, 2014, Erdely wrote in an email message to Jackie's friend, Alex Pinkleton: "So about Jackie.  I get that she's apprehensive about me contacting █, but the thing is █ is going to know about the article one way or another because whether I tell him about it or whether he sees it on the newsstand, he's going to read it, for sure.  (I'd be surprised if he didn't

already know about it.) Either way, I do need to reach out to him to see if he wants to comment. It's part of my obligation as a journalist."



| From: | Sabrina Rubin Erdely <sabrina@sabrinaerdely.com> |
| Sent: | Thursday, October 23, 2014 6:16 PM |
| To: | Alexandria Pinkleton █████████████ |
| Subject: | Re: Rolling Stone |

Hi Alex – congrats on finishing your paper. Yep, I touched base with your & Annie's friend and she was great – SO helpful. Thank you for helping to bring her into the fold.

So about Jackie, I get that she's apprehensive about me contacting ███. But the thing is, ███ is going to know about the article one way or another – because whether I tell him about it or whether he sees it on the newsstand, he's going to read it, for sure. (I'd be surprised if he didn't already know about it.) Either way I do need to reach out to him to see if he wants to comment - it's part of my obligation as a journalist. Phi Psi would never give over a list of its fraternity members, unfortunately, that's just not realistic. (Even if I got his name from a third party, it wouldn't change the fact that Jackie is the one making the accusations, even though she didn't want to name him.) If it makes Jackie feel better, I can let him know that she didn't want him named in the piece (which he won't be), and that she was reluctant to name him even privately. Would that help?

I'm going to call Jackie in a bit, to talk all this over. FYI now it looks like this story might actually run in an earlier issue, like before Thanksgiving  —

Best,
Sabrina
--

(Oct. 23, 2014 Email from Sabrina Rubin Erdely to Alex Pinkleton, RS018952-53 (Ex. 39).)

186.    Also on October 23, 2014, Erdely wrote in an email message to Sean Woods: "FUCK. Jackie is apparently in full freakout mode right now – her friend Alex texted to say that Jackie is right now saying she wants her name out of the piece and is 'thinking of pulling out entirely.' Neither girl will answer my call. It's so weird, because the last time I spoke with her, on Tuesday, she was talking about how optimistic she was feeling about this story, and that she wanted to use her first name. We went over the latter point, like, five times, just to be sure. But then I brought up contacting that guy and I guess she fell apart?" (Oct. 23, 2014 Email from Sabrina Rubin Erdely to Sean Woods, RS003259 (Ex. 14).)  Erdely also blamed Jackie's recalcitrance on Sara Surface, who "wanted to give [Erdely] the deans' point of view." (Id.)

**From:** Sean Woods
**Sent:** Friday, October 24, 2014 12:25 AM
**To:** Sabrina Rubin Erdely
**Subject:** Re: uh oh


Oy!

Sent from my iPhone

> On Oct 23, 2014, at 11:06 PM, "Sabrina Rubin Erdely" <sabrina@sabrinaerdely.com> wrote:
>
> FUCK. Jackie is apparently in full freakout mode right now – her friend Alex texted to say that Jackie is right now saying she wants her name out of the piece and is "thinking of pulling out entirely." Neither girl will answer my call.
>
> It's so weird, because the last I spoke with her, on Tuesday, she was talking about how optimistic she was feeling about this story, and that she wanted to use her first name. We went over the latter point, like, five times, just to be sure. But then I brought up contacting that guy and I guess she fell apart.
>
> I think this also has something to do with other forces trying to talk her out of cooperating – namely this one UVA "activist" named Sara who works closely with the administration, who has twice tried to talk Jackie out of using her name (including yesterday). In fact Sara called me this afternoon, having found out about some of the newer material I'd discovered, and seemed furious with me about it – she wanted to give me the deans' point of view. She also got upset about my use of her quotes. What a mess.
>
> I guess I'll wait and see how things shake out in the morning… But I suspect that I may need to go back to Charlottesville to hash things out with Jackie face to face. Fuck.

(*Id*.)

187.    Woods admitted that, "Yes, Jackie periodically went into freakout mode." (Woods Dep. at 58:7-16 (Ex. 8).)

188.    Woods knew in late October 2014 that Jackie was again expressing reservations about her participation in the article.  (*Id*. at 58:17-21.)

189.    On October 24, 2014, just weeks before the article was published, Erdely sent Jackie an email saying that "I know you're in distress right now" and that "I'm confident that we can talk this through and figure this out … we'll figure out solutions."  (Oct. 24, 2014 Email from Sabrina Rubin Erdely to Jackie, RS018958 (Ex. 41).)

| From: | Sabrina Rubin Erdely <sabrina@sabrinaerdely.com> |
| Sent: | Friday, October 24, 2014 10:16 AM |
| To: | ▮▮▮▮▮▮▮▮▮▮ |
| Subject: | Rolling Stone |

Jackie, I know you're in distress right now. I do have some understanding of what you're going through – people often get jittery during this last part of the reporting process, just before the article comes out, when it suddenly becomes very real. But this article is important; I know we agree that certain truths need to come out if there's going to be any real change (and not just at UVA, but on all college campuses). You're about to make a difference. I want this article to be truthful and powerful, and as we move it forward towards publication, I want you on board to help see it through. I know you can do this, Jackie! I know it's not easy. But you are stronger than you give yourself credit for. To the extent that you were shaken up by the UVA alumni reporter, and the disservice those insensitive interviews did to you and your friends, I just want to remind you that the article I'm doing – the article for which you & I have been speaking for the past 4 months (!) - is NOT that article, and I am not that reporter. I'm the same person you've been talking to for four months, who wants to tell the real story.
I'm confident that we can talk this through and figure this out, so when you're ready, let's talk. Call me and tell me what's on your mind, and we'll figure out solutions. I'd love it if you'd call today, but if you need a couple of days, take the weekend and call me Monday. We'll work this out, OK? In the meanwhile, give yourself a big hug for getting this far. Everything is going to work out fine.
Talk soon —
Best,
Sabrina
--

(*Id.*) Jackie never responded to this email. (*See generally* Erdely Reporting Notes.)

190. On October 24, 2014, Erdely emailed *Rolling Stone's* photo editor, Sacha Lecca, saying, "Um, Jackie is right now not communicating with me, in part because some One Less members (who work closely with the administration) have been critical of her cooperation with the story. So I'm thinking at this point we should work under the assumption that neither Jackie nor One Less will be available for photographing."

| From: | Sabrina Rubin Erdely <sabrina@sabrinaerdely.com> |
| Sent: | Friday, October 24, 2014 2:38 PM |
| To: | Sacha Lecca |
| Subject: | Re: "jackie" |

Um, Jackie is right now not communicating with me, in part because some One Less members (who work closely with the administration) have been critical of her cooperation with the story. So I'm thinking at this point we should work under the assumption that neither Jackie nor One Less will be available for photographing.

(Oct. 24, 2014 Email from Sabrina Rubin Erdely to Sacha Lecca, RS018959-60 (Ex. 38).)

191. Erdely never considered removing Jackie's story as the lead of the article. (Erdely Dep. at 232:16-21 (Ex. 1).)

192.    Alex Pinkleton also testified that Erdely threatened and pressured her and Jackie

to force Jackie to continue to cooperate with the article against Jackie's wishes.  (Pinkleton Dep.

at 200:14-202:21 (Ex. 12).)  Erdely and Pinkleton had the following text message exchange on

October 24, 2014:

> ALEX: Hi Sabrina, this is Alex.  …  I'm talking to Jackie right now and she's
> telling me she 100% does not want her name in the article
>
> ERDELY: Ok.  I don't know why she's changed her mind but whatever she
> decides is fine.  Does she want me to call her now so we can talk it through?  Or
> tomorrow?
>
> ALEX: I don't think calling is a good idea bc she's thinking about pulling out
> entirely
>
> ERDELY: WHAT? why??
>
> ALEX: She's pretty overwhelmed with the idea of ▮
>
> ERDELY: We will figure something out.  There's always a way.  But Jackie
> needs to know she's an essential part of this article.  We'll figure out a way
> forward that's comfortable for her.  I'll need to talk to her by phone tomorrow.  If
> need be, I can also come down so we can talk it over in person
>
> ALEX: I think that'll freak her out bc she feels like she's being pushed.  I'll ask if
> she wants to call you tomorrow instead of it feeling like she's being pressured into
> anything
>
> ERDELY: Ok sounds good
>
> …
>
> ERDELY: Also? I'm up for discussing whatever she wants to discuss (changing
> her name, etc) ***but I need to be clear about this: there's no pulling the plug at
> this point – the article is moving forward***.  & I think its important that Jackie stay
> involved.



I'm talking to Jackie right now and she's telling me she 100% doesn't want her name in the article

Ok. I don't know why she's changed her mind but whatever she decides is fine. Does she want me to call her now so we can talk it through? Or tomorrow?

I don't think calling is a good idea bc she's thinking about pulling out entirely

WHAT? why??

She's pretty overwhelmed with the idea of ▮

We will figure something out. There's always a way.

But Jackie needs to know she's an essential part of this article. We'll figure out a way forward that's comfortable for her. I'll need to talk to her by phone tomorrow. If need be, I can also come down so we can talk it over in person.

I think that'll freak her out bc she feels like she's being pushed. I'll ask if she wants to call you tomorrow instead of it feeling like she's being pressured into anything

Ok great thank you Alex. Fwiw I think Jackie is a strong person; the fact that we've come this far is a testament to her power. (I emailed her something to this effect this morning.) I think Jackie is readier to tell her story than she realizes - but she's being thrown off by the naysayers around her (which is part of the problematic culture that needs to be brought to light). As for agendas, mine has only ever been to get the whole truth out there. But you know that.

Also? I'm up for discussing whatever she wants to discuss (changing her name, etc) but I need to be clear about this: there's no pulling the plug at this point - the article is moving forward. & I think it's important that Jackie stay involved.

(Erdely-Pinkleton Texts at RS014307-09 (Ex. 32); *see also* Pinkleton Dep. at 200:14-202:21.)

193.    Asked what her reaction was to receiving these texts from Erdely, Pinkleton testified, "So with that text, I definitely – [Erdely] made it loud and clear that the article was moving forward *whether or not Jackie wanted it to*.  And I had just said that she – that Jackie might not want to do this entirely.  And since [Erdely's] response was, 'it doesn't matter, this article is happening with or without her,' of course, then my attitude would be: Well, then Jackie

needs to be a part of this because, you know, its her story. So [Erdely] really was giving me no other options other than pressuring me to get Jackie to talk to her." (Pinkleton Dep. at 202:22-203:15.)

