**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

|  |  |  |
|---|---|---|
| NICOLE P. ERAMO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:15-cv-00023-GEC** |
| | ) | |
| ROLLING STONE LLC, | ) | |
| SABRINA RUBIN ERDELY, and | ) | |
| WENNER MEDIA LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Elizabeth A. McNamara (*pro hac vice*)
Samuel M. Bayard (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York  10020
Telephone: (212) 489-8230
Fax: (212) 489-8340

Alison B. Schary (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, D.C.  20006-3401
Telephone: (202) 973-4248
Fax: (202) 973-4448

W. David Paxton (VSB No. 19798)
Michael J. Finney (VSB No. 78484)
GENTRY LOCKE
10 Franklin Road S.E., Suite 900
P.O. Box 40013
Roanoke, Virginia  24022-0013
Telephone: (540) 983-9300
Fax: (540) 983-9400

*Attorneys for Defendants Rolling Stone LLC,
Sabrina Rubin Erdely, and Wenner Media LLC*

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986)................................................................................................3

*Araya v. Deep Dive Media, LLC*,
  966 F. Supp. 2d 582 (W.D.N.C. 2013) .................................................................39

*Barry v. Time, Inc.*,
  584 F. Supp. 1110 (N.D. Cal. 1984) .....................................................................14

*Baumback v. Am. Broad. Cos.*,
  161 F.3d 1, 1998 WL 536358 (4th Cir. 1998) (per curiam) (unpublished) ..............5, 8, 10, 11

*Beard v. Annis*,
  730 F.2d 741 (11th Cir. 1984) ..............................................................................38

*Biospherics, Inc. v. Forbes, Inc.*,
  151 F.3d 180 (4th Cir. 1998) ..........................................................................40, 44

*Blue Ridge Bank v. Veribanc, Inc.*,
  866 F.2d 681 (4th Cir. 1989) ................................................................................20

*Bose Corp. v. Consumer Union of U.S., Inc.*,
  466 U.S. 485 (1984).........................................................................................27, 33

*Canatella v. Van de Kamp*,
  486 F.3d 1128 (9th Cir. 2007) ..............................................................................30

*Carr v. Forbes, Inc.*,
  259 F.3d 273 (4th Cir. 2001) .....................................................................13, 17, 21

*Chapin v. Knight-Ridder, Inc.*,
  993 F.2d 1087 (4th Cir. 1993) ..............................................................................37

*Clark v. Viacom Int'l, Inc.*,
  617 F. App'x 495 (6th Cir. 2015) ...........................................................28, 29, 30

*D.A.R.E Am. v. Rolling Stone Magazine*,
  101 F. Supp. 2d 1270 (C.D. Cal. 2000), *aff'd* 270 F.3d 793 (9th Cir. 2001).........................34

*Dodds v. Am. Broad. Co.*,
  145 F.3d 1053 (9th Cir. 1998) .........................................................................45, 46

*Faltas v. State Newspaper*,
    928 F. Supp. 637 (D.S.C. 1996), *aff'd*, 155 F.3d 557 (4th Cir. 1998) ....................................14

*Fiacco v. Sigma Alpha Epsilon Fraternity*,
    528 F.3d 94 (1st Cir. 2008) ...........................................................................................10

*Finkelstein v. Wachtel*,
    No. 00 Civ. 2672, 2003 WL 1918309 (S.D.N.Y. 2003) ..............................................45

*Fitzgerald v. Penthouse Int'l, Ltd.*,
    691 F.2d 666 (4th Cir. 1982) .........................................................................................13

*Fudge v. Penthouse Int'l, Ltd.*,
    840 F.2d 1012 (1st Cir. 1988) ........................................................................................40

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) .......................................................................................................23

*Hanks v. Wavy Broad., LLC*,
    No. 2:11-cv-439, 2012 WL 405065 (E.D. Va. Feb. 8, 2012) ...............................38, 39, 40, 46

*Hatfill v. New York Times Co.*,
    532 F.3d 312 (4th Cir. 2008) ...............................................................................13, 16, 17

*Hoffman v. Wash. Post Co.*,
    433 F. Supp. 600 (D.D.C. 1977), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978)................................33

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988) .........................................................................................................44

*Hutchinson v. Proxmire*,
    443 U.S. 111 (1979) .......................................................................................................20

*In re Davis*,
    334 B.R. 874 (Bankr. W.D. Ky. 2005), *aff'd in relevant part, rev'd in part*,
    347 B.R. 607 (W.D. Ky. 2006) ......................................................................................31

*In re Davis*,
    347 B.R. 607 (W.D. Ky. 2006) .................................................................................30, 31

*In re Philadelphia Newspapers, LLC*,
    690 F.3d 161 (3d Cir. 2012)...........................................................................................29

*Janklow v. Newsweek, Inc.*,
    788 F.2d 1300 (8th Cir. 1986) .......................................................................................40

*Jankovic v. Int'l Crisis Grp.*,
    822 F.3d 576 (D.C. Cir. 2016).......................................................................................18

*Jenoff v. Hearst Corp.*,
644 F.2d 1004 (4th Cir. 1981) ..................................................................................20

*Johnson v. Robbinsdale Indep. Sch. Dist. No. 281*,
827 F. Supp. 1439 (D. Minn. 1993) ...........................................................................12

*Katz v. Odin, Feldman & Pittleman, P.C.*,
332 F. Supp. 2d 909 (E.D. Va. 2004) .........................................................................28

*Lapkoff v. Wilks*,
969 F.2d 78 (4th Cir. 1992) .......................................................................................40

*Lauderback v. Am. Broad. Cos.*,
741 F.2d 193 (8th Cir. 1984) .....................................................................................46

*Marroquin v. Exxon Mobil Corp.*,
No. 08-391, 2009 U.S. Dist. LEXIS 44834 (E.D. Va. May 27, 2009) ...................46

*McFarlane v. Sheridan Square Press, Inc.*,
91 F.3d 1501 (D.C. Cir. 1996) ..................................................................................33

*Mirafuentes v. Estevez*,
No. 1:15-cv-610, 2015 WL 8177935, at *3 (E.D. Va. Nov. 30, 2015) ............43, 44

*Montgomery v. Risen*,
No. 16-0126 (RC), 2016 WL 3919809 (D.D.C. July 15, 2016) ........................43, 46

*Morrissey v. William Morrow & Co.*,
739 F.2d 962 (4th Cir. 1984) .....................................................................................28

*Nat'l Found. for Cancer Research v. Council of Better Bus. Bureaus, Inc.*,
705 F.2d 98 (4th Cir. 1983) .......................................................................................17

*Nat'l Life Ins. Co. v. Phillips Publ'g, Inc.*,
793 F. Supp. 627 (D. Md. 1992) ................................................................................17

*New Life Ctr., Inc. v. Fessio*,
229 F.3d 1143, 2000 WL 1157800 (4th Cir. 2000) (per curiam) (unpublished) ....17

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) .........................................................................................4, 12, 35

*Nigro v. Va. Comm. Univ./Med. Coll. of Va.*,
492 F. App'x 347 (4th Cir. 2012) (unpublished) ......................................................46

*Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*,
922 F.2d 220 (5th Cir. 1991) .....................................................................................37

*Phantom Touring v. Affiliated Publ'ns,*
   953 F.2d 724 (1st Cir. 1992) .................................................................................44

*Pippen v. NBCUniversal Media, LLC,*
   734 F.3d 610 (7th Cir. 2013) .................................................................................28

*Quantum Elecs. Corp. v. Consumers Union of U.S., Inc.,*
   881 F. Supp. 753 (D.R.I. 1995) .............................................................................21

*Reuber v. Food Chem. News, Inc.,*
   925 F.2d 703 (4th Cir. 1991) ...............................................................14, 18, 46

*Rosenblatt v. Baer,*
   383 U.S. 75 (1966) ...........................................................................4, 5, 10, 12

*Salyer v. S. Poverty Law Ctr., Inc.,*
   701 F. Supp. 2d 912 (W.D. Ky. 2009) ..................................................................31

*Stevens v. Tillman,*
   855 F.2d 394 (7th Cir. 1988) .........................................................................12, 44

*Thomas M. Cooley Law School v. Kurzon Strauss, LLP,*
   759 F.3d 522 (6th Cir. 2014) .................................................................................18

*Trans World Accounts, Inc. v. Associated Press,*
   425 F. Supp. 814 (N.D. Cal. 1977) .......................................................................33

*Williams v. Detroit Bd. of Educ.,*
   523 F. Supp. 2d 602 (E.D. Mich. 2007), *aff'd*, 306 F. App'x 943 (6th Cir.
   2009) .....................................................................................................................12

*Yeager v. Bowlin,*
   693 F.3d 1076 (9th Cir. 2012) ..............................................................................32

*Zerangue v. TSP Newspapers, Inc.,*
   814 F.2d 1066 (5th Cir. 1987) ..............................................................................33

**State Cases**

*Firth v. New York,*
   775 N.E.2d 463 (N.Y. 2002) ...........................................................................28, 32

*Fleming v. Benzaquin,*
   454 N.E.2d 95 (Mass. 1983) .................................................................................45

*Fleming v. Moore,*
   275 S.E.2d 632 (Va. 1981) ....................................................................................12

*Gallman v. Carnes*,
    497 S.W.2d 47 (Ark. 1973)...................................................................................10

*Goodwyn v. Virginiain-Pilot Media Cos.*,
    No. CL11-815 (Portsmouth Cir. Ct. 2012) .........................................................12

*Hicks v. Stone*,
    425 So. 2d 807 (La. Ct. App. 1982) ...................................................................10

*Journal-Gazette Co. v. Bandido's, Inc.*,
    712 N.E.2d 446 (Ind. 1999) ...............................................................................33

*Kapiloff v. Dunn*,
    343 A.2d 251 (Md. App. 1975)............................................................................12

*Kendall v. Daily News Publ'g Co.*,
    No. Civ. 2010-0046, 2011 WL 4434922 (V.I. Sept. 21, 2011) .............................46

*Kotlikoff v. Cmty. News*,
    444 A.2d 1086 (N.J. 1982)..................................................................................45

*Larue v. Brown*,
    333 P.3d 767 (Ariz. Ct. App. 2014) .............................................................30, 31

*Martin v. Daily News L.P*
    121 A.D.3d 90 (N.Y. App. Div. 2014) ................................................................30

*Palmer v. Bennington Sch. Dist.*,
    615 A.2d 498 (Vt. 1992)......................................................................................12

*Reaves v. Foster*,
    200 So. 2d 453 (Miss. 1967)...............................................................................12

*Richmond Newspapers v. Lipscomb*,
    362 S.E.2d 32 (Va. 1987)....................................................................................12

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
    366 N.E.2d 1299 (N.Y. 1977).............................................................................46

*Rybas v. Wapner*,
    457 A.2d 108 (Pa. 1983)......................................................................................45

*Springer v. Viking Press*,
    90 A.D.2d 315 (N.Y. App. Div. 1982), *aff'd*, 458 N.E.2d 1256 (N.Y. 1983) ........38

*State v. Defley*,
    395 So. 2d 759 (La. 1981) ..................................................................................12

*Van Dyke v. KUTV*,
   663 P.2d 52 (Utah 1983) ......................................................................................10

*Webb v. Hansen*,
   No. CL10-2933 (Chesapeake Cir. Ct. 2012) ......................................................12

**State Statutes**

Cal. Civ. Code § 48a ..................................................................................................33

N.C. Gen. Stat. § 99-2 ...............................................................................................33

Tex. Civ. Prac. & Rem. Code §§ 73.051-.062 .........................................................33

Va. Code § 8.01-48 ....................................................................................................33

**Rules**

Fed. R. Civ. P. 30(b)(6) ...............................................................................................8

**Constitutional Provisions**

U.S. Const. amend. I ........................................................................................... *passim*

**Other Authorities**

Charles A. Wright, Arthur R. Miller & Mary A. Kane, 10B Fed. Prac. & Proc.
   Civ. § 2738 (3d ed. 2016) ..................................................................................38

Hon. Robert D. Sack, Sack on Defamation, § 11:2 (4th ed. 2010) ...........................33

Peter S. Cane, *Defamation of Teachers: Behind The Times?*, 56 Fordham L. Rev.
   1191 (1988) ........................................................................................................12

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 3

I.     PLAINTIFF NICOLE ERAMO IS A PUBLIC OFFICIAL AND/OR A LIMITED PURPOSE PUBLIC FIGURE IN CONNECTION WITH STATEMENTS CRITICIZING THE UVA ADMINISTRATION'S RESPONSE TO SEXUAL ASSAULT ALLEGATIONS ..................................... 3

     A.     Eramo is a Public Official ........................................................... 4

     B.     Eramo is a Limited-Purpose Public Figure ................................. 13

           1.     There was a pre-existing public controversy concerning UVA's policies and practices in responding to student sexual assault allegations. ....................................................... 14

           2.     Eramo voluntarily assumed a role of special prominence with respect to this public controversy and sought to influence its outcome, including through press statements, up through the Article's publication .................................................... 21

           3.     FERPA restrictions do not prevent Eramo from being considered a limited-purpose public figure .................................. 22

II.     DEFENDANTS NEVER "REPUBLISHED" THE ARTICLE AFTER NOVEMBER 19, 2014 ......................................................................... 26

     A.     The Print And Online Versions Of The Article Published On The Same Date Are Not Separate Publications .................................. 26

     B.     The December 5 Note to Readers Did Not Constitute a "Republication" of the Original Article .................................... 28

           1.     The December 5 Note to Readers was not published to a "new audience" ...................................................................... 29

           2.     The December 5 Note to Readers did not reaffirm the content of the original Article. .................................................. 30

           3.     Plaintiff's attempt to paint the December 5 Note to Readers as a republication of the Article is squarely at odds with established law and policy. .......................................... 32

III.   NOT ALL OF THE CHALLENGED STATEMENTS ARE "OF AND
CONCERNING" ERAMO, AND HER ARGUMENT THAT REFERENCES
TO THE UVA ADMINISTRATION ARE "OF AND CONCERNING" HER
ONLY UNDERSCORES THAT SHE IS A PUBLIC OFFICIAL ...................... 36

A.    Statement #1 from the Article Is Not "Of and Concerning" Eramo and
Constitutes Protected Opinion ................................................................ 36

B.    Plaintiff's Insistence That Statements #5-11 Refer to Her, Despite
Their Facial Applicability to UVA Itself, Buttresses the Conclusion
That She Is a Public Official ..................................................................... 41

IV.    NONE OF THE STATEMENTS ARE "DEFAMATORY PER SE" ................. 42

CONCLUSION ............................................................................................................................... 47

Defendants Rolling Stone LLC, Wenner Media LLC (collectively, "Rolling Stone"), and Sabrina Rubin-Erdely ("Erdely") respectfully submit this memorandum of law in opposition to Plaintiff's Motion for Partial Summary Judgment.[1]

## PRELIMINARY STATEMENT

In the early afternoon of December 5, 2014—within hours after the magazine first acquired any doubt concerning Jackie's credibility or her story of gang rape—Rolling Stone appended a "Note to Readers" to the top of the published Article.  The Note put the world on notice that Rolling Stone now found "discrepancies in Jackie's account," that the magazine had lost "trust in her," and "apologize[d] to anyone who was affected by the story."  By this motion, Eramo attempts to turn this *apology* into an actionable republication.  Plaintiff's position turns the law of republication on its head, a body of law that revolves around reaffirmation, *not* repudiation.  Equally troubling, Plaintiff's theory flies in the face of longstanding public policy. From the established law that publishing a prompt retraction is evidence of a *lack* of actual malice, not support for the finding, to retraction statutes across the country that give publishers a procedural leg up if a story is corrected in a timely fashion, public policy encourages publishers to act responsibly and to immediately alert readers to "discrepancies," just as Rolling Stone did here.  Eramo cites no authority—and Defendants are aware of none—where a court has found that appending an apology to an article somehow acted as a "republication" of an article. Eramo's position is so contrary to the law, public policy and common sense, that it should be seen for what it is: a desperate attempt to jerry-rig an alternate path to liability because the evidence establishes that Rolling Stone published the Article on November 19, 2014 with

---

[1] Defendants refer herein to the following declarations, and exhibits thereto, previously filed in support of their Motion for Summary Judgment: Declaration of Sean Woods ("SW") (Dkt. 103); Declaration of Sabrina Rubin Erdely ("SRE") (Dkt. 104); Declaration of Elisabeth Garber-Paul ("LGP") (Dkt. 105); Declaration of William Dana ("WD") (Dkt. 106); Declaration of Elizabeth A. McNamara ("EAM") (Dkt. 108).  Defendants also refer to exhibits attached to the Declaration of Alison Schary ("AS"), filed herewith.

complete faith in its accuracy and she therefore cannot meet her heavy burden on actual malice.

