**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

---

NICOLE P. ERAMO,

                   Plaintiff,

       - against -

ROLLING STONE LLC, SABRINA RUBIN
ERDELY, AND WENNER MEDIA LLC,

                   Defendants.

Case No. 3:15-cv-00023-GEC

---

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**COUNTER-STATEMENT OF MATERIAL FACTS**
**IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In support of Defendants' Motion for Summary Judgment, Defendants Rolling Stone

LLC, Wenner Media LLC ("collectively, "Rolling Stone"), and Sabrina Rubin-Erdely ("Erdely")

respectfully submit this statement in response to the Plaintiff's Counter-Statement of Material

Facts in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Dkt.

No. 116). In addition to the responses and objections set forth below, Defendants hereby

incorporate by reference the Statement of Undisputed Material Facts set forth in Defendants'

Memorandum of Law in Support of their Motion for Summary Judgment (Dkt. No. 102) and

Defendants' Response to Plaintiff's Statement of Undisputed Facts (Dkt. No. 122).[1]

---

[1] Plaintiff's Counter-Statement of Material Facts does not respond to or otherwise dispute Defendants' Statement of Undisputed Material Facts, which were set forth in a separately captioned section of their opening brief (Def. Br. at 5-27) pursuant to Local Civ. R. 56(a). Instead, Plaintiff's Counter-Statement is a collection of additional facts that Plaintiff claims are undisputed and offers in further support of her opposition arguments. Plaintiff has separately filed a set of evidentiary objections to a small number of facts and documents submitted by Defendants (Dkt. 119), and Defendants have addressed these objections in a separate filing. Other than the evidentiary objections, Plaintiff does not dispute Defendants' Statement of Undisputed Material Facts pursuant to Fed. R. Civ. P. 56(c)(1). Accordingly, this Court may consider these material facts to be Defendants to be undisputed for purposes of this motion. See Fed. R. Civ. P. 56(e)(2) (where a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion").

I.    **Before Setting Out To Write "A Rape on Campus," Erdely Had A History Of Writing About Rape And Institutional Indifference To Rape.**[2]

      1.    During her tenure as a journalist, Erdely has written many articles accusing various institutions of being indifferent to — or covering up — allegations of rape. Indeed, Erdely's articles about rape have a common thread in that they identify some vulnerable victim of sexual abuse and an indifferent institution to whom the victim reports her assault.

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion in that other articles written by Erdely, and the opinions expressed in those articles, are not at issue in this action.  Nor has Plaintiff established that any issue was raised about the accuracy of such articles or that Defendants were aware of any concerns with such articles. Only a *genuine* issue of *material* fact precludes summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A material fact is one capable of affecting the outcome of the litigation under the applicable substantive law.  *Id.* at 248.  Defendants further object on the basis that Erdely's articles speak for themselves, and respectfully refer the court to Exhibits 2 to 6 of Plaintiff's Counter-Statement of Material Facts in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Counter-Statement") for complete copies of the articles cited herein, as well as to paragraphs 13 and 14 of the Declaration of Sabrina Rubin Erdely in Support of Defendants' Motion for Summary Judgment[3] for a brief description of the many subjects Erdely's work has addressed in her 20 years as a journalist.

---

[2] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 1-6.

[3] Defendants refer herein to the following declarations, and exhibits thereto, previously filed in support of their Motion for Summary Judgment and their Opposition to Plaintiff's Motion for Partial Summary Judgment: Declaration of Sean Woods ("SW") (Dkt. 103); Declaration of Sabrina Rubin Erdely ("SRE") (Dkt. 104); Declaration of Elisabeth Garber-Paul ("LGP") (Dkt. 105); Declaration of William Dana ("WD") (Dkt. 106); Declaration of Elizabeth A. McNamara ("EAM") (Dkt. 108); and Declaration of Alison Schary ("AS") (Dkt. 121). Defendants also refer to exhibits attached to the Declaration of Samuel M. Bayard ("SMB"), filed herewith.

2.      In April 1996, Erdely authored "Intimate Intimidation," an article published in

Philadelphia Magazine. (May 12, 2016 Deposition of Sabrina Rubin Erdely at 44:10-13 ("Erdely

Dep.") (Ex. 1); Sabrina Rubin Erdely, "Intimate Intimidation," Philadelphia Magazine (April

1996) ("Intimate Intimidation") (Ex. 2).) Much like "A Rape On Campus," "Intimate

Intimidation" begins with a horrifying narrative of a woman being sexually assaulted. Rather

than the assault occurring by fraternity members at UVA, Gail Greeby, the protagonist of the

article, was assaulted by her gynecologist. Erdely's article goes on to accuse the medical

profession, and in particular various state medical boards, of failing to stop the alleged

perpetrator. According to Erdely, on the day of Greeby's assault "she became a victim not only

of [the doctor], ... but of a medical board that ignored her complaint and of a justice system that

didn't believe her voice alone was enough." (Intimate Intimidation at 85.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on

this motion for the reasons stated in Response 1, *supra*.  Defendants further object to this fact on

the ground that it selectively quotes from and attributes unstated conclusions to the article

"Intimate Intimidation," which speaks for itself.  Defendants respectfully refer the Court to

Exhibit 2 to Plaintiff's Counter-Statement for the complete contents of the article "Intimate

Intimidation."

3.      In November 2008, Erdely authored an article "The Crime Against Women That

No One Understands," which was published in Self Magazine. (Erdely Dep. at 44:14-17 (Ex. 1);

Sabrina Rubin Erdely, "The Crime Against Women That No One Understands," Self Magazine

(Nov. 2008) ("The Crime Against Women") (Ex. 3).) Just as in "Intimate Intimidation," Erdely

begins the article with a graphic narrative of an alleged rape. According to Erdely, "Leigh," the

alleged victim, claims she was date-raped by a man she met on a popular internet dating website

after their first in-person date. (The Crime Against Women at 190.) As in so many of her articles, Erdely blames another institution—this time the "criminal justice system" and "juries"—for not understanding the nature of "nonstranger rape." Erdely wrote that "[n]ationwide, despite all the legal advances of the past three decades, little has changed for women who report a date rape. Because in far too many instances, juries don't believe date rape exists." (Id. at 191.) Erdely went on to write that "[t]o a juror, a rapist is a guy who jumps out of the bushes and throws a woman to the ground .... She has terrible injuries, and she leaps up and reports it immediately to the police. Anything that falls short of that story is questionable." (*Id.* (quoting a director of a women's rape advocacy group)). Finally, Erdely criticized the criminal justice system because, according to Erdely, "[t]rials often hinge not on the behavior of the defendant, but rather on whether the woman did enough to protect herself." (Id. at 194.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion for the reasons stated in Response 1, *supra*.  Defendants further object to this fact on the ground that it selectively quotes from and attributes unstated conclusions to the article "The Crime Against Women That No One Understands," which speaks for itself.  Defendants respectfully refer the Court to Exhibit 3 to Plaintiff's Counter-Statement for the complete contents of the article "The Crime Against Women That No One Understands."

4.      In Rolling Stone's January 22, 2009 edition, Erdely authored an article titled "Sex, Lies and Phys Ed," about a star high school athlete who engaged in a sexual relationship with his young female physical education teacher. (Erdely Dep. at 44:18-21 (Ex. 1); Sabrina Rubin Erdely, "Sex, Lies, and Phys Ed," Rolling Stone Magazine (Jan. 22, 2009) ("Phys Ed") (Ex. 4).) In the article, Erdely took aim at the alleged disparity of treatment between male and female sexual assault victims — and the high school's and the media's alleged indifference to

4

when a young female high school teacher engages in an inappropriate relationship with a high school boy. According to Erdely, "[g]iven such salacious details [about such an affair], the media tend to treat these cases as entertainment — at least, that is, when the teacher is a woman." (Phys Ed at 61.) Erdely went on to proclaim that when you "[b]lur the lines between teachers and students, [] it creates a backdrop that's part Penthouse Forum, part Melrose Place — a reflection of a broader cultural shift, in which a boy who has sex with his teacher is viewed not as a survivor of sexual abuse, but as the luckiest kid in the 10th grade. Why treat a woman like a criminal, after all, when all she did was give some randy teen the best night of his life?" (Id. at 61-62.) Finally, to emphasize her thesis that the high school was indifferent to this alleged sexual assault, Erdely writes that "[w]hen the [high school athlete] confessed the affair to the school police office, the cop high-fived him, then promised not to tell." (Id. at 62.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion for the reasons stated in Response 1, *supra*.  Defendants further object to this fact on the ground that it selectively quotes from and attributes unstated conclusions to the article "Sex, Lies and Phys Ed," which speaks for itself.  Defendants respectfully refer the Court to Exhibit 4 to Plaintiff's Counter-Statement for the complete contents of the article "Sex, Lies and Phys Ed."

5.     In 2011, Erdely wrote a story for Rolling Stone in which she claimed that an altar boy, pseudonymously called "Billy Doe," was raped by two Catholic priests and a Catholic schoolteacher in Philadelphia, and that these crimes were covered up by the Catholic church. (Erdely Dep. at 44:22-25 (Ex. 1); Sabrina Rubin Erdely, "The Catholic Church's Sex-Crime Files: How a scandal in Philadelphia exposed documents that reveal a high-level conspiracy to cover up decades of sexual abuse," Rolling Stone Magazine (Sept. 15, 2011) ("Sex-Crime Files") (Ex. 5).) The article accused the Catholic church of "the cover-up of sexual abuse," which Erdely

5

explained was because "the mindset of the church's rigid hierarchy, which promotes officials who are willing to do virtually anything they're told, so long as it's in God's name." (Sex-Crime Files at 65.)

**RESPONSE:**  Defendants object to this fact on the ground  that it is not material to any issue on this motion for the reasons stated in Response 1, *supra*.  Defendants further object to this fact on the ground that it selectively quotes from and attributes unstated conclusions to the article "The Catholic Church's Sex-Crime Files," which speaks for itself.  Defendants respectfully refer the Court to Exhibit 5 to Plaintiff's Counter-Statement for the complete contents of the article "The Catholic Church's Sex-Crime Files."

6.       In 2013, Erdely wrote — and Rolling Stone published — an article called "The Rape of Petty Officer Blumer: Inside the military's culture of sex abuse, denial and cover-up." (Erdely Dep. at 42:25-43:7 (Ex. 1); Sabrina Rubin Erdely, "The Rape of Petty Officer Blumer: Inside the military's culture of sex abuse, denial and cover-up," Rolling Stone Magazine (Feb. 14, 2013) ("Rape of Petty Officer Blumer") (Ex. 6).) The article centered on the story of a female naval officer who was arrested for drunk driving and subsequently claimed that she had been drugged and sexually assaulted. In the article, Erdely implied that Navy officials tried to dissuade the officer from reporting her alleged rape and did little to investigate her claims. Erdely suggested in her article that the military was indifferent to this officer's claim of rape and engaged in an effort to cover it up. (Rape of Petty Officer Blumer.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion for the reasons stated in Response 1, *supra*.  Defendants further object to this fact on the ground that it selectively quotes from and attributes unstated conclusions to the article "The Rape of Petty Officer Blumer," which speaks for itself.  Defendants respectfully refer the Court

to Exhibit 6 to Plaintiff's Counter-Statement for the complete contents of the article "The Rape of Petty Officer Blumer."

## II.  Before Interviewing The First UVA Source, Erdely Sets Out To Write An Article About Institutional Indifference To Rape On A College Campus.[4]

7.      Ex. 7 is the "pitch" for the article that became "A Rape on Campus," which Erdely wrote in the winter or spring of 2014 and presented to Deputy Managing Editor Sean Woods. ("A Rape on Campus" Pitch, RS020610-11 ("Pitch") (Ex. 7); Apr. 27, 2016 Deposition of Sean Woods at 20:3-15 ("Woods Dep.") (Ex. 8); Erdely Dep. at 14:8-18 (Ex. 1).)

**RESPONSE:**  Defendants do not dispute this fact.

8.      In her pitch, Erdely wrote about looking at how "administrations" have "turned a blind eye" to sexual assault. (Pitch at RS020610.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion in that the undisputed evidence establishes that the pitch, like most pitches, had little substantive effect on the published Article.  (*See* Pl. Opp. Ex. 1 [Erdely Dep.] 14:19-16:19; Pl. Opp. Ex. 8 [Woods Dep.]22:10-23.)  Defendants further object to this fact on the ground that it selectively and misleadingly quotes from the referenced Exhibit, which speaks for itself. Defendants respectfully refer to the court to Exhibit 7 to Plaintiff's Counter-Statement for the full context of Erdely's pitch, and state that the full sentence quoted reads as follows: "Awareness programs about consent haven't gained much traction in the vast sexual grey area on college campuses, where macho frat culture and 'sex-positive' third-wave feminists find themselves on a collision course against the backdrop of an anything-goes party atmosphere, and

---

[4] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 7-15.

where administrations **have been criticized for** turning a blind eye." (Pl. Opp. Ex. 7 at RS020610 (emphasis added). *See also* [Pl. Opp. Ex. 1 [Erdely Dep.] 17:15-18 (regarding this sentence in her pitch, "I had been reading much in the media that year about this very idea that administrations were mishandling these kinds of reports, which is what these Title IX investigations were all about.").)

9.      Erdely wrote about how universities had shown "institutional indifference" to the problem of sexual assault on campus. (Id.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion for the reasons stated in Response 8, *supra.* Defendants further state that the full phrase quoted in this fact reads as follows: "the Department of Education's Office of Civil Rights has initiated investigations against a dozen elite schools—including Yale, Dartmouth, UVA, Berkeley, Princeton and Harvard Law—**prompted by allegations that institutional indifference towards such complaints has created a hostile environment for women**." (Pl. Opp. Ex. 7 at RS020610 (emphasis added).)

10.     She wrote that she would explore how Yale — her original target campus for the article — "deliberately shields those who commit rape from the consequences." (Id.)

**RESPONSE:**  Defendants object for the reasons stated in Response 8, *supra*, and state that the full phrase quoted in this fact reads as follows: "'Yale deliberately shields those who commit rape from the consequences,' **said Hannah Zeavin**, one of 16 plaintiffs in the Yale case." (Pl. Opp. Ex. 7 at RS020610 (emphasis added).)

11.     Erdely wrote, "I'd like to examine sexual assault on college campuses: The various ways colleges have resisted involvement, and ... juke their stats to make their campuses

appear safer than they are; how they may now be scrambling to clamp down (or sidestep liability) .... As the story's main thread I'll focus on a sexual assault case on one particularly fraught campus — possibly at Yale, though the field is wide — following it as it makes its way through university procedure to its resolution, or lack thereof." (Id. at RS020610-11.)

**RESPONSE:**  Defendants object for the reasons stated in Response 8, *supra*, and state that the full phrase quoted in this fact reads as follows:

> "I'd like to examine sexual assault on college campuses: The various ways colleges have resisted involvement, and *(as was recently revealed at Occidental College)* juke their stats to make their campuses appear safer than they are; how they may now be scrambling to clamp down (or sidestep liability); *and especially how that dynamic is translating into daily social life and hookup culture*. As the story's main thread I'll focus on a sexual assault case on one particularly fraught campus—possibly at Yale, though the field is wide—following it as it makes its way through university procedure to its resolution, or lack thereof."

(Pl. Opp. Ex. 7 at RS020610-11 (emphasis added).)

12.    In a June 6, 2014 email to a potential source regarding what would become the article, Erdely told the source that the article would "revolve around a survivor's experience dealing with rape and its aftermath," and "the way such cases are perceived and handled." (June 6, 2014 Email from Sabrina Rubin Erdley to Source, RS016980 (Ex. 9).) Erdely then said, "I did a similar article last year about rape in the military," and included a hyperlink to her February 2013 article "The Rape of Petty Officer Blumer: Inside the military's culture of sexual abuse, denial and cover-up." (Id.) As set forth above, that article was about the alleged sexual assault of a Navy officer, and it claimed that the military failed to investigate her rape and attempted to cover it up. (Rape of Petty Officer Blumer (Ex. 6); Erdely Dep. at 42:25-43:12 (Ex. 1).)

**RESPONSE:**  Defendants object to this fact on the ground that it selectively quotes from Exhibit 9 to Plaintiff's Counter-Statement, which speaks for itself.  Defendants further object to this fact on the grounds set forth above in Response 6, *supra.*

13.     Similarly, Erdely told source David Lisak on June 1, 2014 that her intention was to take "an immersive look at what is going on in college campuses with respect to sexual assault; in much the same way that I wrote last year about the problem of military sexual assault, teasing out the issues of how and why, and how the issue of culture and climate helped to feed into this culture ... of inaction." (Sabrina Rubin Erdely Reporting Notes, RS004072-502, at RS004099 ("Erdely Reporting Notes") (Ex. 10); Erdely Dep. at 25:22-27:2 (Ex. 1).)

**RESPONSE:**  Defendants object to this fact on the grounds that Erdely testified that this is not a "word for word" quote of what she said to David Lisak, but rather a "summar[y] [of] the substance."  Pl. Opp. Ex. 1 [Erdely Dep.] 26:15-27:12.  Defendants further note that Plaintiff selectively quotes from Erdely's reporting notes, and state that the quoted sentence from Erdely's notes ends with the phrase ". . . and how the issue of culture and climate helped to feed into ***this culture of assault***, and of inaction."  (SRE Ex. 15 at RS004099 (emphasis added).)

14.     In July 2014, before she had ever even interviewed Jackie, Erdely told Emily Renda, a sexual assault advocate at UVA, that she planned to write about "the cultural issues that are sort of in the air and feeds into the problem of rape, and institutional indifference." (Erdely Dep. at 28:17-29:20.)

**RESPONSE:**  Defendants object to this fact on the ground that it selectively quotes from Erdely's reporting notes, and state that Erdely's notes of her July 8, 2014 conversation with Emily Renda show that Erdely was at that point unsettled on what issues to focus on in her article, and immediately followed the quoted passage with the statement, "so ***I've been hashing***

10

***out what the issues are***, and then trying to hone in on what is the campus I'd like for this article

to take place." (SRE Ex. 15 at RS004116 (emphasis added).) Defendants further state that

Erdely's notes indicate Renda responded to the quoted comments by saying, "I have a very deep

love and appreciation for [UVA], but I appreciate its flaws. I think it's ripe for opportunity to

change. We have a strong greek life and a lot of wealthy students as well . . . . The greek life

piece is one that's been underexamined." (*Id*. at RS004116.)

15.     Similarly, Erdely told source Alex Pinkleton on August 4, 2014, "[T]he story I'm

working on is one that not only captures hopefully what it's like to survive a sexual assault on

campus, and how that plays out, but also a picture of what it's like to be on campus now, what

the environment is like, where not only is rape so prevalent but also there's this pervasive hostile

culture, i.e., rape culture. And to demonstrate what we're talking about when we talk about rape

culture, that whole tangle of issues that seem to be present: drinking, hookup culture, gender

roles, sexuality, language around consent, [and] institutional indifference." (Erdely Reporting

Notes at RS004256 (Ex. 10).)

**RESPONSE:**  Defendants do not dispute this fact, but state that Erdely's notes indicate that

Pinkleton responded to Erdely's comment by stating, "yeah I think it's a good school to pick for

this article because I definitely think what causes a lot of rape culture is this idea of male

entitlement and privilege and the patriarchy, and that's not just in the party scene here but in the

whole UVA culture." (SRE Ex. 15 at RS004256.)

**III.    Erdely Set Out To Portray Ms. Eramo As A Callous Administrator Who Was Indifferent To Rape Even Though Erdely Is Told Repeatedly That Ms. Eramo Is Passionate About Seeking Justice For Rape Survivors.[5]**

16.    Erdely admitted numerous times throughout her reporting that she understood that Ms. Eramo is beloved by survivors. For example, during her interview with UVA President Theresa Sullivan, Erdely said, "now I have to say all the students I've talked to, these girls love Dean Eramo. ... They think she's the greatest person ever. They think of her as a friend and a confidant." (Id. at RS004450.)

**RESPONSE:**  Defendants object on the ground that Plaintiff's fact is not material to any issue on this motion (see Liberty Lobby in Response 1, supra), as the Article repeatedly reflects the fact that Eramo is beloved by survivors.  (SW Ex. 1 at RS001076, RS001078.)  For instance, the Article makes clear that Eramo is "beloved by survivors," with victims viewing her as "a friend and confidante" and "their best advocate and den mother."  (Id.)  The Article further makes clear that "Eramo surely has among the most difficult jobs at UVA" and yet again emphasizes that she is "beloved by students."  (Id. at RS001076.)  The Article also states that "Jackie repeatedly calls her 'an asset to the community.'"  (Id. at RS001078.)

17.    Emily Renda, an activist in UVA's sexual assault survivor community, told Erdely that Ms. Eramo was her "favorite human being on the planet," for whom she "ha[s] so much respect" and "appreciate[ion]." (Id. at RS004335.)

**RESPONSE:**  Defendants object on the grounds set forth in Response 16.

18.    Two fraternity brothers at UVA who were also active in the sexual assault advocacy community also spoke highly of Ms. Eramo, with Erdely writing in her notes of the

---

[5] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 16-40.

conversation that they went "out of their way to tell me how impressed they are with Dean Eramo, like everyone else." (Id. at RS004373.)

**RESPONSE:**  Defendants object on the grounds set forth in Response 16.

19.     Even Jackie repeatedly praised Ms. Eramo to Erdely, telling Erdely, "I love her. I think she's fantastic." (Id. at RS004165.)

**RESPONSE:**  Defendants object on the grounds set forth in Response 16.

20.     During a September 2014 dinner interview with Jackie and a then-friend of Jackie's, Jackie told Erdely, "we love Dean Eramo," and Erdely responded, "I get that, and I'm getting that from everybody. Everybody loves her." (Id. at RS004381.)

**RESPONSE:**  Defendants object on the grounds set forth in Response 16.

21.     As early as July 2014, during one of the first interviews Erdely conducted with a UVA source, Emily Renda told Erdely with respect to Jackie's allegations that Ms. Eramo was "passionate" about seeing justice for Jackie, and that Ms. Eramo and the Dean of Students Office was working to investigate Jackie's allegations to pursue ongoing action against Phi Kappa Psi. (Mar. 18, 2016 Deposition of Emily Renda at 79:9-80:17; 176:17-178:7 ("Renda Dep.") (Ex. 11).)

**RESPONSE:**  Defendants object to this fact on the ground that it is not supported by the cited evidence. Renda's cited testimony speaks to a July 14 email she wrote to Erdely and a July 14 telephone conversation she had with Erdely, both of which are reflected in Erdely's interview notes from pages RS004145 to RS004147 of Erdely's reporting file.  (Pl. Opp. Ex. 11 [Renda Dep.] 79:9-80:17, 176:17-178:7.)  As such, this testimony purports to fill in details about what Renda meant when she was speaking and writing to Erdely, but does not purport to reflect what

she actually said to Erdely on July 14.  Defendants further state that the email and Erdely's interview notes reflect that Renda told Erdely only that "*we are trying* to pursue ongoing action" against Phi Kappa Psi, and that there were "two staff people" who were working through "back channels" to get the two additional anonymous rape victims to come forward.  (SRE Ex. 15 at RS004145-46 (emphasis added).)  Erdely's interview notes reflect that Renda said that that Eramo "is very passionate about getting [Phi Kappa Psi] punished.  In some ways we don't want to get them punished because the alumni network is very strong. . . . [B]ut she's very interesting in making sure we can do something punitive and make something stick."  (*Id.* at  RS004147.) Far from supporting Plaintiff's opposition, Renda's confirmation that she and UVA plainly believed Jackie's allegations was highly corroborative of Jackie's credibility. (SRE ¶ 173; LGP ¶ 19; SW ¶ 24.)  Defendants further object that the email and interview notes speak for themselves, and respectfully refer the Court to Exhibit 15 to the Declaration of Sabrina Rubin Erdely at RS004145-47 for the full contents thereof.

22.      But one of Erdely's sources, a campus sexual assault advocate and then-friend of Jackie's named Alex Pinkleton, testified that Erdely repeatedly attempted to blame Ms. Eramo for the fact that Jackie had not pursued a formal sexual misconduct complaint or sought a hearing through the University, even though Jackie had never stated that she wanted to pursue a formal complaint. (Mar. 18, 2016 Deposition of Alex Pinkleton at 140:6-141:10 ("Pinkleton Dep.") (Ex. 12).) Pinkleton further testified, "[Erdely's] point of view was that the main issue Jackie was having with getting her case to go anywhere was the administration, and she came in thinking that; and then even after Jackie and we – and Sara and I had said we didn't think that was the case in regards to Dean Eramo, [Erdely] kept saying that." (Id. at 144:4-21.)

14

**RESPONSE:**  Defendants object to this fact on the grounds that it is not supported by the record, nor is it material to any issue on this motion.  *See Liberty Lobby* at Response 1, *supra*. Defendants object further on the grounds that Pinkleton's personal opinion about Erdely's "point of view" is not relevant or admissible.  A lay witness's unsupported speculation regarding a third party's motivation or "point of view" is not based on personal knowledge and thus is not admissible at trial and cannot be considered at summary judgment.  Federal Rule of Evidence 702; *United States v. Hassan*, 742 F.3d 104, 135–36 (4th Cir.), ("Lay witnesses are not entitled to opine broadly or generally; rather, lay opinion testimony *must* be based on personal knowledge.") (internal quotation marks and citation omitted) *,cert. denied sub nom. Sherifi v. United States*, 134 S. Ct. 2737 (2014).  Defendants further object that Pinkleton's testimony attempts to dispute subjective viewpoints that are not capable of being proven true or false.  *See Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998); *CACI Premier Techs., Inc. v. Rhodes*, 536 F.3d 280, 300-04 (4th Cir. 2008).  In the cited testimony, Pinkleton responded to a question regarding a text message she sent to Sara Surface on September 13, 2014, which reads:

> The point is she could go to trial, yet it hasn't happened, and ***from Sabrina's point of view*** it's partly because of Dean Eramo, ***but from my point of view*** it might be partly Dean Eramo trying to make sure she goes to trial and can definitely win, but also partly because Jackie has never said she really wanted to.

(Pl. Opp. Ex. 11 [Pinkleton Dep.] at 140:6-141:10) (emphasis added).  Pinkleton testified regarding this text message, "Sabrina had one point of view, which was that part of the reason Jackie didn't go to trial was because of what Dean Eramo was saying.  And . . . I disagreed with that because my point of view was that if – I was saying that I didn't think that was the case." (*Id*. at 143:19-144:1 (emphasis added).)

23.     Pinkleton further testified that Erdely "manipulate[d]" her, by claiming she wanted to examine how sexual assaults were handled at UVA, when really "she was looking for

evidence specifically that fit into her story from the beginning, so she just pulled at everything that I said that could be taken as evidence that the administration was to blame.... But I think it was pretty clear to everyone else that what she really was going after in the article and in our conversations where she's very aggressive towards wanting information about [the] administration, that that was her scapegoat." (Id. at 184:20-187:12.)

**RESPONSE:**  Defendants object to this proposed fact on the ground that it is neither material nor admissible with respect to any issue on this motion.  *See Liberty Lobby*; *Hassan* at Response 22, *supra*.  Plaintiffs object further on the ground that cited testimony does not support a conclusion that Erdely was "looking for evidence specifically that fit into her story from the beginning," as it consists only of post-hoc speculation by a third party.  Plaintiffs object further on the ground that Pinkleton's personal opinion that she felt "manipulated" is not material to any issue on this motion.  When pressed at her deposition, Pinkleton was unable to offer any concrete evidence of "manipulation" other than her anger that she was not sufficiently portrayed in the Article as "an advocate and someone who had really intelligent things to say about sexual assault."  (Pl. Opp. Ex. 11 [Pinkleton Dep.] 184:20-194:8).  Defendants state further that Pinkleton admitted in her testimony that Erdely did not misquote her in the Article and "didn't write anything about me saying anything negative about Dean Eramo."  (*Id.* at 190:18-191:14.)

24.      Pinkleton further testified that Erdely constantly attempted to bait her into saying something negative about Ms. Eramo: "I think it's more of like the subtle – more of like subtle instances throughout the process of where I repeated, you know, multiple times, 'I stand with Dean Eramo, this is what I think about her, et cetera, et cetera; and then she comes with me over, like, months of talking to her and keeps saying, well, this is what I see, and this is what Jackie's telling me, like, leading questions too...." (Id. at 189:23-190:17.)

16

**RESPONSE:**  Defendants object to this fact on the grounds set out in Responses 22 and 23, *supra*.  Defendants further object to the characterization that Erdely was "constantly attempt[ing] to bait" Pinkleton on the ground that it is not supported by the quoted testimony, which establishes only that Pinkleton disagreed with Erdely's opinions regarding Eramo's handling of Jackie's case.

25.     Regarding her interviews with Erdely, Pinkleton testified, "The questioning is like a never-ending game of twenty questions and it is a rigged game at that. Because, as was in Sabrina's case, there was already a pre-formed storyline and other stories were going to have to adhere to it. The storyline was such that, (1), there would be – there would need to be a perfectly innocent victim and a monstrous perpetrator to have in the story; (2), there would be no support or advocacy on [campus]; and (3), Dean Eramo would be the scapegoat for [the] administration." (Id. at 191:15-193:23.)

**RESPONSE:**  Defendants object to this proposed fact on the ground that Pinkleton's opinions as to Erdely's motivations are is neither material nor admissible with respect to any issue on this motion.  *See Liberty Lobby* at Response 1, *supra*; *Hassan* at Response 22, *supra*.  Defendants state further that the quoted testimony consists of Pinkleton reading from an email she wrote to Surface on December 18, 2014 (Pl. Opp. Ex. 11 [Pinkleton Dep.] 178:14-179:23), and thus reflects only her post-hoc speculation.

26.     Pinkleton further testified, "I have reason to be suspicious of the tone and kind of the conclusions being drawn as [Erdely's] writing this up, just from past history of being put into an article as, like, a third-year bimbo, given that we had all of these conversations about a very serious topic in which I was an advocate and not just a random third year.... I don't really trust anything that [Erdely] says." (Id. at 103:25-104:21.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion.  *See* Responses 22-25, *supra*.  Defendants further note that the word "bimbo" does not appear anywhere in the Article.

     27.     Pinkleton testified that she was "lied to" by Erdely. (Id. at 117:23-118:15.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion.  *See* Responses 22-25, *supra*.  Defendants object further to this fact on the ground that is not supported by Pinkleton's undisputed testimony.  When asked to elaborate on her statement that Erdely had "lied" to her, Pinkleton could not offer any basis for that opinion, and admitted that "[m]aybe 'lie' was not the best choice of words."  (Pl. Opp. Ex. 11 [Pinkleton Dep.] 184:20-185:3).

     28.     Sara Surface, another student and prominent campus advocate source that Erdely interviewed, testified that Erdely was "out to get [Eramo]," and that Erdely told Surface that Erdely hoped to see Ms. Eramo get fired. (Mar. 23, 2016 Deposition of Sara Surface at 59:11-60:12 ("Surface Dep.") (Ex. 13).)

**RESPONSE:**  Defendants object to this proposed fact on the ground that it is neither material nor admissible with respect to any issue on this motion.  *See Liberty Lobby* at Response 1, *supra*; *Hassan* at Response 22, *supra*.

     29.     Surface felt that "[Erdely] wasn't accurately portraying Dean Eramo and a lot of the work of the administration and campus activists correctly." (Id. at 118:18-119:18.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion.  "Whether a statement is actionable is a matter of law to be determined by the court."  *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993); *CACI Premier*

*Tech., Inc. v. Rhodes*, 536 F.3d 280, 293-94 (4th Cir. 2008) (explaining that whether a statement constitutes protected opinion is a question of law for the court).  Surface's personal views on the meaning of the Article are not probative of the plain and ordinary meaning of the text, nor do they provide any evidence that the text "affirmatively suggest[s] that the author intend[ed] or endors[ed]" the implications that Plaintiff now presses upon it.  *Chapin*, 993 F.2d at 1093. Defendants further object that Pinkleton's testimony attempts to dispute subjective viewpoints that are not capable of being proven true or false.  *See  Biospherics and CACI* in Response 22, *supra*.  Defendants respectfully refer the Court to Exhibit 1 to the Woods Declaration for the complete contents of the Article.

30.     The two main concerns Surface expressed to Erdely were "the portrayal of Dean Eramo and the use of Jackie's name." (Id. at 76:19-24.)

**RESPONSE:**  Defendants object to this fact for the reasons set out in Response 29, *supra*. Defendants further note that Surface at no time testified that her concerns regarding the "use of Jackie's name" had anything to do with Jackie's credibility as a source, and thus this concern is not relevant to any issue on this motion.  (*See* Pl. Opp. Ex. 13 [Surface Dep.] 75:3-25.)

31.     Surface testified that she, Alex, and Jackie all "believed that Dean Eramo was not going to be portrayed as helping Jackie or of having done everything she could do for [Jackie]," that Jackie disagreed with this characterization, and that Jackie, Alex, and Sara all tried to make clear to Erdely that her intended portrayal of Ms. Eramo was inaccurate. (Id. at 83:23-84:9.)

**RESPONSE:**  Defendants object to this fact for the reasons set out in Responses 22 and 29, *supra*.

32.     Both Surface and Jackie attempted to dissuade Erdely from her false portrayal of Ms. Eramo.  Surface testified: "Sabrina made it clear that she – that Dean Eramo was not going to be portrayed well," and that "Jackie began to – to have extreme – she felt extremely guilty," to the point where Jackie was "frequently calling Sabrina" and "saying that that portrayal of Dean Eramo was not correct." (Id. at 83:12-22.)

**RESPONSE:**  Defendants object on the ground that this fact is not material for the reasons stated in Response 16, *supra*.  Defendants further object that Surface's speculation about Jackie's mental state is not admissible or material to any issue on this motion.  *See Liberty Lobby* at Response 1, *supra*; *Hassan* at Response 22.  Defendants further object to the unsupported characterization of Erdely's portrayal of Eramo as "false."  Defendants further object that Surface's testimony about Jackie's calls to Erdely is inadmissible hearsay under Federal Rule of Evidence 802.

33.     Surface testified that she "began to have a number of concerns about Sabrina and her journalistic integrity," particularly because Surface was "very concerned about Sabrina's portrayal of the administration," to the point that Surface "considered reaching out to [Erdely's] editor to tell her – or to tell – to question [Erdely's] professionalism and accuracy in reporting." (Id. at 60:17-61:24.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not admissible or material to any issue on this motion.  *See Liberty Lobby* at Response 1, *supra*; *Hassan* at Response 22, *supra*.  Surface's personal feelings toward a reporter during the reporting process have no bearing on whether the published statements at issue are actionable, or whether they were made with actual malice.  Defendants object further to this fact on the ground that it selectively quotes and mischaracterizes the underlying testimony, which shows that Surface considered "reaching

out to [Erdely's] editor" only after she "had a conversation with Emily [Renda] and Dean Eramo where I – after Alex Pinkleton told me that Sabrina had called me an administrative bulldog." (Pl. Opp. Ex. 13 [Surface Dep.] 61:18-24.)

34.   Surface testified that in response to Erdely's repeated negative statements to her about the administration, Surface "told her again and again" that she was not getting all sides to the story and made it clear that Erdely's intended portrayal of the UVA administration was incorrect. (Id.) Erdely acknowledged that Surface tried to give her "the deans' point of view." (Oct. 23, 2014 Email from Sabrina Rubin Erdely to Sean Woods, RS003259 (Ex. 14).) In response, Erdely called Surface an "administrative watchdog." (Surface Dep. at 74:23-76:16, 161:17-162:17 (Ex. 13).)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion.  *See Liberty Lobby* at Response 1, *supra*.  Defendants further object to this fact on the ground that it quotes selectively from the cited testimony, which does not support its conclusions.  At no point in the cited testimony does Surface describe Erdely's intended portrayal of Eramo as "incorrect."  (Pl. Opp. Ex. 13 [Surface Dep.] 76:5-7.)  Defendants do not dispute the fact that Erdely understood Surface as wanting "to give [Erdely] the deans' point of view," or the fact that Erdely referred to Surface as coming across as the "administration's watchdog" (or an "administrative watchdog").  To the extent Plaintiff is trying to imply that Erdely was biased against Sara Surface and the administration or bore them ill will, Defendants further object to this fact on the ground that is not material to any issue on this motion because "the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991) (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989)).  Defendants

21

further object that Surface's testimony attempts to dispute subjective viewpoints that are not capable of being proven true or false. *See Biospherics and CACI* in Response 22, *supra*.

35.     Surface further testified that the community of sexual assault survivors at UVA was concerned about the article before it was published, because "the process had been extremely frustrating, [] we were worried about what content she was going to publish, because it was clear that [Erdely] wasn't listening to us." (Id. at 110:8-111:3.)

**RESPONSE:**  Defendants object to this fact as inadmissible hearsay under Federal Rule of Evidence 802 to the extent that it purports to relay the views and statements of other sexual assault survivors besides Surface. Defendants further object on the ground that the personal frustration of Surface and other sexual assault survivors are not material to any issue on this motion.  See *Liberty Lobby* in Response 1, supra.

36.     Emily Renda testified that Erdely had a "set narrative in mind" about Ms. Eramo, and that nothing could have stopped her from writing the way she did about Ms. Eramo. (Renda Dep. at 175:15-176:16 (Ex. 11).)

**RESPONSE:**  Defendants object to this fact on the ground that Renda's cited testimony is inadmissible under Rules 802 and 702 of the Federal Rules of Evidence.  Renda testified with regard to the cited testimony that her opinion was not based on her communications with Erdely, but rather on conversations with Sara Surface and Alex Pinkleton, which left her with a "vague conclusion that I thought it was headed in that direction,"  as well to her reaction to the Article following its publication.  (Pl. Opp. Ex. 11 [Renda Dep.] 176:1-25.)  Defendants further object on grounds that Renda's testimony about Erdely's intentions constitutes impermissible lay opinion in violation of Rule 702, *see Hassan* at Response 22.  Defendants further object to this fact as unsupported by the cited testimony, as Renda at no point testifies that "nothing could

have stopped [Erdely] from writing the way she did about Ms. Eramo." Instead, Renda testified that "*if* there was a set narrative in mind, I'm not sure Nicole [Eramo] could have stopped it." (Pl. Opp. Ex. 11 [Renda Dep.] 175:24-25 (emphasis added).) Defendants further object that Renda's testimony attempts to dispute subjective viewpoints that are not capable of being proven true or false. *See Biospherics and CACI* in Response 22, *supra*.

37. Sean Woods was the Deputy Managing Editor of Rolling Stone magazine at the time "A Rape on Campus" was published. (Sean Woods Dep. at 10:19-11:3, 12:7-12 (Ex. 8).) He was the assigning editor for the article. (Id. at 13:11-18.)

**RESPONSE:** Defendants do not dispute this fact.

38. In her first draft, immediately following the article's first mention of Ms. Eramo, Ms. Erdely wrote a note to her editor, Sean Woods, that said: "[end on a different note? the point: That despite the lip service given to rape at UVA and at colleges nationwide, in reality, the combination of a rape-tolerant student body and an indifferent administration creates a collegiate environment that's a free-for-all for sexual predators.]" (Oct. 15, 2014 Email from Sean Woods to Jodi Peckman, Joe Hutchinson, & Sacha Lecca, RS002256-302, at RS002269 (emphasis in original) (Ex. 15); Woods Dep. at 32:4-23.)

**RESPONSE:** Defendants object to this fact as not material to any issue on this motion. *See Liberty Lobby* at Response 1, *supra*.

39. On her first draft, Erdely's placeholder heading for the section describing Jackie's first interactions with Ms. Eramo was: "FOUR: Jackie reports, gets the Eramo/UVA treatment." (Oct. 15, 2014 Email from Sean Woods to Jodi Peckman, Joe Hutchinson, & Sacha Lecca, at RS002278) (emphasis in original.)

**RESPONSE:**  Defendants object to this fact as not material to any issue on this motion.  *See Liberty Lobby* at Response 1, *supra*. Defendants further direct the Court to Erdely's deposition testimony explaining the meaning of this "shorthand" note:

> [T]he treatment that she received was that she was received in a warm, professional manner.  Eramo didn't seem shocked.  She was neutral, which is what I would expect of somebody in that position.  And then she presented Jackie with all of the various options: she could report to police, she could have a formal hearing internally at the uuniversity, she could have an informal hearing at the university, or she could do nothing. And that's, that's exactly what she -- that was the reception that she got. I think, also, there was … a follow-up note from Eramo warmly thanking her for sharing, and telling her that, if she wanted to file a report, she would be there for her.

Pl. Opp. Ex. 1 [Erdely Dep.] 206:13-207:12.

40.    In an effort to underscore the claim that UVA was indifferent to sexual assault, Erdely also omitted from the article the fact that many of the sources identified as random students were actually heavily involved in campus advocacy and student groups related to sexual assault prevention and awareness. Erdely quoted student Sara Surface describing the UVA "party scene," but did not mention that Surface was involved in multiple campus advocacy groups related to sexual assault issues. (Sabrina Rubin Erdely, "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA," Rolling Stone Magazine (Dec. 5, 2014), RS001070-79, at RS001075 ("Original Article") (Ex. 16); Erdely Reporting Notes at RS004369 (Ex. 10).) Erdely quoted Alex Pinkleton talking about fraternity parties and identified her only as a "third year ... expertly clad in the UVA-after-dark uniform of a midriff-baring sleeveless top and shorts," omitting the fact that Erdely knew Pinkleton and was a member of One Less, a student advocacy group. (Original Article at RS001075; Pinkleton Dep. at 188:7-23 (Ex. 12).) Similarly, Erdely quoted student Brian Head talking about student partying, but omitted the fact that Head was the

president of One in Four, an all-male student group dedicated to sexual assault awareness and

prevention.  (Original Article at RS001074; Erdely Reporting Notes at RS004273.)

**RESPONSE:**  Defendants object to this fact as not material to any issue on this motion.  *See*

*Liberty Lobby* at Response 1, *supra*.  To the extent that it purports to ascribe motivations to

Erdely, this fact is unsupported by any of the cited evidence, or indeed any evidence in the

record.  Defendants object further to this fact on the ground that it provides no foundation for its

presupposition that identifying the advocacy activities of various students quoted in the text of

the Article would somehow undermine an imagined claim that Plaintiff "was indifferent to

sexual assault."

### IV.   Before Writing "A Rape On Campus," Erdely Tells Another Source That There Is A Culture Of "Male Privilege And Entitlement" At UVA And That It Is Difficult For Men To Change.[6]

41.     During an interview with one source at UVA, Erdely and the source began talking

about the culture on UVA's campus. The source said to Erdely that "I think that's why we're not

as radical because we think that we have to take these small steps to get the campus culture on

the same line." (Sept. 13, 2014 Erdely Interview with Surface, RS004779-4806, at RS004804

(Ex. 17).) Erdely responds: "I think that's very hard to ask people to change their ways—not to

just be able to change their culture but actually to change things — I think. ... But especially to

ask the men to change because it's like you know what we're talking about is changing the

culture of male privilege and entitlement in a sense that they've been looking forward to their

whole lives — to go to college and indulge in these kinds of behaviors that they've always been

---

[6] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 41-43.

taught it's normal and now they're being told that wait a minute, it's not normal and you need to rethink them and change." (Id. at RS004804-05.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Erdely's opinions about male privilege or whether men or people generally are able to change their culture are not relevant to any of the challenged Statements.  Defendants respectfully refer the Court to Exhibit 17 to Plaintiff's Counter-Statement for the complete context of this September 13, 2014 exchange between Erdely and Sara Surface.

42.     When asked about this during her deposition, Erdely confirmed that she believes that there is, in fact, "a culture of male privilege and entitlement at UVA." (Erdely Dep. at 176:15-20 (Ex. 1).)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion for the reasons stated in Responses 1 and 41, *supra*.  Defendants further object to this fact on the ground that it quotes selectively from the cited evidence.  Defendants state that the cited testimony shows that the phrase quoted is correctly attributed to Eramo's counsel, and that Erdely responded, "[y]es, I came to believe that.  Especially through my conversations with these young women like Sara Surface and Alex Pinkleton."  (Pl. Opp. Ex. 1 [Erdely Dep.] 176:15-22.)

43.     When asked about it during her deposition, Erdely also confirmed that she believes men are taught as a norm that college is a place for drinking and having sex (Id. at 177:15-20), and that the culture of "male entitlement ... bleeds into sexual assault" (*id*. at 178:4-16).

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion for the reasons stated in Responses 1 and 41, *supra*.  Defendants further object to this fact on the ground that it quotes selectively and misleadingly from the cited evidence. Defendants respectfully refer the Court to Exhibit 1 to Plaintiff's Counter-Statement, and state that the first cited testimony by Erdely reads in full as follows:  "Many people go to college, ***male and female***, assuming, from all the expectations that they've been given, that it's going to be a freewheeling good time with lots of drinking and sex – and those are the expectations that our culture loads them with."  (Pl. Opp. Ex. 1 [Erdely Dep.] 177:16-21 (emphasis added).) Defendants further state that the second quoted passage reads in full, "[t]his kind of culture of, sort of, male entitlement and the way that it bleeds into sexual assault is the kind of nuanced thing that I wanted to address in the article" (*id*. at 178:13-16), and that Erdely goes on to cite specific examples of the "outrageous things that have happened on other campuses" that evidence the "culture" referred to.  (*Id*. at 178:18-19.)

## V.   Erdely Tells Other Sources That One Of UVA's Deeply Rooted Traditions Is That "Fraternities Run The Show," And "Fraternity Members Are More Likely To Rape People." [7]

44.    Erdely also told Jackie that at UVA "one of their deeply rooted traditions is [that] fraternities run the show" and "nobody really does anything about it." (Sept. 11, 2014 Interview Tr., RS118221-345, at RS118229 (Ex. 18).) According to Erdely, the only way "if something's going to be done about that, like, there needs to be something erratic that happens." (*Id*.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion for the reasons stated in Response 1, *supra*, and because UVA's traditions

---

[7] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 44-46.

surrounding fraternities and Erdely's opinions regarding fraternities are not relevant to the

Statements at issue in this action.  Defendants further object to this fact on the ground that it

quotes selectively from the cited transcript.  Defendants respectfully refer the Court to Exhibit 18

to Plaintiff's Counter-Statement for the complete contents of the transcript of Erdely's

September 11, 2014 interview with Jackie.

45.     Erdely also told Jackie that she believes that "fraternity members are more likely

to ... rape people. They're also more likely to have ... a rape-supportive attitude, you know, like

to be more sexually aggressive...." (Id. at RS118236.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on

this motion for the reasons stated in Responses 1 and 44, *supra*.  Defendants further object to this

fact on the ground that it quotes selectively from the cited transcript, omitting Erdely's prefacing

statement that "there is actually research to support this," as well as her discussion of the details

of the research she refers to.  (Pl. Opp. Ex. 18 at RS118236.)

46.     On July 14, 2014, Emily Renda told Erdely that she "wanted to raise a concern

about publishing part of Jackie's story," specifically that Renda "may need to urge [Erdely] not

to publish the name of the fraternity ... because we are trying to pursue ongoing action." (Erdely

Reporting Notes at RS004145 (Ex. 10).) When Renda explained that UVA was working to

investigate Jackie's claims and her claims about two other supposed victims, and that

prematurely accusing the fraternity without an adjudication of guilt could be a due process issue

that would complicate future disciplinary proceedings, Erdely insisted that she wanted to be

"able to name this fraternity and take them to task." (Id. at RS004147.)

**RESPONSE:**  Defendants object to this fact on the ground that it selectively quotes from

Erdely's notes of the communications between Renda and Erdely on this topic.  Erdely's

28

interview notes[8] make clear that following Renda's email on the morning of July 14, 2014, Erdely called Renda, and the two had a conversation about the relative merits of publishing the name of the fraternity where Jackie claimed she was assaulted.  In both Renda's email and in Erdely's notes on the phone conversation, Renda indicates that her concern stemmed from the fact that "[t]here are two other young women with similar stories to Jackie who have not come forward fully yet," and "[i]f the article is published with [Jackie's] story in conjunction with the frat name before the other two girls come forward, it could appear their stories are coached or false, which could create a credibility issue."  (SRE Ex. 15 at RS004145.)  Renda also noted that two staff members were working on convincing the two other accusers to come forward, and she hoped that the fact that "we can tell them that another girl has formally made the dean's office aware . . . might be enough to convince them to come forward."  (*Id*. at RS004146-4147.)  Far from supporting Plaintiff's opposition, Renda's confirmation that she and UVA plainly believed Jackie's allegations was highly corroborative of Jackie's credibility. (SRE ¶ 173; LGP ¶ 19; SW ¶ 24.)  Defendants further object to this fact on the ground that at no point in the cited exchange does Renda refer to a "due process" issue.  (SRE Ex. 15 at RS004145-4147.)

## VI.   Erdely Knew That Jackie's Story Of Her Alleged Assault Changed Materially Over Time.[9]

47. During her first interview with Jackie on approximately July 14, 2014, Jackie told Erdely that her "first month [at UVA] in September," she "was gang raped at a fraternity [her] first year of college," and that the rape "wound up being a hazing thing." (Erdely Reporting

---

[8] Erdely's reporting file consist of, among other things, Erdely's typed notes that she took during her interviews with various persons and contain numerous uncorrected typographical/spelling errors.  For ease of reading, we have corrected those purely typographical/spelling errors without including brackets around corrected spellings when we have quoted from those notes herein; no substance or grammatical errors have been changed without indication.

[9] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 47-72.

Notes at RS004153.) Jackie explained to Erdely that her perpetrator "███ a third year whom she had allegedly met while lifeguarding together at the university pool, "picked [her] up and actually took [her] out to eat" before the alleged assault. (Id. at RS004153; 004161.) Later they went to his fraternity party, where ███ took her upstairs to a room where the assault allegedly occurred. (Id. at RS004153.) Jackie told Erdely that "there ended up being eight other boys in the room," and that although ███ "never touched [her] … he told the[] [others] what to do, and seven of them raped [her]." (Id.) Jackie also explained to Erdely that at one point, "one boy, the last one … he couldn't do it. He like physically could not perform … So they made him use a beer bottle." (Id. at RS4156.)

**RESPONSE:** Defendants do not dispute this fact, but note that it selectively quotes from the cited evidence.  Defendants respectfully refer the Court to Erdely's complete notes of her first interview with Jackie.  (SRE Ex. 15 at RS004152-70.)

48. Erdely's first interview with Jackie did not take place until approximately July 14, 2014. Before Erdely interviewed Jackie, she interviewed sexual assault survivor, Emily Renda on July 8, 2014. Renda told Erdely that fraternity rush at UVA — the time when young men interview and attempt to join a fraternity — does not happen until "early February," because UVA "do[esn't] allow rush until the spring." (Id. at RS004118.)

**RESPONSE:** Defendants do not dispute the first two sentences of this fact.  Defendants object to the last sentence because it is taken out of context and is not material to issues in this action (*see Liberty Lobby* in Response 1, *supra*).  Erdely's notes show that in her first telephone interview with Jackie on July 14, 2014, Jackie described her assailants referring to one another as "Armpit and Blanket," and told Erdely "I don't know if they were pledge names because it wasn't pledge season.  It may have been dirty rushing," *i.e.* when rushing activities take place

prior to the formal rush season.  (SRE Ex. 15 at RS004155.)  Defendants also state that Alex

Pinkleton and Sara Surface also independently described rush activities prior to rush season as

"dirty rushing" in interviews with Erdely.  (*Id* at. RS004257; SRE Ex. 25 at RS004792.)

49. During her first conversation with Erdely about Jackie, Renda told Erdely, speaking

of Jackie's gang-rape claims, "obviously maybe her memory of it isn't perfect," because Renda

thought that "since it was coming out in pieces, that there was either more or less to it." (Renda

Dep. at 172:13-20 (Ex. 11).)

**RESPONSE:**  Defendants object to this fact on the ground that it selectively quotes from the

cited evidence.  Defendants further state that Renda's testimony shows that immediately

following the passage quoted in this fact, the following exchange takes place:

> Q.  And as we discussed earlier, that's something common to traumatic -- to
> victims of traumatic rape; isn't that right?
> A.  Yes.
> Q.  And in your mind, that doesn't make the victim less credible, does it?
> . . .
> A.  That the story comes out over time and may change shape or form?  No, not at
> least to me as an advocate.

(Pl. Opp. Ex. 11 [Renda Dep.] 172:13-173:5.)

50. Renda also went on to tell Erdely that Jackie "alleged she was gang raped in the fall,

before rush, and the men who perpetrated it were young guys who were not yet members of the

fraternity, and she [Jackie] remembers one of them saying to another ... 'cmon man don't you

want to be a brother.'" Erdely told Renda that the story was "totally plausible." (Erdely

Reporting Notes at RS004119 (Ex. 10).)

**RESPONSE:**  Defendants object to this fact on the ground that Erdely's notes show the

comment regarding Jackie's story being "totally plausible" is included in brackets, which Erdely

has explained in undisputed testimony indicates a comment has been paraphrased or

summarized.  (Pl. Opp. Ex. 1 [Erdely Dep.] 26:22-27:2.)  Defendants further state that Erdely has

testified with regard to the portion of her notes referred to in this fact:

> I don't believe I used the words "totally plausible," but what ensued was a
> conversation in which I reacted by telling her that I was – I found it really
> shocking, but that somebody had just sent me – it just so happen[ed] that
> somebody had just sent me an article about gang rape that had happened at
> my own alma mater twenty years earlier.  And so, I understood that these
> things actually did sometimes happen.

(*Id*. at 32:11-21.)

51.    Renda explicitly emphasized to Erdely that Renda did not have access to Jackie's

case file and could not verify any of Jackie's allegations beyond what Jackie was saying. (Renda

Dep. at 117:9-118:8 (Ex. 11).) Erdely also knew that Jackie and Renda were not friends at the

time of Jackie's alleged rape, and therefore Renda only knew about Jackie's supposed alleged

assault much later, after the fact. (Erdely Dep. at 60:6-13 (Ex. 1).)

**RESPONSE:**  Defendants do not dispute this fact, but state that the cited testimony from Emily

Renda also indicates that Pat Lampkin instructed Renda to emphasize to Erdely Renda's lack of

access to Jackie's case files, and that Renda had this discussion with Erdely in September 2014,

several months after Erdely first interviewed Renda in July 2014.  (Pl. Opp. Ex. 11 [Renda Dep.]

117:23-118:8.)

52.    In June 2014 testimony before a U.S. Senate subcommittee in which she briefly

referenced Jackie's sexual assault allegations using a pseudonym, Renda stated that Jackie was

assaulted by five men. (Renda Senate Testimony, RS003587-93, at RS003587 (Ex. 19).); Renda

Dep. at 35:24-36:15 (Ex. 11).) Renda was told this number by Jackie. (Id. at 36:17-37:6.)

**RESPONSE:**  Defendants do not dispute the first sentence in Paragraph 52.  Defendants dispute

the second sentence as not properly supported by the record because Renda testified that she did

not have a specific recollection of receiving this information from Jackie.  Renda testified that

she "believe[d]" Jackie "kind of said 'five guys' at one point," but that she "can't remember

exactly" and was "not exactly sure when this kind of number five came out."  Pl. Opp. Ex. 11

[Renda Dep.] 36:17-37:6.  Defendants further note that Renda testified that evolution in a rape

victim's account from five assailants to seven assailants "would not be implausible" based on her

knowledge of research concerning traumatic memory.  *Id.* 149:16-150:5.

53.    Erdely read Renda's Congressional testimony before the article was published.
(Erdely Dep. at 37:8-14 (Ex. 1).)

**RESPONSE:**  Defendants do not dispute this fact.

54.    Erdely never asked Renda about her Congressional testimony or the number of
perpetrators involved in Jackie's alleged assault. (Id. at 37:8-22.)

**RESPONSE:**  Defendants object to this fact as not material to the issues in dispute on this

motion. *See Liberty Lobby* in Response 1, *supra*.  Defendants further state that Erdely stated in

undisputed testimony that:

> I knew, prior to publication, that Jackie had originally -- when she
> originally talked about her assault, she talked about it as being an oral
> assault by five different men . . . that's something she told her roommate,
> Rachel Soltis.  But Rachel told me, as Jackie became more comfortable
> with the details of her assault, she came forward with the truth, which was
> that it actually had been seven men and it was vaginal assault.

(Pl. Opp. Ex. 1 [Erdely Dep.] 38:13-23; see also SRE Ex. 15 at RS004420-21 (notes of interview

with Rachel Soltis).)  Defendants also respectfully refer the Court to Response 49, *supra*,

regarding Renda's statements concerning the memory of trauma victims.

55.    On September 19, 2014, Erdely interviewed one of Jackie's first-year roommates,

Rachel Soltis. During that interview, Erdely asked Soltis if the orchestrator of Jackie's gang rape

had taken Jackie to dinner on the night of the alleged assault. Soltis told Erdely "I honestly don't know that part, I can't recall, about him taking her out." (Erdely Reporting Notes at RS004422 (Ex. 10).) Soltis also told Erdely that Jackie had described her rape in two different ways. Soltis explained to Erdely that Jackie first told Soltis and a group of other friends that "these guys forced her to do oral sex." (Id. at RS4420.) Soltis then explained to Erdely that it was not until much later in time that Jackie told Soltis that "she was raped by I think six guys." (Id. at RS004421.) Soltis also told Erdely that in the later version, Jackie claimed she had been raped with a ▇▇▇▇▇▇. (Id.)

**RESPONSE:**  Defendants object to this fact on the ground that it quotes selectively from Erdely's notes of her interview with Rachel Soltis.  Defendants state further that, regarding whether Jackie's assailant took her to dinner, Erdely's notes clearly show that Soltis responded, "I honestly don't know that part, I can't recall, about him taking her out, *I'm sure she's told me* but I can't remember."  (SRE Ex. 15 at RS004422 (emphasis added).)  Defendants further object to this fact in that the cited evidence does not support the conclusion that "Soltis also told Erdely that Jackie had described her rape in two different ways."  Instead, Soltis told Erdely that Jackie confessed to her roommates in January 2013 that a group of guys had "forced her to do oral sex," but that she finally told Soltis "the full story" in the fall of 2013.  (*Id*. at RS004420-21.) Defendants also respectfully refer the Court to Response 49, *supra*.

    56. Jackie never told Erdely that she was forced to perform oral sex on any of her alleged attackers. (See generally id.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion for the reasons stated in Responses 1 and 49, *supra*.

57. Erdely never asked Jackie why Renda believed she had been raped by five men, why Soltice believed Jackie had been raped by six men, or why Jackie told Erdely that she had been raped by seven men. (See generally id.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion for the reasons stated in Responses 1, 49, 54 and 55, *supra*, as well as Response 60, *infra*.

58. The same day as the Soltis interview, Erdely spoke with Annie Forrest, another then-friend of Jackie's, explaining to Forrest that Erdely was "hoping to verify every part of Jackie's story" and "to make it all as airtight as possible." (Id. at RS004425.) During that interview Forrest explained to Erdely that Jackie had told her that several men had raped her, during which "a coat hanger" was used. (Id. at RS004426.)

**RESPONSE:**  Defendants do not dispute the first sentence of this fact.  Defendants object to the second sentence of this fact on the ground that the citation does not support Plaintiff's fact.  The cited portion of Erdely's notes transcribes Forrest describing how Jackie had told her that one of the assailants "couldn't become erect," but "was so overcome by peer pressure that he proceeded to attempt" assaulting Jackie with a "***foreign object I can't really remember***, a coat hanger, ***I think it was too much to disclose at that point***."  (SRE Ex. 15 at RS004426 (emphasis added).) Defendants further object on the ground that this fact is not material to the actual malice of Rolling Stone.  *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1302-03 (D.C. Cir. 1996) (explaining that actual malice cannot be imputed vicariously except through *respondeat superior*).

35

59. Erdely never asked Jackie to explain why Soltis believed that Jackie had been raped with a ████████, or why Forrest believed that Jackie had been raped with a coat hanger. (See generally id.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion for the reasons stated in Responses 1, 55, and 58, *supra*.  In that regard, Defendants further state that Erdely testified about Soltis's comments regarding the "████████," "I didn't worry about that. . . . [T]o me, the compelling thing was that she remembered that there was a bottle involved."  (Pl. Opp. Ex. 1 [Erdely Dep.] 190:18-20.)  Defendants further state that Erdely testified that she considered the fact that Forrest "volunteered that there was a foreign object involved" to be corroborative of Jackie's story, since it matched an "element[] of the rape that Jackie had told me about."  (*Id*. at 190:22-191:6.)  *See also McFarlane* in Response 58, *supra*.

60. Erdely acknowledged that she "discovered in [her] reporting that some of the details of [Jackie's] account … had morphed with time — early on, she had told friends that she had been forced to perform oral sex on a group of men, and her story had later changed to one of vaginal rape." (Erdely Statement Draft, RS002176-79, at RS002177 (Ex. 20).)

**RESPONSE:**  Defendants do not dispute this fact, but further state that Erdely has stated in undisputed testimony that:

> [I]n my experience in writing about trauma victims and sexual assault victims, I do know that their stories do sometimes morph over time as they come to terms with what happened to them, as they get over the shame and self-blame that afflicts them. They often do come out with further details, or different details, over time.

(Pl. Opp. Ex. 1 [Erdely Dep.] 149:15-21.)  Defendants also respectfully refer the Court to Response 49, *supra*, regarding Renda's statements concerning the memory of trauma victims.

61. Erdely never asked Jackie to explain why her story of rape "morphed with time" from "forced … oral sex on a group of men … to one of vaginal rape." (See generally Erdely Reporting Notes (Ex. 10).)

**RESPONSE:**  Defendants object to this fact as not material to any issues on this motion for the reasons set forth in Response 57, *supra*.

62.    Erdely never mentioned in "A Rape On Campus" that Jackie's story "morphed with time" from "forced ... oral sex on a group of men ... to one of vaginal rape." (See generally Original Article (Ex. 16).)

**RESPONSE:**  Defendants object to this fact as not material to any issues on this motion for the reasons set forth in Response 57, *supra*.

63.    Erdely never told then-Managing Editor Will Dana that Jackie's story of sexual assault had changed over time prior to the publication of the article. (Mar. 15, 2016 Deposition of William Dana at 195:24-196:3, 203:10-16 ("Dana Dep.") (Ex. 21).) Dana testified that he would have acted aggressively had he been told of inconsistencies in Jackie's story. (Id. at 202:18-203:15.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion for the reasons stated in Response 57, *supra*.  Defendants further object on the ground that the cited evidence does not support Plaintiff's statement because Dana did not testify that he would have acted aggressively had he been told of inconsistencies in Jackie's story, but rather that "in general" he would act aggressively if he was "told something that makes the credibility of the source less credible."  (Pl. Opp. Ex. 21 [Dana Dep.] 202:25-203:4.)  Defendants further object to the extent Plaintiff is suggesting these alleged "inconsistencies" in any way

compromised Defendants' belief in Jackie's credibility, which is not supported by the record. *See also McFarlane* in Response 58, *supra*.

64.   Erdely did know, however, that Jackie claimed that her rape was just like a rape that occurred on an episode of Law & Order SVU. (Sept. 12, 2014 Interview Tr., RS118346-440, at RS118374-75 (Ex. 22).) Jackie told Erdely during one of their interviews that she had watched an episode of Law & Order SVU from one "in a later season [where] Elliot was still in it" and that it involved "this girl who is at a fraternity party, and one guy taker her up to a room and calls his friends in, and like four of them gang rape her." (Id. at RS118375.)

**RESPONSE:**   Defendants object to this fact as not material to any of the issues on this motion (*see Liberty Lobby* in Response 1, *supra*) because the undisputed evidence establishes that Jackie told Erdely that she had seen the referenced episode of Law & Order SVU a full year after she had reported her rape to the UVA administration.  A transcript of Erdely's September 12, 2014 interview with Jackie shows that Jackie told Erdely she watched the episode "this May," which can only reasonably be interpreted as referring to May of 2014, a full year after Jackie first reported her assault to the UVA administration.  (*See* Pl. Opp. Ex. 22 [RS118346] at RS118378; *see also* SRE Ex. 26 [RS018282] (confirming Jackie reported her assault to Eramo in May 2013).)  Erdely confirmed at her deposition that she understood Jackie to have seen the Law & Order SVU episode long after she reported her assault and did not consider it to be of any relevance.  (Pl. Opp. Ex. 1 [Erdely Dep.] at 146:25-147:17, 148:15-22.)  Erdely further testified that she never watched the referenced episode (*id.* at 147:13-20, 148:1-8); accordingly, it is not relevant to Erdely's state of mind at the time of publication for purposes of determining actual malice.  *See Bose Corp. v. Consumer Union of U.S., Inc.*, 466 U.S. 485, 512 (1984) (actual malice focuses solely on the defendant's actual state of mind "at the time of publication"); *see*

*also* Response 72, *infra*.  Plaintiffs have offered no countervailing evidence that Jackie watched this episode of Law & Order SVU prior to reporting her assault to the UVA administration or otherwise demonstrated that this episode has any relevance to this action.  *See also McFarlane* in Response 58, *supra*.

65.    Law & Order SVU Season 14, Episode entitled "Girl Dishonored," which originally aired on television in April 2013, involves a woman who is gang raped in the way Jackie described to Erdely during their interview, during a fraternity party, with one boy taking the victim up a flight of stairs in the fraternity house into a bedroom, where several men gang raped the victim. During the rape scene in the episode, one of the attackers yells "Grab her leg!" just as Jackie claimed to Erdely that one of her attackers yelled during her alleged attack, "Grab its motherfucking leg." (Compare Apr. 24, 2014, "Girl Dishonored," LAW AND ORDER SPECIAL VICTIMS UNIT (Ex. 23), with Erdely Reporting Notes at RS004154 (Ex. 10).)

**RESPONSE:**  Defendants object to this fact for the reasons described in Response 64, *supra*. Defendants further note that the referenced line is not materially similar to Jackie's account, since Jackie recalled the men saying "grab *its* motherfucking leg."

66.    Prior to the publication of the article, Erdely also knew that Jackie had told Erdely inconsistent stories about how long the gang-rape supposedly lasted. (Erdely Dep. at 52:17-53:21 (Ex. 1).) She originally told Erdely that she was gang-raped for three-and-a-half hours, but then later claimed the rape lasted from exactly 12:52 a.m. to 3:30 a.m., which she knew from looking at a clock in the room. (*Id.*)

**RESPONSE:**  Defendants object on the ground that the cited evidence does not support Plaintiff's fact, as Erdely did not testify that the "knew that Jackie had told [her] inconsistent stories about how long the gang-rape supposedly lasted."  (Pl. Opp. Ex. 1 [Erdely Dep.] 52:17-

53:21.)  Rather, Erdely testified that Jackie told her the rape lasted from 12:52 a.m. to

approximately 3:30 a.m., and that this time period actually amount to less than three-and-a-half

hours (*id*.), but testified that it "might have felt much longer, an experience like that."  (*Id*. at

53:25-54:1.)  Erdely further testified that "[i]t never occurred to me that Jackie was fabricating

the story" (*id*. at 52:15-16) and that she "didn't think [the time period] was implausible" (*id*. at

52:20-24).  *See also McFarlane* in Response 58, *supra*.

67.     During Erdely's first interview with Jackie on approximately July 14, 2014,

Jackie told Erdely that during her alleged rape "there was a glass coffee table in the middle of the

room [and] I wound up crashing into that and it shattered under our weight. And the glass went

into my back. I have scars from it. I have scars on my back. My friends are always like 'what are

those from,' and I'm like they're from September 28, 2012 [the date of the alleged rape]."

(Erdely Reporting Notes at RS004154.) Jackie goes on to tell Erdely that she "had a huge bruise

on [her] face," as a result of her alleged rape. (*Id*.)

**RESPONSE:**  Defendants do not dispute this fact.

68.     Although Jackie described the significant injuries she received as a result of her

alleged rape, Erdely never asked Jackie whether she sought treatment from a hospital. (See

generally Erdely Reporting Notes.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issues on

this motion (*see Liberty Lobby* in Response 1, *supra*) because the undisputed evidence shows

that Jackie repeatedly informed Erdely that she had *not* sought treatment from a hospital and thus

did not need to ask the question identified in this fact.  As recorded in Erdely's notes of her first

interview with Jackie, Jackie recounted to Erdely her decision not to go to the "women's center"

for medical treatment, as well as the fact that she did not leave her room for two weeks following

40

her assault because her face was "so bruised." ((SRE Ex. 15 at RS004159; *see also id*. at RS004163-64.)  Erdely also testified that "[i]n later interviews, [Jackie] told me that she did not seek medical help."  (Pl. Opp. Ex. 1 [Erdely Dep.] 48:9-10.)  *See also McFarlane* in Response 58, *supra*.

69.    Erdely asked multiple people about Jackie's alleged injuries, yet nobody could corroborate them. (See generally id.) For example, Erdely asked Rachel Soltis whether she has "ever see[n] injuries on her—arms or back?" Soltis responded, "come to think of it, she would always have a lot of scratches on her from the cat, because she has three cats. I would often notice that. But she has a lot of marks on her skin, bruises that haven't really healed, or some discolorations. So I haven't really noticed." (Id. at RS004424.)

**RESPONSE:**  Defendants object to the first sentence of this fact on the ground that Plaintiff has failed to provide specific record citations for the conclusion in this fact.  Defendants object to the second sentence of the fact because it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Erdely  testified that she saw scars on Jackie's arm during an in-person meeting in September 2014.  Pl. Opp. Ex. 1 [Erdely Dep.] 138:25 -139:4.  *See also McFarlane* in Response 58, *supra*.

70. During dinner with Jackie on September 11, 2014, Erdely asked Jackie to see her scars from the assault.  According to Erdely, Jackie "pull[ed] back the beaded woven bracelets on her left wrists, [yet] in the dim lighting [Erdely] s[aw] nothing." (Id. at RS004347.)

**RESPONSE:**  Defendants objects to this fact because it misrepresents the record and state that, when questioned regarding this passage at her deposition, Erdely clarified, "I saw something. But in that lighting I wasn't able to see much. ***The next night I was able to see what she was***

*talking about*."  (Pl. Opp. Ex. 1 [Erdely Dep.] 139:2-4.)  *See also McFarlane* in Response 58, *supra*.

71. The very next night, at a dinner with Jackie, Jackie's then-boyfriend, and Alex Pinkleton, Erdely asked Jackie again about her scars. Jackie explained to Erdely "I was trying to look for them earlier and they're not as distinct anymore. I used to have these really distinct white marks where glass had cut me." Jackie's then-boyfriend chimed in, "I haven't really seen any marks on your back. I haven't seen any." (Id. at RS004378; Sept. 12, 2014 Interview Tr., RS118346-440, at RS118372 (Ex. 22).)

**RESPONSE:**  Defendants do not dispute this fact, but note that Jackie told Erdely that the scars were "not as distinct anymore" (SRE Ex. 15 at RS004378), and that she and her then-boyfriend had only started dating in the summer of 2014, nearly two years after her assault.  (*See id*. at RS004346.)  *See also McFarlane* in Response 58, *supra*.

72. In a December 17, 2014 email to Jackie, Erdely acknowledged that she had known Jackie's description of her injuries from supposedly being gang-raped on a shattered glass table was a lie. Erdely wrote to Jackie, "You also told me 'all' of your friends have asked about the scars on your back – but none of your friends I've spoken with have ever seen scars on your back, including your boyfriend ████ (If you recall, he said this when we were at dinner in September.)" (Dec. 17, 2014 Email from Sabrina Rubin Erdely to Jackie, RS019639-41, at RS019640 (Ex. 24).)

**RESPONSE:**  Defendants object to this fact on the grounds that Plaintiff's citation does not support Plaintiff's fact, as the email does not "acknowledge" that Erdely "had known Jackie's description of her injuries from supposedly being gang-raped on a shattered glass table was a lie," but rather states, from the perspective of hindsight on December 17, 2014, that "none of

42

your friends I've spoken with have ever seen scars on your back, including your boyfriend

████." (Pl. Opp. Ex. 24 at RS019640.)  Defendants further state that the email speaks for

itself and respectfully refer the Court to Exhibit 24 to Plaintiff's Counter-Statement for the full

contents thereof.  Defendants further object to this fact on ground that it is not material to the

issues on this motion (*see Liberty Lobby* in Response 1, *supra*) because the email was sent over a

month after the Article was published and after Erdely had lost confidence in Jackie and

therefore does not support the conclusion that Erdely "had known Jackie's description of her

injuries from supposedly being gang-raped on a shattered glass table was a lie." "[I]t is hornbook

libel law that post-publication events have no impact whatever on actual malice as it bears on

this lawsuit since the existence or non-existence of such malice must be determined as of the date

of publication."  *Secord v. Cockburn*, 747 F. Supp. 779, 792 (D.D.C. 1990)).  *See also Bose*

*Corp. v. Consumer Union of U.S., Inc.*, 466 U.S. 485, 512 (1984) (actual malice focuses solely

on the defendant's actual state of mind "at the time of publication").

**VII.   Although Jackie Claims That She ████████████ As A Result Of Her Alleged
Assault, Erdely Cannot Corroborate The Claim Because Jackie Refuses To Produce
Her ███████████.[10]**

73. During the same September 12, 2014 dinner, Erdely learned during the conversation

that Jackie had told Alex Pinkleton that she ████████████ as a result of her alleged

assault — a claim Jackie had not made to Erdely — and that Jackie has ████████████

████. Erdely asked Jackie, "██████████████████? … I need to know,

anything that bolsters your story is helpful." (Erdely Reporting Notes at RS004382 (Ex. 10);

Sept. 12, 2014 Interview Tr. at RS118387-88 (Ex. 22).) Erdely went on to ask Jackie, "██



---

[10] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence
(including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection
applies to paragraphs 73-78.

████████████████████████████" Jackie responded ███████████. (Erdely Reporting Notes at RS004382; Sept. 12, 2014 Interview Tr. at RS118387-88.)

**RESPONSE:**  Defendants do not dispute this fact.

74. Jackie's then-boyfriend stated that he was not aware of Jackie having ever ████████ ██████████████████ (Erdely Reporting Notes at RS004382; Sept. 12, 2014 Interview Tr. at RS118386-87.)

**RESPONSE:**  Defendants do not dispute the fact, but note that Erdely asked Jackie at the same dinner if she had told her then-boyfriend about ██████████, Jackie responded that she hadn't, because "[i]t was like an embarrassing thing for me.  I think I only ever told [Pinkleton] and Annie.  I don't even think I told Emily about that."  (Pl. Opp.. Ex. 22 at RS118438.)

75. After learning this information, Erdely made repeated requests of Jackie to provide her with these ██████████. At that same dinner, Erdely asked Jackie to provide her with ██████████ corroborating the fact that she was ████████████. (Sept. 12, 2014 Interview Tr. at RS118392.) Jackie responded that her mother must have those █████ at her home in ██████████, Virginia. But then Jackie waffled and said that her mother does not have the ████ because Jackie never told her mother she had ██████████████ from her alleged assault. (Id.)

**RESPONSE:**  Defendants do not dispute that Erdely made repeated requests of Jackie to provide her with these ██████████.  Defendants object to the characterization of Jackie as asserting that her mother "must" have ██████████ and then "waffling" on the grounds that it is not supported by the cited evidence.  When initially asked whether she had the ██████████ ██████████████████████ Jackie responded, "My mom has them," and after only

five seconds (according to the timestamp on the transcript) revises her response to "I don't think my mom has them, actually.  I never told her."  (Pl. Opp.. Ex. 22 at RS118392.)  The conclusion that Jackie was thinking out loud rather than "waffling" is supported by Erdely's notes of the interview, which record the exchange as one unbroken thought:  "I think my mom has them. Actually wait I don't think my mom has them, I may have never told her."  (Pl. Opp.. Ex. 10 at RS004383.)

76. At dinner, Erdely told Jackie that it was important for Jackie to obtain her ███ ███ because they would corroborate Jackie's account of being raped. Erdely said, "I mean for purposes of the article, like I'm hoping to just pull together as many little, no matter like how small the little scraps of evidence might seem, like I want to like pull them all together in one place, you know, to make it very clear that like this isn't just …." (Id. at RS118438.) At that point, Alex, Jackie's friend chimed in, "it's not really deniable." (Id.) Erdely said "right, exactly, exactly." (Id.)

**RESPONSE:**  Defendants do not dispute this fact.

77. Then during an October 20, 2014 interview with Jackie, Erdely asked Jackie "do you have that ████████████████████████████"? Jackie responded, "I know it's at my house in ██████ So I have to ask my mom to look for it. I don't know if she knows about it, but I have a folder of ████████ in my room and I can ask her to bring it." (Erdely Reporting Notes at RS004476 (Ex. 10).)

**RESPONSE:**  Defendants do not dispute this fact.

78. Ultimately, Jackie never provided Erdely with the corroborating ████████████ before the article was published, and Erdely did not insist on seeing them before publishing the article. (Erdely Dep. at 159:2-160:1 (Ex. 1).)

**RESPONSE:**  Defendants do not dispute this fact, but state that the portion of the Article that referred to Jackie ███████████████████ was included in Erdely's first draft sent to her editor on October 15, 2014 (*see* Pl. Opp.. Ex. 15 [**RS002256**] at RS002278-79), but was not included in later drafts because Jackie asked that the reference to this ████████████████████████████ be removed.  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 61:22-62:21.)  Garber-Paul testified that she asked Jackie about ███████████████ and that Jackie "confirmed that it was true and then requested that it be removed from the article." (*Id*. at 62:15-17.)  Garber-Paul further testified that "[s]ince it wasn't something that she'd disclosed and since it wasn't particularly pertinent to the story, it seemed completely appropriate to take it out." (*Id*. at 62:18-21.)  Garber-Paul testified that the ████████████████████ were not a major concern for her because Rolling Stone had taken the reference to ██████████████████ out of the Article and because Garber-Paul didn't believe her █████████████████████████ would be highly corroborative of whether Jackie was raped or not because "all that would prove is that she had ████████████." (*Id*. at 62:4-5, 69-14-18, 70:3-6.)

## VIII.   Although Jackie Claimed That She Wore A Red Dress That Was Bloodied From Her Injuries On The Night Of Her Alleged Assault, Erdely Could Not Corroborate The Claim Because Jackie Refused To Produce The Dress.[11]

79. During their July 30, 2014 interview, Erdely asked Jackie about how she got ready for her date with the night of her alleged assault. Jackie responded that she "went through about ten

---

[11] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 79-85.

dresses in my closet," and ultimately the one she picked "was a red dress." (Erdely Reporting Notes at RS004240.) Erdely asked Jackie whether since "the dress was red, was the blood very evident against it?" Jackie responded that "it wasn't evident." (Id. at RS004242.) Erdely also asked "what did you eventually do with the dress? Did you get rid of it?" (Id. at RS004241.) Jackie told Erdely that Jackie's mother suggested that Jackie should keep the dress "for evidence," but that Jackie told her mother "to burn it." (Id. at RS004241.)

**RESPONSE:**  Defendants do not dispute that, during their July 30, 2014 interview, Jackie told Erdely that she had worn a red dress the night of her gang rape.  Defendants object to Plaintiff's fact on the ground that it quotes selectively from Erdely's interview notes, which includes the following relevant exchange:

> (What did you eventually do with the dress? Did you get rid of it?)
>
> I did get rid of it.  I shoved it in the bottom of [my] closet because I never wanted to look at it again.  And after I told my mom I had her like, I was like mom, when we were moving out, "I know my dress is still at the bottom" and she's like do you want to keep it for evidence" but I was so messed up I was like "I want you to burn it, I never want to see it again" so I'm not sure what she did with it, she later just said that she handled it.  I don't know if she threw it out, but she never brought it up to me again.
>
> . . .
>
> (The dress was red, was the blood very evident against it?)
>
> It wasn't evident.  It was darker than the dress itself but it wasn't really . . . .

(SRE Ex. 15 at RS004241-42).

80. On August 16, Erdely asked Jackie to find out if her mother had gotten rid of the red dress she was allegedly wearing the night of her attack. (Id. at RS004315.) Jackie responded that she would have to ask her mother "when [she] gets home," because Jackie was out of town. (Id.)

**RESPONSE:** Defendants do not dispute this fact and respectfully refer the Court to Exhibit 15 to the Declaration of Sabrina Rubin Erdely at RS004315 for the full context of the conversation.

81. During her interview with Rachel Soltis, Erdely asked Soltis about her feelings about "what should be done … about the fraternity" where Jackie was allegedly assaulted. Soltis responds, in part, "just because we don't have the blue dress, the evidence, I don't think they should go unpunished." (Id. at RS004423.)  *See also* SRE ¶ 96.

**RESPONSE:**  Defendants do not dispute that Rachel Soltis said these words in an interview with Erdely, but object to this fact on the ground that it is not material to any issue on this motion.  Defendants further state that  Erdely's interview notes reflect that Soltis mentioned "the blue dress" in response to Erdely's question about whether UVA should warn the campus or take other action in response to Jackie's allegations.  Soltis said: "I definitely do think they should have done something. …  ***And just because we don't have the blue dress, the evidence***, I don't think they should go unpunished."  (SRE Ex. 15 at RS004423.)  In context, it is clear that Soltis is not describing Jackie's ***actual outfit*** from that night; instead, she is referencing the infamous "blue dress" that provided physical evidence of the Clinton-Lewinsky sex scandal.  (*See* Pl. Opp. Ex. 27 [Garber-Paul Dep.] 297:5-21 ("I believe that's referring to the dress Monica Lewinsky was wearing… that's what I took the blue dress to me[an], was this is a crack about the Monica Lewinsky dress in the Clinton scandal.").

82.      Erdely never asked Jackie why Soltis believed that Jackie wore a blue, rather than a red, dress on the night of her alleged assault. (See generally id.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion for the reasons stated in Response 81, *supra*.

83.    Ultimately, Jackie never provided Erdely the dress to corroborate her (Jackie's) story that she wore a red dress and that she was bloodied on the night of her alleged assault. (See generally id.; Erdely Dep. at 92:4-22 (Ex. 1).) Instead, Jackie simply told Erdely that her mother "threw it out." (Sept. 11, 2014 Interview Tr. at RS118226 (Ex. 18).)

**RESPONSE**:  Defendants object to this fact on the ground that Plaintiff selectively summarizes the September 11 conversation between Jackie and Erdely in which Jackie explains that she has determined that her mother did in fact throw the dress out.  The relevant exchange is as follows:

> Jackie:  I actually asked her [Jackie's mom] about the dress and she said that she just threw it out.
>
> Erdely: [Indiscernible]
>
> Jackie:  Yeah.
>
> Sabrina: Okay.
>
> Jackie:  She was like, she said that she had asked me for six months if I wanted to do anything and I just said no and so she said that she figured that she wasn't going to press me to do anything I didn't want to do.  And so if I asked her to do it, she was going to do it.

(Pl. Opp. Ex. 18 at RS118226.)

84.    Erdely's notes contained more than two pages of single-spaced questions that she intended to ask Jackie's mother to corroborate aspects of Jackie's story. (Erdely Interview Notes, RS014335-58, at RS14339-42 (Ex. 25).)

**RESPONSE:**  Defendants respectfully refer the Court to Exhibit 25 to Plaintiff's Counter-Statement at RS014339-42 for the full content of Erdely's notes, which indicate that Erdely

repeatedly tried to interview Jackie's mother and left voice-mail messages for Jackie's mom on

at least the following days:  9/19, 9/23, 10/14, and 10/23.  Defendants further state that, far from

supporting Plaintiff's theory of actual malice, evidence that Erdely repeatedly sought to

interview Jackie's mother tends to show an absence of actual malice.

85.     Erdely asked Jackie if she could speak with her mother to corroborate her story.

(Erdely Reporting Notes at RS004346.) But ultimately, Erdely never spoke with Jackie's mother

to confirm this — or any other — information. (Erdely Dep. at 236:7-12 (Ex. 1).)

**RESPONSE**:  Defendants do not dispute this fact, but note that Plaintiff summarizes selectively

from Erdely's deposition testimony, in which Erdely testified that, "despite all of my many,

many, many efforts, and many messages, I never spoke with her mother."  (Pl. Opp. Ex. 1

[Erdely Dep.] 236:10-12.)  *See also* Response 84, *supra*.

## IX.     Erdely Caught Jackie In Multiple Other Lies During Her Reporting, But Never Questioned Or Confronted Jackie About Them.[12]

86.     During a September 11, 2014 interview, Jackie told Erdely that Jackie's mother

went to Brown for college. (Sept. 11, 2014 Interview Tr. at RS118225 (Ex. 18).)

**RESPONSE:**  Defendants do not dispute this fact.

87.     Prior to publication of the article, Erdely discovered that this was a lie after

looking up Jackie's mother online. In her notes, Erdely wrote, "note, her profile says she went to

Providence College, NOT Brown, as Jackie told me." (Erdely Interview Notes at RS014344 (Ex.

25).) Erdely never asked Jackie about this discrepancy prior to publication. (See generally id.)

---

[12] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 86-100.

**RESPONSE:**  Defendants do not dispute this that Erdely noted that Jackie's mother's social media profile indicated she went to Providence College rather than Brown, but object to Plaintiff's characterization that Erdely "discovered that this was a lie," since Erdely testified that she believed that "more likely than not, it was just a misunderstanding":

> Q: Did that raise a red flag for you?
>
> A: I wouldn't call it a red flag, but I made a note of it because it was the only inconsistency that I ever noticed of Jackie's. So, I made a note thinking that I would ask [Jackie's mother] about it when I got her on the phone.
>
> Q: Did you ever ask Jackie about why she told you her mother went to Brown when, in fact, she went to Providence College?
>
> A: No. I mean, given all the other things that I wanted to get from Jackie, it just didn't seem to be all that important. It seemed to me it was, more likely than not, it was just a misunderstanding.

(Pl. Opp. Ex. 1 [Erdely Dep.] 239:3-16.)

88.    During a telephone interview with Jackie, Erdely told Jackie that Erdely believed she had located two potential corroborating sources whose full names Jackie had refused to provide to Erdely. Erdely's notes reflect that she asked Jackie if these were the correct individuals, and "she tells me it's not them, but I don't really believe her." (Erdely Reporting Notes at RS004404 (Ex. 10).)

**RESPONSE:**  Defendants do not dispute this fact, but note that Erdely testified that this was not a "red flag" or other cause for concern for her because she found it entirely understandable that Jackie wanted to act as an intermediary with these sources, one of whom Jackie said was an alleged gang rape victim:

> A . . .  None of this actually surprised me at all. That I had blind-sided her with -- you have to understand, she had been -- there's a lot of trust involved when trauma victims are speaking to one another, and when you're speaking to a trauma victim.  So, she had

51

been told by two other people who had been allegedly sexually
assaulted about their assaults. She had no authority to tell me, but
now here I was -- so -- and -- so, here I was, in a sense, threatening
to work around her and contact these people directly, which would
not just reveal to them that she had released their secret, but also
was probably not going to ellicit a positive response from these
people when they were contacted by a stranger to be asked about a
gang rape that they had never told me about.

So, I understood immediately why she answered so sensitively and
why she wanted to be the go-between.

And as a reporter wanting to write about something sensitive, I
mean, the best way to approach somebody who's been through a
traumatic experience really is to be introduced by somebody that
they trust. So, it would have been my preference to reach them
through somebody -- through an intermediary that they trusted.

(Pl. Opp. Ex. 1 [Erdely Dep.] 184:15-185:16.)

89.     During a September 19, 2014 telephone interview, Erdely asked Jackie's former

roommate, Rachel Soltis, if Jackie had told Soltis how Jackie first came to meet with Ms. Eramo.

(Id. at RS004422.) Soltis said that Jackie told her that Jackie met Ms. Eramo when she had been

called in to testify as a witness at a sexual misconduct trial involving a victim who was sexually

assaulted a way similar to Jackie. (Id.) Erdely knew that this was a completely different story

than Jackie had told Erdely about how she met Ms. Eramo, even writing in her notes "IF SO,

THIS IS NEWS TO ME." (Id.) Yet Erdely never confronted or questioned Jackie about this

glaring inconsistency. (See generally id.)

**RESPONSE:**  Defendants do not dispute that this information is reflected in Erdely's interview

notes, but object on the ground that it is not material to any issue on this motion because Rachel

Soltis' incorrect understanding of how Jackie met Eramo demonstrates only that Soltis was

mistaken regarding a background fact that Erdely did not need Soltis to corroborate given the

overwhelming evidence of how Jackie and Eramo actually met.  (See, e.g., SRE Ex. 26 (email

exchange from May 2013).)  Plaintiff has elicited no testimony from Erdely demonstrating that she believed this was noteworthy or a cause for concern.

90.     In an early interview, Jackie told Erdely that a friend of a friend who she did not know said to her at a party that she should have just had fun with being raped by a bunch of hot Phi Psi guys. (Id. at RS004244.) When Erdely later specifically asked Jackie about being told this at a party, Jackie reversed course and claimed that it was actually her former friend Kathryn Hendley — "Cindy" in the article — who said that to her two weeks after the alleged assault. (Id. at RS004406.)  Erdely recognized the about-face at the time, writing in her notes that she was "confused" about this contradictory story and two different attributions for the same quote. (Id.) Nevertheless, Erdely did not confront Jackie about this discrepancy, and Defendants published this callous, supposed quote in the article, and attributed it to Kathryn Hendley. (Original Article at RS001074 (Ex. 16).)

**RESPONSE:**  Defendants do not dispute that Erdely's interview notes reflect that Jackie originally told Erdely that this comment was made by a friend of a friend at a party and later told her in a separate interview that Kathryn Hendley made this statement.  Defendants respectfully refer the Court to Exhibit 15 to the Declaration of Sabrina Rubin Erdely at RS004244 and RS004406 for the relevant context in Erdely's interview notes.  Defendants further state that Erdely testified without rebuttal that she "actually didn't notice any inconsistency there." (Pl. Opp. Ex. 1 [Erdely Dep.] 98:19-20.)

91.     During one of their initial interviews, Jackie told Erdely a story about how she was attacked on a corner in Charlottesville by fraternity brothers whom she claimed threw a beer bottle at her face. Jackie told Erdely that she was afraid to identify the name of Phi Psi in the article because "I had a very bad experience ... with some fraternity guys." (Erdely Reporting

53

Notes at RS004167-8 (Ex. 10).) According to Jackie, as a result of Jackie being "very outspoken" about her experience being gang-raped at Phi Psi, and Jackie "t[elling] [her] friends who are first years not to go to [the Phi Psi house]," "three boys [who were in a fraternity] started calling [her] a fat cunt and a bitch, that [she] was trying to ruin their frat, and they threw a beer bottle at [her] face." (Id.) Jackie told Erdely that her "face was really messed up," because the bottle "hit right below my eye," and that it "was a really nasty cut." (Id.)

**RESPONSE:**  Defendants object to this fact on the grounds that the citation does not support Plaintiff's fact and Plaintiff quotes selectively from and mischaracterizes Erdely's interview notes.  As reflected in the notes, Jackie told Erdely that she understood the bottle attack to be in retaliation for her campus advocacy about sexual assault issues and for being "vocal" in warning women away from various fraternities.  Jackie told Erdely that "once you get involved in  One Less you hear about all the different rapes that go on on grounds.  Now I'm one of the people that knows what fraternities to go to and what to avoid, I definitely have the list where I tell them 'I wouldn't go to this one, this one is known for this, this is known for that.'  It's scary, really scary but somebody has to be the one to tell people."  (*Id*. at RS004167.)  According to the interview notes, Jackie also told Erdely that Emily Renda had a similar experience with some fraternity men.  (*Id*. at RS004168.)

92.    Erdely understood that the alleged incident on the corner was supposedly a result of Jackie speaking out about her alleged gang rape. (Erdely Dep. at 70:13-72:13 (Ex. 1).)

**RESPONSE:**  Defendants object to this fact on the grounds that the citation does not support Plaintiff's fact and Plaintiff mischaracterizes Erdely's deposition testimony.  When asked by counsel whether "Jackie communicated to her that she had been yelled and a bottle thrown at her face for speaking out about her rape at Phi Psi," Erdely testified: "I don't know that I knew that it

54

was about her specifically speaking out about Phi Psi.  1 think that she thought that it was from

her -- her affiliation with One Less, which is a peer education group that is antirape."

 (Pl. Opp. Ex. 1 [Erdely Dep.] 70:24-71:3.)

93.    Jackie further told Erdely that her roommate, "Eliza," who Jackie claimed was a

nurse at the time, "took the glass and everything out" of her face. (Erdely Reporting Notes at

RS004168.) According to Jackie, Eliza was Jackie's "go to person" when the beer bottle was

thrown at her face. (Id.; id. at RS004363; Erdely Dep. at 72:7-13)

**RESPONSE:**  Defendants do not dispute this fact, but clarify that Jackie originally did not

identify her roommate by name (SRE Ex. 15 at RS004618), but later provided the name and

Erdely made a notation "when the beer bottle was thrown at her my go to person" (*id.* at

RS004363).

94.    On September 11, 2014, when Erdely asked Jackie for Eliza's contact

information, Jackie provided her with Eliza's email address. (Erdely Reporting Notes at

RS004363; Erdely Dep. 72:19-73:23.)

**RESPONSE:**  Defendants do not dispute this fact.

95.    Erdely never reached out to Jackie's "go to person" to corroborate the bottle

incident or the extent of Jackie's injuries before publication of the article. (Erdely Dep. at 72:19-

73:23.)

**RESPONSE:**  Defendants do not dispute this fact, but object on grounds that it is not material to

any issue on this motion because Erdely had email exchanges between Eramo and Jackie that

corroborated the bottle attack; Jackie provided photos of her face; and Erdely obtained a letter

from the Charlottesville Police Department through a Freedom of Information Act request,

which showed that Jackie had reported a "felony assault" to the police occurring on the weekend of April 5 at the Corner, resulting in a "laceration" on her face.  (SRE Exs. 17, 18, 27.)

96.     Instead, Jackie offered to, and did in fact, send Erdely photos of her alleged injuries.

[Image omitted]

(Erdely Reporting Notes at RS004314 (Ex. 10); Jackie Injury Photo, RS015312 (Ex. 26).)

**RESPONSE:** Defendants object to Plaintiff's use of the term "instead" as argumentative and not supported by the cited evidence, but otherwise do not dispute this fact.

97. But Erdely — and Jackie's friends — subjectively believed that Jackie's injuries "looked like face paint." At dinner on September 11, 2014, Jackie told Erdely that her friend, Alex Pinkleton, asked Jackie "is that face paint?" And Erdely replied, "it looked like paint — like something smeared on your face." (Erdely Reporting Notes at RS004362; Sept. 11, 2014 Interview Tr. at RS118338-39 (Ex. 18).)

**RESPONSE:**  Defendants object to this fact on the grounds that Plaintiff's citation does not support the fact, to the extent it suggests or implies that Erdely or Jackie's friends subjectively believed that the injury to Jackie's face was faked or simulated using face paint.  The September 11 transcript and interview notes reflect that, in context, Pinkleton and Erdely were simply making observations about how the injury appeared, not stating or suggesting that Jackie had faked the injury.  (SRE Ex. 15 at RS004362; SRE Ex. 22 at RS118338-39.)  Defendants further state that Jackie sent Erdely three photos of herself with the injury, two of which appear to have been taken on a later date (with changes to the appearance of the injury), and one of these latter pictures shows Alex Pinkleton standing next to Jackie.  (Compare SRE Ex. 18 at RS015313, -14, -15.)

98.     From their earliest interviews in July 2014, Jackie repeatedly told Erdely that she was an active member of One Less, a campus sexual assault advocacy group. (See, e.g., Erdely Reporting Notes at RS004167, 4169, 4244, 4254 (Ex. 10).)

**RESPONSE:**  Defendants object to this fact on the ground that the citation does not support the fact.  In a July 2014 interview, Jackie told Erdely she was "involved with One Less. (SRE Ex. 15 at RS004167.) Later in that interview, Jackie refers to taking an alleged sexual assault victim to a meeting, but does not say she is a member of One Less. (Id. at RS004169.)  In a subsequent interview, Jackie mentions 'one girl who is actually in One Less," but does not say that she is a member.  (*Id*. at RS004244.)  Later in that interview, Jackie related to Eramo that Emily Renda told her "come to a One Less meeting it's happening right now. So I  went and I met this whole other world of women that I didn't even know existed, girls just like Emily who I talked to and shared my story with and they shared their story," but she does not say she is a member.  (*Id*. at RS004254.)  Defendants further note that the transcript of Erdely's September 11 interview includes an exchange where Jackie explains that she was ***not*** a formal member of One Less, that "she just kind of just started showing up to stuff" and "they sort of accepted me because I had been sexually assaulted and stuff," but that she needed to go through a formal application process to become a member.  (SRE Ex. 22 at RS118283-84; SRE Ex. 15 at RS004350.)

99.     But on September 30, 2014, Sara Surface told Erdely that One Less has just undertaken their selection process for joining the group, and that Jackie had just been admitted. (Id. at RS004446.) Surface explicitly told Erdely that Jackie had not been a member of the group. (Id.)

**RESPONSE:**  Defendants object on the ground that this fact is not material to any issue on this motion.  *See* Response 98, *supra*.

100.   Erdely never asked Jackie why she claimed to have been so involved in One Less throughout her time at UVA, when Surface told her that Jackie had just joined the group. (See generally id.)

**RESPONSE:**  Defendants object on the ground that this fact is not material to any issue on this motion.  *See* Response 98, *supra*.

X.   **Jackie Refuses To Divulge To Erdely The Identities Of The Three Friends She Claimed She Met With Immediately After Her Supposed Sexual Assault.**[13]

101.   During their first interview in July 2014, Jackie told Erdely that after her sexual assault, she called her three best friends on campus, who met with a bloody, beaten Jackie outside of the Phi Kappa Psi house, then proceeded to callously tell Jackie not to go to the hospital or report her rape because it would hurt the friends' social standing and ability to get into fraternity parties. (Id. at RS004158-4164.) Jackie told Erdely that these individuals' first names were Ryan, Alex, and Catherine. (Id.)

**RESPONSE:**  Defendants do not dispute that Jackie told Erdely in their first interview in July 2014 that, after her sexual assault, she called her three best friends, who she identified as Ryan, Alex, and Catherine, but object to this fact on grounds that Plaintiff's summary of the conversation is not accurate.  The interview notes reflect that Jackie told Erdely that Ryan wanted to take her to the women's center or the hospital, and that Catherine and Alex argued with him that it was not a good idea.  (SRE Ex. 15 at RS004158-59.)  Jackie told Erdely that Alex and Catherine expressed reservations because the fraternity was powerful on campus and Jackie might be dubbed "the girl who cried rape" and expressed fear that "we'll never be allowed into any frat party again."  (*Id.* at RS004159)  Jackie told Erdely that Catherine also told her that

---

[13] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 101-136.

"if you go to the women's center you're gonna have to take your clothes off and you're gonna have to tell them everything that happened to you, [and] it's gonna be like being raped all over again." (*Id*. at RS004159.)  Jackie told Erdely that she "was pissed" when Catherine said "we won't be allowed in" to parties, but that Catherine's comment that going to the women's center would be like getting raped all over again "stuck with [Jackie] and she decided 'yeah I don't want to do that.'"  (Id. at RS004164.)

102.    After Jackie told Erdely about Ryan's, Alex's, and Katherine's reactions, Erdely asked Jackie for the three friends' last names. (Erdely Dep. at 93:14-17 (Ex. 1).) According to Erdely, she asked Jackie "many, many times" for their names. (Id. at 94:21-24.) But Jackie refused to provide Erdely their last names. (Id. at 93:14-25.)

**RESPONSE:**  Defendants do not dispute that Erdely asked Jackie for the last names of the three friends during this interview, or that she asked Jackie "many, many times" for Ryan's last name. (Pl. Opp. Ex. 1 [Erdely Dep.] 94:21-24.)  Defendants further state that Erdely testified that Jackie explained that "she would prefer to get in touch with Ryan because he was the friendliest of the three," and that Jackie "led [Erdely] to believe that the other two were not on friendly terms with her." (*Id*. at 93:18-22.)  Defendants further state that Erdely "repeatedly reminded Jackie to put me in touch with her friend Ryan," and that "Jackie provided me with updates" on her attempts to connect with Ryan and other sources, and that these updates were "replete with precise details concerning her efforts that cause me not to have the slightest doubt that she was genuinely trying to put me in touch with" Ryan and other sources. (SRE ¶ 49.)  Defendants further state that, far from supporting Plaintiff's theory of actual malice, evidence that Erdely repeatedly sought Ryan's name and reminded Jackie to ask him if he would speak with Erdely demonstrates Erdely's diligence and tends to show an absence of actual malice.  Defendants object to the

Plaintiff's alternate use of the name "Katherine" in Paragraphs 101 and 102 and state that Erdely's reporting notes consistently refer to this friend as "Catherine." (*See, e.g.*, SRE Ex. 15 at RS004158-59, RS004164).

103.   Erdely understood that the reason Jackie refused to provide contact information for these three friends — called "Andy," "Randall," and "Cindy" in the article — is that Jackie said she had a "strained relationship" with them. (Id. at 93:14-94:8.)

**RESPONSE:**  Defendants do not dispute this fact.

104.   Instead, Erdely asked Jackie on July 30, 2014 if Jackie would see if Ryan would be willing to speak with Erdely. (Erdely Reporting Notes at RS004242 (Ex. 10).) Jackie responded that Jackie "can text him either later tonight or tomorrow," but that she had not yet "ha[d] a chance" to get in touch with him. (Id.)

**RESPONSE:**  Defendants object to the word "instead" to the extent that it suggests that Erdely asked Jackie to be put in contact with Ryan for the first time on July 30, 2014 , as the interview notes demonstrate that Jackie had already "mentioned that you're going to speak with Ryan about the possibility of speaking with me," indicating that Erdely was checking on a previous request.  (SRE Ex. 15 at RS004242.)  Defendants do not dispute that Jackie told Erdely that Jackie "can text him either later tonight or tomorrow," but that she had not yet "ha[d] a chance" to get in touch with him. (*Id.*)  *See also* Response 102, *supra*, regarding additional evidence of Erdely's diligence in trying to get Jackie to put her in touch with Ryan.

105.   On August 11, 2014, Erdely left a long detailed message for Jackie asking Jackie if she had spoken with Ryan yet to see if Ryan was willing to speak with Erdely. (Id. at RS004309.)

**RESPONSE:**  Defendants do not dispute this fact.  *See also* Response 102, *supra*, regarding additional evidence of Erdely's diligence in trying to get Jackie to put her in touch with Ryan.

106.   Having not heard from Jackie, two days later on August 13, 2014, Erdely left another long message for Jackie, again asking if Ryan would speak with her. (Id. at RS004309.)

**RESPONSE:**  Defendants do not dispute this fact.  *See also* Response 102, *supra*, regarding additional evidence of Erdely's diligence in trying to get Jackie to put her in touch with Ryan.

107.   Jackie responded via email the next day that she "ha[sn't] heard back from ... Ryan." (Id. at RS004309.)

**RESPONSE:**  Defendants do not dispute this fact.  *See also* Response 102, *supra*, regarding additional evidence of Erdely's diligence in trying to get Jackie to put her in touch with Ryan.

108.   On August 16, 2014, Jackie told Erdely that Jackie "texted [Ryan] twice," and "messaged him on Facebook," but that she "still ha[sn't] heard back from [him]." (Id. at RS004310.)

**RESPONSE:**  Defendants do not dispute this fact.  *See also* Response 102, *supra*, regarding additional evidence of Erdely's diligence in trying to get Jackie to put her in touch with Ryan.

109.   During a dinner on September 11, 2014, Jackie told Erdely that Ryan had refused to speak with Erdely because he was in a fraternity and he did not "want the Greek system to ... go down." (Sept. 11, 2014 Interview Tr. at RS118230-31 (Ex. 18).)

**RESPONSE:**  Defendants do not dispute this fact, but object that Plaintiff is quoting selectively from the transcript, which includes the following exchange:

> Jackie:  And, like, you know, I did talk to Ryan.  I finally saw him.
> I saw him actually at Cookout when I was getting a milkshake and
> I was like, "Hey, so hey did you get any of my texts?" and he was

61

like "Yeah, I got them."  And I was like, "So, you know, would
you be interested?"  He was like, "No."  And he was like

Sabrina: Wow!

Jackie:  "Listen," he's like, "you and I haven't spoken in like two
years."  I was like, "I know," and I was like "but, you know, I
thought that I just, you know, wanted to talk to you about that
night and everything."  And I was like, "and just to give the
reporter more background," and he was like, "I'm in a fraternity
here, Jackie."  And he was like, "I don't want the Greek system to,
kind of like go down."  And he was like "And it seems like that's
what you want to happen."

Sabrina:  Woow!

Jackie:  And he was like, "you know, he's like, "I have priorities,"
and he was like, "I go here. I want to graduate here."  And he was
like "And I'm in my own fraternity."  And he was like,
"Something like this," he was like" "it's going to be completely,"
like, "change the Greek system."  And he was like, "So, no.  I
don't want to be part of whatever little  . . ." and he called it a "shit
show."  He's like, "I don't want to be part of whatever little shit
show you're running," . . . .

(SRE Ex. 22 at RS118230-31.)

   110.   Erdely simply took Jackie's word for it and told her that "Ryan is obviously out."

(Id. at RS118256.) Erdely ceased her efforts to speak with Ryan (or any of the three friends)

before publishing the article to confirm that he (or any of the three friends) were able or

unwilling to corroborate Jackie's story. (Erdely Dep. at 275:13-276:17 (Ex. 1).)

**RESPONSE:**  Defendants do not dispute that Erdely said the words "Ryan is obviously out"

later in the September 11, 2014 interview, but object on the ground that the citation does not

support the fact that Erdely "simply took Jackie's word for it" and "ceased her efforts to speak

with Ryan (or any of the three friends) before publishing the article."  Erdely in fact testified

that, while she "took [Jackie] at her word that he did not want to speak" because she was "a very

credible source" (Pl. Opp. Ex. 1 [Erdely Dep.] 95:10-11), Erdely also tried to get Alex Pinkleton

to provide her with contact information for the three friends, but Pinkleton said she would not do it without Jackie's permission.  (*Id*. at 95:12-17; SRE ¶ 76)  Erdely further testified that she had tried to find the identities of the three friends in other ways, including on Facebook, but was not able to find Ryan and the only Alex she found was Alex Pinkleton, and she did not find Catherine (whose name she was misspelling at the time.)  (Pl. Opp. Ex. 1 [Erdely Dep.] 95:21-96:3).  Erdely further testified that she had multiple discussions with Sean Woods about what to do, "but it always came back to the idea that, if Ryan wasn't amendable (sic) to speaking, then how would Kathryn and Alex be amendable (sic) to speaking. And that just seemed like a dead end."  (*Id*. at 276:11-17.)  Defendants further object on the ground that this fact is not material to any issue on this motion because Jackie's reluctance to put Erdely in contact with the three friends and Rolling Stone's failure to locate them to get comment does not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Church of Scientology Int'l v. Daniels*, 992 F.2d 1329, 1334 (4th Cir. 1993) ("the failure to investigate, where there was no reason to doubt the accuracy of the sources used … cannot amount to reckless conduct");  *Hatfill v. New York Times Co.*, 532 F.3d 312, 317 (4th Cir. 2008) ("The standard requires that the defendant have a 'subjective awareness of probable falsity' of the publication.") (citation omitted); *Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987)  ("[D]efamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice *in conjunction* with a false defamatory statement.") (emphasis in original).

111.    Erdely also requested that Jackie provide her contact information for "Alex" and "Catherine," but Jackie refused to provide it. (Apr. 21, 2016 Deposition of Elisabeth Garber-Paul at 102:20-106:1 ("Garber-Paul Dep.") (Ex. 27).)

**RESPONSE:**  Defendants do not dispute this fact, but object on the ground that this fact is not material to any issue on this motion for the reasons set forth in Response 110, *supra*.

112.    Woods testified that he repeatedly asked Erdely to find the three friends, but that "[s]he was telling me she couldn't find out who they were." (Woods Dep. at 126:16-127:25 (Ex. 8).) Erdely told Woods she did not know their last names and that nobody would give them to her. (Id. at 128:1-11.)

**RESPONSE**:  Defendants do not dispute this fact, but object on the ground that this fact is not material to any issue on this motion for the reasons set forth in Response 110, *supra*.

113.    But contrary to Erdely's claims to Woods, on September 19, 2014, during her interview with Jackie's first-year roommate, Rachel Soltis, Erdely learned the last name of Katherine Hendley. Erdely asked Soltis about Jackie's friends' reactions when Jackie told them about her alleged assault, and Soltis explained to Erdely, that "yeah Catherine Hindley or Hinkley, yeah she ... Cathy and Al[ex] told Jackie not to tell because it would ruin [Jackie's] reputation." (Erdely Reporting Notes at RS004421 (Ex. 10).)

**RESPONSE:**  Defendants object to this fact on the ground that the citation does not support the fact, insofar as it says that Erdely "learned the last name of Katherine Hendley" during her interview with Rachel Soltis.  The interview notes reveal only that Soltis guessed at Kathryn's last name, which is reflected in the notes as "chateirine hindley or hinkley." (SRE Ex. 15 at RS004421.)  Erdely testified in her deposition that she had been given a "guess as to what her last name was" (Pl. Opp. Ex. 1 [Erdely Dep.] 291:7-15) and that she "was not aware . . . at the time" (*id*. at 293:12) that the name that Soltis provided her was within one vowel of Kathryn Hendley's real name, explaining:

> [F]irst of all, this is my phonetic spelling of what she had said.  I, I didn't know what her – I was misspelling her first name.  And I wasn't really aware that I had this name at this point in time.  I mean, this was well after I had written the article.
>
> As you can see, I didn't bold it, so I'm not even sure that, in hindsight, I was aware of what I had.  After this whole article came out – after this whole article fell apart and Will Dana was reading my transcript, he actually came across this and had to remind me that I had this information.
>
> So, when I was writing the document, it was not foremost on my mind that Rachel Soltis had given me an approximation of Kathryn's name.

(*Id*. at 293:13-294:3.)  Defendants further object on the ground that this fact is not material to any issue on this motion because Erdely and Rolling Stone's failure to identify and contact Kathryn Hendley does not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 110, *supra.  McFarlane* in Response 58, *supra.*

114.    Although Erdely had Hendley's last name (within one vowel of its proper spelling), Erdely never tried to identify or contact Ms. Hendley to verify whether she did, in fact, discourage Jackie from reporting an alleged gang-rape on the night of Jackie's alleged assault. (Erdely Dep. at 294:4-10 (Ex. 1).)

**RESPONSE:**  Defendants do not dispute that Erdely never identified Kathryn Hendley and reached her for comment, but object that the cited deposition testimony does not support the fact. Defendants further object on the ground that this fact is not material to any issue on this motion for the reasons set forth in Response 113, *supra.*  Defendants further object to the characterization that Erdely "never tried to identify or contact" Kathryn Hendley, as the undisputed evidence shows that Erdely tried to locate her on Facebook and asked Alex Pinkleton

for her full name but was refused.  (Pl. Opp. Ex. 1 [Erdely Dep.] 95:13-96:3.) *See* Response 110,

*supra.*

115.    Erdely knew that it was very easy to find UVA student contact information

through UVA's people search. (Id. at 266:23-269:15.)

**RESPONSE:**  Defendants object to this fact on the ground that the citation does not support the

fact because the cited deposition testimony demonstrates, at most, that Erdely knew that she

could locate people using UVA's people search if she had a full name.  (Pl. Opp. Ex. 1 [Erdely

Dep.] 269:11-15.)  Defendants further object to this fact on the ground that it is not material for

the reasons set forth in Response 113, *supra*.  Defendants further state that both Ryan Duffin and

Kathryn Hendley testified in their depositions that they were not the only person at UVA with

their first names.  (Pl. Opp. Ex. 30 [Duffin Dep.]229:24-230:17; Pl. Opp. Ex. 29 [Hendley

Dep.]76:8-24.)

116.    Erdely also did not bother to tell Rolling Stone's fact-checker, Elizabeth Garber-

Paul that she had learned Kathryn Hendley's last name during her reporting. (Garber-Paul Dep.

at 215:21-216:8 (Ex. 27).) Garber-Paul did not discover this until after the article was published.

(Id.)

**RESPONSE:**  Defendants object to this fact for the reasons set forth in Response 113, *supra*.

Defendants further object to this fact on the ground that the phrase "did not bother" is not

supported by the cited evidence and is argumentative.  *See also McFarlane* in Response 58,

*supra.*

117.    After publication, Woods learned that a source had in fact given Erdely Kathryn Hendley's full name — identified as "Cindy" in the article — but that Erdely never attempted to contact her. (Woods Dep. at 129:18-130:3 (Ex. 8).)  *See also McFarlane* in Response 58, *supra*.

**RESPONSE:**  Defendants object to this fact on the ground that it is not supported by the cited evidence because Woods testified that he learned after publication that "the name was sort of garbled and hard to understand, and you couldn't – it would be hard to read what the last name exactly was."  (Pl. Opp. Ex. 8 [Woods Dep.] 129:24-130:3.)  Woods did not testify that "Erdely never attempted to contact" Kathryn Hendley, and the undisputed record evidence shows that Erdely *did* try to identify and contact her.  *See* Response 114, *supra*.  Defendants further object to this fact for the reasons set forth in Response 113, *supra*.

118.    When Sean Woods provided Garber-Paul with Kathryn Hendley's full name after the publication of the article, Garber-Paul was able to obtain Hendley's email address in three minutes using UVA's public database. (Dec. 11, 2014 Email from Elisabeth Garber-Paul to Sean Woods, RS002973 (Ex. 28); Garber-Paul Dep. at 323:6-325:12 (Ex. 27).)

**RESPONSE:**  Defendants do not dispute this fact, but object that it is immaterial to any issue on this motion because the referenced events occurred on December 11, 2014, weeks after publication.  *See Secord* and *Bose Corp.* in Response 72, *supra*.  Defendants further note that the record does not support Plaintiff's implication that Woods obtained this name from Erdely's notes; instead, the undisputed record reflects that Erdely finally obtained Hendley's full name from Alex Pinkleton following their phone call in the early-morning hours of December 5, 2014. *See* SRE ¶ 166, SRE Ex. 51.  Defendants further object to this fact for the reasons set forth in Response 113, *supra*.

119.    Although Erdely never spoke to Ms. Hendley, the article quotes Ms. Hendley as discouraging Jackie from reporting her gang rape, telling Jackie that if she did, "her reputation [would] be shot for the next four years," and saying to Jackie, referring to her gang rape, "Why didn't you have fun with it? A bunch of hot Phi Psi guys?" (Original Article at RS001072, 1074 (Ex. 16) (emphasis in original).)

**RESPONSE:**  Defendants do not dispute that Kathryn Hendley is the person identified in the Article as "Cindy," and state that the Article speaks for itself.

120.    Had Erdely contacted Kathryn Hendley, she would have willingly spoken to Erdely. (Apr. 13, 2016 Deposition of Kathryn Hendley at 50:20-51:16 ("Hendley Dep.") (Ex. 29).) Hendley would have told Erdely that Jackie's description of the supposed meeting on the night of the assault was almost entirely fabricated. (Id. at 16:14-19:18.)

**RESPONSE**:  Defendants object to this fact on the grounds that this testimony is speculation about a hypothetical interview and is inadmissible for that reason.  Hendley testified that she does not know what questions Erdely would have asked her and therefore cannot say how she would have responded. (Pl. Opp. Ex. 29 [Hendley Dep.] 79:9-18.)  Defendants further note that Hendley testified that she had no knowledge of Jackie's communications with Eramo and did not even know prior to the Article that Jackie had reported her assault to Eramo.  (*Id.* at 86:22-87:10.)  Defendants further object on the ground that the fact is not material for the reasons set forth in Response 110, *supra*.

121.    Hendley would have told Erdely that Jackie was not visibly injured or bloodied, that the meeting took place at a different time of day far from the Phi Psi house, and that Jackie claimed she had been forced to perform oral sex on "one or two" men. (Id. at 22:8-26:25.)

68

**RESPONSE**:  Defendants object to this fact on the ground that it is not material for the reasons set forth in Responses 110 and 120, *supra*.

122.    Hendley would have also told Erdely that the quotations Jackie attributed to Hendley were fabricated. (Id. at 25:9-29:25.)

**RESPONSE**:  Defendants do not dispute this fact, but object on the ground that it is not material for the reasons set forth in Response 110, *supra*.

123.    Alex Pinkleton told Erdely she was friends with Kathryn Hendley ("Cindy" in the article) but despite being in possession of notes from that interview while conducting her own interview with Pinkleton, Rolling Stone fact-checker Elizabeth Garber-Paul also never asked Pinkleton for Kathryn Hendley's full name or contact information. (Garber-Paul Dep. 270:25-271:17 (Ex. 27).)

**RESPONSE**:  Defendants do not dispute that Garber-Paul did not ask Pinkleton for contact information for Ms. Hendley, but object to this fact to the extent it implies that Garber-Paul was aware at the time she spoke to Pinkleton that Pinkleton knew Kathryn.  Pl. Opp. Ex. 27 [Garber-Paul Dep.] 272:18-25.)  Defendants further state that the record reflects that Erdely asked Pinkleton for the three friends' contact information when she visited UVA's campus in September 2014, and Pinkleton refused to provide that information.  (*See* SRE ¶ 76; Pl. Opp. Ex. 1 [Erdely Dep.] 95:6-17.)  Defendants further object on the ground that this fact is not material for the reasons set forth in Response 110, *supra*.

124.    Will Dana, then-Managing Editor of Rolling Stone, agreed that if Erdely had the names of any of the three friends, he would have expected that that person would have been contacted. (Dana Dep. at 383:5-17 (Ex. 21).)

**RESPONSE:**  Defendants do not dispute this fact but state that it is not material for the reasons set forth in Response 110, *supra*.

125.    Ryan Duffin also would have spoken to Erdely if she had contacted him prior to the publication of the article. (Apr. 15, 2016 Deposition of Ryan Duffin at 33:10-34:10 ("Duffin Dep.") (Ex. 30).)

**RESPONSE**:  Defendants do not dispute this fact but, object on the ground that this fact is not material for the reasons set forth in Response 110, *supra*.

126.    Duffin would have told Erdely that Jackie never reached out to him to ask if he would speak to Erdely, and that Duffin never declined to speak with Erdely. (Id. at 33:10¬34:10.) Duffin would have also told Erdely that the quotes Jackie attributed to Alex and Kathryn were fabrications. (Id.)

**RESPONSE:**  Defendants object to this fact on the grounds that this testimony is speculation about a hypothetical interview and is inadmissible for that reason.  Mr. Duffin testified that he does not know what questions Erdely would have asked her and therefore cannot say how he would have responded.  Pl. Opp. Ex. 30 [Duffin Dep.] 234:11-20.  Defendants further note that Duffin testified that prior to the Article's publication, he did not know that Jackie had spoken to Eramo or anyone else within the UVA administration concerning her assault; had no knowledge of Jackie's interactions with Eramo or UVA's investigation of Jackie's allegations; and had never met Eramo personally.  *Id.* at 239:1-23.  Defendants further object on the ground that this fact is not material for the reasons set forth in Response 110, *supra*.

127.    Had Erdely spoken with Duffin, she would have also learned that Duffin believed that Jackie invented a fake person who she called "Haven Monahan" to try to make Duffin

jealous and spark a romantic interest in Jackie. (Id. at 134:14-137:12.) Duffin believed that

Jackie provided him fake telephone numbers for this "Haven Monahan" and encouraged Duffin

to exchange communications with him in a bid to instill romantic feelings in Duffin for Jackie.

(Id.)

**RESPONSE:**  Defendants object to this fact as unsupported by the record.  The quoted

testimony describes information that Duffin learned *after* December 5, 2014, and Duffin testified

that this "catfishing" theory involving Haven Monahan described in Paragraph 127 did not arise

until after the publication of the Article.  (Pl. Opp. Ex. 30 [Duffin Dep.] 224:14-226:1, 231:16-

20, 236:8-12.)  Duffin further testified that confirmed that "as of the time the article was

published, [he] didn't personally know Jackie to have made up stories."  (*Id.* at 235:18-25.)

Accordingly, this fact is not relevant to Defendants' knowledge at the time of publication of any

Statements at issue.  Defendants further object to this fact on the grounds set forth in Responses

110 and 126, *supra*.

128.    Erdely would have also learned that Jackie told Duffin that she had a date with

this "Haven Monahan" on September 28, 2012 — the night she claimed she was sexually

assaulted — and that it was "Haven Monahan" who supposedly orchestrated her alleged sexual

assault and allegedly forced Jackie to perform oral sex on five men. (Id. at 87:9-88:16,

19:14¬20:6, 94:2-12.)

**RESPONSE:** Defendants object to this fact on the grounds set forth in Responses 110, 126, and

127, *supra*.

129.    Erdely would have learned that Duffin learned that there was no UVA student

named Haven Monahan, and that Duffin eventually challenged Jackie regarding Haven

Monahan's existence. (Id. at 96:20-97:17, 102:8-104:11.) Erdely would have learned that Duffin

eventually had a falling out with Jackie over her repeated fabrications because he did not believe her story and did not trust her. (Id. at 110:17-111:23.)

**RESPONSE:** Defendants object to this fact on the grounds set forth in Responses 110, 126 and 127, *supra*. Defendants further object to this fact as unsupported by the record, in that Duffin confirms in the cited testimony that he did not know prior to the Article's publication whether Haven Monahan had been a student at UVA. Pl. Opp. Ex. 30 [Duffin Dep.] at 103:20-24 ("It's something the media was able to turn up since the article's publication that there was no student in – Haven Monahan at UVA. *But it wasn't information I had then.*") (emphasis added).

130.    At the time of the publication of the article, Rolling Stone then-Managing Editor Will Dana believed that Erdely had reached out to Ryan Duffin — called "Randall" in the article — for comment, when in fact she had not. (Dana Dep. at 375:9-377:13 (Ex. 21).)

**RESPONSE:**  Defendants do not dispute that Dana believed Erdely had received a response from Duffin, but object to the mischaracterization of his testimony, which says that he was mistaken in believing Erdely had "reached"—not "reached out"—to Duffin.  The record reflects that Erdely asked Jackie repeatedly to put her in touch with Duffin and subjectively believed, based upon her conversation with Jackie, that Duffin had been contacted and had affirmatively declined to be interviewed.  (*See, e.g.*,  SRE ¶¶ 39, 49, 50, 70, 180; Pl. Opp. Ex. 1 [Erdely Dep.] 94:21-24 (testifying that she asked Jackie to put her in touch with Ryan "many, many times").) Defendants further object on the ground that this fact is not material for the reasons set forth in Response 110, *supra*.

131.    Then-Managing Editor Will Dana agreed that if Erdely had in fact contacted Ryan Duffin, he would have willingly spoken to Erdely and would have rebutted certain central aspects of Jackie's account. (Id. at 379:4-380:9.)

**RESPONSE:**  Defendants object that this fact is not supported by the cited testimony and constitutes inadmissible lay opinion.  Dana did not and could not "agree[]" to what Duffin, a third party, *would have done* in a hypothetical interview.  The cited testimony simply confirms that Dana has no personal knowledge to testify about Duffin's hypothetical actions one way or the other.  Defendants further object for the reasons set forth in Responses 110, 126, and 127 *supra*.

132.    Will Dana agreed that Rolling Stone should have attempted to contact the three friends Jackie claimed she met with on the night of her alleged gang rape, and that doing so "would have been the easiest way to find out the flaws in [Jackie's] story." (Id. at 347:23¬348:14.)

**RESPONSE:**  Defendants object on the grounds that Dana's reflection "in hindsight" (Pl. Opp. Ex. 21 [Dana Dep.] 348:12) is not relevant to Defendants' state of mind at the time of publication.  *See Secord* and *Bose Corp.* in Response 72, *supra*.  Defendants further object on the ground that the fact is not material for the reasons set forth in Response 110, *supra*.

133.    Deputy Managing Editor Sean Woods admitted that Jackie's refusal to provide Rolling Stone with names and contact information of people that could verify her claims was a "roadblock" in Rolling Stone's reporting. (Woods Dep. at 167:12-168:2 (Ex. 8).)

**RESPONSE:**  Defendants do not dispute that Woods described these items as "roadblocks" in this testimony, but object on the ground that the fact is not material for the reasons set forth in Response 110, *supra*.

134.    Sean Woods admitted that failing to contact any of the three friends Jackie
supposedly met with on the night of her supposed sexual assault was "a mistake." (Id. at 123:8-
23.)

**RESPONSE:**  Defendants do not dispute this fact but object on the ground that the fact is not
material for the reasons set forth in Response 110, *supra*.  Defendants further object on the
ground that Wood's post-publication second-guessing of the reporting and editing process is not
probative of Erdely's or Rolling Stone's subjective state of mind at the time of publication.  *See
Secord* and *Bose Corp.* in Response 72, *supra*.

135.    In the original draft of the article, Erdely wrote a note regarding the gang-rape
scene and the depiction of the callous statements of Jackie's friends indicating to the reader that
all of the quotes came from Jackie and that Rolling Stone had not interviewed any of the other
supposed witnesses. (Oct. 15, 2014 Email from Sean Woods to Jodi Peckman, Joe Hutchinson,
& Sacha Lecca, at RS002261 (Ex. 15).) Woods edited the draft to remove this disclaimer.
(Woods Dep. at 83:1-84:1.)

**RESPONSE:**  Defendants do not dispute that in editing Erdely's first draft of the Article, Woods
removed a bracketed note from Erdely stating "she says—all her POV" and replaced it with the
words "Jackie recalls." Defendants object to Plaintiff's mischaracterization of this bracketed note
from reporter to editor as a "disclaimer," and further note that in the cited testimony, Woods
testified that he "felt strongly that the entire lead of the piece was clearly in Jackie's point of
view."  Pl. Opp. Ex. 8 [Woods Dep.] 83:7-23.

136.    In a draft "mea cupla" statement that he wrote for Erdely days after Rolling Stone
published the December 5, 2014 Editor's Note, Woods also stated to Erdely, "When Jackie
balked at revealing her friends' names or said she would be contacting them for [Erdely],

74

[Erdely] should have walked away." (Mea Culpa Draft, RS015041-42, at RS015041 (Ex. 31);
Woods Dep. at 292:15-293:5, 298:5-24 (Ex. 8).) He further told Erdely, "[i]n [your] desire to
bring this issue to a broader audience, [you] neglected to report Jackie's story as vigorously as
[you] should have and to air both sides of a narrative without judgment or bias." (Mea Culpa
Draft at RS0015041.)

**RESPONSE:**  Defendants object to this fact on the ground that it misrepresents and selectively
quotes from the document, which speaks for itself, and respectfully refer the Court to Plaintiff's
Exhibit 31 for the contents thereof.  Defendants further object that this document is not relevant
to any Defendant's state of mind at the time of publication, since it was drafted after December
5, 2014, and note that Woods described the contents of this documents as "hindsight."  (Pl. Opp.
Ex. 8 [Woods Dep.] 292:2-9, 302:1-7.)  Defendants refer the Court to the testimony of Sean
Woods (Pl. Opp. Ex. 8) at 292:21-304:9 for a more fulsome discussion of the contents and
purpose of this document.  Defendants further object on the ground that this fact is not material
to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Erdely's and
Wood's post-publication second-guessing of their reporting and editing process and is not
probative of Erdely's or Rolling Stone's subjective state of mind at the time of publication.  *See
Secord* and *Bose Corp.* in Response 72, *supra*.

## XI.   Jackie Refuses To Divulge To Erdely The Name Of The Supposed Ringleader Of Her Alleged Sexual Assault.[14]

137.     Both Sean Woods' and Will Dana's reactions to reading the first draft of the
article were that they wanted to push for more information on the identity of "Drew" — the
pseudonym used in the article for the supposed ringleader of the assault — and the other

---

[14] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence
(including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection
applies to paragraphs 137-149.

supposed assailants, but Erdely told Woods that "she couldn't find that" and that she "ran into a wall." (Woods Dep. at 27:9-30:17.)

**RESPONSE:**  Defendants object to this fact on the ground that Plaintiff mischaracterizes Woods's testimony.  Wood testified that, after reading the first draft, he was "curious about certainly the identity of Drew," and Dana gave him a note asking "how could we find out more about the rapist, the alleged rapist" and "we were looking for more information on these alleged assailants."  (Pl. Opp. Ex. 8 [Woods Dep.] 28:6-29:22.)  Woods further testified that "it was not a concern, it was just we're pushing as we would do any story."  (*Id*. at 29:6-11.)  Defendants do not dispute this fact, but object on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Erdely's and/or Rolling Stone's failure to identify and get comment from the alleged ringleader of Jackie's gang rape does not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 110, *supra*.

138.    During the reporting of the article, Woods told Erdely at least three times that she needed to learn the full name of the supposed ringleader of Jackie's gang rape so that Rolling Stone could verify his existence. (Id. at 148:24-149:9.)

**RESPONSE:**  Defendants do not dispute this fact, but object that it is not material for the reasons set forth in Response 137, *supra*.  Defendants state further that the record demonstrates that Erdely asked Jackie and her friends repeatedly for "Drew's" full name.  (SRE Ex. 15  at RS004465, RS004477.  Erdely pressed Jackie so hard for the identity of "Drew" that Jackie became upset and marshaled her friends to push back against Erdely's aggressive investigation.

(Pl. Opp. Ex. 13 [Surface Dep.] 95:5-96:2; Pl. Opp. Ex. 12 [Pinkleton Dep.] 115:13-116:8; SRE Ex. 37 at RS014308.)

139.    Prior to the publication of the article, Erdely admitted to Alex Pinkleton that she attempted to verify the existence of the supposed ringleader of Jackie's gang-rape through Facebook using the first name Jackie provided and was unable to do so. (Pinkleton Dep. 125:15-24 (Ex. 12).)

**RESPONSE:**  Defendants do not dispute this fact, but object on the grounds set out in Response 137, *supra*.  Defendants further note that Erdely has stated that this did not in any way diminish her sense of Jackie's credibility.  SRE ¶ 124.  Defendants further note that Pinkleton's testimony relates to the contents of text messages between herself and Erdely (Pl. Opp. Ex. 12 [Pinkleton Dep.] 125:15-24) and respectfully refer the Court to Exhibit 37 to the Declaration of Sabrina Rubin Erdely for the full contents of those text messages.   The record demonstrates that Erdely tried so hard to track down these and other details (including the name of Jackie's assailant) that Jackie became upset and warned friends not to speak with Erdely because she was on a "witch hunt."  (EAM Ex. 114 at RESPJ00001096.)

140.    Jackie also refused to tell Rolling Stone the names of any of her other supposed attackers. (Garber-Paul Dep. at 150:3-20 (Ex. 27.)

**RESPONSE:**  Defendants do not dispute this fact, but object on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Jackie's reluctance to identify the other alleged perpetrators and Rolling Stone's failure to identify them and get comment from them does not tend to show that Erdely or Rolling Stone had had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 110, *supra*.

141.     Erdely never asked Jackie for the name of one of her supposed gang-rapists who Jackie claimed was in a small anthropology discussion class with her. (Erdely Dep. at 56:9-57:3 (Ex. 1).)

**RESPONSE:**  Defendants do not dispute this fact, but clarify that Erdely testified that she "was under the impression that she didn't know the names of anybody who was involved except for the ring leader." (Pl. Opp. Ex. 1 [Erdely Dep.] 56:16-21.)  Defendants further object to this fact for the reasons set out in Response 137, *supra.  See also McFarlane* in Response 58, *supra.*

142.     Erdely never asked Jackie to see her transcript to determine whether Jackie did, in fact, take an anthropology class, and whether she, in fact, failed that semester. (See generally Erdely Reporting Notes, id. at RS004156 (Ex. 10).)

**RESPONSE:**  Defendants object to this fact on the ground that the citation does not support the fact, as Erdely's notes simply do not include a transcript.  Defendants further object for the reasons set out in Response 137, *supra.  See also McFarlane* in Response 58, *supra.*

143.     Erdely never asked Jackie how she was able to identify one of the perpetrators as the pledge master, as Jackie claimed, or what any of her alleged attackers looked like. (See generally Erdely Reporting Notes, id. at RS004156; Erdely Dep. 55:21-23; 56:1 (Ex. 1).)

**RESPONSE:**  Defendants object to this fact on the ground that it lacks foundation because the record reflects only that Jackie used the word "pledge master" in passing when describing her attack (SRE Ex. 15 at RS004156), but there is no evidence in the record that there was in fact a "pledge master" or that this is anything other than Jackie's speculation.  Defendants do not dispute that Erdely did not ask Jackie "how she was able to identify one of the perpetrators as the

78

pledge master," but Erdely testified in her deposition that she did not even contemplate that as a meaningful question:

> Q Did you ever ask her how she was able to identify that he was the pledge master
>
> A No. I took it as being -- eventually, when I was able to put more pieces together, I took it that she -- her, her conclusion was that this was some kind of dirty rushing event and that somebody must have been coordinating it. So she gave somebody the title pledge master. But I didn't know there was any bearing in real life for her to call somebody that.

(Pl. Opp. Ex. 1 [Erdely Dep.] 55:24-56:8.)  Defendants further object for the reasons stated in Response 137, *supra*. *See also McFarlane* in Response 58, *supra*.

144.    Erdely never asked Jackie whether anyone attempted to enter or exit the room during the three-and-a-half hour period of her alleged gang-rape, during which a fraternity party was supposedly going on. Moreover, Erdely never asked Jackie whether anyone heard her alleged screams. (See generally Erdely Reporting Notes, id. at RS004155-57.)

**RESPONSE:**  Defendants object on the ground that the citation does not support the fact because they reflect only a portion of one conversation between Jackie and Erdely.  Defendants further state that Erdely testified that she could not recall whether she had ever asked Jackie whether any other individuals entered the room during the time period of her rape. (Pl. Opp. Ex. 1 [Erdely Dep.] 54:2-6.) Defendants further object to this fact for the reasons set out in Response 137, *supra*.  *See also McFarlane* in Response 58, *supra*.

145. Rolling Stone did not talk to a single source - including Jackie - that ever verified that any of Jackie's supposed assailants existed. (Dana Dep. at 189:18-190:15 (Ex. 21).)

**RESPONSE:**  Defendants object to this fact on the ground that the citation does not support the fact.  When asked whether any of Jackie's friends had "identif[ied] specifically that these

individuals existed" to Rolling Stone, Dana responded "[n]ot that I know of," and, in any event, Dana lacked personal knowledge of the matter.  Defendants further state that Erdely spoke to Rachel Soltis, who said that "[m]e and several other people know exactly who did this to her." (SRE Ex. 15 at RS004423; SW Ex. 1 at RS001078.)  Defendants further state that Jackie and Alex Pinkleton both independently confirmed to Erdely that Eramo stated in a September 2014 meeting that "she'd learned 'through the grapevine' that 'all the boys involved have graduated.'" (Pl. Opp.. Ex. 10 at RS004403-4404; RS004411-13, RS004465; Erdely Decl.  ¶¶88-89; SW Ex. 1 at RS001079.)  Defendants took this statement by Eramo as evidence that UVA might in fact have identified who the perpetrators were.  (SRE ¶ 89; SW ¶ 27; LGP ¶ 20.)  Defendants further state that, as set forth in their Statement of Undisputed Material Facts, there is no evidence in the record that anyone Erdely interviewed who knew Jackie doubted her story or her credibility prior to the Article's publication, much less that they communicated any such doubts to any Defendant; and the undisputed evidence further shows that UVA and Eramo did not doubt Jackie's story.  *See* Def. Br. at 10-11 (citing record evidence).  Plaintiff has not disputed these facts.  *See supra* note 1.  Defendants further object for the reasons in Response 137, *supra*.

146. At the time Rolling Stone published the article, it did not know the real or full name of the supposed ringleader of Jackie's alleged gang rape. (Garber-Paul Dep. at 58:12-15 (Ex. 27).)

**RESPONSE:**  Defendants do not dispute this fact, but object for the reasons set out in Response 137, *supra*.

147. On October 28, 2014, Pinkleton asked Erdely by text, "Have you found out what has to be said if ▇▇▇ last name isn't used?" (Text Messages between Sabrina Erdely and Alex Pinkleton, RS014307-33, at RS0014319 ("Erdely-Pinkleton Texts") (Ex. 32); see also Pinkleton

Dep. at 203:16-204:6 (Ex. 12).) Erdely responded: "Yes, we'd have to say that she refused to disclose his name and so we couldn't follow up. Not in those words, but that's the sentiment. Unfortunately, it would diminish her credibility, so I really, really want to avoid that!"

[image omitted]

(Erdely-Pinkleton Texts at RS0014319-20; Pinkleton Dep. at 203:16-204:6.)

**RESPONSE:**  Defendants do not dispute that Erdely and Pinkleton exchanged the referenced text messages, and Defendants respectfully refer the Court to Exhibit 37 to the Declaration of Sabrina Rubin Erdely for the full contents of those text messages.  Defendants further state that Erdely testified with regards to this text, "that last sentence was just me trying to push her to try to push Jackie further.  I was hoping to get ███ name."  (Pl. Opp. Ex. 1 [Erdely Dep.] 220:17-19.)  Defendants further object on the grounds set forth in Response 137, *supra*.

148. Although Erdely actually did put a disclaimer in one draft of the article that would have informed readers that Jackie refused to divulge "Drew's" real name to Rolling Stone, Deputy Managing Editor Sean Woods cut that disclaimer from the article. (Woods Dep. at 153:2-154:2 (Ex. 8).) Woods admitted it was an intentional decision to leave this disclaimer out of the final version of the article. (Id. at 154:10-155:3.)

**RESPONSE:**  Defendants do not dispute that Erdely's second draft of the Article included a sentence towards the back of the piece stating that Jackie "refused to divulge [the ringleader's] full name to *RS*."  (SW Ex. 3 at RS019061.)  Defendants object to the characterization that "Woods admitted it was an intentional decision to leave this disclaimer out," on the grounds that it is not supported by the underlying testimony.  (Pl. Opp. Ex. 8 [Woods Dep.]154:10-155:3.) Woods testified that he had originally asked Erdely to include the disclaimer, but that in its original location was "all the way in the back of the story," and he "felt that was a disservice," so

decided to cut the disclaimer with the intention of finding a new place for it, "sort of higher up in the piece, maybe the second, third section." (*Id.* at 153:15-25.)  Woods continued that "I meant to put it back in and I didn't," and when asked whether the decision was accidental or intentional, said "I guess it's a little bit of both." (*Id.* at 154:15-19.)  Defendants further object on the ground that this fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Erdely's and/or Rolling Stone's failure to get comment from the ringleader of Jackie's attack and/or to more clearly reflect that Jackie had not provided his full name to Rolling Stone does not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 110, *supra*.

149. Woods admitted that Rolling Stone did not make it clear to readers of the article that Rolling Stone did not know the true name of the supposed ringleader of Jackie's gang-rape and had not even verified that he existed. (Id. at 151:20-152:9.)

**RESPONSE:**  Defendants do not dispute this fact, but object for the reasons set forth in Response 148, *supra*.

## XII.   Jackie Refuses To Divulge The Names Of Two Other Women She Claims Were Also Gang Raped At Phi Kappa Psi.[15]

150. Rolling Stone also claimed in the article that two other girls had been gang-raped recently at Phi Kappa Psi and that Jackie shared this information with Ms. Eramo. (Garber-Paul Dep. at 202:7-203:1 (Ex. 27).)

---

[15] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 150-174.

**RESPONSE:**  Defendants do not dispute that the Article states that "Jackie had come across something deeply disturbing: two other young women who, she says, confided that they, too, had recently been Phi Kappa Psi gang rape victims."  (SW Ex. 1 at RS001078.)  Defendants respectfully refer the Court to Exhibit 1 to the Declaration of Sean Woods for the full contents of the Article.

151. Jackie told Erdely during one of their interviews that she (Jackie) was aware of two other women, ███ and ███, who had allegedly been gang-raped at the Phi Psi house. (Erdely Reporting Notes at RS004155 (Ex. 10); Erdely Dep. at 68:19-69:14 (Ex. 1).).

**RESPONSE:**  Defendants do not dispute this fact.  Defendants state, however, that Erdely was originally told of the existence of two other victims of assault at Phi Kappa Psi by Emily Renda, prior to her first interview with Jackie, and that Renda told Erdely that UVA knew of these two victims "through friends."  (*See* Pl. Opp.. Ex. 10 at RS004145-47; *see also* Response 46, *supra*.)

152. Erdely subjectively believed that this information was "shocking," and that she "can't imagine [gang-rape] is all that common." (Erdely Reporting Notes at RS004155.)  Erdely subjectively believed that "the idea that 3 women were gang raped at the same fraternity seems like too much of a coincidence." (Id.)

**RESPONSE:**  Defendants object to this fact on the grounds that it is not supported by the cited evidence.  Erdely's reporting notes indicate only that when Jackie told her in an interview that she had met two other women who said they had "a similar experience" at the same fraternity, Erdely summarized or paraphrased[16] her responses to Jackie as "shocking," and "I don't know the stats on gang rape but I can't imagine it's all that common?  So that idea that 3 women were

---

[16] Defendants note that the word "shocking" appears in brackets, which Erdely has explained in undisputed testimony indicates a comment has been paraphrased or summarized.  (Pl. Opp. Ex. 1 [Erdely Dep.] 26:22-27:2.)

gang raped at the same fraternity seems like too much of a coincidence." (SRE Ex. 15 at RS004155.) Defendants state further that Jackie responded to Erdely, "It happens a lot more often than people might think." (*Id.*) Defendants further state that Erdely was told by a campus-safety expert that gang rapes are more common in situations involving fraternities and sports teams. (SRE Ex. 15 at RS004233-4234; SRE ¶ 57.)

153. Erdely never asked Jackie for ▮▮▮▮ or ▮▮▮▮ last name. (See generally *id.*)

**RESPONSE:** Defendants object to this fact on the ground that the citation does not support the fact, as Erdely's interviews notes reflect that Erdely did ask to get the last names of the other two Phi Kappa Psi victims from Jackie. (SRE Ex. 15 at RS004404.) Further, Erdely independently attempted to identify and locate ▮▮▮▮ and her sister. Pl. Opp. Ex. 1 [Erdely Dep.] 184:5-9; Pl. Opp. Ex. 25 at RS014346.) *See also* Response 88, *supra.* Defendants further state that, in response to Erdely's request for corroboration that these individuals did not want to speak with Erdely, Jackie provided text messages from one of the other alleged victims and a mutual friend (SRE Ex. 42, 43), which Erdely and Rolling Stone found to be highly corroborative of Jackie's story. (SRE ¶ 131, SW ¶ 23, LGP ¶ 18 (bullet 6).) Defendants further object on the ground that this fact is not material to any issue on this motion because Erdely's failure to reach the two other alleged Phi Kappa Psi victims for comment does not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo. *See Daniels, Hatfill* and *Tavoulareas* in Response 110, *supra.*

154. Instead, Erdely relied on Jackie to see if ▮▮▮▮ and/or ▮▮▮▮ would speak to Erdely. (Id. at RS004310; Erdely Dep. at 69:15-70:12 (Ex. 1).) For example, on September 11, 2014, Erdely asked Jackie about "the other two [Phi Psi] survivors." (Sept. 11, 2014 Interview Tr. at RS118256 (Ex. 18).) Jackie responded that ▮▮▮▮ refused to speak with Erdely because

her parents prohibited it. (Id.) Erdely then asked if Jackie would text ███ to let her know that

Erdely is on campus. (Erdely Reporting Notes at RS004345.) Erdely explained to Jackie that "it

would be important not only to put [ ] story out there but to lend to Jackie's story" and

credibility. (Id.)

**RESPONSE:**   Defendants do not dispute that Erdely repeatedly requested that Jackie put her in

contact with the two other alleged Phi Kappa Psi victims, and that Jackie told Erdely that

███ parents did not want her to speak with Erdely.  In addition to the requests reflected in

this fact, Erdely requested in interviews with Jackie on July 30, 2014 and August 16, 2014 to be

put in touch with ███ and the mutual friend who had put Jackie in touch with ███

███), as well as ███ and ███ sister ███ (Erdely Decl. ¶ 48.).  Erdely also spoke to

Jackie on September 17, 2014 about ways to be in touch with the two other victims.  Erdely's

interview notes reflect that Erdely told Jackie "I'd like to reach out to ███ and make sure she

doesn't want to cooperate, hear it from her," and that Jackie responded, "I'll ask the sister, 'cause

I haven't talked to ███ I'll see what she says.  She was very adamant that her family didn't

want her participating in any way."  (Pl. Opp.. Ex. 10 at RS004404-05.)  The notes of this same

conversation indicate that Jackie also raised the issue of ███ unprompted, saying "I was

thinking about a way you can get ███ story without talking to her, because she kind of told

me to fuck off," and continuing to tell Erdely that ███ had been vehemently rejecting

Jackie's urgings that she come forward since the prior spring.  (*Id*. at RS004407-09.)  Defendants

further state that, in response to Erdely's request for corroboration that these individuals did not

want to speak with Erdely, Jackie provided text messages from one of the other alleged victims

and a mutual friend (SRE Ex. 42, 43), which Erdely and Rolling Stone found to be highly

corroborative of Jackie's story.  (SRE ¶ 131, SW ¶ 23, LGP ¶ 18 (bullet 6).)  Defendants further

object that this fact is not material to any issue on this motion for the reasons set forth in Response 153, *supra*. Defendants further object to the use of the word "instead" in this fact because it is argumentative.

155. Erdely also asked Jackie to speak with a woman named "█████████," who could corroborate █████ story of gang-rape. (Id. at RS004311.) Again, however, although Erdely claims she "hounded" Jackie to get in touch with her, ultimately Erdely was unable to speak with █████ because Jackie failed to provide Erdely with █████ contact information. (Erdely Dep. at 69:15-70:12 (Ex. 1).)

**RESPONSE:**  Defendants do not dispute this fact, but object that this fact is not material to any issue on this motion for the reasons set forth in Response 153, *supra*. Defendants further object to this fact as argumentative.

156. During one of their interviews, Erdely told Jackie "that I think I've found who █████ and ████ [█████ sister who, according to Jackie, was a first-year at UVA] are." According to Erdely, Jackie "tells [her] it's not them, but [Erdely] do[esn't] really believe her." Erdely told Jackie that she would "like to reach out to █████ and make sure she doesn't want to cooperate, hear it from her, maybe she's willing to at least verify the Jackie part of the story, the idea that Jackie confided in them." (Erdely Reporting Notes at RS004404 (Ex. 10).)

**RESPONSE:**  *See* Response 88, *supra*.

157. Jackie suggested instead that she (Jackie) should "talk to [█████ sister," █████ because Jackie did not "have █████ phone number," but that she will "definitely talk to her and see what … she says." Jackie ended the inquiry by telling Erdely that "she was very adamant that her family didn't want her participating in any way." (Id. at RS004404-05.)

**RESPONSE:**  Defendants do not dispute this fact, but object that this fact is not material to any issue on this motion for the reasons set forth in Response 153, *supra*.

158. Ultimately, Erdely never identified or spoke with ████, ████, ████, or ████ because Jackie refused to identify their full names or provide their contact information. (Erdely Dep. at 69:9-14; 70:1-12 (Ex. 1).)

**RESPONSE:**  Defendants do not dispute this fact, but object that this fact is not material to any issue on this motion for the reasons set forth in Response 153, *supra*.  Defendants state further that Jackie made clear to Rolling Stone that her refusal to identify the two other sexual assault victims was at the behest of the victims themselves, and that Rolling Stone was provided corroboration of this in the form of text messages provided by Jackie.  Pl. Opp. Ex. 27 [Garber-Paul Dep.] at 206:10-22; SRE Exs. 42, 43.)

159. At the time it published the article, Rolling Stone did not know who these other supposed victims were and had only nicknames provided by Jackie. (Garber-Paul Dep. at 203:18-204:10 (Ex. 27).)

**RESPONSE:**  Defendants do not dispute the fact that no employees of Rolling Stone knew the full names of the two other victims at the time the Article was published, but state that Erdely believed that she did in fact know the full name of, and had confirmed the existence of, at least one of the two victims, and that she had a copy of a text message between Jackie and the other victim in which the woman refused to participate.  (Pl. Opp. Ex. 1 [Erdely Dep.] 183:25-184:25; SRE Ex. 43)  Defendants object that this fact is not material to any issue on this motion for the reasons set forth in Response 153, *supra*.

160. *Rolling Stone* also knew that UVA did not know who these other two supposed victims were. (*Id*. at 254:23-255:8.)

**RESPONSE:**   Defendants object on the ground that the citation does not support Plaintiff's fact. The cited Garber-Paul deposition testimony relates solely to the content of Erdely's interview notes of a conversation that Erdely and Emily Renda had on July 14, 2014.  Erdely's notes of that conversation reflect that Renda told Erdely that the two other alleged Phi Kappa Psi victims were brought to UVA's attention through "friends" and said that UVA "staff members" were trying to bring these two women forward "through back channels," and suggesting that UVA hoped to have more success with these women by telling them that Jackie had come forward, suggesting that UVA knew who these women were and was speaking with them.  (SRE Ex. 15 at RS004145-47.)  *See also* Response 21, *supra*, and 307, *infra*.

161. *Rolling Stone* never spoke to anyone other than Jackie who claimed to know who these two other supposed victims were. (*Id*. at 204:11-206:5.)

**RESPONSE:**   Defendants do not dispute this fact, but object that this fact is not material to any issue on this motion for the reasons set forth in Response 153, *supra*.

162. Erdely was unable to corroborate anything that Jackie told her about ███ and ███ alleged assaults. Indeed, when Erdely asked Rachel Soltis whether Jackie "ever told [her] anything about [what] ███ might have told [Jackie] about Phi Psi," Soltis responded "not that I can recall." (Erdely Reporting Notes at RS004425 (Ex. 10).)

**RESPONSE:**   Defendants object on the ground that the citation does not support Plaintiff's fact because the cited page from Erdely's interview notes with a single witness does not support the fact that "Erdely was unable to corroborate anything that Jackie told her about ███ and

█████ alleged assaults." (SRE Ex. 15 at RS004425.)  Defendants further state that, in response to Erdely's request for corroboration that these individuals did not want to speak with Erdely,  Jackie provided text messages from one of the other alleged victims and a mutual friend (SRE Ex. 42, 43), which Erdely and Rolling Stone found to be highly corroborative of Jackie's story.  (SRE ¶ 131, SW ¶ 23, LGP ¶ 18 (bullet 6).)  Defendants further state that this fact is not material to any issue on this motion for the reasons set forth in Response 153, *supra*.

163. *Rolling Stone* asked Jackie to provide contact information for these supposed two other victims so that they could verify their existence, and Jackie refused to provide that information. (Garber-Paul Dep. at 206:10-16 (Ex. 27).)

**RESPONSE:**  Defendants do not dispute this fact, but object that this fact is not material to any issue on this motion for the reasons set forth in Response 153, *supra*.

164. In an October 25, 2014 email in which he sent Erdely edits on the first draft of the article, Deputy Managing Editor Woods wrote to Erdely: "A few notes, word choices made some cuts, etc. Piece is great. I worry we can't confirm the two other girls coming to Jackie and alleging gang rape at the same frat, lets discuss Monday am. Any word from Jackie?" (Oct. 25, 2014 Email from Sean Woods to Sabrina Rubin Erdely, RS003216 (Ex. 33).) Erdely responded, "I have the same worry – I wish I had better sourcing on a lot of the Jackie stuff – a lot right now is resting on Jackie's say-so, including the entire lead." (Oct. 26, 2014 Email from Sabrina Rubin Erdely to Sean Woods, RS018980 (Ex. 34).)

**RESPONSE:**  Defendants do not dispute this fact, but object that this fact is not material to any issue on this motion for the reasons set forth in Response 153, *supra*.  *See also* Response 162, *supra*.  Defendants further object because, after this date, on November 6, 2014, Jackie provided text messages from one of the alleged victims and a mutual friend (SRE Exs. 42, 43), which

Erdely and Rolling Stone found to be highly corroborative of Jackie's story.  (SRE ¶ 131; SW ¶ 23; LGP ¶ 118 (bullet 6).)

165. When asked whether she had any knowledge of whether these two other alleged Phi Kappa Psi victims are real people or not, Garber-Paul, *Rolling Stone's* fact-checker, testified: "I don't know either way." (Garber-Paul Dep. at 206:17-207:1 (Ex. 27).)

**RESPONSE:**  Defendants do not dispute this fact, but object that this fact is not material to any issue on this motion for the reasons set forth in Response 153, *supra*.

166. In one of her reporting files, Erdely wrote that she "still need[s] to speak with: Jackie – ███████████████████████████; mom. Catherine; alex? Jackie's mom" (Erdely Interview Notes at RS14338-9 (Ex. 25).) Erdely never spoke with any of these people prior to publication nor did she receive the ███████ from Jackie. (*See generally* Erdely Reporting Notes (Ex. 10).)

**RESPONSE:**  Defendants do not dispute this fact.  With respect to ███████████████, ██████ Defendants object that this fact is not material to any issue on this motion for the reasons set forth in Response 153, *supra*.  With respect to ███████, Defendants respectfully refer the Court to Responses 73-79, *supra*. With respect to Catherine and Alex, Defendants respectfully refer the Court to Responses 102, 103, 110-24, *supra*.

167. Instead, Rolling Stone again put a statement in the article stating that neither woman was willing to speak with Rolling Stone, falsely implying that Rolling Stone knew who the women were, had reached out for comment, and had been rejected. (Original Article at RS001078 (Ex. 16).)

**RESPONSE:**  Defendants do not dispute that the Article states that "Neither woman was willing to talk to RS."  (SW Ex. 1 at RS001078.)  Defendants further state that the Article speaks for itself and respectfully refers the Court to Exhibit 1 to the Woods Declaration for the full contents thereof.  Defendants object to the portion of the fact which states that Rolling Stone was "falsely implying that Rolling Stone knew who the women were, had reached out for comment, and had been rejected" on the ground that it is argumentative, constitutes a legal conclusion, and it is unsupported by citation to any record evidence.  Defendants further state that the undisputed record reflects that Defendants believed they had reached out for comment and been rejected. *See* Responses 153 and 154, *supra*.

168. Although Woods had access to Erdely's reporting file before publication, he only reviewed it in depth after "A Rape on Campus" was published. (Pl. Opp. Ex. 8 [Woods Dep.] 129:18-130:3 (Ex. 8).)

**RESPONSE:**  Defendants do not dispute the fact that Woods did not read Erdely's reporting file prior to publication, and note that in the cited testimony Woods states that it is not his typical practice to do so.  Pl. Opp. Ex. 8 [Woods Dep.] at 129:18-130:3.

169. Woods testified that he expects that the fact checker would do a detailed review of the reporting file prior to publication. (Id. at 315:20-316:6.) But Garber-Paul, the fact checker, testified that she only had time to "skim" Erdely's reporting file. (Garber-Paul Dep. at 295:4-11 (Ex. 27).)

**RESPONSE:**  Defendants do not dispute this fact, but object on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Garber-Paul's failure to read the entirety of the four-hundred-plus page reporting file in detail does not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of

91

the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 110, *supra*.  Defendants further state that Garber-Paul verified and felt confident that each Statement at issue in the Article was accurate.  (LGP¶¶ 43-64.)

170.  Woods admitted that when he reviewed Erdely's reporting notes, it was clear to him that there was a "pattern" of Jackie being "intent on controlling her narrative." (Pl. Opp. Ex. 8 [Woods Dep.] 316:7-317:14.)

**RESPONSE:**   Defendants object on the ground that this fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Wood's post-publication analysis of the reporting file is not probative of Erdely's or Rolling Stone's subjective state of mind at the time of publication.  *See Secord* and *Bose Corp.* in Response 72, *supra*.  Defendants further state that the cited testimony only underscores Rolling Stone's *lack* of actual malice, as Woods testified with regards to the idea that Jackie had been intent on controlling her own narrative that, following the December 5 Editor's Note, "I came to believe it.  And, you know, it's one of the things I kick myself for because ***I didn't see it pre-publication***, and in hindsight, things became clearer."  Pl. Opp. Ex. 8 [Woods Dep.] at 316:18-22.)

171.  Woods admitted that Jackie's many requests, demands, wishes, and failures to provide information should have been "unacceptable," and that Rolling Stone's acquiescence to their source resulted in Rolling Stone "handcuffing" its own reporting. (Dec. 6, 2014 Email from Sean Woods to Will Dana, RS015172; Woods Dep. at 286:7-287:5 (Ex. 35).)

**RESPONSE:**   *See* Response 170, *supra*.

172. Then-Managing Editor Will Dana acknowledged that during the reporting of the story, Rolling Stone and Erdely suspended their skepticism of Jackie as a source. (Dana Dep. at 332:15-334:9 (Ex. 21).)

**RESPONSE:**  Defendants do not dispute this fact, but note that Dana's testimony concerns a statement he made to the *New York Times* months after publication of the statements at issue. (Pl. Opp. Ex. 21 [Dana Dep.] 333:12-20, 334:10-20.)  It therefore is not probative of Erdely's or Rolling Stone's subjective state of mind at the time of publication.  *See Secord* and *Bose Corp.* in Response 72, *supra*.  Defendants state further that Dana's testimony establishes that in the course of reporting the story:

> [I]t did not occur to me that somebody -- to any of us -- not me, to the very many talented experienced people who worked on this story, that [Jackie] was, that she was fabricating or she appeared to be fabricating so many of the details.  Usually, I mean, I think it's very common that through a fact checking process, as you interview someone, more and more they begin to reveal cracks, you know, that she was so consistent in her stories, you know . . . that we didn't see it.

(*Id*. at 336:4-16.)

173. Erdely called Alex Pinkleton on December 5, 2014, and "said that she had messed up and she should have used another one of the stories that had documentation, such as [Alex's], because she had had my trial documents; and she basically admitted to being so focused on this one story that even when she couldn't get ███ name, she had just put so much work into it that she – she should have completely rewritten it and regrets that she didn't." (Pinkleton Dep. at 206:4-24 (Ex. 12).)

**RESPONSE:**  Defendants object to this fact on the grounds that even *if* Pinkleton's self-serving testimony were accurate—which Defendants dispute—Erdely's post-publication second-

93

guessing of her reporting would not be probative of Erdely's or Rolling Stone's subjective state of mind at the time of publication. *See Secord* and *Bose Corp.* in Response 72, *supra*.

174. Erdely admitted to Pinkleton that she knew she should have rewritten the story but that "rewriting the whole story was so much work." (Id. at 208:6-9.)

**RESPONSE:**  Defendants object to this fact for the reasons set out in Response 173, *supra*.

### XIII.   Jackie Repeatedly Refuses To Speak To Erdely And Attempts To Pull Out Of The Article, But Erdely Pressures Jackie Into Cooperating.[17]

175. After Erdely repeatedly requested that Jackie reach out to Ryan, 

and August 2014, Jackie began to refuse to return Erdely's phone calls. Erdely tried to follow up with Jackie on August 21, August 27, and August 31, but Jackie did not respond to her requests. (Erdely Reporting Notes at RS004316 (Ex. 10).)

**RESPONSE**:  Defendants do not dispute that Erdely repeatedly requested that Jackie reach out to Ryan, ████████████████, and ███████ and to provide a name for the ringleader of Jackie's alleged assault, but object on the ground that the citation does not support Plaintiff's fact, as the single page from Erdely's interview notes that is cited indicates only that Erdely left messages for and sent emails to Jackie on August 21, 2014, August 27, 2014, and August 31, 2014, and provides no support any of the remaining factual details included in paragraph 175. (SRE Ex. 15 at RS004316.)  Defendants further object to this fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the fact that Erdely had temporary difficulty reaching Jackie does not demonstrate subjective awareness

---

[17] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 175-203.

of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Church of Scientology Int'l v. Daniels*, 992 F.2d 1329, 1334 (4th Cir. 1993) ("the failure to investigate, where there was no reason to doubt the accuracy of the sources used … cannot amount to reckless conduct"); *Hatfill v. New York Times Co.*, 532 F.3d 312, 317 (4th Cir. 2008) ("The standard requires that the defendant have a 'subjective awareness of probable falsity' of the publication."); *Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987) ("[D]efamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice *in conjunction* with a false defamatory statement.") (emphasis in original).

176. On September 2, 2014, Erdely sent an email to Emily Renda asking if Emily had heard from Jackie, stating that Erdely had not been able to reach her in weeks, and stating, "the silence on [Jackie's] end is starting to bring out the worried Jewish mother in me."

[Image omitted]

(Sept. 2, 2014 Email from Sabrina Rubin Erdely to Emily Renda, RS017073 (Ex. 36).)

**RESPONSE**:  Defendants do not dispute this fact and respectfully refer the Court to the email for the full contents thereof (Pl. Opp. Ex. 36), but object on the ground that it is not material to any issue on this motion.  *See* Response 175, *supra*.

177. Erdely did not get a hold of Jackie until September 11, 2014, when Erdely personally went to Charlottesville. Jackie showed up to their scheduled dinner 15 minutes late, before which Erdely was "seriously nervous" that Jackie would not show up, because as of that time, Erdely knew that "there's only really room for one story to be front and center [in the article], ... and [Jackie' s] is that story." (Erdely Reporting Notes at RS004336; RS004361 (Ex. 10).)

**RESPONSE**:  Defendants do not dispute the first sentence of this fact.  Defendants object to this fact on the ground that it is not material to any issue on this motion.  *See* Response 175, *supra*. Defendants further object to this fact on the ground that the citation does not support Plaintiff's fact and it misleadingly combines material from two unrelated parts of Erdely's interview with Jackie.  Erdely told Jackie that "there's only really room for one story to be front and center" in connection with expressing her hope that Alex Pinkleton would not be disappointed because Alex "might not play a very big role in my Article."  That statement has no connection to Erdely's note that she was nervous about Jackie showing up.  (*See* SRE Ex. 15 at RS004336, RS004361.)  Defendants respectfully refer the Court to Exhibit 15 to the Declaration of Sabrina Rubin Erdely at pages RS004336-63 for the full contents of the September 11, 2014 interview with Jackie.

178. On September 11, 2014, Erdely wrote in an email to Sean Woods: "What a day. Tracked down Jackie. She was freaking out but now is totally back on board .... she'd be ok with just using her first name, no last. That ok?" Woods responded, "Yes, ok."

[picture omitted]

(Sept. 11, 2014 Email from Sean Woods to Sabrina Rubin Erdely, RS015470 (Ex. 37).)

**RESPONSE**:  Defendants do not dispute this fact and respectfully refer the Court to the email for the full contents thereof (Pl. Opp. Ex. 37), but object to this fact on the ground that it is not material to any issue on this motion.  *See* Response 175, *supra*.

179. On September 16, 2014, Erdely interviewed Jackie and asked Jackie "how would [Jackie] feel if [Erdely] reached out to him," meaning the alleged ringleader of Jackie 's assault. (Erdely Reporting Notes at RS004404 (Ex. 10).) Jackie told Erdely that she would not "be comfortable with that." (Id.)

**RESPONSE**:  Defendants do not dispute this fact and respectfully refer the Court to Erdely's interview notes for the full contents thereof (SRE Ex. 15 at RS004401-13), but object to this fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Jackie's reluctance to put Erdely in contact with the alleged perpetrator of her gang-rape has no tendency to show that Erdely or Rolling Stone had awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

180. Erdely did not hear from Jackie again, despite leaving her several voicemails and sending her multiple text messages, until more than a month later. (Id. at RS004471.) Erdely explained the situation to Rolling Stone's photo editor, Sacha Lecca in an email. Erdely told Lecca that "unfortunately … Jackie is in not-great mental shape right now, and won't be for a long while. … She went through a phase recently where she wasn't returning my calls and I had to go to Virginia to make sure she was still on board. (Come to think of it, she hasn't returned my calls this week.)" (Oct. 16, 2014 Email from Sabrina Rubin Erdely to Sacha Lecca, RS018959-60 (Ex. 38).) Erdely told Lecca that she was "trying to be as accommodating [of Jackie] as possible":

[Image omitted]

(Id.)

**RESPONSE**:  Defendants object to this fact as vague and ambiguous as to time period and on the ground that Plaintiff's citation does not support Plaintiff's fact to the extent it suggests that Erdely "did not hear from Jackie again," when in fact the cited page from Erdely's interview notes shows that Erdely spoke to Jackie on October 20.  (SRE Ex. 15 at RS004471.)  Defendants further object to this fact on the ground that it is not material to any issue on this motion for the

97

reasons set forth in Response 175, *supra*.  Defendants further object to this fact on the ground

that Plaintiff's citation does not support Plaintiff's fact to the extent it implies that Erdely

subjectively believed that Jackie was mentally unstable, delusional, or not capable of telling the

truth, when in fact the email only shows that Erdely believed that Jackie was emotionally

vulnerable, something not unexpected for a rape survivor. (Pl. Opp. Ex. 38).

181. On October 20, 2014, Erdely told Jackie "I'm going to have to call ██ to offer him

a chance to comment. I'm not going to use his name in the article, but I have to do my due

diligence anyway. I imagine he's going to say nothing, but it's something I need to do." (Erdely

Reporting Notes at RS004477 (Ex. 10).) According to Erdely, Jackie "sound[ed] shocked" and

she "stammer[ed]" at the request. (Id.) Erdely continued: "I don't know his last name, I've never

asked you for it before. So I'm going to ask you for it now, so that I can reach out to him." (Id.)

Jackie told Erdely, "I don't want to give his last name," and she refused to provide it. (Id.)

**RESPONSE**:  Defendants do not dispute this fact and respectfully refer the Court to Erdely's

interview notes (SRE Ex. 15 at RS004471-77) for the full contents thereof, but object to this fact

on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1,

*supra*) because Jackie's reluctance to put Erdely in contact with the alleged perpetrator of her

gang-rape does not tend to show that Erdely or Rolling Stone had subjective awareness of

probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill*

and *Tavoulareas* in Response 175, *supra*.

182. Erdely again told Jackie that she "need[s] to call him, [because] even though he's

not identified he may still be identifiable [in the article]." (Id. at RS004477.) The article "say[s]

his fraternity and what year he graduated, that he worked at the pool," and that she "need[s] to

give him a chance to comment back," because "[i]t's just part of the process." (Id.) Jackie told

Erdely that she "do[esn't] want to be the one to give [Erdely] the name," but that Erdely could figure out who it was by "ask[ing] Phi Psi for their list." (Id.) Erdely replied, "I'm going to have to make this phone call. Our lawyer is going to insist." (Id.)

**RESPONSE:** *See* Response 181, *supra*.

183. Erdely also suggested to Jackie, "if I promise not to call [█] or reach out to him in any way, could you give me his full name so that I can tell my editors and our lawyer that I know he exists?" (Erdely Interview Notes at RS14339 (Ex. 25).) Jackie still did not agree to provide the name.

**RESPONSE:** Defendants object to this fact on the ground that Erdely's notes show the referenced words are included in brackets, which Erdely has explained in undisputed testimony indicates a comment has been paraphrased or summarized. (Pl. Opp. Ex. 1 [Erdely Dep.] 26:22-27:2.) Defendants further state that, in the context of the referenced notes, it is not clear that the bracketed words were ever conveyed to Jackie. (Pl. Opp. Ex. 25 at RS014339.) Defendants further object on the grounds set forth in Response 181, *supra*.

184. Three days later, on October 23, 2014, Erdely received a call from Sara Surface, a then-friend of Jackie's, who told Erdely that Jackie was having "reservations about using her name" in the article. (Erdely Reporting Notes at RS004492.) Erdely explained to Surface, "I have to call (█)." (Id.)

**RESPONSE:** Defendants object on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the fact that Jackie had reservations about participating in the story does not tend to show that Erdely or Rolling Stone had subjective

awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See*

*Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

185. On October 23, 2014, Erdely wrote in an email message to Jackie's friend, Alex

Pinkleton: "So about Jackie. I get that she's apprehensive about me contacting ██ but the thing

is ██ is going to know about the article one way or another because whether I tell him about it or

whether he sees it on the newsstand, he's going to read it, for sure. (I'd be surprised if he didn't

already know about it.) Either way, I do need to reach out to him to see if he wants to comment.

It's part of my obligation as a journalist."

[Image omitted]

(Oct. 23, 2014 Email from Sabrina Rubin Erdely to Alex Pinkleton, RS018952-53 (Ex. 39).)

**RESPONSE:**  Defendants do not dispute this fact and respectfully refer the Court to Erdely's

email to Pinkleton (Pl. Opp. Ex. 39) for the full contents thereof, but object to this fact on the

ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1,

*supra*) because Jackie's reluctance to put Erdely in contact with the alleged perpetrator of her

gang-rape does not tend to show that Erdely or Rolling Stone had subjective awareness of

probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill*

and *Tavoulareas* in Response 175, *supra*.  Furthermore, Erdely's reference to her "obligation as

a journalist" is not material because even a "highly unreasonable departure from the standards of

investigation and reporting ordinarily adhered to by reasonable publishers" does not constitute

actual malice.  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 664-66 (1989).

186. Also on October 23, 2014, Erdely wrote in an email message to Sean Woods:

"FUCK. Jackie is apparently in full freakout mode right now- her friend Alex texted to say that

Jackie is right now saying she wants her name out of the piece and is 'thinking of pulling out

100

entirely.' Neither girl will answer my call. It's so weird, because the last time I spoke with her,

on Tuesday, she was talking about how optimistic she was feeling about this story, and that she

wanted to use her first name. We went over the latter point, like, five times, just to be sure. But

then I brought up contacting that guy and I guess she fell apart?" (Oct. 23, 2014 Email from

Sabrina Rubin Erdely to Sean Woods, RS003259 (Ex. 14).) Erdely also blamed Jackie's

recalcitrance on Sara Surface, who "wanted to give [Erdely] the deans' point of view." (Id.)

**RESPONSE:**  Defendants do not dispute that Erdely sent this email and respectfully refer the

Court to Erdely's email to Woods (Pl. Opp. Ex. 14) for the full contents thereof.  Defendants

object to this fact on the ground that it is not material to any issue on this motion (*see Liberty

Lobby* in Response 1, *supra*) because Jackie's reluctance to participate in the story does not tend

to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any

of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response

175, *supra*.  Defendants further object to this fact on the ground that is not material to any issue

on this motion to the extent it implies that Erdely was biased against Sara Surface and the

administration or bore them ill will because "the actual malice standard is not satisfied merely

through a showing of ill will or 'malice' in the ordinary sense of the term." *Reuber v. Food

Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991) (quoting *Harte-Hanks*, 491 U.S. at 666).

Defendants further object to this fact on the ground that the citation does not support Plaintiff's

fact to the extent it implies that Erdely or Woods subjectively believed that Jackie was unstable,

delusional, or otherwise not capable of telling the truth, when in fact the email only shows that

Erdely understood Jackie to be emotionally vulnerable and experiencing hesitation about sharing

her story in a national magazine.  (Pl. Opp. Ex. 14).

187.    Woods admitted that, "Yes, Jackie periodically went into freakout mode." (Woods Dep. at 58:7-16 (Ex. 8).)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Jackie's reluctance to participate in the story does not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.  Defendants further object to this fact on the ground that Plaintiff's citation does not support Plaintiff's fact to the extent it implies that Woods subjectively believed that Jackie was mentally unstable, delusional, or otherwise not capable of telling the truth, when in fact Woods testified that he viewed Jackie as traumatized but "sane" and not someone who was "losing their capacity."  (Pl. Opp. Ex. 8 [Woods Dep.]. 82:13:22.)

188.    Woods knew in late October 2014 that Jackie was again expressing reservations about her participation in the article. (Id. at 58:17-21.)

**RESPONSE:**  *See* Response 187 *supra*.

189. On October 24, 2014, just weeks before the article was published, Erdely sent Jackie an email saying that "I know you're in distress right now" and that "I'm confident that we can talk this through and figure this out … we'll figure out solutions." (Oct. 24, 2014 Email from Sabrina Rubin Erdely to Jackie, RS018958 (Ex. 41).)

[Image omitted]

(Id.) Jackie never responded to this email. (See generally Erdely Reporting Notes.)

**RESPONSE**: Defendants do not dispute that Erdely sent this email and respectfully refer the Court to Erdely's email to Jackie (Pl. Opp. Ex. 41) for the full contents thereof.  Defendants

object to this fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Jackie's reluctance to participate in the story does not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo. *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*. Defendants further object to this fact on the ground that Plaintiff's citation does not support Plaintiff's fact to the extent it implies that Erdely subjectively believed that Jackie was mentally unstable, delusional, or otherwise not capable of telling the truth, when in fact the email only shows that Erdely believed that Jackie was in distress and experiencing the kind of "jitters" that many sources feel before sharing their story with a national magazine. (Pl. Opp. Ex. 41).

190. On October 24, 2014, Erdely emailed Rolling Stone's photo editor, Sacha Lecca, saying, "Urn, Jackie is right now not communicating with me, in part because some One Less members (who work closely with the administration) have been critical of her cooperation with the story. So I'm thinking at this point we should work under the assumption that neither Jackie nor One Less will be available for photographing."

[Image omitted]

(Oct. 24, 2014 Email from Sabrina Rubin Erdely to Sacha Lecca, RS018959-60 (Ex. 38).)

**<u>RESPONSE:</u>** Defendants do not dispute that Erdely sent this email and respectfully refer the Court to Erdely's email to Sacha Lecca (Pl. Opp. Ex. 38) for the full contents thereof. Defendants state that the email evidences Defendants' belief in the truth of Statement #2: "Lots of people have discouraged her from telling her story, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang-rape allegations more than a year ago." (SW Ex. 1 at RS001072.)

191. Erdely never considered removing Jackie's story as the lead of the article. (Erdely Dep. at 232:16-21 (Ex. 1).)

**RESPONSE**:  Defendants object to this fact on the grounds that the citation does not support Plaintiff's fact, as Erdely did not testify that she "never considered" removing Jackie's story as the lede, but only that, as of October 24 and November 3, she had not in fact removed Jackie's story as the lede of the Article because she was "still optimistic that Jackie was going to participate."  (Pl. Opp. Ex. 1 [Erdely Dep.] 232:16-21.)  In fact, the full exchange shows that Erdely flatly rejected this proffered fact:

> Q: Is it fair to say that, as of October 24th and your voicemail on November the 3rd, that you had not removed Jackie's gang rape as the lead of your story?
>
> A: I was still optimistic that Jackie was going to participate.
>
> Q: And that you were going to move forward with the story regardless of whether Jackie was going to call you back; is that fair?
>
> A: No, no. Well, I was going -- we were going to move forward with the story about UVA whether Jackie was going to participate or not.  If Jackie was not going to participate, then we would – we would do something else with her story. … I would need to have a conversation with her to figure out what her role would be, if she wanted to be removed entirely, if she wanted to be relegated to a smaller role. That's happened with other stories in the past.

*Id.* at 232:16-233:10.

192. Alex Pinkleton also testified that Erdely threatened and pressured her and Jackie to force Jackie to continue to cooperate with the article against Jackie's wishes. (Pinkleton Dep. at 200:14-202:21 (Ex. 12).) Erdely and Pinkleton had the following text message exchange on October 24, 2014:

ALEX: Hi Sabrina, this is Alex. … I'm talking to Jackie right now and she's telling me she 100% does not want her name in the article

104

ERDELY: Ok. I don't know why she's changed her mind but whatever she decides is fine. Does she want me to call her now so we can talk it through? Or tomorrow?

ALEX: I don't think calling is a good idea bc she's thinking about pulling out entirely

ERDELY: WHAT? why??

ALEX: She's pretty overwhelmed with the idea of ██

ERDELY: We will figure something out. There's always a way. But Jackie needs to know she's an essential part of this article. We'll figure out a way forward that's comfortable for her. I'll need to talk to her by phone tomorrow. If need be, I can also come down so we can talk it over in person

ALEX: I think that'll freak her out bc she feels like she's being pushed. I'll ask if she wants to call you tomorrow instead of it feeling like she's being pressured into anything

ERDELY: Ok sounds good

…

ERDELY: Also? I'm up for discussing whatever she wants to discuss (changing her name, etc) but I need to be clear about this: there's no pulling the plug at this point – the article is moving forward. & I think its important that Jackie stay involved.

[Image omitted]

(Erdely-Pinkleton Texts at RS014307-09 (Ex. 32); see also Pinkleton Dep. at 200:14- 202:21.)

**RESPONSE:**  Defendants do not dispute that this text message exchange occurred.  But Defendants object to this fact on the grounds that Plaintiff's citation does not support the fact that Alex Pinkleton testified at the cited deposition pages that Erdely "threatened and pressured her and Jackie to force Jackie to continue to cooperate," but rather just read part of the text exchange found in Exhibit 37 to the Declaration of Sabrina Erdely.  Defendants further state that the text

exchanges speak for themselves and do not show Erdely threatening or pressuring Alex or Jackie to continue to cooperate.  (SRE. Ex. 37 at RS014307-09.)  Erdely stated that she made this comment in an effort to get Pinkleton to lobby Jackie on her behalf, and Plaintiff has not proffered any countervailing evidence.  SRE ¶ 122.

193. Asked what her reaction was to receiving these texts from Erdely, Pinkleton testified, "So with that text, I definitely - [Erdely] made it loud and clear that the article was moving forward whether or not Jackie wanted it to. And I had just said that she- that Jackie might not want to do this entirely. And since [Erdely's] response was, ' it doesn't matter, this article is happening with or without her,' of course, then my attitude would be: Well, then Jackie needs to be a part of this because, you know, its her story. So [Erdely] really was giving me no other options other than pressuring me to get Jackie to talk to her." (Pinkleton Dep. at 202:22-203:15.)

**RESPONSE:**  Defendants do not dispute that Pinkleton testified that she had this point of view, but object on the ground that Pinkleton lacks personal knowledge regarding what Erdely meant to convey in these text exchanges, which was that Erdely "would be moving forward with a story about UVA regardless of whether Jackie was a centerpiece of that story, a footnote, or not part of it at all."  (SRE ¶ 122.)  Defendants further object on the ground that Plaintiff's fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the fact that Erdely took steps to convince Jackie to continue to participate in the story represents ordinary back-and-forth with a source who temporarily has gone "cold" and does not demonstrate subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

194. Pinkleton further testified that although she repeatedly told Erdely that Jackie did not want to be in the article, "Sabrina was like, well, she's telling me she does want the name in the story, and she gets very aggressive … she was aggressive about, like, no, her name needs to be in this. And then when I was telling her about ███ and Jackie not wanting ███ in the story, and Sabrina says, you know, I'm trying to figure out who ███ is, and I say, well, that's not happening. She's like, well, you can't pull out of this now, there's always a way… And I think that was the day we were baking, because I remember getting that text and being like, okay, [Erdely] is a little bit crazy." (Id. at 188:25-189:22.)

**RESPONSE:**  Defendants do not dispute that Erdely repeatedly sought to obtain the name of the alleged perpetrator of Jackie's rape and that Jackie and Pinkleton refused to provide that information to her.  Defendants otherwise object to Plaintiff's fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Jackie's reluctance to put Erdely in contact with the alleged perpetrator of her gang rape has no tendency to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo, especially because, prior to publication, neither Pinkleton nor any other of Jackie's friends ever suggested to Erdely that they had doubts about Jackie's story or ███ existence based on her refusal to provide his last name.  *See* Response 145, *supra*. *See also Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

195. Sara Surface felt that Erdely was "manipulating" Jackie, giving her "grandiose ideas of what the outcome of the article would really be with her name plastered on it." (Surface Dep. at 74:23-76:16.) Surface observed Erdely pressuring Jackie to participate in the article without regard for Jackie's well-being, and felt that Erdely "was lacking not just journalistic integrity, but like personal integrity." (Id.)

107

**RESPONSE**:  Defendants object to Plaintiff's fact on the grounds that Sara Surface's testimony constitutes improper lay opinion under Federal Rule of Evidence 701 and she lacks personal knowledge regarding the subject matter of her testimony.  Defendants further object on the ground that Plaintiff's fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the fact that Erdely took steps to convince Jackie to continue to participate in the story represents ordinary back-and-forth with a source who temporarily has gone "cold" and does not demonstrate subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

196. Emily Renda also observed Jackie being "pushed to stay in the story," and that whenever Jackie tried to "pull out for her own mental health, [] then somehow Sabrina would always just convince her to go forward anyway." (Renda Dep. at 90:11-91:10 (Ex. 11).)

**RESPONSE**:  Defendants object to this fact with respect to Emily Renda on the same grounds set forth in Response 195, *supra*, with respect to Sara Surface.

197. Just two weeks before publication, on November 3, 2014, Woods asked Erdely by email if she had heard from Jackie, and Erdely responded: "Not a word. Her friend Alex texted last night to say she thinks Jackie may be having a 'hard time' – she didn't show up at a party where she was expected this weekend, and has barely been responding to texts." (Nov. 3, 2014 Email from Sabrina Erdely to Sean Woods, RS019109 (Ex. 42).)

**RESPONSE**:  Defendants do not dispute that Erdely sent this email and respectfully refer the Court to Erdely's email to Woods (Pl. Opp. Ex. 42) for the full contents thereof.  Defendants object to this fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Jackie's reluctance to participate in the story does not tend

108

to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

198. Also on November 3, 2014, Erdely left Jackie a voicemail and told her, "I know you haven't been returning my calls or my texts, but we really need to talk. Please, please call me. I understand that you're scared. But we are in the home stretch with this article, and I need to talk to you. I handed in my final draft on Friday, and we are moving into the production process now. And if all goes according to plan, this article is going to be shipping to the printer in less than two weeks. And I really, really would like for you to be included in this process. So we need to talk about that. We need to talk about what this whole process looks like in the next couple weeks, and how I'd like for you to be involved." (Nov. 3, 2014 Voicemail from Sabrina Erdely to Jackie, RESPJ00000273 (Ex. 43).)

**RESPONSE:**  Defendants do not dispute that Erdely left this voice mail and respectfully refer the court to the audio recording (Pl. Opp. Ex. 43) for the full contents thereof.  Defendants further object on the ground that Plaintiff's fact is not material to any that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the fact that Erdely took steps to convince Jackie to continue to participate in the story represents ordinary back-and-forth with a source who temporarily has gone "cold" and does not demonstrate subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

199. According to Erdely's notes, Jackie "called back finally" later that day. (S. Erdely Reporting Notes, RS004072-4502, at RS004499 (emphasis in original).) But Jackie still refused to provide Erdely with ████ last name. (Id.)

109

**RESPONSE:**  *See* Response 194 *supra.*

200. In a text message to a friend on December 2, 2014, Jackie said that she "never wanted to do this article when it became about my rape [and] I tried to back out of it but [Erdely] said I couldn't . . . ." (Dec. 2, 2014 Text between Jackie and a friend, RESPJ00000368-390, at RESPJ00000374 (Ex. 44.).)

**RESPONSE:**  Defendants object on the ground that Plaintiff's fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Plaintiff cites no evidence that either Erdely or Rolling Stone were aware that Jackie felt this way prior to publication of the Article, and Erdely's interview notes demonstrate that Jackie told Erdely that she would participate so long as the Article identified her as "Jackie" and did not use her full name.  (SRE Ex. 15 at RS004499-RS004502.)  Defendants further state that Jackie's perception that Erdely was aggressive in convincing her to participate in the Article does not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*. Defendants further note that the undisputed record demonstrates that Jackie participated willingly in the Article and the fact-checking process, agreed to use her first name and to name Phi Kappa Psi, and told Erdely after the Article was published that she thought it was "really great."  *See* SRE ¶¶ 69, 151; LGP ¶¶ 14-17.  Defendants further object to this fact on the grounds that it is inadmissible hearsay offered for the truth of the matter asserted under Federal Rule of Evidence 802.

201. Jackie testified that Ms. Erdely repeatedly communicated with her to persuade her to continue her participation in the article, and that she felt Rolling Stone was putting pressure on

her to continue to participate in the article. (Apr. 7, 2016 Deposition of Jackie at 56:2-13 ("Jackie Dep.") (Ex. 45).)

**RESPONSE:** *See* Response 200, *supra.*

202. When Jackie became unresponsive after Erdely pushed her for the name of her assailant, Erdely capitulated and told Jackie that Rolling Stone would just use a pseudonym and would stop asking her for the identity of her assailant. (Woods Dep. at 150:8-20 (Ex. 8).)

**RESPONSE**:  Defendants do not dispute that Erdely and Rolling Stone agreed to use a pseudonym for Jackie's assailant, but object that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Jackie's reluctance to provide the name of the ringleader of her attack and Defendants' willingness to go forward without her perpetrator's full name do not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra.*

203. Then-Managing Editor Will Dana acknowledged that Erdely made a deal with Jackie not to attempt to identify any of her assailants and to cease their efforts to learn whom any of the alleged assailants were. (Dana Dep. at 248:5-250:4 (Ex. 21.)

**RESPONSE:** *See* Response 202, *supra.*

**XIV.  Erdely Had A Financial Incentive To Push Jackie, Not To Rewrite Her Story, And To Publish "A Rape on Campus" Under The Time Pressure Created By Her Contract With Rolling Stone.[18]**

204. Ex. 46 is the March 18, 2014 Independent Contractor Agreement between Rolling Stone and Sabrina Rubin Erdely, the operative agreement between Erdely and Rolling Stone at the time "A Rape on Campus" was published in November 2014. (Mar. 18, 2014 Independent Contractor Agreement between Rolling Stone and Sabrina Rubin Erdely, RS001099-1106; Dana Dep. at 63:24-64:24 (Ex. 21); Erdely Dep. at 9:4-22 (Ex. 1).)

**RESPONSE:**  Defendants do not dispute this fact.

205. Under the terms of her contract, Erdely was obligated to provide seven feature stories accepted by Rolling Stone by June 2016. (Dana Dep. at 72:24-73:23; Erdely Dep. at 10:7-23; Mar. 18, 2014 Independent Contractor Agreement between Rolling Stone and Sabrina Rubin Erdely, RS001099-1106, at ¶ 3.)  If Erdely did not fulfill her obligation to provide seven articles accepted by Rolling Stone, her contract could be terminated.  (Erdely Dep. at 11:19-24.)

**RESPONSE:**  Defendants do not dispute this fact.

206. Former Rolling Stone Managing Editor Will Dana agreed that if a decision is made to kill a story prior to publication, it is possible that the story would not be considered accepted for purposes of the writer's contract requirement. (Dana Dep. at 106:12-107:11.)

**RESPONSE:**  Defendants do not dispute this fact, but object that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Plaintiff has adduced no testimony or other evidence that Erdely made any decision relating to the Article based on her concern about not meeting her contract requirement.  To the contrary, Erdely testified without

---

[18] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 204-208.

rebuttal that "If I had had any doubts prior to publication about the integrity of this story, or about Jackie's credibility as a source, I would not have published it; instead, I would have gone back to my extensive reporting file to write a different story, one in which Jackie's story was at most a footnote." (SRE ¶ 9; *see also id*. ¶¶ 122, 127.)

207. On December 19, 2014, Jackie's lawyer, Palma Pustilnik, wrote a letter to Sean Woods and Rolling Stone's lawyer, demanding that Rolling Stone refrain from their "unrelenting" and "threatening" communications to Jackie, and stating that "[m]y client's clear understanding was that the highly graphic, intensely personal, and traumatic details of her brutal assault were not for publication, and that the focus of the article was to be on survivor support." (Dec. 19, 2014 Letter from Palma Pustilnik to Sean Woods and Elizabeth McNamara, RS001081-1082; Woods Dep. at 342:15-343:6 (Ex. 47).)

**RESPONSE:**  Defendants object on the ground that Plaintiff's fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*), as it constitutes attorney advocacy sent to Rolling Stone after publication of the Article, and it is amply contradicted by Erdely's interview notes, which demonstrate that Jackie told Erdely that she was willing to participate so long as the Article identified her as "Jackie" and did not use her full name, that she fully participated in Rolling Stone's fact-checking process, where it was clear that details of her rape would be included in the Article, and told Erdely in a text message after the Article was published saying that it was "really great."  (SRE Ex. 15 at RS004499-RS004502; LGP ¶¶ 14-17; SRE ¶¶ 69, 151; Declaration of Samuel M. Bayard ("SMB") Ex. 120; SRE Ex. 44.)  Defendants further note that Sean Woods testified that Ms. Pustilnik's letter was "completely untrue" and "having gone through the documents, I know this to be false."  Pl. Opp. Ex. 8 [Woods Dep.]

343:12-345:18.  Defendants further object to this fact on the ground that it is inadmissible

hearsay offered for the truth of the matter asserted under Federal Rule of Evidence 802.

208. Rolling Stone is no longer working with Sabrina Rubin Erdely and has terminated

her contract. (Woods Dep. at 290:20-292:3 (Ex. 8).)

**RESPONSE:**  Defendants object on the ground that Plaintiff's fact is not material to any issue

on this motion (*see Liberty Lobby* in Response 1, *supra*), as the decision was made months after

publication of the Article and has no bearing on Erdely's or Rolling Stone's subjective states of

mind regarding the truth or falsity of any statement about Eramo at the time of publication, and it

has no relevance to whether any of the allegedly defamatory statements at issue are non-

actionable opinion, "of and concerning" Eramo, or capable of the defamatory meaning that

Plaintiff seeks to impose on them.

## XV.   Defendants Knew Jackie Was Mentally Unstable.[19]

209. Erdely once asked Jackie whether she "think[s] [she] ha[s] posttraumatic stress

disorder." (Sept. 11, 2014 Interview between Sabrina Erdely and Jackie, RS118221-8344, at

RS118270 (Ex. 18).) Jackie responded that although she was undiagnosed, she believes that she

"definitely do[es]." Erdely responded to Jackie that "it sounds like it." (Id.)

**RESPONSE:**  Defendants object on the grounds that Jackie's and Erdely's speculation about

Jackie's mental health constitutes improper lay opinion under Federal Rule of Evidence 701.

Defendants further object to this fact on the ground that Plaintiff's citation does not support

Plaintiff's fact to the extent it implies that Erdely subjectively believed that Jackie was mentally

unstable, delusional, or not capable of telling the truth, when in fact the conversation only

---

[19] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 209-219.

reflects that Erdely believed Jackie might have some indications of PTSD given her gang rape, which is not unusual for such a victim.

210. Jackie testified that ███████████████████████

████████████████████████████████████████████

██████████████████. (Jackie Dep. at 340:4-342:19 (Ex. 45).)

**RESPONSE**:  Defendants object on the grounds that Jackie's testimony about her mental health and symptoms at the time of her interviews with Erdely constitutes improper lay opinion under Federal Rule of Evidence 701.  Defendants further object on the ground that this fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Jackie's testimony took place months after publication of the Article and therefore could have no impact on Erdely's or Rolling Stone's subjective state of mind at the time of publication.  *See Secord* and *Bose Corp.* in Response 72, *supra*.

211. Erdely also knew that Jackie was easily manipulated, because Jackie told Erdely that she was.  During their September 11, 2014 interview, Jackie told Erdely, "I think that when you've come … when you come from a background where you're always told that you're worthless, that you end up getting into situations … where it's like people know that about you, you know? It's like you're an easy target because they know that…. I always felt like I was manipulated or something, like I was easily manipulated because I didn't have the self-esteem to … I don't know. It's difficult." (Sept. 11, 2014 Interview between Sabrina Erdely and Jackie, RS118221-8344, at RS118222.)

**RESPONSE:**  Defendants object on the ground that Jackie's statements are improper lay opinion under Federal Rule of Evidence 701.  Defendants further object on the ground that Plaintiff's fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1,

*supra*) because Jackie is describing why she was an "easy target" for her assailant and Jackie's susceptibility to manipulation does not tend to show that Erdely or anyone else actually manipulated Jackie, nor does it tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo. *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

212. Erdely acknowledged that while reporting the article, Jackie's "fragile mental state" became "increasingly apparent," that Jackie wavered on participating in the article and delayed responding to Erdely, and that when Erdely pressed Jackie for the name of the ringleader of her assault, Jackie refused to divulge it and stopped speaking with Erdely altogether. (Erdely Draft Press Statement, RS015018-5023, at RS015018 (Ex. 48).)

**RESPONSE**:  Defendants do not dispute that Erdely wrote these words in notes for a post-publication statement regarding the Article that was never published.  (Pl. Opp. Ex 48.) Defendants object to this fact on the grounds that it is not material to any issue on this motion and Plaintiff's citation does not support Plaintiff's fact to the extent it implies that Erdely subjectively believed that Jackie was mentally unstable, delusional, or not capable of telling the truth, when in fact these notes simply acknowledge that Erdely was aware that Jackie was emotionally fragile, which is consistent with a rape victim. (Pl. Opp. Ex 48.)

213.    Erdely also admitted, "I asked myself at the time—if it was wise to build the opening of a story around someone who seemed so emotionally fragile." (Erdely Statement Draft, RS002176-2179, at RS002178 (Ex. 20).)

**RESPONSE**:  Defendants do not dispute that Erdely wrote these words in a draft of a post-publication statement regarding the Article that was never published and refer the court to Plaintiff's Exhibit 20 to the Counter-Statement for the full contents thereof.  (Pl. Opp. Ex. 20.)

Defendants object to this fact on the grounds that it is not material to any issue on this motion and that Plaintiff's citation does not support Plaintiff's fact to the extent it implies that Erdely subjectively believed that Jackie was mentally unstable, delusional, or not capable of telling the true, when in fact the draft statement simply acknowledge that Erdely was aware that Jackie was emotionally fragile.

214.   Sean Woods admitted that prior to the publication of the article, he was "concerned about [Jackie's] mental health." (Woods Dep. at 81:14-82:9 (Ex. 8).) He worried that she was a "fragile person." (Id. at 82:23-25.)

**RESPONSE:**  Defendants object to this fact on the ground that Plaintiff's citation does not support Plaintiff's fact to the extent it implies that Woods subjectively believed that Jackie was mentally unstable, delusional, or otherwise not capable of telling the truth, when in fact Woods testified that he viewed Jackie as traumatized but "sane" and not someone who was "losing their capacity."  (Pl. Opp. Ex. 8 [Woods Dep.] 82:13:22.)

215.   With respect to the November 3, 2014 email in which he asked Erdely, "Any word from Jackie?" Woods testified, "[a]gain, I mean, I just can't stress this enough how concerned I was about Jackie and her mental health . . . ." (Id. at 103:16-104:11; see also Nov. 3, 2014 Email from Sabrina Erdely to Sean Woods, RS019109 (Ex. 42.).)

**RESPONSE**:  *See* Response 214 *supra*.

216.   In August or September of 2014, Erdely contacted Emily Renda to say that Erdely had not heard from Jackie in a week or two, and that Erdely was "concerned about her emotional and mental wellbeing." (Renda Dep. at 85:15-86:22 (Ex. 11).)

117

**RESPONSE:**  Defendants object to this fact on the grounds that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*), and the citation does not support Plaintiff's fact to the extent it implies that Erdely subjectively believed that Jackie was mentally unstable, delusional, or not capable of telling the truth, when in fact Renda's testimony shows that Erdely was simply concerned about Jackie's emotional and mental well-being.

217.    Erdely admitted, "Jackie's emotional fragility and reluctance should have been a signal that she may not have been up for the challenge of disclosing her full story, whatever the reason. It should have been cause for me to scrutinize her further, if I felt she could withstand it, or else to back off her story." (Erdely Draft Press Statement, RS015043-5045, at RS015044 (Ex. 50).)

**RESPONSE:**  *See* Responses 212 and 213, *supra*.  Defendants further object on the ground that this fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the draft statement reflects Erdely's post-publication second-guessing of her reporting and is not probative of Erdely's or Rolling Stone's subjective state of mind at the time of publication.  *See Secord* and *Bose Corp.* in Response 72, *supra*.

218.    Rolling Stone's fact-checker, Elisabeth Garber-Paul, was also aware prior to publication that Jackie suffered from depression, was on medication for mental health issues, and claimed to suffer from PTSD. (Garber-Paul Dep. at 247:11-23 (Ex. 27).)

**RESPONSE:**  Defendants object on the grounds that this fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*), and the citation does not support Plaintiff's fact to the extent it implies that Garber-Paul subjectively believed that Jackie was mentally unstable, delusional, or not capable of telling the truth, when in fact Garber-Paul's testimony reflects her awareness that Jackie had the emotional response one would expect from a gang-rape

victim.  Garber-Paul testified that she did not view these mental health concerns as impacting

Jackie's credibility negativity, noting that she at "no point . . . found Jackie to be an unreliable

source," and stating that "I would say there are plenty of trustworthy people in my life who have

been – who have suffered from depression and who have been medicated for it.· And I think

that's a strong thing that she could do and, if anything, adds credibility." (Pl. Opp. Ex. 27

[Garber-Paul Dep.]. 247:11-248:17.)

219.    Alex Pinkleton, a friend of Jackie's and a source for Erdely, testified that prior to

the publication of the article, although she supported Jackie as an "advocate," she had

"hesitations" about believing Jackie, noting that "she was going back and forth with what she

was saying. One minute it would be, yes, I want to do this; the next minute it's, no, I don't want

to, so..." (Pinkleton Dep. at 35:6-18 (Ex. 12).)

**RESPONSE:**  Defendants object on the grounds that Plaintiff's citation does not support the fact

to the extent it implies Pinkleton did not believe Jackie's story of gang rape prior to publication

of the Article, as Pinkleton specifically testified that the hesitations she had about Jackie were

"[m]aybe not particularly about her story,"  but about her vacillation regarding participation in

the Article:  "One minute it would be, yes, I want to do this; the next minute it's, no, I don't want

to."  (Pl. Opp. Ex.12 [Pinkleton Dep.]. 35:6-18.)  Defendants further object that Plaintiff's fact is

not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because

Plaintiff presents no evidence that Pinkleton shared this view with Erdely or anyone at Rolling

Stone, and the undisputed evidence demonstrates that she did not share it with Erdely or Garber-

Paul.  (SRE ¶ 126; LGP ¶23.)

**XVI.   Rolling Stone's Fact Checker Alerts Rolling Stone The Article Is Inaccurate, Unverified, And Misleading, But Is Ignored By Sean Woods And Sabrina Erdely.[20]**

220.    Elisabeth Garber-Paul was the Rolling Stone fact-checker assigned to fact-check "A Rape on Campus." (Garber-Paul Dep. at 31:11-22.)

**RESPONSE**:  Defendants do not dispute this fact.

221.    As Rolling Stone's fact-checker for the article, Garber-Paul's job responsibility is "to make sure the article is completely accurate by the time it goes to publication." (Id. at 23:2¬7.)

**RESPONSE**:  Defendants do not dispute this fact.

222.    Part of Garber-Paul's job was to make suggested changes or edits to the story and discuss them with the author and the assigning editor. For "A Rape on Campus," Deputy Managing Editor Sean Woods was the assigning editor and he had final say as to any proposed changes and edits. (Id. at 27:5-30:6.)

**RESPONSE**:  Defendants do not dispute this fact.

223.    Garber-Paul made handwritten edits on three rounds of drafts of the article. (Id. at 35:9-36:11.)

**RESPONSE**:  Defendants do not dispute this fact.

224.    Within a few hours of reading the article for the first time, Garber-Paul asked Erdely by email: "Quick question: did we ever get comment from 'Tom,' or reach out for one?" (Id. at 36:16-41:23; Nov. 3, 2014 Email from Sabrina Erdely to Elisabeth Garber-Paul, RS013618-3619 (Ex. 51).) "Tom" referred to the pseudonym used for the supposed ringleader of

---

[20] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 220-245.

Jackie's gang rape in the first draft, which was later changed to "Drew." (Garber-Paul Dep. at 41:9-18.) This was in fact the first substantive question that Garber-Paul asked Erdely about the article. (Id. at 41:9-42:2.)

**RESPONSE**:  Defendants do not dispute this fact, but object on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Erdely's and/or Rolling Stone's failure to get comment from the alleged ringleader of Jackie's gang rape does not tend to show that Erdely or Rolling Stone had had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

225.    Erdely responded, "Unfortunately, the answer is no and no." (Id. at 50:24-51:6; Nov. 3, 2014 Email from Sabrina Erdely to Elisabeth Garber-Paul, RS013618-3619, at RS013618.)

**RESPONSE**:  See Response 224, *supra*.

226.    Garber-Paul was aware that Erdely has asked Jackie for the name of the alleged ringleader of her gang rape, but that Jackie refused to provide it to Rolling Stone. (Garber-Paul Dep. 52:7-22.)

**RESPONSE**:  See Response 224, *supra*.

227.    Exhibit 52 is Garber-Paul's first round of handwritten fact-checking notes on the draft article. (Garber-Paul Dep. at 70:11-24, 71:11-72:3; Garber-Paul 1st Round Handwritten Notes, RS004810-4849 (Ex. 52.).) She received the draft on November 3, 2014 and made these notations during phone conversations with Jackie on November 4 and 6. (Garber-Paul Dep. at 72:4-24.)

**RESPONSE**:  Defendants do not dispute this fact.

228.    In the draft article, there was a purported quote from "Randall," the pseudonym Rolling Stone used for Ryan Duffin, one of the three friends that supposedly met with Jackie following her supposed gang rape. (Id. at 76:4-22; Garber-Paul 1st Round Handwritten Notes, RS004810-4849, at RS004814). The draft article stated: "Greek life is huge at UVA, with one-third of undergrads belonging to a fraternity or sorority, so Jackie fears the backlash could be big—a "shitshow" predicted by her now-former friend Randall, who, citing loyalty to his own frat, declined to be interviewed." (Id.).

**RESPONSE**:  Defendants do not dispute this fact.

229.    In fact, Rolling Stone had not interviewed or sought comment from Ryan Duffin, and did not even know his full name at the time of publication. (Garber-Paul Dep. 77:19-78:6.)

**RESPONSE**:  Defendants object to this fact insofar as it says that Rolling Stone had not "sought comment from Ryan Duffin," as Garber-Paul lacks personal knowledge of this fact, and Erdely testified without contradiction that she sought to get comment from Ryan Duffin through Jackie, and Erdely's interview notes unambiguously reflect those attempts.  (SRE Ex. 15 at RS004242, RS004309-10, RS004339; Pl. Opp. Ex. 1 [Erdely Dep.] 93:4-93:22, 94:21-96:20, SRE ¶¶ 39, 49, 50, 70.)  Defendants further object on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Erdely's and/or Rolling Stone's failure to get comment from Ryan Duffin does not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo, particularly given that Duffin testified that prior to the Article's publication, he did not know that Jackie had spoken to Eramo or anyone else within the UVA administration concerning her assault; had no knowledge of Jackie's interactions with Eramo or UVA's investigation of

Jackie's allegations; and had never met Eramo personally. Pl. Ex. 30 [Duffin Dep.] 239:1-23.
*See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

230.    In the margin on the draft next to this supposed quote from "Randall," Garber-
Paul wrote, "Put this on Jackie?" (Id. at 76:23-77:11.) Garber-Paul was suggesting that Rolling
Stone should make clear that it had not interviewed Randall and that this supposed Randall quote
came from Jackie. (Id. at 77:12-18, 79:9-14.)

**RESPONSE**:  Defendants do not dispute that Garber-Paul made this notation, but object that it is
not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because
Erdely's and/or Rolling Stone's failure to get comment from Ryan Duffin and/or to more clearly
reflect that Jackie was the source of Ryan's quote in the Article does not tend to show that Erdely
or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at
issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

231.    Garber-Paul's suggestion to "put this on Jackie" was not adopted by the decision-
makers at Rolling Stone. (Id. at 78:7-10, 79:15-17.) The same passage appears unedited in the
final, published version of the article. (Id. at 78:7-20; see also Original Article at RS001072 (Ex.
16).)

**RESPONSE:** : *See* Response 230, *supra*.

232.    Similarly, Garber-Paul's suggestion that this statement be edited to say, "Jackie
says [Randall] declined to be interviewed" was rejected. (Garber-Paul Dep. at 78:21-79:22 (Ex.
27).)

**RESPONSE:** : *See* Response 230, *supra*.

233.    Rolling Stone never confirmed "Randall's" quotes with him because Jackie refused to provide Rolling Stone with Ryan Duffin's contact information. (Id. at 83:7-19.)

**RESPONSE:** : *See* Response 230, *supra*.

234.    Garber-Paul admitted that the "normal response" from a source asked for a friend's contact information would be, "Sure, here's the e-mail address," but Jackie declined to provide Rolling Stone with this contact information. (Id. at 82:8-83:5.)

**RESPONSE:**  Defendants object on the ground that Plaintiff's citation does not support the fact to the extent it suggests that Jackie simply refused to provide contact for Ryan Duffin.  Rather, Garber-Paul testified that Jackie told her that Ryan was not interested in speaking with Rolling Stone, which is consistent with what Jackie had told Erdely.  (Pl. Opp. Ex. 27 [Garber-Paul Dep.]. 82:15-21, 83:1-5; SRE Ex. 15 at RS004339; SRE ¶ 70.)  Defendants further object that Plaintiff's fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Erdely's and/or Rolling Stone's failure to get comment from Ryan Duffin does not tend to show that Erdely or Rolling Stone had had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

235.    Rolling Stone's fact-checker tried to urge Rolling Stone to make it clear in the article that the Randall "shitshow" quote came only from Jackie and not from Randall, but Sean Woods overruled her. (Woods Dep. at 132:21-134:19 (Ex. 8).)

**RESPONSE:**  Defendants object on the ground that Plaintiff's fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Erdely's and/or Rolling Stone's failure to get comment from Ryan Duffin and/or to more clearly reflect that Jackie was the

source of Ryan's quote in the Article does not tend to show that Erdely or Rolling Stone had

subjective awareness of probable falsity regarding any of the Statements at issue regarding

Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

236.    Woods admitted that allowing quotes from the individual called "Randall" into

the article that came only from Jackie, without making it clear to readers that Rolling Stone

never spoke to Randall, misled Rolling Stone's readers into believing that Rolling Stone had

spoken to him and knew who he was. (Id. at 130:4-132:22.)

**RESPONSE:**  *See* Response 235, *supra*.

237.    Then-Managing Editor Will Dana agreed that supposed quotes from Ryan Duffin

were misleadingly attributed in the article to make it appear as though Erdely had spoken to Mr.

Duffin, when in fact she had not. (Dana Dep. at 380:10-18 (Ex. 21).)

**RESPONSE:**  *See* Response 235, *supra*.

238.    Similarly, Rolling Stone included in the article supposed quotes from two of

Jackie's other friends, pseudonymously called "Andrew" and "Cindy," who were quoted as

callously calling Jackie a "baby" for being upset about her gang rape, and as telling Jackie that

she should have just "had fun with" being gang-raped by a "a bunch of hot Phi Psi guys."

(Garber-Paul Dep. at 98:4-99:8 (Ex. 27).)

**RESPONSE:**  Defendants do not dispute this fact, except the use of the word "similarly"

because the issues are distinct.  Defendants object on the ground that Plaintiff's fact is not

material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) and does not tend

to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any

of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

239.    Again, Garber-Paul made a notation asking whether Rolling Stone needed to "put [these] quotes on Jackie?" by which she meant that Rolling Stone should make it clear in the article that these supposed quotes came only from Jackie, and that Rolling Stone had never spoken with "Andrew" or "Cindy." (Id. at 99:14-100:11, 100:24-101:8; Garber-Paul 1st Round Handwritten Notes at RS004821 (Ex. 52).)

**RESPONSE:**  Defendants do not dispute that Garber-Paul made this notation, but object to this fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Erdely's and/or Rolling Stone's failure to get comment from "Andrew" and "Cindy" and/or to more clearly reflect that Jackie was the source of the quotes in the paragraph at RS004821 in Exhibit 55 to the Declaration of Elisabeth Garber-Paul does not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

240.    The final, published version of the article did not incorporate Garber-Paul's suggested changes, and the same quotes appeared unedited in final article. (Garber-Paul Dep. at 101:9-102:4; Original Article at RS001074 (Ex. 16).)

**RESPONSE:**  *See* Response 239, *supra*.

241.    Garber-Paul acknowledged that as a fact-checker, one of her job duties was to confront sources about inconsistencies in their story. (Garber-Paul Dep. at 247:7-10.)

**RESPONSE:**  Defendants do not dispute this fact.

242.   Erdely had been specifically told by one of Jackie's friends that Jackie's original story was that a group of men forced her to perform oral sex, and Erdely was aware that Jackie's story of her supposed sexual assault had changed significantly over time. (Erdely Reporting Notes at RS004429 (Ex. 10); Garber-Paul Dep. at 289:5-290:17 (Ex. 27).) But Erdely did not tell Rolling Stone's fact checker that Jackie's story had morphed from a story of forced oral sex to a graphic, detailed description of a vaginal gang rape with use of a beer bottle. (Garber-Paul Dep. at 290:18-22, 291:25-292:6.)

**RESPONSE:**   Defendants object to Plaintiff's fact on the grounds that the citation does not support Plaintiff's self-serving characterization that Jackie's story had changed "significantly" over time, and respectfully refer the Court to Responses 54 and 60, *supra*.  Defendants further object on the ground that Plaintiff's fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the fact that Erdely did not specifically bring the change from oral sex to vaginal rape to Garber-Paul's attention is not important given that Erdely provided Garber-Paul with her interview notes. (LGP ¶ 11.)  Defendants further object on the ground that Plaintiff's fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Erdely's and Rolling Stone's awareness of changes in the details of Jackie's alleged gang rape do not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.  *See also McFarlane* in Response 58, *supra*.

243.   Erdely also never told Rolling Stone's fact checker that Erdely knew Jackie had told others a false story about how she met Ms. Eramo that was completely different from the

story Jackie told Erdely. (Erdely Reporting Notes at RS004422; Garber-Paul Dep. at 293:7-295:15.)

**RESPONSE:**  Defendants object on the grounds that the citation does not support Plaintiff's fact as stated, because Rachel Soltis' mistaken understanding of how Jackie met Eramo does not demonstrate that "Jackie had told others a false story about how she met Ms. Eramo," much less that Erdely "knew" that Jackie had told others a false story.  (SRE Ex. 15 at RS004422.) Plaintiff cites no record evidence to support the proposition that Erdely "knew" that Jackie had told Rachel Soltis a "false story."  Defendants further object on the ground that Plaintiff's fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the Soltis's mistaken understanding of how Jackie and Eramo met is not related to any specific Statement at issue regarding Eramo.  *See also McFarlane* in Response 58, *supra*.

244.    Erdely never identified to Garber-Paul any inconsistencies, concerns, or outstanding questions about Jackie's story that she wanted Garber-Paul to help fact check. (Garber-Paul Dep. 338:24-339:4.)

**RESPONSE:**  Defendants object to this fact on grounds that it lacks foundation, as Plaintiff has not established through citation to record evidence that Erdely was aware of material inconsistencies in Jackie's story that presented issues for Garber-Paul to fact check; nor does the fact tie any questions to any material contained in the Article. *See also McFarlane* in Response 58, *supra*.

245.    Instead, Erdely was—and encouraged Garber-Paul to be—as accommodating as possible to Jackie during the fact checking process, so as not to scare Jackie away from participating in the article.

[Pictures omitted]

128

(Oct. 16, 2014 Email from Sabrina Rubin Erdely to Sacha Lecca, RS018959-60 (Ex. 38); Nov. 5, 2014 Email chain between Elisabeth Garber-Paul and Sabrina Erdely, RS013606-08 (Ex. 53).)

**RESPONSE:**  Defendants do not dispute that Erdely sent these two emails and respectfully refer the Court to Exhibits 38 and 53 to Plaintiff's Counter-Statement for the full contents thereof. Defendants object on the ground that Plaintiff's fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Erdely's attempts to be accommodating to Jackie as someone she understood to be emotionally fragile as the result of a violent rape does not tend to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

### XVII.   Rolling Stone's Fact-Checker Specifically Alerts Rolling Stone That The Statements In The Article About Ms. Eramo Are False And Misleading, But Defendants Intentionally Ignore Her Concerns.[21]

246. Also on the first round draft, next to the statement in the article, "But the dearth of attention isn't because rape doesn't happen in Charlottesville. It's because at UV A, rapes are kept quiet, both by students - who brush off rapes as regrettable but inevitable casualties of their cherished party culture - and by an administration which critics say is less concerned with protecting students than protecting its own reputation from scandal," Garber-Paul wrote, "Yes, but not Dean Aramo [sic]."

[Image omitted]

(Garber-Paul 1st Round Handwritten Notes at RS004815 (Ex. 52); Garber-Paul Dep. at 83:20-85:3 (Ex. 27).)

---

[21] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 246-279.

**RESPONSE:**  Defendants do not dispute this fact, but object on the ground that that the fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the statement is not a challenged Statement in this action and Garber-Paul further testified that this notation reflected Jackie's personal opinion and the statement in question is attributed to what "critics say," so Garber-Paul determined it was necessary to make any change because "we were not attributing that sentiment to Jackie."  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 85:7-87:18; Compl. ¶¶ 210, 225, 240, 255, 270, 285)

247.    Jackie specifically told Garber-Paul that Jackie did not believe that Ms. Eramo was less concerned with protecting students than with protecting UVA's reputation from scandal. (Garber-Paul Dep. at 85:4-86:17.)

**RESPONSE:**  Defendants do not dispute this fact, but object for the reasons stated in Response 246, *supra*.

248.    The same statement appears unedited in the final, published version of the article. (Id. at 86:13-87:18.)

**RESPONSE:**  *See* Response 246, *supra*.  Defendants further object on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the Article elsewhere makes clear that "Jackie repeatedly calls [Eramo] 'an asset to the community,'" and that Eramo is "beloved by survivors, who consider her a friend and confidante," and that survivors "laud [Eramo] as their best advocate and den mother."  (SW Ex. 1 at RS001076, -78.)

249.    In the draft article where Ms. Eramo was described as "a short woman with curly, dark hair and a no-nonsense demeanor," Garber-Paul circled this statement, wrote a question mark next to it, and wrote, "Very sweet, second mom figure."

[Image omitted]

(Id. at 116:2-20; Garber-Paul 1st Round Handwritten Notes at RS004828.)

**RESPONSE:**  Defendants do not dispute this fact.

250.    This note was based on Garber-Paul's conversation with Jackie, who specifically told Garber-Paul that she disagreed with this characterization of Ms. Eramo because it had a negative connotation. (Garber-Paul Dep. at 116:14-118:12.) The characterization of Ms. Eramo as having a "no-nonsense demeanor" appeared unchanged in the final, published version of the article. (Id. at 116:21-117:6.)

**RESPONSE:**  Defendants do not dispute this fact, but object that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the statement is not a challenged Statement in this action and Garber-Paul further testified that she personally was able to confirm through watching a video online that Eramo did in fact have a "no-nonsense" demeanor.  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 116:2-117:21; Compl. ¶¶ 210, 225, 240, 255, 270, 285.)  Garber-Paul further testified that she believed that Jackie misunderstood that "no-nonsense" meant "mean," when in fact it has no such derogatory connotation.  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 117:10-21.)

251.    Exhibit 54 is the second draft of the article that Garber-Paul performed fact-checking on. (Garber-Paul Dep. 127:3-16; Garber-Paul 2nd Round Handwritten Notes, RS004860-4869 (Ex. 54).)

**RESPONSE:**  Defendants do not dispute this fact.

252.    The "deck" at the beginning of the draft states, "Jackie was just starting her freshman year at the University of Virginia when she was brutally assaulted by seven upper

classmen at a frat party. When she tried to hold them accountable, a whole new kind of abuse began." (Garber-Paul 2nd Round Handwritten Notes at RS004860; Garber-Paul Dep. at 128:18-129:7.)

**RESPONSE:**  Defendants do not dispute this fact.

253.    On the draft, Garber-Paul circled the statement, "When she tried to hold them accountable, a whole new kind of abuse began," and wrote next to it in red pen, "nope."

[Image omitted]

(Garber-Paul 2nd Round Handwritten Notes at RS004860 (emphasis in original); Garber-Paul Dep. at 129:19-132:2.)

**RESPONSE:**  Defendants do not dispute this fact.

254.    Garber-Paul discussed this statement with Deputy Managing Editor Sean Woods, and Woods made the decision to retain the statement, "When she tried to hold them accountable, a whole new kind of abuse began," in the final, published version of the article. (Garber-Paul Dep. at 131:18-132:22.)

**RESPONSE:**  Defendants do not dispute this fact, but object that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Garber-Paul further testified that the reason for the "nope" notation was that she initially misread the sentence as indicating that the "new kind of abuse" was "somehow inherently worse than the original abuse" and "she did not believe that to be true."  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 130:13-24.)  Garber-Paul further testified that Woods explained to her that the sentence was not intended to convey that what happened to Jackie in the aftermath of her rape was worse than the rape itself, and, after that conversation with Woods, Garber-Paul "felt that it was absolutely reasonable and accurate."

(*Id*. at 130:25-132:5.)  Garber-Paul further testified that she did not understand the statement in the dek to be referring to the UVA administration.  (*Id*. at 131:11-17.)

255.     In her conversations with Jackie, Jackie made it clear to Garber-Paul that Jackie considered Ms. Eramo to be an asset to the community. (Id. at 133:4-134:8.) Other sources Garber-Paul spoke to, including Sara Surface, confirmed this view of Ms. Eramo. (Id. at 134:9-18.)

**RESPONSE:**  Defendants do not dispute this fact, but object on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the Article makes clear that "Jackie repeatedly calls [Eramo] 'an asset to the community,'" and that Eramo is "beloved by survivors, who consider her a friend and confidante," and that survivors "laud [Eramo] as their best advocate and den mother."  (SW Ex. 1 at RS001076, -78.)

256.     On the second draft round of fact-check edits, Garber-Paul suggested multiple edits to the statement in the article: "Lots of people have discouraged her from sharing her story, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang rape allegations more than a year ago." (Garber-Paul 2nd Round Handwritten Notes at RS004862 (Ex. 54); Garber-Paul Dep. at 158:20-159:15 (Ex. 27).)

**RESPONSE:**  Defendants do not dispute this fact.

257.     The "trusted UVA dean" referred to in this sentence is Nicole Eramo. (Garber-Paul Dep. at 159:8-10.)

**RESPONSE:**  Defendants do not dispute this fact.

258.     During fact-checking, Garber-Paul suggested editing this sentence to read, "Lots of people have discouraged Jackie from sharing her story so publicly...," in order to make it clear

133

that Rolling Stone was not suggesting that Ms. Eramo discouraged Jackie from speaking about her assault or going to the authorities regarding her assault. (Garber-Paul 2nd Round Handwritten Notes at RS004862; Garber-Paul Dep. 159:11-160:25.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*), as Garber-Paul testified that, given that the paragraph starts with, "Jackie is worried about what might happen to her once this article is out," she and Woods "found it to be very clear to the reader that what we are talking about is sharing her story with a national magazine for publication, especially since we go in later about how Dean Eramo gave Jackie options for how to share her story with different authorities," and that Garber-Paul "thought it was very clear" "even without having 'so publicly' written in there," so "she was comfortable with leaving that out."  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 159:25-160:11.)  Garber-Paul further testified that she backed Woods' decision not to make this change "110 percent, especially since this – this paragraph is bookended by mentions – of this particular Rolling Stone article."  (*Id*. at 161:10-162:5.)  Reflecting the decision to retain this statement as written, Garber-Paul wrote "stet" next to the sentence.  Defendants further object on the ground that the citation does not support Plaintiff's fact insofar as it attributes the specific motive "in order to make it clear that Rolling Stone was not suggesting that Ms. Eramo discouraged Jackie from speaking about her assault or going to the authorities regarding her assault," which is not reflected in Garber-Paul's cited deposition testimony.  (*Id*. at 159:11-160:25.)

259.    Deputy Managing Editor Sean Woods made the decision not to include that change in the final, published version of the article. (Garber-Paul Dep. at 160:18-162:5.)

**RESPONSE:**  *See* Response 258, *supra*.

260.     Garber-Paul made another note on this same sentence, suggesting it be edited further to say, "Lots of people have discouraged her from sharing her story so publicly, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang rape allegations more than a year ago, who fretted that the article might complicate future proceedings." (Garber-Paul 2nd Round Handwritten Notes at RS004862; Garber-Paul Dep. at 162:15-163:12.)

**RESPONSE:**  Defendants do not dispute this fact.

261.     This suggested edit was also not included in the final, published version of the article. (Garber-Paul Dep. at 163:13-17.)

**RESPONSE:**  Defendants do not dispute this fact, but object on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) for the reasons set forth in Response 258, *supra*, and because the fact that Eramo may have "fretted that the article might complicate future proceedings" does not materially change the meaning of the sentence.  "[T]he fact that an article is one sided or fails to include as many positive features about the subject as negative ones 'has no tendency to prove that the publisher believed it to be false.'"  *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 285 (S.D.N.Y. 2013) (citation omitted), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015).  *See also Riley v. Harr*, 292 F.3d 282, 293 (1st Cir. 2002) (rejecting argument that failing to include exculpatory information deprived author of opinion defense; author "was not required to report every single fact about the *Anderson* litigation, but was free to make his own editorial choices, so long as he 'fairly describe[d] the general events involved.'")(citation omitted).

262.     Garber-Paul also wrote an additional note next to the sentence about Ms. Eramo discouraging Jackie from sharing her story, noting "At best, some may be worried about her

mental health, but..." (Id. at 163:18-25; Garber-Paul 2nd Round Handwritten Notes at RS004862). This suggested language was also not included in the final published version of the article. (Garber-Paul Dep. at 164:1-4.)

**RESPONSE:**  *See* Response 261 *supra*.

263.    Garber-Paul's three suggested changes to the sentence—"Lots of people have discouraged her from sharing her story, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang rape allegations more than a year ago"—are depicted below:

[Pictures Omitted]

(Garber-Paul 2nd Round Handwritten Notes at RS004862.)

**RESPONSE:**  *See* Responses 258 and 261 *supra*.  Defendants further object that the image affirmatively misrepresents the evidence, as Garber-Paul testified that she wrote "stet" on the draft to indicate that they had decided to keep the statement as is.  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 162:8-14.)  The "stet" note can be seen in the full-page image accompanying this fact, but curiously, Plaintiff appears to have redacted that note from the magnified detail.

264.    Ultimately, the statement about Ms. Eramo discouraging Jackie from sharing her story was published unedited in the final version of the article, without any of the edits that the fact-checker proposed. (Garber-Paul Dep. at 164:5-165:12; see also Original Article at RS001072 (Ex. 16).)

**RESPONSE::** Defendants do not dispute that the sentence that appeared in the second round fact-checking document ultimately appeared in the final version of the Article, but object to

Plaintiff's self-serving characterization of the sentence and also on the grounds set forth in Responses 258 and 261, *supra*.

265.     In the section of the draft article following the description of Jackie's meeting with Ms. Eramo, the draft article stated: "Absent any real guidance, Jackie would eventually wonder how other student victims tended to handle her situation." (Garber-Paul 2nd Round Handwritten Notes at RS004866 (Ex. 54).) Garber-Paul wrote a note on the draft that said, "Harsh?" (Garber-Paul Dep. at 185:13-186:1 (Ex. 27).)

**RESPONSE:**: Defendants do not dispute this fact, but object that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the statement is not a challenged Statement in this action.  (Compl. ¶¶ 210, 225, 240, 255, 270, 285.)

266.     Garber-Paul admitted that she wrote this note because she thought that the statement that Jackie did not have "any real guidance" "could be interpreted as being too harsh." (Id. at 186:4-6.) In the final, published version of the article, this statement was retained, but was revised to say, "absent much guidance." (Id. at 186:2-10.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*), for the reasons set forth in Response 265 and because Garber-Paul testified that she determined that the revised language "seemed to be a very fair characterization of it" given "the guidance [Jackie] described to me."  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 186:13-15.)

267.     Next to the draft article where the article claims that Ms. Eramo told Jackie that UVA does not publish sexual assault statistics "because nobody wants to send their daughter to

137

the rape school," Garber-Paul wrote: "Did Jackie describe this? Ask Sean." (Id. at 194:13-22;

Garber-Paul 2nd Round Handwritten Notes at RS004867.)

**RESPONSE:**: Defendants do not dispute this fact.

268.    Garber-Paul had discussions with Sean Woods about whether Rolling Stone

should publish the supposed "rape school" quote from Ms. Eramo because they had no

confirmation of this supposed quote other than from Jackie. (Garber-Paul Dep. at

194:23¬195:12.)

**RESPONSE:**: Defendants object to this fact on the ground that Plaintiff's citation does not

support Plaintiff's fact to the extent it suggests that Garber-Paul raised a red flag or concern

regarding the accuracy of this sentence.  Garber-Paul testified that the notation on her second

round fact-checking document referred to a discussion with Woods about whether to change

"gave her a wry look" to "wryly."  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 194:14-22.)  Garber-Paul

also testified that she had discussions with Woods about whether Rolling Stone should publish

"the rape school" quote because this was a quote that Garber-Paul could only confirm through

Jackie. (Id. at 194:23-195:5.)  But far from expressing disagreement with the decision to publish

the quote, Garber-Paul testified that she and Woods "discussed all the other times that Jackie had

been found to be a credible source and our general trust in Jackie," and "we decided that – since

it was clear that this is coming from Jackie and we make that explicitly clear in the quote, that

we're comfortable with it."  (*Id*. at 195:6-12.)  Garber-Paul further testified in her declaration

that she was unable to check the quote with Eramo because UVA did not make her available for

comment, and UVA's public affairs department told Garber-Paul that UVA was not at liberty to

discuss the specifics of any individual student cases.  (LGP ¶ 57.)  Garber-Paul further testified

in her declaration that the "primary factual content of the quote—that UVA did not readily

138

disclose complete and fulsome sexual assault statistics—was well-documented.  President

Sullivan's statement to Sabrina that UVA did not publish all of its data because it might

discourage reporting, as well as statements made to Sabrina by both Emily Renda and Sara

Surface, supported this fact."  (*Id*. ¶ 56.)  Garber-Paul further testified in her declaration that "the

Article's quote from Susan Russell, whose daughter was sexually assaulted while attending

UVA, directly echoed the same sentiment as the 'rape school' comment—namely, that UVA did

not provide fulsome disclosure of sexual assault statistics because it did not want parents to think

the school was unsafe."  (*Id*. ¶ 57.)

269.    Rolling Stone never asked Ms. Eramo or anyone at UVA whether Ms. Eramo ever

actually said this. (Id. at 192:11-194:12.) Rolling Stone decided to include this false quotation

from Ms. Eramo in the final, published version of the article. (Id. at 195:13-16.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on

this motion (*see Liberty Lobby* in Response 1, *supra*), as Garber-Paul testified that "we weren't

able to check it with Eramo" because she was not made available for an interview, and that

Garber-Paul "was told specifically by the UVA administration that I was supposed to solely go

through UVA PR, and that's the contact I had."  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 190:1-4,

194:8-12.)  Garber-Paul further testified that UVA public affairs told her that they could not

answer questions about particular conversations that Eramo had with a student.   (*Id*. at 192:14-

18; LGP ¶ 57.)  Garber-Paul further explained that "We're talking about a very specific quote

from Dean Eramo to a student during a closed-door session, which UVA did -- told us before

they weren't going to comment on."  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 193:9-12.)  Defendants

further object on the ground that Plaintiff's citation does not support this fact to the extent it

suggests that Garber-Paul testified or acknowledged that the quotation was "false." (*Id*. at 195:13-16.)

270.    Exhibit 55 is Garber-Paul's third round of fact-checking edits, which she created on or about November 10, 2014. (Garber-Paul Dep. at 209:4-17; Garber-Paul 3rd Round Handwritten Notes, RS004850-4859 (Ex. 55).)

**RESPONSE:** Defendants do not dispute this fact.

271.    On Exhibit 55, next to the "photo illustration" of Ms. Eramo that was made to appear as if Ms. Eramo was smiling while a crying rape victim sat in her office, Garber-Paul wrote the hand-written notation, "Is this too mean?"

[Image omitted]

(Garber-Paul 3rd Round Handwritten Notes at RS004856 (Ex. 55) (emphasis in original); Garber-Paul Dep. at 230:13-232:4 (Ex. 27).)

**RESPONSE:** Defendants object on the ground that Plaintiff's citation does not support this fact to the extent it characterizes the photo illustration of Eramo in the Article as "smiling while a crying rape victim sat in her office." The photo illustration speaks for itself (LGP Ex. 57 at RS004856; SW Ex. 1 at RS001076), and Garber-Paul did not testify that Eramo was "smiling while a crying rape victim sat in her office." (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 230:13-232:4.) Defendants do not otherwise dispute that Garber-Paul made the notation at RS004856 of Exhibit 57 to Declaration of Elisabeth Garber-Paul.

272.    Garber-Paul admitted that this was her reaction to the doctored photograph of Ms. Eramo in the article. (Garber-Paul Dep. at 232:13-233:1.)

**RESPONSE:**  Defendants object on the ground that Plaintiff's citation does not support this fact to the extent it suggests that Garber-Paul made this notation because the photo illustration showed Eramo "smiling while a crying rape victim sat in her office."  To the contrary, Garber-Paul testified that she initially thought that "it appeared as if Dean Eramo was turning her back to . . . the Take Back the Night types of protest that we describe in the article, while, in the article, we make it very clear that she was a participant – or that she was supportive, at least, of these types of things."  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 231:22-232:12.)  Defendants further object that Plaintiff's fact is misleading because it omits Garber-Paul's explanation that she ultimately determined that she had been taking the illustration too literally, that it actually just depicted "two separate thing that are both happening on campus, and we're using this . . . photo illustration to show both of those things," and that she came to the conclusion that she "was comfortable" that the photo illustration was not too mean.  (*Id.* at  233:6-234:11.)  Defendants further note that, as a result of conversations between Woods and Dana, Rolling Stone changed the caption of the photo illustration to indicate that Eramo was "beloved by students". (Pl. Opp. Ex. 8 [Woods Dep.]172:3-10.)  Defendants further object on the ground that the term "doctored" is self-serving, argumentative, and not supported by citation to evidence in the record.

273.    The same photo illustration appears unchanged in the final, published version of the article. (Id. at 233:2-5; see also Original Article at RS001076 (Ex. 16).)

**RESPONSE:**  Defendants do not dispute this fact, but object for the reasons stated in Responses 271 and 272, *supra*.

274.    Woods admitted that the fact-checker, Garber-Paul, discussed with him her concern that the "photo illustration" of Ms. Eramo in the article was "too mean," but that he ultimately decided to publish it in the final article. (Woods Dep. at 171:16-173:22 (Ex. 8).)

**RESPONSE**:  Defendants object that Plaintiff's fact is misleading because it omits Woods's explanation that he discussed the issue with Will Dana and they came to the conclusion that they "thought it was fair and not mean," and that "the dean is the public face of – you know, guidance counselor, rape counselor, on campus, and we were trying to illustrate the story, and she was an integral part of Jackie's time at UVA where we show her trying to do her job."  (Pl. Opp. Ex. 8 [Woods Dep.]171:20-172:3.)  Woods further testified that the photo illustration showed Eramo "interacting and doing her job, showing, you know, what we show in the piece, she gave choices, that she was there for her every step of the way."  (*Id*. at 173:4-8.)  Defendants further object for the reasons stated in Responses 271 and 272, *supra*.

275.    Then-Managing Editor Will Dana also signed off on the inclusion of the illustration of Ms. Eramo in the final article. (Dana Dep. at 134:5-21 (Ex. 21).)

**RESPONSE:**  Defendants do not dispute this fact.

276.    Woods admitted that the fact-checker, Garber-Paul, attempted to "push the piece and made a number of arguments to make the piece softer on Eramo." (Woods Dep. at 117:15-118:9.)

**RESPONSE:**  Defendants object on the ground that the citation does not support this fact to the extent it implies that Garber-Paul was not successful in making "the piece softer on Eramo." Woods testified that the changes Garber-Paul recommended were in fact made, and the Article reflects that those changes were made.  In fact, Garber-Paul was key to adding information about new strides taken by UVA.  (Pl. Opp. Ex. 8 [Woods Dep.]116:19-117:14, 118:2-9; Pl. Opp. Ex. 27 [Garber-Paul Dep.] 133:4-134:18, 172:11-173:5; SW ¶ 20; LGP ¶ 66(d)-(f); SMB Ex. 121; SW Ex. 1 at RS001074 (noting UVA's strides in recent years and that "students praise UVA

deans as caring folks who answer late-night calls from victims and even make emergency-room visits"), *id*. at RS001078 ("Jackie repeatedly calls her 'an asset to the community'").)

277.    The final, published version of the article does not at all mention the fact that Ms. Eramo took Jackie to meet with the University and Charlottesville Police on multiple occasions. (Garber-Paul Dep. at 268:21-25; see generally Original Article.)

**RESPONSE:**   Defendants object on the ground that Plaintiff's citation does not support this fact to the extent it states that Eramo took Jackie to meet with the police "on multiple occasions"; the testimony discusses "two meetings."  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 268:21-25.) Defendants further object to this fact on the ground that Plaintiff's citation does not support Plaintiff's fact to the extent it implies that Erdely, Garber-Paul, or Rolling Stone disregarded that Eramo had taken Jackie to the police regarding her alleged sexual assault, as the cited testimony does not say that and the April 2014 emails between Jackie and Eramo that Rolling Stone had in its possession referred only to Jackie meeting with the police about the bottle-throwing incident, not about Jackie's sexual assault.  (SRE Ex. 27 at RS017033, RS017035; SRE ¶¶ 85, 195; SW ¶ 73; LGP ¶ 66(b).)  Defendants further state that Eramo admitted in her deposition that the "incident" referred to in these emails was the bottle attack, not Jackie's sexual assault.  (AS Ex. 10 [Eramo Dep.] 184:16-18, 186:21-24.)  Defendants further state that an internal memo that Eramo prepared in May 2014 about her interactions with Jackie states that Eramo connected Jackie with police specifically to report the bottle incident.  (EAM Ex. 110 at UVA040000466.) Defendants further object on the ground that this fact is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the April 2014 emails confirm that Eramo deferred to Jackie's wish not to move forward with any charges over the bottle incident, with Eramo emphasizing to Jackie that it is "YOUR Choice" (SRE Ex. 27 at RS017033), which is

entirely consistent with the Article, which consistently shows Eramo deferring to Jackie's choice to take no action.  (SW Ex. 1 at RS001077-1078.)  Defendants further object for the reasons set forth in Response 261, *supra,* citing *Biro* and *Riley*.

278.    Garber-Paul never even asked Jackie about the substance of her meetings with the police and never asked Jackie if she discussed her supposed sexual assault with the police. (Garber-Paul Dep. at 268:13-269:4.)

**RESPONSE:**  Defendants object on the ground that Plaintiff's citation does not support this fact, as Garber-Paul testified that she "asked [Jackie] about the fact that she had filed a police report," and that she did not "think we went into too much detail about what happened with them because we didn't go into that much detail about them in the article."  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 268:15-20.)  Defendants further object to this fact for the reasons stated in Response 277 *supra*.

279.    Erdely knew from speaking to Jackie's friend, Rachel Soltis, that Jackie had told Soltis a false story about first meeting Ms. Eramo when Jackie supposedly served as a witness at a sexual misconduct trial of a woman who was raped by a fraternity member, but Erdely never alerted Rolling Stone's fact-checker that Jackie had told Soltis a "completely different" story than what Jackie told Erdely with respect to how she met Ms. Eramo (Id. at 293:7-294:17.)

**RESPONSE:**  *See* Response 243, *supra*.

## XVIII. UVA Attempts To Cooperate With Defendants, But Defendants Do Not Give UVA A Meaningful Opportunity To Address The Charges Leveled In The Article.[22]

280.    On September 9, 2014, while attempting to set up an interview with Ms. Eramo through UVA administrator MacGregor McCance, Erdely told McCance during a telephone call that she was "doing an article about rape on college campuses, focusing on University of Virginia." (Erdely Reporting Notes at RS004327 (Ex. 10).) She further explained that "the article is going to be largely about the culture of campus life, and how it affects rape and its aftermath – how rapes are perceived, whether they're reported. So in a sense it's an article about rape culture at college, what that looks like, and how that plays out in the lives of rape victims."  (Id.) During her conversation with McCance, she never mentioned, as she had to myriad others, that her article would focus on "institutional indifference." (See generally id.)

**RESPONSE:**  Defendants do not dispute the first two sentences of this fact.  Defendants object to the third sentence on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because the fact that Erdely did not use the specific words "institutional indifference" in her conversation with McCance does not tend to show that Erdely attempted to mislead him, much less that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.  Defendants further object on the ground that Plaintiff provides no citation to record evidence for the phrase "myriad others," and on the ground that the fact is argumentative.  Defendants further object to the characterization that the Article is about "institutional indifference" – the Article speaks for itself.

---

[22] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 280-290.

281.    On September 9, 2014, UVA provided Erdely additional information to follow up on questions that Erdely had asked, but to which the administrators were unsure of the answers. (Oct. 9, 2014 Email from Anthony deBruyn to Sabrina Erdely, RS016682-6683 (Ex. 56).)

**RESPONSE:**  Defendants do not dispute that Anthony de Bruyn sent to Erdely the emails found in Plaintiff's Exhibit 56 to the Counter-Statement and respectfully refer the Court to those emails for the full contents thereof.  (Pl. Opp. Ex. 56.)

282.    On September 16, 2014, Erdely emailed UVA administrator McGregor McCance asking several questions about UVA's statistics on sexual assault. (Erdely Reporting Notes at RS004399-4400.)

**RESPONSE:**  Defendants do not dispute that Erdely emailed McGregor McCance on September 16 asking several questions about UVA's statistics on sexual assault and respectfully refer the Court to Erdely's interview notes for the full contents of that email (SRE Ex. 15 at RS004399-RS004400.)

283.    McCance worked with Ms. Eramo to collect that data, and provided responsive answers on October 2, 2014. (Id. at RS004446-4448; Oct. 2, 2014 Email from Charles McGregor McCance to Sabrina Erdely, RS018811-13 (Ex. 57).)

**RESPONSE:**  Defendants object on the ground that Plaintiff's citation does not support this fact, as McCance did not provide the requested information on sexual assault statistics for two weeks, and did not do so until the morning of October 2, 2014, just hours before Erdely's interview with President Sullivan.  (Compare SRE Ex. 15 at RS004399-RS004400, *with id*. at RS004448; SRE Ex. 30; SRE ¶ 103.)

284.    On October 2, 2014, the day after Erdely described the theme of her article to Rolling Stone photo editor Sacha Lecca as one of "inaction and silence at UVA" (Oct. 1, 2014 Email from Sabrina Erdely to Sacha Lecca, RS018873 (Ex. 58)), Erdely was provided the opportunity to interview UVA President Teresa Sullivan for the forthcoming article. During that interview, Erdely described "A Rape On Campus" as "the article that I am writing [that] will look at how rape and sexual assault play out against the larger context of a campus, both with respect to student attitudes and also the administration's handlings — so kind of the larger culture in general. The problem of sexual assault is obviously a big national issue, it's happening on every campus, but my article is going to focus specifically on UVA." (Oct. 2, 2014 Interview by Sabrina Erdely with Teresa Sullivan and Susan Davis, RS015046, at Minute 1:05-1:32 (Ex. 59).) Erdely went on to describe the fact that she has interviewed "a lot of students over the past few weeks," and that she "ha[d] a lot of questions about how sexual assault is handled on the UVA campus." (Id., at Minute 1:33-1:42.) During the entirety of her approximately 44-minute interview, Erdely never told President Sullivan that her article was about "institutional indifference" to rape. (See generally id.)

**RESPONSE:**  Defendants do not dispute that Erdely sent the email at Exhibit 58 to Plaintiff's Counter-Statement to Sacha Lecca on October 1, 2014 and respectfully refer the Court to Exhibit 58 for the contents thereof.  Defendants further do not dispute that Erdely interviewed President Sullivan on October 2, 2014, and that she said the words quoted in Plaintiff's fact, among others. Defendants object to the characterization that the Article is about "institutional indifference" – the Article speaks for itself.  Defendants further object to Plaintiff's fact insofar as it states that "Erdely never told President Sullivan that her article was about 'institutional indifference' to rape," on the ground that this fact is not material to any issue on this motion (*see Liberty Lobby*

in Response 1, *supra*) because the fact that Erdely did not use the specific words "institutional indifference" in her interview with President Sullivan does not tend to show that Erdely attempted to mislead the UVA administration.  In this regard, Defendants note that Erdely told President Sullivan that she (Erdely) was aware of "three separate allegations of gang rape" at Phi Kappa Psi being reported to Eramo within the past year.  (SRE Ex. 15 at RS004456-4457; SRE Ex. 31 at 31:26 to 34:50.)  Defendants further object on the ground that the fact is not material to any issue on this motion because none of this tends to show that Erdely or Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

285.    After her interview with President Sullivan, Erdely interacted with Anthony DeBruyn, another UVA administrator, who provided Erdely with additional information responsive to her questions. (Oct. 9, 2014 Email from Anthony deBruyn to Sabrina Erdely, RS016682-6683 (Ex. 56).) Throughout that correspondence, Erdely never told DeBruyn that "A Rape On Campus" was going to focus on UVA's "institutional indifference" to sexual assaults. (See generally id.)

**RESPONSE:**  *See* Response 280, *supra*.  Defendants further object to the characterization that the Article focuses on "institutional indifference" – the Article speaks for itself.

286.    Erdely likewise never asked UVA to verify whether Ms. Eramo said that the reason the school does not post statistics about sexual assaults on their website is because "nobody wants to send their daughter to the rape school." (See generally Erdely Reporting Notes (Ex. 10); Erdely Dep. 200:10-20 (Ex. 1).)

**RESPONSE:**  Defendants object to Plaintiff's fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*), as Erdely testified that she was

confident that the "rape school" quote was accurate, noting that "it was very consistent with what I now knew about the way schools tried to avoid negative publicity through avoiding publishing their rape statistics," and  that "Jackie had told me, twice, about the rape school quote, and I found her to be an entirely credible source."  Erdely's failure to ask UVA to verify the quote likewise is not material because UVA did make Dean Eramo available for an interview with Erdely (Pl. Opp. Ex. 1 [Erdely Dep.] 80:23-81:3; SRE ¶ 3) and made clear to Erdely and Garber-Paul that it would not answer questions about Eramo's interactions with specific students (Pl. Opp. Ex. 56 at RS016682; LGP ¶ 57).

287.    Garber-Paul also exchanged multiple emails and did a telephone interview with University of Virginia representative Anthony DeBruyn. (Garber-Paul Dep. at 301:2-24 (Ex. 27).) Garber-Paul never conveyed to UVA any of the facts that Rolling Stone intended to publish about Jackie's supposed sexual assault, never asked whether or when Jackie actually reported the location of her supposed assault to UVA, and never asked whether UVA had reported Jackie's allegations to the Charlottesville Police Department. (Id. at 313:3-314:11.)

**RESPONSE:**  Defendants object to Plaintiff's fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*), as Garber-Paul testified that "we were told right upfront that we weren't to discuss the details of any specific student cases" and "I was instructed to stay away from all specifics of student cases.  I was only able to talk to him about the generalities of what the administration does in these sorts of situations."  (Pl. Opp. Ex. 27 [Garber Paul Dep]. 313:8-314:9.)

288.    De Bruyn did tell Erdely in an October 9, 2014 email, with respect to a different case Erdely had provided him certain facts about, "your characterization of the facts of the spring

2014 case you referenced during our interview is incorrect." (Oct. 9, 2014 Email from Anthony deBruyn to Sabrina Erdely, RS016682-6683 (Ex. 56).)

**RESPONSE:**  Defendants do not dispute this fact, but object on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because Plaintiff does not allege that there is anything inaccurate about the Article's depiction of Stacy's case, and neither de Bruyn nor anyone else at UVA warned Erdely that she had anything "incorrect" with respect to Jackie's case – including that Eramo had received "three separate allegations," that the allegations concerned "gang rape," and that the assaults allegedly occurred at Phi Kappa Psi. (SRE ¶¶ 106-108.)  Defendants further state that this fact is not material to any issue on this motion because, once tipped off to a potential issue by de Bruyn, Erdely spoke with Stacy and collected documentation to make sure the information in the Article about her was entirely accurate.  (*Id*. ¶¶ 109-113.)

289.    Garber-Paul also never asked Ms. Eramo or anyone else at UVA whether Ms. Eramo had ever actually said the "rape school" quote that Jackie attributed to her. (Garber-Paul Dep. at 189:13-194:12.)

**RESPONSE:**  *See* Response 269, *supra*.

290.    When told by a University of Virginia public relations official in September 2014 that Ms. Eramo could not talk about specific cases or allegations because of student privacy, Erdely specifically raised the possibility of her obtaining a waiver from the student to allow the University and Ms. Eramo to discuss such issues. (Erdely Reporting Notes at RS004326 (Ex. 10.) However, Erdely never attempted to obtain such a waiver from Jackie and never presented one to UVA. (Erdely Dep. at 169:23-172:11 (Ex. 1).) Erdely told UVA in September — two

months before the article was published — that she was not sure she would have time to obtain a waiver. (Erdely Reporting Notes at RS004326.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*) because getting a waiver from Jackie alone would have been futile because all potentially impacted students would have needed to have provided a waiver, not just Jackie. (EAM Ex. 85 [Davis Dep.] 178:25-185:21; EAM Ex. 117.) Defendants further object to this fact on the ground that Plaintiff's citations do not support Plaintiff's fact.  First, Erdely's interview notes show that Erdely raised the possibility of obtaining a waiver to facilitate discussions with Eramo, and UVA representative Macgregor McCance told Erdely "we can look into that, we've never done that" and "I suppose we could look at it, I could run it through the channels and then we could see what the answer is."  (SRE Ex. 15 at RS004326.)  Further, Defendants note that Erdely did not testify that she "never attempted to obtain such a waiver"; rather, Erdely testified that Mr. McCance "never got back to me about it."  (Pl. Opp. Ex. 1 [Erdely Dep.] 171:8-14.) Defendants further object to the last sentence of the fact because the operative time was when Erdely's interview was scheduled with Eramo, not when the Article was published.

## XIX.   Defendants Intentionally Did Not Give Phi Kappa Psi A Meaningful Opportunity To Address Or Rebut Jackie's Allegations.[23]

291.    During dinner on September 12, 2014, Jackie asked Erdely whether Erdely had reached out to the Phi Psi to seek comment, and whether the "Phi Psi guys say they'd talk to [Erdely]" because Jackie was "interested in what they're going to say." (Sept. 12, 2014 Interview Tr. at RS118431 (Ex. 22).)

---

[23] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 291-301.

**RESPONSE:**  Defendants do not dispute this fact, but object on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1, *supra*), as it bears no connection to Erdely's or Rolling Stone's states of mind regarding any Statement at issue concerning Eramo. *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*.

292.  Erdely had not yet sought comment from Phi Psi.  Nevertheless, she told Jackie that "they're either going to say, 'It didn't happen' or they're going to say, 'No comment,' you know? I mean, they'd be foolish to say anything else." (Id. at RS118431-8432.)

**RESPONSE:**  *See* Response 291, *supra*.

293.  When Erdely reached out to Phi Psi's house advisor for UVA to seek comment about "rape allegations at your chapter of Phi Kappa Psi," the house advisor returned Erdely's phone call, asked that she put her questions in writing, and stated that he would "be happy to answer them." (Erdely Reporting Notes at RS004462.) He told her again that he'd "be happy to answer your questions." (Id. at RS004463.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material for the reasons set forth in Response 291, *supra*.  Defendants further object to this fact on the ground that the citation does not support Plaintiff's fact, as Plaintiff is conflating two separate communications with two separate people.  Erdely's reporting file reflects that she sent an email to Stephen Scipione, a UVA undergraduate who was listed on UVA's Inter-Fraternity Council website as the president of Phi Kappa Psi, on October 9, 2014.  (SRE Ex. 15 at RS004462; SRE ¶ 114; SRE Ex. 34.)  Erdely's October 14 email to Scipione stated that she was a writer for Rolling Stone and that she would like to speak with him about "rape allegations at your chapter of Phi Kappa Psi," and asked for his availability for a phone call.  (SRE Ex. 34 at RS016694.)  Erdely then followed up with Scipione as explained in Response 295, *infra*.  (*Id*. at RS016693-94.)  Separately,

Erdely's reporting file reflects that she communicated with Ben Warthen, the house advisor for the UVA chapter of Phi  Kappa Psi, between October 10, 2014 and October 15, 2014.  (SRE Ex. 15 at RS004461-63.)  Specifically, Erdely's reporting file indicates that, on October 10, Erdely spoke to Ben Warthen, but he asked to call her back because he was a lawyer and in the middle of another crisis.  (*Id*. at RS004462-63.)  Erdely's notes further indicate she waited until October 15, at which point she left Warthen a voice-mail message asking to "follow up about [her] questions about allegations of sexual assault at the University of Virginia Chapter of Phi Kappa Psi."  (*Id*. at RS004463.)  Erdely's notes further indicate Warthen returned her call the same day, but, by that point, her notes indicate that she had made contact with Scipione and also was "putting in calls to Phi Psi National instead," and therefore she did not return Warthen's call. (*Id*.)  Defendants further object to this fact on the ground that it is not material to any issue on this motion because Erdely indisputably sought and obtained comment both from Scipione and Phi Psi national executive director Shawn Collinsworth, and their comments were included in the Article.  (SRE ¶¶ 114-15; SW Ex. 1 at RS0001079.)

294.     Erdely, however, "never called him back" because "by that time [she] was putting in calls to Phi Psi national instead." (*Id*.)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Responses 291 and 293, *supra*, and Responses 295 and 296, *infra*.

295.     When Erdely contacted the president of the UVA Phi Kappa Psi chapter to ask about gang-rape allegations, he told Erdely that he was aware fourth-hand that some kind of allegation that something of a sexual nature had taken place at a party, but that he did know any details. Although both Garber-Paul and Erdely were in possession of information from Jackie that would have allowed Phi Kappa Psi a meaningful opportunity to address, admit, or deny

Jackie's allegations, neither Erdely nor Garber-Paul provided any details to the chapter president. (Garber-Paul Dep. at 329:22-332:10 (Ex. 27).)

**RESPONSE:**  Defendants object to this fact on the grounds that it is not material for the reasons set forth in Response 291, *supra*.  Defendants further object to the first sentence of this fact on the ground that it is not supported by citation to any evidence in the record, and it presents an incomplete and misleading representation of Erdely's interactions with UVA chapter president Scipione.  As noted above, Erdely emailed Scipione on October 9, stating that Erdely would like to speak with him about "rape allegations at your chapter of Phi Kappa Psi," and asked for his availability for a phone call.  (SRE Ex. 34 at RS016694.)  Scipione did not write back until October 14, 2014, at which point he claimed that he was too "swamped" to speak with Erdely at any point in the coming weeks and requested that Erdely send questions by email instead.  (*Id.*)  Erdely responded to Scipione's email on October 14, reiterating her request for a phone conversation:  "I understand that you have a lot on your plate, but really, you can't find a few minutes to speak with me by phone?  I'm available right now, if you'd like to call."  (*Id.* at RS016693.)  Erdely then provided a set of questions, asking about the gang-rape allegations, UVA's communications with the fraternity regarding the allegations, and UVA's investigation into those allegations.  (*Id.*)  Erdely closed her email with another exhortation that "again, if you'd like to call, I'm here at my desk."  (*Id.*)  Scipione never took up Erdely's offer of a phone conversation.  (SRE ¶ 114.)  Instead, Scipione responded with a written statement:

> On September 17th, 2014, we had been told that an individual who remains unidentified had supposedly reported to someone who supposedly reported to the University that during a party there was a sexual assault. We were not told that it was rape, but rather that something of a sexual nature took place. Even though this allegation is fourth hand and there are no details and no named accuser, the leadership and fraternity as a whole have taken this very seriously. To my knowledge, our chapter is not currently under investigation by the University. That being said, we are constantly working with the Dean,

the Greek life office, our National organization, and others to figure out what happened and to ensure that, if someone [*sic*] did indeed happen, it does not happen again.

(SRE Ex. 34 at RS016693.)  Erdely included Scipione's response on behalf of the chapter into the published Article.  (SW Ex. 1 at RS001079.)  Defendants further  object to the second sentence of this fact on the ground that undisputed record evidence establishes that representatives of the UVA chapter of Phi Kappa Psi in fact ***did*** know details regarding Jackie's alleged sexual assault ***prior to*** these communications with Erdely, as Eramo had met with representatives of the fraternity on September 17, 2014 and provided them with "all the information [she] had, specifically including the dates of the assaults, [and] the fact that one assault involved a potential fraternity brother who also worked at IM-Rec" (UVA's Intramural-Recreation Center)  (AS Ex. 10 [Eramo Dep.] 249:19-250:10.)  Defendants further object to this fact as not material to any issue on this motion because Erdely's interview notes reflect a conversation with Phi Kappa Psi National's executive director Shawn Collinsworth on October 20, 2014, in which Collinsworth referred to having been in contact with "the UVA administration" in September regarding allegations of sexual assault at the UVA chapter house.  (SRE Ex. 15 at RS004478.)   Erdely's notes show that she informed Collinsworth that the "primary allegation is one that allegedly took place in September of 2012," and asked for comment on that, and after a "long pause" he responded "we went and tried to investigate to see if there was any truth because obviously the safety and well-being of our members is our priority," but that "everything is anonymous so we have nothing to substantiate this."  (*Id*.)  Defendants further object to the statement in this fact that Erdely and Garber-Paul had in their possession information that would have allowed Scipione to have a "meaningful" opportunity to address her questions because it is a legal conclusion, not a fact.

296.     When Erdely reached out to then-Phi Psi chapter president, Stephen Scipione,

Erdely told Scipione that she had "become aware of allegations of [a] gang rape," and she asked

Scipione whether he could "comment on those allegations." (Erdely Reporting Notes at

RS004463-4464; Oct. 15, 2014 Email from Stephen Scipione to Sabrina Erdely, RS016693-6694

(Ex. 60).) Erdely did not provide Scipione the date of the alleged rape, the name of the alleged

fraternity member who perpetrated the alleged rape, or any description of the alleged attack. (*Id.*)

**RESPONSE:**  Defendants object to this fact for the reasons set forth in Responses 291 and 295,

*supra*.  Defendants further object to this fact on grounds that alleged shortcomings in the mode

of seeking comment from a third party who had no information regarding the specific Statements

at issue in this action do not support a finding of actual malice.  *See Tavoulareas*, 817 F.2d at

796 (in determining actual malice, courts "do not sit as some kind of journalism review seminar

offering our observations on contemporary journalism and journalists"); *Daniels,* 992 F.2d at

1334 ("[A]ctual malice cannot be established merely by showing a departure from accepted

journalistic or professional practices."); *Coliniatis v. Dimas*, 965 F. Supp. 511, 518 (S.D.N.Y.

1997) (newspaper did not act with actual malice where it failed to contact plaintiff until one day

before publication of article describing his involvement in kickback arrangement, or to broach

subject matter in interview conducted four days before publication); *Hugger v. Rutherford Inst*.,

94 F. App'x 162 (4th Cir. 2004) (no actual malice where defendant tried but failed over the

course of a single day to contact third party sources for comment, where those sources possessed

information sufficient to put defendant on notice that its primary source had lied).

297.     Scipione responded to her request on the same day, saying that, "an individual

who remains unidentified had supposedly reported to someone who supposedly reported to the

University that during a party there was a sexual assault. We were not told that it was rape, but

rather that something of a sexual nature took place. Even though this allegation is fourth hand and there are no details and no named accuser, the leadership and fraternity as a whole have taken this very seriously." (*Id*.) Phi Psi further told Erdely that "the source of the allegation is anonymous and there is no evidence to substantiate [the claims]." (Erdely Reporting Notes at RS004478 (Ex. 10).)

**RESPONSE:**  Defendants object to this fact for the reasons set forth in Responses 291, 295, and 296, *supra*.

298.    Erdely did not respond to Scipione with any additional information, including identifying the accuser, the nature of the alleged assault, or why Erdely believed that the attack was a gang-rape. (See generally *id*.)

**RESPONSE:**  Defendants object to this fact for the reasons set forth in Responses 291, 295, and 296, *supra*. Defendants further object on the ground that Plaintiff has failed to provide specific record citations for this fact.

299.    Then-Managing Editor Will Dana acknowledged that Erdely did not share enough information about Jackie's allegations with Phi Kappa Psi to allow the fraternity to meaningfully respond to the accusation. (Dana Dep. at 234:3-16 (Ex. 21).)

**RESPONSE:**  Defendants object to this fact for the reasons set forth in Responses 291, 295, and 296, *supra*.  Defendants further object to this fact on the ground that is not material to any issue on this motion because Dana's post-publication thoughts on the reporting and editing process of the Article do not bear on Erdely's or Rolling Stone's state of mind at the time of publication. *See Secord* and *Bose Corp.* in Response 72, *supra*.

300.     The Rolling Stone fact-checker, Garber-Paul, never contacted Phi Kappa Psi prior to the publication of the article and thus did not seek comment, corroboration, or verification of any details of Jackie's story from Phi Psi, such as whether an individual matching the description of the supposed ringleader of Jackie's assault was ever a member of the fraternity. (Garber-Paul Dep. at 327:11-329:11 (Ex. 27).) Garber-Paul did not contact Phi Psi because Erdely told her she shouldn't. (*Id*. at 326:2-327:10.)

**RESPONSE:**  Defendants object to this fact for the reasons set forth in Responses 291, 295, and 297, *supra*.  Defendants further object to this fact on the grounds that Plaintiff's citation does not support Plaintiff's fact as Garber-Paul did not testify at the cited transcript pages that "Erdely told her she shouldn't."  (Pl. Opp. Ex. 27 [Garber-Paul Dep.] 326:2-327:10.)  Rather, Garber-Paul testified that she wrote in a 2015 email to a reporter from the Columbia Journalism School, "Sabrina told me she did not think [Phi Psi] were going to provide any additional information, so I did not follow up further."  (*Id*. at 326:18-23.)  Garber-Paul further testified that "[w]e had the denials from them, and I don't necessarily follow up and get a second denial from a source."  (*Id*. at 327:5-8.)

301.     Then-Managing Editor Will Dana testified with respect to the article that it represented an institutional, individual, and procedural failure, and that "[e]very single person at every level of this thing had opportunity to pull the strings a little harder to question things a little more deeply, and that was not done." (Dana Dep. at 344:16-345:9.)

**RESPONSE:**  Defendants do not dispute that Dana gave the following quote to reporters from the Columbia Journalism School and that this quote reflects his post-publication "feelings" about the Article: "*In retrospect*, Dana, the managing editor who has worked at Rolling Stone since 1996, says the story's breakdown reflected both 'individual failure' and 'procedural failure and

institutional failure. . . .  Every single person at every level of this thing had [the] opportunity to pull the strings a little harder, to questions things a little more deeply, and that was not done.'" (Pl. Opp. Ex. 21 [Dana Dep.] 344:16-345:9. (emphasis added))  Defendants object to this fact on the grounds set forth in Response 291, 295, 296, and 299, *supra*.

**XX.   Rolling Stone Knew Eramo Tried To Get Jackie To Pursue A Complaint And Took Jackie To The Police.[24]**

302.    In one of their first interviews, Jackie told Erdely about telling Ms. Eramo in the spring of 2013 that she had been sexually assaulted. (Erdely Reporting Notes at RS004246 (Ex. 10).) Notably, and contrary to Defendants' claims in the article, Jackie did not tell Erdely that she told Ms. Eramo that she was gang raped, nor did she claim to have told Ms. Eramo where her supposed sexual assault occurred. (Id.) Instead Jackie told Erdely, referring to what she told Ms. Eramo, "I was crying and trying to explain to her what happened because I had never told anybody I had just broken it down into numbers, 'I was up in this room, there was 7 guys and 2 of them told them what to do,' talking incoherently and crying . . . ." (Id.)

**RESPONSE:**  Defendants object to this fact on the ground that the citation does not support Plaintiff's fact, as Erdely's interview notes reflect that Jackie told Erdely that she told Eramo "there [were] 7 guys and 2 of them told them what to do."  (SRE Ex. 15 at RS004246.) Defendants further object to this fact on the ground that it is not material to any issue on this motion because, even before speaking with Jackie, Erdely had already been informed by Renda (who was at that time employed by UVA) that Jackie was a "gang rape" victim, that Jackie's rape took place at the Phi Kappa Psi fraternity, and that Eramo was aware of Jackie's gang rape allegations.  (SRE Ex. 15 at RS004144-47.)  Defendants further object to this fact on the ground

---

[24] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 302-320.

that it misrepresents the Article, which speaks for itself, and does not say that Jackie told Eramo

the location of her gang rape in the meeting that took place in May 2013.  (SW Ex. 1 at

RS001076.)  Defendants further object to this fact on the ground that undisputed record evidence

establishes that Jackie *did* tell Eramo she was sexually assaulted by multiple men at their first

meeting, and that Eramo *did* understand the event was likely to have taken place at the Phi

Kappa Psi house.  (*See* EAM Ex. 108 at UVA030008567; SRE Ex. 26 at RS018284 (Eramo

emailing Jackie in May 2013 referring to the possibility of "hold[ing] ***these men*** accountable."))

(emphasis added).

303.    Jackie told Erdely that Ms. Eramo immediately presented Jackie with the options

of pursing a sexual misconduct complaint with the university and/or criminal charges through the

police. (*Id.*)  Jackie told Erdely that although she told Ms. Eramo she was unwilling to pursue

any kind of complaint, Ms. Eramo contacted her multiple times over the summer and when she

returned to campus to urge her to reconsider that decision. (Id. at RS004250.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on

this motion, as the Article fully reflects that Eramo presented Jackie with the options identified

during her their May 2013 meeting, sent her a follow-up email stating that "while she respected

Jackie's wish not to file a report, she'd be happy to assist 'if you decide to hold these men

accountable,' and consistently deferred to Jackie's choice to take no action thereafter.  (SW Ex. 1

at RS001077, RS001078-79.)  Defendants further object to this fact on the ground that the

citation does not support the second sentence insofar as it states that Jackie told Erdely that

Eramo "contacted her multiple times . . . to urge her to reconsider that decision."  Erdely's

reporting notes reflect that Jackie told Erdely that Eramo asked her several times "have you

thought about it?" (SRE Ex. 15 at RS004250.)

160

304.    As early as July 2014, in one of their first interviews, Jackie told Erdely that she had recently told Ms. Eramo about two other supposed, anonymous Phi Kappa Psi gang rape victims (known only to Jackie). (Id. at RS004169). Jackie told Erdely that she did not want to make a formal complaint or pursue misconduct proceedings regarding her assault and insisted on retaining her anonymity, that Ms. Eramo had spoken with the Dean of Students about whether the University could take away the fraternity's charter in the absence of an adjudicated complaint and while preserving Jackie's anonymity, and that the Dean of Students had concluded that if another student came forward so that there were multiple reliable, anonymous reports about sexual assault at Phi Psi, the University could and would seek to remove Phi Psi's charter. (Id.)

**RESPONSE:**  Defendants object to this fact on the ground that the citation does not support Plaintiff's fact to the extent it suggests that Jackie told Erdely that the two other alleged Phi Kappa Psi victims were "known only to Jackie."  The cited page from Erdely's interview notes does not reflect that the other two victims were "known only to Jackie," and in fact indicates that Jackie told Erdely that she had spoken to the sister of one of the victims about the situation. (SRE Ex. 15 at RS004169.)  Defendants further state that Emily Renda told Erdely earlier, on July 14, that the two other alleged Phi Kappa Psi victims were brought to UVA's attention through "friends" and said that UVA "staff members" were trying to bring these two women forward "through back channels," and suggesting that UVA hoped to have more success with these women by telling them that Jackie had come forward, suggesting that UVA knew who these women were and was speaking with them.  (*Id.* at RS004145-47.)  Defendants do not otherwise dispute that Jackie told Erdely the information in this fact.

305.    Jackie told Erdely that Ms. Eramo's reaction to Jackie's claim of knowing another unnamed girl who was also gang raped at Phi Psi was to say, "you have to have her come in,"

that "[Ms. Eramo] got pissed at the frat, she said two fraternities lost their charter this year it wouldn't bother me at all to add a third." (Id. at RS004312.) Jackie told Erdely that Ms. Eramo repeatedly pressed Jackie to encourage this other supposed victim to come forward to the Dean of Students Office, but Jackie claimed the young woman was unwilling to do so. (Id.) Jackie confirmed to Erdely that she did not tell Ms. Eramo the names of these two other supposed victims, and that UVA did not know who they were. (Id.)

**RESPONSE:**  Defendants object to this fact on the ground that it quotes selectively and misleadingly from Erdely's interview notes, and the cited evidence does not support the statement that "Eramo repeatedly pressed Jackie to encourage this other supposed victim to come forward."  (SRE Ex. 15 at RS004312.)  Defendants' further state that Erdely's interview notes reflect that Jackie told Erdely that Eramo's reaction "wasn't as shocked as you might think" and that Eramo "was just [mild] 'oh you have to have her come in' – she wasn't like 'my god that's crazy' and [she] was more concerned than anything for the girl's well-being." (*Id.*)  The interview notes further reflect that Jackie told Erdely that Eramo "just said there was a way that if maybe there was more than the two of us that came forward, and she had statements from us, and there was a very strong pattern of behavior, we could be anonymous and report it and get their charter taken away, but that it would have to be more than just me and the first year.  And the first year is not willing to participate and I don't know what to do about her."  (*Id.*)  Defendants further object that Plaintiff's fact misrepresents the record because Plaintiff testified that, following the meeting in April 2014 in which Jackie first informed her of the two other alleged victims, she did not reach out to Jackie over the summer to encourage her to file a complaint or to identify the alleged victims.  (AS Ex. 10 [Eramo Dep.] 227:9-228:9.)

306.    Also in July of 2014, Emily Renda told Erdely that Ms. Eramo and Dean of Students Allen Groves were pursuing ongoing action against Phi Psi and that they were working to get Jackie's supposed two anonymous other Phi Psi victims to come forward. (Renda Dep. at 176:17-178:7 (Ex. 11).) Renda told Erdely that Ms. Eramo was "very passionate" about punishing Phi Psi and seeing justice done in Jackie's case. (Id. at 79:12-22.)

**RESPONSE:**  *See* Response 21, *supra*.

307.    Renda also communicated to Erdely that the two other supposed gang rape victims were known only to Jackie, and that Renda and the university did not know who they were but were working to convince them to come forward. (Id. at 77:18-79:5.) Renda also communicated to Erdely that it was very difficult for the university to take action against Phi Psi in the absence of formal reports from Jackie or the supposed other victims. (*Id*. at 80:18-81:7.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not supported by the cited evidence.  Renda's cited testimony speaks to a July 14 telephone conversation she had with Erdely that is reflected in Erdely's interview notes from pages RS004146 to RS004147 of Erdely's reporting file.  (Pl. Opp. Ex. 11 [Renda Dep.] 77:18-81:7.)  As such, this testimony purports to fill in details about what Renda meant when she was speaking to Erdely, but does not purport to reflect what she actually said to Erdely on July 14.  Defendants further state that Erdely's interview notes do not state that "the two other supposed gang rape victims were known only to Jackie," and in fact say that these women were brought to UVA's attention "through friends," and said that UVA "staff members" were trying to bring these two women forward "through back channels," and suggesting that UVA hoped to have more success with these women by telling them that Jackie had come forward, suggesting that UVA knew who these women were and was speaking with them.  (*Id*. at RS004145-47.)  (SRE Ex. 15 at RS004146.)

Far from supporting Plaintiff's opposition, Renda's confirmation that the she and UVA plainly believed Jackie's allegations was highly corroborative of Jackie's credibility. (SRE ¶ 173; LGP ¶ 19; SW ¶ 24.).  Defendants further object that the interview notes speak for themselves, and respectfully refer the Court to Exhibit 15 to the Declaration of Sabrina Rubin Erdely at RS004146-47 for the full contents thereof.  Defendants further object that Renda's testimony about the contents of Erdely's interview notes are not the best evidence of the contents of those interview notes.

308.    Renda further communicated to Erdely that there were serious due process concerns with taking action against a fraternity without a formal allegation and adjudication, but that Ms. Eramo was doing everything in her power while respecting the due process rights of the accused. (Id. at 82:4-84:6.)

**RESPONSE:**    Defendants object to this fact on the ground that it is not supported by the cited evidence.  Renda's cited testimony speaks to an August 15 telephone conversation she had with Erdely that is reflected in Erdely's interview notes from pages RS004304 to RS004309. (Pl. Opp. Ex. 11 [Renda Dep.] 81:14-84:6.)  As such, this testimony purports to fill in details about what Renda meant when she was speaking to Erdely, but does not purport to reflect what she actually said to Erdely on August 15.  Defendants further object that this fact is not material to any issue on this motion because Erdely and Rolling Stone were not required to include every detail that might possibly contradict the opinions and criticisms expressed in the Article.  "[T]he fact that an article is one sided or fails to include as many positive features about the subject as negative ones 'has no tendency to prove that the publisher believed it to be false.'"  *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 285 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015). *See also Riley v. Harr*, 292 F.3d 282, 293 (1st Cir. 2002) (rejecting argument

that failing to include exculpatory information deprived author of opinion defense; author "was not required to report every single fact about the Anderson litigation, but was free to make his own editorial choices, so long as he 'fairly describe[d] the general events involved.'"). Defendants further object that Renda's conjecture about whether something is a "due process concern" constitutes inadmissible lay opinion under Fed. R. Evid. 701.  Defendants further object that Erdely's interview notes speak for themselves, and respectfully refer the Court to Exhibit 15 to the Declaration of Sabrina Rubin Erdely at RS004304-09 for the full contents thereof.

309.    Jackie also told Erdely that after an incident in April 2014 in which fraternity members allegedly assaulted her with a bottle for speaking out about her sexual assault, Ms. Eramo again encouraged Jackie to speak to the police and to pursue a university sexual assault trial. (Erdely Reporting Notes at RS004250.) Jackie again confirmed her refusal to pursue criminal charges regarding her assault. (Id.)

**RESPONSE:**  Defendants object on the ground that the citation does not support Plaintiff's fact to the extent it suggests that Jackie told Erdely that the bottle-throwing incident was retaliation for speaking out about her sexual assault specifically.  (SRE Ex. 15 at RS004250.)  *See* Response 91, *supra*.  Defendants further object to this fact on the ground that it is not material to any issue on this motion because, regardless of whether Jackie told Erdely that Eramo encouraged her to speak to the police, the ultimate outcome of Jackie's interactions with Eramo and the police was that Eramo deferred to Jackie's choice to take no action regarding the bottle-throwing incident, a fact which is reflected in the Article.  (SRE Ex. 27 at RS017033 (reminding Jackie that it is "YOUR choice"); SW Ex. 1 at RS001078 (noting that, after the April 2014 meeting, Jackie "reminded Eramo . . . she didn't feel ready to file a complaint," and that "Eramo, as always,

understood.")  "[T]he fact that an article is one sided or fails to include as many positive features about the subject as negative ones 'has no tendency to prove that the publisher believed it to be false.'"  *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 285 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015).  *See also Riley v. Harr*, 292 F.3d 282, 293 (1st Cir. 2002) (rejecting argument that failing to include exculpatory information deprived author of opinion defense; author "was not required to report every single fact about the Anderson litigation, but was free to make his own editorial choices, so long as he 'fairly describe[d] the general events involved.'").

310.    Jackie also told Erdely that she had met with the Charlottesville Police through Ms. Eramo. (Id. at RS004313.) In August 2014, Jackie forwarded to Erdely correspondence between Jackie and Ms. Eramo in April 2014 reflecting that Ms. Eramo arranged multiple meetings between Jackie and police officers and detectives in spring 2014, and that the detectives had been aggressive about investigating Jackie's claims, but that Jackie had refused to proceed with an investigation. (Aug. 16, 2014 Email Chain from Jackie to Sabrina Erdely, RS017031-42 ("Police Emails") (Ex. 61).)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material for the reasons stated in Response 309, *supra*.  Defendants further object on the ground that this fact selectively summarizes the cited evidence, which unequivocally demonstrates that Eramo arranged for Jackie to meet with police about the bottle-throwing incident, not her sexual assault.  For instance, in the April 2014 emails, Eramo apologized for the CPD officer being "a little aggressive about investigating," but "[t]hat said, it may be worth it to at least have them check the video on the Corner" for the purposes of identifying the men who assaulted Jackie at that location.  (SRE Ex. 27 at RS017033.)   In another email, Eramo wrote "Since the incident

166

happened on the Corner, the City of Charlottesville Police would need to take the report." (*Id*. at RS017035.)  Defendants further state the Erdely obtained a letter from the Charlottesville Police Department through a Freedom of Information Act request, which showed that Jackie had reported a "felony assault" to the police occurring on the weekend of April 5 at the Corner, resulting in a "laceration" on her face.  (SRE ¶ 42; SRE Ex. 17.)  Defendants further state that Eramo admitted in her deposition that the "incident" referred to in April 2014 emails between herself and Jackie was the bottle attack, not Jackie's sexual assault.  (AS Ex. 10 [Eramo Dep.] 183:19-184:16-18, 186:21-24.)  An internal memo that Eramo prepared in May 2014 about her interactions with Jackie states that Eramo connected Jackie with police specifically to report the bottle incident.  (EAM Ex. 110 at UVA040000466.)  Defendants further object that "multiple meetings" is not supported by the cited evidence; the evidence reflects two meetings.  (SRE Ex. 27.)

311.    Sean Woods knew prior to the publication of the article that Ms. Eramo had taken Jackie to the police, because "[t]here were e-mails that I was maybe made aware of that sort of show that there had been a – that Eramo had helped her go to the police.... We had a police report that it had happened and that Dean Eramo was helping Jackie." (Woods Dep. at 42:12-44:1, 46:8-17 (Ex. 8).)

**RESPONSE:**  Defendants do not dispute this fact, but object for the reasons stated in Responses 309 and 310, *supra*.

312.    On November 17, 2014, just two days before the article was published, Jackie told Erdely that she had recently spoken with the "head of university police" about the impending publication of the article and her safety concerns, and Jackie confirmed that this was one of the same officers she spoke to the prior April, that he was aware of her sexual assault allegations,

and that he praised her for going public with her sexual assault allegations, supposedly saying, "I'm glad you guys did this. Everyone should know." (Erdely Interview Notes at RS014343 (Ex. 25).)

**RESPONSE:**  Defendants object on the ground that the citation does not support Plaintiff's fact to the extent it suggests or implies that Jackie told Erdely that the "head of university police" was aware of Jackie's sexual assault allegations prior to their conversation regarding the impending publication of the Article and Jackie's safety concerns.  (Pl. Opp. Ex. 25 at RS014343.) Defendants state further that the cited portion of Erdely's notes states, in full, that Jackie "talked to the head of university police about it already, I told him I'm not worried about the article itself I'm more concerned with the backlash from fraternities.  He's like I'm glad you guys did this, everyone should know.  ***He's the same person I talked to after the bottle was thrown at me.***" (*Id.*) (emphasis added).  Defendants further object to this fact on the grounds stated in Responses 309 and 310, *supra*.

313.    Prior to the publication of the article, then-Managing Editor Will Dana was not made aware that Erdely had emails in her possession showing that Ms. Eramo set up multiple meetings between Jackie and the police. (Dana Dep. at 392:20-393:7 (Ex. 21).)

**RESPONSE:**  Defendants do not dispute this fact, but object for the reasons stated in Responses 309 and 310, *supra*.

314.    Sean Woods made the decision to cut from the first draft of the article the fact that Ms. Eramo took Jackie to meet with the police. (Woods Dep. at 94:23-96:5.)

**RESPONSE:**  Defendants do not dispute this fact, but object for the reasons stated in Responses 309 and 310, *supra*.

315.     The final, published article does not anywhere mention that Ms. Eramo arranged multiple meetings between Jackie and the police. (Dana Dep. at 397:9-18.)

**RESPONSE:**  Defendants object that the Article speaks for itself and respectfully refer the Court to Exhibit 1 to the Woods Declaration for the complete contents of the Article.  Defendants further object for the reasons stated in Responses 309 and 310, *supra*.

316.     In July 2014, Emily Renda explained to Erdely that Dean of Students Allen Groves and Ms. Eramo were pursing ongoing action against Phi Psi and trying to work to get Jackie's supposed two anonymous Phi Psi gang rape victims to come forward. (Renda Dep. at 176:17-178:7 (Ex. 11).)

**RESPONSE:**  *See* Response 306, *supra*.

317.     Woods admitted that Rolling Stone knew prior to publication of the article that Ms. Eramo absolutely wanted to see Jackie's allegations investigated and adjudicated and wanted Jackie to go forward with a complaint. Woods admitted: "We have an e-mail where Eramo is saying, We want to bring these men to justice. We have Eramo in an e-mail with Emily Renda – or Emily Renda stating Eramo is very hot about this, and is looking to investigate Phi Psi, which is one of the reasons they – Renda doesn't – and this is my memory of it, and again, I haven't looked at these – but that Renda said, you know, Eramo wants to bring Phi Psi to justice." (Woods Dep. at 73:11-25.)

**RESPONSE:**  Defendants object on the ground that the citation does not support Plaintiff's self-serving characterization of Wood's testimony that "Rolling Stone knew prior to publication that Ms. Eramo absolutely wanted to see Jackie's allegations investigated and adjudicated and

wanted Jackie to go forward with a complaint."  (Pl. Opp. Ex. 8 [Woods Dep.] 73:11-25.)  In

fact, Woods testimony is as follows:

> Q: What is the basis for your belief that Eramo was not challenging
> the fact that two other women were raped at Phi Psi?
>
> A: We have an e-mail where Eramo is saying, we want to bring
> these men to justice.
>
> We have Eramo in an e-mail with Emily Renda – or Emily Renda
> stating that Eramo is very hot about this, and is looking to
> investigate Phi Psi, which is one of the reasons they – Renda
> doesn't – and this my memory of it, and again, I have not looked at
> these – but that Renda said, you know, Eramo wants to bring Phi
> Psi to justice. Maybe don't name the frat in the piece.

(*Id.*)  Defendants further object to this fact on the ground that it is not material to any issue on

this motion because it is undisputed that UVA did not commence an independent investigation of

Jackie's allegations or those of the two other alleged Phi Kappa Psi victims until September

2014, as represented in the Article.  (Compare Defendants' Statement of Undisputed Facts in

their Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 11-14 &

n.53, *with* Plaintiff's Objections to Evidence and Declarations Submitted in Support of

Defendants' Motion for Summary Judgment at 1-2 (not disputing the portion of Defendants'

Statement of Undisputed Facts asserting that UVA did not "commence any sort of independent

investigation until mid-September 2014").

318.     Emily Renda testified that Ms. Eramo put Jackie in touch with her (Renda)

specifically because Ms. Eramo was concerned that Jackie was not interesting in pursing any

University or police action regarding her sexual assault, and that Ms. Eramo hoped that by

working with Renda, Jackie might get to the point where she was willing and able to do those

things. (Renda Dep. at 25:5-24.)

**RESPONSE:**  Defendants do not dispute this fact, but object on the ground that it is not material to any issue on this motion because the cited testimony provides no evidence that Erdely and/or Rolling Stone had any knowledge of Eramo's motivation.

319. Woods admitted that, "saying that Dean Eramo abused Jackie is just not what happened," and said of Ms. Eramo's support of Jackie, "that's not an abuse." (Woods Dep. at 166:19-167:11.)

**RESPONSE:**  Defendants object that Plaintiff's selective quotation from Woods's deposition testimony is misleading, as Woods was testifying that the language in the dek of the Article was not intended to imply that Eramo abused Jackie and pointing out that the Article reflects Eramo laying out the choices and doing her job.  (Pl. Op. Ex. 8 [Woods Dep.] 166:19-167:11.) Defendants further object that this fact is not material to any issue on this motion because the Article speaks for itself, and the "dek" of the Article is not "of and concerning" Eramo.  (SW Ex. 1 at RS001070.)

320. Woods also admitted that Ms. Eramo did not in any way discourage Jackie from pressing charges with the university or the police. (Woods Dep. at 178:2-19.)

**RESPONSE:**  Defendants object that Plaintiff's selective quotation from Woods's deposition testimony is misleading, as Woods was testifying regarding what the Article can reasonably be understood to imply. (Pl. Op. Ex. 8 [Woods Dep.] 178:2-19.)  Defendants further object that this fact is not material to any issue on this motion because the Article speaks for itself.  (*See generally* SW Ex. 1.)

**XXI. Jackie Herself Repudiates Defendants' Claims About Mr. Eramo's Treatment Of Her.**[25]

321. On September 19, 2014 Jackie texted



(Sept. 19, 2014 Text between Jackie and ▮▮▮▮▮, RESPJ00000808-811, at RESPJ00000808 (Ex. 62); Jackie Dep. at 41:2-25 (Ex. 45).)

**RESPONSE:** Defendants object to this fact on the ground that it is not material to any issue in dispute because it does not relate to any of the Statements at issue on this action. *See Liberty Lobby* in Response 1, *supra*. Defendants further object that the fact is not material to any issue on this motion because Jackie's statements to third parties does not show knowledge of falsity or reckless disregard of the truth by Eramo or Rolling Stone. Defendants further object that the fact is not material because the Article repeatedly reflects the fact that Eramo is beloved by survivors. (SW Ex. 1 at RS001076, RS001078.) For instance, the Article makes clear that Eramo is "beloved by survivors," with victims viewing her as "a friend and confidante" and "their best advocate and den mother." (*Id.*) The Article further makes clear that "Eramo surely has among the most difficult jobs at UVA" and yet again emphasizes that she is "beloved by students." (*Id.* at RS001076.) The Article also states that "Jackie repeatedly calls her 'an asset to the community.'" (*Id.* at RS001078.) Defendants further object to this fact on the ground that it is inadmissible hearsay offered for the truth of the matter asserted under Federal Rule of Evidence

---

[25] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts. This objection applies to paragraphs 321-339.

802.  Defendants further state that Jackie's deposition testimony shows that when asked whether she now "███████████████████████████████████," she responded "██████████." (Pl. Opp. Ex. 45 [Jackie Dep.] 105:9-1)

322.    Jackie testified that ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████. (Jackie Dep. at 43:5-18.)

**RESPONSE:**  Defendants object to this fact for the reasons stated in Response 321, *supra*.

323.    Jackie stressed to Erdely that ███████████████████

████████████████████████████████████████████████

██████████████ (Id. at 93:7-94:12.)

**RESPONSE:**  Defendants object on the ground that this fact is not material to any issue on this motion because the Article repeatedly reflects the fact that Eramo is beloved by survivors. *See* Response 321, *supra*.

324.    On October 20, 2014, Erdely told Jackie that her first draft is about "the culture of silence around rape at UVA, both from the students, who see it as just another aspect of the party culture, and from the administration, who in my opinion just want to keep these things quiet and contained." (Erdely Reporting Notes at RS004471 (Ex. 10).)

**RESPONSE:**  Defendants do not dispute this, but object that it is not material to any issue on this motion because Eramo did not sue over this statement and it plainly constitutes a subjective expression of opinion fully protected by the First Amendment. *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 183-86 (4th Cir. 1998).

325.    On November 7, 2014, just a week-and-a-half before the article was published,

Jackie emailed a friend, saying that ████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████ (Nov. 7, 2014 Email from Jackie to ████████████,

RESPJ00000562-563 (Ex. 63).)  Jackie then added, ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ (*Id.*)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue in

dispute because it does not relate to any of the Statements at issue on this action.  *See Liberty

Lobby* in Response 1, *supra*.  Defendants further object to this fact on the ground that it is not

material to any issue on this motion because Jackie's alleged statements to third parties does not

show knowledge of falsity by any Defendant.  Defendants further object to this fact on the

ground that it is inadmissible hearsay offered for the truth of the matter asserted under Federal

Rule of Evidence 802.  *See also* Response 326, *infra*.

326.    On November 10, 2014, just nine days before the article was published, █████

████████████████████████████████████████████████████████████

████   Nov. 10, 2014 Advocate Note, UVA050000071-72 (Ex. 64).)  ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ (*Id.*)

**RESPONSE:**  Defendants object to this fact for the reasons stated in Response 325, *supra*.

Defendants further object on the ground that Jackie's own text messages expressly contradict this

out-of-court statement.  The following day, Jackie texted Sara Surface to tell her that she had

spoken to Garber-Paul and assuaged her concerns: █████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

(SMB Ex. 120.)  Jackie also texted Erdely shortly after publication to tell her the article was

"really great."  SRE Ex. 44.; *see also* Pl. Opp. Ex. 45 [Jackie Dep.] 212:13-213:8, 214:1-7

(████████████████████████████████████████████████████████████████████

█████████████████████████████████).

    327.    Jackie testified ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████.  (Jackie Dep. at 76:10-

77:4 (Ex. 45).)

**RESPONSE:**  Defendants object to this fact for the reasons stated in Responses 321, 325 and

326, *supra*.  Defendants object further on the ground that the fact selectively quotes from

Jackie's testimony.

    328.    Jackie was ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████  (*Id*. at 78:2-24.)

**RESPONSE:**  Defendants object to this fact for the reasons stated in Responses 321, 325 and

326, *supra*.  Defendants object further to this fact on the ground that it is not supported by the

cited testimony.

329.    On November 21, 2014, Jackie ███████████████████████████
███████████████████████████████████████████████████. (Nov. 21,

2014 Text with Jackie and Alex Pinkleton and Sara Surface, RESPJ00000276-325, at

RESPJ00000300 (Ex. 65).)

**RESPONSE:**  Defendants object to this fact for the reasons stated in Responses 321, 325 and

326, *supra,* and *330, infra*.

330.    Exhibit 66 is a November 24, 2014 Open Letter that Jackie and others wrote to the

Cavalier Daily, the UVA student newspaper, in support of Ms. Eramo. (Students and community

supporters, LETTER: Advocating for Dean Eramo, THE CAVALIER DAILY (Nov. 14, 2015),

ERAMO-00878-891 ("Open Letter") (Ex. 66); Dana Dep. at 283:18-284:12 (Ex. 21); Jackie

Dep. at 24:11-25:8 (Ex. 45).)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on

this motion (*see Liberty Lobby* in Response 1, *supra*), as the Open Letter was published after the

Article and therefore could have no impact on Erdely's or Rolling Stone's subjective state of

mind at the time of publication.  *See Secord* and *Bose Corp.* in Response 72, *supra*.  Defendants

further object to this fact on the ground that it is not material to any issue on this motion because

the Article reflects the positive things that Jackie says about Eramo in the letter, including that

Eramo listened attentively and provided Jackie with resources, gave Jackie the power to make

her own decisions, put Jackie in contact with Emily Renda and One Less, and is "an asset to the

university."  (*Compare* Pl. Opp. Ex. 66 at ERAMO-00878, with SW Ex. 1 at RS001076-79; *see

also* Pl. Opp. Ex. 8 [Woods Dep] 194:18-195:18 (noting that what Jackie says in the Open Letter

is "what we have in the piece").)  Defendants further state that Jackie testified that she wrote the

letter ████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████ (Pl. Opp. Ex. 45

[Jackie Dep.] 25:3-26:7.)  Defendants further object to this fact on the grounds that it is

inadmissible hearsay offered for the truth of the matter asserted under Federal Rule of Evidence

802.

331.    Then-Managing Editor Will Dana was aware of Jackie's statements in the Open

Letter on or about November 24, 2014. (Dana Dep. at 283:18-284:18.) Dana acknowledged there

were internal discussions at Rolling Stone at the time about Jackie having voiced public support

for Ms. Eramo. (Id. at 284:19-285:1.)

**RESPONSE:**  Defendants object to this fact on the ground set forth in Response 330, *supra.*

332.    On December 3, 2014, Jackie texted Ryan Duffin, saying:

> "First off I want to say I'm SO SORRY for the[] way Sabrina
> wrote about you and Alex and Kathryn in the article. The story
> wasn't even supposed to be about my assault. It was supposed to
> be about survivor support and advocacy at uva and since I'm super
> active in the advocacy community I agreed to take an interview
> with her in June and she asked me to explain what happened to me
> so I did but I never thought she would publish it . . . I had no clue
> what she was writing about until October. I tried to pull out of it
> because I know her writing style and I know she would
> sensationalize things and take extreme artistic license (which she
> definitely did) but she said it would be published with or without
> me. I know she misrepresented you and Alex and Kathryn as well
> as [D]ean Eramo and a lot of other people in the story."

(Dec. 3, 2014 Text between Jackie and Ryan Duffin, Duffin-0001-04, at Duffin-0001 (Ex. 67).)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue in

dispute because it does not relate to any of the Statements at issue on this action.  *See Liberty*

*Lobby* in Response 1, *supra.*  Defendants further object that the fact is not material to any issue

on this motion because Jackie's statements to third parties does not show knowledge of falsity or

reckless disregard of the truth by Eramo or Rolling Stone.  Defendants further object to this fact

on the grounds that it is inadmissible hearsay offered for the truth of the matter asserted under

Federal Rule of Evidence 802.  Defendants further state that, when asked at her deposition

whether she believed that Erdely had taken "███████████████████████████████

████████," Jackie responded ██ ████████████████████████████

███████████████████████ (Pl. Opp. Ex. 45 [Jackie Dep.] 99:14-20

(emphasis added).)

333.     The same day, Jackie also texted to Duffin: "Yes, [Erdely] definitely did her own

thing and at the end I had absolutely no control over what she published. It was the shittiest

situation ever. I spoke with a reporter from the [P]ost explaining how Sabrina took a vast

majority of what I said and twisted it and ultimately manipulated my assault to get something

sensational … and I told him that [Erdely] misrepresented you and Dean Eramo." (Id.)

**RESPONSE:**  Defendants object to this fact for the reasons set out in Response 332, *supra*.

334.     Jackie also told Duffin that "[Erdely] basically made up" the entire post-gang rape

scene where Jackie's friends supposedly urged Jackie to keep her sexual assault quiet to protect

her reputation. (Id. at Duffin-0002.)

**RESPONSE:**  Defendants object to this fact for the reasons set out in Response 332, *supra*.

Defendants further object to this fact on the grounds that it is directly contradicted by undisputed

evidence that Jackie did describe to Erdely the post-rape scene involving Jackie's friends

referenced above.  (*See* SRE Ex. 15 at RS004158-4161.)

335.     Jackie confirmed in testimony ████████████████████████████

███████████████████████████. (Jackie Dep. at 106:24-107:14 (Ex.

178

45).) Jackie also confirmed that ███████████████████████████████
████████████████████████████████████████████████████████████████
██████. (*Id*. at 108:5-109:14.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue in

dispute because it does not relate to any of the Statements at issue on this action.  *See Liberty*

*Lobby* in Response 1, *supra*.  Defendants further object that the fact is not material to any issue

on this motion because Jackie's post-publication "belief" about what Erdely may or may not

have done does not does not tend to show knowledge of falsity or reckless disregard of the truth

by Eramo or Rolling Stone.  Defendants further object that Plaintiff quotes selectively from

Jackie's testimony.  *See also* Response 332, *supra*.

336.    Jackie also ███████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████  (*Id*. at 118:4-120:3, 338:7-19.)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on

this motion (*see Liberty Lobby* in Response 1, *supra*) because Jackie's testimony relates to a

subjective viewpoint that cannot be proven true or false and are not actionable.  *Biospherics, Inc.*

*v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998); *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d

280, 300-04 (4th Cir. 2008).  Defendants further object to this fact on the ground that Jackie's

personal views regarding the opinions expressed in the Article or post-publication Statements are

not material to any issue on this motion.  *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092

(4th Cir. 1993); *CACI*, 536 F.3d at 293-94 (whether a statement constitutes protected opinion is a

question of law for the Court).

179

337.    Jackie testified that █████████████████████████████████████

██████████████████████████████████████ (*Id*. at 214:20-215:3,

335:20-25.)

**RESPONSE:**  Defendants object to this fact for the reasons set out in Response 336, *supra*.

Defendants further object on the ground that this fact is not material to any issue on this motion

because the Article makes clear that Jackie supported and loved Eramo, quoting Jackie

describing Eramo as an "asset to the community."  (SW Ex. 1 at RS01078.)

338.    Jackie █████████████████████████████████████████

███████████████████████████████████████████████████

████████████ (*Id*. at 336:9-15.)

**RESPONSE:**  Defendants object to this fact for the reasons set out in Responses 336 and 337,

*supra*.

339.    Jackie also ████████████████████████████████████

██████████████████████████████████████████ (*Id*. at

338:20-339:10.)

**RESPONSE:**  Defendants object to this fact for the reasons set out in Responses 336 and 337,

*supra*.

**XXII.  Rolling Stone Continued To Mislead The Public As Questions Were Raised About Its Reporting.** [26]

340.    On November 26, 2014, Erdely had a telephone conversation in which she asked

Jackie for the name of the ringleader of her supposed gang-rape. Jackie provided a name, but

---

[26] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 340-352.

claimed she was unsure how to spell it and provided multiple different variations. Erdely wrote

in her notes that it was "odd that she doesn't know the name of her attacker." (Erdely Notes,

RS014975-4980, at RS014975 (Ex. 68).)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on

this motion (*see Liberty Lobby* in Response 1, *supra*), as the name of Jackie's alleged attacker

has nothing to do with Eramo or the challenged Statements.   Defendants further object on the

ground that this fact is not material, as post-publication statements are not probative of Erdely's

or Rolling Stone's subjective state of mind at the time of publication.  *See Secord* and *Bose*

*Corp.* in Response 72, *supra*.  Erdely further testified that, following her November 26

conversation with Jackie,

> *I was not worried about the integrity of my story*. The fact that
> Jackie had given me what I thought was a false name, I thought
> was a bit of misdirection . . . because she didn't want to share this
> information with me. It didn't, in any way, compromise that my
> feeling that she had told me the truth.

(*Id*. at 272:25-273:7 (emphasis added).)  Defendants further state that, according to undisputed

evidence, Erdely searched online following her conversation with Jackie, and located a UVA

graduate student with the name Jackie had given her.  (SRE ¶ 160.)

341.    Erdely admitted that she believed Jackie had given her a "false name" for her

attacker on November 26, and that the conversation caused an "alarm bell" to go off in her head

at that time. (Erdely Dep. at 270:19-273:18 (Ex. 1).)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Response 340, *supra*.

Defendants further object on the ground that the citation does not support Plaintiff's fact.  The

words "alarm bell" were spoken by Plaintiff's counsel, referring to a quote Erdely previously

gave to reporters from the Columbia School of Journalism, and Erdely testified that "it was a

poor choice of words on my part."  (Pl. Opp. Ex. 1[Erdely Dep.] 272:1-9).  *See also* Response 340, *supra*.

342.    After Erdely had a telephone conversation with Jackie on November 26, 2014, then-Managing Editor Will Dana acknowledged that he, Sean Woods, and Erdely had discussions over the next several days about concerns with Jackie and there being "some things here to pay attention to." (Dana Dep. at 175:15-176:11 (Ex. 21).)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Responses 340 and 341, *supra*.  Defendants further object on the ground that the characterization of discussions having taken place "over the next several days" is not supported by the cited testimony.  Dana testified that he did not recall any discussions regarding Erdely's November 26 conversation with Jackie until after the Thanksgiving holiday (on Thursday, November 27) and the following weekend. (Pl. Opp. Ex. 21 [Dana Dep.]175:18-24.)  Thus, the soonest Dana remembered having a conversation regarding "some things here to pay attention to" would have been Monday, December 1, 2014, five days after Erdely's conversation with Jackie.

343.    Dana acknowledged that in the days following a conversation Erdely had with Jackie on November 26, 2014, Erdely discussed concerns with Dana about being unable to confirm a name Jackie provided for the supposed ringleader of her assault, and that Erdely communicated to Dana that Erdely was concerned about the integrity of the article. (Id. at 342:4-43:18.)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Responses 340-342, *supra*.  Defendants further object to this fact on the ground that it is not supported by the cited evidence.  Dana testified that the week after Thanksgiving—the week of December 1 to December 5, 2014—he and Erdely had "concerns, you know, and we were monitoring it and

looking at every detail through the course of that week." (Pl. Opp. Ex. 21 [Dana Dep.]343:15-
18.) When asked whether Erdely conveyed to him, "in words or in substance," that "she was
worried about the integrity of her story," Dana responded, "I would say more that she
communicated concerns to me about the story . . . I don't know if we had quite risen to
questioning the entire integrity of the story at this point." (*Id*. at 344:4-12.) Defendants further
state that Dana testified that he had no doubts about Jackie's credibility until the early morning
hours of December 5, 2014 when he received an email from Ms. Erdely indicating that she had
lost faith in Jackie's credibility. (*Id*. at 174:1-176:11, 176:24-177:20, 179:18-180:19, 204:21-
205:5, 208:10-209:13, 217:25-219:10, 227:6-228:3; *see also* WD ¶¶ 14, 24-32.)

344.    During an interview for a Slate magazine podcast published on November 27,
2014, the hosts of the show repeatedly and directly asked Erdely if she knew who any of Jackie's
assailants were and whether Erdely had spoken to or gotten comment from any of Jackie's
assailants. (Nov. 27, 2014 Slate Podcast Tr., Certified Tr., Nov. 27, 2014 Slate DoubleX Gabfest,
"Butch Goddess Edition," Compl. At Ex. D [Dkt. 14-8]; Answer ¶ 188; *see also*
http://www.slate.com/articles/podcasts/doublex_gabfest/2014/11/the_double_x_gabfest_on_uva_
frats_and_rape_in_rolling_stone_husbands_hurting.html.) Each time, Erdely avoided answering
the question, and despite these direct inquiries Erdely did not acknowledge that Jackie refused to
provide the names of any of her assailants to her or that Rolling Stone never obtained their
names or verified that any of them existed. (*Id*.)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Response 340, *supra*.
Defendants further object on the ground that this fact is not material to any issue on this motion
(*see Liberty Lobby* in Response 1, *supra*) because Erdely's and/or Rolling Stone's failure to get
comment from the alleged ringleader of Jackie's gang rape does not tend to show that Erdely or

Rolling Stone had subjective awareness of probable falsity regarding any of the Statements at issue regarding Eramo.  *See Daniels, Hatfill* and *Tavoulareas* in Response 175, *supra*. Defendants further object to this fact on the ground that it misleadingly conflates the November 27, 2014 publication date of the Slate interview with the date it was recorded, which was November 26, 2014 at approximately 9:00 am, prior to Erdely's telephone conversation with Jackie later that day.  (*See* Response 340, *supra*; *see also* SRE Ex. 45.)

345.   In a November 28, 2014 email to Washington Post reporter Paul Farhi, who was asking questions about how Rolling Stone verified Jackie's story, Sean Woods claimed to the Washington Post that Rolling Stone did not name any of Jackie's alleged assailants for "legal reasons." (Nov. 28, 2014 Email from Paul Farhi to Sean Woods, RS016040-6043, at RS016042 (Ex. 69).) Woods did not admit to Farhi that Rolling Stone did not actually know the names of any of the alleged perpetrators. (Woods Dep. at 209:17-210:7 (Ex. 8).)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Responses 340 and 344, *supra*.  Defendants further object to the characterization that Woods "did not admit to Farhi that Rolling Stone did not actually know the names of any of the alleged perpetrators," as Woods' undisputed testimony establishes that, at the time, he was under the impression that Jackie had disclosed "Drew's" identity to Erdely.  (Pl. Opp. Ex. 8 [Woods Dep.]247:20-25.)

346.   In response to more questions from Washington Post reporter Paul Farhi about the reporting of the article, Erdely told Farhi on December 1, 2014: "Paul, once again, I'm not going to comment on whether I talked to Drew or not." (Dec. 1, 2014 Email from Sabrina Erdely to Paul Farhi, RS016119-6122, at RS016120 (Ex. 70).) When Woods suggested she tell Farhi that, "[t]his story wasn't about depicting a he said/she said account of a sexual assault but what happened when a girl comes forward with a claim of brutal rape and how those in power failed to

184

respond to her," Erdely responded to Woods, "Sorry to say, that is a terrible statement – it opens

up the conversation to 'he said' and what his side of the story was, and the fact that we didn't

include it . . . We can't give specifics . . . ." (Id. at RS016119.)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Responses 340 and 344,

*supra*.  Defendants further object to this fact on the ground that it selectively quotes from the

cited evidence, omitting a sentence that displays Erdely's continued confidence that Jackie's

assailant was a real person.  Erdely's response to Woods in fact reads:

> Sorry to say, that is a terrible statement – it opens up the
> conversation to 'he said' and what his side of the story was, and
> the fact that we didn't include it.  ***In its own way, it actually paves***
> ***the way towards him being sympathetic***.  We can't give specifics,
> a blanket statement is better.

(Pl. S.J. Ex. 25 at RS016119)(emphasis added).

347.     On December 1, 2014, Woods lied to Paul Farhi of the Washington Post, speaking

of Jackie's alleged assailants, when he said, "we verified their existence" and "I'm satisfied that

these guys exist and are real. We knew who they were." (Paul Farhi, Author of Rolling Stone

article on alleged U-Va. rape didn't talk to accused perpetrators, THE WASHINGTON POST

(Dec. 1, 2014), ERAMO-04874-4876, at ERAMO-04875 (Ex. 71); Woods Dep. at

244:21¬246:13 (Ex. 8).) Woods admitted that claiming that Rolling Stone knew who Jackie's

attackers were and verified their existence was a "mistake," and that he "shouldn't have said it

like that." (Woods Dep. at 247:17-248:2.) Woods admitted that these statements to Paul Farhi

could be categorized as "falsehoods." (Id. at 276:17-23.)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Responses 340 and 344,

*supra*.  Defendants further object to this fact on the ground that it selectively quotes from and

mischaracterizes Woods's deposition testimony.  The testimony does not support the statement

that Woods "lied," as Woods stated in deposition testimony that he understood his statement to Paul Farhi at the time to be a true statement, stating that, "I thought Jackie at this point had told us the identity of Jay. . . . I shouldn't have said it like that. It's a mistake on my part, and I've walked it back since, and I'd walk it back again." (Pl. Opp. Ex. 8 [Woods Dep.] 247:20-25.) With regard to categorizing his statements as "falsehoods," Woods also testified that "I didn't see them as falsehood*s*, but you can characterize them that way." (*Id*. at 276:22-23.) Defendants further state that, to the extent Woods was not truthful, his failure to admit his mistake to Farhi is not probative of actual malice. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984) ("He had made a mistake and when confronted with it, he refused to admit it and steadfastly attempted to maintain that no mistake had been made—that the inaccurate was accurate. That attempt failed, but the fact that he made the attempt does not establish that he realized the inaccuracy at the time of publication.").

348.    Sara Surface testified that a few days after the article was published, when Jackie gave them the name she had given to Erdely as the supposed ringleader of her assault, Surface and Alex were quickly able to discern from simple online searches that the person by that name was not in Phi Psi and did not match the description Jackie had given of her rapist. (Surface Dep. at 122:19-123:14, 125:8-127:16 (Ex. 13).)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Responses 340, *supra*. Defendants further object to this fact on the ground that is it not material to any issue on this motion because it relates to Surface's knowledge, not that of Erdely or Rolling Stone.

349.    On December 2, 2014, Sara Surface told Erdely that Jackie had recently provided her the same name, but that the only possible UVA student they could find with that name "wasn't in Phi Psi so that was confusing." (Erdely Notes at RS014975-76 (Ex. 68).)

186

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Response 340, *supra*.

Defendants further object to this fact on the ground that the statement that the "only possible

UVA student" Surface could find was not in Phi Psi is not supported by the cited evidence.

Erdely's notes reflect Surface's comment that "Alex [Pinkleton] did some asking around and

there had been a lifeguard by that name but apparently he wasn't in Phi Psi so that was

confusing."  (SRE Ex. 49 at RS014976.)

      350.    Surface also told Erdely on December 2, 2014 and told her that she could not

match Jackie's supposed assailant with an actual person and that "something was up" and she

doubted Jackie's credibility. (Surface Dep. at 131:7-11, 194:19-195:16.) Erdely admitted to

Surface in that conversation that Erdely had also tried to verify the name Jackie had given to

Erdely as Jackie's assailant and that Erdely could not verify it. (Id. at 131:12-132:15.)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Response 340, *supra*.

Defendants object further on the ground that the conclusion that Erdely told Surface "she

doubted Jackie's credibility" on December 2 is not supported by the cited evidence.  Surface

testified regarding this conversation that Erdely "said 'I thought something was up,' but she was

she was kind of, I think, trying to gauge, like: Is there another name? Is there, like, something

else I should be looking into?"  (Pl. Opp. Ex. 13 [Surface Dep.] 132:3-9.)  Defendants state

further that Erdely testified that she did not doubt Jackie's credibility until the early morning

hours of December 5.  (Pl. Opp. Ex. 1 [Erdely Dep.] 279:20-282:7; *see also* Erdely Decl. ¶¶ 5, 7,

161-170; SRE Ex. 52.)  Defendants further state that Plaintiff has not introduced any record

evidence on this motion that Defendants made defamatory statements after December 2.  (*See*

Statement of Undisputed Facts in Support of Plaintiff's Motion for Partial Summary Judgment

("Pl. SUF") ¶¶ 41, 87, 97, 103-104; Counter-Statement of Material Facts in Support of Plaintiff's

Opposition to Defendants' Motion for Summary Judgment ¶¶ 357-361.[27])

351.    On December 5, 2014, a reporter from the Washington Post emailed Erdely to tell

her that he has interviewed Jackie and intended to publish a story questioning the truth of "A

Rape on Campus." (Dec. 5, 2014 Email from Sabrina Rubin Erdely to Melissa Bruno,

RS007816-22, at RS007817 (Ex. 72).) Erdely wrote to a Rolling Stone public relations

employee, saying that it was important that Rolling Stone get a "mea culpa" to press before the

Washington Post article, "so it doesn't look like we were shamed into it." (Id.) Erdely instructed

the PR employee to "hold [the Post reporter] off," "[a]sk him about his deadline," and "[d]elay

him as much as possible, maybe tell him I'd like to talk (though I'm not sure that I do) but that

I'm super busy today?" (Id.)

**RESPONSE:**  Defendants do not dispute that Erdely sent this email on the morning of

December 5, 2014 and respectfully refer the Court to Exhibit 72 to Plaintiff's Counter-Statement

for the full text of the email.  Defendants object to this fact on the ground that it is not material to

any issue on this motion because it relates to post-publication events that are not probative of

Erdely's or Rolling Stone's subjective state of mind at the time of publication.  *See Secord* and

*Bose Corp.* in Response 72, *supra*.  Defendants further object to this fact to the extent it omits

the context for Erdely's email, which was sent in the short time period between when Erdely

discovered that Jackie was no longer credible and when Rolling Stone published its "Note to

Readers,"  which effectively retracted the Article on December 5 by publishing the Note to

Readers telling the public that it had lost faith in those aspects of the Article emanating from

Jackie.  (Pl. Opp. Ex. 1 [Erdely Dep 287:10-20; *see also* Pl. Opp. Ex. 13 [Woods Dep.] 209:5-16,

---

[27] Plaintiff's theory that the December 5 "Note to Readers" is a republication of the Article fails for the reasons set forth in Defendants' Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment at 30-36.

264:7-12, 277:3-15, 288:9-22 ; SW ¶¶ 91-94; Pl. Opp. Ex. 1 [Erdely Dep.] 281:16-283:20; SRE ¶

169; AS Ex. 12 [Fine Dep.] 23:15-26:9; AS Ex. 11 [Wenner Dep.] 96:14-25, 120:15-129:24; AS

Ex. 6.)

352.    Erdely then emailed the Post reporter, telling him, "thanks for reaching out. I'd

actually like to speak with you for your story. What's your deadline?" (Dec. 5, 2014 Email from

Sabrina Rubin Erdely to Taylor Shapiro, RS007825-28, at RS007826-27 (Ex. 73).)

**RESPONSE:**  *See* Responses 340 and 351, *supra*.

## XXIII. Rolling Stone Repeatedly Reaffirms The Defamatory Meaning And Implication Of The Article.[28]

353.    In a press release issued contemporaneously with the publication of the article,

Rolling Stone described the article to other media outlets. (Woods Dep. at 175:4-176:25 (Ex. 8).)

The Rolling Stone press release said:

[image omitted]

(Rolling Stone Press Release, RS008128-29 (Ex. 74).)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on

this motion as Plaintiff does not allege in her complaint that this press release is defamatory and

the press release does not inform any issues on this motion.  *See Liberty Lobby* in Response 11,

*supra*.  Moreover, in the Fourth Circuit, a defamation by implication claim requires that "[t]he

language [of the challenged text] must not only be reasonably read to impart the false innuendo,

but it must also affirmatively suggest that the author intends or endorses the inference."  *Chapin*

*v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993).  This press release sheds no light on

---

[28] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 353-361.

the language of the Article or the post-publication Statements challenged as defamatory in this action.

354.     Will Dana agreed that the statement in the press release, RS008128-8129, is a "fair summary" of the article. (Dana Dep. at 160:14-161:6 (Ex. 21).)

**RESPONSE:**  *See* Response 353, *supra*.

355.     In an October 1, 2014 email to Rolling Stone magazine photo editor Sasha Lecca, author Sabrina Rubin Erdely described the article as "a story about how rape plays out against the culture at the University of Virginia.... Where the main narrative is about a girl who says she was gang raped at a fraternity and the school has done nothing.... The theme will be about the culture of inaction and silence at UVA — both from the students, who want to ignore sexual assaults, because it spoils the giant party of college, and also because of some demented loyalty to the institution and its image of perfection; and from the administration, who'll do anything to avoid scandal." (Oct. 1, 2014 Email from Sabrina Erdley to Sacha Lecca, RS018873 (Ex. 58); see also Erdely Dep. at 200:21-201:18 (Ex. 1).)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion.  Defendants further object that Erdely's comments constitute subjective expressions of opinion and hyperbole that cannot form the basis of a libel claim.  *See Liberty Lobby* in Response 1, *supra; Biospherics* and *CACI* in Response 336, *supra*.

356.     Then-Managing Editor Will Dana acknowledged that the article claims that Ms. Eramo discouraged Jackie from reporting her gang-rape allegations, testifying, "[t]hat's exactly what the story says." (Dana Dep. at 390:16-391:6 (Ex. 21).)

**RESPONSE:**  Defendants object to this fact on grounds that Dana lacks personal knowledge regarding the intended meaning of Statement #2, the statement being discussed in the cited portion of his testimony, (Pl. Opp. Ex. 21 [Dana Dep.] 390:16-391:6), as Dana did not write the Article and he was not the principal editor on the piece.  (Pl. SUF ¶¶ 26, 27; Pl. Opp. Ex. 21 [Dana Dep.] 112:13-113:24 (noting Dana's minimal involvement except for reading the first draft and successive drafts and providing conceptual advice).)  The unrebutted testimony of Erdely, Woods, and Garber-Paul all confirm that Statement #2 referred to discouraging Jackie from sharing her story with Rolling Stone, not reporting her rape. (Pl. Opp. Ex. 8 [Woods Dep.] 159:16-161:1; Pl. Opp. Ex. 27[Garber-Paul Dep.] 158:20-160:11; 161:22-162:5, 165:2-165:12; SRE ¶ 190.)  Defendants' further object on grounds that Dana's personal views on the meaning of the Article are not probative of the plain and ordinary meaning of the text, nor do they provide any evidence that the text "affirmatively suggest[s] that the author intend[ed] or endors[ed]" the implications that Plaintiff now presses upon it.  "Whether a statement is actionable is a matter of law to be determined by the court."  *Chapin*, 993 F.2d at 1092.

357.    In an official statement about the article on December 1, 2014, Rolling Stone described the article as "one woman's account of a sexual assault at a UVA fraternity in October 2012 — and the subsequent ordeal she experienced at the hands of University administrators in her attempts to work her way through the trauma of that evening." (Dec. 1, 2014 Email from Sean Woods to Paul Farhi, RS003077 (Ex. 75); Woods Dep. at 227:24-230:11 (Ex. 8).)

**RESPONSE:**  Defendants do not dispute this fact.

358.    Rolling Stone and Erdely repeatedly described the article as being about how Jackie's sexual assault report to Ms. Eramo was met with "indifference." (See July 1, 2016 Pl.'s Statement of Undisputed Facts in Supp. of Mot. for Summ. J. [Dkt. 99] ¶¶ 41, 87, 97, 104, 135.)

**RESPONSE:**  Defendants object to this fact on the ground that it selectively quotes from the record without context, and respectfully refer the court to Exhibits C, D, and E of the Complaint, as well as to Exhibit 65 to the Declaration of Will Dana, for the complete context of the referenced statements.  Defendants further object to this fact on the grounds set forth in Response 355.  In addition, Defendants respectfully refer the Court to their Response to Plaintiff's Statement of Undisputed Facts (Dkt. 116) at Responses 41, 87, 97, 104, and 135.

359.    In her statements on the November 26, 2014 Brian Lehrer Show and the November 27, 2014 episode of the Slate DoubleX Gabfest Podcast, Erdely claimed that the article showed not only the "indifference" with which Jackie's allegations were met, but also how Ms. Eramo "did nothing" in response to Jackie's allegations, how she "brushed off" Jackie, how Jackie's allegations were not reported to the police, how Jackie was "discouraged from moving this forward," and how Ms. Eramo sought to "suppress" Jackie's supposed sexual assault. (Certified Tr., Nov. 27, 2014 Slate DoubleX Gabfest, "Butch Goddess Edition," Compl. At Ex. D [Dkt. 14-8]; Answer ¶ 188; see also http://www.slate.com/articles/podcasts/doublex_gabfest/2014/11/the_double_x_gabfest_on_uva_frats_and_rape_in_rolling_stone_husbands_hurting.html; Erdely Dep. at 256:8-258:7;,Certified Tr., Nov. 26, 2014 The Brian Lehrer Show, Compl. At Ex. C [Dkt. 14-7]; Compl. ¶ 240; Answer ¶ 240; see also http://www.wnyc.org/story/mishandling-campus-rape/; Erdely Dep. at 250:4-251:16 (Ex. 1).)

**RESPONSE:**  Defendants object to this fact on the ground that it selectively quotes from the Slate DoubleX Gabfest podcast and the Brian Lehrer program, and by taking the language out of context, distorts its meaning; the publications speak for themselves.  Defendants respectfully refer the court to Exhibits C and D of the Complaint for the complete context of the statements

referred to.  Defendants further object to this fact on the ground that it is not material to any issue

on this motion as Erdely's comments constitute subjective expressions of opinion and hyperbole

that cannot form the basis of a libel claim.  *See Liberty Lobby* in Response 1, *supra; Biospherics*

and *CACI* in Response 336, *supra*.

360.    Defendants acknowledge that Erdely's statements on the Slate podcast and Brian

Lehrer Show were meant to "summarize" the "contents of the Article." (July 1, 2016 Mem. of

Law in Supp. of Defs.' MSJ [Dkt 102] at 66.)

**RESPONSE:**  Defendants object to this fact on the ground that it selectively quotes the cited

portion of Defendants Memorandum of Law in Support of their Motion for Summary Judgment,

which reads in full, "None of the post-publication statements purport to convey new facts about

Eramo, but rather summarize and express subjective and strongly felt views about the contents of

the Article in an off-the-cuff, rhetorical fashion."  Defs. Mem. of Law in Supp. of Defs. MSJ

(Dkt. 102) at 66.

361.    Erdely herself acknowledged that these statements were "shorthand for the article

itself." (Erdely Dep. at 252:16-20.)

**RESPONSE:**  Defendants do not dispute that Erdely testified that her statement on the *Brian

Lehrer Show* that Jackie was "brushed off" by the administration was "shorthand for the article

itself."  (Pl. Opp. Ex. 1 [Erdely Dep.] 252:16-20.)  Defendants respectfully refer the Court to

Exhibit C of the Complaint for a full transcript of the show and/or to the audio recording of the

show at http://www.wnyc.org/story/mishandling-campus-rape for the full contents thereof.

## XXIV. Readers Of The Article Understood The Intended Defamatory Meaning And Implication.[29]

362.     Emily Renda, one of Erdely's sources and at the time a campus sexual assault advocate who worked with both Jackie and Ms. Eramo, testified that her impression upon reading the article was that it "misrepresented a lot of things," including "that it painted a particularly unnuanced picture of the administration and Nicole as being indifferent, which I thought was not the case and I felt several of the people that were interviewed for the article would not have said." (Renda Dep. at 96:5-21 (Ex. 11).)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on this motion (*see Liberty Lobby* in Response 1), as Renda's testimony does not relate to any specific Statement at issue.   "Whether a statement is actionable is a matter of law to be determined by the court."  *Chapin*, 993 F.2d at 1093; *CACI*, 536 F.3d at 293-94 (explaining that whether a statement constitutes protected opinion is a question of law for the Court).  Ms. Renda's personal views on the meaning of the Article are not probative of the plain and ordinary meaning of the text, nor do they provide any evidence that the text "affirmatively suggest[s] that the author intend[ed] or endors[ed]" the implications that Plaintiff now presses upon it.  *Chapin*, 993 F.2d at 1092. Defendants further object that Renda's testimony attempts to dispute subjective viewpoints that are not capable of being proven true or false.  *See  Biospherics* and *CACI* in Response 336, *supra*.  Defendants further object that Renda lacks personal knowledge as to what "several of the people that were interviewed for the article would not have said" and that such testimony constitutes impermissible lay opinion.  Defendants respectfully refer the Court to Exhibit 1 to the Woods Declaration for the complete contents of the Article.

---

[29] Defendants object to Plaintiff's headings on the grounds that they are not supported by citation to evidence (including page or paragraph number) and several of them constitute legal conclusions, not facts.  This objection applies to paragraphs 362-379.

363.     Renda felt that the article portrayed Ms. Eramo "negatively" and that the portrayal of Ms. Eramo in the Rolling Stone article was not "fair," because "it paints a picture of someone who does not care and dissuades people from reporting, and that is far and away not the woman I know and not the experience that plenty of people I've known to have worked with her have had." (Id. at 96:22-97:14.)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Response 362, *supra*.

364.     Renda read the article as implying and insinuating that Ms. Eramo was trying to "make [Jackie's allegations] go away," which was false. (Id. 97:15-22.)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Response 362, *supra*.

365.     Renda's impression of the article was that it "portrayed [Ms. Eramo] as someone who was indifferent or didn't care and or had discouraged Jackie from taking further action or seeking help." (Id. at 125:5-126:2.)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Response 362, *supra*.

366.     Renda felt that the article unfairly "demonized" Ms. Eramo. (Id. at 102:3-19.)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Response 362, *supra*.

367.     Renda's impression upon reading the article was that it portrayed Ms. Eramo as discouraging Jackie from reporting her sexual assault to the police or to the University. (Id. at 119:16-120:11.)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Response 362, *supra*.

368.     Renda's impression of the article's description of Jackie's first meeting with Ms. Eramo was that "[the article] nominally ascribes to [Jackie] that it was her choice [not to file a

complaint with the university and/or police] but sets a picture up of somebody who had no

agency and was battered around by a lack of support . . . it seems the thesis of the article is that it

wasn't really an informed choice, or that it wasn't the right choice, or that she wasn't properly

supported in making that choice." (Id. at 196:2-14.)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Response 362, *supra*.

369.    Renda described reading the article as like "being hit over the head with a

baseball bat" because "Jackie's allegations were so shocking and because Dean Eramo had been

treated so unfairly." (Id. at 120:22-121:10.)

**RESPONSE:**  Defendants object to this fact on the grounds set forth in Response 362, *supra*.

370.    Alex Pinkleton testified that she believed Erdely's lip-service statement in the

article about Eramo being beloved by survivors did not detract from the defamatory impact of

the article, saying, "[Erdely], out of an article that was how many pages long, like seven pages

long, so many words, put in one sentence where, like, oh, these three people – oh, regardless of

the fact that Dean Eramo has swept gang rapes and tons of gang rapes other non-gang rapes –

regardless of that fact, these three still stand by her; which is the total reason why Dean Eramo

got death threats, why we got death threats, why we were called terrible advocates. Because I

think that's completely hilarious to think that by putting in one sentence it's like, well, they

support her. You put in the article like we supported the devil. Like, that was exactly how it

read." (Pinkleton Dep. at 144:22-145:15 (Ex. 12).)

**RESPONSE:**  Defendants object to this fact on the ground that it is not material to any issue on

this motion (*see Liberty Lobby* in Response 1), as Pinkleton's testimony does not relate to any

specific Statement at issue.   "Whether a statement is actionable is a matter of law to be

determined by the court." *Chapin*, 993 F.2d at 1093; *CACI*, 536 F.3d at 293-94 (explaining that whether a statement constitutes protected opinion is a question of law for the Court).  Ms. Pinkleton's personal views on the meaning of the Article are not probative of the plain and ordinary meaning of the text, nor do they provide any evidence that the text "affirmatively suggest[s] that the author intend[ed] or endors[ed]" the implications that Plaintiff now presses upon it.  *Chapin*, 993 F.2d at 1092. Defendants further object that Pinkleton's testimony attempts to dispute subjective viewpoints that are not capable of being proven true or false.  *See Biospherics* and *CACI* in Response 336, *supra*.  Defendants respectfully refer the Court to Exhibit 1 to the Woods Declaration for the complete contents of the Article.

371.    Both Ms. Eramo and Rolling Stone received many emails from members of the public who read the article and understood it as attributing to Ms. Eramo unfitness to perform the duties of her employment as an Associate Dean of Students, and as accusing Ms. Eramo of lacking integrity in the discharge of her employment duties. (Dec. 7, 2014 Email from dynatite@gmail.com to letters@rollingstone.com, RS021352-1353 (Ex. 76); Dec. 4, 2014 Email from Colleen Cicale to letters@rollingstone.com, RS021604 (Ex. 77); Nov. 28, 2014 Email from Peter Engisch to letters@rollingstone.com, RS021657 (Ex. 78); Nov. 20, 2014 Email from Kim Raff to Nicole Eramo, ERAMO-00805 (Ex. 79); Nov. 20, 2014 Email from Holly Rhodes to Nicole Eramo, ERAMO-00816 (Ex. 80).)

**RESPONSE:**  Defendants object to this fact on grounds that the personal views of individual readers are not material to any issue on this motion. "Whether a statement is actionable is a matter of law to be determined by the court." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993).  *See also CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 293-94 (4th Cir. 2008) (explaining that whether a statement constitutes protected opinion is a question of law

for the Court).  Defendants respectfully refer the Court to Exhibit 1 to the Declaration of Sean

Woods for the complete contents of the Article.  Defendants further object on the ground that

these emails do not refer to specific Statements alleged to be false and defamatory in the

Complaint.

372.    On November 28, 2014 an individual named Peter Engisch sent an email to

Rolling Stone at the inbox "letters@rollingstone.com" with the subject "A Rape on Campus."

Engisch wrote that "Dean Eramo smells of cover up, deflect, delay and fake text book sensitivity.

Protecting UVA is her No. 1 priority. Sickening." (Nov. 28, 2014 Email from Peter Engisch to

letters@rollingstone.com, RS021657 (Ex. 78).)

**RESPONSE:**  Defendants object to this fact on grounds that the personal views of individual

readers are not material to any issue on this motion.  *See* Response 371, *supra*.

373.    On December 4, 2014 an individual named Colleen Cicale sent an email to

Rolling Stone at the inbox "letters@rollingstone.com" saying "I just finished reading Sabrina

Rubin Erdely's article about UVrApe," and adding that "[Jackie] should be proud of the work

she has been doing as an advocate. She could teach her Dean Eramo a lesson or two on how to

treat survivors." (Dec. 4, 2014 Email from Colleen Cicale to letters@rollingstone.com,

RS021604 (Ex. 77).)

**RESPONSE:**  Defendants object to this fact on grounds that the personal views of individual

readers are not material to any issue on this motion.  *See* Response 371, *supra*.

374.    On December 7, 2014, an individual sent an email to Rolling Stone at the inbox

"letters@rollingstone.com" referencing the article about Jackie and stating: "Dean Eramo should

be fired. The Dean clearly set Jackie further adrift with her ambivalent response and bewildering

options; Eramo well knew Jackie was so conflicted she'd not pursue the case, and Eramo intentionally guided Jackie to this 'solution', offering her a soft shoulder to cry on instead of an iron fist to help face her attackers and protect other students. This softballing was intentional, in my opinion, to keep the case from becoming public and out of UVA control." (Dec. 7, 2014 Email from dynatite@gmail.com to letters@rollingstone.com, RS021352-53 (Ex. 76).)

**RESPONSE:**  Defendants object to this fact on grounds that the personal views of individual readers are not material to any issue on this motion.  *See* Response 371, *supra*.

375.    On November 20, 2014, an individual named Kim Raff sent an email to Ms. Eramo with the subject "About the Rolling Stone article." (Nov. 20, 2014 Email from Kim Raff to Nicole Eramo, ERAMO-00805 (Ex. 79).) Beginning, "Dean Eramo, I am in the process of reading the Rolling Stone article about rapes on the UVA campus," the email said, "I am so sickened by what I have read and I think you should be ashamed of yourself and how you treat victims of sexual assaults." (Id.) The email went on to say, "Why you continue to protect these predators is baffling and I really can't understand how as a woman you can allow them to continue to victimize more young women/men. Please Please Please for the love of god RESIGN! You clearly do not contain the needed skills as a human/woman to do your job correctly. You are a horrible person and your school is an abomination and disgusts me. Please RESIGN so you don't ruin another student's life. Do the right thing." (Id.)

**RESPONSE:**  Defendants object to this fact on grounds that the personal views of individual readers are not material to any issue on this motion.  *See* Response 371 *supra*.

376.    On November 20, 2014, an individual named Holly Rhodes sent an email to Ms. Eramo with the subject "Shame on you." (Nov. 20, 2014 Email from Holly Rhodes to Nicole Eramo, ERAMO-00816 (Ex. 80).) The email stated, "As a woman, how can you turn a blind eye

to these girls who are seeking help from such brutal acts...girls Ms. Eramo; GIRLS. God will have his day with you and hold you accountable just as the boys who have raped and performed these disgusting acts. Do the great state of Virginia a favor and resign. You are a despicable human being." (Id.)

**RESPONSE:**  Defendants object to this fact on grounds that the personal views of individual readers are not material to any issue on this motion.  *See* Response 371, *supra*.

377.    Victoria Groves, a sexual assault survivor and former UVA student, read the article and, based on the article, "became very angry with how University of Virginia officials acted, especially Associate Dean Nicole Eramo." (July 1, 2014 Declaration of Victoria Groves ¶ 4 (Ex. 81).) Groves "believed that, based on the article, Dean Eramo had completely failed to support" Jackie, and that "Dean Eramo had actively worked to convince Jackie to not move forward with reporting her assault in order to preserve the University's reputation." (Id.) She believed that "Dean Eramo was not a real advocate for sexual assault victims and survivors, she was not aware of victim's rights and the duties of individuals in positions like hers to protect and advocate on behalf of sexual assault victims, and that she was directly responsible for the fact that Jackie's attackers never saw justice." (Id. ¶ 5.) She further understood, "based on the article, Dean Eramo put the interest of the University above Jackie's interest and did not act with Jackie's well-being in mind." (Id. ¶ 4.)

**RESPONSE:**  Defendants object to this fact on grounds that the personal views of individual readers are not material to any issue on this motion.  *See* Response 371, *supra*.

378.    In fact, Groves was so "disgusted ... with Dean Eramo's actions" that she "was compelled to voice her opinion" and email Ms. Eramo. (Id. ¶ 6.) To that end, Groves "emailed Dean Eramo directly" and wrote that Ms. Eramo's "'compliance in allowing these offenders to

walk free time and time again [was] an atrocity,'" that "her actions were the equivalent of 'sweep[ing] sexual assault under the rug,'" and that Ms. Eramo's supposed actions, as detailed in the article "sicken[ed] me." (Id. ¶¶ 7-8.)

**RESPONSE:**  Defendants object to this fact on grounds that the personal views of individual readers are not material to any issue on this motion.  *See* Response 371, *supra*.

379.    Based on the article, Groves "held the conviction that Dean Eramo had completely failed Jackie, and likely other sexual assault victims at the University of Virginia, until I began to hear that the article was inaccurate in late 2014 and early 2015." (Id. ¶ 10.)

**RESPONSE:**  Defendants object to this fact on grounds that the personal views of individual readers are not material to any issue on this motion.  *See* Response 371, *supra*.

Dated: New York, New York
       August 5, 2016

By:    /s/ Elizabeth A. McNamara
Elizabeth A. McNamara (*pro hac vice*)
Samuel M. Bayard (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP 1251
Avenue of the Americas, 21st Floor
New York, New York  10020-1104
Telephone: (212) 489-8230
Fax:         (212) 489-8340
Email:     lizmcnamara@dwt.com
                samuelbayard@dwt.com

Alison Schary (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone:  (202) 973-4248
Fax:           (202) 973-4448
E-mail:       alisonschary@dwt.com

W. David Paxton (VSB No. 19798)
Michael J. Finney (VSB No. 78484)
GENTRY LOCKE
10 Franklin Road S.E., Suite 900

P.O. Box 40013
Roanoke, VA 24022-0013
Telephone:   (540) 983-9300
Fax:            (540) 983-9400
E-mail:        paxton@gentrylocke.com
E-mail:        finney@gentrylocke.com

*Attorneys for Defendants Rolling Stone LLC,*
*Sabrina Rubin Erdely, and Wenner Media LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 5, 2016, the foregoing was served by CM/ECF on counsel

of record for all parties to this action.  Notice of this filing will be sent by email to all parties by

operation of the Court's electronic filing system or by mail to anyone unable to accept electronic

filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the

Court's CM/ECF System.


/s/ Elizabeth A. McNamara
Elizabeth A. McNamara