```
              UNITED STATES DISTRICT COURT

         FOR THE WESTERN DISTRICT OF VIRGINIA

               CHARLOTTESVILLE DIVISION


* * * * * * * * * * * * * * *
NICOLE P. ERAMO,            * CIVIL ACTION 3:15-CV-00023
                           * AUGUST 12, 2016   1:02 P.M.
           Plaintiff,      * MOTION HEARING
                           * CHARLOTTESVILLE, VIRGINIA
vs.                        *
                           *
ROLLING STONE, LLC,        *
SABRINA RUBIN ERDELY,      *
WENNER MEDIA, LLC,         * Before:
                           * HONORABLE GLEN E. CONRAD
           Defendants.     * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA

APPEARANCES:

For the Plaintiff:     THOMAS ARTHUR CLARE, ESQUIRE
                       ELIZABETH MARIE LOCKE, ESQUIRE
                       ANDREW CLAY PHILLIPS, ESQUIRE
                       Clare Locke, LLP
                       902 Prince Street
                       Alexandria, VA 22314


For the Defendants:    ELIZABETH ANNE McNAMARA, ESQUIRE
                       SAMUEL M. BAYARD, ESQUIRE
                       Davis Wright Tremaine, LLP
                       1251 Avenue of the Americas, 21st Flr.
                       New York, NY 10020




Court Reporter:        Judy K. Webb, RPR
                       210 Franklin Road, S.W., Room 540
                       Roanoke, Virginia 24011
                       (540)857-5100 Ext. 5333


        Proceedings recorded by mechanical stenography,
transcript produced by computer.
```

 1 | APPEARANCES (Continued):

 2 | For the Defendants:     ALISON B. SCHARY, ESQUIRE
                            Davis Wright Tremaine, LLP
 3 |                        Suite 800
                            1919 Pennsylvania Avenue, N.W.
 4 |                        Washington, DC 20006

 5 |
                            WILLIAM D. PAXTON, ESQUIRE
 6 |                        MICHAEL JOHN FINNEY, ESQUIRE
                            Gentry Locke Rakes & Moore
 7 |                        P.O. Box 40013
                            Roanoke, VA 24022

 8 |

 9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1      (Court convened at 1:02 p.m.)

2          THE COURT:  Good afternoon, everyone.  Welcome to

3  Charlottesville.

4          I'll ask Ms. Moody to announce the style of the next

5  case.

6          THE CLERK:  *Nicole P. Eramo v. Rolling Stone, LLC,*

7  *and others*, *Civil Action* 3:15-CV-23, for a hearing on motion.

8          THE COURT:  As I understand it, there are multiple

9  motions filed by both sides.

10          Looking at the matter, it seems to me that perhaps we

11  ought to have the plaintiff proceed first.  So if that suits,

12  unless you've decided to the contrary, let's proceed in that

13  fashion.

14          MR. CLARE:  Thank you, Your Honor.

15          May it please the Court.  For the record, my name is

16  Tom Clare and I represent the plaintiff, Nicole Eramo.  With

17  me at counsel table today, I have my law partner Libby Locke,

18  and my colleague Andy Phillips.  Also with me is the

19  plaintiff, Nicole Eramo.

20          We have a proposed order in which to take up these

21  many interrelated issues, and we're happy to proceed in

22  whatever order the Court would like.

23          If I could have slide 53, please.

24          But it seemed to us that the most efficient way to

25  get through these issues were to focus on the statements

1  themselves, whether they are "of and concerning" the

2  plaintiff.

3           Plaintiff has moved for summary judgment on all

4  statements on that ground.  The defendants have challenged

5  only one statement as to whether it's "of and concerning" the

6  plaintiff.

7           And then to focus on whether the statements are

8  defamatory per se or have a defamatory meaning.  And the

9  plaintiff has moved on that ground on all statements.  The

10  defendants have challenged three of those.

11           And then to focus on whether it's opinion or not.

12  The defendants have challenged all of those statements.

13           And that way we would understand what the statements

14  at issue are, before turning to the status of the plaintiff

15  and the defendant's state of mind.

16           And if it pleases the Court, we're happy to have the

17  defendants address those interspersed in our argument, or we

18  can do it *seriatim*.

19           By way of background, the Rolling Stone article at

20  the heart of this case is so emblematic of journalist error

21  that it is quite literally an exhibit in a gallery on media

22  mistakes in the news history gallery in the *Newseum*.

23           Slide 54 please.

24           This is a picture of "A Rape On Campus" being

25  installed in the *Newseum*.  And adding it to the collection of

1  media mistakes, the *Newseum* director of collection said, "It
2  is to remind visitors of the power of the press, the
3  responsibilities inherent in that power, and the damage that
4  can occur when journalists don't do their job well. The
5  Rolling Stone campus rape story is a cautionary tale about
6  what can happen when the press doesn't live up to its
7  standards of fact-checking, fairness, and questioning sources
8  when reporting a story."

9        "A Rape on Campus" was a 9,000-plus word article
10  published by Rolling Stone in November of 2014.  It was
11  published in print and on the Rolling Stone website, and it
12  was aggressively promoted by the defendants in a press
13  release, on social media, and on a publicity tour by the
14  author, where additional defamatory statements were made about
15  the plaintiff.

16        The defendants referred to "A Rape on Campus" as a
17  narrative.  It was intending to tell a factual story about
18  facts, about events that happened on the campus of the
19  University of Virgina.  And it purported to recount in graphic
20  detail a brutal gang rape of a woman they called "Jackie" at
21  the Phi Kappa Psi fraternity at UVA.

22        It included alleged quotes from Jackie's friends, who
23  discouraged her from reporting the rape because it would hurt
24  their social lives, and it chronicled efforts by the
25  University of Virginia and Nicole Eramo, in particular, to

1  suppress and discourage Jackie from reporting and doing
2  nothing in response to her reports.

3      Our client, Nicole Eramo, was formerly an associate
4  dean in the dean's office.  That title has been removed from
5  her in the days after the article.  And she was the university
6  administrator that the author of this story, Sabrina Rubin
7  Erdely, cast as the villain of the article, and in her
8  post-publication statements as being a false friend to Jackie
9  and suppressing and discouraging her from moving forward.

10      She is identified by name 33 times in the article.
11 And she is the only University of Virgina official described
12 in the article as having interacted with Jackie who is
13 described by name.  There is one reference to an academic dean
14 who did the initial referral of Jackie to Nicole.  But Nicole
15 is the only person who is depicted by name and by picture of
16 having interacted with Jackie.

17      The article includes a photo illustration, which is
18 up on the screen now, of our client, commissioned by Rolling
19 Stone.  The caption identifies her by name.  And we will argue
20 that what is shown here is Nicole Eramo, that is her picture,
21 taken from a real picture, and photoshopped into a different
22 scene, shown smiling and giving a thumbs-up gesture to a
23 crying sexual assault victim in her office.  That's consistent
24 with our theory of the implication created by the defendant's
25 defamatory statements.  Meanwhile, there are angry protesters

1   outside Ms. Eramo is oblivious to and apparently in the

2   picture, "Stop victim blaming." "No means no." "She's broke

3   and he's okay."

4        That illustration prompted the Rolling Stone

5   fact-checker to ask a question when the fact-checking process

6   was going on. And this is the handwritten notes of the

7   fact-checker up on the screen here, when she saw the draft of

8   the article.

9        She asked the question, "Is this too mean?" But

10  Ms. Erdely and Rolling Stone's top editors overruled those

11  concerns by the fact-checker, and many others that we'll talk

12  about today. They concluded that that photo illustration of

13  Ms. Eramo was not too mean and they published it.

14       In doing so, they ignored dozens of warnings and red

15  flags about the truth of what they were about to publish,

16  including many raised by the fact-checker. And the red flags

17  and warnings that they disregarded run the gamut between

18  Jackie's credibility, whether the gang rape happened and in

19  what form, where it happened, how it happened, et cetera, and

20  in particular in this case, Jackie's interactions with Nicole

21  Eramo. Red flags in each of those categories.

22       They published an article reporting Jackie's gang

23  rape as fact, as if it had occurred. They attributed quotes

24  to Jackie's friends without ever having contacted them or

25  making clear that they hadn't. And the article created the

1  false impression that the account published in the article was

2  the same information that was provided to Nicole Eramo, and

3  she did nothing about it, imputing her fitness for her trade

4  and her profession and her job in a manner that is defamatory

5  per se under Virginia law.

6         The article immediately went viral; 2.7 million

7  readers online.  It prompted national and international shock,

8  outrage, and disgust.  Some of it was directed at the

9  fraternity Phi Kappa Psi, but much of it was directed at the

10  University of Virginia; and Nicole Eramo in particular was

11  accused of having suppressed this horrible thing.

12         The Charlottesville Police Department conducted an

13  investigation, exhausted all investigative leads, and found no

14  substantive basis to support the account of the assault that

15  was reported in the Rolling Stone article.

16         The story also got it flat wrong regarding the

17  interactions between Nicole Eramo and Jackie.  The article

18  [*sic*] falsely accused Ms. Eramo of "doing nothing" -- that's a

19  quote -- in response to Jackie's name -- the defendants did.

20  Excuse me.  That was in the follow-on statement -- didn't take

21  her to the police; suppressed her claim of assault; falsely

22  attributing a quote to Ms. Eramo:  "Nobody wants to send their

23  daughter to the rape school," a statement that she never made.

24         The facts and documents that Rolling Stone had prior

25  to publication establish that Ms. Eramo urged Jackie to report

1  her assault, took her to the police on two occasions, but both

2  times Jackie refused to report.  And interviews of Jackie and

3  other sexual assault victims uniformly refuted the author's

4  view of Nicole Eramo.

5         Consistently and repeatedly, those people who were

6  interviewed said Ms. Eramo exhibited concern for the

7  well-being of Jackie and for the other victims; that Ms. Eramo

8  wanted to punish the fraternity, including taking away the

9  charter; and was very passionate about punishing the

10 fraternity and obtaining justice in Jackie's case, but was

11 prevented from doing so by Jackie's unwillingness to go

12 forward.

13        Within a week, Jackie's story had completely imploded

14 and Ms. Erdely, the author, finally confronted Jackie about

15 all of this and the red flags that had been there for a month.

16        If I could have slide 57, please.

17        This is an example of one of the questions that

18 Ms. Erdely asked to Jackie after the fact, about the scars on

19 her back that evidenced and supposedly would corroborate this

20 brutal assault.

21        Back in September, she says, "Your boyfriend, Conner,

22 told me he had never seen the scars."  These are questions and

23 red flags that should have been addressed prior to the

24 publication.  But after the article comes out, they go back to

25 her and start asking these questions.

1    Ultimately -- slide 58, please -- Ms. Erdely, on

2  December 5th, 2014, says, "We have to issue a retraction.

3  This is our worst nightmare.  I just got off the phone with

4  Jackie and her friend Alex.  Neither I nor Alex find Jackie

5  credible any longer.  We have to issue a retraction."

6    But instead of retracting the article, Rolling Stone

7  republished it.  They added a highly substantive editor's

8  note, a significant edit to the piece, which, under the law,

9  constitutes a separate publication, where additional viewers

10  and additional audience would review the article and see the

11  allegations that now Rolling Stone knows and admits from their

12  own voice stem from Jackie.

13    They have lost faith in her credibility, and yet they

14  published it again and kept the article up there for four

15  months, until April of 2015, when they finally say, "We are

16  officially retracting 'A Rape On Campus,'" and they take it

17  down off their website, five months after Ms. Erdely says, "We

18  have to issue a retraction.  I've lost faith in Jackie."

19    Ms. Nicole Eramo's reputation has been irrevocably

20  damaged.  She's been targeted by protests and demands for her

21  to be fired.  She's been the subject of rape and death

22  threats, emotionally and physically devastated.  Her associate

23  dean title has been taken away from her, and she is unable to

24  continue work in the field that she has devoted her life to,

25  which is supporting sexual assault victims.

1    Discovery is now closed, and we have established that

2  the plaintiff is entitled to partial summary judgment, that

3  all of the statements we have sued on are of and concerning

4  the plaintiff; that all those statements are defamatory per se

5  in that they injure Ms. Eramo in her profession.

6    And under the Virginia case law, they talk about what

7  sorts of allegations will injure somebody in their profession,

8  and this is squarely within those prior decisions.

9    We've also established that Ms. Eramo was a private

10 figure, and that in that second subsequent publication of this

11 article on December 5th, the defendants had actual malice,

12 because we have it from their own e-mail that they had a

13 retraction and they no longer trusted Jackie.

14    I'm going to address first the "of and concerning"

15 prong.  It's an easy legal standard for us to meet, and it's

16 one that Your Honor has taken up in the *AvePoint* case not too

17 long ago.  "It is satisfied if the statement would be

18 understood as referring to the plaintiff and it was intended

19 to refer to her."

20    The defendants, in their motion and in their

21 opposition to ours, focus solely on the intent prong.  And

22 they say, "We didn't subjectively intend some of these

23 references to include Ms. Eramo."  But the Virginia Supreme

24 Court is being clear that the test is satisfied as long as

25 people who read it understood the defendants to be referring

1  to the plaintiff.  And that's exactly what happened here.

2         And as Your Honor pointed out in the *AvePoint* case,

3  if it's plausible somebody would understand these references

4  to the administration of administrators having done nothing,

5  and discouraging, and abusing to be stated to Nicole Eramo, an

6  inference that is supported by the photo illustration in the

7  article, then summary judgment is appropriate for us if these

8  statements are of and concerning the plaintiff.

9         We have also put forward evidence of people who

10  actually do know Ms. Eramo, and people who don't, who reached

11  this conclusion that these articles were about her.

12         It is not required, for a statement to be "of and

13  concerning," that the statement identify the plaintiff by

14  name.  That's the *AvePoint* case and the *Gazette, Inc*. case,

15  cited by the Virginia Supreme Court.

16         It can also be if the connection between the

17  plaintiff and the defamatory statement is clear from

18  subsequent articles and statements, so if the overall body of

19  work and overall series of statements that are made.  Not

20  every one of the series of communications needs to be

21  referring to the plaintiff by name, if a reader would look at

22  the series of communications, including promotional

23  materials -- so teasers and things in a broadcast, for

24  example, may not refer to a plaintiff by name but could be

25  considered to be defamatory if the statements are made in a

1  clear way and readers would understand it to be the same

2  person.  That was a *WJLA-TV* case, which found those statements

3  to be actionable because they were understood by people to be

4  part of the same conversation.

5       Similarly, statements by the same defendant, on the

6  same subject, over the same short period of time can cause a

7  reader to understand a defamatory statement to be of and

8  concerning the plaintiff.  The statements cannot be viewed in

9  isolation, but rather, must be read in whole, in context,

10  together with headlines, captions, and related statements.

11  And that includes the photo of Ms. Eramo and the 32 references

12  of her in the article.

13       Now, for purposes of our motion, the defendants have

14  not challenged our affirmative motion that all of the

15  statements we have sued on are of and concerning the

16  plaintiff, except for one.

17       If I could have slide Number 60, please.

18       This is the one reference that the plaintiffs

19  challenge.  It's in the subhead of the article.  It says,

20  "Jackie was just starting her freshman year at the University

21  of Virginia when she was brutally assaulted by seven men at a

22  frat party.  When she tried to hold them accountable, a whole

23  new kind of abuse began."

24       So "abuse" is easily understood as referring to the

25  plaintiff, and I'm going explain why.  And, in fact, we know

1  that "abuse" can only be understood as referring to the

2  plaintiff, and so the defendants' motion must be denied.  The

3  defendants' motion on this issue must be denied, the

4  plaintiff's motion must be granted.

5        The key to understanding this statement, Your Honor,

6  is that the text itself makes a causal connection between the

7  abuse and the phrase "when she tried to hold them

8  accountable."  That's what the defendant said caused or

9  created the abuse.  "When she tried to hold them accountable,

10  a whole new kind of abuse began."

11        But the key fact from the text of the article is that

12  Jackie's only attempt to hold her assailants accountable was

13  through the plaintiff, through Nicole Eramo.  And every use of

14  the word "accountable" in the article makes reference to

15  either Nicole Eramo specifically or the University

16  disciplinary system more generally.

17        Let's take a look at slide Number 61, please.

18        These are the first two references to the word

19  "accountable" in "A Rape On Campus," in the text of it.

20        And the first one, it's an interaction between

21  Ms. Eramo and Jackie.  "Eramo e-mailed Jackie a follow-up

22  note, thanking her for sharing, saying, 'I could tell that was

23  very difficult for you,' and restating that while she

24  respected Jackie's wish not to file a report, she would be

25  happy to assist, quote, 'If you decide that you would like to

1   hold these men accountable,'" quoting an e-mail from Nicole

2   Eramo.

3           So the defendants have established a connection, by

4   quoting from that e-mail in the manner that they did, between

5   the "accountable" subhead and the use of "accountable" in

6   referring to Ms. Eramo's effort, and the interaction with

7   Jackie to hold her accountable.

8           Secondly, the second interaction also makes reference

9   to Nicole Eramo.  "Of all her assailants, Drew was the one she

10  wanted to see held accountable.  But with Drew about to

11  graduate, he was going to get away with it, because, as she

12  miserably reminded Eramo in her office, she didn't feel ready

13  to file a complaint.  Eramo, as always, understood."  "As

14  always, understood."

15          And so each time that the plaintiff -- that the

16  defendants elected to use the words "holding somebody

17  accountable," it made reference to Nicole Eramo.

18          Now, there are two other instances.

19          If I could have slide Number 62, please.

20          There are two other references now displayed on the

21  left-hand side of the screen.  Both of them, while they don't

22  specifically refer to Nicole Eramo like the first two do, they

23  make reference to holding people accountable by the University

24  disciplinary system.

25          First one says, "The more privileged he is, the more

1  likely the woman has to die before he is held accountable."

2  That's a quote from a third party that was consulted by

3  defendants, and quoted in the article in the context of

4  "schools like University of Virginia."

5         And the second quote, two female students talking

6  about their experience with the sexual misconduct hearings,

7  which felt didn't hold their alleged perpetrators accountable.

8         So we have four instances each time making reference

9  to Nicole Eramo -- either making reference to Nicole Eramo or

10  the University disciplinary process.

11        There is no other use of the word "accountable" in "A

12  Rape On Campus."  And under the legal standards of whether a

13  reader would understand this, this reference in the subhead to

14  "being held accountable" to make reference to Nicole Eramo,

15  these four statements would lead a reader or could plausibly

16  cause a reader to understand that the abuse was at the hands

17  of Nicole Eramo and the University of Virginia.

18        But we have other indications outside of the scope of

19  the article that the holding accountable is synonymous with

20  the administration.

21        Rolling Stone issued a press release content to

22  promote "A Rape On Campus," and again they used this phrase,

23  "When Jackie tried to hold the men accountable."  The press

24  release summarizing the article and promoting it to the

25  outside world said, "When Jackie tried to hold the men

1 accountable, she was horrified to learn how the administration

2 largely overlooks victims of sexual assault."

3       Remember, Nicole Eramo is the only administrator the

4 article talks about as having interacted with Jackie. The

5 inference from this is, of course, "accountable" is the

6 equivalent of interactions with Nicole and interactions with

7 the University disciplinary system.

8       The defendants have admitted that this press summary

9 is a fair summary of the article.

10       The inference is created even further by a press

11 statement that Rolling Stone issued as the article started to

12 implode, as other journalists, the *Washington Post* in

13 particular, started asking questions about the veracity of

14 Jackie's story and the actions that seem to be so out of line

15 with the facts.

16       Rolling Stone issued a press statement to the media.

17 And this e-mail that I've excerpted here is the official

18 statement that Rolling Stone's editor, Shawn Woods, who was

19 the editor who worked on this piece, issued to the Washington

20 Post.

21       "The story we published," he writes, "was one woman's

22 account of a sexual assault at a UVA fraternity in October of

23 2012, and the subsequent ordeal that she experienced at the

24 hands of university administrators in her attempts to work her

25 way through the trauma of that evening."

1        So Rolling Stone's position is that the

2   administrators put Jackie through an ordeal.  That's what they

3   told the world in this press statement.  Contemporaneous, even

4   after their work had started to be questioned, they made that

5   assertion, linking the inference from "abuse" in that subhead

6   to the actions and the ordeal that the administrator put them

7   through.

8        Finally, I would note that people did actually

9   understand this "abuse" language as having referred to Nicole

10  Eramo.  We have submitted two declarations, one from a woman

11  named Laurie Casteen, who is a member of the University of

12  Virginia community and has known Ms. Eramo since 1999, and has

13  submitted sworn affidavits confirming that she read this

14  subhead, this "holding accountable" notion and "abuse," as

15  referring to Nicole Eramo.  Now, she rejects that notion, but

16  she understood that to be what the defendants were

17  communicating.

18        And contrary to what the defendants argue in their

19  motion, these affidavits are not conclusory.  They explain why

20  they reach that conclusion, what information they had or that

21  they read at the time that caused them to reach that

22  conclusion.

23        We also have literally dozens of e-mails from angry

24  people all over the country that came into University of

25  Virginia, that came into Rolling Stone, that have been

1    produced to us in discovery, and that came directly to Nicole

2    Eramo that made clear that people did understand the article

3    as a whole, but also the subhead in particular, of suggesting

4    that Ms. Eramo abused Jackie and subjected her to the ordeal,

5    the same ordeal that the defendants suggested.

6         I want to finally, on this point, address the

7    defendants' argument that they make.  They say, well, the

8    reference to abuse in the subhead of the article makes

9    reference to an incident about Jackie getting hit in the face

10   with a bottle, and that's the abuse that they were talking

11   about.  And that this notion of "holding men accountable,"

12   what that really means is Jackie's efforts to speak out

13   publicly about her assault, speeches on campus and all that

14   sort of thing.

15        That argument, in the face of the other ways the

16   defendants have used the term "accountable" and used the term

17   "ordeal" in describing what the administrators did to them, is

18   disingenuous.

19        The bottle incident, as we've come to call it, is

20   reported only near the very end of the article.  And if you

21   read the article in context, as you must, it was plainly not

22   anywhere close to the focus of the article, this bottle

23   incident.  It would not have been selected, or at least it's

24   not reasonable to assume that it would have been selected for

25   the very first words that Rolling Stone published about this

1  article in the subhead of it.  The incident occurred years

2  after Jackie reported her assault and, quote, "tried to hold

3  them accountable through the university process."  It just

4  doesn't make any sense from the defendants' own perspective.

5         Very briefly on "of and concerning."  We do not

6  understand, and the defendants' brief makes very clear that

7  they are not disputing that any of the other challenged

8  statements in the article are of and concerning the plaintiff.

9         In their opposition to our summary judgment motion,

10 on page 36, they say, "Nevertheless, defendants do not dispute

11 that the statements identified as B through E from the article

12 could be considered of and concerning Eramo."

13        And so other than the abuse statement that we've

14 devoted our time to this afternoon, they concede that the

15 other statements are of and concerning Eramo.

16        We've moved for summary judgment on that and to

17 narrow the issues for trial, we believe we're entitled to

18 partial summary judgment on those other statements, as well as

19 the abuse statement.

20        The same is true of the post-publication statements.

21 On page 41 of defendants' opposition --

22        THE COURT:  Let's back up a minute.  What

23 significance do you attach to that fact, that some of the

24 statements may have been of and concerning the plaintiff, and

25 then as to others, there may be a factual dispute?  What's the

1  practical significance of that distinction?

2       MR. CLARE:  Well, I think it's important, because if

3  the defendants admit, as they have expressly, that when they

4  talked about administrators in these other post-publication

5  statements, that it's -- Ms. Eramo was one of the people that

6  they were referring to in that, and that for purposes of the

7  legal standard of "of and concerning," that that's

8  established.

9       I think that that makes very clear that on our

10  "abuse" question, the one that is disputed, that that is more

11  likely to have been read by the same folks as of and

12  concerning the plaintiff.

13       We have to prove -- we have to demonstrate this

14  element at trial, and if the only issue that the jury has to

15  consider is whether or not that subhead "abuse" refers to the

16  plaintiff or not, you may find that it is a jump ball, that we

17  have good arguments.  I think we have great arguments based on

18  the textual arguments and the contemporaneous press release

19  and the like.  They make a different argument.  There's a

20  factual dispute, maybe, about that, and at the most, that

21  issue should be submitted to the jury.

22       THE COURT:  Let me put it another way.  What if the

23  Court were to agree with you and hold, what, three, four of

24  the references did pertain to Eramo, but yet there's a factual

25  dispute as to the fifth or sixth?  Would that necessitate a

Eramo v. Rolling Stone, et al. - 8/12/16

1  different, a special verdict question being put to the jury,

2  or would we just assume for the purposes of the questionnaire

3  that that element had been met?

4       MR. CLARE:  Well, I think that -- I mean, it's a good

5  question, and obviously, at the charging conference we're

6  going to have to grapple with how the jury is going to be

7  instructed.  But we are --

8       THE COURT:  Well, the answer, though, may have some

9  bearing on how the Court approaches this issue, because if it

10  doesn't matter, then it's not something that needs to be

11  addressed.

12       MR. CLARE:  I think it does matter, because for each

13  of the statements that we're alleging, for each of the

14  statements that we are alleging, we have to meet each of the

15  elements of the tort of defamation.  And if the Court agrees

16  with us on all but one of the statements, then we don't have

17  to prove that and the jury doesn't have to find that.

18       We would have a special interrogatory posed to the

19  jury that says, "As it relates to statement Number 2 about the

20  abuse, there is a dispute between the plaintiff and the

21  defendant about whether it is of and concerning the plaintiff.

22  If you find that this statement is of and concerning

23  Ms. Eramo, check here."  And then you go on to evaluate the

24  other elements as it relates to that statement.  But you would

25  not ask that same question for all the other statements that

1   are at issue here.

2          So I do think it does matter, for purposes of our

3   exercise today, to understand that if we can narrow the issues

4   for proof at trial, we won't have to introduce evidence, we

5   won't have to invoke witness testimony to demonstrate that the

6   other statements, the ones that they concede are about the

7   plaintiff, are "of and concerning."  So I do think it matters.

8          THE COURT:  Okay.

9          MR. CLARE:  Just to close out on that last point, the

10  post-publication statements, the ones that are not in the

11  article, they fit into a couple of different buckets.  They're

12  statements by either Rolling Stone to the press or the author,

13  Ms. Erdely, to the press.

14         Again, the defendants, at page 41 of their opposition

15  brief, do not dispute that Ms. Eramo was included among the

16  people that they were targeting for those comments, and so

17  unless Your Honor has questions specifically about those, or

18  unless we hear something different from the defendants, we

19  believe we've established that and are entitled to partial

20  summary judgment as it relates to those issues.

21         That brings me to the end of my "of and concerning"

22  argument.  If Your Honor wishes, we can hear arguments from

23  the defendants on "of and concerning" or we can power through

24  the rest of it.

25         THE COURT:  Let's push ahead.  The only one I would

1    single out is the public versus private figure.  Maybe we need

2    to have special attention addressed as to that issue, but I

3    think you can lump the others.

4            MR. CLARE:  Okay.  Thank you.  And I should have

5    noted at the outset that I'll be addressing the issues related

6    to the statements, defamatory meaning per se, opinion, and my

7    partner will be addressing issues related to public figure,

8    private figure, and also actual malice.

9            Turning now to defamatory meaning, which is, again,

10   teed up by these cross motions, plaintiff has moved for

11   summary judgment saying that these statements are, under the

12   Fourth Circuit precedent and the Virginia precedent,

13   defamatory per se, a special category of defamation, and,

14   therefore, we have certain -- different evidently hurdles that

15   we'll have to face or not face as a result of that

16   classification.

17           We believe we're entitled to summary judgment.  These

18   statements are defamatory per se.

19           And if you look at the jury instructions, there was a

20   very practical reason for sorting this out right now, because

21   the jury instructions that are given in Virginia for

22   defamation cases go down one track if you've got defamatory

23   per se -- and that's the type of statements that are

24   alleged -- and there's a different set of instructions that

25   would be given, at least on the model instructions, if the

1  statements were not defamatory per se.

2        So that's the purpose of us having moved to have this

3  determined now, so we can understand how the jury will be

4  charged on these issues.

5        We submit that all of the statements and the

6  implication in the article impugns Ms. Eramo in her trade and

7  profession, and attacks her integrity and performance of her

8  job responsibilities, and, therefore, are defamatory per se.

9        The defendants, in their motion, argue that three,

10 only three, of the many statements that we've sued on cannot

11 have the defamatory meaning as a matter of law.

12       I'm going to go through the legal standards again

13 briefly; the Court is familiar with them.  It's an easy legal

14 standard to satisfy, whether a statement is capable of a

15 defamatory meaning.  I'm going to come to what defamatory per

16 se means in a minute.

17       A statement has defamatory meaning if it tends to

18 harm the reputation of another as to lower him in the

19 estimation of the community or to deter third persons from

20 associating or dealing with him.  That's the *Tomblin* case and

21 the *Vaile* case.

22       And a statement is defamatory per se if it imputes to

23 a person's unfitness to perform the duties of an office or

24 employment, or a want of integrity in the discharge of the

25 duties of such an office or employment, or prejudices such

1  person in his or her profession or trade.  The *Tronfeld* and

2  *Carwile* cases cited in our briefs establish those standards.

3       A defamatory implication can be made indirectly, by

4  inference, implication, or insinuation; it does not have to be

5  direct.  It's how a viewer, a reader taking the statements as

6  a whole and in context would understand them.  So we don't

7  zero in and narrowly focus on semantics, but we understand how

8  a reader would understand, in context, the statements.

9       And if there is any question about whether a

10  statement could be understood to be defamatory, it must be

11  resolved by the fact finder at trial.  That's the *Pendleton*

12  case, which also says that extrinsic evidence is admissible to

13  show that a statement could convey defamatory meaning to its

14  recipients.

15      If a statement is capable of multiple

16  interpretations, as is the case in one of the three that we'll

17  be talking about, summary judgment is inappropriate.  That's

18  *Tomblin* and *Tharpe*, the two cases there.

19      If I could have slide 65, please.

20      We'll provide Your Honor and your clerk hard copies

21  of these slides, so you can have a better, more legible copy

22  to read.  But what we've done here in slide 65 is summarized

23  Fourth Circuit case law that we've cited in our brief, Eastern

24  District of Virginia, Western District of Virginia cases,

25  *Echtenkamp*, *Baylor, Singh, Cornwell*, and compared it to the

1  facts of this case, and the types of statements that were at

2  issue.

3          *Echtenkamp*, in particular, talks about the plaintiff

4  being abrasive or unprofessional and rude.  This was a

5  psychologist or a counselor, so I think it has some analogous

6  implications here for Ms. Eramo, who is in that confidential

7  counselor role to Jackie.  And these notions that she was

8  not -- the psychologist in *Echtenkamp* didn't demonstrate the

9  appropriate level of compassion was held to be defamatory per

10 se, because the Court held, correctly, that that imputes an

11 unfitness for the job and a want of integrity from doing your

12 job in some of the other statements.

13         Similarly, the statements that a plaintiff, as an

14 author, plagiarized a screenplay or a person whose integrity

15 was not high, these are things that hurt people in the way

16 that they do their jobs.  And we know that that's the case

17 here.  We have a control experiment, because we know the

18 implications of these defamatory statements in this case.  We

19 know how people read them.  We know the reader reaction to

20 them, the e-mails calling for Ms. Eramo to be fired, calls

21 saying -- criticizing her performance, saying that she doesn't

22 have the skills to do the job, and she should do the state of

23 Virginia a favor and resign.

24         Looking at the different statements, the three that

25 they challenge, the first statement that they challenge, the

1 defendants challenge defamatory meaning is the same one we

2 just looked at a minute ago, that when Jackie tried to hold

3 her assailants accountable, a whole new kind of abuse began,

4 whether that is capable of a defamatory meaning.

5        That takes direct aim at Ms. Eramo's fitness for her

6 position. Instead of helping and supporting Jackie as someone

7 in her position, an associate dean in the Dean of Students

8 office, and someone who is to provide intake and support and

9 resources to victims of sexual assault, Ms. Eramo, according

10 to this statement, did the opposite, subjecting them to an

11 "ordeal" -- borrowing from that press statement again -- and

12 further abuse and trauma.

13        So plainly, if Ms. Eramo subjected Jackie to abuse as

14 the administrator who dealt with her, and as the subhead says,

15 that statement is defamatory per se.

16        THE COURT: Do you perceive that there is some

17 contention between the argument that you're making in this

18 respect with the argument -- not to jump your partner's

19 presentation, but with the argument that you're making about

20 public versus private figure? Because as I understand it,

21 your theory is that the dean was not a policy maker, she

22 didn't decide how these assaults would be handled, she merely

23 implemented decisions that others made, and that she didn't

24 decide on the victim choice response to sexual assault

25 complaints.

1    And yet, here the suggestion is that these statements

2 have to be read to suggest that she herself was forcing the

3 result, that she was discouraging those complaining, that she

4 was orchestrating something that was contrary to the policy

5 that the university had established to deal with these

6 problems.  So is there some tension between the two arguments?

7    MR. CLARE:  No, Your Honor, there is no tension.

8 You're 100 percent correct in your understanding of

9 Ms. Eramo's role in not a policy-making role with the

10 responsibilities that she had.

11    THE COURT:  Well, that's what you say.  But if that's

12 true, then how would someone perceive the actions that were

13 taken pursuant to this policy as reflective of her abilities,

14 Eramo's skills and capacity to deal with these problems?  It

15 was the policy itself, it wasn't her.

16    MR. CLARE:  Well, the interactions that constitute

17 the abuse and that the suppressing, if you will, the

18 discouraging and doing nothing with this information, and

19 being indifferent to assault and Jackie's story of assault in

20 particular, were not in the bucket of things that were being

21 directed by a policy.

22    What they're saying what the article says and what

23 people understood the article to say is Jackie goes to Nicole

24 Eramo in a confidential process, in the role of a counselor, a

25 "Help me find resources at the university."  This is someone

1  who while she doesn't make policy and is not the person that

2  dictates policy and that sort of thing, she's the one that has

3  the direct interaction with these survivors of sexual assault.

4  She's the one that gets the call at 2:00 in the morning to go

5  the emergency room and counsel them in a confidential process.

6       She's not administering a policy or making a policy

7  when she demonstrates compassion and she counsels these young

8  men and women to recover from their trauma and to navigate

9  their way through the university system, she's not doing any

10  of those things, but she's doing it in a confidential process.

11       And so much like the psychologist or counselor who we

12  had in the *Echtenkamp* case, who has this very private

13  patient/doctor relationship, not a public figure in any way,

14  that's the role in which Rolling Stone said Ms. Eramo created

15  this abuse, or did these things, is because she did it in the

16  context of not of making policy or not of administering the

17  formal or informal university process, but rather, in the way

18  that she counseled in the confidential process these young

19  women.

20       THE COURT:  So your reading into this, your spin on

21  all this is that a reader would perceive Eramo as having

22  manipulated these women into a response that wouldn't reflect

23  on the university and, really, wouldn't cause authorities to

24  prosecute the perpetrators?  So it depends on the spin you put

25  on it, doesn't it?

1          MR. CLARE:  Well, that is the way people read the

2    article, and it is, in fact, what the -- when you read these

3    various summaries, they say, well, what we're -- this victim

4    choice thing, and that Ms. Eramo, by becoming a false friend

5    to these folks, pretending to befriend them, pretending to be

6    their advocate and support, coddled them into inaction, and

7    that that was the way Ms. Eramo did all these horrible things.

8    And that's why people who sent in these e-mails understood her

9    as having been, you know, almost worse than a policymaker,

10   because this is someone in a tight, confidential relationship

11   with these young women, who was there in the hours after their

12   assaults, building that trust and then abusing it in that

13   confidential setting.

14          THE COURT:  You know, that may be.  That may be.  It

15   seems to me that, again, it depends on the context and exactly

16   what spin the reader chooses to put on the reasonable

17   implications to be drawn from these statements.

18          But something else you said raises a question for me,

19   and maybe we ought to talk about it now.

20          Am I to understand you to say that you put these

21   questions to some sample group of people, and you've gotten

22   back responses that make you feel that these are statements

23   that are defamatory per se?  And if so, what possible

24   relevance could some sample group, some canvass of a group of

25   individuals who are asked to read the article have for the

Eramo v. Rolling Stone, et al. - 8/12/16

1    Court or for the jury in making its decision?

2          MR. CLARE:  Well, to be clear, we have not gone out

3    and done a survey like you would do in a confusing

4    intellectual property setting and asked people.  We have not

5    done any of that.  But the folks that I was referring to are

6    the people who on their own read the article and --

7          THE COURT:  Drew some response.

8          MR. CLARE:  Reader response.  And we've cited all

9    those in our --

10         THE COURT:  Right.

11         MR. CLARE:  And those folks did, in fact, read the

12   article in the way that I'm suggesting.  So it is reasonable,

13   I would argue at the summary judgment stage, for a juror to

14   infer that that is a plausible reading of it, these negative

15   readings of what Ms. Eramo did, because readers actually did

16   that.

17         THE COURT:  That's the point, it's a jury question.

18   The jury would have to read it for themselves and decide what

19   spin to put on it.  And the mere fact that a number of other

20   people read it one way so as to prompt them to make a response

21   doesn't suggest that others read it another way and didn't

22   feel compelled based on their reading to make a response.

23         MR. CLARE:  That's right.  I mean, ultimately, that

24   is correct.  We believe that the statements themselves and the

25   evidence that we put forward establish as a matter of law that

1 these statements are negative and defamatory; that anybody who

2 would read a statement that a confidential sexual assault

3 counselor abused and discouraged and acted with indifference,

4 anybody that would cause them to hold them up to disrepute and

5 not want to associate with them in the way that the cases talk

6 about, we think that the Court can make that determination.

7 But at a very, very minimum here at the summary

8 judgment stage, the jury must be asked that question:  Is this

9 a reasonable implication from these statements and the article

10 taken as a whole, including the photograph and all the other

11 post-publication statements that make clear this is the

12 overall theme of the article?

13 And so while we move for summary judgment because it

14 will help us with our jury instruction conversation that we'll

15 be having shortly, it, at a minimum, is an issue for the jury.

16 And the courts say that if it's a close question, that's the

17 way you need to do it.

18 THE COURT:  All right.

19 MR. CLARE:  So just to address, again, the three

20 statements that the defendants challenge, because those are

21 the ones that are at most at issue.  This issue about abuse,

22 we've talked about.

23 There's a notion -- they challenge the statement that

24 folks, including Ms. Eramo, discouraged Jackie from sharing

25 her story.  That's one of the three statements they say is not

1  capable of a defamatory meaning. And that takes direct aim at

2  her fitness for her job, because it accuses her of

3  discouraging her from pursuing justice and pursuing these

4  assailants and people who engaged in this supposedly violent

5  assault. Instead of doing those things, it accuses her of

6  doing the opposite, suppressing and discouraging her.

7       Their only argument about this statement is that what

8  they meant was they were discouraging Jackie from sharing the

9  story with Rolling Stone, that was what the statement, in

10 context, means and, therefore, it's not defamatory. We read

11 the statement, and others, we believe, read the statement to

12 say discouraged her from reporting it to the authorities or to

13 the university disciplinary process.

14      My point for today, Your Honor, is it doesn't matter,

15 it doesn't matter which of those two competing interpretations

16 you have. If Ms. Eramo is being accused of telling Jackie,

17 "Don't tell your story to Rolling Stone" or "Don't go public

18 with it," it's the same defamatory implication, because the

19 picture that they're painting is an administrator who cares

20 more about the University's bad publicity and reputation than

21 they do about victims and than they do about helping people.

22      And if the notion is "Don't talk to the press, don't

23 tell your story," and overruling Jackie's inclination to tell

24 her story, that's just as defamatory, and it impugns just as

25 badly her fitness for her job in the mind of a reasonable

 1  reader, because she is imposing her will as an administrator

 2  on the will of a student.  So it doesn't matter for purposes

 3  of this argument.

 4       Finally, I would like to turn to the last statement

 5  that Ms. Eramo had a nonreaction and took no action in

 6  response to Jackie's reported sexual assault.  This portrays

 7  Nicole as a callous, indifferent dean, who does not properly

 8  perform her job duties.  And the defamatory meaning of this

 9  nonreaction is supported and reinforced by the illustration,

10  slide 69.

11       We submit that a jury could conclude that the

12  inference that Rolling Stone was intending to communicate not

13  just from the picture, but from the picture, read in the

14  context of this statement, is that she is indifferent to the

15  concerns and the caring of the sexual assault victim; she's

16  indifferent to the protesters outside; that she's smiling and

17  whistling past the graveyard by giving a thumbs up at a sexual

18  assault victim.

19       I understand that the defendants have a different

20  interpretation of this illustration, and they're entitled to

21  have that, but for purposes of summary judgment, the issue is

22  whether a reasonable reader, a reasonable juror could conclude

23  that, in its totality, a statement that Ms. Eramo had the

24  absence of a reaction to being told of multiple gang rapes is

25  defamatory and impugns her fitness for her position, because

1  her position is to be sensitive, and her position is to

2  understand the issues that relate to reports of sexual

3  assault.

4       THE COURT:  But at the same time, her position, at

5  least at that stage of the investigation, is to be neutral, to

6  recognize that there's probably another side of the story that

7  needs to be heard before some accusation is made.

8       MR. CLARE:  But her job at this stage, it's

9  actually --

10      THE COURT:  She's supposed to be comforting, she's

11  supposed to be reassuring.

12      MR. CLARE:  Her job, as the intake person, is to be

13  comforting, to be compassionate.  It's not to remain, you

14  know, neutral in the sense that -- she's not going to be

15  adjudicating this case.

16      She's trying to get medical attention for these young

17  women, she's trying to understand whether or not they need

18  additional resources, accommodations with, you know, class

19  absences or makeup tests and that sort of thing, making sure

20  that they've got access to counseling, making sure that their

21  needs are taken care of, and that they develop a level of

22  trust with her office so they can decide whether or not

23  they're going to pursue criminal charges, whether they're

24  going to pursue a formal disciplinary complaint.

25      So at that stage, that's her responsibility.  And so

 1  this notion that she had a nonreaction in her job as caring,

 2  compassionate paints the impression that she's blasé about

 3  these reports of sexual assault.  "Oh, I hear stories about

 4  gang rape every day; this is not a big concern for me," and

 5  that implication itself suggests that she's not fit to do her

 6  job, and that's a defamatory implication.

 7          I would like to turn to slide Number 70 just very

 8  briefly.

 9          These are some of the quotes that I made reference to

10  earlier from reader e-mails that speak to the question of

11  whether or not the statements are defamatory per se.

12          "Eramo was a horrible person and a despicable human

13  being that clearly does not contain the needed skills as a

14  human/woman to do her job correctly."  It almost sounds like

15  it comes from a Fourth Circuit case on defamation per se.  But

16  that's the way people understood it, and that's what people

17  wrote in.

18          "She should do the great state of Virginia a favor

19  and resign."  That person clearly thought that she was unfit

20  or lacks integrity in her position.

21          "She smells of cover-up, deflect, delay, and fake

22  textbook sensitivity."

23          These are the sorts of statements that we believe

24  suggest that, at a minimum, summary judgment is inappropriate

25  for the defendants on these statements, and that the

1    implication should be submitted to the jury.  But we believe

2    these statements together, with the way anyone would read

3    them, suggests they're defamatory and defamatory per se.

4           I'm not going to belabor all the other statements in

5    the article, unless Your Honor has questions about them.  I do

6    have a summary, if you will, of each statement, that includes

7    the reason why it is defamatory and the reason why it is

8    defamatory per se, that I would leave with you and your law

9    clerk, and you're welcome to use it as a guide if that would

10   be helpful.

11          THE COURT:  That would be fine.

12          MR. CLARE:  I don't intend to belabor the point.

13          THE COURT:  You may do so.

14          MR. CLARE:  I will hand that up when I'm finished

15   here.

16          THE COURT:  Yes, sir.

17          MR. CLARE:  As far as the last issue that I'll be

18   addressing, this notion of opinion, defendants have moved that

19   these statements are nonactionable opinion.  That motion

20   should be denied.

21          At the outset, it's important to note one thing about

22   the defendants' argument.  They don't argue that the

23   challenged statements --

24          MS. McNAMARA:  Excuse me, Your Honor.  I just would

25   interject.  This is our motion, and I think he is supposed to

1  be arguing his motion at this point.  I mean would be happy to

2  respond --

3          THE COURT:  You didn't have a motion --

4          MR. CLARE:  I didn't.  I'm happy to oppose it.  I

5  thought you wanted me to address all the issues related to the

6  statements.

7          THE COURT:  I think you'll get a chance to respond to

8  their motion.

9          MR. CLARE:  Great.  I'll be happy to.

10          THE COURT:  What about the motion, though -- who is

11  going to handle the issue, and I assume it's brought before

12  the Court on your initiative, as to the number of

13  publications?

14          MR. CLARE:  My partner will be addressing that.

15          THE COURT:  Number of publications.

16          MR. CLARE:  Because the reason -- and I'll just frame

17  the issue, and we can have a discussion later, but it is our

18  motion.  We've moved for two separate findings, if you will,

19  on partial summary judgment.  One is there was a second

20  publication on December 5th.  So the question of, "Yes or no,

21  was there as separate publication?" we believe there was, and

22  my partner will explain why.

23          The reason why it is highly relevant at the summary

24  judgment stage is because it marries closely with actual

25  malice.  And that second publication that was made on

1  December 5th was made with a state of mind that had the

2  defendants' own words attached to it, the e-mail I showed you

3  earlier about, "We have to issue a retraction.  We don't

4  believe in Jackie's credibility anymore."  It's a different

5  exercise on summary judgment.  We're entitled to summary

6  judgment on --

7          THE COURT:  So is that the response that you believe

8  it comes into play, only in the context of actual malice

9  discussion?

10          MR. CLARE:  No.  I think it --

11          THE COURT:  You have a damage component too.

12          MR. CLARE:  I think it absolutely has a damage

13  component to it in terms of the republication of the article,

14  and that's why at the outset, when I was trying to give the

15  overview -- the article was published, it was then republished

16  on December 5th, after new facts had come to light, if you

17  will, that defendants themselves recognize were casting doubt

18  on Jackie's credibility.

19          So there's no question -- it's not even a jury

20  question at that point -- for the December 5th.  But then they

21  left it up for four more months before they took it off their

22  website, and that there's a huge damage component to that:

23  How many additional people saw the second publication and how

24  many people saw the article while it was left up there for

25  months and months and months and the damages continued to

1  accrue before they officially retracted it in April.

2       THE COURT:  So those are the only two contexts in

3  which that argument is to be made: in the assessment of actual

4  malice, and then as a possible element in assessing damages?

5       MR. CLARE:  I would say, yes, with one caveat, in

6  that, as the plaintiff, we have to demonstrate as one of the

7  elements that defendants published the statement.  And so

8  we've clearly satisfied that with regard to the magazine

9  article and the online publications and the interviews that

10 they gave.  So it also knocks out our element of publication

11 for that December 5th version of it.

12      THE COURT:  Okay.  So do we want to go ahead, then,

13 with the plaintiff's second presentation, and then allow a

14 response that incorporates the issues that are being initiated

15 by the defendants, and then have plaintiff's response to those

16 additional elements?

17      MS. McNAMARA:  That's fine, Your Honor.  I understand

18 Ms. Locke is going to -- and, Your Honor, some of these slides

19 we object to because they're not evidenced in the record, but

20 be that as it may.

21      But I understand Ms. Locke is going to address the

22 public figure/public official issue and the republication

23 issue.  And that's their motion, so I don't object to it.

24      MS. LOCKE:  That's correct, Your Honor.

25      My name is Libby Locke.  Again, I represent

1 plaintiff, Nicole Eramo.

2       And with respect to plaintiff's affirmative motion,

3 I'm going to be addressing two points with Your Honor today.

4 One, that Ms. Eramo was a private figure, that she was not a

5 public official, nor was she a limited purpose public figure

6 at the time of Rolling Stone's defamatory publication; and,

7 second, that summary judgment is appropriate on Rolling

8 Stone's republication of the online article on December 5th

9 and December 6th, after they understood Jackie no longer had

10 any credibility in their eyes and yet they added substantive

11 material to the article, which constitutes a republication.

12       THE COURT:  So you agree that that latter issue has

13 relevance only in terms of an assessment of actual malice, if

14 that's necessary given the Court's findings as a matter of law

15 on these other issues?

16       MS. LOCKE:  I think it -- yes, Your Honor, insofar as

17 generally the way republication is looked at is through a

18 statute of limitations issue, and I'll get to that point in a

19 minute, talking about the policy reasons why when you add

20 substantive information to an online publication why, it's

21 important that that is considered a republication, namely

22 because it restarts the statute of limitations.  And if it's

23 not considered, if it's not considered a new publication under

24 the law, what it would effectively allow would be the

25 defendants to add new information to -- new defamatory

1  information to an online publication, and do it with impunity,

2  because there would be no liability, it wouldn't restart the

3  statute of limitations.  But when there is a new cause of

4  action, it also restarts the clock for purposes of actual

5  malice, and all of their knowledge that they had up to that

6  point is relevant and should be considered for purposes of

7  when they added that new substantive information.

8          THE COURT:  Well, maybe.  Let's hear about public

9  versus private figure.

10          MS. LOCKE:  Yes, Your Honor.  So the essence of this

11  case is about a journalist with a preconceived storyline, who

12  set out to write an article demonizing someone in Ms. Eramo's

13  position, even before she had heard Ms. Eramo's name or heard

14  the first thing about Ms. Eramo.

15          When Ms. Erdely started her reporting, Ms. Eramo was

16  one of dozens of assistant deans at the University of

17  Virginia.  At the time of the publication of the article, she

18  was responsible for counseling and performing intake for

19  sexual assault victims.

20          Now, let's be clear, Ms. Eramo did not pick this

21  fight with Rolling Stone, and there was no public controversy

22  until Rolling Stone landed on campus at UVA and published the

23  article.

24          Ms. Eramo was prohibited by law and prohibited by her

25  employer from commenting publicly about her interactions with

1   Jackie.  Nevertheless, Rolling Stone and Ms. Erdely published

2   the very article they set out to write, notwithstanding all of

3   the red flags, the inconvenient facts that Rolling Stone chose

4   to recklessly disregard, Jackie's inconsistent story, and

5   Jackie's stonewalling Rolling Stone's investigation.

6          Now, the Virginia Supreme Court has talked about --

7   let me address for Your Honor first whether Ms. Eramo is a

8   public official.  There are two claims that Rolling Stone has

9   made, that she is a public official or a limited purpose

10  public figure.  So I'm going to address public official first.

11         The Virginia Supreme Court has defined a public

12  official as those, quote, "among the hierarchy of government

13  employees who have or appear to the public to have substantial

14  responsibility for the conduct of government affairs."  And

15  that's the *Richmond Newspapers* case.

16         The Fourth Circuit has said that public figure status

17  applies to policy makers, upper level administrators, and

18  supervisors.

19         Now, Your Honor, it is Rolling Stone's burden, not

20  the plaintiff's burden, to demonstrate that Ms. Eramo was a

21  public figure.  And at this stage of the motion for summary

22  judgment, all inferences must be drawn in Ms. Eramo's favor.

23         Ms. Eramo was the assistant dean of students at the

24  time of the article, that the article was published.  And what

25  did she do in that role?  She counseled sexual assault

1  survivors and did an intake -- she worked in an intake

2  capacity.  As my law partner said, she's the one who would get

3  the call, would show up at the hospital, in a very

4  confidential and private process with students who had

5  suffered some trauma or sexual assault.

6         She was mandated by law to provide precise

7  information about the options that students had when they came

8  forward with an allegation of sexual assault.  She had no

9  discretion in terms of what those options were and how she

10  laid them out for a student.

11        She also had no discretion when it came to whether

12  she -- whether the University of Virginia would issue a campus

13  warning.  This is something that defendants make much ado

14  about, about whether UVA should have issued a campus warning.

15  That was not Ms. Eramo's responsibility, that was her

16  superior's responsibility as to decide whether a campus

17  warning would be issued.  She had no discretion and no

18  decision-making authority in that respect.

19        She was not responsible for taking formal complaints

20  or conducting any investigation whatsoever into allegations of

21  sexual assault.  Moreover, the Federal Education Records

22  Privacy Act prohibited Ms. Eramo from speaking about her

23  interactions with sexual assault victims.  She's prohibited by

24  federal law from disclosing to Rolling Stone and to any other

25  third parties what her interactions were with Jackie.

1         If I could have slide 2.

2         So these are the standards that -- and I don't know

3    why the slide is appearing that way.  But this is the standard

4    that the Virginia Supreme Court and the Fourth Circuit have

5    set forth for a public official.

6         Now, Ms. Eramo -- slide 3 -- had no policy-making

7    authority.  She did not make or comment on sexual assault

8    policy whatsoever in her role as assistant dean of students.

9    So she wasn't a policy maker --

10        Next slide.

11        She was also not --

12        THE COURT:  Give me your opinion on that.  I mean, is

13   there a difference between establishing a policy and

14   commenting on the execution of the policy?  Because, according

15   to the defendant, she certainly did that.  She was

16   interviewed, what, approximately 30 times by campus, the

17   campus newspaper, 28 times perhaps; was interviewed by a local

18   TV station.  She commented on policy, even assuming for

19   purposes of the argument that she didn't help formulate that

20   policy.  Nevertheless, wouldn't the fact that she was the

21   front person, the speaker, the face of the university in terms

22   of sexual assault issues mean that she was an important

23   commentator on policy?

24        MS. LOCKE:  Well, public official status applies to

25   policy makers, and it's clear that Ms. Eramo did not make

1    policy.  And to the extent that she commented publicly about

2    policy is not the standard.

3            In the *Hatfill* case, Your Honor, that defendants cite

4    in their brief, there was -- the question about commenting on

5    policy had to do with the plaintiffs commenting on policy with

6    respect to the CIA, actually advising the CIA and advising the

7    federal government on policy.  And there's no dispute that

8    Ms. Eramo did not advise UVA on policy at the time.

9            And so to the extent that Ms. Eramo gave

10   interviews -- and let me be clear, those interviews were to

11   local newspapers, not on a national stage, and I will come to

12   that in just a second -- that doesn't mean that she was a

13   policy maker or that she commented on policy with respect

14   vis-a-vis the University of Virginia.

15           Now, Ms. Eramo --

16           THE COURT:  So would the president's press secretary

17   be a public figure?

18           MS. LOCKE:  I think that is a tougher question, Your

19   Honor.  I think that because the press secretary -- and I

20   think it also depends on the nature of the dispute, and I'll

21   come to that in a minute about how we define the scope of the

22   controversy.

23           But because the press secretary is out in front in

24   terms of commenting, I mean, I think if you were to talk about

25   the president's -- President Obama's press secretary, that

1  would certainly be a person who was a public official, a

2  public figure.  I think that's a much tougher question, and I

3  think we would be in a very different position if we

4  represented the press secretary of the University of Virginia.

5         THE COURT:  Let's say another example that comes to

6  mind with this case.  Is a magazine's editorial board the

7  policy making board for a magazine or is the owner and

8  publisher the policy maker?

9         MS. LOCKE:  I think probably both are, Your Honor.

10 And I think it would depend on the circumstances, the facts

11 and circumstances of that particular case and what the policy

12 was and who the facts -- how and when they commented on it.

13 But I think that it doesn't -- it's not limited to one person

14 or one designation as to who were to make the policy.

15        THE COURT:  All right.  Let's take Hustler magazine.

16 Can the publisher of Hustler magazine make policy for the

17 magazine itself or can he only make policy in terms of his own

18 public statements?

19        MS. LOCKE:  I think there is a -- I think they can

20 make policy for the magazine itself, being not just his own

21 statements.  And here it is clear that Ms. Eramo did not make

22 policy for the University of Virginia, notwithstanding what

23 defendants have argued; that she had an upper level dean, Dean

24 Allen Groves, who was the upper level administrator, who was

25 the policy maker, who was responsible for issuing the campus

Eramo v. Rolling Stone, et al. - 8/12/16

1   warning, who had that discretion that Ms. Eramo did not.  She

2   was a subordinate to Mr. Groves.  And in her subordinate

3   position, and especially in her intake role, she supervised no

4   employees whatsoever.

5         Now, if we could turn to the next slide.

6         Rolling Stone points to the fact that Ms. Eramo had

7   the title of the head of the sexual misconduct board at the

8   University of Virginia.  And they spend a lot of time arguing

9   that because she held this position, that she's a public

10  official or a limited purpose public figure.

11        Now, let's take a step back and describe exactly what

12  the sexual misconduct board is, because I don't think it is

13  fleshed out very well in the briefs, and I think it's

14  important for the Court to understand what the sexual

15  misconduct board is at the University of Virginia.

16        It is a formal tribunal that hears evidence and

17  adjudicates claims and investigates allegations of sexual

18  assault after there is a formal complaint of sexual assault.

19  It is a very different and formal procedure and process aside

20  from Ms. Eramo's intake role at the University of Virginia.

21        The sexual misconduct board hears evidence, it

22  adjudicates sexual assault incidences, and it has that indicia

23  of due process that is required under Title IX for these

24  universities to have.

25        Now, I want to be very clear here:  Ms. Eramo held

1  the title of the head of the sexual misconduct board at the

2  time of the publication, but she had not actually done

3  anything in that role for more than a year since the article

4  was published.  And, in fact, in that role, it was a

5  ministerial role.  She was not actually a member of the

6  adjudication panel.  She was the one who set the panels up,

7  who put people on the panels to adjudicate.  So in that

8  respect, you know, it was really more of a ministerial role.

9          And Rolling Stone points to the fact that she was the

10 head of the sexual misconduct board to support their position

11 that she is a public official.

12         Now, it's important to note, though, that that is not

13 what the article itself criticized Ms. Eramo's role.  There

14 are two references -- and I point your attention to the slide

15 that is up.  There are two places in the article where the

16 sexual misconduct board is referenced.  The first is

17 identifying Ms. Eramo as the head of the sexual misconduct

18 board, and the second has to do with a sexual assault survivor

19 who is called Stacy in the article and her interactions

20 through the sexual misconduct board, for which Ms. Eramo was

21 not a part of.  She did not do the intake, she did not do any

22 of the -- she was not the head of the sexual misconduct board

23 during Stacy's sexual misconduct board process.

24         So if you turn to slide 6, the law is clear, and I

25 point the Court to the *Richmond Newspapers v. Lipscomb* case

1   that you have to focus on the position that Rolling Stone

2   criticized in the article, and not just any position that

3   Ms. Eramo had at the time the article was published.

4          Here, in the *Lipscomb* case, the Court said, "There

5   has been no showing that *Lipscomb*, the plaintiff, who is not

6   an elected official, either influenced or appeared to

7   influence or control any public affairs or school policy.  And

8   importantly," the court goes on, "We also note that there was

9   no criticism of *Lipscomb* as an acting department head; it is

10  all leveled at her teaching activities."

11         The plaintiff in this case, *Lipscomb*, was both the

12  department head of a public school, as well as a school

13  teacher.  And the Court concluded that because the article and

14  because the controversy criticized the teaching role, not her

15  role as the department head, that you have to focus on what

16  the article criticized to determine whether someone is a

17  public official or private -- or a public figure.

18         THE COURT:  What other cases have the same effect?

19  Because I dispute that this particular statement was

20  dispositive of the *Richmond* case.  I think that was a

21  circumstance that weighed in favor of the court's rule, but I

22  don't think it was a dispositive factor.

23         MS. LOCKE:  It may not have been a dispositive

24  factor, but it is certainly relevant to the court's

25  understanding and analysis.

1    Here, because Ms. Eramo -- the article does not

2    criticize Ms. Eramo's position as the head of the sexual

3    misconduct board.  Remember, Jackie didn't pursue any claims

4    in the sexual misconduct board whatsoever, and so there really

5    is -- it's not relevant to the analysis as to whether she held

6    a title a year before, for work that she had done a year

7    before the article was published, that she hadn't since, she

8    hadn't since conducted.  It's just she should not be

9    considered a public official in that respect.  It's the very

10   private process for which Jackie and Ms. Eramo was engaged in

11   from which Ms. Eramo was prohibited by federal law from

12   actually speaking about.

13   Now, I would say to the Court if the Rolling Stone

14   article had targeted Ms. Eramo in her capacity as the head of

15   the sexual misconduct board -- let's say, for example, that

16   Jackie had actually pursued a formal complaint and she went

17   through that process, and there was a criticism levied at

18   Ms. Eramo in her position as head of the sexual misconduct

19   board.  I think we would be in a very different position

20   vis-a-vis as to whether or not she is a public official.  But

21   that is not what the article targets.  It targets her private

22   interactions with Jackie.

23   THE COURT:  And yet co-counsel argued that to the

24   extent these statements were critical, the fact they were

25   imputable to Dean Eramo in her capacity as the front person

1    for the University's response to sexual assault is part and
2    parcel of the defamation per se argument.

3          MS. LOCKE:  I think that that's right.  I don't see
4    any tension there.  I guess, I don't understand Your Honor's
5    concern about the tension there.

6          The questions are two in my mind.  The question is
7    whether Ms. Eramo was a public official in the capacity that
8    she is criticized in the article, which was her private
9    interactions with Jackie for which she was prohibited by law
10   from discussing publicly.  And then alternatively, whether the
11   statements in the article can be read and imputed as having a
12   defamatory meaning and being defamatory per se.  So I don't
13   think that there is tension there.

14         With respect to whether Ms. Eramo is a limited
15   purpose public figure, there is a five-part test that the
16   Fourth Circuit looks to determine whether a plaintiff is a
17   limited purpose public figure.  Again, this is Rolling Stone's
18   burden, and it's their burden to demonstrate each of the five
19   elements.  This is not a balancing test.

20         And the very first element is whether Ms. Eramo had
21   effective channels of communication to rebut the allegations
22   made against her in the defamatory article.  And the United
23   States Supreme Court, in the *Gertz* case, emphasized this
24   prong.

25         In that case the Court said, "The first remedy any

1  victim of defamation -- the first remedy any victim of

2  defamation has is self-help, using opportunities to contradict

3  the lie or correct the error and thereby minimize its adverse

4  impact on reputation.  Public officials and public figures

5  usually enjoy significantly greater access to the channels of

6  effective communication and hence have a more realistic

7  opportunity to counteract false statements than private

8  individuals normally enjoy."

9        Again, I point Your Honor to the *Lipscomb*, *Richmond*

10 *Newspapers v. Lipscomb* case, which has a nearly identical fact

11 pattern to this case.  There was a claim that a teacher and

12 department head had mistreated a student.  And the Court

13 looked to the facts that the Virginia privacy laws prevented

14 that teacher from rebutting publicly the allegations that the

15 newspaper had made.  And the Court said, I quote, that "The

16 plaintiff had no realistic opportunity to answer false charges

17 about her competence without violating Virginia privacy laws."

18       Rolling Stone doesn't even address the *Lipscomb* case

19 in their briefing, and I think that that's very telling.  It

20 can't distinguish it.

21       There's no dispute in the record that Ms. Eramo was

22 not allowed to discuss her meetings with Jackie under FERPA,

23 that Ms. Eramo was prohibited by the University of Virginia

24 and her bosses from meeting with Rolling Stone to discuss

25 Jackie's case, and there's no dispute that Rolling Stone knew

1 that Ms. Eramo could not rebut or confirm any information

2 about Jackie's case.

3       But most importantly, Your Honor, Rolling Stone could

4 have sought a FERPA waiver from Jackie to allow the University

5 of Virginia and Ms. Eramo to speak.  Rolling Stone literally

6 held the keys and did not use them to allow Ms. Eramo to rebut

7 the narrative that they intended to put forward.  And so we

8 shouldn't be hearing Rolling Stone now to claim that she's a

9 public figure when their own actions prohibited her from

10 speaking about Jackie's case.

11       Now, going back to the five elements of whether

12 Ms. Eramo is a limited purpose public figure.  As I said

13 before, Rolling Stone has to satisfy each of them.  Because

14 Ms. Eramo had no access to effective channels of

15 communication, we can stop there.  But I think because she was

16 prohibited by federal law, that is dispositive of the issue.

17       Nevertheless --

18       THE COURT:  You know, let's jump-start this argument

19 and look at Element Number 4.

20       MS. LOCKE:  Yes.

21       THE COURT:  To me, the real issue in terms of the

22 limited public figure is what the controversy really was in

23 this case.  Was the controversy the treatment of Jackie's

24 particular situation, or was it a broader controversy dealing

25 with the way sexual assault issues are handled at the

1  University of Virginia?  It seems to me that that's important

2  and informs the consideration not only of the fourth element

3  but also --

4          MS. LOCKE:  The second element.

5          THE COURT:  The first, second, and third element as

6  well.

7          MS. LOCKE:  You're exactly right, Your Honor.  And I

8  have here in my outline that is the kit and caboodle of this

9  analysis, and how Your Honor describes what the controversy

10 was really is dispositive of this issue.  So it's a very good

11 question.

12         Rolling Stone claims, as Your Honor correctly notes,

13 that the controversy at issue in the article is the national

14 debate on sexual assault on campus.  They define it very

15 broadly.  And our position is that the debate and the

16 controversy is whether Ms. Eramo mistreated or abused Jackie

17 in her interactions.

18         Now, I suggest that there are three places the Court

19 can and should look to, to determine how to define

20 "controversy."  The first is case law.  The Fourth Circuit for

21 decades has rejected broad subject matter classifications like

22 the ones that Rolling Stone are suggesting.

23         The second place is the text of the article and

24 contemporaneous statements that Rolling Stone made about what

25 the article was about.

1       And the last and most importantly is the scope of the

2  complaint as plaintiff pled it.  That is the controversy,

3  because -- it is the essence of the controversy and why we're

4  here in court.

5       So let me turn to the first point, the case law.

6  There are three cases that I point Your Honor to: the *Jenoff*

7  *v. Hearst* case, which is a Fourth Circuit case from 1981; the

8  *Blue Ridge Bank* case, also a Fourth Circuit case from 1989;

9  and a United States Supreme Court case from 1979, *Hutchinson*

10  *v. Proxmire*.

11       Each one of those cases rejected the use of broad

12  subject matter classifications to define a public controversy

13  because they said that doing so would basically swallow and

14  consume the analysis.

15       We look at the *Blue Ridge Bank* case, the most recent

16  of the Fourth Circuit cases.  The Court said, "We do not

17  believe that the existence of an ongoing public interest in

18  the stability of society's financial institutions and markets,

19  or in the supervision of the gaming industry, or in the

20  regulation of utilities automatically elevates every member of

21  the regulated class to public figure status.

22       "Such an approach would effectively collapse the

23  Court's dual inquiry, prescribed in *Gertz*, regarding the

24  subject matter of the publication (i.e., whether it's a matter

25  of pubic concern) and the status of the defamed entity into a

1  single consideration: a result which has been rejected by the

2  United States Supreme Court since 1971."

3         Now, in *Blue Ridge Bank*, the question at issue was

4  whether a bank was insolvent, and that's where the plaintiff

5  sued on, saying that that was false and provided a defamatory

6  meaning.

7         And in order to suggest that the bank was a public

8  figure, the defendants argued, "Well, it's a public figure

9  because what we care about is the bank's role in, you know,

10 national matters and the gaming industry and the society's

11 financial institutions," and the Fourth Circuit rejected that

12 approach.  I submit that's exactly what Rolling Stone is

13 trying to do here.

14        THE COURT:  I agree with you about that.  I think

15 you're absolutely right as to the broadest formulation of the

16 notion of controversy.  But it seems to me that what's at

17 stake here, the controversy is whether or not the University

18 of Virginia recognized sexual abuse as a problem on the

19 campus, and if so, if there was any mechanism or protocol in

20 place to effectively deal with it.  And as to that latter

21 question, Dean Eramo was very much involved in making sure

22 that there was.

23        Remember, based on your very first pleadings, you say

24 all this came about because Erdely got word through the

25 Department of Education's investigation that the University

1    might be a good place to start looking for answers to this

2    issue.

3             MS. LOCKE:  I'll address the OCR report in just a

4    minute, Your Honor.  But I would define the controversy

5    slightly more narrowly.

6             If I could have slide 10.

7             The article's deck that we looked at previously

8    defines what the article is about.  It was about Jackie

9    starting her freshman year at the University of Virginia when

10   she was brutally assaulted by seven men at a fraternity party;

11   when she tried to hold them accountable, a whole new kind of

12   abuse began.

13            Yes, there is language in the article about UVA and

14   their response to sexual assault policy, but it is told

15   through the lens of Jackie and her interactions with Dean

16   Eramo.  And what Rolling Stone said in the text of the

17   article, when it summarized the article in the deck is it is

18   about Jackie's story and Ms. Eramo's response to that story.

19            Rolling Stone reiterated that in contemporaneous

20   statements that they made to the media, and a statement to the

21   *Washington Post* after the article was crumbling, the

22   credibility of the article was crumbling.  Rolling Stone

23   defined the scope of the article as, "The story we published

24   was one woman's account of sexual assault at UVA, at a UVA

25   fraternity in October of 2012, and the subsequent ordeal she

1  experienced at the hands of the University administrators and

2  her attempts to work her way through the trauma of that

3  evening."

4        That is how Rolling Stone, not Ms. Eramo, defined the

5  controversy.  And I think we should take Rolling Stone at

6  their own words and their own contemporaneous statements about

7  what the scope of the controversy was.  I think that that's

8  much more persuasive than their post hoc, made-for-litigation

9  arguments about the scope of the controversy.

10       Finally, the last place that I would suggest the

11 Court look to figure out what the scope of the controversy is

12 is plaintiff's own complaint.  And this may, in fact, be the

13 most important factor to consider, because it's the essence of

14 the controversy, it is the very reason why Ms. Eramo sued

15 Rolling Stone.

16       We didn't sue Rolling Stone because they have

17 untenable and, frankly, outrageous opinions about what UVA

18 should or shouldn't have done with anonymous reports of sexual

19 assault that it appears that Jackie fabricated.  They're

20 entitled to have those opinions, and that is not what we are

21 challenging in this litigation.

22       What we are challenging is the factual assertions in

23 the article and post-publication statements about how

24 Ms. Eramo treated Jackie.  Those are the narrow statements

25 that we're suing on, and the implication in the article that

1  Ms. Eramo suppressed and discouraged Jackie from taking her

2  story public and discouraged her from reporting the story to

3  the police.

4         The plaintiff is the master of her complaint and

5  Rolling Stone should not be permitted to reshape the

6  controversy it defined in its own words, and that plaintiff

7  sued on in her complaint in order to create its own defense.

8         THE COURT:  Yeah, but, really, there are two separate

9  issues in play.  Whether the statements were defamatory,

10 that's certainly one issue.  But also, in determining that, we

11 have to determine the status that Dean Eramo occupied.  And

12 that resolution of that issue is not governed by the

13 resolution of the second.  They're related but they're not

14 inextricably so.

15        MS. LOCKE:  No.  And, Your Honor, you're correct.  We

16 point to contemporaneous statements that Rolling Stone made

17 both as a count for liability, but also to demonstrate what

18 Rolling Stone believed the controversy to be about, and what

19 Rolling Stone believed the article was about.

20        In any and all of their communications, we never see

21 Rolling Stone defining the article about the national debate

22 on sexual assault or UVA's broad response to sexual assault

23 survivors.  It is Jackie's story.

24        THE COURT:  Well, that may be, but that still doesn't

25 dictate the Court's resolution of the issue of Dean Eramo's

1  status.  The Court certainly considers the way that Rolling

2  Stone described the whole controversy.  But, really, it's more

3  objective than that.  The Court has to look to other sources

4  of information to decide what status she occupies, wouldn't

5  you agree?

6          MS. LOCKE:  I think that there are other indicia of

7  whether Ms. Eramo was a public figure or a private figure.

8  But there is a variety of case law.  And, Your Honor, I will

9  be very candid, the case law goes in multiple different

10 directions in this way.

11         I think that Ms. Eramo is more akin to the provost

12 in -- it's an Ohio case.  The University of Ohio provost was

13 considered a private figure not a public official.  And, you

14 know, the idea that Ms. Eramo had effective channels of

15 communication is just not the case.

16         I mean she really -- again, in defining the scope of

17 the controversy, if the scope of the controversy -- and this

18 is why I say this is the kit and caboodle of the issue:  If

19 the scope of the controversy is whether she is able to talk

20 about sexual assault at UVA generally, yes, she was.  I don't

21 dispute that.

22         THE COURT:  There's no question that factor really

23 favors your side.  No question about that, I concede.

24         MS. LOCKE:  And it's dispositive, Your Honor, because

25 they have to demonstrate each and every element and so --

1       THE COURT:  Except that a lot of it depends on how

2 the notion of controversy is taken.  I mean her opportunities

3 to respond were very, very limited regardless of how the

4 controversy is taken.

5       MS. LOCKE:  That's fair, Your Honor.

6       THE COURT:  If the controversy is the University of

7 Virginia didn't have any way to handle these things, there

8 were things she could have said about that, and there are

9 things the university could have permitted her to say about

10 that.  And it is possible that, you know, that while she could

11 have said things about that, the University wouldn't let her.

12       MS. LOCKE:  And that's another good point, Your

13 Honor.  The very fact that the University of Virginia

14 prohibited her from speaking with Rolling Stone demonstrates

15 and evinces the notion that she was not a high level

16 administrator, she was not someone that they wanted to put out

17 there in a public way.

18       THE COURT:  But they could stop her if they wanted

19 to.

20       MS. LOCKE:  And they stopped her, and they prohibited

21 her from doing that.  She was willing to speak with Rolling

22 Stone, because I think that she sincerely wanted to make sure

23 that they got things right, but she was prohibited from doing

24 so.  I think that cuts in our favor, the fact that she wasn't

25 a public official and the University of Virginia didn't

1  consider her to be one.  They engaged all the communications

2  through the president of the university and through their

3  public affairs office, and so I think that also cuts very much

4  in our favor.

5         THE COURT:  It could have simply been an indication,

6  though, that the University was receiving very good legal

7  advice when it came time to have Dean Eramo make a response.

8         MS. LOCKE:  Well, having interacted with some of the

9  lawyers at the University of Virginia, they do have very

10  excellent lawyers over there.

11        Now, I want to respond to Your Honor's points about

12  whether the controversy existed prior to the publication and

13  the Title IX investigation.  I think it's very important to

14  get a couple of things clear.

15        If I could have slide 8.

16        And, again, this is Element 4, whether a controversy

17  existed prior to publication.

18        In their reply, Rolling Stone points to the OCR, the

19  Office of Civil Rights report, and saying -- and emphasized

20  the fact that there was an ongoing investigation at the

21  University of Virginia.

22        Now, let me be clear, it wasn't just the University

23  of Virginia that was being investigated; there were like 15

24  different schools.  And there's very clear testimony that, I

25  will be very candid, Your Honor, we didn't include in our

1 brief, and having gone back and prepared for this argument,

2 I'm kicking myself that we didn't.  But with Your Honor's

3 permission, I have a two-page supplemental filing that is not

4 argument.  It's really more to supplement the record of

5 testimony that I think it's important for the Court to

6 consider on this very factor.

7         Susan Davis, she's at lawyer at the University of

8 Virginia, was deposed in this case, and she testified very

9 clearly that the Office of Civil Rights investigation had been

10 dormant at the University of Virginia for years prior to the

11 Rolling Stone article.  And it had -- for more than two years,

12 the University of Virginia had heard nothing from the Office

13 of Civil Rights with respect to its Title IX investigation,

14 and that she expected had the Rolling Stone article not been

15 published, they never would have heard from the Office of

16 Civil Rights ever again.

17         But she also testified that the Office of Civil

18 Rights restarted the investigation immediately after

19 publication of the Rolling Stone article.  I'm talking within

20 two or three days after the Rolling Stone article was

21 published, the University of Virginia received a call from the

22 Office of Civil Rights, and the Office of Civil Rights

23 restarted the investigation.  It came to the University of

24 Virginia campus to conduct interviews in the week after the

25 Rolling Stone article was published, and it conducted those

1  interviews in early December.

2          And there is no evidence whatsoever in the record

3  that, prior to the publication of the article that Ms. Eramo

4  was a target of, the Office of Civil Rights investigation,

5  that was dormant before the publication of the article.

6          And so the OCR report that the defendants cite to

7  demonstrate that there was this ongoing public controversy,

8  because the University of Virginia was subject to this

9  investigation, wasn't issued until many, many months after the

10 Rolling Stone article was issued.  That investigation wasn't

11 restarted until the Rolling Stone article was published.

12         And with Your Honor's permission, we'd like to file

13 today a very short supplement to supplement the record on

14 those points, because I think it's very important.  It

15 demonstrates that there really wasn't an ongoing investigation

16 prior to Rolling Stone's publication of this article.  They

17 are the ones that got this investigation regoing, and there's

18 very clear record evidence and testimony in this case to that

19 fact.

20         THE COURT:  So your assertion would be that, based on

21 that, that the University of Virginia was not under regional

22 or national scrutiny about sexual assaults on campus?

23         MS. LOCKE:  That's correct.  That's correct.  This

24 investigation had been dormant, and Ms. Davis testified that

25 she expected that they would not have heard from the Office of

1  Civil Rights at all with respect to this very dormant

2  investigation had Rolling Stone not published its article.

3            It created this mayhem on campus, and that's when OCR

4  came on campus and conducted its interviews.  There is an

5  entire back and forth with respect to how OCR conducted its

6  investigation.  And there's record evidence that the very

7  first draft of the report was so biased and so riddled with

8  factual errors that it was withdrawn after UVA had the

9  opportunity to come back and counteract and rebut some of the

10 points.

11           UVA was not given that opportunity with respect to

12 the second, the second OCR report.  It was just issued and UVA

13 was basically forced to accept the conclusions.  But I don't

14 want to get --

15           THE COURT:  But whether that's true or not, the

16 conclusions were somewhat scathing, even in the second report,

17 as I understand it.

18           MS. LOCKE:  They are.  I don't dispute that they are

19 negative conclusions, but I would say that, as an evidentiary

20 matter, it postdated the publication.  It's not relevant to

21 whether or not there was public controversy at the time.

22           THE COURT:  Yeah, you know, if this case turns -- if

23 the decision on Dean Eramo's status turns on these sorts of

24 considerations, we may have to do something else.  I'm not

25 sure that it does.  I've considered a separate evidentiary

1   proceeding on this issue, and I've considered withholding a
2   ruling on her status until after the plaintiff's evidence is
3   submitted at trial.  And I think there will be some sort of
4   trial in this case.
5           MS. LOCKE:  We would welcome that.
6           THE COURT:  I think that's important.  I think those
7   things are important, but it's really not fair to expect
8   Rolling Stone to respond to this today.
9           MS. LOCKE:  That's fair, Your Honor.
10          MS. McNAMARA:  Your Honor, I'm more than prepared to
11  respond to this today.
12          THE COURT:  What do you think about the need -- the
13  two of you think about the need for a separate evidentiary
14  proceeding on this issue?  Or do you think that we have enough
15  information in the existing record to fairly decide the issue?
16          MS. McNAMARA:  I believe that we have more than
17  enough information in the existing record to establish under
18  the controlling law that Dean Eramo is a public official
19  and/or a limited purpose public figure.  If Your Honor decides
20  otherwise, obviously we would be open to having an independent
21  hearing.
22          THE COURT:  I think of the two, limited purpose
23  public figure seems to me to be more likely.  But then again,
24  I think certain of these, the *Capital Cities* case, the -- I
25  forget the style of it -- it seems to me that certain of the

1  criteria do favor the university, at least based on what I

2  know about the case today.  So, you know, that's not to say

3  that you couldn't find for purposes of the analysis Rolling

4  Stone hadn't met its burdens as to all five.  But still, it's

5  close, it's close on some of these.  I don't know the best

6  method in which to proceed.

7          MS. LOCKE:  Your Honor, I would agree with you that

8  this is a -- it's a tough question.  There's case law on both

9  sides of this issue.  Again, I would go back to the whole kit

10  and caboodle of this is how you define the controversy.

11          THE COURT:  Agreed.

12          MS. LOCKE:  And Your Honor is exactly right with

13  respect to that.

14          We would welcome -- we would certainly welcome an

15  evidentiary hearing on that.  I think that there are facts

16  back and forth on this.  I agree with Ms. McNamara that, from

17  our prospective, there is enough evidence here should the

18  Court conclude that the controversy is as plaintiff's plead in

19  her complaint, and as Rolling Stone said in its own article

20  and contemporaneous statements, that the controversy is the

21  interactions between Jackie and Ms. Eramo, that there is more

22  than enough evidence to demonstrate that she was not a public

23  official or a limited purpose public figure.  If Your Honor --

24          THE COURT:  Agreed.  If that's what the evidence

25  establishes, then you win on the limited purpose test.  But

1  I'm not sure that's what the evidence establishes, at least

2  not today.

3          MS. LOCKE:  We would certainly welcome putting on

4  evidence at trial to that respect.

5          But let me be clear -- and I'm also going to address

6  actual malice; I will do it in response to Ms. McNamara's

7  presentation for her motion.

8          But let me be clear, even if we do have to show

9  actual malice, we still can do so in this case without a

10  doubt.  As we said in our opposition to their motion for

11  summary judgment, this may be well one of the most clear cases

12  the Fourth Circuit has ever seen of actual malice.  And I'll

13  be prepared to address that after Ms. McNamara makes her

14  arguments.

15          Let me turn finally to the question that Your Honor

16  had about the republication.

17          Virginia law is clear that each time a defamatory

18  matter is brought to the attention of the third party, there

19  is a new publication.  So there is something called a single

20  publication rule, and what it does is it limits liability for

21  a defamation defendant, so they are not subject to a myriad of

22  different lawsuits for a single publication of defamation.

23          There's an exception to that where the defendant

24  republishes information, so that the paradigm that is given in

25  the restatement comments is a morning edition of a newspaper

1 and an evening edition of a newspaper.  Those are considered

2 two separate publications, they reach two different, separate

3 audiences, even if the newspaper does not change any material

4 whatsoever and the substance is exactly the same.

5         Now, the case law had to evolve in the wake of the

6 Internet.  How do you deal with republication where we're

7 talking about Internet websites that go up and stay up

8 forever?  And there are a series of cases that have come down

9 that draw the line very clearly into whether new information

10 is provided on a website that is substantive.

11         I would direct Your Honor to the *Larue* case.  It's an

12 Arizona case; it's a state case from Arizona from 2006.  And

13 contrary to a lot of state court cases, this is not a

14 perfunctory analysis.  It really does go through the case law

15 on republication, and, in particular, with respect to the

16 Internet.

17         And it held that modifications to an Internet posting

18 can be considered substantive or nonsubstantive, and it draws

19 that bright line between substantive changes and alterations

20 and nonsubstantive alterations.  And it says that if there is

21 a substantive alteration to the material, to the defamatory

22 material, then there is a republication and it restarts the

23 statute of limitations for the purposes of bringing a

24 defamation claim.

25         Now, by contrast, if the alteration is

1  nonsubstantive, if they're changing advertisements on the

2  website or adding a nonsubstantive, like, technical web link

3  or something like that, that does not republish the defamatory

4  material and is not considered a restarting of the statute of

5  limitations for purposes of a defamation law.

6          I would also direct the Court's attention to an

7  Eastern District of Kentucky bankruptcy case, *In Re Davis*.

8  And it basically says the same thing, that it draws a bright

9  line between substantive and nonsubstantive changes to what is

10  alleged to be a defamatory publication.

11          And it basically lays out the public policy as to

12  why -- and this is what I alluded to before -- why it's

13  important to draw this substantive versus nonsubstantive

14  distinction.  Because if there is considered no republication

15  for adding new substantive information, it basically would

16  allow a publisher, a newspaper, or an Internet publication to

17  publish and add to an article defamatory information without

18  any sort of liability, because the statute of limitations

19  would have run.  So that's the public policy behind this.

20          Now, where there is a new cause of action, there also

21  comes with it all of the knowledge up to that point in time

22  with respect to actual malice and whether you evaluate it.

23          Here, let's be clear, there's no question that there

24  was an Internet article "A Rape on Campus" that was published

25  on November 19th.  There's also no question that on

1    December 5th and December 6th there was new content added,

2    with a reader's note; and there are three new paragraphs that

3    were added to the article, on the same URL, that explained new

4    information about the article.  And that substantive

5    information included the fact that there was no date,

6    function, or formal event at the Phi Psi house; that Drew was

7    not a Phi Psi brother; that Jackie told a story about being

8    forced to perform oral sex, as opposed to the vaginal rape

9    that was depicted in the article, on the night that she was

10   alleged to have been raped; that she had no physical injuries,

11   appeared to have no physical injuries on the night of her

12   alleged assault; that she was found more than a mile away from

13   the fraternity house on the night of the alleged assault; that

14   Rolling Stone never attempted to contact the alleged rapists

15   for comment; and that Rolling Stone did not know the identity

16   of the three friends who came to Jackie's aid on the night in

17   question.

18          None of those substantive changes to the article

19   suggested that Rolling Stone was withdrawing any claims about

20   Jackie's interactions with respect to Ms. Eramo.  In fact,

21   subsequent communications between Rolling Stone and Ms. Eramo

22   demonstrate that they were not withdrawing their claims about

23   Ms. Eramo, and that they stood behind their reporting as it

24   related to Ms. Eramo.

25          So there's no dispute that the original November 19th

 1  article reached 2.8 million unique visitors on the website.

 2  There's also no dispute that the December 5th article that had

 3  the reader's note reached an additional 1 million unique

 4  visitors.  These are different, unique visitors.

 5          And Rolling Stone, in their briefing, concedes that

 6  the very reason they put up the editor's note is because,

 7  "Given the intense press coverage this story had already

 8  received and would continue to receive, defendants knew that

 9  readers would be looking for the article."

10          They knew that new people would be looking to read

11  the article; that's what they concede.  And so there's no

12  dispute that the addition of new information was substantive

13  and that that, under the law, it constitutes a republication,

14  and that there was a republication to a new audience.

15          Now, Rolling Stone, in their defense to this, this

16  element that we move on, asked this Court to consider the

17  substance of the editor's note in order to determine that this

18  wasn't a republication.  They say, "No, no, no, we actually

19  retracted the article on December 5th, and, therefore, it

20  turns this analysis -- that Ms. Eramo is turning this analysis

21  on its head.  Why should we be punished if we're attempting to

22  retract the article?"

23          Well, there's simply no case law whatsoever to

24  support that approach.  The only question for this Court is

25  whether Rolling Stone added substantive information to the

1  article, and whether that constituted a new publication.

2          Rolling Stone cites to the *D.A.R.E. America* case, but

3  that case is highly distinguishable.  There, there was an

4  editor's note or new information that was posted, and the

5  allegation is that that new information was a separate cause

6  of action for defamation.

7          Here, we are not claiming that the editor's note

8  defamed Ms. Eramo.  What we are saying is that by posting that

9  editor's note, they republished the article.  And so the

10  *D.A.R.E.* case is highly distinguishable and really not

11  relevant whatsoever.

12          Let me be clear about why this is so important.  Not

13  only do we allege that, as my colleague got up and presented,

14  that there are specific statements that are defamatory that

15  were published in the original article, and that Rolling Stone

16  with respect to Ms. Eramo doubled down on them when they

17  posted the editor's note, but there is a quote that is

18  attributed to Ms. Eramo that "No one wants to send their

19  daughters to the rape school," that was republished on

20  December 5th, after they knew that Jackie was no longer a

21  credible source.

22          Jackie was the only source for that quote.  Rolling

23  Stone did not reach out to UVA to seek a comment from UVA or

24  Ms. Eramo as to whether she actually made that statement.  And

25  a million different, new, unique visitors saw and read and had

1  that quote attributed to Ms. Eramo.  And so Your Honor is

2  exactly right, this goes not only to actual malice, but the

3  damage that my client suffered as a result of this

4  republication.

5        And I end with this point, Your Honor:  Rolling Stone

6  knows how to issue a retraction when it wants to.  It did so

7  in April 2005 when it actually took down the story, when it

8  actually said it was officially retracting the story.  And so

9  I just don't think that there's any question that this

10 constituted a republication.

11       And finally, Rolling Stone has not disputed that if

12 this Court considers the December 5th edition of the editor's

13 note a republication, that the article was published with

14 actual malice.  They understood that Jackie was no longer a

15 credible source, they stood by their allegations with respect

16 to Ms. Eramo, and there's just basically no credible source

17 for the rape school quote, there's no credible source to

18 attest to Ms. Eramo's interactions with Jackie, and there's no

19 credible source that there were other alleged victims of gang

20 rape at Phi Psi.  They just have no -- there's no credible

21 source whatsoever for the allegations that are made against

22 Ms. Eramo in that December 5th republication, and they just

23 don't dispute that that was published with actual malice if

24 there was a republication on December 5th.

25       THE COURT:  Yes, ma'am.

Eramo v. Rolling Stone, et al. - 8/12/16

1          MS. LOCKE:  Thank you, Your Honor.

2          THE COURT:  Yes, ma'am.

3          MS. McNAMARA:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          MS. McNAMARA:  It's Elizabeth McNamara on behalf of

6    the defendants.  There's a lot to unpack.  We've been going

7    almost two hours, so as you can well imagine, I might have a

8    few things to say.

9          But let me begin by acknowledging my two colleagues

10   that are with me, because they've worked so hard on this case

11   and, in particular, this motion; that's Sam Bayard and Alison

12   Schary.

13         And what I want to do, again recognizing that there's

14   so many issues before the Court and so many have already been

15   addressed, I want to -- and we realize that there are multiple

16   independent grounds, we believe, warranting the dismissal of

17   the challenged statements at issue, but I would like to

18   primarily focus on plaintiff's failure to establish clear and

19   convincing evidence of actual malice, that each defendant was

20   aware and published each statement with actual malice.  And in

21   connection with that, necessarily, we have to begin with the

22   limited purpose public figure issue as well as the public

23   official issue.

24         THE COURT:  Yes, ma'am.

25         MS. McNAMARA:  And we should understand that there's

1  been a lot heard about the harm that has been afforded or

2  accorded to Ms. Eramo.  Rolling Stone has apologized profusely

3  to her.  Rolling Stone took prompt action to try to remedy

4  this action as soon as within hours of it becoming aware that

5  there was any concern with Jackie's credibility or any concern

6  as to the truth and accuracy of anything they published.

7          Now, turning, Your Honor, to the public official and

8  public figure issue.  This has been extensively briefed, and I

9  don't want to burden or overburden the Court, but we do

10  believe that there is far enough evidence in this record to

11  determine as a matter of law that Dean Eramo was a public

12  official as well as a limited purpose public figure.  And much

13  of that evidence in the record has been glossed over by the

14  plaintiff's presentation.

15          And, in fact, no doubt recognizing that her combined

16  role during the periods at issue as the primary intake person

17  for sexual assault, told to Rolling Stone as the leading

18  expert at UVA on the issues of sexual assault, as well as

19  being the chair of the sexual misconduct board makes the

20  plaintiff, as a matter of law, at the very least a public

21  official, as well as a limited purpose public figure.  Thus,

22  it's not surprising, and you heard it much today, she tries to

23  recast herself in her role at UVA.

24          She submitted a declaration that she did not share

25  the hearings of the sexual misconduct board in the year

1  leading up to the article, that it was published, and that she

2  did not have ultimate decision making authority over

3  university policy.

4       But we need to focus on what the operative standard

5  is as set forth by the supreme court and, most particularly,

6  the Fourth Circuit.  And in that regard, Your Honor, I note

7  that they quote from *Baumback*, the Fourth Circuit decision in

8  1998.  And they quote from it, and they exclusively focus on

9  language where the Court says that a public official status

10  can arise in the situation where policy makers or upper level

11  administrators or supervisors are caught up in a public issue.

12       But that is not the end-all and be-all for public

13  official status, as stated by the Fourth Circuit in the same

14  case.

15       The Fourth Circuit found that, "In determining if a

16  defamation plaintiff actually had substantial responsibility

17  for or control over the conduct of governmental affairs,

18  courts examine whether the plaintiff 'made recommendations,

19  participated in policy determinations, and exercised

20  discretion.'"  And the court was quoting from another Fourth

21  Circuit decision, *Artic Company v. Loudoun*.

22       The Court can find public official status if the

23  plaintiff has either actual authority or apparent authority.

24  And the plaintiff, in the argument, ignores that second

25  component, apparent authority.

1          Ms. Eramo's declaration cannot change the undisputed

2   record which establishes she was, in fact, a public official.

3   Among the key evidence in the record is her own complaint.

4   She says she's the master of the complaint, and, indeed, she

5   is.

6          She alleges that she was the chair of the sexual

7   misconduct board, which she describes in her complaint as,

8   "The university body that adjudicates all reports of sexual

9   assault and misconduct."  That's the complaint, paragraph 29

10  to 31.

11         Her own résumé in evidence identifies her as, "The

12  chair of the sexual misconduct board from September 2006 to

13  the present," quote/unquote, and touts her many

14  responsibilities, including that she oversees the adjudication

15  of sexual misconduct hearings, and works to educate students

16  about the board and its functions.

17         Her own performance reviews, again in the record,

18  establish and tout her responsibilities as the chair of the

19  SMB, including an interview about her role as the chair given

20  on November 17, 2014, two days before the publication of the

21  article.

22         And specifically, I direct Your Honor's attention to

23  Exhibit 95 to my declaration, putting in evidence, saying

24  where she, in a performance review, indicates that one of her

25  major accomplishments was that she had, and I quote, "Assisted

1  with extensive review and revision to UVA's sexual assault

2  policy."

3          Your Honor, we go back to the Fourth Circuit's rule,

4  and the Fourth Circuit's rule -- or the standard is that did

5  she participate in making policy determinations?  Her own

6  performance reviews establish that she assisted with extensive

7  review over UVA's sexual assault policies.

8          THE COURT:  But some of the other cases suggest that

9  it's not so discrete, that she has to be a decision maker.

10  And one questions whether the evidence in this case

11  establishes that Dean Eramo, while she was someone who

12  provided input, while she gave anecdotal information, while

13  she told about particular cases, one questions whether she was

14  ever a decision maker within the university community.

15          MS. McNAMARA:  Another way of saying "decision

16  maker," Your Honor, what the courts really look at is:  Did

17  she wield discretion?  Was she able to exercise discretion in

18  implementing UVA sexual assault policies?

19          THE COURT:  Is it enough that she exercises

20  discretion in the implementation, or does she have to exercise

21  discretion in determining what those policies are?

22          MS. McNAMARA:  Yes, I think she does both, Your

23  Honor, and the evidence shows she does both.

24          THE COURT:  I question whether the evidence shows she

25  does the latter.  I agree the University gave her marching

1  orders and she followed those orders; I agree with that.  But

2  did she determine what those orders were going to be?

3        MS. McNAMARA:  Yes.  She was a participant in the

4  determination of those orders.

5        THE COURT:  She gave input into those decisions?

6        MS. McNAMARA:  Yes, and that was enough under

7  *Baumback*, Your Honor.  That was enough to establish that he

8  was one of the deciders, he was one of the implementers.

9        But let me look at what the evidence shows she did.

10 She was the primary person, not just chairing sexual assault,

11 the -- SMB board, but she also was primarily responsible for

12 the informal resolution process.  And in that informal

13 resolution process, it was her duty and her obligation to

14 determine -- if somebody admitted guilt in sexual assault or

15 was determined through that process to have engaged in a

16 sexual assault, she implemented the sanction, she made the

17 decision as to what the sanction would be.

18        Similarly, when students came to her, she was a key

19 person in purposes of intake, in determining whether orders

20 were -- protective orders were going to be issued to protect

21 the student, and to make a series of other judgments that it

22 was within her responsibility to determine and to implement.

23        Now, I also note that there was the unequivocal

24 testimony of the two UVA 30(b)(6) witnesses who testified that

25 Dean Eramo did indeed remain the chair of the Sexual

1   Misconduct Board past the publication of the article.  And

2   there's no dispute that during the year before the article,

3   she, as I indicated, she remained the primary person handling

4   the informal dispute resolution which engaged with significant

5   discretion, including determining the sanction.

6          Indeed, the Office of Civil Rights, out of the

7   Department of Education, found that Eramo's September 21,

8   2014, radio interview was conducted in her role as the chair

9   of the Sexual Misconduct Board.

10         She was not -- they tried to make it she was just

11  passive, she wasn't doing anything.  Well, she was clearly

12  still setting up, she was delegating her authority to other

13  people who were doing it, she was engaging in interviews with

14  a local radio station.  And this interview was given just

15  weeks before the article.  And the Office of Civil Rights

16  concluded that her words in that interview created a hostile

17  environment, in violation of Title IX.

18         She was referred to the interviewer as the expert on

19  issues related to sexual assault at UVA.  And Eramo admits

20  that the finding in the OCR report referred specifically to

21  her; she admitted that in her deposition.

22         And she does not rebut the logical conclusion from

23  this finding.  If she had no actual or apparent authority at

24  UVA concerning sexual assault issues, how could her comments

25  possibly create a hostile environment for students?

1          In the end, Eramo's new contention that she had

2    little to no authority over sexual assault issues, and that

3    that authority resided exclusively in her bosses ignores the

4    operative legal standard.

5          Whether she had sufficient actual authority and

6    discretion in her roles as the primary point person on sexual

7    assault issues, and we submit she plainly did, is not

8    dispositive.  As I previously indicated, she indisputably had

9    apparent authority, as the OCR found and the undisputed record

10   establishes, and that is sufficient for public official

11   status.

12         Indeed, her --

13         THE COURT:  For all purposes?  I mean, it seems to me

14   the argument you're making goes to both components, that she

15   is a public figure in general, and that she's a limited

16   purpose public figure.  And it seems that the evidence, that

17   the circumstances that you're citing support limited purpose

18   to a much greater degree than general public figure.

19         MS. McNAMARA:  Well, we've never made an argument

20   she's a general public figure, Your Honor.  That's not an

21   issue before the Court.

22         THE COURT:  So I accept the notion that for limited

23   purpose public official, yes, she did have discretion, yes,

24   she did have -- she counseled decision makers, she informed

25   decision makers, she had input.  I accept that.

1        What concerns me is whether or not you've met the

2   burden as to the other criteria as established by the Fourth

3   Circuit for a limited purpose public official.

4        MS. McNAMARA:  Your Honor, let me clarify something,

5   because in the Court's response just then, I think there was

6   some confusion that I need to clarify.

7        THE COURT:  Maybe I misunderstood your position, and

8   if I did so, I apologize.

9        MS. McNAMARA:  I'm sure it was me, Your Honor, I'm

10  sure it was me, there's no question.

11       There are two independent means by which she gets a

12  public figure status, one is public official, one is limited

13  purpose public figure.

14       THE COURT:  Right.

15       MS. McNAMARA:  The public official status has nothing

16  to do with commentary that she makes, her ability to make

17  commentary.

18       THE COURT:  She's a public figure or she's not.

19       MS. McNAMARA:  If she's a limited purpose public

20  figure, the limited purpose goes to public figure, it does not

21  go to public official.  One is either a public official or not

22  a public official.

23       THE COURT:  And your argument is not that she is a

24  public official for purposes of these cases that go back to

25  *Gertz*.  Your notion is that she is a limited purpose public

Eramo v. Rolling Stone, et al. - 8/12/16

 1  official in terms of the more recent case law that informs the

 2  Court's analysis.

 3          MS. McNAMARA:  No, Your Honor.  Again, let me try to

 4  clarify.  There is no such thing as a limited purpose public

 5  official.  That is not a term that exists in the law.

 6          THE COURT:  Public figure.

 7          MS. McNAMARA:  There is a limited purpose public

 8  figure, which the five-factor test that --

 9          THE COURT:  I agree, I misspoke.  To the extent there

10  is confusion about the terminology, I agree I misspoke.  She

11  is a public official, so in her case it would be a limited

12  purpose -- but you're right, a limited purpose public figure.

13          MS. McNAMARA:  Correct, Your Honor.

14          THE COURT:  And that is your assertion here and

15  that's the argument you're trying to make.

16          MS. McNAMARA:  We're making both arguments, Your

17  Honor.

18          THE COURT:  And so this is on the limited purpose

19  public figure that this public official is said to have been.

20  And the argument that I'm trying to make, adopting what

21  Ms. Locke has said, is that, yes, in terms of the controversy,

22  in terms of the subject matter, she was someone who was

23  important within the university community, but that these

24  other criteria don't favor you quite as much.

25          MS. McNAMARA:  Well, let me turn to those other

Eramo v. Rolling Stone, et al. - 8/12/16

1  criteria, Your Honor.

2          THE COURT:  Yes, ma'am.

3          MS. McNAMARA:  Because I think that it's important

4  that we deal with them.

5          We've heard a lot, for example, about her inability

6  to speak because of FERPA.  Let me note that that really is,

7  we would argue, a red herring when it comes to public

8  official.  It has nothing to do with public official, whether

9  you have the ability to speak.  Your Honor is limited to speak

10 in certain regards about confidential matters that might be

11 before the Court, to speak with about issues --

12         THE COURT:  And as you found out, the Court doesn't

13 especially appreciate that fact, and we've had several phone

14 calls about that very circumstance.  But be that as it may.

15         MS. McNAMARA:  Yes.  Many, many, public officials are

16 restricted in how they can speak.  That has nothing to do with

17 public official status; it simply is irrelevant.  The head of

18 the CIA would be clearly a public official, yet clearly is

19 limited in what he can speak to on classified information.

20         The same, under their theory of public official

21 status, the president of the university, President Sullivan,

22 would not able to -- would not be a public official because

23 she too could not speak to Jackie's particulars and be guided

24 by FERPA.  That is clearly not the law.  And the law is clear

25 that with regard to public official status, that people like

1  Dean Eramo, who contributes to policy at the university,

2  implements policy at the university, and was critical in that

3  regard, that they are, in fact, a public official.  And --

4        THE COURT:  So how do you think that that first

5  factor in the *Capital Cities* test should be evaluated in these

6  circumstances?

7        MS. McNAMARA:  With regard to what the controversy

8  is, Your Honor?

9        THE COURT:  Yes, the five factors that help us decide

10  if she's a limited purpose public figure.

11        MS. McNAMARA:  Okay.  Your Honor, with regard to the

12  controversy, there is no question that one issue in the

13  article is Jackie and what happened with Jackie and the

14  response of the university to Jackie.  But that is not the

15  entirety of the article, that is not the controversy that is

16  presented by the article.

17        The plaintiff over and over again talks about what

18  Rolling Stone has said about what the controversy is, what

19  they've said subsequently that shows what they believe the

20  controversy to be.  All of that is entirely irrelevant, Your

21  Honor.

22        For determining the controversy in this litigation,

23  what the Court does is look at the articles themselves.  And

24  let me begin by focusing the Court on *Hatfill*, where the very

25  same thing -- *Hatfill v. The New York Times*.  That involved

1  the case of Mr. Hatfill was accused of being the anthrax

2  killer.  Far more damaging than anything asserted here

3  obviously, Your Honor, which underscores the fact that whether

4  something is damaging is not operative, since that action was

5  dismissed on actual malice.

6        But the Fourth Circuit there found Mr. Hatfill to be

7  a limited purpose public figure, and looked at the fair

8  reading of the *New York Times* columns at issue.

9        Eramo strains to define the controversy at issue to

10 be only about UVA's response to Jackie's allegation.  But as

11 we've determined, the fair reading of the article reveals that

12 Jackie's case is a vehicle to consider how UVA generally

13 responds to sexual assault allegations.  Over and over again

14 in the article the lense is pulled back, and Jackie's

15 experience is used as the stepping stone to discuss more

16 generally how sexual assault allegations are addressed at UVA

17 and the criticisms that are raised in the article with regard

18 to the same.

19        They talk about the broader issues involving sexual

20 assault.  They talk about the issue of -- the article talks

21 about victim choice and whether that is a good policy to be

22 followed, not specifically as to Jackie's case per se, but

23 much more broadly, as all the others who are discussed and

24 quoted from and the article discussed.

25        They also discuss the experience of many multiple

 1  victims other than Jackie.  The article is not limited to

 2  Jackie's experience.  We have experience of rape victims

 3  discussed in the article, going all the way back to Liz

 4  Seccuro in the 1980s, up through early 2001, the criticism

 5  that certain victims were told that they could not discuss

 6  what happened at the Sexual Misconduct Board, that it would be

 7  a violation of the Honor Code, that was ruled to be a

 8  violation of the Clery Act; the article discusses that.  The

 9  article discusses the fact that Rolling Stone -- I mean that

10  UVA was subject to the compliance review and far from being

11  dormant, Your Honor.

12          You have to only look at the article itself to

13  determine that this review was not dormant.  As the last page

14  of the article, 1079, is, the entire left column of the

15  article is devoted to recounting how the Board of Regents at

16  the University, here at a meeting that was conducted for a

17  full two hours, that was devoted exclusively to issues of

18  sexual assault, how -- where they discuss the compliance

19  review and the fact that the University was under the

20  compliance review at that hearing, a hearing that was attended

21  by Rolling Stone's reporter.

22          This is not something that was dormant.  It was an

23  issue that the University saw as front and center and the

24  University was addressing at the very time the article was

25  being reported.  And it was in response to the way the

Eramo v. Rolling Stone, et al. - 8/12/16

1  University addressed that; that the Office of Civil Rights,
2  Catherine Lhamon, is quoted as saying that the University's
3  mischaracterization of what a compliance review means, that it
4  was deliberate and irresponsible.  And she says, "Nothing
5  annoys me more than a school not taking seriously their review
6  from the federal government about their civil rights
7  obligations."
8          The evidence here also supports that Eramo
9  acknowledged the public controversy.  Not only was she
10 speaking to numerous press outlets about these issues, but she
11 wrote an op-ed on the issue, which begins with the first
12 sentence, "Sexual misconduct on campuses has garnered much
13 recent attention."
14         The controversy that is discussed in this article is
15 the broader controversy of how the University, specifically
16 UVA, was responding to sexual assault issues, and whether they
17 were addressing it in a fulsome and proper manner.  And there
18 were multiple opinions and experts and comments about that
19 issue both before the publication of the article as well as at
20 the time of the publication of the article.
21         And going back to the FERPA and the issue that she
22 couldn't comment on this, and Your Honor picked up on this,
23 she might have been restricted in some fashion on being able
24 to speak to the specifics of Jackie's case, but she could and
25 did speak to issues like the article's criticism.

1      She could point out that the victim choice was not

2  coddling or nothing like silencing or discouraging a victim.

3  She could argue that due process concerns stopped the school

4  from issuing a warning.  And in this regard, again, the

5  plaintiff is just trying to mix up between public official and

6  public figure status.

7      The plaintiff points to *Richmond Newspapers* on this

8  point.  *Richmond Newspapers* is not a case that even looks at

9  the issue of whether the plaintiff was a limited purpose

10 public figure.  That was not raised in that case.  It was a

11 case exclusively addressing the issue of whether a public high

12 school teacher would constitute a public official.  And the

13 courts across the country have differed on whether public high

14 school teachers would be a public official.

15      But I think we can say there's a far difference

16 between a public high school teacher and an assistant dean at

17 the University of Virginia, one of the most prominent

18 universities in this country, who was also the chair of the

19 Sexual Misconduct Board at all times relevant to this case.

20      Another point I just want to make before I move on to

21 actual malice, Your Honor, is that there's been some issue

22 raised here, I think in their briefs, as well as today that

23 her interviews -- we're supposed to discount her interviews,

24 you know, the 21 or more interviews, that she has given to the

25 press, that she herself produced in connection with her

1  interrogatories, that they're to be discounted because they

2  are local news outlets.

3       But the limited purpose public figure, that's what

4  the "limited" component of that refers to, Your Honor.  You

5  can be a limited public figure in a small pool or a limited

6  public figure with regard to a limited issue, and that's here.

7  Ms. Eramo is a limited public figure in UVA concerning the

8  issue of sexual assault.

9       And I refer again to the Fourth Circuit, and this was

10 in the *Carr v. Forbes* case in 2001, where it wrote -- where

11 the fact that the plaintiff had written editorials for local

12 press and quoted in the local media was sufficient to be a

13 limited purpose public figure.

14      Now, turning next, Your Honor, to the actual malice

15 argument, which we submit is really the dispositive issue on

16 this case.  We think there can and should be as a matter of

17 law a ruling that she is either a public official or a limited

18 purpose public figure.  And with that ruling comes the burden

19 she faces of establishing actual malice.

20      Now, on this issue, Your Honor, there is no dispute

21 about the governing law.  It is plaintiff's burden on this

22 motion to show that each defendant published each statement at

23 issue with knowledge that it was false or with serious doubts

24 as to the truth of the challenged statements.  It is a

25 subjective inquiry that looks at each defendant's actual

1  knowledge at the time of publication.

2         Critically for this action, as the Fourth Circuit

3  instructs in *Chapin*, when a plaintiff bases her case on

4  implications, as the plaintiff here does, she has the

5  additional burden of showing that the defendants intended or

6  endorsed the implication she presses.

7         Finally, the plaintiff must establish -- she can't

8  establish actual malice in the abstract.  She must establish

9  clear and convincing evidence that each defendant had serious

10 doubts about the accuracy of each challenged statement.

11        Underscoring the daunting nature of plaintiff's

12 burden, it is not sufficient to show some question of fact as

13 in a normal summary judgment.  She must establish that there

14 is clear and convincing evidence to submit to a jury that

15 defendants actually doubted the statements at issue.

16        And indeed, the Fourth Circuit on more than one

17 occasion has reversed courts who did not properly implement

18 this component to the standard, and that includes *Ryan v.*

19 *Brooks* as well as *Reuber v. Food Chemical*.  And I note with

20 regard to *Reuber* that that was an en banc decision by the

21 Fourth Circuit, where a case was sent to a jury and then was

22 reversed by the Fourth Circuit because there simply was not

23 sufficient evidence in the record to support actual malice.

24        Here Eramo fails to meet the significant burden the

25 Fourth Circuit identifies.  First, with the undisputed facts

1  here -- and this is important on this motion, Your Honor -- as

2  showing both public official status as well as actual malice,

3  the defendants put in, as the local rules require, a statement

4  of undisputed facts documenting that they published the

5  article and each statement at issue in complete faith as to

6  their accuracy.

7       The plaintiff did not provide any rebuttal to the

8  defendants' presentation of undisputed facts on both the

9  public figure and public official status, as well as the facts

10  on actual malice.  They provided no response.

11       Under the rules, Your Honor, this Court -- under Rule

12  56(e), this Court can consider all those material facts to be

13  undisputed for this record.  And that underscores why we

14  believe that the record here allows the Court to determine as

15  a matter of law the public official status and the public

16  figure status, because the facts put in by the defendants in

17  their motion were not rebutted in any way by the plaintiff.

18  What the plaintiff did is that the plaintiff put in additional

19  facts that they believed supported a finding of actual malice.

20  And in response to those facts, as we've supplied the Court,

21  we believe most are either not material or not supported by

22  the record evidence.

23       Next, plaintiff consistently fails to connect the

24  dots on actual malice.  She throws up a number of theories or

25  arguments that she believes supports actual malice, but she

1   does not even attempt to show how this evidence clearly and

2   convincingly demonstrates that the defendants published

3   particular challenged statements with actual malice.  Nor does

4   she even attempt to show that each defendant independently

5   knew each statement was false or had serious doubts.

6           For example, she identifies a number of fact-checking

7   queries raised by Rolling Stone's fact-checker, all of which

8   were resolved, as I'll get to, Your Honor.  But she never even

9   tries to show, she doesn't put in any evidence in this record

10  that Ms. Erdely, an independent contractor, had knowledge of

11  those queries.

12          As they themselves acknowledge in their opposition,

13  they note that Rolling Stone is bound by the knowledge of its

14  own fact-checker because she was an employee, and we don't

15  disagree with that, Your Honor.  But Rolling Stone is not

16  bound by the knowledge of Ms. Erdely, who is an independent

17  contractor.  And there's been no dispute on that issue in this

18  record.

19          Similarly, the plaintiff leans heavily on information

20  told to Erdely as supposed red flags; and as I've noted, the

21  plaintiff never tries to establish that Rolling Stone was

22  aware of that information, or much of that information.  And

23  Erdely establishes that that information was largely

24  confirmatory.

25          Nor does she make any effort to establish that

1    Rolling Stone published or was even aware or endorsed any of

2    the post-publication statements outside of its own press

3    release.  She put no evidence in this record that Rolling

4    Stone was aware of Ms. Erdely's statements or that they

5    endorsed it.  And to the contrary, the evidence in the record

6    shows that the editors at Rolling Stone didn't listen to her

7    two interviews that were on the radio.  I believe Shawn Woods

8    testified he began to listen to one and then stopped listening

9    to it.

10          THE COURT:  I guess the overriding observation that

11   can be made as to the plaintiff's evidence of actual malice is

12   that, in a way, it's a circumstantial case.  Ms. Erdely's

13   article was intended to point to the University's system for

14   dealing with sexual assault, which apparently was

15   mischaracterized as a victim choice.  And yet Ms. Erdely chose

16   to personalize that and relate it to this interaction that

17   Eramo had with Jackie, losing sight of the fact that it was

18   really the policy that was the subject of the article, or at

19   least probably should have been, and focusing instead on what

20   Ms. Erdely depicted as a very uncaring, kind of callous,

21   manipulative response on the part of Dean Eramo.  And the

22   circumstances indicate that it wasn't just a very analytical

23   talk about what the policy is and what it should be, it turned

24   into a personal vendetta.

25          MS. McNAMARA:  Well, Your Honor, let me try to

1  respond to that.  I mean, I think that --

2          THE COURT:  As I understand it, that's plaintiff's

3  theory.  That's one of plaintiff's theories.

4          MS. McNAMARA:  I think that's plaintiff's theory,

5  that's one of plaintiff's theories, and I don't think it is

6  borne out by the article or the evidence, and I most certainly

7  don't think it's borne out by the law.

8          So let me try to address each of those issues, which

9  really leads me to the point that they spent 60-plus pages

10 devoted to opposing the defendants' motion on -- they spent

11 100 pages opposing, but specifically on actual malice, they

12 spent 60 pages.  And they cite very little law, and they cite

13 not a single case where actual malice was found on comparable

14 facts before this Court, whether you considered the various

15 theories individually or collectively.

16         And the reason, we submit, plaintiff's omission is

17 dictated by the fact that courts in the Fourth Circuit and

18 around the country routinely grant summary judgment to

19 defendants when plaintiffs offer far more damning evidence

20 than anything present here.

21         And, again, I direct your attention to the *Reuber*

22 decision out of the Fourth Circuit, which was an en banc.

23 There the evidence demonstrated that defendant relied on a

24 source with a strong incentive to hurt the plaintiff.  It was

25 accepted in that case that the defendant did not inquire as to

1 the truth or falsity of the allegations.  In fact, the

2 defendant made a conscious decision not to inquire as to the

3 truth or falsity, and that the defendants failed to resolve

4 contradictory information.

5         And more specifically with regard to *Reuber*, you've

6 already heard, and I'm sure you'll hear more on actual malice,

7 that Ms. Erdely had a preconceived notion or a preconceived

8 storyline.

9         But the *Reuber* case resolves that issue and takes it

10 off the table.  It found at page 716 of *Reuber*, and I quote,

11 "Many publications set out to portray a particular viewpoint

12 or even to advance a partisan cause.  Defamation judgments do

13 not exist to police their objectivity.  The First Amendment

14 presupposes that a variable medley of opposing views is better

15 suited for the search for truth."

16         Your Honor, and consider *Hatfill*, where the reporter

17 was actually told that the key source may not be reliable, and

18 all the multiple cases cited on page 11 and 12 of our reply,

19 including the supreme court decision in *St. Amant*, where there

20 was reliance on a single source and absolutely no verification

21 whatsoever.

22         Nothing like that exists here on the evidence before

23 this Court.  And they have not cited a single case that

24 supports a finding of actual malice on the evidence before

25 this Court.  No one told Erdely that Jackie was not credible,

1  that's undisputed in this record; indeed, the opposite was

2  implicitly communicated.

3       She came to Erdely with the imprimatur of UVA, and

4  defendants knew that UVA was belatedly investigating her

5  charges; just like in *Hatfill*, Your Honor, where the fact that

6  plaintiff was under investigation lead to credibility to the

7  allegations.

8       What ultimately dictates the dismissal of plaintiff's

9  action, we submit, is that even if you accept her random,

10 abstract evidence for actual malice, and accept that Erdely

11 had a bias or a preconceived storyline, and accept that

12 fact-checking queries were raised and the unrebutted evidence

13 establishes they were resolved, and you accept that Erdely

14 knew that victims loved Dean Eramo, which the article repeats

15 over and over, and you accept that Jackie's story had some

16 inconsistency, plaintiff has still not cited a single case in

17 this circuit or the supreme court or anywhere else where that

18 combination of evidence was sufficient to meet the burden on

19 actual malice, when, as here, the uncontradicted evidence is

20 that each defendant believed each statement was entirely

21 accurate.  In the end, the law dictates a dismissal of this

22 action because plaintiff fails to meet her burden.

23       Let me briefly address the undisputed facts

24 surrounding defendants' knowledge and belief in the accuracy

25 of the statements at issue, rather than plaintiff's abstract

1  theories.

2          On this motion, defendants provided the blow-by-blow

3  description of her reporting, editing, and fact-checking for

4  this article, documenting with contemporaneous records why

5  they believed each statement to be true.  And as I noted

6  before, on this motion, the plaintiff does not dispute that

7  evidence.

8          Perhaps the best evidence, and it's already been

9  referred to today, that defendants believed Jackie and the

10  article to be true is demonstrated by Erdely's, quote, "Our

11  worst nightmare" e-mail that was sent at 2:00 a.m. on

12  December 5th.  It is vivid evidence of the precise moment when

13  Erdely lost faith in Jackie's story.

14          Up to that exact moment, Erdely was working on a

15  statement by which she and the magazine intended to stand by

16  the story, showing that up to that moment they continued to

17  believe in the truth of the story and the truth of Jackie's

18  allegations.  Needless to say, that statement never was

19  published.

20          And the undisputed evidence also shows that within

21  hours Rolling Stone promptly and responsibly posted its note

22  to readers after receiving Erdely's e-mail alerting the world

23  to the fact that they lost faith in Jackie and that they were

24  apologizing.

25          Now, as to the 13 statements at issue, in an appendix

1  to our motion, Your Honor, we attached and identified each of

2  the 13 statements that are at issue in this action.  Despite

3  the plaintiff's failure to do so, the Court needs to

4  individually assess whether plaintiff has provided clear and

5  convincing evidence that each is a false statement of fact and

6  that each was published by each defendant with serious doubts

7  as to its accuracy.

8          As the Fourth Circuit did in *CACI v. Rhodes*, which

9  found no actual malice, though the challenged statements there

10  included that the plaintiffs were killers, *CACI* provides the

11  road map for this methodical undertaking, and where, like

12  here, the Court weighed 13 separate statements, the Fourth

13  Circuit did not engage in an abstract assessment of various

14  theories of actual malice, it considered the evidence on a

15  statement by statement basis.

16          So let me turn to the statements.  And I'll group

17  them, Your Honor, because I think it's the easiest way to deal

18  with --

19          THE COURT:  Let's do that.

20          MS. McNAMARA:  I understand that.  First, we have a

21  group of statements that we've called what fall under the

22  rubric of the victim choice statements, which gets to Your

23  Honor's question and observation earlier.

24          A number of these statements fall under that where

25  the critique by the article that UVA, in connection with

1  Jackie's case as well as more generally, would cater to

2  victim's choice and that it can have a net effect of a student

3  being paralyzed and taking no action.  Specifically, this

4  involves statements Number 9, 10, and 11 in the appendix, as

5  well as statement Number 2, if you adopt the plaintiff's

6  meaning of statement Number 2, which I'll get to, but we don't

7  agree as the reasonable meaning of it in context.

8          But the issue of victim choice is first raised in the

9  article after the description of Jackie's meeting with Dean

10 Eramo that includes the undisputed facts.  No one disputes

11 about what transpired in that meeting and what was said and

12 what was done with regard to it.

13         It's described in the article that Eramo laid out the

14 options Jackie could pursue, including filing a criminal

15 complaint or filing a complaint with the SMB, and noted that

16 Eramo, quote, "Presented each option to Jackie neutrally," and

17 assuring her that, quote, "Whatever happened next was entirely

18 her choice."

19         After explaining -- the article then proceeds after

20 it explains that UVA, like most schools, catered to victim

21 choice.  The article provides UVA's defense of the practice.

22 It quotes UVA's counsel, Susan Davis, as saying that, "If you

23 force students to engage in more formal proceedings, fewer

24 students would report."  And the article acknowledges that

25 that is, in fact, a sensitive point, but proceeds to suggest

Eramo v. Rolling Stone, et al. - 8/12/16

1    that the sheer menu of choices, paired with the reassurance

2    that each choice is always the right one, often has the end

3    result of coddling the victim into doing nothing.

4         Then Laura Dunn's opinion on the topic is stated, and

5    that appears at 1076, Your Honor.  And she's identified as

6    working for an advocacy group, which is a signal that this is

7    going to be an advocate, someone with strong opinions.  And

8    she is quoted as saying, "This is an alarming trend that I'm

9    seeing on campuses.  Schools are assigning people to victims,

10   who are pretending or even thinking they are on the victim's

11   side."

12        Now, in opposition, plaintiff rewrites Dunn's quotes,

13   much as they do throughout their opposition here, where they

14   extract a word from one paragraph and then pluck it together

15   with two words from a paragraph several pages later.

16        In this Dunn's quote, they rewrite it to have it

17   appear that Ms. Dunn was specifically referring to Dean Eramo,

18   rather than "a trend I'm seeing on campuses" and discussing

19   schools.

20        One of the fundamental issues that the Court needs to

21   keep in mind is that you always have to look at the actual

22   language used in context, not just the precise context where

23   it appears but in the article as a whole.

24        Now, on this victim choice issue, the article comes

25   back to this critique over and over.  It's observed that

1  members of One Less affirm each others choices not to report,

2  in an echo of the University's approach.  That's at RS1078.

3  It is noted that when Jackie meets Eramo the second time, she

4  miserably reminds Eramo that she didn't feel ready to file a

5  complaint, even though Drew would not be held accountable.

6          And the article ends with a revelation that Hannah

7  Graham's murderer had been accused of sexual assault on two

8  Virginia colleges, and arguing that victims should be

9  encouraged to come forward, but again noting that Jackie

10  remained paralyzed.

11          We believe all these statements, in the context in

12  which they must be understood, are protected opinion and not

13  statements of fact necessarily proven to be true or false.

14          And all the facts that underlie these opinions are

15  not in dispute, Your Honor.  There's no dispute that UVA

16  indeed catered to victim choice.  There's no dispute that the

17  reported description of the choices given to Jackie and the

18  fact that Eramo emphasized victim choice over and over with

19  Jackie is not disputed, and it is documented by her own

20  e-mails that are in the record.

21          Further, there's no dispute that Dunn and many

22  experts interviewed supported this point of view, and it's a

23  point of view.  And that there's no dispute that few victims

24  at UVA indeed failed to proceed with formal complaints.  As

25  the article reports, in the prior operative year, there were

1  38 reports of sexual assault and only nine complaints and four

2  hearings before the SMB.

3          Thus, when Erdely says in post-publication interviews

4  that Jackie was "sort of discouraged from moving this

5  forward" -- and the plaintiff always takes out the "sort of"

6  here and uses just "discouraged," and that's statement Number

7  9.  Or we have statements Number 10 and 11, which are much

8  more long-winded, fulsome discussions by Erdely about the

9  support that would be needed for victims to go forward and the

10 like.  These are all shorthand for what's in the article and

11 the point of view and the opinion that catering to victim

12 choice can have the net effect of reducing or discouraging

13 reporting.

14         And there is no doubt about the accuracy of this

15 information, nor has the plaintiff shown that defendants had

16 any doubt about this information.  And this is shown with

17 regard to statement Number 2, which they tried to read as

18 being a statement that Dean Eramo was discouraging Jackie from

19 reporting her assault.

20         But when you look at that in context, as the Court

21 must, it appears in a paragraph where the topic sentence -- we

22 all remember from grade school what topic sentences mean.

23 They mean what the rest of the paragraph is going to be about.

24 That's why the first sentence in the paragraph is often a

25 topic sentence.

1    And here the topic is, "Two years later, Jackie, now

2   a third year, is worried about what might happen to her once

3   this article comes out."  So that later, in that same

4   paragraph, where it is said that lots of people have

5   discouraged her from sharing her story, it's sharing her story

6   with a national magazine.

7    Now, they argue -- they seem to accept, I almost took

8   from their argument this afternoon, that the rational,

9   reasonable interpretation of that clause in that paragraph is

10  discouraging her from sharing her story with a national

11  magazine, and they try to say it is still defamatory.  I would

12  argue I think it was wise counsel, if that was the counsel.

13  It is hardly defamatory to suggest that someone should or

14  should not speak to a magazine, a national magazine.

15    But in the end, Your Honor, turning back to actual

16  malice, if you accept plaintiff's argument that these are in

17  fact verifiable facts, that whether Jackie felt discouraged

18  by, you know, what Dean Eramo did or whether she felt

19  paralyzed, that this is something you can actually prove true

20  or false -- and we submit that you can't -- but if you accept

21  that these are verifiable facts, she has not presented this

22  Court with any evidence that either Erdely or Rolling Stone

23  knew these facts were false, or had any doubts about them or

24  intended or endorsed the implication they pressed.

25    The primary argument plaintiff makes with regard to

1  the victim choice statements and actual malice is that

2  defendants were aware that Eramo took Jackie to the police but

3  did not include that in the article.  She calls this an

4  exculpatory detail that would have eliminated the false

5  innuendo.

6          But, Your Honor, Eramo's e-mail after the meeting

7  establishes that if you accept that -- let me step back.  If

8  you accept that the defendants knew that Jackie told the

9  police about her gang rape and not the bottle incident, and

10  there's no evidence that the defendants actually knew that --

11  the actual e-mails just simply talk about the bottle accident

12  and nothing about her gang rape -- and Jackie told that she

13  only reported the bottle incident -- that's what she told

14  Erdely -- and Erdely independently went to the police to get a

15  police report as to what was reported, doing her due

16  diligence; and the police report indicated that Jackie had

17  reported an assault on the corner and had a laceration,

18  nothing about a gang rape or a sexual assault, but even if you

19  accept that defendants knew that Jackie had reported and also

20  communicated a gang rape to the police, there still is nothing

21  in this record that substantiates actual malice on that.

22          Indeed, Eramo's e-mail after the meeting apologizes

23  for the police being a little aggressive, but reminded her

24  that it was her decision how to proceed.  Quote, "Never

25  forget, however, that it is your choice."  And she put "your"

1  in all caps.

2      And the article on three separate occasions makes it

3  clear that Jackie's choice was not to proceed; thus, the

4  omission of the fact that Eramo took Jackie to the police

5  would not in any way change the underlying critique that

6  plaintiff is challenging, that UVA and Eramo deferred to

7  Jackie's choice not to proceed and did not commence an

8  investigation into her allegations until after September 2014,

9  after Erdely was on campus to report her article.

10     If the omitted information in the article does not

11 change the substance of what is reported in the article, which

12 is a critique about this over deference to victims and the

13 victim choice on not to proceed, that is not an omission that

14 makes any difference in the content of the article, and so it

15 is not in any way supportive of actual malice and that they

16 had actual doubt.

17     The only case they cite, or the primary case they

18 cite on this issue is *Tomblin v. WCHS-TV8* out of the Fourth

19 Circuit in 2011.  But what they failed to talk about, as they

20 do with virtually every case in the actual malice area, they

21 never look at the facts, they never look at what actually was

22 at issue in the case.  And in *Tomblin*, the omission of the

23 facts made a radical difference as to the meaning.

24     There, what was involved was a report where a woman

25 was saying that her son had been sexually abused at

1   plaintiff's daycare, and in reality what occurred was that a

2   four-year-old touched another four-year-old's genitals.

3          And what the evidence showed is that the defendant

4   was aware that there was no evidence that the daycare or its

5   employees were accused of sexual assault.  And there was no

6   evidence -- in fact, they were aware that social services had

7   investigated the incident and had determined that it was not

8   sexual abuse.  Yet the plain implication of the report that

9   was published was that the daycare itself had committed sexual

10  abuse through its employees or otherwise.

11         That is a far cry from the omission that is at issue

12  here, Your Honor, the alleged omission of not including the

13  fact that Eramo also took Jackie to the police.  That falls

14  under the rubric of editorial discretion, where the courts

15  have constantly, when evaluating this, said it is not the

16  Court's place to make a determination as to what to publish

17  and not to publish, that is the publication's discretion.

18         The only other evidence that the plaintiff cites to

19  support actual malice on these victim choice statements is she

20  points -- and I've noted there are four statements.  So the

21  only other evidence, she points us to one of them, and that is

22  on statement Number 2, where she focuses on edits to the

23  particular paragraph proposed by the fact-checker.

24         But what they do every time -- and listen when they

25  speak about the fact checking.  Every single time they only

1  focus on what Liz Garber-Paul -- a question that was raised by

2  her.  They never put into the record or reveal to the Court

3  how the issue was resolved by Rolling Stone and why there was

4  a determination made to publish the article here.  And this is

5  a particular case in point.

6        In her testimony, from testimony that was elicited by

7  the plaintiff, not some post hoc rationalization that they put

8  in someplace else, testimony elicited by the plaintiff,

9  Garber-Paul explained that she and Shawn discussed this

10 paragraph.  And the paragraph we're talking about is

11 discouraged from sharing her story.  And she explained that

12 she and Shawn, that they focused on the fact that the topic

13 sentence of the paragraph begins with the clear statement that

14 it was all about, quote, "sharing her story with a national

15 magazine."  Thus, they determined that the edits were not

16 necessary, particularly since elsewhere in the article, quote,

17 "We go into later about how Dean Eramo gave Jackie options for

18 how to share her story with different authorities."

19        The article expressly makes it clear that instead of

20 discouraging her from reporting, she wrote an e-mail to Jackie

21 affirmatively saying, "I will assist you if you want to

22 report."  That is the absolute opposite of discouraging from

23 reporting.  And in support of the opposition of this motion,

24 they include a blow-up of Garber-Paul's statement in which

25 they show the proposed edits that were resolved not to be

1   included in the article.

2           But the Court should look closely at that blowup --

3   and we'll see how they present it here today, because I'm sure

4   we'll see it again when they get back up -- that Garber-Paul

5   testified, and the document shows, she wrote "stet."  She

6   testified that she often put stet next to when she had

7   proposed changes but it was decided that the changes should

8   not be made, that they were satisfied with the way it was.

9   Yet, in page 67, when they do a blowup of this article, they

10  erased the "stet" and it's not there any longer.

11          In the end, Your Honor, the avoidance that a reasoned

12  analysis was given to the passage and Rolling Stone believed

13  it was entirely accurate as is is the opposite of actual

14  malice.  Plaintiff does not and could not cite to anything in

15  the contrary.

16          Next, I'm going turn to the campus safety statements,

17  and that is the vast bulk of the statements that are at issue

18  here Your Honor.

19          This next category of statements all fall under the

20  article's repeated observation that the UVA administration

21  took no action to warn the campus that an allegation of gang

22  rape had been made against an active fraternity.  This

23  observation, which is absolutely true -- no one disputes it in

24  this case that there was no warning given to the campus -- is

25  repeated three separate times in the article, at RS1077,

1  RS1078, and RS1078, 1079, using virtually identical language.

2       And from this undisputed critique -- which they

3  acknowledge in opposition whether they should or should not

4  have issued a warning is an opinion -- from this Eramo draws

5  eight of the 13 challenged statements.

6       There's statement Number 5, which is the expressed

7  statement of this opinion that experts apprised believed that

8  there should have been a warning.

9       There is statement Number 4:  That Eramo had a

10 nonreaction, which goes to her emotional reaction where she

11 didn't express shock.

12      Statement Number 6:  That Eramo had brushed off or

13 did nothing with the information.

14      Statement Number 7:  Again, that she did nothing.

15      Statement Number 8:  That UVA did not treat rape as a

16 violent crime.

17      And statement Number 9:  That she seeks to suppress

18 something like this.

19      And then finally, Statements Number 12 and 13.  13 is

20 the only post-publication statement that was published by

21 Rolling Stone, Your Honor.  The other are all Erdely

22 statements.  The 12 and 13 are the indifference to notifying

23 the campus.

24      Except for Statement Number 5, which squarely

25 addresses the opinion expressed by experts apprised of the

1  situation, plaintiff attempts to twist the actual language

2  used to invoke a meaning that Eramo did literally nothing.

3  And we've set this out for Your Honor in the supplemental

4  appendix that we put in our reply, which takes the statements

5  in context and puts in bold the letters they seek to extract

6  out of the statements.  Yet the article made it expressly

7  clear -- and, again, the Court has to look at the article in

8  its entirety -- that the "doing nothing" that is challenged is

9  that UVA took, quote, "No action to warn the campus that an

10  allegation of gang rape was made against an active

11  fraternity."

12        As noted, this same critique appears three times in

13  virtually the exact same language.  And at the same time, the

14  article does make clear what actions were taken by Eramo and

15  UVA.  The article reports that Jackie was provided with her

16  options to proceed informally or formally, including pressing

17  criminal charges.  The article reports that Eramo made it

18  clear to Jackie that she would assist her if she wanted to

19  hold the men accountable.  And three times the article reports

20  that Jackie chose to do nothing.

21        The article reports that Eramo comforted her and

22  connected Jackie to Emily Renda and the support group One

23  Less, which the article makes clear helped Jackie enormously.

24        And finally in September 2014, after Erdely was on

25  campus, the article reports that UVA commenced an

1  investigation of Phi Psi, which revealed that all the boys

2  involved -- that Dean Eramo had heard through the grapevine

3  that all the boys involved may have graduated.

4         None of these facts are in dispute, Your Honor, and

5  it is from these facts that defendants repeat their

6  conclusions that UVA did nothing to warn the campus or to

7  commence an investigation sooner.

8         And, again, the only evidence Eramo cites to support

9  a conclusion that defendants published these views, knowing

10  them to be false and verifiable facts, is, first, that the

11  defendants knew Eramo took Jackie to the police, which I've

12  already addressed, and that defendants knew from Emily Renda

13  that Eramo was very passionate about punishing Phi Psi.

14         But plaintiff, first of all, ignores that each of

15  these facts were highly corroborative of Jackie's story in the

16  mind of Rolling Stone, as well as Erdely.  They gave

17  defendants great confidence in Jackie's credibility and the

18  accuracy of the reporting, since it was evident that UVA

19  seemed to credit Jackie as a source, and her allegations, and

20  they were able to independently verify that, just as Jackie

21  said, she had reported the bottle incident to the police.

22  This all gave the defendants confidence in Jackie and her

23  story.

24         More important, neither fact rebuts in any way the

25  conclusion that UVA and Eramo continued to defer to Jackie's

1 choice to do nothing until September 2014, 15 months after she

2 first reported her assault, and five months after she informed

3 the school of two other assaults, and the school had received

4 an anonymous report from another victim, or supposed victim.

5 There's no dispute, again, on these facts.

6 Defendants -- and this is an important, Your Honor.

7 Defendants are fully entitled to draw the conclusions they did

8 from these facts. At most, the situation, as the Supreme

9 Court indicates, was bristling with ambiguities in the

10 language of *Time, Inc. v. Pape*. The law is clear that a

11 publisher may adopt one of a number of possible, rational

12 interpretations of sources that contain ambiguities.

13 The Fourth Circuit reached the same conclusion in

14 *CACI v. Rhodes*, where the court concluded as to one of the

15 statements at issue defendants' conclusion that CACI was

16 impersonating officers was one of more that one rational

17 interpretation.

18 Here, from the undisputed facts -- and this goes

19 right to Your Honor's observation earlier about moving to

20 victim choice and its application to Dean Eramo. From these

21 undisputed facts, plaintiff may believe that she and UVA acted

22 entirely appropriately with their deference to victim choice

23 and failed to -- and failure to notify the campus or sooner

24 commence an investigation.

25 That is a rational interpretation that they acted

1  entirely appropriately. But it is an equally rational

2  interpretation to conclude, as the defendants did, shared by

3  various experts and the OCR, that UVA should have taken action

4  sooner, and that rigid deference to victim choice results in

5  less reporting. Put simply, courts and the First Amendment do

6  not penalize the press for reporting facts and drawing or

7  offering conclusions from those facts. This is a definition

8  of a legitimate debate.

9        Now, turning to the last two statements, Your Honor,

10 there's the abuse statement, which we've already heard a lot

11 about today, and I don't want to belabor this too much.

12       For the reasons set forth in our motion we do not

13 believe that the subhead of the article, "When she tried to

14 hold them accountable, a whole new kind of abuse began," can

15 be reasonably read to include Dean Eramo. As we've indicated,

16 we believe it specifically was representing the bottle

17 incident, because that was the only payback that Jackie was

18 described as having by discussing publicly her sexual assault

19 allegations. It's made clear over and over again that she did

20 indeed report to Dean Eramo on two separate occasions about

21 her sexual assault, but in each occasion, she was refusing to

22 hold anybody accountable.

23       But, Your Honor, the article is also equally

24 expressed in making clear that Jackie loved Dean Eramo and

25 most certainly did not feel abused by her. The article

1   reports that Jackie repeatedly calls her an asset to the

2   community.  The article reports that Eramo is beloved by

3   students, and it reports that she is beloved by survivors, who

4   consider her a, quote, "friend," a, quote, "confidante," a

5   best advocate, a den mother.  That is hardly depicting someone

6   as abusing Jackie or another victim.

7          But even if the statement is of and concerning Eramo,

8   plaintiff has still failed to provide evidence that each

9   defendant intended that reference, a standard they don't

10  dispute, and more importantly, or that there is clear and

11  convincing evidence on the record that each defendant knew

12  that statement was false when it was published and published

13  it with actual malice.

14         There is no way to reasonably read the abuse as

15  referring to Eramo in a factual manner.  Indeed, in opposition

16  to this motion, plaintiff finally ascribes the meaning they

17  were pressing for what abuse means.  And I specifically refer

18  the Court to page 14, note 8, where they say that by "abuse,"

19  it means that Eramo, quote, "antagonized Jackie," and, quote,

20  "caused her to experience trauma or severely negative feelings

21  as a result of reporting her assault."

22         Yet, these remain nonactionable, since it focuses on

23  the nonverifiable effect on Jackie and an ambiguous

24  "antagonized," which could have a world of different meanings,

25  Your Honor, and is an entirely subjective word.

1    But turning to actual malice, Your Honor.  To support

2  its burden on actual malice as to statement Number 1,

3  plaintiff only relies on a fact-checking note made by Liz

4  Garber-Paul next to the deck.  She wrote "note" next to the

5  language in the draft.

6    But plaintiff's argument ignores the testimony her

7  counsel again elicited in this action, quoted at length in our

8  reply, and establishing unequivocally that Ms. Garber-Paul

9  resolved her fact-checking query, which was based on an

10  erroneous interpretation of the clause, which only goes to

11  show how ambiguous it is and that it is hardly a statement of

12  fact.  But Ms. Garber-Paul testified, quote, "After

13  conversations with Shawn, I felt that it was absolutely

14  reasonable and accurate, and that's why it stayed."

15    This testimony shows the opposite of actual malice.

16  The statement stayed because she and her editor believed it

17  was reasonable and accurate.  Plaintiff cites no other

18  evidence in this record supporting a finding that statement

19  Number 1 was published with serious doubts as to its accuracy.

20  And for this reason, it fails along with the other statements.

21    Now, finally turning to the "rape school" statement.

22  In the context of discussing the difficulty of finding actual

23  data surrounding the number of rapes at UVA, the article

24  reports that Jackie got a different explanation from

25  Dean Eramo.  Quote, "She says Eramo answered wryly, 'Because

1  nobody wants to send their daughter to the rape school.'"

2          There's no disputing the record, Your Honor, that

3  Jackie told her this, she said it twice, and one time it's on

4  tape.  And there's no dispute in the record that Jackie

5  confirmed that Dean Eramo made this statement to Rolling

6  Stone's fact-checker.  There's also no dispute that Erdely

7  tested Jackie's ability to accurately quote others, and each

8  time, she verified that quotes Jackie ascribed to others were

9  in fact accurate, including another quote by Eramo,

10  specifically, "The boys have all graduated."  She first heard

11  that from Jackie, and then she went independently to Alex

12  Pinkleton, Jackie's friend who was also in the meeting, and

13  Alex also confirmed that Eramo said that quote, thereby

14  lending credibility not only to that statement but to the fact

15  that Jackie can accurately quote third parties.

16          And there was no dispute as to the accuracy of the

17  underlying facts or the gist of the quote.  Rape statistics

18  are hard to find at UVA.  President Sullivan confirmed that

19  publishing them were not in keeping with best practices, as

20  reported in the article.  And Susan Russel's quote that

21  precedes statement Number 3 is entirely consistent.

22          And she cites at 1076, Your Honor, that -- she was

23  talking about the fact that her daughter's rape, that UVA had

24  mischaracterized it as just some unfortunate circumstances

25  rather than an actual rape.  And she states, the article

1    reports, "UVA parent Susan Russel believes that misdirection

2    is deliberate."  Quote, "When a parent goes to the campus

3    crime log and they don't see sexual assault, they think the

4    school is safe."

5            The content of that quote is essentially similar to

6    the content of the quote ascribed to Dean Eramo.  And in the

7    face of this undisputed evidence in support of actual malice,

8    again plaintiff looks to the normal give and take that

9    occurred between the fact-checker and editor.  She argues that

10   Rolling Stone's fact-checker had a discussion with the editor

11   about this quote, but once again omits that the issue was

12   fully resolved and Rolling Stone was comfortable with the

13   accuracy of the quote.

14           A fact-checker doing her diligence by raising issues,

15   hashing them out with her editor, and concluding that changes

16   do not need to be made do not support a finding of actual

17   malice.  It supports the opposite, Your Honor, that Rolling

18   Stone was being extremely diligent in determining that every

19   sentence in the article was supported and that the magazine

20   and writer firmly believed in its accuracy.

21           In their opposition, the plaintiff tries to

22   characterize this practice is that somehow Liz Garber-Paul was

23   thwarted in her efforts to make the changes she wanted, to

24   add -- to correct inaccurate facts.  They don't cite to any

25   evidence to that effect.  In fact, the record evidence

 1  establishes the precise opposite.  It was through

 2  Garber-Paul's raising questions that additional statements

 3  concerning Dean Eramo were added to the article, including

 4  Jackie's observation that she was an asset to the community.

 5  It was in response to Garber-Paul's question about, "Is this

 6  to mean?" next to the illustration, where they had a

 7  discussion with the editors, and she came to understand it was

 8  a photo illustration in which it is marrying two separate

 9  concepts and that it was an accurate depiction of those.

10          But in response to that observation, what they omit

11  is that they added to the caption that Dean Eramo was beloved

12  by students.  Far from being thwarted, it was through

13  Garber-Paul's raising issues, hashing them out, talking about

14  them that additional information was added to the article that

15  put Dean Eramo in an even more positive light.

16          And it's more fully set forth in our motion,

17  defendants had countless -- let me step back.  Besides that

18  editing, the only other argument they make on these

19  statements, this particular statement, is the credibility of

20  Jackie.  And it's important to understand that while a lot of

21  ink has been spilled on this issue, Jackie's credibility is

22  only really relevant on this particular statement, because all

23  the other statements are borne out by experts, by documents,

24  by evidence, by undisputed facts.  Jackie's credibility only

25  really rests or is at issue on this one statement.  And we've

1  already determined, I've already indicated, that Erdely had

2  tested and was able to confirm that Jackie was a true reporter

3  of third-party quotes.

4       But defendants had countless reasons, the evidence

5  shows, to believe Jackie, not the least being that she was

6  referred to Erdely by an employee of UVA.  Eramo was aware

7  that she was talking to Rolling Stone; never told Emily Renda

8  or anybody else that she shouldn't, that she should not be --

9  that she should refer a different victim, that Jackie wasn't

10 credible.  She didn't think -- or the evidence shows that she

11 told Jackie she shouldn't talk to Rolling Stone, but she never

12 gave any, to Emily Renda or anybody else, any indication that

13 Jackie wasn't credible.

14      UVA clearly believed Jackie's allegations and

15 belatedly was taking action on them, just like in *Hatfill*,

16 where the fact that the institution was taking action lent

17 credibility to the actions.  And at no time did UVA or anyone

18 else suggest that Rolling Stone should not believe Jackie.

19 And concerning statements about Eramo, there was no reason in

20 particular to believe -- disbelieve Jackie, as she made it

21 clear that she loved Eramo.  So why would she be making up

22 stories to paint Eramo in a negative light?

23      There is no evidence in this record, including the

24 alleged contradictions in Jackie's interviews, that even begin

25 to rise to clear and convincing evidence of actual malice.

1  Nor does the plaintiff cite a single case that supports this

2  conclusion.  To the contrary, as I noted earlier with regard

3  to *Hatfill v. New York Times*, the Fourth Circuit found no

4  actual malice there, even though the author was warned that

5  one of his main sources was not trustworthy.

6          Instead, the plaintiff cites to two cases.  Again,

7  they ignore the facts of the cases, because when you look at

8  the facts, you see how they have no application whatsoever to

9  the situation here.  They cite to *Wells v. Liddy* and

10 *Fitzgerald v. Penthouse*, two cases out of the Fourth Circuit,

11 for the proposition that if your source might be deemed to be

12 mentally ill or unstable or suffering depression, or whatever

13 the case may be, that you should be alert and that they might

14 not rely on that.

15         But look at *Wells v. Liddy*, Your Honor.  There it

16 involved this ridiculous proposition being peddled by Liddy

17 that Watergate was really all about a prostitution scandal.

18 And the source there was found to be a paranoid delusional.

19 Liddy was told by his counsel not to rely on him, and he

20 admitted -- Liddy admitted that the source was not

21 trustworthy.

22         Similarly, in *Fitzgerald v. Penthouse*, the source was

23 understood to be suffering persecutory delusions, including

24 that Churchill was responsible for sinking the Lusitania.

25         Now here, Your Honor, what we have is we have a

1   fragile woman who the reporter believed to have suffered a
2   serious gang rape, and that she might have some PTSD or she
3   might have been a little depressed does not put her into the
4   Penthouse category or the Liddy category as some kind of
5   paranoid delusional person who couldn't be trusted.  And
6   moreover, the plaintiff, an advocate for victims of sexual
7   assault, can hardly argue with a straight face that all rape
8   and trauma victims who are deemed to be fragile or depressed
9   are assumed to be liars and unreliable.

10          Plaintiff has not offered any evidence demonstrating
11  that each defendant actually knew Jackie was unreliable or,
12  more specifically, knew that at the time she reported the rape
13  school quote, that that was inaccurate or that they had any
14  doubt whatsoever about the accuracy of that statement.  There
15  is no evidence presented in this record that supports that
16  conclusion.  And for all these reasons, which I've only
17  briefly addressed here, we do believe that this action should
18  be dismissed, because the plaintiff fails to offer clear and
19  convincing evidence showing that the defendants published any
20  or all of the challenged statements with reckless disregard
21  for their truth.

22          And finally, Your Honor, I wanted to address this
23  republication issue that they've raised with regard to the
24  December 5th note.

25          Plaintiff's republication theory is built on

1  defendants' December 5 apology that was appended to the

2  article.  There's no dispute that this was an apology that put

3  the world on notice that the magazine now found, quote

4  "discrepancies in Jackie's account," end quote, and that it

5  lost, quote, "trust in her," end quote, and, quote,

6  "apologized to anyone affected by the story."

7          While plaintiff now wants to quibble about whether

8  this amounted to an effective retraction or not, there can be

9  no dispute that it unequivocally was an apology for

10 discrepancies in Jackie's story.  And applying the

11 republication doctrine to Rolling Stone's apology is

12 fundamentally in conflict with basic actual malice doctrines

13 and public policies that encourage publishers to promptly

14 notify the public of errors.

15          To credit this misguided argument, the plaintiff --

16 if you credited this argument, it would cast a deep chill

17 across all publications, signaling that they correct errors at

18 their peril.  Plaintiff cites no precedent for this finding

19 that appending an apology to an article acts as a

20 republication for actual malice, and we can conceive of no

21 precedent.

22          Instead, the plaintiff primarily invokes, and they

23 reference them again today without getting into the actual

24 facts at issue in the case, they invoke a state court case

25 from Arizona and a federal case from Kentucky and argues that

1  there is a bright-line rule that any substantive modification

2  or addition to a defamatory publication constitutes a

3  republication of the article per se.

4        But those cases, those two cases they cite, do not

5  support a finding that the publication of an apology acts as a

6  republication.  Instead they turn on the common sense

7  principle of a reaffirmation of the statements and the

8  article.

9        First, look at *Larue v. Brown* out of Arizona.  There

10 the defendant posted updates to the bottom of an article, and

11 the Court found that the content of the updates, and I quote,

12 "referred to and realleged the substance of the original

13 articles."  And specifically, and I quote again, "The

14 statements reurged the truth of the original article in

15 response to a reader's question."  I repeat, what that case

16 stands for is that the updates reurged the truth of the

17 original article.

18       Similarly in *In Re Davis*, the original publication

19 was a website -- it was called a "scandal sheet" -- that was

20 devoted entirely to cautioning readers with regard to dealing

21 with the plaintiff.  There the updates and changes to the

22 website involved adding new sections and updates in the same

23 vein as the prior postings, specifically listing additional,

24 quote, "nefarious activities by the plaintiff."  In other

25 words, Your Honor, in both of plaintiff's cases the defendant

1  reaffirmed its original posting, and for that reason, the new

2  posting constituted a republication.

3          Here Rolling Stone's December 5 and 6 note to readers

4  does the exact opposite.  Instead of reaffirming the article,

5  the note to readers alerted people to discrepancies, the fact

6  that the magazine lost trust in Jackie and apologizing to all

7  affected.

8          As the Sixth Circuit found, which they ignore, that

9  the test for whether a statement has been republished is if

10 the speaker has affirmatively reiterated the statements at

11 issue.  Plaintiff makes no effort to distinguish *Clark*, which

12 makes clear that Rolling Stone's apology is not a

13 republication.  Nor does plaintiff attempt to distinguish the

14 wealth of cases finding that publishing a retraction or an

15 apology is evidence of a lack of actual malice, Your Honor,

16 it's not evidence of actual malice.

17         And the only statement -- they mention the "rape

18 school" statement, and they mention the fact that afterwards,

19 you know, defendants still believed a lot of the statements

20 concerning Dean Eramo were true.  And they do, and they do to

21 this day.  We believe that those opinions, the facts, the

22 conclusions drawn by those undisputed facts are reasonable and

23 true, but most certainly were not published at the time.

24         The only statement is the "rape school" statement,

25 and that was discredited by the apology, because it was made

1   clear that they had lost faith in anything that was directly

2   attributed to Jackie.

3          Now, until today, they didn't in opposition, try to

4   distinguish *D.A.R.E. v.* Rolling Stone, which involved Steven

5   Glass, who turned out to be a fabulist and that he had written

6   for a number of national publications and had fabricated

7   certain information.

8          There Rolling Stone had published an editor's note

9   that made clear that -- at the time, D.A.R.E. hadn't sued.

10  But in the editor's note they acknowledged that they found

11  three of the eight challenged statements in error.  And then

12  in the subsequent litigation, the plaintiff argued that

13  somehow they had reaffirmed the other five statements by

14  republishing them with that editor's note.  And the Court

15  there soundly rejected the argument and held that it was not a

16  republication.

17         It said, and I quote, "If a publisher's wholesale

18  refusal to retract" -- and by the way, they also make notion

19  that Rolling Stone didn't formally pull down the article until

20  April, after they commissioned the Columbia Journalism

21  Review -- commendable that they went to the Columbia

22  Journalism Review -- got an entire -- they knew it was going

23  to be negative, got an entire report on their reporting, and

24  then they formally retract.  The law is clear that a failure

25  to retract is not in any way evidence of actual malice.

1    So back to the *D.A.R.E.* case.  The Court found that

2  if a publisher's wholesale refusal to retract did not

3  constitute actual malice, it follows that a publisher's

4  retraction which does not satisfy the aggrieved party surely

5  is not actionable as defamatory.

6    In short, there's no basis in law or common sense, we

7  would suggest, to find that Rolling Stone's publication of an

8  apology acted as a republication.  As we noted in opposition

9  to this motion, plaintiff's attempt to shoehorn this apology

10 into a republication with actual malice should be seen for

11 what it is, an attempt to jerry-rig an alternate path to

12 liability, since the undisputed evidence in the record

13 establishes that Rolling Stone published their article on

14 November 19th, 2014, in complete faith in its accuracy.

15    And for this reason, we believe that plaintiff's

16 cross motion should be denied, except with regard to the other

17 concerning argument on statements Number 2 through 5, which

18 plaintiffs do not dispute, and which raises the issue that

19 Your Honor raised earlier, that she is trying to have it both

20 ways with regard to public figure/public official issue.

21    She says that she is just a ministerial, low-level

22 person, yet when the article refers to UVA and the

23 administration, she naturally is, she argues, being referred

24 to personally.  She really, we argue, can't have it both ways.

25 She's either a limited purpose public official or a public --

Eramo v. Rolling Stone, et al. - 8/12/16

1  now I did your thing.

2        THE COURT:  I have that effect on people.

3        MS. McNAMARA:  So sorry.  It is a tongue twister.

4        -- a limited purpose public figure or a public

5  official.  And if she is going to rely on the post-publication

6  statements that don't refer to her and only talk about the

7  administration or UVA, and then she wants to be swept up on

8  that, then she has to recognize what that means.  She can't

9  have it both ways.  And that's the reason we don't -- we do

10 not object or dispute on their motion that statements Number 2

11 through 5 are of and concerning the plaintiff.

12       But otherwise, we submit that the cross motion should

13 be denied, and we submit that defendants' motion, particularly

14 with regard to opinion as well as with regard to actual malice

15 with looking at each statement and what the evidence is about

16 the doubt on each statement, and then you have to separately

17 assess what is the evidence in the record as to what each

18 defendant knew and believed as to each statement.  And when

19 you go through that methodical process, as the Fourth Circuit

20 did in *CACI*, we suggest that the Court needs to conclude that

21 as to each and every statement there is simply no evidence in

22 this record that anyone had any doubt about the accuracy of

23 the statements at issue.

24       Thank you, Your Honor.  I'm happy to address any

25 additional questions.

1    THE COURT:  I don't know if there are any questions.

2   I guess, ultimately, your response to my last question is that

3   you do not believe, and I think this is probably right, that

4   circumstantial evidence can generally support a finding of

5   actual malice?

6    MS. McNAMARA:  In the abstract, circumstantial

7   evidence can support a finding of actual malice.  There just

8   isn't circumstantial evidence here based upon the record.

9    THE COURT:  Well, that's right.  The concept of

10  actual malice has not fared well in the Fourth Circuit in the

11  40-plus years since *Gertz*.  But, and one cannot help but note

12  this fact, a survey of those Fourth Circuit cases during this

13  40-plus-year period would indicate that most of these issues

14  have been decided after summary judgment.

15   MS. McNAMARA:  Well, they get reversed sometimes when

16  the jury --

17   THE COURT:  Sometimes.  But the actual malice issues

18  have usually proceeded beyond summary judgment.

19   MS. McNAMARA:  Well, Your Honor, often -- that's not

20  true in *CACI*.

21   THE COURT:  It's not true in all the cases.  I would

22  say the majority of the cases that's true.

23   MS. McNAMARA:  I'm not sure of that.  I would have to

24  go back and look at that, Your Honor.  But I would think that

25  the majority of the cases across the country find and the

 1  defendants are usually granted summary judgment on actual

 2  malice.

 3          THE COURT:  No.  I mean it's not a remarkable thing

 4  the Fourth Circuit did not get those cases in most instances

 5  unless there had been a finding after summary judgment.

 6  They're not likely to get that case if the trial court has

 7  decided as a matter of law there's no actual malice.

 8          MS. McNAMARA:  Well, that's not the case.  I think

 9  often when the trial court finds that there's no actual

10  malice, it goes -- often the plaintiff appeals it to the

11  circuit court.

12          THE COURT:  Maybe, maybe not.  My observation has

13  been, in surveying these cases, that most are decided after

14  summary judgment has been granted or denied.

15          MS. McNAMARA:  Yes, but I think the point in the

16  instruction of something like *Ryan v. Brooks*, as well as

17  *Reuber*, which was decided, again, en banc, that to put

18  everybody through the cost and expense and everything of a

19  trial --

20          THE COURT:  That's true.

21          MS. McNAMARA:  -- and the court is going to reverse

22  it is a most unfortunate thing.

23          THE COURT:  And that's why the supreme court has

24  cautioned the trial courts --

25          MS. McNAMARA:  Your Honor, my able assistant has

1  helped me out on this.

2           THE COURT:  Okay.

3           MS. McNAMARA:  And in addition, where the Court has

4  affirmed the grant of summary judgment, you have *Carr*, before

5  the -- *Daniels*, which is the Scientology case; *Hatfill*, which

6  is the New York Times case; you have and then *Reuber*, as I

7  indicated.  And I don't think there's a lot of other cases.  I

8  think that *Reuber* went to a trial.  What else went to a trial?

9  I think, actually, if you do a survey, Your Honor's

10 observation isn't accurate.

11          THE COURT:  Well, we'll see.  We'll see.  It's

12 something to consider.  Thank you.

13          MS. McNAMARA:  Thank you very much, Your Honor.

14          MS. LOCKE:  Your Honor, I have a lot to respond to.

15 I wanted to first pause and see for Your Honor's comfort, for

16 the court reporter's comfort if it makes sense for us to take

17 a --

18          THE COURT:  I don't know, I'm fine, and I've got

19 someplace I need to be later this evening, so I would like to

20 press forward.

21          So, Judy, do you need a break either?

22          THE COURT REPORTER:  No, sir.

23          THE COURT:  Is that a yes or no?

24          THE COURT REPORTER:  No, sir.

25          THE COURT:  Let's press forward.

1    MS. LOCKE:  Okay.  Great.

2        Responding to the argument about public official,

3    Your Honor, Ms. McNamara said that doesn't matter if Ms. Eramo

4    can speak with respect to the analysis for public official,

5    that only comes into play when the analysis is for a limited

6    purpose public figure.  Make sure I say that right.  And

7    that's just not true.

8        The United States Supreme Court recognizes in *Gertz*,

9    and I read this before, "The first remedy any victim of

10   defamation has is self-help, using opportunities to contradict

11   the lie or correct the error and thereby minimize its adverse

12   impact on reputation."

13       And here's the key line:  "Public officials and

14   public figures usually enjoy significantly greater access to

15   the channels of effective communication."  So the supreme

16   court was concerned with both public officials and public

17   figures in terms of whether they had access to effective

18   communication, channels of communication, and I think that

19   that's a relevant analysis for purposes of the public official

20   analysis.

21       And also Ms. McNamara made my point for me in the

22   *Lipscomb* case.  She is correct, that was a public official

23   case not a public figure case.  And in the *Lipscomb* case, the

24   question was whether there were effective channels of

25   communication, and the Virginia privacy laws prevented that

1  teacher from speaking out.

2         And so I think that whether Ms. Eramo had effective

3  channels of communication is relevant not only for her status

4  as a public figure, whether she is one, but also for a public

5  official.  It sounds like Your Honor is on the fence on this

6  question.

7         THE COURT:  No, I think it goes back to the

8  discussion you and I had before, it depends on what the

9  controversy is.  If the controversy surrounds Jackie, then

10 yes, she is very limited.  If the controversy surrounds the

11 policy that the University has adopted to deal with these

12 problems, then, no, she's not limited in what she can say and

13 what she can do.

14        MS. LOCKE:  Well, Your Honor, I would suggest that we

15 be allowed to put on evidence of this at trial and submit

16 posttrial briefing in order for you to evaluate what the

17 appropriate jury instruction is.  We could do briefing on this

18 based on the evidence very quickly.  And if Your Honor is at

19 all on the fence on this issue --

20        THE COURT:  I'm going to think about that.  You know,

21 it so greatly favors the plaintiff to take evidence on

22 something like this, because the plaintiff controls all of the

23 information necessary to inform as to what role Dean Eramo had

24 in the hierarchy, so I'm a little bit reluctant to do it.  I

25 would rather review what I have first and make some decision

1    as to whether there's a need for supplement.

2         MS. LOCKE:  I want to address now the question of

3    actual malice.

4         Now, if Ms. Eramo is a private figure and Your Honor

5    concludes that she is and rules in our favor on that issue,

6    she only needs to show that Rolling Stone acted with

7    negligence for purposes of compensatory damages.  Now, because

8    we are also seeking punitive damages, the question of actual

9    malice is still a relevant inquiry, and so I do want to take

10   some time to respond about Rolling Stone's actual malice.

11        Now, the question of actual malice is whether Rolling

12   Stone had the knowledge of falsity or recklessly disregarded

13   the truth.  And that comes from the United States Supreme

14   Court case *New York Times v. Sullivan*.

15        And the supreme court in the *Harte-Hanks* case noted

16   that it is rare where a defendant actually admits that they

17   had knowledge of falsity or that they acted with reckless

18   disregard.  And that's precisely why circumstantial evidence

19   is necessary to evaluate the question of actual malice.  So

20   the Court is obligated to consider the totality of the

21   evidence not individual pieces of evidence piecemeal, as

22   Rolling Stone suggests.

23        Various courts around the country have considered

24   different pieces of evidence as supporting an inference of

25   actual malice, including whether the author had a preconceived

1    storyline, whether there was ill will or bias towards the

2    plaintiff, whether there was an inadequate investigation,

3    whether there was a failing to interview obvious sources,

4    whether there was an awareness of internal inconsistencies in

5    a story, whether there was an admission of exculpatory

6    details, whether there was a reliance on an unreliable source,

7    and whether there was a reliance on a source who had a mental

8    illness.

9            I would submit, Your Honor, each one of these factors

10   is present here.  Maybe none of one of them is dispositive of

11   the question of actual malice, but when considered in

12   totality, as the Court must, each of those is here.  And it's

13   important to note that Rolling Stone has to demonstrate that

14   the question -- yes, we have the burden to show clear and

15   convincing evidence, but in order to overcome summary

16   judgment, Rolling Stone has to demonstrate that there would be

17   no reasonable juror who could conclude that they acted with

18   reckless disregard for the truth.

19           And I think that many of these questions and all of

20   this evidence that we're going to see today goes to the idea

21   and the concept that this is going to be a jury question, Your

22   Honor.  This is a question of fact for a jury.

23           Slide 12.

24           I don't have it up here on my --

25           THE CLERK:  Give it a minute.

1     MS. LOCKE:  Your Honor, there are six buckets of

2  evidence of actual malice, including what we've heard a little

3  bit about already: the fact-checker's attempt to correct false

4  statements in the article; Ms. Erdely's preconceived story

5  line; the fact that Rolling Stone knew and omitted the fact

6  that Ms. Eramo took Jackie to the police; the fact that

7  Rolling Stone knew that Jackie was not a reliable source; and

8  then Rolling Stone's attempt to cover up the fact that Jackie

9  was not a reliable source.

10     As I mentioned before, you can use circumstantial

11 evidence to demonstrate actual malice.  But here we actually

12 have one of those very rare cases where the very own words of

13 Rolling Stone admits that they knew that many of the

14 statements that we sue on were false.

15     Liz Garber-Paul was the fact-checker of this article,

16 and she was responsible for ensuring the factual accuracy of

17 the statements in the article.  She conducted -- she had

18 Ms. Erdely's entire reporting file, all 400-and-some-odd pages

19 of it, and she conducted multiple rounds of edits to the

20 article, and raised numerous red flags about the portrayal of

21 Ms. Eramo in the article.

22     And Ms. McNamara makes a lot to do about the fact

23 that we are obligated to show that for each of the statements

24 that we sue on, there was a subjective awareness or doubt

25 about the truth or falsity of the statement.

Eramo v. Rolling Stone, et al. - 8/12/16

1       Well, I think we should take a little bit of time and

2  look at the statements that we sued on and what

3  Ms. Garber-Paul raised in terms of issues with respect to each

4  of those statements, because she raised issues with respect to

5  virtually every single statement that we sued on that appears

6  in the article.

7       If I could have slide 13.

8       In the complaint, in Counts One and Two, we lay out

9  what the statements are that we're suing on that appear in the

10  article.

11       The first statement, slide 14, is that, "Jackie was

12  just starting her freshman year at the University of Virginia

13  when she was brutally assaulted.  When she tried to hold them

14  accountable, a whole new kind of abuse began."  We spent a lot

15  of time on that.

16       What did Ms. Garber-Paul say about that when she

17  reviewed it in her fact-checking duties?  She wrote in bold,

18  double underlined red pen, "No."  She, when she read that and

19  she took away from it, she said that that was not a correct

20  statement.  And she testified that she raised this concern

21  with Mr. Woods and that he overruled it.  She had a subjective

22  doubt about the veracity of that statement, and it was

23  overruled by her superior.

24       If I could turn to slide 16.

25       The second statement that we sue on is that, "Lots of

1 people have discouraged Jackie from sharing her story,

2 including the trusted dean to whom Jackie reported her gang

3 rape allegations more than a year ago."

4          What did Ms. Garber-Paul say about this statement

5 that we sued on?

6          Next slide.

7          She made two suggested changes.  First, she suggested

8 that they add the words "sharing so publicly," "have

9 discouraged her from sharing her story so publicly."  And she

10 suggested this change, she testified to this, that she wanted

11 to remove the suggestion that Ms. Eramo discouraged Jackie

12 from speaking with the authorities about her alleged rape.

13 And she suggested including that in to make this clear for

14 readers.  And that change, she raised it with Mr. Woods, the

15 editor of the story, and it was rejected.

16          She also made another change.  Towards the end of

17 that sentence, she wanted to add the words after -- after

18 "lots of people have discouraged her from sharing her story,

19 including the trusted dean to whom Jackie reported her

20 allegations of gang rape more than a year ago," "the dean who

21 fretted that the article might complicate future proceedings,"

22 to make clear that, again, Ms. Eramo was concerned with the --

23 to make clear that Ms. Eramo was not discouraging Jackie from

24 reporting or pursuing charges against her perpetrators.

25          Again, Ms. Garber-Paul testified that it was

1  important to -- that she thought that this was a change that

2  should be made, so that readers would understand that Rolling

3  Stone wasn't suggesting that Ms. Eramo was trying to suppress

4  or discourage her reporting.  She said that she wanted to talk

5  to Shawn, and she did in fact talk to Mr. Woods about that,

6  who rejected these changes.

7       Now, Ms. McNamara makes a point that we omitted the

8  "stet" in here.  We make the point in our briefing that these

9  changes were rejected, and the reason we omitted the "stet"

10  was not to mislead the Court at all, it's just there are a lot

11  of comments here on this page, and we are trying to highlight

12  the ones that we think are most relevant.

13       The "rape school" quote, slide 18.  The next

14  statement that we sue on is the "rape school" quote.  What did

15  Ms. Garber-Paul have to say about the "rape school" quote?

16       Next slide.

17       She says, "Ask Shawn," because she understood that

18  Jackie was the only source for the "rape school" quote.  And

19  it's clear that -- the record evidence is clear that Rolling

20  Stone had an open line of communication with the University of

21  Virginia through their public affairs person, as well as

22  through President Sullivan.  And they knew that, through the

23  public affairs folks, that they had gone back and asked -- UVA

24  had gone back and asked Ms. Eramo questions, to compile

25  statistics to provide to UVA in response to questions.

1    There's no reason whatsoever Rolling Stone could not

2 have gone to the UVA press person and asked:  Is this a quote?

3 Does Ms. Eramo dispute that she said it?  Instead, they relied

4 on Jackie solely for this.

5    Ms. McNamara says there's all this record evidence

6 that Jackie was a reliable source for relaying quotations.  I

7 would submit that there's a factual dispute about that.

8    Some of the quotes that were attributed to one of the

9 three friends, Ms. Kathryn Henley, about, "You should just

10 have -- you should have just had fun with your gang rape," the

11 record evidence demonstrates that that quote, Jackie

12 attributed that quote to two different people and that she was

13 not consistent with that whatsoever.  So I would say that

14 there is a factual dispute as to whether Jackie was consistent

15 in how she demonstrated -- how she relayed these quotes.

16    But the point being here is that Ms. Garber-Paul

17 raised the concern about attributing this statement to

18 Ms. Eramo based solely on Jackie.  She raised that concern and

19 Rolling Stone overruled it and rejected it and included it in

20 the article regardless.

21    She also raised a concern about describing Ms. Eramo

22 as stating this "wryly."  There's no record evidence

23 whatsoever that Jackie described Ms. Eramo as being wry in her

24 response.  And so that's a gloss that Rolling Stone put on it

25 and goes to the negative implication that they're trying to

1 portray Ms. Eramo.

2       Slide 20. In the complaint we lay out very clearly

3 the picture of Ms. Eramo that Rolling Stone used and how they

4 altered it into this photo illustration. And as my colleague

5 pointed out, we allege in the complaint that, you know,

6 Ms. Eramo is portrayed as giving a sneering thumbs up and how

7 she's -- her demeanor is portrayed quite negatively with these

8 protest signs in the background.

9       What did Ms. Garber-Paul have to say about this? She

10 asked the question: Is this too mean? And Rolling Stone --

11 when she first saw this, her very first impression, she

12 testified, was that this was a negative portrayal of

13 Ms. Eramo, and she asked the question and Rolling Stone

14 rejected her concern about whether the illustration portrayed

15 her as whether it is too mean.

16       But I think that goes precisely to the defamatory

17 implication of the article. If Ms. Garber-Paul's very first

18 impression of the illustration was "Is it too mean?" then a

19 reasonable reader and a reasonable juror can conclude that

20 Rolling Stone intended it to be perceived that way.

21       The article also mentions that -- it says in the

22 article, "But the dearth of attention isn't because rape

23 doesn't happens in Charlottesville. It's because at UVA,

24 rapes are kept quiet, both by students who brush off rapes as

25 regrettable but inevitable casualties of their cherished party

1  culture, and by an administration which critics say is less

2  concerned with protecting students than from protecting its

3  own reputation from scandal."

4         What did Ms. Garber-Paul say about this?  She wrote a

5  notation right next to this.  She said, "Yes, that may be true

6  but not with respect to Dean Eramo."  What did Rolling Stone

7  do?  They rejected that change and they continued to include

8  this in the final edited version of the article.

9         I'd also point out that they put in the -- "Critics

10  say that Ms. Eramo is less concerned with protecting students

11  than protecting its own reputation," that critic is Ms. Erdely

12  herself.  There's evidence in the record that Ms. Erdely made

13  these statements to multiple sources that she believed that

14  Ms. Eramo was more concerned with protecting the school's

15  reputation.  So I think it's a little disingenuous for

16  Ms. Erdely to write that it was critics who had this criticism

17  as opposed to she herself who had this criticism.

18         Ms. Garber-Paul also raised a concern about when in

19  the article it describes Ms. Eramo with a no-nonsense

20  demeanor. Ms. Garber-Paul raised the question -- raised the

21  concern that that didn't portray Ms. Eramo accurately, that

22  she was considered a very sweet second mom figure.  Again,

23  that change was rejected and neither of those changes were

24  made in the final article.

25         Let me move to Ms. Erdely's preconceived storyline.

1  The Ninth Circuit has said that evidence that a defendant

2  conceived a storyline in advance of an investigation and then

3  conscientiously set out to make the evidence conform to the

4  preconceived story is evidence of actual malice and may often

5  prove to be quite powerful evidence of actual malice.

6       There is no dispute here that Ms. Erdely had a

7  preconceived storyline, and she wrote exactly the story that

8  she set out to write from the get-go.

9       Slide 24.

10      Ms. Erdely has written numerous articles about

11 institutional indifference to rape.  She has accused the

12 Catholic Church of being indifferent to rape, state medical

13 boards, high school administrators, juries.

14      Slide 25.

15      And in one article written in the year before "A Rape

16 On Campus," she accused the military of being indifferent to

17 rape in the rape of Petty Officer Blumer where she -- the deck

18 of that article is, "Instead the military's culture of sexual

19 abuse, denial, and cover-up."

20      Slide 26.

21      Ms. Erdely told a source early on in her reporting

22 that she had hoped to write an article that takes an immersive

23 look at what's going on in college campuses with respect to

24 sexual assault in much the same way she wrote about the

25 problem of military sexual assault, how the issues of culture

1   and climate helped to feed into this culture of assault and

2   inaction.  She set out to write an article about the culture

3   of inaction on college campuses.

4           In her pitch that she gave to the editors of Rolling

5   Stone as to what the article was going to be about, she said

6   that she wanted to examine sexual assault on college campuses

7   and the various way colleges have resisted involvement, and

8   how they juke their statistics to make their campuses appear

9   safer than they are, and how they may be scrambling to clamp

10  down or sidestepping liability.  This is an entirely negative

11  preconceived storyline of what she intended to write about

12  before she interviewed her first source at the University of

13  Virginia.

14          But even after she had interviewed sources at the

15  University of Virginia and had heard multiple sources

16  include -- every source that she interviewed had heard

17  wonderful -- had told her wonderful things about Ms. Eramo and

18  how passionate she was about pursuing justice for these women,

19  nevertheless, by August 2014 Ms. Erdely tells a source that

20  the article is going to be about institutional indifference to

21  rape.

22          The arc of Ms. Erdely's article never changed.  From

23  the pitch, to the publication, to her post-publication

24  statements, Ms. Erdely wanted to write about the cover-up and

25  institutional indifference of rape on campus, and that's

1  exactly what she did, regardless of what she heard about

2  Ms. Eramo.

3         Ms. Eramo also showed a clear bias -- I'm sorry.

4  Ms. Erdely showed a clear bias against Ms. Eramo.  And that,

5  in the *Harte-Hanks* case, the Supreme Court said, "Evidence of

6  an ulterior motive can often bolster an inference of actual

7  malice."

8         Let's look at what Ms. Erdely said in her own words

9  about how she intended to portray Ms. Eramo in the article.

10  She said to Jackie, "I know you love Dean Eramo.  I mean, I'm

11  getting that from everybody.  Everybody loves her.  I think

12  that Dean Eramo seems like a wonderful person, and I know you

13  guys all really love her.  But I think it's not totally clear

14  that she is actually doing right by you or the University in

15  this scenario.  In fact, I think she's probably mishandling

16  this whole situation.  So, I mean, is this," meaning the

17  article, "going to make Dean Eramo look bad?  I mean, it

18  might, you know.  It might make her look bad.  I mean, if it

19  makes you feel better, I can make it clear how much you guys

20  love her, right?  It can be sort of me saying, like, you know,

21  'This woman should be doing more.'"

22         One thing I'd like to note is that Ms. Erdely made

23  these statements at a dinner on September 12th, where Jackie

24  and Alex Pinkleton, a source for the article and Jackie's then

25  boyfriend, were at dinner with Ms. Erdely.

1      And during that conversation -- I think this is

2   really critical and something important to emphasize --

3   Ms. Erdely turned off her tape recorder to talk negatively

4   about Ms. Eramo, and she made a conscious decision to turn off

5   her tape recorder in order to do so.

6      There's no other instance in the entirety of the

7   reporting file that we have seen where we saw that Ms. Erdely

8   turned off her tape recorder.  And she took copious notes and

9   recorded many, if not most, of her conversations.

10      We think that this, a reasonable juror could

11  conclude, evinces a guilty conscience of what she intended to

12  say and how she intended to portray Ms. Eramo in the article.

13  It demonstrates her subjective awareness that she was out to

14  get and she was out to portray Ms. Eramo in a negative way.

15  And a jury could conclude solely from this evidence of her

16  turning off this recorder that she had subjective doubt

17  about -- she had ill will and negative motive towards

18  Ms. Eramo.

19      Several other sources also testified in this case

20  that Ms. Erdely sought -- had ill will and bias towards

21  Ms. Eramo throughout the arc of her reporting.

22      Sara Surface, another witness, another source for

23  this article, testified that, "Sabrina told me that she hoped

24  there would be changes in the administration structure,"

25  meaning that she hoped to see Dean Eramo got fired.  It was

1  Erdely's hope that Dean Eramo got fired.  And you know what?

2  She achieved that goal.  Ms. Eramo was relieved from her

3  position as the dean of students, and she was no longer

4  allowed to work with sexual assault victims as a result of

5  Ms. Erdely's reporting.

6      Alex Pinkleton, another source, testified that,

7  "Erdely's questioning was like a never-ending game of 20

8  questions, and a rigged game at that, because, as it was in

9  Sabrina's case, there was already a preformed storyline and

10  other stories were going to have to adhere to it.

11      "The storyline was such that there would be a

12  perfectly innocent victim and a monstrous perpetrator to have

13  in the story, there would be no support or advocacy on

14  grounds, and Dean Eramo would be the scapegoat for the

15  administration."

16      And finally, Jackie herself testified that she was

17  concerned about Ms. Erdely's storyline.  During her

18  deposition, she was asked at the time, September 19th, 2014,

19  "Were you sincere in being worried that Ms. Erdely was

20  portraying Dean Eramo in a negative light even though you said

21  you loved Dean Eramo?"

22      She answered that question, "I believe that's what I

23  felt at the time."

24      Later in her deposition she was asked, "And were you

25  concerned that, based on comments and other comments that she

1  may have made about the administration, that Ms. Erdely was

2  intending to paint the administration and Dean Eramo in a

3  negative way in the article?"

4         She answered that question, "At the time, that's what

5  I believe I thought."

6         Turning now to the question of what Rolling Stone

7  knew about Ms. Eramo's attempt to bring Jackie to the police.

8  Rolling Stone knew -- there's no dispute that Rolling Stone

9  knew but omitted the fact that Eramo took Jackie to the

10 police.  Rolling Stone cannot demonstrate that they're

11 entitled to summary judgment where they deliberately omit

12 exculpatory information to create a false innuendo.  It

13 creates a question of fact for a jury.

14        And this is the *Tomblin* case, where there was a

15 newscast allegation of a sexual assault at a daycare -- and

16 Ms. McNamara spoke to this briefly -- and omitted the fact

17 that the sexual assault allegation was that a four-year-old

18 boy was touching another four-year-old.  And the omission

19 created the false implication and the false impression that it

20 was a daycare worker who was involved in a sexual assault.

21        There are similar case law in *Tharp v. Media General*.

22 It's a District of South Carolina case where the Court held

23 that omission of exculpatory facts create a fact question for

24 the jury on actual malice.

25        Here, Rolling Stone knew that Eramo was intent on

1  seeking Jackie -- having Jackie press charges against her

2  alleged perpetrators.  Jackie testified to this.

3         Slide 33.

4         Jackie was asked the question, "And do you believe

5  that if you had wanted to pursue criminal charges against your

6  attackers, that Nicole Eramo would have provided you support

7  during that process?"

8         She answered, "Yes, I believe so."

9         She was asked the follow-up question:  "In your

10 communications with Rolling Stone and Ms. Erdely about

11 Dean Eramo, did you communicate to them in any way those

12 feelings that you believed Dean Eramo would support you in

13 pursuing charges if you had wanted to pursue them?"

14        She answered, "I believe so."

15        Rolling Stone also had an e-mail that Jackie

16 forwarded from -- that she had with an exchange with

17 Ms. Eramo, that Jackie forwarded to Ms. Erdely well before

18 publication of the article.  And the e-mail -- and a lot has

19 been made about this.  Ms. McNamara talks about how this

20 really only goes to the question of the bottle incident.  I

21 think it's important to look at the text of the e-mail and to

22 see what a juror could -- what inference a juror could draw

23 from the text of the e-mail.

24        The e-mail talks about choice.  "It's your choice.

25 Never forget, however, it's your choice to move forward."

1   This echoes what Rolling Stone has been talking about what

2   their opinion is in this article, that it's victim choice as

3   to whether they report their sexual assault or not.

4         The reference to "It's your choice as to whether you

5   pursue a criminal complaint with the police" suggests, and a

6   reasonable juror could understand that Rolling Stone

7   understood that it suggests that she was talking to the police

8   about her sexual assault.

9         The e-mail, the text of the e-mail also talks about,

10  "If we could get good video and check photos of them from the

11  Fraternity Sorority Life roster, we might be able to find them

12  without having to go to the fraternities.  If the individuals

13  are already caught up in the legal system, they (and their

14  brothers) will have a strong disincentive from retaliating

15  against you."

16        We're talking about members of the fraternity being

17  part of the criminal justice system.  This isn't just a

18  reference to a bottle-throwing incident.  It's them being part

19  of a criminal justice system for being rapists, for being

20  repeat rapists.

21        The text of the article talks about "aggressive

22  investigation by the police," which suggests that the

23  investigation was with respect to the sexual assault, not the

24  bottle incident.

25        And finally, Rolling Stone knew that the bottle

1  incident was a result of Jackie talking about her alleged

2  assault on campus.  Jackie alleges that she was retaliated

3  against by fraternity members as a result of going out and

4  talking about her alleged rape.  It is inconceivable and a

5  juror could conclude that it is inconceivable that Jackie

6  would go to the police and talk only about the bottle-throwing

7  incident without the context surrounding it that she was being

8  retaliated against for speaking out about her sexual assault.

9       Shawn Woods testified that Rolling Stone knew that

10 Ms. Eramo took Jackie to the police for the sexual assault.

11 If you look at slide 35, he was asked, "Did you know at any

12 time before 'A Rape On Campus' was published that Dean Eramo

13 took Jackie to the police?"

14      And he answered, "There were e-mails that I was maybe

15 made aware of that sort of showed there had been -- that Eramo

16 helped her go to police.  But, you know, again, we showed

17 Eramo being sympathetic throughout the piece, you know, giving

18 Jackie her choices.  Again, about victim choice and reporting

19 her assault, supporting her where she could, sending e-mails,

20 you know, 'I will help you bring these men to justice,'"

21 meaning with respect to the sexual assault.  "I mean from my

22 point of view, it seemed like Dean Eramo certainly believed

23 Jackie was trying to support her."

24      Finally Jackie spoke with Ms. Erdely before

25 publication in November, and she told Erdely that, "I talked

1  to the head of the University police about the article.  He's

2  like, 'I'm glad you guys did this, everyone should know.'

3  He's the same person I talked to after the bottle was thrown

4  at me."

5         The text of this conversation between Jackie and

6  Erdely before publication suggests that she told Ms. Erdely

7  that she had gone to the University police, told him about the

8  article and what the article was about, meaning her sexual

9  assault, and that this was the same police officer she spoke

10  to after the bottle incident.

11        Based on this evidence, a reasonable juror could

12  absolutely conclude that Rolling Stone knew but omitted the

13  fact that Ms. Eramo took Jackie to the police not just for the

14  bottle incident but for the sexual assault.

15        I would like to turn now to Rolling Stone's

16  understanding that Jackie was not a reliable source for

17  information.

18        The Fourth Circuit has held that where the defendant

19  has a reason to question reliability of a source but still

20  relies on that source, there's evidence of actual malice.  And

21  that's especially true where the source has changed her story,

22  and it's even more true where the source has a history of

23  mental illness.

24        And there's two cases in the Fourth Circuit that

25  support this, the *Fitzgerald v. Penthouse* case from 1982, as

1  well as the *Wells v. Liddy* case from 1999.  And both of these

2  cases involved reliance on a single source for defamatory

3  statements in an article where the defendants knew that the

4  source changed their story and had mental instability.  This

5  is exactly the scenario that we have here, Your Honor.

6       Slide 37.

7       Rolling Stone knew that Jackie's story of rape

8  changed over time.  Here are the sources that Rolling Stone

9  had to rely on and what each of those individuals told Rolling

10  Stone about Jackie's alleged assault:

11       Emily Renda said in her congressional testimony that

12  Jackie was vaginally raped by five men.

13       Rachel Soltis, Jackie's first year roommate, told

14  Rolling Stone that first Jackie told her she was forced to

15  perform oral sex on several men, and then later Jackie changed

16  her story that she had been vaginally raped by six men with a

17  broken beer bottle.

18       Jackie told Erdely that she was vaginally raped by

19  seven men with an unbroken beer bottle.  She never told Erdely

20  that she was forced to perform oral sex on several men.

21       And then finally, Annie Forrest, another source, told

22  Rolling Stone that Jackie had said that she was vaginally

23  raped by several men with a coat hanger.

24       These are just wildly inconsistent and differing

25  stories about the alleged rape.

1    Ms. Erdely herself knew that Jackie's story changed

2  over time, and she admitted it.  Discovery revealed this

3  statement -- it is a *mea culpa* statement that Ms. Erdely was

4  working on that was never published.  And in this *mea culpa*

5  she said, "I discovered in my reporting that some of the

6  details of her account from the night of her sexual assault

7  had morphed with time.  Early on, she had told friends she had

8  been forced to perform oral sex on a group of men, and her

9  story had later changed to one of vaginal rape."

10    What's telling, though, is notwithstanding the fact

11  that Ms. Erdely knew that Jackie's story of rape had changed

12  materially over time, she never bothered to ask Jackie about

13  the inconsistencies or the differences in the story.

14    Rolling Stone also knew that Jackie was mentally and

15  emotionally fragile and unstable.  Shawn Woods testified that

16  before publication of the article, "I was concerned about

17  Jackie's mental health and worried she was, quote, 'a fragile

18  person.'"

19    He later testified in his deposition, "Again, I mean,

20  I just can't stress this enough how concerned I was about

21  Jackie and her mental health."

22    Sabrina Erdely also worried about building her story

23  around someone who was so mentally unstable.  Again, in this

24  *mea culpa* that was never published, she said, "A reader may

25  ask, and I asked myself at the time," meaning before

1  publication of the article, "if it was wise to build the

2  opening of a story around someone who seemed so emotionally

3  fragile and intent on controlling her narrative."

4       Now, this admission that Ms. Erdely wrote alone

5  demonstrates her subjective doubt about Jackie and Jackie's

6  ability and reliability, and that alone could defeat summary

7  judgment.

8       In the *Fitzgerald* case, the Fourth Circuit said that,

9  "Where a source is unreliable, more investigation is

10 necessary, not less."  But that's exactly what Rolling Stone

11 did.  They believed that Jackie was mentally unstable and they

12 took their foot off the gas and did less investigation.

13      Two e-mails that Ms. Erdely sent, the first to Sacha

14 Lecca, which was the photo editor.  She said, "Yeah,

15 unfortunately I would say that Jackie is not in great mental

16 shape right now.  She went through a phase recently where she

17 wasn't returning my calls.  So I'm trying to be as

18 accommodating of her as possible," not digging in further and

19 doing more investigation, but being as accommodating as

20 possible.

21      Erdely also sent a note to the fact-checker, Liz

22 Garber-Paul:  "Thanks for letting her," meaning Jackie, "know

23 that we'll be accommodating of her, which seems crucial

24 towards getting her through this process."  Jackie was so

25 mentally unstable that they had to bend corners, cut corners,

1    to ensure that Jackie would get through the process.

2        In order to accommodate Jackie, they did not require

3    her to provide her perpetrator's name; they didn't require her

4    to provide the three friends that came to her aid, their names

5    so that they could interview them; they didn't require Jackie

6    to provide medical records to corroborate the fact that Jackie

7    had claimed that she was treated for a sexually transmitted

8    disease she received as a result of the assault.  They didn't

9    require Jackie to provide access to her mother to corroborate

10   the story about how she had a bloody red dress after the

11   assault.  They didn't require Jackie to provide any

12   explanation of why her first year roommate believed she wore a

13   blue dress on the night in question rather than a red dress.

14   And they didn't require Jackie to provide the last names of

15   other assault victims that Jackie said were alleged to have

16   been assaulted in a similar gang-rape style at the Phi Psi

17   house.  They cut those corners, and they allowed Jackie off

18   the hook and went ahead and published the story anyway.

19        Towards the end of Ms. Erdely's reporting of this

20   story, there came a time when Jackie told Erdely that she was

21   thinking about withdrawing from the story altogether and

22   removing her participation, that she didn't want to appear in

23   the article.

24        Slide 42.

25        There is a text exchange between one of the sources,

1  Alex Pinkleton, who was a friend of Jackie's, and Sabrina

2  Erdely, where Ms. Pinkleton, her text messages are in gray,

3  says to Ms. Erdely, "I don't think calling Jackie is a good

4  idea, because she is thinking about pulling out entirely,"

5  meaning pulling out of the article entirely.

6       Ms. Erdely responds, "But Jackie needs to know she's

7  an essential part of the article.  We'll figure out a way for

8  her that's comfortable.  I'll need to talk to her tomorrow,

9  and I can come down in person if necessary."

10      Alex says, "I think that will freak her out because

11 she feels like she's being pushed."

12      Ms. Erdely responds the next day, "I'm up for

13 discussing whatever she wants (changing her name), but I need

14 to be clear about this:  There's no pulling the plug at this

15 point.  The article is moving forward, and I think it's

16 important that Jackie stay involved."

17      It's not that Jackie stay as part of the article,

18 it's that Jackie stay involved as part of the process.

19 Ms. Erdely testified at her deposition that none of the drafts

20 of the article removed Jackie's story from the lead.  They

21 were moving forward with Jackie as the lead regardless of

22 whether Jackie was willing to participate or not.

23      There are other indicia of Jackie's unreliability

24 that Ms. Erdely was aware of.  Jackie claimed that she was

25 injured when fraternity brothers threw a bottle at her face,

1  which allegedly cut her around the eye.  She forwarded to

2  Ms. Erdely pictures of her alleged injuries.

3         With the Court's permission, I know the Court has

4  been very sensitive of Jackie's identity, but I would like the

5  Court to see the picture that Ms. Erdely received from Jackie

6  of her alleged injuries.

7         MS. McNAMARA:  Your Honor, I would object to the

8  presentation of this.  She's already put something in the

9  record that's under seal that -- I'm sorry, Your Honor.  I

10 would object to using Jackie's photograph on --

11        THE COURT:  We can limit it just to the Court.  What

12 has she put on already that's under seal?

13        MS. McNAMARA:  About the STD.  That's been put under

14 seal, Your honor, and that should not have been said in open

15 court.

16        THE COURT:  About the what?

17        MS. McNAMARA:  About the STD.

18        MS. LOCKE:  Your Honor, there is no agreement, there

19 is no order in place with respect to what materials can be

20 used in open court.  In fact, the protective order is quite

21 clear that a separate agreement or separate order needs to be

22 entered in terms of --

23        THE COURT:  All right.  That's my rule, and my rule

24 is that I'll look at it.  We can exclude everyone's view of

25 the photograph.  So, yeah, that is --

1          MR. CLARE:  Is it excluded?

2          THE COURT:  Ms. Moody, do we have that capacity in

3     this courthouse?

4          THE CLERK:  Are yours turned off?

5          MR. CLARE:  Ours are on.

6          THE CLERK:  My button says everything is off.  I

7     can't turn off counsel tables, but I can turn off the big

8     ones, so if y'all want to turn your monitors off.

9          Can you see here?

10          THE COURT:  I can see it.

11          MS. LOCKE:  Slide 43, Your Honor, is a picture that

12     Ms. -- that Jackie forwarded to Erdely to corroborate her

13     injuries from the bottle-throwing incident.  And Ms. Erdely's

14     reaction, and she said this at dinner with Jackie, is that it

15     looked like face paint, like something had been smeared on

16     your face.  She didn't believe that Jackie's injuries were

17     actually real.

18          Scars.  Jackie claimed that she suffered severe

19     injuries on her back as a result of her attack, which left

20     scars all over her.

21          If we could turn the slides back on.

22          Jackie told Erdley, "I have scars on my back.  My

23     friends are always like, 'What are those from?' and I'm, like,

24     they're from September 28, 2012."

25          Well, each of the sources that Rolling Stone

 1  interviewed couldn't corroborate the fact that Jackie had any

 2  scars whatsoever.

 3          Rachel Soltis said to Erdley, "I haven't really

 4  noticed."

 5          Sabrina Rubin Erdely herself tried to look at

 6  Jackie's scars, and she said that when Jackie pulled back the

 7  beaded woven bracelet on her left wrist, in the dim light she

 8  didn't see any scars whatsoever.

 9          And Jackie's boyfriend, then long-term boyfriend,

10  also told Erdley that, "I haven't really seen any marks on

11  your back whatsoever."

12          Ms. Erdely knew that she had no corroborating source

13  for the claim that Jackie had suffered any injuries

14  whatsoever.  In a December 2014 e-mail she sent to Jackie,

15  asking all of the questions that she should have asked before

16  the article was published, she said, "You also told me all of

17  your friends have asked about the scars on your back, but none

18  of your friends I've spoken with have ever seen scars on your

19  back, including your boyfriend, Conner.  If you recall, he

20  said this when we were at dinner in September."

21          This demonstrates that Ms. Erdely knew that she had

22  no corroborating evidence to support Jackie's claim.

23          Finally, Jackie claimed that two other women were

24  assaulted in gang rapes at Phi Psi, including the sisters --

25  including the sister of a first year friend who I'll refer to

1  as Becky and Pixie.  Jackie refused to tell Ms. Erdely the

2  last names of these women, and Ms. Erdely attempted to

3  research and identify who these women were on her own.

4       Slide 46.

5       Jackie -- Ms. Erdely then confronts Jackie with her

6  research and says, "I think I've discovered who Becky and

7  Pixie are."  I'm sorry, who Maddie and Pixie are.  I'm sorry,

8  Becky and Pixie.  There are a lot of different names that are

9  used in this case, Your Honor.  "Becky and Pixie are."  And

10  Jackie tells Erdley it's not them.  "But I don't really

11  believe her."  Again, this is subjective doubt about the

12  veracity of her source.

13       Another indicia of unreliability:  Erdely was told by

14  a source that Jackie claimed to have met Ms. Eramo when Jackie

15  testified at a Sexual Misconduct Board trial.  Jackie told

16  Erdley, however, that she first met Eramo when she reported

17  her rape to Ms. Eramo.

18       So Ms. Erdely knew that there was an inconsistent

19  story that Jackie had told with respect to how she had met

20  Ms. Eramo.  And she recognized this at the time, before

21  publication, and she said and wrote in her notes she asked

22  this source, "Do you recall how Jackie came to meet with

23  Dean Eramo?"

24       And the source said, "Jackie was called in to be a

25  witness at a trial of a girl who was raped in a similar way."

1    And Ms. Erdely says, "If so, this is news to me,"

2  evincing an understanding that the way Jackie came to know

3  Ms. Eramo was told in two different ways to two different

4  people.

5    Finally, a minor point, Your Honor, but still

6  evidence of Jackie's inconsistencies in her story.  She told

7  Ms. Erdely that her mother attended Brown College, but when

8  Ms. Erdely did research, she discovered that her mother went

9  to Rhode Island College.  Not necessarily relevant to her

10 story of rape, but just another inconsistency and a lie that

11 Jackie told, that Ms. Erdely knew before publication of the

12 article and which Ms. Erdely never asked Jackie to clarify.

13    Finally, there's plenty of evidence for a jury to

14 conclude that Ms. Erdely doubted Jackie's credibility, and

15 that Rolling Stone doubted Jackie's credibility.  But Rolling

16 Stone's own post-publication conduct demonstrates that they

17 knew Jackie wasn't credible and yet they tried to cover that

18 up.

19    Slide 48.

20    There's a text exchange between Alex Pinkleton and

21 Ms. Erdely.  And Alex Pinkleton asked Erdley, "Have you found

22 out what has to be said if Drew," Jackie's assailant, the name

23 that is used in the article, "if Drew's last name isn't used?"

24 And Ms. Erdely responds, "Yes.  We have to say she refused to

25 disclose his name so we couldn't follow up.  Unfortunately, it

1  would diminish Jackie's credibility, so I really want to avoid

2  that."

3       The final article, however, Your Honor, Jackie still

4  had refused to provide Drew's last name and Rolling Stone

5  never informed their readers of this fact.  They elected,

6  instead, to use a pseudonym, Drew, to cover up the fact that

7  they didn't know who Drew was.  And then when the article

8  started to crumble, and faced with questions about Drew's

9  identity, Rolling Stone tried to cover this up, and tried to

10 cover up their own reporting deficiencies.

11      Slide 49.

12      Sabrina Erdely on the Slate DoubleX Podcasts refused

13 to answer multiple direct questions about Drew's identity,

14 whether she interviewed the alleged rapist, and whether she

15 gave them an opportunity to comment.  Ms. Rosin on the Slate

16 DoubleX Podcast asks, "What about Drew or who these guys were?

17 Do you have a sense of who they are or who Drew is?  I mean

18 you call him Drew.  I don't know if that's his name."

19      Ms. Erdely responded, "That's not his name, it's a

20 pseudonym."

21      Ms. Rosin asked, "So who is he?"

22      Sabrina rejects the opportunity to answer the

23 question.  She says, "Well, I don't want to say much about

24 them as individuals, but I'll say this particular fraternity,

25 Phi Kappa Psi, is really symblomatic in a lot of ways, sort of

1  like elitist fraternity culture." She demurs and refuses to
2  answer the question.

3          Rolling Stone's editor, for his part, went even
4  further in lying to the press about Drew's identity. Shawn
5  Woods told the Washington Post, "We verified their existence.
6  I'm satisfied these guys exist and are real. We know who they
7  were." It's a flat-out lie. Rolling Stone didn't know who
8  they were, and they were attempting to cover up the fact that
9  Jackie refused to tell them who her alleged perpetrators were.

10          Finally, Ms. Erdely told the Washington Post, when
11  they came knocking and asking questions about Drew's identity,
12  "Once again, I'm not going to comment on whether I talked to
13  Drew or not. Suffice it to say we took many steps to verify
14  Jackie's story and feel confident about what we published."
15  Again she refused to answer the question.

16          All of this evidence demonstrates that a reasonable
17  jury could conclude that there was a preconceived storyline,
18  that there was ill will and bias, that there was actual malice
19  and a reckless disregard for the truth and how they portrayed
20  Ms. Eramo.

21          And I think it's important to note, Your Honor, that
22  although some of these pieces of evidence, Ms. McNamara has
23  made much to do about the fact that this evidence goes to
24  Jackie and not to the statements about Ms. Eramo. Remember,
25  the premise of the article is that the reason that Jackie

1  didn't report her rape is because Ms. Eramo discouraged her

2  from doing so, when in actuality the reason Jackie refused to

3  report her rape is because likely it was fabricated. And so I

4  think it's important to draw that distinction and tie why it

5  is important to evaluate Jackie's credibility and the

6  implication that it has for why she refused to report.

7          Finally, just touching on a couple of points that

8  Ms. McNamara made. We keep hearing about Jackie's story came

9  with the imprimatur of UVA because she was referred to --

10  Jackie was referred to Rolling Stone by Emily Renda.

11         At the time Emily Renda introduced Jackie to

12  Ms. Erdely, Emily Renda was a student worker. Emily Renda

13  told Erdely that she had no access to Jackie's sexual assault

14  file. It's like a lunchroom worker introducing a source.

15  This did not come with the imprimatur of UVA, and it certainly

16  didn't come with the imprimatur of Ms. Eramo, and so I want to

17  rebut that notion very clearly.

18         Finally -- maybe not finally. A couple of other

19  points. Ms. McNamara makes the point that Laura Dunn -- that

20  we misquote Laura Dunn, the opinion of the expert in the

21  article. But when read in context, Laura Dunn says in her --

22  in how she is quoted, "This is an alarming trend that I'm

23  seeing on campus." "This is an alarming trend."

24         What is "this," the trend, that she is referring to?

25  Referring back to the prior paragraph, we're talking about

1  coddling a victim into inaction.  So the "this" refers back to

2  Ms. Eramo and how she, according to Rolling Stone, coddled

3  Jackie into inaction.  And the record evidence is clear that

4  Ms. Erdely told Ms. Dunn that she believed, Ms. Erdely

5  believed, that Ms. Eramo was coddling Jackie into an action,

6  and yet the article then suggests that it is Ms. Dunn who was

7  making that statement, and that's just not the case.

8        Finally, I've read multiple times in briefs that

9  President Sullivan had suggested that UVA wasn't following

10 best practices with respect to sexual assault.  I would

11 suggest that Your Honor and maybe Your Honor's law clerk go

12 back and listen or review the transcript of Ms. Erdely's

13 interview with President Sullivan.  She does not say that

14 whatsoever.  In fact, Rolling Stone twists that entirely out

15 of context.

16       In fact, what President Sullivan said is that, "We do

17 try to follow best practices," and that "Putting rape

18 statistics up may not be helping victims come forward and

19 reporting."  And so that's entirely twisted out of context,

20 and I think it's important for the Court to know.

21       Finally with respect to the republication argument,

22 just a couple of points.  There's clear record testimony in

23 this case that Will Dana, the managing editor of Rolling Stone

24 Magazine, and Jann Wenner, the publisher of Rolling Stone

25 Magazine, considered the idea of taking down the article and,

1  instead, decided to publish the editor's note once they had

2  the "worst nightmare" e-mail.  They considered taking it down,

3  but they rejected that and they decided to keep it up.  And

4  there's evidence in this record of Ms. McNamara's

5  correspondence to Ms. Eramo where they stand by the reporting

6  as it relates to Ms. Eramo.

7          And so Ms. McNamara makes a lot about the fact that

8  the republication has to reaffirm the content of the

9  defamatory publication.  That is precisely what Rolling Stone

10  did.  Will Dana and Jann Wenner considered taking down the

11  article, but they left it up and they chose to leave it up and

12  republish it with the editor's note to reaffirm those portions

13  of the article that had nothing to do with Jackie, that had to

14  do with Ms. Eramo and other portions of the article.  And

15  subsequent correspondence demonstrates that is exactly what

16  they intended to do.  And they stood by their reporting, and

17  they still stand by their reporting to this day with respect

18  to Ms. Eramo.

19          They talk about how the editor's note was an apology.

20  It didn't apologize to Ms. Eramo.  They reaffirmed and doubled

21  down on their statements with respect to Ms. Eramo.  So with

22  that, I'll let my colleague address the opinion argument.

23          MR. CLARE:  The hour is late and I'll try to be

24  brief, Your Honor.  Because Ms. McNamara did not spend a lot

25  of time in her presentation on opinion, I will be brief in my

1   remarks on that.

2           I do want to go back.  Your Honor asked me a question

3   when we were having a dialogue about defamatory meaning, about

4   what import reader e-mails and surveys and that sort of thing

5   might have in this jury question, and I wanted to give Your

6   Honor some authority.

7           In the *Tomblin* case that we've talked at length about

8   today and cited in our brief, the Fourth Circuit held that

9   exactly that type of evidence, how real people read the story

10  is admissible to show the defamatory meaning of the

11  publication.

12          In that case, the court considered similar affidavits

13  about a defamatory television broadcast and said, quote,

14  "Moreover, witnesses could surely testify to the understanding

15  about the daycare, that they actually took from the broadcast

16  while watching it."  And so what real people really understood

17  when they read the Rolling Stone article or saw a defamatory

18  broadcast on TV is absolutely relevant and admissible

19  evidence.

20          And in addition to the two affidavits that I

21  mentioned before, we have a declaration from a woman -- I

22  mentioned all these hate e-mails that were sent.  And one of

23  these young women who wrote a very, very negative, scathing

24  e-mail attacking Ms. Eramo, we got in touch with, and she told

25  us how she read the article and how she was misled by the

1 article in terms of forming an impression about the

2 University.  And now that the facts have come out, she is

3 apologetic and sorry that she had expressed that view.

4       But that sort of testimony, the testimony of someone

5 who read the article and formed an impression is, the Fourth

6 Circuit says, relevant, admissible, and bears on the

7 discussion we were having about whether this is a jury

8 question or not.

9       We certainly think that the Court can conclude as a

10 matter of law that it has a defamatory meaning and is

11 defamatory per se, but at a minimum, there is jury questions

12 on those issues.

13       Briefly on opinion, there is no wholesale exemption

14 for anything that might be labeled opinion.  Only pure opinion

15 is not actionable.  And pure opinion is narrowly defined as

16 speech without provably false factual connotation, or

17 statements which cannot reasonably be interpreted as stating

18 actual facts about a person.  If it does contain a provably

19 false factual connotation or can be interpreted as stating

20 actual facts about a person, it's not pure opinion.

21       And the key holdings here come from the Virginia

22 Supreme Court.  The Virginia Supreme Court has repeatedly said

23 that, even where the defendants express an otherwise protected

24 pure opinion, quote, "Factual statements made to support or

25 justify that opinion can form the basis of an action for

 1  defamation."

 2        And so even if you accept this false construct that

 3  there is this student choice opinion in the piece and that

 4  there's a campus safety opinion in the piece, the Virginia

 5  Supreme Court has said that factual statements made to support

 6  or justify those other opinions can form the basis of an

 7  action for defamation.

 8        And when you go through the statements that we

 9  actually sued on, it's not about campus safety and it's not

10  about the victim choice.  What it is, is factual assertions

11  about what Ms. Eramo did or didn't do in encouraging or

12  discouraging Jackie, in supporting her or acting with

13  indifference, in silencing her or offering to help her, in

14  taking her to the police or doing nothing.

15        These are factual questions, and evidence about

16  Ms. Eramo's interactions with Jackie and whether she acted

17  responsive or she was unresponsive, or conduct or inaction,

18  these are factual assertions that Rolling Stone made in the

19  article falsely, that said she did nothing, she tried to

20  silence Jackie.  The jury can prove -- that's capable of being

21  proven true or false to a jury.

22        And I have a summary, which I won't belabor here,

23  I'll hand up, the different statements and the types of

24  evidence that can be submitted on both sides.  I recognize

25  that Rolling Stone has their perspective on this.  They may

1  wish to introduce evidence that these assertions are true,

2  that by Ms. Eramo's conduct, she did have the effect of

3  discouraging Jackie.  That's okay, they can assert that

4  evidence.

5        But a jury can hear that and conclude whether or not,

6  for example, Ms. Eramo did nothing with the information that

7  Jackie provided.  They can hear how she took her to the police

8  and conclude that they actually -- she did something and she

9  did support it.

10        So I will hand up the summary of the statements and

11  the types of evidence and Your Honor can consider that.  But

12  with that, I don't have anything else to say about opinion,

13  unless Your Honor has any questions about that.

14        THE COURT:  Maybe one more question for you.  But

15  this is Ms. Tacoronti and she has just started.  I would

16  appreciate the slides that you've shown, if you would pass --

17  of course, assuming that you don't want them admitted as

18  exhibits at this hearing, I would ask that you pass any of the

19  information that you have had us view to Ms. Tacoronti.

20        MR. CLARE:  Of course.

21        THE COURT:  The only other question I would have of

22  you:  Did I understand you to say and do you stand for the

23  proposition that malice for the purposes of punitive damages

24  and malice as the element of a cause of action under the First

25  Amendment are the same?

Eramo v. Rolling Stone, et al. - 8/12/16

1          MR. CLARE:  So the actual malice would come in under

2   either of those.  If we're seeking punitive damages, it would

3   be the same --

4          THE COURT:  You believe the elements are the same?

5          MR. CLARE:  The elements are the same.  It's the same

6   type of actual malice, yes.

7          THE COURT:  All right.

8          MR. CLARE:  I'll pass up this to --

9          THE COURT:  Do you concur in that last observation,

10  Ms. McNamara?

11         MS. McNAMARA:  Yes, actual malice for purposes of

12  punitive damages is the same as actual malice for purpose of

13  liability.

14         THE COURT:  So that would become important depending

15  on the Court's rulings and depending how the Court, assuming

16  the case goes to trial, determined to present the issues to

17  the jury?

18         MS. McNAMARA:  Correct.

19         THE COURT:  It could be very important.

20         MS. McNAMARA:  Correct.

21         THE COURT:  I'm glad that you both agree on that

22  proposition of law.

23         What would you say --

24         MS. McNAMARA:  Your Honor -- I'm sorry.

25         THE COURT:  What would you say in rebuttal?

Eramo v. Rolling Stone, et al. - 8/12/16

1          MS. McNAMARA:  Yes.  Your Honor, I appreciate the

2     late time.  We really haven't had the same amount of time to

3     address the issues, but I want to be sensitive to the end of

4     the day.

5          On a small point but on the issue of giving the

6     slides, giving a summary of the statement, they really amount

7     to like a post-briefing further reply.

8          THE COURT:  I consider them as argument.

9          MS. McNAMARA:  If the Court is going to consider

10    that, we would like an opportunity to respond to the slides.

11         THE COURT:  You can submit any slides or any

12    summaries of the evidence that you think are relevant.  I

13    consider them just that; I don't consider them as evidence in

14    and of themselves.  I consider them as argument in support of

15    the party's position.

16         MS. McNAMARA:  Thank you.

17         MR. CLARE:  And that's the way we intended them.

18         MS. McNAMARA:  And further to that, Your Honor,

19    throughout the discussion by Ms. Locke, she went through a

20    number of issues, factual contentions that she believes the

21    record bears out, that were addressed and raised by them

22    initially in their counterstatement of additional facts.

23         Remember, they don't dispute our facts, our evidence

24    that we submitted.  That has not been disputed by the

25    plaintiff.  But she went through a number of counterstatements

Eramo v. Rolling Stone, et al. - 8/12/16

1  that we don't believe any of them adds up to actual malice.

2  But we corrected each and every one of those misstatements of

3  the record, and provided the Court with copious record

4  evidence establishing that their characterization of this

5  evidence in the record is simply not accurate.  And we did

6  that in our responses to their additional statement of facts,

7  and that was Docket Number 138.  And we can amplify on that,

8  because a lot of it is built in with the slides.  So we'll

9  provide to the Court, and we appreciate that.

10         Now, I'm going to jump around a little bit because I

11  think a lot of that is dealt with and we'll be able to

12  respond, and I don't want to burden the Court further than I

13  have to.  So I want to hit on a few key points here that were

14  raised and to just kind of, by way of example, show some of

15  the mischaracterization of the record.

16         Importantly, I want to underscore for the Court that

17  we are pressing on this motion that Dean Eramo or Ms. Eramo is

18  either a public official or -- and/or a limited purpose public

19  figure.  We are not just arguing one or the other, and I just

20  wanted to make sure there was no confusion with the Court.

21         THE COURT:  But I didn't think your written

22  submissions really were forceful in making that distinction

23  and, really, making the arguments that you've made today.  So,

24  you know, I have to say, to me, that's the most challenging

25  issue at least as of now in this case.  I have difficulty with

1  it.  I think it turns on the focus and I would be more than

2  happy, if you wanted to submit anything else in writing about

3  this issue, to receive that as well.

4        I'm not inclined at this point to have an additional

5  evidentiary proceeding on the issue, though I think it would

6  not be out of bounds for the Court to do so.  But I would

7  rather focus and consider what we have already, see if I am

8  comfortable making rulings as a matter of law, and if I'm not,

9  perhaps getting back to the parties then.  But in the meantime

10 I welcome any additional arguments you wish to submit in

11 writing.  It's a very critical issue.

12       MS. McNAMARA:  And we will do that.  Thank you for

13 the invitation.

14       THE COURT:  And I will say that simultaneous

15 submissions will suffice in these circumstances.

16       MS. McNAMARA:  And a lot of that turns on, really, as

17 Your Honor has identified, which is the controversy at issue.

18 And I think that we can adequately make clear that the

19 controversy is not the narrow issue they're trying to make it

20 be.

21       THE COURT:  Perhaps not the most broad version of the

22 issue, but it seems to me --

23       MS. McNAMARA:  We're not contending it's like sexual

24 assault in the abstract.  We're talking about sexual assault,

25 how UVA was addressing sexual assault.  And there's no

1  question that that is the entire focus of the article, and we

2  can supplement that and make that clear for the Court.

3        Now, a couple of points I want to respond to that

4  were raised by Ms. Locke as well as Mr. Clare.  And the first

5  is that Ms. Locke began with stating an unequivocal statement

6  that all the Court has to find is that no reasonable juror

7  could conclude that there was actual malice.  That's not the

8  standard, Your Honor.  The standard is that there has to be

9  clear and convincing evidence that supports actual malice

10 before the Court can give it to a juror to entertain that.

11        And despite everything that was just said by the

12 plaintiff's counsel, once again, we heard virtually nothing

13 tying the alleged actual malice or evidence supporting actual

14 malice to either the specific statements at issue, which the

15 supreme court has made clear in *Harte-Hanks* and elsewhere it

16 has to be done; the court in *CACI*, in the Fourth Circuit, made

17 crystal clear it has to be done.  And *Tavoulareas*, which we

18 cite in our paper, out of the D.C. Circuit, also makes clear

19 you cannot show actual malice in the abstract; you have to tie

20 the doubts, the serious doubts to each defendant as well as to

21 each statement.

22        Now, again, and I'm going to jump around a little

23 bit, with regard to the slide on the abuse and the statement

24 of note, it was stated before the Court that Ms. Garber-Paul

25 testified that she was overruled in that statement.  That is

 1  absolutely false.  Your Honor, that's not what Ms. Garber-Paul

 2  testified.

 3          We laid out her testimony in great detail on page 20

 4  and 21 in our reply memo of law.  She never uses the word

 5  "overruled."  And to the contrary, as I indicated at the

 6  outset when I spoke, she ends her colloquy and testimony

 7  elicited by the plaintiff that, "I felt it was absolutely

 8  reasonable and accurate," referring to the subhead, "and

 9  that's why it stayed."  She felt it was reasonable and

10  accurate, she did not believe it was false, she was not

11  overruled.  She had a misunderstanding of the subhead, it was

12  clarified in her discussions.  That's part of the editorial

13  process.  That is what fact-checking is all about.

14          Now, also similarly with the discourage statement, as

15  I predicted, they presented a slide to the Court that erased

16  the word "stet" on it.  That word "stet" is what establishes

17  and was the record.  It's a contemporaneous record.  It's not

18  a post hoc rationalization by the defendants.  It is a

19  contemporaneous record by the defendants, showing that they

20  felt that the statement as written originally was fine, and

21  the edits that were being originally proposed by

22  Ms. Garber-Paul did not need to be made.

23          Then with regard to the "rape school" quote, it was

24  argued that we could have gone to the school and got a

25  question -- and asked whether Ms. Eramo confirmed that quote,

1  that it was accurate.  But the undisputed record in this
2  evidence -- the undisputed evidence in this record, Your
3  Honor, is that Ms. Garber-Paul, as well as Ms. Erdely, were
4  unequivocally told that they would not answer any questions
5  having to do with a particular student.  That statement had to
6  do with a particular student and what was said to a particular
7  student sexual assault victim.  There was no way that they
8  were going answer that question, and that is the reason it
9  wasn't posed.

10      But it's important to note, Your Honor, the law could
11  not be more clear, and we cite numerous cases in our paper
12  even when parties do not seek comment from a party, then that
13  is not evidence of actual malice.  And here the evidence is
14  not in dispute that they not only sought comment and wanted to
15  interview Ms. Eramo, an interview was set up and it was turned
16  down by UVA.  And so this is simply not a case where they did
17  not seek comment or turned a blind eye to avoid it.  That is
18  not -- there is was no evidence in the record to support that.

19      Now, with regard to the, "Is this too mean," that,
20  again, was not rejected.  That's what we heard just now, that
21  Garber-Paul raised it, it was rejected.  The opposite is what
22  the evidence shows, Your Honor.  It was taken into
23  consideration, it was explained why everyone thought the
24  illustration was accurate.  It wasn't any thumbs up; she is
25  holding a pen, clearly, in it, as everyone testified, and it

 1   was addressed.

 2          There were changes made in the article.  The caption

 3   made clear that she was beloved by students.  That was added

 4   in response to the query about, "Is it too mean?" as were

 5   other positive statements to the article about Dean Eramo.

 6          Now, with regard to the "critics saying" statement

 7   that was raised, again, that was testified to as to why there

 8   was a query next to it originally when Garber-Paul was talking

 9   to Jackie and she -- and Jackie said, "Oh, but not

10   Dean Eramo."  And she wrote that in her notes, which she

11   realized, you know, these are notes of when she is talking to

12   various witnesses, the fact-checker.

13          And then she went back and looked at the article, and

14   the article -- I heard on plaintiff say, "Well, that was

15   because it was only because Ms. Erdely believes, and she puts

16   it in the mouth of critics saying."

17          Well, let's look at the article, Your Honor, which is

18   the operative evidence.  After the statement, when it says

19   that, "Critics say that the administration was less concerned

20   with protecting students than it is with protecting its own

21   reputation from scandal," what follows for the next page on

22   the article?

23          We have a quote from Liz Seccuro, who is a critic,

24   who says, "They go to such lengths to protect themselves.

25   There is a national conversation about sexual assault but

1  nothing at UVA is changing."  And again, this is all evidence,

2  Your Honor, about controversy, that it isn't just Jackie's

3  allegations.

4        Then we go to the next critic, Daniel Carter, who

5  talks about, "Carter notes that, 'UVA and other elite schools

6  tend to respond -- do not respond well to criticism, and

7  sanctify tradition over all else.  That is common to a more

8  prestigious institution,'" Carter said.

9        Then it goes to Susan Russell, another vocal critic

10  of UVA and the way it's treated sexual assault.  And she says,

11  "Think about it.  In what world do you get kicked out for

12  cheating, but if you rape someone, you can stay?"

13        The fact that UVA had never, or at least in the last

14  eight or ten years had never expelled a student for sexual

15  assault is discussed in the article, is addressed in the

16  article, and it was under the period of time that Dean Eramo

17  was the chair of the sexual misconduct board that no student

18  was expelled for purposes of sexual assault.

19        Again, that's not just Jackie talking or her

20  allegations.  This is the article exploring the overriding

21  controversy about whether UVA was adequately responding to

22  sexual assaults.

23        But the critics don't end with Susan Russell.  The

24  article goes on to describe Wendy Murphy and how she is quoted

25  as saying, "These schools love to pretend they protect the

1 children as if they were their own, but that's not true.

2 They're interested in money."

3          Then the article goes on and it talks about President

4 Sullivan's response that they do not sweep sexual assault

5 under the rug.  And it makes clear that the UVA deans,

6 presumably including Dean Eramo, are caring folks who answer

7 late-night calls from victims and even make emergency room

8 visits.

9          Now, there was also the notation about, "Oh,

10 Dean Eramo's a sweet second mom," and that that was there.

11 What was added to the article?  What does the article say?  It

12 says that, "Dean Eramo is a den mother."  They're synonomous.

13 It wasn't ignored; it was added to the article and made clear.

14          Now, with regard to the preconceived storyline, Your

15 Honor, again, I already read the statement from *Reuber* out of

16 the Second Circuit -- I mean the Fourth Circuit en banc, that

17 makes it crystal clear that it is fully understood that

18 reporters often come to stories with ideas, that that's what

19 investigative journalism is about; that is not to be sneered

20 at; that is not evidence of actual malice.

21          And it's noteworthy that the plaintiff did not cite

22 to the Fourth Circuit when they were making this argument

23 about preconceived storyline; instead, they cited to the Ninth

24 Circuit.  And the case they're citing is *Harris v. Seattle*.

25 What they didn't reveal is that in *Harris v. Seattle*, while

1  there is dicta about preconceived storyline, there the Court

2  granted summary judgment, which was affirmed by the Ninth

3  Circuit.  Despite this preconceived storyline, it did not give

4  rise to actual malice.

5       Now, again, they went through all the wonderful

6  things that Erdley had said about Eramo, but again, as I

7  previously indicated, that is all reflected in the article.

8  And what the point is that was made by Dunn, the Dunn quote,

9  and this goes to the victim choice opinion argument, Your

10 Honor, is that it is sometimes -- this issue about deans that

11 students love are the ones who, in some ways, are the most --

12 because they feel comfortable and they don't proceed and they

13 don't go forward, because they're getting the attention and

14 the love.

15      That's a criticism.  That is a critique.  Some people

16 believe that this overriding emphasis on victim choice results

17 in a lack of reporting, and even to the deans that are loved.

18 They are not inconsistent, Your Honor, and they're trying to

19 make it sound like it is inconsistent.

20      Now, again, with the emphasis on ill will and bias,

21 which, again, we don't think that there was any evidence in

22 the record that Erdley or Rolling Stone had any ill will or

23 bias against Dean Eramo.  But in any event, it was completely

24 repudiated by the supreme court in *Masson*, which underscored

25 that a court should give low or almost no attention to ill

1  will or bias that comes from a misconception about the use of

2  the word "malice."

3          Now, again, I think I've explained about what they

4  went on, again, about the omitted fact that she went to the

5  police.  We've explained how that is radically different than

6  the facts of *Tomblin* where, you know, two four-year-olds

7  touching genitals is very different than a revelation or

8  publishing something that indicates that the daycare center

9  had engaged in sexual abuse.

10          Here, the fact that Jackie was taken to the police

11 and the fact that Eramo's own e-mails establish that they were

12 deferring to her choice not to do anything was just further

13 evidence confirming that the school, no matter what, deferred

14 to victim choice.

15          And another note on the e-mails, there was

16 evidence -- or there was argument made that the e-mails talk

17 about the rape.  No, Your Honor, and we ask the Court to look

18 closely at this.  That was misrepresented to the Court.  There

19 was a quote, and it appears in one of the slides, and we'll

20 seek to correct it, where it talks about the video, "We could

21 get video," and "These boys are at the fraternity," and blah,

22 blah, blah.  What they omitted from that quote is that the

23 video on the corner might be able to identify the people who

24 threw the bottle.

25          Jackie's rape didn't occur on The Corner; that's a

1   well-known place in Charlottesville.  It occurred, allegedly,

2   at the Phi Kappa Psi house.  What the e-mail is talking about

3   is video on The Corner.

4           In Shawn Woods' testimony, never does he admit that

5   he knew that Jackie went to the police and reported her sexual

6   assault.  He testified that he was aware that Jackie had gone

7   to the police to report her bottle incident.

8           And remember, Your Honor, the fact that we were aware

9   of this, the fact that we have e-mails documenting this, the

10  fact that Erdley independently went to the police and got

11  further confirmation that this report had been made was highly

12  corroborative of Jackie.  She first just told these stories

13  and then they sought out and got the evidence to confirm it.

14          Again, they tried to rely on *Wells v. Liddy* and

15  *Penthouse*, but I won't belabor it, Your Honor.  There you're

16  talking about delusional people who are thinking Churchill

17  sunk the Lusitania.  We have nothing here.  We have a woman, a

18  young woman who was fragile, and she would expect to be

19  fragile when she is recovering from a gang rape.

20          It is undisputed on this record with regard to this

21  changed story and all the evidence that she went from oral

22  sex, to vaginal sex, to some people remembered five men, some

23  people remember seven, it's undisputed on this record from the

24  plaintiff herself as well as Emily Renda that that is common

25  for rape victims.

1    Erdley has reported often on sexual assault issues.
2 She knew that it was common for a sexual assault victim's
3 story to morph and change over time as they come to terms with
4 what happened to them and they felt more comfortable talking
5 about it.  The fact that she may have originally talked about
6 it as oral sex and then once she -- and her roommate Soltis
7 testifies, then she told the whole story.  That's normal, Your
8 Honor.  That was not an indication or a red flag to Erdley or
9 anybody else that there was anything to be doubted about
10 Jackie's story.

11    And there was nothing, Your Honor, about mental
12 health.  The quote I wrote down from the plaintiff's argument
13 is that she was so mentally unstable.  There is no evidence in
14 this record that any of the defendants believed Jackie to be
15 so mentally unstable.  They understood her to be emotionally
16 fragile, and that is not the same as mental instability.  And
17 of course she would be fragile, of course she may have
18 suffered some depression or PTSD.  That's what victims of
19 serious assaults like this do.

20    Now, also, there was reference about Erdley's
21 statement and what supposedly she admitted or said in these
22 statements, and, Your Honor, this is completely inadmissible
23 and irrelevant on the issue of actual malice.  That statement
24 that was quoted from was a statement in December, I believe
25 it's December 17th, almost a month after the publication of

1    the article, and more than a week after the revelation had

2    been realized that Jackie was no longer reliable.  The

3    statements that someone makes after the fact, in case after

4    case, is simply not admissible as to the state of mind of the

5    reporter or anybody else at the time of publication.  That is

6    the relevant inquiry and those should just be wholly

7    disregarded.

8         Now, there was a lot about that we didn't require her

9    to provide certain contrary evidence, but as we established in

10   the record, and as this is established over and over again,

11   the operative fact here is that Erdley was pressing and

12   pressing and pressing to get this information.  She was

13   pressing to get these names, she was pressing to get

14   additional records.  She got a lot of records, she got a lot

15   of evidence that supported Jackie's story, not just the police

16   reports, not just Eramo's e-mails, but evidence that she

17   worked at the swimming place and other evidence.

18        But the fact that she was pressing and pressing to

19   the point where Jackie told her friends she was on a witch

20   hunt is simply evidence that she was trying to get to the

21   bottom of the story and to corroborate it in each and every

22   way that she could.

23        Some of those things she indicated they closed doors

24   and she thought it was done.  She kept trying to speak to

25   Ryan, and then she was ultimately told by Jackie he wasn't

1  going to speak, and she thought it was a done issue at that

2  point.

3          What the law is clear is that you don't have to

4  pursue every possible piece of evidence.  You don't have to go

5  down every alley that conceivably could be gone down.  As the

6  supreme court found in *St. Amant*, where there is no

7  investigation, it does not equal actual malice if the evidence

8  establishes that each defendant believed the statement to be

9  true.  And the evidence here is unequivocal.

10          Now, there was a big show about looking at the

11  photograph of Jackie.  First of all, she supplied Erdley with

12  multiple photographs; it was not simply the photograph that

13  was displayed.  I assume which one it was, since I didn't see

14  it.  And she also has testified unequivocally.

15          She didn't testify that she believed there was paint

16  on her face.  She testified that, from those photographs, that

17  she understood that there had been an actual injury.

18  Moreover, the plaintiff testified that when she met with

19  Jackie at one point, there was a bruise on her cheek and that

20  she saw evidence of the bottle incident.  There's no evidence

21  in this record, Your Honor, that those injuries did not occur.

22  How they precisely occurred, we don't know.  But there's no

23  evidence that there were no such injuries.

24          Now, as to the scars, again another thing they latch

25  onto, they say that it's undisputed that she never saw any

1  scars on her arm.  And she wrote, and she quoted from the

2  tape, she didn't see scars that night, in the dim light.

3  Okay.  What is omitted is the next day, in the bright light,

4  she saw the scars.  So that wasn't something that, again, is

5  in conflict.

6       And what also is omitted, she saw Jackie visibly

7  break down outside the Phi Psi house in a way that would to,

8  any person at that point who understood she was a bona fide

9  rape victim, added huge credibility.

10       Erdley went inside the Phi Psi house and corroborated

11  the layout that Jackie had gave her.  There's piece of

12  evidence, after piece of evidence of the corroboration and

13  reasons why they believed Jackie to be entirely credible.  And

14  there's no evidence in this record, none, unlike in *Hatfill*,

15  unlike in other cases that anybody suggested that Jackie was

16  not credible.  That is simply not in the record.

17       Now, with regard to the post-publication statements,

18  again, they're irrelevant for the state of mind at the time of

19  publication.  But, again, there is a misrepresentation of the

20  record.

21       Shawn Wood did not lie to the Washington Post.  As he

22  testified, at the time he spoke to the Washington Post, when

23  he said that, "We knew the name of Drew," Erdley had spoken

24  further with Jackie and had received a name that at that time

25  they believed to be the name.  And so when he said that, it

Eramo v. Rolling Stone, et al. - 8/12/16

1    was a true statement.

2          Then just a few other comments that seeks to diminish

3    the imprimatur and the fact that she was referred from Renda.

4    Renda was not a student worker.  She had graduated from the

5    university at that time.  She was working in the sexual

6    assault office, alongside with Dean Eramo.  She was with

7    Dean Eramo at the Dartmouth conference when she spoke to

8    Erdley and was communicating the concerns that Eramo did not

9    want the name of the fraternity to be in the article, because

10   they were still hoping that they would get the other victims

11   to come forward and be able to press charges.  Again, further

12   confirmation that the University was crediting Jackie, was

13   looking and hoping to have a further investigation.

14         Now, finally with regard to the opinion, Mr. Clare

15   said it has to be either pure opinion, but if there's any

16   factual statement to justify opinion, that can form the basis

17   of a libel claim.  That is absolutely true, Your Honor.  But

18   here the opinions at issue, all the facts underlying those

19   opinions are put forth in the article, and here are

20   indisputably true.

21         On the victim choice, I went through the facts that

22   support that.  They don't agree with the conclusion that

23   victim choice may lead to, you know, less reporting, but the

24   facts underlying that are true and revealed in the article,

25   the same with the failure to alert the campus on this.  All

1  the facts underlying that are in the article and are
2  indisputably true.
3       The only fact that is not in the article is that she
4  took her to the police.  And as I've indicated more than once,
5  and I won't, you know, belabor it now, that didn't change the
6  opinion, because at the end of the day, the e-mail to Jackie
7  about going to the police was, "It's your choice whether you
8  go forward."  So it was further confirmation of the victim
9  choice argument rather than repudiation of it.
10      Thus, Your Honor -- oh, one other small, and it's a
11 small one, but it bothered me because it was emphasized and
12 it's so inaccurate, again, to the record.
13      A point was made that during the taped interview --
14 and most of her interviews weren't taped.  That's actually not
15 accurate.  The tapes that were made were provided in this
16 case.  But it was indicated that it was mysterious that she
17 turned off the tape because she wanted to bad-mouth Dean Eramo
18 and that that's what went on.
19      Well, let me read you her testimony in turning off
20 the tape.
21      The question was:  "Why did you turn the tape
22 recorder off to speak about Dean Eramo?"
23      "Answer:  It wasn't specifically because I was
24 talking about Dean Eramo.  There was a couple of places here
25 where I turned the tape recorder off.  I often take the time

1   to turn the tape recorder off when I'm going to go on some

2   length.  And I know that I'm the one who does most of the

3   transcribing myself, almost always, and I don't need to hear

4   my own voice on tape.  So if I know that there's going to be a

5   discussion that is not going to wind up in the article, then I

6   wind up turning off the tape.  It has nothing do with this

7   being about Dean Eramo."

8            That's the testimony, Your Honor.  That's what's

9   before the Court.  And that is just, you know, one of many

10  examples of how things are taken out of context or

11  misrepresented and simply is not of the record.

12           The Court needs to look at the full record, and based

13  on the full record, you need to look at each statement at

14  issue and you need to determine as to each defendant whether

15  they had serious doubts about the statement, and there is

16  nothing in this record that substantiates that.

17           Oh, and then finally, I've suggested -- I know,

18  nothing is worse than when a speaker says "finally" more than

19  once.  That is the worst thing someone can do, so I apologize

20  profusely.  But I wanted to -- my esteemed colleagues did a

21  little analysis while the plaintiff was arguing as to the

22  Fourth Circuit case law, and here's the breakdown:

23           There are two cases that the Fourth Circuit heard,

24  went to the jury, but were reversed by the Fourth Circuit,

25  finding that there was insufficient evidence of actual malice

1  and that, therefore, it should not have gone to the jury, and

2  that was *Reuber* and *Ryan*, which I've already indicated.

3           There were six cases before the Fourth Circuit that

4  were granted for defendants on summary judgment.  And those

5  cases are *CACI; Car,* C-A-R; *Daniels v. The Scientology;*

6  *Hatfill; Baumback;* and *Fazzio*.  So there are six cases where

7  the defendants were granted summary judgment and then it was

8  affirmed on appeal.

9           There were two cases that were allowed to proceed by

10 the Fourth Circuit as questions of fact, and those were the

11 *Fitzgerald* and the *Liddy* cases.  And as we've indicated, those

12 are so far afield than anything here.

13          And then last, we have two cases that found no public

14 figure status, so not actual malice on the merits, and that

15 was *Blue Ridge* and *Jenoff*.  And on the public figure cases, as

16 we've put in our brief, *Blue Ridge* and *Jenoff* are entirely

17 inapposite.

18          *Blue Ridge* dealt with the insolvency of a bank and

19 the fact that there was absolutely no controversy about that

20 bank's insolvency prior to the publication at issue.

21          And *Jenoff* dealt with an informant, a police

22 informant, which by definition -- I mean, the fact that a

23 police informant would be a public figure is counterintuitive

24 given that they are usually sub rosa and not someone who would

25 be readily known.

1          So with that, Your Honor, I can say we're done.

2          THE COURT:  Yes, ma'am.

3          MS. McNAMARA:  Thank you very much.

4          THE COURT:  And your survey was of published cases

5     and unpublished cases?

6          MS. SCHARY:  This was of the cases that are cited in

7     our end brief papers.

8          THE COURT:  Okay.

9          MS. McNAMARA:  Okay.  We can see if there are any

10    other cases and we can supplement.

11         MS. SCHARY:  We can do a survey for you.

12         THE COURT:  There will be a lot of unpublished cases.

13         MS. McNAMARA:  Yeah.  If we omitted any other Fourth

14    Circuit cases, we will most certainly --

15         THE COURT:  It's not the biggest point, but

16    nevertheless, it is there.  Of course, a lot of the

17    unpublished cases are no longer unavailable.  They didn't

18    start making those available until about the '90s.  So *Gertz*

19    was decided in '74?

20         MS. McNAMARA:  Pardon me?

21         THE COURT:  *Gertz*, '73?  '74?

22         MS. McNAMARA:  Yes, I believe that's so.

23         THE COURT:  There was a raft of cases in the years

24    after *Gertz*.

25         MS. McNAMARA:  Yes.

Eramo v. Rolling Stone, et al. - 8/12/16

1          THE COURT:  But anyway, that is neither here nor

2     there.

3          As far as our marching orders, am I to understand

4     that both sides wish to submit additional statements of the

5     law, perhaps observations as to the evidence on the public

6     figure issue?

7          MS. McNAMARA:  Correct, Your Honor.

8          THE COURT:  So can we have a simultaneous submission

9     in ten days?  Would that be enough time?

10         MR. CLARE:  Yes.

11         MS. McNAMARA:  Uh-huh.

12         THE COURT:  And then as I understand it, the

13    defendant reserves the right to submit a response to the

14    argumentative slides that the plaintiff has tendered today,

15    and we'll have that in ten days as well.

16         MS. McNAMARA:  Great, Your Honor.

17         THE COURT:  Is there anything else, any other loose

18    ends that we need to deal with today?

19         It will take the Court some time.  As I said, I do

20    believe at least one of these issues is very challenging; two

21    deserve some attention, two or three.  So it's going to be a

22    few weeks before the Court is able to get back to this.

23    There's a lot on the plate for early fall, as is normally the

24    case.  But we'll get something out as quickly as we can.

25         Is there anything else that we need to deal with by

Eramo v. Rolling Stone, et al. - 8/12/16

```
 1   way of preliminary measures, issues before we rule on the

 2   summary judgment motions?

 3            MS. McNAMARA:  No, Your Honor.

 4            THE COURT:  If not, we'll try to get something out to

 5   you as quickly as we can.

 6            I appreciate the spirited arguments.  It is been a

 7   long day and I thank you for your efforts and for very good

 8   written submission.  We'll get something out to you as quickly

 9   as we can.

10            It's good to see everyone.  Good afternoon to you.

11   Safe travels.

12            I'll ask the marshal to adjourn court.

13       (Court recessed at 6:00 p.m.)

14

15                          CERTIFICATE

16   I,  Judy K. Webb, certify that the foregoing is a

17   correct transcript from the record of proceedings in

18   the above-entitled matter.

19

20   /s/  Judy K. Webb              Date:  8/21/16

21

22

23

24

25
```

MR. CLARE: [35]
3/13 21/1 22/3 22/11
23/8 24/3 29/6 29/15
30/25 32/1 32/7
32/10 32/22 33/18
36/7 36/11 38/11
38/13 38/16 39/3
39/8 39/13 39/15
40/9 40/11 41/4
161/25 162/4 170/22
174/19 174/25 175/4
175/7 176/16 197/9
MS. LOCKE: [35]
41/23 42/15 43/9
46/23 47/17 48/8
48/18 51/22 53/2
55/19 56/3 56/6 59/2
61/14 62/5 62/23
63/4 63/11 63/19
64/7 66/22 67/17
68/4 68/8 69/6 69/11
70/2 76/25 134/13
134/25 136/13 137/1
138/25 161/17
162/10
MS. McNAMARA:
[63] 38/23 41/16
68/9 68/15 77/2 77/4
77/24 81/14 81/21
82/2 82/5 84/18 85/3
85/8 85/14 85/18
86/2 86/6 86/12
86/15 86/24 87/2
87/14 88/6 88/10
97/24 98/3 102/19
131/2 132/5 132/14
132/18 132/22 133/7
133/14 133/20
133/24 134/2 134/12
161/6 161/12 161/16
175/10 175/17
175/19 175/23
175/25 176/8 176/15
176/17 178/11
178/15 178/22 196/2
196/8 196/12 196/19
196/21 196/24 197/6
197/10 197/15 198/2
MS. SCHARY: [2]
196/5 196/10
THE CLERK: [4] 3/5
138/24 162/3 162/5
THE COURT
REPORTER: [2]
134/21 134/23
THE COURT: [127]
3/1 3/7 20/21 21/21
22/7 23/7 23/24
28/15 29/10 30/19
31/13 32/6 32/9
32/16 33/17 36/3
36/9 38/10 38/12
38/15 39/2 39/6 39/9
39/14 40/6 40/10
41/1 41/11 42/11
43/7 46/11 47/15
48/4 48/14 51/17
52/22 55/17 55/20

56/4 58/13 61/7
61/23 62/21 62/25
63/5 63/17 64/4
66/19 67/14 67/21
68/5 68/11 68/21
69/10 69/23 76/24
77/1 77/3 77/23 81/7
81/18 81/23 82/4
84/12 84/21 85/6
85/13 85/17 85/22
86/5 86/8 86/13
86/17 87/1 87/11
88/3 88/8 97/9 98/1
102/18 131/1 131/25
132/8 132/16 132/20
133/2 133/11 133/19
133/22 134/1 134/10
134/17 134/22
134/24 136/6 136/19
161/10 161/15
161/22 162/1 162/9
174/13 174/20 175/3
175/6 175/8 175/13
175/18 175/20
175/24 176/7 176/10
177/20 178/13
178/20 196/1 196/3
196/7 196/11 196/14
196/20 196/22
196/25 197/7 197/11
197/16 198/3

'
'73 [1] 196/21
'74 [2] 196/19
196/21
'90s [1] 196/18
'A [3] 10/16 154/12
157/17
'Because [1] 119/25
'I [2] 14/22 154/20
'I'm [1] 155/2
'If [1] 14/25
'made [1] 79/18
'This [1] 148/21
'UVA [1] 183/5
'What [1] 162/23

/
/s [1] 198/20

0
00023 [1] 1/5

1
1 million [1] 74/3
10 [3] 59/6 103/4
106/7
100 [1] 98/11
100 percent [1] 29/8
10020 [1] 1/19
1076 [2] 104/5
120/22
1079 [2] 90/14 113/1
11 [3] 99/18 103/4
106/7
12 [5] 1/6 99/18
113/19 113/22
138/23
1251 [1] 1/18

12th [1] 148/23
13 [8] 101/25 102/2
102/12 113/5 113/19
113/19 113/22 140/7
138 [1] 177/7
14 [2] 118/18 140/11
15 [2] 64/23 116/1
16 [2] 140/24 198/20
17 [1] 80/20
17th [1] 188/25
18 [1] 142/13
1919 [1] 2/3
1971 [1] 58/2
1979 [1] 57/9
1980s [1] 90/4
1981 [1] 57/7
1982 [1] 155/25
1989 [1] 57/8
1998 [1] 79/8
1999 [2] 18/12 156/1
19th [4] 72/25 73/25
130/14 150/18
1:02 [2] 1/6 3/1

2
2.7 [1] 8/6
2.8 million [1] 74/1
20 [3] 144/2 150/7
180/3
20006 [1] 2/4
2001 [2] 90/4 93/10
2005 [1] 76/7
2006 [2] 71/12 80/12
2011 [1] 109/19
2012 [3] 17/23 59/25
162/24
2014 [11] 5/10 10/2
80/20 83/8 109/8
114/24 116/1 130/14
147/19 150/18
163/14
2015 [1] 10/15
2016 [1] 1/6
21 [3] 83/7 92/24
180/4
210 [1] 1/22
21st [1] 1/18
22314 [1] 1/15
23 [1] 3/7
24 [1] 146/9
24011 [1] 1/23
24022 [1] 2/7
25 [1] 146/14
26 [1] 146/20
28 [2] 46/17 162/24
29 [1] 80/9
2:00 [1] 30/4
2:00 a.m [1] 101/11

3
30 [2] 46/16 82/24
31 [1] 80/10
32 [1] 13/11
33 [2] 6/10 152/3
35 [1] 154/11
36 [1] 20/10
37 [1] 156/6
38 [1] 146/21
3:15-CV-00023 [1]

1/5
3:15-CV-23 [1] 3/7

4
40-plus [1] 132/11
40-plus-year [1]
132/13
400-and-some-odd
[1] 139/18
40013 [1] 2/7
41 [2] 20/21 23/14
42 [1] 159/24
43 [1] 162/11
46 [1] 164/4
48 [1] 165/19
49 [1] 166/11

5
5100 [1] 1/23
53 [1] 3/23
5333 [1] 1/23
54 [1] 4/23
540 [2] 1/22 1/23
56 [1] 95/12
57 [1] 9/16
58 [1] 10/1
5th [17] 10/2 11/11
39/20 40/1 40/16
40/20 41/11 42/8
73/1 74/2 74/19
75/20 76/12 76/22
76/24 101/12 125/24

6
60 [2] 13/17 98/12
60-plus [1] 98/9
61 [1] 14/17
62 [1] 15/19
65 [2] 26/19 26/22
67 [1] 112/9
69 [1] 35/10
6:00 [1] 198/13
6th [2] 42/9 73/1

7
70 [1] 37/7
716 [1] 99/10

8
8/21/16 [1] 198/20
800 [1] 2/3
857-5100 [1] 1/23

9
9,000-plus [1] 5/9
902 [1] 1/15
95 [1] 80/23

A
a.m [1] 101/11
abilities [1] 29/13
ability [4] 85/16 87/9
120/7 158/6
able [12] 62/19
81/17 87/22 91/23
115/20 123/2 133/25
153/11 177/11
186/23 192/11
197/22
about [286]

above [1] 198/18
above-entitled [1]
198/18
abrasive [1] 27/4
absence [1] 35/24
absences [1] 36/19
absolute [1] 111/22
absolutely [11] 40/12
58/15 99/20 112/23
119/13 155/12
171/18 180/1 180/7
192/17 195/19
abstract [7] 94/8
100/10 100/25
102/13 132/6 178/24
179/19
abuse [36] 13/23
13/24 14/1 14/2 14/9
14/10 16/16 18/5
18/9 18/14 19/8
19/10 20/19 20/19
21/10 21/15 22/20
28/3 28/12 28/13
29/17 30/15 33/21
58/18 59/12 110/8
110/10 117/10
117/14 118/14
118/17 118/18
140/14 146/19
179/23 186/9
abused [5] 19/4 33/3
56/16 109/25 117/25
abusing [3] 12/5
31/12 118/6
academic [1] 6/13
accept [15] 67/13
84/22 84/25 100/9
100/10 100/11
100/13 100/15 107/7
107/16 107/20 108/7
108/8 108/19 173/2
accepted [1] 98/25
access [7] 36/20
54/5 55/14 135/14
135/17 159/9 168/13
accident [1] 108/11
accommodate [1]
159/2
accommodating [3]
158/18 158/19
158/23
accommodations [1]
36/18
accomplishments [1]
80/25
accorded [1] 78/2
according [3] 28/9
46/14 169/2
account [6] 8/1 8/14
17/22 59/24 126/4
157/6
accountable [31]
13/22 14/8 14/9
14/12 14/14 14/19
15/5 15/5 15/7 15/10
15/17 15/23 16/1
16/7 16/11 16/14
16/19 16/23 17/1
17/5 18/14 19/11

**A**

accountable... [9]
19/16 20/3 28/3
59/11 105/5 114/19
117/14 117/22
140/14
accountable,' [1]
15/1
accrue [1] 41/1
accuracy [15] 78/6
94/10 95/6 100/24
102/7 106/14 115/18
119/19 120/16
121/13 121/20
125/14 130/14
131/22 139/16
accurate [13] 100/21
112/13 119/14
119/17 120/9 122/9
134/10 177/5 180/8
180/10 181/1 181/24
193/15
accurately [3] 120/7
120/15 145/21
accusation [1] 36/7
accused [8] 8/11
8/18 34/16 89/1
105/7 110/5 146/11
146/16
accuses [2] 34/2
34/5
achieved [1] 150/2
acknowledge [2]
96/12 113/3
acknowledged [1]
91/9 129/10
acknowledges [1]
103/24
acknowledging [1]
77/9
across [3] 92/13
126/17 132/25
Act [2] 45/22 90/8
acted [8] 33/3
116/21 116/25 130/8
137/6 137/17 138/17
173/16
acting [2] 51/9
173/12
action [25] 1/5 3/7
35/5 43/4 72/20 75/6
78/3 78/4 89/4 94/2
100/9 100/22 102/2
103/3 112/21 114/9
117/3 119/7 123/15
123/16 125/17 169/5
172/25 173/7 174/24
actionable [3] 13/3
130/5 172/15
actions [6] 17/14
18/6 29/12 55/9
114/14 123/17
active [2] 112/22
114/10
activities [2] 51/10
127/24
acts [2] 126/19
127/5
actual [113] 11/11

24/8 39/24 40/8 41/3
42/13 43/4 70/6 70/9
70/12 72/22 76/2
76/14 76/23 77/19
77/20 79/23 83/23
84/5 89/5 92/21
93/14 93/19 93/25
94/8 94/23 95/2
95/10 95/19 95/24
95/25 96/3 97/11
98/11 98/13 99/6
99/24 100/10 100/19
102/9 102/14 104/21
107/15 108/1 108/11
108/21 109/15
109/16 109/20
110/19 112/13 114/1
118/13 119/1 119/2
119/15 119/22
120/25 121/7 121/16
123/25 124/4 126/12
126/20 126/23
128/15 128/16
129/25 130/3 130/10
131/14 132/5 132/7
132/10 132/17 133/1
133/7 133/9 137/3
137/8 137/10 137/11
137/19 137/25
138/11 139/2 139/11
146/4 146/5 148/6
151/24 155/20
167/18 172/18
172/20 175/1 175/6
175/11 175/12 177/1
179/7 179/9 179/13
179/13 179/19
181/13 184/20 185/4
188/23 190/7 190/17
194/25 195/14
actuality [1] 168/2
actually [29] 12/10
18/8 32/15 36/9 47/6
50/2 50/5 52/12
52/16 74/18 75/24
76/7 76/8 79/16
94/15 99/17 107/19
108/10 109/21
125/11 134/9 137/16
139/11 148/14
162/17 171/15 173/9
174/8 193/14
add [6] 42/19 42/25
72/17 121/24 141/8
141/17
added [13] 10/7
42/10 43/7 73/1 73/3
74/25 122/3 122/11
122/14 182/3 184/11
184/13 191/9
adding [4] 4/25 72/2
72/15 127/22
addition [4] 74/12
127/2 134/3 171/20
additional [19] 5/14
10/10 10/36 18
40/23 41/16 74/3
94/5 95/18 122/2
122/14 127/23

131/25 176/22 177/6
178/4 178/10 189/14
197/4
address [19] 4/17
11/14 19/6 33/19
39/5 41/21 44/7
44/10 54/18 59/3
70/5 70/13 98/8
100/23 125/22
131/24 137/2 170/22
176/3
addressed [11] 9/23
22/11 24/2 77/15
89/16 91/1 115/12
125/17 176/21 182/1
183/15
addresses [1]
113/25
addressing [9] 24/5
24/7 38/18 39/14
42/3 90/24 91/17
92/11 178/25
adds [1] 177/1
adequately [2]
178/18 183/21
adhere [1] 150/10
adjourn [1] 198/12
adjudicate [1] 49/17
adjudicates [3] 49/17
49/22 80/8
adjudicating [1]
36/15
adjudication [2] 50/6
80/14
administering [1]
30/6 30/16
administration [12]
12/4 16/20 17/1
112/20 130/23 131/7
145/1 149/24 150/15
151/1 151/2 182/19
administrator [8] 6/6
17/3 18/6 28/14
34/19 35/1 48/24
63/16
administrators [9]
12/4 17/24 18/2
19/17 21/4 44/17
60/1 79/11 146/13
admissible [5] 26/12
171/10 171/18 172/6
189/4
admission [2] 138/5
158/4
admit [2] 21/3 187/4
admits [4] 10/11
83/19 137/16 139/13
admitted [8] 17/8
82/14 83/21 124/20
124/20 157/2 174/17
188/21
ado [1] 45/13
adopt [2] 103/5
116/11
adopted [1] 136/11
adopting [1] 86/20
advance [2] 99/12
146/2
adverse [2] 54/3

135/11
advertisements [1]
72/1
advice [1] 64/7
advise [1] 47/8
advising [2] 47/6
47/6
advocacy [2] 104/6
150/13
advocate [4] 31/6
104/7 118/5 125/6
affairs [6] 44/14 51/7
64/3 79/17 142/21
142/23
affected [2] 126/6
128/7
affidavits [4] 18/13
18/19 171/12 171/20
affirm [1] 105/1
affirmative [2] 13/14
42/2
affirmatively [2]
111/21 128/10
affirmed [1] 134/4
185/2 195/8
afforded [1] 78/1
afield [1] 195/12
after [48] 6/5 9/18
9/24 10/17 18/4 20/2
31/11 40/16 42/9
49/18 59/21 65/18
65/20 65/24 66/9
67/8 68/2 70/13
75/20 101/22 103/9
103/19 103/19 108/6
108/22 109/8 109/9
114/24 116/1 116/2
119/12 129/20
132/14 133/5 133/13
141/17 141/17
147/14 155/3 155/10
159/10 182/18
188/25 189/1 189/3
189/3 191/12 196/24
afternoon [6] 3/2
20/14 77/3 77/4
107/8 198/10
afterwards [1]
128/18
again [69] 10/14
16/22 23/14 24/9
25/12 28/11 33/15
33/19 41/25 53/17
54/9 62/16 64/16
65/16 68/23 69/9
77/13 80/17 86/3
88/17 89/13 92/4
93/9 98/21 105/9
112/4 113/14 114/7
115/8 116/5 117/19
119/7 121/8 121/11
124/6 126/23 127/13
133/17 141/22
141/25 145/22
154/16 154/18
157/19 157/23
164/11 167/12
167/15 179/12
179/22 181/20 182/7

183/1 183/19 184/15
185/5 185/6 185/20
185/21 186/3 186/4
187/14 189/10
190/24 191/4 191/18
191/19 192/11
193/12
against [12] 53/22
76/21 112/22 114/10
141/24 148/4 152/1
152/5 153/15 154/3
154/8 185/23
aggressive [2]
108/23 153/21
aggressively [1] 5/12
aggrieved [1] 130/4
ago [4] 11/17 28/2
141/3 141/20
agree [13] 21/23
42/12 58/14 62/5
69/7 69/16 81/25
82/1 86/9 86/10
103/7 175/21 192/22
Agreed [2] 69/11
69/24
agreement [2]
161/18 161/21
agrees [1] 21/21
ahead [3] 23/25
41/12 159/18
aid [2] 73/16 159/4
aim [2] 28/5 34/1
akin [1] 62/11
alarming [3] 104/8
168/22 168/23
alert [2] 124/13
192/25
alerted [1] 128/5
alerting [1] 101/22
Alex [10] 10/4 10/4
120/11 120/13
148/24 150/6 160/1
160/10 165/20
165/21
Alexandria [1] 1/15
ALISON [2] 2/2
77/11
all [88] 4/3 4/9 4/12
8/13 9/15 11/3 11/4
13/14 15/9 18/24
19/13 22/16 22/25
25/5 30/21 31/7 32/8
33/10 33/18 38/4
39/5 43/5 44/2 44/22
48/15 51/10 58/24
61/20 64/1 67/1 69/4
72/21 79/12 79/12
80/8 84/13 88/20
89/23 90/3 92/19
95/12 96/7 99/18
105/11 105/14
106/10 106/22 109/1
111/14 112/19
113/21 115/1 115/3
115/14 115/22
120/10 122/22
124/17 125/7 125/16
125/20 126/17 128/6
132/21 136/19

**A**

all... [23] 136/22
  138/19 139/18
  142/10 143/5 148/13
  161/23 162/20
  163/15 163/16
  167/16 171/22 175/7
  179/6 180/13 183/1
  183/7 185/5 185/7
  187/21 190/11
  192/18 192/25
allegation [7] 45/8
  75/5 89/10 112/21
  114/10 151/15
  151/17
allegations [21]
  10/11 11/7 45/20
  49/17 53/21 54/14
  76/15 76/21 89/13
  89/16 99/1 100/7
  101/18 106/8 115/19
  117/19 123/14 141/3
  141/20 183/3 183/20
allege [2] 75/13
  144/5
alleged [23] 5/22
  16/7 24/24 72/10
  73/10 73/12 73/13
  73/14 76/19 110/12
  123/24 141/12 152/2
  154/1 154/4 156/10
  156/25 159/15 161/2
  161/6 166/14 167/9
  179/13
allegedly [2] 161/1
  187/1
alleges [2] 80/6
  154/2
alleging [2] 22/13
  22/14
Allen [1] 48/24
alley [1] 190/5
allow [5] 41/13
  42/24 55/4 55/6
  72/16
allowed [5] 54/22
  136/15 150/4 159/17
  195/9
allows [1] 95/14
alluded [1] 72/12
almost [7] 31/9
  37/14 77/7 107/7
  185/25 188/25 194/3
alone [2] 158/4
  158/6
along [1] 119/20
alongside [1] 192/6
already [16] 74/7
  77/14 99/6 101/8
  115/12 117/10 123/1
  123/1 139/3 150/9
  153/13 161/8 161/12
  178/7 184/15 195/2
also [63] 3/18 8/16
  11/9 12/9 12/16 15/8
  18/23 19/3 24/8
  26/12 41/10 43/4
  45/11 46/11 47/20
  51/8 56/3 57/8 61/10

61/17 64/3 65/17
  70/5 72/6 72/20
  72/25 74/2 82/11
  82/23 89/25 91/8
  92/18 101/20 108/19
  110/13 117/23 120/6
  120/12 120/13
  129/18 135/21 136/4
  137/8 141/16 143/21
  144/21 145/9 145/18
  148/3 149/19 152/15
  153/9 157/14 157/22
  158/21 163/10
  163/16 179/18
  180/14 184/9 188/20
  190/14 191/6
alteration [2] 71/21
  71/25
alterations [2] 71/19
  71/20
altered [1] 144/4
alternate [1] 130/11
alternatively [1]
  53/10
although [1] 167/22
altogether [1] 159/21
always [7] 15/13
  15/14 104/2 104/21
  106/5 162/23 194/3
am [3] 31/20 178/7
  197/3
Amant [2] 99/19
  190/6
ambiguities [2] 116/9
  116/12
ambiguous [2]
  118/23 119/11
Amendment [3]
  99/13 117/5 174/25
America [1] 75/2
Americas [1] 1/18
among [3] 23/15
  44/12 80/3
amount [2] 176/2
  176/6
amounted [1] 126/8
amplify [1] 177/7
analogous [1] 27/5
analysis [15] 51/25
  52/5 56/9 57/14 69/3
  71/14 74/20 74/20
  86/2 112/12 135/4
  135/5 135/19 135/20
  194/21
analytical [1] 97/22
and/or [2] 68/19
  177/18
ANDREW [1] 1/14
Andy [1] 3/18
anecdotal [1] 81/12
angry [2] 6/25 18/23
ANNE [1] 1/17
Annie [1] 156/21
announce [1] 3/4
annoys [1] 91/5
another [24] 21/22
  25/18 32/21 36/6

48/5 63/12 79/20
  81/15 92/20 110/2
  116/4 118/6 120/9
  141/16 149/22
  149/22 150/6 151/18
  156/21 164/13
  165/10 183/9 186/15
  190/24
answer [10] 22/8
  54/16 166/13 166/22
  167/2 167/15 181/4
  181/8 184/6 193/23
answered [6] 119/25
  150/22 151/4 152/8
  152/14 154/14
answers [1] 59/1
antagonized [2]
  118/19 118/24
anthrax [1] 89/1
any [77] 10/5 20/4
  20/7 26/9 30/9 30/13
  32/5 42/10 45/20
  45/24 50/21 51/2
  51/7 52/3 53/4 53/25
  54/1 55/1 58/19
  61/20 63/7 71/3
  72/18 73/19 76/9
  78/5 78/5 95/7 95/17
  96/9 96/25 97/1
  106/16 107/22
  107/23 109/5 109/14
  109/15 112/10
  115/24 121/24
  123/12 123/12
  125/10 125/15
  125/19 127/1 129/25
  131/22 131/24 132/1
  135/9 152/11 154/11
  159/11 163/1 163/8
  163/10 163/13
  174/13 174/18
  176/11 176/11 177/1
  178/10 181/4 181/24
  185/21 185/22
  185/23 188/14
  190/25 191/8 192/15
  196/9 196/13 197/17
anybody [8] 33/1
  33/4 117/22 123/8
  123/12 188/9 189/5
  191/15
anymore [1] 40/4
anyone [4] 38/2
  123/17 126/6 131/22
anything [15] 50/3
  78/6 83/11 89/2
  98/20 112/14 129/1
  172/14 174/12 178/2
  186/12 188/9 195/12
  197/17 197/25
anyway [2] 159/18
  197/1
anywhere [2] 19/22
  100/17
apologetic [1] 172/3
apologize [3] 85/8
  170/20 194/19
apologized [2] 78/2
  126/6

apologizes [1]
  108/22
apologizing [2]
  101/24 128/6
apology [12] 126/1
  126/2 126/9 126/11
  126/19 127/5 128/12
  128/15 128/25 130/8
  130/9 170/19
apparent [4] 79/23
  79/25 83/23 84/9
apparently [2] 7/1
  97/14
appeal [1] 195/8
appeals [1] 133/10
appear [5] 44/13
  104/17 140/9 147/8
  159/22
APPEARANCES [2]
  1/12 2/1
appeared [2] 51/6
  73/11
appearing [1] 46/3
appears [7] 60/19
  104/5 104/23 106/21
  114/12 140/5 186/19
appended [1] 126/1
appending [1]
  126/19
appendix [3] 101/25
  103/4 114/4
application [2]
  116/20 124/8
applies [2] 44/17
  46/24
applying [1] 126/10
appreciate [5] 87/13
  174/16 176/1 177/9
  198/6
apprised [2] 113/7
  113/25
approach [4] 57/22
  58/12 74/24 105/2
approaches [1] 22/9
appropriate [4] 12/7
  27/9 42/7 136/17
appropriately [2]
  116/22 117/1
approximately [1]
  46/16
April [4] 10/15 41/1
  76/7 129/20
April 2005 [1] 76/7
arc [2] 147/22
  149/21
are [174] 3/8 4/1 4/7
  4/14 6/25 9/22 10/15
  11/3 11/4 12/8 12/19
  12/25 13/15 14/18
  15/18 15/20 18/19
  20/7 20/8 20/15 22/7
  22/14 23/1 23/6 23/7
  23/10 23/19 24/11
  24/18 24/21 24/23
  25/8 27/15 31/22
  31/23 31/25 32/5
  33/1 33/20 33/21
  36/21 37/9 37/11
  37/23 38/19 41/2

41/14 44/8 46/2 48/9
  50/14 50/15 53/6
  55/5 55/18 56/22
  57/6 60/20 60/22
  60/24 61/8 62/6 63/8
  66/17 67/18 67/18
  68/7 69/15 70/21
  71/1 71/8 73/2 74/4
  75/7 75/8 75/14
  75/14 76/21 77/10
  77/15 79/11 81/21
  85/11 87/15 88/3
  89/16 89/17 89/23
  93/2 95/21 102/2
  104/9 104/10 104/10
  105/12 105/14
  105/20 106/7 106/10
  107/16 107/21
  110/20 112/17
  113/21 113/22 115/4
  116/7 120/18 122/23
  125/8 125/9 128/22
  131/11 132/1 133/1
  133/13 137/8 139/1
  139/23 140/9 142/10
  142/11 142/12
  144/24 147/9 151/21
  153/13 156/8 156/24
  160/2 160/23 162/4
  162/5 162/23 162/23
  164/7 164/7 164/8
  164/8 164/9 166/17
  167/6 173/15 173/18
  174/1 174/25 175/4
  175/5 176/12 177/17
  177/19 182/11 184/6
  185/11 185/11
  185/17 185/18
  186/21 187/16
  192/19 192/19
  192/24 193/1 193/1
  194/10 194/23 195/5
  195/6 195/12 195/16
  195/24 196/6 196/9
  196/17
area [1] 109/20
argue [11] 6/19
  18/18 25/9 32/13
  38/22 87/7 92/3
  107/7 107/12 125/7
  130/24
argued [5] 48/23
  52/23 58/8 129/12
  180/24
argues [3] 121/9
  126/25 130/23
arguing [5] 39/1 49/8
  105/8 177/19 194/21
argument [43] 4/17
  19/7 19/15 21/9
  23/22 28/17 28/18
  28/19 34/7 35/3
  38/22 41/3 46/19
  53/2 55/18 65/1 65/4
  79/24 84/14 84/19
  85/23 86/15 86/20
  93/15 107/8 107/16
  107/25 119/6 122/18
  126/12 126/16

## A

argument... [12]
129/15 130/17 135/2
169/21 170/22 176/8
176/14 184/22 185/9
186/16 188/12 193/9

argumentative [1]
197/14

arguments [12]
21/17 21/17 21/18
23/22 29/6 60/9
70/14 86/16 95/25
177/23 178/10 198/6

arise [1] 79/10

Arizona [4] 71/12
71/12 126/25 127/9

arm [1] 191/1

around [7] 98/18
137/23 157/23 158/2
161/1 177/10 179/22

ARTHUR [1] 1/13

Artic [1] 79/21

article [286]

article's [3] 59/7
91/25 112/20

articles [5] 12/11
12/18 88/23 127/13
146/10

as [339]

ascribed [2] 120/8
121/6

ascribes [1] 118/16

aside [1] 49/19

ask [9] 3/4 7/5 22/25
142/17 157/12
157/25 174/18
186/17 198/12

asked [25] 7/9 9/18
31/25 32/4 33/8
74/16 142/23 142/24
143/2 144/10 144/13
150/18 150/24 152/4
152/9 154/11 157/25
163/15 163/17
164/21 165/12
165/21 166/21 171/2
180/25

asking [4] 9/25
17/13 163/15 167/11

asks [1] 166/16

assailant [1] 165/22

assailants [4] 14/12
15/9 28/3 34/4

assault [116] 6/23
8/14 8/21 9/1 9/3
9/20 10/25 17/2
17/22 19/13 20/2
28/9 28/24 29/19
29/19 30/3 33/2 34/5
35/6 35/15 35/18
36/3 37/3 43/19
44/25 45/5 45/8
45/21 45/23 46/7
46/22 49/18 49/19
49/22 50/18 53/1
55/25 56/14 59/14
59/24 60/19 61/22
61/22 62/20 73/12
73/13 78/17 78/18

80/9 81/1 81/7 81/18
82/10 82/14 82/16
83/19 83/24 84/2
84/7 89/13 89/16
89/20 90/18 91/16
93/8 97/14 105/7
106/1 106/19 108/17
108/18 110/5 116/2
117/18 117/21
118/21 121/3 125/7
146/24 146/25 147/1
147/6 150/4 151/15
151/17 151/20 153/3
153/8 153/23 154/2
154/8 154/10 154/19
154/21 155/9 155/14
156/10 157/6 159/8
159/11 159/15
168/13 169/10
178/24 178/24
178/25 181/7 182/25
183/10 183/15
183/18 184/4 187/6
188/1 188/2 192/6

assaulted [5] 13/21
59/10 140/13 159/16
163/24

assaults [6] 28/22
31/12 66/22 116/3
183/22 188/19

assert [1] 174/3

asserted [1] 89/2

assertion [3] 18/5
66/20 86/14

assertions [4] 60/22
173/10 173/18 174/1

assess [2] 102/4
131/17

assessing [1] 41/4

assessment [3] 41/3
42/13 102/13

asset [2] 118/1
122/4

assigning [1] 104/9

assist [3] 14/25
111/21 114/18

assistant [5] 43/16
44/23 46/8 92/16
133/25

assisted [2] 80/25
81/6

associate [4] 6/3
10/22 28/7 33/5

associating [1] 25/20

assume [4] 19/24
22/2 39/11 190/13

assumed [1] 125/9

assuming [3] 46/18
174/17 175/15

assuring [1] 103/17
at [239]

attach [1] 20/23

attached [2] 40/2
102/1

attack [1] 162/19

attackers [1] 152/6

attacking [1] 171/24

attacks [1] 25/7

attempt [9] 14/12

96/1 96/4 128/13
130/9 130/11 139/3
139/8 151/7

attempted [2] 73/14
164/2

attempting [2] 74/21
167/8

attempts [3] 17/24
60/2 114/1

attended [2] 90/20
165/7

attention [12] 24/2
36/16 50/14 70/18
72/6 80/22 91/13
98/21 144/22 185/13
185/25 197/21

attest [1] 76/18

attributed [6] 7/23
75/18 76/1 129/2
143/8 143/12

attributing [2] 8/22
143/17

audience [2] 10/10
74/14

audiences [1] 71/3

AUGUST [2] 1/6
147/19

August 2014 [1]
147/19

author [7] 5/14 6/6
9/14 23/12 27/14
124/4 137/25

author's [1] 9/3

authorities [4] 30/23
34/12 111/18 141/12

authority [13] 45/18
46/7 79/2 79/23
79/23 79/25 83/12
83/23 84/2 84/3 84/5
84/9 171/6

automatically [1]
57/20

available [1] 196/18

Avenue [2] 1/18 2/3

AvePoint [3] 11/16
12/2 12/14

avoid [2] 166/1
181/17

avoidance [1]
112/11

aware [13] 77/20
78/4 96/22 97/1 97/4
108/2 110/4 110/6
123/6 154/15 160/24
187/6 187/8

awareness [3] 138/4
139/24 149/13

away [5] 9/8 10/23
15/11 73/12 140/19

## B

back [41] 9/19 9/21
9/24 20/22 31/22
49/11 55/11 65/1
67/5 67/9 69/9 69/16
81/3 85/24 89/14
90/3 91/21 104/25
107/15 108/7 112/4
122/17 130/1 132/24

136/7 142/23 142/24
162/19 162/21
162/22 163/6 163/11
163/17 163/19
168/25 169/1 169/12
171/2 178/9 182/13
197/22

background [2] 4/19
144/8

bad [4] 34/20 148/17
148/18 193/17

bad-mouth [1]
193/17

badly [1] 34/25

balancing [1] 53/19

ball [1] 21/16

banc [4] 94/20 98/22
133/17 184/16

bank [6] 57/8 57/15
58/3 58/4 58/7
195/18

bank's [2] 58/9
195/20

bankruptcy [1] 72/7

based [12] 21/17
32/22 58/23 66/20
69/1 119/9 132/8
136/18 143/18
150/25 155/11
194/12

bases [1] 94/3

basic [1] 126/12

basically [6] 57/13
67/13 72/8 72/11
72/15 76/16

basis [6] 8/14
102/15 130/6 172/25
173/6 192/16

Baumback [3] 79/7
82/7 195/6

BAYARD [2] 1/17
77/11

Baylor [1] 26/25

be [233]

be-all [1] 79/12

beaded [1] 163/7

bearing [1] 22/9

bears [2] 172/6
176/21

because [91] 5/23
11/12 13/3 15/11
21/2 22/9 22/12
24/20 27/10 27/17
28/20 30/15 31/10
32/15 33/13 33/20
34/2 34/18 35/1
35/25 39/16 39/24
41/19 42/22 43/2
46/14 47/19 47/23
49/9 49/12 51/13
51/14 51/19 52/1
55/13 55/15 57/3
57/13 58/9 58/24
60/13 60/16 62/24
63/22 66/8 66/14
72/14 72/18 74/6
77/10 85/5 87/3 87/6
87/22 93/1 94/22
95/16 96/14 100/22

102/17 112/3 117/17
119/16 122/22 124/7
125/18 128/25
136/22 137/7 140/4
142/17 144/22
144/23 150/8 160/4
160/10 168/1 168/3
168/9 170/24 177/8
177/10 182/15
182/15 185/12
185/13 192/9 193/6
193/11 193/17
193/23

Becky [4] 164/1
164/6 164/8 164/9

become [2] 175/14
78/4

becoming [2] 31/4
78/4

been [60] 6/4 9/15
9/23 10/19 10/20
10/21 10/23 18/25
19/23 19/24 20/24
21/11 22/3 31/9 51/5
51/23 58/1 64/5 65/9
65/14 66/24 73/10
77/6 77/14 78/1 78/1
78/8 78/13 86/19
91/23 92/21 96/17
97/19 101/8 105/7
109/25 112/22 113/8
122/21 125/3 128/9
132/14 133/5 133/13
133/14 152/19 153/1
154/15 156/16 157/8
159/16 161/4 161/13
161/14 162/15
176/24 187/11 189/2
190/17 198/6

beer [2] 156/17
156/19

before [48] 1/9 4/14
16/1 36/7 39/11
40/21 41/1 43/13
52/6 52/7 55/13 66/5
72/12 77/14 80/20
83/2 83/15 84/21
87/11 91/19 92/20
98/14 99/22 99/24
101/6 106/2 134/4
135/9 136/8 139/10
146/15 147/12
152/17 154/12
154/24 155/6 157/16
157/25 163/15
164/20 165/11
171/21 179/10
179/24 194/9 195/3
197/22 198/1

befriend [1] 31/5

began [8] 13/23
14/10 28/3 59/12
97/8 117/14 140/14
179/5

begin [4] 77/9 77/21
88/24 123/24

begins [2] 91/11
111/13

behalf [1] 77/5

behind [2] 72/19

**B**

behind... [1] 73/23
being [46] 4/24 6/8
9/7 11/24 16/14 22/1
27/4 29/19 29/20
34/16 35/24 37/13
41/14 48/20 53/12
64/23 73/7 78/19
89/1 90/10 90/25
91/23 103/3 106/18
108/23 121/18
122/12 123/5 124/16
130/23 143/16
143/23 146/12
146/16 150/19
153/16 153/18
153/19 153/19 154/7
154/17 158/19
160/11 173/20
180/21 194/7
belabor [6] 38/4
38/12 117/11 173/22
187/15 193/5
belatedly [2] 100/4
123/15
belief [1] 100/24
believe [44] 20/17
23/19 24/17 32/24
34/11 37/23 38/1
39/21 40/4 40/7
57/17 68/16 77/16
78/10 88/19 95/14
95/21 97/7 101/17
105/11 116/21
117/13 117/16 123/5
123/18 123/20
125/17 128/21
130/15 132/3 150/22
151/5 152/4 152/8
152/14 162/16
164/11 175/4 177/1
180/10 185/16
188/24 196/22
197/20
believed [26] 61/18
61/19 95/19 100/20
101/5 101/9 112/12
113/7 119/16 121/20
123/14 125/1 128/19
131/18 145/13
152/12 154/22
158/11 159/12 169/4
169/5 188/14 190/8
190/15 191/13
191/25
believes [4] 95/25
121/1 176/20 182/15
beloved [4] 118/2
118/3 122/11 182/3
bend [1] 158/25
Besides [1] 122/17
best [6] 69/5 101/8
118/5 120/19 169/10
169/17
better [3] 26/21
99/14 148/19
between [20] 7/17
8/17 12/16 14/6
14/20 15/4 22/20

28/17 29/6 46/13
69/21 71/19 72/9
73/21 92/5 92/16
121/9 155/5 159/25
165/20
beyond [1] 132/18
bias [9] 100/11
138/1 148/3 148/4
149/20 167/18
185/20 185/23 186/1
biased [1] 67/7
big [3] 37/4 162/7
190/10
biggest [1] 196/15
bit [5] 136/24 139/3
140/1 177/10 179/23
blah [3] 186/21
186/22 186/22
blaming [1] 7/2
blasé [1] 37/2
blind [1] 181/17
bloody [1] 159/10
blow [3] 101/2 101/2
111/24
blow-by-blow [1]
101/2
blow-up [1] 111/24
blowup [2] 112/2
112/9
blue [7] 57/8 57/15
58/3 159/13 195/15
195/16 195/18
Blumer [1] 146/17
board [30] 48/6 48/7
49/7 49/12 49/15
49/21 50/1 50/10
50/16 50/18 50/20
50/22 50/23 52/3
52/4 52/15 52/19
78/19 78/25 80/7
80/12 80/16 82/11
83/1 83/9 90/6 90/15
92/19 164/15 183/17
boards [1] 146/13
body [2] 12/18 80/8
bold [2] 114/5
140/17
bolster [1] 148/6
bona [1] 191/8
borne [3] 98/6 98/7
122/23
borrowing [1] 28/11
bosses [2] 54/24
84/3
both [24] 3/9 9/1
15/21 48/9 51/11
61/17 69/8 81/22
81/23 84/14 86/16
91/19 95/2 95/8
127/25 130/19
130/24 131/9 135/16
144/24 156/1 173/24
175/21 197/4
bothered [2] 157/12
193/11
bottle [23] 19/10
19/19 19/22 108/9
108/11 108/13
115/21 117/16

152/20 153/18
153/24 153/25 154/6
155/3 155/10 155/14
156/17 156/19
160/25 162/13
186/24 187/7 190/20
bottle-throwing [3]
153/18 154/6 162/13
bottom [2] 127/10
189/21
bound [2] 96/13
96/16
bounds [1] 178/6
Box [1] 2/7
boy [1] 151/18
boyfriend [5] 9/21
148/25 163/9 163/9
163/19
boys [4] 115/1 115/3
120/10 186/21
bracelet [1] 163/7
break [2] 134/21
191/7
breakdown [1]
194/22
brief [10] 20/6 23/15
26/23 47/4 65/1
170/24 170/25 171/8
195/16 196/7
briefed [1] 78/8
briefing [6] 54/19
74/5 136/16 136/17
142/8 176/7
briefly [7] 20/5 25/13
37/8 100/23 125/17
151/16 172/13
briefs [4] 26/2 49/13
92/22 169/8
bright [4] 71/19 72/8
127/1 191/3
bright-line [1] 127/1
bring [2] 151/7
154/20
bringing [1] 71/23
brings [1] 23/21
bristling [1] 116/9
broad [4] 56/21
57/11 61/22 178/21
broadcast [4] 12/23
171/13 171/15
171/18
broader [3] 55/24
89/19 91/15
broadest [1] 58/15
broadly [2] 56/15
89/23
broke [1] 7/2
broken [1] 156/17
Brooks [2] 94/19
133/16
brother [1] 73/7
brothers [2] 153/14
160/25
brought [2] 39/11
70/18
Brown [2] 127/9
165/7
bruise [1] 190/19
brush [1] 144/24

brushed [1] 113/12
brutal [2] 5/20 9/20
brutally [3] 13/21
59/10 140/13
bucket [1] 29/20
buckets [2] 23/11
139/1
build [1] 158/1
building [2] 31/12
157/22
built [2] 125/25
177/8
bulk [1] 112/17
burden [16] 44/19
44/20 53/18 53/18
78/9 85/2 93/18
93/21 94/5 94/12
94/24 100/18 100/22
119/2 138/14 177/12
burdens [1] 69/4
but [211]
button [1] 162/6

**C**

C-A-R [1] 195/5
caboodle [3] 56/8
62/18 69/10
CACI [8] 102/8
102/10 116/14
116/15 131/20
132/20 179/16 195/5
call [5] 19/19 30/4
45/3 65/21 166/18
called [6] 5/20 50/19
70/19 102/21 127/19
164/24
calling [2] 27/20
160/3
callous [2] 35/7
97/20
calls [6] 27/20 87/14
108/3 118/1 158/17
184/7
came [19] 18/24
18/25 19/1 45/7
45/11 58/24 64/7
65/23 67/4 73/16
82/18 100/3 122/7
159/4 159/20 164/22
165/2 167/11 168/8
campus [40] 4/24
5/5 5/9 5/16 14/5
14/19 16/12 16/22
19/13 43/22 45/12
45/14 45/16 46/16
46/17 48/25 56/14
58/19 65/24 66/22
67/3 67/4 72/24
109/9 112/16 112/21
112/24 113/23 114/9
114/25 115/6 116/23
121/2 146/16 147/25
154/2 168/23 173/4
173/9 192/25
Campus' [1] 154/12
Campus,' [1] 10/16
campuses [7] 91/12
104/9 104/18 146/23
147/3 147/6 147/8

can [85] 4/18 5/4 5/6
12/16 13/6 14/1 23/3
23/22 23/23 24/3
25/3 26/3 26/21 33/6
36/22 39/17 48/16
48/17 48/19 53/11
55/15 56/19 70/9
71/18 77/7 79/10
79/22 87/16 87/19
92/15 93/5 93/16
95/12 97/11 103/2
106/12 107/19
117/14 120/15 125/7
126/8 126/20 132/4
132/7 135/4 136/12
136/13 139/10
144/19 148/6 148/19
148/20 160/9 161/11
161/19 161/24 162/7
162/9 162/10 172/9
172/19 172/25 173/6
173/20 173/24 174/3
174/5 174/7 174/11
176/11 177/7 178/18
179/2 179/10 183/12
192/16 194/19 196/1
196/9 196/10 196/11
197/8 197/24 198/5
198/9
can't [7] 54/20 94/7
107/20 130/24 131/8
157/20 162/7
candid [2] 62/9
64/25
cannot [7] 13/8
25/10 80/1 132/11
151/10 172/17
179/19
canvass [1] 31/24
capable [5] 25/14
26/15 28/4 34/1
173/20
capacity [6] 29/14
45/2 52/14 52/25
53/7 162/2
Capital [2] 68/24
88/5
caps [1] 109/1
caption [2] 6/19
122/11 182/2
captions [1] 13/10
Car [1] 195/5
care [2] 36/21 58/9
cares [1] 34/19
caring [3] 35/15 37/1
184/6
Carolina [1] 151/22
Carr [2] 93/10 134/4
Carter [3] 183/4
183/5 183/8
Carwile [1] 26/2
case [139] 3/5 4/20
7/20 9/10 11/6 11/16
12/2 12/14 12/14
13/2 25/20 25/21
26/12 26/16 26/23
27/1 27/16 27/18
30/12 36/15 37/15
43/11 44/15 47/3

(5) behind... – case

**C**

case... [115]  48/6
48/11 50/25 51/4
51/11 51/20 53/23
53/25 54/10 54/11
54/18 54/25 55/2
55/10 55/23 56/20
57/5 57/7 57/7 57/8
57/8 57/9 57/15 62/8
62/9 62/12 62/15
65/8 66/18 67/22
68/4 68/24 69/2 69/8
70/9 71/5 71/11
71/12 71/12 71/14
72/7 74/23 75/2 75/3
75/10 77/10 79/14
81/10 86/1 86/11
89/1 89/12 89/22
91/24 92/8 92/10
92/11 92/19 93/10
93/16 94/3 94/21
97/12 98/13 98/25
99/9 99/23 100/16
103/1 109/17 109/17
109/20 109/22 111/5
112/24 124/1 124/13
126/24 126/24
126/25 127/15 130/1
133/6 133/8 134/5
134/6 135/22 135/23
135/23 135/23
137/14 137/15 148/5
149/19 150/9 151/14
151/21 151/22
155/25 156/1 158/8
164/9 169/7 169/23
171/7 171/12 175/16
177/25 181/16
184/24 189/3 189/4
193/16 194/22
197/24
cases [51] 24/22
26/2 26/18 26/24
33/5 51/18 57/6
57/11 57/16 70/11
71/8 71/13 81/8
81/13 85/24 99/18
124/6 124/7 124/10
127/4 127/4 127/25
128/14 132/12
132/21 132/22
132/25 133/4 133/13
134/7 139/12 155/24
156/2 181/11 191/15
194/23 195/3 195/5
195/6 195/9 195/11
195/13 195/15 196/4
196/5 196/6 196/10
196/12 196/14
196/17 196/23
cast [2]  6/7 126/16
Casteen [1]  18/11
casting [1]  40/17
casualties [1]  144/25
categories [1]  7/21
category [4]  24/13
112/19 125/4 125/4
cater [1]  103/1
catered [2]  103/20

105/16
catering [1]  106/11
Catherine [1]  91/2
Catholic [1]  146/12
caught [2]  79/11
153/13
causal [1]  14/6
cause [9]  13/6 16/16
30/23 33/4 43/3
72/20 75/5 99/12
174/24
caused [3]  14/8
18/21 118/20
cautionary [1]  5/5
cautioned [1]  133/24
cautioning [1]
127/20
caveat [1]  41/5
center [2]  90/23
186/8
certain [7]  24/14
68/24 68/25 87/10
90/5 129/7 189/9
certainly [14]  46/15
48/1 51/24 61/10
62/1 69/14 70/3 98/6
117/25 128/23
154/22 168/15 172/9
196/14
CERTIFICATE [1]
198/15
certify [1]  198/16
cetera [1]  7/19
chair [9]  78/19 80/6
80/12 80/18 80/19
82/25 83/8 92/18
183/17
chairing [1]  82/10
challenge [6]  13/19
27/25 27/25 28/1
33/20 33/23
challenged [15]  4/4
4/10 4/12 13/14 20/7
38/23 77/17 93/24
94/10 96/3 102/9
113/5 114/8 125/20
129/11
challenging [5]  60/21
60/22 109/6 177/24
197/20
chance [1]  39/7
change [12]  71/3
80/1 109/5 109/11
141/10 141/14
141/16 142/1 145/7
145/23 188/3 193/5
changed [9]  147/22
155/21 156/4 156/8
156/15 157/1 157/9
157/11 187/21
changes [14]  71/19
72/9 73/18 112/7
112/7 121/15 121/23
127/21 141/7 142/6
142/9 145/23 149/24
182/2
changing [3]  72/1
160/13 183/1
channels [8]  53/21

54/5 55/14 62/14
135/15 135/18
135/24 136/3
Chapin [1]  94/3
characterization [1]
177/4
characterize [1]
121/22
charged [1]  25/4
charges [9]  36/23
54/16 100/5 114/17
141/24 152/1 152/5
152/13 192/11
charging [1]  22/5
CHARLOTTESVILLE
[6]  1/3 1/7 3/3 8/12
144/23 187/1
charter [1]  9/9
cheating [1]  183/12
check [2]  22/23
153/10
checker [14]  7/5 7/7
7/11 7/16 96/7 96/14
110/23 120/6 121/9
121/10 121/14
139/15 158/21
182/12
checker's [1]  139/3
checking [10]  5/7
7/5 96/6 100/12
101/3 110/25 119/3
119/9 140/17 180/13
cheek [1]  190/19
Chemical [1]  94/19
cherished [1]  144/25
children [1]  184/1
chill [1]  126/16
choice [41]  28/24
31/4 89/21 92/1
97/15 102/22 103/2
103/8 103/18 103/21
104/2 104/24 105/16
105/18 106/12 108/1
108/25 109/3 109/7
109/13 110/19 116/1
116/20 116/22 117/4
152/24 152/24
152/25 153/2 153/4
154/18 173/3 173/10
185/9 185/16 186/12
186/14 192/21
192/23 193/7 193/9
choices [4]  104/1
105/1 105/17 154/18
chooses [1]  31/16
chose [4]  44/3 97/15
114/20 170/11
chronicled [1]  5/24
Church [1]  146/12
Churchill [2]  124/24
187/16
CIA [3]  47/6 47/6
87/18
circuit [59]  24/12
26/23 37/15 44/16
46/4 53/16 56/20
57/7 57/8 57/16
58/11 70/12 79/6
79/7 79/13 79/15

79/21 85/3 89/6 93/9
94/2 94/16 94/21
94/22 94/25 98/17
98/22 100/17 102/8
102/13 109/19
116/13 124/3 124/10
128/8 131/19 132/10
132/12 133/4 133/11
146/1 155/18 155/24
158/8 171/8 172/6
179/16 179/18
184/16 184/16
184/22 184/24 185/3
194/22 194/23
194/24 195/3 195/10
196/14
Circuit's [2]  81/3
81/4
circumstance [2]
51/21 87/14
circumstances [7]
48/10 48/11 84/17
88/6 97/22 120/24
178/15
circumstantial [6]
97/12 132/4 132/6
132/8 137/18 139/10
cite [14]  47/3 66/6
98/12 98/12 109/17
109/18 112/14
121/24 124/1 124/9
127/4 179/18 181/11
184/21
cited [10]  12/15 26/2
26/23 32/8 99/18
99/23 100/16 171/8
184/23 196/6
cites [7]  75/2 110/18
115/8 119/17 120/22
124/6 126/18
Cities [2]  68/24 88/5
citing [2]  84/17
184/24
civil [15]  1/5 3/7
64/19 65/9 65/13
65/16 65/17 65/22
65/22 66/4 67/1 83/6
83/15 91/1 91/6
claim [7]  8/21 54/11
55/8 71/24 163/13
163/22 192/17
claimed [5]  159/7
160/24 162/18
163/23 164/14
claiming [1]  75/7
claims [6]  44/8
49/17 52/3 56/12
73/19 73/22
clamp [1]  147/9
CLARE [5]  1/13 1/14
3/16 179/4 192/14
clarified [1]  180/12
clarify [4]  85/4 85/6
86/4 165/12
Clark [1]  128/11
class [2]  36/18
57/21
classification [1]
24/16

classifications [2]
56/21 57/12
classified [1]  87/19
clause [2]  107/9
119/10
CLAY [1]  1/14
clear [74]  7/25 11/24
12/17 13/1 19/2 20/6
21/9 32/2 33/11
43/20 46/25 47/10
48/21 49/25 50/24
64/14 64/22 64/24
66/18 70/5 70/8
70/11 70/17 72/23
75/12 77/18 87/24
94/9 94/14 102/4
109/3 111/13 111/19
114/7 114/14 114/18
114/23 116/10
117/19 117/24
118/10 123/21
123/25 125/18
128/12 129/1 129/9
129/24 138/14
141/13 141/22
142/19 148/3 148/4
148/13 148/19
160/14 161/21 169/3
169/22 178/18 179/2
179/9 179/15 179/17
179/18 181/11 182/3
184/5 184/13 187/17
190/3
clearly [14]  37/13
37/19 41/8 65/9 71/9
83/11 87/18 87/18
87/24 96/1 123/14
144/2 168/17 181/25
clerk [2]  26/20 38/9
169/11
Clery [1]  90/8
client [3]  6/3 6/18
76/3
climate [1]  147/1
clock [1]  43/4
close [5]  19/22 23/9
33/16 69/5 69/5
closed [2]  11/1
189/23
closely [3]  39/24
112/2 186/18
co [1]  52/23
co-counsel [1]  52/23
coat [1]  156/23
coddled [2]  31/6
169/2
coddling [4]  92/2
104/3 169/1 169/5
Code [1]  90/7
collapse [1]  57/12
colleague [4]  3/18
75/13 144/4 170/22
colleagues [2]  77/9
194/20
collection [2]  4/25
5/1
collectively [1]  98/15
college [5]  146/23

C

college... [4]  147/3
147/6 165/7 165/9
colleges [2]  105/8
147/7
colloquy [1]  180/6
Columbia [2]  129/20
129/21
column [1]  90/14
columns [1]  89/8
combination [1]
100/18
combined [1]  78/15
come [18]  19/19
25/15 40/16 47/11
47/21 67/9 71/8
105/9 160/9 168/15
168/16 169/18 172/2
172/21 175/1 184/18
188/3 192/11
comes [12]  9/24
37/15 40/8 48/5
72/21 87/7 93/18
104/24 107/3 135/5
137/13 186/1
comfort [2]  134/15
134/16
comfortable [5]
121/12 160/8 178/8
185/12 188/4
comforted [1]  114/21
comforting [2]  36/10
36/13
commence [3]  109/7
115/7 116/24
commenced [1]
114/25
commendable [1]
129/21
comment [9]  46/7
73/15 75/23 91/22
166/15 167/12
181/12 181/14
181/17
commentary [2]
85/16 85/17
commentator [1]
46/23
commented [4]
46/18 47/1 47/13
48/12
commenting [5]
43/25 46/14 47/4
47/5 47/24
comments [8]  23/16
70/25 83/24 91/18
142/11 150/25
150/25 192/2
commissioned [2]
6/18 129/20
committed [1]  110/9
common [5]  127/6
130/6 183/7 187/24
188/2
communicate [2]
35/12 152/11
communicated [2]
100/2 108/20
communicating [2]

18/17 192/8
communication [10]
53/21 54/6 55/15
62/15 135/15 135/18
135/18 135/25 136/3
142/20
communications [6]
12/20 12/22 61/20
64/1 73/21 152/10
community [6]  18/12
25/19 81/14 86/23
118/2 122/4
Company [1]  79/21
comparable [1]
98/13
compared [1]  26/25
compassion [2]  27/9
30/7
compassionate [2]
36/13 37/2
compelled [1]  32/22
compensatory [1]
137/7
competence [1]
54/17
competing [1]  34/15
compile [1]  142/24
complaining [1]  39/15
complaint [20]  15/13
36/24 49/18 52/16
57/2 60/12 61/4 61/7
69/19 80/3 80/4 80/7
80/9 103/15 103/15
105/5 140/8 144/2
144/5 153/5
complaints [4]  28/25
45/19 105/24 106/1
complete [2]  95/5
130/14
completely [3]  9/13
185/23 188/22
compliance [4]  90/10
90/18 90/20 91/3
complicate [1]
141/21
component [6]  40/11
40/13 40/22 79/25
93/4 94/18
components [1]
84/14
computer [1]  1/25
concede [4]  20/14
23/6 62/23 74/11
concedes [1]  74/5
conceivably [1]
190/5
conceive [1]  126/20
conceived [1]  146/2
concept [2]  132/9
138/21
concepts [1]  122/9
concern [13]  9/6
37/4 53/5 57/25 78/5
78/5 140/20 143/17
143/18 143/21
144/14 145/18
145/21
concerned [10]
135/16 141/22 145/2

145/10 145/14
150/17 150/25
157/16 157/20
182/19
concerning [28]  4/1
4/5 11/3 11/14 12/8
12/13 13/8 13/15
20/5 20/8 20/12
20/15 20/24 21/7
21/12 22/21 22/22
23/7 23/21 23/23
83/24 93/7 118/7
122/3 123/19 128/20
130/17 131/11
concerns [5]  7/11
35/15 85/1 92/3
192/8
conclude [17]  35/11
35/22 69/18 117/2
131/20 138/17
144/19 149/11
149/15 154/5 155/12
165/14 167/17 172/9
174/5 174/8 179/7
concluded [4]  7/12
51/13 83/16 116/14
concludes [1]  137/5
concluding [1]
121/15
conclusion [11]
12/11 18/20 18/22
83/22 115/9 115/25
116/13 116/15 124/2
125/16 192/22
conclusions [7]
67/13 67/16 67/19
115/6 116/7 117/7
128/22
conclusory [1]  18/19
concur [1]  175/9
conduct [6]  44/14
65/24 79/17 165/16
173/17 174/2
conducted [9]  8/12
52/8 65/25 67/4 67/5
83/8 90/16 139/17
139/19
conducting [1]  45/20
conference [2]  22/5
192/7
confidante [1]  118/4
confidence [2]
115/17 115/22
confident [1]  167/14
confidential [10]  27/6
29/24 30/5 30/10
30/18 31/10 31/13
33/2 45/4 87/10
confirm [3]  55/1
123/2 187/13
confirmation [3]
187/11 192/12 193/8
confirmatory [1]
96/24
confirmed [4]  120/5
120/13 120/18
180/25
confirming [2]  18/13
186/13

conflict [2]  126/12
191/5
conform [1]  146/3
confronted [1]  9/14
confronts [1]  164/5
confusing [1]  32/3
confusion [3]  85/6
86/10 177/20
congressional [1]
156/11
connect [1]  95/23
connected [1]
114/22
connection [6]  12/16
14/6 15/3 77/21
92/25 102/25
Conner [2]  9/21
163/19
connotation [2]
172/16 172/19
CONRAD [1]  1/10
conscience [1]
149/11
conscientiously [1]
146/3
conscious [2]  99/2
149/4
consider [18]  21/15
60/13 64/1 65/6
74/16 89/12 95/12
99/16 118/4 134/12
137/20 174/11 176/8
176/9 176/13 176/13
176/14 178/7
consideration [3]
56/2 58/1 181/23
considerations [1]
67/24
considered [23]
12/25 20/12 42/21
42/23 42/23 43/6
52/9 62/13 67/25
68/1 71/1 71/18 72/4
72/14 98/14 102/14
137/23 138/11
145/22 169/25 170/2
170/10 171/12
considers [2]  62/1
76/12
consistent [4]  6/23
120/21 143/13
143/14
consistently [2]  9/5
95/23
constantly [1]  110/15
constitute [3]  29/16
92/12 130/3
constituted [3]  75/1
76/10 128/2
constitutes [4]  10/9
42/11 74/13 127/2
construct [1]  173/2
consulted [1]  16/2
consume [1]  57/14
contact [1]  73/14
contacted [1]  7/24
contain [3]  37/13
116/12 172/18
contemporaneous
[10]  18/3 21/18

56/24 59/19 60/6
61/16 69/20 101/4
180/17 180/19
contending [1]
178/23
content [7]  16/21
73/1 109/14 121/5
121/6 127/11 170/8
contention [2]  28/17
84/1
contentions [1]
176/20
context [22]  13/9
16/3 19/21 26/6 26/8
30/16 31/15 34/10
35/14 40/8 103/7
104/22 104/22
105/11 106/20 114/5
119/22 154/7 168/21
169/15 169/19
194/10
contexts [1]  41/2
continue [2]  10/24
74/8
continued [5]  2/1
40/25 101/16 115/25
145/7
contractor [2]  96/10
96/17
contradict [2]  54/2
135/10
contradictions [1]
123/24
contradictory [1]
99/4
contrary [9]  3/12
18/18 29/4 71/13
97/5 112/15 124/2
180/5 189/9
contrast [1]  71/25
contributes [1]  88/1
control [3]  27/17
51/7 79/17
controlling [2]  68/18
158/3
controls [1]  136/22
controversy [56]
43/21 47/22 51/14
55/22 55/23 55/24
56/9 56/13 56/16
56/20 57/2 57/3
57/12 58/16 58/17
59/4 60/5 60/7 60/9
60/11 60/14 61/6
61/18 62/2 62/17
62/17 62/19 63/2
63/4 63/6 64/12
64/16 66/7 67/21
69/10 69/18 69/20
86/21 88/7 88/12
88/15 88/18 88/20
88/22 89/9 91/9
91/14 91/15 136/9
136/9 136/10 178/17
178/19 183/2 183/21
195/19
convened [1]  3/1
conversation [5]
13/4 33/14 149/1

# C

conversation... [2]
155/5 182/25
conversations [2]
119/13 149/9
convey [1] 26/13
convincing [9] 77/19
94/9 94/14 102/5
118/11 123/25
125/19 138/15 179/9
convincingly [1] 96/2
copies [1] 26/20
copious [2] 149/8
177/3
copy [1] 26/21
corner [4] 108/17
186/23 186/25 187/3
corners [3] 158/25
158/25 159/17
Cornwell [1] 26/25
correct [19] 29/8
32/24 41/24 54/3
61/15 66/23 66/23
86/13 121/24 126/17
135/11 135/22 139/3
140/19 175/18
175/20 186/20 197/7
198/17
corrected [1] 177/2
correctly [3] 27/10
37/14 56/12
correspondence [2]
170/5 170/15
corroborate [6] 9/19
159/6 159/9 162/12
163/1 189/21
corroborated [1]
191/10
corroborating [2]
163/12 163/22
corroboration [1]
191/12
corroborative [2]
115/15 187/12
cost [1] 133/18
could [60] 3/23 9/16
12/24 13/17 14/22
15/19 16/15 20/12
26/10 26/13 26/19
31/24 35/11 35/22
46/1 49/5 55/1 55/3
59/6 63/8 63/9 63/10
63/18 64/5 64/15
83/24 87/23 90/5
91/24 92/1 92/3
103/14 112/14
118/24 136/17
138/17 140/7 140/24
143/1 149/10 149/15
152/22 152/22 153/6
153/10 154/5 154/19
155/11 158/6 159/5
162/21 167/17
171/14 175/19 179/7
180/24 181/10
186/20 189/22 190/5
couldn't [5] 69/3
91/22 125/5 163/1
165/25

counsel [10] 3/17
30/5 52/23 103/22
107/12 107/12 119/7
124/19 162/7 179/12
counseled [3] 30/18
44/25 84/24
counseling [2] 36/20
43/18
counselor [5] 27/5
27/7 29/24 30/11
33/3
counsels [1] 30/7
count [1] 61/17
counteract [2] 54/7
67/9
counterintuitive [1]
195/23
counterstatement [1]
176/22
counterstatements
[1] 176/25
countless [2] 122/17
123/4
country [6] 18/24
92/13 92/18 98/18
132/25 137/23
Counts [1] 140/8
couple [7] 23/11
64/14 168/7 168/18
169/22 179/3 193/24
course [6] 17/5
174/17 174/20
188/17 188/17
196/16
court [133] 1/1 1/22
3/1 3/15 3/22 4/16
11/24 12/15 21/23
22/9 22/15 25/13
27/10 32/1 33/6
39/12 44/6 44/11
46/4 49/14 50/25
51/4 51/8 51/13
52/13 53/23 53/25
54/12 54/15 56/18
57/4 57/9 57/16 58/2
60/11 62/1 62/3 65/5
69/18 71/13 74/16
74/24 76/12 77/14
78/9 79/5 79/9 79/20
79/22 84/21 87/11
87/12 88/23 88/24
95/11 95/12 95/14
95/20 98/14 99/19
99/23 99/25 100/17
102/3 102/12 104/20
106/20 107/22 111/2
112/2 114/7 116/9
116/14 118/18
126/24 127/11
129/14 130/1 131/20
133/6 133/9 133/11
133/21 133/23 134/3
134/16 135/8 135/16
137/14 137/15
137/20 138/12
142/10 148/5 151/22
161/3 161/5 161/11
161/15 161/20
169/20 171/12 172/9

172/22 172/22 173/5
175/15 176/9 177/3
177/9 177/12 177/16
177/20 178/6 179/2
179/6 179/10 179/15
179/16 179/24
180/15 185/1 185/24
185/25 186/17
186/18 190/6 194/9
194/12 197/19
197/22 198/12
198/13
court's [11] 42/14
51/21 51/24 57/23
61/25 72/6 85/5 86/2
110/16 161/3 175/15
courthouse [1] 162/3
courts [10] 33/16
79/18 81/16 92/13
94/17 98/17 110/14
117/5 133/24 137/23
cover [9] 37/21
139/8 146/19 147/24
165/17 166/6 166/9
166/10 167/8
cover-up [3] 37/21
146/19 147/24
coverage [1] 74/7
create [4] 61/7 83/25
151/12 151/23
created [8] 6/24 7/25
14/9 17/10 30/14
67/3 83/16 151/19
creates [1] 151/13
credibility [19] 7/18
10/13 40/4 40/18
42/10 59/22 78/5
100/6 115/17 120/14
122/19 122/21
122/24 123/17
165/14 165/15 166/1
168/5 191/9
credible [13] 10/5
75/21 76/15 76/16
76/17 76/19 76/20
99/25 123/10 123/13
165/17 191/13
191/16
credit [2] 115/19
126/15
credited [1] 126/16
crediting [1] 192/12
crime [2] 113/16
121/3
criminal [7] 36/23
103/14 114/17 152/5
153/5 153/17 153/19
criteria [4] 69/1 85/2
86/24 87/1
critic [4] 145/11
182/23 183/4 183/9
critical [4] 52/24
88/2 149/2 178/11
Critically [1] 94/2
criticism [8] 51/9
52/17 90/4 91/25
145/16 145/17 183/6
185/15
criticisms [1] 89/17

criticize [1] 52/2
criticized [5] 50/13
51/2 51/14 51/16
53/8
criticizing [1] 27/21
critics [7] 145/1
145/9 145/16 182/6
182/16 182/19
183/23
critique [7] 102/25
104/25 109/5 109/12
113/2 114/12 185/15
cross [3] 24/10
130/16 131/12
crucial [1] 158/23
crumble [1] 166/8
crumbling [2] 59/21
59/22
cry [1] 110/11
crying [1] 6/23
crystal [2] 179/17
184/17
culpa [3] 157/3
157/4 157/24
culture [6] 145/1
146/18 146/25 147/1
147/2 167/1
cut [3] 158/25
159/17 161/1
cuts [2] 63/24 64/3
CV [2] 1/5 3/7

# D

D.A.R.E [5] 75/2
75/10 129/4 129/9
130/1
D.C [1] 179/18
damage [5] 5/3
40/11 40/12 40/22
76/3
damaged [1] 10/20
damages [7] 40/25
41/4 137/7 137/8
174/23 175/2 175/12
damaging [2] 89/2
89/4
damning [1] 98/19
Dana [2] 169/23
170/10
Daniel [1] 183/4
Daniels [2] 134/5
195/5
Dartmouth [1] 192/7
data [1] 119/23
date [2] 73/5 198/20
daughter [2] 8/23
120/1
daughter's [1]
120/23
daughters [1] 75/19
daunting [1] 94/11
Davis [7] 1/18 2/2
65/7 66/24 72/7
103/22 127/18
day [8] 37/4 128/21
160/12 170/17 176/4
191/3 193/6 198/7
daycare [7] 110/1
110/4 110/9 151/15

151/20 171/15 186/8
days [5] 6/5 65/20
80/20 197/9 197/15
DC [1] 2/4
deal [9] 29/5 29/14
58/20 71/6 87/4
102/17 136/11
197/18 197/25
dealing [4] 25/20
55/24 97/14 127/20
dealt [4] 28/14
177/11 195/18
195/21
dean [77] 6/4 6/13
10/23 28/7 28/7
28/21 35/7 44/23
46/8 48/23 48/23
52/25 58/21 59/15
61/11 61/25 64/7
67/23 68/18 78/11
81/11 82/25 88/1
92/16 97/21 100/14
103/9 104/17 106/18
107/18 111/17 115/2
116/20 117/15
117/20 117/24
119/25 120/5 121/6
122/3 122/11 122/15
128/20 136/23 141/2
141/19 141/20 145/6
148/10 148/12
148/17 149/25 150/1
150/3 150/14 150/20
150/21 151/2 152/11
152/12 154/12
154/22 164/23
177/17 182/5 182/10
183/16 184/6 184/10
184/12 185/23 192/6
192/7 193/17 193/22
193/24 194/7
Dean Eramo [44]
106/18 107/18
111/17 115/2 116/20
117/15 117/20
117/24 119/25 120/5
121/6 122/3 122/11
122/15 128/20
136/23 145/6 148/10
148/12 148/17
149/25 150/1 150/14
150/20 150/21 151/2
152/11 152/12
154/12 154/22
164/23 177/17 182/5
182/10 183/16 184/6
184/12 185/23 192/6
192/7 193/17 193/22
193/24 194/7
Dean Eramo's [1]
184/10
dean's [1] 6/4
deans [4] 43/16
184/5 185/10 185/17
dearth [1] 144/22
death [1] 10/21
debate [4] 56/14
56/15 61/21 117/8
decades [1] 56/21

D

December [25]  10/2
11/11 39/20 40/1
40/16 40/20 41/11
42/8 42/9 66/1 73/1
73/1 74/2 74/19
75/20 76/12 76/22
76/24 101/12 125/24
126/1 128/3 163/14
188/24 188/25
December 17th [1]
188/25
December 2014 [1]
163/14
December 5 [2]
126/1 128/3
December 5th [17]
10/2 11/11 39/20
40/1 40/16 40/20
41/11 42/8 73/1 74/2
74/19 75/20 76/12
76/22 76/24 101/12
125/24
December 6th [2]
42/9 73/1
decide [9]  14/25
28/22 28/24 32/18
36/22 45/16 62/4
68/15 88/9
decided [9]  3/12
112/7 132/14 133/7
133/13 133/17 170/1
170/3 196/19
deciders [1]  82/8
decides [1]  68/19
decision [19]  32/1
45/18 67/23 79/2
79/7 79/21 81/9
81/14 81/15 82/17
84/24 84/25 94/20
98/22 99/2 99/19
108/24 136/25 149/4
decision-making [1]
45/18
decisions [3]  11/8
28/23 82/5
deck [4]  59/7 59/17
119/4 146/17
declaration [4]  78/24
80/1 80/23 171/21
declarations [1]
18/10
deemed [2]  124/11
125/8
deep [1]  126/16
defamation [17]
22/15 24/13 24/22
37/15 53/2 54/1 54/2
70/21 70/22 71/24
72/5 75/6 79/16
99/12 135/10 173/1
173/7
defamatory [69]  4/8
4/8 5/14 6/25 8/4
11/4 12/17 12/25
13/7 24/6 24/9 24/13
24/18 24/22 25/1
25/8 25/11 25/15
25/15 25/17 25/22

26/3 26/10 26/13
27/9 27/18 28/1 28/4
28/15 31/23 33/1
34/1 34/10 34/18
34/24 35/8 35/25
37/6 37/11 38/3 38/3
38/7 38/8 42/6 42/25
53/12 53/12 53/22
58/5 61/9 70/17
71/21 72/3 72/10
72/17 75/14 107/11
107/13 127/2 130/5
144/16 156/2 170/9
171/3 171/10 171/13
171/17 172/10
172/11
defamed [2]  57/25
75/8
defeat [1]  158/6
defendant [29]  13/5
14/8 22/21 46/15
70/21 70/23 77/19
93/22 94/9 96/4
98/23 98/25 99/2
100/20 102/6 110/3
118/9 118/11 125/11
127/10 127/25
131/18 137/16 146/1
155/18 179/20 190/8
194/14 197/13
defendant's [3]  4/15
6/24 93/25
defendants [80]  1/10
1/17 2/2 4/4 4/10
4/12 4/17 5/12 5/16
8/19 11/11 11/20
11/25 13/13 15/3
15/16 16/3 17/8
18/16 18/18 19/5
19/16 20/10 21/3
23/14 23/18 23/23
25/9 28/1 33/20
35/19 37/25 38/18
40/17 41/7 41/15
42/25 45/13 47/3
48/23 58/8 66/6 74/8
77/6 94/5 94/15 95/3
95/16 96/2 98/19
99/3 100/4 101/2
101/9 106/15 108/2
108/8 108/10 108/19
115/5 115/9 115/11
115/12 115/17
115/22 116/6 116/7
117/2 122/17 123/4
125/19 128/19 133/11
156/3 172/23 180/18
180/19 188/14 195/4
195/7
defendants' [14]
14/2 14/3 19/7 20/4
20/6 20/21 38/22
40/2 95/8 98/10
100/24 116/15 126/1
131/13
defense [3]  61/7
74/15 103/21
defer [1]  115/25
deference [3]  109/12

116/22 117/4
deferred [2]  109/6
186/13
deferring [1]  186/12
deficiencies [1]
166/10
define [7]  47/21
56/14 56/19 57/12
59/4 69/10 89/9
defined [5]  44/11
59/23 60/4 61/6
172/15
defines [1]  59/8
defining [2]  61/21
62/16
definition [2]  117/7
195/22
deflect [1]  37/21
degree [1]  84/18
delay [1]  37/21
delegating [1]  83/12
deliberate [2]  91/4
121/2
deliberately [1]
151/11
delusional [3]  124/18
125/5 187/16
delusions [1]  124/23
demands [1]  10/20
demeanor [2]  144/7
145/20
demonizing [1]
43/12
demonstrate [15]
21/13 23/5 27/8 41/6
44/20 53/18 61/17
62/25 66/7 69/22
73/22 138/13 138/16
139/11 151/10
demonstrated [3]
98/23 101/10 143/15
demonstrates [11]
30/7 63/14 66/15
96/2 143/11 149/13
158/5 163/21 165/16
167/16 170/15
demonstrating [1]
125/10
demurs [1]  167/1
den [2]  118/5 184/12
denial [1]  146/19
denied [6]  14/2 14/3
38/20 130/16 131/13
133/14
department [7]  8/12
51/9 51/12 51/15
54/12 58/25 83/7
depend [1]  48/10
depending [2]
175/14 175/15
depends [5]  30/24
31/15 47/20 63/1
136/8
depicted [3]  6/15
73/9 97/20
depicting [1]  118/5
depiction [1]  122/9
deposed [1]  65/8
deposition [5]  83/21

150/18 150/24
157/19 160/19
depressed [2]  125/3
125/8
depression [2]
124/12 188/18
describe [2]  49/11
183/24
described [6]  6/11
6/13 62/2 103/13
117/18 143/23
describes [3]  56/9
80/7 145/19
describing [2]  19/17
143/21
description [3]  101/3
103/9 105/17
deserve [1]  197/21
designation [1]
48/14
despicable [1]  37/12
despite [3]  102/2
179/11 185/3
detail [3]  5/20 108/4
180/3
details [2]  138/6
157/6
deter [1]  25/19
determination [4]
33/6 82/4 110/16
111/4
determinations [2]
79/19 81/5
determine [12]  51/16
53/16 56/19 61/11
74/17 78/11 82/2
82/14 82/22 90/13
95/14 194/14
determined [7]  25/3
82/15 89/11 110/7
111/15 123/1 175/16
determining [7]
61/10 79/15 81/21
82/19 83/5 88/22
121/18
devastated [1]  10/22
develop [1]  36/21
devoted [6]  10/24
20/14 90/15 90/17
98/10 127/20
dialogue [1]  171/3
dicta [1]  185/1
dictate [1]  61/25
dictated [1]  98/17
dictates [3]  30/2
100/8 100/21
did [101]  6/14 8/3
8/19 15/4 18/8 19/2
19/17 21/24 28/10
30/15 30/15 31/7
32/11 32/15 32/15
43/20 44/25 45/1
46/7 46/15 46/25
47/8 48/21 49/1
50/21 50/21 55/6
73/15 75/23 76/6
78/24 79/2 81/4
81/16 82/2 82/9
82/25 84/7 84/23

84/24 85/8 91/25
94/17 95/7 95/18
98/25 102/8 102/13
107/18 108/3 109/7
113/13 113/14
113/15 114/2 115/6
116/7 117/2 117/19
117/25 123/17 130/2
131/1 131/20 133/4
140/16 141/4 142/5
142/14 144/9 145/4
145/6 148/1 152/11
154/11 155/2 158/11
158/12 159/2 165/8
168/15 170/10
170/24 173/11
173/19 174/2 174/6
174/8 174/9 174/22
177/5 180/10 180/22
181/16 184/21 185/3
190/21 191/21 192/8
193/21 194/20
didn't [47]  8/20
11/22 15/12 16/7
27/8 28/22 28/23
32/21 39/3 39/4
46/19 52/3 60/16
63/7 63/25 64/25
65/2 97/6 105/4
113/11 123/10 129/3
129/19 145/21 159/3
159/5 159/8 159/11
159/14 159/22
162/16 163/8 166/7
167/7 168/1 168/16
170/20 173/11
177/21 184/25
186/25 189/8 190/13
190/15 191/2 193/5
196/17
die [1]  16/1
differed [1]  92/13
difference [4]  46/13
92/15 109/14 109/23
differences [1]
157/13
different [31]  6/21
21/19 22/1 23/11
23/18 24/14 24/24
27/24 35/19 40/4
48/3 49/19 52/19
62/9 64/24 70/22
71/2 74/4 75/25
111/18 118/24
119/24 123/9 137/24
143/12 164/8 165/3
165/3 173/23 186/5
186/7
differing [1]  156/24
difficult [1]  14/23
difficulty [2]  119/22
177/25
digging [1]  158/18
diligence [2]  108/16
121/14
diligent [1]  121/18
dim [2]  163/7 191/2
diminish [1]  166/1
192/2

**D**

dinner [4]  148/23
148/25 162/14
163/20
direct [9]  26/5 28/5
30/3 34/1 71/11 72/6
80/22 98/21 166/13
directed [3]  8/8 8/9
29/21
directions [1]  62/10
directly [2]  19/1
129/1
director [1]  5/1
disagree [1]  96/15
disbelieve [1]  123/20
discharge [1]  25/24
disciplinary [6]  14/16
15/24 16/10 17/7
34/13 36/24
disclose [1]  165/25
disclosing [1]  45/24
discount [1]  92/23
discounted [1]  93/1
discourage [3]  6/1
142/4 180/14
discouraged [16]
5/23 33/3 33/24
34/12 61/1 61/2
106/4 106/6 107/5
107/17 111/11 141/1
141/9 141/11 141/18
168/1
discouraging [16]
6/9 12/5 29/3 29/18
34/3 34/6 34/8 92/2
106/12 106/18
107/10 111/20
111/22 141/23
173/12 174/3
discovered [3]  157/5
164/6 165/8
discovery [3]  11/1
19/1 157/2
discredited [1]
128/25
discrepancies [3]
126/4 126/10 128/5
discrete [1]  81/9
discretion [13]  45/9
45/11 45/17 49/1
81/17 81/17 81/20
81/21 83/5 84/6
84/23 110/14 110/17
discretion.' [1]  79/20
discuss [6]  54/22
54/24 89/15 89/25
90/5 90/18
discussed [6]  89/23
89/24 90/3 91/14
111/9 183/15
discusses [2]  90/8
90/9
discussing [5]  53/10
104/18 117/18
119/22 160/13
discussion [8]  39/17
40/9 121/10 122/7
136/8 172/7 176/19
194/5

discussions [2]
106/8 180/12
disease [1]  159/8
disgust [1]  8/8
disincentive [1]
153/14
disingenuous [2]
19/18 145/15
dismissal [3]  77/16
100/8 100/21
dismissed [2]  89/5
125/18
displayed [2]  15/20
190/13
dispositive [9]  51/20
51/22 51/23 55/16
56/10 62/24 84/8
93/15 138/10
dispute [44]  20/10
20/25 21/20 21/25
22/20 23/15 47/7
47/20 51/19 54/21
54/25 62/21 67/18
73/25 74/2 74/12
76/23 83/2 83/4
93/20 96/17 101/6
105/15 105/15
105/16 105/21
105/23 115/4 116/5
118/10 120/14 120/16
120/16 126/2 126/9
130/18 131/10 143/3
143/7 143/14 146/6
151/8 176/23 181/14
disputed [4]  21/10
76/11 105/19 176/24
disputes [2]  103/10
112/23
disputing [2]  20/7
120/2
disregard [5]  44/4
125/20 137/18
138/18 167/19
disregarded [3]  7/17
137/12 189/7
disrepute [1]  33/4
distinction [4]  21/1
72/14 168/4 177/22
distinguish [4]  54/20
128/11 128/13 129/4
distinguishable [2]
75/3 75/10
DISTRICT [8]  1/1
1/2 1/10 1/11 26/24
26/24 72/7 151/22
DIVISION [1]  1/3
do [104]  4/18 5/4
12/10 15/22 20/5
20/10 20/23 23/2
23/7 23/15 27/16
27/22 27/22 28/16
32/3 33/17 34/21
34/21 37/5 37/14
37/18 38/5 38/13
41/12 43/1 44/25
47/5 50/18 50/21
50/21 57/16 58/13
64/9 67/24 68/12
68/14 69/1 70/6 70/8

70/9 71/6 75/13
77/13 78/9 85/16
87/8 87/16 88/4
99/12 102/3 102/19
104/13 109/20
110/24 112/9 114/20
116/1 117/5 117/12
121/16 121/16
125/17 127/4 128/20
128/20 130/18 131/9
132/3 134/9 134/21
136/13 136/17
136/24 137/9 139/22
145/7 149/5 152/4
162/2 164/22 166/17
167/23 169/16
170/13 170/14
170/16 171/2 173/11
174/22 175/9 178/6
178/12 181/5 181/6
181/12 183/6 183/11
184/4 186/12 188/19
194/6 194/19 196/11
197/19
Docket [1]  177/7
doctor [1]  30/13
doctrine [1]  126/11
doctrines [1]  126/8
document [1]  112/5
documented [1]
105/19
documenting [3]
95/4 101/4 187/9
documents [2]  8/24
122/23
does [38]  22/12 23/2
26/4 35/7 37/13 52/1
67/25 70/20 71/3
71/14 72/3 81/20
81/22 81/23 81/25
83/22 85/20 88/23
94/4 96/1 96/3 96/25
101/6 109/10 112/14
114/14 124/1 125/3
128/4 128/13 130/4
143/3 169/13 172/18
184/11 187/4 190/7
194/2
doesn't [19]  5/6 20/4
22/10 22/17 27/21
30/1 30/25 32/21
34/14 34/15 35/2
47/12 48/13 54/18
61/24 87/12 96/9
135/3 144/23
doing [24]  6/1 7/14
8/18 9/11 27/11
29/18 30/9 30/10
34/5 34/6 57/13
63/21 63/23 83/11
83/13 104/13 105/18
114/8 121/14 148/14
148/21 158/19 168/2
173/14
don't [60]  5/4 12/10
15/21 22/16 26/6
34/17 34/17 34/22
34/22 38/12 38/22
40/3 41/23 46/2

49/12 51/22 53/3
53/4 53/12 62/20
67/13 67/18 69/5
76/9 76/23 78/9
86/24 96/14 98/5
98/7 103/6 117/11
118/9 121/3 121/24
131/6 131/9 132/1
134/7 134/18 138/24
160/3 164/10 166/18
166/23 174/12
174/17 176/13
176/23 177/1 177/12
183/23 185/12
185/13 185/21 190/3
190/4 190/22 192/22
194/3
done [1]  12/4 26/22
32/3 32/5 50/2 52/6
60/18 103/12 179/16
179/17 189/24 190/1
196/1
doors [1]  189/23
dormant [7]  65/10
66/5 66/24 67/1
90/11 90/13 90/22
dots [1]  95/24
double [1]  140/18
doubled [2]  75/16
170/20
DoubleX [2]  166/12
166/16
doubt [14]  40/17
70/10 78/15 106/14
106/16 109/16
125/14 131/16
131/22 139/24
140/22 149/16 158/5
164/11
doubted [4]  94/15
165/14 165/15 188/9
doubts [9]  93/23
94/10 96/5 102/6
107/23 119/19
179/20 179/20
194/15
down [17]  10/17
24/22 71/8 75/16
76/7 129/19 147/10
160/9 169/25 170/2
170/10 170/21
181/16 188/12 190/5
190/5 191/7
dozens [3]  7/14
18/23 43/16
draft [3]  7/7 67/7
119/5
drafts [1]  160/19
draw [5]  71/9 72/13
116/7 152/22 168/4
drawing [1]  117/6
drawn [3]  31/17
44/22 128/22
draws [3]  71/18 72/8
113/4
dress [3]  159/10
159/13 159/13
Drew [13]  15/9
15/10 32/7 73/6

105/5 165/22 166/6
166/7 166/16 166/17
166/18 167/13
191/23
Drew's [6]  165/23
166/4 166/8 166/13
167/4 167/11
dual [1]  57/23
due [3]  49/23 92/3
108/15
Dunn [9]  104/17
105/21 168/19
168/20 168/21 169/4
169/6 185/8 185/8
Dunn's [3]  104/4
104/12 104/16
during [8]  50/23
78/16 83/2 132/12
149/1 150/17 152/7
193/13
duties [4]  25/23
25/25 35/8 140/17
duty [1]  82/13

**E**

e-mail [22]  11/12
15/1 15/4 17/17 40/2
101/11 101/22 108/6
108/22 111/20
152/15 152/18
152/21 152/23
152/24 153/9 153/9
163/14 170/2 171/24
187/2 193/6
e-mailed [1]  14/21
e-mails [16]  18/23
27/20 31/8 37/10
105/20 108/11
154/14 154/19
158/13 171/4 171/22
186/11 186/15
186/16 187/9 189/16
each [57]  7/21 15/15
16/8 22/12 22/13
22/14 38/6 53/18
55/13 57/11 62/25
70/17 77/19 77/20
93/22 93/22 93/25
94/9 94/10 95/5 96/4
96/5 98/8 100/20
100/20 101/5 102/1
102/5 102/6 102/6
103/16 104/2 105/1
115/14 117/21 118/8
118/11 120/7 125/11
131/15 131/16
131/17 131/18
131/21 138/9 138/12
139/23 140/3 156/9
162/25 177/2 179/20
179/21 189/21 190/8
194/13 194/14
earlier [6]  37/10 40/3
102/23 116/19 124/2
130/19
early [5]  66/1 90/4
146/21 157/7 197/23
easiest [1]  102/17
easily [1]  13/24

E

Eastern [2] 26/23
72/7
easy [2] 11/15 25/13
echo [1] 105/2
echoes [1] 153/1
Echtenkamp [4]
26/25 27/3 27/8
30/12
ed [1] 91/11
edit [1] 10/8
edited [1] 145/8
editing [2] 101/3
122/18
edition [3] 70/25
71/1 76/12
editor [10] 17/18
17/19 119/16 121/9
121/10 121/15
141/15 158/14 167/3
169/23
editor's [14] 10/7
74/6 74/17 75/4 75/7
75/9 75/17 76/12
129/8 129/10 129/14
170/1 170/12 170/19
editorial [3] 48/6
110/14 180/12
editorials [1] 93/11
editors [4] 7/10 97/6
122/7 147/4
edits [5] 110/22
111/15 111/25
139/19 180/21
educate [1] 80/15
Education [2] 45/21
83/7
Education's [1]
58/25
effect [7] 51/18
103/2 106/12 118/23
121/25 131/2 174/2
effective [9] 53/21
54/6 55/14 62/14
126/8 135/15 135/17
135/24 136/2
effectively [3] 42/24
57/22 58/20
efficient [1] 3/24
effort [3] 15/6 96/25
128/11
efforts [4] 5/24 19/12
121/23 198/7
eight [3] 113/5
129/11 183/14
either [15] 14/15
16/9 23/12 51/6
79/23 85/21 93/17
95/21 107/22 130/25
134/21 175/2 177/18
179/14 192/15
elected [3] 15/16
51/6 166/5
element [13] 21/14
22/3 41/4 41/10
53/20 55/19 56/2
56/4 56/5 62/25
64/16 74/16 174/24
elements [8] 22/15

22/24 41/7 41/16
53/19 55/11 175/4
175/5
elevates [1] 57/20
elicited [4] 111/6
111/8 119/7 180/7
eliminated [1] 108/4
elite [1] 183/5
elitist [1] 167/1
ELIZABETH [3] 1/13
1/17 77/5
else [15] 31/18
67/24 100/17 111/8
123/8 123/12 123/18
134/8 174/12 178/2
183/7 188/9 189/5
197/17 197/25
elsewhere [2]
111/16 179/15
emblematic [1] 4/20
emergency [2] 30/5
184/7
Emily [10] 114/22
115/12 123/7 123/12
156/11 168/10
168/11 168/12
168/12 187/24
emotional [1] 113/10
emotionally [4] 10/22
157/15 158/2 188/15
emphasis [2] 185/16
185/20
emphasize [1] 149/2
emphasized [4]
53/23 64/19 105/18
193/11
employee [2] 96/14
123/6
employees [4] 44/13
49/4 110/5 110/10
employer [1] 43/25
employment [2]
25/24 25/25
en [4] 94/20 98/22
133/17 184/16
encourage [1]
126/13
encouraged [1]
105/9
encouraging [1]
173/11
end [17] 19/20 23/21
76/5 79/12 84/1
100/21 104/2 107/15
112/11 126/4 126/5
141/16 159/19 176/3
183/23 193/6 196/7
end-all [1] 79/12
ending [1] 150/7
endorsed [4] 94/6
97/1 97/5 107/24
ends [3] 105/6 180/6
197/18
engage [2] 102/13
103/23
engaged [6] 34/4
52/10 64/1 82/15
83/4 186/9
engaging [1] 83/13

enjoy [3] 54/5 54/8
135/14
enormously [1]
114/23
enough [10] 68/14
68/17 69/17 69/22
78/10 81/19 82/6
82/7 157/20 197/9
ensure [1] 159/1
ensuring [1] 139/16
entered [1] 161/22
entertain [1] 179/10
entire [6] 67/5 90/14
129/22 129/23
139/18 179/1
entirely [16] 88/20
100/20 103/17
112/13 116/22 117/1
118/25 120/21
127/20 147/10 160/4
160/5 169/14 169/19
191/13 195/16
entirety [3] 88/15
114/8 149/6
entitled [10] 11/2
20/17 23/19 24/17
35/20 40/5 60/20
116/7 151/11 198/18
entity [1] 57/25
environment [2]
83/17 83/25
equal [1] 190/7
equally [2] 117/1
117/23
equivalent [1] 17/6
ERAMO [288]
Eramo's [27] 10/19
15/6 28/5 29/9 29/14
43/12 43/13 44/22
45/15 49/20 50/13
52/2 59/18 61/25
67/23 76/18 80/1
83/7 84/1 108/6
108/22 151/7 173/16
174/2 184/10 186/11
189/16
erased [2] 112/10
180/15
ERDELY [103] 1/9
6/7 7/10 9/14 9/18
10/1 10/17 23/13
43/15 44/1 58/24
96/10 96/16 96/20
96/23 97/15 97/20
99/7 99/25 100/3
100/10 100/13
101/13 101/14 106/3
106/8 107/22 108/14
108/14 109/9 113/21
114/24 115/16 120/6
123/1 123/6 145/11
145/12 145/16 146/6
146/10 146/21
147/19 147/24 148/4
148/8 148/22 148/25
149/3 149/9 149/20
150/19 151/1 152/10
152/17 154/24
154/25 155/6 155/6

156/18 156/19 157/1
157/3 157/11 157/22
158/4 158/13 158/21
159/20 160/2 160/3
160/6 160/12 160/19
160/24 161/2 161/5
162/12 163/5 163/12
163/21 164/1 164/2
164/5 164/13 164/18
165/1 165/7 165/8
165/11 165/12
165/14 165/21
165/24 166/12
166/19 167/10
168/12 168/13 169/4
169/4 181/3 182/15
Erdeli's [15] 97/4
97/12 101/10 101/22
139/4 139/18 145/25
147/22 150/1 150/5
150/7 150/17 159/19
162/13 169/12
Erdlei [16] 162/22
163/3 163/10 164/10
164/16 165/21 185/6
185/22 187/10 188/1
188/8 189/11 190/11
191/10 191/23 192/8
Erdlei's [1] 188/20
erroneous [1] 119/10
error [4] 4/20 54/3
129/11 135/11
errors [3] 67/8
126/14 126/17
especially [3] 49/3
87/13 155/21
ESQUIRE [8] 1/13
1/13 1/14 1/17 1/17
2/2 2/5 2/6
essence [3] 43/10
57/3 60/13
essential [1] 160/7
essentially [1] 121/5
establish [15] 8/25
26/2 32/25 68/17
77/18 80/18 81/6
82/7 94/7 94/8 94/8
94/13 96/21 96/25
186/11
established [9] 11/1
11/9 15/3 21/8 23/19
29/5 85/2 189/9
189/10
establishes [12]
69/25 70/1 80/2
81/11 84/10 96/23
100/13 108/7 122/1
130/13 180/16 190/8
establishing [4]
46/13 93/19 119/8
177/4
esteemed [1] 194/20
estimation [1] 25/19
et [1] 7/19
evaluate [5] 22/23
72/22 136/16 137/19
168/5
evaluated [1] 88/5
evaluating [1]

110/15
even [32] 17/10 18/3
40/19 43/13 46/18
54/18 67/16 70/8
71/3 92/8 96/1 96/4
96/8 97/1 99/12
100/9 104/10 105/5
108/18 118/7 122/15
123/24 124/4 147/14
150/20 155/22 167/3
172/23 173/2 181/12
184/7 185/17
evening [4] 17/25
60/3 71/1 134/19
event [2] 73/6
185/23
events [1] 5/18
ever [5] 7/24 65/16
70/12 81/14 163/18
every [16] 12/20
14/13 37/4 57/20
62/25 109/20 110/24
110/25 121/18
131/21 140/5 147/16
177/2 189/21 190/4
190/5
everybody [3]
133/18 148/11
148/11
everyone [5] 3/2
155/2 181/23 181/25
198/10
everyone's [1]
161/24
everything [3]
133/18 162/6 179/11
evidence [160] 12/9
23/4 26/12 32/25
49/16 49/21 66/2
66/18 67/6 68/2
69/17 69/22 69/24
70/1 70/4 77/19
78/10 78/13 80/3
80/11 80/23 81/10
81/23 81/24 82/9
84/16 91/8 94/9
94/14 94/23 95/22
96/1 96/9 97/3 97/5
97/11 98/16 98/19
98/23 99/22 99/24
100/10 100/12
100/18 100/19 101/7
101/8 101/12 101/20
102/5 102/14 107/22
108/10 110/3 110/4
110/6 110/18 110/21
115/8 118/8 118/11
119/18 121/7 121/25
121/25 122/24 123/4
123/10 123/23
123/25 123/25
125/10 125/19
128/15 128/16
129/25 130/12
131/15 131/17
131/21 132/4 132/7
132/8 136/15 136/18
136/21 137/18
137/21 137/21

**E**

evidence... [71]
137/24 138/15
138/20 139/2 139/11
142/19 143/5 143/11
143/22 145/12 146/1
146/3 146/4 146/5
148/5 149/15 155/11
155/20 163/22 165/6
165/13 167/16
167/22 167/23 169/3
170/4 171/9 171/19
173/15 173/24 174/1
174/4 174/11 176/12
176/13 176/23 177/4
177/5 179/9 179/13
181/2 181/2 181/13
181/13 181/18
181/22 182/18 183/1
184/20 185/21
186/13 186/16
187/13 187/21
188/13 189/9 189/15
189/16 189/17
189/20 190/4 190/7
190/9 190/20 190/20
190/23 191/12
191/12 191/14
194/25 197/5
evidenced [2] 9/19
41/19
evident [1] 115/18
evidentiary [5] 67/19
67/25 68/13 69/15
178/5
evidently [1] 24/14
evinces [2] 63/15
149/11
evincing [1] 165/2
evolve [1] 71/5
exact [3] 101/14
114/13 128/4
exactly [14] 12/1
31/15 49/11 56/7
58/12 69/12 71/4
76/2 146/7 148/1
156/5 158/10 170/15
171/9
examine [2] 79/18
147/6
example [8] 9/17
12/24 48/5 52/15
87/5 96/6 174/6
177/14
examples [1] 194/10
excellent [1] 64/10
except [4] 13/16
63/1 113/24 130/16
exception [1] 70/23
excerpted [1] 17/17
exchange [3] 152/16
159/25 165/20
exclude [1] 161/24
excluded [1] 162/1
exclusively [4] 79/8
84/3 90/17 92/11
exculpatory [4]
108/4 138/5 151/12
151/23

**Excuse** [2] 8/20
38/24
execution [1] 46/14
exemption [1]
172/13
exercise [4] 23/3
40/5 81/17 81/20
exercised [1] 79/19
exercises [1] 81/19
exhausted [1] 8/13
exhibit [4] 4/21
80/23
Exhibit 95 [1] 80/23
exhibited [1] 9/6
exhibits [1] 174/18
exist [2] 99/13 167/6
existed [2] 64/12
64/17
existence [2] 57/17
167/5
existing [2] 68/15
68/17
exists [2] 86/5 99/22
expect [2] 68/7
187/18
expected [2] 65/14
66/25
expelled [2] 183/14
183/18
expense [1] 133/18
experience [6] 16/6
89/15 89/25 90/2
90/2 118/20
experienced [2]
17/23 60/1
experiment [1] 27/17
expert [3] 78/18
83/18 168/20
experts [6] 91/18
105/22 113/7 113/25
117/3 122/23
explain [3] 13/25
18/19 39/22
explained [6] 73/3
111/9 111/11 181/23
186/3 186/5
explaining [1] 103/19
explains [1] 103/20
explanation [2]
119/24 159/12
exploring [1] 183/20
express [2] 113/11
172/23
expressed [4] 113/6
113/25 117/24 172/3
expressly [3] 21/3
111/19 114/6
Ext [1] 1/23
extensive [2] 81/1
81/6
extensively [1] 78/8
extent [4] 47/1 47/9
52/24 86/9
extract [2] 104/14
114/5
extremely [1] 121/18
extrinsic [1] 26/12
eye [2] 161/1 181/17
eyes [1] 42/10

**F**

fabricated [3] 60/19
129/6 168/3
fabulist [1] 129/5
face [13] 11/9 19/15
24/15 24/15 46/21
121/7 125/7 160/25
162/15 162/16
190/16
faced [1] 166/8
faces [1] 93/19
fact [175] 5/7 7/5 7/5
7/7 7/11 7/16 7/23
9/18 13/25 14/11
20/23 26/11 31/2
32/11 32/19 46/20
49/6 50/4 50/9 52/24
54/10 60/12 63/13
63/24 64/20 66/19
73/5 73/20 78/15
80/2 87/13 88/3 89/3
90/9 90/19 93/11
94/12 96/6 96/7
96/14 97/17 98/17
99/1 100/5 100/12
101/3 101/23 102/5
103/25 105/13
105/18 107/17 109/4
110/6 110/13 110/23
110/25 111/12
115/24 119/3 119/9
119/12 120/6 120/9
120/14 120/23 121/9
121/10 121/14
121/25 123/16 128/5
128/18 132/12
138/22 139/3 139/5
139/5 139/6 139/8
139/15 139/22
140/17 142/5 148/15
151/9 151/13 151/16
151/23 155/13
157/10 158/21 159/6
161/20 163/1 166/5
166/6 167/8 167/23
169/14 169/16 170/7
180/13 182/12
183/13 186/4 186/10
186/11 187/8 187/9
187/10 188/5 189/3
189/11 189/18 192/3
193/3 195/10 195/19
195/22
fact-checker [14] 7/5
7/7 7/11 7/16 96/7
96/14 110/23 120/6
121/9 121/10 121/14
139/15 158/21
182/12
fact-checker's [1]
139/3
fact-checking [9] 7/7
7/5 96/6 100/12
101/3 119/3 119/9
140/17 180/13
factor [7] 51/22
51/24 60/13 62/22
65/6 86/8 88/5
factors [2] 88/9

138/9
facts [57] 5/18 8/24
17/15 27/1 40/16
44/3 48/10 48/12
54/13 69/15 94/25
95/4 95/8 95/9 95/12
95/16 95/19 95/20
98/14 100/23 103/10
105/14 107/17
107/21 107/23
109/21 109/23 115/4
115/5 115/10 115/15
116/5 116/8 116/18
116/21 117/6 117/7
120/17 121/24
122/24 124/7 124/8
126/24 128/21
128/22 151/23 172/2
172/18 172/20
176/22 176/23 177/6
186/6 192/18 192/21
192/24 193/1
factual [19] 5/17
20/25 21/20 21/24
60/22 67/8 118/15
139/16 143/7 143/14
172/16 172/19
172/24 173/5 173/10
173/15 173/18
176/20 192/16
failed [5] 99/3
105/24 109/19
116/23 118/8
failed to [1] 116/23
failing [1] 138/3
fails [5] 94/24 95/23
100/22 119/20
125/18
failure [5] 77/18
102/3 116/23 129/24
192/25
fair [6] 17/9 63/5
68/7 68/9 89/7 89/11
fairly [1] 68/15
fairness [1] 5/7
faith [7] 10/13 10/18
95/5 101/13 101/23
129/1 130/14
fake [1] 37/21
fall [4] 102/21
102/24 112/19
197/23
falls [1] 110/13
false [26] 6/8 8/1
31/4 54/7 54/16 58/5
93/23 96/5 102/5
105/13 107/20
107/23 108/4 115/10
118/12 139/3 139/14
151/12 151/19
151/19 172/16
172/19 173/2 173/21
180/1 180/10
falsely [3] 8/18 8/21
173/19
falsity [5] 9/1 99/3
137/12 137/17
139/25
familiar [1] 25/13

far [10] 38/17 78/10
89/2 90/10 92/15
98/19 110/11 122/12
195/12 197/3
fared [1] 132/10
fashion [2] 3/13
91/23
favor [9] 27/23 37/18
44/22 51/21 63/24
64/4 69/1 86/24
137/5
favors [2] 62/23
136/21
Fazzio [1] 195/6
federal [7] 45/21
45/24 47/7 52/11
55/16 91/6 126/25
feed [1] 147/1
feel [8] 15/12 31/22
32/22 105/4 117/25
148/19 167/14
185/12
feelings [1] 118/20
152/12
feels [1] 160/11
felt [9] 16/7 107/17
107/18 119/13
150/23 180/7 180/9
180/20 188/4
female [1] 16/5
fence [2] 136/5
136/19
FERPA [5] 54/22
55/4 87/6 87/24
91/21
few [5] 77/8 105/23
177/13 192/2 197/22
fewer [1] 103/23
fide [1] 191/8
field [1] 10/24
fifth [1] 21/25
fight [1] 43/21
figure [74] 11/10
24/1 24/7 24/8 28/20
30/13 41/22 42/4
42/5 43/9 44/10
44/16 44/21 47/17
48/2 49/10 51/17
53/15 53/17 55/9
55/12 55/22 57/21
58/8 58/8 60/11 62/7
62/7 62/13 68/19
68/23 69/23 77/22
78/8 78/12 78/21
84/15 84/16 84/18
84/20 85/12 85/13
85/18 85/20 85/20
86/6 86/8 86/12
86/19 88/10 89/7
92/6 92/10 93/3 93/5
93/6 93/7 93/13
93/18 95/9 95/16
130/20 131/4 135/6
135/23 136/4 137/4
145/22 160/7 177/19
195/14 195/15
195/23 197/6
figure/public [2]
41/22 130/20

# F

figures [3]  54/4
135/14 135/17
file [7]  14/24 15/13
66/12 105/4 139/18
149/7 168/14
filed [1]  3/9
filing [3]  65/3 103/14
103/15
final [3]  145/8
145/24 166/3
finally [30]  9/14
10/15 18/8 19/6 35/4
60/10 70/15 76/11
94/7 113/19 114/24
118/16 119/21
125/22 150/16
153/25 154/24
156/21 163/23 165/5
165/13 167/10 168/7
168/18 168/18 169/8
169/21 192/14
194/17 194/18
financial [2]  57/18
58/11
find [12]  10/4 21/16
22/17 22/22 29/25
69/3 79/22 120/18
130/7 132/25 153/11
179/6
finder [1]  26/11
finding [14]  83/20
83/23 95/19 99/24
119/18 119/22
121/16 126/18 127/5
128/14 132/4 132/7
133/5 194/25
findings [2]  39/18
42/14
finds [1]  133/9
fine [4]  38/11 41/17
134/18 180/20
finished [1]  38/14
FINNEY [1]  2/6
fired [4]  10/21 27/20
149/25 150/1
firmly [1]  121/20
first [52]  3/11 11/14
14/18 14/20 15/22
15/25 19/25 27/25
43/14 44/7 44/10
50/16 53/20 53/25
54/1 56/5 56/20 57/5
58/23 67/7 88/4
91/11 94/25 99/13
102/20 103/8 106/24
115/10 115/14 116/2
117/5 120/10 127/9
134/15 135/9 136/25
140/11 141/7 144/11
144/11 144/17
147/12 156/13
156/14 158/13
159/12 163/25
164/16 174/24 179/4
187/12 190/11
fit [2]  23/11 37/5
fitness [5]  8/3 28/5
34/2 34/25 35/25

Fitzgerald [5]  124/10
124/22 155/25 158/8
195/11
five [11]  10/17 53/15
53/18 55/11 69/4
86/8 88/9 116/2
129/13 156/12
187/22
five-factor [1]  86/8
five-part [1]  53/15
flag [1]  188/8
flags [8]  7/15 7/16
7/21 9/15 9/23 44/3
96/20 139/20
flat [2]  8/16 167/7
flat-out [1]  167/7
fleshed [1]  49/13
Flr [1]  1/18
focus [15]  3/25 4/7
4/11 11/21 19/22
26/7 51/1 51/15
77/18 79/4 79/8
111/1 178/1 178/7
179/1
focused [1]  111/12
focuses [2]  110/22
118/22
focusing [2]  88/24
97/19
folks [7]  21/11 31/5
32/5 32/11 33/24
142/23 184/6
follow [5]  8/20 14/21
152/9 165/25 169/17
follow up [1]  165/25
follow-on [1]  8/20
follow-up [2]  14/21
152/9
followed [2]  82/1
89/22
following [1]  169/9
follows [2]  130/3
182/21
Food [1]  94/19
foot [1]  158/12
Forbes [1]  93/10
force [1]  103/23
forced [5]  67/13 73/8
156/14 156/20 157/8
forceful [1]  177/22
forcing [1]  29/2
foregoing [1]  198/16
forever [1]  71/8
forget [3]  68/25
108/25 152/25
form [4]  7/19 172/25
173/6 192/16
formal [10]  30/17
36/24 45/19 49/16
49/18 49/19 52/16
73/6 103/23 105/24
formally [3]  114/16
129/19 129/24
formed [1]  172/5
formerly [1]  6/3
forming [1]  172/1
formulate [1]  46/19
formulation [1]  58/15
Forrest [1]  156/21

forth [7]  46/5 67/5
69/16 79/5 117/12
122/16 192/19
forward [18]  6/9 9/12
12/9 32/25 45/8 55/7
105/9 106/5 106/9
134/20 134/25
152/25 160/15
160/21 169/18
185/13 192/11 193/8
forwarded [4]  152/16
152/17 161/1 162/12
found [21]  8/13 13/2
73/12 79/15 83/7
84/9 87/12 89/6
98/13 99/10 102/9
124/3 124/18 126/3
127/11 128/8 129/10
130/1 165/21 190/6
195/13
four [12]  10/14 16/8
16/15 21/23 40/21
106/1 110/2 110/2
110/20 151/17
151/18 186/6
four-year-old [3]
110/2 151/17 151/18
four-year-old's [1]
110/2
four-year-olds [1]
186/6
fourth [54]  24/12
26/23 37/15 44/16
46/4 53/16 56/2
56/20 57/7 57/8
57/16 58/11 70/12
79/6 79/7 79/13
79/15 79/20 81/3
81/4 85/2 89/6 93/9
94/2 94/16 94/21
94/22 94/25 98/17
98/22 102/8 102/12
109/18 116/13 124/3
124/10 131/19
132/10 132/12 133/4
155/18 155/24 158/8
171/8 172/5 179/16
184/16 184/22
194/22 194/23
194/24 195/3 195/10
196/13
fragile [9]  125/1
125/8 157/15 157/17
158/3 187/18 187/19
188/16 188/17
frame [1]  39/16
Franklin [1]  1/22
frankly [1]  60/17
frat [1]  13/22
fraternities [1]
153/12
fraternity [18]  5/21
8/9 9/8 9/10 17/22
59/10 59/25 73/13
112/22 114/11
153/11 153/16 154/3
160/25 166/24 167/1
186/21 192/9
freak [1]  160/10

freshman [3]  13/20
59/9 140/12
fretted [1]  141/21
friend [7]  6/8 10/4
31/4 118/4 120/12
160/1 163/25
friends [10]  5/22
7/24 73/16 143/9
157/7 159/4 162/23
163/17 163/18
189/19
front [4]  46/21 47/23
52/25 90/23
full [3]  90/17 194/12
194/13
fully [4]  116/7
121/12 122/16
184/17
fulsome [1]  91/17
106/8
fun [1]  143/10
function [1]  73/6
functions [1]  80/16
fundamental [1]
104/20
fundamentally [1]
126/12
further [14]  17/10
28/12 105/21 158/18
167/4 176/7 176/18
177/12 186/12
187/11 191/24
192/11 192/13 193/8
future [1]  141/21

# G

gallery [2]  4/21 4/22
game [2]  150/7
150/8
gaming [2]  57/19
58/10
gamut [1]  7/17
gang [19]  5/20 7/18
7/22 35/24 37/4
76/19 108/9 108/12
108/18 108/20
112/21 114/10 125/2
141/2 141/20 143/10
159/16 163/24
187/19
gang-rape [1]
159/16
Garber [30]  111/1
111/9 111/24 112/4
119/4 119/8 119/12
121/22 122/2 122/5
122/13 139/15 140/3
140/16 141/4 141/25
142/15 143/16 144/9
144/17 145/4 145/18
145/20 158/22
179/24 180/1 180/22
181/3 181/21 182/8
Garber-Paul [11]
111/1 111/9 112/4
119/4 121/22 139/15
140/16 141/25
158/22 181/21 182/8
Garber-Paul's [4]

111/24 122/2 122/5
122/13
garnered [1]  91/12
gas [1]  158/12
gave [12]  41/10 47/9
81/12 81/25 82/5
111/17 115/16
115/22 123/12 147/4
166/15 191/11
Gazette [1]  12/14
general [4]  84/15
84/18 84/20 151/21
generally [7]  14/16
42/17 62/20 89/12
89/16 103/1 132/4
genitals [2]  110/2
186/7
Gentry [1]  2/6
Gertz [8]  53/23
57/23 85/25 132/11
135/8 196/18 196/21
196/24
gesture [1]  6/22
get [30]  3/25 15/11
36/16 39/7 42/18
45/2 64/14 67/14
96/8 103/6 108/14
112/4 132/15 133/4
133/6 146/8 149/14
153/10 159/1 183/11
186/21 189/12
189/13 189/13
189/20 192/10
197/22 197/24 198/4
198/8
get-go [1]  146/8
gets [3]  30/4 85/11
102/22
getting [6]  19/9
126/23 148/11
158/24 178/9 185/13
girl [1]  164/25
gist [1]  120/17
give [8]  40/14 46/12
121/8 138/25 171/5
179/10 185/3 185/25
given [13]  24/21
24/25 42/14 67/11
70/24 74/7 80/19
83/14 92/24 105/17
112/12 112/24
195/24
giving [6]  6/22 35/17
144/6 154/17 176/5
176/6
glad [2]  155/2
175/21
Glass [1]  129/5
GLEN [1]  1/10
gloss [1]  143/24
glossed [1]  78/13
go [31]  9/11 9/24
22/23 24/22 25/12
30/4 34/17 41/12
69/9 71/7 71/14 81/3
85/21 85/24 106/9
111/17 131/19
132/24 146/8 153/12
154/6 154/16 169/11

**G**

go... [8] 171/2 173/8 182/24 183/4 185/13 190/4 193/8 194/1
goal [1] 150/2
goes [22] 29/23 51/8 62/9 76/2 84/14 85/20 113/10 116/18 119/10 121/2 133/10 136/7 138/20 143/25 144/16 152/20 167/23 175/16 183/9 183/24 184/3 185/9
going [50] 7/6 11/14 13/25 15/11 22/6 22/6 25/12 25/15 36/14 36/23 36/24 38/4 39/11 41/18 41/21 42/3 44/10 55/11 70/5 77/6 82/2 82/20 90/3 91/21 104/7 106/23 112/16 129/22 131/5 133/21 136/20 138/20 138/21 146/23 147/5 147/20 148/17 150/10 154/3 167/12 176/9 177/10 179/22 181/8 190/1 193/7 194/1 194/4 194/5 197/21
gone [10] 32/2 65/1 142/23 142/24 143/2 155/7 180/24 187/6 190/5 195/1
good [15] 3/2 21/17 22/4 56/10 59/1 63/12 64/6 77/3 77/4 89/21 153/10 160/3 198/7 198/10 198/10
got [20] 8/16 10/3 24/22 36/20 58/24 63/23 66/17 75/13 119/24 129/22 129/23 134/18 149/25 150/1 171/24 180/24 187/10 187/13 189/14 189/14
gotten [1] 31/21
governed [1] 61/12
governing [1] 93/21
government [4] 44/12 44/14 47/7 91/6
governmental [1] 79/17
grade [1] 106/22
graduate [1] 15/11
graduated [3] 115/3 120/10 192/4
Graham's [1] 105/7
grant [2] 98/18 134/4
granted [6] 14/4 133/1 133/14 185/2 195/4 195/7
grapevine [1] 115/2
graphic [1] 5/19

grapple [1] 22/6
graveyard [1] 35/17
gray [1] 160/2
great [8] 21/17 37/18 39/9 115/17 135/1 158/15 180/3 197/16
greater [3] 54/5 84/18 135/14
greatly [1] 136/21
ground [2] 4/4 4/9
grounds [2] 77/16 150/14
group [8] 31/21 31/24 31/24 102/16 102/21 104/6 114/22 157/8
Groves [2] 48/24 49/2
guess [3] 53/4 97/10 132/2
guide [1] 38/9
guided [1] 87/23
guilt [1] 82/14
guilty [1] 149/11
guys [5] 148/13 148/19 155/2 166/16 167/6

**H**

had [178] 7/23 8/24 9/13 9/15 9/22 11/11 11/12 18/4 18/20 22/3 29/5 29/10 30/12 35/5 35/23 37/1 40/1 40/16 42/9 43/5 43/13 45/4 45/7 45/8 45/11 45/17 46/6 47/5 48/23 49/1 49/6 50/2 51/3 52/6 52/14 52/16 53/20 54/12 54/15 54/16 55/14 62/14 65/9 65/11 65/12 65/14 66/24 67/2 67/8 70/16 71/5 73/10 74/2 74/7 75/25 79/16 80/25 83/23 84/1 84/5 84/8 84/25 87/13 93/11 94/9 96/5 96/10 97/17 99/7 100/11 100/15 105/7 106/15 107/23 108/16 108/17 108/19 109/16 109/25 110/6 110/7 110/9 112/6 112/22 113/9 113/12 115/2 115/21 116/3 120/23 121/10 122/6 122/17 123/1 123/4 125/13 129/1 129/5 129/6 129/8 129/13 131/22 133/5 135/17 136/2 136/8 136/23 137/12 137/17 137/25 138/7 139/17 140/21 142/20 142/23 142/24 143/10

145/16 145/17 146/6 146/22 147/14 147/15 147/16 147/17 149/16 149/17 149/20 152/5 152/13 152/15 152/16 154/15 155/7 156/4 156/9 156/16 156/22 157/7 157/7 157/7 157/9 157/11 158/25 159/7 159/10 162/15 163/1 163/12 163/13 163/21 164/19 164/19 166/4 168/13 169/9 170/1 170/13 170/13 172/3 174/19 176/2 180/11 181/5 183/13 183/14 185/6 185/22 186/9 187/6 187/11 189/1 190/17 191/11 191/23 191/24 192/4 194/15
hadn't [5] 7/25 52/7 52/8 69/4 129/9
hand [4] 15/21 38/14 173/23 174/10
handle [2] 39/11 63/7
handled [2] 28/22 55/25
handling [1] 83/3
hands [3] 16/16 17/24 60/1
handwritten [1] 7/6
hanger [1] 156/23
Hanks [3] 137/15 148/5 179/15
Hannah [1] 105/6
happen [2] 5/6 107/2
happened [5] 5/18 7/18 7/19 7/19 12/1 88/13 90/6 103/17 188/4
happens [1] 144/23
happy [8] 3/21 4/16 14/25 39/1 39/4 39/9 131/24 178/2
hard [3] 26/20 77/10 120/18
hardly [4] 107/13 118/5 119/11 125/7
harm [2] 25/18 78/1
Harris [2] 184/24 184/25
Harte [3] 137/15 148/5 179/15
Harte-Hanks [3] 137/15 148/5 179/15
has [106] 4/3 4/9 6/4 10/19 10/23 10/24 11/16 16/1 18/12 18/12 21/14 23/17 24/10 25/17 27/8 30/2 30/12 38/5 40/12 42/12 44/6 44/8 44/11 44/16 49/22 50/18 51/5 54/2 54/10 55/13

56/21 58/1 62/3 70/12 76/11 78/1 78/2 78/8 78/13 79/23 81/9 85/15 86/21 87/8 87/16 88/18 91/12 92/24 94/4 94/17 100/16 102/4 104/2 106/15 107/21 114/7 118/8 122/21 125/10 128/9 128/10 131/8 132/10 133/6 133/12 133/14 133/23 133/25 134/3 135/10 136/11 138/13 138/16 146/1 146/10 146/11 152/18 153/1 155/18 155/19 155/21 155/22 161/3 161/12 165/22 167/22 168/6 170/8 172/10 172/22 173/5 173/25 174/13 174/15 176/24 178/17 179/6 179/8 179/15 179/16 179/17 188/1 190/14 192/15 194/6 197/14
hashing [2] 121/15 122/13
hate [1] 171/22
Hatfill [12] 47/3 88/24 88/25 89/1 89/6 99/16 100/5 123/15 124/3 134/5 191/14 195/6
have [224]
haven't [3] 163/3 163/10 176/2
having [21] 6/12 6/16 7/24 8/11 12/4 17/4 18/9 25/2 30/21 31/9 33/15 53/11 64/8 65/1 68/20 117/18 152/1 153/12 171/3 172/7 181/5
he [28] 9/22 15/11 15/25 16/1 17/21 38/25 48/17 82/7 82/8 87/19 97/8 124/19 129/5 140/21 154/11 154/14 157/19 163/19 166/21 187/4 187/5 187/6 187/6 189/25 191/21 191/22 191/23 191/25
he's [3] 7/3 155/1 155/3
head [15] 49/7 50/1 50/10 50/17 50/22 51/9 51/12 51/15 52/2 52/14 52/18 54/12 74/21 87/17 155/1
headlines [1] 13/10
health [3] 157/17 157/21 188/12
hear [8] 23/18 23/22 37/3 43/8 99/6 174/5

174/7 194/3
heard [21] 36/7 43/13 43/13 65/12 65/15 66/25 78/1 78/22 87/5 99/6 115/2 117/10 120/10 139/2 147/15 147/16 148/1 179/12 181/20 182/14 194/23
hearing [9] 1/6 3/7 55/8 68/21 69/15 90/20 90/20 168/8 174/18
hearings [4] 16/6 78/25 80/15 106/2
hears [2] 49/16 49/21
Hearst [1] 57/7
heart [1] 4/20
heavily [1] 96/19
held [15] 15/10 16/1 16/14 27/9 27/10 49/9 49/25 52/5 55/6 71/17 105/5 129/15 151/22 155/18 171/8 171/9 171/13 173/13 154/20 173/13
help [9] 29/25 33/14 46/19 54/2 88/9 132/11 135/10
helped [4] 114/23 134/1 147/1 154/16
helpful [1] 38/10
helping [3] 28/6 34/21 169/18
hence [1] 54/6
Henley [1] 143/9
her [336]
here [75] 6/20 7/7 12/1 17/17 22/23 23/1 26/22 27/6 27/17 29/1 33/7 38/15 48/21 49/25 51/4 52/1 56/8 57/4 58/13 58/17 69/17 72/23 75/7 86/14 89/2 90/16 91/8 92/22 93/6 94/4 94/24 95/1 95/14 98/20 99/22 100/19 102/12 104/13 106/6 107/1 110/12 111/4 112/3 112/18 116/18 124/9 124/25 125/17 128/3 132/8 138/10 138/12 138/24 139/11 142/8 142/11 143/16 146/6 151/25 156/5 156/8 162/9 172/21 173/22 177/13 181/13 186/10 187/17 189/11 190/9 192/18 192/19 193/24 195/12 197/1
here's [2] 135/13 194/22
herring [1] 87/7
herself [2] 29/2 78/23 92/25 145/12

**H**

herself... [5]  145/17
150/16 157/1 163/5
187/24
hierarchy [2]  44/12
136/24
high [6]  27/15 63/15
92/11 92/13 92/16
146/13
highlight [1]  142/11
highly [6]  10/7 39/23
75/3 75/10 115/15
187/11
him [5]  25/18 25/20
124/19 155/7 166/18
his [11]  26/1 39/1
48/17 48/20 124/5
124/19 157/19
165/25 166/18
166/19 167/3
history [2]  4/22
155/22
hit [2]  19/9 177/13
hoc [3]  60/8 111/7
180/18
hold [18]  13/22 14/7
14/9 14/12 15/1 15/7
16/7 16/23 16/25
20/2 21/23 28/2 33/4
59/11 114/19 117/14
117/22 140/13
holding [6]  15/16
15/23 16/19 18/14
19/11 181/25
holdings [1]  172/21
honor [163]  3/14
11/16 12/2 14/5
23/17 23/22 26/20
29/7 34/14 38/5
38/24 41/17 41/18
41/24 42/3 42/16
43/10 44/7 44/19
47/3 47/19 48/9 54/9
55/3 56/7 56/9 56/12
57/6 59/4 61/15 62/8
62/24 63/5 63/13
64/25 68/9 68/10
68/19 69/7 69/12
69/23 70/15 71/11
76/1 76/5 77/1 77/3
78/7 79/6 81/3 81/16
81/23 82/7 84/20
85/4 85/9 86/3 86/13
86/17 87/1 87/9 88/8
88/11 88/21 89/3
90/7 90/11 91/22
92/21 93/4 93/14
93/20 95/1 95/11
96/8 96/15 97/25
99/16 100/5 102/1
102/17 104/5 105/15
107/15 108/6 110/12
112/11 112/18
113/21 114/3 115/4
116/6 117/9 117/23
118/25 119/1 120/2
120/22 121/17
124/15 124/25
125/22 127/25

128/15 130/19
131/24 132/19
132/24 133/25
134/13 134/14 135/3
136/5 136/14 136/18
137/4 138/9 138/22
139/1 156/5 161/7
161/9 161/14 161/18
162/11 164/9 165/5
166/3 167/21 169/11
170/24 171/2 171/6
174/11 174/13
175/24 176/1 176/18
178/17 179/8 180/1
181/3 181/10 181/22
182/17 183/2 184/15
185/10 185/18
186/17 187/8 187/15
188/8 188/11 188/22
190/21 192/17
192/19 194/8 196/1
197/7 197/16 198/3
Honor's [10]  53/4
64/11 65/2 66/12
80/22 102/23 116/19
134/9 134/15 169/11
HONORABLE [1]
1/10
hook [1]  159/18
hope [1]  150/1
hoped [3]  146/22
149/23 149/25
hoping [2]  192/10
192/13
horrible [3]  8/11 31/7
37/12
horrified [1]  17/1
hospital [1]  45/3
hostile [2]  83/16
83/25
hour [1]  170/23
hours [5]  31/11 77/7
78/4 90/17 101/21
house [6]  73/6 73/13
159/17 187/2 191/7
191/10
how [71]  7/19 17/1
22/6 22/9 25/3 26/5
26/7 27/19 28/22
29/12 40/23 40/23
45/9 47/21 48/12
56/9 56/19 60/4
60/23 63/1 63/3 67/5
69/10 71/6 76/6
83/24 87/16 88/4
89/12 89/16 90/15
90/18 91/15 96/1
108/24 111/3 111/17
111/18 112/3 119/11
124/8 143/15 143/15
144/3 144/6 146/25
147/8 147/9 147/18
148/9 148/19 149/12
152/19 157/20
159/10 164/19
164/22 167/19
168/22 169/2 170/19
171/9 171/25 171/25
174/7 175/15 178/25

183/24 186/5 190/22
194/10
however [4]  108/25
152/25 164/16 166/3
huge [2]  40/22 191/9
huh [1]  197/11
human [2]  37/12
37/14
human/woman [1]
37/14
hunt [1]  189/20
hurdles [1]  24/14
hurt [3]  5/23 27/15
98/24
Hustler [2]  48/15
48/16
Hutchinson [1]  57/9

**I**

I'd [2]  145/9 148/22
I'll [21]  3/4 24/5
38/17 39/9 39/16
42/18 47/20 59/3
70/12 96/8 102/16
103/6 160/8 161/24
163/25 166/24
170/22 170/23
173/23 175/8 198/12
I'm [48]  11/14 13/25
25/12 25/15 32/12
38/4 38/14 39/4 42/3
44/10 65/2 65/19
67/24 68/10 70/1
70/5 85/9 85/9 86/20
99/6 104/8 104/18
112/3 112/16 131/24
132/23 134/18
136/20 136/24 148/3
148/10 158/17
160/12 161/9 162/23
164/7 164/7 167/6
167/12 168/22
175/21 175/24
177/10 178/4 178/8
179/22 194/1 194/2
I've [17]  10/18 17/17
67/25 68/1 96/20
110/20 115/11 123/1
125/16 134/18
163/18 164/6 169/8
186/3 193/4 194/17
195/2
i.e [1]  57/24
idea [4]  62/14
138/20 160/4 169/25
ideas [1]  184/18
identical [2]  54/10
113/1
identified [5]  6/10
20/11 102/1 104/5
178/17
identifies [4]  6/19
80/11 94/25 96/6
identify [3]  12/13
164/3 186/23
identifying [1]  50/17
identity [6]  73/15
161/4 166/9 166/13
167/4 167/11

if [143]  3/11 3/23
4/16 7/23 9/16 11/17
12/3 12/7 12/16
12/18 12/21 12/25
13/17 15/19 19/20
21/2 21/14 21/22
22/9 22/15 22/22
23/3 23/22 24/19
24/22 24/25 25/17
25/22 26/9 26/15
26/19 28/13 29/11
29/17 31/23 33/16
34/16 34/22 38/6
38/9 39/18 40/16
42/13 42/22 42/23
46/1 47/24 48/3 49/5
50/24 52/13 58/19
58/19 59/6 62/17
62/18 63/6 63/18
64/15 67/22 67/22
68/19 69/23 69/24
70/8 71/3 71/20
71/25 72/1 72/14
74/21 76/11 76/23
79/15 79/22 82/14
83/23 85/8 85/19
88/10 100/9 103/5
103/22 107/12
107/16 107/20 108/7
108/7 108/18 109/10
111/21 114/18 118/7
124/11 126/16 128/9
129/17 130/2 131/5
132/1 133/6 134/9
134/16 135/3 136/9
136/10 136/18 137/4
140/7 140/24 144/17
148/18 149/9 152/5
152/13 153/10
153/12 154/11 158/1
160/9 162/8 162/21
163/19 165/1 165/22
165/23 166/18
172/18 173/2 174/16
175/2 176/9 178/2
178/7 178/8 183/12
184/1 190/7 192/15
194/4 196/9 196/13
198/4
if the [1]  34/22
ignore [2]  124/7
128/8
ignored [2]  7/14
184/13
ignores [4]  79/24
84/3 115/14 119/6
ill [8]  124/12 138/1
149/17 149/20
167/18 185/20
185/22 185/25
illness [2]  138/8
155/23
illustration [12]  6/17
7/4 7/12 12/6 35/9
35/20 122/6 122/8
144/4 144/14 144/18
181/24
imagine [1]  77/7
immediately [2]  8/6

65/18
immersive [1]
146/22
impact [2]  54/4
135/12
impersonating [1]
116/16
implement [2]  82/22
94/17
implementation [1]
81/20
implemented [2]
28/23 82/16
implementers [1]
82/8
implementing [1]
81/18
implements [1]  88/2
implication [17]  6/24
25/6 26/3 26/4 33/9
34/18 37/5 37/6 38/1
60/25 94/6 107/24
110/8 143/25 144/17
151/19 168/6
implications [4]  27/6
27/18 31/17 94/4
implicitly [1]  100/2
implode [1]  17/12
imploded [1]  9/13
import [1]  171/4
important [33]  21/2
38/21 42/21 46/22
49/14 50/12 56/1
60/13 64/13 65/5
66/14 68/6 68/7
72/13 75/12 86/23
87/3 95/1 115/24
116/6 122/20 138/13
142/1 149/2 152/21
160/16 167/21 168/4
168/5 169/20 175/14
175/19 181/10
importantly [5]  51/8
55/3 57/1 118/10
177/16
imposing [1]  35/1
impression [7]  8/1
37/2 144/11 144/18
151/19 172/1 172/5
imprimatur [5]  100/3
168/9 168/15 168/16
192/3
impugns [3]  25/6
34/24 35/25
impunity [1]  43/1
imputable [1]  52/25
imputed [1]  53/11
imputes [2]  25/22
27/10
imputing [1]  8/3
in [744]
inability [1]  87/5
inaccurate [3]
121/24 125/13
193/12
inaction [6]  31/6
147/2 147/3 169/1
169/3 173/17
inadequate [1]  138/2

**I**

inadmissible [1]
188/22
inapposite [1]
195/17
inappropriate [2]
26/17 37/24
Inc [2] 12/14 116/10
incentive [1] 98/24
incidences [1] 49/22
incident [19] 19/9
19/19 19/23 20/1
108/9 108/13 110/7
115/21 117/17
152/20 153/18
153/24 154/1 154/7
155/10 155/14
162/13 187/7 190/20
inclination [1] 34/23
inclined [1] 178/4
include [7] 11/23
64/25 108/3 111/24
117/15 145/7 147/16
included [6] 5/22
23/15 73/5 102/10
112/1 143/19
includes [5] 6/17
13/11 38/6 94/18
103/10
including [25] 7/16
9/8 12/22 33/10
33/24 80/14 80/19
83/5 99/19 103/14
110/12 114/16 120/9
122/3 123/23 124/23
137/25 139/2 141/2
141/13 141/19
163/19 163/24
163/25 184/6
inconceivable [2]
154/4 154/5
inconsistencies [3]
138/4 157/13 165/6
inconsistency [2]
100/16 165/10
inconsistent [5] 44/4
156/24 164/18
185/18 185/19
inconvenient [1] 44/3
incorporates [1]
41/14
indeed [11] 80/4
82/25 83/6 84/12
94/16 100/1 105/16
105/24 108/22
117/20 118/15
independent [5]
68/20 77/16 85/11
96/10 96/16
independently [5]
96/4 108/14 115/20
120/11 187/10
indicate [2] 97/22
132/13
indicated [13] 83/3
84/8 108/16 117/15
123/1 134/7 180/5
185/7 189/23 193/4
193/16 195/2 195/11

indicates [3] 80/24
116/9 186/8
indication [3] 64/5
123/12 188/8
indications [1] 16/18
indicia [4] 49/22 62/6
160/23 164/13
indifference [6] 33/3
113/22 146/11
147/20 147/25
173/13
indifferent [6] 29/19
35/7 35/14 35/16
146/12 146/16
indirectly [1] 26/3
indisputably [3] 84/8
192/20 193/2
individual [1] 137/21
individually [2] 98/15
102/4
individuals [5] 31/25
54/8 153/12 156/9
166/24
industry [2] 57/19
58/10
inevitable [1] 144/25
inextricably [1] 61/14
infer [1] 32/14
inference [9] 12/6
17/5 17/10 18/5 26/4
35/12 137/24 148/6
152/22
inferences [1] 44/22
influence [1] 51/7
influenced [1] 51/6
inform [1] 136/23
informal [4] 30/17
82/12 82/12 83/4
informally [1] 114/16
informant [3] 195/21
195/22 195/23
information [41] 8/2
18/20 29/18 42/20
42/25 43/1 43/7 45/7
55/1 62/4 68/15
68/17 70/24 71/9
72/15 72/17 73/4
73/5 74/12 74/25
75/4 75/5 81/12
87/19 96/19 96/22
96/22 96/23 99/4
106/15 106/16
109/10 113/13
122/14 129/7 136/23
151/12 155/17 174/6
174/19 189/12
informed [3] 84/24
116/2 166/5
informs [2] 56/2 86/1
inherent [1] 5/3
initial [1] 6/14
initially [1] 176/22
initiated [1] 41/14
initiative [1] 39/12
injure [2] 11/5 11/7
injured [1] 160/25
injuries [10] 73/10
73/11 161/2 161/6
162/13 162/16

162/19 163/13
190/21 190/23
injury [1] 190/17
ink [1] 122/21
innocent [1] 150/12
innuendo [2] 108/5
151/12
input [3] 81/12 82/5
84/25
inquire [2] 98/25
99/2
inquiry [4] 57/23
93/25 137/9 189/6
inside [1] 191/10
insinuation [1] 26/4
insofar [1] 42/16
insolvency [2]
195/18 195/20
insolvent [1] 58/4
instability [2] 156/4
188/16
installed [1] 4/25
instance [1] 149/6
instances [3] 15/18
16/8 133/4
instead [14] 10/6
28/6 34/5 97/19
111/19 124/6 126/22
127/6 128/4 143/3
146/18 166/6 170/1
184/23
institution [1] 123/16
institution,' [1] 183/8
institutional [3]
146/11 147/20
147/25
institutions [2] 57/18
58/11
instructed [1] 22/7
instruction [3] 33/14
133/16 136/17
instructions [4]
24/19 24/21 24/24
24/25
instructs [1] 94/3
insufficient [1]
194/25
intake [10] 28/8
36/12 43/18 45/1
45/1 49/3 49/20
50/21 78/16 82/19
integrity [5] 25/7
25/24 27/11 27/14
37/20
intellectual [1] 32/4
intend [2] 11/22
38/12
intended [14] 11/18
55/7 94/5 97/13
101/15 107/24 118/9
144/20 147/11 148/9
149/11 149/12
170/16 176/17
intending [3] 5/17
35/12 151/2
intense [1] 74/7
intent [3] 11/21
151/25 158/3
interacted [4] 6/12

6/16 17/4 64/8
interaction [5] 14/20
15/6 15/8 30/3 97/16
interactions [17]
7/20 8/17 17/6 17/6
29/16 43/25 45/23
45/25 50/19 52/22
53/9 56/17 59/15
69/21 73/20 76/18
173/16
interest [1] 57/17
interested [1] 184/2
interject [1] 38/25
internal [1] 138/4
international [1] 8/7
Internet [6] 71/6
71/7 71/16 71/17
72/16 72/24
interpretation [6]
35/20 107/9 116/17
116/25 117/2 119/10
interpretations [3]
26/16 34/15 116/12
interpreted [2]
172/17 172/19
interrelated [1] 3/21
interrogatories [1]
93/1
interrogatory [1]
22/18
interspersed [1] 4/17
interview [10] 80/19
83/8 83/14 83/16
138/3 159/5 169/13
181/15 181/15
193/13
interviewed [9] 9/6
46/16 46/17 105/22
147/12 147/14
147/16 163/1 166/14
interviewer [1] 83/18
interviews [15] 9/2
41/9 47/10 47/10
65/24 66/1 67/4
83/13 92/23 92/23
92/24 97/7 106/3
123/24 193/14
into [27] 6/21 18/24
18/25 23/11 30/20
30/22 31/6 40/8
45/20 57/25 71/9
82/5 97/24 104/3
109/8 111/2 111/17
125/3 126/23 130/10
135/5 144/4 147/1
169/1 169/3 169/5
181/22
introduce [2] 23/4
174/1
introduced [1]
168/11
introducing [1]
168/14
investigated [2]
64/23 110/7
investigates [1]
49/17
investigating [1]
100/4

investigation [33]
8/13 36/5 44/5 45/20
58/25 64/13 64/20
65/9 65/13 65/18
65/23 66/4 66/9
66/10 66/15 66/17
66/24 67/2 67/6
100/6 109/8 115/1
115/7 116/24 138/2
146/2 153/22 153/23
158/9 158/12 158/19
190/7 192/13
investigative [2] 8/13
184/19
invitation [1] 178/13
invoke [3] 23/5
114/2 126/24
invokes [1] 126/22
involved [12] 58/21
88/25 109/24 115/2
115/3 124/16 127/22
129/4 151/20 156/2
160/16 160/18
involvement [1]
147/7
involves [1] 103/4
involving [1] 89/19
irrelevant [4] 87/17
88/20 188/23 191/18
irresponsible [1]
91/4
irrevocably [1] 10/19
is [666]
Island [1] 165/9
isn't [6] 132/8
134/10 144/22
153/17 165/23 183/2
isolation [1] 13/9
issue [104] 4/14
10/2 10/5 10/18 14/3
21/14 21/21 22/9
23/1 24/2 27/2 33/15
33/21 33/21 35/21
38/17 39/11 39/17
40/3 41/22 41/23
42/12 42/18 45/12
55/16 55/21 56/10
56/13 58/3 59/2
61/10 61/12 61/25
62/18 68/1 68/14
68/15 69/9 76/6
77/17 77/22 77/23
78/8 78/16 79/11
84/21 88/12 89/8
89/9 89/20 90/23
91/11 91/19 91/21
92/9 92/11 92/21
93/6 93/8 93/15
93/20 93/23 94/15
95/5 96/17 99/9
100/25 101/25 102/2
103/8 104/24 109/18
109/22 110/11 111/3
112/17 116/15
121/11 122/21
122/25 125/23
126/24 128/11
130/18 130/20
131/23 136/19 137/5

**I**

issue... [16]  176/5
177/25 178/3 178/5
178/11 178/17
178/19 178/22
179/14 185/10
188/23 190/1 192/18
194/14 195/20 197/6

issued [11]  16/21
17/11 17/16 17/19
45/14 45/17 66/9
66/10 67/12 82/20
113/4

issues [43]  3/21
3/25 20/17 23/3
23/20 24/5 24/7 25/4
36/2 39/5 41/14
42/15 46/22 55/25
61/9 77/14 78/18
83/19 83/24 84/2
84/7 87/11 89/19
90/17 91/10 91/16
91/25 98/8 104/20
121/14 122/13
132/13 132/17 140/3
140/4 146/25 172/12
175/16 176/3 176/20
188/1 197/20 198/1

issuing [2]  48/25
92/4

it [476]

it's [119]  4/5 4/11
11/15 11/15 12/3
13/19 14/20 19/23
21/2 21/5 22/4 22/10
25/13 26/5 32/17
33/16 34/10 34/18
36/8 36/13 38/21
39/11 40/4 40/19
42/20 42/22 42/23
46/25 48/13 49/13
50/12 52/5 52/8 52/9
53/18 56/10 57/24
58/8 60/13 62/2
62/12 62/24 64/13
65/4 65/5 66/14
67/20 68/7 69/4 69/5
69/8 71/11 71/12
72/12 77/5 78/22
81/9 87/3 97/12 98/7
101/8 102/17 103/13
104/25 105/22 107/5
112/10 117/19 120/3
122/16 122/20
128/16 132/21 133/3
134/11 138/12
142/10 142/19
144/23 145/15
148/13 151/22
152/21 152/24
152/25 153/2 153/4
153/18 155/22
160/15 160/17
160/18 164/10
166/19 167/7 167/21
168/4 168/14 169/20
172/20 173/9 173/9
175/5 178/11 178/23
180/17 180/17

181/10 183/10
184/21 187/23
188/25 190/25 193/7
193/10 193/12
196/15 197/21
198/10

its [32]  5/6 26/13
32/1 35/23 54/3 61/6
61/7 65/13 67/2 67/4
67/5 69/4 69/19
74/21 80/16 96/13
97/2 101/21 102/7
110/4 110/10 114/8
116/20 119/2 119/19
121/20 128/1 130/14
135/11 145/2 145/11
182/20

itself [8]  14/6 29/15
37/5 48/17 48/20
50/13 90/12 110/9
IX [4]  49/23 64/13
65/13 83/17

**J**

Jackie [247]

Jackie's [85]  5/22
7/18 7/20 7/22 7/24
8/19 9/10 9/11 9/13
14/12 14/24 17/14
19/12 29/19 34/23
35/6 40/4 40/18 44/4
44/5 54/25 55/2
55/10 55/23 59/18
61/23 73/16 73/20
78/5 87/23 89/10
89/12 89/14 89/22
90/2 91/24 100/15
101/13 101/17 103/1
103/9 109/3 109/7
115/15 115/17
115/25 120/7 120/12
122/4 122/21 122/24
123/14 123/24 126/4
126/10 148/24 156/7
156/10 156/13 157/1
157/11 157/17 158/5
160/1 160/20 160/23
161/4 161/10 162/16
163/6 163/9 163/22
165/6 165/14 165/15
165/22 166/1 167/14
168/5 168/8 168/13
183/2 186/25 188/10
189/15

Jann [2]  169/24
170/10

Jenoff [4]  57/6
195/15 195/16
195/21

jerry [1]  130/11

jerry-rig [1]  130/11

job [14]  5/4 8/4 25/8
27/11 27/12 27/22
34/2 34/25 35/8 36/8
36/12 37/1 37/6
37/14

jobs [1]  27/16

JOHN [1]  2/6

journalism [3]

129/20 129/22
184/19

journalist [2]  4/20
43/11

journalists [2]  5/4
17/12

JUDGE [1]  1/10

judgment [37]  4/3
11/2 12/7 20/9 20/16
20/18 23/20 24/11
24/17 26/17 32/13
33/8 33/13 35/21
37/24 39/19 39/24
40/5 40/6 42/7 44/22
70/11 94/13 98/18
132/14 132/18 133/1
133/5 133/14 134/4
138/16 151/11 158/7
185/2 195/4 195/7
198/2

judgments [2]  82/21
99/12

Judy [4]  1/22 134/21
198/16 198/20

juke [1]  147/8

jump [5]  21/16 28/18
55/18 177/10 179/22

jump-start [1]  177/13

juries [1]  146/13

juror [12]  32/13
35/22 138/17 144/19
149/10 152/22
152/22 153/6 154/5
155/11 179/6 179/10

jury [38]  21/14 21/21
22/1 22/6 22/17
22/19 24/19 24/21
25/3 32/1 32/17
32/18 33/8 33/14
33/15 35/11 38/1
40/19 94/14 94/21
132/16 136/17
138/21 138/22
149/15 151/13
151/24 165/13
167/17 171/5 172/7
172/11 173/20
173/21 174/5 175/17
194/24 195/1

just [71]  10/3 13/20
20/3 22/2 23/9 28/2
33/19 34/24 34/25
35/13 37/7 38/24
39/16 47/12 48/20
51/2 52/8 59/3 62/15
64/22 67/12 76/9
76/16 76/20 76/22
82/10 83/10 83/14
85/5 92/5 92/20
97/22 100/5 104/22
106/6 108/11 115/20
120/24 123/15
130/21 132/7 135/7
140/12 142/10 143/9
143/10 153/17
155/13 156/24
157/20 161/11
165/10 168/7 169/7
169/22 174/15

176/13 177/14
177/19 177/19
179/11 181/20 183/2
183/19 186/12
187/12 189/6 189/15
189/16 192/2 194/9

justice [5]  9/10 34/3
147/18 153/17
153/19

justice,' [1]  154/20

justify [3]  172/25
173/6 192/16

**K**

Kappa [4]  5/21 8/9
166/25 187/2

Kathryn [1]  143/9

keep [3]  104/21
168/8 170/3

keeping [1]  120/19

Kentucky [2]  72/7
126/25

kept [3]  10/14
144/24 189/24

key [8]  14/5 14/11
80/3 82/18 99/17
135/13 172/21
177/13

keys [1]  55/6

kicked [1]  183/11

kicking [1]  65/2

killer [1]  89/2

killers [1]  102/10

kind [9]  13/23 14/10
28/3 59/11 97/20
117/14 125/4 140/14
177/14

kit [3]  56/8 62/18
69/9

knew [42]  54/25
74/8 74/10 75/20
96/5 100/4 100/14
107/23 108/8 108/10
108/19 115/11
115/12 118/11
125/11 125/12
129/22 131/18 139/5
139/7 139/13 142/22
151/7 151/8 151/9
151/25 153/25 154/9
155/12 156/3 156/7
157/1 157/11 157/14
163/12 163/21
164/18 165/11
165/17 187/5 188/2
191/23

knocking [1]  167/11

knocks [1]  41/10

know [56]  12/10
13/25 27/16 27/17
27/19 27/19 31/9
31/14 36/14 36/18
46/2 50/8 55/18 58/9
62/14 63/10 67/22
69/2 69/2 69/5 73/15
92/24 107/18 128/19
132/1 134/18 136/20
144/5 148/10 148/12
148/18 148/20 150/1

154/11 154/16
154/17 154/20
158/22 160/6 161/3
165/2 166/7 166/18
167/6 167/7 169/20
177/24 182/11 186/6
190/22 192/23 193/5
194/2 194/4 194/9
194/17

know.' [1]  155/2

knowing [1]  115/9

knowledge [10]  43/5
72/21 93/23 94/1
96/10 96/13 96/16
100/24 137/12
137/17

known [3]  18/12
187/1 195/25

knows [2]  10/11
76/6

**L**

labeled [1]  172/14

laceration [1]  108/17

lack [2]  128/15
185/17

lacks [1]  37/20

laid [5]  45/10 103/13
180/3

landed [1]  43/22

language [1]  18/9
59/13 79/9 104/22
113/1 114/1 114/13
116/10 119/5

largely [2]  17/2
96/23

Larue [2]  71/11
127/9

last [15]  23/9 35/4
38/17 57/1 60/10
90/13 117/9 132/2
159/14 164/2 165/23
166/4 175/9 183/13
195/13

latch [1]  190/24

late [3]  170/23 176/2
184/7

late-night [1]  184/7

later [10]  39/17
104/15 107/1 107/3
111/17 134/19
150/24 156/5 157/19
157/19

latter [3]  42/12 58/20
81/25

Laura [4]  104/4
168/19 168/20
168/21

Laurie [1]  18/11

law [56]  3/17 8/5
10/8 11/6 25/11
26/23 32/25 38/8
42/14 42/24 43/24
45/2 45/6 45/24
50/24 52/11 53/9
55/16 56/20 57/5
62/8 62/9 68/18 69/8
70/17 71/5 71/14
72/5 74/13 74/23

**L**

law... [26]  78/11
78/20 86/1 86/5
87/24 87/24 93/17
93/21 95/15 98/7
98/12 100/21 116/10
129/24 130/6 133/7
151/21 169/11
172/10 175/22 178/8
180/4 181/10 190/3
194/22 197/5
laws [3]  54/13 54/17
135/25
lawsuits [1]  70/22
lawyer [1]  65/7
lawyers [2]  64/9
64/10
lay [2]  140/8 144/2
layout [1]  191/11
lays [1]  72/11
lead [5]  16/15 100/6
160/20 160/21
192/23
leading [2]  78/17
79/1
leads [2]  8/13 98/9
leans [1]  96/19
learn [1]  97/1
least [11]  19/23
24/25 36/5 69/1 70/1
78/20 97/19 123/5
177/25 183/13
197/20
leave [2]  38/8
170/11
Lecca [1]  158/14
left [7]  15/21 40/21
40/24 90/14 162/19
163/7 170/11
left-hand [1]  15/21
legal [8]  11/15 16/12
21/7 25/12 25/13
64/6 84/4 153/13
legible [1]  26/21
legitimate [1]  117/8
lending [1]  120/14
length [3]  119/7
171/7 194/2
lengths [1]  182/24
lens [1]  59/15
lense [1]  89/14
lent [1]  123/16
less [9]  105/1
114/23 117/5 145/1
145/10 158/10
158/12 182/19
192/23
let [26]  21/22 44/7
47/10 57/5 63/11
64/22 70/5 70/8
70/15 75/12 77/9
82/9 85/4 86/3 86/25
87/6 88/24 97/25
98/8 100/23 102/16
108/7 122/17 145/25
170/22 193/19
let's [16]  3/12 14/17
20/22 23/25 43/8
43/20 48/5 48/15

49/11 52/15 55/18
72/23 102/19 134/25
148/8 182/17
letters [1]  114/5
letting [1]  158/22
level [8]  27/9 36/21
44/17 48/23 48/24
63/15 79/10 130/21
leveled [1]  51/10
levied [1]  52/17
Lhamon [1]  91/2
liability [7]  43/2
61/17 70/20 72/18
130/12 147/10
175/13
liars [1]  125/9
Libby [2]  3/17 41/25
libel [1]  192/17
Liddy [9]  124/9
124/15 124/16
124/19 124/20 125/4
156/1 187/14 195/11
lie [5]  54/3 135/11
165/10 167/7 191/21
life [2]  10/24 153/11
light [7]  40/16
122/15 123/22
150/20 163/7 191/2
191/3
like [50]  3/22 14/25
15/22 16/4 21/19
30/11 32/3 35/4 37/7
37/14 56/21 64/23
66/12 72/2 72/3
77/17 87/25 91/25
92/2 99/22 100/5
102/11 103/20
106/10 113/18
123/15 133/16
134/19 136/5 136/22
148/12 148/20
148/22 150/7 154/22
155/2 155/15 160/11
161/4 162/15 162/15
162/23 162/23 167/1
168/14 176/7 176/10
178/23 185/19
188/19
likely [5]  16/1 21/11
68/23 133/6 168/3
limit [1]  161/11
limitations [6]  42/18
42/22 43/3 71/23
72/5 72/18
limited [49]  42/5
44/9 48/13 49/10
53/14 53/17 55/12
55/22 63/3 68/19
68/22 69/23 69/25
77/22 78/12 78/21
84/15 84/17 84/22
85/3 85/12 85/19
85/20 85/25 86/4
86/7 86/11 86/12
86/18 87/9 87/19
88/10 89/7 90/1 92/9
93/3 93/4 93/5 93/5
93/6 93/7 93/13
93/17 130/25 131/4

135/5 136/10 136/12
177/18
limits [1]  70/20
line [8]  17/14 71/9
71/19 72/9 127/1
135/13 139/5 142/20
link [1]  72/2
linking [1]  18/5
Lipscomb [10]  50/25
51/4 51/5 51/9 51/11
54/9 54/10 54/18
135/22 135/23
listen [4]  67/6 97/8
110/24 169/12
listening [1]  97/8
listing [1]  127/23
literally [4]  4/21
18/23 55/5 144/2
litigation [4]  60/8
60/21 88/22 129/12
little [11]  84/2 98/12
108/23 125/3 136/24
139/2 140/1 145/15
177/10 179/22
194/21
live [1]  5/6
lives [1]  5/24
Liz [7]  90/3 111/1
119/3 121/22 139/15
158/21 182/23
LLC [3]  1/8 1/9 3/6
LLP [3]  1/14 1/18
2/2
local [7]  46/17 47/11
83/14 93/2 93/11
93/12 95/3
LOCKE [11]  1/13
1/14 2/6 3/17 41/18
41/21 41/25 86/21
176/19 179/4 179/5
log [1]  121/3
logical [1]  83/22
long [5]  11/17 11/24
106/8 163/9 196/2
long-term [1]  163/9
long-winded [1]
106/8
longer [9]  10/5 11/13
42/9 75/20 76/14
112/10 150/3 189/2
196/17
look [35]  12/21
14/17 24/19 55/19
56/19 57/15 60/11
62/3 81/16 82/9
88/23 90/12 104/21
106/20 109/21
109/21 112/2 114/7
124/7 124/15 127/9
132/24 140/2 146/23
148/8 148/17 148/18
152/21 154/11
161/24 163/5 182/17
186/17 194/12
194/13
looked [7]  28/12
42/17 54/13 59/7
89/7 162/15 182/13
looking [8]  3/10

27/24 59/1 74/9
74/10 131/15 190/10
192/13
looks [4]  53/16 92/8
93/25 121/8
loose [1]  197/17
losing [1]  97/17
lost [7]  10/13 10/18
101/13 101/23 126/5
128/6 129/1
lot [28]  49/8 63/1
71/13 77/6 78/1 87/5
117/10 122/20
128/19 134/7 134/14
139/22 140/14
142/10 152/18 164/8
166/25 170/7 170/24
177/8 177/11 178/16
189/8 189/14 189/14
196/12 196/16
197/23
lots [3]  107/4 140/25
141/18
Loudoun [1]  79/21
love [6]  148/10
148/13 148/20
183/25 185/11
loved [5]  100/14
117/24 123/21
150/21 185/17
loves [1]  148/11
low [2]  130/21
185/25
low-level [1]  130/21
lower [1]  25/18
lump [1]  24/3
lunchroom [1]
168/14
Lusitania [2]  124/24
187/17
lying [1]  167/4

**M**

ma'am [5]  76/25
77/2 77/24 87/2
196/2
Maddie [1]  164/7
made [69]  5/14 8/23
12/19 12/25 15/17
18/4 19/2 26/3 28/23
36/7 37/9 39/25 40/1
41/3 44/9 53/22
54/15 56/24 59/20
60/8 61/16 75/24
76/21 82/16 84/19
97/11 99/2 109/23
111/4 112/8 112/22
114/6 114/10 114/17
117/19 119/3 120/5
121/16 123/20
128/25 129/9 135/21
141/7 141/16 142/2
145/12 145/24
148/22 149/4 151/1
152/19 154/15
167/23 168/8 172/24
173/5 173/18 177/23
179/15 179/16

180/22 182/2 182/3
184/13 185/8 186/16
187/11 193/13
193/15
made-for-litigation [1]
60/8
magazine [17]  41/8
48/7 48/15 48/16
48/17 48/20 101/15
107/6 107/11 107/14
107/14 111/15
121/19 126/3 128/6
169/24 169/25
magazine's [1]  48/6
mail [22]  11/12 15/1
15/4 17/17 40/2
101/11 101/22 108/6
108/22 111/20
152/15 152/18
152/21 152/23
152/24 153/9 153/9
163/14 170/2 171/24
187/2 193/6
mailed [1]  14/21
mails [16]  18/23
27/20 31/8 37/10
105/20 108/11
154/14 154/19
158/13 171/4 171/22
186/11 186/15
186/16 187/9 189/16
main [1]  124/5
major [1]  80/25
majority [2]  132/22
132/25
make [50]  15/23
16/14 19/7 20/4
21/19 30/1 31/22
32/20 32/22 33/6
33/11 45/13 46/7
46/25 48/14 48/16
48/17 48/20 48/21
63/22 64/7 82/21
83/10 85/16 86/15
86/20 92/20 96/25
110/16 114/14
121/23 122/18
129/18 135/6 136/25
141/13 141/22
141/23 142/8 146/3
147/8 148/17 148/18
148/19 177/20
178/18 178/19 179/2
184/7 185/19
maker [8]  28/21 46/9
47/13 48/8 48/25
81/9 81/14 81/16
makers [5]  44/17
46/25 79/10 84/24
84/25
makes [6]  14/6
14/14 15/8 19/8 20/6
21/9 70/13 78/19
85/16 107/25 109/2
109/14 111/19
114/23 128/11
128/12 134/16
139/22 142/7 148/19
168/19 170/7 179/18

**M**

makes... [3] 184/5
184/17 189/3
makeup [1] 36/19
making [27] 7/25
16/8 16/9 28/17
28/19 29/9 30/6
30/16 32/1 36/19
36/20 45/18 46/6
48/7 58/21 79/2 81/5
84/14 86/16 117/24
123/21 169/7 177/22
177/23 178/8 184/22
196/18
malice [102] 11/11
24/8 39/25 40/8 41/4
42/13 43/5 70/6 70/9
70/12 72/22 76/2
76/14 76/23 77/19
77/20 89/5 92/21
93/14 93/19 94/8
94/23 95/2 95/10
95/19 95/24 95/25
96/3 97/11 98/11
98/13 99/6 99/24
100/10 100/19 102/9
102/14 107/16 108/1
108/21 109/15
109/20 110/19
112/14 118/13 119/1
119/2 119/15 121/7
121/17 123/25 124/4
126/12 126/20
128/15 128/16
129/25 130/3 130/10
131/14 132/5 132/7
132/10 132/17 133/2
133/7 133/10 137/3
137/9 137/10 137/11
137/19 137/25
138/11 139/2 139/11
146/4 146/5 148/7
151/24 155/20
167/18 174/23
174/24 175/1 175/6
175/11 175/12 177/1
179/7 179/9 179/13
179/14 179/19
181/13 184/20 185/4
186/2 188/23 190/7
194/25 195/14
managing [1] 169/23
mandated [1] 45/6
manipulated [1]
30/22
manipulative [1]
97/21
manner [4] 8/4 15/4
91/17 118/15
many [21] 3/21 7/11
7/16 25/10 40/23
40/24 66/9 66/9
77/14 77/14 80/13
87/15 87/15 89/25
99/11 105/21 138/19
139/13 149/9 167/13
194/9
map [1] 102/11
marching [2] 81/25

197/3
MARIE [1] 1/13
markets [1] 57/18
marks [1] 163/10
marries [1] 39/24
marrying [1] 122/8
marshal [1] 198/12
Masson [1] 185/24
master [2] 61/4 80/4
material [7] 42/11
71/3 71/21 71/22
72/4 95/12 95/21
materially [1] 157/12
materials [2] 12/23
161/19
matter [27] 3/10
22/10 22/12 23/2
25/11 32/25 34/14
34/15 35/2 42/14
56/21 57/12 57/24
57/24 67/20 70/18
78/11 78/20 86/22
93/16 95/15 133/7
135/3 172/10 178/8
186/13 198/18
matters [3] 23/7
58/10 87/10
may [31] 3/15 12/24
20/24 20/25 21/16
22/8 31/14 31/14
38/13 41/20 51/23
60/12 61/24 67/24
70/11 87/14 99/17
115/3 116/11 116/21
124/13 145/5 146/4
147/9 151/1 157/24
169/18 173/25 188/5
188/17 192/23
24/1 31/19 43/8 85/7
133/12 133/12
138/10 154/14
168/18 169/11
174/14
mayhem [1] 67/3
McNAMARA [17]
1/17 69/16 70/13
77/5 135/3 135/21
139/22 142/7 143/5
151/16 152/19
167/22 168/8 168/19
170/7 170/24 175/10
McNamara's [2] 70/6
170/4
me [61] 3/10 3/17
3/18 8/20 9/22 21/22
23/21 29/25 31/15
31/18 37/4 38/24
39/5 44/7 46/12
47/10 55/21 56/1
57/5 58/16 64/22
68/23 68/25 70/5
70/8 70/15 75/12
77/9 77/10 82/9
84/13 85/1 85/4 85/9
85/10 86/3 86/25
87/6 88/24 91/5
97/25 98/8 98/9
100/23 102/16 108/7

122/17 134/1 135/21
145/25 148/20
149/23 155/4 163/16
165/1 171/2 177/24
178/22 193/11
193/19 196/20
mea [3] 157/3 157/4
157/24
mean [32] 7/9 7/13
22/4 32/23 39/1
46/12 46/22 47/12
47/24 62/16 63/2
84/13 90/9 98/1
106/22 106/23 122/6
133/3 144/10 144/15
144/18 148/10
148/16 148/17
148/18 154/21
157/19 166/17
181/19 182/4 184/16
195/22
mean would [1] 39/1
meaning [28] 4/8
24/6 24/9 25/11
25/15 25/17 26/13
28/1 28/4 34/1 35/8
53/12 58/6 103/6
103/7 109/23 114/2
118/16 148/16
149/25 154/21 155/8
157/25 158/22 160/5
171/3 171/10 172/10
meanings [1] 118/24
means [9] 7/2 19/12
25/16 34/10 85/11
91/3 118/17 118/19
131/8
meant [1] 34/8
meantime [1] 178/9
Meanwhile [1] 6/25
measures [1] 198/1
mechanical [1] 1/24
mechanism [1]
58/19
media [8] 1/9 4/21
5/1 5/13 17/16 59/20
93/12 151/21
medical [3] 36/16
146/12 159/6
medley [1] 99/14
meet [6] 11/15 22/14
94/24 100/18 100/22
164/22
meeting [7] 54/24
90/16 103/9 103/11
108/6 108/22 120/12
meetings [1] 54/22
meets [1] 105/3
member [3] 18/11
50/5 57/20
members [3] 105/1
153/16 154/3
memo [1] 180/4
men [17] 13/21 15/1
16/23 16/25 19/11
30/8 59/10 114/19
154/20 156/12
156/15 156/16
156/19 156/20

156/23 157/8 187/22
mental [8] 138/7
155/23 156/4 157/17
157/21 158/15
188/11 188/16
mentally [7] 124/12
157/14 157/23
158/11 158/25
188/13 188/15
mention [2] 128/17
128/18
mentioned [3]
139/10 171/21
171/22
mentions [1] 144/21
menu [1] 104/1
mere [1] 32/19
merely [1] 28/22
merits [1] 195/14
messages [1] 160/2
met [7] 22/3 69/4
85/1 164/14 164/16
164/19 190/18
method [1] 69/6
methodical [2]
102/11 131/19
MICHAEL [1] 2/6
might [16] 59/1 77/7
87/10 91/23 107/2
124/11 124/13 125/2
125/3 141/21 148/18
148/18 153/11 171/5
172/14 186/23
mile [1] 73/12
military [2] 146/16
146/25
military's [1] 146/18
million [4] 8/6 74/1
74/3 75/25
mind [9] 4/15 34/25
40/1 48/6 53/6
104/21 115/16 189/4
191/18
minimize [2] 54/3
135/11
minimum [4] 33/7
33/15 37/24 172/11
ministerial [3] 50/5
50/8 130/21
minor [1] 165/5
minute [7] 20/22
25/16 28/2 42/19
47/21 59/4 138/25
mischaracterization
[2] 91/3 177/15
mischaracterized [2]
97/15 120/24
misconception [1]
186/1
misconduct [29]
16/6 49/7 49/12
49/15 49/21 50/1
50/10 50/16 50/17
50/20 50/22 50/23
52/3 52/4 52/15
52/18 78/19 78/25
80/7 80/9 80/12
80/15 83/1 83/9 90/6
91/12 92/19 164/15

183/17
misdirection [1]
121/1
miserably [2] 15/12
105/4
misguided [1]
126/15
mishandling [1]
148/15
mislead [1] 142/10
misled [1] 171/25
misquote [1] 168/20
misrepresentation [1]
191/19
misrepresented [2]
186/18 194/11
misspoke [2] 86/9
86/10
misstatements [1]
177/2
mistakes [2] 4/22
5/1
mistreated [2] 54/12
56/16
misunderstanding [1]
180/11
misunderstood [1]
85/7
mix [1] 92/5
model [1] 24/25
modification [1]
127/1
modifications [1]
71/17
mom [2] 145/22
184/10
moment [3] 101/12
101/14 101/16
money [1] 184/2
monitors [1] 162/8
monstrous [1]
150/12
month [2] 9/15
188/25
months [9] 10/15
10/17 40/21 40/25
40/25 40/25 66/9
116/1 116/2
Moody [2] 3/4 162/2
Moore [1] 2/6
more [54] 14/16
15/25 15/25 21/10
26/21 34/20 40/21
50/3 50/8 54/6 59/5
60/8 62/2 62/11 65/4
65/11 68/10 68/16
68/23 69/21 73/12
86/1 89/2 89/15
89/23 91/5 92/24
94/16 98/19 99/5
99/6 103/1 103/23
106/8 115/24 116/16
118/10 122/15
122/16 125/12 141/3
141/20 145/14
155/22 158/9 158/19
174/14 178/1 181/11
183/7 188/4 189/1
193/4 194/18

**M**

more.' [1] 148/21
moreover [4] 45/21
125/6 171/14 190/18
morning [2] 30/4
70/25
morph [1] 188/3
morphed [1] 157/7
most [28] 3/24 21/20
33/21 55/3 57/1
57/15 60/13 70/11
79/5 92/17 95/21
98/6 103/20 116/8
117/25 128/23
132/13 133/4 133/13
133/22 142/12 149/9
177/24 178/21
185/11 193/14 194/2
196/14
mother [5] 118/5
159/9 165/7 165/8
184/12
motion [41] 1/6 3/7
11/20 13/13 13/14
14/2 14/3 14/4 18/19
20/9 25/9 38/19
38/25 39/1 39/3 39/8
39/10 39/18 41/23
42/2 44/21 70/7
70/10 77/11 93/22
95/1 95/17 98/10
101/2 101/6 102/1
111/23 117/12
118/16 122/16 130/9
130/16 131/10
131/12 131/13
177/17
motions [3] 3/9
24/10 198/2
motive [2] 148/6
149/17
mouth [2] 182/16
193/17
move [5] 33/13
74/16 92/20 145/25
152/25
moved [7] 4/3 4/9
20/16 24/10 25/2
38/18 39/18
moving [5] 6/9 106/4
116/19 160/15
160/21
Mr. [8] 49/2 89/1
89/6 140/21 141/14
142/5 179/4 192/14
Mr. Clare [2] 179/4
192/14
Mr. Groves [1] 49/2
Mr. Hatfill [2] 89/1
89/6
Mr. Woods [3]
140/21 141/14 142/5
Ms [11] 28/13 62/14
104/17 135/3 139/4
140/16 141/25
162/12 164/17 179/4
179/5
Ms. [286]
Ms. Davis [1] 66/24

Ms. Dunn [2] 169/4
169/6
Ms. Eramo [146] 7/1
7/13 8/18 8/22 8/25
9/6 9/7 11/5 11/9
11/23 12/10 13/11
14/21 18/12 19/4
21/5 22/23 23/15
25/6 27/6 27/20 28/9
30/14 31/4 31/7
32/15 33/24 34/16
35/5 35/23 42/4
43/14 43/15 43/20
43/24 44/7 44/20
44/23 45/22 46/6
46/25 47/8 47/9
47/15 48/21 49/1
49/6 49/25 50/17
50/20 51/3 52/1
52/10 52/11 52/14
52/18 53/7 53/14
53/20 54/21 54/23
55/1 55/5 55/6 55/12
55/14 56/16 60/4
60/14 60/24 61/1
62/7 62/11 66/3
69/21 73/20 73/21
73/23 73/24 74/20
75/8 75/16 75/18
75/24 76/1 76/16
76/22 78/2 93/7
135/3 136/2 137/4
139/6 139/21 141/11
141/22 141/23 142/3
142/24 143/3 143/18
143/21 143/23 144/1
144/3 144/6 144/13
145/10 145/14
145/19 145/21
147/17 148/2 148/3
148/4 148/9 149/4
149/12 149/14
149/18 149/21 150/2
152/17 154/10
155/13 164/14
164/20 165/3 167/20
167/24 168/1 168/16
169/2 169/5 170/5
170/6 170/14 170/18
170/20 170/21
171/24 173/11 174/6
177/17 180/25
181/15
Ms. Eramo's [16]
15/6 28/5 29/9 43/12
43/13 44/22 45/15
49/20 50/13 52/2
59/18 76/18 80/1
151/7 173/16 174/2
Ms. Erdely [67] 7/10
9/14 9/18 10/1 10/17
23/13 43/15 44/1
96/10 96/16 97/15
97/20 99/7 145/11
145/12 145/16 146/6
146/10 146/21
147/19 147/24 148/4
148/8 148/22 148/25
149/3 149/7 149/20

150/19 151/1 152/10
152/17 154/24 155/6
157/1 157/3 157/11
158/4 158/13 160/3
160/6 160/12 160/19
160/24 161/2 161/5
163/12 163/21 164/1
164/2 164/5 164/18
165/1 165/7 165/8
165/11 165/12
165/14 165/21
165/24 166/19
167/10 168/12 169/4
169/4 181/3 182/15
Ms. Erdely's [10]
97/4 97/12 139/18
145/25 147/22 150/5
150/17 159/19
162/13 169/12
Ms. Garber-Paul [14]
119/8 119/12 140/3
141/4 142/15 143/16
144/9 145/4 145/18
145/20 179/24 180/1
180/22 181/3
Ms. Garber-Paul's [1]
144/10
Ms. Kathryn [1]
143/9
Ms. Locke [4] 41/18
41/21 86/21 176/19
Ms. McNamara [14]
69/16 70/13 135/21
139/22 142/7 143/5
151/16 152/19
167/22 168/8 168/19
170/7 170/24 175/10
Ms. McNamara's [2]
70/6 170/4
Ms. Moody [2] 3/4
162/2
Ms. Nicole [1] 10/19
Ms. Pinkleton [1]
160/2
Ms. Rosin [2] 166/15
166/21
Ms. Tacoronti [2]
174/15 174/19
much [23] 8/9 30/11
45/13 48/2 58/21
60/8 64/3 78/12
78/22 84/18 86/24
89/23 91/12 96/22
104/13 106/7 117/11
134/13 146/24
148/19 166/23
167/23 196/3
multiple [14] 3/8
26/15 35/24 62/9
77/15 89/25 91/18
99/18 139/19 145/13
147/15 166/13 169/8
190/12
murderer [1] 105/7
Murphy [1] 183/24
must [14] 13/9 14/2
14/3 14/4 19/21
26/10 33/8 44/22
94/7 94/8 94/13

105/12 106/21
138/12
my [34] 3/15 3/17
3/18 23/21 24/6
34/14 39/14 39/22
41/25 45/2 53/6 58/6
75/13 76/3 77/9
80/23 132/2 133/12
133/25 135/21
138/24 144/4 154/21
157/5 158/17 161/23
161/23 162/6 162/22
162/22 170/22
170/25 194/4 194/20
myriad [1] 70/21
myself [3] 65/2
157/25 194/3
mysterious [1]
193/16

**N**

N.W [1] 2/3
name [23] 3/15 6/10
6/13 6/15 6/19 8/19
12/14 12/21 12/24
41/25 43/13 159/3
160/13 165/22
165/23 165/25 166/4
166/18 166/19
191/23 191/24
191/25 192/9
named [1] 18/11
namely [1] 42/21
names [5] 159/4
159/14 164/2 164/8
189/13
narrative [3] 5/17
55/7 158/3
narrow [4] 20/17
23/3 60/24 178/19
narrowly [3] 26/7
59/5 172/15
national [12] 8/7
47/11 56/13 58/10
61/21 66/22 107/6
107/10 107/14
111/14 129/6 182/25
naturally [1] 130/23
nature [2] 47/20
94/11
navigate [1] 30/8
near [1] 19/20
nearly [1] 54/10
necessarily [3] 77/21
105/13 165/9
necessary [6] 42/14
111/16 136/23
137/19 158/10 160/9
194/3 194/13 194/14
197/18 197/25
needed [2] 37/13
106/9

Needless [1] 101/18
needs [11] 12/20
22/10 36/7 36/21
102/3 104/20 131/20
137/6 160/6 161/21
194/12
nefarious [1] 127/24
negative [14] 32/14
33/1 67/19 118/20
123/22 129/23
143/25 144/12
147/10 149/14
149/17 150/20 151/3
171/23
negatively [2] 144/7
149/3
negligence [1] 137/7
neither [4] 10/4
115/24 145/23 197/1
net [2] 103/2 106/12
neutral [2] 36/5
36/14
neutrally [1] 103/16
never [29] 8/23 9/22
61/20 65/15 73/14
84/19 96/8 96/21
101/18 108/24
109/21 109/21 111/2
123/7 123/11 147/22
150/7 152/25 156/19
157/4 157/12 157/24
165/12 166/5 180/4
183/13 183/14 187/4
190/25
never-ending [1]
150/7
nevertheless [6]
20/10 44/1 46/20
55/17 147/19 196/16
new [35] 1/19 13/23
14/10 28/3 40/16
42/23 42/25 42/25
43/3 43/7 59/11
70/19 71/9 72/15
72/20 73/1 73/2 73/3
74/10 74/12 74/14
75/1 75/4 75/5 75/25
84/1 88/25 89/8
117/14 124/3 127/22
128/1 134/6 137/14
140/14
news [3] 4/22 93/2
165/1
newscast [1] 151/15
Newseum [3] 4/22
4/25 5/1
newspaper [6] 46/17
54/15 70/25 71/1
71/3 72/16
newspapers [6]
44/15 47/11 50/25
54/10 92/7 92/8
next [21] 3/4 46/10
49/5 93/14 95/23
103/17 112/6 112/16
112/19 119/4 114/9
122/6 141/6 142/13
142/16 145/5 160/12
182/8 182/21 183/4

(20) more. - next

**N**

next... [1]  191/3
NICOLE [35]  1/5 3/6
3/16 3/19 5/25 6/3
6/14 6/14 6/20 7/20
8/2 8/10 8/17 9/4
10/19 12/5 14/13
14/15 15/1 15/9
15/17 15/22 16/9
16/9 16/14 16/17
17/3 17/6 18/9 18/15
19/1 29/23 35/7 42/1
152/6
night [8]  73/9 73/11
73/13 73/16 157/6
159/13 184/7 191/2
nightmare [3]  10/3
101/11 170/2
nine [1]  106/1
Ninth [3]  146/1
184/23 185/2
no [146]  7/2 7/2 8/13
11/13 16/11 29/7
29/7 35/5 39/20
40/10 40/19 42/9
43/2 43/21 45/8
45/11 45/17 45/17
46/6 47/7 49/3 51/5
51/9 54/16 54/21
54/25 55/14 61/15
62/22 62/23 66/2
72/14 72/23 72/25
73/5 73/10 73/11
73/25 74/2 74/11
74/18 74/18 74/18
74/23 75/18 75/20
76/14 76/16 76/17
76/18 76/20 76/20
78/15 83/2 83/23
84/2 85/10 86/3 86/4
88/12 93/20 95/10
96/17 97/3 99/20
99/25 102/9 103/3
103/10 105/15
105/16 105/21
105/23 106/14
108/10 110/4 110/5
112/21 112/23
112/24 114/9 116/5
118/14 119/17 120/2
120/4 120/6 120/16
123/17 123/19
123/23 124/3 124/8
125/15 126/2 126/9
126/18 126/20
128/11 130/6 131/21
133/3 133/7 133/9
134/22 134/23
134/24 136/7 136/12
138/17 140/18 143/1
143/22 145/19 146/6
149/6 150/3 150/13
151/8 160/14 161/18
161/19 163/12
163/22 168/13
172/13 177/20
178/25 179/6 181/7
181/18 183/17
185/25 186/13

186/17 188/13 189/2
190/6 190/20 190/22
190/23 191/14
195/13 195/19
196/17 198/3
no-nonsense [1]
145/19
nobody [2]  8/22
120/1
nonactionable [2]
38/19 118/22
none [6]  73/18 115/4
138/10 160/19
163/17 191/14
nonreaction [4]  35/5
35/9 37/1 113/10
nonsense [1]  145/19
nonsubstantive [6]
71/18 71/20 72/1
72/2 72/9 72/13
nonverifiable [1]
118/23
nor [8]  10/4 42/5
96/3 96/25 106/15
124/1 128/13 197/1
normal [3]  94/13
121/8 188/7
normally [2]  54/8
197/23
not [355]
notation [2]  145/5
184/9
note [41]  10/8 14/22
18/8 38/21 50/12
51/8 73/2 74/3 74/6
74/17 75/4 75/7 75/9
75/17 76/13 79/6
82/23 87/6 94/19
96/13 101/21 118/18
119/3 119/4 125/24
128/3 128/5 129/8
129/10 129/14
132/11 138/13
148/22 158/21
167/21 170/1 170/12
170/19 179/24
181/10 186/15
noted [10]  24/5
96/20 101/5 103/15
105/3 110/20 114/12
124/2 130/8 137/15
notes [7]  7/6 56/12
149/8 164/21 182/10
182/11 183/5
noteworthy [1]
184/21
nothing [34]  6/2 8/3
8/18 12/4 29/18
65/12 85/15 87/8
87/16 91/4 92/2
99/22 104/3 108/12
108/18 108/20
113/13 113/14 114/2
114/8 114/20 115/6
116/1 170/13 173/14
173/19 174/6 179/12
183/1 187/17 188/11
194/6 194/16 194/18
notice [1]  126/3

noticed [1]  163/4
notify [2]  116/23
126/14
notifying [1]  113/22
noting [1]  105/9
notion [15]  18/14
18/15 19/11 33/23
34/22 37/1 38/18
58/16 63/2 63/15
84/22 85/25 99/7
129/18 168/17
notions [1]  27/7
notwithstanding [3]
44/2 48/22 157/10
November [6]  5/10
72/25 73/25 80/20
130/14 154/25
November 17 [1]
80/20
November 19th [3]
72/25 73/25 130/14
now [77]  6/18 10/11
11/1 13/13 15/18
15/20 18/15 24/9
24/20 25/3 31/19
43/20 44/6 44/19
46/6 47/15 49/5
49/11 49/25 50/2
52/13 55/8 55/11
56/18 58/3 64/11
64/22 71/5 71/25
72/20 74/15 78/7
82/23 93/14 93/20
101/25 104/12
104/24 107/1 107/7
117/9 119/21 124/25
126/3 126/7 129/3
131/1 137/2 137/4
137/7 137/11 142/7
151/6 155/15 158/4
158/16 172/2 177/10
177/25 179/3 179/22
180/14 181/19
181/20 182/6 184/9
184/14 185/5 185/20
186/3 188/20 189/8
190/10 190/24
191/17 192/14 193/5
number [38]  13/17
14/17 15/19 22/19
32/19 37/7 39/12
39/15 55/19 95/24
96/6 102/24 103/4
103/5 103/6 106/6
106/7 106/17 110/22
113/6 113/9 113/12
113/14 113/15
113/17 113/19
113/24 116/11 119/2
119/19 119/23
120/21 129/6 130/17
131/10 176/20
176/25 177/7
numerous [4]  91/10
139/20 146/10
181/11
NY [1]  1/19

**O**

Obama's [1]  47/25

object [5]  41/19
41/23 131/10 161/7
161/10
objective [1]  62/3
objectivity [1]  99/13
obligated [2]  137/20
139/23
obligation [1]  82/13
obligations [1]  91/7
oblivious [1]  7/1
observation [10]
97/10 102/23 112/20
112/23 116/19 122/4
122/10 133/12
134/10 175/9
observations [1]
197/5
observed [1]  104/25
obtaining [1]  9/10
obvious [1]  138/3
obviously [3]  22/5
68/20 89/3
occasion [2]  94/17
117/21
occasions [3]  9/1
109/2 117/20
occupied [1]  61/11
occupies [1]  62/4
occur [3]  5/4 186/25
190/21
occurred [6]  7/23
20/1 110/1 121/9
187/1 190/22
OCR [9]  59/3 64/18
66/6 67/3 67/5 67/12
83/20 84/9 117/3
October [2]  17/22
59/25
odd [1]  139/18
off [23]  10/3 10/17
40/21 99/10 113/12
144/24 149/3 149/4
149/8 149/16 158/12
159/17 162/4 162/6
162/7 162/7 162/8
193/7 193/19
193/22 193/25 194/1
194/6
offer [2]  98/19
125/18
offered [1]  125/10
offering [2]  117/7
173/13
office [21]  6/4 6/23
15/12 25/23 25/25
28/8 36/22 64/3
64/19 65/9 65/12
65/15 65/17 65/22
65/22 66/4 66/25
83/6 83/15 91/1
192/6
officer [2]  146/17
155/9
officers [1]  116/16
official [67]  6/11
17/17 41/22 42/5
44/8 44/9 44/10
44/12 46/5 46/24
48/1 49/10 50/11

51/6 51/17 52/9
52/20 53/7 62/13
63/25 68/18 69/23
77/23 78/7 78/12
78/21 79/9 79/13
79/22 80/2 84/10
84/23 85/3 85/12
85/15 85/21 85/21
85/22 85/24 86/1
86/5 86/11 86/19
87/8 87/8 87/17
87/18 87/20 87/22
87/25 88/3 92/5
92/12 92/14 93/17
95/2 95/9 95/15
130/20 130/25 131/5
135/2 135/4 135/19
135/22 136/5 177/18
officially [3]  10/16
41/1 76/8
officials [4]  54/4
87/15 135/13 135/16
often [11]  104/2
106/24 112/6 132/19
133/9 133/10 146/4
148/6 184/18 188/1
193/25
oh [5]  37/3 182/9
184/9 193/10 194/17
Ohio [2]  62/12 62/12
okay [11]  7/3 23/8
24/4 41/12 88/11
134/2 135/1 174/3
191/3 196/8 196/9
old [3]  110/2 151/17
151/18
old's [1]  101/2
olds [1]  186/6
omission [8]  98/16
109/4 109/13 109/22
110/11 110/12
151/18 151/23
omit [2]  122/10
151/11
omits [1]  121/11
omitted [12]  109/10
139/5 142/7 142/9
151/9 151/16 155/12
186/4 186/22 191/3
191/6 196/13
on [363]
once [8]  107/2
121/11 167/12 170/1
179/12 188/6 193/4
194/19
one [92]  4/5 6/13
9/17 11/16 12/20
13/16 13/18 14/20
15/9 15/25 17/21
18/10 21/5 21/10
22/16 23/25 24/22
26/16 28/1 30/2 30/4
32/20 33/25 38/21
39/19 41/5 41/6 42/4
43/16 45/2 48/13
48/14 50/6 57/11
59/24 61/10 64/1
70/11 75/18 80/24
81/10 81/13 82/8

O

one... [49]  82/8
85/12 85/12 85/21
88/12 92/17 94/16
97/8 98/3 98/5 99/25
103/10 104/2 104/14
104/20 105/1 110/21
112/23 114/22
116/11 116/14
116/16 116/16 120/3
122/25 124/5 132/11
136/4 138/9 138/10
139/12 140/8 143/8
146/15 148/22 157/9
159/25 171/22
174/14 177/2 177/19
186/19 190/13
190/19 193/10
193/11 194/2 194/9
197/20
ones [8]  23/6 23/10
33/21 56/22 66/17
142/12 162/8 185/11
ongoing [4]  57/17
64/20 66/7 66/15
online [5]  8/7 41/9
42/8 42/20 43/1
only [53]  4/5 6/11
6/15 14/1 14/12 17/3
19/20 21/14 23/25
25/10 34/7 40/8 41/2
42/13 48/17 56/2
74/24 75/13 75/22
76/2 89/10 90/12
91/9 106/1 108/13
109/17 110/18
110/21 110/25
113/20 115/8 117/17
119/3 119/10 120/14
122/18 122/22
122/24 125/16
128/17 128/24 131/6
135/5 136/3 137/6
142/18 152/20 154/6
172/14 174/21
181/14 182/15 193/3
onto [1]  190/25
op [1]  91/11
op-ed [1]  91/11
open [4]  68/20
142/20 161/14
161/20
opening [1]  158/2
operative [6]  79/4
84/4 89/4 105/25
182/18 189/11
opinion [31]  4/11
24/6 38/18 38/19
46/12 104/4 105/12
106/11 113/4 113/7
113/25 131/14 153/2
168/20 170/22
170/25 172/13
172/14 172/14
172/15 172/20
172/24 172/25 173/3
173/4 174/12 185/9
192/14 192/15
192/16 193/6

opinions [9]  60/17
60/20 91/18 104/7
105/14 128/21 173/6
192/18 192/19
opportunities [3]
54/2 63/2 135/10
opportunity [7]  54/7
54/16 67/9 67/11
166/15 166/22
176/10
oppose [1]  39/4
opposed [2]  73/8
145/17
opposing [3]  98/10
98/11 99/14
opposite [10]  28/10
34/6 100/1 111/22
112/13 119/15
121/17 122/1 128/4
181/21
opposition [14]
11/21 20/9 20/21
23/14 70/10 96/12
104/12 104/13
111/23 113/3 118/15
121/21 129/3 130/8
option [1]  103/16
options [5]  45/7 45/9
103/14 111/17
114/16
or [234]
oral [6]  73/8 156/15
156/20 157/8 187/21
188/6
orchestrating [1]
29/4
ordeal [8]  17/23 18/2
18/6 19/4 19/5 19/17
28/11 59/25
order [12]  3/20 3/22
58/7 61/7 74/17
136/16 138/15 149/5
159/2 161/19 161/20
161/21
orders [7]  82/1 82/1
82/2 82/4 82/19
82/20 197/3
original [7]  73/25
75/15 127/12 127/14
127/17 127/18 128/1
originally [4]  180/20
180/21 182/8 188/5
other [67]  9/3 9/7
15/18 15/20 16/11
16/18 17/12 19/15
20/7 20/13 20/15
20/18 21/4 22/24
22/25 23/6 27/12
32/19 33/10 38/4
42/15 45/24 51/18
62/3 62/6 76/19 81/8
82/21 83/12 85/2
86/24 86/25 90/1
110/18 110/21
113/21 116/3 119/17
119/20 122/18
122/23 127/24
129/13 130/16 134/7
149/6 149/19 150/10

150/25 159/15
160/23 163/23
168/18 170/14 173/6
174/21 177/19 182/5
183/5 189/17 191/15
192/2 192/10 193/10
196/10 196/13
197/17
others [11]  3/7 7/11
20/25 24/3 28/23
32/21 34/11 89/23
105/1 120/7 120/8
otherwise [4]  68/20
110/10 131/12
172/23
ought [2]  3/11 31/19
our [43]  4/17 6/3
6/18 6/24 10/3 13/3
13/14 20/9 20/14
21/9 23/2 26/2 26/23
32/9 33/14 38/25
39/17 41/10 56/15
63/24 64/4 64/25
69/17 70/10 99/18
101/10 102/1 114/4
117/12 119/7 122/16
137/5 142/8 171/8
176/23 176/23 177/6
179/18 180/4 181/11
195/16 196/7 197/3
ours [2]  11/21 162/5
out [70]  9/24 12/2
17/14 19/12 23/9
24/1 24/20 32/2
41/10 43/12 44/2
45/10 47/23 49/13
60/11 63/16 72/11
75/23 83/6 87/12
92/1 98/6 98/7 98/22
99/11 103/13 106/5
107/3 109/18 114/3
114/6 121/15 122/13
122/23 124/10 127/9
129/5 134/1 136/1
140/8 144/2 144/5
145/9 146/3 146/8
147/2 149/13 149/14
154/3 154/8 160/4
160/5 160/7 160/10
165/22 167/7 169/14
169/19 172/2 176/21
178/6 179/18 180/3
183/11 184/15
187/13 194/10
197/24 198/4 198/8
outlets [2]  91/10
93/2
outline [1]  56/8
outrage [1]  8/8
outrageous [1]  60/17
outset [4]  24/5 38/21
40/14 180/6
outside [6]  7/1 16/18
16/25 35/16 97/2
191/7
over [29]  13/6 18/24
64/10 78/13 79/2
79/17 81/7 84/2
88/17 88/17 89/13

89/13 100/15 100/15
104/25 104/25
105/18 105/18
109/12 117/19
117/19 156/8 157/2
157/12 162/20 183/7
188/3 189/10 189/10
overall [3]  12/18
12/19 33/12
overburden [1]  78/9
overcome [1]  138/15
overlooks [1]  17/2
overriding [3]  97/10
183/20 185/16
overruled [7]  7/10
140/21 140/23
143/19 179/25 180/5
180/11
overruling [1]  34/23
oversees [1]  80/14
overview [1]  40/15
own [32]  10/12
11/12 20/4 32/6 40/2
48/17 48/20 55/9
60/6 60/6 60/12 61/6
61/7 69/19 80/3
80/11 80/17 81/5
96/14 97/2 105/19
139/12 145/3 145/11
148/8 164/3 165/16
166/10 182/20 184/1
186/11 194/4
owner [1]  48/7

P

p.m [3]  1/6 3/1
198/13
P.O [1]  2/7
page [12]  20/10
20/21 23/14 65/3
90/13 99/10 99/18
112/9 118/18 142/11
180/3 182/21
pages [5]  98/9 98/11
98/12 104/15 139/18
paint [4]  123/22
151/2 162/15 190/15
painting [1]  34/19
paints [1]  37/2
paired [1]  104/1
panel [1]  50/6
panels [2]  50/6 50/7
Pape [1]  116/10
paper [2]  179/18
181/11
papers [1]  196/7
paradigm [1]  70/24
paragraph [13]  80/9
104/14 104/15
106/21 106/23
106/24 107/4 107/9
110/23 111/10
111/10 111/13
168/25
paragraphs [1]  73/2
paralyzed [3]  103/3
105/10 107/19
paranoid [2]  124/18
125/5

parcel [1]  53/2
Pardon [1]  196/20
parent [2]  121/1
121/2
part [12]  13/4 50/21
53/1 53/15 97/21
153/17 153/18 160/7
160/17 160/18 167/3
180/12
partial [4]  11/2 20/18
23/19 39/19
participant [1]  82/3
participate [2]  81/5
160/22
participated [1]
79/19
participation [1]
159/22
particular [24]  5/25
7/20 8/10 17/13 19/3
27/3 29/20 48/11
51/19 55/24 71/15
77/11 81/13 96/3
99/11 110/23 111/5
122/19 122/22
123/20 166/24 181/5
181/6 181/6
particularly [3]  79/5
111/16 131/13
particulars [1]  87/23
parties [4]  45/25
120/15 178/9 181/12
partisan [1]  99/12
partner [5]  3/17 24/7
39/14 39/22 45/2
partner's [1]  28/18
party [8]  13/22 16/2
59/10 70/18 123/3
130/4 144/25 181/12
party's [1]  176/15
pass [3]  174/16
174/18 175/8
passage [1]  112/12
passionate [3]  9/9
115/13 147/18
passive [1]  83/11
past [2]  35/17 83/1
path [1]  130/11
patient [1]  30/13
patient/doctor [1]
30/13
pattern [1]  54/11
Paul [25]  111/1
111/9 112/4 119/14
119/8 119/12 121/22
139/15 140/3 140/16
141/4 141/25 142/15
143/16 144/9 145/4
145/18 145/20
158/22 179/24 180/1
180/22 181/3 181/21
182/8
Paul's [5]  111/24
122/2 122/5 122/13
144/17
pause [1]  134/15
PAXTON [1]  2/5
payback [1]  117/17
peddled [1]  124/16

P

pen [2]  140/18
181/25
penalize [1]  117/6
Pendleton [1]  26/11
Pennsylvania [1]  2/3
Penthouse [5]
124/10 124/22 125/4
155/25 187/15
people [45]  9/5
11/25 12/9 12/10
13/3 15/23 18/8
18/24 19/2 21/5
23/16 27/15 27/19
29/23 31/1 31/8
31/21 32/4 32/6
32/20 34/4 34/21
37/16 37/16 40/23
40/24 50/7 74/10
83/13 87/25 104/9
107/4 128/5 131/2
141/1 141/18 143/12
165/4 171/9 171/16
185/15 186/23
187/16 187/22
187/23
per [23]  4/8 8/5 11/4
24/6 24/13 24/18
24/23 25/1 25/8
25/15 25/22 27/9
28/15 31/23 37/11
37/15 38/3 38/8 53/2
53/12 89/22 127/3
172/11
perceive [3]  28/16
29/12 30/21
perceived [1]  144/20
percent [1]  29/8
perfectly [1]  150/12
perform [6]  25/23
35/8 73/8 156/15
156/20 157/8
performance [5]
25/7 27/21 80/17
80/24 81/6
performing [1]  43/18
perfunctory [1]  71/14
perhaps [6]  3/10
46/17 101/8 178/9
178/21 197/5
peril [1]  126/16
period [3]  13/6
132/13 183/16
periods [1]  78/16
permission [3]  65/3
66/12 161/3
permitted [2]  61/5
63/9
perpetrator [1]
150/12
perpetrator's [1]
159/3
perpetrators [5]  16/7
30/24 141/24 152/2
167/9
persecutory [1]
124/23
person [27]  6/15
13/2 26/1 27/14 30/1

36/12 37/12 37/19
46/21 48/1 48/13
52/25 78/16 82/10
82/19 83/3 84/6
125/5 130/22 142/21
143/2 148/12 155/3
160/9 172/18 172/20
191/8
person's [1]  25/23
person.' [1]  157/18
personal [1]  97/24
personalize [1]
97/16
personally [1]
130/24
persons [1]  25/19
perspective [2]  20/4
173/25
persuasive [1]  60/8
pertain [1]  21/24
Petty [1]  146/17
phase [1]  158/16
Phi [13]  5/21 8/9
73/6 73/7 76/20
115/1 115/13 159/16
163/24 166/25 187/2
191/7 191/10
PHILLIPS [1]  1/14
3/18
phone [2]  10/3 87/13
photo [7]  6/17 7/12
12/6 13/11 122/8
144/4 158/14
photograph [5]  33/10
161/10 161/25
190/11 190/12
photographs [2]
190/12 190/16
photos [1]  153/10
photoshopped [1]
6/21
phrase [2]  14/7
16/22
physical [2]  73/10
73/11
physically [1]  10/22
pick [1]  43/20
picked [1]  91/22
picture [11]  4/24
6/15 6/20 6/21 7/2
34/19 35/13 35/13
144/3 161/5 162/11
pictures [1]  161/2
piece [8]  10/8 17/19
154/17 173/3 173/4
190/4 191/11 191/12
piecemeal [1]
137/21
pieces [3]  137/21
137/24 167/22
Pinkleton [7]  120/12
148/24 150/6 160/1
160/2 165/20 165/21
pitch [2]  147/4
147/23
Pixie [5]  164/1 164/7
164/7 164/8 164/9
place [8]  56/23
58/20 59/1 60/10

110/16 161/19 187/1
189/17
places [3]  50/15
56/18 193/24
plagiarized [1]  27/14
plain [1]  110/8
plainly [3]  19/21
28/13 84/7
plaintiff [117]  1/6
1/13 3/11 3/16 3/19
4/2 4/3 4/6 4/9 4/14
5/15 11/2 11/4 11/18
12/1 12/8 12/13
12/17 12/21 12/24
13/8 13/16 13/25
14/2 14/13 15/15
20/8 20/24 21/12
21/16 22/20 22/21
23/7 24/10 27/3
27/13 41/6 42/1 51/5
51/11 53/16 54/16
57/2 58/4 61/4 61/6
78/20 79/16 79/18
79/23 79/24 88/17
92/5 92/7 92/9 93/11
94/3 94/4 94/7 95/7
95/17 95/18 95/18
95/23 96/19 96/21
98/24 100/6 100/16
100/22 101/6 102/4
104/12 106/5 106/15
107/25 109/6 110/18
111/7 111/8 112/14
114/1 115/14 116/21
118/8 118/16 119/3
119/17 121/8 121/21
124/1 124/6 125/6
125/10 125/18 126/7
126/15 126/18
126/22 127/21
127/24 128/11
128/13 129/12
131/11 133/10
136/21 136/22 138/2
176/25 180/7 182/14
184/21 187/24
190/18 194/21
197/14
plaintiff's [31]  14/4
41/13 41/15 42/2
44/20 60/12 68/2
69/18 77/18 78/14
93/21 94/11 97/11
98/2 98/3 98/4 98/5
98/16 100/8 100/25
102/3 103/5 107/16
110/1 119/6 125/25
127/25 130/9 130/15
179/12 188/12
plaintiffs [5]  13/18
47/5 98/19 102/10
130/18
plate [1]  197/23
plausible [2]  12/3
32/14
plausibly [1]  16/15
play [3]  40/8 61/9
135/5
plead [1]  69/18

pleadings [1]  58/23
please [9]  3/15 3/23
4/23 9/16 10/1 13/17
14/17 15/19 26/19
pleases [1]  4/16
pled [1]  57/2
plenty [1]  165/13
pluck [1]  104/14
plug [1]  160/14
plus [4]  5/9 98/9
132/11 132/13
Podcast [1]  166/16
Podcasts [1]  166/12
point [48]  19/6 23/9
32/17 34/14 38/12
39/1 40/20 42/18
43/6 50/14 50/25
54/9 57/5 57/6 61/16
63/12 72/21 76/5
84/6 92/1 92/8 92/20
97/13 98/9 103/25
105/22 105/23
106/11 111/5 133/15
135/21 142/7 142/8
143/16 145/9 154/22
160/15 165/5 168/19
176/5 178/4 185/8
189/19 190/2 190/19
191/8 193/13 196/15
pointed [2]  12/2
144/5
points [15]  42/3 49/6
50/9 64/11 64/18
66/14 67/10 92/7
110/20 110/21 168/7
168/19 169/22
177/13 179/3
police [42]  8/12 8/21
9/1 61/3 99/13 108/2
108/9 108/14 108/15
108/16 108/20
108/23 109/4 110/13
115/11 115/21 139/6
151/7 151/10 153/5
153/7 153/22 154/6
154/10 154/13
154/16 155/1 155/7
155/9 155/13 173/14
174/7 186/5 186/10
187/5 187/7 187/10
189/15 193/4 193/7
195/21 195/23
policies [4]  81/7
81/18 81/21 126/13
policy [54]  28/21
29/4 29/9 29/13
29/15 29/21 30/1
30/2 30/6 30/6 30/16
42/19 44/17 46/6
46/8 46/9 46/13
46/14 46/18 46/20
46/23 46/25 47/1
47/2 47/5 47/5 47/7
47/8 47/13 47/13
48/7 48/8 48/11
48/14 48/16 48/17
48/20 48/22 48/25
51/7 59/14 72/11
72/19 79/3 79/10

79/19 81/2 81/5 88/1
88/2 89/21 97/18
97/23 136/11
policy-making [2]
29/9 46/6
policymaker [1]  31/9
pool [1]  93/5
portions [2]  170/12
170/14
portray [6]  99/11
144/1 145/21 148/9
149/12 149/14
portrayal [2]  139/20
144/12
portrayed [4]  144/6
144/7 144/14 167/19
portraying [1]  150/20
portrays [1]  35/6
posed [2]  22/18
181/9
position [22]  18/1
28/6 28/7 35/25 36/1
36/1 36/4 37/20
43/13 48/3 49/3 49/9
50/10 51/1 51/2 52/2
52/18 52/19 56/15
85/7 150/3 176/15
positive [2]  122/15
182/5
possible [7]  31/23
41/4 63/10 116/11
158/18 158/20 190/4
possibly [1]  83/25
post [24]  6/8 17/12
17/20 20/20 21/4
23/10 33/11 59/21
60/8 60/23 97/2
106/3 111/7 113/20
131/5 147/23 165/16
167/5 167/10 176/7
180/18 191/7
191/21 191/22
post-briefing [1]
176/7
post-publication [13]
6/8 20/20 21/4 23/10
33/11 60/23 97/2
106/3 113/20 131/5
147/23 165/16
191/17
postdated [1]  67/20
posted [4]  75/4
75/17 101/21 127/10
posting [4]  71/17
75/8 128/1 128/2
postings [1]  127/23
posttrial [1]  136/16
power [3]  5/2 5/3
23/23
powerful [1]  146/5
practical [2]  21/1
24/20
practice [2]  103/21
121/22
practices [3]  120/19
169/10 169/17
precedent [4]  24/12
24/12 126/18 126/21
precedes [1]  120/21

**P**

precise [4] 45/6 101/12 104/22 122/1
precisely [4] 137/18 144/16 170/9 190/22
preconceived [15] 43/11 99/7 99/7 100/11 137/25 139/4 145/25 146/4 146/7 147/11 167/17 184/14 184/23 185/1 185/3
predicted [1] 180/15
preformed [1] 150/9
prejudices [1] 25/25
preliminary [1] 198/1
premise [1] 167/25
prepared [3] 65/1 68/10 70/13
prescribed [1] 57/23
present [5] 80/13 98/20 112/3 138/10 175/16
presentation [7] 28/19 41/13 70/7 78/14 95/8 161/8 170/25
presented [6] 75/13 88/16 103/16 107/21 125/15 180/15
president [10] 47/25 64/2 87/21 87/21 120/18 142/22 169/9 169/13 169/16 184/3
president's [2] 47/16 47/25
press [31] 5/2 5/6 5/12 16/21 16/23 17/8 17/10 17/16 18/3 21/18 23/12 23/13 28/11 34/22 47/16 47/19 47/23 47/25 48/4 74/7 91/10 92/25 93/12 97/2 117/6 134/20 134/25 143/2 152/1 167/4 192/11
pressed [1] 107/24
presses [1] 94/6
pressing [10] 114/16 118/17 177/17 189/11 189/12 189/12 189/13 189/13 189/18 189/18
prestigious [1] 183/8
presumably [1] 184/6
presupposes [1] 99/14
pretend [1] 183/25
pretending [3] 31/5 31/5 104/10
prevented [3] 9/11 54/13 135/25
previously [3] 59/7 84/8 185/7
primarily [3] 77/18 82/11 126/22

primary [6] 78/16 82/10 83/3 84/6 107/25 109/17
Prince [1] 1/15
principle [1] 127/7
print [1] 5/11
prior [12] 8/24 9/23 11/8 64/12 64/17 65/10 66/3 66/16 105/25 127/23 168/25 195/20
privacy [4] 45/22 54/13 54/17 135/25
private [16] 11/9 24/1 24/8 28/20 30/12 42/4 43/9 45/4 51/17 52/10 52/21 53/8 54/7 62/7 62/13 137/4
privileged [1] 15/25
probably [5] 36/6 48/9 97/19 132/3 148/15
problem [2] 58/18 146/25
problems [3] 29/6 29/14 136/12
procedure [1] 49/19
proceed [12] 3/11 3/12 3/21 69/6 105/24 108/24 109/3 109/7 109/13 114/16 185/12 195/9
proceeded [1] 132/18
proceeding [3] 68/1 68/14 178/5
proceedings [4] 1/24 103/23 141/21 198/17
proceeds [2] 103/19 103/25
process [25] 7/5 16/10 20/3 29/24 30/5 30/10 30/17 30/18 34/13 45/4 49/19 49/23 50/23 52/10 52/17 82/12 82/13 82/15 92/3 131/19 152/7 158/24 159/1 160/18 180/13
produced [3] 1/25 19/1 92/25
profession [5] 8/4 11/5 11/7 25/7 26/1
profusely [2] 78/2 194/20
prohibited [12] 43/24 43/24 45/22 45/23 52/11 53/9 54/23 55/9 55/16 63/14 63/20 63/23
prominent [1] 92/17
promote [1] 16/22
promoted [1] 5/12
promoting [1] 16/24
promotional [1] 12/22
prompt [1] 32/20

78/3
prompted [2] 7/4 8/7
promptly [2] 101/21 126/13
prong [3] 11/15 11/21 53/24
proof [1] 23/4
proper [1] 91/17
properly [2] 35/7 94/17
property [1] 32/4
proposed [5] 3/20 110/23 111/25 112/7 180/21
proposition [4] 124/11 124/16 174/23 175/22
prosecute [1] 30/24
prospective [1] 69/17
prostitution [1] 124/17
protect [3] 82/20 182/24 183/25
protected [2] 105/12 172/23
protecting [7] 145/2 145/2 145/10 145/11 145/14 182/20 182/20
protective [2] 82/20 161/20
protest [1] 144/8
protesters [2] 6/25 35/16
protests [1] 10/20
protocol [1] 58/19
provably [2] 172/16 172/18
prove [5] 21/13 22/17 107/19 146/5 173/20
proven [2] 105/13 173/21
provide [15] 26/20 28/8 45/6 95/7 118/8 142/25 159/3 159/4 159/6 159/9 159/11 159/14 166/4 177/9 189/9
provided [12] 8/2 58/5 71/10 81/12 95/10 101/2 102/4 114/15 152/6 174/7 177/3 193/15
provides [2] 102/10 103/21
provost [2] 62/11 62/12
Proxmire [1] 57/10
pseudonym [2] 166/6 166/20
Psi [13] 5/21 8/9 73/6 73/7 76/20 115/1 115/13 159/16 163/24 166/25 187/2 191/7 191/10
psychologist [3] 27/5 27/8 30/11

PTSD [2] 125/2 188/18
pubic [1] 57/25
public [161] 24/1 24/7 28/20 30/13 34/17 41/22 41/22 42/5 42/5 43/8 43/21 44/8 44/9 44/10 44/10 44/11 44/13 44/16 44/21 46/5 46/24 47/17 48/1 48/2 48/18 49/9 49/10 50/11 51/7 51/12 51/17 51/17 52/9 52/20 53/7 53/15 53/17 54/4 54/4 55/9 55/12 55/22 57/12 57/17 57/21 58/7 58/8 61/2 62/7 62/13 63/17 63/25 64/3 66/7 67/21 68/18 68/19 68/23 69/22 69/23 72/11 72/19 77/22 77/22 78/7 78/8 78/11 78/12 78/20 78/21 79/9 79/11 79/12 79/22 80/2 84/10 84/15 84/16 84/18 84/20 84/23 85/3 85/12 85/12 85/13 85/15 85/18 85/19 85/20 85/21 85/21 85/22 85/24 85/25 86/4 86/6 86/7 86/11 86/12 86/19 86/19 87/7 87/8 87/15 87/17 87/18 87/20 87/22 87/25 88/3 88/10 89/7 91/9 92/5 92/6 92/10 92/11 92/12 92/13 92/14 92/16 92/3 93/5 93/6 93/7 93/13 93/17 93/18 95/2 95/9 95/9 95/15 95/15 126/13 126/14 130/20 130/20 130/25 130/25 131/4 131/4 135/2 135/4 135/6 135/13 135/14 135/16 135/16 135/19 135/22 135/23 136/4 136/4 142/21 142/23 177/18 177/18 195/13 195/15 195/23 197/5
publication [65] 6/8 8/25 9/24 10/9 11/10 20/20 21/4 23/10 33/11 39/20 39/21 39/25 40/23 41/10 42/6 42/20 42/23 43/1 43/17 50/2 57/24 60/23 64/12 64/17 65/19 66/3 66/5 66/16 67/20 70/19 70/20 70/22

72/10 72/16 75/1 80/20 83/1 91/19 91/20 94/1 97/2 106/3 113/20 127/2 127/5 127/18 130/7 131/5 147/23 147/23 152/18 154/25 155/6 157/16 158/1 164/21 165/11 165/16 170/9 171/11 188/25 189/5 191/17 191/19 195/20
publication's [1] 110/17
publications [7] 39/13 39/15 41/9 71/2 99/11 126/17 129/6
publicity [2] 5/13 34/20
publicly [8] 19/13 43/25 47/1 53/10 54/14 117/18 141/8 141/9
publish [6] 7/15 72/17 110/16 110/17 111/4 170/1
published [52] 5/10 5/11 7/13 7/22 8/1 10/14 17/21 19/25 40/15 41/7 43/22 44/1 44/24 50/4 51/3 52/7 59/23 65/15 65/21 65/25 66/11 67/2 72/24 75/15 76/13 76/23 77/20 78/6 79/1 93/22 95/4 96/2 97/1 101/19 102/6 110/9 113/20 115/9 118/12 118/12 119/19 125/19 128/23 129/8 130/13 154/12 157/4 157/24 159/18 163/16 167/14 196/4
publisher [5] 48/8 48/16 72/16 116/11 169/24
publisher's [1] 129/17 130/2 130/3
publishers [1] 126/13
publishing [3] 120/19 128/14 186/8
pull [1] 129/19
pulled [2] 89/14 163/6
pulling [3] 160/4 160/5 160/14
punish [1] 9/8
punished [1] 74/21
punishing [2] 9/9 115/13
punitive [4] 137/8 174/23 175/2 175/12
pure [5] 172/14 172/15 172/20 172/24 192/15
purported [1] 5/19

**P**

purpose [38] 25/2
42/5 44/9 49/10
53/15 53/17 55/12
68/19 68/22 69/23
69/25 77/22 78/12
78/21 84/16 84/17
84/23 85/3 85/13
85/19 85/20 85/25
86/4 86/7 86/12
86/12 86/18 88/10
89/7 92/9 93/3 93/13
93/18 130/25 131/4
135/6 175/12 177/18
purposes [20] 13/13
21/6 22/2 23/2 35/2
35/21 43/4 43/6
46/19 69/3 71/23
72/5 82/19 84/13
85/24 135/19 137/7
174/23 175/11
183/18
pursuant [1] 29/13
pursue [8] 36/23
36/24 52/3 103/14
152/5 152/13 153/5
190/4
pursued [1] 52/16
pursuing [5] 34/3
34/3 141/24 147/18
152/13
push [1] 23/25
pushed [1] 160/11
put [37] 12/9 18/2
18/6 21/22 22/1
30/24 31/16 31/20
32/19 32/25 50/7
55/7 63/16 74/6 95/3
95/16 95/18 96/9
97/3 108/25 111/2
111/7 112/6 114/4
117/5 122/15 125/3
126/2 133/17 136/15
143/24 145/9 161/8
161/12 161/13
192/19 195/16
puts [2] 114/5
182/15
putting [3] 70/3
80/23 169/17

**Q**

queries [3] 96/7
96/11 100/12
query [3] 119/9
182/4 182/8
question [75] 7/5 7/9
21/10 22/1 22/5
22/25 26/9 31/18
32/17 33/8 33/16
37/10 39/20 40/19
40/20 47/4 47/18
48/2 53/6 56/11 58/3
58/21 62/22 62/23
69/8 70/15 72/23
72/25 73/17 74/24
76/9 81/24 85/10
88/12 94/12 102/23
111/1 122/5 127/15

132/2 135/24 136/6
137/2 137/8 137/11
137/19 138/11
138/14 138/21
138/22 144/10
144/13 145/20
150/22 151/4 151/6
151/13 151/23 152/4
152/9 152/20 155/19
159/13 166/23 167/2
167/15 171/2 171/5
172/8 174/14 174/21
179/1 180/25 181/8
193/21
questioned [1] 18/4
questioning [2] 5/7
150/7
questionnaire [1]
22/2
questions [26] 9/17
9/22 9/25 17/13
23/17 31/21 38/5
53/6 81/10 81/13
122/2 131/25 132/1
138/19 142/24
142/25 150/8 163/15
166/8 166/13 167/11
172/11 173/15
174/13 181/4 195/10
quibble [1] 126/7
quickly [4] 136/18
197/24 198/5 198/8
quiet [1] 144/24
quite [5] 4/21 86/24
144/7 146/5 161/20
quotations [1] 143/6
quote [69] 8/19 8/22
14/25 16/2 16/5 20/2
44/12 54/15 75/17
75/22 76/1 76/17
79/7 79/8 80/13
80/25 99/10 101/10
103/16 103/17
104/16 108/24
111/14 111/16 114/9
118/4 118/4 118/19
119/18 119/12
119/25 120/7 120/9
120/13 120/15
120/17 120/20 121/2
121/5 121/6 121/11
121/13 125/13 126/3
126/4 126/5 126/5
126/5 127/11 127/13
127/24 129/17
142/13 142/14
142/15 142/18 143/2
143/11 143/12
157/17 171/13
172/24 180/23
180/25 182/23 185/8
186/19 186/22
188/12
quote/unquote [1]
80/13
quoted [10] 16/3
89/24 91/2 93/12
104/8 119/7 168/22
183/24 188/24 191/1

quotes [9] 5/22 7/23
37/9 103/22 104/12
120/8 123/3 143/8
143/15
quoting [3] 15/1 15/4
79/20

**R**

Rachel [2] 156/11
163/3
radical [1] 109/23
radically [1] 186/5
radio [3] 83/8 83/14
97/7
raft [1] 196/23
raised [26] 7/16
89/17 92/10 92/22
96/7 100/12 103/18
111/1 125/23 130/19
139/20 140/3 140/4
140/20 141/14
143/17 143/18
143/21 145/18
145/20 145/20
176/21 177/14 179/4
181/21 182/7
raises [2] 31/18
130/18
raising [3] 121/14
122/2 122/13
Rakes [1] 2/6
random [1] 100/9
rape [73] 4/24 5/5
5/9 5/16 5/20 5/23
7/18 7/23 8/23 10/16
10/21 14/19 16/12
16/22 37/4 72/24
73/8 75/19 76/17
76/20 90/2 108/9
108/12 108/18
108/20 112/22
113/15 114/10
119/21 120/1 120/17
120/23 120/25 125/2
125/7 125/12 128/17
128/24 141/3 141/12
141/20 142/13
142/14 142/15
142/18 143/10
144/22 146/11
146/12 146/15
146/17 146/17
147/21 147/25 154/4
154/12 156/7 156/25
157/9 157/11 159/16
164/17 165/10 168/1
168/3 169/17 180/23
183/12 186/17
186/25 187/19
187/25 191/9
raped [6] 73/10
156/12 156/16
156/18 156/23
164/25
rapes [5] 35/24
119/23 144/24
144/24 163/24
rapist [1] 166/14
rapists [3] 73/14

153/19 153/20
rare [2] 137/16
139/12
rather [9] 13/9 30/17
100/25 104/18
120/25 136/25
159/13 178/7 193/9
rational [5] 107/8
116/11 116/16
116/25 117/1
rationalization [2]
111/7 180/18
Re [2] 72/7 127/18
reach [4] 18/20
18/21 71/2 75/23
reached [4] 12/10
74/1 74/3 116/13
reaction [4] 27/19
35/24 113/10 162/14
read [38] 11/25 13/9
18/13 18/21 19/21
21/11 26/22 27/19
29/2 31/1 31/2 31/25
32/6 32/11 32/18
32/20 32/21 33/2
34/10 34/11 35/13
38/2 53/11 74/10
75/25 106/17 117/15
118/14 135/9 140/18
168/21 169/8 171/9
171/17 171/25 172/5
184/15 193/19
reader [17] 12/21
13/7 16/13 16/15
16/16 26/5 26/8
27/19 30/21 31/16
32/8 35/1 35/22
37/10 144/19 157/24
171/4
reader's [3] 73/2
74/3 127/15
readers [11] 8/7
13/1 32/15 74/9
101/22 127/20 128/3
128/5 141/14 142/2
166/5
readily [1] 195/25
reading [5] 30/20
32/14 32/22 89/8
89/11
readings [1] 32/15
ready [2] 15/12
105/4
reaffirm [2] 170/8
170/12
reaffirmation [1]
127/7
reaffirmed [3] 128/1
129/13 170/20
reaffirming [1] 128/4
real [6] 6/21 55/21
162/17 167/6 171/9
171/16
realistic [2] 54/6
54/16
reality [1] 110/1
realize [1] 77/15
realized [2] 182/11
189/2

realleged [1] 127/12
really [38] 19/12
30/23 50/8 52/4
55/22 56/10 61/8
62/2 62/16 62/22
65/4 66/15 68/7
71/14 75/10 81/16
87/6 93/15 97/18
98/9 122/22 122/25
124/17 130/24
148/13 149/2 152/20
163/3 163/10 164/10
166/1 166/25 171/16
176/2 176/6 177/22
177/23 178/16
reason [19] 24/20
38/7 38/7 39/16
39/23 60/14 74/6
98/16 119/20 123/19
128/1 130/15 131/9
142/9 143/1 155/19
167/25 168/2 181/8
reasonable [22]
19/24 31/15 32/12
33/9 34/25 35/22
35/22 103/7 107/9
119/14 119/17
128/22 138/17
144/19 144/19
149/10 153/6 155/11
167/16 179/6 180/8
180/9
reasonably [3]
117/15 118/14
172/17
reasoned [1] 112/11
reasons [5] 42/19
117/12 123/4 125/16
191/13
reassurance [1]
104/1
reassuring [1] 36/11
rebut [6] 53/21 55/1
55/6 67/9 83/22
168/17
rebuts [1] 115/24
rebuttal [2] 95/7
175/25
rebutted [1] 95/17
rebutting [1] 54/14
recall [2] 163/19
164/22
recast [1] 78/23
receive [2] 74/8
178/3
received [6] 65/21
74/8 116/3 159/8
161/5 191/24
receiving [2] 64/6
101/22
recent [3] 57/15 86/1
91/13
recently [1] 158/16
recessed [1] 198/13
recipients [1] 26/14
reckless [4] 125/20
137/17 138/18
167/19
recklessly [2] 44/4

# R

recklessly... [1]
137/12
recognize [4] 36/6
40/17 131/8 173/24
recognized [2] 58/18
164/20
recognizes [1] 135/8
recognizing [2]
77/13 78/15
recommendations [1]
79/18
record [74] 3/15
41/19 54/21 65/4
66/2 66/13 66/18
67/6 68/15 68/17
78/10 78/13 80/2
80/3 80/17 84/9
94/23 95/13 95/14
95/22 96/9 96/18
97/3 97/5 100/1
105/20 108/21 111/2
118/11 119/18 120/2
120/4 121/25 123/23
125/15 130/12
131/17 131/22 132/8
142/19 143/5 143/11
143/22 145/12 161/9
169/3 169/22 170/4
176/21 177/3 177/3
177/5 177/15 180/17
180/17 180/19 181/1
181/2 181/18 185/22
187/20 187/23
188/14 189/10
190/21 191/14
191/16 191/20
193/12 194/11
194/12 194/13
194/16 198/17
recorded [2] 1/24
149/9
recorder [7] 149/3
149/5 149/8 149/16
193/22 193/25 194/1
records [5] 45/21
101/4 159/6 189/14
189/14
recount [1] 5/19
recounting [1] 90/15
recover [1] 30/8
recovering [1]
187/19
red [13] 7/14 7/16
7/21 9/15 9/23 44/3
87/7 96/20 139/20
140/18 159/10
159/13 188/8
reducing [1] 106/12
refer [8] 11/19 12/24
15/22 93/9 118/17
123/9 131/6 163/25
reference [18] 6/13
13/18 14/14 15/8
15/17 15/23 16/8
16/9 16/13 16/14
19/8 19/9 37/9 118/9
126/23 153/4 153/18
188/20

referenced [1] 50/16
references [7] 11/23
12/3 13/11 14/18
15/20 21/24 50/14
referral [1] 6/14
referred [11] 5/16
18/9 83/18 83/20
101/9 123/6 127/12
130/23 168/9 168/10
192/3
referring [14] 11/18
11/25 12/21 13/24
14/1 15/6 18/15 21/6
32/5 104/17 118/15
168/24 168/25 180/8
refers [4] 21/15 93/4
130/22 169/1
reflect [1] 30/22
reflected [1] 185/7
reflective [1] 29/13
refusal [2] 129/18
130/2
refused [9] 9/2 164/1
165/24 166/4 166/12
167/9 167/15 168/2
168/6
refuses [1] 167/1
refusing [1] 117/21
refuted [1] 9/3
regard [29] 41/8
79/6 87/25 88/3 88/7
88/11 89/17 92/4
93/6 94/20 99/5
103/12 106/17
107/25 124/2 125/23
127/20 130/16
130/20 131/14
131/14 179/23
180/23 181/19 182/6
184/14 187/20
191/17 192/14
regarding [2] 8/16
57/23
regardless [4] 63/3
143/20 148/1 160/21
regards [1] 87/10
Regents [1] 90/15
regional [1] 66/21
regoing [1] 66/17
regrettable [1]
144/25
regulated [1] 57/21
regulation [1] 57/20
reinforced [1] 35/9
reiterated [2] 59/19
128/10
rejected [15] 56/21
57/11 58/1 58/11
129/15 141/15 142/6
142/9 143/19 144/14
145/7 145/23 170/3
181/20 181/21
rejects [2] 18/15
166/22
relate [2] 36/2 97/16
related [7] 13/10
24/5 24/7 39/5 61/13
73/24 83/19
relates [4] 22/19

22/24 23/20 170/6
relationship [2]
30/13 31/10
relayed [1] 143/15
relaying [1] 143/6
release [5] 5/13
16/21 16/24 21/18
97/3
relevance [2] 31/24
42/13
relevant [17] 39/23
43/6 51/24 52/5
67/20 75/11 92/19
122/22 135/19 136/3
137/9 142/12 165/9
171/18 172/6 176/12
189/6
reliability [2] 155/19
158/6
reliable [6] 99/17
139/7 139/9 143/6
155/16 189/2
reliance [4] 99/20
138/6 138/7 156/2
relied [2] 98/23
143/3
relies [2] 119/3
155/20
relieved [1] 150/2
reluctant [1] 136/24
rely [5] 124/14
124/19 131/5 156/9
187/14
remain [3] 36/13
82/25 118/22
remained [2] 83/3
105/10
remarkable [1] 133/3
remarks [1] 171/1
remedy [4] 53/25
54/1 78/3 135/9
remember [8] 17/3
52/3 58/23 106/22
167/24 176/23 187/8
187/23
remembered [1]
187/22
remind [1] 5/2
reminded [2] 15/12
108/23
reminds [1] 105/4
remove [1] 141/11
removed [2] 6/4
160/20
removing [1] 159/22
Renda [12] 114/22
115/12 123/7 123/12
156/11 168/10
168/11 168/12
168/12 187/24 192/3
192/4
repeat [3] 115/5
127/15 153/20
repeated [2] 112/20
112/25
repeatedly [3] 9/5
118/1 172/22
repeats [1] 100/14
reply [6] 64/18 99/18

114/4 119/8 176/7
180/4
report [27] 8/25 9/2
14/24 59/3 64/19
66/6 67/7 67/12
67/16 83/20 103/24
105/1 108/15 108/16
109/9 109/24 110/8
111/22 116/4 117/20
129/23 153/3 168/1
168/3 168/6 187/7
187/11
reported [20] 8/15
19/20 20/2 35/6
90/25 105/17 108/13
108/15 108/17
108/19 109/11
115/21 116/2 120/20
125/12 141/2 141/19
164/16 187/5 188/1
reporter [6] 1/22
90/21 99/16 123/2
125/1 189/5
reporter's [1] 134/16
reporters [1] 184/18
reporting [35] 5/8
5/23 6/1 7/22 34/12
43/15 61/2 73/23
101/3 106/13 106/19
111/20 111/23
115/18 117/5 117/6
118/21 129/23
139/18 141/24 142/4
146/21 149/7 149/21
150/5 154/18 157/5
159/19 166/10
169/19 170/5 170/16
170/17 185/17
192/23
reports [18] 6/2 36/2
37/3 60/18 80/8
105/25 106/1 114/15
114/17 114/19
114/21 114/25 118/1
118/2 118/3 119/24
121/1 189/16
represent [2] 3/16
41/25
represented [1] 48/4
representing [1]
117/16
republication [32]
40/13 41/22 42/8
42/11 42/17 42/21
70/16 71/6 71/15
71/22 72/14 74/13
74/14 74/18 76/4
76/10 76/13 76/22
76/24 125/23 125/25
126/11 126/20 127/3
127/6 128/2 128/13
129/16 130/8 130/10
169/21 170/8
republish [2] 72/3
170/12
republished [5] 10/7
40/15 75/9 75/19
128/9
republishes [1]

70/24
republishing [1]
129/14
repudiated [1]
185/24
repudiation [1] 193/9
reputation [9] 10/19
25/18 34/20 54/4
135/12 145/3 145/11
145/15 182/21
require [8] 95/3
159/2 159/3 159/5
159/9 159/11 159/14
189/8
required [2] 12/12
49/23
research [3] 164/3
164/6 165/8
reserves [1] 197/13
reshape [1] 61/5
resided [1] 84/3
resign [2] 27/23
37/19
resisted [1] 147/7
resolution [6] 61/12
61/13 61/25 82/12
82/13 83/4
resolve [1] 99/3
resolved [7] 26/11
96/8 100/13 111/3
111/25 119/9 121/12
resolves [1] 99/9
resources [3] 28/9
29/25 36/18
respect [32] 28/18
42/2 45/18 47/6
47/13 50/8 52/9
53/14 65/13 67/1
67/5 67/11 69/13
70/4 71/15 72/22
73/20 75/16 76/15
135/4 140/3 140/4
145/6 146/23 153/23
154/21 161/19
164/19 169/10
169/21 170/17
170/21
respected [1] 14/24
respond [14] 39/2
39/7 63/3 64/11 68/8
68/11 98/1 134/14
137/10 176/10
177/12 179/3 183/6
183/6
responded [1]
166/19
responding [3] 91/16
135/2 183/21
responds [4] 89/13
160/6 160/12 165/24
response [34] 6/2
8/19 28/24 30/22
32/7 32/8 32/20
32/22 35/6 40/7
41/14 41/15 53/1
59/14 59/18 61/22
64/7 70/6 85/5 88/14
89/10 90/25 95/10
95/20 97/21 122/5

**R**

response... [8]
122/10 127/15 132/2
142/25 143/24 182/4
184/4 197/13
responses [2] 31/22
177/6
responsibilities [5]
5/3 25/8 29/10 80/14
80/18
responsibility [6]
36/25 44/14 45/15
45/16 79/16 82/22
responsible [6]
43/18 45/19 48/25
82/11 124/24 139/16
responsibly [1]
101/21
responsive [1]
173/17
rest [2] 23/24 106/23
restart [1] 43/2
restarted [3] 65/18
65/23 66/11
restarting [1] 72/4
restarts [3] 42/22
43/4 71/22
restatement [1]
70/25
restating [1] 14/23
restricted [2] 87/16
91/23
rests [1] 122/25
result [11] 24/15
29/3 58/1 76/3 104/3
118/21 150/4 154/1
154/3 159/8 162/19
results [2] 117/4
185/16
retaliated [2] 154/2
154/8
retaliating [1] 153/14
retract [5] 74/22
129/18 129/24
129/25 130/2
retracted [2] 41/1
74/19
retracting [3] 10/6
10/16 76/8
retraction [9] 10/2
10/5 10/18 11/13
40/3 76/6 126/8
128/14 130/4
returning [1] 158/17
Reuber [11] 94/19
94/20 98/21 99/5
99/9 99/10 133/17
134/6 134/8 184/15
195/2
reurged [2] 127/14
127/16
reveal [2] 111/2
184/25
revealed [3] 115/1
157/2 192/24
reveals [1] 89/11
revelation [3] 105/6
186/7 189/1
reverse [1] 133/21

reversed [4] 94/17
94/22 132/15 194/24
review [14] 10/10
80/24 81/1 81/7
90/10 90/13 90/19
90/20 91/3 91/5
129/21 129/22
136/25 169/12
reviewed [1] 140/17
reviews [2] 80/17
81/6
revision [1] 81/1
rewrite [1] 104/16
rewrites [1] 104/12
Rhode [1] 165/9
Rhodes [2] 102/8
116/14
Richmond [6] 44/15
50/25 51/20 54/9
92/7 92/8
riddled [1] 67/7
Ridge [6] 57/8 57/15
58/3 195/15 195/16
195/18
ridiculous [1] 124/16
rig [1] 130/11
rigged [1] 150/8
right [25] 24/20
32/10 32/23 33/18
48/15 53/3 56/7
58/15 63/23 69/12
76/2 85/14 86/12
104/2 116/19 132/3
132/9 135/6 145/5
148/14 148/20
158/16 161/23 175/7
197/13
rights [13] 64/19
65/9 65/13 65/16
65/18 65/22 65/22
66/4 67/1 83/6 83/15
91/1 91/6
rigid [1] 117/4
rise [2] 123/25 185/4
road [2] 1/22 102/11
Roanoke [2] 1/23
2/7
role [22] 27/7 29/9
29/9 29/24 30/14
44/25 46/8 49/3
49/20 50/3 50/4 50/5
50/8 50/13 51/14
51/15 58/9 78/16
78/23 80/19 83/8
136/23
roles [1] 84/6
ROLLING [183] 1/8
3/6 4/19 5/5 5/10
5/11 6/18 7/4 7/10
8/15 8/24 10/6 10/11
16/21 17/11 17/16
17/18 18/1 18/25
19/25 23/12 30/14
34/9 34/17 35/12
42/6 42/7 43/21
43/22 44/1 44/3 44/5
44/8 44/19 45/24
49/6 50/9 51/1 52/13
53/17 54/18 54/24

54/25 55/3 55/5 55/8
55/13 56/12 56/22
56/24 58/12 59/16
59/19 59/22 60/4
60/5 60/15 60/16
61/5 61/16 61/18
61/19 61/21 62/1
63/14 63/21 64/18
65/11 65/14 65/19
65/20 65/25 66/10
66/11 66/16 67/2
68/8 69/3 69/19
73/14 73/15 73/19
73/21 74/5 74/15
74/25 75/2 75/15
75/22 76/5 76/11
78/2 78/3 78/17
88/18 90/9 90/21
96/7 96/13 96/15
96/21 97/1 97/3 97/6
101/21 107/22 111/3
112/12 113/21
115/16 120/5 121/10
121/12 121/17 123/7
123/11 123/18
126/11 128/3 128/12
129/4 129/8 129/19
130/7 130/13 137/6
137/10 137/11
137/22 138/13
138/16 139/5 139/7
139/8 139/13 142/2
142/19 143/1 143/19
143/24 144/3 144/10
144/13 144/20 145/6
147/4 151/6 151/8
151/8 151/10 151/25
152/10 152/15 153/1
153/6 153/25 154/9
155/12 155/15 156/7
156/8 156/9 156/14
156/22 157/14
158/10 162/25
165/15 165/15 166/4
166/9 167/3 167/7
168/10 169/2 169/14
169/23 169/24 170/9
171/17 173/18
173/25 185/22
room [3] 1/22 30/5
184/7
roommate [3]
156/13 159/12 188/6
rosa [1] 195/24
Rosin [2] 166/15
166/21
roster [1] 153/11
rounds [1] 139/19
routinely [1] 98/18
RPR [1] 1/22
RS1077 [1] 102/2
RS1078 [3] 105/2
113/1 113/1
RUBIN [3] 1/9 6/6
163/5
rubric [2] 102/22
110/14
rude [1] 27/4
rug [1] 184/5

rule [9] 51/21 70/20
81/3 81/4 95/11
127/1 161/23 161/23
198/1
ruled [1] 90/7
rules [3] 95/3 95/11
137/5
ruling [3] 68/2 93/17
93/18
rulings [2] 175/15
178/8
run [2] 7/17 72/19
Russel [1] 121/1
Russel's [1] 120/20
Russell [2] 183/9
183/23
Ryan [4] 94/18
133/16 189/25 195/2
résumé [1] 80/11

**S**

S.W [1] 1/22
SABRINA [8] 1/9 6/6
149/23 157/22 160/1
163/5 166/12 166/22
Sabrina's [1] 150/9
Sacha [1] 158/13
safe [2] 121/4
198/11
safer [1] 147/9
safety [3] 112/16
173/4 173/9
said [73] 5/1 9/6
14/8 16/25 30/14
31/18 44/16 45/2
51/4 53/25 54/15
55/12 57/13 57/16
59/16 63/8 63/11
69/19 70/10 76/8
86/19 86/21 88/18
88/19 103/11 107/4
110/15 115/21 120/3
120/13 129/17 135/3
140/19 142/4 143/3
145/5 146/1 147/5
148/5 148/8 148/10
150/20 156/11
156/22 157/5 157/24
158/8 158/14 159/15
161/14 162/14 163/3
163/6 163/16 163/20
164/21 164/24
165/22 169/16
171/13 172/22 173/5
173/19 179/11 181/6
182/9 183/8 185/6
188/21 191/23
191/25 192/15
197/19
Sam [1] 77/11
same [39] 8/2 13/1
13/4 13/5 13/6 13/6
19/5 20/20 21/11
22/25 28/1 34/18
36/4 51/18 71/4 72/8
73/3 79/13 87/20
88/25 89/18 107/3
114/12 114/13
114/13 116/13

127/22 146/24 155/3
155/9 174/25 175/3
175/4 175/5 175/5
175/12 176/2 188/16
192/25
sample [2] 31/21
31/24
SAMUEL [1] 1/17
sanctify [1] 183/7
sanction [2] 82/16
82/17 83/5
Sara [1] 149/22
satisfied [5] 11/17
11/24 41/8 112/8
167/6
satisfy [3] 25/14
55/13 130/4
saw [12] 7/7 40/23
40/24 75/25 90/23
144/11 149/7 171/17
190/20 190/25 191/4
191/6
say [55] 10/15 11/22
19/7 20/10 29/11
29/23 31/3 31/20
33/16 33/25 34/12
41/5 48/5 52/13
52/15 58/23 62/18
63/9 67/19 69/2
74/18 77/8 92/15
101/18 107/11
118/18 132/22 135/6
136/12 140/16 141/4
142/15 143/13 144/9
145/1 145/4 145/10
149/12 158/15
165/24 166/23
166/24 167/13
169/13 174/12
174/22 175/23
175/25 177/24
178/14 182/14
182/19 184/11
190/25 196/1
saying [19] 14/22
24/11 27/21 27/21
29/22 58/5 64/19
75/8 80/23 81/15
91/2 103/22 104/8
109/25 111/21
148/20 182/6 182/16
183/25
says [33] 9/21 10/2
10/17 13/19 15/25
22/19 26/12 28/14
29/22 71/20 72/8
79/9 80/4 91/4 106/3
119/25 130/21
142/17 143/5 144/21
160/3 160/10 162/6
164/6 165/1 166/23
168/21 172/6 182/18
182/24 183/10
183/24 184/10
scandal [4] 124/17
127/19 145/3 182/21
scapegoat [1]
150/14
scars [14] 9/18 9/22

**S**

scars... [12] 162/18
162/20 162/22 163/2
163/6 163/8 163/17
163/18 190/24 191/1
191/2 191/4
scathing [2] 67/16
171/23
scenario [2] 148/15
156/5
scene [1] 6/22
SCHARY [2] 2/2
77/12
school [27] 8/23
51/7 51/12 51/12
75/19 76/17 91/5
92/3 92/12 92/14
92/16 106/22 116/3
116/3 119/21 121/4
125/13 128/18
128/24 142/13
142/14 142/15
142/18 146/13
180/23 180/24
186/13
school's [1] 145/14
school.' [1] 120/1
schools [7] 16/4
64/24 103/20 104/9
104/19 183/5 183/25
Scientology [2]
134/5 195/5
scope [10] 16/18
47/21 57/1 59/23
60/7 60/9 60/11
62/16 62/17 62/19
scrambling [1] 147/9
screen [3] 6/18 7/7
15/21
screenplay [1] 27/14
scrutiny [1] 66/22
se [23] 4/8 8/5 11/4
24/6 24/13 24/18
24/23 25/1 25/8
25/16 25/22 27/10
28/15 31/23 37/11
37/15 38/3 38/8 53/2
53/12 89/22 127/3
172/11
seal [3] 161/9
161/12 161/14
search [1] 99/15
Seattle [2] 184/24
184/25
Seccuro [2] 90/4
182/23
second [23] 11/10
15/8 16/5 39/19
39/25 40/23 41/13
42/7 47/12 50/18
56/4 56/5 56/23
61/13 67/12 67/12
67/16 79/24 105/3
140/25 145/22
184/10 184/16
Secondly [1] 15/8
secretary [5] 47/16
47/19 47/23 47/25
48/4

sections [1] 127/22
see [23] 10/10 15/10
53/3 61/20 112/3
112/4 121/3 124/8
134/11 134/11
134/15 138/20
149/25 152/22 161/5
162/9 162/10 163/8
178/7 190/13 191/2
196/9 198/10
seeing [3] 104/9
104/18 168/23
seek [5] 75/23 114/5
181/12 181/17
186/20
seeking [3] 137/8
152/1 175/2
seeks [2] 113/17
192/2
seem [2] 17/14
107/7
seemed [4] 3/24
115/19 154/22 158/2
seems [11] 3/10
31/15 56/1 58/16
68/23 68/25 84/13
84/16 148/12 158/23
178/22
seen [6] 9/22 70/12
130/10 149/7 163/10
163/18
selected [2] 19/23
19/24
self [2] 54/2 135/10
self-help [2] 54/2
135/10
semantics [1] 26/7
send [3] 8/22 75/18
120/1
sending [1] 154/19
sense [6] 20/4 36/14
127/6 130/6 134/16
166/17
sensitive [4] 36/1
103/25 161/4 176/3
sensitivity [1] 37/22
sent [7] 31/8 94/21
101/11 158/13
158/21 163/14
171/22
sentence [7] 91/12
106/21 106/24
106/25 111/13
121/19 141/17
sentences [1]
106/22
separate [16] 10/9
39/18 39/21 61/8
67/25 68/13 71/2
71/2 75/5 102/12
109/2 112/25 117/20
122/8 161/21 161/21
separately [1]
131/16
September [10] 9/21
80/12 83/7 109/8
114/24 116/1 148/23
150/18 162/24
163/20

September 12th [1]
148/23
September 19th [1]
150/18
September 2006 [1]
80/12
September 2014 [3]
109/8 114/24 116/1
September 21 [1]
83/7
September 28 [1]
162/24
seriatim [1] 4/18
series [5] 12/19
12/20 12/22 71/8
82/21
serious [9] 93/23
94/9 96/5 102/6
119/19 125/2 179/20
188/19 194/15
seriously [1] 91/5
services [1] 110/6
set [14] 24/24 43/12
44/2 46/5 50/6 79/5
99/11 114/3 117/12
122/16 146/3 146/8
147/2 181/15
setting [3] 31/13
32/4 83/12
seven [4] 13/21
59/10 156/19 187/23
several [6] 87/13
104/15 149/19
156/15 156/20
156/23
severe [1] 162/18
severely [1] 118/20
sex [7] 73/8 156/15
156/20 157/8 187/22
187/22 188/6
sexual [129] 6/23
9/3 10/25 16/6 17/2
17/22 28/9 28/24
30/3 33/2 35/6 35/15
35/17 36/2 37/3
43/19 44/25 45/5
45/8 45/21 45/23
46/7 46/22 49/7
49/12 49/14 49/17
49/18 49/21 49/22
50/1 50/10 50/16
50/17 50/18 50/20
50/22 50/23 52/2
52/4 52/15 52/18
53/1 55/25 56/14
58/18 59/14 59/24
60/18 61/22 61/22
62/20 66/22 78/17
78/18 78/19 78/25
80/6 80/8 80/12
80/15 81/1 81/7
81/18 82/10 82/14
82/16 82/25 83/9
83/19 83/24 84/2
84/6 89/13 89/16
89/19 90/6 90/18
91/12 91/16 92/19
93/8 97/14 105/7
106/1 108/18 110/5

110/8 110/9 117/18
117/21 121/3 125/6
146/18 146/24
146/25 147/6 150/4
151/15 151/17
151/20 153/3 153/8
153/23 154/8 154/10
154/21 155/8 155/14
157/6 164/15 168/13
169/10 178/23
178/24 178/25 181/7
182/25 183/10
183/14 183/17
183/18 183/22 184/4
186/9 187/5 188/1
188/2 192/5
sexually [2] 109/25
159/7
shape [1] 158/16
share [2] 78/24
111/18
shared [1] 117/2
sharing [12] 14/22
33/24 34/8 107/5
107/5 107/10 111/11
111/14 141/1 141/8
141/9 141/18
Shawn [2] 17/18
97/7 111/9 111/12
119/13 142/5 142/17
154/9 157/15 167/4
187/4 191/21
she [533]
she's [37] 7/2 10/20
10/21 30/2 30/4 30/6
30/9 30/10 35/15
35/16 36/10 36/10
36/14 36/16 36/17
37/2 37/5 45/2 45/23
49/9 55/8 65/7 80/4
84/15 84/20 85/18
85/18 85/19 88/10
104/5 130/25 136/12
144/7 148/15 160/6
160/11 161/8
sheer [1] 104/1
sheet [1] 127/19
shock [2] 8/7 113/11
shoehorn [1] 130/9
short [3] 13/6 66/13
130/6
shorthand [1] 106/10
shortly [1] 33/15
should [49] 9/23
21/21 24/4 27/22
37/18 38/1 38/20
43/6 45/14 52/8
56/19 60/5 60/18
61/5 69/17 74/21
77/25 88/5 93/16
97/19 97/23 105/8
107/13 107/14 112/2
112/7 113/3 113/3
113/8 117/3 123/8
123/9 123/18 124/13
125/17 130/10
130/16 131/12 140/1
142/2 143/9 143/10
148/21 155/2 161/14

163/15 185/25 189/6
195/1
shouldn't [4] 55/8
60/18 123/8 123/11
show [17] 26/13
45/3 70/8 93/22
94/12 96/1 96/4 96/9
111/25 119/11 137/6
138/14 139/23
171/10 177/14
179/19 190/10
showed [6] 40/2
110/3 148/3 148/4
154/15 154/16
showing [6] 51/5
94/5 95/2 101/16
125/19 180/19
shown [5] 6/20 6/22
106/15 106/16
174/16
shows [11] 81/23
81/24 82/9 88/19
97/6 101/20 112/5
119/15 123/5 123/10
181/22
sic [1] 8/18
side [4] 15/21 36/6
62/23 104/11
sides [4] 3/9 69/9
173/24 197/4
sidestepping [1]
147/10
sight [1] 97/17
signal [1] 104/6
signaling [1] 126/17
significance [2]
20/23 21/1
significant [3] 10/8
83/4 94/24
significantly [2] 54/5
135/14
signs [1] 144/8
silence [1] 173/20
silencing [2] 92/2
173/13
similar [5] 121/5
151/21 159/16
164/25 171/12
similarly [7] 13/5
27/13 82/18 96/19
124/22 127/18
180/14
simply [14] 64/5
74/23 87/17 94/22
108/11 117/5 131/21
177/5 181/16 189/4
189/20 190/12
191/16 194/11
simultaneous [2]
178/14 197/8
since [12] 18/12
50/3 52/7 52/8 58/2
89/4 111/16 115/18
118/22 130/12
132/11 190/13
sincere [1] 150/19
sincerely [1] 63/22
Singh [1] 26/25
single [12] 24/1 58/1

**S**

single... [10] 70/19
70/22 98/13 99/20
99/23 100/16 110/25
124/1 140/5 156/2
sinking [1] 124/24
sir [3] 38/16 134/22
134/24
sister [1] 163/25
sisters [1] 163/24
situation [6] 55/24
79/10 114/1 116/8
124/9 148/16
six [4] 139/1 156/16
195/3 195/6
sixth [2] 21/25 128/8
skills [3] 27/22 29/14
37/13
Slate [2] 166/12
166/15
slide [41] 3/23 4/23
9/16 10/1 13/17
14/17 15/19 26/19
26/22 35/10 37/7
46/1 46/3 46/6 46/10
49/5 50/14 50/24
59/6 64/15 138/23
140/7 140/11 140/24
141/6 142/13 142/16
144/2 146/9 146/14
146/20 152/3 154/11
156/6 159/24 162/11
164/4 165/19 166/11
179/23 180/15
slides [10] 26/21
41/18 162/21 174/16
176/6 176/10 176/11
177/8 186/19 197/14
slightly [1] 59/5
small [4] 93/5 176/5
193/10 193/11
SMB [4] 80/19 82/11
103/15 106/2
smeared [1] 162/15
smells [1] 37/21
smiling [2] 6/22
35/16
sneered [1] 184/19
sneering [1] 144/6
so [164] 3/11 4/20
7/14 9/11 12/18
12/23 13/24 14/2
15/3 15/15 16/8
17/14 18/1 20/13
23/2 23/7 23/16 25/2
25/3 26/6 26/21 27/5
28/13 29/6 30/11
30/20 30/24 31/23
32/12 32/20 33/13
33/19 35/2 36/22
36/25 36/25 38/13
39/20 40/7 40/19
41/2 41/7 41/10
41/12 41/23 42/12
43/10 44/10 46/2
46/9 47/9 47/16 50/7
50/24 52/4 53/12
55/7 56/10 57/5
57/13 58/19 61/14

62/25 63/24 64/3
66/6 66/20 67/7 67/7
69/2 70/9 70/19
70/21 70/24 72/19
73/25 74/11 75/9
75/12 76/1 76/6 76/8
77/7 77/10 77/14
77/14 81/9 84/22
85/8 86/11 86/18
88/4 98/8 102/3
102/16 107/3 109/14
110/20 123/21 130/1
131/3 134/19 134/21
135/15 136/2 136/21
136/24 137/9 137/19
141/8 141/9 142/2
143/13 143/24
145/15 148/16 149/5
152/8 152/14 157/23
158/2 158/17 158/24
159/5 161/25 162/8
164/18 165/1 165/25
166/1 166/21 168/2
168/3 168/16 169/1
169/19 170/7 170/21
171/16 173/2 174/10
175/1 175/14 177/8
177/13 177/23 178/6
181/16 188/13
188/15 191/4 191/25
193/8 193/12 194/4
194/19 195/6 195/12
195/14 196/1 196/18
196/22 197/8 197/21
social [3] 5/13 5/24
110/6
society's [2] 57/18
58/10
solely [4] 11/21
143/4 143/18 149/15
Soltis [3] 156/13
163/3 188/6
some [47] 8/8 11/22
20/23 22/8 27/5
27/12 28/16 29/6
31/21 31/24 31/24
32/7 36/7 37/9 41/18
45/5 64/8 67/9 68/3
69/5 81/8 85/6 91/23
92/21 94/12 100/15
111/7 120/24 125/2
125/4 136/25 137/10
139/18 143/8 157/5
167/22 171/6 177/14
185/11 185/15
187/22 187/22
188/18 189/23 194/1
197/19 197/21
somebody [4] 11/7
12/3 15/16 82/14
somehow [2] 121/22
129/13
someone [20] 28/6
28/8 29/12 29/25
31/10 43/12 51/16
63/16 81/11 86/22
104/7 107/13 118/5
157/23 158/2 172/4
183/12 189/3 194/19

195/24
someplace [2] 111/8
134/19
something [25]
22/10 23/18 29/4
31/18 45/13 67/24
70/19 72/3 85/4 89/4
90/22 107/19 113/18
133/16 134/12
136/22 149/2 161/8
162/15 174/8 186/8
191/4 197/24 198/4
198/8
sometimes [3]
132/15 132/17
185/10
somewhat [1] 67/16
son [1] 109/25
soon [1] 78/4
sooner [3] 115/7
116/23 117/4
Sorority [1] 153/11
sorry [7] 131/3 148/3
161/9 164/7 164/7
172/3 175/24
sort [12] 19/14 30/2
36/19 68/3 72/18
106/4 106/5 148/20
154/15 166/25 171/4
172/4
sorting [1] 24/20
sorts [3] 11/7 37/23
67/23
sought [4] 55/4
149/20 181/14
187/13
sound [1] 185/19
soundly [1] 129/15
sounds [2] 37/14
136/5
source [43] 75/21
75/22 76/15 76/16
76/17 76/19 76/21
98/24 99/17 99/20
115/19 124/11
124/18 124/20
124/22 138/6 138/7
139/7 139/9 142/18
143/6 146/21 147/12
147/16 147/19
148/24 149/22 150/6
155/16 155/19
155/20 155/21
155/22 156/2 156/4
156/21 158/9 163/12
164/12 164/14
164/22 164/24
168/14
sources [12] 5/7
62/3 116/12 124/5
138/3 145/13 147/14
147/15 149/19 156/8
159/25 162/25
South [1] 151/22
speak [19] 9/12
37/10 55/5 63/21
87/6 87/9 87/9 87/11
87/16 87/19 87/23
91/24 91/25 107/14

110/25 135/4 189/24
190/1 193/22
speaker [3] 46/21
128/10 194/18
speaking [8] 45/22
52/12 55/10 63/14
91/10 136/1 141/12
154/8
special [4] 22/1
22/18 24/2 24/13
specific [2] 75/14
179/14
specifically [18]
14/15 15/22 23/17
80/22 83/20 89/22
91/15 98/11 99/5
103/3 104/17 117/16
118/17 120/10
125/12 127/13
127/23 193/23
specifics [1] 91/24
speech [1] 172/16
speeches [1] 19/13
spend [2] 49/8
170/24
spent [4] 98/9 98/10
98/12 140/14
spilled [1] 122/21
spin [4] 30/20 30/24
31/16 32/19
spirited [1] 198/6
spoke [6] 151/16
154/24 155/9 180/6
191/22 192/7
spoken [2] 163/18
191/23
squarely [1] 11/8
113/24
St [2] 99/19 190/6
stability [1] 57/18
Stacy [1] 50/19
Stacy's [1] 50/23
stage [8] 32/13 33/8
36/5 36/8 36/25
39/24 44/21 47/11
stake [1] 58/17
stand [4] 101/15
170/5 170/17 174/22
standard [12] 11/15
21/7 25/14 46/3 47/2
79/4 81/4 84/4 94/18
118/9 179/8 179/8
standards [5] 5/7
16/12 25/12 26/2
46/2
stands [1] 127/16
start [4] 9/25 55/18
59/1 196/18
started [6] 17/11
17/13 18/4 43/15
166/8 174/15
starting [3] 13/20
59/9 140/12
state [10] 4/15 27/22
37/18 40/1 71/12
71/13 126/24 146/12
189/4 191/18
stated [4] 12/5 79/13
104/4 179/24

statement [128] 4/5
8/20 8/23 11/17
12/12 12/13 12/17
13/7 14/5 17/11
17/16 17/18 18/3
20/13 20/19 22/19
22/22 22/24 25/14
25/17 25/22 26/10
26/13 26/15 27/25
28/10 28/11 28/15
33/2 33/23 34/7 34/9
34/11 34/1 35/4
35/14 35/23 38/6
41/7 51/19 59/20
75/24 77/20 93/22
94/10 95/3 95/5 96/5
100/20 101/5 101/15
101/18 102/5 102/15
102/15 103/5 103/6
106/6 106/17 106/18
110/22 111/13
111/24 113/6 113/7
113/9 113/12 113/14
113/15 113/17
113/20 113/24
117/10 118/7 118/12
119/2 119/11 119/16
119/18 119/21 120/5
120/14 120/21
122/19 122/22
122/25 125/14 128/9
128/17 128/18
128/24 128/24
131/15 131/16
131/18 131/21
139/25 140/5 140/11
140/20 140/22
140/25 141/4 142/14
143/17 157/3 157/3
169/7 176/6 177/6
179/5 179/21 179/23
179/25 180/14
180/20 181/5 182/6
182/18 184/15
188/21 188/23
188/24 190/8 192/1
192/16 194/13
194/15
statements [153]
3/25 4/4 4/7 4/9 4/12
4/13 5/14 6/8 6/25
11/3 11/4 12/8 12/18
12/19 12/25 13/2
13/5 13/8 13/10
13/15 16/15 20/8
20/11 20/15 20/18
20/20 20/24 21/5
22/13 22/14 22/16
22/25 23/6 23/10
23/12 24/6 24/11
24/18 24/23 25/1
25/5 25/10 26/5 26/8
27/1 27/12 27/13
27/18 27/24 29/24
31/17 31/22 32/24
33/1 33/9 33/11
33/20 33/25 37/11
37/23 37/25 38/2
38/4 38/19 38/23

**S**

statements... [88]
39/6 48/18 48/21
52/24 53/11 54/7
56/24 59/20 60/6
60/23 60/24 61/9
61/16 69/20 75/14
77/17 93/24 94/15
96/3 97/2 97/4
100/25 101/25 102/2
102/9 102/12 102/16
102/21 102/22
102/24 103/4 105/11
105/13 106/7 108/1
110/19 110/20
112/16 112/17
112/19 113/5 113/19
113/22 114/4 114/6
116/15 117/9 119/20
122/2 122/19 122/23
123/19 125/20 127/7
127/14 128/10
128/19 129/11
129/13 130/17 131/6
131/10 131/23 139/4
139/14 139/17
139/23 140/2 140/4
140/9 145/13 147/24
148/23 156/3 167/24
170/21 172/17
172/24 173/5 173/8
173/23 174/10
179/14 182/5 188/22
189/3 191/17 197/4
states [8]  1/1 1/10
53/23 57/9 58/2
120/25 135/8 137/13
stating [4]  143/22
172/17 172/19 179/5
station [2]  46/18
83/14
statistics [4]  120/17
142/25 147/8 169/18
status [26]  4/14
44/16 46/24 57/21
57/25 61/11 62/1
62/4 67/23 68/2 79/9
79/13 79/22 84/11
85/12 85/15 87/17
87/21 87/25 92/6
95/2 95/9 95/15
95/16 136/3 195/14
statute [6]  42/18
42/22 43/3 71/23
72/4 72/18
stay [5]  71/7 160/16
160/17 160/18
183/12
stayed [3]  119/14
119/16 180/9
STD [2]  161/13
161/17
stem [1]  10/12
stenography [1]  1/24
step [3]  49/11 108/7
122/17
stepping [1]  89/15
steps [1]  167/13
stet [7]  112/5 112/6

112/10 142/8 142/9
180/16 180/16
Steven [1]  129/4
still [15]  61/24 69/4
70/9 83/12 100/16
107/11 108/20 118/8
128/19 137/9 155/19
165/5 166/3 170/17
192/10
stone [162]  1/8 3/6
4/19 5/5 5/10 5/11
6/19 7/4 8/15 8/24
10/6 10/11 16/21
17/11 17/16 18/25
19/25 23/12 30/14
34/9 34/17 35/12
43/21 43/22 44/1
44/3 44/8 45/24 49/6
50/9 51/1 52/13
54/18 54/24 54/25
55/3 55/5 55/8 55/13
56/12 56/22 56/24
58/12 59/16 59/19
59/22 60/4 60/5
60/15 60/16 61/5
61/16 61/18 61/19
61/21 62/2 63/14
63/22 64/18 65/11
65/14 65/19 65/20
65/25 66/10 66/11
67/2 68/8 69/4 69/19
73/14 73/15 73/19
73/21 74/5 74/15
74/25 75/2 75/15
75/23 76/5 76/11
78/2 78/3 78/17
88/18 89/15 90/9
96/13 96/15 96/21
97/1 97/4 97/6
101/21 107/22 111/3
112/12 113/21
115/16 121/12
121/18 123/7 123/11
123/18 129/4 129/8
129/19 130/13 137/6
137/12 137/22
138/13 138/16 139/5
139/7 139/13 142/3
142/20 143/1 143/19
143/24 144/3 144/10
144/13 144/20 145/6
147/5 151/6 151/8
151/8 151/10 151/25
152/10 152/15 153/1
153/6 153/25 154/9
155/12 156/7 156/8
156/10 156/14
156/22 157/14
158/10 162/25
165/15 166/4 166/9
167/7 168/10 169/2
169/14 169/23
169/24 170/9 171/17
173/18 173/25
185/22
Stone's [22]  7/10
17/18 18/1 42/6 42/8
44/5 44/19 53/17
66/16 90/21 96/7

120/6 121/10 126/11
128/3 128/12 130/7
137/10 139/8 155/15
165/16 167/3
stonewalling [1]  44/5
stood [3]  73/23
76/15 170/16
stop [3]  7/2 55/15
63/18
stopped [3]  63/20
92/3 97/8
stories [6]  37/3
123/22 150/10
156/25 184/18
187/12
story [76]  5/5 5/8
5/17 6/6 8/16 9/13
17/14 17/21 29/19
33/25 34/9 34/17
34/23 34/24 36/6
44/4 59/18 59/23
59/23 61/2 61/2
61/23 73/7 74/7 76/7
76/8 100/15 101/3
101/16 101/17 107/5
107/5 107/10 111/11
111/14 111/18
115/15 115/23 126/6
126/10 138/5 139/4
141/1 141/9 141/15
141/18 146/4 146/7
150/13 155/21 156/4
156/7 156/16 157/1
157/9 157/11 157/13
157/22 158/2 159/10
159/18 159/20
159/21 160/20
164/19 165/6 165/10
167/14 168/8 171/9
187/21 188/3 188/7
188/10 189/15
189/21
storyline [16]  43/11
99/8 100/11 138/1
145/25 146/2 146/7
147/11 150/9 150/11
150/17 167/17
184/14 184/23 185/1
185/3
straight [1]  125/7
strains [1]  89/9
Street [1]  1/15
stress [1]  157/20
strong [3]  98/24
104/7 153/14
structure [1]  149/24
student [13]  35/2
45/10 54/12 82/21
103/2 168/12 173/3
181/5 181/6 181/7
183/14 183/17 192/4
students [20]  16/5
28/7 44/23 45/4 45/7
46/8 80/15 82/18
83/25 103/23 103/24
118/3 122/12 144/24
145/2 145/10 150/3
182/3 182/20 185/11
style [3]  3/4 68/25

159/16
sub [1]  195/24
subhead [13]  13/19
15/5 16/13 18/5
18/14 19/3 19/8 20/1
21/15 28/14 117/13
180/8 180/11
subject [10]  10/21
13/6 56/21 57/12
57/24 66/8 70/21
86/22 90/10 97/18
subjected [2]  19/4
28/13
subjecting [1]  28/10
subjective [8]  93/25
118/25 139/24
140/21 149/13
149/16 158/5 164/11
subjectively [1]
11/22
submission [2]  197/8
198/8
submissions [2]
177/22 178/15
submit [19]  25/5
35/11 58/12 84/7
93/15 94/14 98/16
100/9 107/20 131/12
131/13 136/15 138/9
143/7 176/11 178/2
178/10 197/4 197/13
submitted [8]  18/10
18/13 21/21 38/1
68/3 78/24 173/24
176/24
subordinate [2]  49/2
49/2
subsequent [7]
11/10 12/18 17/23
59/25 73/21 129/12
170/15
subsequently [1]
88/19
substance [4]  71/4
74/17 109/11 127/12
substantial [2]  44/13
79/16
substantiates [2]
108/21 194/16
substantive [17]
8/14 10/7 42/10
42/20 43/7 71/10
71/18 71/19 71/21
72/9 72/13 72/15
73/4 73/18 74/12
74/25 127/1
such [7]  25/25 25/25
57/22 86/4 150/11
182/24 190/23
sue [5]  60/16 139/14
139/24 140/25
142/14
sued [11]  11/3 13/15
25/10 58/5 60/14
61/7 129/9 140/2
140/5 141/5 173/9
suffered [6]  45/5
76/3 125/1 162/18
163/13 188/18

suffering [2]  124/12
124/23
suffice [2]  167/13
178/15
sufficient [6]  84/5
84/10 93/12 94/12
94/23 100/18
suggest [14]  29/2
32/21 37/24 56/18
58/7 60/10 81/8
103/25 107/13
123/18 130/7 131/20
136/14 169/11
suggested [9]  19/5
73/19 141/7 141/7
141/10 141/13 169/9
191/15 194/17
suggesting [4]  19/3
32/12 56/22 142/3
suggestion [2]  29/1
141/11
suggests [8]  37/5
38/3 137/22 153/5
153/7 153/22 155/6
169/6
suing [2]  60/25
140/9
Suite [1]  2/3
suited [1]  99/15
suits [1]  3/11
Sullivan [7]  87/21
120/18 137/14
142/22 169/9 169/13
169/16
Sullivan's [1]  184/4
summaries [2]  31/3
176/12
summarized [2]
26/22 59/17
summarizing [1]
16/24
summary [43]  4/3
11/2 12/7 17/8 17/9
20/9 20/16 20/18
23/20 24/11 24/17
26/17 32/13 33/7
33/13 35/21 37/24
38/6 39/19 39/23
40/5 40/5 42/7 44/21
70/11 94/13 98/18
132/14 132/18 133/1
133/5 133/14 134/4
138/15 151/11 158/6
173/22 174/10 176/6
185/2 195/4 195/7
198/2
sunk [1]  187/17
superior [1]  140/23
superior's [1]  45/16
supervised [1]  49/3
supervision [1]  57/19
supervisors [2]
44/18 79/11
supplement [6]  65/4
66/13 66/13 137/1
179/2 196/10
supplemental [2]
65/3 114/3
supplied [2]  95/20

S

supplied... [1]
190/11
support [30] 8/14
28/8 31/6 50/10
74/24 84/17 94/23
106/9 110/19 111/23
114/22 115/8 119/1
121/7 121/16 127/5
132/4 132/7 150/13
152/6 152/12 154/23
155/25 163/22
172/24 173/5 174/9
176/14 181/18
192/22
supported [7] 12/6
35/9 95/19 95/21
105/22 121/19
189/15
supporting [7] 10/25
28/6 119/18 137/24
154/19 173/12
179/13
supportive [1]
109/15
supports [7] 91/8
95/25 99/24 121/17
124/1 125/15 179/9
supposed [6] 36/10
36/11 38/25 92/23
96/20 116/4
supposedly [3] 9/19
34/4 188/21
suppress [3] 6/1
113/17 142/3
suppressed [3] 8/11
8/21 61/1
suppressing [3] 6/9
29/17 34/6
supreme [24] 11/23
12/15 44/6 44/11
46/4 53/23 57/9 58/2
79/5 99/19 100/17
116/8 133/23 135/8
135/15 137/13
137/15 148/5 172/22
172/22 173/5 179/15
185/24 190/6
sure [13] 36/19
36/20 58/21 63/22
67/25 70/1 85/9
85/10 99/6 112/3
132/23 135/6 177/20
surely [2] 130/4
171/14
Surface [1] 149/22
surprising [1] 78/22
surrounding [3]
100/24 119/23 154/7
surrounds [2] 136/9
136/10
survey [5] 32/3
132/12 134/9 196/4
196/11
surveying [1] 133/13
surveys [1] 171/4
survivor [1] 50/18
survivors [4] 30/3
45/1 61/23 118/3

Susan [6] 65/7
103/22 120/20 121/1
183/9 183/23
swallow [1] 57/13
sweep [1] 184/4
sweet [2] 145/22
184/10
swept [1] 131/7
swimming [1] 189/17
sworn [1] 18/13
symblomatic [1]
166/25
sympathetic [1]
154/17
synonomous [1]
184/12
synonymous [1]
16/19
system [8] 14/16
15/24 17/7 30/9
97/13 153/13 153/17
153/19

T

table [2] 3/17 99/10
tables [1] 162/7
Tacoronti [2] 174/15
174/19
take [14] 3/20 8/20
10/16 14/17 48/15
49/11 60/5 121/8
134/16 136/21 137/9
140/1 193/25 197/19
taken [13] 6/21
10/23 11/16 29/13
33/10 36/21 63/2
63/4 114/14 117/3
181/22 186/10
194/10
takes [6] 28/5 34/1
99/9 106/5 114/4
146/22
taking [12] 9/8 26/5
45/19 61/1 91/5
103/3 123/15 123/16
169/25 170/2 170/10
173/14
tale [1] 5/5
talk [21] 7/11 11/6
31/19 33/5 34/22
47/24 62/19 89/19
89/20 97/23 108/11
109/19 123/11 131/6
142/4 142/5 149/3
154/6 160/8 170/19
186/16
talked [8] 21/4 33/22
44/6 154/25 155/3
167/12 171/7 188/5
talking [24] 16/5
19/10 26/17 42/19
65/19 71/7 111/10
120/23 122/13 123/7
153/1 153/7 153/16
154/1 154/4 168/25
178/24 182/8 182/11
183/19 187/2 187/16
188/4 193/24
talks [11] 17/4 27/3

88/17 89/20 152/19
152/24 153/9 153/21
183/5 184/3 186/20
tape [12] 120/4
149/3 149/5 149/8
191/2 193/17 193/20
193/21 193/25 194/1
194/4 194/6
taped [2] 193/13
193/14
tapes [1] 193/15
target [1] 66/4
targeted [2] 10/20
52/14
targeting [1] 23/16
targets [2] 52/21
52/21
Tavoulareas [1]
179/17
teacher [6] 51/13
54/11 54/14 92/12
92/16 136/1
teachers [1] 92/14
teaching [2] 51/10
51/14
teasers [1] 12/23
technical [1] 72/2
teed [1] 24/10
television [1] 171/13
tell [7] 5/17 14/22
34/17 34/23 34/23
164/1 167/9
telling [3] 34/16
54/19 157/10
tells [2] 147/19
164/10
ten [3] 183/14 197/9
197/15
tend [1] 183/6
tendered [1] 197/14
tends [1] 25/17
tension [5] 29/6 29/7
53/4 53/5 53/13
term [4] 19/16 19/16
86/5 163/9
terminology [1]
86/10
terms [15] 40/13
42/13 45/9 46/21
47/24 48/17 55/21
86/1 86/21 86/22
135/17 140/3 161/22
172/1 188/3
test [7] 11/24 53/15
53/19 69/25 86/8
88/5 128/9
tested [2] 120/7
123/2
testified [31] 65/8
65/17 66/24 82/24
97/8 112/5 112/6
119/12 140/20
141/10 141/25
144/12 149/19
149/23 150/6 150/16
152/2 154/9 157/15
157/19 160/19
164/15 179/25 180/2
181/25 182/7 187/6

190/14 190/16
190/18 191/22
testifies [1] 188/7
testify [2] 171/14
190/15
testimony [19] 23/15
64/24 65/6 66/18
82/24 111/6 111/6
111/8 119/6 119/15
156/11 169/22 172/4
172/4 180/3 180/6
187/4 193/19 194/8
tests [1] 36/19
text [13] 14/6 14/11
14/19 56/23 59/16
152/21 152/23 153/9
153/21 155/5 159/25
160/2 165/20
textbook [1] 37/22
textual [1] 21/18
than [39] 20/13 31/9
34/20 34/21 50/3
54/7 60/8 62/3 65/11
68/10 68/16 69/22
73/12 84/18 89/2
90/1 91/5 94/16
98/20 100/25 104/18
120/25 141/3 141/20
145/2 145/11 147/9
159/13 177/12 178/1
182/20 186/5 186/7
189/1 193/4 193/9
194/18 194/18
195/12
thank [10] 3/14 24/4
77/1 131/24 134/12
134/13 176/16
178/12 196/3 198/7
thanking [1] 14/22
Thanks [1] 158/22
Tharp [1] 151/21
Tharpe [1] 26/18
that [1722]
that's [117] 6/23
8/18 12/1 12/14 14/8
16/2 18/2 19/10 21/7
24/23 25/2 25/20
26/11 26/17 27/16
29/11 29/11 30/14
31/8 32/17 32/23
33/16 33/25 34/24
36/25 37/6 37/16
37/16 40/14 41/17
41/23 41/24 42/14
44/15 48/2 53/3
54/19 56/1 58/4
58/12 60/7 61/10
63/5 63/12 66/23
66/23 67/3 67/15
68/6 68/9 69/2 69/24
70/1 72/19 74/11
77/11 80/9 84/20
86/15 93/3 93/6 98/2
98/3 98/4 98/5 100/1
105/2 106/6 106/24
108/13 119/14 131/9
132/9 132/19 132/22
135/7 135/19 137/18

143/24 147/25
150/22 151/4 155/21
158/10 160/8 161/9
161/12 161/13
161/23 166/18
166/19 169/7 169/19
173/20 174/3 176/17
177/24 179/7 180/1
180/9 180/12 181/20
183/19 184/1 184/18
185/15 186/25 188/7
188/18 193/14
193/18 194/8 194/8
196/22
their [89] 5/4 5/24
8/22 10/11 10/17
11/7 11/12 11/20
11/20 16/6 16/7 18/4
18/18 20/9 23/14
25/9 27/16 30/8 30/9
31/6 31/11 32/6
32/22 34/7 36/20
39/8 40/21 41/23
42/10 43/5 47/4
50/10 53/18 54/19
55/9 59/14 60/6 60/6
60/8 61/20 64/2
64/18 70/10 73/22
73/23 74/5 74/15
75/18 76/15 87/20
91/5 91/6 92/22 95/6
95/17 96/12 99/13
104/13 107/8 115/5
116/22 120/1 121/21
125/21 126/18
129/23 130/13
131/10 142/21
144/25 147/8 147/8
153/2 153/3 153/13
156/4 158/12 159/4
166/5 166/10 167/5
170/16 170/17
170/21 173/25
176/22 177/4 177/6
184/1
them [62] 7/24 13/22
14/7 14/9 15/21 18/6
18/21 19/17 20/3
25/13 26/6 27/19
27/20 28/10 30/5
31/5 31/6 32/20 33/4
33/4 33/5 38/3 38/5
45/10 55/6 55/13
59/11 75/16 87/4
102/17 107/23
110/21 115/10
117/14 120/19
121/15 122/13
122/14 123/15
126/23 129/14
138/10 140/13
152/11 152/13
153/10 153/11
153/18 159/5 164/10
166/15 166/24 167/9
174/17 176/8 176/13
176/13 176/14
176/17 176/21 177/1
188/4

| T | | | | |
|---|---|---|---|---|
| **theme** [1]  33/12 | 3/25 9/22 9/25 11/22 | 33/6 38/25 39/7 | 102/9 105/5 124/4 | **times** [14]  6/10 9/2 |
| **themselves** [8]  4/1 | 12/3 12/7 12/11 | 40/10 40/12 42/16 | 150/20 157/10 178/5 | 46/16 46/17 88/25 |
| 32/18 32/24 40/17 | 14/18 15/1 16/15 | 47/18 47/19 47/20 | **thought** [7]  37/19 | 89/8 92/19 112/25 |
| 88/23 96/12 176/14 | 18/19 21/4 24/10 | 47/24 48/2 48/3 48/9 | 39/5 142/1 151/5 | 114/12 114/19 124/3 |
| 182/24 | 24/11 24/17 25/4 | 48/10 48/13 48/19 | 181/23 189/24 190/1 | 134/6 137/14 169/8 |
| **then** [62]  4/7 4/11 | 26/21 27/7 27/15 | 48/19 49/12 49/13 | **threats** [1]  10/22 | **title** [9]  6/4 10/23 |
| 12/7 20/25 22/10 | 27/18 28/22 29/1 | 51/20 51/22 52/19 | **three** [21]  4/10 | 49/7 49/23 50/1 52/6 |
| 22/16 22/23 29/12 | 29/5 29/14 30/3 30/7 | 53/3 53/13 54/19 | 21/23 25/9 25/10 | 64/13 65/13 83/17 |
| 31/12 40/15 40/20 | 30/15 30/18 30/22 | 55/15 58/14 60/5 | 26/16 27/24 33/19 | **to proceed** [1] |
| 41/4 41/12 41/13 | 31/2 31/5 31/7 31/8 | 60/7 62/6 62/11 | 33/25 56/18 57/6 | 109/13 |
| 41/15 53/10 68/23 | 31/11 31/17 31/20 | 63/22 63/24 64/3 | 65/20 73/2 73/16 | **today** [22]  3/17 7/12 |
| 69/25 71/22 85/5 | 31/22 32/14 33/1 | 64/13 65/5 66/14 | 109/2 112/25 114/12 | 22/3 34/14 42/3 |
| 94/21 97/8 103/19 | 33/9 34/3 36/16 37/3 | 68/3 68/6 68/6 68/12 | 114/19 129/11 143/9 | 66/13 68/8 68/11 |
| 104/4 104/14 113/19 | 37/9 37/23 37/25 | 68/13 68/14 68/22 | 159/4 197/21 | 69/2 70/2 78/22 |
| 120/11 129/11 | 38/2 38/19 41/18 | 68/24 69/15 76/9 | **threw** [2]  160/25 | 92/22 101/9 112/3 |
| 129/24 131/7 131/8 | 42/15 46/2 49/23 | 81/22 85/5 87/3 88/4 | 186/24 | 117/11 126/23 129/3 |
| 131/16 134/6 136/9 | 52/24 63/7 67/23 | 92/15 92/22 93/16 | **through** [41]  3/25 | 138/20 171/8 177/23 |
| 136/12 139/8 144/18 | 68/24 69/5 74/4 | 98/1 98/4 98/5 98/7 | 14/13 14/13 17/25 | 197/14 197/18 |
| 146/2 148/24 156/15 | 85/24 86/23 88/5 | 102/17 107/12 121/3 | 18/2 18/7 20/3 20/11 | **together** [3]  13/10 |
| 156/21 163/9 164/5 | 91/10 102/24 105/11 | 123/10 132/3 132/24 | 23/23 25/12 30/9 | 38/2 104/14 |
| 166/7 169/6 178/9 | 105/14 106/10 | 133/8 133/15 134/7 | 42/17 50/20 52/17 | **told** [51]  9/22 18/3 |
| 180/23 181/12 | 107/16 107/21 | 134/8 134/9 135/18 | 58/24 59/15 60/2 | 35/24 59/14 73/7 |
| 182/13 183/4 183/9 | 107/23 110/19 115/4 | 136/2 136/7 136/20 | 64/2 64/2 71/14 | 78/17 81/13 90/5 |
| 184/3 187/13 188/6 | 115/5 115/9 115/15 | 138/19 140/1 142/12 | 82/15 90/4 110/10 | 96/20 99/17 99/25 |
| 188/7 189/25 192/2 | 116/5 116/8 116/20 | 144/16 145/15 | 115/2 122/1 122/12 | 108/8 108/12 108/13 |
| 194/5 194/17 195/7 | 118/22 122/18 | 148/11 148/13 | 130/17 131/11 | 120/3 123/7 123/11 |
| 195/13 197/12 | 125/16 132/13 | 148/15 149/1 149/10 | 131/19 133/18 | 124/19 146/21 |
| **theories** [6]  95/24 | 133/13 136/11 138/9 | 152/21 160/3 160/10 | 142/21 142/22 | 147/17 149/23 |
| 98/3 98/5 98/15 | 138/19 142/6 142/8 | 160/15 164/6 167/21 | 142/22 158/16 | 154/25 155/6 155/7 |
| 101/1 102/14 | 143/15 144/7 145/13 | 168/4 169/20 172/9 | 158/24 159/1 173/8 | 156/9 156/13 156/14 |
| **theory** [6]  6/24 28/21 | 147/18 148/23 | 176/12 177/11 | 176/19 176/25 185/5 | 156/18 156/19 |
| 87/20 98/3 98/4 | 154/20 156/1 156/24 | 177/21 178/1 178/5 | 192/21 | 156/21 157/7 159/20 |
| 125/25 | 164/2 164/3 166/16 | 178/18 183/11 | **throughout** [4] | 162/22 163/10 |
| **there** [213] | 167/6 167/22 171/22 | 185/21 186/3 | 104/13 149/21 | 163/16 164/13 |
| **there's** [75]  21/19 | 171/23 173/15 | **thinking** [4]  104/10 | 154/17 176/19 | 164/15 164/19 165/3 |
| 21/24 24/24 33/23 | 173/18 174/1 178/15 | 159/21 160/4 187/16 | **throwing** [3]  153/18 | 165/6 165/11 167/5 |
| 36/6 40/19 40/22 | 182/11 183/25 | **third** [8]  16/2 25/19 | 154/6 162/13 | 167/10 168/13 169/4 |
| 47/7 54/21 54/25 | 186/21 187/12 | 45/25 56/5 70/18 | **thrown** [1]  155/3 | 171/24 181/4 187/12 |
| 62/22 64/24 66/17 | 188/21 189/13 | 107/2 120/15 123/3 | **throws** [1]  95/24 | 188/7 189/19 189/25 |
| 67/6 69/8 70/23 | 197/20 | **third-party** [1]  123/3 | **thumbs** [4]  6/22 | **Tom** [1]  3/16 |
| 72/23 72/25 73/25 | **they** [315] | **this** [389] | 35/17 144/6 181/24 | **Tomblin** [7]  25/20 |
| 74/2 74/11 74/23 | **they're** [24]  23/11 | **THOMAS** [1]  1/13 | **thumbs-up** [1]  6/22 | 26/18 109/18 109/22 |
| 76/9 76/16 76/17 | 29/22 34/19 35/20 | **those** [74]  4/10 4/12 | **thus** [5]  78/21 106/3 | 151/14 171/7 186/6 |
| 76/18 76/20 77/6 | 36/23 36/23 38/3 | 4/17 7/10 7/17 9/11 | 109/3 111/15 193/10 | **tomorrow** [1]  160/8 |
| 77/13 77/25 83/2 | 41/19 60/19 61/13 | 11/4 11/8 13/2 20/18 | **thwarted** [2]  121/23 | **tongue** [1]  131/3 |
| 85/10 92/15 92/21 | 61/13 72/1 93/1 | 23/16 23/17 23/20 | 122/12 | **too** [11]  7/9 7/13 |
| 96/17 105/15 105/16 | 133/6 143/25 151/10 | 26/2 29/3 30/10 32/9 | **tie** [2]  168/4 179/19 | 11/16 40/11 87/23 |
| 105/21 105/23 | 162/24 178/19 184/2 | 32/11 33/20 34/5 | **tight** [1]  31/10 | 117/11 144/10 |
| 108/10 113/6 116/5 | 184/12 184/24 | 34/15 41/2 41/15 | **time** [59]  13/6 15/15 | 144/15 144/18 |
| 117/10 120/2 120/4 | 185/13 185/18 | 44/12 45/9 47/10 | 16/8 18/21 20/14 | 181/19 182/4 |
| 120/6 126/2 130/6 | 191/18 | 57/11 60/20 60/24 | 36/4 42/6 43/17 | **took** [24]  9/1 35/5 |
| 133/7 133/9 134/7 | **they've** [4]  36/20 | 65/25 66/14 68/6 | 44/24 47/8 49/8 50/2 | 40/21 76/7 78/3 |
| 137/1 143/1 143/5 | 77/10 88/19 125/23 | 71/1 73/18 81/21 | 51/3 64/7 67/21 | 107/7 108/2 109/4 |
| 143/7 143/22 145/12 | **thing** [17]  8/11 19/14 | 82/1 82/22 82/4 82/5 | 70/17 72/21 90/24 | 110/13 112/21 114/9 |
| 149/6 151/8 155/20 | 30/2 31/4 36/19 | 86/25 95/12 95/20 | 91/20 94/1 105/3 | 115/11 139/6 140/19 |
| 155/24 160/14 | 38/21 43/14 72/8 | 96/11 98/8 117/7 | 110/24 110/25 | 149/8 151/9 154/10 |
| 165/13 165/20 | 86/4 88/25 131/1 | 122/9 127/4 127/4 | 114/13 116/10 120/3 | 154/13 155/13 |
| 169/22 170/4 173/4 | 133/3 133/22 148/22 | 128/21 128/22 | 120/8 123/17 125/12 | 158/12 167/13 |
| 178/25 190/20 | 171/4 190/24 194/19 | 132/12 133/4 138/12 | 128/23 129/9 137/10 | 171/15 174/7 193/4 |
| 190/22 191/11 | **things** [19]  12/23 | 139/12 140/4 145/23 | 140/1 140/15 150/18 | **top** [1]  7/10 |
| 191/14 192/15 194/4 | 27/15 29/20 30/10 | 152/11 156/9 159/17 | 150/23 151/4 154/12 | **topic** [6]  104/4 |
| 197/23 | 30/15 31/7 34/5 63/7 | 162/23 170/12 | 156/8 157/2 157/7 | 106/21 106/22 |
| **thereby** [3]  54/3 | 63/8 63/9 63/11 | 172/12 173/6 175/2 | 157/12 157/25 | 106/25 107/1 111/12 |
| 120/13 135/11 | 63/23 64/14 68/7 | 177/2 189/6 189/23 | 159/20 164/20 | **tort** [1]  21/12 |
| **therefore** [5]  24/14 | 77/8 147/17 185/6 | 190/16 190/21 | 168/11 170/25 176/2 | **totality** [3]  35/23 |
| 25/8 34/10 74/19 | 189/23 194/10 | 192/18 195/4 195/10 | 176/2 183/16 188/3 | 137/20 138/12 |
| 195/1 | **think** [110]  21/2 21/9 | 195/11 196/18 | 189/5 191/18 191/22 | **totally** [1]  148/13 |
| **these** [114]  3/20 | 21/17 22/4 22/12 | **though** [10]  22/8 | 191/24 192/5 193/25 | **touch** [1]  171/24 |
|  | 23/2 23/7 24/3 27/5 | 39/10 50/12 64/6 | 197/9 197/19 | **touched** [1]  110/2 |

**T**

touching [3]  151/18
168/7 186/7
tough [1]  69/8
tougher [2]  47/18
48/2
tour [1]  5/13
tout [1]  80/18
touts [1]  80/13
towards [6]  138/1
141/16 149/17
149/20 158/24
159/19
track [1]  24/22
trade [3]  8/3 25/6
26/1
tradition [1]  183/7
transcribing [1]
194/3
transcript [3]  1/25
169/12 198/17
transmitted [1]  159/7
transpired [1]  103/11
trauma [7]  17/25
28/12 30/8 45/5 60/2
118/20 125/8
travels [1]  198/11
treat [1]  113/15
treated [3]  60/24
159/7 183/10
treatment [1]  55/23
Tremaine [2]  1/18
2/2
trend [5]  104/8
104/18 168/22
168/23 168/24
trial [17]  20/17 21/14
23/4 26/11 68/3 68/4
70/4 133/6 133/9
133/19 133/24 134/8
134/8 136/15 164/15
164/25 175/16
tribunal [1]  49/16
tried [18]  13/22 14/7
14/9 16/23 16/25
20/2 28/2 59/11
83/10 106/17 117/13
140/13 163/5 165/17
166/9 166/9 173/19
187/14
tries [4]  78/22 96/9
96/21 121/21
Tronfeld [1]  26/1
true [28]  20/20
29/12 67/15 101/5
101/10 105/13
107/19 112/23 123/2
128/20 128/23
132/20 132/21
132/22 133/20 135/7
145/5 155/21 155/22
173/21 174/1 184/1
190/9 192/1 192/17
192/20 192/24 193/7
trust [4]  31/12 36/22
126/5 128/6
trusted [4]  11/13
125/5 141/2 141/19
trustworthy [2]  124/5

124/21
truth [15]  7/15 78/6
93/24 99/1 99/3
99/15 101/17 101/17
125/21 127/14
127/16 137/13
138/18 139/25
167/19
try [9]  78/3 86/3
97/25 98/8 107/11
129/3 169/17 170/23
198/4
trying [17]  36/16
36/17 40/14 58/13
86/15 86/20 92/5
130/19 142/3 142/11
143/25 154/23
158/17 178/19
185/18 189/20
189/24
turn [19]  35/4 37/7
49/5 50/24 57/5
70/15 86/25 102/16
112/16 127/6 140/24
149/4 155/15 162/7
162/7 162/8 162/21
193/21 194/1
turn off [1]  162/7
turned [9]  97/23
129/5 149/3 149/8
162/4 181/15 181/17
193/17 193/25
turning [13]  4/14
24/9 74/20 78/7
93/14 107/15 117/9
119/1 119/21 149/16
151/6 193/19 194/6
turning off [1]  194/6
turns [5]  67/22 67/23
74/20 178/1 178/16
TV [3]  13/2 46/18
171/18
TV8 [1]  109/18
twice [1]  120/3
twist [1]  114/1
twisted [1]  169/19
twister [1]  131/3
twists [1]  169/14
two [57]  9/1 14/18
15/18 15/20 15/22
16/5 18/10 26/18
29/6 34/15 39/18
41/2 42/3 44/8 50/14
50/15 53/6 61/8 65/3
65/11 65/20 68/13
68/22 71/2 71/2 77/7
77/9 80/20 82/24
85/11 90/17 97/7
104/15 105/7 107/1
116/3 117/9 117/20
122/8 124/6 124/10
127/4 140/8 141/7
143/12 155/24
158/13 163/23 165/3
165/3 171/20 186/6
194/23 195/9 195/13
197/20 197/21
two-page [1]  65/3
tying [1]  179/13

type [3]  24/23 171/9
175/6
types [3]  27/1
173/23 174/11

**U**

Uh [1]  197/11
Uh-huh [1]  197/11
ulterior [1]  148/6
ultimate [1]  79/2
ultimately [5]  10/1
32/23 100/8 132/2
189/25
unable [1]  10/23
unavailable [1]
196/17
unbroken [1]  156/19
uncaring [1]  97/20
uncontradicted [1]
100/19
under [28]  8/5 10/8
11/6 16/12 24/11
42/23 49/23 54/22
66/21 68/17 74/13
82/6 87/20 90/19
95/11 95/11 100/6
102/21 102/24
110/14 112/19 161/9
161/12 161/13
174/24 175/1 183/16
184/5
underlie [1]  105/14
underlined [1]
140/18
underlying [5]  109/5
120/17 192/18
192/24 193/1
underscore [1]
177/16
underscored [1]
185/24
underscores [2]  89/3
95/13
Underscoring [1]
94/11
understand [35]  3/8
4/13 12/3 13/1 13/7
16/13 16/16 18/9
19/2 20/6 23/3 25/3
26/6 26/7 26/8 28/20
31/20 35/19 36/2
36/17 41/17 41/21
49/14 53/4 67/17
77/25 98/2 102/20
122/7 122/20 142/2
153/6 174/22 197/3
197/12
understanding [6]
14/5 29/8 51/25
155/16 165/2 171/14
understood [23]
11/18 11/25 13/3
13/24 14/1 15/13
15/14 18/16 26/10
29/23 31/8 37/16
42/9 76/14 105/12
124/23 142/17 153/7
171/16 184/17
188/15 190/17 191/8

undertaking [1]
102/11
undisputed [22]  80/1
84/9 94/25 95/4 95/8
95/13 100/1 100/23
101/20 103/10 113/2
116/18 116/21 121/7
122/24 128/22
130/12 181/1 181/2
187/20 187/23
190/25
unequivocal [3]
82/23 179/5 190/9
unequivocally [4]
119/8 126/9 181/4
190/14
unfit [1]  37/19
unfitness [2]  25/23
27/11
unfortunate [2]
120/24 133/22
unfortunately [2]
158/15 165/25
uniformly [1]  9/3
unique [4]  74/1 74/3
74/4 75/25
UNITED [7]  1/1 1/10
53/22 57/9 58/2
135/8 137/13
universities [2]  49/24
92/18
university [84]  5/19
5/25 6/5 6/11 8/10
13/20 14/15 15/23
16/4 16/10 16/17
17/7 17/24 18/11
18/24 20/3 29/5
29/25 30/9 30/17
30/23 34/13 43/16
45/12 46/21 47/14
48/4 48/22 49/8
49/15 49/20 54/23
55/4 56/1 58/17
58/25 59/9 60/1
62/12 63/6 63/9
63/11 63/13 63/25
64/2 64/6 64/9 64/21
64/22 65/7 65/10
65/12 65/21 65/23
66/8 66/21 69/1 79/3
80/8 81/14 81/25
86/23 87/21 88/1
88/2 88/14 90/16
90/19 90/23 90/24
91/1 91/15 92/17
136/11 140/12
142/20 147/12
147/15 148/14 155/1
155/7 172/2 192/5
192/12
University's [5]
34/20 53/1 91/2
97/13 105/2
unless [6]  3/12
23/17 23/18 38/5
133/5 174/13
unlike [2]  191/14
191/15
unpack [1]  77/6

unprofessional [1]
27/4
unpublished [3]
196/5 196/12 196/17
unquote [1]  80/13
unrebutted [1]
100/12
unreliability [2]
160/23 164/13
unreliable [4]  125/9
125/11 138/6 158/9
unresponsive [1]
173/17
unstable [7]  124/12
157/15 157/23
158/11 158/25
188/13 188/15
untenable [1]  60/17
until [10]  10/15
43/22 66/9 66/11
68/2 109/8 116/1
129/3 129/19 196/18
unwillingness [1]
9/11
up [64]  3/20 5/6 6/18
6/22 7/7 10/14 11/16
14/21 20/22 24/10
33/4 35/17 37/21
38/14 40/21 40/24
43/5 45/3 50/6 50/15
71/7 71/7 72/21 74/6
75/13 79/1 79/11
83/12 90/4 91/22
92/5 95/24 101/14
101/16 111/24 112/4
123/21 131/7 138/24
139/8 144/6 146/19
147/24 152/9 153/13
160/12 165/18
165/25 166/6 166/9
166/10 167/8 169/18
170/3 170/11 170/11
173/23 174/10 175/8
177/1 181/15 181/24
194/5 194/6
updates [5]  127/10
127/11 127/16
127/21 127/22
upon [1]  132/8
upper [4]  44/17
48/23 48/24 79/10
urged [1]  8/25
URL [1]  73/3
us [12]  3/24 11/15
12/7 19/1 22/16 25/2
33/14 38/9 110/21
134/16 171/25
174/19
use [10]  14/13 15/5
15/16 16/11 38/9
55/6 57/11 139/10
166/6 186/1
used [11]  16/22
19/16 19/16 89/15
104/22 114/2 144/3
161/20 164/9 165/23
165/23
uses [2]  106/6 180/4
using [4]  54/2 113/1

## U

using... [2] 135/10
161/10
usually [5] 54/5
132/18 133/1 135/14
195/24
utilities [1] 57/20
UVA [66] 5/21 17/22
43/22 45/14 47/8
59/13 59/24 59/24
60/17 62/20 67/8
67/11 67/12 75/23
75/23 78/18 78/23
81/18 82/24 83/19
83/24 89/12 89/16
90/10 91/16 93/7
100/3 100/4 102/25
103/20 105/15
105/24 109/6 112/20
113/15 114/9 114/15
114/25 115/6 115/18
115/25 116/21 117/3
119/23 120/18
120/23 121/1 123/6
123/14 123/17
130/22 131/7 142/23
142/25 143/2 144/23
168/9 168/15 169/9
178/25 181/16 183/1
183/10 183/13
183/21 184/5
UVA's [6] 61/22 81/1
81/7 89/10 103/21
103/22

## V

VA [2] 1/15 2/7
vaginal [3] 73/8
157/9 187/22
vaginally [4] 156/12
156/16 156/18
156/22
Vaile [1] 25/21
variable [1] 99/14
variety [1] 62/8
various [7] 31/3
98/14 102/13 117/3
137/23 147/7 182/12
vast [1] 112/17
vehicle [1] 89/12
vein [1] 127/23
vendetta [1] 97/24
veracity [3] 17/13
140/22 164/12
verdict [1] 22/1
verifiable [3] 107/17
107/21 115/10
verification [1] 99/20
verified [2] 120/8
167/5
verify [2] 115/20
167/13
version [3] 41/11
145/8 178/21
versus [4] 24/1
28/20 43/9 72/13
very [73] 9/9 14/23
19/20 19/25 20/5
20/6 21/9 24/20

30/12 33/7 33/7 37/7
44/2 45/3 48/3 49/13
49/19 49/25 52/9
52/19 53/20 54/19
56/10 56/14 58/21
58/23 60/14 62/9
63/3 63/3 63/13 64/3
64/6 64/9 64/13
64/24 64/25 65/6
65/8 66/13 66/14
66/18 67/1 67/6 71/9
74/6 78/20 87/14
88/24 90/24 97/20
97/22 98/12 115/13
134/13 136/10
136/18 139/12
139/12 144/2 144/11
144/17 145/22 161/4
168/17 171/23
171/23 175/19
178/11 186/7 196/3
197/20 198/7
victim [44] 6/23 7/2
28/24 31/3 35/15
35/18 54/1 54/1
89/21 92/1 92/2
97/15 102/22 103/8
103/20 104/3 104/24
105/16 105/18
106/11 108/1 109/13
110/19 116/4 116/4
116/20 116/22 117/4
118/6 123/9 135/9
150/12 153/2 154/18
169/1 173/10 181/7
185/9 185/16 186/14
191/9 192/21 192/23
193/8
victim's [3] 103/2
104/10 188/2
victims [27] 9/3 9/7
10/25 17/2 28/9
34/21 43/19 45/23
76/19 90/1 90/2 90/5
100/14 104/9 105/8
105/23 106/9 109/12
125/6 125/8 150/4
159/15 169/18 184/7
187/25 188/18
192/10
video [5] 153/10
186/20 186/21
186/23 187/3
view [8] 9/4 105/22
105/23 106/11
154/22 161/24 172/3
174/19
viewed [1] 13/8
viewer [1] 26/5
viewers [1] 10/9
viewpoint [1] 99/11
views [2] 99/14
115/9
villain [1] 6/7
violating [1] 54/17
violation [3] 83/17
90/7 90/8
violent [2] 34/4
113/16

viral [1] 8/6
Virgina [3] 5/19 6/11
59/9
VIRGINIA [62] 1/2
1/7 1/11 1/23 5/25
8/5 8/10 11/6 11/23
12/15 13/21 16/4
16/17 18/12 18/25
24/12 24/21 26/24
26/24 27/23 37/18
43/17 44/6 44/11
45/12 46/4 47/14
48/4 48/22 49/8
49/15 49/20 54/13
54/17 54/23 55/5
56/1 58/18 63/7
63/13 63/25 64/9
64/21 64/23 65/8
65/10 65/12 65/21
65/24 66/8 66/21
70/17 92/17 105/8
135/25 140/12
142/21 147/13
147/15 172/21
172/22 173/4
virtually [5] 109/20
113/1 114/13 140/5
179/12
vis [4] 47/14 47/14
52/20 52/20
vis-a-vis [2] 47/14
52/20
visibly [1] 191/6
visitors [5] 5/2 74/1
74/4 74/4 75/25
visits [1] 184/8
vivid [1] 101/12
vocal [1] 183/9
voice [2] 10/12
194/4

## W

waiver [1] 55/4
wake [1] 71/5
want [29] 19/6 25/24
27/11 33/5 41/12
49/25 64/11 67/14
77/13 77/15 78/9
92/20 111/21 117/11
137/2 137/9 159/22
162/8 166/1 166/23
168/16 171/2 174/17
176/3 177/12 177/13
177/16 179/3 192/9
wanted [23] 9/8
15/10 39/5 63/16
63/18 63/22 114/18
121/23 125/22
134/15 141/10
141/17 142/4 147/6
147/24 152/5 152/13
171/5 177/20 178/2
181/14 193/17
194/20
wants [7] 8/22 75/18
76/6 120/1 126/7
131/7 160/13
warn [3] 112/21
114/9 115/6

warned [1] 124/4
warning [8] 45/13
45/14 45/17 49/1
92/4 112/24 113/4
113/8
warnings [2] 7/14
7/17
warranting [1] 77/16
was [598]
Washington [8] 2/4
17/12 17/19 59/21
167/5 167/10 191/21
191/22
wasn't [22] 29/15
46/9 63/24 64/22
66/9 66/10 66/15
74/18 83/11 97/22
123/9 123/13 142/3
158/17 165/17 169/9
181/9 181/24 184/13
189/25 191/4 193/23
watching [1] 171/16
Watergate [1]
124/17
way [56] 3/24 4/13
4/19 13/1 17/25
21/22 27/15 30/9
30/13 30/17 31/1
31/7 32/12 32/20
32/21 33/5 33/17
37/16 38/2 42/17
46/3 55/25 60/2 62/1
62/10 63/7 63/17
81/15 90/3 90/25
95/17 97/12 102/17
109/5 109/15 112/8
115/24 118/14
129/18 129/25
144/20 146/24 147/7
149/14 151/3 152/11
160/7 164/25 165/2
176/17 177/14 181/7
183/10 189/22 191/7
198/1
ways [7] 19/15
130/20 130/24 131/9
165/3 166/25 185/11
WCHS [1] 109/18
WCHS-TV8 [1]
109/18
we [253]
we'd [1] 66/12
we'll [18] 7/11 24/15
26/16 26/20 33/14
112/3 112/4 134/11
134/11 158/23 160/7
177/8 177/11 186/19
197/15 197/24 198/4
198/8
we're [23] 3/21 4/16
20/17 22/5 22/13
24/17 31/3 40/5 57/3
60/25 71/6 74/21
86/16 92/23 111/10
138/20 140/9 153/16
168/25 175/2 178/23
178/24 196/1
we've [28] 11/9
19/19 20/13 20/16

23/19 25/10 26/22
26/23 32/8 33/22
39/18 41/8 77/6
84/19 87/5 87/13
89/11 95/20 102/21
114/3 117/10 117/15
122/25 139/2 171/7
186/5 195/11 195/16
wealth [1] 128/14
web [1] 72/2
Webb [3] 1/22
198/16 198/20
website [8] 5/11
10/17 40/22 71/10
72/2 74/1 127/19
127/22
websites [1] 71/7
week [9] 9/13 65/24
189/1
weeks [2] 83/15
197/22
weighed [2] 51/21
102/12
welcome [7] 3/2
38/9 68/5 69/14
69/14 70/3 178/10
well [65] 5/4 9/7
19/7 20/18 21/2 22/4
22/8 29/11 29/16
31/1 31/3 32/2 43/8
46/24 49/13 51/12
56/6 58/8 61/24 64/8
70/11 74/23 77/7
77/22 78/12 78/18
78/21 83/11 84/9
86/25 91/19 92/22
94/19 95/2 95/9
97/25 103/1 103/5
115/16 131/14 132/9
132/10 132/15
132/19 133/8 133/16
134/11 136/14 140/1
142/21 152/17 156/1
162/25 166/23 178/3
179/4 179/20 181/3
182/14 182/17 183/6
187/1 187/24 193/19
197/15
well-being [1] 9/7
well-known [1] 187/1
Wells [4] 124/9
124/15 156/1 187/14
Wendy [1] 183/24
WENNER [3] 1/9
169/24 170/10
went [24] 8/6 52/16
108/14 120/11
129/21 134/8 134/8
158/16 159/18 165/8
167/3 176/19 176/25
182/13 185/5 186/4
186/4 187/5 187/10
187/21 191/10
192/21 193/18
194/24
were [113] 3/25 5/14
7/15 9/5 12/11 13/3
18/16 19/10 21/6
21/23 23/19 25/1

## W

were... [101] 27/1
29/12 29/20 29/20
34/8 40/17 45/9
45/25 47/10 47/24
48/14 52/24 52/24
61/9 63/3 63/8 64/23
67/16 73/3 73/22
75/15 76/19 82/2
82/20 82/20 83/13
90/5 91/17 91/18
95/17 96/8 97/7
100/12 100/13
101/23 102/10
105/25 107/23 108/2
110/5 110/6 111/15
111/25 112/8 114/14
115/15 115/20
118/17 120/8 120/19
122/3 128/20 128/23
135/24 139/14 142/9
143/8 145/23 148/25
150/10 150/19
150/24 154/14
159/15 160/21
162/16 163/20
163/23 164/3 166/16
167/7 167/8 167/8
167/9 171/3 171/22
172/7 176/21 177/13
177/22 179/4 180/21
181/3 181/8 182/2
182/4 184/1 184/22
186/11 187/8 190/23
192/10 193/15
193/15 194/24 195/3
195/4 195/7 195/9
195/9 195/10
weren't [1] 193/14
WESTERN [3] 1/2
1/11 26/24
what [198] 4/13 5/6
6/20 7/15 7/19 11/6
12/1 14/8 18/2 18/16
18/18 18/20 19/12
19/17 20/22 21/22
21/23 25/15 26/22
29/11 29/22 29/22
29/22 31/2 31/3
31/16 31/23 32/15
32/18 34/7 34/9
37/16 39/10 42/24
44/24 45/9 45/25
46/16 48/11 48/22
49/11 49/14 50/13
51/15 51/18 52/21
55/22 56/9 56/24
58/9 58/12 59/8
59/16 60/7 60/11
60/17 60/20 60/22
61/17 61/18 62/4
68/12 69/1 69/24
70/1 70/20 72/9
72/12 74/11 75/8
77/13 79/4 81/16
81/21 82/2 82/9
82/17 85/1 86/20
87/19 88/7 88/13
88/17 88/18 88/18

88/19 88/23 90/6
91/3 93/3 95/18
97/19 97/23 97/23
100/8 102/21 103/11
103/11 103/12
106/22 106/23 107/2
107/18 108/13
108/15 109/11
109/19 109/21
109/24 110/1 110/3
110/16 110/24 111/1
114/14 118/17
122/10 124/25
127/15 130/11 131/8
131/15 131/17
131/17 134/8 136/8
136/12 136/13
136/16 136/23
136/25 139/2 140/2
140/9 140/16 141/4
142/14 144/9 145/4
145/6 147/5 147/11
148/1 148/1 148/8
149/11 150/1 150/22
151/4 151/6 152/22
152/22 153/1 153/1
155/8 156/9 158/10
161/11 161/16
161/19 165/22
166/16 167/14
168/24 169/16 170/9
170/15 171/4 171/16
173/10 173/11
175/23 175/25 178/7
180/1 180/13 180/16
181/6 181/20 181/21
182/21 183/11
184/11 184/11
184/18 184/25 185/8
186/3 186/13 186/22
187/2 188/4 188/18
188/21 190/3 191/3
191/6 193/18
what's [6] 20/25
58/16 106/10 146/23
157/10 194/8
whatever [4] 3/22
103/17 124/12
160/13
whatsoever [20]
45/20 46/8 49/4 52/4
66/2 71/4 74/23
75/11 76/21 99/21
124/8 125/14 143/1
143/13 143/23 163/2
163/8 163/11 163/14
169/14
when [92] 5/4 5/6
5/8 7/5 7/7 10/15
13/21 13/22 14/7
14/9 16/23 16/25
21/3 28/2 30/7 31/2
38/14 40/14 42/19
43/3 43/7 43/15 45/7
45/11 48/12 55/9
59/9 59/11 59/17
64/7 67/3 75/16 76/6
76/7 76/7 82/18 87/7
94/3 98/19 100/19

101/12 105/3 106/3
106/20 110/15
110/24 112/4 112/6
112/9 117/13 118/12
121/2 124/7 130/22
131/18 132/15 133/9
135/5 138/11 140/13
140/13 140/16
140/18 144/11
145/18 159/20
160/25 163/6 163/20
164/14 164/16 165/7
166/7 167/10 168/2
168/21 171/3 171/17
173/8 180/6 181/12
182/8 182/11 182/18
184/22 187/19
190/18 191/22
191/25 192/7 194/1
194/18
where [61] 5/14 7/19
10/9 50/15 58/4
70/23 71/6 72/20
79/9 79/10 80/24
88/24 90/18 93/10
93/10 94/21 98/13
99/16 99/19 100/5
100/17 102/11
102/24 104/13
104/22 106/21 107/4
109/24 110/14
110/22 113/10
116/14 118/18 122/6
123/16 134/3 137/16
139/12 146/17
148/23 149/7 151/11
151/14 151/22
154/19 155/18
155/21 155/22 156/3
158/9 158/16 160/2
170/5 172/23 181/16
186/6 186/20 189/19
190/6 193/25 195/6
whether [97] 4/1 4/5
4/7 4/11 7/18 16/12
21/15 22/21 25/14
26/9 28/4 35/22
36/17 36/22 36/23
37/11 44/7 45/11
45/12 45/14 45/16
51/16 52/5 52/20
53/7 53/10 53/14
53/16 53/20 55/11
56/16 57/24 58/4
58/17 61/9 62/7
62/19 64/12 64/16
67/15 67/21 71/9
72/22 74/25 75/1
75/24 79/18 81/10
81/13 81/24 82/19
84/5 85/1 87/8 89/3
89/21 91/16 92/9
92/11 92/13 98/14
102/4 107/17 107/18
113/3 126/7 128/9
135/17 135/24 136/2
136/4 137/1 137/11
137/25 138/1 138/2
138/3 138/4 138/5

138/6 138/7 143/14
144/14 144/15 153/3
153/4 160/22 166/14
166/14 167/12 172/7
173/16 174/5 180/25
183/21 193/7 194/14
which [88] 3/20 6/17
10/8 10/25 13/2 16/7
24/9 26/12 30/14
34/15 41/3 42/11
50/20 52/10 52/11
53/8 53/9 54/10 57/7
58/1 69/6 80/2 80/7
83/4 85/11 86/8 89/3
91/11 93/15 96/7
97/14 98/8 98/22
100/14 101/15 102/8
102/22 103/6 104/6
105/12 106/7 106/17
109/11 111/24
112/23 113/2 113/6
113/10 113/24 114/4
114/23 115/1 115/11
117/10 118/24 119/9
119/10 122/8 125/16
128/8 128/11 129/4
130/4 130/17 130/18
133/17 134/5 134/13
145/1 153/22 158/14
158/23 161/1 162/19
165/12 172/17
173/22 178/17
179/14 179/17
182/10 182/17 185/2
185/21 185/24
190/13 195/2 195/22
while [14] 14/23
15/21 30/1 33/13
40/24 63/10 81/11
81/12 81/12 122/20
126/7 171/16 184/25
194/21
whistling [1] 35/17
who [97] 5/22 6/12
6/14 6/15 9/5 11/25
12/9 12/10 12/10
17/18 17/19 18/11
27/6 28/8 28/14 30/1
30/11 30/12 31/8
31/11 31/25 32/6
33/1 34/4 34/19 35/7
39/10 43/11 44/13
45/2 45/4 48/1 48/12
48/14 48/24 48/24
48/25 49/1 50/6 50/7
50/19 51/5 73/16
81/11 82/24 83/13
86/22 88/1 89/23
92/18 94/17 96/16
104/10 118/3 120/12
125/1 125/5 125/8
129/5 138/7 138/17
141/20 142/6 144/24
145/16 145/17
151/20 157/23 158/2
160/1 163/25 164/3
164/6 164/7 164/25
166/7 166/16 166/17
166/21 166/21 167/6

167/7 167/9 169/6
171/23 172/5 182/23
182/24 183/4 184/6
185/11 186/23
187/16 187/18 191/8
194/2 195/24
whole [15] 13/9
13/22 14/10 19/3
26/6 28/3 33/10
59/11 62/2 69/9
104/23 117/14
140/14 148/16 188/7
wholesale [3] 129/17
130/2 172/13
wholly [1] 189/6
whom [2] 141/2
141/19
whose [1] 27/14
why [34] 13/25
18/19 31/8 38/7 38/7
39/22 39/23 40/14
42/19 42/20 46/3
57/3 60/14 62/18
72/12 72/12 74/21
75/12 95/13 101/4
106/24 111/3 119/14
123/21 133/23
137/18 159/12 168/4
168/6 180/9 181/23
182/7 191/13 193/21
wield [1] 81/17
wildly [1] 156/24
will [40] 6/19 11/7
24/7 25/3 29/17
33/14 35/1 35/2 38/6
38/14 39/14 39/18
39/22 40/17 47/11
62/8 64/25 68/3 70/6
111/21 138/1 149/17
149/20 153/14
154/20 160/10
167/18 169/23
170/10 170/25
174/10 178/12
178/14 178/15
185/20 185/22 186/1
196/12 196/14
197/19
WILLIAM [1] 2/5
willing [2] 63/21
160/22
win [1] 69/25
wind [2] 194/5 194/6
winded [1] 106/8
wise [2] 107/12
158/1
wish [4] 14/24 174/1
178/10 197/4
wishes [1] 23/22
witch [1] 189/19
withdrawing [3]
73/19 73/22 159/21
withdrawn [1] 67/8
withholding [1] 68/1
within [8] 9/13 11/8
65/19 78/4 81/14
82/22 86/23 101/20
without [8] 7/24
54/17 70/9 72/17

W

without... [4]  126/23
153/12 154/7 172/16
witness [3]  23/5
149/22 164/25
witnesses [3]  82/24
171/14 182/12
WJLA [1]  13/2
WJLA-TV [1]  13/2
woman [10]  5/20
16/1 18/10 37/14
109/24 125/1 148/21
171/21 187/17
187/18
woman's [2]  17/21
59/24
women [10]  30/8
30/19 30/22 31/11
36/17 147/18 163/23
164/2 164/3 171/23
won't [5]  23/4 23/5
173/22 187/15 193/5
wonderful [4]  147/17
147/17 148/12 185/5
Wood [1]  191/21
Woods [8]  17/18
97/7 140/21 141/14
142/5 154/9 157/15
167/5
Woods' [1]  187/4
word [11]  5/9 14/14
14/18 16/11 58/24
104/14 118/25 180/4
180/16 180/16 186/2
words [12]  15/16
19/25 40/2 60/6 61/6
83/16 104/15 127/25
139/12 141/8 141/17
148/8
wore [1]  159/12
work [7]  10/24 12/19
17/24 18/4 52/6 60/2
150/4
worked [4]  17/19
45/1 77/10 189/17
worker [4]  151/20
168/12 168/14 192/4
working [4]  101/14
104/6 157/4 192/5
works [1]  80/15
world [6]  16/25 18/3
101/22 118/24 126/3
183/11
worried [4]  107/2
150/19 157/17
157/22
worse [2]  31/9
194/18
worst [4]  10/3
101/11 170/2 194/19
would [145]  3/22
4/13 5/23 9/19 10/10
11/17 12/3 12/21
13/1 14/24 14/25
16/13 16/15 18/8
19/23 19/24 21/25
22/2 22/18 22/24
23/25 24/25 26/6
26/8 28/22 29/12

30/21 32/3 32/13
32/18 33/2 33/4 35/4
37/7 38/2 38/8 38/9
38/11 38/24 39/1
41/5 42/24 42/24
43/2 45/2 45/3 45/12
45/17 47/16 48/1
48/3 48/10 52/13
52/19 57/13 57/22
59/4 60/10 65/15
66/20 66/25 67/19
68/5 68/20 69/7 69/9
69/14 69/14 70/3
71/11 72/6 72/15
72/19 74/8 74/9
74/10 77/17 82/17
86/11 87/7 87/18
87/22 87/22 90/6
92/12 92/14 103/1
103/24 105/5 106/9
107/11 108/4 109/5
114/18 123/21
126/16 130/7 132/13
132/21 132/23
132/24 134/19
136/14 136/25 138/9
138/16 142/2 143/7
143/13 149/24
150/11 150/13
150/14 152/6 152/12
154/6 155/15 158/15
159/1 161/4 161/7
161/10 166/1 169/10
174/15 174/16
174/18 174/21 175/1
175/2 175/14 175/23
175/25 176/10 178/1
178/5 178/6 181/4
187/18 188/17 191/7
192/10 195/23
195/24 197/9
wouldn't [6]  30/22
30/23 43/2 46/20
62/4 63/11
woven [1]  163/7
Wright [2]  1/18 2/2
wrist [1]  163/7
write [8]  43/12 44/2
145/16 146/8 146/22
147/2 147/11 147/24
writer [1]  121/20
writes [1]  17/21
writing [2]  178/2
178/11
written [7]  93/11
129/5 146/10 146/15
177/21 180/20 198/8
wrong [1]  8/16
wrote [16]  37/17
91/11 93/10 111/20
112/5 119/4 140/17
145/4 146/7 146/24
158/4 164/21 171/23
182/10 188/12 191/1
wry [1]  143/23
wryly [2]  119/25
143/22

Y

y'all [1]  162/8

yeah [5]  61/8 67/22
158/14 161/25
196/13
year [22]  13/20 50/3
52/6 52/6 59/9 78/25
83/2 105/25 107/2
110/2 110/2 132/13
140/12 141/3 141/20
146/15 151/17
151/18 156/13
159/12 163/25 186/6
years [7]  20/1 65/10
65/11 107/1 132/11
183/14 196/23
yes [34]  38/16 39/20
41/5 42/16 43/10
55/20 59/13 62/20
76/25 77/2 77/24
81/22 82/3 82/6
84/23 84/23 86/21
87/2 87/15 88/9
133/15 134/23
136/10 138/14 145/5
152/8 165/24 175/6
175/11 176/1 196/2
196/22 196/25
197/10
yet [14]  10/13 21/24
29/1 42/10 52/23
87/18 97/15 110/8
112/9 114/6 118/22
130/22 165/17 169/6
York [6]  1/19 88/25
89/8 124/3 134/6
137/14
you [196]  3/14 14/25
14/25 19/20 19/21
20/23 21/16 21/23
22/22 22/23 22/24
24/3 24/4 24/19
26/21 28/16 29/11
29/17 30/24 31/2
31/9 31/14 31/18
31/20 31/20 31/22
32/3 33/17 34/16
36/13 36/18 38/6
38/8 38/13 39/3 39/5
39/18 40/2 40/7
40/11 40/16 42/12
42/19 47/24 50/8
50/24 51/1 51/15
55/18 58/9 58/14
58/23 62/5 62/13
63/10 67/22 68/12
68/13 68/14 69/2
69/3 69/7 69/10
69/25 71/6 72/22
77/1 77/7 78/22
86/24 87/9 87/12
88/4 90/12 92/24
93/4 98/14 100/9
100/13 100/15 103/5
103/22 104/21
106/20 107/16
107/18 107/19
107/20 107/20 108/7
108/8 108/18 111/21
111/21 124/7 124/8
124/13 126/16

128/19 131/16
131/19 131/24 132/3
134/4 134/6 134/9
134/12 134/13
134/21 136/8 136/16
136/20 139/10 143/9
143/10 144/5 148/10
148/12 148/14
148/18 148/19
148/19 148/20 150/1
150/19 150/20
150/21 150/24 152/4
152/5 152/6 152/11
152/12 152/12
152/13 153/4 153/15
154/11 154/11
154/16 154/17
154/20 154/20 155/2
162/9 163/16 163/19
164/22 165/21
166/17 166/18 173/2
173/8 174/14 174/16
174/17 174/18
174/19 174/22
174/22 174/22 175/4
175/9 175/21 175/23
175/25 176/11
176/12 176/16
177/24 178/2 178/10
178/12 179/19
179/19 182/11
183/11 183/12
183/12 186/6 190/3
190/4 192/23 193/5
193/7 193/19 193/21
194/9 194/13 194/14
196/3 196/11 198/5
198/7 198/8 198/10
you'll [2]  39/7 99/6
you're [12]  28/17
28/19 29/8 38/9 56/7
58/15 61/15 84/14
84/17 86/12 86/15
187/15
you've [7]  3/12
24/22 31/21 85/1
99/5 174/16 177/23
you,' [1]  14/23
young [6]  30/7 30/18
31/11 36/16 171/23
187/18
your [217]
yours [1]  162/4

Z

zero [1]  26/7

(36) without... - zero