IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

---

NICOLE P. ERAMO,

        Plaintiff,

- against -

ROLLING STONE LLC, SABRINA RUBIN ERDELY, AND WENNER MEDIA LLC,

        Defendants.

Case No. 3:15-cv-00023-GEC

---

## DEFENDANTS' MOTION *IN LIMINE* NO. 5 AND SUPPORTING AUTHORITIES: REPORT OF THE COLUMBIA SCHOOL OF JOURNALISM

Defendants Rolling Stone LLC, Wenner Media LLC, and Sabrina Rubin Erdely (collectively, "Defendants") submit this motion *in limine* to exclude evidence and argument, including in opening statements, concerning the conclusions reached in the Columbia School of Journalism about the reporting, editing, and fact-checking processes behind the Article (the "CJR Report"). Defendants submit that the CJR Report itself, as well as any testimony or argument relating to the findings, opinions, or conclusions of the CJR Report, should be excluded because the probative value of this evidence is substantially outweighed by the danger of unfair prejudice, confusing and misleading the jury, and wasting time.[1]

---

[1] To be clear, Defendants do *not* seek to exclude statements made by any party to the Columbia School of Journalism. Likewise, Defendants do *not* seek to exclude testimony or evidence that may refer to the fact of the Columbia School of Journalism's investigation, including that Rolling Stone hired the Columbia School of Journalism to perform an investigation and that Rolling Stone took the Article down from its website at the time the Columbia Journalism Report was published.

**FACTUAL BACKGROUND**

After Rolling Stone published the "Note to Readers" on December 5, 2014, notifying the public that it had lost faith in Jackie's account, Rolling Stone asked the Columbia School of Journalism to conduct an independent review of the editorial processes that led to the publication of the Article. The agreement gave the Columbia investigators full independence in reporting and writing their report.[2]

When the investigation was complete, Rolling Stone published the CJR Report on its website on April 5, 2015.[3] Concurrently with its publication, Rolling Stone took the Article down from Rollingstone.com and replaced it with the Report, accompanied by a "Note from the Editor."[4] The Note concluded with an apology to "our readers and to all of those who were damaged by our story and the ensuing fallout, including members of the Phi Kappa Psi fraternity and UVA administrators and students."[5]

On Rolling Stone's website, the CJR Report is titled "Rolling Stone and UVA: The Columbia University Graduate School of Journalism Report: An Anatomy of a Journalistic Failure," with another subheading saying "'A Rape on Campus' What Went Wrong?"[6] The Report was written by Steve Coll, Dean of the Columbia School of Journalism and a Pulitzer Prize winner, Sheila Coronel, a journalism professor and Dean of Academic Affairs at the

---

[2] Declaration of William Dana in Support of Defendants' Motion for Summary Judgment ("WD") ¶ 48 (Dkt. 106); WD Ex. 77 (Dkt. 106-14).

[3] The Rolling Stone version of the CJR Report is located at http://www.rollingstone.com culture/features/a-rape-on-campus-what-went-wrong-20150405. Rolling Stone also published a shorter version of the CJR in the print edition of *Rolling Stone* magazine in April 2015.

[4] WD ¶ 51.

[5] *Id.*

[6] The Columbia School of Journalism also published the CJR Report on the *Columbia Journalism Review*'s website on April 5, 2015, at http://www.cjr.org/investigation/rolling_stone_investigation.php. Plaintiff used this version of the CJR Report as Plaintiff's Exhibit 6 in depositions, and Defendants have attached that version as Exhibit 1 hereto.

2

Columbia School of Journalism, and Derek Kravitz, a postgraduate research scholar at the Columbia School of Journalism.

