# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

|  |  |  |
|---|---|---|
| NICOLE P. ERAMO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:15-cv-00023-GEC |
| | ) | |
| ROLLING STONE LLC, | ) | |
| SABRINA RUBIN ERDELY, and | ) | |
| WENNER MEDIA LLC, | ) | |
| | ) | |
| Defendants. | ) | |

---

## SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Elizabeth A. McNamara (*pro hac vice*)
Samuel M. Bayard (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 489-8230
Fax: (212) 489-8340

Alison B. Schary (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, D.C. 20006-3401
Telephone: (202) 973-4248
Fax: (202) 973-4448

W. David Paxton (VSB No. 19798)
Michael J. Finney (VSB No. 78484)
J. Scott Sexton (VSB No. 29284)
GENTRY LOCKE
10 Franklin Road S.E., Suite 900
P.O. Box 40013
Roanoke, Virginia 24022-0013
Telephone: (540) 983-9300
Fax: (540) 983-9400

*Attorneys for Defendants Rolling Stone LLC,*
*Sabrina Rubin Erdely, and Wenner Media LLC*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atkinson v. McLaughlin,*
    462 F. Supp. 2d 1038 (D.N.D. 2006) ........................................................................5

*Bindrim v. Mitchell,*
    92 Cal. App. 3d 61 (Ct. App. 1979) .........................................................................9

*McCoy v. Hearst Corp.,*
    42 Cal. 3d 835 (1986) .............................................................................................9

*Churchill v. State,*
    378 N.J. Super. 471 (App. Div. 2005) ....................................................................5

*Clark v. Viacom Int'l Inc.,*
    617 F. App'x 495 (6th Cir. 2015) ......................................................................4, 5, 6

*D.A.R.E Am. v. Rolling Stone Magazine,*
    101 F. Supp. 2d 1270 (C.D. Cal. 2000), *aff'd* 270 F.3d 793 (9th Cir. 2001) ...........10

*In re Davis,*
    347 B.R. 607, 612 (W.D. Ky. 2006) ...............................................................5, 6, 7, 13

*Diamond Ranch Acad., Inc. v. Filer,*
    No. 2:14-CV-751-TC, 2016 WL 633351 (D. Utah Feb. 17, 2016) .........................5

*Firth v. State,*
    98 N.Y.2d 365 (2002) .......................................................................................4, 5, 11

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974) ...............................................................................................9

*Hoffman v. Washington Post Co.,*
    433 F. Supp. 600 (D.D.C. 1977), *aff'd,* 578 F.2d 442 (D.C. Cir. 1978) .................10

*Katz v. Odin, Feldman & Pittleman, P.C.,*
    332 F. Supp. 2d 909 (E.D. Va. 2004) ....................................................................4

*Larue v. Brown,*
    235 Ariz. 440 (Ct. App. 2014) ........................................................................5, 6, 7, 8

*Logan v. D.C.,*
    447 F. Supp. 1328 (D.D.C. 1978) ...........................................................................11

*McFarlane v. Sheridan Square Press, Inc.*,
    91 F.3d 1501 (D.C. Cir. 1996) ....................................................................9

*Morrissey v. William Morrow & Co.*,
    739 F.2d 962 (4th Cir. 1984) ....................................................................4

*New Times, Inc. v. Isaacks*,
    146 S.W.3d 144 (Tex. 2004) ....................................................................10

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ............................................................................9, 12

*Pippen v. NBCUniversal Media, LLC*,
    734 F.3d 610 (7th Cir. 2013) ................................................................4, 5

*Salyer v. S. Poverty Law Ctr., Inc.*,
    701 F. Supp. 2d 912 (W.D. Ky. 2009) ..................................................5, 7

*Time, Inc. v. Johnston*,
    448 F.2d 378 (4th Cir. 1971) ....................................................................6

*Trans World Accounts, Inc.* v. *Associated Press*,
    425 F. Supp. 814 (N.D. Cal. 1977) ........................................................11

