CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 2 2 2016

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| NICOLE P. ERAMO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:15-CV-00023 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| ROLLING STONE, LLC, et al., | ) | |
| | ) | By: Hon. Glen E. Conrad |
| Defendants. | ) | Chief United States District Judge |
| | ) | |

Nicole Eramo filed this defamation action against defendants Rolling Stone, LLC ("Rolling Stone"), Sabrina Rubin Erdely, and Wenner Media LLC ("Wenner Media"). The case is presently before the court on plaintiff's motion for partial summary judgment and defendants' motion for summary judgment. For the reasons set forth below, the motions will be granted in part and denied in part.

### Factual Background

A grant of summary judgment is appropriate only when "the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Phoenix Savings and Loan, Inc. v. The Aetna Cas. and Surety Co., 381 F.2d 245, 249 (4th Cir. 1967). When faced with cross-motions for summary judgment, the court considers each motion separately and resolves all factual disputes and "any competing, rational inferences in the light most favorable to the party opposing the motion." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)). Accordingly, the following facts from the record are either undisputed or presented in the light most favorable to the nonmoving party.

Nicole P. Eramo ("Eramo") is an Associate Dean of Students at the University of Virginia ("UVA"). Rolling Stone and Wenner Media are the publishers of <u>Rolling Stone</u> magazine. Sabrina Rubin Erdely ("Erdely") worked as a reporter and Contributing Editor for Rolling Stone.

On November 19, 2014, defendants published an article written by Erdely and entitled "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA" (the "Article"). Compl. ¶ 45. The Article contained a graphic depiction of the alleged gang-rape of a UVA student, referred to as "Jackie," at a Phi Kappa Psi fraternity party. According to the Article, Jackie's mother informed an academic dean that Jackie had a "bad experience" at a party. <u>Id.</u> ¶ 56. The academic dean then put Jackie in touch with Eramo.

At the time, Eramo's duties at UVA included performing intake of sexual assault complaints and providing support to purported victims. In this position, Eramo also participated in panel discussions and attended conferences on sexual assault. She also provided quotations for articles appearing in the <u>Cavalier Daily</u>, UVA's student-run newspaper, was interviewed on WUVA regarding UVA's sexual misconduct policy, and gave brief interviews to local news channels. Pl.'s Resp. to Defs.' First Set of Interoggs. Nos. 1-3. On campus, Eramo was seen as "an expert in all issues related to sexual assault" and the "point person" for reports of sexual misconduct. 30(b)(6) Dep. of Alan Groves, 82:7-11, 333:16-18.

In her pitch to Rolling Stone, Erdely stated that her article would "focus on a sexual assault case on one particularly fraught campus … following it as it makes its way through university procedure to its resolution, or lack thereof." "Campus Rape" by Erdely, Dkt. 116, Ex. 7. The Article describes Jackie's interactions with Eramo, including how Jackie shared information about two other victims of the same fraternity. Throughout her investigation, Erdely

2

spoke with a number of students about sexual assault at UVA; her notes reflect that several students communicated their admiration of Eramo. Erdely Reporting Notes, RS004381, RS004165, Dkt. 104, Ex. 15. As publication neared, some students expressed to Erdely concerns that her portrayal of Eramo was inaccurate. Dep. of Sara Surface 118:18-119:18.

Erdely relied heavily on the narrative Jackie provided in writing the Article, so much so that she did not obtain the full names of Jackie's assailants or contact them. Nor did Erdely interview the individuals who found Jackie the night of her alleged gang-rape. Similarly, Erdely did not obtain certain corroborating documents Jackie claimed to have access to and was unable to confirm with Jackie's mother Jackie's assertion that her mother had likely destroyed the dress Jackie wore on the night of the alleged rape. Additionally, Erdely was not granted an interview with Eramo to ask about the university's policies. Instead, Eramo's superiors made UVA President, Teresa Sullivan, available.

After its release, the Article created a "media firestorm" and was viewed online more than 2.7 million times. Rolling Stone issued a press release contemporaneously with the Article, and on November 26, 2014, Erdely appeared on the Brian Lehrer Show and the Slate DoubleX Gabfest podcast. On these shows, Erdely discussed the allegations made in the Article.

The complaint asserts that the Article and subsequent media appearances destroyed Eramo's reputation as an advocate and supporter of victims of sexual assault. She was attacked by individuals on television and the internet, and she received hundreds of threatening, vicious emails from members of the public. As a result, Eramo suffered "significant embarrassment, humiliation, mental suffering and emotional distress." Compl. ¶ 207.

Upon further investigation by independent entities, it was reported that the Article, and key components of Jackie's story, could not be substantiated. Within two weeks of the Article's

3

publication, the fraternity where Jackie's alleged attack took place produced evidence demonstrating that no social gathering was held on the night in question and that no member of the fraternity matched the description given by Jackie for her primary attacker.  Id. ¶ 90. Additionally, The Washington Post ran an article addressing the fact that Erdely did not contact Jackie's accused assailants.

