IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
**Charlottesville Division**

------------------------------------------------------------x
NICOLE P. ERAMO,

                Plaintiff,

            - against -

ROLLING STONE LLC, SABRINA RUBIN
ERDELY, AND WENNER MEDIA LLC,

                Defendants.

------------------------------------------------------------x

Case No. 3:15-cv-00023-GEC

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* NO. 1: THE WUVA INTERVIEW

Defendants Rolling Stone LLC, Wenner Media LLC, and Sabrina Rubin Erdely (collectively, "Defendants"), submit this opposition to Plaintiff's Motion *In Limine* No. 1 ("Motion") (Dkt. 168), which seeks to exclude plainly relevant evidence regarding Plaintiff's interview with WUVA and it subsequent broadcast (the "WUVA Interview" or "Interview").

## INTRODUCTION

Plaintiff's Motion rests on the utter fiction that the WUVA Interview "has absolutely no relevance to the claims or defenses or damages in this case." (Motion at 5.) In reality, the WUVA Interview is highly relevant in at least four separate ways.

*First*, it is powerful evidence for Defendants' substantial truth defense—of the Article (and Plaintiff's express and implied claims), the alleged post-November 19 statements, and the overall critique of UVA's response to sexual assault allegations. As the Court recently recognized on summary judgment, the WUVA Interview goes directly to this controversy. Plaintiff herself even recognizes this, testifying under oath that, "frankly," she "feel[s] like this

litigation is somewhat of a challenge of the full [WUVA Interview]."[1] Try as she might to now narrow her claims to isolated, cherry-picked words, Plaintiff cannot run from her prior sworn statement linking the WUVA Interview to this case, nor her claims which rest on specific allegedly defamatory statements, including "the school may have wondered about its responsibilities to the rest of campus," and her contention that the Article asserts that "the administration doesn't really treat rape as a crime, as a violent crime." The WUVA Interview—including its discussion that UVA has not expelled a single student for sexual assault during Eramo's tenure at UVA, even when the crime is admitted—establishes the substantial truth of these and other alleged defamatory statements.

*Second*, the full WUVA Interview is relevant to Rolling Stone's state of mind, as the Article's editor Sean Woods viewed the Interview in its entirety on November 24, 2014. This affirmed Rolling Stone's belief in the truth of the Article and impacted its approach going forward, including with respect to the early December 2014 press statement that Plaintiff alleges is defamatory.

*Third*, with respect to the Interview excerpts posted on October 8, 2014, there is no dispute that they addressed UVA's expulsion practices (or complete lack thereof) for sexual assault. Likewise, there is no dispute that Defendants viewed this clip, which was integral to their fact-checking process and state of mind prior to publication.

*Fourth*, the complete WUVA Interview—which became a national story in its own right—is highly relevant on damages. Far from "rank speculation," the contemporaneous record evidence (including Plaintiff's own deposition testimony) establishes that the WUVA Interview engendered strong outrage and criticism towards Eramo, much of which was based solely on the

---

[1] Ex. 2 [Eramo Dep.] at 85-86.

Interview. And this criticism was warranted; to wit, the OCR Report specifically found that the Interview created a hostile environment at UVA.

Plaintiff also references Rule 403 of the Federal Rules of Evidence. But this argument only repackages Plaintiff's self-serving view (which is also wholly incorrect in terms of substance), that she can not only expand and contract her "claims" on a whim, but also define the scope of *Defendants' defenses*. She plainly cannot.

## RELEVANT BACKGROUND

Plaintiff was interviewed by WUVA on September 16, 2014.[2] For almost 22 minutes, she answered questions about UVA's sexual assault policies and practices,[3] with statements that included the following:

- that she "spoke to 38 sexual assault survivors last year," but only "nine brought some form of complaint forward to the board" (five informal and four formal);[4]

- that no student has ever been expelled for sexual assault during her tenure (*id*. at 13-14);

- that due to the "51 percent" preponderance of evidence standard, she "think[s] there's some mitigation there in terms of sanction and standard" (*id*. at 15);

- that even when students have "actually admitted guilt" to her, they did not get expelled because "there's really no advantage to admitting guilt" in an informal resolution meeting, and she "feel[s] like if a person is willing to come forward in that setting and admit that they violated the policy when there's absolutely no advantage to do so, that that does deserve some consideration," which is "very important to me" (*id*. at 15-16);

- that she disagreed with the proposition that, based on the disparate sanctions for Honor Code violations (many expulsions) versus sexual assault violations (zero expulsions), UVA was tacitly making a statement that "sexual assault is not as important as Honor [Code]" *(id*. at 19-20);

- that if UVA had "information that that person is – has – has been a repeat offender, I think we would absolutely expel that person from the community; but we haven't had the – we haven't had that information in the past" (*id*. at 21);

---

[2] Ex. 2 [Eramo Dep.] at 75.
[3] *See* Ex. 3, WUVA Interview Tr.; *see also* Def. S.J. Ex. 103 (video of the full Interview sent to Court) (Dkt. 108-21).
[4] Ex. 3 at 13.

