```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF VIRGINIA

 3                 CHARLOTTESVILLE DIVISION

 4

 5    *****************************
      NICOLE P. ERAMO,           * CIVIL ACTION 3:15-CV-00023
 6                               * OCTOBER 24, 2016
           Plaintiff,            * JURY TRIAL, Vol. 1
 7    vs.                        *
                                 *
 8    ROLLING STONE,LLC,         *
      SABRINA RUBIN ERDELY,      *
 9    WENNER MEDIA, LLC,         * Before:
                                 * HONORABLE GLEN E. CONRAD
10         Defendants.           * UNITED STATES DISTRICT JUDGE
                                 * WESTERN DISTRICT OF VIRGINIA
11    *****************************

12    APPEARANCES:

13    For the Plaintiff:    THOMAS ARTHUR CLARE, ESQUIRE
                            ELIZABETH MARIE LOCKE, ESQUIRE
14                          ANDREW CLAY PHILLIPS, ESQUIRE
                            JOSEPH R. OLIVERI, ESQUIRE
15                          Clare Locke, LLP
                            902 Prince Street
16                          Alexandria, VA  22314

17
      For the Defendants:   ELIZABETH ANNE McNAMARA, ESQUIRE
18                          SAMUEL M. BAYARD, ESQUIRE
                            ALISON SCHARY, ESQUIRE
19                          Davis Wright Tremaine, LLP
                            1251 Avenue of the Americas, 21st Flr.
20                          New York, NY  10020

21

22    Court Reporter:  JoRita B. Meyer, RPR, RMR, CRR
                            210 Franklin Road, S.W.
23                          Roanoke, Virginia  24011
                            540.857.5100, Ext. 5311
24
              Proceedings recorded by mechanical stenography;
25     transcript produced by computer.
```

1   APPEARANCES (Continued):

2   For the Defendants:     W. DAVID PAXTON, ESQUIRE
                            J. SCOTT SEXTON, ESQUIRE
3                           CHARLES H. SMITH, ESQUIRE
                            Gentry Locke Rakes & Moore
4                           P. O. Box 40013
                            Roanoke, VA  24022
5
    ///
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        EXAMINATION

2    WITNESS:  SABRINA RUBIN ERDELY

3    REDIRECT EXAMINATION                    PAGE

4      By Ms. Locke........................20

5    RECROSS EXAMINATION

6      By Mr. Sexton.......................106

7

8

9                         EXHIBITS

10   PLAINTIFF'S TRIAL EXHIBITS

11                             ADMITTED    TENDERED

12   147..........................          35

13   148..........................          131

14

15   DEFENDANTS' TRIAL EXHIBITS    ADMITTED    TENDERED

16   64...........................  131

17   ///

18

19

20

21

22

23

24

25
```

1  (7:58 a.m.)

2  (Chambers conference as follows:)

3          THE COURT:  We have everyone we need?

4          MS. McNAMARA:  Probably more than you need.

5          THE COURT:  Yeah.  Okay.  What can we do first thing

6  today?

7          MS. LOCKE:  Your Honor, this has to do with the

8  indemnity agreement between Rolling Stone and Wenner and Ms.

9  Erdely.  An issue has come up over the weekend.  We wanted to

10  bring Your Honor's attention to it.

11          This is something we think should have been given to

12  us, the document itself, in discovery.  It never was.  It was

13  raised by Your Honor at the pretrial conference.  You told the

14  parties -- you told the defendants to provide us the material

15  terms of the agreement.

16          We asked for the document again after that, after

17  that hearing.  It again was not provided to us.

18          So we had to shadowbox and we had to ask and play go

19  fish about what was in the terms, what were the material

20  terms, what was in this agreement.

21          We asked if there was a cooperation clause in this

22  agreement.  We were expressly told no, there wasn't.  It turns

23  out now that we found out yesterday that there is.

24          We asked about the scope of the indemnity and

25  whether -- particularly because of Your Honor's question about

1   conflicts in this case, to Ms. McNamara and Mr. Sexton, we

2   asked about the scope of the indemnity.  Because obviously

3   we've got claims for the article as well as post-publication

4   statements.

5           We were told expressly that the scope of that

6   indemnity would cover both the article and post-publication

7   statements.

8           And so yesterday, in attempting to -- we were

9   told -- once we were told that there was no cooperation clause

10  and then it came back yesterday, we were in the midst of

11  trying to negotiate a stipulation, so we put in the language

12  about a cooperation clause, yet defendants are still refusing

13  to agree to the scope, to the fact that it covers both the

14  article and the post-publication statements.

15          And so we're pretty frustrated, Your Honor.  This

16  is -- we've already directed the witness.  We're getting up to

17  redirect the witness.  This is something, like I said, that

18  should have been handled in discovery, not the eve of Ms.

19  Erdely's cross-examination.

20          And, you know, I feel like we're shadowboxing here.

21  We don't know what's in the document.  There's still now, on

22  the day before we are redirecting her, some question about the

23  scope of that agreement.  So this is where we are.

24          MR. SEXTON:  I want to address the substance of some

25  of the allegations that have been implicit in what Ms. Locke

1    has said.

2           First of all, you remember having the conversation

3    about indemnity here, when we had that?

4           THE COURT:  Right.

5           MR. SEXTON:  And think that was on a Friday, and

6    then the following Monday, I obtained the joint defense

7    agreement, which it was a joint defense agreement, and it is,

8    and it's standard, and I obtained the terms and, among all the

9    other things, read through the terms, zeroed in on the

10   indemnity agreement, and noted that it had a counsel-sharing

11   provision and an ability to opt out of that counsel-sharing

12   provision and that Rolling Stone and Wenner Media would

13   indemnify Erdely under this agreement.  And it seemed -- it

14   seemed to be narrower than a normal joint defense agreement

15   because it did not have a cooperation clause specifically.

16          So I called Tom -- and I will take great issue with

17   what Ms. Locke has said, and I believe that Tom Clare will

18   back me up on this --

19          MS. LOCKE:  I was also on the phone.

20          MR. SEXTON:  I don't recall you being on the phone

21   and you didn't identify yourself as being on the phone.

22          MS. LOCKE:  That's not true.  We got into a quite

23   heated debate on that phone.  Remember you said you weren't

24   going to go back and do more than was required under the scope

25   of discovery?  You got very heated with me and told me --

1          MR. SEXTON:  I disagree.

2          MS. LOCKE:  -- and told me you were only going to

3    take a few minutes of your time.

4          MR. SEXTON:  Yes, I do recall that.

5          THE COURT:  So anyway, there was a phone call.

6          MR. SEXTON:  The point is this:  When asked about

7    the scope, I do know exactly how I dealt with it.  There may

8    have been two conversations, but I do recall exactly how I

9    dealt with it, and I turned to the document and I said this is

10   what it says; it says that Rolling Stone and Wenner both

11   indemnify for any liability arising out of the article.  Okay?

12         And I remember saying I would certainly interpret

13   that as covering post-article statements.  Because why would

14   she be giving them had it not been for the article?

15         I said but that's my interpretation; and that's how

16   we left it.

17         I do not think it is possible for them to conclude,

18   Judge, me telling them expressly that the scope of the

19   indemnity did that.  I read the language exactly and allowed

20   it to be interpreted.  And if there's disagreement as to that

21   fact, then I don't see how there could be.

22         THE COURT:  That fact is not important today.

23         MR. SEXTON:  Right.  But the point of this is, I

24   misread the document and believed it did not have a

25   cooperation agreement.

1          Yesterday Mike Finney, I said, Mike, prepare a

2   document.  This doesn't have the cooperation in it.  Go write

3   a brief and let's get it filed.

4          He comes back to me in the afternoon, he says,

5   Scott, I disagree with you, I think it does have a cooperation

6   agreement, if you read the thing in his entirety.  And so he

7   showed me that.

8          And so I called and texted Tom and said, Tom, I need

9   to talk to you.  I spoke to Tom and I said, Tom, I've made a

10  mistake.  It does have a cooperation agreement, and I want to

11  make sure you know that.

12         I think that's exactly what you would expect and

13  that's exactly what happened.  And there was nothing

14  underhanded about it, and it was something that I think every

15  attorney in this court should do if they realize they've made

16  a mistake; and I did.

17         So what happened is we then were looking at the

18  language of the agreement and then -- I wasn't involved in

19  that.  Mike was negotiating that.  And there is a request that

20  we stipulate that it covers post-article.

21         Well, that's a decision to be made by corporate

22  lawyers, who are not here, you know, Rolling Stone's lawyers

23  who handle that, I think it's Simon and Schuster -- not, Simon

24  and Schuster; that's the publishing house.

25         THE COURT:  Is that the only outstanding issue?

1          MS. McNAMARA:  Yes, Your Honor, it's stipulated to,

2    except we wanted to use the actual language of the agreement,

3    "arising out of the article."  And otherwise, we're perfectly

4    comfortable, I think, with, Mike, you can speak to the

5    stipulation.

6          MR. FINNEY:  Yeah, I think we've exchanged drafts.

7    They're fairly close.  There's other differences, so I don't

8    that -- you know, when we sent our draft, the objection was

9    raised that the "arising out of the article" language was not

10   broad enough.  So I don't know if the other changes we made

11   would be agreeable if the stipulation as to indemnity just

12   reflected just "arising out of."

13         MS. LOCKE:  Your Honor, the problem that we have is

14   we don't to hear anything about a conflict of interest at this

15   late date in the trial.

16         MS. McNAMARA:  We're not asserting a conflict.

17         MS. LOCKE:  I just want to make it very clear for

18   the record.  Your Honor has already asked this question.  And

19   to the extent that there's a scope issue here that the

20   defendants are unwilling to agree to, we think there could be

21   a possible conflict of interest.  In fact, they're doing this

22   conference here in chambers, outside of the presence of the

23   witness.

24         THE COURT:  How could it be a conflict of interest

25   as to the post-article interviews and not as to the article

1    itself?

2          MS. LOCKE:  Well, if she is not on the hook -- the

3    post-article interviews, I think, go further and are more

4    express in terms of our overall implication.

5          THE COURT:  If what you're saying is that there's

6    some issue as to whether she was speaking as a representative

7    of Rolling Stone or on her own, yes, that's an issue; but

8    again, it seems to me the importance of that would not come up

9    until the damage phase of the case, if there is one.

10          MS. LOCKE:  But we just want to be very careful

11    here.  We don't want a mistrial.  We don't want them to be

12    asserting -- I mean, the reason they're doing this conference

13    here in chambers is they're doing it outside the presence of

14    Ms. Erdely, which I think it's unethical; I think that the

15    witness should be able to hear this.  But putting that fact

16    aside, we just want it very clear on the record that we don't

17    want to hear anything about a conflict of interest at this

18    late date.

19          THE COURT:  Okay.

20          MR. FINNEY:  Your Honor, can I make a couple of

21    things clear for the record?

22          THE COURT:  Uh-huh.

23          MR. FINNEY:  First of all, the conference where this

24    was brought up on October 11, we brought up the issue of

25    indemnification, not the Court.  And then the Court instructed

1    us that there were three options:  Provide the salient terms

2    of the agreement; or if defendants go out of the case, then

3    provide the agreement at the conclusion of the liability; or

4    provide the agreement if the case proceeds to a punitive

5    damages phase.

6            THE COURT:  So punitive damages is off the table.

7            MR. FINNEY:  Exactly.  There was no request by the

8    Court to provide the terms that we've refused to --

9            THE COURT:  If there is a sanction to be imposed,

10   that would be it.

11           MR. FINNEY:  Yeah, and the second point was the

12   reason we wanted to have this outside the presence of the

13   witness is we have not spoken to Ms. Erdely about this.

14           THE COURT:  How far it extends?

15           MR. FINNEY:  Well, this issue.  We don't want to

16   prejudice her testimony if and when a stipulation is read.

17           We would also say we would ask for the stipulation,

18   if one could be agreed to, that it should be said at the

19   conclusion of her testimony.  Because, otherwise, this could

20   just come out of left field for her to be hearing this.  You

21   know, I think it would be prejudicial?

22           THE COURT:  All right.  Does anyone else want to

23   talk about it?

24           MR. CLARE:  Just very briefly.  Remember how we got

25   here on Friday was the discussion was that the testimony that

1   was elicited about Ms. Erdely's earnings and her job and the

2   impression that has been, we believe, left with the jury that

3   she has already been financially punished by this --

4          THE COURT:  Understood.

5          MR. CLARE:  -- and that she doesn't necessarily have

6   the resources of Rolling Stone and Wenner Media behind her.

7          And so the scope of the indemnification, if you

8   will, is important, we believe, because we want the jury to

9   understand that even her post-publication statements are

10  covered, which is what we had been led to believe.  So we

11  think it's important that there be some clarity.

12         THE COURT:  I'm not so sure about that.  I mean, I

13  don't think the jury would appreciate all these nuances.  I

14  think it's important for the jury to understand there is an

15  agreement and that it is both an indemnification agreement and

16  a cooperation agreement.  But really, that's about all they

17  need to know, at least at this point.

18         I think if you do get to a damage phase, yes, the

19  extent of the agreement, exactly what's being covered becomes

20  a little bit more important.  But in this phase, the liability

21  phase, the whole thing goes only to the witness' credibility

22  and her sincerity and her honesty in answering questions.

23         And the jury is charged to weigh that, and one of

24  the things they can consider is that she has an agreement with

25  Rolling Stone; and that's essentially it.  I don't think it's

1    appropriate in the liability phase for you to ask questions

2    about the extent of that agreement or what it covers or what's

3    implicated.  I think it's only important for the jury in this

4    phase to understand that the agreement is there and they can

5    weigh it, along with everything else, in deciding what weight

6    to give to this woman's testimony.

7            MR. FINNEY:  Your Honor, we'd also be happy to

8    tender -- I'm sure plaintiff has their version of the

9    stipulation.  I think it was actually included in their brief.

10   We have sort of changes to that we can tender for the Court,

11   and also --

12           THE COURT:  It doesn't need to be very long, I can

13   assure you of that.

14           MS. LOCKE:  We were fine with defendants'

15   stipulation except with respect to the scope of the indemnity.

16           THE COURT:  Again, in my view, it's not necessary to

17   say anything about the scope at this point.

18           MR. FINNEY:  And, Your Honor, we'd also be willing

19   to tender in camera the confidentiality agreement.  It's

20   called a joint defense and confidentiality agreement, if Your

21   Honor would like to look at the provision itself.

22           THE COURT:  I don't, but I think as a result of this

23   hearing you should file it under seal; not share it at this

24   point with the plaintiff's attorneys, but file it so we'll

25   have an adequate record made if this issue comes up again.

