```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF VIRGINIA

 3                CHARLOTTESVILLE DIVISION

 4

 5   ******************************
     NICOLE P. ERAMO,            * CIVIL ACTION 3:15-CV-00023
 6                               * OCTOBER 25, 2016
          Plaintiff,             * JURY TRIAL, Vol. 1
 7   vs.                         *
                                 *
 8   ROLLING STONE,LLC,          *
     SABRINA RUBIN ERDELY,       *
 9   WENNER MEDIA, LLC,          * Before:
                                 * HONORABLE GLEN E. CONRAD
10        Defendants.            * UNITED STATES DISTRICT JUDGE
                                 * WESTERN DISTRICT OF VIRGINIA
11   ******************************

12   APPEARANCES:

13   For the Plaintiff:    THOMAS ARTHUR CLARE, ESQUIRE
                           ELIZABETH MARIE LOCKE, ESQUIRE
14                         ANDREW CLAY PHILLIPS, ESQUIRE
                           JOSEPH R. OLIVERI, ESQUIRE
15                         Clare Locke, LLP
                           902 Prince Street
16                         Alexandria, VA  22314

17
     For the Defendants:   ELIZABETH ANNE McNAMARA, ESQUIRE
18                         ALISON SCHARY, ESQUIRE
                           Davis Wright Tremaine, LLP
19                         1251 Avenue of the Americas, 21st Flr.
                           New York, NY  10020
20

21

22   Court Reporter:  JoRita B. Meyer, RPR, RMR, CRR
                      210 Franklin Road, S.W.
23                    Roanoke, Virginia  24011
                      540.857.5100, Ext. 5311
24
             Proceedings recorded by mechanical stenography;
25    transcript produced by computer.
```

```
 1   APPEARANCES (Continued):

 2   For the Defendants:      W. DAVID PAXTON, ESQUIRE
                              J. SCOTT SEXTON, ESQUIRE
 3                            MICHAEL FINNEY, ESQUIRE
                              CHARLES H. SMITH, ESQUIRE
 4                            Gentry Locke Rakes & Moore
                              P. O. Box 40013
 5                            Roanoke, VA  24022

 6   ///

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2                     EXAMINATION
 3   WITNESS:  ELISABETH GARBER-PAUL (CONTINUED)
 4   CROSS EXAMINATION                    PAGE
 5     By Ms. McNamara...................4
 6
 7
 8                      EXHIBITS
 9   PLAINTIFF'S TRIAL EXHIBITS
10                                    ADMITTED
11   (NONE)
12
13
14   DEFENDANTS' TRIAL EXHIBITS
15                                    ADMITTED
16   67...................................18
17   68...................................96
18   69...................................106
19   70...................................108
20   ///
21
22
23
24
25
```

1  (8:00 a.m.)

2  (Jury in)

3  (Open court as follows:)

4        THE COURT:  Good morning, everyone.  Ten jurors in

5  the jury box ready for day eight.

6        I received a note yesterday afternoon from one of

7  you about the scheduling.  And I took this issue up with

8  counsel at the end of the day yesterday.  And I'm happy to

9  report that we're going to be able to finish by 5:30 on

10  Friday.  I know one of you had some conflict, and I wanted to

11  make sure that we finished no later than 5:30.  We're going to

12  certainly try to do that and get you on your way a little bit

13  earlier that day.

14        As you recall, when we finished yesterday afternoon,

15  we were ready for the cross-examination of the witness,

16  Garber-Paul.  And we'll proceed with that at this time.

17        Since a new day has dawned, we'll have the witness

18  again sworn.

19        ELISABETH GARBER-PAUL, called as a witness, having

20  been duly sworn, was examined and testified further as

21  follows:

22        CROSS EXAMINATION

23  BY MS. McNAMARA:

24  Q    Good morning, Ms. Garber-Paul.

25  A    Good morning.

1  Q    I know you know me; Elizabeth McNamara.  You have

2  answered a number of questions for Mr. Phillips.  And I wanted

3  to -- by way of beginning, to get to really the bottom of one

4  of the issues here.

5       At the time that you published the article "A Rape on

6  Campus," did you have any doubts about its accuracy?

7  A    Absolutely not.

8  Q    Did you believe it to be true?

9  A    Yes, I did.

10  Q    And would you say the same answer with regard to any

11  statements concerning Ms. Eramo, the plaintiff in this action?

12  A    Yes.  I believed them all to be true.

13  Q    And would you say the same with regard to any statements

14  about UVa?

15  A    Yes.

16  Q    And the same with regard to Jackie's story.  Did you

17  believe that to be true at the time the article was published?

18  A    Yes.  When we went to press, I believed it all to be

19  true.

20  Q    And did there come a time when you learned that

21  Ms. Erdely had lost faith in Jackie's story or Jackie?

22  A    Yes.

23  Q    And when was that?

24  A    That was the morning of December 5, 2014.

25  Q    And what was your reaction?

1   A    Shock and devastation and confusion.

2   Q    And then what, if anything, happened after that?

3   A    The next few days were a bit of a blur, but there was a

4   retraction, I believe, of all of Jackie's statements from the

5   article.

6   Q    And did you have any participation in the decision-making

7   or publication of the retraction on December 5?

8   A    I was asked to look over it to make sure that the way we

9   described the article in the retraction was accurate, though I

10  did not have any decision-making in issuing it.

11  Q    And what was your understanding with regard to what the

12  magazine was intending to retract on December 5?

13  A    It was my understanding that we were retracting

14  everything that we had based on Jackie's -- Jackie's

15  statements.

16  Q    And what, if any, personal impact did the revelation that

17  Sabrina had lost faith in Jackie have for you?

18  A    Like I said, I was devastated.  I wasn't sure what to

19  believe at that point.  I had spent a long time talking with

20  Jackie and going through her story and making sure everything

21  had been accurate as we understood it.

22       And to have that all fall apart that way was -- it was

23  incredibly traumatic for me.

24  Q    And when you said that it was your understanding when

25  Rolling Stone published the retraction on December 5 that it

1    retracted all information in the article that came from

2    Jackie --

3        Is that correct?

4    A    Yes.

5    Q    -- did that include the statement about Ms. Eramo that

6    she had discouraged Jackie from telling her story?

7    A    Yes, it did.

8    Q    And the statement from Ms. Eramo about the rape school?

9    A    You mean the statement from -- yes.

10   Q    Yes.  I'm sorry.  I misspoke.  You need to correct me

11   because I will misspeak.

12       The statement that was attributed to Ms. Eramo about the

13   rape school.

14   A    Yes.

15   Q    You understood that the December 5 retraction was

16   retracting that?

17   A    Yes, I did.

18   Q    And the same with regard to the description of

19   Ms. Eramo's reaction when Jackie told her about the two other

20   women, you understood that the magazine was retracting that as

21   well?

22   A    Yes.

23   Q    Now, let's step back for a moment and tell the jury about

24   who you are and where you came from.  Where did you grow up?

25   A    I grew up in Chicago.

1    Q    And did you stay there until you moved to New York?

2    A    No.  I moved to Princeton briefly and then to New York.

3    Q    Is it fair to say one of your parents was an academic?

4    A    Yes.  My father.  He worked at the University of Chicago

5    when I was growing up and then went to Princeton in 2002.

6    Q    And what is his field?

7    A    He's a professor of the history of philosophy.

8    Q    And how about your mother?  Does she work?

9    A    Yes.  She's a licensed clinical social worker whose work

10   primarily deals with abused children and sexually abused

11   children.

12   Q    And did that have any impact on the fact-checking of this

13   article?  Did you have any discussions with your mother?

14   A    Yes, I did.  I spoke to her at length about Jackie's

15   story as I was fact-checking and after the fact-checking of it

16   because I respected her opinion on how trauma affects sexually

17   abused young people.

18   Q    Now, Mr. Phillips had established that you're currently

19   the culture editor for RollingStone.com, and that occurred in

20   2006; is that right?

21   A    2016.

22   Q    Yes.  Thank you.  Again, I told you you need to correct

23   me.

24        And prior to that, you were a fact-checker at Rolling

25   Stone for a number of years; is that right?

1   A    Yes.  For about six years.

2   Q    And part of that was when you were on staff, and part of

3   that was when you were doing freelance?

4   A    Yeah.  I was hired as a freelance fact-checker in 2010

5   and then was hired full-time in 2013.

6   Q    And what did you do before becoming a fact-checker at

7   Rolling Stone?

8   A    I was an intern at The Nation magazine.  And before that,

9   I was in college.

10  Q    And when you were an intern at The Nation magazine, you

11  engaged in fact-checking?

12  A    Yes.  That was primarily my duty there.

13  Q    And were you trained there to do fact-checking?

14  A    Yes, that's right.

15  Q    And how were you trained?

16  A    We were, you know, walked through the process of

17  separating fact from opinion and making sure that all of the

18  facts were backed up with solid sources and making sure that

19  the opinions lined up with the facts that were presented in

20  the article as well.

21  Q    During your career of fact-checking over several years,

22  approximately how many articles would you say you

23  fact-checked?

24  A    I tried to look this number up before, but I would place

25  it in the hundreds.

1  Q    And while at Rolling Stone, can you tell us your role for

2  fact-checking?  What did you do?  How did you, on a day-to-day

3  basis, go about your job?

4  A    Well, we worked on a two-week cycle.  So every other

5  Monday, I'd get an assignment from the head of the

6  fact-checking department.  And I would start by asking the

7  writer for backup, which was all the transcripts, notes,

8  articles that they might have used in doing background

9  research, any pertinent e-mails, documents, anything that they

10  could provide.  And then I would spend the next week and a

11  half to two weeks working through all those documents, working

12  through the article, like I said, separating opinion from --

13  from straight facts, and making sure that we had sufficient

14  backup for the facts and there were sufficient facts to back

15  up all the opinions.

16  Q    And if you had to identify the mission of the Rolling

17  Stone fact-checking department, how would you characterize it?

18  A    To make sure that everything was as accurate as possible

19  by the time we went to press.

20  Q    And in your years of performing fact-checking at Rolling

21  Stone, did you believe that they took that very seriously?

22  A    Yeah.  Absolutely.

23  Q    And did you see Rolling Stone's approach to fact-checking

24  the same or different as other publications where you have

25  done fact-checking?

1   A    It was just as rigorous, if not more.

2   Q    And you had not just done fact-checking before Rolling

3   Stone and The Nation; you had worked by freelance at a number

4   of other magazines as well.  Isn't that right?

5   A    Yeah.  When I was freelancing from 2010 to 2013, I worked

6   at New York magazine and at Health magazine doing

7   fact-checking for them as well.

8   Q    And so the conclusion that you just stated that Rolling

9   Stone took it as seriously, if not more so, was based upon

10  your experience at a number of national magazines; is that

11  right?

12  A    Yes.

13  Q    Now, Mr. Phillips had asked you about the fact that

14  Rolling Stone had no written fact-checking policies.  Do you

15  recall that?

16  A    Yes.

17  Q    Was Rolling Stone different in that regard than other

18  magazines that you had worked at?

19  A    Not in my experience, no.

20  Q    And as we've established, those magazines were national

21  magazines as well; is that right?

22  A    New York might be considered a regional magazine, but

23  it's got a very large readership and it takes its work very

24  seriously.

25  Q    And did you have any understanding as to the reason why

1   Rolling Stone and/or other magazines did not have written

2   policies, rules regarding fact-checking?

3   A    Because there's so many different things that come up,

4   depending on the specifics of an article, that I think it was

5   just, the moment you wrote anything down, you'd have to update

6   it and change it based on something new that came in.  So...

7   Q    So it's fair to say that it's fact-determined?

8   A    Yes, absolutely.

9   Q    And there could be many variables that go into the

10  decision on whether you use a pseudonym or whether you have a

11  second source or whether this particular document is

12  sufficient to back up a fact; is that fair to say?

13  A    Absolutely.

14  Q    And you would take all those variables into consideration

15  in making a judgment on whether you were comfortable with the

16  accuracy of information in an article; is that correct?

17  A    Yes.  And in conversation with the editors involved.

18  Q    So please tell the jury how you as a fact-checker at

19  Rolling Stone would go about fact-checking an article

20  generally.

21  A    Well, I would, like I said, divide -- you know, go

22  through, make sure I knew what the sourcing was for all the

23  different parts of the article.  And then I would go about

24  scheduling phone calls with the main sources so that not only

25  did I have the interviews that they would have done with the

1   writer of the article, I would also be able to ask any

2   follow-up questions.

3       Sometimes when you're reading a transcript, it's hard to

4   kind of parse what someone means.  So having an actual phone

5   call with people, you know, really helps straighten things out

6   a lot of the time.

7       And then I would also go through and determine that we

8   weren't saying things that were vastly different than what

9   other publications had said, to make sure that our conclusions

10  that we were drawing were in line with what other publications

11  had drawn.

12      And, yeah, I would go about talking to everyone I could

13  and reading through everything I could, then making sure --

14  you know, checking off that's what you said, on these

15  scribbled-through drafts, go through line by line and word by

16  word and made sure I was comfortable with every letter in the

17  story.

18      And then, after each round of fact-checking, go sit down

19  with my editor and bring up all my questions, all my

20  suggestions, sometimes just suggested edits where I thought it

21  might sound better if we put in, you know, different wording,

22  and have them sign off on everything.

23      And then go through it with the copy department, get that

24  all in the system, and get the next round out for all of us to

25  read and proof and -- until we were completely comfortable

1   with it.  And then we'd send it to press.

2   Q    And is it fair to say that it's a collaborative process?

3   You worked with the writer, you worked with the editor, you

4   worked with the copy editors; is that correct?

5   A    Absolutely.

6   Q    And at the end of the day, have you ever signed off on

7   the publication of an article that you had any doubts about

8   the accuracy of the information in the article?

9   A    No.  Never.

10  Q    If you have a question about anything in the article --

11  and we've seen questions that were raised by Mr. Phillips --

12  or notes or thoughts or comments, how do you address those?

13  A    I start by talking to the writer, not because I want to

14  give them full control over it, just because I know that when

15  I go to the editor, they're going to ask me what the writer

16  thinks about that.  And I want to be fully prepared for that

17  meeting.

18       So I would start by having a conversation with the

19  writer, go through all the questions I had with them, and get

20  their opinion on stuff, because I know they've been working on

21  this material for a lot longer than I have.  So I respect

22  their opinion on it.

23       And then, taking all that information, my research, their

24  opinions, go in and talk to the editor and spend, often, hours

25  in there, kind of going through each of my tiny little

1    questions and suggested changes until we were both comfortable

2    with everything that we had determined.

3    Q    And was it your practice -- you had worked extensively

4    with Mr. Woods; is that fair to say?

5    A    Yes.

6    Q    And was it your practice to bring an issue to Mr. Woods,

7    have him rule on it in effect, and then you'd just passively

8    go back to implement it?

9    A    No.

10   Q    And so tell me how that interaction would work.

11   A    Sean and I had worked together for a long time.  I knew

12   that he had started as a fact-checker as well.  And he always,

13   from my first week on the job, had nothing but respect for my

14   opinions and my research.  And I very much appreciated that.

15        And so we would often spend, you know, upwards of two

16   hours sitting in his office, you know, bickering over all the

17   little details that -- you know, down to the wording of

18   sentences and where a "said" should go in a sentence or -- and

19   he would never just rule on something.  We would have

20   conversations about it and really parse things out until I

21   felt like my concerns were heard and he felt like it was, you

22   know, as accurate as it could be and, you know, still within

23   the Rolling Stone voice.

24   Q    If you ever had occasion to disagree with Mr. Woods or

25   another editor at Rolling Stone, did you have the ability to

1    elevate that concern above them?

2    A    Yes.  My boss, the head of the research department, she

3    was very much an advocate for us.  So, you know, if there was

4    anything that I was really worried about, she would -- she

5    would come in and talk to us.  And we could also escalate that

6    to the managing editor, who would sometimes get involved.

7    Q    And during your fact-checking of "A Rape on Campus," did

8    you at any time elevate a concern you had with the accuracy of

9    the article to either Coco or the managing editor?

10   A    No, I did not.

11   Q    And that was because you were comfortable with the

12   decisions that you and Mr. Woods had made concerning the

13   accuracy of the article?

14   A    Yes.

15   Q    Are you aware -- besides this fun event for you, are you

16   aware of any other lawsuits on any articles that you have

17   fact-checked while you worked at Rolling Stone?

18   A    No.

19   Q    Now, let's turn to the article and your fact-checking of

20   the article per se.  We've established that you were the

21   fact-checker on the article, and you have spoken a little bit

22   about your previous working relationship with Mr. Woods.

23       Could you make a sense of, like, how many articles you've

24   worked with Mr. Woods on fact-checking.

25   A    Yes.  Definitely dozens.  There have been many features

1  that we've worked on together.  And then also just, you know,

2  smaller -- you know, smaller -- what we call front-of-the-book

3  stuff.  That's, like, the little news items that we do, the TV

4  page, things like that.  We work together, you know, every

5  day, at least 40 hours a week.

6  Q    Had you ever worked with Sabrina Rubin Erdely in your

7  role as a fact-checker before this article?

8  A    We had worked together on one other feature that she did.

9  Q    And what was your impression of Ms. Erdely?

10 A    I was impressed by how much reporting she did on her

11 articles.  Sometimes writers are not as organized and dogged

12 as she is.  And I was really impressed by that and really

13 appreciated that, because somebody coming to you with that

14 much information and backup and interviews and who really

15 cared about the subject she was writing about, you don't

16 always encounter that with feature writers.

17 Q    And I believe with Mr. Phillips you had indicated you

18 spent approximately 80 hours fact-checking "A Rape on Campus";

19 is that correct?

20 A    Yes, that's right.

21 Q    And when you worked at Rolling Stone, did you fill out

22 time sheets for your fact-checking?

23 A    Yes, we did.

24 Q    Let me show you what has been marked as Defendants' 142.

25      Ms. Garber-Paul, can you identify the document that I've

1  put in front of you?

2  A    These are my time sheets.

3           MS. McNAMARA:  We would move these into the record,

4  please.

5           THE COURT:  67, without objection.

6  (Defendants' Trial Exhibit 67 admitted)

7  BY MS. McNAMARA:

8  Q    And are these time sheets accurate, to your knowledge?

9  A    Yes, they are.

10  Q    Now, you've undergone a lot of questions from

11  Mr. Phillips about your fact-checking of this article and very

12  specific focused moments or questions or issues that you

13  raised.

14      I would like to step back, and you can tell the jury how

15  you went about fact-checking this article, what you did, in

16  what order, as you recall.

17  A    Sure.

18      I started by reading the article, scanning through the

19  backup.  I mean, there was hundreds of pages, so I didn't sit

20  there and read it, you know, linearly.  But I read through the

21  article carefully and had a conversation with Sabrina.  And

22  started by, you know, that day, e-mailing Jackie and setting

23  up a time that we could start talking.

24      So we had started that Tuesday.  And we started by going

25  through all the details and everything that didn't have to do

1  specifically with her sexual assault.  We went through the

2  background of where she was from, who -- you know, what

3  brought her to the University of Virginia, kind of what --

4  some of the aftermath of the sexual assault, but, overall, the

5  less traumatic parts of her story.  Because I wanted her to

6  start to trust me and, you know, build a rapport with her so

7  that she didn't feel like I was jumping in and asking her

8  these really personal questions just kind of off the bat.  I

9  wanted her to get to know me a little bit too.

10  And so we did that.  And then, the following day, I just

11  spent a little bit more time with the backup and tried to kind

12  of figure out who all the people in the article were and who

13  is going to be important to talk to.  And I also really dove

14  in -- I mean, you know, the stuff we were saying about the

15  University of Virginia was very serious.  And I wanted to make

16  sure that I gave that enough attention too, to, you know, make

17  sure that I got their processes correct and went through all

18  of that information.

19  So I started looking at the questions I knew I was going

20  to ask UVa.  I had been told early on that everything should

21  go through UVa PR, which is pretty standard for when you're

22  working with a big organization like that.  They want to, you

23  know, know where everything is going.  So I thought that was

24  understandable.

