Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

1

1                    UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF VIRGINIA

3                      CHARLOTTESVILLE DIVISION

4

5    ******************************
     NICOLE P. ERAMO,              * CIVIL ACTION 3:15-CV-00023
6                                  * OCTOBER 25, 2016
             Plaintiff,            * TRIAL DAY 8, VOLUME 2
7    vs.                           *
                                   *
8    ROLLING STONE, LLC,           *
     SABRINA RUBIN ERDELY,         * Before:
9    WENNER MEDIA, LLC,            * HONORABLE GLEN E. CONRAD
                                   * UNITED STATES DISTRICT JUDGE
10           Defendants.           * WESTERN DISTRICT OF VIRGINIA
     ******************************

11

12

13   APPEARANCES:

14   For the Plaintiff:       THOMAS ARTHUR CLARE, ESQUIRE
                              ELIZABETH MARIE LOCKE, ESQUIRE
15                            ANDREW CLAY PHILLIPS, ESQUIRE
                              JOSEPH R. OLIVERI, ESQUIRE
16                            Clare Locke, LLP
                              902 Prince Street
17                            Alexandria, VA 22314

18
     For the Defendants:      ELIZABETH ANNE McNAMARA, ESQUIRE
19                            ALISON SCHARY, ESQUIRE
                              Davis Wright Tremaine, LLP
20                            1251 Avenue of the Americas, 21st Flr.
                              New York, NY 10020
21

22   Court Reporter:          Lance A. Boardman, RDR, CRR
                              c/o JoRita B. Meyer, RMR, CRR
23                            210 Franklin Road, S.W.
                              Roanoke, Virginia 24011
24                            540.857.5100, Ext. 5311

25        Proceedings recorded by mechanical stenography;
     transcript produced by computer.

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

2

1
APPEARANCES (Continued):

2
For the Defendants:        W. DAVID PAXTON, ESQUIRE

3                          J. SCOTT SEXTON, ESQUIRE
                           MICHAEL J. FINNEY, ESQUIRE

4                          Gentry Locke Rakes & Moore
                           P. O. Box 40013

5                          Roanoke, VA 24022

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

3

1                          INDEX

2

3

4    WITNESS:                                    PAGE:

5    ELISABETH GARBER-PAUL (CONT'D)

6            REDIRECT EXAMINATION

7            BY MR. PHILLIPS..........................    5

8            RECROSS-EXAMINATION

9            BY MS. McNAMARA..........................   27

10   BENJAMIN REXRODE

11           DIRECT EXAMINATION

12           BY MS. LOCKE.............................   38

13           CROSS-EXAMINATION

14           BY MR. PAXTON............................   62

15           REDIRECT EXAMINATION

16           BY MS. LOCKE.............................   74

17   JACOB VIA

18           DIRECT EXAMINATION

19           BY MS. LOCKE.............................   77

20           CROSS-EXAMINATION

21           BY MR. PAXTON............................   92

22           REDIRECT EXAMINATION

23           BY MS. LOCKE.............................   97

24

25                         * * * * *

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

4

1                    INDEX OF EXHIBITS

2

3    FOR THE PLAINTIFF:                         PAGE:

4    Plaintiff's Exhibit 158 marked for identification...    58

5    Plaintiff's Exhibit 158 admitted into evidence......    61

6

7    FOR THE DEFENSE:

8

9    COURT EXHIBITS:

10

11

12

13                           *****

14

15

16

17

18

19

20

21

22

23

24

25

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

5

1          (The jury is present in Open Court at 1:17 p.m.)

2          THE COURT:  Okay.  All 10 jurors are back and in

3    their places, ready for the redirect examination of the

4    witness.

5          MR. PHILLIPS:  Thank you, Your Honor.

6              (ELISABETH GARBER-PAUL, SWORN)

7              REDIRECT EXAMINATION

8    BY MR. PHILLIPS:

9    Q    Hello, again, Miss Garber-Paul.

10   A    Hello.

11   Q    I want to start by asking you:  You recall that Miss

12   McNamara just asked you some questions about your

13   interpretation of certain statements in the article as well as

14   the implication of the article.

15         Do you recall that?

16   A    Yes.

17   Q    One of the statements she asked you about was a statement

18   in the article that said:  Lots of people have discouraged her

19   from sharing her story, Jackie tells me with a pained look,

20   including the trusted UVa dean to whom Jackie reported her

21   gang rape allegations more than a year ago.

22         Are you familiar with that statement?

23   A    Yes.

24   Q    You testified in your examination with Miss McNamara that

25   you did not understand the article to be suggesting that

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

6

1   Ms. Eramo discouraged Jackie from moving forward with a police

2   or university investigation; is that correct?

3   A    That is correct.

4   Q    And you testified that you don't believe that the article

5   does suggest that, that Ms. Eramo discouraged Jackie from

6   moving her case forward; is that correct?

7   A    That's correct.

8   Q    And Jackie never told you that Ms. Eramo discouraged her

9   from moving her case forward; isn't that correct?

10   A    Yes, she did not.

11   Q    Did you see any evidence in the materials that you

12   reviewed for your fact-checking suggesting that Dean Eramo

13   discouraged Jackie from moving her case forward?

14   A    No, I did not.

15   Q    Did Jackie ever tell you that Ms. Eramo sought to

16   suppress her gang rape?

17   A    No, she did not.

18   Q    Did you see any materials -- or any evidence in the

19   materials that you reviewed suggesting that Dean Eramo sought

20   to suppress Jackie's gang rape?

21   A    No.

22   Q    So when Ms. Erdely said on the Slate podcast -- this is

23   Tab 4 of the --

24        MS. McNAMARA:  Objection.  Foundation, Your Honor.

25        She testified she didn't have anything to do with that.

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

7

1        THE COURT:  Yeah, we haven't heard much about either

2    of the interviews.

3        MR. PHILLIPS:  I'm going to ask her about it.

4        THE COURT:  Well, I think you require some

5    foundation before you can do so.  Did she hear it?  Is she

6    familiar with it?

7    BY MR. PHILLIPS:

8    Q    Are you familiar with Ms. Erdely's statements on the

9    Slate podcast?

10   A    No, I didn't listen to it.

11   Q    You have not been presented with those statements in any

12   way in your preparation for this case?

13   A    No.  Since I wasn't involved with them, we didn't go over

14   them.

15   Q    As the fact-checker for Rolling Stone magazine, do you

16   believe that it's true or false that Ms. Eramo sought to

17   suppress Jackie's gang rape?

18   A    No, I don't believe it's true.

19   Q    You believe that's false?

20   A    Yes.

21   Q    And you're not aware of any materials that you saw in

22   fact-checking the article that supported that statement; is

23   that correct?

24   A    That is correct.

25   Q    As the fact-checker for Rolling Stone magazine, you agree

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

8

1   that it's a false statement that Jackie was discouraged by

2   Ms. Eramo from moving her case forward, correct?

3   A    In the materials that I worked on to fact-check this

4   article, no, I didn't come across anything that said that Dean

5   Eramo discouraged Jackie from moving forward with her case.

6   Q    And Ms. Erdely presented you with her entire reporting

7   file, didn't she?

8   A    Yes, she did.

9   Q    Speaking generally, not necessarily about this article

10  but generally, isn't it true that Rolling Stone magazine seeks

11  to verify quotations from persons to whom they are attributed?

12  A    Yes, whenever possible.

13  Q    That's something that Rolling Stone takes very seriously,

14  correct?  You would agree with that?

15  A    Yes, I would.

16  Q    I want to ask you about Rachel Soltis.

17       You'll recall Rachel Soltis was Jackie's freshman year

18  roommate?

19  A    Yes.

20  Q    And Ms. Erdely spoke to her when she was reporting "A

21  Rape On Campus," correct?

22  A    Yes, she did.

23  Q    And you spoke to Miss Soltis when you were fact-checking

24  the article, correct?

25  A    Yes, I did.

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

9

1   Q    And you know now, as we discussed yesterday, that Miss

2   Soltis had provided Cindy, Kathryn Hendley's, real name to

3   Ms. Erdely, correct?

4   A    Yes.

5   Q    And your testimony is that -- let me back up.

6        You had Ms. Erdely's reporting file, correct, in your

7   possession when you were fact-checking the article?

8   A    Yes, I did.

9   Q    Including Ms. Erdely's interview with Rachel Soltis, the

10  notes of that interview?

11  A    Yes.

12  Q    I believe your testimony is that you simply didn't see it

13  before you spoke to Miss Soltis?

14  A    I may have skimmed through it, but I certainly didn't

15  realize the consequence of what that name was in it, yes.

16  Q    And is it your understanding that Ms. Erdely takes the

17  same position, that she had it but she wasn't -- she just

18  wasn't aware of it?

19  A    That's my understanding, but...

20  Q    Now, you testified in response to questioning from

21  Ms. McNamara that you spoke to Miss Soltis about Kathryn

22  Hendley, correct?

23  A    Yes, I did.

24  Q    Specifically, you said that Kathryn -- that Miss Soltis

25  confirmed the description of Miss Hendley as a, quote/unquote,

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

10

1   hookup queen and referenced how she had slept with, I think

2   you said, around 40 guys.  Is that right?

3   A    I didn't say a number.  I want aware of a number.  I had

4   asked her about her being a self-described hookup queen, and

5   she said yes.

6   Q    And you testified that you discussed with Miss Soltis how

7   Miss Hendley had slept with a large amount of men; is that

8   fair?

9   A    Well, that she had claimed to.  I didn't discuss her

10  actual -- like how many people --

11  Q    To be very clear, I'm not suggesting that Miss Hendley is

12  actually a self-described hookup queen or that she slept with

13  a lot of men.

14       You would agree, as a fact-checker for Rolling Stone

15  magazine, that those statements in the article are completely

16  untrue, correct?

17  A    I would -- yes, since we retracted them since they were

18  based on what Jackie told us.

19       MR. PHILLIPS:  Brian, can we pull up Trial Exhibit

20  10 as RS004421.

21       And feel free to go back a page or two if you need

22  to to confirm.

23       THE CLERK:  It's in the spiral bound.

24       MR. PHILLIPS:  This should be a spiral bound?

25       THE CLERK:  In the spiral bound, yes.

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

11

1        THE WITNESS:  Which page is it?

2        MR. PHILLIPS:  It's RS004421.

3   BY MR. PHILLIPS:

4   Q    And if you go two pages back, if that helps you confirm

5   that this is Ms. Erdely's interview with Miss Rachel Soltis.

6   A    Yes.

7   Q    And this is the interview that was available to you at

8   the time you were fact-checking the article, correct?

9   A    Yes, it was.

10       MR. PHILLIPS:  Brian, let's go forward with 4421.

11  And if we could blow up the lower third or so of the page.

12  Q    And this is where Miss Soltis told Ms. Erdely:  Kathryn

13  Hendley, or Hinkley -- Ms. Erdely didn't know how to spell it,

14  but she said, I've heard that she apparently is a real, I

15  don't want to say it, but she kind of brings guys to her room.

16  And Jackie would say that she had slept with more than 40

17  guys.  I don't want to be slut shaming, but Kathy and Al told

18  Jackie not to tell because it would ruin her reputation.

19       Do you see that?

20  A    Yes.

21  Q    My question, Miss Garber-Paul, is:  On a campus of some

22  20,000 students, how did you know to speak with Miss Soltis

23  about Kathryn Hendley if you hadn't read these notes before

24  that conversation?

25  A    Because I had spoken with Sabrina about her sourcing, and

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

12

1  she told me that a good person to talk to about this section

2  was Rachel Soltis.

3  Q    So Ms. Erdely confirmed to you that Miss Soltis knew

4  Kathryn Hendley?

5  A    Yes.

6  Q    And you knew that prior to publication of the article?

7  A    Yes, I did.

8  Q    So I'm trying to understand your testimony, Miss

9  Garber-Paul.

10      If you knew that Miss Soltis knew Kathryn Hendley, and if

11  Mr. Woods told Columbia that you-all were so desperate to get

12  ahold of these kids but you just couldn't find them, why

13  didn't you ask Rachel Soltis for her name?  Why didn't you

14  call Miss Hendley?

15  A    I really wish I had.  I can't tell you why I made a

16  decision late in the game in fact-checking this.  I was trying

17  to confirm the information in the article.

18      I was under the impression that we couldn't get ahold of

19  them at this point.

20  Q    Did you ask Miss Soltis for Kathryn Hendley's name?

21      I understand you already had it, but when you spoke with

22  her on the phone, did you ask her?

23  A    No, I did not.

24  Q    Why not?

25  A    I don't know how to answer that question.  I really wish

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

13

1   I had.  I didn't because it was -- I was just trying to

2   confirm the information that was in the article, and I should

3   have asked her.

4   Q    You didn't confirm the quotes with Kathryn Hendley.

5   Rolling Stone called Kathryn Hendley a "self-described hookup

6   queen," as in Kathryn Hendley refers to herself as a hookup

7   queen, correct?

8   A    Yes.

9   Q    You did not confirm that with Kathryn Hendley.  You

10  didn't call her?

11  A    I did not.

12  Q    Rolling Stone magazine said that Kathryn Hendley told

13  Jackie, speaking of her gang rape:  Why didn't you just have

14  fun with it, a bunch of hot Phi Psi guys."

15       You didn't confirm that absurdly callous quote with

16  Kathryn Hendley, did you?

17  A    I didn't.

18  Q    You didn't call her because you knew if you did, she

19  would have denied saying those ridiculous things, didn't you?

20  A    That's not true.

21  Q    You didn't want that denial in Rolling Stone magazine?

22  A    That's not true.

23  Q    Those quotes were too perfect, weren't they?

24  A    No.

25  Q    Now, as we discussed yesterday, Jackie told you that she

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

14

1    didn't want Rolling Stone to contact Kathryn Hendley and Alex

2    Stock, who she called "Kathryn" and "Alex," because her

3    relationship with them had turned sour after her assault; is

4    that correct?

