Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

1

1                    UNITED STATES DISTRICT COURT

2                FOR THE WESTERN DISTRICT OF VIRGINIA

3                      CHARLOTTESVILLE DIVISION

4

5    *******************************
     NICOLE P. ERAMO,              * CIVIL ACTION 3:15-CV-00023
6                                  * OCTOBER 24, 2016
              Plaintiff,           * TRIAL DAY 7, VOLUME 2
7    vs.                           *
                                   *
8    ROLLING STONE, LLC,           *
     SABRINA RUBIN ERDELY,         * Before:
9    WENNER MEDIA, LLC,            * HONORABLE GLEN E. CONRAD
                                   * UNITED STATES DISTRICT JUDGE
10            Defendants.          * WESTERN DISTRICT OF VIRGINIA
     *******************************

11

12

     APPEARANCES:
13

     For the Plaintiff:        THOMAS ARTHUR CLARE, ESQUIRE
14                             ELIZABETH MARIE LOCKE, ESQUIRE
                               ANDREW CLAY PHILLIPS, ESQUIRE
15                             JOSEPH R. OLIVERI, ESQUIRE
                               Clare Locke, LLP
16                             902 Prince Street
                               Alexandria, VA 22314
17

18   For the Defendants:      ELIZABETH ANNE McNAMARA, ESQUIRE
                              ALISON SCHARY, ESQUIRE
19                             Davis Wright Tremaine, LLP
                               1251 Avenue of the Americas, 21st Flr.
20                             New York, NY 10020

21

     Court Reporter:      Lance A. Boardman, RDR, CRR
22                        c/o JoRita B. Meyer, RMR, CRR
                          210 Franklin Road, S.W.
23                        Roanoke, Virginia 24011
                          540.857.5100, Ext. 5311

24

         Proceedings recorded by mechanical stenography;
25   transcript produced by computer.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

2

1   APPEARANCES (Continued):

2   For the Defendants:        W. DAVID PAXTON, ESQUIRE
                               J. SCOTT SEXTON, ESQUIRE
3                              MICHAEL J. FINNEY, ESQUIRE
                               Gentry Locke Rakes & Moore
4                              P. O. Box 40013
                               Roanoke, VA 24022
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

3

1                              INDEX

2

3

4    WITNESS:                                    PAGE:

5    ELISABETH GARBER-PAUL

6            DIRECT EXAMINATION

7            BY MR. PHILLIPS......................    13

8

9                          *****

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

4

1

2                      INDEX OF EXHIBITS

3

4  FOR THE PLAINTIFF:                                    PAGE:

5  Plaintiff's Exhibit 149 marked for identification...     7

6  Plaintiff's Exhibit 150 marked for identification...     8

7  Plaintiff's Exhibit 149 admitted into evidence......     9

8  Plaintiff's Exhibit 150 admitted into evidence......    10

9  Plaintiff's Exhibit 151 marked for identification...    10

10 Plaintiff's Exhibit 152 marked for identification...    10

11 Plaintiff's Exhibit 151 admitted into evidence......    11

12 Plaintiff's Exhibit 152 admitted into evidence......    11

13 Plaintiff's Exhibit 153 marked for identification...    37

14 Plaintiff's Exhibit 154 marked for identification...    38

15 Plaintiff's Exhibit 155 marked for identification...    38

16 Plaintiff's Exhibit 153 admitted into evidence......    38

17 Plaintiff's Exhibit 154 admitted into evidence......    38

18 Plaintiff's Exhibit 155 admitted into evidence......    38

19 Plaintiff's Exhibit 156 marked for identification...   100

20 Plaintiff's Exhibit 156 admitted into evidence......   101

21 Plaintiff's Exhibit 157 marked for identification...   102

22 Plaintiff's Exhibit 157 admitted into evidence......   103

23

24

25

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

5

1                    INDEX OF EXHIBITS (CONT'D)

2

3  FOR THE DEFENSE:                                    PAGE:

4  Defendants' Exhibit 65 marked for identification....   11

5  Defendants' Exhibit 65 admitted into evidence.......   12

6  Defendants' Exhibit 66 marked for identification....   12

7  Defendants' Exhibit 66 admitted into evidence.......   12

8

9                            *****

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

6

1    (The jury is present in Open Court at 1:23 p.m.)

2        THE COURT:  I can see that all 10 jurors are back in

3    their places, ready for the continuation of this video

4    deposition.

5    Yes, the video deposition may continue.

6        (Playing of the videotaped deposition of "Jackie"

7    continued at 1:24 p.m.)

8        (Playing of the videotaped was paused at 3:00 p.m.)

9        THE COURT:  I understand we need to take a short

10   break before it finishes up, so let's do so.  We've passed the

11   mid-afternoon point.

12   Again, I would ask you, ladies and gentlemen, not to

13   discuss the case with one another when you're away from us.

14   Don't permit anyone to discuss it with you.

15   Let's plan to return at 10 after 3:00.

16        (A short recess was taken at 3:01 p.m.)

17        (The jury is present in Open Court at 3:14 p.m.)

18        THE COURT:  All 10 jurors are back in their places

19   ready to continue with the video deposition.

20   Now, folks, I understand, and rightly so, that you're

21   tired and you've been -- those chairs are going to grow to

22   you.  You're going to have to take them home with you when

23   this is over.  But I do encourage you to stand up during dead

24   moments in the courtroom.

25   And as far as I'm concerned, you can stand up during the

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

7

1  playing of the video depositions.  I think it's not

2  appropriate for you to stand up when a live witness is

3  testifying.  But feel free to do so when there's some dead

4  time or a video deposition's being played.

5      So with that, we may continue.

6      Susan?

7          (The playing of the videotaped deposition of

8  "Jackie" resumed at 3:37 p.m.)

9          (The playing of the videotaped deposition of

10  "Jackie" concluded at 3:19 p.m.)

11          THE COURT:  Is that it?

12          MR. PHILLIPS:  That's the conclusion, Your Honor.

13          THE COURT:  So we're ready for the next witness?

14          MR. PHILLIPS:  We are, Your Honor.  Briefly, I have

15  a copy of those designations for the record I'll give to

16  Ms. Moody.  I expect we'll be putting that in the record under

17  seal.

18          THE COURT:  Yes, sir.

19          MR. PHILLIPS:  PTX 149 is our next one.

20                  - - -

21          (Plaintiff's Exhibit 149 marked for identification.)

22                  - - -

23          MR. PHILLIPS:  Then we have three exhibits we'll be

24  offering as designations.

25      What's been marked for identification as PTX 149 --

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

8

1        THE CLERK:  This is 149.

2        MR. PHILLIPS:  PTX 149.

3     This one we will offer as PTX 150.

4                    - - -

5        (Plaintiff's Exhibit 150 marked for identification.)

6                    - - -

7        THE COURT:  Are these from the Jackie deposition?

8        MR. PHILLIPS:  Yes, Your Honor.

9        THE COURT:  Okay.  So have you agreed on the

10   exhibits?

11        MR. PAXTON:  Except for the ones that were raised

12   with the Court where Mr. Bayard yesterday noted his

13   objections.  Those are continuing, so we won't repeat those.

14     But the last document that was just offered is entered by

15   agreement.

16        THE COURT:  All right.

17        THE CLERK:  So 149 is the disk, and 150 is the

18   redacted transcript.

19        THE COURT:  So those are admitted over the

20   Defendants' --

21        MR. PAXTON:  No.  Those are with our permission.

22        MR. PHILLIPS:  Those are agreed.

23        MR. PAXTON:  Those are agreed.

24        THE COURT:  All right.  Let me write down then --

25        THE CLERK:  So 149 will be sealed but 150 need not

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

9

1    be sealed?

2            MR. PAXTON:  Correct.

3            THE CLERK:  149 is the sealed video designated

4    deposition.

5            THE COURT:  Okay.

6                              - - -

7            (Plaintiff's Exhibit 149 admitted into evidence.)

8                              - - -

9            THE CLERK:  150 is the redacted designated video

10   deposition of Jackie.

11           MR. PHILLIPS:  No, those are -- sorry, those are

12   texts between Jackie and --

13           THE CLERK:  So these were part of the exhibits that

14   were offered at the deposition?

15           MR. PAXTON:  Mm-hmm.

16           THE COURT:  150.

17           THE CLERK:  150.

18           MR. PAXTON:  But they're redacted since they're

19   public.

20       150.

21           THE CLERK:  I didn't get a transcript.

22           MR. SEXTON:  Okay.

23           MR. PHILLIPS:  149 is the video.  150 is Jackie's

24   texts with Sara Surface.

25                              - - -

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

10

1          (Plaintiff's Exhibit 150 admitted into evidence.)

2                            - - -

3    And we offer as Plaintiff's Exhibit 151 Jackie's texts with

4                       Ryan Duffin.

5          THE CLERK:  Are these accepted?

6          MR. PAXTON:  They are.

7                            - - -

8          (Plaintiff's Exhibit 151 marked for identification.)

9                            - - -

10         MR. PHILLIPS:  And as 512, I believe that is -- that

11   is an e-mail from Jackie to Elizabeth Fox.

12         MR. SEXTON:  That's 152 and -- what was it?

13         MR. PHILLIPS:  Jackie to Elizabeth Fox.

14         THE CLERK:  E-mail dated November 7, 2014, from

15   Jackie to Fox.

16                           - - -

17         (Plaintiff's Exhibit 152 marked for identification.)

18                           - - -

19         MR. PAXTON:  And those are subject to the previous

20   Court's ruling.

21         THE COURT:  151 and 152.

22         MR. PAXTON:  That's correct.

23         THE CLERK:  So they're admitted.

24         MR. PAXTON:  Over our objection.

25         THE CLERK:  Under objection.  Okay.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

11

```
 1                        - - -

 2          (Plaintiff's Exhibit 151 admitted into evidence.)

 3                        - - -

 4          (Plaintiff's Exhibit 152 admitted into evidence.)

 5                        - - -

 6          THE COURT:  All right.  You may call the next

 7  witness.

 8          MR. PAXTON:  I have two, Your Honor.

 9          MR. PHILLIPS:  The defendants had a couple of their

10  own.

11          MR. PAXTON:  Sorry.

12          THE COURT:  These are Defendant's Exhibits to the

13  Jackie deposition.

14          MR. PAXTON:  That's correct, Your Honor.

15          THE COURT:  65.

16                        - - -

17          (Defendants' Exhibit 65 marked for identification.)

18                        - - -

19          MR. PAXTON:  And that would be what was discussed

20  during the deposition as Defendants' Exhibit 25, which was a

21  compilation of communications between Jackie and -- that were

22  sent from Jackie to Ms. Erdely.  It was testified to during

23  Jackie's deposition.

24          MR. PHILLIPS:  That's without objection.

25          THE CLERK:  That will be Defendants' 65.
```

Eramo vs. Rolling Stone, et al. - 10/24/2016  Vol. 2

12

1                        - - -

2              (Defendants' Exhibit 65 admitted into evidence.)

3                        - - -

4         THE COURT:  Okay.

5         MR. PAXTON:  And the second, Your Honor, is a

6   document that was discussed during the deposition as

7   Defendants' Exhibit 32, which are a series of text messages

8   that have been redacted between Jackie and Rachel Soltis.

9         MR. PHILLIPS:  That's without objection.

10                       - - -

11             (Defendants' Exhibit 66 marked for identification.)

12                       - - -

13        THE COURT:  Okay.

14        THE CLERK:  And that's Defendants' 66.

15        THE COURT:  66.

16                       - - -

17             (Defendants' Exhibit 66 admitted into evidence.)

18                       - - -

19        MR. PHILLIPS:  Thank you.

20        MR. PAXTON:  Thank you, Your Honor.

21        THE COURT:  Who's next?

22        MR. PHILLIPS:  With that, Your Honor, plaintiff

23   calls Elisabeth Garber-Paul.

24                     - - - - -

25                   ELISABETH GARBER-PAUL,

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

13

1   being first duly sworn, testifies and says as follows:

2            THE CLERK:  You may have a seat, please.

3                      DIRECT EXAMINATION

4   BY MR. PHILLIPS:

5   Q    Good afternoon, Ms. Garber-Paul.

6   A    Hello.

7   Q    You may recall, we met some months back, but again, my

8   name is Andy Phillips, and I represent the plaintiff, Nicole

9   Eramo.

10       Could you just state your name for the record and

11  identify yourself to the jury, please.

12  A    I'm Elizabeth Garber-Paul.  I was the fact checker on

13  this article.

14  Q    Ms. Garber-Paul, you are an employee of Rolling Stone

15  magazine; is that correct?

16  A    That is correct.

17  Q    And specifically, the corporate entity that employs you

18  is Wenner Media, LLC, one of the defendants; is that correct?

19  A    That is correct.

20  Q    And you -- sorry.  Wenner Media and Rolling Stone's

21  offices are located in New York City; is that correct?

22  A    Yes.

23  Q    And do you reside in New York as well?

24  A    Yes, in Brooklyn.

25  Q    Am I correct that your job title at Wenner Media is

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

14

1   assistant editor?

2   A    At the time of publication, yes, it was.

3   Q    Do you have a different title today?

4   A    Yes.  I am now culture editor for RollingStone.com.

5   Q    Now, at the time of the article, your primary job

6   responsibility for Rolling Stone was fact-checking feature

7   articles; is that correct?

8   A    Yes.

9   Q    Is that still true today?

10  A    No, it's not.

11  Q    What are your primary responsibilities today?

12  A    I now edit the culture section for the website.

13  Q    And as you already mentioned, you were the Rolling Stone

14  magazine fact checker assigned to fact check "A Rape On

15  Campus," the article, correct?

16  A    Yes.

17  Q    Ms. Garber-Paul, as a fact checker for Rolling Stone

18  magazine, would you agree that it was your responsibility to

19  make sure that an article is completely accurate before it

20  goes to publication?

21  A    Yes, and go through line by line and word by word and

22  make sure that everything was as accurate as possible before

23  publication.

24  Q    And you had the same responsibility with respect to "A

25  Rape On Campus," to make sure that it was completely accurate

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

15

1  before publication, correct?

2  A    Yes, sir.

3  Q    When you were fact-checking articles for Rolling Stone,

4  if you found something that was inaccurate or misleading in a

5  draft article that you were fact-checking, it was your job to

6  alert the author and/or the editors at Rolling Stone to that

7  inaccuracy, correct?

8  A    I would say it was more my position to -- it was more my

9  role to alert the editor.  I would go through any questions I

10 had about something with the writer and then take any

11 questions I had then to the editor.

12 Q    And when you were fact-checking a draft, you might

13 suggest edits/changes to improve the story's accuracy; is that

14 true?

15 A    Yes, sir.

16 Q    And you would take those to your editor?

17 A    Yes, sir.

18 Q    Am I correct that you've been an employee at Rolling

19 Stone since 2013?

20 A    Full-time since 2013 and before that, part-time since

21 2010.

22 Q    And when you were part-time, you were freelance

23 fact-checking for Rolling Stone; is that right?

24 A    Yes, sir.

25 Q    When you began working as a freelance fact checker for

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

16

1   Rolling Stone, you did not go through any sort of formal

2   training program related to fact-checking; is that correct?

3   A    No.  I had already done fact-checking work at other

4   publications, so they walked me through what the system was

5   there, but there was no formal training.

6   Q    Am I correct that Rolling Stone never provided you with

7   any written policies or procedures for fact-checking?

8   A    Yes, that's true.

9   Q    And in fact, Rolling Stone does not have any written

10  policies or procedures for fact-checking; is that correct?

11  A    Yes.

12  Q    And that was true in November of 2014 as well, correct,

13  when the article was published?

14  A    Yes.

15  Q    At the time that the article was published, Rolling Stone

16  had no policy relating to the use of anonymous sources; is

17  that correct?

18  A    We would take everything on an individual basis.

19  Q    Was that also true with respect to the use of pseudonyms?

20  A    Yeah.  We would look at everything on a case-by-case

21  basis.

22  Q    At the time the article was published, Rolling Stone had

23  no policies or procedures with respect to how fact-checkers

24  are supposed to verify quotes; is that correct?

25  A    We had nothing formal, but we -- there was nothing

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

17

1   formal, that's true.

2   Q    Now, as a fact checker for Rolling Stone when working on

3   a feature article like "A Rape On Campus," you often worked

4   within some time constraints; is that true?

5   A    Yeah.  We had deadlines for the articles.

6   Q    And in fact, when you were assigned an article to fact

7   check, like "A Rape On Campus," at the time it's assigned to

8   you, there's a deadline for the completion of fact-checking;

9   is that correct?

