1          UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF VIRGINIA

3            CHARLOTTESVILLE DIVISION

4

5  *****************************
   NICOLE P. ERAMO,         * CIVIL ACTION 3:15-CV-00023
6                           * OCTOBER 26, 2016
        Plaintiff,          * JURY TRIAL, Vol. 1
7  vs.                      *
                            *
8  ROLLING STONE,LLC,       *
   SABRINA RUBIN ERDELY,    *
9  WENNER MEDIA, LLC,       * Before:
                            * HONORABLE GLEN E. CONRAD
10      Defendants.         * UNITED STATES DISTRICT JUDGE
                            * WESTERN DISTRICT OF VIRGINIA
11 *****************************

12 APPEARANCES:

13 For the Plaintiff:    THOMAS ARTHUR CLARE, ESQUIRE
                         ELIZABETH MARIE LOCKE, ESQUIRE
14                       ANDREW CLAY PHILLIPS, ESQUIRE
                         JOSEPH R. OLIVERI, ESQUIRE
15                       Clare Locke, LLP
                         902 Prince Street
16                       Alexandria, VA  22314

17

   For the Defendants:   ELIZABETH ANNE McNAMARA, ESQUIRE
18                       ALISON SCHARY, ESQUIRE
                         SAMUEL M. BAYARD, ESQUIRE
19                       Davis Wright Tremaine, LLP
                         1251 Avenue of the Americas, 21st Flr.
20                       New York, NY  10020

21

22 Court Reporter:  JoRita B. Meyer, RPR, RMR, CRR
                    210 Franklin Road, S.W.
23                  Roanoke, Virginia  24011
                    540.857.5100, Ext. 5311

24

        Proceedings recorded by mechanical stenography;
25  transcript produced by computer.

```
1   APPEARANCES (Continued):

2   For the Defendants:    W. DAVID PAXTON, ESQUIRE
                           J. SCOTT SEXTON, ESQUIRE
3                          CHARLES H. SMITH, ESQUIRE
                           Gentry Locke Rakes & Moore
4                          P. O. Box 40013
                           Roanoke, VA  24022
5
    ///
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXAMINATION

WITNESS:  ALLEN W. GROVES

DIRECT EXAMINATION                      PAGE

   By Mr. Clare.......................4

CROSS-EXAMINATION

   By Mr. Paxton......................29

REDIRECT EXAMINATION

   By Mr. Clare.......................153

RECROSS-EXAMINATION

   By Mr. Paxton......................161


                    EXHIBITS

PLAINTIFF'S TRIAL EXHIBITS

                              ADMITTED

(NONE)


DEFENDANTS' TRIAL EXHIBITS           ADMITTED

71...................................56

72...................................62

73, 74, 75...........................69

76...................................78

77, 78...............................130

79...................................151

///

1  (8:03 a.m.)

2  (Jury in)

3          THE COURT:  Four, five, six, seven, eight, nine, ten

4  jurors present, ready for the next day of this trial.

5          Ladies and gentlemen, we're still receiving evidence

6  from the plaintiff.

7          So if you folks are ready, you may call your next

8  witness.

9          MR. CLARE:  Thank you, Your Honor.

10          Plaintiff calls as our next witness Allen Groves.

11          THE WITNESS:  Good morning, Your Honor.

12          THE COURT:  Good morning.

13          MS. MOODY:  Please stand, raise your right hand, and

14  be sworn.

15          ALLEN GROVES, called as a witness, having been duly

16  sworn, was examined and testified as follows:

17                    DIRECT EXAMINATION

18  BY MR. CLARE:

19  Q    Good morning, Mr. Groves.  We met briefly at your

20  deposition -- actually not so briefly.  But, again, my name is

21  Tom Clare.  I'm one of the lawyers representing plaintiff

22  Nicole Eramo in this action, and I'll have a few questions for

23  you this morning.

24  A    Thank you.

25  Q    Will you please introduce yourself to the jury.

1  A    My name is Allen William Groves.

2  Q    And how are you employed?

3  A    I'm employed as the university dean of students for the

4  University of Virginia.

5  Q    And how long have you been the dean of students at the

6  University of Virginia?

7  A    This is my tenth academic year as the dean.

8  Q    When -- in what year were you named dean of students?

9  A    I was named the dean of students on August 7, 2007.

10 Q    Please tell us briefly about your educational background.

11 What degrees do you hold and from what institutions?

12 A    I have a bachelor of arts degree in history from Stetson

13 University in DeLand, Florida, that I received in 1982; and I

14 have a juris doctorate degree from the University of Virginia

15 School of Law that I received in 1999.

16 Q    So you're trained as a lawyer?

17 A    I am.  I spent 16 years as a trial lawyer before

18 returning to the university.

19 Q    Please tell us briefly about that experience as a lawyer

20 before returning back to the university.

21 A    I believe the first six years, I was engaged in the

22 practice of labor and employment litigation.  And for the ten

23 years after that, I was engaged as a partner in a large law

24 firm, handling complex commercial litigation.

25 Q    And did you hold any leadership positions in those law

1  firms?

2  A    Yes.  I was the hiring partner of Seyfarth Shaw LLP in

3  the Atlanta office from 2000 to 2003, and I was the chairman

4  of the litigation practice group in Atlanta from 2003 until

5  2006, when I left to come back to the University of Virginia.

6  Q    And when you started at the University of Virginia, did

7  you start in this position as dean of students?

8  A    I did not.  I initially returned to the university in the

9  position of student affairs development officer.  I had been

10 contacted by the vice president and asked if I was willing to

11 return and help raise money for student programs.

12 Q    Please tell us briefly about the positions you held at

13 the university and how you ended up assuming your current role

14 as dean of students.

15 A    So the year that I was the student affairs development

16 officer, from May 1 of 2006 until August 7, 2007, in addition

17 to meeting with alums and student leaders and talking about

18 what initiatives were important to them, where they thought

19 that we would make the most impact by trying to raise money

20 from alumni, I also ended up working as essentially a

21 strategic adviser to the vice president, Pat Lampkin.  And so

22 on a number of planning issues, long-range and short-range

23 planning, I was essentially, you know, her number two person

24 to assist with that kind of work.

25     When the dean at the time, Penny Rue, who had been the

1  dean of the university for eight years, left to become the

2  vice chancellor at the University of California San Diego,

3  Ms. Lampkin approached me and asked if I would be willing to

4  serve as the interim dean of students for the coming year

5  while they conducted a national search.

6      And then ultimately I became a candidate in that national

7  search and was selected by this search committee and by

8  President Casteen to be the dean.

9  Q    And when during -- what period of time were you appointed

10 as the permanent dean of students?

11 A    I don't remember the exact date, but it was in June of

12 2008.

13 Q    Terrific.

14     I know it's a big job, but if you would please describe

15 briefly what your responsibilities are at the University of

16 Virginia as the dean of students.

17 A    So I'm responsible for managing several units.  Those

18 include, if I go in chronological order, orientation and new

19 student programs when a young person is coming into the

20 university, either as a brand-new first-year or as a transfer

21 student; housing and residence life, which is all the

22 residential living facilities that the university manages

23 where students live; student activities, which is the 600

24 student organizations, what we sometimes call CIOs.  These

25 would be religious, political, cultural, club sports, any kind

of student group.

Fraternity and sorority life, which is a separate office, which is the fraternities and sororities and the four Greek councils; several buildings, including Newcomb Hall, which is the big student union, but about seven other buildings around grounds where students gather and have activities.

Then I also serve on the university's threat assessment team, the critical incident management team, the Thomas Jefferson committee, the athletics advisory council, the public arts committee.

I may be missing some things.

And then I work on issues of safety and security with our police department and the local Commonwealth's attorneys.

Q    Thank you.

In 2013 and 2014, the period we're going to be focusing in on primarily, approximately how many people reported to you and assisted you in discharging those responsibilities?

A    During that time frame -- it is fewer now, based on a restructuring that I did last spring.  But at that time, there would have been, I think, seven to eight associate deans, a couple of assistant deans, an office manager.  Probably ten people.

Q    And was Nicole Eramo one of those associate deans during that time period?

A    She was.  Nicole was an assistant dean.  She'd been an

assistant dean for a year in the office when I was named the
interim dean of students. And when she earned her Ph.D., I
promoted her to associate dean.

So for, I think, roughly nine of the ten years I was in
the role, I supervised Nicole directly.

Q    How long have you known her?

A    I met her shortly after taking the job as student affairs
development officer.

Q    And she's reported to you for almost all of the last
ten-year period, at least since you assumed the role of dean
of students?

A    Yes. Any -- for nine of the years, I believe, that I was
in the office of dean of students, she always reported to me.

Q    And in the time that Nicole reported to you, how closely
did you work with her on a day-to-day basis?

A    Very closely. Our offices were actually in close
physical proximity. So my office is in the corner of the
second floor of Peabody Hall; Nicole's office was three doors
down on that same side of the building. So we interacted
pretty regularly just because of the nature of the space.

But Nicole would -- in addition to having, I think, every
other week, we had a standing one-hour meeting with each
other, which I did with all direct reports, but she would also
poke her head into my door if something was going on that she
needed to discuss with me.

Q    And during that time period, the time that Nicole

reported to you, were you responsible for evaluating her job

performance?

A    Yes.  Each year I completed a written performance

evaluation.  For the first two years, it was in a form that I

had developed and designed, because the university didn't have

a comprehensive system.  And in the last several years, it was

an online common system used throughout the university called

Lead@ that you would complete in an online program using a

profile.

Q    Generally speaking, what was your assessment of Nicole's

job performance in the years that she reported to you in the

office of dean of students?

A    I had a highly favorable view of Nicole's job

performance.

Q    And what strengths, if any, did you observe her to bring

to that position?

A    She was -- we have a database, an incident database,

called Advocate.  It's a confidential database where we will

enter information if something is going on with a student.  It

might be that they're dealing with depression or anxiety; it

might be that they've been arrested for some reason.  Any

incident that we need to document and track, we put into the

system called Advocate.

     Nicole was probably the most detailed notetaker, the best

person I had in terms of making sure that she documented

contacts with students so that we could go back and look and

see:  When was that last contact made?  What was the nature of

that communication?  Those skills were particularly good on

Nicole's part.

There came a time when I gave her additional

responsibilities.  I had her supervising fraternity and

sorority life.  And so she developed a working knowledge, a

very good working knowledge, of hazing.  She took on

responsibility for a hazing consortium with the University of

Maine that we had joined.

So there came a point where I added more job duties to

her.  Almost the entirety of the time that I was her

supervisor, she was the chair of the sexual misconduct board

and was the point person for handling that work.

And so, as I say, my evaluation of her job duties was

always favorable.

She also, to my mind, was one of the best people I had at

follow-up with students, at making sure that after a report

came in that she reached out to them and stayed in touch with

them and supported them.

Q    Did you have occasion over the period of time that Nicole

reported to you to observe Nicole interacting with students?

A    Yes.  Yes.  There were some larger events where I was

present and Nicole was present and there were a number of

1   students around. So these would be informal engagements.

2      There were a handful of meetings where I would sit in

3   where she was meeting with a student.

4      There was one very difficult psychological case that I

5   remember where she was the point person for the student, and

6   there were two occasions in which I joined her for that

7   meeting.

8   Q   From your vantage point as her supervisor and as the dean

9   of students, how did the students that Nicole interacted with

10   responding to her?

11   A   Very favorably. It was my impression that Nicole was

12   very well liked and very well respected by students.

13   Q   And in that position that she held discharging the

14   various interactions with students and assisting you with the

15   responsibilities that you had, how important, if at all, is

16   trust between a student and an associate dean in your office

17   as far as helping them manage these situations in their lives?

18   A   Immensely important. As I think Nicole knows, every

19   person that works in my office, including the new employees --

20   I just did this a few weeks ago -- that's one of the first

21   things I cover with them, is the students have to trust us,

22   they have to believe us, they have to know that we actually

23   have their interests at heart; otherwise, I don't think we can

24   execute our work.

25   Q   I want to talk about the Rolling Stone article "A Rape on

Campus," published in November of 2014.

Have you had an opportunity to read that Rolling Stone article?

A    Yes.

Q    And from your review of the article, are you familiar with the content of it and in particular how the article portrays Nicole Eramo and her interactions with the student named Jackie?

A    Generally, yes.

Q    As the dean of students for the University of Virginia and as the person Nicole has reported to since 2007 and as a person who has worked closely with her and evaluated her performance over that period, was the portrayal of Nicole Eramo in "A Rape on Campus" consistent with the person that you know and supervise?

A    No.

Q    Would you please explain your view.

A    As you may remember, both sets of lawyers from my deposition last spring, the -- I read that article the morning of November 19th, early that morning, when someone called me to tell me that it was on online.  I read it again in the spring of 2015.  And then I read it again several weeks ago.

My first impression -- and it remains my impression -- is that it painted a picture of Nicole as someone who was indifferent.  I think the phrase that I used was "cavalier" --

1   you know, no pun intended for, obviously, the university

2   name -- but very cavalier, very indifferent; and that someone

3   who indeed was trying to, you know, channel students away from

4   what might be in their best interests; that was suppressing

5   statistics; that had, you know, a view of the fact that the

6   environment was unsafe and she didn't want people to know

7   that; and that at the end of the day that she was not, in

8   fact, advocating for students in the way that they were led to

9   believe.

10      That's the best I can do in terms of -- it's not in front

11  of me, but that was the summation of how I remember feeling

12  and still feel.

13  Q    Have you ever known Nicole to channel students away from

14  what might be in their best interests?

15  A    Never.

16  Q    Have you ever known Nicole to discourage a student from

17  reporting a violent sexual assault to the police or the

18  authorities?

19  A    I've never seen information that would lead me to believe

20  that.

21  Q    Have you ever known Nicole to discourage a student from

22  filing or pursuing a complaint under the university

23  disciplinary process?

24  A    No.  Quite the contrary.

25  Q    What do you mean by "quite the contrary"?

A    You know, my knowledge of Nicole's interactions with students -- and I wasn't sitting in the room when she met with these young people; this is based on my conversations with her and my review of notes.

         MR. PAXTON:  Your Honor, at this point if he's not talking from his personal knowledge, I'm not sure that's permissible.

         MR. CLARE:  It's his responsibility to supervise these interactions.  He's privy to and reviews as part of his job responsibility these incident databases that reflect the interactions with the students.  And he --

         THE COURT:  I think it's important to establish that that's the body of information that his testimony is based on.

         MR. CLARE:  Thank you.

BY MR. CLARE:

Q    Dean Groves, Mr. Paxton's objection may be well taken, but in terms of your basis for these views that you have about Nicole and her interaction with students, what would you base that -- those views on?

A    So three things.  Nicole coming to talk with me after a case had come in and saying, "I just met with this young person" -- generally a young woman.  "I met with this young woman.  Here's the nature of the conversation we had."

     Secondly, it would be reviewing from time to time the notes that were in the Advocate system that Nicole had entered

1   where she would recount her interaction with that student.

2       And then lastly, each year at the Take Back the Night

3   week, which is a sexual assault prevention week that's put on

4   by our students and our student activists, Nicole would

5   present a mock sexual misconduct trial.

6       So she would -- one night of that she would put on a mock

7   trial so the students could see, here's how these proceedings

8   take place, and then she would talk generally about the

9   options that were available to students.

10      So my understanding from those three sources of

11  information was that Nicole was telling students there are a

12  variety of things you can do here, and you can do them

13  concurrently.  In other words, you don't have to pick one and

14  exclude the others; you can do many of these things.

15  Q   You just described the two things that -- putting aside

16  for a moment the Take Back the Night and the mock trial piece

17  of it, you described informal interactions with Nicole around

18  the office as it may relate to specific student situations and

19  also your review of the Advocate notes.

20      Did you give each of those two things as it relates to

21  Jackie's case?

22  A   Oh, yes.

23  Q   And so now with that testimony and foundation in mind,

24  and limiting yourself to your review of those materials and

25  those interactions with Nicole, I'll ask you the same

1  question.

2      Have you ever known Nicole to discourage a student, any

3  student, from filing or pursuing a complaint under the

4  university disciplinary process?

5        MR. PAXTON:  Again, Your Honor, I don't know that a

6  foundation has been laid.

7        THE COURT:  I disagree.  He's being asked if it's

8  within his knowledge.

9        THE WITNESS:  Sitting here today, searching my

10  memory, I cannot think of an instance in which I believed that

11  Nicole had dissuaded a student from actively pursuing their

12  options.

13  BY MR. CLARE:

14  Q    Have you ever known Nicole to use the university

15  resources -- the support, counseling, just general kindness --

16  to coddle, if you will, a student into not reporting an

17  assault?

18  A    No.  She certainly made students aware of the women's

19  center and the counseling center and the counseling resources

20  that were available to victims of trauma.  But she never -- I

21  mean, if your question is did she attempt to use those

22  resources to dissuade somebody from pursuing a more formal

23  action through the university or the police?  No, no.

24  Q    Have you ever known Nicole to refer to the University of

25  Virginia in any setting or context as the rape school?

1    A    No.  The only time I've ever heard that was when I read

2    the article.

3    Q    And how was that review of the article consistent or

4    inconsistent with your experience with Nicole in the way that

5    she refers to the university?

6    A    Flatly inconsistent.

7    Q    Have you ever known Nicole to suppress a sexual assault?

8    A    No.

9    Q    Have you ever known Nicole to put the reputation of the

10   university above the interests of the students when it comes

11   to sexual assault?

12   A    No.

13   Q    Have you ever known Nicole to take any steps whatsoever

14   to hide UVa sexual assault reporting rates or sexual assault

15   statistics or keep those numbers low?

16   A    No.  In fact, in the summer of 2014, meaning the summer

17   before the article came out in November, I had gone to Nicole

18   and asked her to give me the number of reports that we had,

19   because in my speech to parents during summer orientation, I

20   cited the 30 some-odd number of sexual assault reports we had

21   had the prior year, I cited the number of physical assaults,

22   and I talked about alcohol statistics.  And those had come

23   from Nicole.

24   Q    As the dean of students, what is your perspective and the

25   perspective of your office regarding the proper role of sexual

assault reporting statistics?  In other words, what do you

want to see happen with those reporting numbers?

A    What do I personally want to see happen?

Q    Yes, sir.

A    I want them to go up.

Q    Why is that?

A    Because if they're going up, it means that we've created

a better culture in which the students will bring them

forward.  What we know -- you know, students have asked me

over the years -- and I'm sorry.  This requires a little

longer answer.  I apologize.

But I've had a lot of conversations with students over

the years.  I try to be very accessible to students to talk

about a lot of challenging issues.  And what I've always said

to them is, "Look, I know this sounds counterintuitive maybe

to you, but we will know we're doing a better job if the

numbers are going up.  Because if the numbers are going up, it

means that we are creating more and more trust in the eyes of

the student body that, if they come forward to the university,

that something will be done with that that is fair and

equitable and responsive."

And Nicole heard me say that many times, which is don't

worry about, you know, your position here if those numbers go

up, because it means the education and the outreach are

working.

1  Q    And, as the dean of students, did you feel that you had

2  support for that view, meaning sexual assault -- your hope

3  that sexual assault reporting numbers would go up?  Did you

4  believe that you had support for that view from higher-ups in

5  the administration?

6  A    I've had that conversation with the vice president and

7  the president, and they both agreed with me.

8  Q    And did you observe Nicole Eramo as either sharing or

9  implementing that view that you just expressed?

10 A    Absolutely.

11 Q    I'd like to talk now briefly about the period immediately

12 after "A Rape on Campus" was published.  Shortly after the

13 article was published, you received a visit from one of the

14 students referenced in the article as one of the three

15 friends.

16      Do you recall that?

17 A    December the 1st, yes.

18 Q    I'm going to test both of our eyesight here and pull up a

19 document on the screen.

20      MR. CLARE:  Brian, if you'd please pull up what's

21 been previously admitted as Plaintiff's Trial Exhibit 009 at

22 Bates range ending 8782.

23      THE WITNESS:  And may I ask the reporter, am I

24 talking too quickly?

25      THE COURT REPORTER:  Slower would be lovely.

1          THE WITNESS:  Yes, ma'am.  I'm sorry.

2          THE COURT REPORTER:  Thank you.

3          THE WITNESS:  I speed up.  I'm sorry.  It's my

4    nature.  So I'll try, ma'am.  Thank you.

5    BY MR. CLARE:

6    Q    So we're going to zoom in on this, and I can show you a

7    hard copy, but I just wanted to orient you to what this is.

8          This is a document that's been previously admitted as an

9    excerpt from the Advocate system.

10          MR. CLARE:  Brian, if we can just zoom in on the

11    upper right-hand corner and show Dean Groves.

12    BY MR. CLARE:

13    Q    This is an entry that was created by you on Tuesday,

14    December 2, 2014, at 10:14 a.m., just to orient you to the

15    document.

16    A    No, I see that.  And I was actually -- when you first put

17    this on the screen before you zoomed in, I was thinking of

18    that scene from My Cousin Vinny where she said, "I think I

19    might need better glasses," because I couldn't see anything.

20          But, yes, you zoomed in, and I see Tuesday, December 2,

21    2014, 10:14, created by Allen Groves.

22          So this is an entry in Advocate that I created at the

23    date and time noted.

24    Q    Thank you.

25          MR. CLARE:  Brian, if we could zoom back out on the

1  document and now zoom in on the text of the entry so Dean

2  Groves can read it along with us.

3  BY MR. CLARE:

4  Q    All right.  Because it is a little bit fuzzy and because

5  the monitors that the jury have in front of them are a little

6  bit smaller and it's not as close to them as you, can you read

7  that aloud, please.  And we are not referring to the full name

8  of the students that are involved, but if you would either

9  skip over the name or refer to them as just "student," we can

10  go from there.

