Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

1

1          UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF VIRGINIA

3            CHARLOTTESVILLE DIVISION

4

5    ********************************
     NICOLE P. ERAMO,              * CIVIL ACTION 3:15-CV-00023
6                                  * OCTOBER 26, 2016
               Plaintiff,          * TRIAL DAY 9, VOLUME 2
7    vs.                           *
                                   *
8    ROLLING STONE, LLC,           *
     SABRINA RUBIN ERDELY,         * Before:
9    WENNER MEDIA, LLC,            * HONORABLE GLEN E. CONRAD
                                   * UNITED STATES DISTRICT JUDGE
10            Defendants.          * WESTERN DISTRICT OF VIRGINIA
     ********************************

11

12

     APPEARANCES:
13

     For the Plaintiff:      THOMAS ARTHUR CLARE, ESQUIRE
14                           ELIZABETH MARIE LOCKE, ESQUIRE
                             ANDREW CLAY PHILLIPS, ESQUIRE
15                           JOSEPH R. OLIVERI, ESQUIRE
                             Clare Locke, LLP
16                           902 Prince Street
                             Alexandria, VA 22314
17

18   For the Defendants:     ELIZABETH ANNE McNAMARA, ESQUIRE
                             ALISON SCHARY, ESQUIRE
19                           SAMUEL M. BAYARD, ESQUIRE
                             Davis Wright Tremaine, LLP
20                           1251 Avenue of the Americas, 21st Flr.
                             New York, NY 10020
21

22   Court Reporter:     Lance A. Boardman, RDR, CRR
                         c/o JoRita B. Meyer, RMR, CRR
23                       210 Franklin Road, S.W.
                         Roanoke, Virginia 24011
24                       540.857.5100, Ext. 5311

25       Proceedings recorded by mechanical stenography;
     transcript produced by computer.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

2

1

APPEARANCES (Continued):

2

For the Defendants:      W. DAVID PAXTON, ESQUIRE
3                            J. SCOTT SEXTON, ESQUIRE
                            TREY SMITH, ESQUIRE
4                            MICHAEL J. FINNEY, ESQUIRE
                            Gentry Locke Rakes & Moore
5                            P. O. Box 40013
                            Roanoke, VA 24022

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

3

INDEX

WITNESS:                                                    PAGE:

LAURIE D. CASTEEN

        DIRECT EXAMINATION BY MR. CLARE..........    8

        CROSS-EXAMINATION BY MR. PAXTON..........   22

ALEXANDRIA PINKLETON

        DIRECT EXAMINATION BY MR. CLARE..........   26

        CROSS-EXAMINATION BY MS. MCNAMARA........   46

SEAN WOODS

        DIRECT EXAMINATION BY MS. LOCKE..........   77


                        *****

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

4

1               INDEX OF EXHIBITS

2

3   FOR THE PLAINTIFF:                              PAGE:

4   Plaintiff's Exhibit 159 marked for identification...    6

5   Plaintiff's Exhibit 160 marked for identification...    6

6   Plaintiff's Exhibit 161 marked for identification...    6

7   Plaintiff's Exhibit 162 marked for identification...    6

8   Plaintiff's Exhibit 163 marked for identification...    7

9   Plaintiff's Exhibit 164 marked for identification...    7

10  Plaintiff's Exhibit 165 marked for identification...    7

11  Plaintiff's Exhibits 159 through 165 admitted into

12  evidence.........................................    8

13  Plaintiff's Exhibit 166 marked for identification...    74

14  Plaintiff's Exhibit 167 marked for identification...    75

15  Plaintiff's Exhibit 168 marked for identification...    75

16  Plaintiff's Exhibit 169 marked for identification...    75

17  Plaintiff's Exhibit 170 marked for identification...    75

18  Plaintiff's Exhibit 171 marked for identification...    75

19  Plaintiff's Exhibit 172 marked for identification...    75

20  Plaintiff's Exhibit 173 marked for identification...    75

21  Plaintiff's Exhibit 174 marked for identification...    75

22  Plaintiff's Exhibit 175 marked for identification...    75

23  Plaintiff's Exhibits 166 through 175 admitted into

24  evidence.........................................    76

25  Plaintiff's Exhibit 176 marked for identification...    77

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

5

1                    INDEX OF EXHIBITS

2

3   FOR THE DEFENSE:                               PAGE:

4   Defendants' Exhibit 80 marked for identification....   53

5   Defendants' Exhibit 80 admitted into evidence.......   54

6   Defendants' Exhibit 81 marked for identification....   56

7   Defendants' Exhibit 81 admitted into evidence.......   56

8   Defendants' Exhibit 82 marked for identification....   70

9   Defendants' Exhibit 82 admitted into evidence.......   70

10

11  COURT EXHIBITS:

12

13

14

15                       * * * * *

16

17

18

19

20

21

22

23

24

25

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

6

1            (The jury is present in Open Court at 1:34 p.m.)

2            THE COURT:  All 10 jurors are back and in their

3    places ready to continue.

4        You may call the next witness, Mr. Clare.

5            MR. CLARE:  Thank you, Your Honor.  Before we call

6    our next witness, Mr. Phillips has a couple of housekeeping

7    issues to move some documents into evidence and some

8    transcripts.

9            MR. PHILLIPS:  Some designations related items.

10       Deposition for Kathryn Hendley.

11            THE CLERK:  Deposition for Kathryn Hendley.  It's

12   159.

13            (Plaintiff's Exhibit 159 marked for identification.)

14            THE CLERK:  And the associated transcript will be

15   160.

16            (Plaintiff's Exhibit 160 marked for identification.)

17            MR. PHILLIPS:  Designated transcript for Mr. Duffin,

18   Ryan Duffin.

19            THE CLERK:  Mr. Duffin's deposition transcript will

20   be -- or video will be 161.

21            (Plaintiff's Exhibit 161 marked for identification.)

22            THE CLERK:  And the transcript 162.

23            (Plaintiff's Exhibit 162 marked for identification.)

24            MR. PHILLIPS:  We have a disk and transcript for

25   Jackie.  The disk is solely the audio that was played.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

7

1          THE CLERK:  The audio disk of the designation is

2    163.

3          (Plaintiff's Exhibit 163 marked for identification.)

4          THE CLERK:  And the transcript as designated is 164.

5          (Plaintiff's Exhibit 164 marked for identification.)

6          THE CLERK:  Did you want to associate these back

7    into the original ones, like 149A and B?

8          THE COURT:  What's 149A and B?

9          THE CLERK:  It's the sealed video deposition.

10         THE COURT:  No, it's not necessary.

11         THE CLERK:  Okay.

12         MR. PHILLIPS:  Finally, we have a transcript for

13   Emily Renda.  The disk of the video is previously marked and

14   admitted.

15         THE CLERK:  Okay.  The transcript for Renda

16   designation would be 165.

17         (Plaintiff's Exhibit 165 marked for identification.)

18         MR. PHILLIPS:  Thank you.

19         THE COURT:  All right.  So 159, 160, 161, 162, 163,

20   164, and 165.  It's the Court's recollection that 159 and 161

21   are coming in over the Defendants' objections in part.  And

22   then as to the remainder of the proposed exhibits, all the

23   others are without objections.

24         MR. PAXTON:  I think that would be right, Your

25   Honor, except for the transcripts which would also contain the

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

8

1    information in 159 and 161.  They would reflect those same

2    objections.

3            THE COURT:  That's fine.  And they will so reflect.

4        Are counsel satisfied that the -- that 163 and 164 are

5    not being admitted in contravention of the Court's protective

6    order?

7            MS. LOCKE:  Yes, Your Honor.

8            MR. PAXTON:  It's our understanding that there's no

9    personal identifying information on them.

10           (Plaintiff's Exhibits 159 through 165 admitted into

11   evidence.)

12           MR. CLARE:  Thank you, Your Honor.

13       Plaintiff will call as her next witness, Laurie Casteen.

14                         - - - - -

15                    LAURIE D. CASTEEN,

16   being first duly sworn, testifies and says as follows:

17                    DIRECT EXAMINATION

18   BY MR. CLARE:

19   Q   Miss Casteen, we met this morning.  My name is Tom Clare.

20   I'm one of the lawyers representing Nicole Eramo in this

21   lawsuit.  I'm going to have a few questions for you this

22   afternoon.

23       Would you please introduce yourself to the jury and state

24   your full name for the record.

25   A   Certainly.  My name is Laurie D. Casteen.  I'm associate

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

9

1    dean of students for the University of Virginia.

2    Q    And maybe could you pull the microphone a little bit

3    closer so the court reporter can hear you.  Thank you.

4        I think you said it but just again, how are you currently

5    employed?

6    A    I'm associate dean of students at the University of

7    Virginia.

8    Q    And how long have you been in the position of associate

9    dean of students?

10   A    Let's see, I believe seven years, eight years.

11   Q    And very briefly, would you just describe what your

12   responsibilities were as associate dean of students in the

13   fall of 2014?

14   A    Sure.  There were several of us associate deans.  We all

15   provided generalist and crisis support to students on a whole

16   range of activities ranging from small concerns to very

17   serious concerns, and responded to evening and weekend crises

18   as well.

19   Q    Thank you.

20       Did you have occasion to meet with a third-year UVA

21   student named Jackie in November of 2014?

22   A    Yes, I did.

23   Q    And in November 2014, was that the first time that you

24   had had any interaction with Jackie?

25   A    That's correct.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

10

1 Q    How is it that you came to meet with Jackie in November

2 of 2014?

3 A    She came accompanied by another student, Sara Surface.

4 They arrived in the office at the very end of the workday and

5 said that they needed to meet with me pretty urgently.  So my

6 colleague assistant brought them to my office.

7 Q    Did they have an appointment to meet with you that day?

8 A    They did not.

9 Q    Did you make a record of your meeting with Jackie in the

10 Advocate system that the jury has heard about?

11 A    Yes, I did.

12        MR. CLARE:  All right.  If we could pull up, Brian,

13 Plaintiff's Trial Exhibit 9, the November 10th, 2014, entry.

14 Q    And this is not an eyesight test, so we're going to pull

15 up the November 10th, 2014, entry.  And because there is some

16 acronyms and abbreviations and things in this notation, I'm

17 going to ask you to read it aloud.  And if you come across an

18 acronym while you're reading, if you would just explain what

19 it refers to.  So can you please read this entry aloud?

20 A    Sure.  LDC -- which refers to me, Laurie D. Casteen --

21 met with the women who reported that they had been to CAPS --

22 which is counselor and psychological services -- and had just

23 met with Michael Mason, and that he had recommended that they

24 meet with LDC -- me -- in order to provide a buffer to Nicole

25 Eramo in light of the pending Rolling Stone article.  Blank

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

11

1  had some concerns about her conversation with the fact checker

2  and worried that the article would completely misconstrue her

3  perspective.  Blank stressed her support for Nicole Eramo and

4  talked about how incredibly supportive Nicole Eramo had been

5  to her throughout, and that he was -- that's a typo on my

6  part -- that she was terrified that the author was trying to

7  do a hack job on Nicole Eramo to try to get her fired.  Blank

8  had visited Nicole Eramo that morning and had cried and told

9  her how worried she was about Nicole, and Nicole told her that

10  she had no reason to worry or feel guilty and that she had not

11  done anything wrong and that whatever the author decided to

12  write is the author's concern, not for blank to worry about.

13  LDC -- me -- reiterated this and stressed that Nicole's first

14  priority is the students and not herself.

15  Q    Now, several times in that description that you just

16  referenced there is a blank, and we've obviously redacted out

17  in the written document the name of the student.  But is the

18  person that you're referring to there in that entry as blank,

19  is that Jackie?

20  A    Correct.

21  Q    And is that description that you just read a fair and

22  accurate description of your conversation with Jackie on

23  November 10th, 2014, in terms of what she said to you and what

24  you said back to her?

25  A    Yes, it is.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

12

1   Q    What observations did you make about Jackie's demeanor

2   during that November 10th meeting with her?

3   A    She was crying on and off, she was panicked, she was

4   anxious, she was very, very nervous.  She was worried,

5   fretting I guess I would say.

6   Q    And what did she tell you was the impetus or the cause

7   for those feelings displayed during that meeting?

8           MR. PAXTON:  Your Honor, I believe this would be

9   hearsay.  She's asking what Jackie told her.  She's read in

10  her report.  I'm not sure she needs to be allowed to testify

11  about what the witness said.

12          MR. CLARE:  I think it goes to the witness's state

13  of mind in terms of the -- what she did in response to this

14  information, how she responded to it.

15          THE COURT:  Well, she can tell what she did in

16  response to the information she received from Jackie.

17  Q    Let me come at this maybe a different way.

18      In the Advocate note that you just read to us, you said

19  that these two women just met with someone in the CAPS

20  counseling center; is that correct?

21  A    Correct.

22  Q    And you made a notation that said that the gentleman from

23  CAPS had recommended that they meet with you in order to

24  provide a buffer to Nicole Eramo in light of the impending

25  Rolling Stone article.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

13

1      What did you mean by that when you wrote that note?

2  A    I think because we -- she had come to understand that the

3  article was going to portray Nicole in a way that was unfair

4  and derogatory, and she was concerned about Nicole's

5  well-being.  And given that --

6           MR. PAXTON:  Your Honor --

7           THE COURT:  Mr. Paxton wants to reassert his

8  objection.

9           MR. PAXTON:  Yes.

10          THE COURT:  It probably has some merit given what

11 the witness is saying.

12      So the Court will sustain the objection, ask the jury to

13 disregard the portion of the answered we received and have

14 counsel repose the question.

15          MR. CLARE:  Sure.

16 Q    And just again, limiting to the university's perspective

17 on this, in terms of what was the university's perspective or

18 your understanding of what it meant to provide a buffer to

19 Nicole Eramo in light of the impending Rolling Stone article?

20          THE COURT:  Not what someone told you you were

21 supposed to do.  Just state your understanding of your role

22 after this development occurred.

23 A    I'm sorry.  My role --

24 Q    After these young women --

25          THE COURT:  You were asked to serve as a buffer.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

14

1  Q    Yes.

2  A    Correct.  To take some of the pressure off of Nicole in

3  light of the impending article.

4  Q    Okay.  And are the statements attributed to you here in

5  this Advocate note in terms of what you told Jackie how she

6  should think about this situation, is that accurate?

7  A    Correct.

8  Q    All right.  I'm going to -- let's pull up the next part

9  of -- the next entry.  Would you please read this highlighted

10  note as well.

11      This is a continuation of the same meeting; is that

12  correct?

13  A    That is correct.

14  Q    All right.  If you'd please read this portion of the

15  Advocate note.

16  A    LDC -- again, that's me -- asked her about whether or not

17  she had any safety concerns for when the article was released,

18  and she said she wasn't sure but possibly so.  LDC discussed a

19  breadth of safety issues with her and stressed the importance

20  of having a low bar for any risk and contacting police ASAP if

21  she had even the slightest concern of threat to her safety.

22  LDC offered to bring in Sex, Lies and Phys Ed Ben Rexrode from

23  UPD -- university police department -- who had assisted blank

24  before.  She agreed that she did want to talk to him and LDC

25  together later that week.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

15

1  Q    And was that a fair and accurate description of a portion

2  of your meeting about the possibility of meeting with Officer

3  Rexrode?

4  A    Yes, it is.

5  Q    And were you aware at the time that you met with Jackie

6  that Jackie and Nicole Eramo had previously met with Officer

7  Rexrode in 2014 regarding a physical assault and Jackie's

8  sexual assault?

9  A    Yes, I was.

10  Q    And how were you made aware of that?

11  A    We had discussed it slightly in the office.  We're aware

12  of one another's cases to some degree.  Certainly I believe I

13  may have asked her to confirm that she had met with him, and

14  she said yes, I know him and he is someone we bring in for any

15  safety concerns.

16  Q    Let's take a look at the next portion of the entry,

17  please.  And I'm going to ask you to read this aloud as well.

18  A    She agreed that she did want to talk to him and LDC

19  together that week.  She expressed appreciation for assistance

20  and said she felt much better but was just nervous, not

21  knowing what the article would say and fearing it would have

22  taken her words out of context based on things the fact

23  checker asked her about that blank said she had not said.  LDC

24  stressed the importance of her being able to tell her story

25  and to help future survivors and not to worry about the rest.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

16

1  Q   And is that description that you just read a fair and

2  accurate description of that portion of the meeting in terms

3  of what Jackie said to you and what you said back to her?

4  A   Yes, it is.

5  Q   Did you, in fact, meet with Jackie and Officer Rexrode a

6  few days later to discuss safety issues relating to the

7  upcoming release of the Rolling Stone article?

8  A   Yes, we did.

9  Q   And would you just tell us briefly about what you recall

10 about that meeting?

