```
 1                UNITED STATES DISTRICT COURT

 2           FOR THE WESTERN DISTRICT OF VIRGINIA

 3                  CHARLOTTESVILLE DIVISION

 4

 5   ******************************
     NICOLE P. ERAMO,            * CIVIL ACTION 3:15-CV-00023
 6                               * NOVEMBER 1, 2016
           Plaintiff,            * JURY TRIAL, Vol. 1
 7   vs.                         * PLAINTIFF'S CLOSING ARGUMENT
                                 *
 8   ROLLING STONE,LLC,          *
     SABRINA RUBIN ERDELY,       *
 9   WENNER MEDIA, LLC,          * Before:
                                 * HONORABLE GLEN E. CONRAD
10         Defendants.           * UNITED STATES DISTRICT JUDGE
                                 * WESTERN DISTRICT OF VIRGINIA
11   ******************************

12   APPEARANCES:

13   For the Plaintiff:    THOMAS ARTHUR CLARE, ESQUIRE
                           ELIZABETH MARIE LOCKE, ESQUIRE
14                         ANDREW CLAY PHILLIPS, ESQUIRE
                           JOSEPH R. OLIVERI, ESQUIRE
15                         Clare Locke, LLP
                           902 Prince Street
16                         Alexandria, VA  22314

17
     For the Defendants:   ELIZABETH ANNE McNAMARA, ESQUIRE
18                         ALISON SCHARY, ESQUIRE
                           SAMUEL B. BAYARD, ESQUIRE
19                         Davis Wright Tremaine, LLP
                           1251 Avenue of the Americas, 21st Flr.
20                         New York, NY  10020

21

22   Court Reporter:  JoRita B. Meyer, RPR, RMR, CRR
                       210 Franklin Road, S.W.
23                     Roanoke, Virginia  24011
                       540.857.5100, Ext. 5311
24
             Proceedings recorded by mechanical stenography;
25    transcript produced by computer.
```

1    APPEARANCES (Continued):

2    For the Defendants:      W. DAVID PAXTON, ESQUIRE
                              J. SCOTT SEXTON, ESQUIRE
3                             MICHAEL FINNEY, ESQUIRE
                              Gentry Locke Rakes & Moore
4                             P. O. Box 40013
                              Roanoke, VA  24022
5    ///

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CONTENTS

2

3   PLAINTIFF'S CLOSING ARGUMENT

4     By Mr. Clare........................4

5   ///

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   (9:31 a.m.)

 2   (Jury in)

 3              THE COURT:  I count all ten jurors back in their

 4   places, ready for the next stage of the trial.

 5              Folks, as you will recall, both sides have now

 6   rested their respective cases, and it becomes time for you to

 7   consider the closing arguments of counsel.

 8              Keep in mind what I've said at the outset of the

 9   trial.  The arguments of counsel are not evidence.  They're

10   merely summaries to help you remember what the evidence has

11   been, focus on what each side believes is important, and

12   understand each side's theory of the case.

13              Under the rules of court, the plaintiff has the

14   opportunity to make the first and last closing statement

15   inasmuch as the plaintiff carries the burden of proof by a

16   preponderance of the evidence in some respects and by clear

17   and convincing evidence in other respects.

18              So, with that explanation, Mr. Clare, are you ready

19   to proceed?

20              MR. CLARE:  Thank you, Your Honor.

21              Good morning, ladies and gentlemen.  Here we are,

22   two weeks later, 12 live witnesses, 11 hours of video

23   testimony, and 286 exhibits admitted into evidence by both

24   sides.

