Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

1

1              UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF VIRGINIA

3               CHARLOTTESVILLE DIVISION

4

5    ********************************
     NICOLE P. ERAMO,              * CIVIL ACTION 3:15-CV-00023
6                                  * NOVEMBER 1, 2016
             Plaintiff,            * TRIAL DAY 13, VOLUME 2
7    vs.                           *
                                   *
8    ROLLING STONE, LLC,           *
     SABRINA RUBIN ERDELY,         * Before:
9    WENNER MEDIA, LLC,            * HONORABLE GLEN E. CONRAD
                                   * UNITED STATES DISTRICT JUDGE
10           Defendants.           * WESTERN DISTRICT OF VIRGINIA
     ********************************

11

12

13   APPEARANCES:

14   For the Plaintiff:      THOMAS ARTHUR CLARE, ESQUIRE
                             ELIZABETH MARIE LOCKE, ESQUIRE
                             ANDREW CLAY PHILLIPS, ESQUIRE
15                           JOSEPH R. OLIVERI, ESQUIRE
                             Clare Locke, LLP
16                           902 Prince Street
                             Alexandria, VA 22314

17

18   For the Defendants:     ELIZABETH ANNE McNAMARA, ESQUIRE
                             ALISON SCHARY, ESQUIRE
19                           SAMUEL M. BAYARD, ESQUIRE
                             Davis Wright Tremaine, LLP
20                           1251 Avenue of the Americas, 21st Flr.
                             New York, NY 10020

21

22   Court Reporter:      Lance A. Boardman, RDR, CRR
                          c/o JoRita B. Meyer, RMR, CRR
23                        210 Franklin Road, S.W.
                          Roanoke, Virginia 24011
24                        540.857.5100, Ext. 5311

25       Proceedings recorded by mechanical stenography;
     transcript produced by computer.

Eramo vs. Rolling Stone, et al. - 11/01/2016    Vol. 2

2

1

APPEARANCES (Continued):

2

For the Defendants:          W. DAVID PAXTON, ESQUIRE

3                                      J. SCOTT SEXTON, ESQUIRE
                                       MICHAEL J. FINNEY, ESQUIRE

4                                      Gentry Locke Rakes & Moore
                                       P. O. Box 40013

5                                      Roanoke, VA 24022

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

3

1                              INDEX

2

3     CLOSING ARGUMENT BY THE DEFENDANTS................    4

4     CLOSING ARGUMENT BY THE PLAINTIFF (REBUTTAL)......   118

5

6                              *****

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

4

 1          (The jury is present in Open Court at 2:01 p.m.)

 2          THE COURT:  Well, we can report that all 10 jurors

 3   are back in their places, ready for defendants' closing

 4   argument.

 5      Mr. Sexton, if you're ready, you may proceed.

 6          MR. SEXTON:  Thank you, Your Honor.

 7              CLOSING ARGUMENT BY THE DEFENDANTS

 8          MR. SEXTON:  When I walked in the courtroom this

 9   morning, I really thought I would be telling you all "good

10   morning" when I stood up, okay?  So I've never actually

11   responded to a three-hour opening [sic] statement, so I'm

12   going to try to make it just a hair under that.  But who

13   knows, it could go any way.

14      Like Mr. Clare, I want to thank each of you on behalf of

15   our clients, on behalf of Sabrina, on behalf of Sean, on

16   behalf of Liz Garber-Paul, who is able to join us now that

17   she's -- this case is over.

18      I want to thank you for your time and attention that you

19   have devoted to this important case.  It is truly remarkable.

20   You have no idea how many times in the course of decades of

21   doing this I've looked over to see jurors asleep, which is not

22   near as disheartening as looking up there and seeing a judge

23   who's asleep.

24          THE COURT:  The day is still young.

25          MR. SEXTON:  But I can tell you from personal

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

5

1    experience, I have seen both at the same time.  So y'all were

2    nothing like that.  I mean, it was absolutely inspiring to see

3    you taking notes the way you did, and I know you are exactly

4    the kind of jurors for this case.  So we thank you.

5        I want you to know what a great privilege it's been for

6    me and for Liz McNamara and David Paxton and the entire team

7    of people who you don't really get to see much to represent

8    such fine, fine clients.  And so it's been a very great honor

9    to be here before you for these 12 days of testimony.

10       And if y'all remember, when we started those 12 days, I

11   told you that you were going to hear a lot of stuff that we

12   didn't think was what the case was about.  And I tried to tell

13   you what the case would be about and that our goal throughout

14   the entire time would be to bring you the whole truth on those

15   facts relevant to the case; the whole truth on everything, but

16   trying to keep the evidence focused on those facts.

17       So the -- obviously, the article at issue is about UVa's

18   response to a story.  Jackie's actual lede takes very little

19   bit of the article, and the rest is the culture on the campus.

20   And that included the culture at UVa generally and the culture

21   how it had been for decades, according to the article, and

22   then how her story was received and acted on or not acted on

23   by the administration.  That's what the article is about.

24       And it was interesting.  Mr. Clare, who is a fine lawyer,

25   he said that -- stood up and said this case is not about

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

6

1    Jackie's rape and whether she was gang raped.  And then by my

2    count, it took an hour and 45 minutes until we got to the

3    actual statements.

4        And I mean that as no disrespect, but obviously there is

5    a huge temptation on the part of Ms. Eramo to sort of

6    piggyback onto the mistakes that were made as to Drew, who may

7    or may not exist.  We don't think he exists.  But clearly

8    there were huge mistakes as to not bird-dogging that harder,

9    not finding his last name, not insisting.  We acknowledge

10   those.  This case is not about Drew.  Ms. Eramo is not Drew.

11       The three friends.  If you recall, I told you in opening

12   we acknowledge huge errors in not being more dogged in

13   obtaining those names and pursuing them.  Obviously, Sabrina

14   tells you that she made some mistakes.

15       Sean, Liz Garber-Paul, everyone has huge regrets about

16   not pursuing that lead further.  They have regrets about that

17   because it would have kept them from perhaps publishing

18   Jackie's gang rape story.  It would not have prevented them

19   from publishing an article about how the University of

20   Virginia responds to allegations of sexual misconduct.

21       There were other people that were considered as

22   alternatives for the article.  One of those was Stacy.  If you

23   recall, she gets quoted.  It's about a -- it's almost a whole

24   page.  At least a whole column and a half of the article is

25   about Stacy.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

7

1       Another thing Sean testified to is he had two feature

2   articles in the can.  If they had had any doubt whatsoever at

3   any point as to the accuracy of Jackie's story, they would

4   have pulled the plug.  That's the only evidence you have.

5   There is no evidence to the contrary.

6       Mr. Clare says, well, you haven't seen a draft.

7       Well, we had articles ready to substitute.  That would

8   have taken a process, but the decision would have had to have

9   been made.

10      So those are the issues.  The issues are, how did UVa

11  respond.

12      I think if you recall Mr. Clare in his opening, he

13  says -- he said very early on -- it's my third point:  Nicole

14  Eramo is a private citizen.

15      True to the extent that we all are.  But as I told you in

16  opening, she's a public figure, a public figure.  She's a

17  highly compensated official at the University of Virginia,

18  which is a state agency, and she is a public figure.

19      The judge has already ruled that she is a public figure.

20  That's what makes this an actual malice case.  We are entitled

21  as citizens of the United States and the Commonwealth of

22  Virginia to criticize public figures.  You are; I am; Rolling

23  Stone is.  It's our right as citizens.

24      And so when a university puts someone out as the point

25  person for their policies, for their procedures -- you all

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

8

1   remember how I said, you know, if these are the policies and

2   the procedures, Ms. Eramo is where they meet the paper?  She

3   is.  She is the face of the university on this, and the

4   university always knew that.

5        And so naturally if there is criticism, some of that is

6   going to go her way.  If there is praise, some of that is

7   going to go her way.

8        But I want you to recall that there are many University

9   of Virginia officials mentioned in the article, starting with

10  Teresa Sullivan, who you heard that interview; Susan Davis,

11  another very high-ranking official; Allen Groves, another, the

12  dean of students.

13       So it is not as if she is the only University of Virginia

14  official so that when they say "criticism of the

15  administration," that that necessarily means Nicole Eramo.

16  But even if it did, she is the face of the administration when

17  it comes to these issues of sexual assault.

18       Now, with that kind of general overview, you have to, in

19  looking at all of these -- and we're going to go through --

20  we're going to go through the jury instructions, because that

21  is the key.

22       One of y'all asked early on for the judge:  Can you just

23  define defamation for us, you know, so we can cut to the

24  chase?

25       I wish we could do that.  And if you remember, I kind of

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

9

1    tried to do that, and I -- this should be the -- oh, I'm
2    sorry.
3        This is going to be 29, slide 29.  Okay.
4        If you all want to know how this works in real life, you
5    start out with a nice, clean outline, and then someone talks
6    for 3 hours and you end up with something that looks sort of
7    like that.  So if that's any indication of my brain today, so
8    this could be fun.
9        Y'all remember this slide that I put up?  And I said you
10    were going to get to this point, and you'd be at the finish
11    line, and you'd have some questions that you needed to ask.
12        Was the statement actually about her?  Was it factually
13    false in a material way?  Did it defame her?  Did it cause
14    actual damage?  And was it made with actual malice?
15        And I told you then that actual malice would be defined
16    for you as knowing it to be false or subjectively holding
17    serious doubt as to the truth of the statements.
18        Now, if you recall, I played this not only at the
19    beginning of opening but again at the end.  But unfortunately,
20    I did not define "defamed her," so fair criticism, fair
21    criticism, I didn't get you that.
22        All right.  So one of the things that I want to focus you
23    on -- because my goal in doing a closing statement is really
24    twofold.  One, it is to tell you what the law is, because the
25    judge is going to instruct you on the law, and you will get --

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

10

1   you will get a book.  It will be about this thick.  You will

2   take it back with you.  It will have page numbers at the

3   bottom.  So when I go through these, I'm going to give you the

4   page number so y'all can write it down if you want to or you

5   can find it back there.

6       But this is the manual as far as how to do this.  All

7   right?

8       But I also -- you had 12 days of evidence.  I want to

9   give you some overview as to some of the evidence we think is

10  relevant.  Obviously, it's impossible to cover it all, but --

11  I think there's 285 documents in those binders.  I'm going to

12  give you numbers today for some of those documents probably,

13  if I remember, if it's still on these pages.  And probably the

14  best way to do it is to go to those binders and look under

15  that tab.

16      Because I think you all probably figured out that once

17  you get to the document, it might have three or four different

18  numbers on it from its history in this case.  So look for the

19  tab.

20      All right.  One of the -- so right now what I'd like to

21  do is go ahead and start with the actual jury instructions.

22      This is the instruction of defamatory meaning.  And Mr.

23  Clare spoke on this just briefly.

24      But defamation is a false statement -- is a false factual

25  statement.  All right?  It's not an opinion.  It's a false

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

11

1   factual statement that concerns and harms the plaintiff or the

2   plaintiff's reputation.  All right?

3       To be defamatory, it must be more than merely insulting,

4   offensive, unpleasant, or inappropriate.  It must have made

5   Nicole Eramo appear odious, infamous, or ridiculous, rendering

6   her contemptible or ridiculous in the public's estimation and

7   exposing her to public hatred, ridicule, or contempt.

8       When you are looking at these -- this is -- when you are

9   looking at these statements, you will want to, as it says on

10  the bottom, take them in their plain and natural language and

11  not -- and you have to understand them as people would

12  normally understand the words to be used in the context in

13  which they appear.  All right?

14      Now, as to the article.  And this is important.  If you

15  remember, we started and there were four claims in the

16  article.  You remember the highlighted part?  Number 4 is

17  gone.  Number 4 is gone.  The judge has ruled as a matter of

18  law that number 4 is gone.  So that's a very important thing

19  for you to remember when you go back.

20      We are looking at three very specific statements, and

21  only three, from this article.

22      Another thing, very important:  If you recall, I told you

23  in opening that the plaintiff was suing on something called

24  defamation by implication, and the judge at one point read you

25  a statement that had been produced by the plaintiff as to what

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

12

1    that was.

2        Just to highlight you on that, that was where the

3    plaintiff alleged that taken as a whole and viewed in the

4    context with its headlines, illustrations, captions,

5    promotional materials, and all of that, it insinuates that

6    Nicole Eramo acted as a false friend, pretending to be on

7    Jackie's side while at the same time discouraging Jackie from

8    pursuing a formal complaint or police investigation regarding

9    her rape allegations in order to suppress the assault and

10   protect the university's reputation.

11       Do y'all remember that?

12       All right.  Now, that is something that a great deal of

13   the evidence in this case dealt with.  I asked so many

14   witnesses about it.  I said, did you intend to convey this?

15   Did you intend?  Did you intend?  And it was obviously a big

16   part of what the plaintiff was trying to prove.

17       This case -- this statement is gone as well.  The judge

18   has dismissed that claim.  There is no claim in this case for

19   defamation by implication.

20       These are key facts for you to remember.  I would suggest

21   to you that that renders roughly 97.3 percent of what Mr.

22   Clare said in opening absolutely irrelevant.

23       I'll give you an example.

24       Remember how he talked about a picture paints a thousand

25   words, a picture paints a thousand words; does this make

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

13

1  Ms. Eramo look bad; is it fair to her?

2      Do you remember the photo illustration that's done by

3  John Ritter in the style that he does everything with?  That

4  is not a statement that is challenged in this case.

5      People suing for defamation can sue for defamation based

6  on a picture.  They can.  It could be one of those statements.

7  It could be one, two, three, and four, the photo illustration,

8  all right?  That's not this case.  They have not sued on the

9  photo illustration.

10     The photo illustration was relevant back when there was a

11 defamation by implication because you were to consider

12 illustrations, captions, everything.  Gone.  Gone.

13     So that renders -- that takes us to what the real

14 statements are, all right?  And we will go through this.  But

15 as to those statements, there has to be this defamatory

16 meaning, okay?  So that's a very significant issue.

17     All right.  Second, I told you in our finish line slide

18 that it has to be of and concerning Ms. Eramo.  All right?

19 That is true.  Here is the instruction that will come from the

20 Court.

21     It has to be published of and concerning her, and it must

22 be made -- let's see -- in order for the statement made by the

23 defendant to be of and concerning the plaintiff, it is not

24 necessary that the plaintiff be designated by name in the

25 statement.  It is a sufficient designation of or reference to

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

14

1   the plaintiff if, under all the surrounding circumstances,

2   those who hear or read the statement would reasonably believe

3   that the plaintiff was the person referred to.

4       I'll submit to you that this is not an issue as to the

5   three statements in the articles, all right?  Because those --

6   those statements are very clearly about Nicole Eramo.

7       If you remember, the first one is sharing her story,

8   discouraged her from sharing her story with Rolling Stone.

9   That's obviously talking about the dean.

10       Then you have rape school.  That's obviously talking

11   about the dean because it says Jackie says, you know, that

12   Dean Eramo said this.

13       And then the other one is about a nonreaction after Dean

14   Eramo has been shown -- I mean been talked to about these

15   other two gang rape victims.  So those are clearly about her.

16       I would submit to you, of and concerning is a huge

17   problem for the plaintiff in the post-article statements by

18   Sabrina where she is talking on one morning to Lehrer and

19   Slate in these back-to-back interviews.  Sabrina never

20   mentions Dean Eramo's name.  Not once.  Sabrina never mentions

21   Dean Eramo's name.

22       Look through her statements.  All you will see was the

23   administration, the administration, the school, the school.

24       And they're not questions where she's being asked about

25   the article.  Very important.  She's not -- she's not asking

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

15

1    those questions:  What did you mean in the article when you

2    said this?

3        It's way more backgroundy stuff like:  What did you find

4    when you researched this?  You know, those are the type of

5    questions you'll see that those are the answers to.  All of

6    those have serious problems with of and concerning.

7        Another statement you're going to get -- by the way, you

8    see how this says "Not Statements About UVA"?  You won't have

9    that at the top of your jury instructions.  This is notes for

10   me.  All right?  So that these are names that -- now, it might

11   have the defamatory meaning, of and concerning.

12       Right here there will not be one that says "Not

13   Statements About UVA," but you will get this instruction.  It

14   is in your package.

15       It says:  You are instructed in this case that every

16   American citizen, including our clients, have the right to

17   criticize the actions and statements of any state government

18   agency, including the University of Virginia, and to criticize

19   actions taken or not taken by that state government agency.

20       Critical point is highlighted here:  If you decide that

21   any of the statements at issue are about actions, statements,

22   or positions taken by the University of Virginia or others who

23   work for UVa and not about Nicole Eramo personally, then you

24   must find for the defendants with respect to those statements.

25       The plaintiff must prove by a preponderance of the

Eramo vs. Rolling Stone, et al. - 11/01/2016    Vol. 2

16

1    evidence that the statement is specifically directed at her.

2        Again, I will tell you that this should not be an issue

3    as to the three statements in the article because they are all

4    about those three.  "Share her story," "rape school," and

5    "nonreaction" are about Dean Eramo and how she reacted

6    personally or things she would have said.  This is a huge

7    problem for the plaintiff in the post-article statement.

8        Falsity.  The plaintiff has the burden of proving that

9    the statement is false.

10        No matter how inflammatory or hurtful a statement may be,

11    no matter what the defendants' motive in writing or publishing

12    it, if the plaintiff fails to prove to you that the statement

13    is false, you must render a verdict for defendant as to that

14    statement.

15        Let me give you an example of that.

16        The nonreaction after Jackie describes the two other gang

17    rapes.  What was -- how did Dean Eramo -- what did her face

18    look like after that?  And the answer given is nonreaction.

19        Has Ms. Eramo come in and proven to you that her facial

20    expression was anything other than nonreaction?  I submit to

21    you, no, she has not.

22        Everything in the record so far is that she behaves in a

23    very neutral and professional manner, particularly when

24    encountering these traumatized students.  So there is no

25    evidence whatsoever as to falsity.  And that's just one

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

17

1    example.  All right?

2        Damage.  The plaintiff must also prove an element of

3    damage.  To damage a plaintiff, the statement must be more

4    than merely insulting, offensive, unpleasant, or

5    inappropriate.  It must harm the plaintiff's reputation,

6    rendering her contemptible or ridiculous in the public's

7    estimation.

8        This is a tremendous problem that the plaintiff has with

9    the post-article statements.

10       Probably the most important slide -- and there are

11   several here we're getting into, all right?  Actual malice.

12   Remember I told you it's an actual malice case?

13       All right.  This one is very important.  Let's go through

14   it word for word.

15       In addition to the foregoing elements, plaintiff must

16   prove -- plaintiff also has the burden of demonstrating by

17   clear and convincing evidence that a defamatory statement was

18   made by one or more defendants with actual malice --

19       All right?  This is a defined term, all right?  It has a

20   specific meaning in First Amendment cases, and here it is:

21       -- that is, with knowledge of the statement's falsity or

22   with reckless disregard of whether or not it is false.

23       Reckless disregard.  So actual knowledge or reckless

24   disregard.

25       All right.  So second big news flash.  Reckless disregard

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

18

1    also has a defined meaning, okay?  So when you're considering

2    this term, you don't go and say, well, I know what it's like

3    to be reckless.  Reckless means driving with blinders on, as

4    Tom pointed out.

5        That's not reckless here.  That is not what this means.

6    The Court is defining for you in this instruction what

7    reckless disregard means right here.

8        Reckless disregard means that the defendant had a high

9    degree of awareness of the probable falsity or must have in

10   fact entertained serious doubts as to the truth of the

11   publication.

12       That's exactly what I said on my finish line slide:

13   knowledge that it's false or serious doubts as to whether it's

14   true.

15       What I told you in opening remains true today.  Look at

16   the next sentence:  It is a subjective inquiry that focuses on

17   the defendants' state of mind at the time the statements were

18   published.

19       Remember how I said this is all about what was in their

20   head?  That's where this is, all right?

21       Let me tell you how this is different from many other

22   cases that you might have been called in to sit on.  Let's say

23   you were called in for Mr. Clare's example of a defective car

24   seat case, all right?

25       In that instance, the plaintiff would say that the

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

19

1    manufacturer of the car seat was negligent; that they didn't
2    adhere to standards in their industry; that there might have
3    been warning signs to them that they should have heeded, all
4    right; that they didn't pay attention to things like red
5    flags, all right, those type of things.  That's a negligence
6    case, all right?
7        And that invites you to compare the defendants' action to
8    a reasonable person.  How would a reasonable person respond in
9    that situation?  A reasonable person for that car seat
10   manufacturer would be, how would other car seat manufacturers
11   respond.
12       That is not this case.  You have to completely scrap that
13   for this case because this is a subjective inquiry as to what
14   was in the defendants' mind.  And we told you that at the very
15   beginning, that that's what you were going to be tasked with
16   doing at the end, and it is.
17       I submit to you that this fact alone renders -- what was
18   it, 97.3 percent before?  I'm up to 99 percent of what the
19   plaintiff said in opening is completely irrelevant.
20       Remember all those red flags?  Should have talked to
21   Drew, should have bird-dogged the three friends, all that
22   business, which I said in opening, we admit that.  And you
23   didn't hear one of our witnesses come in here and not.
24   They've been admitting it since December 5th, and particularly
25   since April 5th when the CJR report was published.  They do

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

20

1  not make excuses for that.

