```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF VIRGINIA

 3              CHARLOTTESVILLE DIVISION

 4

 5    *****************************
      NICOLE P. ERAMO,           * CIVIL ACTION 3:15-CV-00023
 6                               * NOVEMBER 7, 2016
             Plaintiff,          * JURY TRIAL, Vol. 1
 7    vs.                        *
                                 *
 8    ROLLING STONE,LLC,         *
      SABRINA RUBIN ERDELY,      *
 9    WENNER MEDIA, LLC,         * Before:
                                 * HONORABLE GLEN E. CONRAD
10         Defendants.           * UNITED STATES DISTRICT JUDGE
                                 * WESTERN DISTRICT OF VIRGINIA
11    *****************************

12    APPEARANCES:

13    For the Plaintiff:    THOMAS ARTHUR CLARE, ESQUIRE
                            ELIZABETH MARIE LOCKE, ESQUIRE
14                          ANDREW CLAY PHILLIPS, ESQUIRE
                            JOSEPH R. OLIVERI, ESQUIRE
15                          Clare Locke, LLP
                            902 Prince Street
16                          Alexandria, VA  22314

17
      For the Defendants:   ELIZABETH ANNE McNAMARA, ESQUIRE
18                          ALISON SCHARY, ESQUIRE
                            SAMUEL M. BAYARD, ESQUIRE
19                          Davis Wright Tremaine, LLP
                            1251 Avenue of the Americas, 21st Flr.
20                          New York, NY  10020

21

22    Court Reporter:  JoRita B. Meyer, RPR, RMR, CRR
                       210 Franklin Road, S.W.
23                     Roanoke, Virginia  24011
                       540.857.5100, Ext. 5311
24
              Proceedings recorded by mechanical stenography;
25     transcript produced by computer.
```

1    APPEARANCES (Continued):

2    For the Defendants:      W. DAVID PAXTON, ESQUIRE
                              J. SCOTT SEXTON, ESQUIRE
3                             MICHAEL FINNEY, ESQUIRE
                              ANTHONY RUSSELL, ESQUIRE
4                             Gentry Locke Rakes & Moore
                              P. O. Box 40013
5                             Roanoke, VA  24022

6    ///

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      CONTENTS

 2                                        PAGE

 3   OPENING STATEMENT OF PLAINTIFF:      27

 4   OPENING STATEMENT OF DEFENDANTS:     34

 5

 6                    EXAMINATION

 7   ON BEHALF OF PLAINTIFF:

 8   WITNESS:  NICOLE P. ERAMO

 9     DIRECT EXAMINATION               PAGE

10     By Mr. Clare........................45

11     CROSS-EXAMINATION

12     By Mr. Paxton......................119

13   WITNESS:  JANN WENNER, by video.........148

14   WITNESS:  MICHAEL PROVUS, by video......148

15   WITNESS:  KANT LIN, M.D.

16     DIRECT EXAMINATION

17     By Ms. Locke.......................149

18     CROSS-EXAMINATION

19     By Mr. Russell.....................159

20     REDIRECT EXAMINATION

21     By Ms. Locke.......................188

22   ///

23

24

25
```

```
 1                        EXHIBITS

 2   PLAINTIFF'S DAMAGES EXHIBITS

 3                                        ADMITTED

 4   D199 through D207......................65

 5   D208 through D210.....................148

 6   D211 through D213.....................149

 7

 8   DEFENDANTS' DAMAGES EXHIBITS        ADMITTED

 9   D89.................................121

10   D90.................................124

11   D91.................................125

12   D92.................................127

13   D93.................................132

14   D94.................................134

15   D95.................................142

16   ///

17

18

19

20

21

22

23

24

25
```

1    (7:34 a.m.)

2              THE COURT:  Good morning, everyone.  Welcome.

3              I'll ask Ms. Moody to announce the style of this

4    week's first case.

5              MS. MOODY:  Nicole P. Eramo versus Rolling Stone and

6    others, Civil Action 3:15-CV-23, for day 17 of the jury trial,

7    motions first.

8              THE COURT:  Did you say day --

9              MS. MOODY:  17.

10             THE COURT:  17.  I was afraid that's what you said.

11             I understand that there are a few matters to be

12   taken up before we begin the damages phase of the trial of

13   this case.

14             MR. PAXTON:  Yes, Your Honor.

15             THE COURT:  Do you wish to speak?

16             MR. PAXTON:  I'm going to let some other people

17   speak.  Mr. Finney is going to speak.

18             MR. FINNEY:  Good morning, Your Honor.

19             THE COURT:  Good morning.

20             MR. FINNEY:  I'll address the motion regarding the

21   OCR report, and then Ms. Schary will be addressing the

22   third-party harm.  I know time is short this morning, so I'll

23   try to be brief.

24             There's been a lot of discussion today about the OCR

25   report, its relevance and its admissibility.  The Court has

 1   indicated on multiple occasions it believed that the OCR

 2   report must be viewed in a different light than damages.  And

 3   sort of pending this decision, we believe it's important for

 4   this to be addressed on the front end before opening, before

 5   evidence, largely because we already know what the claims will

 6   be going forward.

 7            It's clear from the liability phase that plaintiff

 8   is seeking damages for harm to her reputation as well as her

 9   professional standing beyond the OCR report's issuance date,

10   which is September 21, 2015.

11            She testified extensively about her reassignment in

12   the dean's office, which occurred on March 1st, 2016, although

13   the decision was made in November 2015.

14            Dean Groves also testified about Ms. Eramo's loss of

15   the dean title.  Ms. Eramo testified how important that job,

16   that role, was to her.

17            And plaintiff has made no representation in her

18   opposition brief that she does not seek damages to reputation

19   and professional standing after the OCR report.  So it's clear

20   that those are damages claims in this case.

21            And the reason the OCR report is incredibly relevant

22   at damages is because it makes specific negative findings and

23   statements with respect to Ms. Eramo in her role as the chair

24   of the sexual misconduct board.

25            These are findings from the United States Department

1  of Education Office of Civil Rights, the governing agency that

2  provides oversight for Title IX issues and Title IX

3  compliance.  It's a matter of public record.  It's publicly

4  available on the Department of Education website.

5          These matters were also widely reported after

6  September 2001, 2015.

7          Dean Groves testified about how it entered the

8  public domain at that time, including the negative findings

9  about Ms. Eramo.

10          We also attached the Washington Post article as

11  Exhibit 2 to our motion, which reported on the OCR report

12  findings; and then critically, it also had an entire section

13  devoted to findings with respect to Ms. Eramo that were made.

14          The OCR report's findings and statements are

15  unquestionably relevant to Ms. Eramo's damage claims, her

16  claim for damage to her professional reputation and standing

17  going forward.

18          This is precisely the type of intervening and

19  superseding cause the jury will be instructed about when

20  evaluating whether Ms. Eramo has met her burden of proving

21  damages that was proximally caused by the statements still at

22  issue rather than some other cause.

23          The jury needs to be able to consider this evidence

24  in the formal damages phase.  And you don't have to take our

25  word for the impact.  Ms. Eramo recognized after the OCR

1    report was issued that it was going to have impact on her job.

2            She tested Emily Renda on October 1st, ten days

3    after the report, and said that, quote, "I'm still seething

4    over the OCR findings letter, but I will survive, but I'm

5    likely to get pulled from Title IX work permanently.  Please

6    do not tell others yet."

7            That's on page 4 of defense 59.

8            On the next page, Ms. Eramo also told Ms. Renda that

9    UVa is, quote, "just wanting to move forward, which is good,

10   just not great for me personally."

11           As noted, Ms. Eramo testified that the decision to

12   reassign her from the dean's office was made in

13   mid-November 2015, just weeks after the OCR report, a year

14   after the article.  It would be highly prejudicial to the

15   defendants to not allow the jury to hear this on damages.

16           With respect to plaintiff's opposition brief, it

17   really proves the point as to the admissibility of relevance

18   on damages.  First off, a couple of things not said, you know,

19   not limiting their claim to before September 21, 2015, and

20   also if you do a search of the opposition, you won't find the

21   word "reputation," or any derivation, you won't find

22   "professional standing."

23           It pretty much ignores the opposition, and the

24   specific reasons detail why the OCR report is relevant to

25   Ms. Eramo's damages claim.  Instead, it focuses on issues that

1   were relevant during liability, but not focus on damages.

2           It talks about Jackie's case, about not putting

3   UVa's policies on trial.  This is not about the defendants'

4   substantial truth defense.  This is not about how plaintiff

5   claims that defendants may have defamed her.  Instead, it's

6   about plaintiff's damage claim and what's relevant to that

7   issue.

8           And in short, plaintiff has no response as to the

9   relevance.

10          There is a section devoted to rehashing some of the

11  803 arguments from plaintiff's motion in limine.  I know the

12  Court's ruling, or I believe the Court's ruling on the

13  liability phase, was grounded more on Rule 403, relevance for

14  its prejudice.

15          If you would like, I could go through our response

16  which was detailed in our prior opposition; but if not, I will

17  stop here then.

18          Thank you.

19          MS. LOCKE:  I'll hobble up here, Your Honor.

20          Good morning, Your Honor.  Libby Locke on behalf of

21  Nicole Eramo.

22          Your Honor, we have been down this road before.  We

23  addressed this matter in chambers with Your Honor and so we're

24  a little surprised to see a motion filed again readdressing

25  Your Honor's prior ruling.

1    In the liability phase, Your Honor had ruled that

2  the fact of the OCR report could come in but not the document

3  itself.  We think that that is a reasonable approach here on

4  damages.

5    Here the report is laden with all the same problems

6  that were present in the liability phase.  It's laden with

7  hearsay.  It is laden with other cases beyond Jackie's.  We're

8  not even sure that Jackie's case is referenced in the report.

9    And I think what is good for the goose should be

10  good for the gander, Your Honor.

11    We here in the damages phase are limited to talking

12  about the specific harm of the statements in the article, yet

13  Rolling Stone wants to introduce the entirety of the OCR

14  report and not limit it to statements about Ms. Eramo in that

15  report.  And I think that that's just --

16    THE COURT:  So are you okay with that?  Are you

17  satisfied with the jury viewing those portions of the report

18  that deal with Ms. Eramo?

19    MS. LOCKE:  I'm satisfied with the fact of those

20  coming in, just as they did in the liability phase.  We have

21  no problem with Ms. Eramo being questioned on that fact.  But

22  the actual document itself, that's where we drawn the line.

23  And we think that was appropriate during the liability; it was

24  a reasonable approach.  We stand on our objection to the

25  entirety of it coming in.  I don't want to waive that

1   objection, Your Honor, but we think that's the proper line to

2   be drawn here as well.

3          The -- you know, there's just no reason why -- if we

4   are limited to the statements at issue in the article, why

5   defendants should be able to bring in the entirety of the OCR

6   report.  It's clearly irrelevant to Ms. Eramo and damages.  It

7   relates entirely to UVa, and it would be entirely prejudicial

8   to plaintiff.

9          THE COURT:  Okay.  All right.  Mr. Finney, let's be

10  quick about it.

11         MR. FINNEY:  Yes, Your Honor.

12         There is no double standard here.  The plaintiff

13  needs to prove that the specific statements caused her harm.

14  To the extent anything else in the world could cause harm to

15  her reputation and professional standing, that becomes

16  relevant in the damages phase.

17         I believe Your Honor might have been indicating

18  where the full report did not need to be entered, but only the

19  pages that make specific reference to Ms. Eramo.

20         We don't believe that's a workable solution in this

21  case because those statements need to be put in context and,

22  including, there's a number of acronyms and definitions and

23  phrases that just won't make sense without the context of the

24  full report.

25         The Court has offered a number of limiting

1  instructions for evidence throughout this case.  We believe

2  that would be the appropriate way to handle this situation

3  where the statements regarding Ms. Eramo, in her role as the

4  chair of the SMB, that should be the jury's focus.  But to the

5  extent they need to understand how to put it in context, what

6  terms mean, that's the only relevance, really, of the rest of

7  it.

8       MS. LOCKE:  Your Honor, the same context arguments

9  apply to the article.  We're not able to put in -- talk about

10 the illustration and talk about other aspects of the article

11 to put them in context.  The same argument applies to the OCR

12 report.

13      The facts of these specific instances relating to

14 Ms. Eramo, I think, are fair game for purposes of the fact of

15 them, but not the entire document.  And the context argument

16 cuts both ways.

17      MR. FINNEY:  Again, this is not one way or the

18 other.  It's a different situation.  They have the burden of

19 proving their damages from their claims.  And I believe the

20 ruling is that other -- the jury is not going to have to

21 forget what it knew about the context of the article, you

22 know, in determining the damage caused by the specific

23 statements.  It's just that the damages must flow from the

24 specific statements.

25      Here again, it's the anything else that could have

1   affected her standing or reputation should be relevant in this

2   case, and the OCR report is a very significant document.

3           THE COURT:  Okay.  All right.  Well, the Court did

4   make a distinction about the OCR report when it was discussed

5   very early in these proceedings and I did say, at least to the

6   best of my recollection, that the report was relevant on the

7   timeline in the liability phase but that it shouldn't be

8   admitted during that portion of the trial.  But I think I said

9   that it would have some bearing on damages, and I stand by

10  that.

11          It seems to me that Ms. Eramo has put her reputation

12  at issue.  She's extended the timeline by virtue of what she

13  said during the liability phase of the case -- I had it

14  printed up -- when she talked about the harm that she

15  suffered, the loss of her ability to work with students, the

16  loss of her title of dean.  All of that extended the timeline

17  in terms of the relevance of the report.

18          So I think clearly the portions of the report that

19  deal with Ms. Eramo are relevant and admissible, and the Court

20  so rules.

21          I'm not sure about how much of the report should

22  come in.  I haven't read the whole report since many weeks

23  before this trial, but I didn't think that there was that much

24  problem in understanding what was being said in the portion of

25  the report that dealt just with Ms. Eramo and the many hats

1    that she wore as dean supervising sexual assault claims.  I

2    thought it was pretty straightforward.

3            So I would be inclined to say that in terms of what

4    will be admitted -- and I think it's self-authenticating, by

5    the way -- we can limit it just to that portion of the report

6    that deals with Ms. Eramo.

7            I think a lot of that, though, depends on the

8    evidence that's adduced during the damage phase.  If, for

9    example, the dean, Dean Groves, comes in and has more to say

10   about the report than just that portion dealing with

11   Ms. Eramo, then it's possible that it comes in as impeachment,

12   the entire report.

13           But in terms of what can be admitted, what is

14   self-authenticating, what can be -- the jury can consider as

15   regards Ms. Eramo's claim for damages, it seems to me that it

16   should be limited to that portion of the report that discusses

17   her, again with an instruction that puts the whole thing in

18   context.  That's the ruling.

19           What's the second issue?

20           MS. SCHARY:  Your Honor, the second issue is our

21   motion in limine to exclude evidence related to third-party

22   harm.

23           THE COURT:  Yes, ma'am.

24           MS. SCHARY:  And I will be very brief.

25           Thank you, Your Honor.  Our motion that we filed

1    this weekend was prompted by plaintiff's inclusion,

2    specifically prompted by plaintiff's inclusion of Dean Groves

3    as a damage witness, which we learned Friday in chambers.

4              As the proposed instructions that Your Honor has

5    circulated address, the jury may award damages, obviously,

6    only for the loss that plaintiff herself has endured.  The

7    jury may not consider harm to others close to her, including

8    UVa and its administration and students; as to damages, she

9    may recover for her losses only.

10             In their opposition brief, I know that plaintiff has

11   taken issue with our motion.

12             The way we see it, there are really four buckets of

13   testimony here.

14             We have testimony by the plaintiff about her own

15   emotional distress; we have no objection to that.

16             There's testimony by third parties about their

17   observations of Ms. Eramo being distressed; and they can

18   testify to what they observed in her demeanor at work, at

19   home.  We don't have an objection to that, obviously, subject

20   to other evidentiary considerations.

21             The third bucket would be third parties testifying

22   about harm to themselves, and that is the first one that we

23   start to have an issue with.

24             In particular -- and this is why we filed this

25   motion when Dean Groves was disclosed as a damages witness --

1    at his deposition, Dean Groves talked at length about the harm

2    to him personally by the article.

3           We think that testimony to that effect should not be

4    admissible in the damages phase since UVa is not allowed to

5    recover for its harm.  And Dean Groves would be testifying,

6    obviously, not as the plaintiff in this case.

7           Similarly, we think that the plaintiff's husband

8    should not be permitted to testify about his own personal

9    harm.  While he, of course, can testify to observations of the

10   plaintiff's harm, we think that testimony by third parties

11   about their own suffering should not be permitted at this

12   phase.

13          And the fourth bucket of testimony is third

14   parties -- this is the one that's most attenuated -- third

15   parties testifying about their observations of the effect of

16   this article on other third parties.  And in particular, the

17   one that we have the most issue with here again goes to Dean

18   Groves.

19          In plaintiff's opposition, they talked about how

20   they intend that Dean Groves will talk about the adverse

21   effect and distrust defendants' defamatory statements caused

22   among the survivors to whom Ms. Eramo had dedicated her entire

23   professional life.

24          We think it is improper for Dean Groves to be

25   testifying on what would essentially be speculation and

1    hearsay about the responses of third parties; his observations

2    of third parties who are not going to be called in as

3    witnesses and cross-examined in this case.

4            And while Dean Groves may testify to Ms. Eramo's --

5    his own observations of Ms. Eramo's harm, we think it is

6    improper for him to, through the back door, pull in the effect

7    on the dean of students office as a whole, the university as a

8    whole, unnamed survivors, who we would not have the

9    opportunity to cross-examine.

10           And I would note that, of course, as we have seen in

11   this case, many of those survivors wrote in actually

12   supporting Dean Eramo in their open letter in the Cavalier

13   Daily.

14           So those are kind of the four buckets there.  We see

15   the first two as non-problematic, and I think the plaintiff

16   agrees on that.  But the second two are the ones that we

17   wanted to bring before Your Honor.  And we're doing this in

18   the interest of efficiency, knowing that we want to get

19   through this testimony as quickly as possible and not have to

20   waste time on objections.

21           THE COURT:  Yes, ma'am.

22           MS. LOCKE:  Thank you, Your Honor.

23           So putting this in context of the four buckets that

24   defendants just raised, the third bucket was third-party harm

25   to a third party themself.  And then the fourth bucket was

 1   third-party harm to other third parties.

 2           Let's be clear.  We understand that the harm to

 3   third parties is not on trial here and is not what's at issue

 4   for damages.  But to the extent that Ms. Eramo observed harm

 5   to other third parties and that impacted herself, that would

 6   be fair game.

 7           So, for example, if she observed in her familial

 8   setting, you know, the distress that it caused her family,

 9   that is distress to her and that should be entirely fair game.

10   So that kind of goes to the third party and third-party

11   bucket.

12           With respect to Dean Groves, let me just -- where

13   there are two parties who suffer the same kind of harm, we

14   think it is entirely appropriate for there to be a benchmark.

15   For example, Dean Groves says, I suffered the same kind of

16   harm and I observed Dean Eramo suffering that same kind of

17   harm, and I can relate to it, I can understand it, precisely

18   because I felt that same kind of effect, but hers was ten

19   times worse, something to that effect, we think that that is

20   entirely appropriate where two parties suffered the same kind

21   of harm from the same distinct set of facts and he's able to

22   testify to her harm.

23           And we would have no problem with a limiting

24   instruction because we understand that his harm is not what's

25   at issue here; but for him to be able to relate to what she

1   suffered, we think is entirely fair game.

2           With respect to the other third-party survivors,

3   again, if Nicole is observing harm to survivors that she

4   worked with as a result of the article, that's harm that she

5   suffered.

6           And Dean Groves can testify to that because it is

7   his job responsibility to observe.  And as her supervisor and

8   boss, it is his job responsibility to observe her job

9   performance in that role, and we think that's entirely fair

10  game.

11          THE COURT:  Yes, ma'am.

12          Anything else to be said about it, Ms. Schary?

13          MS. SCHARY:  Very, very brief.

14          I'll take these in order.  With respect to Dean

15  Groves acting as some sort of benchmark, we think that's an

16  improper use of Dean Groves as a damages expert.  Plaintiff

17  has not designated a damages expert.

18          THE COURT:  He's not a damages expert.

19          MS. SCHARY:  Right.  Just to talk about, you know,

20  this is how it feels to me and, therefore, I'm going to

21  extrapolate that this is how it feels to her.

22          Nicole, Ms. Eramo, can testify, obviously, how it

23  feels to her, and having a third party testify that he was

24  defamed by this article, when that is not a claim in this

25  case, he's not a plaintiff in this case, we have not proven

1   that to liability, I think it would be highly improper and

2   prejudicial and basically trying to assert to the jury that

3   there's more than one victim here; they should award damages

4   to Ms. Eramo as a vessel for multiple victims.  That's number

5   one.

6           And as to Ms. Locke's point, you know, that Dean

7   Groves can testify to the harm of survivors, you know, if

8   Ms. Eramo has knowledge of actual harm that she observed --

9   she is going to be testifying -- she can testify to that.

10          What we think is improper is to use Dean Groves to

11  testify about essentially third-party conversations that he is

12  having with unnamed witnesses who are not going to be present

13  in court and cross-examined.  We think that is classic hearsay

14  and that his testimony would be undoubtedly built upon hearsay

15  and built upon speculation, and there would be no way to

16  effectively cross-examine that and subject that to pressure

17  testing.

18          So those would be our objections to the points

19  raised by Ms. Locke.

20          THE COURT:  I don't see too much disagreement.  The

21  Court ruled over the weekend in response to one of the motions

22  in limine that we would deal with issues of third-party input

23  on a question-by-question basis, and I stand by that.

24          But just by way of general guidelines, I pretty much

25  agree with what Ms. Schary has said, especially as to the

1   first two categories.  There's no real dispute on the first

2   two buckets, as you put it.

3           And, really, as to the third bucket, really there's

4   no dispute about that either.  I don't think that Dean Groves

5   can come in and say, this situation wasn't handled as well as

6   it could have been handled if Nicole had been here.

7   Obviously, that's not damage that she suffered.

8           And to the extent that he might offer the opinion

9   that our system of adjudication of these matters suffered

10  because Nicole was not here, that's off limits as well.

11          The third bucket, the third category, is the one

12  that presents cause for individual consideration of the

13  questions.  I think that, for example, Ms. Eramo's husband

14  could come in and testify about how this whole episode in

15  their lives has impacted their lives together and their

16  relationship with others, their relationship with their child.

17  All of that is typically within the realm of damages in a

18  Virginia defamation action, and I think it would be here as

19  well.

20          Now, there's a closer question about Dean Groves.

21  But generally, I agree with the proposition that he can't

22  testify as to the impact that the system or other survivors or

23  the adjudication of these claims experienced as a result

24  Nicole's reassignment.  I agree with that.

25          So again, I think we'll take those up on a

 1  question-by-question basis.

 2          MS. SCHARY:  Thank you, Your Honor.

 3          May I just ask for a point of clarification?  I

 4  think the only one that might not have been covered by that

 5  was about Dean Groves' ability to testify how the article

 6  impacted him and, therefore, it was ten times worse for

 7  Ms. Eramo.

 8          THE COURT:  I agree that he can't testify as to the

 9  impact that it had on him.  I'm not sure that they would want

10  to contrast Dean Groves with Dean Eramo.  Her harm has been

11  much, much greater than his.  But to the extent -- I think it

12  was covered when I said, to the extent that he believes that

13  his job was made more difficult or the system didn't work as

14  well, or that the adjudication of these matters wasn't dealt

15  with as fairly because of Dean Eramo's absence, that's not

16  proper testimony.  That's not a proper element of damage in

17  this case.

18          MS. SCHARY:  Thank you, Your Honor.

19          THE COURT:  Now -- you're standing up, Mr. Finney.

20  Did you have something else?  You submitted a proposed

21  instruction over the weekend.  I think Mr. Clare responded

22  that they had no difficulty with the exception of the phrase

23  "hold defendants accountable."  And it seems that was a pretty

24  good -- pretty good resolution of that issue.

25          MR. FINNEY:  Again, I think we don't have an

1    objection to the objection, so to speak, and I believe

2    Mr. Clare's e-mail was that it could be ambiguous,

3    particularly in that context, it could confuse the jury; and

4    that seemed fair to us.

5          THE COURT:  But the rest of it gets the point across

6    that you need to make?

7          MR. FINNEY:  Yes.  But I would like to raise one

8    additional point.

9          Our motion in limine with respect to punitive

10    damages type evidence did list as a specific statement that

11    plaintiff should not be able to try and elicit, with testimony

12    or argument, the idea of holding defendants accountable.  And

13    I just wanted to make sure that that ruling -- the Court has

14    granted that motion -- is still in play.  And I think that's

15    fair, because if there's ambiguity about whether that is a

16    punitive type idea or something else, I understand why it

17    shouldn't be in a jury instruction; but I also believe, as the

18    Court had ruled, that that shouldn't be something to be argued

19    or elicited.

20          THE COURT:  Depending on how it comes out.  If

21    counsel comes and says, We've got to make these guys pay,

22    that's not part of the case now.

23          MR. FINNEY:  Absolutely.

24          THE COURT:  If they come in and says, We have to

25    make Nicole whole for her loss, the defendants are responsible

 1    for that, that's okay.

 2              MR. FINNEY:  Absolutely.  It's the hold accountable

 3    aspect.

 4              THE COURT:  I agree.  I don't think Ms. Clare or

 5    Ms. Locke --

 6              MR. FINNEY:  No, no.  Yeah, I just wanted to make

 7    that clear.

 8              THE COURT:  All right.

 9              MR. FINNEY:  Thank you.

10              THE COURT:  Let me add one more thing before we

11    bring the jury back.  I went over the instructions again, and

12    we'll still have our charge conference on the record during

13    the lunch recess, but in the meantime, I think that we need to

14    add some paragraph -- I believe I have it designated for page

15    3 of the instructions -- to explain the verdict form.  We

16    failed to do that.

17              We failed to explain the transition that the jury

18    will be expected to make between Ms. Erdely and Rolling Stone

19    and Wenner Media.

20              So we've gotten up something.  I'll have Christina

21    circulate it.  But if the parties have suggestions as to an

22    explanation to the jury as to the progression that the verdict

23    form contemplates, then I'll be happy to receive that.

24              Are there any other matters we need to take up

25    before the jury returns?

1          Let me ask if counsel could limit themselves to
2   about 20 minutes for opening statement.  I very much want to
3   get this phase of the case completed today, because I want
4   people to be able to go home and vote tomorrow.  So I'm
5   committed to getting the damage phase of the case tried today,
6   regardless of how long we have to stay tonight.  Okay?
7          Let's have the jury back in.
8   (Jury in, 8:01 a.m.)
9          THE COURT:  Everyone may be seated.  I count all ten
10  of our jurors back.
11         I'm afraid to say it, but Ms. Moody announced this
12  as day 17 of this trial.  It is day 17.  And I would
13  anticipate that this would be the last day.
14         All ten jurors are back in their places, ready to
15  proceed with the damage phase of this trial.
16         Ladies and gentlemen, I have a few short
17  instructions to give you, about a page worth of instructions,
18  to introduce this phase of the trial.
19         The procedure will be much the same as we
20  experienced before.  Following the Court's opening charge,
21  counsel will present opening statements; we'll proceed to
22  evidence on damages; then the parties will make closing
23  statements; the Court will instruct you as to the law; and you
24  will deliberate then on the damages that are due in this case.
25  The procedure is the same as before.

1          So, given your verdict in what we call the liability

2    phase of plaintiff's case, it becomes necessary for you to

3    consider the issue of damages due plaintiff.  Thus, we will

4    now conduct a second trial in what is considered to be the

5    damages phase of this proceeding.

6          The original instructions that I gave you remain the

7    same, and I do not consider it necessary to repeat all those

8    instructions.  Again, all the things that I told you at the

9    outset of the trial remain in effect, including the procedures

10   we will follow during the damages phase and the evidentiary

11   rules that we will apply.

12         Keep in mind several of those rules that the Court

13   instructed you about at the beginning and the conclusion of

14   the liability phase:  The things that are not to be considered

15   as part of the evidence; the difference in direct and

16   circumstantial evidence; the assessment that you make of

17   witnesses' credibility, you and you alone make that

18   assessment; it's the plaintiff's burden to prove elements of

19   her claim for damages by a preponderance of the evidence.  All

20   these -- all these circumstances remain in play.

21         Also, I tell you that all of the rules regarding

22   your conduct as jurors remain the same.  All the same

23   responsibilities and obligations you owe the Court and the

24   parties about maintaining secrecy and not having contact with

25   outside sources about this damages phase.

1    Finally, I tell you that in addressing the issues

2 now before you, you shall consider all the evidence already

3 admitted in the case as well as any new evidence admitted as

4 regards the new issues now before you.

5    So with those introductory comments, we're ready for

6 the opening statements of counsel in the damages phase.  As

7 was true in the liability phase, the plaintiff has the

8 opportunity to make the first opening statement.

9    So, Mr. Clare, you may proceed.

10    MR. CLARE:  Thank you, Your Honor.

11    May it please the Court, ladies and gentlemen, at

12 the outset, Nicole and I think thank you for your verdict on

13 Friday, the time that you've invested in hearing the evidence

14 thus far -- it's a lot longer than any of us anticipated --

15 and we very much appreciate the conscientious deliberations

16 that produced that verdict on Friday.

17    We have studied your verdict over the weekend very

18 carefully.  It obviously reflects a great deal of attention to

19 the evidence that has already been put in.  We don't intend to

20 repeat that evidence during this phase of the trial.

21    It also reflects a straightforward application of

22 the law that the judge instructed you on.  And we thank you

23 for all of that hard work, and we thank you for your patience

24 and continued attention during this hopefully last day of the

25 final phase of evidence and the final phase relating to the

1    damages that Nicole has suffered.  We hope to put this issue

2    in your hands at the end of the day today.

3          It's always, always uncomfortable to talk about

4    money.  It's no different in a federal court proceeding.  In

5    some ways, no amount of money can erase false and defamatory

6    statements that were made about you on the internet or erase

7    them from the public consciousness or undo emotions, emotional

8    trauma that they caused, or reputational harm, or no amount of

9    money can take Nicole back to the days before the article and

10   these other statements were published, to the life and career

11   that she had before they were made.

12         The task that we all have today is made even more

13   difficult because of the nature of defamation and the harm

14   that it creates, harm to reputation and its emotional

15   distress.  These are things that are not readily measured with

16   invoices, estimates, and paystubs and receipts.  We don't have

17   a lot of that to show you.  It makes your job and our job that

18   much more difficult to try to quantify it.

19         The harm that we intend to prove, the harm to

20   Nicole's reputation, reputation as a person, reputation as a

21   careful and caring administrator, the harm to her in terms of

22   the emotional distress and trauma that she experienced as a

23   result of these defamatory statements, and the loss of

24   standing that she has in her chosen profession, the one she

25   has worked so hard for, money brings none of it back.  None of

1    those things will come back.  But money and monetary damages

2    and the categories that the judge will instruct you on is the

3    only remedy the Court system can provide in such an proceeding

4    like this.

5            The Court can't issue an order undoing the

6    publication or undoing the impact on her life.  Instead, all

7    we can do is ask you for a judgment that will compensate

8    Nicole for the harm that she suffered from the statements that

9    you have found to be false and defamatory and made with actual

10   malice.  And so it will be up to you, guided by the

11   instructions the Court will give you at the end, to attempt to

12   put a value on those injuries.

13           Now, the judge will instruct you on the law at the

14   end.  And the law governs compensatory damages.  These are

15   damages that are designed to compensate Nicole for the

16   injuries that she's suffered and to restore her, as much as

17   money ever can, to the position she would have been in had the

18   defendants not published any of these false and defamatory

19   statements that you found with your verdict.

20           The judge will instruct you -- and I'm going to

21   preview with you now so you can listen to the evidence with

22   these instructions in mind -- that you may award damages to

23   Nicole in several different categories of damages.

24           The first is the insult that these words had to

25   Nicole.  And that insult includes any pain, embarrassment,

1    humiliation, or mental suffering that she experienced as a

2    result of their publication.

3          You may also award her damages in another category:

4    Injury to Nicole's reputation, including injury to her

5    professional prospects.

6          We're going to talk about all those categories

7    today.  You're going to hear directly from Nicole about the

8    insult and the pain and the mental suffering that she

9    experienced.  You're going to hear from her husband.  You're

10   going to hear about the reputational harm that she has

11   suffered from those same folks, but also from the folks she

12   worked with, people that knew her before and after the

13   article.

14         And in determining the amount of damages in these

15   categories, the judge will tell you that you can take into

16   consideration all of the circumstances surrounding the

17   statements that you have found the defendants liable for.

18         That means that you can consider the occasion on

19   which they were made and, very importantly for this case, the

20   extent of their publication, how broadly these statements were

21   disseminated, the reach that they had into the world, the

22   nature and character of the insult, how egregious the

23   statements were, how egregious they would be to be made about

24   someone in Nicole's position.

25         You can consider the probable effect on those who

1  heard the statements.  That means that you're allowed to use

2  your common sense and judge the character of the statements

3  and what the probable effect statements like that would have

4  on people who heard them and reading them, and their natural

5  and probable effect on Nicole's personal feelings and upon her

6  own standing in the community, how they impacted her directly.

7         And I'll show you these instructions again at the

8  conclusion of the trial; but for purposes of listening to the

9  evidence, it's useful to have that.

10        As the judge just instructed you, you're entitled to

11 consider all of the evidence from the first stage of the case

12 as they relate to these issues and as they relate to the

13 statements that you have already found the defendants to be

14 responsible for.

15        So we've made a great effort to try to streamline

16 our presentation as much as possible.  You'll hear additional

17 testimony today from these witnesses specifically relating to

18 the issue of damages.

19        We'll call Nicole herself, who will testify about

20 the impact that these statements have had on her life and the

21 circumstances that she faced in her life at the time they were

22 published.

23        We're going to call Dean Allen Groves back to the

24 stand, who was her supervisor at the University of Virginia at

25 the time these statements were published and who had worked

1    with Nicole for a long time and had an opportunity to observe

2    Nicole in the performance of her job both before and after

3    these false statements were published.

4           We also will put a deposition video from two Rolling

5    Stone witnesses -- actually, three Rolling Stone witnesses.

6    Michael Provus and Allen Ling, this testimony will relate to

7    the extent of the publication, some of the metrics of how

8    broadly the article, the print edition of the article, was

9    disseminated, how many people saw the article, how many people

10   it was sent to, and the same for the online version of the

11   publication.

12          You'll also hear again from Mr. Wenner about certain

13   issues related to publication.

14          You'll hear from a physician, Dr. Lin, who is one of

15   Nicole's doctors, about his observation.

16          Finally, you'll hear from Nicole's husband, Kirt von

17   Daacke, who obviously is in a very close position to be able

18   to observe Nicole, his wife and best friend, before and after

19   the publication of these statements.

20          So with these thoughts in mind, I'd ask you to keep

21   in mind these three things as you listen to the evidence:  The

22   character of the defamatory statements.  Suppressing a brutal

23   gang rape, discouraging a young victim from moving forward, is

24   just about one of the worst things that you can say about a

25   person, especially someone who is in Nicole's position, who

1    has dedicated her career to helping survivors.

2           I'd ask you to keep in mind the reach of the false

3    statements.  We expect the evidence will show that "A Rape on

4    Campus," the print edition, reached 14.3 million people, the

5    first publication that you found, and that includes print and

6    online and digital.  And then an additional 425,000 people in

7    the December 5th republication that you found with your

8    verdict.

9           The reach of Ms. Erdely's statements on The Brian

10   Lehrer Show, broadcast live to the New York City metropolitan

11   area and into New Jersey, where Nicole has family, and

12   published on the internet along with the Slate podcast.

13          And Ms. Erdely's statement to the Washington Post, a

14   paper with significant importance in this region where she

15   lives and works.

16          Finally, I'd ask you to keep in mind the vulnerable

17   state that Nicole was in when these false statements were

18   published and the depth of the emotional trauma that she

19   suffered as a result.

20          At the end of this phase, Nicole and I will ask you

21   to return a verdict awarding damages for these harms that

22   they've suffered.  It will largely be left up to you.

23          Thank you again for giving me your attention this

24   morning and for giving, continuing to give, Nicole's case the

25   attention that you have so far.

 1          Thank you so much.

 2          THE COURT:  Mr. Paxton.

 3          MR. PAXTON:  Thank you, Your Honor.

 4          Ladies and gentlemen, there are times when tough

 5   words need to be spoken and people who have made errors need

 6   to hear that judgment.  Friday afternoon was one of those

 7   times for us.

 8          As we listened to Ms. Moody read your verdicts, we

 9   were heartbroken that you decided that in some of those

10   statements that were made we acted with actual malice.

11          But we thought about it, like Mr. Clare said, over

12   the weekend, and your verdict was incredibly well thought out.

13   We were just struck at how careful you guys had been in terms

14   of really looking at the evidence, applying Judge Conrad's

15   instructions.  It was apparent to us that you had taken this

16   responsibility that's entrusted to jurors to bring their

17   common sense and to really listen to the evidence and make a

18   decision that's the right decision.

19          I think you had 12 days of testimony, 286 exhibits.

20   This was not an emotional decision on your part.  I'm sure

21   there were points that it got emotional.  You couldn't be

22   cooped up in a room together for as long as you were without

23   there being some emotions.

24          But this was tough medicine to receive, and we want

25   you to know that it was heard.  We respect your verdict.  We

1    accept the decision that you made in reaching the conclusion

2    that some of the statements that were made were made with

3    actual malice.  It's important that we heard that.

4            And for that reason, I need to start by apologizing

5    to Ms. Eramo, just as we've done before.  Words can't solve

6    all the problems, but it's important that we apologize to you.

7            We have full confidence that you will apply the same

8    careful analysis of the law and the facts in reaching your

9    decision that we hope you come to today, but we also know that

10   you're not going to be quick to come to a conclusion just

11   because you want to get out of here.  You've invested too much

12   in this.

13           This part of the case, fortunately, will not take as

14   long.  And like Mr. Clare said, we don't intend to recall

15   people to the witness stand to rehash testimony.  We know that

16   you've considered all that evidence in getting to this point.

17           But the thing that will be difficult in this process

18   is that the case is very different from the case as it started

19   out three weeks ago.  At this point, out of the 14 statements

20   that were alleged against Ms. Erdely, there are only six left.

21   So the case is less than half of what it was when we began.

22           Some of that was because of rulings made by the

23   judge; others were because of decisions that you made.  So

24   that has to be taken into consideration.

25           As to Rolling Stone, all of the statements made

 1    prior to the December 5th date are no longer part of the case.

 2    Again, a very different set of circumstances.

 3            And your task is to listen to the evidence and make

 4    a determination as to what's the actual damage that was caused

 5    by the specific statements that are now part of this case; not

 6    from the article as a whole, not from the illustration that

 7    was so offensive to Ms. Eramo and her husband.  They have to

 8    prove their actual damages that flowed from the statements

 9    that are part of the case now, not when it began.

10            And we trust you.  We trust that you're going to get

11    it right.  I know you want to get it right, and we're asking

12    that you do that.

13            Now, the damage phase in a case like this puts us in

14    a really awkward position.  I'm not going to stand here and no

15    one from the defense team is going to stand here and tell you

16    that Ms. Eramo was not harmed.  I'm sure you'll hear

17    significant evidence of her harm.

18            We can't judge her harm.  That's not our job; that's

19    yours to understand that.  We're not going to attack her or

20    try to prevent her from obtaining a fair and reasonable

21    compensation for the actual damages that flowed from the

22    statements -- okay? -- but we are going to have to raise

23    points along the way where those questions need to be focused

24    on, because your judgment in this part of the case, as the

25    judge will likely tell you, can't be based on speculation or

1    guesswork or even sympathy, it has to be based on evidence.

2            Now, so here's my plan.  And I don't know that I

3    will get all the way through this because I think the judge

4    wants to keep us straight, but I think, as Mr. Clare stated,

5    there are a couple of principles, I think, that as you go into

6    this next phase that you need to keep in mind.  And then I'll

7    briefly talk about what's at issue.

8            Number one, the mere fact that Ms. Eramo has

9    suffered harm does not by itself prove that the harm was

10    caused by the statements that are at issue here.  Okay?

11            For example, this means that Ms. Eramo, who I'm sure

12    felt embarrassed, humiliated, and terrible when she read the

13    article as a whole, you can't award damages based on the

14    article as a whole.  I mean, that's not -- the judge will

15    instruct you about that.  The harm has to be tied to the

16    statements.

17            And for this reason, damages can't be presumed.

18    There are some cases where, if a statement is made that's

19    defamatory about an individual, there's sort of a presumption

20    that it's damaging.  Here, there actually has to be evidence

21    of that damage.  And the burden is on Ms. Eramo, as Mr. Clare

22    said, to prove that that's the case.

23            And so as to each element -- he mentioned two.

24    There were others that could have been typical in a case like

25    this.  And one of the things that makes this case a little

 1  different is that Ms. Eramo didn't -- did not lose her job at

 2  the university; she lost the job that she liked.  And that's

 3  not an insignificant thing, but it's very different from

 4  someone who looses their job.

 5          And so part of what you're going to have to do is --

 6  there is sort of a continuum of harm, and as you evaluate

 7  these different elements of harm -- the two ends are, no harm

 8  on this end and extreme harm on the other end.  And we all

 9  know that every day people in this world encounter incredibly

10  difficult circumstances and there is extreme harm to them.

11          Somewhere in between.  We're certainly not claiming

12  that there was no harm.  We also don't believe this is a case

13  of extreme harm.  The questions you have to answer based on

14  the evidence is to find where on that continuum is the right

15  place, based on the evidence.  And it can't be based on

16  sympathy; that you wish this hadn't happened to her, or that

17  you try to put yourself in her shoes.  That's not a proper

18  thing to do.

19          Now, one of the things that won't happen, as

20  Mr. Clare talked about this, is in a lot these cases there is

21  evidence, there's documentation that comes in, there's

22  evidence of wage loss, there will be someone is called to

23  testify that she applied for a job, I couldn't hire her

24  because of the defamatory statements.  There's not going to be

25  any of that.

 1          There's also not going to be evidence that the harm

 2   caused her to seek counseling in terms of there are not going

 3   to be doctors that are called in from a therapeutic

 4   perspective in terms of to work through the anger issues,

 5   other grief issues, all of these things.  That's not to say --

 6   everybody handles grief in their own way, so this is not a

 7   criticism of Ms. Eramo.  Please understand that.  But part of

 8   what you're going to have to do is:  What are the tangible

 9   things that we can look at to see the extent of the harm?

10   Because that's really what you're being asked to do, is to put

11   a measure on the extent of the harm.

12          And, thankfully, Ms. Eramo didn't -- doesn't appear

13   to have sought counseling in a way that would indicate that

14   her -- I mean, some of these cases, there have been some cases

15   where people have been diagnosed with posttraumatic stress

16   disorder, they've had to see counselors, they've been on lots

17   of medication.

18          And thankfully, that's not the case here.  She has a

19   wonderful support system, as you will learn, from her husband

20   and friends.  She was able to get through this.

21          I'm sure she sought counseling, but she's not

22   seeking to present that information to you in any way that you

23   can assess that.

24          So in terms of -- a couple of other things that you

25   need to think about.  And I mentioned the fact that you can't

1  award her damages because of other portions of the article; it

2  has to be tied to the statements. That's kind of a very

3  fundamental issue. And it's a challenge, because most of the

4  criticism comes because of the article as a whole, and so you

5  have to determine, she's got to help you determine, how much

6  of that is tied to the statements.

7       The other thing that's not permitted in this

8  situation is that -- and the judge reminded you of this at the

9  beginning of the case -- the University of Virginia is not a

10 party here. And the people that she worked with lost the

11 enjoyment of working with her, they, you know, may have been

12 disrupted, those kind of damages are not things that you are

13 to consider here. The part of the case is the damage to her,

14 not the impact on the university, not the impact on the

15 students, not the harm -- and certainly you're going to

16 hear -- I'm sure this was an incredible disruption to her

17 family, but as you listen to that, the point of that is to

18 award Ms. Eramo the harm that she suffered, not to compensate

19 her for the harm others, her friends, have suffered. And the

20 judge will instruct you about that.

21       Another thing that is not part of this phase of the

22 case is there's no element of penalizing the defendants. Some

23 of you may be angry at our clients for what's happened. This

24 is not a case where that kind of damage can be awarded in this

25 phase of the case. This is only about compensatory damages,

1    which is what Mr. Clare explained to you.

2           This is -- some people are angry; that the media

3    needs to hear a message.  I can tell you, your verdict last

4    Friday was heard loud and clear.  I know you haven't been able

5    to see it on the internet, but it is a -- you have sent a

6    message by your verdict.  There's no reason that you need to

7    consider yourself -- and the judge will tell you, that that's

8    not a proper thing to do, to send a message at this point.

9    And so there's no reason to increase damages because of that.

10           Another thing, and this is -- and Mr. Clare alluded

11   to this.  This set of statements happened in an unfolding way

12   over time.  You have the article released.  That -- that

13   publication has a pretty wide circulation, as Mr. Clare has

14   said.  Then you have some other statements where I don't

15   believe you're going to have any evidence of what the actual

16   distribution was.  They're going to ask you to sort of guess

17   about what that would be.

18           Your job is to look at the evidence of what the

19   actual extent of publication was.  And if you don't have that

20   evidence, you're not allowed to guess or speculate.  You

21   actually have to have some evidence about what that is.

22           And as we then move forward, you come to December 5.

23   And December 5, the editor's note is published to the world

24   and a sea change happens.

25           To that point in time, the world was criticizing the

1    University of Virginia and, to some degree, Ms. Eramo for

2    their failure to respond to Jackie's case.  We now put

3    forward -- and you found that that was a republication, and we

4    respect that, but you have to look at what was actually said

5    in that; that we were moving away from, we were not standing

6    behind anything that Jackie said.

7          That changes how everything is viewed to that point,

8    particularly the individual statements in the article.  And

9    the three statements that are left are all clearly attributed

10   to Jackie.  We'll explore that in closing.  And you've

11   probably looked at those statements more than you care to, but

12   they are all statements that are clearly attributed to Jackie.

13   And so the question becomes, that has to be considered in

14   terms of the impact of those statements, the republication of

15   that, and all of those things.

16         And so, you know, we really believe that you'll see

17   this right, that you'll look at the evidence.

18         Now, there certainly is going to be a temptation,

19   because this went to a large number of people, to give a big

20   number.  But you need to really look at what's the harm that's

21   been suffered, how can we reasonably and fairly compensate

22   Ms. Eramo for the actual damages she suffered, not things --

23   and it is, as Mr. Clare said, I mean, this is probably the

24   biggest challenge, is because there aren't ways that can

25   easily be brought in to you.  You can't have an expert say:

1    How did this measure damage her?

2           And one of the areas in the reputation area, one of

3    the things that the judge is going to tell you about looking

4    at what caused the harm is that when events occur during the

5    course of time that change the course of things -- like we

6    have the December 5 editor's note.  How does that change

7    things?  Then you need to look at what happened after that.

8    And part of what you're going to find -- and I know you

9    remember this, and we'll walk through a timeline later in the

10   case, is she received a promotion to the deputy Title IX

11   coordinator position in March of 2015.

12          She -- you'll learn that she participated in the

13   Take Back the Night activities in April of 2015.  You'll learn

14   that and be reminded that she received two really significant

15   awards from the University of Virginia in May of 2015 for her

16   work for sexual assault survivors.  She gets a significant pay

17   raise.  She is later in the process of restructuring how they

18   respond to sexual assaults, and so they are going to create a

19   whole new office.  She tells the Cavalier Daily and others in

20   the community that she intends to stay involved once that new

21   office in put in place in September.

22          And then the federal government issues its

23   long-awaited report.  And you're going to have to evaluate

24   that, how that impacts that.

25          And you'll have to look at the text messages that

1  Ms. Eramo shared with Emily Renda within two weeks of that,
2  saying this is not something -- you know, this is not
3  something that I agree with, but it's going to permanently
4  keep me out of doing this work.
5          That's what I urge you.  You'll see those and
6  remember those.
7          And so the fact that later she's actually moved out
8  of the dean of students office, that -- once that event
9  happens, that's an event that you have to evaluate in terms of
10 the damage to her reputation, the impact on her professional
11 standing, because that's -- as Dean Groves testified, it
12 became a matter of public record, and you'll hear evidence
13 that people knew about it.  So I think that's going to be an
14 important issue for you to consider.
15         And we trust that you guys are going to get this
16 right.  You know, Friday was tough.  Today is not fun either.
17 But we do want to take our medicine, but what we mostly want
18 at this stage -- because beginning December 5, 2014, and
19 continuing to this day, this has been a badge of shame for the
20 Rolling Stone and for Ms. Erdely.  They've been roundly
21 criticized.  And what we're asking for is that you provide a
22 fair and reasonable amount to Ms. Eramo for the specific
23 statements that were made, not for everything that happened.
24         You know, an event in time doesn't make you
25 responsible for everything bad that happens to you after that

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

