Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

1

1                    UNITED STATES DISTRICT COURT

2                FOR THE WESTERN DISTRICT OF VIRGINIA

3                      CHARLOTTESVILLE DIVISION

4

5       ********************************
        NICOLE P. ERAMO,              * CIVIL ACTION 3:15-CV-00023
6                                     * NOVEMBER 7, 2016
                Plaintiff,            * TRIAL DAY 17, VOLUME 2
7       vs.                           *
                                      *
8       ROLLING STONE, LLC,           *
        SABRINA RUBIN ERDELY,         * Before:
9       WENNER MEDIA, LLC,            * HONORABLE GLEN E. CONRAD
                                      * UNITED STATES DISTRICT JUDGE
10              Defendants.           * WESTERN DISTRICT OF VIRGINIA
        ********************************

11

12

        APPEARANCES:
13

        For the Plaintiff:      THOMAS ARTHUR CLARE, ESQUIRE
14                              ELIZABETH MARIE LOCKE, ESQUIRE
                                ANDREW CLAY PHILLIPS, ESQUIRE
15                              JOSEPH R. OLIVERI, ESQUIRE
                                Clare Locke, LLP
16                              902 Prince Street
                                Alexandria, VA 22314
17

18      For the Defendants:     ELIZABETH ANNE McNAMARA, ESQUIRE
                                ALISON SCHARY, ESQUIRE
19                              SAMUEL M. BAYARD, ESQUIRE
                                Davis Wright Tremaine, LLP
20                              1251 Avenue of the Americas, 21st Flr.
                                New York, NY 10020
21

22      Court Reporter:      Lance A. Boardman, RDR, CRR
                             c/o JoRita B. Meyer, RMR, CRR
23                           210 Franklin Road, S.W.
                             Roanoke, Virginia 24011
24                           540.857.5100, Ext. 5311

25          Proceedings recorded by mechanical stenography;
        transcript produced by computer.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

2

1

APPEARANCES (Continued):

2

For the Defendants:        W. DAVID PAXTON, ESQUIRE
3                          J. SCOTT SEXTON, ESQUIRE
                           MICHAEL J. FINNEY, ESQUIRE
4                          TONY M. RUSSELL, ESQUIRE
                           Gentry Locke Rakes & Moore
5                          P. O. Box 40013
                           Roanoke, VA 24022
6

7   ///

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

3

1                              INDEX

2

3

4    WITNESS:                                    PAGE:

5    KIRT VON DAACKE

6              DIRECT EXAMINATION

7              BY MR. PHILLIPS.........................   6

8

9                           *****

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

4

1                          INDEX OF EXHIBITS

2

3    FOR THE PLAINTIFF:                                    PAGE:

4    Plaintiff's Damages Exhibit 214 marked for

5       identification...................................     5

6    Plaintiff's Damages Exhibit 215 marked for

7       identification...................................     5

8    Plaintiff's Damages Exhibit 216 marked for

9       identification...................................     5

10   Plaintiff's Damages Exhibit 217 marked for

11      identification...................................     6

12   Plaintiff's Damages Exhibits 214, 215, 216, and

13      217 admitted into evidence.......................     6

14

15   FOR THE DEFENSE:

16   Defendants' Damages Exhibit 96 marked for

17      identification...................................    35

18   Defendants' Damages Exhibit 96 admitted into

19      evidence.........................................    35

20

21    CLOSING ARGUMENT BY THE PLAINTIFF (DAMAGES).......    39

22    CLOSING ARGUMENT BY THE DEFENDANTS (DAMAGES)......    76

23    REBUTTAL CLOSING ARGUMENT BY THE PLAINTIFF          93

24    (DAMAGES).........................................

25    CHARGE TO THE JURY................................   101

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

5

1          (The jury is present in Open Court at 2:24 p.m.)

2          THE COURT:  I see all 10 jurors made it back safely.

3  They're in their places.  We're ready for the next plaintiff's

4  witness.

5          MR. PHILLIPS:  Your Honor, the plaintiff calls Alvin

6  Ling by deposition designation.

7          (The videotaped deposition of Alvin Ling was played

8  at 2:25 p.m.)

9          (The playing of the videotape was concluded at 2:34

10  p.m.)

11          THE CLERK:  The Plaintiff's Damages Exhibit 214 is

12  the disk.

13          (Plaintiff's Damages Exhibit 214 marked for

14  identification.)

15          THE CLERK:  The transcript is 215.

16          (Plaintiff's Damages Exhibit 215 marked for

17  identification.)

18          THE CLERK:  Is that it?

19          MR. PHILLIPS:  Two exhibits.  This is marked as PX

20  350, article views.

21          THE CLERK:  The article views, formerly Plaintiff's

22  Exhibit 350, is now Plaintiff's Damages 216.

23          (Plaintiff's Damages Exhibit 216 marked for

24  identification.)

25          MR. PHILLIPS:  And social media data, formerly PX

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

6

1   351.

2          THE CLERK:  Is now Plaintiff's Damages Exhibit 217,

3   for Mr. Ling.

4          (Plaintiff's Damages Exhibit 217 marked for

5   identification.)

6          THE COURT:  All admitted without objection.

7          (Plaintiff's Damages Exhibits 214, 215, 216, and 217

8   admitted into evidence.)

9          THE COURT:  You may call the next witness.

10         MR. PHILLIPS:  Your Honor, the plaintiff calls

11  Mr. Kirt von Daacke.

12                      - - - - -

13                  KIRT VON DAACKE,

14  being first duly sworn, testifies and says as follows:

15         THE CLERK:  Have a seat right there, please.

16                  DIRECT EXAMINATION

17  BY MR. PHILLIPS:

18  Q    Good afternoon, sir.

19  A    Good afternoon.

20  Q    Can you please introduce yourself to the jury?

21  A    I'm Kirt von Daacke.  I'm Nicole's husband.

22  Q    And, Kirt, do you live with Nicole here in

23  Charlottesville?

24  A    Yes, I do.

25  Q    And what do you do for a living?

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

7

1   A    I'm a history professor.  My specialty is U.S. South,

2   19th Century, slavery and race.  And I'm an assistant dean in

3   the college of arts and sciences, so I do academic advising.

4   Q    How long have you and Nicole been married?

5   A    We have been married for 20 years, and we've been a

6   couple for just over 28 years.

7   Q    Do you have any kids?

8   A    We have one kid, Alex.  He's 9.  And we have four dogs,

9   too, because we have one child.  So like our kids.

10  Q    Kirt, how did you and Nicole meet?

11  A    Oh, my gosh.  So I was 20 years old.  I was a college

12  dropout, and my buddies wanted to go out and go dancing one

13  night.  So I think -- and it's been a long time, but I'm

14  pretty sure we had a mutual friend -- we didn't know each

15  other -- who were dating, you know, 20-year-olds.  And we went

16  out dating.

17       I'd had my wallet stolen, so I was the runner.  My job

18  was -- the '80s.  My job was to run eight blocks to the

19  banking machine every time somebody needed cash.  My buddies

20  were paying for me.

21       And I remember sitting, really kind of being upset, like

22  this was a lousy way to spend an evening.  But I saw her, she

23  was cute, she was dancing with my buddy Smitty.  And then

24  later that night, somehow -- I'm embarrassing her -- we found

25  out that we had these mutual friends, and we met.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

8

1    And I think six weeks later the other 20-year-olds'

2  relationship had ended, and we've been together ever since.

3  Q    What was it about Nicole that attracted you to her

4  initially?

5  A    She was -- she's pretty and she looked kind.  And she is

6  pretty and she is kind.  So I was right for the first time in

7  my life, about 28 years ago.

8  Q    So, Kirt, let's cut right to why we're here today, which

9  is to talk about the statements that the defendants made about

10  your wife.

11    Can you tell us what it was like for you and Nicole the

12  day the article came out?  If you can sort of take us back in

13  time to that week.

14  A    Sure.  I have to back up to a week or two before the

15  article came out.  She came home one night, was very upset.

16  And I did not know Jackie's name at the time, but she said, I

17  just had a conversation with this student.  There's apparently

18  a story coming out in Rolling Stone.  The student was crying

19  in my office and said, I hope I don't get you fired, that the

20  story was going to be very negative in its portrayal of

21  Nicole.

22    So we spent the next week or two, you know, kind of on

23  pins and needles.  She was -- it was a sense of foreboding

24  about what's coming.  We didn't know when it would come out.

25  We thought it was going to come out in December, and then it

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

9

1  hit on November 19th.

2      And so we went from that, you know, week or two of kind

3  of worrying about what we didn't know what was coming to, holy

4  cow.  And it was -- when the article hit, it was as if someone

5  set the University of Virginia on fire.  The place just went

6  nuts.

7  Q    Tell us what it was like in your house that day when

8  Nicole first read the article.

9  A    You heard her talk about this.  She was on call.  She was

10  a person who got up at all hours of the night to answer

11  e-mails and answer the phone if there was an emergency.  So I

12  was used to her getting up a little earlier than me, and it

13  was one of those mornings.  We didn't know the article was

14  going to be there.

15      About 5:00 in the morning, I heard her crying.  And, you

16  know, we -- we had an old 90-year-old house.  It didn't have a

17  right angle left in it.  It's -- you know, you're on top of

18  each other.  The doors don't -- if they shut, they don't stay

19  shut.  You hear everything.

20      So I heard her crying.  Got up and found her in the

21  office.  Someone had I think e-mailed her a link.  I just

22  remember she was reading the article and was just completely

23  shaken, crying, couldn't understand how she could be portrayed

24  that way.  And that was the start of the morning.

25      And then we had to get up and get our kid to school and

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

10

1    go to work.  And it got worse from there.

2    Q    In the days after the article was published, what was the

3    atmosphere like on grounds at the university and in the

4    community?

5    A    I mean, it was literally like they had set the university

6    on fire.  There were protests outside of her office.  I work

7    in the next building, so -- and her office is between my

8    office and the library where I do all my research.  So I had

9    to sort of daily pass the protest that was directly beneath

10   her window.

11       There were people marching by my office with bullhorns.

12   There were students arguing and complaining loudly in the

13   hallway in my academic advising building.  It was -- I've

14   never had an experience like this in my life.  I've never seen

15   so many people so angry and so often specifically talking

16   about my wife.

17       It was -- within two days, there were e-mail chains

18   running in all the departments.  There was one in mine which

19   included a series of my colleagues calling for her to be

20   fired, talking about how basically everyone, you know, in the

21   dean of students office needed to be removed.

22       And I had to intervene and contact my department chair

23   and say, you know, before we rush to judgment, can we remind

24   people that the folks in the dean of students office,

25   including my wife, actually do really hard work, and I am her

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

11

1  husband, and it might not be good to share a public e-mail

2  feed with me.

3       So this was immediate, instant, and it continued for

4  weeks.  It was just like that every day.  And everywhere you

5  went, this was the topic of conversation.

6  Q    So -- because you actually have a different last name

7  than your wife --

8  A    Yeah.

9  Q    -- so people were actually including you on e-mail chains

10  at the university --

11  A    Yup.

12  Q    -- making negative statements about Nicole?

13  A    Yes.  Yeah.  And again, we both have weird last names.

14  We thought we should keep both of them.

15       And I didn't know how that was going to protect me for a

16  week or two at UVa until this happened, that not everyone knew

17  we were married.

18  Q    What about beyond Charlottesville and the immediate

19  community?  Were you aware at the time of the reaction online

20  to this article and the notion that it was going viral?

21  A    Yes.  In fact, I wanted to shield her.  This is -- she

22  described it this morning, I think, helpless.  It's exactly

23  how we felt for two years.  I had nothing I could do to

24  protect her.  I don't even know that my comforting has been of

25  any use.  But I decided to really press her:  Don't read

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

12

1    anything.  I will do all of it.

2        And so I first began tracking all the articles, all the

3    reposting of the article, reading all the comment feeds, so

4    I -- that was -- I continued to do that on a daily basis

5    straight through until May 2015, tracking what people were

6    saying.

7    Q    Do you have any recollection of what specifically people

8    seemed to be upset about with respect to the portrayal of

9    Nicole in the article?

10   A    They thought she was evil.  They thought she was someone

11   who discouraged students who had been -- were victims of

12   sexual assault from reporting them.  They were outraged that

13   she, according to the article, was someone who was told about

14   multiple gang rapes and did nothing about it.

15       And this was, again, visible in every comment feed,

16   visible on social media.  You know, we all have large -- I

17   have kind of a geographically large social media network, so

18   there are people on there who weren't in Charlottesville who

19   didn't know that we were married, didn't know her, and I

20   routinely faced comments:  She's a despicable human being; she

21   should be fired; she's a terrible person.  And it was again

22   always linked to, how could she discourage students from

23   reporting, and how could she be told about a brutal gang rape,

24   or brutal gang rapes, and do nothing about it.

25   Q    Were you aware at this time, and I'm speaking of late

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

13

1    November 2014, that Ms. Erdely was doing press and media

2    appearances to promote the article and making additional

3    statements about Nicole?

4    A    Yes.  Again, I was -- one of my jobs that -- I assigned

5    this.  She didn't give me this job; I gave it to myself.  I'm

6    a researcher.  I felt helpless.  All I knew how to do was

7    research.

8         So I didn't know who Ms. Erdely was.  So I began reading

9    all of her articles, began tracking her on social media.  And

10   indeed, I lived in this strange universe where there were

11   protesters outside her office every day, people were calling

12   for her head on a platter.  We were miserable.

13        And then I'd look on social media, and Ms. Erdely was

14   giddy about a limo ride to another publicity event for the

15   article.

16   Q    One of the publications for which the jury has found

17   actionable statements that were made with actual malice is a

18   Slate podcast that Ms. Erdely appeared on in November 2014.

19        Were you aware of that Slate podcast at the time?  Did

20   you hear it?

21   A    Yeah, one of my great regrets from all this is that one

22   of my pleasures every morning until this happened was getting

23   up and reading Slate and listening to podcasts on a daily

24   basis.  It's one of the places I went.

25        You know, Slate can be a little kind of snarky and edgy,

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

14

1  and it was a nice change of pace from the boring scholarly

2  stuff I spend my days reading.

3        And indeed, I listened to the podcast and heard

4  Ms. Erdely repeat the same charges about my wife, that she had

5  suppressed rape at the university and discouraged students

6  from reporting the rapes.

7  Q    And did you share with your wife your --

8  A    I did.  I doubt she remembers.  There were times where I

9  was so outraged by what I was seeing online or had built up --

10  you know, just the cup had to overflow a little bit.  She

11  would hear from me.  These are the things I tried to not do it

12  much, but I know that was one where I was -- just couldn't

13  believe, here we were again repeating these same stories.

14  Q    As her husband, as the person closest to her, how did

15  these statements affect Nicole?

16        What was her demeanor and disposition like at the time?

17  A    They destroyed her.  My life from November 19th was -- on

18  was watching her on a daily basis, right?  She'd cry herself

19  to sleep.  You know, we have a little house, right?  One

20  bathroom.  It's an old house.  You spent a lot of time

21  together in the bathroom whether you wanted to or not.

22        She'd be in the shower; I'd be brushing my teeth.  She'd

23  be sobbing in the shower.  It probably wasn't every night, but

24  it felt like every night.  At 2 or 3 in the morning after

25  she'd been up pacing the house, I would hear her sobbing, and

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

15

1   I would find her curled up in the fetal position in our little

2   office, crying.  She'd either done what she always does,

3   opened her e-mail box and read another message telling her

4   that someone hoped she was raped or calling her an evil

5   person.  And this was our life.

6       And I watched her stop eating.  It was awful.  It was --

7   I don't really have the words.

8   Q    Did Nicole ever express any dark thoughts to you,

9   suicidal ideations, things like that?

10  A    Yes.  I don't remember the day, but during this stretch,

11  yet another -- it's described as like sobbing from the abyss.

12  It was a wail that I think I never heard come out of her

13  before in my life.

14      I got up, went in to attempt to comfort her, and this

15  time she was curled up in the fetal position under the

16  computer desk and wouldn't come out.  She was just curled up

17  in a little ball, sobbing.

18      I tried to get her to come out and she said, I can't go

19  on anymore.  I don't know that I can live anymore.

20      I don't remember how we got through that day, but that

21  was the daily experience, sometimes multiple times a day.

22      She -- the stress from this, it had to be completely

23  overwhelming.  But she withdrew.  She buried herself back in

24  whatever she was doing at work.  And this had a dramatic

25  effect on our home life as well.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

16

1  Q    Tell us about that.  How did this episode, the actions of

2  the defendants, affect your family?

