# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | | |
|---|---|---|
| NICOLE P. ERAMO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROLLING STONE, LLC, | ) | **Case No. 3:15-cv-00023-GEC** |
| SABRINA RUBIN ERDELY, and | ) | |
| WENNER MEDIA, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Elizabeth A. McNamara (*pro hac vice*)
Samuel M. Bayard (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 489-8230
Fax: (212) 489-8340

Alison B. Schary (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, D.C. 20006-3401
Telephone: (202) 973-4248
Fax: (202) 973-4448

W. David Paxton (VSB No. 19798)
J. Scott Sexton (VSB No. 29284)
Michael J. Finney (VSB No. 78484)
GENTRY LOCKE
10 Franklin Road S.E., Suite 900
P.O. Box 40013
Roanoke, Virginia 24022-0013
Telephone:   (540) 983-9300
Fax:   (540) 983-9400

*Attorneys for Defendants Rolling Stone LLC,*
*Sabrina Rubin Erdely, and Wenner Media LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

ARGUMENT ................................................................................................. 2

I.      LEGAL STANDARD ............................................................................ 2

II.     JUDGMENT AS A MATTER OF LAW IS APPROPRIATE ON THE FINDING
OF REPUBLICATION BY ROLLING STONE ................................................. 2

     A.    No Reasonable Jury Could Have Found that Rolling Stone "Affirmatively
Reiterated" the Article Statements by Placing the Editor's Note at the Top
of the Online Article ............................................................................. 4

     B.    No Reasonable Jury Could Have Found that Rolling Stone Intended to
Reach a New Audience for the Article Statements by Placing the Editor's
Note at the Top of the Online Article ...................................................... 7

     C.    Plaintiff's Arguments that Rolling Stone Failed to Remove the Article on
December 5 and/or Did Not Sufficiently "Retract" It Have No Bearing on
Republication ..................................................................................... 12

III.    JUDGMENT AS A MATTER OF LAW IS APPROPRIATE ON ALL
FINDINGS AGAINST SABRINA RUBIN ERDELY ...................................... 15

     A.    Judgment as a Matter of Law Is Warranted for Statements 5, 7, 8, and 10
Because Plaintiff Failed to Present Evidence that These Statements
Caused Her Special Damages ................................................................. 15

          1.    Plaintiff Was Required to Offer Competent Evidence of Special
Damages Because These Statements Are Not Defamatory *Per Se* .......... 15

          2.    Plaintiff Failed to Present Any Evidence That She Was Harmed by
the Post-Article Statements as Part of Her Liability Case ....................... 17

     B.    The Record Does Not Contain Sufficient Evidence to Find that Defendant
Erdely Made Any of the Statements with Actual Malice ............................ 21

          1.    The Record Does Not Contain Clear and Convincing Evidence
That Erdely Made Statements 1 and 3 With Actual Malice ..................... 22

          2.    The Record Does Not Contain Clear and Convincing Evidence
That Erdely Made Any of the Remaining Post-Article Statements
With Actual Malice ............................................................................. 26

          3.    Plaintiff's Theories of Actual Malice Do Not Support the Verdict
Against Erdely .................................................................................. 32

     C.    None of the Statements Forming the Basis for the Jury's Verdict Are
Actionable as a Matter of Law ............................................................... 35

          1.    Statements 1 and 3 (Article) .................................................................. 35

2.      The Post-Article Statements (Statements 5, 7, 8, and 10) ........................ 39

CONCLUSION .......................................................................................................................... 43

Case 3:15-cv-00023-GEC   Document 392   Filed 12/05/16   Page 3 of 52   Pageid#: 17990

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Biospherics, Inc. v. Forbes, Inc.*,
151 F.3d 180 (4th Cir. 1998) ................................................39

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984)................................................................ *passim*

*CACI Premier Tech., Inc. v. Rhodes*,
536 F.3d 280 (4th Cir. 2008) ................................................27, 40

*Carr v. Forbes, Inc.*,
259 F.3d 273 (4th Cir. 2001) ................................................24

*Chapin v. Greve*,
787 F. Supp. 557 (E.D. Va. 1992), *aff'd sub nom. Chapin v. Knight-Ridder,
Inc.*, 993 F.2d 1087 (4th Cir. 1993) ................................................36

*Church of Scientology Int'l v. Daniels*,
992 F.2d 1329 (4th Cir. 1993) ................................................21, 32

*Clark v. Viacom Int'l Inc.*,
617 F. App'x 495 (6th Cir. 2015) ................................................3, 9, 10, 12

*D.A.R.E. Am. v. Rolling Stone Magazine*,
101 F. Supp. 2d 1270 (C.D. Cal. 2000), *aff'd*, 270 F.3d 793 (9th Cir. 2001)..........................14

*In re Davis*,
347 B.R. 607 (W.D. Ky. 2006) ................................................9

*DeJarnette v. Corning Inc.*,
133 F.3d 293 (4th Cir. 1998) ................................................2

*Doe v. Delta Airlines, Inc.*,
129 F. Supp. 3d 23, 44 (S.D.N.Y. 2015), *aff'd*, --- F. App'x ---, 2016 WL
6989793 (2d Cir. Nov. 29, 2016)................................................15

*Eastwood v. National Enquirer, Inc.*,
123 F.3d 1249 (9th Cir. 1997) ................................................21

*Elias v. Rolling Stone LLC*,
--- F. Supp. 3d ---, 2016 WL 3583080 (S.D.N.Y. June 28, 2016), appeal filed,
No. 16-2465 (2d Cir. July 15, 2016)................................................40

*Firth v. New York*,
775 N.E.2d 463 (N.Y. 2002) ........................................................................11, 14

*Fleming v. Moore*,
275 S.E.2d 632 (Va. 1981) ....................................................................15, 16, 20

*Food Lion, Inc. v. Melton*,
458 S.E.2d 580 (Va. 1995) ..............................................................................18, 19

*Gazette, Inc. v. Harris*,
325 S.E.2d 713 (Va. 1985) ....................................................................................15

*Great Coastal Exp., Inc. v. Ellington*,
334 S.E.2d 846 (Va. 1985), *overruled on other grounds and otherwise ratified
by Cashion v. Smith*, 749 S.E.2d 526 (Va. 2013) ................................................16

*Hanks v. Wavy Broad., LLC*,
No. 2:11CV439, 2012 WL 405065 (E.D. Va. Feb. 8, 2012) ...........................16, 19

*Harte-Hanks Commc'ns v. Connaughton*,
491 U.S. (1989) .............................................................................................23, 35

*Hatfill v. N.Y. Times Co.*,
532 F.3d 312 (4th Cir. 2008) ...............................................................................21

*Hoffman v. Washington Post Co.*,
433 F. Supp. 600 (D.D.C. 1977), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978) ............13, 18

*Hugger v. Rutherford Inst.*,
94 F. App'x 162 (4th Cir. 2004) .....................................................................17, 19

*Janklow v. Newsweek, Inc.*,
788 F.2d 1300 (8th Cir. 1986) ..............................................................................26

*Kidwell v. Sheetz, Inc.*,
982 F. Supp. 1177 (W.D. Va. 1997) ......................................................................15

*Ladd v. Uecker*,
780 N.W.2d 216 (Wis. Ct. App. 2010) .................................................................11

*Larue v. Brown*,
330 P.3d 767 (Ariz. Ct. App. 2014) .......................................................................9

*McFarlane v. Sheridan Square Press, Inc.*,
91 F.3d 1501 (D.C. Cir. 1996) .............................................................................13

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......................................................................................13, 42

*Newton v. National Broadcasting Co.*,
 930 F.2d 662 (9th Cir. 1990) ...............................................................22, 23, 24, 26

*O'Neal v. Celanese Corp.*,
 10 F.3d 249 (4th Cir. 1993) ...............................................................21

*Oja v. United States Army Corps of Eng'rs*,
 440 F.3d 1122 (9th Cir. 2006) ...............................................................11

*Reuber v. Food Chem. News, Inc.*,
 925 F.2d 703 (4th Cir. 1991) ...............................................................21, 34

*Rosenblatt v. Baer*,
 383 U.S. 75 (1966)...............................................................42

*Ryan v. Brooks*,
 634 F.2d 726 (4th Cir. 1980) ...............................................................25

*Saenz v. Playboy Enters., Inc.*,
 841 F.2d 1309 (7th Cir. 1988) ...............................................................23, 24

*Singer v. Dungan*,
 45 F.3d 823 (4th Cir. 1995) ...............................................................2

*Slaughter v. Valleydale Packers, Inc., of Bristol*,
 94 S.E.2d 260 (Va. 1956) ...............................................................16

*St. Amant v. Thompson*,
 390 U.S. 727 (1968) ...............................................................21

*Time, Inc. v. Pape*,
 401 U.S. 279 (1971)...............................................................26, 31

*Webb v. Virginian-Pilot Media Cos.*,
 752 S.E.2d 808 (Va. 2014)...............................................................36

*Wheatley v. Wicomico Cty.*,
 390 F.3d 328 (4th Cir. 2004) ...............................................................2

*Wilhelm v. Blue Bell, Inc.*,
 773 F.2d 1429 (4th Cir. 1985) ...............................................................2

*Yeager v. Bowlin*,
 693 F.3d 1076 (9th Cir. 2012) ...............................................................14

## Other Authorities

Fed. R. Civ. P. 50 ...............................................................1, 2

Restatement (Second) of Torts § 577A, cmt. d...............................................................................10

Case 3:15-cv-00023-GEC   Document 392   Filed 12/05/16   Page 7 of 52   Pageid#: 17994

Defendants Rolling Stone, LLC, Wenner Media, LLC (together, "Rolling Stone"), and Sabrina Rubin Erdely ("Erdely"), by counsel, respectfully submit this brief in support of their motion pursuant to Fed. R. Civ. P. 50(b) for judgment as a matter of law on the jury verdict (i) finding that Defendants Rolling Stone were liable for defamation by republishing Statements No. 1, 2 and 3 (the "Article Statements") on December 5, 2014 by placing an Editor's Note at the top of the previously published online Article and (ii) finding that Defendant Erdely was liable for defamation with respect to Plaintiff's claims concerning Statements 1, 3, 5, 7, 8, and 10.[1]

## INTRODUCTION

On this motion, Defendants ask the Court to issue judgment as a matter of law on the following grounds: (1) The jury's finding that Rolling Stone "republished" the three Article Statements by adding the Editor's Note on December 5, 2014—subjecting it to a $1 million judgment—cannot stand because there is no evidence in the record to support a finding that Rolling Stone intended to "affirmatively reiterate" statements from a source that the Editor's Note affirmatively repudiated and there is no evidence that Rolling Stone was attempting to reach a new audience that the prior dissemination did not encompass; (2) Plaintiff failed to meet her burden of producing evidence of special damages for each of the post-Article statements; (3) Plaintiff failed to meet her burden of producing clear and convincing evidence that Erdely published any of the challenged statements with actual malice; and (4) none of the remaining challenged statements are actionable.

---

[1] In this brief, Defendants refer to the challenged statements by the numbers assigned to them on pages 16-22 of the Jury Instructions.

<u>**ARGUMENT**</u>

## I.      LEGAL STANDARD

Like a motion for judgment as a matter of law under Rule 50(a), a motion for renewed judgment as a matter of law under Rule 50(b) should be granted "if there is no legally sufficient evidentiary basis for a reasonable jury to find for the [non-moving] party."  Fed. R. Civ. P. 50. In other words, judgment as a matter of law is proper "when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment."  *Singer v. Dungan*, 45 F.3d 823, 826 (4th Cir. 1995) (citation omitted).

While a court may not substitute its judgment on credibility or the weight of evidence for that of the jury on a renewed motion, and must "view the evidence in the light most favorable to [the non-movant] and [] draw all reasonable inferences in [her] favor," there must nevertheless be "substantial evidence in the record to support the jury's findings." *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1432-33 (4th Cir. 1985).  "A mere scintilla of evidence is insufficient to sustain the verdict, and the inferences a jury draws to establish causation must be reasonably probable."  *DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998) (quoting *Charleston Area Med. Ctr., Inc. v. Blue Cross & Blue Shield*, 6 F.3d 243, 248 (4th Cir. 1993)).  Furthermore, a motion for renewed judgment as a matter of law under Rule 50(b) is properly granted "if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof."  *Wheatley v. Wicomico Cty.*, 390 F.3d 328, 332 (4th Cir. 2004) (quoting *Singer*, 45 F.3d at 827).

