# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | | |
|---|---|---|
| NICOLE P. ERAMO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:15-cv-00023-GEC |
| | ) | |
| ROLLING STONE LLC, | ) | |
| SABRINA RUBIN ERDELY, and | ) | |
| WENNER MEDIA LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PROPOSED *AMICI CURIAE* BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND EIGHT MEDIA COMPANIES IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

Caitlin Vogus
*Counsel of Record*
Bruce D. Brown
Gregg P. Leslie
Ariel B. Glickman
THE REPORTERS COMMITTEE
   FOR FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1250
Washington, D.C. 20005
Telephone: (202) 795-9300
cvogus@rcfp.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

STATEMENT OF INTEREST.................................................................................................. iv

DISCLOSURE STATEMENTS ................................................................................................. v

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 1

ARGUMENT ............................................................................................................................. 2

I.      Public policy concerns clearly favor and encourage corrections and clarifications to news
        stories. ........................................................................................................................... 2

        A.      Journalists have always recognized an interest in admitting mistakes; doing so on the
                internet in a way that will reach substantially the same audience means that the
                explanation should appear on the original page. ............................................................ 2

        B.      Corrections and clarifications help rebut allegations of actual and common law malice
                and provide evidence to mitigate damages in a defamation case, demonstrating that
                the public interest is served by allowing and encouraging new information explaining
                developments in controversial articles. ......................................................................... 8

CONCLUSION ...................................................................................................................... 10

APPENDIX A: DESCRIPTION OF AMICI ............................................................................ 12

APPENDIX B: ADDITIONAL COUNSEL ............................................................................ 14

i

**Cases**

*Di Lorenzo v. N.Y. News, Inc.*, 78 A.D.2d 669 (N.Y. App. Div. 1980) ..................................... 8, 9

*Hoffman v. The Washington Post Co.*, 433 F. Supp. 600 (D.D.C. 1977), *aff'd mem.*, 578 F.2d 442 (D.C. Cir. 1978) ................................................................................................................. 8, 9

*James v. Powell*, 152 S.E. 539 (Va. 1930) ..................................................................................... 9

*Kerwick v. Orange Cnty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 438 N.Y.S.2d 778 (1981) . 9

*Logan v. District of Columbia*, 447 F. Supp. 1328 (D.D.C. 1978) .................................................. 8

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) .................................................................. 2

*The News Leader Co. v. Kocen*, 3 S.E.2d 385 (Va. 1939). .............................................................. 9

*Times-Dispatch Publ'g Co. v. Zoll*, 139 S.E. 505 (Va. 1927) ........................................................ 9

*Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066 (5th Cir. 1987) ............................................... 8

**Statutes**

VA. CODE ANN. § 8.01-48 (West 1977) .......................................................................................... 9

**Other Authorities**

Anthony De Rosa, *A rule for online news: Errors are inevitable; lack of transparency is not*, L.A. TIMES (Aug. 25, 2015, 5:00 AM), http://lat.ms/1WQMoV8, *archived at* https://perma.cc/CK6A-Y9V6 ............................................................................................... 4

Articles by Jayson Blair Since June 1998, N.Y. TIMES, http://nyti.ms/2gc2B63, *archived at* https://perma.cc/3NZ5-RUNM ........................................................................................... 7

Craig Silverman, *How journalists can do a better job of correcting errors on social media*, POYNTER (July 26, 2012), http://bit.ly/2h0aiha, *archived at* https://perma.cc/3DRQ-APEK .... 1

Craig Silverman, *Scrubbing Away Their Sins*, COLUMBIA JOURNALISM REVIEW (Dec. 5, 2008, 11:58 AM), http://bit.ly/2h44feF, *archived at* https://perma.cc/ZT5H-VR2S.......................... 4

Dan Barry et al., *CORRECTING THE RECORD; Times Reporter Who Resigned Leaves Long Trail of Deception*, N.Y. TIMES (May 11, 2003), http://nyti.ms/1F2RYcH, *archived at* https://perma.cc/7HZC-UCXD ........................................................................................... 8

