# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | | |
|---|---|---|
| | ) | |
| NICOLE P. ERAMO | ) | |
| | ) | |
| Plaintiff | ) | Case No. 3:15-cv-00023-GEC |
| | ) | |
| v. | ) | |
| | ) | |
| ROLLING STONE LLC, | ) | |
| SABRINA RUBIN ERDELY, and | ) | |
| WENNER MEDIA LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

DEFENDANTS UNDERSTATE THE STRINGENT LEGAL STANDARD ..............................3

ARGUMENT ....................................................................................................................4

I.      THE JURY REASONABLY FOUND THAT DEFENDANTS REPUBLISHED A
        RAPE ON CAMPUS ON DECEMBER 5, 2014. .............................................4

        A.     The Jury Reasonably Found That Defendants Affirmatively Reiterated Their
               Defamatory Statements On December 5, 2014 ........................................ 5

        B.     The Jury Reasonably Found Defendants Intended To Reach A New Audience
               On December 5, 2014. ......................................................................... 11

II.     MS. ERAMO PRESENTED MORE THAN SUFFICIENT EVIDENCE OF HARM
        AND DAMAGES FROM THE POST-ARTICLE STATEMENTS TO SUSTAIN
        THE JURY'S VERDICT. ...............................................................................16

III.    MS. ERAMO PRESENTED MORE THAN SUFFICIENT EVIDENCE FOR THE
        JURY TO HAVE REASONABLY FOUND BY CLEAR AND CONVINCING
        EVIDENCE THAT ERDELY MADE HER DEFAMATORY STATEMENTS WITH
        ACTUAL MALICE. ......................................................................................20

        A.     The Jury Heard Concrete Evidence That Erdely Had A Preconceived Storyline
               And Was Determined To Portray Ms. Eramo As Indifferent To Rape
               Allegations Regardless Of The Truth Of Those Statements ............................... 21

        B.     Ms. Eramo Presented Overwhelming Evidence That Erdely Knew Jackie Was
               Not A Reliable Or Credible Source. ................................................... 22

        C.     The Evidence Convincingly Showed That Erdely Knowingly Failed To
               Interview Obvious Sources, Purposefully Avoided The Truth, And Departed
               From Journalistic Standards ................................................................ 25

        D.     The Jury Heard And Saw Convincing Evidence That Erdely Knew Her
               Defamatory Article And Post-Article Statements About Ms. Eramo Were
               False. ............................................................................................... 29

        E.     The Jury Was Entitled To Find That Erdely's Protestations Of Good Faith
               Were Not Credible. ............................................................................. 31

        F.     The Jury Was Not Required To Credit Erdely's Incredible Claim That She
               Did Not Mean For Her Statements To Be Defamatory. ......................... 33

IV.    DEFENDANTS' DEFAMATORY STATEMENTS ARE NOT NONACTIONABLE AS A MATTER OF LAW................................................................................................42

    A.    The Jury's Finding That Defendants' Defamatory Statements In A Rape on Campus (Statements #1 & #3) Had A Defamatory Meaning Was More Than Reasonable, And Erdely's Post Publication Statements (Statements #5, 7, 8, & 10) Are Not Nonactionable "Pure Opinion" Or Rhetorical Hyperbole As A Matter Of Law.................................................................................................... 42

    B.    There Was More Than Sufficient Evidence For The Jury To Reasonably Find That Erdely's Post-Publication Statements Were Of And Concerning Ms. Eramo............................................................................................................ 49

CONCLUSION........................................................................................................................52

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Andrews v. Creacey*,
56 Va. App. 606 (2010) ........................................................................ 12

*Ascend Health Corp. v. Wells*,
No. 12-cv-83, 2013 WL 1010589 (E.D.N.C. Mar. 14, 2013)................. 11

*Atalla v. Abdul-Baki*,
976 F.2d 189 (4th Cir. 1992) .............................................................. 11

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984)......................................................................... 39, 40

*Carwile v. Richmond Newspapers*,
196 Va. 1 (1954) ............................................................................. 20, 43

*Clark v. Viacom Int'l, Inc.*,
617 F. App'x 495 (6th Cir. 2015) ....................................................... 14

*Dotson v. Pfizer, Inc.*,
558 F.3d 284 (4th Cir. 2009) ............................................................... 4

*Eramo v. Rolling Stone, LLC*,
--- F. Supp. 3d ----, 2016 WL 5234688
(W.D. Va. Sept. 22, 2016) ................................. 4, 5, 21, 25, 26, 30, 32, 42, 43, 44, 45, 46, 48

*Firth v. State*,
98 N.Y.2d 365 (N.Y. 2002) ............................................................... 14

*Fitzgerald v. Penthouse Int'l, Ltd.*,
691 F.2d 666 (4th Cir. 1982) ............................................................ 23, 44

*Fleming v. Moore*,
221 Va. 884  (1981) .......................................................................... 17

*Fornshill v. Ruddy*,
891 F. Supp. 1062 (D. Md.1995),
*aff'd*, 89 F.3d 828 (4th Cir. 1996)........................................................ 50

*Fuste v. Riverside Healthcare Ass'n*,
265 Va. 127 (2003) ........................................................................... 43

*Gazette, Inc. v. Harris*,
229 Va. 1 (1985) ............................................................................... 49

*Harte Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ................................................................ 22, 25

*Hatfill v. N.Y. Times Co.*,
    416 F.3d 320 (4th Cir. 2005) .................................................... 49, 50

*In re Davis*,
    347 B.R. 607 (W.D. Ky. 2006) .................................................. 4, 14

*Lack v. Wal-Mart Stores, Inc.*,
    240 F.3d 255 (4th Cir. 2001) .......................................................... 3

*Larue v. Brown*,
    333 P.3d 767 (Ariz. Ct. App. 2014) ................................................ 14

*McCleary v. Keesling*,
    29 Va. Cir. 523 (1990) ................................................................. 44

*Metro. Grp., Inc. v. Meridian Indus., Inc.*,
    505 F. App'x 243 (4th Cir. 2013) .................................................. 11

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ........................................................................ 43

*Moss v. Harwood*,
    102 Va. 386 (1904) ..................................................................... 42

*Murdaugh Volkswagen, Inc. v. First Nat'l Bank of S.C.*,
    801 F.2d 719 (4th Cir. 1986) .......................................... 6, 12, 32

*Murr v. Capital One Bank (USA), N.A.*,
    28 F. Supp. 3d 575 (E.D. Va. 2014) .............................................. 11

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ..................................................................... 19

*Newton v. Nat'l Broad. Co.*,
    930 F.2d 662 (9th Cir. 1990) .................................................... 39, 41

*Pitrolo v. County of Buncombe, N.C.*,
    407 F. App'x 657 (4th Cir. 2011) ..................................... 6, 12, 32

*Reed v. Dep't of Corr., Va.*,
    No. 13-cv-543, 2015 WL 2357357 (W.D. Va. May 15, 2015) ............ 3, 4

*Snyder v. Phelps*,
    580 F.3d 206 (4th Cir. 2009) ........................................................ 43

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) ................................................................. 44

*Tharp v. Media Gen., Inc.*,
   987 F. Supp. 2d 673 (D.S.C. 2013) ..................................................... 44, 47

*Tomblin v. WCHS-TV8*,
   434 F. App'x 205 (4th Cir. 2011) ........................................................ 44, 47

*Tronfeld v. Nationwide Mut. Ins. Co.*,
   272 Va. 709 (2006) .............................................................................. 20, 43

*United States v. Peterson*,
   143 F. Supp. 2d 569 (E.D. Va. 2001) ........................................................ 12

*Vaile v. Willick*,
   No. 07-cv-11, 2008 WL 2754975 (W.D. Va. July 14, 2008) ...................... 43

*Wells v. Liddy*,
   186 F.3d 505 (4th Cir. 1999) .................................................................... 23

*Williams v. Garraghty*,
   249 Va. 224 (1995) .................................................................................. 44

*WJLA-TV v. Levin*,
   264 Va. 140 (2002) ................................................................. 43, 44, 49, 50

*Yeager v. Bowlin*,
   693 F.3d 1076 (9th Cir. 2012) ............................................................... 5, 14

## RULES

Fed. R. Civ. P. 50(a)(1) ....................................................................... 3, 20

## OTHER AUTHORITIES

3 Kevin F. O'Malley et al., *Federal Jury Practice and Instructions* § 121.01 (5th ed. 2000) ..... 12

Restatement (Second) of Torts § 559, cmt. b ............................................ 42

Restatement (Second) of Torts § 8A cmt. b ............................................. 12

# INTRODUCTION

Defendants' Renewed Motion for Judgment as a Matter of Law follows a two-plus-week trial in which the jury rendered what all parties have agreed were careful, considered verdicts. In reaching its verdicts in this case, the jury considered the testimony of twenty-three witnesses presented over the course of fourteen days of testimony and argument, scrutinized over 285 exhibits admitted into evidence, and deliberated for three days. And, in rendering its verdicts, the jury reached consistent, nuanced findings across three detailed verdict forms that demonstrated an incredibly careful consideration and understanding of the evidence. Indeed, Defendants' counsel expressly recognized this, stating numerous times that they were "struck at how careful [the jury] had been in terms of really looking at the evidence, applying Judge Conrad's instructions,"[1] and how the jury "really listen[ed] to the evidence and ma[d]e a decision that's the right decision."[2] Defendants' counsel even recognized that, with regard to the republication issue they now challenge, the jury "found that [there] was a republication, and we respect that."[3]

Now, through their Motion, Defendants ask this Court, as a matter of law, to overrule the jury's considered verdicts and factual findings. They base that request on numerous unsupported assertions of a lack of evidence and cherry-picked testimony they consider favorable to their positions, but they wholly ignore the substantial testimony and evidence that more than adequately support the jury's verdicts. And they ignore the fact that the jury, whose province it is to assess witness credibility, was free to disbelieve Defendants' own self-serving testimony that they now trumpet in support of their Motion. In so doing, Defendants ask this Court to commit reversible error in numerous ways.

---

[1] Nov. 7, 2016 Trial Tr. (Vol. 1) at 34:13-18.
[2] *Id.*
[3] *Id.* at 42:2-6.

1

***First***, Defendants ask the Court to overrule the jury's finding that Rolling Stone and Wenner Media republished their "Rape on Campus" article on December 5, 2014. In other words, Defendants ask the Court to overrule the jury's factual finding that Ms. Eramo satisfied the "publication" element of her claim based on the December 5 Article. They contend that there was absolutely no evidence from which a reasonable jury could conclude that they affirmatively reiterated their defamatory statements on December 5 or intended to reach a new audience in doing so. But, as this Court recognized in denying Defendants' Rule 50(a) Motion, that is simply not true;[4] Defendants ignore substantial testimony and evidence that easily supports the jury's finding of a republication.

***Second***, Defendants assert that the Court should overturn the jury's verdicts as to liability and damages for Erdely because they claim that Ms. Eramo failed to demonstrate harm and damages resulting from Erdely's statements to Slate, The Brian Lehrer Show, and the Washington Post. But Defendants' Motion relies on a mischaracterization of the record. Ms. Eramo more than sufficiently demonstrated harm from these statements during the liability phase of trial, and provided additional evidence of harm in the damages phase following ***Defendants' liability-phase objections and insistence*** that such additional evidence be reserved for the damages phase, an approach the Court agreed to. Because the Court may not grant a Rule 50 motion until Ms. Eramo had a full opportunity to be heard on the issue of harm and damages, the Court must consider the full trial record, including damages phase testimony, in considering Defendants' Motion.

***Third***, Defendants' assertion that the jury could not have reasonably found clear and convincing evidence of Erdely's actual malice must be rejected. Ms. Eramo presented overwhelming proof of every category of actual malice evidence the jury was entitled to

---

[4] Oct. 28, 2016 Trial Tr. (Vol. 2) at 89:3-5, 93:13-18, 94:9-13, 100:11-13.

consider, including evidence that Erdely had a preconceived storyline, had obvious reasons to doubt her source's credibility, failed to investigate in the face of inconsistencies, purposefully avoided the truth, failed to interview obvious witnesses, and was aware of contradictory information. Defendants' assertion that Erdely could not be found liable simply because she testified that she acted without actual malice disregards the evidence, the law, and the role of the jury in determining Erdely's credibility and mental state.

*Finally*, Defendants re-hash their twice-rejected arguments that their defamatory statements are not capable of having a defamatory meaning as a matter of law and that Erdely's post-publication statements cannot reasonably be understood as being of and concerning Ms. Eramo. But, as this Court has already held—twice—Defendants' arguments lack merit, and Defendants cannot overcome the jury's verdict by simply disagreeing with the jury's understanding of their defamatory statements. As explained herein, Defendants' Motion should be denied.

## DEFENDANTS UNDERSTATE THE STRINGENT LEGAL STANDARD

Defendants significantly understate their hefty burden on their Rule 50(b) motion. Because the court is "compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them," *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 259 (4th Cir. 2001), it may grant Defendants' motion "only if it finds that a 'reasonable jury would not have had a legally sufficient evidentiary basis to find for the party on [the issues challenged],'" *Reed v. Dep't of Corr., Va.*, No. 13-cv-543, 2015 WL 2357357, at *1 (W.D. Va. May 15, 2015) (Conrad, J.) (quoting Fed. R. Civ. P. 50(a)(1)). In making its determination, "[t]he court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party," and "cannot substitute its judgment for that of the jury by reweighing the evidence or making credibility determinations." *Id.* (citing *Lack*, 240 F.3d at 259).

Thus, as this Court has recognized, when a jury has returned a verdict for the non-movant, "a court may set aside the verdict only if there exists such **a complete absence of evidence** supporting the verdict that the jury's findings could **only** have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Id.* at \*2 (citation and quotation marks omitted); *accord Dotson v. Pfizer, Inc.*, 558 F.3d 284, 292 (4th Cir. 2009) ("A trial court may not appropriately enter JMOL unless ... the evidence presented supports only one reasonable verdict, in favor of the moving party." (brackets omitted)).[5]

## ARGUMENT

**I.      The Jury Reasonably Found That Defendants Republished A Rape On Campus On December 5, 2014.**

In their Motion, Defendants first contend that the jury could not have reasonably found that Defendants republished A Rape on Campus on December 5, 2014. Stated differently, Defendants ask the Court to overrule the jury's factual finding that Ms. Eramo satisfied the "publication" element of her claim based on the December 5 Article. Defendants' contention ignores substantial evidence supporting the jury's finding and should be rejected.