194. Pinkleton further testified that although she repeatedly told Erdely that Jackie did not want to be in the article, "Sabrina was like, well, she's telling me she does want the name in the story, and she gets very aggressive … she was aggressive about, like, no, her name needs to be in this. And then when I was telling her about ██, and Jackie not wanting ██ in the story, and Sabrina says, you know, I'm trying to figure out who ██ is, and I say, well, that's not happening. She's like, well, you can't pull out of this now, there's always a way… And I think that was the day we were baking, because I remember getting that text and being like, okay, [Erdely] is a little bit crazy." (*Id.* at 188:25-189:22.)

195. Sara Surface felt that Erdely was "manipulating" Jackie, giving her "grandiose ideas of what the outcome of the article would really be with her name plastered on it." (Surface Dep. at 74:23-76:16.) Surface observed Erdely pressuring Jackie to participate in the article without regard for Jackie's well-being, and felt that Erdely "was lacking not just journalistic integrity, but like personal integrity." (*Id.*)

196. Emily Renda also observed Jackie being "pushed to stay in the story," and that whenever Jackie tried to "pull out for her own mental health, [] then somehow Sabrina would always just convince her to go forward anyway." (Renda Dep. at 90:11-91:10 (Ex. 11).)

197. Just two weeks before publication, on November 3, 2014, Woods asked Erdely by email if she had heard from Jackie, and Erdely responded: "Not a word. Her friend Alex texted last night to say she thinks Jackie may be having a 'hard time' – she didn't show up at a party

48

where she was expected this weekend, and has barely been responding to texts." (Nov. 3, 2014 Email from Sabrina Erdely to Sean Woods, RS019109 (Ex. 42).)

198.    Also on November 3, 2014, Erdely left Jackie a voicemail and told her, "I know you haven't been returning my calls or my texts, but we really need to talk.  Please, please call me.  I understand that you're scared. But we are in the home stretch with this article, and I need to talk to you.  I handed in my final draft on Friday, and we are moving into the production process now.  And if all goes according to plan, this article is going to be shipping to the printer in less than two weeks.  And I really, really would like for you to be included in this process.   So we need to talk about that.  We need to talk about what this whole process looks like in the next couple weeks, and how I'd like for you to be involved."  (Nov. 3, 2014 Voicemail from Sabrina Erdely to Jackie, RESPJ00000273 (Ex. 43).)

199.    According to Erdely's notes, Jackie "**called back finally**" later that day. (S. Erdely Reporting Notes, RS004072-4502, at RS004499 (emphasis in original).)  But Jackie still refused to provide Erdely with ███ last name.  (*Id*.)

200.    In a text message to a friend on December 2, 2014, Jackie said that ███████
███████████████████████████████████████████████████████████████
███████████████    (Dec. 2, 2014 Text between Jackie and a friend, RESPJ00000368-390, at RESPJ00000374 (Ex. 44.).)

201.    Jackie testified that ███████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████.  (Apr. 7, 2016 Deposition of Jackie at 56:2-13 ("Jackie Dep.") (Ex. 45).)

202.   When Jackie became unresponsive after Erdely pushed her for the name of her assailant, Erdely capitulated and told Jackie that *Rolling Stone* would just use a pseudonym and would stop asking her for the identity of her assailant.  (Woods Dep. at 150:8-20 (Ex. 8).)

203.   Then-Managing Editor Will Dana acknowledged that Erdely made a deal with Jackie not to attempt to identify any of her assailants and to cease their efforts to learn whom any of the alleged assailants were.  (Dana Dep. at 248:5-250:4 (Ex. 21.)

## XIV.   Erdely Had A Financial Incentive To Push Jackie, Not To Rewrite Her Story, And To Publish "A Rape on Campus" Under The Time Pressure Created By Her Contract With *Rolling Stone*.

204.   Ex. 46 is the March 18, 2014 Independent Contractor Agreement between *Rolling Stone* and Sabrina Rubin Erdely, the operative agreement between Erdely and *Rolling Stone* at the time "A Rape on Campus" was published in November 2014.  (Mar. 18, 2014 Independent Contractor Agreement between *Rolling Stone* and Sabrina Rubin Erdely, RS001099-1106; Dana Dep. at 63:24-64:24 (Ex. 21); Erdely Dep. at 9:4-22 (Ex. 1).)

205.   Under the terms of her contract, Erdely was obligated to provide seven feature stories accepted by *Rolling Stone* by June 2016.  (Dana Dep. at 72:24-73:23; Erdely Dep. at 10:7-23; Mar. 18, 2014 Independent Contractor Agreement between *Rolling Stone* and Sabrina Rubin Erdely, RS001099-1106, at ¶ 3.) ███████████████████████ ███████████████████████████ (Erdely Dep. at 11:19-24.)

206.   Former *Rolling Stone* Managing Editor Will Dana agreed that if a decision is made to kill a story prior to publication, it is possible that the story would not be considered accepted for purposes of the writer's contract requirement. (Dana Dep. at 106:12-107:11.)

207.   On December 19, 2014, Jackie's lawyer, Palma Pustilnik, wrote a letter to Sean Woods and *Rolling Stone's* lawyer, demanding that *Rolling Stone* refrain from their "unrelenting" and "threatening" communications to Jackie, and stating that "[m]y client's clear

understanding was that the highly graphic, intensely personal, and traumatic details of her brutal assault were not for publication, and that the focus of the article was to be on survivor support." (Dec. 19, 2014 Letter from Palma Pustilnik to Sean Woods and Elizabeth McNamara, RS001081-1082; Woods Dep. at 342:15-343:6 (Ex. 47).)

208.    *Rolling Stone* is no longer working with Sabrina Rubin Erdely and has terminated her contract.  (Woods Dep. at 290:20-292:3 (Ex. 8).)

## XV.    Defendants Knew Jackie Was Mentally Unstable.

209.    Erdely once asked Jackie whether she "think[s] [she] ha[s] posttraumatic stress disorder."  (Sept. 11, 2014 Interview between Sabrina Erdely and Jackie, RS118221-8344, at RS118270 (Ex. 18).)  Jackie responded that although she was undiagnosed, she believes that she "definitely do[es]."  Erdely responded to Jackie that "it sounds like it." (*Id.*)

210.    Jackie testified that ██████████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████.  (Jackie Dep. at 340:4-342:19 (Ex. 45).)

211.    Erdely also knew that Jackie was easily manipulated, because Jackie told Erdely that she was.  During their September 11, 2014 interview, Jackie told Erdely, "I think that when you've come  … when you come from a background where you're always told that you're worthless, that you end up getting into situations … where it's like people know that about you, you know?  It's like you're an easy target because they know that….  I always felt like I was manipulated or something, like I was easily manipulated because I didn't have the self-esteem to … I don't know.  It's difficult."  (Sept. 11, 2014 Interview between Sabrina Erdely and Jackie, RS118221-8344, at RS118222.)

212.    Erdely acknowledged that while reporting the article, Jackie's "fragile mental state" became "increasingly apparent," that Jackie wavered on participating in the article and

delayed responding to Erdely, and that when Erdely pressed Jackie for the name of the ringleader of her assault, Jackie refused to divulge it and stopped speaking with Erdely altogether. (Erdely Draft Press Statement, RS015018-5023, at RS015018 (Ex. 48).)

213.    Erdely also admitted, "I asked myself at the time—if it was wise to build the opening of a story around someone who seemed so emotionally fragile." (Erdely Statement Draft, RS002176-2179, at RS002178 (Ex. 20).)

214.    Sean Woods admitted that prior to the publication of the article, he was "concerned about [Jackie's] mental health." (Woods Dep. at 81:14-82:9 (Ex. 8).) He worried that she was a "fragile person." (*Id.* at 82:23-25.)

215.    With respect to the November 3, 2014 email in which he asked Erdely, "Any word from Jackie?" Woods testified, "[a]gain, I mean, I just can't stress this enough how concerned I was about Jackie and her mental health . . . ." (*Id.* at 103:16-104:11; *see also* Nov. 3, 2014 Email from Sabrina Erdely to Sean Woods, RS019109 (Ex. 42.).)

216.    In August or September of 2014, Erdely contacted Emily Renda to say that Erdely had not heard from Jackie in a week or two, and that Erdely was "concerned about her emotional and mental wellbeing." (Renda Dep. at 85:15-86:22 (Ex. 11).)

217.    Erdely admitted, "Jackie's emotional fragility and reluctance should have been a signal that she may not have been up for the challenge of disclosing her full story, whatever the reason. It should have been cause for me to scrutinize her further, if I felt she could withstand it, or else to back off her story." (Erdely Draft Press Statement, RS015043-5045, at RS015044 (Ex. 50).)

218.    *Rolling Stone's* fact-checker, Elisabeth Garber-Paul, was also aware prior to publication that Jackie suffered from depression, was on medication for mental health issues, and claimed to suffer from PTSD.  (Garber-Paul Dep. at 247:11-23 (Ex. 27).)

219.    Alex Pinkleton, a friend of Jackie's and a source for Erdely, testified that prior to the publication of the article, although she supported Jackie as an "advocate," she had "hesitations" about believing Jackie, noting that "she was going back and forth with what she was saying.  One minute it would be, yes, I want to do this; the next minute it's, no, I don't want to, so…"  (Pinkleton Dep. at 35:6-18 (Ex. 12).)

**XVI.  *Rolling Stone's* Fact Checker Alerts *Rolling Stone* The Article Is Inaccurate, Unverified, And Misleading, But Is Ignored By Sean Woods And Sabrina Erdely.**

220.    Elisabeth Garber-Paul was the *Rolling Stone* fact-checker assigned to fact-check "A Rape on Campus."  (Garber-Paul Dep. at 31:11-22.)

221.    As *Rolling Stone's* fact-checker for the article, Garber-Paul's job responsibility is "to make sure the article is completely accurate by the time it goes to publication."  (*Id.* at 23:2-7.)

222.    Part of Garber-Paul's job was to make suggested changes or edits to the story and discuss them with the author and the assigning editor.   For "A Rape on Campus," Deputy Managing Editor Sean Woods was the assigning editor and he had final say as to any proposed changes and edits.  (*Id.* at 27:5-30:6.)