Plaintiff's attempt to avoid her insuperable actual malice hurdle does not end there.  On this motion, she also asks this Court to find that she is not a public official or limited-purpose public figure.  Plaintiff tries to recast herself as a mere functionary, a "low-level, small-town college administrator."  Yet, her own resume, performance reviews she penned, and copious press statements establish that as an Associate Dean and Chair of UVA's Sexual Misconduct Board ("SMB")—a position she fails to even mention in her motion—Eramo was deeply and publicly enmeshed in UVA's response to sexual assault allegations, serving as the University's "primary point person" for such matters.  Indeed, the focus on Eramo as Chair of the SMB in the Letter of Finding issued by the Department of Education's Office for Civil Rights ("OCR") speaks volumes to her substantial public, discretionary, and policy-making role at UVA at the time the Article was published.  Nor can Eramo artificially narrow the controversy at issue to UVA's response to Jackie's allegations, as she argues.  Instead, the Article addresses the very real and substantive controversies at UVA, and nationwide, surrounding sexual assaults on campuses and what should be the proper administrative responses to such assaults.  With a pending federal Title IX investigation and attendant national press coverage, UVA and Eramo were embroiled in these issues.

As a matter of law, Eramo is a "public official" and/or a "public figure" when, as here, she claims the Article is "falsely criticizing" her work in her official capacity at UVA.  Eramo's suit strikes at the very heart of the First Amendment: criticizing the response of a public university to sexual assault allegations, a topic of national conversation.  To protect public debate about such important matters, longstanding First Amendment law requires public officials and public figures like Eramo to clear a significant constitutional bar to survive summary judgment:

2

she must demonstrate that the record contains "clear and convincing evidence" of actual malice, meaning that the defendants published the statements at issue either *knowing* they were false or with "serious doubts" as to their accuracy. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255-56 (1986). As established on Defendants' Motion for Summary Judgment, Eramo cannot meet this significant bar.

Finally, on this motion, Eramo attempts to pick off certain elements of her libel claim, seeking a ruling that all of the statements at issue are "of and concerning" her and "defamatory per se." But Eramo's arguments only illustrate why this case should be dismissed in its entirety. By insisting that this Court should read any criticism of the "UVA administration" as a personal attack on her, Eramo underscores that she should be considered a public official since she is challenging statements that criticize her performance in her official role. Taken together, the entirety of Plaintiff's claim is that she disagrees with Defendants' assessment—which was based on undisputed, disclosed facts—of what she and UVA should have done, or not done, in response to Jackie's allegations, and is upset with Defendants for "criticizing" her. (Plaintiff's Memorandum of Law in Support of her Motion for Partial Summary Judgment (Dkt. 98, hereinafter "Pl. SJ Mot.") at 30.) But criticizing public figures, public officials, and public institutions for their actions is at the core of the First Amendment, and Plaintiff cannot demonstrate that any of these statements are actionable.

Accordingly, for the reasons set forth herein and in Defendants' Motion for Summary Judgment, Plaintiff's Motion for Partial Summary Judgment should be denied, and Plaintiff's complaint should be dismissed in its entirety.

## ARGUMENT

## I.   PLAINTIFF NICOLE ERAMO IS A PUBLIC OFFICIAL AND/OR A LIMITED PURPOSE PUBLIC FIGURE IN CONNECTION WITH STATEMENTS

3

CRITICIZING THE UVA ADMINISTRATION'S RESPONSE TO SEXUAL ASSAULT ALLEGATIONS

It is a question of law for this Court to determine whether Plaintiff is a public official and/or a public figure. *Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966). As explained in Defendants' Memorandum of Law in Support of their Motion for Summary Judgment (Dkt. 102, hereinafter "Def. SJ Mot."), the applicable law and undisputed facts plainly demonstrate that Eramo must be held to the actual malice standard as a public official, a limited-purpose public figure, or both. Def. SJ Mot. at II.A. Plaintiff's arguments to the contrary ignore the undisputed facts and well-established law, and are without merit for the reasons set forth below.

## A.    Eramo is a Public Official

As the Supreme Court explained in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), "actions brought by public officials against critics of their official conduct" lie at the very core of the First Amendment's protection for the press. *Id*. at 283. Application of the actual malice standard in such actions represents "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," even with the express understanding that such debate "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270. "Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized." *Rosenblatt*, 383 U.S. at 85.

The Supreme Court in *Rosenblatt* laid out the principles for defining a "public official." The Court explained that the "public official" designation "applies ***at the very least*** to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Id.* at 85 (emphasis added). While not every employee of a public institution is automatically a "public

official," the designation is not reserved only for those in the highest positions of authority. To be considered a "public official," it is sufficient that the individual have "substantial responsibility—actual or apparent—for the administration of governmental matters," a definition that encompasses "[p]olicymakers, upper-level administrators, and supervisors." *Baumback v. Am. Broad. Cos.*, 161 F.3d 1, 1998 WL 536358, at *3 (4th Cir. 1998) (per curiam) (unpublished).

"In determining if a defamation plaintiff *actually* had substantial responsibility for or control over the conduct of governmental affairs, courts examine, among other things, whether the plaintiff 'made [] recommendations, participated in [] policy determinations, and exercised [] discretion.'" *Id.* (quoting *Arctic Co. v. Loudoun Times Mirror*, 624 F.2d 518, 521-22 (4th Cir. 1980) (emphasis in original)). But it is "equally clear … that a government employee may qualify as a 'public official' if [she] merely *appears* to have substantial control." *Id.* Thus, a plaintiff may qualify as a public official when her "position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *Rosenblatt*, 383 U.S. at 85-86.

Here, the undisputed evidence shows that Plaintiff qualifies as a "public official" under both rubrics. Plaintiff's quixotic attempt to recast herself as a "low-level, small-town college administrator" (Pl. SJ Mot. at 20) is a misstatement of the undisputed record, which includes Plaintiff's resume and self-evaluations, the testimony of her colleagues, and UVA's governing policies outlining the responsibilities of her position.[2] In making this assessment, it should not be lost on the Court that while Eramo claims to be a "low-level" functionary when she believes it is to her benefit, elsewhere in her motion she argues that when the Article or post-publication

---

[2] Defendants' Response to Plaintiff's Statement of Undisputed Facts ("Def. Response to SUF") ¶¶ 5-11.

statements criticize the UVA "administration's" failure to launch an independent investigation of Jackie's allegations or to issue a warning to the campus—actions that implicate significant decision-making authority—those statements are criticizing *her personally*.  *See* Pl. SJ Mot. at II.

The record establishes the following:  At the time the Article was published, Eramo was an Associate Dean of Students at the University of Virginia, one of the country's premier public universities, earning a salary of $106,000.[3]  She also served as the Chair of UVA's Sexual Misconduct Board, a position she had held at that point for over eight years—and a key fact that Plaintiff ignores in her briefing.[4]  On her resume, Plaintiff described her role as Associate Dean of Students to include, among other things, "chair[ing] the Sexual Assault Board, the University body that adjudicates all reported allegations of sexual assault and misconduct" and "oversee[ing] adjudication[s]" by that body.[5]  According to her resume and annual performance evaluations that she submitted, Eramo supervised several subordinate employees, including an Assistant Dean and Director of Fraternity and Sorority Life and the Director of Student Activities.[6]  Eramo was responsible for vetting candidates for the Sexual Misconduct Board, and she planned and conducted trainings on UVA's sexual assault policies for faculty, staff and

---

[3] Pl. Ex. 3 [Groves Dep.] 355:1-357:14; Pl. SUF ¶¶ 4-5.

[4] Def. SJ Mot. at 6; Def. Response to SUF ¶ 7; Compl. ¶¶ 29-31; Pl. Ex. 8 (confirming that since 2006, Eramo has been the "Chair of the SMB and the primary point for most sexual violence cases").  While her motion glosses over this significant role, Eramo's declaration acknowledges that she was the Chair of the SMB but attempts to downplay the significance of that role, stating that "the last case that I chaired for the [SMB] was in the fall of 2013."  Pl. Ex. 1 ¶¶ 12, 13.  Instead of supporting her public official argument, this point only underscores a key point in the Article: very few victims of sexual assault at UVA choose formal hearings.

[5] EAM Ex. 94 at UVA040002148.  *See also* Compl. ¶ 29 (as Chair of the SMB, Eramo was responsible for "overseeing the Board's adjudications").

[6] The list of her subordinates also included the Special Assistant to the University's Honor Committee; the Secretary to the Honor, University Judiciary, and Mediation Services; and other staff supporting the Honor and Judiciary Committees.  *See* EAM Ex. 94 at UVA040002148; EAM Ex. 95 at UVA020003952.  After touting her supervisory roles in her own performance reviews, Eramo now seeks to disclaim her own contentions, stating that "in my role doing intake for…victims of sexual misconduct, I did not supervise any other [UVA] employees…"  Pl. Ex. 1 [Eramo Decl.] ¶ 10.

students.[7]  She also worked on revisions to UVA's sexual misconduct policies and procedures, as well as its procedures and protocols for intake of sexual misconduct cases.[8]

As the Chair of UVA's SMB, Eramo was vested with significant discretion and responsibility to effectuate the University's Sexual Misconduct Policy (the "Policy").  The Policy in effect at the time the Article was published is described at length in OCR's September 2015 Letter of Finding, which makes clear that as the Chair of the SMB, Eramo played a key role in adjudicating reports of sexual misconduct.[9]  In formal proceedings under the Policy, the Chair of the SMB would assign advisors to the student parties; select the makeup of the hearing panel; and determine what evidence would be admitted.[10]  The Chair facilitated the hearing as a non-voting member, determining the order of witnesses, resolving procedural questions, questioning parties and witnesses, and ruling on whether to allow questions by the parties or their advisors.[11]  After the hearing, the Chair of the SMB wrote the first draft of the panel's decision letter; and if a party chose to appeal the final decision, the Chair was charged with defending the appeal.[12]  Furthermore, as Chair of the SMB, Eramo served as the facilitator and arbiter in "informal resolution" proceedings under the Sexual Misconduct Policy, where she was responsible for proposing an appropriate sanction at the close of those proceedings if the accused student

---

[7] Def. SJ Mot. at 6 & n.10; EAM Ex. 95 at UVA020003951; EAM Ex. 96 at UVA020004176-4177; EAM Ex. 97 at UVA040007990; Compl. ¶ 29; Pl. Ex. 9 [Lampkin Dep.] 77:19-23.

[8] EAM Ex. 95 at UVA020003951 (listing among Eramo's "major accomplishments" that she "assisted with extensive review and revision to existing sexual assault policy … allowing for the University to have strong responsive draft in place prior to other schools in the nation"); EAM Ex. 96 at UVA020004176 (listing among Eramo's accomplishments that she "[d]eveloped new protocols and procedures for intake of sexual and gender-based violence cases").

[9] SW Ex. 4 at 9-18.  UVA's representative testified that Nicole Eramo is the individual described as the "Chair of the SMB" in the OCR Letter of Finding.  EAM Ex. 85 [Davis Dep.] 97:6-99:13, 103:10-25.

[10] SW Ex. 4 at 11; AS Ex. 1 §§ IV.F, IV.G, IV.H.1-3.

[11] SW Ex. 4 at 11-12; AS Ex. 1 §§ IV.H.6.  Eramo also had the sole discretion whether to allow a party to testify via closed-circuit television.  Id. § IV.H.8.

[12] SW Ex. 4 at 12; AS Ex. 1 § IV.H.13-14.

accepted responsibility for his or her actions.[13]

In light of this evidence, it is clear that Eramo had substantial "actual" responsibility for UVA's intake and adjudication of sexual misconduct cases, a topic of significant public importance.  Like the plaintiff in *Baumback*, she made recommendations to the University, participated in policymaking and revision, and exercised discretion in both her intake role and as Chair of the SMB.  Accordingly, she is a public official as a matter of law.

In addition to the actual responsibilities of her job, Plaintiff held significant "apparent" responsibility in her public role as the Chair of the SMB.  Plaintiff was routinely held out to the public—including to Erdely and Rolling Stone—as the key "point person" at UVA with respect to the University's sexual assault policies.  UVA's Rule 30(b)(6) representative explained that Plaintiff was *literally* the public face of sexual assault policy at UVA, testifying that if a member of the public clicked on "sexual misconduct" on UVA's website, "Nicole [Eramo]'s picture came up."[14]  Plaintiff's colleagues described her as "an expert in all issues related to sexual assault" at UVA,[15] and UVA's head of communications confirmed to Erdely that Eramo was the "primary authority on sexual assault at UVA."[16]  Eramo also commented frequently to the press on UVA's policies and practices with respect to sexual assault.[17]  OCR's extensive focus on Eramo's role as

---

[13] SW Ex. 4 at 13; AS Ex. 1 § V.B-C. *See also* Pl. Ex. 3 [Groves Dep.] 306:7-22, 307:13-25 (confirming that in an informal investigation, "Dean Eramo had the ability … to issue a sanction")*;* LGP Ex. 60 at RS013354 (UVA confirms to Rolling Stone that Eramo is usually the administrator who moderates informal resolutions).

[14] Pl. Ex. 3 [Groves Dep.] 333:16-18.  Groves further testified that Eramo was included in a photo shoot for a planned UVA alumni magazine story on sexual assault because of her "key role" relating to these issues.  *Id.* 346:3-20.

[15] EAM Ex. 98.  *See also* Pl. Ex. 3 [Groves Dep.] 341:9-342:10.

[16] SRE ¶ 64; SRE Ex. 20.