Based on CJR's own reporting, the Report contains a summary of the facts surrounding the reporting, editing, and fact-checking of the Article, primarily as it relates to Jackie's alleged gang rape and her interactions with the three friends.[7] The Report also touches on Erdely's reporting on UVA and Eramo.[8] Issued by the most prestigious journalism school in the country, the Report contains the authors' professional opinions and conclusions that Erdely and Rolling Stone failed to live up to appropriate journalistic standards. The three primary journalistic criticisms relate to CJR's conclusion that (1) Erdely and Rolling Stone failed to contact the three friends; (2) Erdely and Rolling Stone failed to identify and contact the ringleader of Jackie's alleged gang rape, and (3) Erdely failed to provide sufficient information to Phi Kappa Psi when seeking comment.[9] The Report is rife with further professional judgments criticizing the actions and decisions of Erdely and Rolling Stone, including but not limited to the following:

- "*Rolling Stone*'s repudiation of the main narrative in 'A Rape on Campus' is a story of journalistic failure that was avoidable. The failure encompassed reporting, editing, editorial supervision and fact-checking. The magazine set aside or rationalized as unnecessary essential practices of reporting that, if pursued, would likely have led the magazine's editors to reconsider publishing Jackie's narrative so prominently, if at all. The published story glossed over the gaps in the magazine's reporting by using pseudonyms and by failing to state where important information had come from." (Ex. 1 at ERAMO-04543.)
- "The particulars of *Rolling Stone*'s failure make clear the need for a revitalized consensus in newsrooms old and new about what best journalistic practices entail, at an operating-manual-level of detail." (*Id*. at ERAMO-04544.)
- "But three failures of reporting effort stand out. They involve basic, even routine journalistic practice – not special investigative effort. And if these reporting pathways had been followed, *Rolling Stone* very likely would have avoided trouble." (*Id*. at ERAMO-04547.)

---

[7] *See* Ex. 1 at ERAMO-045341-04551, ERAMO-04555-59.

[8] *See id*. at ERAMO-04551-04555.

[9] *See id*. at ERAMO-04547-04551, ERAMO-04555-59.

3

- "Sean Woods, Erdely'' primary editor, might have prevented the effective retraction of Jackie's account by pressing his writer to close the gaps in her reporting. He started his career in music journalism but had been editing complex reported features at *Rolling Stone* for years. Investigative reporters working on difficult, emotive or contentious stories often have blind spots. It is up to their editors to insist on more phone calls, more travel, more time, until the reporting is complete. Woods did not do enough." (*Id*. at ERAMO-04555.)

Despite the harsh criticism leveled at Erdely and Rolling Stone with respect to Jackie's central account, the Report does not catalogue journalistic errors relating to Rolling Stone's reporting on UVA or Eramo.[10] The Report further finds that Erdely and Rolling Stone "believed firmly" that Jackie's account was reliable,[11] and it found "no evidence" that Erdely had invented any facts in the Article.[12]

## ARGUMENT

### The CJR Report and Testimony about the Findings, Opinions, or Conclusions of the CJR Report Should Be Excluded under Rule 403

Under Rule 403, the Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Rule dictates exclusion here because the CJR Report and its conclusions and findings threaten to confuse the jury into applying an improper standard of fault, improperly influence the jury's fact-finding function, inflame the jury against Defendants, and waste time. These dangers substantially outweigh the limited probative value of the Report and its conclusions, opinions, and findings.

---

[10] *Id*. at ERAMO-04551.

[11] *Id*. at ERAMO-0452.

[12] *Id*. at ERAMO-04560.

### A. The Danger of Unfair Prejudice, Confusing and Misleading the Jury, and Wasting Time is Extremely High

The CJR Report and testimony about its findings, opinions, or conclusions present a serious risk of unfair prejudice to the Defendants for at least four independent reasons.

First, this evidence will confuse the jury regarding the proper standard and tempt jurors to find liability based on the overwhelming impression conveyed by the CJR Report that Erdely and Rolling Stone did something wrong. As illustrated above, the CJR Report applies *objective standards of good journalism* to the Article and then faults Erdely and Rolling Stone for failing to live up to those standards. But the actual malice standard "requires that the defendant have a '*subjective awareness of probable falsity*,'" *Hatfill v. New York Times Co.*, 532 F.3d 312, 317 (4th Cir. 2008) (emphasis added) (citation omitted), and the Supreme Court has long recognized that even an "*extreme departure* from professional standards" does not rise to the level of actual malice. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989) (emphasis added). As the Supreme Court has made clear:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts as to the truth of his publication*.