*Washington Nat. Ins. Co. v. Administrators*,
    2 F.3d 192 (7th Cir. 1993) ....................................................................10

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 4

I.      EXISTING LAW SURROUNDING REPUBLICATION AND ACTUAL MALICE
         REQUIRES A FINDING THAT THE ARTICLE WAS NOT REPUBLISHED .............. 4

         A.      The Note to Readers Did Not Reaffirm the Contents of the Article or Seek
                 New Readership For It, Thus it Was Not a Republication ..................................... 4

         B.      Since the Note to Readers is Probative Only of a *Lack* of Actual Malice,
                 Plaintiff Should Not Be Permitted to Offer it As Evidence of Actual Malice........ 8

II.     POLICY CONSIDERATIONS WEIGH OVERWHELMINGLY AGAINST A
         FINDING THAT THE NOTE TO READERS EFFECTED A REPUBLICATION ....... 11

As requested by the Court, Defendants Rolling Stone LLC, Wenner Media LLC (collectively, "Rolling Stone"), and Sabrina Rubin-Erdely ("Erdely") respectfully submit this supplemental memorandum of law concerning whether the December 5, 2015 disclaimer "A Note to Our Readers" (the "Note to Readers") appended to the online version of "A Rape on Campus" (the "Article") constituted a republication of the challenged statements in the Article itself.

## INTRODUCTION

At the conclusion of the September 15, 2016 hearing, the Court requested further briefing from the parties on the question of whether, when it appended the December 5, 2015 Note to Readers to the online version of the Article, Rolling Stone effectively "republished" any portion of the Article itself. The answer—which can and should be decided by the Court as a matter of law—is that it did not.

The Note to Readers and the apology it contained notified the world that "[i]n the face of new information, there now appear to be discrepancies in Jackie's account, and we have come to the conclusion that our trust in her was misplaced." At oral argument the Court appeared to recognize that the plain language of the Note repudiated—and therefore could not "republish"— any information in the Article that was sourced directly to Jackie. Accordingly, any argument concerning republication cannot as a matter of law apply to three of the four remaining challenged statements in the Article, Statements #2-#4.[1]  Because each of these statements is

---

[1] Jackie is the explicit source of Statement #2 ("Lots of people have discouraged her from sharing her story, *Jackie tells me with a pained look*, including the trusted UVA dean to whom Jackie reported her gang-rape allegations more than a year ago." Compl. ¶¶ 210, 225; SW Ex. 1 (Dkt. 103-1) ("Article") at RS001072; *see also* Plaintiff's Memorandum of Law in Support of Her Motion for Summary Judgment ('Pl. SJ Mot.") (Dkt. 98), Appendix of Challenged Statements.); Statement #3 ("Jackie got a different explanation when she'd eventually asked Dean Eramo the same question. *She says* Eramo answered wryly, 'Because nobody wants to send their daughter to the rape school.'" Compl. ¶¶ 210, 225; Article at RS001077); and Statement #4 ("A bruise still mottling her face, *Jackie sat in Eramo's office in May 2014* and *told her* about the two others. . . . As Jackie wrapped up her story,

unambiguously sourced to Jackie, it follows that the Note to Readers disclaimed each of them and they were not republished.[2]

Instead, the Court appears to be considering whether the Note to Readers in effect "republished" the remaining challenged Statement #5—"Experts apprised of the situation by RS agreed that despite the absence of an official report, Jackie's passing along two other allegations should compel the school to take action out of regard for campus safety"[3]—because the Note did not affirmatively disclaim that Statement.  This is an issue of law for the Court.  The law requires an affirmative reaffirmation of the allegedly defamatory material, and Defendants are aware of no prior decision finding republication via a disclaimer, correction or apology.  Corrections and clarifications are routinely appended to online articles, and in keeping with that practice, Rolling Stone's Note to Readers acted as an effective retraction of Jackie's story.  Finding possible liability for content *not* specifically encompassed by the clarification/correction will cause publishers to either stop appending corrections to online articles—removing the most effective way to provide notice to the public—or force them to publish corrections at a separate location, thereby dramatically reducing the remedial effect.  Because both existing law and significant policy concerns weigh heavily against a finding of republication, the Court should put Plaintiff's novel theory to rest now, and find as a matter of law that no republication occurred.