On December 5, 2014, Rolling Stone issued a statement (the "Editor's Note") that acknowledged the discrepancies in Jackie's account, blamed Jackie for misleading Erdely, and claimed that its trust in Jackie had been "misplaced."  Id. ¶ 91.  This statement appeared appended to the online Article, and also by itself on a separate URL.  On March 23, 2015, four months after the Article was published, the Charlottesville Police Department issued a report regarding its investigation of Jackie's assault.  The report stated that Jackie had told Eramo a wholly different tale of sexual assault than the story published in the Article.  Ultimately, the police concluded that there was no substantive basis in fact to conclude that an incident occurred consistent with the facts in the Article.  In April 2015, after a report by the Columbia Journalism Review described the Article as a "journalistic failure" and concluded that defendants "set aside or rationalized as unnecessary essential practices of reporting," Rolling Stone "officially retracted" and removed the Article from its website.  Id. ¶ 14.  Eramo granted a limited interview to the Columbia Journalism Review as part of their investigation for the report.

On May 12, 2015, Eramo filed a six-count defamation action arising not only from the allegations in the Article but also from other statements made by the defendants in subsequent media appearances.  On May 29, 2015, defendants removed the instant action from the Circuit Court for the City of Charlottesville pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.  Following the close of discovery, plaintiff moved for partial summary judgment and defendants moved for

summary judgment. The court held a hearing on the motions on August 12, 2016. The motions have been fully briefed and are now ripe for disposition.

**Standard of Review**

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute of material fact exists, the court must "view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013). "When faced with cross-motions for summary judgment, [courts] consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Bacon v. City of Richmond, 475 F.3d 633, 636-37 (4th Cir. 2007). "The court must deny both motions if it finds that there is a genuine dispute of material fact, but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." Sky Angel U.S., LLC v. Discovery Commc'ns., LLC, 95 F. Supp. 3d 860, 869 (D. Md. 2015) (citations omitted).

**Discussion**

## I. Public Official or Limited-Purpose Public Figure

Both sides have moved for summary judgment on the issue of whether Eramo was a public official or a limited-purpose public figure. If Eramo was a public official or limited-purpose public figure at the time of publication, as part of her defamation case, she must prove by clear and convincing evidence that defendants acted with actual malice. New York Times Co. v. Sullivan, 376 U.S. 254, 279-280 (1964); Gertz v. Robert Welch, 418 U.S. 323, 342 (1974). The issue of whether Eramo was a public official or limited-purpose public figure is a

5

question of law to be resolved by the court. Wells v. Liddy, 186 F.3d 505, 531 (4th Cir. 1999). The court starts with a presumption that Eramo was a private individual at the time of publication, subject to defendants' burden of proving that plaintiff was a public official or limited-purpose public figure. Foretich v. Capital Cities/ABC, 37 F.3d 1541, 1553 (4th Cir. 1994).

A limited-purpose public figure is one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Gertz v, 418 U.S. at 361. Importantly, these individuals are subject to the actual malice standard for two reasons: (1) because of "their ability to resort to the 'self-help' remedy of rebuttal" as these individuals "usually enjoy significantly greater access [to the media] than private individuals"; and (2) because they have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood." Foretich, 37 F.3d at 1552. To determine whether a plaintiff is a private person or a limited-purpose public figure in relation to a particular public controversy, defendants must prove the following:

> "(1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation."

Fitzgerald v. Penthouse Int'l, Ltd., 691 F.2d 666, 668 (4th Cir. 1982); Foretich, 37 F.3d at 1553 (noting defendant's burden of proof). The second and third factors are often combined and are the heart of the inquiry: "whether the plaintiff had voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome." Foretich, 37 F.3d at 1553.

The scope of the controversy thus becomes a threshold determination. See Hatfill v. The New York Times Co., 532 F.3d 312, 322 (4th Cir. 2008) (stating that the court "first address[es] the nature of the 'particular public controversy' that gave rise to the alleged defamation"). Significantly, it "would be inappropriate to shrink all controversies to the specific statements of which a plaintiff complains." Nat'l Life Ins. Co. v. Phillips Pub., Inc., 793 F. Supp. 627, 637 (D.S.C. 1992). Instead, the court defines the scope through a fair reading of the Article in its entirety. See Hatfill, 532 F.3d at 323 ("[I]t stands to reason that we should look to the scope of the message conveyed in … the articles … [plaintiff] is challenging.").

Here, a fair reading of the Article suggests that the controversy at issue is UVA's response to allegations of sexual assault. The record warrants the determination that Eramo voluntarily assumed a position of "special prominence" on this issue: she took advantage of her access to local media, specifically by appearing on WUVA, providing input to The Cavalier Daily, and speaking to local affiliates of national news networks. See Carr v. Forbes, 259 F.3d 273, 281 (4th Cir. 2001) (finding plaintiff voluntarily assumed a prominent public presence and attempted to influence the outcome because he attended public meetings, wrote editorials for the local press, and was quoted in the local media). Furthermore, the volume of her media appearances, and in some instances their depth, supports the conclusion that Eramo attempted to influence the outcome of the controversy. In 2013, for instance, Eramo authored an opinion piece regarding the University's process for handling sexual assault complaints. See Faltas v. State Newspaper, 928 F. Supp. 637, 645 (D.S.C. 1996) (finding that a teacher and Public Health physician voluntarily assumed a role of special prominence and attempted to influence the outcome because she authored an opinion piece and several letters on the issue and had appeared

7

on various radio programs). The court thus concludes that defendants have met their burden as to the second and third factors. Foretich, 37 F.3d at 1553 ("Typically, we have combined the second and third requirements, to ask 'whether the plaintiff had voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy.'") (citing Reuber v. Food Chemical News, Inc., 925 F.2d 703, 709 (4th Cir. 1991)).