3

- that in cases of *rape*, she is "afraid that if we only have a single sanction, that actually will also hurt our reporting for cases of sexual misconduct" (*id.* at 23-24); and

- that as she had previously said, "I spoke to 38 students last year, only nine of them wished to file a complaint. So **many of them choose not to do that**, and that's not because I'm telling them not to do it, ***that is their choice***." (*Id.* at 26) (emphasis added).

On October 8, 2014, WUVA "posted a five-minute investigative analysis of [UVA's] handling of sexual assault complaints" that featured portions of the Interview, juxtaposing UVA's zero expulsions for sexual assault against the 183 expulsions for Honor Code violations since 1998.[5] The link to the excerpt (which is no longer active) explicitly referenced this subject matter: http://wuvaonline.com/**expulsion-cheating-suspension-sexual-assault**.[6] Eramo also admits that the excerpt "was focused on the expulsion issue."[7]

When the reporter sent her a link to the excerpted Interview on October 9, Eramo told a colleague that "I do not have the stomach to even watch it."[8] That same day, Liz Seccuro—whose 1984 gang-rape was discussed in the Article—forwarded the link to Erdely with the text, "Wow." Erdely responded: "Thanks so much for sending this, Liz. Wow indeed! And how interesting that Nicole Eramo is allowed to speak to the UVA student press but not to [me]."[9]

There is no dispute that Erdely watched this clip at the time. Erdely will testify in detail about the portions of the Interview that WUVA published on October 8, and the impact that Plaintiff's statements had on her reporting, both factually and in terms of her overall thinking and understanding regarding the Article.[10]

---

[5] Ex. 4 (UVA has given Defendants permission to file this document publicly); Ex. 5 at 3.
[6] *Id.* (emphasis added).
[7] Ex. 2 [Eramo Dep.] at 79.
[8] Ex. 6 (This document was produced in discovery with FERPA-related redactions of a student's name and contact information.).
[9] Ex. 7. UVA had abruptly cancelled Erdely's scheduled interview with Eramo on September 11, 2014, less than a week before Eramo sat for the WUVA Interview. *See* Erdely Decl., ¶ 64 (Dkt. 104).
[10] *See* attached Declaration of Sabrina Rubin Erdely, ¶¶ 2-8.

4

On October 24, 2014, Erdely emailed "Stacy"[11] follow-up questions for the Article:

> When during the Take Back the Night mock trial you asked Dean Eramo what it would take for a student to be expelled, and she answered "multiple assaults by one perpetrator" – was that said publicly to everyone assembled (like, during a question & answer session)? Or was it said privately, to you?[12]

In response, Stacy emailed Erdely a link to the excerpted WUVA video, and said that Eramo had said the same thing at the public Take Back the Night event.[13] This exchange and verification about UVA's "repeat offender" stance (as communicated by Eramo) was part of Erdely's reporting and fact-checking process, as she explained in her deposition.[14]

Fact-checker Elisabeth Garber-Paul also reviewed the WUVA Interview expulsion excerpts prior to the Article's publication, which she used to help fact-check Plaintiff's "nonreaction" Statement #4.[15] Further, on November 11, 2014, Garber-Paul forwarded the video link to UVA's university spokesperson to confirm the Article's expulsion statistics.[16]

The Article was published on November 19, 2014. It discussed the same controversy at the heart of the WUVA Interview—UVA's response to sexual assault allegations—making the critique that UVA was not doing enough. In particular, as was explained in Defendants'

---

[11] "Stacy" was the sexual assault victim that, based on Plaintiff's statements at a Take Back the Night event, had introduced evidence of two other victims in her formal hearing, understanding that UVA would expel a "multiple assailant." Stacy took these steps for the safety of the campus, and was bitterly disappointed and disillusioned when her assailant was found guilty, but only received a one-year suspension.

[12] Ex. 8 (this document was produced in discovery with limited redactions to protect the name and contact information of a confidential source).