```
 1            MR. FINNEY:  Just so I understand, Your Honor, when
 2   you say file it under seal, do you mean file it in camera or
 3   do you mean actually --
 4            THE COURT:  File it in camera.
 5            MR. FINNEY:  At some point, at an appropriate point,
 6   can we just make that notation on the record and provide it to
 7   Ms. Moody?
 8            THE COURT:  Sure.  Sure.
 9            Well, the only thing I would disagree with here --
10   so you guys are happy with this wording?
11            MS. McNAMARA:  Yes, we are.
12            MR. FINNEY:  Yes.
13            THE COURT:  Okay.  I think it's fine.  But except, I
14   think that you're entitled, Ms. Locke, to bring it up whenever
15   you want in your redirect.
16            MS. LOCKE:  Thank you, Your Honor.
17            THE COURT:  And you can just ask her, and at that
18   point we can announce that there's a stipulation, and one of
19   you can read it into the record and that will be it.
20            But I don't think that you're entitled to ask her as
21   to her understanding of this agreement now.
22            MS. LOCKE:  That's fine.
23            THE COURT:  The fact of the agreement is all that's
24   important for the jury to know about.
25            MS. LOCKE:  Okay.
```

1          MR. SEXTON:  So none of the terms?

2          THE COURT:  None of the terms now, except what he's

3   stipulating to.

4          MS. LOCKE:  The three that are stipulated to?

5          THE COURT:  Right, but I don't think you need to go

6   into details on what it covers or if it covers the post --

7          MS. LOCKE:  I don't have the terms.  I still don't

8   have the agreement.

9          MS. McNAMARA:  Then what the provision provides.  We

10   represented that to you, and I would hope that you would

11   accept that representation.

12          MS. LOCKE:  Well, we accepted the representation

13   that it didn't have a cooperation clause; and that was

14   obviously not correct.

15          THE COURT:  Well, you pursued it and we found out

16   exactly what it covers.  I think Scott's explanation is fine.

17   I mean, he did, he discharged his ethical obligation when he

18   called back once he discovered that it was there.

19          MR. SEXTON:  So, Judge, I want to be clear on this.

20   The witness will be asked:  Do you have a joint defense

21   agreement with Rolling Stone?  Correct?

22          THE COURT:  Uh-huh.

23          MR. SEXTON:  And then at some point you will --

24          THE COURT:  I'll read it or one of you can read it.

25   Mike can read it.

1    MS. LOCKE:  My understanding, Your Honor, is I can

2  ask about the three things that are in here.  That means so

3  the jury has an understanding --

4    THE COURT:  Everything the jury needs to know is in

5  this statement.

6    MS. LOCKE:  Thank you.

7    MS. McNAMARA:  But just so it's clear, it's going to

8  be read, you're not going to be ask.  That's what the Court --

9  I'm understanding the Court's ruling.

10    THE COURT:  What?

11    MR. SEXTON:  I would like it to be clear that the

12  witness is not going to be asked:  And as part of that

13  agreement, isn't it true that Rolling Stone is paying for your

14  attorneys' fees?

15    THE COURT:  It says that.

16    MR. SEXTON:  Correct.  And that's what I'm trying to

17  say; since you're going read that, there's no need to ask the

18  witness that.

19    THE COURT:  There's no need to ask the witness her

20  understanding of the agreement now.

21    MR. FINNEY:  Yes.  And, Your Honor, I think that is

22  important because part of the reason the stipulation, why we

23  had asked that it be read at end of Ms. Erdely's testimony is

24  because we have not broached this issue.  And so the

25  questions, I mean, we have no idea what would be -- I think

1  she understands she's indemnified, but if there was specific

2  questions, the jury could have the wrong impression.

3          And the point of the stipulation, when we said in

4  lieu of the witness' testimony, was to provide the information

5  to the jury so they can evaluate it --

6          THE COURT:  I agree.

7          MR. FINNEY:  -- not to make Ms. Erdely look like she

8  didn't know what was --

9          THE COURT:  I agree.  First of all, she's not

10  competent to talk about the scope of it.

11          MR. SEXTON:  And for the record, I am competent she

12  does not recall or know that it has a cooperation agreement.

13  And so if she's asked cold about that, we haven't told her,

14  you know, hey, read this agreement, we haven't done anything

15  like that.

16          THE COURT:  The fact that the agreement is in place

17  is the only thing that's important for the jury to understand

18  now.  If you start going into too much detail, you run the

19  risk of causing undue prejudice; and that should be avoided.

20          MS. LOCKE:  I understand that.  I am satisfied.  If

21  Your Honor is going to read this for the jury, I would prefer

22  that Your Honor read it as opposed to one of the parties.  But

23  my concern from the jury's perspective is they won't

24  understand what --

25          THE COURT:  That's for you to argue about.

1          MS. LOCKE:  -- indemnification agreement means.

2          THE COURT:  You will argue at the end that -- when

3     you're arguing as to the credibility of the witness that she

4     has this agreement in place with Rolling Stone, and part of it

5     is cooperation; so in deciding how much weight to accord to

6     her testimony, you can consider how much of her testimony may

7     have been bent in favor of Rolling Stone, along with

8     everything else.  It's one of many factors to consider.

9          MS. LOCKE:  Provided Your Honor reads this, I'm

10    satisfied.

11         THE COURT:  I'll read it.  That's fine.

12         MR. FINNEY:  And, Your Honor, can we have one

13    additional request?

14         THE COURT:  What?

15         MR. FINNEY:  If there is something that anyone wants

16    to put on the record, to have this happen after Ms. Erdely's

17    testimony, again, just to not influence what may or may not be

18    said.

19         THE COURT:  Run that by me again.

20         MR. FINNEY:  In terms of I would like it if we

21    didn't go back into court and there was some statement on the

22    record by plaintiff's counsel about this conference.

23         THE COURT:  Oh, no.

24         MR. FINNEY:  That nothing be said.

25         THE COURT:  I think you're making way too much of

1    this; I think all of you are.

2              MR. FINNEY:  I agree.

3              THE COURT:  I think it may have much more relevance

4    in a damage phase, if there ever is one, but relevance for

5    other reasons then.

6              Anything else?

7              MS. LOCKE:  Thank you, Your Honor.

8              THE COURT:  And you give me the high sign when

9    you're ready for me to read this.  And I think we should file

10   what Mike has tendered this morning.

11   (Chambers conference concluded)

12   (Jury in)

13   (8:15 a.m.)

14   (Open court as follows:)

15             THE COURT:  Ten jurors all present on Monday

16   morning, accounted for, ready to proceed with this trial.

17             I'm sorry we're getting started a little bit late,

18   but I can assure that we're using this time in a very valuable

19   way.  We reached some decisions with the attorneys that will

20   hopefully expedite the trial and eliminate some issues that

21   won't have to be argued.  So it was, indeed, time well spent.

22             As you remember when we finished on Saturday, we had

23   taken a witness out of order.  And now it's proposed that we

24   have the redirect questioning of Ms. Erdely.

25             Since a new day has dawned, I'll ask the clerk to

1    swear the witness.

2              SABRINA RUBIN ERDELY, called as a witness, having

3    been duly resworn to tell the truth, the whole truth, and

4    nothing but the truth, was examined and testified as follows:

5                        REDIRECT EXAMINATION

6    BY MS. LOCKE:

7    Q    Good morning, Ms. Erdely.

8    A    Good morning.

9    Q    We're going to go back to some of the testimony that you

10   gave last week.  And I know you've been on the stand a long

11   time, so I'm going to try and refresh your recollection on

12   some of the things that you've said.  But let me know if you

13   have any trouble remembering.  Okay?

14   A    Okay.

15   Q    Early in your testimony, you testified that the bad thing

16   about journalism is that you don't get paid very well.

17        Do you remember that?

18   A    That -- for me personally or in general?

19   Q    You said in general, one of the bad things about

20   journalism is that you don't get paid very well.

21   A    Well, I mean, it's a profession that you enter into not

22   expecting to be paid very well, yes.

23   Q    Well, that's not very true of your position at Rolling

24   Stone, was it?

25   A    No.  I was very fortunate to be well paid.

1    Q    You were paid $150,000 a year; is that correct?

2    A    For the last year of my time there, yes.

3    Q    Your contract set forth that you would be paid $300,000

4    over the course of two years; isn't that correct?

5    A    Correct.

6    Q    And that contract set forth that you would be paid

7    $300,000 in order to write seven articles; isn't that correct?

8    A    Correct.

9    Q    Ms. Eramo made much less than you, did she not?

10   A    She made less.  I don't know if I can characterize it as

11   much less.

12   Q    She made $40,000 a year less than you did; isn't that

13   correct?

14   A    I don't know what her salary was at the time.

15   Q    Ms. Erdely, isn't it true that you have an

16   indemnification agreement with Rolling Stone?

17   A    Yes.

18           MS. LOCKE:  At this time, Your Honor, I would like

19   for you to read the stipulation that the parties have agreed.

20           THE COURT:  Ladies and gentlemen, you remember at

21   the outset of the trial, I told you that evidence is admitted

22   in a number of ways.  One of those ways is through the

23   submission of a stipulation.  A stipulation is an agreement

24   between the parties that certain facts are true, and it

25   eliminates the necessity of proving those facts in open court.

1          The parties have reached a stipulation about the

2    matter that the witness has just described.  And it's been

3    agreed that I will read the stipulation to you at this time.

4          "Defendants Rolling Stone, LLC, and/or Wenner Media,

5    LLC, have entered a joint defense and confidentiality

6    agreement with the defendant Erdely which contains

7    indemnification and cooperation provisions.

8          "An indemnification agreement is an agreement under

9    which one or more of the parties agree to pay costs incurred

10   or damages assessed against another party.

11         "A cooperation agreement is an agreement under which

12   the parties to a case agree to cooperate with each other in

13   the conduct of that case.

14         "Under the joint defense and confidentiality

15   agreement between the defendants, Rolling Stone, LLC, and/or

16   Wenner Media, LLC, have agreed, one, to pay all of the

17   defendant Erdely's legal fees and costs associated with this

18   case; and, two, to satisfy any judgment and pay any and all

19   damages assessed against the defendant Erdely arising out of

20   the article in this case.

21         "In addition, under the joint defense and

22   confidentiality agreement, defendants have agreed to cooperate

23   with each other in the defense of this case."

24         I'm going to ask that a clean version of just the

25   stipulation be tendered to Ms. Moody, when it can be prepared,

1  and made part of the record in the case.

2          You may proceed, Ms. Locke.

3          MS. LOCKE:  Thank you, Your Honor.

4  BY MS. LOCKE:

5  Q    You testified a little bit about Liz Seccuro.  Do you

6  recall that?

7  A    Yes.

8  Q    Liz Seccuro was a source for your story?

9  A    Yes.

10  Q    And you recall in your testimony how you testified that

11  Liz Seccuro was raped at Phi Psi, correct?

12  A    Correct.

13  Q    Now, it's correct that that incident happened in 1984,

14  isn't it?

15  A    That's right.

16  Q    And that was long before Nicole Eramo ever was dean at

17  the University of Virginia, correct?

18  A    Correct.

19  Q    And it's fair to say that Liz Seccuro and her incident at

20  the University of Virginia had nothing to do with Dean Eramo

21  and her position at the University of Virginia; isn't that

22  correct?

23  A    Correct.

24  Q    We also heard audio -- about the two hours of audio that

25  you were at dinner with Jackie on the night of September 11.

1      Do you recall that?

2  A    Yes.

3  Q    And during that audio, we heard Jackie provide you the

4  names and phone numbers and sometimes e-mail addresses of some

5  of her first-year roommates; isn't that correct?

6  A    Correct.

7  Q    She gave you the name and a phone number or e-mail -- one

8  or the other -- of Trina Trippett, correct?

9  A    Correct.

10  Q    Alicia Cooper, correct?

11  A    Correct.

12  Q    Rachel Soltis?

13  A    Correct.

14  Q    And Eliza Fox, who wasn't necessarily a roommate but was

15  a TA; isn't that right?

16  A    I can't remember if that was Eliza's last name, but it

17  was somebody named Eliza.

18  Q    Now, the only person in that list that you contacted was

19  Rachel Soltis; isn't that correct?

20  A    Prior to the article coming out, yes.

21  Q    You never called Trina Trippett, did you?

22  A    No.

23  Q    You never called Alicia Cooper, did you?

24  A    After the article came out, I called her.

25  Q    You never called her before the article --

1   A    No.

2   Q    -- to confirm Jackie's story, did you?

3   A    No.

4   Q    And you never called Eliza.  You only e-mailed after "A

5   Rape on Campus" came out; isn't that correct?

6   A    She characterized Eliza as being her go-to person during

7   the bottle incident, and I had verified the bottle incident in

8   other ways, through the police report primarily.  So there was

9   no need to call Eliza.

10  Q    My question was a little bit narrower.  Did you or did

11  you not call Eliza Fox before the article "A Rape on Campus"

12  was published?

13  A    No.

14  Q    And Rachel Soltis was the only person in that list of

15  people who you spoke with before "A Rape on Campus" was

16  published; isn't that correct?

17  A    Yes.  Jackie characterized her as being "my best friend."

18  Q    And Rachel Soltis was the one person who told you that

19  Jackie's story of rape changed over time from one of oral sex

20  to vaginal rape; isn't that correct?

21  A    Correct.

22  Q    But you didn't bother to call these other women to

23  understand why Jackie's story changed over time, did you?

24  A    When I called Alicia Cooper later, she told me the same

25  story and the same thing that Rachel told me, which was that

1    it didn't bother her one bit because she understood that the

2    details changed with time as Jackie came to terms with the

3    shame and the self-blame and so forth.

4    Q    But you didn't call any of these women before "A Rape on

5    Campus" to ask them about the discrepancy in Jackie's story,

6    did you?

7    A    No.

8    Q    We also heard testimony on Saturday that Rachel Soltis

9    told you she knew exactly who Jackie's perpetrators were; is

10   that correct?

11   A    Correct.

12   Q    But you never sought to identify Jay from Rachel Soltis,

13   did you?

14   A    I did.

15   Q    Rachel Soltis didn't provide you Jay's identity, did she?

16   A    She did not.

17   Q    You didn't know who Jay was before you went to

18   publication, did you?

19   A    No.

20   Q    Rachel Soltis also told you that, when Jackie was raped,

21   she made some reference to the blue dress, and you

22   characterized it as a joke.

23        Do you recall that testimony?

24   A    Yes.  It was a reference to the Monica Lewinsky scandal.

25   Q    Right.  You understood Rachel to be making reference to

1    the Monica Lewinsky-Bill Clinton scandal; we don't have the

2    blue dress, correct?

3    A    Correct.

4    Q    Now, at the time you interviewed Rachel Soltis -- this

5    was in 2014, correct?

6    A    Correct.

7    Q    She was 18, 19, 20 years old?  Somewhere around that age?

8    Is that right?

9    A    21 years old.

10   Q    21 years old.  And the Bill Clinton and Monica Lewinsky

11   scandal took place in the mid 1990s; isn't that correct?

12   A    Correct.  Are you suggesting that somebody who is young

13   has no knowledge of things that happened prior to their birth?

14   Q    I'm suggesting that Rachel Soltis was a toddler at the

15   time the Bill Clinton and Monica Lewinsky blue dress reference

16   would have been timely.  Isn't that correct?

17   A    I think that -- no, that's not correct.  I think --

18   Q    She would not have been a toddler at the time?

19   A    Oh, yes.  I'm sorry.  I wasn't listening to the question.

20   She would have been a toddler, yes.

21   Q    Thank you.

22        Now, we also heard the audio back-and-forth from the

23   dinner of September 11, and you asked to see Jackie's scars on

24   her wrist that evening.

25        Do you recall that?

1   A    Yes.

2   Q    And during the audio, it sounded like you actually had,

3   in fact, seen scars on her wrist.  You made some comment like,

4   "Oh, oh, yeah."

5        Do you recall that?

6   A    Yes.

7   Q    But you didn't, in fact, see any scars on her wrists that

8   night, did you?

9   A    I saw something, but I couldn't be sure what I saw

10  because the lighting was dim.  It wasn't until the next night

11  that I could see it more clearly.

12  Q    Let's turn to your reporting file, Plaintiff's Exhibit 10

13  at 4347.  It's in the spiral-bound binder, or you can look at

14  it on the screen.  4347.

15       Do you see where I am?  You ask, "I was also hoping to

16  see, if it's okay, I know you have scars from your assault."

17       Do you see where I am?

18  A    Yes.

19  Q    And you write, "Jackie says, 'I have a couple.'" And then

20  you go on to write your impressions; isn't that correct?

21  A    Correct.  I mean, when I wrote here that "I see nothing,"

22  I mean, I remember -- I mean, I remember it in my mind.  I

23  write that I see nothing, but what I meant to say was "I see

24  nothing of significance."

25  Q    You write, do you not, Ms. Erdely, "Pulls back the beaded

1    woven bracelets on her left wrist.  In the dim light I see

2    nothing."

3        That's what you wrote in your reporting file; isn't that

4    correct, Ms. Erdely?

5    A    It is correct.  But, once again, I'd like to remind you

6    that these notes were made for my own benefit.

7        I remember what I saw.  I'm making these notes as a

8    shorthand for myself to remind myself what I saw.  This is not

9    a record meant for litigation.  This was a record meant for me

10   so that I could -- to inform the article.

11   Q    You didn't write, "I see nothing material," did you?

12   A    I wouldn't use the word "material," but I saw nothing of

13   significance, so I typed out "I see nothing."

14   Q    After "A Rape on Campus" was published in December,

15   mid December, December 17, you sent an e-mail to Jackie with a

16   long list of questions that you had for her.

17       Do you recall that?

18   A    Yes, I do.

19   Q    I'd like for you to look in the small binder that's in

20   front of you at what's been identified as Plaintiff's

21   Exhibit 477, Tab 477.

22   A    Yes.

23   Q    Do you recognize this as your December 17 e-mail to

24   Jackie?

25   A    I do.  This was after the article was retracted and I was

1    attempting to -- I was asked to re-report the article to find
2    out what had gone wrong.
3            MS. LOCKE:  Your Honor, at this point in time I
4    would move to admit Plaintiff's Exhibit 477.
5            MR. SEXTON:  Judge, there is an objection to this.
6    And I would like Mr. Finney to handle it.
7            MR. FINNEY:  Your Honor, can we do this at side bar?
8    (Bench conference as follows:)
9            MS. LOCKE:  This is an e-mail that Ms. Erdely sent
10   to Jackie after the fact.  Your Honor, there is a pretrial
11   ruling on this, but our position is that defendants have
12   opened the door to this.  If you recall during opening
13   statement --
14           THE COURT:  Well, it's his objection.  Let him
15   speak.
16           MR. FINNEY:  This is motion in limine six.
17   Post-publication e-mails between Sabrina and Jackie.  And the
18   motion was granted in part, denied in part; the evidence will
19   only be admitted for impeachment purposes.  I think we also
20   took this up with Your Honor in chambers last week, and the
21   issue is that there are certain topics from these e-mails and
22   that that the e-mail itself would not be admissible, but the
23   topic could generally be inquired as to, but not the fact to
24   try to say this e-mail itself would not be admitted into
25   evidence.

Eramo v. Rolling Stone, et al. - 10/24/16