25  So I started working on those questions.  And then that

1   Thursday, that's when I talked to Jackie about the sexual

2   assault itself.  And --

3   Q    And I'm going to get into that in more detail.  So you

4   don't have to go chapter and verse.

5   A    Here.  Actually, I'm going to look at my notes real

6   quick.

7         So that was -- so then I also started working with the

8   other women -- the other young women that had been going to

9   UVa, and setting up phone calls with them, because I really

10  wanted to know what her friends had to say and what the other

11  student activists on campus had to say.

12        So I set up phone calls with them and started talking

13  with them over the weekend as well, just talking to them on

14  the phone, because I know, students, sometimes it's hard to

15  pin them down in the middle of the week.  Sometimes it's hard

16  to pin them down on the weekend, too, but we managed.

17        And I also spent a long time kind of reading through

18  other accounts of similar stories that had been published, not

19  necessarily as long and as involved, but just other kind of

20  reporting that had been going on about sexual assault cases,

21  specifically on campuses.

22        In 2014, there was kind of starting to be a lot of

23  reporting on this.  And I wanted, like I said, to make sure

24  that what we were -- the conclusions we were coming to were

25  not something that -- that other publications hadn't come to

1  as well.

2  Q    Ms. Garber-Paul, you were beginning to look at, you said,

3  your notes.  And you were looking at the document that has

4  been in evidence as Plaintiff's Exhibit 153.  And I believe we

5  established yesterday that this was the first draft of the

6  article you were working on; is that correct?

7  A    Yes.  This is the article that was sent to me by Sean

8  Woods on that Monday.

9  Q    Can you explain -- if you'd look even at the first page

10  of this document, there's a lot of squiggles through each

11  line.  There's green.  There's yellow.  There's red comments.

12  I understand you liked a lot of colored pens.  Is that fair to

13  say?

14  A    It helps me kind of separate who I need to ask what.

15  Using color-coding helps me break down the article, because

16  you can't sit on the phone and, you know, read the whole

17  article to every source.  You'll never get anywhere.  So you

18  kind of have to go through and decide who you're going to ask

19  what.  And every fact-checker has their own system.  But I

20  personally find using different highlighters to correspond

21  with different sources to be helpful.

22  Q    So if you recall correctly, looking again at Plaintiff's

23  Exhibit 153, what signified something in yellow versus

24  something in green?

25  A    These are actually both signifying Jackie in this round.

1    But the yellow signified the stuff that I knew was going

2  to be a little more difficult, so I was kind of holding for a

3  second phone call.  And the green signified stuff that I

4  thought, you know, she might be able to talk about with a

5  little bit less trouble.

6    And then the orange signified stuff that I knew that I

7  could get on my own from other sources or just from, you know,

8  reading things about UVa on the internet and not from Jackie.

9  Q    And in the first paragraph on the first page of

10  Plaintiff's Exhibit 153, I note, for example, you strike

11  through with lines, horizontal lines -- rather, vertical

12  lines, "Phi Kappa Psi, Jackie."

13    What does that signify, if anything?

14  A    That signifies that those are things that I felt

15  comfortable with and we moved forward with.

16  Q    Now, yesterday, Mr. Phillips asked a number of questions

17  about comments in red that you wrote on the side.

18    Can you explain generally what comments in red on the

19  side signify to you.

20  A    These were notes that I was taking while I was on the

21  phone with Jackie.  So they're not all things that I

22  necessarily needed to change; they were just kind of notes I

23  was taking as I went, to make sure that I didn't forget

24  anything that she was telling me.

25  Q    And I believe you've already indicated that, with regard

1    to the first draft of "A Rape on Campus," you largely worked
2    with Jackie on this draft.  Is that fair to say?
3    A    Yes, that's true.
4    Q    Did you speak with other sources with regard to this
5    first draft that you can recall?
6    A    Not so much on this draft, though I did go back and talk
7    with other sources about some stuff in it and go through the
8    backup documents to help confirm some of the things in here.
9    A lot of what's in here is just what I did on the phone with
10   Jackie.  But then I would go back and kind of look at some of
11   these statements and issues again going forward through the
12   other drafts.
13   Q    And let's turn your attention to Plaintiff's Exhibit 154,
14   which is the Round 1 of the article.
15        Do you have that in front of you?
16   A    Uh-huh.
17   Q    And explain again what Round 1 means and what a galley
18   is.
19   A    Sure.  Round 1 -- a Round 1 galley is after we take this
20   very large Word document and make it fit into the layout that
21   the art department has created for it.  That's something that
22   largely happens outside of the fact-checker's domain.  That's
23   more of the job of the editor.
24        So that was something Sean, in my understanding, had
25   worked on that week to make sure that we could get -- you

1  know, compare it together and a sufficient draft of the -- the

2  draft of the story into this layout.  So this is basically a

3  markup of what we were going to be publishing in the magazine.

4  Q    If you would direct your attention to the page that's

5  Bates-stamped on the bottom RS4866 in this Round 1.

6       Do you see on this page there's a number of passages that

7  are highlighted in pink?

8  A    Yes.

9  Q    What, if anything, does that signify to you?

10 A    These are things that I wanted to ask the UVa press

11 department about.

12 Q    And so in the graph that begins, "If Dean Eramo was

13 surprised at Jackie's story," do you see that graph?

14 A    Yes.

15 Q    It indicates that "Eramo surely had one of the most

16 difficult jobs at UVa because she -- because, as the intake

17 person on behalf of the university for all sexual assault

18 complaints since 2007, it's her job to deal with the parade of

19 sobbing students trekking in and out of her office.  UVa

20 declined to make Eramo available for comment."

21      Do you see that?

22 A    Yes.

23 Q    And what did you do to fact-check that information in the

24 article?

25 A    I had a conversation with Anthony de Bruyn and a series

1   of e-mails back and forth, that I think we talked about

2   yesterday as well, talking about Dean Eramo's role in the

3   university, you know, what her official role was and kind of

4   what her involvement was with, you know, working with students

5   who came forward to say they'd been sexually assaulted.

6   Q    And did Mr. de Bruyn, on behalf of the university,

7   correct the 2007?

8   A    Yes.

9   Q    And so because he corrected and changed it to 2006,

10  that's what ultimately got published; is that right?

11  A    Yes, I believe so.

12  Q    And in your conversation with him, did he confirm that

13  UVa had declined to make Eramo available for comment?

14  A    Yes, he did.

15  Q    And when you were speaking with Mr. Phillips, I believe

16  you had indicated, but if you would please explain to me and

17  the jury, what were the ground rules set for you when you

18  began your discussions with Mr. de Bruyn from UVa?

19  A    Well, he said, because of student privacy, that he wasn't

20  going to answer any questions about -- about specific

21  students' cases.  And I understood that probably lined up with

22  student privacy policies at most universities.  He also said

23  that any questions I had about administrators or employees of

24  UVa should go through him as well.

25  Q    So based upon those ground rules, you understood that you

1  could not or should not e-mail directly Ms. Eramo, for

2  example?

3  A    Yes, that was my understanding.

4  Q    And he had already confirmed that Ms. Eramo was not

5  available for comment; isn't that right?

6  A    Yes.

7  Q    And you also understood that he was not going to answer

8  questions about specific events that involved a student

9  dealing with Dean Eramo concerning his or her sexual assault;

10 is that right?

11 A    Yes.

12 Q    Now, turn your attention to the type final, which is

13 Plaintiff's Exhibit 155, and explain, what does a "type final"

14 mean?

15 A    It's essentially a Round 2.  It's the same thing as the

16 Round 1 that we just looked at but incorporates all of my fact

17 changes, any wording changes that the writer might have

18 suggested, any edit changes that the editor might having

19 suggested.  It's supposed to be very close to what the final

20 is going to look like in the magazine.

21 Q    And I note that if you page through the type final, every

22 sentence in the article has a squiggle through it.  Is that

23 right?

24 A    That's true.

25 Q    And what does that indicate to you?

1   A    That means that I'm comfortable with it and that -- that

2   I feel that it's been sufficiently checked.

3   Q    So when you include a squiggle through a line, that is

4   you've basically signed off on that statement; is that right?

5   A    Yes.

6   Q    So all three of these drafts have a lot of squiggles, a

7   lot of comments, a lot of coloring.  Was that unusual for a

8   feature article?

9   A    Not at all.

10  Q    Now, before focusing on the passages at issue in this

11  litigation, by way of example, what did you do to fact-check

12  the information in the left column concerning expulsions at

13  UVa for honor code violations?  And that's at page 4854.

14  A    4854?  Oh, in the --

15  Q    In the left column, about three-quarters of the way down

16  in the bottom of the graph that begins, "Wahoos are enthralled

17  to be at UVa."

18  A    So this sentence that says "UVa's emphasis on honor

19  code"?

20  Q    Correct.

21  A    For this, I had -- in my conversation with the press

22  department at UVa, I had discussed this with them initially.

23  Let me -- hold on.  Let me just look at my past notes, too, to

24  make sure that I'm saying this correctly.

25       Yes.  So this is something that, you know, in my

1 conversation with Mr. de Bruyn, he -- there were some things

2 that he didn't know off the top of his head, which, again, is

3 totally normal for having a conversation with a press officer

4 at a major institution such as this.

5     So he -- we both took notes on what we needed to come

6 back to.  And this is something that he was having a hard time

7 answering.  So what I asked -- what I normally do in this --

8 in this situation, is I'd ask the writer where they found the

9 information, because I know they didn't make it up.

10     So I believe I asked Sabrina where this came from, and

11 she told me that she had found it in a video from the -- the

12 student TV station, I guess, WUVA.  So she sent me a link to

13 that.  And I watched it, and I found this same information

14 that she had told me except there was a mistake with the year.

15 It had said instead of 1993, it was, in fact, 1998.

16     But I wanted to double-check and make sure, since it was

17 a student publication, that they weren't mistaken about the

18 information they had gotten.

19     So I sent Mr. de Bruyn a link to the same video and said,

20 you know, "I found this information in this video.  Can you

21 confirm to me that this is accurate?"

22     And he said, yes, as far as he knows, that is accurate.

23     So I put -- I checked that off.  I made sure that the

24 date -- the year was correct, changed it from 1993 to 1998.

25 And in my notes I put "WUVA video, confirmed by UVa PR" so

1   that I could remember where that came from.

2   Q    Now let me show you what has already been put into

3   evidence as Plaintiff's Exhibit 115.  Are these the e-mails,

4   Ms. Garber-Paul, between you and Mr. de Bruyn at the

5   University of Virginia?

6   A    Yes, they are.

7   Q    And you note, if you turn your attention to the page

8   that's Bates-stamped RS13354, in the middle of the page, it

9   indicates that -- is this where you had just told us about

10  sending a link to the WUVA video to Mr. de Bruyn?

11  A    Yes.

12  Q    And this is where he confirmed that it was accurate that

13  there had been 183 expulsions for honor code violations since

14  1998 but zero expulsions for sexual assault?

15  A    Yes.

16  Q    And you had indicated that, in reviewing this information

17  for its factual accuracy, you had watched the WUVA video that

18  was available before the publication of the article; is that

19  right?

20  A    Yes, I had.

21  Q    And what impression, if any, did you form concerning --

22  let me back up.

23       Do you recall that Ms. Eramo appeared in a video?

24  A    Yes, she did.

25  Q    And what impression, if any, did you form concerning

1   Ms. Eramo from watching that video?

2   A    She seemed serious and concerned about the problem, and,

3   you know, she sounded like she wanted to -- she took these

4   issues very seriously.

5        It was just a small clip of her.  It wasn't a full video

6   of her.  But, you know, that's part of what I used to confirm

7   the no-nonsense statement in the article, because she did seem

8   to really have that demeanor, which I thought was appropriate

9   for an officer of the university.

10  Q    Now, you were asked a lot of questions yesterday about

11  Jackie, her credibility, your reliance or decision to not

12  obtain comment from Drew, your inability or the magazine's

13  inability to get further comment or comment from the three

14  friends.

15       So I want to step back and talk to you in more depth

16  about your interactions with Jackie and your assessment as to

17  the credibility of her and her story.

18       Now, you said that you initially had two long

19  conversations with Jackie at the beginning of your

20  fact-checking process; is that right?

21  A    Yes, that's true.

22  Q    And then you had a number of follow-up smaller

23  conversations?

24  A    Yeah.  I can't even remember how many.

25  Q    And you indicated that those initial conversations with

1   her lasted about four hours; is that right?

2   A    Yeah, they lasted about two hours each.

3   Q    And in those initial conversations, you were working with

4   the galley -- or the first draft of the article, not the

5   galley.  Is that right?

6   A    Yes, that's true.

7   Q    And she confirmed all the information surrounding her

8   background, her interactions with UVa, as well as the details

9   of her story in those conversations; is that right?

10  A    Yes.  She went through them with me in detail and

11  corrected me where I was mistaken, and -- yeah, she went

12  through them in great detail with me.

13  Q    When she confirmed the details about her sexual assault

14  with you, did she ever indicate that she didn't want those

15  details in the article?

16  A    No, never.

17  Q    Did she ever indicate or ask for the article not to

18  include the syphilis detail?  Is that right?

19  A    Yes, she did.  She asked for that to be taken out, and I

20  thought that that -- since it wasn't, you know, directly

21  pertinent to either the sexual assault or, you know, the

22  aftermath of it, that we could respect that.

23  Q    With regard to her sexual assault or any other

24  information surrounding her story, did she ask for any other

25  information to not be included in the article?

1  A     No.

2  Q     Did you perceive her, for the hours of talking to her, as

3  a willing participant in the publication of her story in the

4  article?

5  A     Yes, absolutely.

6  Q     Did you have a conversation with her about the use of her

7  name in the article?

8  A     Yes.  She said she was comfortable with us using her

9  first name in the article.

10 Q     And what, if any, confidence did that give you concerning

11 Jackie's story?

12 A     Well, I knew that she wasn't trying to, you know, hide

13 behind a fake name.  She knew that people on campus were going

14 to know who she was, and she was going to stand up and accept

15 that.  And she felt like this was an important enough story

16 and an important enough issue that she really -- she wanted

17 to, you know, let us use her first name.  She didn't

18 necessarily want to have her last name in there so that the

19 general public, the general internet, wouldn't be able to

20 track her down so easily.

21       But it was my understanding that she was totally

22 comfortable in having her peers know that she was -- she was

23 the Jackie in this article.

24 Q     And did that give you a degree of confidence in the

25 accuracy of her story?

1   A    Yes, it did.

2   Q    Now, you had a lot of questions from Mr. Phillips

3   yesterday about the attribution of Jackie's story.

4        Do you recall those?

5   A    Yes.

6   Q    And you, I believe, indicated yesterday that you believed

7   that the opening passages of the article were clearly in

8   Jackie's voice; is that correct?

9   A    Yes.

10  Q    So let's look at -- I think this may be easiest if we

11  look at the Round 1 iteration of the document and the opening

12  passages.

13       Jackie's description of the sexual assault really begins

14  in detail with the paragraph that begins "Jackie had taken two

15  hours getting ready."

16       Do you see that?

17  A    Yes.

18  Q    And do you see that in -- towards the end of that

19  paragraph, it indicates, "At that same moment she says she

20  detected movement in the room and felt someone bumping into

21  her.  Jackie began to scream."

22       Do you see that?

23  A    Yes.

24  Q    Now, attribution is -- what does that mean to you?

25  A    It means letting a reader know where information comes

1    from.

2    Q    And when you say something like "she says," does that

3    indicate to the reader that this is coming from Jackie?

4    A    Yes.

5    Q    And so in the next passage when it begins, "'Shut up,'

6    she heard a man's voice say as a body barreled into her," do

7    you see that?

8    A    Yes.

9    Q    And again, the "she heard" --

10   A    Yes.

11   Q    -- is that an indication to the reader that this is

12   coming from Jackie?

13   A    Yes, I believe it is.

14   Q    And further down in that paragraph, there is a sentence

15   that begins "For a hopeful moment."

16        Do you see that?

17   A    Yes.

18   Q    And it goes on to say, "Jackie wondered if this wasn't

19   some collegiate prank."

20        Do you see that?

21   A    Yes.

22   Q    And by indicating the "Jackie wondered," was that another

23   communication to the reader that this was Jackie's story?

24   A    Yes, I believe it is.

25   Q    And then the next paragraph begins with -- and excuse

1    me -- "'Grab its motherfucking leg,' she heard a voice say."

2         Do you see that?

3    A    Yes.

4    Q    And then the next sentence begins "She remembers every

5    moment."

6         Do you see that?

7    A    Yes.

8    Q    And then a couple sentences later it says, "She remembers

9    how the spectators swigged from beers."

10        Do you see that?

11   A    Yes.

12   Q    And then the next-to-the-last sentence says, "She

13   remembers the boys' heft."

14        Do you see that?

15   A    Yes.

16   Q    And further down in the next paragraph that begins, "When

17   Jackie came to, she was alone."

18        Do you see that paragraph?

19   A    Yes.

20   Q    About three-quarters of the way down, it indicates,

21   "Jackie recalls her friend Randall demanding.  Jackie shook

22   her head and began to cry."

23   A    Yes.

24   Q    And this is the passage, this is the segment where the

25   three friends are introduced and her interaction with them

1    immediately after she left the Phi Psi house; is that right?

2    A    Yes, it is.

3    Q    And, again, at the outset of that -- of that section, it

4    indicates that Jackie -- we're talking about what Jackie

5    recalls; is that correct?

6    A    Yes.

7    Q    And then in the next paragraph, in the second sentence,

8    it again says, "'Is that such a good idea?' she recalls."

9         Do you see that?

10   A    Yes.

11   Q    And then at the end of that paragraph it says, "Detached,

12   Jackie listened as Cindy prevailed over the group."

13        Do you see that?

14   A    Yes.

15   Q    Now, when you engage in attribution like this, is it the

16   practice, in your experience with working with hundreds of

17   articles, that you would have in every sentence the "she

18   recalls," "she says," or words to that effect?

19   A    No.

20   Q    And why would you not do that?

21   A    Because it would become very difficult for a reader to

22   get through it.

23   Q    It would be clunky?

24   A    It would -- yes, exactly.  Yeah, it would be really

25   clunky.  It would be -- it would just be really hard to read

1  if you did that every single sentence.  So you do it where you

2  think it makes the most sense so that a reader can understand

3  what's going on without you having to knock them over the head

4  with it.

5  Q    So when you get to the next passage that follows the

6  series of "she remembers," "she recalls," and that begins, you

7  know, "Jackie is worried about what might happen to her once

8  this article comes out" --

9  A    Uh-huh.

10 Q    -- in your discussion with Mr. Woods about the

11 attribution in this paragraph, do you recall what you

12 discussed on whether you believed or he believed or you

13 collectively believed that, as reading through this

14 introduction section, that readers would understand that this

15 is continuing to be largely in Jackie's voice?

16 A    You mean the section up to that says "Jackie's worried"?

17 Q    No.  The paragraph that begins "Jackie's worried."

18 A    Oh.  Yeah, we believed that this was also in her voice.

19 Some of these things, you know, are facts that I was able to

20 confirm outside of that, such as Greek life is big, you know,

21 how many people are -- participate in the undergraduate

22 community at UVa.  But other than that one sentence, really,

23 this all seemed to be directly in Jackie's voice.

24 Q    But it's fair to say that, with regard to the Ryan quote,

25 you had, as was established yesterday, had suggested that this

1  should more clearly say that this was coming from Jackie and

2  not directly from Ryan to the magazine; is that right?

3  A    Yes.

4  Q    And you and Sean agreed at the time that in context it

5  would be understood to still be coming from Jackie; is that

6  correct?

7  A    Yes.  At the time when we went to press, we absolutely

8  believed that it was clear.

9  Q    But today you feel a little differently about that

10  decision --

11  A    Yeah.

12  Q    -- is that right?

13  A    In retrospect I agree that we should have made that

14  clearer.

15  Q    Now, I want to go over a little more detail and drill

16  down as to why did you believe Jackie and her story.  Okay?

17  A    Sure.

18  Q    And part of your job as a fact-checker is to assess

19  peoples' credibility; isn't that correct?

20  A    Yes.

21  Q    I assume there's been times in your job when you've got

22  on the phone with somebody and you believed that they were

23  dissembling if not outright lying to you?