5    A    It was my understanding that we weren't able to get in

6    touch with her -- with them because their relationship had

7    turned sour.  It was not my understanding that she was telling

8    us not to.

9    Q    Well, but we're skipping a step there.

10        Your testimony was you weren't able to get in touch with

11   them because Jackie wouldn't give you their names or contact

12   information, correct?

13   A    That's true.

14   Q    And the reason she wouldn't do that is because her

15   relationship with them had turned sour; is that correct?

16   A    It was my understanding, yes.

17   Q    At the time this article was published, you had been a

18   professional fact-checker for some time; is that correct?

19   A    That's correct.

20   Q    Wouldn't you agree as a professional fact-checker that if

21   a source is telling you, I don't want you to speak to this

22   potential corroborating witness, and, even further, I don't

23   want you to speak to this potential corroborating witness

24   because I'm not on good terms with that person, isn't that a

25   giant waving red flag that your source is worried about what

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

15

1   this person is going to say?

2   A    It could be, but I did not see this as a red flag at the

3   time.  I said that I deeply regret not having worked harder to

4   find these people to reach out to them.

5           THE COURT:  In retrospect, do you agree that it was

6   a red flag?

7           THE WITNESS:  I think I didn't understand that she

8   was not letting us reach out to them.  It was my understanding

9   that we couldn't find them.  I didn't realize that she was in

10  any way preventing us from doing so.

11  BY MR. PHILLIPS:

12  Q    Well, now hold on, Miss Garber-Paul.  These were her

13  friends, right, or her former friends, correct?

14  A    Yes.

15  Q    You knew at the time that Jackie could have provided you

16  with their cell phone numbers, their Facebook pages, their

17  e-mail addresses, their publicly-available e-mail addresses.

18  You knew Jackie could have provided that information, correct?

19  A    Yes.

20  Q    And you-all had asked Jackie to provide that information,

21  correct?

22  A    Yes.

23  Q    And Jackie said no, correct?

24  A    That's true.

25  Q    Okay.  Common sense:  Jackie didn't want you to contact

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

16

1  them, correct?

2  A    Yes.

3  Q    And the notion that you needed -- if a source tells you,

4  I don't want you to contact this person who can corroborate my

5  story, doesn't that mean you need to work doubly hard to

6  contact that person?

7  A    Yes.  And it was my understanding that Sabrina had worked

8  very hard to try to find these people.

9  Q    Except that she had her name and didn't call her, right?

10 A    It appears to be that way, yes.

11 Q    And let's be clear.  This is not specialized fact-checker

12 knowledge, right?  This is common sense.  If a source tells

13 you, I don't want you to contact this person, that should be a

14 light bulb in your head telling you, I better contact this

15 person and see why my source doesn't want me to.

16      You would agree with that, right?

17 A    Yes.

18 Q    Now, Miss McNamara asked you during her examination with

19 respect to Jackie's assault claim whether it was common for

20 Rolling Stone magazine to rely on firsthand accounts from

21 sources of events like that.

22      Do you recall that?

23 A    Yes.

24 Q    And you said in your response, you said, if it's an event

25 that only they were present for.

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

17

1       Do you remember saying that?

2   A   Yes, I do.

3   Q   And you caught yourself a little bit, didn't you, when

4   you said that?

5   A   It's possible.

6   Q   Because that wasn't the situation here at all, was it?

7   A   No.  There were other people present, but she was

8   uncomfortable with us contacting them, and I understood that.

9   Q   There were a lot of other people present, weren't there?

10      Jackie told you she went to a date function at a

11  fraternity that night, correct?

12  A   Yes, she did.

13  Q   She told you that there were nine other men in that room,

14  correct?

15  A   Yes.

16  Q   And she told you that she met her three friends on the

17  street corner after that assault, correct?

18  A   Yes.

19  Q   Any of those people could have been potential

20  corroborating witnesses who could have proven or disproven the

21  story that Jackie was telling you all?

22  A   The three friends were not in that room, but, yes, they

23  could have been corroborating.

24  Q   They could have certainly corroborated the quotes that

25  Rolling Stone published and attributed them to them, couldn't

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

18

1   they?

2   A    That's true.

3   Q    They could have corroborated Jackie's supposed injuries

4   from that night:  the beaten face, the bloody dress that's

5   described in this Rolling Stone magazine.  They could have

6   corroborated or disproven that, couldn't they?

7   A    They could have corroborated her physical state, yes.

8          MR. PHILLIPS:  Brian, could we pull up Plaintiff's

9   Trial Exhibit 42, please, the first page.

10          THE CLERK:  The black one.

11          MR. PHILLIPS:  Oh, I'm sorry.  43, please.

12   BY MR. PHILLIPS:

13   Q    If you still have your large version up there, that will

14   be Plaintiff's Trial Exhibit 154.  Same document, larger

15   version.

16   A    Yes, it is.

17   Q    All right.  And this is the Round 1 fact-checking edit

18   that you did, but it's actually your second round of

19   fact-checking edits, correct?

20   A    You are correct.

21   Q    Okay.  I want to ask you about the deck at the top of the

22   page.  We spoke about it yesterday.  Do you recall?

23   A    Yes, I do.

24   Q    What is a deck?

25          A deck is essentially a short summary of what the

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

19

1   article's about, correct?

2   A    Yes, that's fair.

3           MS. McNAMARA:  Objection, Your Honor.  I didn't

4   address this in my cross for redirect.  There were no

5   questions about the deck.

6           MR. PHILLIPS:  She asked her many, many questions

7   about her interpretation of the article.  That's where I'm

8   going.  I'm just using the deck to set it up.

9           THE COURT:  I think it's a fair question.  I

10  overrule the objection.

11          MS. McNAMARA:  Okay.  Thank you.

12  BY MR. PHILLIPS:

13  Q    The deck says, Miss Garber-Paul:  When Jackie was just

14  starting her freshman year at the university -- I'm sorry.

15       "Jackie was just starting her freshman year at the

16  University of Virginia when she was brutally assaulted by

17  seven upper classmen at a frat party.  When she tried to hold

18  them accountable, a whole new kind of abuse began."

19       Correct?

20  A    Yes.

21  Q    We discussed that yesterday.  You circled that sentence:

22  "When she tried hold them accountable, a whole new kind of

23  abuse began."

24       And you wrote "nope" next to it, correct?

25  A    That's correct.

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

20

1    Q    Okay.  Now, I want to understand your testimony when Miss

2    McNamara was speaking to you.

3         You testified at length that you think the article shows

4    Ms. Eramo comforting Jackie and supporting Jackie.  Is that

5    correct?

6    A    Yes, that's true.

7    Q    Do you agree or disagree that this deck suggests that

8    Ms. Eramo abused Jackie?

9    A    It was not my interpretation that this deck was referring

10   to Ms. Eramo.

11   Q    Who did you understand the deck to be referring to?

12   A    I felt this was referring to other students.

13   Q    Let's be clear on the language.  And the second sentence

14   here, that when she tried hold them, that's the same -- that

15   appears exactly the same in the final, published version of

16   the article, correct?

17   A    Yes, it does.

18   Q    And what it says is:  When she tried to hold them --

19   "them" refers to the gang rapists, correct?

20   A    Yes.

21   Q    "When she tried to hold them accountable, a whole new

22   kind of abuse began."

23        Do you see that?

24   A    Yes.

25   Q    And your testimony is that you interpret "accountable" to

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

21

1   mean when Jackie told her friends about the assault?  That's

2   how she was trying to hold them accountable, the gang rapists?

3   A    Yes.  I didn't see anywhere else in the article that she

4   actually went through a process to hold them accountable in

5   any other way than talking about it.

6   Q    Isn't it true that every single time the article uses the

7   word "accountable" in the text of the article, it's referring

8   to holding rapists accountable through the University of

9   Virginia's disciplinary process?  Isn't that true?

10  A    I honestly don't know, but I would have to read through

11  the whole article and look at each time we used the word

12  "accountable."

13       MR. PHILLIPS:  Brian, let's go to Plaintiff's Trial

14  Exhibit 1 at RS001074.

15  Q    Specifically, I want to look at the paragraph in the

16  lower left-hand corner, left column.

17       It says, "Attorney Wendy Murphy, who has filed Title IX

18  complaints and lawsuits against schools, including UVa, argues

19  that in matters of sexual violence, Ivy League and Division I

20  schools' fixation with prestige is their downfall.  'These

21  schools love to pretend they protect children as if they were

22  their own, but that's not true.  They're interested in money,'

23  Murphy says.  'In these situations, the one who gets the most

24  protection is either a wealthy kid, a legacy kid, or an

25  athlete.  The more privileged he is, the more likely the woman

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

22

1    has to die before he's held accountable.'"

2        Do you see that?

3    A    I do.

4    Q    You would agree that the use of the phrase "held

5    accountable" in this paragraph is referencing the school's

6    responsibility to hold the perpetrator accountable, correct?

7    A    It is, but it's not referencing Jackie's story

8    specifically.

9    Q    The deck is referencing Jackie's story specifically,

10   isn't it?

11   A    The deck is, but that's not -- it's a summation of part

12   of the story.  It's not necessarily a summation of the entire

13   story.

14        MR. PHILLIPS:  Brian, let's go to RS001077, please.

15        And I want to look at the paragraph in the left-hand

16   column beginning with "for now, however."

17   Q    This paragraph says, "For now, however, Jackie left her

18   first meeting with Eramo feeling better for having unburdened

19   herself and with the dean's assurance that nothing would be

20   done without her say-so.  Eramo e-mailed a follow-up note

21   thanking Jackie for sharing, saying, 'I could tell that was

22   very difficult for you,' and restating that while she

23   respected Jackie's wish not to file a report, she'd be happy

24   to assist 'if you decide that you would like to hold these men

25   accountable.'"

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

23

1       Do you see that?

2   A    Yes, I do.

3   Q    The phrase as used in this paragraph of the article,

4   "hold these men accountable," that's referencing Jackie's

5   story, isn't it?

6   A    Yes, it is.

7   Q    That's an e-mail from Ms. Eramo to Jackie, isn't it?

8   A    Yes, it is.

9   Q    And it's referencing holding the men accountable through

10  the university disciplinary process, correct?

11  A    Yes, it is.

12       MR. PHILLIPS:  Brian, same page, let's go to the

13  middle column below the pull quote.

14  Q    I'll start the second sentence.  This says, "'They told

15  me it would ruin Jefferson's vision of what the university was

16  supposed to look like,' the alum says.  'As if Thomas

17  Jefferson even knew about electric lights.'  In 2002 and 2004,

18  two female students, including Susan Russell's daughter, were

19  unhappy with their sexual misconduct hearings, which each felt

20  didn't hold their alleged perpetrators accountable."

21       You see that?

22  A    Yes.

23  Q    And the use of the phrase "hold their alleged

24  perpetrators accountable" in this paragraph is referring

25  specifically to the University of Virginia sexual misconduct

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

24

1    process, correct?

2    A    Yes, it is.

3         MR. PHILLIPS:  Brian, let's go to RS001078, the

4    final paragraph on that page.

5    Q    I'll read this one aloud.

6         It says, "'You look different,' Drew told Jackie while

7    she stared back at him in fear, and he was right.  Since

8    arriving at UVa, Jackie had gained 25 pounds from

9    antidepressants and lack of exercise.  That interaction would

10   render her too depressed to leave her room for days.  Of all

11   her assailants, Drew was the one she wanted to see held

12   accountable.  But with Drew about to graduate, he was going to

13   get away with it because, as she miserably reminded Eramo in

14   her office, she didn't feel ready to file a complaint.  Eramo,

15   as always, understood."

16        You see that?

17   A    Yes, I do.

18   Q    This -- the use of the phrase "held accountable" in this

19   paragraph is specifically in reference to Jackie's story,

20   correct?

21   A    Yes, it is.

22   Q    And it's specifically in reference to the notion of

23   Jackie holding her perpetrators accountable by filing a

24   complaint through the university sexual misconduct process

25   with Ms. Eramo, correct?

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

25

1    A    Yes.

2    Q    So don't you agree that when Rolling Stone said in the

3    deck of the article, "When she tried to hold them accountable,

4    a whole new kind of abuse began," given all these uses of the

5    phrase "hold them accountable" throughout the article, a much

6    more plausible interpretation of that deck is that Rolling

7    Stone was referring to Ms. Eramo abusing Jackie, not to

8    Jackie's friends?

9        MS. McNAMARA:   Your Honor, I object to his

10   characterization of it.   That has -- without the foundation, I

11   think he's misrepresenting.

12       THE COURT:   I think the witness has previously

13   spoken about the construction of the article and the

14   importance of something coming before something else, so I

15   think this is a very logical question in response to that

16   observation.

17       Objection overruled.

18   A    I'm sorry.   Can you repeat that?

19   Q    Sure.

20       My question is, you previously testified that the use of

21   the phrase "hold them accountable" in the deck of the article

22   refers to Jackie's interactions with her friends.   Correct?

23   A    I said that in the context that the only way she actually

24   tried to hold anybody accountable, Jackie specifically, was by

25   talking about it in public on campus.

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

26

1  Q    We just agreed, every time the article says "hold them

2  accountable," it's referring to the university disciplinary

3  process, isn't it?

4  A    Okay.  Yes.

5  Q    So would you be shocked to learn that some people read

6  this article to say -- "When she tried to hold them

7  accountable, a whole new kind of abuse began," would you be

8  shocked to learn that a lot of people understood that to refer

9  to Ms. Eramo?

10        MS. McNAMARA:  Objection, Your Honor.  She can't

11  speak to what a lot of people or other people understand about

12  anything in the article.

13        THE COURT:  I agree with that observation.

14  Previously she was able -- she had testified as to how she

15  read it.

16        THE WITNESS:  Yes.

17        THE COURT:  And I'll let you ask her that question.

18  Q    All right.  Is it still your testimony that you believe

19  the deck of the article, when it says "When she tried to hold

20  them accountable, a whole new kind of abuse began," is it

21  still your testimony that you believe the most plausible

22  interpretation of that is referencing Jackie's friends?