10  A    Yeah.  We knew when the article had to go to press, so we

11  worked within those constraints.

12  Q    And is that the close date?

13  A    Yes, exactly.

14  Q    That deadline, the close date, that's based on Rolling

15  Stone's preset publication date for the article; is that

16  right?

17  A    Yes, sir.

18  Q    And that was, in fact, the case with "A Rape On Campus,"

19  when you were assigned to fact-check the article, there was a

20  preset close date when your fact-checking was supposed to be

21  completed; is that correct?

22  A    Yes.  We knew what the schedule was for that issue, so we

23  knew when we had to be completed by, yeah.

24  Q    And you recall that "A Rape On Campus" closed on

25  Wednesday, November 12th?

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

18

1   A    I would have to look at a calendar, but, yes, that sounds

2   correct.

3   Q    Okay.  Now, you were assigned the article "A Rape On

4   Campus" to fact-check in early November, the first week of

5   November, about two weeks before the article was published; is

6   that correct?

7   A    Yes.  It was the Monday before that Wednesday, so it was

8   I guess about 10 days.

9   Q    Okay.  And it was about a week or so before the article

10  was due to close?

11  A    A week and a couple days, so I was assigned it on a

12  Monday, and then it was due to close the following Wednesday.

13  Q    So about nine days?

14  A    Yes.  Thank you.

15  Q    Now, you received some backup materials for your

16  fact-checking of "A Rape On Campus" from Sabrina Rubin Erdely;

17  is that correct?

18  A    Yes.

19  Q    Including some e-mail correspondence and Ms. Erdely's

20  reporting notes; is that correct?

21  A    It was some correspondence, the notes, some photographs,

22  some documents.  It was a whole Dropbox full of information.

23  Q    If you could find up there, Ms. Garber-Paul, I know

24  there's quite an array of binders surrounding you.

25  A    Yes, sir.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

19

1  Q    But the document we've marked at Plaintiff's Trial

2  Exhibit 10 is what we've been referring to as Ms. Erdely's

3  reporting file for "A Rape On Campus."  It should be spiral

4  bound.  Mr. Sexton can probably help you find it.

5          MR. SEXTON:  That's it.

6      Do you want me to take this one and put it away?

7          THE WITNESS:  Yes.

8          MS. McNAMARA:  You might want to move in I think

9  it's Exhibit 2A or -- it's the one that's unredacted.

10         COURT SECURITY OFFICER:  64.

11         MS. McNAMARA:  It might come up and not be relevant

12 but --

13         MR. PHILLIPS:  I'm actually not asking her about it

14 right now.  I have a general question about the reporting

15 file, but if we come to it and there's a redaction issue, I'll

16 keep in mind that that's an option.

17 Q    Actually, all I'm asking, Ms. Garber-Paul, is whether PTX

18 10, do you recognize that as Ms. Erdely's reporting file for

19 "A Rape On Campus"?

20 A    Yes, I do.

21 Q    I want to confirm that you were provided this entire

22 reporting file prior to the publication of "A Rape On Campus";

23 is that right?

24 A    Yes, I was.

25 Q    So all of the information that's contained in PTX 10,

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

20

1   Plaintiff's Trial Exhibit 10, was available to Wenner Media

2   and Rolling Stone prior to the publication of "A Rape On

3   Campus"; is that correct?

4   A    Yes.

5   Q    So we discussed, Miss Garber-Paul, how while

6   fact-checking an article you may bring edits, suggested

7   changes, or questions to your editor.

8        Do you recall that testimony?

9   A    Yes.

10  Q    Was your editor -- the editor for "A Rape On Campus" at

11  Rolling Stone, was that Sean Woods, who's seated over here at

12  defendants' table?

13  A    Yes, it was.

14  Q    And did you in fact review your fact-checking edits for

15  "A Rape On Campus" with Mr. Woods in his office prior to

16  publication?

17  A    Yes, for each round of edits, we sat down and went

18  through them in his office at Rolling Stone.

19  Q    And isn't it true that as the assigning editor for the

20  article and the deputy managing editor for Rolling Stone

21  magazine, that Sean Woods was the one who had final say as to

22  any of your proposed edits or changes to "A Rape On Campus"?

23  A    Yes.

24        MR. PHILLIPS:  All right.  I'm going to ask Brian to

25  call up what's previously been admitted as Plaintiff's Trial

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

21

1   Exhibit 31.

2           MR. SEXTON:  I'll get you the right book here.

3           THE CLERK:  It's the black one, one of the big black

4   ones.

5           THE WITNESS:  Is it this one back here?

6           MR. SEXTON:  Well, there's so many.  I think it is.

7       Yes.

8           THE WITNESS:  Okay.  Thank you.

9   BY MR. PHILLIPS:

10  Q    We'll have it on the screen for you as well, Miss

11  Garber-Paul, but feel free to refer to whichever you're more

12  familiar with.

13      Do you recognize Plaintiff's Exhibit 31 as an exchange of

14  e-mails between you and Sabrina Rubin Erdely on November 3rd,

15  2014?

16  A    Yes, I do.

17          MR. PHILLIPS:  Can we go all the way to first e-mail

18  in the chain, Brian?  It's going to be the last page.

19  Q    So Ms. Garber-Paul, in the initial e-mail in this chain,

20  shortly after noon on November 3rd, 2014, you informed

21  Ms. Erdely that you were going to be fact-checking "A Rape On

22  Campus"; is that correct?

23  A    Yes, that's correct.

24  Q    And this was in fact your first communication with

25  Ms. Erdely regarding the article that became "A Rape On

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

22

1   Campus"; is that right?

2   A    Regarding this article, yes.

3   Q    And you also mention in your e-mail that Sean had

4   provided you with the latest draft of the article that

5   morning.

6        Do you see that?

7   A    Yes, he had.

8   Q    And you were referring to your editor, Sean Woods?

9   A    Yes, I was.

10        MR. PHILLIPS:  If we could go to the 4:19 p.m.

11   e-mail, Brian.

12   Q    And at 4:19, Miss Garber-Paul, Sabrina Rubin Erdely sent

13   you the contact info for the woman that we're calling Jackie

14   in this proceeding; is that right?

15   A    Yes.

16   Q    She also provided you what she called a, quote,

17   sorry-looking transcript, end quote.

18        And my understanding is that that was an original

19   reporting file that was longer and had some non-UVa-related

20   materials in it, but also included everything that's in

21   Plaintiff's Trial Exhibit 10.

22        Is that your recollection as well?

23   A    That was my understanding as well, yes.

24   Q    I want to look at your response to Ms. Erdely at 5:45

25   p.m. on November 3rd.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

23

1    You wrote, "Hey, Sabrina.  Thanks so much for sending

2  this over.  Quick question:  Did we ever get comment from Tom,

3  or reach out for one?  Gonna take off for the night.  Talk

4  tomorrow.  Liz."

5    Is that an e-mail that you sent to Sabrina Rubin Erdely

6  on November 3rd?

7  A    Yes, it is.

8  Q    Now, when you asked Ms. Erdely if Rolling Stone had ever

9  gotten a comment from Tom, or reached out for one, you were

10  referring to the supposed ringleader of Jackie's gang rape; is

11  that correct?

12  A    Yes.  I believe his name was Drew in the final article.

13  Q    Right.  And it's my understanding that he was originally

14  referred to as Tom, and that became Drew in the final

15  published version of the article.  Is that correct?

16  A    I think it was before the final published, but yeah, over

17  the course of editing.

18  Q    And both of those were pseudonyms, fake names, right?

19  A    Yes, that's correct.

20  Q    When you asked Ms. Erdely, "did we ever get comment from

21  Tom, or reach out for one," by "we," were you referring to

22  sort of the Rolling Stone magazine unit of folks that were

23  working on the story?

24  A    Yes, exactly.  I was kind of using a royal "we" as, you

25  know, Sabrina and us.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

24

1   Q    And you and Sean Woods?

2   A    Mm-hmm.  Yes.  I'm sorry.

3   Q    So you sent Ms. Erdely this e-mail asking about whether

4   Rolling Stone ever got comment from Tom within just a few

5   hours of reading the article for the first time; is that

6   right?

7   A    Yes.  I had read it that day.

8   Q    In fact, that was the first substantive question that you

9   asked Ms. Erdely about the article, correct?

10  A    Yes, it was.

11  Q    You wanted to know as the fact checker for Rolling Stone:

12  Did we find this guy, did we talk to him, right?

13  A    It was a question I had, yes.

14  Q    It was the first question you had?

15  A    Yes, it was.

16        MR. PHILLIPS:  Brian, let's call up Plaintiff's

17  Trial Exhibit 27, specifically ERAMO-04547.

18        And Miss Garber-Paul, that's also going to be in the

19  same binder, I hope, Tab 27.

20        THE WITNESS:  Number 27?

21        MR. PHILLIPS:  Yes.

22        THE WITNESS:  Thanks.

23  BY MR. PHILLIPS:

24  Q    Do you recognize Plaintiff's Trial Exhibit 27 as the

25  Columbia Journalism Report that Rolling Stone commissioned

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

25

1  regarding the article?

2  A    Yes, I do.

3  Q    I want to ask you specifically about the statement from

4  the Columbia folks on the page that has the Bates stamp

5  ERAMO-04547.  It should be up on your monitor there.

6  A    Yes.

7  Q    Columbia said:  "Journalistic practice and basic fairness

8  require that if a reporter intends to publish derogatory

9  information about anyone, he or she should seek that person's

10  side of the story."

11      Do you see that?

12  A    Yes, I do.

13  Q    And you agree with that statement, don't you?

14  A    I agree that whenever possible, it's best to track down

15  everybody mentioned in an article.

16  Q    Now, the article accused Drew/Tom of being the ringleader

17  of a violent gang rape, correct?

18  A    Yes.

19  Q    You would agree that's a derogatory accusation, yes?

20  A    Yes.

21  Q    Now, you, Rolling Stone, and Ms. Erdely had the name Jay

22  for that person, correct?  That's the name that Jackie used

23  with you?

24  A    That's the name we had been given, yes.

25  Q    And the article also said that he was a member of Phi

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

26

1   Kappa Psi fraternity at the University of Virginia; is that
2   correct?
3   A    That is correct.
4   Q    The article said that he was a third-year, a junior, at
5   UVa in 2012, correct?
6   A    That's correct.
7   Q    The article also said that he worked as a lifeguard at
8   the UVa pool in the fall of 2012, correct?
9   A    That's correct.
10  Q    Am I correct that Rolling Stone did not seek or obtain
11  Drew/Tom/Jay's side of the story prior to publication?
12  A    I know that Sabrina had spent a long time looking for
13  this individual, and I, using the information that we had,
14  tried to find him and was not able to.
15       And we did not think that he would be recognizable, so we
16  thought that using a pseudonym would be acceptable, especially
17  since Jackie felt so uncomfortable -- it was my understanding
18  that Jackie was so uncomfortable disclosing the name of her
19  rapist.
20  Q    Now, I want to make sure I understand your testimony.
21       You just testified that it was Rolling Stone's belief
22  that Drew, the supposed ringleader of the gang rape as
23  described in the article, would not be recognizable?
24  A    That was my belief, yes.
25  Q    Rolling Stone knew his name or thought they knew his

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

27

1  name.  They had the name Jay.  They stated that he was in Phi

2  Kappa Psi, that he was a junior who worked at the university

3  pool in the fall of 2012.

4      And it's your testimony that had that -- had that

5  individual existed as a real person, he would not have been

6  identifiable to his peers?

7  A   We believed that based on the fact that we were unable to

8  find him, that he was going to be unrecognizable.

9          MR. PHILLIPS:  Lets go back to the e-mail chain if

10 we could, Brian.  That was -- you're ahead of me.

11 Q   That was back to Plaintiff's Trial Exhibit 31,

12 Ms. Garber-Paul.

13 A   Okay.

14 Q   Do you see that Ms. Erdely responded to your comment

15 about reaching out for a comment from Tom/Drew at 6:16 p.m. on

16 November 3rd?

17 A   Yes.

18 Q   And you'd asked if we ever identified him or sought

19 comment.  She said, "Unfortunately, the answer is no and no."

20     Do you see that?

21 A   Yes.

22 Q   And you understood that at the time to mean that

23 Ms. Erdely did not get a comment from Tom and had not reached

24 out for a comment from Tom, correct?

25 A   I understood that to be that, yes, she had not gotten a

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

28

1   comment.

2   Q    So within a few hours of reading the draft article for

3   the first time, you, the Rolling Stone fact checker, asked the

4   author whether she had ever gotten a comment from the alleged

5   rapist or reached out for one, correct?

6   A    Yes, that's true.

7   Q    And Ms. Erdely told you, no, she had not, correct?

8   A    Yes, that's true.

9   Q    Isn't it true that the following day you spoke with both

10  Sean Woods and Ms. Erdely regarding the fact that Ms. Erdely

11  had not located, identified, or spoken to the alleged

12  ringleader of the gang rape?

13  A    Yes, we spoke about it extensively the next day, and I --

14  it was my understanding that Sean and Sabrina had been

15  speaking about it before I was brought into the --

16  Q    Okay.  So there's no doubt that as of approximately

17  November 4th, 2014, Mr. Woods, the deputy managing editor for

18  Rolling Stone magazine, was aware that Ms. Erdely did not know

19  who this individual was and had not spoken to him, correct?

20  A    That's my understanding, yes.

21  Q    During your conversation with Ms. Erdely, she told you

22  she didn't know who this person was, right?

23  A    She told me that Jackie was very scared of disclosing the

24  full name of her attacker.

25  Q    So she in fact told you that Jackie refused to disclose

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

29

1   the identity of this individual to her, right?

2   A   I don't believe she used the word "refused," but she told

3   me she was very scared.

4   Q   She told you that she'd asked Jackie for it, right?

5   A   Yes.

6   Q   So we can quibble over the word "refused," but Ms. Erdely

7   told you she had asked Jackie for this individual's name, and

8   Jackie had declined to provide it.  Is that fair?

9   A   Yes, that's fair.

10  Q   So you, as the Rolling Stone fact checker, were aware as

11  of the first week of November 2014 that Jackie declined to

12  disclose to the magazine the name of the alleged ringleader of

13  her gang rape, correct?

14  A   Yes, that's correct.

15  Q   Now, in the course of fact-checking this article, you

16  spoke to Jackie on the telephone on a couple of occasions; is

17  that correct?

18  A   On two occasions for about two hours each, and then over

19  the course of the next few days a few more times.

20  Q   And when you spoke to Jackie, you asked her for the name

21  as well, didn't you?

22  A   I don't -- I don't remember that I pressed her for the

23  full name.  I definitively talked to her about the attack and

24  about -- I asked her what the first name was that she had

25  given to Sabrina.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

30

1  Q    Did you, as the Rolling Stone fact checker, make any

2  effort to obtain the real identity of Drew from Jackie when

3  you spoke to her?

4  A    I asked if she would talk to me about it, but I did not

5  press her for the full name of the attacker.

6  Q    And you never learned that information on your own prior

7  to publication, correct?

8  A    No, I did not.

9  Q    So just to confirm, it's true that at the time of

10 publication of "A Rape On Campus," you, the fact checker for

11 Rolling Stone magazine, did not know the identity of the

12 individual that supposedly perpetrated the gang rape that was

13 described in the article; is that correct?

14 A    It's true, I did not know his full name.  I believed him

15 to be a real person.

16 Q    You had only the name Jay; is that correct?

17 A    That's correct.

18 Q    Did you have any understanding of whether Jay was a

19 nickname?  Was it short for Jack?  Jake?  James?

20     Did you have any idea at the time of publication?

21 A    I came learn that his -- I believed his name to be James,

22 though I may have learned that from Sabrina.

23 Q    After publication of the article?

24 A    I believe it was before, but it's a little bit --

25 Q    Did you identify any James who was a member of Phi Kappa

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

31

1    Psi prior to the publication of the article?

2    A    We did not have a roster of the members of Phi Kappa Psi.

3    Q    The answer to my question is "no"?

4    A    Yes, that's true.

5            MR. PHILLIPS:  Brian, let's pull up Plaintiff's

6    Trial Exhibit 26, if we can.

7    Q    Do you recognize Plaintiff's Trial Exhibit 26 as a chain

8    of e-mails between you and Sabrina Rubin Erdely on the 4th and

9    5th of November, 2014?

10   A    Yes.

11           MR. PHILLIPS:  Brian, could we go back a page?

12   Q    And I want to look at that e-mail at the bottom here,

13   your 3:36 p.m. e-mail to Ms. Erdely.