11  A    If I know who I'm referring to, you don't want me to use

12  the name?

13  Q    You can use their first name.

14  A    "Student Ryan came to ODOS" -- which is my office -- "on

15  12-1-14 and asked to speak with AWG."  That would be me.  "He

16  advised that he was referenced in the RS" -- Rolling Stone --

17  "article as Randall.  He wanted to speak with someone in

18  response to TAS" -- that's President Sullivan's -- "request

19  that people with knowledge come forward.

20      "AWG provided Ryan with contact information, name, and

21  phone number for CPD" -- that's Charlottesville Police

22  Department -- "Detective Via and Sergeant Harris.  AWG also

23  phoned" Delegate -- "Detective Via and left a voice message

24  for him in Ryan's presence.

25      "Ryan stated that although the Rolling Stone -- RS --

article states that he and other friends dissuaded Jackie from
going to police, in fact, the opposite was the case.  He
specifically urged that she go to the police, but Jackie
refused.  AWG asked that Ryan not provide any details to AWG
but instead go to the Charlottesville police -- CPD -- and
speak with them."

Q     Thank you.

Is that -- what you just read to us, is that the entry
that you input into the Advocate database to describe your
meeting with Randall/Ryan?

A     Yes.  Yeah.  This was put into the system the next day
based on the notes I had taken during my meeting with Ryan.

Q     And is that a fair and an accurate summary of your
meeting with Ryan?

A     Yes.  The only thing that it doesn't reflect was the
circumstances.  He had come to my office, told the
receptionist it was very important that he see me.  She came
to my office and interrupted me, and I said -- he didn't say
what it was about, but I said, "Bring him back."

He came in and sat down in my chair, introduced himself
to me by his full name, said that he was Randall in the story.

I basically said what is here.  I put my hand up and
said, "You know, the president has turned this over to
Charlottesville police.  I don't want you to give me the
details; I want you to give it to the Charlottesville police.

1  May I call them?"  And he said yes.

2      And I picked up the phone, and I made the phone call that

3  I mentioned here.  I got voicemail, so I left a message for

4  Detective Via, giving him Ryan's name and cellphone number.

5  And then I wrote on the back of one of my business cards the

6  Charlottesville police, the two officers' -- the detective and

7  the sergeant's -- names and cellphone numbers, and handed that

8  to him and said, "I hope that you will please go talk to them

9  about this."

10  Q    Thank you.

11      I'd like to shift gears again briefly and talk about

12  changes that were made to Nicole's employment responsibilities

13  after "A Rape on Campus" was published.

14      Shortly after "A Rape on Campus" was published, the

15  university directed Nicole not to be the point of intake for

16  sexual assault cases that were coming in; is that correct?

17  A    That is correct.

18  Q    And why was that?

19  A    Vice President Lampkin, Associate Vice President Susan

20  Davis, and I had talked in the day or two -- several times,

21  but in the day or two after the article had been published, in

22  that maelstrom that was unfolding.  It was our assessment and

23  belief that Nicole could not be put in the position of doing

24  any intake whatsoever involving individuals that were coming

25  forward to report sexual assaults or any kind of sexual

misconduct, or also the people who had been accused, what we call respondents.

The belief was, given the article, that individuals in the system would believe that Nicole somehow was not capable of carrying out those duties in a fair and equitable way or that she might overreact in one way or another based upon what the article had said about her.

Q    And to be clear, was that a perception that you and Ms. Davis and -- well, that you shared?  Let's start with that.

A    I did not believe that she was anything other than fully capable of carrying out her duties.  My fear, and the fear of the other two officials that were with me in those conversations, was that the perception across the student body and elsewhere would be what I have described, based on the article.

Q    Thank you.

And how important is it, as the dean of students and from your vantage point, that -- what is the perception of the student body as it relates to someone in an intake position doing their responsibilities in assisting them?

A    Hugely important.

Q    And can you explain why?

A    The only way that any system like ours, right, where we are not the police, we are the institution where a young

person is matriculating, they are enrolled, the only way that

system is going to work is if they believe that information

they bring forward will be handled carefully, confidentially,

sensitively, but that we will also do the right thing with the

information and act on it appropriately and fairly and

equitably and in a way that is nondiscriminatory.

Q    I take it from the fact -- there's been some testimony

that Nicole continued to receive some salary increases in the

years after "A Rape on Campus" was published.  I take it from

that fact that she continued to receive salary increases that,

based on your own personal experience with Nicole and

evaluation of her work, that you personally did not either

lose trust in her abilities or lose trust in her to discharge

her duties.  Is that correct?

A    That is correct.

Q    And as the dean of students then, why would a negative

perception of her in the community or the student body be

relevant to her ability to work with students going forward,

even if you and other administrators at the university didn't

share that perception?

A    It goes back to the answer I gave you a few minutes ago

about reporting.  If students believe that the system is

biased or that the person that is responsible for doing intake

has some predilection to protect the university or dissuade

them from action in their best interests, they will not come

forward.

Q    And that was the way that -- you personally and the other administrators that you consulted with, that was your concern about the way the students would perceive Nicole after the Rolling Stone article?

A    Yes, that we would -- it would reverse all of the gains we thought we were making in that area.

Q    And what was your basis for believing that students and others in the community would hold that view?

A    Some of what was being published around the country, the conversations that were taking place on national media, the exposure of that depiction of Nicole was very, very widespread.  And I know that she was receiving a lot of e-mails from people outside the university, from alums, from others, that were highly critical of the way she had been portrayed.  And thus, a leap they were making from that, that that was the person that she was.

Q    Nicole was officially moved out of the office of dean of students in March of 2016; is that correct?

A    March 1st, I believe.

Q    And in her new role outside of the office of dean of students, Nicole no longer officially carries the title of dean; is that correct?

A    She lost the title of dean at that time.

Q    Would you describe as best you can what the title of dean

1  or associate dean connotes in the UVa community?

2          MR. PAXTON:  Your Honor, I'm not sure what this

3  witness' personal perception of the dean's role and title, how

4  that's particularly relevant.  Since he's talking about

5  himself, he's obviously going to have a favorable view of

6  that.  So it seems to me that this is a -- I'm just not sure

7  how he can testify as to how it's perceived by others.

8          THE COURT:  I didn't understand that he was asked

9  for a value judgment about the title of dean; he was asked

10 what it meant within the university community.

11         MR. CLARE:  Dean Groves has obviously carried this

12 title for over a decade and has personally experienced what it

13 means and has also had responsibility for delivering that

14 title to the people that work for him.  And I think he can

15 speak to the --

16         THE COURT:  To the extent that he's asked to comment

17 on the significance of the title within the community, I think

18 it's a fair question.

19         MR. PAXTON:  Thank you, Your Honor.

20 BY MR. CLARE:

21 Q    I'll ask it the way that Judge Conrad suggested.

22      What is the significance of the title of dean in the

23 University of Virginia community?

24 A    It is my perception that it matters a great deal.  My

25 full title is associate vice president of student affairs and

1    university dean of students.

2         You will not see associate vice president of student

3    affairs on my signature line in my e-mail or on my business

4    card because what matters in our community is that I am Dean

5    Groves.

6         And I think I said in my deposition last spring, you

7    know, even when students will write to Vice President Lampkin

8    it's almost always "Dear Pat and Dean Groves."  That title

9    matters.  I had a student tell me once, "I have no idea what

10   your first name is because everybody knows you as Dean

11   Groves."

12        Well, the same was true of Nicole.  She was Dean Eramo.

13   And that mattered to her.  And I remember a very painful

14   conversation when I sat down to tell her that she was losing

15   that.

16             MR. CLARE:  Thank you, Dean Groves.  Those are the

17   questions I have for you this morning.  Appreciate you being

18   here.

19             THE WITNESS:  Thank you, sir.

20                  CROSS-EXAMINATION

21   BY MR. PAXTON:

22   Q    Good morning, Dean Groves.

23   A    Good morning.

24   Q    I introduced myself to you before we started today, but

25   my name is David Paxton, and I represent the defendants.

1    Let me first apologize.  This cross-examination, as it
2  is, will be a little disjointed because we originally thought
3  you weren't coming in until Friday.  And we learned late
4  yesterday that you were going to come today because I believe
5  you've got a trip or something that's going to take you out of
6  town?
7  A    That was a revelation to me as well, because Thursday I'm
8  completely booked in things that I couldn't move.  So they
9  asked me could I come sooner.  And I said, yes, that's fine.
10 And, candidly, when the young man, the paralegal, called me to
11 see if I could move it, he perceived that you-all are getting
12 tired, which I said I understand.  And then I said I will come
13 as soon as you need me so --
14 Q    Yeah.  And so I apologize because I thought I had a few
15 more days to get things together, so I may fumble a little bit
16 with the documents.
17 A    Yes, sir.  I respect that.  That's fine.
18 Q    Thank you.
19    Now, I understand that you -- in response to Mr. Clare's
20 questions, that you had the challenge of trying to manage
21 lawyers; is that right?
22 A    When I was a lawyer?
23 Q    Yeah.
24 A    I did indeed.  I was also on the lawyer development
25 committee.  So, in addition to chairing the practice group, I

was responsible for the development of young lawyers, yes.

Q    And that's a difficult job.  Lawyers are very difficult
to manage, aren't they?

A    They tend to be very confident people, yes.

Q    And I understand that the university brought you back to
help them raise money?

A    Initially, yes.

Q    Right.  And so I take it that you'd been active in
fundraising for the university in your role before that?

A    No, not for the university.  I had served as the chairman
of the board of a children's psychiatric hospital in a
volunteer capacity in Atlanta, Georgia, where I practiced.
And I had helped them with a capital campaign.

I had been the -- what was called the international
president, essentially the chairman of the board, of the Pi
Kappa Alpha fraternity, my college fraternity, and had also
assisted in a campaign that they had engaged.

And then, lastly, there was an organization called the
Atlanta Executive Network, where I had helped them as a board
member with some fundraising.

Q    Right.  And so I understand from what you just said that
you were a member of a fraternity in your undergraduate days;
is that correct?

A    I still am, yes.

Q    Oh, you still are?  Oh, okay.

A    Yes.  You're a member for life, so I'm still considered a member.

Q    Okay.  And from your testimony, I take it that you felt like you know Nicole Eramo pretty well?

A    You know, we -- I would answer that by saying yes.  And simply to elaborate, we don't have a social relationship.  We don't go to dinner or our families don't hang out with each other.  So my relationship with Nicole is professional, meaning in the workplace, but it is a very positive relationship of many years' duration.

Q    And you were asked by Mr. Clare about your observations of Ms. Eramo's relationships with students.

A    Yes, sir.

Q    And there were students that she got particularly close with.  Would you say that that was true as well?

A    Absolutely.

Q    And she'd have students babysit for her in her house?

A    You know, I have heard her say -- I never personally observed that.  I have heard her say that.  And I went to her house once.

     She ran a program for us during the summer called L2K, Leadership 2000, for a diverse group of student leaders, where they would come for a week to the university and stay over the summer and meet each other and network with university officials.

1    And there was one or two barbecues.  She would have

2    weekly dinners for those students during the summer at her

3    house.  And there were a couple of those each year that I

4    would try to come out to.

5        So I have been in her home and seen her interacting in a

6    casual way with students, meaning a nonofficial capacity.  And

7    those were very warm relations, as far as I could tell.

8    Q    Did you ever meet Alex Pinkleton?  Is that a name that

9    you know?

10   A    Oh, I know the name.  And I know who Alex is.  And I

11   believe that I have met her on one occasion.

12   Q    And so you don't really know what Alex's relationship is

13   with Dean Eramo?

14   A    No.  I mean, I have heard Nicole speak favorably of Alex

15   in the past as an activist in the sexual assault area.  And

16   Nicole worked very closely with the activists.

17       I mean, Alex Pinkleton, Sara Surface, Emily Renda, those

18   were three young women that I knew Nicole was working closely

19   with them on this topic.

20       And I had a number of opportunities to meet Sara and a

21   number of opportunities to interact with Emily.  With Alex, I

22   have not had those same opportunities.

23   Q    Would you be surprised to learn that in communications

24   with Alex Pinkleton and Jackie, that there's been testimony in

25   the case so far that Dean Eramo, in a meeting on September 17,

told those two students that the university was "flat-out

fucked" because of the situation that existed with Hannah

Graham and the fact that there was a Rolling Stone article

that was likely to come out?

A    I don't know that I have heard that before.  That was

September of 2014?

Q    Correct.

A    Before the article came out?

Q    Correct.

A    Yeah, I don't know that I've heard that before.

Q    Would that surprise you?

A    Yes.

Q    Is that -- would that be inconsistent with the Dean Eramo

that you know?

A    Dean Eramo, like, candidly, me, is capable of

occasionally using off-color language if, you know, you feel

the need.  I try -- I try to be better, but I lose --

occasionally, I slip as well.

     So that said, the sentiment is surprising to me.

     I will tell you, during that time, I was deeply

engaged -- it was a very difficult fall semester for us, I

think the most difficult of any of the ten years I've been

dean.  Hannah Graham's disappearance, I -- sorry.  Sorry.

     (Pause)

     I still have the text message I sent her on that Sunday

1    telling her she wasn't in trouble, and -- sorry.

2         And so all the work we did with students and her family,

3    her parents and her brother.

4         And then we had a young man commit suicide in the

5    residence hall that same fall.  And I was the person on point

6    to go down to the residence hall to sit with the young men on

7    that hall and their RA.  And I was the person on point to work

8    with his family throughout that.

9         And so it was a very difficult, emotional time for us,

10   given the things that were happening in a way that I think we

11   had never seen before.

12        I'm sorry, I -- it's -- I'm sorry.  Yeah.

13   Q    That's perfectly understandable.

14        And would you also be surprised that Dean Eramo would

15   share text messages with students that she had interacted

16   with, like Sara Surface, Alex Pinkleton?

17   A    I'm older than Nicole, and so I have only recently, in

18   the last couple of years, begun to text with students, because

19   I will send them three e-mails and they will not respond to

20   any of them; and then I will text them, and in five seconds,

21   they've texted me back, saying, yes, sir, you know, yes, Dean

22   Groves.  Occasionally, they text back and say, come on, is

23   this really Dean Groves who's doing this?  And I'm like, no,

24   it's me, it's me, it's me.

25        So I'm not the most technologically savvy person.  You

1  know, I can't speak for Nicole.

2      But certainly young people, our students, live through

3  text messages and chat systems, whereas I'm of the generation

4  of e-mails.

5  Q    Well, if it's any consolation, I graduated ten years

6  before you from the University of Virginia's law school, so I

7  get it.

8      Would you be surprised in those text messages between

9  Dean Eramo and students like Sara Surface and Alex Pinkleton

10  that she would describe them as her "awesome bitches"?

11  A    Sure.  Yes, I would have to be honest with you and say

12  that's a surprise to me.  I'm a -- as Nicole heard me say --

13  Nicole is doing on-boarding now for our employees and

14  orientation for new employees.  And she knows that in a

15  session she had me lead with Susan Davis, I think about a

16  month ago -- and I'm actually going somewhere with this.  I

17  promise.

18      I explained to all those new employees that most people

19  are casual by nature and have to work to be formal.  And I am

20  one of those unusual people that is wired the opposite way.

21  So I am formal in my normal default mode.  And I have to work

22  to be more casual.  So that is certainly not a way that I

23  would communicate.

24      But Nicole is a much more casual person than I am.  And

25  so -- but, yes, it does surprise me to hear that phrase.  I

might have told her, hey, Nicole, I might use different

language, if she had mentioned that to me, because my style

was very different.

Q    And I think you've talked previously about the importance

of the role of dean and the title of that.  Those types of

communications, communicating with the students, that they are

"awesome bitches" or that the university is "flat-out fucked,"

are those appropriate things for a dean to say to students?

A    Well, certainly, as to the "flat-out" comment --

Q    Yes.

A    -- if somebody brought that to my attention -- let's say

somebody forwarded that to me.  I would sit down with anyone

who worked for me, and I would say, number one, I don't

believe that.  You know, I don't believe the truth of that

statement.  But, secondly, I would prefer that you not use

that language in interacting with students.

     Yes, I would have said that.

Q    All right.  One thing -- there are a couple of things

that Mr. Clare did not cover with you.  And, unfortunately,

this -- this is our opportunity to have you on the stand,

so -- but it relates to what he questioned you about.

     Would you agree with me, Dean Groves, that, beginning in

January of 2014, with the White House's proclamation that

there needed to be a serious effort to look at how colleges

were handling sexual assaults, that 2014 was a year in which

there was a lot of discussion about how colleges were handling

sexual assaults across the United States?

A    Not exactly.  I would say that that conversation began in

April of 2011.  So the federal government had not issued

guidance under Title IX since 2001.  What they called "Dear

Colleague letters."

And so in April of 2011, they issued what was considered

a very important Dear Colleague letter, where the

administration was laying out in a very -- for the first time,

in my opinion, a more comprehensive way, an idea of

expectations of what they wanted universities to do.

So, for example, as a result of that 2011 Dear Colleague

letter, we changed the standard of proof that we used from

clear and convincing evidence to a preponderance of the

evidence, because that was one of the things they were putting

in the guidance.  And so universities around the country,

Stanford, Vanderbilt, there were a number of schools that used

clear and convincing that then switched to preponderance.

There were a few other things that were put into place.

We -- it goes back four years, so probably not long after

that -- began to do the Green Dot Bystander Intervention

training program, where we brought in experts to talk to all

the first-year and transfer students about the need to

intervene when you saw these kinds of things.  We ramped up a

lot of our education.

1    Your reference to 2014, the next wave of guidance and

2  detailed guidance from the federal government comes out on

3  April 29, 2014, a very detailed -- what we think of as an FAQ,

4  frequently asked questions, where the government kind of posed

5  hypotheticals or kinds of circumstances and said here's what

6  we might want schools to think about and consider.

7    So after the Dear Colleague letter in 2011, there were

8  many conversations at the university and, indeed, a change to

9  our policy.

10    After the guidance that came out in 2014, as I recall,

11  there was another version of the policy that was created to

12  respond to that, and some additional programs put into place,

13  as I recall.

14  Q    And thank you for that --

15  A    Certainly.

16  Q    -- because I was trying to -- you're right.  So for a

17  number of years after the Dear Colleague letter came out,

18  universities were struggling to figure out how best to respond

19  to the government's initiative?

20  A    That's a very fair characterization.

21  Q    And, in fact, there were many critics of how universities

22  were responding?

23  A    That is also true.

24  Q    So no matter how hard the university was trying to get

25  into compliance, you still had critics; is that right?

A     Yes.

Q     And UVa was the subject of criticism from time to time from some of these critics.  Would you agree with that?

A     I would.

Q     And you recall that there was a posting on campus in 2012 by anonymous Wahoo, a young woman, who was dissatisfied with her experience with the university's system?  Do you remember that?

A     No.  It's funny, as I said in my deposition, I don't remember seeing that.  And I certainly don't know who that was.  It was shown to me in the deposition.  I don't recall that.  It's possible that I saw it at the time, but that is one thing that was shown to me that I don't have an independent recollection of.  I'm sorry.

Q     All right.  Do you know who Emily Renda is?

A     I do.

Q     And we met her earlier --

A     Oh.

Q     -- through her deposition.  She's a very impressive young lady, isn't she?

A     Yes.  I always found her to be.

Q     Yeah.  And she asked you to review her testimony that she was going to give to Congress; is that right?

A     Well, yes and no.  I will say that is a mistake that I will own.  She sent me an e-mail that was shown to me in my

deposition that had an attachment, either a Word document or a
PDF. She said in the e-mail that she was going to -- she had
been asked to come testify at Congress. And I knew that Emily
was an activist in the issue of sexual assault. In fact, she
and I were two of the 30 Virginians that served on the
governor's task force that was formed, Governor McAuliffe
formed. And she, in fact, chaired one of the three subgroups
of that.

And so Emily had developed a fairly high profile. And
the mistake that I made when she sent that e-mail -- because I
realized, when it was shown to me in my deposition, that there
was an attachment. And when I got the e-mail from her, I
assumed she was saying that she was going to go to Capitol
Hill and testify as a activist. And I think I said, great,
good luck, or -- and I would never -- if a student said to me
I've been asked to testify or I have a chance to testify, I
would never tell them you can't go talk.

But it is true that I never opened the attachment,
because I assumed that she was going to go talk about her role
as an activist, her role as a survivor. And so I never read
the attachment. And I regret that, because it's been shown to
me. And I realize she talked, in that attachment, I think, in
a lot more detail about what she planned to say. I still
wouldn't have dissuaded her from -- as an individual citizen,
her right to go testify, but I confess I never opened the

1  attachment.

2  Q    And at the time she appeared before Congress, she was an

3  employee of the university at that point, correct?

4  A    I'm almost certain that that's right, because Vice

5  President Lampkin had hired Emily right after she graduated to

6  be a program coordinator in Ms. Lampkin's office, working on

7  prevention.  And I'm almost certain -- although she didn't

8  report to me and wasn't in my chain of command, I'm almost

9  certain she started that summer.

10 Q    And you did understand that when she went before

11 Congress, she would be under oath in giving the information

12 that she gave?

13 A    Absolutely.  Yes.

14 Q    And you now understand that she provided information to

15 Congress about Jackie's story without using Jackie's name; is

16 that correct?

17 A    Yes, sir.  I learned that later.  I think after the

18 Rolling Stone article was published and there were many things

19 being discussed, that's the point that I think I came to know

20 that.