11 A   Sure.  We talked about her housing situation, whether or

12 not she had roommates, any safety concerns she had with

13 respect to the security of her home, potential media

14 attention.  If she were to receive any threats from anyone,

15 direct or indirect, and how to respond to those threats,

16 whether they were directly to her or whether they were written

17 threats.  He talked with her about being mindful of her

18 surroundings and who to contact and how to contact emergency

19 support if she felt that she was in danger at any time.

20 Q   During that meeting with Officer Rexrode, did Jackie

21 provide any information to Officer Rexrode and/or you

22 regarding her sexual assault, any other information?

23 A   We did not discuss the incident in question at that time,

24 no.

25 Q   Did you have occasion to meet with Jackie on November

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

17

1   19th, 2014, the day that the Rolling Stone article came out?

2   A    I couldn't recall the exact date that I met with her.

3   Q    Do you recall meeting with Jackie on or shortly after the

4   Rolling Stone article was published?

5   A    Yes.

6   Q    And that would have been your third meeting with Jackie;

7   is that correct?

8   A    Correct.

9   Q    The first one would have been the first one we looked at

10  together on November 10th.  The second one was the meeting

11  with Officer Rexrode.  And then this would be your third

12  meeting with Jackie; is that correct?

13  A    Correct.

14  Q    All right.  Let's take a look at the Advocate entry for

15  November 19th, 2014.  I'm going to ask you to read this in

16  just a moment.

17       But do you recognize this as the entry that you made in

18  the Advocate database system reflecting a meeting that you had

19  with Jackie and communications that you had with Jackie on the

20  day that the Rolling Stone article was published?

21  A    Yes, I do.

22  Q    All right.  Would you please read the highlighted portion

23  for us.

24  A    LDC -- again, that's me -- contacted blank to ask if she

25  could meet that afternoon, parenthesis, since the article had

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

18

1    dropped earlier than expected, closed parenthesis.  Blank

2    agreed and came in at 4 p.m.  She seemed in pretty good

3    spirits but is definitely agitated about the article having

4    been out.  She felt better about the content than she had

5    worried that it would be but was still flustered because she

6    felt it was not fair to Nicole Eramo.  LDC stressed again not

7    to worry about that but to focus on her feelings and any

8    concerns that she had.

9    Q    Is that entry in Advocate a fair and accurate summary of

10   your meeting with Jackie on the day that the article dropped

11   in terms of what she said to you and what you said to her?

12   A    Yes, it is.

13   Q    All right.  If we could look at the next piece of that

14   entry, please.  If you could read the highlighted portion as

15   well.

16   A    LDC reported that City Police were seeking to do any

17   investigation and wanted to know that was going to on.  Typos

18   on my part.  She was a bit worried, and LDC offered to arrange

19   for a meeting with legal aid attorney to help blank understand

20   her rights in this situation and whether or not she could be

21   compelled to talk or testify if she decided not to.  She was

22   relieved about that idea and readily agreed to do that.  LDC

23   assured her that she would be with her every step and would

24   happily attend all meetings with her to support her if she

25   wanted, and she indicated that she definitely wanted LDC with

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

19

1   her at all meetings related to this case.

2   Q    Okay.  And again, the person, the blank in all these

3   entries that we've been looking at, those are references to

4   Jackie; is that correct?

5   A    Yes, it is.

6   Q    And the CPD investigation that's referred to here in your

7   Advocate note, was that the investigation that University of

8   Virginia President Teresa Sullivan had requested immediately

9   after the publication of the article?

10  A    That's correct.

11  Q    And what was Jackie -- what observation did you make of

12  Jackie's reaction to the news that the Charlottesville Police

13  Department were seeking to do an investigation?

14  A    She was upset, she was nervous.  She wanted to know if

15  she had to participate, what her role had to be in that.  And

16  it was -- she told me that she didn't want to if she didn't

17  have to.

18  Q    And I understand from your note here that you offered to

19  put Jackie in touch with an attorney in order to assist her

20  with that investigation; is that correct?

21  A    That's correct.

22  Q    And did you, in fact, do that?

23  A    I did.

24  Q    And who was the attorney that you put her in touch with?

25  A    Palma Pustilnik from the Legal Aid Society in

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

20

1    Charlottesville.

2    Q    And did you have any further contact with Jackie after

3    you put her in touch with Miss Pustilnik?

4    A    I did.

5    Q    Okay.  And what was that?

6    A    I went with Jackie and with Miss Pustilnik to meet with

7    the Charlottesville city police, and then Jackie and I

8    continued to communicate via text for several months following

9    that time, focusing on support for her.

10   Q    And your focus was to provide support for her during that

11   process?

12   A    That's correct.

13   Q    Would you describe the meeting that you attended, please,

14   with Miss Pustilnik, Jackie, and the Charlottesville Police

15   Department that was part of that investigation?

16   A    Certainly.  They shared with her -- the city police

17   shared with her what they were trying to accomplish, shared

18   with her her rights in that situation, and she made clear that

19   she declined to comment.  And most of that came through her

20   attorney, Miss Pustilnik, although she did verify that those

21   were her wishes.

22   Q    Your notes that we've looked at together, do these

23   Advocate notes reflect the assistance, putting her in touch

24   with the lawyer and other assistance that you were providing

25   to Jackie during this time period?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

21

1  A    Yes, they do.

2  Q    And then what other assistance -- you made reference to

3  support and that sort of thing.  What assistance generally

4  were you personally and the university in general providing to

5  Jackie in this period after the publication of the Rolling

6  Stone article?

7  A    Sure.  We focused very early on on academic support.  She

8  was under a great deal of stress when the article was about to

9  come out and then when it did.  And so we communicated with

10  her academic dean to communicate with her faculty to ask for

11  any leniency they might be able to provide in deadlines,

12  timelines, things of that nature.  She was panicked about her

13  schoolwork.  We certainly made referrals to counseling,

14  encouraged her to continue to seek emotional support from

15  trained professionals.  I checked in with her several times a

16  day via text to ask her how she was doing, because her moods

17  were very much up and down and she was typically in a panicked

18  state when I communicated with her.

19      We worked with the police to talk about safety issues.

20  She'd expressed concern about reporters or others around her

21  home.  So I was in regular contact with the university police

22  to make sure that there were regular patrols of her home and

23  that area.  Some similar support for her roommates in her home

24  at that time.  So it was primarily focused on emotional

25  support, security, and academic support.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

22

1  Q    At any point during those interactions, did Jackie share

2  with you, or with anyone else in your presence or part of the

3  communication, any additional information about her sexual

4  assault?

5  A    No.

6          MR. CLARE:  Thank you, Miss Casteen.  Those are all

7  the questions I have.  Mr. Paxton will have some questions for

8  you.

9          THE WITNESS:  Certainly.

10                    CROSS-EXAMINATION

11  BY MR. PAXTON:

12  Q    Hi, Miss Casteen.

13  A    Hi.

14  Q    My name's David Paxton, as Mr. Clare indicated.  I

15  represent the defendants.  Just a few questions.

16      I take it when you met with Jackie for the first time on

17  November 10, you found her to be credible?

18  A    Credible, yes, sir.

19  Q    You took all of her concerns seriously?

20  A    I did.

21  Q    In fact, she was a very compelling witness when she

22  talked about her -- what was going on in her life from her

23  perspective?

24  A    Yes.

25  Q    All right.  But you have no way of knowing what she was

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

23

1  telling Sabrina Erdely or the fact checker at the Rolling

2  Stone, do you?

3  A    The specifics, no.

4  Q    All right.  And isn't it true that it was quite possible

5  that Jackie was saying something quite different to the fact

6  checker at Rolling Stone and Sabrina Erdely at the same time

7  she was telling you something different?

8           MR. CLARE:  Objection.  Calls for speculation.

9           THE COURT:  It's true.  The point's been made.

10          MR. PAXTON:  Thank you.

11 Q    One of the points in the article involved a student by

12 the name of Stacy.  Does that name ring a bell to you?

13 A    Yes.

14 Q    And Stacy's case was an intake case that Dean Eramo

15 handled and then you chaired the sexual misconduct board; is

16 that correct?

17 A    That's my recollection.

18 Q    And isn't it true that the article portrayed that Stacy

19 was upset with the outcome of her participation in the

20 university process?

21          MR. CLARE:  Your Honor, I'm going to object.  This

22 is beyond the scope.

23          THE COURT:  You know, given the way that the

24 witnesses have unfolded, I think I have to overrule that

25 objection.  If she's going to answer the question at some

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

24

1    point, it might as well be now.

2           MR. PAXTON:  Thank you.

3    A    To be honest with you, I don't recall in detail from the

4    article exactly what Stacy referenced.  That was not my focus

5    in the article, so I don't recall the details of what was --

6    exactly what was said regarding her case.

7    Q    Okay.  And so, but it is true you chaired the hearing or

8    the information was heard and a sanction was awarded; is that

9    correct?

10   A    That is correct.

11   Q    And she appealed that because she was unhappy with the

12   sanction that was awarded?

13   A    That's my recollection.

14   Q    And as the chair of the sexual misconduct board, you got

15   to comment on her appeal; is that correct?

16   A    That is correct.

17   Q    And that's true of whoever serves as the chair of the

18   sexual misconduct board for that particular hearing, right?

19   Correct?

20   A    That's correct.

21   Q    And in fact, you supported no increase in the sanction

22   that was awarded at the original hearing; is that correct?

23   A    I couldn't recall without seeing the documents that I

24   submitted.

25           MR. PAXTON:  Your Honor?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

25

1   Q   Let me show you a document which was marked PX 365.  I'm

2 not intending to offer this, but I want to see if reviewing

3 this refreshes your recollection.

4     (Witness reviewing document.)

5     Does that refresh your recollection?

6   A   Yes, it does.

7   Q   And so it is true, is it not, Dean Casteen, that when

8 Stacy appealed her sanction, you submitted a response that

9 opposed any increase in the sanction; is that right?

10   A   That's correct.

11       MR. PAXTON:  Those are all the questions, Your

12 Honor.

13       MR. CLARE:  I have nothing further.

14       THE COURT:  May the witness be excused?

15       MR. CLARE:  Yes.

16       THE COURT:  Miss Casteen, you may stand down.

17 You're excused.  Thank you for your attendance today.

18       THE WITNESS:  Thank you.

19       MR. CLARE:  Plaintiff calls as her next witness

20 Alexandria Pinkleton.

21    We caught the witness in a spot where I can't retrieve

22 her, but she is on her way.

23                - - - - -

24            ALEXANDRIA PINKLETON,

25 being first duly sworn, testifies and says as follows:

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

26

1      THE CLERK:  Have a seat.

2                    DIRECT EXAMINATION

3  BY MR. CLARE:

4  Q    Good afternoon, Miss Pinkleton.  My name is Tom Clare.

5  I'm one of the lawyers representing Nicole Eramo in this

6  action.  I'll have a couple of questions for you.

7       Could you state your full name for the record, please?

8  A    Alexandria Pinkleton.  Alex.

9  Q    You go by Alex?

10 A    Yes.

11 Q    And where did you go to college?

12 A    So I just graduated from the University of Virginia.

13 Q    And just graduated here in 2016?

14 A    Yes.

15 Q    And where do you live now?

16 A    So I live in Charlottesville.

17 Q    Any plans for further education?

18 A    Yes.  I plan on going to law school.

19 Q    Are you familiar with the Rolling Stone article "A Rape

20 On Campus"?

21 A    Yes.

22 Q    And were you a source, one of the sources, for that

23 article, for Ms. Erdely's work?

24 A    Yes.  I was interviewed for the article.

25 Q    And were you quoted in the article?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

27

1    A    Yes.

2    Q    And as a source for the article, did you have occasion to

3    interact with the author of that piece, Ms. Erdely --

4    A    Yes.

5    Q    -- Sabrina?

6         And over what period of time did you interact with

7    Ms. Erdely as a source for the article before it was

8    published?

9    A    So I first talked to her in August.  I was on vacation in

10   Costa Rica.  And then I texted with her and one time met up

11   with her for dinner.  And, yeah, that was pretty much our

12   interactions.

13   Q    So you said starting in August of 2014, and then "A Rape

14   On Campus" was published in November of 2014.  So over that

15   four-month period, how many times or how often did you

16   interact with her, roughly?

17   A    A dozen times, probably a little bit more.

18   Q    And how did you interact with her?

19        You told us you had an in-person meeting, which we'll

20   talk about a little bit later, but how else did you interact

21   with her?

22   A    Text message, e-mail, phone calls.

23   Q    I want to talk about those meetings and interactions in a

24   bit, but before we get into that, what involvements did you

25   have on your time at UVa as a student?  What involvement did

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

28

1   you have on the campus that in your mind were relevant to the

2   work that Ms. Erdely was doing?

3   A    Okay.  So I was outreach chair for One Less at UVa, which

4   is a sexual assault prevention and advocacy group on grounds.

5   And I also was involved with Take Back the Night, which is a

6   week-long series of survivor events.  And at that time I had

7   just been part of the rally committee.

8   Q    Part of the what committee?

9   A    Rally committee.

10  Q    And what's that?

11  A    So there's a rally before the vigil each year, and so I

12  was helping plan that.

13  Q    And your reference to vigil, that's the vigil that's held

14  at the end of Take Back the Night week?

15  A    Yes.

16  Q    In those areas that you've just described in terms of

17  your involvement on campus with outreach and Take Back the

18  Night and the rally committee and so forth, did you have

19  personal, firsthand experience dealing with Nicole Eramo?

20  A    Yes, I did.

21  Q    And would you describe what interactions you had with her

22  and how you had gotten to know her during your time as a

23  student at UVa?

24  A    Yes.  So I first joined One Less in my first year, and I

25  had heard about Dean Eramo through that organization.  So I

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

29

1   already knew that a lot of people in the advocacy community

2   respected her and thought a lot about her.

3       So I don't remember how many times I had seen her at that

4   point.  She probably had given us a presentation as part of

5   our training.

6       But the first one-on-one contact I had with her was in

7   the spring of 2014.  I had disclosed -- or reported my assault

8   online, and she had been e-mailing with me trying to get me to

9   come in and talk to her about that incident.  So eventually I

10  did.  So that was my first encounter with her.

11      And from then on she became a huge support for me, was

12  always available.  I ended up babysitting for her son.

13      So, yeah, I trusted her a lot, and my experiences were

14  always positive with her.

15  Q   And in terms of the work that you were doing on campus in

16  the advocacy community and with One Less and the rally and

17  Take Back the Night and all the things that you've been kind

18  enough to tell us about this afternoon, were those the things

19  that you had spent at least some of your time talking with

20  Ms. Erdely about?

21  A   Yes.

22  Q   And why did you feel it was important to share your

23  experiences doing those things with Ms. Erdely for her work?

24  A   So when I was talking to Sabrina, I was talking about the

25  rape culture.  I wanted that -- I wanted a piece that would

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

30

1  talk about the nuances of rape culture, because one of the

2  most difficult things in the advocacy community is to talk

3  about, you know, what about the cases where there's alcohol

4  involved or coercion, or what are the factors that are

5  influencing the rape culture at UVa, so that we could reach a

6  point of talking about prevention, because that's something

7  that we hit heavily upon.

8      So, yeah, my goal in all of that was just to raise

9  awareness about what we're dealing with and why it's so

10  difficult to combat this issue.  And that was my main goal.

11  Q   You were kind enough to tell me earlier that you were

12  quoted in "A Rape On Campus."  I'd like to show you, and it

13  will be pulled up on your monitor screen so you can see it,

14  and we can give you a hard copy if you need it.

15      But I'd like to call up Plaintiff's Exhibit 1, which is

16  the Rolling Stone article at tab 1 in the jury books at page

17  73.  We'll blow up a portion of it for you to look at, Alex.

18      Is this the paragraph where you were quoted in "A Rape On

19  Campus"?

20  A   Yes.

21  Q   And if you could read the highlighted portion and just

22  confirm for me that that's a quote that was attributed to you

23  in the article?

24  A   It says, "'Hot girls who are drunk always get in.  It's a

25  good idea to act drunker than you really are,' says third-year

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

31

1   Alexandria Pinkleton, expertly clad in a UVa after-dark
2   uniform of a midriff-baring sleeveless top and shorts.  Also,
3   you have to seem very innocent and vulnerable.  That's why
4   they love first-year girls.'"
5   Q    Were you quoted accurately in this quote you just read to
6   us?
7   A    So I did say this.  This was part of our conversations.
8   But also, 90 percent of our conversations were about rape
9   culture in general, the factors that were influencing it.
10       I was talking to Sabrina as an advocate.  That's who I am
11  90 percent of the time.  10 percent of the time I might be
12  going out and I might be in a crop top.  It might be
13  midriff-baring.  That's also redundant.
14       So clearly she was trying to paint me as someone that I
15  wasn't, or I was at some times, but that's not who I was when
16  I was talking to her.  That's not what I thought this article
17  was going to focus on.
18       When she asked me to be in the article and was asking to
19  send pictures, I sent a picture of her with me in a One Less
20  shirt because I wanted to be in that article as someone that's
21  advocating for survivors, not as someone who was commentating
22  the on frat culture.
23  Q    How did it make you feel when you read the article and
24  saw yourself portrayed in the article that way?
25  A    I mean, obviously I was offended.  I was angry.  It also

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

32

1    is trying to draw a parallel between me and Hannah Graham,

2    because that was a huge topic of conversation.  She was

3    walking around in a black crop top.  Here's Alex Pinkleton who

4    also does that and is talking about, you know, how to get into

5    a frat.