25              I know that you're anxious to begin your
```

1    deliberations, and Nicole and our entire legal team are

2    grateful for the attention and diligence and patience that

3    you've shown with us as we've put on our evidence over the

4    last two weeks.  We've thrown a tremendous amount of

5    information at you all.  And it's evident that you have paid

6    very close attention, and you have done a tremendous job

7    carrying out your oath at the beginning of this case to hear

8    and consider the evidence in resolving this important dispute

9    for Nicole and for her family.

10            I start my argument the same way I began two weeks

11   ago.  This is a case about journalism.  It's not about rape or

12   whether Jackie was or was not sexually assaulted at a

13   fraternity house or whether victim choice is a good or bad

14   policy for universities to follow.  It's not a referendum on

15   the University of Virginia.  The University of Virginia is not

16   a party to this case.  Nicole Eramo is a private citizen; she

17   brought this claim as an individual.

18            This is a case about journalism.  It's about how

19   Nicole Eramo treated Jackie.  It's about whether an

20   experienced professional journalist like Sabrina Erdely and a

21   national magazine like Rolling Stone, whose editors brag about

22   the journalism awards they have won and the high standards

23   that they have for reporting and fact-checking, have to get

24   the facts right before they accuse someone of mistreating and

25   suppressing a brutal gang rape.

1        And, unfortunately, it's about what happens to real

2   people like Nicole Eramo, who get up every day and go do their

3   important jobs, when they become collateral damage in the

4   quest for sensationalized reporting.  And that's exactly what

5   happened here.

6        In "A Rape on Campus," which was first published in

7   November 19th, 2014, and we argue was republished on

8   December 5th, 2014, when Rolling Stone put those editor's

9   notes back up and put the article back up for the world to

10  see, Sabrina Erdely and Rolling Stone falsely accused Nicole

11  Eramo of some horrible things, from discouraging Jackie from

12  telling her story, defending the practice of hiding campus

13  rape statistics for parents "because nobody wants to send

14  their daughter to the rape school," and not reacting to

15  Jackie's allegations of multiple gang rapes at a fraternity.

16       In radio and podcast interviews, in order to

17  generate additional publicity for the article, media

18  appearances set up by Rolling Stone and Wenner Media, Sabrina

19  Erdely answered questions about Nicole Eramo, accusing her of

20  brushing off and suppressing Jackie's allegations, doing

21  nothing with those allegations, not treating rape as a crime,

22  and not reporting Jackie's rape to the police.

23       We've seen the evidence.  We've seen the e-mails.

24  You've heard from the police officers.  You know that's not

25  true.

1      She accused Nicole Eramo of discouraging Jackie from

2 moving the assault forward and meeting Jackie's claim with

3 indifference.  And when other reporters, reporters that had

4 actually done the digging and done the homework, started to

5 ask some questions about the sourcing and the reporting and

6 the attribution in this article, Rolling Stone doubled down on

7 the allegations.

8      They issued a press release on December 1st and

9 circulated it through the 2nd and the 3rd and the 4th of

10 December, accusing Nicole of putting Jackie through an ordeal

11 and again treating her claim with indifference.

12      But they were wrong about all of these things, and

13 that's why we're here.

14      Rolling Stone and Sabrina Erdely made Nicole Eramo

15 the face of institutional indifference for a place where there

16 is no justice for sexual assault victims, where victims are

17 coddled into doing nothing, where advocates are assigned to

18 victims who are pretending or even thinking they're on the

19 victim's side when actually they're discouraging and silencing

20 them, and where reports are met with institutional

21 indifference.

22      All these words appear on the same page as the

23 picture, the doctored photograph of Nicole.

24      Now, these are incredibly serious and false

25 allegations about a person who has devoted her entire adult

1  life to doing the exact opposite of all of these things.  And

2  you've heard the testimony from Nicole about what it took to

3  get to this point in her life.  You've heard the education and

4  the training that she's had, the years she's spent building

5  trust and rapport with students, and you heard from some of

6  those students directly and how much they love Nicole and what

7  she meant in their lives.  That's what makes these allegations

8  so hurtful.

9          And it's now up to you to set the record straight

10  for Nicole with your verdict.

11          After Mr. Sexton and I are done talking to you

12  today, Judge Conrad is going to instruct you on the law that

13  will guide you in your deliberations, and he'll give you a

14  verdict form -- actually, three of them -- to fill out.

15          He's going to instruct you on the law that applies

16  to defamation.  And I realized from one of the notes that was

17  passed earlier in the case that I didn't do a very good job in

18  my opening remarks of explaining to you what defamation is, so

19  I'm going to take that opportunity now.  The judge is going to

20  give you the legal instruction.

21          Defamation -- and I'll show it to you in just a

22  minute, the instruction that Judge Conrad will give you, but

23  defamation is the legal remedy available in the Commonwealth

24  of Virginia to people like Nicole Eramo who have had false

25  things said about them to damage their reputation.

1          Let's look at the definition.  And what I'm going to

2    show you is excerpted from the jury instructions that Judge

3    Conrad will give you and you will have in the jury room to

4    guide your deliberations.

5          And this is the definition of defamation.  It's on

6    page 23 of the jury instruction book that the judge will give

7    to you.  And it's referenced on the verdict form that you will

8    have to fill out.  The judge is going to ask a series of

9    questions about whether the statements at issue in this case

10   are actionable according to this definition.  So this is an

11   important one.

12         For each of the statements at issue, defamation

13   means -- and we will ask you to find, by a preponderance of

14   the evidence, for these elements -- that the defendant made

15   the statement; that the statement was seen, read, or heard by

16   someone other than the plaintiff; that the statement is of and

17   concerning the plaintiff, Nicole Eramo, that the statement was

18   made about her; that the statement is false and defamatory --

19   and I'm going to come back and talk about what defamatory

20   means -- and that Nicole was damaged as a result of the

21   statement.

22         Now, what does it mean for a statement to be

23   defamatory?  The judge will give you another instruction about

24   what that means.  The jury instruction will tell you that

25   defamation is a false factual statement that concerns and

1    harms the plaintiff or the plaintiff's reputation.

2         In the Commonwealth of Virginia, a person has a

3    right to the uninterrupted enjoyment of his or her reputation,

4    and defamation is when someone interrupts the enjoyment of

5    that reputation.

6         To be defamatory, a statement must be more than

7    merely insulting, offensive, unpleasant, or inappropriate.  It

8    must have made Nicole Eramo appear odious, infamous, or

9    ridiculous.

10        Said otherwise, a defamatory statement must be a

11   false statement that harms a person's reputation, rendering

12   her contemptible or ridiculous in the public's estimation and

13   exposing her to public hatred, ridicule, or contempt.

14        All of the statements at issue in this case, the

15   ones that the judge will instruct you on, meet these

16   definitions and meet the definition of defamatory meaning.

17   They were published to a national audience, in the case of

18   Rolling Stone magazine, the print edition, the online edition

19   of the article -- it was published on the internet -- and in

20   those radio and podcast interviews.  The radio broadcast, as

21   you heard, was sent to the entire New York metropolitan area,

22   and the podcast is available on the internet.

23        Those statements describe Nicole specifically by

24   name, in the case of the statements in the article, or in her

25   position as the dean or the trusted dean.  Or in some of the

1    statements, they describe an administrator who treats Jackie a

2    certain way, an administration that brushed off Jackie's

3    claims or suppressed her rape.

4           But Nicole Eramo is the only UVa administrator in "A

5    Rape on Campus" described as having interacted with Jackie.

6           These statements, the ones that we'll be talking

7    about and have been talking about for the past two weeks,

8    damaged Nicole Eramo.  They damaged her reputation, her

9    ability to do her job.

10          You heard Dean Groves talk about the importance of

11   trust in the student community for doing what she does.

12   That's her whole job, is to build trust with these young women

13   and men who come to her.  She told you what a privilege it is

14   to sit with them in their time of need.  And there's a trust

15   that comes in those relationships.  And this article and these

16   statements destroyed that in a minute.

17          And were they defamatory?  Did they cause damage to

18   Nicole?

19          You heard some of the e-mails that Nicole received

20   from readers who read these statements and heard them and felt

21   compelled to look her up and find her e-mail address and write

22   to her about what a despicable human being she is, calling her

23   the dean of rape and other horrible things that plainly,

24   plainly prove that people understood these statements to have

25   the defamatory meaning as required by Virginia law.

1    Now, in his opening statement, Mr. Sexton said that

2 this case requires you to get inside the minds of Sabrina and

3 Sean.  And he talked to you about actual malice.  And that's

4 another thing we're going to have to talk about, because the

5 judge is going to instruct you on what it means to publish a

6 statement with actual malice.

7    There are jury instructions that will guide you on

8 evaluating this.  And I'm going to explain them, go through

9 them briefly now, so that you have them in mind as I present

10 the rest of the evidence to you that we've adduced at trial.

11    The instructions are on pages 32, 35 through 36, and

12 39 of the jury instructions.  And they will talk to you about

13 what the definition of actual malice is and the kinds of

14 evidence that you can consider in evaluating whether there was

15 actual malice.

16    The judge talked to you at the beginning of the case

17 about direct evidence and circumstantial evidence.  And you

18 will see the types of things that the courts and the

19 Commonwealth of Virginia considers to be circumstantial

20 evidence of actual malice.

21    The jury instruction defining actual malice will say

22 that the statement was made with knowledge of the statement's

23 falsity or reckless disregard of whether the statement is

24 false or not.

25    Nobody comes to court and says, "I knew the

1   statements were false when I published them, and I published

2   them anyway."  Or "I recklessly disregarded whether the

3   statement is false or not."  So Judge Conrad will also

4   instruct you that you're entitled to consider that

5   circumstantial evidence bearing on these issues, including

6   failure to investigate under certain circumstances, departure

7   from journalistic standards, evidence of some ill will or

8   intent to injure, and evidence of a preconceived storyline.

9   These are some of the things that are listed on the items that

10  you can consider in evaluating whether the defendants made

11  these statements with actual malice.

12          Judge Conrad will instruct you that you can infer

13  actual malice from certain things if there is evidence that

14  the defendants failed to investigate the story where the story

15  was weakened by inherent improbability and internal

16  inconsistency or apparently reliable contradictory

17  information.  That's the jury instruction.  That is a summary

18  of what happened in this case.

19          A rape story that was too good to be true, quotes

20  from three friends that were too good to be true, internal

21  inconsistencies in the story, and contradictory information

22  available in the reporting file that you all have seen and the

23  audio that you've heard.

24          Judge Conrad will instruct you that if you find the

25  information in defendants' possession at the time of

1    publication did not support the statements that the defendants

2    made or that the defendant was aware of facts contradicting

3    those statements, you can infer actual malice.  And where

4    there exists an apparent reason to question the truthfulness

5    of the source and a defendant makes a deliberate decision not

6    to follow up out of a desire to avoid conflicting information,

7    that can be considered as evidence of actual malice.

8            Now, Mr. Sexton, I anticipate, will stand up after

9    I'm done and tell you that Sabrina and Sean got up here on the

10   stand after the fact and said, "We believed Jackie, and we

11   weren't out to get Nicole, and that we found all of this to be

12   credible until a certain point in time."

13           But you, ladies and gentlemen, are the sole judges

14   of the credibility of that testimony.  And you should

15   carefully scrutinize their testimony under the circumstances

16   under which each witness testified and decide whether or not

17   that testimony is worthy of belief.

18           If you really want to know the truth about what was

19   in someone's mind at a certain point in time back when this

20   article was published and back when it was being investigated,

21   you don't listen to what they say now; you listen to what they

22   said and did at the time and what they did and didn't do at

23   the time, before all of this blew up and before these lawsuits

24   were filed.

25           That includes all of the contrary information about

1    Nicole in Sabrina's reporting file that was shared not just

2    with Ms. Erdely but also with Rolling Stone magazine; her

3    editor, Sean Woods; and the fact-checker, Liz Garber-Paul, who

4    is an employee of Wenner Media, the corporate defendants in

5    this case.

6             You can consider the statements that you heard on

7    audio of Ms. Erdely's contemporaneous statements about Nicole.

8    You hear her time and time again on the audio -- and we're

9    going to listen to it -- talking about what she thinks about

10   these issues and telling these young college women what she

11   thinks and what they should be thinking about Nicole.

12            That's not journalism.  That's not listening to what

13   sources say in reporting on it; that's push polling.  It's

14   telling people your preconceived beliefs and then having it

15   echoed back to you and then reporting on it.  And that's

16   misrepresentation and it's evidence of malice.

17            You also should consider the deviation from

18   journalistic standards in evaluating this.  And a lot has been

19   made in this case about the Columbia Journalism School Report.

20   Everybody has talked about it in this case.  And you will have

21   it available to you in the jury room, if you desire, to read

22   through it for yourselves and see what a Pulitzer

23   prize-winning dean of a journalism school said about "A Rape

24   on Campus" and the journalistic failure that was avoidable.

25            That word "avoidable" is important.  Malice, actual

1   malice, requires recklessness. And you will have to decide

2   whether or not it was reckless. But when something is

3   reckless, there's an element to it where you know there's a

4   danger, you know there's a risk, and you do it anyway. And

5   that's what the Columbia Journalism Review and Dean Coll found

6   when he said the failure was avoidable. And it's a long

7   report. And you can go through it for yourself and see.

8   Don't take my word for it or Mr. Sexton's word for it; read it

9   from yourselves about what it says about the deviation from

10  journalistic standards.

11          You also can evaluate the efforts that they made to

12  cover up the shortcomings in their reporting. We talked a lot

13  about pseudonyms or fake names for no reason. Remember the

14  three friends? They're masking the fact that Sabrina Erdely

15  never spoke to them, masking the fact that their denials -- or

16  their refusals -- excuse me -- to speak with Ms. Erdely all

17  came through Jackie. And you heard from them. You heard from

18  two of the three of them, saying it never happened.

19          The misleading attributions that they put in the

20  story suggesting that they had independent sourcing for a lot

21  of this information, when, in fact, it all came from Jackie.

22  And the lies and misrepresentations that they told to the

23  media after the fact. You heard Mr. Woods say, "We know who

24  these guys are. We verified their existence."

25          We know that's not true.

1    And you heard Mr. Wenner, in his testimony just the

2  other day, say it's okay to lie to the media when he was asked

3  point-blank:  Did people offer to resign over this?  And he

4  said, "Not true.  I don't have an obligation to be honest with

5  the media."

6    This was not just a failure of journalism.  What

7  they did to Nicole here was not just some innocent mistake, as

8  they would have you believe.  They knew exactly what they were

9  doing.  Ms. Erdely and Rolling Stone needed a villain for the

10  story of institutional indifference they wanted to tell.  That

11  institutional villain needed a face.  And that face was Nicole

12  Eramo.

13    Ms. Erdely has spent her entire journalistic career

14  writing story after story of institutional indifference,

15  including a bunch of stories for Rolling Stone edited by Sean

16  Woods.  Rolling Stone, Sean Woods, Will Dana, Jann Wenner, and

17  Wenner Media knew exactly what they were getting when they

18  approved the idea for this story.

19    All of these stories have the same formula.  And

20  with proper credit to a friend of mine, it's the three Vs:

21  victim, villain, and vindicator.  Every one of these stories

22  that Ms. Erdely writes has a victim, victim of a horrible sex

23  crime; an institutional villain engaging in some sort of

24  cover-up, nefarious cover-up, to make sure that the victim

25  does not get justice; and then Ms. Erdely and Rolling Stone

1    are the vindicators, exposing that institutional indifference

2    for the world.

3              Ms. Erdely and Rolling Stone were intent on

4    repeating that exact same formula for their campus rape story.

5    She descended on Charlottesville and started pushing her

6    opinions about institutional indifference and victim choice on

7    young men and women that she talked to.  You heard how

8    frequently in her reporting notes and audio files she was

9    telling the students what she thought about these issues.

10             She took advantage of these kids.  She took

11   advantage of her position as a Rolling Stone reporter.  You

12   know, rock stars.  It's a glamorous thing to be a reporter for

13   Rolling Stone magazine.  And when you're a 19-year-old college

14   student, talking to a Rolling Stone reporter is an exciting

15   opportunity.

16             She took advantage also of the passion that these

17   young men and women have for the advocacy that they do about

18   sexual assault issues.  You heard from some of these young men

19   and women about how much they care about these issues and how

20   they interacted with Nicole about them and how they wanted to

21   tell their story about the positive things that were happening

22   at UVa and talk about advocacy and talk about survivor

23   support.  That's what they thought they were doing.

24             But Ms. Erdely lured them in with promises of

25   bringing national attention to those issues.  And time and

1   time again, she told them what they should be thinking about

2   Nicole.  She zeroed in on one vulnerable, troubled,

3   attention-starved young lady and extracted a really salacious

4   story of a brutal gang rape.

5          Remember, we looked at the instructions about

6   inherent improbability.  That interview where Jackie told the

7   story to Ms. Erdely was at the very, very outset of this

8   conversation.  It came out all in one dose right at the very

9   beginning.  And it was a perfect story in many respects.  It

10  had all of the elements of a perfect story.

11         But when something is too perfect, when something

12  appears too perfect, it usually is.  And that's where you need

13  to take a step back and decide:  Does this really make sense?

14         And at that point, with a perfect victim for the

15  story, the facts about institutional indifference and the

16  facts about how Jackie was not getting justice didn't matter.

17  If the facts that she learned for the rest of her

18  investigation, or Jackie's behavior -- not just what she said,

19  but how she acted and what she would and would not let

20  Ms. Erdely do to investigate -- if it didn't fit that

21  preconceived storyline either as it related to her own assault

22  or as it related to Nicole, it was disregarded.  Reckless

23  disregard for the truth.

24         Ms. Erdely recklessly disregarded the fact that

25  Nicole arranged for Jackie to meet with the police.  You have

1    in your jury books the story -- the article.  The lawyers have

2    talked about it for two weeks.  You'll have it to look at.

3              Read through the entire story yourself.  The law

4    clerk, Christina, read it for us at the beginning.  You will

5    not hear any reference anywhere in the article to Nicole

6    having taken Jackie to the police twice.  That's a really

7    important fact.  And she had the e-mails, and so did Rolling

8    Stone, and so did Wenner Media.

9              Ms. Erdely recklessly disregarded the fact that

10   there were serious discrepancies in Jackie's story.  Now,

11   again, Jackie is not on trial here.  This is not a rape case.

12   And we don't know the reasons why there were these

13   discrepancies.  We're not blaming her.

14             It's true, sometimes victims of trauma have

15   discrepancies in their stories.  But that's why people like

16   Nicole and advocates, as you heard from multiple witnesses,

17   take time to allow the witnesses to talk, to build trust, to

18   make sure that we got the story right before you act on it.

19             There were a lot of discrepancies in Jackie's story

20   that never got resolved.  And there comes a point in time, if

21   you're a magazine writer or you're a magazine, where there are

22   enough discrepancies in a story, where you have a

23   responsibility to say, we don't have this solid enough to push

24   the print button and send this out to millions and millions of

25   people.

1          That's a responsibility the media has, and they

2     failed it here.

3          Ms. Erdely recklessly disregarded the fact of how

4     Jackie behaved.  We've heard the audio.  We heard how Jackie

5     provided Sabrina with all these introductions to people and

6     gladly put her in touch with people to talk to.  But think

7     about who Jackie put her in touch with and who she refused to

8     put her in touch with.

9          Jackie gladly introduced Ms. Erdely to people who

10    had heard Jackie's story from Jackie, but she refused to

11    identify any of the other people who could corroborate or deny

12    what actually happened.

13         The two biggest examples is Drew, the ringleader of

14    the assault -- she refused any effort to identify him or to

15    allow Ms. Erdely to talk to him or to get comment from him --

16    and the three friends, because Jackie said she had had a