2       Okay.  What does -- so let's think about that.

3       We know that in order to find against the defendants, you

4  have to prove -- the plaintiff would have to prove that they

5  knew what they said was false, all right?

6       Now, knew what they said about what?  Knew what they said

7  about every word in this 9,000 page [sic] article?  No.

8  Actually, it's knew what they said about the plaintiff.

9       How many statements is that?  That's three, and you know

10 exactly what they are:  discouraged her; rape school;

11 nonreaction.  Did the defendants have a subjective knowledge

12 of falsity, or did they entertain serious doubts as to those

13 three things.

14      Now, you might -- and I would if I were sitting with you,

15 where you are, I would say, well, why in the world did you

16 spend my 8 a.m. to 6 p.m. talking about Jackie, the three

17 dudes, and Drew and all the stuff you didn't do as to that?

18      Because the plaintiff gets to put on the evidence they

19 want to put on.  That doesn't mean it's relevant.

20      The relevant evidence is whether my clients - Sabrina,

21 Sean, Liz Garber-Paul, Rolling Stone - whether they

22 subjectively believed that the three statements we're down to

23 were false or whether they entertained serious doubts as to

24 their truth.

25      There is no evidence in the record before you, other than

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

21

1  the unrebutted evidence from each one of those witnesses, that

2  they absolutely believed it to be true.  Absolutely.

3      You saw Sabrina testify -- did you all know that was five

4  calendar days that that took?  It was -- it wasn't five full

5  days of testimony, but it was five days of -- covered five

6  calendar days.

7      I think you got a chance to see who she is and how she

8  responds.  I think you got a chance to know whether you

9  believe her when she says, I trusted Jackie.  I trusted Jackie

10 till the evening -- early morning hours of December 5th.

11     That's the question.  That's the question as to Sabrina.

12     Because at the end of the day, Jackie's the one who gave

13 her those words:  nonreaction, rape school, and discouraged

14 her from sharing her story.  All right?

15     So if Jackie wasn't credible, that's a good point.  If

16 Jackie -- if she believed that Jackie was just a liar, well,

17 that would be important to know.  But the only evidence that

18 you have as to what's in Sabrina's state of mind is what

19 Sabrina told you, all right?

20     Now, as to whether she held serious doubts, it's the same

21 question.  I asked her the same questions.  She gave you the

22 answers.  You either believe them or you don't.

23     I submit to you that the only way that you can find

24 against Sabrina in this case is to find that she lied to you

25 on the stand.  That's the only way.  Because it is a

Eramo vs. Rolling Stone, et al. - 11/01/2016    Vol. 2

22

1    subjective inquiry about what's in her state of mind.  Did she

2    know or did she entertain serious doubts as to the truth.

3        Now, I will submit to you that she proved, and she's

4    certainly proven that she had no doubts, no serious doubts at

5    all, as to any part of the story, the Jackie story, what

6    Jackie told her about the rape, how this -- how the friends

7    responded, much of which was corroborated by other evidence

8    she gathered in the course of her investigation.

9        But right or wrong, foolish or not -- and you know she

10   does feel foolish.  This is a woman at the top of her field.

11   She's an excellent journalist.  She feels extraordinarily

12   foolish for having fallen for this, and it's cost her

13   everything.  She hasn't written a classified since then.

14       So the -- but -- so foolish doesn't count.

15       But back to the question:  What does high degree of

16   awareness look like?

17       Remember the "our worst nightmare" e-mail?  That's what

18   it looks like.  It looks like an e-mail that you send on

19   December 5, 2014, at 1:54 a.m., that you send to your editors,

20   your friends, the people you have let down.  And you say:  I

21   just got off the phone with Jackie and her friend Alex.

22   Neither I nor Alex find Jackie credible any longer.  We have

23   to issue a retraction.

24       That's what serious doubts looks like.  And you have a

25   proof as to the precise moment in time that it occurred.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

23

1    That's all you need.  That's the most important piece of

2    evidence in this case.  This is the smoking gun.

3         When did Sabrina figure it out?  1:54 a.m.

4         Now, if you recall, I told you in opening -- remember

5    this?  I said -- I'm going to put this in a little context,

6    maybe going out on a little limb here.  I've been known to do

7    that.

8         But the -- I heard more in this case than just Sabrina

9    was foolish.  I certainly heard more in the closing than

10   Sabrina was foolish.  I heard words to the effect that she had

11   bad character, that she lied.  I know I heard a few times

12   "lied."

13        And I want to tell you, I'm playing this to you for two

14   reasons.  One, I'm going to play you that voicemail she left

15   for Jackie before she wrote that e-mail.  Remember, her whole

16   world's just fallen apart, and she is faced with the toughest

17   e-mail she's going to ever write.  And she's told Jackie, she

18   said, if you're ever going to go to the police, do it now.

19        She's got to send that e-mail, but before she does, she

20   calls Jackie at like 1:30 in the morning and leaves this

21   voicemail, begging her not to go to the police if she's not

22   100 percent sure with her story.

23        Can you play that for me, Scott?

24             (Audio recording played, Sabrina voicemail to

25   Jackie, 12/5/14.)

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

24

1          MR. SEXTON:  That's what serious doubts sounds like.

2     But you know what else that is?  That's what good

3     character sounds like.  That is good character.  That is

4     somebody doing the right thing.  That's a grownup doing the

5     right thing.

6     Now, the -- I heard in the opening also a statement that

7     Sabrina had manufactured facts, just made stuff up.  Do y'all

8     remember that?

9     And I want to refer you back to -- you know, my goodness,

10    I don't know what we would have done without this document.

11    Plaintiff's Exhibit 139 is the Columbia Journalism Review, all

12    right?  And in this, they reviewed everything about 10 ways to

13    Sunday, all right?

14    But one of the things they did review was whether Sabrina

15    or anyone at Rolling Stone had made facts up.  They actually

16    addressed this issue.  And what did they say?

17    This is on page 59 of Plaintiff's Exhibit 139.  The

18    experts in this field said, "There is no evidence in Erdely's

19    materials or from interviews with her subjects that she

20    invented facts."

21    There's no evidence, all right?  You can search all 285

22    of the documents here that you have.  You will find no such

23    evidence.

24    Now, the CJR also found what you are ultimately tasked to

25    find.  Remember how this is a subjective state of mind case

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

25

1    where you have to determine actual malice?  CJR found that

2    Erdely believed firmly, not just believed but believed firmly,

3    that Jackie's account was reliable.  So did her editors and

4    the story's fact checker, who spent more than four hours on

5    the telephone with Jackie reviewing every detail of her

6    experience.

7        So those are facts, all the facts, that you should

8    consider.  You should consider everything in determining

9    this -- everything about her demeanor, everything about how

10   she responded to questions, everything about how she

11   interacted in the September 11 and September 12 audios that

12   you heard, and everything that you heard about how Sabrina

13   thought and how Sean thought and how Liz Garber-Paul thought.

14   And that's all testimony.  But all of that should be taken

15   into consideration.  And when you do, there's just simply no

16   evidence that they did not firmly believe.

17        Now, there's another -- we still haven't made it through

18   the jury instructions, guys.  Don't start fading on me, okay?

19        Actual malice -- this is another actual malice

20   instruction, okay?  When you get back there, you are going to

21   find out that -- no offense, these things are organized, I

22   mean, to where it will say "actual malice," and then you'll

23   flip another couple pages and then it will say something else

24   about actual malice.  And you're like, what?  I mean, it's --

25   just not how it's -- that's just the way it happens.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

26

1    But this is one of the ones on actual malice.  The

2  underlining on here is mine.  You won't have this on your

3  copy.

4    Actual malice is not negligence.

5    Remember how I told you this isn't like the car seat

6  case, this isn't like the blinders case, this isn't like the

7  red flags case?  That closing was about another case, because

8  actual malice is not negligence.

9    Reckless conduct is not measured by whether a reasonably

10  prudent person would have published or would have investigated

11  further before publishing.

12    So all that talk about journalistic standards, and you

13  breached these journalistic standards and whatnot, you have to

14  put it in the context of this legal statement and just cut to

15  the chase right there at the bottom in light of all that.

16    A failure to -- no, let's not -- let's read in the middle

17  because it goes right to what you heard in the first part of

18  Mr. Clare's closing.

19    Remember how he said a failure to investigate, you know,

20  you should consider that?  Here's what the instruction says:

21    A failure to investigate does not establish actual

22  malice.

23    Where is the next "not"?

24    It is not enough for the plaintiff to prove that

25  defendant did not conduct a thorough investigation of the

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

27

1   facts or that the defendant was careless in the way the
2   defendant wrote or edited the article.
3       Likewise, it is not enough for the plaintiff to prove
4   that the defendant departed from accepted standards of
5   journalism in the reporting, editing, or fact-checking of the
6   article.
7       In order to recover -- here are the magic words --
8   plaintiff must prove that the defendant knew the complained
9   statements were false or in fact entertained serious doubts as
10  to whether they were false or not.
11      That's back to that finish line slide I showed you at the
12  very beginning of my opening and at the very ending of the
13  opening, however many days ago that is now.  It was Monday two
14  weeks ago.
15      All right.  So I will submit to you there is a reason why
16  we submitted these to you and there is a reason why the
17  plaintiff did not.  The plaintiff did not come in and prove to
18  you the facts that will allow you to draw these conclusions.
19  The defendant did.  But it is the plaintiff's burden.
20      On this point, one of the slides we've looked at -- and
21  this is very important -- it said that actual malice must be
22  proven by the plaintiff.  She's got to prove every element of
23  her case, every element.  But actual malice has to be proven
24  by a heightened standard of proof.  It's called clear and
25  convincing.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

28

1     So you've heard that word "preponderance" that the judge

2   said.  Maybe you don't remember it.  It's one of those words

3   we use every day, right?  I mean, we don't.  So it's one of

4   the words in this.

5       But preponderance means what you find is more probable

6   than not, okay?  So that's the normal standard.  That's the

7   car wreck standard.  That's the car seat case standard.

8       On actual malice, you have to prove it clear and

9   convincing.  Clear and convincing is going to be one of the

10  instructions that you have.  And clear and convincing is that

11  degree of proof which produces in your mind a high degree of

12  certainty; not just that it's more likely than not, a high

13  degree of certainty that something is true.

14      So when the plaintiff walked into this courtroom, she had

15  the burden of proving that Sabrina knew the statements made

16  about Dean Eramo were false, or she stated them with a high

17  degree of doubt as to whether they were true.  She has to

18  prove that.

19      And she can't prove that by just getting her horse a

20  little bit in front of ours, which she can't do anyway.  She

21  has to prove it by clear and convincing evidence.  That means

22  something that would create in your mind a firm conviction.

23      She has to do the same thing with regard to Sean with

24  regard to Rolling Stone, with regard to Liz Garber-Paul with

25  regard to Rolling Stone.  You have to believe these people

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

29

1    were harboring these serious doubts, or they knew the stuff

2    was false, and that they chose to publish it anyway.  And they

3    have to really have the burden of proving that to you with a

4    very high standard of proof.

5        I will submit to you it has not occurred in this case.

6        Yet again, there's yet another slide because there's yet

7    another page that will be in your book about actual malice.

8        And this is how jury instructions work.  At one point

9    you'll be reading something and you say, okay, I get that, so

10   why does it continue to go on?

11       All right.  So remember how there was this notion in the

12   case of purposeful avoidance?  Like if you failed to go and

13   interview Drew because you just didn't want to hear the

14   answer, you know, because I don't want -- remember we used the

15   phrase "blow up Jackie's story"?  Remember that phrase, okay?

16   That's purposeful avoidance.  When I choose not to go and talk

17   to Drew, when I choose not to go and talk to the three friends

18   because I'm worried in my mind that the story that I've heard

19   from Jackie is false.  That's called purposeful avoidance.

20       So if -- and that's what this instruction is directed to.

21   So if I failed to investigate -- translated, if I failed to

22   call Drew, if I failed to talk to the three friends -- when

23   doubts were in my mind, when doubts were created -- and that's

24   why I highlighted that -- because the story was weakened by

25   inherent probability, internal inconsistency.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

30

1   So if I thought, hey, this can't be true, and I went

2   ahead and didn't follow up on that because of that, then that

3   would be something you could take into account right here.

4   But it's right here.  And see the ellipses.  This is

5   actually a longer page.  But in the middle I put the ellipsis,

6   three periods:  If you find the defendants believed their

7   sources and believed in the accuracy of the statements when

8   published, you must find in favor of the defendants.

9   So it comes right back to that same subjective state of

10  mind.  It always will, because that's the law.

11  Do you remember that question?  Do you remember the

12  question where Liz Garber-Paul was on the stand and

13  Mr. Phillips -- it was toward the end of her examination, and

14  he said words like:  You didn't call her because you knew if

15  you did, she would have denied saying those ridiculous

16  statements, or words to that effect.  Do y'all remember that?

17  And, you know, didn't you?

18  Those quotes were just too perfect.  Remember that line

19  of questioning?

20  That was designed to get at purposeful avoidance, and it

21  did not.  It did not go there.

22  Remember what Liz Garber-Paul said?  Of course not.  You

23  know, of course not.

24  Now, here's another one that you'll want to pay attention

25  to.  It's again another one on actual malice, all right?

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

31

1        The fact that an article is one-sided or fails to include

2   as many positive features about the subject as negative ones

3   is not indicative of actual malice.  All right?

4        Do you remember how much of opening statement from

5   Mr. Clare you heard that said, boy, they could have said this

6   a little nicer.  Why did they call her a den mother?  Why did

7   they do this or that?  Why did they have to say, well, she's a

8   confidante, but people don't know that when they talk to her

9   it's not confidential, which I think is directly related to

10  being a confidante.

11       You know, if I consider you a confidante but I don't know

12  that you can tell people what I tell you, well, that would be

13  an irrelevant fact.

14       But anyway, here it says:  The fact that it is one-sided

15  or fails to include as many positives is not indicative of

16  actual malice.

17       Publishers and reporters are entitled to publish unfair,

18  one-sided attacks on public figures, provided they believe the

19  attacks to be true.  Back to their subjective state of mind.

20       These are really important jury instructions.  That's why

21  I'm taking so long.  I really appreciate your patience on it.

22       Neither is actual malice established merely because a

23  defendant selectively chose which facts to present and which

24  facts to omit in advancing a particular viewpoint.

25       Can you all think of one word that comes to mind when you

Eramo vs. Rolling Stone, et al. - 11/01/2016    Vol. 2

32

1    read this?  I can.  Police.  You know, it was in the first
2    draft and you took it out, and it was about the bottle
3    incident, and you could have left it in there, and you could
4    have left it in there.

5        First off, not one of those three challenged statements
6    relates to the police.  Not one.  Police are irrelevant to
7    this case.  But they're really irrelevant once you know that
8    the Court is instructing you that it's not proven by the fact
9    that you decide to take out facts and present ones you want in
10   advancing a particular viewpoint.

11       So I remind you the issue is whether the publisher
12   recklessly or knowingly published false material.  Those
13   are -- that's the language of the Court.

14       Again, every time you see this word "reckless disregard,"
15   that phrase, this -- my -- where I'm putting my finger right
16   there, that actually is not in the instruction.  I just put
17   that on this slide to remind you.  Every time you see
18   "reckless disregard," it is a defined term that means high
19   degree of awareness of probable falsity, or must have in fact
20   entertained serious doubts as to the truth.  That's what that
21   means.

22       So that's going to be true anytime you see the words
23   "reckless disregard" in these.

24       Similarly, a journalist may express a viewpoint that is
25   one among a number of possible rational interpretations of

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

33

1  ambiguous sources or facts.  Even if the interpretation shows

2  that it's wrong or ill conceived, such expression does not

3  amount to actual malice.

4      In other words, Sabrina and Rolling Stone could have

5  gotten it completely wrong.  Victim choice may be the best

6  thing since sliced bread.  It may be perfect.  Clearly, the

7  article suggests otherwise.  All right?  That's an opinion.

8  That's a viewpoint.  That's a point of view.  It does not

9  amount to actual malice absent knowledge that the

10  interpretation is false or a reckless disregard of whether the

11  interpretation is false or not.

12      Again, for your benefit, I just remind you again that

13  "reckless disregard" is a defined term in this case.

14      Yet another statement:  If you determine that a defendant

15  retracted an allegedly defamatory statement, you may consider

16  that retraction and the circumstances in which it was made in

17  determining whether a defendant acted with actual malice.

18      Does that make sense?  All right.

19      If I learn of events that cause me to change my opinion

20  as to whether a source is credible, and if I act on those

21  events or that changed state of mind, if I do those things, as

22  Rolling Stone did here, as Sabrina did, then that is very good

23  evidence as to whether I was acting with that degree of

24  knowledge up until that point.

25      You see what I mean?  The fact that something happened on

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

34

1   December 5th that caused Sabrina and Rolling Stone to issue

2   that note to the readers, warning everybody that whatever

3   sourced in here to Jackie we no longer believe, we don't know

4   what's true and what's not, but we can't put our name behind

5   it, the fact that that happened, this jury instruction is

6   telling you you can consider that, and you should in this

7   case.

8        Now, to the actual statements.  Guys, we made it through.

9   We made it through some of the instructions.  Guess what,

10  there's probably at least a half a dozen -- half again as much

11  of them in there, but I picked the ones on actual malice.  And

12  you see how many there are?  I mean, that's why it's so

13  important.  It's plainly an actual malice case.

14       All right.  This one was -- this is this discouraged her

15  from sharing her story, all right?  This is statement number 1

16  in your book, and it's a -- this is one of those which -- it

17  says, "Lots of people have discouraged her from sharing her

18  story, Jackie tells me with a pained look, including the

19  trusted UVa dean to whom Jackie reported her gang rape

20  allegations more than a year ago."

21       All right.  That is a statement.

22       First off, Dean Eramo says it is defamatory.  That means

23  it renders her odious and contemptible and all those things

24  that we read about as to what means defamatory.

25       We submit that it doesn't.  We submit that first of all,

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

35

1    I mean, there are many people, in fact I would say most, who

2    would suggest to lots of people that they should not share

3    their personal story with a national magazine.  Right?  I

4    mean, this is just common sense.  You're going to put your

5    story out there in public in a national magazine.  Perfectly

6    rational.  Not many people want to do that.  I certainly don't

7    want to do it.  All right?

8         So as we read this, and as the only way I think it can be

9    read, what the article is saying is that Jackie was

10   discouraged from sharing her story with Rolling Stone.

11        How do we know that?

12        If you go to how that paragraph begins, "Jackie, now a

13   third-year, is worried about what might happen to her once

14   this article comes out."

15        The paragraph is plainly talking about the article.

16        Again, the paragraph ends with, "On this deeply loyal

17   campus, even some of Jackie's closest friends see her going

18   public as tantamount to betrayal."

19        All right.  Going public is sharing your story with a

20   national magazine.  All right?  So it begins with that

21   concept, it ends with that concept, and the sentence right in

22   the middle is sharing her story.

23        So we suggest that there is only one proper English and

24   rational way to interpret that, and that is that sharing her

25   story means sharing her story with the media.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

36

1    All right.  Remember how Mr. Clare pointed out how the

2    fact checker said, oh, the biggest deal here is because, you

3    know, sharing her story they can put it so publicly?

4        That's the immediately preceding sentence, all right?  So

5    if you go back, it is the very sentence that -- right before

6    the final sentence that says, "On this deeply loyal campus,

7    going public is tantamount to a betrayal."

8        As you remember, Liz Garber-Paul said, look, we're not

9    going to put the word "public" in two sentences back to back.

10   It's covered by the second one.  So there is no smoking gun

11   there.  That's a very rational editing position not to put

12   that in there.

13       All right.  So as to the evidence in this case, what

14   evidence do we have as to this issue?

15       Well, we have Sabrina's notes.  We also have the

16   testimony of Sabrina and the testimony of Liz Garber-Paul.

17       Liz Garber-Paul was asked on this stand, sitting right

18   here:  And what did you do to satisfy yourself that statement

19   number one, this statement I just read, was accurate at the

20   time you did your fact-checking?

21       "Well, part of what I did was I spoke with Jackie about

22   it, and she confirmed that to me."

23       All right?  So she says, the only evidence you have

24   before you is that she confirmed it.

25       To my knowledge, you did not hear anyone say contrary to

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

37

1    those facts.