```
 1   point.
 2           So we trust you.  We know you're going to listen
 3   hard.  We know you're going to bring common sense to this.
 4   And for those of you that are angry, I just thank you for
 5   giving us the opportunity to talk to you.
 6           Thank you very much.
 7           THE COURT:  Ladies and gentlemen, do any of you need
 8   to take a break before we start having evidence presented in
 9   the case?  Everyone ready to go forward?
10           Mr. Clare, you may call your first witness.
11           MR. CLARE:  Thank you, Your Honor.
12           We call as our first witness the plaintiff, Nicole
13   Eramo.
14           NICOLE P. ERAMO, called as a witness, having been
15   duly sworn, was examined and testified as follows:
16           DIRECT EXAMINATION
17   BY MR. CLARE:
18   Q    Good morning, Nicole.
19   A    Good morning.
20   Q    You've already had a chance to introduce yourself to the
21   jury in the earlier phase of the case.
22       I'd like to start by having you talk just a little bit
23   this morning about your life before the false statements that
24   were published in the Rolling Stone article and the other
25   false statements that are the subject of the jury's verdict.
```

```
 1        Remind us again who your family members are and where you
 2   live.
 3   A     Sure.
 4        First of all, I just want to say I'm a little nervous
 5   today, and there's a lot of things I want to talk about that I
 6   haven't talked about very much, so it's going to be a little
 7   hard.  So bear with me a little bit.  This is not the place
 8   that I want to be talking about a lot of these things, so I
 9   appreciate your consideration in that.
10        But yeah, I live in Charlottesville, Virginia.  I have a
11   son named Alex, a husband named Kirt, and we've lived here
12   since 1994.  We have been lucky enough to live in a wonderful
13   community and be very happy here for many years.
14        My son is an only child, and we were lucky enough to get
15   into a neighborhood where he -- it's kind of sort of the
16   idyllic neighborhood I wanted to live in when I was a kid.
17   You can walk out in the middle of the day and find friends to
18   hang out with and ride bikes and do whatever.  It's an amazing
19   environment to be in, and so much more special that he has
20   that, because he is an only child.
21        So we just have been very happy in this environment, and
22   have been a happy family.
23   Q    How old was your son in November of 2014 when the false
24   statements in the article were published?
25   A    He was seven.
```

1  Q    And how old were you?

2  A    I was -- what was I?  45.

3  Q    At that time, prior to the publication of those

4  statements, how did you think about your career at the

5  University of Virginia?

6  A    I was, I thought, very blessed to have the career that I

7  had.  I obviously had worked very hard to get where I was, and

8  I was kind of hitting my stride.  And I felt I was in a

9  leadership position in our office.  I was somebody that the

10 dean turned to in important situations, that he trusted.  That

11 was important to me.

12     I felt like I was continuing to build on an already very

13 good reputation in the work that I was doing around sexual

14 assault, but also in other work.

15     I worked a lot with students with significant mental

16 health issues -- suicides; I mean, student deaths -- things

17 that were very serious.  I mean, I was trusted with those

18 things, and I felt I was really valued.  And that was

19 important to me.

20 Q    Why was it important to you about working with students?

21 A    For me, it was a real privilege, just that -- with a

22 young person at a time when they maybe had never told somebody

23 that they were feeling the feelings they were feeling.

24 Sometimes it was, again, somebody having their first bipolar

25 episode, which is incredibly frightening and scary; somebody

1    telling you about a rape, or that their boyfriend wasn't

2    treating them well and they weren't really sure what was going

3    on with that situation.  And they were trusting me with that

4    serious information, maybe for the very first time.  And that

5    was a deep privilege for me and something I enjoyed seeing

6    them through.

7         And through that process, I could see them be successful

8    and oftentimes see them in graduation.  And it was a

9    sustaining thing for me to see that happen.  It was difficult

10   work, but then to be able to see that success was truly a

11   gift.

12   Q    How many hours a week did you do this work?

13   A    It depends on the week.  You know, some weeks you would

14   be around-the-clock working.  You could have one very severe

15   case with -- like, for example, a mental health issue where a

16   student was being admitted to the hospital and their parents

17   were coming into town and friends were freaking out and, you

18   know, you'd spend hours and hours working that one case.  And,

19   you know, other cases would be coming in, other situations.

20   So, you know, it wasn't a 40-hour-a-week job.

21        Students don't keep normal hours, too.  So it was

22   oftentimes nights and weekends.  And that was very normal, and

23   expected, really.

24   Q    What kind of relationships did you forge with the

25   students that you worked with, and how long were they -- how

1  long could they last?

2  A    I'm proud to have students as close friends.  I have

3  wonderful relationships that I've continued.  I've been to

4  many weddings and sent many baby gifts.  That's a real

5  pleasure for me.  We had the opportunity to go to India last

6  fall to a student's wedding, and it was an amazing experience.

7  I deeply treasure those relationships.  They've been very

8  special to me.

9  Q    Tell us, what was it like for you to walk on grounds in

10  the period before these false statements were published?

11  A    It was a pleasure.  The grounds are beautiful; if you've

12  not been there, you should go.  Just feeling like part of that

13  community, like somebody who was contributing to that

14  community in a positive way; having people say, hey,

15  Dean Eramo, how are you doing, come up to me and, you know,

16  hug me and talk to me, that was -- it was just really special.

17  Q    Did you ever consider or were you ever approached for

18  opportunities outside of the University of Virginia during

19  that time period?

20  A    Yes.  I had a few search firms connect with me about dean

21  of students positions at other institutions.

22      I really enjoy my work here.  The thought of being in a

23  position where I was being more of a kind of plain

24  administrator was not as appealing to me, because I did enjoy

25  my work with students.  So my next step had to be something

1    that provided that, you know, core to the work.

2        So it seemed like I had that here and an opportunity to

3    maintain some leadership here, but also that connection.  So

4    that was -- I didn't choose to take on any of those

5    opportunities.

6    Q    Did you receive any indication from the university during

7    that time period, the University of Virginia, that you were

8    being considered for those types of opportunities here at the

9    University of Virginia?

10   A    Yeah.  In the fall of 2014, I was nominated to a

11   succession leadership group that was supposed to be planning

12   for the succession of leaders at the university, as we have

13   kind of an aging population of leaders.  So it was a

14   presidential-level group.  About 30 people were eventually

15   brought into the program, and I was part of that inaugural

16   class.

17       So it included leadership training programs; a mentor

18   program with the vice president, who wasn't in my area, so I

19   was with the vice president for budget and planning, which was

20   an area of interest that I hadn't explored much; and then you

21   also had an opportunity to do a group project and present that

22   to the presidential cabinet at the end of the program.

23   Q    Who appointed you to that leadership program?

24   A    I was recommended to the program, I believe, by Dean

25   Groves and Pat Lampkin, and I was selected out of a group that

1    were recommended.

2    Q    And you said it was the inaugural class.  Was this the

3    first ever of these successions?

4    A    Yes.  It was the Cornerstone leadership program, or

5    something like that.  I can't remember the name exactly.

6    Q    And how many people university-wide were selected for

7    that?

8    A    I believe it was 30.

9    Q    I want to talk about the day that the Rolling Stone

10   article came out, November 19, 2014.  And I'd like you to take

11   us through that day, with a focus on what it was like for you

12   to read these false statements, and tell us what it was like

13   for you that day and how you progressed through your day.

14   A    Sure.

15        Obviously, there was a bit of anticipation leading up to

16   that day.  We were hearing that the story was coming out.  I

17   had had this meeting with Jackie where it seemed like the

18   story was not going to be very good for me, and I was very

19   interested to find out how that was going to turn out.

20        I had heard from Sara Surface that she had heard from a

21   friend that they had received a copy of the magazine.  And by

22   5 o'clock in the morning, when I woke up the next morning,

23   that copy was on my phone in pages, in pictures.  So I

24   immediately opened it and started reading them.

25        It was heartbreaking to me at first.  I mean, the story

1   itself in the beginning was just horrific.  If you've worked
2   with survivors of rape, just the thought of -- the thought of
3   how horrific that experience must have been was tremendous.
4        And I was very confused, obviously, because it was very
5   different from what I knew.  And I just didn't understand why
6   she wouldn't let me help her, if she wouldn't tell me what
7   happened.  And so that was the first thing that kind of stuck
8   out to me.
9        And then it started to talk about me and -- you know,
10  discouraging her to tell her story.  It just was like reading
11  about somebody -- somebody who had your name and, ultimately,
12  when I saw the picture, somebody who had my face, but not
13  somebody I recognized as me, as the person who I know myself
14  to be.  And so that was difficult.
15       And the picture was very difficult to see, because it was
16  me, but then I didn't feel like they were talking about me in
17  the statements they were making.  So --
18  Q    Where were you when you read the article?
19  A    I was home in my living room, sitting, just trying to
20  read it.  It was not very easy to read, frankly, because it
21  was pictures.
22       And my husband came downstairs and I was crying, and he
23  asked what was going on, and I told him the article had come
24  out.  And I showed him the article and I just said:  How am I
25  going to go to work today?  What am I supposed to do?

1    And ultimately I kind of pulled myself together and said,
2  I have to go.  I mean, I didn't feel like I had done anything
3  wrong; I felt like I should be able to hold my head up and go.
4  And I did.
5    So I went to the office that morning, and it was very
6  quiet, which was strange.  And I walked into my office and sat
7  down and opened up my computer, and people were e-mailing me
8  to ask if I was okay, which was my first sign that something
9  was wrong.
10    Then people were saying, don't go on Facebook, which was
11  another sign that something was really wrong, and I realized
12  it was probably blowing up.
13    Within a few minutes of my being in the office, Dean
14  Groves came in and asked if I was okay and said that things
15  were blowing up pretty quickly.  He was also pretty
16  devastated.  We kind of shared that feeling of devastation and
17  kind of fear of the unknown, given what was going on around
18  us.
19    I had student meetings that day.  I had a meeting with my
20  prevention coordinator.
21    I think I just said, you know, try to put the blinders on
22  and do what you have to do; this is what you came here to do.
23  And so I did.
24    At some point that morning I got a call from Christina
25  Morrell, who was our associate VP, also checking to see how I

1    was, but then also saying that I needed to be at a meeting at
2    3 o'clock that afternoon, that I needed to gather all of my
3    current files and bring them with me to the meeting.
4        And at that point, I thought they were going to fire me
5    this afternoon.  And she calmed me down.  She said, we're
6    just, you know, taking it moment by moment, trying to figure
7    out how to weather the storm, and don't worry, just come with
8    your files.  So I tried to focus on the things I had to do,
9    focus on the meetings that I had.
10       And then I went to that meeting, and there were several
11   other of my colleagues there, and I turned over individual
12   students to each one of these colleagues.  I tried to give
13   them a background on each student, where I was in the case,
14   what I thought needed to happen next.
15       And then I was told to go home and rest.
16   Q    At what point did you realize that this was going viral,
17   this was a bigger deal?
18   A    People were calling me and checking on me.  I think I
19   started to get some of the nasty e-mails by that night.  So I
20   knew it was blowing up around me.
21       I tried very hard to -- as a self-preservation maneuver,
22   I just kind of went on lockdown and didn't watch the news or
23   do much in the way of media, just to try to protect myself.
24       But people were clearly very worried about me and
25   checking in on me a bunch, and so I knew things were going

1    crazy around me.  And I had heard that protests were coming;

2    that faculty were planning a protest on the fraternity; that

3    there was students planning protests.

4        By that night, I don't think any of those had happened

5    yet.  The days get a little bit -- they start to blend.  I

6    don't think anything had happened yet.

7        And again, they had sent me home, so I had gone home at

8    that point.

9        Yeah, it was -- but I had a sense of how things were.  I

10   was on the phone most of that evening with friends and people

11   checking in on me.

12   Q    In the days after the article, what did you do?

13   A    I felt committed to continuing to go to work.  I felt

14   like I didn't want to be -- I told people I didn't want to be

15   bullied out of the work.  I still had prevention work I could

16   do.  I thought that was an important opportunity to help heal

17   the community.

18       We were working on a very-large scale training program

19   for bystander intervention, which was actually set to train

20   that whole group of faculty, staff, and students in early

21   January.  So I tried to focus my attention on that.  It was

22   something positive that I could work on.

23       And at the same time, we were getting a lot of requests

24   for information, and it was information that I had the most

25   expertise with, so I was being asked to help gather

1    information for all of these people making inquiries.

2         So I was spending a lot of time, you know, sorting

3    through our Advocate system and all of these documents and,

4    you know, getting stuff to people that they needed, different

5    communications and so forth.  So I was actually working a lot.

6         It was kind of a way for me -- I tend to -- when I get

7    freaked out or something else is going on in my life, I will

8    focus on work, because that's the way to just try to stay

9    centered.  And that's kind of what I did.

10   Q    What was it like on grounds in those days after the

11   statements in the article were published?

12   A    For me, it was kind of surreal.  Everybody was upset.

13   Everybody was -- it was just kind of hysteria.

14        I think by Thursday, there had been a slut walk that came

15   up through the grounds and ended in front of our building with

16   people carrying picket signs.  Kind of recreated the scene in

17   the picture, in a way, except that my office was on the second

18   floor and I was looking down on them.

19        They were yelling and chanting, and I remember Dean

20   Groves going out at one point and feeling like he wanted to

21   speak to them, and at one point being able to speak.  But, you

22   know, I can't imagine what that experience was like.  Watching

23   it was unbelievable, really.

24   Q    Did you have any concerns for your safety or your

25   physical well-being on grounds?

1  A    I did.  Obviously, people knew where my office was, and

2  that information was publicly available.

3      At this point I was getting a lot of e-mails, some of

4  which were filled with vitriol, and the hatred was astounding

5  to me.  And this is just what people would say to me.  You

6  know, there had to be more of that sentiment out there.  So I

7  was definitely fearful.

8      I remember my husband wouldn't let me go out and run by

9  myself.  He made sure to come get me.  I was working late

10  nights, and he would come and make sure that he came to get me

11  or that somebody was walking me to my car -- or his car.

12  Because he actually didn't let me drive on my own.

13      I was sending those e-mails to Ben Rexrode, whom you've

14  all had an opportunity to meet, and Rayshaun Gause, who's

15  another police officer in our department.  They actually came

16  and met with me -- I don't know if it was Thursday or Friday

17  at this point -- to talk about the e-mails and what I could do

18  if any of them were so threatening that I felt like charges

19  needed to be filed, that kind of thing.  So we sat and had

20  that conversation.

21      They asked me if I wanted to see if an officer should

22  come by my house.  At that point, I felt like I wasn't ready

23  to do that.  And they would have had to have brought in the

24  city police, and I just didn't want to go that route.  But we

25  were kind of keeping an eye on that.