3  A    Well, again, one was she stopped being around basically

4  at all.  She was -- when at home, she was either heading -- on

5  the computer trying to do some work, crying, or preparing to

6  go to work, and then she was working really long hours and

7  coming home at odd hours of the day.

8       And this meant that I was getting our son to school every

9  morning, I was picking him up, I was walking the dogs, and

10 then I was often picking her up.

11      I was extremely worried during this time because the

12 campus was just so roiled by this, I was actually deeply

13 worried for her safety.  And I would wait outside, wouldn't

14 let her leave the building without me being there.

15      And this involved often picking her up at 9 or 10 at

16 night, with my seven-year-old son sitting in the car with me.

17 So he would go to bed late as well because I couldn't leave

18 him at home, but I couldn't let her leave the building.

19      And this continued until she went into the hospital in

20 December.

21 Q    Did Alex understand what was going on?  Was this

22 confusing for him?

23 A    It was very confusing.  NPR was always on in the car.  I

24 was distracted.  I was trying to rush through the day and get

25 things done, not paying attention.  Don't know why it took me

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

17

1    so long to figure this out.

2        But sure enough, seven-year-olds, who aren't paying

3    attention to anything you have on the radio until it's about

4    his mom, started to ask me:  Okay, what's going on?

5        And I gave him some short version of events.

6        But we couldn't escape it.  It was every day, everywhere

7    we went:  Why are we waiting here to pick up my mom?  Why am I

8    not in bed?

9        And so we had to have a talk about it.  And I remember

10   describing -- they have an active antibullying campaign at his

11   school called "Bully-Not," and this is how he came to

12   understand what was going on, that she was the world's -- that

13   she was the victim of the world's worst bullying campaign.

14       So this was, again, every day explaining to him, him

15   going:  Why would someone do this to my mommy?

16   Q    Did you perceive that that was something that was

17   difficult for Nicole, trying to explain to Alex what was going

18   on?

19   A    Yeah, I think she was probably nearly incapable of

20   explaining it to him at the time.  And we were all caught in

21   this storm.  I'm not even sure I did a good job, but I at

22   least made sure that he had a basic explanation to try to keep

23   him somewhat shielded from this but have an understanding of

24   what was going on.

25   Q    Did Nicole seek any therapy or counseling services as a

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

18

1    result of the statements that were made about her in the

2    article?

3    A    She did.  And I think she may have addressed this with

4    you this morning.

5         With the cancer, the multiple surgeries, and then the

6    chemotherapy, there was just -- we were just trying to

7    literally survive the stretch from November 19th until the

8    chemo ended in May.

9         And so it wasn't until she had recovered sufficiently

10   from the chemotherapy in the summer that she actually sought

11   out therapy.

12   Q    What about you?  Did you seek counseling as well?

13   A    Yes.

14        MR. RUSSELL:  Your Honor, I'm sorry to interrupt.

15   We have to object on the grounds of 401, 402.

16        THE COURT:  I think that goes beyond the scope of

17   what the Court intended for this witness.  Objection

18   sustained.

19   BY MR. PHILLIPS:

20   Q    Kirt, let's go to December 5th.  One of the issues that

21   the jury has decided in this case is that on December 5th the

22   defendants, Wenner Media, LLC, and Rolling Stone, LLC,

23   republished the article, including the defamatory statements

24   about Nicole discouraging Jackie from sharing her story,

25   calling UVa the rape school, and having a nonreaction to

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

19

1   Jackie's claim of these other two Phi Kappa Psi gang rape

2   victims.

3        Do you recall that Rolling Stone republished the article

4   with an editor's note on December 5th, 2014?

5   A    Yes.

6   Q    What do you remember about that?

7   A    Well, I remember in the days leading up to it, there was

8   this faint glimmer of hope that the Washington Post had begun

9   questioning the article, and we thought maybe this will change

10  the way people are perceiving Nicole.

11       And then the editor's note came out, and it didn't change

12  anything.  In fact, I think it actually made it worse because

13  the takeaway from everyone that I heard from was, oh, well,

14  you know, maybe Jackie got her story wrong, maybe she wasn't

15  quite telling the truth, but everything else is true.

16       There was nothing in that editor's note retracting the

17  statement attributed to my wife that nobody wants to go to the

18  rape school.  That was never made clear.  No one thought that

19  she still didn't discourage students from reporting rapes.

20  Everyone still seemed to think that in fact she did nothing

21  when confronted with multiple gang rapes.

22  Q    So to your perception, Kirt, how did the republication of

23  the article on December 5th, 2014, affect Nicole, if at all?

24  A    Again, it made it worse.  This problem didn't go away.

25  The damage that was done by the article on November 19th

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

20

1  continued, starting on December 5th, continued anew.  And this

2  was on social media, in e-mails to her.

3  Q    Did you perceive that she was hurt by the fact that

4  Rolling Stone had not retracted the statements about her in

5  the article?

6  A    She was, again, destroyed a second time, humiliated,

7  still having to explain to -- again, you can't explain to the

8  world what has just happened to you.  But, no, it was

9  devastating.

10  Q    So let's talk about Nicole's career for a moment.

11      Nicole's former job as an associate dean of students at

12  the University of Virginia, was that something that was just a

13  9-to-5 job for her?

14  A    No.  It was 24/7.  I used to joke that when she left at

15  all hours of the night, that she was going to see her second

16  husband, the, you know, students in crisis at the university.

17  And that's just where she was going to be.

18      We accepted that.  We have busy schedules.  We understood

19  that.

20      Can you remind me of the question?  I'm sorry.

21  Q    Sure.  I asked about Nicole's job as an associate dean of

22  students, her former job.

23      Was she passionate about her work?

24  A    Deeply passionate.  And this was again about a

25  nearly-two-decade-career arc that started in 1998.  She -- you

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

21

1   know, I think she's mentioned this.  She briefly flirted with

2   law school, spent a semester in law school and felt much

3   better of it, and I think has been glad ever since she did

4   that.

5       But she took an entry-level position at the university.

6   I was in graduate school, wasn't making a dime.  I was

7   commuting out of town on a weekly basis.  She was home.

8       She took a job at the shelter for help and emergency and

9   spent her spare time working there.  Became a manager at the

10  shelter.

11      And I was even -- sometimes I would -- sometimes we'd

12  only have one car, one old beat-up car.  I would drive her to

13  the shelter and pick her up sometimes.  I was occasionally

14  called in when she needed to move a family in an emergency

15  from one shelter to another.

16      So even before she ended up on the dean of students

17  track, this was deeply important work to her.  And it

18  continued to be right up until she was removed from the

19  position.

20  Q   And we've heard about how Nicole's job at the university

21  has since changed.

22      As her husband, to your perception, how has that affected

23  your wife, the inability to work directly with students the

24  way she used to?

25  A   I cannot imagine what it must be like when you've

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

22

1  dedicated your life to helping people in crisis and working

2  closely with students.  I don't deal with students in crisis,

3  but I work with students closely.  If someone took that away

4  from me, it would destroy me.

5      Her entire career was gone in a flash.  It's gone, and

6  it's not coming back.

7  Q    Has her passion and drive for her work and her career

8  changed?

9  A    Yeah, she's -- I don't think she likes the work she's

10  doing now.  I don't think the position she is in now has any

11  real career advancement opportunities.  She doesn't get to

12  connect with students.

13      She has had a two-year crisis in confidence.  She's not

14  the same person she was two years ago, and it's -- she tested

15  the waters a little bit but -- applying for those two jobs,

16  and the takeaway at home was that confirmed that she should

17  be -- have a lack of confidence.

18  Q    We've heard from Nicole about some of the ongoing health

19  issues that she was experiencing around the time that the

20  article was published.

21      From your vantage point, how did the publication of these

22  statements and the article about Nicole discouraging Jackie

23  from sharing her story about having a nonreaction to these

24  reports of gang rapes and dealing with the fallout from that,

25  how did that affect her ability to manage the stress of the

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

23

1  cancer issues and vice versa?

2  A    The stress was just -- in that month before she went to

3  the hospital, the stress was overwhelming.  I don't -- still

4  to this day, she's -- the fact that she's still sitting here

5  today is amazing to me.  I don't know how she did it.

6       She went into the hospital, had the double mastectomy,

7  and then as soon as she was able, returned to work because she

8  didn't know what else to do.

9       And she probably pushed too hard, but I think the way to

10 avoid dealing with the stress, I think very unsuccessfully --

11 you can't hide from what she went through -- was to dive right

12 back into work and continue working and hope that she'd wake

13 up one day from this fever dream and her reputation would be

14 back.

15 Q    Kirt, how has this experience affected you and Nicole's

16 daily life in Charlottesville, in the community that you live

17 in?

18 A    Well, we don't go out as much as we used to.  I think

19 it's -- we love this community.  We invested in raising a

20 family here, and we didn't want to leave.  But it's really

21 hard to go out when everyone is looking at you everywhere you

22 go, and they're looking at you because of the Rolling Stone

23 article.

24      I mean, just -- I've lost track of days now, but I think

25 it was day 3 of the trial, she and I went out to get a cup of

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

24

1    coffee.

2         MR. RUSSELL:  Your Honor, I think this has been

3    dealt with previously on objection.

4         I'm sorry to interrupt.

5         THE COURT:  I thought it was a fair question.

6         Overrule the objection.

7    A    As we were walking back to the -- right outside the

8    courthouse at the bus stop a woman yelled:  You're the woman

9    who apologizes for student rape.

10        This is two years later.  This follows her wherever she

11   goes.  I mean, there's 291,000 hits at the beginning of the

12   trial on Google -- again, I'm a researcher -- 53 pages of

13   articles since November 19th, all linking her directly to rape

14   at UVa.  That's --

15   Q    This may seem like an obvious question in light of what

16   you just said, but of course most of these statements were

17   about two years ago.

18        From your perspective as Nicole's husband, is this

19   something that still affects her today?

20   A    Absolutely.  That's -- again, I'm sorry, I don't know how

21   it doesn't.  She's -- it's gotten better, but she still

22   doesn't sleep at night.  I don't think she has slept through

23   the night more than two nights in the last two years.  It's

24   been -- I've even had -- some of the stress in the family has

25   been, you've got to go -- you've got to try to sleep.  I can't

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

25

1   keep getting two hours of sleep at a stretch.

2        So it's -- this is the daily existence.  It's -- again,

3   it's improved.  She doesn't cry as much, but it still happens.

4        We still have to explain what's going on to our son.  We

5   had to have a little talk this morning.  Why are you back in

6   court?  What's going on?

7        It's every day.  It's at the breakfast table.  It's at

8   the dinner table.  It's when we go to bed.

9   Q    Kirt, how is the Nicole of today different than the

10  Nicole you knew on November 18th, 2014?

11  A    This -- to me, it looks like she's aged five years in the

12  past two years.  And I think she's just -- she just lacks the

13  confidence that she used to have.  She is confused about where

14  to go next.

15       It's hard at nearly 50 to suddenly realize the career you

16  thought you were going to be on for the rest of your life is

17  gone, right?  We were already talking before this article hit:

18  Where do we go next?

19       And that's gone, right?  It's really hard to get up and

20  get two jobs.  Many schools have a no spousal hiring

21  provision.  The likelihood that you're going to find a history

22  position and a dean of students position, which was the only

23  career path she had before the article, was very low, and now

24  it's -- I don't know, it's -- she doesn't have a career.

25                 MR. PHILLIPS:  Thank you, Kirt.  I have no more

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

26

1    questions for you.

2                    CROSS-EXAMINATION

3    BY MR. RUSSELL:

4    Q     Good morning -- or afternoon.

5    A     Hard to tell in this room.

6    Q     Yeah, it's like Vegas.

7          I just wanted to say thank you for coming here.  I have

8    no questions.

9               THE COURT:  May the witness be excused?

10              MR. PHILLIPS:  Yes, sir, he may be excused.

11              THE COURT:  Sir, you may stand down.  You are

12   excused.  You may remain in the courtroom or leave, whichever

13   you prefer.  You're done.

14              MR. CLARE:  Your Honor, upon review, we believe the

15   remainder of the testimony we had intended to offer would be

16   duplicative, and so the plaintiff will rest.

17              THE COURT:  Plaintiff rests.

18         Let's take about 10 minutes, ladies and gentlemen.  Then

19   we'll come back and have the defendants' evidence.

20         I would again ask you that even though plaintiff has

21   rested her case on damages, that you not discuss the case with

22   one another, do not permit anyone to discuss it with you.

23         Let's plan to return at about 4:15.

24         Ask the marshal to excuse the jury.

25              (The jury left the courtroom at 3:04 p.m.)

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

27

1           THE COURT:  Please be seated.

2       Any issues as to the defendants' evidence?

3           MR. PAXTON:  We have one.  We have a redacted

4   version of the --

5           THE COURT:  Oh, yeah, let's take a look at it.

6       And I stand to be corrected about the context.  If I'm

7   wrong about that, I can be proven wrong.  But it just seemed

8   to me, based on my recollection, that the context wasn't

9   especially important.

10          MR. PAXTON:  Well -- do you have any issues?

11          MR. CLARE:  No, we're okay with this.  This version

12  as redacted reflects --

13          THE COURT:  Oh, these are the interrogatories.  I

14  thought you had the OCR record redacted.

15          MR. PAXTON:  We do have the OCR report, Your Honor.

16  We had anticipated having the opportunity to redact it.  We

17  haven't had the opportunity to do that.

18          MR. FINNEY:  Your Honor, we have -- we need to

19  make...

20          MR. PAXTON:  Your Honor, for the record, just so

21  that the record is clear, what we're offering to the Court are

22  a limited number of pages from the 26-page report.  It's page

23  1, page 15, a redacted version of page 17, and a full page 21.

24          THE COURT:  Mr. Clare, how does it look to you?

25          MR. CLARE:  I'm just seeing this for the first time,

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

28

1   so --

2           THE COURT:  Me too.

3           MR. CLARE:  -- so I probably need to take a few

4   minutes.

5           THE COURT:  All right.  Let's take a few moments,

6   and then we'll come back a minute or so before the jury

7   returns and hear what you have to say.

8           MR. PAXTON:  We do have one issue, Your Honor.

9           THE COURT:  Yes, sir.

10      Mr. Russell?

11          MR. RUSSELL:  We would move, pursuant to Rule 50,

12   for judgment as a matter of law on the infection claim that

13   the plaintiff had asserted in this case.

14      The law requires the plaintiff to establish a causal

15   connection between the defamatory statements and the

16   infection.  And the evidence that's been adduced thus far is

17   that Ms. Eramo had stress and that stress can potentially lead

18   to infections.  And that came from Dr. Lin.

19          THE COURT:  What paragraph of the complaint?

20          MR. RUSSELL:  I'm sorry?

21          THE COURT:  What paragraph of the complaint is

22   implicated by your argument?

23          MR. RUSSELL:  There is no specific paragraph of the

24   complaint.

25          THE COURT:  Well, then what makes you think there

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

29

1    was a distinct infection claim?

2         MR. RUSSELL:  They have argued as part of their

3    evidence before the jury that the infection is part of her

4    damages.

5         THE COURT:  You can argue to the contrary.  I can

6    understand striking a count of the complaint or striking a

7    claim for damages, a particular claim, but I don't remember

8    one being stated in the complaint.

9         MR. RUSSELL:  Well, and that's the problem.  The

10   jury's been left to speculate, based on the evidence they've

11   heard, that the infection was caused by the stress in this

12   case.

13        THE COURT:  We stopped the doctor from saying

14   anything like that.  And the Court's rule early on was that as

15   a fact witness he could not give that opinion, and he didn't.

16        MR. RUSSELL:  And correct.  And so the plaintiff has

17   not established sufficient evidence to relate the two.  And

18   the jury's heard evidence about her infection and how that led

19   to the delay of chemotherapy and the delay of breast

20   reconstruction.  So the jury may speculate that those are

21   damages in this case.

22       And so we need that claim to be struck and the jury to

23   understand --

24        THE COURT:  There is no particular claim.  There's

25   no count for -- they're not seeking to recover based on some

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

30

1  worsening of her medical condition because of stress.  They

2  just want this to be considered, as I understand it, as one of

3  a variety of factors that the jury might wish to address in

4  assessing damages.

5       MR. RUSSELL:  Well, the issue is, Your Honor, then

6  we would ask the jury to be instructed that they cannot

7  compensate her for the infection, for the delayed

8  chemotherapy, for the delayed breast reconstruction, since

9  there's no evidence establishing the causal connection with

10  the defamatory statements in this case.

11       THE COURT:  I don't think counsel intends to argue

12  that.  I'd be surprised if he did.  If he does, perhaps you're

13  entitled to some curative instruction.

14     But I understand it to be just one of many factors that

15  the plaintiff would have the jury consider in assessing

16  damages.