## II.     JUDGMENT AS A MATTER OF LAW IS APPROPRIATE ON THE FINDING OF REPUBLICATION BY ROLLING STONE

As the Court instructed the jury, in order to find that Rolling Stone "republished" the pre-existing article on December 5, 2014, the jury was required to find that "by adding the 'Editor's

2

Note' to the top of the online article, defendants affirmatively reiterated the content of any allegedly false and defamatory statements with an intent to reach a new audience."  Jury Instructions at 41 (Dkt. 375).[2]  The Court's instruction came directly from the Sixth Circuit's decision in *Clark v. Viacom*: "[T]he test of whether a statement has been republished is if the speaker has ***affirmatively reiterated it in an attempt to reach a new audience that the statement's prior dissemination did not encompass***."  *Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 505 (6th Cir. 2015) (emphasis added).  As set forth in *Clark* and specified in the instructions, the test requires ***both prongs*** be met: the statement must be (1) "affirmatively reiterated" and (2) made "with an intent to reach a new audience."

The record did not contain sufficient evidence to support a jury finding on either prong of the test.  For the reasons set forth below, no reasonable jury could find that Rolling Stone "affirmatively reiterated" any of the Article Statements, nor could it find that the Editor's Note was intended to "reach a new audience" for the very statements it was repudiating.  Because the record was devoid of such evidence, Plaintiff sought to confuse the jury by arguing that if the statements were not sufficiently retracted, they were "republished"—an argument that is flatly contradicted by black-letter law on republication as well as actual malice.   In the end, the jury verdict acts as a million-dollar penalty against a publisher that sought to promptly put readers on notice of serious concerns with an article and, as such, violates basic public policy.  Accordingly, judgment as a matter of law is appropriate for Defendants.

---

[2] For the same reasons set forth herein, Defendants also renew their Rule 50(a) argument that Plaintiff's republication claim failed as a matter of law and should never have been submitted to a jury at all for any Defendant.

### A. No Reasonable Jury Could Have Found that Rolling Stone "Affirmatively Reiterated" the Article Statements by Placing the Editor's Note at the Top of the Online Article

As Defendants argued in their Rule 50(a) motion, there is no evidence in the record by which a reasonable jury could find that Rolling Stone "affirmatively reiterated" any of the three Article Statements when it placed its Editor's Note on the top of the page. The Editor's Note does not repeat or "double down" on the three Article Statements; nor did it signal to readers that Rolling Stone had new information to support the accuracy of these three statements. Instead, by its plain language, the Editor's Note was a warning to any future readers that the magazine had lost faith in Jackie's credibility as a source and no longer stood behind any information sourced from her. Specifically, the Editor's Note alerted readers that Rolling Stone found "discrepancies in Jackie's account" and the magazine came to the conclusion that "our trust in [Jackie] was misplaced."[3] As a result, the magazine "apologize[d] to anyone who was affected by the story."

Implicitly acknowledging that the Note made clear that Rolling Stone no longer stood behind information sourced to Jackie, Plaintiff sowed confusion by arguing that there were "attribution" issues in the Article as a whole. Yet any such concern did not apply to the three Article Statements since each was expressly sourced to Jackie:

> Statement 1: "Lots of people have discouraged her from sharing her story, ***Jackie tells me with a pained look***, including the trusted UVA dean to whom Jackie reported her gang-rape allegations more than a year ago."

> Statement 2: "Like most colleges, sexual-assault proceedings at UVA unfold in total secrecy. Asked why UVA doesn't publish all its data, President Sullivan explains that it might not be in keeping with 'best practices' and thus may inadvertently discourage reporting. ***Jackie got a different explanation*** when she'd eventually asked Dean Eramo the same question. ***She says*** Eramo answered wryly, 'Because nobody wants to send their daughter to the rape school.'"

---

[3] Pl. Ex. 3.

<u>Statement 3</u>: "A bruise still mottling her face, Jackie sat in Eramo's office in May 2014 and told her about the two others.  One, she says, is a 2013 graduate, who'd told Jackie that she'd been gang-raped as a freshman at the Phi Psi house.  The other was a first-year whose worried friends had called Jackie after the girl had come home wearing no pants. Jackie said the girl told her she'd been assaulted by four men in a Phi Psi bathroom while a fifth watched.  (Neither woman was willing to talk to RS.)  ***As Jackie wrapped up her story, she was disappointed*** by Eramo's nonreaction.  ***She'd expected*** shock, disgust, horror. … Of all her assailants, Drew was the one she wanted to see held accountable – but with Drew about to graduate, he was going to get away with it.  Because, as she miserably reminded Eramo in her office, she didn't feel ready to file a complaint.  Eramo, as always, understood."

During the October 28, 2016 oral argument on Defendants' Rule 50(a) motion, the Court recognized the fundamental truth that the Editor's Note could not "affirmatively reiterate" statements from a source it was expressly repudiating.  At the time, the Court suggested that Plaintiff's implication claim (which had not yet been dismissed[4]) could potentially meet the republication standard if submitted to the jury, but acknowledged that there was no basis to find the three Article Statements were "affirmatively reiterated" by the Editor's Note because all were explicitly sourced to Jackie.  The Court stated:

> [T]he statements that are implicated can no longer be actionable because [Rolling Stone] repudiated anything that came from Jackie. … [T]he point is that for the three statements that are targeted, they referenced Jackie.  Sure, there may be a lot of other stuff that's in the article that is defamatory by implication that may permit you to recover, but as to these three statements, it's beyond question that they're attributed to Jackie.[5]

As the Court recognized, an "affirmative reiteration" necessarily requires some level of intent.  And every witness questioned on this issue testified that the Editor's Note was intended to retract *all* information sourced to Jackie.  For example:

**Sean Woods,** the Article's editor and Rolling Stone's corporate representative, testified that "[e]verything from Jackie was retracted" by the December 5 Editor's

---

[4] The Court entered judgment as a matter of law as to the defamation by implication claim on October 31, 2016. 10/31/2016 Trial Tr. (Vol 1) at 5:3-10; Memorandum Opinion (Dkt. 345); Order (Dkt. 348).

[5] 10/28/2016 Trial Tr. (Vol. 2) at 97:11-98:1.

Note, and that he had "[a]bsolutely no doubt" at the time that this was the intent and effect of the Editor's Note.[6]

**Sabrina Rubin Erdely**, the Article's author, testified that the December 5 Note was intended to "retract all of the portions of the Article that were sourced to Jackie," and that it satisfied the request for a retraction that she sent to her editors in the early morning hours of December 5.[7]

**Will Dana**, the magazine's then-managing editor, testified: "[I]t seems to me you could not read that [December 5] note and conclude in any way that Rolling Stone was standing by Jackie's account of what happened to her that night. … I think we made it very clear that we acknowledged that this story had extremely serious problems and that we no longer – and we were announcing to the world that we no longer had faith in the story that Jackie told us."[8]

**Jann Wenner**, the founder and CEO of Rolling Stone magazine, testified that Rolling Stone published the December 5 Editor's Note as an "immediate retraction" of "whatever was attributed to Jackie and her statements. … we said we no longer have confidence in any of the stuff that she said to us. And all – anything pertinent to what Jackie had said about the rape, about the dean, whatever, we say, wait a minute, all this is suspect." Mr. Wenner confirmed that the Editor's Note was intended "to put readers on notice" that Rolling Stone "had lost faith in Jackie's credibility" and was "no longer standing behind any of the information Jackie had provided," including statements Jackie made about Plaintiff.[9]

No record evidence supports a finding that Rolling Stone intended to republish and reiterate the Article Statements. To the contrary, Defendants' witnesses testified that, given the clear attribution to Jackie, they understood that the December 5 Editor's Note retracted each of the three Article Statements.[10] Accordingly, no evidence in the record would allow a reasonable jury to find that Rolling Stone "affirmatively reiterated" any of these statements, as the law requires. The Court's common-sense analysis on October 28 was correct and remains so today:

---

[6] *See* 10/27/2016 Trial Tr. (Vol. 1) at 90:9-91:5, 98:3-6; *see also id.* at 94:14-23, 96:12-17, 99:21-101:11, 107:7-10.

[7] *See* 10/22/2016 Trial Tr. at 126:1-13; 10/20/2016 Trial Tr. at 288:8-289:6.

[8] Pl. Ex. 198 at 307:10-23.

[9] Pl. Ex. 187 at 96:14-25, 121:5-124:3. Even the Columbia Journalism Review, repeatedly relied upon by Plaintiff throughout trial, described the December 5 Editor's Note as "effectively withdr[awing] the magazine's reporting on Jackie's case." Pl. Ex. 139 at 57.

[10] *See, e.g.*, 10/21/2016 Trial Tr. (Vol. 2) at 117:22-119:10 (Erdely); 10/25/2016 Trial Tr. (Vol. 1) at 6:24-7:22 (Garber-Paul); 10/27/2016 Trial Tr. (Vol. 2) at 59:17-64:23, 67:1-4, 68:7-70:18 (Woods).

no reasonable jury could find that these three statements were "affirmatively reiterated" by the Editor's Note. The Court should therefore direct a verdict for Defendants as to the republication claim on this basis alone.

### B. No Reasonable Jury Could Have Found that Rolling Stone Intended to Reach a New Audience for the Article Statements by Placing the Editor's Note at the Top of the Online Article

The record is similarly devoid of any evidence upon which a reasonable jury could conclude that, by adding the Editor's Note, Rolling Stone intended "to reach a new audience" for the three Article Statements that its "prior dissemination did not encompass." To the contrary, the unrebutted evidence at trial consistently shows that Rolling Stone's intent was to prominently warn the public about the problems in Jackie's story and apologize for its errors.

There is no question that the Article's unraveling was a major black eye for Rolling Stone. It defies logic for a jury to find that by placing a prominent disclaimer on the Article notifying readers that Rolling Stone no longer stood behind Jackie as a source, apologizing, and promising a full investigation, Rolling Stone was actually trying to ***recruit*** a new audience and spread now-discredited information from Jackie—including each of the Article Statements attributed to her—more widely than it had previously been distributed. As Mr. Wenner (candidly) testified: "Who wants to post something [that] says, oops, we fucked up so bad?"[11]

Nor does any testimony at trial support the theory that Rolling Stone was trying to recruit new and different readers to the original Article by its Editor's Note. For example, Sean Woods testified:

> Q: As of December 5, did you personally, and you Rolling Stone as the editor, want more people to read this article or did you want people to simply forget that it had ever happened?

---
[11] Pl. Ex. 187 at 100:20-21.

A: Oh, if I could have made it go away, I would have, if I could go back in time and undo what was done. But what's done is done.

Q: Okay. So to the extent that anyone alleges that you, as of December 5, were attempting to republish this article to reach a new and different audience, do you agree or disagree?

A: I completely disagree.[12]

Similarly, when Erdely was asked whether she intended or hoped that the Editor's Note would make the original article "reach a new and different audience and that people would continue to read it," she responded: "Heavens, no."[13]

Instead, every witness questioned on this issue testified consistently that the Editor's Note was intended to—and did—serve as a prominent warning to readers that the magazine no longer stood by anything in the Article sourced to Jackie, including the three Article Statements. Mr. Woods explained that the decision was made to place the Editor's Note on top of the existing story because Rolling Stone wanted to be sure that any future readers would be aware of its flaws: "[I]t was important to let the world know that we were addressing this and that we were taking the story – that our story had fallen apart. … If there had been another copy, it had been swirling around the internet, and people came to it and didn't see our wording, then they could still take it that we were standing by it. And I didn't want that, and I don't think the magazine did either."[14] Mr. Wenner echoed this practical concern:

> It was too late. The article is out there. It was gone. The people who were going to click on it were going to find it anywhere, any way, anywhere. And it would be better to have them get this article from Rolling Stone with a clear disclaimer at the top explaining the problems with it, what we didn't support any longer, and all the material that we found inaccurate. … Taking it down, at this particular

---

[12] 10/27/2016 Trial Tr. (Vol. 1) at 105:8-18.

[13] 10/22/2016 Trial Tr. 126:14-20.