Deborah Howell, *Policy vs. Reality in Correcting Errors*, WASH. POST (May 7, 2006), http://wapo.st/2g80v75, *archived at* https://perma.cc/9RSN-9NR6 ......................................... 3

Deborah Howell, *The Right Way to Admit a Mistake*, WASH. POST (May 14, 2006), http://wapo.st/2fYrhDZ, *archived at* https://perma.cc/B7M9-UN3F ...................................... 2

Digital Publishing Guidelines, *Corrections and clarifications*, WASH. POST (Sept. 1, 2011), http://wapo.st/2ga1tmI, *archived at* https://perma.cc/HW3H-SWES ....................................... 5

E.R. Shipp, *We Make Mistakes*, WASH. POST (Aug. 8, 1999), http://wapo.st/2gPk34i, *archived at* https://perma.cc/7MHE-U46M ................................................................................ 3

*Editors group releases preliminary journalism credibility study*, AM. SOC'Y OF NEWSPAPER EDITORS (Dec. 15, 1998), http://bit.ly/2heAacC, *archived at* https://perma.cc/EU54-XENR. .. 3

Janet Cooke, *Jimmy's World*, WASH. POST (Sept. 28, 1980), http://wapo.st/2h7b0Ki, *archived at* https://perma.cc/T7YX-4B43.............................................................................. 7

Jayson Blair, *Detective Says Sniper Suspect Was Interrogated After He Requested Lawyer*, N.Y. TIMES (Apr. 29, 2003) http://nyti.ms/2glBcC8, *archived at* https://perma.cc/Y5D4-PBKP ...... 7

Mallory Jean Tenore, *5 Ways News Organizations Respond to 'Unpublishing' Requests*, POYNTER INST. (July 19, 2010), http://bit.ly/2gqTS0S, *archived at* https://perma.cc/6JD6-YEZZ ............................................................................................................................................. 5

*Mr. Daisey and the Apple Factory Transcript*, THIS AM. LIFE (2012), http://bit.ly/2gW610L, *archived at* https://perma.cc/A4P3-AB4Q..................................................................... 8

Scott R. Maier, *Confessing Errors in a Digital Age*, NIEMANREPORTS (Sept. 16, 2009), http://bit.ly/2gPiZgZ, *archived at* https://perma.cc/U7E2-MVYA........................................... 5

*See* Deborah Howell, *The Right Way to Admit a Mistake*, WASH. POST (May 14, 2006), http://wapo.st/2fYrhDZ, *archived at* https://perma.cc/B7M9-UN3F ...................................... 4

SPJ Code of Ethics, http://www.spj.org/ethicscode.asp, *archived at* https://perma.cc/JVE3-FQ5J ................................................................................................................................................. 3

U.C.C.D.A., *available at* http://bit.ly/2g9Cgst ............................................................................ 6

iii

**STATEMENT OF INTEREST**

The Reporters Committee for Freedom of the Press ("Reporters Committee") and eight additional *amici* listed below, through undersigned counsel, respectfully submit this memorandum as *amici curiae* in support of Defendants. Defendants consent to the filing of this memorandum; Plaintiff does not.

As representatives of the news media, *amici* have an interest in ensuring that reliable information is disseminated in a way that benefits and serves the public interest. Like Defendants, *amici* are news organizations that employ editor's notes to communicate with and serve the public interest when new information relating to a publication comes to light. *Amici* wish to stress to this Court that publishers should not be penalized for informing the public of developing information and explaining their newsgathering decisions when inaccuracies are discovered. Rather, this Court should encourage appending letters from the editor and notes to readers that set the record straight and avoid chilling debate on matters of public concern.

In addition to the Reporters Committee, the *amicus* parties are: American Society of News Editors, The Associated Press, Gannett Co., Inc., Landmark Media Enterprises, LLC, Online News Association, Radio Television Digital News Association, Society of Professional Journalists, and The Washington Post.

Each is described more fully in Appendix A.