As an initial matter, as this Court recognized in its summary judgment opinion, courts that have considered the question of the republication of online articles have held that "[w]here substantive material is added to a website, and that material is related to defamatory material that is already posted, a republication has occurred." *Eramo v. Rolling Stone, LLC*, --- F. Supp. 3d ----, 2016 WL 5234688, at \*11 (W.D. Va. Sept. 22, 2016) (quoting *In re Davis*, 347 B.R. 607, 612 (W.D. Ky. 2006)). Stated differently, "[i]n the context of internet articles," a statement is republished if "'the statement itself is substantively altered or added to, or the website is directed

---

[5] Emphasis added unless otherwise noted.

to a new audience.'" *Id.* (quoting *Yeager v. Bowlin*, 693 F.3d 1076, 1082 (9th Cir. 2012)). And, under Virginia law, the question whether a plaintiff has proved a republication—like the question of "whether plaintiff has proved the element of publication"—"is a factual one for the jury." *Id.* (citing cases).[6]

Although Defendants do not deny substantively modifying their earlier Rape on Campus article by publishing, on December 5, 2014, a detailed Editor's Note with the full article reprinted below that note,[7] they contend that they did not republish A Rape on Campus at that time because, according to them, there was absolutely no evidence from which the jury could reasonably have concluded that two other elements in the Court's republication jury instruction were satisfied: that Defendants (1) affirmatively reiterated the content of the defamatory statements (2) with an intent to reach a new audience. Defendants' argument, however ignores the plain text of Editor's Note and article as published on December 5, as well as substantial testimony that supports the conclusion that Defendants did in fact affirmatively reiterate the defamatory statements and, in so doing, intended to reach a new audience.

## A. The Jury Reasonably Found That Defendants Affirmatively Reiterated Their Defamatory Statements On December 5, 2014.

Defendants base their assertion that they did not affirmatively reiterate the content of their defamatory statements in their December 5 Article entirely on their contention that "the December 5 Editor's Note retracted each of the [defamatory statements]" and "expressly repudiated" those statements. (Mot. 4-6.)[8] As an initial matter, Defendants base this contention almost entirely on self-serving statements cherry-picked from the testimony of their witnesses.

---

[6] *See also* Pl.'s Supp. Summ. J. Submission Regarding the Propriety of the Jury Deciding the Publication Element of Her Defamation Claims [Dkt. 186] at 1-7 (Sept. 21, 2016) (citing cases).
[7] *See, e.g.*, Oct. 20, 2016 Trial Tr. at 273:18-275:12 (Erdely testimony); Oct. 27, 2016 Trial Tr. (Vol. 1) at 90:17-20 (Woods testimony).
[8] Mem. of Law in Supp. of Defs.' Renewed Mot. for J. as a Matter of Law [Dkt. 392] ("Mot."), at 4-6 (Dec. 5, 2016).

However, it is the province of the jury to evaluate the credibility of witnesses, and the jury was entirely free to disbelieve those witnesses and their self-serving testimony. *Murdaugh Volkswagen, Inc. v. First Nat'l Bank of S.C.*, 801 F.2d 719, 726 n.6 (4th Cir. 1986) (affirming the denial of defendants' Rule 50(b) motion); *see also Pitrolo v. County of Buncombe, N.C.*, 407 F. App'x 657, 659 (4th Cir. 2011) (admonishing that "Rule 50(b) does not permit the court to weigh the evidence or assess the credibility of the witnesses—to do so is to usurp the fact-finding role of the jury," and vacating district court's amended judgment and order granting judgment as a matter of law). And, critically, Defendants' Motion ignores the plain text of the Editor's Note itself—***which Defendants scrupulously avoid quoting or discussing in their Motion***—and substantial testimony evidence from which the jury could reasonably conclude that Defendants did in fact affirmatively reiterate their defamatory statements on December 5.

At the outset, based on the evidence and testimony adduced at trial the jury could easily have reasonably concluded that Defendants affirmatively reiterated their defamatory statements about Ms. Eramo based on the text of the Editor's Note itself, to which the entire Rape on Campus article (including Defendants' defamatory statements) was appended when it was published on December 5.

Although Defendants argue in their Motion that the Editor's Note retracted every statement Defendants wrote that was even possibly attributable to Jackie (Mot. 4-6), the plain text of the Editor's Note makes clear that it did not do so, much less do so as a matter of law. At most, the Editor's Note called into question Jackie's account of her alleged assault—and nothing more. For example, although the Editor's Note states that "there now appear to be discrepancies in Jackie's account," it repeatedly links "Jackie's account" with Jackie's account ***of her alleged***

*assault*.[9]  The second paragraph of the Editor's Note—which introduced the phrase "Jackie's account"—focuses from its topic sentence on Jackie's alleged assault: "Because of the sensitive nature of Jackie's story, we decided to honor her request not to contact the man she claimed orchestrated **the attack** on her nor any of the men she claimed participated in **the attack** for fear of retaliation against her."[10]  It then goes on to state that "[Jackie's] friends and rape activists on campus strongly supported ***Jackie's account***," including because Jackie "had spoken of **the assault** in campus forums."[11]  Although Jackie's friends and campus rape activists could have known and supported Jackie's account of her assault (including from her claims about it at events like Take Back The Night), they could not have similarly known about—much less supported—accounts of Jackie's meetings with Ms. Eramo.  The paragraph then continues to further associate "Jackie's account" with her alleged assault by stating that "[w]e reached out to both the local branch and the national leadership of the fraternity where Jackie said she was ***attacked***," but that the fraternity replied that they could neither "confirm or deny her story."[12]  Likewise, in the following paragraph of the Editor's Note, Defendants wrote that "[w]e were trying to be sensitive to the unfair shame and humiliation many women feel after a sexual ***assault*** and now regret the decision to not contact the ***alleged assaulters to get their <u>account</u>***."[13]

Similarly, the entire first paragraph of the Editor's Note is devoted to reiterating, reaffirming, and instilling continued confidence in Defendants' reporting about UVA and Ms. Eramo.  That paragraph reiterates—and reemphasizes—the article's reporting about "***the university's failure to respond to [Jackie's] <u>alleged</u> assault***" (whether or not her account of that "alleged assault" was accurate in its details), and "[t]he school's troubling history of ***indifference***

---

[9] *See* PTX-3, Sabrina Rubin Erdely, "A Rape on Campus," *Rolling Stone* (Dec. 5, 2014).
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

*to many other instances of alleged sexual assault*," as well as issues with "the way the school *responds to sexual assault allegations*."[14]

Moreover, Defendants' contention that the Editor's Note "retracted" or "expressly repudiated" every statement they wrote that was even possibly attributable to Jackie is belied by substantial testimony from Defendants themselves that the Editor's Note did not retract anything at all, and certainly did not retract their statements about Ms. Eramo. For example, Will Dana, Rolling Stone's then-Managing Editor, testified that retracting A Rape on Campus on December 5, 2014 would have meant actually taking down the article from Rolling Stone's website.[15] Indeed, Mr. Dana testified that he wanted to retract and take down A Rape on Campus on December 5 but was overruled by his boss, Jann Wenner, the owner and publisher of Rolling Stone and Wenner Media, who wanted to continue to make the article available online.[16] And Mr. Dana further testified that "the first time that the magazine retracted officially or unofficially the portions of the story dealing with Dean Eramo" was in April 2015, when the CJR Report was issued and Defendants removed the article from their website.[17]

Jann Wenner went even further and expressly told the jury that "certainly we ... were not withdrawing our reporting [on] ... all the issues involved at which ... Dean Eramo clearly ... is a part of."[18] He then told the jury that, even now, he does "not stand by" any retraction of A Rape on Campus and did "not retract the whole story."[19] Similarly, Sean Woods, Rolling Stone's Deputy-Managing Editor and Rolling Stone's and Wenner Media's corporate representative, testified that even after December 5, 2014, Defendants were "standing by the [Rape on Campus]

---

[14] *Id.*
[15] PTX-198, W. Dana Dep. at 297:7-12.
[16] *Id.* at 280:5-17, 282:16-25 2.
[17] *Id.* at 313:20-314:20.
[18] PTX-187, J. Wenner Dep. at 123:1-20.
[19] *Id.* at 141:1-12; *see also id.* at 141:1-12.

story."[20]  Defendant Erdely likewise testified that even today she stands by her portrayal of Ms. Eramo in A Rape on Campus.[21]

Thus, as the Court properly recognized in referencing Mr. Wenner's testimony while denying Defendants' Rule 50(a) motion, at the very least, it was "in dispute as to whether [the Editor's Note] was a full retraction, and under Mr. Wenner's interpretation it wasn't a full retraction.  He said, we stand by a lot of this, we still believe it true."[22]  Accordingly, the Court rightly observed, "ultimately ... it's a jury question,"[23] and the jury reasonably resolved that question in Ms. Eramo's favor.

Notably, even if the Editor's Note could only be read as Defendants assert—as retracting everything Defendants wrote that was attributed to Jackie—Defendants' argument that the jury could only reasonably have understood the Editor's Note to have retracted, not reiterated, their defamatory statements about Ms. Eramo still fails because readers would not necessarily have been able to determine what statements in the article were sourced only on Jackie and therefore retracted.

As Defendants themselves conceded, "the way [the article] was written could have misled somebody who was reading it."[24]  Similarly, Defendants admitted to the jury that there were not only "real errors," but also "serious editorial errors about attribution," "serious editorial errors about quotations," and "serious editorial errors about sourcing," in A Rape on Campus.[25] Thus, readers could not know with certainty—even where a quote or purported fact was attributed to Jackie—whether that quote or purported fact was actually sourced to Jackie, much

---

[20] Oct. 27, 2016 Trial Tr. (Vol. 1) at 92:19-25; PTX-185, Voicemail from Sean Woods to Jackie.
[21] Oct. 20, 2016 Trial Tr. at 285:21-286:13 ("I portrayed her as doing exactly the job that she was asked to do....").
[22] Oct. 28, 2016 Trial Tr. (Vol. 2) at 94:9-13; id. at 93:13-18 ("[B]ased on what he said, it seems to me that it supports plaintiff's republication theory."); id. at 100:11-13 ("I understood [Wenner's testimony] to mean that when we say administration, we still stick by our guns.").
[23] Id. at 100:11-13.
[24] Oct. 27 2016 Trial Tr. (Vol. 2) at 23:1-5, 30:24-31:2 (testimony of Sean Woods).
[25] Oct. 27, 2016 Trial Tr. (Vol. 1) at 48:11:20 (testimony of Sean Woods).

less ***only*** sourced to Jackie; a reasonable reader could believe that Defendants had verified even quotes and purported facts linked to Jackie with other corroborating sources. Indeed, Defendants expressly acknowledged the existence of problems like this to the jury, testifying that "with all the attribution issues and quotation issues, [] a reader [would not] know what was sourced from Jackie and what wasn't."[26] Even Mr. Wenner, who conceded that a reader would have to read the article (again) to determine what is sourced to Jackie (and supposedly retracted), when asked "[D]o you believe that it is sufficiently clear in the article, from the text of the article, for a reader to be able to do that?" was forced to admit "I don't know."[27]

Moreover, Defendants' argument fails even if their defamatory statements could only be understood as being attributed to Jackie (which as explained above, they cannot be). Even if Defendants' defamatory statements could only be understood as being sourced to Jackie, they are ***also*** unquestionably about Ms. Eramo (as Defendants concede)[28] and her supposed indifference and failure to take action in response to Jackie's alleged assault—and the Editor's Note, whatever it says about Jackie, plainly doubled-down on and affirmatively reiterated Defendants' statements about the supposed "failure to respond to [Jackie's] alleged assault" and the purported history of "indifference" to allegations sexual assault.[29] Thus, at the very least, there was a major ambiguity in the Editor's Note about whether and to what extend there was a retraction, including regarding Defendants' defamatory statements, and the jury was entitled to resolve that ambiguity in one party's favor—to determine the question of publication as a question of fact.

---

[26] *Id.* at 96:18-21.
[27] PTX-187, J. Wenner Dep. at 158:2-7.
[28] Defendants do not contend, in their Motion, that their defamatory statements in *A Rape on Campus* are not of and concerning Ms. Eramo. They only contend, in conclusory fashion, that Erdely's post-publication statements are not of and concerning Ms. Eramo. (*See infra* Part IV.B.)
[29] *See* PTX-3, Sabrina Rubin Erdely, "A Rape on Campus," *Rolling Stone* (Dec. 5, 2014).

Indeed, this Court has already recognized that the Editor's Note at the very least "is ambiguous,"[30] and, as such "[t]he effect of the editor's note, whether that communicated a retraction or whether it communicated something in between whether it was just something to attract new readers ... [t]he jury's going to have to decide that."[31]  Of course, when language "is at least ambiguous ... questions regarding its proper interpretation must be submitted to the jury." *Murr v. Capital One Bank (USA), N.A.*, 28 F. Supp. 3d 575, 589 (E.D. Va. 2014); *accord Metro. Grp., Inc. v. Meridian Indus., Inc.*, 505 F. App'x 243, 245 (4th Cir. 2013) (same); *see also Atalla v. Abdul-Baki*, 976 F.2d 189, 192 (4th Cir. 1992) ("If there is more than one permissible inference as to intent to be drawn from the language employed, the question of the parties' actual intention is a triable issue of fact."); *Ascend Health Corp. v. Wells*, No. 12-cv-83, 2013 WL 1010589, at *6 (E.D.N.C. Mar. 14, 2013) ("[W]hen a publication is of ambiguous or doubtful import, the jury must determine its meaning").

The jury here performed its function, interpreted the ambiguous Editor's Note, and found that Defendants affirmatively reiterated the content of their defamatory statements in the December 5 Article.  That was an eminently reasonable finding, and Defendants' request that the Court overrule that finding is meritless.

**B.    The Jury Reasonably Found Defendants Intended To Reach A New Audience On December 5, 2014.**

Defendants next contend in their Motion that there was no evidence from which the jury could have reasonably founds that Defendants intended to reach a new audience when they published the Editor's Note with the full-text of their Rape on Campus article appended to it on December 5 article.  Again, however, Defendants base their argument on self-serving statements cherry-picked from the testimony of their witnesses that the jury was free to—and did—

---

[30] Oct. 28, 2016 Trial Tr. (Vol. 2) at 106:17-21.
[31] *Id.* at 107:9-12.

disbelieve, and Defendants' mere reiteration of that testimony here cannot justify overruling the jury's verdict. *See Murdaugh Volkswagen*, 801 F.2d at 726 n.6; *Pitrolo*, 407 F. App'x at 659. And again, Defendants' Motion ignores the substantial testimony evidence from which the jury could reasonably conclude that Defendants did in fact intend to reach a new audience when they published the Editor's Note with the full-text of their Rape on Campus article appended to it on December 5.

As an initial matter, although Defendants do not acknowledge it, "intent" in the civil context does not require a significant showing: "[I]n torts cases, '[i]f the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.'" *United States v. Peterson*, 143 F. Supp. 2d 569, 584 (E.D. Va. 2001) (quoting Restatement (Second) of Torts § 8A cmt. b). Thus, "[j]uries in civil cases are instructed that they 'may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.'" *Id.* (quoting 3 Kevin F. O'Malley et al., *Federal Jury Practice and Instructions* § 121.01 (5th ed. 2000)). Intent "may be, and frequently is, shown by circumstances." *Andrews v. Creacey*, 56 Va. App. 606, 628 (2010).