223.    Garber-Paul made handwritten edits on three round of drafts of the article. (*Id.* at 35:9-36:11.)

224.    Within a few hours of reading the article for the first time, Garber-Paul asked Erdely by email: "Quick question: did we ever get comment from 'Tom,' or reach out for one?"  (*Id.* at 36:16-41:23; Nov. 3, 2014 Email from Sabrina Erdely to Elisabeth Garber-Paul,

RS013618-3619 (Ex. 51).) "Tom" referred to the pseudonym used for the supposed ringleader of Jackie's gang rape in the first draft, which was later changed to "Drew." (Garber-Paul Dep. at 41:9-18.) This was in fact the first substantive question that Garber-Paul asked Erdely about the article. (*Id.* at 41:9-42:2.)

225. Erdely responded, "Unfortunately, the answer is no and no." (*Id.* at 50:24-51:6; Nov. 3, 2014 Email from Sabrina Erdely to Elisabeth Garber-Paul, RS013618-3619, at RS013618.)

226. Garber-Paul was aware that Erdely has asked Jackie for the name of the alleged ringleader of her gang rape, but that Jackie refused to provide it to *Rolling Stone*. (Garber-Paul Dep. 52:7-22.)

227. Exhibit 52 is Garber-Paul's first round of handwritten fact-checking notes on the draft article. (Garber-Paul Dep. at 70:11-24, 71:11-72:3; Garber-Paul 1st Round Handwritten Notes, RS004810-4849 (Ex. 52.).) She received the draft on November 3, 2014 and made these notations during phone conversations with Jackie on November 4 and 6. (Garber-Paul Dep. at 72:4-24.)

228. In the draft article, there was a purported quote from "Randall," the pseudonym *Rolling Stone* used for Ryan Duffin, one of the three friends that supposedly met with Jackie following her supposed gang rape. (*Id.* at 76:4-22; Garber-Paul 1st Round Handwritten Notes, RS004810-4849, at RS004814). The draft article stated: "Greek life is huge at UVA, with one-third of undergrads belonging to a fraternity or sorority, so Jackie fears the backlash could be big—a "shitshow" predicted by her now-former friend Randall, who, citing loyalty to his own frat, declined to be interviewed." (*Id.*).

229. In fact, *Rolling Stone* had not interviewed or sought comment from Ryan Duffin, and did not even know his full name at the time of publication. (Garber-Paul Dep. 77:19-78:6.)

230. In the margin on the draft next to this supposed quote from "Randall," Garber-Paul wrote, "Put this on Jackie?" (*Id.* at 76:23-77:11.) Garber-Paul was suggesting that *Rolling Stone* should make clear that it had not interviewed Randall and that this supposed Randall quote came from Jackie. (*Id.* at 77:12-18, 79:9-14.)

231. Garber-Paul's suggestion to "put this on Jackie" was not adopted by the decision-makers at *Rolling Stone*. (*Id.* at 78:7-10, 79:15-17.) The same passage appears unedited in the final, published version of the article. (*Id.* at 78:7-20; *see also* Original Article at RS001072 (Ex. 16.).)

232. Similarly, Garber-Paul's suggestion that this statement be edited to say, "***Jackie says*** [Randall] declined to be interviewed" was rejected. (Garber-Paul Dep. at 78:21-79:22 (Ex. 27).)

233. *Rolling Stone* never confirmed "Randall's" quotes with him because Jackie refused to provide *Rolling Stone* with Ryan Duffin's contact information. (*Id.* at 83:7-19.)

234. Garber-Paul admitted that the "normal response" from a source asked for a friend's contact information would be, "Sure, here's the e-mail address," but Jackie declined to provide *Rolling Stone* with this contact information. (*Id.* at 82:8-83:5.)

235. *Rolling Stone's* fact-checker tried to urge *Rolling Stone* to make it clear in the article that the Randall "shitshow" quote came only from Jackie and not from Randall, but Sean Woods overruled her. (Woods Dep. at 132:21-134:19 (Ex. 8).)

236. Woods admitted that allowing quotes from the individual called "Randall" into the article that came only from Jackie, without making it clear to readers that *Rolling Stone* never

spoke to Randall, misled *Rolling Stone's* readers into believing that *Rolling Stone* had spoken to him and knew who he was.  (*Id.* at 130:4-132:22.)

237.     Then-Managing Editor Will Dana agreed that supposed quotes from Ryan Duffin were misleadingly attributed in the article to make it appear as though Erdely had spoken to Mr. Duffin, when in fact she had not.  (Dana Dep. at 380:10-18 (Ex. 21).)

238.     Similarly, *Rolling Stone* included in the article supposed quotes from two of Jackie's other friends, pseudonymously called "Andrew" and "Cindy," who were quoted as callously calling Jackie a "baby" for being upset about her gang rape, and as telling Jackie that she should have just "had fun with" being gang-raped by a "a bunch of hot Phi Psi guys." (Garber-Paul Dep. at 98:4-99:8 (Ex. 27).)

239.     Again, Garber-Paul made a notation asking whether *Rolling Stone* needed to "put [these] quotes on Jackie?" by which she meant that *Rolling Stone* should make it clear in the article that these supposed quotes came only from Jackie, and that *Rolling Stone* had never spoken with "Andrew" or "Cindy."  (*Id.* at 99:14-100:11, 100:24-101:8; Garber-Paul 1st Round Handwritten Notes at RS004821 (Ex. 52).)

240.     The final, published version of the article did not incorporate Garber-Paul's suggested changes, and the same quotes appeared unedited in final article.  (Garber-Paul Dep. at 101:9-102:4; Original Article at RS001074 (Ex. 16).)

241.     Garber-Paul acknowledged that as a fact-checker, one of her job duties was to confront sources about inconsistencies in their story.  (Garber-Paul Dep. at 247:7-10.)

242.     Erdely had been specifically told by one of Jackie's friends that Jackie's original story was that a group of men forced her to perform oral sex, and Erdely was aware that Jackie's story of her supposed sexual assault had changed significantly over time.  (Erdely Reporting

Notes at RS004429 (Ex. 10); Garber-Paul Dep. at 289:5-290:17 (Ex. 27).) But Erdely did not tell *Rolling Stone's* fact checker that Jackie's story had morphed from a story of forced oral sex to a graphic, detailed description of a vaginal gang rape with use of a beer bottle. (Garber-Paul Dep. at 290:18-22, 291:25-292:6.)

243. Erdely also never told *Rolling Stone's* fact checker that Erdely knew Jackie had told others a false story about how she met Ms. Eramo that was completely different from the story Jackie told Erdely. (Erdely Reporting Notes at RS004422; Garber-Paul Dep. at 293:7-295:15.)

244. Erdely never identified to Garber-Paul any inconsistencies, concerns, or outstanding questions about Jackie's story that she wanted Garber-Paul to help fact check. (Garber-Paul Dep. 338:24-339:4.)

245. Instead, Erdely was—and encouraged Garber-Paul to be—as accommodating as possible to Jackie during the fact checking process, so as not to scare Jackie away from participating in the article.

**From:** Sabrina Rubin Erdely <sabrina@sabrinaerdely.com>
**Sent:** Thursday, October 16, 2014 5:58 PM
**To:** Sacha Lecca
**Subject:** Re: "Jackie"

Sacha, thank you SO much for your feedback – I'm so happy you thought the story was strong & impactful. It's long, I know, but there was so much to say. (Hopefully once it's boiled down a little bit with Sean's help it'll be leaner & meaner.)

Yeah unfortunately I would say Jackie is in not-great mental shape right now, and won't be for a long while. I salute her for wanting to see this story through, but the experience has been overwhelming. She went through a phase recently where she wasn't returning my calls and I had to go to Virginia to make sure she was still on board. (Come to think of it, she hasn't returned my calls this week.) So I'm trying to be as accommodating as possible – which means that when she insisted on no photos, I didn't put up much of a fight, sorry. I argued instead for her to use her real first name (which is a fight I may ultimately lose anyway; last I spoke with her, she was reconsidering, at her friends urging).

> "She went through a phase recently where she wasn't returning my calls … So I'm trying to be as accommodating as possible …."

**From:** Sabrina Rubin Erdely <sabrina@sabrinaerdely.com>
**Date:** Tuesday, November 4, 2014 at 5:07 PM
**To:** Elisabeth Garber-Paul <Elisabeth.Garber-Paul@Rollingstone.com>
**Cc:** Sean Woods <Sean.Woods@rollingstone.com>
**Subject:** Re: just got off the phone with jackie

Fantastic, I'm glad to hear it went well – thanks for letting me know (and for letting HER know we'll be accommodating of her, which seems crucial towards getting her through this process). Yes, let's take out the ███████ line and change "Tom" to something else; I'd picked it because it had the same one-syllable generic feel of "███" but lots of names fill that bill – ███████ ███████ etc etc. Let's just make sure our new choice doesn't share a name with anyone else from Jackie's past!

> "thanks … for letting HER know that we'll be accommodating of her, which seems crucial towards getting her through this process."

(Oct. 16, 2014 Email from Sabrina Rubin Erdely to Sacha Lecca, RS018959-60 (Ex. 38); Nov. 5, 2014 Email chain between Elisabeth Garber-Paul and Sabrina Erdely, RS013606-08 (Ex. 53).)

## XVII. *Rolling Stone's* Fact-Checker Specifically Alerts *Rolling Stone* That The Statements In The Article About Ms. Eramo Are False And Misleading, But Defendants Intentionally Ignore Her Concerns.

246. Also on the first round draft, next to the statement in the article, "But the dearth of attention isn't because rape doesn't happen in Charlottesville. It's because at UVA, rapes are kept quiet, both by students – who brush off rapes as regrettable but inevitable casualties of their cherished party culture – and by an administration which critics say is less concerned with protecting students than protecting its own reputation from scandal," Garber-Paul wrote, "*Yes, but not Dean Aramo [sic]*."



(Garber-Paul 1st Round Handwritten Notes at RS004815 (Ex. 52); Garber-Paul Dep. at 83:20-85:3 (Ex. 27).)

247. Jackie specifically told Garber-Paul that Jackie did not believe that Ms. Eramo was less concerned with protecting students than with protecting UVA's reputation from scandal. (Garber-Paul Dep. at 85:4-86:17.)

248. The same statement appears unedited in the final, published version of the article. (*Id.* at 86:13-87:18.)

249. In the draft article where Ms. Eramo was described as "a short woman with curly, dark hair and a no-nonsense demeanor," Garber-Paul circled this statement, wrote a question mark next to it, and wrote, "***Very sweet, second mom figure.***"



(*Id.* at 116:2-20; Garber-Paul 1st Round Handwritten Notes at RS004828.)