[17] *See, e.g.*, EAM Ex. 116 at p.8 (quoting Eramo on behalf of the UVA administration denying that UVA's confidentiality policy was meant to prevent students from discussion their sexual assault proceedings); AS Ex. 13 at RS120761 (quoting Eramo about anticipated changes in UVA's sexual misconduct policies); AS Ex. 14 at RS120778 (op-ed by Eramo describing UVA's sexual misconduct policy and process for reporting); AS Ex. 15 at RS120785 (quoting Eramo defending UVA's policy on sanctions for sexual assault); AS Ex. 16 at RS120790-91

the Chair of the SMB in its Letter of Finding—which concerned a time period prior to the

Article's publication—only underscores the key role she played with respect to sexual assault

policy and practice during the relevant time period, and makes clear that there was a genuine

public interest in her role.  Indeed, Eramo can hardly be some low-level functionary with no

impact on the public's perception of UVA's sexual assault policies when the OCR found that

"statements made by a University official [Eramo] that were broadcast on the University's radio

station in September 2014 created a basis for a hostile environment for affected students."[18]

As the "primary point person" interacting with students who brought allegations of sexual

misconduct to the University—and in many cases, the only University point of contact for a

student complainant—Plaintiff's interactions with a student necessarily had an impact on

whether the student would move forward with a complaint or not.[19]  Eramo would obtain the

details of the student's initial report for the University's official reporting database, explain the

various options available, and guide the student through the University's policies and

procedures.[20]  Plaintiff also exercised significant discretion in deciding whether or not to honor a

sexual assault victim's request not to take further action on allegations by weighing that request

against the risks to campus safety.[21]  In short, Eramo's two key roles—as the intake person for

---

(quoting Eramo about revisions to UVA sexual misconduct policy); EAM Ex. 99 at Response No. 2 (collecting press quotes).

[18] SW Ex. 4 at 3.  UVA's representative confirmed this was a reference to Eramo's interview with WUVA.  EAM Ex. 85 [Davis Dep.] 97:6-22.  The Letter of Finding references the Chair of the SMB numerous times and makes findings specific to her, including that her multiple roles created the "appearance of a conflict of interest" and that her decision to allow a last minute cross complaint before a hearing was "inequitable, in violation of Title IX."  SW Ex. 4 at 15, 21.  The Letter of Finding further calls out the Chair of SMB's written statements as evidence of "the absence of a prompt investigation" and the failure to "evaluat[e] steps necessary to protect the safety of the broader University community."  *Id.* at 17.

[19] AS Ex. 10 [Eramo Dep.] 129:24-130:3; Pl. Ex. 34 [Groves Dep.] 82:7-11; Pl. Ex. 3[Groves Dep.] 333:6-334:13; 345:9-25.  Eramo was UVA's primary point of contact for Jackie concerning her allegations of sexual assault.  Pl. Ex. 3 [Groves Dep.] 350:5-9, 351:3-24.

[20] AS Ex. 10 [Eramo Dep] 135:23-136:1, 139:21-142:10, 145:19-146:4.

[21] AS Ex. 10 [Eramo Dep] 31:24-33:19; 43:25-44:18.

9

most sexual assault complaints at UVA and as the Chair of the SMB—were central to both the

OCR investigation pending at the time of the Article and the ongoing national and local debates

about how campuses addressed and responded to sexual assaults.[22]  Public interest in Plaintiff's

performance of these roles therefore goes far beyond the "the general public interest in the

qualifications and performance of all government employees."  *Rosenblatt*, 383 U.S. at 86.

Faced with analogous fact patterns, courts around the country have repeatedly held that

administrators of public universities, like Eramo, are "public officials" in the context of

statements concerning their official duties.  In *Fiacco v. Sigma Alpha Epsilon Fraternity*, for

example, the First Circuit found the University of Maine's Director of Community Standards to

be a public official in his libel suit against a fraternity where he—like Eramo—"reviewed

allegations of misconduct" involving students, selected adjudicators and referred cases for

student grievance proceedings, "occasionally adjudicated cases himself," and was quoted

regularly in local news outlets speaking on behalf of his office about university policies and

practices.  528 F.3d 94, 97-98, 100 (1st Cir. 2008).  In particular, the court noted that Fiacco's

job (like Eramo's) involved responding to "allegations of date rape and hazing," which are

"matters of clear public importance."  *Id.* at 100.[23]

The Fourth Circuit's decision in *Baumback* is also instructive.  In that case, the

plaintiff—like Eramo—tried to avoid public-official status by claiming that he worked "deep

---

[22] Ensuring that schools respond effectively to sexual assault complaints is at the core of federal Title IX policy and was a prominent focus of the 2014 White House initiative ("It's On Us").  The emphasis on "victim choice," which Eramo and UVA followed at the time, is but one issue that was the subject of great public debate.  So, too, was the controversy surrounding UVA's failure to remove a single student for sexual assault while, at the same time, students were often expelled for Honor Code violations.  As the Chair of the SMB and the "primary point for most sexual violence cases," Eramo was a key UVA administrator at the heart of both issues.  *See* Pl. Ex. 8 at RS016682; *see also supra* note 17.

[23] Other examples abound.  *See, e.g.*, Def. SJ Mot. at 45 n.179 (collecting cases); *see also, e.g.*, *Gallman v. Carnes*, 497 S.W.2d 47, 50 (Ark. 1973) (finding assistant dean and professor at public law school to be a public official); *Hicks v. Stone*, 425 So. 2d 807, 813 (La. Ct. App. 1982) (finding dean of state university's College of Education to be a public official); *Van Dyke v. KUTV*, 663 P.2d 52, 55-56 (Utah 1983) (finding director of financial aid at public university to be a public official).

within the bureaucracy" of his government agency and was a "relatively anonymous" staff officer relative to others within the agency.  The Fourth Circuit soundly rejected this "structural" argument, finding that Baumback's "relative position" to other government employees was "not dispositive" of the central inquiry: whether Baumback had "actual or apparent substantial responsibility" for government affairs.  *Baumback*, 1998 WL 536358, at *5.  Instead, the court found Baumback to be a "public official" because, like Eramo, his public job description and his resume created the appearance of substantial responsibility; he was frequently mentioned in the press in connection with the relevant issue; and he was "the man" (or in Eramo's case, the "point person") with regard to that issue within the agency.  *Id.* at *4.

In her motion, Plaintiff completely ignores her significant "apparent" responsibility for sexual misconduct issues at UVA at the time the Article was published, and she tries in vain to downplay the "actual" responsibility of her position.  Plaintiff cites a smattering of cases holding that high-school teachers and principals are not public officials, as well as cases denying that designation to low-level government employees (including a shift supervisor at a local jail and a staff psychologist at a government hospital).  But none of the plaintiffs in these cases held anywhere near the position of authority and discretion that Plaintiff enjoyed as an Associate Dean and Chair of the SMB at UVA.

Indeed, the vast majority of plaintiff's cases are a cherry-picked collection of state-court decisions finding that principals of secondary public high schools are not "public officials," most of which arise in the context of personal employment disputes and not, as here, with respect to a national magazine  criticizing sexual assault policies followed at a public university.  *See* Pl. SJ Mot. at 18-19.  Further, Plaintiff ignores the legion of cases—including Virginia cases—holding to the contrary: that public secondary school administrators (and sometimes even teachers) *are*

considered public officials subject to *New York Times* actual-malice requirements.  *See, e.g.*, *Goodwyn v. Virginian-Pilot Media Cos.*, No. CL11-815 (Portsmouth Cir. Ct. 2012) (holding that a school principal was a public official) (attached as Ex. 118 to the McNamara Declaration); *Williams v. Detroit Bd. of Educ.*, 523 F. Supp. 2d 602, 608-09 (E.D. Mich. 2007) (finding public school principal to be a public official), *aff'd*, 306 F. App'x 943 (6th Cir. 2009); *Johnson v. Robbinsdale Indep. Sch. Dist. No. 281*, 827 F. Supp. 1439, 1443 (D. Minn. 1993) (same).[24]  As the federal court notes in *Johnson*, courts declining to find a public school principal a "public official" tend to assume that secondary public education is not sufficiently important to government affairs.  827 F. Supp. at 1443.  Scholars have criticized these cases for misapprehending the *Rosenblatt* analysis.  *See* Peter S. Cane, *Defamation of Teachers: Behind The Times?*, 56 FORDHAM L. REV. 1191 (1988).  But regardless of whether there is a public interest in secondary public education generally, there is clearly a public interest in how federally- and state-funded public universities carry out their obligations to students under Title IX.  Eramo—as the "point person" for the implementation of University procedures in this area and the Chair of the Sexual Misconduct Board—plainly occupied a position of "substantial responsibility" in this area.  *Rosenblatt*, 383 U.S. at 85.

---

[24] *See also Webb v. Hansen*, No. CL10-2933 (Chesapeake Cir. Ct. 2012) (transcript) (assistant principal was a public official) (attached as Ex. 119 to the McNamara Declaration); *Stevens v. Tillman*, 855 F.2d 394, 403 (7th Cir. 1988) (same); *Palmer v. Bennington Sch. Dist.*, 615 A.2d 498, 501-02 (Vt. 1992) (same); *Reaves v. Foster*, 200 So. 2d 453, 456 (Miss. 1967) (same); *Kapiloff v. Dunn*, 343 A.2d 251, 258 (Md. App. 1975) (same); *State v. Defley*, 395 So. 2d 759, 761 (La. 1981) (finding public school supervisor to be a public official).  The two Virginia state cases on which Plaintiff relies, *Richmond Newspapers v. Lipscomb* and *Fleming v. Moore*, are similarly inapposite.  In *Richmond Newspapers*, the Virginia Supreme Court considered a libel claim brought by a public high school teacher who was also an acting department head.  In finding that the teacher was not a public official, the court took care to note that the statements at issue concerned *only* the plaintiff's teaching abilities, and *not* her performance as an administrator. 362 S.E.2d 32, 37 (Va. 1987).  Plaintiff's reliance on *Fleming v. Moore* is similarly misplaced.  The court in *Fleming* found that the professor was not a "limited-purpose" public figure where the statements at issue concerned a purely private real estate matter and not the plaintiff's performance as a university professor.  275 S.E.2d 632, 636-37 (Va. 1981).  It also has no bearing on the "public official" analysis, since the Virginia Supreme Court did not consider this category at all, looking *only* to whether the plaintiff was a "general-purpose" or "limited-purpose" public figure.  Defendants do not argue in this action that Plaintiff is a "general-purpose" public figure, only that she is a "public official" and/or a "limited-purpose" public figure.  *See* Def. SJ Mot. at II.A.

Accordingly, the undisputed record and applicable law make clear that Plaintiff is a "public official" in the context of statements criticizing her and UVA's response to student sexual assault allegations in her official capacity as UVA's Associate Dean of Students and Chair of its SMB.[25]

### B.    Eramo is a Limited-Purpose Public Figure

In addition to being a public official, Eramo is a limited-purpose public figure with respect to the pre-existing public controversy concerning UVA's handling of student sexual assault allegations.  The Fourth Circuit applies a five-factor test to determine whether a plaintiff is a "limited-purpose public figure," with the second and third factors—the plaintiff voluntarily assumed a role of special prominence in a public controversy and the plaintiff sought to influence the resolution or outcome of the controversy—being the "heart of [the] five-factor test."  *Carr v. Forbes, Inc.*, 259 F.3d 273, 280 (4th Cir. 2001).  *See* Pl. SJ Mot. at 20; Def. SJ Mot. at I.A.2.

Here, all five factors are satisfied and Eramo is a limited-purpose public figure in the context of statements concerning UVA's response to and treatment of sexual assault allegations on campus.[26]  The Fourth Circuit and other courts around the contrary have regularly found individuals who, like Eramo, have "cast [themselves] into the forefront of a public issue" to be limited-purpose public figures with regard to those controversies.  *See, e.g.*, *Hatfill v. New York Times Co.*, 532 F.3d 312, 324 (4th Cir. 2008) (research scientist who gave public lectures and briefed government officials about bioterrorism was a limited-purpose public figure with respect to columns about bioterrorism and national security); *Fitzgerald v. Penthouse Int'l, Ltd.*, 691

---

[25] Pl. Ex. 3 [Groves Dep.] 351:2-24 (confirming that Eramo acted in her "official capacity" when receiving and responding to student sexual assault complaints, including Jackie's).

[26] *See* Def. SJ Mot. at II.A.2.

F.2d 666, 668-70 (4th Cir. 1982) (researcher on the military application of dolphin technology who had lectured publicly, published several articles and reports, and given interviews to the press on the subject was a limited-purpose public figure with regard to that topic); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 708 (4th Cir. 1991) (research scientist whose findings were often cited in public health debates had "voluntarily injected himself into a public controversy" and thus was a limited-purpose public figure in that arena).[27]

### 1.   There was a pre-existing public controversy concerning UVA's policies and practices in responding to student sexual assault allegations.

To avoid the inevitable conclusion that she is a limited-purpose public figure, Eramo tries to narrow the scope of the relevant "controversy," characterizing it as UVA's response to *Jackie's* particular allegations, rather than the University's response to sexual assault allegations generally.  Pl. SJ Mot. at 21-22.[28]  But the Article is not so narrowly circumscribed.  It situates Jackie's case within the larger context of UVA's campus culture, using her story as a vehicle to consider how universities generally respond to sexual assault allegations and, more specifically, how *UVA* responds to these allegations.  The Article repeatedly toggles between Jackie's story and these broader issues.  For example, after describing Jackie's first meeting with Eramo, the Article immediately situates that anecdote in the context of a broader policy discussion about UVA's focus on "victim choice" in responding to sexual assault allegations:

---

[27] *See also Barry v. Time, Inc.*, 584 F. Supp. 1110, 1113 (N.D. Cal. 1984) (former head basketball coach at the University of San Francisco was "at least a limited public figure with regard to comments concerning his position as head basketball coach at USF"); *Faltas v. State Newspaper*, 928 F. Supp. 637, 645-46 (D.S.C. 1996) (college professor and medical resident who wrote an op-ed in local newspaper criticizing homosexuality was a limited-purpose figure with respect responses to that article), *aff'd*, 155 F.3d 557 (4th Cir. 1998).

[28] Plaintiff also takes the puzzling position that because she *now* believes that Jackie's "sexual assault never happened [and] that Jackie fabricated her rape," there could not have been a "public controversy" concerning Jackie's rape at the time the Article was published.  Pl. SJ Mot. at 31.  Further, the record is crystal clear that neither UVA nor Eramo believed Jackie's assault was "nonexistent" or "fabricated" when the Article was published.  Def. SJ Mot. at 57-58.  This post-hoc rationalization makes no sense.  If someone pulled a fire alarm and the fire department did not show up, their failure to respond would not be absolved by the fact that ultimately there was no fire.

> Like many schools, UVA has taken to emphasizing that in matters of sexual assault, it caters to victim choice…
>
> "This is an alarming trend that I'm seeing on campuses," says Laura Dunn of the advocacy group SurvJustice. "Schools are assigning people to victims who are pretending, or even thinking, they're on the victim's side, when they're actually discouraging and silencing them. Advocates who survivors *love* are part of the system that is failing to address sexual violence."