*St. Amant v. Thompson,* 390 U.S. 727, 731 (1968) (emphasis added). The Fourth Circuit has held that it is *reversible error* to instruct the jury that actual malice may be established merely "by showing a departure from accepted journalistic practices," *Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 711 (4th Cir. 1991) (*en banc*). Yet the CJR Report is nothing more than a professional/expert evaluation from the leading journalism school in the country of how the Article met, or failed to meet, its view of journalism standards. To admit the CJR Report would invite the jury to find actual malice "by showing a departure from accepted journalistic practices," the exact reversible error the Fourth Circuit found in *Reuber*.

5

Because of this risk, courts routinely exclude or disregard evidence that a defamation defendant has failed to live up to journalistic standards, even when the plaintiff has an expert to testify on the topic (which Eramo does not). *See*, *e.g.*, *Carr v. Forbes, Inc.*, 121 F. Supp. 2d 485, 496 (D.S.C. 2000) (excluding testimony of plaintiff's journalism expert because the "balance and fairness" standard advocated by Plaintiff's experts was inconsistent with the actual malice standard), *aff'd*, 259 F.3d 273 (4th Cir. 2001); *Tilton v. Capital Cities/ABC, Inc.*, 938 F. Supp. 751, 753-54 (N.D. Okla. 1995) (excluding plaintiff's journalism expert because "the testimony would be confusing to the jury, would be a waste of time and would be unfairly prejudice to Defendants"), *aff'd*, 95 F.3d 32 (10th Cir. 1996); *Brueggemeyer v. ABC, Inc.*, 684 F. Supp. 452, 466 (N.D. Tex. 1988) (excluding plaintiff's journalism expert because, among other things, the expert's opinion that the defendant "failed in its newsgathering procedures to exercise due care" was inconsistent with the actual malice standard).[13] Here, by using the CJR Report, Plaintiff in effect seeks to introduce an expert's report on journalistic standards, without the actual expert to testify and be cross-examined.[14] Permitting Plaintiff to put in the CJR Report or testimony about its findings, opinions, or conclusions would give Plaintiff a back door to introducing expert evidence on journalistic standards without meeting the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2) or the substantive requirements of Federal Rule of Evidence 702(a), including that an expert's testimony will "help the trier of fact to understand the evidence or to

---

[13] *See also Desnick v. ABC, Inc.*, 1999 U.S. Dist. LEXIS 994, at *54 (N.D. Ill. Jan. 29, 1999) (disregarding on summary judgment expert testimony that the defendant television network had "violated virtually every code that journalists have" because the plaintiff must prove a "more than extreme departure from professional standards"). *Cf. In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 545 (S.D.N.Y. 2004) (precluding plaintiffs from presenting expert testimony on ethical standards governing pharmaceutical testing where such testimony would "unfairly . . . prejudice and confuse the trier by introducing the 'experts'' opinions and rhetoric concerning ethics as alternative and improper grounds for decision on bases other than the pertinent legal standards").

[14] The CJR authors are beyond the Court's subpoena powers under Fed. R. Civ. P. 45 and have asserted the New York shield law and/or reporter's privilege in response to previous proposed discovery requests from Plaintiff in this case.

6

determine a fact in issue." Far from assisting the jury, introduction of the Report or testimony about its findings and conclusions would hopelessly confuse the jury as to the applicable standard and cause them to surrender their common sense to the aura of journalistic authority surrounding it.