In sum, in looking at the question of whether Rolling Stone published the Article with actual malice, only one date matters:  November 19, 2014.  On that date, Rolling Stone published

---

*she was disappointed* by Eramo's nonreaction. *She'd expected* shock, disgust, horror. . . ."  Compl. ¶¶ 210, 225; Article at RS001078.) (emphasis added to each).

[2] The Court has also indicated that it considers <u>Statement #1</u>, the Article's dek referring to the "whole new kind of abuse" Jackie suffered when she "tried to hold [her assailants] accountable," to be non-actionable opinion and/or hyperbole, and will grant summary judgment to Defendants on that statement.  Statements #6-#13 are not at issue here, since all are post-publication statements that were not implicated by the Note to Readers that was appended to the Article itself.  Thus none could have been "republished" under Plaintiff's theory.

[3] Compl. ¶¶ 210, 225; Article at RS001078-79.

a single, identical article online and in print.[4]  The online edition was published at the web

address http://www.rollingstone.com/culture/features/a-rape-on-campus-20141119 (the "Rape on

Campus URL").[5]  (Ex. 1.)  Subsequent to November 19, the Article was not moved from that

URL, was not published at any other URL, and the text of the Article itself was not modified.

The Article stayed at this same Rape on Campus URL until April 5, 2015, when it was taken

down and replaced by the full independent report of the Columbia Journalism School, which

remains to this day.  The *only* change Rolling Stone made was to add the Note to Readers at the

top of the page on December 5, 2014,[6] putting readers on notice that Rolling Stone now

questioned Jackie's credibility, promising a forthcoming investigation and apologizing to

"anyone affected by the story."  (Ex. 2.)  It would be a cruel irony and an error for Defendants to

face possible liability because they took prompt and decisive steps to address and communicate

their concerns with Jackie's credibility.

---

[4] Plaintiff's Statement of Undisputed Facts in Support of Her Motion for Partial Summary Judgment (Dkt. 99) ("Pl. SUF") ¶¶ 24, 25.

[5] Plaintiff erroneously stated at the September 15 oral argument that the Note to Readers was appended to the Article at a different URL.  The documentary evidence establishes that the URL with the Article never changed.  *See,* Pl. SUF ¶ 135; Defendants' Response to Plaintiff's Statement of Undisputed Facts (Dkt. 122) ("Def. Response to SUF") ¶ 135.

[6] The December 5 Note to Readers was replaced with a revised Note to Readers on December 6, which even more specifically identified some of the "discrepancies" in Jackie's account, acknowledges that Rolling Stone was "mistaken" and again "apologize[d] to anyone affected by the Story."  (Ex. 3)  The text of the Note to Readers was also posted on a separate, stand-alone web page, located at the URL http://www.rollingstone.com/culture/news/a-note-to-our-readers-20141205 (the "Note to Readers URL").  A copy of the December 5 version of the Note to Readers is attached hereto as Exhibit 4.  The text of the Article has never appeared at this stand-alone Note to Readers URL; nor has the Note to Readers contained a link to the Article.  *Id.*; Def. Response to SUF ¶ 136.