Regarding the fourth and fifth factors, Eramo's numerous local media appearances and their temporal proximity to the Article, in addition to the Office of Civil Rights investigation UVA was under at the time, indicate that the controversy at issue, UVA's response to allegations of sexual assault, existed prior to publication of the Article. See Fitzgerald, 691 F.2d at 669 ("The public controversy existed before and after publication of the alleged defamatory article.... The plaintiff had been interviewed for another article in the previous year."). The record also supports the determination that Eramo retained "public figure" status at the time of the alleged defamation: she remained in her position when the article was published. Only several months later was she moved to a different position within the UVA community. Fitzgerald, 691 F.2d at 668 (listing that "the plaintiff retained public-figure status at the time of the alleged defamation" as the fifth factor in determining limited-purpose public figure status).

Plaintiff argues that defendants are unable to show that she had access to effective communication, the first factor, because the Family Educational Rights and Privacy Act ("FERPA") prevented her from speaking to the media. Additionally, UVA would not allow Eramo to speak with Erdely prior to publication. The court is unpersuaded. While FERPA may have precluded Eramo from speaking about Jackie's case, the court cannot agree that it prevented her from speaking about UVA's policy regarding sexual assault allegations in a general sense. Likewise, UVA's unwillingness to allow Eramo to contact the media may have

8

put her in the difficult position of deciding between her job and her reputation. However, the court believes that, despite this prohibition, Eramo still had greater access to The Cavalier Daily or other local news outlets than private citizens, satisfying the first factor. See Fiacco v. Sigma Alpha Epsilon Fraternity, 528 F.3d 94, 100 (1st Cir. 2008) (finding a university administrator had greater access to media when he had been mentioned by name in eleven newspaper articles over the past year). Her access becomes even more apparent upon consideration of the limited interview Eramo granted to the Columbia Journalism Review several months after the Article's publication and without the permission of her superiors. Thus, the court's analysis of the five requirements for limited-public figure status, and its overall review of the record, lead to the conclusion that defendants have met their burden of establishing that, at the time of publication, Eramo warranted the limited-purpose public figure designation.[1]

## II. Actual Malice

A public official, public figure, or limited-purpose public figure may recover for a defamatory falsehood only on a showing of "actual malice." New York Times Co. v. Sullivan, 376 U.S. 254, 279-280 (1964); Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974). At summary judgment, "the appropriate … question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56 (1986). Defendants ask the court to decide, as a matter of law, that plaintiff has failed to forecast evidence that would support a jury determination in plaintiff's favor.

Actual malice "requires at a minimum that the statements were made with reckless disregard for the truth." Harte-Hanks Commc'ns., Inc. v. Connaughton, 491 U.S. 657, 667

---

[1] Because limited-purpose public figures and public officials both must prove actual malice, the court need not decide whether Eramo was a public official.

9

(1989). Reckless disregard means that defendants must have "entertained serious doubts as to the truth of [their] publication." St. Amant v. Thompson, 390 U.S. 727, 730 (1968). The court evaluates "the factual record in full." Connaughton, 491 U.S. at 688. Furthermore, because actual malice is a subjective inquiry, a plaintiff "is entitled to prove the defendant's state of mind through circumstantial evidence." Id. at 668.

It is helpful to review what other courts have determined is and is not sufficient evidence. For example, it is well settled that "failure to investigate will not alone support a finding of actual malice." Connaughton, 491 U.S. at 692; see also Biro v. Conde Nast, 807 F.3d 541, 546 (2d Cir. 2015) ("We recognize that although failure to investigate does not in itself establish bad faith, reliance on anonymous or unreliable sources without further investigation may support an inference of actual malice."). Similarly, departure from journalistic standards is not a determinant of actual malice, but such action might serve as supportive evidence. Reuber v. Food Chemical News, Inc., 925 F.2d 703, 712 (4th Cir. 1991) (en banc), cert. denied, 501 U.S. 1212 (1991). "Repetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted." Goldwater v. Ginzburg, 414 F.2d 324, 337 (2d Cir. 1969), cert. denied, 396 U.S. 1049 (1970) (stating that repetition is one factor that may be probative of actual malice); see also St. Amant, 390 U.S. at 732 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant."). Furthermore, while actual malice cannot be inferred from ill will or intent to injure alone, "[i]t cannot be said that evidence of motive or care never bears any relation to the actual malice inquiry." Connaughton, 491 U.S. at 688; see also Duffy v. Leading Edge Prods., Inc., 44 F.3d 308, 315 n. 10 (5th Cir. 1995) ("[E]vidence of ill will can often bolster an inference of actual malice."). Finally, "evidence that

10

a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence." Harris v. City of Seattle, 152 F. App'x 565, 568 (9th Cir. 2005).

Here, as in most similar cases, plaintiff largely relies on circumstantial evidence. See Herbert v. Lando, 441 U.S. 153, 170 (1979) ("It may be that plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself."). Although failure to adequately investigate, a departure from journalistic standards, or ill will or intent to injure will not singularly provide evidence of actual malice, the court believes that proof of all three is sufficient to create a genuine issue of material fact. Plaintiff, however, goes further. Pointing to Erdely's own reporting notes, plaintiff also forecasts evidence that could lead a reasonable jury to find that Erdely had "obvious reasons to doubt [Jackie's] veracity" or "entertained serious doubts as to the truth of [her] publication." Goldwater, 414 F.2d at 337; St. Amant, 390 U.S. at 731.