[13] *Id.*

[14] Ex. 9 [Erdely Dep.] at 227-28 ("[S]o, while Stacy's appeal was pending talking about exactly this issue where Stacy was saying that this was a semantic game that had been played with her, then Dean Eramo appeared on [WUVA] saying that they had never had a case of a repeat offender.").

[15] Garber-Paul Decl., ¶ 59 (Dkt. 105):

> One could hardly expect "shock" or "horror" with each new assault; "no-nonsense" or "non-reaction" was the professional response. And I independently concluded that Dean Eramo had a "no-nonsense" demeanor. I watched the video interview of Dean Eramo that was posted online by WUVA, the UVA college radio station. And in this video interview where she discussed the school's failure to expel any student for sexual assault, I found Dean Eramo to be very "no-nonsense."

[16] Ex. 5, at 3.

summary judgment briefing, the Article expressed Defendants' views on UVA's practice of deferring to "Victim Choice" as well as not doing enough to protect "Campus Safety."[17]

A few days later, WUVA decided to release the entire WUVA Interview.[18] According to Dean Allen Groves, the entire Interview received "widespread dissemination," including by outlets like CNN.[19] After seeing the Interview, Dean Groves also told Eramo that he did not think it came off well.[20] He further acknowledged that a lot of people had reacted quite negatively to the WUVA Interview.[21]

Eramo too admits that she received significant negative feedback over the WUVA Interview.[22] For example, on November 25, 2014, a community member sent emails to Plaintiff and other UVA administrators titled "Reaction to your interview." She wrote that "I have watched the video in which you discuss and defend your university's policy on not only not referring admitted rapists to the police, but to not even expelling them. That video, and your demeanor in it, was truly one of the most disturbing things I have ever seen." No reference was made to the Article.[23]

By way of another example, on December 13, 2014 (after Rolling Stone's effective retraction), a UVA alum wrote President Sullivan that "the video of Dean Eramo in which she admitted to never having imposed the sanction of expulsion even when the perpetrator had confessed to sexual assault is grounds alone to remove her from any involvement in the sexual

---

[17] *See, e.g.*, Def. S.J. Mot. at 27-37 (Dkt. 102).

[18] Motion at 1 (Plaintiff stating that the full Interview was published on November 23, 2014).

[19] Ex. 10 [Groves Dep.] at 408.

[20] *Id.* at 413.

[21] *Id.* at 413. *See also, generally*, *id.* at 405-14.

[22] Ex. 2 [Eramo Dep.] at 105-06. *See, e.g.*, Ex. 11, a collection of emails referencing the WUVA Interview (UVA has given Defendants permission to file these documents publicly). Eramo further admits that she has no reason to believe that Rolling Stone instructed anyone at WUVA to release the full Interview. Ex. 2 [Eramo Dep.] at 105

[23] Ex. 11 at UVA010000623.

6

misconduct review system."[24] The email continued: "[t]hus, it is not just [the] Rolling Stone article which 'maligned' Dean Eramo – she did so herself in that video."[25]

Finally, Rolling Stone also watched the full WUVA Interview soon after it was made public. Specifically, Deputy Managing Editor Sean Woods watched the complete Interview on November 24, 2014, which had been linked to a *BuzzFeed* story.[26] The WUVA Interview reinforced his convictions about the Article's critiques, and impacted his thinking in the days that followed, including with respect to the press statement that is the basis for Count VI.[27]

## ARGUMENT

### A. The WUVA Interview is Highly Relevant to Liability

#### 1. The WUVA Interview Goes to Substantial Truth of Challenged Statements, and Defendants' Overall Critique of UVA's Response to Sexual Assault Allegations

Given the exhaustive summary judgment briefing on the subject of the parties' claims and defenses, as well as the Court's rulings on the subject matter of the Article, Defendants will not belabor the great relevance of the WUVA Interview to: (i) Plaintiff's expressly alleged defamatory statements;[28] (ii) Plaintiff's shifting defamation by implication claims,[29] which seek to bootstrap Defendants' observations about *UVA's* sexual assault policies into statements about Eramo herself; and (iii) Defendants' overall substantial truth defense.