```
1              THE COURT:  Well, it depends on the context.  Let's
2      look at it.
3              You were getting ready to tell me which portion of
4      it you think is implicated by the ruling on the motion on
5      limine.
6              MS. LOCKE:  Yes, Your Honor.  Remember during
7      opening statement, Your Honor, they elicited a voice mail from
8      Ms. Erdely suggesting that Ms. Erdely was surprised, surprised
9      by the fact that Jackie was so incredible.  But this
10     demonstrates that Ms. Erdely knew that she had never seen
11     scars on Jackie before that night?
12             THE COURT:  What is referring to that portion of it?
13             MS. LOCKE:  There's so much good stuff in here that
14     I --
15             THE COURT:  I think that's part of the concern.
16             MS. LOCKE:  You told me that your -- starts right
17     here.  You told me that your attack left your face pulverized,
18     including a black eye, bruised red cheek, split lip, but four
19     people say that in the two weeks after your assault, they saw
20     no visible injuries that they can recall.  How can you account
21     for that?  You told me all of your friends have asked about
22     the scars on her back.
23             THE COURT:  It does impeach her testimony given
24     today; so that portion of it.  I agree as to the entire
25     e-mail.
```

1          MR. FINNEY:  Your Honor, may I look at the text?

2          THE COURT:  Sure.

3          MR. FINNEY:  Your honor, I don't believe that

4   impeaches the testimony today because the question was if you

5   remember the scars on her arm; it's not the scars on her back.

6          THE COURT:  It impeaches her testimony.  Whether or

7   not it successfully impeaches her testimony is for the jury to

8   decide.  They have to decide the import of this paragraph.

9          MS. LOCKE:  Your Honor, I also intend to raise

10  questions about the fact that she didn't talk with Ryan and --

11         THE COURT:  In a way it's hyperbole on Sabrina's

12  part.  She said, Look, no one has told me about scars.  What

13  can you tell me about scars now?

14         So it may not say exactly what Ms. Locke wants it to

15  say, but nevertheless it says something.

16         MR. FINNEY:  Your Honor, I would like to just say

17  for the record that it is specific to scars on her back, and

18  even more specifically, it was about her boyfriend Connor

19  being able to see that.  This was the meeting where she pulled

20  up her arm and there were scars on her -- her sleeve, her

21  bracelet, and there was scars on her arm, it was not the back.

22         THE COURT:  It doesn't say just her back.  It says

23  but four people say in the two weeks after the assault there

24  were no visible injuries.

25         MS. LOCKE:  Thank you, Your Honor.

1        THE COURT:  So what are we going to do about its

2   context?  I think this paragraph does impeach her testimony

3   today.  The rest of it falls under the motion, the ruling on

4   the motion.

5        MR. FINNEY:  We would ask that it not be admitted

6   but it can be referenced --

7        THE COURT:  What about the rest of it?

8        MS. LOCKE:  Your Honor, can I just run get my notes

9   real quick?

10        THE COURT:  Sure.

11        MS. LOCKE:  Ms. Erdely has also testified that she

12   knew prior to "A Rape on Campus" that her story, that Jackie's

13   story changed from oral sex to vaginal rape.

14        THE COURT:  Where's that?

15        MS. LOCKE:  Here, this is the very first time she

16   ever asked Jackie about that.  She says, You told me you

17   didn't want to speak with Alex, Ryan, and Kathryn because of

18   the harsh way they all perceived you or treated you after the

19   assault.  What was the real reason?  Was it because you

20   stopped being friends?  Was it because, according to them, you

21   told them a different account of what happened on night of

22   September 28?  Did you tell your friends the night of

23   September 28 that you were forced to perform oral on a bunch

24   of --

25        MR. FINNEY:  Your Honor, this e-mail is well after

1    the last publication.  That's why Your Honor granted the

2    motion in limine.  And those types of things where I believe

3    that Sabrina had spoken to those folks in the intervening time

4    so had gained more information.

5          One last point on Your Honor's current ruling about

6    the visible injuries.  That was specifically about the face

7    and the --

8          THE COURT:  That's for the jury to decide.

9          MS. LOCKE:  That's precisely why it's relevant.  She

10   only asked these questions, which she knew before publication

11   were in her mind, she only bothered to raise them after the

12   fact.  That's why this is relevant.

13         THE COURT:  I agree with her.  It seems to me to be

14   consistent with my ruling on the motion in limine.  This does

15   impeach the testimony that she gave on cross, vast portions on

16   this.  And the question is:  Do you want to try to redact

17   everything else, or do you want to just let the whole thing

18   come in?

19         MS. LOCKE:  Your Honor, I submit that there's so

20   much in here that it does need to come in.

21         THE COURT:  Well, what's your feeling about it,

22   Mike?

23         MR. FINNEY:  I mean, I would say that as a first

24   step to impeach what it's specifically asking about, questions

25   much like you treated the OCR report.

1           THE COURT:  That's right.

2           MR. FINNEY:  It's not the --

3           THE COURT:  That's right.  That's the way to handle

4  it.  Ask her the questions, reference the e-mail; and if she

5  answers differently, tries to put a different spin on it or

6  it's inconsistent in any way, then you can move its admission.

7           MS. LOCKE:  Thank you.

8  (Bench conference concluded)

9  (Open court as follows:)

10          THE COURT:  The last document is going to be labeled

11  tendered but not admitted.  It will become Number --

12          MS. MOODY:  147.

13          (Plaintiff's Trial Exhibit 147 tendered)

14  BY MS. LOCKE:

15  Q    Thank you.  If we can go back to Plaintiff's Exhibit

16  Trial Exhibit 10, the prior blow-up, just to get -- reorient

17  the jury as to where we are after that break.

18     Ms. Erdely, you wrote in your notes, "She pulls back the

19  beaded woven bracelets on her left wrist, and in the dim light

20  I see nothing," correct?

21  A    Correct.

22  Q    Now, you sent an e-mail to Jackie after "A Rape on

23  Campus" was published; isn't that correct?

24  A    Correct.

25  Q    You sent it to her on December 17, more than two, almost

1  three weeks, after "A Rape on Campus" was published; isn't
2  that correct?
3  A    Correct.  As I said, this was part of my re-reporting
4  efforts.
5  Q    And in that e-mail you write, "You told me that your
6  attack left you with a 'pulverized' face, including a black
7  eye, a bruised right cheekbone, and a split lip.  But four
8  people say that in the two weeks after your assault, you had
9  no visible injuries that they can recall.  How can you account
10 for that?"
11      Did you write those words to Jackie?
12 A    I did.
13 Q    You go on to write Jackie, "You told me all of your
14 friends have asked you about scars on your back, but none of
15 your friends I've spoken with have ever seen scars on your
16 back, including your boyfriend, Conner.  If you recall, he
17 said this when we were at dinner in September.  Can you give
18 me an example of someone who's seen them who I can talk to?"
19      Did you write that question to Jackie on December 17?
20 A    I did.
21 Q    You also knew before "A Rape on Campus" was published
22 that Jackie's story of rape had changed over time; isn't that
23 correct?
24 A    Correct.
25 Q    From oral sex to vaginal rape; isn't that correct?

1  A    Correct.  And as I've said, that didn't bother me because

2  I know that in cases of sexual assault, people's stories can

3  change with time.  And that didn't seem to bother her friends.

4       As Emily Renda testified, you know, it didn't bother --

5  you know, that's consistent.  And as Dean Eramo testified, it

6  didn't bother her either.

7            MS. LOCKE:  Your Honor, I would move to strike that

8  last piece about what bothered Dean Eramo.  It's inconsistent

9  with Dean Eramo's testimony.

10           THE COURT:  The jury understands that very common

11  observation.  One person can't look into someone else's mind

12  and know what that person is thinking.

13  BY MS. LOCKE:

14  Q    You never bothered to ask Jackie about the change in her

15  story from oral sex to vaginal rape before "A Rape on Campus"

16  was published, did you?

17  A    No.

18  Q    In fact, you waited until after the article was published

19  to ask those important questions, didn't you?

20  A    I didn't consider it an important question.  It was only

21  after the article came out that I went through all my notes.

22  Some of these questions were suggested to me by other people.

23  But I looked at everything with a new skepticism, and I asked

24  her all these questions with that new skepticism in mind.

25  Q    In the very same e-mail that you wrote to Jackie about

1   not having seen scars on her back, did you not ask Jackie,

2   "You said you told me you texted Ryan on my behalf over the

3   summer, asking him to speak with me for the article.  He says

4   you didn't.  Did you?  If not, why did you tell me you did?"

5        Did you ask that of Jackie?

6   A    I did.

7   Q    You go on a couple of paragraphs down, "Was it because,

8   according to them, you told them a different account of what

9   happened on the night of September 28, 2012?"

10       Did you ask her that question?

11  A    Yes.

12  Q    And when you're referring to "them," you were referring

13  to the three friends, correct?

14  A    Correct.

15  Q    Jackie had told the three friends a different account of

16  what had happened to her on that night, correct?

17  A    Correct.  She had said it was oral rape, not vaginal

18  rape.

19  Q    And you go on to write Jackie in this post-publication

20  e-mail, "Did you tell your friends on the night of

21  September 28 that you'd been forced to perform oral on a bunch

22  of guys?"

23       Did you write that question to Jackie on December 17?

24  A    Yes.

25  Q    And that was the first time you had ever posed the

1    question as to Jackie as to why her story of rape had changed
2    over time; isn't that correct?
3    A    Yes.
4    Q    But notwithstanding the fact that you knew that Jackie's
5    story of rape had changed over time, you elected to include
6    only the most graphic description of Jackie's rape in "A Rape
7    on Campus," the vaginal rape; isn't that correct?
8    A    Correct.  As I think I've mentioned, I understood that at
9    the time to be the true and full story as she represented it.
10   Q    Now, during your testimony you referred to a woman as
11   Stacy, who was also an assault victim, a sexual assault
12   survivor, at the University of Virginia.
13        Do you recall that?
14   A    Yes.
15   Q    And in your testimony you relay information about how
16   Stacy was critical of the UVa administration for her handling
17   of her sexual assault.
18        Do you recall that?
19   A    Yes.
20   Q    But she wasn't critical of Nicole Eramo, was she?
21   A    No.
22        MS. LOCKE:  If we can put up Plaintiff's Trial
23   Exhibit 127, which has been previously marked and entered into
24   evidence.
25   BY MS. LOCKE:

1   Q    This is a Cavalier Daily letter that Stacy wrote

2   supporting Dean Eramo; isn't that correct?

3   A    Correct.

4   Q    And Stacy writes, "I was saddened to see her portrayed in

5   such a negative light.  You truly have the most difficult job

6   on grounds, and I respect and appreciate how you have

7   performed it."

8        Stacy wrote those words, did she not?

9   A    She did.

10  Q    And at the very bottom, she says, "I think highly of you,

11  and I always have.  I hope that was not lost in this article.

12  With gratitude, Stacy."

13       Stacy also wrote that letter in support of Dean Eramo --

14  those words in her letter in support of Dean Eramo, did she

15  not?

16  A    She did.

17       And I think that she actually wrote a very astute letter

18  here, because what she says is that --

19  Q    Ms. Erdely, my question was, did Stacy write those words

20  that are highlighted on the screen?

21  A    She did, but I think we should read the whole letter that

22  she wrote.

23  Q    Ms. Erdely, this is my cross-examination.

24           THE COURT:  Mr. Sexton can ask you about that later.

25           THE WITNESS:  Okay.

1         Yes, she did.

2    BY MS. LOCKE:

3    Q    You also testified in your -- while you were on the

4    stand, about a woman who has been identified as anonymous

5    Wahoo, correct?

6    A    Correct.

7    Q    And how anonymous Wahoo was highly critical of her

8    experience at UVa and the handling of her sexual assault.

9         Do you recall that?

10   A    Yes.

11   Q    And are you aware, Ms. Erdely, that Ms. Eramo, when she

12   heads the sexual misconduct board, does not decide the

13   punishment for the alleged assailant?  Are you aware of that

14   fact?

15   A    I am now.

16   Q    And she's not a voting member of the sexual misconduct

17   board when she chairs that panel.  Do you understand that?

18   A    Yes.

19   Q    That it is -- that she does not hand out sanctions

20   whatsoever.  You understand that?

21   A    Yes.

22   Q    Instead, it's a group of peers -- it was a group of peers

23   of anonymous Wahoos who handed down the ruling and the

24   decision in that case.  Are you aware of that?

25   A    Yes.

1  Q    You're aware that the sexual misconduct board did an

2  investigation into anonymous Wahoo's claims of having been

3  assaulted, are you not?

4  A    I don't know that I am.

5  Q    Are you aware that the sexual misconduct board concluded

6  that, contrary to anonymous Wahoo's claims, that she had not

7  been drugged on the night of her alleged attack?

8  A    I don't remember.

9  Q    Are you aware that the sexual misconduct board

10 investigated anonymous Wahoo's claims that her perpetrator had

11 assaulted other women?

12 A    I'm sorry.  Can you ask that again?

13 Q    Are you aware that the sexual misconduct board

14 investigated anonymous Wahoo's claims that her assailant had

15 attacked and sexually assaulted other women?  Are you aware

16 that they did that investigation?

17 A    No, I was not aware.

18 Q    Are you aware that the sexual misconduct board's

19 investigation concluded that those other encounters by this

20 man were consensual?

21 A    No.

22 Q    Are you aware that anonymous Wahoo's peers on the sexual

23 misconduct board concluded that she was not sexually

24 assaulted?

25 A    No.  Because the letter that she was given told her

1   that -- that they believed her, but that nonetheless they were

2   finding that her -- the accused not guilty.

3   Q    You don't include any of the sexual misconduct board's

4   conclusions about the fact that anonymous Wahoo had not been

5   drugged, that her claims that her assailant had attacked other

6   women were unfounded and were concluded to be consensual, you

7   don't include any of those facts in "A Rape on Campus," do

8   you?

9   A    What I included --

10  Q    My question is whether you included those facts, the fact

11  that the peer group concluded she had been drugged and the

12  peer group concluded that the other alleged attacks were

13  consensual in nature.  Did you include those in "A Rape on

14  Campus"?

15  A    No.

16  Q    You also testified about John Foubert, who was a source

17  for your story, correct?

18  A    Correct.

19  Q    And you considered him to be an authority on matters of

20  sexual assault, correct?

21  A    Correct.

22  Q    And he told you he was a former dean at the University of

23  Virginia; is that correct?

24  A    Correct.

25  Q    And he was highly critical of UVa's handling of sexual

1  assaults; isn't that correct?

2  A    Correct.

3  Q    Did Mr. Foubert tell you that he left the University of

4  Virginia under unfavorable terms?

5  A    He did not.

6  Q    Did he tell you that his contract with the University of

7  Virginia was not renewed?

8  A    No.

9  Q    Did he tell you that he was asked to leave the University

10  of Virginia?

11  A    No.

12  Q    It's fair to say that you didn't reveal any of that bias

13  in "A Rape on Campus," did you?

14        MR. SEXTON:  Your Honor, I'm going to object.  I

15  think it's one thing to ask her questions for which there's no

16  basis in the record, but another to assume that it's true.

17        THE COURT:  I agree.  I thought the last question

18  was inappropriate.

19  BY MS. LOCKE:

20  Q    You also relied on S. Daniel Carter as a source for your

21  story; is that correct?

22  A    Yes.

23  Q    And you considered him an authority on the topic of

24  sexual assault, correct?

25  A    Yes.

1    Q    And do you know whether S. Daniel Carter has ever met

2    Nicole Eramo?

3    A    No.

4    Q    Do you know whether he knew before you spoke with him

5    anything about Jackie's case?

6    A    No.

7    Q    You also relied on Susan --

8    A    Actually -- I'm sorry.

9         I believe that he did not know.  I was telling him

10   information on Jackie's case for the first time.

11   Q    So he knew nothing about Jackie's case before you relayed

12   that information to him, correct?

13   A    Correct.

14   Q    You also relied on Susan Russell as a source, correct?

15   A    Correct.

16   Q    And you considered her an authority on matters of sexual

17   assault; isn't that correct?

18   A    At University of Virginia, correct.

19   Q    And her daughter was sexually assaulted at the University

20   of Virginia, correct?

21   A    Correct.

22   Q    And that took place in 2004; isn't that correct?

23   A    Correct.

24   Q    And that's long before Dean Eramo was ever a dean at the

25   University of Virginia; isn't that correct?

1   A    Correct.

2   Q    Do you know whether Ms. Russell knows Ms. Eramo

3   personally?

4   A    I don't know.

5   Q    Do you know whether Ms. Russell knew anything about

6   Jackie's case before you relayed that information to her?

7   A    She did not.

8   Q    You also relied on Laura Dunn as a source, correct?

9   A    Correct.

10  Q    And Laura Dunn is an authority -- who you considered an

11  authority on the matter of sexual assault?

12  A    Yes.

13  Q    Do you know whether Ms. Dunn knows Ms. Eramo personally?

14  A    I don't know.

15  Q    Do you know whether Ms. Dunn knew anything about Jackie's

16  case before you relayed the details of Jackie's case to her?

17  A    She didn't seem to.

18  Q    You testified -- switch gears a little bit.

19       You testified that you and Alex Pinkleton went to Phi Psi

20  on the night of September 12th after dinner; is that correct?

21  A    Yes.

22  Q    You testified that you went inside the house?

23  A    Yes.  There was also a third person with us.

24  Q    You testified that someone told folks at the Phi Psi

25  house that you needed to use the bathroom; isn't that correct?

1    A    Correct.

2    Q    But the real reason you went into the Phi Psi house was

3    you wanted to look around; isn't that correct?

4    A    Correct.

5    Q    You didn't identify yourself as a journalist when you

6    went inside that private property, did you?

7    A    No.

8    Q    When you went in that private property for the ostensible

9    purpose of going to the bathroom, you didn't ask around to ask

10   if any of the brothers knew Jay, did you?

11   A    No.

12   Q    You didn't ask if any of the brothers could identify who

13   Armpit was, did you?

14   A    No.

15   Q    You didn't ask any of the brothers if they could identify

16   Blanket, did you?

17   A    No.

18   Q    You made no attempt to interview any of the men

19   whatsoever, did you?

20   A    That was not my intention going into the house; I merely

21   wanted to look around and see whether it was consistent with

22   Jackie's recollection of what it looked like.