24  A    I would put it as "spinning," but, yeah, definitely.

25  Q    And when you were speaking with Jackie and you spent

1    hours with her, did you have a sense that she was spinning

2    facts?

3    A    No.  I had a sense that she was reliving one of the worst

4    moments of her life.

5    Q    And when you went through with her in great detail about

6    her sexual assault at Phi Psi as well as the other information

7    in the article, did you get a sense as to kind of her

8    credibility, her accuracy?  What was your indication of that?

9    A    Well, when I was going through -- you mean in the -- in

10   the -- the second phone call, when I was --

11   Q    You had two very long phone calls.

12   A    Yeah.

13   Q    I'm trying to get a sense from you as to what brought out

14   to you the belief that she was credible and was being accurate

15   in what she was telling you?

16   A    Well, sometimes people will just rush through phone

17   calls, just confirm everything, yes, yes, yes.  And Jackie

18   didn't do that.  She really wanted to take time to answer

19   questions.  And it wasn't just me, you know, reading things to

20   her.  That's not generally how you work through something like

21   that.

22        So I was asking her kind of open-ended questions, and she

23   was coming back to me with answers that were very similar --

24   you know, the substance was exactly the same, not necessarily

25   the wording, but the substance was exactly the same as what

1  she had gone through with Sabrina.

2      And, you know, she stopped to correct me that, you know,

3  she had done horseback riding in middle school but not really

4  in high school.  So we came up with different things to

5  replace there.

6      And she seemed to really care about getting her story

7  absolutely accurate.  She was not taking this lightly.

8      And, you know, four hours for a college student in one

9  week, that's a lot of time to take to go through something

10  that she's already spent hours talking to Sabrina with this.

11  She could just be like, you know, look at the notes.  But she

12  didn't.  She really -- she cared about making sure that I

13  understood where she was coming from.

14      And then especially when we were going through the sexual

15  assault, she -- that was a really tough thing for her.  And I

16  was asking her really hard questions about, you know, what she

17  remembered.

18      It's -- it was like she had these snapshots in her head

19  of, you know, exactly what she saw at each minute.  There were

20  360-degree memories, that it wasn't just, yeah, it was like

21  this.  She was like she was back there in that moment.

22      We had to pause a couple times for her to catch her

23  breath and regain composure so we could continue the

24  conversation.  And I offered to stop, and she said, "No, let's

25  keep going.  Let's get through this."

1    And we spent two hours talking about this awful, awful

2 moment.  And it was like she could close her eyes and tell me

3 exactly what she was seeing at every stop.

4    And it convinced me.  I trusted her.  And I believed what

5 she said.

6 Q    And would you direct your attention, Ms. Garber-Paul, to

7 the first draft of the article that you were working with.

8 And we've established this is the one you were looking at when

9 you were speaking at length with Jackie; is that right?

10 A    Yes.

11 Q    And I note that there's little changes here and there to

12 the -- to the -- to her story.  You know, like in the first

13 draft it had originally said that she didn't want to seem like

14 a goodie-goodie at one of her very first frat parties.

15    Do you see that?

16 A    Yeah.

17 Q    And you have circled on the side "it was her first."

18 A    Yeah.

19 Q    Was that the type of detail she was seeking to correct?

20 A    Yeah, exactly.

21 Q    And I believe there's an indication that, when she talks

22 about getting ready for her date with Drew, and it had said

23 two hours and it got changed to three hours.

24    Do you see all that?

25 A    Yeah.  I think that's in the next draft during one of her

1  follow-ups, but yeah -- or maybe it's -- oh, no.  There it is.

2  Q    And when a source like -- like Jackie is trying to

3  correct details like that, what, if anything, does that

4  signify to you?

5  A    It signifies that they really care about -- about

6  accuracy and about making sure that nothing is -- it signifies

7  to me that they care about the accuracy of the story and that

8  they want to participate in this process and that they care

9  enough to take time to participate in this process with me.

10 Q    If you would turn your attention to page -- of this

11 Plaintiff's 153, page RS4847.  Do you see in the bottom graph

12 there's some comments and changes?  What do you recall about

13 what Jackie was telling you here?

14 A    Sure.  I recall that, when Jackie had been talking with

15 Sabrina, she had told her that she -- essentially what is

16 originally written here, that "She badly wants to muster the

17 courage to make a formal report to UVa and fantasizes about

18 someday calling the police."

19      This was an example where she had changed her mind.  And

20 I thought that was okay and she was entitled to changing her

21 mind about how she wanted to proceed and we should give her

22 the opportunity to clarify with us, because it had been a

23 couple months since I think Sabrina and Jackie had had their

24 sit-downs.

25      And instead of wanting to go through the process with

1    UVa, she changed her mind to wanting to go through a more

2    formal court process.  So I updated this to reflect that.

3        So we changed it to -- that she -- that we wanted to file

4    criminal charges or even take the case to civil court.

5        So that's an example of sometimes when a source changes

6    their mind on something personal, that it didn't change my

7    view of her credibility that she wanted to now, instead of go

8    through UVa, go through a more formal process.  That just

9    meant that she'd probably spent the last two months thinking

10   about this quite a bit, especially in the face of knowing that

11   this article was going to come out and, you know, really,

12   really looking more at her options and whatnot.

13   Q    So this wasn't an indication that Sabrina had gotten it

14   wrong.  As I understand your testimony, it was an indication

15   that Jackie had evolved in her thinking on how she wanted to

16   pursue possible charges concerning her sexual assault; is that

17   right?

18   A    Yeah.  And that's something that happens in the

19   fact-checking process.  It's -- you know, often, it's a bit of

20   time, you know, either -- several weeks between when a

21   reporter talks to someone and when I talk to someone.

22       So sometimes their thinking changes.  And that doesn't

23   mean that they're lying to us about something; that just means

24   that, you know, she's a 20-year-old girl who changed her mind.

25   Q    During the hours of conversation that you had with

1  Jackie, did you have an impression that she felt pressured to

2  cooperate with the fact-checking process?

3  A    No.  She was very willing.

4  Q    And did she appear to -- did she try to cut the process

5  short?  Did it appear that she was very much involved in it?

6  A    She was very involved.  I mean, I'm sure my phone calls

7  got a little annoying towards the end of the process, but that

8  happens to most subjects.

9  Q    Did she ever tell you, during all of your conversations

10  with her, that she wanted to back out of the story?

11  A    Never.

12  Q    Or that she didn't want the details of her sexual assault

13  to be included in the article?

14  A    She never said that to me.

15  Q    I mean, to the contrary, you went over in meticulous

16  detail every one of those horrific details in her sexual

17  assault; isn't that right?

18  A    Yeah.

19  Q    And the only detail she asked to be removed was the

20  reference to syphilis; is that correct?

21  A    Yes, that's correct.

22  Q    When you spoke with Jackie -- let me back up.

23      Before speaking with Jackie, I gather you had sat down

24  and read Sabrina's interviews with her; is that right?

25  A    Yes, I had gone through them.

Eramo v. Rolling Stone, et al., 10-25-16, Vol 1

1  Q    And when you spoke with Jackie then, did you largely find

2  her story to be consistent with Sabrina's notes?

3  A    Yes.

4  Q    And when you were speaking with Jackie for all these

5  hours, did you consider her motivation in talking with Rolling

6  Stone and having her article --

7  A    Yes, of course I did.

8  Q    And do you often consider motivations of sources?

9  A    When it's something this personal or painful, absolutely.

10 Q    Did you ever get a sense that she wanted retribution

11 against her attackers, that that was the motivation?

12 A    No.  She wouldn't name them to us, so I couldn't imagine

13 that that was her motivation for this.

14 Q    Did you get any kind of sense that she wanted fame or

15 something like that?

16 A    No.  She -- most people around campus had seen -- already

17 had heard her story.  She had not been quiet about it.  She

18 had spoken out about it at Take Back the Night.  And, like I

19 said, her using her first name did mean that people around

20 campus would know that this was her story, but by not using

21 her last name, it seemed to give her enough anonymity that, as

22 far as her, you know, fame went in a larger sense, this wasn't

23 going to give her any of that.

24 Q    And with regard to Ms. Eramo, did you have a sense from

25 speaking with Jackie how she felt about Ms. Eramo?

1  A    I did.  She respected her deeply.

2  Q    And, in fact, she had told you that she considered her to

3  be an asset to the community, amongst other things; isn't that

4  right?

5  A    Yes.  And a mother figure and a mentor figure and someone

6  she really respected on campus.

7  Q    And so if you'd look at the Plaintiff's Exhibit 154,

8  which is Round 1, do you see at the bottom of the first page

9  you have a quote, "an asset to the community"?

10 A    Yes.

11 Q    Was that a note that you made in your conversation with

12 Jackie?

13 A    I think that it had actually been in a previous

14 conversation.  I had written it on the front there because I

15 knew I wanted to figure out a place we could incorporate it.

16 And so it was kind of a note to myself to -- you know, big on

17 the front page, note to myself to make sure we figured out a

18 place we could put it.

19 Q    And did you, in fact, add it to the article or see that

20 it was added?

21 A    Yes.  In consultation with Sean, we figured out the place

22 where it would work the best, and we added it.

23 Q    Given her expressed warm feelings toward Ms. Eramo, did

24 you have any reason to believe that she would misquote

25 Ms. Eramo or say something that -- or lie about Ms. Eramo?

1   A     None at all.

2   Q     Now, you also obtained a number of documents which

3   corroborated many aspects of Jackie's story; is that fair to

4   say?

5   A     Yes, it is.

6   Q     And Sabrina had already supplied you with some of these

7   documents.  And in the course of your fact-checking the

8   article, you obtained additional documents; is that right?

9   A     Yes, that's true.

10  Q     Amongst the documents you had were the e-mails between

11  Jackie and Ms. Eramo; is that correct?

12  A     Yes.

13  Q     And how did -- let me show you Plaintiff's Exhibit 13,

14  which is an e-mail chain.  Alison will help you.

15        These binders are --

16  A     You said Number 13?

17  Q     Yes.

18  A     Can you repeat your question?

19  Q     I didn't have one.  But once you get to the document, I

20  will ask you.

21        I mean, what I'm going to -- and why I want you to have

22  the document in front of you -- is what I want to ask you is,

23  how did this e-mail chain between Ms. Eramo and Jackie help to

24  corroborate your sense of the accuracy of her overall story?

25  A     Let me just look through it real quick.

1        Well, there were a few things that this corroborated for
2   me.  First, she had had conversations with Dean Eramo and
3   meetings with her as referenced in here.  It also backed up
4   the timeline that she talked about, that she'd spent, you
5   know, the fall and spring being depressed and not being as
6   good a student as she wanted to be.

7        This -- also, in our conversation, she had said that she
8   had had a meeting with a different dean who had referred her
9   to Dean Eramo.  And this, you know, says in here that, you
10  know, she met with Dean Lyons, and he referred her to her.  So
11  that backed up that part of her story.

12       And, you know, it also confirmed to me that -- that
13  Dean Eramo had offered different possibilities, options, for
14  her, and that she was not going to press her one way or
15  another, that she was going to let Jackie make the decision
16  about how she wanted to move forward.

17       It also showed me that she had told Dean Eramo initially
18  that it was an assault by multiple men.  She says, "I'm happy
19  to assist you if you would like to hold these men
20  accountable."  So I knew that she had told her that it had
21  been multiple men.

22       And then it also helped me establish kind of what their
23  rapport, what their relationship kind of looked like.  They
24  were very kind to each other.  Jackie seems to be -- you know,
25  Dean Eramo seems to be following up with her, and Jackie is

1  responding as quick as she can.  And they seem to have a good

2  working relationship and are respectful of each other.

3  Q    Now, going back to the paragraph that includes the

4  reference to involving multiple men, that was on 18284 to the

5  paragraph that begins "Thanks, too, for sharing what

6  happened" --

7  A    Yes.

8  Q    -- "with me."

9       Now, you've already indicated that the fact that the

10  documentation verified that she had reported a sexual assault

11  involving multiple men was an important fact for you; is that

12  correct?

13  A    Yes, it was.

14  Q    There's been testimony in this litigation -- oh, and let

15  me back up.

16      That quote from this paragraph about that she would be

17  happy to assist you with filing a report or a complaint, if

18  you decide at some point that you would like to hold these men

19  accountable, that got quoted in the article; is that right?

20  A    Yes, it was.

21  Q    And so you verified that it was, in fact, a response of

22  Ms. Eramo to Jackie when she reported her sexual assault; is

23  that correct?

24  A    Yes.

25  Q    And did it indicate to you that Ms. Eramo was willing and

1    prepared -- indeed, was happy -- to assist Jackie if she

2    wanted to pursue her claims?  Is that right?

3    A    Yes.

4    Q    Now, there's been some testimony in this litigation

5    that -- if you'd go up further in that paragraph, where it

6    indicates that -- where she says, "I understand and respect

7    your wishes not to report this matter further to the

8    authorities or through the sexual misconduct policy here on

9    grounds, but I do want you to continue to consider these

10   options."

11        Do you see that?

12   A    Yes, I do.

13   Q    Did that sentence help to confirm the fact that

14   Dean Eramo and UVa emphasized the wishes of the student in how

15   they wanted to proceed?

16   A    Yes, it did.

17   Q    And the language in that sentence, when it says, "but I

18   do want you to continue to consider these options," do you see

19   that language?

20   A    Yes.

21   Q    That language was not quoted in the article.  Do you

22   recall that?

23   A    Yes.  Okay.  Yes.

24   Q    Did you see that language as somehow being inconsistent

25   or different than the language about "be happy to assist you

1  with filing a report or a complaint if you want to hold these

2  men accountable"?

3  A    No.

4  Q    Were there other e-mails between Jackie and Ms. Eramo

5  that helped to corroborate Jackie's story?

6  A    I believe there were.

7  Q    If you'd direct your attention to Plaintiff's Exhibit 18.

8       And these are the e-mails that span between April and May

9  of 2014; is that right?

10  A    Yes.

11  Q    And did these e-mails help to corroborate that Jackie had

12  also reported to Dean Eramo that she had been physically

13  assaulted by a bottle -- by some young men who had thrown a

14  bottle at her on The Corner in Charlottesville?

15  A    Yes.  This was part of what corroborated her story, and

16  that does.

17  Q    And did these e-mails -- and you can look through them --

18  also confirm that Jackie had refused to take any action at

19  that time?  Is that right?

20  A    Yes.

21  Q    And you knew from these e-mails that Jackie had spoken

22  with the police about the bottle incident; is that correct?

23  A    Yes.

24  Q    In looking through this e-mail chain between Jackie and

25  Dean Eramo, is there any reference to her speaking with the

1  police about a sexual assault?

2  A    No.

3  Q    And if you scroll down to the page that is RS17033, the

4  paragraph that begins, "Thanks for coming in today."

5  A    Yes.

6  Q    Do you see that Ms. Eramo is suggesting that it may be

7  worth it to at least have them check the video on The Corner?

8       Do you see that?

9  A    Yes.

10 Q    And you understood that to be a reference to checking or

11 verifying or doing a further investigation of the bottle

12 incident; is that right?

13 A    Yes.  She had told us that the bottle incident had

14 happened on The Corner, and this helped confirm that to me.

15 Q    And she goes on to say, "If we can get good video and

16 check photos of them from the FSL rosters, we might be able to

17 find them."

18      Is that correct?

19 A    Yes.

20 Q    And, again, that was a reference, you understood, to the

21 bottle incident, correct?

22 A    Yes, exactly.

23 Q    But then, towards the end of this e-mail, she says,

24 "Never forget, however, that it is YOUR choice."  And "YOUR"

25 is in all caps.

1      Do you see that?

2  A    Yes.

3  Q    And was that further confirmation that Ms. Eramo was

4  emphasizing to Jackie that it was her choice on how to

5  proceed?

6  A    Yes, it was.

7  Q    And that UVa was following the policy of victim choice;

8  is that correct?

9  A    Yes.  That's what that confirmed.

10  Q    And do you recall that in your back-and-forth with

11  Anthony de Bruyn at UVa he also confirmed that UVa followed a

12  policy of victim choice; is that right?

13  A    Yes, that's true.

14  Q    Now, you obtained further corroborating documents

15  concerning the bottle incident; is that fair to say?

16  A    That is true.

17  Q    And that included photos from Jackie?

18  A    Yes.  We received -- I had received three photos from

19  Sabrina that had been given to her from Jackie.

20  Q    And did that help to confirm in your mind that the bottle

21  incident had indeed occurred?

22  A    Yes.  It was less that it had occurred and more that, you

23  know, the laceration on her face was consistent with what she

24  had described and also what was said in other parts of the

25  backup.

1  Q    And the article reports that when she met with Dean Eramo

2  after the bottle incident, that she had a bruised mottling on

3  her face; isn't that correct?

4  A    Yes.

5  Q    So that was a means of you to corroborate the accuracy of

6  that information; is that right?

7  A    Yes, that's true.

8  Q    And this is -- you know, pulling the lens back a little

9  bit, all these documents were helping to corroborate Jackie's

10 credibility in your mind; is that right?

11 A    Yes, exactly.

12 Q    You obtained from Sabrina further corroboration regarding

13 the bottle incident; is that correct?

14 A    Yes.  We had a letter from the police.

15 Q    And let's have you look at Plaintiff's Exhibit 87.

16      Is this the letter that Sabrina had obtained from the

17 police concerning Jackie's report, her criminal report, of the

18 bottle incident?

19 A    Yes, it is.

20 Q    And this was part of your fact-checking file?

21 A    Yes, it was.

22 Q    And something that you considered in verifying and

23 corroborating Jackie's story?

24 A    Yes, absolutely.  She had told us it had happened on this

25 date, and this confirmed that.  She had told us that it had

1    happened on The Corner.  And by googling this address -- and I

2    had become somewhat familiar with the layout of

3    Charlottesville through my fact-checking -- this seemed to

4    confirm that as well.  So, yeah.

5    Q    And the fact that this was an official document from the

6    Charlottesville police, did that carry significant weight to

7    you in your mind?

8    A    Yes, absolutely.

9    Q    And did this document from the Charlottesville police in

10   any way indicate that she was reporting her sexual -- or had

11   reported her sexual assault to the Charlottesville police?

12   A    No.  This confirmed to me that she had reported an

13   aggravated assault to the Charlottesville police, something

14   that had taken place in 2014, which was two years after when

15   this alleged rape would have taken place and something that

16   happened in public, on the street, on this block.

17   Q    Now, you're aware that the article does not include a

18   reference to the fact that Jackie spoke to the police about

19   the bottle incident; is that right?

20   A    Yes, that's true.

21   Q    Were you concerned that that was a reference that should

22   have been included in the article?

23   A    No.  I was comfortable with it as written.

24   Q    Why did you not believe that the article should have made

25   some reference to the fact that Jackie had gone to the police

1    with Dean Eramo or the police came in to see her with

2    Dean Eramo concerning the bottle incident?

3    A    Well, mostly because it was concerning an aggravated

4    assault and not a sexual assault.  This was concerning a

5    completely different incident and was not concerning the

6    alleged gang rape.  Also that there had been no action as a

7    result of this, that seemed like it was okay to not include it

8    in the article.

9    Q    And it's fair to say it was a dead end; is that correct?

10   A    Yes.

11   Q    And it was -- but it was another example, as you

12   understood from the e-mails between Ms. Eramo and Jackie, of

13   Ms. Eramo honoring Jackie's choice not to move forward?

14   A    Yes, it was.

15   Q    I mean, she had emphasized that, with all caps, about

16   "YOUR choice"; isn't that right?

17   A    Yes.  It says that "it is YOUR choice."

18   Q    And you obtained some other documents that helped to

19   corroborate some of the details concerning Jackie's story.  Do

20   you recall that?

21   A    Yes.

22   Q    And those included e-mails from Jackie verifying that she

23   had worked at the UVa pool in September of 2012; is that

24   correct?

25   A    Yes.  We received those e-mails.

1  Q    And in her story to you and to Sabrina had indicated that

2  she met Drew -- they were both lifeguards at the UVa pool?

3  A    Yes.

4  Q    Is that correct?

5  A    Yes, it is.

6  Q    So the fact that she was able to verify that she was

7  working at the UVa pool in September 2012, that, in your mind,

8  helped to verify the accuracy of the overall story; is that

9  right?