23  A    That was the way I read it, but I understand that maybe

24  somebody else read it differently.

25        MR. PHILLIPS:  I have no further questions, Your

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

27

1   Honor.  I pass the witness.

2                     RECROSS-EXAMINATION

3   BY MS. McNAMARA:

4   Q   Miss Garber-Paul, just a few brief questions.  I know you

5   need to catch a plane.

6       At the time of the publication, did you understand that

7   Jackie did not want Rolling Stone or Sabrina to contact the

8   three friends?

9   A   That was not my understanding.

10  Q   And in fact, you understood that she had contacted Ryan;

11  isn't that correct?

12  A   Yes, that's true.

13  Q   And the article includes a quote from Ryan in which he

14  said he didn't want to cooperate; is that correct?

15      MR. PHILLIPS:  Objection.  We've established at

16  great length that that's not an actual quote from Ryan.  I

17  think she just needs to rephrase the question.

18      THE COURT:  I tend to agree.  I mean, she can

19  testify as to her understanding based on her own

20  fact-checking.

21      THE WITNESS:  Sure.

22  Q   Based on your fact-checking, Miss Garber-Paul, did you

23  understand that Jackie had in fact spoken with Ryan and that

24  he had refused to cooperate with Rolling Stone?

25  A   Yes.  Jackie had told Sabrina and I that Ryan, Randall,

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

28

1  was not interested in speaking with Rolling Stone.

2  Q    And you also understood that none of the three friends

3  had any information about Jackie -- about Jackie's interaction

4  with Dean Eramo; is that correct?

5  A    Based on the timeline of when she had been interacting

6  with these friends and when she began interacting with Dean

7  Eramo, yes, it was my understanding that they were two

8  separate -- two separate parts of the story.

9  Q    And you didn't understand at the time you were

10 fact-checking that whether Jackie actually reported her

11 assault to UVa was anything that had to do with the three

12 friends?

13 A    Yes, that's true.

14 Q    Because you had documentation that she had in fact

15 reported her sexual assault to UVa, did you not?

16 A    Well, I had documentation that she had had a meeting with

17 Dean Eramo.  She had not gone through a formal reporting

18 process, but she had a sit-down with Dean Eramo where she told

19 her about this gang rape, yes.

20 Q    And so at the time you were fact-checking the article,

21 you had no reason to believe that the three friends would

22 disprove Jackie's story, did you?

23 A    Not at all, no.

24 Q    And so in fact, it was not a red flag for you that you

25 were not able to speak to the three friends; is that correct?

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

29

1          MR. PHILLIPS:  Objection.  Argumentative.

2    Q    Did you believe -- did you see it as a red flag, Miss

3    Garber-Paul, that you were unable to speak to the three

4    friends?

5    A    At the time of fact-checking, no, I did not see that as a

6    red flag.

7    Q    And finally, Your Honor -- I mean, not "Your Honor."

8    Sorry.

9         Finally, Miss Garber-Paul, was it your understanding that

10   Jackie had ever tried to hold her assailants accountable?

11   A    No, she had not.

12   Q    In fact, the article makes clear that she refused to hold

13   her assailants accountable; isn't that right?

14   A    Yes.

15          MS. McNAMARA:  That's all, Your Honor.  Thank you

16   very much.

17          THE COURT:  Anything else, Mr. Phillips?

18          MR. PHILLIPS:  No further questions.

19          THE COURT:  May the witness be excused?

20          MR. PHILLIPS:  The witness may be excused.

21          THE COURT:  Miss Garber-Paul, you may stand down.

22   You can catch that plane, I hope.

23          THE WITNESS:  Thank you.

24          THE COURT:  You may call the next witness.

25          MR. CLARE:  Your Honor, at this time the plaintiff

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

30

1     would present the deposition testimony of Kathryn Hendley.

2          This is another situation where both parties have agreed

3     on the testimony that will be presented, and the video

4     deposition that will be played reflects both the plaintiff's

5     and the defendants' designations of her testimony.

6               THE COURT:  All right.  Let me ask one of you, the

7     two who are responsible for this lady's deposition, to come

8     and let me speak with you just a moment.

9               (At Side Bar.)

10               THE COURT:  You know, in ruling on the motion in

11     limine, I said that as to the three friends, I would receive

12     their testimony but with a limiting instruction.  And I'm

13     willing to give that instruction.  In fact, I think I told

14     Mr. Bayard the other night that I would let you folks try to

15     formulate the instruction that you would want me to give.

16          And I'm still willing to do that, but with the

17     understanding that I'm usually very reluctant to give a

18     limiting instruction that tells the jury what the relevance of

19     the witness's testimony is.

20          So if you guys don't want me to give it, I won't give it.

21     But if I do give it, it's going to be to that effect, that

22     it -- the Court will underline what it considers to be the

23     significance and relevance of the witness's testimony.  That

24     will be true for all of the three friends.

25               MS. McNAMARA:  Okay.  And so what would you

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

31

1   anticipate it being?

2          THE COURT:  I would anticipate something to the

3   effect that the Court ruled on the admissibility of the

4   testimony of the three friends earlier, and I agree that

5   certain -- that their testimony could be admitted to the

6   extent that it reflected what they would have told Ms. Erdely,

7   had she contacted them at some time prior to whatever it is,

8   December 5 or whatever day you want to say is the cutoff date,

9   and that they can consider the testimony to that effect only.

10         And I would probably say something to the effect that

11  just because -- that there's no indication that the three

12  friends would actually have spoken to Ms. Erdely if she had

13  contacted them during that period of time.

14         MS. McNAMARA:  I mean, I personally would prefer

15  just not to have an instruction.

16         THE COURT:  Well, I think based on the general rule

17  that it's wrong for the Court to tell the jury during the

18  presentation of evidence what is especially important, what is

19  especially relevant.

20         MR. CLARE:  I guess my only concern --

21         THE COURT:  And they made the motion to exclude it,

22  so it's her call, really.

23      But what do you have to say about it?

24         MR. CLARE:  Well, the only reason why I think it may

25  be important for the jury to at least hear something about it

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

32

1    is Your Honor's made calls on balls and strikes about what

2    portions of their testimony can be excluded and what not.

3        THE COURT:  But they don't know that.

4        MR. CLARE:  They don't know that, but they may be

5    expecting to hear certain things from them that you've

6    appropriately thrown out under your order.

7        THE COURT:  I think I told them generally about

8    video depositions, that the Court goes through them and we

9    decide what's important, what's not.  We try to streamline the

10   process.  And that basically is all I said.

11       But those sorts of things -- I think the jury understands

12   that the Court rules on the admissibility of particular pieces

13   of evidence, but that's different than the Court saying, this

14   is why this is relevant, this is what you need to consider

15   about this lady's testimony.

16       MR. CLARE:  Yeah, I still -- our preference would

17   still be to give it.  That was our understanding.

18       THE COURT:  It's your call.

19       MR. CLARE:  I defer to the Court.

20       MS. McNAMARA:  I think we would prefer not to have

21   it.  Thank you.

22       (In Open Court.)

23       THE COURT:  So, ladies and gentlemen, this is

24   another video deposition.  And by this time I think you are

25   familiar with all the rules about these video depositions.

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

33

1       They're -- the witnesses are sworn, gives testimony just

2   like the witness would give here if called as a live witness.

3   The witness is subject to cross-examination by both sides.

4   Everything is under oath.

5       And consequently, you should consider the testimony of a

6   video witness just as if the witness had appeared as a live

7   witness.

8       Keep in mind that we have gone through the deposition and

9   tried to streamline it to eliminate those things that are not

10  important for you or that you need not hear and consider, so

11  therefore there will be jumps.  There will be places where it

12  will seem to skip, but that's by design.  Nothing's been left

13  out that you need to hear and consider.

14      So with that explanation, we'll ask that the deposition

15  be played.

16          (The videotaped deposition of Kathryn Hendley was

17  played at 1:52 p.m.)

18          (The playing of the videotape was concluded at 2:24

19  p.m.)

20          THE COURT:  The deposition is at an end, and we've

21  come to the time of our first mid-afternoon break, ladies and

22  gentlemen, so we'll have that now.

23      I would again ask that while you're away from the Court

24  you not discuss the case with one another nor permit anyone to

25  discuss it with you.

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

34

1      Let's return at about 25 till 3:00 or shortly thereafter.

2      Ask the marshal to declare the Court in recess.

3           (A short recess was taken at 2:24 p.m.)

4           (In Chambers at 2:42 p.m.)

5           MR. PAXTON:  Your Honor, we understand that the next

6      witness is going to be Benjamin Rexrode, who is a university

7      police officer.

8           In the disclosures that were made in this case, it was

9      disclosed that Mr. Rexrode is the community service crime

10     prevention coordinator for the University of Virginia and that

11     he was involved in the report of Jackie's allegations to the

12     police and is aware of facts regarding the falsity of the

13     defendants' article, as well as facts recklessly disregarded

14     or purposely avoided by the defendants, which I take that to

15     mean information that we've heard from Hendley and those guys.

16          There's no disclosure here that he's going to be

17     providing testimony about anything that happened once the

18     article came out or anything about interactions with Jackie

19     prior to the beginning of their article.

20          I mean, what we know from some of the documents that have

21     been disclosed is that on November 10, a week before the

22     article came out, he met with Jackie because Jackie was

23     concerned about her safety once the article came out.  There's

24     a lot of hearsay issues and all that.

25          But beyond that, really that part wasn't disclosed.  And

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

35

1    so our position is that his testimony should be limited to the

2    things that were in the disclosure.

3        We also know because Ms. Eramo has introduced during her

4    testimony certain e-mails that she received from third parties

5    after the article came out that she forwarded to Rexrode.

6        So from our perspective, you know, when you choose who

7    you're going to take depositions for, you look at what's

8    involved.

9        THE COURT:  So what exactly do you think he

10   shouldn't say?

11       MR. PAXTON:  I don't think he should testify about

12   anything that involves his interactions after -- certainly

13   after the article came out.  I don't think -- because it's not

14   disclosed that he has any information about --

15       THE COURT:  With Jackie?

16       MR. PAXTON:  I think -- no, with anyone, because

17   it's not disclosed.  In other words, what he was described as

18   he was involved in the report, meaning the original report, to

19   the police in April, the bottle incident, okay?  And then he's

20   aware of facts regarding the falsity of the defendants'

21   article which has nothing to do with -- that happened -- I

22   just -- I think that's -- to me, what he did with Ms. Eramo,

23   you know, I'm sure they want to hear testimony about --

24       THE COURT:  So you're not objecting to falsity of

25   the defendants' article?

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

36

1          MR. PAXTON:  Well, I mean, he can testify what he

2     knows personally but, I mean, that's --

3          THE COURT:  So what else could he say?

4          MS. LOCKE:  Well, Your Honor, so we completely

5     disagree with this characterization.  Ms. Eramo testified that

6     she forwarded e-mails that she received from people in the

7     community because of the safety threat, and that certainly

8     goes to the falsity of the article and what people in the

9     community understood.

10         So we think there was a disclosure.  Also, those e-mails

11    were produced.

12         THE COURT:  So you just want him to testify that she

13    forwarded e-mails to him?

14         MS. LOCKE:  Correct, forwarded e-mails to him from

15    people in the community who were threatening her, who

16    understood the article in a particular way, that she enlisted

17    his help after the article so -- and those were, in fact,

18    disclosed.  Those were produced as part of our production,

19    including the fact that they were forwarded to him.

20         And in our disclosure, we talk about how he knows about

21    the falsity of the article.  And we think that those --

22         THE COURT:  Like what?  Like what falsity would he

23    be able to testify to?

24         MS. LOCKE:  Well, he can certainly testify to

25    whether Dean Eramo suppressed rape in his interactions with

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

37

1  her and --

2           THE COURT:  I mean, did he investigate the rape?

3           MS. LOCKE:  He did.

4           THE COURT:  Okay.  So this is an earlier thing?

5           MS. LOCKE:  This is.

6           MR. PAXTON:  This is after -- I don't think his

7  involvement --

8           MS. LOCKE:  Can I --

9           MR. PAXTON:  I'm sorry.  I don't think his

10  involvement started till after the article came out in terms

11  of the rape.

12           MR. CLARE:  No, that's not correct.

13           MS. LOCKE:  That's not correct.  He met with Jackie,

14  and Dean Eramo set up a meeting with the police.  This is with

15  him.

16           THE COURT:  Okay.

17           MS. LOCKE:  Before the article.  To investigate the

18  bottle incident and the sexual assault.

19           THE COURT:  And did they talk about the sexual

20  assault at that meeting?

21           MS. LOCKE:  Yes, they did.

22           THE COURT:  Okay.  Then that's fair game.

23       But I agree with you -- as to the e-mails received after,

24  the only thing he can do is to confirm that Eramo forwarded

25  e-mails to him because she was concerned that they raised --

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

38

1        MS. LOCKE:  That's all we want.  Thank you.

2        THE COURT:  That's it.

3        (The jury is present in Open Court at 2:42 p.m.)

4        THE COURT:  I count 10 jurors in the jury box ready

5   for the next witness.

6        MS. LOCKE:  Thank you, Your Honor.

7     We call Officer Ben Rexrode.

8                        - - - - -

9                   BENJAMIN REXRODE,

10  being first duly sworn, testifies and says as follows:

11       THE CLERK:  Have a seat right there, please.

12                   DIRECT EXAMINATION

13  BY MS. LOCKE:

14  Q    Good afternoon, Officer Rexrode.

15  A    Good afternoon.

16  Q    Could you introduce yourself to the jury?

17  A    Sure.  My name is Ben Rexrode.  I'm a police officer with

18  the University of Virginia Police Department.