14       Do you see where I'm at?

15   A    Sure.

16   Q    And you told Ms. Erdely in this e-mail that you'd just

17   spoken to Jackie for two hours, correct?

18   A    For about two hours, yes.

19   Q    You also referenced setting up a second "phoner" on

20   Thursday.  Do you see that?

21   A    Yeah, that was the second phone call I referred to

22   before.

23   Q    And you did in fact have a second phone call with Jackie

24   a few days after this?

25   A    Yes, I did.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

32

1  Q    And you asked Jackie -- or, I'm sorry.

2       You asked Ms. Erdely in the second paragraph of your

3  e-mail about cutting a line about Jackie contracting syphilis.

4       Do you see that?

5  A    Yes, I did.

6  Q    You also noted that Jackie asked you to change the name

7  of Tom.

8       Do you see that?

9  A    I had asked Jackie if she had anyone in her life named

10 Tom, because I wanted to make sure that we weren't

11 inadvertently talking about somebody that perhaps she knew.

12      She told me that she dated a person named Tom.  So that's

13 why we changed it from Tom to Drew, I believe.

14 Q    Okay.  When had she dated this person named Tom; do you

15 know?

16 A    I don't know that.

17 Q    Did Rolling Stone ever speak to that individual?

18 A    No, we didn't.

19         MR. PHILLIPS:  Could we go to the next e-mail in the

20 chain, Brian?

21 Q    Sabrina Rubin Erdely's response to you.  She said:

22 Fantastic.  I'm glad to hear it went well.  Thanks for letting

23 me know and for letting her know we'll be accommodating her,

24 which seems crucial towards getting her through this process.

25 Yes, let's take out the syphilis line and change Tom to

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

33

1  something else.

2      And then it continues.

3      Do you see that?

4  A    Yes, I do.

5  Q    Am I correct that the initial draft of the article that

6  you received contained an assertion that Jackie had contracted

7  syphilis from her sexual assault?

8  A    Yes, that's what the article said.

9  Q    Jackie never provided you or Ms. Erdely with any

10 confirmation that she was in fact diagnosed with syphilis; is

11 that correct?

12 A    That's true.  We had taken it out of the article, so I

13 didn't put too much stock in it.  Also, I didn't think that

14 necessarily having her prove she contracted syphilis -- you

15 could contract that through any kind of sexual encounter.

16 Q    Well, and that's fair.

17     It wouldn't necessarily prove that she was gang raped,

18 would it?

19 A    No, that's true.

20 Q    But it would corroborate that she had syphilis, as she

21 told Ms. Erdely that she did; is that true?

22 A    That's true but --

23 Q    The medical records would corroborate that she in fact

24 had been tested and diagnosed with syphilis, as she told

25 Ms. Erdely, correct?

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

34

1  A    That would have corroborated that, yes.

2  Q    Did you know, as the Rolling Stone fact checker prior to

3  publication, whether Sabrina Erdely had ever requested such

4  documentation from Jackie, medical records diagnosing

5  syphilis?

6  A    I don't know.

7       MR. PHILLIPS:  Brian, let's pull up the rest of that

8  e-mail, please.

9  Q    In her 5:07 p.m. e-mail to you, Ms. Erdely also gave you

10 what she called a, quote, note of warning.

11      Do you see that?

12 A    Yes, I do.

13 Q    And she said:  "When you talk to any one of these UVa

14 girls, assume you're talking to all of them because they share

15 information like lightning.  I've already gotten a text from

16 one student activist" -- and activist is in quotation marks --

17 "really a covert mouthpiece for the administration, named Sara

18 Surface, that I think she must have sent within minutes of

19 your call with Jackie.  She's one of the people who's been

20 trying to convince Jackie not to use her name at all, as per

21 Dean Eramo's wishes.  In Sara's text, she demanded to know

22 whether we identified Jackie as a member of One Less.  I

23 haven't answered her yet."

24      Is that an e-mail that you received from Ms. Erdely?

25 A    Yes, it is.

1  Q    Ms. Erdely refers to a woman named Sara Surface as a,

2  quote/unquote, activist, and calls her a covert mouthpiece for

3  the administration.

4      Do you see that?

5  A    Yes, I do.

6  Q    Sara Surface at the time was a college student at the

7  University of Virginia, correct?

8  A    Yes, that was my understanding.

9  Q    And she was a friend of Jackie's?

10  A    Yes.  That was my understanding as well.

11  Q    And you actually spoke with Sara Surface during your

12  fact-checking of the article; is that correct?

13  A    Yes.

14  Q    And you were aware at the time that she was an

15  accomplished student advocate on matters and issues relating

16  to sexual assault, right?

17  A    Yes, I knew she was a member of One Less, and I knew she

18  did activist work on campus.

19  Q    And when you spoke to Sara Surface, she expressed to you

20  her viewpoint that the school was getting a lot better at its

21  handling of the problem of sexual assault on campus; isn't

22  that correct?

23  A    Yes, I spoke to her extensively about that and helped --

24  and worked with Sabrina to draft up language to insert into

25  the article to make those points clear.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

36

1  Q    Did Sabrina ever explain to you why she referred to Miss

2  Surface as a covert mouthpiece for the administration?

3  A    No.  To be honest, I didn't put very much stock into this

4  paragraph.  I took this to be -- I understood this as perhaps

5  Sabrina's interpretation.  But I spoke with Sara Surface as an

6  authority on the activism that was going on on campus.

7  Q    You made reference earlier, Miss Garber-Paul, to rounds

8  of fact-checking for the article.  Do you recall that?

9  A    Yes, I did.

10  Q    So I wanted to move on to that topic.

11  A    Sure.

12  Q    Am I correct that you did three major rounds of

13  fact-checking on different drafts of this article?

14  A    Yes.  There was the Word document that was given to me

15  initially that I referred to on that first Monday e-mail.

16      And then there was -- later in the week it was placed

17  into layout, and I saw it as a Round 1.

18      And then I believe the following week it went to Type

19  Final, which was the final copy that we worked on.

20  Q    I have copies of what I believe to be these rounds for

21  you to try and avoid binder flipping here, so I'm going to

22  provide those to you.  I think it might make it easier?

23  A    Do you guys actually have the larger copies of these?

24  Because these were originally 11 by 14s.

25          MS. McNAMARA:  Yeah, Andy, we actually have them.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

37

1    Do you want us to move them in?  It will be much easier for

2    the witness to have them.

3            MR. PHILLIPS:  Sure, sure, if you have them.

4        We'll also put them up on the screen, of course.

5            THE WITNESS:  Okay.  Can I move this binder for now?

6    Is that okay?

7            MR. PHILLIPS:  Yeah, you can put that aside.

8            MS. McNAMARA:  Can we just get them for you, Andy --

9            MR. PHILLIPS:  Sure.

10           MS. McNAMARA:  -- and then you can have her...

11       Do you want to have these marked as three separate or --

12           MR. PHILLIPS:  Yes, let's mark them as separate

13   exhibits, please.

14           MS. McNAMARA:  Should we bring them in as

15   defendants'?

16           MR. PHILLIPS:  We can put them in as plaintiff's.

17   Let's do that.  I think our next in line is 153, but Miss

18   Moody will correct me if I'm wrong.

19           THE CLERK:  153, yes.

20           MS. McNAMARA:  So this one would be 153.

21           THE CLERK:  These are agreed on?

22           MS. McNAMARA:  These are agreed on?

23           MR. PHILLIPS:  Yes.

24                            - - -

25           (Plaintiff's Exhibit 153 marked for identification.)

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

38

1                           - - -

2           MR. SEXTON:  These are galleys of the article?

3           THE WITNESS:  Yes.

4           MS. McNAMARA:  Two of them are galleys.  One is the

5    Word version.

6           MR. SEXTON:  Is 153 the Word version?

7           MS. McNAMARA:  Correct.

8           THE CLERK:  154 is Round 1 galley.

9                           - - -

10          (Plaintiff's Exhibit 154 marked for identification.)

11                          - - -

12          THE CLERK:  And 155 is marked Type Final?

13                          - - -

14          (Plaintiff's Exhibit 155 marked for identification.)

15                          - - -

16          THE COURT:  So what's 154, Susan?

17          MS. McNAMARA:  Round 1.

18          THE COURT:  Round 1?

19                          - - -

20          (Plaintiff's Exhibit 153 admitted into evidence.)

21                          - - -

22          (Plaintiff's Exhibit 154 admitted into evidence.)

23                          - - -

24          (Plaintiff's Exhibit 155 admitted into evidence.)

25                          - - -

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

39

1  BY MR. PHILLIPS:

2  Q    If I can ask you, Miss Garber-Paul, first to take a look

3  at the document I had handed you that's labeled PTX 42, the

4  smaller version.

5  A    Oh, sure.

6  Q    And can you confirm that that is in fact the first round

7  of fact-checking edits that you did for "A Rape On Campus"?

8  A    Yes, it is.

9  Q    And is that the same document as what has now been marked

10  as Plaintiff's Trial Exhibit 153, albeit 153 is a much larger

11  version of the same document?

12  A    Yes, it is.

13          MR. PHILLIPS:  Brian, I ask you to call up 42,

14  please.

15  Q    Miss Garber-Paul, this document, Plaintiff's Trial

16  Exhibit 42 and Plaintiff's Trial Exhibit 153, contains

17  handwritten notations that you made as part of your

18  fact-checking process for the article; is that correct?

19  A    Yes.

20  Q    Am I correct that all of the handwritten notations on

21  this document were made by you?

22  A    Yes, sir, they were.

23  Q    And this would have been during the first week of

24  November 2014?

25  A    Yes.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

40

1  Q    And some of these notes were made while you were on the

2  phone with Jackie; is that correct?

3  A    Many of them were, yes.

4  Q    I want to start by looking at an example of one of your

5  edits.

6  A    Sure.

7  Q    I'm going to ask you to go to the page with the Bates

8  stamp RS004812.

9      Do you see on the top right-hand corner there's a note

10  that says "she wasn't really yelling"?

11  A    Yes.

12  Q    And this is in the section that's describing the gang

13  rape attack, correct?

14  A    The initial phase of it, yes.

15  Q    And there's an arrow going back from that note to the

16  text, the portion of the text where it had said that Jackie

17  was yelling during her assault.

18      Do you see that?

19  A    I'm sorry?

20  Q    There's an arrow from a portion of the text in the draft

21  that says that Jackie was "yelling during her assault," and

22  then you draw an arrow and had written a note that said "she

23  wasn't really yelling."

24      Do you see that?

25  A    Yes.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

41

1  Q    So what you're doing there is you're making a note that

2  this may be something in the article we want to change.  This

3  is something that Jackie's told me is inaccurate; is that

4  fair?

5  A    It's something Jackie clarified for me, yeah.

6  Q    Miss Garber-Paul, you should also have in front of you

7  one of the documents I gave you as PTX 1.  That's the final

8  published version of the article.

9  A    Yes, I do.  Sorry.

10  Q    And do you recognize Plaintiff's Trial Exhibit 1 as the

11  final published version of the article?

12  A    Yes, I do.

13  Q    I'm going to ask you to turn to the page with the Bates

14  stamp RS001072.

15  A    Mm-hmm.  Sorry.  Yes.

16  Q    And in particular, in the right-hand column, the

17  paragraph beginning "two years later," with the big T.

18       Do you see that?

19  A    Yes, I do.

20  Q    It says in the final version of the article, "Two years

21  later, Jackie, now a third-year, is worried about what might

22  happen to her once this article comes out.  Greek life is huge

23  at UVa, with nearly one-third of undergrads belonging to a

24  fraternity or sorority, so Jackie fears the backlash could be

25  big, a, quote, shitshow predicted by her now-former friend

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

42

1    Randall, who, citing his loyalty to his own frat, declined to
2    be interviewed."
3         Do you see that?
4    A    Yes, I do.
5    Q    I want to look at the edits that you proposed to this
6    paragraph during your first round of fact-checking.  So again,
7    that's PTX 42 and/or PTX 153.
8    A    Can you tell me which Bates stamp that is?
9    Q    Yes.  Let's go to page RS004814.
10        MR. PHILLIPS:  I'm being told I'm squiggling on the
11   screen inadvertently.
12        MR. CLARE:  Just touch down there.
13   Q    All right.  So Ms. Garber-Paul, so looking at RS004814 in
14   the first fact-checking round, do you see in the same sentence
15   here, it's about in the middle of the page or slightly above
16   it, "Greek life is huge at UVa with one-third of undergrads
17   belonging to a fraternity or sorority, so Jackie fears the
18   backlash could be big, a shitshow predicted by her now former
19   friend Randall, who, citing his loyalty to his own frat,
20   declined to be interviewed."
21        Do you see that?
22   A    Yes, I do.
23   Q    Do you see that in the left-hand margin, next to the
24   quote about the article being a shitshow from Randall, you'd
25   written a note that says, "Put this on Jackie, question mark,"

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

43

1  correct?

2  A    Yes, I wrote that.

3  Q    You were suggesting with that note that the article

4  should make it clear that this supposed quote came from Jackie

5  and not directly from Randall, correct?

6  A    Yes.

7  Q    That's what you meant by "put this quote on Jackie"?

8  A    Yeah.

9  Q    And you understood at the time, did you not, that Rolling

10  Stone had not interviewed or sought comment from Randall?

11  A    I understood that we had asked Jackie if we could get in

12  touch with him, and she told us that he was not interested in

13  speaking to us.

14  Q    Right.  So it was Jackie who told you that Ryan declined

15  to be interviewed -- sorry -- Randall declined to be

16  interviewed.  It was not Randall who told you directly that he

17  declined to be interviewed?

18  A    Yes, that's true.

19  Q    And that's what you were trying to make clear with this

20  note here, correct?

21  A    Yes.

22  Q    Let's look back at that same sentence in PTX 1, the final

23  version of the article.

24      Do you see that the same shitshow quote from Randall

25  ended up being published by Rolling Stone exactly as it

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

44

1  appeared in that draft?

2  A    Yes, I do.

3  Q    So am I correct that your suggestion to put this on

4  Jackie was not ultimately adopted by the decision makers at

5  Rolling Stone?

6  A    After a discussion, we decided not to, yes.

7  Q    Looking at the draft again, PTX 42, same sentence.

8        You'd also suggested a note there where it says that

9  Randall declined to be interviewed, citing loyalty to his own

10 frat, you wrote a note that said "who Jackie says declined to

11 be interviewed."

12       Do you see that?

13 A    Yes.  I was referring to the same thing.  They weren't

14 two separate thoughts really.  I was just trying to figure out

15 a way that maybe we could put that in.

16 Q    Same issue:  You were proposing ways that Rolling Stone

17 could make it clear to readers that Rolling Stone had never

18 spoken with Randall and that Randall had not declined to be

19 interviewed, at least not directly, correct?

20 A    Yes, that's true.

21 Q    That suggested language was not adopted by the decision

22 makers at Rolling Stone, correct?

23 A    Yes, that's true, though in retrospect, I wish we had.

24       MR. PHILLIPS:  Brian, if we could just go back to

25 the -- no, let's go back to the PTX 42 but without the full

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

45

1  quote there.

2      Let's go back to PTX 42, the same page we were on.

3  Q    And I just wanted to ask you about this note on the

4  right-hand side here, also in red.

5      Did you write on this draft next to the same sentence,

6  "Is this on her too?  Any way we can confirm with him?"

7      Is that your note?

8  A    Yes, I wrote that.

9  Q    You underlined "this," correct?

10  A    Yes, though often when I'm writing, I underline things

11  just as a tick of my note taking.

12  Q    What you were asking, Ms. Garber-Paul, was whether

13  Rolling Stone could confirm with Randall that Randall actually

14  declined to be interviewed, correct?

15  A    Yes.  I was wondering -- it was a note to myself to find

16  out if there's a way that we could get in touch with him.

17  Q    And to confirm whether Randall had actually referred to

18  the article, the coming article, as a shitshow, correct?

19  A    To confirm that he declined to comment.

20  Q    And in fact, you asked Jackie when you spoke to her if

21  you could get in touch with Randall, and she said no, he's

22  declined to participate; is that correct?

23  A    She told me that he had been very adamant that he was not

24  interested in speaking with a national magazine.

25  Q    So Jackie declined to provide you with any contact

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

46

1  information for Randall; is that correct?

2  A   I asked if she would put us in touch, and she made it

3  very clear to me that he was not interested.  So I didn't

4  press the matter.

5  Q   Did you ever ask Jackie for Randall's full name, his real

6  name?

7  A   I had a first name, but I did not have a last name.  And

8  I don't recall that I asked her for that, no.

9  Q   You had the name Ryan, correct?

10  A   Yes.

11  Q   You don't recall if you ever asked Jackie for a last name

12  to go with Ryan?