21 Q    All right.  And it's also your understanding that this

22 testimony by Ms. Renda, in which she describes the gang rape

23 of Jackie to Congress, is a matter of public record?

24 A    I'm sorry.  Her testimony to Congress?

25 Q    Yes.

1  A    Yes.  I assume that's a matter of public record in the

2  Congressional Record or somewhere.

3  Q    Right.  And it's fair to say that you're proud of her for

4  being an outspoken advocate for victim rights?

5  A    Oh, I was always proud of Emily, yes.

6  Q    Now, some of the critics that have been particularly

7  critical of UVa are -- we've heard some testimony about that,

8  but I want to ask you about a few of them.

9       Do you know the name Wendy Murphy?

10  A    Yes.

11  Q    Who is she?

12  A    Let's see.  My knowledge of her, I first saw her when she

13  was on CNN as a commentator during the Duke lacrosse case.

14  And she mistakenly made a statement that there was DNA that

15  implicated the lacrosse players when, in fact, it was exactly

16  the opposite.

17       I've seen -- someone forwarded me once an article she

18  wrote in a small New England paper where she was pointing to

19  Harvard and Princeton and Virginia and saying that she knew

20  students at each school that she was representing that she

21  thought they had not handled sexual assault appropriately.

22       And then I know that -- whether she was counsel of record

23  or simply an adviser, I know that she was connected to a

24  complaint that a student had brought -- or maybe she had

25  brought for that student or maybe another lawyer had -- with

the Office for Civil Rights in the Department of Education in
2011.

Q    And that was a complaint against the University of
Virginia, and it actually named Ms. Eramo; is that correct?

A    No.  It was a complaint -- you don't name, I think,
individuals like you do in litigation.

It was a complaint filed with OCR in 2011 in which this
young woman alleged that the way in which her case had been
handled through the sexual misconduct board and the ultimate
verdict, that she thought it had been handled inappropriately.
And she raised a number of issues in there about what evidence
was admissible, the rape kit that was done at the hospital.

I remember reading it.  It's been a long time.  But there
were several issues that she was putting into play, and that
Ms. Murphy, or maybe it was the local law firm in Virginia or
Washington, filed a lawsuit in federal court in Washington
against the Department of Education, trying to block them from
implementing some of the guidance that they had published.

Q    But the complaint was about the way the student
misconduct board had handled her case; is that correct?

A    The OCR complaint, yes.

Q    And Ms. Eramo was the chair of the sexual misconduct
board; is that correct?

A    Yes.

Q    Okay.

1   A     At that time, yes.

2   Q     Yes.  And do you also know Susan Russell?

3   A     Oh, yes, yes.  I say I know her; I've never met her.  But

4   I know of her, yes.

5   Q     And you're aware that Susan Russell has been very

6   critical of the way the University of Virginia has responded

7   to sexual assault over the years?

8   A     Yes.  Her -- the issue that she has raised in the past

9   predates my time as dean.  It was a case from 2004, I believe.

10  So I was not at the university when that case happened.  I

11  have never pulled that file from the archives and looked at

12  it.

13        But I do know that that is a case that she has talked

14  about over the years as feeling it was mishandled.  That would

15  predate Ms. Eramo and me in the office.

16  Q     Right.  I understand that.  But she's continued to be a

17  critic of the university and other colleges in Virginia about

18  the way they respond to sexual assault, not being more

19  transparent about the numbers.

20        Do you recall that?

21  A     She had a website for a while.

22  Q     Right.

23  A     There was a period -- I don't think it's active anymore,

24  but there was a period that she had a website.  But when I

25  looked at the website a couple of times, it was old

1    information.  I don't know that it had been updated.  It was

2    still what she had created in the first place.  Then at some

3    point a few years ago, the website stopped to run.

4        I have seen her comment in the Comments section of

5    Cavalier Daily articles where she posts under her name, which

6    I respect, and says, you know, here's my view of how UVa

7    handles it.  So I've seen that.

8        I'm trying to think -- to your point about have I seen

9    her speaking in a broader context other than making comments

10   under stories?  I did see her one time when I went to Richmond

11   when the governor -- after the governor's task force and he

12   was signing some bills that the legislature had passed.  And I

13   was talking to David Toscano, who is the delegate in the house

14   for this area, who I know well.  And David then walked over

15   and was chatting with Susan Russell.  And I recognized her.

16   And the Harrigans were there as well.

17       So I saw several people that I recognized.

18   Q    So you mentioned the governor's task force.  And I don't

19   want to spend too much time on this, but the governor of

20   Virginia actually appointed a task force in 2014 to respond to

21   real concerns about the way universities were handling sexual

22   assaults to come up with best practices and recommendations;

23   is that correct?

24   A    That is correct.

25   Q    And, in fact, through that, part of what came was

1　legislation that was passed the following year in 2015; is

2　that correct?

3　A    I think it's hard to separate -- the short answer is yes.

4　The more complicated response is Hannah Graham played a role

5　in that as well, even though the issue of sexual assault was

6　wrapped in with that in ways that were never really fleshed

7　out in terms of, I think, the public's perception.

8　　But what I will say is I think the issue with Jesse

9　Matthew and the fact that it later came out that he had been

10　at one school and had been subject to an accusation and had

11　moved to another school, I know that also helped motivate some

12　of the legislation in terms of what we do now with transcript

13　notations when a student is under investigation.

14　Q    And, in fact, that's a really good point, because one of

15　the things that came out earlier in the trial was that

16　University of Virginia, if someone were found responsible for

17　a sexual misconduct charge, you would actually put that on the

18　transcript of the student; is that right?

19　A    Yes.

20　Q    That was -- that didn't start until March of 2015 or

21　July, actually, the 1st, of 2015; isn't that right?

22　A    It would have started -- I think legislation in Virginia

23　becomes effective July 1 of each year.

24　Q    Right.

25　A    So it would have been when that legislation became

1  effective, yes.

2  Q    So during 2013 and 2014, there would not have been any

3  kind of notation on a student's transcript that they had been

4  found responsible for a sexual misconduct; is that correct?

5  A    It would be the same notation that would be on there for

6  any disciplinary violation.  So if someone were suspended for

7  sexual misconduct or suspended, let's say, for a physical

8  assault, it would say, I think, "disciplinary suspension," and

9  it would show at the end of the semester or the semester when

10  that happened, and that would be part of the transcript.

11      My understanding of the law that was passed in the

12  Commonwealth that became effective in 2015 was a specific

13  notation about sexual misconduct.

14  Q    Right.  And, Dean Groves, you would agree with me,

15  wouldn't you, that, as a public institution, UVa and yourself

16  are subject to criticism from time to time --

17  A    Yes.

18  Q    -- as to your job?

19  A    Yes.

20  Q    Sort of comes with the job, right?

21  A    I have said publicly on more than one occasion, I am the

22  captain of this metaphorical ship, and I understand that that

23  carries with it criticism.

24  Q    Right.  And were you pleased in 2012 when Playboy

25  magazine named UVa as the number one party school in the

1    country?

2    A    I was not.

3    Q    And why is that?

4    A    Well, as the dean, number one, I mean, I don't think at a

5    school that prides itself on academic excellence and preparing

6    people to be citizen leaders in the model that Jefferson

7    envisioned, I don't think that's something that anyone in an

8    administrative role would take pride in.

9        I did talk to the Cavalier Daily and the students at the

10   time, and I said, "Understand that there is no factual

11   underpinning.  There is no methodology.  There is no science

12   between Playboy making this designation.  There is nothing

13   that, if you required them to prove 'On what do you base

14   this?' that they could produce something even remotely

15   statistically relevant or scientific."

16       But, yes, I'm cognizant that they said that.  And, no, I

17   was not happy.

18   Q    And would you agree that that designation, as you've

19   indicated, is not a scientific study, it certainly was a

20   perception of the University of Virginia at that time?

21   A    In the universe of people that read Playboy or that may

22   have seen that quoted somewhere else, yes.

23   Q    And would you agree that the party scene at the

24   University of Virginia generally revolves around the

25   fraternities and sororities on campus?

A    I would say that what's called Rugby Road, which is where
a lot of fraternities and sororities exist -- although
sororities don't host social functions; fraternities do -- I
would say that, yes, that's one of -- that and The Corner
district, where a number of bars are, would be two places that
are very active in the social scene, yes, sir.

Q    And one of your other recent graduates, Brian Head, came
and shared with us on Saturday.  And he testified that about a
third of undergrads are active in the Greek system,
fraternities and sororities.

    Does that seem correct to you?

A    That is accurate.  I think just slightly over 30 percent.
About a thousand young men and about a thousand young women go
through rush every February.

Q    So by "rush," that's the process of joining?

A    Yes.  I'm sorry.  Rush is how organizations recruit new
members.  Unlike many schools, we don't do it immediately upon
your arrival at the university.  We want first-years to have
some time to get acclimated academically, socially.  So we do
not do rush until February when they come back for the spring.

Q    Now, the summer of 2014 is when Ms. Renda testified
before Congress; is that correct?

A    I believe that's right.

Q    And during that summer, did you come to learn, Dean
Groves, that the Rolling Stone was interested in doing a story

1  about UVa?

2  A    I remember being asked this in my deposition.  So I can't

3  recall -- I think the university certainly knew in July.  I

4  think I'd been shown documents in my deposition, e-mails that

5  indicate that people at the university knew in July.

6      When I knew, I think I would have learned probably from

7  either Nicole or maybe Susan Davis.  Someone did tell me at

8  some point, and I've got to think it was late in the summer.

9  But I don't specifically remember.

10  Q    And you remember that you learned that fact before you

11  actually got an e-mail about it?

12  A    That's possible, yes.

13  Q    Let me -- excuse me just a second.

14  A    Certainly.

15      MR. PAXTON:  If we could bring up Defendants' 5,

16  Defendants' Exhibit 5 previously marked.

17      Dean Groves, let me give -- unfortunately, it may be

18  easier for you to read this.  Well, actually, it may be easier

19  on the screen because we can enlarge it.  It's very small.

20      THE WITNESS:  Yeah, I think the screen is easier.

21      MR. PAXTON:  Yeah.  But I wanted you to have that.

22  BY MR. PAXTON:

23  Q    Do you -- if you scroll down -- if you look down in this

24  e-mail, it begins on Friday, September 5, 2014, an e-mail at

25  11:26 a.m. from Ms. Erdely to Nicole Eramo.

1    Do you see that?

2  A    Yes, I do see that.

3  Q    Okay.  Now, September 5 -- it would have been midday

4  Friday -- would this have been the kind of thing you would

5  expect Ms. Eramo to tell you about when it came in, since she

6  was three doors down from you?

7  A    I'm trying to think about that, because today and for

8  some time the practice has been -- in fact, I got an e-mail

9  from the Cavalier Daily yesterday about something unrelated to

10  this.  And our standard practice for some time has been to

11  forward those to public affairs, to Anthony de Bruyn.  And

12  then Anthony comes back and tells us when we can talk to the

13  press, you know, if he needs to be there, et cetera.

14    I can't recall when that happened.  So there was a period

15  of time where I would have expected Nicole to forward this to

16  public affairs.  She wouldn't necessarily have to tell me.

17    In this case, though, I do know at some point she and I

18  talked about the fact that Ms. Erdely wanted to interview her.

19  So I know I became aware of this.  Whether she got this e-mail

20  and walked down the hall, whether she told me a day or two

21  later, I know I became aware of this.

22  Q    And so if we can go to the first page, please, at the

23  bottom of the first page.  Yeah.

24    This is a response on Saturday.  So it appears that

25  either Ms. Eramo didn't get it until Saturday or she didn't

respond. But she responded directly to Ms. Erdely without
initially forwarding it to the public relations person, as you
indicated.

Is that what this indicates to you?

A    Assuming for the sake of your question that there's no
e-mail to show that she did forward it between Friday and
Saturday, then, yes, that's right.

Q    Right. And she indicated an openness to meeting with
Sabrina when she came to campus?

A    Absolutely. She said the same thing to me.

Q    So if we go to the next e-mail in the chain, please on,
Monday, Ms. Erdely responded and indicated if it's not too
much of a hardship on your schedule to squeeze her in on
Friday, "anytime that's good for you is good for me."

Do you recall seeing an e-mail to this effect?

A    I don't know if I saw the e-mail, but I certainly knew
that Ms. Erdely had reached out to Nicole and Nicole was
willing and eager to give an interview.

Q    And then if we go to the next one in the chain.

Here in this response on Monday, a little after 1:30, she
responds to Ms. Erdely and at this point copies Mr. McCance.

Is he in the public relations area?

A    He is. At this point in time, a man named David
Martel was the head of public affairs, and Anthony de Bruyn
and McGregor McCance -- I don't know who reported to whom. I

think Anthony was more senior than McGregor, but all of them were in public affairs, yes.

Q    So this is, where she forwarded it on on Monday, consistent with the policy that you've talked about; is that correct?

A    Yes.  She's alerting public affairs that a media request has come in.

Q    And do you recall, Dean Groves, that after this exchange of e-mails, that Ms. Erdely forwarded a list of questions and topics that she wanted to discuss with Ms. Eramo?

A    I'm sorry.  This piece of it, I just don't have good recall of.  I'm sorry.  If you want to show that to me.

Q    Sure.

        MR. CLARE:  Thank you.

        MR. PAXTON:  Sure.

        THE WITNESS:  Do you want Defendants' 153 back?

        MR. PAXTON:  I'll get it from you, yes.

        MS. MOODY:  This will be Defendants' 71.

        MR. PAXTON:  Thank you.

BY MR. PAXTON:

Q    Dean Groves, let me show you what has been marked as Defendants' Exhibit 71, which is an e-mail chain produced in this case from the University of Virginia.

A    Just for the record, it's got two designations, Defendants' 61 And Defendants' 71.  So I'm sorry.  I --

1   Q    Well, unfortunately, the -- these documents have been

2   marked a lot of different times.

3   A    Well, I'm looking at one that has both, so we're on the

4   same page.

5   Q    Yeah, yeah.  I completely get it.  It's very confusing.

6   This case has been going on for a long time.  It's been marked

7   at various different points.

8        At the bottom of the -- if we go to the bottom of the

9   first page, there is a September 9, 2014, e-mail from

10  Ms. Erdely, if you look to the -- actually, I take that back.

11        This is an e-mail from McGregor McCance summarizing a

12  discussion that he had had with Ms. Eramo -- with Ms. Erdely.

13  A    So the thread that I see from oldest to newest is

14  Ms. Lampkin e-mailing, Mr. McCance responding, Ms. Lampkin

15  e-mailing, and then me.

16  Q    Right.

17  A    And then Nicole in between.  I'm sorry.  Yes.  I'm sorry.

18  In the thread, which e-mail do you want me to focus on?

19  Q    Let's start at the bottom, because Mr. McCance --

20  A    Oh, I see, I see.

21  Q    Where he was reporting on his conversation.

22  A    I'm sorry.  I thought that was Ms. Lampkin's e-mail.  But

23  you're right.  There's one below it that is McGregor McCance.

24        So let me look at that real quickly.  This is September 9

25  at 11:17.  So he says he's been on the phone with Ms. Erdely,

1    the Rolling Stone writer.  She's going to interview Nicole

2    Friday, says it wasn't confrontational or aggressive, and

3    here's a summary of what we discussed, with looks like bullets

4    that didn't format well; that publication would be late

5    October at the earliest.

6         Do you want me to read this?

7    Q    No, no.

8    A    Oh, okay.

9    Q    So for purposes of your testimony, this was an effort by

10   Mr. McCance to let you and others, Ms. Lampkin and others,

11   know what the issues were that Ms. Erdely wanted to talk with

12   Ms. Eramo about; is that correct?

13   A    Yes.

14        MR. PAXTON:  All right.  And, Your Honor, I would

15   move into evidence Defendants' Exhibit 71.

16        THE COURT:  71, without objection.

17   (Defendants' Trial Exhibit 71 admitted)

18   BY MR. PAXTON:

19   Q    And I take it you read the fact that Mr. McCance

20   indicated that Ms. Erdely was not confrontational or

21   aggressive; is that correct?

22   A    Yes.

23   Q    And --

24   A    This e-mail thread, while I wasn't on the initial e-mail,

25   it looks like I get added at the very end.  So I know I saw

this at some point.

Q   Sure.  And, in fact, at the very top of this e-mail chain, at the end of all of these back-and-forths, you actually weigh in on this issue; is that correct?

A   I do.

Q   Could you read what you said in your e-mail.

A   Absolutely.  This is on September 9, 2014, at 5:20 p.m.

"I'd prefer not to do it at all.  In my opinion, RS has not been objective in recent years.  The description of hypotheticals, OCR, specific cases, et cetera, leads me to believe this is a hatchet job."

Q   Now, did you regularly read the Rolling Stone?

A   You know, in my deposition I joked that everything I refer to as being a couple of years ago, and for me that could be a decade.  I have just reached that age in life where everything seems like it was a couple years ago.

I did used to read Rolling Stone when I was more engaged in the music scene in terms of following popular music.  Now I'm kind of locked into the 1970s and '80s, I think.  So I don't really do that.

But there were some popular culture-type articles that, I might be in a airport, especially when I was a lawyer and I was traveling a lot and I would see the article and I would think the cover story looked good, so I would pick it and read it.

1     And as I think in my deposition, there were some articles

2     that I remember a few years ago by -- I think his name is Matt

3     Taibbi.  And there had been some that I felt were really, kind

4     of to me, slanted and really moving in a way that I didn't see

5     as balanced.  So that is what I was referring to here.

6         I was also concerned, when I talk about specific cases

7     and hypotheticals, that one of the problems is Nicole can't

8     talk about any of those cases.  Right?  So how can this go

9     well if the reporter is going to ask Nicole questions about

10    peoples' cases and Nicole's answer to every one of them is

11    going to be "I can't talk to you about that"?

12    Q    She really wanted to talk to them, though, didn't she?

13    A    Oh, she did, very much so.

14    Q    And the e-mail that you were responding to was from

15    Ms. Eramo saying that she was comfortable talking with her

16    under the guidance noted below, correct?

17    A    Yes.  And she also walked down to my office and said "I

18    really want to do this."

19    Q    And also in that e-mail, she said, "I'm afraid it may

20    look like we're trying to hide something for me not to speak

21    with her."

22    A    Yes.

23    Q    And so, ultimately, the decision was made not to let

24    Ms. Eramo speak with the Rolling Stone; is that correct?

25    A    I believe Vice President Lampkin made that decision, yes.

Q    And so as of -- certainly as of November 9, you knew the Rolling Stone was coming, a reporter from Rolling Stone was coming to the campus to interview a number of people; is that correct?

MR. CLARE:  I think you misspoke.  You said November.  It's September.

MR. PAXTON:  I'm sorry.  September.  Thank you. Thank you very much, Mr. Clare.

THE WITNESS:  And probably earlier.  But certainly, yes, certainly, you're right.  If you want to put a no later than September 9, that's true.  I suspect it was earlier that I knew that.

BY MR. PAXTON:

Q    Right.  And you were also aware, were you not, Dean Groves, that there was an interest in doing a feature article in the Virginia Magazine on how UVa was dealing with sexual assault cases?

A    I came to know that at some point, yes.

Q    And was -- the UVa magazine is an alumni publication; is that correct?

A    Again, I'm not an expert on this, but my belief is that it is a publication of the alumni association of the University of Virginia, which is actually a private entity rather than part of the state -- that is, the institution, which is a part of the state.  It is actually a private

1   entity.

2       What the legal relationship is between the private entity

3   that is the alumni association and the magazine, I don't know.

4   But I know it's their publication.

5   Q    Right.  And so there's a friendly relationship between

6   the University of Virginia and its alumni association?

7   A    I would hope so, yes.

8   Q    Yeah.  And so do you recall whose idea it was to suggest

9   to the magazine how the university was dealing with sexual

10  assault might be a good topic for them to cover?

11  A    I have no recollection or idea on that.  If you have

12  something to show me -- I don't remember being involved at all

13  in that conversation.

14      What I do know is at some point I learned the name of the

15  author -- it's a freelance author -- who was going to write

16  the piece.  And she had done an interview and a piece, a

17  profile piece, on me a couple years earlier, and I thought was

18  a good writer and a good person to work with.

19  Q    Is that Molly?

20  A    No.  She was the fact-checker.  And I'm sorry.  I'm

21  drawing a blank on the reporter's name.  I think she lived in

22  San Antonio, if I remember correctly.

23  Q    So you were aware that this freelance writer for the

24  alumni magazine was going to interview Ms. Eramo?

25  A    I think so.  Again, it's been a couple years, but I think

1 so.

2 Q    And you knew that they were going to talk with Emily

3 Renda as well?

4 A    That, I don't remember as clearly.  But I will -- I think

5 in my deposition they showed me an e-mail where they were

6 taking about taking a photo of Nicole and Emily and me.  So

7 that means, yes, I had to know.

8 Q    Let me -- thank you for mentioning that.

9         MR. PAXTON:  Next in order.

10        MS. MOODY:  72.

11 BY MR. PAXTON:

12 Q    Dean Groves, let me show you -- again, it's going to have

13 two numbers on it, but the one that counts is the one on top,

14 Defendants' Exhibit 72.

15 A    Yes, sir.

16 Q    Is this the e-mail that you were shown during your

17 deposition and also you were referring to just now?

18 A    To the best of my recollection, yes.

19 Q    And do you see -- was the name of the writer Rhonda

20 Saunders?  Does that ring a bell?

21 A    No.  Ms. Saunders is my office manager and also my

22 executive assistant.