6        I'm not expert in how to get into a frat.  I can get into

7    one.  But I consider myself more of an expert about how to

8    help survivors, and that was my main goal.  I wasn't in it for

9    my name to be in it and to be, you know, part of some cool

10   article or, like, cool girl.  That's not who I was talking to

11   her as.

12   Q    I'd like to shift gears, and we're going to talk about

13   the in-person meeting you had with Ms. Erdely.

14       You met with her when she came on campus here in

15   Charlottesville?

16   A    Yes.

17   Q    And just let's talk about the setting for that meeting.

18       Where did you meet with her?

19   A    Restaurant on the Corner.

20   Q    And what -- do you recall what time period this was?

21       If I told you it was in early September, is that

22   consistent with your recollection?

23   A    Yes.

24   Q    And you had dinner with her?

25   A    Yes.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

33

1  Q    And who else was present at that dinner?

2  A    So it was Jackie, Jackie's boyfriend at the time, and

3  Sabrina and myself.

4  Q    And was that in-person meeting the first time that you

5  had interacted with Ms. Erdely?

6  A    Yes.

7  Q    Had you had any -- had you been introduced to her before,

8  electronically over Skype or any other way?

9  A    It was Skype in the initial phone call, but it wasn't

10 visual.  Like we turned off the visual part of it, so it was

11 just audio.

12 Q    So was this in-person meeting that you had on September

13 the first time that you had ever spoken with her?

14 A    No.

15 Q    What do you recall at a high level the topics of

16 conversation at that dinner?

17 A    So we talked about, again, general rape culture, then

18 specific to UVa, what might be influencing that.  We talked

19 about Jackie's story some, and that's the main topics.

20 Q    Were you aware during your dinner that Ms. Erdely was

21 recording the conversation?

22 A    Yes.

23 Q    She let you know that?

24 A    Yes.

25 Q    I'm going to play for you an audio clip.  And we've

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

34

1    already heard -- everyone's already heard in this courtroom

2    the entirety I think of most of that dinner, or at least

3    portions of it.

4        So I'm going to play a clip for you.  I'm going to

5    represent to you that this was turned over to us in the

6    discovery, and this is a portion of the clip at dinner.  So

7    I'm going to it play aloud and put up the transcript of it on

8    the screen for you while we're listening to it.

9        And if you could just listen to it along, I'll have some

10   questions for you when we're done.

11           MR. CLARE:  This is, for the record, Plaintiff's

12   Trial Exhibit 24 previously admitted.

13           MR. SEXTON:  What page?  Do you know what page it

14   starts?

15           MR. CLARE:  Starts on 50, 5-0.  And that's PTX 25 in

16   the transcript.

17   Q    All right.  Alex, are you ready?

18   A    Yes.

19   Q    Okay.

20           (An audio recording was played at 2:13 p.m.)

21   Q    All right.  Alex, do you recognize your voice as one of

22   the voices on that recording we just heard?

23           MR. CLARE:  If you can leave the transcript up,

24   Brian.

25   A    Yes.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

35

1  Q    And the transcript that we've been looking at together,

2  you recognize your voice as having expressed concern about the

3  article and the way it may portray Dean Eramo; is that

4  correct?

5  A    Yes.

6  Q    And why did you raise that concern during the meeting?

7  A    So, like I was saying in that clip, she had made it clear

8  that she was going to write some negative things about Dean

9  Eramo.  I just wanted to make sure that that wasn't coming

10  from me because that wasn't my opinion.

11      And I wanted just to set myself apart from that, because

12  I was very critical of UVa and how they were dealing with

13  sexual assault prevention at the time, but Dean Eramo was not

14  part of that.  I thought that she was very much on our side,

15  very much an advocate that -- within the administration that

16  we could really depend on to help us create change and wasn't

17  someone that was a barrier to it at all.

18  Q    We heard on that recording that Ms. Erdely told you and

19  Jackie and the others at that meeting that Nicole should be

20  doing more for survivors at UVa.

21      Did you agree with that opinion that Ms. Erdely

22  expressed?

23  A    No.  I had always maintained the opinion that she did so

24  much for us.  I know for myself, she gave me her personal

25  number and she was available 24/7.  And I know I'm not the

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

36

1  only one that she did that for.  That's just how she was.  And
2  she was there for survivors 100 percent.
3  Q   And you expressed concern on that audio clip that you did
4  not want to be associated with that opinion in the article; is
5  that correct?
6  A   Correct.
7  Q   And Ms. Erdely said to you, "right, it can be me,"
8  meaning Ms. Erdely sort of just saying, like, all right, you
9  know, this woman should be doing more, you know, but not you
10  guys.  I mean you guys have never said anything to that
11  effect.
12      Do you recall Ms. Erdely saying "it can be me" --
13  Ms. Erdely -- saying that?  Do you recall her making that
14  statement to you?
15  A   She made that statement.  She made that throughout the
16  course of my interactions with her.  She maintained that that
17  would be her stance.
18      And again, we just -- Jackie and myself both wanted to
19  make sure that that was not our stance, because that's not
20  what we believed.
21  Q   And --
22          MR. CLARE:  All right.  You can take that down.
23  Thank you, Brian.
24  Q   The in-person meeting or dinner meeting that you had with
25  Ms. Erdely in early September, did you have occasion to speak

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

37

1  with her again or interact with her again electronically

2  between that evening and the night at the time the article was

3  published?

4  A    Yes.

5  Q    What -- generally, what topics were you discussing with

6  Ms. Erdely in that time period after in-person meeting but

7  before the article was published?

8  A    A lot of it was logistics about when the article would

9  come out.  A lot of it was also back and forth about whether

10 or not Jackie would be using her name in the article.

11 Q    And what -- what was your role in all of this?

12     Why were you communicating with Ms. Erdely about whether

13 Jackie's name would be used in the article and how she would

14 appear?

15 A    So I became kind of a liaison of sorts between Sabrina

16 and Jackie, because at some point Jackie was kind of tired of

17 all the text messages and contact.  She was --

18          MS. McNAMARA:  Objection, Your Honor.  To the way

19 she is --

20          THE COURT:  Stop.

21          MS. McNAMARA:  I'm sorry, Miss Pinkleton.

22     She started to testify about what Jackie believed, what

23 Jackie thought, what Jackie, you know, wanted.

24          THE COURT:  Yes.

25          MS. McNAMARA:  And that's, I think, outside of her

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

38

1  purview, Your Honor.

2          THE COURT:  You are correct.

3      Try to limit your testimony to what you know and

4  understand to be the facts of the case.

5          THE WITNESS:  Okay.

6  BY MR. CLARE:

7  Q    And in doing so, you can make reference to things that

8  Jackie told you, but try not to draw inferences without things

9  that were specific.

10      So anyway, you said you were serving as a liaison between

11  Jackie and Ms. Erdely.

12      Now, with those instructions in mind, go ahead and

13  continue, please.

14  A    Well, I'll be more specific.  That's what I meant, is

15  that Jackie was telling me that this is -- she felt that

16  she --

17          MS. McNAMARA:  Objection.  It's what she felt.  I

18  mean --

19  A    She was telling me that she felt --

20          MR. CLARE:  Hang on.  It's present-sense impression,

21  Your Honor, and it also goes to her state --

22          THE COURT:  I think the objection is well taken.

23      Try to raise another question to help the witness channel

24  her testimony.

25          MR. CLARE:  All right.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

39

1 BY MR. CLARE:

2 Q    Ms. Pinkleton, why did you, independent of what Jackie

3 said to you, why did you feel it was appropriate for you to be

4 serving as a liaison between Jackie and Ms. Erdely, confining

5 yourself to your own beliefs based on your interactions?

6 A    Okay.  So I was texting Sabrina.  I was texting her, and

7 we were talking about Jackie's name because I was supporting

8 Jackie in that moment.  And I felt that it was necessary to --

9 I'm trying to word this correctly -- to make sure that Jackie

10 was involved in the process.  And I felt that if I wasn't

11 acting as a liaison between them, that Jackie would not be

12 talking to her.  So yeah.

13 Q    Okay.  And did you have occasion to text with Ms. Erdely

14 in the middle part of October about these topics?

15 A    Yes.

16 Q    And on that occasion that you were texting with

17 Ms. Erdely about those topics, were you physically present in

18 the same location as Jackie?

19 A    Yes.

20 Q    All right.  I'm going to show you what we've previously

21 marked as Plaintiff's Trial Exhibit 20, previously been

22 admitted, and I'm going to ask you some questions about this

23 document.

24     Do you recognize these documents, or this document,

25 rather, as a text conversation between you and Ms. Erdely?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

40

1     And you'll see on top of it the date is October 23rd.

2     Do you see that?

3   A    Yes.

4   Q    And you start off by saying, "Hi, Sabrina, this is Alex.

5   Is this not a landline?  Testing," testing.

6     Do you see that?

7   A    Yes.

8   Q    On this document, do you recognize the gray text bubbles

9   on the left-hand side to be things that you were saying?

10  A    Yes.

11  Q    And on the right-hand side, the blue text bubbles to be

12  responses that were -- you understood were coming from

13  Sabrina?  Is that -- am I interpreting that correctly?

14  A    Yes.

15  Q    All right.  In your first -- after Ms. Erdely confirms

16  that you're actually communicating with her on her cell phone,

17  you write, "I'm talking to Jackie right now, and she's telling

18  me she 100 percent doesn't want her name in the article."

19    Do you see that?

20  A    Yes.

21  Q    Why did you text that to Ms. Erdely on October 23rd?

22  A    Because Jackie was telling me she 100 percent did not

23  want her name in the article.

24  Q    And was that at that moment?  I mean, in that moment

25  while you were with her that night, did she express that view

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

41

1    to you?

2    A    Yes.

3    Q    And what were you and Jackie doing at that time?  It's

4    10:00 at night on a Thursday.

5    A    I don't know.  Just hanging out.

6    Q    If we could look now to the next page.

7         Ms. Erdely responds to you saying that Jackie needs to

8    know, she's an essential part of this article, we'll figure

9    out a way forward that's comfortable for her.  I'll need to

10   talk to her by phone tomorrow.  If need be, I can also come

11   down and we can talk it over in person.

12        What do you write back to her?

13   A    "I think that will freak her out the because she feels

14   like she's being pushed.  I'll ask if she wants to call you

15   tomorrow instead of it feeling like she's being pressured into

16   anything."

17   Q    Why did you text those words to Ms. Erdely?

18   A    I assume it's because Jackie was telling me that she felt

19   pushed, and that's why I texted it to her.

20   Q    Again, when you texted those words to her, were you there

21   physically in the same location as Jackie and having a

22   conversation with her about this -- your conversation with

23   Ms. Erdely, were you relaying the substance of these texts to

24   her?

25   A    Yes.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

42

1  Q    What was your basis, your basis for telling Ms. Erdely

2  that Jackie was feeling pushed?

3       Did you have any personal observations apart from what

4  Jackie told you that caused you to concur in that view?

5  A    I just saw Jackie, who was a friend at the time, being

6  very anxious about the whole ordeal.  She didn't seem like she

7  was excited about this at all and -- yeah, just really nervous

8  and not at all having fun.

9  Q    All right.  If we could look at the next page, please,

10 continuation of your conversation.

11      In this part of the conversation Ms. Erdely writes to

12 you, "But I need to be clear about this.  There's no pulling

13 the plug at this point.  The article is moving forward, and I

14 think it's important that Jackie stay involved."

15      Do you see that?

16 A    Yes.

17 Q    What conclusion or what impression did you form, you,

18 Alex Pinkleton, form, from those words that you received from

19 Ms. Erdely on October 23rd?

20 A    I formed the opinion that regardless of whether or not

21 Jackie would participate in the article, that this article was

22 going to be published.  And the article that would be

23 published would be focusing on Jackie's story.

24 Q    And did you discuss that view that you just told us with

25 Jackie that evening?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

43

1   A    Yes.

2   Q    And tell us whatever you can remember about that

3   conversation.

4   A    So at that point, after I read it, I just showed her the

5   text message.  And Jackie was freaking out.  She was like,

6   wow, I -- you know, what do I do?

7        And basically, from my point of view, since this article

8   was going to be published whether or not she participated, I

9   thought, it's better for you to be participating so that you

10  have some sort of control over your story.

11       And that's a huge part of advocacy, is that when someone

12  tells you -- I mean, they're telling you about an incident

13  where control has been completely taken away from them, and so

14  what we try to do is give them a sense of control back.

15       So if this is a national article that is focusing on your

16  complete story for millions of people to read, I felt that,

17  you know, rather than it be someone else's interpretation of

18  your story, it's really important for you to have some input.

19       So that was my reaction, and that was kind of our

20  conversation.  And she -- you know, it was all based around

21  the idea that the article is happening regardless of whether

22  or not she wanted it to.

23  Q    I'd like to shift gears now to after the article came

24  out.

25       Did you have occasion to talk to Ms. Erdely after the

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

44

1    publication of "A Rape On Campus"?

2    A    Yes.

3    Q    When, the best you can recall, did you talk with her?

4    A    It was twice.  There was once in -- like around 1 a.m.

5    the day that they published the editor's note and then again

6    at 9 a.m. that same day.

7    Q    So early in the morning and then -- then actually in the

8    morning, for the rest of us who wouldn't be up that time of

9    the night.

10   A    Yes.

11   Q    But you talked with her twice?

12   A    Mm-hmm.

13   Q    And how did it come to be that you spoke with Ms. Erdely?

14        Did you call her or did she call you?

15   A    So she called me both times.  The first time was to ask

16   what was going on, because apparently Jackie had called her in

17   hysterics, and so Sabrina was asking if I thought she was

18   still credible, basically, because, you know, obviously I had

19   been close to Jackie.  I had been there that night as well.

20        And I told her that I didn't think that it was a credible

21   story anymore.

22        And then later that morning, the second call was again

23   just to confirm my feelings about whether or not she was

24   credible.

25        And this time she was extremely upset.  She made the

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

45

1  mention of, like, I just went -- I'm so attached to this

2  article, and I -- and she just made the comment, like, I had

3  your story, I had your paperwork.  And what she was referring

4  to is my informal trial documentation because I had discussed

5  my story with her.  I had given that to her.

6      So she made reference to that and was, like, breaking

7  down and said, you know, I'm going to lose my job, and I need

8  to go write this retraction.  And that was that conversation.

9  Q    Did Ms. Erdely indicate to you in that conversation why

10  she -- why she was making reference to your paperwork?

11  A    Yes, because I had given her the documentation, so I'm

12  assuming that it meant that, you know, there was some sort of

13  verification.  And the reason that the retraction was coming

14  was because there wasn't verification for Jackie's story.

15  Q    Did Ms. Erdely say why she had not elected to write -- to

16  focus the article on your story instead?

17  A    She made the passing comment of, like, she had just spent

18  so much time on this one article and one story, actually,

19  focusing on the one story, that to rewrite it seemed to be,

20  like it would have, all that work would have gone to waste,

21  was basically the sentiment.

22  Q    And did you understand when you said one story meaning

23  reference to Jackie's story?

24  A    Yes.

25  Q    And did you understand that to mean that rewriting it to

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

46

1  include your story would have meant a lot of additional work?

2  A    Yes.

3  Q    Is that the way you understood the conversation?

4  A    Mm-hmm.

5          MR. CLARE:  Thank you, Miss Pinkleton.  Those are

6  all the questions I have.  I think Miss McNamara will have a

7  few questions for you before you go.

8          THE WITNESS:  Okay.

9                  CROSS-EXAMINATION

10 BY MS. McNAMARA:

11 Q    Good afternoon, Miss Pinkleton.  I think we met once

12 before, but as you recall, my name's Elizabeth McNamara.

13      Thank you for coming in today.  I appreciate it.

14 A    You're welcome.

15 Q    I'm going to have a few questions for you, just follow-up

16 issues.

17      It's fair to say you weren't pleased with your depiction

18 in the article?

19 A    Yes, that's fair.

20 Q    And you indicated in questions with Mr. Clare that the

21 one quote from you had you talking about party culture to that

22 effect; is that fair?

23 A    Yes.

24 Q    Now, it's also true that you were quoted two other times

25 in the article.  Do you recall that?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

47

1   A    Yes.

2   Q    So to focus your attention -- and we'll pull up Exhibit

3   1, the article.

4        And if we could focus on page 1078, please.

5        And if we stop here as we go up a little further, in the

6   middle column, there's a long discussion that starts in the

7   bottom of the left-hand column in which Jackie is introduced

8   to Emily Renda.