17    falling out with them.  We're going to talk more about that

18    falling out later and why that's important.

19         But Ms. Erdely disregarded Jackie's behavior.  And

20    when you're an investigative journalist -- she said she's a

21    pretty good judge of witnesses and characters -- you don't

22    just judge what they say; you judge what they do.  You judge

23    their behavior and whether it makes sense in light of all the

24    other facts that you have.  And her refusal -- Jackie's

25    refusal to put Ms. Erdely in touch with people who could

1    corroborate or deny her story was a giant, waving red flag.

2            Ms. Erdely and Rolling Stone recklessly disregarded

3    the fact that Jackie gladly and willingly provided

4    documentation for irrelevant stuff.  That she worked at the

5    pool.  Big deal.  That doesn't prove anything.  It proves she

6    works at the pool.  It doesn't corroborate her story of a gang

7    rape.  It doesn't make her a teller of truths.

8            But, again, when push came to shove and Ms. Erdely

9    asked for things that would actually corroborate her account

10   of what happened, Jackie refused or had a bunch of stories as

11   to why she couldn't that didn't make any sense.

12           The medical records for the syphilis diagnosis.  We

13   heard just yesterday the audio and the changing stories, "Oh,

14   my mom has it.  No, she doesn't.  It's in my dorm room.  No,

15   it's not.  I don't have it."  They never showed up.

16           Same thing with the dress and other things that were

17   asked for that would have directly corroborated what happened

18   that night.

19           And Ms. Erdely recklessly disregarded the fact that

20   Jackie and everyone else she spoke to -- look in the reporting

21   file for yourself -- told her she was dead wrong about Nicole.

22   But none of that mattered to Ms. Erdely.  None of that

23   mattered to Rolling Stone.  It didn't matter that Jackie was

24   emotionally fragile and, at some point, wanted to pull out of

25   the story.

1          And we will never know why.  Maybe she realized that
2    this was getting bigger than she thought it was by talking to
3    Rolling Stone.  Maybe she was having second thoughts about
4    having her name out there.  Doesn't matter why.
5          Ms. Erdely and Rolling Stone knew that Jackie was
6    emotionally troubled, fragile, and intent on controlling her
7    own narrative.  Those words come from her own file.  But they
8    pushed her into staying involved.
9          I suspect you'll hear from Mr. Sexton, and we heard
10   from several witnesses, that they were ready to abandon Jackie
11   if her story -- if she pulled out; they were ready at a
12   moment's notice to do that.  But no one in this case, with all
13   the documents and all the binders and all the exhibits, has
14   produced a single draft of an article or even a start of an
15   article with Stacy's case or any of the other cases at the
16   lede.  It would have required a ton of work to start over at
17   that point.
18         And there's no evidence, other than uncorroborated
19   say-so, that they were willing to do it.  You saw the text
20   messages for yourself.  "Make no mistake, let me be clear,"
21   she said, "there's no pulling the plug at this point."
22         It didn't matter to Ms. Erdely or Rolling Stone that
23   Nicole was in a vulnerable position.  It wasn't just Jackie
24   who was in a vulnerable position.  Nicole, by virtue of her
25   position and by virtue of what she does for a living, is in a

1    vulnerable position.  And I submit that that put a special
2    responsibility on Rolling Stone to make sure they got the
3    facts right.
4         Ms. Erdely knew that Nicole was prohibited by
5    federal privacy laws from talking about Jackie's case and
6    defending herself on any of the specifics.  We've heard
7    reference to FERPA, and you saw the back and forth with the
8    UVa people about the privacy reasons why Nicole would not be
9    able to talk about specific cases.  And you even saw that and
10   heard that in the interview with President Sullivan.  There
11   are certain specific questions that she couldn't get into.
12        And Ms. Erdely also knew, and Rolling Stone also
13   knew, that Nicole's employer, the University of Virginia,
14   would not allow her to sit for an interview.  She wanted to
15   sit for an interview.  You saw the e-mails where she set up
16   the interview.
17        Nicole said, "Yeah, I'll be interviewed.  I don't
18   have anything to hide."  And she fought internally to be able
19   to sit down.  Remember the e-mail that says, "I'm afraid if I
20   don't do the interview, it will look like we have something to
21   hide"?  She wanted to do it, but she was prohibited by her
22   employer from defending herself.
23        Now, that's a decision that UVa made.  And Nicole,
24   as a good soldier, went along with it.  But it left her in a
25   vulnerable position for Rolling Stone and Ms. Erdely to say

1    things about her, because they had the power and she didn't.

2          These things, all of these things that I've been

3    talking about, should have caused Ms. Erdely and Rolling Stone

4    to more carefully check their story and verify facts with

5    people who had actual firsthand information.  But they didn't.

6    They took advantage of Jackie.  They took advantage of Nicole

7    in her vulnerable position.  They made Jackie the victim, and

8    they made Nicole the villain, the face of indifference to

9    Jackie's claims.

10          Who were the folks that did this?  These are the

11   people on the Rolling Stone side of the equation, and I'm

12   going to briefly explain who they all are, because we saw a

13   lot of different testimony and how they all fit together and

14   who these people are.

15          This is Jann Wenner.  You heard his testimony.  He

16   is the majority owner and chairman of Wenner Media, LLC, one

17   of the defendants in this action.  He's the founder,

18   publisher, chief executive officer, and self-described boss of

19   the magazine.

20          Just like any boss, he sets the tone for the

21   organization.  Leaders set the tone.  And you had an

22   opportunity to see and hear for yourself the tone that

23   Mr. Wenner set for the organization.

24          The last thing you heard yesterday from Mr. Woods in

25   our rebuttal case, in the happily short examination that we

1    did of him, was that Wenner Media, together with Rolling

2    Stone, LLC, the other corporate defendant in this case,

3    publishes the magazine.  So these two corporate entities,

4    together with one another, publish the magazine that comes

5    out.

6              Will Dana was the managing editor of Rolling Stone

7    at the time -- no more -- and an employee of Wenner Media at

8    the time it was published.

9              Sean Woods was the senior editor of Rolling Stone

10   and an employee of Rolling Stone when the article was

11   published.

12             And Liz Garber-Paul was the fact-checker.  She was

13   an employee of Wenner Media.

14             And that's important because you're going to be

15   asked to evaluate who knew what, who had what information in

16   their possession that could have stopped this.  And the fact

17   that these folks -- not Mr. Wenner, but the other folks that

18   are shown up here -- had that reporting file we've talked

19   about -- and the reporting file has got -- it's the keys to

20   the kingdom.  It's got all of that information in there.

21             It wasn't just Ms. Erdely who had this information,

22   this contrary information and the internal inconsistencies and

23   all of those elements of it and wrote an article and sent it

24   over to Rolling Stone and Rolling Stone puts it up on the

25   website.

1    Some magazines work like that, but Rolling Stone

2    doesn't.  Mr. Woods was involved in editing.  You heard him

3    testify about how he was actually making the edits.  I think

4    he said at one point he pushed the delete button and deleted

5    some text.  And you saw all the handwritten markups that Liz

6    Garber-Paul made in terms of fact-checking.

7    These folks had the reporting file and all these

8    materials that we have been going through together and could

9    have stopped this, the corporate defendants.

10    Ms. Erdely was a contributing editor at Rolling

11    Stone.  Now, she had a contract.  She's an independent

12    contractor with Rolling Stone.  And you'll see that in the

13    jury instructions, that she was a contractor, not an employee.

14    Now, as you heard the judge say, she is party to a

15    joint defense agreement and confidentiality agreement with

16    Rolling Stone, LLC, and Wenner Media.  And under that

17    agreement, that joint defense agreement and confidentiality

18    agreement, Rolling Stone and Wenner Media have agreed to pay

19    her legal costs and fees in this case and to satisfy any

20    judgment and pay any damages assessed against her arising out

21    of the article.

22    The judge told you that you're entitled to consider

23    that relationship when evaluating the testimony of the

24    witnesses and evaluating their credibility, that cooperation

25    provision that exists in that joint defense contract between

1   them.

2         Now, Ms. Erdely and Mr. Woods are good friends.  We

3   heard about that from Mr. Sexton at the beginning, and I think

4   we've seen that in the courtroom, and we've heard testimony

5   about that relationship.

6         Mr. Woods edited every single article that

7   Ms. Erdely ever wrote for Rolling Stone.  And I'd like you to

8   consider whether or not a magazine should assign a friend to

9   be an editor of someone's work.

10        This is about journalism, after all.  And what are

11  editors supposed to do?  Editors are supposed to be skeptical.

12  They're supposed to be persnickety.  They're supposed to be

13  hard-nosed.  They're supposed to be questioning.  They're

14  supposed to be probing and pushing and all of those things.

15        And that's hard to do with your friends.  It

16  requires a certain distance.  It requires a certain level of

17  separation for you to be able to say, "Hey, what you turned in

18  isn't good enough."  And that's a hard thing to do for your

19  friends.

20        And then there's Mr. Ritter, the illustrator.

21  Rolling Stone, LLC, hired a professional illustrator, John

22  Ritter, to doctor that photograph of Nicole and put it in the

23  article.

24        So these are the players.  These are the folks that

25  you heard from.  Let's talk about how these folks set into

1    motion and how we got here.

2            Ms. Erdely and Rolling Stone set out from the very

3    beginning to write a story about institutional indifference.

4    You heard that word a lot.  We argued about it a lot with the

5    witnesses.  That's called having a preconceived storyline.

6    When you set out from the beginning to write a story and you

7    have in your mind what you want the end of the story to be,

8    that's a preconceived storyline.  And here's why it's

9    important.

10           Once they decided what the article was going to be

11   about, it didn't matter what the facts were.  Once they

12   targeted Nicole to be the villain and the face of

13   institutional indifference at UVa, it didn't matter that

14   everyone she spoke to said she was the furthest thing from a

15   villain that you can imagine.  They disregarded those facts

16   and twisted the ones that they did have in order to make her

17   look bad.

18           And I will show you later in my remarks how they

19   took the positive information and twisted it in the article

20   with a negative spin.  Every positive thing they said about

21   her in the article, echoing back some of the positive things

22   that they heard, was twisted to make her look like a villain.

23   It was done in a very clever way, and it was done very

24   intentionally.

25           Now, here in the courtroom, at the very beginning of

1    this case, very early on, you heard Ms. Erdely claim and tell

2    you this article was not about institutional indifference.

3    That's what she said right here on the witness stand.  But the

4    article itself contradicts that testimony.  "You can trace

5    UVa's cycle of sexual violence and institutional indifference

6    back at least 30 years and, incredibly, the trail leads back

7    to Phi Psi."

8              You can also find that preconceived storyline in

9    Ms. Erdely's internal comment to her good friend Sean Woods in

10   the first draft of the article that she turned in.  She's

11   asking the question -- this wasn't published, but it helps you

12   to get in the mind, as Mr. Sexton said, of what these folks

13   were thinking about what this article was.

14             She asks, "End on a different note?  The point?

15   What's the point of all of this?  That despite the lip service

16   given to rape at UVa and at colleges nationwide, in reality,

17   the combination of a rape-tolerant student body and an

18   indifferent administration creates a collegiate environment

19   that's a free-for-all for sexual predators."

20             That was the point that she was trying to get across

21   here and wanted to make sure it was emphasized in the article.

22   So her testimony this article was not about institutional

23   indifference is rebutted by her own words in the first draft

24   of the article.

25             What happened when she was asked to talk to the

1   Washington Post about what the story was about?  She writes to

2   the Washington Post, "As I've already told you, the gang rape

3   scene that leads the story is an alarming account that Jackie,

4   a person I found to be credible, told me, told her friends

5   and, importantly, what she told the UVa administration, which

6   chose not to act on her allegations in any way, i.e., the

7   overarching point of the article."

8           "Chose not to act on her allegations in any way."

9           Remember the police.

10          She said that is the overarching point of the story.

11  "That is the story," she writes, "the culture that greeted her

12  and so many other women I interviewed who came forward with

13  allegations only to be met with indifference."

14          Who did that greeting?  Who met her claims with

15  indifference?  In the article the only person who interacted

16  with Jackie was Nicole.

17          So make no mistake, the defendants here decided this

18  article was going to be about institutional indifference

19  before they began investigating, and they were going to stick

20  to that story no matter what people said about Nicole.

21          And it wasn't just Ms. Erdely.  Wenner Media and

22  Rolling Stone knew they were working with someone who was

23  going to write this story.  Remember all the other articles

24  that we went through at the very beginning, including "The

25  Rape of Petty Officer Blumer" that has this same villain,

1   victim, vindicator theme?

2          They knew they were working with a reporter who was

3   going to give them a high-impact story about institutional

4   indifference to sexual assault, and they approved it in

5   advance.

6          Remember the pitch document that was presented?

7   Ms. Erdely wrote it; Mr. Woods was consulted on it; it was

8   presented to Will Dana and Jann Wenner for approval before

9   anything had gotten started.

10          The pitch expressly talks about institutional

11   indifference.  And, in an eerie forecast of the rape school

12   statistics quote, the pitch talks about how she wants to look

13   at the various ways colleges have resisted involvement and

14   juked their stats to make their campuses appear safer than

15   they are.

16          This was before a single fact about UVa was known to

17   anybody.  Institutional indifference and juking stats.  Sent

18   over to the corporate folks and approved as the pitch for the

19   story.

20          And that mindset of looking for institutional

21   indifference affected every aspect of what happened

22   afterwards.  She selectively included facts in the article

23   that supported that preconceived storyline, even if it didn't

24   fit, and intentionally rejected other facts that contradicted

25   them.

1          Columbia talked about this, the phenomenon of

2    confirmation bias.  "The problem of confirmation bias, the

3    tendency of people to be trapped by preexisting assumptions

4    and to select facts that support their own views while

5    overlooking contradictory ones, is a well-established finding

6    of social science.  It seems to have been a factor here."

7          And it was.  It was reckless.  It was reckless

8    disregard for the falsity of what they were writing.

9          When you're looking for something, you're going to

10   find it.  And when you're excluding things that don't support

11   that, that's recklessness.  That's intent.  And it's powerful,

12   powerful evidence of the actual malice here.

13         You've heard me say it several times that, instead

14   of listening to her sources and writing what her sources tell

15   her, which is what journalists do, Ms. Erdely is the one who

16   did most of the talking and pushing her own views on these

17   subjects, on these young men and women.

18         You'll see in her reporting file with Alex

19   Pinkleton, where she was prompting her sources to vent about

20   the administration, she says, "She was candid about her

21   experience to me, and she wasn't down on the administration at

22   all, even when prompted to vent."

23         Even when she was encouraged to vent about the

24   administration, Alex Pinkleton wouldn't.  And Ms. Erdely made

25   a note of that.

1          But why is a reporter prompting sources to vent?

2    Hey, is there any bad stuff you want to say about the

3    administration?  Is there any bad stuff you want to say?

4          How about just listening to what people say and

5    write down the facts that they tell you?  That's journalism.

6    This is push polling.

7          Ms. Erdely's sources finally got worried enough that

8    Nicole was being unfairly targeted over the course of these

9    interactions, and Ms. Erdely didn't even try to hide that fact

10   from them.

11         "Is this going to make Dean Eramo look bad?"

12         She says, "I mean, it might, you know.  It might

13   make her look bad."

14         We heard it in her own voice on the audio.

15   (Audio played)

16         That's what she was telling these young women.

17         But even when Ms. Erdely continued to push her

18   sources with her own views about what was okay and not okay

19   about their experiences, her sources, these young men and

20   women, wouldn't take the bait.

21         Here's the reporting file.  Here's what Ms. Erdely

22   says:

23         "I know people tend to love her.  She sounds very

24   nice.  And, yes, I guess I asked because the picture that's

25   being painted by survivors is that after reporting to her,

1    they often didn't get adequate mental health treatment.  They

2    didn't report to police.  They were offered informal

3    mediations.  It's not clear to me that this informal hearing

4    is even okay under Title IX.

5              "Really?

6              "You were satisfied with it in your case.

7              "I don't think I would have been satisfied with the

8    formal, so the informal option was the best one for me."

9              When Ms. Erdely was telling these folks about what's

10   best for them in terms of how their own intimate sexual

11   assault should be handled, these folks pushed back and said,

12   "You know, not for me.  I'm the one that has to sit in that

13   room across from my attackers if I were to pursue a formal

14   claim.  I'm the one that would have to sit on a witness stand

15   in a criminal prosecution.  That's not for me."

16             Ms. Erdely is entitled to her view on victim choice.

17   She's entitled to it.  Everybody is entitled to their

18   opinions.

19             But what you can't do is make up facts in support of

20   your opinion, and that's what happened here.

21             And the sources, the actual real people, the real

22   UVa students that she talked to, wouldn't play along.  They

23   said, No; this is what we want, and this is empowering for us,

24   and this is how Nicole helped us build trust and helped us get

25   to the point where we were healthy enough to be the vibrant

1    young women and men that you saw here testifying and on video.

2           Ms. Erdely also tried to convince Jackie that Nicole

3    was keeping survivors quiet with comfort.  She says, "I wonder

4    if she's counseling survivors but also in a sense that comfort

5    she's giving them is also keeping them quiet."

6           It's not a question.  It's a statement.

7           Jackie doesn't take the bait.  Jackie talks about

8    her experience, about how she's not ready.

9           And there came a point in time, after all of those

10   long audios that we heard, the hours and hours of audio and

11   the country music playing in the background, where even the

12   most minute portions of that dinner, those dinners, were

13   recorded on tape.

14          I was laughing yesterday.  I heard Connor ordering

15   water and the check comes.  And you hear all that detail of

16   those audio.  But there came a point in time where Ms. Erdely

17   did something extraordinary.  She turned the recorder off to

18   trash Nicole to these young women and men who were there.  And

19   she wrote about this in her notes.

20          And, as she told you, she didn't expect these notes

21   would be played in a courtroom someday.  These were to

22   herself.  She said, "I turned the recorder off and tell them I

23   do think there have been some legit worries and issues that

24   have been raised that may not reflect well on the

25   administration, of which Dean Eramo is the most public face

1    because she's the one who deals with the students, because I

2    do have some questions about whether Jackie's case had been

3    handled properly.  Recorder on."

4           Why would you turn off the recorder and leave it on

5    for all the rest of the portions of the dinner?  Why would you

6    turn that off, unless you didn't want your voice to be

7    recorded saying those things about saying -- pushing her views

8    and trashing Nicole like this on tape?

9           I think it's telling that she turned the recorder

10   off.  And her explanation for it on the stand when Mr. Sexton

11   asked her about it was, "Well, sometimes when I'm doing an

12   interview and I'm going to go on at length, I don't want to

13   transcribe it later, so I turn the recorder off."

14          That just means that she was going to go on at

15   length about Nicole and about trashing Nicole.  It proves our

16   point.

17          Sometimes, though, she wasn't so careful.  Sometimes

18   she couldn't filter her contempt for Nicole and her strong

19   feelings about how Jackie's case was being mishandled.  Bear

20   in mind, that's not what anyone else was telling her.  That's

21   not what Jackie was telling her.  Jackie was saying, "I love

22   Nicole.  She's my advocate.  She's doing what she's supposed

23   to do."

24          But sometimes Ms. Erdely could not filter that

25   contempt, and you heard her on tape.

1    (Audio played)

2            Now, reporters, journalists, occupy a special place

3    in our society.  They do important work.  But in order to do

4    that work, you have to maintain some objectivity, some

5    distance from the stories that you're reporting on.

6            Now, they're human and they get invested in their

7    stories too.  But that's when there's risk of publishing false

8    statements, when you're so invested in a story that you're

9    blinded to other facts.

10           And she had a responsibility, if she could not be

11   objective about Dean Eramo, to back off of this.  She didn't.

12           And during that September 12th dinner that we heard,

13   Ms. Erdely recorded herself telling sources that Nicole was

14   not doing right by them and putting the UVa community at risk.

15           Again, this is a reporter telling sources, the

16   people that she's going to report on in the story, that.  She