2         Now, what is the other evidence that you have in this?

3         Remember the slides?  This is Plaintiff's Trial Exhibit

4    20.  These are the Alex Pinkleton slides.  These have some

5    interesting and probably very relevant things if you're

6    looking.  This -- but in this instance, Alex Pinkleton, who

7    also came in here and testified right here, she's writing

8    these text messages back and forth to Sabrina, all right?  And

9    it's this, What is going on?  Why is it that Jackie is

10   suddenly saying that -- you know, to her friends; she never

11   said this to Sabrina -- that, you know, maybe she wasn't

12   comfortable using her name, maybe this, maybe that.  It was a

13   big mystery at this point because just before this

14   interchange, Sabrina testified that she had had a conversation

15   with Jackie and Jackie was on board, she was fine.  In fact,

16   it says it in this chain of text messages.

17        But right here she says:  I just want to make sure --

18   this is Alex talking -- that she is comfortable with

19   everything and doesn't feel like she's getting polar opposite

20   information from you and then from Dean Eramo and company,

21   because that's what I see has been happening.

22        All right?  So in Sabrina's mind, when she writes these

23   words, that Jackie was discouraged from sharing her story with

24   a national magazine, she has that information both from Jackie

25   and she has this information from Alex, all right?  She has

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

38

1    two credible sources, two sources she believes to be credible.

2         When Rolling Stone publishes it, they have Liz

3    Garber-Paul, experienced fact checker, calling her up and

4    saying, did you say this?  I mean, is this -- did she

5    discourage you from talking to our national magazine?  Yes,

6    yes, she did.

7         So this -- you have absolutely got plenty of evidence to

8    make very short shrift of this statement.

9         The next one is the rape school one, because -- statement

10   number 2, "because nobody wants to send their daughter to the

11   rape school."  If you recall, this is where the article is

12   talking about how difficult it is to find statistics at the

13   University of Virginia and how she had searched.

14        She also says in the article, and I thought this was very

15   relevant, that every time she would ask, she'd get the

16   runaround.  It says it in the article.  She said she was --

17   she kept trying to ask for the same information.  How do I get

18   these statistics?

19        And the press release -- the press people, the press

20   department there at UVa, would tell her, oh, go to the police

21   department, they'll get you the information.

22        And then she'd go to the police department and they'd

23   say, no, we don't have that information.  You've got to go

24   back to, you know, to some other place to get it.

25        So this was a very frustrating thing, and that's what's

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

39

1   described in the first part of this.

2       It's also described that of the 38 complaints -- or 38

3   reports that the school received that year, only nine resulted

4   in complaint.  That was a pretty big deal in the article,

5   because that was considered by Sabrina and Rolling Stone to be

6   a very disappointing statistic.

7       But this is the -- clearly coming from Jackie's voice.  I

8   say this because every single one of these three statements

9   that we're talking about in the article are clearly sourced

10  from Jackie.

11      And so when Mr. Clare was talking about how he was just

12  so confused, how would you know, how would you know when you

13  read the article, if you have this retraction notice above it,

14  you know, the note to readers saying, we have lost confidence

15  in Jackie, if you have that, how would you ever know what was

16  being retracted?

17      I submit to you there is no way you could not know that

18  the three statements at issue were attributed to Jackie.

19      And why is that?  Because those three statements say it.

20  She says, she discouraged me.  She says -- this is what the

21  article says:  Jackie says, because nobody wants.

22      It's very easy.  This is not a mystery.  This is not an

23  attribution problem.

24      Now, here's the evidence as to -- I want to play for you

25  this segment, remember, from September 11.  This, by the way,

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

40

1    was the second time that Jackie had told her the rape school

2    comment.  If you wanted to find the first time, it's in

3    Sabrina's notes at page 4314.  So that big binder which is

4    Plaintiff's Exhibit 10, which, by the way, I suggest you don't

5    use.

6         When you're going back, you know, the bound one?  This

7    one, okay?  Use Defendants' Exhibit 64 if you want to look

8    something up, because it's got fewer redactions.  It's nothing

9    bad about what they were trying to do.  Their version was just

10   more protective of privacy because I think those things had

11   been filed earlier in court proceedings, and so there's --

12   they were doing nothing wrong with their version, it's just

13   got more redactions.  So I would suggest you use Defendants'

14   Exhibit 64.

15        Sorry for that.  But when you do, you would -- if you

16   went to page 4314 to 15, you would find the interview when

17   Jackie talked about this the first time.  Now, here's this

18   audio.

19        Scott, do I just hit play?  No, sorry.  Can you do it?

20            (An audio recording was played, 09/11/2014 interview

21   of Jackie.)

22            MR. SEXTON:  All right.  I told you all at the

23   beginning of this case that there were just very few instances

24   in my legal career, and I think in most cases, where you have

25   evidence like this that proves exactly what happened.  Usually

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

41

1  you have people coming in two years later and they're trying

2  to remember, but here it was a really -- a good thing that --

3  I know it might not have been the most fun two and a half

4  hours of your life to listen to that audio all the way

5  through, but it was evidence that you can't get anywhere else,

6  because nobody's memory is that perfect that many years later.

7      I will suggest to you that another thing that is unique

8  in this case is this, these notes.  I mean, y'all heard --

9  y'all heard -- remember when Teresa Sullivan's interview was

10 playing, that audio where she was talking to Teresa Sullivan,

11 and in the background you hear just Sabrina just tearing up

12 the keyboard?

13     All right?  That's how these notes got put together.  You

14 hear it.  She is a fierce typist.  I will warn you she's not

15 very correct in her spelling, okay?  So when you see some of

16 these spellings, you've just got to be a little creative, but

17 you can get there, all right?

18     Now, while I'm on that subject and while I've got this

19 document in front of me -- and this is skipping ahead because

20 that's how my brain works.  But you remember when Mr. Clare

21 said to you, just, oh, just how telling and how awful, and

22 what a hideous person Sabrina is for turning off her recorder

23 and having a conversation?

24     The crazy thing is, if you really were that kind of

25 person -- I think Sabrina explained it.  She said, I don't

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

42

1    want to go back home and transcribe my notes, right?

2         Can you switch me over to the ELMO?

3         While I was listening to that, I just highlighted this.

4    All right.

5         If you're that kind of person who is just trying to hide,

6    and you're a snake in the grass and you're pulling all these

7    tricks, does it make any sense whatsoever to say, I turn the

8    recorder off, and then describe exactly what you did?  Right?

9         The only reason Mr. Clare has any idea what she talked

10   about is because she wrote it down.  And she says, I turn the

11   recorder off and tell them, I do think there have been some

12   legit, worrisome issues that have been raised, and that may

13   not reflect well on the administration, of which Dean Eramo is

14   the most public face -- this is an example of that great

15   spelling -- because she is the one who deals with the

16   "studnet," because I do have some questions about whether

17   Jackie's case has been handled properly.

18        If she had bad motives, if she was trying to pull a fast

19   one, you don't turn your recorder off and then summarize what

20   it is you said, right?

21        See if I'm getting ahead of myself here.

22        Miss Garber-Paul testified about this same thing.  If you

23   recall, she was asked to comment on this statement, which is

24   statement number 2, challenged statement in the article.  And

25   she was asked on this witness stand under oath:  "Did Jackie

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

43

1    tell you that?"

2        You see her answer there:  "Yes."

3        "Did you ask her specifically that quote, or how did it

4    come up?

5        "I asked her about this, this meeting, and, you know,

6    what happened when she asked Dean Eramo about why these things

7    weren't easily available for her on the website.  And Jackie

8    volunteered this quote to me."

9        In this context, you -- you also realize what

10   "volunteered" means in this context.  Is it -- Liz did not

11   have to go to her and say, did you say these words -- did you

12   hear her say these words, "rape school"?

13       What is -- what Liz is saying there is, I asked a general

14   question:  Tell me about this topic.  And in describing this

15   topic, she volunteered those words.

16       That provided a high degree of confidence for Liz that

17   these were in fact true quotes that were being attributed.

18       While we are on that subject, I think it is very

19   important in your consideration of this to know that Jackie

20   really loved Dean Eramo.  That's really clear.  Sabrina

21   believed it to be true.  Liz Garber-Paul said she knew it to

22   be true.  Sean knew it to be true because he had learned it

23   from Liz and Sabrina.  Everyone involved who was assessing

24   this statement knew that that -- that the person who was

25   making it, reporting it, had in fact a great deal of affection

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

44

1  for Dean Eramo.  That goes to why they believed it was true as

2  well.

3      A third thing I will have you consider on this issue is

4  that Dean Eramo was clearly on record making some

5  inappropriately candid statements to students as a

6  high-ranking dean at the University of Virginia.  Do you

7  recall what some of those were?

8      One of them was, "we're flat-out fucked," and that was

9  about Rolling Stone being on campus and Hannah Graham

10  disappearing.  That was confirmed not just through the mouth

11  of Jackie but through the mouth of Alex Pinkleton.

12      In fact, Dean Eramo herself says, I probably said it.

13  They haven't come in and said that wasn't false, all right?

14      Had that been published in this article, that's a

15  verified source.  Would that have been negative?  Oh, yes.

16      All right.  Do you remember what Dean Groves said about

17  that?  He had plainly never heard that when he was up here on

18  the witness stand.  Do y'all remember?  And Mr. Paxton asked

19  him:  Hey, how you feel about your deans going out and, you

20  know, talking about this and saying, in response to a death --

21  or actually a missing student there, and in response to a

22  reporter making inquiries that "we're flat-out fucked"?

23      And he said words to the effect that he would not be in

24  favor of that.  And that's the boss.  That's the dean.  I

25  suggest to you that in all likelihood he --

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

45

1      Is it note time?  Okay.  You all can do hand signals too,
2  like a picture.  This one is land the plane though, okay?
3  It's universal.  When you've had it up to here, okay, you just
4  throw those runway lights on and we're down in about five
5  minutes.

6      But the fact that Rolling Stone decided not to publish
7  that statement says a lot about whether they were out to in
8  fact harm Dean Eramo.  If they wanted to harm Dean Eramo, who
9  they, by the way, don't know, they never met her -- as every
10  one of them explains, she was simply the person in that public
11  position.  Sabrina met her one time, and that was at the Board
12  of Visitors meeting where she said she attempted to introduce
13  herself to her, and I think Dean Eramo said, I'm sorry, I
14  can't talk.  You know, it's -- sorry, we're not being able to
15  talk.

16      And so anyway -- but that's it.  They don't know each
17  other.  My bet is they'd like each other.

18      Do you want to take a break?

19          THE COURT:  Whenever you're at a good point.

20          MR. SEXTON:  Okay.  I'm there.

21          THE COURT:  All right.  So ladies and gentlemen, I
22  understand that you would like to take a break during this
23  segment of the closing arguments.

24      Again, I would ask that while you're away from us you not
25  discuss the case with one another nor permit anyone to discuss

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

46

1    it with you.

2        Just for your planning, I expect to try to complete all

3    of the closing arguments today, so we'll just see how it goes.

4    We may wait and have the Court's charge in the morning.

5    Again, we'll see how much time is left at the end of the day.

6        Let's plan to return at 25 after the hour.

7        Ask the marshal declare the Court in recess.

8            (A short recess was taken at 3:11 p.m.)

9            (The jury is present in Open Court at 3:26 p.m.)

10           THE COURT:  We can report that all 10 jurors are

11   back, ready for the continuation of defendants' argument.

12           MR. SEXTON:  When we paused, we were talking about

13   the "rape school" statement, which is statement number 2.

14   That was 2 of 3 statements challenged in the article.

15       Another thing -- and I had told you about the

16   inappropriately candid statements that had been made, and I

17   think we've seen other examples of that.  I'm not judging

18   anybody, certainly, for use of language because people who

19   live in glass houses...

20       But the -- as a dean of students, I think we also saw

21   some examples of kind of similar writing to students saying,

22   you know, awesome bitches and such things as that.  No

23   judgment.  But there is a recognition that there is this

24   pattern of very candid, candid behavior.

25       Another thing I want to point out to you as to what

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

47

1   Sabrina, Rolling Stone, Liz, would have considered relevant in

2   assessing this quote, and I think it's what all writers

3   consider when they're assessing a quote, was whether the

4   source had been accurate as to other quotes that she had

5   provided.

6       In other words, if you tell me something and you say five

7   things to me, you know, well, David said X and Liz said Y, and

8   then I go and talk to David and I say, David, did you say X

9   and, Liz, did you say Y, and they confirm it, well, I'm going

10  to start believing that you're a good person as far as

11  attributing quotes.  You're good at it.

12      And so here Sabrina had, not purposefully, I don't think,

13  but she had followed up on Jackie with regard to those

14  incidents.  And that was in two or three examples.  One of

15  them was the "flat-out fucked" statement.  She heard it from

16  Jackie.

17      Weeks later she asked Alex Pinkleton, and Alex Pinkleton

18  confirmed it.  And it's in her notes that, yeah, that's what

19  Dean Eramo said.

20      Another example:  All the boys have graduated.

21      Remember that?  It was first told to her by Jackie.  Then

22  she talks to Alex and says, Alex, did you hear that from Dean

23  Eramo when you were at that meeting?  Yes, it is confirmed.

24      So by this point in time, Jackie has been established,

25  just in these other examples, as being someone who is fairly

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

48

1  reliable in providing quotations.  And again, you have to all

2  put that in the context of the fact that she had great

3  affection for Dean Eramo, as did Alex.  So those are very

4  relevant.

5      Now, within the factual context in which this statement

6  is made, nobody wants to be a rape school, do you recall

7  Jackie actually talked about this in her deposition?  That

8  deposition was probably painful.  There was a lot of "I don't

9  know," "I don't remember," but this is one that wasn't.  Do

10  you remember?

11      She remembered this, and she gave testimony on it.  And

12  the testimony was confirmatory.  She said she couldn't

13  remember exactly saying this to Sabrina, but she certainly

14  remembered that -- dealing with Dean Eramo on this issue.  And

15  she pointed that out.

16      And so she went on for probably -- that was probably one

17  of the most substantive conversations that was played in her

18  deposition.  So Jackie even did not retract having heard this.

19      Now, the -- within this context also, it's very important

20  to remember that the factual point that is being made in the

21  article and the one that Sabrina had researched, the one that

22  Liz Garber-Paul researched, is that these statistics were

23  very, very hard to find at the University of Virginia.  It was

24  like -- what'd I say in opening? -- pulling chicken teeth.

25  But it was.  She had been asking and asking and asking.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

49

1    And if you remember, for her, she did not get them until

2    the very morning of the Teresa Sullivan interview.  Mere

3    minutes before that interview was about to start, she gets an

4    e-mail.  I think it was less than an hour before that was

5    supposed to start.

6    So within the context that these are very hard to find --

7    so it did in fact -- the fact that nobody would want to send

8    their daughter to a rape school, whether it's UVa or any

9    school, whether they're publishing these things, was

10   corroborated by the fact that the school did make it

11   incredibly difficult to get.

12   Now, before I move on to the next one, for those of you

13   studious note-takers, I did not give you the numbers of the

14   actual malice instructions when I was going through.  And I

15   think they might have been on the bottom of the slide, but I

16   was missing it.

17   When you go back, all those ones I dealt with on actual

18   malice, they're going to be on page 32 to 40.  32 to 40.

19   All right.  You all ready for the next statement?  I bet

20   you already know what it is.  Nonreaction, okay?

21   This is the one where she tells her about the two others

22   that had been gang raped in the Phi Psi house.  One had been

23   assaulted by four men in the bathroom.  And then as Jackie

24   wrapped up her story -- which is important, okay?  As Jackie

25   wrapped up her story -- that's what we're talking about -- she

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

50

1    was disappointed by Eramo's nonreaction.  She'd expected

2    shock, disgust, and horror.

3        Now, on this score, I want to show you when you go to PTX

4    10 or Defendants' Exhibit 64, you will find these notes from

5    the interview that you've now seen quite a few times.  Okay.

6    In the notebook it won't have that neat little August 16,

7    2014, up at the top.  I did that.

8        Now, let's look at what the question was that Sabrina

9    posed.

10       "I just wondered if you saw the look on her face."

11       Okay?  This is what is being sought here.  This is what

12   is in the mind of the writer.

13       The question she asked:  What was the look on her face

14   when you told her that someone else was shocked.

15       It was not about whether she then got pissed later on

16   about the fraternities.  It is not then whether she held

17   concern for those victims, all right?  It was just about what

18   was the look on her face.

19       This is something we've been saying since this case

20   began.  This is a statement within this article that's about

21   her facial expression.

22       And Jackie says:  It wasn't as shocked as you might

23   think.  She was just mild.  Oh, you have to have her come in.

24   She wasn't like, my God, that's crazy.

25       All right.  Now, I'll suggest to you that it takes an

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

51

1   enormous stretch of literary imagination to turn nonreaction

2   in this context into the kind of global you-don't-do-

3   anything-for-sexual-assault-victims interpretation that Dean

4   Eramo attempts to put on this, all right?

5       This is the actual meaning:  What was the look on her

6   face.  And this is what gets described.  It gets described by

7   Sabrina as a nonreaction.

8       The only question you have in your mind as to that was

9   that did she have a true factual basis on which to make that

10  statement.

11      More importantly, did she have a factual basis that she

12  believed to be true to make that statement.  Did she hold

13  serious doubts as to the factual basis that she held in her

14  mind to make that statement.

15      And the answer is, of course she did not.

16      How do we know that?  Because we know what the question

17  was that she asked.

18      She asked:  What was the look on her face?

19      We know what the answer was that she was given:  It

20  wasn't as shocked as you might think.

21      So that's why it ends up getting stated in the article as

22  she had expected shocked, disgust, or horror.

23      How do we know that she had expected shocked?  Because

24  Jackie says it wasn't as shocked as you might think.  She had

25  expected more shock, all right?

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

52

1      This is not even defamatory.  Describing someone's face

2  when they respond to any kind of substantial issue is simply

3  not defamatory in this context.

4      It is almost impossible to read this and read it as

5  something that would subject Dean Eramo to ridicule or -- what

6  were the other words from defamation, any of you quick

7  studies? -- odious, you know, all those words that apply to

8  defamation meaning.  This is simply not one of those.

9      So she stretches really long and hard to interpret this

10 in the manner in which she does and then to claim that it is

11 defamatory to her.

12     Now, what did we hear in testimony in this case?

13     Dean Eramo was asked:  And it wasn't your practice to

14 react in some kind of aghast or shocked manner to revelations

15 by a student; isn't that correct?

16     No.

17     So she confirms that.

18     But I would certainly show care and concern for what they

19 were telling me about.

20     Of course she would.  There's not been a single person in

21 this courtroom on our side for sure that's come into court and

22 suggested that Dean Eramo was anything other than caring and a

23 concerned person; that of course she would show this.

24     Now, what did Liz Garber-Paul find out?

25     She said -- the paragraph precedes it in this particular

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

53

1    statement:  It was clearly attributed to Jackie; is that

2    correct?

3         What did you do to fact-check this statement?

4         Well, primarily I went through, you know, interaction

5    between Jackie and Dean Eramo, I went through Sabrina's notes,

6    and I went through it with Jackie.

7         So she confirmed these things through Sabrina's notes and

8    then through talking to Jackie as to whether they accurately

9    described it.

10         So we know for a fact that Rolling Stone, when it

11    approved the article to be published, its fact checker had a

12    reason -- had belief that the factual underpinnings for this

13    statement were true.  There's no evidence to the contrary.

14         Now, as I told you, statement number 4 is gone.  That's

15    good news, right?  That would be another five, ten minutes.

16    Defamation by implication is gone.

17         And one of the things I wanted to tell you is I kind of

18    mentioned that the photo obviously is not a challenged

19    statement.  And there was this implication in Mr. Clare's

20    closing where he said that the photographer -- I mean not the

21    photographer -- the artist, John Ritter, the illustrator, that

22    he always used these eyes like that for villains.  Do y'all

23    remember Mr. Clare saying that?  There's absolutely no

24    evidence in the record as to that.

25         There is evidence in the record that John Ritter uses

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

54

1    that style all the time because that is his style.

2        But here's one from an article -- remember they put this

3    in evidence -- "The Rape of Petty Officer Blumer"?  This is

4    another issue, this is another article, that came in very

5    early on on the first day of Sabrina's testimony.  And the

6    illustrator there was John Ritter.

7        Guess who the lady is on the front of the -- on the front

8    of the cover?  That is Petty Officer Blumer.  This is a

9    photograph of her that has been turned into an illustration by

10   this professional illustrator, all right?

11       Her eyes have been treated exactly the same way.  They've

12   been made to be white, and she is not a villain.  In this

13   story she is the rape victim.  All right?