```
 1        Our neighbors, who we're very close with, were keeping an
 2   eye on us, too.
 3   Q    In all the time that you had been employed at the
 4   University of Virginia up to this point, did you ever have
 5   occasion to take those sorts of security precautions before in
 6   dealing with any situation?
 7   A    No.
 8   Q    Did you ever have to meet with police for yourself in
 9   terms of talking about a security assessment like you just
10   described?
11   A    No.
12   Q    You've done that with students many times?
13   A    Yes.  I've worked with Ben on those types of very same
14   conversations on many occasions.
15   Q    What was it like being on the other side of the desk,
16   being the one that was hearing the security issues about you,
17   as opposed to helping a student with it?
18   A    I think it was kind of surreal.  I just never -- the
19   whole time I was just thinking:  How did I get here?  You
20   know, how did this happen?  What could I have done
21   differently?  And I just -- I still can't answer that
22   question.
23   Q    You were kind enough, Nicole, to tell us about the
24   3 o'clock meeting that you had on November 19 where you turned
25   over your student files.
```

1    What concerns, if any, after that did you have about your
2    job, your job security, in the days after the false statements
3    were published?
4    A    Well, I think it was Wednesday or Thursday -- again, days
5    kind of run together -- and there was an announcement that our
6    board would be coming to the grounds on Monday, Monday or
7    Tuesday the following week, for an emergency meeting to
8    discuss the Rolling Stone article.

9        I very much believed that I would be fired at that
10   meeting.

11       There was also a moment when -- over the weekend, I think
12   it was -- I was still receiving all of these e-mails.  I was
13   trying not to read them and just forward them on to Rayshaun
14   and to Ben, but one kept popping up, and it was a MoveOn.org
15   petition.  And I don't know how this person had done it, but
16   clearly -- like, every hundred signatures or something, it
17   would pop into my box.

18       And there was a morning -- it was early.  It was dark.
19   It was probably 4 in the morning, and I was sitting there at
20   my computer, and it just kept popping up over and over again,
21   and I thought -- you know, it had things about how I should
22   resign and do the right thing, and I didn't -- I just wanted
23   to disappear.  I felt like I just wanted to disappear.  And I
24   crawled under the desk in our office and just crawled into a
25   ball, and just started thinking about how I could disappear.

1    And then I realized what I was thinking about, and how I

2    had worked with students who committed suicide and I had seen

3    what happens to their families, and how I could even think

4    about doing that to my family.

5        Sorry.

6        And I just -- I never cried so hard in my life.

7        And Kirt heard me and found me and hugged me and told me

8    it would be okay.  I didn't know how it was going to be okay.

9    Q    To the best of your recollection, that was the Sunday

10   after the article was published?

11   A    Yeah.

12       Excuse me.

13   Q    The false statements in the article and some of the other

14   statements that we've looked at were published in the middle

15   part of November, November 19, the week leading up to

16   Thanksgiving.

17       What was your Thanksgiving like that year?

18   A    It was actually supposed to be a really special

19   Thanksgiving.  It was the first Thanksgiving we were hosting

20   our families here in Charlottesville.  So, of course, they

21   were very concerned about coming.  They called Kirt and said:

22   Should we come?

23       And he decided -- we both decided together -- that

24   actually, having them here would be the best possible thing.

25   It would be -- you know, being surrounded by people who loved

1   me would be the best possible way to spend the weekend.  So

2   they came.

3        You know, it wasn't as celebratory as we wanted it to be,

4   obviously.  It was a little more subdued.  I was still kind of

5   reeling from everything and was very confused about, you know,

6   how to potentially protect myself, how to move on.

7        You know, on Thanksgiving morning, I texted Gina Smith,

8   who is actually one of the principals from Pepper Hamilton,

9   which we talked about is the consulting firm that does

10  Title IX work.  Gina and I had formed a relationship over the

11  last couple of years prior to the article coming out, having

12  seen her at conferences.  She had come down and spoken to our

13  board a couple of times, had done a couple of public events

14  for us, and she's kind of a motherly figure.  I had talked to

15  her on a few occasions and just really enjoyed speaking to

16  her.

17       And out of the blue, I just texted her and said -- I

18  don't even remember what I said.  I just was desperate to talk

19  to somebody.  And I didn't know, you know, who at the

20  university I could trust anymore.  I was just reeling.  And

21  she said:  Call me.

22       And we had a conversation that morning that was really

23  helpful to me.  Just -- she was very comforting, and -- but it

24  was -- it was a rough weekend.  But it was nice to be

25  surrounded by people who loved me.

1  Q    You've told us about -- we looked in the earlier phase of
2  the case at some of the e-mails that you received and phone
3  calls that you got from strangers.
4        Do you recall that?
5  A    Yes.
6  Q    Can you tell us about the phone calls you received?  Was
7  it at the office?  At home?
8  A    Primarily at the office.  There were -- my phone was
9  ringing off the hook.  Part of it was media.  Some of it was
10 people calling me to tell me what a horrible person I was.
11       We got a local legislator who was calling and wanting
12 statistics and information.  He kept calling me.  And his big
13 thing was:  Why didn't you take her to the police?
14       Of course, I couldn't tell him that I actually had, which
15 was really hard.
16       I remember picking up the phone at one point and just
17 identifying myself, and a woman's voice on the end saying:
18 Why didn't you help those girls?  What kind of a person are
19 you?  And I didn't know what to say.  And I just hung up the
20 phone.
21       And then I forwarded my phone to my assistant from then
22 on.
23 Q    We've looked at a few of those e-mails, and we'll look at
24 a few more with you in terms of the e-mails you received.
25 We'll try to go through these as quickly as we can.

1      David, do you have the binder?

2      I hand you --

3  A    Thank you.

4  Q    Nicole, I'm going to ask you to look at a few of them

5  together, and identify whether these are e-mails that you

6  received after the publication of those statements in the

7  article.

8      Number 603.

9  A    Okay.

10 Q    Number 605.

11 A    Uh-huh.

12 Q    Number 606.  Number 620.  Number 687.  Number 688.

13 Number 690.  Number 691.  And number 692.

14     Are those documents that either identify all e-mail

15 communications that were sent -- or received by you at your

16 university e-mail address after the publication of the false

17 statements?

18 A    Yes.

19 Q    And were these e-mails that were sent to your university

20 e-mail?

21 A    Yes.

22 Q    Are these e-mails that were sent to you by people that

23 you knew?

24 A    No, I don't believe I knew any of these people.

25 Q    Are these all e-mails that you saw at the time?

1    A    I did.

2    Q    And in some instances, as reflected on the documents, you

3    forwarded them on to Officer Rexrode?

4    A    Yes, Officer Rexrode and Officer Gause.

5         MR. CLARE:  Your Honor, at this time I would move to

6    admit the documents that I've had the witness identify.

7         MR. PAXTON:  Your Honor, we have some issues with

8    this document that we'd like to take up with you.

9    (Bench conference as follows:)

10        MR. PAXTON:  Your Honor, our concern with these,

11   with several of these documents -- there's several that are

12   directly related to the "rape school" comment that was not an

13   issue at the time these were done.  Most of them make no

14   reference whatsoever to the two statements that are involved.

15   And to allow Ms. Eramo to testify about the illustration

16   doesn't mean we're waiving this.  I believe the statements

17   referring to these documents to be admissible and relate to

18   the statements that are at issue.

19        THE COURT:  It goes to state of mind.  It goes to

20   the impact that the whole episode had on her.  They referred

21   to statements that weren't deemed actual -- actual malice.  I

22   think it's a great point for argument, but in terms of the

23   admissibility of these documents, it seems to me they're all

24   admissible.

25        MR. PAXTON:  If I could have those back.

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1    (Bench conference concluded)

2    (Open court as follows:)

3           THE COURT:  So in terms of the motion to admit the

4    documents, they're to be admitted over defendants' objection.

5           Let's put them down as the next set of plaintiff's

6    exhibits.

7           What would be the first one, Ms. Moody?

8           MS. MOODY:  Damages 199.

9           THE COURT:  It would be 199 through?

10          MS. MOODY:  D199 for P603.  D200 for P605.  D201 for

11   P606.  D202 for P620.  D203 for P687.  D204 for P688.  D205

12   for P690.  D206 for P691.  And D207 for P692.

13          Is that correct?

14          MR. CLARE:  Yes, ma'am.

15   (Plaintiff's Damages Exhibits D199 through D207 admitted)

16          THE COURT:  Is this a good point, Mr. Clare, for us

17   to take a short break?

18          MR. CLARE:  It is, Your Honor.

19          THE COURT:  So, ladies and gentlemen, I understand

20   that you would like to take a short recess at this time.

21          Keep in mind that clock is wrong.  I was reminded of

22   that.

23          I would ask that while you're away from the court

24   you not discuss this matter with one another, nor permit

25   anyone to discuss it with you.

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1          Let's plan to return at 25 after the hour.

2          Ask the marshal to declare in recess until 9:25.

3    (Recess)

4          THE COURT:  I count ten jurors back ready for the

5    continuation of this direct examination.

6          MR. CLARE:  Thank you, Your Honor.

7    BY MR. CLARE:

8    Q    Nicole, before the break, we were just starting to look

9    at a series of e-mails, documents that you had received in the

10   days after the article.

11        I want to go through a few of them with you and ask you

12   just a few questions about them.  I'll try to go through them,

13   and then I'll ask you some questions about the impact that

14   they had on you.

15   A    Okay.

16   Q    The first one I'd like you to look at, it's tab 128.

17   This is previously admitted as Plaintiff's Trial Exhibit 128.

18        Do you have that in front of you?

19   A    Yes.

20   Q    Okay.  And would you -- it's not visible on the screen,

21   but if you would just say -- what is the date of this e-mail?

22   A    Do you have the old tab number?  Because I don't have the

23   tab number.

24   Q    Sure.  It should be 128.

25   A    128?  Oh, sorry.

1          The date is November 20th, 2014.

2    Q    What time of the day or evening was this e-mail received?

3    A    12:10 a.m.

4    Q    And what's the subject of this e-mail?

5    A    About the Rolling Stone article.

6    Q    All right.  If you would -- could you read aloud, please,

7    the portion that's on the screen, which is, I think, the

8    entire e-mail?

9              MS. MOODY:  Is this admitted?  I'm sorry.

10             MR. CLARE:  It was, yes, ma'am.  It's Plaintiff's

11   Trial Exhibit 128.

12   BY MR. CLARE:

13   Q    Again, remember, when you're reading, do it slowly.

14   A    Slowly, right.

15        "Dean Eramo:  I am in the process of reading the Rolling

16   Stone article about rapes on the UVa campus.  I am so sickened

17   by what I have read and I think you should be ashamed of

18   yourself and how you treat victims of sexual assaults.  This

19   line is one of the worst:  'Or Jackie could choose an informal

20   resolution, in which Jackie would simply face her attackers in

21   Eramo's presence and tell them how she felt; Eramo could then

22   issue a directive to the men, such as suggesting counseling.'

23   How could you think that having a victim look her attackers in

24   the eye and talk about how they felt could in any way, shape,

25   or form be healthy or a constructive way of dealing with a

1   felony crime?  People go to jail for years for such crimes.

2   And to think your suggestion of counseling, wow, that is as

3   insane as what happened to Jackie on your 'safe' campus.  Why

4   you continue to protect these predators is baffling and I

5   really can't understand how, as a woman, you can allow them to

6   continue to victimize more young women/men.  Please, please,

7   please, for the love of God, resign.  You clearly do not

8   contain the needed skills as a human/woman to do your

9   correctly.  You are a horrible person and your school is an

10  abomination and disgusts me.  Please resign so you don't ruin

11  another student's life.  Do the right thing."

12  Q    I'd like you to turn, Nicole, please, to what's in your

13  binder at tab number 603.  It's been admitted as Damages 199.

14       What is the date and the subject of this e-mail?

15  A    Thursday, November 20, 2014, 8:19 p.m.

16       The subject is "Shame on you."

17  Q    Would you please -- if we can blow up the top piece of

18  it, can you read that portion aloud, please?

19  A    "As a woman, how can you turn a blind eye to these girls

20  who are seeking help from such brutal acts?  Girls, Ms. Eramo,

21  girls.  God will have his day with you and hold you

22  accountable, just as the boys who have raped and performed

23  these disgusting acts.  Do this great state of Virginia a

24  favor and resign.  You are a despicable human being."

25  Q    Would you please turn -- you have tab 605, which has been

1   admitted as Damages Exhibit 200.

2       And would you identify, please, the date and time of this

3   e-mail, and subject as well?

4   A   Thursday, November, 20, 2014, 1:58 a.m.

5       The subject, "Alumni."

6   Q   Could you please read the e-mail aloud?

7   A   "All, I graduated from UVa.  I support improvement

8   efforts.  However, as I read the Rolling Stone article, I grew

9   ever more angry.  Frankly, you two deans, as well as those

10  past deans who have held your positions, and perhaps even past

11  presidents, should all be brought up on criminal obstruction

12  of justice and civil charges.  It's a disgrace to humanity.

13  Please resign.  For all the good you've done over the years,

14  the terrible acts and non-acts related to these criminal

15  events swamp the good.  If I was you, I'd probably hire

16  counsel immediately; you'll need them.  Oh, and your deletion

17  of e-mails, they'll still turn up.  Save us all the pain and

18  suffering and save the university.  Resign now.  BG."

19  Q   And can you identify, please:  Who are the other

20  individuals who are copied on that e-mail?

21      Maybe we can zoom back out.

22      The e-mail addresses, if you could, decode them for us.

23  You are npe --

24  A   5f.

25  Q   -- 5f?

1         Who is awg8vd?

2    A    I believe that's Dean Groves.

3    Q    And then there's a cc to tas6n?

4    A    I believe that's President Sullivan.

5    Q    Would you please turn in your binder to what's behind

6    tab 606, just admitted as Damages Exhibit 201.

7         What is the date and time of this e-mail?

8    A    November 20, 2014, 4:30 a.m.

9    Q    And what's the subject?

10   A    "Concern."

11   Q    Ms. Eramo, we've seen a number of these e-mails that have

12   come in after midnight and 12:10 and 1:48.  Now, this one is

13   4:30 in the morning.

14        When were you receiving these e-mails and others like it

15   that were coming in?

16   A    Pretty much all day and night.  A lot at night, I think,

17   because that's when people were home off their work e-mail and

18   able to send personal e-mail.

19        But it wasn't uncommon to get them in the middle of the

20   night.  And it wasn't uncommon for me to be up and seeing

21   them, getting them.

22   Q    Would you please read this e-mail with the subject

23   "Concerns" aloud, please?

24   A    "Hi, Nicole.  I really hope that an enterprising US

25   Attorney finds a way to throw you in prison.  You're a

1  disgusting individual and have no place being around young

2  people.  Andrew."

3  Q    Can you turn to -- what's behind tab 691, please.  It's

4  been admitted as Damages 206.

5  A    Yes.

6  Q    What is the date and time of this e-mail, please?

7  A    Saturday, November 22, 2014, 7:59 a.m.

8  Q    And what was the subject matter of that e-mail?

9  A    It's like a forward:  "A Rape on Campus."

10 Q    If you could, read aloud that e-mail.

11 A    "If you were correctly quoted in the Rolling Stone

12 article, you should be prosecuted.  Rape university, you say?

13 Where is your responsibility?  How do you live with yourself?

14 Associate dean of students who obviously wears blinders.

15 Shocking, but not surprising.  Close down the fraternities

16 instead of condoning the rapes."

17 Q    I'd like you to turn to what's behind tab 130 in your

18 binder, please.  This is previously admitted as Plaintiff's

19 Trial Exhibit 130.

20     What is the date and time of the original e-mail?

21 A    Saturday -- wait, I'm sorry.  That's when I forwarded it.

22     It's Friday, November 21st, 2014, at 6:13 p.m.

23 Q    What's the subject?

24 A    "Despicable."

25 Q    And you forward this on.  This is an example of one of

1    the e-mails that you forwarded on to Officer Rexrode.

2        And when did you forward that e-mail to Officer Rexrode?

3    A    Saturday, November 22, 2014, at 5:27 a.m.

4    Q    If I could ask you to read aloud the e-mail that you

5    received at the very bottom.

6    A    "Dear Dean Eramo:  As an alumnus of UVa medical school,

7    your portrayal in the Rolling Stone article was nothing short

8    of despicable.  It appeared that you are part of an

9    administration that perpetuates misogyny and criminal activity

10   at the university.  I am so ashamed right now of having been

11   associated with UVa.  At the same time, I am not surprised by

12   what I read and believe that these acts do happen at UVa and

13   are obviously tolerated.  I think it is time for you to

14   relinquish your post.  Shame on you for not having taken a

15   stronger stand for women at the university.  Disappointedly,

16   Ernie L. Esquivel."

17   Q    I would ask you then to turn, please, to what's behind

18   tab 620, which has been admitted as Damages Exhibit 202.

19   A    Yes.

20   Q    What is the date of the original e-mail and time of the

21   original e-mail that you received?

22   A    Oh, the original e-mail?  November 26, 2014, 2:08 a.m.

23   Q    And at what point -- at what time on November 26 did you

24   forward this e-mail to Officer Rexrode and others?

25   A    Wednesday, November 26, at 3:10 a.m.

1   Q    So the e-mail came in a little after 2 a.m., and at 3:10

2   you're forwarding it on to Officer Rexrode?

3   A    Yes.

4   Q    Would you please read the original e-mail that you

5   received at 2:08 a.m.?

6   A    "I just read the Rolling Stone article and it struck me

7   that you are more evil than the rapists that you personally

8   enable.  You are Paterno in a skirt and a completely

9   disgusting human being.  I pray that one of the many victims'

10  families steps forward and sues UVa into oblivion.  Signed,

11  Father of an American Coed."

12  Q    I ask you to turn behind tab 692, which has been

13  previously admitted as Damages Exhibit 207.

14       And can you please identify the date and time that this

15  e-mail was received?

16  A    Thursday, November 20, 2014, at 5:19 p.m.

17  Q    And this is another one that you forwarded to Officer

18  Rexrode, it looks like at 5:37 a.m. the next morning?

19  A    Actually, it was --

20  Q    Or a couple days later?

21  A    -- a few days later.  I think I went back and started

22  forwarding the ones that I hadn't forwarded in the first day

23  or so.

24  Q    Okay.  You had described being in a lockdown.

25       Did that stop you from answering or looking at your

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1   university e-mail?

2   A    These were coming directly to me, and I obviously

3   couldn't resist.  I was reading them.  I knew I shouldn't be.

4   I kept getting told not to, but I did read them.

5   Q    Why were you still checking your university work e-mail

6   during this time period, if you knew you were receiving these

7   messages?

8   A    I was still working.  I mean, there was talk of getting

9   me another e-mail account, actually shutting down this account

10  and starting a new one.

11       I didn't want to do that, because I knew there were

12  people who might want to get in touch with me, and this was

13  the way they knew how to get in touch with me.  And I didn't

14  feel like I wanted to shut it down.

15       There were a few students who connected with me in a

16  positive way and, frankly, those were sustaining to me,

17  something that helped me get through the day.  So I didn't

18  want to not get those.

19  Q    If I could ask you to read aloud, please, the original

20  e-mail that you received at -- on November 20, at 5:19 p.m.

21  A    "Dean Eramo:  Just in case you needed a refresher on rape

22  in the state of Virginia, here it is."  There's a link to the

23  code.  "Your compliance in allowing these offenders to walk

24  free time and time again is an atrocity.  For a college-aged

25  female who is from the state of Virginia, I'm disgusted.  For

1  years I regarded UVa as an incredible college, where people

2  were held to a higher standard both academically and socially.

3  Clearly I'm wrong.  When a student is denied having lights put

4  up on campus because it would ruin Jefferson's image of the

5  university, then you need to reevaluate the kind of person you

6  are and the kind of people you work with.  When you would, A,

7  deny the fact that Jefferson was truly a visionary who would

8  have praised the invention of the outdoor light, and B, would

9  rather have aesthetically pleasing landscape even if it means

10  a student is assaulted, you need to reevaluate your life.  You

11  can only sweep sexual assault under the rug for so long until

12  the truth comes to light.  You and all you administrators who

13  assisted in letting these perpetrators walk free on a daily

14  basis solely for ratings will now have to live with the fact

15  that you have convinced students to not go forward in

16  investigations, therefore allowing people to walk free.  You

17  sicken me, as someone who has been assaulted before, and I

18  will never again think of UVa as the 'smart school' because

19  what you have done is very, very stupid."

20  Q    Finally, I'd like you to turn to what's behind tab 129 in

21  your binder.  This was previously admitted as Plaintiff's

22  Trial Exhibit 129.

23        I'd like to focus on the e-mail at the bottom of the

24  page.

25  A    Yes.

1  Q    What's the date and time of that e-mail?

2  A    Friday, November 21st, 2014, at 12:24 p.m.

3  Q    If we could blow up the original e-mail that you

4  received.

5       What's the subject of the e-mail?

6  A    "Dean of Rape."

7  Q    Would you please read the e-mail aloud?

8  A    "Dear Nicole Eramo, the 'Dean of Rape,' you are as

9  responsible for what happens to victims on your campus as the

10 men who actually commit the crimes themselves.  How many girls

11 have to get raped before you stop looking out for the

12 university's reputation and start looking out for victims?

13 Your deliberate cover-ups, encouragement of students not to

14 file police reports, and refusal to take action against

15 fraternities and individuals, despite overwhelming evidence of

16 violence and rape, is nothing short of criminal.  Every time

17 someone comes to you for help and you do nothing about it,

18 every day you let pass before taking action against accused,

19 you allow another woman to be abused and violated.  As in the

20 case of Phi Kappa Psi, you let one victim confide in you and

21 did nothing about it, and then immediately after, multiple

22 more rapes took place at the same location.  Unbelievable.

23 You are just as responsible as the monsters who physically

24 perpetrate these crimes.  You are a pathetic, miserable excuse

25 for a human being, and now everyone knows your true face

1    thanks to that article that is being read and shared by

2    thousands as we speak.  Your name is going to be destroyed

3    because of your actions, or lack thereof, and I will

4    personally revel in hearing of your downfall.  You are a

5    coward and a scumbag, and I hope that you burn in hell for

6    your role in your university's sickening rape culture."

7    Q    Nicole, we've looked at a handful of these documents

8    during the time period originally after the article had come

9    out.  These were all in the kind of early -- late November

10    time period.

11        How long did you continue to receive e-mails like this --

12    let me ask you this question, I guess.

13        The ones we've looked at today, these are not all the

14    e-mails you received that were like that; is that correct?

15    A    No.

16    Q    Can you approximate for us, at least the ones that you

17    saw, approximately how many e-mails of a similar character

18    that you saw?

19    A    A couple of hundred.

20    Q    This e-mail and the ones that we've looked at obviously

21    are full of a lot of hateful commentary to you, and this one

22    that we're looking at that we have up on the screen talks

23    about you encouraging students not to file police reports and

24    doing nothing about a response.

25        How did hearing those words from people, reading them in

1  your e-mail, this e-mail and others that we've looked at, how

2  did that affect you?

3  A    It's hard to describe.  I -- it just put me in the lowest

4  point I've ever been.

5       I didn't -- again, I didn't recognize myself in the

6  things that people were saying.  I just -- I knew -- I knew

7  who I was at my core, but I was trying to hold on to that.

8  But I, again, was just thinking:  What did I do?  What could I

9  have done differently?  How did I end up here?  How is this

10  happening?

11  Q    Did the e-mail messages that you received that were like

12  this stop after the republication of the article on December 5

13  with the editor's note?

14  A    No.  I continued to get e-mails when there were spikes in

15  publicity around the article, even after the republication.

16       There was a period when there was a release of documents

17  from the university in January.  I still received some nasty

18  e-mails after that.

19       Just pretty much any time it came into the public view,

20  there were always people who would reach out.

21  Q    I'd like to talk a little bit now about the -- how you

22  coped with this barrage of e-mail.

23       What did you do to cope with these inbound unwanted

24  communications?

25  A    I guess I just tried to remember who I am.  I tried to

1   remember that these people weren't right about me.  But it was

2   hard knowing that that's what people thought of me.  That

3   image is all they had to go on.

4        And so I just really didn't know what to do and how I

5   could -- you know, I knew I couldn't reply to them.

6        There was one person I replied to, I have to say.  It was

7   a person who kept e-mailing me over and over.  This was after

8   the letter of support had come out.  And she was e-mailing me

9   really despicable things, and I just responded and said:  This

10  is who I really am.  Don't pretend you know who I am.  Then I

11  sent her the letter.

12  Q    Even after the students had written out in support of

13  you, you continued to receive these kinds of messages?

14  A    Yes.

15  Q    Let's take a look together at some of the statements in

16  the article.

17       I'd like to pull up Plaintiff's Trial Exhibit 1, tab 1 in

18  the jury book, page 70 of the article.

19       This is the -- one of the statements that was the subject

20  of the jury's verdict on Friday.

21       "Lots of people have discouraged her from sharing her

22  story, Jackie tells me with a pained look, including the

23  trusted UVa dean to whom Jackie reported her gang-rape

24  allegations more than a year ago."

25       What does it mean to you -- as someone in this

1  profession, someone who does this work on a daily basis, what
2  does it mean to you to be described as someone who discouraged
3  a survivor of sexual assault from sharing her story in this
4  manner here?
5  A    It was devastating to me, because here they describe me
6  as "trusted," which I absolutely believed that I was trusted
7  by my students, but I feel the implication here is that I
8  would use that trust to discourage them from reporting, when
9  that was exactly the opposite of what I was trying to do.  I
10 was trying to gain their trust and give them support so that
11 they would feel supported in reporting.  So it seemed to twist
12 what -- everything that I stood for.
13       And someone in this profession, it's incredibly important
14 for them to have the trust of students, but not to be seen as
15 manipulating that trust and manipulating people out of
16 reporting.
17       That would be -- you know, that's a horrible thing to do.
18 If I believed people were doing that, I would call them
19 despicable.
20 Q    As someone who has done this work for as long as you have
21 and worked with as many students, what is the impact of a
22 statement like this on the ability of someone like you to do
23 your job in working with students, being described in this
24 way?
25 A    I don't see how you can continue to be trusted by

1    somebody to help them.

2    Q    Did you -- you can't tell us whether or not you agree or

3    disagree with the decision, but based on what you just said,

4    do you at least understand where the university was coming

5    from when they asked for you to turn over your sexual assault

6    files?

7    A    I do understand it.  It was obviously one of the most

8    difficult things I've ever done.  But I understand the

9    position they were in, and I know that they needed to do that

10   in order to try to preserve the good work that we had been

11   doing in getting more people to report.

12   Q    I'd like to turn to the second statement in the article.

13        This is also at Plaintiff's Trial Exhibit 1, tab 1 of the

14   jury book, page 76 of the article, statement number 3.

15        This is -- we're all familiar with these statements by

16   now, but this is the statement talking about your nonreaction.

17        Do you recall that?

18   A    Yes.

19   Q    I'll ask you the same question.  How did you feel when

20   you read this?  How did it impact you to be described in this

21   way?

22   A    It was kind of horrifying.  You know, how could somebody

23   hear these things and have a nonreaction?  Not -- you know, I

24   knew how I reacted at the time.  I knew it wasn't accurate in

25   terms of my reaction.

82

1      I also felt like it was portraying me as somebody who was

2   callous to this type of -- somebody coming forward and saying

3   this horrible thing had happened, and then it could also

4   happen to two more people, that I could be callous to that,

5   that I would be straight-faced and not show care and

6   compassion and a desire to do something about it, which is

7   actually exactly what did happen.

8      So it was, you know, devastating.

9   Q   In the profession that you're in and the work that you

10  do, what does it mean in terms of your ability to do your job

11  to be described in these terms in a national magazine?

12  A   For somebody to not -- to be seen as not doing anything

13  in the face of these types of facts, as they stood then, with

14  folks believing they were facts, it's reprehensible.

15  Q   We've looked now at the two statements in the article

16  that are now the subject of this damages inquiry, so I need to

17  ask you some questions about these two statements

18  specifically.

19      How did these two statements published in the November 19

20  article affect your emotional well-being?

21  A   I felt -- I just felt trapped.  Like, this is the

22  thing -- this is what people think of me, and how could I

23  possibly help them understand differently, that this isn't the

24  person that I was; that it was in direct opposition to the

25  person that I am, and believe myself to be.

1    And that, again, brought me to a very low point.  How

2   could I -- how could I help people understand that that's not

3   me?

4   Q    That low point that you're describing, is that the point

5   under the table on that Sunday morning?

6   A    Yeah.

7   Q    Did these statements that we've looked at cause you to

8   feel embarrassment or humiliation?

9   A    I was deeply humiliated.  I was -- you know, I used to

10  walk around grounds and people would greet me and say nice

11  things to me and want to hug me.  And those days after the

12  article came out, I know I told other people I felt like a

13  dead man walking.

14       Nobody would look me in the face.  Nobody talked to me.

15       It was -- it was -- I can't even describe it anymore.

16  Q    Did those feelings and that low point that you were

17  experiencing affect your sleep?

18  A    Yes.  I wasn't sleeping.  I had kind of a nightly pace at

19  the house, where I would just again, like -- be thinking,

20  like, what -- how did I end up here?  How did this happen?

21  What could I have done to have made it be different?  You

22  know, the why questions.  So many questions.  And I just

23  couldn't answer them.

24  Q    Did the feelings that you were experiencing and the low

25  point that you described, did that affect your relationship

1  with your husband and your son?

2  A    Yes.  Obviously, I was very -- I was crying all the time.

3  That's not my normal.

4      I was very -- I tend to retreat into myself when I'm

5  upset, and so I just would often go somewhere and try to be

6  alone and not talk to people.

7      And Kirt was great about trying to draw me out.  My

8  friends were great about trying to do that.  But I tend to

9  shut down when I'm that way, and that's pretty much where I

10 was.

11     I wasn't available to my son.  I did my best to try to be

12 available to him, but I didn't want him to see me that way.

13 So the best I could do is retreat.

14 Q    After the original publication of the article, there came

15 a time when the Washington Post and others started asking some

16 questions and publishing some things about the articles.

17     Tell us how you felt when those things started happening.

18 A    At first, I was very hopeful that maybe people would

19 start to realize that this wasn't true, that the things said

20 about me were not true.  So I thought, well, maybe there's a

21 light at the end of the tunnel that's not the train coming.

22     So that was my first reaction:  That, you know, people

23 would start to recognize the issues.

24 Q    What happened to those hopes?

25 A    As, you know, the days progressed, it seemed that while

1  the -- maybe the scenario at the beginning of the article was

2  being questioned, the things that people were saying about my

3  reaction and what I did were not.

4  Q    And what was your basis for believing that?

5  A    The statements that were being made in that period of

6  time by people associated with the magazine.

7  Q    Tell us how you felt when you saw that Rolling Stone had

8  posted the editor's note republishing the two statements that

9  we've looked at today.

10  A    I was frustrated because, while I think it spoke to the

11  opening scene, it did not speak to my actions at all.  And I

12  believe it referenced, continued to reference, the

13  indifference in administrators, and I directly felt targeted

14  by that.  And I knew that not to be true.

15  Q    Now, the jury has found that on that day, on December 5,

16  that Rolling Stone, Wenner Media, republished statements in

17  the article about you, including the one about the "rape

18  school" quote.

19  A    Yes.

20  Q    If we can pull that one up, Plaintiff's Trial Exhibit 1.

21      And the "rape school" quote actually appears twice in the

22  article, doesn't it?

23  A    Yes.  In big bold letters, at one point.

24  Q    And then also in the text?

25  A    Uh-huh.

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1    Q    So focusing on the time period now after the

2    republication, December 5 forward, how did it feel?  How did

3    it impact you to see this quote continue to be attributed to

4    you in that time period?

5    A    It was frustrating.  The way it's presented, I mean,

6    somebody in -- this is exactly the opposite of what we were

7    trying to do at the university.  We were trying to raise our

8    numbers.  I think it's even evident in the article itself that

9    our numbers had increased in reporting over time in the time

10   that I'd been working hard to do that.

11        So it was very frustrating to me to have this still out

12   there saying that I would say we didn't want to see our

13   numbers increase because we didn't want to be the rape school.

14        It was very upsetting and frustrating that it remained

15   out there.

16   Q    And as someone who works in the profession, has done this

17   work as long as you have, what does it mean from your

18   perspective to see someone, in this case you, portrayed as

19   having made a comment like this?

20   A    Incredibly unprofessional; incredibly callous; not

21   thoughtful about your institution.

22        And, again, it was opposite what I think every

23   institution was really striving for, which was to increase

24   reporting.

25   Q    Nicole, some of these questions are a little duplicative,

1  but I have to ask you about this different time period as
2  well.
3  A    Sure.
4  Q    The earlier time period we talked about was after the
5  original publication of the article and before the
6  republication.
7       I want to ask you now about the republication after the
8  time the editor's note came out.
9       How would you describe your emotional well-being in those
10 weeks and months?
11 A    To use a phrase my students use, I was a hot mess.  I was
12 really just not sleeping, not eating, very -- just, again, I
13 kind of retreated into myself.
14      I felt -- kind of felt like a pox on the people around
15 me.  I didn't want to be with people, because I felt like all
16 I did was bring people down and everything I touched was going
17 to hell and, you know, how could I bring all these people down
18 with me?
19      It felt like that hope that I had, that maybe this was
20 going to fall apart and I'd be vindicated, that didn't seem
21 like a possibility; that this was going to be it; they were
22 going to continue to stand by what was said about me.
23      And I didn't really have -- I couldn't think through the
24 tools that I had to fight that, because I was in a position
25 where I couldn't speak to what I had actually done.  So I just

1  felt backed into a corner.  I didn't know how I could change

2  this perception of me.

3  Q    Did you -- were you feeling -- had you experienced low

4  points like the one you described?

5  A    Yes.

6  Q    Embarrassment, humiliation, anxiety?

7  A    Yes.  It was still difficult to walk around grounds.

8        I did continue to work.  Again, I was very committed,

9  because the community had -- was just in such hysterics and