17       MR. RUSSELL:  And that's the problem.  They can't --

18  we would suggest they can't consider that, because to consider

19  it -- for instance, if this was a medical malpractice case,

20  you would have to have competent medical evidence, to a

21  reasonable degree of medical certainty, that stress caused the

22  infection.

23       THE COURT:  That's true if anyone had given that

24  opinion.  Dr. Lin did not give that opinion.

25     What the jury can consider based on his testimony is that

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

31

1   at the time when she was fighting cancer, she also had to

2   fight stress associated with the publication of the defamatory

3   statements.

4        But that's the extent of it.  That's all there is.

5            MR. RUSSELL:  Well, we understand that, but the

6   insinuation has been left with the jury that the plaintiff

7   wants, which is --

8            THE COURT:  That's a matter for argument.

9            MR. RUSSELL:  All right.

10           THE COURT:  I would agree with you if plaintiff

11  attempts to make that argument, plaintiff attempts to make

12  that link with the jury - because she had stress associated

13  with the publication of the article, her recuperation from

14  cancer was prolonged or complicated - if they make that

15  argument, then it's inappropriate.

16           MR. RUSSELL:  And that's the -- you know, that's the

17  issue that prompted me to do this, is they obtained evidence

18  from Dr. Lin that stress can delay recovery and that stress --

19           THE COURT:  That's his opinion --

20           MR. RUSSELL:  Right.  And the --

21           THE COURT:  -- based on many years of treatment of

22  folks with this particular problem.  But he didn't say it

23  happened to her.

24           MR. RUSSELL:  That's right.  And that's why in

25  retrospect, considering the sufficiency of the evidence,

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

32

1    there's not sufficient evidence for the jury to even consider

2    that.  And so thank you.

3            THE COURT:  Mr. Clare, do you have anything you wish

4    to say on the point?

5            MR. CLARE:  No, Your Honor.  I think you understand

6    and have articulated the way we view this evidence and the way

7    we intend to argue it.

8        And as you correctly pointed out, we don't have an

9    infection claim nor have we attempted to elicit the causal

10   connection or seek damages separately for that.  It's the

11   impact that the stress of these two events -- this is the way

12   that they found their plaintiff, was someone who was going

13   through this, and nothing more.

14           THE COURT:  So you agree as to the appropriate

15   argument that can be made given the evidence that was adduced?

16           MR. CLARE:  Yes, Your Honor.

17           THE COURT:  Rule 50 motion denied.

18       Anything else?

19           MR. PAXTON:  Your Honor, I guess before the jury

20   comes back, we'll address the OCR report.  And we may have one

21   other issue for judicial --

22           THE COURT:  Yeah, we'll come back a few minutes

23   before the jury and talk about the OCR report and anything

24   else you wish to raise.

25           MR. PAXTON:  Thank you.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

33

1        THE COURT:  Ask the marshal to declare the court in

2   recess until the return of Court.

3        (A short recess was taken at 3:12 p.m.)

4        (In Open Court at 3:19 p.m.)

5        THE COURT:  Please be seated.

6     Have we reached common ground on the OCR report?

7        MR. CLARE:  Your Honor, we do have several

8   additional redactions that we think need to be made.

9        THE COURT:  Okay.

10        MR. CLARE:  And I don't think they will be --

11        THE COURT:  Maybe you could just get with

12   Mr. Paxton, see if you can agree.  If not, I'll look at them.

13        MR. PAXTON:  Your Honor, one thing while they're

14   addressing that.

15     We realized that the medical records that we produced and

16   introduced were as produced to us by the plaintiff.  And we

17   now realize that there is some information that probably

18   should have been redacted from those, and we would like to

19   substitute the redacted version of those just to -- social

20   security numbers, those types of things.

21        THE COURT:  All right.  Substitution by consent of

22   counsel.

23        THE CLERK:  Okay.  So is it still going to be --

24   it's still yours.  Okay.

25        MR. CLARE:  And subject to what Mr. Finney and I

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

34

1  just worked out in terms of redactions, we still would like to

2  just note for the record our continuing objection to the

3  admission of any portion of the OCR report.  We understand

4  Your Honor's rulings.  We'd just like our objection to it

5  noted for the record.

6       THE COURT:  All right.  Objection overruled for the

7  reasons previously cited by the Court.

8     Anything else before we have the jury seated?

9       MR. PAXTON:  It will take us about five minutes to

10 get the document here.  I don't know if you wanted to do that

11 in the presence of the jury.  I don't want to do it before we

12 rest, because obviously we --

13       THE COURT:  Which document, the OCR?

14       MR. PAXTON:  The OCR to get the additional

15 redactions made.

16       THE COURT:  Do you intend to rest upon submission of

17 the report?

18       MR. PAXTON:  We have one other document we're going

19 to ask the Court to take judicial notice of, which are the

20 initial disclosures made by Ms. Eramo in this case.

21       THE COURT:  Do you intend to publish the OCR report

22 now?

23       MR. PAXTON:  I would like to if we have the

24 opportunity.

25       THE COURT:  All right.  So let's take a recess until

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

35

1    the redacted report is back with the Clerk.

2              (A short recess was taken at 3:22 p.m.)

3              (The jury is present in Open Court at 3:36 p.m.)

4         THE COURT:  All 10 jurors are back in their places,

5    ready to move to the next stage of the trial.

6         Ladies and gentlemen, you'll recall the plaintiff has

7    rested her case on damages, and now the defendants have the

8    opportunity to present evidence if they choose to do so on

9    this same issue.

10        So, Mr. Paxton, if you're ready, you may proceed.

11        MR. PAXTON:  Thank you, Your Honor.

12        The defendants have only one piece of evidence to offer

13   at this point, and that is what's been marked as Defendants'

14   Exhibit 96, which is the redacted version of the OCR report

15   that we've been referring to throughout this proceeding.

16             (Defendants' Damages Exhibit 96 marked for

17   identification.)

18        THE COURT:  All right.  96, over the Plaintiff's

19   objection.

20             (Defendants' Damages Exhibit 96 admitted into

21   evidence.)

22        THE COURT:  So, ladies and gentlemen, very briefly,

23   during the liability phase of the trial, the Court ruled that

24   the OCR report was not relevant for purposes of your

25   consideration of that issue.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

36

1     But it has a different relevance for purposes of the

2  damage phase of the case, so consequently the Court is

3  admitting a redacted, or edited, version of the OCR report,

4  which may or may not be considered by you as relevant in

5  assessing damages.

6          MR. PAXTON:  Your Honor, we'd like to publish.

7          THE COURT:  You may do so.

8          MR. PAXTON:  Thank you.

9     Want to bring up page 21, please?

10    Jacob, let's go back to page 1 real quick.

11    If you would blow up the first paragraph, please.

12    So this was a letter to President Sullivan advising of

13 the outcome of the compliance review.

14         THE COURT:  Now, under these circumstances I don't

15 believe you're going to be able to characterize it or make

16 comment on it.  You simply display it.

17         MR. PAXTON:  That's fine.

18         THE COURT:  And argue about it later.

19         MR. PAXTON:  Correct.

20    And the last sentence there says:  The review further

21 examined whether any failure to promptly respond appropriately

22 allowed for the creation and the continuation of a hostile

23 environment.

24    If you would then turn to page 15.  And if you would

25 enlarge the "concern" and the "furthermore" paragraph.

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

37

1       And if you could pull up the second paragraph.

2               MS. McNAMARA:  David, they didn't get to see it.

3               MR. PAXTON:  They weren't able to see it?

4               MS. McNAMARA:  No, they didn't get to see the first

5       one.

6               MR. PAXTON:  Oh, I'm sorry.  I thought -- I

7       apologize.

8           Okay?  Ready to move to the next paragraph?  You'll have

9       this document to read.

10          Let's move to the second paragraph at this point.

11          If you'd go to page 17, bring up the one paragraph there.

12          And then if you'd -- the last page, if you would bring up

13      the first half of it.  It's a long paragraph, so let's break

14      it.

15          And show the rest of that paragraph, please.

16          And then the last paragraph.

17          Thank you, Your Honor.  The defendants will rest.

18              THE COURT:  Defendants rest.

19          Is there any rebuttal evidence on the part of the

20      plaintiff?

21              MR. CLARE:  No, Your Honor.

22              THE COURT:  Do you need a few moments to marshal

23      your closing statements?

24              MR. PAXTON:  It will be helpful, Your Honor.

25              THE COURT:  So, ladies and gentlemen, both sides

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

38

1   have now rested their cases, and I usually give counsel a few

2   moments to organize their thoughts before they enter into the

3   next stage of the case, the presentation of closing

4   statements.

5        So let's give the attorneys about 10 minutes to prepare,

6   then we'll come back and have closing statements.

7        Again, while you're away from the Court, I would ask that

8   you not discuss the case with each other or permit anyone to

9   discuss it with you.

10       Let's have the marshal declare the Court in recess for

11   about 10 minutes.

12             (A short recess was taken at 3:44 p.m.)

13             (The jury is present in Open Court at 3:55 p.m.)

14             THE COURT:  I see all 10 jurors are back, ready for

15   closing arguments in the case.

16       Ladies and gentlemen, keep in mind what I've said several

17   times about arguments of counsel.  Arguments of counsel are

18   not evidence.  They're merely summaries of what each side

19   believes the evidence has been, designed to help you organize

20   your thoughts, understand each side's theory of the case, and

21   appreciate what the positions of the parties are.

22       Under the rules of court, the plaintiff has the

23   opportunity to make the first and last closing statement, so,

24   Mr. Clare, if you're prepared to do so, you may begin.

25

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

39

1          CLOSING ARGUMENT BY THE PLAINTIFF (DAMAGES)

2

3          MR. CLARE:  Thank you, Your Honor.

4      Members of the jury, I made good on, you know, my promise

5  to you, which is to put this case in your hands before the end

6  of the day, and I appreciate your patience.

7      Rolling Stone, Wenner Media, and Sabrina Erdely want you

8  to believe that Nicole wasn't really damaged by the false and

9  defamatory statements they published about her.

10      You heard Ms. Erdely testify, right here in front of you,

11  that when we asked her if Nicole had been hurt by the article,

12  she said Nicole may have had her feelings hurt.

13      The evidence that we put in shows that it went way, way

14  beyond that.  This isn't a case about hurt feelings.

15      Other times in the case they suggested maybe Nicole is

16  overly sensitive and can't take the criticism.  That's not why

17  we're here today, because Nicole is overly sensitive or can't

18  take criticism.

19      We're here because you have already found in your verdict

20  that Ms. Erdely published false and defamatory statements

21  about her in "A Rape On Campus" and did so with actual malice,

22  and that Rolling Stone and Wenner Media republished false and

23  defamatory statements about Nicole in "A Rape On Campus" and

24  did so with actual malice, and that Ms. Erdely made additional

25  false and defamatory statements about Nicole in radio, podcast

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

40

1  interviews, and a statement to the press.

2     Now, whatever else you might think about Nicole after

3  spending three weeks hearing evidence about her and hearing

4  from her directly, the suggestion that she has not really been

5  damaged by all of this and is just suffering from hurt

6  feelings does her a great disservice.

7     Make no mistake, Nicole is not a weak person.  She's

8  tough.  She's a Jersey girl.  And she has overcome great

9  hardships in her life.  She lost her parents at an early age.

10 She was raised by her grandparents.  And when it came time to

11 leave home, she put herself through school, first at a

12 community college and then at the University of Virginia,

13 eventually earning a PhD, one of the toughest educational

14 degrees you can earn.

15    She beat cancer twice.  She's a survivor, and she's a

16 strong person.  She was strong for Jackie when Jackie came to

17 see her, giving her the strength to speak out at Take Back the

18 Night and to meet with the police.  And every day for nearly a

19 decade before she ever met Jackie, Nicole was strong for the

20 many other UVa students who came to her in their time of

21 greatest need.

22    She was strong for the kids who had been thinking about

23 suicide.  She was strong for the kids with depression.  She

24 was strong for the kids with substance abuse problems and

25 deaths and illnesses back at home, parents, friends, and

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

41

1  family members.  She was strong for them too.

2      But even the strongest people have a breaking point.  And

3  Ms. Erdely and Rolling Stone and Wenner Media found that

4  breaking point for Nicole.  They trashed her good name and the

5  sterling reputation that she had spent her entire adult life

6  building for herself.  They handed her over to an angry

7  Internet mob.  They robbed her of feelings of self-worth and

8  her sense of personal security, and they destroyed the trust

9  and the sacred bond that enabled her to do the job that she

10 loved so much - working with students and the survivors of

11 sexual assault in their time of greatest need.

12     Now, these things would be devastating for anyone,

13 emotionally, professionally, and reputationally.  But these

14 things were quite devastating for Nicole in 2014 and 2015 when

15 she was, quite literally, also fighting for her life.

16     Now, in a few minutes Judge Conrad will instruct you on

17 the law that will govern your deliberation and the amount of

18 damages that you can be awarded [sic].

19     He'll give you a verdict form.  The good news is, there's

20 only one verdict form this time and there's only three

21 questions on it.

22     But you'll be asked to fix two damage numbers.  You'll be

23 asked to fix a damage number attributed to Ms. Erdely for the

24 false and defamatory statements she published in "A Rape On

25 Campus" and for the false and defamatory statements she made

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

42

1   in postpublication interviews.  You'll then be asked to

2   determine whether, above and beyond that damage, Rolling Stone

3   and Wenner Media caused additional damage by their decision to

4   republish false and defamatory statements in "A Rape On

5   Campus."

6       I'm going to show you the jury instruction that governs

7   the categories of damages that you are permitted to consider.

8   These will be on page 9 of the instructions the judge will

9   give you.

10      Just to orient you on the page, we're going to talk about

11   the top paragraph in terms of what you can consider.  In terms

12   of the bottom part of the page, on page 9, deals with the

13   categories of damages that you can consider.

14      The judge will instruct you that you may award damages

15   for any actual out-of-pocket expenses that were caused by the

16   statements for which you have found the defendants liable.

17      Now, I told you this morning, and the evidence hopefully

18   made that clear, that in cases of extreme reputational harm

19   and emotional distress, these are not cases that lend

20   themselves to proof by invoices and bills and estimates and

21   that sort of thing.  So the instructions go on and say you may

22   also award damages to her for any insult to her, including any

23   pain, embarrassment, humiliation, or mental suffering, and any

24   injury to her reputation or professional standing, provided

25   that you find by the preponderance of evidence that plaintiff

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

43

1  suffered these injuries as a consequence of the statements for

2  which you found defendants liable.

3      Nicole and I are asking you to consider and award damages

4  in each of those three categories:  insult to her, injury to

5  her reputation, and injury to her professional standing.

6      The first category - Injury to Reputation.

7      What's a person's reputation worth?

8      Each person is born into this world and goes through life

9  with one name.  It's incredibly important.  A person's

10 reputation can open doors or a person's reputation can close

11 doors.  A reputation can give her a head start or it can cause

12 her to start behind everyone else.  It's why employers and

13 schools rely on letters of recommendation.  It's a form of

14 reputation, so that they have a sense of the person that

15 they're getting before they hire you, before they meet you,

16 before they bring you into their school, bring you into their

17 home.

18     A reputation is what precedes you.  The people you don't

19 even know, the people you haven't even met yet, know your

20 reputation before you ever meet them.  And it's why consumers

21 rely on referrals from friends and online reviews when you're

22 picking where to bank, where to eat, who to trust and who not

23 to trust.

24     Reputation matters.  It matters in a thousand everyday

25 decisions that we make.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

44

1    And in today's modern, digital, Internet era, reputation

2    matters a lot more than it used to.  Before the Internet, if a

3    defamatory statement was spoken to someone in the town square,

4    to the limited number of people that happened to be there to

5    hear it, it could have a limited impact on a person's

6    reputation.  Always move to a new town where no one had heard

7    the statements and reestablish a reputation.  It was a lot

8    easier to escape false and defamatory things that people said

9    about you.

10    But today, with the Internet, with the advent of social

11    media, with the advent of Google, defamatory statements about

12    someone go viral in seconds.  False and defamatory information

13    makes it all the way around the world in a split second.  And

14    things that are published on the Internet live there forever.

15    On the Internet, injury to a person's reputation is

16    written in permanent ink.  Today a person is defined, at least

17    in the minds of people who may not have met her yet, by the

18    Google results.  Every prospective employer will Google the

19    folks they want to hire.  Every prospective student will

20    Google the administrators, schools they want to attend.  Every

21    business contact will Google the folks they're going to meet

22    with.  And all they will know about a person before they meet

23    them is what the Internet says about them.