[14] 10/27/2016 Trial Tr. (Vol. 1) at 105:1-108:18.

point in time, wasn't going to change anything.  It was better to have it out there with our disclaimer.[15]

In denying the Rule 50 motion, the Court focused on a different statement by Mr. Wenner.[16]  Specifically, Mr. Wenner responded to a question from Plaintiff's counsel about how readers might discern what information was repudiated by the Editor's Note by saying "you'd have to read the article."  But Mr. Wenner's common-sense recognition that people might need to read the Article to know what was sourced to Jackie and therefore repudiated by the Editor's Note does not logically support a finding that Rolling Stone was *intending* to affirmatively reiterate the *very same* repudiated statements.  Nor does it support a conclusion that Rolling Stone was seeking a new audience for those same repudiated statements.  Rather, according to the unrebutted testimony, the intent was to warn the worldwide audience that already had access to it, not to reach a "new audience that the statement's prior dissemination did not encompass."  *Clark*, 617 F. App'x at 505.

But that is not the only error.  Simply acknowledging that additional people might still read the Article is not sufficient for a finding that Rolling Stone published the Editor's Note with ***an intent*** to reach a new audience of readers.  The law is clear that republication does ***not*** occur "where audience attention is directed toward the allegedly defamatory statements' preexisting dissemination."  *Clark*, 617 F. App'x at 506 (collecting cases). "Simply alerting a new audience

---

[15] Pl. Ex. 187 at 131:7-23.

[16] *See* 10/28/2016 Trial Tr. (Vol. 2) at 90:9-13, 108:15-109:1 ("When I came in this morning, I fully expected to be granting a motion for judgment as a matter of law on the republication issue.  But based on what Mr. Wenner said today, I feel I just can't do so at this stage of the case.").  The Court's observation appears to focus exclusively on the second component to the test—reaching a new audience—and ignores the fact that both prongs of the standard have to be met.  Even if one found that there was somehow an intent to reach a new audience, it remains necessary to have evidence that Rolling Stone intended to "affirmatively reiterate" the three Article Statements.  And Mr. Wenner's testimony was unequivocal—and consistent with every other witness—in stating that the Editor's Note was intended to "put readers on notice" that the magazine was "no longer standing behind any of the information Jackie had provided," including "what Jackie said about … the dean."  Pl. Ex. 187 at 96:14-25; 121:5-124:3.

to the existence of a preexisting statement does not republish it." *Id.* at 507.[17]  Instead, the

second prong of the standard looks to whether "the ***delivery*** of the online statement is

***intentionally changed*** in a manner that ***enables it*** to be consumed by a wider audience than

before." *Id.* at 506 (emphasis added).  For example, republication may occur when an online

article was "initially published only to limited audiences—perhaps behind a paywall, or available

only to social media users privileged to access the posting, or available only through a fee- or

privilege-based application or other content delivery system—and then later disseminated to a

wider group of third parties or the general public." *Id.*  This aligns with the classic examples of

republication in the print world: for example, a morning and an evening edition of a newspaper,

or a hardcover edition of a book followed months later by a lower-priced paperback version, or a

subsequent re-broadcast of a television or radio show.  *Id.* (collecting cases); *see also*

Restatement (Second) of Torts § 577A, cmt. d.

　　　Adding an Editor's Note to the top of an existing online article at the very same URL

does not remotely fit within these examples.  The trial record indisputably reflects that the

Article was publicly available online to a worldwide audience and had already been seen by

millions of readers prior to December 5.[18]  Where, as here, "the initial posting has already been

directed at most of the universe of probable interlocutors, there is not likely to be any need for a

digital equivalent of a rebroadcast or a second print run."  *Clark*, 617 F. App'x at 506.  The

---

[17] Affirmative reiteration of previously published information looks very different than the Editor's Note at issue here.  For example, in *Larue v. Brown*, 330 P.3d 767 (Ariz. Ct. App. 2014), the defendants posted "updates and rebuttals" below the original article that "referred to and re-alleged the substance of the original articles," and later "added to and altered the substance of the original material by providing additional information in response to a reader's questions, and re-urging the truth of the original articles in response to another reader's criticism."  *Id.* at 773.  Similarly, in *In re Davis*, 347 B.R. 607 (W.D. Ky. 2006), the court found a republication where the defendants added entirely new "breaking news" and "update" sections to a website devoted to criticizing the allegedly defamed party, holding that these new sections added "substantive information" that built upon and altered the originally published material.  *Id.* at 610, 612.

[18] *See* Pl. Ex. 196.

Article was already a major news story at this point, and had been for weeks; adding the Editor's Note did not pluck it from obscurity and cause it to be distributed on a broader platform than it was previously. Instead, as the testimony uniformly establishes, the Editor's Note served an entirely distinct purpose: to put readers on notice that Rolling Stone lost faith in Jackie as a source and that no information from her should continue to be credited.

For the same reason, Plaintiff's emphasis on the fact that an additional 425,000 unique visitors viewed the Article after December 5 is irrelevant. The law of republication requires subjective intent and affirmative action by the defendants to target and recruit a new and different audience than the previous distribution. If the standard were satisfied simply by showing that additional third parties read the article, then simply hosting material on the Internet where it can be accessed by additional readers would constitute a republication, but the cases have rejected that approach as inconsistent with the single-publication rule itself. *See Firth v. New York*, 775 N.E.2d 463, 465 (N.Y. 2002) (rejecting plaintiff's argument that "because publications on the Internet are available only to those who seek them, each 'hit' or viewing of the report should be considered a new publication that retriggers the statute of limitations"); *Ladd v. Uecker*, 780 N.W.2d 216, 220 (Wis. Ct. App. 2010) (rejecting "the notion that each 'hit' or viewing of the information should be considered a new publication that retriggers the statute of limitations"); *Oja v. United States Army Corps of Eng'rs*, 440 F.3d 1122, 1132 (9th Cir. 2006) (rejecting plaintiff's argument that defendant continuously republished information by hosting the information on a website). Therefore, Plaintiff's invocation of additional readers after December 5 does not show an intent to reach a new audience as a matter of law.

**C. Plaintiff's Arguments that Rolling Stone Failed to Remove the Article on December 5 and/or Did Not Sufficiently "Retract" It Have No Bearing on Republication**

In any analysis of the republication claim, it is important to keep in mind why Plaintiff raised it in the first place: as a way to restart the clock on actual malice. Given the clear record showing that Rolling Stone did not doubt the accuracy of the three Article Statements—as the jury found at trial—Plaintiff used her novel apology-as-republication theory to create a back door into imposing liability on Rolling Stone after the point at which it clearly had "serious doubts" about the accuracy of information sourced from Jackie. And that is precisely what the jury ended up doing, imposing an astounding million-dollar verdict on Rolling Stone for responsibly warning readers that it no longer stood behind Jackie as a source.

Plaintiff never plausibly argued to the jury that the Editor's Note "affirmatively reiterated" any of the three Article Statements. Instead, Plaintiff argued that the Editor's Note did not constitute a sufficient *retraction* of the three statements. This argument was a central theme of Plaintiff's closing argument:

> And look how they executed that December 5 editor's note. Look what they did and didn't do. You heard Rolling Stone's managing editor, Will Dana, who Sean Woods says is one of the best in the business. He told Jann Wenner, "We got to pull the article down." And Jann Wenner overruled him and said, 'We're going to leave it up." They had a conversation. They made a decision, we're going to leave the article up. . . .

> You're not going to find the word "retraction" in it because it isn't there. It doesn't say "retract," "retracting," "retracted." You're also not going to find anything in there that says they're backing away from their portrayal of Nicole Eramo, and you're not going to find anything there explaining what portions of the article that they were retracting. . . .

> They're not retracting the story. And the other thing that's evident from this timeline about a retraction, so they put out a defective product. They put out a defective journalistic product on November 19 with this article. And when they went and republished it on December 5th, they didn't tell people—they said, well, there's problems with the article. But they didn't tell people, who were still using that defective product, which portions of it were defective. Imagine, like, a car

12

> seat manufacturer puts out a defective car seat, and then they discover there's a
> problem and they say, well, we're not going to recall it yet. There's a portion of
> this car seat that's defective. We're not going to tell you which one, but use it for
> another five months, and then we'll issue our recall. That's reckless. That wasn't
> a retraction. 425,000 additional people saw it.[19]

Again and again, Plaintiff emphasized Rolling Stone's failure to retract the Article by not taking it down and allowing it to remain online until April 5, 2015, listing all of the times that they claimed Defendants received additional information casting doubt on the Article after December 5, and "still no retraction."[20]

That is not the law. In fact, the *Clark* court specifically notes that "failing to remove a statement from a website after receiving notice of its falsity" does ***not*** constitute republication. *Clark*, 617 F. App'x at 505 (citing *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1167-68 (9th Cir. 2011)). The law of republication requires an ***affirmative reiteration*** and ***intent to reach a new audience***; there is no such thing as republication by omission. Plaintiff has never offered this Court a single legal authority to support her argument that failure to take down an article after publication, or to retract specific statements with her desired level of specificity, constitutes republication. Nor could she, since this theory is at odds with the well-established law that failure to retract or correct an article after publication ***cannot*** provide a basis for new liability. *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) ("[Plaintiff] presents no authority, however, nor are we aware of any, for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication."); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 286 (1964) (defendant's failure to retract was "not adequate evidence of malice for constitutional purposes").

---

[19] 11/1/2016 Trial Tr. (Vol. 1) at 112:25-113:7, 113:12-18, 118:25-119:16.

[20] *See id.* at 116:23-118:11.

In fact, courts routinely find that where, as here, a publisher takes prompt action to correct, retract, or otherwise notify readers of errors in the original publication, these efforts are evidence of a ***lack*** of actual malice, weighing against the imposition of liability. *See, e.g.*, *Hoffman v. Washington Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977) (subsequent retraction "tends to negate any inference of actual malice"), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978). If a failure to retract or correct does not provide a basis for liability, and a retraction or correction mitigates *against* a finding of actual malice, there is no logical or legal support for Plaintiff's claim that by acknowledging and warning readers of its doubts about Jackie's credibility, the Editor's Note acted as a ***republication*** of the original article and subjected it to new liability.

By the same token, a retraction that the plaintiff deems insufficient—as Plaintiff argued here—cannot provide a basis for independent liability. "If a publisher's wholesale refusal to retract . . . did not constitute actual malice, it follows that a publisher's retraction which does not satisfy the aggrieved party surely is not actionable as defamatory." *D.A.R.E. Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1286-87 (C.D. Cal. 2000), *aff'd*, 270 F.3d 793 (9th Cir. 2001).

Serious policy concerns result from the jury's verdict. Had Rolling Stone left the Article up as is—without acknowledging any concern with Jackie as a source—Rolling Stone would face no liability and no million-dollar verdict. Publishers will find a perverse incentive in this result: if you do the right thing by appending a correction, retraction, or apology to an online article as soon as you are aware that it may have problems, you risk "republishing" the content and facing seven-figure liability. Faced with these prospects, many reasonable publishers will choose to stay silent and not alert the public to concerns or errors in an article. Alternatively, publishers can draw the conclusion that it would be prudent to alert readers to errors in an article

14

only by publishing notices on a separate URL—**not** where readers naturally go looking for the story. Without question, neither approach would adequately warn readers of the problems in an article; nor would they serve the interest of the public. These are precisely the results that courts have cautioned against in the republication context, fearing that an overly strict reading of republication "would either discourage the placement of information on the Internet or slow the exchange of such information" by forcing a publisher "to avoid posting on a Web site or use a separate site for each new piece of information." *Firth*, 775 N.E.2d at 467. *See also Yeager v. Bowlin*, 693 F.3d 1076, 1083 (9th Cir. 2012) (citing *Firth* approvingly and noting that to hold otherwise "would encourage websites to be frozen in anticipation of and during potentially lengthy litigation"). If the jury's verdict is allowed to stand, the severe legal risk of adding a warning editor's note to a story will force publishers not to make the very disclosures that the law encourages. Such a result is not only at odds with the law, it flies in the face of common sense, public policy, and the best interests of an informed public.