## DISCLOSURE STATEMENTS

American Society of News Editors is a private, non-stock corporation that has no parent.

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law. It is not publicly traded.

Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company holds 10% or more of its stock.

Landmark Media Enterprises, LLC is a privately held company and no public company owns 10% or more of its stock.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

WP Company LLC d/b/a The Washington Post is a wholly owned subsidiary of Nash Holdings LLC. Nash Holdings LLC is privately held and does not have any outstanding securities in the hands of the public.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

*Amici* submit this brief to discuss the first question presented by the Defendants' motion for judgment notwithstanding the verdict – whether, as a matter of law, adding an "editor's note" to an existing article on a website constitutes a "republication" of the underlying facts in the original article. When the note seeks to provide more information and in fact admits flaws in the original reporting, the question must be answered in the negative. Any other result would harm the public interest in reporting the truth.

Furthermore, in an age where a growing number of people rely upon online publications for their news, which are often reposted and redistributed through social media like Facebook and Twitter, the need to post additional information that updates an article – whether by backing off from reported conclusions or directly correcting, clarifying, or retracting statements – has become even more important. Because such modifications need to be timely and prominent and should reach the same audience as the original article, it only makes sense that in the realm of online reportage, the new information should appear on the original page. An ongoing discussion through social media will certainly provide links to the original, where readers will see the note.

But the need for journalists to append clarifications and ensure the accuracy of their work is nothing new. As early as 1690, the founder of the first newspaper in the United States had established a corrections policy, stating "when there appears any material mistake in anything that is collected, it shall be correct in the next." Craig Silverman, *How journalists can do a better job of correcting errors on social media*, POYNTER (July 26, 2012), http://bit.ly/2h0aiha, *archived at* https://perma.cc/3DRQ-APEK. By 1972, corrections had become common enough that *The New York Times* began dedicating a page for that sole purpose. *See id. The Washington*

1

*Post* now does so as well.  *See* Deborah Howell, *The Right Way to Admit a Mistake*, WASH. POST (May 14, 2006), http://wapo.st/2fYrhDZ, *archived at* https://perma.cc/B7M9-UN3F.

The Court's decision to have the jury determine whether the defamatory information was "republished" when an editor's note was attached would be harmful for news organizations and those who rely upon them for accurate news reports.  Upholding the current verdict would discourage the news media from correcting errors in their stories, particularly because not *mentioning* a particular fact from a story in the note constitutes "republishing" it.  The only recourse available would be to require news sites to completely remove stories when any question of credibility is raised.  Neither choice – ignoring errors or too quickly removing them – would serve the interests of the public; noting errors should never be considered a "republication."

## ARGUMENT

**I.     Public policy concerns clearly favor and encourage corrections and clarifications to news stories.**

There is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  The news media play an important role in upholding this commitment, and in order to ensure this uninhibited debate, they know they must remain accountable to their audience by correcting and clarifying disputed facts.  Accuracy leads to credibility and increases trust in those who report the news.

**A.  Journalists have always recognized an interest in admitting mistakes; doing so on the internet in a way that will reach substantially the same audience means that the explanation should appear on the original page.**

Journalists have always had a commitment to ethical standards by assuming responsibility for their errors and setting the record straight.  Being accountable to the public by updating

2

stories as needed is one way to reassure readers that the news media are dedicated to accuracy in their reporting.  As proof of the power of corrections and their contribution to reputable journalism, a 1998 study conducted by the American Society of Newspaper Editors found that 63 percent of newspaper readers "'feel better' about the quality of the news coverage" when there are corrections.  *Editors group releases preliminary journalism credibility study*, AM. SOC'Y OF NEWSPAPER EDITORS (Dec. 15, 1998), http://bit.ly/2heAacC, *archived at* https://perma.cc/EU54-XENR.