Here, the jury was presented with more than sufficient testimony and evidence to reasonably conclude that this standard was satisfied. For example, Sean Woods testified that "it became a big news story when we put this editor's note up, and it was -- we knew that people would still be looking for the story."[32] Indeed, Mr. Woods went even further, testifying that Defendants wanted people who would look for the article to read it on Rolling Stone's website.[33] Mr. Woods even agreed that Defendants were aware that new readers were coming to Rolling

[32] Oct. 27, 2016 Trial Tr. (Vol. 1) at 106:1-8.
[33] *Id.* at 108:2-8,116:5-9, 117:4-7; Oct. 27, 2016 Trial Tr. (Vol. 2) at 23:1-5.

Stone's website to read the article on and after December 5.[34]  Jann Wenner similarly testified that he knew that "people who were going to click on [the article] were going to find it" and that he wanted those new (and return) readers to "get this article from Rolling Stone."[35]  Moreover, Mr. Wenner testified that he knew that the Editor's Note invited people to read A Rape on Campus (new readers to read the article for the first time and previous readers to read it again) because, he admitted, people would need to actually read the article to try to determine whether information in a given part of the article was sourced to Jackie.[36]  As the Court recognized, Mr. Wenner's testimony shows that the Editor's Note "invites a return or an initial reading of the article."[37]  And notably, Defendants' efforts to reach a new audience were overwhelmingly successful: evidence admitted at trial showed that 425,857 unique visitors viewed A Rape on Campus on Rolling Stone's webpage from December 6, 2014 to April 5, 2015—425,857 people who had not read the article before the Editor's Note was published.[38]

Thus, as the Court held in denying Defendants' Rule 50(a) motion, "a reasonable jury could find" that Defendants "intended to ... reach a new audience."[39]  As the Court explained, "[the jury] could [] deduce from what Mr. Wenner said, that he fully expected new readers to be attracted to the article because of the way the editor's note was written."[40]  This is so because, among other things, "[i]t may be a new reader, someone who didn't read it before, someone who read about ... the editor's note, decided they would check into this, find out what it's all about,

---

[34] Oct. 27, 2016 Trial Tr. (Vol. 2) 116:10-14.
[35] PTX-187, J. Wenner Dep. at 131:4-23.  In their Motion, Defendants ascribe a benevolent motive to Mr. Wenner's desire to drive traffic to Rolling Stone's website to read A Rape on Campus, but the jury could just have easily concluded, based on their assessment of Mr. Wenner's credibility, that his motive was simply to increase Rolling Stone's viewership.  (See, e.g., id. at 197:15-198:7, 200:4-10 (remorselessly admitting to lying to people when it suits him)).
[36] Id. at 158:2-7.
[37] Oct. 28, 2016 Trial Tr. (Vol. 2) at 90:9-13.
[38] See PTX-196, A Rape on Campus Viewership and Revenue Metrics; PTX-194, A. Ling Dep. at 45:4-46:2 (Oct. 26, 2016).
[39] Oct. 28, 2016 Trial Tr. (Vol. 2) at 108:21-109:1.
[40] Id. at 108:9-14.

and then be encouraged to read the article to discover exactly what the editors had in mind in adding this note to the top of it."[41]  That conclusion was correct when the Court stated it, it was correct when the jury found it, and it remains true now.

Notably, when viewed in light of this testimony and evidence—which Defendants' Motion entirely ignores—the very cases Defendants cite as supposedly showing that there was no republication here confirm that there was in fact a republication.  *See In re Davis*, 347 B.R. 607, 612 (W.D. Ky. 2006) (holding addition of "update" section below original article constituted republication of article); *Larue v. Brown*, 333 P.3d 767, 773 (Ariz. Ct. App. 2014) (holding addition of "updates" to articles constitutes republication of original articles giving rise to additional causes of action); *Clark v. Viacom Int'l, Inc.*, 617 F. App'x 495, 506 (6th Cir. 2015) (explaining that, unlike here, a statement is not republished when "any alterations to its online presence do not relate to its substance," but affirming that, like here, substantive modification of a defamatory article "would amount to a new potentially defamatory publication in its own right"); *Firth v. State*, 98 N.Y.2d 365, 371 (N.Y. 2002) (holding only that, in contrast to the situation here, "[t]he mere addition of *unrelated* information to a Web site cannot be equated with the repetition of defamatory matter in a separately published edition of a book or newspaper," because "[t]he justification for the republication exception has no application at all to the addition of *unrelated* material on a Web site"); *Yeager v. Bowlin*, 693 F.3d 1076, 1082 (9th Cir. 2012) (expressly acknowledging that "[o]f course, substantive changes or updates to previously hosted content that are not 'merely technical' may sufficiently modify the content such that it is properly considered a new publication" (quotation marks omitted)).[42]

---

[41] *Id.* at 91:8-13.
[42] Defendants cite the Wisconsin Court of Appeals' decision in *Ladd* and the Ninth Circuit's decision in *Oja* to argue that online articles are not "continuing publications" such that each "hit" on a website is not independently actionable.  But that is an irrelevant, straw-man argument.  Ms. Eramo never took the position that each time A Rape

*        *        *

As explained above, the evidence and testimony adduced at trial more than sufficiently support the jury's finding that Defendants republished A Rape on Campus on December 5, 2014. Defendants and their amicus, while ignoring that evidence, raise an alarmist argument that the jury's verdict here will chill retractions by finding retractions to be republications that can subject publishers to additional liability.[43]  Their argument, however proceeds from the false premise that Defendants' December 5 Editor's Note was actually a retraction.  As explained above, it was not.  Indeed the evidence and testimony adduced at trial showed that had Defendants actually wanted to retract their defamatory statements about Ms. Eramo, they knew how to:  they could have taken the article down from their website like they did following the issuance of the CJR Report in April 2015,[44] or like they did when they received complaints about the accuracy of an article about famous NBA player Derrick Rose.[45]  Or, if Defendants were dead-set on leaving A Rape on Campus up on their website, Defendants could have even, at the very least, posted an Editor's Note that said, in no uncertain terms, that "We have learned information that leads us to now believe that Jackie is not credible, and we retract A Rape on Campus" (full stop).  Or even "We have learned information that leads us to now believe that Jackie is not credible, and we retract our portrayal of Jackie's assault and our portrayal of Dean

---

on Campus was viewed constituted a separate publication.  If she did, she would have asserted millions of causes of action against Defendants—one for each person who viewed the article on Rolling Stone's website.

[43] Defendants appear to contend in their Motion that the jury's republication finding was erroneous because a failure to retract is not independently actionable and, in fact, tends to rebut a finding of actual malice.  Ms. Eramo, however, did not seek liability based on a failure to retract; she argued, and the jury found, that Defendants actually republished A Rape on Campus.  Moreover, Defendants sought and obtained a jury instruction that a retraction can indicate a lack of actual malice. (*See* Jury Instructions [Dkt. 375], at 40 (Nov. 4, 2016) ("Defendants contend that they have retracted the statements in 'A Rape on Campus' that Ms. Eramo alleges are defamatory. ... [I]f you determine that a defendant retracted an allegedly defamatory statement, you may consider that retraction, and the circumstances in which it was made, in determining whether a defendant acted without actual malice.").)

[44] PTX-198, W. Dana Dep. at 313:20-314:20 (testifying that "the first time that the magazine retracted officially or unofficially the portions of the story dealing with Dean Eramo" was in April 2015, when the CJR Report was issued and Defendants removed the article from their website).

[45] Oct. 27, 2016 Trial Tr. (Vol. 2) at 119:5-120:13.

15

Eramo in *A Rape on Campus.*" Instead, Defendants went out of their way in the Editor's Note to bolster the portions of the article not specifically dealing with Jackie's alleged assault, and in particular the criticisms of Dean Eramo's response to Jackie's rape.

That is not a retraction or even an ineffective retraction; as the jury could have reasonably found—and did reasonably find—it is an affirmative reiteration and republication. And it does not implicate the policy concerns that Defendants and their amicus raise. Indeed, although Defendants and their amicus do not acknowledge it, significant public policy concerns would be implicated by *not* finding a republication here: The reason that a republication is found when new, substantive material is added to an online article is to provide a new cause of action (and, for example, restart the statute of limitations clock), in order to avoid enabling publishers to re-urge and republish statements with impunity (and never be held to account) once the statute of limitations has run. Here, Defendants made a decision to add an Editor's Note that reiterated and bolstered what they said about Ms. Eramo. That is a republication.

## II.  Ms. Eramo Presented More Than Sufficient Evidence Of Harm And Damages From The Post-Article Statements To Sustain The Jury's Verdict.

Defendants next contend that the Court should overturn the jury's verdicts as to liability and damages for Erdely because, according to them, Ms. Eramo failed to demonstrate harm and damages resulting from Erdely's post-publication statements. They base that contention on their emphatic assertion that "Plaintiff presented not a scintilla of evidence to support her allegations that she was personally or reputationally harmed by the Post-Article Statements" in either the liability or the damages phase of the trial. (Mot. at 18, 20-21 & n.29.) Defendants are wrong on both counts, and their Motion with respect to the post-publication statements must be denied.

*First*, Defendants' Motion must be denied because Ms. Eramo did in fact present competent evidence of harm caused by the post-publication statements during the liability phase

16

of the trial.  As Defendants implicitly acknowledge, the bar is very low under Virginia law in terms of what is required to show compensable harm, and such harm can be proven solely by the plaintiff's own testimony.  (*See* Mot. at 20-21 n.29); *see also Fleming v. Moore*, 221 Va. 884, 894 (1981) (holding that compensable harm from defamation can be adequately demonstrated by a plaintiff's testimony that she was insulted, mortified, held up to ridicule, humiliated, emotionally upset, or embarrassed by the statement).  Such harm was adequately demonstrated not only through Ms. Eramo's testimony, but also through Plaintiff's Trial Exhibit 97, a letter that Ms. Eramo sent to Rolling Stone magazine owner and publisher Jann Wenner, in April of 2015.[46]  In the letter, Ms. Eramo referenced specifically the post-publication statements that Erdely made to the media after the publication of the article.[47]  Ms. Eramo further set forth in the letter the substance of the precise statements that the jury found Erdely liable for—specifically, the claims that Ms. Eramo did not support Jackie, that she did nothing in response to Jackie's allegations, that she did not report Jackie's allegations to the police, and that she sought to suppress Jackie's assault—and discussed at great length how she was harmed and devastated by these false statements about her.[48]  During her trial testimony, Ms. Eramo also read this letter out loud in its entirety, allowing the jury an opportunity to observe her demeanor and emotion showing how much these statements impacted her personally.[49]  This documentary evidence and testimony alone is sufficient to meet the standard for compensable injury set forth in *Fleming*, and Defendants' Motion entirely fails to acknowledge it, much less dispute it.

Moreover, Defendants' Motion glosses over the fact that Defendants themselves—through objections—prevented Ms. Eramo from offering further testimony regarding these post-

---

[46] *See* PTX-97, Letter from Nicole Eramo to Jann Wenner (Apr. 22, 2015).
[47] *Id.*
[48] *Id.*
[49] Oct. 19, 2016 Trial Tr. at 181:1-188:19.

publication statements during the liability phase of the trial, compelling Ms. Eramo to offer it during the damages portion of the trial.[50] During the liability phase of trial, Defendants argued—successfully—that because Ms. Eramo could not specifically recall when she first became aware of Erdely's post-publication statements, Ms. Eramo's testimony during the first phase of the trial should be strictly limited to whether the statements were true or false.[51] During the damages phase of the trial, Ms. Eramo testified at length about the insult, emotional harm, humiliation, and embarrassment that each of the post-article statements caused her. (*See, e.g.*, Nov. 7, 2016 Trial Tr. (Vol. 1) at 109:15-110:14 (Ms. Eramo describing her feelings of hurt and humiliation knowing that the statements about her on The Brian Lehrer Show were broadcast to the entire New York City market and knowing that even countless people who she had never met think that she acted in the way Ms. Erdely described in those statements); *id*. at 110:15-111:13 (Ms. Eramo describing the statements on the Slate podcast as "deeply offensive," "incredibly damaging," and even "debilitating" because they accused her of acting in a way that was totally inconsistent with her professional responsibilities); *id*. at 111:14-113:4 (Ms. Eramo describing being "quite offended" by Erdely's statements to the Washington Post, and further describing how they crushed her hopes that the story might blow over and explaining they were particularly hurtful because the Post is the paper of record in Virginia). Over the same objection Defendants asserted to this testimony in the liability phase, the Court permitted this testimony regarding harm in the damages phase, holding that Ms. Eramo was permitted to give testimony as to why these statements personally caused her distress.[52] In addition, Ms. Eramo's husband also

---

[50] *See* Oct. 18, 2016 Trial Tr. (Vol. 2) at 133:10-135:1, 138:5-139:9.
[51] *Id.* Defendants' argued was that Ms. Eramo should be so limited in testifying during the liability phase because she could not recall with precision whether she became familiar with these statements before or after she made the decision to sue Defendants. But the issue of when Ms. Eramo heard the statements has no bearing on whether she suffered compensable harm as a result of the statements when she became aware of them. Thus, Ms. Eramo was properly permitted to offer testimony regarding the impact of these statements during the damages phase.
[52] Nov. 7, 2016 Trial Tr. (Vol. 1) at 105:17-109:6.

testified specifically that he shared the content of Ms. Erdely's statements on the Slate podcast with her and that they "destroyed her" emotionally.[53]

By successfully objecting to Ms. Eramo's testimony regarding the impact of the post-publication statements during the liability phase of the trial, Defendants persuaded the Court to reserve much of this testimony beyond the mere existence of harm—which was testified to and admitted in documentary evidence in the liability phase, as explained above—for the damages portion of the case. This was consistent with the arguments that Defendants made, and the approach the Court took, with much other testimony and documentary evidence of harm that was excluded in the liability phase but admitted in the damages phase.[54] Having successfully persuaded the Court to limit the bulk of Ms. Eramo's testimony regarding the harm caused by Erdely's post-publication statements and to reserve that testimony for the damages phase of trial, Defendants are estopped from now arguing that Ms. Eramo failed to or was required to present that evidence during the liability phase. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[J]udicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."); *see also id.* ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.").

---

[53] Nov. 7, 2016 Trial Tr. (Vol. 2) at 13:16-14:17.
[54] For example, during the liability phase, Ms. Eramo was prohibited, on Defendants' objection, from testifying about a disparaging statement a person on the street made to her that mimicked Defendants' false and defamatory allegations about her. (Oct. 19, 2016 Trial Tr. at 175:3-20.) Ms. Eramo, however, was permitted to offer this testimony of harm during the damages phase, without objection. (Nov. 7, 2016 Trial Tr. (Vol. 1) at 113:6-14.) Similarly, on Defendants' motion, any and all testimony regarding how Defendants' defamatory statements impacted Ms. Eramo in light of her contemporaneous battle with cancer were prohibited in the liability phase and reserved solely for the damages phase. (*See* Oct. 13, 2016 Order [Dkt. 273], at 2.)