250.    This note was based on Garber-Paul's conversation with Jackie, who specifically told Garber-Paul that she disagreed with this characterization of Ms. Eramo because it had a negative connotation.  (Garber-Paul Dep. at 116:14-118:12.)  The characterization of Ms. Eramo as having a "no-nonsense demeanor" appeared unchanged in the final, published version of the article.  (*Id*. at 116:21-117:6.)

251.    Exhibit 54 is the second draft of the article that Garber-Paul performed fact-checking on.  (Garber-Paul Dep. 127:3-16; Garber-Paul 2nd Round Handwritten Notes, RS004860-4869 (Ex. 54).)

252.    The "deck" at the beginning of the draft states, "Jackie was just starting her freshman year at the University of Virginia when she was brutally assaulted by seven upper classmen at a frat party.  When she tried to hold them accountable, a whole new kind of abuse

began." (Garber-Paul 2ⁿᵈ Round Handwritten Notes at RS004860; Garber-Paul Dep. at 128:18-129:7.)

253. On the draft, Garber-Paul circled the statement, "When she tried to hold them accountable, a whole new kind of abuse began," and wrote next to it in red pen, "***nope.***"



(Garber-Paul 2ⁿᵈ Round Handwritten Notes at RS004860 (emphasis in original); Garber-Paul Dep. at 129:19-132:2.)

254. Garber-Paul discussed this statement with Deputy Managing Editor Sean Woods, and Woods made the decision to retain the statement, "When she tried to hold them accountable, a whole new kind of abuse began," in the final, published version of the article. (Garber-Paul Dep. at 131:18-132:22.)

255.    In her conversations with Jackie, Jackie made it clear to Garber-Paul that Jackie considered Ms. Eramo to be an asset to the community.  (*Id.* at 133:4-134:8.)  Other sources Garber-Paul spoke to, including Sara Surface, confirmed this view of Ms. Eramo.  (*Id.* at 134:9-18.)

256.    On the second draft round of fact-check edits, Garber-Paul suggested multiple edits to the statement in the article: "Lots of people have discouraged her from sharing her story, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang rape allegations more than a year ago."  (Garber-Paul 2nd Round Handwritten Notes at RS004862 (Ex. 54); Garber-Paul Dep. at 158:20-159:15 (Ex. 27).)

257.    The "trusted UVA dean" referred to in this sentence is Nicole Eramo.  (Garber-Paul Dep. at 159:8-10.)

258.    During fact-checking, Garber-Paul suggested editing this sentence to read, "Lots of people have discouraged Jackie from sharing her story *so publicly*…," in order to make it clear that *Rolling Stone* was not suggesting that Ms. Eramo discouraged Jackie from speaking about her assault or going to the authorities regarding her assault.  (Garber-Paul 2nd Round Handwritten Notes at RS004862; Garber-Paul Dep. 159:11-160:25.)

259.    Deputy Managing Editor Sean Woods made the decision not to include that change in the final, published version of the article.  (Garber-Paul Dep. at 160:18-162:5.)

260.    Garber-Paul made another note on this same sentence, suggesting it be edited further to say, "Lots of people have discouraged her from sharing her story *so publicly*, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang rape allegations more than a year ago, ***who fretted that the article might complicate future***

*proceedings*." (Garber-Paul 2nd Round Handwritten Notes at RS004862; Garber-Paul Dep. at 162:15-163:12.)

261.    This suggested edit was also not included in the final, published version of the article. (Garber-Paul Dep. at 163:13-17.)

262.    Garber-Paul also wrote an additional note next to the sentence about Ms. Eramo discouraging Jackie from sharing her story, noting "***At best, some may be worried about her mental health, but…***" (*Id*. at 163:18-25; Garber-Paul 2nd Round Handwritten Notes at RS004862). This suggested language was also not included in the final published version of the article. (Garber-Paul Dep. at 164:1-4.)

263.    Garber-Paul's three suggested changes to the sentence—"Lots of people have discouraged her from sharing her story, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang rape allegations more than a year ago"—are depicted below:



(Garber-Paul 2nd Round Handwritten Notes at RS004862.)

264.    Ultimately, the statement about Ms. Eramo discouraging Jackie from sharing her story was published unedited in the final version of the article, without any of the edits that the fact-checker proposed.    (Garber-Paul Dep. at 164:5-165:12; *see also* Original Article at RS001072 (Ex. 16).)

265.    In the section of the draft article following the description of Jackie's meeting with Ms. Eramo, the draft article stated: "Absent any real guidance, Jackie would eventually wonder how other student victims tended to handle her situation."    (Garber-Paul 2nd Round

Handwritten Notes at RS004866 (Ex. 54).) Garber-Paul wrote a note on the draft that said, "Harsh?" (Garber-Paul Dep. at 185:13-186:1 (Ex. 27).)

266. Garber-Paul admitted that she wrote this note because she thought that the statement that Jackie did not have "any real guidance" "could be interpreted as being too harsh." (*Id.* at 186:4-6.) In the final, published version of the article, this statement was retained, but was revised to say, "absent much guidance." (*Id.* at 186:2-10.)

267. Next to the draft article where the article claims that Ms. Eramo told Jackie that UVA does not publish sexual assault statistics "because nobody wants to send their daughter to the rape school," Garber-Paul wrote: "Did Jackie describe this? Ask Sean." (*Id.* at 194:13-22; Garber-Paul 2nd Round Handwritten Notes at RS004867.)

268. Garber-Paul had discussions with Sean Woods about whether *Rolling Stone* should publish the supposed "rape school" quote from Ms. Eramo because they had no confirmation of this supposed quote other than from Jackie. (Garber-Paul Dep. at 194:23-195:12.)

269. *Rolling Stone* never asked Ms. Eramo or anyone at UVA whether Ms. Eramo ever actually said this. (*Id.* at 192:11-194:12.) *Rolling Stone* decided to include this false quotation from Ms. Eramo in the final, published version of the article. (*Id.* at 195:13-16.)

270. Exhibit 55 is Garber-Paul's third round of fact-checking edits, which she created on or about November 10, 2014. (Garber-Paul Dep. at 209:4-17; Garber-Paul 3rd Round Handwritten Notes, RS004850-4859 (Ex. 55).)

271. On Exhibit 55, next to the "photo illustration" of Ms. Eramo that was made to appear as if Ms. Eramo was smiling while a crying rape victim sat in her office, Garber-Paul wrote the hand-written notation, "Is this too <u>mean</u>?"



(Garber-Paul 3rd Round Handwritten Notes at RS004856 (Ex. 55) (emphasis in original); Garber-Paul Dep. at 230:13-232:4 (Ex. 27).)

272. Garber-Paul admitted that this was her reaction to the doctored photograph of Ms. Eramo in the article. (Garber-Paul Dep. at 232:13-233:1.)

273. The same photo illustration appears unchanged in the final, published version of the article. (*Id*. at 233:2-5; *see also* Original Article at RS001076 (Ex. 16).)

274. Woods admitted that the fact-checker, Garber-Paul, discussed with him her concern that the "photo illustration" of Ms. Eramo in the article was "too mean," but that he ultimately decided to publish it in the final article. (Woods Dep. at 171:16-173:22 (Ex. 8).)

275. Then-Managing Editor Will Dana also signed off on the inclusion of the illustration of Ms. Eramo in the final article. (Dana Dep. at 134:5-21 (Ex. 21).)

276. Woods admitted that the fact-checker, Garber-Paul, attempted to "push the piece and made a number of arguments to make the piece softer on Eramo." (Woods Dep. at 117:15-118:9.)

277. The final, published version of the article does not at all mention the fact that Ms. Eramo took Jackie to meet with the University and Charlottesville Police on multiple occasions. (Garber-Paul Dep. at 268:21-25; *see generally* Original Article.)

278. Garber-Paul never even asked Jackie about the substance of her meetings with the police and never asked Jackie if she discussed her supposed sexual assault with the police. (Garber-Paul Dep. at 268:13-269:4.)

279. Erdely knew from speaking to Jackie's friend, Rachel Soltis, that Jackie had told Soltis a false story about first meeting Ms. Eramo when Jackie supposedly served as a witness at a sexual misconduct trial of a woman who was raped by a fraternity member, but Erdely never alerted Rolling Stone's fact-checker that Jackie had told Soltis a "completely different" story than what Jackie told Erdely with respect to how she met Ms. Eramo (*Id.* at 293:7-294:17.)

## XVIII. UVA Attempts To Cooperate With Defendants, But Defendants Do Not Give UVA A Meaningful Opportunity To Address The Charges Leveled In The Article.

280. On September 9, 2014, while attempting to set up an interview with Ms. Eramo through UVA administrator MacGregor McCance, Erdely told McCance during a telephone call that she was "doing an article about rape on college campuses, focusing on University of Virginia." (Erdely Reporting Notes at RS004327 (Ex. 10).) She further explained that "the article is going to be largely about the culture of campus life, and how it affects rape and its aftermath – how rapes are perceived, whether they're reported. So in a sense it's an article about rape culture at college, what that looks like, and how that plays out in the lives of rape victims."

(*Id.*)  During her conversation with McCance, she never mentioned, as she had to myriad others, that her article would focus on "institutional indifference."  (*See generally id.*)

281.    On September 9, 2014, UVA provided Erdely additional information to follow up on questions that Erdely had asked, but to which the administrators were unsure of the answers. (Oct. 9, 2014 Email from Anthony deBruyn to Sabrina Erdely, RS016682-6683 (Ex. 56).)

282.    On September 16, 2014, Erdely emailed UVA administrator McGregor McCance asking several questions about UVA's statistics on sexual assault.  (Erdely Reporting Notes at RS004399-4400.)

283.    McCance worked with Ms. Eramo to collect that data, and provided responsive answers on October 2, 2014.  (*Id.* at RS004446-4448; Oct. 2, 2014 Email from Charles McCance to Sabrina Erdely, RS018811-13 (Ex. 57).)