Article at RS001076. [29]

Jackie's allegations per se are not the "controversy" at issue; instead, they are the springboard to a broader discussion concerning the responsibilities of a University to investigate sexual assault allegations and to alert the campus when public safety may be at risk. Thus, after one critic observes that "[t]here's a national conversation about sexual assault, but nothing at UVA is changing," the Article discusses the ongoing Title IX federal investigation into UVA's handling of sexual assault cases, noting that UVA is one of only a dozen schools selected for a more sweeping "compliance review" of its overall practices and policies. *Id.* at RS001073. The Article provides a national context for UVA's struggle in addressing sexual assaults, citing examples of "high profile cases" across the country at other campuses. *Id.* at RS001073, RS001075. Again and again, the Article pulls the lens back from the particulars of Jackie's story to reflect on how it informs the general discussion, from whether UVA "sweeps sexual assaults under the rug," to the "silence," "avoid[ance]" and "skepticism" that victims too often confront from their peers, to the general "abasement of women" seen at other campuses, like Dartmouth or Yale, to the activism present at UVA in the form of such organizations as One Less and One in Four. *See, e.g.*, *id.* at RS001074, RS001075, RS001078.

Indeed, Jackie is not the only UVA sexual assault victim discussed in the Article. The Article also describes the case of "Stacy," who was led to believe by Eramo that an assailant with

---

[29] A copy of the Article is attached to Plaintiff's motion as Plaintiff's Exhibit 11 (Dkt. 99-15).

multiple victims would be expelled—only to be disappointed when her assailant was given a one-year suspension despite multiple witnesses alleging assault by the same perpetrator.  Article at RS001077-78.  It discusses Liz Seccuro, who was gang-raped at a Phi Kappa Psi house in the 1980s and only found justice decades later, and a UVA sexual assault survivor who was told that adding better lighting to the dark, wooded area where she was abducted and raped would "ruin Jefferson's vision" for the campus.  *Id.* at RS001077.  It also mentions two sexual assault survivors in 2002 and 2004 who were threatened with honor-code violations if they talked about their hearings publicly—a directive found to violate the Clery Act in 2008.  *Id.*  Finally, the Article discusses the case of a UVA student who wrote a widely-shared public post on social media under a pseudonym (later reprinted in a student publication) that called out the UVA administration, and Dean Eramo specifically, for failing to hold her assailant accountable.[30]  Accordingly, it is clear that the relevant "controversy" in this case is the general treatment of sexual assault allegations at UVA.[31]

Eramo's attempt to artificially narrow the "public controversy" to encompass only Jackie's assault is not only in conflict with the plain language of the Article, but also at odds with well-established law.  Binding Fourth Circuit precedent makes clear that a "public controversy" should be defined as the more general concern that a work intends to highlight with a specific illustration.  In *Hatfill*, for example, the plaintiff—a research scientist who gave public lectures and briefed government officials about bioterrorism—sued over a series of editorial columns presenting evidence suggesting that he should be a prime suspect in the 2001 anthrax attacks.  Dr. Hatfill—like Eramo—urged the court to interpret the "particular public controversy"

---

[30] Article at RS001077; *see also* Def. Response to SUF ¶ 53.

[31] Indeed, the email that Plaintiff highlights on page 24 of her brief underscores that this is the relevant controversy. Erdely writes: "The theme will be about *the culture of silence and inaction at UVA...*"

narrowly, encompassing only "who committed the anthrax attacks in 2001." 532 F.3d at 322. Reiterating that "the purpose of the public figure doctrine is to encourage robust and uninhibited commentary on public issues," the Fourth Circuit rejected Dr. Hatfill's narrowly-drawn controversy and recognized the broader debate, explaining that "a fair reading of [the] columns reveals a debate about national security, the nation's lack of preparedness for bioterrorism, and the example provided by the FBI's investigation of the anthrax attacks in light of the evidence appearing against Dr. Hatfill." *Id.* at 323. Even though the columns "focus[ed] on solving the anthrax mailings of 2001," the Court explained, this example was part of a "larger debate" about "the government's efforts to protect the nation from a bioterrorist attack." *Id.*

Indeed, as another court in this Circuit has explained, "it would be inappropriate to shrink all controversies to the specific statements of which a plaintiff complains"—especially where, as here, the statements at issue "are a part of, and clearly related to, a much larger story" and "part of an article covering more ground than simply [p]laintiff's situation." *Nat'l Life Ins. Co. v. Phillips Publ'g, Inc.*, 793 F. Supp. 627, 637-38 (D. Md. 1992). The Fourth Circuit regularly rejects attempts, like Eramo's, to narrowly construe the public controversy at issue. *See, e.g.*, *Carr*, 259 F.3d at 279 (rejecting plaintiff's contention that article about the financing and construction of two public-works projects concerns only "isolated local issues" and involved no public controversy, and defining relevant controversy as "the soundness of privately financed public projects of [Plaintiff's] Interwest companies, as exemplified by" the two particular projects).[32]

---

[32] *See also New Life Ctr., Inc. v. Fessio*, 229 F.3d 1143, 2000 WL 1157800, at *4-5 (4th Cir. 2000) (per curiam) (unpublished) (rejecting "oversimplif[ication]" of public controversy by rehabilitation center specializing in the treatment of priests with sexual/behavioral disorders, situating it within a larger public controversy of "the misconduct of priests, as well as the Church's responsibility for the misconduct and its alleged cover-up"); *Nat'l Found. for Cancer Research v. Council of Better Bus. Bureaus, Inc.*, 705 F.2d 98, 101 (4th Cir. 1983) (rejecting plaintiff's argument that the "public controversy" was not about its solicitation efforts, but only about the reasonableness of defendant's rating of plaintiff's efforts). Indeed, even when plaintiffs do not challenge the scope

Eramo argues that a controversy beyond Jackie's rape allegations is "contrive[d]." Pl. SJ Mot. at 26. But there can be no dispute that there was a pre-existing public controversy concerning the way that universities across the country respond to sexual assault allegations, as evidenced by numerous high-profile news stories concerning Title IX lawsuits brought against universities for inadequate response to sexual assault allegations and a White House initiative and task force launched in 2014 to tackle this issue.[33] Indeed, Eramo acknowledged this national controversy in a 2013 op-ed, which opened with the statement: "Sexual misconduct on college campuses has garnered much recent national attention."[34]

More specifically, the pre-existing public controversy over *UVA's* treatment of sexual assault allegations cannot be seriously disputed. At the time the Article was published, UVA was one of only a dozen schools subject to a sweeping, proactive "compliance review" by the

---

of the relevant controversy, the Fourth Circuit routinely draws its contours broader than the specific statements at issue. For example, in *Reuber*, the Fourth Circuit characterized the relevant controversy not as *Reuber's qualifications as a scientist*, but rather as the "public controversy swirling around malathion's safety." 925 F.2d 703, 706, 708 (4th Cir. 1991) (en banc). Courts around the country have also roundly rejected similar efforts by plaintiffs to define themselves out of the controversy by narrowing its scope from a matter of broad public debate to a specific dispute. *See, e.g., Thomas M. Cooley Law School v. Kurzon Strauss, LLP*, 759 F.3d 522, 529-30 (6th Cir. 2014) (finding plaintiff law school to be a limited-purpose public figure in the context of pre-existing public controversies over whether law schools were reporting accurate post-graduate employment and whether law graduates can afford to pay back student loans, and rejecting plaintiff's argument that controversy should be narrowly defined only as *plaintiff's* post-graduate employment rate and loan-repayment data); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585-86 (D.C. Cir. 2016) (rejecting plaintiff's bid to narrow controversy from "the progress of political and economic reform in Serbia" to focus only on a specific time period, explaining that "[t]he court has defined controversies as being broader than the narrower discussion contained in the defamatory document").

[33] *See, e.g.*, SRE Ex. 38; "Rape on Campus: Painful Stories Cast Blame on Colleges," NPR (Apr. 6, 2014) [AS Ex. 19]; Zach Schonfeld, "After Heavy Criticism, Harvard Revises Its Sexual Assault Policies," Newsweek (July 3, 2014) [AS Ex. 20]; Peter Jacobs, "Princeton Found in Violation of Title IX for Mishandling Sexual Assault Complaints," Business Insider (Nov. 5, 2014) [AS Ex. 21]; Tyler Kingkade, "Johns Hopkins University Failed to Notify Campus of Alleged Gang Rape, Complaint Claims," Huffington Post (May 1, 2014) [AS Ex. 22]; Juliet Eilperin, "Seeking to end rape on campus, White House launches 'It's On Us,'" Wash. Post (Sept. 19, 2014) [AS Ex. 23]; Eliza Gray, "White Houses Releases Plan to Curb Campus Sexual Assault," Time (Apr. 28, 2014) [AS Ex. 24].

[34] AS Ex. 14 at RS120778.

OCR for its handling of sexual assault allegations and compliance with Title IX.[35]  UVA's

inclusion in the OCR investigation was widely reported by news outlets.[36]  UVA also drew

critical press coverage over its handling of specific sexual assault cases prior to the Article's

publication—including many of the cases referenced in the Article.[37]  UVA was also in the news

when it hosted a prominent public summit on campus sexual assault issues, featuring a panel by

six university presidents.[38]  Further, UVA was subject to several Title IX civil rights complaints

that were folded into the OCR review, at least two of which specifically named Eramo.[39]  As far

back as 2008, the U.S. Department of Education found UVA to be in violation of the federal

Clery Act when it barred sexual assault victims from discussing their resolution proceedings

---

[35] Article at RS001073; AS Ex. 2 at RS013312.  In the course of OCR's review, which commenced in 2011, federal investigators interviewed Eramo and ultimately issued findings that specifically criticized her.  *See* AS Ex. 10 [Eramo Dep.] 117:2-6; Def. SJ Mot. at 25-26; *see also supra* at 9 & note 18.

[36] *See, e.g.*, Nick Anderson, "55 colleges under Title IX probe for handling of sexual violence and harassment claims," Wash. Post (May 1, 2014) [AS Ex. 25]; Nick Anderson, "Tally of federal probes of colleges on sexual violence grows 50 percent since May," Wash. Post (Oct. 19, 2014) [AS Ex. 26]; Melissa Hipolit, "Feds investigate U.Va, W&M over sexual assault complaints," WTVR.com (May 3, 2013)  [AS Ex. 27].

[37] *See, e.g.*, Tyler Kingkade, "For Years, Students Have Accused Virginia Universities of Botching Sexual Assault Cases," Huffington Post (July 1, 2014) [AS Ex. 28] (discussing a number of Title IX suits against UVA by sexual assault victims and the ongoing OCR review); Elizabeth Ballou, "Dear UVa, Sexual Assault Culture Thrives on Campus," Bustle.com (Nov. 4, 2013) [AS Ex. 29] (describing the author's experience in reporting a sexual assault at UVA and criticizing UVA for the difficulty in holding assailants accountable and expelling them under its policies); Hoda Kotb, "Rape on campus: Do universities do enough to prevent and condemn sexual assaults?" NBC News (2013) [AS Ex. 30] (including interview with a UVA sexual assault victim); Courteney Stuart, "Unsilenced: How this mother fought to protect her daughter … and yours," The Hook (Dec. 7, 2011)  [AS Ex. 31] (describing criticism of UVA's handling of sexual assault cases, including the case of Susan Russell's daughter) ; Courteney Stuart, "Victims' legacy? UVA overhauls sexual assault policy," The Hook (May 9, 2011) [AS Ex. 32] (discussing changes to UVA's sexual assault policies and criticism of the proposed revisions); Courteney Stuart, "How UVA turns its back on rape," The Hook (Nov. 11, 2004) [AS Ex. 33] (discussing criticism of UVA's handling of rape cases, including the fact that no offender had been expelled for sexual assault while numerous students were expelled for honor code violations); Courteney Stuart, "'I harmed you: 21 years, 12 steps later, rape apology backfires," The Hook (Jan. 12, 2006) [AS Ex. 34] (discussing prosecution of Liz Seccuro's assailant and criticism of UVA's response to Seccuro's initial report); Graelyn Brashear, "Allegations of a botched UVA rape investigation at center of a challenge to the Campus SaVE Act," C-Ville Weekly (Mar. 12, 2014) [AS Ex. 35] (discussing 2011 civil rights complaint against UVA for handling of sexual assault allegations, which was folded into OCR review); "UVA Under Investigation for Handling of Sexual Misconduct Case," NBC 29 (June 11, 2014) [AS Ex. 36] (discussing 2011 civil rights complaint, including allegations against Eramo).

[38] *See* Allie Grasgreen, "Straight Talk on Sexual Violence," *Inside Higher Ed* (Feb. 11, 2014) [AS Ex. 37].

[39] SRE Exs. 13, 14.

19

publicly.[40]  The government's finding was reported in the press, including a lengthy investigative

piece by the Center for Public Integrity where Eramo was quoted defending the University's

policies and practices.[41]

Defining the relevant controversy as UVA's response to sexual assault allegations is

hardly a "subject-matter classification" or an abstract concern "shared by most" potential libel

plaintiffs, which was rejected by the Supreme Court in *Hutchinson v. Proxmire*, 443 U.S. 111,

135 (1979).  The cases primarily relied upon by Eramo, *Blue Ridge Bank v. Veribanc, Inc.* and

*Jenoff v. Hearst Corp.*, are readily distinguishable.  In *Blue Ridge Bank*, the Court declined to

find the plaintiff bank to be a limited-purpose public figure based on its status as a regulated

financial institution.  866 F.2d 681, 688-89 (4th Cir. 1989).  Noting that there was no preexisting

controversy over this specific bank's solvency prior to the allegedly defamatory statements, the

court explained that the key inquiry is the *nexus* between the particular plaintiff and the

identified controversy:  "[A] plaintiff should not be considered a limited-purpose public figure

absent the existence of a pre-defamation public controversy *in which the plaintiff has become

directly involved*."  *Id.* at 688 (emphasis added).  Similarly, in *Jenoff v. Hearst Corp.*, the court

reasoned that the plaintiff had not voluntarily participated in any identifiable public controversy

and declined to find that the plaintiff was a limited-purpose public figure solely based on his

status as a police informant.  644 F.2d 1004, 1007-08 (4th Cir. 1981).

Here, there is no question that UVA was embroiled in a national controversy over the

treatment of sexual assault allegations—and as Chair of UVA's Sexual Misconduct Board—

Eramo was central to UVA's response to these claims.

---

[40] AS Ex. 3.