Second, permitting the jury to review the factual findings in the CJR Report or hear testimony about them may improperly influence the jury's decision-making function and tempt them to cede their fact-finding role to Columbia's previous investigation on specific topics at issue in this case. While much of the CJR Report relates to "Drew," the "three friends," and Phi Kappa Psi—and is thus largely irrelevant—a portion deals with specific events and facts that need to be decided by the jury at this trial. For instance, the Report makes factual statements about what Jackie told Eramo in their meeting on May 20, 2014 and their subsequent meetings with police after the bottle incident in Spring 2012.[15] It also makes factual statements about Erdely's communications with Emily Renda in July 2014 about naming Phi Kappa Psi in the Article, as well as Erdely's September 2014 interview with President Sullivan, in which Erdely confronted Sullivan about the three alleged gang rapes reported to Eramo.[16] Relying on unnamed "University sources," the CJR Reports also gives an explanation for the University's delay in launching a formal investigation and notifying Phi Kappa Psi of Jackie's allegations.[17] This material is all cumulative of evidence that the parties can and will offer through live testimony and documents at trial. But worse, it presents a potentially competing set of findings on some of the very factual questions at issue in this case, which can only tempt the jury to cede its fact-finding duty to the previously concluded investigation on the Article. *See Osterneck v.*

---

[15] Ex. 1 at ERAMO-04552-53.

[16] *Id*. at ERAMO-04553, -04554.

[17] *Id*. at ERAMO-04554.

7

*E.T. Barwick Indus., Inc.*, 106 F.R.D. 327, 334 (N.D. Ga. 1984) (excluding report of corporate investigation because of the "potential for unduly influencing the jury's decisionmaking" because the jury might treat it as more than "one more piece of evidence in the case").

Third, the harsh criticism in the Report threatens to inflame the jury against the Defendants and cause them to prejudge the Article as a "failure" rather than performing their duty to independently find the facts based on evidence at trial. The title of the Report itself is highly prejudicial, referring to the Article as a "Journalistic Failure" and asking "What Went Wrong?" The Report pounds away at the theme of "failure," repeatedly stressing how Erdely and Rolling Stone failed to live up to journalistic standards that do not even set the bar in an actual malice case like this one (*see supra*).

Fourth, introduction of the CJR Report or testimony as to its findings presents a real danger of wasting significant time on largely tangential matters like "Drew," the "three friends," and the adequacy of Erdely's request for comment to Phi Kappa Psi. *See Nunnally v. Graham*, 56 A.3d 130, 140-41 (D.C. Ct. App. 2012) (affirming exclusion of investigative report because the evidence was cumulative, the report was based on statements of witnesses not subject to cross examination, and because "the jurors may have been subjected to an extensive mini-trial on the sixty-six page report").

      **B.    The CJR Report and Testimony About Its Findings, Opinions, or Conclusions Have Limited Probative Value**

Weighed against these substantial and palpable risks, the CJR Report has extremely limited probative value. To begin with, and as discussed immediately above, much of the CJR Report relates to topics that are tangential to the main issues. Whatever the merit of Columbia's criticisms on Rolling Stone's failure to identify and locate Drew and the three friends, and the

8

quality of the request for comment to Phi Kappa Psi, these matters do not relate to the allegedly defamatory statements at issue in this case. *See* Compl. ¶¶ 210, 225, 240, 255, 270, 285.

Moreover, to the extent the CJR Report relates directly to Erdely's and Rolling Stone's reporting on Eramo and UVA (as outlined above), it provides cumulative evidence derived from a process that lacks the reliability of this judicial proceeding following the Federal Rules of Evidence. The Report relies on hearsay from anonymous sources and rampant speculations about what "would have happened" if Erdely had done what its authors believe she should have done.[18] Further, the CJR authors did not have access to the full documentary and testimonial record in this case. Jackie did not participate in the CJR investigation,[19] and UVA declined to answer any questions and did not provide documents relating to Jackie's case because of federal student privacy laws.[20] In this proceeding, UVA witnesses (and potentially Jackie) will testify at trial, and the University has produced voluminous documents, including relevant student records pursuant to the Court's Order dated November 19, 2015 (Dkt. 41). Defendants have a right to present all this evidence to the jury without having it prejudge their reporting based on the CJR Report's view of the facts.