## ARGUMENT

## I. EXISTING LAW SURROUNDING REPUBLICATION AND ACTUAL MALICE REQUIRES A FINDING THAT THE ARTICLE WAS NOT REPUBLISHED

### A. The Note to Readers Did Not Reaffirm the Contents of the Article or Seek New Readership For It, Thus it Was Not a Republication

The legal concept of "republication" arises as a narrow exception to a doctrine known as the "single publication rule."  The single publication rule (which both parties agree applies here[7]) holds that a defamation claim accrues when an allegedly defamatory article is first published. Subsequent access to the publication does not trigger the statute of limitations anew unless the article is deemed to have been "republished."[8]  Thus, a new cause of action does not accrue each time a third party reads an offending statement; it only accrues if a publisher reiterates the statement with the goal of reaching a new audience.  "The general rationale behind the [single publication rule] is that if the speaker affirmatively says the same thing again at a later time to a new audience, then he has intended to engender additional reputational harm to the plaintiff." *Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 504–05 (6th Cir. 2015).  Thus the measure of a republication—whether in print or online—is whether the speaker has (i) "*affirmatively* reiterated" the defamatory statement, (ii) "in an attempt to reach a *new audience* that the statement's prior dissemination did not encompass."  *Id.* at 505 (citing *Firth*, 98 N.Y. 2d at 370,) (emphasis added).

---

[7] *See Morrissey v. William Morrow & Co.*, 739 F.2d 962, 967 (4th Cir. 1984) (affirming the application of the single publication rule to a case decided under Virginia law); *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 918 (E.D. Va. 2004) (noting that "Virginia follows the 'single publication rule,' which permits only one [defamation] cause of action to be maintained for any single publication").  *See also* Pl. SJ Mot. p 51, n. 6; Plaintiff's Reply Brief in Support of Her Motion for Partial Summary Judgment (Dkt. 133) ("Pl. Reply Brief") p 34, n. 12.

[8] The single publication rule was developed to give effect to statutes of limitations for publication-based torts, since without the rule, "the statute of limitations would never expire so long as a copy of [a] book remained in stock." *Firth v. State*, 98 N.Y.2d 365, 369  (2002) (extending the single publication rule to online media).  Courts have agreed overwhelmingly that the single publication rule applies equally to online media. *See, e.g., id.* at 369; *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 615-16 (7th Cir. 2013) (noting that "[e]very state court that has considered the question applies the single-publication rule to information online," and collecting cases).

Courts routinely decide the question of whether a republication has occurred as a matter of law. *See, e.g.*, *Firth,* 98 N.Y.2d at 371 ("We conclude as a matter of law that this modification of the State's Web site did not constitute a republication of the allegedly defamatory report at issue here."); *see also Clark*, 617 F. App'x at 506 ; *Atkinson v. McLaughlin*, 462 F. Supp. 2d 1038, 1055 (D.N.D. 2006); *Churchill v. State*, 378 N.J. Super. 471, 478 (App. Div. 2005); *Pippen*, 734 F.3d at 616 ; *Salyer v. S. Poverty Law Ctr., Inc.*, 701 F. Supp. 2d 912, 920 (W.D. Ky. 2009); *Diamond Ranch Acad., Inc. v. Filer*, No. 2:14-CV-751-TC, 2016 WL 633351, at *11-12 (D. Utah Feb. 17, 2016) (finding as a matter of law that a republication had occurred where defendant had made substantial edits and modifications to the content of an original statement). These decisions are consistent with the two cases Plaintiff relies primarily upon. In *Larue v. Brown*, the Arizona Court of Appeals considered a jury's determination that the statute of limitations did not bar the plaintiff's claim since the website at issue had been "published in a modified form." 235 Ariz. 440, 443 (Ct. App. 2014). The court affirmed the decision, but only after rejecting the republication standard put to the jury and determining as a matter of law what *kind* of modification would be sufficient to effect a republication. *Id*. at 445-46.[9] Similarly, in *In re Davis* the district court reviewed a bankruptcy court's order, ruling as a matter of law on the question of whether certain modifications to a website amounted to a republication. 347 B.R. 607, 612 (W.D. Ky. 2006). The question put to this Court is not whether a modification occurred (which could be a question of fact), but rather whether the type of modification that indisputably *did* occur amounted to a republication under the single publication rule. Consistent with *Larue*, *Davis*, and ample other authority, this question is plainly one of law.