First, plaintiff offers evidence that could lead a jury to determine that Erdely had a preconceived story line and may have consciously disregarded contradictory evidence. See Harris, 152 F. App'x at 568 (noting that evidence of a preconceived story line can speak to whether defendant acted with actual malice). A jury could conclude from Erdely's pitch for the Article that Erdely expected to find inaction from the university's administration. She described how the Article would highlight "the various ways colleges have resisted involvement on the issue of sexual assault on campus; [and how it would] focus on a sexual assault case on campus … following it as it makes its way through university procedure to its resolution, or lack

11

thereof." "Campus Rape" by Erdely, Dkt. 116, Ex. 7. Erdely had also previously published five similar articles, and deposition testimony suggests that students felt that Erdely did not listen to what they told her about Eramo. Dep. of Sara Surface 110:25-111:3; Dep. of Alex Pinkerton 190:5-15.

Second, plaintiff has produced evidence supporting the inference that Erdely should have further investigated Jackie's allegations. See Biro, 807 F.3d at 546 (stating that failure to investigate further, in certain circumstances, may support an finding of actual malice). The record suggests that Erdely knew the identity of at least one of the individuals who found Jackie the night of her alleged rape. Erdely Reporting Notes RS004261, Dkt. 104, Ex. 7. Erdely, however, did not seek to contact this individual. Plaintiff cites evidence that could lead a factfinder to determine that others at Rolling Stone knew Erdely did not reach out to these individuals to corroborate Jackie's story. Dep. of Sean Woods 135-136. Additionally, Jackie never provided the full names of her assailants. Consequently, Erdely was unable to test the reliability of Jackie's story with them. The record also supports a finding that Rolling Stone knew that Erdely had not approached these purported wrongdoers. Dep. of Elisabeth Garber-Paul 153:14-154:8. Erdely's notes similarly reveal that Jackie had told Elderly she possessed, or at least had access to, certain documents that could have corroborated her story of the rape. Erdely never received a copy of these documents, and Erdely's notes imply inconsistencies in Jackie's claims about them. Erdely Reporting Notes RS004483, RS004476, Dkt. 104, Ex. 7 (noting that Jackie's mother had these documents, that Jackie likely did not tell her mother about these documents, and that Jackie later told Erdely that her mother had the documents). Finally, Erdely, despite trying, did not speak with Jackie's mother to confirm Jackie's claim that her mother had destroyed the blood-stained dress Jackie wore the night of the alleged rape. From

12

these facts, a reasonable jury could conclude that Erdely should have investigated further, and that her failure to do so could imply that Erdely acted with actual malice.

Third, plaintiff has presented evidence suggesting that Erdely had reasons to doubt Jackie's credibility. E.g., Erdely Reporting Notes RS004404, RS004118, RS004115, Dkt. 104, Ex. 7 (Erdely noted disbelief about Jackie's assertion as to the identities of the two other victims; Erdely was put on notice that Jackie's alleged rape, by individuals supposedly being recruited into the fraternity, occurred several months before fraternity recruitment events; and that Erdely found Jackie's story of three women being gang-raped at the same fraternity "too much of a coincidence"). Erdely was aware that Jackie's account of her alleged rape had changed but, nonetheless, did not press Jackie to explain the inconsistencies. Dep. of Emily Renda 36:17-24 (stating a different number of assailants were involved than what Erdely reported in the article); Dep. of Sabrina Rubin Erdely 37:8-14; see Zerangue v. TSP Newspapers, Inc., 814 F.2d 1066, 1071 (5th Cir. 1987) ("[C]ourts have upheld findings of actual malice when a defendant failed to investigate a story weakened by inherent improbability, internal inconsistency, or apparently reliable contrary information.") (citing sources). Rolling Stone's fact checker was also cognizant of Jackie's inconsistent stories. Dep. of Elisabeth Garber-Paul 290:13-17 (affirming that she knew Jackie's story of sexual assault changed over time). Moreover, a jury could find that Rolling Stone knew that Jackie's version of the story had not been vetted. Dep. of Elisabeth Garber-Paul 77:19-78:3; 104:20-24 (stating she knew that Rolling Stone had not reached out to certain individuals who were quoted in the Article and alleged to have found Jackie on the night of the rape, in part, because Jackie refused to provide their contact information). The court believes this evidence, taken in a light most favorably to the nonmoving party, could support a finding that Erdely and Rolling Stone were cognizant of Jackie's inconsistencies and credibility

13

problems at the time of publication.

Fourth, plaintiff offers evidence suggesting that at least three individuals advised Erdely that her portrayal of Eramo was inaccurate. Dep. of Sara Surface 118:18-119:18; Dep. of Alex Pinkerton 144:11-21; see St. Surin v. Virgin Islands Daily News, Inc., 21 F.3d 1309, 1318 (3d Cir. 1994) (denying summary judgment on the issue of actual malice when a source's testimony "flatly contradicted" what the article portrayed); Bressler v. Fortune Magazine, 971 F.2d 1226, 1252 (6th Cir. 1992) (Batchelder, J., dissenting) (asserting that the reporters exhibited reckless disregard when their own notes did not support the article's statements and the reporters also relied on a second-hand source over a firsthand account that described the event differently). In addition, Erdely's notes show that one student reported that the administration did a better job investigating her sexual assault allegations than the police. Erdely Reporting Notes RS004190, Dkt. 104, Ex. 7. Another individual told Erdely that Eramo was "passionate" about obtaining punishment and "making sure ... something punitive ... sticks." Id. RS004147. Jackie disclosed to Erdely that Eramo "wasn't as shocked as you might think" upon hearing of the two other victims, but then "got pissed at the frat" and suggested that the fraternity could lose its charter. Id. RS004312; see Zerangue, 814 F.2d at 1071 ("A verdict for the plaintiff has been upheld when a reporter's own notes showed that she was aware of facts contradicting her story.") (citing Golden Bear Distrib. Sys. of Texas, Inc. v. Chase Revel, Inc., 708 F.2d 944, 950 (5th Cir. 1983)). Erdely's notes also indicate that Jackie's version of how she met Eramo may have been incorrect, a fact which could support a finding that Erdely should have investigated further in the face of her source's seemingly wavering consistency.