---

[24] Ex. 11 at UVA010007733.
[25] *Id*.
[26] Ex. 1 to the Declaration of Sean Woods ("Woods Decl."); Woods Decl. ¶ 3.
[27] Woods Decl., ¶¶ 4-5.
[28] *See, e.g.*, alleged Statement #5 ("the school may have wondered about its responsibilities to the rest of campus") and Statement #8 ("the administration doesn't really treat rape as a crime, as a violent crime").
[29] Plaintiff's summary judgment briefing purported to add new stand-alone statements, as well as pressed her defamation by implication claims, based on truncated and out-of-context quotations that distort the meaning of the individual "Statements" and the Article as a whole. *See, e.g.*, Defs.' S.J. Reply at 38, n.87 & Reply Appendix (Dkt. 136). This inconsistency and confusion is reflected even in this Motion. Plaintiff contends that her claims are based on the "statement" that she "'coddled' Jackie into keeping her rape quiet." (Motion at 2.). Four pages later, however, "coddle" is not part of the Complaint paragraphs that Plaintiff states constitute her claims. (*Id*. at 6). Then, remarkably, it reappears on the next page when Plaintiff lists statements upon which her claim is based. (*Id*. at 7.)

7

In its summary judgment opinion, the Court twice referenced Plaintiff's WUVA Interview,[30] and recognized how it speaks directly to the "controversy at issue"—namely "UVA's response to allegations of sexual assault."[31] It also stated that, contrary to Plaintiff's contentions here, "it 'would be inappropriate to shrink all controversies to the specific statements of which a plaintiff complains.'"[32] At the September 15, 2016 conference, the Court also acknowledged that the substantial truth of the Article's critiques is a key issue for trial, characterizing Plaintiff's claims as implying "that Dean Eramo was soft on the investigation of sexual assault issues," and that "the administration didn't respond properly to these concerns."[33]

It is difficult to fathom evidence that goes more directly to those issues than a pre-Article interview with Plaintiff on the same subject matter by a UVA student, where the radio station UVA's student-run radio station published excerpts of that Interview concerning expulsion practices just over a month before the Article was published and the entire Interview shortly thereafter, and where the OCR subsequently found the published Interview formed the basis for a hostile environment at UVA. Even Plaintiff agrees, testifying that she "feel[s] like *this litigation is somewhat of a challenge of the full [WUVA Interview], frankly.*"[34]

---

[30] S.J. Opinion at 2, 7 (Dkt. 188).

[31] *Id*. at 7. This was based on a "fair reading of the Article in its entirety." *Id*.

[32] *Id*. at 7 (quoting *Nat'l Life Ins. Co. v. Phillips Pub., Inc*,, 793 F. Supp 627, 637 (D.S.C. 1992)). *See also* S.J. Opinion at 20 (finding that the remaining statements at issue are capable of "assert[ing] factual connotations regarding Eramo ***and the administration's actions***") (emphasis added).

Having based her claims on general references to "UVA" or the "administration" Plaintiff cannot then keep Defendants from introducing evidence supporting their critiques of UVA's response to sexual assault allegations. Just as on the public figure issue, she is attempting to have it "both ways." Ex. 12, Aug. 12, 2016 Hearing Tr. at 130-31. *See also id*. at 28-29 (the Court discussing the "tension" between Plaintiff's disparate arguments).

[33] Ex. 13, Sept. 15, 2016 Hearing Tr. at 37.

[34] Ex. 2 [Eramo Dep.] at 85-86 (emphasis added).

## 2. The Full WUVA Interview Goes to Rolling Stone's State of Mind and Lack of Actual Malice

Contrary to Plaintiff's contention, Rolling Stone did view the entire WUVA Interview prior to a number of relevant publication dates. On November 24, 2014, Deputy Managing Editor Sean Woods watched the complete Interview.[35] This reinforced Rolling Stone's convictions about the Article's critiques, and influenced Woods' state of mind in the days that followed, including with respect to Statement #12 (the December 1, 2014 press statement), and the Notes appended to the Article on December 5 and 6.[36]

## 3. The WUVA Interview Excerpts on UVA's Expulsion Practices Was an Integral Part of Defendants' Reporting and Fact-Checking Process, and Speaks to Their State of Mind and Lack of Actual Malice

Both the Article's author (Erdely) and fact-checker (Garber-Paul) watched the five-minute Interview excerpt posted by WUVA on October 8, 2014. And there is no dispute—even Plaintiff agrees—that this clip related to UVA's expulsion practices for sexual assault as compared to Honor Code violations.

Erdely will testify in detail about the subjects covered by the clip and its effect on her reporting, including her overall thinking about the Article. She will identify the portions that were substantively included in the initially posted video. As for Garber-Paul, she specifically used the WUVA portion to fact-check Statement #4 (Eramo's "nonreaction" when Jackie told her about two other gang-rapes). She also forwarded the video along to UVA as part of her rigorous fact-checking process.