23   Q    Notwithstanding the fact that you told the men that you

24   went in to use the restroom?

25   A    We actually planned to use the restroom, but when we took

1   a look inside, we decided against it.

2   Q    You didn't tell them that you were a journalist and you

3   were going to write a negative story about Phi Psi, did you?

4   A    I did not tell them that I was a journalist.  And at the

5   time, I didn't know whether I was going to write a negative

6   article about Phi Psi.  I didn't know exactly what kind of

7   article I was writing at that point.  It was still taking

8   shape.

9   Q    Ms. Erdely, your job as a journalist is to double-verify

10  every fact that you can; isn't that correct?

11  A    That is what I attempt to do, yes.

12  Q    In fact, you want to double-verify everything because it

13  elevates that material to the level of fact.  Those are your

14  words, aren't they?

15  A    Yes.  This gets back to what I was saying yesterday about

16  being able to tell something in an omniscient way, meaning not

17  having to source it to anything or having to attribute it to

18  something or someone.

19  Q    Let's pull up Plaintiff's Trial Exhibit 10 at 4313.

20       This is your interview with Jackie.  And you asked Jackie

21  if she has the police report from the bottle incident, "could

22  you send it to me.  Anything that's documented, can you send

23  it to me?  I'd love to see it.  It's not because -- it's never

24  because I don't believe you; it's because it's part of my job

25  is double-verifying everything that can be double-verified.

1    It elevates the material to the level of fact."

2         You wrote that in your notes and told that to Jackie, did

3    you not?

4    A    Yes, I did.

5    Q    But you did not double-verify Jay's existence, did you?

6    A    No, I did not.

7    Q    You didn't double-verify Ryan Duffin's "shitshow" quote,

8    did you?

9    A    No.

10   Q    You did not double-verify Kathryn Hendley's "why didn't

11   you just have fun with it?" quote, did you?

12   A    No.  To my great regret.

13   Q    And you didn't double-verify that Dean Eramo said "no one

14   wants to send their daughter to the rape school," did you?

15   A    No.

16   Q    Now, on Saturday, your lawyer showed you text messages

17   that were ostensibly supposedly between Jackie and Maddie.

18        If you could look in your binder, and we could pull up

19   Defendants' Trial Exhibit 23.

20             MS. MOODY:  It's in the white one.  The white big

21   one.

22             MR. SEXTON:  Which binder is it in?  The big one?

23             MS. MOODY:  The big white one, 23.

24   BY MS. LOCKE:

25   Q    If we can flip to the next page.

1    A    Yes.

2    Q    Now, you can flip through this document.  This document

3    nowhere contains the name of Maddie, does it?

4    A    Jackie had represented to me that these were screenshots

5    of her conversation with Maddie.  When she sent it to me, it

6    had the name "Jackie" on top because it was sent to me by

7    Jackie.

8    Q    Maddie's phone number doesn't appear on here anywhere,

9    does it?

10   A    No.  But, I mean, that's -- that's not -- I mean, it

11   wouldn't -- no, it does not.

12   Q    And there's no date on this -- anywhere in this document,

13   is there?  No date to verify when Jackie supposedly had this

14   conversation, is there?

15   A    No.  This is just screenshots.  There was no way to sort

16   of move the text over to see what time or day they were sent.

17   Q    And that's a good point.  It was a screenshot.  It was a

18   fixed capture.  You couldn't manipulate the document at all

19   whatsoever, could you?

20   A    Right.

21   Q    They weren't forwarded to you as if Jackie had gone onto

22   her phone and clicked on the message and pressed "forward" so

23   you could actually see some of the details of that, did she?

24   A    I don't know if that -- is that even possible?

25   Q    It was a screen capture; it wasn't a forward, was it?

1   A    I don't know if a forward is even a thing.

2   Q    So there was no way to know from these text messages that

3   they were, in fact, from Maddie other than Jackie's say-so;

4   isn't that correct?

5   A    Correct.  But I had no reason to doubt it.

6   Q    You never spoke with Maddie directly, did you?

7   A    No.  I mean, to me, this was -- I had asked Jackie for

8   evidence that Maddie had declined to speak, and this seemed

9   like she had declined on the strongest terms possible.

10  Q    Let's look at Defendants' Trial Exhibit 24.  It should be

11  the next tab in your binder.  If we can flip to the first

12  page.

13       These are ostensibly supposed to be texts between Jackie

14  and a woman named Christine, correct?

15  A    Correct.

16  Q    Again, Christine's name does not appear in these text

17  messages, does it?

18  A    Correct.

19  Q    Christine's phone number doesn't appear here, does it?

20  A    Correct.

21  Q    There's no dates on these text messages, are there?

22  A    No.  Once again, I understood these to be screenshots.  I

23  don't think I -- I don't know that forwarding a text message

24  chain is a thing that's within the realm of possibility.  So I

25  accepted this as the means by which Jackie could demonstrate

1    to me that Christine had declined to speak.  And I could see

2    from this chain that she had done so in the strongest possible

3    terms.

4    Q    And you never spoke with Christine directly to confirm

5    that she was unwilling to speak with you, did you?

6    A    No, I did not.

7    Q    Let's look at Plaintiff's Trial Exhibit 1, the article

8    "A Rape on Campus."

9         At page 76 of the article --

10   A    Is that the small binder?

11            MR. SEXTON:  That's the big one.  That's

12   defendants'.

13            THE WITNESS:  Oh.

14   BY MS. LOCKE:

15   Q    Page 76.  The third column, the paragraph says, "a

16   bruise, some mottling on her face."  This is the paragraph

17   where you introduced the concept of Maddie and Becky, correct?

18   A    Correct.

19   Q    You write, "One, she says, is a 2013 graduate who told

20   Jackie she had been gang-raped as a freshman at the Phi Psi

21   house.  The other was a first-year whose worried friends had

22   called Jackie after the girl had come home wearing no pants.

23   Jackie said the girl told her she'd been assaulted by four men

24   in a Phi Psi bathroom while a fifth watched."

25            In parentheses, "neither woman was willing to talk to

1  Rolling Stone."

2      You said that -- you represented to your readers that

3  neither women were willing to speak with Rolling Stone; isn't

4  that correct?

5  A    That's correct.

6  Q    But you never heard that from Maddie or from Becky

7  directly, did you?

8  A    No.

9  Q    You just took Jackie's word for it, didn't you?

10  A    Yes.  I believed her, and I thought that I had proof of

11  it.

12  Q    You testified -- let's talk about the illustration.  If

13  we could turn -- if we could turn in PTX1 to the illustration.

14          MS. MOODY:  Is this admitted?

15  BY MS. LOCKE:

16  Q    You testified that you had nothing to do with the

17  creation of this illustration; is that correct?

18  A    Correct.

19  Q    But you saw the illustration before "A Rape on Campus"

20  was published, did you not?

21  A    I did.  I saw it during the final rounds of production.

22  Q    And you thought the illustration was a fair and accurate

23  depiction of Ms. Eramo, did you not?

24  A    I don't remember what my reaction was.

25  Q    Did you think it was a flattering depiction of Ms. Eramo?

1    A    I really didn't concern myself with the art.  I was

2    really looking at the text.

3    Q    This article -- this illustration was not something that

4    was sourced from Jackie; is that correct?

5    A    I'm sorry.  What do you mean by "sourced"?

6    Q    You had a -- Rolling Stone had an image of Dean Eramo

7    that was changed and altered by the illustrator, that the

8    illustration didn't come from Jackie, correct?

9    A    Correct.

10   Q    Is this illustration something -- we heard your testimony

11   on Friday that you're retracting all the things that were

12   sourced from Jackie.  Is this something that, as you sit here

13   on the stand today, that you're retracting this illustration?

14   A    I don't know that -- I don't know that this illustration

15   is for me to retract.  This is not -- I mean, this is

16   something that probably should be a question for the magazine.

17   I had nothing to do with the illustration.  It's never even

18   occurred to me whether this would be something that I would

19   stand by or not stand by.  I take no ownership of it.

20   Q    As you sit here today, do you think it's a fair and

21   accurate portrayal of Dean Eramo?

22   A    I -- I don't know how to answer that.

23   Q    Why don't you know how to answer that?

24   A    I've never given it much thought.

25   Q    As you sit here today and think about it, do you think

1    it's a fair and accurate depiction of Dean Eramo?

2    A    (Pause)

3        I don't know.  It's hard for me to say.  I'm not sure --

4    I guess the -- I guess the thing for me is that I'm not sure

5    that there should have been a picture of her in there at all.

6    It just doesn't seem to me that she was -- you know, she was a

7    person who I had portrayed in the article as being the person

8    who implemented the policy, but it could have been anybody in

9    that role.  And I think I would have preferred to see a

10   picture of, you know, something else.  I've just never

11   really -- I've just never really given a lot of thought to

12   that particular picture.

13   Q    So it is fair to say that this does not fairly depict her

14   as implementing policy at the University of Virginia?

15   A    Well, I mean, in essence, it does.  It has her counseling

16   a student, and it also shows, you know, the difficulty of her

17   job in terms how much chaos and stuff there is on campus

18   outside.

19   Q    Dean Eramo testified that -- she called this "the devil

20   picture," because it makes her look like the devil.

21       Do you agree with that characterization?

22   A    I don't agree with that.

23   Q    Now --

24   A    I also wanted to say that -- I mean, the caption

25   underneath makes it clear that she's beloved by students.  So

1  maybe that -- I mean, I'm a word person more than a visual

2  person, but, to me, that changes my -- I mean, that is what --

3  not changes -- that influences my perception of the picture.

4  Q    Let's blow up the caption.

5       The caption also says "Where's the justice?" underneath

6  Dean Eramo, does it not?

7  A    It does.

8  Q    Let's move on.

9       You had a quote -- do you remember the testimony? -- in

10  one of the original drafts of the article that Dean Eramo was

11  quoted as saying something along the lines of "we're flat-out

12  fucked"?  Do you recall that?

13  A    Yes.

14  Q    And that was because, according to -- according to your

15  sources, that between Hannah Graham going missing and the

16  article coming out, Dean Eramo had made some suggestion that

17  "we're flat-out fucked."

18       Do you recall that?

19  A    Yes, I do.

20  Q    Fair to say that Dean Eramo was correct?  Fair to say

21  that, as we're sitting here today in court and this

22  litigation, that Dean Eramo was flat-out fucked?

23  A    I actually didn't -- I actually didn't read that as her

24  saying that she personally was flat-out fucked.  I saw her as

25  citing the administration's point of view that they were

1  flat-out fucked.

2  Q    Let's turn our attention to Defendants' Trial Exhibit 12.

3  We looked at this yesterday.

4       Defendants' Trial Exhibit 12 is an e-mail exchange that

5  you had with McGregor McCance at the University of Virginia.

6       Do you recall this testimony?

7  A    I'm sorry.  Can you direct me to which binder it's in?

8  Q    It's in one of the defendants' binders.  Defendants'

9  Trial Exhibit 12.  We can pull out and look at the whole

10 document rather than just the blow-up.

11 A    Yes.

12 Q    This is an e-mail exchange between you and McGregor

13 McCance at the University of Virginia, correct?

14 A    Correct.

15 Q    And McGregor McCance was working with you to get

16 responses to questions that you had for the University of

17 Virginia, correct?

18 A    Working -- I'm not sure that I'd characterize it as

19 working with me, but, yes, he was the point person in the PR

20 office for me at that point.

21 Q    And you posed a bunch of questions to him in this e-mail,

22 did you not?

23 A    Yes.

24 Q    And this e-mail was sent on September 16, 2014; is that

25 correct?

A    Correct.

Q    And let's pull up the list of questions that you asked.

     A variety of questions here, correct?

A    Correct.

Q    You were asking about statistics.  What are the Clery

numbers?  How many students came to Dean Eramo?  Of those

complaints, how many resulted in reports?  How many were made

anonymously?  How many of those reports resulted in a hearing?

     A variety of questions, correct?

A    Correct.

Q    You never asked McGregor McCance whether Dean Eramo said

"nobody wants to send her daughter to the rape school," did

you?

A    No.

Q    Let's look at Defendants' Trial Exhibit 18.  It should be

in your same binder.

     This is Mr. McCance's e-mail back to you laying out the

answers to your questions, correct?

A    Correct.

Q    He goes through all the statistics, the Clery statistics,

the number of reports that were made, those that were

anonymous.  He answers your questions, does he not?

A    Correct.  I mean, many weeks later, but, yes, he did

nonetheless.

Q    And he sent those responses to you -- your original

1  e-mail to him was September 16, and he sent those responses to
2  you on October 2, correct?
3  A    Correct.
4  Q    And that was the day of your President Sullivan
5  interview?
6  A    Yes.  It was about two hours before.
7  Q    And you testified you thought that there was a delay
8  between that September 16 and the October time, a delay in UVa
9  getting those answers to you, correct?
10 A    Yes.  Yes, there was a delay --
11 Q    And you thought that UVa was stonewalling you?  That was
12 your testimony?
13 A    I think my testimony about stonewalling was when they
14 canceled my interview with Nicole Eramo and wouldn't allow me
15 to speak to Claire Kaplan when I was getting on the plane to
16 Charlottesville.
17 Q    But you were frustrated that UVa didn't get you responses
18 as quickly as you thought they should have gotten them to you,
19 correct?
20      You were frustrated that they came to you only two hours
21 before your interview with President Sullivan; isn't that
22 correct?
23 A    I was frustrated, although I was grateful that they came
24 in time for my interview.
25 Q    You testified that on the weekend of September 11 and 12,

1   when you were at Charlottesville, that was the same weekend

2   that Hannah Graham went missing.  Do you recall that?

3   A    Yes.

4   Q    Isn't it a more reasonable explanation that UVa's delay

5   in getting you responses to your questions about statistics is

6   that they were dealing with a student who had been murdered as

7   opposed to dealing with a reporter's questions for statistics?

8   A    I couldn't speculate.

9   Q    But you chalked up the delay to stonewalling?

10  A    I didn't say that.

11  Q    Now, we heard an interview that you conducted with

12  President Teresa Sullivan; is that correct?

13  A    Correct.

14  Q    And you testified that you were upset that the University

15  of Virginia wanted to tape-record that interview, correct?

16  A    I did not say that I was upset.

17  Q    You said that you felt -- you never felt the need to

18  record a telephone conversation before?

19  A    I was just sort of -- I think -- I don't know what word I

20  used in my testimony, but I was kind of bewildered by the fact

21  that they were tape-recording.  It was the first time in 20

22  years of reporting that anybody had tape-recorded a

23  conversation that I had with them over the phone.

24  Q    You had to go out and buy an adapter for your phone so

25  you could also tape-record the conversation, correct?

1  A    Yes.  I felt it was prudent.

2  Q    Ms. Erdely, you recorded the entire dinner that you had

3  with Jackie on September 11, did you not?

4  A    Yes.

5  Q    And you recorded the entire dinner that you had with

6  Jackie, Alex Pinkleton, and Conner on September 12, did you

7  not?

8  A    Yes.  I tape-record conversations when I'm not typing.

9  It's unwieldy to eat dinner with somebody and type at the same

10 time, so I record instead.

11 Q    We heard hours, this jury heard hours, of tape recordings

12 that you yourself made?

13 A    Yes.  Once again, when I'm in person with somebody, I

14 tend to tape-record, although not always.  I mean, one of the

15 interviews that I testified about was with Emily Renda when we

16 were in a coffeehouse, and I typed along with that rather than

17 tape-record.

18 Q    Ms. Erdely, I just asked if you tape-recorded the

19 conversation.

20 A    Is that what you asked?  I didn't think so.

21 Q    Yes.  I just asked if you tape-recorded the conversation

22 that you had on the night of December the 11th as well as on

23 December 12th, the dinners that you had with Jackie.

24 A    Yes, I did.

25 Q    Now, going back to your interview with President

Eramo v. Rolling Stone, et al. - 10/24/16

1   Sullivan, let's look at the way -- I have a transcript of the

2   interview that you had with President Sullivan.  Let's look at

3   the way you described to President Sullivan what your article

4   is going to be about.

5       And this is Plaintiff's Trial Exhibit 124, and I'd like

6   to direct your attention to page 4.

7       I'm sorry.  It's page 3, not page 4.

8   A   Yes.

9   Q   You described to President Sullivan, you say, "So the

10  article that I'm writing is a look at -- as I'm sure you've

11  heard, it's a look at how rape and sexual assault play out

12  against the larger context of a campus, both with respect to

13  student attitudes and also the administration's handlings.  So

14  it's kind of the larger culture in general."

15      Did you tell that to President Sullivan?

16  A   Yes.

17  Q   You don't tell President Sullivan that your article is

18  going to be about institutional indifference, do you?

19  A   It was not about institutional indifference.

20  Q   Let's pull up the article itself.

21      Page 75, first column.  First column, "You can trace" --

22  page 75.  Not 075 on Bates, but 75 of the article.  It has the

23  rape school full quote.  There we go.

24      Bottom left, you write in your article, "You can trace

25  UVa's cycle of sexual violence and institutional indifference

1    back at least 30 years."

2          You write those words in the article, do you not,

3    Ms. Erdely?

4    A    I do.  Because I use a word in the article doesn't mean

5    that that's what the article is about.

6    Q    Now, let's continue with the President Sullivan

7    interview.  On page 4 through 5 of the President Sullivan

8    interview, you tell President Sullivan, "I have a lot of

9    questions about how assault is handled on the UVa campus, and

10   some of them are fairly specific.  So I do hope you have the

11   answers.  Actually, I'm glad that Susan Davis is there

12   because, you know, I was assured that, you know, President

13   Sullivan, you were the person to speak with, since I hadn't

14   been allowed to speak with either Dean Eramo or Claire Kaplan,

15   who are the people who I thought were probably -- had the most

16   direct information."

17         And President Sullivan says to you, "Well, if that

18   happens that I don't have the answer, we certainly would be

19   willing to write down your question and find an answer and

20   send it to you."

21         President Sullivan made that offer, did she not?

22   A    She did.

23   Q    And UVa did, in fact, provide you answers to follow-up

24   questions after the interview was over, did they not?

25   A    They.