10  A    Yes, that's true.

11  Q    Let me show you, just so we can see this, Defendants'

12  Trial Exhibit 22.

13  A    Oh, is this a different book?

14  Q    Yes, defendants' is a different binder.

15            MS. McNAMARA:   Thanks, Alison.

16  BY MS. McNAMARA:

17  Q    You're not the first witness to be burdened with having

18  to go through all these documents.

19  A    Yes, I see it.

20  Q    Now, this was an e-mail chain -- you could see that

21  Sabrina forwarded this e-mail chain on November 6 to you.

22        Do you see that?

23  A    Yes.

24  Q    And this was in the midst of your fact-checking of the

25  article; is that correct?

1    A    Yes.  This was four days in.

2    Q    And if you go down the e-mail chain, you can see that

3    what she had forwarded was a September 12, 2012, e-mail from

4    someone at UVa about her federal tax form and direct deposit,

5    and it was being sent to "UVa-lifeguards at Virginia.edu."

6         Do you see that?

7    A    Yes.

8    Q    And did this help to inform your conclusion that Jackie

9    was, in fact, working at the UVa pool in September 2012 when

10   she met Drew?

11   A    Yes.  This seemed to me that she had been one of the UVa

12   lifeguards.

13   Q    And Jackie provided other corroborating documents

14   concerning elements of her story; is that right?

15   A    Yes, she did.

16   Q    She had sent -- she had indicated in her story that, when

17   she came back to school in January 2013 or thereabouts, she

18   was suffering some depression and that she had sought help

19   from the -- sought mental health counseling from the

20   university; is that right?

21   A    Yes.

22   Q    And she provided documentation to corroborate that fact,

23   did she not?

24   A    Yes, she did.

25   Q    And that was Defendants' Trial Exhibit 10, if you want to

1    look at that.

2    A    Yes.

3    Q    If you scan down this document, I'd like to get the

4    signature.  This is a document from someone at

5    Eservices.Virginia.edu, Ashley Foresman?

6    A    Uh-huh.

7    Q    And this was February 27, 2013.

8         Do you see that?

9    A    Yes.

10   Q    And do you see that the signature for Dr. Foresman, I

11   believe, is a resident in psychology?

12   A    Yes.

13   Q    And so did this confirm in your mind that, as Jackie had

14   told you and had told Sabrina, that when she came back to

15   school in early 2013, she had sought counseling concerning her

16   depression?

17   A    Yes, it did.

18   Q    And you had that fact independently confirmed from Rachel

19   Soltis as well; is that correct?

20   A    Yes.

21   Q    Now, so that we keep all these young women straight,

22   Rachel Soltis was one of Jackie's first-year roommates; is

23   that right?

24   A    Yes.  They had lived together the first year.

25   Q    And so she was someone who was interacting with Jackie

1  contemporaneous with the events that feature at the beginning

2  of the article; is that right?

3  A    Yes.  She told me about how she saw Jackie's depression

4  in the months after the gang rape.

5  Q    And did she also tell you that that depression was in

6  stark contrast from the Jackie she knew at the beginning of

7  the school year?

8  A    Yes.  The Jackie she knew at the beginning of the year

9  was much more outgoing, much more willing to go out and meet

10 people, hang out, be part of campus life.  And then there was

11 a quick and drastic turn.

12 Q    And Jackie had indicated that there was a period of time

13 after the assault where she largely just slept in her room; is

14 that right?

15 A    Yes.

16 Q    And Rachel confirmed that independently, did she not?

17 A    Yes, she did.

18 Q    And she also had confirmed that Jackie became depressed

19 after the winter break in 2012-2013; is that right?

20 A    Yes.

21 Q    And did you find Rachel Soltis to be a credible person

22 when you spoke with her?

23 A    Yes, absolutely.

24 Q    Did you consider the fact that Jackie had become

25 depressed as a result of a gang rape to be -- to make her

1  somehow less credible when you were speaking with her?

2  A    No, absolutely not.

3  Q    Or the fact that she was taking antidepressants, did that

4  make you believe that she was not a credible source relating

5  to her sexual assault?

6  A    No.  I thought that made her strong to try to seek help.

7  Q    Now, you also obtained -- in the course of your

8  fact-checking process, you obtained documentation or text

9  messages from two of the other alleged gang rape victims,

10 Maddie and Christine.

11      Do you recall that?

12 A    Yes.  I believe Christine was a friend of Maddie's.

13 Q    Okay.  So Christine was not a victim?

14 A    Yes.

15 Q    The other victim, her name was Pixie; is that right?

16 A    Pixie?

17 Q    Yes.

18 A    Okay.

19 Q    I'm asking you.

20 A    I thought it was Becky.

21 Q    Okay.  I'm sorry.  I think you're correct.

22 A    Yeah.

23 Q    And what, if anything, did those text messages

24 corroborate for you in the course of the fact-checking?

25 A    They corroborated the existence of the other alleged gang

1    rape victims that Jackie had been told about in confidence.

2        They also corroborated the kind of reaction that Jackie

3    had described from fellow students after telling -- after

4    talking about her gang rape.

5    Q    Let's look at Defendants' Exhibit 24, which are the text

6    messages between Jackie and Maddie.

7            MS. McNAMARA:  Now, going back to the first page

8    just for a moment, Scott.

9    BY MS. McNAMARA:

10   Q    This indicates that Sabrina sent you these text messages

11   on November 6, 2014.  Is that right?

12   A    Yes.

13   Q    And that was in the middle of your fact-checking process;

14   is that fair to say?  Or early on, actually.

15   A    Four days in, so...

16   Q    And if you scroll to the page that is Bates-stamped

17   19663, did you understand these to be images that were copied

18   of these text messages?

19   A    I understood these to be screenshots that had been sent

20   to Sabrina from Jackie's phone.

21   Q    In your experiences, are you able to forward text

22   messages?

23   A    In my experience -- I'm not that tech savvy, but I would

24   take a screenshot of it on the phone and then forward it that

25   way.

1    Q    That was the way you would forward --

2    A    Yes.

3    Q    You couldn't automatically press -- there wasn't an

4    option to press "forward" to forward the actual messages to

5    someone; is that right?

6    A    Not that I'm aware of.

7    Q    In these text messages, they seem to start in the middle

8    of a conversation.  Is that your impression?

9    A    Yes.

10   Q    It's saying, "He's all right.  Pretty boring stuff."  And

11   then the question is introduced, "So have you given any

12   thought to talking to Sabrina or Dean Eramo lately?"

13        Do you see that?

14   A    Yes.

15   Q    And Jackie is encouraging, in these text messages, that

16   you need to talk about it, referring to Maddie's rape?

17   A    Yes.

18   Q    This is on 19664?

19   A    Yes, that's what I understood these to be.

20   Q    And what kind of response did these text messages

21   indicate Maddie communicated to Jackie?

22   A    She did not seem to be supportive of either -- she did

23   not seem to want to go forward herself, and she did not want

24   to -- she thought Jackie was doing it so that people would

25   feel bad for her, which seemed to line up with what Jackie had

1  told Sabrina and told me about the response she had gotten

2  from her -- from fellow students.

3  Q    And so is it fair to say that these text messages helped

4  to confirm, in your mind, the general sense that a number of

5  victims did not want to report their sexual assaults to UVa?

6  A    Yes.

7  Q    And did it also confirm in your mind that UVa students

8  did not think it was a good idea to speak to a reporter for a

9  national magazine?  Is that right?

10  A    Yes, it did.

11  Q    So, in that way, it was consistent with Ryan's comments

12  about the shitshow; isn't that correct?

13  A    Yes, it was.

14  Q    And so, in that way, it was corroborative to you, in your

15  mind, as to the accuracy of Jackie's report that Ryan had

16  communicated he didn't want to be involved in her shitshow?

17  A    Yes.

18  Q    Did you ever consider that these text messages were

19  fabricated or not accurate?

20  A    No.

21  Q    You believed them to be entirely accurate; isn't that

22  right?

23  A    Absolutely.

24  Q    And they were corroborative of your story; isn't that

25  right?

1    A    Yes, they were.

2    Q    And you also received text messages between Jackie and

3    Christine.  Do you recall that?

4    A    Yes, I did.

5    Q    And that's Defendants' Exhibit 23.  Do you have that in

6    front of you?

7    A    Yes.

8    Q    And Sabrina had forwarded these messages to you and Sean

9    as well; is that right?

10   A    Yes, she did.

11   Q    It was on the same day, November 6?

12   A    Yes, and three minutes later.

13   Q    And these messages from Christine were similarly harsh to

14   Jackie; is that correct?

15   A    Yes, they were.

16   Q    And so was this further corroboration to the idea that

17   UVa students didn't think it was a good idea for Jackie to be

18   speaking to a national magazine?

19   A    Yes.

20   Q    Now, yesterday Mr. Phillips had suggested that, because

21   you didn't speak with Maddie or Becky, that you had no reason

22   to believe that they were two other gang rape allegations at

23   Phi Psi.

24        Do you remember that?

25   A    Yes, I do.

1  Q    But, in fact, you were aware of a number of factors that

2  helped to corroborate that there had been two other gang rape

3  allegations made against or alleged to have occurred at

4  Phi Psi; is that right?

5  A    Yes, that's true.

6  Q    And that begins with Emily Renda.  She had told

7  Sabrina --

8       And you spoke to Emily Renda directly, did you not?

9  A    Yes, I did.

10 Q    -- that at the outset, before even speaking with Jackie,

11 she had indicated that UVa was aware that two other young

12 women with similar Phi Psi stories, that the university was

13 aware of that; is that correct?

14 A    Yes.

15 Q    And that the university was trying to bring those young

16 women forward?

17 A    That was my understanding, yes.

18 Q    And it was your understanding that Ms. Eramo was aware of

19 that as well; is that correct?

20 A    Yes.

21 Q    And that helped to corroborate that, in fact, these two

22 other allegations of gang rape at Phi Psi, that that was

23 accurate; isn't that correct?

24 A    Yes, that's true.

25 Q    And that you also were aware, were you not, that Sabrina

1  had interviewed President Sullivan in connection with her

2  reporting; is that right?

3  A    Yes.  I had the transcript of that.

4  Q    And you -- and in that interview, Sabrina had asked about

5  three allegations of gang rape at Phi Kappa Psi.

6       Do you recall that?

7  A    Yes, she had.

8  Q    And, specifically, she had said that three allegations of

9  gang rape had been brought to Dean Eramo; is that right?

10 A    Yes.

11 Q    And in response to Judge Conrad's question yesterday, you

12 confirmed that you reviewed that transcript; is that correct?

13 A    Yes, I did.

14 Q    And so by reviewing that transcript, you were able to

15 confirm that UVa was aware that three separate allegations of

16 gang rape had been made to Dean Eramo; is that right?

17           MR. PHILLIPS:  Objection.  That mischaracterizes the

18 record.  It's just not true.  They all came from the same

19 person, Jackie.  There were not three separate allegations of

20 gang rape.  And I object to the wording of that question.

21           MS. McNAMARA:  Let me rephrase it, Your Honor.

22           THE COURT:  Yes, ma'am.  Thank you.

23 BY MS. McNAMARA:

24 Q    You were aware from reviewing President Sullivan's

25 interview that Sabrina had indicated to her that three

1    allegations of gang rape were brought to Dean Eramo; is that

2    right?

3    A    Yes.

4    Q    And did this further corroborate the fact that you

5    believed that there had been two additional allegations of

6    gang rape beyond Jackie's story?

7    A    Yes, that was my understanding.

8    Q    And it was your understanding that, after the interview

9    with President Sullivan, that Mr. de Bruyn had gone back to

10   Sabrina and tried to correct some information with regard to

11   Stacy's story.

12        Are you familiar with that?

13   A    Yes.

14   Q    And that was, in fact, corrected before the article went

15   to press; isn't that right?

16   A    Yes.  It was my understanding that there was a confusion

17   about part of the process of expulsions on campus.

18   Q    And you spoke to Stacy, did you not?

19   A    Yes, I did.

20   Q    And you confirmed her story directly with her; is that

21   correct?

22   A    Yes, I did.

23   Q    And the entire description of Stacy's story, including

24   the fact that she felt discouraged by the dean of students

25   office, you confirmed that directly with Stacy; is that

1  correct?

2  A    That came directly from the woman we called Stacy, yes.

3  Q    And at no time did you become aware that Mr. de Bruyn or

4  anybody else at UVa had gone back to Sabrina or spoken

5  directly to you to correct the fact that they were aware of

6  three allegations of gang rape, similar allegation also of

7  gang rape, at Phi Psi; isn't that right?

8  A    Yes, that's true.

9  Q    And you also were aware that Sabrina had gone to Phi Psi

10  national to raise the issue about these allegations; is that

11  correct?

12  A    Yes.

13  Q    And that Phi Psi national did not dispute that they were

14  made aware of multiple allegations of gang rape at the

15  fraternity; is that right?

16  A    That's correct.

17  Q    And the article included Phi Psi's response; is that

18  correct?

19  A    Yes, it did.

20  Q    Let's look at the published article at page 1079.

21          MS. McNAMARA:  And that's Plaintiff's Exhibit 1,

22  Scott.

23  BY MS. McNAMARA:

24  Q    Do you see the top paragraph in the -- on this page in

25  the middle?

1   A    Yes.

2   Q    It begins by saying that "UVa at last placed Phi Psi

3   under investigation."

4        Do you see that?

5   A    Yes, I do.

6   Q    And the confirmation from President Sullivan that "We do

7   have the fraternity under investigation"?

8   A    Yes.

9   Q    And you confirmed that quote from the transcript with

10  President Sullivan; is that right?

11  A    Yes, I did.

12  Q    And then it goes on to say that "Phi Kappa Psi national

13  executive director, Shawn Collinsworth, says that UVa indeed

14  notified him of sexual assault allegations."

15       Do you see that?

16  A    Yes.

17  Q    And it was -- and the notification concerned the plural;

18  is that right?

19  A    Yes, it does.

20  Q    And he confirmed that the national fraternity had

21  immediately dispatched a representative to meet with the

22  chapter.

23       Do you see that?

24  A    Yes.

25  Q    And then Sabrina had also had an e-mail exchange with

1    Steve Scipione, the UVa local chapter president.

2        Are you aware of that?

3    A    Yes, she had.

4    Q    And you had that e-mail exchange in your fact-checking

5    file; is that correct?

6    A    Yes, that's true, I did.

7    Q    And Mr. Scipione recalls being told only of a vague

8    anonymous fourth-hand allegation of a sexual assault during a

9    party.

10       Do you see that?

11   A    Yes.  That seemed to accurately represent that e-mail.

12   Q    And he goes on and is quoted in the article saying, "We

13   were not told that it was a rape but rather that something of

14   a sexual nature took place," he wrote to Rolling Stone in an

15   e-mail.  Is that correct?

16   A    Yes.

17   Q    And we go on to also quote that Mr. Collinsworth says

18   that "The paucity of information, we have no evidence to

19   substantiate the alleged assaults."  Is that correct?

20   A    Yes, we have that right there.

21   Q    So did you feel at the time you were fact-checking the

22   article that we had allowed Phi Psi, both national and local,

23   to voice their responses and views to the allegations in the

24   article?

25   A    Yes, I did.

1   Q    And in your questioning from Mr. Phillips, I believe

2   there was some reference to the fact that you didn't

3   independently go to Phi Psi to corroborate these denials.  Is

4   that right?

5   A    Yes, that's true.

6   Q    Was it your practice, when a reporter had obtained a

7   denial from a person or an entity like this, would you

8   independently go back and get a second denial or go back to

9   check that with the organization?

10  A    Not if I was satisfied with the denial that the reporter

11  had obtained.

12  Q    And here, were you satisfied that these denials were

13  accurately included in the article?

14  A    Yes, I was.

15  Q    Now, did the fact that UVa --

16          THE COURT:  Ms. McNamara, at some point I think we

17  need to take a short break.  Is this a transition point?

18  Sounds like it might be.

19          MS. McNAMARA:  Absolutely.  I'm moving to something

20  else.  So perfect.  Thank you.

21          THE COURT:  So, ladies and gentlemen, we'll take our

22  first midmorning break.  I would ask that, while you're away

23  from us, you do not discuss the case with one another, do not

24  permit anyone to discuss it with you.

25          I'll ask the witness not to discuss her pending

1    testimony with counsel from either side.

2            Let's plan to return at ten till 10.

3            Ask the marshal to declare court in recess.

4    (Recess)

5    (Jury in)

6    (Open court as follows:)

7            THE COURT:  Report that all ten jurors are back and

8    in their places, ready for the continuation of

9    cross-examination of this witness.

10   BY MS. McNAMARA:

11   Q    Ms. Garber-Paul, in the course of fact-checking the

12   article, did you learn how Sabrina had been connected to

13   Jackie?

14   A    Yes.  In the course of fact-checking, I learned that

15   Sabrina had been introduced to Jackie by Emily Renda.

16   Q    And did you understand at that time that Emily Renda

17   worked for UVa?

18   A    Yes, I did.

19   Q    Was that -- did that inform your understanding as to

20   Jackie's credibility in any way?

21   A    Yes.  I understood that Emily had believed in Jackie's

22   story enough to introduce her to a reporter from a national

23   magazine.

24   Q    Did you -- in your experience, when someone gets

25   introduced to speak to a national magazine and they're

1    introduced and put forward by an institution, does that help

2    to inform your assessment of the credibility of that source?

3              MR. PHILLIPS:  Objection.  Foundation.  I think she

4    needs to lay a little more for that kind of a broad

5    conclusion.

6              MS. McNAMARA:  I'll do that.  Thank you.

7    BY MS. McNAMARA:

8    Q    So you've indicated that Emily Renda had referred Jackie

9    to Sabrina; is that right?

10   A    Yes, she did.

11   Q    And you understood that she was working for UVa at the

12   time; is that right?

13   A    Yes.

14   Q    And did you have an understanding that UVa was aware that

15   Jackie had been referred to Sabrina and Rolling Stone?

16   A    Well, I knew that Emily had referred her.  And Emily,

17   being an employee, I understood that she probably wouldn't

18   have referred her if she hadn't believed her deeply.

19   Q    And did you understand that -- from reviewing the notes

20   and speaking with Ms. Renda, that Dean Eramo had -- was aware

21   of the referral and the fact that Jackie was speaking to

22   Rolling Stone?

23   A    Yes, I understood that Dean Eramo did know that Jackie

24   was speaking with Rolling Stone.

25   Q    So did the fact that UVa was aware of the fact that

1  Jackie was speaking to Rolling Stone and that a UVa employee
2  had referred Jackie to Rolling Stone, did that help to inform
3  your assessment of Jackie's credibility?
4  A    Yes, it did.  It lent to her credibility, in my mind.
5  Q    Now, I just mentioned Emily Renda, and you, of course,
6  had spoken with her.  Did you also become aware, in the course
7  of your fact-checking process, that she had testified before
8  Congress?
9  A    Yes.  I was given a copy of her testimony as part of my
10  backup from Sabrina.
11  Q    And did you review that testimony in the course of your
12  fact-checking?
13  A    Yes, I did.
14  Q    And as a fact-checker, when you receive documents that
15  are part of the congressional record or a trial record, does
16  that carry any added weight as to the credibility of that
17  information?
18  A    Yes, it does.
19  Q    Did you understand that Ms. Renda was testifying under
20  oath?
21  A    That was my understanding, yes.
22  Q    And did you understand that Ms. Renda included a
23  reference to Jackie's story in her congressional testimony?
24  A    Yes, she did.  She included a reference to the assault
25  and then also to the aftermath and the treatment by her fellow

1  students.

2  Q    And so did you find Ms. Renda's testimony to be

3  corroborative of Jackie's story?

4  A    Yes, I did.

5  Q    And in her testimony, she referred to Jackie's assault as

6  a gang rape, did she not?

7  A    Yes, she did.

8  Q    And she had also referred to the fact that the assault

9  occurred at a fraternity; is that correct?

10  A    Yes, she did.

11  Q    And she had also -- and I think this was noted by

12  Mr. Phillips yesterday -- had referenced that the assault

13  involved five men rather than seven men; is that correct?