19  Q    And you just said that you work for the University of

20  Virginia; is that correct?

21  A    Yes.

22  Q    How long have you worked for the University of Virginia?

23  A    A little over eight years.

24  Q    And how long have you been a police officer, Officer

25  Rexrode?

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

39

1   A    Eight years.

2   Q    As a police officer with the University of Virginia, what

3   is your role on University of Virginia's campus?

4   A    Sure.  Our main goal is obviously to create an

5   environment for safety, protecting, serving all the students,

6   staff, visitors to the university, creating a safe environment

7   to learn and live.

8   Q    And in your work with the University of Virginia Police

9   Department, do you have experience handling sexual assault

10  complaints at the University of Virginia?

11  A    I do in a sense.  The position I'm in for about the past

12  three and a half years, I'm the police department -- I'm a

13  police officer, but I'm the department's prevention and

14  outreach coordinator, and I also do victim/witness assistance

15  for the department.

16  Q    When you said you're a prevention and outreach

17  coordinator, tell us a little bit about what that role

18  entails.

19  A    Sure.  So I do a lot -- on behalf of the police

20  department, I do a lot of the education, not only with

21  students but the entire community, about safety, safety

22  awareness, looking at things such as sexual assault, hazing,

23  gender-based violence, alcohol and drug use, things like that,

24  making awareness education and taking that to the student

25  body.

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

40

1    And also with community policing, creating and developing

2  relationships with the university, community, and students.

3  Q    You also mentioned that you do victim outreach.  Describe

4  for us a little bit what that entails.

5  A    Sure.  So I'm the department's victim/witness assistance

6  coordinator, so I work with victims and survivors of all

7  different types of crimes, everything from just a simple

8  traffic accident all the way up to something like rape, where

9  a report is filed.

10    I work with them, letting them know options and resources

11  and guiding them through the criminal process, and assisting

12  them with making decisions -- or not helping to make decisions

13  but guiding them through the process.  As far as safety

14  planning, you've got courtroom testimony, things like that,

15  and being kind of a resource on behalf of the department for

16  them.

17  Q    Do you know the plaintiff in this case, Nicole Eramo?

18  A    I do.

19  Q    Tell us how long you've known Nicole.

20  A    I'd say I've known of Nicole about my entire time at the

21  department, but I never really conversed with her until I got

22  the position I have now, which was about, gosh, three, three

23  and a half years ago.

24    And within that position, I obviously work a lot with the

25  dean's office directly.  Whenever they had students coming in,

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

41

1   whether it be with an incident or a safety concern, I was kind

2   of their point of contact.  Instead of them trying to just

3   call the department and getting some random person and having

4   you kind of go around, I was just going to be their liaison at

5   the department.  Whether it was a university police or

6   Charlottesville police issue, I'd kind of be the point of

7   contact to the system but also then coming to work with

8   students directly in the dean's office in a setting that was

9   comfortable for them to do safety planning.  And then

10  obviously a police report is being generated to facilitate

11  that there, and kind of be that liaison in working with them.

12  So obviously I worked a lot with Nicole in that aspect.

13  Q    Well, that was going to be my next question.

14  A    Oh, okay.

15  Q    You said in the last three years you've held this

16  position, you've had more interaction with her.

17       Can you tell us just generally speaking how often you

18  would interact with Ms. Eramo?

19  A    Sure, sure.  So I would say for at least that first year

20  and a half it was pretty regularly; maybe some weeks once or

21  twice a week, but then it may go a month or two where I didn't

22  see her in that context, working in the dean's office, whether

23  it be with a student or a case.

24       But obviously we'd see each other on several committees

25  in which she was in charge of, and we -- just having the same

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

42

1    kind of job, we obviously ran into each other.

2        But in the capacity within the dean's office, I'd say

3    pretty regularly, but it could obviously fluctuate, summer and

4    Christmas break, things like that.

5    Q    Did Ms. Eramo ever have an occasion to introduce you to

6    students who had reported a sexual assault to her?

7    A    Yes, yes.

8    Q    Tell us a little bit about Ms. Eramo's role, your

9    understanding of Ms. Eramo's role, that she played in

10   facilitating reports of sexual assault to the police

11   department.

12   A    Sure.  So I know if, say, a student came into the dean's

13   office and they reported something like that, just from my

14   experience in working with Nicole, she would always do kind of

15   the same thing I would do and lay out options and kind of

16   guide them through all the different avenues that a victim

17   could take with their case.

18       And we were doing just that, saying it was their case, I

19   mean, putting that power back with them and not making

20   decisions for them, because that's the last thing you ever

21   want to do with a victim, but guiding them through all what

22   could happen with each different route they took and educating

23   them, but then also being that resource for them and kind of

24   person they could turn to as somebody -- you know, obviously

25   with that being a difficult thing that somebody was reporting,

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

43

1   that she kind of became that person to turn to as kind of that

2   resource and support on behalf of the university working with

3   them.

4   Q    You just testified that in interacting with Ms. Eramo you

5   would emphasize that it was a victim's choice in how to

6   proceed.

7   A    Mm-hmm.

8   Q    Tell us from your experience why that approach was

9   important.

10  A    Sure.  So that's very important, especially cases of

11  sexual violence where it has to do with loss of power.  We

12  could spend hours talking about that.  But in a case like

13  that, in a sexual assault, power is taken from the victim.

14       So -- and part of that process of the healing and trying

15  to have them be best informed to make that decision moving

16  forward, you want to try to give that power back to them, not

17  saying, this is what we're going to do now with your

18  information, regardless of what you want.

19       It's, look, we have -- we do have obligations, but we

20  also, as far as how you proceed, whether it be criminally or

21  just through the university process, you know, we want to --

22  we want you to be able to make that decision for yourself,

23  what's best for you.

24       Because every person is different, everybody's had

25  different experiences, and you have to honor that and try to

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

44

1  just best inform them as you can as far as different routes,

2  but ultimately let them be empowered to make that decision for

3  themselves.

4  Q    In your experience, if a victim is forced to proceed with

5  a criminal complaint, would that be a good thing or a bad

6  thing in your experience with working with survivors of sexual

7  assault?

8  A    Yeah, it's generally a bad thing.  Generally, you know, a

9  victim who does not move forward criminally with the case --

10  and certainly that can happen if it's a case of like a

11  serial-type incident.

12     If you move forward without a cooperative victim, usually

13  the case will not move forward, one, or even if it does move

14  forward with an uncooperative victim, it's not going to be

15  successful.  They're going to usually want to discontinue the

16  case because it's going to go against what they want.

17     So it usually never has a positive outcome for anybody,

18  especially the victim.

19  Q    Now, from your personal observations in your interactions

20  with Ms. Eramo, from your experience, did Nicole Eramo

21  encourage victims to cooperate with police investigations?

22  A    Absolutely.  So obviously with me being -- if I was in

23  her office, usually the police are already there, so -- but

24  obviously by getting me there, she obviously would have

25  encouraged them for -- to be able to bring me in.

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

45

1      So since I was in her office rather regularly, I mean,

2    she was obviously regularly encouraging them to call police,

3    being me, coming in.

4      But also, since -- with her work in prevention and being

5    the face of that as well, you know, I -- there were several

6    presentations or other events that we'd be at together, maybe

7    her speaking on behalf of the university and dean's office and

8    me speaking on behalf of the police department, talking about

9    prevention and awareness.

10      And that was always one of her things is that, you know,

11    accountability and filing -- again, that message of giving

12    people options but also that's something that they always

13    strongly encouraged.

14      I remember hearing her say that in those public open

15    spaces with students, encouraging reporting to police, and

16    encouraging those things but ultimately letting it be their

17    decision, but definitely encouraging.

18    Q    From your personal observations and your interactions

19    with Ms. Eramo, did you ever find Ms. Eramo sought to suppress

20    or cover up allegations of sexual assault?

21         MR. PAXTON:  Objection, Your Honor.  This -- it

22    seems like to me she's asking for incidences of prior conduct

23    to say whether something happened on a particular occasion.

24    It just seems like to me we're getting into the character of

25    events.  I'm not sure that's appropriate.

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

46

1    THE COURT:  Yeah, I think that's right if that's the

2   import of the question.

3    MS. LOCKE:  That's okay.  I can move on, Your Honor.

4    THE COURT:  Good.

5   BY MS. LOCKE:

6   Q    At the time that you were working with Ms. Eramo before

7   the article was published -- and when I say "the article," you

8   understand I'm referring to "A Rape On Campus," the article

9   that's the subject of this litigation?

10  A    Yeah.

11  Q    Before the article was published, did you develop an

12  impression of Ms. Eramo's reputation in the community?

13  A    Sure.  It became very apparent just knowing that she was

14  the dean.  I was a night shift patrol officer for several

15  years before this position, so I was figuratively and

16  literally in the dark, so I didn't really know, you know, all

17  the deans and everybody around as well.

18      But then obviously I knew who she was.  But then once in

19  this position, it became -- I think I actually sat on the

20  interview panel for this position, and it became very apparent

21  of her role in the university.  And then it also became very

22  apparent, very clearly, her reputation, not only among other

23  faculty and staff at the university but among students,

24  because I'm obviously engaging with students daily.

25      Where it became very apparent is she was kind of the face

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

47

1    of not only prevention but response for sexual and

2    gender-based violence at the university.

3    Q    And you described it a little bit, but can you tell the

4    jury a little bit more whether you had a positive or negative

5    impression of Ms. Eramo's reputation in the community?

6    A    It was very positive.  Like I said, just kind of being

7    that face, and then students have seen her as kind of the

8    person -- kind of the person to go to who's going to be there

9    to stand up for you, support you.  And it was very apparent.

10       I don't know how, you know, you could go into depth of

11   just, like I said, all the different encounters of students

12   who would always just speak so highly of her and that they

13   were the person that -- she was always the person that they

14   could always turn to, and they would always tell others to

15   turn to, because she was such the face.  And not, you know,

16   just, you know, part of UVa but somebody who was there for

17   students.

18       I mean, you could tell very quickly, I think -- at least

19   my personal perspective was you could tell it was her passion,

20   doing the job that she did.  She just wasn't doing it for a

21   job.  You could tell this was her life's work.  She was a --

22   just a very head-down, work-oriented person, putting obviously

23   the needs of students before --

24       I mean, I can recall meeting with a student about an

25   incident in the evening at 7 or 8:00 --

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

48

1      MR. PAXTON:  Your Honor, I mean, I've let this go,

2  but, I mean, talking about conversations he's had with other

3  people about events --

4      THE COURT:  I agree.  I think he needs to limit

5  himself just to a general assessment of the role that he

6  played vis-à-vis Dean Eramo and then talk about any particular

7  facts he has relevant to this case.

8      MS. LOCKE:  Thank you.

9  Q    Officer Rexrode, have you ever met Jackie, the woman

10  who's described in the Rolling Stone article "A Rape On

11  Campus"?

12  A    Yes.

13  Q    How were you introduced to Jackie?

14  A    I was contacted by Nicole, I think it was the day prior,

15  so probably on, like, April 21st, 2014.

16      I honestly don't remember the form of communication.

17  Nicole, obviously, and I talked on the phone, texted,

18  e-mailed, about every form of communication at times just

19  because of our busy schedules.

20      But I remember her contacting me saying she had a student

21  who wanted to potentially talk to police, file a report

22  regarding an incident that happened on the Corner several

23  weeks prior, some type of assault.

24      So this wasn't completely out of the ordinary.  These are

25  the types of things a lot of times she was contacting me

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

49

1   about.

2       So I said, absolutely, sure.  We figured out a time,

3   location, and all that.

4       Given that she said it was on the Corner, that is off

5   grounds, so it would be a Charlottesville police jurisdiction.

6       So I contacted Charlottesville police, let them know what

7   I had been told to see if they could have an officer come and

8   meet us the next day in the dean's office to speak with the

9   person Nicole was talking about.

10  Q   And that meeting was on or around April 22nd, 2014; is

11  that correct?

12  A   Yes.

13  Q   And you said that you contacted the Charlottesville

14  Police Department.

15      Was there a Charlottesville Police Department officer who

16  was also present at that meeting?

17  A   Yes.

18  Q   So just so the jury's clear, it was you, a

19  Charlottesville police officer, Nicole and Jackie who attended

20  that meeting; is that correct?

21  A   Yes, mm-hmm.

22  Q   And who was the Charlottesville police officer?

23  A   Officer Wade.

24  Q   And where did that meeting take place?

25  A   Took place in the dean's office in Peabody Hall on

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

50

1   grounds in their conference room.

2   Q    And why was the meeting held, from your perspective, in

3   the dean's office?

4   A    We always tried, especially with students, we realized

5   that students can be -- can sometimes be hesitant to contact

6   police or go forward because it's -- it can be a scary thing,

7   talking to somebody you don't know in uniform about something

8   that's personal or traumatic.

9        So we try to make them as comfortable as possible, so we

10  do it in a setting that's not only convenient for them

11  geographically as far as right on the grounds, where the

12  Charlottesville Police Department is several miles away and

13  our police department is too.  We'd also meet there just

14  because it's convenient, but it's also a little bit more of a

15  familiar setting.  And also, they'll usually request to have

16  Nicole present during that interview.

17  Q    And what was discussed at this meeting between you,

18  Jackie, Nicole, and Officer Wade in the Charlottesville Police

19  Department?

20  A    Sure.

21       MR. PAXTON:  Your Honor, I mean, I think he can

22  relay his understanding of what happened, but he can't say

23  what people discussed because that would be hearsay.

24       MS. LOCKE:  We're not offering it for the truth of

25  the matter asserted.  We're offering it to show the state of

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

51

1    mind and to show Ms. Eramo's interaction.

2        This has been testified to, that she took Jackie to the

3    police, and so we're just trying to lay out the facts of what

4    happened at that meeting, Your Honor.

5        THE COURT:  I think he can testify as to the nature

6    of the complaint presented to him.

7        MR. PAXTON:  Correct.

8    Q    So tell us the nature of the complaint as you understood

9    it for that meeting.