13  A   No.

14  Q   You never asked Jackie for his e-mail address?

15  A   Well, I asked if we could be put in touch, and I -- when

16  she said that he was very adamant about not talking to a

17  magazine, I respected that, and I didn't press the matter.

18  And then that's when I made the suggestion to make it more

19  clear that this -- this had come from Jackie.

20  Q   Now, the fact that Jackie said that Randall didn't want

21  to participate in the article, that didn't stop you, the

22  Rolling Stone magazine fact checker, from reaching out to

23  Randall to confirm that that was actually the case, did it?

24  A   No, but I didn't have contact information for him, so I

25  couldn't.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

47

1   Q    So the fact that Jackie refused to provide Rolling Stone

2   with contact information from Randall -- for Randall, that

3   prevented you from reaching out to Randall; is that correct?

4   A    It was my understanding that he was very adamant to not

5   speak with us, so we didn't have contact information, and we

6   couldn't reach out.

7   Q    That understanding came from Jackie, correct?

8   A    Yes, though at this point, we had 100 percent faith in

9   Jackie.

10  Q    But Jackie told you that Randall, an individual who could

11  have corroborated much of her story, corroborated or disproved

12  much of her story about the events of that evening, Jackie

13  told you that Randall didn't want to talk to you, and you

14  accepted that representation; is that correct?

15  A    Well, I would say that he could have corroborated the

16  immediate aftermath of what happened, maybe not much of her

17  story but the immediate aftermath of what happened that night.

18  And, yes, I believed her when she told me that a college

19  student didn't want to speak to a national magazine.

20          MR. PHILLIPS:  Let's look at Plaintiff's Trial

21  Exhibit 1, the published version of the article.  I want to go

22  to RS001073.

23       And if we could blow up the left-hand column here of

24  1073.

25  Q    There are two sentences in there I want to ask you about,

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

48

1  Ms. Garber-Paul.

2  A    Sure.

3  Q    About the middle of that paragraph, it says, "But the

4  dearth of attention isn't because rape doesn't happen in

5  Charlottesville.  It's because at UVa, rapes are kept quiet,

6  both by students-who brush off sexual assaults as regrettable

7  but inevitable casualties of their cherished party culture-and

8  by an administration that critics say is less concerned with

9  protecting its students than it is with protecting its own

10 reputation from scandal."

11      Do you see that?

12 A    Yes, I do.

13 Q    I want to look at your notes on Plaintiff's Trial Exhibit

14 42, 153 if you're looking at the large version.

15 A    Sure.  What's the Bates number there?

16 Q    It's going to be RS004815.

17      Do you see the same statement in this draft that you

18 fact-checked about an administration that's less concerned

19 with protecting students than with protecting its own

20 reputation from scandal?

21 A    Yes, I do.

22      MR. PHILLIPS:  Brian, if we could step back a bit

23 and look at the note next to that.

24 Q    Did you write that note, Ms. Garber-Paul?

25 A    Yes, I did.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

49

1  Q    It says, "Yes, but not Dean Eramo," correct?

2  A    Yes.  That was based on my conversation with Jackie, and

3  she expressed to me that opinion.

4  Q    Jackie expressed to you the opinion that Dean Eramo was

5  not more concerned with protecting the school's reputation

6  than she was with protecting students, correct?

7  A    Yes, but she was not the critics to which we were

8  referring in that sentence.  We cite the critics directly

9  below them by name in quotes.

10  Q    And Ms. Erdely told us today that none of those critics

11  knew Ms. Eramo personally or knew anything about Jackie's

12  story.

13       Do you have any reason to disagree with that?

14  A    No.  But we said the administration.  We weren't

15  referring to Dean Eramo specifically there.

16  Q    Does the article mention any other UVa administrators

17  that interacted with Jackie about her sexual assault other

18  than Ms. Eramo?

19  A    We weren't specifically talking about Jackie's assault in

20  this paragraph, and we do mention other UVa administration

21  members in the article.

22  Q    None of whom are described as interacting with Jackie,

23  are they?

24  A    No, but this paragraph is about UVa in general, not about

25  Jackie's story specifically.

Eramo vs. Rolling Stone, et al. - 10/24/2016  Vol. 2

50

1  Q    Does any other member of the University of Virginia's

2  administration's photograph appear in this article besides

3  Ms. Eramo?

4  A    No.

5  Q    All right.  Let's go back to Plaintiff's Trial Exhibit 1,

6  the final published version of the article.  And I'm on

7  RS001074, please.  And in particular, I'm looking at the

8  second full paragraph in the right-hand column beginning with

9  "She was having."

10      Do you see where that is?

11 A    Yes, I do.

12 Q    There are quotes from students called Andy and Cindy in

13 the article.

14      Do you see that?

15 A    Yes, I do.

16 Q    Andy's quoted as asking Jackie when she was crying about

17 her gang rape, "You're still upset about that?"

18      Do you see that?

19 A    Yes, I do.

20 Q    Cindy is described as a "self-declared hookup queen," and

21 the article says that she asked Jackie, referring to her gang

22 rape, "Why didn't you have fun with it?  A bunch of hot Phi

23 Psi guys?"

24      Do you see that?

25 A    Yes, I do.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

51

1  Q   And according to the article, Andy called Jackie a baby

2  for being upset about being gang raped.

3      Do you see that?

4  A   Yes.

5  Q   Let's pull up PTX 42 and look at your notes on the first

6  fact-checking round for this paragraph.  And I'd like you to

7  go to RS004821.

8      Do you see the same statements here in the draft that you

9  fact-checked?

10 A   Yes, I do.

11 Q   Although the man referred to as Andy in the final version

12 of the article is referred to as Andrew in this draft; is that

13 right?

14 A   Yes.  There are some edits to it, but it's substantively

15 the same, it seems.

16 Q   Let's look at the notes that you wrote in the right-hand

17 margin next to this paragraph.

18     You've drawn a bracket around this whole paragraph

19 containing these Andrew and Cindy quotes.

20     Do you see that?

21 A   Yes, I did.

22 Q   And you wrote a note that says, "Ask Sean.  Need to put

23 on Jackie?"

24     Do you see that?

25 A   Yes, I wrote that.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

52

1   Q    You wrote that note?

2   A    Yes, I did.

3   Q    What your note was referring to was whether the supposed

4   quotes from Andrew and Cindy need to be put on Jackie rather

5   than on Andrew and Cindy, right?

6   A    That's correct.

7   Q    What you meant was ask Sean, you're referring to Sean

8   Woods, the deputy managing editor of Rolling Stone magazine,

9   correct?

10  A    Yes, I was.

11  Q    What you meant was ask Sean Woods whether the article

12  should make it more clear that these supposed quotes from

13  Andrew and Cindy came from Jackie and Jackie only and that

14  Rolling Stone had never spoken to Andrew and Cindy.  Correct?

15  A    Yeah.  This was a note to myself for when I went into his

16  office to have the sit-down to discuss this first draft, that

17  this was something that I wanted to discuss with him.

18  Q    And if you look at the published version of the article,

19  PTX 1 at RS10074.  Do you see that the same quotes from Andrew

20  and Cindy appear in the final published version of the

21  article?

22  A    Yes.  We came to the determination that this was very

23  much still in her voice, and we were comfortable with having

24  these quotes appear as they did.

25  Q    The final published version of the article does not

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

53

1    incorporate your suggestion to put these quotes on Jackie,

2    does it?

3    A    No.    After a conversation, we agreed that they should run

4    as is.    And when we went to press, I fully believed them.

5    Q    So you suggested putting these quotes on Jackie -- and

6    let's be clear, putting them on Jackie would have meant

7    saying, you're still upset about that?    Jackie says Andy asked

8    one Friday night.    Correct?    That would be an example of

9    putting it on Jackie?

10   A    Yes, exactly.

11   Q    Or "Jackie claims that Cindy said why didn't you have fun

12   with it, a bunch of hot Phi Psi guys," right?

13   A    Yes.

14   Q    That's not what Rolling Stone did, right?    Rolling Stone

15   did not put these quotes on Jackie.    These quotes are

16   attributed directly to Andy and Cindy in the final published

17   version of the article, correct?

18   A    Yes, that's correct.

19   Q    Your testimony is that after a conversation about this

20   with Sean Woods, that was the decision that was made, correct?

21   A    Yes.

22   Q    You're aware now, Ms. Garber-Paul, as we sit here today,

23   that the individual called Andy in the article is actually

24   name Alex Stock; is that correct?

25   A    Yes, I am.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

54

1    Q    And you're aware that the individual called Cindy in the

2    article is actually named Kathryn Hendley; is that correct?

3    A    Yes, I am.

4    Q    It was your understanding when you were fact-checking the

5    article for Rolling Stone that Sabrina Erdely, the reporter,

6    had asked Jackie for Andy's contact information; is that

7    correct?

8    A    It was my understanding that Sabrina had tried to find

9    contact information for all three of these individuals, yeah.

10   Q    And one of the ways she tried was by asking Jackie,

11   right, because Jackie said they were friends of hers?

12   A    Jackie said they used to be friends, and they hadn't been

13   friends after these incidents.  They had not been in touch in

14   a long time.

15   Q    Okay.  So let's unpack that.

16        So you, as the Rolling Stone fact checker, you knew that

17   Sabrina Rubin Erdely had asked Jackie for Andy's contact

18   information, his full name and his contact information,

19   correct?

20   A    Yes.

21   Q    And you knew that Jackie had declined to provide that

22   information, correct?

23   A    It was my understanding that they were not interested in

24   speaking with us and that's why she didn't give us that

25   information.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

55

1  Q    Let me make sure I have an answer to the question I

2  asked, which was it was your understanding prior to

3  publication that Jackie had declined to provide Ms. Erdely

4  with contact information or a full name for Andy; is that

5  right?

6  A    Yes.

7  Q    And Cindy, you also knew that Ms. Erdely had asked Jackie

8  for Cindy's contact information and full name, correct?

9  A    Yes.  I knew she had looked for these individuals, yes.

10 Q    And you knew that Jackie had declined to provide

11 Ms. Erdely with Cindy's contact information and real name,

12 correct?

13 A    Yes.

14 Q    And your understanding, prior to publication, was that

15 the reason Jackie declined to provide these individuals' names

16 was that she said she was on bad terms with them or had a

17 falling out with them; is that right?

18 A    I'm not entirely sure why she declined, to be honest.

19 Q    Did you ask Ms. Erdely why Jackie refused to provide Andy

20 and Cindy's contact information so that you could fact-check

21 the article with them?

22 A    I don't recall having that conversation with her.  I do

23 know that we -- that Sabrina had tried to find these

24 individuals.

25 Q    Okay.  Well, you knew that she had not gotten those names

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

56

1    or their numbers or their e-mail addresses from Jackie, the

2    girl who used to be friends with them, right?

3    A    Yes.  I knew she wasn't able to track them down.

4    Q    Did you, as the Rolling Stone magazine fact checker, ask

5    Ms. Erdely why, why is Jackie refusing to provide us with

6    these people's contact information?

7    A    I don't remember having that conversation.

8    Q    You, as the Rolling Stone fact checker, did not contact

9    these individuals prior to publication to ask them to verify

10   that they actually said any of the quotes that are attributed

11   to them in the article; is that correct?

12   A    No.  I did not have the contact information for them, so

13   I was not able to reach out for them -- reach out to them.

14   Q    Ultimately, as the editor, it was Sean Woods' decision to

15   go forward with publishing these supposed quotes from Andy and

16   Cindy, these very callous quotes, without actually verifying

17   with Andy and Cindy that they said those things; is that

18   correct?

19   A    Yes.

20         MR. PHILLIPS:  Let's pull up PTX 42 again, the first

21   fact-checking round.

22   Q    I want to ask you to go to RS004828.

23   A    482 -- I'm sorry?

24   Q    4828.

25         You see the first full paragraph there that begins "If

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

57

1   Dean Eramo" -- it says, "If Dean Eramo was surprised at

2   Jackie's story of gang rape, it didn't show.  A short woman

3   with curly dark hair and a no-nonsense demeanor," and then it

4   continues.

5        Do you see that?

6   A    Yes.

7   Q    You had circled the description of Ms. Eramo as having a

8   no-nonsense demeanor, and you had written a question mark next

9   to it, correct?

10  A    Yes, I did.

11  Q    And then in the left-hand margin, you'd written,

12  referring to Ms. Eramo, "Very sweet, second mom figure."  Is

13  that correct?

14  A    Yes.  That was what Jackie told me in my conversation

15  with her.  She made it very clear how much respect she had for

16  Dean Eramo.

17  Q    And Jackie made it very clear that she did not want to

18  see Dean Eramo characterized as indifferent to her, didn't

19  she?

20  A    I don't believe she used the word "indifferent," and I

21  don't see what here would say indifferent.

22  Q    I'm not referring to this particular sentence.  I'm

23  asking about your conversations with Jackie.

24  A    Oh.  Yes, she did not feel that Dean Eramo had been

25  indifferent to her, no.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

58

1    Q    Let's go back to Plaintiff's Trial Exhibit 1, page

2    RS001076.  This is the published version of the article.

3         Now, I want to ask you about the full paragraph in the

4    right-hand column there.  It says, "Absent much guidance,

5    Jackie would eventually wonder how other student victims

6    handled her situation.  But when she clicked around on UVa's

7    website, she found no answers.  All she found were the UVa's

8    police's" -- I'm sorry, "All she found were the UVa police's

9    crime logs, which the university makes available online but

10   are mostly a list of bike theft, vandalism, and public

11   drunkenness complaints."

12        Do you see that statement in the final published version

13   of the article?

14   A    Yes, I do.

15             MR. PHILLIPS:  Brian, let's pull up PTX 42, the

16   first fact-checking round at RS004830.

17   Q    In your fact-checking graph, do you see that you had

18   underlined this sentence, "All she could find were the UVa

19   police's crime logs"?

20   A    Yes.

21             MR. PHILLIPS:  Brian, if you could pull back a

22   little bit.

23   Q    And you wrote a note there that says, "She says she never

24   looked into this," correct?

25   A    Yes.  She told me that she hadn't really gone through

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

59

1  them extensively.  She had seen them, and she had scrolled

2  through them quickly and then got a move on to whatever else

3  she was doing.

4  Q    All right.  Let's look at your fact-checking edits for

5  round 2.

6  A    This is confusing, but it's called Round 1.

7  Q    I'm sorry.  Round 1.  Your second round of fact-checking.

8  A    Yes.

9  Q    But it's called Round 1.

10 A    Yes.

11 Q    So am I correct that Plaintiff's Trial Exhibit 43 and the

12 large version you have in front of you I believe is

13 Plaintiff's Trial Exhibit 154 is the second round of

14 fact-checking edits that you did for "A Rape On Campus"?

15 A    Yes, it is.

16 Q    Do you see that in this version the article appears more

17 like it does in the final published version?  It's sort of

18 arranged in that way now?

19 A    Yes.

20 Q    And what time frame were you making the fact-checking

21 edits on Round 1 here?

22 A    This came in kind of late on -- later in the week of that

23 first week of fact-checking, so it was either Thursday or

24 Friday and then it went to either Monday or Tuesday of the --

25 probably Tuesday of the following week.  So kind of right in

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

60

1  the middle.

2  Q    Okay.  And as with the first version that we looked at,

3  am I correct that all of the handwritten notes on Plaintiff's

4  Trial Exhibit 43 and Plaintiff's Trial Exhibit 154 are yours?

5  A    Yes, they are.

6         MR. PHILLIPS:  Brian, let's pull up the first page

7  of PTX 1, the final version of the article.

8  Q    I want to ask you about the opening paragraph of the

9  article.

10      Do you see that at the very top of the page in big bold

11  letters?

12 A    Yes, I do.

13 Q    And that says, "Jackie was just starting her freshman

14 year at the University of Virginia when she was brutally

15 assaulted by seven men at a frat party.  When she tried to

16 hold them accountable, a whole new kind of abuse began."

17      Do you see that?

18 A    Yes.

19 Q    That opening paragraph, that's called the deck of the

20 article; am I correct?

21 A    Yes, it is.

22 Q    We'll look at your fact-checking edits to the deck of the

23 article on Plaintiff's Trial Exhibit 43.

24      In the first sentence, it looks like you -- in the draft

25 it says, "Jackie was brutally assaulted by seven upper

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

61

1  classmen at a frat party," and you'd suggested changing that

2  to say "students" or "men"; is that right?

3  A   Yes.  And we didn't know that they were necessarily all

4  upper classmen.

5  Q   And in the final version of the article, they were

6  identified as seven men; correct, so that kind of was

7  accepted?