23 Q    Oh, okay.  If you go to the fourth page of this, there is

24 an e-mail from Ms. Saunders to Ms. Eramo, to Burke, and Emily

25 Renda.

1      Who is -- is it a Mr. or Mrs. Burke?

2  A    I have no idea.

3  Q    Okay.

4  A    And if I've offended Mr. or Mrs. Burke by that answer,

5  I'm sorry, but the name doesn't ring a bell.

6  Q    That's fine.

7      Do you recall receiving and reviewing this e-mail at some

8  point, knowing that you were going to be contacted about a

9  photo shoot?

10  A    It looks like Ms. Saunders was handling this for me.  And

11  then at some point, it looks like -- yeah, I was on the chain.

12  I don't know how close attention I was paying to it because

13  Rhonda manages my calendar, which is a pretty difficult task

14  given the breadth of my responsibilities.

15      But, yes, absolutely, I must have known about this, and I

16  would have been relying on Rhonda to figure out when this

17  would work, when the time would work for the schedule.

18          MR. PAXTON:  I move admission of Defendants'

19  Exhibit 72.

20          THE COURT:  72, without objection.

21  (Defendants' Trial Exhibit 72 admitted)

22  BY MR. PAXTON:

23  Q    And do you recall, Dean Groves, that in addition to

24  setting up this photo shoot, the alumni magazine forwarded to

25  you a draft of the article that they intended to publish?

1  A    Yes.

2  Q    And that you made some comments on that -- on that?

3  A    Yes.  My recollection in my deposition was that I had

4  done it in a pen.  But they reminded me by showing me the

5  document that I had done a redline, which I don't do much

6  since I'm not a lawyer anymore, but I must have done it on the

7  computer and created a document called a redline, which is

8  where it shows the edits that I'm suggesting.

9  Q    And if you can refer to the screen, "The photo shoot here

10  was to support the sexual misconduct story that we're doing

11  for the winter issue."

12       So was that your understanding at the time, October of

13  2014?

14  A    Based upon my reading this e-mail today, yes, that must

15  have been my understanding.

16  Q    So this was right about the same time that Rolling Stone

17  was doing its interviews and gathering information for its

18  story; is that correct?

19  A    They must have overlapped, yes.

20  Q    Yeah.  And Ms. Eramo was allowed to speak to the UVa

21  magazine but not to Rolling Stone; is that correct?

22  A    I believe that's true.

23  Q    Let me show you -- again I apologize for the clumsiness.

24  A    It's all right.

25           MR. PAXTON:  Let's mark both of these.

1        MS. MOODY:  73.  74.

2        MR. PAXTON:  There's one for the Court.

3   BY MR. PAXTON:

4   Q    Dean Groves, let me show you what -- this has, like,

5   three numbers on it.  So it's really confusing.  But the one

6   that counts is the one on top, Defendants' Exhibit 73.  There

7   you go.  And then Defendants' Exhibit 74.

8   A    Yes, sir.

9   Q    Deposition -- I mean -- I'm sorry.  Defendants'

10  Exhibit 73, is that a copy of your markup?

11  A    I have to tell you that I have not seen that document

12  since I made it, including at my deposition.  I didn't look at

13  it other than them refreshing me by saying this is a redline

14  that you did.  And I said, "Okay.  I must have done it on the

15  computer."

16  Q    But you do --

17  A    I did a redline.

18  Q    Yeah, you did a redline.

19  A    Yes.

20  Q    And let me mark this as another exhibit.

21       MS. MOODY:  75.

22  BY MR. PAXTON:

23  Q    Let me show you an e-mail chain that's marked Defendants'

24  Exhibit 75.  Unfortunately, it is a small type.

25  A    I see this.

1    Q    And is it your recollection of this time period, in --

2    let me say, the e-mail, if you look at Defendants' Exhibit 75,

3    on the second page, you'll see an e-mail from a Molly Minturn

4    to you.

5        Do you see that?

6    A    I do.

7    Q    Okay.  And it says, "Dear Dean Groves:  Thank you very

8    much for your help with our feature on sexual assault at UVa.

9    Here is my story for your review."

10       And the date of that was October 27, 2014?

11    A    Yes.

12    Q    So is it accurate that you received a copy of the draft

13    article on October 27, 2014?

14    A    Looking at this exhibit, that must have been the date,

15    right.

16    Q    And then the next e-mail in that exchange was your

17    response to her; is that correct?

18    A    Yes.  And I'm saying a copy containing my suggested edits

19    is attached.  "The redline didn't save, but I have a hard copy

20    if you need it."

21       What that means is I was trying to save the redline and

22    then send that to her, it would show the changes, but I

23    couldn't get it to save.  And so I sent her a clean copy that

24    contained my edits and said, "I have a hard copy of the

25    redline if you want to look at that and see where I made the

1  changes."

2  Q    And to the best of your knowledge today, is Defendants'

3  Exhibit 73 -- which is a very poor copy, unfortunately -- your

4  edits to that, to that document?

5  A    Yes.  I take your representation that we produced this

6  and that is what it is.  I absolutely remember making what I

7  called suggested edits, because that's what I perceived, was

8  that she was giving me the chance to make suggestions, that I

9  did that, and that this redline reflects those suggested

10 edits.

11          MR. PAXTON:  Your Honor, I would move the admission

12 of Defendants' Exhibits 75 and 73.

13          MR. CLARE:  Your Honor, I'm not sure that -- the

14 relevance of this entirely separate publication to the issues

15 in this case, a magazine article that is not the Rolling Stone

16 article.  But with that notation, I guess I would object on

17 the grounds of relevance.

18          MR. PAXTON:  Your Honor, I'll be able to connect

19 that pretty quickly, I believe.

20          THE COURT:  Well, maybe and maybe not.  I think

21 generally it falls under the category of the dean's

22 observation that, you know, the university is subject to

23 criticism, it's subject to review, it's subject to comment.

24 And, obviously, they cooperated in a process by which that

25 review, that comment, that criticism occurred.

1     So to that extent, I think it's reasonable and

2 relevant to have it as part of the record.

3          MR. PAXTON:  Thank you, Your Honor.

4          MS. MOODY:  So which two did you move in?

5          MR. PAXTON:  73 and 75.

6          MS. MOODY:  Okay.

7 BY MR. PAXTON:

8 Q    And if you would look at Defendants' Exhibit 74 for a

9 moment, this is a similar e-mail to Nicole Eramo produced by

10 the University of Virginia to the one -- the e-mail that you

11 originally received from Molly Minturn on October 27, 2014.

12 Does it look like those e-mails are virtually identical,

13 forwarding her a copy of the article?

14 A    Oh, yes.  I see what you're saying now.  Yes, the Exhibit

15 74, the e-mail from Molly Minturn to Nicole, looks very

16 similar to the e-mail that Molly had sent to me forwarding the

17 article, yes.

18 Q    Right.  That was my point.

19 A    Yes.

20 Q    And so was it your understanding that the people that

21 were involved in this article were sending an advance copy or

22 draft to comment?

23 A    I don't know that I knew Nicole had been sent a copy,

24 because I wasn't copied on this, but I certainly knew that I

25 had, and I knew that at some point in the process Susan Davis

1  and Pat Lampkin had a copy of it.

2  Q    If you would compare Defendants' Exhibit 73, which is

3  your draft, to Defendants' Exhibit 74, 74 is a lot easier to

4  read the attachment -- the attachments to Defendants' Exhibit

5  74 --

6  A    Yes.

7  Q    -- the actual article itself.

8  A    Yes.

9  Q    Take just a minute to compare the article that you edited

10  and the one that was sent to Ms. Eramo.

11  A    I'm doing it by simply looking at the first couple of

12  words of each paragraph?

13  Q    That's fine.  Right.

14  A    I'm not reading every word, but it looks to be the same

15  article.

16        MR. PAXTON:  Your Honor, we would move Defendants'

17  Exhibit 74 into evidence, actually, just to make it a little

18  easier for the witness to read the article that was sent to

19  UVa for comment.

20        THE COURT:  Okay.

21        MR. PAXTON:  Thank you.

22        THE COURT:  Admitted as 74.  So have you moved all

23  three of these?

24        MR. PAXTON:  We have, Your Honor.

25        THE COURT:  All three are admitted as identified by

the witness, 73, 74, and 75.

(Defendants' Trial Exhibits 73, 74 and 75 admitted)

        MR. PAXTON:  So if we would put up 74, which is
DTX39, the second page.

BY MR. PAXTON:

Q    So the title of this draft article was "Sexual assault at
UVa.  What will it take to keep students safe at the
university?"

    Do you see that was the draft of the article?

A    Yes.

Q    And if you see on the screen, the last paragraph that's
shown on the screen says, "At UVa and across the country, an
upswell of outraged college students, parents, activists, and
even the White House are now demanding to know:  How can this
be a typical experience at our nation's institutions for
higher education?"

    Do you see that?

A    Yes.

Q    And this was referring to the beginning of this article,
in which Emily Renda recounted her own experience at UVa
during her first year here; is that correct?

A    Yes.

Q    And you were aware of Emily Renda's account, that she had
met a guy at a fraternity party, she had gotten drunk, and
that she had been sexually assaulted that night; is that

1    correct?

2    A    Yes.  I don't believe she brought that forward at the

3    time it happened.  I think it was a couple of years later that

4    she brought that forward.  But, yes, I was aware of Emily's

5    account and Emily's recitation of her experience as a

6    first-year, yes.

7    Q    And you were also aware, as this article indicated, that,

8    in recalling that night from October 7, 2014, Renda used the

9    word "typical"?  "And in my case, it's a fairly typical campus

10   sexual assault story"; is that right?  Right above?

11   A    Oh, yeah.  She's saying typical of a sexual assault story

12   on a college campus, yes.

13   Q    And that was one of the reasons that she went to Congress

14   to testify, was to talk about her story and others, about the

15   experience that young women were facing on college campuses;

16   is that correct?

17   A    Yes.

18   Q    Now, if you go down in that same article that I read to

19   you to begin with, the last sentence in this paragraph says,

20   "And what are UVa and other universities doing about it?"

21        So that was a question that was being posed, correct?

22   A    Correct.

23   Q    And then the next paragraph says, "And at UVa in

24   particular, the following questions are echoing louder and

25   louder across the grounds:  Why is it that no student has been

expelled for rape in modern university history?"

A    I see that, yes.

Q    "Why is sexual assault not part of the university's revered honor code?"  Right?

A    Yes.

Q    And not to take you back to a sensitive spot, but it says, "In the wake of UVa second-year Hannah Graham's death in September, what are the administrators doing to keep students safe?"

A    Yes.

Q    So all of this information was accurate, was it not?

A    Sentence one and sentence -- well, sentence one is an accurate statement.  Sentence three is a question.

Q    Right.

A    And sentence two, there are reasons why it is not part of the honor code.  But it simply makes a statement -- it's another question.  "Why is it not part of the honor code?"  Yes.

Q    And there's been some testimony in this case about an interview that Dean Eramo gave to WUVA institution.  What is WUVA?

A    My understanding is WUVA is a primarily student-run radio station.

Q    And were you aware that in early October -- actually, maybe even in September, that Dean Eramo had had an occasion

to sit down with a student from the radio station and give an

interview about the university's sexual assault policies and

how they were implemented?

A    Well, as you've probably read in my deposition from last

spring, at the time, my understanding was that Nicole said a

student had contacted her.  And the student said for a class

project, that the student wanted to do an interview, that

Wyatt Andrews -- who is an alum of the university and a

well-known newscaster -- would then critique the student's

case studies or examples of how they interviewed somebody on

an important topic.

I don't think Nicole or I -- and mine was based on what

Nicole was telling me at the time -- perceived that it was

going to be a WUVA interview.  Nicole perceived that it was a

class project.  And I had no problem with her working with a

student on a class project.  The student identified herself as

being associated with WUVA, but Nicole's understanding --

which then was conveyed to me by Nicole -- was that it was a

class project, yes.

MR. PAXTON:  I understand -- I think we've been

asked to take a break at this point.

THE COURT:  If it's a convenient point.

MR. PAXTON:  I think we can stop here and I can pick

back up at this point.

THE COURT:  Ladies and gentlemen, we'll have our

first midmorning break.  I would ask that while you're away

from the court, do not discuss the matter with one another, do

not permit anyone to discuss it with you.  I'll ask the

witness not to discuss pending testimony with counsel from

either side.

Let's plan to return at about ten until 10.

Ask the marshal to declare court in recess.

(Recess)

(Jury in)

(Open court as follows:)

THE COURT:  JoRita can report that all ten jurors

are back in their places, ready for the continuation of the

cross-examination of the dean.

Mr. Paxton, you may proceed.

MR. PAXTON:  Thank you, Your Honor.

BY MR. PAXTON:

Q    Dean Groves, when we broke, I was asking you about the

WUVA interview that Ms. Eramo gave to the campus radio

station.

Do you recall that?

A    To that student, yes.

Q    Yeah.

A    Yes.

Q    And you did become aware that that interview, then, was

broadcast on campus, a portion of it?

1   A    You know, I was asked that question in my deposition.

2   And I can't remember that.  I know there's no question that,

3   after the Rolling Stone article ran, I saw a live link to the

4   WUVA broadcast that you could click onto and watch it.  And I

5   think I either saw or was told that CNN may have run a portion

6   of it.  You know, so it got wide exposure at that point.

7        I know that -- I don't think I saw it before the article

8   ran.  But I certainly, again, was aware that it had happened,

9   that Nicole had given this interview to this student, yes.

10  Q    And from the nature of your responses to my initial

11  questions, it sounds as if at least Ms. Eramo told you that

12  she felt like she had been somehow misled about the nature of

13  the interview before she gave it?

14  A    I can't remember when she told me that, but she did tell

15  me that at some point, yes.

16  Q    And she was concerned about the way that it made the

17  university and her look based on the information that she had

18  shared during that interview?

19  A    I think that was the takeaway that I had from her

20  conversation with me, yes.

21  Q    And isn't it true that during that conversation the

22  student asked her about the number of people that had been

23  expelled for sexual assault?

24  A    I believe so, yes.

25  Q    All right.  And so that was the occasion when the campus

learned that no one had been expelled from the university for
sexual assault.  Would that be fair?

MR. CLARE:  Object to foundation in terms of when
the campus learned certain facts.

MR. PAXTON:  I can rephrase.

THE COURT:  That would be fine.

BY MR. PAXTON:

Q    This article indicates -- that's in front of you, that --
in the paragraph that's highlighted, it says, "At UVa in
particular, the following questions are echoing louder and
louder across grounds:  Why is it that no student had been
expelled for rape in modern university history?"

Are you aware of any other information other than
Ms. Eramo's interview with WUVA that made that information
known to the campus?

A    I believe it's possible that Ms. Russell's website had
said that, but I'm not sure.  I know I had asked the question
at some point.

And if I may elaborate just a little bit.

Q    Go ahead.

A    The system at UVa is highly unusual relative to other
schools because the deans -- and in particular the dean of
students -- doesn't have the authority to discipline students.
The system at UVa is run by a student discipline system, what
we call student self-governance.

So the schools of the university elect students to serve on the honor committee, which is lying, cheating, and stealing. And the schools of the university elect students to serve on what's called the university judiciary committee, the UJC, which covers the 12 standards of conduct. The first is physical assault. The second is, I think, recklessness, violation of law, those kinds of things.

And there is a subset -- and this comes from the board of visitors. And there was a subset of the UJC in those days that was called the sexual misconduct board, the SMB. And it was made up half of students and half of faculty and staff who were trained specially each year to hear those cases. And it was that board, just like the UJC and the honor committee, that actually issued the sanction.

And so I know at some point during the time I was dean, I did ask the question, had -- because it had been raised in some context -- and it might be Ms. Russell -- had there been an expulsion for sexual assault?

Honor committee, there's only one thing they can do is expel. Right? If they find a student guilty, they must expel. There's no other option.

And the answer was no.

And so I know I saw that somewhere; I just don't know where.

MR. PAXTON: Next in order?

1          MS. MOODY:  76.

2     BY MR. PAXTON:

3     Q    Dean Groves, let me show you an e-mail exchange, which,

4     again, has a couple of numbers on it.  The one that counts is

5     Defendants' Exhibit 76 at the top, which is an e-mail chain

6     that includes yourself.

7          Have you had a chance to review this?

8     A    I'm just looking at the bottom of the exhibit to see when

9     the first e-mail was.  I see it's Ms. Minturn at the alumni

10    magazine to me -- no.  It looks like Ali Burke.  Ms. Burke is

11    an art director.  I see that now in this exhibit.  You asked

12    me about that person earlier.  I don't know that person, but I

13    see the name here.

14         So, yes, I see this.

15    Q    And is this an e-mail exchange that you had with the UVa

16    magazine about certain information they intended to include in

17    the article?

18    A    Let's see.  The first e-mail is them asking questions.

19         The next e-mail, October 13, I'm responding that I can't

20    confirm all of those numbers, the 183 expulsions, et cetera,

21    as it's beyond my knowledge, copying Nicole, who may know.

22         Let's see.  "With respect to the purported Rolling Stone

23    article and allegations against unnamed current or former

24    members at Phi Kappa Psi fraternity, I can state the

25    following:  We will always investigate allegations of sexual

1　assault if provided enough specific information to do so."

2　　　What I was saying is -- I was saying in this response to

3　Ms. Minturn, and now I'm copying Nicole, Vice President

4　Lampkin, and Anthony de Bruyn in public affairs, that I can't

5　confirm the 183 honor expulsions since 1998 because I simply

6　don't know the answer, and that I was copying Nicole, who may

7　know, because she had been the special assistant to the honor

8　committee before she became an assistant dean.

9　　　And then I then say that, "With respect to the purported

10　Rolling Stone article and allegations against unnamed current

11　or former members of the Phi Kappa Psi fraternity at UVa, I

12　can state the following:  We will always investigate

13　allegations of sexual assault if provided enough specific

14　information to do so."

15　　　And Nicole then responds that, "The statistics recorded

16　in the WUVA story are correct, to my knowledge."

17　　　　　MR. PAXTON:  So, Your Honor, I would like to move

18　Defendants' Exhibit 76 into evidence.

19　　　　　THE COURT:  76, without objection.

20　(Defendants' Trial Exhibit 76 admitted)

21　BY MR. PAXTON:

22　Q　Now, Dean Groves, let's go back to the first e-mail that

23　you got from Ms. Minturn.  She actually sent you a link to the

24　WUVA interview that was shown on campus; is that correct?

25　A　Yes.  I think I told you earlier I remembered at some

point seeing a live link somewhere.  And this must have been
it.

Q    Okay.  So at this point at least, Ms. Minturn was aware
that allegations against members of the Phi Psi fraternity
that would be covered in the Rolling Stone article; what is
UVa's response to that?

So this appears to have been a fairly open issue on
campus as of October 13, 2014?

A    I don't know how open or widespread the knowledge was in
the university community generally.  It's clear that the
reporter for the alumni magazine and Ms. Minturn as an editor
know this.  As I told you earlier, I certainly knew this.  How
widespread it was beyond that, I don't know.

Q    And in connection with the first bullet point, where she
provided a link to the WUVA report, the reporter stated that
there had been 183 expulsions for the honor code violations
since 1998.  She also states that "According to Pat Lampkin,
no one has ever been expelled from UVa for sexual assault.
Can you confirm that?"

So this information about no expulsions was a topic that
was being discussed in October of 2014, correct?

A    Yes.

Q    And, in fact, as we've seen, the article -- the draft
article specifically references that?

A    Yes.

1   Q   And they contrasted it with the fact that honor code

2   violations have been treated more severely, correct?

3   A   Yes.

4   Q   And that's for the reasons that you've previously stated?

5   A   Yes, that the honor committee only has one option, which

6   is expulsion.

7   Q   So let's go back to the deposition -- I mean -- I'm

8   sorry -- Defendants' Exhibit 74, which is the clean article,

9   clean version of the article.

10   A   Yes, sir.

11   Q   And we'll go down to the paragraph that begins,

12   "Survivors" -- where it says, "Survivors of sexual assault are

13   playing a large role in trying to change the culture on

14   grounds.  No longer willing to remain anonymous, Renda and

15   others are speaking out at rallies, at fraternity house

16   meetings, and via social media.  They're sharing their

17   experiences in very public ways to inform and educate

18   first-years who are on their own for the first time."

19       Do you see that?

20   A   I do.

21   Q   Now, if you compare that version with Defendants'

22   Exhibit 73, it appears that you made an edit to the second

23   sentence of that that says "no longer willing to remain

24   anonymous," where you struck that out?

25   A   Yes.

1  Q    Why did you do that?

2  A    That, I remember.

3      Because I thought that would shame or pressure some women

4  and men who did want to remain anonymous.  In other words, it

5  would create the impression that, if you made an anonymous

6  report, that somehow you were not part of this movement to try

7  to enact change.  And I did not want a student to feel like he

8  or she could not make an anonymous report.

9  Q    And so you were hoping -- but that was -- that -- the

10 writer of the article had the perception that Ms. Renda and

11 others, that's what it was referring to, were no longer

12 willing to remain anonymous.  Is that the way you read that

13 sentence?

14 A    That's one way to read the sentence, yes.  I just was

15 worried -- I remember this particular edit.

16     I was worried about the fact that it might create in the

17 mind of a student that they couldn't or shouldn't be anonymous

18 if that was the way they wanted to approach it.

19 Q    And then the next paragraph down is a quote from Emily

20 Renda.  "Sharing your story, owning it personally, and being

21 honest and frank about it gives permission to other people to

22 be honest and frank, said Renda."