9        You know Emily Renda, do you not?

10  A    Yes.

11  Q    And it goes on -- proceeds to describe Jackie getting

12  involved in One Less.

13       Do you recall that?

14  A    Yes.

15  Q    And you were involved in One Less, were you not?

16  A    Yes, I was.

17  Q    And were you a member of One Less?

18  A    I was.

19  Q    So in the following paragraph after that, the article

20  proceeds to describe a lot of what goes on in One Less and the

21  assistance it gives to people like yourself who have been

22  survivors of sexual assault; is that fair to say?

23  A    It describes One Less in certain terms, but some of it's

24  inaccurate.  Like the line about mostly affirmed, because it's

25  frequently not reported, is completely false.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

48

1  Q    Okay.  And then following the paragraph about One Less,

2  there's a paragraph that begins:  "Some of these women are

3  disturbed by the contradiction."

4       Do you see that?

5  A    Yes.

6  Q    And it's followed by a quote from you saying, "'It's easy

7  to cover up a rape at a university if no one is reporting,'

8  admits Jackie's friend Alex Pinkleton."

9       Do you see that?

10 A    Yes.

11 Q    Preceding that quote, the reference to these women refers

12 to women in One Less; is that not correct?

13 A    Yes.

14 Q    And so in this context you were identified as an activist

15 involved with One Less; is that fair to say?

16 A    I don't think that's fair to say, no.  It does not say

17 that.

18 Q    You wouldn't read that as saying these women as being

19 about One Less immediately following the members in a

20 discussion of One Less?

21 A    No, it doesn't make that connection.

22 Q    Okay.  But you are described as being a supporter of

23 Jackie, are you not, in the article?

24 A    I'm described as a friend.

25 Q    And if you turn to page 1079 of the article.  In the

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

49

1  middle column in the graph that begins "Under investigation,"

2  it indicates that Jackie may have gotten a glimpse into the

3  extent of the investigation when, in the days following my

4  visit to campus, she was called into Eramo's office, bringing

5  along her friend Alex for support.  According to both women,

6  Eramo revealed that she'd learned through the grapevine that

7  all the boys involved have graduated.  Both girls were

8  mystified.  Not only had Jackie just seen one of the boys

9  riding his bike on grounds but, as Alex pointed out, doesn't

10  that mean they're admitting something happened?  No warning

11  had yet been issued to the campus.

12       You're the Alex in that sentence, is that not -- are you

13  not?

14  A    Yes.

15  Q    And here you're described as being a supporter of Jackie;

16  is that not correct?

17  A    I'm referred to as Alex in this one and Alexandria in the

18  other one, so I'm not sure how clear it was to everyone else

19  that I was the same person in both of those.  But I know,

20  because that's me.

21  Q    Thank you.

22       Now, and you were, in fact, prior to the publication of

23  this article, a close friend of Jackie's in 2014, were you

24  not?

25  A    Towards around when the article was, yes, we became close

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

50

1  friends.

2  Q    And you supported her and trusted her during that time,

3  didn't you?

4  A    Yes.

5  Q    And you believed Jackie was sexually assaulted at the

6  time, did you not?

7  A    I never questioned her story.  I just validated what she

8  said because as an advocate, that's what you do.  If someone

9  tells you their story, I'm not going to question it.  I'm

10  going to give you the resources that you need, which I had

11  done, and provide the emotional support that you need as well,

12  which I was also doing.

13  Q    When you began -- there came a time when you began to

14  question Jackie's story.  I think you already indicated you

15  shared with Sabrina that you no longer found her credible.

16  Isn't that right?

17  A    Yes.

18  Q    And when you began to question her story, would it be

19  fair to say that you felt betrayed by Jackie?

20  A    Yes, I did.

21  Q    And you were angry with her, were you not?

22  A    I was angry at the time about a lot of things.

23  Q    But again, as we've established, prior to that December

24  5th date when you had -- around that period of time when you

25  had that conversation with Sabrina about Jackie no longer

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

51

1  being credible, you believed her story to be true, and you

2  knew a lot of facts about her story; isn't that right?

3  A    I didn't know any facts about a story.  I only knew what

4  someone who was coming to me to tell about an experience to me

5  was saying.  I don't ever consider whether or not they're

6  facts.  That's not something that I do.  I don't ever question

7  credibility.  I don't ever look at what you're saying as a

8  series of facts and analyze them because that, again, is not

9  my job.  I give you the resources, I give you emotional

10 support if you need that, but I was not any sort of person

11 that was in the position to analyze or question what she was

12 saying.

13 Q    And thank you, Ms. Pinkleton.  I don't mean to suggest

14 that you were in the role or that you were evaluating or, you

15 know, investigating.  It wasn't your job.  I fully appreciate

16 that you weren't investigating her.

17      What I'm trying to establish is that before the article

18 was published, you understood Jackie's sexual assault to be

19 largely consistent with the depiction in the article; isn't

20 that fair to say?

21 A    I actually don't agree that it was consistent with the

22 depiction in the article.  It was consistent with what -- what

23 she told me was not -- what Jackie told me was not the same as

24 what was in the article, so...

25 Q    Well, Jackie had told you, had she not, that she had been

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

52

1   sexually -- her sexual assault involved nine men, seven of who

2   were perpetrators and two orchestrating it; isn't that right?

3   A    Yes.

4   Q    And she had told you that during the assault, she had

5   crashed through a glass table; isn't that right?

6   A    I don't remember that, but maybe.

7   Q    And she had told you, and this was on April 17th,

8   surrounding Take Back the Night -- you both spoke at Take Back

9   the Night; isn't that right?

10  A    Yes.

11  Q    And you stood together as friends at Take Back the Night

12  when she spoke; isn't that correct?

13  A    Yes.

14  Q    And prior to -- speaking of Take Back the Night, the two

15  of you shared a number of text messages; isn't that fair to

16  say?

17  A    Yes.

18  Q    And she had communicated to you in such a message that

19  she had -- that there were nine men, that she had crashed into

20  a glass table, that she was punched by one of the assailants;

21  is that right?

22  A    She included all that, but there was more than that in

23  the article.

24  Q    And that one of the men couldn't do it, so they made him

25  use a beer bottle.  Do you recall that?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

53

1  A    Yes.  She told me lots of things that were horrific and

2  not true.

3  Q    And prior to -- and I believe you indicated this when you

4  were speaking with Mr. Clare -- prior to the publication of

5  the article, you knew that Jackie's story would be a feature

6  of the Rolling Stone article; isn't that fair to say?

7  A    Not when I initially started talking to her, but

8  eventually it became clear that it would be just about

9  Jackie's story.  So yes.

10 Q    And your reading of the article is that it's only about

11 Jackie's story; is that right?

12 A    I would say, like, 80 percent of it and what people would

13 take away from the story is it -- everything revolved around

14 that one story.  So yes.

15 Q    And prior to the publication of the article, you told a

16 professor at the university that the Rolling Stone article was

17 coming out and it was going to be about gang rapes at UVA.

18      Do you recall that?

19 A    Yes.  We were reading a book that involved talking about

20 gang rapes, so I did mention that.

21           MS. McNAMARA:  Let's -- let me have --

22           THE CLERK:  Defendants' 80.

23           (Defendants' Exhibit 80 marked for identification.)

24 Q    The e-mail that you have in front of you, is that an

25 e-mail that you sent?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

54

1  A     Yes.

2  Q     And it was sent on October 30th, 2014, to Herbert Braun?

3  A     Tico, yes.

4  Q     Is that a professor at UVa?

5  A     Yes.

6         MS. McNAMARA:  I would move its admission, Your

7  Honor.

8         THE COURT:  80 without objection.

9         (Defendants' Exhibit 80 admitted into evidence.)

10  Q    In this e-mail in the second paragraph, did you tell your

11  professor that "There is a Rolling Stone magazine article

12  coming out late November/early December about the gang rapes

13  occurring at UVa"?

14  A    Yes.

15  Q    And you used the plural.  At that time, did you

16  understand there were multiple gang rapes at UVa?

17  A     I had heard from Jackie, so that is my source, that not

18  just her had been gang raped at Phi Psi but some other person.

19  And I also was including Liz Seccuro's case as well that I

20  mentioned in this e-mail.

21  Q     Right, thank you.

22        You go on to say that, "One of my close friend's account

23  of her gang rape by seven fraternity men (I prefer other words

24  for them) is the feature of the story, but Liz Seccuro's case

25  is also mentioned because both of these gang rapes and two

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

55

1  others have all happened in the same fraternity."

2      Do you see that?

3  A    Yes.

4  Q    So you're referencing I guess, since you included the

5  plural with Liz Seccuro, you were referencing four gang rapes

6  at Phi Psi in this e-mail; is that fair to say?

7  A    Yes.

8  Q    Now, at the time the article was published on November

9  19th, 2014, you still believed Jackie had been gang raped at

10 Phi Kappa Psi; is that right?

11 A    Yes.

12 Q    And you believed at that time that Jackie had told the

13 UVa administration that she had been gang raped at Phi Kappa

14 Psi; is that right?

15 A    I believed, yes.

16 Q    And after the article came out, you're aware that UVa was

17 publicly saying that it didn't know all the details of

18 Jackie's rape; is that right?

19 A    Yes.

20 Q    And is it fair to say that you were angry that the UVa

21 administration was saying that it didn't know all the details

22 of Jackie's article -- or rape, rather?

23 A    So, again, at the time my source was Jackie.  She told me

24 that she had told her entire story to the administration.  So

25 then when they said that they didn't know the whole story, I

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

56

1  assumed, because why wouldn't you tell your entire horrific

2  story to them, because she said to me that she wanted

3  something to happen, not -- well, she didn't want -- that was

4  the confusing part.  She wanted something to happen, but she

5  didn't want it reported or to go to the police.  So I don't

6  know what that something would have been.  But that was the

7  confusion that was going on there.

8  Q    And you wrote -- again, you wrote one of your professors

9  about this at the time; is that correct?

10  A    Probably.

11  Q    You communicate with your professors far more than I ever

12  did, so --

13  A    I love my professors.

14  Q    Well, I think that's wonderful.

15        MS. McNAMARA:  Let's have this marked.

16        THE CLERK:  81.

17        (Defendants' Exhibit 81 marked for identification.)

18  Q    Miss Pinkleton, this e-mail is dated November 22nd, 2014,

19  just a few days after the publication of the article.  And it

20  appears to be again you're writing with Mr. Braun, Professor

21  Braun, at UVa.  Is that correct?

22  A    Yes.

23        MS. McNAMARA:  I move its admission, Your Honor.

24        THE COURT:  81 without objection.

25        (Defendants' Exhibit 81 admitted into evidence.)

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

57

1      MS. McNAMARA:  And can we publish the e-mail?  Thank
2  you.
3  Q   I would like you to read into the record, if you would,
4  the second paragraph of this e-mail that begins with "P.S."
5  A   Okay.  "P.S. Dean Groves continues to claim they 'didn't
6  know all the details of the sexual assault in the article.'
7  You, sir, knew it was a gang rape.  Did you really need to
8  know that -- need to know there was a bottle used or that she
9  was called an 'it' for you to do something about it?
10 Apparently so.  And that's exactly why we're furious at you."
11 Q   And that was an e-mail that you wrote to your professor a
12 few days after the publication of the article?
13 A   Yes.
14 Q   And you believed that to be true at the time you wrote
15 it, did you not?
16 A   At the time, yes.
17 Q   But at some point after you had lost faith in Jackie and
18 you were concerned that one upshot of the article might be
19 that survivors like yourself might be less inclined to report
20 sexual assaults; is that fair?
21 A   Yes.
22 Q   And so you came to believe that throwing Jackie under the
23 bus -- I want to make sure I have that right -- would be
24 helpful to work on your sexual assault issues; is that right?
25 A   I don't remember if I used those terms, but --

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

58

1   Q    Well, let me actually refresh your recollection.

2   A    Okay.

3   Q    And just for clarity, your telephone number is

4   180-492-678 -- you read it.  I can't read it.  There were too

5   many numbers when I was doing it.

6   A    1-804-926-7825.

7   Q    And that is your e-mail -- or your telephone number?

8   A    Yes.

9   Q    And I just want to direct your attention.  Those were

10  texts from you between you and Sara Surface?

11  A    Yes.

12  Q    And do you see where you're suggesting throwing Jackie

13  under the bus for the movement?

14  A    Is it okay to -- yes.

15  Q    Thank you.

16       That was something you said to Sara Surface at the time?

17  A    Throwing her under the bus was probably a very strong

18  term that I was using in confidence with a friend.  But, I

19  mean, at that point, we were really angry, and she had lied to

20  us.  So I was completely comfortable with being, like, it's

21  not about you anymore because it's been about you for the past

22  year and, you know what, I care about more than you and a fake

23  story.  I actually care about survivors, which is the entire

24  reason I was even a source for this article.  So -- yup.

25  Q    And, Alex, also prior to the article's publication, you

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

59

1 believed that there was not enough awareness on or education
2 around sexual assault among students at UVa; isn't that right?
3 A    Right.
4 Q    And you believed survivors at UVa didn't feel comfortable
5 sharing their stories; isn't that correct?
6 A    That part -- so I didn't think that in certain spaces,
7 some people would feel completely comfortable sharing their
8 stories, which, you know, that's something that we're working
9 towards.  But at the time I wanted -- when I came in my first
10 year, there wasn't a lot of talk about sexual assault, there
11 weren't resources presented to you.  That was an issue.  It
12 didn't -- it wasn't till actually a little bit before this
13 article came out in my second year that it actually became a
14 huge topic that was all over the media.  It still is a huge
15 topic that we always hear about.  But, yeah, for a year and a
16 half it hadn't been, and so we were still working hard to make
17 sure that people felt comfortable sharing their stories
18 because at that time, I didn't think people were.
19 Q    And prior to the Rolling Stone article, you believed that
20 there weren't -- that statistics were not readily available at
21 UVa documenting the number of sexual assaults at the
22 university; isn't that correct?
23 A    Right.
24 Q    And that was a concern of yours?
25 A    Yes.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

60

1   Q   And that concern, not attributed to you, but that concern

2   was discussed in the article, that statistics were not readily

3   available. Do you recall that?

4   A   I don't recall. It might be in there.

5   Q   Do you have any reason to believe the article did not

6   discuss that?

7   A   No.

8   Q   And since publication of the Rolling Stone article,

9   statistics documenting sexual assault at UVa are now readily

10   available; isn't that correct?

11   A   Yes. I'm not sure if that was directly due to the

12   article, but they're now available.

13   Q   And you believed that there was a lot of mistrust of the

14   system around sexual assault at UVa; isn't that right?

15   A   I thought there was some mistrust. I thought there was a

16   lot of -- a lack of communication that needed to be better.

17   And, you know, one of the reasons we were working with Dean

18   Eramo so much is because she was that liaison for us. And,

19   you know, so, again, that wasn't part of -- the mistrust had

20   nothing to do with her.

21   Q   And I picked that up when you were speaking with

22   Mr. Clare. You, when we heard that audio clip of the dinner,

23   you were concerned that negative statements about Dean Eramo

24   might be attributed to you in the article.

25   A   Correct.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

61

1    Q    Is that right?

2         And Sabrina assured you that negative statements -- any

3    negative implications or statements concerning Dean Eramo

4    would not be attributed to you?

5    A    Yes.

6    Q    And the article did not attribute any such statements to

7    you, did they -- did it?

8    A    It did not.

9    Q    And the article did talk about survivors believed --

10   beloved Dean Eramo.  Do you remember that?

11   A    So I'm not sure that that's something that would have

12   stuck out to a lot of people, because, again, this is an

13   article where it was, like, negative, negative, negative.

14   Also, I can just tell from personal experience.

15        So people after this article came out and who did see

16   that one little line about me saying that --

17             MS. McNAMARA:  Objection.

18   A    -- about Ms. Eramo --

19             MS. McNAMARA:  I don't think she can speak to --

20             THE COURT:  She can certainly testify to her

21   personal experience.

22             THE WITNESS:  I just did.

23             MR. CLARE:  No, she can testify to her personal

24   experience.

25   A    Okay.  So that's what I'm saying.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

62

1    So my personal experience was that people were very angry

2  at me for supporting the devil, because this is the woman

3  painted in the article as sweeping rapes under the rug.  And I

4  was the one who was like...

5  Q    I'm sorry, Miss Pinkleton.  Do you want to take a break?

6  I don't want you to feel uncomfortable.

7          THE COURT:  We can take a mid-afternoon break at

8  this point.

9          MS. McNAMARA:  Absolutely, Your Honor.  We could

10 take a break, Your Honor.

11         THE COURT:  So, ladies and gentlemen, we'll take our

12 first mid-afternoon break at this point.

13    Again, I ask that while you're away from the Court you

14 not discuss the case with one another.  Do not permit anyone

15 to discuss it with you.

16    I'll ask the witness not to discuss her pending testimony

17 with counsel from either side during the break.