17   says, "I think Dean Eramo seems like a wonderful person, and I

18   know you guys all really love her, but I think that it's not

19   totally clear she's actually doing right by you.  I actually

20   think she's probably, like, mishandling this whole situation.

21   She's putting an entire community at risk."

22           And it wasn't just her sources.  It wasn't just

23   these young men and women that she had an opportunity to talk

24   to her views on.  These critics that are quoted in the

25   article.

1           Laura Dunn is a name that appears in the article and
2    we heard some testimony about.  You heard Ms. Erdely admit on
3    cross-examination that she had never met Nicole and she didn't
4    know anything about Jackie's case.  Everything that Laura Dunn
5    knew about this situation that Sabrina was talking to her
6    about came from Sabrina.  And in the --
7    (Audio played)
8           Everything that she knew about it, that did not stop
9    Ms. Erdely from saying that Dean Eramo rubbed her the wrong
10   way, telling this critic -- this, you know, I'm not going to
11   say expert, but telling this consultant, this person that she
12   was asking for opinions on, "I'm the reporter, and I'm calling
13   up someone.  I'm asking for them to tell me what they think."
14   And let me start out the conversation by telling you, "Eh,
15   this Nicole Eramo person rubbed me the wrong way, and it feels
16   like she's coddling these survivors."
17           That's what Sabrina tells to Laura Dunn.  And is it
18   any wonder then that the same quote, "coddling survivors,"
19   appears in the article?
20           But perhaps the most candid example of Ms. Erdely
21   saying -- making clear that it's her, it's Ms. Erdely, is the
22   one who was actually expressing these views that came in the
23   September 12th dinner, she tells her sources, Alex, Sara and
24   Jackie, that, "Hey, it can be me.  I know you guys aren't
25   saying this, but it can be me saying Nicole isn't doing her

1  job."

2  (Audio played)

3          "I mean, you guys have never said anything to that

4  effect."  That's what she tells Alex and Sara and Jackie.

5          But let's contrast that with what she tells

6  President Sullivan during the interview.

7          She says, "So another thing that I'm sort of hearing

8  from these girls, from these girls who come in -- they love

9  Dean Eramo -- they leave Dean Eramo's office kind of paralyzed

10  from the lack of guidance."

11          She's lying to President Sullivan.  She said, "I'm

12  hearing this from the girls."

13          We just saw her say, "You guys have never said

14  anything to that effect."  But she tells President Sullivan

15  she's hearing this from the people, the girls, who are the

16  sources for her article.

17          All of this violates Journalism 101.

18  (Audio played)

19          This violates Journalism 101.  Reporters report the

20  facts as they find them.  They don't create the facts.  They

21  report what the sources tell them.  They don't push their

22  views on sources, especially when those sources are college

23  kids who are eager to talk to them and report their story,

24  tell their story.  Reporters don't turn off their recorders to

25  go on lengthy rants about the targets of their articles.  They

1    don't misrepresent their own views as something that other

2    people told them in order to generate a comment.

3            But that's exactly what she did here.  Those actions

4    and the preconceived storyline that motivated them are

5    powerful, powerful evidence of actual malice, and you should

6    consider all of them in evaluating the mindset that went into

7    publishing this article and investigating.

8            But President Sullivan wasn't the only one who heard

9    one thing from Ms. Erdely and then it turned out to be

10   another.  She also deceived some of these other college kids

11   who agreed, under false pretenses, to serve as sources.

12           You heard directly from Brian Head, the president of

13   One in Four.  He spoke to Ms. Erdely for one and a half hours

14   about his work with One in Four, that all-male student-run

15   sexual assault prevention and advocacy group at UVa.

16           That's something, the fact that there's this

17   all-male group.  And all the things that Brian Head had to say

18   in the hour and a half that he spoke to them would paint a

19   balanced picture of this college environment that she was

20   trying to portray.  But in the article, he was reduced to a

21   fourth-year student who said, "The most impressive person at

22   UVa is the person that gets straight As and goes to all the

23   parties."  He was reduced from being the president of One in

24   Four to a party guy.

25           You heard directly from Emily Renda, an incredibly

1    impressive young woman, who spoke extensively to Ms. Erdely

2    about her own experiences advocating about sexual assault

3    issues on campus.  And she told Ms. Erdely that Nicole was

4    very passionate about getting Phi Psi punished and doing

5    something punitive that would make something stick.  Emily

6    Renda told Sabrina that.

7         But in the article, Emily was reduced to a rape

8    victim who, quote, channeled her despair into hard partying

9    and often ended her nights passed out on the bathroom floor.

10        Maybe one of the saddest things was when Emily

11   testified about how this whole experience, about going through

12   this and telling her story and then seeing how it played out

13   on a national stage, caused her to rethink what she wanted to

14   do with her life, the experience of serving as a source and

15   reading about it about how it affected her, this very

16   impressive young woman.

17        You heard from Alex Pinkleton, who also spoke with

18   Ms. Erdely extensively about One Less and her own experiences

19   with Nicole.  She told Ms. Erdely that Nicole had empowered

20   her.  But Rolling Stone reduced her to a girl expertly clad in

21   a midriff-bearing crop top and giving advice on how to look

22   drunker than you are in order to get into the frat parties.

23   Alex told you how she felt about this.

24        She said, quote, "I was talking to Sabrina as an

25   advocate.  That's who I am 90 percent of the time.  10 percent

1    of the time I might be going out and I might be in a crop top.

2    So clearly she was trying to paint me as someone that I

3    wasn't, or I was at some times, but that's not who I was when

4    I was talking to her.  I'm not expert on how to get into a

5    frat.  I can get into one.  But I consider myself more of an

6    expert on how to help survivors, and that was my main goal."

7         None of that made it into the article.  And that One

8    Less organization, that we've spent way too much talking about

9    in this case, gets portrayed in the article -- instead of what

10   it really is -- a group of young women who have banded

11   together to support one another -- it gets painted as

12   something negative.  It gets painted as folks who sit around

13   and affirm their own choices not to report and echo what the

14   administration is telling them, that doing nothing is a fine

15   option.

16        They did an incredible disservice to the young women

17   who run this organization and Nicole, who advises them.

18        You heard from Sara Surface, who spoke extensively

19   about One Less advocacy and her own experiences with Nicole.

20   But Ms. Erdely dismissed her as a mouthpiece of the

21   administration.

22        Now, why would you say that?  Why would you describe

23   someone, a college student, as a mouthpiece of the

24   administration?  Because she felt that her storyline was

25   getting pushback.  Sara was pretty aggressive in pushing back,

1    and she was dismissed as being a mouthpiece of the

2    administration.

3              Consider whether or not she was being sincere in

4    relaying her own personal experiences.  She was dismissed.

5              And there are others, other sources that we heard

6    some about, ignored other information in the article.  Sandra

7    Menendez, who told Ms. Erdely that Nicole wanted to remove her

8    attacker from the university and pursue a no-contact order.

9    She wasn't interested.  She just wanted counseling.

10             But this notion that Nicole is not giving women

11   guidance and not giving women real options to pursue justice

12   against their attackers was left on the cutting room floor.

13   These were intentional decisions that were made.

14             This was -- the reporter has the ability to craft a

15   story and decide what to cut and what not to cut.  And you

16   can't cut all of these experiences and have it be an accident.

17   It was done intentionally, to meld that preconceived story

18   line.

19             Emily Loranger told Ms. Erdely that, after she was

20   groped at a concert, Nicole got it sent to an investigative

21   team that did a very thorough investigation, as thorough as

22   they could.

23             Two other individuals, Will Cadigan and Tommy Reid,

24   who Sabrina dismissed as being a tool, went out of their way

25   to tell her how impressed they were with Dean Eramo, like

1    everyone else.

2           Now, reporting honestly on what these young men and

3    women, the sources for her story, told her about UVa and about

4    Nicole Eramo would have undermined that villain part of the

5    story.  They needed this institutional indifference and they

6    needed a face.  Instead, she ignored that positive information

7    and twisted it into being negative.  Defendants, all of them,

8    made an intentional decision to build the entire lede of the

9    story around Jackie.

10           In writing an article, writing a term paper or a

11    thesis or a legal brief or anything, there's a process

12    associated with it.  And there's a foundation for it.

13           You heard Mr. Woods talk to us a little about some

14    journalism terms, about the lede of the article.  L-E-D-E, I

15    think, if I got that right.  That's the foundation of the

16    article.  Everything else that comes from it is built on that

17    foundation.

18           And look for yourselves at how Jackie's story weaves

19    through the entire article.  It wasn't just the very beginning

20    of the article.  The article keeps coming back to Jackie to

21    make different points over the whole article.  And especially,

22    it keeps coming back to Jackie's interactions with Nicole as

23    various things happen in the article.  Jackie's story was the

24    foundation.

25           And just like a house, if it has a faulty

1   foundation, if the foundation has a crack and the foundation
2   is flawed, the rest of the article is flawed.  The rest of the
3   house cannot stand if the foundation is flawed.  And they made
4   a decision to have Jackie's story, with all of its inherent
5   improbability and all of its internal inconsistencies, be the
6   foundation for all of this.
7           The Columbia Journalism Review said this.  They said
8   Rolling Stone invested the reputation of the magazine on a
9   single source.
10          It wasn't an accident.  They knew it.  They talked
11  about it.  They did it deliberately.
12          We could spend weeks -- and I promise I'm not going
13  to -- rehashing all of the giant red flags that were ignored
14  here.  I'm going to just touch on a few.
15          "Jackie morphed her story over time."  Those are
16  Ms. Erdely's words.  Jackie's story had morphed over time,
17  from the number of men to the kind of rape to the object she
18  was raped with.
19          These are all the different sources that Rolling
20  Stone had:  Emily Renda, vaginally raped by five men.  Rachel
21  Soltis, oral sex on several men, vaginally raped by six men
22  with a broken beer bottle.  Jackie, vaginally raped by seven
23  men, unbroken beer bottle.  And Annie Forrest, vaginally raped
24  by several men with a coat hanger.
25          Now, again, we don't know why Jackie's story

1    changed.  And trauma victims' stories might change.  But who
2    is the adult in the room?  Who's the reporter who is trying to
3    decide what facts to put in a national magazine?
4           Ms. Erdely tried to explain these morphing stories
5    as being consistent with trauma, so she believed them.  But
6    she never explained -- and there is no explanation -- for how
7    she decided, as an investigative reporter who is supposed to
8    be reporting the facts of what happened, how she decided which
9    of these accounts to tell.
10          She never asked Jackie, she never asked any of her
11   friends, whether the differences really were as a result of
12   trauma or were the symptoms of a false story.  She never asked
13   the question.
14          And remember in that jury instruction that internal
15   inconsistencies -- and if you have reason to believe that
16   there are inconsistencies in a story, as she did -- because
17   this is all in her reporting file -- you have an obligation to
18   go further.
19          Back to the red flags.
20          Red flag number two:  Jackie refused to identify
21   corroborating witnesses.  Jackie repeatedly refused to provide
22   her with the names or contact information for anyone who could
23   corroborate or dispute what Jackie was claiming, the
24   attackers, the three friends, and the two women that Jackie
25   claimed had been gang-raped at Phi Psi:  Maddie and Becky.

1          They tried to explain that away too, saying, well,

2    Jackie didn't want her attackers to be contacted, and the

3    friends had had a falling out, and that there were these

4    screenshots of text messages that had Jackie's name at the top

5    that Jackie said were from Becky and Maddie, two people who,

6    to this day, there's no evidence who they are, that has been

7    submitted to you.  That's a huge red flag, Jackie's behavior

8    in not providing access to these people.  And they knew it.

9          Liz Garber-Paul, the fact-checker, said, in response

10   to a question from Mr. Phillips:  "This is common sense," the

11   question said.  "If a source tells you, 'I don't want you to

12   contact this person,' that should be a lightbulb in your head

13   telling you, I better contact this person and see why my

14   source doesn't want me to.  You would agree with that, right?"

15         And Ms. Garber-Paul said, as she must, "Yes."

16         That's journalism.  That's being skeptical.  That's

17   what investigative reporters are supposed to do.  Why is my

18   source behaving this way?  Are there many, many, possibly

19   multiple, reasons why my source is behaving this way?  Should

20   I explore whether or not she's keeping relevant information

21   from me?  And that's true whether the subject of the article

22   is rape or anything else.

23         The fact that this story was about rape does not

24   change the way a journalist should do their story.  You saw

25   Ms. Erdely's own statement was introduced into evidence, the

1    one she was working on, where she talks about how, even when

2    you're reporting on rape, it requires diligence and patience

3    and skepticism.  There's nothing different about reporting on

4    this.  Journalism doesn't go out the window because of the

5    subject matter that you're writing on.  Journalism is hard,

6    but it requires you to do the work.

7           Back to the third red flag:  Jackie withheld

8    physical evidence.  She kept promising but then withholding

9    the physical evidence that would have helped corroborate or

10    debunk that account.  Medical records about the syphilis; the

11    bloody, torn dress that she claimed to have been wearing on

12    that night.

13           And then we have Ms. Erdely's own firsthand

14    observations.  You heard the recording of Ms. Erdely's own

15    voice, where she said that the injuries from the bottle

16    incident, "Wow.  That looks like face paint."  And that

17    observation appeared in her own reporting file, which the

18    other folks, Wenner Media and Rolling Stone, had in their

19    possession before the article was published.

20           But there are other firsthand observations that are

21    important here too.  The story that Ms. Erdely chose to put in

22    the magazine was a horrific one.  It was hard to read.  It was

23    graphic, and it was detailed.  Remember when I made my opening

24    remarks, I put up all those words on the screens, the factual

25    things of what happened.

1          There was a glass coffee table.  Jackie said she

2    ended up crashing into it, and it shattered under her weight.

3    "I tripped and fell against the coffee table, and it smashed

4    underneath me.  And there was another boy who was throwing his

5    weight on top of me.  I was flailing my arms when I got in

6    there, and he slammed my arm up against the full board, and

7    they were cut up with glass.  And he was so heavy, I couldn't

8    move my arms.  Seven of them raped me.  And the other two

9    stood.  It went on for almost three and a half hours.  I was

10   laying on the broken glass table the whole time.  My dress was

11   soaked with blood.  The glass went into my back.  I have scars

12   from it.  I have scars on my back.  My friends are always

13   like, what are those from?  And I'm like, they're from

14   September 28, 2012."

15         Now, put aside the common sense reaction that if

16   this had happened as Jackie described, what kind of physical

17   condition would she have been in that night when she ran out

18   to meet those three friends?  Talking to those three friends

19   and validating this blood-soaked dress and bleeding arms and

20   glass shards digging into the back would have been an

21   important way to validate those things.

22         Ryan and Kathryn testified that Jackie was shaken

23   but didn't have any of these physical injuries that would have

24   been manifest from this sort of an injury.  The scars that

25   Jackie talked about and said all of her friends had seen would

1    have been an incredible, powerful corroborating fact.  But

2    when Ms. Erdely brought up the scars over dinner two months

3    later, Jackie's boyfriend, Connor, said he had not seen any

4    marks on Jackie's back.  In fact, none of the friends that

5    Ms. Erdely spoke to had ever seen any scars on her back.

6         She asked those questions too late, after the

7    9,000-word article was already out there.  Why haven't your

8    friends seen the scars on your back?

9         And whether Jackie was lying intentionally or

10   whether she was misremembering or whether she had some other

11   kind of trauma at some other point in her life, came to

12   college with, or something else had happened to her at

13   college, the physical evidence proved that what Jackie was

14   telling her was not plausible or reliable.  And all this was

15   in the reporting file.

16        Sean Woods, after the fact, when he did look at the

17   reporting file -- remember he said, "It's not usually what I

18   do.  It's not my job to look at the reporting file when I'm

19   editing the story and supposed to be making skeptical remarks

20   on what was and was not included in the article" -- he said,

21   "After the fact, when I looked at it," he saw a pattern of

22   deception in Jackie's story.

23        "Q    As you discovered, after reviewing

24        the reporting file, that you came to see a

25        pattern in Jackie's behavior; isn't that

1    correct?

2        "A    It wasn't just the reporting file.  I

3    was looking at everything and all the events.

4    But, certainly, the reporting file influenced

5    my thinking, and I did see a pattern.

6        "Q    And that pattern is that she was, in

7    fact, intent on controlling her own narrative;

8    isn't that right?

9        "A    Yes.  And beyond that, I began to see

10    a pattern of deception."

11        With all of these red flags glaring and apparent

12    from the reporting file, Ms. Erdely and Rolling Stone built

13    the foundation of the story about Nicole based on Jackie's

14    say-so.

15        Look at all of the things that come strictly from

16    Jackie that are critical to this story, that are solely based

17    on Jackie.

18        We have her say-so that Drew or Tom or Jay, the

19    ringleader, was a real person who was a Phi Psi brother who

20    worked as a lifeguard and orchestrated this brutal gang rape.

21        The very first question that Liz Garber-Paul asked

22    Ms. Erdely when she was assigned to do the fact-check was

23    whether Sabrina had gotten comment from him.  That was the

24    very first question that appeared to this experienced

25    fact-checker.  Did we get a comment from this guy, the

1    ringleader?  That's Journalism 101.  Did we tell him what

2    we're about to say about him?

3            Now, had Ms. Erdely or the fact-checker or Rolling

4    Stone or Will Dana or Sean Woods or anybody in the equation

5    taken this one simple step, either making sure they knew who

6    this guy was or requiring Jackie to identify him as a

7    condition of her story being included, none of us would be

8    here today.  They would have quickly discovered what Ryan

9    Duffin, a college kid with zero investigative journalism

10   experience, discovered on his own over fall break when he was

11   trying to figure out why Jackie's story didn't make sense, is

12   that this person didn't exist.

13           Ms. Erdely and Liz Garber-Paul spoke to Mr. Woods

14   after the fact about this fact, that they had not located,

15   identified, or spoken with the ringleader, but they decided to

16   publish the story anyway.

17           We have our good friends Armpit and Blanket, the

18   other two fraternity members.  They relied on Jackie's say-so

19   that there were two Phi Psi pledges that had these nicknames.

20   They chose not to ask anyone whether anyone in Phi Psi or the

21   pledge class had those nicknames.

22           Those are pretty distinct nicknames.  How many guys

23   do you think in a fraternity have the nickname Armpit?  Maybe

24   there's more than one, but at least ask the question.

25           And you heard how Ms. Erdely, when she came to

1    campus, concocted this excuse of having to go to the bathroom

2    to get into the Phi Psi house -- she wanted to see it for

3    herself -- but never -- despite going onto their property

4    under false pretenses, never asked the question about whether

5    there was an Armpit or a Blanket or somebody who was in

6    Jackie's anthropology class, another fact that's included in

7    the story.  They relied on Jackie's say-so for this.

8            Same thing with the person who allegedly said in a

9    roomful of people, "Grab its motherfucking leg."  They did

10   nothing to confirm that quote that attributed a truly inhumane

11   sentiment to someone at Phi Psi, as well as the notion, "Don't

12   you want to be a brother?," this somehow suggestion that this

13   was a ritualized thing at Phi Psi.  No questions about that.

14   All based on Jackie's say-so.

15           These are facts that were reported as facts in the

16   article.  Journalism 101.  Got to verify it.  Didn't happen.

17           Relied solely on Jackie for Randall or Ryan Duffin.

18   They took Jackie's word that her friend -- or former friend --

19   Ryan/Randall didn't want to talk, citing loyalty to his own

20   frat.  That just makes it extra-nefarious, that somehow Ryan

21   doesn't want to talk because he's a frat guy.

22           Now, had Ms. Erdely or the fact-checker taken one

23   simple step, either finding him or requiring Jackie to

24   identify -- and Jackie knew who he was.  If she had taken that

25   step as a condition of Jackie including her story in the

1    report, none of us would be here today.  And she also would

2    have discovered a whole bunch of other stuff if she had found

3    Ryan Duffin.

4            Remember that bizarre story about Haven Monahan,

5    which I don't even have time to get into.  But it was a

6    totally different story.  It was a guy in her chemistry class,

7    a guy named Haven.  He was an upper classman.  He didn't

8    exist.  He was texting with Ryan and trying to get Ryan to

9    like Jackie.  If she had found Ryan and Ryan had told any of

10   these experienced investigative journalists any of these

11   things, we wouldn't be here.