14       So this notion that you were supposed to draw that we

15   went out and hired somebody and said, do the villain eyes, is

16   nonsense.  There is no evidence to support it, and there's no

17   evidence that Mr. Ritter does anything other than this type of

18   style.

19       And if you notice, it's exactly the same.  There's the

20   bright color, there's the -- all the things that were

21   described in that video deposition that you listened to.  I

22   just wanted to make that a point.

23       Another thing I wanted to tell you is one of the things

24   that Mr. Clare was talking about on opening, remember "the

25   critics say" kind of part of the article?  Do y'all remember

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

55

1  there was a section we've heard about a number of times:

2  Critics say that, you know, the university is more interested

3  in protecting itself than it is in the interest of students.

4  Critics say, critics say, critics say.  All right?

5       And then there's about five critics:  Laura Dunn, S.

6  Daniel Carter, Wendy Murphy, you know, on and on, and they get

7  quoted right there.  And Mr. Clare was complaining about that.

8       Those are not challenged statements.  All right?  Those

9  are not challenged statements, okay?

10      There are other parts of the article that say things

11  like -- remember the Stacy story?  Can you all remember that

12  one from when it was read to you 12 days ago?

13      The Stacy story was a young lady who taught -- who we got

14  her file.  She actually gave her file to Sabrina, her whole

15  file.  And this was a situation where she came in and she

16  said, I was suppressed, I mean, affirmatively suppressed.  Not

17  suppressed as a result of the system, not suppressed as a side

18  effect of victim choice, but I was specifically told by the

19  dean's office, don't do this, you know, it won't be good for

20  you.  You need to worry about your mental health, all right?

21  And that's all in the article, that the dean's office

22  affirmatively discouraged her.

23      All right?  We know for a fact and the testimony in this

24  case Dean Eramo was involved in that case.  She was involved

25  up until a certain point, and that I believe came in as

Eramo vs. Rolling Stone, et al. - 11/01/2016    Vol. 2

56

1   evidence.

2        Now, she doesn't challenge that statement.  That is not a

3   challenged statement.  This is a statement in the article

4   where it says the dean's office affirmatively discouraged this

5   young woman from going forward.  That's exactly what she told

6   Sabrina.  She doesn't challenge it.  Those are facts you ought

7   to consider.

8        What she challenges are these three limited, very easy to

9   deal with, in my opinion, statements.

10       Now, post-article statements.  I'm going to go back to

11  that defamation.  This is for people like me who may have

12  forgotten.

13       When you think about these post-article statements, think

14  about all these things that Ms. Eramo has to prove.  She, in

15  order to make her case, was required to come -- and we don't

16  have to prove a thing as defendants, not one thing.  Every

17  single burden is on the plaintiff when they walk into a

18  courtroom.  They have to come in and present evidence on each

19  one of these elements that you see here, so all five there.

20       And this one, by the way, doesn't include the actual

21  malice.  That would be six in this one.

22       So one of the things that she has to prove is that the

23  statement was seen, read, or heard by someone other than her.

24       What evidence have you heard in this case from anybody

25  who came in and said, oh, yeah, I was listening to the Lehrer

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

57

1    podcast that day?  Zero.  Zero.  She has not met that burden.

2        She didn't bring a witness in.  She brought witnesses in

3    who said they read the article and that they thought it was

4    unfair and that they thought she was portrayed unfairly.

5    Remember those witnesses?

6        She talked about e-mails that she received that dealt

7    with the article.  She didn't bring in an e-mail that said,

8    hey, I was listening to the Lehrer show and I thought badly of

9    you, it really defamed you and your reputation, did she?  Not

10   one.  You can't find one document and you can't find one

11   witness, because she didn't come in and prove that.

12       So as to those statements, as you sit there, you don't

13   have one single clue whether the statement was seen, read, or

14   heard by someone other than the plaintiff, but you do know for

15   certain that the plaintiff didn't come in and tell you that

16   there was.  She did not come in and produce that witness.

17       The third thing as to those statements, she has to prove

18   that they are of and concerning her, Nicole Eramo.  Search

19   those statements.  It's all administration, administration,

20   school, school, school, administration.

21       There is only one exception to that, and it is on page 12

22   of the Slate broadcast.  And that's where one of the host

23   ladies says:  In your article, you mention this Dean Eramo and

24   the relationship with the students and the university.  Can

25   you tell us generally how the students get along with the

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

58

1    university?

2        So she mentions Dean Eramo.  And nowhere does Sabrina

3    ever mention Dean Eramo.

4        By the way, on all those statements, when you look at

5    those verdict forms that Mr. Clare mentioned, you will notice

6    that Rolling Stone is not a party to those.  Rolling Stone did

7    not make those statements.  Wenner did not make those

8    statements.  So those are only with regard to Sabrina.  The

9    Lehrer and the Slate, only with regard to Sabrina.  All right?

10       Opposite is true for the press release.  Once you get to

11   statement number 11, the press release, that's all on Rolling

12   Stone.  So that's just something that you'll have to watch for

13   in those statements.

14       That the statement is false and defamatory.  In order to

15   prove her case on these post-article statements, she would

16   have to come in and establish that the statements said within

17   them are in fact false and that they were defamatory, again

18   meaning that it subjected her to ridicule and made her odious

19   and an object of scorn.

20       All right.  And finally, that the plaintiff was damaged

21   as a result of the statement.  This is an element of her

22   liability claim.  She has to prove that that particular

23   statement caused her damage.

24       There is zero evidence in this record that any of the

25   post-article statements caused her damage.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

59

1        Now, she did come in and say that she was incredibly
2   offended by the article, that she took it very personally,
3   that others around her saw that it was negative toward her and
4   that they expressed that.
5        Interestingly enough, not one of those people said that
6   it changed their opinion about her.  Not one of those people
7   said that they thought worse of her afterwards.
8        Do you remember that?  They were each asked that:  Did it
9   change your view?
10       But all of that was with regard to the article.  Not one
11  single shred of evidence on damage as a result of these
12  post-article statements.
13       Now, what are they again?  That's the last time you'll
14  ever get to see them again, except they do get repeated in the
15  jury instructions.  All right?
16       The first one is Lehrer.  Jackie was kind of brushed off
17  by her friends and by the administration.  And eventually,
18  when she did report it to the administration, the
19  administration did nothing about -- they -- they, notice the
20  pronoun "they," not "she" -- they did nothing with the
21  information.  And they even continued to do nothing when she
22  eventually told them that she had become aware of two other
23  women who were also gang raped at the same fraternity.
24       Every single time you hear the words "doing nothing" in
25  these post-article statements, it's all about campus safety.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

60

1    That has a meaning that is pretty easy to follow.  They did

2    nothing to investigate or warn.  So that is what it means.

3        Obviously they did things to comfort Jackie, and that's

4    not the point.  The point, is what did they do to investigate

5    and attend to campus safety.  Now -- and that is what the

6    article takes issue with and criticizes.

7        Let's see.  The same is also meant anytime you hear the

8    word "indifference" in these statements, the post-article

9    statements.  Indifference means indifference to campus safety

10   concerns.  And that's a big thing, and we think a very

11   legitimate criticism of how the University of Virginia was

12   handling such things at that time.

13       And I will point to you in the articles, the only "doing

14   nothing" phrase quote in the article is:  So profound was the

15   students' faith in the administration, that although they were

16   appalled by Jackie's story, no one voiced questions about

17   UVa's strategy of doing nothing to warn the campus of gang

18   rape allegations.

19       That's what Sabrina meant by doing nothing.

20       Now, statement number 6 is the Slate podcast.  It's the

21   same exact thing:  continued to do nothing.  It's exactly the

22   same concept as Lehrer.

23       And notice the words.  You do not find the word "Eramo."

24   You find the university did nothing, and they continued to do

25   nothing.  Again, nothing saying Dean Eramo's -- Dean Eramo's

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

61

1   name.

2         And by the way, this is not something that's appended to

3   the article.  You know, they say, well, Dean Eramo's name gets

4   mentioned in the article a whole lot.  Well, these are not

5   appended to the article.  These -- the Lehrer show is a radio

6   show in New York City, and Slate is a podcast, so the article

7   has nothing to do with it.

8         Slate number 9.  Also did nothing.  This is a did nothing

9   thing.  The administration, that doing nothing is a fine

10  option.  The administration's kind of ethos.  No mention of

11  anything with regard to Dean Eramo.

12        Now, there is no doubt, by the way, on this one.  This

13  does get into victim choice because she's talking about how

14  there's this atmosphere on campus that, you know, taking care

15  of your own mental health is good enough, which of course is

16  the first step.  I mean, that's obvious.  But that they --

17  they have all this bystander support.

18        But generally, again, I mean, taking into account the

19  statistics, you have 38 reports and only nine go forward; that

20  they are clearly in the business -- of those 38, the ones that

21  didn't go, they affirm each other in their decisions.

22        Do you remember yesterday listening to that September 12

23  conversation where Jackie and Alex and Connor -- poor guy, he

24  couldn't get a word in edgewise, could he?  Did y'all hear it?

25  I mean, he tried once or twice, but he got the big smack-down.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

62

1    So we didn't hear much from Connor, but we heard an awful lot

2    from Jackie and Alex.

3        And at one point they just kind of went off on, you know,

4    how important it was to tell that victim -- because there had

5    been two rapes that had been reported to them just that week

6    that these two girls had been called on.  And they said, well,

7    you tell her it's her choice, it's her choice, and nobody can

8    make that decision for her.  I mean, they were repeating this

9    almost like it was a religious principle.

10       And so there's no doubt that the students bought into it,

11   and there's no doubt that the university also bought into it

12   because we have victim choice.  We've confirmed it with Teresa

13   Sullivan.  It is that each of these options, including doing

14   nothing, is presented neutrally.

15       And we also know that there's a lot of good reasons for

16   that.  We had witnesses come in and say, of course it's a good

17   reason to do that.  You want to empower this woman.  She's

18   just been victimized.  She's just been made to feel powerless

19   and helpless and out of control.  This allows her to be in

20   charge of that.

21       Very good point.  That's a very good point.

22       But when given all those choices -- and this is the

23   thesis of the article, thesis number 2 of the article, which

24   is, yes, true, it has that laudable goal.  But at the end of

25   the day, going forward with rape charges, whether it's in a

Eramo vs. Rolling Stone, et al. - 11/01/2016  Vol. 2

63

1   formal complaint or whether it's with the police, is nasty

2   business.  No one really wants to go through that.

3       Rape is one of those crimes where if a rape victim is

4   going to report it and go to trial, they're literally doing it

5   for the next person.  They're not doing it for themselves

6   because there's nothing in it for them.

7       Everything about their life is going to be questioned.

8   What were you wearing?  You know, we heard these girls talking

9   about:  What were you wearing?  Why did you go there in the

10  first place?  Were you drinking?  Was alcohol involved?  All

11  these questions.

12      And you hear it every time you hear the news about

13  another allegation of rape.  You know the next day you're

14  going to hear a lawyer for so and so said it was entirely

15  consensual, you know?  And so it's going to be a nightmare for

16  anyone who chooses that.

17      And so from Sabrina and Rolling Stone's standpoint, when

18  you do have these situations that involve serious campus

19  safety, it requires a little bit more than neutrality.  And

20  honestly, I got the impression Dean Eramo agrees, or she

21  certainly agreed by 2014, that you have to give them a sort of

22  a kick in the pants and say, come on, let's do something.

23      You particularly have to give them a kick in the pants if

24  the administration is falling down on its job of doing any

25  investigation in the meantime, because you have placed this

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

64

1   traumatized victim -- she's having to make that choice.  Sure

2   she wants the comfort of not doing anything.  Who wouldn't?

3   But sure she's also feeling guilty about what about that next

4   young woman?  What about her?

5       So there's a conflict there.  If she makes her choice the

6   way she wants to make it, then people are not safe.

7       This is a unique situation because it's a university,

8   where the university can actually do something and honor the

9   young woman's decision not to go forward.  They could have

10  done any number of things.

11      But starting with ones that we will go through as part of

12  this outline that -- I'm now way out of control.  I don't know

13  where it is.  But the -- they could have done things, and the

14  most significant one was go to IM-Rec.

15      Remember the IM-Rec records?  The rapist, the guy who was

16  the ringleader, worked at IM-Rec with Jackie?  He was also a

17  member of a fraternity.  And he -- the university, without any

18  trouble, could have gone to the IM-Rec and gotten a list of

19  people that worked with Jackie.  They could have figured out

20  what pool or whatever Jackie was working at, and they could

21  have gotten a list of all the males that worked there with

22  her.

23      Because she had told right off the bat, that's who

24  organized this.  They didn't do it.  They never did that

25  investigation.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

65

1      So doing no investigation, Sabrina comes in and sees

2   that, that they're not doing an investigation, and she says,

3   okay, well, in this situation for sure this victim choice

4   doesn't seem to be working.  Because of course Jackie feels

5   more comfortable not going to forward, but meanwhile the

6   school is not safe.

7      That's the conflict, and that's the tension that is

8   presented in the article.

9      And I just got off on a long tangent.  Sorry about that,

10   but it's a little bit off of where I was going to go.  But

11   that is the criticism of this, and there is no doubt that they

12   believed in it.

13      Let me tell you there is also no doubt that Dean Eramo

14   believed in it.  She was a big, big proponent of this victim

15   choice concept.  And that victim choice concept at its core

16   says, unless the victim who has made the report completely

17   agrees, you do not do any investigation.  And there was a big

18   dispute on this.

19      In Sabrina's notes, the big binder that you're going to

20   have, PTX 10 or Defendants' Exhibit 64, in that document you

21   will find this at page 4333.  These are notes from a

22   conversation that Sabrina had with Emily Renda.

23      You recall Emily Renda.  We watched her video deposition.

24   And as Mr. Clare said, a very impressive, very impressive

25   witness.  She seemed very sharp.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

66

1    She said to Sabrina these words:  I've been concerned for

2    a while that Catherine Lhamon -- that's the head of the OCR --

3    and ORC tends to be on the side of move forward with an

4    investigation, regardless of what the victim wants.

5    That's one of the points of the article.  That's the

6    point of the article.

7    And Dean Eramo almost ran off, she was so upset.  She

8    said, I'd rather lose my job than force someone to do that.

9    This is what Sabrina was told by an employee of the

10   university who had been at this conference with Dean Eramo

11   on -- in the summer.  It was in July is when the conference

12   was, and it was at Dartmouth.  But she was told this on

13   September 11.

14   So -- and the point, the point of that, is simply that

15   Dean Eramo and the administration definitely bought into that.

16   Now, there was a statement -- now we're at statement

17   number 10.  This was Sabrina to the Washington Post, where she

18   says the UVa administration chose not to act on her

19   allegations in any way.  That is the overarching point of the

20   article.  That is the story.  The culture that greeted her and

21   so many other UVa women I interviewed who came forward with

22   allegations, only to be met with indifference.

23   Indifference again, in this context, means indifference

24   to public safety, indifference to that issue which is at the

25   core of the article.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

67

1      Now, I jumped out of order because -- for a reason.

2  Statement number 7 does not have a did nothing component, but

3  it's got so many components I dread going through it with you.

4      Statement number 7 starts with a very clear indication

5  that Sabrina is speaking from her opinion.  You see where it

6  says "I think," all right?  That's a clear indicator to

7  readers that the author is talking about her opinion.

8      And then -- but let's note what it says:  The

9  administration doesn't really treat rape as a crime, as a

10  violent crime.

11      That again is the administration.

12      They would seek to suppress something like this.

13      Suppress in that context means suppress the

14  investigation, because that's really what they did.

15      Not only did they not report it to the police, but I

16  really feel -- again, pure opinion -- she was sort of

17  discouraged from moving this forward.

18      Now, as to this issue, treat rape as a crime, you

19  remember the WUVA interview that we played?  It was a

20  videotape where Dean Eramo gave the interview to the student

21  TV station?  And she said on there:  Sometimes the victim is

22  just wanting to look into the eyes of the other person and

23  say, you've wronged me -- do you all remember that? -- in some

24  way and is satisfied with the fact that they admit they did

25  something wrong.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

68

1      That had been seen by Sabrina.  That was seen by Liz

2  Garber-Paul.  That was seen in its entirety by Sean.  That,

3  right there, is what was in the mind of Rolling Stone and

4  Sabrina when Sabrina said that they don't seem to treat rape

5  as a crime.

6      Sabrina was troubled by the fact that the administration

7  did not investigate the allegations, and she formed the -- I

8  guess she formed the opinion that the administration simply

9  didn't see this situation the way she did, as a grave matter

10  of public safety.

11      Obviously she reasoned if they did, they would do

12  something about it.

13      Now, this is a concept that gets hammered home in the

14  article.  If I have time, I'll go through some of those with

15  you.  But you remember how the article ends where it says --

16  it's about Hannah Graham's death, okay?

17      To put this in context, guys, Sabrina was out with these

18  girls on September 11 and September 12.  She was walking down

19  Rugby Road.  She was on the Mall.

20      September 13 is when Hannah Graham went missing.

21      Sabrina leaves Charlottesville.  She wakes up the next

22  morning in Pennsylvania, and on the news it's some young lady

23  disappeared right from where she was.  That made it a very

24  significant issue to her, not that it wasn't significant to

25  everybody.  But here she is writing a story about the safety

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

69

1  concerns of how to handle sexual assault, and Hannah Graham

2  goes missing.  It's a very, very key fact.

3      Now, I suppose the one thing we should talk about with

4  regard to this is about where they say -- she says she didn't

5  take her to the police, all right?  If you go back to the

6  article, they -- "not only did they not report it to the

7  police," okay?

8      Now, my goodness, we've had a lot of evidence in this

9  case about the police.  And just to frame those issues,

10  Ms. Eramo takes the position that she arranged for Jackie to

11  go to the police.  She, because she was there, in her mind,

12  knows that they discussed the fact that Jackie had in fact

13  been sexually assaulted two years earlier at the Phi Psi

14  house, all right?

15      That is nowhere apparent in the records that Sabrina had,

16  the records that Sabrina was able to obtain.

17      This, however, was one that Sabrina was able to obtain,

18  and this is the -- this is the e-mail that is Plaintiff's

19  Trial Exhibit 18.  This is the one where Ms. Eramo writes to

20  Jackie and says, thanks for coming in.  I'm sorry, the CPD --

21  the Charlottesville Police Department officer -- was a little

22  aggressive about investigating.

23      Recall, this is about the bottle incident.  It's about

24  the bottle incident.

25      I know it was stressful, and I truly apologize.  That

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

70

1    said, it may be worth it to at least have them check the video

2    on the Corner.

3        Why on the Corner?  Because that's where the bottle

4    incident happened.

5        And then if we can get good video and check photos of

6    them from the FSL rosters, we might be able to find them

7    without having to go to the fraternities.  Fraternities.

8    Right?  Note that it doesn't say the fraternity, like Phi Psi.

9        And the reason was, at this point in time, Jackie had

10   been speaking out publicly as a rape activist on campus

11   against multiple fraternities.  And I'll show you that in just

12   a minute in the notes.  But I think it's very significant that

13   it says fraternities.

14       If the individuals are caught up in the legal system,

15   they and their brothers will have a strong disincentive from

16   retaliating against you.

17       You may recall that when she was examining Sabrina about

18   this, Ms. Locke made it seem like there's only one reasonable

19   interpretation in the world of that, and that means

20   retaliating for your sexual assault.  That's nonsense.

21       The only reasonable way to read this is retaliating

22   against you if you choose to press criminal charges for the

23   bottle incident.

24       Very important to Sabrina is the next line:  Never

25   forget, however, that it is your choice.  "Your" in all caps.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

71

1      That is one of the key points that form the basis for the
2    article, was that Sabrina was witnessing this repeat of the
3    mantra of victim choice.  It's your choice, all caps.  And
4    this is in response to the bottle incident.

5      All right.  I told you I would show you this.  This is
6    where Jackie reported this bottle incident to Dean Eramo, all
7    right, the one we've just heard about.

8      One thing I think is very important and I'm going to
9    direct you to the top of this.  Do you see where it says IR
10   number?  Do y'all see that?  That is the incident report
11   number.  This is a new number.  This is different than
12   Jackie's sexual assault incident number.

13     Her sexual assault incident number has a 2013.  This is
14   00396-2014.  You can find this at PTX 9.

15     PTX 9, by the way, when you go back, that's just
16   Plaintiff's Trial Tab 9.  That's called the Advocate system,
17   and it's all the notes that anyone involved with UVa puts into
18   their system, and it's all right there.  So if you go to that
19   page, you will definitely see this incident report.

20     And by the way, for you taking notes -- sorry it's not on
21   this slide -- this is at page 215.  There are lots and lots of
22   zeroes followed by 215.  But you have a brand new incident
23   number.

24     It also says here that the student is a prior victim of
25   sexual assault and a member of One Less.  In this capacity,

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

72

1   she has spoken openly about concerns regarding fraternities,

2   including Phi Psi and SERP.  The student groups that are

3   involved, Phi Kappa Psi and SERP.