10  everyone was so wounded by what happened, I was really

11  committed to the prevention programming that we were doing.

12        I thought that was an opportunity to provide some healing

13  to the community, the folks who were -- folks were looking for

14  something to do to make things better in the aftermath.  And I

15  thought, well, I can be part of that solution.  So I was

16  working probably harder than ever to try to be that.

17  Q    I have to ask you about this time period as well.  The

18  feelings that you were experiencing in this time period after

19  the republication of the article, did they affect your sleep,

20  continue to affect your sleep?

21  A    Yes.  I continued to pace the house and think -- now, you

22  know, I was more focused on, how -- how can I repair myself?

23  What can I do?  And I didn't really know.

24  Q    Did those feelings and low spots and things that you were

25  experiencing, did they affect, continue to affect, your

1    relationship with Kirt and Alex?

2    A    Yes, absolutely.  I continued to really struggle with how

3    to tell my seven-year-old what was going on.  You know, he had

4    met these young women.  He had met Jackie.

5         We had an experience a few days after the article where

6    we were sitting in the car.  And NPR is just sort of on in our

7    car all the time.  I hadn't really been thinking about it as

8    something we needed to lock down.  But I was sitting in the

9    car, my husband was driving, and there was a story about the

10   article on.  I wasn't really paying attention to the story.

11   And when I realized that's what they were talking about, I

12   started crying.  And they mentioned Jackie and rape and all of

13   these things.  And my son -- I heard my son from his car seat

14   say:  Is that my Jackie?

15        And I looked at Kirt and I said -- I just looked at him.

16   I didn't know what to say.  And Kirt tried to explain it to

17   him.

18        And how do you explain that to a seven-year-old?  We

19   continue to try to help him understand what's going on.

20   Obviously this has been stressful, this whole experience.  So

21   it's been something I never thought I'd experience.

22   Q    How did that experience in the car with your son, how did

23   that make you feel?

24   A    I just wanted to protect him from this, and I didn't know

25   how, and it just really brought home how much this was not

1  just about me.

2  Q    We haven't talked about the "D" word: Depression.  And I

3  know you're not a doctor, but did you ever have what you would

4  consider to be depressing thoughts or symptoms of depression?

5  A    Yeah.  There were very dark moments over the course of

6  the past couple years, frankly.

7        You know, I have been in counseling since soon after the

8  incident.  I went to our sort of university -- FEAP is what

9  they call it; I went there.

10       And then after experiencing a bunch of other health

11 issues that had me with doctors a lot, I then went into more

12 regular counseling.

13 Q    Mr. Paxton made reference to that this morning, that you

14 may not have sought counseling as a result of this experience

15 and the articles.

16       Is that true?

17 A    No.  I was surprised by that, actually.  I've been in

18 pretty consistent counseling since last summer, and remain

19 there.

20 Q    Can you tell us when you started?

21 A    Last summer, after a bunch of other challenges, I went

22 and -- went ahead and sought counseling.

23 Q    Are there any other impacts on your family from the false

24 statements in the article and the other false statements that

25 have been upsetting to you?

1  A    It's been difficult to watch my -- it's been difficult to

2  watch Kirt try to cope with this.  It's been -- I know he

3  feels helpless.  We've talked about that on a lot of

4  occasions.  He's been a tremendous strength to me and I

5  wouldn't be here without him.

6      Sorry.

7      It's -- you know, we're a little family.  We're very,

8  very tight.  And it's just been hard to -- to maintain our

9  relationships and maintain our closeness and -- because,

10  again, my first reaction is to run away.  And I knew I

11  couldn't run away from them.

12  Q    Nicole, I want to shift gears now.  And you made

13  reference to this a couple times in your testimony today, and

14  I want to put it out on the table.

15      The false statements in the Rolling Stone article weren't

16  the only serious issue you were dealing with in your life in

17  November of 2014; is that right?

18  A    That's right.

19  Q    What else?  What else was happening in your life at that

20  time, when these false statements were coming out?

21  A    So in -- right around when school started, at the

22  beginning of the 2014 fall semester -- I had had a small tumor

23  removed from my left breast in 2009.  I had a lumpectomy and

24  radiation for that, and had a very good prognosis, but was

25  being monitored closely.  I was young, and there was concern

1    about recurrence.

2        In the fall of 2014, I went in for an MRI in late August,

3    and they found a different kind of cancer, but in the same

4    breast, something that doesn't generally spread at the breast.

5    But it meant I definitely had to have a mastectomy of that

6    breast.

7        And so in that early -- late August/early September

8    period, I was kind of meeting with doctors and figuring out

9    exactly what this was and how to deal with it.  And so at that

10   time, I made a decision to have a bilateral mastectomy.  No

11   more messing around; I was just kind of going to get rid of it

12   all, and had -- was in a lot of conversations with doctors

13   about how to manage that process.

14   Q    And were you scheduled to have surgery at around that

15   time?

16   A    I was.  I had talked to my doctors about having the

17   surgery over winter break, because it would give me some time.

18       There was a lot going on at the university in the fall,

19   as I know Dean Groves mentioned to you.  There was a lot of

20   work going on around this particular topic; around, you know,

21   very significant changes to our policy.  The prevention work

22   that I had mentioned before, that was really important to me.

23   I knew there was going to have to be a lot of education that

24   went with this new policy, and I wanted to be, you know, a

25   part of that.

93

1    So we were very focused on that in the fall.  So I asked

2    would it be possible to do this over the winter break.  And

3    given what they had found, they didn't think that would be an

4    issue.  So I was scheduled to have surgery December 19.

5    Q    So you were scheduled to have the surgery, the double

6    mastectomy, a month after the article came out?

7    A    Yes.

8    Q    And did you, in fact, have the surgery in the middle of

9    December?

10   A    I did.

11   Q    And these two timelines together, what was still going

12   on?  What was going on as far as the fallout from the false

13   statements in the Rolling Stone article at the time that you

14   were prepping for this surgery?

15   A    It was actually in the real thick of it.  My pre-op

16   appointment was -- I think it was December 1, right after

17   Thanksgiving.  I met with my doctor -- Dr. Brennan had been a

18   surgeon that I had worked with before, and I believe I met

19   with Dr. Lin that day, too, who is a reconstructionist.  And

20   we were going to do a surgery that included starting the

21   reconstruction process.

22       And Dr. Brennan knows me reasonably well.  He actually

23   had a fourth-year young woman at UVa at the time, one of his

24   daughters.  And he asked me how I was doing, and I just broke

25   down.

1  Q    How would you describe, in your own words, your physical

2  and emotional state going into that surgery in the middle of

3  December as a result of what you were experiencing from these

4  false statements?

5  A    I was debilitated.  I was, again, not sleeping.  I was

6  just emotionally on a rollercoaster.  At this point, I was

7  trying to think of:  Did I have options to protect myself?

8  What could those options be?

9       There was just a lot going on.  I could not put off the

10  surgery anymore.  I had to do it.  So there was no waiting.

11  So I just had to do it.

12  Q    So you had the surgery?

13  A    Yes.

14  Q    What happened then?

15  A    I don't want to go into too much graphic detail, but

16  there's a lot of medical -- there's drains and such involved

17  when you have this surgery, and they have to be tended to and

18  cleaned and all of that.

19       I went back to work.  I still had some of my drains in.

20  I went back in because we had this huge training going on for

21  the Green Dot program, our violence prevention strategy.  And

22  it was myself and one other person who really coordinated

23  this, so it was really important for me to go back.  I did get

24  clearance from my doctors to go back to work.

25       And within a couple of weeks of returning, I started to

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1  feel not great.  My drains were taking a little time to come

2  out.  They finally took out the last one toward the end of

3  January.  And then two days later, I started to feel pretty

4  lousy.  One of my -- in fact, one of my coworkers said, you

5  really don't look good; I think you should go to the doctor.

6      I called my -- one of Dr. Lin's residents, I think, and

7  they told me to go to the ER.  And it turned out I had an

8  infection and was admitted to the hospital.

9  Q    How long were you in the hospital?

10  A    About nine days.

11  Q    And what impact, if any, did the infection and what you

12  just described have on the timeline for follow-on treatment

13  for chemotherapy or reconstruction?

14  A    As a result of the infection, the decision was made to

15  abandon reconstruction.  And it also put -- I sort of need to

16  back up and say that when I had the surgery, they realized I

17  did have a positive lymph node, which they were not expecting,

18  which meant that I needed to do chemotherapy on top of the

19  surgery.

20      I was scheduled to start that chemotherapy around the

21  same week that I ended up in the hospital.  So I ended up

22  putting that back a couple of weeks.

23  Q    So just in terms of the timeline, roughly when was it

24  that you were in the hospital?

25  A    I think I went in January 23rd, something like that, and

1    I was in until February; February 1st, I believe.

2    Q    So this is in the time period after the republication of

3    the article, but before the article was taken down from the

4    website; is that right?

5    A    Yes.

6    Q    And after you were out of the hospital and the like, did

7    you eventually then begin to undergo chemotherapy?

8    A    Yes.  I think toward the end of February, I started

9    chemotherapy.

10   Q    And, you know, tell us what the treatment regimen was.

11   And how long did that chemotherapy continue?

12   A    Sure.

13        I first had to have -- it was kind of a pain to figure

14   out how to do the administration because of the infection.

15        A lot of people get chest ports for their chemotherapy

16   administration; because of the chest infection, they didn't

17   want to put anything foreign in my chest.  So we went through

18   a PIC line, which was this big thing that had to be cleaned

19   every day.  And I was like, I can't take this.  I asked for

20   some other option.

21        So then they gave me a port in my arm, which is kind of a

22   different thing, but they said they would try it.  So I went

23   through a couple of different procedures for that.

24        And then it's 16 weeks of chemotherapy.  It's every two

25   weeks, four administrations of two drugs, and then one drug

1    for four more weeks.  And that's what I did during that time.

2    Q    So you were undergoing chemotherapy in the late

3    winter/early spring?

4    A    Yes.  It was from February to May.

5    Q    So you were undergoing chemotherapy at the time --

6    between the time that the recalled article, the false

7    statements, were republished on December 5 and the time the

8    article was taken down by Rolling Stone in April?

9    A    Yes.

10   Q    What's the status of your cancer treatment today?

11   A    I'm being monitored every few months.  And I had decided

12   to put off reconstruction at this point indefinitely.  I just

13   didn't feel like I was in a position to make decisions like

14   this with everything else that's been going on in my life, so

15   I've just put it off for the time being.

16   Q    You're obviously not blaming Rolling Stone or the other

17   defendants for your cancer?

18   A    No.

19   Q    But from your perspective, how did these two things

20   interact with each other, the stress and the trauma that you

21   described in dealing with the article, and also dealing with

22   this serious surgery and follow-on treatment?  Pretty serious

23   stuff.

24   A    Yeah.  I just felt seriously debilitated going into my

25   surgery.  I didn't feel well.  But, again, it was not

1   something I could put off.  It had to be done.

2        And I just felt weak.  I just don't think it helped to be

3   in that position and have to go through major surgery and

4   dealing with all the things that I had to be dealing with, the

5   other decisions that I was trying to make.  It was very

6   complex, and it just made things harder than they needed to

7   be, frankly.

8   Q    I want to shift gears and talk a little bit about the

9   impact that these false statements have had on your career and

10  your professional prospects.

11       What's it been like working at UVa since all of this for

12  you?

13  A    It's been, you know, obviously different.  I don't have

14  the same relationships with students that I had before.  As

15  you heard, there's been a lot of change over time, in the last

16  couple of years.  You know, it all -- none of it has restored

17  me to being able to work with students in the way that I once

18  did and in the way that I really deeply treasured.

19  Q    Do you like the job that you have now?

20  A    The job I have now is very administrative.  There's not a

21  lot of contact with students, which is the reason I got into

22  student affairs in the first place.  It is very different from

23  my prior work.

24       I feel like I'm kind of having to reinvent myself at 47,

25  which I know is something people often have to do, but it's

1  not something, you know, given my trajectory and the

2  experiences that I have had, that I thought I would be doing

3  at this point in my life.

4      It's not -- you don't get the same kind of ability to see

5  a student through a situation and see them blossom in a way

6  that's just, you know, a real gift. That's not something that

7  I get to do anymore.

8  Q    Now, there was a time, wasn't there, in sort of the

9  middle of all of this that you were doing some limited student

10  work? Would you tell us briefly how it was that you came to

11  find yourself in that position?

12  A    In the Title IX coordinator role for students, yeah.

13      So at the end of March, when the new -- the university

14  adopted an interim policy around sexual misconduct, I was

15  asked to take on this role temporarily as someone --

16  basically, they were like, we don't have anybody else to do

17  this right now, and we need you to do this. And I said,

18  absolutely, I will do what you need me to do.

19      It was meant to be more of a coordination role. So

20  essentially, we -- somebody would come in and we'd get a

21  report in some way or fashion, and I would be helping the

22  person who was taking on the intake of that report and making

23  sure they were doing everything that needed to be done under

24  the new policy, so getting all the boxes checked.

25      There was a new meeting where everything had to be

1  presented; making sure they got to that meeting, they got the

2  information to that meeting.

3      I did do some limited intake during that time.

4  Primarily, I did intake on cases involving dating violence,

5  because that was an area of real expertise for me that really

6  nobody else in our office had.  And they were particularly

7  difficult cases.

8      There were a few students -- given that I still had some

9  strong student connections in the community -- you've met Sara

10  and Alex.  You know that they still believed in me.  I did get

11  a couple direct referrals during that time.  And I wouldn't

12  turn away somebody who wanted to report their rape to me.  So

13  I did do those intakes.

14  Q   Did you do that student work with the -- as part of your

15  official job responsibilities or with the direction of your

16  superiors?

17  A   I think they wanted me not to do intake, but especially

18  in the period between March and July, when the new policy was

19  adopted, so between March and the fall semester.  But we

20  hadn't yet trained all our on-call deans to do intake, so

21  there was a very small group doing intake.  So there was just

22  not enough people to do what needed to be done at that point.

23  Q   And if you hadn't stepped in, was it your observation

24  that the needs of the university in terms of people who needed

25  help wouldn't be met?

1   A    Exactly right, yes.

2   Q    What efforts have you made since these false statements

3   were published about you to find another job similar to the

4   one that you still have?

5   A    So I interviewed for a position at the University of

6   Richmond to be the dean of the women's college there.  I was

7   recommended for that opportunity by somebody who had taught me

8   in undergrad and who knew me well over the many years that I'd

9   been working in student affairs.  And she basically talked me

10  up to the search firm, and they contacted me.

11  Q    Did you have an interview?

12  A    I talked with the search firm and they invited me to meet

13  with the search committee.

14       The night before that interview, the search firm -- the

15  director of the search firm called me and said, you know, I

16  think we need to talk about Rolling Stone.  And, you know,

17  that was kind of difficult, because I didn't -- I was already

18  kind of really into this with a lot of trepidation about how

19  to deal with this particular piece of my history.  And having

20  her say that was a bit of a surprise.  And it did turn out to

21  be the first thing that came up in my interview the next day.

22  Q    When you say it was the first thing that came up, was it

23  a question that you were asked?

24  A    Yes.

25  Q    By someone at the University of Richmond?

1   A     Yes.

2   Q     And what happened with that opportunity at the University

3   of Richmond after your interview?

4   A     I wasn't invited back for a further -- for a further

5   interview.

6   Q     Any other efforts to find another job similar to the one

7   that you used to have?

8   A     I did interview internally for a position at the

9   University of Virginia for the director of the women's center.

10  And I did get an interview with the search committee for that.

11  It was -- they did not ask me about the article or about other

12  issues related, but it felt like the elephant in the room the

13  entire time.

14        It colors the way I present myself.  I feel less

15  confident in my presentation, just feeling like it's something

16  I need to be ready to explain at a moment's notice.

17        I wasn't -- I was initially contacted for a finalist

18  interview, and then about a week later, they called me back

19  and said that they decided to go a different way.  And that is

20  all I heard about that position.

21  Q     Did there come a point in time where you stopped looking

22  for work elsewhere?

23  A     At that point, I basically made the decision that I

24  needed to continue to work on rebuilding myself and my

25  confidence, that I didn't really feel I was in a position to

1    present my best self, and I needed to just not make those

2    considerations until things were more settled.

3    Q    Did you ever look for or consider jobs that were further

4    away from the University of Virginia, or Virginia, sort of

5    this epicenter of all of this?

6    A    Given the position that Kirt and I are in, it's difficult

7    for us to just sort of pick up and move to another place.

8    It's difficult professionally in the sense that having two

9    people in the same place, in the academic job market, is not

10   an easy thing.  So it's a twofer.  You know, wherever we go,

11   we sort of have to negotiate the other person in if we can.

12        And the other thing is, as I've said, we're deeply

13   committed and connected to this community.  My son has

14   incredible connections to his friends.  He has incredible

15   opportunities, you know, and it's difficult to pull him out of

16   that as well.

17        So, you know, we've elected to kind of deal with what we

18   have here for the time being.

19   Q    You told us earlier about the inaugural class that you

20   were in of the leadership -- I think you called it a

21   succession planning group, or the leadership development

22   program.

23        Whatever happened with that?

24   A    I dropped out of that program in December of 2014.

25   Q    And why did you do that?

1  A    I just felt like there was too much going on.  I also was

2  at a point where I didn't see myself in that light.  I

3  didn't -- I felt humiliated.  I felt like I didn't deserve to

4  be there.

5  Q    If you could, comment for us in terms of your perception

6  of the opportunities for advancement that you had in November

7  of 2014 in the office of the dean of students working under

8  Dean Groves and Vice President Lampkin.  And would you compare

9  what you perceived to be the advancement opportunities and

10 track in that position versus the position that you find

11 yourself in now?

12 A    Like I said, I really felt like at that point I kind of

13 had hit my stride; that, you know, Allen was trusting me with

14 more complex work; that he saw me as a leader in the office;

15 that people were really recognizing what I was doing.

16      Again, the prevention work was really high-profile, and I

17 felt like that was an opportunity for me to really kind of

18 show myself, in a way.

19      You know, where I am now, it's very much coordinating and

20 behind the scenes -- which is fine; I'm actually quite

21 comfortable with that -- but it's very different than my old

22 position, and it's very -- I'm kind of learning as I go a bit.

23      I don't have the confidence that I'm sort of the leader

24 in planning and assessment in the way that I did in other

25 things before.  And I don't necessarily see where this is

1  going.  There doesn't appear to be any kind of pathway to

2  advancement in this area.  It seems a little bit like a

3  parking lot, in a way.

4  Q    With your health issues that you've described for us this

5  morning, do any of those -- with the ongoing implications of

6  those, do any of those impact your ability to work for the

7  foreseeable future?

8  A    Not so far, knock on wood.  I'm hoping to stay healthy.

9  Q    In terms of what your plans were, did you have plans to

10  continue to work for however long?

11  A    I mean, as Kirt would probably tell you, I'm not great,

12  like, sitting around the house.

13       I enjoy working.  The idea of not working is kind of

14  scary.  Nobody wants to see me with nothing to do.  It's not

15  pretty.  So, you know, for the foreseeable future, I would be

16  working.

17  Q    We focused on the false statements in the "A Rape on

18  Campus" article, both originally and then when republished,

19  and the impact those statements have had on you.

20       I now need you to ask you some questions about the

21  statements that Ms. Erdely made to the media.

22  A    Sure.

23  Q    I'm going to try to do this as efficiently as possible,

24  because we're all familiar with the statements at this point.

25       On November 26, 2014, Ms. Erdely went on The Brian Lehrer

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1    Show and had some comments to say about you -- had some

2    comments to say, and the jury has found them to be about you.

3    And I'm going to play the audio so we don't have to follow

4    along in the transcript.

5        But for those who are following along, this is

6    Plaintiff's Trial Exhibit 5, the transcript; and Plaintiff's

7    Trial Exhibit 6, the audio.

8            MR. PAXTON:  Your Honor, can we approach for a

9    second?

10   (Bench conference as follows:)

11           MR. PAXTON:  Your Honor, during her original

12   testimony she was unable to say when or if she had heard

13   that -- you allowed her to testify only for a very limited

14   purpose, which you made it very clear that you were not going

15   to allow her to testify regarding it all because she couldn't

16   identify whether she first heard this after she engaged

17   counsel.  So to allow this testimony now -- you made it clear

18   at that point.  It seems like we're going too far.

19           MR. CLARE:  It goes to reputation, the fact that

20   these statements were broadcast.

21           THE COURT:  The statement speaks for itself.

22           MR. CLARE:  We don't need to play the statement.  I

23   just don't want to be precluded -- I need to ask her to tie to

24   very specific statements.  I need to ask her why she cares

25   about this.

 1              THE COURT:  I don't think -- I think it's important

 2    that the jury understand exactly what Mr. Paxton said, that

 3    she did not hear the statement, she did not know what was

 4    said; and that to the extent that it has any relevance at all,

 5    it's prospective, going forward.

 6              MR. PAXTON:  I mean, I don't know how -- I mean, the

 7    fact that -- I mean --

 8              THE COURT:  For example, I don't think she can

 9    testify that her standing at the university has been damaged

10    by the statements made on The Brian Lehrer Show.

11              MR. CLARE:  I'm not planning on that, but I need to

12    ask her why she cares about a radio broadcast in New York

13    City.

14              MR. PAXTON:  But in an abstract way, Your Honor,

15    it's allowing her to try to establish a harm that she didn't

16    suffer at the time; it's sort of after the fact.

17              THE COURT:  If I understand the proposed question,

18    he's not asking that.  He's asking why she's concerned about

19    it now.

20              MR. CLARE:  Yeah, it goes directly to harm.  It goes

21    to the --

22              THE COURT:  She may say, I'm not.

23              MR. PAXTON:  I doubt that, Your Honor.

24              THE COURT:  If all of the things that you say are

25    true, in the earlier ruling, I stand by those things, so we

1    won't have the interrogation expanded by that.

2         MR. CLARE:  I'll just ask her why she would care

3    about these articles out there.

4         MR. PAXTON:  It's not still out there.  I guess

5    that's the point.

6         MR. CLARE:  Sure it is.  NPR, I mean --

7         MR. PAXTON:  We don't know how many people heard it.

8    We don't have any evidence of that.

9         THE COURT:  The question as proposed is reasonable,

10   and I overrule the objection.  But I think the parameters that

11   you've outlined are all very well stated and consistent with

12   what the Court said about those radio statements all along.

13        MR. CLARE:  So I can ask why she cares about them in

14   the broadcast?

15        THE COURT:  Yeah.

16        MR. CLARE:  And I can ask the same thing about the

17   podcast?

18        THE COURT:  Yeah.

19        MR. CLARE:  For the statement to the Washington

20   Post, that's different, because she said she had seen that.

21        THE COURT:  I don't know that she said she did.

22        MR. PAXTON:  I don't think she said --

23        THE COURT:  That would be the first question:  Did

24   you read anything in the Washington Post after the article

25   about the statement that Erdely gave to the reporter?

1          MR. CLARE:  If she says no, I can still ask the same

2  question?

3          THE COURT:  Those questions are okay.

4          MR. CLARE:  After, if she says she has seen that

5  Washington Post quote, I can inquire further about it?

6          THE COURT:  Yes.

7  (Bench conference concluded)

8  (Open court as follows:)

9  BY MR. CLARE:

10  Q    This is one of those rare situations where lawyers huddle

11  together and things actually get easier, so I think I'll do

12  this in a more streamlined way.

13      We don't need to play the audio or the transcript at this

14  point.  Everybody is familiar with the statements.

15      My question to you, Ms. Eramo, is this:  The Brian Lehrer

16  Show -- we understand from Mr. Woods that -- you were here and

17  you heard his testimony -- it's a radio show broadcast in New

18  York City, the metropolitan area; is that correct?

19  A    Yes.

20  Q    Do you remember that?

21  A    Uh-huh.

22  Q    You obviously don't live and and work in that market.

23  But why do you care about what's said about you on The Brian

24  Lehrer Show?

25  A    In some ways it's worse, because these are not people

1    that I'll ever have an opportunity to rehabilitate myself

2    with.  These are not people who have any opportunity to know

3    what my real work is like.  And this is all that they think of

4    me.  This is all that they know of me.  It directs their

5    attention back to the article itself.  And it's something that

6    that's all they have to know.  That's all they have to go on

7    about who I am.

8         And it is where I grew up, frankly, and I still have many

9    friends and family there.  I don't know if anyone heard it.

10   They didn't tell me they did.  I'm sure they probably wouldn't

11   if they had.  But in some ways, it's worse.

12        I can't -- I don't have any way of controlling what those

13   folks have to say or think about me.  And I don't have any way

14   of knowing what people think about me when I am there.

15   Q    There's also been testimony in this case -- and the same

16   drill; we've heard statements that Ms. Erdely gave to the

17   Slate podcast.

18        You're a subscriber to the Slate podcast; is that

19   correct?

20   A    No.

21   Q    And you didn't hear it at the time?

22   A    No, I didn't hear it at the time.  There was mention of

23   it by people around me, but I never listened to it at that

24   time, no.

25   Q    So let me ask you the same question.  If it's not

1   something that you subscribe to or that you heard, why do you

2   care what's said about you on the Slate podcast?

3   A    Again, this is what people think of me.  This is my --

4   their view of my work, and it is a deeply flawed view of my

5   work.

6        I think especially that some of the things that were said

7   in that podcast were deeply offensive in terms of somebody who

8   does the type of work I do.  Not viewing a gang rape as a

9   crime, suppressing a gang rape; these are incredibly

10  debilitating charges for somebody who does the type of work

11  that I was doing at the time.  And for people to think that

12  that's what I would do, that's what I was about, is

13  incredibly, incredibly damaging.

14  Q    You know, because you've been here throughout the trial,

15  that there was some testimony about a statement that

16  Ms. Erdely provided to the Washington Post around November 30,

17  2014.  And portions of that were published in the Post.

18       At that time -- this would be early December;

19  December 1st --

20  A    Right.

21  Q    -- were you reading what was going on in the Washington

22  Post about all of this?

23  A    I did read that particular article.  I was directed to

24  that by a colleague.

25  Q    And when you said you read it, you read it at the time,

1  like, when you --

2  A    Yes, I did.

3  Q    So I'm going to refer you now to Plaintiff's Trial

4  Exhibit 144.  This is previously admitted, and I'd like to see

5  if we can pull that up.

6       And I excerpted here the portion of the article that --

7  in which Ms. Erdely's statement was published.

8       Did you read this, Ms. Erdely's statement to the

9  Washington Post, that was published in that paper at the time,

10 on or around December 1st, when it was published?

11 A    Yes, I did.

12 Q    And how did you feel reading that statement?

13 A    This is that point where I was starting to feel hopeful.

14 But then seeing statements like this made me feel like the

15 concept of indifference and that the university administration

16 did nothing, that there was going to be no way of combating

17 that.  Even if the story was falling apart, they were going to

18 continue to stand behind this concept that we'd spoken to so

19 many other people and we'd seen this indifference all along.

20      And I just knew that not to be.  I was actually quite

21 offended by this statement.

22 Q    This was printed in the Washington Post.  Why do you care

23 about a paper in Washington, D.C.?

24 A    It tends to be sort of the paper around here.  It's very

25 regionally important to people in this area.  They report

1  quite a bit on the University of Virginia.  They were

2  obviously doing a tremendous amount of reporting around this

3  particular issue.  So it's seen as quite an important

4  publication in this area.

5  Q    Thank you.  You can take that down.

6       Are you still experiencing some of the impacts from the

7  false statements in the article in your life today?

8       You told us about a number of them:  Emotional;

9  professional; some of the family stress and those sorts of

10 things.

11      Are you still experiencing some or any of those today?

12 A    Yes.  I continue to be in a position where, just

13 recently, somebody yelled at me and called me a rape apologist

14 on the street here in Charlottesville during the trial.

15      I continue to find things about me.  As I've loosened my

16 media restrictions, I've looked at comment feeds and things

17 like that, which I know I probably shouldn't do, but I

18 continue to see pretty negative things.

19      I've discovered things that were happening at the time

20 that I didn't realize were happening, in terms of Facebook

21 posts and things like that.

22      And I'm still obviously feeling the effects in terms of

23 my employment and my career opportunities going forward.

24      And just the sense of trying to rebuild from what

25 happened, trying to rebuild my self-understanding.

1    You know, I always knew I wasn't the person in the

2  article.  I've always known that.  That's why we're here

3  today.  But I still question everything, and I need -- I know

4  I'm not that person, but it's hard to remember that.  It's

5  hard to try to get back to where I was.

6  Q    What's it like walking on grounds now?

7  A    It's different.  I mean, obviously, it's weird, because

8  some of the students still call me Dean Eramo because that's

9  how they know me.  And I don't know:  Should I correct them?

10  I'm not Dean Eramo anymore.  And that will end soon when those

11  students graduate.  And that's hard to know.

12    I'm trying to kind of maintain relationships with

13  students in the limited ways that I can, but it's very

14  different than my past life.

15    I'm just trying to figure out how, in this role, I can

16  make the same type of meaningful contribution I felt like I

17  was making before.  And I don't know.  And that's a process.

18  Q    Are you still undergoing the counseling that you've

19  described?

20  A    Yes, I'm still in counseling.  And that's actually what

21  we're focusing on now, that kind of undermining of my

22  confidence, and trying to figure out -- reestablish that

23  feeling of strength and leadership that I had in the past.

24  Q    And how often are you in counseling?

25  A    We try to get together every two to three weeks.  Both of

1  our schedules are a little challenging, but we're trying to do

2  that every couple of weeks.

3  Q    What about any lasting impacts of these false statements

4  and the impact that it's had on you and the feeling that

5  you've had on your family life?

6  A    I think we're still repairing that as well.  Again, I

7  still have these kind of turtle times when I -- especially

8  when things are difficult, like now -- that I don't want to

9  communicate, or I want to run away.  And I know that's not the

10  answer.

11      So everybody is kind of doing their own work on their

12  own, and then we try to work on that together.

13  Q    Nicole, I know it's tough to talk about money.  I know

14  you don't want to do it; I don't want to do it.  But I do need

15  to ask you a couple questions, in anticipating what Mr. Paxton

16  might ask you in a few minutes.

17      When you first filed this complaint back in May of 2015,

18  you put in the complaint that you were asking for 7.85 million

19  in damages.

20  A    Yes.

21  Q    From your perspective, what, if anything, has changed

22  since you filed that complaint that causes you to think

23  differently about the money aspect of this?

24  A    I think at the time I had no idea what the long-term

25  implications of this article would be.  And they have, you

1  know, changed over time, just in the last two years, and I
2  have no idea how they will change going forward.
3      You know, we've learned the exposure of this article was
4  tremendous.  14 million people saw this article.  And that's
5  not something I think we were aware of when this began.
6      I have lost my position as an associate dean.  And I
7  understand that people think a job is a job; but to me, that's
8  not what it was.
9      I've said that, you know, I kind of mourn the loss of
10 Dean Eramo on a daily basis.  I really liked her.  I know I'm
11 still her, but I don't -- I don't know.  People saw Dean Eramo
12 as somebody who was compassionate, who cared about people, who
13 cared about the community, who wanted to make it better.  And
14 I know that I am still her, but I don't get to live those
15 values in my work.  I don't get to do the things that I did
16 before.  And that is meaningful to me.
17     It wasn't just a job.  It wasn't something I did to pass
18 the time.  And so there's that.
19     Now I've now had a couple of opportunities to try and
20 look at other jobs, and I am very concerned about whether or
21 not I could potentially do that anywhere else.
22     And just the long-term implications of being associated
23 with this article.  You can Google me and this is the first
24 thing that comes up.  First picture that shows is the picture
25 in the article.

 1    There's a Wikipedia site, you know, a very detailed

 2  Wikipedia site, related to this article.

 3    This is out there forever, and I don't think I really

 4  appreciated that when I first started this process.

 5  Q    You've now been here with us three weeks sitting through

 6  this trial.

 7  A    Going on four.

 8  Q    How has the experience of sitting here, how has that

 9  impacted you?

10        MR. PAXTON:  Your Honor --

11        THE COURT:  I sustain that objection.

12  BY MR. CLARE:

13  Q    Let me ask you this way.  We've heard -- there's been

14  testimony about some apologies that were made to various

15  people, all the way back starting in December.  We've seen all

16  of that.  The jury has seen it all.

17    Why aren't those apologies good enough, from your

18  perspective?

19  A    I see it as an apology -- I see that, when asked why

20  people are apologizing in this context, nobody has really been

21  able to answer that question.

22    It feels to me like an apology I'd make my second-grader

23  do.  Or my fourth-grader now.  He's a little better at it now.

24    You need to know why you're apologizing, and I have not

25  felt that was the case until maybe today.  But it took two

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