24    The damage to a person's reputation in the Internet age

25    is unfortunately not just limited to today.  Things on the

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

45

1   Internet live forever.

2       And Nicole's great-great-grandchildren will never have

3   the opportunity to know her.  They won't know how she lived

4   her life every day.  They won't know the admiration of her

5   friends and coworkers who knew her well and knew how she

6   really did her job.

7       What they will know, though, is what the Internet says

8   about her; that the only thing they will know and their future

9   generations will know about their great-grandmother Nicole is

10  what they see online.

11      And in this case, with the false statements that were

12  made by the defendants with actual malice, Ms. Erdely, Rolling

13  Stone, and Wenner Media, powerful media companies and an

14  independent contractor, put a permanent, digital black mark on

15  Nicole's name and her reputation.

16      You heard Mr. Sexton in his opening statement talk about

17  the bootleg copies of the article that exist all over the

18  Internet.  The podcasts and the radio broadcasts and the

19  people commenting in the comment fields and on social media.

20      You heard the testimony -- video testimony of Mr. Ling,

21  who walked you through an exhibit about all the different ways

22  that this article was promoted on Twitter and Facebook and

23  Tumblr.

24      There's no closing Pandora's box once false and

25  defamatory statements get out into that bloodstream of the

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

46

1   Internet.  It metastasizes and spreads throughout the

2   Internet.

3        Thanks to those defamatory statements that Ms. Erdely

4   published in the first instance and Rolling Stone and Wenner

5   Media published in the second instance, Nicole will forever be

6   known on the Internet as the person who discouraged Jackie

7   from telling her story, who didn't react to Jackie's report,

8   and who then condoned UVa's hiding rape statistics from

9   parents because nobody wants to send their daughter to the

10  rape school.

11       Thanks to the defamatory statements spoken by Ms. Erdely,

12  Nicole will forever be known as the villain who brushed off

13  Jackie, did nothing with the information she provided, did not

14  report the assault to police, did not provide the support

15  Jackie needed.

16       You've already determined with your verdict that these

17  statements were false and made with actual malice.  But

18  they're out there.  They're out there for the world to see.

19  And people who have never met Nicole have already judged her

20  by those words and will judge her by those words when that's

21  what they find on the Internet.

22       No amount of money can ever change that.  But as I said

23  to you this morning, unfortunately, money damages are the only

24  remedy that our court system can provide in this situation.

25       So Nicole and I will ask you as your final decision in

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

47

1    the discharge of your service in this case to determine how

2    much money is required to compensate Nicole for all of the

3    defamatory statements that the defendants made about her.

4        You'll be instructed as to the circumstances that are

5    relevant in determining the amount of damages.

6        Again, I'm going to go to the instructions on page 12 and

7    then again on page 9.

8        In determining the amount of any damages you award, you

9    should be guided by dispassionate common sense.  You must use

10   sound judgment in fixing an award of damages, drawing

11   reasonable inferences from the facts in evidence.  You may not

12   award damages based on sympathy, speculation, or guesswork.

13       On the other hand, the law does not require the plaintiff

14   to prove damages -- the amount of her losses with mathematical

15   precision but only with as much definiteness and accuracy as

16   circumstances permit.

17       In considering what circumstances -- this is again on the

18   top of page 9 of the instructions that you'll be given.  In

19   determining the amount of damages to which the plaintiff is

20   entitled, you may take into consideration all of the

21   circumstances surrounding the statements for which you have

22   found the defendants liable, based on all the evidence that

23   you've heard and considering the occasion on which they were

24   made and the extent of their publication -- the extent of

25   their publication -- the nature and character of the insult,

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

48

1    the probable effect on those who heard the statements that you

2    found to be actionable and made with actual malice, and their

3    probable and natural effect on the plaintiff's personal

4    feelings and upon her standing in the community.

5        In assessing the damages, you're entitled to consider all

6    those things, and use your common sense about the statements,

7    how serious they were and how broadly they were disseminated

8    and what kind of impact they would have on a person's

9    reputation.

10       I'm going to talk about each one of those circumstances

11   for a moment.

12       The nature and character of the insult is one of the

13   factors that you're permitted to consider.

14       You have already found with your prior verdict that these

15   statements were defamatory.  I won't belabor the point, but

16   the prior instructions talked about what was required in order

17   for you to find that statement.

18       These are statements that hold people up to being

19   ridiculous and humiliation and odious, which is an old term, I

20   guess, but it has the same meaning.

21       Falsely accusing anyone of suppressing a brutal gang

22   rape, or brushing off a young rape victim or discouraging her

23   from sharing her story or pursuing a complaint, would be one

24   of the worst things that you could say about a person.  But

25   for Nicole, a woman who had dedicated her life and career to

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

49

1   helping and advocating for survivors of sexual assault, the

2   nature and character of the insult to her by these statements

3   is especially damaging.  It's the opposite of the person she

4   is.

5       You're entitled, in assessing damages and applying your

6   own common sense to the impact, to consider the serious nature

7   and character of the false statements in fixing the amount of

8   damages.

9       The second factor is the probable effect on those who

10  heard or read the statements.

11      Well, the law requires you -- the law allows you to focus

12  on the probable effect of those who heard or read them.  In

13  other words, it allows you, the jury, to, applying your

14  everyday experience, think about what the probable effect of

15  hearing these statements might be on the people that heard

16  them.

17      But here we have some evidence to guide your

18  consideration of the effect that those words have on the

19  people who heard or read them.  You saw and heard a sampling

20  of the hate mail that Nicole received, which illustrates the

21  actual effect that the statements had on the people who read

22  them.  The dean of rape; worthless piece of trash; I hope you

23  burn in hell; I hope the attorney general finds a way to throw

24  you in jail; you don't have the skills to be a human.  These

25  are some of the effects that it had on people who read and

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

50

1    heard them and who felt compelled to take the effort to look

2    up Nicole's contact information and write to her directly,

3    often in the middle of the night.

4        So in addition to your own evaluation of the probable

5    effect on those who heard and read them, we ask you to

6    consider the actual effect that those statements had on people

7    who heard and read them.

8        And they may not have used the exact words of the

9    article, but those e-mails talk about the same things that you

10   found with your verdict:  discouraging Jackie, condoning rape,

11   the rape statistics.  These echos in these hate -- this whole,

12   vile, hate mail that Nicole received.

13       You also heard testimony about how the defamatory

14   statements prompted people - students, faculty, other people -

15   to take action, to send petitions around for Nicole's

16   resignation among the faculty.  These aren't just students who

17   were overheated by this article.  These are serious people who

18   read the article and were prompted to circulate petitions to

19   get rid of Nicole and others in the dean of students office,

20   to protest outside her office every day, to leave Post-it

21   Notes on the office door of her building, to call for her to

22   be criminally prosecuted and call for her to be fired.

23       And again, these are only the people that chose to act on

24   the statements that they read.  Our experience would tell us

25   and common sense would tell us that for every person who took

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

51

1  the time to do these things, to protest, to write a Post-it

2  Note, to send an e-mail, for every person who took the time to

3  do that, there are many, many more who had the same reaction

4  but didn't take the time to act on it, to write directly to

5  her.

6      And so you're entitled to consider not just the evidence

7  of the actual effect but also the probable effect.  What

8  effect would these statements have in the minds of the people

9  who heard them.

10      You're entitled to consider the effect these statements

11  had on Nicole's personal feelings.  You heard her testify and

12  you heard her husband testify about the devastating impact

13  that these statements had on her, the pain and embarrassment

14  that she felt, the feelings of hopelessness, the worry about

15  how she was being perceived, the worry about her job, thoughts

16  of suicide, the crying, the lack of sleep.  These are the

17  actual effects that the article had on Nicole.  You heard it

18  directly from her and you heard it from her husband, and in

19  the earlier phase of the case you heard it from Dean Groves.

20      The effects on Nicole's standing in the community.  You

21  heard impact -- you've heard evidence about the impact that

22  these false statements had on Nicole's standing in the

23  community; in particular, the impact that Dean Groves and

24  others testified to about the perception of the loss of trust.

25      Nicole talked about it again this morning, about how

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

52

1  vital that trust is.  It's a sacred bond.  That people who

2  come into her office, the students need to be able to have a

3  trust in her.

4      And the fact that this article destroyed that trust and

5  her ability to do that job had a huge effect on her standing

6  in the professional community that she operates in.  And it

7  was fatal to her ability to continue to do her job with

8  students.

9      Finally, the instructions will tell you that you should

10 consider the circumstances and extent of the publication of

11 the defamatory statements; how these statements appeared on

12 the Internet, having the characteristics that I just

13 described, and the extent of the publication; how many people

14 these statements were blasted out to or went to go see -- the

15 people went to go see them on the Internet.

16     Now, when someone reads a false and defamatory statement,

17 that obviously causes some reputational harm.  But as the size

18 of the mob goes from one person to 10 persons, to 100 people,

19 to millions of people, to tens of millions of people who hear

20 that same thing, the injury to one's reputation grows along

21 with it.

22     This wasn't a whisper of these defamatory statements.

23 This is the loudest megaphone to be imagined.  This is a media

24 company that is expert in getting content in the hands of

25 subscribers and readers.

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

53

1    You heard testimony about how they made those efforts to

2    get them out, on Twitter and Facebook, and to promote them

3    with press releases.  They wanted people to read these

4    articles and they were successful.

5    So you should consider the extent of the publication of

6    each of the defamatory statements in deciding how much

7    representational harm they caused to Nicole.  And to do that,

8    you need to know how many people saw each of the defamatory

9    statements that you've decided.

10    And some of the video testimony we had -- again, I

11    apologize for how dry some of it was and some of the documents

12    that went along with it -- are really where you find that

13    data.  And that data gives you a tangible, data-driven way in

14    order for you to assess the extent of the publication and to

15    assess the damage, the scope of the statements, the reach of

16    them, and to assess damages based on that factor.

17    So let's focus first on the readers of the print edition

18    of the magazine.  1,420,163 issues that were sold.  In the

19    record, that was the testimony of Mr. Provus, who is now the

20    publisher of Rolling Stone, testified as a corporate

21    representative.  And it appeared in the audited circulation

22    data that Mr. Provus testified to, which can be found at

23    Plaintiff's Trial Exhibit 213.  These are hard copies of the

24    magazine based on audited data provided by Rolling Stone.

25    Now, Mr. Provus also talked about, and in fact bragged

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

54

1    about, how high their readers-per-issue number was.  He talked

2    about how Rolling Stone exists at the doctor's office or at

3    your buddy's house and that sort of thing.  And this is a

4    figure, he said, he testified, is the figure that they tell

5    their advertisers, how many people see the hard copy of the

6    magazine.

7         Mr. Provus told us that that number was 8.39 readers per

8    issue.  You'll have his transcript and video testimony in the

9    jury room if you would like to hear that testimony again and

10   have -- understand better what that document means and that

11   metric means.

12        But when you talk about 1,420,163 issues sold and 8.39

13   readers per issue, that gets you to 11.9 million print readers

14   of the magazine.  That's just the print edition.  11.9 million

15   people.

16        So we start with 11.9 million print readers.  And then we

17   need to look at the online publication, because it was

18   published not just in the print edition but also online, on

19   the Internet, on RollingStone.com.

20        Here's the testimony of Mr. Ling, the other corporate

21   representative who testified twice during the course of the

22   trial.  He provided some metrics earlier in the case and some

23   additional metrics today.

24        And Mr. Ling testified about a document, Plaintiff's

25   Trial Exhibit 216, which provided data about the online

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

55

1  publication.

2      How many unique visitors or computers came to visit "A

3  Rape On Campus" online?

4      In the first online publication -- this is the period of

5  time between November 19th and the December 5th republication

6  that you found -- an additional 2.4 million unique visitors,

7  just between November 19 and December 5.

8      So if you add up the print readers and the readers of

9  that first online publication, the extent of the first

10  publication, 14,318,060.

11      Now, we've left some things out just for the sake of

12  simplicity of this number in terms of keeping the math simple.

13  You heard testimony, again from Mr. Provus, about people who

14  can subscribe to the magazine digitally through an iTunes app

15  and how you can download a replica of it.

16      Plaintiff's Trial Exhibit Damages 213, admitted today,

17  talks about additional data for that subscription.  There's an

18  additional 58,000 people, according to that document, that had

19  the ability to download that digital copy, and did download

20  the digital copy, of Rolling Stone Issue 1223.  But in order

21  to be conservative, we have not included that in the numbers

22  here.

23      Mr. Ling was kind enough to explain to us how that works.

24  And there are some options of how those things get purchased

25  and not purchased.  And so for the sake of simplicity, we have

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

56

1    not included that in the number.  But we think it gives this
2    calculation an element of being conservative about the number
3    of people that saw the first publication of the article.

4         You'll also want to consider the extent of the
5    publication of the other statements that were made that you
6    found to be defamatory.  The extent of Ms. Erdely's
7    publication.  The Brian Lehrer show.

8         Mr. Woods testified earlier in the trial.  He testified
9    that the Brian Lehrer show is a radio program that's broadcast
10   in the New York City metropolitan area, including New Jersey.

11        Now, earlier in the case, and in fact in opening
12   statement, one of the defendants' lawyers, I think it was
13   Mr. Sexton, suggested that because Mr. -- because Nicole
14   doesn't live in New York/New Jersey anymore, her reputation
15   wasn't harmed there.  Nonsense.  The fact that most people in
16   New York don't know Nicole before Ms. Erdely's statements on
17   the Brian Lehrer show actually makes it worse.

18        In Charlottesville, where some people know her and have
19   had a personal experience with her and had enough firsthand
20   experience with her to know what kind of person she is and the
21   way she does her job, at least some people here would have
22   that frame of reference.

23        But for many New Yorkers and folks in New Jersey, the
24   very first encounter with Nicole Eramo that they will ever
25   have will be hearing on the radio that she's the kind of

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

57

1  person who brushes off rape victims and doesn't support them

2  and does nothing in response to reports of multiple gang

3  rapes.

4       And so you will have to apply your own judgment, and we

5  trust you to do that, to say, what's it worth for Nicole not

6  to have had her reputation trashed in this manner to radio

7  listeners in one of the largest metropolitan areas in the

8  United States.

9       And as you consider that, I ask you to consider Nicole's

10 testimony as well:  that having grown up in New Jersey, having

11 family and friends that are still there, what's it worth for

12 those people, too, who may remember Nicole not to hear that

13 since she left New Jersey she's become the person that she was

14 portrayed to be on that radio broadcast.

15      I can't tell you what that number is.  I can't tell you

16 what it's worth.  You'll have to apply your own judgment and

17 experience what value to place on that having happened to her

18 as a result of those statements.

19      You also need to consider the extent of the publication

20 of the defamatory statements that Ms. Erdely made on the Slate

21 podcast.  It's available on the Internet.

22      Again, I can't tell you what the value is of that.  Only

23 you can decide what the value is of having that podcast

24 available on the Internet for people to hear.

25      Nicole's own husband heard it.  Obviously it didn't

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

58

1   change the way he thinks about it -- about Nicole.  But think

2   about how other subscribers would take those statements that

3   Ms. Erdely made in assessing how much reputational harm she

4   has suffered.

5       Ms. Erdely also e-mailed to the Washington Post a press

6   statement, answering questions that she knew would appear in

7   the Washington Post.  And it was.  It's the Washington Post.

8   It's not small-time media, not a fly-by-night newspaper or

9   blog where only a handful of people might see it.  It's the

10  largest newspaper in Washington, DC.

11      And you heard Nicole testify in her own experience about

12  the influence that the Washington Post has in this region

13  where Nicole lives and works and how -- almost all we've

14  talked about in this case is how the Washington Post has done

15  the reporting on this issue in getting to the bottom of the

16  real facts.

17      People were looking to the Washington Post in the days

18  after "A Rape On Campus" for information about all of this.

19  After the defendants got everybody excited with the "A Rape On

20  Campus" article and all the national uproar, people were

21  looking to the Washington Post as a source of information.

22      What's it worth to have all those people, and people in

23  our nation's capital and people in our region where Nicole

24  lives and works and the paper of record here, as you heard

25  Nicole say, think that Nicole chose not to act on gang rape

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

59

1    allegations in the manner that Ms. Erdely described?

2        So what I've got up here on the slide, these are the --

3    is the extent of statements that you have already found

4    Ms. Erdely to be responsible for.  And you will have to assess

5    the reputational harm caused by publications that have this

6    reach, this breadth, and this permanence as it relates to

7    Ms. Erdely.

8        The judge will also instruct you that you must consider

9    the extent of the December 5 republication by Rolling Stone

10   and Wenner Media.