### III. JUDGMENT AS A MATTER OF LAW IS APPROPRIATE ON ALL FINDINGS AGAINST SABRINA RUBIN ERDELY

#### A. Judgment as a Matter of Law Is Warranted for Statements 5, 7, 8, and 10 Because Plaintiff Failed to Present Evidence that These Statements Caused Her Special Damages

##### 1. Plaintiff Was Required to Offer Competent Evidence of Special Damages Because These Statements Are Not Defamatory *Per Se*

The Virginia Supreme Court has set out an unambiguous requirement that a plaintiff must show "[s]pecial damages . . . *as a prerequisite to recovery* where the defamatory words are not actionable per se." *Fleming v. Moore*, 275 S.E.2d 632, 639 (Va. 1981) (emphasis added); *accord Gazette, Inc. v. Harris*, 325 S.E.2d 713, 719 (Va. 1985). In the absence of a showing of either *per se* defamation or special damages, a plaintiff has failed to set out the necessary elements of a

claim for defamation and liability fails as a matter of law. *See, e.g.*, *Doe v. Delta Airlines, Inc.*, 129 F. Supp. 3d 23, 44 (S.D.N.Y. 2015) (applying Virginia law) (since plaintiff had "not come forward with *prima facie* evidence of either defamation *per se* or special damages . . . summary judgment [was] warranted" for defendant on plaintiff's defamation claim), *aff'd*, --- F. App'x ---, 2016 WL 6989793 (2d Cir. Nov. 29, 2016); *Kidwell v. Sheetz, Inc.*, 982 F. Supp. 1177, 1188 (W.D. Va. 1997) (granting summary judgment for defendant where plaintiff had alleged no special damages and the supposed falsehoods did not meet the standard for defamation *per se*).

Here, the Court ruled at summary judgment that the challenged statements "are not defamatory *per se*." Sept. 22, 2016 Order (Dkt. 189). *See also* Sept. 22, 2016 Mem. Op. at 22 (Dkt. 188) (explaining that the statements are not defamatory *per se* because "the alleged defamatory meaning ascribed to the challenged statements does not give rise to presumed damages"). Accordingly, Plaintiff was obligated, as a prerequisite to recovery, to prove at trial that she suffered special damages as a result of each statement, including Statement 5 from the Brian Lehrer Show, Statements 7 and 8 from the Slate DoubleX Gabfest, and Statement 10 made to the *Washington Post* (collectively, the "Post-Article Statements").

While special damages under Virginia law "are not to be limited to pecuniary loss," and may consist of "damage to [plaintiff's] reputation and standing in the community, embarrassment, humiliation, and mental suffering," *Fleming*, 275 S.E.2d at 639, all such harm must still be proved by "competent evidence," and not by inference or presumption. *Id.* at 638 n.10 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)); *Hanks v. Wavy Broad., LLC*, No. 2:11CV439, 2012 WL 405065, at *13 (E.D. Va. Feb. 8, 2012) ("Libel *per quod* requires proof of special damages . . . ; they are not presumed by the injury, they must be specially pleaded, and they must be proved by competent evidence.") (internal quotation marks and

citation omitted); *Slaughter v. Valleydale Packers, Inc., of Bristol*, 94 S.E.2d 260, 266 (Va. 1956) ("Special damages are such as in fact have actually occurred as the result or consequences of the injury complained of, and not implied by law.") (citation omitted). Further, a plaintiff must also prove that her damages were actually proximately caused by the allegedly defamatory statements at issue. *See Great Coastal Exp., Inc. v. Ellington*, 334 S.E.2d 846, 855 (Va. 1985) (plaintiff has "the burden of proving by a preponderance of the evidence both the quantum of his loss and that the defamatory words were its proximate cause"), *overruled on other grounds and otherwise ratified by Cashion v. Smith*, 749 S.E.2d 526, 532 (Va. 2013).

A plaintiff may not, therefore, prove special damages by mere allegation, inference or presumption. Indeed, the defining difference between "presumed damages" (which are permitted only in cases of defamation *per se*) and "special damages" (which are required for all other forms of defamation) is that the latter may never be presumed. To allow a presumption of special damages would collapse the age-old legal distinction between defamation *per se* and defamation *per quod*. Indeed, in the words of the Fourth Circuit, to permit a defamation *per quod* plaintiff to satisfy her evidentiary burden in the absence of competent evidence setting out both actual damages and causation would, "in effect, allow[] juries to award damages to defamation plaintiffs on the basis of nothing other than the publication of a defamatory statement. We perceive no difference between such a holding and a rule allowing the recovery of presumed damages." *Hugger v. Rutherford Inst.*, 94 F. App'x 162, 168 (4th Cir. 2004).

> ### 2. Plaintiff Failed to Present Any Evidence That She Was Harmed by the Post-Article Statements as Part of Her Liability Case

Notwithstanding the bifurcation of this action, in pretrial proceedings Plaintiff correctly argued that damages are "an element of the claim" and on that basis she was required to offer

evidence of damages during the liability stage.[21]  As a result, Plaintiff declined any stipulation that would have avoided her burden of showing actual damage proximately caused by each challenged statement during the liability phase of the trial.  Thus the Court ruled pretrial that Plaintiff would have to present sufficient evidence of damages to satisfy all elements of her claim.[22]  Yet, Plaintiff utterly failed to meet the very burden she set for herself during the liability phase of the trial.

As Defendants argued in their Rule 50(a) motion following the close of the liability phase, Plaintiff presented not a scintilla of evidence to support her allegations that she was personally or reputationally harmed by the Post-Article Statements.[23]  No witness testified to hearing or reading any of the Post-Article Statements and thinking less of Plaintiff as a result.[24] No documentary evidence was introduced that showed any reputational harm tied to or caused by the Post-Article Statements.  And Plaintiff herself did not fill those gaps.  Regarding Erdely's statement to the *Washington Post* (Statement 10), Plaintiff provided no testimony whatsoever concerning the Statement:  no evidence that she had ever read the *Post* article, much less that she had been harmed by it.[25]  As for the remaining Post-Article Statements, Plaintiff could not establish that she even heard or was aware of the Brian Lehrer or the Slate DoubleX Gabfest statements (Statements 5, 7, and 8) prior to instituting this lawsuit.  As a result, the Court explicitly limited Plaintiff's testimony to matters of truth, and she thus provided no evidence that

---

[21] *See* 10/7/2016 Hearing Tr. at 61:3-6.

[22] *See* 10/7/2016 Hearing Tr. at 63:22-23; 65:22-24; *see also* 10/11/2016 Hearing Tr. at 45:20-21.

[23] 10/28/2016 Trial Tr. (Vol. 2) at 64:21-65:14, 70:21-71:4, 81:9-84:8.

[24] Sean Woods testified that he heard a portion of the Brian Lehrer show, but he did not testify to hearing Statement 5 and recalled little about the broadcast other than being pleased to hear Erdely's voice.  10/27/2016 Trial Tr. (Vol. 1) at 69:9-70:11.

[25] Sean Woods testified that he had read the *Washington Post* article "many times" and Erdely testified that she read it as well.  *See* 10/27/2016 Trial Tr. (Vol. 1) at 40:23-41:2 (Woods); 10/20/2016 Trial Tr. at 176:11-16 (Erdely).  But neither witness testified as to thinking less of Plaintiff as a result of reading the article or Statement 9 contained therein, thus this testimony does not identify any injury to Plaintiff.

she or her reputation was in any way damaged by the Statements.[26]  In short, the liability record is devoid of any evidence of damages from the Post-Article Statements, and the jury had no basis to find liability absent this key element.

Instead of presenting any evidence to support a finding of actual damage proximately caused by each Post-Article Statement, Plaintiff attempted to avoid her burden by conflating evidence that established publication with evidence that established actual damage.  Plaintiff's sole counter-argument to Defendants' Rule 50(a) motion on the Post-Article Statements was to cite *Food Lion, Inc. v. Melton*, 458 S.E.2d 580 (Va. 1995), for the proposition that a "plaintiff can prove publication by direct evidence or by circumstantial evidence, and the plaintiff need not identify the person to whom the defamatory words were published and need not place in evidence testimony from a third party regarding what the person heard and understood."[27]

This authority misses the mark entirely.  Defendants do not dispute that Plaintiff made a sufficient showing that the Post-Article Statements were published, but Defendants' Rule 50(a) motion was not based on the element of publication.  Instead, the motion turns on the separate and independent element of damages, more specifically Plaintiff's failure to present competent evidence—or indeed any evidence, circumstantial or otherwise—of special damages resulting from the Post-Article Statements.  As established above, because the Statements were not defamatory *per se*, damage was an independent element of Plaintiff's claim for defamation, and cannot be presumed or implied based on the fact that the statements were published.  *Hugger*, 94 F. App'x at 168; *Hanks*, 2012 WL 405065, at *13.  Indeed, the Fourth Circuit in *Hugger* closed

---

[26] *See* 10/18/2016 Trial Tr. (Vol. 2) at 133:1-134:25 (regarding the Brian Lehrer Show statements); *id.* at 138:10-139:9 (regarding the Slate DoubleX Gabfest statements).

[27] 10/28/2016 Trial Tr. (Vol. 2) at 71:19-72:5.

the door on attempts like Plaintiff's to establish damages via a showing of publication, finding that to do so would be a "rule allowing the recovery of presumed damages." *Id.*

Indeed, the *Food Lion* case cited by Plaintiff underscores this critical distinction, as that case—unlike the instant case—involved defamation *per se*. After holding that "a plaintiff may prove publication of defamatory remarks by either direct or circumstantial evidence," 458 S.E.2d at 585, the *Food Lion* court continued by ruling that "since an award of general damages for defamation is based on a concept of per se injury, [plaintiff] was not required to present further proof of injury or loss." *Id. Food Lion* thus reaffirms two fundamental principles: (1) publication and damages are separate, independent elements, and (2) a plaintiff is required to present proof of injury or loss (i.e., special damages) unless the statements are defamatory *per se*.

Plaintiff's attempt to collapse the distinction between the publication and damages elements was most evident during closing arguments on liability. Responding to Defendants' argument that she had failed to present any evidence of damage flowing from the Post-Article Statements, Plaintiff displayed the jury instruction on the publication element of her claim.[28]

This Court should not sanction Plaintiff's attempts to confuse the jury on the law; special damages may never be presumed by the mere fact of publication. Yet, that is precisely what Plaintiff asked the jury to do and presumably it followed that suggestion. In short, while Plaintiff carried her burden on the publication element as to the Post-Article Statements, she failed to offer any evidence of special damages as required under Virginia law.[29] Erdely is therefore

---

[28] 11/01/2016 Trial Tr. (Vol. 2) at 127:13-128:7 (claiming erroneously that Plaintiff did not have to present evidence that anyone heard or read the Post-Article Statements in order to prove damages because—quoting page 27 of the jury instructions—"Publication may be proven by direct evidence . . . or circumstantial evidence [and] plaintiff . . . need not place in evidence testimony from a third party regarding what the person heard and understood").

[29] Evidence offered at the damages stage of trial cannot cure Plaintiff's deficiency. Plaintiff herself acknowledged that she was required her to establish damages for each challenged statement in the liability phase. But even if Plaintiff could cure her deficiency at the damages stage, she failed to do so, since the only evidence relating to special damages concerning the Post-Article Statements was either unsupported speculation, or else failed to establish any basis that those Statements were the proximate cause of the harm. Plaintiff offered her own testimony

entitled to judgment as a matter of law on the Post-Article Statements.

### B. The Record Does Not Contain Sufficient Evidence to Find that Defendant Erdely Made Any of the Statements with Actual Malice

As the Court properly instructed the jury, Plaintiff had the "burden of demonstrating by clear and convincing evidence that a defamatory statement was made by [Erdely] with actual malice, that is, with knowledge of the statement's falsity or with reckless disregard of whether or not it is false." Jury Instructions at 32.[30] "Reckless disregard means that the defendant *had a high degree of awareness of the probable falsity* or must have *in fact entertained serious doubts as to the truth of the publication*." *Id.* (emphasis added). "Actual malice is a *subjective inquiry* that focuses on the defendant's state of mind at the time the statements were published." *Id.* (emphasis added). *See St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984); *Hatfill v. N.Y. Times Co.*, 532 F.3d 312, 324 (4th Cir. 2008); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 711 (4th Cir. 1991).