The code of ethics of the Society of Professional Journalists ("SPJ") instructs the press to "[t]ake responsibility for the accuracy of their work" and "[g]ather, update and correct information throughout the life of a news story."  SPJ Code of Ethics, http://bit.ly/1gKqH69, *archived at* https://perma.cc/JVE3-FQ5J.  As *The Washington Post* Stylebook states, "Preventing and correcting mistakes are two sides of the coin of our realm: accuracy.  Accuracy is our goal, and candor is our defense."  Deborah Howell, *Policy vs. Reality in Correcting Errors*, WASH. POST (May 7, 2006), http://wapo.st/2g80v75, *archived at* https://perma.cc/9RSN-9NR6; *see also* E.R. Shipp, *We Make Mistakes*, WASH. POST (Aug. 8, 1999), http://wapo.st/2gPk34i, *archived at* https://perma.cc/7MHE-U46M (quoting former *Post* executive editor Leonard Downie stating, "Errors should always be corrected.  It's part of the contract we have with our readers."). Journalism is a process, and that process is not complete even after publication.

Under the code, ethical journalists must be accountable to the public for what is printed, and should "[a]cknowledge mistakes and correct them promptly and prominently."  SPJ Code of Ethics, http://bit.ly/1gKqH69, *archived at* https://perma.cc/JVE3-FQ5J.  This standard requires journalists to provide readers with clear and detailed information about changes, so they know of and understand them, and in a place that readers are likely to see them.  *See* Deborah Howell,

3

*The Right Way to Admit a Mistake*, WASH. POST (May 14, 2006), http://wapo.st/2fYrhDZ, *archived at* https://perma.cc/B7M9-UN3F; Craig Silverman, *Scrubbing Away Their Sins*, COLUMBIA JOURNALISM REVIEW (Dec. 5, 2008, 11:58 AM), http://bit.ly/2h44feF, *archived at* https://perma.cc/ZT5H-VR2S.  Here, *Rolling Stone* did just that, appending an editor's note on December 5, 2014 – right above the original publication – that readers could easily find when searching for that article.

In the case of news published on the Internet, the news media can more quickly and meaningfully provide more in-depth modifications and updates than in the traditional print context.  An explanation of a mistake can be made at any time in the same place as the original article, where the same audience is more likely to see it.  In addition, "[d]igital publishing has made it possible for editors not only to scrub or enhance stories as they develop but also to pull back the curtain – to make sure readers see and understand what they've done."  *See* Anthony De Rosa, *A rule for online news: Errors are inevitable; lack of transparency is not*, L.A. TIMES (Aug. 25, 2015, 5:00 AM), http://lat.ms/1WQMoV8, *archived at* https://perma.cc/CK6A-Y9V6.  These updates, which are to the benefit of readers, should not be discouraged by being considered a republication of an underlying article.  Otherwise, no corrections could be made or follow-up reporting done without a complete retraction of a story or a reinvestigation of all facts.

 Once published online, stories are available in a wider variety of ways as they are blogged about, retweeted, "liked" on Facebook, and shared on a vast array of other platforms.  The articles can become subjects of wide-ranging discussions that all link to the original posting.  Thus, making modifications promptly at the original URL as developments occur may be even more important than making corrections to print publications, and the onus is upon the news media to clearly inform readers of deficiencies in their reporting.  Scott R. Maier, *Confessing*

4

*Errors in a Digital Age*, NIEMANREPORTS (Sept. 16, 2009), http://bit.ly/2gPiZgZ, *archived at* https://perma.cc/U7E2-MVYA ("Online errors don't disappear like yesterday's print edition. News organizations need to recognize what the new permanence means for errors and corrections, and act accordingly.").

Mallary Jean Tenore, the managing editor of the Poynter Institute's website, poynter.org, has pointed out that removing the original piece from the website is not always the solution. *See* Mallory Jean Tenore, *5 Ways News Organizations Respond to 'Unpublishing' Requests*, POYNTER INST. (July 19, 2010), http://bit.ly/2gqTS0S, *archived at* https://perma.cc/6JD6-YEZZ, *archived at* https://perma.cc/6JD6-YEZZ ("Most news organizations are reluctant to remove content from their Web sites.  They want to preserve the integrity of the archive, and worry that if they unpublish a story based on one request they'll have to do so for everyone who makes these requests.")  Appending a letter from the editor or note to readers above a questionable or mistaken article, as *Rolling Stone* did, is one effective approach to "promptly and prominently" alert readers.