Under the plain language of Rule 50, a motion for judgment as a matter of law as to a particular issue may not be made until "[the] party has been fully heard on an issue during a jury trial." Fed. R. Civ. P. 50(a)(1). Defendants' own motions and objections ensured, deliberately, that much of the evidence of harm to Ms. Eramo would be reserved for the damages phase of the trial and that Ms. Eramo would not have an opportunity to be fully heard on that issue until the conclusion of the damages phase. Defendants cannot now argue that Ms. Eramo had an opportunity to be fully heard on the issue of harm during the liability phase when Defendants successfully urged that much of the "harm" evidence, including testimony related specifically to the harm caused by Erdely's post-publication statements, had to be reserved for the damages phase. Defendants' Motion therefore must be judged based on the full trial record, including the damages phase, and in both phases Ms. Eramo offered more than sufficient evidence of harm to support the jury's verdict. Defendants' Motion must be denied.[55]

## III. Ms. Eramo Presented More Than Sufficient Evidence For the Jury To Have Reasonably Found By Clear And Convincing Evidence That Erdely Made Her Defamatory Statements With Actual Malice.

Defendants' argument that Ms. Eramo failed to present clear and convincing evidence from which a reasonable jury could find that Erdely acted with actual malice must be rejected, as it was when Defendants made the same argument at summary judgment and in their Rule 50(a) motion.

The evidence and testimony presented over thirteen days in the liability phase of trial was more than sufficient for the jury to find that Erdely made the statements at issue with actual

---

[55] Moreover, the statements at issue that Erdely made on the *Slate* podcast, the Brian Lehrer Show, and to the *Washington Post* are clearly defamatory *per se* and thus **no** showing of harm is required for the jury to award damages based on those statements. *See Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 713 (2006); *Carwile v. Richmond Newspapers*, 196 Va. 1, 7 (1954) (defamatory words are actionable *per se* without showing of special harm if they "impute to a person unfitness to perform the duties of an office or employment of profit," or "want of integrity in the discharge of the duties of such an office or employment," or "prejudice such person in his or her profession or trade."); (*see also* Pl.'s Mem. of Law in Support of Her Mot. for Partial Summ. J. [Dkt. 98] at 42-50).

knowledge of falsity or with reckless disregard for the truth. Importantly, every piece of evidence that the Court found capable of supporting a jury verdict of actual malice at the summary judgment stage—including evidence that Erdely had a preconceived storyline, that she had ill will or bias toward Ms. Eramo, that she had obvious reasons to doubt Jackie's credibility as a source, that she failed to investigate in the face of discrepancies, that she purposefully avoided contrary evidence, that she failed to interview obvious sources, and that she was aware of evidence contradicting her defamatory statements—was presented to the jury at trial.[56] Moreover, Defendants cannot overturn a considered jury verdict based on all of this evidence simply by continuing to claim that Erdely cannot be held liable because she denies having acted with actual malice or because she claims that she intended her statements to be interpreted differently than the jury interpreted them. The jury was well within its rights to determine, after observing Erdely on the stand for five days and on the basis of voluminous contemporary, documentary evidence, that Erdely lacked credibility and that she acted with actual malice in defaming Ms. Eramo.

A. **The Jury Heard Concrete Evidence That Erdely Had A Preconceived Storyline And Was Determined To Portray Ms. Eramo As Indifferent To Rape Allegations Regardless Of The Truth Of Those Statements.**

As this Court has recognized, a jury is permitted to infer actual malice from evidence that a reporter approached a story with a preconceived storyline, as well as evidence of a reporter's bias and ill will towards the individual she defamed. *Eramo*, --- F. Supp. 3d ----, 2016 WL 5234688, at *5-7 (citing cases). The jury was appropriately so instructed.[57] During the trial, the jury heard testimony and saw documentary evidence demonstrating that Erdely set out from the start to write a story about an innocent rape victim who suffered at the hands of indifferent

---

[56] *See* Pl. SJ Opp'n at 9-16.
[57] Jury Instructions [Dkt. 375], at 39.

university administrators who sought to cover up her assault. The jury also was presented with evidence that Erdely was intent on targeting Ms. Eramo even though her sources at UVA universally praised Ms. Eramo as anything but indifferent to rape victims:

- In an email about the subject of her article in June 2014—before she decided to focus on UVA—Erdely explained that the article that became A Rape on Campus would be similar to an article she had written the previous year, in which she accused military officials of failing to respond appropriately to the rape of a female army officer.[58]

- Ms. Erdely's "pitch" for the article that became A Rape on Campus was admitted into evidence as Plaintiff's Trial Exhibit 19. In it, Erdely wrote—before she ever interviewed Jackie or decided to focus on UVA—that her article would be about how university administrators turn a blind eye to sexual assault, how universities "juke their stats" to downplay sexual assault, how administrators "resist[] involvement" in sexual assault allegations, and about how a particular sexual assault case failed to achieve resolution.[59]

- The jury further heard evidence that in Erdely's earliest interviews with sources at UVA— before she even chose to write about Jackie—Erdely explained that the article would be about "institutional indifference" to sexual assault.[60]

- The jury also heard testimony from both Jackie and her friend, Sara Surface, that Erdely seemed determined to portray Ms. Eramo in a negative light.[61]

- The jury also saw that Erdely's own notes reflected that every source she spoke to at UVA expressed a positive impression of Ms. Eramo and her work with sexual assault survivors. In response to Jackie's concerns about how Ms. Eramo was going to be portrayed in the article, Erdely told Jackie, "I'm getting that from everybody. Everybody loves her, and I understand that."[62]

### B. Ms. Eramo Presented Overwhelming Evidence That Erdely Knew Jackie Was Not A Reliable Or Credible Source.

Both the U.S. Supreme Court and the Fourth Circuit have held that where, as here, a defamation-defendant relies on a source for her defamatory statements, actual malice may be proven through evidence that the defendant had reason to doubt the credibility of that source. *E.g.*, *Harte Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989); *Wells v. Liddy*,

---

[58] PTX-23, Email from Sabrina Rubin Erdely to "Maggie" (June 6, 2014); Oct. 19, 2016 Trial Tr. at 222:19-224:19, 225:25-227:5.
[59] PTX-19, Sabrina Rubin Erdely Pitch: "Campus Rape."
[60] Oct. 19, 2016 Trial Tr. at 240:25-242:7, 244:18-245:9.
[61] PTX-164, Jackie Dep. at 41:20-25; Oct. 27, 2016 Trial Tr. (Vol. 2) at 152:2-15.
[62] Oct. 20, 2016 Trial Tr. at 244:21-245:16.

186 F.3d 505, 542-44 (4th Cir. 1999); *Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 670 (4th Cir. 1982); *see also* Mot. at 34-35 (arguing that Erdely cannot be liable for any of the statements if she believed Jackie was credible). The jury was appropriately so instructed.[63]

During Erdely's five days on the witness stand during the liability phase of the trial, the jury heard substantial testimony and saw overwhelming evidence demonstrating that Erdely had obvious reasons to doubt Jackie's credibility as a source prior to her publication of the defamatory statements. While it would be impossible to set forth every piece of evidence here, even a small sampling of the evidence adduced at trial demonstrates that the jury was more than justified in concluding that Erdely acted with actual malice in relying on Jackie for her claims about Ms. Eramo:

- The jury heard evidence demonstrating that Erdely knew Jackie was lying to her and to others on multiple occasions prior to publication. For example, Jackie had claimed to Erdely that she had scars on her back from her supposed violent assault and that her friends were always asking her about them,[64] but when Erdely asked Jackie's friends about the scars prior to publication, they said that they had never seen any scars on her back.[65]

- Similarly, when Erdely asked about the scars at a dinner with Jackie's boyfriend on September 12, 2014, Jackie's boyfriend flatly denied having ever seen any scars on Jackie's back.[66]

- Erdely acknowledged that she was aware, prior to the publication of any of her defamatory statements, that Jackie's story about her alleged sexual assault had "morphed" over time, and that she had originally told friends a story of being forced to perform oral sex on a group of men, while she told Erdely that she had been violently, vaginally gang-raped for hours.[67]

- When Erdely believed she had identified two potential corroborating sources that Jackie had refused to put her in touch with—the other supposed Phi Kappa Psi gang-rape victims— Jackie denied that Erdely had found the right people, and Erdely acknowledged in her own

---

[63] Jury Instructions [Dkt. 375] at 35.
[64] Oct. 20, 2016 Trial Tr. at 49:16-21.
[65] *Id.* at 52:16-19, 53:5-9.
[66] *Id.* at 52:12-15.
[67] *Id.* at 40:14-21.

reporting notes that she believed Jackie was lying to her.[68]  Erdely confirmed in testimony that she believed Jackie was lying to her.[69]

• When relating her story of sexual assault to Erdely at a recorded dinner interview on September 11, 2014, and during a walking tour of campus with Erdely that night, Jackie was unable to even keep the name of the fraternity where she was supposedly assaulted straight, alternately saying "Phi Psi" and "Pi Phi."[70]  The jury specifically noted this glaring discrepancy and submitted a question to the Court about it.[71]

• Jackie originally attributed a comically callous quote of a young woman asking her "why didn't you just have fun with [being violently gang-raped]" because it was "a bunch of hot Phi Psi guys" to a random stranger at a party, then weeks later attributed the quote to Kathryn Hendley, the former best friend Jackie claimed to have had a falling out with.[72]  Erdely noted the attribution discrepancy at the time (prior to publication), writing in her notes that she was "confused."[73]  Erdely nevertheless attributed the disparaging quote to Kathryn Hendley in the published article.[74]

• Erdely knew and admitted, prior to publication, that Jackie was "in not great mental shape."[75]

• Erdely acknowledged that she "asked [her]self at the time"—i.e., prior to publication—"if it was wise to build the opening of a story around someone who seemed so emotionally fragile."[76]

• Erdely acknowledged to Jackie's friend Alex Pinkleton, in a text message sent on October 28, 2014, that if Rolling Stone admitted to its readers that Jackie refused to tell Erdely the name of the supposed ringleader of her assault, "it would diminish [Jackie's] credibility," so Erdely "really really want[ed] to avoid [having to do] that!"[77]

• Erdely discovered prior to publication that Jackie had lied to her about where Jackie's mother went to college.[78]

• On October 25, 2014, Erdely's editor, Sean Woods, wrote to her in an email, "I worry we can't confirm the two girls coming to Jackie and alleging gang rape at the same frat.  Let's

---

[68] *Id.* at 100:7-12; PTX-10 at RS004404, Erdely Reporting Notes.

[69] Oct. 24, 2016 Trial Tr. at 90:14-91:8.

[70] Oct. 31, 2016 Trial Tr. (Vol. 2) at 20:21-25:23; PTX-36 at 1:37:11-1:38:22, Erdely Interview; PTX-10, at RS004354-55; *id.* at RS004393.

[71] Oct. 21, 2016 Trial Tr. (Vol. 1) at 34:25-35:2 (Court reading jury note that says, "is Jackie saying Pi Phi or Pi Psi? It is spelled Phi Psi in the transcript, but it sounds like Phi Phi.").

[72] Oct. 20, 2016 Trial Tr. at 66:1-11, 67:11-19; PTX-10 at RS004244, RS004406.

[73] Oct. 20, 2016 Trial Tr. at 67:15-19; PTX-10 at RS004406.

[74] Oct. 20, 2016 Trial Tr. at 67:25-68:3.

[75] *Id.* at 131:13-18.

[76] PTX-141 at RS002178, Erdely Statement; Oct. 20, 2016 Trial Tr. at 134:7-13.

[77] Oct. 20, 2016 Trial Tr. at 156:13-157:2; PTX-20 at RS014320, Erdely-Pinkleton Text Messages.

[78] Oct. 24, 2016 Trial Tr. (Vol. 1) at 89:18-94:3.

24

discuss Monday a.m."[79]  Erdely responded, "I have the same worry.  I wish I had better sourcing for a lot of the Jackie stuff.  A lot right now is resting on Jackie's say-so."[80]

- Erdely also admitted in testimony that she knew Jackie had told entirely different stories about how she met Ms. Eramo.[81]  While Jackie had told Erdely that she met Ms. Eramo for the first time when she reported her own sexual assault, Jackie's friend, Rachel Soltis, told Erdely that Jackie claimed to have met Ms. Eramo when she (Jackie) testified as a witness at a sexual misconduct board hearing for a girl who was raped in a similar way to Jackie—a tale very different from what Jackie told Erdely.[82]  Erdely acknowledged this was a "completely different story" than Jackie had told her, but she never confronted Jackie about it.[83]

- The jury heard testimony and saw text messages demonstrating that when Jackie attempted to withdraw from the article, Erdely stated that there was "no pulling the plug at this point" and that the article was moving forward.[84]  The jury heard Jackie testify that she felt pressured by Erdely to continue to participate in the article despite having and expressing second thoughts.[85]

### C.    The Evidence Convincingly Showed That Erdely Knowingly Failed To Interview Obvious Sources, Purposefully Avoided The Truth, And Departed From Journalistic Standards.