284.    On October 2, 2014, the day after Erdely described the theme of her article to *Rolling Stone* photo editor Sacha Lecca as one of "inaction and silence at UVA" (Oct. 1, 2014 Email from Sabrina Erdely to Sacha Lecca, RS018873 (Ex. 58)), Erdely was provided the opportunity to interview UVA President Teresa Sullivan for the forthcoming article.  During that interview, Erdely described "A Rape On Campus" as "the article that I am writing [that] will look at how rape and sexual assault play out against the larger context of a campus, both with respect to student attitudes and also the administration's handlings — so kind of the larger culture in general.  The problem of sexual assault is obviously a big national issue, it's happening on every campus, but my article is going to focus specifically on UVA."  (Oct. 2, 2014 Interview by Sabrina Erdely with Teresa Sullivan and Susan Davis, RS015046, at Minute 1:05-1:32 (Ex. 59).)  Erdely went on to describe the fact that she has interviewed "a lot of students over the past few weeks," and that she "ha[d] a lot of questions about how sexual assault is handled on the

UVA campus." (*Id.*, at Minute 1:33-1:42.)  During the entirety of her approximately 44-minute interview, Erdely never told President Sullivan that her article was about "institutional indifference" to rape.  (*See generally id.*)

285.    After her interview with President Sullivan, Erdely interacted with Anthony DeBruyn, another UVA administrator, who provided Erdely with additional information responsive to her questions.  (Oct. 9, 2014 Email from Anthony deBruyn to Sabrina Erdely, RS016682-6683 (Ex. 56).)  Throughout that correspondence, Erdely never told DeBruyn that "A Rape On Campus" was going to focus on UVA's "institutional indifference" to sexual assaults. (*See generally id.*)

286.    Erdely likewise never asked UVA to verify whether Ms. Eramo said that the reason the school does not post statistics about sexual assaults on their website is because "nobody wants to send their daughter to the rape school." (*See generally* Erdely Reporting Notes (Ex. 10); Erdely Dep. 200:10-20 (Ex. 1).)

287.    Garber-Paul also exchanged multiple emails and did a telephone interview with University of Virginia representative Anthony DeBruyn.  (Garber-Paul Dep. at 301:2-24 (Ex. 27).)  Garber-Paul never conveyed to UVA any of the facts that *Rolling Stone* intended to publish about Jackie's supposed sexual assault, never asked whether or when Jackie actually reported the location of her supposed assault to UVA, and never asked whether UVA had reported Jackie's allegations to the Charlottesville Police Department.  (*Id.* at 313:3-314:11.)

288.    De Bruyn did tell Erdely in an October 9, 2014 email, with respect to a different case Erdely had provided him certain facts about, "your characterization of the facts of the spring 2014 case you referenced during our interview is incorrect."  (Oct. 9, 2014 Email from Anthony deBruyn to Sabrina Erdely, RS016682-6683 (Ex. 56).)

69

289.     Garber-Paul also never asked Ms. Eramo or anyone else at UVA whether Ms. Eramo had ever actually said the "rape school" quote that Jackie attributed to her.  (Garber-Paul Dep. at 189:13-194:12.)

290.     When told by a University of Virginia public relations official in September 2014 that Ms. Eramo could not talk about specific cases or allegations because of student privacy, Erdely specifically raised the possibility of her obtaining a waiver from the student to allow the University and Ms. Eramo to discuss such issues.  (Erdely Reporting Notes at RS004326 (Ex. 10.)  However, Erdely never attempted to obtain such a waiver from Jackie and never presented one to UVA.  (Erdely Dep. at 169:23-172:11 (Ex. 1).)  Erdely told UVA in September — two months before the article was published — that she was not sure she would have time to obtain a waiver.  (Erdely Reporting Notes at RS004326.)

## XIX.    Defendants Intentionally Did Not Give Phi Kappa Psi A Meaningful Opportunity To Address Or Rebut Jackie's Allegations.

291.     During dinner on September 12, 2014, Jackie asked Erdely whether Erdely had reached out to the Phi Psi to seek comment, and whether the "Phi Psi guys say they'd talk to [Erdely]" because Jackie was "interested in what they they're going to say."  (Sept. 12, 2014 Interview Tr. at RS118431 (Ex. 22).)

292.     Erdely had not yet sought comment from Phi Psi.  Nevertheless, she told Jackie that "they're either going to say, 'It didn't happen' or they're going to say, 'No comment,' you know?  I mean, they'd be foolish to say anything else."  (*Id*. at RS118431-8432.)

293.     When Erdely reached out to Phi Psi's house advisor for UVA to seek comment about "rape allegations at your chapter of Phi Kappa Psi," the house advisor returned Erderly's phone call, asked that she put her questions in writing, and stated that he would "be happy to

answer them." (Erdely Reporting Notes at RS004462.) He told her again that he'd "be happy to answer your questions." (*Id*. at RS004463.)

294. Erdely, however, "never called him back" because "by that time [she] was putting in calls to Phi Psi national instead." (*Id.*)

295. When Erdely contacted the president of the UVA Phi Kappa Psi chapter to ask about gang-rape allegations, he told Erdely that he was aware fourth-hand that some kind of allegation that something of a sexual nature had taken place at a party, but that he did know any details. Although both Garber-Paul and Erdely were in possession of information from Jackie that would have allowed Phi Kappa Psi a meaningful opportunity to address, admit, or deny Jackie's allegations, neither Erdely nor Garber-Paul provided any details to the chapter president. (Garber-Paul Dep. at 329:22-332:10 (Ex. 27).)

296. When Erdely reached out to then-Phi Psi chapter president, Stephen Scipione, Erdely told Scipione that she had "become aware of allegations of [a] gang rape," and she asked Scipione whether he could "comment on those allegations." (Erdely Reporting Notes at RS004463-4464; Oct. 15, 2014 Email from Stephen Scipione to Sabrina Erdely, RS016693-6694 (Ex. 60).) Erdely did not provide Scipione the date of the alleged rape, the name of the alleged fraternity member who perpetrated the alleged rape, or any description of the alleged attack. (*Id.*)

297. Scipione responded to her request on the same day, saying that, "an individual who remains unidentified had supposedly reported to someone who supposedly reported to the University that during a party there was a sexual assault. We were not told that it was rape, but rather that something of a sexual nature took place. Even though this allegation is fourth hand and there are no details and no named accuser, the leadership and fraternity as a whole have

taken this very seriously." (*Id.*) Phi Psi further told Erdely that "the source of the allegation is anonymous and there is no evidence to substantiate [the claims]." (Erdely Reporting Notes at RS004478 (Ex. 10).)

298.    Erdely did not respond to Scipione with any additional information, including identifying the accuser, the nature of the alleged assault, or why Erdely believed that the attack was a gang-rape. (*See generally id.*)

299.    Then-Managing Editor Will Dana acknowledged that Erdely did not share enough information about Jackie's allegations with Phi Kappa Psi to allow the fraternity to meaningfully respond to the accusation. (Dana Dep. at 234:3-16 (Ex. 21).)

300.    The *Rolling Stone* fact-checker, Garber-Paul, never contacted Phi Kappa Psi prior to the publication of the article and thus did not seek comment, corroboration, or verification of any details of Jackie's story from Phi Psi, such as whether an individual matching the description of the supposed ringleader of Jackie's assault was ever a member of the fraternity. (Garber-Paul Dep. at 327:11-329:11 (Ex. 27).) Garber-Paul did not contact Phi Psi because Erdely told her she shouldn't. (*Id.* at 326:2-327:10.)

301.    Then-Managing Editor Will Dana testified with respect to the article that it represented an institutional, individual, and procedural failure, and that "[e]very single person at every level of this thing had opportunity to pull the strings a little harder to question things a little more deeply, and that was not done." (Dana Dep. at 344:16-345:9.)

## XX.    *Rolling Stone* Knew Eramo Tried To Get Jackie To Pursue A Complaint And Took Jackie To The Police.

302.    In one of their first interviews, Jackie told Erdely about telling Ms. Eramo in the spring of 2013 that she had been sexually assaulted. (Erdely Reporting Notes at RS004246 (Ex. 10).) Notably, and contrary to Defendants' claims in the article, Jackie did not tell Erdely that

she told Ms. Eramo that she was gang raped, nor did she claim to have told Ms. Eramo where her supposed sexual assault occurred. (*Id*.) Instead Jackie told Erdely, referring to what she told Ms. Eramo, "I was crying and trying to explain to her what happened because I had never told anybody I had just broken it down into numbers, 'I was up in this room, there was 7 guys and 2 of them told them what to do,' talking incoherently and crying . . . ." (*Id*.)

303. Jackie told Erdely that Ms. Eramo immediately presented Jackie with the options of pursing a sexual misconduct complaint with the university and/or criminal charges through the police. (*Id*.) Jackie told Erdely that although she told Ms. Eramo she was unwilling to pursue any kind of complaint, Ms. Eramo contacted her multiple times over the summer and when she returned to campus to urge her to reconsider that decision. (*Id*. at RS004250.)

304. As early as July 2014, in one of their first interviews, Jackie told Erdely that she had recently told Ms. Eramo about two other supposed, anonymous Phi Kappa Psi gang rape victims (known only to Jackie). (*Id*. at RS004169). Jackie told Erdely that she did not want to make a formal complaint or pursue misconduct proceedings regarding her assault and insisted on retaining her anonymity, that Ms. Eramo had spoken with the Dean of Students about whether the University could take away the fraternity's charter in the absence of an adjudicated complaint and while preserving Jackie's anonymity, and that the Dean of Students had concluded that if another student came forward so that there were multiple reliable, anonymous reports about sexual assault at Phi Psi, the University could and would seek to remove Phi Psi's charter. (*Id*.)

305. Jackie told Erdely that Ms. Eramo's reaction to Jackie's claim of knowing another unnamed girl who was also gang raped at Phi Psi was to say, "you have to have her come in," that "[Ms. Eramo] got pissed at the frat, she said two fraternities lost their charter this year it wouldn't bother me at all to add a third." (*Id*. at RS004312.) Jackie told Erdely that Ms. Eramo

repeatedly pressed Jackie to encourage this other supposed victim to come forward to the Dean of Students Office, but Jackie claimed the young woman was unwilling to do so. (*Id.*) Jackie confirmed to Erdely that she did not tell Ms. Eramo the names of these two other supposed victims, and that UVA did not know who they were. (*Id.*)

306. Also in July of 2014, Emily Renda told Erdely that Ms. Eramo and Dean of Students Allen Groves were pursuing ongoing action against Phi Psi and that they were working to get Jackie's supposed two anonymous other Phi Psi victims to come forward. (Renda Dep. at 176:17-178:7 (Ex. 11).) Renda told Erdely that Ms. Eramo was "very passionate" about punishing Phi Psi and seeing justice done in Jackie's case. (*Id.* at 79:12-22.)

307. Renda also communicated to Erdely that the two other supposed gang rape victims were known only to Jackie, and that Renda and the university did not know who they were but were working to convince them to come forward. (*Id.* at 77:18-79:5.) Renda also communicated to Erdely that it was very difficult for the university to take action against Phi Psi in the absence of formal reports from Jackie or the supposed other victims. (*Id.* at 80:18-81:7.)