[41] EAM Ex. 116 (quoting Eramo denying that UVA had an official practice of enforcing gag orders concerning sexual assault proceedings); *see also, e.g.*, Courteney Stuart, "UVA rebuked: Feds furious over rape case gag orders," The Hook (Nov. 14, 2008) [AS Ex. 38]

**2.      Eramo voluntarily assumed a role of special prominence with respect to this public controversy and sought to influence its outcome, including through press statements, up through the Article's publication.**

There can be no dispute that Eramo was a prominent figure with respect to UVA's policies and practices in responding to sexual assault claims.  Between 2009 and 2014, she gave at least 21 press interviews on sexual assault and related topics to the press, including a 2013 op-ed in the *Cavalier Daily* in 2013 "regarding the University's process when a sexual misconduct case is reported" and an interview with the Center for Public Integrity in which she defended UVA's policies concerning sexual assault investigations.[42]  She also spoke to local television stations on issues relating to sexual assault at UVA and appeared on panels, gave workshops, and spoke at conferences on the topic of sexual misconduct on college campuses.[43]  When reporters came looking for someone to talk about this issue, they were referred to Eramo, who one of her colleagues described as an "expert in all issues related to sexual assault" at UVA.[44]  Indeed, when Erdely repeatedly insisted on speaking with Eramo for the Article, UVA's head of communications agreed that she was the "most knowledgeable" person at UVA on the subject of sexual assault.  Eramo is hardly in a position to challenge this conclusion; she alleges in the Complaint that she was well-known for her work on sexual assault issues at UVA, earning prestigious awards for her efforts.[45]

---

[42] EAM Ex. 99, Response No. 2; AS Ex. 13 at RS120761; EAM Ex. 116.  Eramo tries to downplay these interviews by claiming that "the vast majority" were with local news outlets (Pl. SUF ¶ 12), but courts regularly find individuals to be limited-purpose public figures based upon their contacts with local press, even where the defendant is a publication with broader circulation.  *See, e.g.*, *Carr*, 259 F.3d at 281 (finding plaintiff to be a limited-purpose public figure for purposes of *Forbes* magazine article where he "wrote editorials for the local press [and] was quoted in the local media"); *Quantum Elecs. Corp. v. Consumers Union of U.S., Inc.*, 881 F. Supp. 753, 766 (D.R.I. 1995) (finding plaintiff to be a limited-purpose public figure in a suit over statements in the national publication *Consumer Reports*, in part because plaintiff "commanded attention in the local Rhode Island press").

[43] *See* EAM Ex. 99, at Response Nos. 1, 3, 6.

[44] *See supra* at 8 & n.15.

[45] Compl. ¶ 33.

21

Eramo regularly communicated with journalists about the University's policies, practices and initiatives with respect to sexual assault, and her comments to the press and others unquestionably were aimed at influencing the public debate on that topic to show that UVA was acting responsibly and sensitively.[46]  For instance, in her interview with *The Center for Public Integrity* in 2009, Eramo defended the University against allegations that it prevented students from speaking about their sexual assault proceedings.[47]  Likewise, in a WUVA interview that was aired just weeks before the Article was published, Eramo vigorously defended UVA's policies regarding treatment of sexual assault reports and discipline for perpetrators.[48]  Given that Eramo was commenting publicly on these issues and continued to hold the position of Associate Dean and Chair of the SMB up through the time of publication, it is clear that the public controversy persisted through the time of publication and that Eramo retained her public-figure status at the time of the allegedly defamatory statements.

### 3.   FERPA restrictions do not prevent Eramo from being considered a limited-purpose public figure.

By artificially restricting the public controversy at issue (*see supra* Section I.B.1), Eramo also tries to dodge the clear record of her numerous press contacts on the actual public controversy over UVA's treatment of sexual assault cases.  To do so, she claims that she was

---

[46] *See, e.g.*, EAM Ex. 99, Response No. 2 (collecting press quotes); EAM Ex. 100, at UVA040001920 (noting both the national and UVA-centric aspects of the controversy; asking "Why is it that no student has been expelled for rape in modern University history?  Why is sexual assault not part of the University's Honor Code?"); EAM Ex. 101, at UVA040001901 (responding to question "Do you feel that the University's current approach to preventing and investigating sexual assault is inadequate?"); EAM Ex. 102, at UVA040001857 (requesting interview to discuss "#HoosGotYourBack and the ongoing campaign against sexual assault that is frequently mentioned in the news as of late"); *see also supra* note 17.  Eramo was photographed for an alumni magazine article due to her "key role" with respect to sexual assault issues.  EAM Ex. 100 at UVA040001923-26; Pl. Ex. 3 [Groves Dep.] 346:8-13.

[47] EAM Ex. 116 at 8 ("'There was no quid pro quo here that I know,' says Nicole Eramo, current chair of the UVA Sexual Assault Board.  'That was just not part of our policy.'").

[48] EAM Ex. 103; AS Ex. 10 [Eramo Dep.] 74:23-75:9, 78:7-14.

prevented by FERPA from accessing the "channels of effective communication."[49]  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974).  *See* Pl. SJ Mot. at 27-30.  This argument rests on defining the public controversy at issue narrowly to be solely Jackie's alleged sexual assault. But, as set forth above, the public controversy is not so narrow and, consequently, Eramo's argument concerning FERPA restrictions also fails.

Even if one accepts that FERPA restrictions are a relevant concern, the record establishes that FERPA does not present the roadblock Eramo depicts.  Notwithstanding FERPA, UVA made President Sullivan available for an interview with Erdely—in lieu of Eramo—and took steps to notify Erdely that she had some details incorrect regarding the case of "Stacy"—without specifying what those details were.[50]  Armed with that warning, Erdely went back to her sources and was able to identify and correct that information.[51]  UVA did *not* notify Erdely of any errors with respect to her understanding that "three separate allegations of gang rape against Phi Psi" were reported to Eramo.[52]

Furthermore, when she believed it was in her own interest, Eramo weighed in on the details of Jackie's case even without authorization from UVA.  When the Columbia Journalism Review ("CJR") was writing its report on the Article, Eramo participated in a nearly hour-long call with CJR, in which Eramo admits she advised CJR as to whether or not its information about

---

[49] In her brief, Eramo tries to claim that UVA was prevented from discussing Jackie's case because Erdely did not obtain a waiver from Jackie under FERPA.  Pl. SJ Mot. at 28; Pl. SUF ¶ 18.  In fact, Erdely specifically asked UVA's representative, McGregor McCance, prior to her scheduled interview with Eramo whether there was a way to obtain some sort of waiver to avoid FERPA issues.  Mr. McCance expressed surprise at the request and told Erdely that he could "look into that," but "we've never done that."  Mr. McCance never got back to Erdely about that the possibility of a waiver.  SRE ¶ 62.  But in any event, testimony in this action makes clear that even if Erdely *had* obtained a waiver from Jackie, it would have been futile because the case was active and involved other students with potential FERPA interests.  EAM Ex. 117; EAM Ex. 85 [Davis Dep.] 178:25-185:21.

[50] SRE ¶ 107; Pl. Ex. 3 [Groves Dep.] 287:9-16.

[51] SRE ¶ 109; Pl. Ex. 3 [Groves Dep.] 297:6-298:1.

[52] SRE ¶ 108; Pl. Ex. 3 [Groves Dep.] 283:6-287:16, 298:2-7.

23

the investigation of Jackie's case was correct based upon her knowledge.[53]  Eramo was not

authorized by UVA to speak with CJR in any capacity, including off the record in this manner.[54]

Yet even though she suspected that it might "look like we are trying to hide something" if she

did not speak with Erdely for the Article,[55] she took no similar action to reach out for an off-the-

record conversation to confirm or deny details.[56]

Finally, there is no basis for Eramo to claim that FERPA is what prevented her from

telling Erdely that "Jackie did not report the assault described in the Article."  Pl. SJ Mot. at 29.

The true facts would have prevented such a statement.  Discovery in this case has confirmed that

Eramo knew all the salient details of Jackie's alleged assault well before the Article was

published.  Specifically, she knew: the assault occurred on September 28, 2012;[57] the assault

occurred at Phi Kappa Psi;[58] Jackie was assaulted by multiple men, possibly seven;[59] Jackie's

assault was orchestrated by her date, who was a co-worker from IM-Rec (which includes the

---

[53] AS Ex. 10 [Eramo Dep.] 305:2-16, 307:3-310:2, 316:2-324:13.

[54] Pl. Ex. 3 [Groves Dep.] 321:6-15, 323:11-16, 326:9-327:23; AS Ex. 10 [Eramo Dep.] 308:6-310:2.

[55] EAM Ex. 113.

[56] AS Ex. 10 [Eramo Dep.] 326:20-327:12.

[57] AS Ex. 10 [Eramo Dep.] 157:11-15; Pl. Ex. 34 [Groves Dep.] 119:6-8; EAM Ex. 110; EAM Ex. 108 at UVA030008567.

[58] AS Ex. 10 [Eramo Dep.] 184:1-4; Pl. Ex. 34 [Groves Dep.] 165:10-12; Pl. Ex. 3 [Groves Dep.] 282:15-17; EAM Ex. 110; EAM Ex. 108 at UVA030008615.  Eramo seeks to sidestep her actual knowledge—and the conclusion that Jackie's report to UVA and Erdely were substantively the same—by defining her knowledge based on her first interview, Pl. SJ Mot. at 13.  Yet, that is not the operative time period.  Her supposed inability to rebut the Article's description of Jackie's assault applies to the fall of 2014, when Erdely was reporting the Article.  Further, even with regard to her first meeting with Jackie in May 2013, Jackie described the location as a fraternity with "Phi" in the name located on "Madison Lane."  Based on that description, Eramo immediately suspected that Jackie was describing Phi Kappa Psi, and even asked if she meant the "fraternity at the head of Mad Bowl."  AS Ex. 10 [Eramo Dep.] 159:14-21; EAM Ex. 110; EAM Ex. 108 at UVA030008567.  Eramo and UVA never investigated their hunch independently by, for example, finding out where at IM-Rec Jackie worked (as a lifeguard at the University pool), obtaining a list of her co-workers, and checking that list of student co-workers against the fraternity roster.  AS Ex. 10 [Eramo Dep.] 166:10-167:13.

[59] AS Ex. 10 [Eramo Dep.] 175:22-176:19; Pl. Ex. 34 [Groves Dep.] 118:21-119:5; EAM Ex. 110; EAM Ex. 108 at UVA030008567.

24

University pool) and who she believed was a brother of Phi Kappa Psi;[60] the assault involved

vaginal penetration;[61] Jackie continued to see her assailants on UVA's campus;[62] Jackie's friends

reacted negatively to the assault;[63] Jackie believed she had suffered physical retaliation for her

campus activism in the bottle attack;[64] and Jackie claimed to know of two additional women who

had allegedly been assaulted by multiple men at the Phi Kappa Psi House over the past several

years, and shared their first names with Eramo.[65]   These details are all consistent with the

account that Jackie told Erdely and that Defendants published in the Article.[66]   It is also

undisputed that, despite having all of this information, UVA never issued a warning to the

campus and did not commence any sort of independent investigation into Jackie's allegations

until September 2014.  Accordingly, there is simply no basis in the record for Plaintiff to contend

that she was prevented by FERPA from sharing any details that would have materially

---

[60] AS Ex. 10 [Eramo Dep.] 159:19-25; Pl. Ex. 34 [Groves Dep.] 112:2-8; EAM Ex. 110; EAM Ex. 108 at UVA030008567.

[61] AS Ex. 10 [Eramo Dep.] 177:13-20, 178:7-18.

[62] AS Ex. 10 [Eramo Dep.] 176:20-22.

[63] AS Ex. 10 [Eramo Dep.] 160:1-5; EAM Ex. 110; EAM Ex. 108 at UVA030008567.

[64] AS Ex. 10 [Eramo Dep.] 182:19-23; Pl. Ex. 34 [Groves Dep.] 165:20-166:3; EAM Ex. 108 at UVA030008613, UVA030008618; EAM Ex. 110.

[65] EAM Ex. 110; EAM Ex. 111; EAM Ex. 108 at UVA030008613-8616; AS Ex. 10 [Eramo Dep.] 210:15-18; Pl. Ex. 34 [Groves Dep.] 166:4-23; Pl. Ex. 3 [Groves Dep.] 282:15-17.

[66] Even the fact that Jackie originally told Eramo the assault consisted of forced oral sex by multiple men is not a material discrepancy, nor would it "disprove" anything in the Article.  Erdely was already aware that Jackie had initially told her friends that the assault involved oral sex, and later told them the "full story" that it was a "gang rape" involving vaginal penetration ——an evolution in detail that both Erdely and Eramo knew to be consistent with traumatic memory in rape victims and an evolution that Eramo was aware of.  AS Ex. 10 [Eramo Dep.] 138:12-139:5; SRE ¶ 97.  *See also* Pl. Ex. 32 [Renda Dep.] 147:20-149:15 (confirming it is not uncommon for a sexual assault victim to come forward with additional details over time, since trauma can affect the way a victim recalls her assault).  Notably, Eramo did not testify that she found Jackie less credible as a result; instead, she found this to be "another aspect of force that was concerning."  AS Ex. 10 [Eramo Dep.] 178:19-24.  UVA's representatives confirmed that the University would not treat an allegation of forced oral sex by multiple perpetrators any differently than an allegation involving vaginal penetration.  Pl. Ex. 34 [Groves Dep.] 115:3-9; EAM Ex. 85 [Davis Dep.] 35:17-36:20.

affected—much less "disproved"—the Article's account of Jackie's interactions with Eramo.[67]

*    *    *

In sum, Eramo plainly satisfies the five-factor test in this Circuit to be considered a limited purpose public figure.  For these reasons and the reasons set forth in Defendants' Memorandum of Law in Support of Summary Judgment, this Court should hold that Plaintiff is a public official and/or a limited-purpose public figure and must prove that the statements at issue were made with actual malice.

## II. DEFENDANTS NEVER "REPUBLISHED" THE ARTICLE AFTER NOVEMBER 19, 2014

### A. The Print And Online Versions Of The Article Published On The Same Date Are Not Separate Publications

Plaintiff insists that "[t]his is not a case where a single edition of a … magazine reached a single, large audience thus warranting application of the single publication rule to avoid a multiplicity of suits over one action by Defendants."  Pl. SJ Mot. at 54.  In fact, the evidence shows that is *exactly* the fact pattern in this case: Rolling Stone published a single, identical article online and in print on November 19, 2014, which was directed at and accessible to a "single, large audience" worldwide.  The text of the Article was never edited after it was originally published on November 19, and it was never moved from its original location on Rolling Stone's website until April 5, 2015, when it was taken down and replaced by the full independent report of the Columbia Journalism School.  Between those dates, the *only* change

---

[67] In fact, the *only detail* that Eramo claims she would have clarified to Erdely is that she "arranged multiple meetings between Jackie and police officers and detectives in an effort to encourage Jackie to pursue a criminal complaint."  But there is absolutely no evidence in the record that Eramo took Jackie to the police specifically to report her assault.  Instead, emails between Jackie and Eramo – which Erdely obtained – made clear that Eramo arranged these meetings specifically to report the bottle incident, as further confirmed by the incident  description Erdely obtained from the Charlottesville Police.  Def. SJ Mot. at 12-13; SRE ¶ 85, Exs. 17, 27.  Furthermore, this detail does not affect the basis for Erdely's criticism, which is that UVA deferred to Jackie's decision not to pursue the matter and did not commence its own investigation until September 2014 or warn the campus at any point.

26

Defendants made was to add the Note to Readers at the top of the page on December 5, 2014,[68] putting readers on notice that Rolling Stone had come to question Jackie's credibility, promising a forthcoming investigation and apologizing to "anyone affected by the story."