Finally, for the reasons stated above, the CJR Report's opinions and conclusions on how Defendants' reporting and editing processes measured up against objective journalism standards are of little (if any) probative value on the question of actual malice, which looks to the defendant's subjective awareness of probable falsity. If anything, the Report helps demonstrate a

---

[18] *See* Ex. 1 at ERAMO-04548, -04549, 04551 (speculation); *id*. at ERAMO-04553, -04554 (anonymous sources). In discovery for this action, Eramo admitted that she spoke off the record to the CJR authors to confirm information attributed in the Report to "UVA sources," and she did so without the authorization of UVA. Ex. 2 [Eramo Dep.] 307:7-25, 308:6-310:2, 316:2-324:13. But the other anonymous source or sources referenced in the Report are unknown.

[19] Ex. 1 at ERAMO-04542.

[20] *Id*. at ERAMO-04552, -04554.

*lack* of actual malice because it specifically found that Erdely and Rolling Stone "believed firmly that Jackie's account was reliable" and uncovered no evidence that Erdely had invented any facts in the Article.[21] But with the harsh criticism directed at Rolling Stone and Erdely in the Report, it will be difficult for the jury to parse these distinctions when weighing actual malice.

In sum, Rule 403 mandates exclusion because the risk of unfair prejudice, confusing and misleading the jury, and wasting time substantially outweighs the limited probative value of this evidence.

## CONCLUSION

Courts in defamation actions "do not sit as some kind of journalism review seminar offering our observations on contemporary journalism and journalists." *Tavoulareas v. Piro*, 817 F.2d 762, 796 (D.C. Cir. 1987) (internal quotation marks and citation omitted). Yet introducing the CJR Report and testimony as to its findings, opinions, and conclusions will improperly invite the jury to do just that. Such an exercise not only would confuse the jury about the applicable standard but distract them from the real issue: whether Erdely and Rolling Stone *knew* any allegedly defamatory statement to be false or *entertained serious doubts* about any allegedly defamatory statement at the time of publication. Furthermore, evidence of this sort will unfairly prejudice Defendants by branding the Article a "failure" and them as outcasts of the journalism profession. For these and other reasons detailed above, the Court should exclude the CJR Report itself, as well as any testimony or argument relating to the findings, opinions, or conclusions of the CJR Report.

---

[21] *Id*. at ERAMO-0452, -04560.

10

Case 3:15-cv-00023-GEC Document 176 Filed 09/16/16 Page 10 of 12 Pageid#: 11301

Dated: New York, New York
September 16, 2016

By: /s/ Elizabeth A. McNamara

    Elizabeth A. McNamara (*pro hac vice*)
    Samuel M. Bayard (*pro hac vice*)

    DAVIS WRIGHT TREMAINE LLP
    1251 Avenue of the Americas, 21st Fl.
    New York, New York 10020-1104
    Telephone: (212) 489-8230
    Fax: (212) 489-8340
    Email: lizmcnamara@dwt.com
             samuelbayard@dwt.com

    Alison Schary (*pro hac vice*)
    DAVIS WRIGHT TREMAINE LLP
    1919 Pennsylvania Avenue NW, Suite 800
    Washington, DC 20006-3401
    Telephone: (202) 973-4248
    Fax: (202) 973-4448
    E-mail: alisonschary@dwt.com

    W. David Paxton (VSB No. 19798)
    J. Scott Sexton (VSB No. 29284)
    Michael J. Finney (VSB No. 78484)
    GENTRY LOCKE
    10 Franklin Road S.E., Suite 900
    P.O. Box 40013
    Roanoke, VA 24022-0013
    Telephone: (540) 983-9300
    Fax: (540) 983-9400
    E-mail: paxton@gentrylocke.com
    E-mail: sexton@gentrylocke.com
    E-mail: finney@gentrylocke.com

    *Attorneys for Defendants Rolling Stone LLC, Sabrina Rubin Erdely, and Wenner Media LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2016, the foregoing was served by CM/ECF on counsel of record for all parties to this action. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                        /s/ Elizabeth A. McNamara
                                        Elizabeth A. McNamara