---

[9] The fact that the court below in *Larue* put the statute of limitations issue to the jury was error that the appellate court remedied on appeal, finding as a matter of law that there was a republication for different reasons. *Id.* To the degree that Plaintiff argues this case is precedent for "republication" being treated as a jury issue, Defendants also note that the *Larue* decision is from a state court in Arizona and has no precedential value for this Court.

Determining the question of republication as a matter of law is particularly appropriate here, where the material facts regarding when and how the Note to Readers was appended to the Article are not in dispute.[10]  The issue is as follows:  When a publisher appends to an online article a remedial correction, disclaimer, and/or partial retraction, can that publisher be held newly liable for any statements in the associated article or posting that are not expressly disclaimed in the correction?  Existing law surrounding republication and actual malice weigh squarely against such a finding.

In applying the two-prong test to online publications, courts have use tailored criteria to determine whether a publisher intended to reiterate the challenged statement and draw a new audience to it.  Thus, courts look at whether an allegedly defamatory article has been "substantively modified," *Larue,* 235 Ariz. at 446, focusing on whether the publisher has indicated an intention to affirmatively re-state, or double-down on, the allegedly defamatory statements.  Indeed, "[b]ecause a materially substantive change to the statement generally would amount to a new potentially defamatory publication in its own right, the courts' reference to substantive alterations is shorthand for the recognition that the republication doctrine focuses upon audience recruitment."  *Clark*, 617 F. App'x at 506.

This focus on an affirmative reaffirmation of the content is the precise approach taken in *Larue* and *Davis*.  In both of these cases, the court found republication because the newly added material either explicitly or implicitly *endorsed* the original content.  In *Larue*, the defendants posted "updates and rebuttals" below the original article that "referred to and re-alleged the substance of the original articles," and later "added to and altered the substance of the original

---

[10] Indeed, disposing of this question now is of particular importance given the Court's indication that Eramo will be treated as a limited-purpose public figure, required to show that Defendants acted with actual malice.  "[I]f the *New York Times* immunity rule applies, summary judgment, rather than trial on the merits, is a proper vehicle for affording constitutional protection."  *Time, Inc. v. Johnston*, 448 F.2d 378, 383 (4th Cir. 1971).

material by providing additional information in response to a reader's questions, ***and re-urging the truth of the original articles*** in response to another reader's criticism."  235 Ariz. at 446, 333 P.3d at 773 (emphasis added).  In *Davis*, the court similarly found a republication where the defendants added entirely new "breaking news" and "update" sections to a website devoted to criticizing the allegedly defamed party, holding that these new sections added "substantive information" that built upon and altered the originally published material.  334 B.R. at 610, 612.

Here, in connection with information in the Article that was sourced to Jackie, the Note to Readers does exactly the opposite.  Rather than reiterating its belief in the original story as told by Jackie, Rolling Stone explicitly warned readers of serious concerns and apologized, writing that, "[i]n the face of new information, there now appear to be discrepancies in Jackie's account, and we have come to the conclusion that our trust in her was misplaced."[11]  Perhaps most telling, at the time it was published, the Note to Readers was understood as an "effective retraction."  It was reported that way by the press[12] and it was understood that way by third-party witnesses in this case who were close to Eramo.[13]  Accordingly, there is no basis for Plaintiff to assert that the Note to Readers affirmed or reiterated any of the content of the original Article sourced to Jackie, which expressly applies to Statements #2, #3 and #4.

With regard to Statement #5, Plaintiff asks this Court to hold that the failure to actively disclaim the statement amounts to a passive reaffirmation of it and everything else in the 9,000-

---

[11] Ex. 2 at p 2.  The mere fact that the Note to Readers references the original Article does not make it a republication.  *See, e.g.*, *Salyer v. S. Poverty Law Ctr., Inc.*, 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009) (subsequent articles referencing and linking to original article do not constitute republications of original article).