Fifth, plaintiff points to deposition testimony from which a jury could reasonably infer that Erdely harbored ill will for Eramo or intended to injure the administration. Connaughton,

14

491 U.S. at 667-68 (suggesting that motive can support an ultimate finding of actual malice). Erdely told a student that she hoped the Article would bring changes to the structure of UVA's administration. When a student attempted to provide Erdely with Eramo's "point of view," Erdely referred to that student as an "administrative watchdog." Dep. of Sara Surface 162:10-17; cf. Guccione v. Flynt, 618 F. Supp. 164, 166 (S.D.N.Y. 1985) (finding plaintiff had presented sufficient circumstantial evidence, including evidence of derogatory comments, to survive summary judgment on the issue of actual malice). While ill will or intent to injure alone is insufficient to show actual malice, plaintiff has also advanced evidence indicating Erdely had a preconceived story line, did not adequately investigate in the face of contradictory information, and had a reasonable basis upon which she would likely understand that her portrayal of Eramo was inaccurate. The court believes that a reasonable jury could infer actual malice in light of this record.

Finally, plaintiff offers evidence regarding how, between the November 18 publication date and the December 5th Editor's Note, Rolling Stone, through internal conversations and discussions with outside sources, concluded that their trust in Jackie had been "misplaced." A jury could determine that this evidence also supports a finding of actual malice. See David Elder, Defamation: A Lawyer's Guide § 7.7 (July 2016) (discussing how "some types of evidence [] relate back and provide inferential evidence of defendant's knowing or reckless disregard of falsity at the time of publication"); Franco v. Confel, 311 S.W.3d 600, 607 (Tex. App. 2010) ("Circumstantial evidence showing reckless disregard may derive from the defendant's words or acts before, at, or after the time of the communication.'") (quoting Clark v. Jenkins, 248 S.W.3d 418, 435 (Tex. App. 2008)). Conversely, the post-publication process

could speak to defendants' good faith in publishing the original article. Elder, supra § 7.7; Hoffman v. Washington Post Co., 433 F. Supp. 600, 605 (D.D.C. 1977), aff'd, 578 F.2d 442 (D.C. Cir. 1978) (suggesting that a prompt retraction can negate an inference of actual malice). The court believes a jury should determine the proper effect of this evidence. Gunning v. Cooley, 281 U.S. 90, 94 (1930) ("Issues that depend on the credibility of the witnesses, and the effect or weight of evidence, are to be decided by the jury.").

Arguably, a reasonable jury could find that none of the evidence presented independently supports a finding of actual malice by clear and convincing evidence. Taken as a whole, however, a jury could conclude otherwise. Tavoulareas v. Piro, 817 F.2d 762, 790 (D.C. Cir. 1987), cert. denied, 108 S. Ct. 200 (1987) ("[A] plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence."). Therefore, the court heeds the Fourth Circuit's admonition that summary judgment should be employed carefully when addressing a party's subjective state of mind. See Nat'l Life Ins. Co. v. Phillips Pub., Inc., 793 F. Supp. 627, 632 (D. Md. 1992) (citing Herold v. Hajoca Corp., 864 F.2d 317, 319 (4th Cir. 1988)) ("[W]here possibly subjective evaluations are at issue, as here where a determination of whether Defendants acted with actual malice is at issue, the Fourth Circuit has cautioned against a Court taking those determinations away from a jury."); see also Henry v. Nat'l Ass'n of Air Traffic Specialists, Inc., 836 F. Supp. 1204, 1211 (D. Md. 1993), aff'd, 34 F.3d 1066 (4th Cir. 1994) ("Because the question of actual malice involves subjective evaluations, the Court is reluctant to take the malice determination from a jury."); Denny v. Seaboard Lacquer, Inc., 487 F.2d 485, 491 (4th Cir. 1973) ("Where state of mind is at issue, summary disposition should be sparingly used."). The court will thus deny defendants' motion for summary judgment as to actual malice.

### III. The Challenged Statements

Both sides have also moved for summary judgment on the issue of whether the challenged statements are actionable. "In Virginia, the elements of libel are (1) publication of (2) an actionable statement with (3) the requisite intent." Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993). To be actionable, a statement must contain a "provably false factual connotation," must be "of or concerning" the plaintiff, and must "tend[] to harm the reputation [the plaintiff]." WJLA-TV v. Levin, 264 Va. 140, 156 (2002); Gazette, Inc v. Harris, 229 Va. 1, 37 (1985); Chapin, 993 F.2d at 1093. It is for the court to decide whether a statement has a provably false factual connotation or is protected opinion and whether a statement is capable of having a defamatory meaning, that is, tending to harm the plaintiff's reputation. CACI Premier Tech., Inc. v. Rhodes, 536 F.3d 280, 294 (4th Cir. 2008); Hatfield v. New York Times Co., 416 F.3d 320, 330 (4th Cir. 2005).