---

[35] Woods Decl., ¶ 3.

[36] Without waiving the Defendants' objections to the Court's summary judgment ruling on "republication," (S.J. Opinion at 23-25 (Dkt. 188)), if this issue is to be tried the Interview would be relevant evidence for the jury to consider in evaluating 'actual malice" and substantial truth, if the jury were to find the postings of the Note constitutes a republication.

9

Although the entire WUVA Interview is highly relevant for substantial truth (*see supra*), Rolling Stone's state of mind for post-November 19 statements (*see supra*), and damages (*see infra*), the October 8 excerpts are as well.[37]

### B. The WUVA Interview Is Highly Relevant to Plaintiff's Damages Claims

Plaintiff is claiming over $7.5 million in damages, including for harm to her reputation and adverse employment actions. The WUVA Interview was nationally disseminated on November 23, 2014. There is no dispute that it resulted in strong outrage and criticism toward Eramo,[38] culminating with the "hostile environment" finding by the OCR. Defendants will establish that it is a separate and self-inflicted cause of Plaintiff's alleged harms, and thus the WUVA Interview is highly relevant on damages. *See, e.g.*, Sheckler v. Va. Broad. Corp., 63 Va. Cir. 368, 377 (Charlottesville Cir. Ct. 2003) (defendants are only responsible for harm from the defamatory statements, not from "attendant" events or coverage).[39]

### C. Plaintiff's Rule 403 Argument Is Wholly Without Merit

As detailed above, the WUVA Interview is extremely relevant to this case. Plaintiff's Rule 403 argument ignores this. Moreover, it is founded on the assumption that Plaintiff cannot only shape-shift her own claims, but dictate the terms of the ***Defendants' case***. This is procedurally improper, and the Court has already determined that she is substantively wrong: the WUVA Interview goes directly to the "controversy at issue," which is "UVA's response to allegations of sexual assault."

---

[37] Given the multiple bases for the full WUVA Interview's independent relevance and admissibility, as well as the facts that the subject matter of the portions published on October 8 are undisputed and Defendants' are able to testify as to what they reviewed and its effect, Plaintiff's "best evidence" argument misses the mark entirely. In fact, the "best evidence" of the WUVA Interview is the full Interview, providing all of the context for Eramo's statements.

[38] Ex. 2 [Eramo Dep.] at 105-06 (Plaintiff's testimony that she "received many negative comments from people that also mentioned the video").

[39] There is no basis (and no cited authority) for Plaintiff's argument that WUVA's decision to release the full WUVA Interview after the Article could transform this independent reporting into "irrelevant" evidence. (*See* Motion at 9).

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiff's Motion *In Limine* No. 1, and allow Defendants to introduce the full WUVA Interview at the liability stage of trial as well as, if necessary, at the damages stage.

Dated: New York, New York
September 26, 2016

By: /s/ Elizabeth A. McNamara

    Elizabeth A. McNamara (*pro hac vice*)
    Samuel M. Bayard (*pro hac vice*)
    DAVIS WRIGHT TREMAINE LLP
    1251 Avenue of the Americas, 21st Fl.
    New York, New York 10020-1104
    Telephone: (212) 489-8230
    Fax: (212) 489-8340
    Email: lizmcnamara@dwt.com
               samuelbayard@dwt.com

    Alison Schary (*pro hac vice*)
    DAVIS WRIGHT TREMAINE LLP
    1919 Pennsylvania Avenue NW, Suite 800
    Washington, DC 20006-3401
    Telephone: (202) 973-4248
    Fax: (202) 973-4448
    E-mail: alisonschary@dwt.com

    W. David Paxton (VSB No. 19798)
    J. Scott Sexton (VSB No. 29284)
    Michael J. Finney (VSB No. 78484)
    GENTRY LOCKE
    10 Franklin Road S.E., Suite 900
    P.O. Box 40013
    Roanoke, VA 24022-0013
    Telephone: (540) 983-9300
    Fax: (540) 983-9400
    E-mail: paxton@gentrylocke.com
    E-mail: sexton@gentrylocke.com
    E-mail: finney@gentrylocke.com

    *Attorneys for Defendants Rolling Stone LLC,*
    *Sabrina Rubin Erdely, and Wenner Media LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2016, the foregoing was served by CM/ECF on counsel of record for all parties to this action. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                                 /s/ Elizabeth A. McNamara
                                                 Elizabeth A. McNamara