```
 1   Q    At the end of the interview -- let's flip to the end of

 2   the interview on page 37 -- President Sullivan told you that

 3   they were going to get information from Nicole Eramo directly,

 4   did she not?

 5        You say, "Uh-huh.  Okay.  Thanks so much for the time and

 6   your help.  About the follow-up questions that I had, I think

 7   there were a couple of questions that you had said that

 8   Dean Eramo would be best equipped to answer."

 9        Do you see that?

10   A    I do.

11   Q    But you never asked UVa through Dean Eramo or through

12   anyone else to verify the rape school quote, did you?

13   A    No.

14   Q    Now, you testified in -- with Mr. Sexton that the

15   thesis -- one of the theses of your article is you're

16   concerned that victim choice has the effect of discouraging

17   young women from moving forward with a formal complaint.

18        Do you remember that back-and-forth that you had with

19   Mr. Sexton?

20   A    Yes.

21   Q    But -- and let's look at what you told President Sullivan

22   about this thesis, about your concern that victim choice has

23   the effect of discouraging young women from moving forward.

24   Let's look at pages 20 through 21 in your interview.

25        You say to President Sullivan:
```

1       "So another thing that I'm sort of hearing from these

2  girls who come in -- and they say this with no malice -- so,

3  like I said, they love Dean Eramo.  One of their biggest fears

4  in speaking with me candidly about this is that they -- they

5  don't want to get her in trouble, in any kind of trouble.

6       "But they leave Dean Eramo's office with all of these

7  options and feeling so heard -- not hurt, but heard -- and

8  unburdened after finally telling their stories and so

9  comforted, but also kind of paralyzed from the lack of

10  guidance, you know, having all of these options before them,

11  that they often wind up doing nothing, not filing any

12  complaint at all, and getting a lot of reassurance, that's

13  okay because that's their choice; you know, whatever choice

14  they make is the right one for them.  And they feel perfectly

15  fine with that.

16       "But I just wondered, could you comment on that for me?

17  Because I wonder whether that is actually sort of feeding into

18  the lack of reports."

19       You said that and asked that question to President

20  Sullivan, correct?

21  A    I did.

22  Q    But these girls didn't tell you that they were feeling

23  paralyzed and that they were being discouraged from filing a

24  report.  You told them that.  You told these women that,

25  didn't you?

1   A      No.

2   Q      Let's look at your file.

3   A      That was my observation from their own behaviors.

4   Q      Let's look at your reporting notes.  Plaintiff's Trial

5   Exhibit 10, 4315.  This is your interview with Jackie.

6          You asked Jackie, "What is her role exactly?" meaning

7   Dean Eramo.  "Is she a dean, an administrator, where it gets

8   reported?  Or is it a safe space, counselor, privilege?"

9          And Jackie responds, "I'm not sure."  And towards the end

10  of her response to you, "I don't know if it's wrong to view

11  her as a friend, almost a motherly figure, but I do.  A lot of

12  us find comfort in Dean Eramo, but when it comes to legality I

13  don't know."

14         And this is what you tell Jackie, not what Jackie tells

15  you:

16         "I've wondered if she's counseling the survivors, but

17  also in a sense that comfort she's giving them is also keeping

18  them quiet."

19         You tell that to Jackie, do you not?

20  A      Yes.  I'm asking her a question.

21  Q      And Jackie doesn't respond that "Yes, Nicole Eramo is

22  keeping them quiet."  She says, "The thing about rape is that

23  there's no right answer.  And so in a perfect world, every

24  rapist would be brought to justice, would go to jail, and

25  every survivor would have justice.  But especially when it

1   comes to college, we live in a culture where it's, 'Oh, you
2   dressed too seductively or you drank too much,' and there's
3   guilt that goes with it.  And also the fact that so many girls
4   I talked to were, like, 'Even though he wouldn't listen to
5   "no," I wouldn't want to ruin his life forever,' which I get,
6   but that's why the informal processes are so popular, I guess,
7   because you can make them go to counseling or you can make
8   them do whatever."
9       Jackie doesn't respond about Nicole Eramo in that
10  response at all, does she?
11  A    She doesn't there.  Instead she kind of goes on a
12  monologue about, you know, what the process would be like in
13  an ideal world or what it should be like.
14      But just because she didn't directly tell me -- I mean, I
15  am -- I went in there to collect all of their perspectives.
16  They all talked to me about what their perspectives were.
17      But also my job is not necessarily just to report back on
18  what people say to me and write down what every single
19  person's perspective is, but it's also for me to bring in my
20  outsider's perspective and see what is actually happening.
21      And what I saw with these girls was that despite -- and
22  this was one of the things that I found so interesting when I
23  came on campus -- was that they were all telling me that they
24  all loved Dean Eramo.  And yet what I was seeing was that very
25  few of these reports were being filed.

1    And so I sought to figure out what was the gap between

2  these two things.  It didn't matter that these girls were not

3  necessarily telling me that they didn't raise the issue.  As

4  the journalist, I was the one who raised the issue and made

5  these observations.  That's part of my job.

6  Q    Ms. Erdely, you told President Sullivan, "I'm hearing

7  from these girls who come in and they say they love Dean Eramo

8  but also kind of paralyzed from lack of guidance."

9    You told President Sullivan that you had heard that from

10  these girls when, in fact, you were telling these girls that;

11  isn't that correct?

12  A    Maybe the word that I should have used was "I'm seeing

13  from these girls."  Either way, it was reflective of what

14  their experience was.

15  Q    You testified that you have no personal animosity towards

16  Nicole Eramo; isn't that correct?

17  A    Did I testify to that?  I'm sorry.

18  Q    Yes.

19  A    Yes.

20  Q    Moving on.

21  A    Oh, yes.

22  Q    You testified that you have no ill will or malice towards

23  her; isn't that correct?

24  A    Correct.

25         MS. LOCKE:  Let's play the audio, Plaintiff's Trial

1    Exhibit 72.

2              (Audio played)

3    BY MS. LOCKE:

4    Q    Those were your words, were they not?  "It makes me so

5    fucking mad.  Why isn't Dean Eramo doing anything?"

6    A    Yes.  This is when Jackie was telling me that Dean Eramo

7    had received an anonymous report from the second -- this

8    alleged gang rape victim.  I was under the impression that --

9    I had not yet figured out what Dean Eramo's role was in terms

10   of decision-making.

11         Just because I said that I was mad, though, over the fact

12   that -- and I was mad.  I was upset to find out that the

13   administration knew about more than one alleged gang rape and

14   had done nothing, taken no action on campus.  I was mad.  That

15   doesn't mean --

16   Q    You were being sincere.  You were being sincere when you

17   were saying, "Why isn't Dean Eramo doing anything?  I'm so

18   fucking mad."  You were sincere when you made that statement,

19   weren't you?

20   A    Sure.  Although, I was misinformed that Dean Eramo had

21   any -- or I was working under the misguided suggestion that

22   Dean Eramo had any power to actually do anything.

23         But I was mad in general, and I was expressing that I was

24   mad.  But that doesn't mean I have any personal animosity

25   towards Dean Eramo, which I did not and don't.

1   Q    Let's look at the article again and how you characterized

2   your interview with President Sullivan.  Plaintiff's Trial

3   Exhibit 1, page 72.

4        You describe President Sullivan's interview.  You say,

5   "And when President Sullivan was at last made available for an

6   interview, her most frequently invoked answer to my specific

7   questions about sexual assault-handling at UVa, while two

8   other UVa staffers sat in on the reported call, was, 'I don't

9   know.'"

10       You wrote those words, did you not?

11  A    Yes, I did.

12  Q    We went back and tallied up the questions, the number of

13  questions that you asked President Sullivan.  Would you be

14  surprised to learn that you asked President Sullivan more than

15  40 questions?

16  A    That would not surprise me.

17  Q    But President Sullivan only answered that she didn't know

18  the answer to a question five times.  Would that surprise you?

19  A    That would surprise me.  I think a lot of her -- I mean,

20  I'd have to go back and double-check.  I think a lot of her

21  questions were, "I don't know," "I can't speculate."

22       I see right here that Susan Davis' answer here is "I

23  can't speak to that."

24       So I think a lot of the questions that I asked were

25  answered with some version of "I don't know" or "I can't

1    answer that."

2    Q    You characterized her interview for readers who didn't

3    hear it as "Her most frequently invoked answer to my specific

4    questions about sexual assault-handling at UVa was 'I don't

5    know.'"

6         Isn't that correct?

7    A    That's correct.

8    Q    I think we'll let the jury decide as to whether President

9    Sullivan answered most frequently "I don't know."

10        You testified that, as of December 5, you retracted your

11   statement in the article that Dean Eramo had a nonreaction.

12   Is that correct?

13   A    That's correct.

14   Q    Because it was sourced from Jackie; is that correct?

15   A    Yes.

16   Q    Who you no longer found to be credible; is that correct?

17   A    Correct.

18   Q    But Jackie told you earlier -- and it's in your reporting

19   file, is it not? -- that Dean Eramo was pissed at the

20   fraternities upon hearing information about these two other

21   sexual assault victims; isn't that correct?

22   A    Correct.

23   Q    Let's look at your reporting file.  Plaintiff's Trial

24   Exhibit 10, 4312, you asked, "What was Dean Eramo's reaction

25   when you told her about the other girl?  I just wondered if

1  you saw the look on her face when you told her there was

2  someone else, whether she seemed shocked."

3      And Jackie responds, "It wasn't as shocked as you might

4  think.  She was just, 'Oh, you have to get her to come in.'

5  She wasn't like, 'Oh, my God.  That's crazy.'  She was more

6  concerned than anything for the girls' well being.  And then

7  she got pissed at the frat.  She said, 'Two fraternities had

8  lost their charter this year.  It wouldn't bother me at all to

9  add a third.'"

10      Jackie told you that, didn't she?

11  A    Yes.

12  Q    And you bolded it in your notes, did you not?

13  A    Yes.

14  Q    And that was in your August 16 interview with Jackie, was

15  it not?

16  A    I'd have to double-check.

17  Q    This was before publication of "A Rape on Campus," was it

18  not?

19  A    It was.

20  Q    And you believed Jackie, did you not?

21  A    I believed her, but what she told me after this was -- I

22  mean what she told me, I think, immediately after this bold

23  section is that, although Dean Eramo got pissed at the frat,

24  she also told Jackie that she couldn't move forward -- that

25  the best way to move forward would be if these other two

1  victims came out of the woodwork, and that way they could

2  build a case.

3      So me it reflected -- although I had no reason to doubt

4  that Dean Eramo was pissed at the frat, it showed me a certain

5  kind of ambivalence about moving forward against the

6  fraternities and taking any kind of action.

7  Q    You knew long before "A Rape on Campus" was published

8  that Dean Eramo didn't have a nonreaction, that she got pissed

9  at the frats; isn't that correct?

10 A    That is not correct.  Her reaction to -- when I asked

11 Jackie, "What was her reaction?" she said that she wasn't

12 shocked; she was just -- she had a mild look on her face, and

13 she said --

14 Q    "She wasn't as shocked as you might think, and she got

15 pissed at the frats."  Isn't that correct?

16 A    Her initial reaction -- the reaction to being told about

17 the other girl was to just -- was a mild one.  And she did an

18 impression of Dean Eramo speaking in a very mild manner.

19 Q    Now, you testified also that, as of December 5, you

20 retracted any statements that were sourced from Jackie; is

21 that correct?

22 A    That's correct.

23 Q    Including the statement that Dean Eramo had a

24 nonreaction?

25 A    Correct.

```
1   Q     Including the rape school quote?
2   A     Correct.
3   Q     Including the statement that Dean Eramo discouraged
4   Jackie from telling her story about her assault; isn't that
5   correct?
6   A     That's correct.
7   Q     But your lawyer, Liz McNamara, told Nicole Eramo that
8   Rolling Stone stood by the statements in the article after
9   December 5, did she not?
10  A     I'm not sure what you're referring to.
11  Q     I'm going to hand you what's been marked as Plaintiff's
12  Exhibit 10.
13            MR. SEXTON:  Your Honor, on this one, I think there
14  is a pending objection.
15            THE COURT:  I thought all the ones that were
16  premarked were admitted.
17            MS. MOODY:  No.
18            MR. SEXTON:  It's not premarked.
19            MS. MOODY:  That's their numbering.  It's not
20  admitted.  It's not.
21            MR. SEXTON:  Side bar on this one?
22            THE COURT:  Let me read it first.
23            Is there a pending question for the witness?
24            MS. LOCKE:  Yes.
25            Your lawyer told Nicole Eramo after December 5 that
```

1  they stood by -- that they stood by the article as it relates

2  to Dean Eramo, that they were not aware of any inaccuracies

3  concerning Dean Eramo in the article, which was well-sourced

4  and fact-checked?

5  (Bench conference as follows:)

6           MR. SEXTON:  Judge, our objection is -- as you can

7  tell, this is setting up a settlement conference.

8           THE COURT:  I agree.

9           MS. LOCKE:  This is not marked as settlement

10  conference.

11           THE COURT:  I think what you need to do is have her

12  answer that question, and then if she says -- if she denies

13  that they ever told Eramo this or clarified this, then you can

14  show her the letter, have her answer the question.  And if she

15  says no, you can have that paragraph.

16           MR. SEXTON:  There's no foundation that she had any

17  knowledge of any letter ever sent by --

18           THE COURT:  Then she can say that, and that would be

19  the answer.

20           MR. SEXTON:  I think that should be the first

21  question.

22           THE COURT:  I agree.  That should be the first.  Do

23  you know whether --

24           MS. LOCKE:  Okay.

25  (Bench conference concluded)