14  A    Yes.

15  Q    Did that cause you any concern in your mind as to the

16  accuracy of Jackie's story?

17  A    No, because when I spoke with Jackie, who was the only

18  individual we had who had been in a room, she clarified for me

19  that it was seven men.

20  Q    Did you ask her about the discrepancy with Emily Renda's

21  testimony?

22  A    I asked her how many men it was.  I don't believe I would

23  have referred to it as a discrepancy in our conversation where

24  I was asking her for very personal details.  But I did have

25  her go through with me in detail how many men there were in

1  that room.

2  Q    And in the course of your fact-checking of the article,

3  did you also become aware that the university had informed

4  Phi Psi of Jackie's allegations?

5  A    Yes, that was my understanding.

6  Q    And did you also become aware that Dean Eramo had told

7  Jackie that Phi Psi had been alerted about her allegations?

8  A    Yes, from both Jackie and from Alex Pinkleton.

9  Q    And there's a quote in the article from the meeting that

10 Jackie had with Dean Eramo concerning the notification to

11 Phi Psi.

12     Do you recall that?

13 A    Yes, I do.

14 Q    And it included a quote from Dean Eramo; is that right?

15 A    Yes.

16 Q    And what was that quote?

17 A    I would have to look at the document.  I'm sorry.

18 Q    Please do.  It is -- it's Plaintiff's Exhibit --

19 A    Here we go.  I actually have it in front of me.  This is

20 on 1079 on the final article, below the pull quote in the

21 center.

22     "According to both women, Eramo revealed that she learned

23 through the grapevine that all the boys involved had

24 graduated."

25 Q    And you confirmed that quote with Jackie when you spoke

1  with her?

2  A    Yes, I did.

3  Q    Did you also confirm that quote with Alex Pinkleton?

4  A    Yes, I did.

5  Q    And was it of import to you that both young women had

6  confirmed the same quote from Dean Eramo?

7  A    Yes.  It gave utter confidence in this.

8  Q    And the fact that she was saying -- or was quoted as

9  saying, all the boys involved have graduated, what, if

10  anything, or how, if anything, did that inform your assessment

11  as to the credibility of Jackie and the accuracy of her story?

12  A    It lent credibility to her and her story.

13  Q    And you knew -- I mean, this was an instance where Jackie

14  was reporting a quote from Dean Eramo, a thirdhand quote?

15  A    Yes.

16  Q    And so you were able to verify that she had, in fact,

17  said that through Alex Pinkleton as well; isn't that correct?

18  A    Yes.  Since this had been a meeting between Jackie and

19  Eramo where Alex had attended, I did have an extra source for

20  that -- for that quote, and both women confirmed it to me.

21  Q    Did that help in your mind to substantiate that Jackie

22  was an accurate reteller of quotes from other individuals?

23  A    Yes, it did.

24  Q    And specifically Dean Eramo; isn't that right?

25  A    Yes.

1  Q    Now, you also knew that UVa had finally contacted the

2  fraternity, we've established; is that right?

3  A    Yes.

4  Q    How did that help to inform your sense of confidence in

5  Jackie's story, if it did?

6  A    Well, we were setting this up as an allegation.  The

7  story in my mind was about unadjudicated allegations, which

8  are inherently hard to report on because you don't have the

9  official documentation that you might have from an allegation

10  that's actually gone through the process.

11      So this to me confirmed that everybody involved was aware

12  of this allegation, was going through an investigative process

13  for it, and that lent credence to me.

14  Q    And did -- in your mind, at the time you were assessing

15  the credibility of this story and its accuracy, did the fact

16  that UVa was finally taking action help to confirm to you that

17  they believed Jackie?

18  A    Yes.

19  Q    And you didn't -- did you have a view that whether the

20  university would take action and contact the fraternity, did

21  that, you know, in your mind, help to establish that they

22  found Jackie's story to be credible?

23  A    Yes, they were looking into it.  They were investigating.

24  Q    And when both Jackie and Alex confirmed that Dean Eramo

25  said that both boys had graduated, did that also indicate to

1   you that they knew who the boys were?

2   A    Well, it said all the boys, and yes.

3   Q    And you knew from Jackie's story that Drew was a

4   third-year at the time of her assault in 2012; is that right?

5   A    Yes.

6   Q    And so this meeting with Jackie and Alex in which they

7   learned from Dean Eramo that all the boys had graduated, that

8   was in the fall of 2014; is that right?

9   A    Yes.

10  Q    So if Drew was a third-year in 2012-2013, he would have

11  graduated by fall of 2014, assuming he didn't stay longer at

12  UVa than normal; is that right?

13  A    Yes, that was my understanding.

14  Q    And so did that also help to confirm the accuracy of

15  Jackie's story?

16  A    Yes.

17  Q    Now, you also spoke to a number of Jackie's friends

18  regarding her allegations of gang rape.

19       Do you recall that?

20  A    Yes, I did.

21  Q    You spoke to Alex Pinkleton; is that right?

22  A    Yes.

23  Q    And did she have, in sum or substance, the same story of

24  Jackie's allegation?

25  A    Yes.

1  Q    And did she confirm that with you in the course of your

2  conversations with Alex?

3  A    Yes.  I believe it was just one, one conversation.  But,

4  yes, she confirmed that with me.

5  Q    And you also spoke to Sara Surface; is that right?

6  A    Yes, I did.

7  Q    And did she also confirm the basic elements of Jackie's

8  story of gang rape at Phi Psi?

9  A    I believe she did, yes.

10  Q    And Emily Renda you had spoken with as well.  And she

11  also confirmed that she was aware of Jackie's allegations of

12  gang rape; is that correct?

13  A    Yes.

14  Q    And as we've established, she testified about it before

15  Congress?

16  A    Yes.

17  Q    And she, Emily Renda, also confirmed Jackie's story

18  regarding her connection with One Less; isn't that right?

19  A    Yes.  She told me in detail about the conversation she

20  had with Jackie that we have in the article.

21  Q    And so the description of One Less, the conversation that

22  Emily Renda had with Jackie, and the referral from Dean Eramo

23  to Emily Renda was all confirmed by Jackie as well as Emily

24  Renda?

25  A    Yes.

1  Q    So this is another instance where you're not just relying

2  on Jackie; is that correct?

3  A    Yes, this is true.

4  Q    And as we've previously indicated, you also spoke with

5  Jackie's first-year roommate, Rachel Soltis?

6  A    Yes, I did.

7  Q    And you confirmed the details of Jackie's story with

8  Rachel in many ways as well --

9  A    Yes.

10  Q    -- is that right?

11  A    Yes, that's true.

12  Q    Now, Mr. Phillips had indicated earlier that Rachel had

13  first reported that Jackie said that she had been forced to

14  engage in oral sex.

15       Do you recall that?

16  A    Yes.

17  Q    Were you aware of that at the time in your fact-checking

18  process?

19  A    I was not.  I was -- I was under the impression it was

20  gang rape.

21  Q    And did you have any conversation with Rachel Soltis

22  about any kind of evolution in the story?

23  A    I don't recall having a conversation with her in detail

24  about that.

25  Q    But you were aware from Emily Renda's testimony that the

1    number of men had evolved?

2    A    Yes, that's true.

3    Q    Or at least there was a different recounting of that; is

4    that right?

5    A    Yes.

6    Q    And had you -- did that cause any concern in your mind as

7    to the accuracy or credibility of Jackie's story?

8    A    No.  I believed her to be entirely credible.  It was my

9    understanding, it is my understanding, that victims of

10   traumatic experiences and also, you know, including traumatic

11   sexual assault, it sometimes takes some time for them to come

12   to terms with what happened to them and their story to

13   solidify.

14   Q    And was your understanding in that regard informed by

15   discussions with your mother?

16   A    Yes, it was.

17   Q    Tell me about that.

18   A    You know, I was troubled by this article.  As I was

19   working on it, it was emotionally difficult for me to have

20   these conversations with Jackie and to fact-check an article

21   you really have to -- you have only a few days to dive right

22   into it.

23        And my mother and I are close.  And this is something

24   that she has to deal with on a regular basis, so I thought,

25   you know, to reach out to her to have conversations.  And I

1  told her about my conversations with Jackie and about how, you

2  know, her story had solidified.  And my mother, you know, said

3  that that is a thing that sometimes happens and sometimes it

4  takes, especially a young person, some time to come to terms

5  with troubling things that have happened to them.

6      So it didn't make me -- it didn't concern me.  You know,

7  it didn't stick out as something that I needed to call her out

8  on or, you know, confront her with, like, an inaccuracy.  It

9  seemed like she was telling me as much as she could remember

10  about this thing that had happened to her two years before she

11  was talking to me.

12  Q    Did you also have a conversation with Emily Renda about

13  trauma victims and how they process their traumas?

14  A    Yes.  We did have a conversation.

15  Q    What do you recall about that conversation?

16  A    Just that in talking, you know, Emily had said, you know,

17  well, her story had been slightly different.  And I said, no,

18  I understand that, and it's my understanding that sometimes

19  this can happen with trauma victims.  And she said, yeah,

20  that's my understanding as well.

21      And we talked about it for a few minutes and then

22  continued confirming things about the university and about her

23  work there and about the people she knew there.

24  Q    So you were working with an understanding that helped to

25  inform your fact-checking process that trauma victims often

1  will -- their stories may evolve or they may become more

2  comfortable with getting the details of their story out; is

3  that fair to say?

4  A    Yes.

5  Q    And -- but it's clear that, as to the details, the actual

6  details of the rape that is described at the outset of the

7  article, we did not have -- we were relying on Jackie for

8  that; is that right?

9  A    Yes, it's true.

10  Q    And I think, as we established earlier, you believed, to

11  readers, we were communicating that this was Jackie's story;

12  is that right?

13  A    Yes.  I believed we were communicating that clearly.

14  Q    In your experience with dealing with hundreds of articles

15  at Rolling Stone, is it unusual to rely on a first-person

16  account of an event?

17  A    If it's an event that only they were present for, then --

18  or that -- no, it's not that -- it's not very unusual.

19  Q    And have you -- do you have an understanding about some

20  of the difficulties of reporting on rape?

21  A    It's my understanding that often victims of rape are not

22  comfortable coming forward -- or not comfortable disclosing

23  the name of their attacker.  And I understood that going into

24  this article.

25  Q    And the -- you had a number of questions from

1   Mr. Phillips concerning the fact that the magazine made the

2   decision to not seek comment from Drew and to not even

3   specifically know Drew's full name.

4        Do you recall that?

5   A    Yes, I do.

6   Q    And the assessment of the magazine going forward with not

7   knowing Drew's full name and not being able to get comment

8   from him, was that taken lightly by the magazine?

9   A    No, it was not.

10  Q    And do you remember having more than one conversation

11  with Mr. Woods about that?

12  A    Yes.

13  Q    And in the context of making that assessment, did you

14  look at the -- all the information you had in the totality

15  regarding Jackie and her story?

16  A    Yes.  We took it all into consideration.

17  Q    So you considered in making that assessment that you

18  personally had found Jackie to be highly credible when you

19  spoke to her; is that fair to say?

20  A    Yes.  I told him multiple times that I found Jackie to be

21  very credible, and these were the reasons why.

22  Q    And given your relationship with Mr. Woods, it was your

23  understanding that he valued your assessment; is that right?

24  A    Absolutely.

25  Q    And you were also aware -- the magazine was also aware

1  that Sabrina found Jackie to be entirely credible; is that

2  right?

3  A    Yes, we knew that.

4  Q    And that she had provided you, as well as Sabrina, with a

5  lot of details concerning her story; is that right?

6  A    Yes, that's true.

7  Q    And she had also provided you, as we've established this

8  morning, a significant number of corroborating documents that

9  helped to confirm a lot of the details surrounding her story;

10  is that right?

11  A    Yes, she did.

12  Q    Her relationship with Dean Eramo?

13  A    Yes.

14  Q    And the fact that she worked at the pool?

15  A    Yes.

16  Q    The fact that she had gone to mental health?

17  A    For mental health counseling, yes.

18  Q    The fact that she had gone to the police, as well as the

19  text messages, all these documents, did that help to inform

20  your overarching assessment of Jackie's credibility and the

21  accuracy of her story?

22  A    Yes, it did.

23  Q    You also were aware, as we've established, that UVa

24  appeared to believe Jackie?

25  A    Yes, and that they were investigating this.

1  Q    And that, I assume -- am I correct to assume? -- helped

2  to inform the overarching assessment of Jackie's credibility

3  and the accuracy of her story?

4  A    Yes, it did.

5  Q    And then, finally, you've spoken to a number of her

6  friends -- Alex Pinkleton, Sara Surface, Emily Renda, Rachel

7  Soltis -- and that they had confirmed Jackie's story in many

8  significant ways, to your mind; is that right?

9  A    Yes.

10 Q    And did you take all that information together to make an

11 assessment, in your conversations with Mr. Woods and Sabrina,

12 that the magazine felt comfortable going forward with Jackie's

13 description of her gang rape without speaking to Drew?

14 A    Yes, I did.

15 Q    And at the time you published that story, did you have

16 any reason to believe that Jay did not actually exist?

17 A    No.  I absolutely believed Jay existed.

18 Q    And besides Jackie and her story, did you have any other

19 corroboration that led you to the conclusion that Jay must

20 exist?

21 A    Yes.  I mean, there was the -- there was the conversation

22 that they had graduated.  That led me to believe that Jay

23 existed.

24 Q    And what about your conversation with Rachel Soltis?

25 A    Yes.  In my conversation with Rachel Soltis, she seemed

1  to believe that Jay existed.  And I knew that in her

2  conversation with Sabrina, she indicated that she knew that

3  Jay existed.

4  Q    And during your fact-checking process, did you undertake

5  independent efforts to try to find Jay?

6  A    No, I did not.

7  Q    Did you have a phone conversation with Sabrina in which

8  you tried to find a list of the 2012 members of Phi Psi?

9  A    We tried to find that.  We tried to find a list of people

10  that worked at the pool.  None of these things were available

11  to us as, you know, nonmembers of the UVa community.

12  Q    But you were trying to find lists to identify Jay, either

13  from a list of the fraternity members or people who worked at

14  the pool; is that right?

15  A    Yes.  We tried to know that.

16  Q    And it didn't work; is that right?

17  A    Yes.

18  Q    And so, ultimately, you, Sean, and Sabrina felt

19  comfortable without getting comment from Drew; is that right?

20  A    Yes, we did.

21  Q    And that was based upon all the corroboration that we've

22  gone through; is that fair to say?

23  A    Yes, that's fair.

24  Q    Now let's turn our attention to the three friends.

25       Mr. Phillips had also asked you a number of questions

1    about the fact that Sabrina did not get comment from the three

2    friends directly.  Do you recall that?

3    A    Yes, I do.

4    Q    Is it fair to say you regret that decision?

5    A    Yes, that's very fair to say.

6    Q    But when you published the recount of the three friends

7    in the immediate aftermath of Jackie's assault, you believed

8    that it was true; is that right?

9    A    Yes, I did.

10   Q    And you were aware that Sabrina had pressed Jackie over

11   and over to be put in contact with Ryan or the three friends;

12   is that right?

13   A    Yes, that was my understanding.

14   Q    And you understood at the time you published that,

15   through Jackie, she had obtained comment from Ryan and that he

16   didn't want to talk to Rolling Stone; is that right?

17   A    Yes.  And I went through that with Jackie on the phone

18   myself as well.

19   Q    And, again, I think we've established -- but because it's

20   probably important for you to acknowledge that you believed

21   that the attribution of Ryan's quote was not as clear as you

22   would have wanted; is that right?

23   A    Yes.  I wish in retrospect that we had made that clearer

24   to the reader.

25   Q    But to be clear -- and I'm going to get to this -- unlike

1    the attribution to Ryan, each quote from Jackie that was

2    specifically about Ms. Eramo was clearly credited to Jackie;

3    is that right?

4    A    Yes.  Yes, that is true.

5    Q    Did you ever have any understanding in the course of your

6    fact-checking process that the three friends knew anything

7    about Jackie's interactions with Dean Eramo?

8    A    No.  That didn't seem to be in the same kind of parts of

9    the story.

10   Q    During the course of your fact-checking process, did you

11   have any understanding that any of the three friends knew

12   anything about Jackie's interactions with UVa independent of

13   Dean Eramo?

14   A    No.

15        MR. PHILLIPS:  Your Honor, I want to object.  She

16   never spoke to the three friends, so I'm not sure how she

17   could have formed an understanding of what they did or didn't

18   know.

19        THE COURT:  I think that's well taken.

20        MS. McNAMARA:  Thank you.

21   BY MS. McNAMARA:

22   Q    When you were looking at the information from the three

23   friends, did you have any information that they were involved

24   or knowledgeable about Jackie's relationship with UVa?

25   A    It was my understanding that those three friends had been

1  present the night of the alleged sexual assault and that they

2  had met her after she had come out of the fraternity and that

3  they were around for the next, you know, several weeks and had

4  said these cruel things to her in the immediate aftermath.

5      It was also my understanding that Jackie's interaction

6  with UVa and with Dean Eramo did not happen until the

7  following spring.  So I saw these things to be happening in

8  separate periods of time in Jackie's life.

9  Q    In your discussions with Mr. Woods or your discussion

10 with Sabrina, did you ever get the sense that she was trying

11 to avoid to speak with the three friends?

12 A    Absolutely not.

13 Q    Did you ever get a sense that there was a concern that,

14 if she or the magazine spoke with one or more of the three

15 friends, that Jackie's story would somehow blow up and not be

16 true?

17 A    No.  I believe we all wanted to talk to those

18 individuals.

19 Q    Now, Mr. Phillips had mentioned that Sabrina's notes

20 included an approximation of Kathryn Hendley's name.

21     Do you recall that?

22 A    Yes, I do.

23 Q    And that came from the interview with Rachel Soltis; is

24 that correct?

25 A    Yes, that's true.

1  Q    Did you, in reviewing Sabrina's notes, see that

2  reference?

3  A    I don't remember seeing that reference until after

4  publication.

5  Q    And it didn't have any meaning, or you didn't -- since

6  you didn't know her last name, it didn't have any resonance if

7  you didn't see it; but would it have had, in your mind, any

8  resonance?

9  A    I don't think it would have stuck out as such an

10  important piece of information.

11  Q    And Sabrina had provided you with a 400-plus-page

12  reporting file; isn't that right?

13  A    Yes, she had.

14  Q    And it wasn't searchable; is that correct?

15  A    That is true.

16  Q    And was that a source of some frustration for you?

17  A    Yes.

18  Q    And in the course of your fact-checking process, did you

19  have any reason to believe that Sabrina was aware that she had

20  a variant of Kathryn Hendley's name in her notes?

21  A    No, I don't believe she knew that.  That was not my

22  understanding.

23  Q    And at the front of Sabrina's large reporting file, she

24  had a long contact list.  Are you familiar with that?

25  A    Yes, I am.

1  Q    And that included names of all sorts of people that came

2  up in her reporting and contact information associated with

3  those names; is that right?

4  A    Yes.  Yes.

5       And I -- I would imagine that if she realized she had

6  this name, she would have given it to me on that same long

7  contact list that she had provided at the outset of the

8  fact-checking process.

9  Q    And if you look at the contact list -- I think you have

10  there in front of you, her -- yeah, it's the bound.

11       Do you see any reference to Kathryn or some variation of

12  Kathryn Hendley?

13  A    No.

14  Q    Now, with regard to the woman who is identified as Cindy

15  in the article, one of the three friends, do you recall that

16  she was -- at one point in the article, she's described as "a

17  hook-up queen"?

18  A    Yes.

19  Q    You didn't rely solely on Jackie for that description,

20  did you?

21  A    That also came from Rachel Soltis.

22  Q    And she had confirmed that it was her understanding or

23  she -- you understood she knew this Cindy; is that right?

24  A    Yes.

25  Q    And she had confirmed that Cindy was known to sleep with

1  a lot of people; is that right?

2  A    I don't know if I'm comfortable saying that.

3  Q    Okay.  Tell me what you're comfortable with and what you

4  understood.

5  A    She had confirmed that she was aware that that was

6  something that this individual had said about themselves.