10   A    Sure.  So I kind of introduced myself to Jackie as, you

11   know, my role, even though I am a police officer, you know,

12   I'm here for more victim's assistance and support, and Officer

13   Wade is there more as the police officer doing the

14   investigation as to what you're talking about.

15       At that point, Jackie began to tell about an incident

16   that had occurred on the Corner, it was like two weeks prior,

17   where she was walking down the Corner at night, and several

18   guys came up behind her, yelling obscenities at her, to which

19   she kept walking and tried to ignore.

20       And then at one point they called her by name, and she

21   turned around.  And they threw a brown bag with what was

22   believed to be a glass bottle in it, hitting her, I think,

23   underneath her eye, on her check, at which point she took off

24   running back to her apartment.

25       So that was essentially what she told us as far as what

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

52

1  happened.  That was the incident she was there to report.

2  Q    Did she -- did Jackie identify any of her attackers by

3  name?

4  A    No.

5  Q    Did she tell you why or -- why or why she wouldn't do

6  that?

7  A    She said she didn't -- if I recall, she didn't want to

8  get them in trouble, she didn't remember who they were.  She

9  said that they were part of a -- probably part of a

10  fraternity, but she couldn't identify them by name, or she

11  wouldn't.

12  Q    Did Jackie tell you that she wanted to pursue a criminal

13  complaint against these attackers who threw a bottle at her?

14  A    She did not.  That was something we offered as far as

15  criminal investigation moving forward.

16      And obviously I took part of that conversation of

17  explaining -- we try to be open and transparent about what

18  that will look like, a criminal investigation.  We explained

19  that to her.

20      And then from the beginning she did not want any kind of

21  a criminal investigation.  She said she would like to know who

22  they were so she could let them know what they did was wrong,

23  but she said she did not want to take part in any kind of

24  criminal investigation.

25  Q    During that meeting, was there any conversation or report

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

53

1   of an alleged sexual assault?

2          MR. PAXTON:  Your Honor, again, objection to the

3   statement made unless it came from Jackie, because I believe

4   Officer Rexrode has actively reported that he came to gather a

5   report of a bottle incident.  He's described that.  Now she's

6   asking for other communications from other people.

7          THE COURT:  Again, I think -- well, I'm not sure

8   about that.

9      I think that to the extent that he is asked to relay and

10  present the nature of Jackie's complaint, it's fair and

11  appropriate that he do so.

12     So I don't know.

13     What was the question again, Miss Locke?

14         MS. LOCKE:  Was there conversation about the sexual

15  assault at this meeting.

16         THE COURT:  I think the question should be, did

17  Jackie's complaint extend to a claim of sexual assault.

18         MR. PAXTON:  Thank you, Your Honor.

19  BY MS. LOCKE:

20  Q    Did Jackie's complaint extend to a sexual assault?

21  A    Yes.

22  Q    Explain to us the details of that.

23  A    Obviously, she was asked regarding the bottle incident:

24  Did she know why these individuals would have been following

25  her or throwing bottles at her.

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

54

1    She said, yes, because I was raped at their -- probably

2    their fraternity several years ago, and now they're thinking

3    that I --

4         THE COURT:  I sustain the objection as to what the

5    assailants may have been thinking.

6         MR. PAXTON:  Thank you.

7    Q    You can go ahead.  Just try to limit your testimony to

8    what you understood and not what others were thinking.

9    A    Sure.

10        That she had been -- that they were mad because she had

11   been saying things about their fraternity because she had been

12   raped there several years ago.

13   Q    Did Jackie want the university police department -- did

14   you have an understanding of whether Jackie wanted the

15   university police department to pursue an investigation of her

16   sexual assault?

17   A    She did not, and it was -- since it was with the

18   Charlottesville Police Department, our department didn't have

19   really any input in that but just did jurisdiction of where

20   she said it occurred.

21        And she was very adamant and shut down very quickly and

22   said she did not want to give any more information about it,

23   any -- she did not want any investigation, any further details

24   about it at all whatsoever.

25   Q    Did you discuss a no-contact order, or did you offer a

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

55

1  no-contact order, with Jackie during your meeting?

2  A    Sure.  So we said if -- you know, as part of what we do

3  as far as victim safety regarding these instances is we can

4  offer things such as protective orders or no-contact orders

5  through the university, but we have to -- you know, we'd have

6  to know who the people are.

7       And so, you know, that can come forth during an

8  investigation and at which point if she was concerned for her

9  safety, we could obtain a protective order against the

10 individuals in either incident.

11 Q    During your meeting with Jackie on April 22nd, did you

12 observe any visible bruising or scars on Jackie's face?

13 A    No.

14 Q    And you testified that this meeting took place within two

15 weeks of the alleged bottle incident; is that right?

16 A    Yes.

17 Q    Did you discuss this meeting with Officer Wade after it

18 ended?

19 A    I think Officer Wade and I were walking out to our

20 cars --

21      MR. PAXTON:  Your Honor, again, I think he can't

22 testify what Officer Wade talks to him about because that's

23 hearsay.

24      THE COURT:  I agree.

25 Q    Officer Rexrode, did you ultimately read the article "A

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

56

1    Rape On Campus"?

2    A    I did.

3    Q    And was the article's portrayal, based on what you know

4    about Dean Eramo, consistent with what you had personally

5    observed during your interactions with her and students?

6    A    Not at all.  It was -- it was shocking to see how she was

7    portrayed as far as just -- again, from my interaction with

8    her, it was in fact completely opposite.

9         As far as putting university interests before student

10   interests first, things like that, it was just shocking to

11   read.  It was just very different from what I had seen working

12   with Nicole Eramo over the years.

13   Q    From your observation with your meeting between Nicole

14   Eramo, Jackie, and Officer Wade, was Ms. Eramo supportive in

15   having Jackie pursue a police complaint against her alleged

16   attackers for the sexual assault?

17   A    Absolutely.  Absolutely.  Not only getting us there --

18   obviously she was supportive having police interaction, just

19   getting us in the room.

20        But then as far as moving forward, she was supportive in

21   that when we were talking about whether it be protective

22   orders, no-contact orders, you know, there were things we

23   could do to help protect her if she was worried about her

24   safety with moving forward, her identity, talking about those

25   protective orders and how not only the dean's office but also

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

57

1   the police, we could assist with her protection and safety

2   through those no-contact orders, protective orders, and that

3   we would be with her through the whole process, whether that

4   be with interviews and the like.

5   Q   Was it ever your impression in your meeting with Nicole

6   Eramo, Jackie, and Officer Wade that Ms. Eramo sought to

7   suppress Jackie's allegation of this rape at Phi Psi?

8   A   Oh, not at all, not at all.

9   Q   After the article was published, did Nicole Eramo

10   ultimately contact you afterwards?

11   A   Yes, yes, she did.

12   Q   And explain to me your understanding of why Ms. Eramo

13   contacted you after the article was published.

14        MR. PAXTON:  Your Honor, we had a conversation prior

15   to the jury coming back, and I think this goes beyond --

16        THE COURT:  Yeah, I believe that extends beyond what

17   the Court considered to be the reach and the scope of Roberts.

18        MS. LOCKE:  I'm just laying a foundation, Your

19   Honor, for the reason for the communications.  I'm just laying

20   a foundation for the e-mail communications.

21        THE COURT:  I think you can -- it's a simple matter

22   just to ask him if Eramo forwarded e-mails that she had

23   received about the incident to him.

24        MS. LOCKE:  Okay.

25        THE COURT:  I don't think it requires any greater

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

58

1   foundation than that.

2   BY MS. LOCKE:

3   Q    Did Nicole Eramo forward you e-mails that she had

4   received from individuals after the article came out?

5   A    Yes.

6   Q    I'm going to hand you what we've marked for

7   identification Plaintiff's Exhibit 610.

8           THE CLERK:  Plaintiff's 158.

9                       - - -

10          (Plaintiff's Exhibit 158 marked for identification.)

11                      - - -

12          MR. PAXTON:  Your Honor, we have an objection to

13   this.  If we could go to Side Bar.

14          THE COURT:  Okay.

15          (At Side Bar.)

16          THE COURT:  What's the point of it?

17          MS. LOCKE:  It's the fact that she forwarded this

18   e-mail to Rexrode.  We had this conversation in chambers.

19          THE COURT:  Yeah, if that's all it is, then I

20   think --

21          MR. PAXTON:  But the content of this, there's no

22   signature.  We have no earthly idea who sent this to Eramo,

23   whether it's legitimate.  We don't have any information about

24   the authenticity of this, other than obviously she received it

25   and forwarded it.  But to allow --

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

59

1          THE COURT:  Let's limit the argument to she received

2    it, she forwarded it to him.  She offered this as the type of

3    e-mails that she would be receiving.

4       To that extent it's admissible, whether it's truthful or

5    whether it was sent by someone who had a legitimate concern

6    about the article, that's another matter that can be proven

7    not to be, perhaps, or at least it can be argued to be.

8          MS. LOCKE:  Well, cross-examine him on it.

9          MR. PAXTON:  Well, we don't know his, you know,

10   his -- unfortunately, we're involved in a case where there are

11   accusations against one of the key players here about things

12   that are being forwarded that are created and not what they

13   appear to be.  And so I think this -- there's no question that

14   this came to her.

15      I guess the concern -- I'm not -- they've already

16   introduced two documents in the record where -- that were

17   forwarded to Rexrode.  I don't see why they need a third one

18   when it's not --

19          MS. LOCKE:  That's argument, Your Honor.  That goes

20   to the weight.

21          MR. PAXTON:  But it goes to --

22          MS. LOCKE:  No, this is entirely relevant.  This is

23   entirely relevant.  This is an e-mail that she forwarded to

24   Rexrode after the fact in order to protect -- she called on

25   the police officer to protect her from safety.  This goes to

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

60

1    reputational harm.  It goes to the damage that she's suffered.

2          THE COURT:  I would feel a little bit differently

3    about it if it was an anonymous e-mail, but it's not.

4          MR. PAXTON:  It doesn't have any --

5          MS. LOCKE:  Kate Gomes [ph], from Kate Gomes to

6    Eramo at Virginia.edu.

7          THE COURT:  It could be proven not to be sent.  It

8    could be proven to be fictitious if it's not an actual e-mail

9    that she received.

10         MS. LOCKE:  Thank you, Your Honor.

11         THE COURT:  Overrule the objection.

12         (In Open Court.)

13   BY MS. LOCKE:

14   Q    Thank you for the wait, Officer Rexrode.

15        Do you recognize what I have handed you and what has been

16   marked as Plaintiff's Exhibit 158?

17   A    Yes.

18   Q    And can you tell -- can you tell us what this is?

19   A    This is one of the e-mails that Nicole sent to me after

20   the article came out.  She was receiving dozens of e-mails

21   similar to this.  At one point she just said she can't read

22   them anymore.

23        So she just started forwarding any e-mails she got

24   directly to me so that I could review them just for making

25   sure they're not putting descriptive information or threats to

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

61

1  her or her family or anything like that.

2          MS. LOCKE:  Your Honor, at this point in time, I

3  would move to admit Plaintiff's Exhibit 158.

4          THE COURT:  158 admitted over the defendants'

5  objection.

6                          - - -

7          (Plaintiff's Exhibit 158 admitted into evidence.)

8                          - - -

9          MS. LOCKE:  If we could publish to the jury.

10          THE COURT:  You may.

11  BY MS. LOCKE:

12  Q    Officer Rexrode, could you read the content of the e-mail

13  out loud to the jury?

14  A    Sure.

15      "Are you bat shit crazy?  You are a woman.  You should be

16  fighting with these women, not against them.  The article in

17  Rolling Stone was disgusting.  You are a rape apologist who

18  must love her precious money so much that you would turn your

19  back on these young girls.  Do you have daughters?  Sisters?

20  Nieces?  You think that could easily be one of them?  Then

21  what?  You just ignore them and let it happen over and over

22  again.  How do you sleep at night knowing all of these

23  dangerous men are still out there because of you?  You are a

24  disgusting, worthless piece of trash.  And that's probably 10

25  times better than what these women think of themselves after."

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

62

1   Q    Now, Officer Rexrode, is this the only e-mail that

2   Ms. Eramo forwarded to you after the article was published?

3   A    No, there was numerous e-mails.

4   Q    Tell me in your approximation how many e-mails she

5   forwarded to you that were in like or form like this.

6   A    Approximately dozens.  It's hard to guess.  I know that

7   she didn't forward -- I know she had received several before

8   she started forwarding to me, so I know she had already had

9   some and then at some point started forwarding them.  Probably

10  at least one to two dozen, if not more.

11  Q    Were you concerned for Nicole Eramo's safety after the

12  publication of "A Rape On Campus"?

13  A    Sure, sure.  And some of them were very in-depth,

14  referring to hope she had a daughter, hope they get raped so

15  that you know the pain.  Very personal.

16       And that's why we were screening, to make sure nobody was

17  listing her address or anything very personally identifiable

18  that could be in local.  Certainly was concerned for her.

19       MS. LOCKE:  Thank you, Officer Rexrode.  I have no

20  further questions for you at this point in time.

21       THE WITNESS:  Sure.

22                    CROSS-EXAMINATION

23  BY MR. PAXTON:

24  Q    Hi, Officer Rexrode.  How are you?

25  A    Good.  How are you?

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

63

1   Q    Good.

2        My name's David Paxton.  We have not met before.  And I

3   represent the defendants, Rolling Stone and Sabrina Erdely.

4        Thank you for coming today.

5   A    Certainly.

6   Q    And thank you for the service to our community.

7   A    Thank you.

8   Q    Now, when you met with Jackie in Dean Eramo's office on

9   April the 21st, were you in uniform?  Is that the way you

10  dress on campus?

11  A    Did you say on November 21st?

12  Q    April.  I'm sorry.  April 21st.

13  A    April 22nd?

14  Q    22nd?  I just want to make sure I have the right -- April

15  of 2014.