8  A   Yes.  Yes, it was.

9  Q   Okay.  On your fact-checking draft, PTX 43, you circled

10  the second sentence of the deck; is that right, the one that

11  says, "When she tried to hold them accountable, a whole new

12  kind of abuse began"?

13  A   Yes, I did.

14  Q   And did you write the note that's next to that deck on

15  the right-hand side?

16  A   I did.  Part of my job as a fact checker is to be very

17  overly literal in reading all the different parts of the

18  article, including the deck.  And I had initially read that to

19  mean that somehow the abuse she faced on campus, mostly at the

20  hands of her peers, was somehow worse than the initial attack,

21  and I didn't agree with that, but after talking that through

22  with the editors, I -- or with Sean, I realized that it wasn't

23  necessarily a judgment that one was worse than the other.  It

24  was just kind of what she faced.

25  Q   So let's be clear.  That same statement that's in the

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

62

1  draft deck on PTX 43, that's unchanged in the final published

2  version of the article.  It appears exactly the same, correct,

3  "When she tried to hold them accountable, a whole new kind of

4  abuse began"?

5  A    Yes, that's true.

6  Q    And as the Rolling Stone fact checker working on "A Rape

7  On Campus," your first reaction to reading that sentence in

8  the deck was, "Nope."  Is that correct?

9  A    That was my off-the-cuff initial reaction to this, yes.

10  Q    In fact, you underlined "nope" twice?

11  A    Yes, I did.

12  Q    You discussed that note with Sean Woods, the deputy

13  managing editor of Rolling Stone and Ms. Erdely's good friend,

14  correct?

15  A    He was the deputy managing editor of Rolling Stone and

16  the editor I was working with on this, and, yes, I did discuss

17  it with him.

18  Q    And Sean Woods, the deputy managing editor of Rolling

19  Stone magazine, made the final decision to retain that same

20  language in the deck in the final version of the article,

21  "When she tried to hold them accountable, a whole new kind of

22  abuse began," am I correct?

23  A    Yes, and I agreed with him.

24  Q    I'd like to go to PTX 43, page RS004862.

25        And in particular, the middle column above the pull

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

63

1  quotes.

2      Do you see where I am, Ms. Garber-Paul?

3  A    Yes, I do.

4  Q    And this is in the section in the draft that you read

5  that's describing Jackie's gang rape at Phi Kappa Psi; is that

6  correct?

7  A    Yes, it is.

8  Q    Do you see that there are a number of quotes in here from

9  Jackie's supposed assailants?

10  A    Yes.  There are, though -- sorry.  Yes, yes, there are.

11  Q    For example, it states that one said, quote, "Grab its

12  mother fucking leg," correct?

13  A    Yes, though it seems that that's being placed on her.

14  But, yes, that quote is in here.

15  Q    Okay.  Am I correct that at the time Rolling Stone

16  magazine published "A Rape On Campus" -- well, first of all,

17  let me back up.

18      This same quote appears in the final published version of

19  the article, correct?

20  A    I believe so, but -- yes.

21  Q    Am I correct that at the time Rolling Stone published the

22  article, as the fact checker for Rolling Stone magazine, you

23  didn't have any idea who that person was that supposedly said

24  that to Jackie, correct?

25  A    Yeah, I don't think Jackie really knew.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

64

1   Q    Sitting here today as the fact checker for Rolling Stone

2   magazine, do you have any idea if that person exists?

3   A    I don't know either way.

4   Q    What about the quote in the next paragraph?  And I

5   believe this is discussing the gentleman who supposedly

6   assaulted Jackie with a beer bottle.  This is someone speaking

7   to the gentleman assaulting Jackie with the beer bottle.

8        It quotes one of the supposed assailants as saying --

9   pardon my language -- "Pussy.  What?  She's not hot enough for

10  you?"

11       Do you see that?

12  A    Yes.

13  Q    At the time Rolling Stone magazine published this

14  article, did you, the fact checker, have any idea who the

15  person was that supposedly said that?

16  A    No, we did not have their identity.

17  Q    As you sit here today, do you have any idea if that

18  person exists?

19  A    I don't know either way.

20  Q    The previous paragraph also claims that the gang rapists

21  called each other nicknames like Armpit and Blanket.

22       Do you see that?

23  A    Yes, that's what Jackie recalled to me.

24  Q    And that was in the draft that you fact-checked as well

25  as the final published version of the article, correct?

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

65

1  A    Yes, it was.

2  Q    You don't know who those people are either, do you?

3  A    No, but they seemed like pretty generic nicknames to me.

4  Q    At the time Rolling Stone magazine published "A Rape On

5  Campus," you didn't have any idea who those people were, did

6  you?

7  A    No, but I was comfortable that this was a rape victim

8  recounting her own sexual assault, and I was comfortable

9  having it in her voice.  And these were her recollections of

10 that night.

11 Q    As the Rolling Stone fact checker, you never asked anyone

12 from Phi Kappa Psi if there were pledges or brothers of that

13 fraternity in 2012 with the nicknames Armpit or Blanket,

14 correct?

15 A    That's true.

16 Q    Let's look at the third paragraph in the middle column of

17 RS004862.

18      This is describing the young man that was allegedly told

19 to assault Jackie with a beer bottle.

20      It says, "As the last boy sank onto her, Jackie was

21 startled to recognize him.  He attended her tiny anthropology

22 discussion group."

23      And then it describes how he was unable to "get it up"

24 and was jeered at by the crowd.

25      Do you see that?

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

66

1   A    Yes, I do.

2   Q    Okay.  And the article goes on to claim that this

3   classmate of Jackie sexually assaulted her with a beer bottle,

4   correct?

5   A    Yes, it does.

6   Q    There's identifiable information about this individual in

7   here, correct, in the draft that you fact-checked?

8   A    Only that they had both been in an anthropology

9   discussion group.

10  Q    A tiny anthropology discussion group in the fall semester

11  of 2012, correct?

12  A    Yes.

13  Q    Did you, the Rolling Stone magazine fact checker, ask

14  Jackie what the name of this class was or who the professor

15  was?

16  A    No.  I had a discussion with her about this portion of

17  the story, and I asked her about the class and about what size

18  it was.  And I made sure that there were multiple boys in that

19  class so that we wouldn't be calling out, like, the only man

20  who happened to be in this class with her.  And she recounted

21  this to me in great detail.

22  Q    What was the size of the class?

23  A    To the best of my recollection -- let me see if it's in

24  my notes, in the other one.

25       To the best of my recollection, it was about 15 people.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

67

1   Q    You didn't ask Jackie for the man's name, did you?

2   A    No.  Jackie had already expressed that she was very

3   scared of her attackers and not willing to disclose the names

4   of her attackers.

5   Q    You certainly didn't know the individual's name at the

6   time of publication, correct?

7   A    No, I did not.

8   Q    As you sit here today, do you have any idea if that

9   person exists or not?

10  A    I don't know either way.

11  Q    On page RS004862, Plaintiff's Trial Exhibit 43.

12       Looking at the paragraph beginning with "When Jackie came

13  to."

14       Do you see that?

15  A    Yes.

16  Q    And this is the portion of, well, both the draft and the

17  final article that describes this meeting that Jackie

18  allegedly had with three friends after her assault?

19  A    Yes.

20  Q    And in this draft and in the final article, both Andy and

21  Cindy are quoted as discouraging Jackie from reporting her

22  sexual assault, correct?

23  A    Yes, that's true.

24  Q    Again, as the Rolling Stone fact checker, you never

25  contacted Cindy or Andy to verify these quotes.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

68

1    I know we looked at other quotes prior, but you never

2  verified these quotes with Cindy and Andy either; is that

3  correct?

4  A    Yeah, I didn't have their contact information.

5  Q    You also never spoke with the young man called Randall in

6  the article to verify his quotes, correct?

7  A    Yes.  Like I testified before, it was my understanding

8  that he very much did not want to speak with Rolling Stone.

9  And I asked to be put in touch and that had not happened, so I

10  was unable to verify those quotes.

11  Q    Okay.  Rolling Stone magazine, at the time of

12  publication, believed Randall, Cindy, and Andy to all be

13  students at the University of Virginia, correct?

14  A    Yes, that's true.

15  Q    Were you aware when you were fact-checking the article

16  that the University of Virginia has a publicly-available

17  database of students, a directory?

18  A    I was not aware at the time of publication, and -- but

19  given that all I had were first names, I -- even if I had

20  them, I'm not sure what I would have been able to do with

21  that.

22  Q    So because Jackie refused to provide you with their

23  names, you couldn't search for them in the directory, even had

24  you known about it?

25  A    Yes, that's true.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

69

1    Q    You learned after publication of the article that Rachel

2    Soltis, a young woman Erdely spoke to, had in fact given

3    Sabrina Rubin Erdely Kathryn Hendley's name; isn't that

4    correct?

5    A    Yes, I found that out after publication.

6    Q    And Kathryn Hendley is the young woman called Cindy in

7    the article, right?

8    A    Yes.

9    Q    Sabrina Erdely never told you prior to publication that

10   she had Kathryn Hendley's name; is that correct?

11   A    It was my impression that Sabrina did not know that she

12   had that name.

13   Q    It was in her notes, correct?

14   A    Yes.  I -- I was not given that before publication, but I

15   have no reason to think she was holding it from me.

16   Q    You mean you were not given that information verbally by

17   Sabrina Erdely?

18   A    Yes, that's true.

19   Q    But you had possession of the notes, correct?

20   A    Yes.

21   Q    You had possession of Kathryn Hendley's name at the time

22   of publication, correct?

23   A    It was not her name spelled correctly.  It was -- it

24   was --

25   Q    Hindley, right?  Within one vowel?

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

70

1  A    I think there were two different -- I mean, again I'd

2  have to actually look at the notes, but there were two

3  different things, two different last names, two different

4  versions of spellings of last names.  And I read that portion

5  of the notes, but I did not realize what we had there.

6  Q    We saw earlier that Rolling Stone attributed to Kathryn

7  Hendley some fairly callous quotes, I mean, "Why don't you

8  have fun with it."

9       It had also referred to her as a "self-declared hookup

10 queen"; is that correct?

11 A    Yes.

12 Q    Those quotes don't reflect very well on Miss Hendley, do

13 they?

14 A    No, not well.

15 Q    But nobody at Rolling Stone ever contacted her prior to

16 publication to ask if she made those unbelievably callous

17 statements to Jackie, correct?

18 A    Had we realized that we had the contact information, we

19 absolutely would have reached out.  But as we went to press, I

20 did not have contact information for that individual, and I

21 did not feel I was able to reach out.

22 Q    So you, as the Rolling Stone fact checker, had been told

23 Kathryn Hendley's name prior to publication.  Say, if Sabrina

24 had told you her name, you would have absolutely reached out

25 to her, correct?

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

71

1  A    Yes.

2  Q    Were you aware at the time of your fact-checking that

3  Alex Pinkleton, one of the --

4           THE COURT:  If you're switching individuals, this

5  might be a good time for a break.

6           MR. PHILLIPS:  I am switching individuals.  This is

7  a great time, Your Honor.

8           THE COURT:  All right.  So we have one more

9  mid-afternoon break, ladies and gentlemen, and now it has come

10  that time.

11     I'll again ask that while you're away from us that you

12  not discuss the case with one another.  Do not permit anyone

13  to discuss it with you.

14     I'll ask the witness not to discuss her pending testimony

15  with counsel from either side.

16     Let's plan to come back at about 5 till 5:00.

17           (A short recess was taken at 4:42 p.m.)

18           (The jury is present in Open Court at 4:57 p.m.)

19           THE COURT:  Mr. Phillips, you may continue.

20           MR. PHILLIPS:  Thank you, Your Honor.

21           THE COURT:  All 10 jurors being present and

22  accounted for.

23  BY MR. PHILLIPS:

24  Q    Miss Garber-Paul, before we continue, I want to ask you

25  about Alex Pinkleton.

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

72

1    You remember Alex Pinkleton?

2  A    Yes, I do.

3  Q    And she was one of the sources for "A Rape On Campus,"

4  correct?

5  A    Yes.

6  Q    Did you have a fact-checking call with Miss Pinkleton?

7  A    Yes, I did.

8  Q    And were you aware when you spoke to Miss Pinkleton that

9  she knew "Cindy," Kathryn Hendley, in real life?

10 A    No, I was not.

11 Q    So you didn't ask Miss Pinkleton for Kathryn Hendley's

12 name, I take it?

13 A    I did not.

14       MR. PHILLIPS:  Brian, let's bring up Plaintiff's

15 Trial Exhibit 1, the final published version of the article,

16 RS001072.

17 Q    Miss Garber-Paul, do you see below the bolded pull quote

18 there in the final version of the article there's a statement

19 that says, "Lots of people have discouraged her from sharing

20 her story, Jackie tells me with a pained look, including a

21 trusted UVa dean to whom Jackie reported her gang rape

22 allegations more than a year ago."

23       Do you see that?

24 A    Yes, I do.

25 Q    As the fact checker for Rolling Stone magazine, you

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

73

1  understood prior to publication that the reference to the

2  trusted UVa dean was a reference to Ms. Eramo, correct?

3  A    Yes, I did.

4  Q    Let's go to PTX 43.  And I want to look at your

5  fact-checking edits to this statement and draft.

6  A    Yes.

7  Q    Do you see that where it says, "lots of people have

8  discouraged her from sharing her story," you drew a red line

9  up from there, and at the top of the right-hand margin you

10  wrote, "so publicly."

11       Do you see that?

12  A    Yes, I wrote that.

13  Q    So you had suggested an edit to this sentence to say,

14  "Lots of people have discouraged Jackie from sharing her story

15  so publicly, Jackie tells me with a pained look"; is that

16  correct?

17  A    Yes, but then I realized we had "going public" in the

18  following sentence, and that would have just introduced a

19  repetition of the word "public."

20  Q    You also proposed a change below that where it says, "who

21  fretted that the article might complicate future proceedings";

22  is that right?

23  A    Yes, I wrote that.

24  Q    And you wrote a bracket around that language about the

25  trusted UVa dean discouraging Jackie from sharing her story.

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

74

1    Do you see that?

2  A    Yes, I do.

3  Q    And to the right of that you wrote a note, and that note

4  says, "Talk to Sean," right?

5  A    Yes.  I wanted to discuss this section with him, so it

6  was a note to myself.

7  Q    Okay.  That was a note to yourself to discuss this

8  statement about Dean Eramo with Sean Woods, correct?

9  A    Yes, correct.

10  Q    And Sean Woods, the deputy managing editor of Rolling

11  Stone, ultimately decided to publish this language in the

12  final article as it is in the draft without these proposed

13  edits, correct?

14  A    After sitting down and talking with him in his office

15  about all my questions about this draft, we determined that it

16  was clear enough as stated, and we didn't need to put in any

17  caveats.

18  Q    Okay.  So despite the questions that you have in your

19  fact-checking draft, after sitting down and discussing them

20  with Sean Woods, you all decided to publish this as written,

21  correct?

22  A    Yes, we did.

23  Q    Let's go to RS004864, Plaintiff's Trial Exhibit 43?

24        MR. PHILLIPS:  Brian, if you could blow up for us

25  the top left-hand column there.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

75

1   Q    Do you see a quote in the draft from a UVa student named

2   Brian Head that says, "Most impressive person at UVa is the

3   person who gets straight As and goes to all the parties,

4   explains fourth-year student Brian Head."

5        Do you see that?

6   A    Yes, I do.

7   Q    You wrote a note in the margin next to that quote.  That

8   note that you wrote says, "Add that he's the president of One

9   in Four."  Is that correct?

10  A    Yes, it is.

11  Q    And you knew that One in Four was a student group

12  comprised of male students that did sexual assault prevention

13  and advocacy outreach work on the UVa campus, correct?

14  A    Yes.  I believe I discussed that with Brian Head.

15  Q    Okay.  And you were questioning whether Rolling Stone

16  should identify Brian Head as such as the president of that

17  organization, correct?

18  A    Yes, that's true.

19  Q    The final published version of the article does not

20  identify Brian Head as the president of One in Four, correct?

21  It just identifies him as a UVa student?

22  A    Yes.  We determined that since One in Four hadn't been

23  introduced yet, we -- it wasn't necessary to add that into the

24  identification for Brian Head in this instance.

25  Q    And Sean Woods made the ultimate decision on that, again,

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

76

1   right, not to include a note identifying Brian Head as the

2   president of One in Four?

3   A    Yes, but I agreed with him on this.

4   Q    Let's go to RS004865.  Top left-hand column.  There's a

5   quote from a student named Sara Surface.