23     Do you see that?

24 A    Yes.

25 Q    And you didn't make any change to that, to that

1  paragraph, in your edits?

2  A    It doesn't appear that I did, no.

3  Q    Right.  Now, this article that the Virginia alumni

4  association was preparing to publish never got published, did

5  it?

6  A    No, not to my knowledge.

7  Q    And the reason it didn't get published is because you,

8  Susan Davis, and Pat Lampkin decided it needed to be killed;

9  isn't that correct?

10 A    No, I didn't decide anything of the sort.  I provided

11 these suggested edits back to Ms. Minturn.

12       I know that it ultimately was killed.  I know that -- or

13 didn't run.  I know that Ms. Lampkin talked with me about

14 that.  I think Ms. Davis was involved in those conversations.

15 And I know it did not run.

16 Q    Well, if we turn back to Defendants' Exhibit 75, the

17 e-mail exchange, you in your -- at the bottom of page 1, where

18 you attach your -- that's the wrong one.

19       It is DTX40.  Sorry.

20 A    Yes.  I have 75 in front of me.

21 Q    It's actually, yeah, Exhibit 75.

22       And in responding to the fact-checker for the alumni

23 magazine, you copied Susan Davis and Pat Lampkin on your

24 response.

25       Do you see that?

A    And Nicole, yes.

Q    Right.  And the response from Ms. Davis was, "I don't believe we can or should include someone's case.  Let's discuss before this goes to press."

So was there a discussion that took place between you and Ms. Davis and Ms. Lampkin about this?

A    As I said, I know that I talked to Ms. Lampkin about it at some point after I had submitted my edits.  I know that Ms. Davis and I talked about it.  Whether the three of us met, I don't know.  I definitely remember this e-mail chain -- this e-mail thread, rather.

Q    And Ms. Davis followed up with you the second time, just a few minutes later, saying, "Let's huddle on this article. There's something privileged.  If this is a must-do, it needs to be substantially revised.  We need to lose all of the blank section and everything on sanctioning.  This reads as if we are not compliant with Title IX, even though we are."

Do you recall that?

A    I recall all of this, yes.  As I say, I recall that I got the draft article from Ms. Minturn, that I did a redline saying here are my suggested edits since you've asked for my thoughts, and submitted those to her; that this e-mail exchange happens, where Ms. Davis says I'm not sure this should run at all.

And you can see what follows in the e-mail thread.

1   Q    So let's go to next one.  You're responding to Ms. Davis

2   at this point?

3   A    Yes.

4   Q    And so you made sure that they had a copy of your

5   attached edits.  And you say, "I defer to Susan, but if it is

6   to be killed or modified, they said it must be done by

7   Wednesday, which would be October 29."

8        Is that correct?

9   A    Yes.  They must have given me a date by which I was

10  supposed to submit edits, and that's what I'm referring to

11  here.  And I wouldn't have edited the article if I was trying

12  to kill it, I guess is my point to you.

13  Q    Right.  And so the next -- so if I understand you -- so

14  if you were editing it, you felt comfortable with the content

15  of the article at that point?

16  A    Again, as you can tell from what we've gone over so far,

17  I viewed this as the alumni magazine saying to me, here's a

18  draft of the article.  Do you have any thoughts about it?

19       I responded and said, thank you for asking for my

20  thoughts.  Here are my suggested edits in the attached.

21       My assumption was that it was going to run.

22  Q    Right.  And so -- I mean, they asked for your input as

23  the dean of students of the University of Virginia, correct?

24  A    Yes.

25  Q    And so the next part of this e-mail exchange with Susan

Davis and you and Ms. Lampkin is that she agreed with your
edits and that she voted to kill it, "but if that is not going
to fly, we need to modify it substantially."

And so it's your understanding that, after this e-mail
exchange, Pat Lampkin decided to kill this article; is that
correct?

A    I wasn't part of the conversation that ultimately must
have taken place between Ms. Lampkin and Alumni Hall, but,
yes, that's my understanding, is that Ms. Lampkin ultimately
said to them I don't think this should run.  And she may have
said what Susan says here, that, if so, it needs to be
modified.

But I know it never ran.

Q    And isn't it true, from your interactions from
Ms. Lampkin, that you understand the reason she killed this
article was because she didn't like the tone of the article?

A    I don't have a very clear --

MR. CLARE:  Your Honor, object.  That calls for
hearsay.

THE COURT:  Right.  I think it calls for some
speculation as to what was in someone else's mind or how the
decision process unfolded.  I'm not sure that he's qualified
to give an answer as to that question.

MR. PAXTON:  Okay.  That's fine.

BY MR. PAXTON:

1  Q    But just to conclude this, this article, which raised a

2  number of questions about what the university was doing to

3  protect campus safety in this particular area of sexual

4  assault, was never published by the Virginia alumni magazine;

5  isn't that true?

6  A    Yes.  To my knowledge, that's right.  I get the alumni

7  magazine, and I never saw it.

8       MR. PAXTON:  Now, what I'd like to do -- if we can

9  bring up Defendants' Exhibit 45, which is the 2011 sexual

10 misconduct policy for the University of Virginia.

11 BY MR. PAXTON:

12 Q    And, Dean Groves, let me give you a printed copy.  It's

13 easier for you.

14 A    Thank you.

15 Q    Earlier in your testimony you indicated that in 2011, I

16 believe, there was a Dear Colleague letter that came out; is

17 that correct?

18 A    April of 2011, yes.

19 Q    And this policy, if you turn to the last page, was signed

20 by President Sullivan on July 8, 2011?

21 A    Yes.

22 Q    Is that her signature?

23 A    Yes.

24 Q    And so this policy was developed after you got the new

25 guidance from the federal government about how colleges should

1  respond to reports of sexual misconduct; is that correct?

2  A    Yes.

3  Q    Sexual -- yeah, sexual misconduct.

4       And sexual misconduct is a very broad term under this

5  policy; is that correct?

6  A    It encompasses many types of prohibited activity, yes.

7  Q    Do you know if the word "rape" appears anywhere in this

8  policy?

9  A    I don't know.

10 Q    Your job, as the dean of students, was to make sure that

11 this policy was implemented; is that correct?

12 A    Yes.  I would say that was one of the roles I played, was

13 assisting others in the university in ensuring that the policy

14 was disseminated and implemented.  Yes.

15 Q    And during the time that this policy was in effect, which

16 I believe was from July 8, 2011, until March 30, 2015, when

17 the interim policy was adopted, you were designated as the

18 deputy Title IX coordinator for student matters; is that

19 correct?

20 A    That is correct.  During that time frame, yes.

21 Q    And so while you were not the day-to-day person

22 implementing this policy, you were expected to understand this

23 policy and know its provisions; is that correct?

24 A    Yes, absolutely.

25 Q    And you had some involvement in helping to prepare this

1    policy?

2    A    Limited.  Susan Davis was the expert in student affairs.

3    She's also a lawyer on this area.  I believe Susan drafted the

4    policy, vetted it with the general counsel's office.  I know I

5    saw a draft at some point before it became finalized.  So my

6    role would have been looking at a draft once Susan had put it

7    together and vetted it.

8    Q    And you're a lawyer as well, correct?

9    A    I am.

10   Q    So if you turn to page 2 of the policy in the second

11   paragraph, it says, "As a recipient of federal funding" --

12        Sorry.  Help me get this off here.  Okay.  Thank you.

13   I'm not very technologically adept.

14        "As a recipient of federal funds, the university is

15   required to comply with Title IX of the higher education

16   amendments of 1972 Title IX."

17        Is that your understanding?  Is that correct?

18   A    Oh, yes.

19   Q    And so the last sentence says, "University of Virginia is

20   committed to providing programs, activities, and an education

21   in an environment free from sexual discrimination."

22        Is that correct?

23   A    Correct.

24   Q    And so this policy, then, undertakes to lay out how

25   that's going to occur; is that right?

1   A    I'm only hesitating for a moment because the office --

2   now it's called Office of Equal Opportunity and Civil Rights,

3   but it used to be called OEP, Equal Opportunity Programs.

4        There are aspects of sex discrimination that are within

5   their purview under things like Title VII, for example, for

6   employment.

7        There are a variety of other parts of the university that

8   are also concerned about nondiscrimination in the area of

9   gender, but this policy was an important part of that in

10  particular in complying with our obligations under Title IX.

11  Q    And it was -- Title IX addresses students in particular,

12  correct?

13  A    Yes.  Higher education opportunities.  Yes.

14  Q    And so this was the university's policy on this issue?

15  A    On Title IX, yes.

16  Q    Right.  And so if you'll turn to page 5 of the document

17  with me about jurisdiction.

18       Now, one of the provisions of this policy -- I'd like you

19  to help me understand a little bit.  It appears from

20  paragraph 1 that, if a student that was involved in committing

21  an act of sexual misconduct graduated, the university no

22  longer had jurisdiction over them.

23       Is that how you understand paragraph No. 1?

24  A    Yes.

25  Q    Okay.  So if you got a complaint about a student who was

1  a fourth-year student in January, prior to graduation in May,

2  if no charge was filed and nothing was done prior to

3  graduation, you would lose the ability to address that with

4  that particular student; is that correct?

5  A    Yes.  Unless a hold was put on their record to

6  essentially hold their degree from being issued, that's right.

7  Once a student graduates from the university or otherwise

8  leaves the university, we would not have jurisdiction over

9  them under this policy because they would not be a student

10  matriculating at the university.

11  Q    But in terms of geography, the next section, "This policy

12  applies regardless of where the student is."

13      So the fact that an assault happened in a fraternity

14  house on Rugby Road, which is not on campus property, that was

15  still covered by this policy, correct?

16  A    Yes.  And I think -- I'm trying to wrack my brain, but I

17  think that was one of the changes in 2011.  Nicole would know

18  better than I would, but I think there used to be a geographic

19  limitation, as there are in the other standards of conduct.

20  Some of them say Charlottesville and Albemarle County, for

21  example, that we have jurisdiction over things that happen in

22  that area.

23      But this policy, I know, was made extremely broad so that

24  we could cover things that happened in California, in Austria

25  during study abroad; that we could have jurisdiction over

1  anything that happened with students under this policy.

2      And if I remember correctly, we also eliminated any kind

3  of statute of limitations, meaning that you had to bring a

4  claim -- like, the UJC, it's 45 days you have to bring the

5  claim.  I think honor, it used to be a couple years.

6      But this policy was made any time until that student

7  graduates, you could bring a charge forward.

8  Q    And so, for instance, if a student was sexually assaulted

9  in September of 2012 and didn't contact the dean's office

10 until May of 2013, that was perfectly acceptable under this

11 policy, correct?

12 A    That has happened.  We have had cases brought during

13 fourth year alleging misconduct during the first year, yes.

14 Q    And then if you return with me, if you could, to page 7.

15     And just for reference, if you turn back to page 6 just

16 so you can see.

17     Subsection E of this part of the policy talks about the

18 effect of criminal prosecution.

19     Do you see that?

20 A    I do.

21 Q    And because sexual misconduct can be both a violation of

22 Title IX as well as criminal activity, there are certain

23 situations where the police may have an interest in the matter

24 if the student moves the case forward; is that correct?

25 A    There are cases where the police might have an interest

1  as well as the university have an interest?

2  Q    Yes.

3  A    Absolutely.

4  Q    And if you turn to the next page, it's also true, if you

5  look in this top paragraph, where it says "in other words,"

6  one of the things that's different between -- this is before I

7  ask a specific question regarding this.  One of the things

8  that's different -- and you mentioned this a little bit

9  earlier -- different standards of proof, correct?

10 A    Correct.

11 Q    So in a criminal case, the prosecution, the government,

12 has to prove beyond a reasonable doubt that someone has

13 committed a crime; is that right?

14 A    That is right.

15 Q    And in the student arena, under this policy, the student

16 would only need to prove by preponderance of the evidence that

17 the person had engaged in sexual misconduct?

18 A    That's correct.

19 Q    And so even if a law enforcement agency lacks sufficient

20 evidence of a crime and declined to prosecute, this didn't

21 mean that the university was relieved of its own obligation to

22 investigate the matter and take appropriate action; is that

23 correct?

24 A    Yes.

25 Q    And if we go to the next paragraph in this policy.

1    The last paragraph there says, "The filing of a
2  complaint," which would be a formal process under this policy
3  for disciplinary action; is that correct?
4  A    I'm sorry.  Come again, please.
5  Q    Well, I'll read the first sentence for you, and then I'll
6  ask you a question.  That's simpler.
7    "The filing of a complaint of sexual misconduct under
8  this policy is independent of any criminal investigation or
9  proceeding; and, except that the university's investigation
10 may be delayed temporarily while criminal investigators are
11 gathering evidence, the university will not wait for the
12 conclusion of any criminal investigation or proceedings to
13 commence its own investigation and take interim measures to
14 protect the complainant and the university community, if
15 necessary, as described below."
16 A    Yes.
17 Q    Okay.  So my question to you is:  The university's
18 obligation to conduct its own investigation was completely
19 independent as to whether or not a criminal charge was brought
20 where there was a pending criminal investigation; is that not
21 true?
22 A    Depending on the amount of information the university had
23 available, but, yes, that is right.
24   And that was something that was new in the 2011 guidance
25 that would then be fleshed out in much greater detail in the

1   April 29, 2014, guidance.

2   Q   Right.  And then if you'll turn with me to the next page

3   of the policy, on page 8 -- well, let's back up.  Let's

4   start -- okay.  So you have -- just below that, you have the

5   process initial steps, and there's number A is intake meeting

6   with the complainant; then B, complainant wishes.

7       Intake meeting with the complainant; B is complainant

8   wishes to pursue formal or informal resolution; and then on

9   the next page, in Section C, complainant does not wish to

10   pursue resolution or requests confidentiality.

11       So those -- and then -- so those were the two primary

12   situations that the university could do.  The student would be

13   told their options:  That they could file a formal complaint;

14   they could ask for an informal resolution; or they could do

15   nothing about it, other than maybe get some counseling, if

16   they didn't really want to pursue disciplinary action towards

17   their assaulter.  Is that correct?

18   A   Yes.

19   Q   And that was the university's approach to make sure the

20   student understood all their options that were available to

21   them.  And if a student elected to do nothing in the sense of

22   not pursuing a charge either with the police or with the

23   university's disciplinary process, they were not criticized

24   for that, were they?

25   A   If a student chose not to participate or to assist us, we

1  did not criticize them.  Is that the question?

2  Q    Uh-huh.

3  A    Yes.

4  Q    And it was perfectly their choice?

5  A    Yes.  My understanding -- and Nicole had a greater

6  expertise than I in this.  But my understanding from the

7  literature was that it was important to give a survivor of

8  sexual assault the ability to control aspects of the process

9  as part of what were considered best practices.  At least

10 that's what I had read in the literature.

11 Q    So in Subsection C, the policy specifically contemplates

12 that situation; is that correct?

13 A    It does.

14 Q    And so if you'll read along with me, it says, "If the

15 complainant does not wish to pursue formal or informal

16 resolution and/or requests that his or her complaint remain

17 confidential, Title IX nevertheless requires the university to

18 investigate and take reasonable action in response to the

19 complainant's information."

20 A    Yes.  And as the next sentence says, "However, the

21 university's ability to respond may be limited."

22 Q    Correct.  So one of the things you mentioned now, the

23 frequently asked questions or the Q and A that came out in

24 April 2014, part of that guidance was that universities needed

25 to do more in the area of investigation than what they had

1   been doing under the law; is that correct?

2   A     Yes.   I think there were about -- that section -- I can't

3   remember the letter; I think it may have been E, but in a

4   section there were about four hypotheticals or -- I'm going

5   back on memory.

6   Q     Right.

7   A     There were about four hypotheticals where they said, if

8   you have a situation where the young person doesn't want to

9   participate, doesn't want to make a complaint, isn't willing

10   to assist, what are some of the options available to a

11   university?

12         For example, one was to conduct targeted training.   If

13   there's an area where you think or a group where you think a

14   problem exists, training might be an option.   Another was to

15   investigate to the extent that you have information.   But they

16   gave several hypotheticals.

17   Q     And so -- but if you look at your policy, isn't it true

18   that, at a minimum, the university -- it says, "Title IX

19   nevertheless requires the university to investigate," correct?

20   A     Yes.

21   Q     That's a mandate?

22   A     Yes.

23   Q     And then the second half of the sentence is "and then to

24   take reasonable action in response to the complainant's

25   information."

1    A    Yes.

2    Q    And so the second part of this policy makes it clear that

3    there's some judgment about what's reasonable and what's not;

4    is that correct?

5    A    Yes, I would suppose so.

6    Q    As contrasted with a mandate to do an investigation

7    that's required?

8    A    Yes, that's what our policy says.

9    Q    And so, as you understood it, this was the University of

10   Virginia's attempt to comply with Title IX, by adopting this

11   policy?

12   A    Yes.

13   Q    Okay.  And so different people might have different

14   reactions to what a reasonable response would be in this

15   situation.  Isn't that contemplated by this policy?

16   A    That reasonable people could disagree?

17   Q    Yeah.

18   A    Yes.

19        THE COURT:  In fact, you understand there's been a

20   lot of disagreement about that very provision?

21        THE WITNESS:  Yes, sir.

22   BY MR. PAXTON:

23   Q    And at this point, under this policy, it's your

24   understanding that this policy was designed to reflect the

25   sort of a victim's choice approach to how the university would

respond?  In other words, if the student really didn't want to
go forward, the university was going to try to honor that
request as much as possible?

A    I believe that to be generally true.  I know in that
April 29, 2014, guidance the government talked about the
balancing of the interests and the fact that there was
importance to empowering survivors to feel like they had
ownership of the process but also to balance that against
other factors.

And that led to our development, I think in the winter of
2015, 2014-'15, to this list of factors and an evaluation
panel that we now used to balance those factors.

Q    In fact, wasn't that policy adopted by the University of
Virginia on August 26, 2014, just before the start of the new
school year?

A    I'm sorry.  I don't remember the date, but I know there
was this policy; then there was an interim policy put in after
the guidance in April 2014; and then a final policy that is
the one we have now.  I think that was maybe in July after
that.  But I can't remember the time line.

MR. PAXTON:  Excuse me one second.

(Counsel conferring)

BY MR. PAXTON:

Q    I'll come back to that --

A    That's fine.

1    Q    -- to help refresh your recollection.  I don't have it

2    handy; I don't want to hold us up at this point.

3         Let's go to the situation involving Jackie, if we can.

4    A    Yes, sir.

5    Q    And if I use the word "Jackie," you know who I'm

6    referring to?

7    A    I do.

8    Q    Okay.  Now, you're aware that Jackie met with Dean Eramo

9    on May 20, 2013; is that correct?

10   A    May 20, 2013?

11   Q    Yes.

12   A    Yes.

13   Q    And were you made aware of that meeting with Ms. Eramo

14   shortly after that meeting took place?

15   A    Yes.

16   Q    And she also made an entry in the Advocate system that

17   you've testified about previously; is that correct?

18   A    Yes.  I don't have it in front of me, but my recollection

19   is absolutely.

20   Q    And you've indicated that she was really good at making

21   entries in the Advocate system and doing them on a timely

22   basis and that was one of her strengths, correct?

23   A    Actually, the best person in the office at that, yes.

24   Q    And so do you recall -- and I'll be able to show you a

25   document if you don't -- that in this initial report by

Ms. Eramo that Jackie had reported to her that several men at
a fraternity had forced her to engage in unwanted sexual
contact and that there had actually been what your policy
refers to as sexual intercourse, oral sex, against her will?

A    Yes.  My recollection is that Nicole told me that a young
woman had come forward saying that the prior September, the
beginning of her first year, that she had visited a fraternity
house and had entered a room where I believe five men or a
group of men -- there is a number five that is in my mind;
when I learned that, I can't remember -- had coerced or forced
her to perform oral sex.  That's my recollection.

Q    And under the policy that we looked at a few minutes ago,
the university doesn't draw any distinction between oral sex,
vaginal sex, any other form where there's a penetration into
the body; is that correct?

A    Yes, that's right.

Q    So the fact that it was a description of oral sex didn't
make it less significant; is that correct?

A    Not to me or under the policy, no.

Q    And do you recall that Jackie couldn't remember the exact
name of the fraternity, but she knew it had a phi in the name?
Do you remember that?

A    My recollection was that Nicole told me that Jackie
believed it was a fraternity that may have been located on
Madison Lane, that she thought there was a phi in the name,

that Nicole had specifically asked her, "Is it the fraternity
at the end of Mad Bowl?" which is Phi Psi, and that Jackie was
not certain about that.

Q   And so just for the jury, we've talked a little bit about
Rugby Road, and that's sort of where the fraternities are.

Madison Lane, is that just on the opposite side of Mad
Bowl?

A   Thank you.  So let me try to explain the topography.

So Rugby Road is a main road that kind of runs away from
the Rotunda.  And along -- if you're going away from the
university, on the left and right side are several houses
which are Greek, fraternities and sororities.  But to the
right of Rugby is a large sports field called Madison Bowl.
Mad Bowl, students call it.  It's right behind Madison Hall,
the president's office.

And then Madison lane, I think it is, is just on the
other side of that athletic field.  And it too is lined with
fraternity and sorority houses.  And then there's also one at
the very end that faces Mad Bowl, and that's the Phi Psi
house.

And then there's Chancellor, which runs from Rugby behind
Madison and curves around to be parallel, which also has a
number of Greek houses.

Q   Just so I understand:  So the president's office at the
University of Virginia is in Madison Hall; is that correct?