18    Let's plan to return at a little bit after 3:05.

19    Ask the marshal declare the Court in recess.

20         (A short recess was taken at 2:54 p.m.)

21         (The jury is present in Open Court at 3:12 p.m.)

22         THE COURT:  Well, all 10 jurors are back in their

23 places.  We're ready to continue with the cross-examination of

24 this witness.

25         MS. McNAMARA:  Thank you, Your Honor.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

63

1  BY MS. McNAMARA:

2  Q    Ms. Pinkleton, you'll be happy to hear I don't have that

3  many additional questions, so you'll be out of her relatively

4  quickly, I hope.

5      Prior to the article's publication, you made it known

6  that you didn't care if the article made UVa bad; isn't that

7  correct?

8  A    That I didn't care if the article made UVa what?  Bad?

9  Q    Look bad.

10 A    Oh, look bad.

11     I was critical about how UVa was handling things, so if

12 the aspects that we talked about that I criticized were in

13 there, that didn't bother me.

14 Q    And I think you put it a little more colorfully.  And I

15 apologize for putting this out there, but I believe you said,

16 and I quote, "Fuck this school's reputation.  You can't polish

17 a fucking turd, and right now we're trying to shine a giant

18 pile of shit."

19     Is that fair to say that that was a quote from you?

20 A    So that was a quote about how I felt about whether or not

21 the reputation was harmed if it was a discussion about a

22 nuanced -- a nuanced discussion about sexual assault at UVa.

23 Because I was very clear, and you probably heard multiple

24 times that, you know, I felt that more could have been done.

25     So that's put at the most, you know, as you said,

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

64

1    colorful way that I could have put it.

2    Q    Well, as I -- I had a conversation with my 26-year-old in

3    the course of this litigation about text messages, and I think

4    that that's something you can kind of derive from this, if

5    nothing else.

6         But it's fair to say that before the article's

7    publication, you were very frustrated with how UVa was

8    treating sexual assault; is that correct?

9    A    The lack of prevention in particular, yes.

10   Q    And you were also skeptical about the way UVa was

11   handling Jackie's case in particular; isn't that right?

12   A    From what Jackie was telling me, I was frustrated about

13   what I felt they could have been doing.  But, again, that was

14   based off what she said was happening and what she had done.

15   Q    And you felt that UVa's response to Jackie's case was

16   inexcusable?

17   A    I felt that what Jackie told me she had told them, and

18   then what she told me the response to what she had told them,

19   which she told me had been everything, would have been

20   inexcusable.  But what she told me was different than perhaps

21   what was actually happening.

22   Q    And --

23        THE COURT:  Could I ask, what else did you think she

24   had told you that she didn't tell them?

25        I may have missed it when you -- I can't hear everything

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

65

1  that you've said.

2      What was the difference between what she -- you think she

3  told you and what she told the university?

4          THE WITNESS:  So I don't know completely what she

5  told the university, but she told me that she had told them

6  everything that she told me about it.

7          THE COURT:  Okay.  So it was the same?  You thought

8  if she had told them everything she told you, then they should

9  have taken additional action and done something more

10  proactive?

11          THE WITNESS:  Yes.

12  BY MS. McNAMARA:

13  Q    And I think in the text between you and Jackie prior to

14  the publication of the article, you indicated that "I've

15  become more skeptical of the administration throughout this

16  process, like administration says they couldn't do anything

17  about Phi Psi once they got your report.  Yet if there is a

18  danger, they can investigate and notify students, which they

19  didn't.  That's inexcusable."

20      Was that a text you sent to Jackie?

21  A    So I was under the impression that there was no

22  investigation.  I didn't know about any of that.  I didn't

23  know -- she had told me she didn't want to report, and then

24  maybe she did at that point.  I didn't really know what was

25  happening.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

66

1    Q    And you also at the same time told Sabrina that you

2    wanted Jackie's story to come out because it would be amazing

3    to have exposure on such a silent terror at UVa; isn't that

4    right?

5    A    So I, again, had initially been very excited about an

6    article because I thought that it would introduce new nuances

7    about sexual assault, and it would reach a different audience

8    than may normally, you know, read articles about sexual

9    assault.

10        I'm not sure that -- you know, I figured Rolling Stone,

11   that's a different audience to be tapping into, and we could

12   educate the public with this article.  But that's not the

13   article that came out, so...

14   Q    And if we can look at Plaintiff's Trial Exhibit 20.

15        You'll see it on your screen, Miss Pinkleton, I think,

16   and if you want a paper copy, we can give you one.

17   A    Screen is fine.

18   Q    And these are a series of text messages between you and

19   Sabrina; is that correct?  Do you understand that?

20   A    Yes.

21   Q    We can show you another page if -- do you understand

22   that?

23   A    Yes, that is...

24   Q    On October 24th.  So this was a few weeks before the

25   article.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

67

1  A    Yes.

2  Q    And in this text message you say -- where are we?  The

3  "everyone."  I want to start with "everyone does have their

4  own agenda."

5       And this is a text message from you?

6  A    Yes.

7  Q    Do you want to read into the record your message to

8  Sabrina that begins with "everyone does have their own

9  agenda"?

10 A    "Everyone does have their own agenda, and mine is

11 obviously first to make sure she's okay.  But then if she is,

12 I'm biased towards wanting the article because it would be

13 amazing to have exposure on such a silent terror here because

14 of course I wouldn't be radical and sacrifice someone for the

15 cause.  If she's strong enough though, and I think she is, she

16 just has doubts about her own strength, then I'll encourage

17 the article."

18 Q    And that's what you communicated to Sabrina at the end of

19 October?

20 A    Yes.

21 Q    And at the same time, you told Sabrina that Jackie was

22 getting polar opposite information from Dean Eramo about

23 whether to participate in the article; is that right?

24 A    I actually think I was referring to whether or not she

25 should have her name in the article.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

68

1   Q    But you understood that Jackie was getting different

2   information from Dean Eramo?

3   A    About whether or not to have her name in the article.

4   Q    And the day that the article came out --

5           MS. McNAMARA:  You can put that down.  Thanks,

6   Scott.

7   Q    -- you told your friend Sara Surface that you were super

8   excited about the article after speaking with Sabrina.

9           I think I misspoke.  The day before the article came out,

10  you told Sara that you were super excited.

11          Do you recall that?

12  A    I was excited.  Again, I still was under the impression

13  that this would be something that was helpful for the advocacy

14  community.  And, you know, I thought that there would be a

15  conversation that could be really productive about how to help

16  survivors create an environment where more people were

17  speaking out because, look, there's this person who had spoke

18  out.  I can too.

19          So that were -- those were my feelings at the time.

20  Q    Now, when you were deposed in this action, when we first

21  met, you were represented by counsel, were you not?

22  A    Yes.

23  Q    And who was your counsel?

24  A    Clare Locke, LLP.

25  Q    And the same counsel that's representing Dean Eramo?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

69

1  A    Yes.

2  Q    Are you represented by counsel today?

3  A    Yes.

4  Q    And were you prepared by Ms. Eramo's attorneys in

5  preparation for your testimony today?

6  A    Yes.

7  Q    How long did you spend preparing?

8  A    Several hours.

9  Q    After Ms. Eramo brought this lawsuit, she asked you to

10  speak with her lawyers, didn't she?

11  A    Probably.

12  Q    And you agreed to do so, didn't you?

13  A    Yes.

14  Q    Because, I believe you said, you enjoy ranting about

15  Sabrina.  Is that fair to say?

16  A    Well, the real reason that I wanted counsel is because

17  Rolling Stone subpoenaed me for my -- all of my text messages

18  from the past two years, and I didn't know, you know, how to

19  respond to that.  So obviously I needed counsel.

20      And it's not like I'm rolling in the dough since I just

21  got out of undergrad, so for me this is a good option.

22  Q    I understand that, and as we all do.

23      And after the article was published, you also sent

24  Ms. Eramo a card; is that correct?

25  A    Yes.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

70

1  Q    And you were telling her cheers on her successful -- to a

2  successful lawsuit; isn't that right?

3  A    I don't remember what was in the card.

4  Q    Okay.  Let me show you, and we can have marked...

5           THE CLERK:  Plaintiff's 166.

6           MS. McNAMARA:  Defendants'.

7           THE CLERK:  That would help.  Defendants' 82.  Just

8  grabbed the first one.

9           (Defendants' Exhibit 82 marked for identification.)

10 Q    And you can look at this card.

11     Is this the card that you sent to Dean Eramo after the

12 article was published?

13 A    Yes.

14 Q    And if you turn to the second page in particular, this is

15 your handwriting?

16 A    Yes.

17          MS. McNAMARA:  I move its admission, Your Honor.

18          THE COURT:  80 --

19          THE CLERK:  82.

20          THE COURT:  -- 2 without objection.

21          (Defendants' Exhibit 82 admitted into evidence.)

22          MS. McNAMARA:  And can we publish it for the jury,

23 please.

24 Q    On the first page of the article, that is a depiction of

25 the rotunda here at the university?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

71

1   A    Yes.

2   Q    And you did a little addition to the rotunda; is that

3   fair to say?

4   A    It is a beautiful doodle that I added.

5   Q    And could you read for the record what your doodle says?

6   A    It says, "Fuck Rolling Stone," and it's attributed to TJ.

7   Q    And "TJ" would be Thomas Jefferson?

8   A    Yes.

9   Q    Okay.  And let's turn your attention to the note that you

10  wrote to Dean Eramo.  And I won't have you read the entire

11  note, but I'd like you to read into the record the note

12  beginning with "people were not there for you."

13  A    "People were not there for you, so fuck them."

14  Q    Do you want me to read it, Ms. Pinkleton?  Thank you.

15       "People were not there for you, so fuck them.  You are

16  one of the strongest, most generous people I know, and fuck

17  Rolling Stone for trying to paint the picture otherwise.

18  Thank you so much for all that you have done before, during,

19  and since, and cheers to a successful lawsuit and becoming

20  self-actuated bitches.

21       "Love, Alex?"

22  A    "Self-actualized."

23  Q    "Self-actualized."  Thank you.  You know, I was having a

24  little hard time with that word.

25       And that was what you sent to Ms. Eramo; is that right?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

72

1  A    Yes.

2          MS. McNAMARA:  Thank you, Miss Pinkleton.  I have no

3  further questions.

4          THE COURT:  Miss Pinkleton, let me ask you one

5  question.  And again, I had some difficulty hearing,

6  especially the earlier portions of what you had to say.

7      Do you remember when they showed you the text between you

8  and Sabrina about publication of the article with or without

9  Jackie's consent?

10          THE WITNESS:  Yes.

11          THE COURT:  And you said Jackie was there with you

12  at that time, and you shared those texts with her?

13          THE WITNESS:  Mm-hmm.

14          THE COURT:  And I believe your testimony was, and

15  correct me if I'm wrong, that your understanding was that

16  Sabrina was trying to communicate that the article was going

17  forward whether Jackie approved of the use of her story or

18  not.

19          THE WITNESS:  Yes.

20          THE COURT:  What made you think that?

21      Why was that your understanding of the exchange of text

22  messages?

23          THE WITNESS:  Well, because that's basically what it

24  said in the text messages.  She was, like, regardless, this is

25  going -- moving forward.  That's almost a direct quote.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

73

1          THE COURT:  Well, based on your experience as a

2    sexual abuse victim advocate, do you think that if she had

3    tried to do so, Sabrina could have found another victim to

4    make the centerpiece of the article if Jackie had wanted to

5    get out?

6          THE WITNESS:  Well, I had been texting with her and

7    trying to get, first of all, Jackie's name out of it and then

8    Jackie to get out of it, and that didn't seem to be working.

9       I definitely was unprepared for the situation because I

10   hadn't worked with media before.  I didn't know the

11   rules and -- I mean, in hindsight, I think I could have done

12   more to prevent it from happening.

13         THE COURT:  In hindsight, could it have been that

14   Sabrina was saying, I'm going forward with the article whether

15   I use Jackie's name or not?

16         THE WITNESS:  No, that's not how I read it at all.

17         THE COURT:  Any other direct examination of this

18   witness?

19         MR. CLARE:  I don't have any further questions.

20         THE COURT:  Anything else you would have, Miss

21   McNamara?

22         MS. McNAMARA:  No.

23         THE COURT:  May the witness be excused?

24         MR. CLARE:  Yes, Your Honor.

25         THE COURT:  You may stand down, Miss Pinkleton.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

74

1   You're excused.  Thank you for your appearance and attendance
2   today.

3       You may call your next witness.

4           MR. CLARE:  Thank you, Your Honor.

5       We are going to at this point call by deposition
6   testimony the testimony of a man named John Ritter.

7       Just by way of explanation and housekeeping, Mr. Ritter
8   was the illustrator who did some of the artwork in the piece.

9       We're going to do something a little bit different.  I
10  know it's been our practice to move the admission of exhibits
11  after the testimony has been played.  We've reached agreement
12  with the defendants on the exhibits that accompany
13  Mr. Ritter's testimony.  And in order to try to make the video
14  a little bit more visually appealing, we'll be displaying some
15  of those images alongside his testimony.

16      So just as a housekeeping matter, I'm going to move the
17  admission of several exhibits, and then we'll play
18  Mr. Ritter's testimony.

19          THE COURT:  That's fine.

20          MR. CLARE:  So I've got -- I move the admission of
21  the video and the transcript.

22          THE CLERK:  The video is Plaintiff's 166 for
23  Mr. Ritter.

24          (Plaintiff's Exhibit 166 marked for identification.)

25          THE CLERK:  And the transcript is 167.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

75

1          (Plaintiff's Exhibit 167 marked for identification.)

2          MR. CLARE:  And then there is a series of

3  illustrations.

4          THE CLERK:  Okay.  The first illustration, Ritter

5  56, is 160 -- well, I'm sorry.  Let me look up here.  I can't

6  really read it.  Becomes 168.

7          (Plaintiff's Exhibit 168 marked for identification.)

8          THE CLERK:  Plaintiff's 300, Ritter 58, becomes 169.

9          (Plaintiff's Exhibit 169 marked for identification.)

10          MR. CLARE:  That's okay.  I've got to keep up with

11  you here.

12          THE CLERK:  That's fine.  Makes it easier for later.

13     Ritter 59 becomes Plaintiff's 170.

14          (Plaintiff's Exhibit 170 marked for identification.)

15          THE CLERK:  Plaintiff's 564 becomes 171.

16          (Plaintiff's Exhibit 171 marked for identification.)

17          THE CLERK:  Plaintiff's 574 becomes 172.

18          (Plaintiff's Exhibit 172 marked for identification.)

19          THE CLERK:  Plaintiff 576 becomes Plaintiff's 173.

20          (Plaintiff's Exhibit 173 marked for identification.)

21          THE CLERK:  Previously Plaintiff's 577 becomes 174.

22          (Plaintiff's Exhibit 174 marked for identification.)

23          THE CLERK:  Previously Plaintiff's 578 becomes 175.

24          (Plaintiff's Exhibit 175 marked for identification.)

25          MR. CLARE:  Thank you, Susan.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

76

1          THE CLERK:  Thank you.

2          MR. CLARE:  Your Honor, again, these designations

3   reflect the total of the plaintiff's designations as well as

4   the designations by the defendant, and they'll just play

5   straight through.

6          THE COURT:  Yes, sir.  166 through 175 by

7   stipulation.

8          THE CLERK:  Yes, through 175.

9          MR. CLARE:  Thank you, Your Honor.

10         (Plaintiff's Exhibits 166 through 175 admitted into

11  evidence.)

12         THE COURT:  So, ladies and gentlemen, all the things

13  we've said before about video depositions, they remain true

14  for Mr. Ritter's video deposition.

15     (The videotaped deposition of John Ritter was played at

16  3:30 p.m.)

17     (The playing of the videotape was concluded at 4:30 p.m.)

18         MR. CLARE:  That concludes our video designation.

19         THE COURT:  Ladies and gentlemen, we'll have a

20  mid-afternoon break at this point.  I would again ask while

21  you're away from the Court you not discuss the matter with

22  anyone or permit anyone to discuss it with you.

23     Let's plan to return at about quarter to 5:00.

24     Ask the marshal to declare the Court in recess.

25         (A short recess was taken at 4:30 p.m.)

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

77

1      (Plaintiff's Exhibit 176 marked for identification.)

2                        - - - - -

3      (The jury is present in Open Court at 4:49 p.m.)

4      THE COURT:  By my count, all 10 jurors are back in

5  their box ready to proceed.

6      Miss Locke, you may call the next witness.

7      MS. LOCKE:  Yes, Your Honor.  Plaintiff Nicole Eramo

8  calls Sean Woods.

9                        - - - - -

10                     SEAN WOODS,

11  being first duly sworn, testifies and says as follows:

12      THE CLERK:  Have a seat right there, please.

13                 DIRECT EXAMINATION

14  BY MS. LOCKE:

15  Q    Good afternoon, Mr. Woods.  You and I have met before

16  during your deposition.  My name is Libby Locke, and I

17  represent the plaintiff, Nicole Eramo.