12           They also took Jackie's say-so about Cindy/Kathryn

13   Hendley.  They took her say-so that Cindy, one of the women --

14   the woman, the only woman, but one of the friends that had

15   come to Jackie's aid that night, had mocked her with this

16   horrendously callous statement, "Why didn't you just have fun

17   with it?"

18           That's a horrible thing to attribute to this young

19   woman.  She would have denied it.  And, remember, this isn't

20   one where she had to find this woman.  She had her name in the

21   reporting file, and she was talking with someone who knew her.

22   I'm going to come back to that in a minute.

23           Alex Stock, another person she took Jackie's say-so

24   on.  Alex is the one who is reported as saying to Jackie,

25   "Hey, you've been a baby ever since this experience."  Another

1  callous quote.

2          And then there's Becky and Maddie.  Rolling Stone

3  and Ms. Erdely accepted Jackie's say-so and screenshots of

4  text messages that had Jackie's name on them that Becky and

5  Maddie were real people and that they were unwilling to

6  comment.

7          And, importantly, they also relied on Jackie's

8  say-so for the inflammatory and false rape school quote, which

9  Nicole never said and the defendants never verified.

10          Ms. Erdely and Liz Garber-Paul did not contact any

11  of these people before the article was published.  They hadn't

12  even confirmed that most of them even existed, and Sean Woods

13  knew that those steps had not been taken.  Instead of speaking

14  to people with firsthand information, which is what reporters

15  do, people who observe things with their five senses --

16  Journalism 101 -- they published gossip.

17          They took Jackie's say-so and they used as

18  corroboration evidence people who Jackie had told these

19  stories:  Emily Renda, Pinkleton, Sara Surface, Rachel Soltis.

20  None of these women had firsthand information about what

21  happened to Jackie.

22          The people on the slide I just showed you, the

23  people that had that firsthand information, everything those

24  people knew about what happened that night comes back to

25  Jackie.  She was the sole foundation.  She was the base of it,

1    and they knew it.  They knew it was all single-sourced to

2    Jackie.  They knew it.  They knew that none of these people

3    had firsthand experience.  They knew all of these people had

4    heard the story from Jackie.  And they knew that Jackie did

5    not want them to speak to anyone who was actually there that

6    night.

7              I want to show you again on the three friends,

8    Kathryn Hendley.  Ms. Erdely sat here under oath and told you

9    that she could not find Kathryn Hendley because she had

10   overlooked Kathryn Hendley's name in her reporting file.

11             Really?  Before you accuse seven men of gang rape,

12   before you accuse someone of covering up a brutal gang rape

13   and suppressing it, you don't know what's in your own

14   reporting file?  You're a journalist.  That's Journalism 101.

15             It's reckless.  It's reckless disregard of the

16   information in her possession that would have led this to a

17   different conclusion.

18             And Mr. Woods, to his credit, was asked:

19             "Q    "Isn't it fair to say that a

20        reporter's job is to know what's in her

21        reporting file?

22             "A    I think that's fair."

23             And in a similar moment of candor, the fact-checker,

24   Liz Garber-Paul, admitted the truth, that the avoidance of

25   Kathryn Hendley wasn't just an oversight.  They knew they had

1   a pathway to find Kathryn Hendley.  Ms. Erdely told the

2   fact-checker that Rachel Soltis, one of the sources, knew

3   Kathryn Hendley.

4           "Q    So Ms. Erdely confirmed to you that

5       Ms. Soltis knew Kathryn Hendley?

6           "A    Yes."

7           And yet rather than asking Rachel Soltis to put them

8   in touch with Kathryn Hendley, the woman who they said, "Why

9   don't you just have fun with it, a bunch of hot Phi Psi

10  guys?," how did they use their time with Rachel Soltis?

11  Instead of saying, Can you put us in touch with one of these

12  three friends that we've been desperate to find, whose name is

13  in our reporting file -- and now they've got a source, they've

14  got someone who knows her.  How did they use their time with

15  her?

16          They chose to spend their time asking Rachel Soltis

17  about how many men Kathryn Hendley had slept with so they

18  could portray her as a hook-up queen in the magazine without

19  ever contacting her.

20          Those are deliberate choices of journalism, of where

21  to investigate and where not to investigate, about what facts

22  to include in the article and what facts not to include in the

23  article.  This isn't negligent.  These were deliberate

24  decisions that were made by Ms. Erdely that were known to the

25  fact-checker and that were blessed and approved by the editor.

1          Kathryn would have told them, if they had bothered
2  to do any of these things, Jackie has kind of a tendency to
3  fabricate things.
4          That's purposeful avoidance of these friends who
5  Jackie told her she'd had a falling-out with.
6          There's that lightbulb that Ms. Garber-Paul told us
7  about.  It should have been a lightbulb that she needed to
8  talk to these people.
9          Kathryn Hendley also would have told them that the
10 scene depicted in the article of the meeting afterwards was
11 inaccurate and that she had never described herself as a
12 hook-up queen.
13         "Q    Did you ever, in fact, ask Jackie why
14      she just didn't have fun with being gang-raped?
15         "A    No, I did not."
16         This is a violation of Journalism 101.  As the
17 Columbia Journalism Report found, these things are not
18 advanced investigative reporting tactics.  They said, "The
19 failures of reporting effort involved basic, even routine,
20 journalistic practice, not special investigative effort.  And
21 if these reporting pathways had been followed, Rolling Stone
22 very likely would have avoided trouble."
23         Ms. Erdely's own documents, when she was trying to
24 get people to cooperate, she admits that she had a
25 journalistic obligation to do some of these things.  She

1  admits, "Either way, I do need to reach out to him" -- talking

2  about Jay. "Either way, I do need to reach out to him to see

3  if he wants to comment. It's part of my obligation as a

4  journalist."

5          She knew it. She's an experienced journalist,

6  knowing what that obligation was and knowing that it had not

7  been followed through in this case.

8          Now, in court, these folks are saying they had no

9  doubt whatsoever about Jackie's credibility. They found her a

10 hundred percent reliable despite these things. They say, We

11 had no doubt and we weren't worried.

12          But, again, I go back to what I said at the

13 beginning. If you want to know what someone was thinking,

14 what did they say and what did they do at the time?

15          Sean Woods, on behalf of Rolling Stone and their

16 contributing editor, Ms. Erdely, had this exchange not long

17 before the article was published. Sean Woods said, "I worry

18 that we can't confirm the two girls coming to Jackie and

19 alleging gang rape at the same frat."

20          "I worry." That is subjective doubt and concern

21 about a single source.

22          Ms. Erdely says, "I have the same worry. I wish I

23 had better sourcing for a lot of the Jackie stuff. A lot

24 right now is resting on Jackie's say-so, including the entire

25 lead."

1    They knew Jackie was the sole source.  They knew she
2  had these credibility and reliability problems.  And they --
3  in a draft, Ms. Erdely admitted, she said, "I asked myself at
4  the time" -- meaning prior to publication -- "if it was wise
5  to build the opening of a story around someone who seemed so
6  emotionally fragile."
7    If you have to ask yourself that question, is it
8  wise, am I doing the right thing here, if you ask yourself
9  that question, you need to do more to make sure you're
10 satisfied and to make sure that you get the facts right.
11 Because they have enormous power to publish these stories to a
12 national and global audience.  And before you hit that print
13 button and before you send out a glossy color magazine with
14 photo illustrations to millions and millions of people, you
15 got to get it right.
16    Here's that quote that I just read to you.
17 Ms. Erdely asked if it was wise to build it around someone who
18 seemed so emotionally fragile.  Sean Woods, when he was
19 editing the statement, added in, "intent on controlling her
20 narrative."
21    They knew prior to publication about -- that Jackie
22 was intent on controlling her narrative.  They knew this
23 behavior that I've talked about -- not what she said, but what
24 she did and how she acted -- they knew this was worrisome.
25    And managing editor, Will Dana, and the Columbia

1   Journalism School said, "Every single person at every level of
2   this thing had the opportunities to pull the strings a little
3   harder, to question things a little more deeply, and that was
4   not done."
5            In October 2014, Jackie stopped communicating with
6   Ms. Erdely for several weeks and tried to back out of
7   participating in the article.  She didn't return phone calls
8   or text messages.  Ms. Erdely new that Jackie was in full
9   freak-out mode.
10           Remember this e-mail that I played for you in
11  opening.  "Fuck.  Jackie is apparently in full freak-out mode
12  right now.  Her friend Alex texted to say that Jackie is right
13  now saying she wants her name out of the piece and is thinking
14  of pulling out entirely."  Quote, thinking of pulling out
15  entirely, close quote.
16           "I suspect I may need to go back to Charlottesville
17  to hash things out with her face to face.  Fuck."
18           Now, we heard testimony of what was going on behind
19  the scenes on the other side of this, Jackie having concerns
20  about her personal safety and her friends being concerned for
21  her personal safety.  But they plowed ahead with it anyway.
22  They pushed Jackie to participate, texting Alex Pinkleton to
23  pass a message along to Jackie.
24           Alex says, "She feels like she's being pushed."  She
25  is told, "Jackie is an essential part of the article, and I

1    need to be clear about this.  There's no pulling the plug at

2    this point.  The article is moving forward, and I think it's

3    important that Jackie stay involved."

4              Doesn't say that "I think it's important that

5    Jackie's story be told" or "I want to write the article with

6    someone else, and I think Jackie should stay involved in the

7    process."

8              "The article is moving forward.  I think it's

9    important that Jackie stay involved."  And Jackie, a

10   vulnerable college student, hearing this from a news reporter

11   at a national magazine, gave in and reengaged.

12             With all the facts I've outlined for you and the

13   evidence in this case, it was absolutely reckless for Rolling

14   Stone and Ms. Erdely to build the entire narrative of their

15   story around Jackie and her stories.  And remember, what

16   Jackie knew -- I'm sorry, what Rolling Stone and Ms. Erdely

17   knew about the interactions with Nicole came from Jackie.

18   It's not just about the rape story.  It's not just about what

19   happened at Phi Psi.  Jackie was the one that was reporting on

20   what Nicole -- her interactions with her.  And all of those

21   were positive.

22             "I love Nicole.  She was a huge support for me."

23   You saw the e-mails with all the support that was provided.

24   And they had all of them.  They knew about all of that.

25             They admit now, and they've admitted on the stand,

1    that they made some very, very serious journalistic mistakes.

2              And you're entitled and should consider those

3    mistakes as to whether or not this was reckless.

4              They admitted that they made a mistake in relying on

5    Jackie as a source.

6              They admitted they made mistakes engaging in

7    misleading attributions to Jackie.

8              They admitted they made a mistake by not calling

9    Kathryn Hendley, whose name they had; not insisting on talking

10   to Ryan Duffin or Alex Stock; not insisting on getting Jay's

11   name; not disclosing to readers that Jackie refused to

12   identify who Jay was by taking out that disclosure that Jackie

13   had refused to do that.  They admit that it was a mistake to

14   tell the Washington Post that they could verify who these men

15   were, or not providing more detail.

16             Now, maybe one or two of these mistakes you could

17   say was careless, but not that many.  How many times did you

18   hear these witnesses say, "To my deep regret, to my deep

19   regret, to my deep regret"?  "When I said I was -- let me be

20   clear, I was the opposite of clear."

21             You can't have this many mistakes and have it be

22   just chalk it up to carelessness.  It was reckless.

23             They had blinders on, ladies and gentlemen.  They

24   had blinders on.  This preconceived story that they wanted to

25   write and their views on these issues put blinders on them.

 1    They had blinders of a preconceived storyline.  They had

 2    blinders of believing that the subject matter of the article

 3    is more important than factual accuracy.  And the blinders

 4    that come with having the reporter's good friend edit the

 5    story.  Those are blinders.

 6           Now, if we were to get behind the wheel of a car and

 7    drive down the highway with blinders on, there would be no

 8    difficulty concluding that it would be reckless.  And this is

 9    no different.

10           Here these folks were not driving a car with

11    blinders on.  They were driving something just as dangerous:

12    a heavily promoted feature story in a national magazine that

13    reaches millions and millions of people.  That comes with the

14    responsibility not to be reckless and to take those blinders

15    off and to see the full picture.

16           But they weren't just reckless in how they

17    approached the truth about Nicole.  We spent a lot of time

18    talking about Jackie.  Let's talk about how they approached

19    Nicole.

20           The disregard of the truth with Nicole was a lot

21    more deliberate and a lot more intentional because the facts

22    were a lot more one-sided.

23           All of those survivors, all of those things in the

24    reporting file talked about how much they loved Nicole and how

25    much -- what Nicole had done for them and empowered them.

1           And you could see the love that these students have

2    for her.  You had a chance to observe their demeanor when they

3    wrote and talked about her.

4           Let's look at some of the statements in the article,

5    the ones that we're here on, the ones that you're going to be

6    asked to pass on, and see how they deliberately twisted

7    information in order to make Nicole look bad.

8           Defamatory statement number one:  "'Lots of people

9    have discouraged her from sharing her story,' Jackie tells me

10   with a pained look, including the trusted UVa dean to whom

11   Jackie reported her gang rape allegations more than a year

12   ago."

13          But Nicole did not discourage Jackie from sharing

14   her story with anyone.  And the defendants knew it before the

15   article was published.

16          First, they had Jackie's e-mail to Nicole where

17   Jackie credited Nicole for helping her to speak publicly at

18   the Take Back the Night vigil about her assault.

19          "Hi, Nicole.  Thank you so much for everything

20   you've done this week.  I couldn't have gotten up last night

21   and spoken if it wasn't for you and all the help you've given

22   me."

23          And they had Nicole's response to that e-mail where

24   she says, "It was great to hear your voice, strong and clear,

25   last night.  You should be very proud of how far you've come

1    and the work that you're doing.  I'm glad that I could play a

2    very small role in that for you."

3            Rolling Stone says -- and Mr. Sexton will stand up

4    later and say -- well, they weren't talking about discouraging

5    her from taking the case forward; they were talking about

6    speaking publicly or talking to Rolling Stone.  And he's going

7    to point you to other words in that paragraph about speaking

8    publicly.

9            This was a public speech.  These e-mails that he had

10   referenced Nicole Eramo having an exchange with Jackie saying,

11   "I'm proud of you for speaking publicly at a public event,

12   Take Back the Night vigil," and Jackie thanking Nicole for

13   playing a role in getting her to the point where she was

14   strong enough and well enough to speak publicly about that.

15           Regardless of what interpretation to that story --

16   that article -- that sentence you put on it, it's false.  She

17   didn't discourage her from talking to the police; she didn't

18   discourage her from taking it to a formal hearing; she didn't

19   discourage her from moving it forward in a university

20   disciplinary process.  She did none of those things.  But she

21   also didn't discourage her from talking publicly about her

22   assault.  Take Back the Night, the vigil, disproves it.

23           These e-mails were in their possession.  They knew

24   it, and they wrote it anyway.

25           They knew that Nicole had taken Jackie to meet with

1    the police.  They had, from different documents they had, the

2    two police officers, Officer Rexrode and Detective Via, both

3    of whom you heard from.  They knew prior to publication that

4    Nicole had taken her to the police.

5              And they have an explanation for that too.  And at

6    some point you have to ask yourselves:  If you have to explain

7    away this many things, can you believe what they're saying?

8              They have an explanation, that we thought this was

9    only about the bottle incident; we didn't know it had to do

10   with the sexual assault.

11             Mr. Sexton said in his opening statement a phrase

12   that struck me.  He said, "We're not mind readers."

13             No, they're not mind readers.  They're investigative

14   journalists.  We don't expect them to be mind readers.  We

15   expect them to investigate.  We expect them to do their job.

16   We expect them to pick up the phone and call people to

17   confirm.

18             They got this information, and they did nothing to

19   follow up.  They never asked Jackie, with all of these

20   interactions, all these hour-long dinners and informal

21   meetings and phone calls and text messages and all the

22   communications they had with her, they never asked Jackie,

23   "Did you talk to the police about your sexual assault?"

24             The word "police" does not occur anywhere in the

25   article as it relates to Nicole and Jackie.

1    That's an important fact when you're saying that you

2  don't encourage or provide guidance to survivors.  Even if it

3  was just about the bottle incident, which it wasn't -- and you

4  heard the testimony, and I'm going to come back to explain and

5  remind you why it wasn't -- even if you thought it was just

6  about the bottle incident, there still isn't a reference.  It

7  was in there in the draft, and they cut it.

8    Why?  Because if they had put it in there, it would

9  have undermined the story they wanted to tell of a woman who

10 was being retaliated against and was being mistreated on

11 campus for speaking out and wasn't told to go to the police.

12   They also had Nicole's e-mail of May 24, the one

13 right after Jackie had first come to her.

14   Remember, when Jackie first reported, she didn't

15 tell Nicole about Phi Psi.  It wasn't until almost a year

16 later that she first said it had happened at Phi Psi.

17   And she didn't tell Nicole any of the details that

18 were published in the Rolling Stone.  It was a different

19 story.  And she refused to allow any further investigation or

20 make any report or go to the police, even though all of those

21 options were presented to her and even though Nicole Eramo

22 said, "I do want you to consider those options."

23   Rolling Stone edited out that part of the e-mail and

24 said she'd be happy to assist if you decide at some point that

25 you'd like to hold these men accountable.

1          Nicole didn't discourage anything, and they knew it.

2     They made these false allegations that Nicole discouraged

3     Jackie, even though, as Liz Garber-Paul testified, there was

4     no evidence to support a notion that Dean Eramo sought to

5     suppress the gang rape.

6          "Q    Did you see any materials or any

7          evidence in the materials that you reviewed

8          suggesting that Dean Eramo sought to suppress

9          Jackie's gang rape?

10         "A    No.

11         "Q    As the fact-checker for Rolling Stone

12         magazine, do you believe that it's true or

13         false that Ms. Eramo sought to suppress

14         Jackie's gang rape?

15         "A    No, I don't believe it's true.

16         "Q    You believe that's false?

17         "A    Yes."

18         That's Wenner Media talking on the stand through its

19    employee, Liz Garber-Paul, who had the entire reporting file.

20         Instead, what they did was they twisted the positive

21    information they had about Nicole in order to make her look

22    like she was suppressing Jackie's sexual assault.

23         Jackie wanted to pull out of the article because she

24    was scared for her personal safety.  She was freaking out

25    about that.  At least that's what she was telling people.

1          The people who actually cared about her and weren't

2    using her for a story, the people who actually cared about

3    her, her friends and Nicole, were worried about her safety.

4    Jackie shared those concerns with her friends, with Officer

5    Rexrode, and also with Nicole.

6          Remember Emily Renda?  What did she say about this

7    whole episode of why it may not be a good idea for Jackie's

8    name to be in the story?

9          She told Ms. Erdely that she worried that

10   prematurely naming Phi Psi in a national magazine would

11   undermine the ongoing efforts to do something punitive to

12   Phi Psi and making that stick and would damage the credibility

13   of the two other women that Jackie claimed had been attacked.

14          "Our goal is to get good punitive action to stick,

15   so we're trying to work the back channels to get them to come

16   forward."

17          That was the concern.  But Ms. Erdely took these

18   legitimate concerns about Jackie and Phi Psi, which all

19   stemmed from the university wanting to do something to punish

20   these folks if this had occurred, and misrepresented them in a

21   way to make it appear like Nicole had tried to discourage

22   Jackie from sharing her story with anyone, including the

23   police and including her peers.

24          The fact-checker, again Ms. Garber-Paul, admitted

25   under oath that she did not see any evidence suggesting that

 1    Nicole discouraged Jackie from moving her case forward.

 2         "Q    Did you see any evidence in materials

 3         that you reviewed suggesting that Dean Eramo

 4         discouraged Jackie from moving her case

 5         forward?

 6         "A    No, I did not."

 7         Now, remember these markups that Liz Garber-Paul did

 8    to this paragraph of the article, the one that we're suing on,

 9    one of the ones that we're suing on.  It's hard to read, but

10    look in the markup and the red text next to it.  We've kind of

11    reproduced it there in text.

12         "Lots of people have discouraged her from sharing

13    her story," Liz Garber-Paul writes, "'so publicly,' Jackie

14    tells me with a pained look, including the trusted UVa dean to

15    whom Jackie reported her gang rape allegations more than a

16    year ago."

17         And then Liz Garber-Paul writes, "Who fretted that

18    the article might complicate future proceedings."

19         That's kind of an important fact.  It would have