4       This is conclusive evidence.  If Jackie were telling

5   anyone that she had been assaulted with a bottle because of

6   her rape at Phi Psi, we would not be talking about SERP.  But

7   they were both talking about SERP.  And that's who gets

8   reported in this.

9       Now, on -- let's see what day this was.  This was April

10  21, April 21, 2014.  This is Plaintiff's Trial Exhibit 107.  I

11  don't think it got a lot of air time in this trial, but these

12  are the handwritten notes by Dean Eramo on April 21, 2014,

13  about the bottle incident.

14      Do you see the bottom?  Doesn't know which frat they were

15  talking about.  Because they had said, SERP has also had

16  issues with people -- So this is Jackie talking with Dean

17  Eramo -- has also had issues with people.  Knows of eight

18  women who may have been roofied and assaulted at SERP.  Club

19  was going to have a function there and offered to have it free

20  there.  Was concerned about their reputation and having

21  functions there.  President of club -- and it's redacted to

22  keep her name secret -- named her.  Club e-mailed and named

23  her.  Something, probably a bottle.  Doesn't know which frat

24  they were talking about.

25      So Jackie made it very clear that she did not know.  It

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

73

1    could have been one of multiples.

2        There are similar -- by the way, guys, there are many

3    similar examples in there.  I'll just for the record, so you

4    can go back and find these if you want, Plaintiff's Trial

5    Exhibit 9 is another -- there's an e-mail from Eramo to James

6    Mooney that has the same content, and there is another from --

7    Advocate entry that does the same.  We're going to skip those.

8        Now, what did Sabrina say to -- I'm sorry.  What did

9    Jackie say to Sabrina about this?  And that's where we go back

10   again to Plaintiff's Trial Exhibit 10 or Defendants' Exhibit

11   64.  If you go to page 4168 in that exhibit, you will see

12   these notes.

13       Sigma Phi, I just know it as SERP.  She's telling here

14   it's about SERP.  That's where people are roofied and raped.

15   I told my friends who are first-years not to go there, and I

16   was just very outspoken about it.

17       And then she goes on to describe how these boys had

18   thrown something at her and she had been cut.

19       So to come into court and suggest to you that somehow

20   this police report is, by definition, only an idiot wouldn't

21   know that it was about the sexual assault, is just a false

22   impression to give to you.

23       Sabrina talked to Jackie about it.  Jackie said it was

24   about her advocacy.  Jackie talked to Dean Eramo about it, and

25   Jackie told Dean Eramo it was about her advocacy.  It was

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

74

1    about two fraternities, potentially.

2         Jackie made the exact same statements to the police

3    officers that were involved.

4         Now, what else did Sabrina do?  She did a FOIA request.

5    Remember there was -- that she wanted to confirm whether in

6    fact Jackie had made a report of this, and the City of

7    Charlottesville responded.  They told her it was a 2014

8    aggravated assault in the Corner and that there was a

9    laceration reported as a result of the assault.

10        Sabrina did her job.

11        And I think you heard that why she said it wasn't really

12   relevant to the story line.  It was a totally separate

13   assault.  That's why it didn't make it into the final cut of

14   the article.  It started out in the first draft as 13 or

15   14,000 pages [sic], and it ended up getting cut to nine.  That

16   is one of the things that got cut.  There's nothing nefarious

17   about it.

18        Now, statement number 8:  She's particularly afraid of

19   Drew.  And this is where she's talking about what would it

20   take to get Jackie to actually file a police report or proceed

21   forward with a formal complaint.

22        And she says, I think it would take a great deal of

23   support for her to move forward into any of these options.

24   But notice how she begins it:  "I just think."  Again, pure

25   opinion.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

75

1   I just think it would require a great deal of support for

2   her to moved forward into any of these options to resolve her

3   case, something that's been completely absent.

4   From Sabrina's standpoint, from her point of view, it was

5   absent, realizing that it takes a tremendous amount of more

6   than support even, just affirmatively pushing someone to go

7   forward in that context.

8   Now, statement number 11, this is the Rolling Stone

9   statement.  This is the one -- which, by the way, Dean Eramo

10  said not one word about this statement in her testimony,

11  absolutely nothing.  The same is true for a couple of the

12  other ones.  But not one word did she even say.  She didn't

13  say that anything in it was false.  She obviously didn't say

14  she had been damaged by it.  She didn't say she had read it.

15  So she made absolutely no comment about this statement from

16  the witness stand.

17  This is the press release that Rolling Stone issued and

18  that was ultimately -- primarily issued to the Washington Post

19  on December 1.  And it's the one that talks about the story

20  and tries to describe it.

21  At this point, Rolling Stone was in fact defending the

22  story and saying that it was proud to have given it air time.

23  And they describe it.

24  Well, what Dean Eramo apparently takes issue with is the

25  subsequent ordeal she experienced at the hands of the

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

76

1   university administrators in her attempts to work her way

2   through the trauma of that evening.

3       Again, Dean Eramo did not even comment on this press

4   release in the evidence in this case.

5       But to give some degree of explanation for that -- and I

6   think we discussed it with Sean while he was on the witness

7   stand and also with Sabrina.  The ordeal concept is sort of

8   the flip side of that coin of victim choice.

9       And I talked to you about how there is this -- there's

10  the comforting part of victim choice and there's the

11  empowering part of victim choice.  But when you then tell the

12  same person you're trying to comfort and empower that in order

13  to do anything for campus safety with these two other alleged

14  gang rapes at Phi Psi, that she has to go out and get those

15  girls to come in and that all three of them have to agree to

16  come in and that it's kind of her responsibility -- all right?

17  So that's the flip side.  That's the not so kind, not so

18  gentle, side of victim choice.

19      Bear in mind that the university's not going to do an

20  investigation.  She has to rely on these traumatized people to

21  come forward.

22      Pushing somebody in that sense was seen by Rolling Stone

23  as an ordeal, and that's what that's about.  They had a

24  reasonable basis for it.

25      Now, I want to talk to you briefly about the

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

77

1  republication, that issue.

2      Mr. Clare said that Rolling Stone and Sabrina republished

3  the three statements in the article when they posted the

4  December 5 note, that apology to our readers.  This is a

5  pretty easy issue.  We think there's not a lot -- no dispute

6  on the facts.

7      We know that Sabrina lost faith in the article on

8  December 5th.  We know she lost faith in any statement made by

9  Jackie.  We know that Rolling Stone did the exact same thing.

10  This occurred in the middle of the night, 1:54 a.m.  We

11  watched that.

12      So what Rolling Stone did was they put a big warning on

13  the top of the article.  That's that note to our reader, and

14  there you see it.

15      The judge will instruct you in this case that -- oh, I'm

16  sorry, I needed to push this button again.  Yes.

17      This is what it actually says in the retraction:  In the

18  face of new information, there now appear to be discrepancies

19  in Jackie's account, and we have come to the conclusion that

20  our trust in her was misplaced.  We are taking this seriously

21  and apologize to anyone who was affected by the story.

22      You heard every single witness come in and testify that

23  they intended it, Rolling Stone intended it, everyone intended

24  it, as notice to the world that everything attributed in this

25  article to Jackie was not trustworthy.  Some of it might be

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

78

1   true, some of it might not, but we know this:  We can't put

2   our name behind it, and we can't say that it's true or false,

3   and we don't even believe that it's true.  We don't know.

4       And that was what the point of this was, and this was a

5   huge black eye for Rolling Stone to have to do this.

6       Now, the judge will instruct you that -- on

7   republication.  That is one of the jury instructions you will

8   have in here.

9       In order to find the defendants republished the original

10  article on December 5, 2014, you must find that by adding the

11  editor's note to the top of the online article, defendants

12  affirmatively reiterated the content of any allegedly false

13  and defamatory statements with an intent to reach a new

14  audience.  That's what they have to prove to you.

15      In other words, the article with the reader's note means

16  we are affirmatively reiterating those statements that Jackie

17  made.

18      Did you all follow?  You can't get there from here.  And

19  it's obviously absurd, right, because the reader's note says,

20  we misplaced our trust in Jackie.  We don't have confidence in

21  Jackie.  Right?

22      Why is it that the plaintiff is arguing this?

23      Because they know they have no actual malice at any point

24  up until December 5th.  They know it.  They know they can't

25  prove that case.  They know that the record that they have put

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

79

1  before you, no reasonable juror would believe that Sabrina and

2  Sean and Liz published the Rolling Stone article, "A Rape On

3  Campus," believing it to be false.  They know that no

4  reasonable juror, like you, would believe that they held

5  serious doubts.

6      So that is why they have had to come up with this inane

7  theory.  Because as of December 5, guess what they know?  I

8  told you.  We've got serious doubts, okay?

9      Remember my question to you earlier this afternoon?  What

10  does serious doubts look like?  It looks like that e-mail that

11  Sabrina wrote.  And it sounds like that voicemail message.

12  Okay?

13      And that's why they're doing it.  Because they want you

14  to believe that somehow we affirmatively reiterated these --

15  the content of this article to Jackie.  You cannot

16  affirmatively reiterate and say "we misplaced our trust" at

17  the same time, all right?

18      Second prong they have to prove.  They have to prove that

19  we did it with an intent to reach a new audience.  All right?

20      Remember I asked Sean that?  Were you doing this because

21  you wanted somebody to go out and look at it?

22      I asked Sabrina the same thing.

23      Sabrina said she had never been back to that website.

24  She wants to forget it.  She wants everyone to forget it.

25  It's the worst thing that's ever happened to Rolling Stone

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

80

1  professionally.  It's the worst thing that's ever happened to

2  Sabrina professionally.

3      They were not trying to reach a new audience.  They were

4  doing best -- their best to make sure that what they did do

5  was on the official website of Rolling Stone; that they leave

6  up this disclaimer to the world, this warning, so when someone

7  comes and tries to find the official copy, not some bootleg

8  copy but the official one, that they will know that it has

9  this serious warning.  It's plain as day.  That was the point.

10      We are not proud of that article.  We're not proud of

11  recounting Jackie's story.  We are proud of the hard work that

12  Sabrina put into it.  She did a tremendous amount of work on

13  this, and she got a great deal of it right.  But the Jackie

14  story capsized the whole book.

15      Now, I want to give you another context.  Remember

16  Columbia Journalism?  And you've got to remember this.  I know

17  I asked Sean about it, and I think I asked Sabrina about it.

18  Remember how -- what the finding was in Columbia Journalism?

19      They said that the December 5 note to readers effectively

20  retracted -- that's on page 10.  By the way, this is

21  Plaintiff's Trial Exhibit 139, just again.

22      On page 57, they say again, it effectively withdrew.

23      And on page 70, they call it a straight-out retraction.

24      That's all talking about the December 5 note to reader.

25      So as you go through those, you have to consider whether

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

81

1  in fact we had these intentions to say -- there it was --

2  affirmatively reiterate with the intent to reach a new

3  audience of each one of these statements:  the rape school,

4  the sharing her story, and the nonreaction.

5      Your Honor, I need to switch gears for just a second.

6  Would now be a good time for just a short break?

7          THE COURT:  Yes, sir, I think everyone would enjoy

8  another short break.

9      So, ladies and gentlemen, we'll excuse you for a few

10 moments, again with the understanding that you not discuss the

11 case with one another nor permit anyone to discuss it with

12 you.

13     Let's plan to return at about 4:30.

14     Ask the marshal declare the Court in recess.

15         (A short recess was taken at 4:20 p.m.)

16         (The jury is present in Open Court at 4:34 p.m.)

17         THE COURT:  All 10 jurors are back in their places,

18 ready to continue with defendants' closing argument.

19         MR. SEXTON:  Okay.  I was just about to move on from

20 this issue of retraction.  I think we had beat that dead horse

21 about hard enough.  But I wanted to -- there were a few things

22 I had intended to say but didn't.  A few more.

23     In the testimony in this case, you heard several

24 witnesses, plaintiff's witnesses, who referred to the December

25 5th note to editors as a retraction.  That's how it was

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

82

1    perceived in Charlottesville.  As of that date, the article

2    was debunked.

3         There had been this big furor and tumult going up to

4    December 5th, and it was like little bits of pieces coming out

5    here and there in that couple of days right before December

6    5th.  And as of December 5th, we issue our retraction.  The

7    Washington Post issues its very significant criticism of some

8    of the factual underpinnings of Jackie's story.

9         And so Emily Renda called it a retraction, Alex Pinkleton

10   called it a retraction, and Brian Head called it a retraction.

11        Now, one of the key points -- and I had mentioned it

12   earlier, but I want to reiterate it here.  As to this issue

13   with attribution, on those three statements which are at issue

14   in this case and which are what's being sued on, there's no

15   doubt they are attributed to Jackie.  Jackie says.  Jackie

16   saw.  So it's all coming from the mouth of Jackie.

17        So if we are saying in the note to readers that we have

18   lost faith in Jackie, it should be very clear to any reader

19   that we have lost faith in these statements.

20        So that's -- that is very -- in a nutshell.

21        Now, I don't want to spend too much time on this because

22   it -- A, because it takes -- it's a lot of pages in this

23   outline, and the clock is just not my friend.

24        But I want to tell you that there is plenty of evidence

25   that establishes that Sabrina was not stupid or foolish in

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

83

1  trusting Jackie.  She might have been foolish in letting

2  Jackie talk her out of pressing for Drew, but she did it for

3  good reasons, all right?  She did it because she thought that

4  that was traumatizing Jackie.  And who knows, maybe it was.

5      Sabrina was foolish, perhaps, could be criticized for not

6  pressing harder on the three friends, although it does take a

7  good degree of speculation to determine what those friends

8  would have said to her that might have derailed the entire

9  story.

10     Let me put it to you this way:  Jackie was good at coming

11 up with explanations for everything, so they -- it is somewhat

12 speculative.  But of course she feels bad for not doing that.

13     But as far as just the general notion of here's this

14 young person, she's telling you this story, believe her, don't

15 believe her, all right?  Does she sound credible or not

16 credible?

17     Sabrina was very reasonable in believing this young

18 lady's story.

19     First of all, she was obviously open about talking.  She

20 was open about telling her story.  You heard her demeanor.

21 She was very forthcoming.  She has a very easy demeanor.  She

22 gives these incredibly detailed answers on some things, and on

23 some things she's purpose -- you know, appropriately

24 circumspect and not throwing out huge details.

25     Think about the example.  Do you remember Becky, when she

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

84

1   is describing Becky in the September 11 video?  She's like,

2   oh, yeah, she has this cute nose.  Can you all remember that?

3   She had a cute nose and she had kind of like a raspy voice,

4   you know, not like a smoker's voice but cute.

5       And she goes into this crazy detail, and she talked like

6   Spock, and she was very formal.  And she said, you know, they

7   summoned me.  And she's throwing in all these details.  This

8   young woman was very good at telling this story.

9       So, A, she was extremely good.

10      Let's also don't forget that that at the time that

11  Sabrina was introduced to Jackie, how did that happen?  Emily

12  Renda, who gets my vote as -- except for my client, okay?

13  Except for my client, she gets my vote as the most impressive

14  witness you heard in this trial.

15      Do y'all remember the videotape of the young woman who is

16  now at Berkeley Law School?  She is the one who introduces

17  Jackie and Sabrina.

18      So when that happens, Emily Renda has already testified

19  before Congress, something that Sabrina knows.  Emily Renda

20  has testified about Jackie's story before Congress, something

21  Sabrina knows because she gets a copy of the Congressional

22  testimony.  It's one of the exhibits in this record.

23      At that point in time, Emily Renda has not only testified

24  about the rape but has testified about how hateful Jackie's

25  friends were when she told them her story on the campus of

Eramo vs. Rolling Stone, et al. - 11/01/2016    Vol. 2

85

1    UVa.  That's -- she had done that.

2        Now, we also note that before introducing Jackie and

3    Sabrina, Emily Renda sent an e-mail to Dean Eramo saying, I've

4    been asked to give a few names of survivors.  Would -- do you

5    think it would be a good idea for me to give them Jackie's

6    name?  No push-back at all from the university.

7        So now put yourself there, and you're going to say, well,

8    sitting there, it sure does sound like the University of

9    Virginia is saying this is a good person for you to talk to.

10   It's one of their employees.

11       And they mocked this young woman by calling her a camp

12   counselor.  She was working in Pat Lampkin's office at the

13   University of Virginia.  She had a significant job.

14       Yes, as part of that, Dean Eramo had these summer camps

15   for a couple of weeks and she helped with that, but she was

16   not a camp counselor.  You can tell that.  That is a woman who

17   is going places, and she was a -- she was seen by Sabrina as

18   somebody very reliable.  So introduced by that person.

19       Now, what else happened at that introduction?

20       Emily told her there were two other rapes at Phi Psi that

21   had been reported, okay?  So not only did she tell her about

22   Jackie, she tells her there's two other rapes at Phi Psi.  She

23   tells her that the dean is passionate about Phi Psi and

24   bringing some punitive action to that fraternity.

25       But at the same time she says, but we're also a little

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

86

1   reluctant because they're very rich and powerful.  Remember

2   that one?  That's...

3        So, again, in this use of Sabrina, she says, well, that

4   seems kind of ambivalent.  Is UVa the kind of place where

5   power and money is all that matters?

6        It's a fair conclusion to draw from that.  We'd like to

7   do something but we won't.

8        But more importantly, there are two other rapes that have

9   been reported, gang rapes, at that particular fraternity,

10  which is an incredible coincidence.

11       The CJR report, by the way, found it to be very

12  significant that Renda was the one who made this introduction.

13  They looked at it from the reporter's point of view and said,

14  that was significant.

15       And, you know, you look back on the trail and you say,

16  well, if I hadn't -- if I had met her somehow otherwise -- and

17  I think there's a part of us -- we all like to look at this,

18  and I did when I first got involved in this case, look at it

19  and say, she wouldn't have fooled me.  I think that's an

20  inherent temptation, that we want to look at this and say,

21  would she have fooled me.

22       And I got through that 911 audio and I was like, she got

23  me.  Because -- but I think all of us have that temptation to

24  say, would she or would she not have fooled you.  But that's

25  human nature, and it's all hindsight at this point.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

87

1    Sabrina lived it in realtime.  Sabrina lived it as it
2    unfolded, one little bit at a time.
3        We cannot properly judge her in whether that was
4    coulda-shoulda-woulda, because we have the benefit of knowing
5    everything the way it -- how the story ends, right?  So it's
6    completely different.
7        So we heard that significant interview.  We heard the one
8    on September 12.  She has looked into the eyes of this woman
9    and heard her story.  The woman had a tattoo put on her body
10   to commemorate September 28, 2012.
11       Remember that line of questioning?
12       Who in the world would do that if it wasn't true?
13       She showed Sabrina her tattoo.  She showed Sabrina scars
14   that were on her wrists.  Remember on September 11 the
15   lighting was bad; she couldn't see them.  She saw them on
16   September 12.
17       She understood that Jackie had scars on her back that had
18   faded.  This made sense to Sabrina.  It was not the be-all,
19   end-all.
20       So Rachel Soltis, another significant fact.  Rachel
21   Soltis, her roommate from freshman year, said, yes, she got
22   depressed during this time period and confirmed all that stuff
23   that had been said.  So that was very confirmatory to Sabrina.
24   And Rachel was very forthcoming.
25       Rachel also told Sabrina words to this exact effect, that

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

88

1    she knew exactly who did this to Jackie.  And she just wasn't

2    willing to give Jackie -- I mean, give Sabrina the names.

3        But it was very significant in that Jackie was willing to

4    let her use her name.  As the reporter here, there's nothing

5    to gain.  What is the motive of this young woman to come

6    forward and lie about something like this?  There's no person

7    in her life who she's punishing.  She's not naming the man,

8    right?

9        You would think most false accusations of rape would

10   involve some type of hatred toward a relationship where you

11   would want to punish somebody because you named them.  Not

12   here.  She doesn't name the man.

13       People know she's a rape activist on campus.  People know

14   that she has spoken out at Take Back the Night.  People

15   associate her with stories of this nature.

16       Her name is Jackie.  She goes by Jackie.  She agreed to

17   allow her name to be used.  Very significant to the editors at

18   Rolling Stone; very significant to Sabrina.

19       The bottle incident occurred.  Think about that.  Think

20   about this in terms of sequence.  Hannah Graham goes missing.

21   Bottle incident -- you know, you have all of these things that

22   are confirmatory or that are glossed with that experience.

23   And then you have the bottle incident that gets confirmed.

24   She gets the police report.

25       So they say it's ridiculously callous, the statements

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

89

1    that are attributed to the friends.  But there are plenty of

2    references in that Plaintiff's Exhibit 10 and Defendants' 64,

3    those reporting notes, where there's confirmation from these

4    other friends, yes, they said things that were hateful.  I

5    mean, others said, yes, that sounds about right, they were

6    hateful like that.