```
 1    years to get to that point.  And I don't think, if I hadn't
 2    done all of this, that I would have had that apology.  And I
 3    don't feel like that really should have had to happen for me
 4    to get a real apology.  And I still honestly don't believe
 5    it's a real apology, because nobody can explain to me why
 6    they're making it.
 7        And I feel like there's a lot of discussion of regret,
 8    but the regret that I see is regret that they're in the
 9    position that they're in today.  And that doesn't have
10    anything to do with me.
11              MR. CLARE:  Thank you, Nicole.  Those are the
12    questions I have for you.
13              I pass the witness.
14              THE COURT:  We'll have a break.
15              So ladies and gentlemen, this will be our second
16    midmorning break.
17              I would ask that while you're away from the court
18    you do not discuss the case with each other, do not permit
19    anyone to discuss it with you.
20              I'll ask the witness not to discuss her pending
21    testimony with counsel from either side.
22              Let's plan to return at five after the hour.
23    (Recess)
24              THE COURT:  I count all ten jurors back, ready for
25    the cross-examination of the last witness.
```

1          Mr. Paxton, you may proceed.

2          MR. PAXTON:  Thank you, Your Honor.

3          CROSS-EXAMINATION

4   BY MR. PAXTON:

5   Q    Good morning, Ms. Eramo.

6   A    Good morning.

7   Q    One of the things I wanted to ask you about was

8   statements made to the press Friday afternoon, after the

9   verdict was announced.

10         Do you recall being outside with Ms. Locke after the

11  hearing?

12  A    Yes.

13  Q    Yeah.  And do you recall that Ms. Locke told the media

14  that was there that the verdict on Friday was a complete

15  vindication of you?

16         Do you remember that?

17  A    I don't recall exactly what she said.  I remember the

18  word "vindication" being used, yes.

19  Q    Let me show you, just to refresh your recollection.  This

20  is an AP report with a picture of you and Ms. Locke there.  If

21  you would --

22  A    It's a terrible picture.

23  Q    If you would, turn to the second page, please.

24  A    Sure.

25  Q    And I don't want to give you the highlighted version, but

1  this section down here, if you would read that yourself and

2  see if that refreshes your recollection.

3  A    Yes.

4  Q    So does that refresh your recollection that Ms. Locke

5  said that the verdict on Friday was a complete vindication of

6  you?

7  A    Yes.

8  Q    And a complete repudiation of the Rolling Stone and

9  Ms. Erdely's false and defamatory articles?

10  A    Yes.

11  Q    Do you recall early in this case -- I believe your

12  counsel said it was filed in May -- that you were asked to

13  produce all the records that you were going to rely upon to

14  support your claim of damages?  Do you recall that?

15  A    Yes.

16  Q    And do you recall that as part of that, the records that

17  you produced, you produced some medical records from your stay

18  at the UVa hospital in January of 2015?

19  A    Yes.

20            MR. PAXTON:  I'll get this marked.

21            MS. MOODY:  That would be Defendants' D89.

22            THE COURT:  D89 without objection.

23            MR. CLARE:  I'm not sure what these are.  Could I

24  just take a look?

25            MR. PAXTON:  Oh, I'm sorry.

1          MR. CLARE:  Without objection, Your Honor.

2          THE COURT:  Thank you.

3    BY MR. PAXTON:

4    Q    Ms. Eramo, let me show you documents which have been

5    marked D89, which appear to be your records for your nine-day

6    stay in the hospital.  And if you could, just look at those

7    and see.  I'm not going to ask you a lot of questions about

8    them.

9    A    Okay.  These appear to be them.  From the top sheet,

10   that's what it appears to be, yes.  Uh-huh.

11   Q    Okay.  Thank you.

12         MR. PAXTON:  Your Honor, we move the admission of

13   D89.

14         THE COURT:  D89, without objection.

15   (Defendants' Damages Exhibit D89 admitted)

16   BY MR. PAXTON:

17   Q    Ms. Eramo, did you produce any records from any of the

18   counseling, the counselors that you visited, that you've

19   testified about?

20   A    Actually, I believe we did produce the information that I

21   was in counseling and my counselor's information.

22   Q    Did they -- but did you produce any actual records from

23   those counselors?

24   A    I'm unsure, honestly.

25   Q    Ms. Eramo, we all listened with a lot of disgust to the

1  e-mails that you got right after the article came out in

2  November?

3  A    Yes.

4  Q    Now, have you produced all the e-mails that you received

5  that were relevant to this article?

6  A    I believe that I did, yes.

7  Q    And do you believe that you produced e-mails that you

8  received after December 5 --

9         MR. CLARE:  Your Honor, I just want to make a point

10  of clarification for the record that the e-mails that are

11  being requested were produced by the University of Virginia,

12  not by Ms. Eramo individually.  So to that extent, I would

13  object to her being asked questions about what documents were

14  produced by a third party, by the university.

15         MR. PAXTON:  Fair enough.  I'll rephrase the

16  question.

17  BY MR. PAXTON:

18  Q    You're aware that the University of Virginia produced

19  e-mails that came to your e-mail account during the course of

20  this litigation?

21  A    Yes.

22  Q    Have you reviewed some of those e-mails?  That's some of

23  the ones that were produced and shown to you earlier today?

24  A    Yes.

25  Q    And can you identify for the jury today any e-mail that

1  was produced by the University of Virginia that had anything

2  critical or negative to say about you after December 5, 2014?

3  A    I definitely recall having received some in January after

4  there had been a FOIA dump of information out to The Daily

5  Progress, I believe it was; and I received a few e-mails at

6  that time as well.

7  Q    Other than a few e-mails in late January, there was none

8  between then?  And the last e-mail that you introduced to the

9  Court I believe was dated November 29, 2014.

10  A    As far as I know, you all have what I had in my UVa

11  account.

12  Q    Ms. Eramo, let me show you what has been marked as D90.

13  A    Yes.

14  Q    Take a second to look at that, this document, which is a

15  compilation of documents.

16  A    Yes.

17  Q    Can you identify for the jury what these documents are?

18  A    They appear to be notes I received with flowers after the

19  article came out from people in the immediate Charlottesville

20  community who knew me and knew my work.

21  Q    And was the first set of flowers that you got from Allen,

22  Pat, and Susan, the very top note?  Did you know who that was

23  from?

24  A    Yes.

25  Q    Who is Allen, Pat, Susan, and Christina?

```
 1   A    Dean Groves, Pat Lampkin, Susan Davis, and Christina

 2   Morrell.

 3   Q    So the people that were your superiors?

 4   A    Yes.

 5          MR. PAXTON:  Your Honor, we move the admission of

 6   the exhibit.

 7          MR. CLARE:  Without objection.

 8          THE COURT:  Next numbered defense Damages exhibit.

 9          MS. MOODY:  It's Defendants' 90.  That's not

10   displayed to the jury.

11   (Defendants' Damages Exhibit D90 admitted)

12          MS. MOODY:  Do you want that displayed to the jury,

13   that last exhibit?

14          MR. PAXTON:  Sure.  Let's display at least the first

15   one.

16   BY MR. PAXTON:

17   Q    So just the jury -- I'm sorry.  I forgot to do that

18   earlier.  I apologize.  Thank you, Ms. Moody.

19          So this top one we were just discussing, is that Allen

20   Groves, Pat Lampkin, Susan Davis, and Christina Morrell?

21   A    Yes.

22   Q    And I take it these were flowers that were given to you

23   in the immediate aftermath of the article coming out?