11       And you may remember back in the liability phase, I put

12   up this timeline showing that between December 5th and the

13   time Rolling Stone finally took the article down off its

14   website in April 2015, months and months later, an additional

15   425,857 people came to the Rolling Stone website to read the

16   article.

17       You also heard the testimony of Sean Woods, who said it

18   was a big news story when those editor's notes went up.

19       And so in determining the extent of republication, I'd

20   ask you to consider that 425,857 people, by Rolling Stone's

21   own data, went to the website to read the article.  That's 10

22   times the population of the city of Charlottesville in that

23   republication period.

24       So in considering what damages to assess against Rolling

25   Stone and Wenner Media for the false and defamatory statements

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

60

1   that Nicole discouraged Jackie and had a nonreaction to

2   hearing the report and condoned hiding statistics because no

3   one wants to send their daughter to the rape school, you

4   should consider the extent of the publication.

5       So that's injury to reputation, the first of our three

6   categories of damage.

7       The second category of damage we're asking you to assess

8   is the pain and mental suffering that Nicole experienced.

9       The jury instructions refer to it as pain, embarrassment,

10  humiliation, and mental suffering.

11      You saw the hate mail.  Shame on you, you disgrace to

12  humanity.  How do you live with yourself?  You are more evil

13  than the rapists you enable.  You can only sweep sexual

14  assault under the rug for only so long.  Deliberate coverups

15  and encouraging students not to file police reports.

16      And you can review these e-mails for yourself,

17  Plaintiff's Trial Exhibits 128 and 129 from the liability

18  phase, and Damages Exhibit 199 through 207.

19      You heard how she had to take security precautions for

20  herself and her family.  Police officers were screening her

21  e-mails for threats.  She was taking precautions in coming to

22  and from work because of the content of these e-mails.

23      You heard about the angry protests and the Post-it's on

24  her door calling for Nicole to be fired.  And you heard Nicole

25  and her husband, Kirt, testify about the impact that those

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

61

1    statements had on her, about how she had to get off of social

2    media for fear of facing more hate, how she couldn't sleep,

3    and how on Sunday morning after the article, Kirt found her

4    under a desk, crying uncontrollably, and thinking about taking

5    her own life.

6        You can consider the pain and mental suffering that the

7    defendants' statements caused to Nicole.  You can't take it

8    away, but you can award damages to compensate her for having

9    suffered in that way and continuing to suffer in the way that

10   she described to you this morning.

11       While Nicole was facing these unrelenting, vicious

12   attacks on her reputation and livelihood and getting barraged

13   with hate mail, she was also quite literally fighting for her

14   life, knowing that in a month she was going to have to undergo

15   surgery for breast cancer and worrying that the stress that

16   the defamatory statements caused her would have an impact on

17   her recovery.

18       I want to be very clear.  We're not blaming Rolling Stone

19   for Nicole's cancer.  We're not blaming Rolling Stone or

20   Ms. Erdely for it coming back.  We're not saying to you that

21   they caused these things.  But there is some responsibility

22   that they have in that this was the situation Nicole was in on

23   November 19th when she woke up in the morning.  She had

24   already been rediagnosed.  She had surgery scheduled.

25       She should have been able to focus on fighting cancer.

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

62

1    She should have been able to focus on getting well for her

2    family.  She should have been able to focus on sleeping and

3    eating and taking care of herself the way that she had taken

4    care of so many students when they needed help.

5        But Rolling Stone and Ms. Erdely took away from her the

6    ability to focus on that fight.  In addition to fighting

7    cancer, in addition to worrying about cancer, in addition to

8    worrying about the impact that it would have on her career and

9    family and recovery and surgery and all of the horrible

10    decisions and options and thoughts that would go through your

11    head anyway under those circumstances, they piled on top of

12    all of that a worry about her job, whether it would still be

13    there, a worry about her reputation, a worry about the hate

14    mail, and the stress and anxiety of knowing that literally

15    tens of millions of people thought these horrible things about

16    her.  They piled onto a person that was already experiencing a

17    great trauma.

18        They're not responsible for the cancer, but they are

19    absolutely responsible for piling on to Nicole at that time

20    and making her burden heavier, making her worry deeper and her

21    anxiety and stress greater at a time when she should not have

22    had to be worried in one way about what Rolling Stone magazine

23    was saying about her.

24        But she did.  They put that worry on her from November

25    19th to December 5, and then from December 5 up to today.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

63

1    And you heard testimony about how at the same time she's

2    undergoing chemotherapy, trying to deal with an infection and

3    hospitalization, Rolling Stone had not yet taken that article

4    off the website.  This was in that time period after the

5    republication of the article but before the Columbia

6    journalism school finally shamed them into taking it down,

7    before they had ever said they had made a mistake as it

8    related to Nicole.  I'm still not sure we've heard that in

9    those words.

10    We've heard some apologies.  We've heard things crafted

11    as apologies.  But they've also been accompanied by statements

12    about how much Rolling Stone has suffered through all of this.

13    That's not what this is about.  That's not what an

14    apology is about.  An apology is about what you've done to the

15    other person and making it right.

16    And before that was ever done by taking the article off

17    the website, Nicole had to deal with the stress and anxiety of

18    all of this at the same time she was fighting for her life,

19    fighting cancer, and worried about this existential threat to

20    her career and her reputation and her well-being.

21    And so, ladies and gentlemen, for each of the defendants,

22    you'll have to make some decisions based on these factors:

23    What would it be worth to Nicole to be able to turn the

24    clock back to November 18, 2014, the day before those

25    statements were published, before the hate mail, before the

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

64

1    protests and the Post-it Notes, before the embarrassment and

2    the humiliation, before the depression and the suicide

3    thoughts and crying in the shower, what would it be worth to

4    be able to turn the clock back to that day and have it never

5    happen and put her in the same position mentally?

6        What's it worth?

7        What's it worth for Nicole to be able now, to be able to

8    try to go to a conference or meet somebody new, in town or out

9    of town, and wonder whether the person she's meeting is one of

10   the 14 million people who saw these statements?

11       What would it be worth to Nicole to go back in time when

12   she could walk down the pedestrian mall here in downtown

13   Charlottesville and not have strangers on the street shout

14   "rape apologist" at her?

15       What would it be worth to her to go through the rest of

16   her life not having to worry about what her son Alex sees on

17   TV about her or hears on the radio about her or will read on

18   the Internet about her?  He's a young man right now, and they

19   have control over what he sees and to some extent what he

20   hears.  But that's not going to last forever.  And you heard

21   how she tried to -- she's tried to protect him from all of

22   this.  What would it be worth for her not to have that worry

23   in raising a son?

24       What would it be worth to be able to have the same

25   pleasure that many of us take in having social media, Facebook

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

65

1    or Twitter account, or even e-mail, and not have to worry

2    about opening a message that you don't intend to open that

3    calls you a despicable piece of filth?  Being bombarded with

4    nasty, hateful, threatening messages.  What would it be worth

5    not to have that fear when you open up your social media

6    account or your e-mail?

7        What would it be worth not to be worried or embarrassed

8    or humiliated at the thought of what people will find if they

9    Google her as she tries to make new friends and new

10   professional acquaintances?  Not to be worried and embarrassed

11   about applying for a job because the search firm is going to

12   say this is something you're going to need to address?  Or

13   worry whether the first question in the interview isn't going

14   to be about these allegations?  Not to be worried about what a

15   neighbor or a new friend will think if they go and look her up

16   online.

17       What would it be worth to go back to that time?

18       What would it be worth, and what would it have been worth

19   for Nicole to have been able to fight cancer and undergo

20   chemotherapy and fight for her life without the additional

21   stress created by these defamatory statements?

22       And what would it be worth for her as the primary

23   breadwinner for her family to have a job she likes?

24       I want to talk a little bit about injury now to

25   professional standing, the last of the three categories that

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

66

1    we're asking you to consider in determining total damages for

2    each defendant.

3         The last category of damages is the loss of her dream

4    job.

5         You heard Nicole testify earlier in the trial and again

6    today what it meant to her to be in this position, working

7    with students to raise awareness of sexual assault on campus,

8    to work directly with survivors, to be there for them in their

9    darkest moments.  And you also heard how the same day when the

10   article came out, November 19th at 3 p.m., she was summoned to

11   a meeting, told to pack up her student files and turn them

12   over to someone else.

13        Those were not just files to Nicole.  They may have been

14   paper that she turned over at 3:00 that day, but each of those

15   files represented a young woman or man that Nicole had built a

16   relationship with, often over the course of many years.

17        You've seen how it takes time to develop trust with these

18   young people who come to see her and how frequently she has to

19   communicate with them.  Each of those files that she turned

20   over represented work that she had done, trust that she had

21   built, relationships that she had built, friendships she had

22   started with these folks, with young men and women that she

23   had comforted and counseled and built trust with over all that

24   time.

25        Her dream job ended at 3:00 the day the article was

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

67

1    published.

2        Now, Dean Groves told you earlier in the case, and also

3    Emily Renda, that that didn't happen because the people that

4    actually worked with Nicole believed that she had done these

5    things in that Rolling Stone article.  Of course not.  They

6    had worked with her for years, and they knew the kind of

7    person she was and they knew how she approached her job.

8        It was because of the false perception that those false

9    statements created and the damaged trust that they created:

10   that she didn't have survivors' interests at heart, that she

11   would discourage them from sharing their stories and would

12   have the type of nonreaction.

13       It wasn't true, but it was the false perception that they

14   worried about that took her out of the box, that took her out

15   of the ability to effectively do that job for the university.

16       Her dream job ended at 3:00 the day the article came out,

17   through no fault of her own.

18       Those defamatory statements by the defendants, the ones

19   that you found them liable for, breached a trust with

20   students, the current students at the University of Virginia

21   and the ones that would come in the years to follow, that

22   couldn't be repaired.

23       And so the folks who have to make these tough decisions,

24   notwithstanding how they felt about Nicole, made the decision

25   that she would no longer be able to continue her job working

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

68

1    with survivors.

2         You'll have to decide what that's worth, what the loss of

3    a dream job is worth.

4         What's it worth to Nicole to spend most of her adult life

5    having worked on prevention and awareness of sexual assault,

6    now not to be able to do it anymore.

7         What's it worth to spend years earning a college degree

8    and a graduate degree and years working at a women's shelter,

9    to spend all of those years laying the groundwork, to have the

10   skills and experience to do that dream job to the best of her

11   ability, and to finally achieve that dream job working with

12   students and advocating for them in their darkest moments, and

13   to earn that title, the Dean Eramo title that you've heard had

14   meant so much to her, and to do it all at the school that

15   educated her, at her alma mater where her husband also has his

16   job as a professor?  What's it worth to have all of those

17   things carefully built up over many, many years of hard work

18   destroyed, to be told that she needed to go into her office,

19   pack up her student files, bring them into a conference room

20   and hand them over?

21        What's it worth to Nicole not to have been shuffled

22   around after that from interim position to interim position

23   within the university by administrators who recognized that

24   the situation wasn't her fault, but because of the false

25   perception, she couldn't do it, working with survivors

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

69

1   anymore.

2       What's it worth not to have to try to recreate her dream

3   job at a different university?

4       What's it worth not to go on interviews and be asked

5   about this?

6       Now, she still has a job at the University of Virginia,

7   that's true, and she is grateful for the University of

8   Virginia colleagues who know her well and have not allowed

9   these statements to change their opinion of her.  She's

10  grateful for that.

11      And, yes, she's received small salary increases, about

12  the same amount you'd get from a cost-of-living adjustment.

13      But not all jobs are created equal.  She isn't doing what

14  she loves anymore.  It's not her passion.  And when you have

15  to get up and go to work every day, as we all do, the fact

16  that you don't love your job and the fact that you don't see a

17  path for yourself there and you don't see advancement for

18  yourself in the way that you once did, that's a big deal for

19  someone who is as young as Nicole and has many, many years to

20  work ahead of her in a job that she no longer likes.

21      The fact that she still gets a paycheck from the

22  University of Virginia doesn't change any of that.  Those

23  paychecks don't come with erasers.  They don't come with an

24  eraser that erases what happened to her.  They don't come with

25  an eraser that allows her to get rid of those statements on

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

70

1    the Internet about her.  They don't erase the loss of her

2    life's work.

3         She's 46 years old.  She has many, many more years of

4    work ahead of her, now in a position with an uncertain future

5    and a decided lack of enjoyment relative to what she once had.

6         She'd have many more years of waking up happy, going to

7    work in the morning knowing that she was making a difference

8    in the lives of young people, many more years of having the

9    satisfaction of doing that work.  And so you will have to

10   decide:  What's it worth that all of that has been taken away

11   from her?

12        So the sum of these things - the injury to reputation,

13   the pain and mental suffering, and the injury to professional

14   standing - is what we would ask you with your verdict to award

15   as the total damages to Nicole.  We ask you to award that both

16   as to Ms. Erdely for the statements that she made, that you

17   have found were made with actual malice and were false and

18   defamatory, and we ask you to award damages against Wenner

19   Media and Rolling Stone for their republication of those

20   statements.

21        The jury instructions will tell you that the damages you

22   award must be fair and reasonable compensation for the harm

23   that Nicole suffered, no more and no less.  That's on page 8.

24        And you are entitled to consider the fact that there is

25   an agreement in place between the parties, the joint defense

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

71

1   and confidentiality agreement, where Rolling Stone and Wenner

2   Media have agreed to pay all of the defendant, Ms. Erdely's,

3   legal fees and costs, and to satisfy any judgment and pay any

4   and all damages assessed against her arising out of the

5   article in this case.

6       In determining the amount that you award against each of

7   the defendants -- and you must award damages separately

8   against Ms. Erdely, and then if you find additional harm,

9   against Wenner Media and Rolling Stone.  In determining that

10   amount, we urge you to consider the extent of those

11   publications.

12       And so I got the same data that I put up before

13   summarized here on the left side, the publications that you

14   found to be made by Ms. Erdely with actual malice:  14.3

15   million people in "A Rape on Campus"; New York metropolitan

16   area for the Brian Lehrer show; the national Internet audience

17   for the Slate podcast; and Washington DC and the region around

18   it for the Washington Post.

19       And as it relates to the republication of those

20   statements by Rolling Stone and Wenner Media, the 425,857

21   people who came to the website and read the article after

22   Ms. Erdely warned them, we have to issue a retraction, and

23   after they said, our faith in Jackie is no more, for five long

24   months until they finally took it down off the website.

25       Now, it bears noting that just because Rolling Stone and

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

72

1   Wenner Media republished those statements on December 5th, it

2   doesn't mean that in considering the scope, the time scope,

3   for how long Ms. Erdely's statements will continue to hurt

4   Nicole and her reputation, the impact that it had, it doesn't

5   just stop just because Rolling Stone and Wenner Media

6   republished those statements.

7        You will have to consider the extent to which

8   Ms. Erdely's statements had ongoing harm beyond that

9   republication date and make that allocation in your award.

10       Mr. Wenner said that he and Rolling Stone have suffered

11  just as much as Nicole has.  And we've heard testimony about

12  some of the changes that they have made at the magazine -

13  getting rid of Will Dana, terminating Ms. Erdely's contract,

14  having public relations people put out press releases with

15  ambiguous apologies.

16       But getting rid of Will Dana and getting rid of

17  Ms. Erdely and not letting her write anymore, they don't

18  compensate Nicole for the harm that she suffered.

19       And the apologies and retractions that they claim to have

20  made - too little, too late.  Each time the apology has been

21  made, it was because something was about to happen to them.

22       The first was on December 5th when the Washington Post

23  was about to come out with an article.  That was the first

24  time the editor's note went up with the first so-called

25  apology, apologizing to anyone who may have been impacted by

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

73

1  the article.

2      The second was in April when they took it down off the

3  website and they said, again, we apologize to anyone who may

4  have been impacted by this article.  This time they were a

5  little more specific, and they said, including the fraternity

6  and the UVa administrators, and still no mention of Nicole by

7  name.  But that was because Columbia journalism school was

8  about to come out with a scathing report.  That's what

9  prompted the apology.

10      They did apologize to Nicole by name when she wrote a

11  long letter to them.  They published a part of it in the

12  magazine and said, yup, we apologize to Nicole too.  But that

13  only came after Nicole called them out publicly for not having

14  made it right sooner.

15      And even today, Mr. Paxton stood up this morning and

16  apologized to Nicole.  It is appreciated, but it's because

17  what you all are about to do.  That's why we heard that

18  apology today and not before.

19      And I ask you to consider that, and I ask you to consider

20  how long it took for them to do the right thing and the impact

21  that it had on Nicole in compensating her in each of these

22  three categories.

23      I'm going to speak very briefly to you about the verdict

24  form, and then I'll have a few other comments for you after

25  the defendants have had a chance to speak.