---

speculating that her reputation in the New York metropolitan area might have been affected by the Brian Lehrer show, but she didn't *actually know* if that was the case. 11/7/2016 Trial Tr. (Vol. 1) at 109:22-110:14 ("I don't know if anyone heard it. They didn't tell me they did. . . . I don't have any way of knowing what people think about me when I am there."). Plaintiff testified similarly with regard to the Slate DoubleX Gabfest, speculating *post-hoc* (since she admitted to not having heard the podcast at the time) that because she thinks that "some of the things that were said in that podcast were deeply offensive," therefore others might have thought so too. *Id.* at 111:3-13. With regard to Statement 10 in the *Washington Post*, Plaintiff testified only that "I was actually quite offended by this statement." *Id.* at 112:12-21. This testimony falls far short of the "competent evidence" of "damage to [Plaintiff's] reputation and standing in the community, embarrassment, humiliation, [or] mental suffering" required to satisfy her burden on the "special damages" element. *Fleming*, 275 S.E.2d at 638 n. 10. In addition, Plaintiff's husband Kirt Von Daacke testified that he had in fact heard the Slate DoubleX Gabfest around the time of its publication, and that he told Plaintiff about it, but "doubt[s] she remembers," underscoring that Plaintiff suffered *no emotional harm* as a result of those statements. 11/7/2016 Trial Tr. (Vol. 2) at 13:16-14:8. Moreover, when asked about Plaintiff's "demeanor and disposition" around the time of those statements, Von Daacke responded by saying "[t]hey destroyed her," but then described Plaintiff's general emotional state "from November 19th" (even though the Slate DoubleX Gabfest and Lehrer were not published until November 27), and cited the painful effect on Plaintiff of reading ugly *third party emails* that had nothing to do with the Slate statements. *Id.* at 14:17-15:5. Thus, while Von Daacke's testimony describes emotional harm suffered by Plaintiff, it does not establish the required causal link between that harm and the Post-Article Statements. *See O'Neal v. Celanese Corp.*, 10 F.3d 249, 255 (4th Cir. 1993) (affirming entry of a judgment N.O.V. against plaintiff where plaintiff had failed to prove defendant's actions proximately caused his injuries).

[30] The "clear and convincing" standard of proof imposes a "heavy burden [on plaintiffs], far in excess of the preponderance sufficient for most civil litigation." *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1252 (9th Cir. 1997) (internal quotation marks and citations omitted). *Accord Church of Scientology Int'l v. Daniels*, 992 F.2d 1329, 1334 (4th Cir. 1993) ("[A] public figure plaintiff faces a significant burden in proving actual malice.").

Here, as explained below, the record does not contain sufficient evidence for any rational jury to find by clear and convincing evidence that Erdely made any of the challenged statements knowing they were false or subjectively entertaining serious doubts as to their accuracy. Therefore, judgment as a matter of law is appropriate for Erdely on all of Plaintiff's libel claims.

1. **The Record Does Not Contain Clear and Convincing Evidence That Erdely Made Statements 1 and 3 With Actual Malice**

With respect to the Article, the jury found actual malice on Statement 1 and 3 only. Special Verdict Form Number One at 1-2 (Dkt. 366). Based on the trial record, no reasonable jury could find that Erdely acted with actual malice with respect to Statements 1 and 3 because the unrebutted evidence demonstrated that Erdely did not intend to convey the allegedly defamatory meanings that the Plaintiff pressed and the jury presumably read into them.

In *Bose Corp.*, the Supreme Court held that, under the actual malice standard, a magazine publisher could not be held liable for conveying a defamatory meaning that it did not intend to convey. 466 U.S. at 512-13. There, a *Consumer Reports* reviewer testified that, when describing the sound characteristics of the plaintiff's speaker system, he intended the phrase "about the room" to convey the movement of sound "along the wall." *Id*. at 494, 512. The district court concluded that because no "reasonable reader" or "intelligent speaker" would understand the statement that way, the reviewer must have known that his statement was false. *Id*. at 496-97, 512-13. Noting that the evidence did not show that the engineer "realized the inaccuracy at the time of publication," the Supreme Court rejected the district court's reasoning: "Under the District Court's analysis, any individual using a malapropism might be liable, simply because an intelligent speaker would have to know that the term was inaccurate in context, even though he did not realize his folly at the time." *Id*. at 513. The Supreme Court therefore concluded that the record did not contain clear and convincing evidence of actual malice. *Id*.

Similarly, in *Newton v. National Broadcasting Co.*, 930 F.2d 662 (9th Cir. 1990), the Ninth Circuit reversed a jury verdict, holding that the district court erred in ruling that NBC could be liable for "unintentionally [leaving] the impression that organized crime had financed Newton's purchase of the Alladin [hotel]" because that impression "should have been foreseen" by NBC and its failure to do so showed "a reckless disregard for the truth." *Id.* at 680. The court noted that it was impermissible "to uphold the jury's verdict against NBC on the ground that, because the defendants are trained journalists (or, as in *Bose*, 'intelligent speakers') or because the broadcast may be capable of supporting the impression Newton claims, NBC must therefore have intended to convey the defamatory impression at issue here." *Id.* at 681. It further cautioned that "[s]uch an approach eviscerates the First Amendment protections established by *New York Times*" because it "[i]t would permit liability to be imposed not only for what was not said but also for what was not intended to be said." *Id.* The court concluded that "[t]he district court erred because it substituted its own view as to the supposed impression left by the broadcast for that of the journalists who prepared the broadcast. This substitution gave the trier of fact an expanded role which *New York Times*, *Bose*, and *Harte–Hanks* do not permit." *Id. See also Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988) (affirming summary judgment on actual malice because plaintiff proffered no evidence that the defendants "intended to label him a torturer," and the evidence "confirm[ed] the fact that neither *Playboy* nor Morris believed that the article accused Saenz of torture").

At trial, Erdely testified without contradiction that she understood Statement 1 to refer to Jackie's claim that Eramo had discouraged her from sharing her story *with Rolling Stone*.[31] Plaintiff elicited no evidence that Erdely intended Statement 1 to convey that Eramo

---

[31] 10/22/2016 Trial Tr. at 78:13-80:14, 88:4-89:13.

intentionally discouraged Jackie from reporting to the police or moving her case forward at UVA, or that Erdely intended it to convey the impression that Eramo discouraged Jackie from sharing her story at "Take Back the Night," as Plaintiff argued in closing argument.[32]  The same is true for Statement 3.  The unrebutted testimony established that Erdely understood Statement 3's reference to "nonreaction" to be a description of Eramo's facial expression and demeanor, not a general statement about Eramo's substantive response.[33]  In both instances, Plaintiff simply urged the jury to substitute its own view of what Statements 1 and 3 mean for Erdely's understanding of what she wrote.  But, as *Bose*, *Newton*, and *Saenz* make clear, the actual malice standard does not permit liability for failing to foresee that an unintended defamatory meaning could be drawn from the text.

The trial record demonstrates that Erdely had ample factual support for Statements 1 and 3 as she understood them at the time of publication.  With respect to Statement 1, Erdely testified without rebuttal that Jackie—a source with first-hand knowledge of the conversations who Erdely trusted[34]—told her that Eramo had discouraged her from participating in the story.[35]  Erdely's reporting file reflects the same,[36] and Erdely had a text message from Alex Pinkleton stating that Jackie was getting "polar opposite information from you and then from dean eramo" regarding participating in the Article.[37]  In addition, Liz Garber-Paul fact-checked Statement 1 and confirmed it with Jackie.[38]  *See Carr v. Forbes, Inc.*, 259 F.3d 273, 283 (4th Cir. 2001) (affirming summary judgment to *Forbes* and author on actual malice grounds, in part because "it

---

[32] 11/1/2016 Trial Tr. (Vol. 1) at 66:13-67:24 (closing argument).

[33] 10/20/2016 Trial Tr. at 236:19-238:23 (Erdely); 10/22/2016 Trial Tr. at 82:4-83:22 (Erdely).

[34] 10/20/2016 Trial Tr. at 288:8-13 (Erdely).

[35] 10/22/2016 Trial Tr. at 67:9-16 (Erdely).

[36] Def. Ex. 64 at RS004500; 10/22/2016 Trial Tr. at 73:11-74:9, 79:14-25 (Erdely).

[37] Pl. Ex. 20 at RS014310.

[38] 10/25/2016 (Vol. 1) at 118:16-19 (Garber-Paul).

is undisputed that the fact-checker independently verified every fact in the final published version"). Finally, Erdely's scheduled interview with Eramo was cancelled and it was made clear to her, and the fact checker, that neither UVA nor Eramo would respond to questions about specific students.[39]

Similarly, Erdely had ample factual support for Statement 3. Erdely's reporting file memorializes Jackie telling this information to Erdely, and the notes reflect that Erdely asked Jackie specifically whether she "saw the look on [Eramo's] face when you told her there was someone else," and that Jackie told Erdely that "it wasn't as shocked as you might think. She was just [mild] 'oh you have to have her come in'— she wasn't like 'my god that's crazy' she was more concerned than anything for the girls' well-being."[40] As with Statement 1, Liz Garber-Paul fact-checked this statement and testified that they were comfortable that it was accurate.[41] Here too, it was not possible for Erdely to get Eramo's side of the conversation.[42]

Plaintiff urged the jury to find actual malice on Statement 3 because the "nonreaction" language did not track exactly what was reflected in Erdely's notes, and because Erdely did not include the statement from Jackie that Eramo "got pissed at the frat."[43] But Erdely flatly rejected the suggestion that she doubted the accuracy of this statement.[44] Instead, she testified that she asked Jackie about Eramo's facial expression and received an answer that supported what she

---

[39] Def. Ex. 5; Def. Ex. 26; 10/18/2016 Trial Tr. (Vol. 2) at 94-95 (Eramo); 10/21/2016 Trial Tr. (Vol. 2) at 50:11-53:18, 53:23-55:9 (Erdely).

[40] Def. Ex. 64 at RS004312. *See also* 10/21/2016 Trial Tr. (Vol. 2) at 117:22-118:2 (Erdely).

[41] 10/24/2016 Trial Tr. (Vol. 2) at 115:9-17 (Garber-Paul), 10/25/2016 Trial Tr. (Vol. 1) at 129:6-132:14 (Garber-Paul).

[42] *See supra* note 39.

[43] 11/1/2016 Trial Tr. (Vol. 1) at 77:19-80:10 (closing argument).

[44] 10/24/2016 Trial Tr. (Vol. 1) at 71:18-73:18, 116:6-118:8 (Erdely).

wrote in the Article.[45]  When a statement is factually supported, the actual malice standard does not permit liability to be based on this kind of second-guessing of authorial word-choice and other editorial decisions.  *Ryan v. Brooks*, 634 F.2d 726, 733 (4th Cir. 1980) (no actual malice based on author's "use of slightly stronger language than his source's"); *Newton*, 930 F.2d at 685-86 ("Complaints or disagreements about choice of language are editorial decisions that do not give rise to liability."); *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir. 1986) ("[T]he First Amendment cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words.").[46]

In sum, no rational jury could have found clear and convincing evidence that Erdely knew that Statements 1 and 3 were false or entertained serious doubts about their accuracy at the time of publication.  Therefore, judgment as a matter of law in Erdely's favor is appropriate.

> **2.    The Record Does Not Contain Clear and Convincing Evidence That Erdely Made Any of the Remaining Post-Article Statements With Actual Malice**

Based on the trial record, no reasonable jury could have concluded that Erdely made the Post-Article Statements with actual malice because they are rational interpretations of complex and ambiguous events, based on facts that Erdely believed to be true at the time.  In *Time, Inc. v. Pape*, 401 U.S. 279 (1971), the Supreme Court considered a defamation claim arising from a magazine writer's omission of the word "alleged" when discussing a government report of an incident of alleged police brutality.  The Court held that "Time's omission of the word 'alleged' amounted to the adoption of *one of a number of possible rational interpretations* of a document that *bristled with ambiguities*. The deliberate choice of such an interpretation, though arguably

---

[45] 10/24/2016 Trial Tr. (Vol. 1) at 116:6-118:8 (Erdely).

[46] This is especially true because the Article elsewhere incorporates Jackie's positive views about Eramo, including that Jackie "repeatedly calls her 'an asset to the community.'"  Pl. Ex. 1 at RS001078. *See also id*. at RS001076.

reflecting a misconception, was not enough to create a jury issue of 'malice' under New York

Times." *Id.* at 290 (emphasis added). *See also Bose*, 466 U.S. at 512-13 ("Here, [] adoption of

the language chosen was 'one of a number of possible rational interpretations' of an event 'that

bristled with ambiguities' and descriptive challenges for the writer. The choice of such

language, though reflecting a misconception, does not place the speech beyond the outer limits of

the First Amendment's broad protective umbrella.") (citation omitted); *CACI Premier Tech., Inc.*

*v. Rhodes*, 536 F.3d 280, 296 (4th Cir. 2008) ("a speaker or publisher may adopt 'one of a

number of possible rational interpretations of [sources] that [contain] ambiguities") (alterations

in original).