*The Washington Post* follows this same policy, placing corrections on the same page as the original article on washingtonpost.com.  Its news guidelines state, "When a correction is made online, . . . [t]he change should be made within the article and the correction should also be noted at the top of the item."  *See* Digital Publishing Guidelines, *Corrections and clarifications*, WASH. POST (Sept. 1, 2011), http://wapo.st/2ga1tmI, *archived at* https://perma.cc/HW3H-SWES. The guidelines add: "As a matter of editorial policy, we do not grant take-down requests. . . . [O]ur response will be to consider whether further editorial action is warranted, but not to remove the article as though it had never been published."  *Id.*

The Uniform Correction or Clarification of Defamation Act ("U.C.C.D.A."), model legislation drafted by the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association in 1994 (but only adopted by three states), notes that corrections and clarifications allow defamed individuals to address alleged damage to their reputations promptly, rather than after a long trial. *See* U.C.C.D.A., *available at* http://bit.ly/2g9Cgst, and Prefatory Note, *available at* http://bit.ly/2fY5QD5. Through corrections and clarifications, both plaintiffs and publishers are afforded a cost-effective way to fix inaccuracies and ensure that the most accurate information is reported. In addition, through corrections and clarifications, news organizations can help restore public trust and faith in the journalism profession by taking responsibility and apologizing for errors, resulting in a "far less chilling effect [than litigation] on editorial processes." U.C.C.D.A. at 9.

In appending a correction or clarification or editor's note informing the public of weaknesses in publications, the press need only be "reasonably effective," *id.* at 10, because they cannot be expected to reach the *same exact* audience to whom the statements were previously communicated – only "*substantially the same* audience." *Id.* at 9 (emphasis added). The act of placing the letter or note above the inaccurate piece serves the public interest by informing "substantially the same audience" of the exact work that has been corrected and highlighting specific errors that were made. *Id.*

Numerous high-profile examples show that the tradition that has developed in online journalism is to leave a controversial story on the website while noting the problems with it. Adding an explanation by no means indicates that the publishers are supporting, reaffirming, or republishing the facts of the original story. On the contrary, they are preserving the record of what was previously written while adding greater context. For example:

6

- *The Washington Post* still makes available the story "Jimmy's World," written by Janet Cooke in 1980 and awarded a Pulitzer Prize the next year, before Cooke admitted that she made up the subject, an eight-year-old heroin addict, and other key details of the story. The article, added to the *Post's* Internet archive long after it was published, starts with a note saying, "The following article is not factually correct and is a fabrication by the author." *See* Janet Cooke, *Jimmy's World*, Wash. Post (Sept. 28, 1980), http://wapo.st/2h7b0Ki, *archived at* https://perma.cc/T7YX-4B43.

- *The New York Times* has added editor's notes to stories by Jayson Blair, who admitted to fabricating details in many articles he wrote for the paper in 2002 and 2003, but has not taken them down from the paper's website. The *Times* also ran a long story detailing all of the errors and misstatements found during its investigation of his work, and each editor's note references that article. A typical correction on a Blair story reads: "On Sunday, May 11, 2003, The Times published a two-full-page accounting of misrepresentations and plagiarism by Jayson Blair, who resigned on May 1 as a reporter. This article was among those described." The correction then includes details about the questioned statements in the articles. *See* Jayson Blair, *Detective Says Sniper Suspect Was Interrogated After He Requested Lawyer*, N.Y. Times (Apr. 29, 2003) http://nyti.ms/2glBcC8, *archived at* https://perma.cc/Y5D4-PBKP (story about D.C. snipers with correction). *See also* Articles by Jayson Blair Since June 1998, N.Y. Times, http://nyti.ms/2gc2B63, *archived at* https://perma.cc/3NZ5-RUNM (list of articles with errors); Dan Barry et al., *CORRECTING THE RECORD; Times Reporter Who Resigned Leaves Long Trail of Deception*, N.Y. Times (May 11, 2003), http://nyti.ms/1F2RYcH,

*archived at* https://perma.cc/7HZC-UCXD (story detailing errors and investigation into Blair's work).