The U.S. Supreme Court and this Court have also held that a jury can infer actual malice based on evidence of a reporter's purposeful avoidance of the truth and failure to interview obvious witnesses that the reporter knew could have corroborated or disproved a source's story. *Connaughton*, 491 U.S. at 688, 692 (holding that actual malice may be shown by "purposeful avoidance of the truth" and "failure to interview" key witnesses); *id*. at 692 (explaining that a jury can infer that a defendant's failure to interview obvious witnesses was "a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [its source's] charges"); *Eramo*, --- F. Supp. 3d ----, 2016 WL 5234688, at *6 ("Plaintiff cites evidence that could lead a factfinder to determine that others at Rolling Stone knew Erdely did

---

[79] Oct. 20, 2016 Trial Tr. at 190:25-191:22; PTX-39, Email from Sean Woods to Sabrina Rubin Erdely (Oct. 25, 2014).
[80] Oct. 20, 2016 Trial Tr. at 193:24-194:19; PTX-145, Email from Sean Woods to Sabrina Rubin Erdely (Oct. 26, 2014).
[81] Oct. 24, 2016 Trial Tr. (Vol. 1) at 92:18-94:3.
[82] *Id.*
[83] *Id.*
[84] PTX-20 at RS014312-13, Erdely-Pinkleton Text Messages.
[85] PTX-164, Jackie Dep. at 46:08-49:16, 50:01-08, 51:24-52:05.

not reach out to these individuals to corroborate Jackie's story.... From these facts, a reasonable jury could conclude that Erdely should have investigated further, and that her failure to do so could imply that Erdely acted with actual malice.").) The jury was appropriately so instructed.[86]

The jury in this case heard substantial testimony and saw voluminous evidence demonstrating that Erdely knew that in order to corroborate Jackie's incredible story, she needed to identify and interview Jackie's three friends who were supposedly present the night of the alleged assault, the man that Jackie claimed orchestrated the assault, and the two other women that Jackie claimed were also similarly gang-raped at Phi Kappa Psi—but that Erdely failed to do so. In fact, Erdely's excuse for her failure to interview these obvious sources—that Jackie refused to give Erdely these individuals' names or contact information because Jackie did not want Erdely to speak to them—simply served to underscore and reinforce the jury's conclusion that Erdely had obvious reasons to doubt Jackie's credibility. The jury further heard evidence from experts retained to produce a report for *Rolling Stone* that demonstrated that Erdely's failure to identify and interview these witnesses constituted an extreme departure from accepted standards of journalism. *Eramo*, --- F. Supp. 3d ----, 2016 WL 5234688, at *5 (departure from journalistic standards can serve as supportive evidence of actual malice). The evidence of Erdely's purposeful avoidance of the truth and failure to interview obvious sources was overwhelming and devastating to Erdely's credibility:

- Defendants wrote in A Rape on Campus that the ringleader of Jackie's gang rape was a Phi Kappa Psi brother who in 2012 was a third-year student at UVA and worked as a lifeguard at the University pool.[87] When speaking to Erdely, Jackie referred to him as "Jay."[88] Erdely acknowledged in testimony that she knew she had a "journalistic obligation" to seek comment from Jay before publishing a story claiming that he orchestrated a gang rape.[89]

---

[86] Jury Instructions [Dkt. 375] at 35, 39.
[87] *See generally* PTX-1, Sabrina Rubin Erdely, "A Rape on Campus," *Rolling Stone* (Nov. 19, 2014).
[88] Oct. 20, 2016 Trial Tr. at 110:16-111:2.
[89] Oct. 20, 2016 Trial Tr. at 152:10-21.

- The jury also saw an October 24, 2014 email from Erdely to Jackie's friend, Alex Pinkleton, in which Erdely said, "I do need to reach out to [Jay] to see if he wants to comment. It's part of my obligation as a journalist."[90]

- Erdely also told Ms. Pinkleton in a text message on October 28, 2014, that if Jackie refused to identify Jay to Erdely, Rolling Stone would have to tell its readers that Jackie refused to identify her attacker.[91] Erdely added, "Unfortunately, it would diminish [Jackie's] credibility," to have to include this disclaimer in the article, so Erdely "really really want[ed] to avoid [having to do] that!"[92]

- During an interview with Jackie on October 20, 2014, Erdely asked Jackie directly for Jay's full and last name, saying, "Jackie, I'm going to have to make this phone call [to Jay]. Our lawyer is going to insist."[93]

- However, the jury heard that Erdely never did contact "Jay" prior to publication of the defamatory statements, and that Jackie consistently refused to provide his name to Erdely.[94]

- The testimony and documentary evidence further showed that after Erdely told Jackie in October that she needed Jay's last name because she had to contact him, Jackie's friend Alex Pinkleton texted Erdely on October 23 to tell her that Jackie was thinking of pulling out of the article entirely because she was "overwhelmed" with being "pushed" to identify her supposed assailant.[95] Erdely then contacted her editor and stated that Jackie was "in full freak-out mode," was refusing to answer Erdely's calls, and was threatening to "pull out [of participating in the article] entirely."[96]

- Erdely admitted that with just weeks to go before the scheduled publication of the article, Jackie now "went completely dark" and stopped communicating with Erdely.[97] Following that, Erdely agreed with Jackie not to seek comment from Jay.[98]

- Erdely further admitted that because Jackie refused to provide Jay's real name, Erdely and Rolling Stone instead used a fake name for him in the article and did not inform readers that Jackie had refused to provide his identity, or that Erdely and Rolling Stone had no idea who Jay was.[99]

---

[90] PTX-142, Email from Sabrina Rubin Erdely to Alex Pinkleton; Oct. 20, 2016 Trial Tr. at 153:19-155:12.
[91] PTX-20 at RS014320.
[92] Oct. 20, 2016 Trial Tr. at 156:13-157:2; PTX-20 at RS014320.
[93] Oct. 20, 2016 Trial Tr. at 113:15-115:19; PTX-10 at RS004477.
[94] Oct. 20, 2016 Trial Tr. at 115:20-25.
[95] *Id.* at 118:22-121:18; PTX-20 at RS014308-09.
[96] Oct. 20, 2016 Trial Tr. at 125:16-126:11; PTX-33, Email from Sean Woods to Sabrina Rubin Erdely (Oct. 24, 2014).
[97] Oct. 20, 2016 Trial Tr. at 150:8-14.
[98] *Id.* at 152:4-9.
[99] *Id.* at 157:3-25.

Case 3:15-cv-00023-GEC   Document 405   Filed 12/27/16   Page 33 of 60   Pageid#: 18682

- During Erdely's first interview with Jackie, Jackie claimed that after her alleged gang-rape, she called her three best friends on campus to come meet her.[100] Jackie told Erdely that their first names were Ryan, Alex, and Kathryn, but did not tell Erdely their last names.[101]

- Jackie claimed to Erdely that although Ryan wanted to take her to the hospital, Alex and Kathryn discouraged it.[102] In the article, Erdely described a bruised and beaten Jackie, sitting "mute in her bloody dress," while Alex and Kathryn asked "Is that such a good idea?", told Jackie that if she reported being violently gang raped, "[h]er reputation will be shot for the next four years," and worried that if Jackie reported being gang-raped, "we'll never be allowed into any frat party again."[103] Also in the article, Erdely quoted Alex as calling Jackie a "baby" for being upset about being gang-raped, claimed that Kathryn was a "self-declared hookup queen," and claimed that Kathryn asked Jackie, "Why didn't you just have fun with" being gang-raped by "[a] bunch of hot Phi Psi guys?"[104]

- The jury saw that the Columbia Journalism Review concluded that "[j]ournalistic practice and basic fairness" required Erdely to contact the three friends and seek their side of the story, and Erdely admitted she failed to so do.[105]

- The jury heard that Erdely never spoke to any of these three individuals—whose real names are Ryan Duffin, Kathryn Hendley, and Alex Stock—and never verified with them the quotes she attributed to them in the article or any of the details of Jackie's supposed assault, any of the injuries she claimed resulted from her assault, or any information about Jackie's supposed assailant.[106]

- Erdely testified that she wanted to speak to the three friends, but that Jackie declined to provide their names or contact information, claimed that Ryan would not speak to Erdely, and told Erdely that she did not want Erdely to speak to Ryan and Kathryn because Jackie had had a falling out with them.[107]

- Erdely claimed in the article that Ryan declined to be interviewed, but in fact she never spoke to him and did not disclose to readers that she had never identified or spoken to him.[108]

- Erdely instead used pseudonyms for all of these individuals in the article.[109]

- Erdely's editor, Sean Woods, told the Columbia Journalism Review that he repeatedly asked Erdely to go reach the three friends, but that she told him she could not and that she had exhausted all avenues for finding them.[110] Erdely admitted to the Columbia Journalism

---

[100] *Id.* at 63:8-22.
[101] *Id.*
[102] Oct. 20, 2016 Trial Tr. at 63:23-64:8.
[103] PTX-1 at RS001072.
[104] *Id.* at RS001074.
[105] Oct. 20, 2016 Trial Tr. at 91:15-92:12; PTX-27 at ERAMO-04547, Columbia Journalism School Report.
[106] Oct. 24, 2016 Trial Tr. (Vol. 1) at 98:5-99:6.
[107] Oct. 21, 2016 Trial Tr. (Vol. 1) at 12:6-13:21.
[108] Oct. 20, 2016 Trial Tr. at 87:13-88:15.
[109] *Id.* at 95:23-96:9.
[110] PTX-27 at ERAMO-04548, 04556.

Review she was "surprised" that nobody pushed her harder about reaching the three friends before publication, but that she "wasn't going to press that issue."[111]

- Erdely testified that she told her editor that she could not speak to any of the three friends because she did not have their last names.[112] She testified that Jackie refused to provide Kathryn's last name because Jackie said they were not on friendly terms.[113]

- However, the jury heard testimony and saw documentary evidence that Erdely did in fact have Kathryn's last name prior to publication, and that it was given to her by a friend of Jackie's named Rachel Soltis.[114] Erdely admitted in her trial testimony that she could have located Kathryn Hendley using the information Ms. Soltis provided to her.[115]

- Erdely also claimed in the article that two other young women were recently gang-raped at Phi Kappa Psi just as Jackie was.[116] Jackie told Erdely about these two women and claimed their names were "Becky" and "Maddie."[117]

- Erdely did not obtain their last names from Jackie or verify their identities.[118] When Erdely thought she may have found who these individuals were, she asked Jackie and Jackie said those were not the right people, but Erdely believed Jackie was lying.[119]

- Erdely's editor expressed concern to her in October 2012 that Erdely had not confirmed the claim that these two other women had told Jackie they were also gang-raped at Phi Kappa Psi, and Erdely acknowledged in response that she shared that concern.[120]

- Despite having what she believed to be the Facebook page contact information for "Becky," Erdely never reached out to her to confirm whether she had in fact told Jackie that she was gang-raped at Phi Psi.[121] Erdely never spoke to either "Becky" or "Maddie" prior to publication.[122]

    D.    **The Jury Heard And Saw Convincing Evidence That Erdely Knew Her Defamatory Article And Post-Article Statements About Ms. Eramo Were False.**

Finally, as the Court noted in its summary judgment opinion, actual malice can be shown

by presentation of evidence that shows that the reporter was aware of facts contradicting the

---

[111] *Id.* at ERAMO-04556.
[112] Oct. 20, 2016 Trial Tr. at 94:6-95:5.
[113] *Id.* at 70:21-71:22.
[114] *Id.* at 71:23-76:21; PTX-10 at RS004421.
[115] Oct. 20, 2016 Trial Tr. at 76:13-77:10.
[116] *See generally* PTX-10.
[117] Oct. 20, 2016 Trial Tr. at 96:10-98:2.
[118] *Id.* at 98:3-9.
[119] *Id.* at 98:13-100:12; Oct. 24, 2016 Trial Tr. (Vol. 1) at 90:14-20.
[120] Oct. 20, 2016 Trial Tr. at 190:25-191:22, 193:24-194:19; PTX-39; PTX-145.
[121] Oct. 20, 2016 Trial Tr. at 100:13-101:12.
[122] *Id.* at 101:10-12.

defamatory statements she made.  *Eramo*, --- F. Supp. 3d ----, 2016 WL 5234688, at *7.  The

jury was appropriately so instructed.[123]

       During the course of the trial, the jury heard testimony and saw documentary evidence

demonstrating that in addition to her obvious reasons to doubt Jackie's credibility generally,

Erdely also knew that the specific statements that she (Erdely) made about Ms. Eramo were

false.  This evidence alone was sufficient to find that Erdely acted with actual malice as to all of

the statements at issue:

- With respect to the statement in the article that Ms. Eramo "discouraged [Jackie] from sharing her story" of sexual assault, the jury saw emails between Ms. Eramo and Jackie— which Erdely had in her possession prior to publication—in which Ms. Eramo congratulated Jackie for speaking out about her assault at a public forum on UVA grounds, and expressed how proud she was of Jackie for doing so.[124]  The same emails showed Ms. Eramo arranging multiple meetings between Jackie and police detectives in the spring of 2014.[125]

- Moreover, despite the fact that Erdely transcribed all of her voluminous interviews with Jackie and even audio-recorded several of them, at no time did the Defendants ever point to any portion of Erdely's reporting file or audio recording in which Jackie ever claimed to Erdely that Ms. Eramo discouraged her from speaking publicly or going to the police about her sexual assault.  In fact, the jury heard testimony directly from Jackie that the claim that Ms. Eramo "discouraged her from reporting [her assault]" was an untrue statement.[126]

- Similarly, with respect to Erdely's statement that Ms. Eramo had a "nonreaction" to hearing from Jackie that two other young women had also been gang raped at Phi Kappa Psi, the jury saw Erdely's own contemporaneous notes of the interview in which Jackie described to Erdely this meeting with Eramo.  Far from telling Erdely that Ms. Eramo had a "nonreaction" to this information, Jackie told Erdely that Ms. Eramo immediately expressed concern for the alleged victims' well-being, that she implored Jackie to convince these unidentified women to come in and speak with Ms. Eramo, and that Ms. Eramo "got pissed" and began to contemplate taking away the fraternity's charter.[127]  The jury similarly saw evidence that Erdely was aware that immediately following this meeting, Ms. Eramo arranged for Jackie to meet twice with police detectives and encouraged Jackie to share information with them.[128]

- With respect to Erdely's post-publication statements that Ms. Eramo "brushed off" Jackie, "did nothing" about her alleged assault, sought to "suppress" Jackie's assault, did not report

---

[123] Jury Instructions [Dkt. 375] at 35.
[124] PTX-18 at RS017037, Email from Jackie to Sabrina Rubin Erdely (Aug. 16, 2014).
[125] *Id.* at RS017031-36.
[126] PTX-164, Jackie Dep. at 82:11-14.
[127] PTX-10 at RS004312; Oct. 20, 2016 Trial Tr. at 235:20-237:23.
[128] PTX-18 at RS017031-35.

Jackie's assault to the police, "discouraged [Jackie] from moving this forward," and "chose not to act on her allegations in any way," the jury heard and saw testimony and documentary evidence demonstrating that Erdely knew these claims were false. The jury saw that Erdely was in possession of emails between Jackie and Ms. Eramo immediately following Jackie's informal report of a sexual assault in which Ms. Eramo encouraged Jackie to file a formal complaint and expressed that she would be happy to assist Jackie in doing so.[129] The jury further saw that Erdely was in possession of emails between Ms. Eramo and Jackie showing that Ms. Eramo did in fact arrange multiple meetings between Jackie and the police and encouraged Jackie to share information with them when Jackie expressed reluctance.[130]

- The jury also heard the testimony of Emily Renda, who said she told Erdely that Ms. Eramo was "passionate" about seeking "punitive" action against Jackie's alleged attackers, and was working diligently to try to get the supposed, unidentified other victims to come forward in order to build a case against Phi Psi.[131] Erdely's own reporting file also reflected this conversation.[132]

- Erdely's own source flatly disputed Erdely's claims about Ms. Eramo's treatment of Jackie and Jackie's rape allegations. Jackie testified that Ms. Eramo did not treat her with indifference, that she did not seek to suppress her assault, that she did not discourage Jackie from reporting her assault, and that she wanted Jackie to pursue a formal complaint and/or a police investigation regarding the alleged assault.[133]

- Finally, in the face of all the evidence in Erdely's possession contradicting Erdely's post-publication statements about Ms. Eramo, Erdely failed to point to any testimony or evidence supporting the truth of those statements, let alone Erdely's belief in their truth at the time that she made them. In fact, in their Motion, Defendants expressly concede that Erdely's statements suggested that Jackie's failure to pursue her allegations was the result of deliberate action by Ms. Eramo to achieve that result. (Mot. at 31.)