308. Renda further communicated to Erdely that there were serious due process concerns with taking action against a fraternity without a formal allegation and adjudication, but that Ms. Eramo was doing everything in her power while respecting the due process rights of the accused. (*Id.* at 82:4-84:6.)

309. Jackie also told Erdely that after an incident in April 2014 in which fraternity members allegedly assaulted her with a bottle for speaking out about her sexual assault, Ms. Eramo again encouraged Jackie to speak to the police and to pursue a university sexual assault trial. (Erdely Reporting Notes at RS004250.) Jackie again confirmed her refusal to pursue criminal charges regarding her assault. (*Id.*)

310.    Jackie also told Erdely that she had met with the Charlottesville Police through Ms. Eramo.  (*Id*. at RS004313.)  In August 2014, Jackie forwarded to Erdely correspondence between Jackie and Ms. Eramo in April 2014 reflecting that Ms. Eramo arranged multiple meetings between Jackie and police officers and detectives in spring 2014, and that the detectives had been aggressive about investigating Jackie's claims, but that Jackie had refused to proceed with an investigation.  (Aug. 16, 2014 Email Chain from Jackie to Sabrina Erdely, RS017031-42 ("Police Emails") (Ex. 61).)

311.    Sean Woods knew prior to the publication of the article that Ms. Eramo had taken Jackie to the police, because "[t]here were e-mails that I was maybe made aware of that sort of show that there had been a – that Eramo had helped her go to the police…. We had a police report that it had happened and that Dean Eramo was helping Jackie."  (Woods Dep. at 42:12-44:1, 46:8-17 (Ex. 8).)

312.    On November 17, 2014, just two days before the article was published, Jackie told Erdely that she had recently spoken with the "head of university police" about the impending publication of the article and her safety concerns, and Jackie confirmed that this was one of the same officers she spoke to the prior April, that he was aware of her sexual assault allegations, and that he praised her for going public with her sexual assault allegations, supposedly saying, "I'm glad you guys did this.  Everyone should know."  (Erdely Interview Notes at RS014343 (Ex. 25).)

313.    Prior to the publication of the article, then-Managing Editor Will Dana was not made aware that Erdely had emails in her possession showing that Ms. Eramo set up multiple meetings between Jackie and the police.  (Dana Dep. at 392:20-393:7 (Ex. 21).)

314.     Sean Woods made the decision to cut from the first draft of the article the fact that Ms. Eramo took Jackie to meet with the police. (Woods Dep. at 94:23-96:5.)

315.     The final, published article does not anywhere mention that Ms. Eramo arranged multiple meetings between Jackie and the police. (Dana Dep. at 397:9-18.)

316.     In July 2014, Emily Renda explained to Erdely that Dean of Students Allen Groves and Ms. Eramo were pursing ongoing action against Phi Psi and trying to work to get Jackie's supposed two anonymous Phi Psi gang rape victims to come forward. (Renda Dep. at 176:17-178:7 (Ex. 11).)

317.     Woods admitted that *Rolling Stone* knew prior to publication of the article that Ms. Eramo absolutely wanted to see Jackie's allegations investigated and adjudicated and wanted Jackie to go forward with a complaint. Woods admitted: "We have an e-mail where Eramo is saying, We want to bring these men to justice. We have Eramo in an e-mail with Emily Renda – or Emily Renda stating Eramo is very hot about this, and is looking to investigate Phi Psi, which is one of the reasons they – Renda doesn't – and this is my memory of it, and again, I haven't looked at these – but that Renda said, you know, Eramo wants to bring Phi Psi to justice." (Woods Dep. at 73:11-25.)

318.     Emily Renda testified that Ms. Eramo put Jackie in touch with her (Renda) specifically because Ms. Eramo was concerned that Jackie was not interesting in pursing any University or police action regarding her sexual assault, and that Ms. Eramo hoped that by working with Renda, Jackie might get to the point where she was willing and able to do those things. (Renda Dep. at 25:5-24.)

319.    Woods admitted that, "saying that Dean Eramo abused Jackie is just not what happened," and said of Ms. Eramo's support of Jackie, "that's not an abuse." (Woods Dep. at 166:19-167:11.)

320.    Woods also admitted that Ms. Eramo did not in any way discourage Jackie from pressing charges with the university or the police. (Woods Dep. at 178:2-19.)

## XXI.    Jackie Herself Repudiates Defendants' Claims About Mr. Eramo's Treatment Of Her.

321.    On September 19, 2014 Jackie texted ███████████████████████



███████████████████████ (Sept. 19, 2014 Text between Jackie and ██████████, RESPJ00000808-811, at RESPJ00000808 (Ex. 62); Jackie Dep. at 41:2-25 (Ex. 45).)

322.    Jackie testified that ████████████████████████

████████████. (Jackie Dep. at 43:5-18.)

323.    Jackie stressed to Erdely that ████████████████

████████████ (Id. at 93:7-94:12.)

324.    On October 20, 2014, Erdely told Jackie that her first draft is about "the culture of silence around rape at UVA, both from the students, who see it as just another aspect of the party

culture, and from the administration, who in my opinion just want to keep these things quiet and contained." (Erdely Reporting Notes at RS004471 (Ex. 10).)

325. On November 7, 2014, just a week-and-a-half before the article was published, Jackie emailed a friend, saying that ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ (Nov. 7, 2014 Email from Jackie to ██████████, RESPJ00000562-563 (Ex. 63).) Jackie then added, ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████ (*Id.*)

326. On November 10, 2014, just nine days before the article as published, ██████████

███████████████████████████████████████████████████████

(Nov. 10, 2014 Advocate Note, UVA050000071-72 (Ex. 64).) ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████ (*Id.*)

327. Jackie testified that ████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████. (Jackie Dep. at 76:10-77:4 (Ex. 45).)

328.     Jackie was ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████. (*Id.* at 78:2-24.)

329.     On November 21, 2014, Jackie told ████████████████████████

████████████████████████████████████████████████████. (Nov. 21,

2014 Text with Jackie and Alex Pinkleton and Sara Surface, RESPJ00000276-325, at

RESPJ00000300 (Ex. 65).)

330.     Exhibit 66 is a November 24, 2014 Open Letter that Jackie and others wrote to the

*Cavalier Daily*, the UVA student newspaper, in support of Ms. Eramo.   (Students and

community supporters, *LETTER: Advocating for Dean Eramo*, THE CAVALIER DAILY (Nov.

14, 2015), ERAMO-00878-891 ("Open Letter") (Ex. 66); Dana Dep. at 283:18-284:12 (Ex. 21);

Jackie Dep. at 24:11-25:8 (Ex. 45).)

331.     Then-Managing Editor Will Dana was aware of Jackie's statements in the Open

Letter on or about November 24, 2014.  (Dana Dep. at 283:18-284:18.)  Dana acknowledged

there were internal discussions at *Rolling Stone* at the time about Jackie having voiced public

support for Ms. Eramo.  (*Id.* at 284:19-285:1.)

332.     On December 3, 2014, Jackie texted Ryan Duffin, saying:

"First off I want to say I'm SO SORRY for the[] way Sabrina wrote about you
and Alex and Kathryn in the article.  The story wasn't even supposed to be about
my assault.  It was supposed to be about survivor support and advocacy at uva and
since I'm super active in the advocacy community I agreed to take an interview
with her in June and she asked me to explain what happened to me so I did but I
never thought she would publish it . . .  I had no clue what she was writing about
until October.  I tried to pull out of it because I know her writing style and I know
she would sensationalize things and take extreme artistic license (which she
definitely did) but she said it would be published with or without me.  I know she
misrepresented you and Alex and Kathryn as well as [D]ean Eramo and a lot of
other people in the story."

(Dec. 3, 2014 Text between Jackie and Ryan Duffin, Duffin-0001-04, at Duffin-0001 (Ex. 67).)

333.    The same day, Jackie also texted to Duffin: "Yes, [Erdely] definitely did her own thing and at the end I had absolutely no control over what she published.  It was the shittiest situation ever.  I spoke with a reporter from the [P]ost explaining how Sabrina took a vast majority of what I said and twisted it and ultimately manipulated my assault to get something sensational … and I told him that [Erdely] misrepresented you and Dean Eramo." (*Id.*)

334.    Jackie also told Duffin that "[Erdely] basically made up" the entire post-gang rape scene where Jackie's friends supposedly urged Jackie to keep her sexual assault quiet to protect her reputation.  (*Id.* at Duffin-0002.)



335.    Jackie confirmed in testimony ███████████████████████████ ████████████████████████████. (Jackie Dep. at 106:24-107:14 (Ex. 45).)  Jackie also confirmed that ████████████████████████████ ████████████████████████████████ ███. (*Id.* at 108:5-109:14.)

336.    Jackie also ██████████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████████████ (*Id.* at 118:4-120:3, 338:7-19.)

337.    Jackie testified that ████████████████████████ ████████████████████████ (*Id.* at 214:20-215:3, 335:20-25.)

338.    Jackie ████████████████████████ ████████████████████████████████ ██████████████ (*Id.* at 336:9-15.)

339.    Jackie also ████████████████████████████████████████████

██████████████████████████████████████████████████████ (*Id.* at

338:20-339:10.)

## XXII. Rolling Stone Continued To Mislead The Public As Questions Were Raised About Its Reporting.

340.    On November 26, 2014, Erdely had a telephone conversation in which she asked

Jackie for the name of the ringleader of her supposed gang-rape.  Jackie provided a name, but

claimed she was unsure how to spell it and provided multiple different variations.  Erdely wrote

in her notes that it was "odd that she doesn't know the name of her attacker."  (Erdely Notes,

RS014975-4980, at RS014975 (Ex. 68).)

341.    Erdely admitted that she believed Jackie had given her a "false name" for her

attacker on November 26, and that the conversation caused an "alarm bell" to go off in her head

at that time.  (Erdely Dep. at 270:19-273:18 (Ex. 1).)

342.    After Erdely had a telephone conversation with Jackie on November 26, 2014,

then-Managing Editor Will Dana acknowledged that he, Sean Woods, and Erdely had

discussions over the next several days about concerns with Jackie and there being "some things

here to pay attention to."  (Dana Dep. at 175:15-176:11 (Ex. 21).)

343.    Dana acknowledged that in the days following a conversation Erdely had with

Jackie on November 26, 2014, Erdely discussed concerns with Dana about being unable to

confirm a name Jackie provided for the supposed ringleader of her assault, and that Erdely

communicated to Dana that Erdely was concerned about the integrity of the article.  (*Id.* at 342:4-

343:18.)