Plaintiff's bid to create multiple "publications" of the Article begins with an attempt to carve out a distinction—when none exists—between the print and online publication of the Article.  Pl. SJ Mot. at 50-56.  The Article was first published *both* online and in print on November 19, 2014.[69]  Although the print magazine bears a cover date of December 4, 2014, former Managing Editor Will Dana testified that the cover date represents the *last* date that the issue is to be displayed on newsstands, and that the issue was first displayed for sale on November 19, 2014—*a fact that Plaintiff included in her Statement of Undisputed Facts*.[70] Accordingly, there is no dispute that the Article was first published both online and in print on the same day—November 19, 2014—and there is absolutely no basis in the record for Plaintiff to refer to a "December 4 Article."[71]

Plaintiff next claims that the print and online versions of the Article were published to "separate audiences" but cites no evidence establishing this contention.  All Plaintiff cites is the general circulation and newsstand sales for the print Article, and the number of unique visitors to the online version.  Pl. SJ Mot. at 52.  But the online Article was already publicly available to a

---

[68] The December 5 Note to Readers was replaced with a revised Note to Readers on December 6, which even more specifically identified some of the "discrepancies" in Jackie's account, acknowledges that Rolling Stone was "mistaken" and again "apologize[d] to anyone affected by the Story."  WD ¶ 40; WD Exs. 69-70.  Plaintiff does not appear to base her republication theory on this December 6 Note to Readers.

[69] Pl. SUF ¶¶ 24, 25.

[70] Pl. SJ Mot. at 52; Pl. SUF ¶ 24; Pl. Ex. 10 [Dana Dep.] 44:12-45:13.  Moreover, the documentary evidence shows that Plaintiff herself first saw a copy of the print Article in the early morning hours of November 19, when Sara Surface sent her photos of each page.  AS Ex. 4.

[71] Even if the print and online version of the Article *were* to be considered separate publications, that finding has no substantive effect on actual malice since it is undisputed that the print and online versions were both published on November 19, and therefore Defendants' state of mind for the actual-malice inquiry must be evaluated as of that date.  *Bose Corp. v. Consumer Union of U.S., Inc.*, 466 U.S. 485, 512 (1984) (actual malice is determined "at the time of publication").

worldwide audience; accordingly, any subscribers to the print edition were simply a subset of the audience to which the online Article was directed.  *See Clark v. Viacom Int'l, Inc.*, 617 F. App'x 495, 506 (6th Cir. 2015) (recognizing that "[s]tatements that are posted to a forum that is prominently accessible to the online public have a presumptively global audience").

**B.**     **The December 5 Note to Readers Did Not Constitute a "Republication" of the Original Article**

In perhaps her furthest reach, Eramo next tries to argue that Defendants "republished" the Article on December 5 when Rolling Stone added the Note to Readers to the top of the Article— at the exact same URL—warning of "discrepancies in Jackie's account," alerting readers that it lost "trust in her," and apologizing to anyone affected by the story.  Pl. SJ Mot. at 55-56. Plaintiff cites *no law* for the unprecedented proposition that a publisher who adds a disclaimer to an article should be considered to have "republished" the article and incur new liability for its contents.  This position is directly at odds with the law concerning republication, as well as public policy and established industry practice encouraging publishers to promptly correct the record when they become aware of errors in a story.  To credit Plaintiff's misguided argument would cast a deep chill across all publications, signaling that they correct errors at their peril.

Trying to find support for her republication theory, Eramo begins with an analysis of the "single publication rule."  Pl. SJ Mot. at 52.  The "single publication rule" holds that a defamation claim accrues when an allegedly defamatory article is first published; subsequent access to the publication does not trigger the statute of limitations anew unless the article is deemed to have been "republished."[72]  To determine whether an article has been "republished"

---

[72] *See Morrissey v. William Morrow & Co.*, 739 F.2d 962, 967 (4th Cir. 1984) (upholding application of single publication rule); *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 918 (E.D. Va. 2004) (noting that "Virginia follows the 'single publication rule,' which permits only one [defamation] cause of action to be maintained for any single publication").  Courts have uniformly applied the "single publication rule" to online publications, holding that a libel claim over an online article accrues when it is first published.  *See, e.g.*, *Firth v. New York*, 775 N.E.2d 463, 465-66 (N.Y. 2002); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 615-16 (7th

under the single publication rule, the test is whether the speaker has "affirmatively *reiterated* it in an attempt to reach a *new audience* that the statement's prior dissemination did not encompass." *Clark*, 617 F. App'x at 505 (citing *Firth*, 775 N.E.2d at 466) (emphasis added).  Here, Plaintiff's claim fails under both prongs: there is no evidence that the Note to Readers was published to a new or broader audience not reached by the original Article (*see* II.B.1).  Nor did the Note to Readers reaffirm the content of the Article or, specifically the Statements challenged by Eramo; to the contrary, it did the exact opposite and expressly notified readers that it no longer had confidence in Jackie's account (*see* II.B.2).  Plaintiff's attempt to argue otherwise flies in the face of established law and policy (*see* II.B.3).

### 1.   The December 5 Note to Readers was not published to a "new audience".

Plaintiff first attempts to argue that when the December 5 Note to Readers was added to the online Article, it was published to "separate audiences."  Pl. SJ Mot. at 54.  The documentary record demonstrates that is false.  On December 5, Rolling Stone appended the Note to Readers to the top of the exact same web page where the Article was originally published on November 19, located at the URL http://www.rollingstone.com/culture/features/a-rape-on-campus-20141119 (the "Rape on Campus URL").[73]  Given that the Note to Readers was added to the same web page as the Article, it was plainly intended to reach the *exact same audience.*

Next, Plaintiff attempts to sow confusion by noting that Rolling Stone also placed the text of the Note to Readers on a separate, stand-alone web page, located at the URL http://www.rollingstone.com/culture/news/a-note-to-our-readers-20141205 (the "Note to Readers URL").  The text of the Article does not appear anywhere at this stand-alone Note to Readers

---

Cir. 2013) (collecting cases); *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 174 (3d Cir. 2012); *Clark*, 617 F. App'x at 503-04.

[73] Pl. SUF ¶ 135; Def. Response to SUF ¶ 135.

URL; nor is there a link to the Article.[74]

Thus, Plaintiff's claim that Rolling Stone published "the the December 5 online article" at this "separate URL" is incorrect.  Pl. SJ Mot. at 52, 54.  So too is Plaintiff's claims that the "December 5 online article" at the Note to Readers URL "contained allegedly defamatory statements about Ms. Eramo."[75]  Again, the *only* text that appeared at the Note to Readers URL is the text of the Note, not the Article.  Plaintiff has not sued over the text of the Note to Readers in this action—and for good reason, since it makes no reference to her but instead is an apology and notice that there was "discrepancies" in Jackie's story.  Accordingly, Plaintiff's assertion that Defendants published the Article online at a "second location" on December 5 (or at any time) is demonstrably false.[76]

### 2.    The December 5 Note to Readers did not reaffirm the content of the original Article.

Republication is only found where the facts support a finding that the challenged defamatory statements were reiterated or reaffirmed: in other words, as Plaintiff likes to say, a "doubling down" on the allegedly defamatory statements.  This is made clear in the two cases cited by Plaintiff, *Larue v. Brown*, 333 P.3d 767 (Ariz. Ct. App. 2014) and *In re Davis*, 347 B.R. 607 (W.D. Ky. 2006).  In each case, the court found republication because the newly added

---

[74] WD Ex. 66; Def. Response to SUF ¶ 136.

[75] Plaintiff wrongly suggests that Rolling Stone treated the "December 5 article" as a "completely separate publication."  Pl. SJ Mot. at 54-55.  The testimony of Alvin Ling and Michael Provus do not support this assertion. As is clear from the transcripts, and explained in Defendants' Response to Plaintiff's Statement of Undisputed Facts ("Def. Response to SUF"), the only "separate content" referred to during these exchange is the web page at the Note to Readers URL—which contained *only* the text of the "Note to Readers," not the text of the Article itself.  Def. Response to SUF ¶¶ 136-138; WD Ex. 66.

[76] Even if Rolling Stone *had* posted the unchanged text of the original Article to a second URL on its website— which it did not—courts have made clear that posting allegedly defamatory statements to a different section of the same website (at a different URL) does not constitute republication.  *Canatella v. Van de Kamp*, 486 F.3d 1128, 1134-35 (9th Cir. 2007).  *See also Martin v. Daily News L.P.*, 121 A.D.3d 90, 104 (N.Y. App. Div. 2014) (reposting article without alteration after inadvertent deletion from website did not constitute republication).  Because statements posted on a public website already reach a "presumptively global audience," simply shifting the identical article elsewhere on the website or altering the page where it appears does not have a "measurable effect on the statements' ability to be accessed by a new band of viewers."  *Clark*, 617 F. App'x at 506.

material either explicitly or implicitly endorsed the original content.  In *Larue*, the defendants posted "updates and rebuttals" below the original article that "referred to and re-alleged the substance of the original articles," and later "added to and altered the substance of the original material by providing additional information in response to a reader's questions, *and re-urging the truth of the original articles* in response to another reader's criticism."  333 P.3d at 773 (emphasis added).  In *Davis*, the court found a republication where the defendants added entirely new "breaking news" and "update" sections to a website devoted to criticizing the allegedly defamed party because these new sections added "substantive information" that built upon and altered the originally published material.  *In re Davis*, 334 B.R. 874, 884 (Bankr. W.D. Ky. 2005), *aff'd in relevant part, rev'd in part*, 347 B.R. 607 (W.D. Ky. 2006).

Here, the Note to Readers appended to the Article does exactly the opposite.  Rather than reiterating its belief in the original story as told by Jackie, Rolling Stone explicitly warned readers of serious concerns, writing that, "[i]n the face of new information, there now appear to be discrepancies in Jackie's account, and we have come to the conclusion that our trust in her was misplaced."[77]  Rolling Stone further promised that "[w]e are taking this seriously and apologize to anyone who was affected by the story."[78]  Perhaps most telling, at the time it was published, the Note to Readers was understood as an "effective retraction."  It was reported that way by the press;[79] it was characterized that way by the Columbia Journalism School in its

---

[77] The mere fact that the Note to Readers references the original Article does not make it a republication.  *See, e.g.*, *Salyer v. S. Poverty Law Ctr., Inc.*, 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009) (subsequent articles referencing and linking to original article do not constitute republications of original article).

[78] WD Ex. 66; Pl. SUF ¶ 135.

[79] *See, e.g.*, Associated Press, "Rolling Stone retracts UVA rape story," *KOIN 6* (Dec. 5, 2014) [AS Ex. 39]; "Rolling Stone Backs Away from University of Virginia Rape Story"; Reuters, "Rolling Stone Backs Away from University of Virginia Rape Story," *Newsweek* (Dec. 5, 2014) [AS Ex. 40] Greg Toppo, "Rolling Stone retraction complicates fraught rape story," *USA Today* (Dec. 8, 2014) [AS Ex. 41].

subsequent independent review;[80] and it was understood that way by third-party witnesses in this case who were close to Eramo.[81]   Accordingly, there is no basis for Plaintiff to assert that the Note to Readers affirmed or reiterated the content of the original Article.  For this independent reason, Eramo's republication theory should be dismissed.

### 3.   Plaintiff's attempt to paint the December 5 Note to Readers as a republication of the Article is squarely at odds with established law and policy.

Defendants are not aware of any case law supporting Plaintiff's novel theory: that a correction, retraction, or editor's note could constitute a republication when it is appended to an article for the specific purpose of notifying readers of problems with the original article and affirmatively apologizing.  Plaintiff's theory, if credited, would have the perverse effect of forcing publishers to *avoid* notifying readers of problems with previously published stories for fear of incurring new liability for the original article.  Courts have repeatedly cautioned that "republication" should be interpreted narrowly to avoid the chilling effect surrounding the publication of new material on a website.  *See, e.g.*, *Firth*, 775 N.E.2d at 467 (explaining that allowing any modification of a website to trigger republication "would either discourage the placement of information on the Internet or slow the exchange of such information" by forcing publishers "to avoid posting on a Web site or use a separate site for each piece of information"); *Yeager v. Bowlin*, 693 F.3d 1076, 1082-83 (9th Cir. 2012) (noting that plaintiff's proposed approach of finding republication whenever new content is added to a website "would encourage websites to be frozen in anticipation of and during potentially lengthy litigation").  Indeed, well-established law and public policy takes the opposite approach, strongly encouraging

---

[80] SW Ex. 6 at ERAMO-04543 (editor's note on December 5 "effectively retracted *Rolling Stone*'s reporting on Jackie's allegations of gang rape").

[81] *See, e.g.*, Pl. Ex. 19 [Surface Dep.] 132:10-133:9; Pl. Ex. 32 [Renda Dep.] 88:19-89:5, 213:6-214:2; EAM Ex. 87 [Pinkleton Dep.] 216:16-217:3.

publishers to correct the record and alert readers to errors in a previously published article.  In fact, state retraction statutes (including the statute in Virginia) incentivize prompt corrections of the record.[82]

Eramo's "republication" theory is particularly ill-suited because she invokes it in an attempt to restart the clock on actual malice (rather than to extend the statute of limitations, as is usually the case when plaintiffs argue "republication").[83]  Yet, she runs head first into two fundamental actual malice principals that belie her theory.  First, her theory is at odds with well-established law that post-publication actions (or inaction) with respect to retracting or correcting an article do not demonstrate actual malice in the original publication.  "[Plaintiff] presents no authority, however, nor are we aware of any, for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication."  *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996)  Second, when as here, a publication promptly attempts to correct, retract or otherwise notify readers of errors courts consistently find that to be evidence of a *lack* of actual malice.  *Hoffman v. Wash. Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977) (subsequent retraction "tends to negate any inference of actual malice"), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978).[84]  If a failure to retract or correct does not demonstrate actual malice in the original article, and a retraction or correction

---

[82] *See, e.g.* VA. CODE § 8.01-48 (publication of retraction or apology may be offered as evidence in mitigation of damages in libel case); CAL. CIV. CODE § 48a (limiting plaintiff's damages where publisher complies with demand for retraction or correction); N.C. GEN. STAT. § 99-2 (same); TEX. CIV. PRAC. & REM. CODE §§ 73.051-.062 (requiring plaintiffs to serve a retraction demand as a prerequisite to suit and limiting recoverable damages where retraction is published).  At least 33 states have retraction statutes.  *See* Hon. Robert D. Sack, SACK ON DEFAMATION, § 11:2 (4th ed. 2010).

[83] Actual malice looks to the defendant's state of mind "at the time of publication."  *Bose*, 466 U.S. at 512.

[84] *See also, e.g.*, *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987) (readiness to retract "weighs against" actual malice); *Trans World Accounts, Inc. v. Associated Press*, 425 F. Supp. 814, 823 n.6 (N.D. Cal. 1977) (publication of retraction "may create a large obstacle to plaintiff's efforts to prove actual malice"); *Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 468 (Ind. 1999) (no actual malice where publication "admitted without hesitation from the very beginning that it made a mistake" and promptly ran a correction and apology).

mitigates *against* actual malice, there is no logical or legal support for Eramo's claim that
Rolling Stone's apology was a republication of the Article, with knowledge of falsity.

The *D.A.R.E.* case is particularly instructive on this point.  In 1998, *Rolling Stone*
published an article by Stephen Glass, a prolific journalist who was later revealed to have
fabricated information published in a number of major publications.[85]  After Glass's fabrications
came to light, Rolling Stone conducted an internal investigation, and it ran an editor's note that
reiterated the accuracy of the "gist" of the article, but specifically noted certain fabricated quotes
and incidents.  *D.A.R.E Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1286-87 (C.D.
Cal. 2000), *aff'd* 270 F.3d 793 (9th Cir. 2001).  The plaintiff sued over eight statements in the
article and claimed that the editor's note was an additional libel because it only identified three
of those statements as fabricated, thereby "purposely convey[ing]" that the rest of the article was
"truthful, accurate and documented."  *Id.* at 1276.