[12] *See, e.g.*, Associated Press, "Rolling Stone retracts UVA rape story," *KOIN 6* (Dec. 5, 2014) [AS Ex. 39 (Dkt. 121-39)]; Reuters, "Rolling Stone Backs Away from University of Virginia Rape Story," *Newsweek* (Dec. 5, 2014) [AS Ex. 40 (Dkt. 121-40)]; Greg Toppo, "Rolling Stone retraction complicates fraught rape story," *USA Today* (Dec. 8, 2014) [AS Ex. 41 (Dkt. 121-41)].  *See also* the Columbia Journalism Review's report, SW Ex. 6 (Dkt. 103-6) at ERAMO-04543 (editor's note on December 5 "effectively retracted *Rolling Stone*'s reporting on Jackie's allegations of gang rape").

[13] *See, e.g.*, Pl. Ex. 19 (Dkt. 99-23) [Surface Dep.] 132:10-133:9; Pl. Ex. 32 (Dkt. 99-36) [Renda Dep.] 88:19-89:5, 213:6-214:2; EAM Ex. 87 (Dkt. 108-5) [Pinkleton Dep.] 216:16-217:3.

plus word Article.  Yet, as set forth above, the very cases Plaintiff relies on for her republication theory turn on a finding that the publisher was endorsing the original content and was "re-urging the truth of the original article[]." *Larue* 235 Ariz. at 446.   The purpose of the Note was plainly to alert readers to concerns with Jackie's credibility; not to reaffirm, republish or comment on the rest of the Article, much less to statements therein relating to Plaintiff.

**B.**    **Since the Note to Readers is Probative Only of a *Lack* of Actual Malice, Plaintiff Should Not Be Permitted to Offer it As Evidence of Actual Malice**

The republication doctrine invariably involves situations where the statute of limitations would otherwise bar a plaintiff's claims.  Here, Plaintiff faces no time bar.  Instead, she presses that republication occurred on December 5, 2014 because she hopes it will create a second opportunity for the jury to find actual malice.   However, an alleged defamatory statement can only be sent to a jury when the Court determines in the first analysis that a jury could find that clear and convincing evidence of actual malice exists in the record.  Here, Plaintiff has provided this Court with no evidence whatsoever—let alone clear and convincing evidence so that it is an appropriate jury question—that Rolling Stone published the Note to Readers with any doubt as to the accuracy of Statement #5 (the only statement at issue not clearly repudiated by the Note to Readers) or any implications they press from the Article.  To put this issue before a jury is contrary to established principles of actual malice.

First, republication can be evidence of possible actual malice only where the republication occurred following the emergence of information creating a "subjective awareness of probable falsity" of the allegedly defamatory statements.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332 (1974); *Bindrim v. Mitchell*, 92 Cal. App. 3d 61, 73 (Ct. App. 1979), *disapproved of on other grounds by McCoy v. Hearst Corp*., 42 Cal. 3d 835 (1986) (defendant only acted with actual malice with regard to the republished paperback edition of the challenged book).  But

here, Defendants' "subjective awareness" on December 5, 2014 was only that they no longer believed that Jackie was a credible source. The sources for Statement #5 were UVA (who confirmed that UVA issued no notice), UVA's public records documenting that no Clery Act notice went out, and multiple experts who confirmed that they believed the facts should have caused UVA to issue a notice because of campus safety. Plaintiff has identified not a scintilla of evidence (and indeed there is none) that Defendants subjectively believed *at any time* that Statement #5 was false, and most certainly no evidence to support such knowledge emerged after November 19, 2014.

Even more troubling, Plaintiff's republication theory for Statement #5 turns on the supposed failure to affirmatively disclaim it in the Note to Readers. Yet, it is black-letter law that a failure to retract an allegedly defamatory statement after publication may not be considered as evidence of actual malice, even when the statement has been shown to be false. *New York Times Co. v. Sullivan*, 376 U.S. 254, 286 (1964) (defendant's failure to retract was "not adequate evidence of malice for constitutional purposes"); *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) (finding "no authority . . . for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication."). If a failure to retract any part of an article cannot be evidence of actual malice, it necessarily follows that a partial retraction cannot be evidence of actual malice with regard to other statements not encompassed by that retraction. To find otherwise (as Plaintiff asks here) would defy established constitutional principles. Indeed, in the only decision Defendants have found addressing whether a partial retraction can support actual malice, the court roundly rejected this theory *as a matter of law*. *D.A.R.E Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1287 (C.D. Cal. 2000), *aff'd* 270 F.3d 793 (9th Cir. 2001) ("If a

publisher's wholesale refusal to retract . . . did not constitute actual malice, it follows that a publisher's retraction which does not satisfy the aggrieved party surely is not actionable as defamatory.").