In deciding whether statements convey a factual connotation or are protected opinion, the court looks to "the context and tenor of the article," whether the language is "loose, figurative, or hyperbolic language which would negate the impression that the writer" is making a factual assertion, and whether the statement is "subject to objective verification." Biospherics, Inc. v. Forbes, Inc., 151 F.3d 180, 184 (4th Cir. 1998). Even when a statement is subject to verification, the statement will remain protected if it is "clear to all reasonable listeners that [the statement is] offered ... as exaggerated rhetoric intended to spark the debate" or "the opinion of the author drawn from the circumstances related." CACI, 536 F.3d at 301; Chapin, 993 F.2d at 1093. "Locating the line separating constitutionally protected speech from actionable defamation can be difficult and requires consideration of the nature of the language used and the context and general tenor of the article to determine whether the statement can reasonably be

17

viewed as an assertion of actual fact." Choi v. Kyu Chul Lee, 312 F. App'x 551, 554 (4th Cir.

2009). If "a reasonable factfinder could conclude that the statements ... imply an assertion [of

fact]," the statements are not protected. Milkovich v. Lorain Journal Co., 497 U.S. 1, 21 (1990).

Additionally, "factual statements made to support or justify an opinion can form the basis of an

action for defamation." WJLA-TV, 264 Va. at 156; see also AvePoint, Inc. v. Power Tools, Inc.,

981 F. Supp. 2d 496, 506 (W.D. Va. 2013).

Merely because the statements may be deemed to have a false factual connotation,

however, is not sufficient to support a defamation action. See Katz v. Odin, Feldman &

Pittleman, P.C., 332 F. Supp. 2d 909 (E.D. Va. 2004) ("[T]he fact that some of the alleged

statements may have been false, without more, is not sufficient to maintain a cause of action for

defamation."). The statements must also be capable of having a defamatory meaning. See Perry

v. Isle of Wight Cty., No. 2:15cv204, 2016 WL 1601195, at *3 (E.D. Va. April 20, 2016). A

statement that "tends to harm the reputation of another as to lower him in the estimation of the

community or to deter third persons from associating or dealing with him" has a defamatory

meaning. Chapin, 993 F.2d at 1092; see also Restatement (Second) of Torts § 559, cmt. b

("Communications are often defamatory because they tend to expose another to hatred, ridicule

or contempt."); Moss v. Harwood, 102 Va. 386, 387 (1904) ("It is sufficient if the language tends

to injure the reputation of the party,... [or] to hold him up as an object of scorn, ridicule, or

contempt."). In determining whether a statement is capable of having a defamatory meaning, the

court considers the plain and natural meaning of the words in addition to the inferences fairly

attributable to them. Pendleton v. Newsome, 290 Va. 162, 172 (2015) (citing Wells v. Liddy,

186 F.3d 505, 503 (4th Cir. 1999)); Vaile v. Willick, No.6:07cv00011, 2008 WL 2754975, at *4

(W.D. Va. July 14, 2008) ("Because a defamatory charge may be made 'by inference,

implication or insinuation,' the Court must look not only to the actual words spoken, but also to all inferences fairly attributable to them.") (quoting Carwile v. Richmond Newspapers, 196 Va. 1, 7 (1954)). However, whether the plaintiff was actually defamed remains a question to be resolved by the factfinder. Pendleton, 290 Va. at 172.

Defendants argue that the challenged statements are not actionable because, as a matter of law, they are protected opinion and not capable of harming Eramo's reputation. In contrast, plaintiff contends that the challenged statements are factual and defamatory per se. "[A] statement is defamatory per se if it, among other circumstances,... 'impute[s] to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment.'" CACI, 536 F.3d at 292-93 (quoting Carwile v. Richmond Newspapers, Inc., 196 Va. 1, 7 (1954)).

After reviewing the Article, the court believes that it is not "clear to all reasonable listeners" that all twelve statements targeted by the plaintiff are "exaggerated rhetoric" or "the opinion of the author." CACI, 536 F.3d at 301. Unlike the regularly-published advice column in Biospherics, "A Rape on Campus" is described as a "Special Report" on the front cover of the magazine. 151 F.3d at 181. Contrary to the talk-show host in CACI, Erdely has not admitted to "making frequent use of hyperbole." On the contrary, Erdely has written at least five other similarly-styled, solemn and fact-intensive articles about rape. These circumstances support the notion that "A Rape on Campus" was largely a report of a factual occurrence. Likewise, the characterization of the article as an investigation in subsequent interviews bolsters the court's understanding that the general tenor of the Article, and reasonable understanding of it, is one of factual assertion. Compl. Ex. C (describing the Article as an "investigation of campus rape" on the Brian Lehrer show); Biospherics, 151 F.3d at 184 (looking to the general tenor of the article

19

to determine whether the statements were assertions of fact or opinion).