```
1    (Open court as follows:)
2            THE COURT:  Ms. Locke, I was told during that last
3    exchange that the jury had asked about the midmorning break.
4    So perhaps this would be a good time for that.
5            So, ladies and gentlemen, we will take our first
6    midmorning break.  I would ask that, while you're away from
7    us, you not discuss the case with one another, do not let
8    anyone discuss it with you.
9            Once again I'll ask the witness not to discuss her
10   pending testimony with counsel from either side.
11           Let's plan to return at 20 till 10.
12           Ask the marshal to declare court in recess.
13   (Recess)
14   (Jury in)
15   (Open court as follows:)
16           THE COURT:  They don't have juries in bankruptcy
17   court.  That's the difference.
18           I do count all ten jurors back in their places.
19   We're ready for the redirect of this witness.
20           MR. SEXTON:  Judge, can we have a side bar?
21           THE COURT:  Sure.  Okay.
22   (Bench conference as follows:)
23           MR. SEXTON:  Mike has pointed out to me that there
24   is a pending objection to this document that's been made in
25   writing and that this was discussed and the objection
```

1    withdrawn and that it was noted that this was a --

2            THE COURT:  All right.  So there was some

3    negotiation and that it wasn't independently admissible.  And

4    I stand by that ruling.

5            MR. SEXTON:  I think at the time, from my review of

6    what Mike just showed me on the transcript, he said it would

7    have to be some witness authenticated it in this trial.

8            THE COURT:  I agree.

9            MR. SEXTON:  But my point is, in a situation like

10   that, when there is a pending objection and such a ruling as

11   you had given a preview of, it's inappropriate for the lawyer

12   to read from the document.

13           THE COURT:  I do agree with that.  I thought that

14   was unfortunate.  I think the better course is to ask her if

15   she knows if her attorney has said this.

16   (Bench conference concluded)

17   (Open court as follows:)

18   BY MS. LOCKE:

19   Q    Ms. Erdely, just to reorient the jury, we were talking

20   about the statements that you had testified had been retracted

21   as of December 5.  Do you recall that?

22   A    Yes.

23   Q    And you had testified that as of December 5, you had lost

24   faith in Jackie's credibility; and as a result, on December 5

25   you retracted statements about Dean Eramo having a

1    nonreaction, correct?

2    A    Correct.

3    Q    And that Dean Eramo discouraged Jackie from telling her

4    story about her assault, correct?

5    A    To the magazine, correct.

6    Q    And Jackie's attribution of the rape school quote to

7    Dean Eramo, correct?

8    A    Correct.

9    Q    Now, Ms. Erdely, are you aware that your lawyer, Liz

10   McNamara, sent to Dean Eramo's counsel on December 30, many

11   weeks after December 5, a letter that stood by the --

12          MR. SEXTON:  Your Honor, the witness should be asked

13   if she has seen the letter --

14          THE COURT:  Right.

15          MR. SEXTON:  -- and if she can authenticate it.

16          THE COURT:  Let me try it.

17          Is it your understanding that Ms. McNamara, who is

18   one of the attorneys who represents you, later made a

19   statement in which she indicated that Rolling Stone stands by

20   all the statements that were made about Dean Eramo?

21          MR. SEXTON:  And, Your Honor, that is not a proper

22   characterization of what --

23          THE COURT:  All right.

24          MR. SEXTON:  The words "stand by" do not occur in

25   this letter.

1          THE COURT:  Well, maybe that was my characterization

2     of it.

3          MR. SEXTON:  Yes, Your Honor.

4          THE COURT:  But it is fair that your attorney,

5     Ms. McNamara, indicated at some later time that she was

6     unaware of any information that would change the conclusions

7     as to the accuracy of information concerning Dean Eramo?

8          THE WITNESS:  Am I being asked whether I've seen

9     this letter before?

10          MR. SEXTON:  Yes.

11          THE COURT:  Whether you've seen the letter before or

12     whether you may have learned this from some other source.  Did

13     you have any understanding of this?

14          THE WITNESS:  No.  I believe this is the first time

15     I'm seeing it.

16     BY MS. LOCKE:

17     Q    Ms. Erdely, you agree that the article, "A Rape on

18     Campus," portrayed Dean Eramo fair and accurately, do you not?

19     A    Yes.

20     Q    Did the nonreaction quote portray Dean Eramo fair and

21     accurately?

22     A    I believed it was accurate at the time.

23     Q    That's not my question.  My question is:  As you sit here

24     today, did the nonreaction quote portray Dean Eramo fair and

25     accurately?

1   A    We have retracted that, so I don't -- I don't know that

2   there's a need to discuss whether that was fair or accurate.

3        We believed it was fair and accurate at the time of

4   publishing it.

5   Q    That's not my question, and it's not your place to decide

6   whether it's an appropriate question.

7        My question is whether, as you sit here today, the

8   nonreaction quote portrays Dean Eramo fair and accurately.

9   A    I mean, I can only answer it the way that I believe it

10  needs to be answered, which is at the time that we published

11  it, the answer was yes.

12  Q    Do you believe it now?

13  A    It is not accurate, no.  Well, actually, no, I don't know

14  whether it's accurate or not.

15  Q    Did the language in the article that Dean Eramo

16  discouraged Jackie from sharing her story, was that a fair and

17  accurate representation of Dean Eramo?

18  A    When we published it, we believed that it was fair and

19  accurate, and now we don't know whether it's accurate or not.

20  Q    The rape school quote, did that fairly and accurately

21  portray Dean Eramo in the article?

22  A    Once again, when we published it, we believed it to be

23  fair and accurate, and now we don't know whether or not it's

24  accurate.

25  Q    You testified earlier that, if Jackie had wanted, you

1  would have allowed her to drop out of the article completely;

2  is that correct?

3  A    Correct.

4  Q    Let's look at your text messages to Alex Pinkleton.  This

5  is Plaintiff's Trial Exhibit 20, at 14309.

6       You tell Alex Pinkleton that "Jackie needs to know she's

7  an essential part of the article," do you not?

8            MR. SEXTON:  What was the number?  I'm sorry.

9            MS. LOCKE:  Plaintiff's Trial Exhibit 20, 14309.

10 Actually, let's go to the prior page.  We can look at 14308.

11           THE WITNESS:  Yes.

12 BY MS. LOCKE:

13 Q    14308, Alex texts you, at the very top, "I don't think

14 calling is a good idea, because she, Jackie, is thinking about

15 pulling out entirely."

16      Do you see that?

17 A    Yes.

18 Q    And then the next page -- or at the bottom of this page,

19 either one -- it's the same text, it just bleeds over -- you

20 tell Alex, "Jackie needs to know she's an essential part of

21 this article."

22      Do you not tell her that?

23 A    Yes.  I was being encouraging.

24 Q    And you didn't tell Alex in these text messages it's okay

25 for Jackie to pull out of the article, did you?

1    A    Well, we hadn't reached that point in the discussion.  I

2    was so shocked -- if you can see in the previous page, my

3    response was so shocked.  I said, WHAT?  In all caps.  Why,

4    question mark, question mark.

5         And that was because I had just talked to Jackie earlier

6    that day.  And she had seemed so excited about the article.

7    So I hadn't even considered at that point that Jackie would

8    want to be pulled out of the article.

9         But throughout these texts, I assure Alex and I tell

10   Jackie in an e-mail that, you know, we'll come up with a way

11   that's comfortable for her.  You know, I'm hoping to just get

12   Jackie on the phone so we can talk through the options.  And

13   one of those options would be that she wouldn't be in the

14   article at all if that was really her preference.

15   Q    You texted Alex Pinkleton that Jackie needs to know she's

16   an essential part of this article, did you not?

17   A    Yes.  I wanted to be -- I wanted to encourage her to be

18   in the article if that's what she wanted.

19   Q    My question was only did you text that to her?

20   A    Yes, I did.

21   Q    You did not text to her, "It's okay.  Jackie can pull

22   out," did you?

23   A    No.

24   Q    The following text messages -- if we turn to 14312 and

25   14313 -- you say, "Also, I'm up for discussing whatever she

1    wants to discuss, changing her name, et cetera.  But I need to

2    be clear about this:  There's no pulling the plug at this

3    point.  The article is moving forward."

4         Did you text those words to Alex Pinkleton?

5    A    I did.

6         And, once again, I know that we've covered this, and I

7    hate to sound like a broken record, but when I said that I

8    wanted to be clear, I was unfortunately the opposite of clear;

9    that I was trying to tell her that the story about UVa was

10   moving forward, there was no pulling the plug on it, and I

11   really wanted her to be a part of it.

12   Q    You said, "I think it's important that Jackie stay

13   involved."  You did not say it's okay for Jackie to drop out,

14   did you?

15   A    No, I did not.

16   Q    You said, "I need to be clear.  There's no pulling the

17   plug at this point."

18        Those were your words to Alex Pinkleton; isn't that

19   correct?

20   A    Yes.  I'm sorry that I wasn't clearer about what my

21   actual meaning was.

22   Q    Now, you testified -- we've looked a lot at the

23   e-mails -- what I call the police e-mails -- where your

24   testimony is you believed the e-mails were -- where Nicole

25   Eramo was saying about meetings with the police were only

1    about the bottle incident.

2        Do you recall that testimony?

3    A    Correct.

4    Q    And we've looked at those e-mails now multiple times --

5    and I'm not going to put them back in front of the jury

6    again -- but just so we're all on the same page, that's the

7    document that we're talking about, correct?

8    A    I'd have to see the document, but yes.

9    Q    We're talking about the police e-mails?  You understand

10   what I'm referring to?

11   A    Yes.

12   Q    And you testified that you never asked Jackie -- even

13   though you had those e-mails in your possession, you never

14   asked Jackie whether Nicole took Jackie to the police

15   regarding her sexual assault, correct?

16   A    Jackie indicated that these meetings were about the

17   bottle incident.

18   Q    But you never asked -- again, you testified about this

19   when you were on the stand, that you never actually asked the

20   question whether Nicole took Jackie to the police for the

21   sexual assault, did you?

22   A    No.

23   Q    Okay.  Let's look at the Slate podcast, the statements

24   that you gave to Hanna Rosin on the Slate podcast.  And this

25   is Plaintiff's Trial Exhibit 7 at 4592.

1    It's page 10 in the jury book.

2    And here you say to Hanna Rosin, "Even this case, right,

3  exactly, this is why this case blew my mind, that Jackie's

4  situation blew my mind.  Even in a situation that was so

5  extreme and so obviously within the realm of criminal, that

6  they would seek to suppress something like this, because

7  that's what they did.  Not only did they not report it to the

8  police, but, really, I feel she was sort of discouraged from

9  moving this forward.  I would think that the first thing they

10 would do would be to tell her this needs to go to the police."

11    You told this to Hanna Rosin, correct?

12 A    Correct.

13 Q    That she was discouraged from moving her rape forward;

14 isn't that correct?

15 A    That was my opinion at the time, that she didn't have the

16 encouragement that she needed to move forward.  And that was

17 tantamount to a kind of discouragement.

18 Q    And you gave this interview on November 26, the day

19 before Thanksgiving, correct?

20 A    Correct.

21 Q    Let's look at your notes from November 17, nine days

22 earlier.  And this is Plaintiff's Trial Exhibit 29, your call

23 list, not the big reporting file.  So Plaintiff's Trial

24 Exhibit, so it's in one of your big binders.

25    And Plaintiff's Trial Exhibit 29 at 14342 is a

1   conversation that you had with Jackie nine days before your

2   Slate podcast interview, correct?

3   A    Correct.

4   Q    Now, let's -- so this was obviously before "A Rape on

5   Campus" hit the newsstands, correct?

6   A    Correct.

7   Q    Let's look at the next page, your notes of your

8   conversation with Jackie.

9        Jackie tells you, "I talked to the head of the university

10  police about it already.  I told him I'm not worried about the

11  article itself; I'm concerned with the backlash from the

12  fraternities.  He's like, 'I'm glad you guys did this,

13  everyone should know.'  He's the same person I talked to after

14  the bottle was thrown at me."

15       Jackie told you nine days before your Slate podcast

16  interview that she had spoken with the head of the university

17  police about her sexual assault; isn't that correct?

18  A    No, that's not correct.

19  Q    She told you that she spoke to the police about the

20  article; isn't that correct?

21  A    No.  She was telling -- well, yes, she was telling me

22  that she was concerned about retaliation.  So she went to

23  university police, identified herself as being a subject of

24  the article, and asked if there was anything that could be

25  done about her safety.

1  Q    And the subject of the article was her gang rape, was it

2  not?

3  A    She did not go to university -- she did not represent to

4  me that she went to university police to report her sexual

5  assault; she went because she was concerned about retaliation.

6  Q    For the article which was about her gang rape?

7  A    Yes.  But there's a difference.  She did not go in to

8  report her sexual assault; she went for police protection.

9  Q    She told you, "He's the same person I talked to after the

10 bottle was thrown at me," did she not?  She tells you that?

11 A    Yes, she does.

12 Q    And you still went on Slate and said that she didn't

13 report her assault to the police?

14 A    She did not.  She did not report her assault to the

15 police.

16 Q    And you said that she was discouraged from going to the

17 police.  This was nine days before you went on Slate; isn't

18 that correct?

19 A    I had -- she was not -- from what I was aware, she was

20 not encouraged to go to the police.  And the kind of

21 encouragement that she received, in fact, the only

22 encouragement that I was aware of, were these bottle-incident

23 e-mails that you referred to, in which even after the meeting

24 with police about reporting the bottle incident, Dean Eramo

25 writes her back -- writes her to assure her that if she wants

1   to go forward with -- I believe she was talking about the

2   bottle incident, whatever she decides to do is -- all in

3   caps -- "YOUR choice."

4   Q    Ms. Erdely, so it's your position that Dean Eramo was

5   encouraging Jackie to go to the police for a bottle being

6   thrown at her face but not for an alleged sexual assault?

7   Does that make any sense to you?

8   A    That is -- does it make any sense to me?  Is that the

9   question?

10  Q    Yes.

11  A    That was -- it was mystifying to me, yes.

12  Q    Yet you never asked the question?  You never asked Jackie

13  the question whether Dean Eramo took her to the police for the

14  rape, notwithstanding the fact that you just testified it was

15  mystifying to you; isn't that correct?

16  A    Jackie always --

17  Q    Isn't that correct?

18  A    Jackie always told me that she repeatedly told Dean Eramo

19  that she was not ready to go to police, and Dean Eramo always

20  told her that that was fine.

21       There was no need for me to ask Jackie whether she had

22  ever told Dean Eramo whether, you know, or whether Dean Eramo

23  had ever asked her to go to police, because Jackie had already

24  told me that she had told Dean Eramo that that was not an

25  option for her, and that Dean Eramo immediately accepted that.

1  Q     You testified during your examination with Mr. Sexton

2  that you found Jackie entirely credible up until the early

3  morning hours of December 5, 2014; isn't that correct?

4  A     That's correct.

5  Q     Do you remember giving that testimony?

6  A     Yes.

7  Q     And, in fact, you knew, did you not, before December 5

8  that there were multiple occasions where Jackie was lying to

9  you, didn't you?

10  A     Lying to me?  There were two occasions -- there was an

11  occasion that I testified to in which she had told me that --

12  when I told her that I had unearthed the names of other rape

13  victims, that she was concerned that -- I felt that she was

14  concerned that I was going to contact her without her

15  authorization, and so she told me that they weren't the right

16  ones.

17        Is that what you're referring to?

18  Q     Let's talk about all the instances in which you

19  discovered that Jackie was lying to you.

20        You testified, for example, that when Jackie gave you the

21  names of James Larsen or James Larson on November 26, and she

22  couldn't spell it, that you thought she was giving you a fake

23  name; isn't that correct?

24  A     Right.  But it was post-publication.  But, yes, then this

25  was -- and that was consistent with the idea that she was

1    probably -- I assumed she was fearful that I was going to go

2    ahead and call him anyway.

3    Q    But that was on November 26.  It was before December 5,

4    correct?

5    A    Correct.

6    Q    And you thought it was an intentional misdirection on

7    Jackie's part.  That was your testimony, was it not?

8    A    Correct, for reasons that I -- that I felt were

9    understandable.

10   Q    In other words, Jackie lied to you?  You believed that

11   Jackie lied to you about the name of James Larsen, did you

12   not?

13   A    Yes.  I believed she was telling me a white lie.

14   Q    And on September 16, during your interview with Jackie,

15   months before December 5, when you told Jackie that you

16   thought you had found out who the people she called Becky and

17   Maddie were, she denied it was them.  And you thought she was

18   lying to you at that point too; isn't that correct?

19   A    Yes.  And for the reasons that I've already discussed, it

20   didn't --

21   Q    Let's look at your notes, Plaintiff's Trial Exhibit 10 at

22   Rolling Stone 4404.  You say in your notes, "I tell her I

23   think I've found who -- I think it's Pixie and Becky are.  She

24   tells me it's not them, but I don't really believe her."

25        Isn't that what you wrote in your notes on September 16,

1  2014?

2  A    Yes.

3  Q    In other words, you thought Jackie was lying to you;

4  isn't that correct?

5  A    Yes, for the understandable reasons that she didn't want

6  me to violate the fact that she had broken their confidence.

7  And she assured me that she was going to follow up with them

8  instead.  I was satisfied with that.

9  Q    We heard yesterday on the audio of your September 11,

10  2014, dinner with Jackie, that Jackie told you her mother went

11  to Brown University; isn't that correct?

12  A    That's correct.

13  Q    And that's an Ivy League school, correct?

14  A    Correct.

15  Q    But you learned before publication of the article that

16  Jackie had lied to you about that as well; isn't that correct?

17  A    It turns out, the following night, when we were out to

18  dinner with Alex, she actually repeated the thing about Brown,

19  but she also said that her mother had gone to PC.

20  Q    Let's look in your notes, Plaintiff's Trial Exhibit 29 at

21  14344.  This is in your call lists.  You had done some -- you

22  looked up Jackie's mom on Facebook.  It says, "Sharon, mom,

23  http.www.facebook.com, Sharon A." and then the last name is

24  redacted.

25        Do you see where I am?

1  A     Yes.

2  Q     So you looked up Jackie's mother on Facebook, correct?

3  A     Yes.  After Jackie mentioned that -- yes, I looked up

4  Jackie's mother on Facebook.  And I took note of the fact that

5  there was an inconsistency there because Jackie had said that

6  she had gone to Brown, and it showed here that she went to

7  Providence College.

8  Q     And you wrote in your notes, "Note:  Her profile says she

9  went to Providence College, not Brown, as Jackie told me,"

10  correct?

11  A     Correct.

12  Q     So it's yet another inconsistency in Jackie's story?

13  A     Well, yes and no, because it was resolved because the

14  following night at dinner, when she was talking about her

15  mother, she said that she had gone to Brown, she had gone to

16  PC.  That was something that I actually hadn't picked up on in

17  my notes at the time.

18  Q     You also spoke with Rachel Soltis, Jackie's first-year

19  roommate.  And you learned from Ms. Soltis that Jackie had

20  told Rachel an entirely different story about how she had met

21  Dean Eramo; isn't that correct?

22  A     That's correct.

23  Q     Jackie told you that she met Dean Eramo when she first

24  went in to report her sexual assault; isn't that correct?

25  A     Correct.

Eramo v. Rolling Stone, et al. - 10/24/16

```
1    Q    Yet Rachel Soltis told you that she met Dean Eramo when

2    Jackie was testifying in front of the sexual misconduct board;

3    isn't that correct?

4    A    Correct.

5    Q    And that story wasn't true, was it?

6    A    I chalked that up to Rachel misremembering it.  It seemed

7    more likely that Jackie would have a good memory of how she

8    knew Dean Eramo.

9         In fact, Rachel didn't even pronounce Dean Eramo's name

10   correctly.  She called her Dean Oramo.

11   Q    Let's look at your notes, Plaintiff's Trial Exhibit 10,

12   at 4422, the bottom of the paragraph.

13        This is your interview with Rachel Soltis.  You asked

14   Rachel Soltis, "Do you recall how Jackie came to meet with

15   Dean Eramo?"

16        And Rachel Soltis tells you, "Jackie was called in to be

17   a witness at trial at a girl who was raped in a similar way."

18        And you recall and recognize in your notes, "If so, this

19   is news to me," in all caps.  You wrote that, did you not?

20   A    I did.

21   Q    And of course that's a completely different story than

22   what Jackie told you as to how she met Dean Eramo; isn't that

23   correct?