7  Q    Now, you mentioned earlier that you fact-checked the

8  article with UVa; is that right?

9  A    Yes, I did.

10  Q    And you had a lot of back-and-forth with UVa and Anthony

11  de Bruyn; is that correct?

12  A    I did.

13  Q    I want to hand you --

14        MS. McNAMARA:  We're going to mark what's been

15  marked as Defendants' Exhibit 266 for identification.  It will

16  be --

17        MS. MOODY:  Defendants' 68.

18  BY MS. McNAMARA:

19  Q    Can you identify for the record, Ms. Garber-Paul, what

20  this document is?

21        MR. PHILLIPS:  Liz, do you have a copy?

22        MS. McNAMARA:  Oh, I'm so sorry.

23        THE WITNESS:  This is the initial communication

24  between myself and Anthony de Bruyn.

25  BY MS. McNAMARA:

1   Q    And these e-mails are all on November 7, 2014; is that

2   right?

3   A    Yes, they are.

4           MS. McNAMARA:  Your Honor, I move for these to go

5   into the record.

6           THE COURT:  68, without objection.

7   (Defendants' Trial Exhibit 68 admitted)

8   BY MS. McNAMARA:

9   Q    Now, turning your attention to the second page of

10  Defendants' Exhibit 68, do you see your first e-mail to

11  Mr. de Bruyn dated November 7?

12  A    Yes.

13  Q    And you introduce yourself, that you're a fact-checker at

14  Rolling Stone.  And then you go on to say, "I'd like to go

15  through some facts, details, and characterizations and make

16  sure that the university is being represented as accurately as

17  possible."

18       Do you see that?

19  A    Yes.

20  Q    And was that your intent at the time?

21  A    Yes, absolutely.

22  Q    And did you believe, at the completion of your

23  fact-checking process, that you had met that goal?

24  A    Yes, I did.

25  Q    And you believed that the presentation and

1  characterization of UVa in the article was as accurate as
2  possible?
3  A    Yes.  That was my belief when we went to publication.
4  Q    And that would include any reference to Ms. Eramo, who,
5  of course, worked at the university; is that right?
6  A    Yes, that's true.
7  Q    Now, after this initial reach-out to Mr. de Bruyn, you
8  had a phone call with him?
9  A    Yes.
10 Q    And I would like to show you now what's in evidence as
11 Plaintiff's Exhibit 154.
12      Do you have that in front of you?
13 A    No.  Give me one moment.  I got to find the right binder.
14      MS. McNAMARA:  Is she in the right one?
15      MS. SCHARY:  The Round 1.
16      MS. McNAMARA:  No, it's not the Round 1.
17      MS. SCHARY:  It's the Round 1, galley.
18      MS. McNAMARA:  Oh, thank you.  Someone knows what's
19 going on here.  Thanks.
20      THE WITNESS:  That's easy.
21 BY MS. McNAMARA:
22 Q    Now, directing your attention to page 4863, there's a
23 discussion in the article on this page about the fact that UVa
24 was one of only 12 schools under a sweeping investigation
25 known as a compliance review.

1      Do you see that?

2   A    Yes.

3   Q    And were you able to confirm with Mr. de Bruyn that UVa

4   was, in fact, complying with the OCR's investigation?

5   A    Yes.  And I also spoke with the Office of Civil Rights

6   itself.

7   Q    And did the Office of Civil Rights confirm that UVa was

8   under a compliance review and that it was only one of 12

9   schools subject to that type of review --

10  A    I would have to --

11  Q    -- at the time?

12  A    I would have to double-check that that's what made it

13  into the final, but I'm very confident about everything that

14  the Office of Civil Rights was telling me was accurate.

15  Q    And on page 4864 of this galley, I believe we -- at the

16  outset of your testimony today, you confirmed that UVa had

17  verified that they had canceled Sabrina's interview with

18  Dean Eramo; is that right?

19  A    Yes, that's true.

20  Q    And also that you were told that you were not to contact

21  any administrators at UVa; is that right?

22  A    Yes, that was my understanding.

23  Q    And you also confirmed with Mr. de Bruyn that UVa

24  emphasized -- had taken to emphasizing that, in matters of

25  sexual assault, the university catered to victim choice.  And

 1  that appears at 4866 of the galley.

 2       It's in the middle column, Ms. Garber-Paul.

 3  A    Oh, yes.

 4  Q    "Like many schools, UVa had taken to emphasizing" --

 5  A    Yes.

 6  Q    And Mr. de Bruyn had confirmed that for you?

 7  A    Yes, he did.

 8  Q    And that's why a squiggle appears through the line?

 9  A    Yes.  And I still had "like many schools" highlighted

10  because I needed to check with other schools, or, you know,

11  check with other people that knew about other schools, to make

12  sure that this was a common thing.

13  Q    And you, in fact, endeavored to do that; is that right?

14  A    Yes, I did.

15  Q    And did you document that, that other schools emphasized

16  victim choice as well?

17  A    Yes.  I believe in my speaking with the -- yes.  In my

18  speaking with the experts in this section, I became

19  comfortable with that.

20  Q    And turning your attention to the page that's

21  Bates-stamped 4867, on this page, were you able to confirm the

22  statistics that are included in the article, specifically that

23  in the last academic year, 38 students complained to Eramo

24  about a sexual assault, up from about 20 students three years

25  ago?

1  A    Wait.  I'm sorry.  I'm a little lost.

2       You said 4867?

3  Q    I believe so.

4           MS. SCHARY:  Yes.  Top left corner.

5  BY MS. McNAMARA:

6  Q    It's the top left corner.

7  A    Okay.  Got it.  I'm sorry.

8       Okay.  I'll just look on the screen here.

9       Yes?

10 Q    And did Mr. de Bruyn confirm these statistics that, of

11 the 39 complaints or reports of sexual assault, only 9

12 resulted in complaints and the other 29 students evaporated?

13 A    Yes.  And we had changed -- this is one of the confusing

14 things, was the difference between complaints and reports.  So

15 he talked me through and explained the difference in the UVa

16 system, that what we were specifically talking about are

17 complaints and not reports.

18 Q    And in this same paragraph, you confirmed from the

19 interview that Sabrina conducted with President Sullivan that

20 publishing these statistics was not in keeping with best

21 practices?

22 A    Yes.  I believe I also -- based on the color-coding I

23 have here -- also discussed that with Mr. de Bruyn.

24 Q    And directing your attention to 4867 on this same page,

25 with regard -- there's a discussion about Annie Hylton and

1   Kathryn Russell in the middle column.

2        Do you see that below the big pull quote?

3   A    Yes.

4   Q    And it's the paragraph that begins, "If Seccuro's story

5   of administrative cover-up and indifference sounds outrageous,

6   it's actually in keeping with the stories told by other UVa

7   survivors."

8        Do you see that?

9   A    Yes.

10  Q    And the paragraph goes on to recount the events of Annie

11  Hylton and Kathy Russell, with a conclusion at the end of the

12  paragraph, "For the issuance of a directive that these

13  students could not discuss the results of their sexual

14  misconduct hearings, UVa had been found guilty by the Office

15  of Civil Rights of violating the Clery Act in 2008."

16       Do you see that?

17  A    Yes.  And I have a correction there.  I believe that it

18  says they had been found in violation of the Clery Act by the

19  Department of Education's Office of Civil Rights.

20  Q    And so that was an example of you wanting to be as

21  accurate as possible that it wasn't a criminal finding of

22  guilt; it was rather they were found in violation of the Clery

23  Act.  Is that right?

24  A    Yes, exactly.

25  Q    Now, you had some follow-up with Mr. de Bruyn concerning

1    your fact-checking queries; is that right?

2    A    Yes, a lot.

3    Q    And I'll show you Plaintiff's Trial Exhibit 115.

4    A    Yes.  I'm here.  Sorry.

5    Q    Okay.  I'm sorry.

6         In this document, were you able to confirm through

7    Mr. de Bruyn the fact about that the school had had no

8    expulsions for sexual assault in recent history but over a

9    hundred expulsions for honor code violations?

10   A    Yes.  That's on 13354.

11        And this is where I cite the statistics that are given in

12   the WUVA video and ask for him to let me know if this

13   reporting is inaccurate.

14   Q    And I know that we've talked about that Mr. de Bruyn made

15   it clear that you should not contact specific administrators

16   at the university -- and I know you've mentioned this -- but

17   explain to me what your understanding was concerning asking

18   him questions about the specific facts surrounding reports,

19   individuals' reports of sexual assault.

20   A    That seemed very much something that we were allowed to

21   talk about.  He was willing to talk about the -- you know, the

22   general policies and the statistics at the university.  It was

23   just I couldn't ask about, you know, what happened with an

24   individual student's case.

25   Q    And specifically with regard to -- and I'm going to get

1    to it in more detail -- but with regard to the quote

2    attributed to Ms. Eramo from Jackie about the rape school

3    quote --

4    A    Yes.

5    Q    -- are you familiar with that?

6    A    Yes, I am.

7    Q    And you didn't ask Mr. de Bruyn about that quote; is that

8    right?

9    A    No, I did not.

10   Q    And what was the reason you didn't ask Mr. de Bruyn about

11   that quote?

12   A    Because it had to do with the meeting that happened

13   between an individual student and Dean Eramo, and it was in a

14   closed-door meeting, and it was an off-the-cuff comment that

15   she had given to -- that I understood that she had given to

16   Jackie.

17   Q    You considered this to be part of her interactions with a

18   sexual assault victim, specifically Jackie; is that right?

19   A    Yes, I did.

20   Q    And you understood from your discussions with

21   Mr. de Bruyn that you were not to -- or he was not going to

22   provide you any information concerning the interactions or the

23   facts of specific students' sexual assault?

24   A    Yes, that was my understanding.

25   Q    Let's turn to the depiction of Ms. Eramo in the article.

1   A    Sure.  Let me put this back.

2        Yes.

3   Q    Having read the article and when working closely with the

4   article over the fact-checking process, how did you view the

5   general depiction of Ms. Eramo in the article?

6   A    I saw it as a nuanced picture of a person who had a

7   really hard job and who was deeply cared for by her -- by the

8   students that worked with her.

9   Q    Is it fair to say that there was some criticism as well

10  about UVa's response to sexual assault allegations?  And, of

11  course, Ms. Eramo worked with UVa; is that right?

12  A    Sure.  I definitely saw, you know, part of what we were

13  doing here was it -- was a criticism of UVa's policy towards

14  sexual assault victims; and Dean Eramo, being the implementer

15  of this policy, she was certainly discussed.  But I did not

16  see this as a criticism of her personally.

17  Q    And what did you understand there to be, in the course of

18  your discussions with Sabrina and Mr. Woods, any overarching

19  themes of the article?

20  A    Yes.  That sometimes a desire to -- to work with victims

21  and to leave victims in charge of what they were going to do

22  about their assaults could have unintended consequences,

23  negative unintended consequences towards security on campus.

24  Q    And how did you understand there to be a negative

25  unintended consequences about safety?

1 A    By letting victims like Jackie determine how they were

2 going to proceed with their own reporting of their rapes.

3 There weren't sufficient -- you know, according to experts we

4 talked to and according to -- you know, according to people

5 knowledgeable on these subjects, that there weren't sufficient

6 warnings issued on campus.

7 Q    And did you speak with some of those, what the article

8 calls experts, in the course of your fact-checking process?

9 A    Yes, I did.

10         MR. PHILLIPS:  Object to the characterization of

11 "experts," Your Honor.

12         THE COURT:  That was a fair question.  Overrule the

13 objection.

14         MS. McNAMARA:  Thank you.

15 BY MS. McNAMARA:

16 Q    And so included amongst the people identified in the

17 article as experts, did you speak with Daniel Carter?

18 A    Yes, I did.

19 Q    And did you speak with him about those issues about the

20 obligation of a university to protect students and the safety

21 of students in the face of sexual assault allegations?

22 A    Yes, we did.

23 Q    And did he confirm the depiction or the conclusions

24 reached in the article?

25 A    Yes.

1  Q    And did you also speak with Laura Dunn?

2  A    Yes, I did.

3  Q    And did she also confirm the article's -- the quotes from

4  her as well as the article's depiction of victim choice at the

5  university?

6  A    Yes.

7         MS. McNAMARA:  Let me have marked for identification

8  Defendants' --

9         MS. MOODY:  69.

10  BY MS. McNAMARA:

11  Q    Can you identify for the record whether these are e-mails

12  that were received by you from S. Daniel Carter in November of

13  2014?

14  A    Yes.  This seems to be a series of e-mails going back and

15  forth both scheduling a call and then following up on a call

16  between me and Daniel Carter.

17         MS. McNAMARA:  I move the admission of the e-mails,

18  Your Honor.

19         THE COURT:  69, without objection.

20  (Defendants' Exhibit 69 admitted)

21  BY MS. McNAMARA:

22  Q    And does this e-mail chain confirm that you, in fact,

23  spoke with Mr. Carter?

24  A    Yes.

25  Q    And that he had confirmed the description about the

1  obligations of the university for campus safety?

2  A    Yes.

3  Q    And did you -- when you spoke with Mr. Carter, did you

4  understand him to be an authority in this area?

5  A    Yes, that was my understanding.

6  Q    And so you credited his conclusions and opinions as

7  expressed to you; is that correct?

8  A    Yes, I did.

9  Q    And you felt that that was verification of the depiction

10 of the university's obligations surrounding campus safety; is

11 that right?

12 A    Yes.  Especially since we were quoting him by name and

13 giving his -- you know, his brief background, his title.

14 Q    And, now, you've also mentioned that you spoke with Laura

15 Dunn; is that correct?

16 A    Yes, I did.

17       MS. McNAMARA:  Let me have marked --

18       MS. MOODY:  Defendants' 70.

19       MS. McNAMARA:  Thank you.

20 BY MS. McNAMARA:

21 Q    Can you identify for the record what this e-mail chain

22 is?

23 A    Yes.  This is just a quick e-mail chain between me and

24 Ms. Dunn.

25 Q    Documenting that you had set up an interview with her?

1    A    Yes, we had.  I don't believe we had any follow-up.  We

2    just had a brief phone call discussing the content of this

3    portion of the article.

4           MS. McNAMARA:  And I move the admission of this

5    document, Your Honor.

6           THE COURT:  70, without objection.

7    (Defendants' Exhibit 70 admitted)

8    BY MS. McNAMARA:

9    Q    You also spoke with John Foubert; is that correct?

10   A    Yes, it is.

11   Q    And did he also confirm background facts concerning UVa

12   and their practices surrounding campus safety?

13   A    Yes, he did.

14   Q    And when you spoke with Ms. Dunn, did she confirm the

15   quote in the article about an alarming trend that she's seen

16   on campus?

17   A    You'd have to point me to --

18   Q    I want to direct your attention to the article that is at

19   RS1076.  In the right-hand column, in the far -- the whole

20   first paragraph.

21   A    Yes.  I wouldn't have -- like I said yesterday, I

22   wouldn't have read back probably the quote verbatim because we

23   try not to do that.  But I discussed this -- I discussed

24   this -- the content of it with her.

25   Q    And you made sure that the content of the quote was

1    accurate, with Ms. Dunn; is that right?

2    A    Yes, I did.

3    Q    And did you also confirm with Ms. Dunn at -- if you

4    direct your attention to the article at 1079, where she's

5    quoted as saying, "'The fact that they already had the first

6    victim, they should have been taking action,' says

7    SurvJustice's Laura Dunn.  'That school could really be

8    sued.'"

9         Do you see that?

10   A    Yes.

11   Q    Did you confirm that with Ms. Dunn when you spoke with

12   her?

13   A    The content, yes.

14   Q    Now, back to Ms. Eramo.  The article includes a number of

15   positive things concerning Ms. Dunn.  Is that fair to say?

16   A    You mean Ms. Eramo?

17   Q    Yes.  Thank you.

18   A    Yes.

19   Q    Again, you have to keep me honest here.

20        First, I'll direct your attention to 1076.  In the

21   left-hand column in the graph that begins, "If Dean Eramo was

22   surprised at Jackie's story of gang rape, it didn't show."

23        Is that right?

24   A    Yes.

25   Q    And it indicates that "Eramo surely has among the most

1    difficult jobs at UVa."

2        Is that correct?

3    A    Yes, it does.

4    Q    And then further down in that same paragraph it says, "A

5    UVa alum herself, Eramo is beloved by survivors, who consider

6    her a friend and confidante."

7        Do you see that?

8    A    Yes, that was --

9    Q    And -- I'm sorry.

10   A    Oh, that was an opinion expressed by all the women at UVa

11   that I spoke with.

12   Q    And that was going to be my question.  When you spoke

13   with Emily Renda and Sara Surface and Alex Pinkleton and

14   Jackie, all these women had indicated that she was beloved and

15   that they considered her a friend and confidante; is that

16   right?

17   A    Yes, definitely.

18   Q    And so you made sure that that was included in the

19   article; is that correct?

20   A    Yes.

21   Q    And did you see that these positive statements about

22   Ms. Eramo being beloved and the like was inconsistent with the

23   criticism concerning victims' choice?

24   A    No.

25   Q    Why not?

1  A    Because they saw her as somebody who they could speak to,

2  and she was supportive of them no matter what they decided to

3  do.

4  Q    And does the article indicate that she was supportive of

5  the victims?

6  A    Yes, it does.

7  Q    And how does it indicate that she was supportive of the

8  victims?

9  A    We say multiple times that she -- you know, I mean, these

10 are in the portions from Jackie, but we say that at every step

11 of the way, Eramo was there for her and said, "No matter what

12 your choice is, I'm here."

13 Q    And after -- still on the page 1076, after the

14 description or introduction of Jackie's recounting -- or

15 rather, strike that.

16      After the description of Dean Eramo that appears in the

17 paragraph that Dean Eramo was surprised, the next paragraph

18 begins, "When Jackie finished talking, Eramo comforted her and

19 then calmly laid out her options."

20      Is that correct?

21 A    Yes.

22 Q    And that was meant to communicate that she was comforting

23 to Jackie.  Is that fair to say?

24 A    She was comforting and helpful, yes.

25 Q    And she underscored at the end of that paragraph that

1   whatever happened next was entirely Jackie's choice; is that

2   right?

3   A    Yes.

4   Q    Turning your attention to page 1068.  Actually, I think

5   it's 10 --

6   A    1078?

7   Q    78.  Thank you.

8        Here -- and I believe we already touched on this, but the

9   article in the left column towards the bottom specifically

10  credits Dean Eramo as having connected Emily -- connected

11  Jackie with Emily Renda, a fourth-year, who had become active

12  in One Less.

13       Do you see that?

14  A    Yes.

15  Q    And I believe, when you were being questioned by

16  Mr. Phillips, there was a suggestion that you should have

17  identified or the article should have identified that Emily

18  Renda was now working for UVa.

19       Do you recall that?

20  A    Yes.

21  Q    And in this paragraph, it was set at a time when Emily

22  was actually a fourth-year student; is that right?

23  A    Yes.  We set it in the fall of 2013.

24  Q    And so it would have been -- it wouldn't have been

25  accurate to identify her as an employee of UVa at the time

1    that Dean Eramo had connected with her, correct?

2    A    No.  It was my understanding she did not become employed

3    by UVa until after she graduated.

4    Q    And in the middle column of the article on this same

5    page, 1078, there's a sentence that begins, "After feeling

6    isolated for more than a year, Jackie was astonished at how

7    much she and this sisterhood had in common, including the fact

8    that a surprising number hadn't pursued any form of complaint,

9    although many had contacted Dean Eramo, whom they loved as

10   their best advocate and den mother.  Jackie repeatedly calls

11   her an asset to the community.  Few, however, filed reports

12   with UVa or with the police."

13        Do you see that?

14   A    Yes.

15   Q    And the article, in describing One Less and Jackie's

16   interactions with One Less, it made it clear that the referral

17   by Dean Eramo, her referral to Emily Renda and Jackie's

18   resulting involvement with One Less, was of great significance

19   to Jackie; is that fair to say?

20   A    Yes, that was my understanding.

21   Q    And the article makes clear that she was considered by

22   many of these survivors as their best advocate and den mother;

23   is that right?