16  A    Okay.  We met twice.  I was trying to make sure of the

17  date.  It was the 22nd.

18  Q    Right.

19  A    I wear my uniform maybe once or twice a week.  Usually

20  I'm dressed down to kind of have a more dressed-down approach

21  or appearance.  I don't believe I was in uniform, but I

22  couldn't testify either way.

23  Q    Sure.

24       And so if we use the word "Jackie" in our questions, the

25  jury understands it's the young woman that's depicted in the

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

64

1   Rolling Stone article?

2   A    Yes.

3   Q    Okay.  Now, you said that you acquired the job where you

4   became more interactive with Dean Eramo about three and a half

5   years ago.  Would that have been in May of 2013?

6   A    I believe -- oh, gosh, off the top of my head.  I believe

7   I got this position in, like, August of -- oh, gosh, about

8   three and a half years ago.  It was in the summer 2013 maybe.

9   During the summer 2013 I believe is when I got the position I

10  have now at the department.

11  Q    Okay.  And at that time, was there a -- I take it there

12  was a person in your job before you got that job?

13  A    Yes.

14  Q    And who was that?

15  A    Angela Tabler.

16  Q    And was there a transition between Miss Tabler and you on

17  matters that she was handling with Dean Eramo so that you

18  would not overlook something that needed to be followed up on?

19  A    Yeah, we definitely worked together for about three weeks

20  or a month, just kind of making that transition and kind of

21  taking me to Dean Eramo's office and also the dean's office,

22  along with the other stops, kind of letting me know who they

23  are, what they do, and those types of things.

24  Q    Right.  And so as part of this transition and during the

25  summer of 2013, did you become aware that Jackie had met with

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

65

1    Dean Eramo in May of 2013 to report her sexual assault at a

2    fraternity on September 28, 2012?

3    A    No.

4    Q    And was the first time that you became aware that Jackie

5    had reported her sexual assault to Dean Eramo was in April of

6    2014?

7    A    Yes.

8    Q    So I take it that during the summer of 2013, fall of

9    2013, and until you met with Jackie on April 22nd, 2014, the

10   university police were not doing anything to investigate this

11   gang rape that had been reported to determine; is that

12   correct?

13   A    No.

14   Q    And at that point it was unclear where -- are you

15   familiar now with the fact that Jackie went to Dean Eramo in

16   May of 2013?  Are you aware that that's when she first went to

17   her?

18   A    Yes.

19   Q    And at that time, Dean Eramo was told that Jackie went to

20   a party at a fraternity, correct?

21            MS. LOCKE:  Objection, Your Honor.  Hearsay.

22            THE COURT:  I think that's not for the truth of the

23   matter asserted.

24            MR. PAXTON:  Thank you.

25            THE COURT:  You had facts -- you had the facts of

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

66

1   the alleged incident at that earlier time, did you not?

2           THE WITNESS:  I'm sorry?

3           THE COURT:  You had the facts of the alleged

4   incident at a time before the investigation was undertaken?

5           THE WITNESS:  No, I did not.  I did not become aware

6   of it till April 22nd.

7   BY MR. PAXTON:

8   Q    But you're aware today --

9   A    Yes.

10  Q    -- because of events that bring us here today --

11  A    Yes.

12  Q    -- that in -- on May 20, 2013, Jackie met with Dean Eramo

13  and made her first report of this assault?

14  A    Yes.

15  Q    And you're also aware that as part of that report to Dean

16  Eramo, on May 20, 2013, she reported to Dean Eramo that she

17  had gone to a fraternity with a coworker from IM-Rec; is that

18  correct?

19  A    Mm-hmm.

20  Q    IM-Rec is a university facility; is that correct?

21  A    Yes.

22  Q    And when university police conduct investigations,

23  they're able to get university records as part of the

24  investigation; is that true?

25  A    Yes.

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

67

1    Q    And do you recall any conversation with Ms. Eramo, once

2    you became the victim services coordinator in the summer of

3    2013, until you met with Jackie on April 22nd, 2014, where she

4    asked you to get work records from the IM-Rec facility to see

5    if Jackie worked there and whether or not another person

6    worked there?

7    A    I don't recall.  I don't recall being asked that.

8    Q    If I understood what you testified in response to Miss

9    Locke's questioning of you, you had a brief interaction with

10   Dean Eramo prior to meeting with Jackie on April the 22nd; is

11   that correct?

12   A    Yes.

13   Q    And you're not really sure whether that was a text or an

14   e-mail or a phone call?

15   A    It could have been -- like I said, I ran into Nicole

16   almost sometimes daily in meetings.  It could have been in

17   person, phone call.  I don't recall.  It just -- it's a pretty

18   regular occurrence to say, hey, I got a student we need to

19   meet and talk with about some issue.

20        I don't remember the form of communication.

21   Q    And this isn't a memory test.  I'm just trying to make

22   sure you get it right.

23        And what you understood going into that meeting, based on

24   your interactions with Ms. Eramo, was that you had a student

25   who had some type of incident on the Corner a couple of weeks

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

68

1   prior to that; is that right?

2   A    Yes.

3   Q    And that's why you called the Charlottesville police?

4   A    Yes.

5   Q    Okay.  And did you ever see the police report that

6   Officer Wade submitted?

7   A    Yes.

8   Q    Can we pull up -- and your testimony earlier was that you

9   didn't remember seeing any kind of bruising or anything like

10  that on her face?

11  A    I don't recall seeing any kind of bruising, scratches.

12       MR. PAXTON:  Can we pull up Plaintiff's Exhibit 87,

13  please?

14       And let me get this for you.

15       THE CLERK:  It would be -- the black one is the

16  plaintiff's.

17  Q    Officer Rexrode, the second page of this is a letter that

18  was sent from the Charlottesville Police Department to Sabrina

19  Erdely.  It's been introduced into evidence.

20       Do you see -- there's three paragraphs in this letter.

21  Could you read for us the second paragraph of what the police

22  report indicated?

23  A    "The criminal incident information is provided here, as

24  this incident involved a felony.  On April 6, 2014, an

25  aggravated assault was reported to have occurred in the area

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

69

1    of 1600 University Avenue in the City of Charlottesville.

2    Detective J. Via was assigned the case.  There was a

3    laceration reported as a result of the assault."

4    Q    Okay.  Now, when this report says there was a laceration

5    reported as a result of the assault, what do you take that to

6    mean?

7    A    That Jackie reported that she had a laceration as a

8    result of the assault.

9    Q    Okay.  And so you don't read this to say that the police

10   actually saw a laceration; is that your testimony?

11   A    No, I did not see that.

12   Q    Okay.  And did you talk with Dean Eramo about the sexual

13   assault -- I mean about the bottle incident with Jackie prior

14   to Jackie's arrival at her office on April 22nd?

15   A    I don't believe I did, no.

16   Q    Okay.  And --

17          MR. PAXTON:  You can take this down now.  Thanks.

18   Q    And in the meeting with Jackie on April 22nd, 2014, in

19   the conference room in the dean of students office was you,

20   Officer Wade, Nicole Eramo, and Jackie; is that correct?

21   A    Yes.

22   Q    How long did it last?

23   A    I guess -- I would guess probably around an hour,

24   roughly.

25   Q    And at all times Jackie made it very clear that she did

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

70

1   not want to proceed with a criminal investigation or charges;

2   is that correct?

3   A    Yes.

4   Q    Did you ever meet with -- prior to -- from that meeting

5   on April 22nd to the 1st of November, did you have any other

6   contact with Jackie at any time?

7   A    If I did have contact with Jackie, I don't know if it was

8   before or after November 1st.  I don't know the exact date.

9   It was -- right before the article came out, I met with her

10  again.

11  Q    Okay.  And at that time, the reason you met with her is

12  she was concerned about the backlash that might come from the

13  article?

14  A    That's correct.

15  Q    And so you provided the same type of support services to

16  her that you would provide to anyone in that situation?

17  A    Yes.

18  Q    So from the time that you left that meeting on April

19  22nd, 2014, until the date the article came out, there was no

20  investigation on campus that you were involved in to look into

21  the bottle incident or the alleged sexual assault; is that

22  true?

23  A    There was not.  Since both of the locations of these

24  incidents were off grounds, it was Charlottesville police

25  jurisdiction, and they had filed a report about them.

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

71

1   Q    And so as the liaison, are you aware -- in this case, if

2   Jackie had proceeded to file a charge, would you have stayed

3   involved in that matter?

4   A    In somewhat terms.  At that point if it had gone towards

5   her criminal case, Charlottesville Victim/Witness would have

6   taken over, my counterparts in their office, to assist her

7   with criminal.  But certainly I would have made myself

8   available, but it would predominantly have been the

9   Charlottesville city office.

10  Q    But to your knowledge, was the City of Charlottesville

11  Police Department conducting any investigation into any of the

12  allegations that Jackie was -- discussed during the April 22nd

13  meeting on 2014?

14  A    No.  I mean, their practice is normally if they don't

15  have a victim or survivor that wants to move forward, they

16  don't begin investigating.

17       They were reaching out to her, but they did not conduct

18  an investigation, as they were unable to reach her or she

19  didn't want to move forward.

20  Q    Okay.  So from certainly about May the 1st or 2nd, so the

21  month of May, June, July, August, September, there was no

22  Charlottesville Police Department investigation or university

23  police department investigation into Jackie's allegations; is

24  that correct?

25  A    No.

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

72

1  Q    So it would be accurate to say that in terms of police

2  activity, there was nothing going on because Jackie was not

3  willing to cooperate with the investigation?

4  A    Yes.

5  Q    Now, at any time prior to the article coming out, did

6  Dean Eramo indicate to you that she believed that Jackie's

7  allegation of being sexually assaulted at the Phi Psi

8  fraternity was false?

9  A    I don't believe so, no.

10 Q    Did she ever express any doubt in the accuracy of

11 Jackie's allegations?

12 A    I don't -- I think I maybe spoke with her one time before

13 the article came out, and it was just to say, hey, I hear

14 there's this article coming out.  Oh, wow, okay, that's crazy.

15 And that was about the extent of it.  We never had, to my

16 recollection, really, any really true, in-depth conversations,

17 is my memory about it.

18 Q    All right.  And I take it on November 19 when the article

19 came out, do you recall that President Sullivan announced and

20 requested that the Charlottesville police begin conducting an

21 investigation into the allegations as reported in Rolling

22 Stone?

23 A    Yes.

24 Q    And were you asked at that point, as part of that

25 investigation, to get the IM-Rec student records from

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

73

1   September 2012 to see if Jackie and Drew, or whoever else, may

2   have been working at IM-Rec?

3   A    I personally did not, no.

4   Q    Are you aware that after November 19, 2014, when the

5   article came out and a police investigation was begun, those

6   records were finally obtained?

7   A    I had no knowledge of it.

8   Q    Okay.

9        MR. PAXTON:  Officer Rexrode, thank you very much

10  for what you do in the community, and thank you for your

11  testimony.

12       THE WITNESS:  Thanks.

13       THE COURT:  The e-mail that you read to the jury,

14  did you investigate that e-mail?

15       THE WITNESS:  We did not.

16       THE COURT:  So you must not have considered it a

17  credible threat.

18       THE WITNESS:  We looked at it, and Nicole said that

19  she did not want to try to pursue any kind of criminal charges

20  relating to them, Your Honor.

21       THE COURT:  Okay.  Any other questions of this

22  witness?

23       MS. LOCKE:  Just a few follow-up, Your Honor.

24       THE COURT:  Sure.

25       MS. LOCKE:  If we could pull up Plaintiff's Trial

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

74

1    Exhibit 87.  If we could go to the second page.  If we could
2    blow up the second paragraph, "the criminal incident."
3                        REDIRECT EXAMINATION
4    BY MS. LOCKE:
5    Q    Officer Rexrode, in Plaintiff's Exhibit 87 there's a
6    name, Detective J. Via.
7         Who is Detective Via?
8    A    Detective Via is a sergeant with the Investigations of
9    the Charlottesville Police Department.
10   Q    From your understanding, what involvement, if any, did
11   Detective Via have regarding Jackie and her alleged sexual
12   assault?
13   A    After the report was taken with both incidents reported
14   to Officer Wade on April 22nd, a case of -- with having
15   felonies involved, normal protocol is that it's transferred to
16   Investigations.  And Detective Via was the investigator it was
17   assigned to after April 22nd.
18   Q    And Detective Via is with the Charlottesville Police
19   Department; is that correct?
20   A    Yes.
21   Q    He's not with the university?
22   A    That's correct.
23   Q    And why, again, would Detective Via of the
24   Charlottesville Police Department have gotten involved in this
25   situation?

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

75

1   A    Through -- both of the incidents that Jackie reported,

2   the bottle incident on the Corner as well as the sexual

3   assault at the fraternity, are both not in the University of

4   Virginia Police Department jurisdiction, and they both lie in

5   the Charlottesville police jurisdiction.

6   Q    What is your understanding, if you have any, of whether

7   Detective Via pursued an investigation of Jackie's alleged

8   sexual assault?

9   A    I know that he did reach out to her several times

10  following that April 22nd meeting, phone call, e-mail, asking

11  her if she had other questions, if she wanted to change her

12  mind, if she needed anything, to contact him.  Just kind of

13  standard protocol is following up with victims to see if they

14  would want to change their mind and move forward, if they had

15  any other questions regarding --

16  Q    And what is your understanding, if you have any, of what

17  Jackie's response was?

18  A    I don't believe there was much response, if any, to most

19  of it.  She -- again, I'm not a hundred percent certain.  I

20  think she may have responded once or twice, but I don't know

21  if there was -- how much follow-up there was, but it was

22  pretty minimal as far as her not changing her mind to move

23  forward regarding any criminal investigation.

24          MS. LOCKE:  Thank you.  I have no other questions.

25          THE COURT:  Any other questions of this witness?

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

76

1        MR. PAXTON:  No, Your Honor.

2        THE COURT:  May the witness be excused, Ms. Locke?

3        MS. LOCKE:  Yes, Your Honor.

4        THE COURT:  Sir, you may stand down.  Thank you for

5    testimony and appearance here today.  You are excused.