6        Do you see that?

7   A    Yes, I do.

8   Q    Says, quote, "I don't know many people who are engrossed

9   in the party scene and have spoken out about their sexual

10  assaults, says third-year student activist Sara Surface."

11       Do you see that?

12  A    Yes.

13  Q    And on this graph, you crossed out the word "activist,"

14  correct?

15  A    I did.

16  Q    You were aware at the time that Sara Surface, like Brian

17  Head, was a prominent student advocate on sexual assault

18  prevention and awareness issues, correct?

19  A    Yes, I was.

20  Q    And I believe you mentioned earlier that you were aware

21  that Sara Surface was a member of the student group One Less,

22  correct?

23  A    Yes.  She walked me through all of the positive changes

24  that had been happening at UVa.

25  Q    Sara Surface had specifically asked you to include her

1  affiliation with One Less in the article, correct?

2  A    Yes.  But again, we hadn't introduced One Less in the

3  article, and it seemed like it might be confusing to a reader

4  to introduce an organization that we hadn't fully explained

5  what it was yet.

6  Q    So like Brian Head, Sara Surface was simply identified as

7  a student discussing the party culture at the University of

8  Virginia.  She was not identified as a student advocate,

9  correct?

10  A    Yes, that's true.

11  Q    Let's go to page RS004868, Plaintiff's Trial Exhibit 43.

12  Specifically, the bottom paragraph in the left-hand column.

13       You see that this is the section discussing Jackie's

14  first meeting with Emily Renda?

15  A    Yes, I do.

16  Q    And Emily Renda is identified as a fourth-year student

17  who had become active in One Less.

18       Do you see that?

19  A    Yes.

20  Q    You wrote a note in the left-hand margin next to Emily

21  Renda's name, and you wrote, "Add that she is now employed by

22  UVa"; is that correct?

23  A    Yes, that was a note I wrote.

24  Q    And you knew that at the time Erdely interviewed her,

25  Emily Renda actually worked in the dean of students office at

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

78

1  UVa on sexual assault prevention issues, correct?

2  A    I knew that she was working with UVa, yes.

3  Q    You were suggesting that Rolling Stone should note that

4  this prominent advocate on sexual assault matters who was so

5  helpful to Jackie is actually employed by the university now;

6  is that correct?

7  A    It was a note to see if there was a way to put that in,

8  yeah.

9  Q    That did not make it in, right?  The final published

10  version of the article does not note that Emily Renda is

11  employed by the University of Virginia; is that correct?

12  A    That's true, yes.

13  Q    Let's go to page RS004865, the same document.  Middle

14  column, below the bolded pull quote.

15       And we just discussed Alex Pinkleton.  There's a quote

16  here from Alexandria Pinkleton, correct?

17  A    Yes, there is.

18  Q    Miss Pinkleton's quote is, "'Hot girls who are really

19  drunk always get in,'" speaking of frat parties.  "'It's a

20  good idea to act drunker than you really are,' advises

21  third-year Alexandria Pinkleton, expertly clad in the UVa

22  after-dark uniform of a midriff-bearing sleeveless top and

23  shorts.  'Also, you have to seem very innocent and vulnerable.

24  That's why they love first-year girls.'"

25       Do you see that?

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

79

1   A    Yes.

2   Q    You were aware that prior to publication, like Sara

3   Surface and like Brian Head, Miss Pinkleton was a prominent

4   student advocate on sexual assault issues at the University of

5   Virginia, correct?

6   A    Yes, and later in the article, I mention that she

7   accompanies Jackie to a meeting with Dean Eramo.

8   Q    You also knew that Alex Pinkleton was a member of One

9   Less, correct?

10  A    Yes.

11  Q    Miss Pinkleton is not identified in the article as a

12  student activist, correct?

13  A    No, she's not, though again, she does accompany Jackie to

14  meetings and expresses her opinions about these things, so...

15  Q    Let's go to page RS004866 of Plaintiff's Trial Exhibit

16  43.

17       This is the section of the article that follows Jackie's

18  first meeting with Ms. Eramo.

19       Do you see that?

20  A    Yes, I do.

21  Q    It says, "Absent any real guidance, Jackie would

22  eventually wonder how other student victims tend to handle her

23  situation."  Then it continues.

24       Do you see that?

25  A    Yes.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

80

1  Q    And you wrote a note off of the statement in the draft

2  Jackie lacked any real guidance, and you wrote in a circle

3  there, "harsh, question mark"; is that correct?

4  A    Yes, I did.  And I believe we changed that.

5  Q    And that's correct, that was changed in the final

6  published version of the article, correct?  It was changed

7  from "absent any real guidance," which you thought was too

8  harsh, right?

9  A    Yeah.

10  Q    And it was changed to "absent much guidance," correct?

11  A    Yes.  I felt more comfortable with that, so Sean and I

12  changed it.

13  Q    Let's go to page RS004857 of Plaintiff's Trial Exhibit

14  43.

15  A    I'm sorry.  Can you repeat that number?

16  Q    Oh, sorry.  4867 of Plaintiff's Trial Exhibit 43.

17       This is the rape school quote, right?

18  A    Yes, it is.

19  Q    It says that -- mentions President Sullivan's explanation

20  about best practices and reporting of data, and then it says,

21  "Jackie got a different explanation when she'd ultimately

22  asked Dean Eramo the same question.  She says Eramo gave her a

23  wry look and answered, 'because nobody wants to send their

24  daughter to the rape school.'"

25       Correct?

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

81

1  A    That's what this draft said, yes.

2  Q    And you wrote a note there on the left that said, "Did

3  Jackie describe this?"  Correct?

4  A    Yes, that was a question to myself.

5  Q    And you were referring to the wry look that Ms. Erdely

6  wrote, speaking of Eramo saying this statement to Jackie?

7  A    Yes.  And I followed up with Jackie to discuss this in

8  particular.

9  Q    And you changed it from "She says Eramo gave her a wry

10  look" to "She says Eramo answered wryly"; is that correct?

11  That was the edit to that sentence?

12  A    Yes, because I thought the "answered wryly" was just

13  referring to the quote itself being wry, not the manner in

14  which she said it.

15  Q    Now, the quote itself, "Because nobody wants to send

16  their daughter to the rape school," whether it was made wryly

17  or with a wry look, that quote remained in the final published

18  version of the article, correct?

19  A    Yes, it does.

20  Q    And you were in contact with the University of Virginia

21  during your fact-checking of the article, correct?

22  A    Yes, I was quite a bit.

23  Q    You asked them a lot of questions?

24  A    I did.

25  Q    You never asked UVa if Dean Eramo ever referred to UVa as

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

82

1   the rape school, did you?

2   A   They had made it very clear to me that they weren't going

3   to talk to me about interactions specifically between Dean

4   Eramo and students, which I thought was part of their privacy

5   policy and respected, and so I wasn't going to ask them about

6   a comment that was made during a closed-door meeting between a

7   student and a dean.

8   Q   You didn't try, you didn't ask, correct?

9   A   No, I did not ask.

10  Q   You also didn't ask Ms. Eramo.  You had her e-mail

11  address, correct?

12  A   Yes, but I was told specifically by UVa PR to direct all

13  questions through UVa.

14  Q   And you never asked UVa PR, can you confirm or deny

15  whether Dean Eramo has ever said UVa is the rape school?

16  A   This seemed to be an off-the-cuff comment that she had

17  made to Jackie in a closed-door meeting, and she had told

18  Sabrina about it, and she had offered it to me without much

19  prompting, so I -- and we also put it on Jackie, saying "She

20  says Eramo said that."  And so, yes, I was comfortable with

21  this.

22  Q   There's a note in the left-hand margin, again we've seen

23  this a few times, it says, "Ask Sean," right?

24  A   Yes.

25  Q   And you meant ask Sean Woods about the rape school quote,

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

83

1  right?

2  A    Yes, I did.

3  Q    You had discussions with Sean Woods about whether Rolling

4  Stone should publish the rape school quote, didn't you?

5  A    I had a discussion to make sure that we were making it

6  clear enough that this came from Jackie's recollection of this

7  conversation.  I don't believe -- I mean, yeah, we definitely

8  discussed this.

9  Q    Isn't it true that you told Sean Woods that this quote

10 came only from Jackie and that you couldn't confirm it any

11 other away?

12 A    Yes, I did.  And I believed we made that clear in the way

13 that we wrote it.

14 Q    Sean Woods made the decision to publish this quote,

15 correct?

16 A    Yes, ultimately it was his decision.

17 Q    Let's go to page RS004868.  Middle column.

18     Do you see a quote there from a young woman named Rachel

19 Soltis?

20 A    Yes, I do.

21 Q    Rachel Soltis is quoted in this draft and in the final

22 version of the article as saying, "They should have done

23 something in Jackie's case.  Me and several other people know

24 exactly who did this to her."

25     Do you see that?

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

84

1    A    Yes, I do.

2    Q    You spoke with Rachel Soltis prior to the publication of

3    the article when you were doing your fact-checking, correct?

4    A    Yes, sir, I did.

5    Q    Now, both this draft and the final version of the article

6    claim that Rachel Soltis or at least Ms. Erdely claims that

7    Rachel Soltis told her that she knew who gang raped Jackie,

8    correct?

9    A    Yes.

10   Q    At the time you were fact-checking the article, you were

11   aware that Rolling Stone had no idea who any of these supposed

12   gang rapists were, correct?

13   A    Yes, that's true.

14   Q    You saw in this draft article that Erdely had included

15   this supposed quote from Rachel Soltis claiming that Rachel

16   Soltis knew who they were, right?

17   A    This was in Sabrina's transcript of her conversation with

18   Rachel, so I had no reason to not believe that it was

19   absolutely accurate, and I discussed -- I discussed many

20   things with Rachel, and I believe all of the points made in

21   here we discussed.

22   Q    You did not verify the accuracy of this quote with Rachel

23   Soltis, did you?  You did not ask Rachel Soltis if she said

24   this to Ms. Erdely?

25   A    No.  I mean, I -- we generally don't read back quotes,

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

85

1   but I did discuss the substance of this quote.  We didn't go

2   through who exactly did this to her.

3   Q    So you had in front of you when you were fact-checking

4   the article this supposed quote from Rachel Soltis saying, "Me

5   and several other people know exactly who did this to her,"

6   and you the fact checker for Rolling Stone magazine did not

7   ask Rachel Soltis who?  Am I correct?

8   A    Yes.  I did not feel it was my role as fact checker to

9   try and independently track these people down when I knew

10  Sabrina had been working on it for a long time.

11  Q    You did not feel it was your role as the fact checker for

12  Rolling Stone magazine to verify that any of these nine

13  supposed gang rapists exists; is that your testimony?

14  A    I had felt that we had verified that this had taken

15  place.  I did not work with Rachel to try to independently

16  track down these individuals, that's true.

17  Q    Still in this fact-checking draft, Plaintiff's Trial

18  Exhibit 43, still on page RS004868, I want to look at this

19  description of Jackie e-mailing Ms. Eramo after the supposed

20  bottle attack.

21       Do you see that?

22  A    I'm sorry.  Can you point out -- oh, here we go.  Yes.

23  Q    It says of Jackie, "She e-mailed Dean Eramo so they could

24  discuss the attack - and discuss another matter too which was

25  troubling Jackie a great deal.  Because through her

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

86

1   ever-expanding network, Jackie had come across something

2   deeply disturbing:  Two other young women who, she says,

3   confided that they too had recently been Phi Kappa Psi gang

4   rape victims."

5        Do you see that?

6   A    Yes, I do.

7   Q    At the time Rolling Stone published "A Rape On Campus,"

8   it did not know who these supposed other victims were,

9   correct?

10  A    We had first names.

11  Q    You had first names or nicknames that Jackie used when

12  describing these girls, correct?

13  A    Yes.

14  Q    Okay.  I believe it was Maddie and Becky?

15  A    Yes.

16  Q    You did not have last names for these young women,

17  correct?

18  A    No, we didn't.  Jackie had told us that these girls had

19  come to her in confidence.  I believe in another part of the

20  article we talk about how she was having, you know, young

21  women come to her and tell her about their experiences.  So we

22  took this to be, you know, examples of that.  And that she was

23  not comfortable giving us their full names because they had

24  come to her in confidence.

25  Q    Okay.  So it was your understanding as the fact checker

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

87

1    for Rolling Stone prior to publication that Ms. Erdely had

2    asked Jackie to put her in touch with these young women; is

3    that correct?

4    A    Yes.

5    Q    And Jackie had declined to provide full names or contact

6    information for these individuals, correct?

7    A    Yes.  But she did provide a series of text messages

8    between her and one of the victims in which the victim seemed

9    very scathing in her rejection of talking to Rolling Stone.

10   Q    So Jackie declined a request to actually provide these

11   women's names or contact information so that Rolling Stone,

12   Ms. Erdely or you, could speak with them, correct?

13   A    Yes, that's true.

14   Q    At the time Rolling Stone published "A Rape On Campus,"

15   isn't it true that Rolling Stone magazine had not spoken to

16   anyone other than Jackie who claimed to know who these two

17   other alleged Phi Kappa Psi victims were?

18   A    No, though we did note that -- we did know that they were

19   trying to figure out who they were.  We did know that other

20   individuals were also trying to figure out who these people

21   are.

22   Q    Right, but that wasn't my question, Ms. Garber-Paul.

23        My question was, isn't it true that Rolling Stone

24   magazine did not speak to anyone other than Jackie who claimed

25   to know who these two young women were?

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

88

1  A    Yes.  It was our understanding that Jackie was the only

2  one who knew.

3  Q    Nobody else had spoken with these individuals, nobody at

4  Rolling Stone, nobody at UVa, none of Jackie's friends,

5  correct?

6  A    That was my understanding.

7  Q    As you sit here today, do you have any idea whether those

8  two other Phi Kappa Psi victims are real people or not?

9  A    I don't know either way.

10 Q    The third round of fact-checking edits, is that

11 Plaintiff's Trial Exhibit 45, and the big version, Plaintiff's

12 Trial Exhibit 155?

13 A    Got it.

14 Q    Is this your third round of fact-checking notes?

15 A    Yes, it is.

16 Q    That's the one that says "Type Final" on it?

17 A    Yes, exactly.

18 Q    And again, as with the prior two, all of the handwriting

19 on this document is yours, correct?

20 A    Yes.

21 Q    And in this draft, you can confirm on the third page, but

22 I believe we now have the name of Drew for Jackie's attacker;

23 is that correct?  We look at 4852 at the top.

24 A    Yes.  You -- wait.  I might -- I think I'm missing 4852

25 in here.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

89

1  Q    It's the page after the illustration of the young woman

2  with handprints all over her.

3  A    Yeah, mine goes straight from 51 to 53.

4       MS. McNAMARA:  Here, let me give you -- sorry.  Must

5  have been a duplication error.

6       THE WITNESS:  Yup.

7       MS. McNAMARA:  There you go.

8       THE WITNESS:  Thank you.

9       MR. PHILLIPS:  And perhaps we can correct the

10 official exhibit.

11      MS. McNAMARA:  Yeah, yeah, tomorrow we'll put in the

12 right one so it has the page.

13 BY MR. PHILLIPS:

14 Q    I want to look at page RS0053.  And specifically the

15 caption there under the picture that says, "Partying with the

16 Wahoos."

17      Do you see that?

18 A    Yes.

19 Q    The caption says, "UVa students call themselves Wahoos

20 after a fish that can drink twice its own body weight.  In

21 2012, the year of Jackie's rape, UVa was rated the nation's

22 top party school."

23      Do you see that?

24 A    Yes.

25 Q    And you wrote a couple notes on this caption.  You wrote

1   on the left-hand side, "Does this need alleged?"

2        Do you see that?

3   A    Yes.

4   Q    And you were suggesting that it be edited to say "In

5   2012, the year of Jackie's alleged rape, UVa was rated the

6   nation's top party school," correct?

7   A    Yes, that was my suggestion.

8   Q    The note in the top right says, "Says she was," correct?

9   A    Yes, that's what that says.

10  Q    You were suggesting this be edited to say, "In 2012, the

11  year Jackie says she was raped," correct?

12  A    Yes, that would have accomplished the same thing as

13  alleged, in my opinion.  They were two different suggestions

14  to get to the same place.

15  Q    Again, what you were attempting to accomplish as the fact

16  checker for Rolling Stone in these proposed edits was to put

17  it more on Jackie, right?

18  A    Yes, though we determined that given that we make it very

19  clear in the article that this is her alleged rape, that we

20  were comfortable having it not in the -- not in the caption

21  here.