A    Yes.

Q    And her office then looks out on the Mad Bowl?

A    It does.

Q    And so she can look right across -- is the Mad Bowl on
campus?

A    Is it our property?

Q    Yeah.

A    Yes.

Q    It is.  Okay.  But the fraternities around Mad Bowl are
not your property; is that right?

A    Correct.  Except for the three on the left side of Rugby,
which we're not talking about here.  But those three sit on
university land.  All the rest are on private land.

Q    Right.  So if some event happens there that might be
criminal in nature, the Charlottesville police would have to
be involved at that point?

A    The Charlottesville police have jurisdiction over
anything that happens in one of those houses other than the
six that sit on university land.

Q    Right.  And so at the time of this report, 2013, how many
fraternities in that area had the term "phi" in it?

A    Well, part of it depends upon how we define the area,
right?  Because I think that was part of the question here.
If it's just Madison Lane, there are three, one of which is
right now closed.  The letters are still there, I think, but

it's closed, which is Sigma Phi Epsilon; Phi Kappa Psi at the

end of Mad Bowl; and Phi Gamma Delta up closer to the front of

Madison Lane.

Q    So was the fraternity that you mentioned first that's

closed, was it closed in 2012 and 2013 too?

A    Yes.  I terminated our relationship with that fraternity

in 20 -- maybe -- 10 for hazing, and so it has been shut down.

Q    Now, in addition to the information that you shared with

us about the report you received from Ms. Eramo, did you also

understand that Jackie reported that she had gone to this

fraternity house with a coworker that worked with her at

IM-Rec?

A    Yes.  I believe I was told that by Nicole at some point,

yes.

Q    And so -- and that he was an upper classman and possibly

a member of the fraternity?

A    Yes, I believe that's right.

Q    And so in May of 2013, you knew that you had what was

described as a horrific sexual assault in a fraternity and

that one of the perpetrators of this was a coworker with

Jackie at IM-Rec; is that correct?

A    I can't remember when the IM-Rec knowledge came to us.

It may have been close in that time, I believe.  But, yes,

those facts you have laid out I think are what we knew at the

time.

Q    And so at the time that you learned about that, did the university take any steps to collect the work records from IM-Rec?

A    Not to my knowledge.

Q    If you had gotten the IM-Rec work records from September 2012, you would have a list of all the people that worked at the same time that Jackie worked, because you knew Jackie's name at that point, correct?

A    With the caveat that, as I said in my deposition, I don't believe I know how IM-Rec -- they're part of athletics.  I don't know how they classify employees, what records they keep on schedules.  They hire a number of students to be -- to manage the various IM-Rec facilities.  I think there's four or five of them across the university, the gymnasiums where students work out.

So they're lifeguards, they're intramural officials, they check students in and out of the gymnasiums, they work as trainers.  So I don't know what the numbers are of students that work in those positions, and I don't know how IM-Rec keeps the records.

That said, given the predicate of your question, yes, if the question is whatever records IM-Rec had, could you compare those against a list of members of various fraternities, I assume at some point you could, yes.

Q    Thank you.

A     I just don't know if you could show who worked with

Jackie at exactly the same time.  I don't know that.

Q     Right.  So if I understand correctly from the testimony

that Ms. Eramo gave earlier from May 20, 2013, until she had

another meeting with her in her office on April 21, 2014, the

university did not conduct any investigation into Jackie's

allegations of a brutal assault in a fraternity; is that

correct?

A     My understanding to that is that Nicole was in regular

touch with Jackie and that Jackie had not given us the name of

the young man that had brought her and would not, had not been

able to tell us what fraternity this had occurred at, thought

it might have been on Madison Lane but wasn't certain of that.

      So, yes, based on the information that we had available

to us, the decision was made to try to support Jackie and to

hope that at some point more information might have been

forthcoming.

Q     Then you did become aware that Jackie came back to see

Ms. Eramo in April of 2014; is that right?

A     April 22 of 2014, I believe.

Q     And if the report says that they met on April 21, you

would defer to that?

A     I would defer to that.  I'm going off my memory, so yes.

Q     It's amazing.

A     Yes, sir.

1    Q    More than two years ago.

2         So, at that time, did Ms. Eramo report to you that, when

3    Jackie came to meet with her, she reported that she had been

4    the victim of an assault on The Corner, with a bottle being

5    thrown at her?

6    A    Yes.  My recollection is that Jackie had come to see

7    Nicole, Dean Eramo; and that she had reported that she was

8    walking down The Corner, which is the district across from the

9    Rotunda where there are bars and restaurants and very heavily

10   frequented by students; and that she had been walking by -- I

11   forget which of the establishments, one of eateries and bars

12   there -- and that some young men had called out to her, I

13   think maybe even by name, by Jackie or something like that;

14   and that she had turned, and they had said something like,

15   stop saying things about us or talking about our fraternity,

16   or something like that, and had allegedly thrown a paper bag

17   at her, which she described to Nicole as striking her in the

18   face and cutting her or something like that.  And so she

19   perceived there must have been a bottle inside the bag, and

20   that that's what prompted her to either ask to come see Nicole

21   or show up.  I don't know what had made it happen, but on the

22   21st when she came in.

23   Q    So I want to pause for a second and go back to the

24   document that I couldn't find.

25   A    Okay.

1    Q    If we can pull up Defendants' Exhibit 16.  Go to page 38,

2    please, just close the loop so people will have that.

3         This is a report that the University of Virginia

4    published in September 30th, 2014.  This is -- within that

5    longer report is this document.

6    A    Yes.  This is August 25, 2014, when we were announcing

7    that almost all of the employees of the university were

8    responsible employees, with a duty to come forward with

9    reports of sexual misconduct made to them by students, and

10   that only a small classification of psychological counselors

11   and medical doctors would be excluded from that.

12   Q    Right.

13        MR. PAXTON:  And if you go down, Scott, if you

14   could.

15   BY MR. PAXTON:

16   Q    If you continue to go through it, this is where --

17   there's also a panel, an evaluation panel, that is

18   established.

19        MR. PAXTON:  If you -- keep going.  All right.

20   Okay.

21   BY MR. PAXTON:

22   Q    At the top of this page -- you can stop and go back up --

23   it says, "Consistent with Title IX and other applicable

24   federal laws, this policy outlines the options available to

25   students who report alleged sexual misconduct, as defined in

the policy, to a variety of people to report such disclosures
to the university's Title IX coordinator so that the
university may provide appropriate support to the students and
commence an investigation into the alleged sexual misconduct
in appropriate cases."

So this was designed to address this additional -- this
was the reason that you were adopting the policy, correct?

A    Yes.  The focus of this was this decision to designate
virtually all employees of the university, whether they were a
groundskeeper or the president, as a responsible employee who
must bring forward.  They could not have a student come to
them, say, a professor, have the student say, I want to talk
to you in confidence, and the professor not report that to the
university.

Q    And prior to this, I guess there must have been some
uncertainty on campus who was obligated to report and who
wasn't?

A    I think that was our perception.

Q    Okay.  Continue.  I think there is a -- sorry.  I don't
have the hard document in front of me.

You see here there's an evaluation panel and the
definition.  It says, "A three-person panel charged with
evaluating the reporter's request for confidentiality.  Such
panel will be comprised of the Title IX coordinator, the dean
of students, and a member of the university's threat

1  assessment team."

2      So this policy, also in addition to designating people

3  who needed to report the information, there was now a new

4  evaluation panel that was being put in place to evaluate

5  situations where there was a request for confidentiality?

6  A    Yes, sir.  Where a report came in and the student

7  requested confidentiality, there would be an evaluation panel

8  that would review that report.  I think it remained in place

9  like this for the duration of that academic year, 2014-'15,

10 and then changed.  The evaluation panel looks different today.

11 But yes.

12 Q    And that was changed under the policies that were adopted

13 after the Rolling Stone article came out, correct?

14 A    I think, yeah, sometime maybe in the next summer, I

15 believe.

16 Q    And do you recall that this policy set out the criteria

17 by which the evaluation panel was supposed to make its

18 assessment about whether they can honor the confidentiality

19 request of a reporting student?

20 A    I could flip through this, but my recall is that the

21 information that was contained in the April 29, 2014, guidance

22 from the federal government was looked at and a set of factors

23 or criteria were developed that ultimately resulted at some

24 point in a sheet that we use today that you go through this

25 set of factors -- the current evaluation panel, which is much

larger, goes through and looks at those factors.

Q    And so prior to August 25, 2014, there wasn't a formal process that UVa used to evaluate whether or not a student's request for confidentiality was to be honored or whether or not the university needed to do a more in-depth investigation; is that correct?

A    I think that's fair.

Q    Okay.  And do you know -- okay.  So thank you.  We'll go from that document.

Let me go back to the conversation we were having. Sometimes I have a hard time changing gears.

But we were talking about the second time that Jackie came to see Nicole Eramo in April of 2014.

In addition to this bottle incident that you described, do you recall that Ms. Eramo reported to you that she had become aware that a first-year student had been sexually assaulted on January 24, 2015, at the same fraternity that she had been assaulted at?

A    My recollection was a conversation with Nicole.  It must have been -- I don't know when Jackie came in on the 21st, but it must have been sometime on the 21st.  Because I know Nicole -- I haven't gone back to look at my calendar, but I think it was very quickly in time that Nicole came in to see me, said that Jackie had come back in, that Jackie alleged that she had been hit with this bottle -- and I say "alleged"

1    because I'm a lawyer -- but I think Nicole said Jackie was hit

2    by a bottle and came in to see me and was very upset, and that

3    Nicole had talked to her about going to the police, and that

4    Jackie had agreed to talk to the police.

5         And I remember I was very happy about that.  And I said,

6    "Okay.  Well, that's great.  We can finally get the police

7    involved now in this."

8    Q    Right.

9    A    And she said that Jackie had said that the

10   bottle-throwing was in retaliation for her being an outspoken

11   advocate because of her own experience as a survivor of being

12   assaulted.  And Nicole got her, as I recall, in front of a UPD

13   and CPD officer the next day, within 24 hours.  I think that's

14   the 22nd day that I had in my mind, was the meeting with the

15   police, and that there was then a subsequent meeting with a

16   Charlottesville police detective on May 1, maybe.

17   Q    So, in addition to the bottle incident, do you recall

18   that she also told you about this second sexual assault?

19   A    I'm sorry.  Yes.  In going through that, I forgot to

20   address that part of your question.  I apologize.

21   Q    That's okay.

22   A    Yes.  That Jackie, in this conversation with Nicole, had

23   said that Jackie was aware of a first-year student, whose name

24   was never given to me -- and I don't think whose name we ever

25   had -- who alleged that in January that she had been

1    assaulted.

2         In this same conversation, Jackie said to Nicole for the

3    first time, it's Phi Psi, it's Phi Kappa Psi, and that this

4    first-year claimed or told Jackie that an assault had occurred

5    to her in January, several months earlier, at the same

6    fraternity.

7         And I'm trying to remember.  I believe Nicole said to

8    Jackie -- asked for the name, Jackie declined, said can this

9    student make a report?  And that almost immediately from

10   Jackie leaving the office, the report came in.

11   Q    And it was an anonymous report, correct?

12   A    It was.

13   Q    It was consistent with the information that Jackie

14   reported to Ms. Eramo at that point.

15   A    It was brief.  But, to my knowledge, yes, it was

16   consistent with what Jackie had said.

17   Q    And it made it clear that, just three months earlier,

18   there had been a sexual assault at the Phi Psi fraternity by

19   multiple men on this first-year student, correct?

20   A    Yes.

21   Q    And at the time you got that information, you believed

22   that information to be true?  You didn't have any reason to

23   doubt it, did you?

24   A    I did not.

25   Q    And so, in addition, were you aware that Jackie had also

told Ms. Eramo that she had learned of a student who had
graduated in 2013 who had been sexually assaulted at the
Phi Psi fraternity in 2010, so before Jackie's assault?

A    And I've thought about that, because I -- in thinking
about coming here to testify, I can't remember when that was
brought up.  You may be right.

But I know at some point, Nicole told me that Jackie was
also alleging that a student who was about to graduate said
that she was assaulted in the fall of 2010 at the same
location.

Q    Right.  So now you have three reports of really brutal
criminal activity in a fraternity house, not on campus but
adjacent to campus, virtually on campus --

A    It doesn't matter to me that it's not on campus.

Q    Right.

And so did you report this to Pat Lampkin?

A    Yes.

Q    And did you report this to President Sullivan?

A    Yes.

Q    And it's your -- I believe you testified that Jackie had
originally agreed to meet with the police on April 22?

A    The next day.

Q    Right.  And so we've heard testimony from the officer.
After that meeting on April 22, what information did you get
about what happened at that meeting?

A    I'm trying to remember when Nicole updated me, because I know there ended up being a second meeting with the police.

I clearly remember being told by Nicole about Jackie's report and that Jackie was going to talk to the police now.  I was ecstatic, you know, because the police have the ability to do things that we cannot do.  Jackie had not been willing to give us names, specific information, that -- you know, of who we could obviously pull in as a suspect.

The police have the ability to subpoena, use search warrants, get text messages.  That had been effective in a couple of big hazing cases we had had, which allowed me to prove the case against the fraternity because the police had gotten electronic messages that I wouldn't have otherwise been able to get.

So my perception was that this was now going to move into the police realm and that we were going to get an outcome, a positive outcome.

Q    And so -- but it didn't turn out that way, did it?

A    It didn't.

What I do have a very clear memory of was Nicole speaking with me sometime after May 1, because that was the second meeting with the detective one on one, and that Jackie was now backing away from talking with the police.  I think she had said to Nicole that the detective was aggressive or something like that, in her mind.

1     Nicole told me she had gone back to Jackie and said, "I'm

2  sorry if you felt he was aggressive.  Police, you know,

3  sometimes come across that way," but I think she had tried to

4  calm Jackie and say this was important.  At least that's what

5  I was hearing from Nicole.

6     What I remember too was Nicole telling me -- and I think

7  she put this in Advocate shortly thereafter -- the

8  Charlottesville police said they were suspending the

9  investigation, not closing it, suspending it, and that they

10  were willing to reopen that investigation.

11     And so whenever you're ready to ask me about it -- I know

12  what I did after that -- I'm happy to talk about that.

13  Q   So would you be surprised that Officer Via testified

14  yesterday and said he closed the file?

15  A   That was not how it was communicated to me at the time.

16  Q   And so you were led to believe that there was still some

17  pending criminal investigation at that time?

18  A   The word that I remember being told -- and I think she --

19  was "suspended."  And so my interpretation -- although I

20  wasn't in contact with the police; Ms. Eramo was.  My view of

21  "suspended" was they were willing to reopen it if Jackie would

22  come back in.

23  Q   But as we've seen earlier under your policy, you still

24  had an obligation to conduct your investigation whether she

25  went forward with the police report at that point or not;

1  isn't that true?

2  A    We had an obligation to attempt to find out what we

3  could, yes.

4  Q    Right.  And so, at that point, in April of 2014 or early

5  May of 2014, at this point, you now knew that Jackie's alleged

6  assailant was a member of Phi Psi?  She believed that to be

7  the case?

8  A    (Indicating in the affirmative.)

9  Q    You knew that the two of them had worked together at

10  IM-Rec, correct?

11  A    Yes.

12  Q    You also knew that there was another young woman who had

13  been assaulted three months earlier, in virtually the same

14  context that Jackie had reported, correct?

15  A    But with no name of that individual to interview her and

16  find out details.

17  Q    But you also had the information that the assailant of

18  the anonymous report was a fourth-year student; is that

19  correct?

20  A    That's possible.  I'm sorry.  I don't remember.  But

21  that's possible, yes.

22  Q    And so here you were at a crux in time of May -- late

23  April, early May, right before graduation, where you had

24  information about a potential assailant at a fraternity about

25  ready to graduate?

1  A    I don't remember thinking about it in that way.  But I

2  hear what you're saying, yes.

3  Q    And so once that student, if they were -- the report that

4  was made to you guys was that -- through this anonymous

5  source, was that a fourth-year student had assaulted her in a

6  very similar way to the assault that had happened to Jackie.

7  And unless some action was taken before graduation, if that

8  person graduated, you had no jurisdiction over them; is that

9  correct?

10 A    Under our policy, you are correct.

11 Q    And so during the months of May, June, July, and August,

12 to your knowledge, did the University of Virginia do anything

13 to investigate Jackie's allegations or these other allegations

14 of rape at the Phi Psi fraternity?

15 A    So what I recall is she comes in on April 21st.  She's

16 with the police on April 22.  On May 1st, she's with the

17 police again.  I know on April 29, in between the police

18 meetings, is when the federal government issued the new

19 guidance that had the details.  I know that in -- Nicole was

20 keeping me apprized of the conversations with Jackie.

21     Whenever after May 1st Nicole came and told me that the

22 investigation by the police had been suspended because Jackie

23 wouldn't participate or cooperate, I said to Nicole, keep

24 working on her -- because she was upset about this police

25 officer being aggressive -- and see if you can change her

1  mind, stay in touch with her.  Nicole said yes.

2      I know Ms. Davis, Ms. Lampkin, and I briefed President

3  Sullivan at a dinner, I think on May 5, 6 -- I remember

4  looking at my calendar, somewhere in there -- told her where

5  we were.  We had multiple meetings, Ms. Davis, Ms. Lampkin,

6  and I, in mid May -- because we were in final exams at this

7  point -- in mid May about the fact that -- I'll be frank with

8  you --

9  Q    Please.

10  A    -- and I don't want to be uncharitable, but I was -- I

11  was angry about the fact that Jackie would not tell us

12  anybody's name.  She clearly knew the name of the guy that

13  brought her there.  She wouldn't give us that name.  She

14  wouldn't give us the name of these two women who she said had

15  told her that other physical assaults had happened.

16      It was as frustrated as I think I ever remember being in

17  this job, because I couldn't understand how you can have that

18  kind of a violent act and be unwilling to tell people the very

19  facts they need to take action.  And so I know at the end of

20  May, beginning of June, there was a privileged conversation --

21  which you know I can't talk about -- where I sought the legal

22  counsel from the university's attorneys about options

23  available to me.

24      Ultimately, the conclusion that we in student affairs --

25  Ms. Lampkin, Ms. Davis, and I -- drew was that Nicole would

1  stay in touch.  We didn't believe the fraternity house would

2  have any activity over the summer.  That tended to be the

3  practice at UVa, that they closed over the summer.  That

4  Nicole would stay in touch with Jackie, that -- the hope that,

5  when Jackie went home for the summer, that she would change

6  her mind.  And that when we came back in the fall, we could

7  see if Jackie was willing to help us in any way.

8      If she didn't, Ms. Davis had mentioned doing the targeted

9  training, essentially going to Phi Psi and saying we're going

10  to do Title IX training, as the federal government has said

11  that we should do as one option.

12      I had raised the issue in May.  I think it was in mid

13  May, I raised the concern -- I'm sorry.  Do you need me to

14  wait?

15  Q    No.  Go ahead.

16  A    Oh, okay.

17      In mid May, I had raised the concern about terminating

18  our agreement with the fraternity.  And I had said that we

19  certainly had three allegations, but I couldn't prove them.  I

20  didn't have the evidence to prove them.  I didn't have a

21  witness who was going to say, yes, this is what happened and

22  this is who did it.

23      And the risk that I feared, unlike the hazing cases --

24  because I've closed four fraternities in my time as dean for

25  hazing.  And in those cases, I had the evidence, I had

witnesses, and so I was able to go to the national fraternity
which gives the charter to the organization to operate, and I
could go to the alumni who owned the house, the physical
property, the house and the land.

And in each of those cases, I was able to convince the
two of them that they should join with me, that when I
terminated the operating agreement between the fraternity and
the university, they would shut the fraternity down, which
they had the power to do and I didn't.

And the issue I raised in mid May with Ms. Lampkin and
Ms. Davis was that, if I had tried to terminate the operating
agreement with Phi Psi but couldn't prove a case, that Phi Psi
would continue to be open but as an unrecognized fraternity at
the university.  They own the land.  They own the house.
They're still there.  And now I no longer have any leverage
with them whatsoever.

And I saw that happen when I lived in Atlanta at Emory
University with the AE PI chapter.  The university had
terminated the operating agreement with them, but they
continued to operate and actually became a very popular
fraternity because it was perceived as the rebellious thing to
do to join them.

So I had a very real fear that if I acted against
Phi Psi -- which I wanted to do at that point because I
believed this to be true at the time -- that they would

1  continue to operate and I would have no leverage over them

2  whatsoever and would have achieved essentially nothing.

3  Q    And that was your judgment about the situation, correct?

4  A    Yes, sir, that was my judgment.

5  Q    And as we have seen under the policy, the policy says

6  "reasonable measures."  So people can disagree with that

7  perception, right?

8  A    Oh, people can disagree with my decision on that?

9  Q    Sure.

10  A    Sure.

11  Q    Sure.

12      Now, would you be surprised to know that when Detective

13  Via testified yesterday that at the end of the meeting on

14  May 1, he made it very clear that their investigation was

15  closed, and that Dean Eramo said the university would be --

16  would look into this and that Jackie left that meeting happy

17  with that?

18           MR. CLARE:  Objection.  That's a mischaracterization

19  of Detective Via's testimony.  It misstates the record.

20           THE COURT:  I have to agree.  That's not my

21  recollection.  Perhaps we could pull that excerpt.  There's

22  one portion of it that I don't think coincides with my

23  recollection of what the detective said.

24           MR. PAXTON:  Well, Judge, I trust the jury to --

25  their recollection.  I think that's what's really important

1  here.