18      Good afternoon.

19  A    Good afternoon, Miss Locke.

20  Q    Could you introduce yourself to the jury briefly.

21  A    I'm Sean Woods, deputy managing editor of Rolling Stone

22  magazine.

23  Q    Mr. Woods, you just said that you're deputy managing

24  editor of Rolling Stone; is that correct?

25  A    That is correct.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

78

1    Q    Who is your employer?

2    A    Rolling Stone.

3    Q    When you say "Rolling Stone," is that Rolling Stone, LLC?

4    A    Yes.

5    Q    Are you also employed by Wenner Media?

6    A    That is the parent company.

7    Q    You are here and have been here throughout the course of

8    this trial sitting in on the testimony; is that correct?

9    A    Correct.

10   Q    And that's because you have been designated as the

11   corporate representative of Rolling Stone, LLC, and Wenner

12   Media, correct?

13   A    Yes.

14   Q    If you could, for just a -- briefly, provide an overview

15   for the jury of the difference between Rolling Stone, LLC, and

16   Wenner Media.

17   A    That's really not my forte, so I don't know if I can

18   really speak to that.  I'm an editor of Rolling Stone.  I know

19   I'm representing the company, but -- I was editor of the

20   piece, but I -- I don't know much about corporate matters.

21   Q    So you, sitting here today as the corporate

22   representative of Rolling Stone, LLC, and Wenner Media, can't

23   tell for the jury the difference between the two entities?

24   A    I can tell you that Wenner Media is three magazines

25   essentially:  Us Weekly, Men's Journal, Rolling Stone.  Other

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

79

1    corporate matters I don't really have much knowledge of, I'm

2    sorry.

3    Q    Rolling Stone, LLC, is the publisher of Rolling Stone

4    magazine; is that correct?

5    A    That is correct.

6    Q    And Rolling Stone, LLC, contracts with contributing

7    editors like Sabrina Rubin Erdely; is that correct?

8    A    Yes.

9    Q    We saw earlier in the testimony, you recall that

10   Ms. Erdely testified that she had a contract.  Her contractor

11   agreement was with Rolling Stone, LLC.

12        Was that -- do you recall that?

13   A    Yes, that is correct.

14   Q    She also testified though that she was paid -- her

15   paycheck came from Wenner Media.  Do you have any reason to

16   dispute that?

17   A    I do not.  My paycheck comes from Rolling Stone, but I

18   don't know the difference.

19   Q    Thank you for that clarification.

20        Do you have any idea -- Will Dana was the managing editor

21   of Rolling Stone magazine at the time of "A Rape On Campus";

22   is that correct?

23   A    Yes, he is my boss and good friend.

24   Q    Your boss and good friend, you said?

25   A    Yes.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

80

1    Q    Do you have any idea whether Mr. Dana was employed under

2    the Wenner or under the Rolling Stone umbrella?

3    A    I couldn't speak to that.

4    Q    And what about Liz Garber-Paul?  I believe that she has

5    previously testified that she is employed by Wenner Media.

6         Do you have any reason to dispute that?

7    A    I do not.

8    Q    Now, Sabrina Rubin Erdely was a contributing editor of

9    the Rolling Stone magazine, correct?

10   A    Yes.

11   Q    We saw that she has an independent contractor agreement,

12   but I want to ask you about Ms. Erdely's representations that

13   she makes to the public.

14        She is permitted by Rolling Stone to hold herself out as

15   a Rolling Stone reporter; is that correct?

16   A    Her title is contributing editor, which essentially is a

17   writer for Rolling Stone magazine.

18   Q    And if Ms. Erdely were to make a promise to a source, for

19   example, that she would keep the anonymity of a source, could

20   she -- would she be permitted to make that promise to a source

21   without getting approval from you or someone at Rolling Stone?

22   A    She would have to have a discussion with us, the editors,

23   yes.

24   Q    If she made that promise, would Rolling Stone and Wenner

25   Media adhere to that promise; for example, if she promised,

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

81

1  for example, not to disclose the identity of a confidential

2  source?

3  A    We would have a discussion about it, but if it was an

4  agreement with her confidential source, no.  It would be her

5  decision.

6  Q    I'm sorry?

7  A    It would be her decision.  I don't -- yes --

8  Q    But Rolling Stone would adhere to that judgment call that

9  she would make; is that right?

10  A    Yes.

11  Q    Okay.  Now, Mr. Woods, you've worked at Rolling Stone

12  since 1999; is that correct?

13  A    Yes.  I started as a freelance fact checker in 1999.

14  Q    And that was going to be my next question.  You started

15  as a freelance fact checker at Rolling Stone magazine.  That

16  was your first position at Rolling Stone; is that correct?

17  A    That was my first position, yes.

18  Q    And when you started at Rolling Stone as a fact checker,

19  Rolling Stone had no written policies with respect to how

20  fact-checking was conducted, did it?

21  A    That is correct.

22  Q    And to this day, Rolling Stone still has no written

23  policies about how fact-checking is conducted under the

24  magazine; is that correct?

25  A    Yes.  There's nothing written in stone.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

82

1 Q And when you joined Rolling Stone magazine in 1999 as a

2 fact checker, it's fair to say that you received no formal

3 training from Rolling Stone with respect to how to perform

4 your job duties as a fact checker; is that correct?

5 A Well, I came in with experience, so I had some knowledge.

6 And there was a -- you know, I was walked through some

7 processes. But there was no book or --

8 Q Your experiences were with other magazines, not with

9 Rolling Stone when you first came to Rolling Stone; isn't that

10 correct?

11 A That's correct.

12 Q So other than what was on your résumé and the fact that

13 you had worked for other magazines, Rolling Stone didn't know

14 what your prior training, formal training or not, had been.

15 Isn't that fair to say?

16 A Well, my boss at the other magazines brought me to

17 Rolling Stone, so there was some knowledge of my work.

18 Q But when you came to Rolling Stone itself, no one sat you

19 down in one of these boring corporate training sessions and

20 said, here at Rolling Stone this is the way that we do

21 fact-checking, did they?

22 A It wasn't that formal, no, but there was a -- there were

23 conversations for sure; you know, this is how we would

24 fact-check a feature.

25 Q And you maintained your position as a fact checker up

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

83

1  until approximately 2004; is that correct?

2  A    Yes, that's correct.

3  Q    And that's when you joined Rolling Stone's editorial

4  team; is that right?

5  A    Yes.

6  Q    And you rose through the ranks at Rolling Stone from 1999

7  to become deputy managing editor about three or four years

8  ago; is that correct?

9  A    That sounds right.

10  Q    And you held the position and title of deputy managing

11  editor at the time "A Rape On Campus" was published; isn't

12  that correct?

13  A    Yes.

14  Q    And as deputy managing editor, you were responsible for

15  running the features department, with the exception of music

16  features; isn't that correct?

17  A    Yeah, I edited the occasional music feature but mostly

18  nonmusic, politics.

19  Q    Now, you were also the assigning editor for "A Rape On

20  Campus"; is that correct?

21  A    Yes, I was.

22  Q    And the assigning editor for an article is responsible

23  for assigning the piece and the overall editing responsibility

24  for that particular feature; is that correct?

25  A    That is correct.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

84

1  Q    As the assigning editor, it was your responsibility to

2  receive the first draft from the author; is that correct?

3  A    Yes.

4  Q    And you would go about as assigning editor of editing

5  that draft and providing comments and feedback to the author;

6  is that correct?

7  A    Yes, that's correct.

8  Q    And you in fact engaged in that process with Ms. Erdely

9  on "A Rape On Campus"; is that correct?

10  A    Yes, I did.

11  Q    As assigning editor for "A Rape On Campus," it was your

12  responsibility to ensure the factual accuracy of "A Rape On

13  Campus"; isn't that correct?

14  A    Yes.

15  Q    And as assigning editor, it was your responsibility to

16  ensure that Rolling Stone magazine was adhering to high

17  ethical standards for journalism in publishing "A Rape On

18  Campus"; isn't that correct?

19  A    That is correct.

20  Q    The buck stops with you; isn't that correct?

21  A    Yes.  And Will, my immediate -- the editor in chief, but,

22  yes, me.

23  Q    Now, it was Nicole Erdely's idea to write about sexual

24  assault on college campuses; isn't that correct?

25  A    That is correct.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

85

1 Q    And she had written a variety of articles about sexual

2 assault for Rolling Stone magazine in the past, hadn't she?

3 A    Yes.  It was a topic she had covered.

4 Q    And you in fact had acted as her editor on those articles

5 about sexual assault for Rolling Stone magazine; isn't that

6 correct?

7 A    Yes.

8 Q    Let's look at a few of those.

9        MS. LOCKE:  Pull up Plaintiff's Trial Exhibit 138.

10 Q    You recognize Exhibit 138 as an article that Ms. Erdely

11 wrote, "The Rape of Petty Officer Blumer"?

12 A    Yes.

13 Q    And you were the assigning editor for "The Rape of Petty

14 Officer Blumer," correct?

15 A    That is correct.

16 Q    And just like "A Rape On Campus," you received the first

17 draft of this article and were ultimately responsible for the

18 editing and going back and forth with Ms. Erdely for "The Rape

19 of Petty Officer Blumer"; isn't that correct?

20 A    Yes, that's correct.

21 Q    And if we could pull up the article's deck on the top

22 left-hand side of the page.

23     "The Rape of Petty Officer Blumer" took a look inside the

24 military's culture of sexual abuse, denial, and coverup; isn't

25 that correct?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

86

1  A    That is correct.

2  Q    That's the summary of what this article is going to be

3  about; isn't that right?

4  A    A very brief summary, but yes.

5  Q    Let's look at Plaintiff's Trial Exhibit 137.

6  A    Am I in the right notebook?  Is this --

7  Q    Yes.  All the exhibits are in there.  You can also look

8  at it on the screen, and they're marked by tab numbers so --

9       MR. SEXTON:  Is this that small one?

10 Q    So we have -- we put together a witness binder for this

11 witness.  Every exhibit we're going to look at will be in this

12 binder for you, so you won't have to be flipping back and

13 forth.

14 A    I truly appreciate it.

15 Q    We finally got our act together for you.

16      MR. SEXTON:  Do you have another one?

17      MS. LOCKE:  Yes, we have an extra one.  I'm sorry.

18 I thought you guys already had it.  Sorry about that.

19      MR. SEXTON:  Thank you.

20 BY MS. LOCKE:

21 Q    So Plaintiff's Trial Exhibit 137, do you recognize this

22 as an article entitled "The Catholic Church's Secret Sex Crime

23 Files" that Ms. Erdely wrote for Rolling Stone magazine?

24 A    Yes, I do.

25 Q    And you were also the editor for this article, were you

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

87

1    not?

2    A    Yes, I was.

3    Q    And this article looks at -- and if we can look at the

4    deck on the right-hand side of the page -- was about "How a

5    scandal in Philadelphia exposed the church's most-guarded

6    archive-documents that reveal a high-level conspiracy to cover

7    up decades of sexual abuse by Catholic priests."

8         That's what this article was about, correct?

9    A    Yes, it was.

10   Q    Let's look at Plaintiff's Trial Exhibit 136.

11   A    Looks like it's missing half the --

12   Q    Do we have the other half of the page?

13        Just take a second.

14        So Plaintiff's Trial Exhibit 136 do you recognize is an

15   article that Ms. Erdely wrote called "Sex, Lies and Phys Ed"

16   for Rolling Stone magazine?

17   A    Yes, I do.

18   Q    And you were also the editor for "Sex, Lies and Phys Ed";

19   is that correct?

20   A    That is correct.

21   Q    And you received the first draft and went back and forth

22   in the same process that you did with Ms. Erdely for "A Rape

23   On Campus"; is that correct?

24   A    Yes, ma'am.

25   Q    Now, as the assigning editor for "A Rape On Campus," you

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

88

1    were responsible for receiving Ms. Erdely's pitch, her written

2    proposal for the article; is that correct?

3    A    Yes, she would send me pictures.  We would have meetings

4    and talk about the stories.

5    Q    And the pitch or the proposal is a short summary of what

6    she thinks the article may focus on; is that correct?

7    A    It may or may not.  It depends on what the reporting

8    bears out.  It's an idea.

9    Q    It's an idea.  It's her idea, it's her initial idea about

10   what she wants to write about; isn't that correct?

11   A    That's correct.

12   Q    And it's a short summary of what her initial thoughts are

13   and what she's going to try and focus on?

14   A    Yeah, it's a proposal.

15   Q    And in a pitch, an author writes a pitch because she's

16   trying to sell an article to her editors; isn't that correct?

17   A    She's trying to get an assignment.  She had a number of

18   assignments every year, so we would find something else if we

19   didn't like it.

20   Q    But it was a piece of written work product that she would

21   share with the editors in order to share her ideas so that the

22   editors would ultimately sign off and say, go forward, go

23   forward with your reporting?

24   A    Yes, that's correct.

25   Q    Let's look at Ms. Erdely's pitch for "A Rape On Campus,"

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

89

1  Plaintiff's Trial Exhibit 19 that's already been admitted.

2      Do you recognize this as Ms. Erdely's pitch?

3  A    Yeah, I'll pulling up the paper.

4      Yes.

5  Q    And Ms. Erdely wrote this document, did she not?

6  A    Yeah.

7  Q    And you reviewed this pitch, did you not?

8  A    Yes.  We had a story meeting about -- brought up story

9  ideas meeting.

10 Q    And in her pitch Ms. Erdely writes in the first paragraph

11 that -- we'll wait -- there we go.

12     "Awareness programs about consent haven't gained much

13 traction in the vast sexual grey area on college campuses

14 where macho frat culture and sex-positive third-wave feminists

15 find themselves on a collision course against the backdrop of

16 an anything-goes party atmosphere, and where administrations

17 have been criticized for turning a blind eye."

18     Do you see that?

19 A    I do.  This was -- this pitch is drawing from news

20 articles that were happening at the time.  This was obviously

21 a very hot button topic in early 2014.

22 Q    And one of the areas that Ms. Erdely was thinking about

23 focusing on in reporting for "A Rape On Campus" was how the

24 administrations are turning a blind eye to the issue of sexual

25 assault.  That's what she wrote, did she not?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

90

1   A    She did, but it was also something that was in the news

2   and people were talking about that.  I mean, these were pulled

3   from clips.  In other words, she's pulling from newspaper

4   reports at that time.

5   Q    And that's one of the things that she wrote about and

6   presented to you and to Mr. Dana, that she was thinking about

7   writing about how administrations turn a blind eye to the

8   issue of sexual assault; isn't that correct?

9   A    It was one avenue of reporting that could happen.

10  Q    One avenue.  Let's look at some of her other avenues of

11  reporting in her pitch.

12  A    Sure.

13  Q    In her pitch, Ms. Erdely also writes, "Universities are

14  now in crisis over sexual harassment and assault, because with

15  the help of student activists known as the Title IX Network,

16  the Department of Education's Office of Civil Rights has

17  initiated investigations against a dozen elite schools,

18  including Yale, Dartmouth, UVa, Berkeley, Princeton, and

19  Harvard Law, prompted by allegations that institutional

20  indifference towards such complaints has created a hostile

21  environment for women."

22       It's fair to say that Ms. Erdely, as one avenue of her

23  reporting, was going to focus on the concept of institutional

24  indifference by an administration that creates a hostile

25  environment for women?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

91

1  A    Well, I mean, I think yes, but I think with what she's

2  drawing from here is that these colleges were under Title IX

3  investigation, and these were some of the allegations from the

4  Department of Education.

5  Q    And this is one of her avenues of reporting, wasn't it,

6  that she was going to focus on an institution that had been

7  criticized for institutional indifference; isn't that correct?

8  A    It's a possibility, yes.

9  Q    It's a possibility that she was going to focus on?

10  A    Right.

11  Q    In her pitch, Ms. Erdely also writes, towards the bottom

12  of the page in the last paragraph, "I'd like to examine sexual

13  assault on college campuses:  The various ways colleges have

14  resisted involvement, and (as was recently revealed at

15  Occidental College) juke their stats to make their campuses

16  appear safer than they are; how they may now be scrambling to

17  clamp down (or side step liability); and especially how that

18  dynamic is translating into daily social life and hookup

19  culture.  As the story's main thread I'll focus on a sexual

20  assault case on one particularly fraught campus -- possibly at

21  Yale, though the field is wide -- following it as it makes its

22  way through university procedure to its resolution or lack

23  thereof."

24      Ms. Erdely wrote those words, did she not?

25  A    Yes, she did.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

92

1  Q    And one avenue of her reporting that she told you in this

2  pitch was that she was going to focus on the various ways

3  colleges have resisted involvement in sexual assaults; isn't

4  that correct?

5  A    It was a possible avenue, yes.

6  Q    And another possible avenue that she was going to pursue

7  was to focus on how colleges, quote, juke their statistics to

8  make their campuses appear safer than they are; isn't that

9  correct?