20    made clear what was really going on here, that this was an

21    effort to complicate the concern about, if there was one, what

22    had to do with proceedings that the university and Nicole

23    wanted to see happen.

24         But she was overruled by Sean Woods in making those

25    edits.  It wasn't an accident.  It didn't happen because they

1    believed Jackie, which is their defense now.  It was a

2    deliberate and intentional choice by a journalist and her

3    editor to misrepresent what was in their own reporting file,

4    that this was -- any concern about talking was in an effort to

5    do something against the fraternity.

6              That deliberate choice is actual malice.

7              Let's talk about the rape school quote.  The

8    statement is "Like most colleges, sexual assault proceedings

9    at UVa unfold in total secrecy.  Asked why UVa doesn't publish

10   all of its data, President Sullivan explains that it might not

11   be in keeping with best practices and, thus, may inadvertently

12   discourage reporting.

13             "Jackie got a different explanation when she'd

14   eventually asked Dean Eramo the same question.  She says Eramo

15   answered wryly, 'Because nobody wants to send their daughter

16   to the rape school.'"

17             The sole source for this inflammatory quote is

18   Jackie.

19             Now, you heard Nicole look you in the eye and

20   testify she never said this to Jackie or otherwise.  She's

21   never referred to UVa, her alma mater, the school that

22   educated her, the school where she works and the school where

23   her husband works, she never referred to this institution as

24   the rape school.  And other witnesses, Dean Groves and others,

25   confirmed that they've never heard Nicole say things like

1    this.

2            They knew that Jackie was at the time emotionally

3    fragile and starved for attention.  "Attention-starved" is

4    what it says in the article.  And there's a reason why they

5    chose to violate journalistic standards and avoid confirming

6    this quote with Nicole.

7            The fact-checker -- again, Ms. Garber-Paul -- told

8    them that Jackie was the only source for this rape school

9    quote.  Mr. Woods, on behalf of the magazine, made the call to

10   publish it anyway, without verifying it with Nicole.

11           That was a choice, a deliberate choice, not to

12   verify it with Nicole.

13           Now, let's look at what their explanation for this

14   is, the explanation for why you don't do what journalists are

15   supposed to do.

16           They say, "Well, UVa told us we're not allowed to

17   interview Nicole."

18           That doesn't absolve them of their obligation as a

19   journalist or their responsibility to verify and fact-check

20   things.

21           Investigative reporters, serious journalists, like

22   the ones that are at issue here, they don't listen to what

23   public relations departments say if they're in pursuit of an

24   investigative story and they want to get to the truth.  They

25   don't just read the press release and report on it.  That's

1   not what investigative reporters do.

2          They never asked Nicole whether she said it.  They

3   knew that Nicole had responded to Sabrina's e-mails.  They had

4   her e-mail address.  They had her telephone number, which was

5   publicly available and on her e-mail signature.  They didn't

6   ask Nicole.

7          They never asked UVa.  They were in regular contact

8   with UVa, as a follow-up to the Sullivan interview, asking a

9   lot of questions about a lot of different things, but they

10  never once asked Nicole or UVa to verify the rape school.

11         Columbia Journalism School said, "Journalistic

12  practice and basic fairness requires that, if a reporter

13  intends to publish derogatory information about anyone, he or

14  she should seek that person's side of the story."

15         That applies to Nicole.  That applies to the three

16  friends.

17         Do they need a break?

18         THE COURT:  They do.

19         MR. CLARE:  Okay.  Sorry.

20         THE COURT:  So we'll take a midmorning break.

21         Ladies and gentlemen, I would ask that, while you're

22  away from the court, you not discuss the case, the arguments,

23  the evidence with each other.  Do not permit anyone to discuss

24  it with you.

25         Let's plan to return at 25 until the hour.

1        Ask the marshal to declare court in recess.

2   (Recess)

3   (Jury in)

4        THE COURT:  JoRita can report that all ten jurors

5   are back in the jury box.

6        You may continue.

7        MR. CLARE:  Thank you.

8        Trials like this are sometimes made up of small

9   moments, and on the break I was reminded that I was the one

10  that stood up during jury selection and talked about being in

11  the unenviable position of being the lawyer who has to talk to

12  you all before lunch and standing between y'all and lunch.  I

13  was talking about Mr. Sexton then, but now it's me.  And I beg

14  your indulgence.

15       We were talking before the break about the rape

16  school quote and about how Jackie was the sole source and

17  about how the decision was made not to follow the journalistic

18  practice and verify with Nicole.

19       The fact-checking on the rape school quote showed

20  something else too.  The fact-checker's notes show that the

21  entire setup for the rape school quote in the article, that

22  Jackie had tried to find UVa's rape statistics, never

23  happened.

24       These are the notes about the rape school quote.

25  And you see in the text of the article, there's the whole

1  setup where Jackie is supposedly looking for statistics.  She

2  clicked around on the website.  She found no answers.  All she

3  could find were UVa's police crime logs.

4        A little bubble down on the right-hand side says,

5  "She says never happened.  She said she never looked into

6  this," meaning Jackie never looked into this.

7        That's the setup for this quote, this rape school

8  quote.  But that correction, like all the others that we've

9  looked at, this correction that would have fixed the fake

10  setup for the rate school quote, was never corrected and was

11  published in the article as is.

12        That was a deliberate editorial choice to give

13  additional credence to that statement.  And they chose not to

14  verify it.  That is actual malice.

15        Those editorial decisions disregarding things,

16  including the fact that the fact-checker said "never happened"

17  as the setup for this quote, shows they were trying to portray

18  Nicole in a negative light.

19        Statement number three:  Nicole's nonreaction,

20  alleged nonreaction, to the stories of gang rape.

21        "As Jackie wrapped up her story, she was

22  disappointed by Eramo's nonreaction.  She'd expected shock,

23  disgust, and horror."

24        That is a false statement.  This is the meeting in

25  May of 2014, as you see at the top here, the paragraph.  This

1    is the one, the meeting a year after the first time Jackie and

2    Nicole had met, where Jackie tells Nicole for the first time

3    Phi Psi.  First time Nicole knew the location, and also

4    reported these two other women that Jackie said had come to

5    her about other assaults at that fraternity.

6            It's false that there was a nonreaction.  You heard

7    Nicole testify that Jackie left her office, and she

8    immediately picked up the phone and called the police, set up

9    a meeting the very next day with Officer Rexrode and

10   immediately informed Dean Groves, her boss.

11           It's false to say that she had a nonreaction.

12           Now, Rolling Stone says, "Well, we're only talking

13   about her physical reaction, only talking about her face and

14   the way that she reacted in the moment.  We're not talking

15   about her broader reaction that she had," which is clearly

16   false, and that's why they don't want to talk about it.

17   "We're talking about her physical reaction and what she said

18   and did in the moment with Jackie."

19           But even that interpretation, the one that Rolling

20   Stone has urged you to adopt, is flatly contradicted by

21   Erdely's own reporting file.  This is what her reporting file

22   says about that.

23           It says, "Jackie told Erdely that, after hearing

24   Jackie's claim, Nicole wasn't as shocked as you might think.

25   She was just, 'Oh, you have to have her come in.'  She wasn't

1    like, 'My God, that's crazy.' She was more concerned than
2    anything for these girls' well-being. And then she got pissed
3    at the frat. She said two fraternities had lost their charter
4    this year, and it wouldn't bother Nicole at all to add a third
5    to the list."
6         That was her reaction. "Get these girls in here.
7    I'm concerned for their well-being." And then after that
8    initial reaction of concern for the students, which is what
9    you'd expect from Nicole -- first caring about the students --
10   after that moment passed, then she got pissed at the frat.
11        Those are Jackie's words reported and recorded in
12   Nicole's own file.
13        Now, where in the article, even under their
14   interpretation, do you see this? Where do you see her saying,
15   "I would like to add a third fraternity to the list of ones
16   that I've had to revoke their charters."
17        That's not a nonreaction. That's anger. That's
18   frustration. That's "I want to punish these guys on hearing
19   this information."
20        Intentionally left out of the article why?
21        Because it didn't support the theme. Selective
22   inclusion, reckless disregard for the falsity of what they
23   were writing. They intentionally disregarded the part where
24   she says she was concerned for well-being. They intentionally
25   disregarded the part that said Nicole got pissed at the frat

1    and it wouldn't bother her to add a third.  And they

2    intentionally transformed Jackie's characterization of

3    Nicole's professional demeanor, "not being as shocked as you

4    might think," to something that would sound more like

5    institutional indifference, a disappointing nonreaction.

6           These were deliberate and intentional word choices

7    made by professionals who make their living working with

8    words, these reporters and editors.  It's a false statement,

9    and it was done intentionally and deliberately, with actual

10   malice.

11          Now, there were a bunch of statements made after the

12   fact, during the press tour.  On The Brian Lehrer Show,

13   Ms. Erdely said that "Jackie was kind of brushed off by her

14   friends and by the administration.  She was told -- she told

15   the administration that she had been brutally gang-raped, and

16   the university did nothing with this information.  Jackie's

17   situation blew my mind, that they would seek to suppress

18   something like this, because that's really what they did.  She

19   really had not had any of that support from the

20   administration," talking about Jackie.  "The administration

21   doesn't really treat rape as a crime, as a violent crime."

22          This one is really amazing.

23          "Not only did they not report it to police, but

24   really I feel she was sort of discouraged from moving this

25   forward."

1          And tell the Washington Post, Ms. Erdely did, that

2     Jackie's gang rape allegations were met with indifference by

3     the administration.

4          Now, I've lumped all these together because,

5     otherwise, I'd be talking to you before dinner, not lunch.

6     These are the statements, the other statements, that were made

7     after the article came out.

8          And what's important about these, and what I would

9     urge you to focus on, is this is Ms. Erdely being asked

10    questions about her article.  And all of the references here

11    are to Jackie and Jackie's interactions with Nicole.

12          They'll tell you that's not what the story is about.

13    They're going to say it's about victim choice and campus

14    safety, but all of these statements are about describing

15    facts, or purporting to describe facts, about what the

16    administration and administrators did to Jackie.

17          And the only administrator in the article who did

18    anything to Jackie or with Jackie or for Jackie described in

19    the article, in terms of what the millions and millions of

20    people knew, was Nicole.

21          And the jury instructions, you will see, that in

22    order for a statement to be about someone, they don't have to

23    be mentioned by name.  It's enough if the reference makes it

24    clear.

25          These statements are clearly referring to the person

1    who was interacting with Jackie, and that person was Nicole.

2           When the news organizations, these other reporters,

3    started asking questions, Rolling Stone then doubled down in

4    that defamatory statement Number 7 with a press statement.

5    Wenner Media and Rolling Stone issued a press release.

6           "The story we published was one woman's account of a

7    sexual assault at a UVa fraternity and the subsequent ordeal

8    she experienced at the hands of university administrators in

9    her attempts to work through the trauma of that evening."

10          Remember, if you want to know what's really true,

11   you got to look at what people wrote and said at the time.

12          This is how they described the story.  They didn't

13   say, "We were writing an opinion piece about victim choice or

14   campus safety."

15          "The story we published was an account of one

16   woman's sexual assault and the ordeal that administrators put

17   her through."

18          What ordeal was that?  Who are they talking about?

19   Who are the university administrators who put her through an

20   ordeal?  It was Nicole that they were accusing here in their

21   press statement issued when questions started to arise.  They

22   doubled down.

23          Now, all of these statements, all the ones that

24   we've just looked at -- the ones in the article and the ones

25   that came after the article and the press statements -- I told

1   you in opening statement that the most powerful evidence and

2   the one thing, was the number one thing I wanted you to keep

3   in mind, was the fact that Nicole took Jackie to the police.

4           Immediately after that meeting where Phi Kappa Psi

5   was identified, Nicole arranged for Jackie to meet, and she

6   drew on the relationship that she had built.  You heard her

7   testify that she had been the one in her office to develop

8   this relationship with the victim coordinator to make sure

9   that there was a police officer, a law enforcement person, who

10  was trained and experienced and comfortable working with

11  sexual assault victims so that they would report and so that

12  they would feel comfortable reporting.

13          And she arranged, Nicole arranged, for the meeting

14  to take place in an environment where Jackie would feel most

15  comfortable talking about her assault:  Her own office.  She

16  brought Officer Rexrode and Officer Wade to her office.  And

17  Nicole sat there with her and attended the meeting with her to

18  support her in reporting the bottle incident and support her

19  in reporting the sexual assault.  But Jackie was still

20  unwilling to go forward.

21          Those facts appeared nowhere in the article.

22          So the article, which is plainly about what they

23  told the Washington Post, the ordeal that they experienced at

24  the hands of administrators, is completely undermined by the

25  meetings with the police.

1    Nicole then arranged for a second meeting with

2  Detective Via just a few days later, and again she attended

3  the meeting to support Jackie in reporting the rape.  That

4  meeting was only about the rape.

5    Jackie shut down immediately, you heard.  Detective

6  Via said she would not report, she would not allow her name to

7  be used, she would not allow it to go forward.  Sergeant Via

8  told you that, in the Commonwealth of Virginia, in his

9  experience, without a complaining witness, there's nothing

10  more they can do.

11    So they suspended their investigation but said,

12  "We'll keep it open.  We will close it; we'll suspend it; but

13  we will reopen it any time Jackie wants to come forward."

14    And Nicole worked on it from that point forward.  So

15  this notion that they put her through an ordeal, that they

16  suppressed or they discouraged it, is flatly wrong.

17    And you're entitled to bring your common sense, and

18  you should bring your common sense, to evaluating the

19  arguments that Rolling Stone makes.

20    They say that this meeting was just about the bottle

21  incident.  Well, all these statements -- brushing off and

22  suppressing and trying to keep sexual assault statistics

23  low -- if Nicole Eramo was trying to suppress gang rape on

24  campus and was in the middle of trying to suppress Jackie's

25  gang rape in particular, why would she take Jackie to meet

1   with the police about anything?  And why would she go to these

2   efforts to do it?

3           Just doesn't make any sense.  If she was in the

4   middle of an ongoing coverup of Jackie's assault or trying to

5   discourage her from going to the police, why do it at all,

6   even if it was just about the bottle incident, which it

7   wasn't?

8           Rolling Stone knew about the police meetings.  They

9   knew Officer Rexrode, his name.  They knew he's listed in the

10  university directory, publicly available information.  They

11  also had the e-mail where one of the police detectives, police

12  officers, was described as being a little aggressive about

13  investigating.  And Nicole is apologizing for that because it

14  was scaring Jackie off.

15          The defendants knew this.  All of them knew this.

16  Ms. Erdely had it.  Rolling Stone employee Sean Woods had it.

17  Wenner Media employee Liz Garber-Paul had it.  And an early

18  draft of the article even had a reference to this.  So we know

19  they knew, as it related to the bottle incident, this

20  parenthetical.

21          Now, there's lots of other parentheticals that were

22  not cut in the article.  We were told it was cut because it

23  was a parenthetical.  Look, there are other ones in there.

24  Those weren't cut.

25          But the one that made Nicole look good, the one that

1    might have cast some doubt on Jackie's -- the fact that Jackie

2    had been brushed off, that one was cut.  That was edited out.

3    That's the way it was reported.

4         They made an intentional decision to remove the

5    reference to police from the article.  That's actual malice.

6         No references to the police meetings appear anywhere

7    in the 9,000 words of the article.  And so when 2.7 million

8    people went to the website to view it online and millions more

9    people read this article in print, they never knew that Nicole

10   brought Jackie to the police for two meetings, for anything,

11   much less the truth that you heard from Nicole and Rexrode and

12   Via.  Instead, they were left only with the words that were

13   written in the article.  And Ms. Erdely said after the fact

14   that she was discouraged from moving forward, her allegations

15   were brushed off, her report was suppressed, and they met her

16   with indifference.

17        Now, I want to spend a few minutes talking about

18   their interpretation of the article.  Make no mistake, the

19   article is about Jackie's interactions with Nicole.  It's

20   clear.  Read it for yourself and you'll make up your own mind,

21   that their after-the-fact explanation is to say, no, it really

22   wasn't about Jackie and Nicole.  It didn't matter which

23   foundation we built our house on.  Doesn't really matter which

24   story we picked.  It was all about victim choice, and it was

25   about campus safety.  And this was an opinion piece about

1   those things.

2           Well, that's not the style of the reporting.  They

3   say don't pay any attention to the fact that Nicole is

4   mentioned 30 times by name in the article.  Don't pay any

5   attention to the fact that she's mentioned ten times by her

6   title.  Don't pay any attention to the fact that she's the

7   only person described in the article as interacting with

8   Jackie and in these other cases that they report.  That wasn't

9   the case.

10          She's the only person pictured in the article with a

11  photo illustration.  Don't pay any attention to the press

12  releases where Rolling Stone says her claim was met with

13  indifference.  Despite this, they say it's not really about

14  Nicole; it's about victim choice and public safety.

15          Nonsense.  It's not an opinion piece.  They reported

16  Jackie's rape as if it happened, as a news item.  And they

17  reported the interactions with Nicole as if it happened that

18  way, supported with factual, verifiable details that I showed

19  you during my opening statement.  These are all things that

20  could have been verified.  Same thing with the meeting after

21  the fact.

22          They reported this as a news story.  This was not an

23  opinion piece why victim choice may not be the right answer.

24          And as I said, let's be clear.  They're entitled to

25  have their opinions about victim choice or campus safety.

1    They're entitled to write a piece that says these things -- I
2    don't think that victim choice is the right one -- and have a
3    legitimate, honest debate about that.  Reasonable minds can
4    differ about that.
5            They can criticize schools that implement it.  They
6    can call on schools to change their policy.
7            None of what's going on in this case is about
8    stopping them from holding or writing those opinions.  But
9    what you can't do when you're a journalist, even if you have
10   opinions, is make up facts to support them.  And that's what
11   happened here, if, in fact, you believe they held these
12   opinions and that's what this is about.
13           They can't report as a fact a brutal gang rape that,
14   according to the Charlottesville Police Department, there's no
15   substantive basis to support.  They can't falsely report that
16   Nicole discouraged or suppressed that assault in support of
17   their opinion when Nicole did everything right, including
18   taking Jackie to the police.
19           This isn't an opinion; that's dishonest reporting of
20   news, of facts.  It's dishonest reporting of facts that gets
21   in the way of journalists' credibility.  And when -- in this
22   case, when they disregarded the truth recklessly, as we've
23   hopefully demonstrated to you with clear and convincing
24   evidence, it's defamation.
25           But regardless of what interpretation of the article

1   you adopt -- and I urge and believe the evidence will show, as

2   shown, that this was about Jackie and Nicole -- even if you

3   buy their argument about police safety -- campus safety and

4   victim choice, the fact that Nicole took Jackie to the police

5   completely undermines both of those views.

6           Victim choice.  They say it's about victim choice

7   and this is a piece about victim choice.  But Nicole told you

8   that she brought up the rape to the police officers with

9   Jackie in the room without having Jackie fully on board with

10  that.

11          This is what she said in her trial testimony:  "She

12  described the bottle incident to Officer Wade.  She was

13  reluctant to talk about the rape.  I, frankly, brought it up.

14  It was unusual for me to do something like that in that

15  situation, but, given the situation, I thought I had to bring

16  it up.  So I brought up the rape and the other report."

17          That's not victim choice.  Nicole recognized that

18  this was a serious situation and this was a young lady who

19  needed to be encouraged and needed to be pushed a little bit.

20  With the safety of two police officers in the room, she pushed

21  and she brought up the rape.

22          Flatly inconsistent with the concept of victim

23  choice.  So the real facts negate that perspective as well.

24          Same thing with campus warnings.  If that's what

25  they say this article was about now, contrary to what the

1   article says, Nicole bringing Jackie to the police undermines