7        Ironically, for their case, Emily Renda testified as to

8    some very similar statements in her Congressional testimony,

9    that that was what she was talking about, how there's this

10   victim-blaming problem that occurs and -- culturally here at

11   the University of Virginia and everywhere, actually.

12       So UVa also had a history of noncompliance.  They had

13   this OCR investigation going on, which, by the way, ultimately

14   found that they were in fact not taking this seriously enough,

15   that there were failures to do things properly.

16       You all heard some testimony about that.  And we know for

17   a fact that the testimony in this case that that OCR report

18   found that Dean Eramo created a hostile environment for sexual

19   assault victims at the University of Virginia.  That's what

20   they found.

21       She confirmed it.  She disagrees with it.  Everyone at

22   University of Virginia disagrees with the OCR report.  But

23   there is unequivocal evidence in the record that that was the

24   finding.

25       And why did they find it?  Because of the statements she

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

90

1  made during the WUVA interview which Sabrina saw, which Liz

2  Garber-Paul saw, which Sean Woods saw.  Very significant.

3      Within this context of believability, you then have UVa

4  closing ranks.  UVa closes ranks.  It won't give her any

5  information.  Makes it really tough.

6      She has an interview scheduled with Dean Eramo.  They

7  cancel it on the 11th hour.  She's headed to Charlottesville,

8  and they cancel the interview, all right?  That was on

9  September 11.

10      Then they had this runaround thing:  We're trying to get

11  the statistics.  And they ultimately give her to Teresa

12  Sullivan, which of course we're not belittling President

13  Sullivan, but as it turned out, she doesn't know a whole lot

14  about these issues.  She's certainly not the person who knows

15  the most.  Dean Eramo.

16      And if you recall in that e-mail chain, Sabrina said, I

17  must insist on speaking to the person who knows the most.

18  Sabrina was not trying to avoid information.  She was trying

19  to get information.

20      This was not, as was insinuated to you with one witness

21  during the trial, drive-by journalism.  It's so far from the

22  opposite.  This file is extraordinary in the level of detail

23  and effort that Sabrina went to to do it right.  Tons and tons

24  of research about UVa, tons and tons of research on how to

25  handle these sexual assault issues, and that is all reflected

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

91

1   in her record.

2        Another significant thing:  Sabrina was looking at these

3   issues as she had the -- OCR was investigating Phi Psi -- I'm

4   sorry, Johns Hopkins for failing to respond to a gang rape.

5   They're actually being sued for the exact same thing:  failing

6   to do an investigation.  That all colored the way things were

7   seen.

8        Now, as far as Ms. Garber-Paul, what she found so

9   credible with regard to Jackie, she testified that she

10   corrected the smallest little details.

11        And do you remember on the sheet she did, on those -- on

12   those -- where she galleys where she was making the

13   corrections?  Correcting the tiniest little details.  She was

14   fully engaged in the process.  She seemed very anxious to

15   participate in the article, and Liz spent more than four hours

16   with her.

17        From Sean's perspective, he testified to -- that it was

18   very significant to him that Phi Psi was under investigation.

19   He viewed that as very confirmatory.  Why would the university

20   be investigating Phi Psi if there wasn't some fire under the

21   smoke.  So he saw that as a big deal.  He also saw Renda as a

22   big deal.

23        He had a lot of trust in his fact checker, and he told

24   you that this was his best writer.  These were all good

25   reasons as to why they believed it.

Eramo vs. Rolling Stone, et al. - 11/01/2016    Vol. 2

92

1        Now, they point and point and point to this changing

2   story:  oral versus vaginal.  Sabrina gave you her view of

3   that.

4        In hindsight, in perfect hindsight, does she wish she had

5   said, hey, let's probe deeper on that?  I'm sure she must.

6   But as to this trauma culture that she was in, they all

7   testified that this is normal, this is absolutely normal, that

8   these things evolved.

9        Dean Eramo was not troubled by it.  She had first heard

10  oral, and then in April of 2014 learned vaginal.  And what did

11  she say?  It was even more significant to her because it was

12  another element of force.  I remember those exact words that

13  she said.  It did not discourage her from believing her.

14       Dean Allen Groves believed her.  Everyone, everyone who

15  encountered this young woman, believed her.

16       Yet we are the ones who stand here, and we are the ones

17  who are in a sense being tried for having believed her.

18       I do want to point out to you there's a number of issues

19  I'm skipping over, you'll be glad to know, but it is very

20  significant that you understand and believe Sean Woods when he

21  said to you, if he had any doubt, if he had any doubt about

22  the reliability of that story, reliability of Jackie as a

23  source, that article would not have been published.  That's

24  what that man stood up here and testified to.

25       There's no evidence to the contrary.  And he is a very

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

93

1    believable and honorable man.

2        He said he had two articles in the can.  "In the can"

3    means he had other feature stories sitting there ready to go.

4    In fact, they had moved this story into production ahead of

5    one of those.

6        They did not have to publish in any kind of urgency.

7    They also had the opportunity to rewrite.  That is a very

8    significant fact in this case.

9        I do also want to point out that the other people who

10   were negatively impacted by this story, the ones who really

11   were, the three friends who got quoted, okay, Kathryn Hendley,

12   Ryan Duffin, they -- they testified in this case, and they

13   said they didn't question Sabrina's good faith.  Do you

14   remember that?

15       Ryan -- I think Jackie testified to that as well.  She

16   was asked in her deposition.  She said -- well, you know, for

17   what it's worth, however credible you find Jackie, but she

18   said about Sabrina:  I thought she wanted to help.  I mean, I

19   thought she was very eager to write a story, but I think that

20   her intention was good.

21       Did you form an impression that she wanted to address an

22   important issue that was close to you:  sexual assault?

23       I believe so.  That was her motive.  That's what her

24   motive was, yes.

25       Ryan Duffin.  Can you tell me about what you remember

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

94

1   about your phone conversation with Sabrina?

2       I mean, I remember leaving it with the impression that

3   she was very, very genuinely apologetic --

4       Of course she was.  She's genuine.

5       -- for what had happened.  It really seemed like she

6   didn't realize when writing the article how much of a factual

7   basis it lacked.  She said that she had gotten a lot of her

8   facts directly from Jackie.  She said that she, you know,

9   tried to reach out to additional sources, including me, via

10  Jackie.

11      We know that's true because you heard it.  Remember the

12  Ryan cookout quote?

13      And took Jackie on her word when those connections fell

14  through.  So, you know, really, I feel like Sabrina was acting

15  in good faith when she wrote the article with the information

16  that she had.  Didn't seem like -- you know, my initial

17  impression of the article was that she had trumped up a lot of

18  information herself to make it read as a better story.  After

19  my conversation with her, I don't believe that.  I think that

20  when she -- that what she wrote was based on the information

21  she had been given and didn't involve any additional

22  elaboration or fabrication on her part.

23      Kathryn Hendley, very gracious.  This is the one about

24  whom probably the worst things were said, okay?  She said:  I

25  felt really bad for Sabrina because, I mean, I definitely

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

95

1   understood what it was like to be lied to by Jackie.  And that

2   cost her her job and her credibility.

3        If those young people had wanted to bring a claim about

4   the three friends, they could, all right?

5        They are not Dean Eramo, and Dean Eramo is not them.  All

6   right?  But we heard from them and what their attitude was.

7   They thought Sabrina just got caught up in this vortex of

8   insanity, just like everybody else did.

9        Now, I want to switch gears and talk a little bit about

10  the campus safety theme just a bit.

11       All right.  One of the key documents that you will look

12  at in this case is Defendants' Exhibit 45.

13       No yawning.  It's against the rules.  Just kidding.

14       All right.  Okay.  This is the sexual misconduct policy.

15  This is a very, very significant document in this.  This is

16  the rule book.  These are the rules that University of

17  Virginia should have been following when Sabrina walked onto

18  the campus.

19       What does it say?  When a complainant does not wish to

20  pursue resolution or requests confidentiality.

21       By the way, in this book, if you go to page 8 and look

22  for paragraph C, you will find this:

23       If the complainant does not wish to pursue resolution or

24  request confidentiality -- this is what it says -- Title IX

25  nevertheless requires the university to investigate and take

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

96

1   reasonable action in response to the complainant's

2   information.

3       Do you recall Dean Groves was asked this by David Paxton?

4   He said, okay, Dean Groves, do you agree with me that it

5   mandates the university to investigate?

6       Do y'all remember that?

7       And the dean said yes.

8       Now -- and then he said, and take reasonable action in

9   response.

10      Remember Mr. Paxton asked:  Do you agree with me that

11  that means reasonable minds can differ?  Remember when they

12  had that interchange?  This is what they were talking about.

13  This is the policy.

14      Look at what else it says:  The dean may conduct a

15  preliminary investigation into the alleged sexual misconduct.

16      In other words, even if the victim doesn't want to, all

17  right?  Because, as I said, they are the grownup in the room.

18  They're the ones who have to say, what does campus safety

19  require.

20      This is the lens through which every single thing about

21  the administration was said by the article and in the article.

22  This is what it's about.

23      Now, in effect, the university had procedures that were

24  diametrically opposed to this.  They did not do this, and this

25  is what Sabrina was commenting on.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

97

1    I'm going to show you a timeline, just a brief timeline,

2   that talks about some of these issues.

3    You have 2008, UVa was found in violation of the Clery

4   Act.

5    In 2011, the Office of Civil Rights, OCR, sends out a

6   letter that says -- that explains to the universities that

7   they have to consider these public safety issues even when the

8   victim does not want compliance, want to disclose anything,

9   when they want to maintain confidentiality.  That's

10  Defendants' Trial Exhibit 29.

11   2011, UVa adopts that sexual misconduct policy that we

12  just looked at.

13   2012, there was a letter that was called The Anatomy of a

14  Rape Case at the University of Virginia.  That was an article

15  that was very critical of the administration that was

16  published.

17   September 28, 2012, Jackie's alleged rape occurs.

18  Obviously, there's no warning to the campus or no

19  investigation because she doesn't report it.

20   Now, however, she did report it in 2013 to the

21  administration.  As you know, in May of 2013 she reports it,

22  and this is what the administration knows as of that time

23  period.

24   It's a sexual assault by multiple men.  They know that it

25  was at a fraternity with Phi in the name, so this is

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

98

1    incorrect.  This was probably a late-night slide.  And then
2    that the perpetrator worked with Jackie at IM-Rec and they
3    know the date.
4         Now, from that point forward, as you saw, there was one
5    e-mail from Dean Eramo to Jackie in June, but from July to
6    October 2013, the university does not even communicate with
7    Jackie.
8         Now, in April -- in 2014, the university learns a great
9    deal more.  In connection with Take Back the Night, which
10   occurred right around the time of the bottle incident and in
11   connection with the bottle incident, the UVa administration
12   now knows that there was a sexual assault by multiple men.  It
13   was at a -- it was at Phi Kappa Psi.  The perpetrator worked
14   with Jackie.  They know the date.  They know there's two
15   additional allegations of gang rape and that one of them was
16   an official anonymous report; in other words, a separate
17   report filed electronically with the university.
18        What happens here?  There is no warning to the campus,
19   and there is no investigation by UVa.
20        What Dean Eramo says is that she was trying to push
21   Jackie into doing something with the police by using this
22   bottle incident as the catalyst to do that.
23        Jackie did not know about those plans, and Jackie did not
24   like those plans.  And so when that apparently came up, Jackie
25   pushed back and the police -- she wasn't going anywhere with

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

99

1   it.

2       And it's very significant that the police officer

3   testified on the stand that they closed their file.  That's

4   what his testimony was, they closed their file.

5       And I think you noticed Mr. Clare corrected himself today

6   when he said "suspended."  The man said "closed."  And so you

7   have to reopen the file if it was going to be reopened, if you

8   remember.

9       There was absolutely no warning to the campus and no

10  investigation.  No cross-checking records at IM-Rec.  And

11  interestingly enough, Dean Eramo, she considered doing that.

12  She considered doing that in 2013.  It is in the record.

13       September 21 -- I covered a lot of ground really fast.

14       Actually, to properly do this, you would have to say that

15  Sabrina then begins her inquiry.  She comes to campus.  And in

16  doing so, the -- right about that time period is the first

17  time there's any kind of inquiry made to Phi Psi by the

18  administration.  And as we figured out, it turns out to be

19  they just asked them to investigate themselves.  But they were

20  actually making inquiries.

21       And then we have the -- I'm sorry, I'm going to go back

22  to that.

23       A very significant time is the fact that in September 21,

24  2015, OCR investigation findings release -- that report is

25  released.  That's the one in which Dean Eramo was found to

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

100

1    have created a hostile environment.

2        On the damages issue, which she has to prove, you know

3    she has -- that she feels like she was taken out of this Title

4    IX work because of the Rolling Stone article.  The reality is

5    that the timeline on that simply doesn't work.

6        She was taken out of that position months and months --

7    it was in fact 16 months after the article, 16 months after

8    the article.

9        But what had happened in the interim was this finding,

10   this finding by OCR, that she had created a hostile

11   environment at the University of Virginia for sexual assault

12   victims.  That is why she was taken out of any Title IX work.

13       Okay.  Now, back to how Dean Eramo perceived this.  We're

14   getting close.  Back to how she perceived it.

15       In May 2013, this is what Dean Eramo testified to in this

16   case.  She says she told Jackie -- or she said she was

17   concerned about the behavior she was describing.  It sounded

18   like it was premeditated and was very worrisome.

19       "I had concern about whether or not we should attach some

20   further inquiry into the matter."

21       You know what that is?  What that means is investigation,

22   all right?  She had concern about whether they should do it.

23       "And you asked Dean Groves if you should pull the records

24   from IM-Rec; isn't that correct"?

25       Answer:  I did.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

101

1      I just talked to you about this.  Eramo said that the

2  alleged vaginal gang rape that she learned of in 2014 was

3  another aspect of force that was concerning.  She was very

4  distressed by what Jackie was telling her.

5      "And I also now had the information about Phi Psi, and

6  now I also had potential information about another assault, so

7  I was very concerned."

8      Very significant to you in those notes as well, in the

9  Advocate system notes:  As of April 21, 2014, Jackie gave the

10  administration permission to inquire with the fraternity.  She

11  did.  It's in those notes.  They had the ability to do it as

12  of April 2014.

13      There it is.  "Jackie gave Eramo permission to speak with

14  the fraternities."  That's PTX 9 at page 217.

15      This is the meeting in April of 2014 that we discussed.

16  I just want to refer you to the second line of the big

17  paragraph:

18      Student is willing to report this matter to the police

19  but unsure if the administration would move forward with an

20  investigation.  Student is also willing to have NPE speak with

21  the fraternities about the concerning behavior.

22      Now, Dean Groves, what did he testify to?

23      As of April 2014, he has these three reports of gang

24  rape.  And it doesn't matter to him that it's not on campus,

25  and so he reports this immediately to Pat Lampkin and to

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

102

1    President Sullivan.  This goes all the way up the chain to the

2    highest person in the administration.

3        Officer Via, like I just said, the case was closed.

4        Another very significant thing that he said during this

5    conversation.  Do you remember when Ms. Locke asked him:  Did

6    it seem like she was trying to suppress Jackie from proceeding

7    with a claim?

8        And he -- this was his answer:  She -- and that means

9    Eramo -- said that, you know the university would look into

10   this, and Jackie was happy with that.

11       So we know he's closing his file, and we know according

12   to the police officer he says that Dean Eramo says the

13   university would look into this.  And we know that from his

14   perspective, Jackie was happy with that.

15       But the reality is, the university did not look into

16   this.  This is in April of 2014.  Nothing happened until

17   Sabrina arrived on campus in September, and that's when the

18   phone started ringing over at Phi Psi.  Nothing happened.

19   Five months.

20       Now, one thing I wanted to describe to you.  I wanted to

21   just real quickly hit how significant this was to the article.

22   These are -- we have tons of references, seven in fact,

23   express references to campus safety within the article.  I'm

24   just going to flip through them real quickly, and you can look

25   on your screen, because I don't want to take the time to

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

103

1    actually read them to you.

2        But the -- I pointed them out to you in opening, and it

3    was all about the responsibilities to the rest of the campus,

4    regard for campus safety.  No warning has yet been issued to

5    the campus.

6        And this one is the one that clinches it together.  This

7    occurs on the very last page of the article, and it's a grisly

8    dossier of which Matthew has been accused, underscores -- this

9    is Jesse Matthew, the killer of Hannah Graham -- has been

10   accused, underscores the premise that campus rape should not

11   be seen through the schema of a dubious party foul but as a

12   violent crime, and that victims should be encouraged to come

13   forward as an act of civic good that could potentially spare

14   future victims.

15       So those were in fact the dominant -- that was the

16   dominant theme in the article.

17       I covered that.  This is where I was talking about he

18   had -- reasonable people could differ.  And we all know that

19   Dean Eramo was very devoted to this victim choice.

20       Now, the reality as well is that the university knew that

21   it was subject to criticism on this issue.  The university

22   knew that it was subject to criticism.

23       I'm going to take you back to this one slide.  This is

24   where Dean Groves was testifying.  He said that reasonable

25   people could disagree.

Eramo vs. Rolling Stone, et al. - 11/01/2016    Vol. 2

104

1    And the Court said, in fact, you understand there's been

2    a lot of disagreement about that very provision.

3    And the witness said:  Yes, sir.

4    All right?

5    But before this article was about to come out, Dean Eramo

6    testified that she sent a text message to, I believe it was,

7    Sara Surface and Emily Renda, and she was talking about how

8    she was about to be thrown under the bus by the Phi Psi

9    fraternity.

10   And this is the quote:  "I should have conducted an

11   investigation due to the public safety risk, despite the

12   wishes of the survivor."

13   These were criticisms that were being leveled at her by

14   the Phi Psi fraternity before the article even came out.  The

15   university knew that it was subject to this criticism.

16   And the point being here, the point of this article,

17   jurors, is this.  We all now know that the story can't be

18   believed, but we all also now know that the administration

19   believed it.  They didn't disbelieve it.  And we know what was

20   said to them.  And the question is, how did they respond?

21   What did they do with that information?  Did they follow their

22   rules?  Did they not?

23   And just because someone makes a false fire alarm doesn't

24   mean the fire engines don't roll, right?  A false claim,

25   you've still got to roll those fire engines.  The sirens have

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

105

1    to go off.  You've got to do your job.

2         That was the criticism in this case.  That's the

3    criticism in this article.  And that's the criticism they

4    still don't want to hear.  Every University of Virginia

5    employee came in here and said, we don't like the OCR report.

6    We don't like its findings.  We don't like the article.  We

7    don't like its findings.

8         That's not about Jackie.  They heard and believed the

9    exact same story.  It's about the criticisms.  They don't like

10   it.

11        Dean Groves did testify in this court that the OCR report

12   had found that UVa was not doing enough to respond in a timely

13   and efficient manner to reports of sexual assault under the

14   2011 policy when the student elected not to pursue criminal

15   charges or the disciplinary process at the university.

16        Davis testified OCR found the university did not promptly

17   investigate information that it received regarding two cases

18   of sexual assault involving fraternities in 2013 and 2014.

19        She was able to confirm that the 2014 case referenced by

20   OCR was Stacy's case, the one that's in the article that's

21   dealt with at length.  And she says she's reasonably confident

22   that the 2013 case referenced by OCR was Jackie.  That's very

23   significant.

24        Now, I was talking to you about these damages a little

25   bit earlier and how Dean Eramo complains that -- and I'm sure

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

106

1    she misses that work.  I don't question that being genuine.

2    It had to be very rewarding work for her, and in many respects

3    she had to be just great at it.  But in the campus safety

4    aspect, maybe not the best.

5        But here's what she wrote to Emily Renda after those OCR

6    findings were released:

7        I'm still seething over the OCR findings letter, but I

8    will survive.  But I am likely to get pulled from the Title IX

9    work permanently.  Please do not tell others yet.  Still

10   hoping I may be able to ultimately continue some prevention

11   and SVPC contact.

12       This is Defendants' Trial Exhibit 59.  That is why she

13   was attributing to her friend, a young woman named Emily

14   Renda, why it was that she was being pulled.

15       Now, as to the good out of this?  Brian Head testified

16   that the university made a lot of changes in general after the

17   article came out, and they were positive changes.  Do y'all

18   remember him saying that?  All right.

19       Now, there's been a lot of criticism in this case that

20   Rolling Stone and Sabrina unfairly criticized UVa for wanting

21   to protect its image, all right?  Now, that is not one of the

22   statements sued on.  Ms. Eramo is not suing on that statement.

23       But to the credit of the article, Rolling Stone did ask

24   UVa for this statistical information.  UVa did shut down the

25   interviews with Nicole Eramo and Claire Kaplan, the school

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

107

1    nurse -- or the school health person who handles this.