24   A    Yes.

25   Q    Ms. Eramo, let me show you what's been marked as D91.
```

1  It's again a compilation of items and events.

2      Do you recognize that?

3  A    Yes, these are events from students that I worked with.

4  Q    Those are all student notes to you?

5  A    I'm not sure if they are all students because I haven't

6  had a chance to review them all.

7  Q    But these --

8          MR. PAXTON:  Your Honor, I would move the admission

9  of the exhibit.

10         MR. CLARE:  Without objection.

11         THE COURT:  Next numbered Defendants' exhibit.

12         MS. MOODY:  D91.

13  (Defendants' Damages Exhibit D91 admitted)

14  BY MR. PAXTON:

15  Q    And all of these notes that you received -- I believe

16  there are 21 of them total -- all came in in the immediate

17  aftermath of the article being published; is that correct?

18  A    Yes.  I think people who were close to me knew how

19  devastated I was by the article and wanted to try and reach

20  out and make me feel better.

21  Q    Correct.  And I completely understand that.

22      And you took some comfort from the people in the

23  community reaching out to support you?

24  A    They were very sustaining, yes.

25  Q    In the same way, I'm sure, you had to feel very favorable

1    that the open letter was published in the Cavalier Daily on

2    November 24 by Sara Surface and others who had arranged for

3    that?

4    A    I believe it kept me from getting fired.

5    Q    Did anyone at the University of Virginia ever tell you

6    you were going to be fired?

7    A    I did have conversations with people about the board

8    meeting and concerns that I would be fired at the board

9    meeting, yes.

10   Q    Were these people -- was it Allen Groves?

11   A    It was Pat, Pat Lampkin.

12   Q    Okay.

13   A    We talked about how I would negotiate a severance

14   package.

15   Q    And did she give you some assurance that she was going to

16   stand up for you?

17   A    She said she would do her best.

18   Q    And you were not fired, were you?

19   A    No, I wasn't.

20   Q    And I know that had to be terribly difficult for you,

21   that you were worried that you were going to lose your job in

22   this situation?

23   A    Yes, because it would have meant losing everything.  I

24   was the primary breadwinner in our household.  It would have

25   meant losing our house.

 1   Q     So we're all thankful that that didn't happen.

 2   A     Very much so.

 3   Q     Let me show you DTX301.

 4         MS. MOODY:  Defendants' 90 -- I'm sorry, D92.

 5   BY MR. PAXTON:

 6   Q     Ms. Eramo, I'm going to show you what's been marked as

 7   D92.  Can you identify these as being e-mails that you

 8   received at your UVa account, e-mail account?

 9   A     They appear to be from -- again, from students and people

10   I was close with.

11   Q     So you know all the people that are in this document?

12   A     I haven't had a chance to look at all of them.  But so

13   far I do know all of these people as people I worked closely

14   with or I have some connection to all of these people.  Let me

15   continue to read it, though.

16   Q     Sure.

17   A     (Perusing document further).

18         Yes, these are all people I have a direct connection to.

19   Q     Okay.  If you would, look at the --

20         MR. PAXTON:  Your Honor, we move these into

21   evidence.

22         THE COURT:  Okay.  Without objection.

23   (Defendants' Damages Exhibit D92 admitted)

24   BY MR. PAXTON:

25   Q     If we could pull up DTX301, if you could turn to the page

```
 1   in the bottom right-hand corner, the last four digits are
 2   4680.  It's an e-mail exchange from Dorothy Edwards.
 3   A    4860, did you say?
 4   Q    Yes, ma'am.  Yes, ma'am.
 5           MR. PAXTON:  Is it not in there?
 6           MR. CLARE:  I don't think --
 7           THE WITNESS:  There's an e-mail in here, but I'm
 8   having trouble.  Oh, wait, here it is.  You're not pointing in
 9   Bates order.  Sorry.
10   BY MR. PAXTON:
11   Q    That's my fault.  I apologize.  They may be in
12   chronological order as opposed to Bates order.  I think that's
13   the situation.
14       Who is Dorothy Edwards?
15   A    Dorothy is the executive director of the Green Dot
16   violence prevention program, the program we were bringing to
17   UVa; somebody I'd worked with for several years.
18   Q    And so that's the program that was being launched in
19   January 2015; is that correct?  In other words, you had
20   testified earlier --
21   A    Sorry.
22   Q    -- that you -- one of the reasons you were interested in
23   coming back in January after your surgery was to participate
24   in the training of leaders that was going to take place --
25   A    Yes.
```

1  Q    -- right?

2  A    Right.

3  Q    And so this is the person --

4  A    This is the person who was coming to do the training with

5  our staff, yes.

6  Q    And can you -- at the top of this, there is a

7  back-and-forth.  There's an e-mail from her and then there's a

8  quick response, "Can we talk tomorrow?"

9       But I'd like to emphasize the response that she made to

10 you on November 19 at 7:21 p.m.

11      So this is the night that the article comes out; is that

12 right?

13 A    Yes.

14 Q    All right.  And could you read for the jury what

15 Ms. Edwards said to you about the article?

16 A    "Hi.  Tough article.  But, my reading, you personally are

17 doing right by victims, giving them unconditional support and

18 not letting politics put you in a position of pressuring them

19 either way.  In this climate, to have a whole lot of victims

20 all reporting feel validated and supported by you is a good

21 thing."

22      And then there's information about scheduling.

23 Q    All right.  And Ms. Edwards is a nationally known expert

24 in sexual assault training and prevention; is that correct?

25 A    She's a prevention expert, yes.

1   Q    Did you take comfort in what Ms. Edwards told you about

2   her perception of the article?

3   A    Certainly I valued her opinion.

4   Q    Ms. Eramo, may I show you now D93, I believe it is?

5   A    Okay.

6   Q    First of all, can you look at the very last page of that

7   document.  Is that your signature?

8   A    Yes.

9   Q    And do you recall that as part of the lawsuit you were

10  asked a series of written questions and you worked with your

11  lawyers to come up with written responses, and then you signed

12  what are referred to in lawyer speak as interrogatories?

13  A    Yes.

14  Q    And is this exhibit in front of you those

15  interrogatories?

16  A    It appears to be.

17          MR. PAXTON:  Thank you.  Move the admission.

18          MR. CLARE:  I don't have any issue with him asking

19  questions about this.  There's a lot of hearsay in this

20  document, a lot of issues that are no longer relevant in terms

21  of this phase of the case.  I think there's a foundation

22  question.

23          THE COURT:  Is there a motion to admit the entire

24  set of interrogatories, or just one interrogatory and the

25  response?

1           MR. PAXTON:  All of it, Your Honor.

2           THE COURT:  I guess we have to look at all of them,

3   then.

4           MR. CLARE:  Right.

5           MR. PAXTON:  I can narrow it.  I can make it answer

6   to interrogatory number 1, answer to interrogatory number 4.

7   And those are the only two.  Yes, those are the only two.

8           MR. CLARE:  I don't have any objection to those two

9   being admitted.

10          THE COURT:  So I think maybe, ladies and gentlemen

11  of the jury, you haven't been exposed to interrogatory

12  responses as of yet.  You know from what's taken place already

13  that much discovery goes forward before a case is tried.  The

14  depositions that you've seen are one form of discovery.

15  Another form of discovery are interrogatories and responses,

16  designed by the parties to identify information that is basic

17  and not disputed.

18          Mr. Paxton seeks to admit and will be permitted to

19  admit into evidence interrogatory responses by plaintiff as to

20  two specific inquiries, 1 and 4.  And the Court is going to

21  admit those interrogatories and the responses as the next

22  numbered defendants' exhibit.

23          I'm going to ask that some effort be made to redact

24  all the others.  I think I would have to pass on them

25  individually.  And to save doing so, we'll admit the redacted

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

```
 1   version of the interrogatories.
 2            MR. PAXTON:  Your Honor, we can take care of that at
 3   the lunch break?
 4            THE COURT:  Yes, sir.
 5   (Defendants' Damages Exhibit D93 admitted)
 6   BY MR. PAXTON:
 7   Q    Ms. Eramo, if you would look at interrogatory number 1,
 8   which is on page 3.
 9   A    Yes.
10   Q    The question was to identify every speaking engagement
11   and instructional talk you've undertaken since 2006 where you
12   addressed or referred to sexual assault.  And the question
13   goes on, but that's the gist of it.
14            Would you then turn to page 4?
15   A    Yes.
16   Q    And so what is listed in this part of the answer reads,
17   "Additionally, plaintiff recalls and has been able to locate
18   the following responsive information," and you have a series
19   of presentations you were involved in in two thousand -- one
20   in 2013, which is here.  And then several in -- two in 2013.
21   You also presented a workshop in 2013.
22            But for my purposes, I'm particularly interested in the
23   fact that in April of 2015, which was four months after the
24   article came out, you were participating in Take Back the
25   Night presentations similar to the ones you had done in the
```

1    two previous years; is that correct?

2    A    Yes.  At that point I was in the temporary Title IX

3    coordinator for students role, and I was helping to educate

4    the students on the new policy.  So I was on that panel

5    discussion with Anne Coughlin, who was a law professor at the

6    university, and we were discussing the new policy.

7    Q    And in addition to the panel discussion, you also

8    participated in the mock trial, which was the thing that was

9    very similar to what had taken place in the last three years;

10   is that correct?

11   A    Actually, I don't think that's correct now that I'm

12   looking at it.  I apologize for that.  I don't remember that

13   we had a mock trial that year, because we no longer had

14   trials.  Apologies.

15   Q    Would you turn over to page 7, interrogatory number 4.

16   And so this asks to identify honors and awards that you've

17   received since 2006.  And the top two that you referred to

18   occurred in the spring of 2015; is that correct?

19   A    That's correct.

20   Q    And I believe during your testimony earlier you discussed

21   the Algernon Sydney Sullivan award as being quite a high

22   honor?

23   A    Yes, it is.

24   Q    Let me show you --

25              MS. MOODY:  D94.

 1  BY MR. PAXTON:

 2  Q    Ms. Eramo, let me show you what has been marked as D94,

 3  which is a publication off of the UVa website about the

 4  graduation in 2015?

 5  A    Yes.

 6  Q    Do you recognize this event as depicted in this article

 7  by the University of Virginia?

 8  A    Yes.

 9       MR. PAXTON:  Your Honor, I move the admission of

10  this exhibit.

11       MR. CLARE:  Your Honor, I don't have any objection

12  to Mr. Paxton questioning about this, but the document itself

13  is hearsay.  It's a news article.

14       THE COURT:  May I see it?

15       Ladies and gentlemen, the next exhibit is one of the

16  awards that Ms. Eramo received and it talks about the

17  circumstances surrounding that award.  The Court will admit it

18  subject to the understanding that it is only demonstrated to

19  memorialize that the award itself and should not be read to

20  assume truth of any of the matters that are said therein.  It

21  memorializes the award that she received at graduation.

22       MR. PAXTON:  Thank you.

23  (Defendants' Damages Exhibit D94 admitted)

24  BY MR. PAXTON:

25  Q    Ms. Eramo, did you attend this ceremony?

1    A    I did.

2    Q    And do you recall -- who was -- do you recall who gave

3    you this award, who the chair of the committee was?

4    A    I know the person who gave it to me was Meg Gould, but I

5    don't know who chaired -- if she actually chaired the

6    committee or how that worked.  I don't know the who nominated

7    me or that part of the process.

8    Q    Do you recall that it was said publicly at this

9    presentation that "Nicole Eramo will forever have our heart

10   and we'll forever have her back"?

11   A    Yes, I do.  They gave me a commendation that says that on

12   it.

13   Q    And that had to mean a lot to you?

14   A    It was very meaningful.  Again, these are people in our

15   community who were deeply hurt by what happened as well, and I

16   think recognized the hurt that occurred to me and wanted to

17   recognize me in some way for the work they knew I had done for

18   almost 20 years at the university.

19   Q    Right.  And do you also recall that Ms. Gould said that

20   "Nicole is selfless, professional, accessible, and unwavering

21   in her support of students"?

22   A    Yes.  I was very touched by that.

23   Q    And they also said that "People value her advice, seek

24   her out for her opinion, and trust her moral compass"?

25   A    Yes.  Again, I was very touched by that.

1  Q    Let's go back to the interrogatory answer, which is the

2  second item that's listed there from the spring of 2015.  This

3  is on page 7 of DTX164.  There is a Henry St. George Tucker

4  award.

5       Can you explain to the jury what that is?

6  A    It's a faculty award given by the honor committee every

7  year at their banquet for service to the community.  I started

8  my career working with the honor committee.  I worked with

9  them almost nine years before moving to the dean's office.

10 Q    I take it that that had to be also a very meaningful

11 supportive response to you, in light of everything that had

12 happened?

13 A    Yes.

14 Q    You've described a little bit -- can we pull out DTX119,

15 which is, I think, Plaintiff's Trial Exhibit 119.

16      If you'd just focus at first on the top of the e-mail,

17 just so everyone can see what it is.

18      Ms. Eramo, do you recall that Pat Lampkin sent out the

19 announcement of your change in position on February 24, 2016?

20 A    Yes.

21 Q    Okay.  And she begins after the first line saying,

22 "First, I am very pleased to announce that Nicole Eramo will

23 be joining my staff as executive director of assessment and

24 planning, assuming a new set of responsibilities that will be

25 pivotal in the shaping of the student experience and in

1  determining how we align student affairs resources to better

2  serve students and parents."

3      Now, your office is now three doors down from Pat

4  Lampkin; is that right?

5  A   I think so, yes.

6  Q   Did you -- when you saw this e-mail, did you believe that

7  Ms. Lampkin was trying to indicate that you were getting an

8  important position at the university?

9  A   I think she was trying to communicate to people that I

10  wasn't being punished by moving me out of the dean's office.

11  Q   And part of what you are assigned to do is to work as

12  part of the Cornerstone program; is that correct?  Is that

13  what your role is?  Part of what you're working on is part of

14  the Cornerstone program at the University of Virginia?

15  A   So the Cornerstone is the strategic plan for the

16  University of Virginia, the overall strategic plan.  I'm not

17  directly working on that.  I'm working on how our plan

18  connects with that in some way.

19      So I'm working on different pieces of our connection to

20  the Cornerstone plan, things like that, but I'm not part of

21  that particular initiative.  That's above us.

22  Q   Is the Cornerstone program the program that the

23  University of Virginia is spending a half billion dollars on

24  in the next several years?

25  A   It's the strategic planning initiative that they've been

1    putting resources into, yes.

2    Q    Can we go to the second paragraph, please.

3         So this is where Ms. Lampkin explains what you will

4    actually be doing in your new role; is that correct?

5    A    Yes.  Part of this has changed a bit.

6    Q    And then could you read the last sentence in that

7    paragraph, please?  "As part of the university's Cornerstone"

8    --

9    A    Okay.  That's the second-to-last sentence.

10   Q    Oh, I'm sorry.

11   A    That's okay.  "As part of the university's Cornerstone

12   plan, which includes an emphasis on strengthening the

13   university's distinctive residential culture, I've asked

14   Nicole to begin focusing her attention on the second-year

15   experience.  The second year is a critical time for our

16   students and Nicole's contributions in this area will help us

17   set a division-wide direction for new initiatives."

18   Q    So this is not a makeshift job; this is a very important

19   position that you're in right now; is that right?

20   A    I'm not actually doing this part of the position.  And, I

21   mean, I'm just telling you how I felt about it.

22   Q    Sure.

23   A    I felt like it was a place to put me for the time being.

24   There was another individual, Christina Morrell, above me, who

25   was sort of more connected to the president's initiatives,

1    more kind of in that line of direct work with the Cornerstone

2    folks.  And I've taken on a piece of that work, but not all of

3    it.  And I'm not actually working on the second-year

4    experience piece at the moment, given her departure.

5    Q    Christina Morrell left?

6    A    Yes.  Well, she's still at the university, but she's no

7    longer in student affairs.

8    Q    I see.  And one of the roles that you had in the dean's

9    office that Dean Groves told us about was his appointment of

10   you to the hazing board, hazing prevention advisory board?

11   A    So that kind of rolled over from my old job.  When --

12   this is going a few years back.  I supervised part of student

13   activities and fraternity and sorority life, and during that

14   time the director of fraternity and sorority life and I took a

15   deep interest in hazing as an issue at the university and

16   wanted to tackle it.  And during that time, we joined a

17   consortium of universities that were trying to deal with

18   hazing and hazing prevention.  And I -- that was a three-year

19   program, and so I stayed on as working with that three-year

20   program until its end even though I wasn't -- by its end, I

21   was no longer even in the dean's office, but it didn't make

22   sense to shift that work to somebody else.

23        So I continued more -- in more of a supporting role to

24   maintain some involvement in the hazing piece, because I've

25   been involved with it since its inception.  And I think I'm

1    actually the only staff member left on our small working group

2    that's been involved since the beginning.

3        And so for that reason I continued that work just so give

4    them moreso institutional memory than anything more.  So I've

5    continued that work a bit, but it's not -- it's not really in

6    my job description at the moment, but they kind of need that

7    support to sustain the effort.

8    Q    And so you continue to serve on that board; is that

9    right?

10   A    The consortium has ended.  I continue to work in our kind

11   of behind-the-scenes small working group to keep that group

12   afloat.

13   Q    Now, you mentioned your application to the University of

14   Richmond in your testimony with Mr. Clare?

15   A    Yes.

16   Q    Can you tell us the time period that that occurred?

17   A    I think it was February, March.  I remember my interview

18   being around my birthday, which is toward the end of March.

19   Q    And that's February, March of this year; is that correct?

20   A    '16.  Yes.  Sorry.

21   Q    And so at that time, in February of 2016, you indicated

22   that there was a question about the article; is that right?

23   A    The search firm director contacted me the night before

24   and suggested that I be open and speak about the article.

25   Q    And was it from a perspective of:  How did you learn from

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1    that?  Have you grown from that?  They weren't questioning you

2    about that they thought you had done something wrong at that

3    point, were they?

4    A    They were questioning -- she suggested that the search --

5    that the search committee might want to know that I wasn't

6    running away from something at UVa.

7    Q    Sure.

8    A    I don't know how to read into that or not.

9    Q    And so this interview in February or March of 2016 would

10   have been almost six months after the OCR report came out that

11   was very critical of you; is that correct?

12   A    Yes.  But that did not come up in the interview.

13   Q    It did not?

14   A    It did not.

15   Q    But you don't know whether that was a factor that was

16   considered by the committee, do you?

17   A    I have no way of knowing that.  But I know they didn't

18   speak of it to me.

19   Q    And isn't it true, Ms. Eramo, that when the OCR report

20   came out, that there was publicity in the Washington Post

21   about that finding and the fact that it was critical to you?

22   A    There was.  It was nothing like the publicity around the

23   article itself.

24            MS. MOODY:  D95.

25   BY MR. PAXTON:

1   Q    Ms. Eramo, let me show you an article that has a date of

2   September 21, 2015, which has been marked as D95.

3   A    Yes.

4   Q    Can you identify this as the article that appeared in the

5   Washington Post on September 21, 2015?

6   A    I see the date.  I'm not certain I read it at the time.

7   Q    But you're familiar with it now?

8   A    Yes.

9        MR. PAXTON:  Move its admission, Your Honor.

10        MR. CLARE:  Your Honor, I would object to the

11   admission subject to the same rulings that we had at side bar

12   in terms of laying a foundation for this witness having

13   reviewed and being familiar with certain materials.

14        In addition, this document contains hearsay well

15   beyond the scope of the issues for the limited purpose that

16   the Court has described, so I would object on hearsay grounds

17   as well.  Foundation and hearsay.

18        THE COURT:  Overruled, especially based on the

19   witness's own description of the prominence of the Washington

20   Post in the local community.

21        MR. PAXTON:  Thank you, Your Honor.

22   (Defendants' Damages Exhibit D95 admitted)

23   BY MR. PAXTON:

24   Q    If you would turn to the third page, please.

25   A    Yes.

1  Q    Top two paragraphs.  "The University of Virginia

2  investigation began in June 2011, less than a year after

3  Sullivan took office.  The only OCR case dating that far back

4  is at the University of Massachusetts at Amherst."

5       It goes on to say, "In the 26-page letter, OCR focused on

6  an associate dean of students, Nicole Eramo, who is widely

7  regarded on campus as a compassionate advocate for sexual

8  assault survivors.  The letter said that Ms. Eramo helped

9  create a basis of a hostile environment through comments she

10  made in September 2014 to a university radio station."

11       Did you have family and friends tell you that they saw

12  this in the Washington Post?

13  A    I don't recall.

14  Q    And do you agree that the Washington Post described it

15  accurately, that OCR found that you had created a basis for a

16  hostile environment through your WUVA interview?

17  A    Yes.  I believe I've testified several times to my

18  concerns about that finding --

19  Q    Okay.

20  A    -- and that interview in and of itself.

21  Q    And then if you scroll down a little bit, please, to

22  here, down just below where it says "UVa dean sues Rolling

23  Stone," you see that it says, "Sullivan," referring to

24  President Sullivan, "declined to dispute the OCR findings"?

25  A    Yes.

1    Q    And so that was your understanding, is that the

2    university had declined to dispute the OCR findings, including

3    the ones against you?

4    A    It is my understanding that they did not agree with the

5    findings, but they were not going to enter into the

6    administrative process that was required for a formal dispute.

7    Q    Do you agree with me, Ms. Eramo, that an individual such

8    as yourself who was in the position of a Title IX coordinator

9    at the time that these findings came out, that would be a

10   negative thing on your professional reputation?

11   A    No one at the university indicated that there were

12   concerns about my performance related to this report.

13   Q    And nobody at the university expressed concerns about the

14   depiction of you in the article either, did they?

15   A    Oh, that is not true at all.

16   Q    Didn't you testify earlier in this that Pat Lampkin, all

17   the people that you reported to, were very supportive of you

18   and said it didn't change their opinion of you at all?

19   A    I think what you're saying is a little bit different.

20   They were very concerned about the depiction of me in terms of

21   its impact on me.  They were not concerned in terms of my --

22   they knew my job performance and they knew those things not to

23   be true.

24   Q    It was a poorly worded question.  I wasn't trying to

25   argue with you --

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1   A    Okay.  Point taken.

2   Q    -- not at all, but simply to say that the same response

3   to the article; is that correct?

4   A    I don't think those responses are similar.  But that's --

5   we'll have to agree to disagree on that one.

6   Q    All right.  Now, you testified at some length about the

7   illustration and how horrible that was for you?

8   A    Yes.

9   Q    Yeah.  And as you sit here today, you understand that the

10  illustration and the article as a whole is not part of what

11  the jury is going to consider, right?

12  A    I do understand that.  It was also my understanding --

13  and forgive if I'm not getting this right; I'm not a lawyer --

14  that they consider those statements in the context of the

15  broader article.

16  Q    So in your mind, there's really no difference, it's all

17  one thing?  Is that what you're saying?

18  A    No, that's not exactly what I'm saying.  But you can't

19  just look at that one sentence and say it's that one sentence;

20  it's in the context of a broader piece.

21  Q    But in terms of if you were going to measure the harm to

22  you between the statements that the jury has found were made

23  with actual malice, versus the illustration, the article as a

24  whole, can you provide the jury with any guidance at all about

25  how you would weigh those two?

1          MR. CLARE:  I'm going to object.  It calls for

2    speculation and foundation.

3          THE COURT:  Ladies and gentlemen, ultimately the

4    Court is going to ask you to consider the harm and damage, if

5    any, caused by the statements that you have found to be

6    actionable and made with actual malice.  So that's the

7    inquiry.

8          The witness may have her own impression about what

9    you'll be asked to consider, but I tell you that your

10   deliberations will track the statements that you have found to

11   be actionable.

12         MR. PAXTON:  Do I need to -- is the question

13   permitted or -- he objected.

14         THE COURT:  I think she's given her best answer.

15         MR. PAXTON:  I just wasn't sure she had given her

16   answer at that point.

17   BY MR. PAXTON:

18   Q    So are you able to make an allocation?

19         MR. CLARE:  See, this is the request for the

20   allocation that I believe calls for the same sorts of invasion

21   of the province of the jury that Mr. Paxton spoke about in his

22   opening statement.  I don't think it's proper to ask this

23   witness to do that, given the way that the jury will be

24   charged.

25         I object that it calls for speculation, and lack of

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1   foundation.

2            THE COURT:  Again, the Court believes that the

3   witness has given her best answer to the question as posed.

4            THE WITNESS:  And I have to be perfectly honest that

5   I don't know the question anymore, so I think I've done what I

6   can.

7            THE COURT:  Well, let him ask another question.

8            THE WITNESS:  Okay.

9            MR. PAXTON:  Just one minute, Your Honor.  I need to

10  consult something real quick.

11           Those are all my questions, Your Honor.

12           THE COURT:  Any redirect?

13           MR. CLARE:  No, Your Honor, I don't have any further

14  questions.  The witness may be excused from our perspective.

15           THE COURT:  Ms. Eramo, you may stand down.  Thank

16  you.

17  (Witness stood aside)

18           THE COURT:  Do you have a short witness we might get

19  in before lunch?

20           MR. CLARE:  Well, here's what I was going to

21  suggest.  We have one witness who has a very limited window of

22  availability.  Dr. Lin, given his medical responsibilities,

23  has to be done between the hours of 12:15 and 1:15.  His

24  examination we anticipate being very short, so what I would

25  propose to do is we would play one of the video witnesses

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1    until he can get here in about 15 minutes, and then we do

2    Dr. Lin before lunch, and then we take our lunch break then.

3                THE COURT:  All right.  That's fine.  Let's do that.

4                So ladies and gentlemen, we're to receive another

5    video deposition.  Keep in mind all the things the Court has

6    said about video depositions for purposes of this trial.  It's

7    testimony given under oath.  The witness was subject to

8    cross-examination.  It should be considered just as would

9    testimony from any witness who appears live.

10   (Video deposition of Jann Wenner played)

11               MR. PHILLIPS:  We'll move the disc and the

12   transcript of this into the record.

13               MS. MOODY:  This will be Plaintiff's; the disc will

14   be 208, and the transcript will be D209.  It's Plaintiff's

15   D208 and Plaintiff's D209.

16               MR. PHILLIPS:  And the e-mail exchange between Sean

17   Woods and Jann Wenner.

18               MS. MOODY:  And this e-mail will be D210.

19               THE COURT:  All admitted without objection.

20   (Plaintiff's Damages Exhibits 208, 209 and 210 admitted)

21               MR. PHILLIPS:  We're going to do another video

22   deposition, Your Honor, Mr. Provus, Rolling Stone 30(b)(6)

23   witness.

24   (Video deposition of Michael Provus played)

25               MS. MOODY:  The disc will be Plaintiff's Exhibit

1   D211.  The transcript, Plaintiff's Exhibit D212.  And the

2   exhibit, Plaintiff's Exhibit D213.

3           MR. PHILLIPS:  That's the audit report referred to

4   in the transcript.

5           THE COURT:  All admitted without objection.

6   (Plaintiff's Damages Exhibits 211, 212, and 213 admitted)

7           THE COURT:  Are we ready for Dr. Lin?

8           MS. LOCKE:  Yes, Your Honor.  He's walking in the

9   building as we speak.

10          THE COURT:  Okay.  Are you too exhausted to get up

11  and stretch?  You know, you wanted to earlier in the trial.

12  This will be a good chance.

13          KANT LIN, M.D., called as a witness, having been

14  duly sworn, was examined and testified as follows:

15          DIRECT EXAMINATION

16  BY MS. LOCKE:

17  Q   Dr. Lin, thank you for being here this afternoon.  I know

18  that you have a very busy schedule, and so we appreciate your

19  time.

20  A   Sure.

21  Q   My name is Libby Locke.  I represent Nicole Eramo.  I

22  think we've spoken once before?

23  A   Yes, we have.

24  Q   Can you please introduce yourself to the jury.

25  A   Sure.  My name is Kant Lin.  I'm a reconstructive and

1    plastic surgeon working over at UVa.  I'm a professor in the

2    department of plastic surgery and I have a specialty where I

3    take care of women who have had mastectomies following breast

4    cancer diagnosis.

5    Q    And you said that you are a plastic surgeon at the

6    University of Virginia.  That's here at the medical center?

7    A    Yes, I am.

8    Q    And you also said that you're a professor.  Can you

9    describe what your educational work is?

10   A    Sure.  There's a hierarchy system in the university, and

11   when you first start out, after you finish training, you're at

12   the lowest level, which is what we call an assistant

13   professor.  And then over the years, as you produce more

14   things, scholastic scholarly achievements, textbooks, papers,

15   you go up on the ranks.  And I'm at the highest level now.

16   I've been here for 25 years and I'm a tenured professor at the

17   university.

18        So I've created a certain body of achievement as far as

19   textbooks written, articles published, positions held in

20   national societies and so forth.  So that's what I mean by I'm

21   a professor.

22   Q    Thank you for that explanation.

23        Tell us what, if any, specialties you have in your work.

24   A    So as I was saying before, I have two specialties.  I

25   take care of children that have congenital deformities, like

1   cleft lip and palate and head deformities.  And I'm part of
2   the breast cancer team, so I take care of women who have had
3   mastectomies following breast cancer operations.  So I will do
4   breast reconstructions on them.
5   Q    Tell us about your educational background.  Where did you
6   go to college and where did you go to medical school.
7   A    I went to the University of Pennsylvania as an
8   undergraduate.  And then following that, I went to Mt. Sinai
9   School of Medicine in New York City, where I trained, got my
10  medical degree.  And then I went and did five years of general
11  surgery training back at the University of Pennsylvania in
12  Philadelphia, followed by two years of plastic surgery
13  training, followed by a year of fellowship at the University
14  of Toronto in Canada, where I specialized in pediatric plastic
15  surgery.  And then I came here.  And this is the only job I've
16  ever had here.
17  Q    So in total, how long have you been a doctor, Dr. Lin?
18  A    Let's see.  I've been here for 25 years, and I took
19  seven, eight years of training.  So whatever number that is.
20  Q    I want to talk briefly about the kind of different
21  external factors that can impact success or failure of a
22  surgery.
23       I take it in your 25-plus years being a doctor, you've
24  had an opportunity to observe what stress can do on a patient
25  who is undergoing surgery?

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1   A    Yes, I have.  Yes, I have.

2   Q    Tell us, in your experience, what impact, if any, can

3   stress have on a patient who is getting ready to undergo a

4   surgical operation?

5   A    Well, stress is a very insidious thing.  I'm sure most

6   everyone in this room has experienced stressful situations,

7   and you know that there are phases of that.

8        Initially, there may be sort of an adrenaline rush

9   because something has happened that's very, you know,

10  disconcerting or anxiety-producing.  But there's also

11  longer-term effects.  And some of the science is now starting

12  to come out, especially with the way that stress alters

13  certain hormones and other types of factors that are in your

14  blood system.

15       And so I think that, certainly from a doctor's point of

16  view, we like to have the patient under the least amount of

17  stress before they have surgery because surgery itself is an

18  extremely stressful situation.  And we have found that stress

19  definitely has some correlation with being more susceptible to

20  different types of infections.

21       We've all experienced, like I said, if you feel run down

22  and you're not sleeping and you're worried, you're anxious.

23  You know, that's going to create a very unfavorable situation

24  for a surgical healing.

25  Q    That was going to be my next question.  Can stress -- in

1   your experience, can stress lead to longer recovery times?

2   A    Oh, absolutely.  Absolutely.  You know, even if the

3   patient is too stressed out to eat or to sleep properly, you

4   know, not getting the proper rest or proper nutrition, that's

5   a side effect not necessarily of the stress itself, but even

6   the stress itself can cause some alterations in your way that

7   your body responds to other types of insults, such as bacteria

8   and other types of virus infections.

9   Q    Dr. Lin, do you know the plaintiff, Nicole Eramo?

10  A    Yes, I do.

11  Q    Tell the jury how you know Ms. Eramo.

12  A    So I first met Ms. Eramo in September, and she was -- I

13  work -- like I said, I work on the breast cancer team, and she

14  was --

15  Q    Let me stop you.  When you say September, you mean

16  September 2015?

17  A    2015, that's correct.

18  Q    Excuse me.  2014?

19  A    2014.  I'm sorry.  2014.

20  Q    I'm sorry.  2014.

21  A    And she -- was it 2014?

22       MRS. ERAMO:  (Indicating in the affirmative)

23  A    Yes, I think it was.  Was it 2014?  I think it might have

24  been 2014.  That's right.

25       So she was part of the -- she had been seen by the breast