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

74

1    The judge is going to give you a verdict form after we're

2    done.  It has three questions on it.

3    Question 1, you will be asked to identify the amount of

4    damages that Nicole has proven as it relates to Ms. Erdely for

5    all of the statements that you have found her responsible for.

6    Each of the statements -- and I'll show this to you in a

7    minute.  All of the statements are reproduced there.  They're

8    all the statements that you -- your verdict has found her to

9    be responsible for.  And there's one place for you to write a

10   number.

11   This is the verdict form that you will see.  And again,

12   each of the statements is reproduced.  The two statements from

13   "A Rape On Campus," the statement on the Brian Lehrer show,

14   the statement on the Slate DoubleX Gabfest podcast, all of

15   those statements.

16   Ms. Erdely's e-mailed statement to the Washington Post

17   reporter are all reproduced on the verdict form, until you get

18   to Question Number 1.

19   As against Sabrina Rubin Erdely, and based on all of the

20   foregoing statements, state the amount of damages, if any, you

21   believe plaintiff has proven by a preponderance of the

22   evidence that she is entitled to recover.

23   And the number that you will write in that space should

24   include the sum of all three of those categories of damages

25   that we've asked you to consider:  reputational harm, mental

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

75

1   anguish, and professional injury.

2       And when you do that, you should consider that those

3   statements in Question Number 1 were published to 14.3 million

4   people, the New York metropolitan area, to a national Internet

5   audience, and in the Washington Post.

6       The verdict form continues then as to the republished

7   statements, kind of below the line here.

8       As to these statements republished on December 5th, 2014,

9   you see the now three statements that you found to be

10  actionable against Wenner Media and Rolling Stone -

11  discouraging from sharing the story, the nonreaction, and the

12  rape school - are all republished there for your review.

13      Question 2(a) will ask you:  Do you find by a

14  preponderance of the evidence that plaintiff suffered separate

15  and additional harm resulting from the republication of those

16  statements?

17      And we would ask you to answer that question "yes," and

18  to consider the fact, as you do, that 425,857 people read the

19  defamatory statements after the December 5 republication that

20  you found.

21      Question 2(b) invites you to go on and say:  If you

22  answered "yes" to Question 2(a), state the amount of damages,

23  if any, that you believe the plaintiff has proven by a

24  preponderance of the evidence that she is entitled to recover

25  against Rolling Stone and Wenner Media based on the

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

76

1   republication of those statements.

2       And again, we urge you to consider the extent of the

3   publication and the circumstances surrounding them.  425,857

4   people in permanent ink on the Internet.

5       I'll have some additional comments for you after the

6   defendants are done.  Thank you for your attention.

7           THE COURT:  Ladies and gentlemen, let's have a short

8   break before we have defendants' closing statement.

9       Again, even though one of the statements has been made, I

10  ask that you not begin to deliberate, that you not discuss the

11  case with one another or permit anyone to discuss it with you.

12      Let's return about 15 after 5.

13      Ask the marshal declare the Court in recess.

14          (A short recess was taken at 5:06 p.m.)

15          (The jury is present in Open Court at 5:29 p.m.)

16          THE COURT:  All 10 of my jurors are back in place,

17  ready for the defendants' closing statement.

18      Mr. Paxton, you may proceed.

19          MR. PAXTON:  Thank you, Your Honor.

20

21      <u>CLOSING ARGUMENT BY THE DEFENDANTS (DAMAGES)</u>

22

23          MR. PAXTON:  When I talked with you this morning, I

24  said this was not going to be an easy task.  It hasn't gotten

25  any easier.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

77

1    I had a really long closing argument that I prepared, and

2  I'm not going to give that to you today.  But I want to

3  respond to some of the things that Mr. Clare said, because I

4  think you've been here now for 13 days hearing evidence.

5  There are some things, though, that have been said that need

6  to be carefully thought about here.

7    Much of the argument that you heard today was based on a

8  $14 million [sic] number of possible people that could have

9  possibly read this print edition of the magazine.  And if you

10  recall, Mike Provus, you saw his video today, he explained to

11  you that that 8.3 kind of multiplier is something that they

12  use for advertising purposes.  Because if you go into a

13  doctor's office or barbershop or someplace, somebody might

14  pick it up.

15    What Mr. Clare has asked you to do is to assume and

16  presume that, A, that there in fact were 14 million people

17  that actually touched the magazine and that they took the time

18  to open it up and read it, and read the article that we're

19  here to talk about today.

20    That number is a number.  Advertising people like to

21  inflate numbers because it encourages people to buy ads.  It's

22  not an unreal number, but what it means is it's a pickup

23  number.  It's the number of people that might pick up the

24  magazine in an office someplace.

25    I don't know about you, but over the years I've had

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

78

1    subscriptions to Time magazine and I've had subscriptions to

2    Newsweek, Sports Illustrated.  I don't read all the articles,

3    and neither does anyone else.

4        And so to say that 14,318,000 -- I thought he'd leave his

5    board up there so I'd have the actual number for you -- that

6    they actually read this article?  They're asking you to make

7    some assumptions there.

8        And even for the numbers -- even before you multiply it,

9    did all 1,420,163 subscribers actually read this article?  You

10   don't have any evidence about that at all.

11       And so I think those numbers need to be really carefully

12   thought about because to -- because as Mr. Clare has

13   indicated, the scope or the extent of the publication is

14   something you're supposed to consider, but it needs to be

15   based on actual evidence, not advertising numbers.

16       And so I think from a perspective -- those numbers were

17   presented to you as conservative numbers when, in fact,

18   they're not conservative.  That's the best case scenario.  If

19   the Rolling Stone had 11,915,000 readers of every edition,

20   they would be thrilled, just like if everybody in New York

21   listened to the NPR station.

22       You know, there's -- they offered -- they did offer this

23   information to you about the viewership of the magazine.  They

24   could have gotten information from the radio station or the

25   podcast about the number of people that subscribe or listen to

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

79

1   their station, but they didn't offer any of that information

2   to you.  So they ask you to sort of assume that everybody in

3   the city of New York and the metropolitan area heard that.

4   And that's not evidence.

5       You obviously have the right to make reasonable

6   assumptions.  You're supposed to use your common sense.  But

7   to base any kind of decision on the extent of harm based on

8   those kind of generalized large numbers would be a mistake and

9   would not be fair and reasonable compensation, which is what

10  you're being asked to do.

11      So think through that very carefully as you consider

12  this.

13      I think one of the things that was said early in

14  Mr. Clare's comments was that we're claiming that Ms. Eramo

15  was not really damaged, and that's just not true.  I mean, I

16  stood up this morning and told you we're not here to claim

17  that she wasn't damaged, she wasn't harmed.

18      It's obvious to anybody that's listened over the last

19  three weeks that she has been harmed.  The question is, is all

20  that harm attributable to the statements that you found to be

21  defamatory?

22      You'll recall when Ms. Eramo was on the stand, she said

23  when she Googles the article, the picture comes up.  It was

24  all about the picture, the picture, the picture.  So I asked

25  her in cross-examination:  How do you weigh, how do you

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

80

1   separate out, the two statements that you found to be

2   defamatory against the picture, which obviously was very

3   hurtful to her.

4       And we're not here to criticize that.  But that's the

5   basis for an award in this case.

6       And she couldn't do it.

7       And if you recall, Mr. Clare stood up and objected and

8   said she'd be speculating.  Well, she's asking you to do the

9   same thing.

10      How do you allocate that?

11      The jury instructions that you'll get make it very clear

12  that she has an obligation to give you a reasonable basis for

13  figuring out how that allocation should be made.

14      Jacob, are you able to pull up instruction number 6 on

15  page 6?  I think it's still there.

16      So this is the instruction that the judge is going to

17  give you.  It says, if you find from the evidence that the

18  damage to the plaintiff resulted from more than one cause, and

19  that defendants are only responsible for one, you shall hold

20  the defendants liable only for the damage they caused.

21      The burden is on the plaintiff to produce evidence that

22  found to a reasonable degree of certainty the share of damages

23  for which the plaintiffs [sic] are responsible.

24      Okay?  Now, the -- if you go back there, instruction 5,

25  which is the one right before that.

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

81

1    And when you get these, please, I know you'll look at

2    these instructions, but it says, the defendants may only be

3    held responsible for the injury and harm inflicted by the

4    statements that you found to be actionable and made by the

5    defendants with actual malice.  Injury or harm sustained from

6    the statements removed from the action cannot be the basis for

7    a recovery.

8         And you recall when this case started, the big claim was,

9    look at the whole article, look at the illustration, look what

10   they did.  And the judge dismissed that claim before you ever

11   got a chance to consider it.

12        This instruction is telling you:  If the harm that

13   Ms. Eramo has suffered comes from the overall article and

14   illustration, and that's where most of the harm comes from, we

15   are not responsible for that because those things are not

16   defamatory, and they were not made with actual malice.

17        There's lots in that article that was never challenged,

18   lots of things in there.  And so the instruction on 6 that I

19   read you is she has to produce evidence that gives you a

20   reasonable degree of certainty of how you sort that out, and

21   she has not done that.

22        You can't just give her a big award because you feel like

23   she's been harmed.  That's the -- the instructions make that

24   very clear.

25        One of the things that we did during the course of the

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

82

1    case, you may remember when Ms. Eramo was on the stand we had

2    a side bar with the judge about some e-mails that she

3    introduced.  And our point was that most of those e-mails

4    don't refer to the statements at all.  In fact, they refer to

5    things that are not involved here.

6        And so -- but they were things that were hurtfully sent

7    to Ms. Eramo.  She definitely was damaged by those things.  My

8    goodness, who would ever want to get those kind of e-mails?  I

9    mean, it's terrible, and no one should ever have had to deal

10   with that.

11       We introduced some additional information that showed

12   that they weren't all negative during that time.  But the

13   positive e-mails, I'm sure, did not offset the really

14   disgusting e-mails.  And we weren't doing it for that purpose,

15   but it was more to show that there was an awful lot of support

16   for her here.

17       And that one of the things that I think is really telling

18   is that the last e-mail that they have offered to you in

19   evidence happened before December 1st, 2015 -- '14, I'm sorry.

20       And Mr. Clare and Ms. Locke and their law firm are

21   terrific lawyers.  They offered to you over 200 exhibits to

22   support their claim.  If they had had e-mails in December,

23   January, February, after the -- particularly after the

24   retraction, the editor's note, they would have certainly

25   presented those to you.  And they didn't do that.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

83

1      And I think the lack of that supports our view that the

2   horror that Ms. Eramo endured during that time period between

3   when the article came out and when she went into the hospital

4   for her surgery was horrific.  And it was difficult for me as

5   a husband and father and grandfather to listen to her husband

6   tell you how difficult that was for them.

7      But the intensity of that time period was relatively

8   intense, but it was not -- that level of intensity did not

9   exist for a long time.

10      Now, we kept Dr. Lin on the stand probably longer than

11   most of you wanted us to, but the point of that was, at that

12   point in time in January she was not in stress.  That's what

13   his testimony was.  There's no evidence at all in the record

14   about that.

15      And so if that went a little long and upset some of you,

16   I'm sorry that we were keeping you from lunch.  That was not

17   our intention.

18      But what you have in this situation is harm to her

19   reputation, no question about that, as Mr. Locke [sic] had

20   said.  The question is the extent of that harm, something

21   you're going to have to evaluate.

22      There are -- the harm, though, in this case -- and one of

23   the things that I was a little surprised that Mr. Clare sort

24   of broke out reputational harm and professional standing,

25   because when you read the instructions, they're sort of

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

84

1  together.  But a big part of what he was arguing was that

2  Nicole lost her dream job, and that sort of is in both of

3  those buckets.

4      But what you have to keep in mind, and one of the reasons

5  we felt it was important for you to see the OCR report, is

6  that the University of Virginia -- and we introduced the

7  interim policy for March of 2015.  The way the University of

8  Virginia was handling and responding to sexual assault claims

9  from 2011 until March of 2015 was found to be in violation of

10 Title IX.  They had to change everything.  They went from an

11 18-page policy to a 50-page policy.  They had to restructure

12 the entire operation of the way it was done.

13     Previously it had all been within the dean of students

14 office, as you saw it.  I probably didn't let you read the OCR

15 report as carefully as I would have liked you to, but I was

16 mindful of your time.  But part of that was Ms. Eramo had

17 multiple hats, if it were, involved in all of that.

18     And I think that it is -- what ends up happening -- I'm

19 not going to make you read that whole document, but they

20 basically do away with the Sexual Misconduct Board.  They are

21 going to create a whole new Title IX office.

22     You remember Dean Groves testified that all of those

23 functions were going to go out of the dean of students office.

24 And even Ms. Eramo today said the intake process was going to

25 be done elsewhere.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

85

1      Now, the dean's office has continued to have some

2  involvement on a -- with the student calls.  And Dean Groves

3  said, you know, I got a call, I think he said last week, that

4  there's a kind of a rotational thing where people can call,

5  and sometimes the call will be about a sexual assault.

6      And the dean of students office continues to provide

7  support to the survivors, but they're not involved in the

8  intake or process of how you -- how those claims get handled.

9      And so Dean Eramo, as a deputy Title IX coordinator,

10  which she was appointed to in March of 2015, those duties were

11  going to leave the dean of students office in the fall.

12      We've introduced to you the letter from the Cavalier

13  Daily from September 11, 2015, where Ms. Eramo said she was

14  going to continue to serve in that role after the new

15  position.  The question of how all of that would have been

16  worked out and whether Ms. Eramo would have been allowed to

17  remain in that role in some way in the dean's office or be

18  moved over into the new Title IX office we'll never really

19  know, because 10 days later the OCR report came out.

20      Now, everybody at the University of Virginia doesn't like

21  that OCR report because it's a 26-page indictment, basically,

22  of the way the university was handling these things.  And it

23  was specifically, in very specific ways, critical of

24  Ms. Eramo.

25      And while I'm sure she did not set out to create a

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

86

1   hostile environment, the energy that she gave on the WUVA --

2   to the radio station, the broadcast, I encourage you to read

3   the report.  We've only given you a couple pages out of the 26

4   pages so you don't have to read the whole thing.  And I think

5   you'll find that what the office of civil rights was saying is

6   that the approach that was being taken, and in particular the

7   comments made by Ms. Eramo, had the effect of creating a

8   hostile environment.

9       Now, that's a finding by the federal government.  They

10  don't agree with it, but I can -- use your common sense.  If

11  you're a school, if you're the University of Virginia, if

12  you're any other college, as part of the background search

13  that you do, would you not check to see what their history was

14  in this regard.

15      Ms. Eramo testified about an opportunity that she sought

16  at the University of Richmond.  She didn't really know why she

17  didn't get the job.  She didn't bring anybody from the

18  University of Richmond to explain that, which would typically

19  be the way you would do that, to prove that that's the reason

20  that she lost the job, the article, as she mentioned.

21      There's an awful lot here where they have walked you up

22  to a certain point and then asking you to sort of guess and

23  fill in the gaps.  And the jury instructions are very clear

24  about this.  And Mr. Clare showed them to you, and I think it

25  is important to go back to it.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

87

1          Could you pull up page 12, please.

2          In the -- I'd almost like to start at the end, because I

3    think that helps.  It says, on the other hand, the law does

4    not require the plaintiff to prove the amount of losses with

5    mathematical precision.

6          And that's not what we're arguing here.  I'm not saying

7    she's going to come in and say it was -- like she -- like they

8    had tried to do with the subscriptions.  I suffered

9    reputational harm and it was a number, a specific number, and

10   this is how I calculated it.  That's -- and so this is what

11   that's saying.

12         But you almost -- but she must prove it with as much

13   definiteness and accuracy as the circumstances permit.

14         So then you go back to how did this start?

15         It says, in determining the amount of damages that you

16   award, you should be guided by dispassionate common sense.

17         Let me stop there for a second.

18         It's hard to listen to a presentation like Mr. Clare's

19   and not be upset.  He's a fine lawyer and someone who's very

20   good at what he does.  But as the judge has told you, that's

21   not evidence.  And so your job as jurors is to be guided by

22   dispassionate common sense.

23         The second thing that you're supposed to do is to use

24   sound judgment in fixing an award of damages, drawing

25   reasonable inferences from the facts and evidence.  They don't

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

88

1  have to fill in every gap.  You're entitled to make

2  inferences.

3      You may not award damages based on sympathy, speculation,

4  or guesswork.  Make sure -- and I know you will -- take that

5  very seriously.