 At trial, Erdely testified that her Post-Article Statements encapsulated the criticisms that

she made in the Article and she believed them to be accurate when she made them.[47] Indeed, she

testified that the "concerns that [she] raised in the article about campus safety issues at the

University of Virginia" were "reasonable and well-founded opinions" and that they were

"justified under the facts as [she] honestly understood them at the time."[48] The Post-Article

Statements fall into three categories of critiques that flowed from the Article. <u>First</u>, Erdely's

statements that the UVA administration "brushed off" Jackie's allegations (Statement 5), "did

nothing" (Statement 5), "chose not to act on her allegations in any way" (Statement 10), and

responded with "indifference" (Statement 10) reflect the Article's criticism that UVA was aware

of three credible allegations of gang rape at a fraternity and yet failed to do a prompt

investigation or warn the campus, in violation of its own policy and federal law.[49] <u>Second</u>,

---

[47] 10/20/2016 Trial Tr. at 218:12-219:20, 227:1-228:15, 290:6-24; 10/22/2016 Trial Tr. at 93:7-96:17.

[48] 10/22/2016 Trial Tr. at 85:3-11. *See also* 10/21/2016 (Vol. 2) at 115:2-18 ("I followed it through all of the various channels, all the various permutations, to figure – to get my arms around it and finally came to the conclusion that they did have a responsibility to act and they chose to do nothing.").

[49] 10/20/2016 Trial Tr. at 218:18-219:20, (Erdely); 10/21/2016 Trial Tr. at 115:2-6; 10/22/2016 Trial Tr. at 93:7-94:6 (Erdely); 10/24/2016 Trial Tr. (Vol. 1) at 127:8-16 (Erdely).

Erdely's statements that Jackie "was sort of discouraged from moving this forward" (Statement 7), that the administration "would seek to suppress" her allegations (Statement 7), and that Jackie "hasn't had any of that support from her friends, from the administration, nor from her family" (Statement 8) reflect the Article's criticism that UVA's deference to victim choice in sexual-assault reporting had the consequence of lulling sexual assault victims like Jackie into taking no action.[50] Third, Erdely's statement that "the student body and the administration doesn't really treat rape as a crime, as a violent crime" (Statement 7) reflects not only Erdely's campus safety concerns, but also her accurate observations that UVA had never expelled anyone for sexual assault, while 183 students had been expelled for lying, cheating, and stealing since 1998, and that UVA used an "informal resolution process" to handle claims of sexual assault.[51]

Turning to the first criticism, the trial evidence showed that, at the time of publication, Erdely had a substantial factual basis for concluding that the UVA administration was failing to live up to the requirements of federal law and its own sexual misconduct policy by deferring to Jackie's choice and not undertaking a prompt investigation and, if warranted, issuing a warning to campus.[52] Erdely knew that UVA's own sexual misconduct policy and federal law required the school "to investigate and take reasonable action" even if a complainant did not want to pursue it.[53] She also knew that, by late May 2014 at the very latest, UVA was aware of three

---

[50] 10/24/2016 Trial Tr. (Vol. 1) at 87:16-88:25 (Erdely); 10/22/2016 Trial Tr. at 88:4-18 (in context of discussing "discourage" in implication claim); 10/20/2016 Trial Tr. at 227:1-228:15 (Erdely); 10/22/2016 Trial Tr. at 95:4-96:17 (Erdely). The "suppress" statement reflects both the campus safety and victim choice criticism. 10/20/2016 Trial Tr. at 224:18-225:13, 225:17-226:7 (Erdely).

[51] 10/22/2016 at 94:7-95:3 (Erdely).

[52] 10/20/2016 Trial Tr. at 285:18-286:17 (Erdely); 10/21/2016 Trial Tr. (Vol. 1) at 54:19-56:3 (Erdely); 10/21/2016 Trial Tr. (Vol. 2) at 114:16-115:18 (Erdely); 10/22/2016 Trial Tr. at 85:3-11 (Erdely); 10/24/2016 Trial Tr. (Vol. 1) at 128:23-129:1 (Erdely).

[53] Def. Ex. 45 at UVA040000774; 10/21/2016 Trial Tr. (Vol. 1) at 54:19-55:19, 55:20-56:3 (Erdely). *See also* 10/18/2016 Trial Tr. (Vol. 2) at 171:10-24 (Eramo).

credible allegations of gang rape against Phi Kappa Psi.[54]  At trial, Eramo admitted this was true.[55]  Erdely also knew that UVA did not commence an investigation of Phi Kappa Psi until September 2014[56] and never issued a warning to the campus.[57]  Again, Eramo's trial testimony confirmed this was true.  She testified that, even after Phi Psi was solidly identified in May 2014, UVA officials did not pull IM-Rec records or seek to compare those records with Phi Psi members to identify a possible perpetrator.[58]  Eramo further testified that, from May 2014 until September 2014, the administration's plan was to try to get Jackie to move forward, but that it took no further action to investigate Jackie's allegations, and she did not contact Jackie over the summer.[59]  Eramo also confirmed that no warning was issued.[60]  On these facts, it was entirely rational for Erdely to conclude that UVA failed to take sufficient action to protect campus safety.  Even recognizing that others might have different rational interpretations from these facts, under *Pape*, *CACI*, and a host of other cases, Erdely cannot be found to have published these statements with actual malice when she adopted one among other rational interpretations of the established facts.

---

[54] Emily Renda told Erdely that the school was aware of three gang-rape allegations before Erdely even met Jackie. *See* 10/21/2016 Trial Tr. (Vol. 1) at 9:10-10:3, 29:13-24 (Erdely); Def. Ex. 64 at RS004145-47; Pl. Ex. 21.  Erdely reasonably understood that Jackie had conveyed information about her own gang rape to Eramo as early as May 2013.  Def. Ex. 64 at RS004165 (Jackie told all of this to Dean Eramo, "the dean of sexual assault"); *id.* at RS004246 (Jackie told Erdely she had told Eramo "there [were] 7 guys and 2 of them told me what to do"); Pl. Ex. 13 at RS018284 (email from Eramo to Jackie offering to "hold these men accountable" if Jackie decided to take action).  Jackie told Erdely that she had conveyed the other two gang-rape allegations to Eramo in April 2014.  Def. Ex. 64 at RS004312-13.

[55] 10/19/2016 Trial Tr. at 16:6-17, 18:1-19:15, 22:5-14, 23:7-24:19, 26:7-27:17 (Eramo).

[56] Pl. Ex. 124 at 28:12-29:25.  Erdely also confirmed through other avenues that UVA had contacted Phi Kappa Psi in September 2014 regarding Jackie's allegations.  *See* Def. Ex. 64 at RS004401-04, RS004412-13, RS004478; Pl. Ex. 88.

[57] 10/19/2016 Trial Tr. at 54:24-55:4 (Eramo).

[58] 10/19/2016 Trial Tr. at 28:13-21 (Eramo).

[59] 10/19/14 Tr. (Vol. 1) at 29:16-30:6 (Eramo).

[60] 10/18/2016 Trial Tr. (Vol. 2) at 201:14-20 (Eramo); 10/19/2016 Trial Tr. at 28:22-29:1 (Eramo).

Turning to the second criticism, the trial evidence also established that Erdely had ample basis to conclude that the UVA's deference to victim choice in sexual-assault reporting had the result of lulling sexual assault victims, including Jackie, into taking no action. UVA President Teresa Sullivan confirmed on the record that UVA followed the policy of catering to victim choice.[61] Erdely knew from Emily Renda that Eramo was a strong proponent of the policy,[62] and Erdely had emails in her possession showing that Eramo consistently deferred to Jackie's choice not to take action.[63] Plus, UVA's own statistics showed that during the 2013-2014 academic year, 38 students went to Eramo about a sexual assault, and only nine brought formal complaints as a result; the other 29 did not pursue disciplinary action.[64] Putting these statistics together with her own reporting on Jackie's case, it was entirely rational for Erdely to conclude that the school's practice resulted in survivors not moving their cases forward.[65]

On the third criticism, Erdely testified about the bases she had for her view that the administration did not really treat rape as a violent crime.[66] She knew, for example, that, since 1998, UVA had expelled 183 students for honor code violations such as lying, cheating, and stealing, but no student had been expelled for sexual assault.[67] Erdely testified that she also

---

[61] Pl. Ex. 124 Tr. at 18:10-25.

[62] Def. Ex. 64 at RS004333, RS004335; 10/21/2016 Trial Tr. (Vol. 1) at 50:21-51:16 (Erdely).

[63] Pl. Ex. 13 at RS018284 (Eramo understood and respected "your wishes to not report this matter further to the authorities or through the Sexual Misconduct policy here on Grounds"); Pl. Ex. 18 at RS017033 ("Never forget, however, that it is YOUR choice.").

[64] Def. Ex. 18 at RS018811.

[65] Erdely further buttressed her critical viewpoints by consulting with authorities in the field who agreed with her views on UVA's obligations to campus safety and the problems of victim choice. 10/21/2016 Trial Tr. (Vol. 2) 15:14-16:13 (Erdely) (discussing views of S. Daniel Carter); Def. Ex. 64 at RS004235 (reflecting views of S. Daniel Carter); 10/21/2016 (Vol. 2) at 20:1-24:23, 26:13-28:15 (Erdely) (discussing views of Laura Dunn); Def. Ex. 64 at RS004300-4301 (reflecting views of Laura Dunn). Moreover, Erdely presented her viewpoints on victim choice and campus safety to UVA President Teresa Sullivan for comment and included Sullivan's denial that "the administration sweeps sexual assault under the rug" in the Article. Pl. Ex. 124 at 16:25-18:25, 20:14-22:13, 28:12-31:3, 35:5-37:17; 10/21/2016 Trial Tr. (Vol. 2) at 91:4-15 (Erdely).

[66] 10/22/2016 Trial Tr. at 94:7-95:3 (Erdely).

[67] 10/21/2016 Trial Tr. (Vol. 2) at 105:20-106:15 (Erdely); Pl. Ex. 46 at RS013302.

viewed portions of Eramo's WUVA interview, including Eramo's comments about survivors finding satisfaction in the informal resolution process because they can "look into the eyes of that other person and say, you wronged me in some way" and "they're generally feeling quite satisfied with the fact that the person has admitted that they've done something wrong."[68] The reasonableness of Erdely's conclusion that UVA did not treat rape seriously enough cannot be seriously challenged, given the evidence presented at trial that the Office for Civil Rights later found that the same WUVA interview "communicate[d] the official position of the university that *limited sanctions would be imposed for sexual misconduct brought to the university's attention*."[69] Indeed, Eramo admitted at trial that "people might think that UVA did not take sexual assaults seriously enough based on the fact that no student had been expelled for sexual assault" during the time that she served as chair of the Sexual Misconduct Board.[70]

Given the complex and ambiguous nature of Jackie's case, Erdely was entitled to adopt the "rational interpretations" regarding UVA's and Eramo's response to it. *Pape*, 401 U.S. at 290. To be sure, Erdely phrased some of the Post-Article Statements in an off-the-cuff, hyperbolic fashion that present them in stronger language than that used in the Article. Her use of the phrases "seek to suppress" and "really I feel she was sort of discouraged" do not precisely reflect the Article's more nuanced argument that inaction is an *unintended consequence* of UVA's deference to victim choice, not a deliberate purpose of the practice.[71] Similarly, Erdely's statements that the UVA administration "did nothing" or "kind of brushed off" Jackie's allegations are obvious overstatements of the argument that UVA should have taken more

---

[68] Def. Ex. 48 at 17:6-14; 10/21/2016 Trial Tr. (Vol. 2) at 108:24-109:15 (Erdely); 10/22/2016 Trial Tr. at 94:7-95:3 (Erdely).

[69] 10/19/2016 Trial Tr. at 79:1-80:10 (Eramo) (emphasis added).

[70] 10/19/2016 Trial Tr. at 64:15-65:1 (Eramo).

[71] *See* Pl. Ex. 1 at RS001076 (explaining both sides of the debate over victim choice).

proactive steps to investigate Jackie's allegations and/or warn the campus.[72]  But the First

Amendment protects this type of colorful expression, and Plaintiff adduced no evidence that

Erdely actually realized her statements were false or that she subjectively doubted them at the

time she made them.  *See Church of Scientology*, 992 F.2d at 1330-35 (affirming grant of

summary judgment on actual malice grounds; while defendant's statement that the Church of

Scientology was "no church" and that "every judge and every investigative journalist who has

ever looked at it has come away with that conclusion" was not literally accurate, his statements

were generally supported by magazine and news articles he read that painted a picture of the

Church that was "at odds with a common understanding of what a 'church' is").

In short, the First Amendment protects Erdely's rational interpretations of complex and

ambiguous events set forth in the Post-Article Statements.  No reasonable jury could have found

that Erdely acted with actual malice with respect to them, and therefore judgment as a matter of

law in Erdely's favor on these four statements is warranted.