- The public radio program "This American Life" retracted a complete episode after it found that reporter Mike Daisey had fabricated many of the details of his January 2012 story on the workers who make iPhones and other Apple products in China, but the transcript of the complete episode remains on the website with an editor's note. The note explains that the transcript has been left up for reference, and links to an entire episode of the program about the story and the retraction. *See Mr. Daisey and the Apple Factory Transcript*, THIS AM. LIFE (2012), http://bit.ly/2gW610L, *archived at* https://perma.cc/A4P3-AB4Q.

**B. Corrections and clarifications help rebut allegations of actual and common law malice and provide evidence to mitigate damages in a defamation case, demonstrating that the public interest is served by allowing and encouraging new information explaining developments in controversial articles.**

Many courts have found that a publisher's willingness to retract false or questionable portions of news stories negates a finding of actual malice, the required standard in defamation cases brought by a public figure or where punitive damages are sought. *See, e.g.*, *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987); *Logan v. District of Columbia*, 447 F. Supp. 1328, 1332 (D.D.C. 1978); *Hoffman v. The Washington Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977), *aff'd mem.*, 578 F.2d 442 (D.C. Cir. 1978); *Di Lorenzo v. N.Y. News, Inc.*, 78 A.D.2d 669, 672–73 (N.Y. App. Div. 1980). In *Hoffman v. The Washington Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977), the court found it "significant" that *The Post* came forward about "indisputably inaccurate portions" of a published article after discovering deficiencies in it. That evidence supported the assumption that the author of the article did not "act[] with an awareness

of the probable falsity of his statements or with utter disregard of whether there [sic] were false

or not." *Id.* Thus, the law encourages prompt response to new information about a news story.

Traditionally, courts have also interpreted the news media's correction of an error as a

lack of ill will or common law malice. *E.g.*, *Kerwick v. Orange Cnty. Publ'ns Div. of Ottaway*

*Newspapers, Inc.*, 438 N.Y.S.2d 778, 779 (1981); *Di Lorenzo*, 78 A.D.2d at 672–73. And others

consider the news media's apology in mitigating damages. *See, e.g.*, *James v. Powell*, 152 S.E.

539, 547 (Va. 1930); *Times-Dispatch Publ'g Co. v. Zoll*, 139 S.E. 505, 506 (Va. 1927). In

*Times-Dispatch Publishing Co. v. Zoll*, 139 S.E. 505, 506 (Va. 1927), the Supreme Court of

Virginia relied upon numerous authorities to conclude that libel defendants may "introduce

testimony in mitigation of damages where malice as a basis of recovery is charged in the

pleadings." The court highlighted that this evidence could prove the defendant "acted in good

faith and with diligence in its efforts to obtain reliable information . . . ." *Id.*

Virginia's retraction statute specifies that a "publisher, owner, editor, reporter or employee

of any newspaper, magazine or periodical" can present evidence of an "apology or retraction, if

any, was made with reasonable promptness and fairness" to lower damages in a defamation

action. VA. CODE ANN. § 8.01-48 (West 1977). A fair interpretation of this text provides that an

apology or retraction is only a *mitigating* factor to consider in awarding damages – not the

impetus for another cause of action against the news media or an increase in damages. Shortly

after the implementation in 1934 of an earlier version of the statute, the Supreme Court of

Virginia addressed its impact, specifically noting that "the express mandate of that act . . . was

designed to mitigate general damages to which a plaintiff theretofore had been entitled." *See The*

*News Leader Co. v. Kocen*, 3 S.E.2d 385, 389-90 (Va. 1939).