### E. The Jury Was Entitled To Find That Erdely's Protestations Of Good Faith Were Not Credible.

At bottom, much of Defendants' argument relies—as it has throughout both summary judgment and Defendants' Rule 50(a) motion in this case—on the assertion that the jury categorically cannot find actual malice if Erdely testified that she believed Jackie to be credible and thus that Erdely believed that her statements about Ms. Eramo were true at the time she made them. (*See* Mot. at 34-35.) That is not the law. (*See* Jury Instructions [Dkt. 375] at 5-6

---

[129] PTX-13, Email from Jackie to Sabrina Rubin Erdely (Sept. 15, 2014).
[130] PTX-18.
[131] PTX-165, Emily Renda Dep. at 79:1-22, 177:3-178:7.)
[132] PTX-10 at RS004146; Oct. 20, 2016 Trial Tr. at 26:5-27:6.
[133] PTX-164, Jackie Dep. at 81:22-82:14, 336:09-15, 337:06-339:01, 339:09-10.

(the jury is the sole judge of a witness's credibility and is not required to credit a witness's bald statements); *Murdaugh Volkswagen*, 801 F.2d at 726 n.6; *Pitrolo*, 407 F. App'x at 659. As set forth above and in the record of this case, Ms. Eramo presented a strong and convincing circumstantial case demonstrating Erdely's actual malice, including not only her knowledge that Jackie was not a credible source, but also that Erdely made the specific defamatory statements about Ms. Eramo with knowledge of their falsity. Notably, all of the evidence that the Court specifically referenced in its summary judgment opinion as collectively sufficient for a reasonable jury to infer actual malice was presented, persuasively, at trial.

Moreover, as the Court noted in its summary judgment opinion, the jury is not required to credit Erdely's self-serving testimony; rather, it is for the jury to determine Erdely's credibility. *Eramo*, --- F. Supp. 3d ----, 2016 WL 5234688, at *7. This is particularly important in an actual malice case, in which the jury must judge the subjective state of mind of the defendant at the time of publication. *Id.* (noting that actual malice is a subjective evaluation of a party's state of mind and that the Fourth Circuit has cautioned against taking such a determination away from the jury); (Jury Instructions [Dkt. 375] at 39 (it is for the jury to decide, taking all of the evidence as a whole, what the defendants' state of mind was)). In this case, Erdely testified for portions of five trial-days and the jury had a full and fair opportunity to hear and her judge her credibility and motivation. The fact that the jury found Erdely to lack credibility and discredited her testimony is further underscored by the split jury verdict on actual malice: although the jury determined that *Rolling Stone* did not act with actual malice in publishing the original article, the jury found that Erdely did act with actual malice in doing so. The only reasonable conclusion to draw from the jury's carefully considered verdict is that the jury found *Rolling Stone's* witnesses to be credible when they stated that they did not doubt Jackie's credibility or the truth of the

statements about Ms. Eramo, whereas the jury found that Erdely—the on-the-ground reporter and author with far greater first-hand knowledge, and the defendant who most extensively interacted with Jackie—to not be credible.

### F. The Jury Was Not Required To Credit Erdely's Incredible Claim That She Did Not Mean For Her Statements To Be Defamatory.

Finally, Defendants argue that "no reasonable jury could find that Erdely acted with actual malice with respect to Statements 1 and 3"—the "discouraged" and "nonreaction" statements—because Erdely testified that she intended these statements to refer only to Ms. Eramo discouraging Jackie from speaking *to Rolling Stone*, and to Ms. Eramo's emotional reaction to Jackie's tale of two additional gang-rapes, respectively. (Mot. at 23-26.) This argument fails for two primary reasons. First, the jury was not required to credit Erdely's trial testimony, and was entitled to reach its own conclusion about whether Erdely was credible and to consider the mountain of contemporary evidence Ms. Eramo presented showing exactly what Erdely intended by these statements. Second, even if the jury did accept Erdely's claims about how she intended these statements, the jury was still entitled to find that they were made with actual malice because the evidence convincingly showed that the statements were false even in the way Erdely claimed she intended them to be understood, and that Erdely knew it.

To begin, as noted above, the jury was not required to credit Erdely's testimony on any point, including her prepared trial testimony about how she supposedly intended these statements to be understood. Defendants' claim that Erdely's testimony about the intended meaning of these statements was "unrebutted" and "without contradiction" (Mot. at 22-23) is simply false.

With respect to Erdely's protestation that *Statement #1*—"Lots of people have discouraged her from sharing her story, Jackie tells me with a pained look, including the trusted UVA dean to whom Jackie reported her gang rape allegations more than a year ago"—was only

33

intended to refer to Ms. Eramo discouraging Jackie from speaking *to Rolling Stone*, Erdely's claim that she intended that meaning is belied by the plain text of the article, which clearly ***does not*** say that Ms. Eramo discouraged Jackie from speaking to Rolling Stone, but instead conveys the meaning that Ms. Eramo discouraged Jackie from sharing her story with anyone (which would include, for example, UVA investigatory/disciplinary personnel and the authorities).

This is confirmed by the sentence immediately following the "discouraged" statement, which provides that "[o]n this deeply loyal campus, even some of Jackie's closest friends see her going public as tantamount to betrayal,"[134] and clearly continues and refers directly back to Defendants' discussion in the immediately preceding paragraph that, when Jackie went to her friends in the immediate aftermath of her alleged assault, those friends stated that "[Jackie's] reputation will be shot for the next four years" if she reported her alleged assault or went to the hospital and that those friends engaged in "a heated discussion about the social price of ***reporting*** Jackie's rape."[135] Moreover, the very next paragraph of the article claims that at UVA, "rapes are kept quiet" by "an administration that critics say is less concerned with protecting students than it is with protecting its own reputation from scandal."[136] The article likewise states that UVA "sweeps sexual assault under the rug," and claims that administrators like Ms. Eramo are "discouraging and silencing" sexual assault victims.[137] Indeed, on the Slate DoubleX Gabfest podcast, Erdely expressly stated that it ***was*** her intent to say that Ms. Eramo "discouraged [Jackie] from moving this [allegation] forward," and that Ms. Eramo sought to "suppress" Jackie's sexual assault.[138]

---

[134] PTX-1 at RS001072, Sabrina Rubin Erdely, "A Rape on Campus," *Rolling Stone* (Nov. 19, 2014).
[135] *Id.*
[136] PTX-1 at RS001073.
[137] *Id.* at RS00174, 1076.
[138] Special Verdict Form 1 [Dkt. 366].

Defendants thus clearly linked their statement about Ms. Eramo supposedly "discourag[ing] Jackie from sharing her story" with the reporting of Jackie's alleged assault to UVA personnel and the authorities. Indeed, the Court recognized as much in analyzing the context in which Defendants' "discouraged" statement appears, explaining that "just before the statement that is targeted [], the preceding statement is, 'But her concerns go beyond taking on her alleged assailants and their fraternity,' which "speaks to a broader range of concerns that [Jackie] may have had with Dean Eramo"[139]—not just supposed concerns about speaking to Rolling Stone.[140] And, as the jury heard through the testimony of Defendants' own witnesses, Defendants rejected numerous pre-publication edits to this statement that could have made the statement convey the meaning that Defendants now, *post hoc*, strategically attempt to ascribe to it.[141] It is thus Defendants, not Ms. Eramo, that seek to impose a meaning onto the "discouraged" statement that is not present in the article. The plain language of the article and Erdely's own contemporary explanations of her intentions, in addition to her lack of credibility as a witness, was more than sufficient for the jury to find that Erdely intended Statement #1 to say exactly what it says—that Ms. Eramo discouraged Jackie from sharing her story of sexual assault.

Moreover, Defendants' argument fails because the jury was entitled to find this statement knowingly false and defamatory even under Defendants' proffered meaning. In the context of an article and related statements asserting that Ms. Eramo (and UVA) sought to keep rapes quiet in order to protect UVA's reputation, even the false claim that Ms. Eramo actively discouraged Jackie from speaking to a Rolling Stone reporter about her assault is a defamatory charge that

---

[139] Oct. 28, 2016 Trial Tr. (Vol. 2) at 85:7-14.
[140] *See id.*
[141] Oct. 24, 2016 Trial Tr. (Vol. 2) at 73:7-12, 74:3-17 (testimony of Garber-Paul); Oct. 27, 2016 Trial Tr. (Vol. 1) at 55:11-56:4 (testimony of Woods); PTX-43 at RS004862, Fact Check of A Rape on Campus.

would reflect negatively on Ms. Eramo's professional standing given her role as an advocate for and supporter of sexual assault survivors.  And contrary to Erdely's claims, the evidence at trial conclusively showed that Erdely knew that the statement that Ms. Eramo discouraged Jackie from speaking to her was false.  As Erdely knew at the time of publication, far from discouraging Jackie from discussing her assault, Ms. Eramo had actively encouraged and *praised* Jackie for speaking out publicly about her sexual assault.[142]  The *only* shred of contemporary evidence that Erdely points to in order to support the truth of the charge that Ms. Eramo discouraged Jackie from sharing her story with Erdely is a single reference in the reporting file in which Jackie supposedly stated that Ms. Eramo expressed concerned about Jackie's safety if her *full name* appeared in the article.  (*See* Mot. at 24 n.36 (citing DTX-64 at RS004500).)  That is plainly not the same thing as discouraging Jackie from speaking to Erdely at all; in fact, Erdely and *Rolling Stone* used only Jackie's nickname in the article for the same reason (fear for her safety). Indeed, given the facts that Erdely's interviews with Jackie were all either transcribed or audio-recorded and the jury was able to carefully review all of the statements that Jackie made to Erdely, the fact that Erdely's reporting file nowhere reflects Jackie claiming that Ms. Eramo discouraged her from speaking to Erdely was alone sufficient for the jury to find that this statement was made with actual malice.

Next, Erdely claims that *Statement #3*—that Ms. Eramo had a "nonreaction" to Jackie's claim that two other unidentified women had similarly been recently gang-raped at Phi Kappa Psi—was intended to refer to "Eramo's facial expression and demeanor" or "emotional reaction" rather than her "substantive response" to Jackie's allegations.  (Mot. at 24, 38-39.)  Defendants similarly claim that Erdely's "unrebutted" testimony established conclusively that this was the

---

[142] PTX-18 at RS017037.

intended meaning. (*Id.*) But again, Erdely simply ignores the wealth of contemporary evidence presented at trial showing exactly how Erdely intended this statement.

Again, Defendants contention simply ignores the plain text of the article and the testimony and evidence presented at trial. A Rape on Campus does not reference Ms. Eramo's "facial expression" or "emotional reaction," but rather immediately and repeatedly asserts that Ms. Eramo was indifferent to and did nothing in response to Jackie's allegations of additional gang-rapes. The very paragraph alleging that Ms. Eramo had a "nonreaction" to those additional gang-rape allegations proceeds to discuss Jackie's "helplessness" at knowing that her assailants still walk campus unpunished, and the very next paragraph asserts that Ms. Eramo affirmed and supported Jackie's inability to file a complaint in order to hold them "accountable."[143] This is plainly a direct callback and reference to the earlier accusation that Ms. Eramo was "coddling" sexual assault victims "into doing nothing."[144] The following paragraph then accuses Ms. Eramo of abdicating her responsibilities to the safety of the campus, criticizes Ms. Eramo for failing to "take action," and suggests that UVA could be sued.[145] And the section immediately preceding the claim about Ms. Eramo's "nonreaction" to Jackie's allegations references UVA's supposed "strategy of doing nothing" in response to Jackie's allegations.[146]

Moreover, the jury heard and saw multiple contemporary statements by Erdely in which she expressly claimed that Ms. Eramo failed to take action—i.e., had a "nonreaction"—in response to Jackie's allegations. The jury found Erdely liable for statements that she made on The Brian Lehrer Show, in which she claimed that Ms. Eramo "brushed off" Jackie, "did nothing" about Jackie's allegations, and "continued to do nothing when [Jackie] eventually told

_____

[143] PTX-1 at RS001078.
[144] *Id.* at 1076.
[145] Id. at 1078-79.
[146] *Id.* at 1078.

[Ms. Eramo] that she had become aware of two other women who were also gang raped at the same fraternity."[147]  The jury similarly found Erdely liable for her statement to The Washington Post in which Erdely explained, just days after the article was published, that the "overarching point of the article" was how Ms. Eramo "chose not to act on [Jackie's] allegations in any way," and met her allegations with "indifference."[148]  Similarly, the jury saw how Erdely sent an email to a colleague just weeks before the article was published, explaining that the article would be about "the culture of inaction and silence at UVA."[149]  And the jury saw how Erdely ranted and cursed to Jackie's friends about her anger that Ms. Eramo wasn't "fucking doing anything" in response to Jackie's allegations.[150]  Given the plain language of the article, the wealth of contemporary evidence regarding how Erdely intended this statement, and Erdely's lack of credibility as a witness, the jury was more than reasonable in concluding that Statement #3 was intended to say exactly what it does say—that Ms. Eramo had a "nonreaction" to Jackie claiming that she and two other women had been gang raped at Phi Kappa Psi.

Erdely's argument also fails because the jury was entitled to find this statement knowingly false and defamatory even under Erdely's proffered meaning.  In the context of an article and related statements asserting that Ms. Eramo, and UVA as an institution, are indifferent to allegations of sexual assault, the claim that Ms. Eramo had a "nonreaction" to Jackie's claims—even if solely describing Ms. Eramo's alleged demeanor and physical reaction—is a defamatory charge that would reflect negatively on Ms. Eramo's professional standing given her role as an advocate for, and supporter of, sexual assault survivors.  Indeed, the jury could easily have interpreted "nonreaction" to convey callousness, coldness, and

---

[147] Special Verdict Form 1 [Dkt. 366].
[148] Id.
[149] Oct. 20, 2016 Trial Tr. at 196:8-9, 198:1-5
[150] Oct. 20, 2016 Trial Tr. at 250:20-24.

indifference—not calm neutrality as Defendants assert—especially in light of the article's numerous descriptions of Ms. Eramo's alleged indifference to sexual assault victims.