344.    During an interview for a *Slate* magazine podcast published on November 27,

2014, the hosts of the show repeatedly and directly asked Erdely if she knew who any of Jackie's

assailants were and whether Erdely had spoken to or gotten comment from any of Jackie's assailants. (Nov. 27, 2014 Slate Podcast Tr., Certified Tr., Nov. 27, 2014 *Slate DoubleX Gabfest*, "Butch Goddess Edition," Compl. At Ex. D [Dkt. 14-8]; Answer ¶ 188; *see also* http://www.slate.com/articles/podcasts/doublex_gabfest/2014/11/the_double_x_gabfest_on_uva_ frats_and_rape_in_rolling_stone_husbands_hurting.html.) Each time, Erdely avoided answering the question, and despite these direct inquiries Erdely did not acknowledge that Jackie refused to provide the names of any of her assailants to her or that *Rolling Stone* never obtained their names or verified that any of them existed. (*Id.*)

345.   In a November 28, 2014 email to Washington Post reporter Paul Farhi, who was asking questions about how Rolling Stone verified Jackie's story, Sean Woods claimed to the *Washington Post* that *Rolling Stone* did not name any of Jackie's alleged assailants for "legal reasons." (Nov. 28, 2014 Email from Paul Farhi to Sean Woods, RS016040-6043, at RS016042 (Ex. 69.).) Woods did not admit to Farhi that *Rolling Stone* did not actually know the names of any of the alleged perpetrators. (Woods Dep. at 209:17-210:7 (Ex. 8).)

346.   In response to more questions from *Washington Post* reporter Paul Farhi about the reporting of the article, Erdely told Farhi on December 1, 2014: "Paul, once again, I'm not going to comment on whether I talked to Drew or not." (Dec. 1, 2014 Email from Sabrina Erdely to Paul Farhi, RS016119-6122, at RS016120 (Ex. 70).) When Woods suggested she tell Farhi that, "[t]his story wasn't about depicting a he said/she said account of a sexual assault but what happened when a girl comes forward with a claim of brutal rape and how those in power failed to respond to her," Erdely responded to Woods, "Sorry to say, that is a terrible statement – it opens up the conversation to 'he said' and what his side of the story was, and the fact that we didn't include it . . . We can't give specifics . . . ." (*Id.* at RS016119.)

347.    On December 1, 2014, Woods lied to Paul Farhi of the *Washington Post*, speaking of Jackie's alleged assailants, when he said, "we verified their existence" and "I'm satisfied that these guys exist and are real. We knew who they were." (Paul Farhi, *Author of Rolling Stone article on alleged U-Va. rape didn't talk to accused perpetrators*, THE WASHINGTON POST (Dec. 1, 2014), ERAMO-04874-4876, at ERAMO-04875 (Ex. 71); Woods Dep. at 244:21-246:13 (Ex. 8).) Woods admitted that claiming that *Rolling Stone* knew who Jackie's attackers were and verified their existence was a "mistake," and that he "shouldn't have said it like that." (Woods Dep. at 247:17-248:2.) Woods admitted that these statements to Paul Farhi could be categorized as "falsehoods." (*Id.* at 276:17-23.)

348.    Sara Surface testified that a few days after the article was published, when Jackie gave them the name she had given to Erdely as the supposed ringleader of her assault, Surface and Alex were quickly able to discern from simple online searches that the person by that name was not in Phi Psi and did not match the description Jackie had given of her rapist. (Surface Dep. at 122:19-123:14, 125:8-127:16 (Ex. 13).)

349.    On December 2, 2014, Sara Surface told Erdely that Jackie had recently provided her the same name, but that the only possible UVA student they could find with that name "wasn't in Phi Psi so that was confusing." (Erdely Notes at RS014975-76 (Ex. 68).)

350.    Surface also told Erdely on December 2, 2014 and told her that she could not match Jackie's supposed assailant with an actual person and that "something was up" and she doubted Jackie's credibility. (Surface Dep. at 131:7-11, 194:19-195:16.) Erdely admitted to Surface in that conversation that Erdely had also tried to verify the name Jackie had given to Erdely as Jackie's assailant and that Erdely could not verify it. (*Id.* at 131:12-132:15.)

351.    On December 5, 2014, a reporter from the *Washington Post* emailed Erdely to tell her that he has interviewed Jackie and intended to publish a story questioning the truth of "A Rape on Campus."   (Dec. 5, 2014 Email from Sabrina Rubin Erdely to Melissa Bruno, RS007816-22, at RS007817 (Ex. 72).)   Erdely wrote to a Rolling Stone public relations employee, saying that it was important that Rolling Stone get a "mea culpa" to press before the *Washington Post* article, "so it doesn't look like we were shamed into it."  (*Id*.)  Erdely instructed the PR employee to "hold [the *Post* reporter] off," "[a]sk him about his deadline," and "[d]elay him as much as possible, maybe tell him I'd like to talk (though I'm not sure that I do) but that I'm super busy today?"  (*Id*.)

352.    Erdely then emailed the Post reporter, telling him, "thanks for reaching out.  I'd actually like to speak with you for your story.  What's your deadline?"  (Dec. 5, 2014 Email from Sabrina Rubin Erdely to Taylor Shapiro, RS007825-28, at RS007826-27 (Ex. 73).)

**XXIII. Rolling Stone Repeatedly Reaffirms The Defamatory Meaning And Implication Of The Article.**

353.    In a press release issued contemporaneously with the publication of the article, *Rolling Stone* described the article to other media outlets.  (Woods Dep. at 175:4-176:25 (Ex. 8).) The *Rolling Stone* press release said:



**Rolling Stone: A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA**

The new issue of *Rolling Stone* features a chilling account of rape at the University of Virginia campus. It tells the story of "Jackie," who was just starting her freshman year at UVA when she was brutally assaulted by seven men at a frat party. When Jackie tried to hold the men accountable, she was horrified to learn how the administration largely overlooks victims of sexual assault...and how the abusers keep getting away with their crimes.

The article was written by contributing editor Sabrina Rubin Erdely. Erdely sheds light on UVA's long history of basically letting sexual abuse go unpunished – and how victims have been discouraged from pressing charges.

The full story is on RollingStone.com: http://www.rollingstone.com/culture/features/a-rape-on-campus-20141119

*(Rolling Stone* Press Release, RS008128-29 (Ex. 74).)

354. Will Dana agreed that the statement in the press release, RS008128-8129, is a "fair summary" of the article. (Dana Dep. at 160:14-161:6 (Ex. 21).)

355. In an October 1, 2014 email to *Rolling Stone* magazine photo editor Sasha Lecca, author Sabrina Rubin Erdely described the article as "a story about how rape plays out against the culture at the University of Virginia….  Where the main narrative is about a girl who says she was gang raped at a fraternity and the school has done nothing….  The theme will be about the culture of inaction and silence at UVA — both from the students, who want to ignore sexual assaults, because it spoils the giant party of college, and also because of some demented loyalty to the institution and its image of perfection; and from the administration, who'll do anything to avoid scandal." (Oct. 1, 2014 Email from Sabrina Erdley to Sacha Lecca, RS018873 (Ex. 58); *see also* Erdely Dep. at 200:21-201:18 (Ex. 1).)

356.   Then-Managing Editor Will Dana acknowledged that the article claims that Ms. Eramo discouraged Jackie from reporting her gang-rape allegations, testifying, "[t]hat's exactly what the story says."  (Dana Dep. at 390:16-391:6 (Ex. 21).)

357.   In an official statement about the article on December 1, 2014, *Rolling Stone* described the article as "one woman's account of a sexual assault at a UVA fraternity in October 2012 — and the subsequent *ordeal* she experienced at the hands of University administrators in her attempts to work her way through the trauma of that evening."  (Dec. 1, 2014 Email from Sean Woods to Paul Farhi, RS003077 (Ex. 75); Woods Dep. at 227:24-230:11 (Ex. 8).)

358.   *Rolling Stone* and Erdely repeatedly described the article as being about how Jackie's sexual assault report to Ms. Eramo was met with "*indifference*."  (*See* July 1, 2016 Pl.'s Statement of Undisputed Facts in Supp. of Mot. for Summ. J. [Dkt. 99] ¶¶ 41, 87, 97, 104, 135.)

359.   In her statements on the November 26, 2014 Brian Lehrer Show and the November 27, 2014 episode of the *Slate* DoubleX Gabfest Podcast, Erdely claimed that the article showed not only the "*indifference*" with which Jackie's allegations were met, but also how Ms. Eramo "*did nothing*" in response to Jackie's allegations, how she "*brushed off*" Jackie, how Jackie's allegations were not reported to the police, how Jackie was "*discouraged from moving this forward*," and how Ms. Eramo sought to "*suppress*" Jackie's supposed sexual assault.  (Certified Tr., Nov. 27, 2014 *Slate DoubleX Gabfest*, "Butch Goddess Edition," Compl. At Ex. D [Dkt. 14-8]; Answer ¶ 188; *see also* http://www.slate.com/articles/podcasts/doublex_gabfest/2014/11/the_double_x_gabfest_on_uva_frats_and_rape_in_rolling_stone_husbands_hurting.html; Erdely Dep. at 256:8-258:7;,Certified Tr., Nov. 26, 2014 *The Brian Lehrer Show*, Compl. At Ex. C [Dkt. 14-7]; Compl. ¶ 240; Answer

¶ 240; *see also* http://www.wnyc.org/story/mishandling-campus-rape/; Erdely Dep. at 250:4-251:16 (Ex. 1).)

360.    Defendants acknowledge that Erdely's statements on the *Slate* podcast and Brian Lehrer Show were meant to "summarize" the "contents of the Article."  (July 1, 2016 Mem. of Law in Supp. of Defs.' MSJ [Dkt 102] at 66.)

361.    Erdely herself acknowledged that these statements were "shorthand for the article itself."  (Erdely Dep. at 252:16-20.)

## XXIV. Readers Of The Article Understood The Intended Defamatory Meaning And Implication.

362.    Emily Renda, one of Erdely's sources and at the time a campus sexual assault advocate who worked with both Jackie and Ms. Eramo, testified that her impression upon reading the article was that it "misrepresented a lot of things," including "that it painted a particularly unnuanced picture of the administration and Nicole as being indifferent, which I thought was not the case and I felt several of the people that were interviewed for the article would not have said."  (Renda Dep. at 96:5-21 (Ex. 11).)