In other words, the plaintiff complained that *Rolling Stone*'s editor's note did not go far
enough, and that by not expressly repudiating each and every statement plaintiff complained of,
it should be seen as "republishing" those it did not call out as false.  The court roundly rejected
this argument, holding that the editor's notes were not actionable as "republications" of the
original article.  *Id.* at 1287.  The court explained: "If a publisher's wholesale refusal to retract …
did not constitute actual malice, it follows that a publisher's retraction which does not satisfy the
aggrieved party surely is not actionable as defamatory."  *Id.*

Plaintiff will presumably take the position that Rolling Stone either should not have
appended the Note to Readers to the top of the Article and/or that it should have removed the

---

[85] Obviously, the *D.A.R.E.* case differs in a very important respect from this case: unlike Stephen Glass, there is
absolutely no evidence in the record that Erdely fabricated any part of the story in any way.  Instead, Plaintiff is
alleging that Defendants should be held liable for finding Jackie to be a credible source at all times up until the early
morning hours of December 5.

Article from its website as soon as it suspected errors.  These arguments are without merit.

Given the intense press coverage this story had already received and would continue to receive

after Rolling Stone effectively retracted Jackie's allegations, Defendants knew that readers

would be looking for the Article—and in that case, it would be far better for them to access the

Article on Rolling Stone's website with the prominent disclaimer at the top rather than seeking a

pirated or archived copy that did not include the "Note to Readers."[86]

Rolling Stone's actions are also entirely consistent with the practice followed by news

organizations that routinely notify readers of problems with a story by appending similar notes,

without altering or removing the original story.  For example, the *Washington Post* still has on its

website Janet Cooke's 1980 article "Jimmy's World," a Pulitzer Prize-winning article about a

young heroin addict that was later found to be fabricated—causing the Pulitzer committee to

withdraw its award.  The article is prefaced by a prominent disclaimer alerting readers that the

"article is not factually correct."[87]  The *New York Times* still has Jayson Blair's articles on its

websites, with a correction and editor's note appended indicating that the articles were later

found to be fabricated and/or plagiarized.[88]  Other publications have similarly effectively

retracted articles by adding an "editor's note" indicating the subsequent concerns that came to

light and apologizing to readers—just as Rolling Stone did in its "Note to Readers."[89]

In sum, Plaintiff's misguided "republication" theory should be rejected.  Rolling Stone

---

[86] WD ¶ 45.

[87] WD Ex. 72.  Indeed, the *Washington Post*'s Digital Publishing Guidelines state that the site will publish a correction, update, or follow-up coverage, but that it does not take down articles "as a matter of editorial policy": "In short, our response will be to consider whether further editorial action is warranted, ***but not to remove the article as though it had never been published***."  WD Ex. 75.

[88] WD ¶ 46; WD Ex. 71.

[89] *See, e.g.*, WD Ex. 74 (editor's note appended to online version of article published in *New York* magazine, noting that statements appear to have been "falsified" and the magazine's "fact-checking process was obviously inadequate" and apologizing to readers).

appended its Note to Readers to the Article at the same URL within hours of learning that Erdely

no longer found Jackie to be a credible source and before Defendants had undertaken any

internal investigation or retained the Columbia Journalism Review for an independent review.

For purposes of this lawsuit, Plaintiff now tries to wrench that effective retraction from its

context and twist it into a "republication" of the information in the Article that it was

repudiating.  Plaintiff's characterization of the Note to Readers as a "republication" of the

original Article is at odds with the facts, the law, and common sense.

**III.  NOT ALL OF THE CHALLENGED STATEMENTS ARE "OF AND CONCERNING" ERAMO, AND HER ARGUMENT THAT REFERENCES TO THE UVA ADMINISTRATION ARE "OF AND CONCERNING" HER ONLY UNDERSCORES THAT SHE IS A PUBLIC OFFICIAL**

**A.   Statement #1 from the Article Is Not "Of and Concerning" Eramo and Constitutes Protected Opinion**

Plaintiff argues that all five statements she challenges from the Article are "of and

concerning" her.  As explained more fully in Defendants' Motion for Summary Judgment, none

of these statements are actionable.  Nevertheless, Defendants do not dispute that the statements

identified as (b)-(e) from the Article (Pl. SJ Mot. at 33-34) could be considered "of and

concerning" Eramo.[90]  But, as established on Defendants' motion, Statement #1—the "dek" of

the Article[91]—cannot be read as "of and concerning" Eramo based on the undisputed law and the

Article's plain text.  Statement #1 reads: "Jackie was just starting her freshman year at the

University of Virginia when she was brutally assaulted by seven men at a frat party.  When she

tried to hold them accountable, a whole new kind of abuse began."[92]

Plaintiff acknowledges that the relevant legal standard is whether the Statement "was

---

[90] These are Statements #2-5 in the Appendix to Defendants' motion.

[91] The "dek" is a sub-heading intended to be a summary and introduction to the rest of the Article.  LGP ¶ 44; SW ¶ 65; SRE ¶ 189.

[92] Article at RS001070.

intended to refer to [the plaintiff] and would be so understood by persons reading it who knew [the plaintiff]." Pl. SJ Mot. at 32.[93] Here, there is absolutely no evidence that the "whole new kind of abuse" is "intended to refer to" *Eramo* "abusing" Jackie. The plain text of the Article does not support this reading. To the contrary, Eramo is shown to be supportive of Jackie in their interactions—providing her with her options, offering to assist her if she wants to "hold these men accountable," and introducing her to supportive peers like Emily Renda and the women of One Less. The Article also makes clear that Jackie does not see Eramo as "abusing" her—to the contrary, she loves her and thinks of her as an "asset to the community."[94]

Glaringly absent from Eramo's motion is a single piece of evidence that Defendants intended or endorsed the implication that she presses. To the contrary, each witness testified that the dek was *not* intended to refer to Eramo.[95] Instead, Eramo submits two boilerplate, identical affidavits from one of her colleagues (Laurie Casteen) and a former student (Sara Surface) reciting a legal conclusion that this statement "could only be plausibly read to refer to Jackie's interactions with Nicole Eramo as described in the article."[96] Affidavits like these that express "ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*, 922

---

[93] This standard is consistent with the standard followed in the Fourth Circuit for libel claims based on implication or innuendo: "The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993). Here, Eramo argues that the statement implicitly refers to her.

[94] Furthermore, the Article makes clear that Jackie repeatedly chose not to move forward with a complaint through any of UVA's resolution proceedings. Article at RS001077-79. Instead, the only way the Article describes Jackie attempting to "hold" her assailants "accountable" is by "throwing herself into peer education," joining the community of One Less, and speaking out against her assailants at Take Back the Night. Article at RS001078. It is through this work that Jackie experiences the only physical "abuse" specified in the Article—she is hit in the face with a bottle in what she believes is an act of retaliation for her campus activism, similar to the verbal abuse experienced by her friend Emily Renda. *See also* Def. SJ Mot. at 38-39.

[95] *See* Pl. Ex. 13 [Woods Dep.] 164:23-167:11; Pl. Ex. 6 [Garber-Paul Dep.] 130:13-131:17; SRE ¶ 189; SW ¶ 65; LGP ¶ 44-45.

[96] Pl. Ex. 20 ¶ 8; Pl. Ex. 21 ¶ 8.

F.2d 220, 225 (5th Cir. 1991) (internal quotation marks and citation omitted); *Beard v. Annis*,

730 F.2d 741, 743 (11th Cir. 1984) (affidavit failed to raise genuine issue because it expressed

"ultimate or conclusory facts and conclusions of law"); Charles A. Wright, Arthur R. Miller &

Mary A. Kane, 10B FED. PRAC. & PROC. CIV. § 2738, at 346-50 (3d ed. 2016) (same).  Nor do

emails received by Rolling Stone's general mailbox after the Article's publication expressing

generalized negative opinions of Eramo—none of which reference the "dek" of the Article—

demonstrate that *this specific statement* in the Article is "intended to refer to" Eramo.  Pl. SJ

Mot. at 35.  Furthermore, a plaintiff cannot back into an identification by claiming that third

parties incorrectly read into the article something that the text cannot support.  *See Springer v.

Viking Press*, 90 A.D.2d 315, 318-21 (N.Y. App. Div. 1982) (dismissing libel claim because

reasonable reader would not conclude that fictional character in novel was plaintiff,

notwithstanding letter in record from third party stating that she understood the fictional

character to be plaintiff), *aff'd*, 458 N.E.2d 1256 (N.Y. 1983).

 In a Hail Mary, Plaintiff argues that "Eramo is the only individual in the entire article

who is depicted visually" and "[t]hat alone is enough for this Court to conclude, as a matter of

law, that this statement is 'of and concerning' her."  Pl. SJ Mot. at 36.  Yet, the illustration

appears *five full pages* after the dek, and nothing in the text of the Article or the caption[97] to the

illustration remotely links the illustration to "abuse."[98]  Plaintiff's argument flies in the face of

the bedrock principle that the allegedly defamatory statements must be evaluated in their proper

context.  *Hanks v. Wavy Broad., LLC*, No. 2:11-cv-439, 2012 WL 405065, at *8 (E.D. Va.

---

[97] Plaintiff's argument that the illustration caption demonstrates that the "dek" of the Article is "intended to refer to" her is similarly baseless.  The phrase "Where's the Justice" in that caption plainly refers to the rest of that caption, which states that "Dean Eramo is the head of UVA's Sexual Misconduct Board and beloved by students, but in the history of the school, no one has ever been expelled for sexual assault."  UVA's failure to expel students accused of sexual assault cannot reasonably be understood as "abuse" perpetrated by Dean Eramo.

[98] Article at RS001070-76.

Feb. 8, 2012).[99] *Hanks* is illustrative, as the court there found that general statements in the

opening of a news broadcast and article about "unscrupulous tax preparers" could not reasonably

be understood to apply to the plaintiff, the owner of a tax preparation company discussed later in

the broadcast and article as making a costly mistake and being required to give its customer a

refund. *Id.* at *1-2, *7-9. Relying solely on the allegedly defamatory publications themselves,

the court reasoned that "a plain reading of the Article and viewing of the Newcast reveals that

absolutely no reasonable person would infer that the language used in these publications

affirmatively suggests that Defendants intended to or did endorse an inference that Plaintiff was

an 'unscrupulous tax preparer'" because "there is no insinuation that [plaintiff's company]

engaged in any unscrupulous or illegal conduct," and the challenged text and broadcast made

clear that the plaintiff's company simply made a costly mistake. *Id.* at *9. Likewise here, there

is no tenable connection between the "abuse" statement and the nuanced depiction of Eramo in

the body of the Article, which makes clear that the criticisms on UVA's failure to take decisive

action and its practice of deferring to victim choice, makes clear not on any purported "abuse" of

Jackie by Dean Eramo.

     Moreover, even if Statement #1 were of and concerning Eramo, the phrase "a whole new

kind of abuse began" still is not actionable as a matter of law because it constitutes unverifiable

---

[99] The only case Eramo cites to support this argument, *Araya v. Deep Dive Media, LLC*, 966 F. Supp. 2d 582 (W.D.N.C. 2013), is distinguishable. There, the entire allegedly defamatory news article "involve[d] statements pertaining to one individual and one individual only." *Id.* at 595. The headline read "Female High School Student Accused of Flashing Vagina in Yearbook Photo" and underneath it appeared "a still photograph captured from . . . news footage of the controversy, in which the Plaintiff appeared in her cap and gown—her face and pelvic area, however, had been obscured by black bars." *Id.* at 586. Although the article did not identify the plaintiff by name, it reported that "[o]n page 14 of the Lake Norman High School yearbook there is a photo of a girl lifting her graduation gown and exposing her hooha," *id.* at 585, providing "a precise roadmap for readers to view the unaltered and uncensored picture." *Id.* at 596. Nothing remotely similar is at issue here. Rather than focusing on "one individual and one individual only," Statement #1 presents a summary of the rest of the Article, *id.* at RS001070, which involves numerous events and actions by multiple different people, including alleged gang rapists, unsympathetic peers, and fraternity boys who threw a bottle at Jackie's face (the logical reference point for the word "abuse," *id.* at RS001077). And, unlike in *Araya*, where the photo purported to depict the allegedly defamatory fact itself (*i.e.*, the student exposing herself), here the photo illustration shows Eramo comforting a troubled student and includes a caption that says Eramo is "beloved by students." *Id.* at RS001076.

opinion and rhetorical hyperbole.  *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 183-86 (4th Cir. 1998).  Indeed, the word "abuse" is not even capable of a precise meaning in this context—underscored by the fact that Eramo never bothers to specify what sort of "abuse" she claims the Article accuses her of.  Is it physical abuse, verbal abuse, psychological abuse or some abstract negative reaction?  The Fourth Circuit has repeatedly protected such statements of "rhetorical hyperbole" that cannot reasonably be understood as stating actual facts about a plaintiff.  *CACI*, 536 F.3d at 301-02 (radio host's statement that military contractor was "torturing" prisoners at Abu Ghraib was not actionable because it was not used in "any narrow, legalistic sense, but in a broader sense that encompassed the range of severe abuses at Abu Ghraib"); *Lapkoff v. Wilks*, 969 F.2d 78, 80 (4th Cir. 1992) (statement that defendant "wouldn't trust [a car dealer] any farther than [he] could throw him" amounted to opinion); *Hanks*, 2021 WL 405065, at *9-12 (holding that, even if the term "unscrupulous" did refer to the plaintiff, it would be non-actionable opinion because it was  "a broad, unfocused and wholly subjective" comment").  In particular, courts recognize that such "hyperbole and loose characterization" is common in headlines, and the dek—which appears in large print at the top of the page—serves the same "attention-gett[ing]" function to draw the reader into the story.  *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1017 (1st Cir. 1988).[100]

Accordingly, Plaintiff is not entitled to partial summary judgment on her argument that Statement (a) (Statement #1) is "of and concerning" her.  To the contrary, Erdely and Rolling Stone are entitled to judgment summary judgment on grounds that Statement #1 is not "of and concerning" her as a matter of law and constitutes non-actionable opinion and hyperbole.  *See* Def. SJ Mot. at 27-39.

---

[100] This is particularly the case with magazines like *Rolling Stone*, which "have a tradition of more colorful, even feisty language, than do dailies," and whose "generally freer style of personal expression … would signal the reader to expect a fair amount of opinion."  *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir. 1986).

**B.      Plaintiff's Insistence That Statements #5-11 Refer to Her, Despite Their Facial Applicability to UVA Itself, Buttresses the Conclusion That She Is a Public Official**

Eramo's motion targets an additional six statements that do not refer to her by name or title, but instead refer generally to "the administration," "the school," or "the University."[101]  One of these (Statement #5) is found in the Article; the other six statements are from Erdely's appearances on the Brian Lehrer Show[102] (Statement #6) and the *Slate* DoubleX Podcast (Statement #7-11).[103]  Defendants do not dispute that Eramo is included among members of the administration that Erdely criticized in these statements.  This is ultimately a moot point, however, because all of these statements are expressions of non-actionable opinion and were not published with actual malice as explained in Defendants' motion (Def. SJ Mot. at 27-37, 49-65, 66-69) and Section IV, *infra*.