Finally, courts have held time and time again that correcting, clarifying, or retracting an allegedly defamatory publication, far from evidencing actual malice, in fact *negates* a finding of actual malice. *See, e.g.*, *Washington Nat. Ins. Co. v. Administrators,* 2 F.3d 192, 196 (7th Cir. 1993) (holding that "Iowa treats repetition of defamatory statements as evidence of malice. It ought to follow, as other courts have held, that subsequent statements negating any defamatory implications may show the absence of malice by demonstrating that the speaker did not contemplate the defamatory reading in the first place," and overturning a jury award for plaintiff for this reason); *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 166 (Tex. 2004) (where an editor realized that a satirical piece was being perceived as sincere, and subsequently "changed the heading of the on-line version to satire" and responded to reader inquiries with clarifications, the court found such actions constituted "evidence a lack of actual malice"); *Hoffman v. Washington Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977) *aff'd*, 578 F.2d 442 (D.C. Cir. 1978) ("since the issue of actual malice focuses on the defendant's state of mind, his attitude toward the truth or falsity of the material published, it is significant and tends to negate any inference of actual malice on the part of the Post Company that it published a retraction of the indisputably inaccurate portions of the Mirkin article in the next day's edition") (citation omitted).[14]

---

[14] See, also, *Trans World Accounts, Inc.* v. *Associated Press*, 425 F. Supp. 814, 823, n.6 (N.D. Cal. 1977) (publication of a corrective story "only nine days after publication of the erroneous story" would "create a large obstacle to plaintiff's efforts to prove actual malice."); *Logan v. D.C.,* 447 F. Supp. 1328, 1332 (D.D.C. 1978) ("Both [the author] and the Post have asserted that the article was published in the good faith belief that it was true. Moreover, the correction published the next day by the Post 'is significant and tends to negate any inference of actual malice.'") (Citing *Hoffman,* 433 F.Supp. at 605).

It would be wholly contrary to actual malice doctrine, and indeed to plain logic, to allow a remedial measure such as the Note to Readers to support Plaintiff's claim of actual malice. Such a finding would create a fissure in established constitutional doctrine, leading to the bizarre result that the *location* where a correction or clarification is published would determine whether it would be probative of actual malice or of a lack of actual malice. This kind of focus on form over substance to the detriment of free expression is precisely what the *Firth* court warned against. 98 N.Y.2d at 372 (declining to adopt a rule under which "a publisher would be forced either to avoid posting on a Web site or use a separate site for each new piece of information"). Indeed, if the location of a remedial statement were to factor into an actual malice inquiry, the only logical inference would be that the *most* potentially remedial placement (i.e. at the top of an allegedly defamatory article) would weigh *against* a finding of actual malice, while the *least* remedial placement (i.e. in a separate, unrelated posting, with no hyperlinks guiding readers between the remedial statement and the article) would weigh in its favor. The law simply cannot allow a determination of a defendant's subjective state of mind to turn on where a remedi*a*l statement is published. A finding of a republication in this context would essentially sanction just that result.