Looking to each statement, only one, the "deck" of the article, can fairly be characterized as hyperbole and not factual.[2] The use of the phrase "a whole new kind of abuse" is similar to the term "hired-killers" to describe military contractors. CACI, 536 F.3d at 301. Like the phrase "hefty mark-up" in Chapin, the challenged statement is "just too subjective a word to be proved false." 993 F.2d at 1093. While the question is close, when looking to the general tenor of the Article, the court believes the challenged phrase "consists of terms that are either too vague to be falsifiable or sure to be understood as merely a label for the labler's underlying assertions." Dilworth v. Dudley, 75 F.3d 307, 309 (7th Cir. 1996). Erdely seemingly used "exaggerated or figurative language to drive home an underlying factual assertion." Cashion v. Smith, 286 Va. 327, 341 (2013) (McClanahan, J., dissenting). This figurative language remains protected while the underlying factual assertions do not. Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.2d 122, 129-132 (1st Cir. 1997) (finding one challenged statement to be hyperbole and another to be an assertion of fact); Williams v. Garraghty, 249 Va. 224, 233 (1995) (finding plaintiff's statements about a specific event and subsequent receipt of derogatory notes to be factual assertions but plaintiff's expression that she believed the notes and event were sexual harassment to be opinion).

As to the remaining statements, the court is persuaded that a reasonable understanding is that they assert factual connotations regarding Eramo and the administration's actions. See Tronfeld v. Nationwide Mut. Ins. Co., 272 Va. 709, 715-16 (2006) (finding that statements relating that plaintiff "just takes people's money" contained "a provably false factual

---

[2]    The "deck" refers to the phrases just below the headline of an article and above the first sentences. In "A Rape on Campus," the deck stated: "Jackie was just starting her freshman year at the University of Virginia when she was brutally assaulted by seven men at a frat party. When she tried to hold them accountable, a whole new kind of abuse began."

20

connotation"). For example, a jury could find that the "trusted UVA dean" either did or did not discourage Jackie from sharing her story, that Eramo did or did not tell Jackie that "nobody wants to send their daughter to the rape school," and that Eramo did or did not have a nonreaction to Jackie's assertion that two other individuals were raped at the same fraternity. Fuste v. Riverside Healthcare Ass'n, 265 Va. 127, 133 (2003) ("In other words, [the statements] are capable of being proven true or false."). Even the statements asserting that the administration should have acted in light of Jackie's allegation that two other individuals were raped at the Phi Kappa Psi fraternity is capable of conveying a verifiable fact: that the administration did not act. See Milkovich, 497 U.S. at 18 ("[E]xpressions of 'opinion' may often imply an assertion of objective fact."); Restatement (Second) of Torts § 566, cmt. b (Am. Law Inst. 1965) (describing "an opinion in form" that is "apparently based on facts ... that have not been stated"). Therefore, the court finds the remaining challenged statements impart what a reasonable reader would believe to be factual.

Similarly, considering all reasonable inferences, the court believes that the statements are capable of having a defamatory meaning. Chapin, 993 F.2d at 1092, 1104-05 (statements are capable of a defamatory meaning if they tend to harm the plaintiff's reputation, hold her up as an object of scorn, ridicule or contempt, or otherwise make her appear "odious, infamous, or ridiculous") (citing McBride v. Merrell Dow and Pharmaceuticals, Inc., 540 F. Supp. 1252, 1254 (D.D.C. 1982) and Adams v. Lawson, 58 Va. 250, 255-56 (1867)); Wells, 186 F.3d at 523 ("We look not only to the actual words spoken, but also to inferences fairly attributable to them.") (citations omitted). A reasonable factfinder could conclude that the challenged statements imply the defamatory meaning plaintiff ascribes to them: that Eramo discouraged Jackie from sharing her story, including filing a formal complaint; that Eramo had no reaction to Jackie's story of

21

two other victims; and that the administration did nothing in light of these allegations. Restatement (Second) of Torts § 614(2) (stating that the "jury determines whether a communication, capable of a defamatory meaning, was so understood"); Chapin v. Greve, 787 F. Supp. 557, 564 (E.D. Va. 1992) ("The dispositive question presented is whether or not a reasonable factfinder could conclude that the article or statements in the article state or imply, in their plain and natural sense, the defamatory meanings ascribed to them by plaintiffs.").

Plaintiff, however, asks the court to further find that the challenged statements are defamatory per se. Stamathis v. Flying J, Inc., 389 F.3d 429, 440 (4th Cir. 2004) ("The critical distinction between defamation per se and other actions for defamation is that a person so defamed is presumed to have suffered general damages, and any absence of actual injury is considered only in diminution of damages."). As with actual malice, it is instructive to review what other courts have found to be defamatory per se. For example, in Cretella v. Kuzminkski, the district court found the assertions that plaintiff caused embarrassment to his employer and was in danger of losing his professional license to be defamatory per se. 640 F. Supp. 741, 763 (E.D. Va. 2009). Similarly, in Carwile v. Richmond Newspapers, statements implying that the plaintiff was guilty of conduct for which "the plaintiff could and should be subject to disbarment proceedings" were held to be defamatory per se. 196 Va. 1, 8 (1954). Here, however, the court believes that the alleged defamatory meaning ascribed to the challenged statements does not give rise to presumed damages. This is not to imply that Eramo has or has not been damaged; it is to keep the determination of damages, and the determination of whether the statements actually defamed Eramo, with the factfinder.[3] Pendleton, 290 Va. at 172 (stating that whether the statements defamed plaintiff is a question for the jury).

---

[3] Or, otherwise, as the parties may agree to stipulate.