24   A    Correct.

25   Q    And you never went back to Jackie to ask, why does Rachel
```

1  Soltis believe that you were a part of a sexual misconduct

2  board hearing, did you?

3  A    No, I did not.

4  Q    You've admitted before that, in your own mind, before

5  publication of "A Rape on Campus," that you questioned whether

6  you should rely on Jackie, a source who seemed so emotionally

7  fragile; isn't that correct?

8  A    No, I don't believe I said that.  I -- that was -- can I

9  see the document that you're referring to?

10  Q    Let's look at Plaintiff's Trial Exhibit 141 that's

11  already been introduced into evidence.  Let's look at the

12  prior document without the pulled-out piece.

13       Plaintiff's Trial Exhibit 141 -- this is not in the big

14  binder.  This is in your small binder because it was admitted

15  yesterday.  And it's under Tab 399.

16  A    Thank you.

17       All right.  I have it.

18  Q    This is a document that you wrote after "A Rape on

19  Campus" was published, correct?

20  A    Correct.

21  Q    And this was a document that you were writing to explain

22  the errors in your reporting in "A Rape on Campus"; isn't that

23  correct?

24  A    Correct.

25  Q    And if we can do the blow-up.

1    You said in this document, "When I informed Jackie it was

2  time for me to contact the student she said was her date the

3  night of her attack, she became very upset and fearful and

4  begged me not to do so, citing fears for her safety.  She

5  refused to even share his name."

6    And you wrote these words, did you not?  "A reader may

7  ask -- and I asked myself at the time -- if it was wise to

8  build the opening of a story around someone who seemed so

9  emotionally fragile and intent on controlling her narrative."

10    Isn't that correct?

11 A    Well, that's not entirely correct.

12    Anything that's in all caps was added in by an editor.  I

13 did write this.  This was a draft of something that we were

14 thinking about publishing to try to explain, you know, what

15 had gone wrong.

16    This is a document -- it doesn't reflect how I actually

17 felt at the time.  This is riddled with hindsight,

18 second-guessing upon second-guessing.  This is in the days

19 after the whole thing fell apart.  We did not really

20 understand what had happened, how it had happened.  There was

21 a lot of self-flagellation happening, you know, beating

22 ourselves up.

23    And so I did ask myself, now, in hindsight, whether it

24 was wise to build the opening of the story around Jackie.  I

25 had been concerned about her emotional fragility.  But at the

1    time, I had not thought that that was -- that was an issue.

2    Q    Ms. Erdely, you wrote those words, did you not?  "A

3    reader may ask -- and I asked myself at the time -- if it was

4    wise to build the opening of a story around someone who seemed

5    so emotionally fragile."

6         You wrote those words?

7    A    I wrote those words, but they were never published.  This

8    was a draft.  These were things that I was writing to myself.

9    And, again, this was second-guessing upon second-guessing.  I

10   do not recall ever thinking that at that time.  I was

11   concerned about Jackie's mental health, but it did not make me

12   concerned about using her in the lead.

13   Q    Ms. Erdely, were you being insincere when you wrote those

14   words?

15   A    I was not being insincere; I was grappling with a lot of

16   really big emotions and a lot of self-doubt.

17   Q    You said that the words that are in the all caps were

18   written by an editor.  In fact, the words "intent on

19   controlling her narrative" were written by Sean Woods; isn't

20   that correct?

21   A    I believe so, but I'm not sure.

22   Q    Now, Ms. Erdely, there were a variety of people that were

23   referenced in "A Rape on Campus" that you never spoke with;

24   isn't that correct?  Ryan Duffin?  Kathryn Hendley?

25   A    Yes.

1    Q    Alex Stock?

2         A variety of people that were referenced in "A Rape on

3    Campus" that you never personally spoke with; isn't that

4    correct.

5    A    Yes.  Other than -- other than them, was there anybody

6    else?

7    Q    Becky?

8    A    Oh, yes.

9    Q    Maddie?

10   A    (Indicating in the affirmative.)

11   Q    Christine?

12   A    Yes.  Well, Christine was not in the article.  Yes.

13   Q    And these were all sourced from Jackie, correct?

14   A    Correct.

15   Q    Maddie.  You never spoke with Maddie directly, correct?

16   A    No.

17   Q    But she was referenced in "A Rape on Campus"; isn't that

18   correct?

19   A    Yes.

20   Q    Jackie was your only source for information about Maddie;

21   isn't that correct?

22   A    Yes.

23   Q    Becky.  You never spoke with her directly, did you?

24   A    No.

25   Q    But she was referenced in "A Rape on Campus," wasn't she?

1    A    Yes.

2    Q    And Jackie was your only source for information about

3    Becky; isn't that correct?

4    A    Yes.

5    Q    Ryan Duffin.  You never spoke with Ryan Duffin directly,

6    correct?

7    A    Correct.

8    Q    But he was also referenced and quoted in "A Rape on

9    Campus"; isn't that correct?

10   A    To my great regret, yes.

11   Q    And Jackie was your only source of information about Ryan

12   and his quote, correct?

13   A    Correct.

14   Q    Alex Stock.  You never spoke to Alex Stock directly, did

15   you?

16   A    No.

17   Q    And he was referenced in "A Rape on Campus" and quoted in

18   "A Rape on Campus"; isn't that correct?

19   A    To my great regret, yes.

20   Q    And Jackie was your only source for information about

21   Alex Stock; isn't that correct?

22   A    Yes.

23   Q    Kathryn Hendley.  You never spoke to Kathryn Hendley

24   directly, did you?

25   A    No.

1    Q    And she was referenced in "A Rape on Campus," wasn't she?

2    She was quoted in "A Rape on Campus," wasn't she?

3    A    Yes, to my regret.

4    Q    And Jackie was your only source of information about

5    Kathryn Hendley; isn't that correct?

6    A    Yes.

7    Q    Jay was referenced in "A Rape on Campus," isn't that

8    correct, under the pseudonym Drew?

9    A    Yes.

10   Q    Jackie was your only source of information about Jay;

11   isn't that correct?

12   A    Yes.

13   Q    Now, you testified --

14   A    I'm sorry.  Can I just clarify one more thing?

15        You asked about whether Jackie was my only source of

16   information about Maddie and Becky.  But, in fact, I mean, I

17   was aware of their existence also through Emily Renda.

18   Q    Who was aware of their existence from Jackie, correct?

19   A    I was unaware of that at the time.

20   Q    That's correct, though, isn't it?

21   A    I -- in hindsight, after all of this, I now know that

22   that is correct.

23   Q    Now, you testified earlier that you did not intend to

24   portray Nicole Eramo as a callous administrator.

25        Do you recall that testimony?

1  A    Yes.

2  Q    And you didn't intend to suggest in any way that she was

3  different to Jackie's claims of sexual assault; isn't that

4  correct?

5  A    Correct.

6  Q    And that you never endorsed that view; isn't that

7  correct?

8  A    Correct.

9  Q    Let's turn to Plaintiff's Trial Exhibit 58, which is

10  Rolling Stone's statement to the media.

11      This is a statement that Rolling Stone published in early

12  December after questions were being raised about your article;

13  isn't that correct?

14  A    Correct.

15  Q    And you reviewed and commented on this statement, did you

16  not?

17  A    I might have.  I don't recall.

18  Q    And this statement was made after you said an alarm bell

19  went off in your head because Jackie had given you the

20  incorrect name for Jay; isn't that correct?

21  A    Correct.  Again, "alarm bell" is, you know, overstating

22  my reaction.  I knew that she had -- I suspected that perhaps

23  she'd given me a fake name, but that didn't at all change my

24  feeling that she was credible.

25  Q    And Rolling Stone's statement to the media was this:  "'A

1    Rape on Campus,' the story we published was one woman's

2    account of a sexual assault at a UVa fraternity in

3    October 2012 and the subsequent ordeal she experienced at the

4    hands of the university administrators in her attempts to work

5    her way through the trauma of that evening.  The indifference

6    with which her complaint was met, we discovered, was sadly

7    consistent with the experience of many other UVa women who

8    have tried to report such assaults.  Through our extensive

9    reporting and fact-checking, we found Jackie to be entirely

10   credible and courageous.  And we are proud to have given her

11   disturbing story the attention it deserves."

12        That was the statement that Rolling Stone issued to the

13   media, is it not?

14   A    It was.

15   Q    And Jackie's experience was described as, quote, an

16   ordeal at the hands of the university administrators; isn't

17   that correct?

18   A    It is.

19   Q    The only UVa administrator that Jackie interacted with,

20   as depicted in "A Rape on Campus," was Nicole Eramo; isn't

21   that correct?

22   A    That's correct, but we're talking about -- we're talking

23   about the ordeal of dealing with -- okay.  So --

24   Q    My question was just that Jackie's interaction -- the

25   only interaction that Jackie had with a UVa administrator with

1    respect to her sexual assault in the article was with

2    Dean Eramo.  Isn't that correct?

3    A    Correct.  And Dean Lyons as well, yes.

4    Q    You weren't suggesting that Dean Lyons was indifferent to

5    Jackie's claim of sexual assault, were you?

6    A    No.  What we're saying here is --

7    Q    And you weren't suggesting that Dean Lyons put Jackie

8    through an ordeal, were you?

9    A    No.

10   Q    Again, the only UVa administrator, as depicted in the

11   article as directly dealing with Jackie's assault, is Nicole

12   Eramo; isn't that correct?

13   A    That's correct.  But that's not what this statement is

14   about.  This statement is about the university administration

15   and their handling --

16   Q    Your counsel can bring that out.

17   A    Okay.  I apologize.

18   Q    I'm asking the questions that I'm here to ask, and I

19   would like you to answer those directly.

20        Now, you testified very compellingly that Alex Pinkleton,

21   Jackie, and Conner walked up to the Phi Psi house after your

22   dinner on September 11 -- September 12, correct?

23   A    Correct.

24   Q    And that Jackie, upon seeing the Phi Psi house, got very

25   emotional and broke down and fell into Conner's arms, correct?

1   A    Correct.

2   Q    And that she was sobbing and crying and just very upset

3   by the whole experience; isn't that correct?

4   A    Yes.

5   Q    And that Jackie and Conner had to leave at that point in

6   time because Jackie was so upset by seeing the Phi Psi house;

7   is that right?

8   A    Yes.

9   Q    But Jackie wasn't so upset that she couldn't go to a

10  fraternity party later that evening, was she?

11  A    I -- I'm -- I don't know what you're talking about.

12  Q    She told you, before she left, in that moment, that she

13  and Alex were going to meet up at a fraternity party later

14  that evening; isn't that correct, Ms. Erdely?

15  A    That's not correct.

16  Q    Let's look at your notes.  Plaintiff's Trial Exhibit 10,

17  4394.  At the top, just for the jury's reference, "Jackie just

18  stares at it, frozen.  Then her eyes brim with tears and she

19  begins to loudly sob.  She walks a few paces away, collapses,

20  sobbing, into Conner's arms."

21       Do you see where I am?

22  A    Yes.

23  Q    Down towards the next line, "Alex goes and talks to

24  Jackie.  She, Jackie, agrees to meet her friends at Phi Lam

25  and hurries away."

1        Do you see that in your notes?

2   A    I do.

3   Q    You wrote that in your notes, did you not, Ms. Erdely?

4   A    I did.  I didn't remember until now.

5   Q    Ms. Erdely, we've heard you testify about this critique

6   of yours that UVa and Ms. Eramo should have issued a warning

7   to the campus about the gang rape at Phi Psi, based on

8   Jackie's allegations.

9        Do you recall that?

10  A    Well, I mean that they should have done something.  For

11  example, they should have investigated, and perhaps that would

12  have led them to issue a warning.  Yes.

13  Q    But your criticism is that UVa didn't issue a warning;

14  isn't that correct?  One of your criticisms.

15  A    Yes.

16  Q    Now, you knew at the time that Jackie's allegations had

17  not been adjudicated or proven either by a court of law or in

18  a sexual misconduct board hearing; isn't that correct?

19  A    Correct.

20  Q    And that she had refused to file a police report or a

21  university misconduct complaint at that time; isn't that

22  correct?

23  A    Correct.

24  Q    But your view is that UVa should have issued a warning

25  notwithstanding the fact that Phi Psi had not been adjudicated

1    guilty; isn't that correct?

2    A    Correct.  And that's not just my view.  That's what the

3    OCR report found when they found UVa in violation of Title IX.

4    Q    If Ms. Eramo or UVa had done that and had issued a

5    warning that there was a gang rape at Phi Psi, wouldn't they

6    have done exactly what you and Rolling Stone magazine did and

7    have been so roundly criticized for by falsely accusing

8    innocent men of a gang rape?

9    A    No.  Because it wasn't necessary -- you know, I didn't

10   know all the steps necessary -- necessarily that the

11   administration had to take in order -- or had available to

12   them.  What I knew was that they needed to do something and

13   that they chose to do nothing.

14        So their investigation could have taken many forms.  They

15   could have investigated in such a way that they didn't have --

16   they could have done it privately in a way that didn't

17   embarrass any students.

18        What I know is that they needed to take some kind of

19   step, and that would have led them to take the next step and

20   then the next step, and then perhaps it would have led to a

21   campus warning or perhaps not.

22        But what I discovered and what the OCR report complained

23   about was that there was never even any discussion to do so.

24   They never took those steps, even though that was what was

25   required of them.

1   Q    You think that UVa should have issued a warning that

2   there was a gang rape at Phi Psi which would have accused

3   innocent men of committing a crime that the Charlottesville

4   Police Department concluded there was no evidence to

5   substantiate; isn't that correct?

6   A    If they had taken the first step to take an

7   investigation, then perhaps it would have led them to issue

8   that kind of warning if they felt that that was required.  But

9   they never even took that first step.  They chose to remain in

10  the dark.  That is what my article critiqued them for.

11  Q    We will let the jury decide as to what steps UVa and

12  Ms. Eramo took.

13          MS. LOCKE:  Thank you.  I have no further questions

14  for this witness.

15          THE WITNESS:  Thank you.

16                  RECROSS EXAMINATION

17  BY MR. SEXTON:

18  Q    Groundhog Day.

19  A    Yes.

20  Q    That small binder, I mean, your reporting one, PTX10.

21          MR. SEXTON:  Scott, we're going to go to 4374.

22  BY MR. SEXTON:

23  Q    Sabrina, I think I'm going to be mercifully brief here

24  and just cover just a few things --

25  A    Thank you.

1    Q    -- that you were asked today.

2    A    What page did you say we're on?

3    Q    4374.  All right.  Do you see at the top -- are these

4    notes from your -- from your meeting that you had on

5    September 12, the dinner meeting where Conner and Alex and

6    Jackie met you?

7    A    Yes.

8    Q    Okay.  And in this -- in this meeting, did you have

9    better lighting?

10   A    Yes, I did.

11   Q    Did you ask again to see the scars on Jackie's wrists?

12   A    Yes.

13   Q    All right.  And in the better lighting, were you able to

14   see what she described as the lingering scars?

15   A    Yes, I did.

16   Q    And did your notes reflect that?

17   A    Yes.

18   Q    All right.  We'll probably come back to this document a

19   couple times, but right now I want to have you look at

20   Plaintiff's Trial Exhibit 127.

21           MR. BAYARD:  It's not in the binder.

22           MR. SEXTON:  Oh.  Okay.  Do you have this, Scott?

23           TECHNICIAN:  Yeah.

24           MR. SEXTON:  Thank you.

25   BY MR. SEXTON:

```
 1   Q    All right.  Remember when you were asked about Stacy's
 2   letter and you wanted to say something about the content of
 3   the entire middle of the letter?
 4   A    Yes.
 5   Q    And Ms. Locke wouldn't let you?
 6   A    Yes.
 7   Q    Please explain to the jury what you wanted to tell them
 8   about what you read Stacy to be saying here.
 9   A    Could you -- would you mind --
10        MR. SEXTON:  And, Scott -- just a second -- if you
11   could go to -- if you could capture the bottom where it says
12   "Dearest Dean Eramo" on page 1.
13        THE WITNESS:  So I was impressed with Stacy's letter
14   because I thought it was a very intelligent and perceptive
15   reading and it really captured what the article was about.
16   She mentions here how much she loves Dean Eramo, you know, how
17   she truly had the most difficult job on grounds, which is what
18   I say in the article.  She mentions her respect and
19   appreciation for Dean Eramo.
20        But what she continues to say here is, "However, I
21   think it's time for the university to change, to" --
22   BY MR. SEXTON:
23   Q    Can I ask you to back up?
24   A    Oh, yes.
25   Q    And I'm just going to ask you to read along with me.
```

1   A    Yes.

2   Q    Right after you say that, does it say, "My critique in

3   Rolling Stone was not of you"?

4   A    Yes.

5   Q    Did you understand Stacy to have provided you a critique

6   in Rolling Stone?

7   A    I did.

8   Q    And did you understand Stacy to have told you in that

9   critique that she was affirmatively discouraged from going

10  forward with a formal complaint?

11  A    Yes.  She said she was discouraged.

12  Q    And did you understand her to express to you a

13  frustration that she felt she had been deceived as to what it

14  would take in order to have the person found guilty and then

15  actually expelled from the campus?

16  A    Yes.

17  Q    And did she feel strongly enough about that that she

18  appealed that decision?

19  A    Yes, she did.

20  Q    And did she send you an e-mail with a link to the WUVA

21  interview where Nicole Eramo said, "If we have knowledge that

22  the person has done this before, well, of course, we would act

23  on it"?  Did she send you that link?

24  A    She did.

25  Q    And did you understand her to be telling you she felt

1    that she had been deceived by the administration on that very

2    point?

3    A    She did.  She felt she was deceived, and she was outraged

4    that Dean Eramo would be repeating the university's position

5    to further deceive students.

6    Q    Okay.  So she says, "My critique in Rolling Stone was not

7    of you; it was of the administration as a whole."

8    A    Uh-huh.

9    Q    Next sentence, "Your job is not to encourage reporting;

10   it is to be an unbiased source of information."

11         In the article do you believe that you portrayed

12   Dean Eramo as an unbiased source of information?

13   A    Yes, I do.

14   Q    Do you, in fact, say in the article that she presents all

15   of these options -- criminal, formal, informal, or nothing --

16   as the victim's choice?

17   A    Yes.

18   Q    Okay.  She says next, "I appreciate the gravity of that

19   task, given how strongly you wish to make our community a

20   safer place.  However, I think it is time for the university

21   to change."

22         Did you believe that you expressed in your article a

23   concern that perhaps it was time for the university to change?

24   A    Yes, I did.

25   Q    Was that a concern that you shared with Stacy?

1   A    Yes.

2   Q    And this, "To create a more reporting-positive

3   environment" -- this next part -- "to show that there are

4   tangible consequences to such horrible crimes."

5       Is that also something that you expressed -- that you

6   understood her to be saying when you were talking to her as

7   part of your reporting process?

8   A    Yes.  And what she's referring to here as tangible

9   consequences, she's talking about the notion -- in her

10  particular case her assailant had also allegedly assaulted two

11  other people.  And so she understood that there was a larger

12  responsibility to campus safety.

13  Q    All right.  And in your -- in one of the post-article

14  interviews on that podcast that morning of November 26,

15  there's been some statement that you, you know, defamed

16  Ms. Eramo by saying that the administration doesn't treat rape

17  as a crime.

18      Was it your understanding that Stacy shared that concern

19  and had expressed that?

20  A    Yes, she did.

21  Q    And does she say so here --

22  A    Yes.

23  Q    -- to your interpretation?

24      All right.  Then next, "But until we change the rules the

25  administrators such as yourself must adhere to, you must do

1   your job as described."

2       Do you agree with that statement?

3   A    Yes.  She's saying exactly what the article is saying,

4   that there's a certain policy that's in place and that

5   Dean Eramo is required to fulfill that policy.

6   Q    And did you understand, when you wrote the article, that

7   Dean Eramo was the point of contact where the policies and

8   procedures of the University of Virginia met the student body?

9   A    Yes.

10  Q    And was her name necessarily associated with that with

11  each student who came into her office to talk about sexual

12  assault?

13  A    It was.  Because Dean Eramo was the intake person who met

14  with each individual student who came in, she was the person,

15  she was the face of the university, who implemented the

16  university administration's policy of victim choice.

17  Q    All right.  And she said, "I understand, then, and

18  acknowledge these certain limitations and plan to be part of a

19  constructive solution."

20      Is that what you had hoped to see following your article,

21  that there would be a constructive dialogue about maybe

22  changing some of the things that caused you such grave

23  concerns for public safety, especially in the light of Hannah

24  Graham?

25  A    That was always my great hope, was that some kind of

1  constructive and positive change would come out of this

2  article.

3  Q    And did you hear Brian Head, a very impressive young man

4  who came and testified on Saturday morning, testify that, in

5  fact, there were lots of changes -- and I believe he told

6  Mr. Paxton, they were all good -- that occurred after that?

7       Did you hear that?

8  A    I did.

9  Q    All right.  In spite of all this junk that has happened

10 to your life since then, did that at least give you something,

11 a little bit to be -- maybe a glimmer of hope that maybe this

12 was worth something?

13 A    It did.

14 Q    I want to talk to you about the anonymous Wahoo letter.

15 I think that might be a little out of context.

16      What's the context in the article that you use and refer

17 to the anonymous Wahoo?  How do you use that in your article?

18 A    I talk about how the -- how disappointed the students can

19 feel by the formal hearing process in front of the sexual

20 misconduct board and how this young woman was so disappointed

21 that she wrote an open letter to the -- she wrote an article

22 in a student publication talking about her own experiences and

23 that the ultimate decision in her case was that.

24      And she quoted from the -- I won't be able to quote it

25 from memory, but she quoted from the decision paper that was

1  handed down, the judgment that was handed down in her case,

2  that found that, even though they found her to be totally

3  credible and believable, that they actually found in favor of

4  her alleged perpetrator.

5      And her quote was to the effect of how much faith she

6  lost in the process and in her university and the betrayal

7  that she felt, that, "How could they say that they believed me

8  and loved me and wanted to take care of me but they still --

9  you know, they still" -- I forget how she ended that quote.

10  "They still, you know, betrayed me like this."

11  Q   And in your statistical analysis of these cases, did you

12  come to find -- the ones that you got from -- from UVa --

13          MS. LOCKE:  Objection, Your Honor, as to statistical

14  analysis.  There's no foundation for that, nor is this witness

15  an expert.

16          MR. SEXTON:  I'm not asking --

17          THE COURT:  I think it's a fair question.  The

18  witness can answer.

19  BY MR. SEXTON:

20  Q   You asked -- I mean, I think Ms. Locke asked you to talk

21  about all the numbers and reports and how many people have

22  been convicted and all that stuff.

23      Do you remember that, when she was asking you about

24  McGregor McCance?

25  A   Yes.

1  Q    And were you knowledgeable enough to write those

2  questions and say, "Hey, can you give me this information?"

3  A    Yes.

4  Q    And were you knowledgeable enough to read it once he gave

5  it to you?

6  A    Yes.

7  Q    And did you come to understand from that that there had

8  been only very few convictions of sexual assault in the

9  history of the University of Virginia?

10  A    Yes.  I believe -- I believe, if I'm remembering the

11  article correctly, that Stacy's case in which her perpetrator

12  was found guilty was the fourteenth in all of UVa's history to

13  be found guilty.

14  Q    Okay.  Out of all the complaints, out of all the trials

15  in that formal complaint process?

16  A    Yes.

17  Q    Only 14?

18  A    Yes.

19  Q    Now, I believe Ms. Locke asked you questions about

20  whether Ms. Eramo could issue sanctions.  I think she was

21  talking about in the formal complaint process.

22       Did you become aware that there's also this thing called

23  an informal process?

24  A    Yes.

25  Q    All right.  And did you become aware that Ms. Eramo sits

1   as something of a mediator in that process?

2   A    Yes.

3   Q    All right.  And in that process, did you become aware

4   that she does at times have the authority to issue sanctions?

5   A    Yes.

6   Q    Okay.  I'm going to ask you to look at -- back to your

7   reporting file, this one.  Exhibit 1, Plaintiff's Exhibit 1,

8   and go to 4312.

9           MR. SEXTON:  Can you go to the bottom paragraph,

10  Scott?

11  BY MR. SEXTON:

12  Q    All right.  What I'm going to ask you to do, when you

13  describe in the article the -- that Dean Eramo had a

14  nonreaction, was it your intent to talk about her physical and

15  verbal response to simply the allegation that there had been

16  two additional gang rapes at Phi Psi?

17  A    Yes.

18  Q    Facial expression, that sort of thing?

19  A    Yes.  Facial expression, body language.

20  Q    All right.  And just looking at this, if you would, "It

21  wasn't as shocked as you might think," period.  "She was just

22  mild, 'Oh, you have to have her come in.'  She wasn't like,

23  'My God, that's crazy.'  She was more concerned than anything

24  for the girls' well-being."  Period.

25  A    Uh-huh.

1  Q    Do you see the period there?

2  A    Yes.

3  Q    Okay.  And in your mind, does this, what I have just

4  read, describe for you her physical and verbal response to the

5  allegations of the two new allegations at Phi Psi?

6  A    It does.  And it actually further amplifies what's bolded

7  above, when I had first said, "What was Dean Eramo's reaction

8  when you told her about the other girl?"  And she said, "She

9  told me to just keep telling her she can come in and talk to

10 me about therapy groups to go to, this is a safe space, we

11 won't tell her parents.  So I told her that, but it was like

12 talking to a wall."

13 Q    Okay.  And is the question that you're asking her here --

14 I'll put a mark here -- oh, I'm sorry.  I am going take that

15 back.  I think it's down here.  This one that I put a mark by.

16     "I just wondered if you saw the look on her face when you

17 told her about someone else, whether she seemed shocked."

18     Is that all you sought to accomplish in referencing the

19 nonreaction in the -- in the article?

20 A    Yes.  I wanted to know what Dean Eramo's instantaneous

21 reaction was to something so -- so surprising.

22 Q    Okay.  And after that, do you see where I put the dot?

23 A    Yes.

24 Q    Do you see the period?

25 A    Yes.

1    Q    And after having described how her face seemed, by the
2    look on her face, does she then go on to describe, "And then
3    she got pissed"?
4    A    Right, her secondary reaction.
5    Q    Okay.  All right.  And does that -- does that "And then
6    she got pissed" say anything to you about what was on her
7    face?
8    A    No.
9    Q    Okay.  All right.  You were -- as of December 5, you had
10   lost confidence in Jackie's story, right?
11   A    Yes.
12   Q    Did you know what was true and what was false that Jackie
13   had told you?
14   A    I did not.
15   Q    And in that process, did you learn things, for example,
16   that, well, Phi Psi says they didn't have a party that day?
17   Did you learn that during time period?
18   A    Yes.
19   Q    Okay.  So as to what Jackie had told you about Phi Psi,
20   did you have a strong suspicion that that was, in fact, false?
21   A    I -- I had a strong suspicion, yes.  I didn't know what
22   to think.
23   Q    And as to the name James Larsen, did you have a very
24   strong suspicion that that was just completely false?
25   A    Yes.

1    Q    By December 5 and the aftermath of that, right?

2    A    Yes.

3    Q    Because people were coming forward with details, and they

4    were telling the world, Phi Psi was saying, "Hey, we didn't

5    have a party.  We don't have a member who's in IM-rec," words

6    to that effect?

7    A    Yes.

8    Q    Right?

9    A    Yes.

10   Q    And that's information that was coming in to you letting

11   you know that there were specific issues in your article

12   attributed to Jackie that were, in fact, specifically false,

13   correct?

14   A    Correct.

15   Q    All right.  Now, as of December 30, the date on which

16   Ms. Locke is saying that Liz McNamara has said, "Can you tell

17   us what the inaccuracies are" -- right? -- "in Dean Eramo's

18   story?" then had you had any communication from Dean Eramo to

19   say, "Here are all the things in the story that are inaccurate

20   that Jackie says about me"?  Had you received anything like

21   that?

22   A    No.

23   Q    To your knowledge, had Liz McNamara received anything

24   like that?

25   A    Not to my knowledge.

1    Q    And so, as you sat there in those months and weeks

2    following, is it fair to say you didn't know if anything

3    Jackie had said that came from the mouth of Dean Eramo was

4    true or false, correct?

5    A    Correct.

6    Q    That could have been she presented three options

7    neutrally, correct?

8    A    Correct.

9    Q    Could have been any single thing that Jackie said about

10   Dean Eramo, correct?

11   A    Correct.

12   Q    You just -- fair to say, you just knew you couldn't trust

13   her?

14   A    Right.  We had yet to have really, really combed over --

15   I mean, I was still making sense of it all.  All I knew was

16   that anything that Jackie had told me, I just couldn't trust

17   because she was no longer reliable.

18   Q    Do you find it unreasonable that someone charged with

19   representing you and trying to get to the bottom of this would

20   say to Dean Eramo's counsel, "Hey, can you tell us what the

21   facts are that she says are false in this article about her?"

22   Do you find that odd?

23   A    No, that's not unreasonable, especially when I remember

24   what it was like for us at that time, just trying to figure

25   out, you know, what was what.

1   Q    And is that exactly what Phi Psi had done publicly

2   through the press by saying, "Hey, we did not have a

3   fraternity party, and we don't have a member who's in IM-rec"?

4   Had they done that sort of?

5   A    Yes, they had.

6   Q    And isn't it true that by then, the three friends, Ryan

7   and Kathryn, they had appeared on national television shows,

8   correct?

9   A    Correct.  Everything that happened, all the things that

10  emerged, as painful as it was for us, it actually helped to

11  clarify what it was that we had gotten wrong.

12  Q    And so those individuals had come forward publicly to

13  specifically say this and this and this is what went wrong,

14  correct?

15  A    Correct.

16  Q    And so Ms. McNamara and Rolling Stone, they would have

17  known that because they would have that public access,

18  correct?

19  A    Correct.

20  Q    All right.  I'm going to take you to Defendants' -- I

21  think it's Plaintiff's Trial Exhibit 25.  It's the transcript,

22  yes.

23       This is that transcript of your September 12 conference.

24  I'm going to have Scott take us to page 118421.

25       Okay.  There we are.  Okay.

1    I'll just represent to you that this is what's been

2  admitted in evidence as the transcribed copy of your

3  September 12 interview.

4  A    Yes.

5  Q    All right.  And on the previous page --

6         MR. SEXTON:  I don't know, Scott, if you can break

7  it to the previous one line.

8  BY MR. SEXTON:

9  Q    All right.  Jackie is talking, correct?

10 A    Correct.

11 Q    And she says, "I mean, she got into a really good school

12 and stuff."

13     Did you understand her to be talking about her mother?

14 A    She was.

15 Q    "Like, you know, she went to Brown, she went to PC."

16     Did you understand her to mean -- to be referring to

17 Providence College?

18 A    Yes.

19 Q    All right.  And do you understand that Brown and

20 Providence College are in the same town?

21 A    Yes.

22 Q    And is that town Providence, Rhode Island?

23 A    Yes, it is.

24 Q    Okay.  Would it strike you as unusual that somebody's

25 mother might have gone to both Providence College and Brown

1  during their college years?

2  A    No.  That wouldn't be unusual.

3  Q    There was another statement you were asked.  Remember

4  when you were being asked about the Rolling Stone's press

5  release on December 1 that contained the word "ordeal"?

6  A    Yes.

7  Q    All right.  And I think I got the sense that you wanted

8  to explain something.  And, first of all, did you have any

9  what you would consider meaningful involvement in drafting

10  those words?

11  A    I did not.

12  Q    And do you think it's an easy thing from a literary

13  standpoint to try to summarize in a sentence or two a

14  9,000-page article?

15  A    No.  I think it's very -- I think it's very difficult to

16  take a 9,000-word article that I -- I tried to be very nuanced

17  and full of a lot of different concepts and try to shrink it

18  down into a press release that's just a few sentences.

19  Q    Okay.  So that's a hard job for whoever does it, right?

20  A    Yes.

21  Q    And, in this case, it wasn't your responsibility to draft

22  that, right?

23  A    Correct.

24  Q    Okay.  Now, in that -- and I don't know if we need to

25  even pull it up, but it was Plaintiff's Exhibit 58.  But --

1          MR. SEXTON:  You want to make sure she finds it?

2   BY MR. SEXTON:

3   Q    And just -- I don't even think you need to look at it to

4   answer the question I had.

5          The question is simply, what -- if you were defending the

6   word "ordeal" that was chosen here by somebody else to

7   describe what Jackie suffered at the hands of the

8   administration, what would you say in defense of that word?

9          So, like, what was it that you would have to agree you

10  perceived to be an ordeal from Jackie's perspective?

11  A    I mean, what I sort of -- what I concluded about -- I do

12  think that Jackie went through an ordeal, and so did Stacy.

13  And I think that this is part of what resulted from the

14  combination of sort of like victim choice meets an

15  administration that doesn't investigate what it's supposed to.

16         And that is -- and that's also not just my finding.  I

17  mean, you know, again, the OCR report found that the

18  university did not do enough investigation, not just -- not

19  just with regard to campus safety, but also in cases during

20  the formal complaint process, that they put too much reliance

21  on -- on -- too much emphasis, I think was their word, on the

22  participants in the formal process themselves to come up with

23  evidence and witnesses when the investigators should have done

24  it themselves.

25         So I think that what the ordeal really was for these

1    traumatized victims really came down to the idea that, between

2    victim choice and between the idea that they had to kind of be

3    their own investigators, that there was a huge burden on them.

4    Jackie had the burden of bringing out -- she was told that in

5    order to get a punishment, a meaningful punishment against

6    this fraternity, that she needed the word of two other people

7    to come out and support her.

8    Q    And did you highlight that in your notes for the jury

9    earlier, days ago, in your testimony?

10   A    I did.  I did.

11   Q    And that's where Dean Eramo said not just two, but three,

12   the three of you need to come forward?

13   A    Right.

14        And Jackie really felt that it was her responsibility to

15   bring these two other people to light, that this was her --

16   you know, that she was kind of deputized to do this.  And --

17   Q    And I want to stop and make it clear.  As you sit here

18   today, that was Jackie's account to you of what Dean Eramo had

19   said, correct?

20   A    Yes.

21   Q    And you have absolutely no idea whether Dean Eramo

22   actually said that to Jackie, given the lack of confidence

23   that you have in Jackie's testimony generally -- or her story

24   to you generally, as you sit here today?

25   A    Right.  I don't know how much pressure Jackie was

1   actually under, because I don't consider her a reliable
2   narrator.
3          I also don't know how much of it was actually from
4   Dean Eramo or perhaps was Jackie's own perception.  But I do
5   know that her account to me was that, you know, she felt
6   herself under pressure and that, in addition -- so that -- I
7   mean, for somebody who has been, you know, let's just say, you
8   know, traumatized by a sexual assault, or, you know, even a
9   gang rape, that additional burden would constitute a huge
10  ordeal.
11         And in a case like Stacy's, where she was tasked with
12  bringing -- with also bringing two additional witnesses out of
13  the woodwork in the form of victim statements, you know,
14  helping to convince them to submit these statements in support
15  of her -- for her formal process, that also constituted a huge
16  burden for her and added to her mental burden.  And that also
17  constituted an ordeal.
18  Q    So I think you described earlier that there was this
19  one -- one side of victim choice which was kind of empowering,
20  that it allowed the victim to actually feel a sense of control
21  over their own life.  And did you see that as a potential
22  positive for the victim?
23  A    I did.  And I think that was the philosophy -- I mean,
24  the well-meaning philosophy behind victim choice.
25  Q    Okay.  And this "but if I choose nothing, the whole

1   campus may be rendered unsafe if I take this choice," is that

2   the part you saw as the perhaps not-so-kind, not-so-gentle

3   flip side of victim choice?

4   A    Exactly.

5   Q    All right.  And is that what you perceived Jackie and

6   others to be going through as you were witnessing it?

7   A    Yes.

8        Also, just one more thing about this, this little

9   bite-sized press release, is that, when they talk about the

10  indifference with which her complaint was met, I mean, in my

11  reading of it or my intentions behind writing it was, when I

12  talk about the indifference, I'm talking about the way that

13  the administration was indifferent to campus safety; that her

14  complaint was met -- it was not followed through with any kind

15  of investigation to see whether there was a larger threat to

16  the community.

17            MR. SEXTON:  Okay.  Let me see if any of my

18  colleagues have any questions.

19            Those are all the questions I have, Sabrina.

20            THE WITNESS:  Thank you.

21            THE COURT:  Let me ask the witness one or two

22  questions about something that she's touched upon but really

23  has said very little about during the course of -- what? --

24  three days' worth of testimony.

25            I believe you said that throughout the phases of

1  preparing the article for publication, you collaborated fairly

2  often with the editors of Rolling Stone, Ms. Garber-Paul,

3  others, as you went through each draft of the article.

4         THE WITNESS:  Yes, sir.

5         THE COURT:  The attorneys have -- both sides have

6  asked you about your impressions and what conclusions you drew

7  from various interactions you had during this period of time.

8         And I would ask you this:  Was it your impression

9  that the editors, Ms. Garber-Paul, the others that you

10  interacted with at Rolling Stone, were enthusiastic about the

11  article at all the critical stages?

12         THE WITNESS:  Yes, sir, they were.

13         THE COURT:  Now, is it your sense that they were

14  enthusiastic about the article because it was investigative

15  journalism that fit the Rolling Stone brand, or were they

16  invested in the same theme that you were invested in, the

17  wrongness of victim choice, the potential that that system had

18  for letting dangerous people roam the campus, the need -- the

19  pressing need to have something done about that sooner rather

20  than later, and the importance of using Jackie's story as the

21  centerpiece for an article underlying all these important

22  points?

23         THE WITNESS:  I felt it was the latter, sir.  I felt

24  that they had the same perspective that I did, that we were

25  shining a really important light on something and had the

1   potential to make a change.

2           THE COURT:  Okay.  Let's take the second midmorning

3   break, and then we'll come back and see if there are any final

4   questions for the witness.

5           Ladies and gentlemen, I would again ask that, while

6   you're away from the court, do not discuss the case with one

7   another, do not permit anyone to discuss it with you.  I'll

8   ask Ms. Erdely not to discuss her pending testimony with

9   counsel from the other side.

10          Let's plan to return at five after the hour.

11          (Recess)

12  (Open court as follows:)

13          THE COURT:  I see all ten jurors are back.  I

14  hesitate to ask this, but are there any questions or any

15  additional direct examination?

16          MR. SEXTON:  The world record for the longest

17  witness.

18          MS. LOCKE:  Your Honor, fortunately, we are content

19  to report for you and the jury that we have no further

20  questions at this point.

21          THE COURT:  Ms. Erdely, you may stand down.

22          THE WITNESS:  Thank you.

23  (Witness stood aside)

24          MR. PAXTON:  Just before we -- one of the things

25  that we had wanted to take up was the introduction of the

1  less-redacted copy of her notes, since she's now leaving the

2  stand.  I don't think there's any opposition to the version of

3  that.  So we wanted -- the current version is Plaintiff's

4  Trial Exhibit 10.

5          MS. MOODY:  10.

6          MR. PAXTON:  We'll be offering this as the

7  defendants' exhibit next in order.

8          THE COURT:  All right.  Am I to understand that this

9  is a replacement to the version already admitted or a parallel

10  version?

11          MR. PAXTON:  It could be used as a replacement.  We

12  didn't talk about that.

13          MS. MOODY:  We can call them 10 and 10A.

14          MR. PHILLIPS:  Just for record clarity, let's keep

15  the other one in.  We can have this as an additional

16  defendants' exhibit, 10A or whatever.

17          MR. PAXTON:  Yeah, absolutely.

18          THE COURT:  So that will become --

19          MS. MOODY:  Defendants' 64.

20          THE COURT:  Ms. Locke, what is the plaintiff's

21  inclination as to the letter of -- I believe it's December 10?

22  Do you want it marked tendered but not admitted, or do you

23  wish to withdraw it?

24          MS. LOCKE:  Tendered but not admitted, Your Honor.

25          THE COURT:  That will become plaintiff's what?

1                 MS. MOODY:  148.

2                 THE COURT:  Plaintiff's 148?  Is that what you said?

3                 MS. MOODY:  Yes.

4                 And then the next defendants' exhibit would be 64.

5       So both of these.

6                 MR. PAXTON:  Yes.

7                 MS. MOODY:  Okay.

8                 THE COURT:  All right.

9                 MR. PAXTON:  Thank you, Your Honor.

10                THE COURT:  64?

11                MS. MOODY:  Yes.

12                THE COURT:  64, you said?

13                MS. MOODY:  Yes.

14                (Defendants' Trial Exhibit Number 64 admitted)

15                (Plaintiff's Trial Exhibit 148 tendered)

16                THE COURT:  Ms. Locke, call the next witness.

17                MS. LOCKE:  Yes, Your Honor.  At this point in time,

18      we would like to play the video deposition of Jackie, the

19      witness known as Jackie.

20                We were hoping that Your Honor could explain to the

21      jurors the difference between plaintiff's designations and

22      defendants' designations and how they will all be played at

23      the same time.

24                THE COURT:  Well, I'm not sure I know the answer to

25      that, but I'll give it a try.

1          MS. LOCKE:  I can explain it to the jurors.

2          THE COURT:  Let me try it.  If I make a mistake, you

3     correct me.

4          So we have another video deposition.  Keep in mind

5     what I said about depositions from witnesses not in court.

6     Those depositions are given -- yes, those depositions are

7     given just like testimony in court.  The deponent, the

8     witness, is under oath.  They're expected to answer

9     truthfully.  The witness is examined by the attorney who

10    scheduled the deposition, who noticed it.  And then they are

11    cross-examined by opposing counsel, just as would be the case

12    here in open court.

13         So in all practical instructions, you should

14    consider this testimony as if it was given by a live witness.

15         Now, as I told the other day, the attorneys, with

16    the aid and great assistance of the Court, have undertaken to

17    cut out from the deposition things that really are not

18    relevant, things that are not important, things that are not

19    admissible; and, in this case, identifiers for the witness,

20    because as I indicated earlier in the trial, the Court

21    believes there is some importance in keeping this woman's

22    identity confidential.

23         So you'll notice jumps in the video.  It will seem

24    to skip from one place to the next.  That's one of those

25    instances that the Court has approved a redaction or ruled

1    that some portion of the transcript is not admissible and

2    should not be heard by you.

3           Ms. Locke, does that explain what you wanted to have

4    explained?

5           MS. LOCKE:  Yes, Your Honor.  I just wanted the jury

6    to understand that some of these were designated by

7    plaintiff's counsel and some were designated by defendants'

8    counsel but that we're going to run straight through.

9           THE COURT:  Right.  In deciding on the redactions,

10   the portions to be omitted, some were sought by the defendant;

11   some were sought by the plaintiff.  All were approved by the

12   Court.

13          You may proceed.

14          MS. LOCKE:  Thank you, Your Honor.  We're going to

15   move our chairs around so that we can see the video without

16   displaying it to the gallery.

17          (Video played)

18          MR. CLARE:  Your Honor, we're partially through the

19   examination, but it's getting to be about the lunch hour.  It

20   looks like the testimony is about to shift in a different

21   direction.

22          If Your Honor and the jury are inclined to take a

23   break, this might be a good time to do it.

24          THE COURT:  Thank you, Mr. Clare.  I think so too.

25          So counsel tell me that they are at a stopping point

1    in the video.  And, ladies and gentlemen, we will have our

2    midday lunch recess.

3            Again I would ask that, while you're away from the

4    court, you not discuss the matter with one another, do not

5    permit anyone discuss it with you.

6            Let's plan to return at about 20 after 1.

7            Ask the marshal to declare court in recess.

8            (Lunch recess)

9

10                    CERTIFICATE

11      I, JoRita B. Meyer, certify that the foregoing is a

12   correct transcript from the record of proceedings in

13   the above-entitled matter.

14   /s/ JoRita B. Meyer              Date: 10/24/16

15

16

17

18

19

20

21

22

23

24

25