24   A    Yes.

25   Q    I think in the note that Mr. Phillips had drawn to your

1    attention yesterday, in an early draft of the article, you had
2    indicated that Jackie considered her as a second mother figure
3    or words to that effect.
4         Do you recall that?
5    A    Yes, I do.
6    Q    And do you believe that the article captures that concept
7    in this paragraph?
8    A    I thought "den mother" was a fair way to represent that
9    in the article.
10   Q    And this is where -- we had talked about the fact that
11   Jackie had underscored that she wanted it to be clear that she
12   believed Dean Eramo was an asset to the community.  This is
13   where you found to put it in the article; is that right?
14   A    Yeah.  I believe yesterday I pointed to a place where we
15   had crossed that out and said that it's just because it didn't
16   fit there, like it wasn't -- it didn't read correctly.  So
17   this is the place that, in working with Sean and Sabrina, we
18   thought that it -- it was appropriate to add this.  So we did.
19   Q    And I believe you indicated in your testimony yesterday
20   that, through the fact-checking process, you had spoken with
21   Sara Surface, correct?
22   A    Yes, I had.
23   Q    And she had talked to you about and emphasized that she
24   believed that UVa was making some positive steps to address
25   sexual assault; is that right?

1   A    Yes.  She had a lot of -- she had a lot of information

2   about the good things that were happening at UVa.  So she and

3   I sat on the phone for a while, and she walked me through all

4   the positive changes she saw happening and that, you know, she

5   had helped to work on.

6        And after, you know, talking to her for a while, then I

7   took all of that information and talked to Sabrina, and

8   Sabrina then drafted out some additions to the article and we

9   put them in.

10  Q    Let me show you Defendants' Trial Exhibit 19.

11  A    Thank you.

12  Q    Is this the e-mail exchange between you and Sean and

13  Sabrina about working out the language that you would add to

14  the article about the positive developments?

15  A    Yeah.  I believe Sabrina and I spoke on Monday morning

16  and kind of discussed what I thought was important to add to

17  the article to make it clear that UVa did have some positive

18  changes.  And based on our conversations, Sabrina added these

19  sections.

20  Q    And if you direct your attention, then, back to the

21  article on page 1074, in the middle column.  It's the

22  paragraph that begins that "UVa president, Teresa Sullivan,

23  denies the administration sweeps sexual assault under the

24  rug."

25       Do you see that?

1    A    Yes.

2    Q    So we included, first of all, the president's denial that

3    they were in any way turning a blind eye to sexual assault; is

4    that correct?

5    A    Yes, we did.

6    Q    And then it proceeds to, is this where the information

7    was included that you had first obtained from Sara Surface and

8    then worked out with Sabrina about some of the positive steps

9    being undertaken by UVa to address sexual assault?

10   A    Yes.

11   Q    That it had hosted a first-ever sexual assault summit for

12   college administrators; is that right?

13   A    Yes.

14   Q    And that it's true that recently, while under close

15   government scrutiny, the school had made some encouraging

16   changes, including designating most of UVa authority figures

17   as mandatory reporters of sexual assault and teaming up with

18   student activists to create a bystander intervention campaign.

19        Do you see that?

20   A    Yes.

21   Q    And this was the information that was not in the original

22   draft but was included after you spoke to Ms. Surface; is that

23   right?

24   A    Yes, it was.

25   Q    And then immediately following that, it indicates that

1    "Students praise UVa deans as caring folks who answer

2    late-night calls from victims and even make emergency room

3    visits."

4         Do you see that?

5    A    Yes.

6    Q    And was that a fact that you confirmed with Anthony

7    de Bruyn at UVa?

8    A    Yes, it is.  And he confirmed that with me.

9    Q    Now I want to direct your attention to the specific

10   statements that -- at issue in this litigation that the

11   plaintiff claims defames her from the article.  Okay?

12   A    Yes, sure.

13   Q    The first statement appears on page 1072 of the article

14   in the right-hand column.

15   A    1072?

16   Q    Right.  Where it reads that "Two years later, Jackie, now

17   a third-year, is worried about what might happen to her once

18   this article comes out.  Greek life is huge at UVa, with

19   nearly one-third of undergrads belonging to a fraternity or a

20   sorority.  So Jackie fears the backlash could be big, a,

21   quote/unquote, shitshow predicted by her now former friend

22   Randall, who, citing loyalty to his frat, declined to be

23   interviewed.  But her concerns go beyond taking on her alleged

24   assailants and the fraternity.  Lots of people have

25   discouraged her from sharing her story, Jackie tells me with a

 1   pained look, including the trusted UVa dean to whom Jackie

 2   reported her gang rape allegations more than a year ago.  On

 3   this deeply loyal campus, even some of Jackie's closest

 4   friends see her going public as tantamount to betrayal."

 5        Do you see that paragraph?

 6   A    Yes, I do.

 7   Q    Now, first, there was a lot of discussion about

 8   attribution.  In the context of this paragraph, the fact that

 9   the UVa dean had discouraged her from sharing her story is

10   specifically attributed to Jackie, is it not?

11   A    Yes.  We say "Jackie tells me."  So that indicated

12   attribution to me.

13   Q    And what did you do to satisfy yourself that statement

14   number one, this statement that I just read, was accurate at

15   the time you did your fact-checking?

16   A    Well, part of what I did was I spoke with Jackie about

17   it, and she confirmed that to me.  She told me that, yes,

18   Dean Eramo had told her that maybe, you know, talking to

19   Rolling Stone about her gang rape was not a great idea.

20        And then when I spoke with some of the other women, Emily

21   and Alex and -- Emily and Alex told me that they believed that

22   to be true, and then they gave me some caveats for it.  They

23   said that maybe it was because they were worried about --

24   maybe Dean Eramo was worried about that this could affect

25   future proceedings.

1    So I took that to be confirmation, though I did note that

2  perhaps we wanted to include some of those.  But it did not to

3  me mean that this was not a true statement.

4  Q    And in the context of --

5         THE COURT:  Let's make no mistake about it.  The

6  only way you knew what was said between Dean Eramo and Jackie

7  is what Jackie told you?

8         THE WITNESS:  Yes, that's true.

9         THE COURT:  The only way?

10        THE WITNESS:  That's the only way I could know for

11  sure, yes.

12        THE COURT:  Okay.

13  BY MS. McNAMARA:

14  Q    But you understood from speaking with some of Jackie's

15  friends that they understood that Jackie was being discouraged

16  from sharing her story with Rolling Stone; is that right?

17  A    Yes, that was my understanding.

18  Q    And in the context of this statement, did you understand

19  that, or were you intending for the article to report that

20  Dean Eramo was discouraging Jackie from pursuing her sexual

21  assault allegations before the police or the sexual misconduct

22  board?

23  A    Definitely not.  I thought we made it very clear

24  throughout the article that Dean Eramo was going to stand

25  behind Jackie, whatever she decided.

1   Q   And the article makes clear that Dean Eramo would assist

2   her if she wanted to pursue her sexual assault allegations; is

3   that correct?

4   A   Yes.

5   Q   And was assistance consistent with discouraging her from

6   reporting, in your mind?

7   A   No.

8   Q   And in the context of this particular section of the

9   article, did you understand the discouraging her from sharing

10   her story to mean sharing her story with a national magazine?

11   Is that right?

12   A   Yes, that was absolutely my understanding.

13   Q   And why did you believe that?

14   A   Because the paragraph starts talking about how Jackie is

15   worried what might happen to her once this article comes out.

16   So I took that topic sentence to mean that we were looking at

17   her fears specifically about publishing her account in Rolling

18   Stone.  And the end, we say that "On this deeply loyal campus,

19   even some of Jackie's closest friends see her going public as

20   tantamount to betrayal."

21       So I thought this kind of bookended this idea that this

22   paragraph in particular was talking about Jackie talking with

23   Rolling Stone.

24   Q   And you had -- we've already gone over it, but you had

25   the text messages from Maddie and other communications that

1  led you to conclude that this was not an unusual sentiment; is

2  that right?  That people were uncomfortable with a student

3  talking to a national magazine and making -- possibly making

4  UVa look bad?

5  A    No.  And in my experience, any community is generally

6  discouraging of people who might have critical things to say

7  about it going public to a national magazine.

8  Q    And that's made clear at the beginning of the next

9  paragraph after this quote; isn't that right?

10 A    Yes.

11 Q    Where Jackie is saying, "One of my roommates said, 'Do

12 you want to be responsible for something that's going to paint

13 UVa in a bad light?'"

14 A    That's true.

15 Q    And what was going to possibly paint UVa in a bad light

16 was the article; is that right?

17 A    Yes, that was my understanding.

18 Q    So when the article says "discouraging her from sharing

19 her story," you understood or you intended that that refer to

20 Jackie talking to a national magazine?

21 A    Yes.

22 Q    And at the time you completed your fact-checking, with

23 regard to this paragraph and specifically this statement about

24 lots of people having discouraged her from sharing her story,

25 did you believe that to be accurate?

1  A    Yes, I did.

2  Q    Did you have any doubt whatsoever about the accuracy of

3  that information?

4  A    No, I did not.

5  Q    Now, turning your attention to the rape school quote.

6  And that appears at RS1077, in the left column, the sentence

7  that begins "Like most colleges."

8        The article read, "Like most colleges, sexual assault

9  proceedings at UVa unfold in total secrecy."

10       And I'll pause there for a second.  Back on the

11  discouraging comment, since you understood that sexual assault

12  proceedings proceeded in secrecy, would it make sense that you

13  would describe her going forward or being discouraged to go

14  forward with her sexual assault allegations as something that

15  would be public?

16  A    No.

17  Q    So that was -- this portion of the article would be

18  inconsistent with the statement or the contention by Ms. Eramo

19  that the discouraging from telling her story actually

20  referenced discouraging her from proceeding with a report

21  either to the police or to the sexual misconduct board; is

22  that right?

23  A    Yes, that's true.

24  Q    And then this paragraph goes on to say, "Asked why UVa

25  doesn't publish all its data, President Sullivan explains that

1    it might not be in keeping with best practices and thus may

2    inadvertently discourage reporting.  Jackie got a different

3    explanation when she eventually asked Dean Eramo the same

4    question.  She says Eramo answered wryly, 'Because nobody

5    wants to send their daughter to the rape school.'"

6         Do you see that?

7    A    Yes.

8    Q    And did Jackie tell you that?

9    A    Yes.

10   Q    Did you ask her specifically that quote, or how did it

11   come up?

12   A    No.  We were having a conversation about her kind of

13   going through the -- the statistics and things that she found

14   on the website and her experience in doing research on her own

15   after meeting with Dean Eramo.  And then we had a conversation

16   about -- you know, I asked her about this -- this meeting and,

17   you know, what happened when she asked Dean Eramo about why

18   these things weren't easily available for her on the website.

19   And Jackie volunteered this quote to me.

20   Q    And were you aware during your fact-checking process that

21   Jackie had told Sabrina this quote on two separate occasions?

22   A    Yes.

23   Q    And you were also aware, as we've established, that

24   Jackie loved Dean Eramo; is that right?

25   A    Very much.

1  Q    Did you have any understanding that she would try to
2  malign Dean Eramo in some way?
3  A    Not at all.  She repeatedly told me how much she cared
4  for her and what a good -- what a good person she had been to
5  her at UVa, what an important person she had been to her at
6  UVa.
7  Q    And from the "boys have all graduated" quote that you
8  were able to independently confirm with Alex Pinkleton, did
9  you have any understanding as to whether you could trust
10 Jackie to accurately quote Dean Eramo?
11 A    Yes, I did.
12 Q    And what was that understanding?
13 A    It was that she was able to accurately tell us about
14 these meetings that she'd had with Dean Eramo.  And I felt
15 comfortable moving forward with this quote even though nobody
16 else was in that room with her other than Dean Eramo, who I
17 wasn't able to talk to.  So nobody else was in that room with
18 her to confirm that to me.
19      And I was also comfortable because we made it very clear
20 that this was coming specifically from Jackie.
21 Q    What about the substance of the quote?  When you check a
22 quote from a source and you only have it from one person, do
23 you try to assess the accuracy of the content of the quote?
24 A    Even if I have it from multiple people, I try to assess
25 the accuracy of the content of the quote.

1  Q    And here the substance of the rape school quote was that

2  UVa's sexual assault statistics were hard to find.  That was

3  part of it, wasn't it?

4  A    Yes.

5  Q    And the other component of the substance of the quote was

6  that, by the fact that it wasn't widely available, parents

7  would feel that the school was safe?

8  A    Yes.  And we had Susan Russell, one of the -- the parent

9  of the one we called Stacy, saying effectively the same thing

10 on the record.

11 Q    And directing your attention to the prior page of the

12 article at the bottom of 1076.

13 A    Yes.

14 Q    And Susan Russell, you understood, was the parent of the

15 student at UVa who was told to keep quiet about the hearing

16 and the proceedings before the sexual misconduct board; is

17 that right?

18 A    Yes.

19 Q    And the one that was found to be in violation of the

20 Clery Act; is that correct?

21 A    Yes.

22 Q    And read the quote or the passage from Susan Russell that

23 appears at the bottom of 1076.

24 A    "When a parent goes to the campus crime log and they

25 don't see 'sexual assault,' they think the school is safe."

1    Q    And before that, it had indicated that "UVa parent Susan

2    Russell believes that misdirection is deliberate"?

3    A    Yes.  And I made sure in the drafting of this section

4    that we made it very clear that that was coming from Susan

5    Russell.

6    Q    And you -- did you -- in your fact-checking process in

7    assessing the accuracy of the rape school quote, did you find

8    this quote from Susan Russell to be consistent with the

9    content of that quote?

10   A    Yeah, I found them to be substantively the same.

11   Q    And you yourself had tried to find statistics on UVa's

12   website; is that right?

13   A    I had, Sabrina had, and we were not able to.

14   Q    And it was difficult.  So the fact that statistics were

15   hard to come by surrounding sexual assault and the number of

16   assaults was something that you independently verified; is

17   that right?

18   A    Yes, absolutely.

19   Q    And you also had from President Sullivan, she confirmed

20   that statistics are not widely reported; is that right?

21   A    Yes.  And I confirmed that with UVa PR as well.

22   Q    And she had explained -- she had an explanation for it,

23   which we put into the article; is that right?

24   A    Yes, we did.

25   Q    And her explanation was that not publishing all its data

1   explains that -- Sullivan explained that "it might not be in
2   keeping with best practice and thus inadvertently discourage
3   reporting."
4       Do you see that?
5   A   Yes.
6   Q   And did you find that to be also corroborative of the
7   substance of the rape school quote?
8   A   Yes.  And we have it right there in the same paragraph.
9   Q   So at the time you signed off on the article and its
10  inclusion of the quote from Jackie about the rape school, did
11  you believe that it was an accurate statement?
12  A   Yes, I did.
13  Q   And in that quote, when it's used, we specifically
14  attribute it -- or the magazine specifically attributes it to
15  Jackie, does it not?
16  A   Yes, absolutely.
17  Q   It says, "She says, 'Eramo answered wryly'"; is that
18  right?
19  A   Yes.
20  Q   Did you have any doubts whatsoever, when the article went
21  to press, that that was an accurate statement from Dean Eramo?
22  A   No.
23  Q   Let's turn to statement Number 3.
24          THE COURT:  Ms. McNamara, I think the jury wants a
25  second break before we take up the next statement.  So let's

1  do that.

2          Ladies and gentlemen, I'll ask that while you're

3  away from the court you not discuss the case with one another,

4  do not permit anyone to discuss it with you.  I'll ask the

5  witness not to discuss her pending testimony with counsel from

6  either side.

7          Let's plan to return at 25 after the hour.

8          Ask the marshal to declare court in recess.

9  (Recess)

10  (Jury in)

11  (Open court as follows:)

12          THE COURT:  Well, I see ten jurors back, seated in

13  the jury box, ready for the last leg of this morning's

14  session.

15          We're ready for the continuation of the

16  cross-examination of Ms. Garber-Paul.

17          MS. McNAMARA:  Thank you, Your Honor.

18  BY MS. McNAMARA:

19  Q    Ms. Garber-Paul, right before the break, we were going

20  through the statements that are at issue in this litigation.

21          Do you remember that?

22  A    Yes.

23  Q    And I want to turn your attention to the third statement

24  that appears at RS1078.

25          And, specifically, it's the second paragraph that follows

 1   immediately after Jackie reporting to Dean Eramo that she had

 2   learned of two other women who had similar sexual assault

 3   allegations at Phi Psi.

 4        Do you see that?

 5   A    Yes.

 6   Q    And it reads, "Because" -- excuse me.

 7        It reads, "As Jackie wrapped up her story, she was

 8   disappointed by Eramo's nonreaction.  She'd expected shock,

 9   disgust, horror."

10        Do you see that?

11   A    Yes.

12   Q    And this paragraph -- the paragraph that precedes it in

13   this particular statement, it was clearly attributed to

14   Jackie; is that correct?

15   A    Yes.  That was my understanding.

16   Q    What did you do to fact-check this statement?

17   A    Well, primarily, I went through -- just as far as the,

18   you know, interaction between Jackie and Dean Eramo, I went

19   through Sabrina's notes and I went through it with Jackie.

20        And it was my understanding, as we set out here, that,

21   you know, when she was talking to her friends about these new

22   allegations that these girls had told her in confidence, that,

23   you know, they're shocked and disgusted and horrified by it.

24   They're young women who have, you know, lots of real emotions

25   that come out.

1    And when she went to Dean Eramo's office, Dean Eramo did

2    not have the same reaction as a 19- or 20-year-old woman,

3    which it seemed like Jackie interpreted as a nonreaction.  But

4    I interpreted it as this same kind of professional,

5    no-nonsense approach to dealing with, you know, women who come

6    forward saying that they have been victims of sexual assault.

7    Q    Did you see that as a professional response by

8    Dean Eramo, as depicted here?

9    A    Yes.  I saw that as -- I would not expect a dean at a

10   university to come out expressing shock, horror, and disgust

11   when interacting with a student.

12   Q    And the no-nonsense demeanor of Dean Eramo, you've

13   referred to that a number of times.  And I believe you've

14   already indicated that you independently corroborated that?

15   A    I did, by watching the WUVA video.

16   Q    And we've already established that you didn't feel that

17   you were able to specifically ask Dean Eramo whether she had

18   this reaction; is that right?

19   A    Yes, that's true, given that this was specifically about

20   a meeting between Jackie and Dean Eramo.

21   Q    And are you aware, Ms. Garber-Paul, in this lawsuit that

22   the plaintiff claims that this statement conveys the message

23   that she took no action in response to Jackie's allegations?

24   A    I'm aware of that, yes.

25   Q    And was that your understanding of the passage at the

1    time you fact-checked the article?

2    A    No, that was not my understanding.

3    Q    Was it your intent to convey to readers that Dean Eramo

4    specifically took no action in response to Jackie's

5    allegations?

6    A    No.

7    Q    And was it your understanding that the article conveyed

8    that impression?

9    A    That was not my understanding of what the article was

10   saying, no.

11   Q    Did you understand "nonreaction" to refer to Ms. Eramo's

12   emotional response?

13   A    Yes.

14   Q    And this same paragraph indicates toward the end that

15   "for a whole year, I thought about how he had ruined my life

16   and how he was the worst human being, and then I saw him and I

17   couldn't say" -- moving down.  I want to go further.  I'm

18   sorry.  I've got the wrong one.

19   A    Uh-huh.

20   Q    At the end of the paragraph it begins, "You look

21   different"?

22   A    Yes.

23   Q    It says, "Because, as she miserably reminded Eramo in her

24   office, she didn't feel ready to file a complaint.  Eramo, as

25   always, understood."

1    Do you see that passage?

2  A    Yes.

3  Q    And so did you understand in context it was made clear

4  that it was Jackie, not Dean Eramo, who was deciding to take

5  no action?  Is that right?

6  A    Yes.  I thought we made it clear throughout that it was

7  always Jackie who decided to not move forward, and Dean Eramo

8  was going to be supportive no matter what her decision was.

9  Q    And at the time you signed off on this passage in the

10  course of your fact-checking of the article, did you believe

11  this statement to be accurate?