6        You may call the next witness.

7        MR. CLARE:  Your Honor, at this time, we're going to

8    present the testimony of Mr. Ryan Duffin by deposition

9    designation.

10       Again, this is an area which the plaintiff and the

11   defendants have agreed on the designations that will be

12   presented, and it includes testimony selected by both parties.

13       THE COURT:  Yes, sir.

14       So, ladies and gentlemen, we're to see another video

15   deposition, and the rules, the considerations, all remain the

16   same as indicated earlier by the Court.

17       You may proceed with the video deposition.

18            (The videotaped deposition of Ryan Duffin was played

19   at 3:30 p.m.)

20            (The playing of the videotape concluded at 4:25

21   p.m.)

22       THE COURT:  That is the end of the video deposition.

23       So, ladies and gentlemen, we will take our last

24   mid-afternoon break.  I would ask that while you're away from

25   the Court you not discuss the matter with one another nor

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

77

1   permit anyone to discuss it with you.

2        Let's return at about 20 till 5.

3        Ask the marshal declare the Court in recess.

4             (A short recess was taken at 4:24 p.m.)

5             (The jury is present in Open Court at 4:41 p.m.)

6             THE COURT:  All 10 of our jurors are back, ready for

7   the last leg of today's trial.

8        You may call the next witness, Miss Locke.

9             MS. LOCKE:  Thank you, Your Honor.

10       Plaintiff is calling her last witness of the day,

11  Sergeant Jake Via.

12                          - - - - -

13                       JACOB VIA,

14  being first duly sworn, testifies and says as follows:

15            THE CLERK:  Thank you.  You may have a seat.

16            THE WITNESS:  Thank you.

17                    DIRECT EXAMINATION

18  BY MS. LOCKE:

19  Q    Good afternoon, Detective Via.

20  A    Good afternoon.

21  Q    Could you introduce yourself to the jury?

22  A    Yes.  My name is Jacob Via.  I'm a sergeant with the

23  Charlottesville Police Department.

24  Q    Detective Via, how long have you -- well, Sergeant Via;

25  sorry about that -- how long have you worked with the

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

78

1   Charlottesville Police Department?

2   A    I've been with Charlottesville since 2001.

3   Q    And during when "A Rape On Campus" was published --

4        You understand "A Rape On Campus" is the article that's

5   the subject of this litigation?

6   A    Yes, ma'am.

7   Q    -- you were a detective with the Charlottesville Police

8   Department; is that correct?

9   A    That's correct.

10  Q    And you've since been promoted?

11  A    That's correct.

12  Q    And you are now a sergeant?

13  A    That's correct.

14  Q    Before you served with the Charlottesville Police

15  Department in 2001, were you a police officer anywhere else?

16  A    I was not.

17  Q    Tell us a little bit about the Charlottesville Police

18  Department and whether it handles any incidents on UVa

19  property.

20  A    We do not.  That's actually -- university police

21  department will handle incidents in cases that happen on UVa

22  grounds, the hospital.

23  Q    So which police department would handle incidences for

24  things that happen on Rugby Road or on the Corner?

25  A    That would be Charlottesville.  That would be my

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

79

1   department.  We do everything -- off-campus housing, that's

2   all within the Charlottesville city limits.  But anything

3   that's actually UVa property or on grounds is university

4   police.

5   Q    And so Rugby Road is where the Phi Psi house is.  That

6   would be Charlottesville Police Department jurisdiction; is

7   that correct?

8   A    That is correct.

9   Q    Okay.  Sergeant Via, do you know the plaintiff in this

10  case, Nicole Eramo?

11  A    I do.

12  Q    Tell us how you know Ms. Eramo.

13  A    I know Ms. Eramo -- beginning in May of 2014 was the

14  first time that I met Ms. Eramo in reference to an assault

15  involving Jackie.

16  Q    And I was going to ask the next question.

17       Do you know a woman named Jackie who's the subject --

18  who's the subject of the "A Rape On Campus" article?

19  A    Yes, ma'am.

20  Q    And tell us how you came to be introduced to Jackie.

21  A    I was introduced to her, actually, and Ms. Eramo on the

22  same date.  Jackie had made a police report on April 22nd to

23  one of our patrol officers that she had been physically

24  assaulted on the UVa Corner.

25  Q    And that was Officer Wade?

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

80

1    A    Correct.

2    Q    Okay.  And tell us about that report.

3    A    He -- Officer Wade had met with Jackie, Officer Rexrode

4    from UVa PD, and Ms. Eramo in regards to this report where

5    Jackie said she was -- a bottle was thrown at her face.

6        During Officer Wade's -- when he was taking the report,

7    she had mentioned to him that she was also sexually assaulted

8    in 2012 but did not give any details to that assault.

9    Q    So how did it come to be that from that meeting with

10    Officer Wade that you became involved in Jackie's situation?

11    A    Yeah.  So Officer Wade's report, the physical assault,

12    was actually a suspended case.  There was no evidence, no

13    witnesses, and Jackie did not wish for an investigation.  And

14    that case was closed.

15        My supervisor at the time actually reviews all the

16    reports that come in, and he had seen in there where she had

17    mentioned the sexual assault in 2012, and he thought that a

18    follow-up needed to be done in reference to that.

19        At the time, I was working in our special victims units.

20    We did sexual assaults involving children and adults, and I

21    was tasked to follow up with Jackie in reference to the sexual

22    assault from 2012.

23    Q    And when you were tasked to follow up, did there come a

24    point in time where you had a meeting with Jackie and

25    Ms. Eramo?

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

81

1   A    That's correct.

2   Q    And was that meeting on May 1st, 2014?

3   A    Yes, ma'am.

4   Q    And is it correct that it was the three of you at this

5   meeting and no one else?

6   A    That's correct.

7   Q    And where did that meeting take place?

8   A    That was in Ms. Eramo's office.

9   Q    And describe for me what happened at that meeting.

10  A    I introduced myself to Jackie, told her that I was a

11  detective and basically what my job is.  I told her that I was

12  under the assumption that there was a sexual assault in 2012

13  and I wanted to follow up.

14       She didn't give me any statements, go into any detail

15  about that.  She was -- her questions were more about my

16  investigation, how would I go about investigating it, who

17  would I talk to, and then also the court process if it was --

18  someone was to be charged, the process of going to court.

19  Q    What, if anything, did Jackie tell you about her sexual

20  assault during that meeting?

21  A    She didn't tell me anything about the sexual assault.

22  She said that she did not wish to give me any details about

23  it, she did not wish for me to pursue an investigation, and

24  she was comfortable with the university handling it.

25  Q    And what was your impression, if any, that you -- did you

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

82

1   develop any impression of Ms. Eramo and whether she was

2   supportive or discouraging of Jackie pursuing an investigation

3   of sexual assault during that meeting?

4          THE COURT:  Mr. Paxton, do you wish to be heard?

5          MR. PAXTON:  Yes, Your Honor.  I mean, I believe his

6   testimony is he met her for the first time.  I think the

7   question needs a little bit more foundation before you can get

8   to an assessment of whether --

9          THE COURT:  I'm not sure exactly what's being asked.

10      Is he being asked to say whether he thought that he

11   observed any indication that Jackie was being convinced not to

12   report, or is there some other question --

13          MS. LOCKE:  I'm just asking him what his impressions

14   of Ms. Eramo were during that meeting, whether she was

15   supportive or discouraging of Jackie pursuing a complaint.

16          THE COURT:  I'll let him answer that question.

17          THE WITNESS:  She was supportive.  She said that,

18   you know, the university would look into this, and Jackie was

19   happy with that.

20   BY MS. LOCKE:

21   Q    At that time, around May 1st, 2014, and this meeting, did

22   the Charlottesville Police Department pursue an investigation

23   of Jackie's alleged sexual assault?

24   A    We did not.

25   Q    And tell me why.

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

83

1    A    Our policy is that we would need a complaining victim or

2    complaining witness of a criminal offense.  Jackie, at the

3    time, was not willing to cooperate and have an investigation,

4    give any information about it.

5        The conclusion -- at the conclusion of the meeting I gave

6    her my business card, and it contained my personal cell phone,

7    e-mail, and told her that if she ever decided she would like

8    to pursue a criminal investigation, she could contact me

9    directly, I'd be happy to start it up.

10       So we did not pursue an investigation based on that.

11   Q    So it's fair to say that you left open the possibility of

12   pursuing an investigation with Jackie quite clearly for her?

13   A    Absolutely.

14   Q    In your experience, why is it important that you have a

15   complaining witness in order to pursue an investigation?

16   A    Well, you need a -- you know, you need a victim of a

17   crime that gives you detail, evidence, some type of witnesses

18   to -- you know, to develop, you know, probable cause in a

19   case.

20       You know, without -- you know, without a cooperating

21   victim, you really don't have much information to go on.

22   Q    After the article was published, "A Rape On Campus," it's

23   my understanding that the Charlottesville Police Department

24   opened an investigation into Jackie's alleged sexual assault.

25   Is that correct?

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

84

1  A    That is correct.

2  Q    And are you familiar with that investigation?

3  A    I am.

4  Q    Did you meet with Jackie after "A Rape On Campus" was

5  published in regard to that investigation?

6  A    I did.

7  Q    And tell us how that meeting came about.

8  A    On November 19th, I actually -- after reading the article

9  and determining that Jackie was the person I spoke to in May,

10  I called her.  I left her a voice message, said I would like

11  to talk to her about this.

12       I did not receive a phone call back.

13       I sent her an e-mail the following day, which would have

14  been November 20th, stating the same thing:  I would like to

15  speak with her.

16       The afternoon of the 20th I did receive a phone call from

17  Jackie.  She said she was on Thanksgiving break, she was glad

18  that I had called, that she did want to sit down and talk

19  about what had happened and --

20  Q    And did you ultimately meet with Jackie after that?

21  A    I did.

22  Q    And when was that meeting?

23  A    That meeting was December 2nd.

24  Q    And who was at that meeting?

25  A    Jackie showed up with her boyfriend at the time, Dean

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

85

1    Laura Casteen from UVa, and then also her attorney from legal

2    aid, Palma Pustilnik.

3    Q    And did Jackie speak at all during that meeting?

4    A    She did not.

5    Q    Who spoke during that meeting?

6    A    Her attorney, Miss Pustilnik.

7    Q    And describe that meeting that you had with Jackie, her

8    boyfriend, Miss Pustilnik, and Dean Casteen.

9    A    It was very brief.  Her attorney, Miss Pustilnik, said

10   that at the time Jackie was not ready to make a statement.

11       I told her that it was, you know, important to get a

12   statement, that we may -- you know, we may lose evidence if we

13   don't move forward with it.  And I also said that there may be

14   a decision made by our attorney's office to investigate

15   without their cooperation.

16       And her attorney, Miss Pustilnik, said that they still

17   weren't going to give us a statement, and that was the end of

18   that meeting.

19   Q    Did you form any impressions of Jackie herself during

20   that meeting?

21   A    It was very brief, but she was very quiet, no eye

22   contact.  She kind of looked down the whole time Miss

23   Pustilnik was talking.

24   Q    And what happened at the end of that meeting?  How did it

25   end?

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

86

1   A    Just with her attorney saying, we're not going to give

2   you a statement today.

3        And I explained to her that, you know, anytime she's

4   ready to, let us know, we'll be ready to investigate.

5   Q    You mentioned during that meeting that the

6   Charlottesville Police Department may end up pursuing an

7   investigation even though Jackie was unwilling to go forward.

8        Do you recall that?

9   A    Yes.

10  Q    And did that ultimately happen?  Did the Charlottesville

11  Police Department pursue an investigation without Jackie's

12  help?

13  A    We did.

14  Q    Tell us why.

15  A    We -- I had a meeting.  It was with Chief Longo and our

16  Commonwealth attorney, Dave Chapman.

17  Q    Who is Chief Longo?

18  A    Chief Longo at the time was the chief of police for

19  Charlottesville.

20  Q    And who else did you meet with?

21  A    And it was our Commonwealth attorney, Dave Chapman; my

22  lieutenant, Paul Davis; and Sergeant David Harris.

23           MR. PAXTON:  And, Your Honor, just -- it looks like

24  we're headed towards the direction of conversations with third

25  parties, as we've said before.  And so I think -- I just want

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

87

1   to make sure that we're not going to end up with a lot of

2   hearsay.

3         THE COURT:  Well, I'm not sure that's where we're

4   headed.  I don't think so.  We'll see.

5         MR. PAXTON:  Okay.

6   Q    You can go ahead.

7   A    Thank you.

8         During this meeting, I explained to Mr. Chapman, the

9   Commonwealth attorney, that Jackie was not at this time

10  willing to cooperate and give us a statement.  And he made the

11  decision to go forward with it anyway.

12  Q    What did you think about opening an investigation without

13  Jackie's involvement?

14  A    I've never worked a case, investigated a case, without a

15  victim.  I was against it personally at the time.

16  Q    And what instructions, if any -- what was your direction,

17  if any, did you have with respect to this investigation?

18  A    I was instructed to investigate this case until I could

19  not investigate any further.

20  Q    And did you in fact do that?

21  A    I did.

22  Q    And aside from yourself, was there anyone else involved

23  with this investigation at the Charlottesville Police

24  Department?

25  A    I was the lead detective, and then Sergeant David Harris

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

88

1    was my direct supervisor, and he assisted me with it.  So it

2    was just the two of us.

3    Q    And how long did your and Sergeant Harris's investigation

4    last?

5    A    I believe we concluded beginning of March 2015.

6    Q    So that would have been approximately four months of an

7    investigation?

8    A    That's correct.

9    Q    And did you have Jackie's cooperation at any point in

10   time during this four-month period?