22  Q    Okay.  And in fact, if we pull up Plaintiff's Trial

23  Exhibit 1 and RS001073, that caption does not include your

24  proposed edits, correct?  It does not say alleged, and it does

25  not say the year Jackie says she was raped, correct?

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

91

1   A    Yes.

2   Q    On page RS00586 of this document, the left-hand column.

3   A    I'm sorry, can you repeat that number again?

4   Q    Sure.  RS004856.

5   A    Yes.

6            MR. PHILLIPS:  Not there yet.  I want to go to the

7   left-hand column, please.  And specifically, Brian, if you can

8   pull up the middle paragraph of the left-hand column and

9   include the notes there.

10  Q    Did you write this note next to -- or after the sentence

11  that says, "Eramo is beloved by survivors who consider her a

12  friend and confidante," did you write this note that says,

13  "Jackie repeatedly calls her an asset to the community"?

14  A    Yes, I did.

15  Q    And you were suggesting including that in the final

16  version of the article, correct?

17  A    I believe we included it in a different place.

18  Q    Because that's a sentiment that Jackie repeated to you

19  multiple times on the phone when you spoke with her, isn't it?

20  A    Yes, and -- yes, she did.  And it just seemed that this

21  wasn't the right place to put it in.

22  Q    Let's go to Plaintiff's Trial Exhibit 1, the final

23  published version of the article.  And we're on RS001076 here,

24  Ms. Garber-Paul.

25  A    Yes.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

92

1  Q    Do you see this photo illustration of Ms. Eramo that

2  appeared in the article?

3  A    Yes, I do.

4  Q    It depicts Ms. Eramo seated at her desk with a crying

5  woman in front of her and protest imagery behind her, correct?

6  A    Yes.

7  Q    Let's look at your fact-checking edits, Plaintiff's Trial

8  Exhibit 45 at RS00107 -- not 1076.  That's going to be

9  RS004856.

10      Did you write the note next to this illustration of

11  Ms. Eramo that says, "Is this too mean?"

12  A    Yes, I wrote that.

13  Q    And "mean" is double underlined, correct?

14  A    Yes, it is.

15  Q    And that was, in fact, your initial reaction as the fact

16  checker for Rolling Stone magazine to seeing this proposed

17  photo illustration of Ms. Eramo, correct?

18  A    Yes, though like I said before, part of my job as the

19  fact checker is to be very overly literal in looking at words

20  and images on the page, and I took this to perhaps mean that

21  Dean Eramo was turning her back on the student activist

22  community at UVa, which, as we clearly state in the article,

23  she does not.  She's very supportive of the activist community

24  at UVa.

25      And after sitting on this for a minute and having a

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

93

1   discussion with Sean, I realized that this didn't mean that

2   Dean Eramo was not supportive of activists on campus.  It

3   just -- we were trying to have multiple things in this

4   illustration, both Dean Eramo sitting in front of this student

5   and counseling her and also the fact that there were these

6   kinds of protests happening.

7   Q    So you did, in fact, discuss this question of yours with

8   Sean Woods, the deputy managing editor of Rolling Stone

9   magazine, correct?

10  A    Yes, I did.

11  Q    You took that question to Sean Woods, was this too mean?

12  A    As part of the rest of my fact-checking of this round,

13  yes.

14  Q    And Sean Woods discussed the image with you, and the

15  ultimate conclusion reached by Rolling Stone magazine was that

16  this was not too mean, and it was, in fact, published in the

17  final version of the article, correct?

18  A    Yes.  And we made sure to say in the caption just how

19  beloved she was.

20  Q    The caption that says, "Where is the justice," correct?

21  A    Yes.  That was referring to the no one has ever been

22  expelled for sexual assault.

23  Q    Let's pull up Plaintiff's Trial Exhibit 27.  This is the

24  Columbia Journalism Report.  And I want to go to the page

25  Eramo 04558.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

94

1  A    Give me one moment, please.

2       Yes, I'm here.  Sorry.

3  Q    Okay.  I want to ask you about the last sentence in the

4  second paragraph under the heading "Fact-checking above my pay

5  grade."

6       It says, "The checker did not provide the school, UVa,

7  with the details of Jackie's account to Erdely of her assault

8  at Phi Kappa Psi."

9       Is that correct?

10 A    Yes, that's correct.  And I --

11 Q    That was me.  Sorry.

12 A    I didn't believe that -- that the press department at the

13 University of Virginia was the correct source to talk through

14 the specific details of what happened to Jackie in that room

15 that night.

16 Q    The article mentions another victim named Stacy; is that

17 correct?

18 A    Yes.

19 Q    Now, isn't it true that Rolling Stone did provide UVa

20 with details that it intended to publish about Stacy's case?

21 A    That had been an adjudicated case, so I think that was a

22 different -- that was slightly different because they had

23 already gone through, like, a process with the school, so it

24 was -- that was different in my opinion.

25 Q    Okay.  And Rolling Stone did, in fact, tell -- or, I'm

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

95

1    sorry, UVa did, in fact, tell Rolling Stone that the details

2    it intended to publish about Stacy's case were incorrect; is

3    that right?

4    A    It was my understanding that the details they informed us

5    after publication they believed us to have incorrect had to do

6    with the adjudication process with UVa, not with the details

7    of what happened to that woman.

8    Q    Okay.  But -- so that's a fair qualification.

9         So UVa told Rolling Stone that what they intended to

10   publish about that victim's experience with the UVa

11   administration and her case was incorrect; is that right?

12   A    Yes, but that did not have to do with what happened in

13   that room with her that night.  That was not her details of

14   her rape.  That was what happened with her in the process of

15   dealing with UVa.

16   Q    And that's fair.

17        Did you provide UVa with any of the details that you

18   intended to publish about Jackie's interactions with

19   Ms. Eramo?

20   A    No.  They told us that they were not at liberty to speak

21   with us about the details of what happened with a particular

22   student and Dean Eramo.

23   Q    Let's look at the next paragraph.  Under the heading,

24   "The editors invested Rolling Stone's reputation in a single

25   source."

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

96

1      Do you see that?

2  A    Yes.

3  Q    This paragraph from Columbia says, "The checker" -- and

4  that's referring to you, right?

5  A    Yes.

6  Q    Says, "The checker did try to improve the story's

7  reporting and attribution of quotations concerning the three

8  friends.  She marked on a draft that Ryan-Randall under

9  pseudonym-had not been interviewed, and that his shitshow

10 quote had originated with Jackie.  'Put this on Jackie,' the

11 checker wrote?  'Any way we can confirm with him?'"

12     And we saw those questions from you earlier, correct?

13 A    Yes.

14 Q    Columbia went on to say, "She said she talked about this

15 problem with clarity with Woods and Erdely."

16     And they quote you as saying, "I pushed.  They came to

17 the conclusion that they were comfortable with not making it

18 clear to readers that they had never contacted Ryan."

19     Did Columbia quote you accurately?

20 A    Yes.  The quote I believe ends with comfortable.  The

21 rest is Columbia's interpretation.

22 Q    And you told Columbia that you pushed Woods and Erdely,

23 correct?

24 A    I did.  We had a conversation like we discussed before

25 that we might want to make this more clearly that it was

1  coming from Jackie and that we as magazine -- as writers had

2  not been able to be in contact with Ryan directly.

3  Q    And Mr. Woods and Ms. Erdely came to the conclusion that

4  they were comfortable with not making those changes that you

5  had pushed for, correct?

6  A    Yes.

7  Q    Ms. Garber-Paul, isn't it true that as a fact checker,

8  one of your duties is to confront sources about

9  inconsistencies in their story?

10 A    Yes, it is.

11 Q    Isn't it true that prior to publication, you were aware

12 that Jackie's story of her supposed sexual assault had changed

13 over time?

14 A    I was aware that it had changed, yes.

15 Q    Isn't it true that during your fact-checking calls with

16 Jackie, you never once confronted her about the fact that her

17 story had changed?

18 A    I don't recall confronting her about that because I

19 didn't see that as something that -- it wasn't something that

20 troubled me deeply because I knew and -- through conversations

21 I'd had with other people involved in this story and outside

22 of this story that often a victim of traumatic sexual

23 assaults, their story solidifies over time.  And I was aware

24 that that could happen.

25      And when I was talking to Jackie, I made sure that I had

1  her recollection to the best of her knowledge.

2  Q    Okay.  But you never asked Jackie about the stories that

3  she told other people before she spoke to you.  You never

4  asked her about that, correct?

5  A    Which specific stories are you referring to?

6  Q    Well, you tell me.  You said you were aware that Jackie's

7  story had changed over time.  What was your understanding?

8  A    I was aware that others had recalled her saying that it

9  was five individuals, not seven.  And I clarified with her

10  that it was seven.  And that was really the only thing that I

11  was aware of.

12       I found out after publication that there had been a

13  question of whether it was forced oral sex or forced vaginal

14  sex.  I can't say whether or not I would have talked to her

15  about that because I didn't -- I wasn't aware of that until

16  after publication.

17  Q    Okay.  So Ms. Erdely never told you prior to publication

18  that Jackie's story had originally been one of oral sex rather

19  than of vaginal gang rape, correct?

20  A    I don't recall having that conversation.

21  Q    When you said you were aware of Jackie having originally

22  told the story involving maybe five or six men, were you

23  referring to Emily Renda's testimony?

24  A    That was one of them, yeah.

25            PHILLIPS:  Brian, if we could pull up Plaintiff's

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

99

1  Trial Exhibit 21.

2  Q    And I just want to confirm:  Is this a document, Miss

3  Garber-Paul, that you had available to you for fact-checking

4  the article prior to publication?

5  A    Yes.

6  Q    Yes, you had it available to you?

7  A    Sorry.  Yes, yes, I did have it available.

8  Q    And you never asked Jackie any questions about Miss

9  Renda's senate testimony; is that correct?

10 A    I didn't ask her specifically about the senate testimony.

11 I asked how many men there were, and she described to me that

12 there were seven.

13 Q    You never asked her if she had told others a different

14 number; is that correct?

15 A    I don't recall having that conversation with her, no.

16        MR. PHILLIPS:  Brian, let's pull up Plaintiff's

17 Trial Exhibit 18.

18 Q    Do you recognize Plaintiff's Trial Exhibit 18, Miss

19 Garber-Paul?

20 A    Yes, I do.

21 Q    I believe we've been referring to these as the police

22 e-mails.

23      Are you aware that these are e-mails that Jackie

24 forwarded to Ms. Erdely showing her communications with

25 Ms. Eramo regarding meetings with the police in the spring of

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

100

1   2014?

2   A    Yes.  And Sabrina forwarded them -- provided them to me

3   as well.

4   Q    Okay.  And that's what I wanted to ask.

5        I wanted to confirm that as the fact checker for Rolling

6   Stone magazine, you had these e-mails available to you when

7   you were fact-checking the article prior to publication?

8   A    Yes, I did.

9            MR. PHILLIPS:  Brian, could we pull up Plaintiff's

10  Trial Exhibit 13, please?

11  Q    Miss Garber-Paul, is this a document that you had

12  available to you for your fact-checking prior to the

13  publication of "A Rape On Campus"?

14  A    Yes, it is.

15  Q    And these are e-mails between Ms. Eramo and Jackie,

16  correct?

17  A    Yes.

18           MR. PHILLIPS:  If I may approach, Your Honor?

19           THE COURT:  You may.

20                         - - -

21           (Plaintiff's Exhibit 156 marked for identification.)

22                         - - -

23  Q    Miss Garber-Paul, I'm handing what you what we've marked

24  for identification as Plaintiff's 362.

25  A    Yes.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

101

1    MR. PHILLIPS:  I'll be with you in just a moment.

2  Let me confirm what the document is with Miss Garber-Paul.

3  Q   Miss Garber-Paul, this is a chain of e-mails between you

4  and Sean Woods in December of 2014?

5  A   Yes, it seems to be an e-mail he sent me and a response I

6  sent back.

7  Q   Okay.

8    MR. PHILLIPS:  Yes, at this time I would move the

9  admission of this document as Plaintiff's Trial Exhibit --

10    THE CLERK:  Plaintiff's 156.

11    MR. PHILLIPS:  156.

12    THE COURT:  156 without objection.

13    - - -

14    (Plaintiff's Exhibit 156 admitted into evidence.)

15    - - -

16  Q   Miss Garber-Paul, the first e-mail in this chain at the

17  bottom, is that an e-mail from Sean Woods to you on December

18  11th, 2014, at 8:25 p.m.?

19  A   Yes, it is.

20  Q   And it looks like Mr. Woods sent you a link to an ABC

21  News article about questions being raised about Rolling

22  Stone's UVa's rape story; is that correct?

23  A   Yes, that's true.

24  Q   You responded to Woods at 8:28 p.m., correct?

25  A   Yes, that appears to be true.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

102

1   Q     Three minutes later?

2   A     Yes.

3   Q     And you sent him the University of Virginia e-mail

4   addresses for Kathryn Hendley and Alex Stock, correct?

5   A     Correct, I did.

6   Q     Okay.  Am I correct that you were able to find these

7   e-mail addresses in three minutes?

8   A     Once we had the last names, yes.

9   Q     And did you find them using that publicly-available

10  University of Virginia directory?

11  A     Yes, I did.

12        MR. PHILLIPS:  I'd like this marked for

13  identification as PX 281.

14                          - - -

15        (Plaintiff's Exhibit 157 marked for identification.)

16                          - - -

17  Q     Miss Garber-Paul, do you recognize the document I've

18  handed you as an e-mail exchange in March of 2015 between you

19  and Andy Young?

20  A     Yes, I do.

21  Q     And Andy Young was the fact checker for the Columbia

22  Journalism Report; is that correct?

23  A     Yes, he was.

24        MR. PHILLIPS:  At this time I'd move the admission

25  of what's been marked for identification as PX 281 as

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

103

1  Plaintiff's Trial Exhibit 157.

2          THE COURT:  157 without objection.

3                      - - -

4          (Plaintiff's Exhibit 157 admitted into evidence.)

5                      - - -

6  Q   Miss Garber-Paul, do you see that Mr. Young asked you

7  when fact-checking the Columbia report:  "Hi, Liz.  I just

8  want to triple check whether you contacted the national Phi

9  Kappa Psi office to ask for comment about the allegations or

10 whether Sabrina was the only one to do so.  Also, if you did,

11 did you go into the granular details of the alleged assault or

12 did you leave it at 'a gang rape at UVa's Phi Psi house in

13 September 2012'"?

14      Do you see that?

15 A   Yes, it's an e-mail I received.

16 Q   Okay.  Let's look at your response to Mr. Young.

17      You told Mr. Young, "Hey, Andy.  Sabrina had been in

18 contact with Phi Psi.  She had been back and forth with the

19 national chapter (who had in my understanding visited the UVa

20 after she contacted them) and had gotten a short response from

21 the UVa chapter.  Sabrina told me that they had closed ranks

22 and weren't offering any information other than they were

23 looking into it and a denial.  Sabrina told me that she did

24 not think that they were going to provide any additional

25 information, so I did not follow up further."

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

104

1     Is that a response that you sent to Mr. Young?

2   A    Yes, I wrote that.

3   Q    Is everything in that e-mail true?

4   A    Yes, that was our understanding.

5   Q    Okay.  Ms. Erdely told you that Phi Psi had closed ranks,

6   correct, and were not offering any information?

7   A    That was my understanding, yes.

8   Q    Okay.  And you independently, as the fact checker for

9   Rolling Stone, did not reach out to anyone at Phi Kappa Psi

10  prior to publication of the article; is that correct?

11  A    I was comfortable with the responses we had gotten from

12  Phi Kappa Psi.

13  Q    Okay.  The answer to my question is, yes, as the fact

14  checker for Rolling Stone magazine, you did not reach out to

15  anyone at Phi Kappa Psi prior to the publication of "A Rape On

16  Campus"?

17  A    Yes, that's true.

18  Q    Let's pull up Plaintiff's Trial Exhibit 46, please.  It

19  should be in the same big binder in front of you.

20  A    This guy here?  I think it ends at 45.

21  Q    Oh, it might be another binder.  It should be the first

22  one in here.  I'll trade with you.

23  A    This one here?

24  Q    Yup.

25  A    Thank you.

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

105

1  Q    Do you recognize Plaintiff's Trial Exhibit 46 as a

2  November 2014 e-mail chain between you and Anthony de Bruyn?

3  A    Yes, I do.

4  Q    Mr. de Bruyn was a communications -- an individual in

5  communications with the University of Virginia, correct?

6  A    Yes, he was my contact who I was instructed to go through

7  for everything UVa-related.