2  THE COURT:  So let's move to the next question.

3  MR. PAXTON:  Absolutely, Your Honor.

4  BY MR. PAXTON:

5  Q    So when you came back -- when school started in August of

6  2014 --

7  A    Right.  August 20-something is when we usually start,

8  yes.

9  Q    Did you immediately reach out to the fraternity to talk

10 with them about this situation?

11 A    Not immediately.  I think it was early September.  We had

12 a couple of more meetings when the school year started.  I

13 asked Nicole again, "Where is Jackie in this process?"

14 Jackie was, at that point, not willing to do anything

15 more, not willing to start the police investigation again.  I

16 was aware of a conversation I had had with Dave Chapman -- who

17 is the prosecutor for Charlottesville, the Commonwealth's

18 attorney -- in a hazing case a couple years earlier, one or

19 two years earlier.

20 And Dave had told me that he was very concerned about me

21 tipping off people that were about to be part of a criminal

22 investigation.  And that was part of what I had sought counsel

23 about in June.

24 And so I continued to say, okay, what can I do here?  And

25 I don't want to interfere with a police investigation, but if

this individual, Jackie, is never going to work with the

police, then there's never going to be a reopened criminal

investigation.  And so I may be tipping off Phi Psi, you know,

and interfering with a police investigation that may come in

the future, but I'm running out of options here.

     And so we had several conversations at the beginning of

the school year that ultimately led to Ms. Davis and

Ms. Lampkin agreeing with me that I could reach out to the

national fraternity.

Q    And so that also happened during the same time period

that you learned that Ms. Erdely was coming to campus to

conduct interviews, correct?

A    I think I had known that -- I think you-all have shown me

in the past, in my deposition.  I think I had known that in

July.  But, yeah, sure, I knew that was going on.

Q    Right.  And, in fact, we showed earlier some e-mails

that, as of September 9, you knew she was actually coming very

soon because she was trying to arrange an interview with

Dean Eramo, correct?

A    Sure.  That's possible.  I don't remember linking the two

in my mind, because I had been very focused on this case since

May, April, when Nicole told me Phi Psi.

Q    And the first call that you made to anyone at Phi Psi was

on September 12; is that correct?

A    I knew it was early in September, so that's probably

right.

My recollection is I called -- I e-mailed first and then called Shawn Collinsworth, who is the chief executive officer of Phi Psi national fraternity.

Q   And as part of that, ultimately what happened is the national fraternity sent someone to campus?

A   Yes.  I told him, having worked at a fraternity myself in the 1980s, at a headquarters of my own fraternity, I told him, "Don't send somebody junior.  This is very serious.  I want you to send somebody senior."

And I think they sent the number two person on his staff within a matter of days.

Q   And you were not able to meet with him because of the Hannah Graham situation, so Ms. Eramo helped him; is that correct?

A   That is correct.

Q   And is it your understanding that at the meeting that took place at the chapter house while that representative from the national was here, that the details of what Ms. Eramo knew was shared with the fraternity in as much detail without giving the names?

A   I wasn't at the meeting.  I believe the director of fraternity and sorority life was there.  I think Nicole was there.  I just can't remember.  I'm sorry.  But I know Nicole met with this individual.  I think there were multiple

meetings, because there was a later meeting where some alums

may have been involved.  I met with the leadership of the

chapter.

So my timeline isn't real good, but I know I called the

CEO of the national fraternity, told him that I had concern

about a pattern of sexual assaults by multiple males occurring

in that house, that I had no complainant but that I might in

the future.  I gave him dates -- 2010, 2012, 2014, January

'14 -- and said I want you to send somebody down here because

I don't have the police involved, I can't execute a search

warrant, I can't look and see if they have group chats and

those kinds of things in the fraternity, but you potentially

can, and can you come down and do that right away.

Q    And so, by this point in September of 2014, you knew or

at least could have known that the attacker that was reported

to have been involved in the January 24, 2014, event had

likely graduated if he was a fourth-year man at that time?

A    As I've said to you previously in my testimony, I don't

remember thinking about that piece of it.  I was very focused

on having these people put in jail and shutting down the

fraternity.

Q    And so you asked the fraternity to conduct an

investigation of itself; is that right?

A    On those issues that I just mentioned to you, which is to

come in and figure out if there were text group chats, those

1    kinds of things that the fraternity had access to, because

2    that had come up in a hazing case involving Sigma Nu, that the

3    national had been able to access a group chat that showed the

4    gentlemen talking about what was going on, and that was the

5    evidence I needed to shut them down.

6              MR. PAXTON:  Looks like we need a break.

7              THE COURT:  Yes.

8              So, ladies and gentlemen, we'll take our second

9    midmorning break.  Looking ahead, I'll again ask that while

10   you're away from us, you do not discuss the case with one

11   another, do not permit anyone to discuss it with you.  I'll

12   ask the witness not to discuss his pending testimony with

13   counsel from either side.

14             Let's plan to return at 25 after the hour.

15             Ask the marshal to declare the court in recess.

16   (Recess)

17   (Jury in)

18   (Open court as follows:)

19             THE COURT:  I see the ten jurors are in their

20   places, ready to move forward.

21             Mr. Paxton, you may continue.

22             MR. PAXTON:  Thank you, Your Honor.

23             THE WITNESS:  May I ask one thing?  I'd like to

24   supplement a prior answer during the break that I thought

25   about, something I didn't say.

BY MR. PAXTON:

Q     We're here to get the truth.

A     Thank you, sir.  I agree.

       Sometime in that period after Jackie had come to Nicole
in April/May -- April of 2014 and then the police meetings,
Detective Via and Sergeant Harris came to see me.  That's how
I had their contact information to give to Ryan when he came
to see me in December.

       And I told them the only witness name that I had ever
been given was Jackie's and that I urged them to use --
because of FERPA, I couldn't give them my Advocate system.
But I told them if they served us with a search warrant -- or
a subpoena, that we would turn the whole thing over to them.

       So I met with those two officers myself personally.  And
I failed to mention that to you.

Q     And do you recall that that occurred sometime in late
April or early May?

A     My best estimate would be that it was either -- it
definitely was between the April 22 and May 1st, or shortly
after May 1st.  It wasn't much further than that.

Q     I'm going to shift gears.  Thank you very much.

A     Certainly.

Q     One of the things that you had mentioned earlier in your
testimony was that the policy of the university changed from
the 2011 policy that we were talking about.  And I believe

1  your testimony was it changed in March of 2015.

2      Is that your recollection?

3  A    I think so.  I know there was the 2011 policy, July '11;

4  there was an interim policy; and then there was ultimately the

5  policy that we have today.

6          MR. PAXTON:  Okay.  Mark this and this.

7          MS. MOODY:  Defendants' 77 and 78.

8          THE COURT:  77?

9          MS. MOODY:  Yes.  And 78.

10          THE COURT:  Tell me what 76 was.

11          MR. PAXTON:  77, Your Honor, is --

12          THE COURT:  76.

13          MS. MOODY:  76 was the 10-13 e-mail thread between

14  Eramo --

15          THE COURT:  Oh, yeah.

16          What's 77, Mr. Paxton?

17          MR. PAXTON:  The executive summary of the policy

18  changes.

19          THE COURT:  Thank you.

20          MR. PAXTON:  And 78 is the interim policy.

21          THE COURT:  Thank you.

22  BY MR. PAXTON:

23  Q    This only has one sticker on it.

24  A    Thank you.  Thank you.

25  Q    Dean Groves, can you identify what has been marked as

1    Defendants' Exhibit 75 as the executive summary of the policy

2    changes that took effect in March?

3    A    I think you mean 77.

4    Q    77.  Sorry.  That's correct.

5    A    Yes.  At some point we posted on the website an executive

6    summary and the new policy.  And 77 appears to be what you got

7    if you clicked on the link for the executive summary, and 78

8    appears to be the full interim policy.  I think they were

9    separate links that you could highlight to and click onto on

10   the website.

11   Q    And Deposition 78, which is the interim policy, on the

12   first page indicates it's 50 pages long; is that correct?

13   A    Yes.

14   Q    And if you compare that to the Defense Exhibit 45, which

15   was the sexual misconduct policy that I believe we've been

16   talking about, that was 18 pages; is that correct?

17   A    Yes.

18   Q    And so Deposition Exhibit 77 is an executive summary of

19   the various changes that were made in the policy; is that

20   right?

21   A    Give me one moment.

22   Q    Sure.

23   A    I believe that to be right, but it's been a while since

24   I've seen this.

25        Yes.  We had put the draft policy out for public comment,

kind of like federal rule-making is done in November, and I

see they reference that. They talk about the various federal

guidance that been issued so that people were aware of that.

And then there's a summary of key changes from the prior

policy to this interim policy. Yes, sir.

             MR. PAXTON: And just for the record, Your Honor, I

have this terrible habit of saying "deposition exhibit"

because I do that a lot more than I am in court.

             THE COURT: Everyone does these days.

             MR. PAXTON: Yeah. So I apologize for that. So it

is defense exhibit, not deposition exhibit.

BY MR. PAXTON:

Q    Now, if you look at the first page of the executive

summary --

             MR. PAXTON: Your Honor, I move these into evidence.

             THE COURT: 77 and 78 without objection.

(Defendants' Trial Exhibits 77 and 78 admitted)

BY MR. PAXTON:

Q    If we can pull up -- it's DTX49.

     If you'll look -- while he's doing that, Dean Groves, if

you'll look at the second paragraph of the executive summary.

A    That begins "The development of"?

Q    Yes, yes.

A    Okay.

Q    The last sentence of that says, "It also reflects the

expertise of Pepper Hamilton, a national firm retained by the university to provide consultation and guidance in this endeavor."

Is it your understanding that the University of Virginia, after the article came out, hired Pepper Hamilton to give them advice?

A    With the caveat that I don't know when that happened, because it would have been done by the general counsel's office or someone else.  And with the caveat that Gina Smith, the principal in this area, who's considered one of the national experts on this, I had met her previously and spoken with her at conferences.

With those two caveats, there's no question that the university retained Pepper Hamilton during this time frame.  I just can't remember when that retention was made because I wasn't involved in it.

Q    Gina Smith is one of the lawyers from Pepper Hamilton. Is that what you're --

A    It was Gina Smith and Leslie Gomez, I think is her last name.  Yes.

Q    But they'd never been hired by the University of Virginia prior to the -- to give advice on a policy that you were responsible for prior to this article coming out; is that correct?

                    MR. CLARE:  Objection.  Foundation.

1    THE COURT:  I think that's -- what's to come may be

2  of some concern, but I think that's fine.

3    The witness may answer.

4    THE WITNESS:  I don't know.  The general counsel's

5  office would be the place that would retain them under a

6  privilege, I assume.  And nobody consulted with me about this,

7  even at this time, so I don't know.

8  BY MR. PAXTON:

9  Q    But it was important for the university in this -- in

10  this policy -- were you involved in helping to put this

11  together?

12  A    I don't think so.  Just like the other policy, Susan

13  Davis would have been working with Gina Smith and our in-house

14  attorneys.  And at some point someone would have shared a

15  draft with me.  And I don't believe I changed anything because

16  it was essentially prepared at that point.

17  Q    So based on that, your interactions with Ms. Smith and

18  your knowledge of Pepper Hamilton, you would agree with the

19  description here that they're a national law firm that has

20  expertise in this area?

21  A    Yes.  They have been quoted many times in the press and

22  have worked with many schools.

23  Q    They were the lawyers that handled the Baylor University

24  coaching situation, right?

25  A    I think they've handled -- I think Gina told me at one

1    point they were representing, I don't know, 50, 60 schools.

2    Yeah.

3    Q    And so if you turn to the second page, the draft policy

4    was put up for comment.  And I believe, if this report is

5    accurate, the university received 568 responses during the

6    time period that this policy was up.

7    A    I have no reason to dispute that, no.

8    Q    Okay.  And so if you'll turn now to Defendants'

9    Exhibit 78, which is the interim policy.

10        This was the policy that took effect in late March of

11   2015 and remained in effect until the permanent policy which

12   you currently have in effect was adopted in July; is that

13   correct?

14   A    Yes.

15   Q    If you'll turn to page 7 of that document.

16        Do you see here under this interim policy in March of

17   2015 that Nicole Eramo was named as the deputy Title IX

18   coordinator for students?

19   A    Yes.

20   Q    So that was the position you'd held under the old policy,

21   correct?

22   A    Yes.

23   Q    And she'd not had that responsibility prior to this

24   interim policy coming out, correct?

25   A    She had not had that designation, correct.

Q    And so this was an important role for the university,
correct?

A    Yes.

Q    And so you had testified during Mr. Clare's questioning
that there was a time period when Ms. Eramo was at least
temporarily removed from dealing with students in the intake
area; is that right?

A    Permanently.  But yes.

Q    Well, at this point she's now being put back in charge of
that entire process, correct, of intake and making sure that
complaints are handled properly?

A    She's been given the oversight role but has been told
that she is not to actually conduct the intake herself.

Q    It's not your testimony, though, that she never did any
intake after November of 2014, is it?

A    I'm trying to think.  I thought I had a conversation with
her where I said that intake would be handled by the deans on
call.

     So somebody is on call in my office 24 hours a day, 7
days a week.  So an assistant, an associate dean, has
responsibility for Thursday to Sunday and Monday to Thursday.
And that person is tasked with handling any incidents that are
reported to us by the police or from students or others.

     The exception, up until the Rolling Stone article, was
sexual misconduct.  The sexual misconduct report came into the

university; the dean on call channeled it always to Nicole.

After the story came out, the instruction was that the deans on call were to handle those intakes themselves and the -- at this point we also had the special assistant for the honor committee, Alex Carroll, now Alex Hall, who was serving as a case manager to triage all of those.

Q   But if Ms. Eramo testified that she did have involvement in the intake area through November of 2015, you would defer to her testimony?

A   If she said she was doing some intake, that's -- she would know better than I would.

Q   Right.  Under this policy, she was given the most important job in terms of overseeing how the university was handling Title IX compliance when it came to student issues, correct?

A   Yes.  I had kept her in full responsibility, as she always had been, for all of our prevention work, which had really ratcheted up.  I had talked to the board of visitors in the fall about that, so had Ms. Davis.  So we were really ratcheting up a lot of the prevention efforts that we were doing.

So as being deputy Title IX coordinator, I saw Nicole's role as being all of the prevention work and oversight to make sure we were handling these things correctly during that window of time.  I felt that that role should shift from me to

her because she had been the one that really was paying the

close attention to it, and I felt that that role was correctly

put with her.

Q    So, in effect, that was a bit of promotion for her.  From

just doing intake, she now was in charge of much more,

correct?

A    I would say that she had added some responsibilities,

lost some responsibilities; but regrettably, I didn't pay her

anymore.  Yes, that's right.

Q    So she got a pay raise in July?

A    In July she got an increase during the regular cycle.

That's right.

Q    Right.  And she continued in the role as Title IX deputy

coordinator when the policy became effective in July of 2015

and became the permanent policy, correct?

A    Right.  During this time, during this spring period, we

had recognized that we were going to hire a stand-alone

Title IX office.  That was part of the advice that we were

getting from Pepper Hamilton.  And so we were going to create

an office that would do nothing but handle these Title IX

cases.

And so the person that was hired to be the new Title IX

coordinator started in August of '15.  And then as soon as she

hired her two deputies, we moved out of this work entirely,

and we began to do nothing but support and prevention work,

```
 1   and all of the case handling was done by the Title IX office.
 2   Q    So when you use the word "we" --
 3   A    Dean of students.
 4   Q    -- you're referring to dean of students?
 5   A    Dean of students office.
 6   Q    If we can pull up Defense Exhibit 57, please.
 7        This is an article from the Cavalier Daily introducing
 8   the first full-time Title IX coordinator, which you just
 9   mentioned.  And do you see there -- actually, let's go to the
10   bottom of the page, if we can, where it begins, "Associate" --
11   do you see "Associate dean of students Nicole Eramo said in an
12   e-mail statement" --
13   A    Okay.  I'm sorry.  I see it.  Yes.  In the bottom.
14   Q    "She will remain in her capacity as Title IX coordinator
15   of students alongside Hodge."
16   A    Yes.  Until Ms. Hodge, I think, hired the two deputies,
17   which happened sometime over the course of that fall, that is
18   correct, as I said earlier.  At this point it's just Ms. Hodge
19   who has come.  It ends up being a team of three people.
20   Q    And all of that responsibility is outside the dean's
21   office, correct?
22   A    All of the case intake.  So, for example, I had someone
23   come to see me this week, didn't tell me why, came into my
24   office, and explained that it was one of these cases.
25        I first said -- I'm giving you kind of a way of how it
```

1   works now.

2       I said, "I'm the responsible employee.  I want you to

3   understand that this won't be confidential, whatever you're

4   about to tell me."  And this person understood that.

5       The person then gave me the information.  And then what I

6   did is said, "Okay.  I'm going to document this into Advocate,

7   which will trigger the case manager to notify the Title IX

8   office, who will also see it, and they will then unassign me

9   from the case and take over responsibility."

10      The Title IX office now does the investigations.  The

11  Title IX office now handles all of the adjudication work and

12  the sanctioning.  The Title IX office issues the no-contact

13  directives and the interim remedial measures.  The only role

14  that we play now in this is to provide support to the student

15  who has brought it forward and support to the student who is

16  the respondent, the accused student in the process, and to do

17  all of the education across the university and outreach.

18      So, for example, last night the Title IX deputy

19  coordinator and I conducted a Title IX training for an

20  athletic team.

21  Q    And so under that change, for Dean Eramo to have

22  continued as the Title IX coordinator, she would have had to

23  leave the dean's office; is that correct?

24  A    She would have to go to work in the Title IX office.

25  That's right.

Q    Right.  And so what you've just described of someone

coming to you to report their sexual assault, or whatever the

situation was --

A    In this case, misconduct, but yes.

Q    Right.  And so -- but that's true of any professor on

campus.  They can go to them, and that's exactly the same

situation, correct?

A    Yes and no.  Yes, they would be required to then put it

into the Just Report It system.  They don't use Advocate the

way I have the ability to use Advocate.  Right?

       But, yes, we have an online portal now called Just Report

It that used to be only for bias reports that we expanded to

include reports of sexual misconduct and hazing.

       And so when you go to Just Report It now, there's a

picture of President Sullivan and kind of a narrative, and you

can choose which of those you're putting in.  And part of what

we have trained the faculty to do is to go to that website if

a student says to them, "I was raped" or "I'm being stalked or

harassed," and that they are then to put it into the system in

that manner.

       And the Title IX office will then be pinged to know to

respond to that and that my office will know that we're to

reach out and provide support.

Q    And so once that happens, in your case, did you go

through all the list of options that were available?

1  A     Not anymore, no.  What I told them was we have an

2  infographic that was put together.  So it's an infographic

3  that talks about all of their options.  We're told to give

4  them the infographic and to tell them that the Title IX office

5  will be in touch with them and that we are available for any

6  support they need, a referral to counseling services, those

7  kinds of things.

8       And when I meet with the responding student, the Title IX

9  office will call that person in and ask me to be there.

10  That's going to change at some point, but right now for any

11  respondent, the Title IX office has asked me to be the support

12  person, and the deans on call are handling the students who

13  are bringing the reports, because they're dealing with that

14  student when the student walks in.

15       I'm never on call.  So I'm the one person that we know is

16  never going to have had contact with the reporting student.

17       The hope and plan is that that is going to change at some

18  point.

19  Q     And so one of the things from your testimony -- we

20  haven't really talked about it, but there was an investigation

21  of the way the University of Virginia was complying with

22  Title IX that was ongoing during the time period of 2011 up

23  until September of 2015; isn't that true?

24  A     Yes.

25  Q     And part of what they were -- the federal government was

looking at was whether the policies that the University of

Virginia had were compliant with the legal requirements?

A     That was my recall, yes.  This is the only thing I'm

looking at that I brought today, because it's been so long

ago, the letter that they wrote us.

"OCR's review will examine the university's policies and

grievance procedures regarding sexual harassment and sexual

assault and will examine the training the university provides

its staff to handle these complaints."

Q     And what is that document?  We probably need to mark

that.

A     That's all right.  That's a July 15, 2011 -- because I

just couldn't remember anymore -- letter.

MR. CLARE:  Your Honor, this document has been the

subject of a pretrial ruling.  The scope of inquiry about it

has been addressed previously.

THE COURT:  Ladies and gentlemen, the Court has

dealt with a number of matters in this case, the admissibility

of evidence, on a pretrial basis.  And one of the rulings that

I made is that a number of the documents that deal with events

after the publication of the article, after the investigation

of Jackie's allegations, after the main part of the case had

closed down are not really important for your consideration.

They have some relevance in deciding what the timeline of the

case is -- remember, I spoke to you about the timeline at the

outset -- but have no independent relevance.  The

Charlottesville police report fell in that category; the OCR

report falls in this category as well.

So while I'm allowing you to know the bottom line,

the determination of the investigating agency for purposes of

both reports, it was the Court's rule that the reports

themselves have very little bearing on the findings that you

need to make in this case.

So with that limiting instruction, the questioning

can continue, but I agree that the letter is not admissible,

nor is the report itself.

MR. PAXTON:  Well, and I believe --

THE WITNESS:  I apologize, Your Honor.  I'll leave

that alone.  I didn't --

THE COURT:  You had no way of understanding what the

Court's rulings have been.

MR. PAXTON:  The only reason that I asked to have it

marked is I believe he said it was a 2011 document, not the

later document.  But that's --

THE COURT:  Does it verify something that the report

itself doesn't?  If it just evinces some indication that the

investigation was going to begin, then I see it has no real

importance.