10  A    Yes, but, I mean, this was also -- this was -- this had

11  been revealed that Occidental College did it.  I mean, this

12  was in the news that Occidental College was alleged to have

13  juked their stats.

14  Q    Now, Ms. Erdely in "A Rape On Campus" in the final

15  version of the article that was ultimately published did have

16  a section talking about statistics at the University of

17  Virginia, did she not?

18  A    Yes, she did.

19  Q    And how they're hard to find?

20  A    Yes, that's true.

21  Q    And in that she included a quote from -- a supposed quote

22  from Dean Eramo about why they're hard to find, that nobody

23  wants to send their daughter to the rape school; isn't that

24  correct?

25  A    That is correct.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

93

1  Q    Now, she also, as one avenue of reporting, wanted to

2  focus on how colleges may be scrambling to clamp down or

3  sidestep liability; isn't that correct?

4  A    Yes, that's correct.

5  Q    She didn't write that she wanted to focus on how colleges

6  are trying to step up and address this problem.  She wrote

7  that she wanted to focus on how colleges may be scrambling to

8  clamp down or sidestep liability; isn't that correct?

9  A    That is correct.

10  Q    And she also told you and Mr. Dana as part of an avenue

11  of reporting, one of her avenues of reporting, that she was

12  going to focus on a sexual assault case on one particularly

13  fraught campus, following it as it makes its way through

14  university procedure to resolution or lack thereof.

15      She was very open to the possibility that a university

16  was not going to have follow-through on a procedure and a

17  resolution; isn't that correct?

18  A    We didn't know where the reporting was going to take us,

19  but...

20  Q    But that was an avenue of reporting that she was focused

21  on?

22  A    It was a possibility.  I didn't mean to speak over you.

23  Q    And you thought that this was a good pitch, didn't you?

24  A    I thought it was a solid pitch, yeah.

25  Q    And you thought that this was a good topic for Rolling

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

94

1   Stone magazine to cover, didn't you?

2   A    In 2014, this was a very big topic.

3   Q    You approved this pitch, did you not?

4   A    I did.

5   Q    You didn't push back on Ms. Erdely and say, hey, maybe

6   this is too slanted one way or the other?

7   A    No, no, but I didn't know -- this was a proposal.  This

8   could have -- she could have gone anywhere with this.  And we

9   talked about any number of campuses where this could have

10  taken place and what the story was going to be.

11  Q    Now, Ms. Erdely says in her pitch that she -- if we could

12  pull that back up in the last paragraph -- that she wants to

13  follow a sexual assault case as it makes its way through

14  university procedure to resolution or lack thereof.  It's fair

15  to say that, according to Ms. Erdely, that was Jackie's case

16  as it made its -- there was lack of resolution, according to

17  Ms. Erdely, of Jackie's case; isn't that correct?

18  A    Well, yeah, there was a lack of resolution to Jackie's

19  case, yes.

20  Q    Now, you approved this pitch in the spring of 2014; is

21  that correct?

22  A    Yeah, I don't remember the exact date but spring, late

23  winter, sounds right.

24  Q    And after the approval of the pitch, then Ms. Erdely was

25  thereafter allowed to go out and begin her reporting on "A

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

95

1  Rape On Campus"; is that right?

2  A    Yes, that's how it works.

3  Q    So between spring 2014 until August of 20 -- I'm sorry,

4  October of 2014, October 2014 is when Ms. Erdely turns in her

5  first draft of "A Rape On Campus" to you; is that correct?

6  A    That is my recollection.  I think the record shows that.

7  Q    Let's look at Plaintiff's Trial Exhibit 38.

8       Plaintiff's Trial Exhibit 38, and this goes on for many

9  pages, and you can flip through, but this is Ms. Erdely's

10  first draft of "A Rape On Campus" that she turned in to you on

11  October the 11th, 2014; is that correct?

12  A    Yes, that is correct.

13  Q    And this was the first draft that you had reviewed of "A

14  Rape On Campus"; is that right?

15  A    Yes.  We had had discussions over the summer about the

16  reporting, but this was the first draft I saw.

17  Q    And in her first draft, if we can turn to Bates 2260 to

18  2261.  This is the first section of the article that depicts

19  the aftermath of Jackie's alleged gang rape where she meets

20  the three friends.  I'll let you get there.

21  A    Yes, I see it.

22  Q    Is that right?

23       This is that section of the article that was

24  ultimately -- it was ultimately published in a similar way, in

25  the final draft of the article that depicts Jackie's

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

96

1   experience after the gang rape where she meets her three

2   friends, correct?

3   A    That is correct.

4   Q    And Ms. Erdely in her first draft, there's a -- there's a

5   section highlighted here where she says, "She says-all her

6   POV."

7        Do you see that?

8   A    I do.

9   Q    And in this first draft, Ms. Erdely was communicating to

10  you that the quotes that are attributed in the three friends

11  section to Cindy, Randall, and Alex, were all from Jackie --

12  Jackie's point of view; isn't that correct?

13  A    Yeah.  I mean, I think the whole lead was as her point of

14  view, is really what -- you know, in these notes too.  Yes, it

15  does contain that as well.

16  Q    And Ms. Erdely, including those bold brackets, was

17  communicating to you as deputy managing editor and assigning

18  editor that all of these quotes here in the three friends

19  section were all from Jackie's point of view; isn't that

20  correct?

21  A    Yes.

22  Q    Okay.  Let's look at Plaintiff's -- before we get there,

23  we're going to flip back and forth.

24       After Ms. Erdely turned in the first draft, you reviewed

25  the first draft on a computer, correct?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

97

1    A    I think I might have maybe printed it out rather and

2    marked out and then put in my notes, yes.

3    Q    But you put in your notes and edited it in like a word

4    processing system and sent her back another draft of the

5    article?

6    A    Yeah, in a Word document.

7    Q    In a Word document?

8    A    Yes.

9    Q    Let's look at that Word document, Plaintiff's Trial

10   Exhibit 39.  And in particular, I want to direct your

11   attention to Bates ending in 3220.

12        And just so we orient the jury, this -- the prior

13   document we were looking at was Ms. Erdely sending her first

14   written draft to you, and now we're looking at your comments,

15   sending them back to Ms. Erdely after you edited the document.

16   Fair?

17   A    First pass, yes.

18   Q    Okay.  First pass through?

19   A    Yeah.

20   Q    And if you look, and feel free to flip back and forth if

21   you'd like, the description of the three friends doesn't

22   change at all with the sole exception that where Ms. Erdely

23   had "all her POV," all her point of view, you changed to

24   "Jackie recalls"; is that correct?

25   A    Yes, ma'am, I did.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

98

1    Q    You didn't go through the rest of the quotations to

2    attribute those to Jackie.  You just did it in this one place

3    where Ms. Erdely said "all her POV," correct?

4    A    Yeah.  I thought it was clear to the reader that this was

5    all Jackie's recollection.  I've been criticized for this, and

6    I'll own that criticism.

7    Q    But, for example, at the very bottom of the second page

8    in -- the last paragraph says, "Still detached, Jackie

9    listened as Cindy prevailed over the group.  She's going to be

10   the girl who cried rape, and we'll never be allowed into any

11   frat party again."

12       That doesn't suggest that that was Jackie's point of

13   view.  That suggests that Cindy actually made those words --

14   made that statement; isn't that correct?

15   A    Yes, but I really thought -- I thought I had made it

16   clear to the reader that we were at Jackie's point of view,

17   and I really regret the way I handled this.  But I thought the

18   whole lead of Jackie listened, Jackie recalls, I thought this

19   was clearly Jackie's memory.  And I've been fairly harshly

20   criticized for that and I accept that.

21   Q    I just want to be clear so the jury understands,

22   Ms. Erdely raised this issue with you, all her point of view,

23   in the first draft; isn't that correct?

24   A    I don't know if she was raising the issue.  She was

25   letting me know that this was -- she was making it clear to

1  me.  It was a writer's note to an editor.

2  Q    She was communicating, her being the writer, to her

3  assigning editor and to the deputy managing editor of Rolling

4  Stone, to you, that this section was all Jackie's point of

5  view, wasn't she?

6  A    Yes, that's correct.

7  Q    And the only change that you made in the first round of

8  edits was this one place where it says, "Jackie recalls";

9  isn't that right?

10  A    Yes, that's correct.

11  Q    Okay.  Let's go on and let's go back to Ms. Erdely's

12  first draft.

13  A    That's 39 -- which one is that?

14  Q    38.

15  A    38.

16  Q    Now, we're looking at Bates 2262 to 2263.  The bottom of

17  2262 is where we begin and it cuts over.

18      And this is the second section of her draft of the

19  article; is that right?  You can kind of flip back and forth

20  to orient yourself.

21  A    Yeah, that is -- this is what we would call the nut

22  section.

23  Q    It's what you call what?

24  A    A nut section.  It's sort of your view from 30,000 feet.

25  Q    And her view you from 30,000 feet, let's read this.  Her

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

100

1  view from 30,000 feet was:  From reading headlines today, one
2  might think colleges have suddenly become hotbeds of protest
3  by celebrated antirape activists.  But like most colleges
4  across America, gentile University of Virginia has no radical
5  feminist culture seeking to upend the patriarchy.  There are
6  no red-tape-wearing protests like at Harvard, no
7  "sex-positive" clubs promoting the female orgasm like at Yale,
8  no mattress-hauling performance artists like at Columbia, and
9  certainly no "slut walks."  UVa isn't an edgy or progressive
10  campus by any stretch.  The pinnacle of its polite activism is
11  its annual Take Back the Night rally, which on this campus of
12  21,000 students attracts an audience of 50 souls.  But the
13  dearth of attention isn't because rape doesn't happen in
14  Charlottesville.  It's because at UVa, rapes are kept quiet,
15  both by the student body, who brush off rapes as regrettable
16  but inevitable casualties of their cherished party culture,
17  and by an administration, which critics say is, in brackets,
18  less concerned with protecting students than with protecting
19  its own reputation from scandal.
20      Then Ms. Erdely includes here a note to you which says,
21  "Here?  It's an environment that helps create a free-for-all
22  for the serial predators who inevitably lurk on every campus."
23  Isn't that correct?
24  A    Yes, that's what it says here.
25  Q    Now, in the prior sentence, Ms. Erdely includes in

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

101

1   brackets in that sentence that talks about an administration

2   that's less concerned with protecting students than with

3   protecting its own reputation from scandal, she includes

4   brackets, "which critics say is."

5       Do you see that?

6   A   I do.

7   Q   And Ms. Erdely, by including that phrase in brackets, was

8   posing a question to you, was she not?

9   A   I actually don't know what she intended to mean with

10  these brackets here.  We included that in the final draft is

11  my recollection.  We say, "which critics say" and right below

12  this we list some of the critics.

13  Q   Well, Ms. Erdely here includes the brackets to suggest

14  that maybe she shouldn't include that; isn't that correct?

15  A   No, I don't -- I didn't see it that way.

16  Q   Is it fair to say that if Ms. Erdely had not included

17  that bracket, those words, "which critics say," that that

18  sentence would have suggested that Rolling Stone, not critics

19  but Rolling Stone, was saying that the UVa administration is

20  less concerned with protecting students than with protecting

21  its own reputation from scandal?

22  A   Yeah, that's why I included it in the final piece because

23  I think we're making it clear that this is some of the

24  criticism coming from other sources.

25  Q   Well, Ms. Erdely put that in brackets.  Why, if she were

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

102

1  going to -- if there was any question in her mind if it was

2  critics who were saying this, why include it in brackets at

3  all, why not just include it as the text of the article?

4  A    I don't know why it's in brackets.  Because the brackets

5  right below have, you know, notes saying here, and that didn't

6  make it in.  I'm not sure what the brackets signify there.

7  But we put it in and we took it seriously in that this was --

8  I certainly read this as we have these critics talking in this

9  piece.

10  Q    Let's look at the end of the second section that we're

11  here in Ms. Erdely's draft.  And if you look at -- at Rolling

12  Stone 2269.  This is the end of the section that we just

13  looked at where she talks about the administration who's more

14  concerned with protecting its reputation from scandal than it

15  is with students.

16      Ms. Erdely writes at the end of the second section in a

17  note to you, she asks, "End on a different note?  The point:

18  That despite the lip service given to rape at UVa and at

19  colleges nationwide, in reality, the combination of a

20  rape-tolerant student body and an indifferent administration

21  creates a collegiate environment that's a free-for-all for

22  sexual predators."

23      She included that note to you, did she not?

24  A    Yes, she did, and I cut it.

25  Q    You understood, did you not, that Ms. Erdely was telling

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

103

1   you that the point of this section was that despite the lip

2   service given to rape at UVa and at colleges nationwide, in

3   part, in reality, in part, that it's a result of an

4   indifferent administration?  That's what she told you, did she

5   not?

6   A    That is a note she has here.  I don't think we ended up

7   agreeing on that, and I cut it.  That's why it didn't end up

8   in the final piece.

9   Q    She was asking you if this was the right note to end on,

10  was she not?

11  A    Right, and I disagreed.

12  Q    But you didn't change the article, did you?  You didn't

13  change the prior paragraphs in the article, did you?

14  A    There were changes throughout this drafting process.

15  Q    But you certainly didn't cut the prior sentence that we

16  talked about that the dearth of attention isn't because rapes

17  don't happen in Charlottesville, it's because at UVa rapes are

18  kept quiet, both by the student body who brush off rapes as

19  regrettable but inevitable casualties of their cherished party

20  culture, and by an administration which critics say is less

21  concerned with protecting students than with protecting its

22  own reputation from scandal.

23       It's the same point that she's making, isn't it?

24  A    Yeah, it was redundant, but I think when we're saying

25  critics are saying this, it's different from the magazine

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

104

1  saying it.  We list the criticisms and we also -- we tried to

2  be balanced in that section of it.

3  Q    But Ms. Erdely was communicating to you that that was the

4  point of the section, wasn't she?

5  A    She was trying to make a point to me and I disagreed with

6  it, a typical conversation between a reporter and an editor.

7  Q    But you didn't disagree with it so much that you cut that

8  prior sentence earlier in the draft, did you?

9  A    I think it's fair to have critics talking in an article.

10  Q    You didn't cut the sentence that critics say that the

11  school is more concerned with protecting its own reputation

12  than it is with sexual assault survivors, did you?

13  A    No, I did not.

14  Q    Let's look at Section 4 of the first draft -- of

15  Ms. Erdely's first draft.  And that is at --

16  A    Are we going back to 38?

17  Q    38.

18  A    Okay.

19  Q    38 at Rolling Stone 2274.

20        And if you want to flip forward a little bit.  Section 4

21  is the section where Ms. Eramo is really for the first time

22  introduced to the reader; isn't that correct?

23  A    I might be on the wrong page.  I'm sorry.  What was it?

24  Q    2278.

25  A    2278.  Sorry.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

105

1     Yes.  Here we are.

2  Q   So 2278, that's the beginning of Section 4 where

3  Ms. Eramo is really introduced to the reader for the first

4  time in a meaningful way; isn't that correct?

5  A   That is correct.

6  Q   And that's where she's meeting with Jackie for the first

7  time, and Jackie is, according to the article, telling her all

8  about her alleged sexual assault at Phi Psi; is that right?

9  A   Yes.

10  Q   Ms. Erdely in her first draft has a heading that she uses

11  to summarize Section 4, does she not?

12  A   She does.

13  Q   And in that summary she says, "Four:  Jackie reports,

14  gets the Eramo/UVa treatment."  That was the heading, was it

15  not?

16  A   Yes, it was.

17  Q   In this section -- we go to the next page -- Ms. Erdely

18  writes that, if Dean Eramo was surprised at Jackie's story of

19  gang rape, it didn't show."

20     Fair to say that that was the Eramo treatment that

21  Ms. Erdely was talking about in her heading on Section 4?

22  A   No, I disagree with that.

23  Q   Ms. Erdely also says, and includes in this section, a

24  critique of schools who are offering victims a choice as to

25  whether they pursue their sexual assault.  And she writes,

1  "Like many schools, UVa has taken to emphasizing that in

2  matters of sexual assault, they cater to victim choice.  If

3  students feel that we are forcing them into a criminal or

4  disciplinary process that they don't want to be part of,

5  frankly we'd be concerned that we would get fewer reports,

6  says Susan Davis.  Which in theory makes sense:  Being forced

7  into an unwanted choice is a sensitive point for a sexual

8  assault victim.  But in practice, that utter lack of guidance

9  can be counterproductive for a traumatized 19-year-old who is

10 so wracked with emotional pain, as Jackie was, that she can

11 barely get out of bed.  Setting aside for a moment the

12 absurdity of a school offering to internally handle the

13 investigation and adjudication of a felony sex crime-something

14 Title IX requires but which no liberal arts school on Earth is

15 equipped to do-the sheer menu of choices, paired with the

16 reassurance that any chase is the right chase, often has the

17 end result of coddling the victim into doing nothing."