2   that too.  They say, well, she had this obligation to warn the

3   campus for public safety.  Question I posed to Nicole:

4           "Q    What department or division within

5       the university has responsibility for assessing

6       information and deciding whether or not a

7       warning should be issued to the campus?

8           "A    The university police department."

9           That's what she did.  She brought Jackie to the

10  people who make those decisions, campus safety.  That's not

11  suppressing it.  That's not doing nothing with the

12  information.  That's not being indifferent.  She brought

13  Jackie to the people that do this, the campus safety warnings.

14  So it undermines the campus safety thing as well.

15          We've heard argument -- or we've heard a suggestion

16  that -- in the article and in this lawsuit, that Nicole

17  brought some of this on herself because she didn't sit for an

18  interview.  Nonsense.

19          We talked to you about FERPA and how that would have

20  limited her ability to talk about Jackie's case.  The

21  defendants knew it.  They chose not to ask Jackie for

22  permission to do that, leaving Nicole defenseless against

23  these allegations.  Nicole wanted to be interviewed.  Her own

24  e-mail said she had nothing to hide.

25          UVa decided that President Sullivan would do that

1    instead, to be the voice of the university on this important

2    issue, to take it seriously, to show Rolling Stone the things

3    that the university was doing.  And, even then, you heard

4    yourself, though, on the audio that Ms. Davis and President

5    Sullivan said several times, we'll circle back with Nicole

6    Eramo on specific questions that they had.

7           No one ever prohibited her from contacting Nicole to

8    verify quotes.  Nicole responded to every e-mail Sabrina had

9    sent.  And they never verified that rape school quote.

10          Ms. Erdely's choice not to ask Jackie for a waiver,

11   for permission to talk to Nicole about these things or the

12   school about these things, left Nicole in a position that was

13   vulnerable and defenseless.  And they knew it.  They knew it.

14   It made her an easy target to make her the face.  Because,

15   hey, she can't talk to us, so we don't know her side of the

16   story, and that gives us the excuse.

17          That's not an excuse.  It makes it even more

18   important that they get the facts right from people with

19   firsthand information.  They took full advantage of it.

20          They knew prior to publication that people would

21   read these stories about -- as Nicole keeping rapes quiet on

22   campus.  They knew that was the -- what they were reporting

23   on.  The fact-checker said -- there's a statement in the

24   article, in the draft, "It's because at UVa rapes are kept

25   quiet, both by students who brush off rapes as regrettable but

1  inevitable casualties of their cherished party culture and by

2  an administration which critics say is less concerned with

3  protecting students than with protecting its own reputation

4  from scandal."

5          When they were fact-checking this, Jackie told Liz

6  Garber-Paul, "Yes, but not Dean Eramo."

7          That correction was overruled too.

8          Remember the headline of the article?  This was

9  written by the managing editor, Will Dana.  And after speaking

10  to Jackie about it, the fact-checker writes, "Nope."  But they

11  went ahead with it anyway.

12          The defendants intentionally ignored all of this

13  information that came up during the fact-checking.  They

14  intentionally ignored all of the information that was provided

15  to them by their sources about what a good person Nicole was

16  and all that she had done and all the red flags about Jackie

17  and all the information about what she had done for Jackie.

18          And this is the way it was summarized in the first

19  draft of the article.

20          Jackie reports, "Gets the Eramo/UVa treatment."

21  They had a name for this.

22          Now, that language does not appear in the final

23  article.  But it tells you what Ms. Erdely and Mr. Woods were

24  trying to convey to readers.  This is "the Eramo treatment."

25  And just to make sure that nobody misunderstood what the Eramo

1    treatment was, they put that picture in.

2            Now, Rolling Stone's lawyers are going to want you

3    to focus on the so-called positive things that the article

4    says about Nicole.  But the article, very cleverly and

5    deliberately, takes each one of these so-called positive

6    statements and juxtaposes them with negative ones to make

7    Nicole out to be a bad person, one who is actually involved in

8    suppressing the rape.

9            The article starts, as we showed, with a lengthy

10   description of Jackie and her rape and the horrifyingly

11   callous reactions of the three friends.  And then we finally

12   get to Nicole.

13           It says -- these are some of the positive things

14   that they point to to say, we didn't really mean to hurt

15   Nicole.  Well, let's look at how they did that.  Let's look at

16   the positive things that they said.

17           "A UVa alum herself, Eramo is beloved by survivors,

18   who consider her a friend and a confidante, even though, as

19   only a few students are aware, her office isn't a confidential

20   space at all."

21           They take the positive, twist it into the negative.

22   "Even though."  By juxtaposing these facts, they're trying to

23   make Nicole look bad.  And that's malice.

24           Directly under the doctored photo of Nicole, this

25   photo illustration, it says, "Dean Eramo" -- "Where's the

1    justice?," it starts out.  "Dean Eramo is the head of UVa's

2    sexual misconduct board and beloved by students."

3              We've heard that a lot.  "We put that in the

4    article.  We said she's beloved by students."

5              "But in the history of the school, no one has ever

6    been expelled for sexual assault."

7              Now, as you heard Nicole testify, she's not the

8    person who decides whether someone gets expelled or not for

9    sexual assault.  Even though she is the chair of the sexual

10   misconduct board, she's not a voting member on the panel of

11   students and faculty that make those decisions about

12   sanctions.  She doesn't hand out expulsions.  She's not the

13   tsar of sanctions.

14             They said she's beloved by students, but where's the

15   justice?  But no one has ever been expelled, suggesting, as is

16   shown elsewhere in the article, that she's discouraging

17   survivors from seeking justice.

18             If there was any doubt about how Nicole was

19   portrayed, here's the statement from Laura Dunn.  Right after

20   they say -- right next to, in the article -- very clever, the

21   way this is done.  Right next to it in the article, where it

22   says she's beloved by students, right next to it, "'This is an

23   alarming trend that I'm seeing on campuses,' says Laura Dunn

24   of the advocacy group SurvJustice.  'Schools are assigning

25   people to victims who are pretending or even thinking that

1    they're on the victim's side, when they're actually

2    discouraging them and silencing them.  Advocates who survivors

3    love are part of the system that is failing to address sexual

4    violence.'"

5            So this notion of being beloved by students is

6    paired two inches away with a quote about some people

7    pretending to be on a victim's side and then saying that

8    advocates who victims love are part of the system that are

9    discouraging people.

10           Here's another positive thing that they twist.

11   "Although many had contacted Dean Eramo, who they laud as

12   their best advocate and den mother, Jackie repeatedly calls

13   her an asset to the community."

14           First of all, the words "den mother" don't appear

15   anywhere in that reporting file, because no one actually told

16   Ms. Erdely they called Nicole that.  She just made it up and

17   attributed it to survivors because "den mother" sounds good,

18   sounds like a word that they can use to kind of say something

19   good about you but in a slightly pejorative way.

20           And it's true that Jackie and many others described

21   Nicole as their advocate.  But that didn't fit with the

22   storyline, so they needed to pair this with negative

23   information.

24           Dash, "Although many had contacted Dean Eramo, few

25   ever filed reports with UVa or with police," suggesting, with

1  the "although" and the dash, that that's Nicole's fault.

2  Again, it goes back to that first statement, "discouraging

3  Jackie from sharing her story."

4       Here's what Alex Pinkleton took about it.  And the

5  article talks about how survivors beloved Eramo.  Do you

6  remember that?

7       "So I'm not sure that that's something that would have

8  stuck out to a lot of people, because, again, this is an

9  article where it was, like, negative, negative, negative.

10  People were very angry at me for supporting the devil because

11  this was the woman painted in the article as sweeping rapes

12  under the rug."

13       That was Alex Pinkleton describing her reading of the

14  article and also her own experience with readers who told her

15  about it.

16       A picture is worth a thousand words.  You saw how Rolling

17  Stone paid an award-winning illustrator to take this picture

18  of Nicole teaching a sexual assault mock trial, where --

19  teaching people how the university actually holds people

20  accountable for sexual assault, and converted it into this.

21       It shows Nicole -- it hides the welcoming gesture in her

22  right hand behind a computer.  It shows her smiling and

23  sneering and giving -- appearing to give a thumbs-up.

24       Do you remember we asked Mr. Woods about the pen?  He

25  said it was darker than he would have liked.

1    Well, when you have that dark pen, it sure looks like

2 she's sitting there giving a thumbs-up to this crying victim.

3 With that sneer on her face and with the eyes that way, it

4 doesn't paint her in a sympathetic light, which is what they

5 told you, that it shows her caring and supporting of

6 survivors.

7    There's signs right outside, right over her head, that

8 say "Stop victim blaming" and "No means no" and "She's broken;

9 he's okay."

10    And one other thing about the photograph that came up in

11 Mr. Ritter's testimony.  Remember, he was the illustrator from

12 Pennsylvania who did it.  I asked him:

13       "Q    Did you alter the appearance of her

14       eyes or eyelids?

15       "A    Yes.  What I will do is -- when I'm

16       building a composition like this, is select

17       pupils of the eye, and then re-render, you

18       know, the eyes, and move the pupils to create a

19       glance to look at where it needs to look.

20       "Q    And in moving the direction of the

21       irises in her eyes, did you also add or alter

22       the appearance of the whites of her eyes?

23       "A    Yes.  I rendered in the whites of her

24       eyes."

25          This is Mr. Ritter's signature style for villains in

1   articles.  You may wonder why we put up these other Ritter

2   illustrations.  I asked him, "These are the Cleveland Five,

3   with the whites of their eyes shown this way, terrorists who

4   hatched an unsuccessful plot to blow up a bridge; a student

5   whose locker is being searched for drugs with whitened eyes;

6   Henry Hill, the brutal mobster associated with the Lucchese

7   crime family, played by Ray Liotta in 'Goodfellas'; and a

8   Chinese sailor who was the cover art for an article, 'How We

9   Would Fight China.'"

10        This is the handwritten note written by the

11  fact-checker next to the illustration on a draft, "Is this too

12  mean?"

13        The top editors -- you heard testimony from their

14  corporate representative that this wasn't something that they

15  just kind of went through.  They convened a group of people to

16  talk about whether this was too mean.  And they all decided,

17  specifically and intentionally and knowingly, that they didn't

18  think it was too mean.  And they published it anyway.

19        Managing editor, Will Dana, deputy managing editor,

20  Sean Woods, discussed it with Rolling Stone's in-house

21  counsel.  Everyone agreed that it was not too mean and it was

22  a fair and accurate depiction of the situation in the story

23  and agreed to leave it as is.

24        In fact, Will Dana even e-mailed the team when he

25  saw the draft of it.  And he was told that the illustration

99

Eramo v. Rolling Stone, et al., 11/1/16, Vol 1

1    was of Nicole Eramo.  And he wrote, "This is great,"

2    exclamation point.

3           "Where's the justice?" is the way that they

4    captioned this article.  This altered picture is the only

5    depiction of a real person in the article.  And they published

6    this image with these defamatory statements to millions and

7    millions of people.  They weren't trying to portray Nicole in

8    a balanced way.

9           All of these decisions, all these juxtapositions,

10   the "buts" and the "even thoughs" and the "although she's

11   beloved by students," and all these things weren't done to

12   portray her in a balanced way; it was done intentionally.

13          But even if those textual examples leaves any doubt,

14   this photo drives home the point they were trying to convey,

15   when you're comparing Nicole, the same visual style that they

16   had used, the illustrator, with all these villains.

17          Now, when we asked them whether this is really a

18   fair and accurate depiction of Nicole, Ms. Erdely couldn't

19   decide how to respond.

20          "Q    As you sit here today and think about

21       it, do you think it's a fair and accurate

22       depiction of Dean Eramo?"

23       This is one of those moments where you have to evaluate

24   the witness's demeanor and credibility.  There was a long

25   pause in the court transcript where she thought about this.

1    And after days of trying to explain every other aspect of the

2    decisions, she sat there silently and said:

3         "A    "I'm not sure there should have been

4         a picture of her in there at all.  It could

5         have been anybody in that role."

6         And that's really, really telling.  They wanted to

7    cast someone in the role of a villain, and it didn't matter to

8    them, it didn't matter to Ms. Erdely, that the person they

9    were casting as a villain and the person that they were

10   depicting is a real person, with a real life and a real job

11   and a real reputation and real relationships that she values

12   on campus and a reputation she spent decades building.

13        "It could have been anybody in that role."

14        It's reckless, it's cavalier, and it was

15   intentional.

16        So there were concerns about attribution and

17   misleading readers about where the article -- where the

18   article had gotten facts.  They knew it was malpractice to

19   publish quotes without verifying them and to publish

20   derogatory accusations without giving people an opportunity to

21   comment.  So they did it in a very clever way through the use

22   of pseudonyms and suggesting that other folks had actually

23   given these quotes.

24        Elisabeth Garber-Paul repeatedly raised these

25   attribution problems, repeatedly circled statements and asked

1  things like, "Put this on Jackie?" and "Is this on her too?"

2  Sean Woods overruled all of those concerns.

3          "Ask Sean.  Need to put this on Jackie?"

4          Liz Garber-Paul later told the Columbia Journalism

5  School that she pushed for these attributions to be fixed, but

6  Sean Woods overruled her, deciding not to disclose to readers

7  this masking of attribution issues that would have let people

8  know that she had actually contacted -- that she had never

9  actually contacted the attackers, the three friends, or the

10 other alleged victims.  Mr. Woods admitted this when we

11 questioned him about it.

12         "Q    It misled Rolling Stone's readers

13         into believing that Rolling Stone knew who

14         these three friends were; isn't that correct?

15         "A    I would agree with that."

16          Misleading readers.  That's not journalism.

17 Journalists don't mislead their readers.

18         "Q    Rolling Stone's editors did not make

19         clear to readers that Erdely and Rolling Stone

20         did not know Jay's full identity -- full name;

21         is that correct?

22         "A    Yes, and I deeply regret it.

23         "Q    Again, it misled Rolling Stone's

24         readers, did it not?

25         "A    Yeah, I think it did."

1          Mr. Woods also admitted that there was a disclosure

2    in one of the drafts that Jackie had refused to identify Jay's

3    full identity.

4          "Q    In one of the drafts that Ms. Erdely

5          had submitted to you, she had indicated a

6          disclosures to readers that she had not --

7          Jackie refused to identify Jay's full identity;

8          isn't that correct?

9          "A    Yes.  It was a line I'd asked her to

10         put in there.

11         "Q    And you deleted it?

12         "A    I did.

13         "Q    And you did so intentionally?

14         "A    Well, I pressed delete, so, yes, it

15         was intentional.

16         "Q    You made an intentional decision to

17         remove the disclosure from readers that Jackie

18         had refused to identify who Jay was, did you

19         not?

20         "A    I did."

21         The Columbia Journalism School criticized them for

22    this.  "Glossing over gaps in the reporting by using

23    pseudonyms and failing to state where important information

24    had come from."

25         Misled sources, misled readers, and then misled the

1    media.

2           You heard Ms. Erdely admit on the stand that she was

3    being evasive when the host of the Slate podcast repeatedly

4    asked her if she knew who the attackers were or if she had

5    contacted them.

6           You also heard her testify that in response to a

7    direct question from the Washington Post about whether she had

8    talked to Drew, she elected not to answer and instead write

9    that she had seen scars.  She hadn't.

10          You heard Erdely testify that she communicated with

11   her editor, Sean Woods, about that response.

12          Mr. Woods also lied to the media.

13          "Q   Ms. Erdely" --

14          This is a question about the medical records.

15          "Q   Ms. Erdely never got those medical

16       records, did she?

17          "A   No, she did not.

18          "Q   You told Mr. Farhi, the Washington

19       Post reporter, that the fact-checker reviewed

20       medical records; isn't that correct?

21          "A   I did.

22          "Q   You told Mr. Farhi, for publication

23       in the Washington Post, that we knew who

24       Jackie's attackers were, didn't you?

25          "A   Yeah.  I stepped over the line.  It

1          was a big mistake on my part."
2               They lied to the media when things started breaking
3   bad.  That's not journalism; it's a cover-up.
4               "Q    You didn't tell Mr. Farhi, we don't
5          know who Jay is, Jackie declined to disclose
6          who he was, did you?
7               "A    No, I did not.
8               "Q    You didn't tell Mr. Farhi that you
9          used a pseudonym for Jay because you didn't
10         know who he was, did you?
11              "A    No, I did not."
12              Remember, Mr. Wenner also lied to the media about
13  whether or not Mr. Woods and Mr. Dana had offered to resign.
14              "Q    And your recollection is that both
15         Mr. Woods and Mr. Dana, on separate occasions,
16         offered to resign?
17              "A    That's correct.
18              "Q    Did you tell the New York Observer
19         that it was not true that --
20              "A    If getting rid of them is, no, none
21         of your business, or, no, not true, or any of
22         their business, or even lying to them.  They're
23         gossip reporters.  I'm under no obligation to
24         discuss this or tell the truth to gossip
25         reporters."

1        So now, having seen these documents, the e-mails
2   that I showed him was back and forth with the paper.
3        "Q    Does this refresh your recollection
4        that you told the New York Observer 'absolutely
5        not truthful'?
6        "A    Yes.
7        "Q    And your prior testimony is that you
8        thought it was okay to lie to them because it
9        was none of their business?
10        "A    It's none of their goddamn business."
11        That was his answer.
12        There were lots of opportunities to stop this train
13   from running down the tracks.  Even Jackie knew that
14   Ms. Erdely was -- had it out for Nicole and planned to publish
15   false statements about her.  You heard the audio where they
16   tried to stop her from saying bad things about her.
17        And after the fact-checking conversation with
18   Jackie, Jackie went to Dean Laurie Casteen to report her
19   concerns and said that she thought -- " after talking to the
20   fact-checker late in the game, was worried that the article
21   would completely misconstrue her perspective.  She stressed
22   her support for Nicole Eramo and talked incredibly about how
23   supportive she had been and that she was terrified that the
24   author was trying to do a hack job on Nicole and to get her
25   fired."

1          That was Jackie's perspective on it.

2          After the article came out, Jackie herself

3    repudiated, in texts to Ryan Duffin, "I tried to pull out

4    because I know her writing style and I know she would

5    sensationalize things and take extreme artistic license, which

6    she definitely did.  But she said it would be published with

7    or without me."

8          This is Jackie's words now.

9          "I know she misrepresented you" -- you, Ryan -- "and

10   Alex and Kathryn as well as Dean Eramo and a lot of other

11   people in the story."

12         Under oath, when we finally got Jackie's

13   deposition -- you saw her and you saw the questions we asked.

14        "Q    Did Nicole Eramo communicate to you

15        that she would help you if you elected to

16        pursue charges against your attackers?

17        "A    Yes, she did.

18        "Q    Did you believe that Dean Eramo could

19        have done more for you at the time during the

20        period of time that you were consulting her?

21        "A    I don't know if it's that I believe;

22        it's that I personally thought she did

23        everything right.

24        "Q    Was it your impression that

25        Dean Eramo was discouraging you from moving

1    forward with those options in order to suppress

2    the fact of it?

3         "A    No.  I never felt like she suppressed

4    my sexual assault."

5         This is the person who was the primary source for

6    their article.  They built the foundation on this woman.  And

7    this is her sworn testimony.

8         The timeline is important.  The judge told you at

9    the beginning of this case -- and he'll tell you again in the

10   jury instructions -- the timeline of what happened here in the

11   publications were important.  I want to spend a minute talking

12   to you about the timeline.

13        Ms. Erdely testified that she was under no time

14   pressure to get this article published.  And that's a good

15   thing, because when you're not under any time pressure, you

16   have time to get the facts right.  But they didn't do any of

17   the things that I've talked about today.

18        Instead, they published "A Rape on Campus" on

19   November 19, 2014, in print and online, and that's when it was

20   shipped out to newsstands.  And they offered up Nicole as the

21   person who is the face.

22        The reaction to the article was swift and furious

23   after November 19.  Angry protesters picketed outside of

24   Nicole's office, just like in this doctored photo.

25        Nicole had never had protesters outside of her

1    window before.  Life was imitating art or, in this case, life

2    was imitating fiction.  They created this reality.