2         To her credit, Ms. Eramo was perfectly willing to speak

3    to Sabrina.  She was the perfect person to speak to Sabrina.

4    Had they spoken, they would have probably gone on for hours

5    talking about victim choice.  And I have a strong feeling that

6    Dean Eramo might have come out on top of that discussion

7    because she knows what -- she knows her views and she's been

8    trained in this.  And that is exactly what Sabrina was wanting

9    to hear.  She wanted to hear from somebody who knew.

10        But you heard what happened when she talked to Teresa

11   Sullivan.  She was like, laid it all out.  We laid out all the

12   themes to the article on that Teresa Sullivan interview.  And

13   on the main one, about victim choice ultimately causing

14   victims to do nothing, not on purpose but as a byproduct, she

15   said, yeah, I just can't comment on that.  All right?  I don't

16   want to speculate.

17        I guarantee Dean Eramo could have commented, probably for

18   two or three hours, but she wasn't given the opportunity.

19   That was UVa trying to control the narrative, all right?  They

20   did not put the person that was best suited for that.

21        Now, by contrast, Ms. Eramo gave an interview to WUVA

22   that turned out to be very important because it ended up being

23   the basis for the OCR finding.  She also gave an interview to

24   UVA Magazine.

25        Do y'all remember this one, the magazine article that was

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

108

1   also about rape and it was coming out about the same time and

2   it was about sexual assault?  And Dean Groves testified about

3   it, and that was the one where the administration -- he got to

4   review it before it got published.  And there was this

5   somewhat embarrassing e-mail exchange with these top

6   executives -- or administrators at the university where they

7   said, let's kill it.  Let's don't -- you know, and he said,

8   yeah, it was killed.

9       So that's another thing we know about UVa wanting to

10   control its narrative.  The article came out -- oh, by the

11   way, and obviously a Rolling Stone reporter rolls into town

12   and Phi Psi gets a telephone call.

13       The article comes out on September 19, 2014.

14       And do you remember Renda testifying as to this?  She

15   said -- she was very compelling and powerful too.  I mean, it

16   was clear that Emily Renda felt bad.  She felt bad about

17   having put Sabrina in touch with Jackie.  She felt bad for the

18   ramifications that that was going to have for her friend, Dean

19   Eramo, her colleague, her coworker, who she clearly valued as

20   a great mentor.  And there were these exchanges between the

21   two of them at the time.  But I found this very compelling.

22       After describing how she was reacting during that first

23   week, she describes this as coming from Dean Eramo:

24       And she felt very strongly, like, she was only continuing

25   at the university, or rather she was only still employed,

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

109

1   simply because she would be free to talk to the media if she
2   wasn't employed.

3       Okay, now, Dean Eramo is an assistant -- I mean,
4   associate dean at the school at this time.  And what is she
5   saying to this young colleague at that time?

6       She's saying, look, the only reason I think I've got my
7   job is to keep me quiet.  The University of Virginia
8   administration does not want me talking to the press.  Because
9   that was in the context of talking to the press.

10      So that's coming from the mouth of Emily Renda in
11  testimony about Dean Eramo specifically.

12      Now, another very significant piece of evidence that came
13  into -- in the case, this came in in two places that you
14  probably didn't even notice.  I really want you to pay
15  attention.  It's Defendants' Trial Exhibit 79.

16      Jackie was asked about it in her deposition, and then
17  Dean Groves was asked about it on the stand as well, although
18  he provided no substantive testimony about it because he said
19  he didn't write it.  All right?

20      But this is a letter that was written -- let's see.  It
21  was about a month after the article, on December 17, 2014.

22      At this point the University of Virginia has had almost a
23  month to gather its thoughts on the Jackie gang rape.  It
24  knows full well all those things we just described that Dean
25  Eramo and the dean's office knew as of April -- May 2013 and

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

110

1   April 2014.  But it sends Jackie a statement asking her to

2   sign this.

3        The University of Virginia asked Jackie to sign a

4   statement that said:  The incident of September 28, 2012, is

5   not accurately described in the Rolling Stone article, nor did

6   I ever state to anyone at the University of Virginia that I

7   was gang raped on that date in the Phi Kappa Psi house.

8        This is what the University of Virginia asked Jackie to

9   sign a month after the article came out.

10       It is simply false.  We have been through the records.

11   You know full well that the university was told of a gang rape

12   in April 2014.  Wasn't told Phi Kappa Psi.  Said a fraternity

13   house on Mud Bowl with a Phi in the name.

14       But as of April 2014, we have seen Dean Eramo's official

15   Advocate records.  They show the University of Virginia knew

16   full well that it was Phi Kappa Psi, that it was September 28,

17   2012, and that it was a gang rape, because she testified she

18   knew it was -- she knew it was -- gang rape oral and gang rape

19   vaginal is still gang rape.  But she knew it was vaginal as of

20   April 2014.  Yet the university was asking her to do this.

21       It is simply false.  It's impossible to believe that the

22   university did not know this to be false when it sent it to

23   Jackie December 17, 2014.

24       Had Jackie signed this, in clear contradiction to the

25   evidence that sat in the dean of students office, the evidence

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

111

1    that sat in that Advocate system, she would have violated that

2    honor code that they talked so much about.  The school could

3    have expelled her just like that because there's no question

4    it was false.  It would have been a lie.

5        Okay.  I get it.  You can't say everything, right?

6        A few words I do want to tell you.  It's not -- it's

7    really hard to deal with Jackie because I think everyone on

8    our side believes something really bad did happen to her

9    somewhere along the line.  Something's not right.  Don't know

10   what, don't know how, don't know if, really.  But we do know

11   that she deceived us, and we do know that some of it was

12   purposeful.

13       That statement that you all heard where she said that --

14   where she talks about how Ryan had told her at cookout that he

15   didn't want to be part of her little shitshow?  Do you

16   remember that?  That's not a rape memory.  That's not a trauma

17   memory.  That's a current, in-the-moment deception.  That's a

18   lie.  Can't color it any other way.  And that was a lie

19   designed for one purpose, and that was to get Sabrina to

20   believe something that was false, all right?

21       Jann Wenner was right when he said, we don't live our

22   lives expecting this.  Who expects that?  Who expects somebody

23   to lie to you like that?  Who expects someone to pull out

24   their cell phone like Sabrina said and just send these text

25   messages to God knows who?  Maybe she wasn't even doing it,

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

112

1    okay?

2        But it happened.  And she -- it happened to Sabrina.

3    We're just not equipped for it.

4        At the same time she was triangulating with others.  She

5    would be on a phone call with Sabrina, telling her how excited

6    she was or something, and then she'd send a text message or

7    call some friend and tell them the complete opposite.

8        We know for a fact she was telling Sabrina that she was

9    perfectly fine to name the fraternity and use her name on

10   September 11.

11       On September 17 she goes -- you know, just a few days

12   later, she goes into Nicole Eramo's office and says, you know,

13   I'm just so anxious about this, and I don't want to use the

14   fraternity's name.

15       And her notes from that day -- this is PTX 9 at 299.  She

16   says:  The reporter will run with the story identifying the

17   fraternity.  Jackie is very anxious and upset.  NPE will work

18   with her to get counseling.

19       Dean Eramo got her counseling because she was telling her

20   she was so upset they were going to use her name.  We heard

21   her talk for two and a half hours to Sabrina about how okay

22   she was with using her name.  These are five days apart, all

23   right?

24       Then she's telling Sabrina that she's excited about the

25   article coming out.  She's going and telling Dean Eramo and

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

113

1   Lori Casteen at that point, oh, how nervous she is about it.

2   She was playing all the sides at each other, and that's where

3   it really started to come into play.

4        And so it is no surprise then that when the article came

5   out, Dean Eramo saw it through the eyes -- through the fat

6   lens.  She saw it through the lens of this young woman who had

7   been coming to her and telling her, hey, I'm being taken

8   advantage of.

9        That's not the same young woman that had been talking to

10  Sabrina.  She was playing everyone off each other.

11       After the article she tells Ryan, her friend, hey, she

12  totally misquoted you on all that stuff.  I'm sorry, Sabrina's

13  just an out-of-control writer.  Those are things that are in

14  this record.

15       But she's telling Sabrina at the same time she's sending

16  her a text message, saying, article was great, loved it.

17       So that's the type of situation that you're in.  There

18  are a lot of takeaways you could spend the rest of your life

19  probably thinking about, what it would be like to be a victim

20  of such a hoax, such a fraud.  But it happened to us.

21       Nobody plans their life looking for a Bernie Madoff.  We

22  just don't.  We don't.  It's like a perfect storm.  Nobody

23  expects this to happen.  And our world would shut down if we

24  walked out of this courtroom expecting everyone to lie to us

25  like that.  It just couldn't function.  We don't go about our

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

114

1   life doing that.  Trust is inherent, at least some degree of

2   trust.

3       But we know this:  Everybody believed her - Dean Eramo,

4   Lori Casteen, Dean Groves, Alex Pinkleton, Amy Forrest, Rachel

5   Soltis, Sara Surface, Emily Renda, Sabrina, Liz Garber-Paul,

6   and Sean.

7       Now, when you go back into the jury room, which is going

8   to have to be tomorrow, we didn't get to it today -- and I'm

9   going to go through the verdict form with you just real

10  quickly, just really quickly, before I sit down.

11      But I suggest that you do this.  As to these issues that

12  are nonissues, as to the ones that Mr. Clare spent 99 percent

13  of his time talking about, whether Sabrina made the most

14  colossal mistake of her life in not pursuing the three

15  friends, whether she should have hounded for Drew's name,

16  whether she should have, could have, would have, all these red

17  flags, should she have known that this or that, should she

18  have known that those statements were inherently, you know,

19  too stupid to be true, should she have, should she have,

20  should she have.  All right?  All that stuff has nothing to do

21  with whether these statements are true or false that she

22  said -- and that are attributed to the three ones at issue in

23  the case.

24      I suggest to you that you simply spend a few minutes, get

25  that out of your system, talk about it, and then put it in a

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

115

1    box.  And take that box, open the jury room door, and put the

2    box outside, because it is not the issues in this case.  Those

3    are not the issues.

4        The issues are the ones that I went over with you:

5    actual malice, subjective knowledge, what did Sabrina believe,

6    what did Sean believe, what did Liz Garber-Paul believe.  Did

7    they hold serious doubts.  Those are the issues.

8        Now, I am going to tell you -- it's like one of those

9    sample ballot forms, you know?

10       May I switch over here?  Okay.

11            MS. McNAMARA:  That's the wrong one.

12            MR. SEXTON:  Is this the wrong one?  These are the

13   ones y'all gave me.

14       I think these have been through a number of versions, so

15   it's a little bit understandable when we grab the wrong one.

16       As Mr. Clare said, there will be a statement that is the

17   one at issue.  For example, this is the one that is -- lots of

18   people have discouraged her from sharing her story.

19       Your first question:  Do you find by a preponderance of

20   the evidence that this statement is actionable, by satisfying

21   each of the elements set forth on page 23...

22       Page 23 is the page I showed you that means it's

23   defamatory and whatnot.  It's not context for malice, all

24   right?

25       If you answer no, which is what we suggest that you do,

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

116

1    you move on.  You don't go anywhere else.  You just go down to

2    the next number, 2, but you don't do B.

3        If you answer yes, then you have to answer the following

4    question:  Do you find that the plaintiff has established by

5    clear and convincing evidence -- that's the higher standard

6    that I was discussing with you -- that Sabrina Rubin Erdely

7    acted with actual malice in making this statement?

8        The answer is no.

9        And then it just goes through one after another, just

10   like that.

11       There is -- using the definitions that the Court

12   provided, the republication definitions, on number 10 you will

13   be asked:  Do you find by a preponderance of the evidence that

14   Sabrina Erdely republished the article on December 5th?

15       The answer is no.  If it is no, you stop.

16       And that -- in this verdict form situation, you will

17   not -- I can't remember if any of y'all have been on jury duty

18   before, but you will not be asked -- we certainly -- let me

19   retry to take that plane off just one more time.

20       We believe that there is no way that you should find in

21   favor of the plaintiff on these issues.  We believe the

22   evidence cannot in any stretch support a finding of actual

23   malice on these statements.

24       If, however, you were to find otherwise, that would mean

25   you would find for the plaintiff, right?  But in this case,

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

117

1    you are not going to be asked to fix damages at this point.

2    That would be for another day, all right?

3         So this -- there's no place on that form where you're

4    going to be asked:  And I award damages in the amount of X

5    dollars.  All right?

6         So when you answer these questions, that's it, all right?

7    So it is somewhat different.  And because -- you know, I

8    didn't want you to be confused when you go back and do that.

9         Ladies and gentlemen, I want to thank you so much again

10   on behalf of our clients.  They're great clients, and they are

11   very appreciative of you for being great jurors.  They've

12   watched attentively as you all have given them every ounce of

13   attention you can possibly give between the hours of 8 a.m.

14   and 6 p.m. every day.

15        We thank you for your service.  We just thank you for

16   being such good, active participants in this.  And we have

17   every confidence that you will apply the law just as you're

18   instructed to by Judge Conrad.

19        Thank you very much.

20            THE COURT:  Does anyone need a break before we have

21   plaintiff's last closing statement?

22        Anyone need a break?

23        Mr. Clare, then I think they're ready for your final

24   argument.

25            MR. CLARE:  Can we switch back over?  Actually, put

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

118

1    it on the ELMO if you could.

2            THE CLERK:  Okay.

3            CLOSING ARGUMENT BY THE PLAINTIFF (REBUTTAL)

4            MR. CLARE:  Mr. Clare's final argument, I think you

5    just heard the judge say.  I'm sure you're happy about that.

6        Not only was I the lawyer that was standing between you

7    and lunch, now I'm the lawyer that's standing between you and

8    dinner.  I will try to respect that and be relatively brief.

9        But I do need to go back and address some of the things

10   that Mr. Sexton said to you.  This is sort of like Paul

11   Harvey:  This is going to be the rest of the story.

12       Mr. Sexton started out by saying that Rolling Stone and

13   Ms. Erdely wanted to do an article about how UVa responds, and

14   they wanted to have a criticism of a public figure.  But you

15   have to do those things if you're going to do them honestly.

16       We can have a debate in this country about these issues,

17   but you have to have an honest debate.  You can't misrepresent

18   the facts in order to gain an unfair advantage in the public

19   debate over these or any other issues.  That's not journalism.

20   You have to get the facts right, and then we can have a

21   debate.

22       Mr. Sexton said that 97.3 percent of what we wanted to

23   talk about is irrelevant.  He asked you to ignore all those

24   red flags and ignore all of those mistakes that were admitted

25   and all of those explanations that kept coming and coming and

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

119

1    coming about all of the errors that they made and all the

2    things that they disregarded and said, just take a few moments

3    and get those out of your system, put them in a box and put

4    them outside the jury room.

5        Well, ladies and gentlemen, the instructions that you

6    will be given, only some of which Mr. Sexton showed you, when

7    you read them in their entirety -- and the judge will read

8    them to you tomorrow and you'll have them in there, without

9    the ellipsis in there, in their entirety -- you'll see why

10   these issues are directly relevant to this question of actual

11   malice.

12       Mr. Sexton told you that Drew and the three friends and

13   all those sorts of things are irrelevant.

14       Let's look at page 35 of the jury instructions, which you

15   will have.  I showed you a portion of this earlier:

16       However, if there is evidence that the defendants failed

17   to investigate when doubts were created because the story was

18   weakened by inherent improbability, internal inconsistency, or

19   apparently reliable contradictory information, you are

20   permitted to infer from that evidence that a defendant acted

21   with actual malice.

22       The Court will instruct you, you are permitted to draw

23   that inference and find, yes, that the defendants acted with

24   actual malice when those things occurred.

25       Repetition of another's words does not release one of

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

120

1  responsibility.

2      So Rolling Stone and Ms. Erdely are not released from

3  responsibility if the repeater knows that the words are false

4  or inherently improbable or there are obvious reasons to doubt

5  the veracity of the person quoted.

6      Again, all those conflicts in her story, all those

7  refusals to put her in touch with the people that actually had

8  firsthand information, those are obvious reasons to doubt the

9  veracity of the person quoted.

10     Ms. Garber-Paul, I'm glad she's here in the courtroom

11 because if they had listened to her, some of this could have

12 been avoided.

13     Quote:  When a defendant relies on a source for a

14 statement alleged to be defamatory and has subjective doubt as

15 to the truth of the source, you may infer that a defendant

16 acted with actual malice by making a deliberate decision not

17 to follow up out of a desire to avoid conflicting information.

18     That's Kathryn Hendley, that's Ryan Duffin, and that's

19 Drew, and it's the other guys from Phi Psi.  It's absolutely

20 relevant to your consideration.

21     You need consider the information that Jackie told

22 Rolling Stone as a whole and the information she refused to

23 tell them as a whole in order to discharge your duty under

24 this instruction and evaluate whether these things were true

25 or not.  You may infer actual malice from those facts.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

121

1    You may not, consistent with the instructions, do what

2  Mr. Sexton asked and put them in a box outside of the jury

3  room.

4    He also said that failure to investigate is irrelevant.

5  That's not actual malice.

6    Page 39 of the instructions will tell you that failure to

7  investigate can be relevant to actual malice.  A plaintiff,

8  Ms. Eramo, is entitled to prove the Defendants' state of mind

9  through circumstantial evidence.  You are entitled to consider

10 failures to investigate, departures from journalistic

11 standards, evidence of ill will or intent to injury, and

12 evidence of a preconceived story line in determining whether a

13 defendant had a high degree of awareness of the probable

14 falsity of the statements.

15    You may infer from -- actual malice from these facts.

16 You may evaluate a preconceived story line or a failure to

17 investigate as evidence of actual malice and whether -- given

18 the facts in her possession, the inconsistencies in Jackie's

19 behavior, whether or not more should have been done.

20    Mr. Sexton talked about the radio interview statements by

21 Ms. Erdely after the fact.  He said this wasn't about the

22 article, and it's not clear it was talking about Dean Eramo.

23    Well, you've had this jury book in your laps for the last

24 two weeks, and you've seen it and had a chance to read it.

25 That's just not true, and I'm going to show you two of the

Eramo vs. Rolling Stone, et al. - 11/01/2016    Vol. 2

122

1    examples of it.

2        Tab 4 of your jury book.  This is the Slate podcast, if

3    I've got that right.  Page 10, line 16, a question was posed

4    to Ms. Erdely:  Sabrina, one of the things you talk about is

5    how there are kind of three options, that Dean Eramo presented

6    Jackie with the three options as all people in this position

7    do.

8        And she sort of went on to talk about it.

9        And it's in response to these questions from this caller

10   that these post-publication statements were made.

11       The same true on page 10 -- sorry, page 12.  Another

12   question:  Sabrina, can you talk a little bit more about the

13   relationship between the community of survivors of the alleged

14   victims of the university and particularly Dean Eramo?

15       That's our statement number 9.  And that's where she

16   talks about the attitude that radiates from the

17   administration:  that if you unburden yourself to the dean and

18   take care of your own mental health, that's good enough.

19       So these post-publication statements were plainly about

20   the article, and they were plainly about Dean Eramo.  They

21   were in response to questions about Dean Eramo.  And they were

22   there talking about the article and promoting the article,

23   driving website traffic to it.

24       Mr. Sexton talked to you about the Columbia Journalism

25   Report, what it said and what it didn't say about what Rolling

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

123

1    Stone believed and what witnesses believe.  And the Columbia

2    Journalism School report is a great document.  Both sides have

3    said a lot about it.  But it's no substitute for your

4    evaluation of the credibility of these witnesses.

5         Columbia Journalism School, for all of the benefits that

6    it had, did not have the benefit that you have.  They didn't

7    have subpoena power like we did in order to gather all these

8    documents for you and be able to get the testimony and

9    witnesses under oath from people.  They couldn't put people

10   under oath.

11        They didn't have testimony from Jackie.  Jackie refused

12   to cooperate with them.  We have Jackie's sworn testimony.

13        They didn't have any of the documents that we were able

14   to get from Rolling Stone about their behavior after the

15   publication, and they didn't have the benefit of Jann Wenner's

16   statements about the retraction after it was all over, because

17   they retracted only after the Columbia Journalism School came

18   out with it.

19        So they didn't have the benefit of hearing Mr. Wenner

20   say, I don't stand by that retraction, meaning the April

21   retraction.

22        I agree with Mr. Sexton.  I think he should consider the

23   circumstances and timing retraction in deciding whether or not

24   there was actual malice.  And I think you should apply your

25   common sense to whether December 5 was a retraction or not.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

124

1   Doesn't say the word "retraction."  They didn't take it down

2   from the website.

3       Managing editor, Will Dana, one of the best in the

4   business, according to them, said, that's what a retraction

5   means to him, is when you take it down.