```
 1   team and they referred her to me to discuss possible breast
 2   reconstruction, because she was entertaining the idea of
 3   having mastectomies done for her breast cancer.
 4   Q    You said you met with her in 2014.  Just to orient the
 5   jury, the Rolling Stone article was published in November of
 6   2014.  So you met with Ms. Eramo about two months before the
 7   article was published?
 8   A    That's correct.  That's correct.
 9   Q    And when you first met with Ms. Eramo in September of
10   2014, what did you observe in terms of her stress level at
11   that point in time before the article was published?
12   A    So she was not particularly under any sort of stress that
13   I could tell, although she was -- you know, one thing that
14   struck me about her was that she was extremely dedicated to
15   her job and to her students.  And so she had this diagnosis of
16   breast cancer even though it was a very early form.  But she
17   was very insistent about not having her surgery until after
18   the semester was over.
19        So, I mean, here she was walking around with an early
20   form of breast cancer but she was thinking about something
21   else besides her own health at that time.  So I was very
22   struck by that.  So that's why we didn't end up doing anything
23   for her until December.
24   Q    Now, my understanding is that you had a preoperative
25   meeting with Ms. Eramo on December 1st.
```

1      Do you recall that meeting?

2   A    I vaguely recall it.

3   Q    Tell the jury -- so this is December 1st.  The Rolling

4   Stone article came out on November 19.  Tell the jury what, if

5   anything, you recall about observing Ms. Eramo on that

6   December 1st preoperative meeting.

7   A    I don't remember the real specifics of it.  I just

8   remember that at that point it had just come out, and I think

9   initially there was some concern about, you know, identifying

10  people and so forth.

11       So, you know, as a physician I'm always a little bit

12  careful about getting into people's businesses outside of just

13  their medical care, but I do remember that she was a lot

14  more -- I think she exhibited signs of having a lot more

15  anxiety at that time, because this was right in the middle of

16  the whole thing.  And I just sort of remember seeing that, you

17  know, she seemed a little bit more preoccupied.

18  Q    And Ms. Eramo's surgery was ultimately scheduled for

19  December 19, 2014.  Is that consistent with your recollection?

20  A    Yes, it is.

21  Q    As Nicole was preparing for her surgery, would you have

22  considered her in an ideal state from a stress level

23  perspective going into her operation?

24  A    I don't think I would consider it an ideal state at all,

25  no.

1  Q    Tell me why not.

2  A    Again, I like my patients to be well rested, to have as

3  calm as possible frame of mind.  I actually tell them that,

4  you know, they should be thinking very positive thoughts and

5  that they should, you know, sort of be focused on their

6  surgery and their health and their recovery.

7        And, you know, I think, clearly, she was very preoccupied

8  with other things.

9  Q    Now, Ms. Eramo had surgery on December 19.  Did you

10  ultimately meet with her postoperatively?

11  A    Multiple times, yes.

12  Q    And tell us a little bit about postoperatively the

13  procedure, the drains that are placed, that were placed in

14  Ms. Eramo's surgical sites, and just describe that for the

15  jury as best you can.

16  A    Sure.  So Ms. Eramo had bilateral mastectomies done.  And

17  following the mastectomies, I started to do what we call

18  implant-based breast reconstruction.  And so we put in a

19  device which allows us to manipulate and create a space

20  underneath her skin and underneath her muscle in which a

21  breast implant will eventually be placed, sort of standard of

22  care for breast reconstruction.

23        Following the surgery, there's always a certain amount of

24  trauma to the -- from the surgery itself, and there's a lot of

25  swelling and bruising.  And people will collect fluid, and so

1   we put drains, which are these little rubber tubes that come

2   out through the skin, and they actually are attached to a

3   suction bulb.  And these actually help to drain that fluid so

4   that the fluid doesn't collect.  If you collect too much

5   fluid, you are much more prone to having complications such as

6   an infection, for example.

7   Q    And so these drains were placed in Ms. Eramo's surgical

8   site; is that correct?

9   A    Yes.

10  Q    And tell us, if you can, what, if anything, happened to

11  those drains after they were placed in her, in the weeks after

12  they were placed in her surgical site.

13  A    Well, I tend to see my patients almost weekly after the

14  surgery.  I remember I came in and saw Ms. Eramo on Christmas

15  Eve, and the rest of the clinic was closed because of the

16  holidays.  So I decided I needed to see her anyway.  So she

17  came in and we saw her.

18       And she did well for the first couple of weeks, I think.

19  But at this point, again, a lot of topic of the conversation

20  was about how all the things that were going around in the

21  rest of her life were affecting her.

22       I mean, it's very difficult even if you have nothing

23  going on in your life after surgery, because you're in a lot

24  of discomfort, you're in a lot of pain, you may have some

25  nausea, you're not sleeping well, your sleeping hours are all

1    mixed up, your appetite is compromised.  I mean, all these

2    different things kind of play in.  And that's just normal

3    postoperatively.  Then on top of all that --

4          THE COURT:  Was she eventually treated for an

5    infection at the operative site?

6          THE WITNESS:  Yes, she actually --

7          THE COURT:  Tell us about that.

8          THE WITNESS:  Yeah, she actually came in one day and

9    had what looked like some redness in the area.  And that's

10   usually the first sign that there's an infection brewing.

11         It does take several weeks for infection to actually

12   start to set in.  And so it was sometime in the middle of

13   January that she started having this problem.

14         So when I saw her, I immediately admitted her to the

15   hospital, and we put her on some very strong broad-spectrum

16   antibiotics through her veins.  But, unfortunately, she

17   progressed; and eventually we took her back to the operating

18   room.

19   BY MS. LOCKE:

20   Q    And you said you took her back to the operating room.

21   What was the surgical procedure that was conducted after the

22   infection?

23   A    We basically washed out the -- there was actually

24   purulent pus inside, and we washed all that out and we took

25   the implants out and closed.

1  Q    What, if any, impact did the infection have on

2  Ms. Eramo's -- the timing of chemotherapy for Ms. Eramo's

3  treatment of cancer?

4  A    Well, I'm not the expert on chemotherapy, but clearly you

5  don't want to treat somebody with drugs that will basically

6  stymie their ability to heal and also fight any further

7  infections with chemotherapy.

8         So, you know, as long as she was ill and needed surgery

9  to have the implants removed, she could not be on

10 chemotherapy.

11 Q    And what impact, if any, did the infection that Nicole

12 had impact the reconstructive breast surgery that she was

13 planning to have?

14 A    It basically stopped it completely.  I mean, now she has

15 to start all over again, if we're going to do that.

16 Q    And what, if anything -- is there a difference in the

17 kind of breast reconstructive surgery that she would have to

18 have now versus before she had the infection?

19 A    I don't believe so, no.  She'll be able to have what she

20 had back then.

21         MS. LOCKE:  Thank you.  I have no further questions

22 of you.

23         THE COURT:  Mr. Russell?

24         CROSS-EXAMINATION

25 BY MR. RUSSELL:

1  Q    Good afternoon, Dr. Lin.

2  A    Yes.

3  Q    My name is Tony Russell and I'm one of the lawyers for

4  the defendants.  Thank you for coming here today.

5  A    Sure.

6  Q    First I want to talk about infection that you've been

7  talking about.

8  A    Yes.

9  Q    It is well-recognized that with any type of mastectomy

10 procedure and breast reconstruction that infection is a risk

11 that can happen no matter what, whether you're stressed, not

12 stressed, no matter what, correct?

13 A    Absolutely.

14 Q    And you have actually authored literature about your

15 experience concerning infections following the same sort of

16 procedure that Ms. Eramo had following breast reconstruction;

17 is that right?

18 A    That's correct.

19 Q    And your literature that you have authored based on your

20 experience delved into what are the factors that increase the

21 risk of an infection in a patient like Ms. Eramo who has

22 undergone breast reconstruction; is that correct?

23 A    Yes.

24 Q    For instance, you authored a piece of literature

25 published in the Annals of Surgical Oncology titled "An

1    Outcome Study of Breast Reconstruction:  Presurgical

2    Identification of Risk Factors for Complications"; is that

3    correct?

4    A    Yes.

5    Q    And the Annals of Surgical Oncology, just so we all know,

6    that is what's called a peer-reviewed piece of literature?

7    A    That's correct.

8    Q    And by peer review, what we mean is any doctor who wants

9    to submit an article, have it published, can't do that; there

10   are a set of gatekeepers, physicians who review every article,

11   make sure it's a sound article, and make sure it's

12   scientifically valid, correct?

13   A    Yes.

14   Q    And the Annals of Surgical Oncology in which your article

15   about the risk factors for breast reconstruction

16   complications, including infection, was published, that's a

17   national journal that goes throughout the United States to

18   physicians?

19   A    Yes, it is.

20   Q    And in that article, you identified three risk factors

21   that increase the risk of infections for patients like

22   Ms. Eramo who are undergoing breast reconstruction, correct?

23   A    Yes.

24   Q    And those risk factors include obesity?

25   A    Yes.

1    Q    Smoking?

2    A    Yes.

3    Q    And the third factor, most importantly, is prior

4    radiation therapy?

5    A    Yes.

6    Q    And what you determined in this article, based on your

7    going back to all the patients that you've treated -- I

8    believe the time period was five years here at the University

9    of Virginia medical center where Ms. Eramo's procedure was

10   done -- what you determined is that patients who have

11   undergone prior radiation therapy are at a substantial

12   increase of infection following breast reconstruction surgery,

13   correct?

14   A    Yes.

15   Q    And to put it into perspective, Ms. Eramo, unfortunately,

16   was a patient who had undergone prior radiation therapy before

17   the breast reconstruction?

18   A    Yes.

19   Q    And so you knew going into Ms. Eramo's tissue expander

20   breast reconstruction procedure that she was at a substantial

21   increased risk of infection given her prior radiation therapy

22   in 2009, correct?

23   A    Yes.

24   Q    And then to follow up that study, Dr. Lin, about the risk

25   of infection, you also published another article in which you

1    looked at the outcome of patients undergoing breast

2    reconstruction who had infection; and that was titled,

3    "Implant-based Two-stage Breast Reconstruction in the Setting

4    of Radiation Injury:  An Outcome Study"; is that correct?

5    A    Yes.

6    Q    And that was published in the Journal of Plastic and

7    Reconstructive Surgery?

8    A    Yes.

9    Q    And that actually was published just a year before

10   Ms. Eramo's procedure, correct?

11   A    Yes.

12   Q    And to go back again, the Journal of Plastic and

13   Reconstructive Surgery is a peer-reviewed journal?

14   A    Yes.

15   Q    Meaning in order for you to be able to publish this

16   article about your experience at UVa with patients who have

17   undergone breast reconstruction and suffered infections, that

18   article was vetted by many other physicians around the country

19   to make sure it was scientifically valid and had merit?

20   A    Yes.

21   Q    And the Journal of Plastic and Reconstructive Surgery is

22   also a national journal that is read by physicians around the

23   country?

24   A    Yes, it is.

25   Q    And the background for that article was following up on

1    the three risk factors that you had previously identified for

2    infection -- smoking, obesity and radiation therapy --

3    correct?

4    A    Yes.

5    Q    And what you determined -- again, after analyzing, I

6    believe it was a ten-year period at UVa of all the patients

7    who had undergone breast reconstructive surgery, patients like

8    Ms. Eramo -- is that you determined that, correct, "Radiation

9    therapy for the treatment of breast cancer significantly

10   increases the incidence of major reoperative complications

11   such as infection"; is that correct?

12   A    Yes.

13   Q    And in the conclusion to that article, you specifically

14   stated, "Radiation therapy, whether given before mastectomy

15   and implant-based reconstruction or during the reconstruction,

16   resulted in a significantly higher rate of major reoperative

17   complications, including infections"?

18   A    Yes.

19   Q    And when we talk about mastectomy and implant-based

20   reconstruction, that's the same procedure that you performed

21   on Ms. Eramo?

22   A    Yes.

23   Q    And when we talk about major reoperative complications,

24   such as infection, that are caused, that includes infections

25   like Ms. Eramo's, where the patient has to be admitted to the

1  hospital, undergo intravenous antibiotics, undergo a procedure

2  to remove the infection and the expanders, and those patients

3  also had chemotherapy delayed because of the infection?

4  A    Yes.

5  Q    And so Ms. Eramo's case at the University of Virginia is

6  not an unusual scenario, given a patient with radiation

7  therapy and the significant risks of infection that are

8  created in having to go back in, do another surgery, delay

9  chemotherapy, and effect the reconstruction?

10 A    When you say it's not an uncommon thing, it's still

11 fairly uncommon, but it is -- it has happened at UVa,

12 absolutely.

13 Q    And not only has it happened, but there were a

14 substantial number of patients that you identified in your

15 articles that you used to come to the conclusion that prior

16 radiation therapy like Ms. Eramo had significantly increased

17 the risk of major reoperative complications, including

18 infections?

19 A    So those patients that I had analyzed, it was what we

20 call a retrospective review, so I looked at all the patients

21 that you had mentioned over the past ten years, but we use

22 that information to help make improvements.  And so since that

23 article was published, we have actually changed our protocol

24 in order to address the issue.  So you don't just simply say,

25 well, we accept this and that's the way it is.  So the numbers

1   are not -- they change with time.

2   Q    Right.  And I know today, in 2016, measures have been

3   taken --

4   A    Right.

5   Q    -- but at the time this article was written, which is the

6   same time period of Ms. Eramo's procedure, this was still the

7   scenario, where there was a substantial risk of infection, as

8   you published?

9   A    Well, I think at the time frame it may have been a little

10  different.  If you can look at my article there, I don't think

11  that time frame is up to 2014.

12  Q    The article, though, was published in '14, was it not?

13  A    Yeah.  But to get print published, it takes at least six

14  months to a year before it comes out.

15       And again, like I said, the review of the patients was a

16  retrospective review, and so the data for those patients was

17  much older.

18  Q    Now, let's switch from talking about the substantial

19  increased risk of infection for patients undergoing breast

20  reconstruction who had prior radiation therapy to the surgery

21  you had mentioned with Ms. Eramo.

22       Ms. Eramo has previously testified that when she met with

23  you in mid to late September, that she asked you, and I think

24  Dr. Brennan, the oncologist, whether she could wait until

25  December to undergo the surgery, and she explained that you

1   and Dr. Brennan said that there shouldn't be any problem in

2   waiting four months to have the surgery; is that correct?

3   A    When you say no problem, you mean like from a biologic

4   point of view or --

5   Q    You and Dr. Brennan did not believe there would be any

6   adverse outcome by her waiting, and you allowed her to be able

7   to wait four months?

8   A    That was a decision for Dr. Brennan to make because he

9   was treating her breast cancer.

10  Q    But you're aware that Dr. Brennan in making that decision

11  said it was okay for her to wait four months to have her

12  breast reconstruction, mastectomy and breast reconstruction?

13  A    I am aware that that was what his opinion was, yes.

14  Q    Now, I'd like to talk to you -- you had mentioned about

15  patients with breast cancer, really any type of cancer, that

16  undergo surgery, that is a stress in and of itself, correct?

17  A    Yes.

18  Q    Especially a patient who has had prior breast cancer

19  successfully treated with a lumpectomy and radiation in 2009,

20  like Ms. Eramo, and then to hear devastating news in August to

21  September five years later that she either has a recurrence of

22  her cancer or a brand-new cancer?

23  A    Yes.

24  Q    And as you explained to Ms. Locke, that you and your

25  team -- knowing that patients with cancer have stress,

1   anxiety, psychosocial, psychological issues because of it, you

2   and your team pay particularly close attention to those

3   patients to see if those patients have stress, have anxiety,

4   have sleep issues, have eating issues so that you can help

5   intervene from a psychological and emotional standpoint?

6   A    I try to.

7   Q    And when Ms. Eramo was admitted on January 23, 2015 to

8   the hospital for her infection, you were her admitting

9   provider; is that correct?

10  A    Yes, I believe I was.

11  Q    Could we put up page 1 of -- I believe the exhibit is

12  D89.

13       Thank you, Ms. Moody.  Page 1 of the medical records.

14       I think it's under DTX270, page 1.  Oh, here we go.  And

15  blow up, if you would, the admitting provider, Dr. Lin.  There

16  we go.

17       Now, you and your team took care of Ms. Eramo during this

18  hospitalization, and you actually performed surgery on her on

19  January 28 for the infection; is that correct?

20  A    Yes.

21  Q    Now, during this time, when I talk about you and your

22  team, it included you, it included nurses, it included social

23  workers, it included occupational therapists, it included

24  other physicians, residents, fellows in infectious disease,

25  and other plastic surgeons; is that correct?

1  A     Yes.

2  Q     And during the nine days that Ms. Eramo was in the

3  hospital, as you mentioned before, you and your team are

4  trained to pay particularly close attention to her emotional,

5  psychological state, to see if she has any anxiety, stress,

6  depression, anything like that, correct?

7  A     Well, there are members of the team that aren't -- that

8  that are not trained in that way.  The occupational

9  therapists, or oftentimes the residents, are not as familiar

10  with that.

11  Q     Well, you train them that they need to pay attention, the

12  residents in training, correct?

13  A     Well, we try to, yeah.

14  Q     And so every day she was in the hospital, someone would

15  check her psychological status to see if there were no signs

16  present or whether there were any signs of any psychological

17  problems; is that correct?

18  A     The focus of every daily visit was mostly the wound and

19  how she was responding to the antibiotics and the surgery.

20  But we do come in and talk to the patient and ask her how

21  things are going.

22  Q     Right.  So let's go to page 724.  Now, this is for the

23  period of the whole day on January 24, 2015.

24        Do you see that?

25  A     Yes.

1  Q    All right.  And if we go down on the sheet, on this day,

2  all systems were checked, including Ms. Eramo's psychological

3  condition, correct?

4  A    I don't know.  I don't know who filled this out.  It

5  certainly -- you can see there it says wound examined by M.D.

6  at this time.  But I don't know who filled this out.

7  Q    Well, there were no signs of any psychological problems

8  noted on January 24, 2015, correct?

9  A    According to who?

10      MS. LOCKE:  Objection, Your Honor.  There's no

11  foundation for this witness.

12      THE COURT:  Would you agree that whoever filled out

13  the form noted no psychological manifestations?

14      THE WITNESS:  I can't speak for that because I don't

15  know what kind of assessment that person did.  I have no idea

16  who wrote this or where it came from.

17      THE COURT:  That's the witness's answer.

18  BY MR. RUSSELL:

19  Q    All right.  Well, let's go to the next day, January 25,

20  2016, page 669.  And as you can see, Dr. Lin, this is for the

21  whole day of January 25, 2015, correct?

22  A    Yes.

23  Q    And you see again on this day, among other systems

24  checked, Ms. Eramo's psychological condition was checked, and

25  there were no signs of any psychological problems, depression,

1    anxiety, stress, et cetera?

2    A    Again, I have no idea where this came from or who did

3    the -- who filled this sheet out.  I really don't -- I can't

4    vouch for anything.

5    Q    You recognize this as part of Ms. Eramo's medical

6    chart --

7    A    It is.

8    Q    -- that the plaintiff produced in this case, correct?

9    A    It is.  It is.

10   Q    Let's go to the next date, January 26, 2015, page 618.

11   And again, now you see here, this is for the whole day of

12   January 26, 2015, correct?

13   A    Yes.

14   Q    And again on this day, her psychological condition was

15   checked, and again there were no signs of any psychological

16   problems, either anxiety, depression, anything like that?

17   A    It says "none" there.  But there are vital signs that are

18   given there.  The vital signs are usually taken by an LPN

19   that's assigned on the floor, is not part of the team.

20        When you're -- when you're admitted to the hospital,

21   there's a hospital service that comes around and checks your

22   blood pressure and your vitals, measures your temperature.

23   But they're not part of the breast cancer team.  They're not

24   part of my team.  They're part of the hospital.

25        So I think that this, this document, was generated from

1    one of those people.

2    Q    And that's part of the hospital healthcare provider team

3    that was caring for Ms. Eramo --

4    A    Correct.

5    Q    -- during this hospitalization?

6    A    But not part of my team, no.

7    Q    Now, let's go to the next date, January 27, 2015, which

8    is page 570.  And again you see here this is for the whole day

9    of January 27, 2015, correct?

10   A    Yes.  Yes.

11   Q    And the hospital team about which you were speaking

12   earlier again on this date checked Ms. Eramo's psychological

13   condition and found no signs of any psychological problems,

14   depression, anxiety, anything of that?

15   A    The document says "none."

16   Q    The next day, January 28, 2015, page 505, again on this

17   date, the hospital team, as you mentioned before, among

18   checking all the different components, including neurological,

19   respiratory, et cetera, checked psychological and again, as

20   prior days, there were no signs of any psychological problems,

21   either emotional distress, anxiety, depression, et cetera?

22   A    It says "none."

23   Q    Let's go to the next day, January 29, 2015, page 428 of

24   her medical chart at UVa.  And on this whole day again, among

25   the other components that were checked by the hospital team,

1   her psychological condition was once again checked, and there

2   were no signs of any emotional distress, anxiety, depression?

3   A    What was the date on this one again?

4   Q    You see at the top I circled January 29, 2015, from

5   midnight until 11:59 p.m.?

6   A    Yeah, I believe she had her second surgery that day.

7   Wasn't that the day that she had her removal of her implants?

8   Q    No, sir.  I believe that surgery was January 28, the day

9   before.

10  A    Okay.  And so on the day she had surgery, to measure her

11  psychological things seems a little bit unusual in the sense

12  that usually somebody who is going to have surgery is

13  extremely anxious, whether it's a small surgery or not.  Just

14  the fact that they have to go to the operating room, people

15  are pretty anxious about it.

16       So I'm a little -- you know, a little bit puzzled by why

17  somebody would write "none" even on the surgery day or the day

18  before surgery or the day after surgery.

19  Q    Well, this would be the day after surgery; is that

20  correct?

21  A    Yeah.

22  Q    All right.  So let's go to two days after the surgery, on

23  January 30th, the next day, page 365.  And do you see on this

24  date, this is January 30, the whole day, so it would be two

25  days post-op of her first surgery by you, and again her

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1  psychological conditions, among other systems, were checked,

2  and there were no signs of emotional distress, depression,

3  anxiety, correct?

4  A    None are indicated.

5  Q    And then on the day she was discharged from the hospital,

6  January 31, 2015, the next day, page 320, before she was

7  discharged, the systems were once again checked, and

8  psychologically again, there were no signs of any

9  abnormalities, including emotional distress, anxiety,

10 depression, correct?

11 A    According to this document, no.

12 Q    All right.  So we've been talking about the hospital, so

13 let's talk now about physicians.

14      So let's go to page 11, if we can, which is the day she

15 was admitted, January 23, 2015.

16      Now, physicians, this is Dr. Amita Sudhir.

17      Do you see that?

18 A    Yes, I do.

19 Q    And on the day of admission, one of things that you do as

20 physicians is you do two things:  You take a subjective

21 history from the patient where you ask the patient, you know,

22 how you're doing, do you have any problems, any distress,

23 anxiety, depression, et cetera, and then the other thing you

24 do, which is an objective measure, is you perform what's

25 called a physical examination; is that correct?

1  A    I don't know if I would characterize the first one in

2  terms of -- you do ask them what brings them there, but you

3  don't always go through a very detailed psychological

4  assessment.

5  Q    Well, when you do your physical exam, some of the things

6  for which you check as a physician are looking to see whether

7  the patient is, for instance, debilitated, worn down,

8  depressed, anxious, things like that, like you mentioned that

9  you looked at before for Ms. Eramo, correct?

10 A    There are no real physical signs of those kinds of

11 things, unless the patient tells you that they are that way.

12 Q    Well, on this day, constitutional -- that means overall,

13 the body overall, correct?

14 A    Correct.

15 Q    And it's listed by Dr. Sudhir, and I covered it up,

16 N-A-D.

17       Do you see that?

18 A    Yes.

19 Q    Now, you recognize that acronym as a medical acronym that

20 stands for "no acute distress"?

21 A    That's correct.

22 Q    Meaning that at the time of admission, Ms. Eramo was not

23 in any acute distress, correct?

24 A    According to Dr. Sudhir, yes.

25 Q    All right.  Now, let's go to page 70, still on the day of

1    admission that Ms. Eramo was admitted to the hospital.

2    Another emergency department provider, Dr. Mary Warlaumont.  I

3    hope I didn't butcher Dr. Warlaumont's name.  But she also saw

4    Ms. Eramo, performed a constitutional physical exam of her,

5    and as with Dr. Sudhir, noted that Ms. Eramo was NAD, meaning

6    no acute distress, correct?

7    A    Yes.

8    Q    Let's go to page 137.

9    A    Now, when you say no acute distress, that can mean lots

10   of different things to different doctors.  You can be what we

11   call in extremis, meaning that you have, you know, some type

12   of association of physical findings that means that you're,

13   you know, either short of breath or some kind of other type of

14   acute distress type of thing.

15   Q    Right.  For instance, if you have anxiety, that would

16   show up potentially with a physical exam, correct?  Your blood

17   pressure would be increased, pulse rate increased?

18   A    Potentially.  Remember, I said it was initially an acute

19   thing and then more of a chronic thing.

20   Q    Right.  Now, on January 23rd, the day of admission, not

21   only was Ms. Eramo seen by Dr. Sudhir and Dr. Warlaumont, but

22   she was seen by one of your other physicians on your team,

23   Dr. Jonathan Black, who is also a professor at the University

24   of Virginia, correct?

25   A    Yes.

1  Q    And Dr. Warlaumont [sic], as part of his review of

2  systems, discussed with Ms. Eramo whether she was -- this is

3  page 137, discussed with Ms. Eramo whether she was having any

4  psychiatric or behavioral problems, including emotional

5  distress or anxiety or depression, and she was having none; is

6  that correct?

7  A    Well, under constitutional, he noted that she had weight

8  loss, malaise, fatigue.

9  Q    I'm sorry.

10 A    Malaise and fatigue; not weight loss.

11 Q    I'm sorry.  He specifically noted at that point in time,

12 two months after the article, she did not have any weight

13 loss?

14 A    That's what he wrote there.

15 Q    And from a psychiatric and behavioral standpoint, now two

16 months after the publication of the article, she was negative

17 for any psychiatric or behavioral issues, including

18 depression, anxiety, emotional distress, correct?

19 A    He wrote "negative" there, yes.

20 Q    And that's what negative means?

21 A    Yes.

22 Q    And again, as with the prior physicians, on physical

23 exam, he noted that she was not in any acute distress,

24 correct?

25 A    That's right.

1   Q   Let's go to page 140, if we may.  Still on the day of

2   admission, in addition to being seen by Dr. Sudhir,

3   Dr. Warlaumont, Dr. Black, she was also seen by Dr. Lobb, who

4   did a review of systems and specifically went over with

5   Ms. Eramo whether she was having any psychiatric or behavioral

6   problems, such as anxiety, depression, emotional distress,

7   anything like that; and she was not, correct?

8   A   So I don't know -- I mean, I wasn't there when they did

9   these review of systems, so I don't know what was specifically

10   discussed, but it says "negative" there.

11   Q   But with psychiatric and behavioral, those are the things

12   that you would discuss with a patient in determining a review

13   of systems, correct?

14   A   You would ask them if there was anything.  If they chose

15   not to tell you, then you would write down "negative."

16   Q   And then also as before with Dr. Black, Dr. Lobb

17   discussed whether Ms. Eramo was having any weight loss

18   problems; and she was negative for that, correct?

19   A   Yes.

20   Q   We can keep going through these with the other physicians

21   that documented negative, but what I'd like to do now is go

22   over your specific notes.  Let's turn to page 89, if we may.

23      Now, Dr. Lobb, as we discussed before, he was a resident;

24   is that correct?

25   A   Yes.

1 Q    And as a resident, you -- you Dr. Lin -- who cosigned

2 this note, were responsible for overseeing Dr. Lobb on that

3 day, reviewing his note, and ensuring that it was accurate and

4 cosigning it?

5 A    Correct.

6 Q    And this is on January 27 now, which is the day before

7 the surgery, correct?

8 A    Yes.

9 Q    There was a physical exam done and you, as well as

10 Dr. Lobb, your resident, found that Ms. Eramo, even here the

11 day before the surgery, was not in any acute distress; is that

12 right?

13 A    Yes.  But I do want to point out that it says no

14 distress, not no acute stress.  So I think there is a

15 difference between those two.

16 Q    Did you note anywhere in your note -- and I'm happy --

17        MR. RUSSELL:  May I approach, Your Honor?

18        THE COURT:  You may.

19 BY MR. RUSSELL:

20 Q    Here are the complete medical records from that

21 hospitalization that we introduced.

22 A    Sure.

23 Q    And feel free to refer to any you need.

24        What I'm interested in is, instead of going through every

25 one of your notes in this hospitalization, can we agree that

1   at no point in time during any of these nine days while she

2   was in the hospital you documented anything about her being in

3   emotional distress?

4   A    As far as I remember, I did not document any of that.

5   Q    And during the whole nine days she was in the hospital,

6   you didn't document anything about her having anxiety?

7   A    Not during the hospitalization, no.

8   Q    And during the whole hospitalization, you didn't note

9   anything about her having any emotional problems, distress?

10  A    I don't recall, no.

11  Q    And during the whole hospitalization, you didn't make any

12  consult to any psychologist or psychiatrist for any sort of

13  counseling or mental health intervention?

14  A    No.

15  Q    And during this hospitalization, you did not prescribe

16  any medications to Ms. Eramo for any stress, anxiety, or

17  depression?

18  A    I don't know whether she got anything for sleep, any

19  medications for sleep.

20  Q    No, sir.  And I'll be happy to go over --

21  A    I don't remember if there was anything written for her

22  for that or not.

23  Q    Let's go to page 131, if we can.  This is on January 27,

24  the day -- one of the days that you saw Ms. Eramo.  And you

25  see at the bottom of the page, under scheduled medications --

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1    A    Yes.

2    Q    -- you see those three there:  Docusate sodium,

3    loratadine, and Vancomycin?

4    A    Yes.

5    Q    And none of those were given for an antidepressant,

6    antianxiety, emotional distress, sleep, or anything like that?

7    A    No.

8    Q    And then if we go to the next page, page 132, she had

9    what are called -- in addition to those medicines during her

10   hospitalization, she had prn meds, correct?

11   A    Yes.

12   Q    And what prn means in medical terminology is as needed

13   meds; so if she needed these meds, they could be given to her?

14   A    Yes.

15   Q    And the prn meds that she had were acetaminophen,

16   naloxone -- I can't pronounce the middle word -- and Oxycodone

17   and Oxycodone.  And none of those medications were provided to

18   her for any type of depression, anxiety, emotional distress,

19   sleep, anything else, correct?

20   A    Some people use the Oxycodone to help them sleep, but

21   it's not specifically for sleep, no.

22   Q    And when Ms. Eramo was discharged from the hospital --

23   page 810, please -- as you see from this, this is the

24   discharge medications; is that correct, Dr. Lin?

25   A    Yes.

1  Q    And she was told to start taking three medicines, the

2  dicloxacillin, which is I believe is a penicillin, Oxycodone?

3  A    Yes.

4  Q    And another Oxycodone?

5  A    Yes.

6  Q    And none of those medications were provided to her

7  because of any emotional problems, like emotional distress,

8  anxiety, fear, anything of that, correct?

9  A    No.  No.

10  Q    And then if we can minimize that, and then the medicines

11  that she was supposed to continue taking were the -- and I

12  butchered the big name of it, but it's Decadron, which is a

13  steroid, and Claritin.  And again, those medicines were not

14  for any sort of emotional issues?

15  A    No.

16  Q    Anxiety, depression, distress, et cetera?

17  A    No.

18  Q    So again, just so we can be on the same page, at no point

19  in time during this hospitalization or when she was discharged

20  did you or any other member of your team provide her any

21  medications for any emotional distress, anxiety, fear,

22  anything of that nature?

23  A    No.

24  Q    And we can go through the chart, but during the whole

25  nine days that she was there, there was never any

1  documentation by anyone that she was having any weight

2  fluctuations or eating changes because of stress or anxiety?

3  A    No.

4  Q    There was no documentation at any point during this time,

5  now two months after the article, that she was having sleep

6  problems, like insomnia?

7  A    No, there was no documentation of that.

8  Q    Now, on January 27, 2015, part of the team, part of all

9  the healthcare providers who saw Ms. Eramo, would include an

10  occupational therapist typically, correct?

11  A    Not typically, but it can happen.  I don't specifically

12  recall if one came and saw her.

13  Q    Let's go to page 93, if we may, please.  Now, on this

14  day, she was seen by Alexander Wilson, OT, on January 27,

15  2015.

16      That's an occupational therapist, correct?

17  A    Yes, uh-huh.

18  Q    And during this meeting, Mr. Wilson, the occupational

19  therapist, talked to Ms. Eramo, and Ms. Eramo specifically

20  told him that, quote, she had a good Christmas, end quote.  Is

21  that correct?

22  A    It says that there, yes.

23          THE COURT:  We're going to have to take a break.

24  This has gone much longer than I anticipated.

25          MR. RUSSELL:  I'm sorry.