6      No one's saying that Ms. Eramo -- it's not guesswork that

7  Ms. Eramo was hurt, okay?  That's not what we're talking

8  about.  You've heard her testify about that.  The question

9  there is, how long -- you know, I talked early in my opening

10  with you, I talked about the continuum of harm.  You have the

11  no harm on this end and really serious, horrible harm on the

12  other.

13      If I had been able to read the newspaper in the last

14  three weeks, which I haven't because I've been busy with this

15  case, I'm sure every day there is a tragedy in the world where

16  people -- typhoons hit, hurricanes hit, people lose their

17  lives, they lose everything, everything.  People lose their

18  children in car accidents, and it's not their fault.  Those

19  are kind of the extreme examples of really extreme harm.

20      Now, that's not to say that a person's good name doesn't

21  have value and their reputation is not important.  It doesn't

22  mean that your desire to pursue the job that you really loved

23  is not important.  But it has to be put in that balance, on

24  that continuum, of what is a reasonable and fair amount of

25  compensation.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

89

1     And that's why we have a jury.  That's why you're here,

2  because you have to bring that common sense and experience to

3  things, about what is fair and reasonable in this situation.

4     Ms. Eramo has been through a lot.  No one at the Rolling

5  Stone knew she had cancer, and they didn't suggest that to

6  you.  But that doesn't mean you shouldn't consider it because,

7  my goodness, to struggle with cancer and then have this

8  happen, it's just -- couldn't have been worse timing.

9     And I agreed with Mr. Clare.  I'm sure it felt like it

10  was piling on, at least for the initial period of time.

11     But you have to look at what the evidence is and how this

12  played out.

13     I think that as to all of these harms, whether it's the

14  emotional distress, reputational harm, whether it's her

15  inability to continue to do the exact job that she loves, I

16  mean, Ms. Eramo is a very talented, hard-working person that

17  has got amazing skills.  I mean, I think you've seen that.

18  She's got a PhD.

19     No one at the University of Virginia came in to testify

20  that the position that she is in is a dead-end job, that it

21  has no prospects.  There's none of that that's been presented

22  to you.

23     What we have is Pat Lampkin, who recruited -- I believe

24  the testimony was that's how Ms. Eramo got involved in student

25  affairs, because she didn't know that was a line of work, I

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

90

1 believe was her testimony.

2     Pat Lampkin and others have made sure that she has very
3 important positions.  I mean, the role that she's been
4 appointed to in the vice president of student affairs offices
5 is not a makeshift job.  It is a position where she can be
6 successful.  She is part of a team that has tried to implement
7 over a half-billion-dollar program to reinvent the university.
8 And she's handsomely paid.

9     Now, I know money -- it's kind of interesting.  We're in
10 the situation where we're talking about money, how money can't
11 really do everything, but her pay is significant, and it has
12 continued to go up.

13     She hasn't lost her job.  There's no indication she's
14 going to lose her job.  And so while what she does every day
15 is not exactly what she would do if she had her choice about
16 it, how much is that worth?  You have to decide that.

17     You know, it is a -- it's a situation where people can
18 throw out numbers of what they think it is or what it should
19 be.  I think any attempt by a lawyer to stand up and put a
20 number on the hurt that she's felt, to put a dollar number on
21 the reputational harm that she had -- and to that point, I
22 think it is important that as she acknowledged, your verdict
23 on Friday was described by her lawyer as a complete
24 vindication.  So as the Google searches start to pick up, the
25 story is not going to be about the Rolling Stone discredited

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

91

1   article.  It's going to be about the vindication that

2   Ms. Eramo obtained from you.

3        I mean, when you go home tonight or tomorrow and you

4   start Googling this, you're going to be amazed at what you

5   find, about the number -- the coverage of this case.

6        Now, the one thing that I do want to talk about, which I

7   think is important, is the editor's note.  And as I mentioned

8   to you, we respected the decision that you guys made that that

9   was a republication.

10       But I think you have to look at what the note says, as I

11  know you did.  And it's very clear that any statement from

12  Jackie, they're walking away from.  And the three statements

13  that are at issue are directly from Jackie.  The "rape school"

14  quote in that article said, "Jackie said."  So I think that

15  colors how people view that.

16       And, you know, even the "discouraged" statement is,

17  Jackie said with a pained look on her face, I believe it was.

18       And then the "nonreaction" was also from Jackie.  Jackie

19  was disappointed, I think it said.

20       So, I mean, those statements, unadorned as they were when

21  they originally appeared, were very different.  You have to

22  look at that in the context.  It changes everything.

23       And I think that the fact that there were so few people

24  that came comparatively to the site to look at the note

25  indicates that they weren't coming to look at the article,

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

92

1   they were coming to look at the notice that Rolling Stone

2   published that we had really messed up here, that we had

3   published an article that we didn't do our homework on.

4       And while the apologies that were issued have been

5   discounted, those apologies mean something.  It is rare for

6   publishers to publish apologies at all.  And I think that the

7   law that the judge will instruct you on is those apologies

8   matter and should be taken into consideration.

9       And I think that it is a situation where today, when I

10  end here in just a few minutes, you'll have the opportunity to

11  make the decision that's going to have a lasting effect on

12  everybody that has participated in this.

13      From my perspective, and I know from the perspective of

14  our clients, we could not entrust this decision to a better

15  group of people.  We know that you're going to look at the

16  judge's instructions.  You're not going to be misled by

17  speculation and sympathy.  You're going to use your good

18  common sense and figure out what it -- what fair and

19  reasonable compensation is for the statements that were made,

20  not for everything that happened here.

21      And that's the temptation.  Because what happened here

22  overall is a really big thing.  I mean, you -- I mean, when

23  the case started, we had 14 statements.  We're down in

24  Ms. Erdely's case to six out of the 14, and with Rolling Stone

25  it's down to three.  It's actually -- I mean, so this is --

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

93

1   was a case that was filed like this, and now it's here.  And

2   it has to be decided on the basis of the harm caused by those

3   statements, not everything else.

4       And I know that you're going to get that right.  I know

5   that you're going to do your best, just like you did before.

6   And I really appreciate your attention.  This has been a long

7   trial, and I know you're going to take the time you need and

8   not just make a decision to get out of here at 9.

9       So I thank you very much.

10

11      REBUTTAL CLOSING ARGUMENT BY THE PLAINTIFF (DAMAGES)

12

13          MR. CLARE:  I also want to thank you.  This will be

14  the last time I'll have to address you before you deliberate.

15      Mr. Paxton and I agree on one thing:  I don't think we

16  could have entrusted this important case to a better and more

17  dedicated group of folks.

18      As I said this morning, the verdict that you've already

19  rendered is a -- speaks volumes in terms of the thoughtfulness

20  that went into it.  And we have every confidence that you will

21  bring that same degree of thoughtfulness and careful

22  consideration to the important decision that you still have

23  before you.

24      And that's how to put Nicole back in the position that

25  she would have been in if defendants had not published the

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

94

1    statements you have already found to be defamatory.  That's

2    your task, and it isn't an easy one.

3        I want to respond to a few of the things that Mr. Paxton

4    said, but I do want to leave you with my thanks and Nicole's

5    thanks and the thanks of our entire team for listening to us

6    over the last three weeks and carefully considering our

7    evidence and our argument.  We very much appreciate it.

8        Mr. Paxton talked about the 8.39 number that Mr. Provus

9    said.  He said that's the number they use for advertisers.  He

10   said we're asking you to make some assumptions, and he made it

11   sound like that was highly speculative.

12       Well, the assumption, the only assumption, that we're

13   asking you to make is that Rolling Stone isn't lying to its

14   advertisers when it sells them advertisements and says, these

15   are the number of people that see our magazine.  We're

16   assuming they're telling the truth to their advertisers about

17   that.  That's a reasonable assumption for you to make.

18       And Mr. Provus said that number was based on syndicated

19   research.  You can consider that.

20       Mr. Paxton talked about how to separate out the harm

21   caused by the article as a whole and the illustrations and all

22   of that, and he made reference to an objection that I made

23   this morning where I said it calls for speculation.

24       My objection was a little bit different.  What I said is

25   it invades the province of the jury.  That was my objection.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

95

1    It is your decision, as evidenced on the verdict form, to make

2    that determination and to consider the way people in the real

3    world read these articles.  They don't just read the five

4    words.  They read them in context.

5        Mr. Paxton criticized us and said there's been no

6    specific evidence tying the harm that Ms. Eramo has suffered

7    to those specific statements.  Well, if you read carefully

8    those e-mails, and I would encourage you to do that, that's

9    not true.

10       The statement about a nonreaction to a report of multiple

11   gang rapes, Plaintiff's Trial Exhibit for Damages 200 makes

12   reference to Nicole's nonacts related to these criminal

13   events.

14       Plaintiff's Trial Exhibit 203 talks about that you seem

15   to deal with rape in such a cavalier manner, where at UVa rape

16   is excused or ignored or accepted.

17       PTX 204 talks about the writer's revulsion of the gang

18   rape and Nicole's refusal to do anything in the response is

19   beyond despicable.

20       Plaintiff's Trial Exhibit 207:  You're compliant in

21   allowing these offenders to walk free.  Talking about

22   nonreactions.

23       You hear about Plaintiff's Trial Exhibit 199:  How can

24   you turn a blind eye to these girls?

25       They didn't use the word "nonreaction."  They didn't

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

96

1    choose the same word that Ms. Erdely chose when she wrote the

2    article, but the defamatory statements that you have already

3    found to have been made with actual malice are echoed in those

4    e-mails.

5        So too with the statement that Nicole discouraged Jackie

6    from sharing her story.

7        Plaintiff's Trial Exhibit 129 talks about encouragement

8    of students not to file police reports and deliberate

9    coverups.

10        Plaintiff's Trial Exhibit 203:  Shame on you for

11    knowingly working and supporting an institution that covers up

12    and apologizes for rape.

13        Plaintiff's Trial Exhibit 204 talks about Nicole's

14    silence and complicity.

15        Plaintiff's Trial Exhibit 205 talks about hundreds of

16    thousands of women have walked across the campus harboring

17    secrets that Nicole encouraged them to keep.  They didn't use

18    the word "discouraged," but they talked about them encouraging

19    her to keep those secrets.

20        The echos of these statements are in the evidence that

21    we've presented, and you're entitled to consider those in

22    rendering your verdict.

23        Mr. Paxton talked about the OCR report.  We've heard

24    about the WUVA interview and the hostile environment.  If you

25    read the OCR report, it was the broadcast of that that was the

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

97

1    issue that OCR took with.

2        And you remember Nicole said she didn't know that this

3    was going to be broadcast.  It was never intended to be

4    broadcast.  This was a student project.  She had nothing to do

5    with the decision to broadcast it.

6        So too with this notion that Nicole -- criticizing the

7    multiple hats that she wore.  If you read what the OCR report

8    said about the multiple hats, it says the appearance of a

9    conflict of interest because the chair of the Sexual

10   Misconduct Board wears multiple hats.

11       Read that paragraph about the conflict of interest.  Read

12   what it says.  It says that Nicole is the one that does the

13   intake.  She's the one that supports the survivor.  She's the

14   one that provides counseling.  She's the one that helps them.

15   She's the one that develops a relationship with them, and this

16   bond and this trust.  And what they're saying is that then,

17   when she is trying to organize a panel, it's not fair to the

18   perpetrators.

19       The conflict of interest is not against the rape victims.

20   The conflict of interest is against the people who perpetrated

21   the crime.  And the office of civil rights said those roles

22   should be separated, and they were.

23       That's not a criticism of Nicole, certainly not a

24   criticism of Nicole in the way that Rolling Stone did.

25       Mr. Paxton said about her job -- I wrote this down.  He

Eramo vs. Rolling Stone, et al. - 11/07/2016  Vol. 2

98

1    said, it wouldn't be the job she would hold if she'd had a

2    chance -- if she'd had her choice about it.

3        Well, that's exactly the point.  She didn't have a choice

4    in terms of what happened to her job.  3:00 on November 19th,

5    that choice was taken away from her by the defendants.  They

6    took away her ability to have the job she had chosen.  And

7    that means something.

8        Even today, even at this late hour, we're still hearing

9    argument that the December 5th editor's note was trying to

10   walk back from Jackie's allegations and don't really amount to

11   an affirmation of what was in the story about Nicole.

12       But that's not your verdict.  They're still arguing what

13   you have already found that December 5th to be.  Your verdict

14   was that that statement was a republication of those

15   statements and all the things that come along with it.  It

16   absolutely republished it, and republished it to a new

17   audience.

18       Even today, we're still not hearing what that really was

19   and an acceptance that that was a republication.

20       Finally -- and I do greatly appreciate the compliment

21   that Mr. Paxton paid me.  He and his team are fine lawyers

22   too, and I appreciate the compliment that he paid me.  But the

23   way you've considered the evidence thus far, and I would --

24   this is not about me, it's not about my advocacy, it's not

25   about our team's advocacy and the job we've done for Nicole.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

99

1   This is about Nicole, and it's about compensating Nicole, and

2   it's about making this right and bringing her back.  That's

3   what this is about.

4       And I was thinking about Nicole and the way that she's

5   been portrayed in this case over the last three weeks when

6   you've had an opportunity to get to know her, and you got to

7   know the person that we put on and you've gotten to hear a lot

8   of people talk about her.

9       But the thing I'd like to leave you with is kind of where

10  we started.  One of the very first things that was said about

11  Nicole in this courtroom was when Mr. Sexton stood up in his

12  opening statement, and he was relaying an analogy that

13  Mr. Woods had come up with where he described her as the tip

14  of the pen.  Remember that?  Said she's the tip of the pen,

15  where the policy meets the students.  And we heard a lot about

16  her being the tip of the pen.

17      That's not right.  It makes her sound like a bureaucrat,

18  someone who is removed from the day-to-day work that is done

19  at the university and universities all over America.

20      Nicole is not the tip of the pen at the University of

21  Virginia.  She was the tip of the spear for the university.

22  She was the one that answered the call in the middle of the

23  night.  She's the one that left her own husband and her own

24  son and her own bed to meet someone else's son or daughter,

25  people she had never met, whose son or daughter needed help,

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

100

1   to hold their hand in an emergency room or talk them through a

2   manic bipolar episode or work with them on a suicide ideation,

3   hold the hand of an 18-year-old freshman who's away from home

4   for the first time and needed help.  She was the tip of the

5   spear for the university.  She's the one who was on the front

6   lines doing that work for other people's children, leaving her

7   own family to do it.

8        And when she was performing that role, she stood tall.

9   She stood tall for Jackie.  She stood tall for Stacy.  She

10  stood tall for Emily Renda, Alex Pinkleton, Sara Surface,

11  Emily Loranger, Sandra Menendez, and countless other women and

12  men who came to her for help.  She stood tall for survivors of

13  sexual assault when they needed her.  She stood tall for other

14  students who called her for suicide and depression.

15       And after the article came out, she did her best to stand

16  tall.  She reached out to Jackie, and she kept coming to work

17  every day, every day that her health allowed her to.  She

18  didn't quit.  She didn't give up.  She did her best to stand

19  tall.  And she's still doing her best to stand tall today, but

20  it's very hard.

21       She's the main breadwinner for her family, and she deals

22  with the fallout from that article and those publications

23  every day when she gets up to go to work.

24       So I'm asking you to stand tall with Nicole.  Give her an

25  amount that will fully compensate her for the destruction of

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

101

1    her reputation.  Give her back through your award the dignity

2    and self-worth that the defendants took away from her with

3    these false statements with actual malice.  Give her the full

4    amount that will compensate her for the destruction of her

5    life's work and her dream job.

6        Stand tall for Nicole with your verdict.  Thank you.

7            THE COURT:  Ladies and gentlemen, do you need a few

8    moments before the Court delivers its charge or are you ready

9    to receive the instructions now?

10       Everyone's ready to go forward?  It won't take as long as

11   before.

12

13                       CHARGE TO THE JURY

14

15           THE COURT:  Folks, now that you have heard the

16   evidence and the parties' arguments, it becomes my duty to

17   give you the instructions as to the law that applies in the

18   damages phase of this case.

19       Having found in favor of plaintiff in part on her

20   defamation claim, you must now determine the amount of actual

21   damages to which she is entitled.

22       As I mentioned at the outset, the evidentiary rules

23   remain the same during this phase, including all the things

24   that we've identified that are not to be considered as

25   evidence, the assessment of witnesses' testimony and

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

102

1   credibility, which is your duty, and the plaintiff's burden to
2   prove the elements of her claim for damages by a preponderance
3   of the evidence.

4        I tell you that in addressing the issues now before you,
5   you shall consider all the evidence already admitted in the
6   case that regard -- that regards the statements you have found
7   to be actionable and made with actual malice, those still
8   subject to any limiting instructions given to you, as well as
9   any new evidence admitted during the damages phase of the
10  case.