### 3.     Plaintiff's Theories of Actual Malice Do Not Support the Verdict Against Erdely

Plaintiff attempted to show that Erdely acted with actual malice by putting on evidence

that Eramo arranged for Jackie to meet with the police about her sexual assault, but Plaintiff

adduced no evidence that Erdely knew this fact prior to publication.  To the contrary, Erdely's

testimony was unequivocal that she understood these meetings to be about the bottle incident

only, and the documents Erdely had in her possession prior to publication all supported that

view.[73]  The April 2014 emails that Plaintiff relies on refer exclusively to the bottle incident;[74]

---

[72] Pl. Ex. 1 at RS001078-79 (noting that Jackie conveying information about two additional Phi Psi victims "should compel the school to take action out of regard for campus safety").

[73] 10/21/2016 Trial Tr. (Vol. 2) at 33:17-37:15, 41:22-42:4 (Erdely); 10/20/2016 Trial Tr. at 198:22-25, 201:15-202:16, 202:22-204:13 (Erdely); Def. Ex. 64 at RS004313; Pl. Ex. 18; Pl. Ex. 87.

[74] Pl. Ex. 18 at RS017033, RS017035.

nowhere do they reference reporting Jackie's gang rape to the police. Even more critically, Erdely filed a freedom of information request with the Charlottesville Police Department and received a letter that confirmed that Jackie reported the bottle attack and conveyed no information about Jackie reporting or speaking to the police about her sexual assault.[75] With all this information in hand, Plaintiff's suggestion that Erdely consciously avoided the truth by failing to specifically ask Jackie whether she had spoken to the police about her sexual assault[76] or by failing to contact Officer Rexrode[77] is nonsense. No principle of journalism, much less the law of actual malice, would require Erdely to have gone further than contacting the Charlottesville Police Department for its official account of what Jackie reported.

Likewise, Plaintiff's attempt to premise actual malice on Erdely's supposed "preconceived storyline" fails to support the jury's verdict. Plaintiff introduced evidence that Erdely had written a handful of articles in the course of her twenty-plus-year career that Plaintiff self-servingly characterizes as about "institutional indifference,"[78] told sources that she'd written a "similar" article on rape in the military,[79] used the words "institutional indifference" (among many others) in general statements to sources and colleagues about the Article,[80] wrote a story proposal that drew on media accounts of ongoing controversies about sexual assault on college campuses,[81] and transparently shared her views with Jackie and Alex Pinkleton on the

---

[75] Pl. Ex. 87 at RS015352-53.

[76] See 10/20/2016 Trial Tr. at 205:8-15, 206:1-207:4 (Erdely); 10/24/2016 Trial Tr. (Vol. 1) at 84:12-22 (Erdely).

[77] 11/1/2016 Trial Tr. (Vol. 1) at 85:8-10 (closing argument).

[78] 10/19/2016 Trial Tr. at 209:20-224:19 (Erdely).

[79] 10/19/2016 Trial Tr. at 225:20-228:12; 230:23-232:8 (Erdely); Pl. Ex. 23 at RS016890; Def. Ex. 64 at RS004099 ("I'm hoping to look into colleges in much the same way").

[80] 10/19/2016 Trial Tr. at 240:25-245:9 (Erdely); Def. Ex. 64 at RS004116, RS004256; 10/20/2016 Trial Tr. at 196:1-198:19 (Erdely); Pl. Ex. 146 ("The theme will be about the culture of inaction and silence at UVA.").

[81] 10/19/2016 Trial Tr. at 232:9-239:7 (Erdely); Pl. Ex. 19.

shortcomings she perceived in Eramo's and UVA's handling of Jackie's case.[82]  None of this rationally creates an inference that Erdely *subjectively disbelieved* any of the challenged statements.  If anything, it demonstrates just the opposite:  that Erdely genuinely believed UVA and Eramo were not handling Jackie's case appropriately.  As the Fourth Circuit has recognized, "many publications set out to portray a particular viewpoint or even to advance a partisan cause.  Defamation judgments do not exist to police their objectivity; the First Amendment presupposes that a veritable medley of opposing voices is better suited to the search for truth."  *Reuber*, 925 F.2d at 716.  Here, a reasonable jury could have found that Erdely was not entirely objective, but it could not have found that she subjectively doubted the statements she made.

Finally, Plaintiff's theory that Erdely's reliance on Jackie showed conscious avoidance of the truth does not pass muster.  In fact, the jury must have found that Erdely *did not* act with actual malice in relying on Jackie as a source, given the verdict on Statement 2.  Special Verdict Form Number One at 2.[83]  Thus, the jury's findings on the other statements cannot logically be premised on Erdely's trust in Jackie or her failure to take further steps to investigate Jackie's story.[84]  But even if the jury had not done so, the record reveals no basis for finding conscious

---

[82] 10/20/2016 Trial Tr. at 245:17-252:13 (Erdely); 10/24/2016 Trial Tr. (Vol. 1) at 69:1-25 (Erdely); Def. Ex. 64 at RS004380-82, RS004383; Pl. Ex. 24; Pl. Ex. 25 at RS118384-90, RS118393-95. Plaintiff also questioned Erdely about telling President Sullivan that the survivors who meet with Eramo come away "also kind of paralyzed from the lack of guidance," saying that the survivors never told Erdely that they felt paralyzed.  But Erdely accurately pointed out that this was "my observation from their own behaviors."  10/24/2016 Trial Tr. (Vol. 1) 65:6-66:3 (Erdely).

[83] The jury's rejection of actual malice in connection with Erdely's reliance on Jackie is not surprising given the plethora of reasons Erdely had to reasonably believe that Jackie was a credible and reliable source.  *See, e.g.* 10/20/2016 Trial Tr. at 321:9-10, 322:7-16, 324:11-18, 324:24-325:12 (Erdely); 10/21/2016 Trial Tr. (Vol. 1) at 10:25-11:7, 11:14-23, 14:20-23, 17:10-18:1, 18:7-16, 21:16-22:3, 25:8-26:8, 27:1-9, 32:13-33:2, 64:10-13, 65:4-20 (Erdely); 10/21/2016 Trial Tr. (Vol. 2) at 73:25-75:1 (Erdely); 10/22/2016 at 19:6-21:3, 23:15-23, 24:9-24, 27:25-28:2, 28:3-11, 30:12-31:4 (Erdely). Tellingly, nearly all of Plaintiff's witnesses testified that they believed Jackie's story before publication.  10/26/2016 Trial Tr. (Vol. 1) at 148:11-149:1 (Groves); 10/27/2016/ Tr. (Vol. 2) at 171:19-22, 172:3-5 (Surface); 10/26/2016 Trial Tr. (Vol. 2) at 50:2-7, 55:8-11 (Pinkleton).  Eramo expressed no skepticism about Jackie's story prior to publication and testified that Jackie's allegations "raised serious concerns for public safety."  10/19/2016 Trial Tr. at 27:13-15 (Eramo).

[84] 11/1/2016 Trial Tr. (Vol. 1) at 45:13-65:15 (closing argument).

34

avoidance of the truth. Erdely testified unequivocally that she subjectively believed the Article to be accurate at the time of publication and only began to doubt its accuracy on December 5, 2014,[85] and this testimony was backed up by contemporaneous evidence that demonstrated exactly when Erdely first lost faith in Jackie's credibility.[86] Furthermore, the linchpin of conscious avoidance is a deliberate choice not to acquire knowledge of facts that might undermine the story. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. at 682-84, 691-92 (1989). Here, Plaintiff put on no evidence that even suggests that Erdely deliberately avoided reaching out to Drew, the three friends, or anyone else because she believed those individuals would disprove Jackie's story. To the contrary, the record demonstrates that Erdely aggressively pursued potential sources and documents that would support Jackie's story, but ultimately was unsuccessful, in part due to Jackie's deliberate deceptions.[87]

In sum, Plaintiff failed to offer any evidence—much less clear and convincing evidence—showing that Erdely harbored "serious doubts" as to the truth of any challenged statement prior to publication. Therefore, judgment as a matter of law is appropriate.

### C. None of the Statements Forming the Basis for the Jury's Verdict Are Actionable as a Matter of Law

#### 1. Statements 1 and 3 (Article)

Defendants are entitled to judgment as a matter of law with respect to Statements 1 and 3 because Plaintiff's claims rest on a patently unreasonable reading of the statements. When read

---

[85] 10/20/2016 Trial Tr. at 287:19-23, 288:8-13 (Erdely); 10/24/2016 Trial Tr. (Vol. 1) at 80:15-19 (Erdely); 10/24/2016 Trial Tr. (Vol. 1) at 79:20-80:11 (Erdely).

[86] Pl. Ex. 40 at RS014976-78 (notes of December 5 telephone calls); Pl. Ex. 41 (December 5 email); Pl. Ex. 70 (December 5 voicemail); Def. Ex. 38 (December 4 draft statement defending Article); Def. Ex. 63 (later draft of December 4 statement defending Article); 10/22/2016 Trial Tr. at 108:18-112:7, 114:3-123:24,125:2-13, 125:14-25 (Erdely).

[87] *See, e.g.* 10/20/2016 Trial Tr. at 325:14-326:11 (Erdely); 10/21/2016 Trial Tr. (Vol. 1) at 12:12-13:21, 15:12-16:11, 16:12-17:7 (Erdely); 10/22/2016 Trial Tr. at 47:9-48:25 (Erdely); Pl. Ex. 12; Pl. Ex. 35 at RS118230-31; Pl. Ex. 36; Pl. Ex. 69; Pl. Ex. 73; Pl. Ex. 113; Def. Ex. 11.

in context, as the law requires, neither statement is defamatory as a matter of law and no reasonable jury could have found them actionable.

"To be defamatory as a matter of law, a statement must be more than merely unpleasant or offensive; it must make the plaintiff appear odious, infamous, or ridiculous." *Chapin v. Greve*, 787 F. Supp. 557, 562 (E.D. Va. 1992), *aff'd sub nom. Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993) (internal quotation marks and citation omitted). Where, as here, the Plaintiff relies on innuendo or implication, "[a] defamatory implication must be present in the plain and natural meaning of the words used." *Chapin*, 993 F.3d at 1092. "[T]he meaning of the alleged defamatory language cannot, by innuendo, be extended beyond its ordinary and common acceptation." *Webb v. Virginian-Pilot Media Cos.*, 752 S.E.2d 808, 811 (Va. 2014). "The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." *Chapin*, 993 F.2d at 1092-93.

Here, Statement 1's immediate context makes clear that "discouraged her from telling her story" refers specifically to Jackie's participation in the *Rolling Stone* article. The paragraph where Statement 1 appears begins with the topic sentence: "Two years later, Jackie, now a third-year, is worried about what might happen to her ***once this article comes out***." After the challenged statement, the paragraph concludes: "On this deeply loyal campus, even some of Jackie's closest friends see her ***going public*** as tantamount to betrayal." And the next paragraph underscores once again that Jackie is receiving pushback specifically about "going public" in a national magazine article, when Jackie relates how one of her roommates said "***Do you want to be responsible for something that's gonna paint UVA in a bad light?***"[88] Nowhere in the

---

[88] Pl. Ex. 1 at RS001072 (emphasis added).

immediate context of Statement 1 is there any textual anchor for Plaintiff's interpretation that this statement means that Eramo discouraged Jackie from moving her case forward or from sharing her story generally at events like "Take Back the Night."[89]

Moreover, Plaintiff's proposed readings of Statement 1 are inconsistent with the Article as a whole, which shows Eramo comforting and supporting Jackie, laying out her options neutrally, and offering to help Jackie "hold these men accountable."[90] The Article also makes clear that Eramo connected Jackie with Emily Renda, a supportive fourth-year student activist to whom Jackie "poured out her whole story" and felt "flooded with gratitude" by Ms. Renda's response.[91] This led to Jackie's connection with One Less, an organization that helped her feel less "isolated" and inspired her to "share[] her story" with other women on campus.[92] Thus, in its full context, the word "discouraged" can only reasonably mean "discouraged" from cooperating with Rolling Stone or using Jackie's name in the Article.

Properly understood, Statement 1 is not defamatory. During oral argument on Defendants' Rule 50(a) motion, the Court agreed that if the statement refers only to Jackie being discouraged from speaking to Rolling Stone, it is not actionable:

> Again, Ms. McNamara reads this as an effort by Ms. Erdely only to talk about Dean Eramo's effort to discourage Jackie from talking with Rolling Stone, and she says that's the only reasonable interpretation that can be attached to it and, *if that's true, then it's not actionable*.[93]

---

[89] 11/1/2016 Trial Tr. (Vol. 1) at 66:13-67:24 (closing argument).