Because correcting false statements in an article, even short of retracting the entire article, will often be considered a mitigation of damages or evidence of lack of malice, responding to new information and posting updates are clearly encouraged by courts and seen as a positive act. Allowing the attachment of an editor's note to the original article, which backs away from claims in that publication, to constitute a "republication" is thus inconsistent with clear public policy interests in encouraging greater explanation as stories develop.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully urge this Court to grant Defendants' motion for judgment notwithstanding the verdict with respect to the question of whether the editor's note constituted a "republication" of the entire article.

Respectfully submitted this 8th day of December 2016.

/s/ Caitlin Vogus
Caitlin Vogus
Bruce D. Brown
Gregg P. Leslie
Ariel B. Glickman
THE REPORTERS COMMITTEE
   FOR FREEDOM OF THE PRESS

*Attorneys for Amici Curiae*

10

# CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of December 2016, I filed the foregoing motion via

the CM/ECF system, which electronically served the following:

Elizabeth A. McNamara (*pro hac vice*)
Samuel M. Bayard (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 489-8230

Alison B. Schary (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, D.C. 20006
Telephone: (202) 973-4248

W. David Paxton
Michael J. Finney
J. Scott Sexton
GENTRY LOCKE
10 Franklin Road S.E., Suite 900
P.O. Box 40013
Roanoke, Virginia 24022
Telephone: (540) 983-9300

*Attorneys for Defendants Rolling Stone LLC,*
*Sabrina Rubin Erdely, and Wenner Media LLC*

Elizabeth M. Locke
Thomas A. Clare
Andrew C. Phillips
Joseph R. Oliveri
CLARE LOCKE LLP
902 Prince Street
Alexandria, Virginia 22314
Telephone: (202) 628-7400
tom@clarelocke.com
libby@clarelocke.com
andy@clarelocke.com
joe@clarelocke.com

*Attorneys for Plaintiff Nicole P. Eramo*

/s/ Caitlin Vogus
Caitlin Vogus

11

## APPENDIX A: DESCRIPTION OF AMICI

With some 500 members, American Society of News Editors ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas. ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders. Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

The Associated Press ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York, and owned by its 1,500 U.S. newspaper members. The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and Internet content providers. The AP operates from 300 locations in more than 100 countries. On any given day, AP's content can reach more than half of the world's population.

Gannett Co., Inc. is an international news and information company that publishes 109 daily newspapers in the United States and Guam, including USA TODAY. Each weekday, Gannett's newspapers are distributed to an audience of more than 8 million readers and the digital and mobile products associated with the company's publications serve online content to more than 100 million unique visitors each month.

Landmark Media Enterprises, LLC is a privately held media company headquartered in Norfolk, Virginia. Landmark owns The Virginian-Pilot, a daily newspaper in Norfolk.

Online News Association ("ONA") is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. ONA's more than 2,000 members include news writers, producers, designers, editors,

bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital delivery systems. ONA hosts the annual Online News Association conference and administers the Online Journalism Awards. ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism.  RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries.  RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

The Reporters Committee for Freedom of the Press is a voluntary, unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media.  The Reporters Committee has provided assistance and research in First Amendment and Freedom of Information Act litigation since 1970.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

WP Company LLC (d/b/a The Washington Post) publishes one of the nation's most prominent daily newspapers, as well as a website, www.washingtonpost.com, that is read by an average of more than 20 million unique visitors per month.

13

## APPENDIX B: ADDITIONAL COUNSEL

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for American Society of News Editors*

Karen Kaiser
General Counsel
The Associated Press
450 W. 33rd Street
New York, NY 10001

Barbara W. Wall
Senior Vice President & Chief Legal Officer
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107

Kathleen A. Kirby
Wiley Rein LLP
1776 K St., NW
Washington, DC 20006
*Counsel for Radio Television Digital News Association*

Bruce W. Sanford
Mark I. Bailen
James Romoser
Baker & Hostetler LLP
1050 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
*Counsel for Society of Professional Journalists*

John B. Kennedy
James A. McLaughlin
Kalea S. Clark
The Washington Post
1301 K St. NW
Washington, DC 20071