Contrary to Defendants' claims, the evidence at trial conclusively showed that Erdely knew that even the notion that Ms. Eramo had no emotional or physical reaction to hearing this news was completely false. Erdely's own reporting file showed that Jackie told Erdely that Ms. Eramo immediately expressed concern for the alleged other victims' well-being, that she implored Jackie to convince these unidentified women to come in and speak with Ms. Eramo, and that Ms. Eramo "got pissed" and began to openly discuss strategies to take away the fraternity's charter.[151] The jury similarly saw evidence that Erdely was aware that immediately following this meeting, Ms. Eramo arranged for Jackie to meet twice with police detectives and encouraged Jackie to share information with them.[152] It was entirely reasonable for the jury to conclude that Erdely knew that the claim that Ms. Eramo had a "nonreaction" to these allegations of multiple gang rapes—even if intended to refer only to Ms. Eramo's immediate demeanor and statements upon hearing the news—was false and was made with full knowledge that it was false.

Defendants' reliance on *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984), and *Newton v. National Broadcasting Co.*, 930 F.2d 662 (9th Cir. 1990), for the notion that Erdely cannot be held liable if she simply testifies that she intended the statements to be understood differently than their plain meaning completely misses the mark. In *Bose*, the phrase at issue was an obscure and confusing description of the performance of stereo speakers in a product disparagement action, and whether the defendant disparaged the product with malice when he said the speakers made sound appear to travel "about the room" rather than "along the

---

[151] PTX-10 at RS004312; Oct. 20, 2016 Trial Tr. at 235:20-237:23.
[152] PTX-18.

wall," which is what he said he meant to describe. *Bose*, 466 U.S. at 511-14. In that case, the ***only*** evidence that the district court pointed to in support of the finding that the defendant knew the "about the room" description was false when he made it was disbelief in the defendant's credibility when he testified that he thought "about the room" meant the same thing as "along the wall"; this finding was vacated on appeal as insufficient evidence of actual malice. *Id.* at 498, 511-12.

In vacating the judgment, the Court in *Bose* emphasized that credibility determinations of witnesses are still to be found by the fact-finder, but noted that when a witness is found not to be credible, the witness's testimony is to be disregarded entirely rather than used as a ***sole basis*** for reaching a contrary factual conclusion. *Id.* at 512.[153] But here, where there was sufficient evidence to reach a contrary factual conclusion, the jury was free to find Erdely not to be credible, to accordingly disregard Erdely's testimony as to how she intended the statements, ***and*** to further find that she intended the statements differently ***based on contrary evidence such as the context of the statements in the article and the wealth of contemporary statements by Erdely demonstrating Erdely's true intentions***. With Erdely's testimony as to her intentions disregarded as not credible, there was ample other evidence in the record for the jury to factually determine how Erdely intended the statements, and thus *Bose* is inapplicable. Nothing in that opinion remotely suggests, as Defendants argue, that the jury was ***required*** to believe and credit Erdely's testimony as to how she intended the statements; rather, it confirms that the jury was entitled to disregard Erdely's testimony entirely and give it no weight at all.

*Newton* is also inapplicable because *Newton* was a defamatory-implication case and involved an unintended ***implied*** defamatory meaning apart from the plain language of the

---

[153] In other words, if a witness testifies that the light was green, the jury is free to entirely disregard that testimony as non-credible, but the discredited testimony alone is not normally considered a sole sufficient basis for reaching the contrary factual conclusion that the light was actually red. *See Bose*, 466 U.S. at 512.

statement at issue.  *Newton*, 930 F.2d at 680.  The Ninth Circuit, in reversing the district court, held that an author could not be liable for defamatory impressions he neither wrote nor intended absent evidence that implied defamatory meaning was in fact intended.  *Id.* at 681.  Further, as in *Bose*, the jury could not find that the implied, unwritten meaning was intended **solely** on a finding that the defendant's testimony was not credible.  *Id.* at 680-81.  Here, Erdely was held liable for Statements #1 and #3 not on a theory of implication but based on the plain meaning of the statements themselves, whereas ***Erdely*** attempted in her testimony to graft additional implied language onto her defamatory statements in order to escape that plain meaning—such as claiming that the actual words "[Ms. Eramo] discouraged [Jackie] from sharing her story" should instead be read to impliedly mean "[Ms. Eramo] encouraged Jackie to consider whether she should allow her full name to be used in this *Rolling Stone* article because of safety concerns." (*See* Mot. at 23 n.31 (citing Oct. 22, 2016 Trial Tr. at 78:13-80:14, 88:4-89:13).)  If anything, both *Newton* and *Bose* underscore the fact that the jury was entitled to ***entirely disregard*** Erdely's testimony as to the supposed implied meaning of these statements and to instead focus on their plan and natural meaning in context, along with other evidence suggesting Erdely's state of mind and intentions.

The jury was absolutely permitted to consider the statements in context, to consider the clear evidence demonstrating what Erdely intended the statements to mean at the time, ***and*** to judge whether Erdely's testimony that she meant something different was credible or was to be disregarded.  Defendants fail to cite any authority or record evidence casting doubt on the reasonableness of the jury's conclusion that these statements were defamatory and were made with actual malice.

**IV.    Defendants' Defamatory Statements Are Not Nonactionable As A Matter Of Law.**

Finally, Defendants contend in their Motion that, notwithstanding the jury's considered verdict, that verdict must be set aside because their defamatory statements are not capable of having a defamatory meaning or are "pure opinion" or rhetorical hyperbole as a matter of law and because Erdely's post-publication statements cannot reasonably be understood as being about Ms. Eramo.  In so doing, Defendants re-assert (for the third time) the same arguments they made—and the Court rejected—at the summary judgment stage and at the close of Ms. Eramo's case.  Nothing has changed since then, and the Court's previous rulings, which were entirely correct then, remain entirely correct now.

> **A.    The Jury's Finding That Defendants' Defamatory Statements In A Rape on Campus (Statements #1 & #3) Had A Defamatory Meaning Was More Than Reasonable, And Erdely's Post Publication Statements (Statements #5, 7, 8, & 10) Are Not Nonactionable "Pure Opinion" Or Rhetorical Hyperbole As A Matter Of Law.**

Defendants' rehashed contentions that their defamatory statements are not capable of having a defamatory meaning or are nonactionable opinion or hyperbole as a matter of law fails now for the same reasons they failed at summary judgment and on Defendants' Rule 50(a) motion.

At the outset, as this Court has recognized, a statement has a defamatory meaning if it "tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Eramo*, --- F. Supp. 3d ----, 2016 WL 5234688, at *8; *see also* Restatement (Second) of Torts § 559, cmt. b ("Communications are often defamatory because they tend to expose another to hatred, ridicule or contempt."); *Moss v. Harwood*, 102 Va. 386, 387 (1904) ("It is sufficient if the language tends to injure the reputation of the party,... or to hold him up as an object of scorn, ridicule, or contempt.").  And "[b]ecause a defamatory charge may be made 'by inference, implication or insinuation,'" one must consider

"not only to the actual words spoken, but also [] all inferences fairly attributable to them." *Eramo*, --- F. Supp. 3d ----, 2016 WL 5234688, at *8 (quoting *Vaile v. Willick*, No. 07-cv-11, 2008 WL 2754975, at *4 (W.D. Va. July 14, 2008)); *accord Carwile v. Richmond Newspapers*, 196 Va. 1, 7 (1954).

Moreover, as Ms. Eramo explained in detail in her summary judgment briefing, there is no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-21 (1990); *WJLA-TV v. Levin*, 264 Va. 140, 156 (2002) (similar); *Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127, 132 & n.2 (2003) (similar).[154] Rather, only "speech which does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action." *Fuste*, 265 Va. at 132; *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 714 (2006) (same); *WJLA-TV*, 264 Va. at 156 (same). As Virginia courts have explained, this is the case in the limited circumstances in which a statement is inherently "relative in nature *and* depend[s] largely upon the speaker's viewpoint," *Tronfeld*, 272 Va. at 714; *Fuste*, 265 Va. at 132 (same), or the speaker resorts to use of a rhetorical question or a hyperbolic epithet, *e.g.*, *Snyder v. Phelps*, 580 F.3d 206, 223-24 (4th Cir. 2009). In other words, if a statement *does* "contain a provably false factual connotation" or *can* "be interpreted as stating actual facts about a person," then it is *not* protected as "pure opinion" and *can* properly form the basis of a defamation claim. *See Milkovich*, 497 U.S. at 18-21; *Fuste*, 265 Va. at 132; *WJLA-TV*, 264 Va. at 156. Moreover, the Virginia Supreme Court has repeatedly held that even where, unlike here, a defamation defendant does express a protected "pure" opinion that itself cannot be interpreted as containing any provably false factual connotation or as stating actual

---

[154] *See* Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. [Dkt. 117] ("Pl. SJ Opp'n"), at 5-17 (July 22, 2016); Pl.'s Reply Br. in Supp. of her Mot. for Partial Summ. J. [Dkt. 133], at 27-32 (Aug. 5, 2016).

facts about a person, "factual statements made to support or justify [that] opinion **can** form the basis of an action for defamation." *WJLA-TV*, 264 Va. at 156; *Williams v. Garraghty*, 249 Va. 224, 233 (1995).

Whether a plaintiff is defamed is "a question to be resolved by the factfinder." *Eramo*, --- F. Supp. 3d ----, 2016 WL 5234688, at *8. Critically, as the Fourth Circuit and Virginia courts have admonished, if a statement is capable of more than one meaning, one actionable as defamation and one not, it is up to the jury to determine the statement's meaning. *See, e.g.*, *Tomblin v. WCHS-TV8*, 434 F. App'x 205, 209 (4th Cir. 2011); *McCleary v. Keesling*, 29 Va. Cir. 523, at *2 (1990) (citing *Tavoulareas v. Piro*, 817 F.2d 762, 779-80 (D.C. Cir. 1987)); *see also Fitzgerald v. Penthouse Int'l, Ltd.*, 639 F.2d 1076, 1079 (4th Cir. 1981); *Tharp v. Media Gen., Inc.*, 987 F. Supp. 2d 673, 683 (D.S.C. 2013). And as this Court recognized in its summary judgment opinion, "[i]n deciding whether statements convey a factual connotation or are protected opinion," one must "look[] to the context and tenor of the article, whether the language is loose, figurative, or hyperbolic language which would negate the impression that the writer is making a factual assertion, and whether the statement is subject to objective verification." *Eramo*, --- F. Supp. 3d ----, 2016 WL 5234688, at *8 (quotation marks omitted).

Here, as the Court has already thoroughly explained, Defendants' defamatory statements—which they once again contend, as a matter of law, are either not capable of being defamatory (Statements #1 & 3, in A Rape on Campus) or are only capable of being understood as "pure opinion" or "rhetorical hyperbole" (post-publication Statements #5, 7, 8, & 10)—**are** in fact capable of being understood as defamatory and as conveying or implying facts.

As the Court first explained in its summary judgment opinion, which the Court has correctly explained that it will "stand by":[155]

> A reasonable factfinder could conclude that the challenged statements imply the defamatory meaning plaintiff ascribes to them: that Eramo discouraged Jackie from sharing her story, including filing a formal complaint; that Eramo had no reaction to Jackie's story of two other victims; and that the administration did nothing in light of these allegations.

*Eramo*, --- F. Supp. 3d ----, 2016 WL 5234688, at *10. And the Court likewise explained that those statements are at least capable of "impart[ing] what a reasonable reader would believe to be factual," and "assert[ing] factual connotations regarding [Ms.] Eramo," and are not capable of being "pure opinion" or "rhetorical hyperbole" as a matter of law. *Id.* at *9-10.[156]

Similarly, in denying Defendants' Rule 50(a) motion, the Court "ma[d]e the point again" that, in light of the testimony and evidence adduced at trial (which included not only Ms. Eramo's case-in-chief but also the vast majority of Defendants' case).[157] As the Court explained, Defendants' defamatory Statements #1, 3, 5, 7, 8, and 10—the statements that are the subject of Defendants' current motion—are capable of being understood as conveying false and defamatory statements of fact because they "can be read to assert that [Ms.] Eramo is indifferent to victims of sexual assault," and "can be read to assert that [Ms.] Eramo discouraged or convinced victims of sexual assault not to report sex crimes."[158] And that is exactly what the jury found after being instructed that, to be actionable, Defendants' statements must have a defamatory meaning and be false, factual statements.[159]

---

[155] Oct. 28, 2016 Trial Tr. (Vol. 2) at 84:13-15.

[156] As the Court likewise explained, those statements are "capable of having a defamatory meaning," and, of course, the jury found that they did, in fact, have a defamatory meaning. *Eramo*, --- F. Supp. 3d ----, 2016 WL 5234688, at *10. Defendants in their Motion do not argue that Erdely's post-publication statements do not have (or are not capable of having) a defamatory meaning; rather, they only contend that those statements are nonactionable opinion or hyperbole.

[157] Oct. 28, 2016 Trial Tr. (Vol. 2) at 85:14-23.

[158] *Id.*; *see also id.* at 87:4-10.

[159] Jury Instructions [Dkt. 375], at 23, 25-26.

The Court's holding and the jury's findings were and are eminently correct. As Ms. Eramo testified, in her role as an Assistant Dean of Students, she was responsible for working with, assisting, and supporting sexual assault victims,[160] and Defendants' defamatory statements about Ms. Eramo took direct aim at her ability to perform those employment responsibilities and even accused her of silencing sexual assault victims, suppressing their assaults, and discouraging victims from pursuing complaints against their attackers. Such accusations are clearly at least capable of "tend[ing] to harm the reputation of [Ms. Eramo] as to lower [her] in the estimation of the community or to deter third persons from associating or dealing with [her]." *Eramo*, --- F. Supp. 3d ----, 2016 WL 5234688, at *8. And, significantly, the jury was presented with substantial evidence that Ms. Eramo's reputation did in fact suffer as a result of Defendants' defamatory statements, as confirmed by, for example, the voluminous hate messages she received following Defendants' publication of those statements.[161]

Defendants' re-assertion of the arguments they made at summary judgment and during the trial and in their Rule 50(a) motion do not change that conclusion.

***First***, Defendants contend that ***Statement #1***—which provides that Ms. Eramo "discouraged [Jackie] from sharing her story"—cannot be defamatory because, according to Defendants, that statement can only reasonably be understood as providing that Ms. Eramo only discouraged Jackie from sharing her story *with Rolling Stone*. (Mot. 36-38.) Defendants are incorrect: As set forth above, the plain text of A Rape on Campus, as well as testimony and evidence adduced at trial, make clear that that statement is at least capable of suggesting that

---

[160] Oct. 18, 2016 Trial Tr. (Vol. 2) at 17:17-21, 20:5-21:18, 166:18-21 (testimony of Ms. Eramo).

[161] *See, e.g.*, PTX-128, E-mail from K. Raff to N. Eramo; PTX-129, E-mail from J. Blomster to N. Eramo; PTX-130, E-mail from E. Esquivel to N. Eramo; PTX-158, E-mail from K. Gomes to N. Eramo; PTX-D199, E-mail from H. Rhodes to N. Eramo; PTX-D200, E-mail from B.G. to N. Eramo, A. Groves, tas6n@virginia.edu; PTX-D201, E-mail from A. Langille to N. Eramo; PTX-D202, E-mail from D. Hammond to N. Eramo; PTX-D203, E-mail from J. Drewrey to N. Eramo; PTX-D204, E-mail from M. Housen to N. Eramo; PTX-D205, E-mail from A. Williams to N. Eramo; PTX-D206, E-mail from Larson to N. Eramo; PTX-D207, E-mail from V. Groves to N. Eramo.