363.    Renda felt that the article portrayed Ms. Eramo "negatively" and that the portrayal of Ms. Eramo in the *Rolling Stone* article was not "fair," because "it paints a picture of someone who does not care and dissuades people from reporting, and that is far and away not the woman I know and not the experience that plenty of people I've known to have worked with her have had."  (*Id.* at 96:22-97:14.)

364.    Renda read the article as implying and insinuating that Ms. Eramo was trying to "make [Jackie's allegations] go away," which was false.  (*Id.* 97:15-22.)

365.    Renda's impression of the article was that it "portrayed [Ms. Eramo] as someone who was indifferent or didn't care and or had discouraged Jackie from taking further action or seeking help." (*Id.* at 125:5-126:2.)

366.    Renda felt that the article unfairly "demonized" Ms. Eramo. (*Id.* at 102:3-19.)

367.    Renda's impression upon reading the article was that it portrayed Ms. Eramo as discouraging Jackie from reporting her sexual assault to the police or to the University. (*Id.* at 119:16-120:11.)

368.    Renda's impression of the article's description of Jackie's first meeting with Ms. Eramo was that "[the article] nominally ascribes to [Jackie] that it was her choice [not to file a complaint with the university and/or police] but sets a picture up of somebody who had no agency and was battered around by a lack of support . . . it seems the thesis of the article is that it wasn't really an informed choice, or that it wasn't the right choice, or that she wasn't properly supported in making that choice." (*Id.* at 196:2-14.)

369.    Renda described reading the article as like "being hit over the head with a baseball bat" because "Jackie's allegations were so shocking and because Dean Eramo had been treated so unfairly." (*Id.* at 120:22-121:10.)

370.    Alex Pinkleton testified that she believed Erdely's lip-service statement in the article about Eramo being beloved by survivors did not detract from the defamatory impact of the article, saying, "[Erdely], out of an article that was how many pages long, like seven pages long, so many words, put in one sentence where, like, oh, these three people – oh, regardless of the fact that Dean Eramo has swept gang rapes and tons of gang rapes other non-gang rapes – regardless of that fact, these three still stand by her; which is the total reason why Dean Eramo got death threats, why we got death threats, why we were called terrible advocates. Because I

think that's completely hilarious to think that by putting in one sentence it's like, well, they support her. You put in the article like we supported the devil. Like, that was exactly how it read." (Pinkleton Dep. at 144:22-145:15 (Ex. 12).)

371. Both Ms. Eramo and *Rolling Stone* received many emails from members of the public who read the article and understood it as attributing to Ms. Eramo unfitness to perform the duties of her employment as an Associate Dean of Students, and as accusing Ms. Eramo of lacking integrity in the discharge of her employment duties. (Dec. 7, 2014 Email from dynatite@gmail.com to letters@rollingstone.com, RS021352-1353 (Ex. 76); Dec. 4, 2014 Email from Colleen Cicale to letters@rollingstone.com, RS021604 (Ex. 77); Nov. 28, 2014 Email from Peter Engisch to letters@rollingstone.com, RS021657 (Ex. 78); Nov. 20, 2014 Email from Kim Raff to Nicole Eramo, ERAMO-00805 (Ex. 79); Nov. 20, 2014 Email from Holly Rhodes to Nicole Eramo, ERAMO-00816 (Ex. 80).)

372. On November 28, 2014 an individual named Peter Engisch sent an email to *Rolling Stone* at the inbox "letters@rollingstone.com" with the subject "A Rape on Campus." Engisch wrote that "Dean Eramo smells of cover up, deflect, delay and fake text book sensitivity. Protecting UVA is her No. 1 priority. Sickening." (Nov. 28, 2014 Email from Peter Engisch to letters@rollingstone.com, RS021657 (Ex. 78).)

373. On December 4, 2014 an individual named Colleen Cicale sent an email to *Rolling Stone* at the inbox "letters@rollingstone.com" saying "I just finished reading Sabrina Rubin Erdely's article about UVrApe," and adding that "[Jackie] should be proud of the work she has been doing as an advocate. She could teach her Dean Eramo a lesson or two on how to treat survivors." (Dec. 4, 2014 Email from Colleen Cicale to letters@rollingstone.com, RS021604 (Ex. 77).)

374.    On December 7, 2014, an individual sent an email to *Rolling Stone* at the inbox "letters@rollingstone.com" referencing the article about Jackie and stating: "Dean Eramo should be fired.  The Dean clearly set Jackie further adrift with her ambivalent response and bewildering options; Eramo well knew Jackie was so conflicted she'd not pursue the case, and Eramo intentionally guided Jackie to this 'solution', offering her a soft shoulder to cry on instead of an iron fist to help face her attackers and protect other students.  This softballing was intentional, in my opinion, to keep the case from becoming public and out of UVA control."  (Dec. 7, 2014 Email from dynatite@gmail.com to letters@rollingstone.com, RS021352-53 (Ex. 76).)

375.    On November 20, 2014, an individual named Kim Raff sent an email to Ms. Eramo with the subject "About the Rolling Stone article."  (Nov. 20, 2014 Email from Kim Raff to Nicole Eramo, ERAMO-00805 (Ex. 79).)  Beginning, "Dean Eramo, I am in the process of reading the Rolling Stone article about rapes on the UVA campus," the email said, "I am so sickened by what I have read and I think you should be ashamed of yourself and how you treat victims of sexual assaults."  (*Id.*)  The email went on to say, "Why you continue to protect these predators is baffling and I really can't understand how as a woman you can allow them to continue to victimize more young women/men.   Please Please Please for the love of god RESIGN!  You clearly do not contain the needed skills as a human/woman to do your job correctly.  You are a horrible person and your school is an abomination and disgusts me.  Please RESIGN so you don't ruin another student's life.  Do the right thing."  (*Id.*)

376.    On November 20, 2014, an individual named Holly Rhodes sent an email to Ms. Eramo with the subject "Shame on you."  (Nov. 20, 2014 Email from Holly Rhodes to Nicole Eramo, ERAMO-00816 (Ex. 80).)  The email stated, "As a woman, how can you turn a blind eye to these girls who are seeking help from such brutal acts…girls Ms. Eramo; GIRLS.

God will have his day with you and hold you accountable just as the boys who have raped and performed these disgusting acts. Do the great state of Virginia a favor and resign. You are a despicable human being." (*Id.*)

377. Victoria Groves, a sexual assault survivor and former UVA student, read the article and, based on the article, "became very angry with how University of Virginia officials acted, especially Associate Dean Nicole Eramo." (July 1, 2014 Declaration of Victoria Groves ¶ 4 (Ex. 81).) Groves "believed that, based on the article, Dean Eramo had completely failed to support" Jackie, and that "Dean Eramo had actively worked to convince Jackie to not move forward with reporting her assault in order to preserve the University's reputation." (*Id.*) She believed that "Dean Eramo was not a real advocate for sexual assault victims and survivors, she was not aware of victim's rights and the duties of individuals in positions like hers to protect and advocate on behalf of sexual assault victims, and that she was directly responsible for the fact that Jackie's attackers never saw justice." (*Id*. ¶ 5.) She further understood, "based on the article, Dean Eramo put the interest of the University above Jackie's interest and did not act with Jackie's well-being in mind." (*Id.* ¶ 4.)

378. In fact, Groves was so "disgusted ... with Dean Eramo's actions" that she "was compelled to voice her opinion" and email Ms. Eramo. (*Id.* ¶ 6.) To that end, Groves "emailed Dean Eramo directly" and wrote that Ms. Eramo's "'compliance in allowing these offenders to walk free time and time again [was] an atrocity,'" that "her actions were the equivalent of 'sweep[ing] sexual assault under the rug,'" and that Ms. Eramo's supposed actions, as detailed in the article "sicken[ed] me." (*Id.* ¶¶ 7-8.)

379.    Based on the article, Groves "held the conviction that Dean Eramo had completely failed Jackie, and likely other sexual assault victims at the University of Virginia, until I began to hear that the article was inaccurate in late 2014 and early 2015." (*Id.* ¶ 10.)

Dated:  July 22, 2016                    Respectfully submitted,

                                         By:   */s/ Elizabeth M. Locke*
                                         Thomas A. Clare (VA Bar No. 39299)
                                         Elizabeth M. Locke (VA Bar No. 71784)
                                         Andrew C. Phillips (VA Bar No. 88880)
                                         Joseph R. Oliveri (VA Bar No. 84335)
                                         CLARE LOCKE LLP
                                         902 Prince Street
                                         Alexandria, Virginia 22314
                                         Telephone: (202) 628-7400
                                         tom@clarelocke.com
                                         libby@clarelocke.com
                                         andy@clarelocke.com
                                         joe@clarelocke.com

                                         *Attorneys for Plaintiff Nicole P. Eramo*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of Plaintiff's Counter-Statement of Material Facts in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment was served on the below counsel of record on July 22, 2016, via the Court's electronic filing system.

> Michael John Finney & William David Paxton
> GENTRY LOCKE RAKES & MOORE
> P.O. Box 40013
> Roanoke, VA 24022-0013
> Telephone: (540) 983-9373
> Telephone: (540) 983-9334
> Fax: (540) 983-9400
> Email: finney@gentrylocke.com
> Email: paxton@gentrylocke.com
>
> Elizabeth A. McNamara & Samuel M. Bayard
> DAVIS WRIGHT TREMAINE LLP
> 1251 Avenue of the Americas, 21st Floor
> New York, New York 10020
> Telephone: (212) 489-8230 / Fax: (212) 489-8340
> Email: lizmcnamara@dwt.com
> Email: samuelbayard@dwt.com
>
> Alison B. Schary
> DAVIS WRIGHT TREMAINE LLP
> 1919 Pennsylvania Avenue NW, Suite 800
> Washington, DC 20006-3401
> Telephone: (202) 973-4248 / Fax: (202) 973-4448
> E-mail: alisonschary@dwt.com
>
> *Attorneys for Defendants Rolling Stone LLC,*
> *Sabrina Rubin Erdely, and Wenner Media LLC*
>
> Benjamin Gaillard Chew
> MANATT, PHELPS & PHILLIPS, LLP
> 1050 Connecticut Avenue, NW, Suite 600
> Washington, DC 20036-5303
> Telephone:  (202) 585-6511
> Email:  bchew@manatt.com
>
> *Attorney for Defendant Sabrina Rubin Erdely*

Dated:  July 22, 2016                              By:   _/s/ Elizabeth M. Locke_
                                                              Elizabeth M. Locke