Nevertheless, Eramo's motion concerning these statements is revealing in two important respects.  First, Eramo concedes that the post-publication statements must be considered in the context of the Article, which was the "subject of" the radio interviews.  Pl. SJ Mot. at 37, 40.  By doing so, she effectively acknowledges that the challenged statements from these interviews are nothing more than shorthand for criticisms explained in detail in the Article.[104]  Second, to establish that she is identified in the interviews, Eramo asks this Court to agree that she is synonymous with the "administration" or "the University" when it comes to the criticisms laid out in the Article, including UVA's decisions not to issue a warning to the campus or to conduct a prompt and independent investigation of Jackie's claims about herself and two additional Phi

---

[101] *See* the Appendix of Challenged Statements, annexed to Def. SJ Mot., for the full text of these Statements.

[102] Eramo's name is never even uttered during the Brian Lehrer Show.  SRE ¶ 157; Compl. Ex. C.

[103] Plaintiff has not moved for summary judgment that Statements #12 and #13 are "of and concerning" her.  But in any event, these statements fall into the same category as Statements #5-11.

[104] Pl. SUF ¶ 98; Def. Response to SUF ¶ 98.

Kappa Psi victims.  By arguing that these criticisms of actions taken—or, more precisely, not taken—by the "administration" necessarily refer to Eramo, she all but concedes that she exercised significant decision-making authority over the very policies and practices called into question in the Article.  This confirms what the undisputed record evidence also demonstrates—that Eramo is a public official and/or a limited-purpose public figure for purposes of these criticisms.  *See* Section I, *supra*.

## IV.   NONE OF THE STATEMENTS ARE "DEFAMATORY PER SE"

Finally, Plaintiff asks this Court to find that all of the Statements at issue are "defamatory per se" as a matter of law.  Pl. SJ Mot. at III.  Plaintiff's argument should be denied as moot because, as set forth in Defendants' motion, Plaintiff cannot survive summary judgment with respect to *any* of the 13 statements at issue because the challenged Statements and claimed implications are not actionable as a matter of law,[105] and, even if they were, Eramo cannot establish by clear and convincing evidence that Defendants made them with actual malice.[106]

In support of her argument that she is entitled to judgment as a matter of law declaring all the challenged Statements defamatory per se, Plaintiff provides a bulleted list of ten allegedly defamatory statements and implications.  Pl. SJ Mot. at 42-43.  Besides dropping a perfunctory citation, Eramo does not attempt to match up these statements and implications with the specific allegedly defamatory statements identified in the Complaint (Compl. ¶¶ 210, 225, 240, 255, 270, 285), nor does she place them in any sort of meaningful context.  In fact, most are just

---

[105] Def. SJ Mot. at 27-43, 66-69.  Most of the challenged Statements are non-actionable opinion, but Statements #2 and #4 are not capable of Plaintiff's proffered defamatory meaning, nor has Plaintiff demonstrated that they are substantially false.  As explained in Defendant's motion, when viewed in its proper context, Statement #2 refers to Jackie being discouraged from participating in the Article, not from being discouraged from reporting her alleged rape.  Def. SJ Mot. at 39-40.  Statement #4 refers to Eramo's admittedly neutral demeanor when Jackie told her about two additional Phi Kappa Psi victims.  *See id.* at 40-42.

[106] Def. SJ Mot. at 43-65, 69-72.

reiterations of allegedly defamatory implications that Eramo reads into the Article, presented through cherry-picked and rearranged quotations stripped from their surroundings.[107]

When placed back into the context of the Article as a whole, as Plaintiff concedes they must be, these allegedly defamatory statements and implications all reduce to the same central grievance:  the Article criticizes Eramo and UVA for (1) failing to warn the campus of multiple gang-rape allegations against an active fraternity; (2) failing to initiate an independent investigation of Jackie's claims regarding Phi Kappa Psi until September 2014; and (3) rigidly following the "victim choice" approach to sexual-assault reporting with the consequence that a significant number of UVA sexual assault victims never take meaningful action to bring their perpetrators to justice.[108]  As explained in Defendants' motion, these are subjective expressions of opinion that are fully supported by accurate facts disclosed in the Article.  It is undisputed that UVA *did not* warn the campus in response to Jackie's allegations at any time prior to publication, and it *did not* launch any independent investigation into her allegations until September 2014.[109]  It is also undisputed that UVA catered to victim choice in matters of sexual assault, and that an exceedingly small number of UVA sexual assault victims chose to pursue

---

[107] Three of the items on this list—the third, fourth and fifth bullet points—are additional statements from the Article that Eramo has already admitted she is *not* challenging in this action.  AS Ex. 10 [Eramo Dep.] 30:21-31:22 (testifying that the five statements identified in Counts I & II are the only statements from the Article at issue in this action).  Having failed to sue over these specific statements, Plaintiff cannot ask this Court to find them "defamatory per se."  Furthermore, when properly read in context, *none* of these selective quotes are actionable, since they plainly express the opinions of Erdely and critics who she interviewed and quoted in the Article.  *See, e.g.*, *Montgomery v. Risen*, No. 16-0126 (RC), 2016 WL 3919809 (D.D.C. July 15, 2016), at *3, *32-34 (statement in book that plaintiff was responsible for "what many current and former U.S. officials … now believe was one of the most elaborate and dangerous hoaxes in American history" is not actionable because it asserts the beliefs of third parties, which is not objectively verifiable); *Mirafuentes v. Estevez*, No. 1:15-cv-610, 2015 WL 8177935, at *3 (E.D. Va. Nov. 30, 2015) (article's assertion that plaintiff was "perceived to be among the most corrupt Mexicans in 2013" is not actionable "because it is not objectively verifiable and instead amounts to a subjective assertion").

[108] Article at RS001076-79.

[109] *Id.* at RS001077-79.

formal proceedings in the year prior to publication.[110]  Def. SJ Mot. at 27-38.  Post-publication,

Erdely expressed these subjective and strongly felt views in a loose, hyperbolic, and off-the-cuff

fashion on live radio programs, which any reasonable reader would recognize as her subjective

viewpoint and rhetorical hyperbole.  *Id.* at 66-69.

Eramo tries to bolster her argument by pointing out that she received negative responses

after the Article was published, including emails that criticized her performance at UVA—

sometimes in scathing language.  But the fact that the Article and post-publication statements

reflected negatively on Eramo—or even that she received harsh criticism as a result of them—do

not make them actionable.  The Supreme Court has made plain that the First Amendment

protects speakers and writers "even when [they are] motivated by hatred or illwill" and express a

"slashing and one-sided" opinion that is "outrageous" and "offensive."  *Hustler Magazine, Inc. v.

Falwell*, 485 U.S. 46, 53-55 (1988).  Furthermore, courts across the nation routinely recognize

that the opinion doctrine protects harsh but unverifiable rhetoric even when it casts the plaintiff

in an extremely negative light.  *See, e.g.*, *CACI*, 536 F.3d at 301-02 (holding that characterization

of military contractors as "killers" in the course of talk radio show was reasonably understood as

"exaggerated rhetoric intended to spark the debate"); *Phantom Touring v. Affiliated Publ'ns*, 953

F.2d 724, 728, 730-31 (1st Cir. 1992) (holding that description of theatre production as "a rip-

off, a fraud, a scandal, a snake-oil job" was rhetorical hyperbole and subjective criticism

supported by disclosed facts) (cited with approval in *Biospherics*, 151 F.3d at 185); *Stevens v.

Tillman*, 855 F.2d 394, 402 (7th Cir. 1988) (holding that statements that plaintiff "made very

racist statements during the boycott ... is a racist ... [and] [w]e cannot have racist people around

---

[110] *Id.* at RS001076-77.

our children" were protected expressions of opinion, and thus, not actionable).[111]

Eramo also claims that all of these criticisms should be considered defamatory per se because they "imputed to her unfitness to perform her duties as an Associate Dean at UVA who is responsible for supporting and assisting sexual assault victims."  Here, again, her argument falls short.  The Article never suggests that Eramo was a rogue employee who failed to follow UVA's policies and practices.  To the contrary, it criticizes UVA's approach of "victim choice," which Eramo faithfully implemented in her interactions with Jackie.  Whether Eramo couches this complaint as an accusation that she "brush[ed] off" Jackie, acted with "indifference," "did nothing," or other similar phrases, she is taking aim at the same criticism: that Erdely (and sources she consulted) believed UVA was not doing enough in response to Jackie's allegations because it did not issue a warning to the campus, deferred to her wishes not to proceed, and did not undertake its own investigation until September 2014—a subjective and hyperbolic expression of opinion based on facts that are undisputed in this action.[112]

No matter how Eramo tries to dress up this criticism, it is a classic expression of protected opinion that lies at the heart of the First Amendment and cannot form the basis for a libel claim.  "[T]he media and the public are free to express their opinions regarding the fitness or qualifications of public officials ....  The right to express such opinions lies at the heart of the democratic process, and it is, indeed, an oft-exercised form of free speech."  *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1059-60 (9th Cir. 1998) (citing *Monitor Patriot Co. v. Roy*, 401 U.S.

---

[111] *See also Finkelstein v. Wachtel*, No. 00 Civ. 2672, 2003 WL 1918309, at *7 (S.D.N.Y. 2003) (holding that statements that plaintiff was a  "crook" and that this was going to be a "very dirty business" were protected opinion, because the terms are "colloquial, loose, figurative terms that do not necessarily convey to the listener that Plaintiff had, in fact, engaged in criminal behavior"); *Fleming v. Benzaquin*, 454 N.E.2d 95, 100-01 (Mass. 1983) (holding that statement that plaintiff was a "Nazi[]" was protected opinion); *Rybas v. Wapner,* 457 A.2d 108, 110-11 (Pa. 1983) (holding that statement that plaintiff was "anti-Semitic" was protected opinion); *Kotlikoff v. Cmty. News*, 444 A.2d 1086, 1091 (N.J. 1982) ("Pejorative statements of opinion are entitled to constitutional protection no matter how extreme, vituperous or vigorously expressed they may be.")

[112] *See* Def. SJ Mot. at 11-14, 27-38, 66-69.

265 (1971)).  Courts routinely reject libel claims based on far sharper criticisms of a plaintiff's job performance—especially where, as here, the plaintiff is being criticized in her official capacity as a public official or public figure.  *See, e.g.*, *Dodds*, 145 F.3d at 1065-68 (statements or implications that judge was unfit to serve were nonactionable); *Nigro v. Va. Comm. Univ./Med. Coll. of Va.*, 492 F. App'x 347, 356 (4th Cir. 2012) (unpublished) ("perceptions of [the plaintiff's] performance" are "expressions of opinion" and "cannot be proven false"); *Lauderback v. Am. Broad. Cos.*, 741 F.2d 193, 195-97 (8th Cir. 1984) (statement implying that insurance agent was "rotten," "unethical," "sometimes illegal," "crook" and "liar" was protected opinion based on disclosed true facts); *Hanks*, 2012 WL 405065, at *9-12 (statements that tax preparer is "unscrupulous" is non-actionable opinion); *Marroquin v. Exxon Mobil Corp.*, No. 08-391, 2009 U.S. Dist. LEXIS 44834, at *23 (E.D. Va. May 27, 2009) (characterizing "conduct as 'very bad' or 'inappropriate,' or creating an 'improper' commitment with a customer are expressions of opinion that rest on each speaker's perspective").[113]  While Plaintiff may disagree with Defendants' assessment of what should have been done in response to Jackie's allegations, those disagreements are the province of the court of public opinion, not a libel suit.  *See Reuber v. Food Chem. News*, *Inc.*, 925 F.2d 703, 717, 721 (4th Cir. 1991) (en banc) (noting that public figures should voice disagreement "on the field of polemical battle [rather] than in a defamation suit," for the First Amendment abhors the very object of this lawsuit, "an award of damages that

---

[113] *See also Montgomery v. Risen*, No. 1:16-cv-00126 (RC), 2016 WL 3919809, at *21-22 (D.D.C. July 15, 2016) (description of government contractor as "crazy" and a "con artist" who was "the maestro behind what many current and former U.S. officials … now believe was one of the most elaborate and dangerous hoaxes in American history" was nonactionable opinion); *Kendall v. Daily News Publ'g Co.*, No. Civ. 2010-0046, 2011 WL 4434922, at *8 n.18 (V.I. Sept. 21, 2011) (statements that judge was "arrogant" and his decisions "leave us concerned for the very safety of Virgin Islands citizens and the integrity of the territory's Superior Court" are "clearly constitutional protected opinions"), *aff'd*, 716 F.3d 82 (3d Cir. 2013); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 366 N.E.2d 1299, 1306-07 (N.Y. 1977) (statement that judge was "incompetent" was protected opinion).

would leave only a legacy of one-sided debate").[114]

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully submit that the Court should deny

Plaintiff's Motion for Partial Summary Judgment.

Dated: New York, New York
　　　　July 22, 2016

By: ___/s/ Elizabeth A. McNamara_____
　　　　Elizabeth A. McNamara (*pro hac vice*)
　　　　Samuel M. Bayard (*pro hac vice*)
　　　　DAVIS WRIGHT TREMAINE LLP
　　　　1251 Avenue of the Americas, 21st Floor
　　　　New York, New York  10020-1104
　　　　Telephone:　　(212) 489-8230
　　　　Fax:　　(212) 489-8340
　　　　Email:　　lizmcnamara@dwt.com
　　　　　　　　samuelbayard@dwt.com

　　　　Alison Schary (*pro hac vice*)
　　　　DAVIS WRIGHT TREMAINE LLP
　　　　1919 Pennsylvania Avenue NW, Suite 800
　　　　Washington, D.C.  20006-3401
　　　　Telephone:　(202) 973-4248
　　　　Fax:　　(202) 973-4448
　　　　E-mail:　　alisonschary@dwt.com

　　　　W. David Paxton (VSB No. 19798)
　　　　Michael J. Finney (VSB No. 78484)
　　　　GENTRY LOCKE
　　　　10 Franklin Road S.E., Suite 900
　　　　P.O. Box 40013
　　　　Roanoke, Virginia  24022-0013
　　　　Telephone:　(540) 983-9300
　　　　Fax:　　(540) 983-9400
　　　　E-mail:　　paxton@gentrylocke.com
　　　　E-mail:　　finney@gentrylocke.com

　　　　*Attorneys for Defendants Rolling Stone LLC,*
　　　　*Sabrina Rubin Erdely, and Wenner Media LLC*

---

[114] Furthermore, even if criticisms of UVA's response to Jackie's allegations should be considered statements of fact—which they cannot—Plaintiff cannot survive summary judgment because she cannot possibly demonstrate that these assertions are substantially false, given that the federal government came to the same conclusion in September 2015 based upon its review of Jackie's file.  *See* Def. SJ Mot. at 26-27.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 22, 2016, the foregoing was served by CM/ECF on counsel

of record for all parties to this action.  Notice of this filing will be sent by email to all parties by

operation of the Court's electronic filing system or by mail to anyone unable to accept electronic

filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the

Court's CM/ECF System.


<u>/s/ Elizabeth A. McNamara</u>
Elizabeth A. McNamara