## II. POLICY CONSIDERATIONS WEIGH OVERWHELMINGLY AGAINST A FINDING THAT THE NOTE TO READERS EFFECTED A REPUBLICATION

Defendants are not aware of any case law supporting Plaintiff's novel theory: that a clarification, correction, or retraction could constitute a republication when it is appended to an article for the specific purpose of notifying readers of problems with the original article and apologizing. This is not due to the rarity of disclaimers and corrective statements—to the contrary it is the practice of the most respected publications in this country to add corrective statements to online versions alerting readers when they learn of errors or potential issues with

sourcing in an article after publication.[15]  Rather, the lack of support for Plaintiff's position

evidences only how far afield she asks this Court to go.  Plaintiff's theory, if credited, would

have the perverse effect of forcing publishers to *avoid* notifying readers of errors in previously

published stories in the most effective way for fear of incurring new liability for other

information in the original article.  And potentially injured parties would also suffer, since

publishers would be essentially barred from taking the most effective remedial measure

available—i.e. alerting readers to problems as soon as they access the article or posting's URL.

Moreover, a finding that only statements *not* affirmatively disclaimed by the Note to

Readers were republished would not mitigate this damaging result.  If publishers could be held

newly liable for everything they *don't* say in their corrective statements, there would be a strong

disincentive to make any corrective statement at all.  A publisher made aware of a problem with

some aspect of an article's reporting would have only two reasonable options: either publish a

corrective statement in a separate location, and thereby fail to alert most readers to the problem,

or else re-report the entire underlying article, regardless of whether there is any reason to believe

that the whole article suffers from the known reporting problem.[16]  The former option would

disserve readers as well as potentially defamed parties, and the latter option is simply impractical

and unrealistic.  Publishers are far more likely to leave a problematic article untouched than face

such a burden.

---

[15] See Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (Dkt. 120) ("Def. SJ Opp.") at V.B.3.

[16] The publisher could also elect to take the article down entirely, regardless of the accuracy of the rest of its contents.  There is no basis—nor should there be—for the position that when a particular source or particular information in an article is found to be in error, the publisher has a duty to remove the entire article or risk additional liability.  That is contrary to every First Amendment principle protecting speech.  *See New York Times*, 376 U.S. at 271-72 ("erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive'").

The law should encourage, not discourage, prompt remedial statements. The ability of online publishers to immediately alert readers to issues with articles is a boon to public interest and to defamed persons' interests alike. This Court must not allow the republication doctrine to be warped into service of a theory that would punish online publishers for attempting to remediate in the most effective manner possible. Such a result would not be "consistent with a public policy that encourages the free transmission of information and ideas." *In re Davis*, 347 B.R. at 611–12. Accordingly, the Court should hold as a matter of law that the Article was never republished subsequent to its original publication on November 19, 2014.

Dated: New York, New York
        September 20, 2016

By:    /s/ Elizabeth A. McNamara
    Elizabeth A. McNamara (*pro hac vice*)
    Samuel M. Bayard (*pro hac vice*)
    DAVIS WRIGHT TREMAINE LLP
    1251 Avenue of the Americas, 21st Floor
    New York, New York  10020-1104
    Telephone:       (212) 489-8230
    Fax:       (212) 489-8340
    Email:     lizmcnamara@dwt.com
          samuelbayard@dwt.com

    Alison Schary (*pro hac vice*)
    DAVIS WRIGHT TREMAINE LLP
    1919 Pennsylvania Avenue NW, Suite 800
    Washington, D.C.  20006-3401
    Telephone:   (202) 973-4248
    Fax:       (202) 973-4448
    E-mail:      alisonschary@dwt.com

    W. David Paxton (VSB No. 19798)
    Michael J. Finney (VSB No. 78484)
    J. Scott Sexton (VSB No. 29284)
    GENTRY LOCKE
    10 Franklin Road S.E., Suite 900
    P.O. Box 40013
    Roanoke, Virginia  24022-0013

Telephone:   (540) 983-9300
Fax:   (540) 983-9400
E-mail:   paxton@gentrylocke.com
E-mail:   finney@gentrylocke.com

*Attorneys for Defendants Rolling Stone LLC,*
*Sabrina Rubin Erdely, and Wenner Media LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2016, the foregoing was served by CM/ECF on counsel of record for all parties to this action.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


/s/ Elizabeth A. McNamara
Elizabeth A. McNamara