Next, plaintiff asks the court to conclude, as a matter of law, that all twelve statements are "of or concerning" Eramo. Defendants do not contest plaintiff's contention that the statements are "of and concerning" Eramo except in regards to the "deck" of the Article. The court, however, finds that the deck is hyperbole, not subject to verification, and therefore not actionable. Thus, it is irrelevant whether the deck is of or concerning Eramo. As to the other statements, there is no dispute that these statements are of or concerning Eramo. Cf. Magill v. Gulf & Western Indus., Inc., 736 F.2d 976, 979 (4th Cir. 1984) (stating that summary judgment is inappropriate if there is a dispute as to the conclusions to be drawn from undisputed facts). Thus, with the exception of the "deck" of the Article, the court will grant plaintiff's motion for partial summary judgment on the issue of whether the other statements are of or concerning Eramo. The court will deny plaintiff's motion for partial summary judgment as to whether the statements are defamatory per se, and will deny defendants' motion for summary judgment regarding whether the statements are protected opinion and not capable of having a defamatory meaning. The court believes that the latter question, as to whether the statements actually have a defamatory meaning, is properly committed to the jury.

## IV. Republication

Plaintiff asks the court to find that Rolling Stone's December 5th statement acknowledging discrepancies in Jackie's account (the "Editor's Note") was a republication published with actual malice. Plaintiff asserts that the addition of an appendix to the original Article affected substantive changes such to render the combined Editor's Note and Article a "republication" under the law. In contrast, defendants contend that the December 5th Editor's Note is not a republication because it did not reaffirm the substance of the Article. Instead, defendants urge the court to view the Editor's Note as an "effective retraction."

23

While the Virginia Supreme Court has not yet faced the issue, the Fourth Circuit has upheld the application of the single publication rule, which dictates that defamatory forms of mass communication or aggregate publication support only a single cause of action. See Morrissey v. William Morrow & Co., Inc., 739 F.2d 962, 967-68 (4th Cir. 1984). Jurisdictions that have adopted the single publication rule are "nearly unanimous" in applying it to internet publications. Atkinson v. McLaughlin, 462 F. Supp. 2d 1038, 1051-52 (D.N.D. 2006). It is less clear how the republication exception to the single publication rule applies in the context of electronic media. In re Philadelphia Newspapers, LLC, 690 F.3d 161, 174 (3d Cir. 2012).

The republication exception is meant to give plaintiffs an additional remedy when a defendant edits and retransmits the defamatory material or redistributes the material with the goal of reaching a new audience. In re Davis, 347 B.R. 607, 611 (W.D. Ky. 2006). Stated differently, republication occurs when the speaker has "affirmatively reiterated" the statement. Clark v. Viacom Int'l Inc., 617 F. App'x 495, 505 (6th Cir. 2015). In the context of internet articles, other courts have held that "a statement on a website is not republished unless the statement itself is substantively altered or added to, or the website is directed to a new audience." Yeager v. Bowlin, 693 F.3d 1076, 1082 (9th Cir. 2012); see also Davis, 347 B.R. at 612 ("[W]here substantive material is added to a website, and that material is related to defamatory material that is already posted, a republication has occurred.").

Under Virginia defamation law, the question of whether plaintiff has proved the element of publication is a factual one for the jury. Thalhimer Bros. v. Shaw, 156 Va. 863, 871 (1931) (finding sufficient evidence to submit to the jury the question of publication). It follows, then, that republication is also for the factfinder to determine.[4] Woodhull v. Meinel, 202 P.3d 126,

---

[4] Generally, republications are separate torts. WJLA-TV v. Levin, 264 Va. 140, 153 (2002). In consequence, the court believes that republication only satisfies the first element of a defamation claim. Plaintiff

131 (N.M. Ct. App. 2008) ("The question of whether an Internet republication has occurred is highly factual in that it turns on the content of the second publication as it relates to the first."); Weaver v. Lancaster Newspaper, Inc., 926 A.2d 899, 907 (Pa. 2007) (finding a genuine issue of fact regarding whether there was a republication).

Here, it is not disputed that defendants appended the original Article. However, a reasonable jury could find that the defendants did not act with intent to recruit a new audience. Likewise, there is a genuine dispute regarding whether defendants "affirmatively reiterated" the challenged statements. See Clark, 617 F. App'x at 505 (stating that republication occurs when the speaker "affirmatively reiterates" the statement and that the doctrine of republication "focuses upon audience recruitment"). From deposition testimony, the court believes a reasonable jury could determine that the December 5th Editor's Note "effectively retracted" only the statements regarding the alleged rape, not the statements about Jackie's interactions with Eramo. Dep. of Erdely 282:6-10; Dep. of William Dana 308:6-15; cf. Nevada Independent Broadcasting Corp. v. Allen, 664 P.2d 337, 345 (Nev. 1983) (finding that an attempted correction could be considered a republication). Conversely, a factfinder could determine that the challenged statements were either "substantially altered or added to" or that they were not. Yeager, 693 F.3d at 1082. Accordingly, in the court's view, there remains a genuine issue of fact warranting jury consideration. The court will deny plaintiff's motion for partial summary judgment on the issue. Consequently, the court declines to reach the question of whether there was a republication made with actual malice.

---

must again prove the other elements of defamation, namely actionable statements and intent. Chapin, 993 F.2d at 1092 (listing the Virginia elements of defamation). In this instance, the effect of the Editor's Note will be relevant in determining whether the statements are actionable and whether the defendants had the requisite intent, should a jury find defendants republished the challenged statements.

25

## Conclusion

For the foregoing reasons, the court will grant in part and deny in part the parties' motions for summary judgment and partial summary judgment. The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 22ᵈ day of September, 2016.

Chief United States District Judge