12  A    Yes, I did.

13  Q    Did you have any doubt whatsoever about its accuracy?

14  A    No, I did not.

15  Q    Now, turning your attention to statement Number 4, which

16  appears at 1078 to 79 of the article, it starts with, "Given

17  the swirl of gang rape allegations Eramo had now heard against

18  one of UVa's oldest and most powerful fraternities" -- and

19  then it goes on -- "the school may have wondered about its

20  responsibilities to the rest of the campus.  Experts apprized

21  of the situation by RS agree that, despite the absence of an

22  official report, Jackie's passing along two other allegations

23  should compel the school to take action out of regard for

24  campus safety."

25  A    Yes.

1  Q    And, now, this particular passage is not attributed to

2  Jackie; is that right?

3  A    No, it's not.

4  Q    And did you understand Jackie to be a source for the

5  observation that the school may have wondered about its

6  responsibilities to the rest of the campus?

7  A    I did not believe that Jackie was being cited here as an

8  expert, no.

9  Q    But you did -- and I believe we've already covered this,

10 so we won't retread it -- but you spoke to both Ms. Dunn and

11 Mr. Carter to confirm this statement; is that right?

12 A    Yes.  To confirm the substance of the statement, yes.

13 Q    And did you do anything to check the underlying accuracy

14 of the fact that the school was only now, in the fall of 2014,

15 taking any -- taking action to investigate Jackie's

16 allegations?

17 A    Yes.  We became aware of that through the University of

18 Virginia, I believe.

19 Q    And how did you verify that?  How did you become aware?

20 A    I would have to look at my notes, actually.

21 Q    Well, to move things along, is it correct that President

22 Sullivan, in that interview -- you looked at that transcript;

23 is that right?

24 A    Yes, I did.

25 Q    And in that transcript, she had confirmed that the school

1  had started its investigation just a few weeks ago; is that

2  right?

3  A    Yes, that's true.

4  Q    And that interview had taken place in September of 2014?

5  A    Yes.

6  Q    And you were also able to verify that Phi Psi had been

7  contacted for the first time in mid-September of 2014; is that

8  right?

9  A    Yes, that's true.

10  Q    And you also confirmed, did you not, that UVa never

11  issued a Clery warning; is that right?

12  A    Yes, it did.

13  Q    How did you confirm that?

14  A    I confirmed that with UVa.

15  Q    And did you also look on the websites for Clery warnings,

16  or did you try to find it independently there?

17  A    Yes.  I was not able to find anything.

18  Q    And how did you understand the take action, what that

19  meant in the context of that statement?

20  A    To issue a warning.

21  Q    And/or to do an investigation?  Did you understand that

22  as well?

23  A    Yes.

24  Q    And you're aware, are you not -- I believe you addressed

25  that one of the -- you've already indicated that one of the

1  themes of the article was that the school was not taking with

2  sufficient seriousness the safety of the community in

3  addressing these allegations; is that right?

4  A    Yes.  I believe that was a major point of the article.

5  Q    And that's repeated several times in the article, is it

6  not?

7  A    Yes, it is.

8  Q    In fact, this wording that appears in this statement on

9  1079 is the third time that it had been said in the article in

10 words substantively similar to here; is that right?

11 A    Yes.

12 Q    I direct your attention to page 1077.  Do you see right

13 before the quotes from the Rugby Road song, it says, "In the

14 meantime, having presumably judged there to be no threat to

15 public safety, the UVa administration took no action to warn

16 the campus that an allegation of gang rape had been made

17 against an active fraternity."

18 A    Yes, that's true.

19 Q    Do you see that "no action" is defined in that sentence?

20 A    Yes.  It seems to be defined as a warning to the campus.

21 Q    And on page 1078, in the context of discussing One Less

22 in the middle column, do you see the passage where it says,

23 "So profound was the students' faith in its administration

24 that, although they were appalled by Jackie's story, no one

25 voiced questions about UVa's strategy of doing nothing to warn

1    the campus of gang rape allegations against a fraternity that

2    still held parties and was rushing a new pledge class."

3        Do you see that?

4    A    Yes.

5    Q    And was "doing nothing" defined in that sentence?

6    A    "Doing nothing" here is defined as, again, warning the

7    campus.

8    Q    And so when you were addressing the accuracy of the

9    statement on page 1078, which is the third iteration of this

10   idea about taking no action, did you understand what -- how a

11   reader would interpret "taking no action"?

12            MR. PHILLIPS:  Objection, Your Honor.  She can't

13   testify as to how a reader would understand it.

14            THE COURT:  I think it's a fair question.  If she

15   can answer it, I'll have her do so.

16            THE WITNESS:  It was my reading of it.

17            You're right.  I can't speak to what a reader might

18   interpret.

19            But it was my reading of it, given that we'd said

20   substantively the same thing three times, and defined it the

21   first two, that a reasonable person could figure out that what

22   we were discussing here was issuing a warning to campus.

23   BY MS. McNAMARA:

24   Q    And at the time you signed off on this passage, when you

25   completed your fact-checking process, did you believe it to be

1  accurate?

2  A    Yes, I did.

3  Q    Did you have any doubt whatsoever about the accuracy of

4  this information at the time you signed off and the article

5  was published?

6  A    Not at all.

7  Q    Now, are you familiar with the Columbia Journalism

8  Report?

9  A    Yes, I am.

10  Q    And I assume you've read it?

11  A    Yes, I have.

12  Q    It was a little painful; is that fair to say?

13  A    That would be fair, yes.

14  Q    I want to, if we could, put up on the screen Plaintiff's

15  Exhibit 139 on page 7.

16        MS. SCHARY:  I believe it's actually in here.

17        THE WITNESS:  Yes.  I'm here.

18  BY MS. McNAMARA:

19  Q    Do you see the last paragraph on this page, where it

20  indicates that "Erdely believed firmly that Jackie's account

21  was reliable, and so did her editors and the story's

22  fact-checker, who spent more than four hours on the phone with

23  Jackie reviewing every detail of her experience.  'She wasn't

24  just answering yes, yes, yes; she was correcting me,' the

25  checker said.  'She was describing the scene for me in a very

1    vivid way.  I did not have doubt.'"

2        Is that a quote from you, Ms. Garber-Paul?

3    A    Yes, it is.

4    Q    And you had cooperated with the Columbia Journalism

5    Review in its analysis of the reporting of this article; is

6    that right?

7    A    Yes.  I had sat in for a long interview with Sheila

8    Coronel and Derek Kravitz for this.

9    Q    And did you agree with the conclusion of the Columbia

10   Journalism Review in its findings that you believed firmly in

11   Jackie's account?

12   A    Yes, I did.

13   Q    And that you believed firmly that the account was

14   reliable?  You agreed with the Columbia Journalism Review

15   findings to that effect; is that right?

16   A    Yes, I did.

17   Q    Now, there were some questions about the photo

18   illustration that appears in the article; is that right?

19   A    Yes.  I believe there were.

20   Q    Do you have anything to do with the assigning or

21   development of photo illustrations?

22   A    No, I don't.

23   Q    But you did review this illustration and had a comment;

24   is that right?

25   A    Yes, that's true.

1  Q    And I know you've mentioned this yesterday, but the

2  comment was, you know, "Is this too mean"?

3  A    Yes.  I wrote that.

4  Q    And tell us how you resolved that question.

5  A    Well, I -- there were a couple of things.  Let me turn to

6  this so I can look at it.

7       When I first reviewed my type final -- so the

8  almost-final copy -- which is when photo illustrations which

9  are being worked out by different departments are finally

10 placed in for everybody to see, I looked at this, and I

11 thought that it -- that people might look at it and think that

12 Dean Eramo was turning her back on the -- the -- the victim

13 advocate's protest that seems to be happening outside her

14 window.

15      I took this to kind of be an illustration of the Take

16 Back the Night type protest that we discuss in the article.  I

17 was worried that -- you know, I thought her having her back to

18 it, I thought it might look like she was dismissive of it or

19 nonsupportive of it.  But in looking at this and kind of --

20 that was my initial reaction, going through, looking at

21 everything, kind of jotting it down.

22      In sitting there and looking at it more, and in talking

23 to Sean about it as well, I changed my mind and decided that

24 it was fair because it was simply trying to incorporate

25 multiple themes, multiple themes from the article, into one

1    illustration.  So we're showing Dean Eramo counseling a young

2    student who seems to be going to her, and Dean Eramo looks

3    like she's comforting her and spending time with her, and

4    not -- so she's spending time with her.  And then also, in

5    addition to, there's this protest that's happening outside.

6        And I thought we made it very clear in the article that

7    Dean Eramo is supportive of these kinds of protests and these

8    kinds of, you know, activist organizing things.  So between

9    that and the caption making it explicitly clear that she's

10   beloved by students, I decided that I was very comfortable

11   with this.

12       And my initial reaction to this was different than my

13   considered reaction to this.  So that's why I signed off on

14   it.

15   Q    And as a result of your communications with Sean

16   concerning this, the caption was changed; is that right?

17   A    Yes, we changed the caption.

18   Q    And a change that was made was that it now incorporated

19   that Dean Eramo was beloved by students; is that right?

20   A    Yes.

21   Q    And the protest imagery that's included in the

22   illustration, you understood those to be protests surrounding

23   Take Back the Night; is that right?

24   A    Yeah.  I took that to be somewhat, for lack of a better

25   word, generic, antirape kinds of campus protests that happen

1    across the country.

2    Q    It wasn't a protest that was being depicted as protesting

3    UVa per se, was it?

4    A    No.

5            MR. PHILLIPS:  Objection, Your Honor.  I haven't

6    said much about leading -- and I know Your Honor's view on

7    that -- but at times here, Ms. McNamara really seems to be

8    testifying for the witness.  I mean, I don't know if I want

9    her asking Ms. Garber-Paul's interpretation of this; but she's

10   explaining her interpretation and then asking Ms. Garber-Paul

11   to agree with that.

12           THE COURT:  It is a leading question, but don't you

13   think it's a little late now to start complaining?

14           MR. PHILLIPS:  Fair enough, Your Honor.  I thought

15   that one was even a bit over the top by today's standards.

16   BY MS. McNAMARA:

17   Q    There's been testimony here that the image portrays

18   Dean Eramo as a devil.  Do you agree with that conclusion?

19   A    No.  I don't believe that's true.

20   Q    Now, Ms. Eramo also contends that the article overall

21   creates an implication.  Are you -- a false implication.

22        Are you aware of that?

23   A    Yes, I am.

24   Q    And the implication that she has identified is that the

25   article implies "she was a false friend to Jackie, pretending

1    to be on her side, at the same time discouraging Jackie from

2    pursuing a formal complaint or police investigation regarding

3    her rape allegations in order to suppress the assault and

4    protect the university's reputation"?

5    A    Yes.

6    Q    Do you agree or was it your intent that the article

7    portray that implication?

8    A    No.

9    Q    And let's break it down.

10        How do you believe -- or do you think that the article

11   does, in fact, depict Ms. Eramo as a false friend?

12   A    No.  I believe it depicts her as a real friend to these

13   people.

14   Q    And why?  What do you use to reach that conclusion?

15   A    She sits down with them on multiple occasions.  She

16   offers her -- she offers to be there for them no matter what

17   they decide to do.  She's not pushing them to do one thing or

18   another.  She's offering them options.  She's telling what she

19   can.  She's offering them support.

20   Q    And do you believe that the article depicts that

21   Ms. Eramo was discouraging Jackie from pursuing a formal

22   complaint or a police investigation regarding her rape

23   allegations?

24   A    No, I don't believe it does.

25   Q    And, in fact, as we've discussed, the article makes clear

1   that she would assist her if she wanted to pursue an

2   investigation; isn't that right?

3   A    Yes.  We -- I believe it makes it clear that no matter

4   what Jackie wanted to do, Dean Eramo was going to be

5   supportive of her decision.

6   Q    At the time you completed your fact-checking process of

7   this article, did you intend an implication to be created that

8   Dean Eramo was discouraging Jackie from reporting her

9   allegations?

10  A    No, absolutely not.

11  Q    Do you believe that anything in the article endorses that

12  implication?

13  A    No, I don't believe it does.

14  Q    In fact-checking the article, did you believe that it

15  depicted Ms. Eramo as discouraging Jackie from moving forward

16  in order to protect UVa's reputation?

17  A    No.

18  Q    Did you see anything in the article that supported that

19  conclusion?

20  A    No, I did not.

21  Q    And let's -- I think when Mr. Phillips was asking you, he

22  directed your attention to the "critics say" statement.

23  A    Yes.

24  Q    And I believe that appears at 1073 of the article.

25       And when you were originally speaking with Jackie, you

1   had written a note on that passage with Jackie saying, "not

2   Dean Eramo."

3       Do you recall that?

4   A   Yes, we did.

5   Q   And did -- and you didn't make a change in this passage;

6   is that right?

7   A   No, I did not.

8   Q   Do you -- what did you understand this passage to be

9   discussing, in context?

10  A   Well, I had asked Jackie's opinion on this passage, just

11  because I was interested in her opinion, and I made a note of

12  it.  But I understood this passage to be referring to the

13  critics of the administration at UVa, not current students who

14  were supportive of it.

15  Q   And immediately following that passage, does the article

16  proceed to recount the observations of the number of critics?

17  A   Yes.  We have specifically two critics on the record,

18  both Liz Seccuro and S. Daniel Carter, speaking and being

19  quoted on their specific criticisms.

20  Q   And when you turn to the next page, the article also

21  quotes Susan Russell, does it not?

22  A   Yes, it does.

23  Q   And did you consider her to be a critic of the

24  administration?

25  A   Yes, I did.

1   Q    And, specifically, what was she being quoted here on page

2   1074 in the left column?

3   A    She was -- she believed that there was not enough being

4   done to -- to punish people who had perhaps raped someone.

5   Q    And could you read her quote.  It begins "Think about

6   it."

7   A    Sure.  "'Think about it,' says Susan Russell, whose UVa

8   daughter's sexual assault report helped trigger a previous

9   federal investigation.  'In what world do you get kicked out

10  for cheating, but if you rape someone, you can stay?'"

11  Q    And I believe before -- and I think this got cleared up,

12  but I want to make sure the record is clear.  You didn't

13  understand that Susan Russell was Stacy's mother --

14  A    No.

15  Q    -- is that correct?

16  A    No.  No, that's true.  She was not.  She was one of the

17  other rape victim's mothers.

18  Q    And then in the next paragraph there's another critic

19  that's quoted in the article, is there not?

20  A    In the next paragraph there's a Wendy Murphy.

21  Q    And she's quoted as saying, "These schools love to

22  pretend they protect children as if they were their own, but

23  that's not true.  They're interested in money."

24       Do you see that?

25  A    That's true.

1   Q    You understood that that was another example of the

2   critics who were questioning that the administration was less

3   concerned with protecting students than it is with protecting

4   its own reputation from scandal?

5   A    Yes.  And I was comfortable with this, because then

6   immediately after that, we go into the UVa president, Teresa

7   Sullivan, then giving her viewpoint of it.

8   Q    Right.  That's where she's quoted as saying that the

9   administration does not sweep sexual assault under the rug; is

10  that correct?

11  A    Yes.

12  Q    Now, Ms. Eramo has contended a number of allegations with

13  regard to post-publication statements on podcasts and the

14  like.

15       Are you aware of that?

16  A    I'm aware of those, yes.

17  Q    Did you have anything to do with any of those

18  post-publication statements?

19  A    No, I didn't.

20  Q    Did you fact-check them?

21  A    No, I did not.

22  Q    So back on the "critics say," your notation about, "yes,

23  but not about Dean Eramo," you didn't see that in conflict

24  with the "critics say" statement?

25  A    No.  I did not see Jackie to be a critic of the

1    administration.

2    Q    Now, you've also indicated that the reference to syphilis

3    was removed from the article; is that right?

4    A    Yes, that's true.

5    Q    Do you know or have any knowledge about whether medical

6    records were obtained from Jackie to confirm that?

7    A    I have not seen them.

8    Q    And did you feel that that was an important piece of

9    documentation you needed?

10   A    No, I did not.

11   Q    Did you confirm that fact directly with Jackie?

12   A    I did.  She confirmed it with me.  She told me that she

13   believed it had come during the course of the sexual assault,

14   and she asked that we remove it.  And I said I thought that

15   would be okay.

16        I, you know, checked with Sabrina and Sean to make sure

17   that we weren't -- you know, because I check all of my

18   questions with them.

19        But, yeah, I did not see it -- I was not at that point

20   trying to revet this individual, and I was not trying to come

21   up with, you know, new corroborating documents that -- for

22   facts that weren't going to be included in the story.

23   Q    And do you recall Mr. Phillips asked you about the fact

24   that the reference to Brian Head did not include the fact that

25   he was the president of One in Four?  Do you recall that?

1   A    Yes.

2   Q    And at the time that Mr. Head is quoted in the article,

3   had One in Four been introduced into the article?

4   A    No, it had not.

5   Q    And so from an editorial perspective, would it have made

6   sense to include the observation that he was the president of

7   One in Four?

8   A    No.  In our opinion, it did not.

9   Q    And why not?

10  A    Because we would have had to introduce an entirely new

11  section of the story in a place where it didn't make sense.

12  And also, what he was speaking to, we figured he was an

13  authority on that just as a student of UVa, not necessarily as

14  a president of this organization.

15  Q    And what did you understand him to be speaking to in the

16  quote?

17  A    He was speaking -- sorry.

18  Q    No.  Go ahead.

19  A    He was speaking to campus culture.

20  Q    And is that true as well for the identification of Sara

21  Surface and Alex Pinkleton?

22  A    Yes, that's true.

23  Q    So at the time they were quoted, their affiliation -- or

24  the introduction of One Less and what that organization was on

25  campus had not been introduced to the article; is that right?

1  A    Yes.  We had a whole section about it, but that was a
2  little bit later in the article.
3  Q    Now, in closing, Ms. Garber-Paul -- you'll be happy to
4  hear -- we've established that you spent a lot of hours going
5  over this article; is that right?
6  A    Yes.
7  Q    And you felt that you had pulled a lot of threads and
8  that you had looked at a lot of documents and spoken to a
9  number of people; is that right?
10 A    Yes.
11 Q    And you -- at the time you were dealing with this
12 article, you had no animus against the plaintiff, Nicole
13 Eramo; is that right?
14 A    Absolutely not.
15 Q    You had never met her; is that correct?
16 A    No, I had not.
17 Q    And you had no animus against the University of Virginia,
18 did you?
19 A    No, I did not.
20 Q    So at the time you completed your fact-checking process,
21 did you believe -- as we established at the outset, but to
22 reestablish, did you believe that everything in the article
23 was accurate?
24 A    Yes, I believed everything in the article to be
25 absolutely accurate.

1  Q    And that included any and all references to Dean Eramo;

2  is that right?

3  A    Yes, that's correct.

4  Q    And you -- at the time you published this article, you

5  had no doubts whatsoever about its accuracy.  Is that fair to

6  say?

7  A    Yes, that's fair.

8  Q    And given your level of certitude, is that why you were

9  so upset and shocked on December 5 when you became aware that

10 Sabrina had lost faith in Jackie?

11 A    I was -- I was initially shocked and, over the course of

12 that day and that weekend, just became heartsick and

13 devastated.

14         MS. McNAMARA:  Thank you.  I appreciate your time.

15         THE COURT:  How long, Mr. Phillips, for redirect?

16         MR. PHILLIPS:  Maybe an hour.

17         THE COURT:  Let's go ahead and have our lunch break.

18         Ladies and gentlemen, the plaintiff is entitled to

19 redirect examination of this witness, and you've heard counsel

20 say that it will take about an hour.  So this is probably a

21 good time for us to break for lunch.

22         I would ask that, while you're away from the court,

23 you not discuss the case with one another, do not permit

24 anyone to discuss it with you.

25         I'll ask the witness not to discuss her pending

1    testimony with counsel from either side.

2              Let's plan to return at 15 after 1.

3              Ask the marshal to declare court in recess for

4    lunch.

5    (Lunch recess)

6

7                    CERTIFICATE

8        I, JoRita B. Meyer, certify that the foregoing is a

9    correct transcript from the record of proceedings in

10   the above-entitled matter.

11   /s/ JoRita B. Meyer                    Date: 10/25/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25