11   A    I did not.

12   Q    After your December 2nd, 2014, conversation with Miss

13   Pustilnik where Jackie was present, did you or anyone else

14   that you're aware of at the Charlottesville Police Department

15   ever speak with Jackie again with respect to the investigation

16   of her sexual assault?

17   A    We did not.  We were instructed to contact her attorney

18   if we had anything -- we were specifically told by her

19   attorney not to contact her.

20   Q    How many people did you speak with, approximately, in

21   connection with your investigation of the sexual assault?

22   A    I'd say approximately 70 to 80 people.

23   Q    And the Charlottesville Police Department ultimately

24   reached a variety of conclusions as a result of this

25   investigation; isn't that correct?

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

89

1    A    We did.

2    Q    And after having interviewed 70 to 80 people, the

3    Charlottesville Police Department concluded that Jackie had

4    reported that she was struck in the face by a glass bottle

5    in -- sometime in early April, that Jackie had reported that

6    incident.  Correct?

7    A    That is correct.

8    Q    And Jackie had reported that her roommate at the time,

9    who was a nursing student, assisted her in removing glass from

10   Jackie's face, that Jackie had reported that to sort of the

11   police at that time; is that correct?

12   A    That's correct.

13   Q    But you conducted a subsequent interview with Jackie's

14   roommate; is that correct?

15   A    Yes, ma'am.

16   Q    And the Charlottesville -- you and the Charlottesville

17   Police Department concluded that the roommate had denied ever

18   picking shards of glass out of Jackie's face; is that correct?

19   A    Yes, ma'am, that's correct.

20   Q    Jackie -- the Charlottesville Police Department also

21   concluded that Jackie had reported that she had stood in the

22   parking garage near the Corner, correct, during -- after the

23   bottle incident; is that right?

24   A    That's correct.

25   Q    And that Jackie reported to police that she had called

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

90

1   her mother; is that right?

2   A    Yes, ma'am.

3   Q    And you did a subsequent search of phone records of

4   Jackie's; is that correct?

5   A    Yes, ma'am.

6   Q    And what evidence, if any, did that search reveal about

7   Jackie having called her mother?

8   A    There was no phone call made at that time.

9        MR. PAXTON:  Your Honor, could we approach for a

10  second?

11       (At Side Bar.)

12       MR. PAXTON:  Your Honor, obviously this report has

13  been a subject of motions in limine.  I wanted to make sure,

14  number one, that our objections are preserved to this, but

15  more importantly, I think it sounds like to me -- I thought

16  that what the Court's ruling was is that these sort of

17  findings could be --

18       THE COURT:  You're right.  It exceeds what the Court

19  intended by its earlier ruling on the motion in limine.  I

20  think that it's appropriate for you to ask him at this point:

21  Were you -- did you determine -- did you ultimately determine

22  that Jackie's allegations of sexual assault could not be

23  factually substantiated?

24       MS. LOCKE:  Okay.  There is also investigation that

25  this officer did about who Haven Monahan was, Your Honor, and

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

91

1    we've heard --

2          THE COURT:  After the fact.

3      You know, my ruling on Haven Monahan was that anything

4    that occurred before the publication of the article, or the

5    alleged publication, was fair game, but it is of no relevance

6    whatsoever to any of the issues that the jury's going to have

7    to decide.

8          MS. LOCKE:  But he did interview Ryan Duffin as part

9    of his investigation.  It would have been the same information

10   that Ms. Erdely would have learned had she contacted him.

11         THE COURT:  Not so, because -- I mean, I think that

12   a police officer -- this is one of the reasons for the ruling

13   on the motion in limine.  I think that a police officer can

14   expect a greater measure of cooperation than could an

15   investigative reporter.

16     So I don't believe you could ever affirmatively state

17   that she could have gotten the same information that he had.

18   He had resources above and beyond those that she could

19   maintain.  So that analogy just can't be made.

20         MS. LOCKE:  Just so I understand Your Honor's scope

21   of your ruling, so beyond the fact that he can't substantiate

22   the fact that there was a sexual assault, am I allowed to go

23   beyond that at all in --

24         THE COURT:  No.  The report can be used to impeach

25   other witnesses.  That was my ruling all along.  And I think

Eramo vs. Rolling Stone, et al. - 10/25/2016  Vol. 2

92

1   that the issuance of the report and its finding are important

2   for purposes of the timeline, but that's the extent of it.

3           MS. LOCKE:  Okay.

4           (In Open Court.)

5   BY MS. LOCKE:

6   Q   Sergeant Via, after your four-month investigation and

7   having interviewed 70 to 80 people, what evidence, if any,

8   were you able to conclude, were you able to determine, as to

9   whether there was a sexual assault on the night of September

10  28, 2012?

11  A   I found that there was no corroborating evidence to

12  support that there was an alleged sexual assault as it was

13  written in the article.

14  Q   And was that ultimately the conclusion of the

15  Charlottesville Police Department, that based on the

16  information known to investigators at the time it concluded

17  its investigation, that there was no substantive basis to

18  conclude that an incident occurred that was consistent with

19  the alleged gang rape as it was described in Rolling Stone's

20  article "A Rape On Campus"?

21  A   That is correct.

22          MS. LOCKE:  Thank you, Your Honor.

23                   CROSS-EXAMINATION

24  BY MR. PAXTON:

25  Q   Good afternoon.

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

93

1    A    Good afternoon.  How are you?

2    Q    Good.

3         Detective Via, I'm David Paxton, and I have the privilege

4    of representing the defendants in this case.  And we've not

5    had a chance to meet before.

6    A    Yes, sir.

7    Q    So if I understand your testimony, you had never met

8    Nicole Eramo before May 1st?

9    A    That's correct.

10   Q    And you had not met Jackie before that day either; is

11   that correct?

12   A    That's correct, yes, sir.

13   Q    And is the only information that you had going into that

14   meeting was that there had been a mention of Jackie's sexual

15   assault at the prior meeting on April 22nd?

16   A    That is correct.

17   Q    Okay.  So you were not provided information that another

18   student had filed an anonymous complaint of gang rape with

19   Ms. Eramo on January 24, 2014, at the same fraternity?

20   A    I was not aware of that.

21   Q    All right.  And you also were not aware that Jackie had

22   told Nicole Eramo on April 21st that she was aware of another

23   student who had been raped at that same fraternity in 2010?

24   A    No, sir, I was not aware of that.

25   Q    Okay.  And so if I understood your testimony correctly,

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

94

1   there was never any criminal investigation by the

2   Charlottesville police force until November 19, 2014, when

3   President Sullivan asked that you begin an investigation; is

4   that correct?

5   A    That's correct.

6        THE COURT:  I believe that requires just a little

7   bit more specificity.

8        No investigation of Jackie's allegations.

9        MR. PAXTON:  Correct.  Yes, thank you, Your Honor.

10       THE WITNESS:  That's correct.

11  BY MR. PAXTON:

12  Q    And as far as you were concerned when you left Peabody

13  Hall and Ms. Eramo's office and left she and Jackie there, the

14  matter was closed, as far as you were concerned, at that

15  point?

16  A    Yes, sir.

17  Q    Now, you mentioned that you spoke to 70 or 80 people

18  during the course of your interview.  Did you reach out to

19  Sabrina Erdely, the writer of the article?

20  A    We did.

21  Q    And did she promptly get back to you after you sent her

22  an e-mail, I believe?

23  A    Yeah, I can --

24       MS. LOCKE:  Your Honor, I have an objection.  This

25  goes outside the scope of what I was allowed to examine this

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

95

1    witness on.

2         THE COURT:  No, I'm going to let you ask and have an

3    answer to that question.

4    A    Can you repeat the question, sir?

5    Q    Yeah.

6         My question was, you had reached out to her asking for an

7    interview; is that correct?

8    A    That is correct.

9    Q    And she had promptly responded?

10   A    She did.

11   Q    And so she was one of the 70 or 80 people that you spoke

12   with; is that correct?

13   A    Yes, sir.

14   Q    And did you find that she was cooperative with you and

15   provided you answers to all the questions that you asked her?

16   A    She did.

17   Q    And the first time that you spoke to her was December 18,

18   2014.  Does that sound correct?

19   A    That sounds about right.

20   Q    Okay.  And I take it that you found her information at

21   least responsive enough that you were willing to call her a

22   second time; isn't that also true?

23   A    That is correct, we did speak a second time.

24   Q    Okay.  And on both of those occasions, she was fully

25   cooperative with you and gave you information that you asked

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

96

1   for?

2   A    She did.

3   Q    And did she ever refuse to answer any question that you

4   asked her?

5   A    She did not.

6   Q    And did she express to you that she was confused by what

7   had happened?

8   A    I have to actually -- I have to -- if I could, I can

9   refer to my notes about our conversation.  I can't recall off

10  the top of my head about that.

11         MS. LOCKE:  Your Honor, I object.  He's getting into

12  the substance of what was --

13         THE COURT:  I think I'd have to let her ask about

14  the details of every other interrogation if he answered that

15  question.

16         MR. PAXTON:  Okay.

17  Q    And at the end of the investigation that the

18  Charlottesville Police Department did, they indicated that

19  they did not find that Jackie had not been assaulted.  It just

20  didn't happen on the date and at the time and place that was

21  reported.  Is that correct?

22  A    Correct.

23  Q    So you're not saying that Jackie -- something bad didn't

24  happen to Jackie, it's just you couldn't find corroborating

25  evidence for her story; is that correct?

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

97

1    A    Yes, sir.

2    Q    All right.

3         MR. PAXTON:  And those are all my questions.  Thank

4    you very much.

5         THE WITNESS:  Thank you.

6                   REDIRECT EXAMINATION

7    BY MS. LOCKE:

8    Q    Sergeant Via, we just heard that you spoke with

9    Ms. Erdely as part of your investigation.  Is it fair to say

10   that even with all of the information that Ms. Erdely provided

11   you, you and the Charlottesville Police Department found no

12   substantive basis to conclude that an incident occurred that

13   was consistent with the alleged rape that was reported in

14   Rolling Stone magazine?

15   A    Yes, ma'am, that's correct.

16        MS. LOCKE:  Thank you.  I have nothing else.

17        THE COURT:  Anything else, Mr. Paxton?

18        MR. PAXTON:  No, Your Honor.

19        THE COURT:  May the witness be excused?

20        MS. LOCKE:  Yes, Your Honor.

21        THE COURT:  Sergeant, you may stand down.

22   Thank you for your attendance and testimony today.

23   You're excused.

24        THE WITNESS:  Yes, sir.

25        THE COURT:  Have you ever testified in a civil trial

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

98

1  before?

2          THE WITNESS:  I'm sorry?

3          THE COURT:  Have you ever testified in a civil trial

4  before?

5          THE WITNESS:  I have.  I have.

6          THE COURT:  So you're one of a few, I suspect, in

7  that regard.

8          THE WITNESS:  Yes, yes.

9          THE COURT:  Thank you.

10          THE WITNESS:  In circuit courts.

11          THE COURT:  Thank you.

12          THE WITNESS:  Yes, sir.

13          MS. LOCKE:  Thank you, Sergeant Via.

14          THE COURT:  Ladies and gentlemen, as I understand

15  it, this concludes the evidence for today.  We've exhausted

16  all the witnesses who were scheduled to appear, so we can

17  consider ourselves done.

18      Does it still suit all of you to be here at 8 in the

19  morning?

20      All right.  Well, let's plan on maintaining the same

21  schedule tomorrow and make further progress.

22      I would again ask that while you're away from the Court

23  you not discuss the case with anyone at home.  Do not permit

24  anyone to discuss it with you.  Don't attempt to do any

25  research about the case on the Internet or attempt to find out

Eramo vs. Rolling Stone, et al. - 10/25/2016    Vol. 2

99

1    about any of the people who have appeared and testified.

2    Don't read any account of the case in the newspaper or listen

3    to anything said about the case on the radio or TV.

4        Put the matter out of your mind until you come back in

5    the morning at 8 prepared to resume the consideration of

6    evidence in the case.

7        Ladies and gentlemen, you may go.  You're excused for the

8    afternoon.

9        (The jury was excused for the day at 5:11 p.m.)

10        THE COURT:  Let me ask counsel to be seated for just

11    a moment.

12        I want to memorialize an agreement that we reached in

13    chambers earlier today, and that is that even though we have

14    come to determine that one of the jurors no longer qualifies

15    as a Charlottesville juror and perhaps now resides in the

16    Harrisonburg Division, everyone nonetheless considers him to

17    be eligible to continue as a juror in this case.

18        Is that a true understanding of everyone?

19        MR. SEXTON:  It is, Your Honor.

20        MS. LOCKE:  Yes, Your Honor.

21        MR. CLARE:  Yes, Your Honor.

22        THE COURT:  Along those same lines, let me tell you

23    that since that meeting in chambers, I've done a little more

24    research.  And upon my review of Rule 58 [sic] and the

25    inclination that I spoke of earlier about the Court's desire

Eramo vs. Rolling Stone, et al. - 10/25/2016   Vol. 2

100

1   to have all the jurors continue in the case and to ultimately

2   deliberate, I've decided that I have authority to keep all 10,

3   and I'm going to do that.

4        I just think it's one of the saddest things when people

5   work so hard and are so attentive and on time and do all the

6   things that we ask them to do, to tell them they have to stand

7   down.

8        And I believe I have that discretion under Rule 48.  I'm

9   going to exercise it and let all 10 deliberate if they -- if

10  they continue to the end of the case.

11        Are there any other matters that need to be taken up this

12  afternoon?

13            MS. McNAMARA:  No, Your Honor.

14            THE COURT:  All right.  Ask the marshal declare the

15  Court adjourned for the day.

16        (Court adjourned for the day at 5:13 p.m.)

17                              *   *   *

18

19                    CERTIFICATE OF REPORTER

20

        I certify that the foregoing is a correct transcript of
21  the record of proceedings in the above-entitled matter.

22

23

24

    10/25/16                  /s/  Lance A. Boardman, RDR, CRR
25