8  Q    I want to ask you about the November 12, 2014, 1:04 p.m.

9  from Mr. de Bruyn to you.  That's on RS013302.

10  A    Sure.

11  Q    You had asked Mr. De Bruyn, "Is it accurate to say that

12  the UVa administration believes that Rolling Stone publishing

13  this story might discourage sexual assault victims from coming

14  forward in the future?"

15      Do you see that?

16  A    Yes.

17  Q    Mr. de Bruyn's response was, "We are concerned that any

18  story be factually accurate and clearly state that students

19  are encouraged by us to report sexual misconduct, including

20  sexual assault."

21      Do you see that?

22  A    Yes, I see that.

23  Q    Was that quote from Mr. de Bruyn included in the article?

24  A    No, but I certainly kept it in mind as I was

25  fact-checking.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

106

1    Q    Let's look at Mr. de Bruyn's response to your fifth

2    question, below that.

3         Mr. de Bruyn told you, "We believe that all students are

4    entitled to appropriate due process, including students

5    accused of sexual assault.  An alleged assault would need to

6    have been fully and fairly adjudicated before the Sexual

7    Misconduct Board, giving the accused student a right to appear

8    and present evidence before any sanction could be imposed

9    based upon that alleged assault.  Again, the Sexual Misconduct

10   Board is required to consider suspension or expulsion for any

11   student found responsible for sexual misconduct."

12        Do you see that?

13   A    Yes, I do.

14   Q    And finally, I wanted to go back to Mr. de Bruyn's

15   November 11th, 2014 e-mail.  This is RSO13304.

16        You asked Mr. de Bruyn whether Dean Eramo was the primary

17   intake person for any complaints.

18        Do you see that?

19   A    Yes, I do.

20   Q    Mr. de Bruyn told you, "It is important to note that a

21   complaint is not the same as reporting and/or making the

22   office of the dean of students aware that an incident may have

23   occurred (i.e., consulting with Dean Eramo).  A complaint

24   means a student has elected to invoke the university's formal

25   disciplinary process."

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

107

1     Do you see that?

2  A    Yes, I remember going through this in detail.  It was a

3  bit confusing trying to figure out exactly what the

4  terminology was, so I know we kept -- I know we had a long

5  conversation about that on the phone, and we kind of kept

6  coming back to it.

7  Q    Okay.  Was it your understanding at the time you were

8  fact-checking the article that Jackie had not filed a formal

9  complaint with the University of Virginia?

10 A    Yes.

11 Q    So Jackie's allegations had not been adjudicated,

12 correct?

13 A    Yes, absolutely.

14 Q    Do you ever ask Mr. de Bruyn whether Jackie's allegations

15 had been reported to the Charlottesville Police Department?

16 A    No.  Again, I was not -- I was told to not bring up

17 specifics of the allegations and specific students with

18 university -- the university press department, so...

19 Q    Did you, as the fact checker for Rolling Stone magazine,

20 ever ask Jackie her waiver -- for her waiver so that you could

21 obtain her records from the University of Virginia?

22 A    No, I was not aware that that was an option.

23 Q    Sabrina Rubin Erdely never mentioned that option to you?

24 A    That there was a way to get a waiver to receive her

25 documents?  No.  I don't remember having that conversation,

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

108

1    but I know I wasn't aware of it.

2              THE COURT:  Did Ms. Erdely provide you with a tape,

3    a recording, of her interview with the UVa president?

4              THE WITNESS:  No.  It's usually standard for us to

5    just get transcripts of all of these conversations, because

6    if we have to sit there and listen to all the tape in real

7    time...

8              THE COURT:  Did you get that transcript?

9              THE WITNESS:  I did get that transcript, yes.

10   BY MR. PHILLIPS:

11   Q    Miss Garber-Paul, I want to recap some of the characters

12   that are in the article with you, the fact checker, and figure

13   out what Rolling Stone did or didn't know at the time of

14   publication.

15        I want to start with the man named Randall in the

16   article.  His real name is Ryan Duffin, correct?

17   A    Okay.

18   Q    Rolling Stone did not know Randall's real name at the

19   time of publication, correct?

20   A    We did not know his full name, that's true.

21   Q    The article does not disclose to readers that Rolling

22   Stone did not know Randall's full name, correct?

23   A    No, it does not.

24   Q    And Jackie had refused to provide Ms. Erdely and Rolling

25   Stone with Randall's name and contact information, correct?

1   A    Yes, she declined to do so.  It was my understanding that

2   she declined to do so based on his wishes.  But, yes, we did

3   not have his contact information.

4   Q    The article does not disclose to readers that Jackie

5   declined to provide Ryan's real name and contact information

6   to Rolling Stone, correct?

7   A    Yes, that's true.

8   Q    Cindy, real name Kathryn Hendley.  Rolling Stone did not

9   know Cindy's real name at the time of publication, correct?

10  A    That's true.

11  Q    The article does not disclose to readers that Rolling

12  Stone did not know Cindy's real name at the time of

13  publication, correct?

14  A    We did not know her full name, and we did not disclose

15  that in the article, that's true.

16  Q    Jackie had refused to provide Cindy's real name and

17  contact info to Ms. Erdely and to you, correct?

18  A    She did not provide it to either of us, that's true.

19  Q    And you all asked for it, right?

20  A    Yes.

21  Q    The article does not disclose to readers that Jackie

22  refused to provide Cindy's real name and contact information

23  to Rolling Stone, correct?

24  A    Yes, that's true.

25  Q    The third friend, Andy, his real name is Alex Stock?

1  A    Yes.

2  Q    Rolling Stone did not know Andy's real name at the time

3  of publication, correct?

4  A    Yes, that's true.

5  Q    The article does not disclose to readers that Rolling

6  Stone did not know Andy's real name at the time of

7  publication, correct?

8  A    We did not know his full name, yes, and we don't disclose

9  that.  We knew his real first name.

10 Q    Jackie had refused to provide Andy's last name or contact

11 information to Ms. Erdely and to you, correct?

12 A    Yes.  We did not obtain that from Jackie.

13 Q    And the article -- in the article, Rolling Stone did not

14 disclose to its readers that Jackie had refused to provide

15 that information, correct?

16 A    Yes.  That's not made clear.

17 Q    Okay.  And there's the supposed ringleader of the gang

18 rape, Drew/Tom/Jay, correct?

19 A    Yes.

20 Q    Rolling Stone did not know Drew's real name at the time

21 of publication, correct?

22 A    Yes.  We did not know his full name.

23 Q    The article does not disclose to readers that Rolling

24 Stone did not know Drew's real name, correct?

25 A    No, it does not say in there that we don't have his full

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

111

1  name.

2  Q    Jackie refused to provide Drew's real name and contact

3  information to Ms. Erdely and to Rolling Stone, correct?

4  A    Yes.  We could not obtain that.  She told us she was

5  afraid of her attackers.

6  Q    And the article does not disclose to Rolling Stone's

7  readers that Jackie had refused to provide Drew's real name or

8  contact information, correct?

9  A    Yes.  We don't make that explicitly clear.

10  Q    Then there's the other alleged rapist that allegedly

11  assaulted Jackie with a bottle and was in her tiny

12  anthropology discussion group.  Rolling Stone did not know

13  that man's name at the time of publication, correct?

14  A    Yes, that's true.

15  Q    The article does not disclose to readers that Rolling

16  Stone did not know who that man was, correct?

17  A    No, we did not.

18  Q    Jackie had refused to provide that man's name to Rolling

19  Stone, correct?

20  A    Yes, though again, she told us she was afraid of her

21  attackers and uncomfortable disclosing the names of them.  And

22  we were working under -- we were working under that reality.

23  Q    The article does not disclose to readers that Jackie

24  refused to provide any of her attackers' names to Rolling

25  Stone, correct?

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

112

1  A    Yes, we did not -- we didn't explicitly say that we

2  didn't have their names in the article.

3  Q    Then there are the two other alleged Phi Psi gang rape

4  victims, who Jackie claimed to you-all were called Maddie and

5  Becky, correct?

6  A    Yes, but I don't believe we used those names in the

7  article.

8  Q    Rolling Stone did not know these two other alleged

9  victims' real names at the time of publication, correct?

10  A    Yes.  We only had first names.

11  Q    The article does not disclose to Rolling Stone's readers

12  that Rolling Stone magazine did not know these women's

13  identities, correct?

14  A    Yes, but give me one moment.

15        Yes, though we don't actually, like, name them as

16  individuals in this.  We said that she had come across -- she

17  says that she had been confided that they knew they were --

18  that she had been told about these gang rape victims.

19        So I actually felt it was clear that since we talk about

20  this being confided to her, told to her in confidence, that I

21  don't think we're making -- though we don't make it clear that

22  we don't know, I don't think we're -- I don't think it appears

23  to a reader necessarily that we have their contact

24  information.

25  Q    Well, the final article actually says neither woman was

1  willing to speak with Rolling Stone, doesn't it?

2  A    Yes, and that was our understanding based on text

3  messages and also speaking with Jackie, who we took to be a

4  very credible witness.

5  Q    Doesn't that disclaimer suggest to readers that Rolling

6  Stone contacted them and they declined to speak with Rolling

7  Stone?

8  A    What is the wording again?

9       Can you point this out to me where this is?

10 Q    Plaintiff's Trial Exhibit 1 at RS001078.

11 A    Okay.

12 Q    Do you see the paragraph that begins "a bruise still

13 mottling her face"?

14 A    Yes.

15      Neither woman was willing to talk to RS.  I think that

16 could -- that doesn't necessarily mean that we were able to

17 find them and reach out for comment.  We knew that neither

18 woman was willing to talk to RS.

19 Q    The article certainly does not disclose to readers that

20 Rolling Stone didn't know who these women were.  You agree

21 with that, right?

22 A    No, but we don't ever say that we do know who they are.

23 I mean, we say that they -- they had confided in Jackie, which

24 to me implies that there's a certain confidence.  And then we

25 say that neither woman was willing to talk to RS.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

114

1    So, yes, we didn't make it explicitly clear that we

2  weren't able to locate them, but I don't think we were

3  misleading readers.

4  Q   Do you agree or disagree that the article suggests that

5  there were two other victims of gang rapes at Phi Kappa Psi

6  similar to Jackie's?

7  A   Yes, we do.

8  Q   And the article does not disclose to readers that Rolling

9  Stone did not know who those women were at the time of

10  publication, correct?

11  A   Yes, that's true.

12  Q   Okay.  The article also does not disclose to readers that

13  Jackie declined to provide those women's names and contact

14  information to Rolling Stone, correct?

15  A   No, we don't explicitly disclose that.

16  Q   Now, the article also attributes to Jackie certain claims

17  about Ms. Eramo, doesn't it?

18  A   Yes, it does.

19  Q   For example, it says that Jackie claimed that Ms. Eramo

20  called UVa the rape school, right?

21  A   Yes.  And we have that coming from Jackie.

22  Q   That's right.  And it also says that Ms. Eramo

23  discouraged Jackie from sharing her story, correct?

24  A   We had that she discouraged her from sharing her story

25  with Rolling Stone.

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

115

1  Q    It doesn't say with Rolling Stone, does it?  It says,

2  discouraged her from sharing her story.

3  A    Yes, it does, but in the context of that paragraph, I

4  think it's pretty clear that we're talking about this story

5  particularly.

6       And -- because we do have other places in the article

7  where Dean Eramo does say that it's up to her if she wants to

8  talk about her story.

9  Q    The article also attributes to Jackie the claim that

10 Ms. Eramo had a nonreaction to hearing about the two other

11 alleged Phi Kappa Psi gang rape victims, correct?

12 A    Yes, though I took that to mean that Dean Eramo did not

13 have the same reaction as the other, you know, 20-year-old

14 people that had heard about this who might have a more

15 emotional reaction.  I took nonreaction as the same

16 no-nonsense professional manner that I heard from other people

17 at UVa and I witnessed myself in the WUVA video.

18 Q    Do you agree with me that the "rape school" quote, the

19 "discouraged Jackie from sharing her story," and the

20 "nonreaction," do you agree that those were all sourced from

21 Jackie?

22 A    The "rape school" quote, the "discouraged" --

23 Q    That Ms. Eramo discouraged her from sharing her story --

24 A    Uh-huh.

25 Q    -- and Ms. Eramo had a nonreaction to hearing about the

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

116

1  two other alleged Phi Kappa Psi gang rape victims.

2      Do you agree with me that all of those claims in the

3  article are sourced to Jackie?

4  A   Yes, and I believe we make it clear as well, for all

5  three of those, that she is our source for that.

6  Q   But the readers of Rolling Stone who read those claims

7  about Ms. Eramo sourced from Jackie were not told that Jackie

8  refused to identify to Rolling Stone:  Andy, Cindy, Kathryn,

9  the two other alleged Phi Kappa Psi gang rape victims, Drew,

10  the eight other alleged rapists.

11     None of that was disclosed to readers, correct?

12  A   Not as -- not explicitly no, yeah.

13  Q   Don't you think that Rolling Stone readers might have

14  evaluated the claims about Ms. Eramo in the article

15  differently if the article had disclosed to readers that

16  Jackie refused to provide all of that information to Rolling

17  Stone?

18  A   I think it would have certainly shaped their view, but I

19  can't tell you what they would have or would not have -- what

20  conclusions they would have come to.

21     MR. PHILLIPS:  Miss Garber-Paul, I have no further

22  questions for you at this time.

23     I'll pass the witness.

24         THE COURT:  So we'll call it a day, Ms. McNamara.

25         MS. McNAMARA:  That's what I was going to suggest,

Eramo vs. Rolling Stone, et al. - 10/24/2016   Vol. 2

117

1   Your Honor, given the hour.  Thank you.

2           THE COURT:  Ladies and gentlemen, this will be the

3   end of today's session of the trial, and we'll send you home

4   after having done a hard day's work.

5       I would again ask you that while you're away from the

6   Court you not discuss the case with anyone at home, don't

7   permit anyone to discuss it with you.  You know the drill.

8   Don't listen to anything said about the case on the radio or

9   TV, don't read any account in the newspaper, and certainly do

10  not try to undertake any research about the case on your own.

11      Put the matter out of your minds, come back tomorrow

12  refreshed and ready for another day's evidence.

13      And I'll ask the witness not to discuss her pending

14  testimony with counsel from either side till the

15  cross-examination tomorrow.

16      You folks are excused.  Thank you.

17      (The jury was excused for the day at 6:00 p.m.)

18          THE COURT:  Let me ask Counsel -- you all can have a

19  seat for just a moment.

20      We have received another communication from a juror, and

21  it's not a difficult proposition.

22      Miss Lisa Story reports that she has a preplanned event

23  that she is hosting on Friday night.  "I have changed the time

24  from 6 to 7 p.m.  I would like to request a dismissal of 5:30

25  on this coming Friday to allow me travel time home."

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

118

1    I see no reason not to grant the request.  They've been

2  such a diligent, hard-working jury.

3        MS. McNAMARA:  I couldn't agree more, Your Honor.

4  We've asked a lot of these people.

5        THE COURT:  It's hard to deny her her extra half

6  hour.  So we'll announce tomorrow that that's going to be

7  granted.

8    I hand the note to Miss Moody and ask her to make the

9  juror's note a part of the record in the case.

10    Is there anything else that needs to be taken up this

11  afternoon from anyone?

12        MS. McNAMARA:  No, Your Honor.

13        THE COURT:  Well, maybe, maybe not.

14        MR. FINNEY:  Just one housekeeping matter, Your

15  Honor.

16        THE COURT:  Yes, sir.

17        MR. FINNEY:  To follow up on our conversation in

18  chambers, I did want to tender the defendants' joint defense

19  and confidentiality agreement for the Court's in camera

20  review.  It has not been provided to plaintiff's counsel.

21  We'd also ask this be filed under seal.

22        THE COURT:  I take it there's no objection to it

23  being filed under seal at the present time.  It may have

24  additional relevance down the road, but as of today, it seems

25  that that's the appropriate disposition for the agreement.

Eramo vs. Rolling Stone, et al. - 10/24/2016    Vol. 2

119

1    So that request will be granted.  I'll ask you to hand it

2    to Ms. Moody, and she will see that it's filed under seal.

3    Anything else?

4    If not, we'll ask the marshal declare the Court adjourned

5    for the day.

6    (Court adjourned for the day at 6:03 p.m.)

7                              *  *  *

8

9

10

11                    CERTIFICATE OF REPORTER

12

13

14    I certify that the foregoing is a correct transcript of

15    the record of proceedings in the above-entitled matter.

16

17

18

19   10/24/16                    /s/  Lance A. Boardman, RDR, CRR

20

21

22

23

24

25