MR. PAXTON:  I agree.  I just -- for the record, I

wanted to offer that as an exhibit.

1          THE COURT:  Objection sustained.

2    BY MR. PAXTON:

3    Q    So, Dean Groves, from the time that you received the

4    letter that you referred to in 2011, or at least were made

5    aware of that letter, there was an ongoing investigation by

6    the federal government into how the university was compliant

7    with its Title IX obligations?

8    A    Yes, right.

9    Q    And would you agree with me that UVa was not doing enough

10   to respond in a timely and efficient manner to reports of

11   sexual assault under the 2011 policy when the student elected

12   not to pursue criminal charges or the disciplinary process at

13   the university?

14   A    Would I agree that we were not doing enough?

15   Q    Right.

16   A    No.

17   Q    And would you agree that the Office of Civil Rights

18   disagreed with you on that issue?

19   A    Ultimately?

20   Q    Yes.

21   A    Yes.

22   Q    And that included a determination as to how the

23   university had handled its responses to cases where no formal

24   charge was brought and no criminal charge was involved either?

25          MR. CLARE:  I think we're getting into the area of

1 subfindings that was discussed in the Court's pretrial

2 rulings.

3          THE COURT:  I agree.

4          MR. PAXTON:  Okay.

5 BY MR. PAXTON:

6 Q    There's been testimony from Ms. Eramo that the Office of

7 Civil Rights found that she had created a hostile work

8 environment -- or hostile environment for students based on

9 the WUVA interview that was broadcast; is that correct?

10 A    Am I aware of that?

11 Q    Yes.

12 A    Yes.

13 Q    And that fact became known in the public.  In other

14 words, it was reported in the newspapers and around; is that

15 correct?

16 A    It was put into the public domain.

17 Q    Right.

18 A    It got nothing like the attention your client's article

19 did.

20 Q    Let's back up for that for just a minute.

21      You mentioned earlier that, after the article came out,

22 you actually were provided a link, I think, to the full

23 interview with WUVA?

24 A    Yes.

25 Q    And that CNN had run an issue about that; is that

1  correct?

2  A    I believe I was told that, yes.

3  Q    And do you recall that CNN actually contacted you and/or

4  the university to interview Ms. Eramo about the contents of

5  that interview?

6  A    I don't remember them contacting me.  If they did, I

7  would have sent it to Anthony or Dave.  If they did, I would

8  have forwarded it on to public affairs.

9       The only request that I remember getting was one from

10 Time magazine that wanted to interview Nicole and me after the

11 article ran, and I declined that and sent it on to the public

12 affairs folks.

13      But I was interviewed by NBC 29 and the Daily Progress,

14 the local media.

15 Q    Can we pull up Defense Exhibit 55, please.  DTX312.

16      Let's start at the top of the e-mail, since that's what

17 you're copied on.

18      This is an e-mail exchange from November 25, 2014.  And

19 you see that you're copied on this?

20 A    I'm looking.  I'm sorry.  Yes, yes, yes.

21 Q    Okay.  And so at the bottom, there is an e-mail from CNN

22 saying that they are "working on a story about the situation

23 with UVa regarding sexual assault on campus and would really

24 love to include your voice.  We've seen the overwhelming

25 support for you" -- this is addressed to Ms. Eramo -- "from

students, alumni, and others and feel it's important to hear
from you.  We'd like to do an on-camera interview today if
possible."

And so this was the first request that you had gotten; is
that correct?

A     No.  The first request to be interviewed after the
Rolling Stone piece?

Q     Right.

A     No, not to my knowledge.  I think the local media were
pretty fast in asking the president and I to give interviews.

Q     And so if you look at Ms. Eramo's response, which she
copied you on, "I'm getting more requests like this one.  I
know it's a ploy to get me in front of cameras and to get me
to say something I probably shouldn't.  And I do" --

A     I see that.  I guess her line "I'm getting more requests
like this one" tells me this might not have been the first,
but I -- but yes.

Q     And then it says, "That said, I do feel like I could
convey my passion and care for this work and dispel some of
the absolute vitriol that is being said about me right now
because of that stupid WUVA student project."

A     I see that.

Q     And so on November 25, Ms. Eramo was concerned about
addressing the issue of the WUVA interview, correct?

A     That's what it seems to say here, yes, absolutely.

Q    And did she appear -- was she given permission to talk to
CNN?

A    I don't recall another e-mail, but I know she never did
appear on CNN, and I'm pretty confident that public affairs
said no.  But I don't think that I was ever told that; I just
know it never happened.

The only interviews that I'm aware of were the ones that
the president and I ended up giving.

Q    Right.  There's one more line of questions, and then I'm
done.

A    That's quite all right.

Q    Now, after -- after the article came out, you were aware
that Jackie met with the police?

A    I'm trying to think.  I'm sorry.

Q    Sure.  No, sure.

A    I know -- I'm sure you have this date.  There was a date
where the president announced that she was asking the
Charlottesville police to -- essentially sua sponte to
investigate it.  Because I remember -- there were so many
things in the Rolling Stone article that I had never seen or
heard on Jackie's case, that the 20th, I started looking into
some of those facts that were in the article.

I pulled, for example, the anthropology course roster.
She said the young man was in her anthropology course and that
it was hard for her to go back to the class.  I pulled the

roster.  It was a very small class, less than ten males.  I

pulled the Phi Psi roster from 2012, and there were no

matches.

     But then I was immediately told to stand down because the

police were going to take this case.  So I know -- I just

can't remember how fast, but I think it was pretty fast, that

the president asked the Charlottesville police to take it.

Q    In fact, it was the same day as the article?

A    That may be, because I know when I started looking into

it on the 20th I was told to stop.

Q    So prior to the article coming out, everybody that you

knew at UVa believed that Jackie's story was true?

A    Prior to the Rolling Stone article coming out?

Q    Right.

A    Yes, I think that's -- well, strike that.

     I can't speak for everybody at UVa.  I believed that it

was true.

Q    And as far as you could tell from Ms. Eramo, she believed

it was true as well, based on your interactions with her?

          MR. CLARE:  Object.  It calls for speculation.

          THE COURT:  We've been letting witnesses testify as

to their sense and impression, so I think it's fair to let the

dean do so as well, if he can.  If he can't, he can say so.

          THE WITNESS:  Thank you, sir.

          Yeah, I don't recall prior to the article Nicole

1  expressing doubts to me.

2          I do remember, when I met with the student

3  leadership of Phi Psi -- there were four or five of the young

4  men that came in to see me in September after I had called in

5  the national office and then I called those student leaders

6  in.  And when I walked them through the allegations -- having

7  been a trial lawyer for a long time, I'm a reasonably good

8  judge of a witness, or at least I believe that I am -- they

9  seemed genuinely stunned and shocked and overwhelmed by what I

10  was telling them.  And I had told them that something like

11  this had happened multiple times, somebody must have talked

12  about it, somebody must have said something.

13          And then -- so I know that they seemed -- that was

14  one thing I will tell you.  They seemed stunned.  And these

15  were young men who were fourth-years, meaning they had been

16  third-years when that alleged January incident had happened.

17  And at UVa, third-years tend to be the ones that live in the

18  fraternity house.  So they would have been, in some cases, the

19  young men living in that house at that time and seemed

20  genuinely stunned and shocked by what I was telling them.

21          That was the only thing prior to the publication, in

22  my mind, that had caused me to say that's odd; that they

23  genuinely seemed overwhelmed and stunned.

24  BY MR. PAXTON:

25  Q    But as you've testified, it didn't change your belief

1 that the allegation was likely true?

2 A    No.  I still believed at that point it was true.

3 Q    And so -- but you did become aware that Jackie refused to

4 cooperate with the police; isn't that true?

5 A    Probably not until Chief Longo had his press conference,

6 because the police weren't updating me.  If they were updating

7 others -- I know at some point -- I think it was Chief Longo,

8 wasn't it, that said she declined to cooperate with us?  But I

9 don't remember if anybody told me that before.

10 Q    You were designated as an official representative for the

11 university to testify on certain matters at your deposition in

12 this case.

13 A    Yes.  Last spring, yes.

14 Q    And as part of that, you were designated to testify about

15 communications between the university and Jackie about this

16 issue, correct?

17 A    I may have been.  I know I didn't read all of the text

18 messages between Laurie -- Dean Casteen, Laurie Casteen, and

19 Jackie.  Laurie was supporting Jackie.  So I've never read

20 through all of those, no.

21 Q    And do you recall at your deposition that you were shown

22 a communication from the university to Jackie -- Jackie's

23 lawyer, with a proposed statement for Jackie to sign?

24 A    Oh, yes.  You and I talked about it this morning as well,

25 yes.  Yes.

Q    Right.  Let me show you what's been marked as Defendants'
Exhibit 79.

A    Yes.

Q    Is this a communication from the University of Virginia
to Jackie's lawyer on December 17, 2014?

A    Yes.  As I told you this morning outside the province of
the jury when you asked me about this, yes, Rick Kast, at this
time, was an associate general counsel at the university, one
of the university's attorneys.  And while I didn't see this at
the time, I was shown this in my deposition.  And as I said
then, I believe, and as I told you this morning, I have no
reason to believe this wasn't sent by Rick Kast to Jackie's
attorney on the date and time noted.

Q    All right.  And you were aware, were you not, that the
university was attempting to get Jackie to sign a statement to
try to clear up some of the confusion that people had about
her story?

A    Yes.

Q    And this was that communication, as far as you know?

A    Yes.

          MR. PAXTON:  Move admission of this exhibit, 79.

          THE COURT:  Let's see.  79, without objection.

(Defendants' Trial Exhibit 79 admitted)

          MR. PAXTON:  If you'd publish this to the jury.

BY MR. PAXTON:

1   Q    And this is DTX36.  Turn to the second page.

2   A    And, again, Counsel, just so the record is clear -- I

3   don't want the jury confused -- I didn't author this, nor did

4   I see it at the time, but I've been shown it since then.  And,

5   yes, I know who these people are at the university.  Yes.

6        MR. PAXTON:  And if you turn to the second page,

7   Scott.

8   BY MR. PAXTON:

9   Q    The first paragraph of this would be a statement that

10  says "The account in the November 19, 2014, Rolling Stone

11  article 'A Rape on Campus, a Brutal Assault and Struggle for

12  Justice at UVa,' does not accurately reflect what I told the

13  writer of the story, Sabrina Rubin Erdely."

14       That was a statement that the university was asking

15  Jackie to agree with; is that correct?

16  A    That's what this appears to me to be, yes.

17  Q    Do you know if -- did Jackie or her lawyer ever agree

18  with this statement?

19       MR. CLARE:  Object on foundation grounds.  I think

20  the witness has already testified he wasn't involved in this

21  exchange.

22       THE COURT:  It's a different question.  The witness

23  can answer if he knows.

24       THE WITNESS:  Thank you, Your Honor.

25       I have no idea.  I never saw it if it was agreed to.

1  BY MR. PAXTON:

2  Q    Okay.  Were you aware at the time that, if Jackie had

3  signed this statement, or one like this, that the university

4  intended to release it to the public?

5       MR. CLARE:  Same objection.

6       THE COURT:  Same ruling.  If he knows, he can

7  answer.  If he doesn't know, he can say so.

8       THE WITNESS:  I do not know because I wasn't

9  involved in this transaction, this communication.

10      MR. PAXTON:  Thank you.  You've been very patient

11 with my questions.  Thank you very much.

12      THE WITNESS:  You're quite welcome.

13                REDIRECT EXAMINATION

14 BY MR. CLARE:

15 Q    Thank you again, Dean Groves.  I'll try to be brief.

16      Mr. Paxton asked you a series of questions about a draft

17 article that was apparently being prepared for the UVa alumni

18 magazine.  Do you recall those questions?

19 A    Oh, I do.

20 Q    And he asked you a series of questions about the

21 decision-making around why that article was published.  Do you

22 recall generally that, those questions and the answers that

23 you gave?

24 A    Yes.  I was asked why the article never ran.

25 Q    And based on your involvement in those discussions, did

1  the reasoning for why the article never ran, or the

2  discussions that were had about that issue that you were

3  involved in, did any of them involve a desire by the

4  university not to talk publicly about issues related to campus

5  safety or sexual assault?

6  A    No.  As I mentioned earlier, I had used the 36 or 38

7  number in conversations with parents of incoming students that

8  previous summer of 2014.  And I thought we had talked --

9  there's video of it on the web -- when we presented to the

10  board of visitors about all the new initiatives we were trying

11  to undertake.

12  Q    Mr. Paxton asked you a series of questions about Madison

13  Lane.  Do you recall that?

14  A    Yes.

15  Q    And he asked you a series of questions about fraternities

16  that sit on Madison Lane.  Do you recall that?

17  A    Yes.

18  Q    And, in particular, the ones that have the name "phi" or

19  "psi" in the name of the fraternity.

20      Do you recall that?

21  A    Phi was the word, yes.

22  Q    Phi was the word.

23  A    Yes.

24  Q    And you testified in response to his question that it

25  depended on how you defined Madison Lane or the Mad Bowl area.

1   And Mr. Paxton asked you just about the fraternities that were

2   on Madison Lane.

3       If you were to expand that geography to include what is

4   colloquially referred to as the Mad Bowl area, what would

5   happen to the number of fraternities that would include that

6   denomination?

7   A    You would add -- there were three fraternities on the

8   other side of Mad Bowl that face it in a little U.  They

9   include, Chi Phi, Sigma Phi, and Kappa Sig.  So two of those

10  have "Phi" in the name.

11  Q    Mr. Paxton asked you a series of questions --

12  A    And I should -- I'm sorry.  I should finish that

13  question.  I apologize.

14      When Jackie reported the bottle-throwing to Dean Eramo,

15  the two fraternities that she believed might be responsible

16  were Phi Kappa Psi and Sigma Phi, which is known as "Surf."

17  Q    And both of those are located on Mad Bowl?

18  A    Sigma Phi faces Mad Bowl from the west; Phi Psi sits at

19  the end of Mad Bowl on the north.

20  Q    Mr. Paxton asked you a series of questions about these

21  anonymous allegations that Jackie had reported from other

22  women about assaults on -- that allegedly occurred at the Phi

23  Kappa Psi house.

24      Do you recall him asking you those questions in the

25  testimony?

A      I do.

Q      In describing your decision-making or in thinking about

your decision-making as it relates to those anonymous reports,

and also Jackie's report, given her willingness to go forward

or not go forward, what role, if any, does the concept of due

process play in those considerations?

A      As I mentioned -- maybe not articulately enough for the

jury, and I apologize -- but when I said I have to be able to

prove a case, I have to be able to make a case, the students

who are charged with any misconduct are entitled to due

process.  As a public institution, we are governed by the U.S.

Constitution.  The Constitution only applies to state actors,

meaning the state and federal government.  We are the state,

unlike a private school like Duke, so we are required to

provide appropriate procedural due process to students.  And

the way we interpret it, also organizations that are accused

of misconduct.

        So when I said earlier my frustration, that built to

anger, over the fact that I was not being given the facts that

I needed to be able to make the case and prove that case,

that's what I was talking about.  Because I couldn't simply

shut them down without being able to make a case, and I

certainly couldn't go after an individual student without

being able to make the case.

        As I also said, my hope, when all of this was disclosed

to me, was that individuals would be criminally prosecuted.
And I remember, when I read the Rolling Stone article, you
know, part of my frustration was Ms. Erdely appeared to have
been given all sorts of names of witnesses and people that
were allegedly involved in this that were never, ever given to
us.

Q    Mr. Paxton asked you a series of questions about media
requests that Ms. Eramo and maybe others in your office had
received about the WUVA interview from CNN and other national
outlets.

     Do you recall that testimony?

A    I do.

Q    Prior to publication of the Rolling Stone article "A Rape
on Campus," had you or anyone in your office, to your
knowledge, received media inquiries from a national outlet or
otherwise asking about that WUVA interview?

A    I had not, and no one in my office told me they had.

Q    Mr. Paxton asked you a series of questions designed to
elicit a timeline of various steps that you and your office
took relative to Jackie's allegations and the timeline of your
knowledge of the Rolling Stone article and when Ms. Erdely was
on campus.

     Do you recall generally that testimony?

A    Yes.

Q    What role, if any, in your own words, did the fact that a

Rolling Stone reporter was asking questions and pursuing a

possible article play in any aspect of your handling or your

office's handling of Jackie's allegations?

A     None.  I mean, I was cognizant, as I've said before, I

think in the summer, that Rolling Stone was looking at an

article.  It was described in different ways at different

times.  But no.

Q     I want to look at one document that Mr. Paxton showed

you.  It's DTX71, if you can pull that up briefly.

Do you recall that -- Dean Groves, that this is a series

of e-mails from September of 2014 relating to the

decision-making around whether Ms. Eramo would participate in

an interview with Rolling Stone?

Do you recall that?

A     Yes.

Q     And this is dated September -- your e-mail was dated

September 9, 2004, approximately two months before publication

of the article.

A     I'm trying to do the math in my head.  Yes, you're right.

Q     And in your e-mail you said "The description of

hypotheticals, OCR, specific cases, et cetera, leads me to

believe this is a hatchet job."

Do you recall in September of 2014 predicting that the

Rolling Stone article would be a hatchet job?

A     Yes.

1   Q    And as you sit here today, two years after the

2   publication of "A Rape on Campus" and everything that's come

3   from it, how would you evaluate your prediction?

4   A    You remember from my deposition, I don't like talking

5   about that article and the impact it had on a lot of people.

6        The summer after, the summer of '15, I remember sitting

7   with the head of the counseling center, and he said to me --

8              MR. PAXTON:  Your Honor --

9              THE COURT:  I'm going to sustain that objection.

10             MR. PAXTON:  It's a simple answer.

11             THE WITNESS:  Well, I'm sorry, sir.  It mattered a

12  lot in my life.

13             But the short answer is, yes, I think it was a

14  hatchet job.

15             MR. CLARE:  Thank you, sir.  Those are all the

16  questions I have for you.  Appreciate your being here.

17             THE COURT:  Let me ask you then, Dean, in response

18  to that last question, having read "A Rape on Campus," do you

19  believe that the central theme of the article was to attack,

20  critique, suggest change in the victim choice policy in

21  handling sexual assault complaints at the University of

22  Virginia, and perhaps other universities as well?

23             THE WITNESS:  No, sir.  And I can only speak to my

24  interpretation of the article.

25             THE COURT:  That's fine.

1          THE WITNESS:  When I read it that morning and I read

2     it subsequently, I thought it -- and it's funny, because I

3     actually read it again a few weeks ago knowing that I would

4     testify.  And I hadn't read it in a long time.

5          And, in hindsight, I look at it now and I say it was

6     so over the top that how -- how did people believe it?  How

7     did I get caught up in that moment and feeling so traumatized

8     by it?  Because I read it, and still to this day read it, as

9     designed to make an almost comic demonization of the people

10    that were trying to do this work at universities.

11         I mean, the interposition of quotes from, you know,

12    critics of sexual assault handling around the country, the way

13    in which I was described -- which I have always said was false

14    and wrong -- the way Ms. Eramo was described -- which I've

15    testified in my deposition was ten times worse than what I

16    got -- I thought it characterized us as indifferent, as,

17    indeed, intentionally misleading the university community, as

18    distracting students from pursuing their rights, preventing

19    people to be held accountable for this.

20         And I know in my heart and in my mind, sir, that

21    that is not true.

22         THE COURT:  Any other questions of this witness,

23    Mr. Paxton?

24         MR. PAXTON:  Just one.  Hopefully, one.

25         THE WITNESS:  That's all right.  I'm here, so...

RECROSS-EXAMINATION

BY MR. PAXTON:

Q    On several occasions, you expressed kind of a level of frustration and anger that Jackie had not wanted to provide more information to the university prior to the article coming out.

A    Yes, sir, absolutely.

Q    But under the policy that the university had, that was -- she had the absolute right to do that; isn't that true?

A    She did.

Q    And that's the issue of victim choice, correct, that she had the right to choose, and that limited what the university could do, from your perspective; is that right?

A    Yes, sir.  She had the right to say "I'm not going to cooperate with you and help you with this."

        But as I've testified earlier in response to one of your questions, sir, when you're making the kind of allegations she was making and you're not providing the university with information that you later provided to a reporter, so that we could interview witnesses and try to do something, I remained frustrated by that, yes, sir.

Q    But at the time, that was the way the policy was set up, and she was within her rights to do so, correct?

A    And she would be within her rights today to do so, because we allow students to say -- we can't coerce them into

testifying and providing information.  We don't have that
authority.

      MR. PAXTON:  Thank you.

      THE WITNESS:  You're welcome, sir.

      THE COURT:  Any other questions of this witness?

      MR. CLARE:  No, Your Honor.

      THE COURT:  May the witness be excused?

      MR. CLARE:  Yes, he may.

      THE COURT:  You may stand down.  Thank you.  Thank
you for your time.

      THE WITNESS:  Thank you, Your Honor.

      THE COURT:  You're excused.

      Ladies and gentlemen, at this time, we'll have our
lunch recess.  I would again ask that while you're away from
the court, you not discuss the case with one another nor
permit anyone to discuss it with you.

      Let's plan to return at 1:30.

      Ask the marshal to declare the court in recess for
lunch.

(Lunch recess)

                        CERTIFICATE

   I, JoRita B. Meyer, certify that the foregoing is a
correct transcript from the record of proceedings in
the above-entitled matter.

/s/ JoRita B. Meyer               Date: 10/26/16