18      Ms. Erdely wrote that in her first draft, did she not?

19 A    She did.

20 Q    So fair to say that by offering -- Ms. Eramo offering

21 Jackie, quote, a sheer menu of choices paired with the

22 reassurance that any choice is the right choice, that that was

23 the Eramo treatment that Ms. Erdely was talking about in the

24 heading of Section 4?

25 A    No, I disagree with that.  I think this is a criticism of

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

107

1   choice.

2   Q   Ms. Erdely goes on in this article to quote Laura Dunn.

3   She says:  This is a trend I'm seeing on many campuses that's

4   very alarming, says Laura Dunn of the advocacy group

5   SurvJustice.  Schools are assigning people to victims who are

6   pretending or even thinking they're on the victim's side when

7   they're actually discouraging and silencing them.  It's a

8   harsh critique but it's true:  Advocates who survivors love

9   are part of the system that is hiding and failing to address

10  sexual violence.

11      Ms. Erdely quoted Miss Dunn in her draft that way, did

12  she not?

13  A   Yes.

14  Q   Isn't it fair to say that Ms. Erdely was suggesting that

15  Nicole Eramo was pretending she was actually on Jackie's side

16  when she was discouraging and silencing Jackie?

17      Wasn't that the Eramo treatment that Ms. Erdely was

18  referring to in the heading of Section 4?

19  A   No, I disagree with that characterization.

20  Q   Let's look at 2278.  We're going to go backwards a couple

21  pages.

22  A   Sure.

23  Q   Ms. Erdely writes in her draft:  In May 2013, Jackie

24  found herself in the Peabody Hall office of Dean Eramo, the

25  head of UVa's Sexual Misconduct Board.  This was a big step

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

108

1  for Jackie.  She still hadn't even managed to tell her own

2  mother what had happened at Phi Kappa Psi, although Jackie's

3  mom made an educated guess, especially after finding sexual

4  assault pamphlets Jackie had grabbed from UVa's Women's

5  Center.

6      And then Ms. Erdely includes a note in her draft, "TK

7  that with mom," meaning to confirm that with Jackie's mother;

8  isn't --

9  A    Yeah, it's an editor -- it's a journalistic phrase, "TK."

10  You're going to get it, hopefully.

11  Q    Ms. Erdely included this in her draft as a note to

12  herself and to you that she needed to check with Jackie's mom

13  about the accuracy of what she had written in that draft;

14  isn't that correct?

15  A    Yes, that's correct.

16  Q    But she never did that, did she?

17  A    We never got in touch with the mother.  She wouldn't call

18  us back.

19  Q    Let's look at the bottom of 2278, going over onto the

20  page of 2279.

21      Ms. Erdely writes:  Concerned about disease, she, Jackie,

22  had gone to a health clinic and discovered she had contracted

23  syphilis.

24      "To confirm medical records."

25      Do you see that?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

109

1   A    I do.

2   Q    And that was a note that Ms. Erdely wrote to herself and

3   to you that she needed to obtain medical records from Jackie

4   to confirm what Jackie had told her about contracting syphilis

5   and having gone to obtain medical treatment for that; isn't

6   that correct?

7   A    That is correct.

8   Q    She didn't do that either, did she?

9   A    She did not.  Jackie never provided them.  I thought she

10  had at one point, but she never did.

11  Q    And it's fair to say that medical records would have

12  confirmed that Jackie had in fact contracted an STD -- had she

13  gotten them, would have corroborated or not corroborated

14  Jackie's claim that she contracted an STD on or around the

15  time of her alleged rape?

16  A    Yes, that's true.

17  Q    It would have corroborated Jackie's story, would it

18  have -- or not?

19  A    An element of it.  But Jackie asked us to remove the

20  syphilis from the draft at some point, talking to Miss

21  Garber-Paul, I think, as testimony showed earlier.

22       Yeah, we didn't get -- we didn't get --

23  Q    The medical records wouldn't have just corroborated the

24  fact of the existence or nonexistence of syphilis.  It would

25  have corroborated other elements of Jackie's story, would it

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

110

1    have not?

2    A    It would have been one element.

3    Q    But Ms. Erdely never got those medical records, did she?

4    A    No, she did not.

5    Q    Let's look at Ms. Erdely's first draft on 2293.  We're

6    going to flip forward a couple of pages.

7        And this is the section of the article that deals with

8    the bottle incident.  You see where we are, "but payback"?

9    A    2293.  Yup.

10   Q    And it goes on to 2294.

11   A    Sure.

12   Q    Ms. Erdely writes:  But payback for being so public on a

13   campus accustomed to silence was swift.  This past April, in

14   separate incidences, both Emily Renda and Jackie were harassed

15   by men outside bars on the Corner who recognized them from

16   presentations and proceeded to yell slurs, calling them cunt

17   and feminazi bitch.  One flung a bottle at Jackie, which

18   struck her hard in the side of the face, leaving a blood-red

19   bruise around her eye.  Quote, those boys, I've never seen

20   them in my life, and they hate me, Jackie says, parentheses,

21   who reported the attack to Charlottesville Police.  It remains

22   an open investigation.

23       Ms. Erdely included that fact in her first draft to you,

24   the fact that the bottle incident had been reported to the

25   police; isn't that correct?

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

111

1  A    Yes, that is correct.

2  Q    She goes on in the next paragraph -- we can go over onto

3  2294.

4       Ms. Erdely goes on to write:  She e-mailed Dean Eramo so

5  they could discuss the attack -- the bottle attack and discuss

6  another matter too which was troubling Jackie a great deal.

7  Because through her ever-expanding network, Jackie had come

8  across something disturbing:  two other young women who she

9  says confided that they too had been Phi Kappa Psi gang rape

10 victims.

11      Now, in this paragraph Ms. Erdely introduces Dean Eramo

12 again to tell the readers that Jackie told Ms. Eramo about the

13 two other alleged victims; isn't that correct?

14 A    Yes, that's correct.

15 Q    But Ms. Erdely in this paragraph doesn't include the fact

16 that Dean Eramo took Jackie to the police for the bottle

17 incident, does she?

18 A    No, we do not.

19 Q    And she didn't include it in the parenthetical that we

20 looked at previously, that Jackie had reported it to the

21 police and that it remained an open investigation, did she?

22 A    No.

23 Q    She left out the fact, notwithstanding the fact that she

24 knew and she had e-mails from Dean Eramo to Jackie setting up

25 those police meetings, and she didn't include it in the draft

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

112

1   of her article, that Dean Eramo set those meetings up, did

2   she?

3   A    That is correct.

4   Q    Now, let's look at your edits to this section.

5   Plaintiff's Trial Exhibit 39, if you could look at 3251.

6        Just so the jury is with us, we were looking at

7   Ms. Erdely's first draft, and now we're looking at your edits

8   to Ms. Erdely's first draft and what you sent back to her.

9   A    Right.

10   Q    And this is the same section that you have cut down;

11   isn't that correct?

12   A    Yes.  The piece was many thousands of words too long.

13   Q    And as editor, you were responsible for cutting pieces

14   out; isn't that right?

15   A    That's correct.

16   Q    And here, the end of the first paragraph, the last

17   sentence, "One flung a bottle at Jackie, which struck her hard

18   in the side of the face, leaving a blood-red bruise around her

19   eye."

20        That's where Ms. Erdely in her first draft had included

21   the reference to the fact that there was an open police

22   investigation; isn't that correct?

23   A    That's correct.  And I cut it.

24   Q    You cut it?

25   A    Yes, I did.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

113

1   Q    You made that call?

2   A    Yes, I did.  It was a dead end.

3   Q    I'm sorry?

4   A    It was a dead end.

5   Q    But you also knew, before publication of "A Rape On

6   Campus," that Dean Eramo had taken Jackie to the police,

7   didn't you?

8   A    I believe I did, yes.

9   Q    You had seen those e-mails?

10   A    I had seen those e-mails.

11   Q    And you cut it from the draft?

12   A    I did, because I thought it was about the bottle

13   incident.  And the bottle incident didn't seem to go anywhere,

14   other than Jackie got assaulted.

15   Q    Let's look at a graphic that shows Ms. Erdely's first

16   draft, which is on the left-hand side, and your edits to her

17   first draft on the right-hand side.  And in particular, I want

18   to draw the jury's attention to the red parenthetical that was

19   in Ms. Erdely's first draft.

20      Is this a fair and accurate depiction of what Ms. Erdely

21   wrote in her first draft and how you edited it after you

22   received it from her?

23   A    I believe it is.

24   Q    Now, you just testified that you believed that the police

25   report and the e-mails only had to do with the bottle

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

114

1  incident.  Is that your testimony?

2  A    Yes, that is my testimony.

3  Q    Let's look at the police e-mails.  Let's look at

4  Plaintiff's Exhibit 81.

5  A    81?

6  Q    I'm sorry.  It's 18.  Sorry.  It was 81 for the

7  deposition.  It's 18 for the trial.

8  A    We've had a lot of conversations.

9  Q    If only we were able to flip the numbers on all of the

10 exhibits, then it would be a lot easier to follow along, but

11 unfortunately not.

12 A    18.

13 Q    18.

14    Plaintiff's Trial Exhibit 18 are the e-mails between

15 Nicole Eramo and Jackie that you had reviewed prior to

16 publication of "A Rape On Campus"; isn't that correct?

17 A    Yes, I saw these at some point.

18 Q    You saw these before the article was published; isn't

19 that right?

20 A    That is correct.

21 Q    And you saw them because Jackie had forwarded them to

22 Ms. Erdely; isn't that correct?

23 A    I believe that's how, yeah.

24 Q    Let's look at the April 22nd e-mail on Bates 17033, so

25 two pages in.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

115

1      And I know we've seen this a lot, so I'm not going to

2   belabor this point.  But I just want to establish that you, as

3   deputy managing editor at Rolling Stone, saw these e-mails

4   before "A Rape On Campus" was published.

5   A    I did.

6   Q    And here in this e-mail Ms. Erdely -- I'm sorry,

7   Ms. Eramo was talking about:  If the individuals are already

8   caught up in the legal system, then they and their brothers

9   will have a strong disincentive from retaliating against you.

10      Do you see that language?

11  A    I do.

12  Q    And you understood that Ms. Eramo was talking about

13  retaliation in reference to Jackie speaking out about her

14  sexual assault; isn't that correct?

15  A    I believe that to be true, yes.  But I believe this whole

16  e-mail to really be about the bottle incident.

17  Q    But she's talking about retaliation.  Retaliation for

18  what?  For the sexual assault.  Isn't that correct?

19  A    We're also talking about reporting here, and she didn't

20  want to move forward with the bottle incident particularly.

21  So I -- I didn't see it -- this e-mail particularly to be

22  about a sexual assault.

23  Q    But you never asked the question, did you, Mr. Woods?

24      You never asked the question of Ms. Erdely or of Jackie:

25  Did Nicole Eramo take you to the police for the sexual

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

116

1  assault?

2      You never asked that question, did you?

3  A    No.  I took this to be about the bottle incident.

4  Q    You had police e-mails.  You knew that Nicole Eramo set

5  up multiple meetings with the police, and you never bothered

6  to ask the question whether it had anything to do with the

7  sexual assault, notwithstanding the fact the e-mails talk

8  about "retaliating against you"?

9  A    I'm not sure I knew there were multiple meetings with the

10  police.

11  Q    This e-mail talks about multiple meetings with the

12  police.

13  A    I'm -- really?

14  Q    We can go through it if you'd like.

15  A    I think I didn't understand that when I read it the first

16  time.  I thought this was in regards to the bottle incident.

17  Q    Why don't you flip through this e-mail and review it, and

18  tell me if you dispute that there -- that this e-mail is in

19  fact about multiple meetings with the police.

20      And if you look at the back of the e-mail, she's talking

21  about setting up a meeting.

22  A    April 28th?  April 22nd.

23  Q    You look at --

24  A    No, you're correct.

25  Q    Mr. Woods, under what circumstances did you review these

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

117

1　police e-mails?  Why did you review them?

2　A   I think I was just talking to Liz Garber-Paul about maybe

3　the bottle incident.  I don't really recall the conversation.

4　And I don't know if I saw all of them.

5　　I definitely saw this last -- or the first one, April

6　22nd.  That's the one I remember.

7　Q   You had already cut the reference to the fact that Jackie

8　had reported the bottle incident to the police department.  We

9　saw -- we can go back and look at your e-mail.

10　　It was October 15th that you sent this draft back to

11　Ms. Erdely; isn't that correct?

12　A   That is correct.  But that doesn't mean I don't want to

13　see information from my fact checker.

14　Q   But if it wasn't a relevant piece of information and you

15　had already cut it, what was the point in looking at these

16　e-mails at all?

17　A   I disagree that it was not relevant.  I think the bottle

18　incident was relevant, and I just wanted to make sure it

19　happened.

20　Q   Just not relevant enough to tell your readers that Nicole

21　Eramo set up that meeting with the police; isn't that correct?

22　A   And I disagree with that characterization.

23　Q   It's fair to say, Mr. Woods, that as deputy managing

24　editor of Rolling Stone and the assigning editor for "A Rape

25　On Campus," you took, you personally took, no steps whatsoever

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

118

1  to determine whether Dean Eramo had taken Jackie to the police

2  for her sexual assault; isn't that fair to say?

3  A   That's typically not what I do, but yes, that's fair to

4  say.

5  Q   And it's fair to say that as you sit here today, you

6  can't say with certainty whether Ms. Erdely knew the entire

7  scope of Jackie's interactions with the police?

8  A   Yeah, I'd say that's correct.

9  Q   You didn't feel you had a role in it, did you?

10  A   No, I had a -- I had a role in this story, and I accept

11  that.

12  Q   But you didn't feel like you had a role to figure out

13  what the scope of the interaction was between the police,

14  Jackie, and Ms. Eramo.  You didn't think that that was your

15  role, did you?

16  A   I had a reporter and a fact checker doing that.

17  Q   But the buck stopped with you, didn't it?

18  A   That's absolutely true.

19       MS. LOCKE:  Your Honor, at this point I'm at a good

20  stopping place for the evening.  I'm about to get into another

21  long module.

22       THE COURT:  Good.  That sounds like a good plan.

23    So, ladies and gentlemen, as you've heard, counsel

24  indicates that this is a good stopping point for the day, and

25  we will conclude.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

119

1    While you're away from us this afternoon, I would ask

2  that you not discuss the case with one another.  Do not permit

3  anyone to discuss it with you.  Don't attempt to do any

4  research about the case at home.  Don't attempt to listen to

5  any account of the case on radio or TV or read anything that's

6  written about the case in the news media.

7    And I'll ask the witness not to discuss his pending

8  testimony with counsel from either side.

9    As for the next two days, we'll plan to remain on the

10  regular schedule, but there may be some deviations, and we'll

11  try to let you know about those as quickly as possible.  But

12  the Court will honor its commitment that you be allowed to

13  have Saturday off, and we won't be having court this Saturday.

14    You folks are excused at this time.  We'll see you at 8

15  in the morning.  Thank you, and have a safe trip home.

16    (The jury was excused for the day at 5:47 p.m.)

17      THE COURT:  Please be seated for just a moment.

18    I wonder, Mr. Clare, Miss Locke, can you give us some

19  idea about the length of the remaining portion of your case?

20      MR. CLARE:  I think so.  So we have -- we're making

21  very good progress.  Miss Locke will need to finish her

22  examination of Mr. Woods, which we anticipate tomorrow

23  morning.  And I know Mr. Sexton will probably have a few

24  questions for him.  I don't know how long we can anticipate

25  that lasting.

Eramo vs. Rolling Stone, et al. - 10/26/2016 Vol. 2

120

1      After that, we have one more, maybe two more, live

2  witnesses, and then we have two, I would call them, extended

3  designations to play.  We have Mr. Will Dana, who is the

4  managing editor of Rolling Stone at the time, and we also have

5  Mr. Jann Wenner, who is the owner and publisher of the

6  magazine, both of whom are important to the corporate

7  liability issue that Your Honor will be considering.

8      We have one more student witness who we will put on live

9  tomorrow, and then that's it.  That should be it.

10     We have some shorter designations that we'll discuss with

11 Your Honor tonight, some of which may end up getting moved to

12 the later phase.

13         THE COURT:  Do you anticipate finishing tomorrow?

14         MR. CLARE:  I think we will be finished tomorrow.  A

15 lot of that will depend on Mr. Sexton.

16         THE COURT:  Okay.  All right.  So we have some

17 designations to do.  We'll proceed to that immediately.

18     The Court will be seeing everyone at 8 in the morning.

19 Have a good evening.

20     Ask the marshal declare the Court adjourned for the day.

21     (Court adjourned for the day at 5:48 p.m.)

22                         *   *   *

23              CERTIFICATE OF REPORTER
        I certify that the foregoing is a correct transcript of
24 the record of proceedings in the above-entitled matter.

25 10/26/16                /s/  Lance A. Boardman, RDR, CRR