3            That's when Nicole began receiving the flood of hate

4    mail calling her dean of rape, pathetic, a miserable excuse

5    for a human being, coward, scumbag, I hope you burn in hell,

6    shame on you.

7            These are not people who were reacting to a subtle,

8    nuanced, balanced picture of someone who was beloved by

9    students.  This is the way real people read the article, and

10   felt compelled to express it to Nicole.

11           But importantly, people started to speak out.  The

12   advocates, the people who actually knew Nicole, went -- tried

13   to write something public in support.  On November 22nd, the

14   survivors that actually knew Nicole published those letters in

15   the Cavalier Daily, Emily Renda and Sara Surface and Jackie

16   herself.  "We are writing today advocating for our advocate,

17   Nicole Eramo.  In our darkest moments, Nicole has stood by us,

18   felt for us, listened to us, given us heart.  How can we not

19   do the same for her in her darkest moments?  We are advocates

20   because she advocated for us first.  Now we stand for her."

21           Now, this is important.  Jackie herself wrote an

22   article after "A Rape on Campus" came out, wrote an open

23   letter to be published in here.

24           "Dean Eramo has truly saved my life.  She helped me

25   get through the most difficult time in my life and has been

1   with me every step of the way.  There's no one more qualified

2   and more capable of doing this job.  She is, above and beyond,

3   the best resource the university has."

4          So too with Stacy, this other person portrayed in

5   the article.

6          "I was saddened to see you portrayed in such a

7   negative light," she wrote.  "I think highly of you and always

8   have.  I hope that was not lost in the article."

9          Here's why the Cavalier Daily letter is important,

10  because the folks at Rolling Stone read it.  They knew in the

11  days after they published the article that the very people

12  they were purporting to write about said, "That's not the

13  Nicole Eramo that we know.  The Rolling Stone portrayal got it

14  wrong."

15         But instead of doing something about it, knowing

16  that there was this criticism from the actual real people, the

17  following Wednesday, November 22nd, the day before

18  Thanksgiving, Ms. Erdely was giving press statements.  These

19  are the statements where she says "brushing off" and "didn't

20  take it to the police" and those sorts of things; just keep

21  going with the narrative, even though it's not correct, about

22  how the administration brushed off the gang rape.

23         We have the Brian Lehrer interview.

24  (Audio played)

25         Just after that, she went on Slate.

1    (Audio played)

2            And then something really important happens.  While

3    she's out there repeating this narrative, continuing to double

4    down on the same allegations, she has a conversation with

5    Jackie that night and asked for the name of the ringleader,

6    finally.  The story has already been published.

7            Asks and says, "Will you just tell me what the name

8    is?"  Jackie gives her a name, and she tells the Columbia

9    Journalism School, "An alarm bell went off in my head,"

10   November 26.

11           Now, if you had just published an article that was

12   all based on a woman and her say-so on all these different

13   things and you have a conversation that causes an alarm bell

14   to go off in your head, and you really cared, you're going to

15   do something about it.

16           This is what her reporting note says about it.

17   "Mental note:  It's odd that she doesn't know the name of her

18   attacker, but I ran James Larsen through the PeopleSearch, and

19   there's someone there by that name who's a UVa grad, now a

20   grad student.  Google turns up nothing.  I think I'll pursue

21   this more after the holiday weekend."

22           So the same day that she'd given these press

23   accounts and she talked on the phone with Jackie and asked for

24   the name of the ringleader, she goes off and enjoys a holiday

25   weekend, Thanksgiving.

1          And, meanwhile, in Charlottesville, Nicole is

2    spending that weekend in self-preservation mode.  She's got to

3    avoid the media, avoid people, because she's the devil

4    portrayed in this article, while they sit and they wait after

5    the alarm bell had already gone off on November 26.

6          Now, the alarm bell is still ringing in the

7    background on December 1st when Rolling Stone issues that

8    "ordeal" press release.  The alarm bell is ringing.  December

9    1st, 2nd, 3rd, and 4th, first circulated on the 1st, and then

10    sent to a bunch of media outlets.  The names are listed in

11    your jury books.  They publish to the world a press statement

12    about the ordeal that these -- Jackie had experienced at the

13    hands of the university administrators.

14          The next day, December 2nd, Sara Surface talks to

15    Ms. Erdely about this guy, Jay Larsen.  Sara and Alex

16    Pinkleton had done some investigative reporting themselves,

17    even though they're college students, not trained as

18    journalists.  And they found out and they concluded for

19    themselves, I guess, that Jackie had given Ms. Erdely a fake

20    name, that this Jay Larsen person was fake.  And they called

21    her up to tell her.

22          So we've got Jay Larsen out on December 2nd.

23          It was around that time they started looking back at

24    the reporting file.  Mr. Wenner says, "I want you to go back

25    and figure out what happened."

1          Too little too late, though.

2          Ms. Erdely says, "I looked at everything with a new

3   skepticism, and I asked her all these questions with that new

4   skepticism in mind."

5          Why wasn't that skepticism there before they hit

6   print and before they sent out the article?  All of those

7   questions that were then asked needed to have been asked

8   before it was first published.

9          And, finally, on December 5th we saw that "our worst

10  nightmare" e-mail.  That's exactly what she wrote to Sean

11  Woods and Will Dana at 1:54 a.m., "It's our worst nightmare."

12  She says, "We can't run our statement tomorrow.  In fact,

13  we're going to have to run a retraction."  She said it twice.

14         But let's be clear about why she wrote this.  We'll

15  come back to the lie of the retraction in a minute.  But why

16  did she say this?

17         It wasn't because she felt bad for creating all this

18  damage to Nicole.  It wasn't because she pushed a scared

19  college girl into this national spotlight.  She wrote them

20  because she had to beat the Washington Post to the punch.  "I

21  think we need to publish before the Post or else it will look

22  like the Post shamed us into it."

23         That was the reason why they came out with the

24  December 5 editor's note.

25         And look how they executed that December 5 editor's

1    note.  Look what they did and didn't do.  You heard Rolling
2    Stone's managing editor, Will Dana, who Sean Woods says is one
3    of the best in the business.  He told Jann Wenner, "We got to
4    pull the article down."  And Jann Wenner overruled him and
5    said, "We're going to leave it up."
6            They had a conversation.  They made a decision,
7    we're going to leave the article up.
8            And so with their own reputation in mind, they
9    published this December 5th editor's note, which was a second
10   publication of the article.  That second publication appears
11   behind Tab 7 of your jury book.  You can read it as many times
12   as you want.  You're not going to find the word "retraction"
13   in it because it isn't there.  It doesn't say "retract,"
14   "retracting," "retracted."
15           You're also not going to find anything in there that
16   says they're backing away from their portrayal of Nicole
17   Eramo, and you're not going to find anything there explaining
18   what portions of the article that they were retracting.
19           Mr. Wenner, the boss, told us you would have to read
20   the article again to figure out what portions were sourced
21   from Jackie and which ones weren't.  He was inviting people
22   with this editor's note that they published, expressly
23   inviting people, to read the article again with the editor's
24   note in mind and figure out what's true and what's false.  He
25   knew more people would read it.

1        Here's what he said:  "And certainly we also were

2   not withdrawing our reporting of a picture of the overall

3   situation on the UVa campus with regard to rape, Title IX, and

4   all the issues involved at which, you know, Dean Eramo clearly

5   in her office is a position of."

6        So they weren't.  The boss.  This is the guy who

7   said we're not going to take the article down.  This is what

8   he had to say about it.

9        I asked him, "How would a reader know which portions

10  of the story were sourced from Jackie compared to the ones

11  that were not sourced from Jackie and, thus, that you were not

12  retracting?"

13       "I'd say you'd have to read the article."

14       Columbia Journalism School said, "What about the

15  attributions problems?  Wouldn't that impair a reader's

16  ability to know?"

17       "Well," he says, "if it's not clearly stated who the

18  source is, of course you can't determine."

19       That was a republication of "A Rape on Campus."

20  They knew, Mr. Wenner knew, the boss knew, that people would

21  have to read the story again, including all of the defamation

22  and defamatory statements in there about Nicole, on

23  December 5.

24       And you will see a jury instruction that will talk

25  to you about republication and what factors you can consider.

1  And if you know people are going to be reading it and it's
2  going to generate additional content, evaluate for yourselves,
3  under the directions that the judge gives you, whether this is
4  a republication.
5          But Sean Woods also knew that it was going to be a
6  big news story when they put the editor's note up.  And it
7  was.  Remember, they flip-flopped positions.  At first they
8  said -- the first editor's note said it's Jackie's fault; our
9  trust in her was misplaced.
10         They took that down and put up a new one with
11 another explanation saying, no, we've made some mistakes.
12         That generated huge publicity.  Sean Woods said it
13 became a big news story when we put up this editor's note.  We
14 knew people would still be looking for the story.
15         They knew, when they decided not to take the article
16 down, that people would not just read the editor's note but
17 would read the same defamation about Nicole.
18         And Jann Wenner, the boss, knew that there was no
19 way to tell that they were retracting the story about Nicole
20 without reading it again.  And even then, because of the
21 attribution problems, it wasn't clear.
22         Even in the editor's note, they still want to get in
23 their dig, the one that they said was a retraction.  They talk
24 about the university's failure to respond to this alleged
25 assault and the school's troubling history of indifference.

1   They still have to get their shot in, even in this retraction

2   where they're saying, well, we've made some mistakes.

3           You think a reader is supposed to take away from

4   that that Nicole Eramo, the person pictured in the article,

5   that they're withdrawing it?  Of course not.  Jann Wenner

6   never intended that.  He told you so under oath.  This was a

7   republication of the article.

8           It also says that "Because of the sensitive nature

9   of Jackie's story, we decided to honor her request and not

10  contact these men."

11          This statement falsely implies to readers that

12  Rolling Stone knew who the attackers were and that they

13  existed.  And they didn't.  It also implies that these are the

14  only key people in the article that they hadn't contacted or

15  confirmed.  It wasn't.

16          And then they try to bolster Jackie's credibility.

17  "Jackie neither said nor did anything that made Erdely or

18  Rolling Stone editors or fact-checkers question Jackie's

19  credibility."

20          How are you supposed to take away that this is a

21  retraction of Jackie?  They blame her.  "Our trust in her was

22  misplaced."

23          Let's go back to our timeline.

24          Phi Kappa Psi comes out with a statement saying, "We

25  didn't have a party that night."  Still no retraction of the

1   article.  This is on December 5th.  Still no retraction.  We

2   know this because on December 8th, Sean Woods sends a

3   voicemail.

4   (Audio played)

5           Three days after the alleged retraction, here's the

6   deputy managing editor, "We are standing by the story.  We

7   want to stand by the story."

8           This whole notion this was a retraction is a lie.

9           Back to the timeline.

10          December 11, the three friends come out debunking

11  Jackie's account.  Still no retraction.

12          And as soon as this happens, remember, we saw

13  this -- Sean Woods sends a link of that news story, the ABC

14  news story, to Liz Garber-Paul.  And three minutes later, Liz

15  Garber-Paul finds the e-mail addresses for Kathryn Hendley and

16  Alex Stock.  Took her three minutes.

17          It was only then, a month after the first

18  publication and a week after the second, that anyone from

19  Rolling Stone reached out to the three friends.  But even

20  then, they didn't retract the article.  That's when they

21  started doing what they should have done all along, trying to

22  get the facts right.

23          December 22nd, they announce the investigation, the

24  Columbia investigation.  They did not retract the article

25  then.

1          In January, February, or March, even when the

2   Charlottesville Police Department came out and said in March,

3   no evidence to support the account that was published in

4   Rolling Stone magazine, still no retraction.

5          It wasn't until April 5th, with the publication of

6   Columbia Journalism School Report, that Rolling Stone says,

7   "We are officially retracting 'A Rape on Campus.'"

8          By that time, the second publication had been seen

9   by a new audience.  425,857 unique visitors to Rolling Stone's

10  website between the December 5 republication and the time that

11  they finally took it down off the website in April.

12         That's nearly ten times the population of the city

13  of Charlottesville saw the article after it was republished.

14  And that's in addition to the 2.4 million people who saw it on

15  the website between the first and the second publication, just

16  online.  That doesn't count the close to 11 million people who

17  got the print edition, according to Mr. Wenner.

18         But even now, even after all of this, Rolling Stone

19  doesn't stand by its retraction, even after they took it down.

20  Remember, Mr. Wenner, "Will Dana's retraction is inaccurate.

21  I do not stand by it.  I do not retract the whole story."

22         Ms. Erdely sat here in the courtroom and claimed

23  that she believed that the portrayal of Nicole Eramo was fair

24  and accurate.

25         They're not retracting the story.

1          And the other thing that's evident from this

2    timeline about a retraction, so they put out a defective

3    product.  They put out a defective journalistic product on

4    November 19 with this article.  And when they went and

5    republished it on December 5th, they didn't tell people --

6    they said, well, there's problems with the article.  But they

7    didn't tell people, who were still using that defective

8    product, which portions of it were defective.

9          Imagine, like, a car seat manufacturer puts out a

10   defective car seat, and then they discover there's a problem

11   and they say, well, we're not going to recall it yet.  There's

12   a portion of this car seat that's defective.  We're not going

13   to tell you which one, but use it for another five months, and

14   then we'll issue our recall."

15         That's reckless.  That wasn't a retraction.  425,000

16   additional people saw it.

17         After hearing what Nicole had to say about what she

18   endured, Ms. Erdely tried to minimize it in saying that what

19   Nicole had experienced was hurt feelings.

20         There's no real dispute here that Nicole was damaged

21   by this, by the article and the media tour.  You saw a small

22   portion of the hate mail she received.  You heard testimony

23   about the protesters.  And you heard Emily Renda testify about

24   how the article demonized Nicole.

25         That sentiment was echoed by Dean Groves, who talked

1    about the trust that had been diminished.

2         "It was our assessment and belief that Nicole could

3    not be put in the position of doing any intake whatsoever

4    involving individuals that were coming forward.  I did not

5    believe she was anything other than fully capable of carrying

6    out her duties, but my fear and the fear of the other two

7    officials was that the perception came across in the student

8    body based on the article.  If the students believed the

9    system is biased and that the person who is responsible for

10   doing intake has some predilection to protect the university

11   or dissuade them from action, they would not come forward."

12        And she was removed from doing the job, her dream

13   job.  So in addition to the hate mail and the e-mails and the

14   rape threats and all of the emotional distress that came along

15   with it, her dream job was taken away from her.

16        Mr. Wenner said, "We apologize to anyone who was

17   affected by this story."  And he said that Nicole was one of

18   the people to whom Rolling Stone was apologizing.

19        I don't think it was a real sincere apology, but he

20   admitted that Nicole has been damaged.  Another one of the

21   elements we have to prove.

22        But it wasn't a real apology because he says, "Well,

23   Nicole is a victim in all of this the same that we all were."

24   It's really about them, that they were the ones that were

25   damaged.

1        But they're the ones that hit print.  They're the

2   ones that made the decision to do this.  Nicole didn't ask to

3   be included in this article.  She's not the journalist.  She's

4   not the one with the responsibility.  They were.  So it's

5   nonsense that they were damaged in the same way.

6        They created this problem.  And Nicole and I are

7   asking you with your verdict to hold them responsible.

8        I'm almost done.  To borrow Mr. Sexton's term, the

9   plane is about ready to land.

10       And we are asking you to return a verdict after you

11  deliberate finding that all of the defendants -- Ms. Erdely,

12  Rolling Stone, Wenner Media -- defamed her in "A Rape on

13  Campus," not just once on November 19, but in the second

14  publication on December 5th.

15       We're asking you with your verdict to determine that

16  Ms. Erdely defamed Nicole in the radio and podcast interviews

17  that she gave -- those are Statements 5 through 9 in the jury

18  book -- and that all of the defendants defamed her in the

19  statement issued to the Washington Post, Statement Number 10

20  in the jury book; and that Rolling Stone defamed her in the

21  press statement they issued in early December, December 1

22  through December 4.

23       The judge is going to give you a verdict form, three

24  of them.  One is for Ms. Erdely, one is for Rolling Stone, and

25  one is for Wenner Media.  And the jury verdict form is very

1    clear as to how you fill it out.

2          You have to answer questions for each one of these

3    statements for each one of the defendants.  I'm not going to

4    go through all of them with you in terms of how to do that,

5    but I am going to show you the verdict form that the judge is

6    going to give you at the end of the deliberations, and I'm

7    going to show you an example of how we would ask you to fill

8    out the form.

9          Susan, can we turn on the Elmo?

10         MS. MOODY:  Uh-huh.

11         MR. CLARE:  So there are three of these forms, this

12   one right here, Special Verdict Form Number 1 for Sabrina

13   Rubin Erdely.  And there are a number of different questions.

14   Each question has two parts for each one of the statements

15   that are at issue here.

16         Again, I'm not going to go through all of the

17   statements as to all of the defendants, but the verdict form

18   is set up in a very clear way to answer the questions.

19         As to this statement appearing in the November 19,

20   2014, print edition and online editions of "A Rape on Campus,"

21   1A, 1B, here's the statement -- the statement is reprinted

22   here for you -- "Do you find by a preponderance of the

23   evidence that this statement is actionable by satisfying each

24   of the elements set forth on page 23 of the instructions

25   against Sabrina Rubin Erdely?

1          Answer yes or no.

2          So for each statement, for each defendant, we're

3    asking you to answer that question yes.

4          If you answered the question no, go to Question 2.

5    But by answering yes, you then have to answer question 1B.

6          If you answer yes, answer the following question:

7    "Do you find that the plaintiff has established, by clear and

8    convincing evidence, that Sabrina Rubin Erdely acted with

9    actual malice in making this statement?"

10         We ask you, for each one of the statements, to

11   answer that question yes as well.

12         We ask you to answer yes to each of the questions

13   that are posed to you on the verdict form.  All of the

14   questions for Ms. Erdely and all of the questions for Wenner

15   Media and all of the questions for Rolling Stone fit that

16   pattern.

17         But there is a question about republication, which

18   is a little bit different.

19         Bear with me one second.

20         THE COURT:  Starts with Number 10 on mine.

21         MR. CLARE:  Thank you, Judge.  Yeah, this is it.

22   Thank you.

23         This is a different format than the one I had

24   prepared.

25         For each of the defendants there will be a similar

1   question about republication.  That's Question 10 on this one

2   as it relates to Ms. Erdely.

3           "Do you find by a preponderance of the evidence that

4   Sabrina Rubin Erdely" -- or whichever defendant you're asked

5   about -- "republished the article 'A Rape on Campus' on

6   December 5th?"

7           And we ask you to answer that question yes as to all

8   the defendants, that they published these statements in "A

9   Rape on Campus" and then republished them on December 5 and

10  that all of the statements were made with actual malice.

11          As the judge instructed you, I'll have an

12  opportunity to stand up much more briefly after Mr. Sexton is

13  done and have some additional rebuttal remarks.

14          But I want to thank you for your patience again in

15  listening to us recount the evidence and describe for you what

16  we're asking.  It's a very important case for Nicole, and

17  these are very important issues.  And we appreciate your

18  patience and your time and your service.  Thank you very much.

19          THE COURT:  Ladies and gentlemen, we'll now have

20  lunch.  I would ask that, while you're away from the court,

21  you do not discuss the case with one another and do not permit

22  anyone to discuss it with you.  Even though plaintiff's first

23  argument has been made, don't begin to consider the merits of

24  the case and certainly don't begin to deliberate.

25          If you leave for lunch, I'm going to ask that --

1    remind you to leave your notebooks in the jury room.  Don't

2    take your notebooks out with you.

3            Let's plan to return at 2 p.m. for the defendants'

4    closing statement.

5            Ask the marshal to declare the court in recess until

6    2 p.m.

7    (Recess)

8

9                        CERTIFICATE

10       I, JoRita B. Meyer, certify that the foregoing is a

11   correct transcript from the record of proceedings in

12   the above-entitled matter.

13   /s/ JoRita B. Meyer                    Date: 11/01/16

14

15

16

17

18

19

20

21

22

23

24

25