6       They didn't do either one of those things on December

7   5th.  Not one of them.

8       They knew how to retract an article when they wanted to.

9   We know that, because in April when they did want to retract

10  it, the managing editor published a note to all of their

11  readers saying, we are hereby officially retracting "A Rape On

12  Campus," and they took it down from their website.  That's a

13  retraction.

14      It's just not credible that December 5th was anything

15  other than an editor's note that doubled down on the

16  allegations about the university, and left it muddy and

17  unclear about what it was they were actually walking back from

18  and which ones they weren't.  They were asking readers to

19  figure out for themselves and reread the defamatory statements

20  about Dean Eramo.

21      Columbia Journalism School did not have the benefit of

22  Mr. Wenner's statements after the fact saying, I don't stand

23  by even the full retraction in April.

24      So I think you should consider the fact they waited five

25  months to retract the article and to take it down from their

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

125

1  website and have almost half a million more people come to

2  their website to see it.  I think you should consider that in

3  terms of whether or not they acted with actual malice.  I

4  agree with Mr. Sexton about that.

5      The rape school quote, only sourced from Jackie.  And

6  there was a deliberate decision made not to follow up and find

7  out from Nicole Eramo whether or not she had ever said it or

8  not.  Not a word from Mr. Sexton in his closing about the

9  false setup for that rape quote, also from Jackie.

10     Jackie told Liz Garber-Paul, that didn't happen.  I

11 wasn't looking at those crime statistics -- that they left in

12 anyway, even though Jackie had said it didn't happen like

13 that.  That was enough to cast doubt on the entire quotation.

14     They should have followed journalism 101 and asked Nicole

15 or UVa to verify.

16     Now, we heard from Mr. Sexton that this quote was

17 credible in part to Rolling Stone because they had had a hard

18 time getting the statistics out from UVa before their

19 interview of President Sullivan.  That's one of the things why

20 they said it's so believable.

21     Well, the University of Virginia had a lot of things

22 going on when Sabrina Erdely was demanding these statistics.

23 They had a student who was missing.  And, you know, the

24 deans -- the dean of students and the president of the

25 university was rightfully focused on that as opposed to

Eramo vs. Rolling Stone, et al. - 11/01/2016    Vol. 2

126

1    getting Sabrina the statistics she wanted in the time that she

2    wanted.  They made time to interview with her because it was

3    important, but it wasn't more important than finding Hannah

4    Graham.  And it certainly doesn't make it more credible that

5    Nicole Eramo would have issued this quote.

6        Post-publication statements, these radio interviews and

7    other Washington Post statements and that sort of thing, they

8    know they can't defend what those statements mean, that they

9    are false and defamatory, the brushing off and suppressing and

10   didn't take to police.  They know that they can't defend it on

11   those grounds.

12       So what do they say?  There's no damage from that.

13       Well, the reason why we have jurors, real people,

14   citizens, not lawyers who've had this, because we want people

15   with common sense to come in and apply some common sense to

16   these factual questions.  They beat it out of us in law

17   school, but we need you to apply some common sense.  And you

18   should bring your common sense to this question.

19       You can certainly determine whether a radio broadcast

20   that was heard all over the New York City metropolitan area,

21   including, by the way, Jersey, where Nicole is from, grew

22   up -- heard her talk about that -- whether people heard it or

23   not.  These radio shows, the transcripts are there, the hosts

24   heard these statements, the callers, the people who called in

25   on these radio -- they heard these statements.  That's in

Eramo vs. Rolling Stone, et al. - 11/01/2016    Vol. 2

127

1    evidence.

2        And you can make your own determination whether or not it

3    meets the standards set forth in the jury instructions for

4    whether or not it would damage her in her position of

5    employment.

6        Page 31 of the jury instructions that the judge will give

7    you.  "It must harm plaintiff's reputation, rendering her

8    contemptible or ridiculous in the public's estimation."

9        That's the standard.  You can make that determination

10    about whether the statement she brushed off and suppressed

11    sexual assault and didn't take to the police, didn't treat

12    rape as a serious crime, you can make that determination.

13        And Mr. Sexton said that she -- we didn't have a witness

14    that came in from New York to testify that they heard this.

15    Well, Mr. Woods said that he heard it.  But even putting

16    Mr. Woods aside, you have evidence about the callers and the

17    host.

18        But it also flatly contradicts what the jury instructions

19    say.  Page 27.  The judge will instruct you that "a defamatory

20    statement is deemed published or made by the defendant when it

21    is communicated to and understood by a person other than the

22    plaintiff."

23        That's what we were criticized for not having put in

24    evidence.

25        "Publication may be proven by direct evidence" -- that's

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

128

1    if we had brought in somebody from New York -- "or

2    circumstantial evidence.  The plaintiff need not identify the

3    person to whom the defamatory words were published and need

4    not place in evidence testimony from a third party regarding

5    what the person heard and understood."

6         That's what Mr. Sexton was criticizing us for.  The law

7    is to the contrary.  We do not have to put in that evidence.

8    The judge will instruct you on that.

9         Mr. Sexton had a couple of shout-outs for the note-takers

10   in the crowd, and I'm going to do my own.

11        On the nonreaction statement, you can tell -- you can

12   look at the article yourself and see whether or not this was a

13   description of the facial expressions or not.  But I'd like

14   you to write down in the margin next to the nonreaction

15   statement, Plaintiff's Trial Exhibit 10 at the pages ending

16   4312.  That's where Jackie reported to Sabrina that:  Nicole

17   then got pissed at the frat and said, there have been two

18   fraternities whose charters have been canceled.  I wouldn't

19   mind a third.

20        Plaintiff's Trial Exhibit 10, 4312.

21        It's not a nonreaction.

22        You didn't hear a lot about the police in Mr. Sexton's

23   remarks.  He said, well, it's about a totally separate

24   assault.  Had nothing to do with that situation, nothing to do

25   with what this article was about.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

129

1      Nonsense.  Rolling Stone included two paragraphs in the

2   article about it.  They chose to include that fact in the

3   article.  They're the ones that made the decision it had

4   something to do with Jackie's story.  They thought it enhanced

5   her credibility.  They thought the bottle incident was

6   relevant.

7      What they didn't think was relevant was the fact that

8   Nicole had taken her to the police.  And what they didn't

9   think was important enough to do, in light of all of this

10  information and the fact that Jackie and Nicole are sitting in

11  a room with two police officers when we're talking about gang

12  rapes and campus safety and warnings and all these things that

13  they claim to be so concerned about, no one asked Jackie the

14  question:  Were you asked about your sexual assault in this

15  setting?  No one.

16     No one asked Jackie:  Isn't it true that Nicole Eramo

17  brought up the rape, the sexual assault, in that meeting and

18  pushed you to do that?  As she testified happened in that

19  meeting.

20     And Detective Via and Officer Rexrode told you the exact

21  same thing.  It wasn't just about the bottle incident.  It was

22  about the sexual assault as well.  But no one asked the

23  question.  And they had every reason to ask the question when

24  you're talking about these issues they claim to be interested

25  in:  victim choice, campus safety, or how Nicole interacted

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

130

1   with Jackie.

2       Mr. Sexton said Sabrina did her job by issuing a FOIA

3   request.  But she didn't ask her main source, who she had

4   spent months and months with, the simple question.  So the

5   answer to Mr. Sexton's question, did she do her job, is no,

6   she did not.

7       Mr. Sexton talked about this notion of an ordeal, and we

8   saw that in some of the press statements that -- made after

9   the fact, that they put Jackie through an ordeal, the

10  university administrators put her through an ordeal.

11      That's a tricky one for them.  That's a hard one for them

12  to explain what that means, because it's at the hands of

13  university administrators and an ordeal.  So they've come up

14  with this theory that it was putting her through an ordeal to

15  ask Jackie to go back to these two women, whose identity is

16  known only to Jackie, and try to get them to come forward.

17  That was the ordeal that they supposedly put her through, this

18  burden of going back and asking these two women, who are known

19  only to Jackie, and Jackie's the only person on the planet who

20  has seen -- claims to have seen or talked to or knows anything

21  about them, even though she can't answer questions about their

22  name or their hair color or where they lived or any of the

23  questions that I asked her in the deposition.

24      Nicole Eramo asked this young woman, she said, my God,

25  get these women to come in and see me so I can help them.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

131

1    And yeah, she said, I know this is stressful for you

2  because you're having to deal with your own assault.  But she

3  had no other choice.  There's no other way she could have

4  found out anything about these women or done anything with

5  these -- for these women or with their information or any of

6  the things that Mr. Sexton is criticizing Nicole and the

7  university for doing without that information.

8    And it's a damned if you do, damned if you don't from

9  that situation.

10    When -- if she wouldn't have asked that question of

11  Jackie, if she wouldn't have said, my God, bring them in or

12  bring me their names or tell me who they are, Rolling Stone

13  and Sabrina would be criticizing them for doing nothing.  They

14  didn't do an investigation.  They don't care about campus

15  safety.  We've heard that whole thing.

16    And then when Nicole asks the question and says, my God,

17  bring these women in, then it's putting her through an ordeal.

18    So it's one or the other.  It's either you're not

19  investigating, you don't care about campus safety, or when you

20  ask a question to help these two unnamed women, it's putting

21  her through an ordeal.  It's damned if you do and damned if

22  you don't.  And that's the problem Nicole is in with the way

23  that they reported the story from the very beginning.

24    Mr. Sexton spent some time talking about republication,

25  but not a word about the testimony from Jann Wenner, the man

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

132

1  at the top, who said a reader would have to go read the

2  article to find out what we were walking away from and what we

3  weren't, inviting readers to go look at that article and read

4  it again.

5      And not a word about the testimony from Sean Woods who

6  said, it was a big news story when we issued this.

7      And not a word about the nearly half a million people

8  after the fact who went and did exactly what Jann Wenner said

9  would need to be done and validated what Sean Woods had said,

10  that this was a big news story.  Not a word about that.  It

11  was absolutely a republication on December 5th.

12      Mr. Sexton said, what was the motive for Jackie to make

13  this up?  It was so improbable that she would make up all

14  these stories and that sort of thing.

15      Well, I don't know what her motive was, and in some ways

16  we will never know.

17      But what Rolling Stone perceived about Jackie is right

18  there in the article.  They described her as

19  attention-starved.  And I think you can listen to the

20  audiotape, and you can see from the files that that's probably

21  spot on, that Jackie was attention-starved.

22      And when Ms. Erdely, Rolling Stone reporter, breezes into

23  town and wants to sit down with someone like that who's

24  attention-starved, it's like feeding crack to someone who is

25  desiring attention.  This is what Jackie was craving.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

133

1   That's why she wanted her name to be used.  That's why

2   she was okay with having Jackie, an abbreviation of her full

3   name, being used.

4   Now, if you look carefully at the reporting notes, which

5   they claim to have done, you see other things that support

6   this notion.  It wasn't just Jackie that had a bottle

7   incident.  It's right there in the article.  Emily Renda had

8   something thrown at her in a similar incident a while earlier.

9   In fact, you heard Jackie talk about how the bottle-throwing

10  incident occurred right on the way -- as she was on her way to

11  Emily's birthday party.

12  Did she copy her story from Emily in order to get some of

13  the attention that Emily got on campus as being an advocate?

14  I don't know.  But if I'm an investigative reporter for a

15  major magazine and I'm trying to evaluate the credibility and

16  motives of my source, that's a question I'm going to ask.

17  It's right there in the article they published that Emily

18  Renda had a bottle incident similar to it.  Never asked the

19  question.

20  Same thing about the tattoo.  We hear about the tattoo

21  defense, that she got the tattoo and that somehow means that

22  the story was all true.

23  Well, in the reporting file, you also hear that Alex

24  Pinkleton had a tattoo.  Jackie looked up to these girls.

25  She'd found a community of friends in this support group of

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

134

1   One Less, this group that doesn't judge, this group that

2   accepts and believes and supports and empowers.  She found

3   friends with these groups.  And if it meant copying a bottle

4   incident or getting a tattoo in order to fit in, in order to

5   be part of that group, these are questions that an

6   investigative journalist should be asking.

7       These are not questions, though, in terms of being

8   skeptical of Jackie, that Nicole Eramo was supposed to be

9   asking or the other litany of people that Mr. Sexton rattled

10  off - Rachel Soltis and her friends and Sara Surface and Alex

11  Pinkleton and all these other folks that he rattled off.  He's

12  got a better litany than I do of all the people that believed

13  Jackie.  These are all advocates.  These are all supporters.

14  These are all friends.

15      These are all people who did what friends are supposed to

16  do, which is believe and support and love and empower; not

17  question, not poke for criticisms, and not try to get to the

18  actual facts right.

19      These are people who are trying to help Jackie deal with

20  whatever it was that she was dealing with.  And Nicole was

21  right there at the front of the line trying to help Jackie.

22      And so the fact that Nicole believed Jackie, and the fact

23  that Emily Renda believed Jackie, and the fact that Rachel

24  Soltis believed Jackie, and all these other women, is

25  irrelevant.  They have a different job and a different role in

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

135

1    this drama than Sabrina and Rolling Stone.  These are

2    advocates and friends.

3        These are journalists sitting behind me.  It's a major

4    news organization that brags about the awards that it wins,

5    its hard-hitting reporting, and its fact-checking.  They have

6    a different role.  They're supposed to be skeptical.  They're

7    supposed to ask hard questions.  They're supposed to ferret

8    out inconsistencies.  That's what they're supposed to do.

9        So the fact that these other people believed and repeated

10   does not discharge them of their obligation to do their job.

11   Nicole did hers; these other advocates did theirs.  These

12   folks didn't do theirs.

13       We heard about a couple of things that aren't in the

14   article that I suppose are designed even today to try to make

15   Nicole look bad.

16       We heard about this WUVA interview creates a hostile

17   environment on campus.  It has nothing to do with Jackie,

18   which is what the article is about.  It's not referenced in

19   the article.  The whole story about how that was a student

20   project that got misrepresented to Nicole.  But putting all of

21   that aside, it has nothing to do with it.  The only reason for

22   bringing it up is that they're still attacking Nicole, and

23   they want you to think less of her as a result of that WUVA

24   article.

25       But don't be distracted from it.  It has nothing to do

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

136

1   with what they published about her on November 19th and

2   republished on December 5th.  Not referenced in the article at

3   all.  Has nothing to do with Jackie.

4      The same thing with these -- I can't remember what the

5   phrase is -- inappropriately candid communications with

6   students, "flat-out fucked" and "awesome bitches" comments.

7      Well, you know, Nicole is trying to build a relationship

8   with these young women.  She's in the dean of students office.

9   And when you're trying to relate to students, you have to

10  relate to students.

11     And these women became her friends.  They became her

12  babysitters in some cases.  They have nothing to do with the

13  issues that you're being asked to describe [sic].  There's no

14  jury instruction that will tell you that those issues are

15  relevant to any of the questions here, other than the fact

16  that they're still trying to run Nicole down to this day.

17     They say they've apologized.  They said they retracted.

18  But even as we sit here, this -- that's what's going on.

19     They make a big deal of the fact -- they try to make a

20  big deal of the fact that Nicole had several job changes after

21  the article came out, and they point to the last one in the

22  chain.  They say, oh, this came in 16 months after the article

23  came out.

24     Well, the testimony, which you will remember from Dean

25  Groves and from Nicole, it's a lot more complicated than that.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

137

1   The one thing that you will remember from what Nicole
2   testified to and what Dean Groves testified to was that the
3   day after the article came out, after Nicole pulled herself
4   out of her house, stopped crying long enough to go to the
5   office, she was told, gather your files and turn them over to
6   someone else.

7       These survivors that she had spent years and semesters
8   trying to build relationships with and getting them to the
9   point where they trusted her were all handed over to somebody
10  else.  And so it did a great disservice, I submit, not just to
11  Nicole but to all these other men and women that had been
12  working with her for all this time, that now start over with
13  somebody else.

14      But that was the day, the day after the article came out,
15  when she was -- said, bring your files to this meeting.  And
16  she testified, I thought I was going to be fired that day.

17      Thank God she wasn't.  Thank God that people like Dean
18  Groves and Pat Lampkin, who know Nicole, who know the real
19  Nicole, didn't fire her.

20      And of course they didn't change their opinion of her
21  based on the article.  Of course not.  They know her.  The
22  people that know Nicole and watched her work with survivors,
23  they know that's not her that was portrayed in the article,
24  and not portrayed with the thumbs up to survivors as shown in
25  the picture.  Of course it didn't change the way they thought

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

138

1   about it.

2       But they knew that that's not the way the world would

3   perceive Nicole and that that student trust that had been

4   built up over those many years was gone.  And so the day after

5   the article came out they said, give us your files.  And she

6   doesn't have them back today.

7       So no interim job changes have anything to do with the

8   fact that she lost her ability to do what she loved, which was

9   working with students.

10      Mr. Sexton brought up a point about a statement they

11  asked Jackie to sign.  UVa did.  Nicole had nothing to do with

12  that.  There's no evidence that she did.  There's nothing on

13  the e-mail that Nicole had anything to do with it.

14      As when -- after the story came out, Nicole was in full

15  lockdown mode.  She wasn't involved in dealing with Jackie

16  other than, as you've heard her testify to, she tried to

17  express through an intermediary concern about her well-being.

18  She wasn't trying to get Jackie to issue a statement.  Totally

19  irrelevant to the issues here.

20      I'm going to end on this note.  Mr. Sexton made a point

21  saying -- I think it was about Sabrina, but it may have been

22  about the larger group of folks behind me.  He said, they

23  didn't want to republish it, he says.  They want everyone to

24  forget it.  He wishes it never happened, the article.

25      I bet they do.  I bet they wish it never happened.

Eramo vs. Rolling Stone, et al. - 11/01/2016    Vol. 2

139

1    But they're the ones that did this.  They're the ones

2  that set this in motion.  They're the ones that hit "print"

3  and "send" and published this to a global audience.

4    Nicole did not have that choice.  The folks behind me had

5  the choice to publish or not publish, and they chose to do it.

6  Nicole did not have the luxury of making that decision, of

7  forgetting it.  She doesn't have the luxury of forgetting the

8  e-mails that she received calling her the dean of rape and a

9  despicable human being and hoping that she rots in hell.  She

10  does not have that luxury.

11    And that is why we need you ladies and gentlemen to enter

12  a verdict setting the record straight.

13    Thank you and good night.

14        (Closing arguments concluded at 6:05 p.m.)

15        THE COURT:  Ladies and gentlemen of the jury, this

16  concludes today's session of the trial.  In just a moment I'm

17  going to send you home for the evening.  But I want to say in

18  stronger words something I've said all along as you go home

19  each day of the case, and that is this:

20    Don't try to begin to deliberate overnight.  Don't think

21  about the case or how you view the evidence or how you weigh

22  the instructions that you've heard imparted from the attorneys

23  during the course of closing arguments.  It would be a

24  violation of your sworn duty as jurors to begin to deliberate

25  before the Court charged you to do so.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

140

1      I also tell you that I would be very disappointed if you

2   spoke to anyone at home about the case or read any account

3   about the case or listened to any broadcast about the case

4   until I tell you it's time to begin your deliberations and

5   collectively talk about the evidence and reach your verdict.

6      And there's a very practical reason for this.  I'm going

7   to charge you about the law first thing in the morning.  The

8   attorneys, with my permission, have shared portions of the

9   instructions with you during the course of their arguments.

10      But it would be wrong to single out any one instruction

11   as stating the law of the case.  It would be wrong to consider

12   the instructions individually.  They need to be considered in

13   tandem, at the same time, when all of you have a set of the

14   instructions, when I read them to you and you have a set to

15   take back with you to the jury room.

16      So it is for this very practical reason as well that I

17   tell you:  Don't think about the case tonight.  Don't begin to

18   deliberate.  Don't speak with anyone about the case.  Put it

19   out of your minds till you come back in the morning ready to

20   receive the Court's charge and shortly thereafter begin your

21   deliberations.

22      You folks are excused at this time.  Have a safe trip

23   home.

24           A JUROR:  What time do we come back in the morning?

25           THE COURT:  Oh.  That's the most important thing.

Eramo vs. Rolling Stone, et al. - 11/01/2016   Vol. 2

141

1          Let's begin at 9 in the morning if that suits everyone.

2               A JUROR:  9?

3               THE COURT:  9:00.  9 a.m.

4          Ask the marshal declare the Court adjourned for the day.

5               (Court adjourned for the day at 6:08 p.m.)

6                         *   *   *

7

8                      CERTIFICATE OF REPORTER

9

          I certify that the foregoing is a correct transcript of
10    the record of proceedings in the above-entitled matter.

11

12

13
     11/02/2016                  /s/   Lance A. Boardman, RDR, CRR
14

15

16

17

18

19

20

21

22

23

24

25