```
 1              THE COURT:  So we'll break for lunch.  I don't know
 2   what we're going to do about Dr. Lin.  He can come back.  The
 3   jury is going to have to break.
 4              MS. LOCKE:  The doctor is not available this
 5   afternoon.  He's got patients to see.
 6              THE COURT:  How many more questions do you have,
 7   Mr. Russell?
 8              MR. RUSSELL:  I have less than five minutes, Your
 9   Honor.  I'm about done.
10              THE COURT:  Can you wait five more minutes, ladies
11   and gentlemen?
12              JURORS:  Sure.
13              THE COURT:  All right.  Let's hurry it along.
14              MR. RUSSELL:  Yes, sir.
15   BY MR. RUSSELL:
16   Q    And then also in addition, he found that she was very
17   active and participates in physical activities both with
18   hobbies and leisure at this point in time?
19   A    It says what it says.
20   Q    And let's go to page 720, if we may.  And at this point
21   in time, during the hospitalization -- and I can't do it
22   because my fingers are a little chubby -- Ms. Eramo was asked
23   whether she was subject to any physical abuse or verbal abuse,
24   and now two months after the report she denied either; is that
25   correct?
```

1   A    That's what it says, yeah.

2   Q    And then page 729, she was also asked during the

3   hospitalization whether there was currently any risk of

4   threats or harms that she was subject to, and it was written

5   there was no indicator or concern that she was at current risk

6   of any threats or harms now, two months after the article?

7   A    Yes.

8   Q    And it was also asked whether she had any psychosocial

9   needs, and she said no?

10  A    I don't know where this came from, but I assume that they

11  asked her.

12  Q    That's part of the chart at the University of Virginia

13  medical center, correct?

14  A    It is part of the chart, yes.

15  Q    And then in addition to occupational therapists, social

16  worker -- social workers would have seen her, go to page 109,

17  please.

18       So on this date, Kerry Grant, a master's with social

19  work, on January 24, 2015, saw her and documented that, again,

20  as we saw before, there were no current risks of any threats

21  or harms now, correct?

22  A    Yes.

23  Q    And that he did not anticipate that Ms. Eramo would need

24  any psychosocial needs, correct?

25  A    It says what it says, yes.

1  Q    Go to page 110, the next page, please.  In addition,

2  Mr. Grant documented that he found no mental health concerns,

3  correct?

4  A    It just says no unmet needs were identified.

5  Q    No, sir.  I'm sorry.  Again, my fingers are a little

6  bit -- no mental health or substance abuse concerns noted?

7  A    Oh, that's what it says, yes.

8  Q    And then six days later, before Ms. Eramo was discharged,

9  she was seen by another social worker, page 50, please, and

10  this was Kimberly Buesking, again a master's of social work,

11  on January 30, 2015, and she consulted with the 5 West team

12  for psychosocial needs for Ms. Eramo.

13       And just to be clear, 5 West was the wing on which

14  Ms. Eramo was located, correct?

15  A    Yes.

16  Q    And Ms. Eramo did not have any psychosocial needs now, at

17  the end of her hospitalization?

18  A    She didn't report any, that's right.

19  Q    And throughout these records, there's no indication of

20  any posttraumatic stress disorder?

21  A    No.

22  Q    And my final question is:  Go to page -- let's see.  Bear

23  with me one second.  Go to page 112, if we can.

24       This is your operative report on January 28, 2015, for

25  the surgery that you performed for the infection, correct?

1    A    Yes.

2    Q    And you'll see here, you have what's written,

3    preoperative diagnosis and postoperative diagnosis, correct?

4    A    Yes.

5    Q    And what a diagnosis is in the medical profession is it's

6    a determination of what was going on with the patient,

7    correct?

8    A    Yes.

9    Q    And both your preoperative diagnosis and your

10   postoperative diagnosis were the same, which is bilateral

11   breast periprosthetic infection, left breast radiation

12   therapy, correct?

13   A    Yes.

14   Q    And that goes back, as we discussed before, to your

15   articles which talked about the substantial increased risk of

16   infection with breast reconstruction in patients who have had

17   radiation therapy?

18   A    Yes.

19          MR. RUSSELL:  Thank you, Dr. Lin.  Those are all my

20   questions.

21          MS. LOCKE:  I have two or three very brief

22   questions.

23          THE COURT:  All right.

24          MS. LOCKE:  I promise to keep it very short.  I know

25   everyone is hungry.

1              REDIRECT EXAMINATION

2    BY MS. LOCKE:

3    Q    Dr. Lin, we heard you testify about the three factors

4    that you wrote about in your articles were obesity, smoking,

5    and prior radiation therapy that could lead to infection.

6         Do you recall that testimony?

7    A    Yes, I do.

8    Q    Tell us, what impact does the timing of radiation have on

9    the risk factor for infection?  For example, if a patient

10   underwent radiation therapy five years earlier, are they more

11   or less likely to have an increased risk factor for infection

12   than a patient who underwent radiation six months before a

13   surgery?

14   A    So the effects of radiation are divided into acute and

15   chronic phases.  And the acute phase would fall into that

16   six-month scenario you gave.

17        At that point there's a very high risk of infection.  So

18   I don't operate on people that have had radiation within the

19   previous six months.  I always, always tell them they have to

20   wait at least six months.

21        Most scientific papers would say that the risk of an

22   infection decreases as you go further and further away.  The

23   problem is that it doesn't ever go away to zero.  It doesn't

24   ever go away to being just like not radiated patients.

25   Q    So a patient who had undergone radiation five years

1   earlier would have a lower risk profile than a patient who had

2   undergone radiation a year prior; is that fair to say?

3   A    I think it would be fair to say that, yes.

4   Q    We also heard about your resident, Dr. Lobb?

5   A    Yes.

6   Q    He was your resident at the time that you were caring for

7   Ms. Eramo; is that correct?

8   A    Yes.

9   Q    Would it surprise you to learn that Dr. Lobb recommended

10   counseling on the day before surgery, on January 27?

11   A    Would it surprise me?  I don't think it would surprise

12   me.

13           MS. LOCKE:  I have no further questions, Your Honor.

14           THE COURT:  Any other questions of this witness?

15           MR. RUSSELL:  No, Your Honor.

16           THE COURT:  Dr. Lin, you're excused.  Thank you so

17   much for being with us.

18           THE WITNESS:  Thank you, Your Honor.

19           THE COURT:  Thank you for your patience with us.

20   (Witness stood aside)

21           THE COURT:  Ladies and gentlemen, we will now have

22   your midday recess, though it's considerably past midday.  I

23   will answer a question that I know many of you are

24   entertaining right now.  I'm very cognizant of what you said

25   late Friday afternoon about the scheduling in this case.  I

 1   fully intend for this phase of the trial to be completed

 2   today, regardless of how late we have to stay.  In some trials

 3   I've stayed very late in the evening, and even into the early

 4   hours of the following day.  But it has to be finished today.

 5   If it's not done today, if it's not completed today, I don't

 6   know when the trial can resume.  So that's one reason for

 7   this, the importance of finishing this afternoon.

 8        I would ask that while you're away from the court

 9   you not discuss the case with one another, nor permit anyone

10   to discuss it with you.

11        Let's plan to return at 20 after the hour.  Let's

12   excuse the jury.

13   (Jury out, 1:20 p.m.)

14        THE COURT:  I'll ask everyone to be seated.  As

15   promised, the Court intends to conduct a charge conference on

16   the record, and I would have the record reflect that late

17   Friday afternoon, after the verdict was returned in the

18   liability phase of the case, the Court had an informal

19   conference with the parties about the damage charge.  Many

20   issues were resolved by consent.  A few were resolved for --

21   reserved for ruling today, and there were some other issues to

22   be raised today as well.

23        I wanted to give the parties the opportunity to note

24   formal objections for the record as to any of the issues on

25   which the Court ruled against one side or the other and an

1    objection was noted.

2              First of all, as to the additional issues that have

3    been raised, I think we resolved Mr. Finney's motion this

4    morning about an instruction designed to advise the jury as to

5    the need to avoid punishment of the defendant.  And I believe

6    that we agreed on language for that charge, Mr. Clare.

7              The Court ruled on one of the unresolved issues over

8    the weekend, by order entered late Sunday afternoon, on the

9    tax liability that might be associated with an award to the

10   plaintiff.

11             So I believe that that deals with all the matters

12   that were left hanging.  Let's have objections noted as to the

13   charge that the Court has decided to give.

14             Christina, have we shared the latest version of the

15   damage charge with counsel?

16             I've added one.  I think it's on page 3 that deals

17   with the transition the jury is asked to make on the verdict

18   form.  So let's focus on that and see if there are any

19   concerns about the way that's structured.  And then we can

20   have objections noted to the proposed charge.

21             Do you have one for me, Christina?  Thank you.

22             Everything else is the same?  Page 7 changed, didn't

23   it?

24             We'll hear from the plaintiff first.

25             MR. CLARE:  Would Your Honor just like me to limit

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

1  myself to the two issues that --

2          THE COURT:  Any objections that have been reserved,

3  any objections you want to memorialize for the record.

4          MR. CLARE:  On behalf of the plaintiff, I would just

5  note for the record the two additional paragraphs that were

6  tendered to us here during the lunch break, that we do not

7  have any objection to those formulations.  We think they're

8  appropriate and do not have any objection to those.

9          The only objection that I would preserve on the

10 record, based on our off-the-record discussion and the Court's

11 prior ruling, is the Court's decision to decline to give the

12 proposed instruction regarding the taxability of and tax

13 treatment of any award.

14         So we note that objection for the record.

15         THE COURT:  Yes, sir.  Thank you, Mr. Clare.

16         Ms. McNamara?

17         MS. McNAMARA:  Thank you, Your Honor.  We have no

18 objection to the language you proposed.  I think it looks

19 straightforward.

20         We would like to raise a couple issues about the

21 instructions.

22         THE COURT:  Yes, ma'am.

23         MS. McNAMARA:  In reviewing them over the weekend, a

24 few things leapt out at us, so we'd like to just raise a

25 couple of issues, if we may.

Eramo v. Rolling Stone, et al., 11-7-16 - Vol. 1

```
1              THE COURT:  Sure.  You may.

2              MS. McNAMARA:  On page 5, in the second sentence,

3    it's a double negative, and we just found it very confusing

4    and we were concerned that the jury might as well.

5              THE COURT:  What page?

6              MS. McNAMARA:  We have a proposal for a revision to

7    kind of remove the double negative.

8              THE COURT:  Yes, ma'am.  What would you have us say

9    at that point?

10             MS. McNAMARA:  "Injury or harm sustained from the

11   statements removed from the action cannot be a basis for

12   recovery."  I think it has the same meaning, it just isn't a

13   double negative.

14             MR. CLARE:  That's fine.

15             THE COURT:  Done.

16             MS. McNAMARA:  Thank you, Your Honor.

17             Then on page 7, we're just worried that the way this

18   is constructed -- and we went back to the Virginia rules, and

19   I think it's normally constructed a little different.  That

20   after the third line, after "damage," I think to be proper and

21   to not collapse defining proximate cause as a but for, it

22   would read better to say, The statement produces the injury or

23   damage, comma, and, comma, without cause, rather than defining

24   the former as that is.

25             MR. CLARE:  I'm not sure I understood.  What page
```

1    were you on?

2              MS. McNAMARA:  Page 7.

3              THE COURT:  The first paragraph.

4              MS. McNAMARA:  The first paragraph.

5              MR. CLARE:  And I'm sorry.  Can you give me that

6    again?

7              MS. McNAMARA:  Yeah, I'm sorry.  So state in the

8    third line, produces the injury or damage, comma, and, comma,

9    without the cause, the injury or harm.

10             As written, our concern is that it's collapsing two

11   concepts, which is proximate cause and but for cause.

12             THE COURT:  She wants to make one sentence out of

13   two.

14             MR. CLARE:  I don't think it's unclear, but I don't

15   have any objection to the proposed modification.

16             THE COURT:  All right.  So we'll say produces the

17   injury damage, comma, without the cause, the complained of

18   harm would not have occurred.

19             MS. McNAMARA:  Thank you very much.

20             Then on page 9, Your Honor, we were concerned with

21   the clause, "from the plaintiff's perspective."  We were

22   concerned that it is kind of injecting almost a violation of

23   the golden rule test, to ask the jurors to step into the

24   plaintiff's shoes.

25             THE COURT:  Give me the line.

1          MS. McNAMARA:  It's the second line on the first

2    paragraph.

3          THE COURT:  The second line on the first paragraph.

4          MS. McNAMARA:  It says you may take into

5    consideration, and then it has the clause, qualifying clause,

6    "from the plaintiff's perspective."  And we would propose just

7    to delete that and just do the recitation of everything you

8    can take into consideration.

9          MR. CLARE:  We would object to that, Your Honor.  I

10   do not believe that it has any remote implication of the

11   golden rule.  And since the entire purpose of the exercise is

12   to evaluate the impact the article had on the plaintiff, it

13   seems appropriate and also an important lense through which to

14   view the impact on the plaintiff.

15         THE COURT:  I think you would be better off with the

16   language the way it is.  And the way it would have to read if

17   it's changed -- the only way it can be changed is to say, "In

18   determining the amount of damages to which plaintiff is

19   entitled, you may take into consideration from plaintiff's

20   perspective the statements for which you have found defendants

21   liable."

22         MS. McNAMARA:  Would you prefer that?  I'm asking my

23   group.  Or would you prefer it the way it is now?

24         MR. PAXTON:  I'm not sure that fixes the problem.

25         MS. McNAMARA:  Yeah, we're not sure that fixes the

1  problem, Your Honor, but if --

2          THE COURT:  I'm not sure I understand what the

3  problem is.  It has to be the impact of the statements for

4  which the defendants are liable upon the plaintiff.

5          MS. McNAMARA:  I think -- I see you're right.  It's

6  just the concern is that's kind of proposing for them to, in

7  effect, step into her shoes, and we're trying to avoid them

8  understanding that that's their role.  So it might be better

9  to have -- yeah, the impact and the -- and what is different?

10  I can't read your writing.

11          MR. FINNEY:  Sorry to double team, Your Honor.  It

12  sounds like that the plaintiff's perspective is different, is

13  sort of outgoing as opposed to impact on the plaintiff.  And I

14  think the impact language that we want to have -- I mean, our

15  objection is really about "from the plaintiff's perspective."

16          THE COURT:  I'd be willing to say, "all the

17  circumstances surrounding the statements based on plaintiff's

18  testimony for which you have found the defendants liable."

19          MS. McNAMARA:  I think that's fine, Your Honor.  I

20  think that's fine.

21          MR. CLARE:  I don't think it's just based on the

22  plaintiff's testimony, though.

23          MS. McNAMARA:  Or the evidence.  You could say

24  "based on the evidence."

25          MR. CLARE:  I mean, if the problem is "perspective,"

1    I guess I just fail to see what the issue is with that word.

2    There's nothing in those three words, four words, that invites

3    the jurors --

4            THE COURT:  Well, Ms. McNamara feels like it would

5    invite the jury to say:  What would I do if this happened to

6    me or how would I feel if these things were said about me?

7            MR. CLARE:  I guess I must disagree with

8    Ms. McNamara that those four words invite any such inquiry.

9    If the word "perspective" is a problem, "vantage point" would

10   be something else that could be said.  But I don't see the

11   difference.

12           THE COURT:  I'm kind of attracted to what defendants

13   have just suggested.  I'm willing to say, "In determining the

14   amount of damages to which the plaintiff is entitled, you may

15   take into consideration all the circumstances, all the

16   circumstances surrounding the statements, based on all the

17   evidence that you've heard, for which you have found the

18   defendants liable."

19           MS. McNAMARA:  That makes perfect sense, Your Honor.

20           MR. CLARE:  I don't see the need for the change, but

21   that's fine if you want to make that --

22           THE COURT:  Well, I think it's more precise.

23           MS. McNAMARA:  And then finally, Your Honor,

24   tracking, I think, the language that was added this morning on

25   the page that Christina gave us, it struck us that when --

1  we're looking at the verdict form, so if you might want to

2  know.

3          THE COURT:  I've got that.  2 and 3?

4          MS. McNAMARA:  Yes.

5          THE COURT:  Okay.

6          MS. McNAMARA:  Paragraph 2B, this is with regard to

7  Rolling Stone --

8          THE COURT:  It's been changed again.  We made it two

9  separate questions now.

10         MS. McNAMARA:  Oh.

11         THE COURT:  I don't know that it makes any

12 difference, 2A or 2B.  What's the problem with the

13 formulation?

14         MS. McNAMARA:  Okay.  Again, we were just wanting to

15 track the language.  I think that is similar to the language

16 that you added in the instructions about -- so we were going

17 to suggest that it should be, "If you believe the plaintiff

18 has proven by a preponderance of the evidence that she's

19 entitled to recover against Rolling Stone, LLC, and Wenner

20 Media, LLC, based on the separate and additional harm caused

21 by the republication of these statements," rather than

22 simply --

23         THE COURT:  If they follow the Court's instruction

24 and read the questions literally, that shouldn't be necessary.

25         MS. McNAMARA:  Okay.  Thank you, Your Honor.  I

1    appreciate it.

2            THE COURT:  Are there any other objections to be

3    preserved at this point?

4            MS. McNAMARA:  No.

5            THE COURT:  Any other matters to be taken up before

6    we recess for lunch?

7            Ask the marshal to declare court in recess for

8    lunch.

9    (Lunch recess)

10

11                    CERTIFICATE

12       I, JoRita B. Meyer, certify that the foregoing is a

13   correct transcript from the record of proceedings in

14   the above-entitled matter.

15   /s/ JoRita B. Meyer                    Date: 11/8/16

16

17

18

19

20

21

22

23

24

25