11       In this portion of the trial, the issue that you are to
12  consider is what amount of actual damages, if any, is the
13  plaintiff entitled to recover.  On this issue, the plaintiff
14  has the burden of proof by a preponderance of the evidence.

15       Now, once again, during their closing arguments the
16  attorneys have forecast certain of the instructions that the
17  Court intends to give you.  They did so correctly.  All the
18  things that you were shown on the screen are part of the
19  Court's charge in this case.  But keep in mind something that
20  I told you in the earlier phase.

21       In conducting your deliberations, you should not single
22  out one instruction alone as stating the law of the case.
23  Instead, you are to consider the instructions together, in
24  tandem, in conducting your deliberations and in deciding what
25  amount, if any, the plaintiff is entitled to recover.

Eramo vs. Rolling Stone, et al. - 11/07/2016  Vol. 2

103

1    At this time I'm going to ask Dan to collect from the

2  clerk sample -- copies of the verdict form that the Court

3  intends to use to help you in your deliberations and to

4  communicate your verdict to the Court.  I'll ask that he

5  distribute one to each of you.  Read over the verdict form,

6  and then look up at me when you've finished reading so I'll

7  know when it's time to continue.

8    So let's continue.

9    I charge you that damages are not to be presumed, nor may

10  they be based on speculation.  Instead, damages must be

11  proven.

12    The burden is on the plaintiff to prove by a

13  preponderance of the evidence each item of damage he claims

14  and to prove that each item was caused by the statement for

15  which the particular defendant is liable.

16    Now, the verdict form is broken up in roughly the same

17  format as was the earlier verdict form.  The first part of the

18  verdict form deals with the defendant Sabrina Rubin Erdely,

19  and the second part of the form deals with the remaining

20  defendants, Rolling Stone, LLC, and Wenner Media, LLC.

21    If you find that plaintiff has established by a

22  preponderance of the evidence that she is entitled to recover

23  damages for the statements for which you have found Sabrina

24  Rubin Erdely liable, you shall state the amount of damages in

25  response to Question 1.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

104

1      So Question 1 is prefaced by the statements that you

2    found in the liability phase to be the responsibility of

3    Ms. Erdely.  The question then becomes the amount of damage,

4    if any, plaintiff is entitled to recover as a result of these

5    statements.

6      In doing so, it will be necessary for you to determine

7    the period of time over which any harm occurred.  Given your

8    verdict in the liability phase, once you have made that

9    initial damage determination, it will then be for you to

10   decide whether there was additional harm above and beyond the

11   damage done by Sabrina Rubin Erdely which was caused by the

12   republication.

13     This is the inquiry set forth in Question 2(a).  If you

14   determine that there was additional damage occasioned by the

15   republication, it will be necessary in Question 2(b) for you

16   to determine the amount of damages, if any, occasioned by the

17   republication.

18     In proving actual damages, plaintiff must prove that a

19   statement you found to be actionable and made with actual

20   malice caused the injury or damage that she claims.  If you

21   find that the plaintiff has proven that the statement caused

22   her claimed damage, then she is not required to prove the

23   exact amount of her damage.  However, she must show sufficient

24   facts and circumstances to permit you to make a reasonable

25   estimate of each item.  She may not rely on speculation or

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

105

1    guesswork.

2         Defendants may only be held responsible for injury and

3    harm inflicted by the statements that you found to be

4    actionable and made by the defendants with actual malice.

5    Injury or harm sustained from the statements removed from the

6    action cannot be a basis for plaintiff's recovery.

7         If you find from the evidence that damage to plaintiff

8    resulted from more than one cause and that defendants are

9    responsible -- are only responsible for one cause, you shall

10   hold the defendants liable only for the damage that they

11   caused.

12        The burden is on the plaintiff to produce evidence that

13   establishes to a reasonable degree of certainty the share of

14   damages for which the defendants are responsible.

15        A statement is a cause of plaintiff's damage when, in the

16   natural and continuous sequence, unbroken by intervening

17   cause, the statement produces the injury or damage; and,

18   without the cause, the injury or harm would not have occurred.

19        You may not award damages if you find that an independent

20   event broke the causal connection between the statement --

21   that for which you found the defendants liable and the harm.

22        Therefore, the mere fact that the plaintiff may have

23   suffered harm or damage is not proof of the fact that the

24   statements that you found actionable and made with actual

25   malice caused that harm or damage.  You may not award damages

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

106

1   for harm that resulted from matters other than defendants'

2   statement that you found to be actionable and made with actual

3   malice.

4       The damages that you award, if any, must be fair and

5   reasonable compensation for the harm plaintiff suffered, no

6   more and no less.

7       I remind you that the University of Virginia is not

8   entitled to recover in a defamation case.  You may only award

9   damages for the loss the plaintiff herself has incurred.  You

10  may not enhance or increase the compensatory damage award to

11  Ms. Eramo because you believe that others close to her,

12  including the University of Virginia and its administrators,

13  employees, and students, have also suffered damage or loss.

14  She may recover for her losses only.

15      Likewise, in determining the amount of actual damages to

16  fairly and reasonably compensate the plaintiff, you may not

17  enhance or increase that award in order to punish the

18  defendants or to send a message to the defendants, the media,

19  or anyone else.  That is not the purpose of this part of the

20  trial.

21      In determining the amount of damages to which the

22  plaintiff is entitled, you may take into consideration all of

23  the circumstances surrounding the statements for which you

24  have found the defendants liable, based on all the evidence

25  that you have heard and considering the occasion on which they

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

107

1    were made and the extent of their publication, the nature and

2    character of the insult, the probable effect on those who

3    heard the statements that you found to be actionable and made

4    with actual malice, and their probable and natural effect upon

5    the plaintiff's personal feelings and upon her standing in the

6    community.

7        You may award damages for any actual out-of-pocket

8    expenses that were caused by the statements for which you have

9    found the defendants liable.

10       You may also award damages for any insult to her,

11   including any pain, embarrassment, humiliation, or mental

12   suffering, and any injury to her reputation or professional

13   standing, provided that you find by the preponderance of the

14   evidence that plaintiff suffered these injuries as a

15   consequence of the statements for which you found the

16   defendants liable.

17       However, if you determine that the plaintiff has failed

18   to prove facts by the preponderance of the evidence as to any

19   component of damages, then plaintiff may not recover for that

20   item.

21       You have heard evidence of the circumstances of

22   publication and republication, including the source of the

23   information, the grounds of reliance, and the circumstances

24   surrounding retractions and apologies.  You may consider this

25   evidence, and evidence of an apology to plaintiff, in

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

108

1    mitigation of plaintiff's compensatory damages.  You may not

2    consider it in mitigation of any out-of-pocket losses

3    plaintiff actually incurred.

4        I'll also tell you that the plaintiff had a duty to

5    minimize her damages.  If you find that she did not act

6    reasonably to minimize her damages and that as a result they

7    increased, she may not recover by the amount her damages

8    increased.

9        In determining the amount of damages that you award, you

10   should be guided by dispassionate common sense.  You must use

11   sound judgment in fixing an award of damages, drawing

12   reasonable inferences from the facts in evidence.  You may not

13   award damages based on sympathy, speculation, or guesswork.

14       On the other hand, the law does not require that the

15   plaintiff prove the amount of her losses with mathematical

16   precision but only with as much definiteness and accuracy as

17   the circumstances permit.

18       Finally, I tell you that the mere fact that I have

19   instructed you regarding damages should not be considered as

20   intimating any view of mine as to the measure of damages.

21   Instruction as to the measure of damages is given for your

22   guidance only.

23       Arthur, let me ask you to collect the sample verdict

24   forms at this time.

25       Folks, in just a few moments it will be time for you to

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

109

1    retire to the jury room to begin your deliberations on the

2    issue of damages.  The foreperson will again preside over your

3    deliberations and will be your spokesperson here in open

4    court.

5        We intend to send one copy of the verdict form with you

6    to the jury room to help you in your deliberations and to aid

7    you in reporting your verdict.

8        I tell you that in answering the questions on the verdict

9    form, it is necessary that each of you agree as to the

10   response to any question that you find it necessary to answer.

11   Your verdict as to the measure of damages must be unanimous.

12       The verdict must represent the considered judgment of all

13   of you.  It is your duty as jurors to consult with one another

14   and to deliberate with a view to reaching an agreement if you

15   can do so without violence to individual judgment.

16       I'm also going to send with you a copy of the

17   instructions, once again, the damage instructions, and then

18   all of the exhibits will be available for you to review.  I

19   think we've set up the same audio-visual equipment for you to

20   view any of the depositions or any of the video or audio disks

21   that you want to consider in your review of the evidence.

22       If you wish to communicate with me during the course of

23   your deliberations, you may do so by way of a written

24   question.

25       I'll tell you that before I respond to any inquiry, I

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

110

1   will consult with the attorneys about any answer and then, in

2   all likelihood, bring you back here in open court so I can

3   respond to all of you at the same time.

4       Let me ask Arthur or Dan if you would take the jury out

5   into the hall for just a moment and let me speak with counsel

6   before we commit you to your deliberations.

7               (The jury is not present.)

8               THE COURT:  Please be seated for a moment.

9       At this time I invite challenges to the charge as

10  delivered.  And again, I'm perfectly capable of misspeaking,

11  so if I've done so, let me know and I'll try to correct it if

12  I can.

13      Mr. Clare?

14              MR. CLARE:  The plaintiff has no objection to the

15  charge as delivered.

16              THE COURT:  Mr. Paxton?

17              MR. PAXTON:  No, not as delivered.

18              THE COURT:  Then let's have the jury back.  They can

19  just stand here in this open area for a moment, Dan.

20              (The jury is present.)

21              THE COURT:  Ladies and gentlemen, the charge will

22  stand as delivered.  And at this time I commit you to begin

23  your deliberations.

24      I think we've arranged for some food to be brought in, so

25  enjoy dinner, begin your review, and let us know if you have

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

111

1   any questions to pose.

2        You folks are excused at this time.  Thank you.

3   Appreciate your service.

4              (The jury was excused to begin deliberations at 6:30

5   p.m.)

6              THE COURT:  I'll ask the marshal declare the Court

7   in recess pending return of the jury.

8              (A recess was taken at 6:30 p.m.)

9              (The jury is present in Open Court at 8:05 p.m.)

10             THE COURT:  I count all 10 jurors back, seated in

11  the jury box, possibly for the last time.

12       Ladies and gentlemen of the jury, have you reached a

13  verdict on the damage phase in this case?

14             THE JURORS:  Yes.

15             THE COURT:  I'll ask the foreperson to pass your

16  verdict form to the marshal and for the marshal to deliver it

17  to the Court.

18       I'll ask the Clerk to publish the jury verdict.

19       Are counsel willing to waive a reading of the statements?

20             MR. CLARE:  Yes, Your Honor.

21             MS. McNAMARA:  Yes, Your Honor.

22             THE COURT:  We'll just have the questions and

23  answers read.

24             THE CLERK:  In the matter of Nicole P. Eramo versus

25  Rolling Stone, LLC, and others, Civil Action 3:15-cv-23

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

112

1   Special Verdict Form Number 4.

2       As against Sabrina Rubin Erdely and based on the

3   foregoing statements, state the amount of damages, if any, you

4   believe plaintiff has proven, by a preponderance of the

5   evidence, that she is entitled to recover.

6       "$2 million."

7       Do you find by a preponderance of the evidence that

8   plaintiff suffered separate and additional harm resulting from

9   the republication of these statements?

10      "Yes."

11      If you answered "yes," state the amount of damages, if

12  any, you believe plaintiff has proven by the preponderance of

13  the evidence that she is entitled to recover against Rolling

14  Stone, LLC, and Wenner Media, LLC, based on the republication

15  of these statements.

16      "$1 million."

17      Signed and dated this date by your foreperson, Deborah

18  Parmelee, 11/7/2016.

19      Is this the correct reading of your return, so say you

20  all?

21              THE JURORS:  Yes.

22              THE COURT:  Is there a request that the jury be

23  polled?

24              MR. PAXTON:  Yes, Your Honor.

25              THE COURT:  I'll ask the clerk to poll the jury.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

113

1          THE CLERK:  Ladies and gentlemen, as I state your

2     name, please answer "yes" or "no" as to whether or not the

3     verdict just read in open court is in fact your verdict.

4        Lucy Aslett?

5          JUROR ASLETT:  Yes.

6          THE CLERK:  Heather Atterberry?

7          JUROR ATTERBERRY:  Yes.

8          THE CLERK:  Carolyn Brauner?

9          JUROR BRAUNER:  Yes.

10         THE CLERK:  Casey Brooks?

11         JUROR BROOKS:  Yes.

12         THE CLERK:  Mary Ellen Furman?

13         JUROR FURMAN:  Yes.

14         THE CLERK:  Deborah Parmelee?

15         JUROR PARMELEE:  Yes.

16         THE CLERK:  Lisa Story?

17         JUROR STORY:  Yes.

18         THE CLERK:  Cody Thacker?

19         JUROR THACKER:  Yes, ma'am.

20         THE CLERK:  Alyssa Waller?

21         JUROR WALLER:  Yes.

22         THE CLERK:  And Tal Wilk?

23         JUROR WILK:  Yes.

24         THE COURT:  Ladies and gentlemen of the jury, this

25     concludes your service in the case.  And before you go, I want

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

114

1    to add my voice to those of counsel who have recognized the

2    very diligent service that you have performed in this matter.

3          This was a long trial.  It took a greater number of days

4    than our cases normally take.  And furthermore, we pushed you

5    kind of hard in terms of the number of hours that we stayed in

6    court each day.  And indeed, we went on one Saturday.

7          But it was my observation that throughout this period of

8    time, each and every one of you paid close attention to the

9    evidence.  I thought that you were very diligent in the

10   performance of your obligation.  It seemed to me that each of

11   you did an excellent job serving as a juror, and I thank you

12   for that.

13         I'll tell you that it's also the Court's belief that all

14   of you listened to my admonition each evening as we adjourned

15   for the day and that you didn't speak with folks about the

16   case, you didn't do any research, you didn't do any of the

17   things that I asked you not to do.

18         That obligation is at an end.  And as of tonight, you're

19   free to speak to anyone about the case that you choose to

20   speak to, or if you choose not to speak, that's your option as

21   well.  It's up to you now to decide whether you want to speak

22   to others about your performance as jurors about the case or

23   whether you want to keep these matters to yourselves or

24   perhaps to your family and close friends.  All that is left to

25   your discretion.

Eramo vs. Rolling Stone, et al. - 11/07/2016   Vol. 2

115

1    As I discharge you from further obligation in this case,

2  I tell you, as I told those who were discharged who were not

3  asked to serve, that performance of work as a juror is one of

4  those fundamental obligations of citizenship.  It's one of

5  those facets of our judicial system that makes our judicial

6  system perhaps the greatest in the world.

7    The right to have one's case tried by a jury of one's

8  peers is one of those fundamental rights, is one of the

9  cornerstones of our system of justice in this nation.  It has

10 served us well over 200 years, and it continues to be a viable

11 part of our legal process today.

12   So as you go home this afternoon, you may hold your heads

13 high knowing that you performed a very valuable service, both

14 to the Court and to the parties in this case, and also to your

15 fellow citizens in your towns, in your state, in your nation.

16   It's a job well done.  I congratulate you and thank you

17 for your hard work.

18   You folks are excused at this time.

19       (The jury was excused at 8:11 p.m.)

20       THE COURT:  Please be seated.

21   I want to congratulate counsel as well.  From the Court's

22 perspective, the matter was ably prosecuted, it was

23 competently presented, it was effectively defended, it was a

24 good job on both sides of the aisle, and I congratulate

25 counsel.

Eramo vs. Rolling Stone, et al. - 11/07/2016    Vol. 2

116

1      I plan to enter a judgment on the verdict forthwith

2   unless there's some request that it be withheld pending

3   completion of any posttrial motions that might be presented.

4           MS. McNAMARA:  We'll be making posttrial motions, I

5   predict, Your Honor, but we don't think that that needs to

6   preclude the entry.

7           THE COURT:  So I'll go ahead and enter a judgment on

8   the verdict.

9      Is there anything else that needs to be done in the case

10  this afternoon?

11     If not, we'll ask the marshal declare the Court adjourned

12  for the day.

13          (The case adjourned at 8:16 p.m.)

14                      *   *   *

15

16              CERTIFICATE OF REPORTER

17

18     I certify that the foregoing is a correct transcript of
    the record of proceedings in the above-entitled matter.

19

20

21
     11/08/2016                    /s/  Lance A. Boardman, RDR, CRR
22

23

24

25