[90] Pl. Ex. 1 at RS001076-77.

[91] *Id*. at RS001078.

[92] *Id*.

[93] 10/28/2016 Trial Tr. (Vol. 2) at 51:14-18 (emphasis added). The Court ultimately submitted the statement to the jury believing that the jury could decide how to interpret it. *See* 10/28/2016 Trial Tr. (Vol. 2) at 84:19-85:6. For the reasons explained in this section, Defendants respectfully disagree that any reasonable jury could accept the Plaintiff's interpretations.

Defendants agree. It is not defamatory for a professional like Ms. Eramo, concerned about a college student's well-being and the intense pressure and publicity that would likely come from an article like this, to counsel that student against sharing her story with a national magazine. Furthermore, Plaintiff admitted in her testimony that this was true: she *was* concerned about Jackie participating in the Rolling Stone article. She testified: "I was concerned on two fronts. I was concerned about her well-being, that this would be somewhat—could be a traumatic experience in and of itself, and I was concerned about undermining a potential investigation, yes."[94] Because the only reasonable reading of this statement is neither defamatory nor false, no reasonable jury could have found that Statement 1 is actionable.

Similarly, no reasonable jury could have found Statement 3 actionable. In context, the word "nonreaction" can only reasonably be understood as referring to Eramo's *visible emotional reaction* upon hearing Jackie's revelation about two other victims. This is evident from the sentence immediately following it: "She'd expected shock, disgust, horror."[95] And, as noted above, the Article makes clear that Eramo did many supportive and helpful things in response to Jackie's allegations, plainly contradicting any impression that Statement 1 could mean that Eramo literally did nothing or reacted in a callous manner to Jackie's allegations.

There is nothing defamatory about portraying Eramo as acting with a calm, neutral demeanor in response to Jackie's allegations, rather than having a visible emotional outburst. Indeed, Plaintiff confirmed at trial that "it wasn't [her] practice to react in some kind of a[n] aghast or shocked manner to revelations by a student."[96] Nor did Plaintiff testify that she did, in fact, have a dramatic visible outburst, rendering the description false. Furthermore, Jackie's

---

[94] 10/19/2016 Trial Tr. at 31:9-16 (Eramo). *See also id.* at 92:20-24 ("I had reservations regarding her well-being and undermining our potential investigation.").

[95] Pl. Ex. 1 at RS001078.

[96] 10/18/2016 Trial Tr. (Vol. 2) at 190:3-7 (Eramo).

perception of Eramo's physical reaction in a one-on-one meeting—and Jackie's personal

response to that reaction ("she was *disappointed*")—are opinions not capable of being proven

true or false.

At oral argument on Defendants' Rule 50(a) motions, the Court agreed with Defendants

that the "literal" reading of this passage—that Eramo did not have an immediate physical or

facial reaction—is not actionable:

> If it's as Ms. McNamara posits, then there's no way to prove it to be truthful or
> not. If she's right, it's not subject to being proven. It can't be defamatory.
> There's no way to establish that it's a false statement.[97]

But the Court allowed this statement to go to the jury because it believed the jury should

determine whether the statement refers to Plaintiff's "physical reaction" or whether it was

instead a broader reference to "what Eramo did in response" to Jackie's allegations—i.e., "not

immediately pursuing the perpetrators, not immediately shutting down the fraternity."[98] Not

only is this alternate reading foreclosed by the context—which clearly refers only to an

immediate physical reaction ("shock, disgust, horror")—but it is also non-actionable opinion. If

"nonreaction" sums up the whole of Plaintiff's—and UVA's—response to Jackie's allegation,

then it is a subjective judgment about the adequacy of that response, which is plainly opinion.

*See also infra* at 39-41. Accordingly, judgment as a matter of law is warranted on Statement 3.

## 2. The Post-Article Statements (Statements 5, 7, 8, and 10)

The Post-Article Statements are similarly non-actionable. The First Amendment fully

protects the expression of subjective viewpoints that cannot be proven true or false. *See, e.g.*,

*Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998) ("When a speaker plainly

expresses a subjective view, an interpretation, a theory, conjecture, or surmise, rather than [a]

---

[97] 10/28/2016 Trial Tr. (Vol. 2) at 53:11-15.

[98] 10/28/2016 Trial Tr. (Vol. 2) at 23:6-12, 85:23-86:7.

claim[] to be in possession of objectively verifiable [false] facts, the statement is not actionable.") (internal quotation marks and citation omitted).[99]  Likewise, the First Amendment protects rhetorical hyperbole that cannot reasonably be understood as stating actual facts about the plaintiff.  *See, e.g.*, *CACI*, 536 F.3d at 304 (finding the description of CACI as "hired killers" was "exaggerated rhetoric intended to spark the debate about the wisdom of the use of contractors in Iraq").  As set forth in Defendants' summary judgment papers, Erdely's statements to the Brian Lehrer Show (Statement 5), the Slate DoubleX podcast (Statements 7 and 8), and the *Washington Post* (Statement 10) are all statements of opinion and rhetorical hyperbole.[100]  They are simply off-the-cuff shorthand, expressed in loose and figurative language, for the opinions expressed in the Article:  namely, that UVA should have taken independent action to investigate Jackie's allegations and to warn the campus, that victim-choice lulls survivors into inaction, and that UVA does not treat rape seriously enough as a disciplinary matter.  *See supra* at 27-28.

Furthermore, these opinions were based on facts that were not disputed at trial.  For instance, Eramo and Dean Groves testified at trial that UVA's policies and federal law required the school to "investigate and take reasonable action" in response to Jackie's allegations even if Jackie herself did not want to pursue them, and that UVA's obligation to conduct an investigation was "independent" of whether police decided to undertake a criminal investigation.[101]  There is also no dispute that UVA was aware of three allegations of gang rape

---

[99] Notably, another district court analyzing Erdely's post-Article interviews held the statements in question to be protected opinion.  *See Elias v. Rolling Stone LLC*, --- F. Supp. 3d ---, 2016 WL 3583080, at *9 (S.D.N.Y. June 28, 2016) (dismissing claims based on Erdely's comments on Slate DoubleX podcast because "her statements were phrased in a way that readily identified them as speculation and hypothesis"), appeal filed, No. 16-2465 (2d Cir. July 15, 2016).

[100] *See* Def. SJ Br. (Dkt. 102) at 66-69; Def. SJ Reply Br. (Dkt. 136) at 34-45.

[101] 10/18/2016 Trial Tr. (Vol. 2) at 171:10-24 (Eramo); 10/26/2016 Trial Tr. (Vol. 1) at 91:17-93:23, 95:11-21, 96:17-97:18 (Groves); Def. Ex. 45 at UVA040000772-74.

at Phi Kappa Psi by at least May 2014.[102]  Eramo testified at trial that Jackie's allegations "raised serious concerns for public safety" and that Dean Groves shared her "quite escalated" concerns.[103]  Yet despite these concerns, it is also undisputed that UVA did not commence any investigation of Phi Kappa Psi until September 2014[104] and never issued a warning to the campus.[105]  Accordingly, Erdely's comments that the University "kind of brushed off" Jackie (Statement 5), "did nothing" (Statements 5), "chose not to act" (Statement 10), and responded with "indifference" to Jackie's allegations (Statement 10) were all expressions of her subjective belief, based upon these undisputed facts, that UVA was not responding appropriately to Jackie's claims.  *See also supra* at 28-29.

Likewise, Erdely's opinion that Jackie was "sort of discouraged" from moving her case forward (Statement 7), that the administration "would seek to suppress" her allegations (Statement 7), and that she "really hasn't had" a "great deal of support" from the administration (Statement 8) are all variations on the Article's critique that UVA deferred to victim choice, which may result in few students choosing to move forward with administrative action.  These opinions, again, are based upon facts that were not disputed at trial.  *See supra* at 30.  Similarly, Erdely's opinion that the UVA administration "doesn't really treat rape as a crime, as a violent crime" (Statement 7) is based on the undisputed facts that Erdely was aware of at the time.  *See supra* at 30-31.  Accordingly, because all of these statements are opinions based upon facts that were undisputed at trial, judgment should be directed for Erdely on these statements.

---

[102] *See supra* at 28-29 & note 55.

[103] 10/19/2016 Trial Tr. at 22:9-14, 27:13-17 (Eramo).

[104] 10/26/2016 Trial Tr. (Vol. 1) at 122:9-11 (Groves); 10/19/2016 Trial Tr. at 34:9-17 (Eramo); Pl. Ex. 9 at UVA030008651, UVA030008654.

[105] 10/19/2016 Trial Tr. at 54:24-55:4 (Eramo).

Finally, judgment as a matter of law is appropriate on the Post-Article Statements because none of them are specific statements about Eramo personally and were therefore not of and concerning her. Instead, they all refer to "UVA," the "administration," or "the University." Indeed, Eramo's name **does not appear** in any of the challenged Post-Article Statements, and Erdely herself never uttered Eramo's name during any of these interviews. Nor is Eramo the only UVA administrator referenced in the Article. The Article also quotes UVA President Teresa Sullivan,[106] Associate Vice President for Student Affairs Susan Davis,[107] Dean of Students Allen Groves,[108] as well as former UVA dean John Foubert and another former dean of students who told Mr. Foubert that UVA could "pick our lawsuit from a potential sixth victim, or from [the perpetrator], for denying him access to an education."[109]

As the Court properly recognized in its instructions to the jury, UVA is not permitted to sue for defamation because it is a public entity. Jury Instructions at 29. *See Rosenblatt v. Baer*, 383 U.S. 75, 81 (1966) ("[P]rosecutions for libel on government" are something that "the Constitution does not tolerate in any form."). The Supreme Court has made clear that public employees like Plaintiff may not "transmut[e] criticism of government . . . into personal criticism, and hence potential libel, of the officials of whom the government is composed," holding that such suits "strike[] at the very center of the constitutionally protected area of free expression." *New York Times*, 376 U.S. at 292 (reversing judgment in defamation case brought by police commissioner over advertisement criticizing police department response to Dr. Martin

---

[106] Pl. Ex. 1 at RS001074.

[107] *Id.* at RS001076.

[108] *Id.* at RS001079.

[109] *Id.* at RS001077. Furthermore, the word "indifference" in Statement 10 refers to "the culture that greeted [Jackie] *and so many other UVA women I interviewed*"—a group that spans three decades and includes Liz Seccuro (1984), two female students including Susan Russell's daughter (2002 and 2004), and the woman who was told that additional lighting on campus would "ruin Jefferson's vision" for the university (1993), all of whom predate Eramo's tenure on the Sexual Misconduct Board.

Luther King's protests in Montgomery).  Accordingly, because all of the Post-Article Statements criticize the UVA administration generally, rather than Eramo personally, judgment should be directed for Defendants.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should grant Defendants' Rule 50(b) motion for renewed judgment as a matter of law and should enter judgment for Defendants notwithstanding the jury's verdict.


Dated: New York, New York
December 5, 2016

By: /s/ Elizabeth A. McNamara

Elizabeth A. McNamara (*pro hac vice*)
Samuel M. Bayard (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York  10020-1104
Telephone: (212) 489-8230
Fax:          (212) 489-8340
Email:     lizmcnamara@dwt.com
                samuelbayard@dwt.com

Alison Schary (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, D.C.  20006-3401
Telephone:  (202) 973-4248
Fax:          (202) 973-4448
E-mail:        alisonschary@dwt.com

W. David Paxton (VSB No. 19798)
J. Scott Sexton (VSB No. 29284)
Michael J. Finney (VSB No. 78484)
GENTRY LOCKE
10 Franklin Road S.E., Suite 900
P.O. Box 40013
Roanoke, Virginia  24022-0013
Telephone:  (540) 983-9300
Fax:          (540) 983-9400

43

E-mail:      paxton@gentrylocke.com
E-mail:      sexton@gentrylocke.com
E-mail:      finney@gentrylocke.com

*Attorneys for Defendants Rolling Stone LLC,*
*Sabrina Rubin Erdely, and Wenner Media LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2016, the foregoing was served by CM/ECF on

counsel of record for all parties to this action.  Notice of this filing will be sent by email to all

parties by operation of the Court's electronic filing system or by mail to anyone unable to accept

electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing

through the Court's CM/ECF System.


/s/ Elizabeth A. McNamara
Elizabeth A. McNamara