Ms. Eramo discouraged Jackie from sharing her story at all, including with UVA investigatory/disciplinary personnel and the authorities. (*See supra* Part III.F) Accordingly, it was up to the jury to determine the statement's actual meaning, and Defendants' Motion must be denied as to this statement.[162] *See Tomblin*, 434 F. App'x at 218; *Tharp*, 987 F. Supp. 2d at 683. And, in any event, as likewise explained above, even if the jury could have interpreted Defendants' statement that Dean Eramo "discouraged [Jackie] from sharing her story" to mean that Ms. Eramo discouraged Jackie from sharing her story with Rolling Stone, that statement would still be capable of having a defamatory meaning. (*See supra* Part III.F)[163]

*Second*, Defendants contend that ***Statement #3***—which provides that Ms. Eramo had a "nonreaction" when Jackie reported the gang-rapes of two other students to her—cannot be defamatory because, according to Defendants, that statement can only reasonably be understood as describing Eramo's "emotional reaction" to that report. (Mot. at 38-39.) Again, Defendants are incorrect: As set forth above, the plain text of A Rape on Campus, as well as testimony and evidence adduced at trial, make clear that that statement is at least capable of suggesting that Ms. Eramo failed to take action in response to Jackie's allegations. (*See supra* Part III.F.) Thus, it was up to the jury to determine the statement's actual meaning, and Defendants' Motion must be denied as to this statement as well. *See Tomblin*, 434 F. App'x at 218; *Tharp*, 987 F. Supp. 2d at 683. And as with Statement #1, even if the jury could have interpreted Defendants' statement

---

[162] Contrary to Defendants' assertion (Mot. at 37), the Court has ***not*** held that such an interpretation is incapable of having a defamatory meaning. Rather, the quotation from the Court that Defendants present in their Motion was simply the Court's paraphrasing of Ms. McNamara's argument in a question to Ms. Eramo's counsel; the Court's ruling on the statement appears 35 transcript pages later.

[163] Contrary to Defendants' assertion (Mot. at 37), the Court has ***not*** held that such an interpretation is incapable of having a defamatory meaning. Rather, the quotation from the Court that Defendants present in their Motion was simply the Court's paraphrasing of Ms. McNamara's argument in a question to Ms. Eramo's counsel; the Court's ruling on the statement appears 35 transcript pages later.

to describe a supposed emotional "nonreaction" by Ms. Eramo, the statement would still have been false and capable of having a defamatory meaning. (*See supra* Part III.F.)[164]

*Finally*, Defendants contend that Erdely's post-publication statements (**Statements #5, 7, 8, & 10**) are statements of pure opinion or rhetorical hyperbole as a matter of law that cannot reasonably be interpreted as conveying provably false factual connotations or stating facts. But, as the Court has recognized—twice—that is not true. Those statements are at least capable of "assert[ing] factual connotations regarding [Ms.] Eramo," because "[a] reasonable factfinder could conclude" that these statements are capable of conveying the meaning or implying that "Eramo discouraged Jackie from sharing her story, including filing a formal complaint; that Eramo had no reaction to Jackie's story of two other victims; and that the administration did nothing in light of these allegations." *Eramo*, --- F. Supp. 3d ----, 2016 WL 5234688, at *9-10.[165] And that is exactly what the jury found after being instructed that, to be actionable, Defendants' statements must have a defamatory meaning and be false, factual statements.[166] Indeed, Ms. Eramo explained in great detail in her summary judgment briefing the types of evidence that could prove the truth or falsity of these statements,[167] and Defendants cannot overrule the jury's verdict simply because they are unhappy that the jury found, based on the evidence adduced at trial, that those statements were false and defamatory.

---

[164] *See, e.g.*, PTX-10 at RS004312, Erdely's Reporting Notes (noting that when Jackie reported the other alleged rapes to Ms. Eramo, Ms. Eramo "got pissed" and began to contemplate taking away Phi Psi's charter); *see also* Oct. 20, 2016 Trial Tr. at 235:20-237:23 (testimony of Erdely). And again, contrary to Defendants' assertion (Mot. at 39), the Court has **not** held that such an interpretation is incapable of having a defamatory meaning. Again, the quotation from the Court that Defendants present in their Motion was simply the Court's paraphrasing of Ms. McNamara's argument in a question to Ms. Eramo's counsel; the Court's ruling on the statement appears over 30 transcript pages later.

[165] Oct. 28, 2016 Trial Tr. (Vol. 2) at 85:14-22, 87:4-10 (The Court explaining that these statements "can be read to assert that [Ms.] Eramo is indifferent to victims of sexual assault," or "can be read to assert that [Ms.] Eramo discouraged or convinced victims of sexual assault not to report sex crimes.").

[166] Jury Instructions [Dkt. 375], at 23, 25-26.

[167] Pl. SJ Opp'n at 12-14.

**B.** **There Was More Than Sufficient Evidence For The Jury To Reasonably Find That Erdely's Post-Publication Statements Were Of And Concerning Ms. Eramo.**

Last, Defendants repeat their conclusory contention that the Court should overrule the jury's factual finding that Erdely's post-publication statements were of and concerning Ms. Eramo. They make this contention based on nothing more than their unsupported assertion that those statements could only reasonably be understood as being about the UVA administration in general and not Ms. Eramo because Ms. Eramo's name does not expressly appear in the precise sentences Erdely spoke. But Defendants' argument ignores settled law providing that a plaintiff's name need not appear at all in a defamatory statement for that statement to be actionable, as well as both the context of Erdely's statements and testimony from Erdely herself that make clear that the jury could have reasonably understood Erdely's post-publication statements as being of and concerning Ms. Eramo.

As the Court recognized in its jury instructions, the standard for satisfying the of and concerning element of defamation claims is not stringent:

> In order for the statement made by the defendant to be of or concerning the plaintiff, *it is not necessary that the plaintiff be designated by name in the statement.* It is a sufficient designation of or reference to the plaintiff if, under all the surrounding circumstances, those who hear or read the statement would reasonably believe that the plaintiff was the person referred to.

(Jury Instructions [Dkt. 375], at 28); *accord Gazette, Inc. v. Harris*, 229 Va. 1, 37 (1985) (same). Moreover, and significantly, "*statements or publications by the same defendant regarding one specific subject or event and made over a relatively short period of time, some of which clearly identify the plaintiff and others which do not, may be considered together* for the purpose of establishing that the plaintiff was the person 'of or concerning' whom the alleged defamatory statements were made." (Jury Instructions [Dkt. 375], at 28); *accord Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 330 n.4 (4th Cir. 2005) (citing *WJLA-TV*, 240 Va. at 152). And as this Court has

49

explained, "'[t]he question of whether a publication is of and concerning a defamation plaintiff is a matter for the jury to decide.'" (Oct. 11, 2016 Mem. Op. [Dkt. 265], at 2 (quoting *Fornshill v. Ruddy*, 891 F. Supp. 1062, 1070 (D. Md.1995), *aff'd*, 89 F.3d 828 (4th Cir. 1996)).)

Here, there was more than sufficient evidence—which Defendants completely ignore—from which the jury could have reasonably concluded that Erdely's defamatory post-publication statements were of and concerning Ms. Eramo.

To begin, contrary to Defendants' suggestion, Erdely's post-publication statements—on a radio show and podcast promoting A Rape on Campus and to a Washington Post reporter specifically asking Erdely questions about A Rape on Campus—must be read and interpreted in conjunction with the article, A Rape on Campus, itself, which Erdely and her co-defendants had published just before she made those statements. *See Hatfill*, 416 F.3d at 330 n.4 (citing *WJLA-TV*, 264 Va. at 152). Indeed, as the jury heard, the connection between A Rape on Campus and Erdely's post-publication statements could not be clearer: Rolling Stone and Wenner Media arranged and coordinated Erdely's radio and podcast appearances to promote A Rape on Campus,[168] and Erdely's statements to Washington Post reporter Paul Farhi came in direct response to questions about A Rape on Campus, for a story about A Rape on Campus.[169]

Viewed in context with A Rape on Campus, there is not only sufficient, but overwhelming, evidence from which the jury could reasonably have found that Ederly's post-publication statements were of and concerning Ms. Eramo. Indeed, in her defamatory post-publication statements, Erdely spoke about the member of the UVA administration to whom

---

[168] Oct. 20, 2016 Trial Tr. at 216:9-16, 221:7-22 (testimony of Erdely); PTX-117 & PTX-120 (emails from Wenner Media Publicity Director Melissa Bruno coordinating podcast appearances); *see* also Oct. 27, 2016 Trial Tr. (Vol. 1) at 66:25-67:2 (testimony of Sean Woods: "Q. Ms. Erdely also promoted 'A Rape on Campus' when she appeared on the Brian Lehrer radio show; isn't that right? A. That's correct.").
[169] PTX-143.

Jackie reported her alleged sexual assault,[170] and A Rape on Campus makes clear that that member of the UVA administration was Ms. Eramo. A Rape on Campus explicitly identifies ***Ms. Eramo*** by name numerous times as the individual member of "the administration" to whom Jackie reported her sexual assault allegations.[171] The article also explicitly identifies ***Ms. Eramo*** by name as the individual member of "the administration" who Jackie told that she had become aware of two other women who were gang raped at the same fraternity.[172] The article further claims that ***Ms. Eramo*** took no action in response to Jackie's reporting of these alleged sexual assaults.[173] And, when questioned about her post-publication statement on The Brian Lehrer Show, ***Erdely even admitted to the jury that her statements were "shorthand for the article itself."***[174] In short, viewed in the context of A Rape on Campus, there was more than sufficient evidence from which the jury could reasonably have concluded that Erdely's post-publication statements were of and concerning Ms. Eramo.

The same conclusion follows from a simple review of Erdely's post-publication statements themselves in the context of the interviews and emails in which she made them. For example, on the Slate DoubleX Gabfest Podcast, Ms. Eramo was mentioned by name multiple times, including in questions preceding and following Erdely's defamatory statements. Erdely stated that Jackie received no support from the administration in direct response to a question about how "***Dean Eramo*** presented Jackie with three options," including pursuing a formal complaint, making an informal report, or not making a report.[175] Similarly, Erdely's statements about encouraging victims to "do[] nothing" came in direct response to a question that asked her

---

[170] *See generally* PTX-5 (Brian Lehrer Show transcript), PTX-7 (Slate DoubleX Gabfest Podcast transcript), PTX-183 (email to Paul Farhi).
[171] PTX-1, Sabrina Rubin Erdely, "A Rape on Campus," *Rolling Stone* (Nov. 19, 2014).
[172] *Id.*
[173] *Id.*
[174] Oct. 20, 2016 Trial Tr. 219:9-15 (testimony of Erdely).
[175] PTX-7, at 10:16-12:2 (Slate DoubleX Gabfest Podcast transcript).

to explain "the relationship between ... alleged victims and the University, ***particularly Dean Eramo.***"[176]   Erdely's statement about seeking "to suppress" reports of assaults and "discourag[ing]" victims "from moving [their complaints] forward" was likewise immediately linked to Jackie's interaction with "Dean Eramo."[177]

Moreover, the jury also heard testimony from Erdely herself confirming that her post-publication statements were of and concerning Ms. Eramo.  For example, when testifying about her post-publication statements, Erdely confirmed to the jury the only member of the UVA administration aside from Ms. Eramo that she was aware of that interfaced with Jackie regarding her sexual assault allegations was an academic dean named "Dean Lyons," whose sole role was to refer Jackie to Ms. Eramo.[178]  And Erdely further conceded that she did ***not*** accuse ***Dean Lyons*** of brushing off Jackie or meeting Jackie's allegations with indifference when she made her post-publication statements.[179]  Perhaps most tellingly, Erdely went so far as to expressly admit to the jury that she was speaking about Ms. Eramo in her post-publication statements,[180] and, again, to further testify that ***those statements were in fact "shorthand for [A Rape on Campus] itself."***[181]

In sum, there was more than sufficient evidence for the jury to reasonably find that Erdely's post-publication statements were of and concerning Ms. Eramo, and Defendants' Motion should be denied.

## CONCLUSION

For the foregoing reasons, Ms. Eramo respectfully requests that the Court deny Defendants' Renewed Motion for Judgment as a Matter of Law.

---

[176] *Id.* 12:3-13:2.
[177] *Id.* at 10:2-22.
[178] Oct. 20, 2016 Trial Tr. at 219:21-24, 220:15-18 (testimony of Erdely).
[179] *Id.* at 220:11-14, 220:19-24 (testimony of Erdely).
[180] *Id.* at 223:17-24 (testimony of Erdely).
[181] *Id.* at 219:9-15 (testimony of Erdely).

Dated:  December 27, 2016

Respectfully submitted,

By:   _/s/ Elizabeth M. Locke_
Thomas A. Clare (VA Bar No. 39299)
Elizabeth M. Locke (VA Bar No. 71784)
Andrew C. Phillips (VA Bar No. 88880)
Joseph R. Oliveri (VA Bar No. 77152)
CLARE LOCKE LLP
902 Prince Street
Alexandria, Virginia 22314
Telephone: (202) 628-7400
tom@clarelocke.com
libby@clarelocke.com
andy@clarelocke.com
joe@clarelocke.com

*Attorneys for Plaintiff Nicole P. Eramo*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiff's Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law was served on the below counsel of record on December 27, 2016 in accordance with the Fed. R. Civ. P.:

Michael John Finney & William David Paxton
GENTRY LOCKE RAKES & MOORE
P.O. Box 40013
Roanoke, VA 24022-0013
Telephone: (540) 983-9373
Telephone: (540) 983-9334
Fax: (540) 983-9400
Email: finney@gentrylocke.com
Email: paxton@gentrylocke.com

Elizabeth A. McNamara & Samuel M. Bayard
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 489-8230 / Fax: (212) 489-8340
Email: lizmcnamara@dwt.com
Email: samuelbayard@dwt.com

Alison B. Schary
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4248 / Fax: (202) 973-4448
Email: alisonschary@dwt.com
*Attorneys for Defendants Rolling Stone LLC,*
*Sabrina Rubin Erdely, and Wenner Media LLC*

Benjamin Gaillard Chew
MANATT, PHELPS & PHILLIPS, LLP
1050 Connecticut Avenue, NW, Suite 600
Washington, DC 20036-5303
Telephone:  (202) 585-6511
Email:  bchew@manatt.com
*Attorney for Defendant Sabrina Rubin Erdely*

Dated:  December 27, 2016

By:   _/s/ Elizabeth M. Locke_____
Elizabeth M. Locke